UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

RECEIVED
IN MONROE, LA.

NOV 0 6 2023
AM
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

JON FD TURPIN, et al.     )
                          )  Civil Action No. 1:23-CV-01059-TAD-JPM
         V                )
                          )
JOSEPH R BIDEN, JR, et al. )
                          )

11/11/2023

Motion 3

Please correct my reference to Caitlyn "Casey" to
Caitlyn Stinson of the Shreveport, LA & Baton Rouge, LA FBI.

Thankyou,
Jon F. "D" Turpin
2421 S. Plum St.,
Yorktown, IN 47396
225-259-6270

JIM JORDAN, Ohio
CHAIRMAN

JERROLD NADLER, New York
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON THE JUDICIARY
2138 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6216
(202) 225-6906
judiciary.house.gov

February 16, 2023

The Honorable Christopher A. Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, DC 20535

Dear Director Wray:

The Committee on the Judiciary is continuing to examine the Federal Bureau of Investigation's (FBI) handling of domestic violent extremism (DVE) investigations. Over the last year, we have written to you several times about startling allegations that the FBI is misusing DVE resources for apparent political purposes.[1] Since those letters, new information has become public about the FBI's targeting of a set of Catholic Americans for their religious beliefs. We therefore write to request additional information about this serious misuse of federal law-enforcement resources.

On January 23, 2023, the FBI's Richmond Field Office published an official document that linked "racially or ethnically motivated violent extremists" (RMVEs) with a "radical-traditionalist Catholic" (RTC) ideology.[2] In this document, the FBI purported to distinguish what it called "traditional Catholics" from the disfavored RTC adherents, who the FBI characterized as embracing "anti-Semitic, anti-immigrant, anti-LGBTQ, and white supremacist ideology."[3] The FBI even identified certain public policy issues—such as immigration and life issues—that it believed would "catalyz[e]" RTC adherents.[4] In addition to attempting to separate and categorize Catholic Americans based on theological distinctions, the FBI underscored the

---

[1] See, e.g., Letter from Rep. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, to Hon. Christopher A. Wray, Dir., Fed. Bureau of Investigation (July 27, 2022); Letter from Rep. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, to Hon. Christopher A. Wray, Dir., Fed. Bureau of Investigation (Sept. 14, 2022); Letter from Rep. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, to Hon. Christopher A. Wray, Dir., Fed. Bureau of Investigation (Sept. 19, 2022).
[2] Fed. Bureau of Investigation, U.S. Dep't of Justice, Domain Perspective, Interest of Racially or Ethnically Motivated Violent Extremist Radical-Traditionalist Catholic Ideology Almost Certainly Presents New Mitigation Opportunities (Jan. 23, 2023).
[3] Id.
[4] Id.

The Honorable Christopher A. Wray
February 16, 2023
Page 2

political nature of its actions: "FBI Richmond assesses RMVE interest in RTCs is likely to increase over the next 12 or 24 months in the run-up to the next general election cycle."[5]

The FBI's document cites to biased and partisan sources, including the Southern Poverty Law Center (SPLC), *Salon*, and *The Atlantic*, to support its assessment.[6] The SPLC misleadingly defines RTCs as "the largest group of serious anti-Semites in America" and believes to have identified nine RTC "hate groups" across the United States.[7] The SPLC also identifies the broad term "Christian identity" as a hate group—a term that could arguably encompass millions of Americans with sincerely held religious beliefs.[8] The SPLC routine maligns several mainstream conservative and religious organizations as "hate" groups, simply because the SPLC disagrees with their views.[9] The fact that the FBI would blindly accept and regurgitate the SPLC's spin is highly concerning and undercuts the FBI's assertion that it is unbiased and politically neutral.

In the wake of the backlash against the FBI's anti-Catholic document, the FBI withdrew the document and blamed the local level field office for its creation and dissemination.[10] However, there remain many questions about the genesis, review, and approval of this document, as well as the FBI's commitment to upholding First Amendment protected activity. To inform our ongoing oversight of the FBI, please provide the following documents and information:

1. All documents and communications referring or relating to intelligence products about "racially or ethnically motivated violent extremists" and "radical-traditionalist Catholics" for the period of January 20, 2021, to the present;

2. All documents and communications referring or relating to the basis for the January 23, 2023, Domain Prospective, entitled "Interest of Racially or Ethnically Motivated Violent Extremist Radical-Traditionalist Catholic Ideology Almost Certainly Presents New Mitigation Opportunities," approved and disseminated by FBI's Richmond Field Office;

3. A list of the FBI investigations, local law enforcement agency reporting, and liaison reporting, with varying degrees of cooperation and access that the FBI's Richmond Field Office relied upon to make its assessments in the January 23, 2023, Domain Prospective, entitled "Interest of Racially or Ethnically Motivated Violent Extremist Radical-Traditionalist Catholic Ideology Almost Certainly Presents New Mitigation Opportunities"; and

4. A list of all FBI employees involved in drafting, reviewing, approving, or disseminating the January 23, 2023, Domain Prospective, entitled "Interest of Racially or Ethnically

---

[5] *Id.*

[6] *Id.* at 11.

[7] Sothern Poverty Law Center, Radical Traditional Catholicism, https://www.splcenter.org/fighting-hate/extremist-files/ideology/radical-traditional-catholicism (last visited Feb. 13, 2023).

[8] *Id.*

[9] *See, e.g.*, Susan Ferrechio, *SPLC finds fewer hate groups but still targets evangelicals, conservatives as haters*, WASH. TIMES (Mar. 10, 2022).

[10] Kayla Bailey, *FBI labeling Catholics as possible violent extremists is an excuse to oppress 'political enemies': Evita Duffy*, FOX NEWS (Feb. 12, 2023).

The Honorable Christopher A. Wray
February 16, 2023
Page 3

Motivated Violent Extremist Radical-Traditionalist Catholic Ideology Almost Certainly Presents New Mitigation Opportunities."

Please provide this information as soon as possible, but no later than 5:00 p.m. on March 2, 2023. We remind you that whistleblower disclosures are protected by law and that we will not tolerate any effort to retaliate against whistleblowers for their disclosures.

The Judiciary Committee is authorized to conduct oversight of the Federal Bureau of Investigation pursuant to the Rules of the House of Representatives.[11] If you have any questions, please contact Committee staff at (202) 225-6906. Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman

Mike Johnson
Chairman
Subcommittee on the Constitution
and Limited Government

cc:     The Honorable Jerrold L. Nadler, Ranking Member
        The Honorable Mary Gay Scanlon, Ranking Member, Subcommittee on the Constitution
        and Limited Government

---

[11] Rules of the U.S. House of Representatives, R. X (2023).



Federal Bureau of Investigation
Department of Homeland Security

[ Strategic Intelligence Assessment and Data on ]
Domestic Terrorism

This *doesn't* describe me, nor my wife, but it may

*Submitted to the Permanent Select Committee on Intelligence, the Committee on*
*Homeland Security, and the Committee of the Judiciary of the United States House*
*of Representatives, and the Select Committee on Intelligence, the Committee on*
*Homeland Security and Governmental Affairs, and the Committee of the Judiciary*

~~describe those who~~ *of the United States Senate* have targeted us for two years.

I wish to be very clear: Simply because I
read and understand, to the best of my ability, "the law",
I do not consider     June 2023     myself to be of the

" sovereign citizen" group... there are simply some
factual circumstances which cause types of immunity.
It is my opinion that my circumstances do cause it.
however, I'm not "the judge" and simply, in my opinion,
know how to "argue my case" and I'm non-violent.

Page 1 of 46

**Table of Contents**

I.      Overview of Reporting Requirement...................................................................2
II.     Executive Summary...........................................................................................2
III.    Domestic Terrorism: Definitions, Terminology, and Methodology .....................3
IV.     Strategic Intelligence Assessment......................................................................6
V.      Discussion and Comparison of Investigative Activities......................................11
VI.     Data on Domestic Terrorism ............................................................................23
VII.    Recommendations...........................................................................................30
        Appendix A......................................................................................................33
        Appendix B......................................................................................................40

## I.  Overview of Reporting Requirement

Pursuant to Section 5602(a) and (b) of the National Defense Authorization Act for Fiscal Year (FY) 2020[1] (hereafter "the Act"), the Federal Bureau of Investigation (FBI) and the Department of Homeland Security (DHS), in consultation with the Office of the Director of National Intelligence (ODNI), including the National Counterterrorism Center (NCTC), and the Department of Justice (DOJ), jointly produce a report containing a strategic intelligence assessment and data on domestic terrorism (DT). The Act requires the report to contain a strategic intelligence assessment, a discussion of specified activities, certain data on DT matters, and recommendations. Section 5602(d) of the Act requires the Director of the FBI and the Secretary of Homeland Security, in consultation with the Director of National Intelligence (DNI) in a manner consistent with the authorities and responsibilities of such Director, to jointly submit to the appropriate Congressional committees annual updates to those reports. This report constitutes the annual updates for FY 2022.[2]

## II.  Executive Summary

Preventing terrorist attacks remains a top priority for both the FBI and DHS, and the FBI serves as the lead investigative agency on terrorism matters. The threat posed by international and domestic threat actors has evolved significantly since 9/11. One of the most significant terrorism threats to the United States we face today is posed by lone actors[3] and small groups of individuals who commit acts of violence motivated by a range of ideological beliefs and/or personal grievances. Of these actors, domestic violent extremists represent one of the most persistent threats to the United States today. These individuals are often radicalized online and

---

[1] Public Law 116-92, enacted 20 December 2019.
[2] Consistent with Congressional direction, as of December 2022, NCTC has limited its work to the transnational and international dimensions of the terrorism threat against the United States. Because this report covers the prior FY 2022 period, it includes descriptions of NCTC's involvement in lines of effort and assessments during that period.
[3] The FBI and DHS define a lone actor as an individual motivated by one or more violent extremist ideologies who, operating alone, supports or engages in acts of unlawful violence in furtherance of that ideology or ideologies that may involve influence from a larger terrorist organization or a foreign actor. The mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics does not constitute violent extremism, and is constitutionally protected.

look to conduct attacks with easily accessible weapons. Many of these violent extremists are motivated and inspired by a mix of ideological, socio-political, and personal grievances against their targets. This report provides our strategic intelligence assessments on DT, a detailed discussion of our procedures and methods to address DT threats, as well as data on DT incidents and FBI investigations.

### III.  Domestic Terrorism: Definitions, Terminology, and Methodology

Section 5602(a) of the Act requires the Director of the FBI and the Secretary of Homeland Security, in consultation with the DNI, to jointly develop, to the fullest extent feasible and for purposes of internal recordkeeping and tracking, uniform and standardized definitions of the terms "domestic terrorism," "act of domestic terrorism," "domestic terrorism groups," and any other commonly used terms with respect to DT; methodologies for tracking incidents of DT; and descriptions of categories and subcategories of DT and ideologies relating to DT; and to jointly submit the information in a report to the appropriate Congressional committees.

*Definitions*

For the FBI's purposes, "domestic terrorism" is defined by 18 USC § 2331(5), as activities:

- Involving acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;
- Appearing to be intended to:
  o Intimidate or coerce a civilian population;
  o Influence the policy of government by intimidation or coercion; or
  o Affect the conduct of a government by mass destruction, assassination or kidnapping; and
- Occurring primarily within the territorial jurisdiction of the United States.

DHS derives its definition of "domestic terrorism" from the Homeland Security Act definition of "terrorism," 6 USC § 101(18), which is similar, but not identical, to the 18 USC § 2331(5) definition. Under the Homeland Security Act of 2002, "terrorism" is defined as any activity that:

- Involves an act that:
  o Is dangerous to human life or potentially destructive of critical infrastructure or key resources; and
  o Is a violation of the criminal laws of the United States or of any State or other subdivision of the United States; and
- Appears to be intended to:
  o Intimidate or coerce a civilian population;
  o Influence the policy of a government by intimidation or coercion; or
  o Affect the conduct of a government by mass destruction, assassination, or kidnapping.

Both references in the US Code are definitions and not federal criminal charging statutes for DT.

*Terminology*

The FBI and DHS use the term "domestic violent extremism" to refer to DT threats. The word "violent" is important because the mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics does not constitute violent extremism and is constitutionally protected. The FBI and DHS do not investigate, collect, or maintain information on US persons solely for the purpose of monitoring activities protected by the First Amendment. Under FBI policy and federal law, no investigative activity may be based solely on activity protected by the First Amendment, or the apparent or actual race, ethnicity, national origin, religion, gender, sexual orientation, or gender identity of an individual or group. Similarly, DHS's Office of Intelligence and Analysis (I&A) is prohibited from engaging in any intelligence activities for the purpose of affecting the political process in the United States or for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States, and DHS policy prohibits any intelligence activities based solely on an individual's or group's race, ethnicity, gender, religion, sexual orientation, gender identity, country of birth, or nationality.

A "domestic violent extremist" (DVE) is defined as an individual based and operating primarily within the United States or its territories without direction or inspiration from a foreign terrorist group or other foreign power who seeks to further political or social goals, wholly or in part, through unlawful acts of force or violence dangerous to human life.

The US Government, including the FBI and DHS, continually reviews and evaluates intelligence and information from multiple sources to ensure it appropriately identifies and categorizes national security threats, including those that are criminal in nature, to the United States. As part of this continual internal review, the FBI and DHS prioritize threat categories, which are further described below, as needed, and as threats evolve. While categories help the FBI and DHS better understand threats associated with broad categories of DT-related criminal actors, the FBI and DHS recognize motivations vary, are nuanced, and sometimes are derived from a blend of ideologies. Categories also inform our intelligence and prevention efforts.

Since 2019, the US Government uses the following five threat categories to understand the DT threat:

**(1) Racially or Ethnically Motivated Violent Extremism:** This threat category encompasses threats involving the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political or social agendas which are deemed to derive from bias, often related to race, held by the actor against others, including a given population group. Racially or ethnically motivated violent extremists (RMVEs) use both political and religious justifications to support their racially- or ethnically-based ideological objectives and criminal activities. One set of RMVE threat actors use their belief in the superiority of the white race to justify their use of violence to further their political, cultural, and religious goals. A separate and distinct set of RMVE threat actors use real or perceived racism or injustice in American society, their desire for a separate Black homeland, and/or violent

interpretations of religious teachings to justify their use of violence to further their social or political goals.

**(2) Anti-Government or Anti-Authority Violent Extremism:** This threat category encompasses the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas, which are deemed to derive from anti-government or anti-authority sentiment, including opposition to perceived economic, social, or racial hierarchies, or perceived government overreach, negligence, or illegitimacy. This threat category typically includes threats from anarchist violent extremists (AVEs), militia violent extremists (MVEs), sovereign citizen violent extremists (SCVEs), and anti-government or anti-authority violent extremists-other (AGAAVE-Other).

**(3) Animal Rights or Environmental Violent Extremism:** This threat category encompasses the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas by those seeking to end or mitigate perceived cruelty, harm, or exploitation of animals and/or the perceived exploitation or destruction of natural resources and the environment.

**(4) Abortion-Related Violent Extremism:** This threat category encompasses the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas relating to abortion, including individuals who advocate for violence in support of either pro-life or pro-choice beliefs.

**(5) All Other Domestic Terrorism Threats:** This threat category encompasses threats involving the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas which are not otherwise exclusively defined under one of the other threat categories. Such agendas may derive from, but are not limited to, a mixture of personal grievances and beliefs, political concerns, and aspects of conspiracy theories, including those described in the other DT threat categories. Some actors in this category may also carry bias related to religion, gender, or sexual orientation. Several DVEs have combined components of different ideologies to develop a personalized belief system that they use to justify violent, criminal action.

*In my opinion*

*Methodology* *This describes the bad apples who continue to cause us harms*

*and losses, as they threatened to do.*

The FBI defines a "DT incident" as a criminal act, including threats or acts of violence to specific victims, made in furtherance of a domestic political and/or social goal, which has occurred and can be confirmed. The FBI defines a "DT plot" as a combination of criminal activity and planning that collectively reflect steps toward criminal action in furtherance of a domestic political or social goal. "Disrupted DT plots" are plots which, absent law enforcement intervention, could have resulted in a DT incident.

*In my opinion*

*This also describes the bad apples. My biological dad*

DHS I&A defines a "DT attack" as an incident motivated by a DVE ideology in which a weapon *bought*
or tactic is purposefully deployed against a target for the purpose of causing injury, death, or *a gun from*
property destruction. DHS I&A defines a "DT plot" as an incident motivated by a DVE ideology *me, then*
in which a specific target is identified, and significant steps have been taken to acquire weapons
or plan the tactics intended to be used against the target. For DHS, these ideologically driven *has attempted*
criminal acts must be dangerous to human life or potentially destructive to critical infrastructure *to label me*
or key resources to meet the definition of DT. A single incident may be part of a spree of *as "suicidal"...*
criminal or violent activity conducted by the same perpetrator(s) using the same tactic(s), which
are carried out against multiple locations in short succession.

*He also threatened I'd be shot, that our wife and kids would be destitute...*
The FBI and DHS I&A make every effort to document lethal and non-lethal DT incidents, but *and that he*
there is no mandatory incident reporting requirement for state, local, tribal, and territorial (SLTT) *would*
law enforcement agencies to report criminal activity that appears to be motivated by a social or *shoot school*
political goal and is mitigated at the SLTT level. As such, some DT incidents likely go *administrator.*
unreported by other law enforcement agencies. These factors make it difficult for the FBI and
DHS I&A to identify every DT incident that has occurred in the United States. DHS I&A *None of that*
complements the FBI's effort to document DT incidents through I&A's ongoing DT incident *is okay at all.*
tracking initiative, which is informed by I&A's intelligence officers deployed to fusion centers,
engagement with SLTT law enforcement and homeland security partners, review of DHS
Component information and US Intelligence Community reporting, and open source research.
The results of DHS's incident tracking efforts are also shared with the FBI, SLTT, and private
sector partners. Therefore, Appendix A provides information that represents significant DT
incidents and disrupted plots that have occurred in the United States, of which the FBI and DHS
I&A have knowledge, but not a comprehensive listing of all incidents.

## IV.  Strategic Intelligence Assessment
The FBI, in coordination with prosecutors in the US Attorneys' Offices (USAOs) and DOJ's
National Security Division (NSD), continues to successfully investigate and disrupt DVE
activities, plots, and threats. The FBI and DHS I&A continue to provide strategic warnings and
analysis of the heightened DT threat, and Appendix B provides a strategic intelligence
assessment authored by the FBI, DHS, and NCTC, titled *Wide-Ranging Domestic Violent
Extremist Threat to Persist*, published on 17 June 2022. Analytic overviews of the current state
of the various DVE threats can be found below. DVE lone offenders and small groups motivated
by a range of ideological beliefs and personal grievances continue to pose a persistent and lethal
threat to the Homeland.

### *Racially or Ethnically Motivated Violent Extremism*

Throughout 2022, RMVEs driven by a belief in the superiority of the white race remained among
the FBI's highest priority threats. RMVEs continued to pose the most consistent threat of lethal
and non-lethal violence against religious, cultural, and government targets. The FBI, in
conjunction with state and local partners, disrupted RMVEs based on a number of criminal
violations. This RMVE movement remained fluid and decentralized, consisting of both
organized groups and individuals. Nearly all those in this RMVE movement engaged heavily
online across a variety of different platforms, which continues to contribute to some RMVEs

coalescing online; the creation of new, primarily online groups; and the fragmentation of other groups. While RMVEs used the internet to spread propaganda for many years, 2022 saw a significant shift in some RMVEs' coordinated efforts to spread overtly violent and racist propaganda within encrypted chat applications, specifically to encourage others to engage in violence. RMVE lethal attacks also continued in 2022, including one in the United States and another abroad. In May 2022, an RMVE conducted an attack at a grocery store in Buffalo, New York, resulting in the deaths of 10 individuals, most of whom were Black. Before the attack, the RMVE posted a manifesto online which aligned with that of Australian RMVE attacker Brenton Tarrant, who attacked two mosques in New Zealand in 2019. In November 2022, an RMVE conducted an attack in Slovakia which resulted in two fatalities outside an LGBTQ+ bar. The attacker also authored a manifesto; referenced past attackers, including the recent Buffalo, New York, RMVE attacker; and lauded other RMVEs' propaganda and efforts to incite others to violence. These RMVEs' behavior, and their attacks, signify the influence overtly violent propaganda and manifestos continue to have on this RMVE movement in the United States and abroad.

During 2022, other RMVEs, such as those motivated by perceptions of racial injustice in American society, the desire for a separate Black homeland, or violent interpretations of religious teachings, posed a generally low threat of lethal and non-lethal violence. These RMVEs are characterized by disparate motivating ideologies and grievances that target a range of perceived ideological opponents, including law enforcement, the Jewish community, and individuals of the white race. While some RMVEs advocate for a separate Black homeland or starting a "race war," many broadly target law enforcement and the US Government. Retaliation and retribution for perceived or actual color of law violations and the perception of unjust legal proceedings surrounding the officers involved are among the organizing drivers for some RMVEs. RMVEs who adhere to violent interpretations of Black Hebrew Israelite religious teachings use anti-Semitic rhetoric as justification for violence. Although violent rhetoric and threats of violence by these RMVEs remained consistent, there were minimal observed acts of violence in 2022.

### Anti-Government or Anti-Authority Violent Extremism

#### Anarchist Violent Extremism

Anarchist violent extremists (AVEs) are a subset of the anti-government or anti-authority extremism threat category. The FBI and DHS I&A continue to assess the most serious threat AVEs pose likely will continue to be their use, or potential use, of improvised incendiary devices (IIDs) or improvised explosive devices (IEDs); their injury of law enforcement and others during confrontations; and their access and occasional intent to illegally use firearms. Throughout FY 2022, AVEs continued to oppose government and corporate policies perceived to infringe on individual freedoms referencing anti-capitalism, anti-fascism, anti-gentrification, anti-government, and anti-law enforcement sentiment, and social issues related to the environment, immigration, reproductive rights, and Indigenous Peoples' rights as justification for criminal activity.

For example, on several occasions throughout 2022, AVEs and others opposed to construction of a public safety training facility in Atlanta, Georgia, committed numerous crimes to include vandalizing construction equipment and personal property, and using IIDs to damage law enforcement vehicles, construction equipment, and business property. Law enforcement authorities continue to investigate these and other related incidents throughout the country to identify perpetrators. Most AVE-related criminal activity continues to involve physical assaults and property crimes, often committed by self-directed or small groups of AVEs. While most crimes violate state or local laws, some crimes such as arson, acts of sabotage, and threats of violence are investigated by the FBI and may be prosecuted at the federal level.

### *Militia Violent Extremism*

In late 2021 and throughout 2022, militia violent extremists (MVEs), a subset of the anti-government or anti-authority extremism threat category, more frequently cited singular sociopolitical issues as their justifications for violence or criminal activity. These increasingly diffuse grievances contrasted with the compounding grievances of 2020 surrounding civil unrest, COVID-19-related restrictions, election issues, and the deaths of individuals in encounters with law enforcement, which led to a surge in MVE activity and, to a degree, centralization within the movement. As the overlapping grievances of 2020 faded, MVEs began citing standalone issues that often did not have movement-wide appeal but that individual MVEs still perceived to indicate the movement's longstanding narratives surrounding government overreach, abuse of power, and incompetence.

Additionally, lack of a high-profile, public leader within the MVE movement; prominent law enforcement arrests and disruptions of MVE actors; and absence of a galvanizing event to unite MVEs contributed to the increasingly diffuse nature of the MVE threat from late 2021 through 2022. Issues MVEs most frequently cited as potential mobilizers to violence included immigration and southern border policy; potential changes to firearms laws; conspiratorial perceptions about the tax enforcement provisions of the Inflation Reduction Act of 2022; and perceived government inaction or overreach related to child welfare issues, including crimes against children or Child Protective Services matters. Despite MVE grievances being more disjointed than in previous years, the most likely targets for MVE violence very likely continue to be government officials, facilities, law enforcement personnel, and specific populations. Barring unifying events or figures reminiscent of 2020, the FBI and DHS I&A assess that through 2023, the MVE threat likely will be defined by lone actors and small cells who cite singular sociopolitical issues in their mobilization to violence.

### *Sovereign Citizen Violent Extremism*

Sovereign citizen violent extremists (SCVEs), a subset of the anti-government or anti-authority extremism threat category, posed a threat of ideologically motivated violence and crimes through FY 2022 and into recent months, continuing to target law enforcement, government officials, and court personnel. SCVE violence occurs most commonly during law enforcement encounters. SCVEs threaten and harass officials and personnel with threats of kidnapping and criminal acts including filing of fraudulent liens and illicit monetary or tax claims. Individuals also use the ideology to justify criminal acts and use of force related to loss of, or infringement upon,

perceived rights. SCVE incidents, threats, and criminal acts in the past two years remained rooted in grievances and perceptions of infringed rights, or claims of immunity from government actions, frequently emanating from responses and circumstances relating to the COVID-19 pandemic.

SCVEs range from lone actors to loose networks and small groups. Disruption and prosecution of SCVEs occurs on an ongoing basis, frequently in coordination with federal, state, and local law enforcement partners. The FBI and DHS I&A assess SCVE and ideologically motivated threats and crimes of fraud or theft may increase if economic circumstances within the United States result in widespread housing or property losses, to include widespread evictions. Historically, periods of major economic downturns with broad scale negative impacts on the housing sector have borne an attendant rise in SCVE and other sovereign citizen crimes involving property.

### *Anti-Government or Anti-Authority Extremism-Other*

AGAAVEs citing anti-government or anti-authority motivations for violence or criminal activity not otherwise defined include, but are not limited to, those motivated by a desire to commit violence against individuals or entities they perceive to be associated with a specific political party or faction thereof. AGAAVE-Others do not fit within the AVE, MVE, or SCVE threat subcategories.Threats from these DVEs have increased in the last two years, and any further increases in threats likely will correspond to potential flashpoints, such as high-profile elections and campaigns or contentious current events.

Historically, these DVEs have conducted or plotted attacks targeting perceived political opponents, including elected officials, other government officials and law enforcement, candidates for public office, political party offices, and members of the media. In 2018, a DVE mailed 16 IEDs packed with explosive material and glass shards to victims including prominent figures in the media and Democratic Party; he pleaded guilty to 65 felony counts and was sentenced to 20 years in federal prison. In 2017, a now-deceased DVE injured several Republican members of Congress, staffers, and responding officers after opening fire at a charity baseball event in Alexandria, Virginia.

More recently, an AGAAVE-Other subject was indicted in November 2022 on charges related to breaking into the residence of the then-Speaker of the House and assaulting the Speaker's husband. Since FY 2022, at least six other AGAAVE-Other subjects were arrested for threatening government or law enforcement officials to whom they were ideologically opposed. These DVEs likely will continue to pose a heightened threat as they plot or threaten violence to redress political and/or social grievances and continue to draw inspiration from conspiracy theories surrounding a range of current events.

Investigations, arrests, and prosecutions related to the 6 January 2021 breach of the US Capitol are ongoing, and dozens of these subjects are categorized as AGAAVE-Other. For example, in March 2022, an AGAAVE-Other subject was arrested in Miami, Florida, for alleged activity related to the Capitol breach; in June 2022, he and four associates were charged in a superseding indictment with seditious conspiracy and other counts.

### *Abortion-Related Violent Extremism*

Abortion-related violent extremists (AbRVEs) – both pro-life and pro-choice – have threatened, vandalized, and impeded access to facilities that provide reproductive health services or counseling, which can violate the Freedom of Access to Clinic Entrances Act (FACE Act). FACE Act violations can be jointly investigated as civil rights violations and as domestic violent extremism. AbRVE violence can be connected to flashpoint events such as abortion-related legislation or court proceedings. One such flashpoint was the leak of the draft opinion and the subsequent decision by the US Supreme Court in *Dobbs v. Jackson Women's Health Organization*. Prior to the *Dobbs* decision, the majority of abortion-related violence was perpetrated by pro-life aligned AbRVEs. However, the FBI and DHS I&A assess the *Dobbs* decision exacerbated the grievances of pro-choice aligned AbRVEs, resulting in an increase in violent activity.

### *Animal Rights or Environmental Violent Extremism*

The FBI and DHS I&A assess the animal rights violent extremism threat remained persistent throughout FY 2022. Animal rights violent extremists (ARVEs) continued to target entities perceived to be harming or exploiting animals through crimes such as vandalism, trespassing, and threats of violence. Typical targets included individuals and entities involved in animal research; the fur industry; and businesses selling animal products or involved in concentrated animal feeding operations. ARVEs operated and likely will continue to operate in individual or small groups when committing criminal acts. ARVEs used vitriolic rhetoric and threats of violence as a means to intimidate or coerce those perceived as harming or exploiting animals. ARVEs often communicate threats of violence by telephone or email, or by posting threatening language on social media. The FBI and DHS I&A assess ARVEs in FY 2023 likely will continue to pose a persistent threat, and likely will commit actions intended to cause financial losses, intimidation, and heightened awareness of animal rights-related issues.

The FBI and DHS I&A assess environmental violent extremists (EVEs) in FY 2022 continued to commit criminal actions intended to cause financial loss or operational damage and disruption against entities perceived to be exploiting or contributing to destruction of the environment or natural resources. Criminal acts continued in the form of property destruction, acts of vandalism, and threats of violence. Although federal criminal activity associated with EVEs has decreased in the last several years, some crimes, such as threats of violence or destruction of property are investigated by the FBI and may be prosecuted at the federal level. However, most EVE-related criminal activity in the last few years has violated state or local laws. The FBI and DHS I&A assess opposition to oil and natural gas infrastructure developments or expansion projects – particularly those near perceived ecologically sensitive habitats or waterways or in close proximity to farmlands, urban, or Native American lands – and issues related to the environmental impact of climate change and deforestation likely will remain drivers for criminal actions in FY 2023. Criminal acts likely will continue to include acts of vandalism or arson to delay or disrupt construction projects and cause financial loss.

### *All Other DT Threats*

DVEs motivated by a personalized ideology, or an ideology that does not fit within the US Government's identified categories, continue to pose an intermittent threat of lethal violence. DVEs within this broad category include involuntary celibate violent extremists (IVEs) and DVEs with a personalized mix of various DVE ideologies. IVEs continue to consume online rhetoric supporting their personal grievances against women who reject them or against men whom they deem as more romantically successful. IVEs have targeted both men and women for violence in an attempt to either promote awareness of IVE grievances or punish populations for their own perceived romantic failures. Generally, IVE violence is rarely connected to current events or environmental variables.

## V.  Discussion and Comparison of Investigative Activities

The Act calls for a discussion and comparison of the following activities:

- The criteria for opening, managing, and closing DT and international terrorism (IT) investigations.

- Standards and procedures for the FBI with respect to the review, prioritization, and mitigation of DT and IT threats in the United States.

- The planning, development, production, analysis, and evaluation of intelligence and intelligence products relating to terrorism, noting any differences with respect to DT and IT.

- The sharing of information relating to DT and IT by and between the federal government, SLTT and foreign governments, the appropriate Congressional committees, nongovernmental organizations, and the private sector.

- The criteria and methodology used by the FBI to identify or assign terrorism classifications to DT investigations.

- Compliance with privacy, civil rights, and civil liberties policies and protections, including protections against the public release of names or other personally identifiable information of individuals involved in incidents, investigations, indictments, prosecutions, or convictions for which data is reported under the Act.

- Information regarding any training or resources provided to assist federal and SLTT law enforcement agencies in understanding, detecting, deterring, and investigating acts of DT, including the date, type, subject, and recipient agencies of such training or resources.

### *Criteria for Opening, Managing, and Closing DT and IT Investigations*

The FBI's criteria for opening, managing, and closing DT and IT investigations stem from agency authorities outlined in the *Attorney General's Guidelines for Domestic FBI Operations (AGG-Dom)* and are implemented through FBI policy, referred to as the *Domestic Investigations*

*and Operations Guide (DIOG)*. Consistent with those policies, the following outlines the criteria and methodology the FBI utilizes when conducting both DT and IT investigations:

**Opening**: The FBI opens a full investigation[4] predicated on an "articulable factual basis" that reasonably indicates the existence of federal criminal activity or a threat to national security, or to protect against such activity or threat. The opening of a full investigation must be approved by a Supervisory Special Agent and notice to the responsible Headquarters unit must be provided within 15 days of opening. The FBI may open a preliminary investigation[5] on the basis of any "allegation or information" indicative of possible criminal activity or threats to the national security.[6] The opening of a preliminary investigation by a Field Office requires the approval of a Supervisory Special Agent, but does not require notice to the DOJ, unless it involves a sensitive investigative matter (SIM).[7]

The opening of an investigation involving a SIM must be reviewed by the Field Office's Chief Division Counsel (CDC), approved by the Special Agent in Charge, and provided to the responsible Headquarters Unit Chief within 15 days of opening as notice to Headquarters. The Field Office must notify the USAO within 30 days unless inappropriate and, in that case, Headquarters must notify and provide an explanation to DOJ within 30 days.

No investigation may be opened based solely on activities protected by the First Amendment or the lawful exercise of rights secured by the Constitution or laws of the United States.

Opening a preliminary or full investigation classified as one of the identified DT threat categories must be approved by the Field Office's CDC; however, the opening of a full investigation classified as an IT matter does not have the same requirement.

**Managing**: The *AGG-Dom* authorizes all lawful investigative methods in the conduct of a full investigation; however, the *AGG-Dom* requires that the "least intrusive" means or method of

---

[4] A full investigation may be opened if there is an "articulable factual basis" for the investigation that reasonably indicates one of the following circumstances exists: an activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur, and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity. An enterprise investigation is a type of full investigation that examines the structure, scope, and nature of the group or organization.

[5] A preliminary investigation is a type of predicated investigation that may be opened (predicated) on the basis of any "allegation or information" indicative of possible criminal activity or threats to the national security. Preliminary investigations may be opened to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security. Enterprise investigations cannot be conducted as preliminary investigations or assessments, nor may they be conducted for the sole purpose of collecting foreign intelligence.

[6] The significance of the distinction between the full and preliminary investigation is in the availability of investigative tools. A preliminary investigation, which is based on the lesser factual predicate, limits the investigative tools and methods available, while the full investigation, which is based on the more robust factual predicate, permits the full range of legally available investigative tools and methods. In some instances, cases opened as preliminary investigations may be converted to full investigations based on the development of additional facts during the course of the investigation.

[7] A SIM involves the activities of a domestic public official or political candidate (involving corruption or a threat to the national security), religious or political organization or individual prominent in such an organization, or news media, or any other matter which, in the judgment of the official authorizing an investigation, should be brought to the attention of FBI Headquarters and other DOJ officials.

investigation be considered and, if reasonable based on the facts and circumstances of the investigation, that investigative method should be used to obtain information in lieu of other more intrusive methods. The FBI requires file reviews of full investigations every 90 days. Some investigative methods the FBI is authorized to use differ between DT and IT investigations, based on the differences in statutory investigative authorities available in criminal matters, such as DT investigations, and in foreign intelligence matters, such as IT investigations. For example, a full investigation of a DT matter may conduct electronic surveillance, if authorized, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968. A full investigation of an IT matter may also conduct electronic surveillance, as authorized, pursuant to the Foreign Intelligence Surveillance Act of 1978, as amended. Additionally, investigations of DT and IT matters may make use of federal grand jury subpoenas to compel the disclosure of records and other relevant information, but investigations of IT matters may also use a National Security Letter[8] to compel defined categories of records from certain businesses. Finally, investigations of DT matters must be periodically reviewed by the Field Office's CDC, and investigations of IT matters do not have the same requirement.

**Closing**: A Supervisory Special Agent must approve the closure of both full and preliminary investigations. A preliminary investigation must be closed within six months of its opening but may be extended for an additional six months. At the conclusion of either type of investigation, each of the following items must be documented:

- A summary of the results of the investigation.

- Whether logical and reasonable investigation was completed.

- Whether all investigative methods/techniques initiated have been completed and/or discontinued.

- Whether all set leads have been completed and/or discontinued.

- Whether all evidence has been returned, destroyed, or retained in accordance with evidence policy.

- A summary statement of the reason the full investigation will be closed.

At the conclusion of a full investigation, the Field Office must also document whether sufficient personnel and financial resources were expended on the investigation, or an explanation or justification for not expending sufficient resources.

There are no substantive differences in how the FBI closes full investigations of DT or IT matters.

---

[8] A National Security Letter is a statutorily-created administrative tool that allows investigators to issue a demand for documents or records that are relevant to a predicated investigation to protect against international terrorism or clandestine intelligence activities.

The following chart presents a comparison of FBI policies for both DT and IT preliminary and full investigations.

| | PRELIMINARY INVESTIGATION | FULL INVESTIGATION |
|---|---|---|
| PREDICATION | Information or an allegation indicating the existence of federal criminal activity or a threat to national security (or to protect against such activity or threat) | Articulable factual basis that reasonably indicates the existence of federal criminal activity or a threat to national security (or to protect against such activity or threat) |
| APPROVAL TO OPEN | • Supervisory Special Agent (SSA)<br>• If a Domestic Terrorism (DT) matter, Field Office (FO) Chief Division Counsel (CDC) | • SSA<br>• Notice to the responsible Headquarters (HQ) unit must be provided within 15 days of opening<br>• If a DT matter, FO CDC |
| APPROVAL TO OPEN: *SENSITIVE INVESTIGATIVE MATTER (SIM)* | • FO CDC<br>• FO Special Agent in Charge (SAC)<br>• Notice to responsible HQ Unit Chief within 15 days of opening<br>• Notice to the US Attorney's Office (USAO) within 30 days unless inappropriate, HQ must notify the Department of Justice (DOJ) within 30 days | • FO CDC<br>• FO SAC<br>• Notice to responsible HQ Unit Chief within 15 days of opening<br>• Notice to the USAO within 30 days unless inappropriate, HQ must notify DOJ within 30 days |
| FILE REVIEW | Every 90 calendar days | Every 90 calendar days |
| EXAMPLES OF AUTHORIZED INVESTIGATIVE METHODS | In a DT Matter:<br>• Obtain public information<br>• Physical surveillance<br>• Federal grand jury subpoenas<br><br>In an International Terrorism (IT) Matter:<br>• Obtain public information<br>• Physical Surveillance<br>• Federal grand jury subpoenas and National Security Letters (NSLs) | In a DT Matter:<br>• Obtain public information<br>• Physical surveillance<br>• Federal grand jury subpoenas<br>• Electronic surveillance pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968<br><br>In an IT Matter:<br>• Obtain public information<br>• Physical Surveillance<br>• Federal grand jury subpoenas and NSLs<br>• Electronic surveillance pursuant to Foreign Intelligence Surveillance Act of 1978, as amended |
| CLOSURE | Must be closed within six months but may be extended for an additional six months | No duration limit |
| APPROVAL TO CLOSE | • SSA<br>• Notice to the responsible HQ unit must be provided prior to closing | • SSA<br>• Notice to the responsible HQ unit must be provided prior to closing |
| APPROVAL TO CLOSE: *SIM* | SSA, with SAC approval | SSA, with SAC approval |

### *Standards and Procedures for Reviewing, Prioritizing, and Mitigating DT and IT Threats*

The FBI uses the Threat Review and Prioritization (TRP) process as a standardized method for reviewing and prioritizing threats within operational programs to inform threat strategies, mitigation plans, and resource allocation. Headquarters operational divisions use the TRP process to uniformly define threat issues for the organization, determine their prioritization at the national level, establish FBI National Threat Priorities (NTPs), and develop national threat strategies for those threats for the FBI enterprise. Field Offices then cascade the results of the national-level TRP process to prioritize threat issues and create threat strategies to mitigate threats based on the threat landscape of their specific areas of responsibility (AORs). The FBI conducts the TRP process on a biennial basis, but it may be conducted annually at the discretion of the Field Office or Headquarters operational division head. For DT and IT threats, DOJ Counterterrorism Section (CTS) attorneys offer prosecutorial views during the national-level TRP process.

The TRP process seeks to build consensus, and includes applicable USAO(s) and stakeholders, such as NSD/CTS, to determine prioritization (banding) and to develop threat strategies for mitigation of threat issues. Headquarters operational divisions develop national threat strategies for each threat issue to guide enterprise-wide mitigation efforts. Field Offices develop threat strategies annually for all threat issues they band, and they detail the particular steps the Field Office plans to take to mitigate each banded threat issue in their AOR. These threat strategies must be used to guide mitigation of each threat issue for the upcoming fiscal year, unless a change in threat banding or threat strategies occurs during midyear negotiations. The TRP of the FBI is classified as it incorporates sources and methods as a basis of strategic alignment of national security resources.

There are no differences in how the FBI reviews and prioritizes DT and IT threats, and each threat issue is reviewed independently; however, the threat band dictates priorities within these programs. Investigative methods the FBI is authorized to use differ between DT and IT investigations, and DT investigations may be subject to additional legal review.

### *Planning, Development, Production, Analysis, and Evaluation of Intelligence and Intelligence Products Relating to DT and IT*

The FBI intelligence cycle for both DT and IT matters consists of planning intelligence efforts around priorities based on national or Field Office threat strategies, collecting raw intelligence information, processing and synthesizing data, analyzing and crafting assessments into analytic intelligence products, disseminating those products, briefing analysis to decision makers, and evaluating disseminated products and the production process to inform future efforts.

Similarly, DHS began Intelligence Threat Banding in 2019, a process in which DHS intelligence leadership, in coordination with the Homeland Security Intelligence Council, prioritizes threat topics. The process is informed by DHS's execution of the intelligence cycle – development of requirements, collection through field operations or open source collectors, and analysis to

produce finished intelligence in the DT space. DHS implements Intelligence Threat Banding across its mission areas. Results are used to inform and drive the Department's collection and analysis efforts for maximum impact against the "high banded" topic areas; develop cross component programs, projects, and activities; and inform intelligence resource allocation decisions.

During the planning phase of the intelligence cycle, both the FBI and DHS consider the National Intelligence Priorities Framework, which documents the US Intelligence Community's priorities; the FBI also considers its own standing intelligence and investigative responsibilities, which are addressed and prioritized in the TRP process. During the TRP process, the FBI identifies intelligence needs related to threat priorities, and those intelligence needs drive subsequent stages of the intelligence cycle. Meanwhile, DHS also addresses any additional priorities and/or requirements identified by the Secretary of Homeland Security or the Under Secretary of Homeland Security for Intelligence and Analysis, the latter of whom serves as the DHS Chief Intelligence Officer.

During the collection and processing phases of the intelligence cycle, both the FBI and DHS obtain raw intelligence from lawful collection methods consistent with their respective authorities and then synthesize this data into a form intelligence personnel can use. In the analysis and evaluation phases, analysts examine and evaluate all source intelligence, including collected information; add context, as needed; and integrate the information into finished intelligence assessments. Analysts make assessments about information implications for national security.

Legal review is required for any FBI intelligence product, such as an Intelligence Information Report (IIR),[9] related to a potential SIM or other sensitive information, in accordance with the guidelines in the FBI's *DIOG* and identified "legal review triggers." One such legal review trigger is information related to DT. Similarly, in accordance with DHS I&A policy, I&A's finished intelligence products undergo a rigorous review prior to dissemination to ensure compliance with all legal requirements; policies for the protection of privacy, civil rights, and civil liberties; and oversight principles, guidelines, and procedures.

Finally, intelligence analysis is disseminated in either a written intelligence product or a verbal briefing during the production phase. Intelligence analysis customers for both the FBI and DHS include leadership, policymakers, military leaders, other federal and SLTT government officials, private sector partners, and operational counterparts who then make decisions informed by that information. For DHS, the Homeland Security Information Network is the primary platform for disseminating unclassified raw intelligence reporting and finished intelligence products to authorized federal and SLTT partners.

DHS also maintains a mobile application to enhance our SLTT and federal government partners' ability to consume intelligence information from their mobile devices. The DHS Intel App was a collaborative effort, which enables a secure way for approved users to access and view

---

[9] An IIR is the FBI's primary document used to share raw, non-compartmented FBI intelligence information.

intelligence information produced across the country, receive alerts on new intelligence products, and search key topics related to homeland security.

To support and improve intelligence and information sharing efforts nationwide, DHS, in coordination with federal and SLTT law enforcement, intelligence, and homeland security organizations, sponsored an Intelligence Summit (Summit) in August 2022. Senior leaders and stakeholders across federal, SLTT, and campus communities participated to discuss existing intelligence and information sharing issues and gaps, as well as focus areas requiring action and resolution to address the evolving threat environment. The Summit served as a forum to galvanize and unify collaboration, with senior leaders reaffirming commitments to discovering new opportunities and improving existing avenues to enhance information sharing between and across all levels of government, while ensuring the protection of privacy, civil rights, and civil liberties of US citizens.

### *Sharing of Information Relating to DT and IT*

The FBI's *National Strategy for Information Sharing and Safeguarding* provides the common vision, goals, and framework needed to guide information sharing initiatives with our federal and SLTT partners, foreign government counterparts, and private sector stakeholders. The FBI shares information consistent with the Privacy Act, FBI policy, and any other applicable laws and memoranda of understanding or agreement with other agencies.

The FBI works closely with our federal and SLTT law enforcement partners to investigate and disrupt both DT and IT. The FBI also has a strong working relationship with DOJ's CTS, which, as of June 2022, includes a Domestic Terrorism Unit.

Drawing on expertise across NSD and the DOJ more broadly, the DOJ's Domestic Terrorism Unit has several functions: prosecuting and coordinating DT cases, developing training and policies on DT matters, and supporting the work of the Department in implementing a whole-of-government strategy on countering DT. This structure preserves flexibility, while allowing CTS to better support the FBI. Recognizing that countering DT must be a whole-of-Department effort, the unit will include liaisons from components outside of NSD, including the Civil Rights Division and the Tax Division, among others, to marshal Department-wide expertise and resources and offer a mechanism for DOJ components to assess collaboratively and bring to bear all available tools to hold violent extremists accountable. It will also leverage the strong work by our SLTT law enforcement partners. The unit will engage in outreach to these partners to share lessons learned, increase information sharing, and ensure that we are bringing all available tools – state and federal – to bear against violent extremism.

The front line of the counterterrorism mission in the United States is the FBI-led Joint Terrorism Task Forces (JTTFs). The FBI maintains about 56 JTTFs nationwide spanning over 100 locations, with representation in all 56 FBI Field Offices and satellite Resident Agencies. The JTTFs have participation of over 50 federal and over 500 SLTT agencies. These relationships are critical to effective information sharing and the leveraging of local expertise and experience in FBI investigations. The FBI also shares intelligence products with federal and SLTT partners, as

appropriate, to inform them of the current threat environment and these products are posted on portals like the Law Enforcement Enterprise Portal.

The FBI and DHS I&A, in coordination with NCTC, produce Joint Intelligence Bulletins (JIBs) and other products that communicate updated threat information and assessments to our federal, SLTT, and private sector partners at the Unclassified//For Official Use Only (FOUO) or Law Enforcement Sensitive (LES) levels. JIBs alert our partners to significant arrests – including those accomplished through collaboration among different law enforcement entities – and trends we have observed in both the DT and IT arenas. Additionally, in early 2022, the FBI, DHS I&A, and NCTC began producing tri-seal domestic violent extremism-focused intelligence products under the auspices of a Joint Analytic Cell (JAC). The JAC ensures close collaboration among the three agencies, as appropriate, to provide more data-informed strategic analysis of the DT threat environment and better inform policymakers and state and local law enforcement agencies of changes in the threat landscapes. NCTC will ensure any continued collaboration and contributions through the JAC, or otherwise, are consistent with recent Congressional direction, limiting its contributions to these intelligence products to analysis concerning terrorism threats with an identified foreign nexus.

DHS products within the DT and IT spaces are shared with authorized federal, SLTT, and private sector partners, including the National Network of Fusion Centers, private sector security officials, and other customers. For those operating at primarily the unclassified level, products at the FOUO and LES levels are shared via the Homeland Security Information Network.

### *Criteria and Methodology to Identify or Assign Terrorism Classifications to FBI DT Investigations*

While classifications, or categories, help the FBI better understand the criminal actors we pursue, we recognize actors' motivations vary, are nuanced, and sometimes are derived from a blend of socio-political goals or personal grievances. Regardless of the classification, the FBI follows the facts and evidence of the case to carry out our investigations. Currently, the US Government broadly refers to the DT threat by using the following threat categories, which are further defined in the "Definitions, Terminology and Methodology" section of this report: (1) racially or ethnically motivated violent extremism; (2) anti-government or anti-authority violent extremism; (3) animal rights or environmental violent extremism; (4) abortion-related violent extremism; and (5) all other DT threats.

In addition to conducting investigative activity in response to the DT threats described above, the FBI also conducts civil unrest and anti-riot investigations under its DT Program. Although civil unrest and anti-riot investigations may not be directly aligned to the DT threat categories, these investigations are part of the FBI's DT Program for multiple reasons, including: because investigation of these matters may be closely related to separate terrorism investigations; because this criminal activity may be motivated by similar ideologies as those that appear in the DT threat categories; and/or for other administrative or organizational matters.

The FBI conducts civil unrest investigations to address violations of federal criminal law involving a civil disturbance, and the FBI conducts anti-riot investigations to address violations

of federal criminal law in which an individual uses force or violence during a public gathering. For both civil unrest and anti-riot investigations, the FBI provides information or assistance to other federal, state, or local authorities.

### Compliance with Privacy, Civil Rights, and Civil Liberties Policies and Protections

The FBI is responsible for protecting the security of our nation and its people from crime and terrorism while maintaining rigorous obedience to the Constitution and compliance with all applicable statutes, regulations, and policies. The *AGG-Dom* establishes a set of basic principles that serve as the foundation for all FBI mission-related activities. These principles demonstrate respect for civil liberties and privacy as well as adherence to the Constitution and laws of the United States.

One of the most important principles in the *AGG-Dom* is the threshold requirement that all investigative activities be conducted for an authorized purpose, which under the *AGG-Dom* means an authorized national security, criminal, or foreign intelligence collection purpose. The authorized purpose must be well-founded and well-documented, and the information sought and investigative method used to obtain it must be focused in scope, time, and manner to achieve the underlying purpose. Furthermore, the Constitution sets limits on what that purpose may be. It may not be solely to monitor the exercise of constitutional rights, such as the free exercise of speech, religion, assembly, press and petition; and, equally important, the authorized purpose may not be based solely on the race, ethnicity, gender, national origin, religion, disability, sexual orientation, or gender identity of an individual, group, or organization, or a combination of only those factors.

The *AGG-Dom* authorizes all lawful investigative methods in the conduct of a full investigation. These methods, which range in intrusiveness, consider the effect on the privacy and civil liberties of individuals and the potential to cause harm to, or otherwise damage the reputation of individuals. According to policy, the least intrusive method should be used, based upon the circumstances of the investigation, but the FBI may use any lawful method consistent with the *AGG-Dom*. A more intrusive method may be warranted in light of the seriousness of a criminal or national security threat or the importance of a foreign intelligence requirement, and the options available to obtain the intelligence, information, or evidence.

By emphasizing the use of the least intrusive means to obtain intelligence, information, or evidence, FBI employees can effectively execute their duties while mitigating the potential negative impact on the privacy and civil liberties of all people encompassed within the investigation, including targets, witnesses, and victims.

As a matter of FBI policy, law enforcement activities within the scope of DT investigations are particularly subject to close internal legal review and supervisory approvals to ensure constitutional rights, privacy, and civil liberties are protected at each juncture. DT investigations undergo numerous legal reviews due to the likelihood these investigations may touch upon First Amendment-protected activities, and/or other Constitutional rights, civil liberties and privacy-related considerations.

DHS is committed to ensuring activities are conducted in a manner that is consistent with the Constitution; applicable statutes, including the Privacy Act; applicable executive orders and Presidential Directives, including Executive Order 12333, *United States Intelligence Activities*, as amended; and other applicable law, policies, and procedures pertaining to the appropriate handling of information about US persons (as defined in Executive Order 12333) and other individuals protected by US law and Department policy.[10] DHS I&A is also governed by its *Intelligence Oversight Guidelines*, approved by the Attorney General in 2017.[11] These guidelines reflect I&A's legal authorities and policy protections for privacy, civil rights, and civil liberties. Countering domestic violent extremism is a vital part of the Department's broader obligation to help ensure the security of our nation, and DHS recognizes that our mission can succeed only if the Department respects and protects the our national values. DHS prioritizes rigorous safeguarding civil rights, civil liberties, and individual privacy protections across all its domestic counterterrorism efforts, including those related to countering DT.

In confronting the threat of domestic violent extremism, DHS focuses on threats related to individuals, groups, and/or events that meet national and Departmental intelligence requirements. It does not engage in any intelligence activity for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States, or for the purpose of retaliating against a whistleblower or suppressing or burdening criticism or dissent. Further, as a matter of internal DHS policy, I&A personnel are not permitted to engage in intelligence activities based solely on an individual's or group's race, ethnicity, gender, religion, sexual orientation, gender identity, country of birth, or nationality.

How DHS identifies and detects DT requires faithful adherence to fair information practice principles and privacy-focused departmental policies. DHS always incorporates privacy protections in information technology systems, technologies, rulemakings, programs, pilot projects, and other activities that involve the planned use of personally identifiable information. DHS's Office for Civil Rights and Civil Liberties, Privacy Office, and Office of the General Counsel are involved in all of its counterterrorism and prevention missions, and DHS I&A's intelligence activities are further reviewed by its internal Privacy and Intelligence Oversight Branch. These offices continue to help oversee and train DHS intelligence personnel on how to respect the privacy, civil rights, and civil liberties of all people and communities.

NCTC supports the FBI and DHS, as appropriate, including through analytic work focusing on the transnational dynamics of violent extremist movements and threats and by identifying linkages to international or transnational terrorism. NCTC ensures these efforts are fully consistent with NCTC's authorities and undertaken in accordance with the *ODNI Intelligence Activities Procedures Approved by the Attorney General Pursuant to Executive Order 12333* (*ODNI Guidelines*) for the protection of US person information. NCTC has issued procedures to

---

[10] Executive Order 12333 defines a US person as a US citizen, an alien known by the intelligence element concerned to be a permanent resident alien, an unincorporated association substantially composed of US citizens or permanent resident aliens, or a corporation incorporated in the United States, except for a corporation directed and controlled by a foreign government or governments.

[11] The *Intelligence Oversight Guidelines* are available via: www.dhs.gov/publication/office-intelligence-and-analysis-intellience-oversight-program-and-guidelines.

implement the *ODNI Guidelines* requirements and established additional prudential safeguards to inform the Center's support to the FBI and DHS in this area. These safeguards include prior supervisory approval and completion of training on domestic counterterrorism authorities prior to undertaking queries designed to retrieve domestic counterterrorism intelligence.

Consistent with Congressional direction, NCTC's support to the FBI and DHS focuses on transnational threats and trends, and when assessing individual actors to identify any connections to international or transnational terrorism, NCTC relies on FBI and DHS determinations of whether specific individuals are DVEs. Legal, privacy, civil rights, and civil liberties officers advise on all aspects of NCTC's support to the FBI and DHS related to domestic violent extremism. NCTC is not authorized to and does not collect, access, obtain, or maintain information concerning US persons solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States.

### Training or Resources Provided to Federal, State, Local, and Tribal Law Enforcement Agencies

The FBI takes a leadership role in identifying and addressing emerging threats and, as such, actively engages with its federal and SLTT law enforcement partners through the JTTFs. The FBI shares and encourages the sharing of intelligence and participates in multi-agency command posts to ensure maximum coordination. In order to proactively address threats, especially during ongoing incidents, the FBI has developed and shared best practices that are implemented across the nation.

The FBI's Behavioral Threat Assessment Center (BTAC), housed within the FBI's Critical Incident Response Group, supports the FBI JTTFs, as well as state and local law enforcement partners by providing operational support in the form of tailored threat management strategies in complex threat and terrorism investigations. The BTAC is the only national-level, multi-agency, multidisciplinary federal task force focused on the prevention of terrorism and targeted violence through the application of behaviorally-based operational support, training, and research. The BTAC trains internally and externally on lessons learned from operational experience and research to better inform violence prevention efforts. The BTAC is leading an unfunded national Threat Assessment and Threat Management (TATM) initiative to organize, coordinate, and synchronize the FBI's enterprise-wide strategy to incorporate TATM principles, which endeavors to build operational response capabilities within all FBI Field Offices and develop stronger partnerships across all levels of government, with local mental health practitioners, and other relevant stakeholders in an effort to prevent acts of terrorism and targeted violence.

Since 2018, the FBI's BTAC has established designated Threat Management Coordinators (TMCs) in each Field Office, provided advanced training to 115 TMCs, hosted a Mental Health Practitioners Conference to inform and educate FBI mental health partners on TATM-related topics, and commenced training of FBI Task Force Officers to work as liaison counterparts within state and local governments. The BTAC and local Field Office TMCs have identified 12 active local or regional TATM teams with FBI participation, and an additional five FBI-led TATM teams. The 12 local/regional teams are in/around and have participation from FBI Field

Offices in Baltimore, Buffalo, Las Vegas, Los Angeles, Miami, Minneapolis, New Haven, New York, Phoenix, Pittsburgh, San Antonio, and Washington, DC; the five FBI-led teams are run by the FBI Boston, Denver, Honolulu, Oklahoma City, and Philadelphia Field Offices. There has been great interest from the FBI Field Offices on helping establish and support local/regional teams. Given this interest, we expect these local/regional TATM teams to increase in 2023. In addition, during 2022 the FBI established the Behavioral Analysis Unit-Counterterrorism Division Threat Management Alliance, which aims to expand implementation of the BTAC's TATM initiative to mitigate terrorism threats, particularly in relation to challenging investigations involving subjects who are juveniles, young adults, or persons with severe mental health challenges.

In 2021, the FBI, DHS I&A, and NCTC jointly updated the booklet, *US Violent Extremist Mobilization Indicators*, which contains observable indicators to help bystanders or observers recognize behaviors that may indicate mobilization to violence. Unlike prior editions – which focused entirely on foreign terrorist-inspired, homegrown violent extremists – the 2021 edition was expanded to include indicators that apply across US-based ideologically motivated violent extremists, including indicators validated as relevant for DVEs.[12] The booklet was published to help law enforcement and first responder partners and the public at large recognize potentially dangerous behaviors that may indicate individuals are preparing to engage in violent extremist activities. It is important to note some behavioral indicators may relate to constitutionally-protected or otherwise lawful activities. Law enforcement action should never be taken solely on the basis of constitutionally-protected activities; therefore, the FBI considers the totality of the circumstances in determining whether there is a lawful basis for investigative activity.

The FBI also maintains the eGuardian system as a resource to facilitate sharing of suspicious activity reports for terrorism or other threat-related information by federal and SLTT law enforcement agencies, to include 80 state and local fusion centers and the Department of Defense. Partners in all 50 states, four US Territories, and the District of Columbia currently use eGuardian.

Specific to formalized training, the FBI offers the Counterterrorism Baseline Operational Learning Tool (CT BOLT) course to all new counterterrorism employees, including Task Force Officers supporting the JTTFs. In addition to operational training and instruction, the course provides training on applicable privacy and civil liberties law and policy and the fundamentals of protecting First Amendment rights during the course of FBI investigations. The FBI conducts the CT BOLT course on a monthly basis and, during 2022, more than 220 students completed the course.

DHS I&A's National Threat Evaluation and Reporting (NTER) program, established in 2019, provides law enforcement and homeland security partners with resources and training to assist in identifying and preventing targeted violence and mass casualty incidents, including terrorism. NTER leads the Nationwide Suspicious Activity Reporting (SAR) Initiative, which assists partners in identifying, reporting, and sharing suspicious activity. Additionally, NTER's Master

---

[12] The 2021 edition served as an update to a prior version published in 2019, and it was published on the ODNI's public website.

Trainer Program trains federal and SLTT partners in behavioral threat assessment and management techniques to assist local communities in implementing a behavioral approach to violence prevention by identifying and assessing risk and warning signs, and managing potential threat of future, targeted violence, regardless of motive.

The DHS Office for State and Local Law Enforcement (OSLLE) is a headquarters-level organization created on the recommendation of the 9/11 Commission. OSLLE's mission is to lead DHS coordination, liaison, and advocacy for SLTT and campus law enforcement by building and cultivating strong partnerships. The office executes its mission by sharing timely and pertinent information and resources with SLTT and campus partners; advising the Secretary and DHS components on the issues, concerns, and recommendations of SLTT and campus law enforcement during policy, program, and initiative development; and ensuring that DHS law enforcement and terrorism focused grants are appropriately focused on terrorism prevention activities. To efficiently and effectively share many of the resources readily available to SLTT and campus law enforcement, including training and grant opportunities, OSLLE maintains the *DHS Law Enforcement Resource Guide*,[13] and works to share these resources with SLTT campus law enforcement and other related stakeholders through various forums. When a SLTT and campus law enforcement request for resources cannot be fulfilled by existing DHS resources, OSLLE works with intra- and interagency partners to develop customized solutions.

The US Secret Service National Threat Assessment Center (NTAC), within DHS, is authorized by the Presidential Threat Protection Act of 2000[14] to conduct research, training, and consultation on threat assessment and the prevention of targeted violence. NTAC is comprised of a multidisciplinary team of social science researchers and regional program managers who support and empower our partners in law enforcement, schools, government, and other public and private sector organizations to combat the ever-evolving threat of targeted violence impacting communities across the United States. NTAC publishes operationally relevant research examining all forms of targeted violence and produces guides for establishing proactive, targeted violence prevention programs. NTAC staff provide training on threat assessment and the prevention of targeted violence, by request, to public safety audiences, which often include SLTT law enforcement, schools, universities, and other agencies and organizations with public safety responsibilities. NTAC is authorized to provide consultation on the development of threat assessment policies and protocols, as well as on complex threat assessment cases.

## VI.  Data on Domestic Terrorism

The Act calls for annual updates to the following data and information, and this report provides an annual update, to include data and information for FY 2022:[15]

- For each completed or attempted DT incident that has occurred in the United States: a description of such incident; the date and location of such incident; the number and type of completed and attempted federal nonviolent crimes committed during such incident; the

---

[13] The *DHS Law Enforcement Resource Guide* is available via: https://www.dhs.gov/sites/default/files/2023-01/23_0126_OSLLE_LE-resource-guide-signed_508.pdf.
[14] Public Law 106-544, enacted 19 December 2000.
[15] For data related to investigations, DHS defers to the FBI.

number and type of federal and state property crimes committed during such incident, including an estimate of economic damages resulting from such crimes; and the number and type of completed and attempted federal violent crimes committed during such incident, including the number of people killed or injured as a result of such crimes.

- An identification of each assessment,[16] preliminary investigation, full investigation, and enterprise investigation with a nexus to DT opened, pending, or closed by the FBI; and the number of assessments, preliminary investigations, full investigations, and enterprise investigations associated with each DT investigative classification.

- The number of assessments, preliminary investigations, full investigations, and enterprise investigations with a nexus to DT initiated as a result of a referral or investigation by a federal, SLTT, or foreign government of a hate crime.

- The number of federal criminal charges with a nexus to DT, including the number of indictments and complaints associated with each DT investigative classification; a summary of the allegations in each such indictment; the disposition of the prosecution; and, if applicable, the sentence imposed as a result of a conviction on such charges.

- Referrals of DT incidents by or to SLTT or foreign governments, to or by departments or agencies of the federal government, for investigation or prosecution, including the number of such referrals associated with each DT investigative classification, and a summary of each such referral that includes the rationale for such referral and the disposition of the applicable federal investigation or prosecution.

- The number of intelligence products associated with each DT investigative classification.

- With respect to the FBI, the number of staff working on DT matters and a summary of time utilization by and recordkeeping data for personnel working on such matters, including the number or percentage of such personnel associated with each DT investigative classification in the FBI's Headquarters Operational Divisions and Field Divisions.

- With respect to DHS I&A, the number of staff working on DT matters.

- With respect to NCTC, the number of staff working on DT matters and the applicable legal authorities relating to the activities of such staff.

### *Completed or Attempted DT Incidents in the United States*

Appendix A provides information that represents significant DT incidents and disrupted plots that have occurred in the United States during FY 2022. Many DT incidents are rooted in state and local level criminal activity. While the FBI and DHS I&A make every effort to document

---

[16] An assessment is an investigative activity, which requires an authorized purpose and articulated objective(s). Assessments may be carried out to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence.

lethal and non-lethal DT incidents, there is currently no mandatory incident reporting requirement for reporting these incidents by SLTT law enforcement to the federal government. As such, some DT incidents likely go unreported by other law enforcement agencies, which makes it difficult for the FBI and DHS I&A to identify every DT incident that has occurred in the United States.

### *Identification and Number of Each FBI Investigation in the DT Program*

As of the end of FY 2022, the FBI's DT Program included approximately 2,700 pending investigations. Approximately half of the FY 2022 investigations were directly related to the unlawful activities during the January 2021 breach of the US Capitol. The following table presents the percentage breakout of investigations within the FBI's DT Program by investigative case classification as of the end of FY 2022.

| Percentage Breakout of Investigations within the FBI's Domestic Terrorism Program, by Investigative Case Classification | |
|---|---|
| Investigative Classification | End of FY 2022 |
| Racially or Ethnically Motivated Violent Extremism | 19% |
| Anti-Government or Anti-Authority Violent Extremism | 31% |
| Animal Rights or Environmental Violent Extremism | 1% |
| Abortion-Related Violent Extremism | 1% |
| All Other DT Threats | 13% |
| Anti-Riot Laws/Civil Unrest* | 35% |

*Non-DT threat category case classifications that are covered under the DT Program

### *Identification of FBI DT Assessments and Investigations as a Result of a Hate Crime*

Hate crimes and DT are not mutually exclusive. A hate crime is targeted violence motivated by the offender's bias against a person's actual or perceived characteristics, while a DT incident involves acts dangerous to human life that are in violation of criminal laws and in furtherance of a social or political goal. The FBI's Domestic Terrorism-Hate Crimes Fusion Cell helps to address the intersection of the FBI counterterrorism and criminal investigative missions to combat DT and provide justice to those who are victims of hate crimes.

The Hate Crime Statistics Program of the FBI's Uniform Crime Reporting (UCR) Program collects data regarding criminal offenses motivated, in whole or in part, by the offender's bias against a person's actual or perceived race/ethnicity, gender, gender identity, religion, disability, or sexual orientation, and committed against persons, property, or society. The FBI publishes an annual report of hate crime statistics and, in 2021, law enforcement agencies participating in the UCR Program reported 9,065 hate crime incidents.[17]

---

[17] The FBI's *Hate Crime Statistics, 2021*, released Fall 2022, and updated in March 2023. As of the date of this report, the FBI has not yet published the annual report for 2022.

While the FBI collects and reports hate crime statistics, there is no mandatory reporting requirement to identify hate crime incidents that are also considered criminal activity that appears motivated by a political and/or social goal consistent with the DT threat categories. In instances of a potential hate crime, the FBI opens a civil rights investigation. If throughout the investigation a DT ideology is identified, the Criminal Investigative Division and Counterterrorism Division work together through the Domestic Terrorism-Hate Crimes Fusion Cell to determine the best path forward. This may include, but is not limited to, converting the investigation to a DT case, assigning a DT agent to the case, or developing regular communication between the two programs. In cases involving DVEs where a potential hate crime is identified, the Counterterrorism Division's DT Program coordinates with the Criminal Investigative Division's Civil Rights Program and the local USAO to assess the potential for a hate crimes charge. In certain instances, based on the specific context of the investigation, parallel DT and hate crimes cases are opened.

### Number of Federal Charges with a DT Nexus

A litany of federal and state charges are used to charge DT subjects for applicable criminal violations. Federal charges include those related to weapons, explosives, threats, attacks on federal officials or facilities, hate crimes, arson, violence against animal enterprises, and material support to terrorists. Under 18 USC § 2339A, it is a crime to provide material support or resources to another knowing or intending they will be used in preparation for or carrying out certain terrorism-related offenses. Unlike a violation of 18 USC § 2339B, the recipient of material support need not be a designated foreign terrorist organization.

In FY 2022, the FBI, often in coordination with partner agencies, arrested over 400 subjects included within the domestic terrorism program.

Individuals whose conduct involves DT or a threat thereof may be prosecuted by any USAO under a wide range of criminal statutes, some of which on their face relate to DT, and others of which do not.[18] While the criminal code includes a definition of DT, *see* 18 USC § 2331(5), there is no standalone federal DT statute. For example, the DOJ has prosecuted cases against such individuals using weapons charges, e.g., 18 USC §§ 922, 924; charges relating to use or possession of destructive devices, e.g., 26 USC §§ 5845, 5861;[19] threat, hoax, or riot charges, e.g., 18 USC §§ 871, 875, 876, 1038, 2101; and charges proscribing attacks on federal officials or facilities, e.g., id. § 111, 115, 351, 844, 930, 1114, 1361, 1751. DOJ has also prosecuted cases involving DT using the material support to terrorist activity statute at 18 USC § 2339A. Hate crimes charges, e.g., id. § 249, may be appropriate where individuals engage in DT that is motivated by biases against a race, religion, ethnicity, or other specified factors. However, not all hate crimes cases involve DT. Arson, id. § 844, or specific charges relating to violence against

---

[18] Several statutes reach conduct that may be associated with terrorism, without regard to whether the offense itself involves domestic or international terrorism. These include statutes relating to aircraft sabotage, id. § 32; weapons of mass destruction, e.g., id. §§ 175, 175b, 175c, 229, 831, 832, 2332a, 2332h, 2332i; arson and bombing of federal property, e.g., id. §§ 844, 2332a, 2332f; and causing injury or death to a federal official, e.g. id. §§ 111, 115, 351, 1114, 1751; among others. It is also a crime to provide material support or resources to another knowing or intending that they be used in preparation for or carrying out certain terrorism-related offenses. Id. § 2339A.

[19] Offenses under the Gun Control Act of 1968 and National Firearms Act of 1934 are primarily investigated and enforced by DOJ's Bureau of Alcohol, Tobacco, Firearms and Explosives.

animal enterprises, id. § 43, may apply to animal rights or environmental violent extremists. In some cases, drug trafficking, tax, or state and local charges could also provide a lawful basis to disrupt an individual believed to be planning or pursuing acts of DT. Finally, in some DT cases, DOJ seeks the use of the terrorism sentencing enhancement.[20]

DOJ recognizes the need for coordination and consistency in DOJ and FBI efforts to hold accountable DVEs who engage in criminal conduct. An important part of achieving those goals is to have the ability to identify and internally track investigations and prosecutions involving conduct related to domestic violent extremism, and the Department is implementing changes that will allow us to better identify and track such cases. In March 2021, the Acting Deputy Attorney General issued guidance to all USAOs to provide information to NSD on DT investigations and prosecutions. This directive not only highlighted the need for effective coordination, but also implemented a plan for better tracking of the important DVE-related work being done by federal investigators and prosecutors around the country. In November 2022, an update to the Justice Manual codified these notification and coordination requirements and made additional changes to promote consistency and appropriate coordination and oversight of DVE-related matters.

### Referrals of DT Incidents to the FBI

The eGuardian system is the FBI's case management system for handling suspicious activity reports from federal and SLTT law enforcement agencies and the Department of Defense related to counterterrorism, counterintelligence, cyber incidents, criminal complaints, and weapons of mass destruction. These reports are then migrated to the FBI's internal Guardian system where they are further evaluated by the appropriate squad or JTTF for any action deemed necessary.

In FY 2022, the FBI had approximately 5,772 total Guardians on possible DT incidents. In FY 2022, the FBI received approximately 3,440 referrals of possible DT incidents from federal and/or SLTT partners. In FY 2022, the FBI referred approximately 1,118 possible DT incidents to federal and/or SLTT partners. The FBI refers incidents to partner agencies for multiple reasons. For example, the incident may not have a federal criminal nexus or the incident may be the statutory responsibility of another law enforcement organization. In addition, the FBI may refer an incident to a partner agency, but continue to investigate the incident jointly. In FY 2022, the FBI converted approximately 394 Guardians on possible DT incidents to preliminary or full investigations.

### DT Intelligence Products

During FY 2022, the FBI produced approximately 3,000 DT-related intelligence products. A single intelligence product often contains threat reporting or case information from subjects associated with multiple investigative classifications and, as such, the FBI does not have the data to determine the number of intelligence products associated with each DT investigative

---

[20] The Sentencing Guidelines provide a significant sentencing enhancement for offenses that involve, or are intended to promote, a "federal crime of terrorism" – often increasing the guideline range to the statutory maximum. See USSG § 3A1.4. "The Sentencing Guidelines also provide for a similar upward departure for other offenses that were calculated to influence or affect the conduct of government by intimidation or coercion, to retaliate against government conduct, or to intimidate or coerce a civilian population." See id. cmt. n.4.

classification. FBI intelligence products incorporate collection, domain, targeting, or threat analysis and are written at the tactical, operational, and strategic levels. FBI intelligence products are prepared for both internal and external audiences.

During FY 2022, DHS I&A produced over 200 DT-related raw intelligence reports (IIRs, Open Source Intelligence Reports, and Field Intelligence Reports) and produced, jointly produced, or contributed to approximately 100 finished intelligence products related to DT, with the majority of these products released at the Unclassified//FOUO level to better inform SLTT partners. The finished intelligence products are available to appropriate Congressional partners via CapNet.

In NCTC's support role to FBI and DHS on DT, the Center regularly partnered during FY 2022 with these organizations on joint analytic products related to this topic – particularly as part of the FBI-DHS-NCTC JAC. The JAC particularly focused on publishing broad, strategic analytic products on DT trends.

### *Number of Staff Working DT Matters*

One of the FBI's most vital assets in the counterterrorism fight is our ability to remain agile in combatting the threats we face. Staffing for the FBI's counterterrorism mission is aligned based on threat priorities and, as is true across the FBI, can and does realign in response to the evolution of the threats and any critical incidents.

The front line of the counterterrorism mission in the United States is represented by the FBI-led JTTFs, which investigate both DT and IT matters. The FBI leads approximately 56 JTTFs spanning over 100 locations nationwide and across all 56 Field Offices, including our satellite Resident Agencies, with participation of over 50 federal and over 500 SLTT agencies. The JTTFs are comprised of approximately 4,400 investigators, including FBI special agents and task force officers, and additional analysts and professional staff who support these JTTF members and the investigations they lead. The JTTF partnerships at the federal and SLTT levels are force multipliers leveraging local expertise, experience, and resources in FBI counterterrorism investigations.

In FBI Field Offices, squads are dedicated to the counterterrorism mission and not necessarily assigned specifically to investigate DT or IT matters. This is significant because the motivation behind an alleged threat or act of terrorism may not be immediately apparent. Additionally, when an incident occurs, Field Office personnel from all operational programs – for example, criminal or counterintelligence – may respond.

Similar to our posture against the IT threat, the FBI's Counterterrorism Division at Headquarters has a dedicated Domestic Terrorism Operations Section (DTOS), comprised of special agents, intelligence analysts, and professional staff. The FBI's DTOS oversees and provides operational and tactical intelligence support to all 56 Field Offices and their Resident Agencies in investigating the use of violence by individuals to further political and/or social goals in violation of federal criminal statutes. The DTOS oversees the Domestic Terrorism-Hate Crimes Fusion Cell, which creates more opportunities for investigative creativity, provides multi-program

coordination, helps ensure seamless information sharing, and enhances investigative resources to combat the DT threat.

The FBI's Counterterrorism Division also has specialized intelligence and targeting units that work to combat DT specifically, as well as additional units that provide support across the FBI's counterterrorism mission, not exclusive to DT or IT matters. The FBI conducts national-level strategic analysis of the DT threat through the Counterterrorism Analysis Section. This dedicated body of intelligence analysts focuses on providing strategic assessments of the IT and DT threat and actively works with DHS and NCTC to provide accurate intelligence on the threat picture. Further, all FBI counterterrorism investigations are led by Counterterrorism Division Deputy Assistant Directors, who have unique vantage points from which to assess the terrorism threat around the globe and prioritize investigations and operations across the country. Additionally, the FBI's Office of the General Counsel employs in-house attorneys within the National Security and Cyber Law Branch that are dedicated to providing legal assistance on DT operations at FBI Headquarters. This aligns with the legal counsel represented in all 56 FBI Field Offices.

As indicated above, DOJ/NSD also recently established a Domestic Terrorism Unit within the CTS with several functions: prosecuting and coordinating DT cases, developing training and policies on DT matters, and supporting the work of the Department in implementing a whole-of-government strategy on countering DT. The Department believes that this change best enables us to respond to the evolving and persistent DT threat.

DHS I&A's Counterterrorism Mission Center (CTMC) leads I&A's analysis of DT issues. CTMC provides intelligence support and analysis that focuses on domestic threat actors, including DVEs, consistent with the Department's statutory charges to identify priorities for protective and support measures regarding terrorist and other threats to homeland security. In 2021, DHS I&A created a Domestic Terrorism Branch, housed within CTMC, consisting of intelligence personnel solely dedicated to focusing on the DT landscape. These analysts have enabled DHS I&A to increase its production and sharing of information on DT threats, engagement with FBI and NCTC counterparts to jointly author strategic DT intelligence products, briefings to government and private sector customers, and interactions with subject matter experts outside government. This branch currently consists of ten full time DHS intelligence analysts and one manager. Additionally, DHS I&A maintains a presence at state and major urban area fusion centers through its Office of Regional Intelligence,[21] and DHS I&A analysts at DHS Headquarters work with those individuals to author joint products and share threat-related information on issues relevant to their regions, including domestic violent extremism and physical threats to critical infrastructure.

In addition, DHS I&A maintains the Open Source Intelligence Division with a branch of open source collection officers that research and report on publicly available information sources online within the DT space, consistent with I&A's *Intelligence Oversight Guidelines*.

DHS I&A's Office of Regional Intelligence has over 130 personnel deployed to field locations across the United States, primarily in state and major urban area fusion centers. These officers

---

[21] The Office of Regional Intelligence was formerly the Field Operations Division.

work across a range of threat issues and actors, including the DVE mission space. DHS I&A's field-deployed intelligence officers collect and report intelligence information in serialized raw intelligence reports and provide regionally-focused analysis, which may include DVE topics.

DHS I&A's Engagement and Liaison Office has one person detailed to FBI Headquarters to serve as the senior DHS Intelligence representative to the FBI responsible for improving the multi-directional information flow by meeting mutual intelligence needs of the Department and FBI. The Liaison Officer works across a range of threat issues and actors, including the DVE mission space.

All of the DHS staff mentioned are specific to DHS I&A, in accordance with reporting requirements. Similar to FBI, DHS added personnel and resources to counter DT in response to the evolution of the threat and to support implementation of the June 2021 *National Strategy for Countering Domestic Terrorism*. These personnel span the breadth and depth of the DHS mission set, including but not limited to DHS representatives to JTTFs. DHS is the largest and longest standing federal contributor to the JTTFs nationwide and those personnel are closely involved with countering DT through the JTTFs.

While NCTC's primary missions are focused on the threat posed by IT, the Center provides domestic counterterrorism support, where appropriate and consistent with Congressional direction, to the FBI and DHS, which are the lead domestic counterterrorism agencies. NCTC identifies and monitors international and transnational trends across a range of violent extremist actors and looks for and analyzes transnational linkages. NCTC defers to the FBI and DHS regarding assessments of the overall threat posed by DVEs and determinations of whether specific individuals are DVEs. NCTC does not have analysts focused exclusively on domestic violent extremism threats.

## VII. Recommendations

The Act requires the Director of the FBI and the Secretary of Homeland Security, in consultation with the DNI, to jointly submit to the appropriate Congressional committees a report on DT containing recommendations with respect to the need to change authorities, roles, resources, or responsibilities within the federal government to more effectively prevent and counter DT activities, and measures necessary to ensure the protection of privacy and civil liberties.

### Implementation of the National Strategy for Countering Domestic Terrorism

In June 2021, the White House released the first-ever *National Strategy for Countering Domestic Terrorism*, which provides a government-wide strategy to counter domestic violent extremism. The national strategy references the March 2021, US Intelligence Community intelligence assessment titled, *Domestic Violent Extremism Poses Heightened Threat in 2021*, and lays out a comprehensive strategy to address the DT threat, building on a foundation of US Government collaboration on programmatic aspects of countering DT – such as information sharing, training, prevention, and intervention efforts – while fostering a broader community that extends beyond the US Government to critical partners. The national strategy also reinforces the US Government's commitment to approaching this important work while avoiding unlawful

discrimination, bias, and stereotyping and the protection of American civil rights and civil liberties, including preserving and safeguarding constitutionally protected freedom of speech and association, while focusing on addressing unlawful violence. The strategy also includes prevention efforts to enhance community resilience against DT and the provision of available resources.

The FBI and DHS, with support from NCTC, remain dedicated to working with our partners on the effective implementation of the national strategy and continue to evolve our response to this threat.

As part of the national strategy, the FBI has increased intelligence production regarding the DT threat; continued to develop and implement TATM teams throughout the country; enhanced engagement with private sector partners; and developed and provided unclassified resources – such as the *US Violent Extremist Mobilization Indicators* booklet, which was jointly developed with DHS and NCTC – to multiple audiences, including law enforcement partners, first responders, and the American public.

Importantly, DHS plays a key role in this whole-of-government effort, and DHS I&A has undertaken a number of actions and initiatives to support the national strategy, in line with broader Departmental efforts. As noted above, in 2021, DHS I&A established a Domestic Terrorism Branch solely focused on analyzing threats from domestic violent extremism. Since January 2021, DHS I&A also regularly delivered in-person and virtual briefings to a variety of partners regarding the DVE movements and various trends impacting homeland security, and DHS I&A contributed to the development of seven National Terrorism Advisory System bulletins, which provide the public awareness of the current threat environment in the Homeland.

DHS continues to enhance the role of its Counterterrorism (CT) Coordinator. As the principal counterterrorism official at DHS, the CT Coordinator is responsible for the Department's counterterrorism-related activities ensuring they are appropriately developed, coordinated, integrated, aligned, and implemented.

DHS's Center for Prevention Programs and Partnerships (CP3) also continues to expand its efforts to prevent terrorism and targeted violence by providing partners at the state and local level with tools to prevent violence. Through technical, financial, and educational assistance, CP3 is leveraging community-based partnerships to enhance local capabilities and help ensure individuals receive help before they radicalize to violence. CP3 also partners with DHS's Federal Emergency Management Agency to administer the Targeted Violence and Terrorism Prevention (TVTP) Grants Program, which provides funding to enhance and expand prevention capabilities. The TVTP grant program complements existing programs that enhance the preparedness of our nation, including the Nonprofit Security Grant Program which provides support for target hardening and other physical security enhancements at nonprofit organizations, as well as the State Homeland Security Program and Urban Area Security Initiative grant programs, which have prioritized combatting domestic violent extremism as a "National Priority Area" in both FY 2021 and FY 2022.

DHS's Office for Civil Rights and Civil Liberties (CRCL) conducts extensive engagement with diverse communities across the country, including communities threatened by targeted violence, and frequently facilitates direct engagement between senior DHS leadership and these communities. CRCL partners with DOJ and other federal agencies to provide information to communities on federal efforts to prevent violent extremism and hear directly from communities about concerns they need to address. Trusted partnerships built as a result of these CRCL engagements enable DHS to work closely with diverse communities on DT prevention efforts.

### Legislative Initiatives

DOJ continually assesses whether additional legislative authorities would improve our efforts to combat DT and other national security threats. The FBI is actively working with DOJ on some broader legislative initiatives that can benefit both federal investigations and prosecutions, including those relating to DT. For example, there are ongoing discussions about adjusting legislation in response to the challenges in disrupting juvenile threat actors via federal law enforcement actions. We will inform and work with the Congress and the Office of Management and Budget in the event we identify any critical gaps in our authorities that may negatively impact our ability to accomplish our mission.

### Resource Enhancements

To close the gaps in the FBI's ability to disrupt and deter DT threats, the DOJ and FBI have continuously engaged with Congress and the Office of Management and Budget to appropriately allocate resources towards combatting the DT threat.

Meanwhile, DHS is committed to expanding its ability to collect domestic violent extremism information obtained overtly or from publicly available sources, consistent with its authorities, while simultaneously safeguarding privacy, civil rights, and civil liberties of all persons. We are enhancing DHS's ability to rapidly analyze and communicate DT threats and inform policymakers' and its homeland security partners' decisions and actions, designed to prevent acts of terrorism and targeted violence.

**Appendix A**

## Significant Domestic Terrorism Incidents in the United States from Fiscal Year 2022[22]

This appendix includes domestic terrorism (DT) incidents from fiscal year 2022 that FBI and DHS Office of Intelligence and Analysis identify as significant, including high-profile attacks, plots, threats of violence, arrests, and disruptions. To be considered a DT incident, the incident must involve the use or threat of force or violence, have the potential for a federal violation, and appear intended to further social or political goals. These incidents are typically investigated by the FBI for a variety of potential federal criminal activities, including hate crimes, and/or

---

[22] Unless otherwise noted, some of these matters are active/pending. All defendants are presumed innocent unless and until proven guilty in a court of law.

investigated by state and local law enforcement for criminal violations in their respective jurisdictions.

| Date and Location | Description |
|---|---|
| October 2021: Missouri | Two anarchist violent extremists (AVEs) were convicted and sentenced to prison related to their June 2020 attempt to set fire to a convenience store during the 2020 civil disorder. In September 2021, one AVE pleaded guilty to a federal charge of possessing a firearm as a convicted felon and intentionally demonstrating a technique that would be unlawfully employed in furtherance of a civil disorder and was sentenced to 36 months in prison. In October 2021, the second AVE was arrested on a federal charge of conspiracy to commit arson, and in February 2022, the AVE pleaded guilty. In August 2022, the AVE was sentenced to 27 months in prison. |
| October 2021: Michigan | Approximately 10 masked individuals claiming association with environmental groups broke into a pipeline facility and used tools and equipment to close an emergency shut-off valve on the pipeline. The event was livestreamed and posted to multiple social media accounts. This incident remains under investigation as potential environmental violent extremism. |
| November 2021: Arkansas | Four racially or ethnically motivated violent extremists (RMVEs) were arrested and federally charged with unlawful possession of, and conspiracy to sell, a firearm to a prohibited person. This case is pending. |
| November 2021: Ohio | An RMVE was arrested and federally charged with possession of a firearm by a convicted felon. This arrest disrupted the movement of illegally purchased firearms to numerous individuals, some of whom are known felons. In April 2023, the RMVE pleaded guilty, and is awaiting sentencing. |
| November 2021: Virginia | An RMVE was arrested and federally charged with possession of a firearm by an unlawful user of controlled substances. In January 2022, the RMVE pleaded guilty and in July 2022, was sentenced to four years and nine months in prison. |
| November 2021: Pennsylvania | An AVE was arrested and federally charged with interstate threats after placing telephone calls threatening violence against law enforcement officers following an officer involved shooting. In March 2022, the AVE pleaded guilty, and in June 2022, was sentenced to seven months time served. |
| November 2021: New York | An RMVE was arrested and federally charged with unlawful possession of a firearm and ammunition by a convicted felon. This case is pending. |
| December 2021: Washington | An AVE was arrested and federally charged with unlawful possession of destructive devices in connection with a September 2020 plot to burn the Seattle Police Officers Guild building. In September 2022, the AVE pleaded guilty, and is awaiting sentencing. |
| December 2021 and January 2022: Washington | Two militia violent extremists (MVEs) were arrested and federally charged with conspiracy to make or possess an unregistered destructive device, which they planned to use to attack law enforcement officers. In March 2023, both MVEs pleaded guilty, and are awaiting sentencing. |

| | |
|---|---|
| January 2022:<br>Texas | An MVE, who identifies as the founder and leader of the Oath Keepers, was arrested and federally charged with seditious conspiracy and other charges related to the breach of the US Capitol on 6 January 2021. In November 2022, the MVE was found guilty, and in May 2023, was sentenced to 18 years in prison. |
| January 2022:<br>North Carolina | An MVE was arrested and federally charged with teaching the making of an explosive device weapon of mass destruction for use in furtherance of a federal crime of violence and possession of unregistered firearms and destructive devices. The MVE owned a tactical training company and provided instructions for the manufacture and sale of improvised explosive devices. This case is pending. |
| January 2022:<br>Texas | An AVE was arrested and federally charged with attempt to destroy property that affects interstate or foreign commerce by means of explosive. The AVE attempted to detonate a device to damage or destroy a portion of a natural gas pipeline in Texas as part of his fight against capitalism and climate change. In October 2022, the AVE pleaded guilty, and in February 2023, was sentenced to five years in prison. |
| February 2022:<br>Alabama, Mississippi | Eight AVEs were arrested and federally charged with conspiracy to maliciously destroy by fire in connection with a series of fires set at four Walmart stores — two in Alabama and two in Mississippi — in May and June 2021. During 2022, all eight AVEs pleaded guilty. In May 2023, one was sentenced to 18 years; a second was sentenced to 15 years; and a third was sentenced to three years. In June 2023, two others were sentenced to four years; and the sixth was sentenced to two years. The remaining two AVEs are awaiting sentencing. |
| February 2022:<br>Florida | A DVE with a personalized ideology was arrested and federally charged with transmitting interstate threatening communications after posting a video online in February 2021, threatening to kill an FBI special agent attempting to interview the DVE in furtherance of an investigation into the 6 January 2021 breach of the US Capitol. In July 2022, the DVE was found guilty, and in April 2023, was sentenced to 18 months in prison. |
| March 2022:<br>New York | An anti-government or anti-authority violent extremist-other (AGAAVE-Other) was arrested and federally charged with transmitting interstate threatening communications after sending voicemails threatening violence against a member of Congress due to a dislike of public statements by the Congressperson. This case is pending. |
| April 2022:<br>New York | An RMVE was arrested and federally charged with committing a terrorist attack or other violence against a mass transportation vehicle after conducting a shooting attack on the New York City subway in Brooklyn, New York, resulting in dozens of gunshot wounds and other injuries. In January 2023, the RMVE pleaded guilty, and is awaiting sentencing. |

| | |
|---|---|
| April 2022: Utah | Two environmental violent extremists (EVEs) were arrested on state charges in connection with the May 2020 purposeful damaging or sabotaging of several pieces of heavy operating machines used in construction. Losses were estimated in excess of $500,000. In September 2022, one EVE pleaded guilty, and in November 2022, was sentenced to a suspended prison term of one to 15 years and 120 days of home confinement. In January 2023, the second EVE pleaded guilty, and in March 2023, was sentenced to a suspended prison term of one to 15 years, with one year prison. |
| April 2022: Oklahoma | An AVE was arrested and federally charged with illegal possession of a machine gun and possession of numerous firearms and ammunition by a convicted felon after making threatening statements to law enforcement. In July 2022, the AVE pleaded guilty, and is awaiting sentencing. |
| May 2022: New York | An RMVE was arrested on state charges following a mass shooting attack, which targeted victims because of their actual or perceived race or color, at a grocery store, and which killed 10 individuals and injured three others. The RMVE was subsequently federally charged with a hate crime resulting in death, use of a firearm to commit murder, and use and discharge of a firearm during and in relation to a crime of violence. The RMVE posted a manifesto on social media outlining violent extremist views, including self-identified white supremacist ideology, and livestreamed the shooting on social media. In November 2022, the RMVE pleaded guilty to state charges of murder motivated by hate, and is awaiting sentencing. The federal case is pending. |
| May 2022: Nevada | A sovereign citizen violent extremist (SCVE) was arrested and federally charged with prohibited person in possession of a firearm after threatening Douglas County court personnel — including a judge, defense attorney, district attorneys, and county sheriff -- in furtherance of his SCVE ideology. The SCVE filed false legal documents alleging violations of federal statutes, threatening the individuals with arrest and death. This case is pending. |
| May 2022: Illinois | An SCVE was arrested on state charges of aggravated battery to a peace officer and resisting arrest following a traffic stop during which the SCVE refused to recognize the authority of the law enforcement officers, proclaimed himself to be a "nationalist," and fought the officers while being extracted from the vehicle. In March 2023, the presiding judge in the state trial declared a mistrial with prejudice. |
| June 2022: Louisiana | An RMVE was arrested and federally charged with possession of firearms by a convicted felon. The RMVE posted threats to kill preachers on a social media platform, and was apparently motivated in part by violent interpretations of Black Hebrew Israelite teachings. This case is pending. |

| | |
|---|---|
| June 2022:<br>New York | An RMVE was arrested and federally charged with aiding and abetting the making of a false statement to a federal firearm licensee that was material to the lawfulness of the sale of a firearm and pertained to information required to be kept by the licensee in connection with purchase of a firearm, and conspiring to do the same. This case is pending. |
| June 2022:<br>Maryland | An abortion-related violent extremist (AbRVE) was arrested and federally charged with attempting to kidnap or murder a US Supreme Court Justice following the leak of a draft opinion in the US Supreme Court case, *Dobbs v. Jackson Women's Health Organization*, regarding federal abortion protections. This case is pending. |
| June 2022:<br>Oregon | An AVE was arrested on state charges for attempting to build a destructive device. The arrest followed information the AVE was constructing Molotov cocktails and may have been planning to use them at a protest; search warrants resulted in seizure of material consistent with manufacture of destructive devices. |
| June 2022:<br>Ohio | An RMVE was arrested on multiple federal charges related to making and selling untraceable homemade weapons using a 3D printer. While employed to provide security services at local synagogues and Jewish schools, the RMVE threatened to commit a shooting attack at a synagogue. Prior to the federal arrest, the RMVE was arrested by local law enforcement on state charges including making terroristic threats. In February 2023, the RMVE was sentenced in federal court to 71 months in prison, and was sentenced in county court to six years in prison, to be served concurrently with the federal term. |
| July 2022:<br>Texas | An MVE was arrested and federally charged with unlawful possession of a firearm by a felon. The MVE conducted armed patrols of the US-Mexico border. This case is pending |
| July 2022:<br>South Dakota | One or more unknown individuals fired multiple gunshots into a substation that powers the Keystone Pipeline. The damages resulted in lost production and physical property damage to the transformer and pump station. This incident remains under investigation as potential environmental violent extremism. |
| July 2022:<br>Tennessee | An AbRVE was arrested and federally charged with destruction of government property related to a drive-by shooting, which struck the windows of an occupied federal courthouse in Knoxville, Tennessee. The AbRVE also allegedly fired at and set fire to a reproductive health services facility. |
| July 2022:<br>Multiple states | A juvenile RMVE was formally petitioned after calling in a false active shooter threat to a middle school and making threatening calls and swatting incidents targeting historically Black colleges and universities. In October 2022, after pleading guilty to a state charge of conspiracy to make false threats, the RMVE was sentenced to nine months' probation, including a juvenile assessment, counseling, and behavior program. |

| | |
|---|---|
| August 2022: Oklahoma | Two alleged SCVEs were arrested and federally charged with kidnapping following the abduction of a minor and refusal to comply with law enforcement. In March 2023, the charges were dismissed without prejudice. |
| August 2022: Ohio | An AGAAVE-Other attempted to breach the FBI's Cincinnati Field Office with the intention of killing FBI personnel. The AGAAVE-Other fled the area and was fatally wounded after an hours-long standoff with law enforcement. |
| August 2022: Pennsylvania | An MVE was arrested and federally charged with making interstate threats and influencing or retaliating against a federal officer by threat for making threats of violence against the FBI following the FBI's execution of a federal search warrant at a former President's Florida home. In June 2023, the MVE pleaded guilty, and is awaiting sentencing. |
| August 2022: Pennsylvania | One or more unknown individuals vandalized construction vehicles in a state park and left warning signs that trees had been "spiked," and cutting the trees could result in damage or injury. This incident remains under investigation as potential anarchist violent extremism. |
| August 2022: Florida | An AGAAVE-Other was arrested and federally charged with mailing threatening communications after sending nine threatening letters to individuals who participated in, or were linked to, the 6 January 2021 breach of the US Capitol. In October 2022, the AGAAVE-Other pleaded guilty, and in February 2023, was sentenced to time served. |
| September 2022: North Carolina | An SCVE was arrested and federally charged with transmission of threats in interstate or foreign commerce after sending multiple purported "Writs of Execution," all of which threatened to arrest county officials, law enforcement, and others. In January 2023, the SCVE pleaded guilty, and is awaiting sentencing. |
| September 2022: North Carolina | An RMVE was arrested and federally charged with receiving, possessing, transferring, or manufacturing an unregistered firearm. In April 2023, the RMVE pleaded guilty, and is awaiting sentencing. |
| September 2022: Texas | An RMVE was arrested and federally charged with interstate threatening communications and threatening a federal officer after posting threatening statements against law enforcement officers, government officials, and racial and religious groups on a social media platform. In June 2023, the RMVE pleaded guilty, and is awaiting sentencing. |

**Appendix B**

SPECIAL ANALYSIS
JOINT ANALYTIC CELL

17 JUNE 2022



## (U) Wide-Ranging Domestic Violent Extremist Threat to Persist

(U) The Department of Homeland Security (DHS), Federal Bureau of Investigation (FBI), and National Counterterrorism Center (NCTC) assess that domestic violent extremists (DVEs) fueled by various evolving ideological and sociopolitical grievances pose a sustained threat of violence to the American public, democratic institutions, and government and law enforcement officials. Flashpoint events in the coming months may exacerbate these perceived grievances, further increasing the potential for DVE violence. DVEs adhering to different violent extremist ideologies have coalesced around anger at issues including perceived election fraud, as well as immigration and government responses to the COVID-19 pandemic, drawing on their varied perceptions of those issues. These factors, along with fluid conspiracy theories, have amplified longstanding DVE grievances, including perceptions of government and law enforcement overreach or oppression and shifts in US demographics and cultural values.

- (U) The mass shooting last month targeting Black people in Buffalo, New York, was allegedly perpetrated by a racially or ethnically motivated violent extremist (RMVE) driven by a belief in the superiority of the white race. The RMVE was charged with federal hate crimes and using a firearm to commit murder in June 2022. This attack underscores how RMVEs—who have been responsible for a majority of DVE-related deaths since 2010—pose a significant threat of lethal violence against civilians, particularly of racial, ethnic, and religious minorities.

- (U) The lethal threat from militia violent extremists (MVEs) remains elevated, primarily toward government and law enforcement personnel, as MVEs remain willing to use violence to redress perceived government overreach and other sociopolitical grievances, judging from an increase in MVE plotting, disruptions, and FBI investigations since 2020. Anarchist violent extremists (AVEs) present a threat of sporadic violent physical assaults and property crimes impacting the efficient operation of critical infrastructure; developments that heighten perceptions of inequality or social injustice might further embolden AVEs to commit acts of violence.

- (U) Several DVEs motivated by perceptions of fraud in the 2020 general election were arrested in 2021 and 2022 for plotting or threatening violence against federal, state, and local officials and political party representatives, highlighting the elevated threat posed to elected officials countrywide. In November 2021, a New York–based MVE was sentenced to 19 months in prison for threatening to assault and murder members of the US Congress.

- (U) A wide-ranging set of DVEs have shared their perceptions of government overreach on COVID-19 pandemic mitigation efforts and anger at government responses to immigration issues in person and online and have encouraged one another to act violently. Anger at the mitigation efforts of businesses and federal, state, and local governments motivated several DVE attacks, plots, and calls for violence against health care workers and mobile vaccine clinics in 2020 and 2021. In 2021, some DVEs visited the US–Mexico border with the intention of detaining those crossing into the United States.

(U) For the purpose of this assessment, DHS, FBI, and NCTC use the term DVE to refer to an individual based and operating primarily within the United States or its territories without direction or inspiration from a foreign terrorist group or other foreign power who seeks to further political or social goals, wholly or in part, through unlawful acts of force or violence. The mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics do not constitute domestic violent extremism and is constitutionally protected. DHS, FBI, and NCTC apply this term as appropriate within the scope of their respective authorities.

PAGE 1 of 1

AUTHORED by FBI, DHS, NCTC

UNCLASSIFIED

## SPECIAL ANALYSIS
JOINT ANALYTIC CELL

17 JUNE 2022





(U) Developments related to midterm elections, immigration, perceptions of government overreach or social injustice, and other flashpoint events will probably motivate some DVEs across ideologies to plot or attempt violence in the coming months. In the context of these events, some DVEs might promote or exploit the public prevalence of violent extremist narratives to encourage violence. DVE attackers and plotters are typically lone actors—individuals acting without the direct support of others—who plot or conduct attacks on soft targets using easily accessible weapons. The persistent difficulty of detecting threats from such actors underscores the value of the public's assistance in identifying people who might be mobilizing to violence and in reporting concerning behavior to authorities before violence occurs.

- (U) Heightened tensions surrounding the 2022 midterm election cycle will probably cause some DVEs to target political candidates, party offices, judges, election events, or poll workers because of their actual or perceived political affiliations, as several did in 2021. On 26 January 2021, FBI arrested a California-based MVE for allegedly threatening family members of a member of the US Congress and a journalist. The MVE was sentenced to three years in prison in December 2021.

- (U) Immigration-related developments, amplified by DVEs in violent extremist messaging, might spur DVEs to conduct planned or opportunistic violence. Historically, RMVEs—such as the Pittsburgh synagogue attacker in 2018 and the El Paso Walmart attacker in 2019—have conducted attacks motivated in part by immigration-related grievances, and MVEs have targeted perceived immigration-related threats to national security, including initiating armed border patrols with the intent of curbing illegal immigration, posing a potential risk to law enforcement and immigrants. AVEs have targeted US Immigration and Customs Enforcement (ICE) facilities in opposition to US Government immigration policies.

- (U) Even if perceptions of government overreach related to COVID-19 mitigation measures subside, some DVEs will probably continue adhering to evolving anti-government and conspiracy narratives that they adopted during the pandemic and might use to justify violence. Some DVE adherents to QAnon conspiracy theories continue to violently target a shifting array of individuals and entities that they accuse of perpetrating or enabling child abuse. Such conspiracy theories have led to threats or acts of violence, including against businesses, US Government buildings, public officials, and the transportation sector that significantly impacted their operations.

- (U) New legislation or US Supreme Court rulings that exacerbate DVEs' grievances or deepen their animosity toward perceived ideological opponents, including on high-salience issues such as abortion and gun rights, might result in increased threats of violence from a range of DVEs. Law enforcement involvement in the deaths of DVEs or like-minded people might also lead to calls for violence. Additionally, in 2020, some DVEs exploited lawful gatherings after law enforcement-involved deaths of unarmed African-Americans to engage in violence against ideological opponents and other targets.

Interstate

AUTHORED BY FBI DHS, NCTC

UNCLASSIFIED

UNCLASSIFIED

**SPECIAL ANALYSIS**
JOINT ANALYTIC CELL                                                                        17 JUNE 2022



**(U) RMVEs Motivated by Real or Perceived Racism and Injustice in American Society, the Desire for a Separate Black Homeland, and/or Violent Interpretations of Religious Teachings Will Probably Engage in Sporadic Violence**

(U) RMVEs who are motivated by perceptions of racial injustice in American society, the desire for a separate Black homeland, and/or violent interpretations of religious teachings will probably continue to commit intermittent acts of violence. This subset of RMVEs has historically targeted those they perceive as representing oppression, including government officials, law enforcement, and white people, as well as individuals and locations associated with Judaism. These RMVEs conducted 11 lethal attacks from 2010 to 2021, resulting in 25 fatalities.

- (U) On 23 June 2021, an RMVE allegedly used his interpretations of Black Hebrew Israelite religious teachings to justify violence and shot to death a law enforcement officer in Daytona Beach, Florida. The suspect has been charged with capital murder and is awaiting trial.

- (U) In December 2019, an RMVE allegedly motivated by antisemitism and his interpretations of Black Hebrew Israelite religious teachings attacked the home of a Hasidic rabbi in New York during a Hanukkah celebration, wounding five people, one of whom later died. In the same month, two RMVEs with similar motivations fatally shot a local law enforcement officer at a cemetery in New Jersey and attacked a nearby kosher supermarket, killing three people and injuring several others. Both RMVEs were fatally wounded during an encounter with responding law enforcement officers.

- (U) RMVEs conducted attacks on law enforcement in the weeks after the officer-involved shooting deaths of two African Americans in Louisiana and Minnesota in July 2016. On 7 July 2016, a now-deceased RMVE motivated by incidents of actual or perceived police brutality ambushed and shot 11 law enforcement officers, killing five, in Dallas, Texas. On 17 July 2016, a now-deceased RMVE with similar motivations ambushed and shot six law enforcement officers, killing three, in Baton Rouge, Louisiana.

## (U) Anti-Government or Anti-Authority Violent Extremism

**(U) MVEs Pose Heightened Lethal Threat to Law Enforcement and Symbols of Government**

(U) The lethal threat level from MVEs to law enforcement and government personnel will almost certainly remain elevated in the coming months because some of these actors are willing to use violence to redress perceived government overreach and other sociopolitical issues. Some MVEs will almost certainly continue to harbor grievances over their perceptions of fraud during the 2020 election and government measures related to the COVID-19 pandemic. Some MVEs might also mobilize to violence in response to the enactment of any legislation that they perceive as restricting access to firearms, expanding immigration, or managing public land that MVEs might view as unacceptable infringements on civil liberties or harmful to the security of the United States.

- (U) In April 2021, FBI arrested an MVE in Texas who intended to bomb a commercial cloud service provider's servers under the belief that the data center provided services to federal agencies, including CIA and FBI. The MVE pleaded guilty to a malicious attempt to destroy a building with an explosive and was sentenced to 10 years in federal prison in October 2021.

- (U) In January 2021, FBI disrupted a plot by two suspected MVEs who were allegedly planning to bomb the state headquarters of a political party in Sacramento, California. Federal investigators discovered multiple pipe bombs and dozens of firearms at the home of one of the MVEs. The subjects pleaded guilty to multiple offenses and are awaiting sentencing.

2022-11514

AUTHORED BY FBI, DHS, NCTC

UNCLASSIFIED

UNCLASSIFIED

SPECIAL ANALYSIS                                                                    17 JUNE 2022
JOINT ANALYTIC CELL



- (U) Dozens of probable MVEs were arrested for their involvement in the violent, unlawful entry of the US Capitol building on 6 January 2021.

## (U) Most AVEs Will Probably Engage in Nonlethal Criminal Activity, Impact Law Enforcement Operations

(U) We assess that AVEs will continue to plot and potentially conduct sporadic attacks on critical infrastructure and federal, state, and local facilities, as well as violent physical assaults against their perceived ideological opponents. Perceptions of inequality or social injustices related to flashpoint events might further embolden AVEs to commit acts of violence. Target selection by AVEs—whether premeditated or opportunistic—will probably remain focused on people or institutions seen as representing authority, capitalism, and oppression, including perceived racism or fascism. Although AVEs have sometimes acted collectively, we assess AVEs are not organized at the countrywide level.

- (U) In January 2021, FBI arrested a Florida-based AVE after he issued a "call to arms" for like-minded individuals to join him with firearms to violently confront others who might gather at a lawful protest at the Florida Capitol earlier that month. In October 2021, the AVE was sentenced to 44 months in federal prison for communicating a threat to kidnap or injure others.
- (U) In August 2020, an individual who expressed views on social media consistent with AVE ideology fatally shot a man during an event with individuals of opposing ideologies in Portland, Oregon. This incident was the first known lethal attack in the United States by an AVE in more than 20 years. The AVE was subsequently killed after drawing a firearm when law enforcement attempted to arrest him.
- (U) In July 2019, a probable AVE set fire to a vehicle and threw incendiary devices at a building near a detention facility linked to ICE operations in Tacoma, Washington. He then engaged responding law enforcement officers with an AR-style rifle and was killed during the encounter.

## (U) SCVEs Pose Sporadic Threat of Violence Against Law Enforcement and Government Personnel

(U) We assess that sovereign citizen violent extremists (SCVEs) will continue to pose a sporadic threat of violence against law enforcement and government personnel on the basis of SCVEs' perceived rights and belief in their immunity from government authority and laws. In furtherance of these beliefs, SCVEs have committed a wide variety of property and financial crimes that have often brought them into conflict with law enforcement, sometimes resulting in violence. Law enforcement officers will probably remain SCVEs' most frequent targets, with violence most likely to occur during law enforcement encounters, including traffic stops.

- (U) On 3 July 2021, 11 individuals, believed to be members of an armed organization that espouses sovereign citizen ideology, engaged in an hours-long armed standoff with Massachusetts State Police near Wakefield that was streamed live by the group's spokesperson on a social media platform. The incident occurred after an attempted traffic stop on a vehicle driven by group members and had the potential to escalate to violence. After the standoff, the individuals were charged with multiple firearms-related violations. Group members' statements before, during, and after the standoff have been consistent with sovereign citizen extremist ideology.
- (U) In February 2018, a probable SCVE opened fire on local law enforcement officers who were trying to serve a warrant at the violent extremist's residence in Locust Grove, Georgia, for failure to appear in court. After the SCVE killed one police officer and wounded two sheriff's deputies, law enforcement officers shot and killed him.

UNCLASSIFIED

**SPECIAL ANALYSIS**
JOINT ANALYTIC CELL                                                    17 JUNE 2022



**(U) All Other Domestic Terrorism Threats**

**(U) Other DVEs Pose Threat of Violence Because of Political Grievances, Conspiracy Theories**

(U) We assess that DVEs who mobilize to commit violence in response to partisan grievances and who do not fall under other DVE threat categories will pose a heightened threat to individuals in the 2022 midterm election cycle because of their actual or perceived political affiliation. These DVEs might target candidates, government officials, other civilians, and institutions with violence to try to redress their perceived grievances or advance their agendas. Conspiracy theories related to the 2020 general election will probably continue to contribute to the radicalization of some DVEs with partisan grievances and potentially be reinforced by their view that the Capitol breach on 6 January 2021 was a success.

- (U) In December 2021, a DVE motivated by partisan grievances who is awaiting trial was arrested en route to Washington, DC after telling law enforcement officers that he would "do whatever it takes" to kill government leaders on his "hit list." The DVE was found to have a rifle, ammunition, loaded magazines, body armor, and medical kits.
- (U) In September 2021, authorities arrested a DVE motivated by partisan grievances for throwing a Molotov cocktail at the offices of a political party in Austin, Texas. The subject pleaded guilty to one count of arson and was sentenced to six years in prison.
- (U) In June 2017, a now-deceased DVE injured several members of Congress, staffers, and responding officers after opening fire at a charity baseball event in Alexandria, Virginia.

(U) Conspiracy theories related to the COVID-19 pandemic almost certainly contribute to the mobilization to violence of some DVEs who do not fall into the other threat categories. We assess that these DVEs pose an ongoing threat to government officials and critical infrastructure.

- (U) In March 2020, a DVE deliberately derailed a train that he was operating near the USNS Mercy hospital ship at the Port of Los Angeles to draw media attention to the ship's presence. The DVE told law enforcement that he believed that the ship had an "alternate purpose" related to COVID-19 or an unspecified US Government takeover and that he wanted to "wake people up." In April 2022, he was sentenced to three years in prison after pleading guilty to committing a terrorist attack and other violence against railroad carriers and mass transportation systems.

(U) We assess that adherence to elements of the continuously evolving QAnon conspiracy theory—some of which are bolstered by the resonance of election fraud narratives—will contribute to the radicalization and mobilization to violence of a small number of DVEs, posing a threat to individuals and institutions that supporters of the conspiracy theory have prominently denounced. The participation of some self-identifying QAnon adherents in the breach of the US Capitol on 6 January 2021—who were arrested and charged with violent entry and disorderly conduct in a restricted building and obstruction of an official proceeding — underscores how some QAnon adherents can accept the legitimacy of violent action.

- (U) On 7 January 2021, a North Carolina–based, self-identified QAnon adherent was arrested by FBI in Washington, DC, and charged with interstate communication of threats after he brought firearms and ammunition into the city and threatened the Speaker of the House and DC Mayor. The DVE pleaded guilty and was sentenced to two years in federal prison.
- (U) On 8 January 2021, a probable DVE and self-identified QAnon adherent was arrested on charges of destroying government property after allegedly firing several rounds at a federal courthouse in Oregon. In November 2021, the DVE was sentenced to probation.

2022-10414

AUTHORED BY FBI DHS NCTC

UNCLASSIFIED

UNCLASSIFIED

## SPECIAL ANALYSIS
JOINT ANALYTIC CELL

17 JUNE 2022



(U) Some DVEs form uniquely personalized grievances that might also draw from established DVE movements and, on a limited basis, from other violent extremist ideologies, probably aided by the proliferation and accessibility of a wide range of DVE and other extremist content online, a trend we expect to continue in coming years.

- (U) On 21 June 2021, a now-deceased DVE conducted a shooting attack in Arvada, Colorado, killing two people. The preliminary investigation revealed that the alleged attacker's personalized ideology included a hatred of police stemming from perceptions of corruption among law enforcement agencies.

- (U) On 16 March 2021, a DVE with a personalized ideology related to his claimed sex and pornography addictions allegedly conducted shootings at spas near Atlanta, Georgia, killing eight people. The attacker was sentenced to life in prison for four murders to which he pleaded guilty and is awaiting trial on four counts of murder to which he pleaded not guilty.

(U) We assess that involuntary celibate violent extremists (IVEs) pose a persistent threat of violence against women, heterosexual couples, and others perceived as successful in sexual or romantic pursuits. IVEs motivated by grievances related to their belief that society unjustly denies them sexual or romantic attention have conducted three lethal attacks in the United States since 2014, mostly using firearms, that have resulted in 17 fatalities. The incel movement, which includes IVEs, has online participants in many Western countries, and at least four Canadian IVEs have conducted lone-actor attacks since 2016.

- (U) In July 2021, FBI arrested an IVE based on his alleged actions in planning an attack on women at a university in Ohio. The IVE allegedly wrote a manifesto describing his hatred of women and his desire to "slaughter" them. He was charged with illegal firearms possession and attempting to commit a hate crime and is awaiting trial.

- (U) In May 2020, a self-identified involuntary celibate shot and injured three people at an outdoor mall in Glendale, Arizona, before authorities arrested him. In March 2022, the IVE pleaded guilty to two counts of attempted first degree murder and two counts of assault with a deadly weapon.

## (U) Abortion-Related Violent Extremism
### (U) Abortion-Related Violent Extremists Might React to Ongoing Events

(U) We assess that abortion-related violent extremist activity will probably increase in line with abortion-related legislative and legal debates, such as those surrounding the recent unauthorized disclosure of a draft opinion in the anticipated US Supreme Court ruling in the case of Dobbs v. Jackson Women's Health Organization. Historically, abortion-related violent extremists motivated by pro-life beliefs have committed acts of violence, including at least 10 murders and dozens of bombings and arsons, all targeting abortion providers and facilities. Abortion-related violent extremists motivated by pro-choice beliefs—although historically less violent than pro-life abortion-related violent extremists—will probably pose a threat to individuals or critical infrastructure and will most often likely target organizations or people expressing pro-life views.

- (U) On 31 December 2021, a fire destroyed an unoccupied reproductive health clinic in Knoxville, Tennessee. Local investigators determined that the event was an arson attack by unknown perpetrators.

- (U) In September 2021, an individual from Oklahoma was arrested for making online threats targeting Texas lawmakers associated with state-level abortion restrictions. The individual pleaded guilty and is awaiting sentencing.

AUTHORED BY FBI LENS, NCTC

UNCLASSIFIED

UNCLASSIFIED

SPECIAL ANALYSIS
JOINT ANALYTIC CELL

17 JUNE 2022



- (U) On 3 January 2020, a DVE with a history of expressing pro-life beliefs online threw an incendiary device at the front window of a reproductive healthcare facility in Newark, Delaware, starting a fire that damaged the front porch and window. The subject pleaded guilty in February 2021 and was sentenced to 26 months in federal prison in March 2022.

### (U) Animal Rights and Environmental Violent Extremism

#### (U) Animal Rights and Environmental Violent Extremists Primarily Target Critical Infrastructure

(U) We assess that violent extremists supporting animal rights and environmental causes will continue to disrupt the operation of critical infrastructure to try to exact an economic toll on the industries they target. Most environmental violent extremist activity in recent years has opposed oil and natural gas infrastructure projects, particularly those near perceived ecologically sensitive habitats or waterways; while animal rights violent extremists primarily oppose large-scale farming or animal agriculture.

- (U) In November 2020, two environmental violent extremists in Whatcom County, Washington, were arrested and charged with impeding the operation of a railroad signal system by using a "shunt" across the railroad tracks, which disrupts the electrical current on the tracks and can disable safety features, potentially causing derailments or other accidents. A claim of responsibility followed a similar incident in early 2020, stating that extremists had carried out the shunting with the goal of preventing the construction of an oil pipeline across British Columbia. Both defendants were found guilty and sentenced to one year and to six months in prison, respectively.

2022-D-10161

AUTHORED BY FBI, DHS, NCTC

UNCLASSIFIED

Page **46** of **46**

*Your Honor, we are Roman Catholic, and I am of Jewish Heritage, and we have been threatened and discriminated against.*

"Becker" "jewish"   🔍

🔍 All   🖼 Images   ▷ Videos   📰 News   ◉ Maps   🛒 Shopping   ⚙ Settings

All regions ▾   Safe search: moderate ▾   Any time ▾

*My maternal grandfather is Frederick William Becker and my family immigrated from Germany, and ▬ were and are practicing Catholics of Jewish Heritage.*

https://www.ancestry.com › name-origin?surname=becker
**Becker Name Meaning & Becker Family History at Ancestry.com®**
**Jewish** (Ashkenazic): occupational name for a baker from German Bäcker (compare 1 and Backer) or Yiddish beker 'baker'. ... The **Becker** family name was found in the USA, the UK, Canada, and Scotland between 1840 and 1920. The most **Becker** families were found in USA in 1880. In 1840 there were 236 Becker families living in New York.

    **Decker**
    German: occupational name for a roofer
    (thatcher tiler slater or shingler) or a...

https://www.hebrewsurnames.com › BECKER
**BECKER - becker meaning - Jewish Genealogy**
**Becker** Genealogy. The vast majority of Argentine Jews are descended from immigrants who arrived from Europe. These ashkenazic Jews migrated from small towns or shtetels of Poland, Lithuania, Russia, Germany, Romania or Ukraine, leaving behind most of their Jewish relatives. After two or three generations, those **Jewish** families lost track of ...

G https://www.geni.com › surnames › becker
**Becker Genealogy, Becker Family History - Geni.com**
There are already 1,293 users and over 42,420 genealogy profiles with the **Becker** surname on Geni. Explore **Becker** genealogy and family history in the World's Largest Family Tree. Follow. ... **Jewish** Families from Mehlingen, Kaiserslautern, Rhineland-Palatinate, Germany; Jewish Families of Kraków (Poland) Time Travelers;

https://karlradl14.substack.com › p › is-boris-becker-jewish
**Is Boris Becker Jewish? - Karl's Substack**
Aug 18, 2023 · **Boris Becker** - the famous former several time Tennis World Champion - is often assumed to be a German Catholic, which in a sense is true. However, delving a little bit of his biography reveals that his Czechoslovakian mother Elvira was in fact **jewish** (1) or rather 'had **jewish** relatives'. (2) This would mean that in halakhah - i.e., **jewish** religious law - and according to the Israel ...

🖼 Images for "**Becker**" "**jewish**"



More Images →

https://jewishdata.com › jewish_genealogy_search › Becker › - › 100

Share Feedback

Becker I Jewish Genealogy I Jewish Cemeteries I Jewish Tombstones ...

Becker 1938 Judisches Gemeindeblatt - Berlin, Germany- Courtesy of the Leo Baeck Institute

https://www.tabletmag.com › sections › news › articles › a-night-with-the-grooviest-half-jewish-b...
### Farewell to Walter Becker, Weirdo Prince of Smart Rock
And since half-**Jewish** is, in America today, the new **Jewish**, Steely Dan is the new Simon and
Garfunkel. Plus, Tablet has written about Donald Fagen before (it seems his partner, Walter **Becker**, is ...

https://www.beckertrust.org › the-becker-foundation
### The Becker Foundation I Becker Trust
The Newton D. and Rochelle F. **Becker** Foundation partners with the Newton and Rochelle **Becker**
Charitable Trust to support non-profits within the same priority areas. It is a support organization of the
**Jewish** Community Foundation of Los Angeles. The Newton D. and Rochelle F. **Becker** Foundation, a
sister organization to the Newton and Rochelle ...

https://www.jewishdowntown.org › bnai-spotlight---becker-family.html
### B'nai Spotlight - Becker Family - B'nai Israel Synagogue
From archives of the **Jewish** Museum of Maryland **Becker** family group photograph. Several of the
young women are wearing the young men's bowler hats. It's probable that these are the ten children of
Abraham and Krainde **Becker**: Minnie, Wolf, Moses, Belle, David, Isaac, Ella, Bertha, Herman, and Lena,
born between 1860 and 1884.

https://njjewishnews.timesofisrael.com › david-becker
### David Becker I New Jersey Jewish News
David **Becker**, 98, of Verona died Oct. 27, 2015. He was born and raised in Long Branch. Mr. **Becker**
rose to the executive level at Bamberger's and Macy's, dedicating his life's work to the fur industry. He
was a veteran of World War II. He helped form the **Jewish** Aces in the early 1930s, taking part in their
basketball victory against the ...

W https://en.wikipedia.org › wiki › Ben_Becker
### Ben Becker - Wikipedia
Biography. **Becker** was born in Bremen, the son of actress Monika Hansen and actor Rolf **Becker**.He is
the brother of actress Meret **Becker** and the stepson of Otto Sander.His grandmother was the
comedian Claire Schlichting.**Becker** is **Jewish** through his maternal grandmother Claire Schlichting's
father who was a **Jewish** merchant from Wuppertal.. As a child, **Becker** participated in radio dramas and
had ...

**More Results**



**Get Our Browser**

Protect your data as you
search and browse.



**Help Spread DuckDuckGo**

Help your friends and family
take back their privacy!



**Privacy Newsletter**

Stay protected and informed
with our privacy newsletter.

Share Feedback



## Your DNA looks most like DNA from these 8 world regions

We compare your DNA against a worldwide reference panel to see which populations your DNA looks most like.

How do we calculate this?

- Norway — 21% >
- Germanic Europe — 19% >
- England & Northwestern Europe — 19% >
- Scotland — 19% >
- Ireland — 8% >
- Sweden & Denmark — 7% >
- Wales — 6% >
- Finland — 1% >

View all 2,600+ regions tested

View previous estimate & FAQs

Updated August 2023

Remember to check out your communities, The Midwest, and Story Growth®.

# America's dark and not-very-distant history of hating Catholics

**Progressives and conservatives are in a rare unity welcoming Pope Francis to the US, but anti-Catholicism was rampant before John F Kennedy was president**



**Rory Carroll** *in Los Angeles*

🐦 **@rorycarroll72**
Sat 12 Sep 2015 07.00 EDT



Congress and the United Nations rolling out their red carpets, nuns working overtime to bake communion hosts, prison inmates carving a walnut throne, tickets for events snapped up in seconds: America is gearing up for pope-mania.

Pope Francis is expected to be greeted with huge crowds and across-the-board reverence when he tours Washington, New York and Philadelphia during his first visit as pontiff to the United States.

The rapture, however, will not change the awkward – and largely forgotten fact – that for centuries the US discriminated against Catholics.

The land of immigrants enshrined freedom of religion in the constitution yet spent much of its history despising, harassing and marginalising Catholics.

From the first Puritan settlers to televangelists, leading political, business and religious figures lambasted followers of Rome as theological abominations and traitorous fifth columnists.

"When you look back at the true, hidden history of the United States this strand of anti-Catholicism is very powerful," said Kenneth Davis, a prominent historian and commentator.

"We want to show this patriotic view that we were this melting pot of religious freedom. Nonsense. People wanted their own religious freedom, not freedom for others. There was a very, very deep hatred of Catholics."



Thomas Nast's anti-Catholic cartoon in Harper's Weekly in 1875. It depicts Roman catholic bishops as crocodiles attacking public schools, with the connivance of Irish catholic politicians. Photograph: Public Domain

Discrimination dwindled in the 20th century, especially after John F Kennedy became the first Catholic president, bequeathing a sort of amnesia, said Davis. "It's really astonishing how it has been swept under the rug. It's as if with JFK all the past is forgiven."

That history will seem distant indeed if, as expected, progressives and conservatives seek to co-opt the Pope, the former cheering his denunciations of poverty, inequality and climate change, the latter his espousal of family values.

The political establishment no longer frets about the religion. Joe Biden, the vice-president, is Catholic, as are three Republican presidential candidates: Jeb Bush, Rick Santorum and Bobby Jindal.

Yet historians agree discrimination once thrived. "The deepest bias in the history of the American people," according to Arthur Schlesinger. "The most luxuriant, tenacious tradition of paranoiac agitation in American history," said John Higham.

Catholics got in an early bit of sectarian homicide in 1556 when Spanish forces slaughtered a colony of French Huguenot Protestants in what is now Florida.

When Pilgrims and Puritans settled in New England half a century later they brought fresh venom from Europe's religious conflicts, including the idea that the Pope was

the "anti-Christ" and the "whore of Babylon".

At first banned from the colonies, "papists" were grudgingly allowed entry but with severe civic restrictions, including exclusion from political power. Jews and Quakers also suffered discrimination but were seen as a lesser threat.



Justice Hugo Black surrounded by press in Norfolk, Virginia. Photograph: New York Daily News/NY Daily News via Getty Images

The establishment of a secular republic which separated church and state did not end prejudice.

Lurid myths about Catholic sexual slavery and infanticide spread through pamphlets and books such as Awful Disclosures of Maria Monk, an 1834 supposed memoir about a Canadian convent.

Demagogues in the nativist movement incited fury and fear about the huge numbers of impoverished German and Irish Catholic immigrants, many barely speaking English, who spilled off ships.

Newspapers and Protestant clergymen, including Lyman Beecher, co-founder of the American Temperance Society, swelled the outcry, warning the influx would take jobs, spread disease and crime and plot a coup to install the Pope in power.

In 1844 mobs burnt Catholic churches and hunted down victims, notably in Philadelphia where, coincidentally or not, Francis will wrap up his week-long visit.

Abuse from Protestant officers partly drove hundreds of Irish soldiers to defect from the US army to the Mexican side before and during the 1846-48 war with Mexico. The

deserters obtained revenge, for a while, by forming the San Patricio battalion and targeting their former superiors in battle, only to wind up jailed, branded and hanged after Mexico surrendered.

The growth of the Ku Klux Klan in the early 20th century gave a new impetus to attacks – mostly verbal – on Catholics. Hugo Black, a KKK member and US senator, gave fiery anti-Catholic speeches before going on to become a defender of civil liberties on the supreme court bench.

Writers and intellectuals had no hesitation bashing the Catholic church. Mark Twain noted he was "educated to enmity toward everything that is Catholic".

The burgeoning power of Irish and other immigrant Catholic communities paved Al Smith's election as governor of New York but Lutheran and Baptist opposition helped sink his presidential bid in 1928.



📷Catholicism remained an obstacle to Kennedy's White House run in 1960. Photograph: Sipa Press/Rex Shutterstock

Hostility gradually dwindled, especially during the collective bonding of the second world war, but remained an obstacle to Kennedy's White House run in 1960. He tried to neutralise the issue, telling a group of Protestant ministers: "I am not the Catholic candidate for president. I am the Democratic party's candidate for president who also happens to be a Catholic. I do not speak for my Church on public matters – and the Church does not speak for me."

Kennedy's victory, and the Catholic church's alliance decades later with Protestant evangelicals on social issues, completed the integration into mainstream public life.

Common ground with evangelicals on abortion and same-sex marriage paved the way for Bush, Jindal and Santorum to court a constituency which once would have reviled them. "They seem to have forgotten this deep, ugly past that they have," said Davis, the historian.

Sex abuse scandals have in recent years shined a harsh and legitimate spotlight on the church. And the Catholic League for Religious and Civil Rights, an advocacy group, claims Catholic bashing is a staple of US society. But Davis thinks discrimination is in the past. "It's now largely a non-issue."

If some religious fanatics greet Francis with posters calling him the anti-Christ and Babylon's whore they will be on the fringe of the fringe. The US, no longer fearful of a papist coup, seems close to a rare unity in wanting to welcome the Pope.

POLITICS & SOCIETY   DISPATCHES

# Former F.B.I. leaders: Leaked memo was wrong to label 'radical traditionalist Catholics' as possible domestic threats

Michael J. O'Loughlin | Christopher Parker
February 21, 2023

Two former agents of the Federal Bureau of Investigation who went on to hold leadership roles in the church say a recently revealed and subsequently retracted memo characterizing Catholics with a devotion to the Traditional Latin Mass as possible domestic threats is a troubling example of the law enforcement agency not following its own guidelines.

"It's one thing if a journalist writes this in an opinion piece," Kathleen McChesney, a former head of F.B.I. field offices in Chicago and Portland, told **America**. "It's another thing when it's in a government document."

Ms. McChesney, who previously held the third-highest role in the F.B.I., described the memo as "a terrible analytical document" and "antithetical to F.B.I. professional practices and guidelines."

News of the memo popped up earlier this month, when a conservative news and commentary website, UncoverDC.com, published what it said was a copy of an internal F.B.I analysis. The memo reports on a growing interest in Catholic traditionalism by some racially or ethnically motivated violent extremists, and it speculates that the overlap in these circles will continue to rise ahead of the next presidential election.

*Ms. McChesney, who previously held the third-highest role in the F.B.I., described the memo as "a terrible analytical document" and "antithetical to F.B.I. professional practices and guidelines."*

A former F.B.I. special agent who was suspended last year leaked the document, Newsweek reported. In a statement to the Catholic News Agency, the F.B.I. said it was taking steps to remove the document, which it said "does not meet the exacting standards of the FBI."

Read more from America

MORE FROM AMERICA



**What a failed 18th-century synod—and a talking point for Archbishop Viganò—can teach us about synodality**

Shaun Blanchard



**'Synodal Babel': Cardinal Burke says synod will weaken the church's moral teachings**

Cindy Wooden



**Man who killed 6-year-old Palestinian boy in Illinois is a Catholic parishioner**

Gina Christian - OSV News



**Joe Biden and Pope Francis discuss war in Israel and Gaza in 20-minute phone call**

× 



**Retired bishop in New York...**
Michael Hill - Associated Press



**Pope Francis intervenes...**
Cindy Wooden - Catholic News Service



**Father Marko Rupnik, disgraced...**
Gina Christian - Catholic News Service

The memo about traditionalist Catholics appears to draw its information from secondary sources, including a report from the Southern Poverty Law Center and published news reports. Ms. McChesney said the S.P.L.C. produces solid research and that journalism can be helpful in understanding the broader context of specific investigations but that this particular memo was too broad.

"I didn't see details of crimes that people were committing," Ms. McChesney said. "You have to tie everything back to the actor, the criminal."

Phil Andrew, a former special agent both in the United States and abroad, told **America** that the problem with the memo lies in its generalizing verbiage, which seemed to say that Catholics with a preference for traditionalism could become involved in domestic terrorist activity due to their religious beliefs.

> *"I didn't see details of crimes that people were committing," Ms. McChesney said. "You have to tie everything back to the actor, the criminal."*

Based on his reading of the memo, Mr. Andrew said that this does not point to any actual F.B.I. investigation underway that unfairly targets Catholics. Intelligence reports like this one are based on an analyst's research and are not necessarily indicative of any active investigations.

But he said the language in the memo suggests to him that something was amiss in its creation and dissemination.

"Something went wrong where it didn't get peer reviewed. And I think seemingly biased language was used in the drafting of it, and that shouldn't be," he said.

Matters related to religion are particularly sensitive when it comes to F.B.I. investigations, especially following the Sept. 11 terrorist attacks and the bureau's surveillance of Islamic communities in the United States.

"You stay out of that kind of conjecture," Ms. McChesney said of the memo. "It's unprofessional, it's wrong, and it goes into areas about religion that the F.B.I. doesn't get into."

In addition, the creation of the memo seems to run afoul of strict guidelines related to investigations that went into effect after a scandal in 1983 involving the Committee in Solidarity with the People of El Salvador,

Read more from America



CLASSIFIEDS
**MARKETPLACE**

Your source for jobs, books, retreats, and much more.

---

**Enneagram Retreat Weekend**
Events

---

**The Bollandists: Historians of the Impossible**
Activities, Events

---

**Seeking dynamic leader(s) of innovative formation programming.**
Jobs

---

**Malvern Retreat House**
Retreat Houses, Retreats

---

**The Bollandists: Historians of the Impossible**
Activities, Events

---

See all Classifieds



Retired bishop in New York...
Michael Hill - Associated Press



Pope Francis intervenes...
Cindy Wooden - Catholic News Service



Father Marko Rupnik, disgraced...
Gina Christian - Catholic News Service

*"You stay out of that kind of conjecture," Ms. McChesney said of the memo. "It's unprofessional, it's wrong, and it goes into areas about religion that the F.B.I. doesn't get into."*

The central issue in the CISPES case—when surveillance on possible security threats infringes on free speech—remains salient today and has drawn comparison to the Catholic memo.

Ms. McChesney said that senior F.B.I. leadership should respond to the letter from several state attorneys general and inquiries from congressional leaders and that the memo should prompt a review of internal procedures and policies. She said that the power granted to the F.B.I. means that it must take seriously its duty to follow best practices.

"If it was accurately reported that it was approved in the field office, then there is a tremendous need for training about preparing documents, conducting investigations and training supervisors who approve those documents," she said.

In recent years, the F.B.I. has been the subject of intense criticism from conservative leaders, who accuse the agency of trying to undermine the presidency of Donald J. Trump and of targeting conservative political groups.

In their letter to Attorney General Merrick Garland and F.B.I. Director Christopher Wray, the 20 state attorneys general write, "Anti-Catholic bigotry appears to be festering in the FBI, and the Bureau is treating Catholics as potential terrorists because of their beliefs."

*Ms. McChesney said that while the memo should give F.B.I. leaders pause, it does not impugn the work of the entire bureau.*

Mr. Andrew, who went on to lead an anti-violence initiative for the Archdiocese of Chicago and who teaches at DePaul University, said he never experienced any bigotry related to his Catholic faith during his career. He condemns any attempt to use the memo as a tool "to tear down the work of the F.B.I. and the mission of the F.B.I. and somehow discredit it across the board."

The Biden administration announced in 2021 that it would examine threats of domestic terrorism, which it called "the most urgent terrorism threat the United States faces today." A White House fact sheet notes that the administration aims "to protect both the nation and the civil liberties of its citizens."

Read more from America



Retired bishop in New York...
Michael Hill - Associated Press



Pope Francis intervenes...
Cindy Wooden - Catholic News Service



Father Marko Rupnik, disgraced...
Gina Christian - Catholic News Service

And I think that that allows for some of this ambiguity, that could be settled if we clearly defined what that is and separated speech from action," he said.

Ms. McChesney, who went on to found and lead the office of child protection of the U.S. Conference of Catholic Bishops, said that while the memo should give F.B.I. leaders pause, it does not impugn the work of the entire bureau.

"The F.B.I. still remains a very powerful national and international law enforcement agency with tremendous authority and responsibility," she said. "It has to strive everyday to be the best it can be. You have lots of people, thousands of employees, who are doing just that."



More:   **CRIMINAL JUSTICE** / **US CHURCH**

**SHOW COMMENTS (9)**

WHAT TO READ NEXT



## Tim Wakefield's death reminds us how (not) to accompany the dying

The baseball world recently mourned the loss of former Red Sox ace Tim Wakefield, but news of his grave illness was shared in an inherently anti-Christian way.

Michael O'Brien   October 13, 2023



## Synod Diary: The synod isn't hiding its disagreements. That's a good thing.

"Recognizing the divergences is unitive," a bishop

Read more from America



Retired bishop in New York...

Michael Hill - Associated Press



Pope Francis intervenes...

Cindy Wooden - Catholic News Service



Father Marko Rupnik, disgraced...

Gina Christian - Catholic News Service



## As the synod's first session closes, assembly addresses letter to the 'people of God'

In a new letter to the People of God, the synod participants emphasized the importance of continued discernment for the Church's future.

Justin McLelan - Catholic News Service   October 25, 2023



## Pope Francis calls for a stop to Israel–Hamas war for the 6th time

Today, Pope Francis prayed "for all those who suffer" and said he hoped that "paths of peace" may be found for the conflict in the Middle East.

Gerard O'Connell   October 25, 2023



## Take Scripture personally

A Reflection for Wednesday of the Twenty-ninth Week in Ordinary Time, by Molly Cahill

Molly Cahill   October 25, 2023

Read more from America



**Retired bishop in New York...**
Michael Hill - Associated Press



**Pope Francis intervenes...**
Cindy Wooden - Catholic News Service



**Father Marko Rupnik, disgraced,...**
Gina Christian - Catholic News Service

# The FBI's Catholicism Memo Is No Laughing Matter | Opinion

May 03, 2023 at 9:45 AM EDT



By **Ashley McGuire**
Senior Fellow, The Catholic Association

💬 184                                              ⌣                                              🎧

"It's okay to be Roman Catholic, right?"

That was the question Congressman Jeff Van Drew (R-N.J.) posed to an FBI official in recent investigative hearings run by Congressman Jim Jordan (R-Ohio).

"Somebody answer me please," Van Drew followed up, after an awkward silence.

You'll forgive him for asking. The hearings, ignored almost entirely save for a handful of conservative news outlets, were looking into the leaked FBI memo alleging some kind of tie between what it called "radical-traditionalist Catholic ideology" and "violent extremism." The FBI is now being sued over its failure to comply with a standard FOIA request to release emails discussing its contents. The agency's recalcitrance is unsurprising, given the memo's appalling contents.

**SUBSCRIBE NOW FOR JUST $1 PER MONTH**

In its title, the memo states that "racially or ethnically motivated violent extremists in radical-traditionalist Catholic ideology almost certainly presents new mitigation opportunities." It discusses "new avenues for tripwire and source development," including "through

outreach to traditionalist Catholic parishes and the development of sources with the placement and access to report on" these supposed extremists, among others. That's jargon for "get local priests and parishioners to spy on fellow massgoers."

The memo is almost laughable. Some FBI rookie clearly read too many spy novels and got out over his or her skis writing it.

---

📰 NEWSLETTER

### The Bulletin

Your daily briefing of everything you need to know

| Email address | SIGN UP |
|---|---|

---

But this was no novel. It was a very real memo proposing an FBI operation of spying on people of certain religious beliefs *in their houses of worship* and it appears to have been initially approved—though later disavowed—by people way higher up than the memo's author. Rep. Jordan's subpoena states that whistleblowers have told his committee that "the FBI distributed [the memo] to field offices across the country" and considered expanding its operation to include "mainline Catholic churches" and "local 'diocesan leadership.'"

It's all the more deranged when you consider that Roman Catholics are currently the targets of an alarming pattern of attacks, many of them by actual violent extremists who don't like the Church's position on issues like abortion. According to a tracker maintained by CatholicVote, since the May 2022 leak of the Supreme Court decision overturning *Roe v. Wade*, there have been nearly 150 attacks on Catholic Churches. Since CatholicVote began tracking in May 2020, the number is over 300.



WASHINGTON, DC - FEBRUARY 09: House Judiciary Committee Chairman Jim Jordan (R-OH) presides over a hearing of the Weaponization of the Federal Government Subcommittee in the Rayburn House Office Building on Capitol Hill on February 09, 2023 in Washington, DC. This was the first hearing of the new subcommittee, created by a sharply divided Congress to scrutinize what Republican members have charged is an effort by the federal government to target and silence conservatives.
**CHIP SOMODEVILLA/GETTY IMAGES**

One of these attacks was perpetrated against a church two miles from my home, where I personally have worshipped and where some of my daughter's friends go to school. Arsonists knocked over statues, desecrated the tabernacle, and tore down the stations of the cross.

The priest didn't mince words in his response. "I believe that this is because of the Church's stand on the issue of life," he told the press, "when it begins and that it should be protected—and that this is one of the manifestations of the deep divisions right now within our country, that there are those who believe that we do not have even the right to practice our faith."

SIGN UP FOR NEWSWEEK'S DAILY HEADLINES

The response from the Justice Department, the FBI, and a president who likes to tout his Catholic *bona fides* has been another long, awkward silence.

And if one had any doubt as to whether abortion was an underlying issue motivating the FBI's "investigation," the memo explicitly cites anti-abortion activism as a hallmark of what defines a radical-traditionalist Catholic.



READ MORE

- Conservatives Wrongly Demonized as 'Hate Groups' May Get Justice at Last →

- Biden Challengers Will Have To Beat Censorship Regime in 2024 →

And then there is the fundamental question of who, in the eyes of the FBI, counts as a radical-traditionalist Catholic. Who makes that call? In the case of the memo, it was the Southern Poverty Law Center, which the agency explicitly credited with the definition.

And what gives the government the right to decide which forms of Christianity are acceptable and which are not? Is it when a group's beliefs don't align with those of the current presidential administration? And where does that end? Not with Catholics, be assured. Let's not forget this was the same FBI that was caught "investigating" parents labeled "domestic terrorists" because they were upset their kids were locked out of public schools for 18 months during the coronavirus pandemic.

The FBI isn't entirely off, however, in its idea that the federal government could learn a lot by sending agents to mass. The other day at Sunday mass it occurred to me that that hour is the only time all week that I spend under the same roof with the elderly, the disabled, children of all ages, people of all socioeconomic backgrounds and races, and people of varying political beliefs. Catholic churches, like so many other houses of worship, are among just a handful of remaining threads holding a disintegrating society together.

A government looking to quell violent extremism should be studying the few remaining ties that bind us—instead of trying to sever them.

*Ashley McGuire is a Senior Fellow with The Catholic Association.*

# New York Uses Historic Gun Bans Against Native Americans, Catholics to Justify Current Restrictions in Court Filing

Stephen Gutowski     August 18, 2022     5:00 am

The Empire State believes its gun-carry restrictions are similar to racist gun bans from the past, and that's why they should be upheld.

New York cited historical bans on gun ownership by Native Americans and Catholics to support its current concealed-carry permitting law. The state argued in a Monday filing its "good moral character" clause, which allows officials to deny permits to those they don't feel are good people, is rooted in the historical tradition of "Anglo-American" gun regulations. It first pointed to several colonial gun bans as analogous to its own law.

"From the early days of English settlement in America, the colonies sought to prevent Native American tribes from acquiring firearms, passing laws forbidding the sale and trading of arms to Indigenous people," the filing from the office of Attorney General Letitia James (D.) reads.

New York then cited historical laws in England and America denying people their gun rights based on religion as another example of the tradition its requirement is based in.

"[E]ven after the English Bill of Rights established a right of the people to arm themselves, the right was only given to Protestants, based on a continued belief that Catholics were likely to engage in conduct that would harm themselves or others and upset the peace," the filing said.

The arguments come in an effort to save the subjective standard for issuing permits after the Supreme Court struck down the state's similarly subjective "good reason" clause earlier this year in *New York State Rifle and Pistol Association v. Bruen*. That case also established a new standard for reviewing Second Amendment cases that involves proving regulations are rooted in tradition from the time of the founding.

New York resorting to examples of openly racist or bigoted laws as analogs indicates they may have a difficult time convincing courts it is constitutional. That's especially true if the case makes its way back up to the Supreme Court, where five of the nine justices themselves are Catholic.

Additionally, the Supreme Court has written at length about the racist history of gun-control laws in the United States. In both *Bruen* and *McDonald v. Chicago*, the Court argued race-based bans were an affront to, and evidence of, the fundamental nature of the right to keep and bear arms.

New York's filing acknowledges the bigoted nature of the laws they cite as similar to their own. However, it argued that the laws show a tradition of subjectively denying the right to bear arms.

"A clear-eyed look at American history and doctrine will necessarily reveal episodes that are shameful but nonetheless relevant, as the *Bruen* opinion teaches us," the filing said in a footnote. "Of course, if a modern instance were to arise where gun licensing requirements were applied in a discriminatory manner, it could, should, and would be struck down as unconstitutional."

But the Court explicitly rejected Chicago's argument in *Mcdonald* that racist antebellum gun bans were an indication severe restrictions could be legal if decoupled from their discriminatory factors.

"[W]hile §1 of the Fourteenth Amendment contains 'an antidiscrimination rule,' namely, the Equal Protection Clause, municipal respondents can hardly mean that §1 does no more than prohibit discrimination," the Court wrote in the case. "If that were so, then the First Amendment, as applied to the States, would not prohibit nondiscriminatory abridgments of the rights to freedom of speech or freedom of religion; the Fourth Amendment, as applied to the States, would not prohibit all unreasonable searches and seizures but only discriminatory searches and seizures—and so on. We assume that this is not municipal respondents' view, so what they must mean is that the Second Amendment should be singled out for special—and specially unfavorable—treatment. We reject that suggestion."

The Court further argued the reaction to racist restrictions on the ownership and carry of guns by African-Americans, the so-called "Black codes," were indications that Second Amendment protections were understood to be fundamental to basic human rights.

"[M]unicipal respondents' argument ignores the clear terms of the Freedmen's Bureau Act of 1866, which acknowledged the existence of the right to bear arms," the Court wrote. "If that law had used language such as 'the equal benefit of laws concerning the bearing of arms,' it would be possible to interpret it as simply a prohibition of racial discrimination. But §14 speaks of and protects 'the constitutional right to bear arms,' an unmistakable reference to the right protected by the Second Amendment. And it protects the 'full and equal benefit' of this right in the States. It would have been nonsensical for Congress to guarantee the full and equal benefit of a constitutional right that does not exist."

New York's filing identified a few other laws it said were similar to the "good moral character" clause it hopes to preserve. It cited some militia regulations from the 17th and 18th centuries, which empowered government officials to disarm people they believed posed a threat to the community. It also cited statutes that allowed people to be disarmed after being involved in a rebellion or insurrection against the United States unless or until they swore an oath of loyalty.

"In the Revolutionary era, colonies frequently disarmed individuals based on their reputation for being disloyal or hostile to the new American nation," the filing said.

Overall, New York's filing seeks to convince the Court the Second Amendment's history provides a wide birth for gun regulations, even those based solely on the description of state officials. The state argues there is precedent for all sorts of restrictions to be found in the historical record.

"1) colonial laws providing for disarmament of dissident or hostile groups," the state filing said. "2) Revolutionary laws individually disarming persons' disaffected to the cause of America,' 3) militia mustering statutes providing for disarmament if a person was deemed unfit at inspection, and 4) Reconstruction-era and later licensing requirements like New York City's that involved an individualized assessment of dangerousness – is 'relevantly similar' to the good moral character assessment under the CCIA, and therefore satisfies the Bruen standard."

The case is just one of many filed in the aftermath of the *Bruen* decision, which served as a catalyst for New York lawmakers to pay a myriad of new gun restrictions that seemingly fly in the face of the ruling. How the case turns out will likely provide a good barometer for how well the other new restrictions fair in federal court.

# Israel Loosens Strict Gun Control Laws To Arm 'As Many Citizens As Possible'

BY: EMILY MILLER

OCTOBER 09, 2023

4 MIN READ



ISRAEL DEFENSE FORCES/FLICKR/CC BY NC 2.0

**After horrific terrorist attacks by Hamas from Gaza, Israel's government made it slightly easier for its citizens to own firearms for self-defense.**



**EMILY MILLER**

MORE ARTICLES

SHARE

Israel, the tiny democracy in the Middle East with terrorists along all its borders, has more stringent gun-control laws than anywhere in the United States. Unlike our Second Amendment, there is no recognition of the right to keep and bear arms.

After the horrific terrorist attack by Hamas from Gaza, Israel's government suddenly made it slightly easier for its citizens to own firearms for self-defense.

Israeli Minister of National Security Itamar Ben-Gvir <u>announced</u> Sunday in Hebrew an emergency declaration that will "allow as many citizens as possible to arm themselves." Currently, a mere 1.5 percent of the civilian population has a license to own a gun.

# Emergency Gun Policy

Ben-Gvir's emergency policies for the Firearm Licensing Department went into effect in 24 hours.

The laws that require proving "a need" to own and carry a gun have not changed. However those eligible to apply for a license under the "self-defense test" can now do the required interview on the phone instead of in person. The applicant will be approved for the license within a week under the new order.

While a citizen can still purchase only one handgun, the limit on rounds of ammunition has been increased from 50 to 100.

According to the minister, 4,000 citizens who applied for a conditional permit in 2023 but let the license expire before using it can now purchase a firearm. Another 1,800 people in the past six months who returned their guns to the government for not taking a training renewal course can get their weapons back.

# Israel's Strict Gun Control Track Record

The narrow eligibility criteria for Israelis to apply for a gun license remain the same as before the attack. You are eligible to apply only if you live or work in the settlement areas or are employed in professions that use guns — like security guards, police officers, or firefighters. Active duty military, military veterans of a certain rank, and special forces can also apply.

When applying, an individual must provide references, proof of residency for three years and meet the minimum age requirement

(based on military service and residency.) Applicants must also prove a basic knowledge of Hebrew and provide a health declaration from a doctor.

The person must pass the interview, pay a licensing fee, buy the gun, and attend 4.5 hours of training at a shooting range.

Applicants can meet all these requirements but still <u>be</u> denied based on criminal convictions, drug use, or certain mental health conditions.

An Israeli who no longer meets all the eligibility requirements must notify the Firearm Licensing Department and deposit their firearm and license at a police station within 72 hours.

The complex application process may explain why <u>only 140,000</u> of the 9 million Israelis have a permit.

# Gun Rights Advocate

Ben-Gvir has <u>been pushing</u> for more civilian gun ownership to deal with both terrorist attacks and crime since he took office at the beginning of this year. He made it easier to get permits by adding staff to process the licenses. He expanded those qualified to apply to include more veterans and medic volunteers.

"I want more weapons on the streets so that the citizens of Israel can defend themselves," he said in January.

By early June, the Jerusalem Post reported that new licenses jumped by 280 percent compared to the same four-month period in 2022.

Ben-Gvir said in August that his policies led to an 88 percent increase in the number of women receiving firearms licenses.

"Women that want to defend themselves and their families is a blessed thing," said Ben-Gvir. The government's quick announcement after the devastating attack to ease gun-control laws shows that some Israelis Israelis want to arm themselves instead of waiting for the military or police to arrive. Our God-given right to self-defense is ingrained in all of us and knows no borders.

---

*Emily Miller is an award-winning investigative journalist in Washington, D.C. She manages the Substack newsletter "Emily Post News" and is the author of the gun control policy book, Emily Gets Her Gun (Regnery). Follow her on Twitter @EmilyMiller.*

300-plus arrested after gathering at Capitol complex to protest Israel-Hamas war
The large-scale demonstration follows a similar event at the White House.

By Luke Barr
October 18, 2023, 6:11 PM



Protesters on Capitol Hill call for Gaza ceasefire
U.S. Capitol Police say demonstrations are not allowed inside Congressional buildings and are working t...                    Read More

Approximately 300 people were arrested by Capitol Police during a large-scale demonstration on Wednesday against the Israel-Hamas war, a Capitol Police spokesperson said.

Most were arrested for demonstrating in the Capitol, according to the spokesperson.

Hundreds of people had gathered in and outside of the U.S. Capitol complex on Wednesday before the arrests, calling for an end to the conflict between Israel and Hamas, a Palestinian militant group that launched a terror attack in Israel earlier this month.

Some of the demonstrators, organized by a left-wing Jewish group, then entered the Cannon House Office Building at different security entrance points and assembled in the rotunda, the police spokesperson said.

The large-scale demonstration follows a similar event at the White House earlier this week that also resulted in dozens of arrests.

Protesters, like the rest of the public, can legally enter the Capitol complex and only risk issues when they cause a disturbance, according to the police spokesperson.



Demonstrators involved in a civil disobedience action organized by a group called "Jewish Voice for Peace" are detained by U.S. Capitol police officers during a protest calling for a cease fire in Gaza while occupying the rotun...

Jonathan Ernst/Reuters

Show more ⌄

Police departments from the surrounding areas were called in to help at the complex on Wednesday, including Washington's Metropolitan Police and officers from Virginia, according to law enforcement sources.

Some lawmakers, who have offices in the Cannon House Office Building, chided the demonstrators.

"The irony is the US Constitution protects these protesters freedom to be absolute idiots," Rep. Ryan Zinke, R-Mont., wrote in a post on X.

*ABC News' Jack Date contributed to this report.*

# Following Terrorist Attack, Israel Relaxes Gun Laws and Arms Civilians

**MONDAY, OCTOBER 16, 2023**



Following an unprecedented terrorist attack on civilians that indiscriminately targeted even the elderly, women, and children, Israel has loosened its gun laws and is distributing firearms to civilians. As of press time, the number of victims killed in the terrorist attack was over 1,300, including at least 27 American citizens.

According to the Times of Israel, on October 10, National Security Minister Itamar Ben Gvir announced a plan to arm civilian security teams in towns near the country's borders. The report explained that the Ministry of National Security, "is purchasing 10,000 rifles to arm civilian security teams, specifically those in towns close to Israel's borders around the country, as well as mixed Jewish-Arab cities and West Bank settlements." The ministry also intends to equip these civilian teams with bulletproof vests and helmets.

Explaining that the Israeli government will expand civilian security teams to new areas, Gvir noted, "We will turn the world upside down so that towns are protected. I have given instructions for massively arming the civilian security teams to provide solutions for towns and cities, and so as not to leave towns unprotected."

The item also reported that a move three years ago to limit the availability of some types of firearms civilian security teams previously had access to left some of these teams fighting off heavily armed terrorists with pistols. The piece explained,

> *Approximately three years ago, the IDF began taking away firearms from some of these security teams due to the repeated theft of such weapons.*

*Hebrew news outlets reported on the problem back in 2021, and members of some of the teams have told the media in the last few days that they were essentially unarmed during Hamas's invasion.*

*Members of such a team told the Calcalist newspaper on Sunday that they had engaged Hamas terrorists armed with just pistols, while the terrorists bore assault rifles, grenades and anti-tank missiles.*

*"The IDF took our rifles recently, they left us with just a few. We repelled a Hamas commando terror cell with just pistols," one said.*

Aside from formal efforts by the Israeli government to get the means of protection into citizens' hands, there has been renewed interest in private firearm acquisition.

On October 11, the Jerusalem Post ran an article titled, "Nearly 8,000 Israelis request firearm licenses amid Hamas war." In response to the high demand, the National Security Ministry is increasing the staff at its firearm licensing department.

Further, the item explained that Gvir is making it easier for civilians to obtain firearm licenses, instituting something closer to a shall-issue licensing regime. The news outlet reported,

*According to the ministry's updated conditions, any Israeli citizen interested in obtaining a permit, either for self-defense or because they are serving in the IDF, will be entitled to a gun license, provided that they have medical approval, police approval, and passed the exams for carrying private firearms.*

Another way the licensing process is being expedited is that according to the Jerusalem Post, "those interested will only have to undergo a quick phone interview, rather than having to appear in person, after which the permit will be issued within a week's time."

Gvir explained, "Every city resident will be able to get an armament license... We are facing operation Guardian of the Walls 2, so we will be ensuring that we are prepared, with guns on every street corner."

Reporting from American firearm news outlet The Reload noted two other key changes to Israel's firearm licensing rules, explaining that one "allows anyone who had a permit to purchase a firearm in 2023 but didn't do so before the license expired to buy a gun without going through the process." Further, "another 1,800 citizens would also be allowed to retrieve a gun they were forced to give up in the last six months because the owner didn't get 'refresher training or renewal training.'"

Israeli gun rights activists have been vocal about the need for civilian firearm ownership in the wake of the terrorist attack. On October 10, the Times of Israel published a piece titled, "As Hamas war rages, personal firearm activists see surge in interest."

Referencing Israel's relatively strict firearms laws, activist Rabbi Raz Blizovsky said, "People are changing their opinion, and now there is more awareness." Blizovsky added, "It's a pity this is happening the way it did... I have been involved with groups that have been talking about this issue for years. During calm times, people don't do anything."

Describing some of Blizovsky's activism, the piece stated,

*On Sunday morning, one day after the Hamas assault began, Blizovsky started several WhatsApp communities for those who wish to have easier access to personal weapons. They have drawn some 4,000 members in 24 hours. An online petition he created, in order to press the government on the issue, garnered some 8,000 signatures in the same timeframe.*

*If more people had access to personal firearms, the horrific scenes coming out of the Gaza-adjacent communities could have been averted, he opined.*

The article also quoted digital marketing agency CEO Yoel Israel, who the piece described as being "active in libertarian political circles." Israel lamented, "Who has a gun? The terrorists, and all the criminals. Who doesn't? Law-abiding tax-payers."

At least one story of heroism from October 7 suggests that armed citizens can make a tremendous difference.

Multiple news outlets have reported the story of Inbar Lieberman, the 25-year-old security coordinator at Kibbutz Nir Am. An account of her actions in the New York Post explained that after the security coordinator realized the kibbutz was under attack, she "rushed to open the armory, distributed guns to the 12-member security team and coordinated their decisive response amid the unfolding attack."

The article went on to report,

*She placed her squad of kibbutzniks in strategic positions across the settlement and set up ambushes that caught the gunmen off guard and turned the tables on them during their mission to inflict mass casualties.*

*Lieberman killed five terrorists by herself, while the others gunned down 20 more over four hours as they turned Nir Am into an impenetrable fortress — while nearby kibbutzim suffered heavy losses.*

Middle East

## Israel arms civilian security squads, fearing internal strife

By Dan Williams

October 22, 2023 12:44 PM EDTUpdated 4 days ago

 





[1/2]A member of Israeli border police stands guard as Palestinians attend Friday prayers outside the Old City of Jerusalem, October 20, 2023.
REUTERS/Ammar Awad *Acquire Licensing Rights*

JERUSALEM, Oct 22 (Reuters) - Israel has set up hundreds of volunteer security squads in the two weeks since the Gaza war erupted and is arming them should there be knock-on Jewish-Arab unrest, authorities said on Sunday, despite what police said was "exemplary" conduct so far.

The last Gaza war in 2021 saw sometimes violent pro-Palestinian protests among the Arab citizens who make up 21% of Israel's population.

Triggered by a devastating Oct. 7 mass-infiltration by Hamas gunmen, the current war - and escalations of hostilities on the Lebanese border and in the occupied West Bank - have stirred worries for Israel's already frayed internal ethnic relations.

Advertisement · Scroll to continue

Israeli police have arrested dozens of Arab citizens on suspicion of incitement and support for Hamas, based on social media posts. Some lawyers for those arrested have described the measures as unlawful and designed to stifle dissent at the war.

The police chief, Inspector-General Kobi Shabtai, said such monitoring enabled officers to preempt any eruptions of violence.

"There has been exemplary conduct here," he told a parliamentary review panel, "and almost zero incidents, with all those pinpoint events being dealt with at the local level and with less media resonance".

Advertisement · Scroll to continue

"There is dialogue with the (Arab) leadership and in parallel we are poised and ready for any scenario."

Minister for police Itamar Ben-Gvir has predicted that this war could see a repeat of the 2021 unrest and has ordered an easing of regulations for issuing gun licenses to private citizens. These generally require applicants to have served in the Israeli military, from which most Arabs are exempt.

Advertisement · Scroll to continue

An additional measure has been the setting up of volunteer security squads to patrol the streets and back up police. Shabtai said 527 such squads have been created since Oct 7.

The deputy director-minister of Ben-Gvir's ministry, Eliezer Rosenbaum, told lawmakers that 20,000 firearms had been ordered for distribution to such squads, with another 20,000 to follow. He said volunteers would also be issued with flak jackets and helmets.

He did not elaborate on the kind of gun involved. Ben-Gvir has posted online video of himself handing out M-16 or M-4 assault rifles.

Naella Gelkopf-Belais, a social activist from the mixed Jewish-Arab city of Haifa, said police should work with civic authorities and be wary of "the creation of private militias".

"We in the city are on a tinderbox," she said.

Shabtai said security squads would be subordinate to police.

"It is good that there will be a lot of security squads and force, but caution must be exercised with this," he said. "What is permitted and what is forbidden must be understood, and care must be taken that no finger is too light on the trigger."

Writing by Dan Williams; Editing by David Holmes

The FBI director warns about threats to Americans from those inspired by the Hamas attack on Israel

FBI Director Christopher Wray is warning that Hamas' rampage inside Israel could inspire violence in the U.S. He told lawmakers on Tuesday that multiple foreign extremist groups have called for attacks against Americans and the West in recent weeks

By LINDSAY WHITEHURST Associated Press
October 31, 2023, 3:08 PM

**f** 𝕏 ✉ 🔗

FBI Director Christopher Wray testifies during a Senate Homeland Security and Governmental Affairs Committee hearing on threats to the homeland, Tuesday, Oct. 31, 2023, on Capitol Hill in Washington. (AP Photo/Stephanie Scarbrough)

FBI Director Christopher Wray testifies during a Senate Homeland Security and Governmental Affairs Committee hearing on threats to the homeland, Tuesday, Oct. 31, 2023, on Capitol Hill in Washington. Show more ⌄

The Associated Press

FBI Director Christopher Wray warned on Tuesday that Hamas' rampage inside Israel could inspire violence in the U.S., telling lawmakers that multiple foreign extremist groups have called for attacks against Americans and the West in recent weeks.

"We assess that the actions of Hamas and its allies will serve as an inspiration the likes of which we haven't seen since ISIS launched its so-called caliphate years ago," Wray said, using an acronym for the Islamic State group.

In his testimony before the Senate Homeland Security Committee, Wray gave his most detailed and ominous assessment of potential threats to the U.S. since the Oct. 7 attack by Hamas on Israeli soldiers and civilians.

His reference to the Islamic State, a reminder of when the FBI scrambled to disrupt hastily developed plots of violence by people inspired by the group's ascendancy, underscores the bureau's concerns that the current Middle East conflict could create a similarly dangerous dynamic.

Though the FBI isn't currently tracking an "organized threat" inside the United States, law enforcement is concerned about the potential of attacks by individuals or small groups, as occurred during the rise of the Islamic State in Syria and Iraq a decade ago.

The bureau has already seen an increase in attacks on overseas military bases and expects cyberattacks targeting American infrastructure to get worse as the conflict expands, he said.

"It is a time to be concerned. We are in a dangerous period," Wray said. "We shouldn't stop going out, but we should be vigilant."

Department of Homeland Security Secretary Alejandro Mayorkas, meanwhile, said his agency has responded to an increase in threats against Jewish, Muslim, and Arab American communities in the U.S. since the Oct. 7 attack.

"Hate directed at Jewish students, communities and institutions add to a preexisting increase in the level of antisemitism in the United States and around the world," he said.

Democratic Sen. Maggie Hassan said Jewish leaders in her state of New Hampshire say congregants are scared to go to synagogue, and Republican Sen. Rick Scott of Florida has heard similar fears from people in his state.

"I know our Jewish families all across my state and all across the country are pretty scared to death right now," Scott said.

Wray cited sobering statistics in his response, saying that Jewish people make up 2.4% of the U.S. population but are the targets of about 60% of religious-based hate crimes. "That should be jarring to everyone," he said.

The FBI has also opened a hate-crime investigation in the death of a 6-year-old Muslim boy who police say was stabbed to death by his landlord in an attack that also seriously wounded his mother, Wray said. Police and relatives have said the victims were singled out because of their faith and as a response to the war between Israel and Hamas.