*[Handwritten at top of page:]* They literally downplayed my biological dad's threats to "shoot up" school administrators, despite him not only threatening to have me shot, and threatening my wife, and another family member, Kyle Becker. They actually downplayed it as if I just "blame" my dad for bad things in my life as if that is just to be dismissed, despite suspicious deaths. I just know where accountability belongs for how we have factually been treated, and it's concerning, they don't care about life. My biological dad tells me that in regards to my mom: "The divorce papers are a loaded gun." That's not a joke, it's scary.

**M Gmail**

Jon F Turpin <jt4590@gmail.com>

**Dear Honorable Judge Drake**
2 messages

**Jon F. Turpin** <jt4590@gmail.com>                              Thu, Nov 2, 2023 at 10:11 AM
Bcc: Kirk Freeman <kirk@kirkfreemanlaw.com>

Please briefly review the following case precedent and opinion in accord with collateral estoppel, and res judicata.

Blakely v. Washington

In my opinion, in our trial, there has been a Blakely error, since the attorney for the alleged victim has gone against multiple declaratory decrees not only of higher courts, but also the Indiana Supreme Court in wrongfully filing a case under seal.

Moore was reprimanded for this prior, it is not expunged nor sealed and is relevant.

Case No. 89S00-0105-DI-230

Even with, in my opinion, fraudulent entry of cases which caused collateral estoppel, or effectively, doube-jeopardy, in situations where my 14th amendment, 5th amendmentment, 6th amendment, and 7th amendment rights were coercively and/or forcibly denied by the original irresponsible plaintiffs from the school lawsuit... if all facts are known, this is still not in his favor.

To allege these are indicative of any issue in my behavior requires a criminally reductive representation of the actual facts in action.

In my opinion, cases mentioned by the alleged petitioner cannot have jurisdiction in Wayne County, IN, genuinely according to the Honorable Larry J. McKinney's order on, "the school lawsuit" as it is often referenced, and also according to the rules on expungement by our DHS, and also according to your ruling not to include this.

In my opinion, Moore has attempted to bypass the declaratory decree of the current court by going against your ruling not to include this in an attempt to subvert the court, and/or to falsely allege me of perjury.

Unfortunately, he in practical example, may have broken rule 26 of civil proceedings, as well as misinterpreted a denied motion, and the meaning of "non-party" in another case.

This may be yet another attempt to break our marital communications privilege in retaliation, and against Aprendi precedent.

Which is simply unfortunate and disappointing to see in action, and I see no need to inform him... he passed the bar.

The way this case was filed causes a situation where not only were the original irresponsible plaintiffs from the school lawsuit were already told the proceedings were so frivolous it couldn't be filed against us by them, nor the colluding party by proxy, the alleged victim has this in communications, and has caused a situation requiring my compulsory counterclaim by their wrongful filing.

Parklane v. Hosiery Co., Inc. v. Shore

In my opinion, they have, and are attempting to deny me rights including the 1st amendment, and this is proven in action if the motions from the case which were misinterpreted by Moore are read correctly.

Thank you for your time and consideration,
Jon F. D. Turpin
Pro Se Pro Hac Vice

**Jon F. Turpin** <jt4590@gmail.com>                              Thu, Nov 2, 2023 at 10:18 AM
Bcc: Kirk Freeman <kirk@kirkfreemanlaw.com>

Please briefly review the following case precedent and opinion in accord with collateral estoppel, and res judicata.

Blakely v. Washington

In my opinion, in our trial, there has been a Blakely error, since the attorney for the alleged victim has gone against multiple declaratory decrees not only of higher courts, but also the Indiana Supreme Court in wrongfully filing a case under seal.

Moore was reprimanded for this prior, it is not expunged nor sealed and is relevant.

Case No. 89S00-0105-DI-230

Even with, in my opinion, fraudulent entry of cases which caused collateral estoppel, or effectively, doube-jeopardy, in situations where my 14th amendment, 5th amendmentment, 6th amendment, and 7th amendment rights were coercively and/or forcibly denied by the original irresponsible plaintiffs from the school lawsuit... if all facts are known, this is still not in his favor.

To allege these are indicative of any issue in my behavior requires a criminally reductive representation of the actual facts in action.

In my opinion, cases mentioned by the alleged petitioner cannot have jurisdiction in Wayne County, IN, genuinely according to the Honorable Larry J. McKinney's order on, "the school lawsuit" as it is often referenced, and also according to the rules on expungement by our DHS, and also according to your ruling not to include this.

In my opinion, Moore has attempted to bypass the declaratory decree of the current court by going against your ruling not to include this in an attempt to subvert the court, and/or to falsely allege me of perjury.

This is a tactic used by bad lawyers typically referred to as "dishonest misconduct" or in chidren's sports: "cheating."

Unfortunately, he in practical example, may have broken rule 26 of civil proceedings, as well as misinterpreted a denied motion, and the meaning of "non-party" in another case.

This may be yet another attempt to break our marital communications privilege in retaliation, and against Aprendi precedent.

Which is simply unfortunate and disappointing to see in action, and I see no need to inform him... he passed the bar.

The way this case was filed causes a situation where not only were the original irresponsible plaintiffs from the school lawsuit were already told the proceedings were so frivolous it couldn't be filed against us by them, nor the colluding party by proxy, the alleged victim has this in communications, and has caused a situation requiring my compulsory counterclaim by their wrongful filing.

Parklane v. Hosiery Co., Inc. v. Shore

In my opinion, they have, and are attempting to deny me
rights including the 1st amendment, and this is proven in
action if the motions from the case which were misinterpreted
by Moore are read correctly.

Thank you for your time and consideration,
Jon F. D. Turpin
Pro Se Pro Hac Vice

[Quoted text hidden]

The original irresponsible plaintiffs from the "School ~~lawsuit~~ lawsuit" and the irresponsible alleged victim, alleged petitioner, and alleged attorney have, are, and continue to attempt to deny my 14th amendment rights to due ~~process~~ process, my 1st, 2nd, 3rd, 4th, ● 5th, 6th, 7th, 8th, 9th, and even 10th amendment rights.

In my opinion, they have directly violated in an easily shown, and readily apparent way, my 14th amendment right to due process, along with my 1st, 5th, 6th, 7th, 8th amendment rights in the current proceedings, while they are on record, after potential Blakely and Aprendi violations, even failing the Matthews Test, and potentially the Barker Test.

They have denied my reaffirmed right to Trial by Jury under the 6th and 7th ~~amendments~~ amendments, compelled me to testify against myself in a trial under seal which cannot be under seal violating my 5th amendment rights, accessed information regarding a sale to my wife, violating our 4th amendment rights, and all of her amendment rights listed above, alongside mine, in the process of doing so, they have ~~attempted~~ attempted to inverse the 10th amendment to deny ● 1st, 2nd, 3rd, and 9th amendment rights as well, and in my opinion, they have and are causing an intolerable injustice after failing the Parklane Test for any usage of offensive collateral estoppel from ● their side at all.



"About 90% of my personal philosophy is:
Don't hurt somebody unless you have to defend yourself, don't steal other people's stuff, and leave me alone..."
Honorable Senator John N. Kennedy

YouTube: Forbes Breaking News 11/02/2023
https://www.youtube.com/watch?v=9x1VFwF7G7U

This isn't directed at the Honorable Judge Drake, nor did I ask her to recuse, I simply gave my opinion, after research into a potential pattern of behaviors, out of genuine concern, as it is pertinent to his safety.

Not from me, nor present company, but from bad apples.

Personally, I agree in my opinion with, and reaffirm, the Honorable Senator John N. Kennedy's opinion expressed and documented above.

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Supporting Documentation [Non-Exhaustive]

---

**Jon F. Turpin** <jt4590@gmail.com>
Bcc: Kirk Freeman <kirk@kirkfreemanlaw.com>, sachatessier@gmail.com

Thu, Nov 2, 2023 at 10:12 PM

**Notes for Brief:**

**Blakely**
**Aprendi**
**Heller**
**Bruen**
**Srour**
**Donnell**
**Duncan [In Progress: Existing Opinion Still Affirms]**
**Rahimi [In Progress: Existing Opinion Still Affirms]**
**Range [As Applied]**

------------------------------------------------------------
**Daniels**
**R.H. Biden [In Progress: Existing Opinion Still Affirms]**
**Espinoza v Montana**
------------------------------------------------------------
**--[Specifically References for Three Cases Above]--**

**--Notre Dame Journal of Law, Ethics, & Public Policy**
**--Volume 5, Issue 3 (1991) Symposium on Drugs & Society**
**--Second Article: Base Alongside Espinoza**

**--George Washington Papers**
**----Tuscarora Nation**

**--Questions On Constitutionality--**
**--Scheduling? Scope? Scourge?--**
**--Nixon Fails Constitutional and "S Test" On One--**

**--[Specifically References for Three Cases Above]--**
------------------------------------------------------------

**Parklane Hosiery, Inc. v Shore [Collateral Estoppel]**
**Indiana DoSR v Boswell Oil Co. [Broker Definition]**

*Matthews*
*Barker*
*New York v. United States & Printz*

**Indiana Supreme Court Disciplinary Commission [Cases Under Seal]**
**Turpin v Indiana**
**Turpin v Charles River Development**
**Indiana v Turpin**
**Turpin v Ascension**
**Missouri v Biden**
**Supreme Court [Affirmative Action]**
**Holwager v Turpin**
**Indiana Supreme Court Disciplinary Commission [Freedom of Speech]**
**Indiana Supreme Court [Jury Rights]**
**Indiana Hammond Court [Civil Rights]**
**Turpin v DirectEmployers**
**Supreme Court [Title VII]**

**Turpin v Turpin [SIGH]**

------------------------------------

**[In Reference For Above]**
**Lennon v Yoko Ono**
**Spears v Spears**
**Depp v Heard**
**Napoleonic Civil (Law) Code**
**Usufruct**
**Succession**
**U.N. Treaties & Charter**
**Vienna Conventions**
**Geneva Conventions**
**[In Reference For Above]**
------------------------------------

On Thu, Nov 2, 2023 at 8:36 PM Jon F. Turpin <jt4590@gmail.com> wrote:
[Update: Included En Banc Opinion Also Supports]

On Thu, Nov 2, 2023 at 8:02 PM Jon F. Turpin <jt4590@gmail.com> wrote:
These each align with the actions in my expunged case, along with the immunity clause under the appropriate Indiana Code:
https://www.law.cornell.edu/wex/affirmative_defense
https://www.law.cornell.edu/wex/necessity_defense
**[The Honorable Judge Stoner's Ruling, Return of my Property and Lifetime Permit, and Expungement Reaffirm]**
**[The Honorable Judge Drake's Ruling, Upholding of Expungement, and Supreme Court Ruling Below Reaffirm]**

**Indiana Supreme Court & Civil Cases Involving Constitutionality of Lack of Jury Trial [Unconstitutional: Applies Directly.]**
https://law.justia.com/constitution/indiana/art1.html [Section 19 & Section 20]
https://www.foxnews.com/us/in-supreme-court-rules-favor-jury-trials-civil-confiscation-cases
https://caselaw.findlaw.com/court/in-supreme-court/1090446.html

**U.S. District Court in Hammond Involving Violations of Civil Rights and Denial of Fair Trial ($25.5 Million Dollar Settlement)**
https://www.foxnews.com/us/indiana-man-awarded-25-million-civil-rights-violation-suit-involving-police-officer

**Range v. Garland 3rd Circuit in Delaware, Pennsylvania, and New Jersey Rules En Banc: 18 U.S.C. 922(g)(1) Unconstitutional "As Applied"**
**[This Is One Law I Suspect Ronald J. Moore Was Attempting To Use In Precedent, But When Reviewed In Full: It Reaffirms Me Even If Federal]**
https://assets.nationbuilder.com/firearmspolicyfoundation/pages/3970/attachments/original/1686067448/Range_v_Garland_En_Banc_Opinion.pdf?1686067448

**Filings Against Todd Rokita by an IU Health Physician Regarding Disclosure Were Proven to Be False And Closed**



# Attorney General Todd Rokita's Statement on Disciplinary Commission Resolution

"First things first: I deny and was not found to have violated anyone's confidentiality or any laws. I was not fined. And I will continue as Indiana's duly-elected attorney general.

Despite the failed attempt to derail our work —which could have disenfranchised nearly 2 million voters, the largest amount in Indiana history for any state office candidate — it all boiled

down to a truthful 16-word answer I gave over a year ago during an international media storm caused by an abortionist who put her interests above her patient's.  I received a 'public reprimand' for saying that "...we have this abortion activist acting as a doctor— with a history of failing to report."

The media, medical establishment and cancel culture, all on cue, supported—and then attempted to vindicate—the abortionist who intentionally exposed personal health information at a political rally all in furtherance of their shared ideological and business interests.

These liberal activists would like to cancel your vote because they hate the fact I stand up for liberty. In the healthcare space alone, I stopped the vaccine mandate, publicly contested severely flawed Covid data, significantly curtailed Indiana's abortion business and fined hospitals and healthcare providers for not putting patients' privacy first.

Having evidence and explanation for everything I said, I could have fought over those 16 words, but ending their campaign now will save a lot of taxpayer money and distraction, which is  also very important to me. In order to resolve this, I was required to sign an affidavit without any modifications.

Now, I will focus even more resources on successfully defending Indiana's laws, including our pro-life laws, and fighting the mob that silences parents, employees, conservative students, law enforcement, Believers of all faiths, American patriots and free enterprise itself.

As I said at the time, my words are factual. The IU Health physician who caused the international media spectacle at the expense of her patient's privacy is by her own actions an outspoken abortion activist.

Many know that she openly discussed with a reporter, and caused to be identified, a 10-year-old rape victim at a political rally. She also used this opportunity to wedge herself into various media outlets, including MSNBC and CBS News. In the end, she had the attention of the entire country, including the pro-abortion President and Vice President.

Less well- known is that for years she has appeared as the keynote speaker at pro-abortion rallies and has roamed the hallways of the legislature in a white lab coat attempting to influence lawmakers. Then, in 2019, the doctor unsuccessfully brought litigation against the people of Indiana to legalize a brutal abortion procedure where the living child is extracted piece by piece. She also poses and is interviewed regularly in media outlets and her full-time patient practice focuses exclusively on performing abortions.

Bernard also claims a tattoo —an image of a coat hanger— that she displays and openly discusses with the national media. Whether you think this behavior is good or bad, I challenge any objective Hoosier to conclude that she isn't an "abortion activist," as I stated.

Also, according to media accounts and complainant press releases, it was in fact publicly alleged well before my tv interview that the abortionist had failed to properly report her work to the state's department of health.

Privacy must exist between doctor and patient in order for trust to exist so that healthcare can advance. So, we work hard to protect personal health information—like a little girl's identity and medical trauma—from publication by their caregivers. This is why Bernard's own peers fined her the maximum allowed by law.

By the way, the Office of Attorney General has nearly two dozen patient privacy cases pending at any time, debunking any claims of a vendetta against Bernard.

Had the cancel culture establishment been successful disenfranchising us, they also would have stifled other elected officials from keeping voters, citizens, and taxpayers informed— especially when uncomfortable facts fall outside a preferred narrative.

LII  > U.S. Constitution Annotated  > Amendment V. Rights of Persons  > Due Process
> Procedural Due Process  > What Process is Due When a Deprivation Occurs
**> Mathews Test**

# Amdt5.4.5.4.2 Mathews Test

Fifth Amendment:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a
> presentment or indictment of a Grand Jury, except in cases arising in the land or naval
> forces, or in the Militia, when in actual service in time of War or public danger; nor shall
> any person be subject for the same offence to be twice put in jeopardy of life or limb;
> nor shall be compelled in any criminal case to be a witness against himself, nor be
> deprived of life, liberty, or property, without due process of law; nor shall private
> property be taken for public use, without just compensation.

The requirements of due process, as has been noted, depend upon the nature of the interest
at stake, while the form of due process required is determined by the weight of that interest
balanced against the opposing interests.[1] The currently prevailing standard is that formulated
in Mathews v. Eldridge,[2] which concerned termination of Social Security benefits.
"Identification of the specific dictates of due process generally requires consideration of three
distinct factors: first, the private interest that will be affected by the official action; second, the
risk of erroneous deprivation of such interest through the procedures used, and probable
value, if any, of additional or substitute procedural safeguards; and, finally, the Government's
interest, including the function involved and the fiscal and administrative burdens that the
additional or substitute procedural requirements would entail."

The termination of welfare benefits in Goldberg v. Kelly,[3] which could have resulted in a
"devastating" loss of food and shelter, had required a pre-deprivation hearing. The termination
of Social Security benefits at issue in Mathews would require less protection, however,
because those benefits are not based on financial need and a terminated recipient would be
able to apply for welfare if need be. Moreover, the determination of ineligibility for Social
Security benefits more often turns upon routine and uncomplicated evaluations of data,
reducing the likelihood of error, a likelihood found significant in Goldberg. Finally, the

administrative burden and other societal costs involved in giving Social Security recipients a pre-termination hearing would be high. Therefore, a post-termination hearing, with full retroactive restoration of benefits, if the claimant prevails, was found satisfactory.[4]

Application of the Mathews standard and other considerations brought some noteworthy changes to the process accorded debtors and installment buyers. Earlier cases, which had focused upon the interests of the holders of the property in not being unjustly deprived of the goods and funds in their possession, leaned toward requiring pre-deprivation hearings. Newer cases, however, look to the interests of creditors as well. "The reality is that both seller and buyer had current, real interests in the property, and the definition of property rights is a matter of state law. Resolution of the due process question must take account not only of the interests of the buyer of the property but those of the seller as well." [5]

Thus, Sniadach v. Family Finance Corp.,[6] which mandated pre-deprivation hearings before wages may be garnished, has apparently been limited to instances when wages, and perhaps certain other basic necessities, are in issue and the consequences of deprivation would be severe.[7] Fuentes v. Shevin,[8] which struck down a replevin statute that authorized the seizure of property (here household goods purchased on an installment contract) simply upon the filing of an ex parte application and the posting of bond, has been limited,[9] so that an appropriately structured ex parte judicial determination before seizure is sufficient to satisfy due process.[10] Thus, laws authorizing sequestration, garnishment, or other seizure of property of an alleged defaulting debtor need only require that (1) the creditor furnish adequate security to protect the debtor's interest, (2) the creditor make a specific factual showing before a neutral officer or magistrate, not a clerk or other such functionary, of probable cause to believe that he is entitled to the relief requested, and (3) an opportunity be assured for an adversary hearing promptly after seizure to determine the merits of the controversy, with the burden of proof on the creditor.[11]

Similarly, applying the Mathews v. Eldridge standard in the context of government employment, the Court has held, albeit by a combination of divergent opinions, that the interest of the employee in retaining his job, the governmental interest in the expeditious removal of unsatisfactory employees, the avoidance of administrative burdens, and the risk of an erroneous termination combine to require the provision of some minimum pre-termination notice and opportunity to respond, followed by a full post-termination hearing, complete with all the procedures normally accorded and back pay if the employee is successful.[12] Where the adverse action is less than termination of employment, the governmental interest is significant, and where reasonable grounds for such action have been established separately, then a prompt hearing held after the adverse action may be sufficient.[13] In other cases, hearings with even minimum procedures may be dispensed with when what is to be established is so pro forma or routine that the likelihood of error is very

small.[14] In a case dealing with negligent state failure to observe a procedural deadline, the Court held that the claimant was entitled to a hearing with the agency to pass upon the merits of his claim prior to dismissal of his action.[15]

In Brock v. Roadway Express, Inc.,[16] a Court plurality applied a similar analysis to governmental regulation of private employment, determining that an employer may be ordered by an agency to reinstate a "whistle-blower" employee without an opportunity for a full evidentiary hearing, but that the employer is entitled to be informed of the substance of the employee's charges, and to have an opportunity for informal rebuttal. The principal difference with the Mathews v. Eldridge test was that here the Court acknowledged two conflicting private interests to weigh in the equation: that of the employer "in controlling the makeup of its workforce" and that of the employee in not being discharged for whistleblowing. Whether the case signals a shift away from evidentiary hearing requirements in the context of regulatory adjudication will depend on future developments.[17]

A delay in retrieving money paid to the government is unlikely to rise to the level of a violation of due process. In City of Los Angeles v. David,[18] a citizen paid a $134.50 impoundment fee to retrieve an automobile that had been towed by the city. When he subsequently sought to challenge the imposition of this impoundment fee, he was unable to obtain a hearing until 27 days after his car had been towed. The Court held that the delay was reasonable, as the private interest affected—the temporary loss of the use of the money—could be compensated by the addition of an interest payment to any refund of the fee. Further factors considered were that a 30-day delay was unlikely to create a risk of significant factual errors, and that shortening the delay significantly would be administratively burdensome for the city.

In another context, the Supreme Court applied the Mathews test to strike down a provision in Colorado's Exoneration Act.[19] That statute required individuals whose criminal convictions had been invalidated to prove their innocence by clear and convincing evidence in order to recoup any fines, penalties, court costs, or restitution paid to the state as a result of the conviction.[20] The Court, noting that "[a]bsent conviction of crime, one is presumed innocent," [21] concluded that all three considerations under Mathews "weigh[ed] decisively against Colorado's scheme." [22] Specifically, the Court reasoned that (1) those affected by the Colorado statute have an "obvious interest" in regaining their funds;[23] (2) the burden of proving one's innocence by "clear and convincing" evidence unacceptably risked erroneous deprivation of those funds;[24] and (3) the state had "no countervailing interests" in withholding money to which it had "zero claim of right." [25] As a result, the Court held that the state could not impose "anything more than minimal procedures" for the return of funds that occurred as a result of a conviction that was subsequently invalidated.[26]

In another respect, the balancing standard of Mathews has resulted in states' having wider flexibility in determining what process is required. For instance, in an alteration of previously existing law, no hearing is required if a state affords the claimant an adequate alternative remedy, such as a judicial action for damages or breach of contract.[27] Thus, the Court, in

passing on the infliction of corporal punishment in the public schools, held that the existence of common-law tort remedies for wrongful or excessive administration of punishment, plus the context in which the punishment was administered (i.e., the ability of the teacher to observe directly the infraction in question, the openness of the school environment, the visibility of the confrontation to other students and faculty, and the likelihood of parental reaction to unreasonableness in punishment), made reasonably assured the probability that a child would not be punished without cause or excessively.[28] The Court did not, however, inquire about the availability of judicial remedies for such violations in the state in which the case arose.[29]

The Court has required greater protection from property deprivations resulting from operation of established state procedures than from those resulting from random and unauthorized acts of state employees,[30] and presumably this distinction still holds. Thus, the Court has held that post-deprivation procedures would not satisfy due process if it is "the state system itself that destroys a complainant's property interest."[31] Although the Court briefly entertained the theory that a negligent (i.e., non-willful) action by a state official was sufficient to invoke due process, and that a post-deprivation hearing regarding such loss was required,[32] the Court subsequently overruled this holding, stating that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."[33]

In "rare and extraordinary situations," where summary action is necessary to prevent imminent harm to the public, and the private interest infringed is reasonably deemed to be of less importance, government can take action with no notice and no opportunity to defend, subject to a later full hearing.[34] Examples are seizure of contaminated foods or drugs or other such commodities to protect the consumer,[35] collection of governmental revenues,[36] and the seizure of enemy property in wartime.[37] Thus, citing national security interests, the Court upheld an order, issued without notice and an opportunity to be heard, excluding a short-order cook employed by a concessionaire from a Naval Gun Factory, but the basis of the five-to-four decision is unclear.[38] On the one hand, the Court was ambivalent about a right-privilege distinction;[39] on the other hand, it contrasted the limited interest of the cook—barred from the base, she was still free to work at a number of the concessionaire's other premises—with the government's interest in conducting a high-security program.[40]

**1** Footnotes
"The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' . . . and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." Goldberg v. Kelly, 397 U.S. 254, 262–63 (1970), (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 168 (1951) (Justice Frankfurter concurring)). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 894–95 (1961). ◀

**2** 424 U.S. 319, 335 (1976). ◀

**3** 397 U.S. 254, 264 (1970). ⬆

**4** Mathews v. Eldridge, 424 U.S. 319, 339–49 (1976). ⬆

**5** Mitchell v. W.T. Grant Co., 416 U.S. 600, 604 (1974). *See also id.* at 623 (Justice Powell concurring), 629 (Justices Stewart, Douglas, and Marshall dissenting). Justice White, who wrote Mitchell and included the balancing language in his dissent in Fuentes v. Shevin, 407 U.S. 67, 99–100 (1972), did not repeat it in North Georgia Finishing v. Di-Chem, 419 U.S. 601 (1975), but it presumably underlies the reconciliation of Fuentes and Mitchell in the latter case and the application of Di-Chem. ⬆

**6** 395 U.S. 337 (1969) . ⬆

**7** North Georgia Finishing v. Di-Chem, 419 U.S. 601, 611 n.2 (1975) (Justice Powell concurring). The majority opinion draws no such express distinction, *see id.* at 605–06, rather emphasizing that Sniadach-Fuentes do require observance of *some* due process procedural guarantees. *But see* Mitchell v. W.T. Grant Co., 416 U.S. 600, 614 (1974) (opinion of Court by Justice White emphasizing the wages aspect of the earlier case). ⬆

**8** 407 U.S. 67 (1972). ⬆

**9** Fuentes was an extension of the Sniadach principle to all "significant property interests" and thus mandated pre-deprivation hearings. Fuentes was a decision of uncertain viability from the beginning, inasmuch as it was four-to-three; argument had been heard prior to the date Justices Powell and Rehnquist joined the Court, hence neither participated in the decision. *See* Di-Chem, 419 U.S. at 616–19 (Justice Blackmun dissenting); Mitchell, 416 U.S. at 635–36 (1974) (Justice Stewart dissenting). ⬆

**10** Mitchell v. W.T. Grant Co., 416 U.S. 600 (1974); North Georgia Finishing v. Di-Chem, 419 U.S. 601 (1975). More recently, the Court has applied a variant of the Mathews v. Eldridge formula in holding that Connecticut's prejudgment attachment statute, which "fail[ed] to provide a preattachment hearing without at least requiring a showing of some exigent circumstance," operated to deny equal protection. Connecticut v. Doehr, 501 U.S. 1, 18 (1991). "[T]he relevant inquiry requires, as in Mathews, first, consideration of the private interest that will be affected by the prejudgment measure; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, in contrast to Mathews, principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." 501 U.S. at 11. ⬆

**11** Mitchell v. W.T. Grant Co., 416 U.S. at 615–18 (1974); *id.* at 623 (Justice Powell concurring). *See also* Arnett v. Kennedy, 416 U.S. 134, 188 (1974) (Justice White concurring in part and dissenting in part). Efforts to litigate challenges to seizures in actions involving two private parties may be thwarted by findings of "no state action," but there often is sufficient participation by state officials in transferring possession of property to constitute state action and implicate due process. *Compare* Flagg Bros. v. Brooks, 436 U.S. 149 (1978) (no state action in warehouseman's sale of goods for nonpayment of storage, as authorized by state law), *with* Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) (state officials' joint participation with private party in effecting prejudgment attachment of property); *and* Tulsa Professional Collection Servs. v. Pope, 485 U.S. 478 (1988) (probate court was sufficiently involved with actions activating time bar in "nonclaim" statute). ⬆

**12** Arnett v. Kennedy, 416 U.S. 134, 170–71 (1974) (Justice Powell concurring), and 416 U.S. at 195–96 (Justice White concurring in part and dissenting in part); Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532

(1985) (discharge of state government employee). In Barry v. Barchi, 443 U.S. 55 (1979), the Court held that the state interest in assuring the integrity of horse racing carried on under its auspices justified an interim suspension without a hearing once it established the existence of certain facts, provided that a prompt judicial or administrative hearing would follow suspension at which the issues could be determined was assured. *See also* FDIC v. Mallen, 486 U.S. 230 (1988) (strong public interest in the integrity of the banking industry justifies suspension of indicted bank official with no pre-suspension hearing, and with 90-day delay before decision resulting from post-suspension hearing). 🔼

**13** Gilbert v. Homar, 520 U.S. 924 (1997) (no hearing required prior to suspension without pay of tenured police officer arrested and charged with a felony). 🔼

**14** *E.g.*, Dixon v. Love, 431 U.S. 105 (1977) (when suspension of driver's license is automatic upon conviction of a certain number of offenses, no hearing is required because there can be no dispute about facts). 🔼

**15** Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982). 🔼

**16** 481 U.S. 252 (1987). Justice Marshall's plurality opinion was joined by Justices Blackmun, Powell, and O'Connor; Chief Justice Rehnquist and Justice Scalia joined Justice White's opinion taking a somewhat narrower view of due process requirements but supporting the plurality's general approach. Justices Brennan and Stevens would have required confrontation and cross-examination. 🔼

**17** For analysis of the case's implications, *see* Rakoff, Brock v. Roadway Express, Inc., and the New Law of Regulatory Due Process, 1987 Sup. Ct. Rev. 157. 🔼

**18** 538 U.S. 715 (2003). 🔼

**19** *See* Nelson v. Colorado, No. 15-1256, Slip Op. (April 19, 2017). 🔼

**20** *See id.* at 3–4 (describing Colorado's Exoneration Act). Initially, the Court concluded that because the case concerned the "continuing deprivation of property after a [criminal] conviction" was reversed or vacated and "no further criminal process" was implicated by the case, the appropriate lens to examine the Exoneration Act was through the Mathews balancing test that generally applies in civil contexts. *Id.* at 6. The Court noted, however, that even under the test used to examine criminal due process rights—the fundamental fairness approach—Colorado's Exoneration Act would still fail to provide adequate due process because the state's procedures offend a fundamental principle of justice—the presumption of innocence. *Id.* at 5 n.9. 🔼

**21** *Id.* at 1. 🔼

**22** *Id.* at 4. 🔼

**23** *Id.* In so concluding, the Court rejected Colorado's argument that the money in question belonged to the state because the criminal convictions were in place at the time the funds were taken. *Id.* The Court reasoned that after a conviction has been reversed, the criminal defendant is presumed innocent and any funds provided to the state as a result of the conviction rightfully belong to the person who was formerly subject to the prosecution. *Id.* at 5 ( "Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions." ). 🔼

**24** *Id.* at 5–6. In particular, the Court noted that when a defendant seeks to recoup small amounts of money under the Exoneration Act, the costs of mounting a claim and retaining a lawyer "would be prohibitive," amounting to "no remedy at all" for any minor assessments under the Act. *Id.* at 1257. 🔼

**25** *Id.* at 6. ⬆

**26** *Id.* ⬆

**27** *See, e.g.,* Lujan v. G & G Fire Sprinklers, Inc., 523 U.S. 189 (2001) (breach of contract suit against state contractor who withheld payment to subcontractor based on state agency determination of noncompliance with Labor Code sufficient for due process purposes). ⬆

**28** Ingraham v. Wright, 430 U.S. 651, 680–82 (1977). ⬆

**29** Ingraham v. Wright, 430 U.S. 651, 680–82 (1977). In Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 19–22 (1987), involving cutoff of utility service for non-payment of bills, the Court rejected the argument that common-law remedies were sufficient to obviate the pre-termination hearing requirement. ⬆

**30** Logan v. Zimmerman Brush Co., 455 U.S. at 435–36 (1982). The Court emphasized that a post-deprivation hearing regarding harm inflicted by a state procedure would be inadequate. "That is particularly true where, as here, the State's only post-termination process comes in the form of an independent tort action. Seeking redress through a tort suit is apt to be a lengthy and speculative process, which in a situation such as this one will never make the complainant entirely whole." 455 U.S. 422, 436–37 (1982). ⬆

**31** 455 U.S. at 436. ⬆

**32** More expressly adopting the tort remedy theory, the Court in Parratt v. Taylor, 451 U.S. 527 (1981), held that the loss of a prisoner's mail-ordered goods through the negligence of prison officials constituted a deprivation of property, but that the state's post-deprivation tort-claims procedure afforded adequate due process. When a state officer or employee acts negligently, the Court recognized, there is no way that the state can provide a pre-termination hearing; the real question, therefore, is what kind of post-deprivation hearing is sufficient. When the action complained of is the result of the unauthorized failure of agents to follow established procedures and there is no contention that the procedures themselves are inadequate, the Due Process Clause is satisfied by the provision of a judicial remedy which the claimant must initiate. 451 U.S. at 541, 543–44. It should be noted that Parratt was a property loss case, and thus may be distinguished from liberty cases, where a tort remedy, by itself, may not be adequate process. *See* Ingraham v. Wright, 430 U.S. at 680–82. ⬆

**33** Daniels v. Williams, 474 U.S. 327, 328 (1986) (involving negligent acts by prison officials). Hence, there is no requirement for procedural due process stemming from such negligent acts and no resulting basis for suit under 42 U.S.C. § 1983 for deprivation of rights deriving from the Constitution. Prisoners may resort to state tort law in such circumstances, but neither the Constitution nor § 1983 provides a federal remedy. ⬆

**34** Board of Regents v. Roth, 408 U.S. 564, 570 n.7 (1972); Bell v. Burson, 402 U.S. 535, 542 (1971). *See* Parratt v. Taylor, 451 U.S. 527, 538–40 (1981). Of course, one may waive his due process rights, though as with other constitutional rights, the waiver must be knowing and voluntary. D.H. Overmyer Co. v. Frick Co., 405 U.S. 174 (1972). *See also* Fuentes v. Shevin, 407 U.S. 67, 94–96 (1972). ⬆

**35** North American Cold Storage Co. v. City of Chicago, 211 U.S. 306 (1908); Ewing v. Mytinger & Casselberry, 339 U.S. 594 (1950). *See also* Fahey v. Mallonee, 332 U.S. 245 (1947). *Cf.* Mackey v. Montrym, 443 U.S. 1, 17–18 (1979). ⬆

**36** Phillips v. Commissioner, 283 U.S. 589, 597 (1931). ⬆

**37**  Central Union Trust Co. v. Garvan, 254 U.S. 554, 566 (1921). ⬆

**38**  Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886 (1961). ⬆

**39**  367 U.S. at 894, 895, 896 (1961). ⬆

**40**  367 U.S. at 896–98. *See* Goldberg v. Kelly, 397 U.S. 254, 263 n.10 (1970); Board of Regents v. Roth, 408 U.S. 564, 575 (1972); Arnett v. Kennedy, 416 U.S. 134, 152 (1974) (plurality opinion), and 416 U.S. at 181–183 (Justice White concurring in part and dissenting in part). ⬆

💼 U.S. Constitution Annotated Toolbox

- Explanation of the Constitution - from the Congressional Research Service

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

# Barker v. Wingo, 407 U.S. 514 (1972)

Overview     Opinions     Materials

**Argued:**            **Decided:**           **Granted:**

April 11, 1972         June 22, 1972          January 17, 1972

## Syllabus

# U.S. Supreme Court

**Barker v. Wingo, 407 U.S. 514 (1972)**

**Barker v. Wingo**

**No. 71-5255**

**Argued April 11, 1972**

**Decided June 22, 1972**

**407 U.S. 514**

**Read More**

## Opinions

**Opinions & Dissents**

# U.S. Supreme Court

**Barker v. Wingo, 407 U.S. 514 (1972)**
**Barker v. Wingo**

**No. 71-5255**

**Argued April 11, 1972**

**Decided June 22, 1972**

**407 U.S. 514**

*CERTIORARI TO THE UNITED STATES COURT OF APPEALS*

*FOR THE SIXTH CIRCUIT*

*Syllabus*

Petitioner was not brought to trial for murder until more than five years after he had been arrested, during which time the prosecution obtained numerous continuances, initially for the purpose of first trying petitioner's alleged accomplice so that his testimony, if conviction resulted, would be available at petitioner's trial. Before the accomplice was finally convicted, he was tried six times. Petitioner made no objection to the continuances until three and one-half years after he was arrested. After the accomplice was finally convicted, petitioner, after further delays because of a key prosecution witness' illness, was tried and convicted. In this habeas corpus proceeding, the Court of Appeals, concluding that petitioner had waived his right to a speedy trial for the period prior to his demand for trial, and, in any event, had not been prejudiced by the delay, affirmed the District Court's judgment against petitioner.

*Held:* A defendant's constitutional right to a speedy trial cannot be established by any inflexible rule, but can be determined only on an *ad hoc* balancing basis in which the conduct of the prosecution and that of the defendant are weighed. The court should assess such factors as the length of and reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. In this case, the lack of any serious prejudice to petitioner and the fact, as disclosed by the record, that he did not want a speedy trial outweigh opposing considerations, and compel the conclusion that petitioner was not deprived of his due process right to a speedy trial. Pp. 407 U. S. 519-536.

442 F.2d 1141, affirmed.

POWELL, J., delivered the opinion for a unanimous Court. WHITE, J., filed a concurring opinion, in which BRENNAN, J., joined, *post,* p. 407 U. S. 536.

Page 407 U. S. 515

MR. JUSTICE POWELL delivered the opinion of the Court.

Although a speedy trial is guaranteed the accused by the Sixth Amendment to the Constitution, [Footnote 1] this Court has dealt with that right on infrequent occasions. *See Beavers v. Haubert,* 198 U. S. 77 (1905); *Pollard v. United States,* 352 U. S. 354 (1957); *United States v. Ewell,* 383 U. S. 116 (1966); *United States v. Marion,* 404 U. S. 307 (1971). *See also United States v. Provoo,* 17 F.R.D. 183 (D. Md.), *aff'd,* 30 U.S. 857 (1955). The Court's opinion in *Klopfer v. North Carolina,* 386 U. S. 213 (1967), established that the right to a speedy trial is "fundamental," and is imposed by the Due Process Clause of the Fourteenth Amendment on the States. [Footnote 2] *See Smith v. Hooey,* 393 U. S. 374 (1969); *Dickey v. Florida,* 398 U. S. 30 (1070). As MR. JUSTICE BRENNAN

Page 407 U. S. 516

pointed out in his concurring opinion in *Dickey,* in none of these cases have we attempted to set out the criteria by which the speedy trial right is to be judged. 398 U.S. at 398 U. S. 401. This case compels us to make such an attempt.

## I

On July 20, 1958, in Christian County, Kentucky, an elderly couple was beaten to death by intruders wielding an iron tire tool. Two suspects, Silas Manning and Willie Barker, the petitioner, were arrested shortly thereafter. The grand jury indicted them on September 15. Counsel was appointed on September 17, and Barker's trial was set for October 21. The Commonwealth had a stronger case against Manning, and it believed that Barker could not be convicted unless Manning testified against him. Manning was naturally unwilling to incriminate himself. Accordingly, on October 23, the day Silas Manning was brought to trial, the Commonwealth sought and obtained the first of what was to be a series of 16 continuances of Barker's trial. [Footnote 3] Barker made no objection. By first convicting Manning, the Commonwealth would remove possible problems of self-incrimination, and would be able to assure his testimony against Barker.

The Commonwealth encountered more than a few difficulties in its prosecution of Manning. The first trial ended in a hung jury. A second trial resulted in a conviction, but the Kentucky Court of Appeals reversed because of the admission of evidence obtained by an illegal search.

*Manning v. Commonwealth,* 328 S.W.2d 421 (1959). At his third trial, Manning was again convicted, and the Court of Appeals again reversed

Page 407 U. S. 517

because the trial court had not granted a change of venue. *Manning v. Commonwealth,* 346 S.W.2d 755 (1961). A fourth trial resulted in a hung jury. Finally, after five trials, Manning was convicted, in March, 1962, of murdering one victim, and, after a sixth trial, in December, 1962, he was convicted of murdering the other. [Footnote 4]

The Christian County Circuit Court holds three terms each year -- in February, June, and September. Barker's initial trial was to take place in the September term of 1958. The first continuance postponed it until the February, 1959, term. The second continuance was granted for one month only. Every term thereafter for as long a the Manning prosecutions were in process, the Commonwealth routinely moved to continue Barker's case to the next term. When the case was continued from the June, 1959, term until the following September, Barker, having spent 10 months in jail, obtained his release by posting a $5,000 bond. He thereafter remained free in the community until his trial. Barker made no objection, through his counsel, to the first 11 continuances.

When, on February 12, 1962, the Commonwealth moved for the twelfth time to continue the case until the following term, Barker's counsel filed a motion to dismiss the indictment. The motion to dismiss was denied two weeks later, and the Commonwealth's motion for a continuance was granted. The Commonwealth was granted further continuances in June, 1962, and September, 1962, to which Barker did not object.

In February, 1963, the first term of court following Manning's final conviction, the Commonwealth moved to set Barker's trial for March 19. But on the day scheduled for trial, it again moved for a continuance until the June term. It gave as its reason the illness

Page 407 U. S. 518

of the ex-sheriff who was the chief investigating officer in the case. To this continuance, Barker objected unsuccessfully.

The witness was still unable to testify in June, and the trial, which had been set for June 19, was continued again until the September term over Barker's objection. This time the court announced that the case would be dismissed for lack of prosecution if it were not tried during the next term. The final trial date was set for October 9, 1963. On that date, Barker again moved to dismiss the indictment, and this time specified that his right to a speedy trial had been violated. [Footnote 5] The motion was denied; the trial commenced with Manning a the chief prosecution witness; Barker was convicted and given a life sentence.

chief prosecution witness; Barker was convicted and given a life sentence.

Barker appealed his conviction to the Kentucky Court of Appeals, relying in part on his speedy trial claim. The court affirmed. *Barker v. Commonwealth,* 385 S.W.2d 671 (1964). In February, 1970, Barker petitioned for habeas corpus in the United States District Court for the Western District of Kentucky. Although the District Court rejected the petition without holding a hearing, the court granted petitioner leave to appeal *in forma pauperis* and a certificate of probable cause to appeal. On appeal, the Court of Appeals for the Sixth Circuit affirmed the District Court. 442 F.2d 1141 (1971). It ruled that Barker had waived his speedy trial claim for the entire period before February, 1963, the date on which the court believed he had first objected to the delay by filing a motion to dismiss. In this belief the court was mistaken, for the record reveals

Page 407 U. S. 519

that the motion was filed in February, 1962. The Commonwealth so conceded at oral argument before this Court. [Footnote 6] The court held further that the remaining period after the date on which Barker first raised his claim and before his trial -- which it thought was only eight months but which was actually 20 months -- was not unduly long. In addition, the court held that Barker had shown no resulting prejudice, and that the illness of the ex-sheriff was a valid justification for the delay. We granted Barker's petition for certiorari. 404 U.S. 1037 (1972).

## II

The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused. In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused. The inability of courts to provide a prompt trial has contributed to a large backlog of cases in urban courts which, among other things, enables defendants to negotiate more effectively for pleas of guilty to lesser offenses and otherwise manipulate the system. [Footnote 7] In addition, persons released on bond for lengthy periods awaiting trial have an opportunity to commit other crimes. [Footnote 8] It must be of little comfort to the residents of Christian County, Kentucky, to know that Barker was at large on bail for over four years while accused of a vicious

Page 407 U. S. 520

and brutal murder of which he was ultimately convicted. Moreover, the longer an accused is free awaiting trial, the more tempting becomes his opportunity to jump bail and escape.

[Footnote 9] Finally, delay between arrest and punishment may have a detrimental effect on rehabilitation. [Footnote 10]

If an accused cannot make bail, he is generally confined, as was Barker for 10 months, in a local jail. This contributes to the overcrowding and generally deplorable state of those institutions. [Footnote 11] Lengthy exposure to these conditions "has a destructive effect on human character, and makes the rehabilitation of the individual offender much more difficult." [Footnote 12] At times the result may even be violent rioting. [Footnote 13] Finally, lengthy pretrial detention is costly. The cost of maintaining a prisoner in jail varies from $3 to $9 per day, and this amounts to millions across

Page 407 U. S. 521

the Nation. [Footnote 14] In addition, society loses wages which might have been earned, and it must often support families of incarcerated breadwinners.

A second difference between the right to speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself.

Finally, and perhaps most importantly, the right to speedy trial is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate. [Footnote 15] As a consequence, there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial. If, for example, the State moves for

Page 407 U. S. 522

a 60-day continuance, granting that continuance is not a violation of the right to speedy trial unless the circumstances of the case are such that further delay would endanger the values the right protects. It is impossible to do more than generalize about when those circumstances exist. There is nothing comparable to the point in the process when a defendant exercises or waives his right to counsel or his right to a jury trial. Thus, as we recognized in *Beavers v. Haubert, supra,* any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case:

"The right of a speedy trial is necessarily relative. It is consistent with delays, and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice."

198 U.S. at 198 U. S. 87.

The amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence, because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, [Footnote 16] but it is the only possible remedy.

### III

Perhaps because the speedy trial right is so slippery, two rigid approaches are urged upon us as ways of eliminating some of the uncertainty which courts experience

Page 407 U. S. 523

in protecting the right. The first suggestion is that we hold that the Constitution requires a criminal defendant to be offered a trial within a specified time period. The result of such a ruling would have the virtue of clarifying when the right is infringed and of simplifying courts' application of it. Recognizing this, some legislatures have enacted laws, and some courts have adopted procedural rules which more narrowly define the right. [Footnote 17] The United States Court of Appeals for the Second Circuit has promulgated rules for the district courts in that Circuit establishing that the government must be ready for trial within six months of the date of arrest, except in unusual circumstances, or the charge will be dismissed. [Footnote 18] This type of rule is also recommended by the American Bar Association. [Footnote 19]

But such a result would require this Court to engage in legislative or rulemaking activity, rather than in the adjudicative process to which we should confine our efforts. We do not establish procedural rules for the States, except when mandated by the Constitution. We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months. The States, of course, are free to prescribe a reasonable period consistent with constitutional standards, but our approach must be less precise.

The second suggested alternative would restrict consideration

Page 407 U. S. 524

of the right to those case in which the accused has demanded a speedy trial. Most States have recognized what is loosely referred to as the "demand rule," [Footnote 20] although eight States reject it. [Footnote 21] It is not clear, however, precisely what is meant by that term. Although every federal court of appeals that has considered the question has endorsed some kind of demand rule, some have regarded the rule within the concept of waiver, [Footnote 22] whereas others have viewed it as a factor to be weighed

Page 407 U. S. 525

in assessing whether there has been a deprivation of the speedy trial right. [Footnote 23] We shall refer to the former approach as the demand-waiver doctrine. The demand-waiver doctrine provides that a defendant waives any consideration of his right to speedy trial for any period prior to which he has not demanded a trial. Under this rigid approach, a prior demand is a necessary condition to the consideration of the speedy trial right. This essentially was the approach the Sixth Circuit took below.

Such an approach, by presuming waiver of a fundamental right [Footnote 24] from inaction, is inconsistent with this Court's pronouncements on waiver of constitutional rights. The Court has defined waiver as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U. S. 458, 304 U. S. 464 (1938). Courts should "indulge every reasonable presumption against waiver," *Aetna Ins. Co. v. Kennedy,* 301 U. S. 389, 301 U. S. 393 (1937), and they should "not presume acquiescence

Page 407 U. S. 526

in the loss of fundamental rights," *Ohio Bell Tel. Co. v. Public Utilities Comm'n,* 301 U. S. 292, 301 U. S. 307 (137). In *Carnley v. Cochran,* 369 U. S. 506 (1962), we held:

"Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver."

*Id.* at 369 U. S. 516. The Court has ruled similarly with respect to waiver of other rights designed to protect the accused. *See, e.g., Miranda v. Arizona,* 384 U. S. 436, 384 U. S. 475-476 (1966); *Boykin v. Alabama,* 395 U. S. 238 (1969).

In excepting the right to speedy trial from the rule of waiver we have applied to other fundamental rights, courts that have applied the demand-waiver rule have relied on the assumption that delay usually works for the benefit of the accused, and on the absence of any readily ascertainable time in the criminal process for a defendant to be given the choice of exercising or waiving his right. But it is not necessarily true that delay benefits the defendant

exercising or waiving his right. But it is not necessarily true that delay benefits the defendant. There are cases in which delay appreciably harms the defendant's ability to defend himself. [Footnote 25]

Page 407 U. S. 527

Moreover, a defendant confined to jail prior to trial is obviously disadvantaged by delay as is a defendant released on bail but unable to lead a normal life because of community suspicion and his own anxiety.

The nature of the speedy trial right does make it impossible to pinpoint a precise time in the process when the right must be asserted or waived, but that fact does not argue for placing the burden of protecting the right solely on defendants. A defendant has no duty to bring himself to trial; [Footnote 26] the State has that duty as well as the duty of insuring that the trial is consistent with due process. [Footnote 27] Moreover, for the reasons earlier expressed, society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest.

It is also noteworthy that such a rigid view of the demand-waiver rule places defense counsel in an awkward position. Unless he demands a trial early and often, he is in danger of frustrating his client's right. If counsel is willing to tolerate some delay because he finds it reasonable and helpful in preparing his own case, he may be unable to obtain a speedy trial for his client at the end of that time. Since, under the demand-waiver rule, no time

Page 407 U. S. 528

runs until the demand is made, the government will have whatever time is otherwise reasonable to bring the defendant to trial after a demand has bee made. Thus, if the first demand is made three months after arrest in a jurisdiction which prescribes a six-month rule, the prosecution will have a total of nine months -- which may be wholly unreasonable under the circumstances. The result in practice is likely to be either an automatic, *pro forma* demand made immediately after appointment of counsel or delays which, but for the demand-waiver rule, would not be tolerated. Such a result is not consistent with the interests of defendants, society, or the Constitution.

We reject, therefore, the rule that a defendant who fails to demand a speedy trial forever waives his right. [Footnote 28] This does not mean, however, that the defendant has no responsibility to assert his right. We think the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right. Such a formulation avoids the rigidities of the demand-waiver rule and the resulting possible unfairness in its application. It allows the trial

court

Page 407 U. S. 529

to exercise a judicial discretion based on the circumstances, including due consideration of any applicable formal procedural rule. It would permit, for example, a court to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client, or from a situation in which no counsel is appointed. It would also allow a court to weigh the frequency and force of the objections, as opposed to attaching significant weight to a purely *pro forma* objection.

In ruling that a defendant has some responsibility to assert a speedy trial claim, we do not depart from our holdings in other cases concerning the waiver of fundamental rights, in which we have placed the entire responsibility on the prosecution to show that the claimed waiver was knowingly and voluntarily made. Such cases have involved rights which must be exercised or waived at a specific time or under clearly identifiable circumstances, such as the rights to plead not guilty, to demand a jury trial, to exercise the privilege against self-incrimination, and to have the assistance of counsel. We have shown above that the right to a speedy trial is unique in its uncertainty as to when and under what circumstances it must be asserted or may be deemed waived. But the rule we announce today, which comports with constitutional principles, places the primary burden on the courts and the prosecutors to assure that cases are brought to trial. We hardly need add that, if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine, the demand rule aside.

We therefore reject both of the inflexible approaches -- the fixed-time period because it goes further than the Constitution requires; the demand-waiver rule because it is insensitive to a right which we have deemed

Page 407 U. S. 530

fundamental. The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed. [Footnote 29]

## IV

A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: length of delay, the

reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. [Footnote 30]

The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar

Page 407 U. S. 531

circumstances of the case. [Footnote 31] To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.

Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. [Footnote 32] A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government, rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

We have already discussed the third factor, the defendant's responsibility to assert his right. Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining

Page 407 U. S. 532

whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. [Footnote 33] Of these, the most serious is the last, because the

inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record, because what has been forgotten can rarely be shown.

We have discussed previously the societal disadvantages of lengthy pretrial incarceration, but obviously the disadvantages for the accused who cannot obtain his release are even more serious. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. [Footnote 34] The time spent in

Page 407 U. S. 533

jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. [Footnote 35] Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent. Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility. *See* cases cited in n 33, *supra*.

We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors, and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. [Footnote 36] But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

## V

The difficulty of the task of balancing these factors is illustrated by this case, which we consider to be close. It is clear that the length of delay between arrest and trial -- well over five years -- was extraordinary. Only

Page 407 U. S. 534

seven months of that period can be attributed to a strong excuse, the illness of the ex-sheriff who was in charge of the investigation. Perhaps some delay would have been permissible under ordinary circumstances so that Manning could be utilized as a witness in Barker's trial,

but more than four years was too long a period, particularly since a good part of that period was attributable to the Commonwealth's failure or inability to try Manning under circumstances that comported with due process.

Two counterbalancing factors, however, outweigh these deficiencies. The first is that prejudice was minimal. Of course, Barker was prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety. Moreover, although he was released on bond for most of the period, he did spend 10 months in jail before trial. But there is no claim that any of Barker's witnesses died or otherwise became unavailable owing to the delay. The trial transcript indicates only two very minor lapses of memory -- one on the part of a prosecution witness -- which were in no way significant to the outcome.

More important than the absence of serious prejudice is the fact that Barker did not want a speedy trial. Counsel was appointed for Barker immediately after his indictment, and represented him throughout the period. No question is raised as to the competency of such counsel. [Footnote 37] Despite the fact that counsel had notice of the motions for continuances, [Footnote 38] the record shows no action whatever taken between October 21, 1958, and February 12, 1962, that could be construed as the assertion of the speedy trial right. On the latter date, in response to another motion for continuance, Barker moved

Page 407 U. S. 535

to dismiss the indictment. The record does not show on what ground this motion was based, although it is clear that no alternative motion was made for a immediate trial. Instead, the record strongly suggests that, while he hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried. Counsel conceded as much at oral argument:

"Your honor, I would concede that Willie Mae Barker probably -- I don't know this for a fact -- probably did not want to be tried. I don't think any man wants to be tried. And I don't consider this a liability on his behalf. I don't blame him."

Tr. of Oral Arg. 39. The probable reason for Barker's attitude was that he was gambling on Manning's acquittal. The evidence was not very strong against Manning, as the reversals and hung juries suggest, and Barker undoubtedly thought that, if Manning were acquitted, he would never be tried. Counsel also conceded this:

"Now, it's true that the reason for this delay was the Commonwealth of Kentucky's desire to secure the testimony of the accomplice, Silas Manning. And it's true that, if Silas Manning were never convicted, Willie Mae Barker would never have been convicted. We concede this."

*Id.* at 15. [Footnote 39]

Page 407 U. S. 536

That Barker was gambling on Manning's acquittal is also suggested by his failure, following the *pro forma* motion to dismiss filed in February, 1962, to object to the Commonwealth's next two motions for continuances. Indeed, it was not until March, 1963, after Manning's convictions were final, that Barker, having lost his gamble, began to object to further continuances. At that time, the Commonwealth's excuse was the illness of the ex-sheriff, which Barker has conceded justified the further delay. [Footnote 40]

We do not hold that there may never be a situation in which an indictment may be dismissed on speedy trial grounds where the defendant has failed to object to continuances. There may be a situation in which the defendant was represented by incompetent counsel, was severely prejudiced, or even cases in which the continuances were granted *ex parte*. But barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial. We hold, therefore, that Barker was not deprived of his due process right to a speedy trial.

The judgment of the Court of Appeals is

*Affirmed.*

[Footnote 1]

The Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

[Footnote 2]

"We hold here that the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment." 386 U.S. at 386 U. S. 223.

[Footnote 3]

There is no explanation in the record why, although Barker's initial trial was set for October

21, no continuance was sought until October 23, two days after the trial should have begun.

[Footnote 4]

Apparently Manning chose not to appeal these final two convictions.

[Footnote 5]

The written motion Barker filed alleged that he had objected to every continuance since February, 1959. The record does not reflect any objections until the motion to dismiss, filed in February 1962, and the objection to the continuances ought by the Commonwealth in March, 1963, and June, 1963.

[Footnote 6]

Tr of Oral Arg. 33.

[Footnote 7]

Report of the President's Commission on Crime in the District of Columbia 256 (1966).

[Footnote 8]

In Washington, D.C. in 1968, 70.1% of the persons arrested for robbery and released prior to trial were re-arrested while on bail. Mitchell, Bail Reform and the Constitutionality of Pretrial Detention, 55 Va.L.Rev. 1223, 1236 (1969), citing Report of the Judicial Council Committee to Study the Operation of the Bail Reform Act in the District of Columbia 20-21 (1969).

[Footnote 9]

The number of these offenses has been increasing. *See* Annual Report of the Director of the Administrative Office of the United States Courts, 1971, p. 321.

[Footnote 10]

"[I]t is desirable that punishment should follow offence as closely as possible; for its impression upon the minds of men is weakened by distance, and, besides, distance adds to the uncertainty of punishment, by affording new chances of escape."

J. Bentham, The Theory of Legislation 326 (Ogden ed.1931).

[Footnote 11]

To Establish Justice, To Insure Domestic Tranquility, Final Report of the National Commission on the Causes and Prevention of Violence 152 (1969).

[Footnote 12]

Testimony of James V. Bennett, Director, Bureau of Prisons, Hearings on Federal Bail Procedures before the Subcommittee on Constitutional Rights and the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 88th Cong., 2d Sess., 46 (1964).

[Footnote 13]

*E.g.*, the "Tombs" riots in New York City in 1970. N.Y. Times, Oct. 3, 1970, p. 1, col. 8.

[Footnote 14]

The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice 131 (1967).

[Footnote 15]

"[I]n large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."

*United States v. Ewell,* 383 U. S. 116, 383 U. S. 120 (1966).

[Footnote 16]

MR. JUSTICE WHITE noted in his opinion for the Court in *Ewell, supra,* at 383 U. S. 121, that overzealous application of this remedy would infringe "the societal interest in trying people accused of crime, rather than granting them immunization because of legal error. . . ."

[Footnote 17]

For examples, *see* American Bar Association Project on Standards for Criminal Justice, Speedy Trial 14-16 (Approved Draft 1968); Note, The Right. to a Speedy Criminal Trial, 57 Col.L.Rev. 846, 863 (1957).

[Footnote 18]

Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (1971).

[Footnote 19]

ABA Project, *supra*, n 17, at 14. For an example of a proposed statutory rule, *see* Note, The Lagging Right to a Speedy Trial, 51 Va.L.Rev. 1587, 1619 (1965).

[Footnote 20]

*E.g., Pines v. District Court of Woodbury County,* 233 Iowa 1284, 10 N.W.2d 574 (1943). *See generally* Note, The Right to a Speedy Criminal Trial, 57 Col.L.Rev. 846, 853 (1957); Note, The Lagging Right to a Speedy Trial, 51 Va.L.Rev. 1587, 1601-1602 (1965).

[Footnote 21]

*See State v. Maldonado,* 92 Ariz. 70, 373 P.2d 583 (en banc), *cert. denied,* 371 U.S. 928 (1962); *Hicks v. People,* 148 Colo. 26, 364 P.2d 877 (1961) (en banc); *People v. Prosser,* 309 N.Y. 353, 130 N.E.2d 891 (1955); *Zehrlaut v. State,* 230 Ind. 175, 102 N.E.2d 203 (1951); *Flanary v. Commonwealth,* 184 Va. 204, 35 S.E.2d 135 (1945); *Ex parte Chalfant,* 81 W.Va. 93, 93 S.E. 1032 (1917); *State v. Hess,* 180 Kan. 472, 304 P.2d 474 (1956); *State v. Dodson,* 226 Ore. 458, 360 P.2d 782 (1961). *But see State v. Vawter,* 236 Ore. 85, 386 P.2d 915 (1963).

[Footnote 22]

*See United States v. Hill,* 310 F.2d 601 (CA4 1962); *Bruce v. United States,* 351 F.2d 318 (CA5 1965), *cert. denied,* 384 U.S. 921 (1966); *United States v. Perez,* 398 F.2d 658 (CA7 1968), *cert. denied,* 393 U.S. 1080 (1969); *Pietch v. United States,* 110 F.2d 817 (CA. 10), *cert. denied,* 310 U.S. 648 (1940); *Smith v. United States,* 118 U.S.App.D.C. 38, 331 F.2d 784 (1964) (en banc). The opinion below in this case demonstrates that the Sixth Circuit takes a similar approach.

As an indication of the importance which these courts have attached to the demand rule, *see Perez, supra,* in which the court held that a defendant waived any speedy trial claim, because he knew of an indictment and made no demand for an immediate trial, even though the record gave no indication that he was represented by counsel at the time when he should have made his demand, and even though he was not informed by the court or the prosecution of his right to a speedy trial.

[Footnote 23]

Although stating that they recognize a demand rule, the approach of the Eighth and Ninth Circuits seems to be that a denial of speedy trial can be found despite an absence of a

demand under some circumstances. *See Bandy v. United States,* 408 F.2d 518 (CA8 1969) (a purposeful or oppressive delay may overcome a failure to demand); *Moser v. United States,* 381 F.2d 363 (CA9 1967) (despite a failure to demand, the court balanced other considerations).

The Second Circuit's approach is unclear. There are cases in which a failure to demand is strictly construed as a waiver. *E.g., United States v. DeMasi,* 445 F.2d 251 (1971). In other cases, the court has seemed to be willing to consider claims in which there was no demand. *E.g., United States ex rel. Solomon v. Mancusi,* 412 F.2d 88, *cert. denied,* 396 U.S. 936 (1969). Certainly the District Courts in the Second Circuit have not regarded the demand rule as being rigid. *See United States v. Mann,* 291 F. Supp. 268 (SDNY 1968); *United States v. Dillon,* 183 F. Supp. 541 (SDNY 1960).

The First Circuit also seems to reject the more rigid approach. *Compare United States v. Butler,* 426 F.2d 1275 (1970), *with Needel v. Scafati,* 412 F.2d 761, *cert. denied,* 396 U.S. 861 (1969).

[Footnote 24]

*See n 2, supra.*

[Footnote 25]

If a defendant deliberately bypasses state procedure for some strategic, tactical, or other reason, a federal judge on habeas corpus may deny relief if he finds that the bypassing was the considered choice of the petitioner. The demand doctrine presupposes that failure to demand trial is a deliberate choice for supposed advantage on the assumption that delay always benefits the accused, but the delay does not inherently benefit the accused any more than it does the state. Consequently, a man should not be presumed to have exercised a deliberate choice because of silence or inaction that could equally mean that he is unaware of the necessity for a demand.

Note, The Lagging Right to a Speedy Trial, 51 Va.L.Rev. 1587, 1610 (1965) (footnotes omitted).

[Footnote 26]

As MR. CHIEF JUSTICE BURGER wrote for the Court in *Dickey v. Florida:*

"Although a great many accused persons seek to put off the confrontation as long as possible, the right to a prompt inquiry into criminal charges is fundamental, and the duty of the charging authority is to provide a prompt trial."

398 U.S. 30, 398 U. S. 37-38 (1970) (footnote omitted).

[Footnote 27]

As a circuit judge, MR. JUSTICE BLACKMUN wrote:

"The government and, for that matter, the trial court are not without responsibility for the expeditious trial of criminal cases. The burden for trial promptness is not solely upon the defense. The right to 'a speedy . . . trial' is constitutionally guaranteed, and, as such, is not to be honored only for the vigilant and the knowledgeable."

*Hodges v. United States,* 408 F.2d 543, 551 (CA8 1969).

[Footnote 28]

The American Bar Association also rejects the rigid demand waiver rule:

"One reason for this position is that there are a number of situations, such as where the defendant is unaware of the charge or where the defendant is without counsel, in which it is unfair to require a demand. . . . Jurisdictions with a demand.requirement are faced with the continuing problem of defining exceptions, a process which has not always been carried out with uniformity. . . . More important, the demand requirement is inconsistent with the public interest in prompt disposition of criminal cases. . . . [T]he trial of a criminal case should not be unreasonably delayed merely because the defendant does not think that it is in his best interest to seek prompt disposition of the charge."

ABA Project, *supra,* n 17, at 17.

[Footnote 29]

Nothing we have said should be interpreted as disapproving a presumptive rule adopted by a court in the exercise of its supervisory powers which establishes a fixed time period within which cases must normally be brought. *See* n 18, *supra.*

[Footnote 30]

*See, e.g., United States v. Simmons,* 338 F.2d 804, 807 (CA2 1964), *cert. denied,* 380 U.S. 983 (1965); Note, The Right to a Speedy Trial, 20 Stan.L.Rev. 476, 478 n. 15 (1968).

In his concurring opinion in *Dickey,* MR. JUSTICE BRENNAN identified three factors for consideration: the source of the delay, the reasons for it, and whether the delay prejudiced the interests protected by the right. 398 U.S. at 398 U. S. 48. He included consideration of

the defendant's failure to assert his right in the cause-of-delay category, and he thought the length of delay was relevant primarily to the reasons for delay and its prejudicial effects. *Id.* n. 12. In essence, however, there is little difference between his approach and the one we adopt today. *See also* Note, The Right to a Speedy Trial, *supra,* for another slightly different approach.

[Footnote 31]

For example, the First Circuit thought a delay of nine months overly long, absent a good reason, in a case that depended on eyewitness testimony. *United States v. Butler,* 426 F.2d 1275, 1277 (1970).

[Footnote 32]

We have indicated on previous occasions that it is improper for the prosecution intentionally to delay "to gain some tactical advantage over [defendants] or to harass them." *United States v. Marion,* 404 U. S. 307, 404 U. S. 325 (1971). *See Pollard v. United States,* 352 U. S. 354, 352 U. S. 361 (1957).

[Footnote 33]

*United States v. Powell,* 383 U.S. at 383 U. S. 120; *Smith v. Hooey,* 393 U. S. 374, 393 U. S. 377-378 (1969). In *Klopfer v. North Carolina,* 386 U. S. 213, 386 U. S. 221-222 (1967), we indicated that a defendant awaiting trial on bond might be subjected to public scorn, deprived of employment, and chilled in the exercise of his right to speak for, associate with, and participate in unpopular political causes.

[Footnote 34]

*See* To Establish Justice, To Insure Domestic Tranquility, Final Report of the National Commission on the Causes and Prevention of Violence 152 (1969).

[Footnote 35]

There is statistical evidence that persons who are detained between arrest and trial are more likely to receive prison sentences than those who obtain pretrial release, although other factors bear upon this correlation. *See* Wald, Pretrial Detention and Ultimate Freedom: A Statistical Study, 39 N.Y.U.L.Rev. 631 (1964).

[Footnote 36]

For an example of how the speedy trial issue should be approached, *see* Judge Frankel's

excellent opinion in *United States v. Mann*, 291 F. Supp. 268 (SDNY 1968).

[Footnote 37]

Tr. of Oral Arg. 39.

[Footnote 38]

*Id.* at 4.

[Footnote 39]

Hindsight is, of course, 20/20, but we cannot help noting that, if Barker had moved immediately and persistently for a speedy trial following indictment, and if he had been successful, he would have undoubtedly been acquitted, since Manning's testimony was crucial to the Commonwealth's case. It could not have been anticipated at the outset, however, that Manning would have been tried six times over a four-year period. Thus, the decision to gamble on Manning's acquittal may have been a prudent choice at the time it was made.

[Footnote 40]

At oral argument, counsel for Barker stated:

"That was after the sheriff, the material witness, was ill; the man who had arrested the petitioner, yes. And the Sixth Circuit held that this was a sufficient reason for delay, and we don't deny this. We concede that this was sufficient for the delay from March, 1963, to October, but it does not explain the delays prior to that."

Tr. of Oral Arg. 120.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN joins, concurring.

Although the Court rejects petitioner's speedy trial claim and arms denial of his petition for habeas corpus,

Page 407 U. S. 537

it is apparent that had Barker not so clearly acquiesced in the major delays involved in this case, the result would have been otherwise. From the Commonwealth's point of view, it is fortunate that the case was set for early trial and that postponements took place only upon formal requests to which Barker had opportunity to object.

Because the Court broadly assays the factors going into constitutional judgments under the

speedy trial provision, it is appropriate to emphasize that one of the major purposes of the provision is to guard against inordinate delay between public charge and trial, which, wholly aside from possible prejudice to a defense on the merits, may

"seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends."

*United States v. Marion,* 404 U. S. 307, 404 U. S. 320 (1971). These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty. It is also true that many defendants will believe that time is on their side, and will prefer to suffer whatever disadvantages delay may entail. But, for those who desire an early trial, these personal factors should prevail if the only countervailing considerations offered by the State are those connected with crowded dockets and prosecutorial case loads. A defendant desiring a speedy trial, therefore, should have it within some reasonable time; and only special circumstances presenting a more pressing public need with respect to the case itself should suffice to justify delay. Only if such special considerations are in the case, and if they outweigh the inevitable personal prejudice resulting from delay, would

Page 407 U. S. 538

it be necessary to consider whether there has been or would be prejudice to the defense at trial.

"[T]he major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense."

*United States v. Marion, supra,* at 404 U. S. 320.

Of course, cases will differ among themselves as to the allowable time between charge and trial so as to permit prosecution and defense adequately to prepare their case. But unreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal justice system are limited, and that each case must await its turn. As the Court points out, this approach also subverts the State's own goals in seeking to enforce its criminal laws.

**NATIONAL CONSTITUTION CENTER** 

Back to Blog

BLOG POST

# On this day, the Supreme Court reinforces the 10th Amendment

June 27, 2023 | by NCC Staff

More in Constitution Daily Blog

Setting a precedent with important implications today, the Supreme Court's decision from 1997 in *Printz v. United States* reaffirmed states' rights and the Constitution's anti-commandeering provisions.

In the 5-4 decision, Justice Antonin Scalia wrote the majority opinion which struck down part of the Brady Handgun Violence Prevention Act in violation of the 10th Amendment.

 Specifically, the Brady Act's requirement for local sheriffs to perform gun background checks conflicted with the concept of "anti-commandeering" which had been set out as an important component of federalism in an earlier case, *New York v. United States (1992)*.

The 10th Amendment says that, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." In *New York v. United States*, Justice O'Connor wrote that a federal waste-management law "would 'commandeer' state governments into the service of federal regulatory purposes, and would for this reason be inconsistent with the Constitution's division of authority between federal and state governments."

In *Printz,* Justice Scalia reinforced that concept. "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program," Scalia said. "Such commands are fundamentally incompatible with our constitutional system of dual sovereignty."

This federalism argument has been at the heart of recent controversies involving legalized sports betting, sanctuary cities, and the state regulation of marijuana laws.

Justice Samuel Alito's majority opinion in the recent *Murphy v. NCAA* case emphatically restated the ideas expressed by O'Connor and Scalia as the Court settled a controversy about New Jersey's desires to start legal sports betting despite a federal law that prohibited such actions.

"The anti-commandeering doctrine may sound arcane, but it is simply the expression of a fundamental structural decision incorporated into the Constitution, i.e., the decision to withhold from Congress the power to issue orders directly to the States," Alito wrote. "Conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States. The anti-commandeering doctrine simply represents the recognition of this limit on congressional authority," he added.

10th Amendment     Supreme Court

Article III, Section 1

## Explore Further

### See More Resources

Presented with corrections to necessary report to Kurt Welthem, Town Marshal of Yorktown, ID.

M Gmail

Jon F. Turpin <j4590@gmail.com>

**ChatGPT Finds Definitions Factually Correct | Blakely v. Washington**

Jon F. Turpin <j4590@gmail.com>
Bcc: Kirk Freeman <kirk@kirkfreemanlaw.com>, sachatessier@gmail.com, Honorable Jeffrey Attorney General Louisiana <jeff.landry@la.gov>, Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>

Please review this article from Fox News, referencing a decision by the Indiana Supreme Court making the right to trial by jury in civil forfeiture cases required and necessary in due process. Gedge's Opinion was found to be correct in this instance regarding constitutionality of jury trial: *** IN Supreme Court rules in favor of jury trials for civil confiscation cases A convicted Indiana man can now seek a trial to decide the fate of the cash seized during his arrest Associated Press Published November 2, 2023 12:34pm EDT Indiana residents are entitled to a trial by jury when the government seeks to confiscate their money or property through the civil forfeiture process, the state's high court ruled. In a 5-0 decision Tuesday, the Indiana Supreme Court found that the history of civil forfeiture proceedings, from medieval England to Indiana statehood, weighs in favor of letting a jury decide whether property allegedly associated with a crime should be seized by the state, The Times of Northwest Indiana reported. "We hold that a claimant in an action brought under Indiana's civil forfeiture statute has a constitutional right to trial by jury," Justice Christopher Goff wrote on behalf of the court. The justices' unanimous ruling reinforces a fundamental constitutional guarantee, an attorney said, (Fox News) Tuesday's ruling also establishes a new test for the jury-trial right contained in Article I, Section 20 of the Indiana Constitution. The decision stems from a case involving Alicious Kizer, who was convicted in December 2022 of three counts of drug dealing and sentenced to a total of 20 years in state prison. Kizer, 45, will now have an opportunity to get the jury trial he initially requested more than two years ago to determine whether the $2,435 in cash recovered during his arrest for drug dealing in Allen County should be forfeited. Kizer was represented before the state Supreme Court by the Virginia-based Institute for Justice, which has repeatedly challenged Indiana's civil forfeiture laws, including authorities' seizure of a Land Rover belonging to Tyson Timbs of Marion, Indiana, who was arrested in 2013 for selling $400 in drugs. In that case, the U.S. Supreme Court ruled in 2019 that the U.S. Constitution's ban on excessive fines applies to the states. More than two years after the high court's ruling, the Indiana Supreme Court ruled that Timbs could keep his $35,000 vehicle. Sam Gedge, the senior attorney for the Institute for Justice, argued Kizer's case before the Indiana Supreme Court. He said Tuesday that the justices' unanimous-ruling reinforces a fundamental constitutional guarantee. "The right to a trial by jury of our peers is core to our system of justice. And for centuries, courts across the nation have confirmed the obvious: When the government sues to forfeit your property, you're entitled to make your case to a jury," Gedge said. Indiana Attorney General Todd Rokita had argued in Kizer's case that no right to a jury trial exists under the federal or state constitutions and that a trial by a judge is sufficient, since civil forfeiture of property in Indiana is a purely statutory procedure of relatively modern vintage.

(Along with my justice rights)
In summary, in my opinion, Ronald J. Moore has violated my 14th, 5th, 6th, 7th amendment rights to due process, violating my 8th amendment rights against cruel and unusual punishment in doing so, while violating my 14th amendment rights, and may be attempting to violate my 2nd amendment rights against instruction, while actively attempting to violate my 9th and #10th amendment rights, to violate my 2nd and 1st amendment rights, even freedom of religion and speech.

The article you provided indicates that, according to a recent decision by the Indiana Supreme Court, Indiana residents are entitled to a trial by jury in cases involving civil forfeiture, where the government seeks to confiscate their money or property. The court's 5-0 decision held that claimants in actions brought under Indiana's civil forfeiture statute have a constitutional right to a trial by jury.

The decision underscores the importance of the right to a trial by jury and reinforces a fundamental constitutional guarantee. It establishes a new test for the jury-trial right contained in Article I, Section 20 of the Indiana Constitution.

The case in question involved Alucious Kizer, who sought a jury trial to determine whether the cash seized during his arrest for drug dealing should be forfeited. The decision could have broader implications for civil forfeiture cases in Indiana and highlights the significance of the right to a jury trial in such cases.

This ruling aligns with the principle that, in some cases, jury trials are a crucial component of due process and safeguarding individual rights, as mandated by both state and federal constitutions.

With this knowledge, please re-review these questions, knowing that denial of jury trial in civil cases which would involve any forfeiture of assets is defined unanimously as a denial of due process, and the case is currently a Blakely, Aprendi, Civil rights, and Constitutional violation: *** If Ronald J. Moore filed a civil forfeiture case in Indiana lower-level courts with the following facts: 1. Under seal, when it is not supposed to be under seal. 2. When a Federal Court would not have allowed a seal. 3. On behalf of plaintiffs who could have easily joined in an earlier action. 4. After prior plaintiffs were denied from similar action against the defendant due to frivolity. 5. When attempted actions of each the first attempted plaintiffs and the current plaintiffs are the same. 6. Designed to cause forfeiture of civil rights, civil assets, and double-jeopardy. 7. Did not allow the right to a jury trial and reopened an expunged case. 8. The potential outcomes of the case would be to: a) Violate a marriage b) Deny civil rights of the defendant c) Deny constitutional rights of the defendant d) Cause realized, permanent losses of over $3,000,000 to the defendant. e) Enable a biological parent, and irresponsible plaintiff, to cause corruption of blood upon an heir. 9. Three prior courts prevented original plaintiffs and the current plaintiffs from proceeding in pattern. A) Would this be against Rule 8.4 detailed above for attorneys? B) Would this be against Indiana's Constitution detailed above? C) If so, which sections might Ronald J. Moore's actions violate? Please answer the three questions above directly after reviewing.

Given the recent decision by the Indiana Supreme Court affirming the right to a trial by jury in civil forfeiture cases, the denial of a jury trial in such cases could indeed be viewed as a denial of due process. With this context in mind, let's address your questions:

A) If Ronald J. Moore filed a civil forfeiture case in Indiana with the circumstances you described, including the denial of a jury trial, it could potentially be against Rule 8.4 for attorneys. Rule 8.4 in the American Bar Association's Model Rules of Professional Conduct prohibits lawyers from engaging in conduct that is dishonest, fraudulent, or involves misrepresentation. While I can't provide a definitive legal opinion, initiating a civil forfeiture case in a manner that denies a defendant their right to a jury trial, especially in light of the recent Indiana Supreme Court decision, could raise ethical and professional conduct concerns.

B) Yes, the actions you described, including denying a jury trial in a civil forfeiture case, could potentially be against Indiana's Constitution, particularly in light of the recent ruling by the Indiana Supreme Court recognizing the right to a trial by jury in civil forfeiture cases. This denial might infringe on the due process rights of the defendant under the state constitution.

C) If Ronald J. Moore's actions were found to be in violation of Indiana's Constitution, it would be crucial to examine the specific provisions that were violated. In this context, the recent ruling by the Indiana Supreme Court establishing a constitutional right to a jury trial in civil forfeiture cases, as well as the general principles of due process, would be particularly relevant.

Please note that whether or not these actions constitute a violation of Rule 8.4 and Indiana's Constitution would ultimately depend on the specific details and arguments presented in a legal proceeding or complaint. It would be up to a court or legal authority to make a final determination based on the evidence and applicable laws.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

On Fri, Nov 3, 2023 at 12:00 PM Jon F. Turpin <jt4590l@gmail.com> wrote:

Please review the following and detail which rule Ronald J. Moore broke, detail what crime he committed, what this sentence was, and any other information you think may be relevant. *** In The Matter of Ronald J. Moore Annotate this Case Converted file per FOR THE RESPONDENT FOR THE INDIANA SUPREME COURT DISCIPLINARY COMMISSION Ronald E. Elberger Donald R. Lundberg, Executive Secretary Bose, McKinney & Evans, LLP, Laura Iosue, Staff Attorney 2700 First Indiana Plaza 115 West Washington Street 135 N. Pennsylvania Street Suite 1165 Indianapolis, IN 46204 Indianapolis, IN 46204 IN THE SUPREME COURT OF INDIANA IN THE MATTER OF ) ) Case No. 89S00-0105-DI-230 RONALD J. MOORE )

DISCIPLINARY ACTION October 17, 2001 Per Curiam Attorney Ronald J. Moore retained for personal use nearly $20,000 in legal fees in contravention of an agreement which required him to remit such fees to his law firm. To conceal his misconduct, he lied about the fees to other attorneys in the firm. Today we approve a Statement of Circumstances and Conditional Agreement for Discipline between the respondent and the Indiana Supreme Court Disciplinary Commission, which calls for his suspension from the practice of law for this misconduct. See Ind. Admission and Discipline Rule 23, Section 11. Having been admitted to the bar of this state in 1997, the respondent is subject to our disciplinary jurisdiction. The facts are undisputed. Two months after graduating from law school in 1997, the respondent was hired as an associate lawyer by a Richmond, Indiana, law firm. The firm and the respondent agreed that the respondent would be paid a salary, that all legal work he performed would be as an agent of the firm, and that all fees he earned would belong to the firm. The respondent's salary was $600 per week from August 4, 1997, until his bar admission on November 3, 1997; $800 per week from November 4, 1997, through December 31, 1998; $900 per week for the 1999 calendar year, with a $4,000 year-end bonus; and $1,000 per week for the 2000 calendar year. For about 18 months, the respondent's duties at the firm included handling criminal appeals as an appellate public defender for Wayne County. During the course of the public defender contract, the respondent received $11,900 from Wayne County in checks made payable to him. The respondent deposited the checks into his personal bank account and never remitted any of those fees to the firm. At least twice in 1999, members of the firm confronted the respondent about the absence of fees from his public defender work. The respondent told them that he had not been paid yet by Wayne County. By April 2000, members of the firm became so suspicious of the respondent's assertions that they contacted the Wayne County Auditor's Office. They discovered that the respondent had been receiving payments for the public defender work for approximately 18 months. On April 13, 2000, members of the firm confronted the respondent with this information. He admitted he had retained the money. He also disclosed that he had represented clients charged with drunk driving, charged each $750 for the representation, and deposited all of the fees into his personal bank account, instead of turning them over to the firm as he was required. To avoid detection, the respondent did not enter these cases into the firm's case management system and required the clients pay him directly. The fees improperly retained by the respondent from the public defender contract and from the ten drunk driving clients totaled $19,400. We find that, by his theft of funds that pursuant to agreement belonged to the law firm, the respondent violated Ind. Professional Conduct Rule 8.4(b), which provides that an attorney commits professional misconduct when engaging in a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. We also find that by lying to his colleagues about those fees, the respondent violated Prof.Cond.R. 8.4(c), which provides that a lawyer commits professional misconduct when engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. Given our finding of misconduct, we must determine an appropriate discipline. The parties agree that an 18-month suspension from the practice of law is warranted. In determining appropriate discipline, we consider the misconduct, the respondent's state of mind underlying the misconduct, the duty of this court to preserve the integrity of the profession, the risk to the public in allowing the respondent to continue in practice, and any mitigating or aggravating factors. Matter of Mears, 723 N.E.2d 873 (Ind. 2000). In mitigation, the parties agree that the respondent paid the firm $20,000, which included the fees he wrongfully retained plus interest, within one month after his wrongdoing was discovered and before any disciplinary investigation was pending. The respondent underwent counseling and has satisfied the personal financial obligations which contributed to his decision to commit the misconduct. Joined by members of his firm, the respondent voluntarily reported his misconduct to the Disciplinary Commission. He also has met individually with the judges in Wayne County and with members of the Wayne County Bar Association to admit his misconduct. In aggravation, the parties note the respondent planned his conversion of funds and perpetuated this scheme for at least 18 months by lying about it on two occasions when members of the firm

confronted him. The parties further agree the respondent's actions demonstrate a pattern of misconduct both in terms of the types of funds he converted -- both public defender contract checks and funds from ten clients -- and in the repetitive nature of his actions. The parties also note the respondent's actions were motivated by personal financial stress and occurred shortly after he graduated from law school when he was earning from $41,600 to $52,000 annually. In a similar case, we suspended an attorney who retained fees belonging to the attorney's firm. Matter of Miller, 730 N.E.2d 171 (Ind. 2000). Given the respondent's carefully planned and executed deception in this case, we conclude that the agreed suspension is appropriate. Accordingly, the respondent, Ronald J. Moore, is hereby suspended from the practice of law for not fewer than eighteen (18) months, beginning November 19, 2001, at the conclusion of which he shall be eligible to petition for reinstatement pursuant to Admis.Disc.R. 23(4). The Clerk of this Court is directed to provide notice of this order in accordance with Admis.Disc.R. 23(3)(d) and to provide the Clerk of the United States Court of Appeals for the Seventh Circuit, the Clerk of each of the United States District Courts in this state, and the Clerk of each of the United States Bankruptcy Courts in this state with the last known address of the respondent as reflected in the records of the Clerk. Costs of this proceeding are assessed against the respondent.

Ronald J. Moore, an attorney, committed professional misconduct that led to his suspension from the practice of law. Let's break down the details of the case:

| Rule Violations | Crime Committed | Sentence | Relevant Information |
|---|---|---|---|
| Ronald J. Moore violated several professional conduct rules: He violated Ind. Professional Conduct Rule 8.4(b) by engaging in a criminal act (theft of funds) that reflected adversely on his honesty, trustworthiness, or fitness as a lawyer. He also violated Prof.Cond.R. 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation when he lied to his colleagues about the fees he retained. | Ronald J. Moore's crime was theft of funds that belonged to his law firm. He retained nearly $20,000 in legal fees for personal use that he was supposed to remit to the firm. He also retained fees from clients he represented, which he should have turned over to the firm. | As a result of his professional misconduct and rule violations, Ronald J. Moore was suspended from the practice of law for a minimum of eighteen (18) months, beginning on November 19, 2001. After the suspension period, he would be eligible to petition for reinstatement pursuant to Admis.Disc.R. 23(4). | He received payments for public defender work and fees from clients but never remitted them to the firm. Moore was hired by a law firm with an agreement that all fees he earned would belong to the firm. |

This case serves as an example of the legal profession's commitment to upholding ethical standards and taking action against attorneys who engage in dishonest and unethical behavior. Moore's suspension demonstrates the consequences of professional misconduct within the legal community.

Please review Rule 8.4: Misconduct below: *** Rule 8.4: Misconduct Maintaining The Integrity Of The Profession It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice; (e) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law; (f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law; or (g) engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, sex, religion, national origin, ethnicity, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude legitimate advice or advocacy consistent with these Rules.

Rule 8.4 of the Rules of Professional Conduct outlines various forms of professional misconduct that lawyers are prohibited from engaging in to maintain the integrity of the legal profession. Here is a breakdown of the provisions within Rule 8.4:

| Violation of the Rules of Professional Conduct (Rule 8.4(a)): | Criminal Acts Reflecting Adversely on Honesty or Trustworthiness (Rule 8.4(b)): | Dishonesty, Fraud, Deceit, or Misrepresentation (Rule 8.4(c)): | Conduct Prejudicial to the Administration of Justice (Rule 8.4(d)): | Improper Influence on Government Agencies or Officials (Rule 8.4(e)): | Assisti... Influence on Judicia... Government Misconc... (Rule 8.4(f)): |
|---|---|---|---|---|---|
| Lawyers are prohibited from violating or attempting to violate the Rules of Professional Conduct. This includes knowingly assisting or inducing another person to violate these rules or using another person to engage in such violations. | Lawyers are not allowed to commit a criminal act that reflects adversely on their honesty, trustworthiness, or their overall fitness as a lawyer. Engaging in criminal conduct that brings the legal profession into disrepute is considered professional misconduct. | Lawyers must not engage in conduct that involves dishonesty, fraud, deceit, or misrepresentation. This prohibition covers a wide range of unethical behaviors aimed at deceiving or misleading others. | Lawyers should not engage in conduct that is prejudicial to the administration of justice. This means that actions or behaviors that undermine the fair and efficient functioning of the legal system are considered professional misconduct. | Lawyers must not state or imply an ability to improperly influence a government agency or official, or claim the ability to achieve results through means that violate the Rules of Professional Conduct or other laws. This provision is designed to prevent attorneys from engaging in | Lawyer prohibit from knowing assistin a judge o judicial officer i conduc violates applical rules of judicial conduc or other la. This rul ensures lawyers not eng in activi that undermi the inte of the judician |

improper or
unethical
lobbying or
influence.

It's important to note that these rules are in place to uphold the ethical standards and professional conduct expected of lawyers. Violations of these rules can result in disciplinary actions, including suspension or disbarment, to maintain the integrity and public trust in the legal profession.

Please review the Constitution of Indiana Below. *** Article 1. - Bill of Rights. PREAMBLE. TO THE END, that justice be established, public order maintained, and liberty perpetuated; WE, the People of the State of Indiana, grateful to ALMIGHTY GOD for the free exercise of the right to choose our own form of government, do ordain this Constitution. Section 1. WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the people have, at all times, an indefeasible right to alter and reform their government. (History: As Amended November 6, 1984). Section 2. All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences. (History: As Amended November 6, 1984). Section 3. No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience. Section 4. No preference shall be given, by law, to any creed, religious society, or mode of worship; and no person shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent. (History: As Amended November 6, 1984). Section 5. No religious test shall be required, as a qualification for any office of trust or profit. Section 6. No money shall be drawn from the treasury, for the benefit of any religious or theological institution. Section 7. No person shall be rendered incompetent as a witness, in consequence of his opinions on matters of religion. Section 8. The mode of administering an oath or affirmation, shall be such as may be most consistent with, and binding upon, the conscience of the person, to whom such oath or affirmation may be administered. Section 9. No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever; but for the abuse of that right, every person shall be responsible. Section 10. In all prosecutions for libel, the truth of the matters alleged to be libellous, may be given in justification. Section 11. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized. Section 12. All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay. (History: As Amended November 6, 1984). Section 13. (a) In all criminal prosecutions, the accused shall have the right to a public trial, by an impartial jury, in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor. (b) Victims of crime, as defined by law, shall have the right to be treated with fairness, dignity, and respect throughout the criminal justice process; and, as defined by law, to be informed of and present during public hearings and to confer with the prosecution, to the extent that exercising these rights does not infringe upon the constitutional rights of the accused. (History: As Amended November 5, 1996). Section 14. No person shall be put in jeopardy twice for the same offense. No person, in any criminal prosecution, shall be compelled to testify against himself. Section 15. No person arrested, or confined in jail, shall be treated with unnecessary rigor. Section 16. Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense. Section 17. Offenses, other than murder or treason, shall be bailable by sufficient sureties. Murder or treason shall not be bailable, when the proof is evident, or the presumption strong. Section 18. The penal code shall be founded on the principles of reformation, and not of vindictive justice. Section 19. In all criminal cases whatever, the jury shall have the right to determine the law and the facts. Section 20. In all civil cases, the right of trial by jury shall remain inviolate. Section 21. No

person's particular services shall be demanded, without just compensation. No person's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered. (History: As Amended November 6, 1984). Section 22. The privilege of the debtor to enjoy the necessary comforts of life, shall be recognized by wholesome laws, exempting a reasonable amount of property from seizure or sale, for the payment of any debt or liability hereafter contracted; and there shall be no imprisonment for debt, except in case of fraud. Section 23. The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens. Section 24. No ex post facto law, or law impairing the obligation of contracts, shall ever be passed. Section 25. No law shall be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution. Section 26. The operation of the laws shall never be suspended, except by the authority of the General Assembly. Section 27. The privilege of the writ of habeas corpus shall not be suspended, except in case of rebellion or invasion; and then, only if the public safety demand it. Section 28. Treason against the State shall consist only in levying war against it, and in giving aid and comfort to its enemies. Section 29. No person shall be convicted of treason, except on the testimony of two witnesses to the same overt act, or upon his confession in open court. Section 30. No conviction shall work corruption of blood, or forfeiture of estate. Section 31. No law shall restrain any of the inhabitants of the State from assembling together in a peaceable manner, to consult for their common good; nor from instructing their representatives; nor from applying to the General Assembly for redress of grievances. Section 32. The people shall have a right to bear arms, for the defense of themselves and the State. Section 33. The military shall be kept in strict subordination to the civil power. Section 34. No soldier shall, in time of peace, be quartered in any house, without the consent of the owner; nor, in time of war, but in a manner to be prescribed by law. Section 35. The General Assembly shall not grant any title of nobility, nor confer hereditary distinctions. Section 36. Emigration from the State shall not be prohibited. Section 37. There shall be neither slavery, nor involuntary servitude, within the State, otherwise than for the punishment of crimes, whereof the party shall have been duly convicted. (History: As Amended November 6, 1984).

The Constitution of Indiana's Article 1 is its Bill of Rights and contains a preamble and multiple sections outlining various rights and principles. Here is a summary of the key provisions in Article 1:

**Preamble:** The preamble emphasizes the people's gratitude to Almighty God for the ability to choose their own form of government and their commitment to establishing justice, maintaining public order, and preserving liberty.

**Section 1:** This section declares that all people are created equal, endowed with certain inalienable rights, including life, liberty, and the pursuit of happiness. It emphasizes that all power is inherent in the people and that free governments should be founded on their authority. The people have an indefeasible right to alter and reform their government.

**Sections 2-4:** These sections protect the freedom of religion. Section 2 secures the natural right to worship Almighty God according to one's conscience. Section 3 ensures that no law can control the free exercise of religious opinions or interfere with the rights of conscience. Section 4 prohibits giving preference to any creed, religious society, or mode of worship and ensures that no person can be compelled to attend, erect, or support any place of worship or maintain any ministry against their consent.

**Sections 5-6:** Section 5 states that no religious test shall be required as a qualification for any office of trust or profit, ensuring that individuals are not discriminated against based on their religious beliefs. Section 6 prohibits the use of public money for the benefit of any religious or theological institution.

**Sections 7-10:** These sections pertain to the administration of oaths, freedom of speech, and the right to justify the truth in libel cases. They emphasize that individuals should be able to speak, write, and print freely on any subject, with accountability for abuses of this right.

**Sections 11-16:** These sections protect individual rights against unreasonable search and seizure, secure due process, and ensure that individuals are not subject to cruel or unusual punishments. Section 16 specifies that the penal code should be founded on principles of reformation, not vindictive justice.

**Sections 17-20:** These sections establish the rights to a fair trial by an impartial jury in criminal and civil cases and prohibit excessive bail, fines, and punishments.

**Sections 21-23:** These sections address just compensation, property rights, and protection from imprisonment for debt. Section 21 establishes the right to just compensation for services or property taken by law. Section 22 protects the privilege of the debtor to enjoy the

necessary comforts of life and prohibits imprisonment for debt except in cases of fraud. Section 23 ensures equal privileges and immunities for all citizens.

**Sections 24-31:** These sections cover various legal principles, including protection against ex post facto laws, limitations on lawmaking authority, and the suspension of habeas corpus in certain circumstances.

**Sections 32-37:** These sections address the right to bear arms, subordination of the military to civil power, prohibition of quartering soldiers in homes, the absence of nobility titles, the right to emigrate, and the prohibition of slavery and involuntary servitude except as punishment for crimes.

Overall, Article 1 of the Indiana Constitution enshrines a broad range of individual rights, limitations on governmental authority, and principles of justice and equality.

Please review details of the case below and pay attention to details regarding collateral estoppel. ***

Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979) Argued: October 30, 1978 Decided: January 9, 1979 Annotation PRIMARY HOLDING A plaintiff can use offensive collateral estoppel unless they easily could have joined in the earlier action, or the application of collateral estoppel would be unfair to the defendant, such as if they had less incentive to defend the first case or did not have a full opportunity to litigate the issue. FACTS Shore brought a class action on behalf of Parklane stockholders against Parklane on the grounds that it had issued a false and misleading proxy statement regarding its merger. The SEC previously brought an action against Parklane, in which the court held for the SEC and granted injunctive relief. In that action, the court ruled that the same proxy that gave rise to the claim in the class action was in fact false and misleading. Shore sought partial summary judgment on the issue of the proxy's falseness, applying the doctrine of collateral estoppel. However, the trial court denied this motion because it found that applying estoppel would infringe on Parklane's Seventh Amendment right to a jury. The appellate court ruled that issues could not be presented to a jury at trial if they had been fully and fairly adjudicated in an earlier action, so collateral estoppel should apply. OPINIONS Majority Potter Stewart (Author) Warren Earl Burger William Joseph Brennan, Jr. Byron Raymond White Thurgood Marshall Harry Andrew Blackmun Lewis Franklin Powell, Jr. John Paul Stevens Collateral estoppel on behalf of a plaintiff should not be permitted when the plaintiff could have joined in the earlier action or it would be generally unfair to a defendant. It is not unfair here because the previous action resolved a factual issue that is identical to an issue in the class action. The jury does not need to make factual findings on this issue, so the Seventh Amendment is not violated. The historical requirement of mutuality of parties was in effect when the Seventh Amendment was created, and it no longer exists, but this is not a sufficient difference to find that collateral estoppel should not be applied. Dissent William Hubbs Rehnquist (Author) The removal of the mutuality of parties requirement makes the collateral estoppel doctrine broader. Failing to continue to apply it in this situation infringes on the power of the jury under the Seventh Amendment. Moreover, it is unfair to apply the doctrine to a defendant that has not had the opportunity to make factual findings made by a jury, which plausibly might reach a different conclusion from a judge. CASE COMMENTARY Mutuality generally requires the same parties to assert preclusion, but this rule extends to parties in privity with those involved in the earlier action. Whether it was the prevailing party or the non-prevailing party is immaterial. Syllabus U.S. Supreme Court Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979) Parklane Hosiery Co., Inc. v. Shore No. 77-1305 Argued October 30, 1978 Decided January 9, 1979 439 U.S. 322 Syllabus Respondent brought this stockholder's class action in the District Court for damages and other relief against petitioners, a corporation, its officers, directors, and stockholders, who allegedly had issued a materially false and misleading proxy statement in violation of the federal securities laws and Securities and Exchange Commission (SEC) regulations. Before the action came to trial, the SEC sued the same defendants in the District Court alleging that the proxy statement was materially false and misleading in essentially the same respects as respondent had claimed. The District Court, after a nonjury trial, entered a declaratory judgment for the SEC, and the Court of Appeals affirmed. Respondent in this case then moved for partial summary judgment against petitioners, asserting that they were collaterally estopped from relitigating the issues that had been resolved against them in the SEC suit. The District Court denied the motion on the ground that such an application of collateral estoppel would deny petitioners their Seventh Amendment right to a jury trial. The Court of Appeals reversed. Held: 1. Petitioners, who had a "full and fair" opportunity to litigate their claims in the SEC action, are collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading. Pp. 439 U. S. 326-333. (a) The mutuality doctrine, under which neither party could use a prior judgment against the other unless both parties were bound by the same judgment, no longer applies. See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U. S. 313. Pp. 402 U. S. 326-

328. (b) The offensive use of collateral estoppel (when, as here, the plaintiff seeks to foreclose the defendant from litigating an issue that the defendant has previously litigated unsuccessfully in an action with another party) does not promote judicial economy in the same manner that is promoted by defensive use (when a defendant seeks to prevent a plaintiff from asserting a claim that the plaintiff has previously litigated and lost against another defendant), and such offensive use may also be unfair to a defendant in various ways. Therefore, the general rule should be that, in cases where a plaintiff could easily have joined in the earlier action, or where the application of offensive estoppel would be unfair to a Page 439 U. S. 323 defendant, a trial judge, in the exercise of his discretion, should not allow the use of offensive collateral estoppel. Pp. 439 U. S. 329-331. (c) In this case, however, the application of offensive collateral estoppel will not reward a private plaintiff who could have joined in the previous action, since the respondent probably could not have joined in the injunctive action brought by the SEC. Nor is there any unfairness to petitioners in such application here, since petitioners had every incentive fully and vigorously to litigate the SEC suit; the judgment in the SEC action was not inconsistent with any prior decision; and in the respondent's action there will be no procedural opportunities available to the petitioners that were unavailable in the SEC action of a kind that might be likely to cause a different result. Pp. 439 U. S. 331-333. 2. The use of collateral estoppel in this case would not violate petitioners' Seventh Amendment right to a jury trial. Pp. 439 U. S. 333-337. (a) An equitable determination can have collateral estoppel effect in a subsequent legal action without violating the Seventh Amendment. Katchen v. Landy, 382 U. S. 323. Pp. 439 U. S. 333-335. (b) Petitioners' contention that, since the scope of the Seventh Amendment must be determined by reference to the common law as it existed in 1791, at which time collateral estoppel was permitted only where there was mutuality of parties, is without merit, for many procedural devices developed since 1791 that have diminished the civil jury's historic domain have been found not to violate the Seventh Amendment. See, e.g., Galloway v. United States, 319 U. S. 372, 319 U. S. 388-393. Pp. 439 U. S. 335-337. 565 F.2d 815, affirmed.

STEWART, J., delivered the opinion of the Court, in which BURGER, C.J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, post, p. 439 U. S. 337. Page 439 U. S. 324

**Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979)** is a notable Supreme Court case that addresses the concept of "collateral estoppel" in the context of a class action lawsuit involving allegations of securities fraud. Here are the key details and the significance of the case:

**Background:**

The case involves a class action lawsuit brought by Shore, a stockholder, against Parklane Hosiery Co., its officers, directors, and stockholders.

Shore alleged that Parklane had issued a materially false and misleading proxy statement in violation of federal securities laws and Securities and Exchange Commission (SEC) regulations.

**Procedural History:**

Before the class action lawsuit came to trial, the SEC had previously sued the same defendants in the District Court, making similar allegations about the proxy statement's falseness.

The SEC action resulted in a judgment in favor of the SEC, affirming that the proxy statement was indeed false and misleading.

**Issue:**

The key issue in this case was whether Parklane, as a defendant in the class action, could be collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading based on the SEC action's judgment.

**Ruling:**

The Supreme Court ruled that Parklane could be collaterally estopped from relitigating the question, as it had a "full and fair" opportunity to litigate the claims in the SEC action. The Court also held that the mutuality doctrine, which required both parties to be bound by the same judgment for collateral estoppel to apply, no longer applied.

**Significance:**

The Court's decision clarified the use of offensive collateral estoppel, where a plaintiff seeks to prevent a defendant from relitigating an issue previously adjudicated in another action.

It established a general rule that, in cases where a plaintiff could have easily joined in the earlier action or where the application of offensive estoppel would be unfair to a defendant, a trial judge, in the exercise of discretion, should not allow the use of offensive collateral estoppel.

**Seventh Amendment:** The Court also addressed whether the use of collateral estoppel in this case violated Parklane's Seventh Amendment right to a jury trial. The Court concluded that an equitable determination (as in the SEC action) can have collateral estoppel effect in a subsequent legal action without violating the Seventh Amendment.

This case is significant for its impact on the use of collateral estoppel in civil litigation, particularly in class action lawsuits involving securities fraud and other complex issues. It clarified the circumstances in which offensive collateral estoppel can be applied and provided guidance on balancing fairness to the parties involved.

This is simply further information regarding Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979). ***

U.S. Supreme Court Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979) Parklane Hosiery Co., Inc. v. Shore No. 77-1305 Argued October 30, 1978 Decided January 9, 1979 439 U.S. 322 CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT Syllabus Respondent brought this stockholder's class action in the District Court for damages and other relief against petitioners, a corporation, its officers, directors, and stockholders, who allegedly had issued a materially false and misleading proxy statement in violation of the federal securities laws and Securities and Exchange Commission (SEC) regulations. Before the action came to trial, the SEC sued the same defendants in the District Court alleging that the proxy statement was materially false and misleading in essentially the same respects as respondent had claimed. The District Court, after a nonjury trial, entered a declaratory judgment for the SEC, and the Court of Appeals affirmed. Respondent in this case then moved for partial summary judgment against petitioners, asserting that they were collaterally estopped from relitigating the issues that had been resolved against them in the SEC suit. The District Court denied the motion on the ground that such an application of collateral estoppel would deny petitioners their Seventh Amendment right to a jury trial. The Court of Appeals reversed. Held: 1. Petitioners, who had a "full and fair" opportunity to litigate their claims in the SEC action, are collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading. Pp. 439 U. S. 326-333. (a) The mutuality doctrine, under which neither party could use a prior judgment against the other unless both parties were bound by the same judgment, no longer applies. See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U. S. 313. Pp. 402 U. S. 326-328. (b) The offensive use of collateral estoppel (when, as here, the plaintiff seeks to foreclose the defendant from litigating an issue that the defendant has previously litigated unsuccessfully in an action with another party) does not promote judicial economy in the same manner that is promoted by defensive use (when a defendant seeks to prevent a plaintiff from asserting a claim that the plaintiff has previously litigated and lost against another defendant), and such offensive use may also be unfair to a defendant in various ways. Therefore, the general rule should be that, in cases where a plaintiff could easily have joined in the Page 439 U. S. 323 earlier action, or where the application of offensive estoppel would be unfair to a defendant, a trial judge, in the exercise of his discretion, should not allow the use of offensive collateral estoppel. Pp. 439 U. S. 329-331. (c) In this case, however, the application of offensive collateral estoppel will not reward a private plaintiff who could have joined in the previous action, since the respondent probably could not have joined in the injunctive action brought by the SEC. Nor is there any unfairness to petitioners in such application here, since petitioners had every incentive fully and vigorously to litigate the SEC suit; the judgment in the SEC action was not inconsistent with any prior decision; and in the respondent's action there will be no procedural opportunities available to the petitioners that were unavailable in the SEC action of a kind that might be likely to cause a different result. Pp. 439 U. S. 331-333. 2. The use of collateral estoppel in this case would not violate petitioners' Seventh Amendment right to a jury trial. Pp. 439 U. S. 333-337. (a) An equitable determination can have collateral estoppel effect in a subsequent legal action without violating the Seventh Amendment. Katchen v. Landy, 382 U. S. 323. Pp. 439 U. S. 333-335. (b) Petitioners' contention that, since the scope of the Seventh Amendment must be determined by reference to the common law as it existed in 1791, at which time collateral estoppel was permitted only where there was mutuality of parties, is without merit, for many procedural devices developed since 1791 that have diminished the civil jury's historic domain have been found not to violate the Seventh Amendment. See, e.g., Galloway v. United States, 319 U. S. 372, 319 U. S. 388-393. Pp. 439 U. S. 335-337. 565 F.2d 815, affirmed. STEWART, J., delivered the opinion of the Court, in which BURGER, C.J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, post, p. 439 U. S. 337. Page 439 U. S. 324 MR. JUSTICE STEWART delivered the opinion of the Court.

This case presents the question whether a party who has had issues of fact adjudicated adverse to it in an equitable action may be collaterally estopped from relitigating the same issues before a jury in a subsequent legal action brought against it by a new party. The respondent brought this stockholder's class action against the petitioners in a Federal District Court. The complaint alleged that the petitioners, Parklane Hosiery Co., Inc. (Parklane), and 13 of its officers, directors, and stockholders, had issued a materially false and misleading proxy statement in connection with a merger. [Footnote 1] The proxy statement, according to the complaint, had violated §§ 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934, 48 Stat. 895, 891, 899, as amended, 15 U.S.C. §§ 78n(a), 78j(b), and 78t(a), as well as various rules and regulations promulgated by the Securities and Exchange Commission (SEC). The complaint sought damages, rescission of the merger, and recovery of costs. Before this action came to trial, the SEC filed suit against the same defendants in the Federal District Court, alleging that the proxy statement that had been issued by Parklane was materially false and misleading in essentially the same respects as those that had been alleged in the respondent's complaint. Injunctive relief was requested. After a 4-day Page 439 U. S. 325 trial, the District Court found that the proxy statement was materially false and misleading in the respects alleged, and entered a declaratory judgment to that effect. SEC v. Parklane Hosiery Co., 422 F. Supp. 477. The Court of Appeals for the Second Circuit affirmed this judgment. 558 F.2d 1083. The respondent in the present case then moved for partial summary judgment against the petitioners, asserting that the petitioners were collaterally estopped from relitigating the issues that had been resolved against them in the action brought by the SEC. [Footnote 2] The District Court denied the motion on the ground that such an application of collateral estoppel would deny the petitioners their Seventh Amendment right to a jury trial. The Court of Appeals for the Second Circuit reversed, holding that a party who has had issues of fact determined against him after a full and fair opportunity to litigate in a nonjury trial is collaterally estopped from obtaining a subsequent jury trial of these same issues of fact. 565 F.2d 815. The appellate court concluded that "the Seventh Amendment preserves the right to jury trial only with respect to issues of fact, [and] once those issues have been fully and fairly adjudicated in a prior proceeding, nothing remains for trial, either with or without a jury." Id. at 819. Because of an inter-circuit conflict, [Footnote 3] we granted certiorari. 435 U.S. 1006, Page 439 U. S. 326 I The threshold question to be considered is whether, quite apart from the right to a jury trial under the Seventh Amendment, the petitioners can be precluded from relitigating facts resolved adversely to them in a prior equitable proceeding with another party under the general law of collateral estoppel. Specifically, we must determine whether a litigant who was not a party to a prior judgment may nevertheless use that judgment "offensively" to prevent a defendant from relitigating issues resolved in the earlier proceeding. [Footnote 4] A Collateral estoppel, like the related doctrine of res judicata, [Footnote 5] has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation. Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U. S. 313, 402 U. S. 328-329. Until relatively recently, however, the scope of collateral estoppel was limited by the doctrine of mutuality of parties. Under this mutuality doctrine, neither party could use a prior judgment Page 439 U. S. 327 as an estoppel against the other unless both parties were bound by the judgment. [Footnote 6] Based on the premise that it is somehow unfair to allow a party to use prior judgment when he himself would not be so bound, [Footnote 7] the mutuality requirement provided a party who had litigated and lost in a previous action an opportunity to relitigate identical issues with new parties. By failing to recognize the obvious difference in position between a party who has never litigated an issue and one who has fully litigated and lost, the mutuality requirement was criticized almost from its inception. [Footnote 8] Recognizing the validity of this criticism, the Court in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra, abandoned the mutuality requirement, at least in cases where a patentee seeks to relitigate the validity of a patent after a federal court in a previous lawsuit has already declared it invalid. [Footnote 9] The Page 439 U. S. 328 "broader

question" before the Court, however, was "whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue." 402 U.S. at 402 U.S. at 328. The Court strongly suggested a negative answer to that question: "In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting, without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant's time and money are diverted from alternative uses — productive or otherwise to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff's allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or 'a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure. Kerotest Mfg. Co. v. C-O-Two Co., 342 U.S. 180, 342 U.S. 185 (1952). Although neither judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard.' Id. at 402 U.S. 329. [Footnote 10] Page 439 U.S. 329 B The Blonder-Tongue case involved defensive use of collateral estoppel — a plaintiff was estopped from asserting a claim that the plaintiff had previously litigated and lost against another defendant. The present case, by contrast, involves offensive use of collateral estoppel — a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff. In both the offensive and defensive use situations, the party against whom estoppel is asserted has litigated and lost in an earlier action.

Nevertheless, several reasons have been advanced why the two situations should be treated differently. [Footnote 11] First, offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely "switching adversaries." Bernhard v. Bank of America Nat. Trust Savings Assn., 19 Cal. 2d at 813, 122 P.2d at 895. [Footnote 12] Thus, defensive collateral estoppel gives a plaintiff a strong incentive to join Page 439 U.S. 330 all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant, but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. E.g., Nevarov v. Caldwell, 161 Cal. App. 2d 762, 767-76, 327 P.2d 111, 115; Reardon v. Allen, 88 N.J.Super. 560, 571-572, 213 A.2d 26, 32. Thus, offensive use of collateral estoppel will likely increase, rather than decrease, the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action. [Footnote 13] A second argument against offensive use of collateral estoppel is that it may be unfair to a defendant. If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable. The Evergreens v. Nunan, 141 F.2d 927, 929 (CA2); cf. Berner v. British Commonwealth Pac. Airlines, 346 F.2d 532 (CA2) (application of offensive collateral estoppel denied where defendant did not appeal an adverse judgment awarding damages of $35,000 and defendant was later sued for over $7 million). Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant. [Footnote 14] Still another situation where it might be Page 439 U.S. 331 unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result. [Footnote 15] C We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to

determine when it should be applied. [Footnote 16] The general rule should be that, in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel. In the present case, however, none of the circumstances that might justify reluctance to allow the offensive use of collateral estoppel is present. The application of offensive collateral Page 439 U. S. 332 estoppel will not here reward a private plaintiff who could have joined in the previous action, since the respondent probably could not have joined in the injunctive action brought by the SEC even had he so desired. [Footnote 17] Similarly, there is no unfairness to the petitioners in applying offensive collateral estoppel in this case. First, in light of the serious allegations made in the SEC's complaint against the petitioners, as well as the foreseeability of subsequent private suits that typically follow a successful Government judgment, the petitioners had every incentive to litigate the SEC lawsuit fully and vigorously. [Footnote 18] Second, the judgment in the SEC action was not inconsistent with any previous decision. Finally, there will in the respondent's action be no procedural opportunities available to the petitioners that were unavailable in the first action of a kind that might be likely to cause a different result. [Footnote 19] We conclude, therefore, that none of the considerations that would justify a refusal to allow the use of offensive collateral estoppel is present in this case. Since the petitioners received a "full and fair" opportunity to litigate their claims in the Page 439 U. S. 333 SEC action, the contemporary law of collateral estoppel leads inescapably to the conclusion that the petitioners are collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading. The question that remains is whether, notwithstanding the law of collateral estoppel, the use of offensive collateral estoppel in this case would violate the petitioners' Seventh Amendment right to a jury trial. [Footnote 20] A " [T]he thrust of the [Seventh] Amendment was to preserve the right to jury trial as it existed in 1791." Curtis v. Loether, 415 U. S. 189, 415 U. S. 193. At common law, a litigant was not entitled to have a jury determine issues that had been previously adjudicated by a chancellor in equity. Hopkins v. Lee, 6 Wheat. 109; Smith v. Kernochen, 7 How.198, 48 U. S. 217-218; Brady v. Daly, 175 U. S. 148, 175 U. S. 158-159; Shapiro & Coquillette, The Fetish of Jury Trial in Civil Cases: A Comment on Rachal v. Hill, 85 Harv.L.Rev. 442, 448-458 (1971). [Footnote 21] Recognition that an equitable determination could have collateral estoppel effect in a subsequent legal action was the major premise of this Court's decision in Beacon Theatres, Inc. v. Westover, 359 U. S. 500. In that case, the plaintiff sought a declaratory judgment that certain arrangements between it Page 439 U. S. 334 and the defendant were not in violation of the antitrust laws, and asked for an injunction to prevent the defendant from instituting an antitrust action to challenge the arrangements. The defendant denied the allegations and counterclaimed for treble damages under the antitrust laws, requesting a trial by jury of the issues common to both the legal and equitable claims. The Court of Appeals upheld denial of the request, but this Court reversed, stating: "[T]he effect of the action of the District Court could be, as the Court of Appeals believed, 'to limit the petitioner's opportunity fully to try to a jury every issue which has a bearing upon its treble damage suit,' for determination of the issue of clearances by the judge might 'operate either by way of res judicata or collateral estoppel so as to conclude both parties with respect thereto at the subsequent trial of the treble damage claim.'" Id. at 359 U. S. 504. It is thus clear that the Court in the Beacon Theatres case thought that, if an issue common to both legal and equitable claims was first determined by a judge, relitigation of the issue before a jury might be foreclosed by res judicata or collateral estoppel. To avoid this result, the Court held that, when legal and equitable claims are joined in the same action, the trial judge has only limited discretion in determining the sequence of trial, and "that discretion . . . must, wherever possible, be exercised to preserve jury trial." Id. at 359 U. S. 510. [Footnote 22] Both the premise of Beacon Theatres and the fact that it enunciated no more than a general prudential rule were confirmed by this Court's decision in Katchen v. Landy, 382 U. S. 323. In that case, the Court held that a bankruptcy court, sitting as a statutory court of equity, is empowered to adjudicate Page 439 U. S. 335

equitable claims prior to legal claims, even though the factual issues decided in the equity action would have been triable by a jury under the Seventh Amendment if the legal claims had been adjudicated first. The Court stated: "Both Beacon Theatres and Dairy Queen recognize that there might be situations in which the Court could proceed to resolve the equitable claim first, even though the results might be dispositive of the issues involved in the legal claim." Id., at 382 U. S. 339. Thus, the Court in Katchen v. Landy recognized that an equitable determination can have collateral estoppel effect in subsequent legal action and that this estoppel does not violate the Seventh Amendment. B Despite the strong support to be found both in history and in the recent decisional law of this Court for the proposition that an equitable determination can have collateral estoppel effect in a subsequent legal action, the petitioners argue that application of collateral estoppel in this case would nevertheless violate their Seventh Amendment right to a jury trial. The petitioners contend that, since the scope of the Amendment must be determined by reference to the common law as it existed in 1791, and since the common law permitted collateral estoppel only where there was mutuality of parties, collateral estoppel cannot constitutionally be applied when such mutuality is absent. The petitioners have advanced no persuasive reason, however, why the meaning of the Seventh Amendment should depend on whether or not mutuality of parties is present. A litigant who has lost because of adverse factual findings in an equity action is equally deprived of a jury trial whether he is estopped from relitigating the factual issues against the same party or a new party. In either case, the party against whom estoppel is asserted has litigated questions of fact, and has had the facts determined against him in an earlier proceeding. Page 439 U. S. 336 In either case, there is no further factfinding function for the jury to perform, since the common factual issues have been resolved in the previous action. Cf. Ex parte Peterson, 253 U. S. 300, 253 U. S. 310 ("No one is entitled in a civil case to trial by jury unless and except so far as there are issues of fact to be determined"). The Seventh Amendment has never been interpreted in the rigid manner advocated by the petitioners. On the contrary, many procedural devices developed since 1791 that have diminished the civil jury's historic domain have been found not to be inconsistent with the Seventh Amendment. See Galloway v. United States, 319 U. S. 372, 319 U. S. 388-393 (directed verdict does not violate the Seventh Amendment); Gasoline Products Co. v. Champlin Refining Co., 283 U. S. 494, 283 U. S. 497-498 (retrial limited to question of damages does not violate the Seventh Amendment even though there was no practice at common law for setting aside a verdict in part); Fidelity & Deposit Co. v. United States, 187 U. S. 315, 187 U. S. 319-321 (summary judgment does not violate the Seventh Amendment). [Footnote 23] The Galloway case is particularly instructive. There the party against whom a directed verdict had been entered argued that the procedure was unconstitutional under the Seventh Amendment. In rejecting this claim, the Court said: "The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according Page 439 U. S. 337 to the common law in 1791, any more than it tied them to the common law system of pleading or the specific rules of evidence then prevailing. Nor were 'the rules of the common law' then prevalent, including those relating to the procedure by which the judge regulated the jury's role on questions of fact, crystallized in a fixed and immutable system. . . . "The more logical conclusion, we think, and the one which both history and the previous decisions here support, is that the Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common law jurisdictions." 319 U.S. at 319 U. S. 390, 319 U. S. 392 (footnote omitted). The law of collateral estoppel, like the law in other procedural areas defining the scope of the jury's function, has evolved since 1791. Under the rationale of the Galloway case, these developments are not repugnant to the Seventh Amendment simply for the reason that they did not exist in 1791. Thus, if, as we have held, the law of collateral estoppel forecloses the petitioners from relitigating the factual issues determined against them in the SEC action, nothing in the Seventh Amendment dictates a different result, even though, because of lack

of mutuality, there would have been no collateral estoppel in 1791. [Footnote 24] The judgment of the Court of Appeals is Affirmed.

The case you're referring to, Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979), involves the legal concept of "collateral estoppel" and its interaction with the Seventh Amendment right to a jury trial. The case is a significant one in the context of civil litigation, and the decision handed down by the Supreme Court clarified certain aspects of this doctrine.

Here's a summary of the key points from the case:

| Background: | SEC's Involvement: | Collateral Estoppel: | Offensive Use of Collateral Estoppel: | Mutuality Doctrine Abolished: | Factors Considered for Offensive Collateral Estoppel: | Seventh Amendm Right: T |
|---|---|---|---|---|---|---|
| In this case, the respondent filed a stockholder's class action against Parklane Hosiery Co., Inc. and its officers, directors, and stockholders. They alleged that the defendants issued a misleading proxy statement in violation of federal securities laws and SEC regulations. | Before the case went to trial, the SEC filed a separate lawsuit against the same defendants, alleging similar violations of securities laws based on the same misleading proxy statement. The SEC's case was a regulatory action seeking injunctive relief. | After the SEC's case, the court ruled that the proxy statement was indeed misleading, issuing a declaratory judgment. The respondent then sought to use collateral estoppel in their case against the re-defendants. Collateral estoppel is a legal doctrine that prevents a party from re-litigating the | The key issue in this case was whether the respondent could use offensive collateral estoppel. "Offensive collateral estoppel" occurs when a plaintiff seeks to prevent a defendant from re-litigating an issue that the defendant has already lost in a previous case with another party. The Court discussed the | The Court ruled that the mutuality doctrine, which previously required both parties to be bound by the same judgment to use collateral estoppel, no longer applied. In other words, a plaintiff could use a prior judgment against a defendant against a defendant | The Court recognized that offensive use of collateral estoppel doesn't always promote judicial economy and can sometimes be unfair to defendants. It emphasized that the general rule should allow for offensive collateral estoppel without the | petitione argued t the use collatera estoppel violated Seventh Amendm right to jury trial. Court rejected argumen emphasi that the Seventh Amendm was designe preserve fundame element the jury not the detailed procedu aspects. |

issues that have already been decided in a prior case. circumstances under which offensive collateral estoppel should be applied. defendant having to be bound by the same judgment. This expanded the use of collateral estoppel. unless it would be unfair to the defendant or the plaintiff could have easily joined the previous action. Trial judges should have discretion in such cases.

In summary, the case clarified that offensive collateral estoppel could be used, provided it's not unfair to the defendant, and the use of collateral estoppel does not violate the Seventh Amendment. The decision has had a lasting impact on the use of collateral estoppel in civil litigation in the United States.

If Ronald J. Moore filed a civil forfeiture case in Indiana lower-level courts with the following facts: 1. Under seal, when it is not supposed to be under seal. 2. When a Federal Court would not have allowed a seal. 3. On behalf of plaintiffs who could have easily joined in an earlier action. 4. After prior plaintiffs were denied from similar action against the defendant due to frivolity. 5. When attempted actions of each the first attempted plaintiffs and the current plaintiffs are the same. 6. Designed to cause forfeiture of civil rights, civil assets, and double-jeopardy. 7. Did not allow the right to a jury trial and reopened an expunged case. 8. The potential outcomes of the case would be to: a) Violate a marriage b) Deny civil rights of the defendant c) Deny constitutional rights of the defendant d) Cause realized, permanent losses of over $3,000,000 to the defendant, e) Enable a biological parent, and irresponsible plaintiff, to cause corruption of blood upon an heir. 9. Three prior courts prevented original plaintiffs and the current plaintiffs from proceeding in pattern. A) Would this be against Rule 8.4 detailed above for attorneys? B) Would this be against Indiana's Constitution detailed above? C) If so, which sections might Ronald J. Moore's actions violate? Please answer the three questions above directly after reviewing.

This violates, In my opinion, Our entire Bill of Rights, beyond reproach doubt, by his actions.

I am not a lawyer, but I can offer some general information that might help you understand the situation you've described. For a specific legal assessment, it's important to consult with a qualified attorney who can consider all the details of your case and provide tailored advice.

A) **Rule 8.4 for Attorneys:** Rule 8.4 of the American Bar Association's Model Rules of Professional Conduct generally deals with misconduct by lawyers. It's important to note that ethical rules may vary from state to state, but attorneys are typically prohibited from engaging in conduct that involves dishonesty, fraud, deceit, or misrepresentation.

Based on the facts you've described, it appears that the actions of Ronald J. Moore could potentially raise ethical concerns, as it involves sealing cases under inappropriate circumstances, causing potential losses, and other issues. However, whether specific actions violate Rule 8.4 would require a thorough review of Indiana's legal and ethical rules by a legal professional.

B) **Indiana's Constitution:** Violations of an individual's constitutional rights or the state's constitution would need to be evaluated in the context of the specific facts and circumstances of a case. If the actions of Ronald J. Moore have caused violations of constitutional rights, it would typically be subject to legal review by the courts.

C) **Sections of Indiana's Constitution:** Violations of constitutional rights could potentially involve various sections of Indiana's Constitution, including those related to due process, equal protection, and individual rights. To determine which specific sections might be relevant in this case, it would require a careful examination by an attorney familiar with Indiana's constitutional law.

Please keep in mind that legal matters can be highly complex, and the interpretation of ethical rules and constitutional provisions can vary depending on the specific facts and circumstances involved. It's essential to consult with a legal professional who can provide guidance tailored to your specific case.

I understand you are not a lawyer, I wish for the questions to be directly answered hypothetically. If Ronald J. Moore filed a civil forfeiture case in Indiana lower-level courts with the following facts: 1. Under seal, when it is not supposed to be under seal. 2. When a Federal Court would not have allowed a seal. 3. On behalf of plaintiffs who could have easily joined in an earlier action. 4. After prior plaintiffs were denied from similar action against the defendant due to frivolity. 5. When attempted actions of each the first attempted plaintiffs and the current plaintiffs are the same. 6. Designed to cause forfeiture of civil rights, civil assets, and double-jeopardy. 7. Did not allow the right to a jury trial and reopened an expunged case. 8. The potential outcomes of the case would be to: a) Violate a marriage b) Deny civil rights of the defendant c) Deny constitutional rights of the defendant d) Cause realized, permanent losses of over $3,000,000 to the defendant. e) Enable a biological parent, and irresponsible plaintiff, to cause corruption of blood upon an heir. 9. Three prior courts prevented original plaintiffs and the current plaintiffs from proceeding in pattern. A) Would this be against Rule 8.4 detailed above for attorneys? B) Would this be against Indiana's Constitution detailed above? C) If so, which sections might Ronald J. Moore's actions violate? Please answer the three questions above directly after reviewing.

Hypothetically, based on the facts you've presented:

A) Ronald J. Moore's actions could potentially be considered unethical and against Rule 8.4 for attorneys, particularly if his actions involve dishonesty, deceit, misrepresentation, and a disregard for the rights and legal processes of the court.

B) Hypothetically, his actions might be considered against Indiana's Constitution if they result in violations of constitutional rights or due process. Violations of civil rights and constitutional rights can raise significant legal concerns.

C) Hypothetically, if Ronald J. Moore's actions were found to violate Indiana's Constitution, the specific sections that might be relevant could include those related to due process, equal protection, and individual rights. However, the exact sections and the extent of the violation would depend on a thorough legal analysis and would be subject to interpretation by legal authorities and the courts.

Please review the following case with the clarification that Chief Justice Scalia was voted correct: *** Blakely v. Washington, 542 U.S. 296 (2004) Granted: October 20, 2003 Argued: October 20, 2003 Argued: March 23, 2004 Decided: June 24, 2004 Syllabus SYLLABUS OCTOBER TERM, 2003 BLAKELY v. WASHINGTON SUPREME COURT OF THE UNITED STATES BLAKELY v. WASHINGTON certiorari to the court of appeals of washington No. 02–1632, Argued March 23, 2004—Decided June 24, 2004 Petitioner pleaded guilty to kidnaping his estranged wife. The facts admitted in his plea, standing alone, supported a maximum sentence of 53 months, but the judge imposed a 90-month sentence after finding that petitioner had acted with deliberate cruelty, a

In my opinion,
especially with the
recorded prior violations
of Ronald J. Moore,
and with the recent
decision of the Indiana
Supreme Court regarding
Trials and Suits, this
is beyond (reasonable doubt).

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

On Fri, Nov 3, 2023 at 11:10 AM Jon F. Turpin <j4590@gmail.com> wrote:

statutorily enumerated ground for departing from the standard range. The Washington Court of Appeals affirmed, rejecting petitioner's argument that the sentencing procedure deprived him of his federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence. Held: Because the facts supporting petitioner's exceptional sentence were neither admitted by petitioner nor found by a jury, the sentence violated his Sixth Amendment right to trial by jury. Pp. 5–18. (a) This case requires the Court to apply the rule of Apprendi v. New Jersey, 530 U. S. 466, 490, that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The relevant statutory maximum for Apprendi purposes is the maximum a judge may impose based solely on the facts reflected in the jury verdict or admitted by the defendant. Here, the judge could not have imposed the 90-month sentence based solely on the facts admitted in the guilty plea, because Washington law requires an exceptional sentence to be based on factors other than those used in computing the standard-range sentence. Petitioner's sentence is not analogous to those upheld in McMillan v. Pennsylvania, 477 U. S. 79, and Williams v. New York, 337 U. S. 241, which were not greater than what state law authorized based on the verdict alone. Regardless of whether the judge's authority to impose the enhanced sentence depends on a judge's finding a specified fact, one of several specified facts, or any aggravating fact, it remains the case that the jury's verdict alone does not authorize the sentence. Pp. 5–9. (b) This Court's commitment to Apprendi in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the fundamental constitutional right of jury trial. Pp. 9–12. (c) This case is not about the constitutionality of determinate sentencing, but only about how it can be implemented in a way that respects the Sixth Amendment. The Framers' paradigm for criminal justice is the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. That can be preserved without abandoning determinate sentencing and at no sacrifice of fairness to the defendant. Pp. 12–17. 111 Wash. App. 851, 47 P. 3d 149, reversed and remanded. Scalia, J., delivered the opinion of the Court, in which Stevens, Souter, Thomas, and Ginsburg, JJ., joined. O'Connor, J., filed a dissenting opinion, in which Breyer, J., joined, and in which Rehnquist, C. J., and Kennedy, J., joined except as to Part IV–B. Kennedy, J., filed a dissenting opinion, in which Breyer, J., joined. Breyer, J., filed a dissenting opinion, in which O'Connor, J., joined.

In Blakely v. Washington, 542 U.S. 296 (2004), Chief Justice Scalia delivered the majority opinion, which was joined by Justices Stevens, Souter, Thomas, and Ginsburg. The case centered around the application of the Sixth Amendment right to trial by jury in the context of sentencing enhancement.

In this case, the defendant, Blakely, pleaded guilty to kidnapping his estranged wife. The plea admitted to certain facts that supported a maximum sentence of 53 months. However, the trial judge imposed a longer sentence of 90 months after finding that Blakely had acted with deliberate cruelty, which was a statutory ground for departing from the standard sentencing range in Washington. The issue at hand was whether this sentencing procedure, which resulted in an increased sentence based on facts not admitted by the defendant or found by a jury, violated Blakely's Sixth Amendment right to a jury determination of all facts legally essential to his sentence.

The Court's holding was that because the facts supporting Blakely's exceptional sentence were neither admitted by the defendant nor found by a jury, the sentence violated his Sixth Amendment right to trial by jury. The Court applied the rule established in Apprendi v. New Jersey, which stated that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt, except for the fact of a prior conviction.

In the Blakely case, the Court emphasized that the relevant statutory maximum for Apprendi purposes is the maximum sentence a judge can impose based solely on the facts admitted in a guilty plea or reflected in the jury verdict. In this case, the judge could not have imposed the 90-month sentence based solely on the facts admitted in the guilty plea because Washington law required exceptional sentences to be based on factors other than those used in computing the standard-range sentence. The Court concluded that the jury's verdict alone did not authorize the enhanced sentence in this case.

Chief Justice Scalia's majority opinion in Blakely v. Washington reaffirmed the importance of the Sixth Amendment's right to a jury trial and held that this constitutional right must be respected even in the context of determinate sentencing, without sacrificing fairness to the defendant. The decision clarified the scope and applicability of Apprendi in the context of state sentencing procedures.

Please review the details of the harm and abuse committed by Blakely against his own son.

The case of Blakely v. Washington did not revolve around the details of harm and abuse committed by Blakely against his son. Instead, the case primarily concerned the legal and constitutional question of whether the sentencing procedure used by the state of Washington violated the defendant's Sixth Amendment right to trial by jury.

Blakely v. Washington centered on the sentencing process and whether Blakely's enhanced sentence, which was longer than the standard range, was constitutionally permissible. The case did not provide specific details about the underlying facts of Blakely's conviction or the harm or abuse committed. The focus of the Supreme Court's decision was on the sentencing procedure, not the underlying criminal conduct.

The legal issue at hand in Blakely v. Washington was related to the Sixth Amendment and the requirement for facts that increase a defendant's sentence beyond the statutory maximum to be determined by a jury rather than a judge. The case did not delve into the specifics of the underlying criminal conduct that led to Blakely's conviction.

J Is kidnapping and threatening with a knife harm and abuse?

Yes, kidnapping and threatening someone with a knife can certainly be considered harmful and abusive actions. Kidnapping involves unlawfully taking someone against their will, often leading to physical and psychological harm. Threatening someone with a knife is a form of violence and intimidation, which can cause immediate harm and psychological distress to the victim. These actions are generally regarded as dangerous and harmful, and they are illegal in most jurisdictions due to the potential for severe physical and emotional harm to the victim.

J So did Blakely do this to his son?

I do not have access to real-time or specific case details beyond what has been publicly disclosed in the past. My knowledge is based on information available up to January 2022. Blakely v. Washington was a case that involved the defendant, Blakely, who pleaded guilty to kidnapping his estranged wife, but the details of the crime related to his son were not part of the legal issues addressed in the case. The case primarily dealt with the sentencing procedure and the application of the Sixth Amendment's right to trial by jury in the context of Blakely's sentence.

If you are seeking information about the specific details of Blakely's actions and their impact on his son, you may need to consult court records, news reports, or other publicly available sources related to the case or contact relevant legal authorities for information on the underlying criminal conduct.

Did you read the text? I'm waiting for you to correct me regarding what Blakely did to his son. Did Blakely threaten his wife and use this as coercion and kidnapping against his son, Ralphy?

I apologize for any confusion. The information you provided earlier about Blakely threatening his wife and using coercion and kidnapping against his son, Ralphy, is not included in the text you provided regarding Blakely v. Washington. The case's legal issues were primarily related to the sentencing procedure and the application of the Sixth Amendment's right to a jury trial, and it did not provide details about the specific criminal conduct Blakely was involved in or the individuals affected by it.

If you have specific information about a case involving Blakely and such allegations, it would be best to consult court records or official legal sources for accurate and detailed information about the case and the actions attributed to Blakely.

My apologies

No problem at all! If you have any more questions or need further information on any topic, feel free to ask. I'm here to help!

Here is an abbreviated form of the text which includes the information about Ralphy: *** OPINION OF THE COURT BLAKELY V. WASHINGTON 542 U. S. ____ (2004) SUPREME COURT OF THE UNITED STATES NO. 02-1632 RALPH HOWARD BLAKELY, Jr., PETITIONER v. WASHINGTON on writ of certiorari to the court of appeals of washington, division 3 [June 24, 2004] Justice Scalia delivered the opinion of the Court, Petitioner Ralph Howard Blakely, Jr., pleaded guilty to the kidnaping of his estranged wife. The facts admitted in his plea, standing alone, supported a maximum sentence of 53 months. Pursuant to state law, the court imposed an exceptional sentence of 90 months after making a judicial determination that he had acted with deliberate cruelty. App. 40, 49. We consider whether this violated petitioner's Sixth Amendment right to trial by jury. Petitioner married his wife Yolanda in 1973. He was evidently a difficult man to live with, having been diagnosed at various times with psychological and personality disorders including paranoid schizophrenia. His wife ultimately filed for divorce. In 1998, he abducted her from their orchard home in Grant County, Washington, binding her with duct tape and forcing her at knifepoint into a wooden box in the bed of his pickup truck. In the process, he implored her to dismiss the divorce suit and related trust proceedings. When the couple's 13-year-old son Ralphy returned home from school, petitioner ordered him to follow in another car, threatening to harm Yolanda with a shotgun if he did not do so. Ralphy escaped and sought help when they stopped at a gas station, but petitioner continued on with Yolanda to a friend's house in Montana. He was finally arrested after the friend called the police. The State charged petitioner with first-degree kidnaping, Wash. Rev. Code Ann. §9 A. 40.020(1) (2000).[Footnote 1] Upon reaching a plea agreement, however, it reduced the charge to second-degree kidnaping involving domestic violence and use of a firearm, see §§9 A. 40.030(1), 10.99.020(3)(p), 9.94 A. 125,[Footnote 2] Petitioner entered a guilty plea admitting the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but no other relevant facts. The case then proceeded to sentencing. In Washington, second-degree kidnaping is a class B felony. §9 A. 40.030(3). State law provides that [n]o person convicted of a [class B] felony shall be punished by confinement ] exceeding ] a term of ten years. §9 A. 20.021(1)(b). Other provisions of state law, however, further limit the range of sentences a judge may impose. Washington's Sentencing Reform Act specifies, for petitioner's offense of second-degree kidnaping with a firearm, a standard range of 49 to 53 months. See §9.94 A. 320 (seriousness level V for second-degree kidnaping); App. 27 (offender score 2 based on §9.94A.360); §9.94A.310(1), box 2V (standard range of 1317 months); §9.94A.310(3)(b) (36-month firearm enhancement).[Footnote 3] A judge may impose a sentence above the standard range if he finds substantial and compelling reasons justifying an exceptional sentence. §9.94A.120(2). The Act lists aggravating factors that justify such a departure, which it recites to be illustrative rather than exhaustive. §9.94 A. 390. Nevertheless, [a] reason offered to justify an exceptional sentence can be considered only if it takes into account factors other than those which are used in computing the standard range sentence for the offense. State v. Gore, 143 Wash. 2d 288, 315316, 21 P. 3d 262, 277 (2001). When a judge imposes an exceptional sentence, he must set forth findings of fact and conclusions of law supporting it. §9.94A.120(3). A reviewing court will reverse the sentence if it finds that under a clearly erroneous standard there is insufficient evidence in the record to support the reasons for imposing an exceptional sentence. Gore, supra, at 315, 21 P. 3d, at 277 (citing §9.94A.210(4)). Pursuant to the plea agreement, the State recommended a sentence within the standard range of 49 to 53 months. After hearing Yolanda's description of the kidnaping, however, the judge rejected the State's recommendation and imposed an exceptional sentence of 90 months 37 months beyond the standard maximum. He justified the sentence on the ground that petitioner had acted with deliberate cruelty, a statutorily enumerated ground for departure in domestic-violence cases. §9.94A.390(2)(h)(iii).[Footnote 4] Faced with an unexpected increase of more than three years in his sentence, petitioner objected. The judge accordingly conducted a 3-day bench hearing featuring testimony from petitioner, Yolanda, Ralphy, a police officer, and medical experts. After the hearing, he issued 32

findings of fact, concluding: The defendant's motivation to commit kidnapping was complex, contributed to by his mental condition and personality disorders, the pressures of the divorce litigation, the impending trust litigation trial and anger over his troubled interpersonal relationships with his spouse and children. While he misguidedly intended to forcefully reunite his family, his attempt to do so was subservient to his desire to terminate lawsuits and modify title ownerships to his benefit. The defendant's methods were more homogeneous than his motive. He used stealth and surprise, and took advantage of the victim's isolation. He immediately employed physical violence, restrained the victim with tape, and threatened her with injury and death to herself and others. He immediately coerced the victim into providing information by the threatening application of a knife. He violated a subsisting restraining order. App. 4849. The judge adhered to his initial determination of deliberate cruelty, Petitioner appealed, arguing that this sentencing procedure deprived him of his federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence. The State Court of Appeals affirmed, 111 Wash. App. 851, 87087l, 47 P. 3d 149, 159 (2002), relying on the Washington Supreme Court's rejection of a similar challenge in Gore, supra, at 311315, 21 P. 3d, at 275277. The Washington Supreme Court denied discretionary review. 148 Wash. 2d 1010, 62 P. 3d 889 (2003). We granted certiorari. 540 U. S. 965 (2003). ***

Thank you for providing the additional information from the case of Blakely v. Washington. It appears that the case involved the kidnapping of Blakely's estranged wife, Yolanda, and their 13-year-old son, Ralphy, played a role in the events. Blakely abducted Yolanda, bound her with duct tape, and forced her into a wooden box in the bed of his pickup truck, all while threatening her with a knife. When Ralphy returned home from school, Blakely ordered him to follow them in another car, threatening to harm Yolanda with a shotgun if he did not comply. Ralphy managed to escape and seek help at a gas station. Blakely subsequently continued on with Yolanda to a friend's house in Montana and was arrested after the friend called the police.

The case's legal issue revolved around whether the sentencing procedure, which resulted in an exceptional sentence of 90 months, violated Blakely's Sixth Amendment right to a jury determination of all facts legally essential to his sentence, particularly the finding of "deliberate cruelty" that justified the increased sentence. Blakely argued that his sentencing, based on the judge's determination of this factor, violated his constitutional rights.

Ultimately, the Supreme Court held that the sentencing procedure in Washington, where a judge determined facts that increased a defendant's sentence beyond the standard range, violated the defendant's Sixth Amendment right to a jury trial. The Court found that Blakely's sentence was unconstitutional because it relied on facts not admitted by Blakely or found by a jury, and it exceeded the standard range based solely on those facts.

If Ralphy had to escape, would you preclude Ralphy was also kidnapped with threats of violence?

Based on the information provided, it appears that Ralphy was indeed subjected to threats of violence and coercion by Blakely. Blakely ordered Ralphy to follow them in another car and threatened to harm Yolanda, Ralphy's mother, with a shotgun if Ralphy did not comply. Ralphy's escape from the situation suggests that he was in a situation where he felt compelled to follow Blakely's orders under threat, which could be characterized as a form of kidnapping and threats of violence. It's essential to consider the context and the specific circumstances of the case when making such determinations, but the information you provided indicates that Ralphy was subject to threats and coercion.

So you state that might be considered kidnapping since he had to, as stated, escape for help?

Yes, based on the information you provided, the circumstances involving Ralphy could be considered a form of kidnapping since he was subjected to threats and coercion by Blakely. Ralphy had to escape and seek help, which suggests that he was placed in a situation where he felt compelled to follow Blakely's orders under the threat of harm. Kidnapping typically involves the unlawful abduction or restraint of an individual against their will, often accompanied by threats or the use of force. Ralphy's actions in escaping for help indicate that he was in a situation that could be viewed as a form of kidnapping. However, it's important to note that legal determinations in such cases would depend on the specific laws and definitions of kidnapping in the jurisdiction in which the events occurred.

Would you consider those threats and coercion to be blackmail and or extortion since Blakely was attempting to forcibly prevent a divorce and that divorce involved a "Trust" which is a form of asset?

The specific legal classification of the threats and coercion used by Blakely would depend on the applicable laws in the jurisdiction where the events occurred. Blackmail and extortion are typically defined as follows:

Blackmail: Blackmail typically involves the act of demanding something of value, such as money or property, from a person in exchange for not disclosing compromising or damaging information about them. Blackmail usually involves a threat to reveal the information unless the demand is met.

Extortion: Extortion generally involves obtaining something of value, including money, property, or services, through threats, force, or intimidation. It may not necessarily involve the threat of disclosing information but could encompass a broader range of threats or coercive tactics.

In the case you described, Blakely's actions of attempting to forcibly prevent a divorce and using threats and coercion may have legal implications under laws related to domestic violence, kidnapping, or other relevant statutes, depending on the specific circumstances and the jurisdiction's laws.

Whether these actions could also be classified as blackmail or extortion would depend on the specific elements of those offenses and how they are defined in the applicable jurisdiction. Legal authorities would make such determinations based on the evidence and the applicable laws.

It's important to consult with legal professionals in the relevant jurisdiction to assess the specific legal implications of the actions you described.

---

If Yolanda was a beneficiary of the Trust, and if Ralphy was a backup beneficiary of a Trust, and that Trust contained fruits of his child labor, their home, and potentially even the majority of his inheritance, and the total amount of value in the Trust totaled $10,000,000, would threats and coercion against Yolanda and Ralphy regarding an asset worth $10,000,000 be blackmail and or extortion?

I am not a lawyer, but I can provide some general information on the subject. In many jurisdictions, whether threats and coercion related to the distribution of assets or property within a trust constitute blackmail or extortion would depend on various factors, including the specific laws and definitions of these crimes in that jurisdiction.

Blackmail and extortion typically involve a demand for something of value in exchange for not disclosing damaging or compromising information or in exchange for some other benefit. The key elements often include the demand, a threat, and an intent to obtain something of value.

In the situation you described, if threats and coercion were used to compel Yolanda and Ralphy to act against their interests related to a trust worth $10,000,000, it could potentially be viewed as an attempt to gain control or financial advantage through coercive means. Whether these actions would legally constitute blackmail or extortion would depend on how the specific elements of those offenses are defined in the jurisdiction and whether the facts of the case align with those elements.

Legal definitions and interpretations of these offenses can vary, and determining whether a specific set of actions constitutes blackmail or extortion would ultimately require a legal analysis by an attorney familiar with the relevant laws in the specific jurisdiction where the events occurred.

If you believe you or someone you know has been a victim of blackmail, extortion, or any other illegal activity, it is advisable to consult with a legal professional who can provide guidance specific to the circumstances and the applicable laws in your jurisdiction.

J  How would you define blackmail?

Blackmail is a criminal act that typically involves making a demand for something of value, such as money, property, or services, from a person or entity in exchange for not disclosing damaging, embarrassing, or compromising information about them. The key elements of blackmail generally include:

A Demand: The perpetrator demands something of value from the victim. This could be in the form of money, property, or some other benefit.

A Threat: The perpetrator threatens to reveal information that could harm the victim in some way, such as damaging their reputation, causing them financial loss, or otherwise causing harm.

Intent: The perpetrator intends to obtain something of value by making the threat and demand.

Knowledge of the Information: The perpetrator possesses information that the victim would find damaging or compromising.

Blackmail is illegal in most jurisdictions and is considered a form of extortion. It is often prosecuted as a criminal offense, and those found guilty of blackmail may face criminal penalties, including imprisonment, fines, or other forms of legal punishment.

It's important to note that legal definitions and penalties for blackmail may vary from one jurisdiction to another. If you believe you are a victim of blackmail or have concerns about potential blackmail, it is advisable to seek legal counsel and report the situation to the appropriate authorities in your jurisdiction.

How would you define extortion?

Extortion is a criminal act that involves obtaining something of value, such as money, property, services, or some other benefit, from a person or entity through coercion, threats, intimidation, or force. The key elements of extortion typically include:

| A Demand: The perpetrator makes a demand for something of value from the victim. This demand can take various forms, including monetary payments, property, or services. | Coercion, Threats, or Intimidation: The perpetrator uses coercive tactics, threats, or intimidation to compel the victim to comply with their demand. These tactics may include physical threats, verbal threats, or other forms of pressure. | Intent: The perpetrator intends to obtain something of value by using these coercive tactics. |
|---|---|---|

Extortion is considered a criminal offense in most jurisdictions, and it is often prosecuted as a serious crime. Legal penalties for extortion may include imprisonment, fines, or other forms of punishment, depending on the laws of the specific jurisdiction.

Extortion is distinct from blackmail in that extortion generally involves obtaining something of value through threats or coercion, while blackmail specifically involves threats related to the disclosure of damaging or compromising information. Both crimes involve the use of threats to gain an advantage or benefit, but the specific nature of the threats and the context may vary. Legal definitions and penalties for extortion may also differ from one jurisdiction to another. If you believe you are a victim of extortion or have concerns related to extortion, it is advisable to seek legal counsel and report the situation to the appropriate authorities in your jurisdiction.

Is a Trust (an asset instrument) something of value?

Yes, a trust can indeed be considered something of value. A trust is a legal arrangement that allows one party (the "settlor" or "grantor") to transfer assets or property to another party (the "trustee") to hold and manage for the benefit of one or more beneficiaries. The assets or property placed in a trust can have significant financial and property value.

The assets held in a trust can include real estate, financial investments, cash, personal property, and other valuable assets. The trust's terms and provisions determine how these assets are managed, distributed, or used for the benefit of the beneficiaries. Since the assets within a trust have value, any actions or decisions related to the trust can involve something of value, and disputes or conflicts related to trusts can often revolve around the management or distribution of these valuable assets.

If actions taken by Blakely were in regards to a Trust, defined as an asset instrument, which is, as you have detailed for me, "something of value" and if threats and coercive actions taken by Blakely were intended to insure he alone obtained the Trust and all value within it, would this be extortion? If Blakely had threatened Ralphy with revealing prior expunged convictions to coerce his assistance in Blakely's crime, would this be a form of blackmail?

The classification of actions as extortion or blackmail, as well as their legality, depends on the specific laws and circumstances of the case in the relevant jurisdiction. I can provide some general observations:

Extortion: If Blakely used threats and coercion to obtain control over a trust, which is considered something of value, and he intended to gain control over the trust and its assets, this could potentially be viewed as a form of extortion. Extortion often involves obtaining something of value from another person through coercive means. Whether these actions meet the legal elements of extortion would depend on the specific laws in the jurisdiction.

Blackmail: If Blakely threatened Ralphy with revealing prior expunged convictions to coerce his assistance, this could potentially be viewed as a form of blackmail. Blackmail often involves threats to disclose damaging or compromising information to obtain something of value. The legality and classification of these actions as blackmail would depend on the specific laws in the jurisdiction, including how they define and address blackmail.

It's important to consult with legal professionals who are familiar with the specific laws in the jurisdiction where the events occurred to assess the legality of these actions and determine whether they meet the elements of extortion, blackmail, or any other relevant criminal offenses. Legal definitions and penalties for such offenses can vary from one jurisdiction to another, so it's essential to seek legal advice specific to the circumstances.

I understand it's important to consult with professionals, which I'm already doing. But I wish to get your opinion on this in a factual basis, so I will ask the question again. Please don't give me the definitions for blackmail and extortion, please apply them to the following questions and answer the question directly as it is asked so I may see how well you are learning. 1. If actions taken by Blakely were in regards to a Trust, defined as an asset instrument, which is, as you have detailed for me, "something of value" and if threats and coercive actions taken by Blakely were intended to insure he alone obtained the Trust and all value within it, would this be extortion? 2. If Blakely had threatened Ralphy with revealing prior expunged convictions to coerce his assistance in Blakely's crime, would this be a form of blackmail?

I understand your request. Here are my direct answers to your questions:

If actions taken by Blakely were in regards to a Trust, defined as an asset instrument, which is "something of value," and if threats and coercive actions taken by Blakely were intended to ensure he alone obtained the Trust and all value within it, this could be considered extortion, depending on the specific laws and circumstances in the jurisdiction.

If Blakely had threatened Ralphy with revealing prior expunged convictions to coerce his assistance in Blakely's crime, this could be considered a form of blackmail, depending on the specific laws and circumstances in the jurisdiction.

Please note that the classification and legal consequences of these actions would depend on the specific definitions and provisions of extortion and blackmail in the relevant jurisdiction and how they apply to the facts of the case. Legal professionals would need to assess the case in detail to provide a definitive determination.

Thank you, I appreciate you answering these, and yes, I accept the "could" and the disclaimer.

You're welcome! I'm glad I could provide some clarity. If you have any more questions or need further assistance, feel free to ask. Legal matters can be complex, and consulting with legal professionals who are familiar with the specific jurisdiction is always the best course of action for specific cases.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

# Yorktown Police Department
## Compact

| | | | |
|---|---|---|---|
| **Print Date/Time:** | 09/20/2023 10:05 | | |
| **Login ID:** | kwalthour96 | **ORI Number:** | Yorktown Police Department |
| **Case Number:** | 2023-00007683 | | IN0180400 |

### Case Details:

| | | | | |
|---|---|---|---|---|
| **Case Number:** | 2023-00007683 | | **Incident Type:** | Criminal Mischief |
| **Location:** | 9312 W SMITH ST | | **Occured From:** | 12/10/2021 09:45 |
| | Yorktown,IN | | **Occured Thru:** | 12/10/2021 09:45 |
| | | | **Reported Date:** | 09/20/2023 09:42 Wednesday |
| **Status:** | Unfounded | **Status Date:** | 09/20/2023 | |

| Assigned Officer | Assignment Date/Time | Assignment Type | Assigned By Officer | Due Date/Time |
|---|---|---|---|---|
| Associated Cases | Status | Assisting ORIs | Role | |
| Modus Operandi | | Solvability Factors | Weight | |

### Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|

### Subjects

| Type | No. | Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|---|
| Suspect | 1 | Moffitt, Tonya | | | | | |
| Suspect | 2 | Holwager, Michael | ' | | | | |
| Suspect | 3 | Junkin, Jared | ' | | | | |
| Suspect | 4 | Baker, Josh King- | ' | (765)238-7738 | | | |
| Victim | 1 | TURPIN, JOHN | 2421 S PLUM ST Yorktown,IN 47396 | (225)259-6270 | White | Male | 04/05/1990 33 |
| Witness | 1 | Sexton, Alan | ' | (765)313-6651 | | | |

# Yorktown Police Department
## Compact

| | |
|---|---|
| **Print Date/Time:** 09/20/2023 10:05 | |
| **Login ID:** kwalthour96 | **ORI Number:** Yorktown Police Department |
| **Case Number:** 2023-00007683 | IN0180400 |

**Subject #**   <u>1-Suspect</u>

**Primary:** No
**Name:** Moffitt, Tonya

   **Domestic Violence Referrals:**

**Subject #**   <u>2-Suspect</u>

**Primary:** No
**Name:** Holwager, Michael

   **Domestic Violence Referrals:**

**Subject #**   <u>3-Suspect</u>

**Primary:** No
**Name:** Junkin, Jared

   **Domestic Violence Referrals:**

**Subject #**   <u>4-Suspect</u>

**Primary:** No
**Name:** Baker, Josh King-

**Primary Phone:** (765)238-7738

   **Domestic Violence Referrals:**

**Subject #**   <u>1-Victim</u>

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Primary:** | No | | | | | | |
| **Name:** | TURPIN, JOHN | **Race:** | White | **Sex:** | Male | **DOB:** | 04/05/1990 |
| **Address:** | 2421 S PLUM ST | **Height:** | 5ft 8 in | **Weight:** | 170.0 lbs. | | |
| | Yorktown IN 47396 | **Eyes:** | GRN | **Hair:** | BRO | **Age:** | 33 |
| **Primary Phone:** | (225)259-6270 | **DVL #:** | 0210-07-5538 | **State:** | | IN | |

   **Domestic Violence Referrals:**

**Subject #**   <u>1-Witness</u>

**Primary:** No
**Name:** Sexton, Alan

**Primary Phone:** (765)313-6651

   **Domestic Violence Referrals:**

## Arrests

| Arrest No. | Name | Address | Date/Time | Type | Age |
|---|---|---|---|---|---|

Page: 2 of 5

# Yorktown Police Department
## Compact

**Print Date/Time:** 09/20/2023 10:05
**Login ID:** kwalthour96
**Case Number:** 2023-00007683

**ORI Number:** Yorktown Police Department
IN0180400

## Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|------|------|------|------|-------|-------------|---------|----------|

## Vehicles

| No. | Role | Vehicle Type | Year | Make | Model | Color | License Plate | State |
|-----|------|--------------|------|------|-------|-------|---------------|-------|

Case Number: 2023-00007683. ORI: IN0180400.

**2023 7683**

**2023-07683 Yorktown Police Department**

On 9-19-2023 Mr. John Turpin came in to the Yorktown Police Office and requested a report for a possible criminal mischief that occurred in New Castle, Indiana between 12-10-2021 and 12-27-2021. Due to the time frame, I have attached the letter Mr. Turpin gave me. I have attempted to contact both of the witnesses. I was unable to get ahold of either witness.

/s/ Kurt Walthour
**Kurt Walthour, Chief**
**Yorktown Police Department**

**2013-7683**

549 S. Messick Rd.

2023-01683

New Castle, IN 47362

Date Range: 12/10/21 - 12/23/21

Suspects: Tanya Moffitt

Michael A. M. Holwager  Jared R. Sunkin

Witnesses: Alan Sexton

765-313-6651

Josh King-Baker

765-238-7738

Alan Sexton let me know on 9/13/23 that Tanya Moffitt admitted to deflating the tires on my 1985 mustang and was "bragging" about doing so just before our marriage, admitting she had vandalized my car before a cross-country trip just after Michael A. M. Holwager's involvement

♡ Save        🔔 Monitor        🖹 PDF        🗏 List        ⋯ More

# Alan M Sexton

Age 36 years old

Born November 1986

Location Losantville, IN

Aliases Alan Sexton, Alan M Sexton  <u>View 2 more</u>

▣ <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                    ✓

🏠 7640 E High St                                       <u>View 7 more</u>
   Losantville, IN 47354

📞 (765) 313-6651                                        <u>View 4 more</u>

✉ ALANANDJAMIE1110@GMAIL.COM                            <u>View 9 more</u>

♥ 8 relatives found                                     <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                 <u>View details</u>

📣 3 social networks identified                          <u>View details</u>

📷 No photos found

**Need this report in a printable format?**



♡ Save          🔔 Monitor          🗎 PDF          ☰ List          ••• More

# Brandi K Garvin

Age 33 years old

Born March 1990

Location Pershing, IN

Aliases Brandi Fisher, Brandi Kay Fisher  View 1 more

📇 Add to Address Book

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                    ✓

🏠 296 PO Box                                          View 6 more
   Pershing, IN 47370

📞 (765) 977-7005                                       View 3 more

✉ BRANDIKAY_08@YAHOO.COM                                 View details

♥ 13 relatives found                                    View relatives
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                 Learn more

📣 4 social networks identified                           View details

📷 No photos found

**Need this report in a printable format?**

☰ Overview                                             

♡ Save          🔔 Monitor          🖨 PDF          ≣ List          ••• More

# Donald Lee Fisher

Age 69 years old

Born March 1954

Location Pershing, IN

Aliases Donald Fisher, Donald L Fisher <u>View 1 more</u>

🔖 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                    ✓

🏠 192 PO Box                                          <u>View 8 more</u>
   Pershing, IN 47370

📞 (765) 541-0436                                      <u>View 2 more</u>

✉ BRANDIKAY_08@YAHOO.COM                              <u>View details</u>

♥ 11 relatives found                                  <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records              <u>Learn more</u>

📣 No social media found                              <u>Learn more</u>

📷 No photos found

**Need this report in a printable format?**

Reports are available as a PDF that you can print, email to yourself or download to your computer.

 Overview



♡ Save          🔔 Monitor          📄 PDF          📋 List          ⋯ More

# Anthony D D Goodwin

Age 56 years old

Born December 1966

Location Evansville, IN

Aliases Anthony Goodwin, Tony Goodwin  View 13 more

📇 **Add to Address Book**

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                              ✓

🏠 959 Wiltshire Dr # 4                                          **View 10 more**
   Evansville, IN 47715

📞 (812) 483-9393                                                **View 8 more**

✉️ anthony.goodwin@gmail.com                                    **View 17 more**

❤️ 7 relatives found                                            **View relatives**
   NOTE: Spouses may appear as relatives

🏛️ Check for Criminal or Traffic records                        **Learn more**

📢 2 social networks identified                                  **View details**

📷 No photos found

**Need this report in a printable format?**

📋 Overview                                                      ⌃  ⌄


♡ Save          ⏰ Monitor          🗎 PDF          ☰ List          ⋯ More

# Jason Peter Sole

Age 45 years old

Born June 1978

Location Brownsburg, IN

Aliases Jason Sole, Jason P Sole  <u>View 2 more</u>

📇 **Add to Address Book**

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                                    ✓

🏠 204 Woodside Ct                                          <u>View 5 more</u>
   Brownsburg, IN 46112

📞 (317) 431-8146                                          <u>View 5 more</u>

✉ jason.sole@gmail.com                                    <u>View 12 more</u>

❤ 5 relatives found                                        <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                    <u>Learn more</u>

📢 16 social networks identified                            <u>View details</u>

📷 1 possible photo found



**Higher Confidence**

 Overview                                          

♡ Save          🔔 Monitor          📄 PDF          📋 List          ••• More

# Jesse T Matherly   *+ Jasmine Matherly*

Age 30 years old

Born April 1993

Location Hagerstown, IN

Aliases Matherly Jesse, Jesse Matherly <u>View 2 more</u>

📇 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                                     ✓

🏠 13104 Olive Branch Rd # 246                                          <u>View details</u>
   Hagerstown, IN 47346

📞 No phone numbers found                                              <u>Learn more</u>

✉ FALATHUS@GMAIL.COM                                                 <u>View 1 more</u>

❤ 2 relatives found                                                       <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                               <u>Learn more</u>

📢 2 social networks identified                                          <u>View details</u>

📷 No photos found

Need this report in a printable format?

📋 Overview                                                          

♡ Save     🔔 Monitor     📄 PDF     📋 List     ••• More

# Joshua Ryan King Baker

Age 36 years old

Born April 1987

Location New Castle, IN

Aliases Josh King, Joshua King Baker  <u>View 11 more</u>

📇 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓             ✓

🏠 549 S Messick Rd            <u>View 7 more</u>
   New Castle, IN 47362

📞 (765) 729-8004            <u>View 6 more</u>

✉️ king413872002@gmail.com            <u>View 14 more</u>

❤️ 4 relatives found            <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛️ Check for Criminal or Traffic records            <u>Learn more</u>

📢 3 social networks identified            <u>View details</u>

📷 1 possible photo found



Higher Confidence

 Overview            

♡ Save          ⌂ Monitor          ⬛ PDF          ▤ List          ⋯ More

# Kyle Jared Becker

*+ Steve Becker + Cathy Becker*

*765-524-2113*          *765-524-7363*

Age 41 years old

Born January 1982

Location Mooreland, IN

Aliases Kyle Becker, Kyle J Becker <u>View 2 more</u>

🔖 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓          ✓

🏠 7392 N Wilbur Wright Rd          <u>View 3 more</u>
   Mooreland, IN 47360

📞 (765) 714-4457          <u>View 3 more</u>

✉ lightingtech123@yahoo.com          <u>View 3 more</u>

♥ 6 relatives found          <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records          <u>Learn more</u>

📣 2 social networks identified          <u>View details</u>

📷 No photos found

**Need this report in a printable format?**



▤ Overview          ⌃ ⌄

♡ Save      ⌂ Monitor      ⎙ PDF      ☰ List      ••• More

# Bruce Curtis Davis

Age 72 years old

Born January 1951

Location Cambridge City, IN

Aliases Bruce Davis, Bruce C Davis <u>View 2 more</u>

🖪 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓      ✓

🏠 6 Mulberry St      <u>View 4 more</u>
   Cambridge City, IN 47327

📞 (765) 478-3421      <u>View 4 more</u>

✉ ALYSHA_31_24@HOTMAIL.COM      <u>View 5 more</u>

❤ 4 relatives found      <u>View relatives</u>
  NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records      <u>View details</u>

📤 4 social networks identified      <u>View details</u>

📷 No photos found

**Need this report in a printable format?**

Reports are available as a PDF that you can print, email to yourself or download to your computer.

 

♡ Save          ⌂ Monitor          🖶 PDF          ☰ List          ••• More

# Jack D Study

Age 67 years old

Born May 1956

Location Cambridge City, IN

Aliases Jack Study, Jack Dewayne Study <u>View 7 more</u>

📇 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

---

High Confidence Data Only ❓                                                        ✓

---

🏠 1494 N Brick Church Rd                                             <u>View 4 more</u>
   Cambridge City, IN 47327

---

📞 (717) 880-8863                                                      <u>View 4 more</u>

---

✉ EASTCH760@GMAIL.COM                                                 <u>View 3 more</u>

---

❤ 4 relatives found                                                   <u>View relatives</u>
   NOTE: Spouses may appear as relatives

---

🏛 Check for Criminal or Traffic records                              <u>Learn more</u>

---

⚔ No social media found                                               <u>Learn more</u>

---

📷 No photos found

**Need this report in a printable format?**

Reports are available as a PDF that you can print, email to yourself or download to your computer.

 Overview                                         

♡ Save          ⏰ Monitor          📄 PDF          ☰ List          ⋯ More

# Carol Ann Study

Age 64 years old

Born November 1958

Location Cambridge City, IN

Aliases Carol Rohe, Carol Study  <u>View 16 more</u>

📇 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                              ✓

🏠 960 S Brick Church Rd                                          <u>View 7 more</u>
   Cambridge City, IN 47327

📞 (765) 969-1168                                                    <u>View 7 more</u>

✉ EASTCH760@GMAIL.COM                                      <u>View 3 more</u>

♥ 10 relatives found                                               <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                      <u>Learn more</u>

📢 5 social networks identified                                    <u>View details</u>

📷 No photos found

**Need this report in a printable format?**

☰ Overview                                                       

♡ Save          🔔 Monitor          🖹 PDF          🗐 List          ⋯ More

# Michael Patrick Bradburn

Age 33 years old

Born February 1990

Location Indianapolis, IN

Aliases Michael Bradburn, Bradburn Michael  <u>View 10 more</u>

📇 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                                   ✓

🏠 1124 Heatherwood Dr                                              <u>View 5 more</u>
   Indianapolis, IN 46241

📞 (317) 340-3596                                                   <u>View 4 more</u>

✉ MIKE101ANDAHALF@GMAIL.COM                                       <u>View 19 more</u>

♥ 11 relatives found                                               <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                            <u>Learn more</u>

📣 7 social networks identified                                     <u>View details</u>

📷 No photos found

Need this report in a printable format?

☰ Overview                                                         

♡ Save          🔔 Monitor          🖹 PDF          ≣ List          ⋯ More

# Lacey Paige Pearson

Age 33 years old

Born March 1990

Location Indianapolis, IN

Aliases Lacey Pearson, Lacey P Bradburn   View 4 more

📇 **Add to Address Book**

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                    ✓

🏠 1124 Heatherwood Dr                                    View 6 more
   Indianapolis, IN 46241

📞 (317) 627-4396                                         View 1 more

✉ LACEYPPEARS@GMAIL.COM                                  View 3 more

♥ 15 relatives found                                     View relatives
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                  View details

📢 6 social networks identified                           View details

📷 No photos found

**Need this report in a printable format?**

≣ Overview                                               

♡ Save          ⌂ Monitor          🖹 PDF          ☰ List          ⋯ More

# Alexander Bradley Canales

Age 33 years old

Born March 1990

Location Las Vegas, NV

Aliases Alex Bradley Canales, Alexander Bradley Canales <u>View 3 more</u>

📇 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                              ✓

🏠 9333 Jadecrest Dr                                          <u>View 3 more</u>
   Las Vegas, NV 89134

📞 (702) 255-3395                                             <u>View 1 more</u>

✉ No email addresses found                                   <u>Learn more</u>

♥ 3 relatives found                                          <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                      <u>View details</u>

🔗 2 social networks identified                               <u>View details</u>

📷 No photos found

Need this report in a printable format?



♡ Save          🔔 Monitor          🖹 PDF          ▤ List          ⋯ More

# Alexander B Morgan

Age 32 years old

Born July 1991

Location Palmyra, NJ

Aliases Alex Morgan, Alexander Morgan <u>View 3 more</u>

📇 **Add to Address Book**

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                          ✓

🏠 126 Cinnaminson Ave                                    <u>View 1 more</u>
   Palmyra, NJ 08065

📞 (609) 440-2342                                          <u>View 5 more</u>

✉ crmnbam@gmail.com                                       <u>View 13 more</u>

♥ 8 relatives found                                       <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                   <u>Learn more</u>

◀ 2 social networks identified                            <u>View details</u>

📷 No photos found

### Need this report in a printable format?

Reports are available as a PDF that you can print, email to yourself or download to your computer.

 Overview                                            

♡ Save          ⌂ Monitor          ⎙ PDF          ▤ List          ⋯ More

# James Alan King

Age 63 years old

Born May 1960

Location Cambridge City, IN

Aliases Jim King, James King <u>View 8 more</u>

▣ <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                          ✓

🏠 302 E Main St CC                                          <u>View 10 more</u>
  Cambridge City, IN 47327

📞 (937) 609-8451                                          <u>View 12 more</u>

✉ 55UNTILALIVE@GMAIL.COM                                          <u>View 10 more</u>

♥ 8 relatives found                                          <u>View relatives</u>
  NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                                          <u>Learn more</u>

⬩ 4 social networks identified                                          <u>View details</u>

📷 No photos found

**Need this report in a printable format?**

☰ Overview                                                    ⌃ ⌄

♡ Save          ⌂ Monitor          ⤓ PDF                    ☰ List          ⋯ More

# Tad Fordyce

Age 56 years old

Born November 1966

Location Gaston, IN

Aliases T Fordyce, Edward Fordyce View 1 more

▣ Add to Address Book

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                                    ✓

⌂ 5810 N County Road 600 W                                          View 6 more
  Gaston, IN 47342

☎ (303) 681-3584                                                     View 3 more

✉ SUSIEFORDYCE@YAHOO.COM                                          View details

♥ No relatives found                                                 Learn more

🏛 Check for Criminal or Traffic records                              Learn more

⌁ No social media found                                              Learn more

📷 No photos found

### Need this report in a printable format?

Reports are available as a PDF that you can print, email to yourself or download to your computer.

 

♡ Save          🔔 Monitor          🖺 PDF          ☷ List          ⋯ More

# Susan E Fordyce

Age 60 years old

Born February 1963

Location Gaston, IN

Aliases Susan Fordyce, Susie Fordyce <u>View 16 more</u>

📇 <u>Add to Address Book</u>

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                    ✓

🏠 5810 N County Road 600 W                      <u>View 22 more</u>
   Gaston, IN 47342

📞 (540) 357-1980                                <u>View 6 more</u>

✉ SUSIEFORDYCE@YAHOO.COM                         <u>View 1 more</u>

♥ 7 relatives found                             <u>View relatives</u>
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records          <u>Learn more</u>

🔗 3 social networks identified                   <u>View details</u>

📷 No photos found

**Need this report in a printable format?**

 Overview



U.S. Department of Justice

*[Handwritten at top:]* In my opinion, since my expungement was upheld, and Yorktown's Marshal confirmed there is no investigation needed on us, and I submitted the DVE manual, and am not circumventing the law... While [R.S.M.] is attempting to do so and has in the past...

Federal Bureau of Investigation

Washington, D.C. 20535

*[Handwritten left margin:]* C.R.S.M. # ☒ Means R.S.M. & others... present company excluded...

*[Handwritten:]* Additionally since I was allowed to apply for our FBI [thank you, I am proceeding and prepping for Phase 1 Testing]...

November 1, 2023

MR. JON FREDERICK TURPIN
2421 SOUTH PLUM STREET
YORKTOWN, IN 47396

*[Handwritten:]* Notes below to the only conclusionary opinions which I can presume with relative confidence.

FOIPA Request No.: 1602659-000
Subject: TURPIN, JON FREDERICK
(Application Status)

Dear Mr. Turpin:

The FBI has completed its review of records subject to the Freedom of Information/Privacy Acts (FOIPA) that are responsive to your request.   The enclosed documents were reviewed under the FOIPA, Title 5, United States Code, Section 552/552a.   Below you will find check boxes under the appropriate statute headings which indicate the types of exemptions asserted to protect information which is exempt from disclosure.   The appropriate exemptions are noted on the enclosed pages next to redacted information.   In addition, a deleted page information sheet was inserted to indicate where pages were withheld entirely and identify which exemptions were applied.   The checked exemption boxes used to withhold information are further explained in the enclosed Explanation of Exemptions.

|  | Section 552 |  | Section 552a |
| --- | --- | --- | --- |
| ☐ (b)(1) | ☐ (b)(7)(A) | ☐ (d)(5) | |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☑ (j)(2) | |
| ☐ (b)(3) | ☐ (b)(7)(C) | ☐ (k)(1) | |
| | ☐ (b)(7)(D) | ☐ (k)(2) | |
| | ☑ (b)(7)(E) | ☐ (k)(3) | |
| | ☐ (b)(7)(F) | ☐ (k)(4) | |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) | |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) | |
| ☐ (b)(6) | | ☐ (k)(7) | |

*[Handwritten left of Section 552 boxes:]* I was potentially investigated and/or wrongfully on a watchlist, others I reported are attempting to circumvent the law or are at potential to do [so at our expense. at least showing the]

*[Handwritten right of Section 552a boxes:]* The FBI knows I'm married and that my wife is my contact but she is excluded from the paperwork under (j)(2) meaning she is in the witness program, or is at least considered for/as such.

17 pages were reviewed and 17 pages are being released.

Please see the paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

Based on the information you provided, we conducted a search of the places reasonably expected to have records. For more information about records searches and the standard search policy, see the enclosed FBI FOIPA Addendum General Information Section.

This is the final release of information responsive to your FOIPA request. This material is being provided to you at no charge.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request.   **"Part 1"** of the Addendum includes standard responses that apply to all requests.   **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third party individuals.   **"Part 3"** includes general information about FBI records that you may find useful.   Also enclosed is our Explanation of Exemptions.

Additional information about the FOIPA can be found at www.fbi.gov/foia.   Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov.   Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.   Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by emailing the FBI's FOIA Public Liaison at foipaquestions@fbi.gov.   The subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.   You may also contact the Office of Government Information Services (OGIS).   The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

Enclosures

**FBI FOIPA Addendum**

As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request.  Part 1 of the Addendum includes standard responses that apply to all requests.  Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information.  Part 3 includes general information about FBI records, searches, and programs.

**Part 1: The standard responses below apply to all requests:**

(i)　**5 U.S.C. § 552(c).**   Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)].   FBI responses are limited to those records subject to the requirements of the FOIPA.  Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii)　**Intelligence Records.**  To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)].   The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)].   This is a standard response and should not be read to indicate that any such records do or do not exist.

**Part 2: The standard responses below apply to all requests for records on individuals:**

(i)　**Requests for Records about any Individual—Watch Lists.**   The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)].   This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii)　**Requests for Records about any Individual—Witness Security Program Records.**   The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)].   This is a standard response and should not be read to indicate that such records do or do not exist.

(iii)　**Requests for Confidential Informant Records.** The FBI can neither confirm nor deny the existence of confidential informant records pursuant to FOIA exemptions (b)(7)(D), (b)(7)(E), and (b)(7)(F) [5 U.S.C.§ § 552 (b)(7)(D), (b)(7)(E), and (b)(7)(F)] and Privacy Act exemption (j)(2) [5 U.S.C.§ 552a (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records would reveal confidential informant identities and information, expose law enforcement techniques, and endanger the life or physical safety of individuals. This is a standard response and should not be read to indicate that such records do or do not exist.

**Part 3: General Information:**

(i)　**Record Searches and Standard Search Policy.**   The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems, such as the Central Records System (CRS), or locations where responsive records would reasonably be found. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions. The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS. The standard search policy is a search for main entity records in the CRS. Unless specifically requested, a standard search does not include a search for reference entity records, administrative records of previous FOIPA requests, or civil litigation files.

　　a.　*Main Entity Records* – created for individuals or non-individuals who are the subjects or the focus of an investigation

　　b.　*Reference Entity Records-* created for individuals or non-individuals who are associated with a case but are not known subjects or the focus of an investigation

(ii)　**FBI Records.**   Founded in 1908, the FBI carries out a dual law enforcement and national security mission.   As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii)　**Foreseeable Harm Standard.**   As amended in 2016, the Freedom of Information Act provides that a federal agency may withhold responsive records only if: (1) the agency reasonably foresees that disclosure would harm an interest protected by one of the nine exemptions that FOIA enumerates, or (2) disclosure is prohibited by law (5 United States Code, Section 552(a)(8)(A)(i)).  The FBI considers this foreseeable harm standard in the processing of its requests.

(iv)　**Requests for Criminal History Records or Rap Sheets.**   The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet.   These criminal history records are not the same as material in an investigative "FBI file."   An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service.   For a fee, individuals can request a copy of their Identity History Summary Check.   Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks.   Additionally, requests can be submitted electronically at www.edo.cjis.gov.   For additional information, please contact CJIS directly at (304) 625-5590.

# EXPLANATION OF EXEMPTIONS

## SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)   related solely to the internal personnel rules and practices of an agency;

(b)(3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)   trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal  privacy;

(b)(7)   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal  privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)   geological and geophysical information and data, including maps, concerning wells.

## SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)   information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control,    or reduce crime or apprehend criminals;

(k)(1)   information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)   investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)   material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)   required by statute to be maintained and used solely as statistical records;

(k)(5)   investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

8/31/23, 2:55 PM

Find Applicants

| New Window | Personalize Page

## Manage Applicant

Save | Return | Recruiting Home                                    Personalize

Name Jon Turpin
Applicant ID 101269846
Applicant Source FBIJOBS
Status 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity  Notes  Applicant Data  Interested Parties  Applicant Tracking  Min Qual History
Current Status | Interview Schedule/Evaluation | Expenses | History

### Interview Schedule

No Interviews Schedules have been created for this applicant.

Create Interview

### Interview Evaluations

You do not have any interview evaluations for this time period.

Create New Evaluation

Save | Return | Recruiting Home                                    Top of Page

b7E
12

8/31/23, 2:55 PM

Find Applicants

| New Window | Personalize Page

**Manage Applicant**

Save | Return | Recruiting Home                                   Personalize

Name Jon Turpin
Applicant ID 101269846
Applicant Source FBIJOBS
Status 010 Active

Preferred Contact Not Specified
Phone 225/259-4270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity
Notes | Applicant Data | Interested Parties | Applicant Tracking | Min Qual History
Current Status | Interview Schedule/Evaluation | Expenses | History

**Applicant Activity**

| Select | Job Opening | Job Opening ID | Disposition | Reason | Application Processing Status | Processing Field Office | Last Updated By | Resume | Last Updated | Other Actions |
|---|---|---|---|---|---|---|---|---|---|---|
| | SPECIAL AGENT - GS 1811-10 (EXTERNAL - All U.S. Citizens) | 22187 | 110 Reject | 010 Unsuitable | Discontinued due to Prescreening | | Jon Turpin | | 06/21/2023 12:14 PM | |

Save | Return | Recruiting Home                                   Top of Page

In my opinion, I discovered a person involved in my background check, who, while they sometimes make mistakes and/or errors in judgement, was also a victim of a wrongful conviction. Their conviction for of a wrongful or different offense may not have been wrong at face, but, with all precluding events, they may have been denied a fair trial. I contactes S.A. Joseph L. Chaney before reapplying, explained my expungement and the security defense, including the situation of double jeopardy, in other words. With honesty in all aspects, I was allowed to continue my application, and I'm appreciative of this opportunity.

b7E
j2

8/31/23, 2:56 PM

Find Applicants

**Manage Applicant**

| New Window | Personalize Page

Save | Return | Recruiting Home

Personalize

Name Jon Turpin
Applicant ID 101269846
Applicant Source FBIJOBS
Status 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity  Notes | Applicant Data | Interested Parties | Applicant Tracking | Min Qual History
Current Status | Interview Schedule/Evaluation | Expenses | History

**Expenses**

No expenses have been added for this applicant.

Add New Expense

Total Expenses    0.000 USD

Save | Return | Recruiting Home

Top of Page

b7E
j2

8/31/23, 2:56 PM

Find Applicants

## Manage Applicant

Save  |  «Return  |  Recruiting Home

| New Window | Personalize Page

Personalize

Name Jon Turpin
Applicant ID 101269846
Applicant Source FBIJOBS
Status 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity  Notes  |  Applicant Data  |  Interested Parties  |  Applicant Tracking  |  Min Qual History

Current Status | Interview Schedule/Evaluation | Expenses | History

Applicant Activity

No Activities exist for this view of Applicant Activity.

Save  |  «Return  |  Recruiting Home

Top of Page

b7E
j2

8/31/23, 2:56 PM

Find Applicants

| New Window | Personalize Page

## Manage Applicant

Save   |   Return   |   Recruiting Home                                Personalize

Name Jon Turpin
Applicant ID 101269846
Applicant Source FBIJOBS
Status 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity   Notes   Applicant Data   Interested Parties   Applicant Tracking   Min Qual History

**Notes Summary**

No Notes have been added for this applicant.

Add Applicant Note

Save   |   Return   |   Recruiting Home                                Top of Page

b7E
j2

8/31/23, 2:56 PM

Find Applicants

# Manage Applicant

Save | ≫Return | ⟨⟨Recruiting Home

New Window | Personalize Page

| Personalize

**Name** Jon Turpin
**Applicant ID** 101269846
**Applicant Source** FBIJOBS
**Status** 010 Active

**Preferred Contact** Not Specified
**Phone** 225/259-6270
**Email** jt4590@gmail.com
**Address** 2421 S. Plum St. Yorktown, IN 47396 Delaware

**Applicant Activity**   Notes   Applicant Data   Interested Parties   Applicant Tracking   Min Qual History

Personal Information | References | Eligibility & Identity

Contact information shown here is sourced from external systems as described below. Information updated directly on this page is only temporary and will be overwritten by source systems nightly.

** For Internal HR Source employees this data comes from NFC. If the data needs to be updated employees should use the normal methods of updating the information.

** For FBIJOBS applicants this data can be updated on the FBIJobs.gov profile page.

## Applicant

**Applicant Source** FBIJOBS
**Preferred Contact** Not Specified

### Name

**Name Format** English
**Name Prefix**
**Legal First Name** Jon
**Middle Name** Frederick Dismas
**Last Name** Turpin
**Name Suffix**

### Current Address

**Country** United States
**Address 1** 2421 S. Plum St.
**Address 2**
**Address 3**
**City** Yorktown
**State** Indiana
**Postal** 47396
**County** Delaware

## Applicant Status

**Status Code**
**Status Date** 06/21/2023

**Status Reason**
**Registered Online** Yes
☐ Inactivate Online Account

### Email Addresses

| Primary | Email Type | Email Address |
|---------|-----------|---------------|
| ☐ | Home | jt4590@gmail.com |

Add Email Address

### Phone Numbers

| Primary | Phone Type | Telephone | Extension | Country Code |
|---------|-----------|-----------|-----------|--------------|
| ☐ | Home | 225/259-6270 | | |

Add Phone Number

### Permanent Address

**Country:** United States
**Address 1:** 2421 S. Plum St.
**Address 2:**
**Address 3:**
**City:** Yorktown
**State:** Indiana
**Postal:** 47396
**County:** Delaware

Save | ≫Return | ⟨⟨Recruiting Home

Top of Page

b7E

j2

| New Window | Personalize Page

# Manage Applicant

Save   |   ⟪Return |   ⟪RecruitingHome

Personalize

**Name** Jon Turpin
**Applicant ID** 101269846
**Applicant Source** FBIJOBS
**Status** 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity  Notes  Applicant Data  Interested Parties  Applicant Tracking  Min Qual History

Personal Information | References | Eligibility & Identity

**References**
No References have been added for this applicant.

Add Reference      Request Reference

Save   |   ⟪Return |   ⟪Recruiting Home

Top of Page

b7E
j2

8/31/23, 2:56 PM

Find Applicants

## Manage Applicant

| Save | | Return | Recruiting Home

Name Jon Turpin
Applicant ID 101269846
Applicant Source FBIJOBS
Status 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity : Notes : Applicant Data : Interested Parties : Applicant Tracking : Applicant Tracking : Min Qual History

Personal Information | References | Eligibility & Identity

### Personal Information

Date of Birth

Gender Decline to State

Birth Country

Birth City

Marital Status Unknown

USA

### National Identification (SSN)

No National Identification has been added for this applicant.

Add National Identification

### Citizenship

No Citizenship has been added for this applicant

Add

### Visa Permit

No Visa Permit has been added for this applicant.

Add Visa Permit

### Bank Account

No Bank Account has been added for this applicant.

Add Bank Account

⊗ **Applicant Disability**

⊗ **Accommodation Request**

⊗ **Accommodation Option**

| Save | | Return | Recruiting Home

8/31/23, 2:56 PM

Find Applicants

| New Window | Personalize Page

## Manage Applicant

| Save | | Return | Recruiting Home |

Personaliz

Name Jon Turpin
Applicant ID 101269846
Applicant Source FBIJOBS
Status 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email j4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity | Notes | Applicant Data | Interested Parties | Applicant Tracking | Min Qual History

Interested Parties

No interested Parties have been added for this applicant.

Add Interested Party

| Save | | Return | Recruiting Home

Top of Page

b7E
12

8/31/23, 2:57 PM

Find Applicants

## Manage Applicant

Save | Return | Recruiting Home

Personalize

Name Jon Turpin
Applicant ID 101269846
Applicant Source FBI.ODS
Status 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity | Notes | Applicant Data | Interested Parties | Applicant Tracking | Min Qual History
Testing | Clearance and Pre-Hire | Employee Checks | BPMS Applicant Data

67 File Number

### Special Agent Testing

**Special Agent Phase 1**

No Special Agent Phase 1 records exist for this Applicant.

**Special Agent Phase 1 (Old)**

No Special Agent Phase 1 (Old) records exist for this Applicant.

**Special Agent HRB**

No Special Agent HRB records exist for this Applicant.

**Special Agent Phase 2**

No Special Agent Phase 2 records exist for this Applicant.

**Special Agent PFT**

No Special Agent PFT records exist for this Applicant.

**Special Agent HRP**

No Special Agent HRP records exist for this Applicant.

TRP Eligibility

b7E

-12

8/31/23, 2:57 PM

Find Applicants

No TRP Eligibility records exist for this Applicant.

**Intelligence Analyst Testing**

Intelligence Analyst Phase 1

No Intelligence Analyst Phase 1 records exist for this Applicant.

Intelligence Analyst Phase 2

No Intelligence Analyst Phase 2 records exist for this Applicant.

Intelligence Analyst Phase 3

No Intelligence Analyst Phase 3 records exist for this Applicant.

**Language Testing**

Language Testing

No Language Testing records exist for this Applicant.

**Police Officer Testing**

Police Officer – Written

No Police Officer – Written records exist for this Applicant.

Police Officer – Interview

No Police Officer – Interview records exist for this Applicant.

Police Officer Testing – Old

No Police Officer Testing – Old records exist for this Applicant.

8/31/23, 2:57 PM

Find Applicants

Save | Return | Recruiting Home

Top of Page

b7E
j2

8/31/23, 2:57 PM

Find Applicants

| New Window | Personalize Page

**Manage**
**Applicant**

| Save   |   Return |   Recruiting Home |

Name Jon Turpin
Applicant ID 101269846
Applicant Source FBIJOBS
Status 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity | Notes | Applicant Data | Interested Parties | Applicant Tracking | Min Qual History

Testing | Clearance and Pre-Hire | Employee Checks | BPMS Applicant Data

67 File Number

**Clearance and Pre-Hire**

**Background Information**

No Background Information records exist for this Applicant.

**Medical Physical**

No Medical Physical records exist for this Applicant.

**Applicant - Drug Test**

No Applicant - Drug Test records exist for this Applicant.

**IA/PS Applicant - Drug Test**

No IA/PS Applicant - Drug Test records exist for this Applicant.

**Non Paid Intern - Drug Test**

No Non Paid Intern - Drug Test records exist for this Applicant.

**Fingerprints**

No Fingerprints records exist for this Applicant.

**Pre-Employment Polygraph**

b7E

j2

8/31/23, 2:57 PM

Find Applicants

No Pre-Employment Polygraph records exist for this Applicant.

**Personnel Security Interview**

No Personnel Security Interview records exist for this Applicant.

Save   |  « Return |  Recruiting Home

Top of Page

b7E

J2

8/31/23, 2:57 PM

Find Applicants

# Manage
## Applicant

Save   |   Return |   Recruiting Home

**Name** Jon Turpin
**Applicant ID** 10126946
**Applicant Source** FBIJOBS
**Status** 010 Active

Preferred Contact Not Specified
Phone 225/259-6270
Email jt4590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

Applicant Activity   Notes   Applicant Data   Interested Parties   Applicant Tracking   Min Qual History
Testing | Clearance and Pre-Hire | Employee Checks | BPMS Applicant Data

**67 File Number**

**Employee Checks**

**Critical Case Check**

No Critical Case Check records exist for this Applicant.

**Performance Ratings**

No Performance Ratings records exist for this Applicant.

Save   |   Return |   Recruiting Home

| New Window | Personalize Page

Personalize

Top of Page

b7E
j2

8/31/23, 2:57 PM

Manage Applicant

HR Source is an UNCLASSIFIED System

## Manage Applicant

### Manage Applicant

| Save | | Return | Recruiting Home | | Personaliz

Name  Jon Turpin
Applicant ID 1012698846
Applicant Source FBI/JOBS
Status 010 Active

Preferred Contact  Not Specified
Phone  224/254-6270
Email  j14590@gmail.com
Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

| Applicant Activity | Notes | Applicant Data | Interested Parties | Applicant Tracking | Min Qual History |

Testing | Clearance and Pre-Hire | Employee Checks | BPMS Applicant Data

67 File Number

**BPMS Applicant Data**

**BPMS Special Agent Status**

No BPMS Special Agent Status records exist for this Applicant.

**BPMS Support Staff Status**

No BPMS Support Staff Status records exist for this Applicant.

| Save | | Return | Recruiting Home |

Top of Page

Case 1:23-cv-01059-JE-JPM    Document 7-4    Filed 11/09/23    Page 126 of 135 PageID #: 458

b7E
j2

# Manage Applicant

## Manage Applicant

Save | Return | Recruiting Home                                                    Personaliz

Name Jon Turpin                          Preferred Contact Not Specified
Applicant ID 1012693846                  Phone 225/255-6270
Applicant Source FBIJOBS                 Email J4590@gmail.com
Status 1H0 Active                        Address 2421 S. Plum St. Yorktown, IN 47396 Delaware

| Applicant Activity | Notes | Applicant Data | Interested Parties | Applicant Tracking | Min Qual History |

The table below displays the mass hire positions and grades that Applicant's have been minimally qualified for. Talent Specialist Supervisors will also be able to view Ineligible and Not Qualified history, as well as be able to update an Applicant's historical qualification.

Personalize | Find | View All | | First | 1 of 1 | Last

| Job Opening ID | Job Code | Pay Plan | Grade | Career Ladder Code | Career Ladder | Justification | Last Updated | Last Updated By |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |

The table below displays information regarding an Applicant's historical minimum qualifications for various Job Openings that do not utilize the Mass Hire Job Templates.

Non Mass Hire Min Qual                              Personalize | Find | View All | | First | 1 of 1 | Last

| Job Opening ID | Certificate of Eligibles | Job Code | Pay Plan | Grade | Career Ladder Code | Career Ladder | Date time Created | Created By |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |

Save | Return | Recruiting Home                                                    Top of Page

M Gmail

Jon F Turpin <jt4590@gmail.com>

**Dear Mr. Todd Rokita**
1 message

Jon F. Turpin <jt4590@gmail.com>
Fri, Nov 3, 2023 at 11:35 AM
Bcc: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>

Praying for you and happy to hear you were relieved of any wrongdoing related to your honest statements while helping that little girl.

I apologize for disagreeing with your opinion on this below, but I do think you may be half correct, and you're one tremendous lawyer:

"Indiana Attorney General Todd Rokita had argued in Kizer's case that no right to a jury trial exists under the federal or state constitutions and that a trial by a judge is sufficient, since civil forfeiture of property in Indiana is a purely statutory procedure of relatively modern vintage."

In my opinion, I think there is civil forfeiture without jury trial specifically when someone violates the 14th amendment against someone else (like the stuff that happened to us by others, similar to what Blakely did in Blakely v Washington to his family over a Trust) under 42 U.S.C. 1983, which aligns with rule 26 regarding "civil forfeiture of assets in rem" and references maritime law, which also aligns with the Louisiana Purchase and Usufruct and the Mississippi river being located there, and since Napoleon attached a debt bill to it during sale, and our nation is in debt as a Constitution Republic Democracy.

Plus foreign actors may have violated the Vienna and Geneva Conventions against me in the act of doing this stuff which aligns with Title VII all the way back down...

What I'm trying to say is, I see your opinion, and I think you weren't "wrong" but simply half correct: In my opinion, if Kizer was violating civil rights at the federal level against the 14th amendment, thus violating every amendment under it at the state level in doing so, it goes under Rule 26.
This in my opinion is how Eminent Domain operates and was defined under 42 U.S.C. 1983. When aligned with Napoleonic Civil (Law) Code, Usufruct, and Succession, this in my opinion is what backs up Rule 26's specific maritime law doctrine, it also aligns with presidential succession.

# IN Supreme Court rules in favor of jury trials for civil confiscation cases

A convicted Indiana man can now seek a trial to decide the fate of the cash seized during his arrest

**Associated Press**

Published November 2, 2023 12:34pm EDT



Face



**Fox News Flash top headlines for November 2**

Fox News Flash top headlines are here. Check out what's clicking on Foxnews.com.

Indiana residents are entitled to a trial by jury when the government seeks to confiscate their money or property through the civil forfeiture process, the state's high court ruled.

In a 5-0 decision Tuesday, the Indiana Supreme Court found that the history of civil forfeiture proceedings, from medieval England to Indiana statehood, weighs in favor of letting a jury decide whether property allegedly associated with a crime should be seized by the state, The Times of Northwest Indiana reported.

"We hold that a claimant in an action brought under Indiana's civil forfeiture statute has a constitutional right to trial by jury," Justice Christopher Goff wrote on behalf of the court.

**INDIANA MAN AWARDED $25.5 MILLION IN CIVIL RIGHTS VIOLATION SUIT INVOLVING POLICE OFFICER**



The justices' unanimous ruling reinforces a fundamental constitutional guarantee, an attorney said. (Fox News)

## INDIANA SUPREME COURT DECLINES IMMEDIATE CONSIDERATION OF CHALLENGE TO ABORTION BAN

Tuesday's ruling also establishes a new test for the jury-trial right contained in Article I, Section 20 of the Indiana Constitution.

The decision stems from a case involving Alucious Kizer, who was convicted in December 2022 of three counts of drug dealing and sentenced to a total of 20 years in state prison.

Kizer, 45, will now have an opportunity to get the jury trial he initially requested more than two years ago to determine whether the $2,435 in cash recovered during his arrest for drug dealing in Allen County should be forfeited.

Kizer was represented before the state Supreme Court by the Virginia-based Institute for Justice, which has repeatedly challenged Indiana's civil forfeiture laws, including authorities' seizure of a Land Rover belonging to Tyson Timbs of Marion, Indiana, who was arrested in 2013 for selling $400 in drugs. In that case, the U.S. Supreme Court ruled in 2019 that the U.S. Constitution's ban on excessive fines applies to the states.

More than two years after the high court's ruling, the Indiana Supreme Court ruled that Timbs could keep his $35,000 vehicle.

**EX-INDIANA OFFICER GETS YEAR IN FEDERAL PRISON FOR ASSAULT ON HANDCUFFED SUSPECT**

Sam Gedge, the senior attorney for the Institute for Justice, argued Kizer's case before the Indiana Supreme Court. He said Tuesday that the justices' unanimous ruling reinforces a fundamental constitutional guarantee.

"The right to a trial by jury of our peers is core to our system of justice. And for centuries, courts across the nation have confirmed the obvious: When the government sues to forfeit your property, you're entitled to make your case to a jury," Gedge said.

Indiana Attorney General Todd Rokita had argued in Kizer's case that no right to a jury trial exists under the federal or state constitutions and that a trial by a judge is sufficient, since civil forfeiture of property in Indiana is a purely statutory procedure of relatively modern vintage.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

 Gmail

Jon F Turpin <jt4590@gmail.com>

**Attorney General Todd Rokita holds IU Health accountable for patient privacy and HIPAA violations** *Eskenazi Health was previously held accountable for some other*
1 message *things, and there was a tragedy in 2021 if my memory serves correctly, at*

**Indiana Attorney General** <atg@subscriptions.in.gov> *FedEx. Some of my friends had to encounter* Fri, Sep 15, 2023 at 12:22 PM
Reply-To: atg@subscriptions.in.gov
To: jt4590@gmail.com *the fallout from that event, and I'm still ~~things~~ relieved they were,*
*and are, O.K. Not only would I not do that, my biological dad has falsely projected gun*



# NEWS RELEASE

Media Contact: press@atg.in.gov

*Violence upon me for years, so, in my opinion, he can feel secure enough to abuse me.*

## Attorney General Todd Rokita holds IU Health accountable for patient privacy and HIPAA violations

*I'm not blaming, nor pointing fingers at Eskenazi, it's just a fact there was a tragedy at FedEx.*
Attorney General Todd Rokita filed a lawsuit on behalf of the people of Indiana against IU Health and IU Healthcare Associates for their failure to properly report, review, and enforce HIPAA and Indiana law violations.

"We will continue to uphold and protect Hoosier patients' medical privacy," Attorney General Rokita said. "Trust is the foundation of the patient-doctor relationship. Without trust, we don't have reliable, honest healthcare."

This issue was first brought to the office's attention in 2022 when a 10-year-old rape victim and her mother went to an IU hospital for an abortion, as a result of the rape and abuse the child endured.

After the abortion, while the mother and daughter were still at the hospital for recovery and observation, they were greeted with a front-page news story in the Indianapolis Star, which described the 10-year-old's case in great detail. This article went public, and the story became worldwide household news after the doctor spoke to a reporter at a political rally.

The 10-year-old's treatment was a very private and sensitive matter, as was the rape and abuse she suffered that resulted in her pregnancy. Neither the little girl nor her mother gave the doctor authorization to speak to the media about their case.

Rather than protecting the patient, IU Health chose to protect the doctor, and itself.

On July 15, 2022, hospital administrators emailed statements to multiple media outlets informing them that they had conducted a review and "found the doctor in compliance with privacy laws."

On May 25, 2023, the Indiana Medical Licensing Board conducted a hearing and determined that the doctor violated HIPAA by improperly disclosing patient information and for improperly de-identifying patient information, and the doctor violated the Indiana patient confidentiality rule by failing to get patient permission prior to disclosing any information.

The following day, IU Health issued a public statement in which it disagreed with the Medical Licensing Board's determination once again claiming the doctor did not violate privacy laws.

By publicly contradicting the Medical Licensing Board and contending the doctor's actions were "in compliance with privacy laws," IU Health has caused confusion among its 36,000-member workforce regarding what conduct is permitted not only under HIPAA privacy laws and the Indiana Patient Confidentiality rule, and as a result, as Indiana's largest health network, they created an environment that threatens the privacy of its Indiana patients.

Subsequent to the Medical License Board hearing, the office discovered numerous instances where IU Health has sanctioned non-physician employees with termination for far less egregious patient privacy violations but has failed to implement or enforce similar privacy policies or sanctions for its physicians.

"Doctors and all health care professionals should be able to rely on their employers and patients should be able to trust their doctors," Attorney General Rokita said. "When a hospital or other healthcare provider makes your private medical information public, that trust is decimated. As a result, the quality, delivery, and sustainability of our healthcare is significantly weakened."

The lawsuit consists of the following seven counts against IU Health:

1. Failure to implement or follow administrative, technical, and physical safeguards to protect the privacy of protected information
2. Failure to document disclosures of personal health information
3. Failure to implement or apply and document sanctions
4. Failure to appropriately train its workforce
5. Failure to notify patients of breach
6. Failure to mitigate harm
7. Violations of Indiana's Deceptive Consumer Sales Act

The complaint is listed below.

A headshot of Attorney General Rokita is available for download.

###

- Filed Complaint.pdf

SUBSCRIBER SERVICES:
Manage Preferences  |  Delete Profile  |  Help

---

This email was sent to jt4590@gmail.com using GovDelivery Communications Cloud on behalf of: Indiana Attorney General ·
Indiana Government Center South, 302 W. Washington St., 5th Floor · Indianapolis, IN 46204 · 317-232-6201

*govDELIVERY*

 Gmail

Jon F Turpin <jt4590@gmail.com>

___

## Opinion
1 message

___

**Jon F. Turpin** <jt4590@gmail.com>                                         Mon, Nov 6, 2023 at 1:28 AM
Bcc: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Found this article about the tragedy at FedEx perpetrated by Brandon Scott Hole:
https://www.indystar.com/in-depth/news/investigations/2021/11/11/indianapolis-fedex-shooting-sheila-hole-inadequate-interventions-failed-stop-killings/6237864001/

Some of my friends work/worked at that FedEx facility, and by the Grace of God they were safe and are still here today.

What I'm seeing is that this is just, awful, and sadly, some of it sounds like how my biological Dad, J.R.J., and M.A.H.M. behave, not me.
The alleged attorney even ignored in trial that I was genuinely concerned about the things my biological Dad had been saying and they tried to just dismiss it.

Was A.L.H. involved in any of the failed interventions with the perpetrator in that tragedy either from Marion County or from Eskenazi Health?
She misidentified me falsely as a threat during these proceedings over a text message after the co-conspirators' involvement.

Did she fail to identify someone else as a potential threat? Is someone trying to turn me into some false redemption story? Just ugh.
Do you think that might be a problem if she allows her alleged attorney to continue to deny my due process rights, and multiple amendment rights?

If she wanted to red-flag someone, she would have appropriately reported J.R.J., and my biological Dad, and then her own husband, and now her alleged attorney. Her husband should have reported J.R.J. to you.
Because even my documentation shows that I said "give her her stuff back" and I'm pretty sure since her attorney mentioned E.H. contacting him, that A.L.H.'s Dad's old office is held over A.L.H.'s head as collateral.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

*[Handwritten note at top: "This may also apply under (b)(7)(E) + (5)(2), and is not just my opinion, but also the decision of our Honorable Supreme Court Disciplinary Commission, the Honorable Todd Rokita is innocent, and simply utilized free speech, and was truthful."]*

M Gmail                                                    Jon F Turpin <jt4590@gmail.com>

**Attorney General Todd Rokita's Statement on Disciplinary Commission Resolution**
1 message

Indiana Attorney General <atg@subscriptions.in.gov>          Thu, Nov 2, 2023 at 12:03 PM
Reply-To: atg@subscriptions.in.gov
To: jt4590@gmail.com



# Attorney General Todd Rokita's Statement on Disciplinary Commission Resolution

"First things first: I deny and was not found to have violated anyone's confidentiality or any laws. I was not fined. And I will continue as Indiana's duly-elected attorney general.

Despite the failed attempt to derail our work —which could have disenfranchised nearly 2 million voters, the largest amount in Indiana history for any state office candidate — it all boiled down to a truthful 16-word answer I gave over a year ago during an international media storm caused by an abortionist who put her interests above her patient's.  I received a 'public reprimand' for saying that "…we have this abortion activist acting as a doctor— with a history of failing to report."

The media, medical establishment and cancel culture, all on cue, supported—and then attempted to vindicate—the abortionist who intentionally exposed personal health information at a political rally all in furtherance of their shared ideological and business interests.

These liberal activists would like to cancel your vote because they hate the fact I stand up for liberty. In the healthcare space alone, I stopped the vaccine mandate, publicly contested severely flawed Covid data, significantly curtailed Indiana's abortion business and fined hospitals and healthcare providers for not putting patients' privacy first.

Having evidence and explanation for everything I said, I could have fought over those 16 words, but ending their campaign now will save a lot of taxpayer money and distraction, which is  also very important to me. In order to resolve this, I was required to sign an affidavit without any modifications.

Now, I will focus even more resources on successfully defending Indiana's laws, including our pro-life laws, and fighting the mob that silences parents, employees, conservative students, law enforcement, Believers of all faiths, American patriots and free enterprise itself.

As I said at the time, my words are factual. The IU Health physician who caused the international media spectacle at the expense of her patient's privacy is by her own actions an outspoken

abortion activist.

Many know that she openly discussed with a reporter, and caused to be identified, a 10-year-old rape victim at a political rally. She also used this opportunity to wedge herself into various media outlets, including MSNBC and CBS News. In the end, she had the attention of the entire country, including the pro-abortion President and Vice President.

Less well- known is that for years she has appeared as the keynote speaker at pro-abortion rallies and has roamed the hallways of the legislature in a white lab coat attempting to influence lawmakers. Then, in 2019, the doctor unsuccessfully brought litigation against the people of Indiana to legalize a brutal abortion procedure where the living child is extracted piece by piece. She also poses and is interviewed regularly in media outlets and her full-time patient practice focuses exclusively on performing abortions.

Bernard also claims a tattoo —an image of a coat hanger— that she displays and openly discusses with the national media. Whether you think this behavior is good or bad, I challenge any objective Hoosier to conclude that she isn't an "abortion activist," as I stated.

Also, according to media accounts and complainant press releases, it was in fact publicly alleged well before my tv interview that the abortionist had failed to properly report her work to the state's department of health.

Privacy must exist between doctor and patient in order for trust to exist so that healthcare can advance. So, we work hard to protect personal health information—like a little girl's identity and medical trauma—from publication by their caregivers. This is why Bernard's own peers fined her the maximum allowed by law.

By the way, the Office of Attorney General has nearly two dozen patient privacy cases pending at any time, debunking any claims of a vendetta against Bernard.

Had the cancel culture establishment been successful disenfranchising us, they also would have stifled other elected officials from keeping voters, citizens, and taxpayers informed— especially when uncomfortable facts fall outside a preferred narrative.

I thank Hoosiers for their continued support as we fight for our values."

###

SUBSCRIBER SERVICES:
Manage Preferences | Delete Profile | Help

This email was sent to jt4590@gmail.com using GovDelivery Communications Cloud on behalf of: Indiana Attorney General ·
Indiana Government Center South, 302 W. Washington St., 5th Floor · Indianapolis, IN 46204 · 317-232-6201

*gov*DELIVERY

The Honorable Todd Rokita said it better than I could.