Jon F D Turpin
2421 S Plum St
Yorktown IN 47396

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

OTC

# UNITED STATES DISTRICT COURT

**U.S. DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**RECEIVED**

**JUL 26 2023**

TONY R. MOORE, CLERK
BY: _____
      DEPUTY

for the

WESTERN District of LOUISIANA

_____ Division

Jon F. D. Turpin & POA E.R.G.

_____
Plaintiff(s)
*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

-v-

Joseph R. Biden JR ET AL

_____
Defendant(s)
*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names.)*

Case No.   **1:23-cv-1059**
           *(to be filled in by the Clerk's Office)*

Jury Trial:  *(check one)*   ☑ Yes   ☐ No

## COMPLAINT FOR A CIVIL CASE

**I.    The Parties to This Complaint**

**A.    The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | | |
|---|---|---|
| Name | Jon F. "D" Turpin & POA E.R.G. | |
| Street Address | 2421 S Plum St | 247 Maximillian St |
| City and County | Yorktown Delaware | Baton Rouge East Baton Rouge |
| State and Zip Code | Indiana 47396 | Louisiana 70802 |
| Telephone Number | 225-259 6770 | 225-438-5524 |
| E-mail Address | ct45900@gmail.com | |

**B.    The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1
    Name      *Richard E. Bell*
    Job or Title *(if known)*
    Street Address
    City and County
    State and Zip Code
    Telephone Number
    E-mail Address *(if known)*

Defendant No. 2
    Name      *Jon B Turpin + Linda B Turpin*
    Job or Title *(if known)*
    Street Address
    City and County
    State and Zip Code
    Telephone Number
    E-mail Address *(if known)*

Defendant No. 3
    Name      *Michael A. M. Holwager + Andrea L. Holwager*
    Job or Title *(if known)*
    Street Address
    City and County
    State and Zip Code
    Telephone Number
    E-mail Address *(if known)*

Defendant No. 4
    Name      *Jared R. Junkin + Soraya "Cinnamon" Murphy*
    Job or Title *(if known)*
    Street Address
    City and County
    State and Zip Code
    Telephone Number
    E-mail Address *(if known)*

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## II.   Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

[✓] Federal question          [ ] Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.   If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

RICO, Megan's Law, Freedom of Speech, Double-jeopardy, etc.

### B.   If the Basis for Jurisdiction Is Diversity of Citizenship

1.   The Plaintiff(s)

   a.   If the plaintiff is an individual
        The plaintiff, *(name)* _____, is a citizen of the
        State of *(name)* _____.

   b.   If the plaintiff is a corporation
        The plaintiff, *(name)* _____, is incorporated
        under the laws of the State of *(name)* _____
        and has its principal place of business in the State of *(name)*
        _____.

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.   The Defendant(s)

   a.   If the defendant is an individual
        The defendant, *(name)* _____, is a citizen of
        the State of *(name)* _____. Or is a citizen of
        *(foreign nation)* _____.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

    b.    If the defendant is a corporation

The defendant, *(name)* ___Turpin Electric, Inc.___ , is incorporated under

the laws of the State of *(name)* ___Indiana___ , and has its

principal place of business in the State of *(name)* ___Indiana___ .

Or is incorporated under the laws of *(foreign nation)* _____

and has its principal place of business in *(name)* _____

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

    3.    The Amount in Controversy    $77,000,000

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

Conspiracy for absolute decimation of employment, liberty and justice for all, and attempts to violate our marriage and all constitutional and civil rights via RemoteTxt

**III.    Statement of Claim**

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Attached

**IV.    Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Emailed to Doughty Motions doughty_motions@lawd.uscourts.gov

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## V.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:

Signature of Plaintiff

Printed Name of Plaintiff

### B.   For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address



Go to previous versions of this Section                                    ↓

# 2021 US Code
# Title 42 - The Public Health and Welfare
# Chapter 21 - Civil Rights
# Subchapter I - Generally
# Sec. 1983 - Civil action for deprivation of rights

Download PDF

42 U.S.C. § 1983 (2021)

## §1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

(R.S. §1979; Pub. L. 96–170, §1, Dec. 29, 1979, 93 Stat. 1284; Pub. L. 104–317, title III, §309(c), Oct. 19, 1996, 110 Stat. 3853.)

## EDITORIAL NOTES CODIFICATION

R.S. §1979 derived from act Apr. 20, 1871, ch. 22, §1, 17 Stat. 13.

Section was formerly classified to section 43 of Title 8, Aliens and Nationality.

## AMENDMENTS

**1996**—Pub. L. 104–317 inserted before period at end of first sentence ", except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable".

**1979**—Pub. L. 96–170 inserted "or the District of Columbia" after "Territory", and provisions relating to Acts of Congress applicable solely to the District of Columbia.

## STATUTORY NOTES AND RELATED SUBSIDIARIES EFFECTIVE DATE OF 1979 AMENDMENT

Amendment by Pub. L. 96–170 applicable with respect to any deprivation of rights, privileges, or immunities secured by the Constitution and laws occurring after Dec. 29, 1979, see section 3 of Pub. L. 96–170, set out as a note under section 1343 of Title 28, Judiciary and Judicial Procedure.

United States Code, 2018 Edition, Supplement 3, Title 42 - THE PUBLIC HEALTH AND WELFARE

Bills and Statutes

United States Code

Y 1.2/5:

Title 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 21 - CIVIL RIGHTS
SUBCHAPTER I - GENERALLY
Sec. 1983 - Civil action for deprivation of rights



| section 1983 |
| 2021 |
| January 3, 2022 |
| No |
| standard |
| 17 Stat. 13 <br> 93 Stat. 1284 <br> 110 Stat. 3853 |
| Public Law 96-170, Public Law 104-317 |

**Disclaimer:** These codes may not be the most recent version. United States may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.



OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA

302 W. WASHINGTON ST. 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

## TODD ROKITA
### ATTORNEY GENERAL

July 7, 2023

Mr. Jon Turpin
2421 S. Plum St.
Yorktown, IN 47936

Dear Mr. Turpin,.

This week we received both the U.S. Mint coin of President Theodore Roosevelt and your handgun license in the mail. While the coin was a very thoughtful gift, we are unfortunately unable to accept. Indiana Code prevents state employees from accepting gifts or favors from their constituents.

Also enclosed is your State of Indiana license to carry handgun. We recommend you retain this document for your personal records. If you have any questions about the license, please contact the Firearms Division of the Indiana State Police at (317) 232-8264 with your questions.

Please let us know if we can be of assistance in the future.

Sincerely,

Constituent Services
Office of Indiana Attorney General Todd Rokita

cs/hm

*Please investigate and prosecute this RICO, sir.*



# UNITED STATES DISTRICT COURT
## Southern District of Indiana

### Roger A.G., Clerk of Court

Birch Bayh Federal Building
& U.S. Courthouse, Room 105
46 East Ohio Street
Indianapolis, IN  46204
(317) 229-3700

U.S. Courthouse, Room 104
921 Ohio Street
Terre Haute, IN 47807
(812) 231-1840

Winfield K. Denton Federal Building
& U. S. Courthouse, Room 304
101 NW Martin Luther King Blvd.
Evansville, IN 47708
(812) 434-6410

Lee H. Hamilton Federal Building
& U.S. Courthouse, Room 210
121 West Spring Street
New Albany, IN 47150
(812) 542-4510

August 1, 2023

Jon F. Turpin
2421 S. Plum St.
Yorktown, IN 47396

Mr. Turpin:

We are returning the enclosed check as no fees are due in this case. We have filed your Motion for Release of Affidavit for Troy Davis and the court will rule in due course.


Sincerely,


United States District Court for the Southern District of Indiana

# Ind. Code § 35-41-5-2

⬇ Download PDF

Current through P.L. 178-2022, P.L.2-2022SP1

Section 35-41-5-2 - Conspiracy

 (a) A person conspires to commit a felony when, with intent to commit the felony, the person agrees with another person to commit the felony. A conspiracy to commit a felony is a felony of the same level as the underlying felony. However, a conspiracy to commit murder is:

  (1) a Level 2 felony if the conspiracy does not result in the death of a person; and

  (2) a Level 1 felony if the conspiracy results in the death of another person.

 (b) The state must allege and prove that either the person or the person with whom he or she agreed performed an overt act in furtherance of the agreement.

 (c) It is no defense that the person with whom the accused person is alleged to have conspired:

  (1) has not been prosecuted;

  (2) has not been convicted;

  (3) has been acquitted;

  (4) has been convicted of a different crime;

  (5) cannot be prosecuted for any reason; or

  (6) lacked the capacity to commit the crime.

 IC 35-41-5-2

Amended by P.L. 158-2013, SEC. 409, eff. 7/1/2014.
As added by Acts1976 , P.L. 148, SEC.1. Amended by Acts1977 , P.L. 340, SEC.23.



There is a newer version of the Louisiana Laws ↓

View our newest version here →

# 2011 Louisiana Laws
# Revised Statutes
# TITLE 14 — Criminal law
# RS 14:26 — Criminal conspiracy

**Universal Citation:** LA Rev Stat § 14:26

SUBPART E. INCHOATE OFFENSES

§26. Criminal conspiracy

A. Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.

If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one shall not bar prosecution for the other.

B. Whoever is a party to a criminal conspiracy to commit any crime shall be fined or imprisoned, or both, in the same manner as for the offense contemplated by the conspirators; provided, however, whoever is a party to a criminal conspiracy to commit a crime punishable by death or life imprisonment shall be imprisoned at hard labor for not more than thirty years.

C. Whoever is a party to a criminal conspiracy to commit any other crime shall be fined or imprisoned, or both, in the same manner as for the offense contemplated by the conspirators; but such fine or imprisonment shall not exceed one-half of the largest fine, or one-half the longest term of imprisonment prescribed for such offense, or both.

Amended by Acts 1977, No. 538, §1.

**Disclaimer:** These codes may not be the most recent version. Louisiana may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.



> **There is a newer version of this Statute**   ↓

> **View our newest version here**   →

# 2021 Louisiana Laws
# Revised Statutes
# Title 40 - Public Health and Safety
# §979. Attempt and conspiracy

**Universal Citation:** LA Rev Stat § 40:979 (2021)

RS 979 - Attempt and conspiracy

Any person who attempts or conspires to commit any offense set forth in the provisions of this Part shall, upon conviction, be fined or imprisoned in the same manner as for the offense planned or attempted, but such fine or imprisonment shall not exceed one-half of the longest term of imprisonment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

Added by Acts 1972, No. 634, §1. Amended by Acts 1977, No. 632, §1; Acts 2001, No. 403, §4, eff. June 15, 2001; Acts 2018, No. 199, §1.

**Disclaimer:** These codes may not be the most recent version. Louisiana may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

LII  > U.S. Code  > Title 18  > PART I  **> CHAPTER 96**

Quick search by citation:

**Title**

enter title

**Section**

section

Go!

# 18 U.S. Code Chapter 96 - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS

U.S. Code     Notes

§ 1961. Definitions
§ 1962. Prohibited activities
§ 1963. Criminal penalties
§ 1964. Civil remedies
§ 1965. Venue and process
§ 1966. Expedition of actions
§ 1967. Evidence
§ 1968. Civil investigative demand

LII  > U.S. Code  > Title 18  > PART I  > CHAPTER 96  **> § 1961**

Quick search by citation:
**Title**

enter title

**Section**

section

Go!

# 18 U.S. Code § 1961 - Definitions

U.S. Code    Notes

As used in this chapter—

**(1)** "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to

extortionate credit transactions), section 932 (relating to straw purchasing), section 933 (relating to trafficking in firearms), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461– 1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581–1592 (relating to peonage, slavery, and trafficking in persons).,[1] sections 1831 and 1832 (relating to economic espionage and theft of trade secrets), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white

slave traffic),[2] sections 175–178 (relating to biological weapons), sections 229–229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

**(2)** "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

**(3)** "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

**(4)** "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

**(5)** "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

**(6)** "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

**(7)** "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

**(8)** "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

**(9)** "documentary material" includes any book, paper, document, record, recording, or other material; and

**(10)** "Attorney General" includes the Attorney General of the United States, the Deputy Attorney General of the United States, the Associate Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

(Added Pub. L. 91–452, title IX, §901(a), Oct. 15, 1970, 84 Stat. 941; amended Pub. L. 95–575, §3(c), Nov. 2, 1978, 92 Stat. 2465; Pub. L. 95–598, title III, §314(g), Nov. 6, 1978, 92 Stat. 2677; Pub. L. 98–473, title II, §§901(g), 1020, Oct. 12, 1984, 98 Stat. 2136, 2143; Pub. L. 98–547, title II, §205, Oct. 25, 1984, 98 Stat. 2770; Pub. L. 99–570, title I, §1365(b), Oct. 27, 1986, 100 Stat. 3207–35; Pub. L. 99–646, §50(a), Nov. 10, 1986, 100 Stat. 3605; Pub. L. 100–690, title VII, §§7013, 7020(c), 7032, 7054, 7514, Nov. 18, 1988, 102 Stat. 4395, 4396, 4398, 4402, 4489; Pub. L. 101–73, title IX, §968, Aug. 9, 1989, 103 Stat. 506; Pub. L. 101–647, title XXXV, §3560, Nov. 29, 1990, 104 Stat. 4927; Pub. L. 103–322, title IX, §90104, title XVI, §160001(f), title XXXIII, §330021(1), Sept. 13, 1994, 108 Stat. 1987, 2037, 2150; Pub. L. 103–394, title III, §312(b), Oct. 22, 1994, 108 Stat. 4140; Pub. L. 104–132, title IV, §433, Apr. 24, 1996, 110 Stat. 1274; Pub. L. 104–153, §3, July 2, 1996, 110 Stat. 1386; Pub. L. 104–208, div. C, title II, §202, Sept. 30, 1996, 110 Stat. 3009–565; Pub. L. 104–294, title VI, §§601(b)(3), (i)(3), 604(b)(6), Oct. 11, 1996, 110 Stat. 3499, 3501, 3506; Pub. L. 107–56, title VIII, §813, Oct. 26, 2001, 115 Stat. 382; Pub. L. 107–273, div. B, title IV, §4005(f)(1), Nov. 2, 2002, 116 Stat. 1813; Pub. L. 108–193, §5(b), Dec. 19, 2003, 117 Stat. 2879; Pub. L. 108–458, title VI, §6802(e), Dec. 17, 2004, 118 Stat. 3767; Pub. L. 109–164, title I, §103(c), Jan. 10, 2006, 119 Stat. 3563; Pub. L. 109–177, title IV, §403(a), Mar. 9, 2006, 120 Stat. 243; Pub. L. 113–4, title XII, §1211(a),

Mar. 7, 2013, 127 Stat. 142; Pub. L. 114–153, §3(b), May 11, 2016, 130 Stat. 382; Pub. L. 117–159, div. A, title II, §12004(a)(3), June 25, 2022, 136 Stat. 1328.)

💼 U.S. Code Toolbox

Law about... Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

LII  > U.S. Code  > Title 18  > PART I  > CHAPTER 96  > § 1962

Quick search by citation:

**Title**

enter title

**Section**

section

Go!

# 18 U.S. Code § 1962 - Prohibited activities

U.S. Code    Notes

**(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the

collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

**(b)** It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

(Added Pub. L. 91–452, title IX, § 901(a), Oct. 15, 1970, 84 Stat. 942; amended Pub. L. 100–690, title VII, § 7033, Nov. 18, 1988, 102 Stat. 4398.)

💼 U.S. Code Toolbox

Law about... Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?

LII  > U.S. Code  > Title 18  > PART I  > CHAPTER 96  **> § 1963**

Quick search by citation:
**Title**

enter title

**Section**

section

Go!

# 18 U.S. Code § 1963 - Criminal penalties

U.S. Code      Notes

**(a)** Whoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both, and shall forfeit to the United States, irrespective of any provision of State law—

**(1)** any interest the person has acquired or maintained in violation of section 1962;

**(2)** any—

**(A)** interest in;

**(B)** security of;

**(C)** claim against; or

**(D)** property or contractual right of any kind affording a source of influence over;

any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

**(3)** any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

The court, in imposing sentence on such person shall order, in addition to any other sentence imposed pursuant to this section, that the person forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by this section, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.

**(b)** Property subject to criminal forfeiture under this section includes—

**(1)** real property, including things growing on, affixed to, and found in land; and

**(2)** tangible and intangible personal property, including rights, privileges, interests, claims, and securities.

**(c)** All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (l) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

**(d)**

**(1)** Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) for forfeiture under this section—

**(A)** upon the filing of an indictment or information charging a violation of section 1962 of this chapter and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section; or

**(B)** prior to the filing of such an indictment or information, if, after notice to persons appearing to have an interest in the property and opportunity for a hearing, the court determines that—

**(i)** there is a substantial probability that the United States will prevail on the issue of forfeiture and that failure to enter the order will result in the property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture; and

**(ii)** the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order is to be entered:

*Provided, however,* That an order entered pursuant to subparagraph (B) shall be effective for not more than ninety days, unless extended by the court for good cause shown or unless an indictment or information described in subparagraph (A) has been filed.

**(2)** A temporary restraining order under this subsection may be entered upon application of the United States without notice or opportunity for a hearing when an information or indictment has not yet been filed with respect to the property, if the United States demonstrates that there is probable cause to believe that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section and that provision of notice will jeopardize the availability of the property for forfeiture. Such a temporary order shall expire not more than fourteen days after the date on which it is entered, unless extended for good cause shown or unless the party against whom it is entered consents to an extension for a longer period. A hearing requested concerning an order entered under this paragraph shall be held at the earliest possible time, and prior to the expiration of the temporary order.

**(3)** The court may receive and consider, at a hearing held pursuant to this subsection, evidence and information that would be inadmissible under the Federal Rules of Evidence.

**(e)** Upon conviction of a person under this section, the court shall enter a judgment of forfeiture of the property to the United States and shall also authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper. Following the entry of an order declaring the property forfeited, the court may, upon application of the United States, enter such appropriate restraining orders or injunctions, require the execution of satisfactory performance bonds, appoint receivers, conservators, appraisers, accountants, or trustees, or take any other action to protect the interest of the United States in the property ordered forfeited. Any income accruing to, or derived from, an enterprise or an interest in an enterprise which has been ordered forfeited under this section may be used to offset ordinary and necessary expenses to the enterprise which are required by law, or which are necessary to protect the interests of the United States or third parties.

**(f)** Following the seizure of property ordered forfeited under this section, the Attorney General shall direct the disposition of the property by sale or any other commercially feasible means, making due provision for the rights of any innocent persons. Any property right or interest not exercisable by, or transferable for value to, the United States shall expire and shall not revert to the defendant, nor shall the defendant or any person acting in concert with or on behalf of the defendant be eligible to purchase forfeited property at any sale held by the United States. Upon application of a person, other than the defendant or a person acting in concert with or on behalf of the defendant, the court may restrain or stay the sale or disposition of the property pending the conclusion of any appeal of the criminal case giving rise to the forfeiture, if the applicant demonstrates that proceeding with the sale or disposition of the property will result in irreparable injury, harm or loss to him. Notwithstanding 31 U.S.C. 3302(b), the proceeds of any sale or other disposition of property forfeited under this section and any moneys forfeited shall be used to pay all proper expenses for the forfeiture and the sale, including expenses of seizure, maintenance and custody of the property pending its disposition, advertising and court costs. The Attorney General shall deposit in the Treasury any amounts of such proceeds or moneys remaining after the payment of such expenses.

**(g)** With respect to property ordered forfeited under this section, the Attorney General is authorized to—

    **(1)** grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this chapter, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this chapter;

(2) compromise claims arising under this section;

(3) award compensation to persons providing information resulting in a forfeiture under this section;

(4) direct the disposition by the United States of all property ordered forfeited under this section by public sale or any other commercially feasible means, making due provision for the rights of innocent persons; and

(5) take appropriate measures necessary to safeguard and maintain property ordered forfeited under this section pending its disposition.

(h) The Attorney General may promulgate regulations with respect to—

(1) making reasonable efforts to provide notice to persons who may have an interest in property ordered forfeited under this section;

(2) granting petitions for remission or mitigation of forfeiture;

(3) the restitution of property to victims of an offense petitioning for remission or mitigation of forfeiture under this chapter;

(4) the disposition by the United States of forfeited property by public sale or other commercially feasible means;

(5) the maintenance and safekeeping of any property forfeited under this section pending its disposition; and

(6) the compromise of claims arising under this chapter.

Pending the promulgation of such regulations, all provisions of law relating to the disposition of property, or the proceeds from the sale thereof, or the remission or mitigation of forfeitures for violation of the customs laws, and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to forfeitures incurred, or alleged to have been incurred, under the provisions of this section, insofar as applicable and not inconsistent with the provisions hereof. Such duties as are imposed upon the Customs Service or any person with respect to the disposition of property under the customs law shall be performed under this chapter by the Attorney General.

(i) Except as provided in subsection (l), no party claiming an interest in property subject to forfeiture under this section may—

**(1)** intervene in a trial or appeal of a criminal case involving the forfeiture of such property under this section; or

**(2)** commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section.

**(j)** The district courts of the United States shall have jurisdiction to enter orders as provided in this section without regard to the location of any property which may be subject to forfeiture under this section or which has been ordered forfeited under this section.

**(k)** In order to facilitate the identification or location of property declared forfeited and to facilitate the disposition of petitions for remission or mitigation of forfeiture, after the entry of an order declaring property forfeited to the United States the court may, upon application of the United States, order that the testimony of any witness relating to the property forfeited be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged be produced at the same time and place, in the same manner as provided for the taking of depositions under Rule 15 of the Federal Rules of Criminal Procedure.

**(l)**

**(1)** Following the entry of an order of forfeiture under this section, the United States shall publish notice of the order and of its intent to dispose of the property in such manner as the Attorney General may direct. The Government may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the order of forfeiture as a substitute for published notice as to those persons so notified.

**(2)** Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

**(3)** The petition shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in

the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought.

**(4)** The hearing on the petition shall, to the extent practicable and consistent with the interests of justice, be held within thirty days of the filing of the petition. The court may consolidate the hearing on the petition with a hearing on any other petition filed by a person other than the defendant under this subsection.

**(5)** At the hearing, the petitioner may testify and present evidence and witnesses on his own behalf, and cross-examine witnesses who appear at the hearing. The United States may present evidence and witnesses in rebuttal and in defense of its claim to the property and cross-examine witnesses who appear at the hearing. In addition to testimony and evidence presented at the hearing, the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture.

**(6)** If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

**(A)** the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

**(B)** the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

**(7)** Following the court's disposition of all petitions filed under this subsection, or if no such petitions are filed following the expiration of the period provided in paragraph (2) for the filing of such petitions, the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee.

**(m)** If any of the property described in subsection (a), as a result of any act or omission of the defendant—

> **(1)** cannot be located upon the exercise of due diligence;
>
> **(2)** has been transferred or sold to, or deposited with, a third party;
>
> **(3)** has been placed beyond the jurisdiction of the court;
>
> **(4)** has been substantially diminished in value; or
>
> **(5)** has been commingled with other property which cannot be divided without difficulty;
>
> the court shall order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs (1) through (5).

(Added Pub. L. 91–452, title IX, § 901(a), Oct. 15, 1970, 84 Stat. 943; amended Pub. L. 98–473, title II, §§ 302, 2301(a)–(c), Oct. 12, 1984, 98 Stat. 2040, 2192; Pub. L. 99–570, title I, § 1153(a), Oct. 27, 1986, 100 Stat. 3207–13; Pub. L. 99–646, § 23, Nov. 10, 1986, 100 Stat. 3597; Pub. L. 100–690, title VII, §§ 7034, 7058(d), Nov. 18, 1988, 102 Stat. 4398, 4403; Pub. L. 101–647, title XXXV, § 3561, Nov. 29, 1990, 104 Stat. 4927; Pub. L. 111–16, § 3(4), May 7, 2009, 123 Stat. 1607.)

 U.S. Code Toolbox

Law about... Articles from Wex

Table of Popular Names

Parallel Table of Authorities

How current is this?

LII  > U.S. Code  > Title 18  > PART I  > CHAPTER 96  **> § 1964**

Quick search by citation:

**Title**

> enter title

**Section**

> section

> Go!

# 18 U.S. Code § 1964 - Civil remedies

U.S. Code     Notes

**(a)** The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

**(b)** The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining

orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

**(c)** Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

**(d)** A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.

(Added Pub. L. 91–452, title IX, §901(a), Oct. 15, 1970, 84 Stat. 943; amended Pub. L. 98–620, title IV, §402(24)(A), Nov. 8, 1984, 98 Stat. 3359; Pub. L. 104–67, title I, §107, Dec. 22, 1995, 109 Stat. 758.)

💼 U.S. Code Toolbox

Law about... Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?

LII  > U.S. Code  > Title 18  > PART I  > CHAPTER 96  **> § 1965**

Quick search by citation:

**Title**

enter title

**Section**

section

Go!

# 18 U.S. Code § 1965 - Venue and process

### U.S. Code

**(a)** Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

**(b)** In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

**(c)** In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district,

subpenas issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

**(d)** All other process in any action or proceeding under this chapter may be served on any <u>person</u> in any judicial district in which such <u>person</u> resides, is found, has an agent, or transacts his affairs.

(Added <u>Pub. L. 91–452, title IX, § 901(a)</u>, Oct. 15, 1970, <u>84 Stat. 944</u>.)



LII  > U.S. Code  > Title 18  > PART I  > CHAPTER 96  **> § 1966**

Quick search by citation:
**Title**

> enter title

**Section**

> section

> Go!

# 18 U.S. Code § 1966 - Expedition of actions

U.S. Code   Notes

In any civil action instituted under this chapter by the United States in any district court of the United States, the Attorney General may file with the clerk of such court a certificate stating that in his opinion the case is of general public importance. A copy of that certificate shall be furnished immediately by such clerk to the chief judge or in his absence to the presiding district judge of the district in which such action is pending. Upon receipt of such copy, such judge shall designate immediately a judge of that district to hear and determine action.

(Added Pub. L. 91–452, title IX, § 901(a), Oct. 15, 1970, 84 Stat. 944; amended Pub. L. 98–620, title IV, § 402(24)(B), Nov. 8, 1984, 98 Stat. 3359.)

LII  > U.S. Code  > Title 18  > PART I  > CHAPTER 96  **> § 1967**

Quick search by citation:

**Title**

enter title

**Section**

section

Go!

# 18 U.S. Code § 1967 - Evidence

U.S. Code

In any proceeding ancillary to or in any civil action instituted by the United States under this chapter the proceedings may be open or closed to the public at the discretion of the court after consideration of the rights of affected persons.

(Added Pub. L. 91–452, title IX, § 901(a), Oct. 15, 1970, 84 Stat. 944.)

LII  > U.S. Code  > Title 18  > PART I  > CHAPTER 96  **> § 1968**

Quick search by citation:

**Title**

enter title

**Section**

section

Go!

# 18 U.S. Code § 1968 - Civil investigative demand

U.S. Code

**(a)** Whenever the Attorney General has reason to believe that any person or enterprise may be in possession, custody, or control of any documentary materials relevant to a racketeering investigation, he may, prior to the institution of a civil or criminal proceeding thereon, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such material for examination.

**(b)** Each such demand shall—

**(1)** state the nature of the conduct constituting the alleged racketeering violation which is under investigation and the provision of law applicable thereto;

**(2)** describe the class or classes of documentary material produced thereunder with such definiteness and certainty as to permit such material to be fairly identified;

**(3)** state that the demand is returnable forthwith or prescribe a return date which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and

**(4)** identify the custodian to whom such material shall be made available.

**(c)** No such demand shall—

**(1)** contain any requirement which would be held to be unreasonable if contained in a subpena duces tecum issued by a court of the United States in aid of a grand jury investigation of such alleged racketeering violation; or

**(2)** require the production of any documentary evidence which would be privileged from disclosure if demanded by a subpena duces tecum issued by a court of the United States in aid of a grand jury investigation of such alleged racketeering violation.

**(d)** Service of any such demand or any petition filed under this section may be made upon a person by—

**(1)** delivering a duly executed copy thereof to any partner, executive officer, managing agent, or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on behalf of such person, or upon any individual person;

**(2)** delivering a duly executed copy thereof to the principal office or place of business of the person to be served; or

**(3)** depositing such copy in the United States mail, by registered or certified mail duly addressed to such person at its principal office or place of business.

**(e)** A verified return by the individual serving any such demand or petition setting forth the manner of such service shall be prima facie proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand.

**(f)**

**(1)** The Attorney General shall designate a racketeering investigator to serve as racketeer document custodian, and such additional racketeering investigators as he shall determine from time to time to be necessary to serve as deputies to such officer.

**(2)** Any person upon whom any demand issued under this section has been duly served shall make such material available for inspection and copying or reproduction to the custodian designated therein at the principal place of business of such person, or at such other place as such custodian and such person thereafter may agree and prescribe in writing or as the court may direct, pursuant to this section on the return date specified in such demand, or on such later date as such custodian may prescribe in writing. Such person may upon written agreement between such person and the custodian substitute for copies of all or any part of such material originals thereof.

**(3)** The custodian to whom any documentary material is so delivered shall take physical possession thereof, and shall be responsible for the use made thereof and for the return thereof pursuant to this chapter. The custodian may cause the preparation of such copies of such documentary material as may be required for official use under regulations which shall be promulgated by the Attorney General. While in the possession of the custodian, no material so produced shall be available for examination, without the consent of the person who produced such material, by any individual other than the Attorney General. Under such reasonable terms and conditions as the Attorney General shall prescribe, documentary material while in the possession of the custodian shall be available for examination by the person who produced such material or any duly authorized representatives of such person.

**(4)** Whenever any attorney has been designated to appear on behalf of the United States before any court or grand jury in any case or proceeding involving any alleged violation of this chapter, the custodian may deliver to such attorney such documentary material in the possession of the custodian as such attorney determines to be required for use in the presentation of such case or proceeding on behalf of the United States. Upon the conclusion of any such case or proceeding, such attorney shall return to the custodian any documentary material so withdrawn which has not passed into the control of such court or grand jury through the introduction thereof into the record of such case or proceeding.

**(5)** Upon the completion of—

**(i)** the racketeering investigation for which any documentary material was produced under this chapter, and

**(ii)** any case or proceeding arising from such investigation, the custodian shall return to the person who produced such material all such material other than copies thereof made by the Attorney General pursuant to this subsection which has not passed into the control of any court or grand jury through the introduction thereof into the record of such case or proceeding.

**(6)** When any documentary material has been produced by any person under this section for use in any racketeering investigation, and no such case or proceeding arising therefrom has been instituted within a reasonable time after completion of the examination and analysis of all evidence assembled in the course of such investigation, such person shall be entitled, upon written demand made upon the Attorney General, to the return of all documentary material other than copies thereof made pursuant to this subsection so produced by such person.

**(7)** In the event of the death, disability, or separation from service of the custodian of any documentary material produced under any demand issued under this section or the official relief of such custodian from responsibility for the custody and control of such material, the Attorney General shall promptly —

**(i)** designate another racketeering investigator to serve as custodian thereof, and

**(ii)** transmit notice in writing to the person who produced such material as to the identity and address of the successor so designated.

Any successor so designated shall have with regard to such materials all duties and responsibilities imposed by this section upon his predecessor in office with regard thereto, except that he shall not be held responsible for any default or dereliction which occurred before his designation as custodian.

**(g)** Whenever any person fails to comply with any civil investigative demand duly served upon him under this section or whenever satisfactory copying or reproduction of any such material cannot be done and such person refuses to surrender such material, the Attorney General may file, in the district court of the United States for any judicial district in which such person resides, is found, or

transacts business, and serve upon such person a petition for an order of such court for the enforcement of this section, except that if such person transacts business in more than one such district such petition shall be filed in the district in which such person maintains his principal place of business, or in such other district in which such person transacts business as may be agreed upon by the parties to such petition.

(h) Within twenty days after the service of any such demand upon any person, or at any time before the return date specified in the demand, whichever period is shorter, such person may file, in the district court of the United States for the judicial district within which person resides, is found, or transacts business, and serve upon such custodian a petition for an order of such court modifying or setting aside such demand. The time allowed for compliance with the demand in whole or in part as deemed proper and ordered by the court shall not run during the pendency of such petition in the court. Such petition shall specify each ground upon which the petitioner relies in seeking such relief, and may be based upon any failure of such demand to comply with the provisions of this section or upon any constitutional or other legal right or privilege of such person.

(i) At any time during which any custodian is in custody or control of any documentary material delivered by any person in compliance with any such demand, such person may file, in the district court of the United States for the judicial district within which the office of such custodian is situated, and serve upon such custodian a petition for an order of such court requiring the performance by such custodian of any duty imposed upon him by this section.

(j) Whenever any petition is filed in any district court of the United States under this section, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry into effect the provisions of this section.

(Added Pub. L. 91–452, title IX, §901(a), Oct. 15, 1970, 84 Stat. 944.)

U.S. Code Toolbox

Law about... Articles from Wex

# APPRENDI *v.* NEW JERSEY

### CERTIORARI TO THE SUPREME COURT OF NEW JERSEY

No. 99–478.   Argued March 28, 2000—Decided June 26, 2000

Petitioner Apprendi fired several shots into the home of an African-American family and made a statement—which he later retracted—that he did not want the family in his neighborhood because of their race. He was charged under New Jersey law with, *inter alia,* second-degree possession of a firearm for an unlawful purpose, which carries a prison term of 5 to 10 years. The count did not refer to the State's hate crime statute, which provides for an enhanced sentence if a trial judge finds, by a preponderance of the evidence, that the defendant committed the crime with a purpose to intimidate a person or group because of, *inter alia,* race. After Apprendi pleaded guilty, the prosecutor filed a motion to enhance the sentence. The court found by a preponderance of the evidence that the shooting was racially motivated and sentenced Apprendi to a 12-year term on the firearms count. In upholding the sentence, the appeals court rejected Apprendi's claim that the Due Process Clause requires that a bias finding be proved to a jury beyond a reasonable doubt. The State Supreme Court affirmed.

*Held:* The Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. Pp. 474–497.

(a) The answer to the narrow constitutional question presented—whether Apprendi's sentence was permissible, given that it exceeds the 10-year maximum for the offense charged—was foreshadowed by the holding in *Jones* v. *United States,* 526 U. S. 227, that, with regard to federal law, the Fifth Amendment's Due Process Clause and the Sixth Amendment's notice and jury trial guarantees require that any fact other than prior conviction that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proved beyond a reasonable doubt. The Fourteenth Amendment commands the same answer when a state statute is involved. Pp. 474–476.

(b) The Fourteenth Amendment right to due process and the Sixth Amendment right to trial by jury, taken together, entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt. *E. g., In re Winship,* 397 U. S. 358, 364. The historical foundation for these principles extends down centuries into the common law. While

Syllabus

judges in this country have long exercised discretion in sentencing, such discretion is bound by the range of sentencing options prescribed by the legislature. See, e. g., *United States* v. *Tucker*, 404 U. S. 443, 447. The historic inseparability of verdict and judgment and the consistent limitation on judges' discretion highlight the novelty of a scheme that removes the jury from the determination of a fact that exposes the defendant to a penalty exceeding the maximum he could receive if punished according to the facts reflected in the jury verdict alone. Pp. 476–485.

(c) *McMillan* v. *Pennsylvania*, 477 U. S. 79, was the first case in which the Court used "sentencing factor" to refer to a fact that was not found by the jury but could affect the sentence imposed by the judge. In finding that the scheme at issue there did not run afoul of *Winship*'s strictures, this Court did not budge from the position that (1) constitutional limits exist to States' authority to define away facts necessary to constitute a criminal offense, 477 U. S., at 85–88, and (2) a state scheme that keeps from the jury facts exposing defendants to greater or additional punishment may raise serious constitutional concerns, *id.*, at 88. *Almendarez-Torres* v. *United States*, 523 U. S. 224—in which the Court upheld a federal law allowing a judge to impose an enhanced sentence based on prior convictions not alleged in the indictment—represents at best an exceptional departure from the historic practice. Pp. 485–490.

(d) In light of the constitutional rule expressed here, New Jersey's practice cannot stand. It allows a jury to convict a defendant of a second-degree offense on its finding beyond a reasonable doubt and then allows a judge to impose punishment identical to that New Jersey provides for first-degree crimes on his finding, by a preponderance of the evidence, that the defendant's purpose was to intimidate his victim based on the victim's particular characteristic. The State's argument that the biased purpose finding is not an "element" of a distinct hate crime offense but a "sentencing factor" of motive is nothing more than a disagreement with the rule applied in this case. Beyond this, the argument cannot succeed on its own terms. It does not matter how the required finding is labeled, but whether it exposes the defendant to a greater punishment than that authorized by the jury's verdict, as does the sentencing "enhancement" here. The degree of culpability the legislature associates with factually distinct conduct has significant implications both for a defendant's liberty and for the heightened stigma associated with an offense the legislature has selected as worthy of greater punishment. That the State placed the enhancer within the criminal code's sentencing provisions does not mean that it is not an essential element of the offense. Pp. 491–497.

159 N. J. 7, 731 A. 2d 485, reversed and remanded.

Opinion of the Court

STEVENS, J., delivered the opinion of the Court, in which SCALIA, SOUTER, THOMAS, and GINSBURG, JJ., joined.  SCALIA, J., filed a concurring opinion, *post*, p. 498.  THOMAS, J., filed a concurring opinion, in which SCALIA, J., joined as to Parts I and II, *post*, p. 499.  O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and KENNEDY and BREYER, JJ., joined, *post*, p. 523.  BREYER, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 555.

*Joseph D. O'Neill* argued the cause for petitioner.  With him on the briefs were *Charles I. Coant, Richard G. Singer,* and *Jeffrey T. Green.*

*Lisa Sarnoff Gochman,* Deputy Attorney General of New Jersey, argued the cause for respondent.  With her on the brief was *John J. Farmer, Jr.,* Attorney General.

*Edward C. DuMont* argued the cause for the United States as *amicus curiae* urging affirmance.  With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson, Deputy Solicitor General Dreeben,* and *Nina Goodman.**

JUSTICE STEVENS delivered the opinion of the Court.

A New Jersey statute classifies the possession of a firearm for an unlawful purpose as a "second-degree" offense.  N. J. Stat. Ann. §2C:39–4(a) (West 1995).  Such an offense is punishable by imprisonment for "between five years and 10 years."  §2C:43–6(a)(2).  A separate statute, described by that State's Supreme Court as a "hate crime" law, provides for an "extended term" of imprisonment if the trial judge finds, by a preponderance of the evidence, that "[t]he de-

---

*Briefs of *amici curiae* urging reversal were filed for the National Association of Criminal Defense Lawyers et al. by *Steven B. Duke, Kyle O'Dowd, Lisa B. Kemler,* and *Peter Goldberger;* and for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden.*

Briefs of *amici curiae* urging affirmance were filed for the Anti-Defamation League by *David M. Raim, Steven M. Freeman,* and *Michael Lieberman;* and for the Brudnick Center on Violence and Conflict et al. by *Brian H. Levin.*

Opinion of the Court

fendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." N. J. Stat. Ann. § 2C:44–3(e) (West Supp. 1999–2000). The extended term authorized by the hate crime law for second-degree offenses is imprisonment for "between 10 and 20 years." § 2C:43–7(a)(3).

The question presented is whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt.

I

At 2:04 a.m. on December 22, 1994, petitioner Charles C. Apprendi, Jr., fired several .22-caliber bullets into the home of an African-American family that had recently moved into a previously all-white neighborhood in Vineland, New Jersey. Apprendi was promptly arrested and, at 3:05 a.m., admitted that he was the shooter. After further questioning, at 6:04 a.m., he made a statement—which he later retracted—that even though he did not know the occupants of the house personally, "because they are black in color he does not want them in the neighborhood." 159 N. J. 7, 10, 731 A. 2d 485, 486 (1999).

A New Jersey grand jury returned a 23-count indictment charging Apprendi with four first-degree, eight second-degree, six third-degree, and five fourth-degree offenses. The charges alleged shootings on four different dates, as well as the unlawful possession of various weapons. None of the counts referred to the hate crime statute, and none alleged that Apprendi acted with a racially biased purpose.

The parties entered into a plea agreement, pursuant to which Apprendi pleaded guilty to two counts (3 and 18) of second-degree possession of a firearm for an unlawful pur-

Opinion of the Court

pose, N. J. Stat. Ann. §2C:39–4a (West 1995), and one count (22) of the third-degree offense of unlawful possession of an antipersonnel bomb, §2C:39–3a; the prosecutor dismissed the other 20 counts.   Under state law, a second-degree offense carries a penalty range of 5 to 10 years, §2C:43–6(a)(2); a third-degree offense carries a penalty range of between 3 and 5 years, §2C:43–6(a)(3).   As part of the plea agreement, however, the State reserved the right to request the court to impose a higher "enhanced" sentence on count 18 (which was based on the December 22 shooting) on the ground that that offense was committed with a biased purpose, as described in §2C:44–3(e).   Apprendi, correspondingly, reserved the right to challenge the hate crime sentence enhancement on the ground that it violates the United States Constitution.

At the plea hearing, the trial judge heard sufficient evidence to establish Apprendi's guilt on counts 3, 18, and 22; the judge then confirmed that Apprendi understood the maximum sentences that could be imposed on those counts. Because the plea agreement provided that the sentence on the sole third-degree offense (count 22) would run concurrently with the other sentences, the potential sentences on the two second-degree counts were critical.   If the judge found no basis for the biased purpose enhancement, the maximum consecutive sentences on those counts would amount to 20 years in aggregate; if, however, the judge enhanced the sentence on count 18, the maximum on that count alone would be 20 years and the maximum for the two counts in aggregate would be 30 years, with a 15-year period of parole ineligibility.

After the trial judge accepted the three guilty pleas, the prosecutor filed a formal motion for an extended term.   The trial judge thereafter held an evidentiary hearing on the issue of Apprendi's "purpose" for the shooting on December 22.   Apprendi adduced evidence from a psychologist and from seven character witnesses who testified that he did not

Opinion of the Court

have a reputation for racial bias. He also took the stand himself, explaining that the incident was an unintended consequence of overindulgence in alcohol, denying that he was in any way biased against African-Americans, and denying that his statement to the police had been accurately described. The judge, however, found the police officer's testimony credible, and concluded that the evidence supported a finding "that the crime was motivated by racial bias." App. to Pet. for Cert. 143a. Having found "by a preponderance of the evidence" that Apprendi's actions were taken "with a purpose to intimidate" as provided by the statute, *id.*, at 138a, 139a, 144a, the trial judge held that the hate crime enhancement applied. Rejecting Apprendi's constitutional challenge to the statute, the judge sentenced him to a 12-year term of imprisonment on count 18, and to shorter concurrent sentences on the other two counts.

Apprendi appealed, arguing, *inter alia*, that the Due Process Clause of the United States Constitution requires that the finding of bias upon which his hate crime sentence was based must be proved to a jury beyond a reasonable doubt, *In re Winship*, 397 U. S. 358 (1970). Over dissent, the Appellate Division of the Superior Court of New Jersey upheld the enhanced sentence. 304 N. J. Super. 147, 698 A. 2d 1265 (1997). Relying on our decision in *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986), the appeals court found that the state legislature decided to make the hate crime enhancement a "sentencing factor," rather than an element of an underlying offense—and that decision was within the State's established power to define the elements of its crimes. The hate crime statute did not create a presumption of guilt, the court determined, and did not appear "'tailored to permit the . . . finding to be a tail which wags the dog of the substantive offense.'" 304 N. J. Super., at 154, 698 A. 2d, at 1269 (quoting *McMillan*, 477 U. S., at 88). Characterizing the required finding as one of "motive," the court described it as a traditional "sentencing factor," one not considered an "essen-

tial element" of any crime unless the legislature so provides.
304 N. J. Super., at 158, 698 A. 2d, at 1270. While recogniz-
ing that the hate crime law did expose defendants to
"'greater and additional punishment,'" *id.*, at 156, 698 A. 2d,
at 1269 (citing *McMillan*, 477 U. S., at 88), the court held
that that "one factor standing alone" was not sufficient to
render the statute unconstitutional, 304 N. J. Super., at 156,
698 A. 2d, at 1269.

A divided New Jersey Supreme Court affirmed. 159 N. J.
7, 731 A. 2d 485 (1999). The court began by explaining that
while due process only requires the State to prove the "ele-
ments" of an offense beyond a reasonable doubt, the mere
fact that a state legislature has placed a criminal component
"within the sentencing provisions" of the criminal code "does
not mean that the finding of a biased purpose to intimidate
is not an essential element of the offense." *Id.*, at 20, 731
A. 2d, at 492. "Were that the case," the court continued,
"the Legislature could just as easily allow judges, not juries,
to determine if a kidnapping victim has been released un-
harmed." *Ibid.* (citing state precedent requiring such a
finding to be submitted to a jury and proved beyond a rea-
sonable doubt). Neither could the constitutional question be
settled simply by defining the hate crime statute's "purpose
to intimidate" as "motive" and thereby excluding the provi-
sion from any traditional conception of an "element" of a
crime. Even if one could characterize the language this
way—and the court doubted that such a characterization was
accurate—proof of motive did not ordinarily "increase the
penal consequences to an actor." *Ibid.* Such "[l]abels," the
court concluded, would not yield an answer to Apprendi's
constitutional question. *Ibid.*

While noting that we had just last year expressed serious
doubt concerning the constitutionality of allowing penalty-
enhancing findings to be determined by a judge by a prepon-
derance of the evidence, *Jones* v. *United States*, 526 U. S.

Opinion of the Court

227 (1999), the court concluded that those doubts were not essential to our holding.    Turning then, as the appeals court had, to *McMillan,* as well as to *Almendarez-Torres* v. *United States,* 523 U. S. 224 (1998), the court undertook a multifactor inquiry and then held that the hate crime provision was valid.    In the majority's view, the statute did not allow impermissible burden shifting, and did not "create a separate offense calling for a separate penalty."    159 N. J., at 24, 731 A. 2d, at 494.    Rather, "the Legislature simply took one factor that has always been considered by sentencing courts to bear on punishment and dictated the weight to be given that factor."    *Ibid.,* 731 A. 2d, at 494–495.    As had the appeals court, the majority recognized that the state statute was unlike that in *McMillan* inasmuch as it increased the maximum penalty to which a defendant could be subject.    But it was not clear that this difference alone would "change the constitutional calculus," especially where, as here, "there is rarely any doubt whether the defendants committed the crimes with the purpose of intimidating the victim on the basis of race or ethnicity."    159 N. J., at 24–25, 731 A. 2d, at 495.    Moreover, in light of concerns "idiosyncratic" to hate crime statutes drawn carefully to avoid "punishing thought itself," the enhancement served as an appropriate balance between those concerns and the State's compelling interest in vindicating the right "to be free of invidious discrimination."    *Id.,* at 25–26, 731 A. 2d, at 495.

The dissent rejected this conclusion, believing instead that the case turned on two critical characteristics: (1) "[A] defendant's mental state in committing the subject offense . . . necessarily involves a finding so integral to the charged offense that it must be characterized as an element thereof"; and (2) "the significantly increased sentencing range triggered by . . . the finding of a purpose to intimidate" means that the purpose "must be treated as a material element [that] must be found by a jury beyond a reasonable doubt."

*Id.,* at 30, 731 A. 2d, at 498. In the dissent's view, the facts increasing sentences in both *Almendarez-Torres* (recidivism) and *Jones* (serious bodily injury) were quite distinct from New Jersey's required finding of purpose here; the latter finding turns directly on the conduct of the defendant during the crime and defines a level of culpability necessary to form the hate crime offense. While acknowledging "analytical tensions" in this Court's post-*Winship* jurisprudence, the dissenters concluded that "there can be little doubt that the sentencing factor applied to this defendant—the purpose to intimidate a victim because of race—must fairly be regarded as an element of the crime requiring inclusion in the indictment and proof beyond a reasonable doubt." 159 N. J., at 51, 731 A. 2d, at 512.

We granted certiorari, 528 U. S. 1018 (1999), and now reverse.

## II

It is appropriate to begin by explaining why certain aspects of the case are not relevant to the narrow issue that we must resolve. First, the State has argued that even without the trial judge's finding of racial bias, the judge could have imposed consecutive sentences on counts 3 and 18 that would have produced the 12-year term of imprisonment that Apprendi received; Apprendi's actual sentence was thus within the range authorized by statute for the three offenses to which he pleaded guilty. Brief for Respondent 4. The constitutional question, however, is whether the 12-year sentence imposed on count 18 was permissible, given that it was above the 10-year maximum for the offense charged in that count. The finding is legally significant because it increased—indeed, it doubled—the maximum range within which the judge could exercise his discretion, converting what otherwise was a maximum 10-year sentence on that count into a minimum sentence. The sentences on counts 3 and 22 have no more relevance to our disposition than the dismissal of the remaining 18 counts.

Opinion of the Court

Second, although the constitutionality of basing an enhanced sentence on racial bias was argued in the New Jersey courts, that issue was not raised here.[1] The substantive basis for New Jersey's enhancement is thus not at issue; the adequacy of New Jersey's procedure is. The strength of the state interests that are served by the hate crime legislation has no more bearing on this procedural question than the strength of the interests served by other provisions of the criminal code.

Third, we reject the suggestion by the State Supreme Court that "there is rarely any doubt" concerning the existence of the biased purpose that will support an enhanced sentence, 159 N. J., at 25, 731 A. 2d, at 495. In this very case, that issue was the subject of the full evidentiary hearing we described. We assume that both the purpose of the offender, and even the known identity of the victim, will sometimes be hotly disputed, and that the outcome may well depend in some cases on the standard of proof and the identity of the factfinder.

Fourth, because there is no ambiguity in New Jersey's statutory scheme, this case does not raise any question concerning the State's power to manipulate the prosecutor's burden of proof by, for example, relying on a presumption rather than evidence to establish an element of an offense, cf. *Mullaney* v. *Wilbur*, 421 U. S. 684 (1975); *Sandstrom* v. *Montana*, 442 U. S. 510 (1979), or by placing the affirmative defense label on "at least some elements" of traditional crimes, *Patterson* v. *New York*, 432 U. S. 197, 210 (1977). The prosecutor did not invoke any presumption to buttress the evidence of racial bias and did not claim that Apprendi had the burden of disproving an improper motive. The question whether Apprendi had a constitutional right to

---

[1] We have previously rejected a First Amendment challenge to an enhanced sentence based on a jury finding that the defendant had intentionally selected his victim because of the victim's race. *Wisconsin* v. *Mitchell*, 508 U. S. 476, 480 (1993).

have a jury find such bias on the basis of proof beyond a
reasonable doubt is starkly presented.

Our answer to that question was foreshadowed by our
opinion in *Jones* v. *United States*, 526 U. S. 227 (1999), con-
struing a federal statute. We there noted that "under the
Due Process Clause of the Fifth Amendment and the notice
and jury trial guarantees of the Sixth Amendment, any fact
(other than prior conviction) that increases the maximum
penalty for a crime must be charged in an indictment, sub-
mitted to a jury, and proven beyond a reasonable doubt."
*Id.*, at 243, n. 6. The Fourteenth Amendment commands the
same answer in this case involving a state statute.

### III

In his 1881 lecture on the criminal law, Oliver Wendell
Holmes, Jr., observed: "The law threatens certain pains if
you do certain things, intending thereby to give you a new
motive for not doing them. If you persist in doing them,
it has to inflict the pains in order that its threats may con-
tinue to be believed."[2] New Jersey threatened Apprendi
with certain pains if he unlawfully possessed a weapon and
with additional pains if he selected his victims with a pur-
pose to intimidate them because of their race. As a matter
of simple justice, it seems obvious that the procedural safe-
guards designed to protect Apprendi from unwarranted
pains should apply equally to the two acts that New Jersey
has singled out for punishment. Merely using the label
"sentence enhancement" to describe the latter surely does
not provide a principled basis for treating them differently.

At stake in this case are constitutional protections of
surpassing importance: the proscription of any deprivation
of liberty without "due process of law," Amdt. 14, and the
guarantee that "[i]n all criminal prosecutions, the accused
shall enjoy the right to a speedy and public trial, by an im-

---

[2] O. Holmes, The Common Law 40 (M. Howe ed. 1963).

Opinion of the Court

partial jury," Amdt. 6.[3]   Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States* v. *Gaudin,* 515 U. S. 506, 510 (1995); see also *Sullivan* v. *Louisiana,* 508 U. S. 275, 278 (1993); *Winship,* 397 U. S., at 364 ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

As we have, unanimously, explained, *Gaudin,* 515 U. S., at 510–511, the historical foundation for our recognition of these principles extends down centuries into the common law.   "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the Constitution of the United States 540–541 (4th ed. 1873), trial by jury has been understood to require that *"the truth of every accusation,* whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . ." 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (hereinafter Blackstone) (emphasis added).   See also *Duncan* v. *Louisiana,* 391 U. S. 145, 151–154 (1968).

---

[3] Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment.   He relies entirely on the fact that the "due process of law" that the Fourteenth Amendment requires the States to provide to persons accused of crime encompasses the right to a trial by jury, *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and the right to have every element of the offense proved beyond a reasonable doubt, *In re Winship,* 397 U. S. 358 (1970).   That Amendment has not, however, been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury" that was implicated in our recent decision in *Almendarez-Torres* v. *United States,* 523 U. S. 224 (1998).   We thus do not address the indictment question separately today.

Opinion of the Court

Equally well founded is the companion right to have the jury verdict based on proof beyond a reasonable doubt. "The 'demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula "beyond a reasonable doubt" seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt.' C. McCormick, Evidence §321, pp. 681–682 (1954); see also 9 J. Wigmore, Evidence §2497 (3d ed. 1940)." *Winship,* 397 U. S., at 361. We went on to explain that the reliance on the "reasonable doubt" standard among common-law jurisdictions " 'reflect[s] a profound judgment about the way in which law should be enforced and justice administered.' " *Id.,* at 361–362 (quoting *Duncan,* 391 U. S., at 155).

Any possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by court[4] as it existed during the years surrounding our Nation's founding. As a general rule, criminal proceedings were submitted to a jury after being initiated by an indictment containing "all the facts and circumstances which constitute the offence, . . . stated with such certainty and precision, that the defendant . . . may be enabled to determine the species of offence they constitute, in order that he may prepare his defence accordingly . . . and *that there may be no doubt as to the judgment which should be given,* if the defendant be convicted." J. Archbold, Pleading and Evidence in Criminal Cases 44 (15th ed. 1862) (emphasis added). The defendant's ability to predict with certainty the judgment from the face of the felony indictment flowed from the invariable linkage of punishment with crime. See 4 Black-

---

[4] "[A]fter trial and conviction are past," the defendant is submitted to "judgment" by the court, 4 Blackstone 368—the stage approximating in modern terms the imposition of sentence.

Opinion of the Court

stone 369–370 (after verdict, and barring a defect in the indictment, pardon, or benefit of clergy, "the court *must pronounce that judgment, which the law hath annexed to the crime*" (emphasis added)).

Thus, with respect to the criminal law of felonious conduct, "the English trial judge of the later eighteenth century had very little explicit discretion in sentencing. The substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense. The judge was meant simply to impose that sentence (unless he thought in the circumstances that the sentence was so inappropriate that he should invoke the pardon process to commute it)." Langbein, The English Criminal Trial Jury on the Eve of the French Revolution, in The Trial Jury in England, France, Germany 1700–1900, pp. 36–37 (A. Schioppa ed. 1987).[5] As Blackstone, among many others, has made clear,[6] "[t]he judg-

_____

[5] As we suggested in *Jones* v. *United States*, 526 U. S. 227 (1999), juries devised extralegal ways of avoiding a guilty verdict, at least of the more severe form of the offense alleged, if the punishment associated with the offense seemed to them disproportionate to the seriousness of the conduct of the particular defendant. *Id.*, at 245 ("This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included offenses, manifestations of what Blackstone described as 'pious perjury' on the jurors' part. 4 Blackstone 238–239").

[6] As the principal dissent would chide us for this single citation to Blackstone's third volume, rather than his fourth, *post*, at 525–526 (opinion of O'CONNOR, J.), we suggest that Blackstone himself directs us to it for these purposes. See 4 Blackstone 343 ("The antiquity and excellence of this [jury] trial, for the settling of civil property, has before been explained at large"). See 3 *id.*, at 379 ("Upon these accounts the trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law. And, if it has so great an advantage over others in regulating civil property, how much must that advantage be heightened, when it is applied to criminal cases!"); 4 *id.*, at 343 ("And it will hold much stronger in criminal cases; since, in times of difficulty and danger, more is to be apprehended from the violence and partiality of judges appointed by the crown, in suits between the king and the subject, than in disputes between one individual and another, to settle the metes and boundaries of private property");

Opinion of the Court

ment, though pronounced or awarded by the judges, is not their determination or sentence, but the determination and sentence of the law." 3 Blackstone 396 (emphasis deleted).[7]

This practice at common law held true when indictments were issued pursuant to statute. Just as the circumstances of the crime and the intent of the defendant at the time of commission were often essential elements to be alleged in the indictment, so too were the circumstances mandating a particular punishment. "Where a statute annexes a higher degree of punishment to a common-law felony, if committed under particular circumstances, an indictment for the offence, in order to bring the defendant within that higher degree of punishment, must expressly charge it to have been committed under those circumstances, and must state the circumstances with certainty and precision. [2 M. Hale, Pleas of the Crown *170]." Archbold, Pleading and Evidence in Criminal Cases, at 51. If, then, "upon an indictment under the statute, the prosecutor prove the felony to have been committed, but fail in proving it to have been committed under the circumstances specified in the statute, the

---

4 *id.,* at 344 ("What was said of juries in general, and the trial thereby, in *civil* cases, will greatly shorten our present remarks, with regard to the trial of *criminal* suits; indictments, informations, and appeals").

[7] The common law of punishment for misdemeanors—those "smaller faults, and omissions of less consequence," 4 *id.,* at 5—was, as we noted in *Jones,* 526 U. S., at 244, substantially more dependent upon judicial discretion. Subject to the limitations that the punishment not "touch life or limb," that it be proportionate to the offense, and, by the 17th century, that it not be "cruel or unusual," judges most commonly imposed discretionary "sentences" of fines or whippings upon misdemeanants. J. Baker, Introduction to English Legal History 584 (3d ed. 1990). Actual sentences of imprisonment for such offenses, however, were rare at common law until the late 18th century, *ibid.,* for "the idea of prison as a punishment would have seemed an absurd expense," Baker, Criminal Courts and Procedure at Common Law 1550–1800, in Crime in England 1550–1800, p. 43 (J. Cockburn ed. 1977).

Opinion of the Court

defendant shall be convicted of the common-law felony only."
*Id.*, at 188.[8]

We should be clear that nothing in this history suggests
that it is impermissible for judges to exercise discretion—
taking into consideration various factors relating both to
offense and offender—in imposing a judgment *within the
range* prescribed by statute. We have often noted that
judges in this country have long exercised discretion of this
nature in imposing sentence *within statutory limits* in the
individual case. See, *e. g., Williams* v. *New York*, 337 U. S.
241, 246 (1949) ("[B]oth before and since the American colo-
nies became a nation, courts in this country and in England
practiced a policy under which a sentencing judge could
exercise a wide discretion in the sources and types of evi-
dence used to assist him in determining the kind and extent
of punishment to be imposed *within limits fixed by law*"
(emphasis added)).   As in *Williams,* our periodic recognition
of judges' broad discretion in sentencing—since the 19th-
century shift in this country from statutes providing fixed-
term sentences to those providing judges discretion within
a permissible range, Note, The Admissibility of Character
Evidence in Determining Sentence, 9 U. Chi. L. Rev. 715
(1942)—has been regularly accompanied by the qualification
that that discretion was bound by the range of sentencing
options prescribed by the legislature.   See, *e. g., United
States* v. *Tucker,* 404 U. S. 443, 447 (1972) (agreeing that
"[t]he Government is also on solid ground in asserting that a

---

[8]To the extent the principal dissent appears to take issue with our re-
liance on Archbold (among others) as an authoritative source on the com-
mon law of the relevant period, *post,* at 525, 526, we simply note that
Archbold has been cited by numerous opinions of this Court for that very
purpose, his Criminal Pleading treatise being generally viewed as "an es-
sential reference book for every criminal lawyer working in the Crown
Court."   Biographical Dictionary of the Common Law 13 (A. Simpson ed.
1984); see also Holdsworth, The Literature of the Common Law, in 13 A
History of English Law 464–465 (A. Goodhart & H. Hanbury eds. 1952).

sentence imposed by a federal district judge, *if within statutory limits,* is generally not subject to review" (emphasis added)); *Williams,* 337 U. S., at 246, 247 (explaining that, in contrast to the guilt stage of trial, the judge's task in sentencing is to determine, "within fixed statutory or constitutional limits[,] the type and extent of punishment after the issue of guilt" has been resolved).[9]

The historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties provided highlight the novelty of a legislative scheme that removes the jury from

---

[9] See also 1 J. Bishop, Criminal Law §§ 933–934(1) (9th ed. 1923) ("With us legislation ordinarily fixes the penalties for the common law offences equally with the statutory ones. . . . Under the common-law procedure, the court determines in each case what *within the limits of the law* shall be the punishment,—the question being one of discretion" (emphasis added)); *id.,* § 948 ("[I]f the law has given the court a discretion as to the punishment, it will look in pronouncing sentence into any evidence proper to influence a judicious magistrate to make it heavier or lighter, yet not to exceed the limits fixed for what of crime is within the allegation and the verdict. Or this sort of evidence may be placed before the jury at the trial, if it has the power to assess the punishment. But in such a case the aggravating matter must not be of a crime separate from the one charged in the indictment,—a rule not applicable where a delinquent offence under an habitual criminal act is involved" (footnotes omitted)).

The principal dissent's discussion of *Williams, post,* at 545–546, 547, fails to acknowledge the significance of the Court's caveat that judges' discretion is constrained by the "limits fixed by law." Nothing in *Williams* implies that a judge may impose a more severe sentence than the maximum authorized by the facts found by the jury. Indeed, the commentators cited in the dissent recognize precisely this same limitation. See *post,* at 544–545 (quoting K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998) ("From the beginning of the Republic, federal judges were entrusted with wide sentencing discretion . . . , permitting the sentencing judge to impose any term of imprisonment and any fine *up to the statutory maximum*" (emphasis added)); Lynch, Towards A Model Penal Code, Second (Federal?), 2 Buffalo Crim. L. Rev. 297, 320 (1998) (noting that judges in discretionary sentencing took account of facts relevant to a particular offense "within the spectrum of conduct covered by the statute of conviction")).

Opinion of the Court

the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.[10]

We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears "that the jury right could be lost not only by gross denial, but by erosion." *Jones,* 526 U. S., at 247–248.[11]  But practice must at least adhere to the basic principles undergirding the requirements of trying to a jury all facts necessary to constitute a statutory offense, and proving those facts beyond reason-

---

[10] In support of its novel view that this Court has "long recognized" that not all facts affecting punishment need go to the jury, *post,* at 524, the principal dissent cites three cases decided within the past quarter century; and each of these is plainly distinguishable.  Rather than offer any historical account of its own that would support the notion of a "sentencing factor" legally increasing punishment beyond the statutory maximum—and JUSTICE THOMAS' concurring opinion in this case makes clear that such an exercise would be futile—the dissent proceeds by mischaracterizing our account.  The evidence we describe that punishment was, by law, tied to the offense (enabling the defendant to discern, barring pardon or clergy, his punishment from the face of the indictment), and the evidence that American judges have exercised sentencing discretion within a legally prescribed range (enabling the defendant to discern from the statute of indictment what maximum punishment conviction under that statute could bring), point to a single, consistent conclusion: The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury.  Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition "elements" of a separate legal offense.

[11] As we stated in *Jones:* "One contributor to the ratification debates, for example, commenting on the jury trial guarantee in Art. III, §2, echoed Blackstone in warning of the need 'to guard with the most jealous circumspection against the introduction of new, and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time, imperceptibly undermine this best preservative of LIBERTY.'  A [New Hampshire] Farmer, No. 3, June 6, 1788, quoted in The Complete Bill of Rights 477 (N. Cogan ed. 1997)."  526 U. S., at 248.

able doubt. As we made clear in *Winship,* the "reasonable doubt" requirement "has [a] vital role in our criminal procedure for cogent reasons." 397 U. S., at 363. Prosecution subjects the criminal defendant both to "the possibility that he may lose his liberty upon conviction and . . . the certainty that he would be stigmatized by the conviction." *Ibid.* We thus require this, among other, procedural protections in order to "provid[e] concrete substance for the presumption of innocence," and to reduce the risk of imposing such deprivations erroneously. *Ibid.* If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached.

Since *Winship,* we have made clear beyond peradventure that *Winship's* due process and associated jury protections extend, to some degree, "to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence." *Almendarez-Torres,* 523 U. S., at 251 (SCALIA, J., dissenting). This was a primary lesson of *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), in which we invalidated a Maine statute that presumed that a defendant who acted with an intent to kill possessed the "malice aforethought" necessary to constitute the State's murder offense (and therefore, was subject to that crime's associated punishment of life imprisonment). The statute placed the burden on the defendant of proving, in rebutting the statutory presumption, that he acted with a lesser degree of culpability, such as in the heat of passion, to win a reduction in the offense from murder to manslaughter (and thus a reduction of the maximum punishment of 20 years).

The State had posited in *Mullaney* that requiring a defendant to prove heat-of-passion intent to overcome a pre-

Opinion of the Court

sumption of murderous intent did not implicate *Winship*
protections because, upon conviction of either offense, the
defendant would lose his liberty and face societal stigma
just the same.   Rejecting this argument, we acknowledged
that criminal law "is concerned not only with guilt or in-
nocence in the abstract, but also with the degree of crimi-
nal culpability" assessed.   421 U. S., at 697–698.   Because
the *"consequences"* of a guilty verdict for murder and for
manslaughter differed substantially, we dismissed the pos-
sibility that a State could circumvent the protections of
*Winship* merely by "redefin[ing] the elements that constitute
different crimes, characterizing them as factors that bear
solely on the extent of punishment."   421 U. S., at 698.[12]

## IV

It was in *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986),
that this Court, for the first time, coined the term "sen-
tencing factor" to refer to a fact that was not found by a
jury but that could affect the sentence imposed by the
judge.   That case involved a challenge to the State's Man-

[12] Contrary to the principal dissent's suggestion, *post*, at 530–532, *Pat-
terson* v. *New York*, 432 U. S. 197, 198 (1977), posed no direct challenge to
this aspect of *Mullaney*.   In upholding a New York law allowing defend-
ants to raise and prove extreme emotional distress as an affirmative de-
fense to murder, *Patterson* made clear that the state law still required the
State to prove every element of that State's offense of murder and its
accompanying punishment.   "No further facts are either presumed or
inferred in order to constitute the crime."   432 U. S., at 205–206.   New
York, unlike Maine, had not made malice aforethought, or any described
*mens rea*, part of its statutory definition of second-degree murder; one
could tell from the face of the statute that if one intended to cause the
death of another person and did cause that death, one could be subject
to sentence for a second-degree offense.   *Id.*, at 198.   Responding to the
argument that our view could be seen "to permit state legislatures to
reallocate burdens of proof by labeling as affirmative defenses at least
some elements of the crimes now defined in their statutes," the Court
made clear in the very next breath that there were "obviously constitu-
tional limits beyond which the States may not go in this regard."   *Id.*,
at 210.

datory Minimum Sentencing Act, 42 Pa. Cons. Stat. § 9712 (1982). According to its provisions, anyone convicted of certain felonies would be subject to a mandatory minimum penalty of five years' imprisonment if the judge found, by a preponderance of the evidence, that the person "visibly possessed a firearm" in the course of committing one of the specified felonies. 477 U. S., at 81–82. Articulating for the first time, and then applying, a multifactor set of criteria for determining whether the *Winship* protections applied to bar such a system, we concluded that the Pennsylvania statute did not run afoul of our previous admonitions against relieving the State of its burden of proving guilt, or tailoring the mere form of a criminal statute solely to avoid *Winship*'s strictures. 477 U. S., at 86–88.

We did not, however, there budge from the position that (1) constitutional limits exist to States' authority to define away facts necessary to constitute a criminal offense, *id.*, at 85–88, and (2) that a state scheme that keeps from the jury facts that "expos[e] [defendants] to greater or additional punishment," *id.*, at 88, may raise serious constitutional concern. As we explained:

> "Section 9712 neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm. . . . The statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense. Petitioners' claim that visible possession under the Pennsylvania statute is 'really' an element of the offenses for which they are being punished—that Pennsylvania has in effect defined a new set of upgraded felonies—would have at least more superficial appeal if a finding of visible possession exposed them to greater or additional punish-

Opinion of the Court

ment, cf. 18 U. S. C. §2113(d) (providing separate and greater punishment for bank robberies accomplished through 'use of a dangerous weapon or device'), but it does not." *Id.*, at 87–88.[13]

Finally, as we made plain in *Jones* last Term, *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998), represents at best an exceptional departure from the historic practice that we have described. In that case, we considered a federal grand jury indictment, which charged the petitioner with "having been 'found in the United States . . . after being deported,'" in violation of 8 U. S. C. §1326(a)—an offense carrying a maximum sentence of two years. 523 U. S., at 227. Almendarez-Torres pleaded guilty to the indictment, admitting at the plea hearing that he had been deported, that he had unlawfully reentered this country, and that "the earlier deportation had taken place 'pursuant to' three earlier 'convictions' for aggravated felonies." *Ibid.* The Government then filed a presentence report indicating that Almendarez-Torres' offense fell within the bounds of §1326(b) because, as specified in that provision, his original deportation had been subsequent to an aggravated felony conviction; accordingly, Almendarez-Torres could be subject to a sentence of up to 20 years. Almendarez-Torres objected, contending that because the indictment "had not mentioned his earlier aggravated felony convictions," he could be sentenced to no more than two years in prison. *Ibid.*

---

[13] The principal dissent accuses us of today "overruling *McMillan*." *Post*, at 533. We do not overrule *McMillan*. We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the *McMillan* opinion itself. Conscious of the likelihood that legislative decisions may have been made in reliance on *McMillan*, we reserve for another day the question whether *stare decisis* considerations preclude reconsideration of its narrower holding.

Opinion of the Court

Rejecting Almendarez-Torres' objection, we concluded that sentencing him to a term higher than that attached to the offense alleged in the indictment did not violate the strictures of *Winship* in that case.  Because Almendarez-Torres had *admitted* the three earlier convictions for aggravated felonies—all of which had been entered pursuant to proceedings with substantial procedural safeguards of their own—no question concerning the right to a jury trial or the standard of proof that would apply to a contested issue of fact was before the Court.  Although our conclusion in that case was based in part on our application of the criteria we had invoked in *McMillan*, the specific question decided concerned the sufficiency of the indictment.  More important, as *Jones* made crystal clear, 526 U. S., at 248–249, our conclusion in *Almendarez-Torres* turned heavily upon the fact that the additional sentence to which the defendant was subject was "the prior commission of a serious crime."  523 U. S., at 230; see also *id.,* at 243 (explaining that "recidivism . . . is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence"); *id.,* at 244 (emphasizing "the fact that recidivism 'does not relate to the commission of the offense . . .'"); *Jones,* 526 U. S., at 249–250, n. 10 ("The majority and the dissenters in *Almendarez-Torres* disagreed over the legitimacy of the Court's decision to restrict its holding to recidivism, but both sides agreed that the Court had done just that").  Both the certainty that procedural safeguards attached to any "fact" of prior conviction, and the reality that Almendarez-Torres did not challenge the accuracy of that "fact" in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a "fact" increasing punishment beyond the maximum of the statutory range.[14]

---

[14] The principal dissent's contention that our decision in *Monge* v. *California,* 524 U. S. 721 (1998), "demonstrates that *Almendarez-Torres* was" something other than a limited exception to the jury trial rule is both

Opinion of the Court

Even though it is arguable that *Almendarez-Torres* was incorrectly decided,[15] and that a logical application of our reasoning today should apply if the recidivist issue were

---

inaccurate and misleading. *Post*, at 536. *Monge* was another recidivism case in which the question presented and the bulk of the Court's analysis related to the scope of double jeopardy protections in sentencing. The dissent extracts from that decision the majority's statement that "the Court has rejected an absolute rule that an enhancement constitutes an element of the offense any time that it increases the maximum sentence." 524 U. S., at 729. Far from being part of "reasoning essential" to the Court's holding, *post*, at 536, that statement was in response to a dissent by JUSTICE SCALIA on an issue that the Court itself had, a few sentences earlier, insisted "was neither considered by the state courts nor discussed in petitioner's brief before this Court." 524 U. S., at 728. Moreover, the sole citation supporting the *Monge* Court's proposition that "the Court has rejected" such a rule was none other than *Almendarez-Torres;* as we have explained, that case simply cannot bear that broad reading. Most telling of *Monge's* distance from the issue at stake in this case is that the double jeopardy question in *Monge* arose because the State had failed to satisfy its own statutory burden of proving beyond a reasonable doubt that the defendant had committed a prior offense (and was therefore subject to an enhanced, recidivism-based sentence). 524 U. S., at 725 ("According to California law, a number of procedural safeguards surround the assessment of prior conviction allegations: Defendants may invoke the right to a jury trial . . . ; the prosecution must prove the allegations beyond a reasonable doubt; and the rules of evidence apply"). The Court thus itself warned against a contrary double jeopardy rule that could "create disincentives that would diminish these important procedural protections." *Id.*, at 734.

[15] In addition to the reasons set forth in JUSTICE SCALIA's dissent, 523 U. S., at 248–260, it is noteworthy that the Court's extensive discussion of the term "sentencing factor" virtually ignored the pedigree of the pleading requirement at issue. The rule was succinctly stated by Justice Clifford in his separate opinion in *United States* v. *Reese*, 92 U. S. 214, 232–233 (1876): "[T]he indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted." As he explained in "[s]peaking of that principle, Mr. Bishop says it pervades the entire system of the adjudged law of criminal procedure, as appears by all the cases; that, wherever we move in that department of our jurisprudence, we come in contact with it; and that we can no more escape from it than from

contested, Apprendi does not contest the decision's validity and we need not revisit it for purposes of our decision today to treat the case as a narrow exception to the general rule we recalled at the outset.   Given its unique facts, it surely does not warrant rejection of the otherwise uniform course of decision during the entire history of our jurisprudence.

In sum, our reexamination of our cases in this area, and of the history upon which they rely, confirms the opinion that we expressed in *Jones.*   Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.   With that exception, we endorse the statement of the rule set forth in the concurring opinions in that case: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.   It is equally clear that such facts must be established by proof beyond a reasonable doubt."   526 U. S., at 252–253 (opinion of STEVENS, J.); see also *id.,* at 253 (opinion of SCALIA, J.).[16]

---

the atmosphere which surrounds us.   1 Bishop, Cr. Pro., 2d ed., sect. 81; Archbold's Crim. Plead., 15th ed., 54; 1 Stark Crim. Plead., 236; 1 Am. Cr. Law, 6th rev. ed., sect. 364; *Steel* v. *Smith,* 1 Barn. & Ald. 99."

[16] The principal dissent would reject the Court's rule as a "meaningless formalism," because it can conceive of hypothetical statutes that would comply with the rule and achieve the same result as the New Jersey statute.   *Post,* at 539–542.   While a State could, hypothetically, undertake to revise its entire criminal code in the manner the dissent suggests, *post,* at 540—extending all statutory maximum sentences to, for example, 50 years and giving judges guided discretion as to a few specially selected factors within that range—this possibility seems remote.   Among other reasons, structural democratic constraints exist to discourage legislatures from enacting penal statutes that expose *every* defendant convicted of, for example, weapons possession, to a maximum sentence exceeding that which is, in the legislature's judgment, generally proportional to the crime. This is as it should be.   Our rule ensures that a State is obliged "to make its choices concerning the substantive content of its criminal laws with full awareness of the consequences, unable to mask substantive policy choices"

Opinion of the Court

## V

The New Jersey statutory scheme that Apprendi asks us to invalidate allows a jury to convict a defendant of a second-degree offense based on its finding beyond a reasonable doubt that he unlawfully possessed a prohibited weapon; after a subsequent and separate proceeding, it then allows a judge to impose punishment identical to that New Jersey provides for crimes of the first degree, N. J. Stat. Ann. §2C:43–6(a)(1) (West 1999), based upon the judge's finding, by a preponderance of the evidence, that the defendant's "purpose" for unlawfully possessing the weapon was "to intimidate" his victim on the basis of a particular characteristic the victim possessed.   In light of the constitutional rule ex-

---

of exposing all who are convicted to the maximum sentence it provides. *Patterson* v. *New York*, 432 U. S., at 228–229, n. 13 (Powell, J., dissenting). So exposed, "[t]he political check on potentially harsh legislative action is then more likely to operate."   *Ibid.*

In all events, if such an extensive revision of the State's entire criminal code were enacted for the purpose the dissent suggests, or if New Jersey simply reversed the burden of the hate crime finding (effectively assuming a crime was performed with a purpose to intimidate and then requiring a defendant to prove that it was not, *post,* at 542), we would be required to question whether the revision was constitutional under this Court's prior decisions.   See *Patterson,* 432 U. S., at 210; *Mullaney* v. *Wilbur,* 421 U. S. 684, 698–702 (1975).

Finally, the principal dissent ignores the distinction the Court has often recognized, see, *e. g., Martin* v. *Ohio,* 480 U. S. 228 (1987), between facts in aggravation of punishment and facts in mitigation.   See *post,* at 541–542.   If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute.   If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme.

plained above, and all of the cases supporting it, this practice cannot stand.

New Jersey's defense of its hate crime enhancement statute has three primary components: (1) The required finding of biased purpose is not an "element" of a distinct hate crime offense, but rather the traditional "sentencing factor" of motive; (2) *McMillan* holds that the legislature can authorize a judge to find a traditional sentencing factor on the basis of a preponderance of the evidence; and (3) *Almendarez-Torres* extended *McMillan*'s holding to encompass factors that authorize a judge to impose a sentence beyond the maximum provided by the substantive statute under which a defendant is charged. None of these persuades us that the constitutional rule that emerges from our history and case law should incorporate an exception for this New Jersey statute.

New Jersey's first point is nothing more than a disagreement with the rule we apply today. Beyond this, we do not see how the argument can succeed on its own terms. The state high court evinced substantial skepticism at the suggestion that the hate crime statute's "purpose to intimidate" was simply an inquiry into "motive." We share that skepticism. The text of the statute requires the factfinder to determine whether the defendant possessed, at the time he committed the subject act, a "purpose to intimidate" on account of, *inter alia*, race. By its very terms, this statute mandates an examination of the defendant's state of mind—a concept known well to the criminal law as the defendant's *mens rea.*[17] It makes no difference in identifying the nature

---

[17] Among the most common definitions of *mens rea* is "criminal intent." Black's Law Dictionary 1137 (rev. 4th ed. 1968). That dictionary unsurprisingly defines "purpose" as synonymous with intent, *id.,* at 1400, and "intent" as, among other things, "a state of mind," *id.,* at 947. But we need not venture beyond New Jersey's own criminal code for a definition of purpose that makes it central to the description of a criminal offense. As the dissenting judge on the state appeals court pointed out, according to the New Jersey Criminal Code, "[a] person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object

Opinion of the Court

of this finding that Apprendi was also required, in order to
receive the sentence he did for weapons possession, to have
possessed the weapon with a "purpose to use [the weapon]
unlawfully against the person or property of another,"
§ 2C:39–4(a). A second *mens rea* requirement hardly de-
feats the reality that the enhancement statute imposes of its
own force an intent requirement necessary for the imposi-
tion of sentence. On the contrary, the fact that the language
and structure of the "purpose to use" criminal offense is
identical in relevant respects to the language and struc-
ture of the "purpose to intimidate" provision demonstrates
to us that it is precisely a particular criminal *mens rea* that
the hate crime enhancement statute seeks to target. The
defendant's intent in committing a crime is perhaps as
close as one might hope to come to a core criminal offense
"element." [18]

_____

to engage in conduct of that nature or to cause such a result." N. J. Stat.
Ann. § 2C:2–2(b)(1) (West 1999). The hate crime statute's application to
those who act "with a *purpose to intimidate* because of" certain status-
based characteristics places it squarely within the inquiry whether it was
a defendant's "conscious object" to intimidate for that reason.

[18] Whatever the effect of the State Supreme Court's comment that the
law here targets "motive," 159 N. J. 7, 20, 731 A. 2d 485, 492 (1999)—and it
is highly doubtful that one could characterize that comment as a "binding"
interpretation of the state statute, see *Wisconsin* v. *Mitchell,* 508 U. S., at
483–484 (declining to be bound by state court's characterization of state
law's "operative effect"), even if the court had not immediately thereafter
called into direct question its "ability to view this finding as merely a
search for motive," 159 N. J., at 21, 731 A. 2d, at 492—a State cannot
through mere characterization change the nature of the conduct actually
targeted. It is as clear as day that this hate crime law defines a particular
kind of prohibited *intent,* and a particular intent is more often than not
the *sine qua non* of a violation of a criminal law.

   When the principal dissent at long last confronts the actual statute at
issue in this case in the final few pages of its opinion, it offers in response
to this interpretation only that our reading is contrary to "settled prece-
dent" in *Mitchell. Post,* at 553. Setting aside the fact that Wisconsin's
hate crime statute was, in text and substance, different from New Jersey's,
*Mitchell* did not even begin to consider whether the Wisconsin hate crime

Opinion of the Court

The foregoing notwithstanding, however, the New Jersey Supreme Court correctly recognized that it does not matter whether the required finding is characterized as one of intent or of motive, because "[l]abels do not afford an acceptable answer." 159 N. J., at 20, 731 A. 2d, at 492. That point applies as well to the constitutionally novel and elusive distinction between "elements" and "sentencing factors." *McMillan*, 477 U. S., at 86 (noting that the sentencing factor—visible possession of a firearm—"might well have been included as an element of the enumerated offenses"). Despite what appears to us the clear "elemental" nature of the factor here, the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?[19]

As the New Jersey Supreme Court itself understood in rejecting the argument that the required "motive" finding was simply a "traditional" sentencing factor, proof of motive did not ordinarily "increase the penal consequences to an actor." 159 N. J., at 20, 731 A. 2d, at 492. Indeed, the effect of New Jersey's sentencing "enhancement" here is unquestionably to turn a second-degree offense into a first-degree offense, under the State's own criminal code. The law thus runs directly into our warning in *Mullaney* that *Winship* is

_____

requirement was an offense "element" or not; it did not have to—the required finding under the Wisconsin statute was made by the jury.

[19] This is not to suggest that the term "sentencing factor" is devoid of meaning. The term appropriately describes a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense. On the other hand, when the term "sentence enhancement" is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an "element" of the offense. See *post*, at 501–502 (THOMAS, J., concurring) (reviewing the relevant authorities).

Opinion of the Court

concerned as much with the category of substantive offense as "with the degree of criminal culpability" assessed.   421 U. S., at 698.   This concern flows not only from the historical pedigree of the jury and burden rights, but also from the powerful interests those rights serve.   The degree of criminal culpability the legislature chooses to associate with particular, factually distinct conduct has significant implications both for a defendant's very liberty, and for the heightened stigma associated with an offense the legislature has selected as worthy of greater punishment.

The preceding discussion should make clear why the State's reliance on *McMillan* is likewise misplaced.   The differential in sentence between what Apprendi would have received without the finding of biased purpose and what he could receive with it is not, it is true, as extreme as the difference between a small fine and mandatory life imprisonment. *Mullaney*, 421 U. S., at 700.   But it can hardly be said that the potential doubling of one's sentence—from 10 years to 20—has no more than a nominal effect.   Both in terms of absolute years behind bars, and because of the more severe stigma attached, the differential here is unquestionably of constitutional significance.   When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as "a tail which wags the dog of the substantive offense." *McMillan*, 477 U. S., at 88.

New Jersey would also point to the fact that the State did not, in placing the required biased purpose finding in a sentencing enhancement provision, create a "separate offense calling for a separate penalty." *Ibid.*   As for this, we agree wholeheartedly with the New Jersey Supreme Court that merely because the state legislature placed its hate crime sentence "enhancer" "within the sentencing provisions" of the criminal code "does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense."   159 N. J., at 20, 731 A. 2d, at 492.   Indeed,

Opinion of the Court

the fact that New Jersey, along with numerous other States, has also made precisely the same conduct the subject of an independent substantive offense makes it clear that the mere presence of this "enhancement" in a sentencing statute does not define its character.[20]

New Jersey's reliance on *Almendarez-Torres* is also unavailing. The reasons supporting an exception from the general rule for the statute construed in that case do not apply to the New Jersey statute. Whereas recidivism "does not relate to the commission of the offense" itself, 523 U. S., at 230, 244, New Jersey's biased purpose inquiry goes precisely to what happened in the "commission of the offense." Moreover, there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.

Finally, this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. *Walton* v. *Arizona*, 497 U. S. 639, 647–649 (1990); *id.*, at 709–714 (STEVENS, J., dissenting). For reasons we have explained, the capital cases are not controlling:

---

[20] Including New Jersey, N. J. Stat. Ann. § 2C:33–4 (West Supp. 2000) ("A person commits a crime of the fourth degree if in committing an offense [of harassment] under this section, he acted with a purpose to intimidate an individual or group of individuals because of race, color, religion, gender, handicap, sexual orientation or ethnicity"), 26 States currently have laws making certain acts of racial or other bias freestanding violations of the criminal law, see generally F. Lawrence, Punishing Hate: Bias Crimes Under American Law 178–189 (1999) (listing current state hate crime laws).

"Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense.  What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed . . . .  The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge." *Almendarez-Torres,* 523 U. S., at 257, n. 2 (SCALIA, J., dissenting) (emphasis deleted).

See also *Jones,* 526 U. S., at 250–251; *post,* at 520–522 (THOMAS, J., concurring).[21]

\*          \*          \*

The New Jersey procedure challenged in this case is an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system.  Accordingly, the judgment of the Supreme Court of New Jersey is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[21] The principal dissent, in addition, treats us to a lengthy disquisition on the benefits of determinate sentencing schemes, and the effect of today's decision on the federal Sentencing Guidelines.  *Post,* at 544–552. The Guidelines are, of course, not before the Court.  We therefore express no view on the subject beyond what this Court has already held.  See, *e. g., Edwards* v. *United States,* 523 U. S. 511, 515 (1998) (opinion of BREYER, J., for a unanimous court) (noting that "[o]f course, petitioners' statutory and constitutional claims would make a difference if it were possible to argue, say, that the sentences imposed exceeded the maximum that the statutes permit for a cocaine-only conspiracy.  That is because a maximum sentence set by statute trumps a higher sentence set forth in the Guidelines.  [United States Sentencing Commission, Guidelines Manual § 5G1.1 (Nov. 1994)]").

JUSTICE SCALIA, concurring.

I feel the need to say a few words in response to JUSTICE BREYER's dissent. It sketches an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. (Judges, it is sometimes necessary to remind ourselves, are part of the State—and an increasingly bureaucratic part of it, at that.) The founders of the American Republic were not prepared to leave it to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free.

As for fairness, which JUSTICE BREYER believes "[i]n modern times," *post,* at 555, the jury cannot provide: I think it not unfair to tell a prospective felon that if he commits his contemplated crime he is exposing himself to a jail sentence of 30 years—and that if, upon conviction, he gets anything less than that he may thank the mercy of a tenderhearted judge (just as he may thank the mercy of a tenderhearted parole commission if he is let out inordinately early, or the mercy of a tenderhearted governor if his sentence is commuted). Will there be disparities? Of course. But the criminal will never get *more* punishment than he bargained for when he did the crime, and his guilt of the crime (and hence the length of the sentence to which he is exposed) will be determined *beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens.*

In JUSTICE BREYER's bureaucratic realm of perfect equity, by contrast, the facts that determine the length of sentence to which the defendant is exposed will be determined to exist (on a more-likely-than-not basis) by a single employee of the State. It is certainly arguable (JUSTICE BREYER argues it) that this sacrifice of prior protections is worth it. But it is not arguable that, just because one thinks it is a better system, it must be, or is even more likely to be, the system envisioned by a Constitution that guarantees trial by jury. What ultimately demolishes the case for the dis-

senters is that they are unable to say what the right to trial by jury *does* guarantee if, as they assert, it does not guarantee—what it has been assumed to guarantee throughout our history—the right to have a jury determine those facts that determine the maximum sentence the law allows. They provide no coherent alternative.

JUSTICE BREYER proceeds on the erroneous and all-too-common assumption that the Constitution means what we think it ought to mean.   It does not; it means what it says. And the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial, by an impartial jury," has no intelligible content unless it means that all the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins as to Parts I and II, concurring.

I join the opinion of the Court in full.   I write separately to explain my view that the Constitution requires a broader rule than the Court adopts.

## I

This case turns on the seemingly simple question of what constitutes a "crime."   Under the Federal Constitution, "the accused" has the right (1) "to be informed of the nature and cause of the accusation" (that is, the basis on which he is accused of a crime), (2) to be "held to answer for a capital, or otherwise infamous crime" only on an indictment or presentment of a grand jury, and (3) to be tried by "an impartial jury of the State and district wherein the crime shall have been committed."   Amdts. 5 and 6.   See also Art. III, §2, cl. 3 ("The Trial of all Crimes . . . shall be by Jury").   With the exception of the Grand Jury Clause, see *Hurtado* v. *California*, 110 U. S. 516, 538 (1884), the Court has held that these protections apply in state prosecutions, *Herring* v. *New York*, 422 U. S. 853, 857, and n. 7 (1975).   Further, the Court has held that due process requires that the jury find

THOMAS, J., concurring

beyond a reasonable doubt every fact necessary to constitute the crime.  *In re Winship,* 397 U. S. 358, 364 (1970).

All of these constitutional protections turn on determining which facts constitute the "crime"—that is, which facts are the "elements" or "ingredients" of a crime.  In order for an accusation of a crime (whether by indictment or some other form) to be proper under the common law, and thus proper under the codification of the common-law rights in the Fifth and Sixth Amendments, it must allege all elements of that crime; likewise, in order for a jury trial of a crime to be proper, all elements of the crime must be proved to the jury (and, under *Winship,* proved beyond a reasonable doubt).  See J. Story, Commentaries on the Constitution §§ 928–929, pp. 660–662, § 934, p. 664 (1833); J. Archbold, Pleading and Evidence in Criminal Cases *41, *99–*100 (hereinafter Archbold).[1]

Thus, it is critical to know which facts are elements.  This question became more complicated following the Court's decision in *McMillan* v. *Pennsylvania,* 477 U. S. 79 (1986), which spawned a special sort of fact known as a sentencing enhancement.  See *ante,* at 478, 485, 494.  Such a fact increases a defendant's punishment but is not subject to the constitutional protections to which elements are subject.  JUSTICE O'CONNOR's dissent, in agreement with *McMillan* and *Almendarez-Torres* v. *United States,* 523 U. S. 224 (1998), takes the view that a legislature is free (within unspecified outer limits) to decree which facts are elements and which are sentencing enhancements.  *Post,* at 524.

Sentencing enhancements may be new creatures, but the question that they create for courts is not.  Courts have

_____

[1] JUSTICE O'CONNOR mischaracterizes my argument.  See *post,* at 527–528 (dissenting opinion).  Of course the Fifth and Sixth Amendments did not codify common-law procedure wholesale.  Rather, and as Story notes, they codified a few particular common-law procedural rights.  As I have explained, the scope of those rights turns on what constitutes a "crime." In answering that question, it is entirely proper to look to the common law.

THOMAS, J., concurring

long had to consider which facts are elements in order to determine the sufficiency of an accusation (usually an indictment). The answer that courts have provided regarding the accusation tells us what an element is, and it is then a simple matter to apply that answer to whatever constitutional right may be at issue in a case—here, *Winship* and the right to trial by jury. A long line of essentially uniform authority addressing accusations, and stretching from the earliest reported cases after the founding until well into the 20th century, establishes that the original understanding of which facts are elements was even broader than the rule that the Court adopts today.

This authority establishes that a "crime" includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment). Thus, if the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact—of whatever sort, including the fact of a prior conviction—the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime. Similarly, if the legislature, rather than creating grades of crimes, has provided for setting the punishment of a crime based on some fact—such as a fine that is proportional to the value of stolen goods—that fact is also an element. No multifactor parsing of statutes, of the sort that we have attempted since *McMillan*, is necessary. One need only look to the kind, degree, or range of punishment to which the prosecution is by law entitled for a given set of facts. Each fact necessary for that entitlement is an element.

## II

### A

Cases from the founding to roughly the end of the Civil War establish the rule that I have described, applying it to

502                 APPRENDI *v.* NEW JERSEY

THOMAS, J., concurring

all sorts of facts, including recidivism.   As legislatures varied common-law crimes and created new crimes, American courts, particularly from the 1840's on, readily applied to these new laws the common-law understanding that a fact that is by law the basis for imposing or increasing punishment is an element.[2]

Massachusetts, which produced the leading cases in the antebellum years, applied this rule as early as 1804, in *Commonwealth* v. *Smith,* 1 Mass. *245, and foreshadowed the fuller discussion that was to come.   Smith was indicted for and found guilty of larceny, but the indictment failed to allege the value of all of the stolen goods.   Massachusetts had abolished the common-law distinction between grand and simple larceny, replacing it with a single offense of larceny whose punishment (triple damages) was based on the value of the stolen goods.   The prosecutor relied on this abolition of the traditional distinction to justify the indictment's omissions.   The court, however, held that it could not sentence the defendant for the stolen goods whose value was not set out in the indictment.   *Id.,* at *246–*247.

The understanding implicit in *Smith* was explained in *Hope* v. *Commonwealth,* 50 Mass. 134 (1845).   Hope was indicted for and convicted of larceny.   The larceny statute at

---

[2] It is strange that JUSTICE O'CONNOR faults me for beginning my analysis with cases primarily from the 1840's, rather from the time of the founding.   See *post,* at 527–528 (dissenting opinion).   As the Court explains, *ante,* at 478–480, and as she concedes, *post,* at 525 (O'CONNOR, J., dissenting), the very idea of a sentencing enhancement was foreign to the common law of the time of the founding.   JUSTICE O'CONNOR therefore, and understandably, does not contend that any history from the founding supports her position.   As far as I have been able to tell, the argument that a fact that was by law the basis for imposing or increasing punishment might not be an element did not seriously arise (at least not in reported cases) until the 1840's.   As I explain below, from that time on—for at least a century—essentially all authority rejected that argument, and much of it did so in reliance upon the common law.   I find this evidence more than sufficient.

THOMAS, J., concurring

issue retained the single-offense structure of the statute addressed in *Smith*, and established two levels of sentencing based on whether the value of the stolen property exceeded $100.  The statute was structured similarly to the statutes that we addressed in *Jones* v. *United States*, 526 U. S. 227, 230 (1999), and, even more, *Castillo* v. *United States, ante*, at 122, in that it first set out the core crime and then, in subsequent clauses, set out the ranges of punishments.[3] Further, the statute opened by referring simply to "the offence of larceny," suggesting, at least from the perspective of our post-*McMillan* cases, that larceny was the crime whereas the value of the stolen property was merely a fact for sentencing.  But the matter was quite simple for the Massachusetts high court.  Value was an element because punishment varied with value:

> "Our statutes, it will be remembered, prescribe the punishment for larceny, with reference to the value of the property stolen; and for this reason, as well as because it is in conformity with long established practice, the court are of opinion that the value of the property alleged to be stolen must be set forth in the indictment." 50 Mass., at 137.

Two years after *Hope*, the court elaborated on this rule in a case involving burglary, stating that if "certain acts are, by force of the statutes, made punishable with greater severity, when accompanied with aggravating circumstances," then

---

[3] The Massachusetts statute provided: "Every person who shall commit the offence of larceny, by stealing of the property of another any money, goods or chattels [or other sort of property], if the property stolen shall exceed the value of one hundred dollars, shall be punished by imprisonment in the state prison, not more than five years, or by fine not exceeding six hundred dollars, and imprisonment in the county jail, not more than two years; and if the property stolen shall not exceed the value of one hundred dollars, he shall be punished by imprisonment in the state prison or the county jail, not more than one year, or by fine not exceeding three hundred dollars."  Mass. Rev. Stat., ch. 126, § 17 (1836).

THOMAS, J., concurring

the statute has "creat[ed] two grades of crime." *Larned* v. *Commonwealth,* 53 Mass. 240, 242 (1847). See also *id.,* at 241 ("[T]here is a gradation of offences of the same species" where the statute sets out "various degrees of punishment").

Conversely, where a fact was *not* the basis for punishment, that fact was, for that reason, not an element. Thus, in *Commonwealth* v. *McDonald,* 59 Mass. 365 (1850), which involved an indictment for attempted larceny from the person, the court saw no error in the failure of the indictment to allege any value of the goods that the defendant had attempted to steal. The defendant, in challenging the indictment, apparently relied on *Smith* and *Hope,* and the court rejected his challenge by explaining that "[a]s the punishment . . . does not depend on the amount stolen, there was no occasion for any allegation as to value in this indictment." 59 Mass., at 367. See *Commonwealth* v. *Burke,* 94 Mass. 182, 183 (1866) (applying same reasoning to completed larceny from the person; finding no trial error where value was not proved to jury).

Similar reasoning was employed by the Wisconsin Supreme Court in *Lacy* v. *State,* 15 Wis. *13 (1862), in interpreting a statute that was also similar to the statutes at issue in *Jones* and *Castillo.* The statute, in a single paragraph, outlawed arson of a dwelling house at night. Arson that killed someone was punishable by life in prison; arson that did not kill anyone was punishable by 7 to 14 years in prison; arson of a house in which no person was lawfully dwelling was punishable by 3 to 10 years.[4] The court had no trouble

---

[4]The Wisconsin statute provided: "Every person who shall willfully and maliciously burn, in the night time, the dwelling house of another, whereby the life of any person shall be destroyed, or shall in the night time willfully and maliciously set fire to any other building, owned by himself or another, by the burning whereof such dwelling house shall be burnt in the night time, whereby the life of any person shall be destroyed, shall suffer the same punishment as provided for the crime of murder in the second degree; but if the life of no person shall have been destroyed, he shall be punished by imprisonment in the state prison, not more than fourteen

Thomas, J., concurring

concluding that the statute "creates three distinct statutory offenses," 15 Wis., at \*15, and that the lawful presence of a person in the dwelling was an element of the middle offense. The court reasoned from the gradations of punishment: "That the legislature considered the circumstance that a person was lawfully in the dwelling house when fire was set to it most material and important, and as greatly aggravating the crime, is clear from the severity of the punishment imposed." *Id.*, at \*16. The "aggravating circumstances" created "the higher statutory offense[s]." *Id.*, at \*17. Because the indictment did not allege that anyone had been present in the dwelling, the court reversed the defendant's 14-year sentence, but, relying on *Larned, supra,* the court remanded to permit sentencing under the lowest grade of the crime (which was properly alleged in the indictment). 15 Wis., at \*17.

Numerous other state and federal courts in this period took the same approach to determining which facts are elements of a crime. See *Ritchey* v. *State,* 7 Blackf. 168, 169 (Ind. 1844) (citing *Commonwealth* v. *Smith,* 1 Mass. \*245 (1804), and holding that indictment for arson must allege value of property destroyed, because statute set punishment based on value); *Spencer* v. *State,* 13 Ohio 401, 406, 408 (1844) (holding that value of goods intended to be stolen is not "an ingredient of the crime" of burglary with intent to steal, because punishment under statute did not depend on value; contrasting larceny, in which "[v]alue must be laid, and value proved, that the jury may find it, and the court, by that means, know whether it is grand or petit, and apply the grade of punishment the statute awards"); *United States* v. *Fisher,* 25 F. Cas. 1086 (CC Ohio 1849) (McLean, J.) ("A car-

---

years nor less than seven years; and if at the time of committing the offense there was no person lawfully in the dwelling house so burnt, he shall be punished by imprisonment in the state prison, not more than ten years nor less than three years." Wis. Rev. Stat., ch. 165, § 1 (1858). The punishment for second-degree murder was life in prison. Ch. 164, § 2.

Case 1:23-cv-01059-JE-JPM   Document 8-2   Filed 11/16/23   Page 83 of 258 PageID #:  628

rier of the mail is subject to a higher penalty where he steals
a letter out of the mail, which contains an article of value.
And when this offense is committed, the indictment must
allege the letter contained an article of value, which aggra-
vates the offense and incurs a higher penalty"); *Brightwell
v. State*, 41 Ga. 482, 483 (1871) ("When the law prescribes a
different punishment for different phases of the same crime,
there is good reason for requiring the indictment to specify
which of the phases the prisoner is charged with.   The rec-
ord ought to show that the defendant is convicted of the
offense for which he is sentenced").   Cf. *State* v. *Farr*, 12
Rich. 24, 29 (S. C. App. 1859) (where two statutes barred pur-
chasing corn from a slave, and one referred to purchasing
from slave who lacked a permit, absence of permit was not
an element, because both statutes had the same punishment).

Also demonstrating the common-law approach to deter-
mining elements was the well-established rule that, if a
statute increased the punishment of a common-law crime,
whether felony or misdemeanor, based on some fact, then
that fact must be charged in the indictment in order for the
court to impose the increased punishment.   Archbold *106;
see *id.*, at *50; *ante*, at 480–481.   There was no question of
treating the statutory aggravating fact as merely a sen-
tencing enhancement—as a nonelement enhancing the sen-
tence of the common-law crime.   The aggravating fact was
an element of a new, aggravated grade of the common-law
crime simply because it increased the punishment of the
common-law crime.   And the common-law crime was, in re-
lation to the statutory one, essentially just like any other
lesser included offense.   See Archbold *106.

Further evidence of the rule that a crime includes every
fact that is by law a basis for imposing or increasing punish-
ment comes from early cases addressing recidivism statutes.
As JUSTICE SCALIA has explained, there was a tradition of
treating recidivism as an element.   See *Almendarez-Torres*,
523 U. S., at 256–257, 261 (dissenting opinion).   That tradi-

THOMAS, J., concurring

tion stretches back to the earliest years of the Republic. See, *e. g., Commonwealth* v. *Welsh,* 4 Va. 57 (1817); *Smith* v. *Commonwealth,* 14 Serg. & Rawle 69 (Pa. 1826); see also Archbold *695–*696. For my purposes, however, what is noteworthy is not so much the fact of that tradition as the reason for it: Courts treated the fact of a prior conviction just as any other fact that increased the punishment by law. By the same reasoning that the courts employed in *Hope, Lacy,* and the other cases discussed above, the fact of a prior conviction was an element, together with the facts constituting the core crime of which the defendant was charged, of a new, aggravated crime.

The two leading antebellum cases on whether recidivism is an element were *Plumbly* v. *Commonwealth,* 43 Mass. 413 (1841), and *Tuttle* v. *Commonwealth,* 68 Mass. 505 (1854). In the latter, the court explained the reason for treating as an element the fact of the prior conviction:

> "When the statute imposes a higher penalty upon a second and third conviction, respectively, it makes the prior conviction of a similar offence a part of the description and character of the offence intended to be punished; and therefore the fact of such prior conviction must be charged, as well as proved. It is essential to an indictment, that the facts constituting the offence intended to be punished should be averred." *Id.,* at 506.

The court rested this rule on the common law and the Massachusetts equivalent of the Sixth Amendment's Notice Clause. *Ibid.* See also *Commonwealth* v. *Haynes,* 107 Mass. 194, 198 (1871) (reversing sentence, upon confession of error by attorney general, in case similar to *Tuttle*).

Numerous other cases treating the fact of a prior conviction as an element of a crime take the same view. They make clear, by both their holdings and their language, that when a statute increases punishment for some core crime based on the fact of a prior conviction, the core crime and

the fact of the prior crime together create a new, aggravated crime. *Kilbourn* v. *State*, 9 Conn. 560, 563 (1833) ("No person ought to be, or can be, subjected to a cumulative penalty, without being charged with a cumulative offence"); *Plumbly, supra,* at 414 (conviction under recidivism statute is "one conviction, upon one aggregate offence"); *Hines* v. *State,* 26 Ga. 614, 616 (1859) (reversing enhanced sentence imposed by trial judge and explaining: "[T]he question, whether the offence was a second one, or not, was a question for the jury. . . . The allegation [of a prior offence] is certainly one of the first importance to the accused, for if it is true, he becomes subject to a greatly increased punishment"). See also *Commonwealth* v. *Phillips,* 28 Mass. 28, 33 (1831) ("[U]pon a third conviction, the court may sentence the convict to hard labor for life. The punishment is to be awarded upon that conviction, and for the offence of which he is then and there convicted").

Even the exception to this practice of including the fact of a prior conviction in the indictment and trying it to the jury helps to prove the rule that that fact is an element because it increases the punishment by law. In *State* v. *Freeman,* 27 Vt. 523 (1855), the Vermont Supreme Court upheld a statute providing that, in an indictment or complaint for violation of a liquor law, it was not necessary to allege a prior conviction of that law in order to secure an increased sentence. But the court did not hold that the prior conviction was not an element; instead, it held that the liquor law created only minor offenses that did not qualify as crimes. Thus, the state constitutional protections that would attach were a "crime" at issue did not apply. *Id.,* at 527; see *Goeller* v. *State,* 119 Md. 61, 66–67, 85 A. 954, 956 (1912) (discussing *Freeman*). At the same time, the court freely acknowledged that it had "no doubt" of the general rule, particularly as articulated in Massachusetts, that "it is necessary to allege the former conviction, in the indictment, when a higher

THOMAS, J., concurring

sentence is claimed on that account." *Freeman, supra,* at 526. Unsurprisingly, then, a leading treatise explained *Freeman* as only "apparently" contrary to the general rule and as involving a "special statute." 3 F. Wharton, Criminal Law § 3417, p. 307, n. *r* (7th rev. ed. 1874) (hereinafter Wharton). In addition, less than a decade after *Freeman,* the same Vermont court held that if a defendant charged with a successive violation of the liquor laws contested identity—that is, whether the person in the record of the prior conviction was the same as the defendant—he should be permitted to have a jury resolve the question. *State* v. *Haynes,* 35 Vt. 570, 572–573 (1863). (*Freeman* itself had anticipated this holding by suggesting the use of a jury to resolve disputes over identity. See 27 Vt., at 528.) In so holding, *Haynes* all but applied the general rule, since a determination of identity was usually the chief factual issue whenever recidivism was charged. See Archbold *695–*696; see also, *e. g., Graham* v. *West Virginia,* 224 U. S. 616, 620–621 (1912) (defendant had been convicted under three different names).[5]

---

[5] Some courts read *State* v. *Smith,* 8 Rich. 460 (S. C. App. 1832), a South Carolina case, to hold that the indictment need not allege a prior conviction in order for the defendant to suffer an enhanced punishment. See, *e. g., State* v. *Burgett,* 22 Ark. 323, 324 (1860) (so reading *Smith* and questioning its correctness). The *Smith* court's holding was somewhat unclear because the court did not state whether the case involved a first or second offense—if a first, the court was undoubtedly correct in rejecting the defendant's challenge to the indictment, because there is no need in an indictment to negate the existence of any prior offense. See *Burgett, supra,* at 324 (reading indictment that was silent about prior offenses as only charging first offense and as sufficient for that purpose). In addition, the *Smith* court did not acknowledge the possibility of disputes over identity. Finally, the extent to which the court's apparent holding was followed in practice in South Carolina is unclear, and subsequent South Carolina decisions acknowledged that *Smith* was out of step with the general rule. See *State* v. *Parris,* 89 S. C. 140, 141, 71 S. E. 808, 809 (1911); *State* v. *Mitchell,* 220 S. C. 433, 434–436, 68 S. E. 2d 350, 351–352 (1951).

### B

An 1872 treatise by one of the leading authorities of the era in criminal law and procedure confirms the common-law understanding that the above cases demonstrate. The treatise condensed the traditional understanding regarding the indictment, and thus regarding the elements of a crime, to the following: "[T]he indictment must allege whatever is in law essential to the punishment sought to be inflicted." 1 J. Bishop, Law of Criminal Procedure 50 (2d ed. 1872) (hereinafter Bishop, Criminal Procedure). See *id.,* § 81, at 51 ("[T]he indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted"); *id.,* § 540, at 330 ("[T]he indictment must . . . contain an averment of every particular thing which enters into the punishment"). Crimes, he explained, consist of those "acts to which the law affixes . . . punishment," *id.,* § 80, at 51, or, stated differently, a crime consists of the whole of "the wrong upon which the punishment is based," *id.,* § 84, at 53. In a later edition, Bishop similarly defined the elements of a crime as "that wrongful aggregation out of which the punishment proceeds." 1 J. Bishop, New Criminal Procedure § 84, p. 49 (4th ed. 1895).

Bishop grounded his definition in both a generalization from well-established common-law practice, 1 Bishop, Criminal Procedure §§ 81–84, at 51–53, and in the provisions of Federal and State Constitutions guaranteeing notice of an accusation in all criminal cases, indictment by a grand jury for serious crimes, and trial by jury. With regard to the common law, he explained that his rule was "not made apparent to our understandings by a single case only, but by all the cases," *id.,* § 81, at 51, and was followed "in all cases, without one exception," *id.,* § 84, at 53. To illustrate, he observed that there are

> "various statutes whereby, when . . . assault is committed with a particular intent, or with a particular

THOMAS, J., concurring

weapon, or the like, it is subjected to a particular corre-
sponding punishment, heavier than that for common as-
sault, or differing from it, pointed out by the statute.
And the reader will notice that, in all cases where the
peculiar or aggravated punishment is to be inflicted, the
peculiar or aggravating matter is required to be set out
in the indictment." *Id.*, § 82, at 52.

He also found burglary statutes illustrative in the same way.
*Id.*, § 83, at 52–53. Bishop made no exception for the fact
of a prior conviction—he simply treated it just as any other
aggravating fact: "[If] it is sought to make the sentence
heavier by reason of its being [a second or third offence], the
fact thus relied on must be averred in the indictment; be-
cause the rules of criminal procedure require the indictment,
in all cases, to contain an averment of every fact essential to
the punishment sought to be inflicted." 1 J. Bishop, Com-
mentaries on Criminal Law § 961, pp. 564–565 (5th ed. 1872).

The constitutional provisions provided further support, in
his view, because of the requirements for a proper accusa-
tion at common law and because of the common-law under-
standing that a proper jury trial required a proper accusa-
tion: "The idea of a jury trial, as it has always been known
where the common law prevails, includes the allegation, as
part of the machinery of the trial . . . . [A]n accusation
which lacks any particular fact which the law makes essen-
tial to the punishment is . . . no accusation within the require-
ments of the common law, and it is no accusation in reason."
1 Bishop, Criminal Procedure § 87, at 55. See *id.*, § 88, at
56 (notice and indictment requirements ensure that before
"persons held for crimes . . . shall be convicted, there
shall be an allegation made against them of every element
of crime which the law makes essential to the punishment
to be inflicted").

Numerous high courts contemporaneously and explicitly
agreed that Bishop had accurately captured the common-law
understanding of what facts are elements of a crime. See,

*e. g., Hobbs* v. *State,* 44 Tex. 353, 354 (1875) (favorably quoting 1 Bishop, Criminal Procedure § 81); *Maguire* v. *State,* 47 Md. 485, 497 (1878) (approvingly citing different Bishop treatise for the same rule); *Larney* v. *Cleveland,* 34 Ohio St. 599, 600 (1878) (rule and reason for rule "are well stated by Mr. Bishop"); *State* v. *Hayward,* 83 Mo. 299, 307 (1884) (extensively quoting § 81 of Bishop's "admirable treatise"); *Riggs* v. *State,* 104 Ind. 261, 262, 3 N. E. 886, 887 (1885) ("We agree with Mr. Bishop that the nature and cause of the accusation are not stated where there is no mention of the full act or series of acts for which the punishment is to be inflicted" (internal quotation marks omitted)); *State* v. *Perley,* 86 Me. 427, 431, 30 A. 74, 75 (1894) ("'The doctrine of the court, says Mr. Bishop, is identical with that of reason, viz: that the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted" (internal quotation marks omitted)); see also *United States* v. *Reese,* 92 U. S. 214, 232–233 (1876) (Clifford, J., concurring in judgment) (citing and paraphrasing 1 Bishop, Criminal Procedure § 81).

<div align="center">C</div>

In the half century following publication of Bishop's treatise, numerous courts applied his statement of the common-law understanding; most of them explicitly relied on his treatise. Just as in the earlier period, every fact that was by law a basis for imposing or increasing punishment (including the fact of a prior conviction) was an element. Each such fact had to be included in the accusation of the crime and proved to the jury.

Courts confronted statutes quite similar to the ones with which we have struggled since *McMillan,* and, applying the traditional rule, they found it not at all difficult to determine whether a fact was an element. In *Hobbs, supra,* the defendant was indicted for a form of burglary punishable by 2 to 5 years in prison. A separate statutory section provided for an increased sentence, up to double the punishment

to which the defendant would otherwise be subject, if the entry into the house was effected by force exceeding that incidental to burglary. The trial court instructed the jury to sentence the defendant to 2 to 10 years if it found the requisite level of force, and the jury sentenced him to 3. The Texas Supreme Court, relying on Bishop, reversed because the indictment had not alleged such force; even though the jury had sentenced Hobbs within the range (2 to 5 years) that was permissible under the lesser crime that the indictment had charged, the court thought it "impossible to say . . . that the erroneous charge of the court may not have had some weight in leading the jury" to impose the sentence that it did. 44 Tex., at 355.[6]  See also *Searcy* v. *State*, 1 Tex. App. 440, 444 (1876) (similar); *Garcia* v. *State*, 19 Tex. App. 389, 393 (1885) (not citing *Hobbs*, but relying on Bishop to reverse 10-year sentence for assault with a bowie knife or dagger, where statute doubled range for assault from 2 to 7 to 4 to 14 years if the assault was committed with either weapon but where indictment had not so alleged).

As in earlier cases, such as *McDonald* (discussed *supra*, at 504), courts also used the converse of the Bishop rule to explain when a fact was not an element of the crime. In *Perley, supra*, the defendant was indicted for and convicted of robbery, which was punishable by imprisonment for life

---

[6]The gulf between the traditional approach to determining elements and that of our recent cases is manifest when one considers how one might, from the perspective of those cases, analyze the issue in *Hobbs*. The chapter of the Texas code addressing burglary was entitled simply "Of Burglary" and began with a section explicitly defining "the offense of burglary." After a series of sections defining terms, it then set out six separate sections specifying the punishment for various kinds of burglary. The section regarding force was one of these. See 1 G. Paschal, Digest of Laws of Texas, Part II, Tit. 20, ch. 6, pp. 462–463 (4th ed. 1875). Following an approach similar to that in *Almendarez-Torres* v. *United States*, 523 U. S. 224, 231–234, 242–246 (1998), and *Castillo* v. *United States*, ante, at 124–125, one would likely find a clear legislative intent to make force a sentencing enhancement rather than an element.

or any term of years.   The court, relying on Bishop, *Hope,*
*McDonald,* and other authority, rejected his argument that
Maine's Notice Clause (which of course required all elements
to be alleged) required the indictment to allege the value
of the goods stolen, because the punishment did not turn on
value: "[T]here is no provision of this statute which makes
the amount of property taken an essential element of the
offense; and there is no statute in this State which creates
degrees in robbery, or in any way makes the punishment of
the offense dependent upon the value of the property taken."
86 Me., at 432, 30 A., at 75.   The court further explained
that "where the value is not essential to the punishment it
need not be distinctly alleged or proved."   *Id.,* at 433, 30 A.,
at 76.

   Reasoning similar to *Perley* and the Texas cases is evident
in other cases as well.   See *Jones* v. *State,* 63 Ga. 141, 143
(1879) (where punishment for burglary in the day is 3 to 5
years in prison and for burglary at night is 5 to 20, time of
burglary is a "constituent of the offense"; indictment should
"charge all that is requisite to render plain and certain every
constituent of the offense"); *United States* v. *Woodruff,* 68 F.
536, 538 (Kan. 1895) (where embezzlement statute "contem-
plates that there should be an ascertainment of the exact
sum for which a fine may be imposed" and jury did not deter-
mine amount, judge lacked authority to impose fine; "[o]n
such an issue the defendant is entitled to his constitutional
right of trial by jury").

   Courts also, again just as in the pre-Bishop period, applied
the same reasoning to the fact of a prior conviction as they
did to any other fact that aggravated the punishment by law.
Many, though far from all, of these courts relied on Bishop.
In 1878, Maryland's high court, in *Maguire* v. *State,* 47 Md.
485, stated the rule and the reason for it in language indistin-
guishable from that of *Tuttle* a quarter century before:

      "The law would seem to be well settled, that if the party
      be proceeded against for a second or third offence under

the statute, and the sentence prescribed be different from the first, or severer, by reason of its being such second or third offence, the fact thus relied on must be averred in the indictment; for the settled rule is, that the indictment must contain an averment of every fact essential to justify the punishment inflicted." *Maguire, supra,* at 496 (citing English cases, *Plumbly* v. *Commonwealth,* 43 Mass. 413 (1841), Wharton, and Bishop).

In *Goeller* v. *State,* 119 Md. 61, 85 A. 954 (1912), the same court reaffirmed *Maguire* and voided, as contrary to Maryland's Notice Clause, a statute that permitted the trial judge to determine the fact of a prior conviction. The court extensively quoted Bishop, who had, in the court's view, treated the subject "more fully, perhaps, than any other legal writer," and it cited, among other authorities, "a line of Massachusetts decisions" and *Riggs* (quoted *supra,* at 512). 119 Md., at 66, 85 A., at 955. In *Larney,* 34 Ohio St., at 600–601, the Supreme Court of Ohio, in an opinion citing only Bishop, reversed a conviction under a recidivism statute where the indictment had not alleged any prior conviction. (The defendant had also relied on *Plumbly, supra,* and *Kilbourn* v. *State,* 9 Conn. 560 (1833). 34 Ohio St., at 600.) And in *State* v. *Adams,* 64 N. H. 440, 13 A. 785 (1888), the court, relying on Bishop, explained that "[t]he former conviction being a part of the description and character of the offense intended to be punished, because of the higher penalty imposed, it must be alleged." *Id.,* at 442, 13 A., at 786. The defendant had been "charged with an offense aggravated by its repetitious character." *Ibid.* See also *Evans* v. *State,* 150 Ind. 651, 653, 50 N. E. 820 (1898) (similar); *Shiflett* v. *Commonwealth,* 114 Va. 876, 877, 77 S. E. 606, 607 (1913) (similar).

Even without any reliance on Bishop, other courts addressing recidivism statutes employed the same reasoning as did he and the above cases—that a crime includes any fact to which punishment attaches. One of the leading cases was

THOMAS, J., concurring

*Wood* v. *People*, 53 N. Y. 511 (1873).  The statute in *Wood* provided for increased punishment if the defendant had previously been convicted of a felony then discharged from the conviction.  The court, repeatedly referring to "the aggravated offence," *id.*, at 513, 515, held that the facts of the prior conviction and of the discharge must be proved to the jury, for "[b]oth enter into and make a part of the offence . . . subjecting the prisoner to the increased punishment." *Id.*, at 513; see *ibid.* (fact of prior conviction was an "essential ingredient" of the offense).  See also *Johnson* v. *People*, 55 N. Y. 512, 514 (1874) ("A more severe penalty is denounced by the statute for a second offence; and all the facts to bring the case within the statute must be [alleged in the indictment and] established on the trial"); *People* v. *Sickles*, 156 N. Y. 541, 544–545, 51 N. E. 288, 289 (1898) (reaffirming *Wood* and *Johnson* and explaining that "the charge is not merely that the prisoner has committed the offense specifically described, but that, as a former convict, his second offense has subjected him to an enhanced penalty").

Contemporaneously with the New York Court of Appeals in *Wood* and *Johnson*, state high courts in California and Pennsylvania offered similar explanations for why the fact of a prior conviction is an element.  In *People* v. *Delany*, 49 Cal. 394 (1874), which involved a statute making petit larceny (normally a misdemeanor) a felony if committed following a prior conviction for petit larceny, the court left no doubt that the fact of the prior conviction was an element of an aggravated crime consisting of petit larceny committed following a prior conviction for petit larceny:

> "The particular circumstances of the offense are stated [in the indictment], and consist of the prior convictions and of the facts constituting the last larceny.
>
> .          .          .          .          .
>
> "[T]he former convictions are made to adhere to and constitute a portion of the aggravated offense." *Id.*, at 395.

THOMAS, J., concurring

> "The felony consists both of the former convictions and
> of the particular larceny. . . . [T]he former convictions
> were a separate fact; which, taken in connection with
> the facts constituting the last offense, make a distinct
> and greater offense than that charged, exclusive of the
> prior convictions."  *Id.*, at 396.[7]

See also *People* v. *Coleman*, 145 Cal. 609, 610–611, 79 P. 283,
284–285 (1904).

Similarly, in *Rauch* v. *Commonwealth*, 78 Pa. 490 (1876),
the court applied its 1826 decision in *Smith* v. *Commonwealth*, 14 Serg. & Rawle 69, and reversed the trial court's
imposition of an enhanced sentence "upon its own knowledge
of its records."  78 Pa., at 494.  The court explained that
"imprisonment in jail is not a lawful consequence of a mere
conviction for an unlawful sale of liquors.  It is the lawful
consequence of a second sale only after a former conviction.
On every principle of personal security and the due administration of justice, the fact which gives rightfulness to the
greater punishment should appear in the record."  *Ibid.*
See also *id.*, at 495 ("But clearly the substantive offence,
which draws to itself the greater punishment, is the unlawful
sale after a former conviction.  This, therefore, is the very
offence he is called upon to defend against").

Meanwhile, Massachusetts reaffirmed its earlier decisions,
striking down, in *Commonwealth* v. *Harrington*, 130 Mass.
35 (1880), a liquor law that provided a small fine for a first
or second conviction, provided a larger fine or imprisonment
up to a year for a third conviction, and specifically provided
that a prior conviction need not be alleged in the complaint.
The court found this law plainly inconsistent with *Tuttle* and
with the State's Notice Clause, explaining that "the offence
which is punishable with the higher penalty is not fully and

---

[7] The court held that a general plea of "guilty" to an indictment that
includes an allegation of a prior conviction applies to the fact of the prior
conviction.

THOMAS, J., concurring

substantially described to the defendant, if the complaint fails to set forth the former convictions which are essential features of it."   130 Mass., at 36.[8]

Without belaboring the point any further, I simply note that this traditional understanding—that a "crime" includes every fact that is by law a basis for imposing or increasing punishment—continued well into the 20th century, at least until the middle of the century.   See Knoll & Singer, Searching for the "Tail of the Dog": Finding "Elements" of Crimes in the Wake of *McMillan v. Pennsylvania*, 22 Seattle U. L. Rev. 1057, 1069–1081 (1999) (surveying 20th-century decisions of federal courts prior to *McMillan*); see also *People v. Ratner*, 67 Cal. App. 2d Supp. 902, 903–906, 153 P. 2d 790, 791–793 (1944).   In fact, it is fair to say that *McMillan* began a revolution in the law regarding the definition of "crime."   Today's decision, far from being a sharp break with the past, marks nothing more than a return to the *status quo ante*—the status quo that reflected the original meaning of the Fifth and Sixth Amendments.

### III

The consequence of the above discussion for our decisions in *Almendarez-Torres* and *McMillan* should be plain enough, but a few points merit special mention.

---

[8] See also *State* v. *Austin*, 113 Mo. 538, 542, 21 S. W. 31, 32 (1893) (prior conviction is a "material fac[t]" of the "aggravated offense"); *Bandy* v. *Hehn*, 10 Wyo. 167, 172–174, 67 P. 979, 980 (1902) ("[I]n reason, and by the great weight of authority, as the fact of a former conviction enters into the offense to the extent of aggravating it and increasing the punishment, it must be alleged in the information and proved like any other material fact, if it is sought to impose the greater penalty.   The statute makes the prior conviction a part of the description and character of the offense intended to be punished" (citing *Tuttle* v. *Commonwealth*, 68 Mass. 505 (1854))); *State* v. *Smith*, 129 Iowa 709, 711–712, 106 N. W. 187, 188–189 (1906) (similar); *State* v. *Scheminisky*, 31 Idaho 504, 506–507, 174 P. 611, 611–612 (1918) (similar).

First, it is irrelevant to the question of which facts are elements that legislatures have allowed sentencing judges discretion in determining punishment (often within extremely broad ranges). See *ante,* at 481–482; *post,* at 544–545 (O'CONNOR, J., dissenting). Bishop, immediately after setting out the traditional rule on elements, explained why:

> "The reader should distinguish between the foregoing doctrine, and the doctrine . . . that, within the limits of any discretion as to the punishment which the law may have allowed, the judge, when he pronounces sentence, may suffer his discretion to be influenced by matter shown in aggravation or mitigation, not covered by the allegations of the indictment. . . . The aggravating circumstances spoken of cannot swell the penalty above what the law has provided for the acts charged against the prisoner, and they are interposed merely to check the judicial discretion in the exercise of the permitted mercy [in finding mitigating circumstances]. This is an entirely different thing from punishing one for what is not alleged against him." 1 Bishop, Criminal Procedure § 85, at 54.

See also 1 J. Bishop, New Commentaries on the Criminal Law §§ 600–601, pp. 370–371, § 948, p. 572 (8th ed. 1892) (similar). In other words, establishing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed are two different things.[9]

---

[9] This is not to deny that there may be laws on the borderline of this distinction. In *Brightwell* v. *State,* 41 Ga. 482 (1871), the court stated a rule for elements equivalent to Bishop's, then held that whether a defendant had committed arson in the day or at night need not be in the indictment. The court explained that there was "no provision that arson in the night shall be punished for any different period" than arson in the day (both being punishable by 2 to 7 years in prison). *Id.,* at 483. Although there was a statute providing that "arson in the day time shall be punished for a less period than arson in the night time," the court concluded that it merely set "a rule for the exercise of [the sentencing

Cf. 4 W. Blackstone, Commentaries on the Law of England 371–372 (1769) (noting judges' broad discretion in setting amount of fine and length of imprisonment for misdemeanors, but praising determinate punishment and "discretion . . . regulated by law"); *Perley,* 86 Me., at 429, 432, 30 A., at 74, 75–76 (favorably discussing Bishop's rule on elements without mentioning, aside from quotation of statute in statement of facts, that defendant's conviction for robbery exposed him to imprisonment for life or any term of years). Thus, it is one thing to consider what the Constitution requires the prosecution to do in order to entitle itself to a particular kind, degree, or range of punishment of the accused, see *Woodruff,* 68 F., at 538, and quite another to consider what constitutional constraints apply either to the imposition of punishment within the limits of that entitlement or to a legislature's ability to set broad ranges of punishment. In answering the former constitutional question, I need not, and do not, address the latter.

Second, and related, one of the chief errors of *Almendarez-Torres*—an error to which I succumbed—was to attempt to discern whether a particular fact is traditionally (or typically) a basis for a sentencing court to increase an offender's sentence. 523 U. S., at 243–244; see *id.,* at 230, 241. For the

judge's] discretion" by specifying a particular fact for the judge to consider along with the many others that would enter into his sentencing decision. *Ibid.* Cf. *Jones* v. *State,* 63 Ga. 141, 143 (1879) (whether burglary occurred in day or at night is a "constituent of the offense" because law fixes different ranges of punishment based on this fact). And the statute attached no definite consequence to that particular fact: A sentencing judge presumably could have imposed a sentence of seven years less one second for daytime arson. Finally, it is likely that the statute in *Brightwell,* given its language ("a less period") and its placement in a separate section, was read as setting out an affirmative defense or mitigating circumstance. See *Wright* v. *State,* 113 Ga. App. 436, 437–438, 148 S. E. 2d 333, 335–336 (1966) (suggesting that it would be error to refuse to charge later version of this statute to jury upon request of defendant). See generally Archbold *52, *105–*106 (discussing rules for determining whether fact is an element or a defense).

reasons I have given, it should be clear that this approach just defines away the real issue. What matters is the way by which a fact enters into the sentence. If a fact is by law the basis for imposing or increasing punishment—for establishing or increasing the prosecution's entitlement—it is an element. (To put the point differently, I am aware of no historical basis for treating as a nonelement a fact that by law sets or increases punishment.) When one considers the question from this perspective, it is evident why the fact of a prior conviction is an element under a recidivism statute. Indeed, cases addressing such statutes provide some of the best discussions of what constitutes an element of a crime. One reason frequently offered for treating recidivism differently, a reason on which we relied in *Almendarez-Torres,* *supra,* at 235, is a concern for prejudicing the jury by informing it of the prior conviction. But this concern, of which earlier courts were well aware, does not make the traditional understanding of what an element is any less applicable to the fact of a prior conviction. See, *e. g., Maguire,* 47 Md., at 498; *Sickles,* 156 N. Y., at 547, 51 N. E., at 290.[10]

Third, I think it clear that the common-law rule would cover the *McMillan* situation of a mandatory minimum sentence (in that case, for visible possession of a firearm during the commission of certain crimes). No doubt a defendant could, under such a scheme, find himself sentenced to the same term to which he could have been sentenced absent the mandatory minimum. The range for his underlying crime

---

[10] In addition, it has been common practice to address this concern by permitting the defendant to stipulate to the prior conviction, in which case the charge of the prior conviction is not read to the jury, or, if the defendant decides not to stipulate, to bifurcate the trial, with the jury only considering the prior conviction after it has reached a guilty verdict on the core crime. See, *e. g.,* 1 J. Bishop, Criminal Law § 964, pp. 566–567 (5th ed. 1872) (favorably discussing English practice of bifurcation); *People* v. *Saunders,* 5 Cal. 4th 580, 587–588, 853 P. 2d 1093, 1095–1096 (1993) (detailing California approach, since 1874, of permitting stipulation and, more recently, of also permitting bifurcation).

522                    APPRENDI *v.* NEW JERSEY

THOMAS, J., concurring

could be 0 to 10 years, with the mandatory minimum of 5
years, and he could be sentenced to 7.   (Of course, a similar
scenario is possible with an increased maximum.)   But it is
equally true that his expected punishment has increased as
a result of the narrowed range and that the prosecution is
empowered, by invoking the mandatory minimum, to require
the judge to impose a higher punishment than he might wish.
The mandatory minimum "entitl[es] the government," *Wood-
ruff, supra,* at 538, to more than it would otherwise be enti-
tled (5 to 10 years, rather than 0 to 10 and the risk of a
sentence below 5).   Thus, the fact triggering the mandatory
minimum is part of "the punishment sought to be inflicted,"
Bishop, Criminal Procedure 50; it undoubtedly "enters into
the punishment" so as to aggravate it, *id.,* § 540, at 330, and
is an "ac[t] to which the law affixes . . . punishment," *id.,* § 80,
at 51.   Further, just as in *Hobbs* and *Searcy,* see *supra,* at
512–513, it is likely that the change in the range available to
the judge affects his choice of sentence.   Finally, in numer-
ous cases, such as *Lacy, Garcia,* and *Jones,* see *supra,* at
504–505, 514, the aggravating fact raised the whole range—
both the top and bottom.   Those courts, in holding that such
a fact was an element, did not bother with any distinction
between changes in the maximum and the minimum.   What
mattered was simply the overall increase in the punishment
provided by law.   And in several cases, such as *Smith*
and *Woodruff,* see *supra,* at 502, 514, the very concept of
maximums and minimums had no applicability, yet the same
rule for elements applied.   See also *Harrington* (discussed
*supra,* at 517–518).

Finally, I need not in this case address the implications of
the rule that I have stated for the Court's decision in *Walton*
v. *Arizona,* 497 U. S. 639, 647–649 (1990).   See *ante,* at 496.
*Walton* did approve a scheme by which a judge, rather than
a jury, determines an aggravating fact that makes a convict
eligible for the death penalty, and thus eligible for a greater
punishment.   In this sense, that fact is an element.   But
that scheme exists in a unique context, for in the area of cap-

O'CONNOR, J., dissenting

ital punishment, unlike any other area, we have imposed special constraints on a legislature's ability to determine what facts shall lead to what punishment—we have restricted the legislature's ability to define crimes. Under our recent capital-punishment jurisprudence, neither Arizona nor any other jurisdiction could provide—as, previously, it freely could and did—that a person shall be death eligible automatically upon conviction for certain crimes. We have interposed a barrier between a jury finding of a capital crime and a court's ability to impose capital punishment. Whether this distinction between capital crimes and all others, or some other distinction, is sufficient to put the former outside the rule that I have stated is a question for another day.[11]

\*          \*          \*

For the foregoing reasons, as well as those given in the Court's opinion, I agree that the New Jersey procedure at issue is unconstitutional.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE BREYER join, dissenting.

Last Term, in *Jones* v. *United States*, 526 U. S. 227 (1999), this Court found that our prior cases suggested the following principle: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.*, at 243, n. 6. At the time, JUSTICE KENNEDY rightly criticized the Court for its failure to ex-

---

[11] It is likewise unnecessary to consider whether (and, if so, how) the rule regarding elements applies to the Sentencing Guidelines, given the unique status that they have under *Mistretta* v. *United States*, 488 U. S. 361 (1989). But it may be that this special status is irrelevant, because the Guidelines "have the force and effect of laws." *Id.*, at 413 (SCALIA, J., dissenting).

plain the origins, contours, or consequences of its purported constitutional principle; for the inconsistency of that principle with our prior cases; and for the serious doubt that the holding cast on sentencing systems employed by the Federal Government and States alike. *Id.,* at 254, 264–272 (dissenting opinion). Today, in what will surely be remembered as a watershed change in constitutional law, the Court imposes as a constitutional rule the principle it first identified in *Jones.*

## I

Our Court has long recognized that not every fact that bears on a defendant's punishment need be charged in an indictment, submitted to a jury, and proved by the government beyond a reasonable doubt. Rather, we have held that the "legislature's definition of the elements of the offense is usually dispositive." *McMillan* v. *Pennsylvania,* 477 U. S. 79, 85 (1986); see also *Almendarez-Torres* v. *United States,* 523 U. S. 224, 228 (1998); *Patterson* v. *New York,* 432 U. S. 197, 210, 211, n. 12 (1977). Although we have recognized that "there are obviously constitutional limits beyond which the States may not go in this regard," *id.,* at 210, and that "in certain limited circumstances *Winship*'s reasonable-doubt requirement applies to facts not formally identified as elements of the offense charged," *McMillan, supra,* at 86, we have proceeded with caution before deciding that a certain fact must be treated as an offense element despite the legislature's choice not to characterize it as such. We have therefore declined to establish any bright-line rule for making such judgments and have instead approached each case individually, sifting through the considerations most relevant to determining whether the legislature has acted properly within its broad power to define crimes and their punishments or instead has sought to evade the constitutional requirements associated with the characterization of a fact as an offense element. See, *e. g., Monge* v. *California,* 524 U. S. 721, 728–729 (1998); *McMillan, supra,* at 86.

O'CONNOR, J., dissenting

In one bold stroke the Court today casts aside our traditional cautious approach and instead embraces a universal and seemingly bright-line rule limiting the power of Congress and state legislatures to define criminal offenses and the sentences that follow from convictions thereunder.   The Court states: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Ante*, at 490.   In its opinion, the Court marshals virtually no authority to support its extraordinary rule.   Indeed, it is remarkable that the Court cannot identify a *single instance*, in the over 200 years since the ratification of the Bill of Rights, that our Court has applied, as a constitutional requirement, the rule it announces today.

According to the Court, its constitutional rule "emerges from our history and case law."  *Ante*, at 492.   None of the history contained in the Court's opinion requires the rule it ultimately adopts.   The history cited by the Court can be divided into two categories: first, evidence that judges at common law had virtually no discretion in sentencing, *ante*, at 478–480, and, second, statements from a 19th-century criminal procedure treatise that the government must charge in an indictment and prove at trial the elements of a statutory offense for the defendant to be sentenced to the punishment attached to that statutory offense, *ante*, at 480–481.   The relevance of the first category of evidence can be easily dismissed.   Indeed, the Court does not even claim that the historical evidence of nondiscretionary sentencing at common law supports its "increase in the maximum penalty" rule.   Rather, almost as quickly as it recites that historical practice, the Court rejects its relevance to the constitutional question presented here due to the conflicting American practice of judges exercising sentencing discretion and our decisions recognizing the legitimacy of that American practice.   See *ante*, at 481–482 (citing *Williams* v. *New York*, 337 U. S. 241, 246 (1949)).   Even if the Court were to

claim that the common-law history on this point did bear on the instant case, one wonders why the historical practice of judges pronouncing judgments in cases between private parties is relevant at all to the question of criminal punishment presented here. See *ante,* at 479–480 (quoting 3 W. Blackstone, Commentaries on the Laws of England 396 (1768), which pertains to "remed[ies] prescribed by law for the redress of injuries").

Apparently, then, the historical practice on which the Court places so much reliance consists of only two quotations taken from an 1862 criminal procedure treatise. See *ante,* at 480–481 (quoting J. Archbold, Pleading and Evidence in Criminal Cases 51, 188 (15th ed. 1862)). A closer examination of the two statements reveals that neither supports the Court's "increase in the maximum penalty" rule. Both of the excerpts pertain to circumstances in which a common-law felony had also been made a separate statutory offense carrying a greater penalty. Taken together, the statements from the Archbold treatise demonstrate nothing more than the unremarkable proposition that a defendant could receive the greater statutory punishment only if the indictment expressly charged and the prosecutor proved the facts that made up the statutory offense, as opposed to simply those facts that made up the common-law offense. See *id.,* at 51 (indictment); *id.,* at 188 (proof). In other words, for the defendant to receive the statutory punishment, the prosecutor had to charge in the indictment and prove at trial *the elements* of the statutory offense. To the extent there is any doubt about the precise meaning of the treatise excerpts, that doubt is dispelled by looking to the treatise sections from which the excerpts are drawn and the broader principle each section is meant to illustrate. See *id.,* at 43 ("Every offence consists of certain acts done or omitted under certain circumstances; and in an indictment for the offence, it is not sufficient to charge the defendant generally with having committed it, . . . but all the facts and circumstances constituting

O'CONNOR, J., dissenting

the offence must be specially set forth"); *id.*, at 180 ("Every offence consists of certain acts done or omitted, under certain circumstances, all of which must be stated in the indictment . . . and be proved as laid"). And, to the extent further clarification is needed, the authority cited by the Archbold treatise to support its stated proposition with respect to the requirements of an indictment demonstrates that the treatise excerpts mean only that the prosecutor must charge and then prove at trial *the elements* of the statutory offense. See 2 M. Hale, Pleas of the Crown *170 (hereinafter Hale) ("An indictment grounded upon an offense made by act of parliament must by express words bring the offense within the substantial description made in the act of parliament"). No Member of this Court questions the proposition that a State must charge in the indictment and prove at trial beyond a reasonable doubt the actual elements of the offense. This case, however, concerns the distinct question of when a fact that bears on a defendant's punishment, but which the legislature has not classified as an element of the charged offense, must nevertheless be treated as an offense element. The excerpts drawn from the Archbold treatise do not speak to this question at all. The history on which the Court's opinion relies provides no support for its "increase in the maximum penalty" rule.

In his concurring opinion, JUSTICE THOMAS cites additional historical evidence that, in his view, dictates an even broader rule than that set forth in the Court's opinion. The history cited by JUSTICE THOMAS does not require, as a matter of federal constitutional law, the application of the rule he advocates. To understand why, it is important to focus on the basis for JUSTICE THOMAS' argument. First, he claims that the Fifth and Sixth Amendments "codified" preexisting common law. Second, he contends that the relevant common law treated any fact that served to increase a defendant's punishment as an element of an offense. See *ante,* at 500–501. Even if JUSTICE THOMAS' first assertion were

correct—a proposition this Court has not before embraced—he fails to gather the evidence necessary to support his second assertion. Indeed, for an opinion that purports to be founded upon the original understanding of the Fifth and Sixth Amendments, JUSTICE THOMAS' concurrence is notable for its failure to discuss any historical practice, or to cite any decisions, predating (or contemporary with) the ratification of the Bill of Rights. Rather, JUSTICE THOMAS divines the common-law understanding of the Fifth and Sixth Amendment rights by consulting decisions rendered by American courts well after the ratification of the Bill of Rights, ranging primarily from the 1840's to the 1890's. Whatever those decisions might reveal about the way American state courts resolved questions regarding the distinction between a crime and its punishment under general rules of criminal pleading or their own state constitutions, the decisions fail to demonstrate any settled understanding with respect to the definition of a crime under the relevant, pre-existing common law. Thus, there is a crucial disconnect between the historical evidence JUSTICE THOMAS cites and the proposition he seeks to establish with that evidence.

An examination of the decisions cited by JUSTICE THOMAS makes clear that they did not involve a simple application of a long-settled common-law rule that any fact that increases punishment must constitute an offense element. That would have been unlikely, for there does not appear to have been any such common-law rule. The most relevant common-law principles in this area were that an indictment must charge the elements of the relevant offense and must do so with certainty. See, *e. g.*, 2 Hale *182 ("Touching the thing wherein or of which the offense is committed, there is required a certainty in an indictment"); *id.*, at *183 ("The fact itself must be certainly set down in an indictment"); *id.*, at *184 ("The offense itself must be alledged, and the manner of it"). Those principles, of course, say little about when a specific fact constitutes an element of the offense.

O'CONNOR, J., dissenting

JUSTICE THOMAS is correct to note that American courts
in the 19th century came to confront this question in their
cases, and often treated facts that served to increase punish-
ment as elements of the relevant statutory offenses.  To the
extent JUSTICE THOMAS' broader rule can be drawn from
those decisions, the rule was one of those courts' own inven-
tion, and not a previously existing rule that would have been
"codified" by the ratification of the Fifth and Sixth Amend-
ments.  Few of the decisions cited by JUSTICE THOMAS indi-
cate a reliance on pre-existing common-law principles.  In
fact, the converse rule that he identifies in the 19th-century
American cases—that a fact that does not make a differ-
ence in punishment need not be charged in an indictment,
see, *e. g., Larned* v. *Commonwealth,* 53 Mass. 240, 242–244
(1847)—was assuredly created by American courts, given
that English courts of roughly the same period followed a
contrary rule.  See, *e. g., Rex* v. *Marshall,* 1 Moody C. C.
158, 168 Eng. Rep. 1224 (1827).  JUSTICE THOMAS' collection
of state-court opinions is therefore of marginal assistance in
determining the original understanding of the Fifth and
Sixth Amendments.  While the decisions JUSTICE THOMAS
cites provide some authority for the rule he advocates, they
certainly do not control our resolution of the *federal consti-
tutional* question presented in the instant case and cannot,
standing alone, justify overruling three decades' worth of
decisions by this Court.

In contrast to JUSTICE THOMAS, the Court asserts that its
rule is supported by "our cases in this area."  *Ante,* at 490.
That the Court begins its review of our precedent with a
quotation from a dissenting opinion speaks volumes about
the support that actually can be drawn from our cases for
the "increase in the maximum penalty" rule announced
today.  See *ante,* at 484 (quoting *Almendarez-Torres,* 523
U. S., at 251 (SCALIA, J., dissenting)).  The Court then cites
our decision in *Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), to
demonstrate the "lesson" that due process and jury protec-

tions extend beyond those factual determinations that affect a defendant's guilt or innocence. *Ante,* at 484. The Court explains *Mullaney* as having held that the due process proof-beyond-a-reasonable-doubt requirement applies to those factual determinations that, under a State's criminal law, make a difference in the degree of punishment the defendant receives. *Ante,* at 484. The Court chooses to ignore, however, the decision we issued two years later, *Patterson* v. *New York,* 432 U. S. 197 (1977), which clearly rejected the Court's broad reading of *Mullaney.*

In *Patterson,* the jury found the defendant guilty of second-degree murder. Under New York law, the fact that a person intentionally killed another while under the influence of extreme emotional disturbance distinguished the reduced offense of first-degree manslaughter from the more serious offense of second-degree murder. Thus, the presence or absence of this one fact was the defining factor separating a greater from a lesser punishment. Under New York law, however, the State did not need to prove the absence of extreme emotional disturbance beyond a reasonable doubt. Rather, state law imposed the burden of proving the presence of extreme emotional disturbance on the defendant, and required that the fact be proved by a preponderance of the evidence. 432 U. S., at 198–200. We rejected Patterson's due process challenge to his conviction:

> "We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused. Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch." *Id.,* at 210.

O'CONNOR, J., dissenting

Although we characterized the factual determination under New York law as one going to the mitigation of culpability, *id.*, at 206, as opposed to the aggravation of the punishment, it is difficult to understand why the rule adopted by the Court in today's case (or the broader rule advocated by JUS-TICE THOMAS) would not require the overruling of *Patterson.* Unless the Court is willing to defer to a legislature's formal definition of the elements of an offense, it is clear that the fact that Patterson did not act under the influence of extreme emotional disturbance, in substance, "increase[d] the penalty for [his] crime beyond the prescribed statutory maximum" for first-degree manslaughter. *Ante,* at 490. Nonetheless, we held that New York's requirement that the defendant, rather than the State, bear the burden of proof on this factual determination comported with the Fourteenth Amendment's Due Process Clause. *Patterson,* 432 U. S., at 205–211, 216; see also *id.*, at 204–205 (reaffirming *Leland* v. *Oregon,* 343 U. S. 790 (1952), which upheld against due process challenge Oregon's requirement that the defendant, rather than the State, bear the burden on factual determination of defendant's insanity).

*Patterson* is important because it plainly refutes the Court's expansive reading of *Mullaney.* Indeed, the defendant in *Patterson* characterized *Mullaney* exactly as the Court has today and we *rejected* that interpretation:

> "*Mullaney*'s holding, it is argued, is that the State may not permit the blameworthiness of an act *or the severity of punishment authorized for its commission* to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt. In our view, the *Mullaney* holding should not be so broadly read." *Patterson, supra,* at 214–215 (emphasis added) (footnote omitted).

We explained *Mullaney* instead as holding only "that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense." 432 U. S., at 215. Because nothing had been presumed against Patterson under New York law, we found no due process violation. *Id.,* at 216. Ever since our decision in *Patterson,* we have consistently explained the holding in *Mullaney* in these limited terms and have rejected the broad interpretation the Court gives *Mullaney* today. See *Jones,* 526 U. S., at 241 ("We identified the use of a presumption to establish an essential ingredient of the offense as the curse of the Maine law [in *Mullaney*]"); *Almendarez-Torres,* 523 U. S., at 240 ("*[Mullaney]* suggests that Congress cannot permit judges to increase a sentence in light of recidivism, or any other factor, not set forth in an indictment and proved to a jury beyond a reasonable doubt. This Court's later case, *Patterson* v. *New York,* . . . however, makes absolutely clear that such a reading of *Mullaney* is wrong"); *McMillan,* 477 U. S., at 84 (same).

The case law from which the Court claims that its rule emerges consists of only one other decision—*McMillan* v. *Pennsylvania.* The Court's reliance on *McMillan* is also puzzling, given that our holding in that case points to the rejection of the Court's rule. There, we considered a Pennsylvania statute that subjected a defendant to a mandatory minimum sentence of five years' imprisonment if a judge found, by a preponderance of the evidence, that the defendant had visibly possessed a firearm during the commission of the offense for which he had been convicted. *Id.,* at 81. The petitioners claimed that the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's jury trial guarantee (as incorporated by the Fourteenth Amendment) required the State to prove to the jury beyond a reasonable

doubt that they had visibly possessed firearms. We rejected both constitutional claims. *Id.*, at 84–91, 93.

The essential holding of *McMillan* conflicts with at least two of the several formulations the Court gives to the rule it announces today. First, the Court endorses the following principle: "'[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts *that increase the prescribed range of penalties* to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.'" *Ante*, at 490 (emphasis added) (quoting *Jones, supra*, at 252–253 (STEVENS, J., concurring)). Second, the Court endorses the rule as restated in JUSTICE SCALIA's concurring opinion in *Jones*. See *ante*, at 490. There, JUSTICE SCALIA wrote: "[I]t is unconstitutional to remove from the jury the assessment of facts *that alter the congressionally prescribed range of penalties* to which a criminal defendant is exposed." *Jones, supra*, at 253 (emphasis added). Thus, the Court appears to hold that any fact that increases or alters *the range* of penalties to which a defendant is exposed—which, by definition, must include increases or alterations to either the minimum or maximum penalties—must be proved to a jury beyond a reasonable doubt. In *McMillan*, however, we rejected such a rule to the extent it concerned those facts that increase or alter the minimum penalty to which a defendant is exposed. Accordingly, it is incumbent on the Court not only to admit that it is overruling *McMillan*, but also to explain why such a course of action is appropriate under normal principles of *stare decisis.*

The Court's opinion does neither. Instead, it attempts to lay claim to *McMillan* as support for its "increase in the maximum penalty" rule. According to the Court, *McMillan* acknowledged that permitting a judge to make findings that expose a defendant to greater or additional punishment "may raise serious constitutional concern." *Ante*, at 486. We said nothing of the sort in *McMillan*. To the contrary, we

began our discussion of the petitioners' constitutional claims by emphasizing that we had already "rejected the claim that whenever a State links the 'severity of punishment' to 'the presence or absence of an identified fact' the State must prove that fact beyond a reasonable doubt." 477 U. S., at 84 (quoting *Patterson,* 432 U. S., at 214). We then reaffirmed the rule set forth in *Patterson*—"that in determining what facts must be proved beyond a reasonable doubt the state legislature's definition of the elements of the offense is usually dispositive." *McMillan,* 477 U. S., at 85. Although we acknowledged that there are constitutional limits to the State's power to define crimes and prescribe penalties, we found no need to establish those outer boundaries in *McMillan* because "several factors" persuaded us that the Pennsylvania statute did not exceed those limits, however those limits might be defined. *Id.,* at 86. The Court's assertion that *McMillan* supports the application of its bright-line rule in this area is, therefore, unfounded.

The Court nevertheless claims to find support for its rule in our discussion of one factor in *McMillan*—namely, our statement that the petitioners' claim would have had "at least more superficial appeal" if the firearm possession finding had exposed them to greater or additional punishment. *Id.,* at 88. To say that a claim may have had "more superficial appeal" is, of course, a far cry from saying that a claim would have been upheld. Moreover, we made that statement in the context of examining one of several factors that, in combination, ultimately gave "no doubt that Pennsylvania's [statute fell] on the permissible side of the constitutional line." *Id.,* at 91. The confidence of that conclusion belies any argument that our ruling would have been different had the Pennsylvania statute instead increased the maximum penalty to which the petitioners were exposed. In short, it is clear that we did not articulate any bright-line rule that States must prove to a jury beyond a reasonable doubt any fact that exposes a defendant to a greater punishment.

O'CONNOR, J., dissenting

Such a rule would have been in substantial tension with both our earlier acknowledgment that *Patterson* rejected such a rule, see 477 U. S., at 84, and our recognition that a state legislature's definition of the elements is normally dispositive, see *id.,* at 85.  If any single rule can be derived from *McMillan,* it is not the Court's "increase in the maximum penalty" principle, but rather the following: When a State takes a fact that has always been considered by sentencing courts to bear on punishment, and dictates the precise weight that a court should give that fact in setting a defendant's sentence, the relevant fact need not be proved to a jury beyond a reasonable doubt as would an element of the offense.  See *id.,* at 89–90.

Apart from *Mullaney* and *McMillan,* the Court does not claim to find support for its rule in any other pre-*Jones* decision.  Thus, the Court is in error when it says that its rule emerges from our case law.  Nevertheless, even if one were willing to assume that *Mullaney* and *McMillan* lend some support for the Court's position, that feeble foundation is shattered by several of our precedents directly addressing the issue.  The only one of those decisions that the Court addresses at any length is *Almendarez-Torres.*  There, we squarely rejected the "increase in the maximum penalty" rule: "Petitioner also argues, in essence, that this Court should simply adopt a rule that any significant increase in a statutory maximum sentence would trigger a constitutional 'elements' requirement.  We have explained why we believe the Constitution, as interpreted in *McMillan* and earlier cases, does not impose that requirement."  523 U. S., at 247.  Whether *Almendarez-Torres* directly refuted the "increase in the maximum penalty" rule was extensively debated in *Jones,* and that debate need not be repeated here.  See 526 U. S., at 248–249; *id.,* at 268–270 (KENNEDY, J., dissenting).  I continue to agree with JUSTICE KENNEDY that *Almendarez-Torres* constituted a clear repudiation of the rule the Court adopts today.  See *Jones, supra,* at 268 (dis-

senting opinion). My understanding is bolstered by *Monge* v. *California,* a decision relegated to a footnote by the Court today. In *Monge,* in reasoning essential to our holding, we reiterated that "the Court has rejected an absolute rule that an enhancement constitutes an element of the offense any time that it increases the maximum sentence to which a defendant is exposed." 524 U. S., at 729 (citing *Almendarez-Torres*). At the very least, *Monge* demonstrates that *Almendarez-Torres* was not an "exceptional departure" from "historic practice." *Ante,* at 487.

Of all the decisions that refute the Court's "increase in the maximum penalty" rule, perhaps none is as important as *Walton* v. *Arizona,* 497 U. S. 639 (1990). There, a jury found Walton, the petitioner, guilty of first-degree murder. Under Arizona law, a trial court conducts a separate sentencing hearing to determine whether a defendant convicted of first-degree murder should receive the death penalty or life imprisonment. See *id.,* at 643 (citing Ariz. Rev. Stat. Ann. § 13–703(B) (1989)). At that sentencing hearing, the judge, rather than the jury, must determine the existence or nonexistence of the statutory aggravating and mitigating factors. See *Walton,* 497 U. S., at 643 (quoting § 13–703(B)). The Arizona statute directs the judge to "'impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in [the statute] and that there are no mitigating circumstances sufficiently substantial to call for leniency.'" *Id.,* at 644 (quoting § 13–703(E)). Thus, under Arizona law, a defendant convicted of first-degree murder can be sentenced to death *only if* the judge finds the existence of a statutory aggravating factor.

Walton challenged the Arizona capital sentencing scheme, arguing that the Constitution requires that the jury, and not the judge, make the factual determination of the existence or nonexistence of the statutory aggravating factors. We rejected that contention: "'Any argument that the Constitution requires that a jury impose the sentence of death or

O'CONNOR, J., dissenting

make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court.'"   *Id.*, at 647 (quoting *Clemons* v. *Mississippi*, 494 U. S. 738, 745 (1990)).   Relying in part on our decisions rejecting challenges to Florida's capital sentencing scheme, which also provided for sentencing by the trial judge, we added that "'the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury.'"   *Walton, supra,* at 648 (quoting *Hildwin* v. *Florida*, 490 U. S. 638, 640–641 (1989) *(per curiam)).*

While the Court can cite no decision that would require its "increase in the maximum penalty" rule, *Walton* plainly rejects it.   Under Arizona law, the fact that a statutory aggravating circumstance exists in the defendant's case "'increases the maximum penalty for [the] crime'" of first-degree murder to death.   *Ante,* at 476 (quoting *Jones, supra,* at 243, n. 6).   If the judge does not find the existence of a statutory aggravating circumstance, the maximum punishment authorized by the jury's guilty verdict is life imprisonment.   Thus, using the terminology that the Court itself employs to describe the constitutional fault in the New Jersey sentencing scheme presented here, under Arizona law, the judge's finding that a statutory aggravating circumstance exists "exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone."   *Ante,* at 483 (emphasis in original).   Even JUSTICE THOMAS, whose vote is necessary to the Court's opinion today, agrees on this point.   See *ante,* at 522 (concurring opinion).   If a State can remove from the jury a factual determination that makes the difference between life and death, as *Walton* holds that it can, it is inconceivable why a State cannot do the same with respect to a factual determination that results in only a 10-year increase in the maximum sentence to which a defendant is exposed.

O'CONNOR, J., dissenting

The distinction of *Walton* offered by the Court today is baffling, to say the least. The key to that distinction is the Court's claim that, in Arizona, the jury makes all of the findings necessary to expose the defendant to a death sentence. See *ante*, at 496–497 (quoting *Almendarez-Torres*, 523 U. S., at 257, n. 2 (SCALIA, J., dissenting)). As explained above, that claim is demonstrably untrue. A defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty. Indeed, at the time *Walton* was decided, the author of the Court's opinion today understood well the issue at stake. See *Walton*, 497 U. S., at 709 (STEVENS, J., dissenting) ("[U]nder Arizona law, as construed by Arizona's highest court, a first-degree murder is not punishable by a death sentence until at least one statutory aggravating circumstance has been proved"). In any event, the extent of our holding in *Walton* should have been perfectly obvious from the face of our decision. We upheld the Arizona scheme specifically on the ground that the Constitution does not require the jury to make the factual findings that serve as the "'prerequisite to imposition of [a death] sentence,'" *id.*, at 647 (quoting *Clemons, supra,* at 745), or "'the specific findings authorizing the imposition of the sentence of death,'" *Walton, supra,* at 648 (quoting *Hildwin, supra,* at 640–641). If the Court does not intend to overrule *Walton*, one would be hard pressed to tell from the opinion it issues today.

The distinction of *Walton* offered by JUSTICE THOMAS is equally difficult to comprehend. According to JUSTICE THOMAS, because the Constitution requires state legislatures to narrow sentencing discretion in the capital punishment context, facts that expose a convicted defendant to a capital sentence may be different from all other facts that expose a defendant to a more severe sentence. See *ante*, at 522–523.

JUSTICE THOMAS gives no specific reason for excepting capital defendants from the constitutional protections he would extend to defendants generally, and none is readily apparent. If JUSTICE THOMAS means to say that the Eighth Amendment's restriction on a state legislature's ability to define capital crimes should be compensated for by permitting States more leeway under the Fifth and Sixth Amendments in proving an aggravating fact necessary to a capital sentence, his reasoning is without precedent in our constitutional jurisprudence.

In sum, the Court's statement that its "increase in the maximum penalty" rule emerges from the history and case law that it cites is simply incorrect. To make such a claim, the Court finds it necessary to rely on irrelevant historical evidence, to ignore our controlling precedent *(e. g., Patterson)*, and to offer unprincipled and inexplicable distinctions between its decision and previous cases addressing the same subject in the capital sentencing context *(e. g., Walton)*. The Court has failed to offer any meaningful justification for deviating from years of cases both suggesting and holding that application of the "increase in the maximum penalty" rule is not required by the Constitution.

## II

That the Court's rule is unsupported by the history and case law it cites is reason enough to reject such a substantial departure from our settled jurisprudence. Significantly, the Court also fails to explain adequately why the Due Process Clauses of the Fifth and Fourteenth Amendments and the jury trial guarantee of the Sixth Amendment require application of its rule. Upon closer examination, it is possible that the Court's "increase in the maximum penalty" rule rests on a meaningless formalism that accords, at best, marginal protection for the constitutional rights that it seeks to effectuate.

Any discussion of either the constitutional necessity or the likely effect of the Court's rule must begin, of course, with an understanding of what exactly that rule is. As was the case in *Jones*, however, that discussion is complicated here by the Court's failure to clarify the contours of the constitutional principle underlying its decision. See *Jones*, 526 U. S., at 267 (KENNEDY, J., dissenting). In fact, there appear to be several plausible interpretations of the constitutional principle on which the Court's decision rests.

For example, under one reading, the Court appears to hold that the Constitution requires that a fact be submitted to a jury and proved beyond a reasonable doubt only if that fact, as a formal matter, extends the range of punishment *beyond the prescribed statutory maximum.* See, *e. g., ante,* at 490. A State could, however, remove from the jury (and subject to a standard of proof below "beyond a reasonable doubt") the assessment of those facts that define narrower ranges of punishment, *within the overall statutory range,* to which the defendant may be sentenced. See, *e. g., ante,* at 494, n. 19. Thus, apparently New Jersey could cure its sentencing scheme, and achieve virtually the same results, by drafting its weapons possession statute in the following manner: First, New Jersey could prescribe, in the weapons possession statute itself, a range of 5 to 20 years' imprisonment for one who commits that criminal offense. Second, New Jersey could provide that only those defendants convicted under the statute who are found by a judge, by a preponderance of the evidence, to have acted with a purpose to intimidate an individual on the basis of race may receive a sentence greater than 10 years' imprisonment.

The Court's proffered distinction of *Walton* v. *Arizona* suggests that it means to announce a rule of only this limited effect. The Court claims the Arizona capital sentencing scheme is consistent with the constitutional principle underlying today's decision because Arizona's first-degree murder statute itself authorizes both life imprisonment and

O'CONNOR, J., dissenting

the death penalty. See Ariz. Rev. Stat. Ann. § 13–1105(C) (1989). "'[O]nce a *jury* has found the defendant *guilty* of *all the elements* of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed.'" *Ante*, at 497 (emphasis in original) (quoting *Almendarez-Torres*, 523 U. S., at 257, n. 2 (SCALIA, J., dissenting)). Of course, as explained above, an Arizona sentencing judge can impose the maximum penalty of death only if the judge first makes a statutorily required finding that at least one aggravating factor exists in the defendant's case. Thus, the Arizona first-degree murder statute authorizes a maximum penalty of death only in a formal sense. In real terms, however, the Arizona sentencing scheme removes from the jury the assessment of a fact that determines whether the defendant can receive that maximum punishment. The only difference, then, between the Arizona scheme and the New Jersey scheme we consider here—apart from the magnitude of punishment at stake—is that New Jersey has not prescribed the 20-year maximum penalty in the same statute that it defines the crime to be punished. It is difficult to understand, and the Court does not explain, why the Constitution would require a state legislature to follow such a meaningless and formalistic difference in drafting its criminal statutes.

Under another reading of the Court's decision, it may mean only that the Constitution requires that a fact be submitted to a jury and proved beyond a reasonable doubt if it, as a formal matter, *increases* the range of punishment *beyond that which could legally be imposed absent that fact.* See, *e. g., ante*, at 482–483, 490. A State could, however, remove from the jury (and subject to a standard of proof below "beyond a reasonable doubt") the assessment of those facts that, as a formal matter, *decrease* the range of punishment *below that which could legally be imposed absent that fact.* Thus, consistent with our decision in *Patterson*, New

O'CONNOR, J., dissenting

Jersey could cure its sentencing scheme, and achieve virtually the same results, by drafting its weapons possession statute in the following manner: First, New Jersey could prescribe, in the weapons possession statute itself, a range of 5 to 20 years' imprisonment for one who commits that criminal offense. Second, New Jersey could provide that a defendant convicted under the statute whom a judge finds, by a preponderance of the evidence, *not* to have acted with a purpose to intimidate an individual on the basis of race may receive a sentence no greater than 10 years' imprisonment.

The rule that JUSTICE THOMAS advocates in his concurring opinion embraces this precise distinction between a fact that increases punishment and a fact that decreases punishment. See *ante,* at 501 ("[A] 'crime' includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment)"). The historical evidence on which JUSTICE THOMAS relies, however, demonstrates both the difficulty and the pure formalism of making a constitutional "elements" rule turn on such a difference. For example, the Wisconsin statute considered in *Lacy* v. *State,* 15 Wis. *13 (1862), could plausibly qualify as either increasing or mitigating punishment on the basis of the same specified fact. There, Wisconsin provided that the willful and malicious burning of a dwelling house in which "the life of no person shall have been destroyed" was punishable by 7 to 14 years in prison, but that the same burning at a time in which "there was no person lawfully in the dwelling house" was punishable by only 3 to 10 years in prison. Wis. Rev. Stat., ch. 165, § 1 (1858). Although the statute appeared to make the *absence* of persons from the affected dwelling house a fact that mitigated punishment, the Wisconsin Supreme Court found that the *presence* of a person in the affected house constituted an aggravating circumstance. *Lacy, supra,* at *15–*16. As both this example and the above hypothetical redrafted New Jersey statute demonstrate, see *supra,* at 540, whether a fact is responsible for an

O'CONNOR, J., dissenting

increase or a decrease in punishment rests in the eye of the beholder. Again, it is difficult to understand, and neither the Court nor JUSTICE THOMAS explains, why the Constitution would require a state legislature to follow such a meaningless and formalistic difference in drafting its criminal statutes.

If either of the above readings is all that the Court's decision means, "the Court's principle amounts to nothing more than chastising [the New Jersey Legislature] for failing to use the approved phrasing in expressing its intent as to how [unlawful weapons possession] should be punished." *Jones*, 526 U. S., at 267 (KENNEDY, J., dissenting). If New Jersey can, consistent with the Constitution, make precisely the same differences in punishment turn on precisely the same facts, and can remove the assessment of those facts from the jury and subject them to a standard of proof below "beyond a reasonable doubt," it is impossible to say that the Fifth, Sixth, and Fourteenth Amendments require the Court's rule. For the same reason, the "structural democratic constraints" that might discourage a legislature from enacting either of the above hypothetical statutes would be no more significant than those that would discourage the enactment of New Jersey's present sentence-enhancement statute. See *ante*, at 490–491, n. 16 (majority opinion). In all three cases, the legislature is able to calibrate punishment perfectly, and subject to a maximum penalty only those defendants whose cases satisfy the sentence-enhancement criterion. As JUSTICE KENNEDY explained in *Jones*, "[n]o constitutional values are served by so formalistic an approach, while its constitutional costs in statutes struck down . . . are real." 526 U. S., at 267.

Given the pure formalism of the above readings of the Court's opinion, one suspects that the constitutional principle underlying its decision is more far reaching. The actual principle underlying the Court's decision may be that any fact (other than prior conviction) that has the effect, *in real terms,* of increasing the maximum punishment beyond an

otherwise applicable range must be submitted to a jury and proved beyond a reasonable doubt. See, *e. g., ante,* at 494 ("[T]he relevant inquiry is one not of form, but of effect— does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"). The principle thus would apply not only to schemes like New Jersey's, under which a factual determination exposes the defendant to a sentence beyond the prescribed statutory maximum, but also to all determinate-sentencing schemes in which the length of a defendant's sentence within the statutory range turns on specific factual determinations (*e. g.,* the federal Sentencing Guidelines). JUSTICE THOMAS essentially concedes that the rule outlined in his concurring opinion would require the invalidation of the Sentencing Guidelines. See *ante,* at 523, n. 11.

I would reject any such principle. As explained above, it is inconsistent with our precedent and would require the Court to overrule, at a minimum, decisions like *Patterson* and *Walton.* More importantly, given our approval of—and the significant history in this country of—discretionary sentencing by judges, it is difficult to understand how the Fifth, Sixth, and Fourteenth Amendments could possibly require the Court's or JUSTICE THOMAS' rule. Finally, in light of the adoption of determinate-sentencing schemes by many States and the Federal Government, the consequences of the Court's and JUSTICE THOMAS' rules in terms of sentencing schemes invalidated by today's decision will likely be severe.

As the Court acknowledges, we have never doubted that the Constitution permits Congress and the state legislatures to define criminal offenses, to prescribe broad ranges of punishment for those offenses, and to give judges discretion to decide where within those ranges a particular defendant's punishment should be set. See *ante,* at 481–482. That view accords with historical practice under the Constitution. "From the beginning of the Republic, federal judges were entrusted with wide sentencing discretion. The great

O'CONNOR, J., dissenting

majority of federal criminal statutes have stated only a maximum term of years and a maximum monetary fine, permitting the sentencing judge to impose any term of imprisonment and any fine up to the statutory maximum." K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998) (footnote omitted). Under discretionary-sentencing schemes, a judge bases the defendant's sentence on any number of facts neither presented at trial nor found by a jury beyond a reasonable doubt.  As one commentator has explained:

> "During the age of broad judicial sentencing discretion, judges frequently made sentencing decisions on the basis of facts that they determined for themselves, on less than proof beyond a reasonable doubt, without eliciting very much concern from civil libertarians. . . . The sentence in any number of traditional discretionary situations depended quite directly on judicial findings of specific contested facts. . . . Whether because such facts were directly relevant to the judge's retributionist assessment of how serious the particular offense was (within the spectrum of conduct covered by the statute of conviction), or because they bore on a determination of how much rehabilitation the offender's character was likely to need, the sentence would be higher or lower, in some specific degree determined by the judge, based on the judge's factual conclusions." Lynch, Towards A Model Penal Code, Second (Federal?), 2 Buffalo Crim. L. Rev. 297, 320 (1998) (footnote omitted).

Accordingly, under the discretionary-sentencing schemes, a factual determination made by a judge on a standard of proof below "beyond a reasonable doubt" often made the difference between a lesser and a greater punishment.

For example, in *Williams* v. *New York*, a jury found the defendant guilty of first-degree murder and recommended life imprisonment.  The judge, however, rejected the jury's

recommendation and sentenced Williams to death on the basis of additional facts that he learned through a presentence investigation report and that had neither been charged in an indictment nor presented to the jury. 337 U. S., at 242–245. In rejecting Williams' due process challenge to his death sentence, we explained that there was a long history of sentencing judges exercising "wide discretion in the sources and types of evidence used to assist [them] in determining the kind and extent of punishment to be imposed within limits fixed by law." *Id.,* at 246. Specifically, we held that the Constitution does not restrict a judge's sentencing decision to information that is charged in an indictment and subject to cross-examination in open court. "The due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure." *Id.,* at 251.

Under our precedent, then, a State may leave the determination of a defendant's sentence to a judge's discretionary decision within a prescribed range of penalties. When a judge, pursuant to that sentencing scheme, decides to increase a defendant's sentence on the basis of certain contested facts, those facts need not be proved to a jury beyond a reasonable doubt. The judge's findings, whether by proof beyond a reasonable doubt or less, suffice for purposes of the Constitution. Under the Court's decision today, however, it appears that once a legislature constrains judges' sentencing discretion by prescribing certain sentences that may only be imposed (or must be imposed) in connection with the same determinations of the same contested facts, the Constitution requires that the facts instead be proved to a jury beyond a reasonable doubt. I see no reason to treat the two schemes differently. See, *e. g., McMillan,* 477 U. S., at 92 ("We have some difficulty fathoming why the due process calculus would change simply because the legislature has seen fit to provide sentencing courts with additional guidance"). In this respect, I agree with the Solicitor General that "[a] sen-

O'CONNOR, J., dissenting

tence that is constitutionally permissible when selected by a court on the basis of whatever factors it deems appropriate does not become impermissible simply because the court is permitted to select that sentence only after making a finding prescribed by the legislature." Brief for United States as *Amicus Curiae* 7. Although the Court acknowledges the legitimacy of discretionary sentencing by judges, see *ante*, at 481–482, it never provides a sound reason for treating judicial factfinding under determinate-sentencing schemes differently under the Constitution.

JUSTICE THOMAS' attempt to explain this distinction is similarly unsatisfying. His explanation consists primarily of a quotation, in turn, of a 19th-century treatise writer, who contended that the aggravation of punishment within a statutory range on the basis of facts found by a judge "'is an entirely different thing from punishing one for what is not alleged against him.'" *Ante*, at 519 (quoting 1 J. Bishop, Commentaries on Law of Criminal Procedure § 85, p. 54 (rev. 2d ed. 1872)). As our decision in *Williams* v. *New York* demonstrates, however, that statement does not accurately describe the reality of discretionary sentencing conducted by judges. A defendant's actual punishment can be affected in a very real way by facts never alleged in an indictment, never presented to a jury, and never proved beyond a reasonable doubt. In Williams' case, facts presented for the first time to the judge, for purposes of sentencing alone, made the difference between life imprisonment and a death sentence.

Consideration of the purposes underlying the Sixth Amendment's jury trial guarantee further demonstrates why our acceptance of judge-made findings in the context of discretionary sentencing suggests the approval of the same judge-made findings in the context of determinate sentencing as well. One important purpose of the Sixth Amendment's jury trial guarantee is to protect the criminal defendant against potentially arbitrary judges. It effectuates this promise by preserving, as a constitutional matter, certain

O'CONNOR, J., dissenting

fundamental decisions for a jury of one's peers, as opposed
to a judge.   For example, the Court has recognized that the
Sixth Amendment's guarantee was motivated by the English
experience of "competition . . . between judge and jury over
the real significance of their respective roles," *Jones*, 526
U. S., at 245, and "measures [that were taken] to diminish the
juries' power," *ibid.*   We have also explained that the jury
trial guarantee was understood to provide "an inestimable
safeguard against the corrupt or overzealous prosecutor and
against the compliant, biased, or eccentric judge.   If the de-
fendant preferred the common-sense judgment of a jury to
the more tutored but perhaps less sympathetic reaction of
the single judge, he was to have it."   *Duncan* v. *Louisiana*,
391 U. S. 145, 156 (1968).   Blackstone explained that the
right to trial by jury was critically important in criminal
cases because of "the violence and partiality of judges ap-
pointed by the crown, . . . who might then, as in France or
Turkey, imprison, dispatch, or exile any man that was obnox-
ious to the government, by an instant declaration, that such
is their will and pleasure."   4 Blackstone, Commentaries, at
343.   Clearly, the concerns animating the Sixth Amend-
ment's jury trial guarantee, if they were to extend to the
sentencing context at all, would apply with greater strength
to a discretionary-sentencing scheme than to determinate
sentencing.   In the former scheme, the potential for mis-
chief by an arbitrary judge is much greater, given that the
judge's decision of where to set the defendant's sentence
within the prescribed statutory range is left almost entirely
to discretion.   In contrast, under a determinate-sentencing
system, the discretion the judge wields within the statutory
range is tightly constrained.   Accordingly, our approval of
discretionary-sentencing schemes, in which a defendant is
not entitled to have a jury make factual findings relevant to
sentencing despite the effect those findings have on the
severity of the defendant's sentence, demonstrates that the
defendant should have no right to demand that a jury make

the equivalent factual determinations under a determinate-sentencing scheme.

The Court appears to hold today, however, that a defendant is entitled to have a jury decide, by proof beyond a reasonable doubt, every fact relevant to the determination of sentence under a determinate-sentencing scheme. If this is an accurate description of the constitutional principle underlying the Court's opinion, its decision will have the effect of invalidating significant sentencing reform accomplished at the federal and state levels over the past three decades. JUSTICE THOMAS' rule, as he essentially concedes, see *ante*, at 523, n. 11, would have the same effect.

Prior to the most recent wave of sentencing reform, the Federal Government and the States employed indeterminate-sentencing schemes in which judges and executive branch officials (*e. g.*, parole board officials) had substantial discretion to determine the actual length of a defendant's sentence. See, *e. g.*, U. S. Dept. of Justice, S. Shane-DuBow, A. Brown, & E. Olsen, Sentencing Reform in the United States: History, Content, and Effect 6–7 (Aug. 1985) (hereinafter Shane-DuBow); Report of Twentieth Century Fund Task Force on Criminal Sentencing, Fair and Certain Punishment 11–13 (1976) (hereinafter Task Force Report); A. Dershowitz, Criminal Sentencing in the United States: An Historical and Conceptual Overview, 423 Annals Am. Acad. Pol. & Soc. Sci. 117, 128–129 (1976). Studies of indeterminate-sentencing schemes found that similarly situated defendants often received widely disparate sentences. See, *e. g.*, Shane-Dubow 7; Task Force Report 14. Although indeterminate sentencing was intended to soften the harsh and uniform sentences formerly imposed under mandatory-sentencing systems, some studies revealed that indeterminate sentencing actually had the opposite effect. See, *e. g.*, A. Campbell, Law of Sentencing 13 (1978) ("Paradoxically the humanitarian impulse sparking the adoption of indeterminate sentencing systems in this country has resulted in

O'CONNOR, J., dissenting

an actual increase of the average criminal's incarceration term"); Task Force Report 13 ("[T]he data seem to indicate that in those jurisdictions where the sentencing structure is more indeterminate, judicially imposed sentences tend to be longer").

In response, Congress and the state legislatures shifted to determinate-sentencing schemes that aimed to limit judges' sentencing discretion and, thereby, afford similarly situated offenders equivalent treatment. See, *e. g.,* Cal. Penal Code Ann. § 1170 (West Supp. 2000). The most well known of these reforms was the federal Sentencing Reform Act of 1984, 18 U. S. C. § 3551 *et seq.* In the Act, Congress created the United States Sentencing Commission, which in turn promulgated the Sentencing Guidelines that now govern sentencing by federal judges. See, *e. g.,* United States Sentencing Commission, Guidelines Manual (Nov. 1998). Whether one believes the determinate-sentencing reforms have proved successful or not—and the subject is one of extensive debate among commentators—the apparent effect of the Court's opinion today is to halt the current debate on sentencing reform in its tracks and to invalidate with the stroke of a pen three decades' worth of nationwide reform, all in the name of a principle with a questionable constitutional pedigree. Indeed, it is ironic that the Court, in the name of constitutional rights meant to protect criminal defendants from the potentially arbitrary exercise of power by prosecutors and judges, appears to rest its decision on a principle that would render unconstitutional efforts by Congress and the state legislatures to place constraints on that very power in the sentencing context.

Finally, perhaps the most significant impact of the Court's decision will be a practical one—its unsettling effect on sentencing conducted under current federal and state determinate-sentencing schemes. As I have explained, the Court does not say whether these schemes are constitutional,

but its reasoning strongly suggests that they are not. Thus, with respect to past sentences handed down by judges under determinate-sentencing schemes, the Court's decision threatens to unleash a flood of petitions by convicted defendants seeking to invalidate their sentences in whole or in part on the authority of the Court's decision today. Statistics compiled by the United States Sentencing Commission reveal that almost a half-million cases have been sentenced under the Sentencing Guidelines since 1989. See Memorandum from U. S. Sentencing Commission to Supreme Court Library, dated June 8, 2000 (total number of cases sentenced under federal Sentencing Guidelines since 1989) (available in Clerk of Court's case file). Federal cases constitute only the tip of the iceberg. In 1998, for example, federal criminal prosecutions represented only about 0.4% of the total number of criminal prosecutions in federal and state courts. See National Center for State Courts, A National Perspective: Court Statistics Project (federal and state court filings, 1998), http://www.ncsc.dni.us/divisions/research/csp/csp98-fscf.html (showing that, in 1998, 57,691 criminal cases were filed in federal court compared to 14,623,330 in state courts) (available in Clerk of Court's case file). Because many States, like New Jersey, have determinate-sentencing schemes, the number of individual sentences drawn into question by the Court's decision could be colossal.

The decision will likely have an even more damaging effect on sentencing conducted in the immediate future under current determinate-sentencing schemes. Because the Court fails to clarify the precise contours of the constitutional principle underlying its decision, federal and state judges are left in a state of limbo. Should they continue to assume the constitutionality of the determinate-sentencing schemes under which they have operated for so long, and proceed to sentence convicted defendants in accord with those governing statutes and guidelines? The Court provides no answer,

O'CONNOR, J., dissenting

yet its reasoning suggests that each new sentence will rest
on shaky ground.   The most unfortunate aspect of today's
decision is that our precedents did not foreordain this disrup-
tion in the world of sentencing.   Rather, our cases tradition-
ally took a cautious approach to questions like the one pre-
sented in this case.   The Court throws that caution to the
wind and, in the process, threatens to cast sentencing in the
United States into what will likely prove to be a lengthy
period of considerable confusion.

## III

Because I do not believe that the Court's "increase in the
maximum penalty" rule is required by the Constitution,
I would evaluate New Jersey's sentence-enhancement stat-
ute, N. J. Stat. Ann. §2C:44–3 (West Supp. 2000), by analyz-
ing the factors we have examined in past cases.   See, *e. g.,*
*Almendarez-Torres,* 523 U. S., at 242–243; *McMillan,* 477
U. S., at 86–90.   First, the New Jersey statute does not shift
the burden of proof on an essential ingredient of the offense
by presuming that ingredient upon proof of other elements
of the offense.   See, *e. g., id.,* at 86–87; *Patterson,* 432 U. S.,
at 215.   Second, the magnitude of the New Jersey sentence
enhancement, as applied in petitioner's case, is constitution-
ally permissible.   Under New Jersey law, the weapons pos-
session offense to which petitioner pleaded guilty carries a
sentence range of 5 to 10 years' imprisonment.   N. J. Stat.
Ann. §§2C:39–4(a), 2C:43–6(a)(2) (West 1995).   The fact that
petitioner, in committing that offense, acted with a purpose
to intimidate because of race exposed him to a higher sen-
tence range of 10 to 20 years' imprisonment.   §2C:43–
7(a)(3).   The 10-year increase in the maximum penalty to
which petitioner was exposed falls well within the range we
have found permissible.   See *Almendarez-Torres, supra,* at
226, 242–243 (approving 18-year enhancement).   Third, the
New Jersey statute gives no impression of having been

O'CONNOR, J., dissenting

enacted to evade the constitutional requirements that attach when a State makes a fact an element of the charged offense. For example, New Jersey did not take what had previously been an element of the weapons possession offense and transform it into a sentencing factor. See *McMillan,* 477 U. S., at 89.

In sum, New Jersey "simply took one factor that has always been considered by sentencing courts to bear on punishment"—a defendant's motive for committing the criminal offense—"and dictated the precise weight to be given that factor" when the motive is to intimidate a person because of race. *Id.,* at 89–90. The Court claims that a purpose to intimidate on account of race is a traditional *mens rea* element, and not a motive. See *ante,* at 492–493. To make this claim, the Court finds it necessary once again to ignore our settled precedent. In *Wisconsin* v. *Mitchell,* 508 U. S. 476 (1993), we considered a statute similar to the one at issue here. The Wisconsin statute provided for an increase in a convicted defendant's punishment if the defendant intentionally selected the victim of the crime because of that victim's race. *Id.,* at 480. In a unanimous decision upholding the statute, we specifically characterized it as providing a sentence enhancement based on the "motive" of the defendant. See *id.,* at 485 (distinguishing between punishment of defendant's "criminal conduct" and penalty enhancement "for conduct *motivated* by a discriminatory point of view" (emphasis added)); *id.,* at 484–485 ("[U]nder the Wisconsin statute the same criminal conduct may be more heavily punished if the victim is selected because of his race . . . than if no such *motive* obtained" (emphasis added)). That same characterization applies in the case of the New Jersey statute. As we also explained in *Mitchell,* the motive for committing an offense has traditionally been an important factor in determining a defendant's sentence. *Id.,* at 485. New Jersey, therefore, has done no more than what we held permissible

in *McMillan;* it has taken a traditional sentencing factor and dictated the precise weight judges should attach to that factor when the specific motive is to intimidate on the basis of race.

The New Jersey statute resembles the Pennsylvania statute we upheld in *McMillan* in every respect but one. That difference—that the New Jersey statute increases the maximum punishment to which petitioner was exposed—does not persuade me that New Jersey "sought to evade the constitutional requirements associated with the characterization of a fact as an offense element." *Supra,* at 524. There is no question that New Jersey could prescribe a range of 5 to 20 years' imprisonment as punishment for its weapons possession offense. Thus, as explained above, the specific means by which the State chooses to control judges' discretion within that permissible range is of no moment. Cf. *Patterson, supra,* at 207–208 ("The Due Process Clause, as we see it, does not put New York to the choice of abandoning [the affirmative defense] or undertaking to disprove [its] existence in order to convict of a crime which otherwise is within its constitutional powers to sanction by substantial punishment"). The New Jersey statute also resembles in virtually every respect the federal statute we considered in *Almendarez-Torres.* That the New Jersey statute provides an enhancement based on the defendant's motive while the statute in *Almendarez-Torres* provided an enhancement based on the defendant's commission of a prior felony is a difference without constitutional importance. Both factors are traditional bases for increasing an offender's sentence and, therefore, may serve as the grounds for a sentence enhancement.

On the basis of our prior precedent, then, I would hold that the New Jersey sentence-enhancement statute is constitutional, and affirm the judgment of the Supreme Court of New Jersey.

BREYER, J., dissenting

JUSTICE BREYER, with whom THE CHIEF JUSTICE joins, dissenting.

The majority holds that the Constitution contains the following requirement: "[A]ny fact [other than recidivism] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Ante*, at 490.   This rule would seem to promote a procedural ideal—that of juries, not judges, determining the existence of those facts upon which increased punishment turns.   But the real world of criminal justice cannot hope to meet any such ideal.   It can function only with the help of procedural compromises, particularly in respect to sentencing.   And those compromises, which are themselves necessary for the fair functioning of the criminal justice system, preclude implementation of the procedural model that today's decision reflects.   At the very least, the impractical nature of the requirement that the majority now recognizes supports the proposition that the Constitution was not intended to embody it.

I

In modern times, the law has left it to the sentencing judge to find those facts which (within broad sentencing limits set by the legislature) determine the sentence of a convicted offender.   The judge's factfinding role is not inevitable.   One could imagine, for example, a pure "charge offense" sentencing system in which the degree of punishment depended only upon the crime charged (*e. g.,* eight mandatory years for robbery, six for arson, three for assault).   But such a system would ignore many harms and risks of harm that the offender caused or created, and it would ignore many relevant offender characteristics.   See United States Sentencing Commission, Sentencing Guidelines and Policy Statements, Part A, at 1.5 (1987) (hereinafter Sentencing Guidelines or Guidelines) (pointing out that a "charge offense"

system by definition would ignore any fact "that did not constitute [a] statutory elemen[t] of the offens[e] of which the defendant was convicted"). Hence, that imaginary "charge offense" system would not be a fair system, for it would lack proportionality, *i. e.*, it would treat different offenders similarly despite major differences in the manner in which each committed the same crime.

There are many such manner-related differences in respect to criminal behavior. Empirical data collected by the Sentencing Commission make clear that, before the Guidelines, judges who exercised discretion within broad legislatively determined sentencing limits (say, a range of 0 to 20 years) would impose very different sentences upon offenders engaged in the same basic criminal conduct, depending, for example, upon the amount of drugs distributed (in respect to drug crimes), the amount of money taken (in respect to robbery, theft, or fraud), the presence or use of a weapon, injury to a victim, the vulnerability of a victim, the offender's role in the offense, recidivism, and many other offense-related or offender-related factors. See United States Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 35–39 (1987) (hereinafter Supplementary Report) (table listing data representing more than 20 such factors); see generally Department of Justice, W. Rhodes & C. Conly, Analysis of Federal Sentencing (May 1981). The majority does not deny that judges have exercised, and, constitutionally speaking, *may* exercise sentencing discretion in this way.

Nonetheless, it is important for present purposes to understand why *judges*, rather than *juries*, traditionally have determined the presence or absence of such sentence-affecting facts in any given case. And it is important to realize that the reason is not a theoretical one, but a practical one. It does not reflect (JUSTICE SCALIA's opinion to the contrary notwithstanding) an ideal of procedural "fairness," *ante*, at 498 (concurring opinion), but rather an administrative need

BREYER, J., dissenting

for procedural *compromise*.   There are, to put it simply, far too many potentially relevant sentencing factors to permit submission of all (or even many) of them to a jury.   As the Sentencing Guidelines state the matter,

> "[a] bank robber with (or without) a gun, which the robber kept hidden (or brandished), might have frightened (or merely warned), injured seriously (or less seriously), tied up (or simply pushed) a guard, a teller or a customer, at night (or at noon), for a bad (or arguably less bad) motive, in an effort to obtain money for other crimes (or for other purposes), in the company of a few (or many) other robbers, for the first (or fourth) time that day, while sober (or under the influence of drugs or alcohol), and so forth."   Sentencing Guidelines, Part A, at 1.2.

The Guidelines note that "a sentencing system tailored to fit every conceivable wrinkle of each case can become unworkable and seriously compromise the certainty of punishment and its deterrent effect."   *Ibid.*   To ask a jury to consider all, or many, such matters would do the same.

At the same time, to require jury consideration of all such factors—say, during trial where the issue is guilt or innocence—could easily place the defendant in the awkward (and conceivably unfair) position of having to deny he committed the crime yet offer proof about how he committed it, *e. g.,* "I did not sell drugs, but I sold no more than 500 grams."   And while special postverdict sentencing juries could cure this problem, they have seemed (but for capital cases) not worth their administrative costs.   Hence, before the Guidelines, federal sentencing judges typically would obtain relevant factual sentencing information from probation officers' presentence reports, while permitting a convicted offender to challenge the information's accuracy at a hearing before the judge without benefit of trial-type evidentiary rules. See *Williams* v. *New York,* 337 U. S. 241,

249–251 (1949) (describing the modern "practice of individualizing punishments" under which judges often consider otherwise inadmissible information gleaned from probation reports); see also Kadish, Legal Norm and Discretion in the Police and Sentencing Processes, 75 Harv. L. Rev. 904, 915–917 (1962).

It is also important to understand how a judge traditionally determined which factors should be taken into account for sentencing purposes. In principle, the number of potentially relevant behavioral characteristics is endless. A judge might ask, for example, whether an unlawfully possessed knife was "a switchblade, drawn or concealed, opened or closed, large or small, used in connection with a car theft (where victim confrontation is rare), a burglary (where confrontation is unintended) or a robbery (where confrontation is intentional)." United States Sentencing Commission, Preliminary Observations of the Commission on Commissioner Robinson's Dissent 3, n. 3 (May 1, 1987). Again, the method reflects practical, rather than theoretical, considerations. Prior to the Sentencing Guidelines, federal law left the individual sentencing judge free to determine which factors were relevant. That freedom meant that each judge, in an effort to tailor punishment to the individual offense and offender, was guided primarily by experience, relevance, and a sense of proportional fairness. Cf. Supplementary Report 16–17 (noting that the goal of the Sentencing Guidelines was to create greater sentencing uniformity among judges, but in doing so the Guidelines themselves had to rely primarily upon empirical studies that showed which factors had proved important to federal judges in the past).

Finally, it is important to understand how a legislature decides which factual circumstances among all those potentially related to generally harmful behavior it should transform into elements of a statutorily defined crime (where they would become relevant to the guilt or innocence of an accused), and which factual circumstances it should leave to

BREYER, J., dissenting

the sentencing process (where, as sentencing factors, they would help to determine the sentence imposed upon one who has been found guilty). Again, theory does not provide an answer. Legislatures, in defining crimes in terms of elements, have looked for guidance to common-law tradition, to history, and to current social need. And, traditionally, the Court has left legislatures considerable freedom to make the element determination. See *Almendarez-Torres* v. *United States*, 523 U. S. 224, 228 (1998); *McMillan* v. *Pennsylvania*, 477 U. S. 79, 85 (1986).

By placing today's constitutional question in a broader context, this brief survey may help to clarify the nature of today's decision. It also may explain why, in respect to sentencing systems, proportionality, uniformity, and administrability are all aspects of that basic "fairness" that the Constitution demands. And it suggests my basic problem with the Court's rule: A sentencing system in which judges have discretion to find sentencing-related factors is a workable system and one that has long been thought consistent with the Constitution; why, then, would the Constitution treat sentencing *statutes* any differently?

## II

As JUSTICE THOMAS suggests, until fairly recent times many legislatures rarely focused upon sentencing factors. Rather, it appears they simply identified typical forms of antisocial conduct, defined basic "crimes," and attached a broad sentencing range to each definition—leaving judges free to decide how to sentence within those ranges in light of such factors as they found relevant. *Ante,* at 510–512, 518 (concurring opinion). But the Constitution does not freeze 19th-century sentencing practices into permanent law. And dissatisfaction with the traditional sentencing system (reflecting its tendency to treat similar cases differently) has led modern legislatures to write new laws that refer specifically to sentencing factors. See Supplementary Report 1

(explaining that "a growing recognition of the need to bring greater rationality and consistency to penal statutes and to sentences imposed under those statutes" led to reform efforts such as the Federal Sentencing Guidelines).

Legislatures have tended to address the problem of too much judicial sentencing discretion in two ways. First, legislatures sometimes have created sentencing commissions armed with delegated authority to make more uniform judicial exercise of that discretion. Congress, for example, has created a federal Sentencing Commission, giving it the power to create Guidelines that (within the sentencing range set by individual statutes) reflect the host of factors that might be used to determine the actual sentence imposed for each individual crime. See 28 U. S. C. § 994(a); see also United States Sentencing Commission, Guidelines Manual (Nov. 1999). Federal judges must apply those Guidelines in typical cases (those that lie in the "heartland" of the crime as the statute defines it) while retaining freedom to depart in atypical cases. *Id.,* ch. 1, pt. A, 4(b).

Second, legislatures sometimes have directly limited the use (by judges or by a commission) of particular factors in sentencing, either by specifying statutorily how a particular factor will affect the sentence imposed or by specifying how a commission should use a particular factor when writing a guideline. Such a statute might state explicitly, for example, that a particular factor, say, use of a weapon, recidivism, injury to a victim, or bad motive, "shall" increase, or "may" increase, a particular sentence in a particular way. See, *e. g., McMillan, supra,* at 83 (Pennsylvania statute expressly treated "visible possession of a firearm" as a sentencing consideration that subjected a defendant to a mandatory 5-year term of imprisonment).

The issue the Court decides today involves this second kind of legislation. The Court holds that a legislature cannot enact such legislation (where an increase in the maximum is involved) unless the factor at issue has been charged,

BREYER, J., dissenting

tried to a jury, and found to exist beyond a reasonable doubt. My question in respect to this holding is, simply, "*why* would the Constitution contain such a requirement"?

## III

In light of the sentencing background described in Parts I and II, I do not see how the majority can find in the Constitution a requirement that "any fact" (other than recidivism) that increases the maximum penalty for a crime "must be submitted to a jury." *Ante,* at 490. As JUSTICE O'CONNOR demonstrates, this Court has previously failed to view the Constitution as embodying any such principle, while sometimes finding to the contrary. See *Almendarez-Torres, supra,* at 239–247; *McMillan, supra,* at 84–91. The majority raises no objection to traditional pre-Guidelines sentencing procedures under which judges, not juries, made the factual findings that would lead to an increase in an individual offender's sentence. How does a legislative determination differ in any significant way? For example, if a judge may on his or her own decide that victim injury or bad motive should increase a bank robber's sentence from 5 years to 10, why does it matter that a legislature instead enacts a statute that increases a bank robber's sentence from 5 years to 10 based on this same judicial finding?

With the possible exception of the last line of JUSTICE SCALIA's concurring opinion, the majority also makes no constitutional objection to a legislative delegation to a commission of the authority to create guidelines that determine how a judge is to exercise sentencing discretion. See also *ante,* at 523, n. 11 (THOMAS, J., concurring) (reserving the question). But if the Constitution permits Guidelines, why does it not permit Congress similarly to guide the exercise of a judge's sentencing discretion? That is, if the Constitution permits a delegatee (the commission) to exercise sentencing-related rulemaking power, how can it deny the

delegator (the legislature) what is, in effect, the same rule-making power?

The majority appears to offer two responses. First, it argues for a limiting principle that would prevent a legislature with broad authority from transforming (jury-determined) facts that constitute elements of a crime into (judge-determined) sentencing factors, thereby removing procedural protections that the Constitution would otherwise require. See *ante,* at 486 ("[C]onstitutional limits" prevent States from "defin[ing] away facts necessary to constitute a criminal offense"). The majority's cure, however, is not aimed at the disease.

The same "transformational" problem exists under traditional sentencing law, where legislation, silent as to sentencing factors, grants the judge virtually unchecked discretion to sentence within a broad range. Under such a system, judges or prosecutors can similarly "transform" crimes, punishing an offender convicted of one crime as if he had committed another. A prosecutor, for example, might charge an offender with five counts of embezzlement (each subject to a 10-year maximum penalty), while asking the judge to impose maximum and consecutive sentences because the embezzler murdered his employer. And, as part of the traditional sentencing discretion that the majority concedes judges retain, the judge, not a jury, would determine the last-mentioned relevant fact, *i. e.,* that the murder actually occurred.

This egregious example shows the problem's complexity. The source of the problem lies not in a legislature's power to enact sentencing factors, but in the traditional legislative power to select elements defining a crime, the traditional legislative power to set broad sentencing ranges, and the traditional judicial power to choose a sentence within that range on the basis of relevant offender conduct. Conversely, the solution to the problem lies, not in prohibiting legislatures from enacting sentencing factors, but in sentencing rules that determine punishments on the basis of properly defined

BREYER, J., dissenting

relevant conduct, with sensitivity to the need for procedural protections where sentencing factors are determined by a judge (for example, use of a "reasonable doubt" standard), and invocation of the Due Process Clause where the history of the crime at issue, together with the nature of the facts to be proved, reveals unusual and serious procedural unfairness. Cf. *McMillan*, 477 U. S., at 88 (upholding statute in part because it "gives no impression of having been tailored to permit the [sentencing factor] to be a tail which wags the dog of the substantive offense").

Second, the majority, in support of its constitutional rule, emphasizes the concept of a statutory "maximum." The Court points out that a sentencing judge (or a commission) traditionally has determined, and now still determines, sentences *within* a legislated range capped by a maximum (a range that the legislature itself sets). See *ante*, at 481–482. I concede the truth of the majority's statement, but I do not understand its relevance.

From a defendant's perspective, the legislature's decision to cap the possible range of punishment at a statutorily prescribed "maximum" would affect the actual sentence imposed no differently than a sentencing commission's (or a sentencing judge's) similar determination. Indeed, as a practical matter, a legislated mandatory "minimum" is far more important to an actual defendant. A judge and a commission, after all, are legally free to select any sentence below a statute's maximum, but they are not free to subvert a statutory minimum. And, as JUSTICE THOMAS indicates, all the considerations of fairness that might support submission to a jury of a factual matter that increases a statutory maximum apply *a fortiori* to any matter that would increase a statutory minimum. See *ante*, at 521–522 (concurring opinion). To repeat, I do not understand why, when a legislature *authorizes* a judge to impose a higher penalty for bank robbery (based, say, on the court's finding that a victim was injured or the defendant's motive was bad), a new crime is born; but

where a legislature *requires* a judge to impose a higher penalty than he otherwise would (within a pre-existing statutory range) based on similar criteria, it is not. Cf. *Almendarez-Torres,* 523 U. S., at 246.

## IV

I certainly do not believe that the present sentencing system is one of "perfect equity," *ante,* at 498 (SCALIA, J., concurring), and I am willing, consequently, to assume that the majority's rule would provide a degree of increased procedural protection in respect to those particular sentencing factors currently embodied in statutes. I nonetheless believe that any such increased protection provides little practical help and comes at too high a price. For one thing, by leaving mandatory minimum sentences untouched, the majority's rule simply encourages any legislature interested in asserting control over the sentencing process to do so by creating those minimums. That result would mean significantly less procedural fairness, not more.

For another thing, this Court's case law, prior to *Jones* v. *United States,* 526 U. S. 227, 243, n. 6 (1999), led legislatures to believe that they were permitted to increase a statutory maximum sentence on the basis of a sentencing factor. See *ante,* at 529–539 (O'CONNOR, J., dissenting); see also, *e. g., McMillan, supra,* at 84–91 (indicating that a legislature could impose mandatory sentences on the basis of sentencing factors, thereby suggesting it could impose more flexible statutory maximums on same basis). And legislatures may well have relied upon that belief. See, *e. g.,* 21 U. S. C. §841(b) (1994 ed. and Supp. III) (providing penalties for, among other things, possessing a "controlled substance" with intent to distribute it, which sentences vary dramatically depending upon the amount of the drug possessed, without requiring jury determination of the amount); N. J. Stat. Ann. §§2C:43–6, 2C:43–7, 2C:44–1a–f, 2C:44–3 (West 1995 and Supp. 1999–2000) (setting sentencing ranges for crimes, while providing for lesser or greater punishments

BREYER, J., dissenting

depending upon judicial findings regarding certain "aggravating" or "mitigating" factors); Cal. Penal Code Ann. § 1170 (West Supp. 2000) (similar); see also Cal. Court Rule 420(b) (1996) (providing that "[c]ircumstances in aggravation and mitigation" are to be established by the sentencing judge based on "the case record, the probation officer's report, [and] other reports and statements properly received").

As JUSTICE O'CONNOR points out, the majority's rule creates serious uncertainty about the constitutionality of such statutes and about the constitutionality of the confinement of those punished under them. See *ante*, at 549–552 (dissenting opinion). The few *amicus* briefs that the Court received in this case do not discuss the impact of the Court's new rule on, for example, drug crime statutes or state criminal justice systems. This fact, I concede, may suggest that my concerns about disruption are overstated; yet it may also suggest that (despite *Jones* and given *Almendarez-Torres*) so absolute a constitutional prohibition is unexpected. Moreover, the rationale that underlies the Court's rule suggests a principle—jury determination of all sentencing-related facts—that, unless restricted, threatens the workability of every criminal justice system (if applied to judges) or threatens efforts to make those systems more uniform, hence more fair (if applied to commissions).

Finally, the Court's new rule will likely impede legislative attempts to provide authoritative guidance as to how courts should respond to the presence of traditional sentencing factors. The factor at issue here—motive—is such a factor. Whether a robber takes money to finance other crimes or to feed a starving family can matter, and long has mattered, when the length of a sentence is at issue. The State of New Jersey has determined that one motive—racial hatred—is particularly bad and ought to make a difference in respect to punishment for a crime. That determination is reasonable. The procedures mandated are consistent with traditional sentencing practice. Though additional proce-

BREYER, J., dissenting

dural protections might well be desirable, for the reasons JUSTICE O'CONNOR discusses and those I have discussed, I do not believe the Constitution requires them where ordinary sentencing factors are at issue. Consequently, in my view, New Jersey's statute is constitutional.

I respectfully dissent.


JIM JORDAN, Ohio
CHAIRMAN

JERROLD NADLER, New York
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6216

(202) 225-6906
judiciary.house.gov

February 16, 2023

The Honorable Christopher A. Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, DC 20535

Dear Director Wray:

The Committee on the Judiciary is continuing to examine the Federal Bureau of Investigation's (FBI) handling of domestic violent extremism (DVE) investigations. Over the last year, we have written to you several times about startling allegations that the FBI is misusing DVE resources for apparent political purposes.[1] Since those letters, new information has become public about the FBI's targeting of a set of Catholic Americans for their religious beliefs. We therefore write to request additional information about this serious misuse of federal law-enforcement resources.

On January 23, 2023, the FBI's Richmond Field Office published an official document that linked "racially or ethnically motivated violent extremists" (RMVEs) with a "radical-traditionalist Catholic" (RTC) ideology.[2] In this document, the FBI purported to distinguish what it called "traditional Catholics" from the disfavored RTC adherents, who the FBI characterized as embracing "anti-Semitic, anti-immigrant, anti-LGBTQ, and white supremacist ideology."[3] The FBI even identified certain public policy issues—such as immigration and life issues—that it believed would "catalyz[e]" RTC adherents.[4] In addition to attempting to separate and categorize Catholic Americans based on theological distinctions, the FBI underscored the

---

[1] See, e.g., Letter from Rep. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, to Hon. Christopher A. Wray, Dir., Fed. Bureau of Investigation (July 27, 2022); Letter from Rep. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, to Hon. Christopher A. Wray, Dir., Fed. Bureau of Investigation (Sept. 14, 2022); Letter from Rep. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, to Hon. Christopher A. Wray, Dir., Fed. Bureau of Investigation (Sept. 19, 2022).
[2] Fed. Bureau of Investigation, U.S. Dep't of Justice, Domain Perspective, Interest of Racially or Ethnically Motivated Violent Extremist Radical-Traditionalist Catholic Ideology Almost Certainly Presents New Mitigation Opportunities (Jan. 23, 2023).
[3] Id.
[4] Id.

The Honorable Christopher A. Wray
February 16, 2023
Page 2

political nature of its actions: "FBI Richmond assesses RMVE interest in RTCs is likely to increase over the next 12 or 24 months in the run-up to the next general election cycle."[5]

The FBI's document cites to biased and partisan sources, including the Southern Poverty Law Center (SPLC), *Salon*, and *The Atlantic*, to support its assessment.[6] The SPLC misleadingly defines RTCs as "the largest group of serious anti-Semites in America" and believes to have identified nine RTC "hate groups" across the United States.[7] The SPLC also identifies the broad term "Christian identity" as a hate group—a term that could arguably encompass millions of Americans with sincerely held religious beliefs.[8] The SPLC routine maligns several mainstream conservative and religious organizations as "hate" groups, simply because the SPLC disagrees with their views.[9] The fact that the FBI would blindly accept and regurgitate the SPLC's spin is highly concerning and undercuts the FBI's assertion that it is unbiased and politically neutral.

In the wake of the backlash against the FBI's anti-Catholic document, the FBI withdrew the document and blamed the local level field office for its creation and dissemination.[10] However, there remain many questions about the genesis, review, and approval of this document, as well as the FBI's commitment to upholding First Amendment protected activity. To inform our ongoing oversight of the FBI, please provide the following documents and information:

1. All documents and communications referring or relating to intelligence products about "racially or ethnically motivated violent extremists" and "radical-traditionalist Catholics" for the period of January 20, 2021, to the present;

2. All documents and communications referring or relating to the basis for the January 23, 2023, Domain Prospective, entitled "Interest of Racially or Ethnically Motivated Violent Extremist Radical-Traditionalist Catholic Ideology Almost Certainly Presents New Mitigation Opportunities," approved and disseminated by FBI's Richmond Field Office;

3. A list of the FBI investigations, local law enforcement agency reporting, and liaison reporting, with varying degrees of cooperation and access that the FBI's Richmond Field Office relied upon to make its assessments in the January 23, 2023, Domain Prospective, entitled "Interest of Racially or Ethnically Motivated Violent Extremist Radical-Traditionalist Catholic Ideology Almost Certainly Presents New Mitigation Opportunities"; and

4. A list of all FBI employees involved in drafting, reviewing, approving, or disseminating the January 23, 2023, Domain Prospective, entitled "Interest of Racially or Ethnically

---

[5] *Id.*

[6] *Id.* at 11.

[7] Sothern Poverty Law Center, Radical Traditional Catholicism, https://www.splcenter.org/fighting-hate/extremist-files/ideology/radical-traditional-catholicism (last visited Feb. 13, 2023).

[8] *Id.*

[9] *See, e.g.*, Susan Ferrechio, *SPLC finds fewer hate groups but still targets evangelicals, conservatives as haters*, WASH. TIMES (Mar. 10, 2022).

[10] Kayla Bailey, *FBI labeling Catholics as possible violent extremists is an excuse to oppress 'political enemies': Evita Duffy*, FOX NEWS (Feb. 12, 2023).

The Honorable Christopher A. Wray
February 16, 2023
Page 3

Motivated Violent Extremist Radical-Traditionalist Catholic Ideology Almost Certainly Presents New Mitigation Opportunities."

Please provide this information as soon as possible, but no later than 5:00 p.m. on March 2, 2023. We remind you that whistleblower disclosures are protected by law and that we will not tolerate any effort to retaliate against whistleblowers for their disclosures.

The Judiciary Committee is authorized to conduct oversight of the Federal Bureau of Investigation pursuant to the Rules of the House of Representatives.[11] If you have any questions, please contact Committee staff at (202) 225-6906. Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman

Mike Johnson
Chairman
Subcommittee on the Constitution
and Limited Government

cc:   The Honorable Jerrold L. Nadler, Ranking Member
      The Honorable Mary Gay Scanlon, Ranking Member, Subcommittee on the Constitution
      and Limited Government

---

[11] Rules of the U.S. House of Representatives, R. X (2023).

*Your Honor, we are Roman Catholic, and I am of Jewish Heritage, and we have been threatened and discriminated against.*

*My maternal grandfather is Frederick William Becker and my family immigrated from Germany, and ▓▓ were and are practicing Catholics of Jewish Heritage.*

"Becker" "jewish"    🔍

Q All    🖼 Images    ▷ Videos    📰 News    📍 Maps    🛒 Shopping    ⚙ Settings

All regions ▾   Safe search: moderate ▾   Any time ▾

🌐 https://www.ancestry.com › name-origin?surname=becker
**Becker Name Meaning & Becker Family History at Ancestry.com®**
Jewish (Ashkenazic): occupational name for a baker from German Bäcker (compare 1 and Backer) or Yiddish beker 'baker'. ... The Becker family name was found in the USA, the UK, Canada, and Scotland between 1840 and 1920. The most Becker families were found in USA in 1880. In 1840 there were 236 Becker families living in New York.

Becker
German: occupational name for a roofer
(thatcher tiler slater or shingler) or a...

🌐 https://www.hebrewsurnames.com › BECKER
**BECKER - becker meaning - Jewish Genealogy**
Becker Genealogy. The vast majority of Argentine Jews are descended from immigrants who arrived from Europe. These ashkenazic Jews migrated from small towns or shtetels of Poland, Lithuania, Russia, Germany, Romania or Ukraine, leaving behind most of their Jewish relatives. After two or three generations, those Jewish families lost track of ...

G https://www.geni.com › surnames › becker
**Becker Genealogy, Becker Family History - Geni.com**
There are already 1,293 users and over 42,420 genealogy profiles with the Becker surname on Geni. Explore Becker genealogy and family history in the World's Largest Family Tree. Follow. ... Jewish Families from Mehlingen, Kaiserslautern, Rhineland-Palatinate, Germany; Jewish Families of Kraków (Poland) Time Travelers;

🌐 https://karlradl14.substack.com › p › is-boris-becker-jewish
**Is Boris Becker Jewish? - Karl's Substack**
Aug 18, 2023 · Boris Becker - the famous former several time Tennis World Champion - is often assumed to be a German Catholic, which in a sense is true. However, delving a little bit of his biography reveals that his Czechoslovakian mother Elvira was in fact jewish (1) or rather 'had jewish relatives'. (2) This would mean that in halakhah - i.e., jewish religious law - and according to the Israel ...

🖼 Images for "Becker" "jewish"



More Images →

🌐 https://jewishdata.com › jewish_genealogy_search › Becker › - › 100

Share Feedback

Becker | Jewish Genealogy | Jewish Cemeteries | Jewish Tombstones ...

Becker 1938 Judisches Gemeindeblatt - Berlin, Germany- Courtesy of the Leo Baeck Institute

https://www.tabletmag.com › sections › news › articles › a-night-with-the-grooviest-half-jewish-b...

### Farewell to Walter Becker, Weirdo Prince of Smart Rock

And since half-Jewish is, in America today, the new Jewish, Steely Dan is the new Simon and
Garfunkel. Plus, Tablet has written about Donald Fagen before (it seems his partner, Walter Becker, is ...

https://www.beckertrust.org › the-becker-foundation

### The Becker Foundation | Becker Trust

The Newton D. and Rochelle F. Becker Foundation partners with the Newton and Rochelle Becker
Charitable Trust to support non-profits within the same priority areas. It is a support organization of the
Jewish Community Foundation of Los Angeles. The Newton D. and Rochelle F. Becker Foundation, a
sister organization to the Newton and Rochelle ...

https://www.jewishdowntown.org › bnai-spotlight---becker-family.html

### B'nai Spotlight - Becker Family - B'nai Israel Synagogue

From archives of the Jewish Museum of Maryland Becker family group photograph. Several of the
young women are wearing the young men's bowler hats. It's probable that these are the ten children of
Abraham and Krainde Becker: Minnie, Wolf, Moses, Belle, David, Isaac, Ella, Bertha, Herman, and Lena,
born between 1860 and 1884.

https://njjewishnews.timesofisrael.com › david-becker

### David Becker | New Jersey Jewish News

David Becker, 98, of Verona died Oct. 27, 2015. He was born and raised in Long Branch. Mr. Becker
rose to the executive level at Bamberger's and Macy's, dedicating his life's work to the fur industry. He
was a veteran of World War II. He helped form the Jewish Aces in the early 1930s, taking part in their
basketball victory against the ...

W https://en.wikipedia.org › wiki › Ben_Becker

### Ben Becker - Wikipedia

Biography. Becker was born in Bremen, the son of actress Monika Hansen and actor Rolf Becker.He is
the brother of actress Meret Becker and the stepson of Otto Sander.His grandmother was the
comedian Claire Schlichting.Becker is Jewish through his maternal grandmother Claire Schlichting's
father who was a Jewish merchant from Wuppertal.. As a child, Becker participated in radio dramas and
had ...

**More Results**

**Get Our
Browser**

Protect your data as you
search and browse.



**Help Spread
DuckDuckGo**

Help your friends and family
take back their privacy!



**Privacy
Newsletter**

Stay protected and informed
with our privacy newsletter.

Share Feedback



**Your DNA looks most like DNA from these 8 world regions**

We compare your DNA against a worldwide reference panel to see which populations your DNA looks most like.

How do we calculate this?

| Region | Percentage |
| --- | --- |
| ● Norway | 21% › |
| ● Germanic Europe | 18% › |
| ● England & Northwestern Europe | 19% › |
| ● Scotland | 19% › |
| ● Ireland | 8% › |
| ● Sweden & Denmark | 7% › |
| ● Wales | 6% › |
| ● Finland | 1% › |

View all 2,600+ regions tested

Updated August 2023

View previous estimate & FAQs

Remember to check out your communities, ThruLines®, and StoryScout®.



Michael Alan (Mann) Holwager's
Account on TikTok

1:16 

**Details**

 **milkmann109**
Account not found                                    >

Mute notifications                                   ⬤

Pin to top                                           ⬤

Block                                                ⬤

Report





Messages to my wife, telling her to "Suffer!! Lol."

In my opinion, this may be premeditated by Michael Alan Mann Holwager.

Sent to Louisiana in the 5th District Jurisdiction.

Michael Alan Mann Holwager attempting to stalk me via my wife after making her uncomfortable as well with his behavior.

1:53

**Michael**

As he said...another day in his life...

If you have Uncomfortable or dark emotions that you need to speak through we're here for you girl. 👍😄

12:02 PM

Or just talk about the good. We like that too! 😂

12:03 PM

Friday, December 10, 2021

Do you know that Jt is on a plane to come see you?

11:35 AM

Rather, were you told prior to him going?

11:43 AM



11:42

**Michael Mann**

Saturday, December 11, 2021

I just had anxiety and concern and I'm in a safe place now and taking care of my own needs with my primary care physician and therapist.

Thank you for your help and I'll coordinate having my things picked up.

I appreciate that my parents will leave me alone now. I want true distance.

Josh will pickup the cats in the near future and he has purchased my shotgun.

Josh reached out and we are working with him to move things as you are requesting.

Thank you very much

Sunday, December 12, 2021

I'm still true to our chat from high school



Sent to Louisiana in the 5th District Jurisdiction.

11:43

< **Michael Mann**

As of today, all your stuff has been moved out, and we helped move all the stuff over to Josh's outside barn.

The fact you were NOT here to move YOUR stuff yet all of us did this for you is childish and wrong on so many levels.

Andrea and I refused to touch your guns due to the accusations you placed on your father. Phillip and Josh placed them into Josh's car.

Due to how badly you have hurt my fiance and myself with your lies and gaslighting, such as telling others I was "going to restrain you" (what the hell man?) and the variety of other stories you are now fabricating that never occurred, you have placed us in fear of interacting with you.

Therefore, until you get serious help, you are not welcome to come near either of us. We cannot be around your manipulation and gas lighting anymore. Please get serious help before you hurt someone or yourself.

You have disrespected my house by turning our lives upside down when we bent over backwards to help you.

Copy text          Share          More



Sent to Louisiana in the 5th District Jurisdiction.

11:43 · 99%

< Michael Mann
9:26 PM, Dec 12

Also, Andrea has a recording of the converation
where you spoke your love for her while she was
at the shelter. This is because the shelter has
survelliance on the inside of the building, and she
had you on speaker due to cleaning the cages.
Unlike you, Andrea doesn't intentionally record
conversations. But the shelter did since they saw
Andrea's face was alarmed and checked on her.

She was/is a true friend of yours because she
never shared it with anyone but me. The fact you
had the NERVE to do this to Andrea before you
even moved into our home shows how much
disrespect you had towards me and how much
HELP you need.

It also shows how good of friends we are
because we still wanted you to be safe.

Due to how much I have watched my fiance cry
yesterday from your lies, and how much you have
hurt her, you too have hurt me to the core.

Even after all your lies about us (which of course
the guys told me since they knew it was wrong
and lies), we still only want what's best for you.

Copy Text        Share        More

Sent to Louisiana In
the 5th District Jurisdiction.



11:43

## Michael Mann
9:35 PM, Dec 12

But we have to protect ourselves from you now as you are a serious danger to us. Contrary to what you may think, you are NOT the victim here, but you sure as hell are leaving victims behind on the wake of your lies and deceit. The pain you have caused Andrea (someone who would still do anythiny for you) is nearly unforgivable. But  man to man, do not text or call until you get serious help.

Sent to Louisiana in the 5th District Jurisdiction.

Copy text          Share          More



11:43

Me
5:38 PM, Dec 15

I want to be clear with you and Andrea.

She is my sister, and of course I love her as my sister

I've always defended you and even let her know you two should be closer

But if you had something happen to you, I would take care of my sister

In a completely platonic way

When I was younger and going through the stuff at the school I think she truly cared for me, but I can't say for sure

But she was always yours, and always will be and I've never challenged that

Erin is the one for me

Only one response, de-escalation, provide clarity.



Sent to Louisiana in
the 5th District Jurisdiction.



One response, de-escalation, provide clarity.



Sent to Louisiana in
the 5th District Jurisdiction.



11:43

**Michael Mann**
9:41 PM Dec 15

If the things you are doing or saying are not causing you to gain peace then they are not the actions you should be taking.

Guilt for behaviours that are embarrassing is normal. Face the things about yourself that are the most ugly and adapt them or yourself to be more at ease.

No one can ermanatly live in the red zone of fear and survive.

Copy text     Share     More

Sent to Louisiana In the 5th District Jurisdiction.



Sent to Louisiana in
the 5th District Jurisdiction.

Only one response, desescalation,
provides clarification.

← Sent to Louisiana In
the 5th District Jurisdiction.

11:44

### Michael Mann
9:54 PM, Dec 15

For the two weeks you were in my home, safely sheltered, provided food, and round the clock shoulders to rant or cry on about any and all things running through your mind. From one cycle to the next your reasons for what people do and for your actions to others would change.

This was not properly questioned as we thought you were processing.

Any other person would have pushed your behavior out of their lives.

I woke up to you run/falling down my staircase is a paranoid frenzy to leave for fear that a sleeping person was going to physically restrain you.

This is not rational.

I know you have the ability to understand. I just don't think your thoughts are able to slow down and allow you the clarification needed to see what has happened for the last few weeks clearly.

I'm afraid you are going to have another paranoid flight at the tail end of a 24 hour or more period of no sleep and realise too late how bad things have gotten while you were hyper focused on your paranoia.

Copy text          Share          More

Sent to Louisiana in the 5th District Jurisdiction.





Sent to Louisiana in the 5th District Jurisdiction.

Only one response, de-escalation, provides clarification.

11:44

99%

### Michael Mann
4:35 AM, Dec 16

The link you sent is discussing fear of death from a heart attack...not fear of everybody around you. That's a different kind of paranoia.

What makes this worse is the 1st text you sent yesterday states how you were just expressing platonic love to my fiance.... I have the recorded conversation from the shelter, so I heard your words...

However, as I said in the original texts on Sunday, she and I put this aside to let you in our home (as it did not matter to us) because we wanted you to get better. And we still do friend.

But the fact you told others Andrea put you in fear, and that I was going to restrain you...Do you even care/understand the false accusations you're throwing at people?

Andrea has had physical heart pain from the worry over the lies you spread about her last Friday. I have had her take an aspirin every day to be safe. JT, your acts have hurt her so much.

You are not the victim here. Please seek psychiatric/medical care asap to get better asap...

Copy text    Share    More

Sent to Louisiana in the 5th District Jurisdiction.

1:49

## Michael, Jon
10:22 PM, Dec 21

**(No subject)**

Jon, I was informed today you have again used my name in a defamatory manner in conversation. Specifically, you told Crystal that I was taking advantage of Jared.

Please stop attempting to manipulate people with your deceptions as you are hurting yourself by continuing to knowingly lying about persons who disagree with you.

I want to be clear, I have contacted an attorney. They have stated the pursuit of a case against you for defamation is well within reason.

I have repeatedly asked you to stop lying when using my or Andrea's name. This is the last verbal warning you will receive. The next contact on this subject will be from an attorney.

I have attached Erin in this text message in an effort to make your malice STOP.

Stop the character assination of every person who asks you to get treatment. You have crushed Andrea with your lies and manipulation. She has taken an aspirin everyday for the chest pain your lies have caused her. For our well being, LEAVE US ALONE!

Copy text          Share          More

Michael Alan Mann Holmager using ▓▓▓ D.A.R.V.O. method, and attempting to threaten and manipulate my wife along with me.

Get on the path to results today. Call 765.962.7700.



# Connect With Us





# Contact Us

## The Moore Law Firm is located in Historic Richmond, Indiana & assists clients in Eastern Indiana

*Please note that by filling out information in the "contact us" form, that action does not constitute an attorney-client relationship, nor is the information protected under attorney privilege*

# The Moore Law Firm, LLC

113 S. Third Street, Richmond, IN 47374

Phone: 765.962.7700
Fax: 765.962.7779
Email: info@themoorelawfirm.com

## Hours

Today Closed ⌄

**GET IN TOUCH!**

Copyright © 2020 The Moore Law Firm, LLC - All Rights Reserved.

 

Powered by GoDaddy Website Builder





## Ronald J. Moore, Esq.

Ron Moore is the owner of The Moore Law Firm, LLC. He received his J.D. from the Indiana University Robert McKinney School of Law in Indianapolis in 1997, and his B.A. in Sociology and Criminal Justice from The Ohio State University in 1993. He received an A.A. from Los Angeles Harbor College in 1989, and studied Mechanical Engineering at the Georgia Institute of Technology from 1987-1989. He was recently named a 2020 member of Lawyers of Distinction, and has been named a Top 100 National Trial Lawyer in the areas of Civil Plaintiff and Criminal Defense.

Ron has resided and practiced in Richmond since 1997. He is a member of St. Mary's Catholic Church. His youngest son attends Seton Catholic School, and his oldest son is a lawyer in New York City.

Ron is a member of the Wayne County Bar Association, the National Association of Criminal Defense Lawyers, Lawyers of Distinction, Boy Scouts of America, the National Rifle Association and the Indiana Free & Accepted Masons. He is admitted to the Bar of the State of Indiana, and both the Northern and Southern Districts of the Federal Courts of Indiana.





# In The Matter of Ronald J. Moore

Converted file per

FOR THE RESPONDENT      FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION

Ronald E. Elberger        Donald R. Lundberg, Executive Secretary
Bose, McKinney & Evans, LLP.     Laura Iosue, Staff Attorney
2700 First Indiana Plaza       115 West Washington Street
135 N. Pennsylvania Street      Suite 1165
Indianapolis, IN 46204       Indianapolis, IN 46204

IN THE

SUPREME COURT OF INDIANA

IN THE MATTER OF ) ) Case No. 89S00-0105-DI-230 RONALD J. MOORE )

DISCIPLINARY ACTION

October 17, 2001

Per Curiam
Attorney Ronald J. Moore retained for personal use nearly $20,000 in legal fees in
contravention of an agreement which required him to remit such fees to his law firm. To
conceal his misconduct, he lied about the fees to other attorneys in the firm. Today we
approve a Statement of Circumstances and Conditional Agreement for Discipline between

the respondent and the Indiana Supreme Court Disciplinary Commission, which calls for his suspension from the practice of law for this misconduct. See Ind. Admission and Discipline Rule 23, Section 11.

Having been admitted to the bar of this state in 1997, the respondent is subject to our disciplinary jurisdiction.

The facts are undisputed. Two months after graduating from law school in 1997, the respondent was hired as an associate lawyer by a Richmond, Indiana, law firm. The firm and the respondent agreed that the respondent would be paid a salary, that all legal work he performed would be as an agent of the firm, and that all fees he earned would belong to the firm. The respondent's salary was $600 per week from August 4, 1997, until his bar admission on November 3, 1997; $800 per week from November 4, 1997, through December 31, 1998; $900 per week for the 1999 calendar year, with a $4,000 year-end bonus; and $1,000 per week for the 2000 calendar year.

For about 18 months, the respondent's duties at the firm included handling criminal appeals as an appellate public defender for Wayne County. During the course of the public defender contract, the respondent received $11,900 from Wayne County in checks made payable to him. The respondent deposited the checks into his personal bank account and never remitted any of those fees to the firm. At least twice in 1999, members of the firm confronted the respondent about the absence of fees from his public defender work. The respondent told them that he had not been paid yet by Wayne County. By April 2000, members of the firm became so suspicious of the respondent's assertions that they contacted the Wayne County Auditor's Office. They discovered that the respondent had been receiving payments for the public defender work for approximately 18 months. On April 13, 2000, members of the firm confronted the respondent with this information. He admitted he had retained the money. He also disclosed that he had represented clients charged with drunk driving, charged each $750 for the representation, and deposited all of the fees into his personal bank account, instead of turning them over to the firm as he was required. To avoid detection, the respondent did not enter these cases into the firm's case management system and required the clients pay him directly. The fees improperly retained by the respondent from the public defender contract and from the ten drunk driving clients totaled $19,400.

We find that, by his theft of funds that pursuant to agreement belonged to the law firm, the respondent violated Ind. Professional Conduct Rule 8.4(b), which provides that an attorney commits professional misconduct when engaging in a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. We also find that by lying to his colleagues about those fees, the respondent violated Prof.Cond.R. 8.4(c), which provides that a lawyer commits professional misconduct when engaging in conduct

involving dishonesty, fraud, deceit or misrepresentation.

Given our finding of misconduct, we must determine an appropriate discipline. The parties agree that an 18-month suspension from the practice of law is warranted. In determining appropriate discipline, we consider the misconduct, the respondent's state of mind underlying the misconduct, the duty of this court to preserve the integrity of the profession, the risk to the public in allowing the respondent to continue in practice, and any mitigating or aggravating factors. Matter of Mears, 723 N.E.2d 873 (Ind. 2000).

In mitigation, the parties agree that the respondent paid the firm $20,000, which included the fees he wrongfully retained plus interest, within one month after his wrongdoing was discovered and before any disciplinary investigation was pending. The respondent underwent counseling and has satisfied the personal financial obligations which contributed to his decision to commit the misconduct. Joined by members of his firm, the respondent voluntarily reported his misconduct to the Disciplinary Commission. He also has met individually with the judges in Wayne County and with members of the Wayne County Bar Association to admit his misconduct.

In aggravation, the parties note the respondent planned his conversion of funds and perpetuated this scheme for at least 18 months by lying about it on two occasions when members of the firm confronted him. The parties further agree the respondent's actions demonstrate a pattern of misconduct both in terms of the types of funds he converted -- both public defender contract checks and funds from ten clients -- and in the repetitive nature of his actions. The parties also note the respondent's actions were motivated by personal financial stress and occurred shortly after he graduated from law school when he was earning from $41,600 to $52,000 annually.

In a similar case, we suspended an attorney who retained fees belonging to the attorney's firm. Matter of Miller, 730 N.E.2d 171 (Ind. 2000). Given the respondent's carefully planned and executed deception in this case, we conclude that the agreed suspension is appropriate.

Accordingly, the respondent, Ronald J. Moore, is hereby suspended from the practice of law for not fewer than eighteen (18) months, beginning November 19, 2001, at the conclusion of which he shall be eligible to petition for reinstatement pursuant to Admis.Disc.R. 23(4).

The Clerk of this Court is directed to provide notice of this order in accordance with Admis.Disc.R. 23(3)(d) and to provide the Clerk of the United States Court of Appeals for the Seventh Circuit, the Clerk of each of the United States District Courts in this state, and the Clerk of each of the United States Bankruptcy Courts in this state with the last known address of the respondent as reflected in the records of the Clerk.

Costs of this proceeding are assessed against the respondent.

**PAYCHECK PROTECTION LOAN DATA NOW AVAILABLE** — FederalPay is now hosting the latest publicly released PPP loan company data from the SBA (Updated September 30, 2023)

FederalPay is an independent website, and **we rely on ad revenue** to keep our site running and our information free. ✕
If this site has helped you out, please consider donating!

Today, November 10th, 2023, is a federal holiday. All non-essential federal employees are off work in observance of **Veterans Day.** ✕
(Note: Veterans Day is observed on November 10th because November 11th falls on a weekend)
**Read more about Federal Holidays!**

## Federal Employee Profile — Ronald J. Moore

# Ronald J. Moore

Title: General Attorney (Job titles are sourced from the OPM. Keep in mind that the OPM has a limited set of job classifications with which to describe a wide variety of employees, so in some cases a generic job classification will be used if a more specific one is not available.)

Agency: U.S. Trustee Program

In 2022, Ronald J. Moore was a General Attorney at the U.S. Trustee Program in Indianapolis, Indiana. Moore began working at the U.S. Trustee Program in 2007 with a starting salary of $103,266. Since then, Moore's salary has increased to $165,400 in 2022.

Ronald J. Moore is a AD-00 under the administratively determined rates, not elsewhere specified payscale.

| Year | Occupation | Paygrade | Base Salary | Bonus | Location |
|------|-----------|----------|-------------|-------|----------|
| 2022 | General Attorney | AD-00 | $165,400 | $0 | Indianapolis, Indiana |
| 2021 | General Attorney | AD-00 | $161,813 | $0 | Indianapolis, Indiana |
| 2020 | General Attorney | AD-00 | $155,500 | $0 | Indianapolis, Indiana |
| 2019 | General Attorney | AD-00 | $151,500 | $0 | Indianapolis, Indiana |
| 2018 | General Attorney | AD-00 | $149,400 | $0 | Indianapolis, Indiana |
| 2017 | General Attorney | AD-00 | $149,247 | $0 | Indianapolis, Indiana |
| 2016 | General Attorney | AD-00 | $141,856 | $0 | Indianapolis, Indiana |
| 2015 | General Attorney | AD-00 | $136,400 | $0 | Indianapolis, Indiana |
| 2014 | General Attorney | AD-00 | $127,400 | $0 | Indianapolis, Indiana |
| 2013 | Miscellaneous Administration And Program | AD-00 | $126,056 | $0 | Indianapolis, Indiana |
| 2012 | Miscellaneous Administration And Program | AD-00 | $118,921 | $0 | Indianapolis, Indiana |
| 2011 | Miscellaneous Administration And Program | AD-00 | $118,921 | $0 | Indianapolis, Indiana |
| 2010 | Miscellaneous Administration And Program | AD-00 | $118,921 | $0 | Indianapolis, Indiana |
| 2009 | Miscellaneous Administration And Program | AD-00 | $110,098 | $0 | Indianapolis, Indiana |

| Year | Occupation | Paygrade | Base Salary | Bonus | Location |
|------|------------|----------|-------------|-------|----------|
| 2008 | Miscellaneous Administration And Program | AD-00 | $106,323 | $0 | Indianapolis, Indiana |
| 2007 | Miscellaneous Administration And Program | AD-00 | $103,266 | $0 | Indianapolis, Indiana |

**FederalPay's Employee Information Policy**

Federal employees' salaries are considered public information under 5 U.S.C. § 552, and in the interest of government transparency FederalPay publishes the salary information of all federal employees who earn more than $100,000 per year, or who are in the highest paid 10% of their agency. This data is published unmodified, as provided by the OPM.

🔍  Run a people search on Ronald J. Moore 🗗

Search U.S. Trustee Program Employees

 **Employee Statistics**

Ronald J. Moore's 2022 pay is

⬆ **9%**

higher than the average General Attorney across all agencies.

Ronald J. Moore's 2022 pay is

⬆ **30%**

higher than the average pay of an AD employee at the U.S. Trustee Program.

Ronald J. Moore's pay trend during his or her government career in the U.S. Trustee Program:



## Data Sources

The information provided on these pages is sourced from the Office of Personnel Management (OPM) 🗗 Enterprise Human Resources Integration (EHRI) 🗗 dataset. Postal Service data is managed exclusively by the USPS 🗗. All information is displayed unmodified and as provided by the source agency.

**Federal employee salaries are public information under open government laws (5 U.S.C. § 552).** FederalPay provides this data in the interest of government transparency — employee data may not be used for commercial soliciting or vending of any kind. Learn more about the FederalPay Employees Dataset here.

** This Document Provided By **www.FederalPay.org** - The Civil Employee's Resource **

*Source:* www.federalpay.org/employees/us-trustee-program/moore-ronald-j

 **Gmail**

Jon F Turpin <jt4590@gmail.com>

---

**Opinion**

---

**Jon F. Turpin** <jt4590@gmail.com>
Bcc: braun_casework@braun.senate.gov

Tue, Oct 31, 2023 at 11:50 PM

---

————— Forwarded message —————
**From: Jon F. Turpin** <jt4590@gmail.com>
Date: Tue, Oct 31, 2023 at 11:01 PM
Subject: Re: Opinion
To:

*[Handwritten: Evidence may have been disclosed against rule 26 to an attorney participating in collusion and conspiracy, despite it regarding impeachment of]*

# Rule 26. Duty to Disclose; General Provisions Governing Discovery *[Handwritten: Alejandro Mayorkas, and it regarding]*

(a) REQUIRED DISCLOSURES. *[Handwritten: Civil forfeiture of assets "In rem" which is "why"]*

(1) *Initial Disclosure.* *[Handwritten: I referenced "Napoleonic Eminent Domain"... Maritime law etc.]*

(A) *In General.* Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:

(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

(ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

(iii) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and

(iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

(B) *Proceedings Exempt from Initial Disclosure.* The following proceedings are exempt from initial disclosure:

(i) an action for review on an administrative record;

(ii) a forfeiture action in rem arising from a federal statute; *[Handwritten: 42 U.S.C. § 1983]*

Sincerely,
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

[CORRECTION]
On Tue, Oct 31, 2023 at 10:46 PM Jon F. Turpin <jt4590@gmail.com> wrote:
> In my opinion, Ronald J. Moore has violated a declatory decree and attempted to deny me declaratory and coercive relief by causing double jeopardy and preventing appropriate collateral estoppel despite how the case was filed, in my opinion, preventing the plaintiffs from proceeding, [along with prior rulings ]and they have been provided with evidence which may be used for a forfeiture action in rem, and potentially for Mayorkas' impeachment, which may preclude the disclosure requirement in Rule 26, meaning, in my opinion they may have yet again obtained access to infirmation via intrusion and not following the rules of civil procedure, nor even the prior orders of the 5th circuit, and the Indiana Supreme Court Disciplinary Commission.

On Tue, Oct 31, 2023, 10:23 PM Jon F. Turpin <jt4590@gmail.com> wrote:

Even the courts knew in their filing that the case didn't have a valid reason to be filed under seal by how the paperwork is written, [which clearly includes the alleged victims and alleged petitioners purported addresses] and in my opinion... Mr. Moore's last assertions and questions went against the order of the court to uphold my expungment and my 3rd and 4th amendment rights by attempting yet again to attempt to disable me from a compulsory counterclaim via 42 U.S. Code 1983 due to their own actions.

[CORRECTION]

In my opinion, it is yet another attempt to cause double jeopardy in a court without jurisdiction, and it was clarified the alleged victim used to work for Eskenazi Health.



# Catholic University Law Review

Volume 59
Issue 3 *Spring 2010*                                                        Article 7

2010

# Opening the Umbrella: The Expansion of the Prosecutorial Vindictiveness Doctrine in United States v. Jenkins

Melodie Bales

Follow this and additional works at: https://scholarship.law.edu/lawreview

**Recommended Citation**
Melodie Bales, *Opening the Umbrella: The Expansion of the Prosecutorial Vindictiveness Doctrine in United States v. Jenkins*, 59 Cath. U. L. Rev. 855 (2010).
Available at: https://scholarship.law.edu/lawreview/vol59/iss3/7

This Notes is brought to you for free and open access by CUA Law Scholarship Repository. It has been accepted for inclusion in Catholic University Law Review by an authorized editor of CUA Law Scholarship Repository. For more information, please contact edinger@law.edu.

# NOTES

## OPENING THE UMBRELLA: THE EXPANSION OF THE PROSECUTORIAL VINDICTIVENESS DOCTRINE IN *UNITED STATES V. JENKINS*

*Melodie Bales*[+]

You are a prosecutor. You are handed a case file concerning a recidivist offender allegedly involved in a series of four robberies in your jurisdiction. You are told to indict the suspect by the end of the day. After reading through the file, however, it appears that although there is strong evidence the suspect committed the most recent robbery, the evidence is weaker when it comes to the other three. Do you charge the suspect with all four crimes? Do you wait to see whether new evidence will surface later? If you are a federal prosecutor in the Ninth Circuit, the decision is clear: indict the suspect on all four counts, even if the evidence is weak.

Traditionally, prosecutors enjoy broad discretion when determining whether to charge a person with a crime.[1] Courts, however, must ensure that the government does not bring charges for improper purposes, such as retaliation.[2] The basis for this judicial oversight is to protect defendants' due process rights from government infringement.[3] At bottom, due process is the foundation of the U.S. criminal-justice system.[4]

---

[+] J.D. Candidate, May 2011, The Catholic University of America, Columbus School of Law; B.A., 2007, Mount St. Mary's University. The author wishes to thank Professor Cara H. Drinan for her guidance; her fiancé, Rob, for his unwavering support; her family for their encouragement; and the entire *Catholic University Law Review* staff and editorial board for their assistance.

1. *See* Craig H. Solomon, Note, *Prosecutorial Vindictiveness: Divergent Lower Court Applications of the Due Process Prohibition*, 50 GEO. WASH. L. REV. 324, 324 (1982).

2. *Id.* at 325.

3. *See id.* The Due Process Clause of the Fifth Amendment mandates: "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Fourteenth Amendment contains its own Due Process Clause with respect to the states, providing: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

4. *See* Solomon, *supra* note 1, at 325 (explaining that the Fifth and Fourteenth Amendments provide the constitutional basis for "prohibit[ing] the prosecutor's misuse of his charging authority"). Specifically, the Supreme Court, in *Bordenkircher v. Hayes*, stated that vindictive prosecution violates the Due Process Clause of the Fourteenth Amendment. Bordenkircher v. Hayes, 434 U.S. 357, 362 (1978) (quoting North Carolina v. Pearce, 395 U.S. 711, 725 (1969)).

The doctrine of prosecutorial vindictiveness[5] is deeply rooted in Supreme Court jurisprudence.[6]   The doctrine originally arose to prevent judicial vindictiveness—to protect defendants who successfully appealed convictions.[7] The Supreme Court next applied the doctrine to prosecutorial charging decisions, finding vindictiveness where a prosecutor increased charges from misdemeanor to felony after a defendant exercised his statutory right to seek a new trial.[8]  In *Blackledge v. Perry*, decided in 1974, the Supreme Court held that any "increased punishment upon retrial after appeal . . . that pose[s] a realistic likelihood of 'vindictiveness'" violates due process.[9]  Although the concept of vindictive prosecution seems straightforward, the federal circuit courts have interpreted "vindictiveness" in various ways and have grappled with the doctrine's application.[10]

Once a realistic likelihood of vindictiveness is shown, a presumption of vindictiveness arises.[11]  However, the prosecutor can rebut this presumption by presenting objective evidence explaining the reason for the charges.[12]   The federal circuit courts have interpreted and expanded the *Blackledge* principle,

---

5.   Vindictive prosecution has been defined by the United States Court of Appeals for the Seventh Circuit as behavior that results from "specific animus or ill will" or that occurs when a prosecutor "charges a more serious violation . . . in retaliation for the exercise of a legal or constitutional right in connection with the original charge." United States v. DeMichael, 692 F.2d 1059, 1061–62 (7th Cir. 1982).

6.   *See* Alabama v. Smith, 490 U.S. 794, 798, 501 (1989) (discussing a significant number of Supreme Court cases establishing and construing the prosecutorial vindictiveness doctrine).

7.   *See Pearce*, 395 U.S. at 726 (holding that judges ordering harsher sentences for defendants who had successfully won a trial de novo upon appeal must base their sentencing decision on "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding").

8.   Blackledge v. Perry, 417 U.S. 21, 27–29 (1974). "The Court has treated prosecutorial vindictiveness and judicial vindictiveness as a single issue, developing a uniform presumption for both types of cases." Jonathan D. Youngwood, Comment, *The Presumption of Judicial Vindictiveness in Multi-Count Resentencing*, 60 U. CHI. L. REV. 725, 731 n.36 (1993).

9.   *Blackledge*, 417 U.S. at 27. Additionally, the Court noted that due process also requires that defendants be free to exercise their rights to challenge their convictions without the fear of retaliation by prosecutors. *Id.* at 28.

10.   *See* United States v. Andrews, 612 F.2d 235, 257 (6th Cir. 1979) (Keith, J., dissenting) ("Given the chaotic nature of the law in the circuits regarding prosecutorial vindictiveness, we can expect further guidance on this question from the Supreme Court in the near future."); *see also* Wasman v. United States, 468 U.S. 559, 570 (1984) ("*Pearce* is not without its ambiguities . . . ."); Hardwick v. Doolittle, 558 F.2d 292, 299 (5th Cir. 1977) ("Decisions after *Pearce* have not been entirely consistent in applying the *Pearce* Principle."); Solomon, *supra* note 1, at 331–40 (discussing the various tests used by the circuit courts, which highlight that even slight variations in interpretations of Supreme Court precedent can have a significant effect on vindictiveness rulings).

11.   United States v. Jenkins (*Jenkins I*), 504 F.3d 694, 700 (9th Cir. 2007).

12.   *See Blackledge*, 417 U.S. at 28, 29 n.7 (noting an example in which a defendant's due process was not violated because the prosecutor's subsequent harsher charge was not done in bad faith).

attempting to safeguard the rights of defendants while ensuring that prosecutors continue to have broad discretion in making charging decisions.[13]

*United States v. Jenkins* (*Jenkins I*) came to the United States Court of Appeals for the Ninth Circuit after the government appealed the district court's decision to dismiss the case based on its finding of an appearance of prosecutorial vindictiveness.[14]   The Ninth Circuit affirmed the district court's decision, finding that the defendant's confession to prior acts of illegal-alien smuggling—given while testifying at her trial for importing marijuana—could not be used as the basis for alien smuggling charges because its use raised a presumption of vindictiveness that the government failed to rebut.[15]   The Ninth Circuit denied a rehearing en banc, and a seven-judge dissent lamented the extension of the doctrine.[16]

This Note will examine the background and potential impact of *Jenkins I* on the doctrine of prosecutorial vindictiveness.   First, this Note will examine the origins of the doctrine in Supreme Court decisions and discuss how the federal courts of appeal have interpreted the doctrine since its inception.   Specifically, this section will explore how the circuits have either narrowed or expanded the scope of the doctrine over time.   Second, this Note will address the Ninth Circuit's application of the doctrine in *Jenkins I*.   In particular, this section will investigate whether the Ninth Circuit properly applied the doctrine when it affirmed the dismissal of criminal charges for vindictive prosecution based on new charges brought during trial for conduct unrelated to the trial.   Third, this Note will evaluate the impact of *Jenkins I* on the Ninth Circuit and other courts' precedent and predict the possible impact of the decision on the doctrine.   This section will show that *Jenkins I* effectively protects defendants

---

13.   *See, e.g.*, United States v. Griffin, 617 F.2d 1342, 1348 (9th Cir. 1978) (emphasizing that prosecutors must be given discretion to bring charges based on the "legitimate requirements of the justice system," and noting that "[n]othing in *Blackledge* presumed to give a defendant a free ride for separate crimes he may have committed, or to prevent a prosecutor from bringing new charges as a result of changed or altered circumstances which properly bear on prosecutorial discretion"); *Hardwick*, 558 F.2d at 302 (stating that adopting an "apprehension of vindictiveness" standard rather than an *actual* vindictiveness standard would essentially "render the prosecutor's discretion meaningless"); United States v. DeMarco, 550 F.2d 1224, 1227 (9th Cir. 1977) (explaining that the *Blackledge* Court's reasoning was based on its conclusion "that fear of vindictiveness for exercising a statutory right to appeal was as forceful as actual vindictiveness in chilling a defendant's 'free and unfettered' choice in deciding to appeal" (citation omitted)).

14.   *Jenkins I*, 504 F.3d at 697–98.

15.   *Id.* at 697, 701–02.

16.   United States v. Jenkins (*Jenkins II*), 518 F.3d 722, 723–29 (9th Cir. 2008) (O'Scannlain, J., dissenting from denial of the rehearing en banc).   The chief dissent was authored by Judge Diarmuid F. O'Scannlain, and was joined by Chief Judge Alex Kozinski, and Judges Andrew J. Kleinfeld, Richard C. Tallman, Consuelo M. Callahan, Carlos T. Bea, and Milan D. Smith, Jr.   *Id.* at 723.   The dissent argued that the *Jenkins I* majority not only "contradict[ed]" Ninth Circuit precedent, but also created a circuit split that would only further confuse the doctrine's application.   *Id.* at 723–29.

who confess to crimes while testifying at trial for different crimes. Thus, as this section will demonstrate, prosecutors will be forced to charge defendants with all possible crimes, even if the evidence is weak at the time the charges are brought. Finally, this Note will conclude that *Jenkins I* was wrongly decided because it expanded the doctrine beyond the scope recognized by other circuits, overextending the protections of the Due Process Clause.

## I. THE ORIGINS AND COMPETING INTERPRETATIONS OF THE PROSECUTORIAL VINDICTIVENESS DOCTRINE

### A. The Supreme Court Announces the General Rules

In 1969, the Supreme Court acknowledged the issue of vindictiveness in *North Carolina v. Pearce*.[17] In *Pearce*, the Supreme Court reviewed two consolidated cases, both of which involved a convicted criminal defendant who successfully challenged his conviction and who, upon conviction after retrial, received a longer sentence without apparent justification for the extension.[18] The Court held that "[d]ue process of law . . . requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial," and therefore, "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for doing so must affirmatively appear."[19]

In *Blackledge v. Perry*, the Court extended the *Pearce* rule to include prosecutorial vindictiveness.[20] The defendant in *Blackledge* was convicted of a misdemeanor and exercised his right to seek a new trial.[21] The prosecutor then charged Perry with a felony for the same actions that resulted in Perry's misdemeanor conviction.[22] The Court found that even though there was "no evidence that the prosecutor acted in bad faith or maliciously," his actions violated Perry's right to due process because "a defendant [must] be freed of apprehension of such a retaliatory motivation."[23]

In neither *Pearce* nor *Blackledge* did the Court require a showing of actual vindictiveness on the part of the judge or prosecutor in order to establish a due

17. North Carolina v. Pearce, 395 U.S. 711, 725 (1969).

18. *Id.* at 713–16, 726.

19. *Id.* at 725–26. The reasons given by the judge "must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Id.* Further, the Court recognized that "due process . . . requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." *Id.* at 725.

20. Blackledge v. Perry, 417 U.S. 21, 27–29 (1974).

21. *Id.* at 22.

22. *Id.* at 23.

23. *Id.* at 28. Specifically, the Court was concerned that prosecutors might discourage appeals by "upping the ante" on defendants, in effect threatening defendants that harsher charges would be brought in subsequent trials. *Id.* at 27–28.

process violation.[24]  The Court was concerned that the fear of vindictiveness would deter defendants from exercising their rights, therefore it held that due process is offended by actions that "pose a realistic likelihood of 'vindictiveness.'"[25]

While *Pearce* and *Blackledge* arose in the post-trial appeal setting, the Supreme Court has also addressed vindictiveness in the pretrial setting.[26]  In the pretrial setting, however, the Court has been more willing to extend deference to prosecutorial discretion and less willing to find a presumption of vindictiveness.[27]  In *United States v. Goodwin*, the Court indicated that the timing of the prosecutor's action affects whether the prosecutor's actions are presumed to be vindictive.[28]  One of the primary reasons for this distinction lies in the Court's general vindictiveness rationale.  For example, in *Blackledge*, the Court indicated that vindictiveness was more likely to be found in situations in which a prosecutor's actions could be driven by an effort to save time and money by discouraging defendants from exercising their legal rights, such as in seeking a retrial.[29]

---

24.  *See id.* at 28 (noting that *Pearce* did not require "actual retaliatory motivation," and finding that causing apprehension of such motivation is sufficient to raise the presumption of vindictiveness).

25.  *Id.* at 27–28.

26.  *See, e.g.*, Bordenkircher v. Hayes, 434 U.S. 357, 362–65 (1978).

27.  *See, e.g.*, United States v. Goodwin, 457 U.S. 368, 380–82 (1982) (finding no presumption of vindictiveness where a defendant requested a jury trial based on misdemeanor charges and was later charged with a felony, because prosecutors have broad discretion to amend charges based on newly discovered information or modified trial strategy); *Bordenkircher*, 434 U.S. at 358–59, 362–65 (finding that due process was not violated where a prosecutor carried out a threat made during plea negotiations, when the defendant did not accept the government's plea offer).  It is nearly impossible to prove vindictiveness in the material setting after *Bordenkircher*, and it has even been argued that *Bordenkircher* shifted the underlying rationale of the vindictiveness rule from protecting a defendant from government pressure that would deter the defendant from exercising a legal right, to a focus on protecting the defendant from government retaliation. *See* Solomon, *supra* note 1, at 330–31.

28.  *See Goodwin*, 457 U.S. at 381–82 (noting that a prosecutor's initial charging decision "should not freeze future conduct" and "may not reflect the extent to which an individual is legitimately subject to prosecution," and concluding that "the timing of the prosecutor's action in this case suggests that a presumption of vindictiveness is not warranted").

29.  *See Blackledge*, 417 U.S. at 27.  In *Goodwin*, the Court found that the defendant's request for a jury trial, as opposed to a bench trial, did not provide the prosecutor with a sufficient incentive "to engage in 'self-vindication,'" and therefore did not give rise to a presumption of vindictiveness. *See Goodwin*, 457 U.S. at 383.  The defendant in *Goodwin* argued that the government was retaliating because the defendant requested a trial by jury, but the Court found that a trial by jury is not as burdensome on the government as a retrial, which was the issue in *Blackledge*. *Id.* Thus, the Court found that the likelihood of "institutional bias" present in *Blackledge* was absent in *Goodwin* because the incentive to avoid a costly retrial was also absent. *Id.* The Court noted that in the *Blackledge* context, a prosecutor has a "personal stake" in deterring a new trial, whereas prosecutors generally are not concerned with whether a trial will be a bench or jury trial. *Id.*

Although *Pearce* and *Blackledge* are settled law, the Court has admittedly "been chary about extending the *Pearce* presumption of vindictiveness when the likelihood of vindictiveness is not as pronounced as it was in *Pearce* and *Blackledge*."[30]  The Court has repeatedly noted that the government generally has broad discretion when bringing charges, and has explained that "[t]his broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review."[31]  The Court has recognized that there are multiple factors that prosecutors weigh when making charging decisions, including "the strength of the case" that "courts are [not] competent to undertake."[32]

## B. Application of the Doctrine in the Ninth Circuit

### 1. The Rule and the Rationale Behind the Rule

The seminal Ninth Circuit case applying *Pearce* and *Blackledge* is *United States v. Ruesga-Martinez*.[33]  In *Ruesga-Martinez*, the Ninth Circuit found vindictive prosecution where the prosecutor increased the charges against the defendant from a misdemeanor to a felony after the defendant pled not guilty and refused to waive his rights to be tried by a district judge or a jury.[34]  In so doing, the court established the rule that where a defendant is reindicted after exercising a procedural right, "the prosecution bears a heavy burden of proving that any increase in the severity of the alleged charges was not motivated by a vindictive motive."[35]

---

30.  Wasman v. United States, 468 U.S. 559, 566 (1984) (noting that the reluctance to extend the *Pearce* presumption stems from the concern that the presumption works to bar "legitimate" criminal prosecution).

31.  Wayte v. United States, 470 U.S. 598, 606–07 (1985).  Though *Wayte* arose in the context of selective prosecution, the Court pointed to *Bordenkircher* and *Goodwin* when discussing the great difficulties and potential policy concerns inherent in judicial review of prosecution decisions. *Id.* at 607.

32.  *Id.*  The Court listed factors weighed by the government when making charging decisions, including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Id.*  Additionally, the Court noted that considerations of judicial economy counsel against allowing judges to review charging decisions, because such review "delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.*  Thus, the Court has indicated that judicial review of charging decisions presents both separation-of-powers concerns and practical issues. *See id.*

33.  *See* United States v. Ruesga-Martinez, 534 F.2d 1367, 1368 (9th Cir. 1976); *see also* Peter J. Henning, *Prosecutorial Misconduct and Constitutional Remedies*, 77 WASH. U. L.Q. 713, 737 n.79 (1999).

34.  *Ruesga-Martinez*, 534 F.2d at 1368, 1371.  In this case, the defendant refused to waive his rights to trial by a district judge and trial by jury. *Id.* at 1368.

35.  *Id.* at 1369.  The court stressed that it was neither admonishing the prosecutor nor questioning the prosecutor's charging decision, but rather, it was eliminating any apprehension of

A key policy consideration in these cases is the deterrent effect on defendants because courts do not want defendants to refrain from fully exercising their rights out of fear of government retaliation.[36] In *United States v. Griffin*, the Ninth Circuit acknowledged the need to curb the deterrent effect that subsequent charges might have on a defendant's decision to exercise a right,[37] but explained that when assessing the deterrence factor, courts must also remember the need to respect prosecutorial discretion:

> Prosecutors require a certain amount of discretion in bringing indictments, including the extent to which an indictment covers all the acts of the defendant which constitute crimes. Nothing in *Blackledge* presumed to give a defendant a free ride for separate crimes he may have committed, or to prevent a prosecutor from bringing new charges as a result of changed or altered circumstances which properly bear on prosecutorial discretion.[38]

Thus, the Ninth Circuit has traditionally deferred to the charging decisions of prosecutors, while emphasizing the prophylactic nature of the rule.[39] In possibly the most cited statement regarding the rule, the Ninth Circuit

---

vindictive prosecution when exercising a legal right. *Id.* In addition, the Ninth Circuit later held that procedural rights, the exercise of which is relevant to determining vindictiveness, are not confined to constitutionally protected rights; so long as the right at issue is sufficiently similar to those at issue in *Pearce* and *Blackledge*, it will be protected. *See* United States v. DeMarco, 550 F.2d 1224, 1227 (9th Cir. 1977). *Pearce* addressed the exercise of a right to appeal, and *Blackledge* addressed the exercise of a right to a new trial. *Id.* In *DeMarco*, the defendant "insisted" on exercising his right to change venue. *Id.* After the court granted the motion to change venue, the government obtained a second indictment against him based on conduct known at the time of the first indictment. *Id.* at 1226. Further, the prosecutor had previously threatened to bring the additional charges if the defendant successfully changed venue. *Id.*

36.   *DeMarco*, 550 F.2d at 1227; *Ruesga-Martinez*, 534 F.2d at 1369.

37.   United States v. Griffin, 617 F.2d 1342, 1348 (9th Cir. 1980). In *Griffin*, the Department of Justice delayed in filing a second indictment against the defendant because the Federal Bureau of Investigations (FBI) was still investigating the crimes that formed the basis for the second indictment and were "wholly unrelated" to the crimes charged in the first indictment. *Id.* at 1347. However, the court noted that defendants should not be able to point to the deterrence effect of alleged vindictive prosecution as a "shield" to avoid "legitimate" prosecution. *Id.* at 1348 (finding that because the FBI's investigation was ongoing, the defendant should have been on notice that additional charges might be filed).

38.   *Id.* (citing Blackledge v. Perry, 417 U.S. 21, 29 n.7 (1974)).

39.   *DeMarco*, 550 F.2d at 1227. The court pointed out that the rule limits prosecutorial discretion and checks retaliation against defendants who take advantage of their procedural rights. *Id.* The Ninth Circuit, however, has identified situations where the threat of additional charges would not deter a defendant from exercising a procedural or constitutional right. For example, in *United States v. Robison*, the defendant won a reversal of his death sentence, only to be subsequently indicted on other charges. United States v. Robison, 644 F.2d 1270, 1271 (9th Cir. 1981). Robison argued that the government was retaliating against him because he exercised his rights in prior cases, successfully getting one conviction reversed and other charges dismissed; the Ninth Circuit rejected this argument. *Id.* at 1272–73. The court found that the later charges—carrying only a ten-year maximum sentence—could not have deterred Robison from seeking a reversal of his death sentence. *Id.* at 1273.

explained its rationale: "[t]he prophylactic rule is designed not only to relieve the defendant who has asserted his right from bearing the burden from 'upping the ante' but also to prevent chilling the exercise of such rights by other defendants who must make their choices under similar circumstances in the future."[40]

### 2. The "Appearance of Vindictiveness" Test and Rebutting the Presumption Once It Has Been Established

When assessing prosecutorial vindictiveness claims, the Ninth Circuit takes several steps. In *Griffin*, the Ninth Circuit articulated a totality-of-the-circumstances approach, under which it assessed whether the "overall picture" reflects the appearance of vindictiveness.[41] Specifically, the court looked at the charging decision to determine whether it "suggest[ed] the 'appearance of vindictiveness.'"[42] If the defendant establishes facts that trigger the presumption, the burden shifts to the prosecution to rebut it by showing that "the prosecutorial decision was justified by either independent reasons or intervening circumstances."[43]

### 3. "Factual Nucleus" of Charges Is Only One Factor in Determining Vindictiveness and Is Not a Decisive Factor

The Ninth Circuit has distinguished between subsequent charges based on the same or related conduct as the original charge and subsequent charges

---

40.  *DeMarco*, 550 F.2d at 1227.

41.  *Griffin*, 617 F.2d at 1347–48.

42.  *Robison*, 644 F.2d at 1272 (citing *Griffin*, 617 F.2d at 1347).  The appearance-of-vindictiveness approach has been criticized for being overreaching. *See* Solomon, *supra* note 1, at 342–43.  The Ninth Circuit has found an "appearance of vindictiveness . . . even when the defendant has not . . . asserted any legal right." *See* United States v. Alvarado-Sandoval, 557 F.2d 645, 645–46 (9th Cir. 1977); *see also* Solomon, *supra* note 1, at 333 (noting that the *Alvarado-Sandoval* Court held that when a prosecutor raised a charge from a misdemeanor to a felony after a defendant delayed in filing a plea, the prosecutor's actions suggested the appearance of vindictiveness).  However, the appearance-of-vindictiveness approach has also been heralded as a way to provide defendants relief in situations where vindictiveness would be impossible to detect because the theory turns on a prosecutor's subjective, and presumably secret, motives. *See* Nancy Rader Whitehead, Note, *Evaluating Prosecutorial Vindictiveness Claims in Non-plea-bargained Cases*, 55 S. CAL. L. REV. 1133, 1148 (1982) (noting that "rarely will the evidence clearly indicate that retaliation was the only possible motive for the charging decision").

43.  *Robison*, 644 F.2d at 1272.  In *Griffin*, the Ninth Circuit indicated that evidence suggesting that an "intervening circumstance," other than the defendant's assertion of his rights, between the lesser initial charge and the greater subsequent charge, such as additional findings from an ongoing investigation, reduces the appearance of vindictiveness. *See Griffin*, 617 F.2d at 1348 (finding that where an investigation was ongoing, the defendant should have expected that the subsequent charge could be brought at some point).  Another example of an intervening circumstance includes new facts or evidence discovered by a prosecutor after a trial. *See* United States v. Preciado-Gomez, 529 F.2d 935, 939 (9th Cir. 1976).  In *Preciado-Gomez*, the court went on to point out that where "valid reasons exist" for "pursuing more serious charges," "courts should refrain from interfering with the prosecutor's right to exercise his discretion." *Id.*

based on conduct unrelated to the original charge.[44]   It has held that there is a greater likelihood of vindictiveness when the subsequent charges are based on conduct related to the conduct at issue in the original charge.[45]   Conversely, vindictiveness is less likely when the subsequent charge is based on conduct unrelated to the conduct in the original charge.[46]   However, this factor alone, though important, is not dispositive in determining whether the presumption arises.[47]    In sum, the Ninth Circuit has adopted an appearance-of-vindictiveness test based on the totality of the circumstances surrounding new charges, with one factor being whether the new charges arise out of the same facts as the initial charges.[48]

---

44.   *See* United States v. Groves, 571 F.2d 450, 454 (9th Cir. 1978); *DeMarco*, 550 F.2d at 1226.   Ultimately, however, the Ninth Circuit rejected the government's contention that *Blackledge* was distinguishable, noting that "[t]he factual nucleus of both indictments was the same." *Id.*

45.   *See Groves*, 571 F.2d at 454 (explaining that although the factual similarities between the charges is a factor for determining vindictiveness, it is only one of the factors). In *Groves*, the court found that the two crimes charged were "interrelated" because the first charge of cocaine possession was based on evidence discovered during an interrogation related to the second charge of marijuana trafficking. *Id.*

46.   *See Griffin*, 617 F.2d at 1347–48.   In *Griffin*, the Ninth Circuit found that the government's delay in bringing a second indictment did not raise the presumption of vindictiveness in part because the second indictment was based on a separate investigation into separate conduct by a separate government agency. *Id.* In addition, it reiterated the holding in *Groves* that the relationship between the conduct underlying the indictments is only one factor, "in the context of the whole case," that courts use to determine whether prosecutorial conduct rises to the level of vindictiveness. *Id.* at 1348. The Ninth Circuit has stated that when "the second charge is unrelated to the first, the presumption [of vindictiveness] does not arise." United States v. Martinez, 785 F.2d 663, 669 (9th Cir. 1986), *amended on other grounds by* 855 F.2d 621 (9th Cir. 1988).

47.   *Groves*, 571 F.2d at 454; *see also Robison*, 644 F.2d at 1272–73. In *Robison*, the court found that no presumption of vindictive prosecution existed when the two sets of charges "arose from events separate and distinct" from each other. *Id.* The Ninth Circuit noted that whether the new charges arise "out of the same nucleus of operative facts as the original charge . . . is one of the key indicia scrutinized by courts when confronted with a claim of vindictive prosecution." *Id.* at 1272–73. Though it is not a dispositive factor, the court stated that the defendant's failure to show that the charges in the two indictments were based on similar facts "weakened" the defendant's case. *Id.* The court further noted that the defendant's argument essentially boiled down to a fallacious "*post hoc*" argument—the mere fact that the second charge followed the exercise of a right did not mean that the second indictment was brought *because* the defendant exercised his rights. *Id.* at 1273.

48.   *Robison*, 644 F.2d at 1272.

### C. *Restrained Approach to the Doctrine Favoring Prosecutorial Discretion in Bringing Charges*

#### 1. *The Majority Approach: Distinguishing Between Subsequent Charges Brought for the Same and Other Crimes*

The consensus among the federal courts of appeals that have addressed this issue is that separate charges based on separate crimes do not raise the presumption of vindictiveness.[49]  The United States Court of Appeals for the Fifth Circuit has recognized that prosecutors may add charges in the course of a trial without violating the defendant's right to due process because the government has broad discretion in making charging decisions.[50]  The United States Court of Appeals for the Eleventh Circuit has held that the presumption of vindictiveness does not arise where the prosecutor brings subsequent charges based on conduct unrelated to earlier charges.[51]  The United States Court of Appeals for the Eighth Circuit has held that "[a] presumption of vindictiveness arises only when a prosecutor chooses to bring a more serious charge against a defendant in a second trial."[52]  The United States Court of Appeals for the District of Columbia Circuit has held that a presumption of vindictiveness does not arise when, among other things, the criminal activity alleged in a subsequent indictment is separate and apart from that alleged in the first.[53]

---

49.  Williams v. Bartow, 481 F.3d 492, 501 (7th Cir. 2007); United States v. Johnson, 171 F.3d 139, 141–42 (2d Cir. 1999); United States v. Andrews, 612 F.2d 235, 244 (6th Cir. 1980); *see* United States v. Peoples, 360 F.3d 892, 896 (8th Cir. 2004); United States v. Gary, 291 F.3d 30, 34 (D.C. Cir. 2002); Humphrey v. United States, 888 F.2d 1546, 1549 (11th Cir. 1989).

50.  *See* United States v. Krezdorn, 718 F.2d 1360, 1364 (5th Cir. 1984).  According to the Fifth Circuit's decision in *Krezdorn*, courts should not look at the various factors, such as the timing of added charges or the nucleus of facts upon which the charges are based. *Id.*  Nor should courts attempt to "strike the delicate balance between the rights of defendant and prosecutor," but rather, courts should look at the bigger picture. *Id.*  Specifically, the Fifth Circuit has held that no presumption will arise "[i]f any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision to increase the severity of charges was motivated by some purpose other than a vindictive desire to deter or punish appeals." *Id.* at 1365.  Conversely, if the proceedings reflect no possible evidence that the charges were brought for a purpose other than vindictiveness, the presumption properly arises and the government must rebut the presumption by a preponderance of the evidence. *Id.*

51.  *Humphrey*, 888 F.2d at 1549.  In *Humphrey*, the defendant claimed that because the government filed charges while he pursued habeas relief following his conviction, the government's conduct raised the presumption of vindictiveness. *Id.* at 1548.  However, the court found that these facts took the case out of the *Blackledge* rule, which only proscribes "retaliation by *substituting* a more serious charge for the original charge." *Id.* at 1549.

52.  *Peoples*, 360 F.3d at 896 (finding that the presumption of vindictiveness did not arise when the government renewed its notice to seek the death penalty after the defendant was awarded a new trial even though the notice was withdrawn during the first trial).

53.  *See Gary*, 291 F.3d at 33–34 (finding that the government exercised proper authority in issuing a second indictment, even though the defendant had already successfully appealed, explaining that even though the government brought a second indictment against the defendant

In *United States v. Andrews*, the United States Court of Appeals for the Sixth Circuit explicitly rejected the Ninth Circuit's approach to the presumption of vindictiveness, distinguishing between a prosecutor's decision to substitute charges and the decision to bring additional charges based on independent events.[54]   The *Andrews* court refused to extend the presumption of vindictiveness to a situation where the government brought a conspiracy charge that arose out of the same facts as the original charge, but where the court found that the new charge was additional, as opposed to substitute, and distinct from the original charges.[55]   Addressing the *Ruesga-Martinez* decision, the *Andrews* court found that the Ninth Circuit inappropriately extended the prosecutorial vindictiveness doctrine, stating that the "broad and strong language" of *Ruesga-Martinez* was "philosophically incompatible" with the Sixth Circuit's interpretations of *Pearce* and *Blackledge*.[56]

---

after the defendant successfully challenged her sentence on the first indictment, the government had the right to bring indictments for all of the defendant's criminal activity).

54.  *See Andrews*, 612 F.2d at 241, 243–45 (explaining that when "alleged criminal conduct will support only a single charge, with the prosecution having the option of charging the defendant under different provisions of the law carrying varying penalties . . . once the judgment is made as to which penal statute is to be invoked, the full extent of prosecutorial discretion has been exercised").  The same is true of a final sentencing decision made by a judge in the *Pearce* context. *Id.* at 241.  In contrast, when a prosecutor does not "exhaust[] [his] arsenal of potential charges with the initial indictment," and subsequently brings new, additional charges based on a separate substantive offense, "the full extent of prosecutorial judgment and/or discretion [has] not been exercised" and no presumption of vindictiveness arises. *Id.*  The Sixth Circuit explained that although the difference between added and substituted charges is a "subtle," but "critical" distinction, it is one that has been recognized by other courts. *Id.* at 242–43.

55.  *See id.* at 241.  In *Andrews*, the defendants were indicted for narcotics offenses, among other things, and eventually posted bail. *Id.* at 237.  After making bail, the government charged the defendants with conspiracy, in addition to the narcotics charges. *Id.*  The defendants responded by arguing that the conspiracy charges were brought in retaliation for asserting their right to bail. *Id.*  The Sixth Circuit found that although the subsequent charges arose out of "the same total factual pattern" as the initial charges, conspiracy is a separate crime and therefore constituted an additional, as opposed to a substitute, charge. *Id.* at 241.  Ultimately, the Sixth Circuit remanded the case to the district court, which wrongly applied the standard for substituted charges. *See id.* at 245.

56.  *Id.* at 244.  The court noted that while it strongly disagreed with the Ninth Circuit's vindictiveness jurisprudence, it agreed with the Fifth Circuit's "basic approach" to the doctrine. *Id.*  The court also identified *Ruesga-Martinez* as the source of the "appearance of vindictiveness" standard. *Id.* at 243 n.10.  The *Andrews* court rejected the appearance-of-vindictiveness standard, and instead relied on the "realistic likelihood of vindictiveness" standard, finding it to be more grounded in Supreme Court precedent. *Id.* at 244.  The benefit of the realistic-likelihood test is that it "strikes an appropriate balance between the apparent vindictiveness and actual vindictiveness standards," protecting "a defendant's due process rights while allowing the prosecution sufficient opportunity to justify its actions." Solomon, *supra* note 1, at 346.  Judge Gilbert S. Merritt, Jr., in his concurring opinion in *Andrews*, went so far as to state that the doctrine of prosecutorial vindictiveness "is theoretically endless and unmanageable unless limited to the post-conviction, double jeopardy context." *Andrews*, 612 F.2d at 246 (Merritt, J., concurring).  Judge Merritt was concerned that the prosecutorial vindictiveness doctrine is based on "elusive" concepts that fail to take into account the adversarial nature of the criminal-justice

*Catholic University Law Review*

The United States Court of Appeals for the Seventh Circuit has also found that the presumption of vindictiveness does not arise where subsequent charges are based on different conduct than the original charges.[57] In *Williams v. Bartow*, the defendant was charged with sexually assaulting a child in 1996.[58] At the defendant's trial, two witnesses testified that they too had been sexually assaulted by the defendant in 1990. The defendant was subsequently convicted of sexual assault for the 1996 incident twice, and in the third trial the government charged the defendant with two additional counts of sexual assault based on the earlier testimony.[59] The defendant argued that the additional charges were vindictive, but the Seventh Circuit disagreed.[60] The court noted that the new charges were based on a factually distinct crime unrelated to the original charges.[61] Significantly, the court pointed out that the evidence presented at trial by the 1990 victims, under oath, gave the prosecutor "new reasons for bringing the charges based on the earlier incident."[62] The Seventh Circuit also noted that the Supreme Court had not ruled on the precise issue presented: whether *Blackledge* applies in cases where the defendant is charged for unrelated crimes after a successful appeal, rather than for crimes arising out of the same factual scenario.[63] The court ultimately held that if a prosecutor brings charges based on criminal conduct unrelated to that which supported the initial charges, "the defendant must demonstrate actual vindictiveness rather than relying on the presumption recognized in *Blackledge* and *Thigpen*."[64]

---

system, including the multiple factors that prosecutors take into account when bringing charges. *Id.* at 246–47. In particular, Judge Merritt stated that eliminating the appearance of vindictiveness is an "unworkable goal" in a process that, by its nature, is competitive and heated. *Id.* at 247. The appearance test has also been criticized for its low burden of proof that "enables defendants to successfully challenge enhanced charges too easily." Solomon, *supra* note 1, at 343 (noting that under the appearance test, courts often disregard objectively plausible explanations by prosecutors for added subsequent charges).

57.  *See* Williams v. Bartow, 481 F.3d 492, 501 (7th Cir. 2007).

58.  *Id.* at 495.

59.  *Id.* at 495–96. The prosecutor stated that he did not bring charges earlier because he needed more evidence. *Id.* at 494–95; *accord* United States v. Mallah, 503 F.2d 971, 988 (2d Cir. 1974) ("It is one thing to increase a charge from manslaughter to murder, and quite another to charge a defendant, subsequent to a successful appeal, with a second murder.").

60.  *Williams*, 481 F.3d at 501.

61.  *Id.* (citing Humphrey v. United States, 888 F.2d 1546, 1549 (11th Cir. 1989)) (noting that it is proper to distinguish between charges based on the same set of facts and charges based on different facts).

62.  *Id.* (noting that even though the prosecutor had police reports from the 1990 event, once the prosecutor had the testimony of the girls, he took a "new approach" to the prosecution).

63.  *Id.* at 502.   The court reiterated that the Eleventh Circuit found this distinction significant, reasoning that the presumption does not apply where later charges relate to "*other* criminal conduct." *Id.* The court also found that the Ninth Circuit reached the same conclusion in *Martinez*. *Id.* at 502–03 (citing United States v. Martinez, 785 F.2d 663, 669 (9th Cir. 1986)).

64.  *Id.* at 502. The Seventh Circuit noted the emphasis the Wisconsin state court placed on the fact that the prosecutor brought additional charges only after the two 1990 victims testified at trial. *Id.* at 503. Thus, "the[] circumstances were . . . vastly different from those confronted by

The United States Court of Appeals for the Second Circuit follows the same rule, holding in *United States v. Johnson* that "a new federal prosecution following an acquittal on separate federal charges does not, without more, give rise to a presumption of vindictiveness."[65]  In *Johnson*, the government did not explain why it waited until the defendant had been acquitted of the first charges before bringing the second set of charges.[66]  The court even acknowledged that it was "conceivable" that the new charges were brought to retaliate against the defendant for exercising his right to a jury trial, which resulted in an acquittal.[67]  However, the court concluded that there was no "realistic likelihood" of vindictiveness because the government might have had other reasons for not bringing the charges earlier, therefore the presumption of vindictiveness did not arise.[68]  The Second Circuit, in *Johnson*, relied heavily on the United States Court of Appeals for the Third Circuit's decision in *United States v. Esposito*, in which the court held that a second set of charges predicated on the same criminal conduct as prior charges—of which the defendant was acquitted—did not trigger a presumption of vindictiveness.[69]  Although *Esposito* did not deal with separate charges based on separate criminal conduct, the Third Circuit generally noted that new charges supported by evidence did not raise a presumption of vindictiveness because the charges were brought to punish the defendant for the crimes he committed and not for the defendant's exercise of a right.[70]  In addition, both the Second and Third Circuits noted the possible negative consequences a contrary holding might have on the criminal-justice system, namely that prosecutors would be forced to bring every conceivable charge at once—"overcharg[ing]" an offense—to avoid being barred from bringing additional charges at a later point.[71]

The Second Circuit addressed an issue related to vindictiveness in *United States v. Bryser*, holding that a defendant's testimony at trial for one set of charges could be used as the basis for bringing subsequent charges.[72]  In

---

the original prosecutor in the 1990 incident, when [the victims] were five and six year[s] old," respectively. *Id.*  Because the 1990 victims were older, "they were better suited to offer testimony," thus giving the prosecutor a new, non-vindictive, reason to bring the charges. *Id.*

65.  *See* United States v. Johnson, 171 F.3d 139, 141–42 (2d Cir. 1999) (following the holdings of the United States Courts of Appeals for the Third, Eighth, and Tenth Circuits).

66.  *Id.* at 141.

67.  *Id.*

68.  *Id.*  The court noted that the government added weapons charges after the defendant was acquitted of his RICO charges, and the government may have decided that the weapons charges were "superfluous unless the RICO prosecution proved unsuccessful." *Id.*

69.  *Id.*; *see* United States v. Esposito, 968 F.2d 300, 304 (3d Cir. 1992).

70.  *Esposito*, 968 F.2d at 304.

71.  *See Johnson*, 171 F.3d at 141–42 (worrying that prosecutors would "overcharge" defendants initially); *Esposito*, 968 F.2d at 306 (finding that the presumption would "fashion[] a new constitutional rule that requires prosecutors to bring all possible charges in an indictment or forever hold their peace").

72.  United States v. Bryser, 95 F.3d 182, 186 (2d Cir. 1996).

*Bryser*, the defendant argued that charges brought against him subsequent to his testimony in court should be thrown out because he testified to the criminal conduct while on trial for another crime.[73]  The court found that the defendant could not possibly expect he would be immune from prosecution of other crimes if he admitted to them on the stand.[74]  The Second Circuit, consistent with its application of the vindictiveness doctrine, found that granting the defendant immunity would "lead[] to the absurd result that incriminating statements may not be used as evidence because they were made otherwise in aid, or under the umbrella, of a constitutional right."[75]

Therefore, the majority of circuits that have addressed this issue have held that the presumption of vindictiveness does not arise where subsequent charges are brought for different crimes than those originally charged.

### 2. *Overcoming the Presumption: Various Ways by which the Government Can Prove Charges Are Not Vindictively Motivated and Thus Rebut the Presumption*

Once the presumption of vindictiveness has been raised, the burden shifts to the government to provide objective, non-vindictive reasons for bringing the subsequent charges.[76]  In general, the federal courts of appeals give prosecutors the benefit of the doubt that charges are brought for legitimate reasons.[77]  For this reason, the courts accept a variety of explanations for charging decisions.[78]  Additionally, courts have found delayed charges may be justified, and therefore do not necessarily give rise to a presumption of vindictiveness.[79]

---

73.  *Id.*  The defendant pointed to *Simmons v. United States*, which held that if a defendant takes the stand in his own defense, his testimony may not be used against him with respect to the initial charges. *Id.*; *see* Simmons v. United States, 390 U.S. 377, 394 (1968).

74.  *Bryser*, 95 F.3d at 186–87.

75.  *Id.* at 187 (noting also that "[a]ncillary 'losses' of constitutional rights may often attend the commission of criminal acts").

76.  *See* United States v. Goodwin, 457 U.S. 368, 374 (1982) (citing North Carolina v. Pearce, 395 U.S. 711, 726 (1969)) (citing the *Pearce* rule and reiterating that the objective information must be entered into the record so that "the constitutional legitimacy of the increased sentence may be fully reviewed on appeal"); United States v. Saltzman, 537 F.3d 353, 360 (5th Cir. 2008) ("Even if a defendant establishes a realistic likelihood of vindictiveness, however, the government still has an opportunity to proffer legitimate, objective reasons for its conduct."); United States v. Andrews, 612 F.2d 235, 241 n.6 (6th Cir. 1979) (noting that the Supreme Court has not resolved whether substituted charges could be justified).

77.  *See* United States v. Barner, 441 F.3d 1310, 1319 (11th Cir. 2006) (finding the presumption rebutted where the government brought superseding charges to correct a charging mistake); United States v. O'Hara, 301 F.3d 563, 571 (7th Cir. 2002) (finding the presumption rebutted where new charges were based on evidence that was previously unavailable to the prosecution); United States v. Johnson, 171 F.3d 139, 141 (2d Cir. 1999) (finding the prosecution might have had some legitimate reason that was not fully revealed at trial).

78.  *See Barner*, 441 F.3d at 1319; *O'Hara*, 301 F.3d at 571; *Johnson*, 171 F.3d at 141.

79.  *See O'Hara*, 301 F.3d at 571 (finding the presumption rebutted where witness testimony became available after the initial charging decision); *Johnson*, 171 F.3d at 141 (refusing to find the presumption when the government did not provide a reason for delay in bringing the

The circuit courts have identified various ways prosecutors can demonstrate that allegedly vindictive charges were not brought in retaliation against a defendant.[80]   For example, the prosecutor may rebut the presumption of vindictiveness by showing that new evidence was obtained after the original charges were brought,[81] or that an intervening event occurred.[82]   Additionally, the prosecution could point to "mistake or oversight in the initial action, a different approach to prosecutorial duty by the successor prosecutor, or public demand for prosecution on the additional crimes allegedly committed."[83] Thus, the general rule among the circuits is that a variety of explanations by the government can rebut a presumption of vindictiveness once it is raised.[84]

---

additional charges, reasoning that the government might have originally believed it was not necessary to bring the additional charges).

80.   *See* Hardwick v. Doolittle, 558 F.2d 292, 301 (5th Cir. 1977); *see also Andrews*, 612 F.2d at 245 n.14 ("Inadvertence and prosecutorial inexperience would be within the range of explanations blunting a claim of prosecutorial vindictiveness.").   In *Andrews*, the court recognized the distinction between added and substituted charges, finding that additional charges based on separate crimes could raise the presumption of vindictiveness, which the prosecution could rebut by introducing evidence to "reasonably explain or justify the action taken and negate any inference of vindictiveness in fact." *Andrews*, 612 F.2d at 245. The Sixth Circuit, in *Andrews*, found that this standard incorporated the defendant's and the prosecution's perspectives, and also provided the trial court with discretion in assessing the veracity of the prosecution's purported motives. *Id.*

81.   *See, e.g.*, United States v. Suarez, 263 F.3d 468, 480 (6th Cir. 2001) (finding the presumption rebutted where new charges were based on new evidence); *Hardwick*, 558 F.2d at 301.

82.   *See* Byrd v. McKaskle, 733 F.2d 1133, 1136 (5th Cir. 1984) (citing United States v. Krezdorn, 718 F.2d 1360, 1365 (5th Cir. 1983)) (finding that an increase in charges did not raise the presumption of vindictiveness because an amendment to the Texas Penal Code drastically cut the sentence of the original indictment).

83.   *See Hardwick*, 558 F.2d at 301. The Fifth Circuit has also found that when prosecutors are making arguments like those noted in *Hardwick*, "the burden of proof (to a preponderance of the evidence) remains on the defendant who raised the affirmative defense" and only shifts to the prosecutor if the record reveals no possible objective reason for the prosecutor's decision to bring additional charges. *Krezdorn*, 718 F.2d at 1365.   In addition, it is important to note that these possible arguments are "illustrative rather than exhaustive." *Hardwick*, 558 F.2d at 301 (finding that a prosecutor's decision to bring more severe charges against a defendant could be easily explained).   Consistent with the Fifth Circuit, the Second Circuit has held that an increase in charges was justified when a new prosecutor was assigned a misdemeanor case and then added a felony charge. *See* United States v. Ricard, 563 F.2d 45, 48 (2d Cir. 1977) ("[T]his was a reasonable step for the prosecutor to take.").

84.   *See, e.g.*, United States v. Barner, 441 F.3d 1310, 1319 (11th Cir. 2006); *O'Hara*, 301 F.3d at 571; *Johnson*, 171 F.3d at 141; *Byrd*, 733 F.2d at 1138; *Andrews*, 612 F.2d at 245 n.14; *Hardwick*, 558 F.2d at 301.

## II. SITUATING *UNITED STATES V. JENKINS* WITHIN THE NINTH CIRCUIT'S PROSECUTORIAL VINDICTIVENESS JURISPRUDENCE

### A. Jenkins I *Works its Way to the Ninth Circuit*

The Ninth Circuit most recently addressed the doctrine of prosecutorial vindictiveness in *United States v. Jenkins* (*Jenkins I*).[85] In October 2004, Sharon Ann Jenkins, a U.S. citizen, was twice caught at the United States-Mexico border attempting to smuggle undocumented aliens into California.[86] Jenkins was first caught on October 19, 2004, at which time she admitted to being paid to smuggle non-citizens.[87] Jenkins was caught a second time on October 20, 2004, waived her *Miranda* rights, and told officers that although she had been paid to drive the vehicle into California, she was unaware that there were undocumented aliens hidden in the vehicle.[88] However, the government did not charge Jenkins for either border-crossing attempt.[89]

On January 9, 2005, Jenkins was again stopped at the border, and a search of her vehicle revealed large amounts of marijuana.[90] After border agents read Jenkins her *Miranda* rights, she claimed that she thought she was smuggling undocumented aliens across the border and did not know about the marijuana.[91] Jenkins was charged with illegally importing marijuana into the United States, and at trial she testified in her own defense.[92] Jenkins's testimony included a confession to smuggling undocumented aliens on two prior occasions and echoed her statements to the border official at the January incident that she believed she was once again smuggling undocumented aliens, and not marijuana.[93]

While the jury deliberated in the marijuana case, the government charged Jenkins with smuggling an undocumented alien, and later charged her for both October 2004 incidents.[94] In the district court, Jenkins successfully moved to dismiss the alien-smuggling charges on the basis that the charges were vindictive.[95] Jenkins claimed that "the government brought the alien smuggling charges in retaliation for her exercising her right to testify" in her

---

85. United States v. Jenkins (*Jenkins I*), 504 F.3d 694, 697 (9th Cir. 2007).

86. *Id.* at 697–98.

87. *Id.*

88. *Id.* at 698.

89. *Id.*

90. *Id.*

91. *Id.* Jenkins pointed to the October incidents, admitting that she had been paid to bring non-citizens across the border twice before and that she had been caught both times. *Id.*

92. *Id.*

93. *Id.*

94. *Id.* The jury convicted Jenkins of the marijuana smuggling charges, and Jenkins pled not guilty to the alien-smuggling charges. *Id.* at 698 & n.1.

95. *Id.*

own defense.[96]   The government argued that the charges were not vindictive because even though the government theoretically could have brought the charges earlier, Jenkins's testimony under oath regarding the earlier crimes strengthened the government's case.[97]   The government appealed the district court's dismissal to the Ninth Circuit.[98]

### B. The Ninth Circuit's Response to the Arguments in Jenkins I

#### 1. The Majority Opinion of Jenkins

The Ninth Circuit in *Jenkins I* noted from the outset that it was addressing a claim of presumptive vindictiveness rather than actual vindictiveness.[99]   Not surprisingly, therefore, the Ninth Circuit concluded that the filing of the alien-smuggling charges created the appearance of vindictiveness thus triggering a presumption of vindictiveness.[100]   The court reached this conclusion upon determining that the government had a strong case against Jenkins before she ever testified at the marijuana trial.[101]   Specifically, it pointed to Jenkins's October admissions to border officials and her admission in January to the border official regarding the October incidents.[102]   In addition, the court flatly rejected the government's argument that the presumption of vindictiveness does not arise in cases where the subsequent charges "do not arise out of the same nucleus of operative fact."[103]   The court stressed that the relatedness of the conduct upon which the charges are based is just one of the many factors affecting a vindictiveness determination.[104]

The court then turned to the question of whether the government rebutted the presumption of vindictiveness, concluding that it did not.[105]   The court stated that to overcome the presumption, the government "must show that the

96.  *Id.*

97.  *Id.*

98.  *Id.* at 699.

99.  *Id.* Jenkins argued that the government brought the charges stemming from the October incidents because she testified at trial, thereby raising the presumption of vindictiveness. *Id.* at 698–99.

100.  *Id.* at 699–701.

101.  *Id.* at 700. The court noted that the government's case "essentially was open and shut even before Jenkins testified in court." *Id.*

102.  *Id.* The court pointed out that although Jenkins received *Miranda* warnings before the second and third statements, the record was not clear that she had received the warning before the first statement in October. *Id.* at 700 n.2.

103.  *Id.* at 700–01.

104.  *Id.* at 701. The court acknowledged that *Martinez* appeared to foreclose the possibility that a presumption of vindictiveness can arise in situations where the subsequent charges are unrelated to the earlier charges. *Id.* However, it also noted that *Martinez* relied on *Robison* to reach this conclusion, and that *Robison* stated that the "relatedness of the charges 'is neither dispositive nor essential to prove vindictiveness.'" *Id.* (quoting United States v. Robison, 644 F.2d 1270, 1272 (9th Cir. 1981)).

105.  *Id.* at 701–02.

additional charges 'did not stem from a vindictive motive, or [were] justified by independent reasons or intervening circumstances that dispel the appearance of vindictiveness.'"[106]   The government again argued that although it had evidence before trial, once Jenkins admitted to the October crimes under oath, the government had "no choice but to bring charges" because "to walk away from [the opportunity] would be inexcusable."[107]   The court rejected this argument and agreed with the district court's observation that the government had more evidence before Jenkins's testimony than is generally needed for a conviction.[108]   Finding that the government did not overcome the presumption of vindictiveness, the Ninth Circuit affirmed the district court's dismissal of the indictments related to the two October incidents.[109]

### 2. *The Dissent of* Jenkins II *and the Possible Impact of the Decision*

After affirming the district court's decision in 2007, the Ninth Circuit denied the government's petition to rehear the case en banc in 2008 in *United States v. Jenkins* (*Jenkins II*).[110]   Seven judges dissented from the denial of rehearing, concluding that Jenkins did not establish the presumption of vindictiveness, and that the government's actions were well within its discretion.[111]   At the outset, the dissent pointed out the "well-established principle that courts should tread upon prosecutorial charging decisions with hesitation."[112]   The dissent concluded that the majority had effectively usurped the prosecutor's role, deciding that the government should have brought the charges earlier because it *could* have.[113]

---

106.  *Id.* at 701 (quoting United States v. Gallegos-Curiel, 681 F.2d 1164, 1168 (9th Cir. 1982)).

107.  *Id.* (alteration in original).  The government also argued that it did not wait to file the charges until after the trial was over because it wanted to avoid appearing vindictive.  *Id.* at 702. The court rejected this argument as well, finding that the government should have known Jenkins would testify about the two October crimes on the stand, and should therefore not have been surprised when she did.  *Id.*

108.  *Id.* at 701–02.  The court stated that "although a confession in open court certainly added to the repertoire of evidence against Jenkins, we find the government's explanation unpersuasive." *Id.* at 701.

109.  *Id.* at 702.  Judge Suzanne B. Conlon, Senior United States District Judge for the Northern District of Illinois, sitting by designation, dissented from the decision in *Jenkins I* for many of the same reasons articulated in the dissent from the denial of rehearing en banc. Therefore, this Note will not explore each dissent in detail; rather, this Note will focus on the dissent from the denial of rehearing en banc, which incorporates Judge Conlon's concerns.

110.  United States v. Jenkins (*Jenkins II*), 518 F.3d 722, 723 (9th Cir. 2008).

111.  *Id.* at 723–24 (O'Scannlain, J., dissenting from the denial of rehearing en banc).

112.  *Id.* at 724.  The dissent cited the Supreme Court's language in *Wayte* dealing with selective prosecution, which stated that "the decision to prosecute is particularly ill-suited to judicial review" because courts simply cannot assess the strengths of a given case, or the government's motives and stake in a given case.  *Id.* at 725 (citing Wayte v. United States, 470 U.S. 598, 607 (1985)).

113.  *Id.* at 725.  The dissent argued that courts are in no position to weigh the same factors that the government does because courts have a very limited perspective of the charging process.

In reaching this conclusion, the dissent highlighted several places where it believed the majority opinion diverged from Ninth Circuit precedent.[114]  First, the dissent stated that the presumption of vindictiveness is not triggered when the new charge arises out of a different factual nucleus rather than the same nucleus.[115]  It further noted that the Seventh[116] and Eleventh[117] Circuits followed the same rule.

The dissent also pointed to *United States v. Baker*, a Ninth Circuit case standing for the proposition that "the content of a defendant's testimony on his own behalf can be used as the basis for a new prosecution against him."[118]  The dissent noted that the rationale behind this rule is that defendants should not be able to testify to crimes and then expect that the government will be barred from prosecuting that crime.[119]  Additionally, in *Jenkins I*, there was evidence

---

*Id.*  The dissent admonished that the opinion ignores "the Supreme Court's caution against encroaching upon prosecutorial charging decisions by independently weighing the strength of the government's evidence." *Id.*

114.  *Id.* at 725–28.

115.  *Id.* at 725 (quoting United States v. Martinez, 785 F.2d 663, 669 (9th Cir. 1986)).

116.  *See id.* at 726–27.  The Seventh Circuit addressed the precise issue in *Williams v. Bartow. See supra* notes 57–64 and accompanying text.  In *Williams*, the defendant was on trial for child molestation in 1996, and a victim who was molested by the defendant in 1990 testified at the trial, leading the government to charge the defendant for the 1990 acts. *See* Williams v. Bartow, 481 F.3d 492, 501 (7th Cir. 2007).  The *Jenkins II* dissent pointed out that after the prosecution introduced new charges based on the 1990 event, the Seventh Circuit found that the charges were not vindictive and, therefore, could stand.  *Jenkins II*, 518 F.3d at 726 (O'Scannlain, J., dissenting from the denial of rehearing en banc).  The *Williams* court had made a clear distinction between new charges based on related events and new charges arising out of different events.  *Williams*, 481 F.3d at 502–03.  The dissent in *Jenkins II* noted that the *Jenkins II* decision came out the exact opposite way, despite the fact that the facts of *Jenkins I* were closely aligned with those in *Williams. Jenkins II*, 518 F.3d at 726 (O'Scannlain, J., dissenting from the denial of rehearing en banc).

117.  *See Jenkins II*, 518 F.3d at 726–27 (O'Scannlain, J., dissenting from the denial of rehearing en banc).  The dissent found that the majority opinion was at odds with the Eleventh Circuit's decision in *Humphrey v. United States. Id.*  In *Humphrey*, prosecutors brought additional auto-theft charges against the defendant while the defendant was challenging a prior conviction.  Humphrey v. United States, 888 F.2d 1546, 1549 (11th Cir. 1989).  The Eleventh Circuit found that because the charges were brought for different conduct than that originally charged, no presumption of vindictiveness arose.  *Id.*  The *Jenkins II* dissent specifically noted that the Eleventh Circuit recognized a distinction between *Blackledge* and *Humphrey*, because *Blackledge* simply proscribed "substituting" harsher charges, whereas *Humphrey* was based on entirely new charges arising out of "independent acts."  *See Jenkins II*, 518 F.3d at 727 (O'Scannlain, J., dissenting).

118.  *Jenkins II*, 518 F.3d at 727 (O'Scannlain, J., dissenting from the denial of rehearing en banc) (citing United States v. Baker, 850 F.2d 1365, 1370 (9th Cir. 1988) (rejecting defendant's argument that his confessions at trial could not be used against him)).  In *Baker*, the Ninth Circuit recognized the rule established by the Supreme Court in *Harrison v. United States* that "'a defendant's testimony at a former trial is admissible against him in a later proceeding.'"  *Baker*, 850 F.2d at 1370 (citing Harrison v. United States, 392 U.S. 219, 222 (1968)).

119.  *See Jenkins II*, 518 F.3d at 727 (O'Scannlain, J., dissenting from the denial of rehearing en banc).  The concern of the dissent is that the *Jenkins II* rule is at odds with *Baker* and also

that Jenkins had not been read her *Miranda* rights before her first confession at the first October incident, making the government's argument that the in-court testimony strengthened the case more plausible.[120]

In addition, the dissent was concerned that the *Jenkins I* rule was overly broad, and would have the practical effect of requiring a vindictiveness ruling whenever a criminal defendant has been previously charged with a crime.[121]

Finally, the dissent noted that the *Jenkins I* decision created a circuit split on the issue of whether separate charges that are based on separate criminal conduct can trigger the presumption of vindictiveness.[122]  The dissent sided with the Fourth, Eighth, and Tenth Circuits, concluding that the presumption should only arise where the new charges are brought based on the same crime and are harsher.[123]  In closing, the dissent reiterated the untenable precedent set by *Jenkins I* and lamented the fact that the court had overstepped its boundaries, becoming too judicially active in the determination of when and where to bring charges—traditionally, decisions primarily within the prosecutor's discretion.[124]

In sum, the Ninth Circuit, in both *Jenkins I* and *Jenkins II*, believed that the decisions were consistent with Ninth Circuit precedent in treating the factual

---

provides defendants with the incentive to testify to other crimes on the stand, to immunize themselves against possible future charges. *See id.*  The dissent pointedly opined that the majority "create[d] the preposterous rule that a defendant can shield himself from further prosecution for unrelated crimes by openly admitting to them on the stand." *Id.*

120.   *See id.* at 724 & n.1; *see also* United States v. Jenkins (*Jenkins I*), 504 F.3d 694, 704 (9th Cir. 2007) (Conlon, J., dissenting) (pointing out that even the majority recognized that there is no evidence Jenkins received the proper *Miranda* warnings at the first October incident, and noting that while confessions to border agents are contestable by defendants, confessions under oath are "virtually unchallengeable" and therefore much stronger evidence).  The dissent in *Jenkins I* also argued that Jenkins's confession at trial served as an intervening cause, which normally justifies subsequent charges and rebuts the presumption of vindictiveness. *Jenkins I*, 504 F.3d at 704 (Conlon, J., dissenting).

121.   *Jenkins II*, 518 F.3d at 727 (O'Scannlain, J., dissenting from the denial of rehearing en banc).  The dissent pointed out that the traditional vindictiveness standard required a court to find vindictiveness only where a charging decision poses "'a realistic likelihood of vindictiveness,'" *id.* (quoting Blackledge v. Perry, 417 U.S. 21, 27 (1974)), but that the *Jenkins* rule pushes the court beyond its traditional role, requiring it to judge whether the government had a strong enough case to charge the defendant earlier. *Id.*

122.   *Id.* at 728 (relying on *United States v. Peoples*, 360 F.3d 892, 892 (8th Cir. 2004), in which the Eighth Circuit held that the presumption is limited to cases where harsher charges are brought in a subsequent trial).

123.   *Id.* (finding that generally, vindictiveness "'involves a showing that the prosecutor has re-indicted the defendant and increased the severity of the charge, after the defendant has exercised a statutory or constitutional right'" (quoting United States v. Burt, 619 F.2d 831, 836 (9th Cir. 1980))).

124.   *Id.*  The dissent predicted that *Jenkins* would lead to the "perverse result of compelling prosecutors to rely on ever-weaker evidence in bringing charges, lest they lose the opportunity to pursue those charges." *Id.*

nucleus of charges as only one factor in determining vindictiveness.[125]  The dissents, on the other hand, concluded that the *Jenkins I* decision not only veered away from Ninth Circuit precedent, but also diverged from other circuits that found the factual nucleus of charges to be a decisive and crucial factor in determining whether vindictiveness occurred.[126]

### III. *Jenkins I* Not Only Reflects a Shift in Ninth Circuit Jurisprudence, It Solidifies a Split with the Consensus of Other Circuits

*A.  Jenkins I Did Not Confine the Presumption to Instances Where Subsequent Charges Are Based on the Same Underlying Conduct*

In *Jenkins I*, the defendant committed three distinct and separate crimes, each occurring on different dates.[127]  The Ninth Circuit in *Jenkins I* concluded that because the defendant admitted to the two prior crimes when she was caught committing them, and then again while testifying in her own defense, the government was barred from prosecuting those two crimes.[128]  This is precisely the kind of judicial oversight of prosecutorial charging decisions that other courts have avoided.[129]

*Jenkins I* departed from the Ninth Circuit's precedent set forth in *United States v. Martinez*, which clearly stated that the presumption of vindictiveness does not arise when the later charges are not related to the initial charges.[130]  In clear contradiction to this precedent, the Ninth Circuit in *Jenkins I* stressed that

---

125.  *Jenkins I*, 504 F.3d at 700–01.

126.  *Jenkins II*, 518 F.3d at 725 (O'Scannlain, J., dissenting from the denial of rehearing en banc).

127.  *Jenkins I*, 504 F.3d at 698.  Jenkins attempted to smuggle undocumented aliens into the United States on October 19, 2004, and October 20, 2004, and attempted to smuggle marijuana on January 9, 2005. *Id.*

128.  *Id.* at 702.

129.  *See* Wayte v. United States, 470 U.S. 598, 607 (1985) (finding that the government has broad discretion to prosecute, because "the decision to prosecute is particularly ill-suited to judicial review"); *see also* United States v. Barner, 441 F.3d 1310, 1319 (11th Cir. 2006); United States v. O'Hara, 301 F.3d 563, 571 (7th Cir. 2002); United States v. Johnson, 171 F.3d 139, 141 (2d Cir. 1999); United States v. Andrews, 612 F.2d 235, 243–44 (6th Cir. 1980) (noting that prosecutors have "traditional and proper discretion in deciding which of multiple charges against a defendant are to be prosecuted or whether they are all to be prosecuted at the same time" (internal citation omitted)).

130.  *See* United States v. Martinez, 785 F.2d 663, 669 (9th Cir. 1986) (citing United States v. Robison, 644 F.2d 1270, 1273 (9th Cir. 1981) ("The defendant's position is weakened by the fact that the instant prosecution is based on a different set of facts from those previous prosecutions.")) ("If . . . the second charge is unrelated to the first, the presumption does not arise."); *see also* United States v. Griffin, 617 F.2d 1342, 1347–48 (9th Cir. 1980) (finding that "an investigation into conduct different from that which has already been made the subject of an indictment should not be limited by the time schedule established for the earlier prosecution").

the nucleus of events upon which the charges are based is a non-determinative factor,[131] even though it was the decisive factor in *Martinez*.[132]

*Jenkins I* also split with the consensus among the circuits that had addressed this issue that the nucleus of events plays a significant role when determining whether the presumption arises.[133] The distinction between charges based on the same conduct and charges based on different conduct makes sense, given the rationale and effect of the distinction[134] and the Supreme Court's wariness in extending the doctrine.[135] In *Goodwin*, the Supreme Court reiterated that due process only requires the presumption in cases where prosecutors may be retaliating against defendants who have exercised a right.[136] The Due Process Clause, however, does not provide criminals with blanket immunity for any criminal acts admitted in the course of trial.[137] Yet the Ninth Circuit in *Jenkins I* held exactly that—that such confessions cannot be used against criminals if the government could potentially have brought the charges earlier.[138]

Under the *Jenkins* rule, the defendant not only receives a windfall by escaping meritorious prosecution, but the prosecutor is barred from charging the defendant with a legitimate crime, even when the crime is unrelated to the original crime. Thus, a prosecutor is placed in a tricky predicament: either bring every potential charge based on every possible crime against a defendant at the same time regardless of the strength of the evidence, or delay bringing all possible charges and risk losing the chance of ever bringing them.

Curtailing the prosecutor's charging discretion in this way seems counterintuitive and antithetical to our criminal-justice system. If *Jenkins I* had dealt with charges arising from the same nucleus of events, it would make more sense for the court to presume vindictiveness in the subsequent prosecution. If a prosecutor increased charges after the defendant exercised a legal right, that decision would be difficult to justify to a court and would

---

131. *Jenkins I*, 504 F.3d at 700–01.

132. *Martinez*, 785 F.2d at 669 (noting that *Blackledge* never intended to give "the defendant a free ride for separate crimes he may have committed").

133. *See* Williams v. Bartow, 481 F.3d 492, 501–03 (7th Cir. 2007); *Johnson*, 171 F.3d at 141; Humphrey v. United States, 888 F.2d 1546, 1549 (11th Cir. 1989); *Andrews*, 612 F.2d at 244.

134. *See* United States v. Jenkins (*Jenkins II*), 518 F.3d 722, 723–29 (9th Cir. 2008) (O'Scannlain, J., dissenting from the denial of rehearing en banc). The debate over whether added charges should be distinguished from substituted charges is not a recent development, and commentators have recognized that the distinction has created confusion among courts. *See* Whitehead, *supra* note 42, at 1145 (pointing out that disregarding the distinction could force a prosecutor to charge a defendant with every possible crime in order to avoid a vindictiveness charge later in the proceedings).

135. *See* Wasman v. United States, 468 U.S. 559, 566 (1984).

136. *See* United States v. Goodwin, 457 U.S. 368, 375–76 (1982).

137. *See, e.g.*, United States v. Bryser, 95 F.3d 182, 187 (2d Cir. 1996).

138. *See* United States v. Jenkins (*Jenkins I*), 504 F.3d 694, 700 (9th Cir. 2007).

reflect a "realistic likelihood of vindictiveness."[139]     However, when determining whether an actual, realistic likelihood of vindictiveness existed, the Ninth Circuit seemed more focused on deciding whether the prosecution could have charged the defendant earlier, thereby substituting its own judgment on charging decisions that are traditionally left to the prosecutor's broad discretion.[140]

The Supreme Court has not applied the presumption of vindictiveness when additional charges have been brought against a defendant for crimes unrelated to the original crimes,[141] but that is exactly what the Ninth Circuit did in *Jenkins I*.[142]     This decision effectively bars prosecutors from bringing subsequent charges based on criminal conduct known by the government at the time the initial charges were brought once a trial begins.[143]     Therefore, prosecutors will be forced to bring all possible charges at the outset of a case, thus drastically reducing the prosecutor's discretion in making charging decisions.[144]

---

139. Blackledge v. Perry, 417 U.S. 21, 27 (1974) (internal quotations omitted).

140. *See* United States v. Jenkins (*Jenkins II*), 518 F.3d 722, 727 (9th Cir. 2008) (O'Scannlain, J., dissenting from the denial of rehearing en banc); *Jenkins I*, 504 F.3d at 700. The *Jenkins II* dissent pointed out that the Ninth Circuit's inquiry into whether prosecutors could possibly have brought charges at an earlier time was wrong, and that the court should have instead been testing whether the prosecution's actions reflected a realistic likelihood of vindictiveness. *Id.* It has been argued that the appearance test ultimately "places an undue burden on the government to justify its actions" because the test creates too high a bar for the government to overcome. *See* Solomon, *supra* note 1, at 342. Additionally, Solomon argues that when courts apply the appearance test, which imposes closer review of charging decisions, they ignore "the adversarial nature of the criminal justice process." *Id.*

141. *See* Williams v. Bartow, 481 F.3d 492, 502 (7th Cir. 2007) (recognizing that the Supreme Court has not yet addressed whether *Blackledge* applies in cases where new charges are based on different crimes than those originally charged).

142. *See Jenkins I*, 504 F.3d at 700–01 ("[R]elatedness of the charges 'is neither dispositive nor essential to prove vindictiveness.'" (quoting United States v. Robison, 644 F.2d 1270, 1272 (9th Cir. 1981))).

143. *See* United States v. Andrews, 612 F.2d 235, 243 (6th Cir. 1980) ("We do not read [presumption-of-vindictiveness precedent] as taking away from prosecutors their traditional and proper discretion in deciding which of multiple charges against a defendant are to be prosecuted or whether they are all to be prosecuted at the same time." (citation omitted)).

144. *Cf.* United States v. Johnson, 171 F.3d 139, 141–42 (2d Cir. 1999) (noting that prosecutors might overcharge defendants to avoid being barred from bringing charges later); United States v. Esposito, 968 F.2d 300, 306 (3d Cir. 1992) (finding that a *Jenkins*-like application of the presumption would create a new rule "requir[ing] prosecutors to bring all possible charges in an indictment or forever hold their peace").

### B. *The Ninth Circuit Did Not Recognize the Explanation Offered by the Prosecution to Rebut the Presumption of Vindictiveness, Contrary to Other Circuits*

The government in *Jenkins I* provided several reasons for bringing the new charges later than was possible, but the Ninth Circuit rejected them.[145] Primarily, the prosecutor pointed to Jenkins's confession to both October 2004 incidents while testifying under oath at trial.[146]  The court rejected this explanation, finding that the prosecution could have brought the charges earlier because Jenkins already confessed to those crimes at the time of each incident to border officials.[147]

However, the Seventh Circuit reached the opposite conclusion in *Williams v. Bartow*, a case procedurally similar to *Jenkins I*.[148]  In *Williams*, the court found the sworn testimony of sexual assault victims much more persuasive and significant than their accusations outside of court, especially because before trial, the only report the prosecutor had from the girls was given when they were quite young.[149]  Similarly, the testimony given by Jenkins was stronger evidence than her out-of-court confession to border officials.[150]  As the dissent in *Jenkins I* pointed out, it is much easier for defendants to challenge confessions made to law-enforcement officers than it is to challenge confessions made under oath.[151]

Thus, the Ninth Circuit in *Jenkins I* should have given more weight to Jenkins's sworn confession and should have found that the confession was an intervening cause for bringing the later charges.[152]  Instead, the Ninth Circuit determined that the distinction between in-court, under-oath confessions, and an out-of-court statement to an arresting officer was insignificant and thus foreclosed prosecution of those crimes.[153]  In effect, the court sided with the defendant on principle rather than deciding the case based on precedent.

145.  *Jenkins I*, 504 F.3d at 701–02.

146.  *Id.* at 698.

147.  *Id.* at 700–01.  The Ninth Circuit admitted, however, that one of the confessions might not have occurred subsequent to proper *Miranda* warnings. *Id.* at 700 n.2. *But see Johnson*, 171 F.3d at 141 (finding that even though the government did not provide an excuse as to why it waited to bring additional charges until the defendant was acquitted by a jury, the presumption did not arise because the government could have had a legitimate reason for the delay).

148.  *See* Williams v. Bartow, 481 F.3d 492, 501 (7th Cir. 2007).

149.  *Id.* at 501.

150.  *Jenkins I*, 504 F.3d at 701; *cf.* United States v. Saltzman, 537 F.3d 353, 362 (5th Cir. 2008) (ruling that a concession in open court could serve as the basis for added charges).

151.  *Jenkins I*, 504 F.3d at 704 (Conlon, J., dissenting).  The dissent pointed to the possibility that officers did not read Jenkins her *Miranda* rights before the first confession, which could serve as a basis for her to challenge the admissibility of the evidence. *Id.*

152.  *See id.*; *see also* United States v. Bryser, 95 F.3d 182, 187 (2d Cir. 1996) (refusing to provide immunity from prosecution based on incriminating statements made during the course of a trial for other crimes).

153.  *Jenkins I*, 504 F.3d at 701–02.

### C. *The Underlying Rationale of the Doctrine Does Not Support the* Jenkins I *Decision, Because Jenkins's Testimony Was Not Burdensome to the Government*

The Supreme Court has clearly articulated one method of identifying vindictiveness: an examination of the burden placed on the government by a defendant's exercise of a right.[154] In *Blackledge*, the Court noted that because new trials are so costly for the government, prosecutors have a "considerable stake" in deterring defendants from appealing.[155] Therefore, the rule against vindictive prosecution exists, at least in part, to affect the incentive a prosecutor may have to use additional charges as a means to prevent costly criminal trials.[156] It makes sense, then, that the presumption is triggered more easily in cases where the government is burdened by the defendant's actions.

The converse of this rule also makes sense: in cases where the right exercised by a defendant does not burden the government, the presumption is less easily triggered. In *Jenkins I*, the right exercised by the defendant was testifying in her own defense.[157] The burden placed on the government by the exercise of this right was far less than that imposed by an appeal or a retrial. In keeping with this aspect of the Supreme Court's rationale behind the vindictiveness rule, the presumption of vindictiveness should not have arisen in *Jenkins I*.[158]

### D. *The Prosecutorial Vindictiveness Doctrine Should Be Cabined Rather than Expanded, Contrary to the Ninth Circuit's Holding in* Jenkins I

The Supreme Court has reiterated that, in general, the decision whether to prosecute rests solely with the government.[159] Although the federal courts of appeals agree with this premise, *Jenkins I* marks a dramatic shift in the type and intensity of judicial scrutiny of government charging decisions.[160] As the

---

154. *See* United States v. Goodwin, 457 U.S. 368, 383 (1982) (finding that where harsher charges are brought following a defendant's request for a jury trial, the presumption does not arise because a jury trial is not necessarily more burdensome than a bench trial); Blackledge v. Perry, 417 U.S. 21, 27–29 (1974) (finding that the presumption arises more easily when harsher charges are brought during a retrial, because the government must expend much time and effort to retry a defendant).

155. *Blackledge*, 417 U.S. at 27.

156. *See id.* at 27–28.

157. United States v. Jenkins (*Jenkins II*), 518 F.3d 722, 724 (9th Cir. 2008) (O'Scannlain, J., dissenting from the denial of rehearing en banc).

158. *See Blackledge*, 417 U.S. at 27–28.

159. *See* Wayte v. United States, 470 U.S. 598, 607–08 (1985) (noting that "[i]n our criminal-justice system, the Government retains 'broad discretion' as to whom to prosecute," and that when courts scrutinize charging decisions, they must be careful not to "undermine prosecutorial effectiveness by revealing the Government's enforcement policy").

160. *See Jenkins II*, 518 F.3d at 725 (O'Scannlain, J., dissenting from the denial of rehearing en banc) ("Given the Supreme Court's admonition against judicial oversight of prosecutorial charging decisions, it is not surprising that the doctrine of presumed vindictiveness has been

Supreme Court noted, courts are not in a good position to review decisions to charge because the government considers many factors when making charging decisions.[161]

In *Jenkins I*, the court reviewed the government's evidence with respect to Jenkins's prior criminal conduct before Jenkins testified, and determined that because the government had a strong enough case before hearing the testimony, the fact that its case became stronger after the testimony was of no consequence.[162] It appears that after *Jenkins I*, the Ninth Circuit will permit courts to substitute their own judgment as to when certain charges could or should have been brought instead of confining its reviews to the real question: whether the government truly acted with vindictiveness.[163]

In addition, the Ninth Circuit's rule is inconsistent with the Supreme Court's warning against judicial oversight of charging decisions.[164] Such judicial scrutiny is not good for any party involved criminal proceedings. It is not good for defendants who will face more charges based on less reliable evidence. It is not good for prosecutors who will be placed in a very difficult position with respect to charging decisions. It is not good for the integrity of the criminal-justice system because it could result in admitted criminals gaming the system to receive immunity.

### E. Jenkins I *Will Lead to Further Erosion of the Doctrine and Greater Judicial Oversight of Prosecutorial Discretion*

The Ninth Circuit in *Jenkins I* ignored the distinction between subsequent charges based on unrelated conduct and subsequent charges based on conduct arising out of the same factual nucleus.[165] Because this rule departs from *Martinez*, which stressed the importance of this distinction in determining

---

substantially curtailed by this and other courts."); United States v. Jenkins (*Jenkins I*), 504 F.3d 694, 705 (9th Cir. 2007) (citing United States v. Griffin, 617 F.2d 1342, 1348 (9th Cir. 1980)) ("The doctrine of vindictive prosecution does not diminish the principle of prosecutorial discretion."). For an argument in favor of expanding the doctrine of prosecutorial vindictiveness to afford criminal defendants additional protections, see *Breathing New Life Into Prosecutorial Vindictiveness Doctrine*, 114 HARV. L. REV. 2074, 2092–97 (2001) (asserting that the current criminal-law system is evidence of the need to reform the doctrine).

161. *See Wayte*, 470 U.S. at 607 (listing factors such as "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan").

162. *Jenkins I*, 504 F.3d at 701–02.

163. *Cf.* United States v. Krezdorn, 718 F.2d 1360, 1365 (5th Cir. 1984) (explaining that the Fifth Circuit looks to see whether a defendant could realistically believe the prosecution's charges were vindictive).

164. *See* United States v. Wasman, 468 U.S. 559, 566 (1984) (explaining the reluctance in extending the *Blackledge* doctrine); *see also Wayte*, 470 U.S. at 607 (addressing the selective prosecution doctrine generally, but also noting the inherent difficulties in judicial oversight of charging decisions).

165. *Jenkins II*, 518 F.3d at 725, 728 (O'Scannlain, J., dissenting from the denial of rehearing en banc).

whether the presumption arises, courts following *Jenkins I* are left to wonder just how important the distinction really should be. Particularly because other circuits treat this distinction as dispositive evidence of no vindictive motive, *Jenkins I* creates significant confusion among the circuits.[166] Because other circuits have expressed disagreement with the Ninth Circuit in this area, other circuits will likely not follow *Jenkins I*.[167] With respect to the vindictiveness doctrine, the Ninth Circuit seems to be moving in the opposite direction of the other circuits.

In addition, the *Jenkins I* decision seems to raise the bar for the showing that the prosecution must make to rebut the presumption of vindictiveness. In *Jenkins I*, the court did not consider a subsequent confession under oath to be an intervening circumstance, which would rebut the presumption.[168] However, the Seventh Circuit reached the opposite conclusion, finding that such testimony clearly strengthens a prosecutor's case, constitutes a meaningful intervening event, and therefore undermines any allegation of vindictiveness.[169] Similarly, the Fifth Circuit has identified several ways by which prosecutors may overcome the presumption once it is established, each of which is at least somewhat incompatible with *Jenkins*.[170] However, the Ninth Circuit does not provide such guidance, and courts looking to *Jenkins I* will likely find that more is required of prosecutors in the Ninth Circuit to rebut the presumption of vindictiveness. The consequence of this heightened standard is that courts may now provide defendants, such as Jenkins, blanket immunity for crimes committed and admitted under oath.

## IV. CONCLUSION

Because defendants must be able to defend themselves without fearing retaliation from prosecutors, the doctrine of prosecutorial vindictiveness is

---

166.  *See* Williams v. Bartow, 481 F.3d 492, 501–02 (7th Cir. 2007); United States v. Peoples, 360 F.3d 892, 896 (8th Cir. 2004) (citing Blackledge v. Perry, 417 U.S. 21, 28–29 (1974)) ("A presumption of vindictiveness arises only when a prosecutor chooses to bring a more serious charge against a defendant in a second trial."); United States v. Miller, 948 F.2d 631, 633 (10th Cir. 1991); Humphrey v. United States, 888 F.2d 1546, 1549 (11th Cir. 1989); United States v. Andrews, 612 F.2d 235, 244 (6th Cir. 1979).

167.  *See, e.g., Andrews*, 612 F.2d at 244 (disagreeing with the Ninth Circuit's interpretation of Supreme Court vindictive prosecution precedent).

168.  United States v. Jenkins (*Jenkins I*), 504 F.3d 694, 701 (9th Cir. 2007). Particularly because there was a potential *Miranda* violation during the arrest for the first border-smuggling incident, it would make sense that an under-oath confession would be a compelling intervening circumstance. *See id.* at 704 (Conlon, J., dissenting) (concluding that Jenkins's trial testimony was much stronger evidence when compared to the confession to the border official).

169.  *See Williams*, 481 F.3d at 501 (finding that testimony which was under oath and subject to cross-examination was much stronger evidence than out-of-court statements).

170.  *See* Hardwick v. Doolittle, 558 F.2d 292, 301 (5th Cir. 1977) (providing that acceptable explanations for delay in bringing charges include "mistake or oversight in the initial action, a different approach to prosecutorial duty by the successor prosecutor, or public demand for prosecution on the additional crimes allegedly committed").

necessary in certain procedural settings. That, however, is the extent of the doctrine. As the Supreme Court has articulated, the Due Process Clause is not designed to give defendants any type of umbrella protection against legitimate charges by the government.[171]  The effect of the Ninth Circuit's rule in *Jenkins I* is that defendants may become immune to prosecution for crimes they admit to committing while on trial for separate criminal behavior. *United States v. Jenkins* exemplifies the Ninth Circuit's expansion of the doctrine beyond its original purpose as a procedural safeguard into a defendant's weapon that accomplishes far more than protecting due process rights.

---

171.   Blackledge v. Perry, 417 U.S. 21, 27 (1974).

# NOTICE

Wayne Circuit Court
301 E Main Street
Richmond Indiana 47374

Andrea Lynn Holwager v.Jon Frederick Turpin

89C01-2305-PO-000087

89C01-2305-PO-000087
To: Jon Frederick Turpin
2421 S. Plum Street
Yorktown, IN 47396

To view any documents attached, type the hyperlink provided below in a web browser.  Note this link is valid for 21 days.  If you need a copy of this document, download it immediately.

If a document is confidential, the system will prompt you to enter your email address.  However, because you received this paper notice, the court does not have a valid email address for you.  Please file an Appearance with the clerk and include a valid email on the Appearance.

If you are unable to download the document attached and need a physical copy of the document, please contact the clerk or court.

## EVENTS

| Entry Date | File Stamped / Order Signed | Event and Comments |
|---|---|---|
| 06/01/2023 | 06/01/2023 | Order Issued |

https://m.in.gov/NDC46N22

| OTHER PARTY - NOTICED | OTHER PARTY - ENOTICED |
|---|---|
| N/A | Ronald Joseph Moore  (Attorney) |

| 06/01/2023 | | Hearing Scheduling Activity<br>Hearing on Petition for Protection Order scheduled for 06/21/2023 at 10:00 AM. |
|---|---|---|

| OTHER PARTY - NOTICED | OTHER PARTY - ENOTICED |
|---|---|
| N/A | Ronald Joseph Moore  (Attorney) |

STATE OF INDIANA    )
                        ) SS:
COUNTY OF **WAYNE**   )

IN THE _____ COURT_____
( _____ DIVISION, ROOM ___)

ANDREA HOLWAGER
Petitioner

vs.

JON TURPIN
Respondent

CASE NO. 89C01-2305-PO-000087

## NOTICE TO APPEAR

The Petitioner having filed a petition for an Order for Protection, the Court now finds the conditions in Indiana Code § 34-26-5 have been met, and sets this matter for Hearing as follows:

TO:                   JON TURPIN
DATE OF HEARING:   JUNE 19, 2023
TIME OF HEARING:    1:30 PM
LOCATION OF HEARING:  WAYNE COUNTY CIRCUIT COURT
                        301 E MAIN STREET
                        RICHMOND, IN 47374

Please bring all documents and witnesses relating to this case with you to Court on your hearing date.

___ THE SHERIFF OF_____ COUNTY, INDIANA, IS ORDERED to personally serve this notice upon Respondent and make due return.

DATE: 6/1/2023

Recommended for approval by, if applicable:

_____, COMMISSIONER/REFEREE

Approved and ordered by:

_____, JUDGE/MAGISTRATE

## ******IMPORTANT NOTICE******

IF YOU DO NOT ATTEND THE HEARING IN THIS CASE, THE JUDGE MAY HEAR THE CASE IN YOUR ABSENCE AND ORDER ADDITIONAL RELIEF THAT MAY INCLUDE:

- EVICTION/EXCLUSION FROM A RESIDENCE;
- RESTRICTING POSSESSION OF PERSONAL PROPERTY;
- RESTRICTING PARENTING TIME;
- AWARDING CHILD SUPPORT; AND,
- PROHIBITING POSSESSION OF FIREARMS, AMMUNITION, OR DEADLY WEAPONS.

TCM-PO-0106 Approved 07/02
Rev. by State Ct. Admin. 07/14

**89C01-2305-PO-000087**

Wayne Circuit Court

Filed: 5/30/2023 12:04 PM

SL

Clerk

Wayne County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | |
| | ) SS: | CIVIL DIVISION, ROOM _____ |
| COUNTY OF WAYNE | ) | Case Number: |

(To be supplied by Clerk when case is filed.)

## APPEARANCE BY ATTORNEY IN CIVIL CASE

**This Appearance Form must be filed on behalf of every party in a civil case.**

1.  The party on whose behalf this form is being filed is:

    Initiating __✓__   Responding _____   Intervening _____ ; and

    the undersigned attorney and all attorneys listed on this form now appear in this case for the
    following parties:

    Name of party:  Andrea Lynn Holwager

    Address of party:  *(see Question #6 below if this case involves a protection from abuse
    order, a workplace violence restraining order, or a no-contact order)*

    113 S. 3rd Street
    Richmond, IN 47374

    Telephone # of party:  (765) 969-0628

    Email Address:  _____

    *(List on a continuation page additional parties this attorney represents in this case.)*

2.  Attorney information for service as required by Trial Rule 5(B)(2)

    Name:  Ronald Moore                         Attorney Number:  20278-89

    Address:  113 S 3RD ST   RICHMOND  IN  47374

    Phone:  7659627700

    Email Address:  ron@themoorelawfirm.com

    *(List on continuation page additional attorneys appearing for above party.)*

3.  This is a PO/JQ case type as defined in administrative Rule 8(B)(3).

4.  This case involves a protection from abuse order, a workplace violence restraining order,
    or a no – contact order.  Yes __✓__  No _____ *(If Yes, the initiating party must provide an*

*Addresses are included, proving the case had no right to be filed under seal, by an attorney with a criminal history of wrongfully filing cases under seal.*

*address for the purpose of legal service but that address should not be one that exposes the whereabouts of a petitioner.)* The party shall use the following address for purposes of legal service:

    ___✓___    Attorney's address    ron@themoorelawfirm.com

    _____    The Attorney General Confidentiality program address

    _____    (contact the Attorney General at 1-800-321-1907 or e-mail address is **confidential@atg.in.gov).**

    _____    Another address (provide)

5. This case does not involve a petition for involuntary commitment.  Yes __✓__  No ____

6. There are related cases: Yes __✓__ No ____   *(If yes, list on continuation page.)*

Used against rules of expungement, used as blackmail & extortion against us, used to deny due process against 14th amendment and 42USC§1983, used against us in violation of a declaratory decree, used as blackmail.

| Caption: | Case Number: |
|---|---|
| State of IN v. Jon Turpin | 49G06-1612-F5-046714 |

7. There are other party members:  Yes ____ No __✓__  *(If yes, list on continuation page.)*

8. This form has been served on all other parties and Certificate of Service is attached:
Yes ____  No __✓__

/s/ Ronald Moore
Attorney-at-Law
(Attorney information shown above.)

# NOTICE

A Petition For Order For Protection has been filed.  The Indiana Civil Protection Order Act, I.C. 34-26-5 et seq., was passed by the Indiana General Assembly in 2002.  Under the Act, Courts can issue Orders to protect people from domestic or family violence, stalking, or a sex offense.  These Court Orders are called "Protection Orders" or "Orders For Protection," and the terms are used interchangeably.

The terms "domestic or family violence," "stalking," and "sex offense" are legal terms and have definite legal meanings.  These terms are all defined by Indiana statutes and you should become familiar with these terms by reading the Indiana statues.

The person asking for the Order is called the "Petitioner."   If a hearing has been set, the Petitioner will be required to prove the requirements that domestic or family violence, stalking, or a sex offense has occurred.  This is why it is important that you read the statutes defining these terms prior to the hearing.  Although you may be proceeding without an attorney ("pro se"), you will receive no special indulgence from the Court and you will have to abide by the same standards as an attorney as to the law and procedure.  The Indiana Rules of Evidence are applicable to a hearing on a Petition For Order For Protection.

At a hearing the Petitioner will go first.  The Petitioner will present his or her evidence as to why an Order For Protection should be entered.  The evidence presented should be as specific as possible and give dates, times, and who was present.  Do not use legal conclusions such as, "he stalked me."  Present the evidence in such a manner that relays the facts as to what happened.  Again, your evidence should attempt to meet each and every prong of the Indiana statute.  Following the presentation of the Petitioner's evidence, the Respondent will have the opportunity to cross-examine the Petitioner.  This allows the Respondent the opportunity to ask questions of the Petitioner about the testimony the Petitioner just gave.  Following all of Petitioner's evidence, the Respondent will then have the opportunity to present his or her evidence followed by Petitioner's cross-examination of Respondent.

Protection Orders are serious matters and are treated as such by the Courts.  It is recommended that you utilize the services of an attorney but, if you elect to proceed *pro se,* you should come to Court prepared, having familiarized yourself with the applicable Indiana statutes.

89C01-2305-PO-000087

Filed: 5/30/2023 12:04 PM

Wayne Circuit Court
Petition Number: 2023053011263517

SL
Clerk

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE |
| | ) SS: ( _____ DIVISION, ROOM ____ ) Wayne County, Indiana |
| COUNTY OF WAYNE | ) | CASE NO. _____ |

Andrea Lynn Holwager _____, )

**Petitioner (Your Name)** )

    vs. )

Jon Frederick Turpin _____, )

**Respondent (Person to be Restrained)** )

# PETITION FOR AN ORDER FOR PROTECTION AND REQUEST FOR A HEARING - Filed by Person Seeking Protection

**IMPORTANT: This is a public document and a copy of it will be placed in the Court's file. A copy may also be sent to the Respondent.**

*(Check those which apply)*

1. **I am filing this Petition for myself:**

   ____ a.  I am or have been a victim of domestic or family violence;

   ____ b.  I am or have been a victim of a sex offense;

   ____ c.  I am or have been a victim of stalking.

   ✓ d.  I am or have been a victim of repeated acts of harassment.   *False*

2. **The Respondent's relationship to me is:**

   a.  the Respondent is my family or household member *(Check only the line which best applies)*:

   ____ the Respondent is my spouse;

   ____ the Respondent used to be my spouse;

   ____ the Respondent and I resided together in an intimate relationship;

   ____ the Respondent and I have a child in common;

   ____ the Respondent and I are dating, or have dated, each other;

   ____ the Respondent and I are, or have been, engaged in a sexual relationship;

   ____ the Respondent and I are related by blood or adoption. The Respondent is my ;

   ____ the Respondent and I are, or used to be, related by marriage. The Respondent is my ;

   ____ the Respondent is, or used to be, my guardian;

   ____ the Respondent is, or used to be, my ward;

   ____ the Respondent is, or used to be, my custodian;

   ____ the Respondent is, or used to be, my foster parent; or,

   ____ I am a minor child of a person in one of the types of relationships described above.

   ____ I have adopted the child of the respondent.

*If Respondent is not a family or household member as indicated above, but Respondent has*

1

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office Ct. Serv. 07/19

Petition Number: 2023053011263517

*committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies):*

b. \_\_\_\_ the Respondent has committed stalking against me.

c. \_\_\_\_ the Respondent has committed a sex offense against me.

d. ✓ the Respondent has committed repeated acts of harassment against me. *False, we were harassed, blackmailed, and we being extorte*

3. How old is the Respondent? __33__ years old.

4. **Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent:**

| Case Name | Case Number | County & State |
| --- | --- | --- |
| State of IN v. Jon Turpin | 49G06-1612-F5-046714 | Marion, IN |

5. **This case is filed in this county because:**

\_\_\_\_ a. the Respondent lives in this county.

✓ b. the incident(s) of domestic or family violence, stalking, sex offense, or harassment happened in this county. *False, I, as confirmed by a petitioner, am not abusiv*

✓ c. I live in this county. *We were stalked, and we were threatened.*

6. **If you are not represented by an attorney, fill in your public mailing address:**

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at: confidential@atg.state.in.us to get information on how to participate in that program.

7. **The Respondent has committed the following act(s) of domestic or family violence, stalking, a sex offense, or harassment** *(Check those which apply):\**

\_\_\_\_ a. the Respondent attempted to cause physical harm to me;

✓ b. the Respondent threatened to cause physical harm to me; *False*

\_\_\_\_ c. the Respondent did cause physical harm to me;

✓ d. the Respondent placed me in fear of physical harm; *False, I left and avoid them.*

\_\_\_\_ e. the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

\_\_\_\_ f. the Respondent committed stalking against me;

\_\_\_\_ g. the Respondent committed a sex offense against me;

\_\_\_\_ h. the Respondent committed an act of animal cruelty by beating, torturing, mutilating, or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass or terrorize a family or household member.

✓ i. the Respondent committed repeated acts of harassment against me.

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office Ct. Serv. 07/19

2

*False, I gave closure, and witness by Faith.*

Petition Number: 2023053011263517

8. **Describe what happened in each of the above incidents including the date(s), place(s) and witnesses to each incident:**

**Incident #: 1**

**Date of Incident** (on or about) 05/06/2023

**Place of Incident:**
Text Message

*They were informed I would litigate, and this is freedom of speech, which they violated.*

**Description of Incident:**
Random text message received by Michael Holwager after a few months of radio silence from Turpin. Random number. Called voicemail, and notified that it was the voicemail of Jon Turpin. See Attachment.

**List the names of all the people who were present during the incident. You must include your own name if you were present:**
1. Holwager, Andrea Lynn

( **Description continued on attachment(s)** )

**Incident #: 2**

**Date of Incident** (on or about) 12/11/2021

**Place of Incident:**
Richmond, Indiana

*This is true, Freedom of speech.*

**Description of Incident:** *I communicated with my biological mom, she confirm*
Turpin began communicating with other family members that Mr. and Mrs. Holwager were threatening to put him in a mental institution. Please see attached total of three screenshots of the conversation that transpired.

**List the names of all the people who were present during the incident. You must include your own name if you were present:**
1. Holwager, Michael Alan

( **Description continued on attachment(s)** )

**Incident #: 3**

**Date of Incident** (on or about) 12/12/2021

**Place of Incident:**
Richmond, Indiana

*This shows how Michael A. M. Holwager communicates and uses "DARVO"*

**Description of Incident:**
Mr. Holwager sent text messages to Mr. Turpin letting him know all of his stuff had been moved out of their home. Mr. Holwager asked Mr. Turpin to leave the parties alone until he got professional help. See attached 4 total screenshots of this conversation.

**List the names of all the people who were present during the incident. You must include your own name if you were present:**

3

Petition Number: 2023053011263517

1. Holwager, Andrea Lynn

( Description continued on attachment(s) )

---

**Incident #: 4**

**Date of Incident** (on or about) 12/21/2021

**Place of Incident:** *This, along with every referenced case*
Richmond, Indiana *being either double jeopardy, collateral estoppel, an*

**Description of Incident:** *or extortion and blackmail as well as being outside of*
Text message conversation attached between Mr. Holwager and Turpin's parents. *jurisdiction and*
*a federal question, proves conspiratorial collusion with the original*
See attachment. *irresponsible plaintiffs, my biological parents, grandparent*

**List the names of all the people who were present during the incident. You must include your own name if you were present:**

1. Holwager, Andrea Lynn

( Description continued on attachment(s) )

---

**Incident #: 5**

**Date of Incident** (on or about) 10/9/2022

**Place of Incident:** *Provided witness for their wedding, before it,*
Richmond, Indiana *and let them know I wished to avoid them, was*

**Description of Incident:** *prompt to block and go no-contact as requested.*
Facebook messages sent to Andrea Holwager's mother by Jon Turpin.

"See Attached."

**List the names of all the people who were present during the incident. You must include your own name if you were present:**

1. Holwager, Michael Alan

( Description continued on attachment(s) )

---

9.   **I am asking the Court to order the following relief** *(check all which apply):*

**NOTE: The following requested relief may be granted immediately by the Judge without a hearing. However, if the petition is based on harassment alone, the relief may be granted ONLY after notice to the Respondent and after a hearing to be held within thirty (30) days.**

✓ Prohibit the Respondent from committing, or threatening to commit, acts of domestic or family violence, stalking, or sex offenses against me; *I already didn't, and don't.*

✓ Prohibit the Respondent from committing, or threatening to commit, acts of domestic or family violence, stalking, or sex offenses against my family or household members, whose

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office Ct. Serv. 07/19

Petition Number: 2023053011263517

names are: *I already didn't and don't, he threatened, stalked, blackmail,*
1. Michael Alan Holwager ~~both~~ *extorted and potentially wiretapped me/us.*

✓ Prohibit the Respondent from harassing, annoying, telephoning, contacting, or directly or indirectly communicating with me;

✓ Order the Respondent to stay away from my residence, school, place of employment, or other place, which is the <u>537 W. Main Street, Richmond, IN 47374</u>, located at <u>113 E. Delaware St., Cambridge City, IN 473237</u>; *I already do so. In my opinion, they*

_____ Order the Respondent to stay away from the following location(s) frequented by my family *are afraid* or household member(s), which may include a residence, school, or place of employment: *I will*

***Please complete:*** *collect witness statements from school board members*

Please list all owners or lease signers at my residence: *Who my biological dad may have*
1. Michael Holwager  *threatened and/or blackmailed, extorted, coerced, et*
2. Andrea Holwager
*They also may not wish for me to collect medication information*

***NOTE: The following requested relief may be granted immediately by the Judge without a hearing. However, if the petition is based on harassment alone, the relief may be granted ONLY after notice to the Respondent and after a hearing to be held within thirty (30) days.***

_____ Evict the Respondent from my residence, which is located at:

_____ Order the Respondent to give me the possession and use of the following:

_____ The residence located at: ;

_____ An automobile/other motor vehicle, described as:

_____ Other necessary personal items, described as:

_____ Prohibit Respondent from removing, transferring, injuring, concealing, harming, attacking, mistreating, threatening to harm, or otherwise disposing of the animal(s) listed below. (Limit 5)

_____ Order that I will have the exclusive possession, care, custody, or control of an animal(s) owned, possessed, kept, or cared for by myself, the Respondent, a minor child of myself or the Respondent, or any other family or household member listed below. (Limit 5)

_____ Order the following additional relief necessary to provide for my safety and welfare and the safety and welfare of my family or household members:

***NOTE: The following requested relief may be granted ONLY after notice to the Respondent and after a hearing to be held within thirty (30) days:***

_____ Specify the arrangements for parenting time with our minor child(ren);

_____ Require that parenting time be supervised by a third party;

_____ Deny the Respondent parenting time;

_____ Order the Respondent to pay my attorney fees;

_____ Order the Respondent to pay rent for my residence;

_____ Order the Respondent to make payment on a mortgage for my residence;

_____ Order the Respondent to pay child support for our minor child(ren);

_____ Order the Respondent to pay support/maintenance for me;

_____ Order the Respondent to reimburse me for expenses related to the domestic or family

5

Petition Number: 2023053011263517

violence, stalking, sex offense, or harassment as follows:
*(specify the amount for each expense and bring documentation of the expense with you to Court for the Hearing):*

_____Medical expenses:                                           $_____

_____Counseling:                                                 $_____

_____Shelter:                                                    $_____

_____Repair or replacement of damaged property:                 $_____

_____Other costs or fees I have as a result of bringing this case:  $_____

✓  Prohibit the Respondent from using or possessing a firearm, ammunition, or deadly
    weapon; My wife and I were threatened with death & destitution.

_____Order the Respondent to surrender the following firearm(s), ammunition, or deadly
    weapon(s) to a specified law enforcement agency (list each item below):

_____Order a wireless service provider to transfer to me the right to continued use of, and
    financial responsibility for, the following telephone number(s) used by me or by a minor
    child in my custody (limit 10):

*NOTE: A wireless service provider's normal requirements for setting up a new cellular telephone account still apply. You should consider whether you will be able to set up an account in your own name and whether you will be able to pay for the account.*

**OJA-PO-0100** Approved 07/02
Rev. by Ind. Office Ct. Serv. 07/19

Petition Number: 2023053011263517

By filing this Petition, I am respectfully requesting that the Court immediately issue an Ex Parte Order for Protection. I understand that, if I have asked the Court for any of the following:

- evicting the Respondent from my/our home;
- giving me the possession of personal property;
- giving me possession of an animal;
- prohibiting Respondent from taking action against an animal;
- establishing rules for child parenting time;
- requiring the Respondent to pay fees, expenses, or child support;
- forbidding the Respondent from possessing a firearm, ammunition, or a deadly weapon;
- ordering the Respondent to surrender firearm(s), ammunition, or deadly weapons; or,
- allowing me or a child to continue to use a telephone number for which I will be financially responsible;

I must also ask the Court to set a date for a Hearing within thirty (30) days of today's date.

I understand that if my petition is based on harassment alone, the Court may grant relief ONLY after notice to the Respondent and after a hearing to be held within thirty (30) days.

I understand that if a Hearing is set, and if I fail to appear for the Hearing, the court may terminate the Ex Parte Order and/or dismiss the case.

I affirm, under the penalties for perjury, that the foregoing representations are true:
   a. on the basis of my own personal knowledge.
   b. on the basis that I have been informed and believe that the facts stated are true.

*(NOTE: If this Petition is made solely on the basis of Petitioner's information and belief, Petitioner must attach affidavits by one or more persons who have personal knowledge of the facts stated.)*

DATE: _____05/30/2023_____     /s/ Ronald J. Moore for Andrea and Michael Holwager
                                    **PETITIONER (Signature)**
                                    Ronald J. Moore for Andrea and Michael Holwager
                                    **PETITIONER (Type or print name)**

7

♡ Save        🔔 Monitor        📄 PDF        List        ··· More

# Elaine Marie Holwager

Age 66 years old

Born January 1957

Location Aurora, CO

Aliases Elaine Holwager, Holwager Elaine  View 4 more

📇 Add to Address Book

Monitor this report to receive updates

Turn monitoring on

High Confidence Data Only ❓                                          ✓

🏠 6702 S Winnipeg Cir Apt 104                               View 4 more
   Aurora, CO 80016

📞 (765) 969-6862                                            View 1 more

✉️ EMHOLWAGER@GMAIL.COM                                      View 3 more

♥ 5 relatives found                                         View relatives
   NOTE: Spouses may appear as relatives

🏛 Check for Criminal or Traffic records                     Learn more

🔗 3 social networks identified                              View details

📷 No photos found

**Need this report in a printable format?**

☰ Names & Ancestry                                          

Reports are available as a PDF that you can print, email to yourself or download to your computer.

[🖶 Print PDF]  [✈ Email PDF]

# Possible Phone Numbers

⚫ Learn more

Alerts

⋯

---

✔ Best phone number match

## (765) 969-6862 (/app/generate/phone?phone=7659696862&referringBvid=N_MDAxMTU5MDk5Njk1)

Phone type Mobile
Dates seen Oct 2013 - Aug 2023

View phone report (/app/generate/phone?phone=7659696862&referringBvid=N_MDAxMTU5MDk5Njk1)

Is this accurate?

---

Higher Confidence

## (765) 478-4842 (/app/generate/phone?phone=7654784842&referringBvid=N_MDAxMTU5MDk5Njk1)

Dates seen May 1981 - Aug 2023

View phone report (/app/generate/phone?phone=7654784842&referringBvid=N_MDAxMTU5MDk5Njk1)

Is this accurate?

---

WARNING: Please be advised, numbers and addresses may be associated with do-not-call, unsubscribe or other telemarketing activity contact restrictions and, as a reminder, our Terms (https://www.beenverified.com/faq/terms-conditions/) strictly prohibit use of our data for spam and other marketing activity.

✉ **Possible Emails**                                    Alerts

👤 **Personal Emails (4)**

emholwager@gmail.com (/app/generate/email?email=emholwager%40gmail.com)   ✔ Best email address match
Last seen: 04/14/2022

blackrose4842@gmail.com (/app/generate/email?email=blackrose4842%40gmail.com)   Higher Confidence

eholwager@aol.com (/app/generate/email?email=eholwager%40aol.com)   Higher Confidence
Last seen: 12/20/2021

☰ **Names & Ancestry**

● Show more

# Possible Address History

⚙ ···

Alerts

✔ Learn more

5 addresses identified

---

✔ Best address match

## 6702 S Winnipeg Cir Apt 104
## Aurora, CO 80016
## (/app/generate/property?
## address=6702%20S%20Winnipeg%20Cir.%20Apt%20104&city=Aurora&state=CO&zipcode=80
## 016)

Dates seen Sep 2016 - Nov 2022

Search this property (/app/generate/property?address=6702%20S%20Winnipeg%20Cir.%20Apt%20104&city=Aurora&state=CO&zipcode=8...

Is this accurate?

---

Higher Confidence

## 111 E Delaware St # 113
## Cambridge City, IN 47327
## (/app/generate/property?
## address=111%20E%20Delaware%20St.%20%23%20113&city=Cambridge%20City&parent_id=1
## 44158428&state=IN&zipcode=47327)

Dates seen Jan 2005 - Feb 2021

Search this property (/app/generate/property?address=111%20E%20Delaware%20St.%20%23%20113&city=Cambridge%20City&parent_id=...

Is this accurate?

---

Higher Confidence

## 113 E Delaware St
## Cambridge City, IN 47327

Dates seen Nov 1992 - Jan 2020

Is this accurate?

---

Higher Confidence

## 201 Mulberry St

≡ Names & Ancestry

## Cambridge City, IN 47327
### (/app/generate/property?address=201%20Mulberry%20St.&city=Cambridge%20City&state=IN&zipcode=47327)

Address type Old
Dates seen May 1981 - Sep 1993

Search this property (/app/generate/property?address=201%20Mulberry%20St.&city=Cambridge%20City&state=IN&zipcode=47327)

Is this accurate?

Higher Confidence

## 707 N Cambridge Rd
## Cambridge City, IN 47327
### (/app/generate/property?address=707%20N%20Cambridge%20Rd.&city=Cambridge%20City&state=IN&zipcode=47327)

Dates seen Oct 1998

Search this property (/app/generate/property?address=707%20N%20Cambridge%20Rd.&city=Cambridge%20City&state=IN&zipcode=47327)

Is this accurate?

WARNING: Please be advised, numbers and addresses may be associated with do-not-call, unsubscribe or other telemarketing activity contact restrictions and, as a reminder, our Terms (https://www.beenverified.com/faq/terms-conditions/) strictly prohibit use of our data for spam and other marketing activity.

## Possible Relatives

Alerts

⊙ Learn more

### David Richard Richard Holwager (/app/generate/person?bvid=N_MDAxMTU5NDA2NDk0&name=DAVID%20RICHARD%20RICHARD%20HOLWAGER)

Deceased at age ~65 on Sep 2019

Lived in Cambridge City, IN
May also go by David E Holwager, D Holwager

View person report (/app/generate/person?bvid=N_MDAxMTU5NDA2NDk0&name=DAVID%20RICHARD%20RICHARD%20HOLWAGER)

⊙ Show less contact info

| Address | 707 N Cambridge Rd |
| | Cambridge City, IN 47327 |
| | (/app/generate/property?address=707%20N%20Cambridge%20Rd.&city=Cambridge%20City&state=IN&zipcode=47327) |
| Dates seen | Aug 1995 - Aug 2023 |
| Address | 537 W Main St |
| | Richmond, IN 47374 |
| | (/app/generate/property?address=537%20W%20Main%20St.&city=Richmond&state=IN&zipcode=47374) |
| Dates seen | Mar 2022 - Oct 2022 |

| Address | 111 E Delaware St # 113 |
| --- | --- |
| | Cambridge City, IN 47327 |
| | (/app/generate/property?address=111%20E%20Delaware%20St.%20%23%20113&city=Cambridge%20City&state=IN&zipcode=47327) |
| Dates seen | Mar 1989 - Jan 2009 |

| Phone number | (765) 478-4842 (/app/generate/phone?phone=7654784842) |
| --- | --- |
| Dates seen | - |

Is this accurate?

## Andrea Lynn Holwager (/app/generate/person?bvid=N_MTg4MDU5ODMyMTc5&name=ANDREA%20LYNN%20HOLWAGER)

Age 35
Lives in Richmond, IN
May also go by Angrea L Holwager

View person report (/app/generate/person?bvid=N_MTg4MDU5ODMyMTc5&name=ANDREA%20LYNN%20HOLWAGER)

🔺 Show less contact info

| Address | 537 W Main St |
| --- | --- |
| | Richmond, IN 47374 |
| | (/app/generate/property?address=537%20W%20Main%20St.&city=Richmond&state=IN&zipcode=47374) |
| Dates seen | Nov 2020 - Aug 2023 |

| Address | 113 E Delaware St |
| --- | --- |
| | Cambridge City, IN 47327 |
| | (/app/generate/property?address=113%20E%20Delaware%20St.&city=Cambridge%20City&state=IN&zipcode=47327) |
| Dates seen | Feb 2023 - May 2023 |

| Address | 111 E Delaware St |
| --- | --- |
| | Cambridge City, IN 47327 |
| | (/app/generate/property?address=111%20E%20Delaware%20St.&city=Cambridge%20City&state=IN&zipcode=47327) |
| Dates seen | Apr 2023 - Apr 2023 |

| Phone number | (765) 969-0628 (/app/generate/phone?phone=7659690628) |
| --- | --- |
| Dates seen | - |

Is this accurate?

## Mary Jean Holwager (/app/generate/person?bvid=N_MTE4Mjg4MDEzNzUy&name=MARY%20JEAN%20HOLWAGER)

Age 36
Lives in Bloomington, IN
May also go by Maryjean Holwager

View person report (/app/generate/person?bvid=N_MTE4Mjg4MDEzNzUy&name=MARY%20JEAN%20HOLWAGER)

Names & Ancestry
Show less contact info

| Address | 3701 N Kinser Pike |
|---|---|
| | Bloomington, IN 47404 |
| | (/app/generate/property?address=3701%20N%20Kinser%20Pike.&city=Bloomington&state=IN&zipcode=47404) |
| Dates seen | Jun 2022 - Aug 2023 |

| Address | 3341 N Kinser Pike |
|---|---|
| | Bloomington, IN 47404 |
| | (/app/generate/property?address=3341%20N%20Kinser%20Pike.&city=Bloomington&state=IN&zipcode=47404) |
| Dates seen | Aug 2013 - Aug 2023 |

| Address | 3313 E John Hinkle Pl |
|---|---|
| | Bloomington, IN 47408 |
| | (/app/generate/property?address=3313%20E%20John%20Hinkle%20Pl.&city=Bloomington&state=IN&zipcode=47408) |
| Dates seen | Aug 2011 - May 2015 |

| Phone number | (765) 969-0638 (/app/generate/phone?phone=7659690638) |
|---|---|
| Dates seen | - |

◓ Show less relatives

## Alex W Jorck (/app/generate/person?bvid=N_MDAzODQ3Nzc0NTA5&name=ALEX%20W%20JORCK)

Age 36

Lives in Bloomington, IN

May also go by Jorck Alexander, Alexander Watt Jorck, Jorck Alexander Watt **+1 more**

View person report (/app/generate/person?bvid=N_MDAzODQ3Nzc0NTA5&name=ALEX%20W%20JORCK)

◓ Show less contact info

| Address | 3701 N Kinser Pike |
|---|---|
| | Bloomington, IN 47404 |
| | (/app/generate/property?address=3701%20N%20Kinser%20Pike.&city=Bloomington&state=IN&zipcode=47404) |
| Dates seen | Jun 2022 - Aug 2023 |

| Address | 3341 N Kinser Pike |
|---|---|
| | Bloomington, IN 47404 |
| | (/app/generate/property?address=3341%20N%20Kinser%20Pike.&city=Bloomington&state=IN&zipcode=47404) |
| Dates seen | Jun 2013 - May 2023 |

| Address | 9182 W Tulip Dr |
|---|---|
| | Columbus, IN 47201 |
| | (/app/generate/property?address=9182%20W%20Tulip%20Dr.&city=Columbus&state=IN&zipcode=47201) |
| Dates seen | Oct 2001 - Jul 2011 |

| Phone number | (812) 371-6197 (/app/generate/phone?phone=8123716197) |
|---|---|
| Dates seen | - |

| Phone number | (812) 342-4011 (/app/generate/phone?phone=8123424011) |
|---|---|
| Dates seen | - |

Names & Ancestry

## Michael Alan Mann (/app/generate/person? bvid=N_MTQ1MjMzMTYyNjEz&name=MICHAEL%20ALAN%20MANN)

Age 35
Lives in Richmond, IN

View person report (/app/generate/person?bvid=N_MTQ1MjMzMTYyNjEz&name=MICHAEL%20ALAN%20MANN)

⊘ Show less contact info

| | | |
|---|---|---|
| Address | 537 W Main St | |
| | Richmond, IN 47374 | |
| | (/app/generate/property?address=537%20W%20Main%20St.&city=Richmond&state=IN&zipcode=47374) | |
| Dates seen | Oct 2020 - Aug 2023 | |
| Address | 707 N Cambridge Rd | |
| | Cambridge City, IN 47327 | |
| | (/app/generate/property?address=707%20N%20Cambridge%20Rd.&city=Cambridge%20City&state=IN&zipcode=47327) | |
| Dates seen | May 2009 - Dec 2020 | |
| Address | 897 Spring Creek Rd | |
| | Montrose, CO 81403 | |
| | (/app/generate/property?address=897%20Spring%20Creek%20Rd.&city=Montrose&state=CO&zipcode=81403) | |
| Dates seen | Oct 2020 - Oct 2020 | |

Phone number   (765) 541-9643 (/app/generate/phone?phone=7655419643)
Dates seen        -

⊘ Show less relatives

## Glena Jo Burke (/app/generate/person? bvid=N_MDAwMzI2NzE0NzU4&name=GLENA%20JO%20BURKE)

Age 55
Lives in Clinton, OK
May also go by Glena Jo Clark, Glenna J Mann, Glena J Mann +1 more

View person report (/app/generate/person?bvid=N_MDAwMzI2NzE0NzU4&name=GLENA%20JO%20BURKE)

⊘ Show less contact info

| | | |
|---|---|---|
| Address | 10494 N 2310 Rd | |
| | Clinton, OK 73601 | |
| | (/app/generate/property?address=10494%20N%202310%20Rd.&city=Clinton&state=OK&zipcode=73601) | |
| Dates seen | Jan 2012 - Aug 2023 | |
| Address | 500 W Main St | |
| | Cambridge City, IN 47327 | |
| | (/app/generate/property?address=500%20W%20Main%20St.&city=Cambridge%20City&state=IN&zipcode=47327) | |
| Dates seen | Jun 2002 - Jul 2016 | |
| Address | 501 S 11th St | |
| Names & Ancestry | Clinton, OK 73601 | |

| | |
|---|---|
| Dates seen | Feb 2009 - Jan 2011 |

| | |
|---|---|
| Phone number | (765) 577-0104 (/app/generate/phone?phone=7655770104) |
| Dates seen | - |

## Nicole Renee Mann (/app/generate/person?bvid=N_MTY1Njc5Mjc3Njk5&name=NICOLE%20RENEE%20MANN)

Age 33
Lives in Clinton, OK
May also go by Nicole Man

View person report (/app/generate/person?bvid=N_MTY1Njc5Mjc3Njk5&name=NICOLE%20RENEE%20MANN)

◯ Show less contact info

| Address | 10494 N 2310 Rd |
|---|---|
| | Clinton, OK 73601 |
| | (/app/generate/property?address=10494%20N%202310%20Rd.&city=Clinton&state=OK&zipcode=73601) |
| Dates seen | Jun 2013 - Aug 2023 |

| Address | 501 S 11th St |
|---|---|
| | Clinton, OK 73601 |
| | (/app/generate/property?address=501%20S%2011th%20St.&city=Clinton&state=OK&zipcode=73601) |
| Dates seen | Nov 2008 - Feb 2014 |

Is this accurate?

## William Joseph Holwager (/app/generate/person?bvid=N_MDAxMTU5NTI4NTA2&name=WILLIAM%20JOSEPH%20HOLWAGER)

Age 68
Lives in Indianapolis, IN
May also go by Willia J Holwager, Bill J Holwager

View person report (/app/generate/person?bvid=N_MDAxMTU5NTI4NTA2&name=WILLIAM%20JOSEPH%20HOLWAGER)

◯ Show less contact info

| Address | 5212 Greenheart Pl |
|---|---|
| | Indianapolis, IN 46237 |
| | (/app/generate/property?address=5212%20Greenheart%20Pl.&city=Indianapolis&state=IN&zipcode=46237) |
| Dates seen | Apr 2009 - Aug 2023 |

| Address | 27741 Hacienda East Blvd Unit 1 |
|---|---|
| | Bonita Springs, FL 34135 |
| | (/app/generate/property?address=27741%20Hacienda%20East%20Blvd.%20Unit%201&city=Bonita%20Springs&state=FL&zipcode=34135) |
| Dates seen | Jul 2004 - Jul 2023 |

| Address | 2950 E Banta Rd |
|---|---|

Names & Ancestry

Indianapolis, IN 46227

(/app/generate/property?address=2950%20E%20Banta%20Rd.&city=Indianapolis&state=IN&zipcode=46227)

| Dates seen | Mar 1989 - Mar 2016 |
|---|---|

**Phone number** (813) 784-4655 (/app/generate/phone?phone=8137844655)

| Dates seen | - |
|---|---|

**Phone number** (239) 948-4977 (/app/generate/phone?phone=2399484977)

| Dates seen | - |
|---|---|

⊗ Show less relatives

## Sarah Elizabeth Goode (/app/generate/person?bvid=N_MDAwOTY1ODM1NTk0&name=SARAH%20ELIZABETH%20GOODE)

Age 62

Lives in Indianapolis, IN

May also go by Sarah Elizabeth Elizabeth Holwager, Sara E Goode

View person report (/app/generate/person?bvid=N_MDAwOTY1ODM1NTk0&name=SARAH%20ELIZABETH%20GOODE)

⊗ Show less contact info

| Address | 5212 Greenheart Pl |
|---|---|
| | Indianapolis, IN 46237 |
| | (/app/generate/property?address=5212%20Greenheart%20Pl.&city=Indianapolis&state=IN&zipcode=46237) |
| Dates seen | Jan 2013 - Aug 2023 |

| Address | 2950 E Banta Rd |
|---|---|
| | Indianapolis, IN 46227 |
| | (/app/generate/property?address=2950%20E%20Banta%20Rd.&city=Indianapolis&state=IN&zipcode=46227) |
| Dates seen | Jan 2000 - Jan 2023 |

| Address | 8413 N Armenia Ave Apt 906 |
|---|---|
| | Tampa, FL 33604 |
| | (/app/generate/property?address=8413%20N%20Armenia%20Ave.%20Apt%20906&city=Tampa&state=FL&zipcode=33604) |
| Dates seen | Jun 1983 - Jul 2009 |

**Phone number** (317) 788-0627 (/app/generate/phone?phone=3177880627)

| Dates seen | - |
|---|---|

## Suellen Holwager Holwager (/app/generate/person?bvid=N_MjM3Njk1NjgwNTg2&name=SUELLEN%20HOLWAGER%20HOLWAGER)

Age N/A

Lives in Indianapolis, IN

May also go by Suellen M Holwager

View person report (/app/generate/person?bvid=N_MjM3Njk1NjgwNTg2&name=SUELLEN%20HOLWAGER%20HOLWAGER)

⊗ Show less contact info

Names & Ancestry

| | |
|---|---|
| Address | 5212 Greenheart Pl |
| | Indianapolis, IN 46237 |
| | (/app/generate/property?address=5212%20Greenheart%20Pl.&city=Indianapolis&state=IN&zipcode=46237) |
| Dates seen | Sep 2018 - Jun 2023 |

## Debra S Holwager (/app/generate/person? bvid=N_MDAxMTU5MDgwNDk1&name=DEBRA%20S%20HOLWAGER)

Deceased at age ~43 on Jan 1999

Lived in Indianapolis, IN
May also go by Debra S Holwoger, Deborah S Holwalm

View person report (/app/generate/person?bvid=N_MDAxMTU5MDgwNDk1&name=DEBRA%20S%20HOLWAGER)

◉ Show less contact info

| | |
|---|---|
| Address | 2950 E Banta Rd |
| | Indianapolis, IN 46227 |
| | (/app/generate/property?address=2950%20E%20Banta%20Rd.&city=Indianapolis&state=IN&zipcode=46227) |
| Dates seen | Jan 1988 - Aug 2023 |

| | |
|---|---|
| Phone number | (813) 784-4655 (/app/generate/phone?phone=8137844655) |
| Dates seen | - |

## Margaret Jean Holwager (/app/generate/person? bvid=N_MDAxMTU5NzA3NzAx&name=MARGARET%20JEAN%20HOLWAGER)

Deceased at age null on Feb 2017

Lived in Beech Grove, IN
May also go by Jean M Holwager, J E Holwager, M J Holwager **+2 more**

View person report (/app/generate/person?bvid=N_MDAxMTU5NzA3NzAx&name=MARGARET%20JEAN%20HOLWAGER)

◉ Show less contact info

| | |
|---|---|
| Address | 1818 Main St |
| | Beech Grove, IN 46107 |
| | (/app/generate/property?address=1818%20Main%20St.&city=Beech%20Grove&state=IN&zipcode=46107) |
| Dates seen | Aug 2015 - Aug 2023 |

| | |
|---|---|
| Address | 4030 Oak Trail Dr |
| | Indianapolis, IN 46237 |
| | (/app/generate/property?address=4030%20Oak%20Trail%20Dr.&city=Indianapolis&state=IN&zipcode=46237) |
| Dates seen | Jan 2004 - Aug 2023 |

| | |
|---|---|
| Address | 606 Ash St |
| | Beech Grove, IN 46107 |
| | (/app/generate/property?address=606%20Ash%20St.&city=Beech%20Grove&state=IN&zipcode=46107) |
| Dates seen | Jul 1964 - Apr 2005 |

Phone number   (317) 784-4292 (/app/generate/phone?phone=3177844292)

Dates seen           -

---

## Mark Welsg Holwager (/app/generate/person?
## bvid=N_MDQ2MDQzOTYwNjA1&name=MARK%20WELSG%20HOLWAGER)

Age 37

Lives in Indianapolis, IN

May also go by Mark Welsh Holwager

View person report (/app/generate/person?bvid=N_MDQ2MDQzOTYwNjA1&name=MARK%20WELSG%20HOLWAGER)

⊘ Show less contact info

| | |
|---|---|
| Address | 5218 Greenheart Pl |
| | Indianapolis, IN 46237 |
| | (/app/generate/property?address=5218%20Greenheart%20Pl.&city=Indianapolis&state=IN&zipcode=46237) |
| Dates seen | Jan 2018 - Aug 2023 |
| Address | 1818 Main St |
| | Beech Grove, IN 46107 |
| | (/app/generate/property?address=1818%20Main%20St.&city=Beech%20Grove&state=IN&zipcode=46107) |
| Dates seen | Mar 2017 - Feb 2023 |
| Address | 5745 Sly Fox Ln |
| | Indianapolis, IN 46237 |
| | (/app/generate/property?address=5745%20Sly%20Fox%20Ln.&city=Indianapolis&state=IN&zipcode=46237) |
| Dates seen | Nov 2015 - Jul 2019 |

---

## Laralyn Ann Ann Montanez (/app/generate/person?
## bvid=N_MDAxNDM3OTI5OTc4&name=LARALYN%20ANN%20ANN%20MONTANEZ)

Age 37

Lives in Indianapolis, IN

May also go by Laralyn Ann Kuster, Laralyn Ann Ann Holwager, Laralyn Ann Hubble

View person report (/app/generate/person?bvid=N_MDAxNDM3OTI5OTc4&name=LARALYN%20ANN%20ANN%20MONTANEZ)

⊘ Show less contact info

| | |
|---|---|
| Address | 5218 Greenheart Pl |
| | Indianapolis, IN 46237 |
| | (/app/generate/property?address=5218%20Greenheart%20Pl.&city=Indianapolis&state=IN&zipcode=46237) |
| Dates seen | Jun 2019 - Aug 2023 |
| Address | 5745 Sly Fox Ln |
| | Indianapolis, IN 46237 |
| | (/app/generate/property?address=5745%20Sly%20Fox%20Ln.&city=Indianapolis&state=IN&zipcode=46237) |
| Dates seen | Aug 2010 - Sep 2020 |
| Address | 3 Dancing Horse Ln |
| Names & Ancestry | Corrales, NM 87048 |

(/app/generate/property?address=3%20Dancing%20Horse%20Ln.&city=Corrales&state=NM&zipcode=87048)

| Dates seen | Apr 2001 – Sep 2019 |
|---|---|

| Phone number | (505) 341-9660 (/app/generate/phone?phone=5053419660) |
|---|---|
| Dates seen | - |

| Phone number | (505) 897-7161 (/app/generate/phone?phone=5058977161) |
|---|---|
| Dates seen | - |

## J E Holwager (/app/generate/person?bvid=N_MDAxMTU5MjMwMDk5&name=J%20E%20HOLWAGER)

Deceased at age ~71 on Jul 1987

Lived in Beech Grove, IN
May also go by Joseph Holwager

View person report (/app/generate/person?bvid=N_MDAxMTU5MjMwMDk5&name=J%20E%20HOLWAGER)

⊙ Show less contact info

| Address | 606 Ash St |
|---|---|
| | Beech Grove, IN 46107 |
| | (/app/generate/property?address=606%20Ash%20St.&city=Beech%20Grove&state=IN&zipcode=46107) |
| Dates seen | Feb 1990 – Dec 2006 |

| Phone number | (317) 784-4292 (/app/generate/phone?phone=3177844292) |
|---|---|
| Dates seen | - |

Is this accurate?

## Possible Marriage & Divorce Records

Alerts

No possible marriage & divorce records found. Please note that the absence of any information or results within our reports may not necessarily be 100% accurate, complete or up to date, so please do not use it in lieu of your own due diligence.

## Names & Ancestry

Alerts

⊙ Learn more

### Elaine

From an Old French form of Helen . It appears in Arthurian legend; in Thomas Malory's 15th-century compilation Le Morte d'Arthur Elaine was the daughter of Pelleas, the lover of Lancelot, and the mother of Galahad. It was not commonly used as an English given name until after the appearance of Tennyson's Arthurian epic Idylls of the King (1859).

Usage: English, Arthurian Romance

 Names & Ancestry



*Facebook message Jon Fredrick Turpin sent to my mother (Elaine Holwager). I, Andrea Holwager, made the reply for her.*

**Fritz Turpin**

Inbox

1/10/22, 11:02 AM

Happy Birthday! 🎂 *We used to be Facebook friends.*

10/9/22, 10:25 PM

Michael threatened to sue me and my wife. I'm sorry I left the stuff at their house, but I wasn't "hitting on Andrea" like he has been spouting off.

So I won't be around anymore for Andrea while she's with that man, I'm sorry for that.

Hope she picks someone who doesn't cheat on her and lie about it someday.

That's the second time Michael has threatened me and it will be the last. I'm not sure if you sold them the office or not, but I'd like to know so I can avoid it if that's the case.

Anyway, I hope you're doing well and it's just my opinion, but I figured I'd say why I won't be around.

*In my opinion, the words below are written by M.A.M.H. See pages 3, 5, 6, 7.*

10/11/22, 4:52 AM

Jon Turpin, due to your continued defamation of character by intentionally spreading known false and malicious lies about my future son-in-law (Michael Mann) and the mental anguish you have caused my daughter (Andrea Holwager), this response is being written with legal assistance.

You are NEVER allowed on ANY of my properties at any time or anywhere near me. This includes 113 E Dr ↓ e Street located in Cambridge City, IN, or any other residences in my d/o family's name. We feel threatened, bullied, and intimidated by your continuous false accusations

**You blocked messages and calls from Fritz Turpin's Facebook account**
You can't message or call them in this chat, and you won't receive their messages or calls.

**Unblock**

**Something's wrong**

(20+) Messenger | Facebook

23, 11:03 AM

Q Search

**Inbox**












Fritz Turpin

**You blocked messages and calls from Fritz Turpin's Facebook account**
You can't message or call them in this chat, and you won't receive their messages or calls

**Unblock**

**Something's wrong**

I also blocked, and ceased contact.

2

Filed 3/30/2023 12:04 PM
Clerk
Wayne County, Indiana

‹ Me                                          ⋮

(No subject)

Jon, I was informed today you have again used my name in a defamatory manner in conversation. Specifically, you told Crystal that I was taking advantage of Jared.

Please stop attempting to manipulate people with your deceptions as you are hurting yourself by continuing to knowingly lying about persons who disagree with you.

I want to be clear, I have contacted an attorney. They have stated the pursuit of a case against you for defamation is well within reason.

I have repeatedly asked you to stop lying when using my or Andrea's name. This is the last verbal warning you will receive. The next contact on this subject will be from an attorney.

I have attached Erin in this text message in an effort to make your malice STOP.

Stop the character assination of every person who asks you to get treatment. You have crushed Andrea with your lies and manipulation. She has taken an aspirin everyday for the chest pain your lies have caused her. For our well being, LEAVE US ALONE!

D.A.R.V.O.

Deny
Attack
Reverse
Victim
and
Offender

Threatens my wife and attempts to control her, later attempts to manipulate her for informant regarding me while he attempts to stalk us and intrude again

89C01-2305-PO-000097

Filed 5/30/2023 12:04 PM
Clerk
Wayne County, Indiana



4

Filed 6/30/2023 12:04 PM
Clerk
Wayne County, Indiana

89C01-2305-PO-000067

< Me

But we have to protect ourselves from you now as you are a serious danger to us. Contrary to what you may think, you are NOT the victim here, but you sure as hell are leaving victims behind on the wake of your lies and deceit. The pain you have caused Andrea (someone who would still do anythiny for you) is nearly unforgivable. But man to man, do not text or call until you get serious help.

Deny
Attack
Reverse Victim
And
Offender

Attemp to Control medical treatment.

5

89C01-2305-PO-000087

Clerk
Wayne County, Indiana

< Me                                          ⋮

Also, Andrea has a recording of the conversation where you spoke your love for her while she was at the shelter. This is because the shelter has survelliance on the inside of the building, and she had you on speaker due to cleaning the cages. Unlike you, Andrea doesn't intentionally record conversations. But the shelter did since they saw Andrea's face was alarmed and checked on her.

She was/is a true friend of yours because she never shared it with anyone but me. The fact you had the NERVE to do this to Andrea before you even moved into our home shows how much disrespect you had towards me and how much HELP you need.

It also shows how good of friends we are because we still wanted you to be safe.

Due to how much I have watched my fiance cry yesterday from your lies, and how much you have hurt her, you too have hurt me to the core.

Even after all your lies about us (which of course the guys told me since they knew it was wrong and lies), we still only want what's best for you.

                    

Wiretapping
(Third Party)
Blackmail

Deny
Attack

Reverse Victim
And
Offender

6

**Me**

As of <u>today</u>, all your stuff has been moved out, and we helped move all the stuff over to Josh's outside barn.

The fact you were NOT here to move YOUR stuff yet all of us did this for you is childish and wrong on so many levels.

Andrea and I refused to touch your guns due to the accusations you placed on your father. Phillip and Josh placed them into Josh's car.

Due to how badly you have hurt my fiance and myself with your lies and gaslighting, such as telling others I was "going to restrain you" (what the hell man?) and the variety of other stories you are now fabricating that never occurred, you have placed us in fear of interacting with you.

Therefore, until you get serious help, you are not welcome to come near either of us. We cannot be around your manipulation and gas lighting anymore. Please get serious help before you hurt someone or yourself.

You have disrespected my house by turning our lives upside down when we bent over backwards to help you.

Intrusion

Deny
Attack

Reverse victim
And
Offender

Deny

Attack

Reverse Victim
and
Offender

7

Filed 5/30/2023 2:04 PM
Clerk
Wayne County, Indiana



J.T. Turpin

As of today, all your stuff has been moved out, and we helped move all the stuff over to Josh's outside barn.

The fact you were NOT here to move YOUR stuff yet all of us did this for you is childish and wrong on so many levels.

Andrea and I refused to touch your guns due to the accusations you p

View all

Also, Andrea has a recording of the converation where you spoke your love for her while she was at the shelter. This is because the shelter has survel-liance on the inside of the building, and she had you on speaker due to cleaning the cages. Unlike you, Andrea doesn't intentionally record conversati

View all

But we have to protect ourselves from you now as you are a serious danger to us. Contrary to what you may think, you are NOT the victim here, but you sure as hell are leaving victims behind on the wake of your lies and deceit.

89C01-2305-PO-000087

Filed: 5/30/2023 12:04 PM
Clerk
Wayne County, Indiana



Attempts to control my medical treatment despite me already contacting EAP, my therapist, my doctor, and another qualified social worker, who informed me I should leave the situation.

EAP also let me know that the way I was treated by my biological parents, that, in their words:

"You are an orphan."

Filed: 5/30/2023 12:04 PM
Clerk
Wayne County, Indiana



10



4:10   🔋 18%

← J.T. Turpin   📹 📞 🔍 ⋮

distance.

Josh will pickup the cats in the near future and he has purchased my shotgun.

Saturday, Dec 11 · 4:16 PM

I was informed today you are telling people I have placed you "in fear of saying you are manic."

That is terrifying and not okay. I just suggested looking into this as a possibility, and we discussed the criteria together. I have constantly and repeatedly told you I am just your friend and not a therapist.

Once we went over it, you stated you "identified with nearly all criteria", hugged me, cried, and thanked me for having another avenue to discuss with your doctor and therapist.

I again stressed as long as you get professional help, it does not matter the diagnosis (anxiety, ptsd, etc...) that matters is you

Text message

Handwritten annotations:

← Confirmed, this was lightly attempted by alleged petitioner inside the courtroom

I cried because they tried to call me bipolar after I and my wife were threatened with death and destitute

Who does that?

89C01-2305-PO-000087

Filed 5/30/2023 12:04 PM
Clerk
Wayne County, Indiana



Jon Turpin, JR.

You fucked up. Get ready broke bitch.

Please check your number. I believe you are off a touch... 

Let's see which one of us can pay a lawyer longer.

It would help if I knew who this is. How we have interacted. What you are even talking about.

For starters.

This is Alan.

Who are you trying to make aware of "having fucked up?"

Oh. Little Jon. Good to know. Thank you for leaving your name in you voice-mail message so i could even know what was going on.

*Handwritten annotations (right margin):*

Freedom of speech, but I apologize for copying their language & Not threatened: not fighting words.

Clarity of litigation

Two Responses

Not threatened. Belittles and Demeans.

I didn't even receive this, as, after notifying of potential litigation, I blocked M.A.H.M.

12

**jt4590@gmail.com**

| | |
|---|---|
| **From:** | Jon F. Turpin <jt4590@gmail.com> |
| **Sent:** | Sunday, October 15, 2023 4:39 PM |
| **To:** | Eden Branch Black & White Printer Public Library |
| **Subject:** | Fwd: Case Number 98C01-2305-PO-000087 |
| **Attachments:** | image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png; image.png |

On Tue, Oct 3, 2023 at 8:47 PM Jon F. Turpin <jt4590@gmail.com> wrote:
[UPDATE TO ENSURE PICTURES ARE PRESENT]

On Tue, Oct 3, 2023 at 6:40 PM Jon F. Turpin <jt4590@gmail.com> wrote:
Thus far in the case...:
1.
A) The case was filed under seal by an attorney with a criminal background who has a past record of filing cases under seal without legal grounds, Ronald J. Moore, during a time when President Joseph R. Biden, Jr. potentially cannot seal pseudonyms on his emails under seal, and as well, plaintiffs, even citizens, cannot file their own pseudonyms under seal in a public civil rights case against the government itself.

1

**Louisiana Western District Court**
**Judge:**
**Referred:**
**Case #:**
**Nature of Suit**
**Cause**

Terry A Doughty
Joseph H L Perez-Monte
1:23-cv-01059
440 Civil Rights - Other (
42:1983 Civil Rights Act

Docket        Parties (10)

Last checked: **Saturday Sep 09, 2023 5:58 AM CDT**

**Defendant**
Richard E Bell

**Defendant**
Joseph R Biden, Jr

**Defendant**
Andrea L Holwager

**Defendant**
Michael A M Holwager

**Defendant**
Jared R Junkin

**Defendant**
Soraya Cinnamon Murphy

**Defendant**
Jon B Turpin

**Defendant**
Linda B Turpin

**Plaintiff**
P O A E R G
247 Maximillian St
Baton Rouge, LA 70802

**Plaintiff**
Jon F D Turpin
2421 S Plum St
Yorktown, IN 47396

| 325 | Aug 16, 2023 | MOTION for Leave to Proceed under ~~Pseudo~~nym by Brandon Q Doe. Motion McClusky. Motion Ripe Deadline set for 8/16/2023. (Attachments: # 1 Redact to Intervene, # 3 Letter, # 4 Proposed order)(crt,Miletello, A) (Additional attach Envelope) (Miletello, A). (Entered: 08/16/2023) |
| --- | --- | --- |
| | | Main Document      Motion for Miscellaneous Relief |
| | | Attachment 1      Redacted Exhibit |
| | | Attachment 2      Proposed Motion for Leave to Intervene |
| | | Attachment 3      Letter |
| | | Attachment 4      Proposed order |
| | | Attachment 5      Envelope |
| 326 | Aug 16, 2023 | MOTION to Seal Attached Document by Brandon Q Doe. Motions referred to Motion Ripe Deadline set for 8/16/2023. (Attachments: # 1 Proposed order, # Envelope)(crt,Miletello, A) (Entered: 08/16/2023) |
| | | Main Document      Motion to Seal Attached Document |
| | | Attachment 1      Proposed order |
| | | Attachment 3      Envelope |
| | Aug 16, 2023 | Motions Transferred regarding 325 MOTION for Leave to Proceed under Pse Document. Motions referred to Judge Terry A Doughty. (crt,Miletello, A) |
| | | Motions Transferred |
| 327 | Aug 18, 2023 | MEMORANDUM ORDER denying 325 Motion for Leave to Proceed under P: Attached Document. Signed by Judge Terry A Doughty on 8/17/2023. (crt,Cra |
| | | Main Document      Order on Motion for Miscellaneous Relief |
| 328 | Aug 18, 2023 | MAIL RETURNED as Undeliverable: Mail sent to Mike Webb, 955 S Columb Notice of Consolidation, 316 Order on Motion to Consolidate Cases returned Deliverable as Addressed, Unable to Forward. (Attachments: # 1 Return Doc 08/18/2023) |
| | | Main Document      Mail Returned |
| | | Attachment 1      Return Document #317 |
| 329 | Aug 25, 2023 | MOTION for Reconsideration re 327 Memorandum Order by Brandon Q Doe Kayla D McClusky. (Attachments: # 1 Supplements to Motion, # 2 Letter, # 3 (crt,Miletello, A) (Entered: 08/25/2023) |
| | | Main Document      Motion for Reconsideration |
| | | Attachment 1      Supplements to Motion |
| | | Attachment 2      Letter |
| | | Attachment 3      Proposed order |
| | | Attachment 4      Envelope |

B) The case was filed for an alleged petitioner who in their testimony has directly testified against having knowledge of a "family business" and in doing so, potentially denied the existence of the alleged victim, purportedly his wife, and

attempted to reference and go against the already decided and entered cases of at least three superseding districts, and no less than 5 Honorable Judges decisions, even posthumous.

C) The alleged petitioner has admitted on record that I'm not abusive, don't touch anyone, and has attempted to tell the The Honorable Judge Drake that I "make stuff up" while his testimony regarding a school beating where he watched me be beaten on a floor, and didn't assist, nor anything to help me except enter a police report after being told his lack of action while claiming he was my friend was deeply concerning.

D) In my opinion, the attempt to tell the Honorable Judge Drake that I "make stuff up" aligns with an attempt to falsely diagnose me as Bipolar, which the alleged petitioner, who has given up his 5th amendment rights, by entering evidence in court that no one else could have since he wasn't responded to after his two texts, and I already had him blocked even if he was messaging me.

E) In my opinion, the testimony from the alleged petitioner against the alleged victim would even violate, if they are married, marital communications privilege.

F) In my opinion, the way this case was filed prevents the alleged victim and alleged petitioner from receiving any civil relief at all since it was entered by falsely accessing information, and hidden under seal, also without any legal grounds, proven in confirmed pattern by the Honorable Judge Drake reaffirming the Honorable Judge Stoner's opinion to expunge a prior case by the Marion County Superior Court.

G) Importantly, in that prior case, each the defense and prosecution, and the judge, showed in actions my right to self defense, retained my right to appeal, retained my 2nd amendment rights and lifetime gun permit, and followed the immunity clause in Indiana's Self Defense laws for protecting another person in doing so in actions.

H) The alleged victim is not a law enforcement officer and left the Indianapolis Metropolitan Police Department allegedly after going against her chain of command.

I) The alleged victim is not a therapist, and had to be reported out of genuine concern for attempting to offer schedule 2 substances to myself in line with attempts to falsely interdict me, and only to protect the alleged victim and the alleged petitioner themselves against their own irresponsible actions and their own marital issues.

J) In my opinion, these issues belong between them, and their priest if they are Catholic, have nothing to do with us, just as I told them before cutting off contact months and months ago when their actions, along with the actions of the irresponsible plaintiffs referenced in the "School Lawsuit" which is otherwise irrelevant to this case, except to say that each of the parties have attempted to stop our marriage.

**K) Even now to the point of contacting our priest, and filing a court case so irresponsible and causing a swath of destruction so severe that even law enforcement, medical professionals, the EEOC, and honorable judges in the 5th District Court of Louisiana have suggested and accepted we civilly sue them, because they may be completely incapable of controlling themselves, yet are seemingly "control freaks."**

4



## Acknowledgment Letter



**eeoc@mail.custhelp.com**
to me ▾



Office of Field
Programs

Thank you for contacting the U.S. Equal Employment Opportunity Commission (EEOC).

Our agency enforces the federal laws that prohibit job discrimination based on race, color, religion, sex, national origin, age, disa

In response to your recent communication with our EEOC Intake Information Group (IIG), you were provided information about th
Equal Pay Act (EPA), require you to file a charge before you can file a lawsuit in court for unlawful employment discrimination.

**There are strict time limits for filing a charge of employment discrimination, and you must file a charge with the EEOC v**
and the EEOC will not take further action.

**If you wish to begin the charge process, please go to** https://publicportal.eeoc.gov/ which will allow you to complete a pre-cha

If you have any difficulty with the online portal, including scheduling an intake appointment, please call 1-800-669-4000 or email a

Additional information about the laws we enforce and our charge filing procedures is available on our web site at www.eeoc.gov.

Sincerely,

U.S. Equal Employment Opportunity Commission (EEOC)

**L) AN ATTEMPT TO FALSELY DIAGNOSE, INTERDICT, CONSERVATORSHIP, OR CAUSE ME ANY LOSS OF
CONSTITUTIONAL AND CIVIL RIGHTS WOULD BE AN ATTEMPT TO VIOLATE NOT ONLY HIPAA LAWS, BUT AN
ATTEMPT TO INVALIDATE THE ALREADY PRIVATELY DOCUMENTED DIAGNOSIS OF ME AS A FUNCTIONAL AUTISTIC
MAN WITH "ASPERGERS" SIMPLY, AUTISM.
M) MY DIAGNOSIS WAS PERFORMED BY THE SAME PH.D. PSYCHOLOGIST ORIGINALLY FROM LOUISIANA, WHO
THEN PRACTICED IN INDIANA, AND ASSISTED IN TRAINING INDIANA'S LAW ENFORCEMENT PROFESSIONALS,
VERIFIED EVEN AFTER EGREGIOUS ABUSE OF ME THAT I WAS NOT A THREAT NOR DISORDERED AND
RECOMMENDED AGAINST THE ATTEMPTED PROCEEDINGS.**

Steven J. Couvillion, Ph.D.   ABPdN.
Patricia M. Couvillion, Ph.D.
Jonni L. Gonso, Ph.D.
Melody N. Dilk, Ph.D., J.D.

Kevin Dugan, Ph.D.
Bonnie Pisano, Ph.D.

H. Jeffrey Davis, Ph.D.
Corby A. Bubp, Ph.D.
Keith B. Magnus, Ph.D.
Polly Shepard, Psy.D.

# INDEPENDENT MEDICAL EVALUATION
# PSYCHOLOGICAL EVALUATION

| | |
|---|---|
| **Name:** | Jon F. Turpin |
| **Date of Birth:** | 04-05-1990 |
| **Dates Seen:** | 11/06/2008, 12/04/2008, 12/22/2008, 1/15/2009, 2/9/2009 |
| **Psychologist:** | Steven J. Couvillion, Ph.D., ABPdN, HSPP |

## Biography:

Dr. Steven Couvillion earned a Ph.D. in Clinical Psychology from Florida State University in 1975. His pre-doctoral inter at IN U Medical Center, he developed and trained pediatric residents, Mental Health workers in a novel Behavioral, fa

In 1975, Dr. Couvillion became Director of Child and Adolescent Services for a six county Mental Health Center in Sou services to many families of outpatient populations in a newly established CMHC.  In 1978, Dr. Couvillion returned wi supervised by Dr. Kathleen FitzhughBell. (This was one of the first Peds Post-Doctoral trainings in the US).

Since 1981, Dr. Couvillion, along with his staff of 10 psychologists, provided pediatric neuropsychology and a broad ra disabilities, ADHD, developmental and genetic disorders, autism and conduct and emotional problems. He served as intervention for children with special needs. Dr. Couvillion has been appointed by the courts as a special mediator for Bayh to the Indiana State Mental Health Commission for five years.

Through most of his career, Dr. Couvillion has been a Board Member of the IN Psychological Association, holding the members for continuing education credits, along with presentations in conjunction with the Indiana Bar Association, *BARROWS AWARD  For Distinguished Contributions to Psychology over a Lifetime.*

*Dr. Steve Couvillion's current practice focuses on Forensic Evaluations and consultation and treatment of difficult case 1983.  He is privileged to be married to psychologist  Dr. Patricia Couvillion. Besides his professional work, golf, woodw Cajun speaking member of the American Board of Pediatric Neuropsychology.*

**N) THIS IS THE SAME PSYCHOLOGIST WHO ASSISTED A VAST MULTITUDE OF ABUSE VICTIMS IN HEALING FROM AND EXITING ABUSIVE, CONTROL FREAK SITUATIONS SUCH AS THE ONE ON DISPLAY BY THE ALLEGED PETITIONER, AND ALLEGED VICTIM, EVEN AGAINST THEIR OWN WORDS.**

THIS PHOTO IS OF THE ALLEGED VICTIM, OUTSIDE OF 1 MULBERRY ST, CAMBRIDGE CITY, IN



THE TOP SUBSECTION OF THE PHOTO BELOW IS OF THE ALLEGED PETITIONER, INSIDE OF 1 MULBERRY ST, CAMBRIDGE CITY, IN
THE BOTTOM SUBSECTION OF THE PHOTO BELOW HAS THE SIDE OF THE SAME CAR BEHIND THE ALLEGED PETITIONER

FOR REFERENCE.

May a young man who works with you and your Dad just watch as you're beaten?



May a friend just watch a friend be punched over 35 times and choked on a cement floor?

The alleged petioner's testimony in court went against his own words, which, during a time which Facebook was being monitored and free speech was benig violated on a scale so vast it required an injunction upon the Federal Government... may have allowed the alleged petitioner to access an expunged case fraudulently by attempting to falsely label me as a gun-violent, bipolar threat to society.

The alleged petioner's words were potentially so defamatory that others reached out to me in genuine concern that these allegations did not fit my character at all:







7:31

## Andrea Holwager

Hey love. I know it's late, but I wanted to let you know I read those screenshots that you sent to Michael. I am still so sorry for everything you are going through. We are here to support you, but please be very cautious with using my name in a conversation. The reason I say this is if this were to

**View all**   >

My bad

I'll be honest that doesn't feel very supportive. However, I do understand where you're coming from and I wasn't thinking of it that way.

I'm sorry

We're still talking about the house

7:31

## Andrea Holwager

Hey love. I know it's late, but I wanted to let you know I read those screenshots that you sent to Michael. I am still so sorry for everything you are going through. We are here to support you, but please be very cautious with using my name in a conversation. The reason I say this is if this were to escalate to a court case (which hopefully it does not), my name brought into it can slow me down/prevent me from getting my license (since I do not have it yet). Sadly, the licensure process slows dramatically if your name gets associated with a case (as a lot of background checks are run throughout this process).