7/20/23, 6:08 AM                                    Gmail - Shiba Inu and DeFi Token Scams - Help

 **Gmail**                                    Jon F Turpin <jt4590@gmail.com>

## Shiba Inu and DeFi Token Scams - Help
3 messages

**Jon F. Turpin** <jt4590@gmail.com>                             Tue, Jun 15, 2021 at 3:36 PM
To: InfraGardTeam@fbi.gov

Hi,
I'm contacting you because I cannot remember my username and I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring. I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this will be immediately passed over to the FBI to investigate.

Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please spread awareness before more people are taken for all they have.

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

**Jon F. Turpin** <jt4590@gmail.com>                             Tue, Jun 15, 2021 at 3:50 PM
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Hi Joseph,
I'm contacting you because I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring. I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this will be immediately passed over to the FBI to investigate.

7/20/23, 6:08 AM                                Gmail - Shiba Inu and DeFi Token Scams - Help

Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please spread awareness before more people are taken for all they have.

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Sun, Jul 2, 2023 at 2:59 AM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

The majority of times I've reported anything: My Dad's abuse, Michael's abuse, the abuse of me at the school which they didn't help stop, but instead, attempted to use me as collateral in and "put me down" as gay, my report of the unconstitutional Revocable Trust that has been used to falsely, against my civil rights, classify me as a dependent:

All have been attempts to ensure I'd never have a family, nor inherit, and now that I've reported the crypto scam, and potential child porn by Jared Junkin, and Michael Mann, there have been further, persistent attempts to destroy me, my wife, our marriage, our home, and even our ability to exist, and it still continues, with me properly reporting out of genuine concern, and enduring the same situation I had to endure as a child in the Western Wayne School Systems, without, so far, justice.

I've identified the "bad apples" and have done so by researching and pointing out a pattern, so, why will no one collect the evidence I've provided, and/or attempted to provide from the start, without attempting to continuously force me under the tyranny of my Dad, who has treated me as collateral to use for court cases instead of as a son?

Why, as the actual victim, who still loves our state of Indiana, and even denied taking a settlement from Western Wayne School Systems, and instead asked them then to "keep your money and just make this School a better place for kids so this doesn't happen again" am I still allowed to be abused?

I don't blame our government, nor our state, nor our Indiana Bar Association, nor our lawyers, nor our ISP, nor our STK, nor the government agencies with good people that do their best every day, nor my family, friends, nor even my former employers for being "duped" by these persons.

But I do say these persons are the issue here, and I am disappointed that, even now that they have proven their pattern of bad behaviors, that it may be allowed to continue, with not only me, but my wife losing everything to just even be heard.

They even threatened us with this destitution and loss of employment, and they always follow through, or attempt to, and they've threatened us with either complete and utter loss of rights and character and family, and/or death.

Now there are accusations to the DHS that we are threats to society, or that I'm a potentially gun violent person (one of the only ways to invalidate a valid expungement and attempt to force a false eviction from a home we purchased, which will be yet another attempt to prevent us from home ownership in our state of Indiana, and would allow my Dad to excise me from inheritance, and divorce my mom, as he threatened to do, while blaming me).

When that didn't/doesn't work, then the claims become that we must be mentally unfit, or potentially drug addicts, which is just incorrect and untrue.

7/20/23, 6:08 AM                                    Gmail - Shiba Inu and DeFi Token Scams - Help

Mr. Rokita, I wouldn't care what they said about me if it hadn't already been used in such a way to damage my character irreparably without a full pardon, and if it hadn't already been used to damage my jobs repeatedly, and even my career, and most importantly, if it hadn't been used to hurt and attempt to continue to hurt my wife, and our marriage without justice.

I truly don't care about my reputation, but this has damaged my character, and Faith alongside character make the foundation on which a man builds a life with his wife, and protects his family and children.

They have no right to my Faith, nor my wife, nor my character, nor my independence, nor our peace of mind, and further they have no right to destroy my life and my wife's life simply because they cannot carry their own false reputations, cannot view themselves honestly in the mirror, and cannot sleep with their own guilty consciences for their sins.

With that in mind, would you ever allow this to happen to your wife and children, even if some of the persons perpetrating it claimed they were your Dad, or claimed they were your friends? Their actions speak otherwise to me.

My Dad even contacted our priest from states away and tried to claim I was incompetent and unfit to be married, against the opinion of our qualified priest.


For independence day, I pray for true independence, and for justice, and I've already asked Jesus, Mary, and God, and I have Faith in them, and now I'm asking you.



Sincerely,
Jon F. D. Turpin

--------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Tue, Jun 15, 2021, 3:50 PM
Subject: Fwd: Shiba Inu and DeFi Token Scams - Help
To: SA Joseph L. Chaney <jlchaney@fbi.gov>



Hi Joseph,
I'm contacting you because I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring. I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this will be immediately passed over to the FBI to investigate.


Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please spread awareness before more people are taken for all they have.

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*


BAS in CIT - IUPUI

Gmail - Shiba Inu and DeFi Token Scams - Help

AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

7/20/23, 6:05 AM                                      Gmail - InfraGard Account - Dormant Status

 **Gmail**                                          Jon F Turpin <jt4590@gmail.com>

---

## InfraGard Account - Dormant Status
2 messages

---

**Joseph Chaney** <jlchaney@fbi.gov>                          Tue, Mar 22, 2022 at 3:01 PM

Good Afternoon,

With the increase of potential cyber threats related to the Russia-Ukraine war, it is important for cybersecurity professionals to stay informed. If you are receiving this email, you are listed as a <u>dormant</u> InfraGard member. Dormant members are those whom have not logged-in to the portal for over one year. Dormant members DO NOT received network broadcast emails from InfraGard National or the local InfraGard Chapter. If you have trouble logging in to the portal, please contact the InfraGard helpdesk at InfraGardTeam@fbi.gov for assistance to re-establish your login credentials. We encourage you to re-establish your InfraGard Secure Portal Account and encourage you to review DHS CISA's Shield's Up public web site at https://www.cisa.gov/shields-up and the FBI's public facing web site at www.IC3.gov for additional public intelligence and cyber security practices.

Thank You,

Joseph L. Chaney

Special Agent, FBI Indianapolis

Private Sector Coordinator, InfraGard Coordinator

Imminent Threat or Crime in Progress – call 911

Reporting Computer Intrusions (Including Ransomware) – www.ic3.gov or 1-800-callFBI

Business Email Compromise – www.ic3.gov & **contact your financial institution immediately**

State of Indiana -Indiana Cyber Hub : **www.in.gov/cybersecurity/report-a-cyber-crime/.**

---

**Joseph Chaney** <jlchaney@fbi.gov>                          Tue, Mar 22, 2022 at 3:09 PM

Good Afternoon,

Despite my best efforts to manually filter through the membership roster, a few Active InfraGard members were captured in this email, so I do apologize if you received this message in error. However, a good time to make sure your InfraGard login credentials still work.

Thanks!

[Quoted text hidden]

7/20/23, 6:07 AM                                      Gmail - FBI InfraGard Portal | Username & Credentials

 **Gmail**                                                    Jon F Turpin <jt4590@gmail.com>

---

## FBI InfraGard Portal | Username & Credentials
1 message

**jt4590@gmail.com** <jt4590@gmail.com>                              Mon, Jun 26, 2023 at 12:57 AM
To: InfraGardTeam@fbi.gov
Cc: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Dear FBI InfraGard,
My name is Jon F. D. Turpin, and I've recertified as requested and need to reestablish my credentials with the FBI
InfraGard for appropriate login.
There are ongoing attempts by those I've reported to infiltrate our personal information, accounts, and identities, so it is
imperative I reach out:
Accounts of mine have been hacked and I've been "doxxed" after successfully reporting a major cryptocurrency scam, so
my username may need updated, along with a password reset.

Would you please contact me directly at jt4590@gmail.com, or via phone at 225-259-6270, and/or provide me with the
appropriate number to call in this situation?

Thank you for your assistance,
Jon F. D. Turpin
FBI InfraGard
225-259-6270
jt4590@gmail.com

---------- Forwarded message ----------
From: "Jon F. Turpin" <jt4590@gmail.com>
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>
Cc:
Bcc:
Date: Tue, 15 Jun 2021 15:50:06 -0400
Subject: Fwd: Shiba Inu and DeFi Token Scams - Help

Hi Joseph,
I'm contacting you because I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring.
I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find
me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be
named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've
never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this
will be immediately passed over to the FBI to investigate.

Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting
scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please
spread awareness before more people are taken for all they have.

7/20/23, 6:07 AM                                    Gmail - FBI InfraGard Portal | Username & Credentials

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

📄 **Fwd: Shiba Inu and DeFi Token Scams - Help.eml**
6K

7/20/23, 6:07 AM                                   Gmail - This is What They Are Abusing and Attempting

 Gmail                                          Jon F Turpin <jt4590@gmail.com>

## This is What They Are Abusing and Attempting
1 message

**jt4590@gmail.com** <jt4590@gmail.com>                       Mon, Jun 26, 2023 at 1:21 AM
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

This correlates directly with some of the threats that were made towards me and my wife and shows the motivation behind the current abuse of the court system in attempts to falsely accuse and destroy us completely.

The bad actors have abused our government all the way to the Department of Homeland Security, and our court system, in successful attempts to wrongfully terminate me repeatedly, wrongfully charge us, and evict us.

Situations such as the one we're currently presented with, which I unfortunately predicted would happen, because persons with behaviors such as those I've identified are predictable, are why it's imperative I receive a pardon.

Not only was the original conviction wrongful and forced upon me via unconstitutional use of a Revocable Trust to falsely claim me as a dependent and further abuse and neglect. Expungement has been utilized by the same bad actors, not by our government, to falsely identify me as a threat to society when I'm attempting to turn over required evidence to prevent future corruption of this nature, which is on an unprecedented scale, from continuing.

By journaling, documenting, researching, and understanding our history, legacy, and to some degree out of necessity our legal system, I've been able to identify and "pull back the curtain" on the motivations behind these attacks.

Unfortunately, even when I do this, the bad actors further pretend that I'm a problem for simply destroying their illusion and presenting their, in my opinion once shown, obvious end goals, which I can only describe as dire hatred.

Hatred towards us for merely existing and attempting through all odds to continue to exist, safely, with the rights to protect ourselves and continue our life, liberty, and pursuit of happiness, as our forefathers intended.

Judge Mark D. Stoner needs to be contacted by the FBI about this, and we, in my opinion, should be considered key witnesses in, my assumed unqualified but potentially qualified opinion, a top-priority indictment of bad actors.

3.    The Indiana State Police Central Repository for Criminal History information is ordered to seal Petitioner's expunged records relating to Cause No. 49G06-1612-F5-046714. Records sealed may be disclosed only to:

A.    A prosecuting attorney if authorized by court order and needed to carry out the official duties of the prosecuting attorney,

B.    A defense attorney, if authorized by a court order and needed to carry out the professional duties of the defense attorney,

C.    A probation department, if authorized by a court order and necessary to prepare a presentence report,

D.    The Federal Bureau of Investigation and the Department of Homeland Security, if disclosure is required to comply with an agreement as to the sharing of criminal history information,

E.    The Indiana Supreme Court, members, the executive directors or employees of the Indiana State Board of Law Examiners in accordance with rules adopted by the such board for determining whether an applicant possesses the necessary good moral character for admission to the bar and

F.    A person required to access expunged records to comply with the Secure and Fair Enforcement of Mortgage Licensing Act (12 U.S.C. 5101 et seq.) or regulations adopted under such act.

Signed Expungement Order - Turpin.pdf
241K

 Gmail

Jon F Turpin <jt4590@gmail.com>

## FBI VCC & NCOP Swatting

4 messages

**Jon F. Turpin** <jt4590@gmail.com>
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Fri, Jun 30, 2023 at 12:14 PM

Dear Mr Chaney,
After what we've experienced over the last two years at the hands of a few individuals, and the unfortunate, in my opinion, waste of government resources by potetial repeated attempts of these individuals to:

1. Classify me falsely as someone who is "gun violent."

2. Classify my wife falsely as "mentally unsound" and or an "abusive spouse."

3. Destroy via fictitious and fractious abuse of our thin blue line, legal system, department of homeland security, and other esteemed governmental agencies:
Our character, careers, livelihood, savings, freedom of speech, and most importantly, our marriage, health, civil rights, peace of mind, and ability to have a family and pets.

Potentially as attempts to vicariously carry out their prior expressed threats upon us, simply for reporting out of concern for our safety, and for necessary "whistle blowing," but most unfortunately, potentially for the expressed enjoyment of these individuals to not only watch us suffer but cause us to "suffer lol," in the words of a man now attempting to abuse our court systems...

It is my sincere opinion that there was an active attempt by these, in my opinion, "bad actors" to "swat" us, and I thank you and our FBI for creating the NCOP within our VCC to combat this potentially dangerous bad behavior in our nation.

Would you please review, and include me, and my wife, Jon F. Turpin, and Erin R. Golden, appropriately as victims of potential swatting in our national swatting database in an effort to keep us safe from further harms and/or attempts by bad actors to abuse not only us, but our thin blue line and governmental agencies and resources?


Thank you sincerely,
Jon F. Turpin & Erin R. Golden
225-259-6270 & 225-432-5574
jt4590@gmail.com & erin465336@gmail.com
2421 S. Plum St. Yorktown, IN 47396

**Jon F. Turpin** <jt4590@gmail.com>
To: Legal <legal@kirkfreemanlaw.com>

Fri, Jun 30, 2023 at 4:56 PM

Request to be added to the FBI's VCC NCOP Database as victims of "swatting," due to recent events where Michael A. M. Holwager may have attempted to wrongfully classify me as someone who is "gun violent" and/or as an active shooter.
https://abcnews.go.com/US/fbi-creates-national-database-track-swatting/story?id=100527427

Best Regards,
**Jon F. Turpin**
E-mail: jt4590@gmail.com

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley
[Quoted text hidden]

**Jon F. Turpin** <jt4590@gmail.com>
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Fri, Jun 30, 2023 at 5:04 PM

7/14/23, 10:45 PM                                    Gmail - FBI VCC & NCOP Swatting

Messages sent by Michael A. M. Holwager with statements regarding me, "JT" and "gun violence."



**Jon F. Turpin**
E-mail: jt4590@gmail.com

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Fri, Jun 30, 2023 at 5:05 PM
To: Legal <legal@kirkfreemanlaw.com>

Messages sent by Michael A. M. Holwager with statements regarding me, "JT" and "gun violence."

7/14/23, 10:45 PM                                    Gmail - FBI VCC & NCOP Swatting



**Jon F. Turpin**
E-mail: jt4590@gmail.com

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

[Quoted text hidden]





Gmail

Jon F Turpin <j4590@gmail.com>

**Extremely Compassionate and Reserved | Defamation, Losses, Harms, Distress, Etc. Et Al | Potentially Overly Lenient Starting Estimates Breakdown and Descriptions**

Jon F. Turpin <j4590@gmail.com>
Bcc: compass@rfkhumanrights.org, judiciary_whistleblower@mail.house.gov, braun_casework@lawd.uscourts.gov, braun_casework@awd.uscourts.gov, Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney <klirk@irkfreemanlaw.com>, sachatessler@gmail.com, "SA Joseph L. Chaney" <jlchaney@fbi.gov>, His Holiness Pope Francis <info@vaticanrome.it>

These are some of our current losses just from losing access to one digital asset while protecting the Ascension Health Patient Data Backups.
It doesn't even include the losses from wrongful eviction, loss of rights, violation of freedom of speech, vandalism, wrongful termination etc.

There's another $25,000 from the loss of a vehicle, which I donated to our Indiana State Police foundation in good faith efforts.
Bills from the wear and tear on our vehicles, and having at least two of them tampered with that likely total in excess of $20,000.

Replacement property, higher interest rate and legal expenses easily totaling over $20,000.
Wrongful termination with losses currently totaling over $20,000 after taxes before interest.

Travel expenses and hotel costs that easily total in the thousands also.
Medical expenses and now lack of health insurance and medical care.

Not even including the loss of a business which was making $40,000+ per year at dissolution.
Including loss of all digital assets, stocks, retirement, and looking at the potential loss of home.

This may easily total over $500,000 of actualized losses without even factoring pain, suffering, and interest.



Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

A revocable trust is a type of trust that allows the person who created it, known as the grantor, to retain control over the assets placed in the trust during their lifetime. This means that the grantor can modify or even revoke the trust at any time.

While a revocable trust can be a useful estate planning tool, it can also be used for abuse in certain situations. Here are some ways that a revocable trust can be used for abuse:

1. Financial exploitation: A revocable trust can be used to financially exploit vulnerable individuals such as elderly or incapacitated individuals. The grantor can transfer assets to the trust and appoint themselves or a trusted individual as the trustee. The trustee can then use these assets for their own benefit, rather than for the benefit of the trust's beneficiaries.

2. Controlling behavior: In some cases, a grantor may use a revocable trust as a tool for controlling the behavior of their beneficiaries. For example, they may condition the receipt of assets on the beneficiary meeting certain conditions or following certain rules.

3. Concealing assets: A grantor may use a revocable trust to conceal assets from creditors or other individuals. For example, they may transfer assets to the trust to avoid paying debts or to avoid having those assets subject to probate.

4. Tax avoidance: While there are legitimate ways to use a revocable trust for tax planning purposes, a grantor may use a revocable trust to avoid paying taxes that they otherwise would be required to pay.

It's important to note that while a revocable trust can be used for abuse, it can also be used properly to achieve legitimate estate planning goals. If you are considering creating a revocable trust, it's important to consult with an experienced estate planning attorney to ensure that it is being used appropriately.

It's not being used appropriately, and it is proof of a promise to pay the beneficiaries in other words, us, for our losses, and ███ they are liable, they being my biological parents.



Each our home and vehicles would be paid off, Our retirement would still be intact, with savings and surplus to repair our home and begin having a family of our own, were it not for this bad apple and co-conspirators.

Our losses are enormous and irreparable, and we desire restoration, recompense and justice.



My biological dad is a "broker" and taxes may have been avoided, willfully, and with intent, please notify the IRS... I have.

Refer to Indiana Department of Revenue v. Boswell Oil Company

**CROSSCOUNTRY MORTGAGE™**

1 Corporate Drive
Suite 360
Lake Zurich, IL 60047-8945

**MORTGAGE STATEMENT**
Statement Date: 11/01/2023

| Property Address: | 2421 S PLUM ST YORKTOWN IN 47396 |
|---|---|
| Account Number | 1494273525 |
| Payment Due Date | 12/01/2023 |
| **Amount Due** | **$874.61** |

*If payment is received after 12/11/2023, a $25.00 late fee will be charged.*

*I want the Trust to pay this off in full.*

* 0402677 000054841 093M13-00917622
JON FREDERICK TURPIN
2421 S PLUM ST
YORKTOWN, IN 47396

| Contact Us | 1-877-538-8790 |
|---|---|

### Account Information

| | |
|---|---|
| Outstanding Principal Balance | $90,254.97 |
| Current Escrow Account Balance | $1,489.04 |
| Maturity Date | July 2052 |
| Interest Rate | 5.250% |
| Prepayment Penalty | No |

### Explanation of Amount Due

| | |
|---|---|
| Principal | $113.16 |
| Interest | $394.87 |
| Escrow (for Taxes and Insurance) | $366.58 |
| **Regular Monthly Payment** | **$874.61** |
| Fees Charged Since Last Statement | $0.00 |
| Total Fees Charged | $0.00 |
| Overdue Payment | $0.00 |
| **Total Amount Due** | **$874.61** |

**Housing Counselor Information:** If you would like counseling or assistance, you can contact the following: US Department of Housing and Urban Development (HUD): For a list of homeownership counselors or counseling organizations in your area, go to http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800-569-4287.

### Transaction Activity (10/3/2023 to 11/01/2023)

| Date | Description | Charges | Payments | Escrow Activity |
|---|---|---|---|---|
| 10/20 | County Taxes | $0.00 | $0.00 | $-703.04 |
| 11/01 | Payment – Thank you | $0.00 | $874.61 | $0.00 |

### Past Payments Breakdown

| Description | Paid Last Period | Paid Year to Date |
|---|---|---|
| Principal | $112.67 | $1,212.74 |
| Interest | $395.36 | $4,375.59 |
| Escrow (Taxes and Insurance) | $366.58 | $4,032.38 |
| Fees | $0.00 | $0.00 |
| Partial Payment (Unapplied)* | $0.00 | $0.00 |
| **Total** | **$874.61** | **$9,620.71** |

**IMPORTANT MESSAGES:**
* **Partial payments:** Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account. If you pay the balance of a partial payment, the funds will then be applied to your mortgage.

For a list of HUD approved Housing Counseling Agencies, go to www.hud.gov or call HUD toll free at 1-800-569-4287.

NOTICE TO CUSTOMERS WHO ARE IN BANKRUPTCY OR WHOSE OBLIGATION HAS BEEN DISCHARGED AND NOT REAFFIRMED: TO THE EXTENT YOUR ORIGINAL OBLIGATION WAS DISCHARGED, OR IS SUBJECT TO AN AUTOMATIC STAY OF BANKRUPTCY UNDER TITLE 11 OF THE UNITED STATES CODE, THE INFORMATION IN THIS MORTGAGE STATEMENT IS FOR REGULATORY COMPLIANCE AND INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT IN VIOLATION OF THE AUTOMATIC STAY OR THE DISCHARGE INJUNCTION NOR AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR SUCH OBLIGATION. HOWEVER, CREDITOR RETAINS RIGHTS UNDER ITS SECURITY INSTRUMENT, INCLUDING THE RIGHT TO FORECLOSE ITS LIEN. **PLEASE SEE REVERSE FOR ADDITIONAL IMPORTANT NOTIFICATIONS.**

*Please note: If you have enrolled in our automatic payment service, your payment will process as scheduled pursuant to the terms of your signed Authorization Form. This statement is provided for informational purposes pursuant to regulatory requirements established by the CFPB.*



**Oscar Cordon**
Sales Manager/Outside Loan Originator
NMLS829081

📞 331.210.0898
✉ oscar.cordon@ccm.com
🌐 ccm.com/Oscar-Cordon

Looking at a new home?
Or want to refi?
I'm ready to finance it.

**Contact us today
to get started.**

JON FREDERICK TURPIN
2421 S PLUM ST
YORKTOWN, IN 47396 -

**PAYMENT COUPON**
*Return This Portion
With Your Payment*

**CROSSCOUNTRY MORTGAGE™**

| Amount Due | |
|---|---|
| Due By 12/01/2023 | $874.61 |

*If payment is received after 12/11/2023, a $25.00 late fee will be charged.*

Please designate how you want us to apply any additional funds.

| | |
|---|---|
| Additional Principal | $ |
| Additional Escrow | $ |
| **Total Amount Enclosed** | $ |

Loan Number: 1494273525
Next Payment Due: 12/01/2023

*Make Check Payable To:
CrossCountry Mortgage, LLC*

☐ CHECK HERE IF YOUR ADDRESS INFORMATION HAS CHANGED AND COMPLETE FORM ON REVERSE SIDE.

CrossCountry Mortgage, LLC
P.O. Box 371306
Pittsburgh PA 15250-7306

149427352500899610087461131201238

## IMPORTANT INFORMATION

**Payments:** Detach your payment coupon and mail with your check or money order in the envelope provided. Do not delay payments while waiting for additional or corrected billing statements. Please write your loan number on your check or money order and mail to the Payment Processing Center listed on the front of this statement.

**Automatic Payment Drafting:** For information about automatically deducting your mortgage payment from your checking or statement savings account at no charge, please contact our Customer Service Department toll-free at 1-877-538-8790.

**Late Charges** To avoid any late charges, please schedule the mailing of your payment to arrive no later than the specified due date. Payments received after the grace period may incur a late charge; please refer to your note for your grace period.

**Additional Amounts:** Please ensure your remittance is for the exact amount due shown on the coupon. If you wish to make additional payments to your principal or escrow, please indicate the amounts in the area specified on the coupon. If you do not specify, any additional funds will be applied to your principal balance and/or any outstanding fees.

**Payoff Amounts:** None of the amounts in this statement are payoff amounts. Only certified funds in the form of a Certified Cashier's Check or Wire will be accepted for payoffs; all other payments will be returned.  Payoff funds will not be accepted through bill payment services, websites, ACH drafts, or by telephone.  To obtain a Payoff Statement, please contact Customer Service at 1-877-538-8790 or fax the request to 1-847-574-7659. Interest and any applicable fees or charges will continue to accrue if certified funds are not received by the date in the Payoff Statement.

**Telephone Payments:** Some payments can be made by telephone. When permitted by applicable law, a fee may apply for this service in the amount of $9.50 when using the automated system, or $11.50 when speaking with a live representative. Payments can be submitted by mail or online for no additional fee, and other free payment options may also be available. To make a telephone payment or obtain information about free payment options, please contact us at 1-877-538-8791.

**Inquiries:** General inquiries should be mailed separately from your mortgage payment to our correspondence address. Be sure to include your loan number and telephone number, including area code, on all inquiries. RESPA Notices of Error and Requests for Information must be sent only to the address indicated below, including the specific Attention line noted.

| | | |
|---|---|---|
| **Correspondence**<br>Mail Stop 1290<br>1 Corporate Drive, Suite 360<br>Lake Zurich, IL 60047-8945 | **Payoff/Overnight Payments**<br>Mail Stop 1270<br>1 Corporate Drive, Suite 360<br>Lake Zurich, IL 60047-8945 | **RESPA Notice of Error/**<br>**Request for Information**<br>**Attention: Mail Stop NOE 1290**<br>1 Corporate Drive, Suite 360<br>Lake Zurich, IL 60047-8945 |
| **Customer Service Department**<br>1-877-538-8790<br>TDD: 1-866-352-3684<br>Fax: 1-847-574-7659<br>Monday - Friday<br>8:00 am - 8:00 pm CST | **Telephone / Fax Numbers and Hours**<br>**Collection Department**<br>1-877-538-8791<br>TDD: 1-866-352-7564<br>Monday - Friday<br>9:00 am - 6:00 pm CST | **Website Address**<br>www.CrossCountryMortgage.com |

**Hazard Insurance Reminders:** It is your responsibility to maintain proper and sufficient hazard insurance coverage. Hazard insurance includes Fire and Extended Coverage, and where required, Flood Insurance. To protect our mutual interest in the mortgaged property, we will require evidence of proper insurance. Absent this evidence, we are required to force place coverage (not insuring your equity) on your behalf and charge your mortgage account. You will be given prior notice before coverage is placed. Periodically, please consult your insurance agent to ensure that your policy adequately meets your needs. Please forward all insurance policies and bills that you receive to Hazard Insurance Department, PO Box 961292, Fort Worth, TX 76161-0292 or fax to 855-640-4865.

**Property Tax Reminders:** It is your responsibility to file for any tax exemptions. Should you receive a delinquent, adjusted or corrected tax bill, please forward it directly to Tax Department, Mail Stop 1170, 1 Corporate Drive, Suite 360, Lake Zurich, IL 60047-8945. Supplemental bills are often issued in addition to yearly real estate tax bills and are your responsibility. They are not collected through an escrow account.

**Credit Reporting:** We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report. If you believe any information we have reported or may report to a credit bureau about your loan is inaccurate, please notify us at the following address: Credit Information Department, Attention: Mail Stop NOE 1290, 1 Corporate Drive, Suite 360, Lake Zurich, IL 60047-8945.

**ADDITIONAL NOTICE TO CUSTOMERS WHO ARE IN BANKRUPTCY OR WHOSE OBLIGATION HAS BEEN DISCHARGED:** THIS MORTGAGE STATEMENT INCLUDES INFORMATION REQUIRED UNDER THE CONSUMER FINANCIAL PROTECTION BUREAU REGULATIONS. IF THE FIRST NOTICE OR FILING HAS BEEN MADE, THIS IS NOT AN ATTEMPT TO IMPOSE PERSONAL LIABILITY FOR THE DISCHARGED OBLIGATION BUT INSTEAD REFLECTS THE CREDITOR'S RIGHTS TO ENFORCE THE SECURITY INTEREST IN THE PROPERTY. **LATE CHARGES:** LATE CHARGES DO NOT APPLY TO DISCHARGED OBLIGATIONS AND WILL NOT BE COLLECTED FROM DEBTORS WITH OBLIGATIONS THAT ARE SUBJECT TO AN AUTOMATIC STAY UNDER TITLE 11 OF THE UNITED STATES CODE.

## CHANGE OF ADDRESS OR PHONE NUMBER

☐ Address Change            ☐ Phone Number Change

| | |
|---|---|
| Loan Number | Date |
| Borrower's Name | Co-Borrower's Name |
| Street Address | City/State/Zip |
| (    ) Home Phone | (    ) Business Phone |
| Borrower's Signature | Co-Borrower's Signature |

**BANK OF AMERICA** 🇺🇸

P.O. Box 45224
Jacksonville FL  32232-5224

**Customer service information**
bankofamerica.com
800.215.6195

**Mail payments to:**
Bank of America, N.A.
P.O. Box 17237
Wilmington DE 19886-7237

CA 0913    007 472 1    05411 #@01 AB 0.537

JON TURPIN
2421 S PLUM ST
YORKTOWN, IN  47396-1513

**Switch to paperless or pay with e-bills through bofa.com or with our mobile banking app.**

*I also want the Trust to pay this off, in full.*

Account #  630-10063978335

## Important messages

**Credit Reporting Notice -** We are required by law to provide the following notification: We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be reflected in your credit report.

## Loan account status

| | |
|---|---|
| Maturity date: | 06/27/2029 |
| Loan Interest rate: | 7.94% |
| Payoff balance*: | $20,662.56 |
| Payoff good through: | 09/27/2023 |

*Payoff does not include any fees, credits, or reversals that have not posted.*

| | |
|---|---|
| Previous year's interest paid: | $0.00 |
| Statement date: | 09/07/2023 |
| Current payment due: | $367.31 |
| Amount past due: | $0.00 |
| Total fees and charges: | $0.00 |
| Total payment due by 09/27/2023 is: | $367.31 |

## Transaction activity

| Effective date | Description | Amount | Detail |
|---|---|---|---|
| Beginning principal balance | | | $20,707.65 |
| 08/16/2023 | PAYMENT - THANK YOU | -$367.31 | |
| | PRINCIPAL | | $232.17 |
| | FINANCE CHARGE | | $135.14 |
| Ending principal balance | | | $20,475.48 |

This is an attempt to collect a debt.  Any information will be used for that purpose.

Put your bill on cruise control! Enroll in automatic payment today.

0000000000036731630100639783350584560804

BANK OF AMERICA, N.A.
P.O. BOX 17237
WILMINGTON DE 19886-7237

JON TURPIN
2421 S PLUM ST
YORKTOWN, IN  47396-1513

Account number: 63010063978335

| | |
|---|---|
| **Amount due on 09/27/2023** | **$367.31** |
| Late fee amount | $0.00 |
| Amount  Past due | $0.00 |
| Total fees and charges | $0.00 |

Check box for change of address

Check box if you are paying loan balance in full

| | | |
|---|---|---|
| Additional principal | $ | . |
| **Total enclosed** | $ | . |

584 560804 630 10063978335



**BANK OF AMERICA**

JON TURPIN                                    | Account # 630-10063978335 | August 8, 2023 - September 7, 2023 | Page 3 of 4

## Important messages

**Bank of America appreciates the opportunity to service your account.** Please contact us if you have any questions regarding your account. For faster service, reference the account number above and have your authentication information, including social security number available.

**Braille and Large Print Request –** You can request a copy of this statement in either Braille or Large Print by calling 800.432.1000 or going to bankofamerica.com and enter Visually Impaired Access from the home page.

**Ancillary Products -** Upon early termination of a retail installment agreement through payoff, voluntary surrender, repossession, or otherwise, you will be entitled to a refund or credit for any unearned portion of an ancillary product (specifically including but not limited to any GAP waiver, "debt cancellation" agreement, GAP insurance, credit life insurance, credit accident and health insurance, credit involuntary unemployment insurance, or diminished value protection) financed as part of the retail installment transaction based on a formula set forth in the product contract, or as required by law.
Please contact the administrator of any ancillary product financed as identified on your retail installment agreement or product contract for identification of the amount of such refund or credit that is available to you.



Go to previous versions of this Article                                    ↓

# 2022 Louisiana Laws
# Civil Code
# Art. 3546. Punitive damages

**Universal Citation:** LA Civ Code Art. 3546 (2022)

Art. 3546. Punitive damages

Punitive damages may not be awarded by a court of this state unless authorized:

(1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled; or

(2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury was domiciled.

Acts 1991, No. 923, §1, eff. Jan. 1, 1992.

**Disclaimer:** These codes may not be the most recent version. Louisiana may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Posted on: January 17, 2022

Many states limit how much accident victims can recover in personal injury cases. However, this generally only applies to certain types of damages and particular kinds of injury cases. Understanding Louisiana's cap on damages in some incidents can help you get a better idea of your possible financial recovery after suffering injuries.



Louisiana does not limit the money damages recoverable in most personal injury cases. For example, the victims of car accidents, falls, and defective product cases can all recover their documented compensable damages. However, the state limits recovery in some other types of injury cases.

# What Caps does Louisiana Place on Financial Recovery?

Louisiana places dollar limits on financial recovery in two types of claims:

- Medical malpractice claims
- Claims against a government agency

Under La. Rev. Stat. § 40:1299.41, most victims of medical malpractice cannot recover more than $500,000. However, there are exceptions; this limit does not apply to future necessary medical care. In addition, it only applies when the doctor, hospital, or another provider in question is qualified and certified. If they were not a qualified health care provider, there is no limit on recovery.

Likewise, La. Rev. Stat. § 5106 limits damages recoverable from a government agency to only $500,000. This could come into play when someone suffers a fall in a public park or is hurt in a car accident caused by a municipal employee.



# Louisiana Law Blog

## INSIGHT AND INFORMATION ON LOUISIANA LAW, LITIGATION, AND LEGAL CULTURE

# How Much is Too Much? The Louisiana Supreme Court Holds that a Punitive Damage Award Ratio of 184:1 is Excessive

By Kean Miller on June 25, 2018

By the **Admiralty and Maritime** Team

Punitive damages are designed to punish a tortfeasor. They are available as a remedy in general maritime actions where a tortfeasor's intentional or wanton and reckless conduct amounted to a conscious disregard for the rights of others. The punitive damage standard requires a much higher degree of fault than simple negligence. The amount of a punitive damage award must be considered on a case-by-case basis; however, prior punitive damage awards can provide insight as to what is appropriate.  In the matter of *Warren v. Shelter Mutual Ins. Co., et al.*, 233 So 3d 568 (La. 2017) the Louisiana Supreme Court provided guidance as to when a jury's punitive damage award was grossly excessive.

The *Warren* case centered around the wrongful death of Derrick Hebert in a recreational boating accident.  The facts surrounding Derrick Hebert's death are tragic.  In May 2005, Hebert was a passenger in a boat that suddenly, and without warning, turned violently when the hydraulic steering system failed.  Hebert and four of the other passengers were ejected from the boat. The boat continued to spin around (the kill switch had not been engaged) and its propeller struck Hebert 19 times. Hebert died at the scene. The decedent's family and estate sought to recover damages under the General Maritime Law and Louisiana Products

Liability. Included in the *Warren* Plaintiffs' demand was a punitive damage claim under the General Maritime Law.

Nine years after Warren's untimely death later, the case was tried. At the close of the 2014 litigation, the jury returning a finding of no liability on the part of the Defendants. However, the trial court granted the *Warren* Plaintiffs a new trial based on what it believed to be prejudicial error during the first trial. The second trial resulted in a jury verdict in favor of the *Warren* Plaintiffs. The jury awarded compensatory damages of $125,000 and punitive damages of $23,000,000. The Louisiana Third Circuit later affirmed the punitive damage award. A full discussion of the Third Circuit's decision can be found **here**.

Defendants successfully applied for writs to the Louisiana Supreme Court. The Louisiana Supreme Court addressed several assignments of error proffered by the Defendants; however, this article will only address the punitive damage review. After reviewing the record, the Louisiana Supreme Court held that an award of punitive damages was correct. The tortfeasor knew of the serious risks of its steering system and failed to warn its customers that ejection, severe injury, and death could result. Further, the Louisiana Supreme Court agreed with the Third Circuit that the tortfeasor's conduct was reprehensible and resulted in great harm to the decedent and his family. However, Plaintiffs failed to prove that Defendant acted maliciously or that its behavior was driven primarily for design or gain. While the compensatory damages of $125,000 were deemed low, the harm caused was great and opened the door to higher awards. Yet, the Louisiana Supreme Court found that the award of punitive damages in the amount of $23,000,000 (a ratio of 184:1) was higher than reasonably required to satisfy the objective of punitive damage awards, namely punishment, general deterrence, and specific deterrence. Indeed, the $23,000,000 in punitive damages awarded by the jury did not, in the eyes of the Louisiana Supreme Court, further the goals of punitive damages. While the Defendant was considered a "wealthy corporation," wealth should not be a driving factor between a punitive damage award and the absence of a showing that the Defendant's conduct was motivated by greed or malice. Accordingly, the Louisiana Supreme Court found that the award of $23,000,000 violated the Defendant's due process rights.

Thereafter, the Louisiana Supreme Court took it upon itself to set the punitive damage award. In its view, based on the actual harm, it found that a punitive damage award of

$4,250,000 (a reduction of $18,750,000) more appropriately furthered the goal of punitive damages while protecting the Defendant's right to due process. Otherwise, the decision of the Third Circuit was affirmed.

## Louisiana Law Blog

The publisher of this Web Blog is:

Copyright ©2023, Kean Miller LLP All Rights Reserved.

## PARTIAL SUMMARY JUDGMENTS UNDER RULE 56(a)

Even where a defendant admits facts in his answer which show that he is liable for a measurable part of the plaintiff's claim, federal courts have rarely entered judgment for that amount until the full trial has been completed. In spite of rule 56(a) of the Federal Rules of Civil Procedure which provides that "a party seeking to recover upon a *claim* . . . may . . . move for a summary judgment in his favor upon all or *any part* thereof,"[1] plaintiffs have been denied the use of money admittedly due them. The possibility of forcing a settlement for less than the court would eventually award, and the desire to retain use of the money during the several years that the case may be in the courts, prompt defendants to refuse payment.[2] Thus money due on sales contracts,[3] insurance claims,[4] loans,[5] or salaries,[6] for example, can be withheld from deserving plaintiffs for long periods of time.

In *Bamberger Broadcasting Serv., Inc. v. William Irving Hamilton, Inc.*,[7] rule 56(a) was properly applied. The plaintiff sought payment for three months of radio advertising and defendant conceded that one

[1] FED. R. CIV. P. 56(a) (emphasis added). "Partial summary judgment," as used in this comment, refers to the granting of judgment on a portion of a single claim. It is not used to refer to the granting of judgment on a single claim where more than one claim is presented in a case.

[2] Rule 56(b) provides that defendants may move for summary judgment as to "all or any part" of a claim. This comment focuses on partial summary judgments for plaintiffs since the only time a defendant really needs a partial judgment, as opposed to a pre-trial order, is when his credit is impaired because of a large pending suit. If he can get judgment in his favor on part of the suit, his credit as well as state of mind may improve. The analysis of doctrinal arguments herein applies equally to rules 56(a) and (b).

[3] Liberty Die & Button Mould Corp. v. Consolidated Button & Buckle Corp., 160 N.Y.S.2d 728 (Sup. Ct. 1957). Plaintiff shipped $137.50 worth of merchandise to defendant, who returned a portion and asked for a $35.00 credit. Plaintiff issued only a $30.00 credit. The court held that plaintiff was entitled to partial summary judgment for $100 since that amount was not in controversy. N.Y.R. CIV. PRAC. 114 specifically authorizes such partial judgments; see note 43 *infra*.

[4] Commonwealth Ins. Co. v. O. Henry Tent & Awning Co., 266 F.2d 200 (7th Cir. 1959).

[5] Meadow Brook Nat'l Bank v. De Giacomo, 23 Misc. 2d 270, 206 N.Y.S.2d 224 (Sup. Ct. 1960). Partial summary judgment was entered for the face amount of the notes and the question of interest rates was held over for trial.

[6] Sloane v. Land, 16 F.R.D. 242 (S.D.N.Y. 1954). The employee sued the employer for $2,600, and $2,100 liability was admitted. The court refused to enter partial summary judgment.

[7] 33 F. Supp. 273 (S.D.N.Y. 1940).

month's charges were due. Partial summary judgment was entered, and the plaintiff was free to have execution for the single month's charges.

Likewise, the plaintiff in *McDonald v. Batopilas Mining Co.*,[8] an attorney who had represented the defendant before the Mexican Claims Commission, sought twenty per cent of the money awarded by that body. The defendant answered that there was a ten per cent statutory limit on attorney's fees. The court entered partial summary judgment for ten per cent of the award—the amount for which liability was admitted —and ordered trial as to the remainder. While there was no mention of the federal rule under which the judgment was entered, it properly fits within 56(a).[9]

But since 1948, the date of *McDonald*, there has been no federal decision of record granting partial summary judgment.[10] To the contrary, there have been numerous holdings, citing neither *McDonald* nor *Bamberger*, that the federal rules do not permit partial judgments.[11]

One group of cases reads rule 56(a) in terms of rule 56(d) or 54(b). For example, when the O. Henry Co. alleged fire damages of $32,000, its insurance company offered only $14,000 on the grounds that O. Henry had failed to meet the reporting requirements of the policy. Partial summary judgment was entered in favor of O. Henry for $14,000 and the insurance company immediately appealed. The Seventh Circuit reversed in *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.*,[12] relying on its previous decision in *Biggins v. Oltmer Iron Works.*[13] In

---

[8] 8 F.R.D. 226 (E.D.N.Y. 1948).

[9] It is not clear whether payment was immediately made in *Bamberger* and *McDonald*. It is possible that execution was not sought for fear it would adversely affect any settlement that was in the offing. Considerations of this type are always factors in deciding whether to seek and execute a partial summary judgment.

[10] A district court in Pennsylvania entered a partial summary judgment in 1948. Though the case is unreported, it is mentioned in Coffman v. Federal Labs., Inc., 171 F.2d 94, 96 (3d Cir. 1948). There is also an earlier decision in the Southern District of New York that purportedly granted partial summary judgment. The case, however, is unclear and may involve five separate claims such that the judgment entered would have been on a whole claim. Tractor & Equip. Corp. v. Chain Belt Co., 50 F. Supp. 1001 (S.D.N.Y. 1942).

[11] Rabekoff v. Lazere & Co., 323 F.2d 865 (2d Cir. 1963); Commonwealth Ins. Co. v. O. Henry Tent & Awning Co., 266 F.2d 200 (7th Cir. 1959); New Hampshire Fire Ins. Co. v. Perkins, 30 F.R.D. 382 (D. Del. 1962); Sloane v. Land, 16 F.R.D. 242 (S.D.N.Y. 1954).

[12] 266 F.2d 200 (7th Cir. 1959).

[13] 154 F.2d 214 (7th Cir. 1946). The court also cited Coffman v. Federal Labs., Inc., 171 F.2d 94 (3d Cir. 1948) (issue whether partial summary judgment which had been entered and satisfied had res judicata effect on any of the remaining issues between the parties; court held it did not, and by way of dicta expressed the view that partial summary judgments are not permitted). *Coffman* in turn relied on *Biggins*. The court in *O. Henry* also cited Leonard v. Socony-Vacuum Oil Co., 130 F.2d 535 (7th Cir. 1942) (held merely that a partial summary judgment entered under 56(d) was a pre-

*Biggins,* the plaintiff salesman had sought money due him as sales representative for the defendant. The claim consisted of five items of back salary and plaintiff moved for summary judgment on two. Supporting affidavits were submitted, and after the defendant's failure to answer, the court entered partial summary judgment. On appeal the *Biggins* court concluded that rule 56 "does not contemplate a summary judgment for a portion of a single claim in a suit."[14] It produced a curious argument: since rule 56(d) provides for a pre-trial order, rule 56(a) must provide for no more.[15]

Authority for this proposition was conspicuously wanting,[16] and it cannot stand analysis. Rule 56(d) reads:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court . . . shall if practicable ascertain what material facts exist without substantial controversy. . . . It shall thereupon make an order specifying the facts that [are not in controversy] . . . .

Rule 56(a) speaks of a "judgment," and rule 56(d) of an "order." It seems likely that the draftsmen intended some difference. Indeed, according to the Advisory Committee Notes,[17] the purpose of 56(d) is to provide for a pre-trial order whenever the court must deny a motion for summary judgment. Since the court must consider affidavits and exhibits in passing upon the motion for summary judgment,[18] rule 56(d) allows it to reap some benefit from the time expended by narrowing the issues and shortening the eventual trial. Rule 56(d), then, is concerned with limiting the issues for that portion of the case that remains after the motion for summary judgment under 56(a) has been ruled upon. The

---

trial order and hence not appealable); Porter v. American Tobacco Co., 7 F.R.D. 106 (S.D.N.Y. 1946) (relying on *Biggins;* held that partial summary judgments could not be entered and confined its discussion to rules 56(d) and 54(b)); Audi Vision, Inc. v. RCA Mfg. Co., 136 F.2d 621 (2d Cir. 1943) (held that where there is a claim and a counterclaim which depend on the same underlying facts, the dismissal of either one alone is not a final decision).

14  154 F.2d at 216.

15  *Ibid.*

16  *Biggins* cited no cases in support of its position. On this point, *O Henry* cited Pasquel v. Owen, 97 F. Supp. 157 (W.D. Mo. 1951) (partial summary judgment as to liability could not be granted on the basis of evidence taken at a previous trial, since the appellate court had ordered a complete new trial); Harms, Inc. v. Tops Music Enterprises, Inc., 160 F. Supp. 77 (S.D. Cal. 1958) (partial summary judgment denied under rule 54(b) for amount of settlement offer with no discussion as to the applicability of 56(a)); Wilbur v. Ford, 89 F. Supp. 407 (D. Mass. 1950) (partial judgment not allowed under rule 56(d) for the amount of a surety bond, relying on *Biggins, Coffman,* and Audi Vision, Inc. v. RCA Mfg. Co., 136 F.2d 621 (2d Cir. 1943)).

17  NOTES OF THE ADVISORY COMMITTEE ON RULES, 28 U.S.C. at 3317 (1946).

18  FED. R. CIV. P. 56(e).

*Biggins-O. Henry* position in effect rewrites rule 56; it improperly replaces the right to execution and payment provided by 56(a) with the merely provisional remedies of 56(d).[19]

A second argument implicit in *Biggins* and *O. Henry* is that, prior to completion of a case, rule 54(b) is the sole determinant of when judgment may be entered. The rule states:

> When more than one claim for relief is presented in an action . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay. . . .

Since this rule provides for judgment on "one or more" claims the Seventh Circuit drew the negative inference that judgment is not permitted on a portion of a claim. It drew the further inference that the language authorizing partial summary judgments in 56(a) was to be ignored because it had not been repeated in 54(b). Nothing in the federal rules supported this proposition, and there was no precedent for it.

A state court[20] has suggested that first, if final judgment for partial relief may be granted freely under 56(a), there is no need for 54(b), and second, it would be unreasonable freely to permit partial summary judgments under 56(a) while they are limited to special conditions under 54(b). The first argument completely ignores that 54(b) applies to all multiple claim situations while rule 56 deals only with summary judgments. The second argument fails because it overlooks the basic similarity of purpose between the two rules. Under 54(b) the court may enter a final judgment by stating that there is no just reason for delay. If the judge does not want to enter a final judgment he may enter an "order . . . [which] is subject to revision at any time before the entry of judgment adjudicating all the claims. . . ." This is precisely the alternative that a court has under rule 56. If the judge wishes to enter a final judgment, he can do so under 56(a); if he does not, he can enter an order under 56(d) that is likewise subject to revision before completion of the trial.[21] The only distinction between the two rules on this

---

[19] The 56(d) order differs significantly from a partial summary judgment, since it is not final, not subject to execution, and may be revised at any time prior to the close of the trial.

[20] Fontainebleau Hotel Corp. v. Young, 162 So. 2d 303 (Fla. Dist. Ct. App. 1964).

[21] Where summary judgment is granted on a single claim, in a multiple claim situation, certification under 54(b) has been required to make the judgment appealable. Hence there is the asymetrical situation that a certificate is required for summary judgment on a whole claim while there is no similar requirement for judgment on a partial claim. It would be more reasonable to exclude summary judgments entirely from the provisions of 54(b) since a judge's decision to enter a judgment under 56(a) rather than an order under 56(d) is tantamount to saying that there is no just reason for delay.

point, then, is the requirement in rule 54(b) of a formal certificate, the main function of which is to provide certainty as to whether a final judgment has been entered.[22] This distinction certainly does not justify saying 56(a) must be read in light of 54(b).

In its recent decision in *Rabekoff v. Lazere & Co.*,[23] the Second Circuit criticized the Seventh Circuit's whole approach and opened a different line of attack against partial summary judgments. The court said that a partial summary judgment is not a "final decision from which an appeal may be taken. . . ."[24] Essentially, it argued that regardless of the provisions of the federal rules, the requirements of section 1291 must be independently satisfied.[25] Thus, if partial summary judgments are not final decisions, they are not appealable and are really only interlocutory orders.

The weakness in the *Rabekoff* argument is the presumption that "final decision" has a readily ascertainable meaning, and that it imposes a rigid standard upon the courts. The "final judgment" rule, as it is popularly known, was stated by Mr. Justice Brandeis in *Collins v. Miller*:[26] "the rule requires that the judgment to be appealable should be final not only as to all the parties, but as to the whole subject-matter and as to all the causes of action involved."[27] This traditional view treats each case as a single judicial unit, and no appeal is permitted without full and complete disposition of the case.

But while the "final judgment rule" has been on the books since 1789,[28] the courts have not always felt bound by its traditional meaning. As early as 1848 the Supreme Court allowed an appeal in *Forgay v. Conrad*,[29] where execution had been ordered on a partial judgment, because it would have been unjust to subject the defendant to seizure of his property without the right to be heard on appeal. The *Forgay*

---

[22] See Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 512 (1950).

[23] 323 F.2d 865 (2d Cir. 1963).

[24] *Id.* at 867. Rule 56(a) was not directly involved in this case. Partial summary judgment was entered, and the trial judge certified under 54(b) because he thought that multiple claims were involved. The Second Circuit held that there was only a single claim involved and that the Judicial Code, 28 U.S.C. § 1291 (1958), forbade partial judgments on a single claim. But the statement that the trial courts in *Biggins* and *O. Henry* had exceeded their jurisdiction makes it clear that the Second Circuit would have reached the same result if the judgment had been entered under 56(a).

[25] In case of an open conflict between the federal rules and the Judicial Code on the question of appellate court jurisdiction, the latter prevails. Sears, Roebuck & Co. v. Mackey, 351 U.S. 427 (1956).

[26] 252 U.S. 364 (1920).

[27] *Id.* at 370.

[28] 1 Stat. 84 (1789).

[29] 47 U.S. (6 How.) 200 (1848).

principle has shown great vitality and has been continually reaffirmed by the Supreme Court[30] and the lower courts.[31] Mr. Justice Frankfurter explained:

> In short, the rationale of these cases is that a judgment directing immediate delivery of physical property is reviewable and is to be deemed dissociated from a provision for an accounting even though that is decreed in the same order. In effect such a controversy is a multiple litigation. . . .[32]

In other words, where the court divides the payment of damages into two parts it creates two separate judicial units for purposes of the final decision rule. In *Sears, Roebuck & Co. v. Mackey*,[33] the Court saw "a need for relaxing the restriction upon what should be treated as a judicial unit for purposes of appellate jurisdiction."[34] More recently the Court noted that the final judgment rule must be given a "practical rather than a technical construction."[35] Section 1291 does nothing more than impose a requirement on the courts to define "final decision." There is nothing about rule 56(a) which is inconsistent.

However, the doctrinal arguments may merely mask a judicial ap-

[30] Local 438, Construction Union v. Curry, 371 U.S. 542, 549 (1963); Brown Shoe Co. v. United States, 370 U.S. 294, 308 (1962); Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 432 (1956); Radio Station WOW, Inc. v. Johnson, 326 U.S. 120, 125 (1945); Gulf Refining Co. v. United States, 269 U.S. 125, 136 (1925); Hill v. Chicago & Evanston R.R., 140 U.S. 52, 54 (1891); Farmers Loan & Trust Co., Petitioner, 129 U.S. 206, 213 (1889); Winthrop Iron Co. v. Meeker, 109 U.S. 180, 183 (1883); Thomson v. Dean, 74 U.S. (7 Wall.) 342 (1868); Bronson v. Railroad Co., 67 U.S. (2 Black) 524, 531 (1862).

[31] Gillespie v. United States Steel Corp., 321 F.2d 518, 522 (6th Cir. 1963); Kasishke v. Baker, 144 F.2d 384, 385 (10th Cir. 1944); Victor Talking Machine Co. v. George, 69 F.2d 871, 877 (3d Cir. 1934), *rev'd on other grounds*, 293 U.S. 378 (1935); *In re* Michigan Central R.R., 124 Fed. 727, 731 (6th Cir. 1903); City of Eau Claire v. Payson, 107 Fed. 552, 557 (7th Cir. 1901); Bergh v. Ceballos, 61 Fed. 113, 115 (2d Cir. 1894).

[32] Radio Station WOW, Inc. v. Johnson, 326 U.S. 120, 126 (1945).

[33] 351 U.S. 427 (1956). Mr. Justice Jackson, speaking for the Court, has said that the purpose of § 1292 of the Judicial Code is to "allow appeals from orders other than final judgments when they have a final and irreparable effect on the rights of the parties." Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 545 (1949). In effect, the Court said that Congress never intended the "final judgment" rule to be binding in situations where it will work an injustice. See Local 438, Construction Union v. Curry, 371 U.S. 542 (1963); McDonnell v. Birrell, 321 F.2d 946 (2d Cir. 1963).

[34] 351 U.S. at 432. Professor Moore has taken the position that the court is free to define "final decision" in any way that pleases it. MOORE, JUDICIAL CODE 517 (1949). However, Professor Moore does not believe that partial summary judgments under rule 56(a) are appealable. He believes that only a pre-trial order in the nature of rule 56(d) is contemplated by rule 56(a). 6 MOORE, FEDERAL PRACTICE § 56.20[4], at 2311 (2d ed. 1953). The difficulty with this position is discussed in note 16 *supra* and accompanying text.

[35] Gillespie v. United States Steel Corp., 379 U.S. 148, 152 (1964), citing Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546 (1949).

prehensiveness that granting partial summary judgments would result in a flood of additional appeals. For example, partial summary judgments have been termed "obnoxious to the orderly administration of justice,"[36] and numerous courts have announced a policy against "piecemeal appeals."[37] However, under current law Congress permits appeals from interlocutory orders in suits involving injunctions,[38] admiralty cases,[39] receiverships,[40] patent infringements,[41] and any case where the judge feels there is a controlling issue of law, the determination of which will speed the outcome of the litigation.[42] Further, federal rule 54(b) allows appeals where judgment has been entered on one but less than all claims and the judge sees no just reason for delay. Likewise, the *Forgay* line of cases has permitted many additional appeals. Experience under these exceptions and in the states that permit partial judgments[43] makes it seem unlikely that partial summary judgments would cause a significant increase in appeals.

Practical considerations facing the respective parties reinforce this view. Plaintiffs would only seek partial summary judgments when, first, the amount admitted is a substantial portion of the total claim. Thus, if the claim is for $10,000 and it is clear that partial judgment can be obtained for $9,000, the plaintiff may seek partial judgment; if he is certain to get only $100, however, the partial judgment would not compensate for delaying the trial. Second, he would only seek partial judgment when the full trial promises to take considerable time; the

---

[36] Commonwealth Ins. Co. v. O. Henry Tent & Awning Co., 266 F.2d 200, 201 (7th Cir. 1959).

[37] Rexford v. Brunswick-Balke-Collender Co., 228 U.S. 339 (1913); United States v. Girault, 52 U.S. (11 How.) 21 (1850); Commonwealth Ins. Co. v. O. Henry Tent & Awning Co., 273 F.2d 163, 165 (7th Cir. 1959); In the Matter of Heddendorf, 263 F.2d 887, 889 (1st Cir. 1959).

[38] 28 U.S.C. § 1292 (1958).

[39] *Ibid.*

[40] *Ibid.*

[41] *Ibid.*

[42] *Ibid.*

[43] New York has permitted partial summary judgments for a number of years. See, *e.g.*, Sheehan v. Andrew Cone Gen. Advertising Agency, 176 Misc. 882, 29 N.Y.S.2d 317 (Sup. Ct. 1941). Michigan and Illinois, prior to their recent adoption of the federal rules, both provided for partial summary judgments. Mich. Ct. R. 30(5) (1945); 2 Ill. Laws 1941 at 464. Illinois will permit partial summary judgments under its new rule which is identical to 56(a). Ill. Rev. Stat. ch. 110 § 56 (1963); Ill. Sup. Ct. R. 16. Michigan has had no cases under its new rules so it is difficult to predict its future course. Several states have adopted the federal rules, *e.g.*, Fla. R. Civ. P. 1.36; Minn. R. Civ. P. 56; Wyo. R. Civ. P. 56, and federal court decisions may be persuasive in the state interpretations. The *Biggins-O. Henry* view has already made itself felt in Florida. Fontainebleau Hotel Corp. v. Young, 162 So. 2d 303 (Fla. Dist. Ct. App. 1964).

longer the prospective trial, the more desirable the partial judgment. Finally, the plaintiff would consider how badly he needed the money.

From the standpoint of the court, there would properly be reluctance to enter partial judgments except in clear-cut cases. Where the judge has doubt whether material issues are in controversy, he can enter a pre-trial order under 56(d) and reserve the right to revise the order during the trial.

If treated this way, even where partial summary judgment has been entered it is unlikely that many would be appealed. The defendant who has admitted liability, as in *O. Henry*, would have no issues on which to base an appeal. Where the defendant has not formally admitted liability, but his answers and affidavits nonetheless make liability clear, there would likewise be little incentive for him to throw money away appealing. He might appeal solely for purposes of delay, but the cost of the appeal would in most cases certainly outweigh the value to him of a short-term delay in paying the partial amount.[44]

Of course even if rule 56(a) is construed to permit partial summary judgments, there may be cases where the plaintiff's counsel will believe it unwise to invoke it. He may believe that routine negotiations, rather than financial pressure, will lead to a higher settlement. Thus he may prefer not to have a hostile act like execution of the partial judgment interfere with the rapport between the defense counsel and himself. This attitude would be reinforced if his client had money to tide himself over until completion of the suit. But cases like *O. Henry* show that there are cases in which plaintiffs *do* want partial summary judgment. How many more would have been sought but for the prevailing rule cannot be estimated, but where partial summary judgment *is* desired there is no valid reason for the courts to refuse to grant it. Its use should accelerate the course of justice without overly taxing the judicial machinery.

---

[44] One objection that might be raised is that the defendant's answers will simply become more evasive in order to avoid admission, thus dissipating the anticipated benefit from partial summary judgments. This is unlikely for two reasons. First, in hearing a motion for summary judgment the court also considers depositions, answers to interrogatories and affidavits in accord with rule 56(c). It would require more than simply rewording the answer to create an issue of material fact. Second, the courts could control the problem of evasive pleadings through stricter use of rule 11, which requires attorneys to certify that pleadings are not interposed for delay and authorizes the court to take "appropriate disciplinary action."

LII > Wex > **collateral estoppel**

# collateral estoppel

Collateral estoppel is an important doctrine in the fields of criminal law and civil procedure.

In criminal law, collateral estoppel protects criminal defendants from being tried for the same issue in more than one criminal trial through the double jeopardy clause of the Fifth Amendment. As established in *Benton v. Maryland*, collateral estoppel is binding on both federal and state governments through incorporation by way of the Due Process Clause of the Fourteenth Amendment.

In civil procedure, collateral estoppel refers to the application of res judicata principles through issue preclusion. For issue preclusion, a party can utilize collateral estoppel to prevent another party from re-litigating any issue that has been validly, finally, and actually determined on the merits in a previous case.

In deciding if any given issue has already been determined, the court will consider whether that issue was essential to the previous holding. Under this test, any issue previously raised in court which would change the outcome of the case had it been decided differently is deemed actually determined.

Validity and finality for the purposes of collateral estoppel are determined by whether the first case would survive a collateral attack. Common reasons why a case may not survive a collateral attack include a lack of personal jurisdiction, a lack of subject matter jurisdiction, and a failure of due process in the first case.

There are two forms of issue preclusion/collateral estoppel - offensive and defensive:

- Defensive issue preclusion occurs when the party being sued raises collateral estoppel.
  - As established in *Bernhard v. Bank of America*, defensive issue preclusion does not require mutuality.

- In other words, a person who was not a party to the initial case can raise issue preclusion.
  - For example, if a court determines that Frank cannot recover in a lawsuit against Sally because Frank was negligent, then Susan can raise collateral estoppel as to Frank's negligence if she too is sued by Frank.
- Offensive issue preclusion occurs when the party who initiates the lawsuit/claim raises collateral estoppel against the defendant in a previous case.
  - Offensive issue preclusion generally does require mutuality; meaning it can only be used by parties to the initial lawsuit, though a few exceptions exist.
    - For example, if a court determines that Frank can recover against Sally because Sally was negligent, Susan generally cannot raise collateral estoppel as to Frank's negligence in a second case against Frank.
  - Courts have broad discretion as to whether they will allow non-mutual offensive issue preclusion, with a few common justifications outlined in *Parklane Hosiery Co. v. Shore*.
  - These justifications include misaligned incentives in the first case, different procedural factors in the first case than in the second case, and whether the plaintiff in the second case could have easily joined the first case.

[Last updated in July of 2022 by the Wex Definitions Team]
- wex
  - CIVICS
  - the Constitution
  - THE LEGAL PROCESS
  - appellate procedure
  - criminal law
  - criminal procedure
  - civil procedure
  - courts and procedure
  - criminal law and procedure
  - legal education and practice
  - wex definitions

-

💼 Wex Toolbox

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

LII > Wex > **compulsory counterclaim**

*According to Parklane Hosiery Co., Inc.*

*Shore 439 U.S. 322 (1979)* ✓

*Only my wife and I have ability for collateral estoppel and a compulsory/permissive counterclaim.*

# compulsory counterclaim

A compulsory counterclaim is a claim made by a defendant against a plaintiff that arises from the same transaction or occurrence as the plaintiff's claim, and which is forfeited if not raised in the same lawsuit. If the defendant fails to assert a counterclaim in their answer, they are thereafter precluded from asserting it against the plaintiff in the plaintiff's pending action or in an independent action. Compulsory counterclaims are governed by Federal Rule of Civil Procedure 13(a).

While failing to raise a compulsory counterclaim typically results in the loss of that claim, a few exceptions exist.

- If an otherwise compulsory counterclaim requires adding a party over whom the court cannot obtain jurisdiction, that counterclaim does not need to be raised.
- Additionally, if the pleader fails to make a compulsory counterclaim as the result of through oversight, inadvertence, or excusable neglect, or if justice requires it - then the pleader may by leave of court set up a counterclaim by amendment.

Compulsory counterclaims are contrasted with permissive counterclaims, or claims which are not forfeited if you fail to raise them in an answer.

[Last updated in July of 2022 by the Wex Definitions Team]

- wex
  - THE LEGAL PROCESS
  - courts
  - civil procedure
  - accidents and injuries
  - courts and procedure
  - wex definitions

- Keywords
  - civil procedure

💼 Wex Toolbox

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

LII  > Wex  > **permissive counterclaim**

# permissive counterclaim

A permissive counterclaim is a claim brought by a defendant against a plaintiff in the situation where the defendant's claim does not arise from the same transaction or occurrence as the plaintiff's claim. Therefore, if the defendant does not raise the claim in the pending cause of action, it is not waived, and the defendant is free to bring an independent action on the claim.

- wex
    - THE LEGAL PROCESS
    - civil procedure
    - wex definitions

- Keywords
    - civil procedure



Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

LII  > Wex  > **necessity defense**

# necessity defense

A necessity defense is a defense to liability for unlawful activity where the conduct cannot be avoided and one is justified in the particular conduct because it will prevent the occurrence of a harm that is more serious.

In criminal law, a necessity defense claims the actor's illegal conduct was the necessary lesser of two evils in a situation threatening specific harm to the actor or others. According to California jury instructions, a successful necessity defense must prove:

- The actor acted to prevent injury to the actor or someone else;
- The actor had no reasonable alternative;
- The actor did not create greater danger than the danger avoided;
- The actor actually believed the illegal conduct was necessary to prevent the threatened harm or evil;
- A reasonable person would have also believed the illegal conduct was necessary in the circumstances and
- The actor did not substantially contribute to the emergency.

Most jurisdictions follow similar elements, but some also include a proportionality element between the harm threatened and the illegal conduct. Necessity defenses will not apply if the actor acted with a different intent than to avoid harm, had a reasonable alternative, had no influence on the threatened harm, or failed any of the other elements. A necessity defense is an affirmative defense and a justification defense.

Necessity is very similar to duress and the two defenses are sometimes indistinguishable. Both defenses claim an actor's illegal conduct was justified due to the threat of harm. However, duress is usually caused by actions of people while necessity is caused by other

circumstances or forces. Additionally, an actor under duress does not have the required mental state to commit a crime due to the threat of harm while an actor acting out of necessity chooses the better of two unavoidable evils.

In tort law, there are two different categories of the necessity defense that can be employed: public necessity and private necessity.

[Last updated in July of 2023 by the Wex Definitions Team]

- wex
  - ACADEMIC TOPICS
  - trial process/advocacy
  - LIFE EVENTS
  - accidents & injuries (tort law)
  - standards of tort liability
  - THE LEGAL PROCESS
  - courts
  - criminal law
  - criminal procedure
  - legal practice/ethics
  - courts and procedure
  - criminal law and procedure
  - legal education and practice
  - wex definitions

- Keywords
  - tort law



Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

LII > Wex > **respondeat superior**

*According to the Matthew's Test, In line with my whistleblow, I share no culpability, and have immunity due to multiple factors, including the necessity defense, denial of due process and civil rights, etc.*

# respondeat superior

Respondeat superior is a legal doctrine, most commonly used in tort, that holds an employer or principal legally responsible for the wrongful acts of an employee or agent, if such acts occur within the scope of the employment or agency.  Typically when *respondeat superior* is invoked, a plaintiff will look to hold both the employer and the employee liable. As such, a court will generally look to the doctrine of joint and several liability when assigning damages.

Jurisdictional Differences

There is not a national standard for *respondeat superior*. Because states create their own standards for the doctrine, different jurisdictions will use different tests to prove *respondeat superior*. However, most jurisdictions will use 1 of the following 2 tests:

1. Benefits Test
    1. When the employee's social or recreational pursuits on the employer's premises after hours are endorsed by the express or implied permission of the employer and are conceivably of some benefit to the employer, then the employer is liable for harm resulting from the employee's actions.
2. Characteristics Test
    1. If the employee's action is common enough for that job that the action could be fairly deemed to be characteristic of the job, then the employer will be liable for harm resulting from the employee's actions.

Strict Liability Comparison

A court will choose to apply the doctrine of *respondeat superior* to an employer, regardless of how closely the employer was monitoring the employee. As such, *respondeat superior* may be compared with strict liability.

Exceptions

Independent Contractors

*Respondeat superior* applies to employees, but not to independent contractors.

The Third Restatement of Torts helps to outline the difference between an employee and an independent contractor for the purpose of *respondeat superior*. It presents a fairly thorough balancing test:

1. the extent of control that the agent and the principal have agreed the principal may exercise over details of the work
2. whether the agent is engaged in a distinct occupation or business
3. whether the type of work done by the agent is customarily done under a principal's direction or without supervision
4. the skill required in the agent's occupation
5. whether the agent or the principal supplies the tools and other instrumentalities required for the work and the place in which to perform it
6. the length of time during which the agent is engaged by a principal
7. whether the agent is paid by the job or by the time worked
8. whether the agent's work is part of the principal's regular business
9. whether the principal and the agent believe that they are creating an employment relationship
10. whether the principal is or is not in business.
11. the extent of control that the principal has exercised in practice over the details of the agent's work."

Federal Employees

Under the Westfall Act, federal employees will not be held liable for wrongdoings committed during the scope of their employment.

Further Reading

For more on the doctrine of *respondeat superior*, please see this Santa Clara Law Review article, this Michigan Law Review article, and this Louisiana Law Review article.

- wex
    - accidents & injuries (tort law)
    - standards of tort liability
    - tort damages
    - wex definitions

- Keywords
    - tort law
    - vicarious liability
    - liability
    - Agency
    - AGENCY LAW
    - joint and several liability

- ○ <u>JOINT-AND-SEVERAL LIABILITY</u>

💼 Wex Toolbox

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Opinion
2 messages

**Jon F. Turpin** <jt4590@gmail.com>                                    Mon, Oct 30, 2023 at 9:44 PM
Bcc: Kirk Freeman <kirk@kirkfreemanlaw.com>, sachatessier@gmail.com, doughty_motions@lawd.uscourts.gov,
compass@rfkhumanrights.org, judiciary_whistleblower@mail.house.gov, info@vaticanrome.it

In my opinion,

According to Patklane Hosiery Co., Inc. v Shore, 439 U.S. 322 (1979) a plaintiff could use collateral estoppel "unless they
easily could have joined in the earlier action, or the application of collateral estoppel would be unfair to the defendant,
such as if they had less incentive to defend the first case or did not have a full opportunity to litigate the issue."

As the forced defendant of the alleged plaintiffs, each current and former, and each irresponsible, in my opinion, they
have no right to collateral estoppel by the opinion above, which I affirm and documented in my request for a report to the
Supreme Court Disciplinary Commission regarding Moore.

Who in my opinion, must be disbarred now.


Why? According to the FBI's and DHS's "Strategic Intelligence Assessment and Data on Domestic Terrorism" the actions
of the plaintiffs match beyond reasonable doubt the defintion of a "DVE Plot" against me and my wife and may be hate
crimes.

In Blakely v. Washington we find not only a reaffirmation of the opinion of the Honorable Supreme Court Justice Scalia,
and of the Honorable Supreme Court Justice Thomas, but also an eerily similar scenario in the actions of Blakely, when
aligned with the irresponsible plaintiffs... taken when he, like potentially my biological Dad, and or the current alleged
petitioner, was encountering the possibility of divorce, and a follow-up civil suit regarding a Trust.

Which was also used, much like the public Britney Spears conservatorship case, as a method of control against many civil
rights.

Blakely, regardless of his moral turpitude, did present a proper and compelling argument in line with the right to trial by
jury, and established with this precedent that not only the 6th amendment right to trial by jury would be violated by these
current proceedings, but also, due to Indiana's constitution, 7th amendment rights as well.

Thus not only are the current proceedings against us a criminal act of moral turpitude, but with all respect to the
Honorable Trial Judges who provide us with their invaluable public service and time in our Judiciary... protective orders as
they are even attempted to be implemented in action today without right to trial by jury and without any criminal act, nor
even past history of criminal acts by any defendant are without a doubt unconstitutional in at least breach of the
separation of powers.

In fact, the current protective order being attempted under the current administration may even disprove the allegations
levied by the Honorable Hakeem Jeffries against the Honorable Mike Johnson of not respecting "separation of church and
state" since the Honorable Mike Johnson is attempting to prevent such abuses of our courts by upholding our
constitutional rights, which would prevent fraudulent, fictitious, and fractious protective orders from being used as a
weapon, as referenced clearly in the opinion on Rahimi, and clearly documented in the proceedings falsely levied against
us.

Because the outcome of this protective order would be to leave us without rights to defend ourselves from a perpetual
DVE plot, and/or to remove our livelihood, home, and even more importantly, marriage, and right to worship in our
Catholic Church under God, and to raise our own children in Faith.


It is direct violation of our 1st amendment when and if applied against us in this way, and is no doubt unconstitutional at
face.

In my opinion, it is appalling in all aspects.

Sincerely,
Jon F. D. Turpin
Pro Se Pro Hac Vice

---

**Jon F. Turpin** <jt4590@gmail.com>                                        Mon, Oct 30, 2023 at 9:54 PM
Bcc: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>, Father Brent Maher <padrepbm@gmail.com>

---------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Mon, Oct 30, 2023, 9:44 PM
Subject: Opinion
To:

In my opinion,

According to Patklane Hosiery Co., Inc. v Shore, 439 U.S. 322 (1979) a plaintiff could use collateral estoppel "unless they easily could have joined in the earlier action, or the application of collateral estoppel would be unfair to the defendant, such as if they had less incentive to defend the first case or did not have a full opportunity to litigate the issue."

As the forced defendant of the alleged plaintiffs, each current and former, and each irresponsible, in my opinion, they have no right to collateral estoppel by the opinion above, which I affirm and documented in my request for a report to the Supreme Court Disciplinary Commission regarding Moore.

Who in my opinion, must be disbarred now.

Why? According to the FBI's and DHS's "Strategic Intelligence Assessment and Data on Domestic Terrorism" the actions of the plaintiffs match beyond reasonable doubt the defintion of a "DVE Plot" against me and my wife and may be hate crimes.

In Blakely v. Washington we find not only a reaffirmation of the opinion of the Honorable Supreme Court Justice Scalia, and of the Honorable Supreme Court Justice Thomas, but also an eerily similar scenario in the actions of Blakely, when aligned with the irresponsible plaintiffs... taken when he, like potentially my biological Dad, and or the current alleged petitioner, was encountering the possibility of divorce, and a follow-up civil suit regarding a Trust.

Which was also used, much like the public Britney Spears conservatorship case, as a method of control against many civil rights.

Blakely, regardless of his moral turpitude, did present a proper and compelling argument in line with the right to trial by jury, and established with this precedent that not only the 6th amendment right to trial by jury would be violated by these current proceedings, but also, due to Indiana's constitution, 7th amendment rights as well.

Thus not only are the current proceedings against us a criminal act of moral turpitude, but with all respect to the Honorable Trial Judges who provide us with their invaluable public service and time in our Judiciary... protective orders as they are even attempted to be implemented in action today without right to trial by jury and without any criminal act, nor even past history of criminal acts by any defendant are without a doubt unconstitutional in at least breach of the separation of powers.

In fact, the current protective order being attempted under the current administration may even disprove the allegations levied by the Honorable Hakeem Jeffries against the Honorable Mike Johnson of not respecting "separation of church and state" since the Honorable Mike Johnson is attempting to prevent such abuses of our courts by upholding our constitutional rights, which would prevent fraudulent, fictitious, and fractious protective orders from being used as a weapon, as referenced clearly in the opinion on Rahimi, and clearly documented in the proceedings falsely levied against us.

Because the outcome of this protective order would be to leave us without rights to defend ourselves from a perpetual DVE plot, and/or to remove our livelihood, home, and even more importantly, marriage, and right to worship in our Catholic Church under God, and to raise our own children in Faith.

It is direct violation of our 1st amendment when and if applied against us in this way, and is no doubt unconstitutional at face.

In my opinion, it is appalling in all aspects.

Sincerely,
Jon F. D. Turpin
Pro Se Pro Hac Vice

UNITED STATES
POSTAL SERVICE®

PRIORITY® MAIL

PRIORITY MAIL
MEDIUM FLAT RATE
POSTAGE REQUIRED

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

MEDIUM FLAT RATE BOX
FOR DOMESTIC AND INTERNATIONAL USE

PRB1 July 2022
ID: 11 x 8.5 x 5.5
OD: 11.25 x 8.75 x 6
ODO UFT: 0.341

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

PS00011000000

PRIORITY
★ MAIL ★

UNITED STATES
POSTAL SERVICE®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM: Jon F. D'Turpin
2421 S. Main St.
Yorktown, IN 47396

ATTN: Adrienne Meiring, Exec. Dir.
TO: Indiana Supreme
Court Disciplinary Commission
251 N. Illinois St., Suite 1650
Indianapolis, IN 46204

FOR DOMESTIC AND INTERNATIONAL USE

Label 228, March 2019

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

**UNITED STATES**
**POSTAL SERVICE ®**

**PRIORITY**
**★ MAIL ★**

VISIT US AT USPS.COM ®
ORDER FREE SUPPLIES ONLINE

FROM: Jason F "Us" Turgeon
2421 S. Plum St.,
Yorktown, IN 47396

ATTN: Michele Fisdon Esq., B.S.
TO: U.S. FEOC Indianapolis
District Office
101 W. Ohio St., Suite 1900
Indianapolis, IN 46204

FOR DOMESTIC AND INTERNATIONAL USE

**PRESS FIRMLY TO SEAL**

**PRIORITY ®**
MAIL

**UNITED STATES**
**POSTAL SERVICE ®**

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.
** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

**FLAT RATE ENVELOPE**
ONE RATE ■ ANY WEIGHT

**TRACKED ■ INSURED**

EP14F July 2022
OD: 12 1/2 x 9 1/2

PS00001000014

This package is made from post-consumer waste. Please recycle - again.

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

VISIT US AT USPS.COM®

PRIORITY MAIL

PRESS FIRMLY TO SEAL
PRESS FIRMLY TO SEAL

PRIORITY MAIL

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.
** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

TRACKED ■ INSURED

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

EP14F July 2022
OD: 12 1/2 x 9 1/2

PS00001000014

This package is made from post-consumer waste. Please recycle - again.

FROM: Jon F. "D" Turpin
2421 S. Plum St.
Kokomo IN 47396

ATTN: Greg Wilson Exec. Dir.
TO: Indiana Civil Rights Commission
100 N. Senate Ave, Room N103
Indianapolis IN 46204

# Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979)

Overview     Opinions     Materials

**Argued:**

October 30, 1978

**Decided:**

January 9, 1979

## Annotation

### PRIMARY HOLDING

A plaintiff can use offensive collateral estoppel unless they easily could have joined in the earlier action, or the application of collateral estoppel would be unfair to the defendant, such as if they had less incentive to defend the first case or did not have a full opportunity to litigate the issue.

### FACTS

Shore brought a class action on behalf of Parklane stockholders against Parklane on the grounds that it had issued a false and misleading proxy statement regarding its merger. The SEC previously brought an action against Parklane, in which the court held for the SEC and granted injunctive relief. In that action, the court ruled that the same proxy that gave rise to the claim in the class action was in fact false and misleading. Shore sought partial summary judgment on the issue of the proxy's falseness, applying the doctrine of collateral estoppel. However, the trial court denied this motion because it found that applying estoppel would infringe on Parklane's Seventh Amendment right to a jury. The appellate court ruled that issues could not be presented to a jury at trial if they had been fully and fairly adjudicated in an earlier action, so collateral estoppel should apply.

### OPINIONS

Majority
- Potter Stewart (Author)
- Warren Earl Burger
- William Joseph Brennan, Jr.
- Byron Raymond White
- Thurgood Marshall
- Harry Andrew Blackmun
- Lewis Franklin Powell, Jr.
- John Paul Stevens

Collateral estoppel on behalf of a plaintiff should not be permitted when the plaintiff could have joined in the earlier action or it would be generally unfair to a defendant. It is not unfair here because the previous action resolved a factual issue that is identical to an issue in the class action. The jury does not need to make factual findings on this issue, so the Seventh Amendment is not violated. The historical requirement of mutuality of parties was in effect when the Seventh Amendment was created, and it no longer exists, but this is not a sufficient difference to find that collateral estoppel should not be applied.

Dissent
- William Hubbs Rehnquist (Author)

The removal of the mutuality of parties requirement makes the collateral estoppel doctrine broader. Failing to continue to apply it in this situation infringes on the power of the jury under the Seventh Amendment. Moreover, it is unfair to apply the doctrine to a defendant that has not had the opportunity to have factual findings made by a jury, which plausibly might reach a different conclusion from a judge.

**CASE COMMENTARY**

Mutuality generally requires the same parties to assert preclusion, but this rule extends to parties in privity with those involved in the earlier action. Whether it was the prevailing party or the non-prevailing party is immaterial.

**Show Less**

# Syllabus

# U.S. Supreme Court

**Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979)**

**Parklane Hosiery Co., Inc. v. Shore**

**No. 77-1305**

**Argued October 30, 1978**

**Decided January 9, 1979**

**439 U.S. 322**

*Syllabus*

Respondent brought this stockholder's class action in the District Court for damages and other relief against petitioners, a corporation, its officers, directors, and stockholders, who allegedly had issued a materially false and misleading proxy statement in violation of the federal securities laws and Securities and Exchange Commission (SEC) regulations. Before the action came to trial, the SEC sued the same defendants in the District Court alleging that the proxy statement was materially false and misleading in essentially the same respects as respondent had claimed. The District Court, after a nonjury trial, entered a declaratory judgment for the SEC, and the Court of Appeals affirmed. Respondent in this case then moved for partial summary judgment against petitioners, asserting that they were collaterally estopped from relitigating the issues that had been resolved against them in the SEC suit. The District Court denied the motion on the ground that such an application of collateral estoppel would deny petitioners their Seventh Amendment right to a jury trial. The Court of Appeals reversed.

*Held:*

1. Petitioners, who had a "full and fair" opportunity to litigate their claims in the SEC action, are collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading. Pp. 439 U. S. 326-333.

(a) The mutuality doctrine, under which neither party could use a prior judgment against the other unless both parties were bound by the same judgment, no longer applies. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U. S. 313. Pp. 402 U. S. 326-328.

(b) The offensive use of collateral estoppel (when, as here, the plaintiff seeks to foreclose the defendant from litigating an issue that the defendant has previously litigated unsuccessfully in an action with another party) does not promote judicial economy in the same manner that is promoted by defensive use (when a defendant seeks to prevent a plaintiff from asserting a claim that the plaintiff has previously litigated and lost against another defendant), and such offensive use may also be unfair to a defendant in various ways. Therefore, the general rule should be that, in cases where a plaintiff could easily have joined in the

Page 439 U. S. 323

earlier action, or where the application of offensive estoppel would be unfair to a defendant, a trial judge, in the exercise of his discretion, should not allow the use of offensive collateral estoppel. Pp. 439 U. S. 329-331.

(c) In this case, however, the application of offensive collateral estoppel will not reward a private plaintiff who could have joined in the previous action, since the respondent probably could not have joined in the injunctive action brought by the SEC. Nor is there any unfairness to petitioners in such application here, since petitioners had every incentive fully and vigorously to litigate the SEC suit; the judgment in the SEC action was not inconsistent with any prior decision; and in the respondent's action there will be no procedural opportunities available to the petitioners that were unavailable in the SEC action of a kind that might be likely to cause a different result. Pp. 439 U. S. 331-333.

2. The use of collateral estoppel in this case would not violate petitioners' Seventh Amendment right to a jury trial. Pp. 439 U. S. 333-337.

(a) An equitable determination can have collateral estoppel effect in a subsequent legal action without violating the Seventh Amendment. *Katchen v. Landy,* 382 U. S. 323. Pp. 439 U. S. 333-335.

(b) Petitioners' contention that, since the scope of the Seventh Amendment must be determined by reference to the common law as it existed in 1791, at which time collateral estoppel was permitted only where there was mutuality of parties, is without merit, for many procedural devices developed since 1791 that have diminished the civil jury's historic domain have been found not to violate the Seventh Amendment. *See, e.g., Galloway v. United States,* 319 U. S. 372, 319 U. S. 388-393. Pp. 439 U. S. 335-337.

565 F.2d 815, affirmed.

STEWART, J., delivered the opinion of the Court, in which BURGER, C.J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J.,

filed a dissenting opinion, *post,* p. 439 U. S. 337.

Page 439 U. S. 324

**Show Less**

---

# Opinions

## Opinions & Dissents

Hear Opinion Announcement - January 09, 1979

# U.S. Supreme Court

**Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979)**

**Parklane Hosiery Co., Inc. v. Shore**

**No. 77-1305**

**Argued October 30, 1978**

**Decided January 9, 1979**

**439 U.S. 322**

*CERTIORARI TO THE UNITED STATES COURT OF APPEALS*

*FOR THE SECOND CIRCUIT*

*Syllabus*

Respondent brought this stockholder's class action in the District Court for damages and other relief against petitioners, a corporation, its officers, directors, and stockholders, who allegedly had issued a materially false and misleading proxy statement in violation of the federal securities laws and Securities and Exchange Commission (SEC) regulations. Before the action came to trial, the SEC sued the same defendants in the District Court alleging that the proxy statement was materially false and misleading in essentially the same respects as respondent had claimed. The District Court, after a nonjury trial, entered a declaratory judgment for the SEC, and the Court of Appeals affirmed. Respondent in this case then moved for partial summary judgment against petitioners, asserting that they were collaterally estopped from relitigating the issues that had been resolved against them in the SEC suit. The District Court denied the motion on the ground that such an application of collateral estoppel would deny petitioners their Seventh Amendment right to a jury trial. The Court of Appeals reversed.

*Held:*

1. Petitioners, who had a "full and fair" opportunity to litigate their claims in the SEC action, are collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading. Pp. 439 U. S. 326-333.

(a) The mutuality doctrine, under which neither party could use a prior judgment against the other unless both parties were bound by the same judgment, no longer applies. *See Blonder-*

other unless both parties were bound by the same judgment, no longer applies. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U. S. 313. Pp. 402 U. S. 326-328.

(b) The offensive use of collateral estoppel (when, as here, the plaintiff seeks to foreclose the defendant from litigating an issue that the defendant has previously litigated unsuccessfully in an action with another party) does not promote judicial economy in the same manner that is promoted by defensive use (when a defendant seeks to prevent a plaintiff from asserting a claim that the plaintiff has previously litigated and lost against another defendant), and such offensive use may also be unfair to a defendant in various ways. Therefore, the general rule should be that, in cases where a plaintiff could easily have joined in the

Page 439 U. S. 323

earlier action, or where the application of offensive estoppel would be unfair to a defendant, a trial judge, in the exercise of his discretion, should not allow the use of offensive collateral estoppel. Pp. 439 U. S. 329-331.

(c) In this case, however, the application of offensive collateral estoppel will not reward a private plaintiff who could have joined in the previous action, since the respondent probably could not have joined in the injunctive action brought by the SEC. Nor is there any unfairness to petitioners in such application here, since petitioners had every incentive fully and vigorously to litigate the SEC suit; the judgment in the SEC action was not inconsistent with any prior decision; and in the respondent's action there will be no procedural opportunities available to the petitioners that were unavailable in the SEC action of a kind that might be likely to cause a different result. Pp. 439 U. S. 331-333.

2. The use of collateral estoppel in this case would not violate petitioners' Seventh Amendment right to a jury trial. Pp. 439 U. S. 333-337.

(a) An equitable determination can have collateral estoppel effect in a subsequent legal action without violating the Seventh Amendment. *Katchen v. Landy,* 382 U. S. 323. Pp. 439 U. S. 333-335.

(b) Petitioners' contention that, since the scope of the Seventh Amendment must be determined by reference to the common law as it existed in 1791, at which time collateral estoppel was permitted only where there was mutuality of parties, is without merit, for many procedural devices developed since 1791 that have diminished the civil jury's historic domain have been found not to violate the Seventh Amendment. *See, e.g., Galloway v. United States,* 319 U. S. 372, 319 U. S. 388-393. Pp. 439 U. S. 335-337.

565 F. 2d 815, affirmed.

STEWART, J., delivered the opinion of the Court, in which BURGER, C.J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, *post,* p. 439 U. S. 337.

Page 439 U. S. 324

MR. JUSTICE STEWART delivered the opinion of the Court.

This case presents the question whether a party who has had issues of fact adjudicated adverse to it in an equitable action may be collaterally estopped from relitigating the same issues before a jury in a subsequent legal action brought against it by a new party.

The respondent brought this stockholder's class action against the petitioners in a Federal District Court. The complaint alleged that the petitioners, Parklane Hosiery Co., Inc. (Parklane), and 13 of its officers, directors, and stockholders, had issued a materially false and misleading proxy statement in connection with a merger. [Footnote 1] The proxy statement, according to the complaint, had violated §§ 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934, 48 Stat. 895, 891, 899, as amended, 15 U.S.C. §§ 78n(a), 78j(b), and 78t(a), as well as various rules and regulations promulgated by the Securities and Exchange Commission (SEC). The complaint sought damages, rescission of the merger, and recovery of costs.

Before this action came to trial, the SEC filed suit against the same defendants in the Federal District Court, alleging that the proxy statement that had been issued by Parklane was materially false and misleading in essentially the same respects as those that had been alleged in the respondent's complaint. Injunctive relief was requested. After a 4-day

Page 439 U. S. 325

trial, the District Court found that the proxy statement was materially false and misleading in the respects alleged, and entered a declaratory judgment to that effect. *SEC v. Parklane Hosiery Co.,* 422 F. Supp. 477. The Court of Appeals for the Second Circuit affirmed this judgment. 558 F.2d 1083.

The respondent in the present case then moved for partial summary judgment against the petitioners, asserting that the petitioners were collaterally estopped from relitigating the issues that had been resolved against them in the action brought by the SEC. [Footnote 2] The District Court denied the motion on the ground that such an application of collateral estoppel would deny the petitioners their Seventh Amendment right to a jury trial. The Court of Appeals for the Second Circuit reversed, holding that a party who has had issues of fact

determined against him after a full and fair opportunity to litigate in a nonjury trial is collaterally estopped from obtaining a subsequent jury trial of these same issues of fact. 565 F.2d 815. The appellate court concluded that

"the Seventh Amendment preserves the right to jury trial only with respect to issues of fact, [and] once those issues have been fully and fairly adjudicated in a prior proceeding, nothing remains for trial, either with or without a jury."

*Id.* at 819. Because of an inter-circuit conflict, [Footnote 3] we granted certiorari. 435 U.S. 1006.

Page 439 U. S. 326

**I**

The threshold question to be considered is whether, quite apart from the right to a jury trial under the Seventh Amendment, the petitioners can be precluded from relitigating facts resolved adversely to them in a prior equitable proceeding with another party under the general law of collateral estoppel. Specifically, we must determine whether a litigant who was not a party to a prior judgment may nevertheless use that judgment "offensively" to prevent a defendant from relitigating issues resolved in the earlier proceeding. [Footnote 4]

*A*

Collateral estoppel, like the related doctrine of *res judicata*, [Footnote 5] has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U. S. 313, 402 U. S. 328-329. Until relatively recently, however, the scope of collateral estoppel was limited by the doctrine of mutuality of parties. Under this mutuality doctrine, neither party could use a prior judgment

Page 439 U. S. 327

as an estoppel against the other unless both parties were bound by the judgment. [Footnote 6] Based on the premise that it is somehow unfair to allow a party to use prior judgment when he himself would not be so bound, [Footnote 7] the mutuality requirement provided a party who had litigated and lost in a previous action an opportunity to relitigate identical issues with new parties.

By failing to recognize the obvious difference in position between a party who has never litigated an issue and one who has fully litigated and lost, the mutuality requirement was

litigated an issue and one who has fully litigated and lost, the mutuality requirement was criticized almost from its inception. [Footnote 8] Recognizing the validity of this criticism, the Court in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra,* abandoned the mutuality requirement, at least in cases where a patentee seeks to relitigate the validity of a patent after a federal court in a previous lawsuit has already declared it invalid. [Footnote 9] The

Page 439 U. S. 328

"broader question" before the Court, however, was "whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue." 402 U.S. at 402 U. S. 328. The Court strongly suggested a negative answer to that question:

"In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting, without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant's time and money are diverted from alternative uses -- productive or otherwise to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff's allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or 'a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure.' *Kerotest Mfg. Co. v. C-O-Two Co.,* 342 U. S. 180, 342 U. S. 185 (1952). Although neither judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard."

*Id.* at 402 U. S. 329. [Footnote 10]

Page 439 U. S. 329

## B

The *Blonder-Tongue* case involved defensive use of collateral estoppel -- a plaintiff was estopped from asserting a claim that the plaintiff had previously litigated and lost against another defendant. The present case, by contrast, involves offensive use of collateral estoppel -- a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff. In both the offensive and defensive use situations, the party against whom estoppel is asserted has litigated and lost in an earlier

action. Nevertheless, several reasons have been advanced why the two situations should be treated differently. [Footnote 11]

First, offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely "switching adversaries." *Bernhard v. Bank of America Nat. Trust Savings Assn.*, 19 Cal. 2d at 813, 122 P.2d at 895. [Footnote 12] Thus, defensive collateral estoppel gives a plaintiff a strong incentive to join

Page 439 U. S. 330

all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant, but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. *E.g., Nevarov v. Caldwell,* 161 Cal. App. 2d 762, 767-76, 327 P.2d 111, 115; *Reardon v. Allen,* 88 N.J.Super. 560, 571-572, 213 A.2d 26, 32. Thus, offensive use of collateral estoppel will likely increase, rather than decrease, the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action. [Footnote 13]

A second argument against offensive use of collateral estoppel is that it may be unfair to a defendant. If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable. *The Evergreens v. Nunan,* 141 F.2d 927, 929 (CA2); *cf. Berner v. British Commonwealth Pac. Airlines,* 346 F.2d 532 (CA2) (application of offensive collateral estoppel denied where defendant did not appeal an adverse judgment awarding damages of $35,000 and defendant was later sued for over $7 million). Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant. [Footnote 14] Still another situation where it might be

Page 439 U. S. 331

unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result. [Footnote 15]

*C*

we have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. [Footnote 16] The general rule should be that. in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

In the present case, however, none of the circumstances that might justify reluctance to allow the offensive use of collateral estoppel is present. The application of offensive collateral

Page 439 U. S. 332

estoppel will not here reward a private plaintiff who could have joined in the previous action, since the respondent probably could not have joined in the injunctive action brought by the SEC even had he so desired. [Footnote 17] Similarly, there is no unfairness to the petitioners in applying offensive collateral estoppel in this case. First, in light of the serious allegations made in the SEC's complaint against the petitioners, as well as the foreseeability of subsequent private suits that typically follow a successful Government judgment, the petitioners had every incentive to litigate the SEC lawsuit fully and vigorously. [Footnote 18] Second, the judgment in the SEC action was not inconsistent with any previous decision. Finally, there will in the respondent's action be no procedural opportunities available to the petitioners that were unavailable in the first action of a kind that might be likely to cause a different result. [Footnote 19]

We conclude, therefore, that none of the considerations that would justify a refusal to allow the use of offensive collateral estoppel is present in this case. Since the petitioners received a "full and fair" opportunity to litigate their claims in the

Page 439 U. S. 333

SEC action, the contemporary law of collateral estoppel leads inescapably to the conclusion that the petitioners are collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading.

The question that remains is whether, notwithstanding the law of collateral estoppel, the use of offensive collateral estoppel in this case would violate the petitioners' Seventh Amendment right to a jury trial. [Footnote 20]

A

"[T]he thrust of the [Seventh] Amendment was to preserve the right to jury trial as it existed

in 1791." *Curtis v. Loether*, 415 U. S. 189, 415 U. S. 193. At common law, a litigant was not entitled to have a jury determine issues that had been previously adjudicated by a chancellor in equity. *Hopkins v. Lee*, 6 Wheat. 109; *Smith v. Kernochen*, 7 How.198, 48 U. S. 217-218; *Brady v. Daly*, 175 U. S. 148, 175 U. S. 158-159; Shapiro & Coquillette, The Fetish of Jury Trial in Civil Cases: A Comment on *Rachal v. Hill*, 85 Harv.L.Rev. 442, 448-458 (1971). [Footnote 21]

Recognition that an equitable determination could have collateral estoppel effect in a subsequent legal action was the major premise of this Court's decision in *Beacon Theatres, Inc. v. Westover*, 359 U. S. 500. In that case, the plaintiff sought a declaratory judgment that certain arrangements between it

Page 439 U. S. 334

and the defendant were not in violation of the antitrust laws, and asked for an injunction to prevent the defendant from instituting an antitrust action to challenge the arrangements. The defendant denied the allegations and counterclaimed for treble damages under the antitrust laws, requesting a trial by jury of the issues common to both the legal and equitable claims. The Court of Appeals upheld denial of the request, but this Court reversed, stating:

"[T]he effect of the action of the District Court could be, as the Court of Appeals believed, 'to limit the petitioner's opportunity fully to try to a jury every issue which has a bearing upon its treble damage suit,' for determination of the issue of clearances by the judge might 'operate either by way of *res judicata* or collateral estoppel so as to conclude both parties with respect thereto at the subsequent trial of the treble damage claim.'"

*Id.* at 359 U. S. 504.

It is thus clear that the Court in the *Beacon Theatres* case thought that, if an issue common to both legal and equitable claims was first determined by a judge, relitigation of the issue before a jury might be foreclosed by *res judicata* or collateral estoppel. To avoid this result, the Court held that, when legal and equitable claims are joined in the same action, the trial judge has only limited discretion in determining the sequence of trial, and "that discretion . . . must, wherever possible, be exercised to preserve jury trial." *Id.* at 359 U. S. 510. [Footnote 22]

Both the premise of *Beacon Theatres* and the fact that it enunciated no more than a general prudential rule were confirmed by this Court's decision in *Katchen v. Landy*, 382 U. S. 323. In that case, the Court held that a bankruptcy court, sitting as a statutory court of equity, is empowered to adjudicate

Page 439 U. S. 335

equitable claims prior to legal claims, even though the factual issues decided in the equity action would have been triable by a jury under the Seventh Amendment if the legal claims had been adjudicated first. The Court stated:

"Both *Beacon Theatres* and *Dairy Queen* recognize that there might be situations in which the Court could proceed to resolve the equitable claim first, even though the results might be dispositive of the issues involved in the legal claim."

*Id.* at 382 U. S. 339. Thus, the Court in *Katchen v. Landy* recognized that an equitable determination can have collateral estoppel effect in subsequent legal action and that this estoppel does not violate the Seventh Amendment.

*B*

Despite the strong support to be found both in history and in the recent decisional law of this Court for the proposition that an equitable determination can have collateral estoppel effect in a subsequent legal action, the petitioners argue that application of collateral estoppel in this case would nevertheless violate their Seventh Amendment right to a jury trial. The petitioners contend that, since the scope of the Amendment must be determined by reference to the common law as it existed in 1791, and since the common law permitted collateral estoppel only where there was mutuality of parties, collateral estoppel cannot constitutionally be applied when such mutuality is absent.

The petitioners have advanced no persuasive reason, however, why the meaning of the Seventh Amendment should depend on whether or not mutuality of parties is present. A litigant who has lost because of adverse factual findings in an equity action is equally deprived of a jury trial whether he is estopped from relitigating the factual issues against the same party or a new party. In either case, the party against whom estoppel is asserted has litigated questions of fact, and has had the facts determined against him in an earlier proceeding.

Page 439 U. S. 336

In either case, there is no further factfinding function for the jury to perform, since the common factual issues have been resolved in the previous action. *Cf. Ex parte Peterson,* 253 U. S. 300, 253 U. S. 310 ("No one is entitled in a civil case to trial by jury unless and except so far as there are issues of fact to be determined").

The Seventh Amendment has never been interpreted in the rigid manner advocated by the

petitioners. On the contrary, many procedural devices developed since 1791 that have diminished the civil jury's historic domain have been found not to be inconsistent with the Seventh Amendment. *See Galloway v. United States,* 319 U. S. 372, 319 U. S. 388-393 (directed verdict does not violate the Seventh Amendment); *Gasoline Products Co. v. Champlin Refining Co.,* 283 U. S. 494, 283 U. S. 497-498 (retrial limited to question of damages does not violate the Seventh Amendment even though there was no practice at common law for setting aside a verdict in part); *Fidelity & Deposit Co. v. United States,* 187 U. S. 315, 187 U. S. 319-321 (summary judgment does not violate the Seventh Amendment). [Footnote 23]

The *Galloway* case is particularly instructive. There the party against whom a directed verdict had been entered argued that the procedure was unconstitutional under the Seventh Amendment. In rejecting this claim, the Court said:

"The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according

Page 439 U. S. 337

to the common law in 1791, any more than it tied them to the common law system of pleading or the specific rules of evidence then prevailing. Nor were 'the rules of the common law' then prevalent, including those relating to the procedure by which the judge regulated the jury's role on questions of fact, crystallized in a fixed and immutable system. . . ."

"The more logical conclusion, we think, and the one which both history and the previous decisions here support, is that the Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common law jurisdictions."

319 U.S. at 319 U. S. 390, 319 U. S. 392 (footnote omitted).

The law of collateral estoppel, like the law in other procedural areas defining the scope of the jury's function, has evolved since 1791. Under the rationale of the *Galloway* case, these developments are not repugnant to the Seventh Amendment simply for the reason that they did not exist in 1791. Thus, if, as we have held, the law of collateral estoppel forecloses the petitioners from relitigating the factual issues determined against them in the SEC action, nothing in the Seventh Amendment dictates a different result, even though, because of lack of mutuality, there would have been no collateral estoppel in 1791. [Footnote 24]

The judgment of the Court of Appeals is

*Affirmed.*

[Footnote 1]

The amended complaint alleged that the proxy statement that had been issued to the stockholders was false and misleading because it failed to disclose: (1) that the president of Parklane would financially benefit as a result of the company's going private; (2) certain ongoing negotiations that could have resulted in financial benefit to Parklane; and (3) that the appraisal of the fair value of Parklane stock was based on insufficient information to be accurate.

[Footnote 2]

A private plaintiff in an action under the proxy rules is not entitled to relief simply by demonstrating that the proxy solicitation was materially false and misleading. The plaintiff must also show that he was injured and prove damages. *Mills v. Electric Auto-Lite Co.,* 396 U. S. 375, 396 U. S. 386-390. Since the SEC action was limited to a determination of whether the proxy statement contained materially false and misleading information, the respondent conceded that he would still have to prove these other elements of his *prima facie* case in the private action. The petitioners' right to a jury trial on those remaining issues is not contested.

[Footnote 3]

The position of the Court of Appeals for the Second Circuit is in conflict with that taken by the Court of Appeals for the Fifth Circuit in *Rachal v. Hill,* 435 F.2d 59.

[Footnote 4]

In this context, offensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. Defensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant.

[Footnote 5]

Under the doctrine of *res judicata,* a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action, and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action. 1B J. Moore, Federal Practice � 0.405[1], pp. 622-624 (2d ed.1974); *e.g., Lawlor v. National Screen Serv. Corp.,* 349 U. S. 322, 349 U.

S. 320; *Commissioner v. Sunnen*, 333 U. S. 591, 333 U. S. 597; *Cromwell v. County of Sac*, 94 U. S. 351, 94 U. S. 352-353.

[Footnote 6]

*E.g., Bigelow v. Old Dominion Copper Co.*, 225 U. S. 111, 225 U. S. 127 ("It is a principle of general elementary law that estoppel of a judgment must be mutual"); *Buckeye Powder Co. v. E. I. DuPont de Nemours Powder Co.*, 248 U. S. 55, 248 U. S. 63; Restatement of Judgments § 93 (1942).

[Footnote 7]

It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U. S. 313, 402 U. S. 329; *Hansberry v. Lee*, 311 U. S. 32, 311 U. S. 40.

[Footnote 8]

This criticism was summarized in the Court's opinion in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra* at 402 U. S. 332-327. The opinion of Justice Traynor for a unanimous California Supreme Court in *Bernhard v. Bank of America Nat. Trust & Savings Assn.*, 19 Cal. 2d 807, 812, 122 P.2d 892, 895, made the point succinctly:

"No satisfactory rationalization has been advanced for the requirement of mutuality. Just why a party who was not bound by a previous action should be precluded from asserting it as *res judicata* against a party who was bound by it is difficult to comprehend."

[Footnote 9]

In *Triplett v. Lowell*, 297 U. S. 638, the Court had held that a determination of patent invalidity in a prior action did not bar a plaintiff from relitigating the validity of a patent in a subsequent action against a different defendant. This holding of the *Triplett* case was explicitly overruled in the *Blonder-Tongue* case.

[Footnote 10]

The Court also emphasized that relitigation of issues previously adjudicated is particularly wasteful in patent cases because of their staggering expense and typical length. 402 U.S. at 402 U. S. 334, 402 U. S. 348. Under the doctrine of mutuality of parties, an alleged infringer might find it cheaper to pay royalties than to challenge a patent that had been declared invalid in a prior suit, since the holder of the patent is entitled to a statutory presumption of validity. *Id.* at 402 U. S. 338.

validity. Id. at 402 U. S. 338.

[Footnote 11]

Various commentators have expressed reservations regarding the application of offensive collateral estoppel. Currie, Mutuality of Estoppel: Limits of the Bernhard Doctrine, 9 Stan.L.Rev. 281 (1957); Semmel, Collateral Estoppel, Mutuality and Joinder of Parties, 68 Colum.L.Rev. 1457 (1968); Note, The Impacts of Defensive and Offensive Assertion of Collateral Estoppel by a Nonparty, 35 Geo.Wash.L.Rev. 1010 (1967). Professor Currie later tempered his reservations. Civil Procedure: The Tempest Brews, 53 Calif.L.Rev. 25 (1965).

[Footnote 12]

Under the mutuality requirement, a plaintiff could accomplish this result since he would not have been bound by the judgment had the original defendant won.

[Footnote 13]

The Restatement (Second) of Judgments § 88(3) (Tent.Draft No. 2, Apr. 15, 1975) provides that application of collateral estoppel may be denied if the party asserting it "could have effected joinder in the first action between himself and his present adversary."

[Footnote 14]

In Professor Currie's familiar example, a railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, plaintiff wins in suit 26. Professor Currie argues that offensive use of collateral estoppel should not be applied so as to allow plaintiffs 27 through 50 automatically to recover. Currie, *supra*, 9 Stan.L.Rev. at 304. *See* Restatement (Second) of Judgments § 88(4), *supra*.

[Footnote 15]

If, for example, the defendant in the first action was forced to defend in an inconvenient forum, and therefore was unable to engage in full scale discovery or call witnesses, application of offensive collateral estoppel may be unwarranted. Indeed, differences in available procedures may sometimes justify not allowing a prior judgment to have estoppel effect in a subsequent action even between the same parties, or where defensive estoppel is asserted against a plaintiff who has litigated and lost. The problem of unfairness is particularly acute in cases of offensive estoppel, however, because the defendant against whom estoppel is asserted typically will not have chosen the forum in the first action. *See id.* § 88(2) and Comment d.

[Footnote 16]

[Footnote 16]

This is essentially the approach of *id.,* § 88, which recognizes that

"the distinct trend, if not the clear weight of recent authority, is to the effect that there is no intrinsic difference between 'offensive,' as distinct from 'defensive,' issue preclusion, although a stronger showing that the prior opportunity to litigate was adequate may be required in the former situation than the latter."

*Id.,* Reporter's Note, at 99.

[Footnote 17]

*SEC v. Everest Management Corp.,* 475 F.2d 1236, 1240 (CA2) ("[T]he complicating effect of the additional issues and the additional parties outweighs any advantage of a single disposition of the common issues"). Moreover, consolidation of a private action with one brought by the SEC without its consent is prohibited by statute. 15 U.S.C. § 78u(g).

[Footnote 18]

After a day trial in which the petitioners had every opportunity to present evidence and call witnesses, the District Court held for the SEC. The petitioners then appealed to the Court of Appeals for the Second Circuit, which affirmed the judgment against them. Moreover, the petitioners were already aware of the action brought by the respondent, since it had commenced before the filing of the SEC action.

[Footnote 19]

It is true, of course, that the petitioners in the present action would be entitled to a jury trial of the issues bearing on whether the proxy statement was materially false and misleading had the SEC action never been brought -- a matter to be discussed in 439 U. S. But the presence or absence of a jury as factfinder is basically neutral, quite unlike, for example, the necessity of defending the first lawsuit in an inconvenient forum.

[Footnote 20]

The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right to jury trial shall be preserved. . . ."

[Footnote 21]

The authors of this article conclude that the historical sources

"indicates that in the late eighteenth and early nineteenth centuries, determinations in equity

were thought to have as much force as determinations at law, and that the possible impact on jury trial rights was not viewed with concern. . . . If collateral estoppel is otherwise warranted, the jury trial question should not stand in the way."

85 Harv.L.Rev. at 455-456. This common law rule is adopted in the Restatement of Judgments § 68, Comment j (1942).

[Footnote 22]

Similarly, in both *Dairy Queen, Inc. v. Wood*, 369 U. S. 469, and *Meeker v. Ambassador Oil Corp.*, 375 U. S. 160, the Court held that legal claims should ordinarily be tried before equitable claims to preserve the right to a jury trial.

[Footnote 23]

The petitioners' reliance on *Dimick v. Schiedt*, 293 U. S. 474, is misplaced. In the *Dimick* case, the Court held that an increase by the trial judge of the amount of money damages awarded by the jury violated the second clause of the Seventh Amendment, which provides that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." Collateral estoppel does not involve the "reexamination" of any fact decided by a jury. On the contrary, the whole premise of collateral estoppel is that, once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed.

[Footnote 24]

In reaching this conclusion, the Court of Appeals went on to state:

"Were there any doubt about the [question whether the petitioners were entitled to a jury redetermination of the issues otherwise subject to collateral estoppel], it should in any event be resolved against the defendants in this case for the reason that, although they were fully aware of the pendency of the present suit throughout the non-jury trial of the SEC case, they made no effort to protect their right to a jury trial of the damage claims asserted by plaintiffs, either by seeking to expedite trial of the present action or by requesting Judge Duffy, in the exercise of his discretion pursuant to Rule 39(b), (G), F.R.Civ.P., to order that the issues in the SEC case be tried by a jury or before an advisory jury."

565 F.2d at 821-822. (Footnote omitted.)

The Court of Appeals was mistaken in these suggestions. The petitioners did not have a right to a jury trial in the equitable injunctive action brought by the SEC. Moreover, an advisory jury, which might have only delayed and complicated that proceeding, would not, in any

jury, which might have only delayed and complicated that proceeding, would not, in any event, have been a Seventh Amendment jury. And the petitioners were not in a position to expedite the private action and stay the SEC action. The Securities Exchange Act of 1934 provides for prompt enforcement actions by the SEC unhindered by parallel private actions. 15 U.S.C. § 78u(g).

MR. JUSTICE REHNQUIST, dissenting.

It is admittedly difficult to be outraged about the treatment accorded by the federal judiciary to petitioners' demand for a jury trial in this lawsuit. Outrage is an emotion all but

Page 439 U. S. 338

impossible to generate with respect to a corporate defendant in a securities fraud action, and this case is no exception. But the nagging sense of unfairness as to the way petitioners have been treated, engendered by the imprimatur placed by the Court of Appeals on respondent's "heads I win, tails you lose" theory of this litigation, is not dispelled by this Court's antiseptic analysis of the issues in the case. It may be that, if this Nation were to adopt a new Constitution today, the Seventh Amendment guaranteeing the right of jury trial in civil cases in federal courts would not be included among its provisions. But any present sentiment to that effect cannot obscure or dilute our obligation to enforce the Seventh Amendment, which was included in the Bill of Rights in 1791 and which has not since been repealed in the only manner provided by the Constitution for repeal of its provisions.

The right of trial by jury in civil cases at common law is fundamental to our history and jurisprudence. Today, however, the Court reduces this valued right, which Blackstone praised as "the glory of the English law," to a mere "neutral"

Page 439 U. S. 339

factor and, in the name of procedural reform, denies the right of jury trial to defendants in a vast number of cases in which defendants heretofore have enjoyed jury trials. Over 35 years ago, Mr. Justice Black lamented the

"gradual process of judicial erosion which in one-hundred-fifty years has slowly worn away a major portion of the essential guarantee of the Seventh Amendment."

*Galloway v. United States*, 319 U. S. 372, 319 U. S. 397 (1943) (dissenting opinion). Regrettably, the erosive process continues apace with today's decision. [Footnote 2/1]

I

The Seventh Amendment provides:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

The history of the Seventh Amendment has been amply documented by this Court and by legal scholars, [Footnote 2/2] and it would serve no useful purpose to attempt here to repeat all that has been written on the subject. Nonetheless, the decision of this case turns on the scope and effect of the Seventh Amendment, which, perhaps more than with any other provision of the Constitution, are determined by reference to the historical

Page 439 U. S. 340

setting in which the Amendment was adopted. *See Colgrove v. Battin,* 413 U. S. 149, 413 U. S. 152 (1973). It therefore is appropriate to pause to review, albeit briefly, the circumstances preceding and attending the adoption of the Seventh Amendment as a guide in ascertaining its application to the case at hand.

*A*

It is perhaps easy to forget, now more than 200 years removed from the events, that the right of trial by jury was held in such esteem by the colonists that its deprivation at the hands of the English was one of the important grievances leading to the break with England. *See* Sources and Documents Illustrating the American Revolution 1764-1788 and the Formation of the Federal Constitution 94 (S. Morison 2d ed.1929); R. Pound, The Development of Constitutional Guarantees of Liberty 69-72 (1957); C. Ubbelohde, The Vice-Admiralty Courts and the American Revolution 208-211 (1960). The extensive use of vice-admiralty courts by colonial administrators to eliminate the colonists' right of jury trial was listed among the specific offensive English acts denounced in the Declaration of Independence. [Footnote 2/3] And after

Page 439 U. S. 341

war had broken out, all of the 13 newly formed States restored the institution of civil jury trial to its prior prominence; 10 expressly guaranteed the right in their state constitutions, and the 3 others recognized it by statute or by common practice. [Footnote 2/4] Indeed, "[t]he right to trial by jury was probably the only one universally secured by the first American state constitutions. . . ." L. Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 281 (1960). [Footnote 2/5]

One might justly wonder, then, why no mention of the right of jury trial in civil cases should have found its way into the Constitution that emerged from the Philadelphia Convention in 1787. Article III, § 2, cl. 3, merely provides that "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury." The omission of a clause protective of the civil jury right was not for lack of trying, however. Messrs. Pinckney and Gerry proposed to provide a clause securing the right of jury trial in civil cases, but their efforts failed. [Footnote 2/6] Several reasons

Page 439 U. S. 342

have been advanced for this failure. The Federalists argued that the practice of civil juries among the several States varied so much that it was too difficult to draft constitutional language to accommodate the different state practices. *See Colgrove v. Battin, supra,* at 413 U. S. 153. [Footnote 2/7] Whatever the reason for the omission, however, it is clear that, even before the delegates had left Philadelphia, plans were under way to attack the proposed Constitution on the ground that it failed to contain a guarantee of civil jury trial in the new federal courts. *See R. Rutland, George Mason 91 (1961); Wolfram 662.*

The virtually complete absence of a bill of rights in the proposed Constitution was the principal focus of the Anti-Federalists' attack on the Constitution, and the lack of a provision for civil juries featured prominently in their arguments. *See Parsons v. Bedford,* 3 Pet. 433, 28 U. S. 445 (1830). Their pleas struck a responsive chord in the populace, and the price exacted in many States for approval of the Constitution was the appending of a list of recommended amendments, chief among them a clause securing the right of jury trial in civil cases. [Footnote 2/8] Responding to the pressures for a civil jury

Page 439 U. S. 343

guarantee generated during the ratification debates, the first Congress under the new Constitution at its first session in 1789 proposed to amend the Constitution by adding the following language:

"In suits at common law, between man and man, the trial by jury, as one of the best securities to the rights of the people, ought to remain inviolate."

1 Annals of Cong. 435 (1789). That provision, altered in language to what became the Seventh Amendment, was proposed by the Congress in 1789 to the legislatures of the several States and became effective with its ratification by Virginia on December 15, 1791. [Footnote 2/9]

The foregoing sketch is meant to suggest what many of those who oppose the use of juries in civil trials seem to ignore. The founders of our Nation considered the right of trial by jury in

civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary. [Footnote 2/10] Those who passionately advocated the right to a civil jury trial did not do so because they considered the jury a familiar procedural device that should be continued; the concerns for the institution of jury trial that led to the passages of the Declaration of Independence and to the Seventh Amendment were not animated by a belief that use of juries would lead to more efficient judicial administration. Trial by a jury of laymen, rather than by the sovereign's judges,

Page 439 U. S. 344

was important to the founders because juries represent the layman's common sense, the "passionate elements in our nature," and thus keep the administration of law in accord with the wishes and feelings of the community. O. Holmes, Collected Legal Papers 237 (1920). Those who favored juries believed that a jury would reach a result that a judge either could not or would not reach. [Footnote 2/11] It is with these values that underlie the Seventh Amendment in mind that the Court should, but obviously does not, approach the decision of this case.

B

The Seventh Amendment requires that the right of trial by jury be "preserved." Because the Seventh Amendment demands preservation of the jury trial right, our cases have uniformly held that the content of the right must be judged by historical standards. *E.g., Curtis v. Loether,* 415 U. S. 189, 415 U. S. 193 (1974); *Colgrove v. Battin,* 413 U.S. at 413 U. S. 155-156; *Ross v. Bernhard,* 396 U. S. 531, 396 U. S. 533 (1970); *Capital Traction Co. v. Hof,* 174 U. S. 1, 174 U. S. 8-9 (1899); *Parsons v. Bedford, supra* at 28 U. S. 446. Thus, in *Baltimore & Carolina Line v. Redman,* 295 U. S. 654, 295 U. S. 657 (1935), the Court stated that "[t]he right of trial by jury thus preserved is the right which existed under the English common law when the Amendment was adopted."

Page 439 U. S. 345

And in *Dimick v. Shiedt,* 293 U. S. 474, 293 U. S. 476 (1935), the Court held:

"In order to ascertain the scope and meaning of the Seventh Amendment, resort must be had to the appropriate rules of the common law established at the time of the adoption of that constitutional provision in 1791. [Footnote 2/12]"

If a jury would have been impaneled in a particular kind of case in 1791, then the Seventh Amendment requires a jury trial today, if either party so desires.

To be sure, it is the substance of the right of jury trial that is preserved, not the incidental or collateral effects of common law practice in 1791. *Walker v. New Mexico & S. P. R. Co.,* 165 U. S. 593, 165 U. S. 596 (1897).

"The aim of the Amendment, as this Court has held, is to preserve the substance of the common law right of trial by jury, as distinguished from mere matters of form or procedure, and particularly to retain the common law distinction between the province of the court and that of the jury. . . ."

*Baltimore & Carolina Line v. Redman, supra,* at 295 U. S. 657. *Accord, Colgrove v. Battin, supra,* at 413 U. S. 156-157; *Gasoline Products Co. v. Champlin Refining Co.,* 283 U. S. 494, 283 U. S. 498 (1931); *Ex parte Peterson,* 253 U. S. 300, 253 U. S. 309 (1920).

"The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according to the common law of 1791, any more than it tied them to the common law system of pleading or the specific rules of evidence then prevailing."

*Galloway v. United States,* 319 U.S. at 319 U. S. 390.

To say that the Seventh Amendment does not tie federal courts to the exact procedure of the common law in 1791 does

Page 439 U. S. 346

not imply, however, that any nominally "procedural" change can be implemented regardless of its impact on the functions of the jury. For to sanction creation of procedural devices which limit the province of the jury to a greater degree than permitted at common law in 1791 is in direct contravention of the Seventh Amendment. *See Neely v. Martin K. Eby Constr. Co.,* 386 U. S. 317, 386 U. S. 322 (1967); *Galloway v. United States, supra* at 319 U. S. 395; *Dimick v. Schiedt, supra* at 293 U. S. 487; *Ex parte Peterson, supra* at 253 U. S. 309-310. And since we deal here not with the common law *qua* common law, but with the Constitution, no amount of argument that the device provides for more efficiency or more accuracy or is fairer will save it if the degree of invasion of the jury's province is greater than allowed in 1791. To rule otherwise would effectively permit judicial repeal of the Seventh Amendment, because nearly any change in the province of the jury, no matter how drastic the diminution of its functions, can always be denominated "procedural reform."

The guarantees of the Seventh Amendment will prove burdensome in some instances; the civil jury surely was a burden to the English governors who, in its stead, substituted the vice-admiralty court. But, as with other provisions of the Bill of Rights, the onerous nature of the

protection is no license for contracting the rights secured by the Amendment. Because

"'[m]aintenance of the jury as a factfinding body is of such importance and occupies so firm a place in our history and jurisprudence . . . any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.'"

*Dimick v. Schiedt, supra* at 293 U. S. 486, quoted in *Beacon Theatres, Inc. v. Westover,* 359 U. S. 500, 359 U. S. 501 (1959).

*C*

Judged by the foregoing principles, I think it is clear that petitioners were denied their Seventh Amendment right to a

Page 439 U. S. 347

jury trial in this case. Neither respondent nor the Court doubts that, at common law as it existed in 1791, petitioners would have been entitled in the private action to have a jury determine whether the proxy statement was false and misleading in the respects alleged. The reason is that, at common law in 1791, collateral estoppel was permitted only where the parties in the first action were identical to, or in privity with, the parties to the subsequent action. [Footnote 2/13] It was not until 1971 that the doctrine of mutuality was abrogated by this Court in certain limited circumstances. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U. S. 313. [Footnote 2/14] But developments in the judge-made doctrine of collateral estoppel, however salutary, cannot, consistent with the Seventh Amendment, contract in any material fashion the right to a jury trial that a defendant would have enjoyed in 1791. In the instant case, resort to the doctrine of collateral estoppel does more than merely contract the right to a jury trial: it eliminates the right entirely, and therefore contravenes the Seventh Amendment.

The Court responds, however, that, at common law,

"a litigant was not entitled to have a jury [in a subsequent action at law between the same parties] determine issues that had been previously adjudicated by a chancellor in equity,"

and that

"petitioners have advanced no persuasive reason . . . why the meaning of the Seventh Amendment should depend on

Page 439 U. S. 348

whether or not mutuality of parties is present."

*Ante* at 439 U. S. 333, 439 U. S. 335. But that is tantamount to saying that, since a party would not be entitled to a jury trial if he brought an equitable action, there is no persuasive reason why he should receive a jury trial on virtually the same issues if, instead, he chooses to bring his lawsuit in the nature of a legal action. The persuasive reason is that the Seventh Amendment requires that a party's right to jury trial which existed at common law be "preserved" from incursions by the government or the judiciary. Whether this Court believes that use of a jury trial in a particular instance is necessary, or fair, or repetitive, is simply irrelevant. If that view is "rigid," it is the Constitution which commands that rigidity. To hold otherwise is to rewrite the Seventh Amendment so that a party is guaranteed a jury trial in civil cases unless this Court thinks that a jury trial would be inappropriate.

No doubt parallel "procedural reforms" could be instituted in the area of criminal jurisprudence, which would accomplish much the same sort of expedition of court calendars and conservation of judicial resources as would the extension of collateral estoppel in civil litigation. Government motions for summary judgment, or for a directed verdict in favor of the prosecution at the close of the evidence, would presumably save countless hours of judges' and jurors' time. It can scarcely be doubted, though, that such "procedural reforms" would not survive constitutional scrutiny under the jury trial guarantee of the Sixth Amendment. Just as the principle of separation of powers was not incorporated by the Framers into the Constitution in order to promote efficiency or dispatch in the business of government, the right to a jury trial was not guaranteed in order to facilitate prompt and accurate decision of lawsuits. The essence of that right lies in its insistence that a body of laymen not permanently attached to the sovereign participate along with the judge in the factfinding

Page 439 U. S. 349

necessitated by a lawsuit. And that essence is as much a part of the Seventh Amendment's guarantee in civil cases as it is of the Sixth Amendment's guarantee in criminal prosecutions. *Cf. Thiel v. Southern Pacific Co.,* 328 U. S. 217, 328 U. S. 220 (1946).

Relying on *Galloway v. United States, Gasoline Products Co. v. Champlin Refining Co.,* and *Fidelity & Deposit Co. v. United States,* 187 U. S. 315 (1902), the Court seems to suggest that the offensive use of collateral estoppel in this case is permissible under the limited principle set forth above that a mere procedural change that does not invade the province of the jury and a defendant's right thereto to a greater extent than authorized by the common law is permissible. But the Court's actions today constitute a far greater infringement of the defendant's rights than it ever before has sanctioned. In *Galloway,* the Court upheld the modern form of directed verdict against a Seventh Amendment challenge, but it is clear that

a similar form of directed verdict existed at common law in 1791. *E.g., Beauchamp v. Barret,* Peake 148, 170 Eng.Rep. 110 (N.P. 1792); *Coupey v. Heley,* 2 Esp. 540, 542, 170 Eng.Rep. 448, 449 (C. P. 1797). [Footnote 2/15] The modern form did not materially alter the function of the jury. Similarly, the modern device of summary judgment was found not to violate the Seventh Amendment because, in 1791, a demurrer to the evidence, a procedural device substantially similar to summary judgment, was a common practice. *E.g., 8 U. S. United States,* 4 Cranch 219, 8 U. S. 221-222 (1808). [Footnote 2/16]

Page 439 U. S. 350

The procedural devices of summary judgment and directed verdict are direct descendants of their common law antecedents. They accomplish nothing more than could have been done at common law, albeit by a more cumbersome procedure. *See also Montgomery Ward & Co. v. Duncan,* 311 U. S. 243, 311 U. S. 250 (1940). And while at common law there apparently was no practice of setting aside a verdict in part, [Footnote 2/17] the Court in *Gasoline Products* permitted a partial retrial of "distinct and separable" issues because the change in procedure would not impair the substance of the right to jury trial. 283 U.S. at 283 U. S. 498. The parties in *Gasoline Products* still enjoyed the right to have a jury determine all issues of fact.

By contrast, the development of nonmutual estoppel is a substantial departure from the common law, and its use in this case completely deprives petitioners of their right to have a jury determine contested issues of fact. I am simply unwilling to accept the Court's presumption that the complete extinguishment of petitioners' right to trial by jury can be justified as a mere change in "procedural incident or detail." Over 40 years ago, Mr. Justice Sutherland observed in a not dissimilar case:

"[T]his court, in a very special sense, is charged with the duty of construing and upholding the Constitution; and, in the discharge of that important duty, it ever must be alert to see that a doubtful precedent be not extended by mere analogy to a different case if the result will be to weaken or subvert what it conceives to be a principle of the fundamental law of the land."

*Dimick v. Schiedt,* 293 U.S. at 293 U. S. 485.

Page 439 U. S. 351

## II

Even accepting, *arguendo,* the majority's position that there is no violation of the Seventh Amendment here, I nonetheless would not sanction the use of collateral estoppel in this case. The Court today holds:

"The general rule should be that, in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel."

*Ante* at 439 U. S. 331. In my view, it is "unfair" to apply offensive collateral estoppel where the party who is sought to be estopped has not had an opportunity to have the facts of his case determined by a jury. Since, in this case, petitioners were not entitled to a jury trial in the Securities and Exchange Commission (SEC) lawsuit, [Footnote 2/18] I would not estop them from relitigating the issues determined in the SEC suit before a jury in the private action. I believe that several factors militate in favor of this result.

First, the use of offensive collateral estoppel in this case runs counter to the strong federal policy favoring jury trials, even if it does not, as the majority holds, violate the Seventh Amendment. The Court's decision in *Beacon Theatres, Inc. v. Westover,* 359 U. S. 500 (1969), exemplifies that policy. In *Beacon Theatres,* the Court held that, where both equitable and legal claims or defenses are presented in a single case,

"only under the most imperative circumstances, circumstances which, in view of the flexible procedures of the Federal Rules, we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims. "

Page 439 U. S. 352

*Id.* at 359 U. S. 510-511. [Footnote 2/19] And in *Jacob v. New York,* 315 U. S. 752, 315 U. S. 752-753 (1942), the Court stated:

"The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts."

*Accord, Simler v. Conner,* 372 U. S. 221, 372 U. S. 222 (1963); *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.,* 356 U. S. 525, 356 U. S. 537-539 (1958) (strong federal policy in favor of juries requires jury trials in diversity cases, regardless of state practice). Today's decision will mean that, in a large number of private cases, defendants will no longer enjoy the right to jury trial. [Footnote 2/20] Neither the Court nor respondent has adverted or cited to any unmanageable problems that have resulted

Page 439 U. S. 353

from according defendants jury trials in such cases. I simply see no "imperative circumstances" requiring this wholesale abrogation of jury trials. [Footnote 2/21]

Second, I believe that the opportunity for a jury trial in the second action could easily lead to a different result from that obtained in the first action before the court, and therefore that it is unfair to estop petitioners from relitigating the issues before a jury. This is the position adopted in the Restatement (Second) of Judgments, which disapproves of the application of offensive collateral estoppel where the defendant has an opportunity for a jury trial in the second lawsuit that was not available in the first action. [Footnote 2/22] The Court accepts the proposition that it is unfair to apply offensive collateral estoppel "where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Ante* at 439 U. S. 331. Differences in discovery opportunities between the two actions are cited as examples of situations where it would be unfair to permit offensive collateral estoppel. *Ante* at 439 U. S. 331 n. 15. But, in the Court's view, the fact that petitioners would have been entitled to a jury trial in the present action is not such a "procedural opportunit[y]," because

"the presence or absence of a jury as factfinder is basically *neutral,* quite unlike, for example, the

Page 439 U. S. 354

necessity of defending the first lawsuit in an inconvenient forum."

*Ante* at 439 U. S. 332 n. 19 (emphasis added).

As is evident from the prior brief discussion of the development of the civil jury trial guarantee in this country, those who drafted the Declaration of Independence and debated so passionately the proposed Constitution during the ratification period, would indeed be astounded to learn that the presence or absence of a jury is merely "neutral," whereas the availability of discovery, a device unmentioned in the Constitution, may be controlling. It is precisely because the Framers believed that they might receive a different result at the hands of a jury of their peers than at the mercy of the sovereign's judges, that the Seventh Amendment was adopted. And I suspect that anyone who litigates cases before juries in the 1970's would be equally amazed to hear of the supposed lack of distinction between trial by court and trial by jury. The Court can cite no authority in support of this curious proposition. The merits of civil juries have been long debated, but I suspect that juries have never been accused of being merely "neutral" factors. [Footnote 2/23]

Contrary to the majority's supposition, juries can make a difference, and our cases have, before today at least, recognized this obvious fact. Thus, in *Colgrove v. Battin,* 413 U.S. at

413 U. S. 157, we stated that

"the purpose of the jury trial in . . . civil cases [is] to assure a fair and equitable resolution of factual issues, *Gasoline Products Co. v. Champlin Co.,* 283 U. S. 494, 283 U. S. 498 (1931). . . ."

And in *Byrd v. Blue Ridge*

Page 439 U. S. 355

*Rural Electrical Cooperative, supra* at 356 U. S. 537, the Court conceded that

"the nature of the tribunal which tries issues may be important in the enforcement of the parcel of rights making up a cause of action or defense. . . . It may well be that, in the instant personal injury case, the outcome would be substantially affected by whether the issue of immunity is decided by a judge or a jury."

*See Curtis v. Loether,* 415 U.S. at 415 U. S. 198; *cf. Duncan v. Louisiana,* 391 U. S. 145, 391 U. S. 156 (1968). Jurors bring to a case their common sense and community values; their "very inexperience is an asset, because it secures a fresh perception of each trial, avoiding the stereotypes said to infect the judicial eye." H. Kalven & H. Zeisel, The American Jury 8 (1966).

The ultimate irony of today's decision is that its potential for significantly conserving the resources of either the litigants or the judiciary is doubtful, at best. That being the case, I see absolutely no reason to frustrate so cavalierly the important federal policy favoring jury decisions of disputed fact questions. The instant case is an apt example of the minimal savings that will be accomplished by the Court's decision. As the Court admits, even if petitioners are collaterally estopped from relitigating whether the proxy was materially false and misleading, they are still entitled to have a jury determine whether respondent was injured by the alleged misstatements and the amount of damages, if any, sustained by respondent. *Ante* at 439 U. S. 325 n. 2. Thus, a jury must be impaneled in this case in any event. The time saved by not trying the issue of whether the proxy was materially false and misleading before the jury is likely to be insubstantial. [Footnote 2/24] It is just as probable that today's decision will have the result of coercing defendants to agree to consent orders or settlements

Page 439 U. S. 356

in agency enforcement actions in order to preserve their right to jury trial in the private actions. In that event, the Court, for no compelling reason, will have simply added a powerful club to the administrative agencies' arsenals that even Congress was unwilling to provide

club to the administrative agencies' arsenals that even Congress was unwilling to provide them.

[Footnote 2/1]

Because I believe that the use of offensive collateral estoppel in this particular case was improper, it is not necessary for me to decide whether I would approve its use in circumstances where the defendant's right to a jury trial was not impaired.

[Footnote 2/2]

*See, e.g., Colgrove v. Battin,* 413 U. S. 149 (1973); *Capital Traction Co. v. Hof,* 174 U. S. 1 (1899); *Parsons v. Bedford,* 3 Pet. 433 (1830); Henderson, The Background of the Seventh Amendment, 80 Harv.L.Rev. 289 (1966) (hereinafter Henderson); Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn.L.Rev. 639 (1973) (hereinafter Wolfram). *See also United States v. Wonson,* 28 F. Cas. 745 (No. 16,750) (CC Mass. 1812) (Story, C.J.).

[Footnote 2/3]

The Declaration of Independence states: "For depriving us in many cases, of the benefits of Trial by Jury." Just two years earlier, in the Declaration of Rights adopted October 14, 1774, the first Continental Congress had unanimously resolved that

"the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law."

1 Journals of the Continental Congress 69 (1904).

Holdsworth has written that, of all the new methods adopted to strengthen the administration of the British laws,

"the most effective, and therefore the most disliked, was the extension given to the jurisdiction of the reorganized courts of admiralty and vice-admiralty. It was the most effective because it deprived the defendant of the right to be tried by a jury which was almost certain to acquit him."

11 W. Holdsworth, A History of English Law 110 (1966). While the vice-admiralty courts dealt chiefly with criminal offenses, their jurisdiction also was extended to many areas of the civil law. Wolfram 654 n. 47.

[Footnote 2/4]

Ga.Const., Art. LXI (1777), in 2 The Federal and State Constitutions Colonial Charters, and Other Organic Laws 785 (F. Thorpe ed.1909) (hereinafter Thorpe); Md.Const., Art. III (1776), in 3 Thorpe 1686-1687; Mass.Const., Art. XV (1780), in 3 Thorpe 1891-1892; N.H.Const., Art. XX (1784), in 4 Thorpe 2456; N.J.Const., Art. XXII (1776), in 5 Thorpe 2598; N.Y.Const., Art. XLI (1777), in 5 Thorpe 2637; N.C.Const., Declaration of Rights, Art. XIV (1776), in 5 Thorpe 2788; Pa.Const., Declaration of Rights, Art. XI (1776), in 5 Thorpe 3083; S.C.Const., Art. XLI (1778), in 6 Thorpe 3257; Va.Const., Bill of Rights, § 11 (1776), in 7 Thorpe 3814. *See* Wolfram 655.

[Footnote 2/5]

When Congress, in 1787, adopted the Northwest Ordinance for governance of the territories west of the Appalachians, it included a guarantee of trial by jury in civil cases. 2 Thorpe 960-961.

[Footnote 2/6]

The proposal was to add the following language to Art. III: "And a trial by jury shall be preserved as usual in civil cases." 2 M. Farrand, The Records of the Federal Convention of 1787, p. 628 (1911). The debate regarding this proposal is quoted in *Colgrove v. Battin, supra* at 413 U. S. 153-155, n. 8.

[Footnote 2/7]

The objection of Mr. Gorham of Massachusetts was that "[t]he constitution of Juries is different in different States, and the trial itself is usual in different cases in different States." 2 M. Farrand, *supra* at 628. Commentators have suggested several additional reasons for the failure of the convention to include a civil jury guarantee. *See* Henderson 294-295; ("[T]he true reason for omitting a similar provision for civil juries was, at least in part, that the convention members simply wanted to go home"); Wolfram 660-666.

[Footnote 2/8]

*See* Henderson 298; Wolfram 667-703. Virginia's recommended jury trial amendment is typical:

"That, in controversies respecting property, and in suits between man and man, the ancient trial by jury is one of the greatest securities to the rights of the people, and [ought] to remain sacred and inviolable."

3 J. Elliot, Debates on the Federal Constitution 658 (2d ed. 1836).

[Footnote 2/9]

The Judiciary Act of September 24, 1789, which was passed within six months of the organization of the new government and on the day before the first 10 Amendments were proposed to the legislatures of the States by the First Congress, provided for a civil jury trial right. 1 Stat. 77.

[Footnote 2/10]

Thomas Jefferson stated: "I consider [trial by jury] as the only anchor yet imagined by man by which a government can be held to the principles of its constitution." 3 The Writings of Thomas Jefferson 71 (Washington ed. 1861).

[Footnote 2/11]

Wolfram 671. Professor Wolfram has written:

"[T]he anti-federalists were not arguing for the institution of civil jury trial in the belief that jury trials were short, inexpensive, decorous and productive of the same decisions that judges sitting without juries would produce. The inconveniences of jury trial were accepted precisely because, in important instances, through its ability to disregard substantive rules of law, the jury would reach a result that the judge either could not or would not reach. Those who favored the civil jury were not misguided tinkerers with procedural devices; they were, for the day, libertarians who avowed that important areas of protection for litigants in general, and for debtors in particular, would be placed in grave danger unless it were required that juries sit in civil cases."

*Id.* at 671-672.

[Footnote 2/12]

The majority suggests that *Dimick v. Schiedt* is not relevant to the decision in this case because it dealt with the second clause of the Seventh Amendment. *Ante* at 439 U. S. 336 n. 23. I disagree. There is no intimation in that opinion that the first clause should be treated any differently from the second. The *Dimick* Court's respect for the guarantees of the Seventh Amendment applies as much to the first clause as to the second.

[Footnote 2/13]

*See Smith v. Kernochen,* 7 How.198, 48 U. S. 218 (1849); *Hopkins v. Lee,* 6 Wheat. 109, 19 U. S. 113-114 (1821); F. Buller, An Introduction to the Law Relative to Trials at Nisi Prius *232

(7th ed. 1817); T. Peake, A Compendium of the Law of Evidence 38 (2d ed. 1806).

[Footnote 2/14]

The Court's decision in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation* is, on its facts, limited to the defensive use of collateral estoppel in patent cases. Abandonment of mutuality is a recent development. The case of *Bernhard v. Bank of America Nat. Trust & Sav. Assn.*, 19 Cal. 2d 807, 122 P.2d 892, generally considered the seminal case adopting the new approach, was not decided until 1942.

[Footnote 2/15]

*See* Henderson 302-303 ("In the England of 1790, the phrase *to direct a verdict' was common. Further, it was commonplace to instruct the jury `that the plaintiff was entitled to recover,' or `the plaintiff must have a verdict'")*; Scott, *Trial by Jury and the Reform of Civil Procedure*, 31 Harv.L.Rev. 669, 686 (1918) (cases cited therein).

[Footnote 2/16]

To demur, a party would admit the truth of all the facts adduced against him and every adverse inference that could be drawn therefrom, and the court would determine which party should receive judgment on the basis of these admitted facts and inferences. *See Slocum v. New York Life Ins. Co.*, 228 U. S. 364, 228 U. S. 388 (1913); *Gibson v. Hunter*, 2 H.Bl. 187, 126 Eng.Rep. 499 (N.P. 1793); Henderson 3305; Scott, *supra*, 439 U.S. 322fn2/15|>n. 15, at 683-684.

[Footnote 2/17]

The Court in *Gasoline Products* quoted Lord Mansfield, who stated that, when a verdict is correct as to one issue but erroneous as to another "*for form's sake, we must set aside the whole verdict. . . .'" Edie v. East India Co., 1 W. Bl. 295, 298 (K.B. 1761), quoted 283 U.S. at 283 U. S. 498.*

[Footnote 2/18]

I agree with the Court that "petitioners did not have a right to a jury trial in the equitable injunctive action brought by the SEC." *Ante* at 439 U. S. 338 n. 24.

[Footnote 2/19]

*Meeker v. Ambassador Oil Corp.*, 375 U. S. 160 (1963) (per curiam), is a case where the doctrine of collateral estoppel yielded to the right to a jury trial. In *Meeker,* plaintiffs asserted both equitable and legal claims, which presented common issues, and demanded a jury trial.

The trial court tried the equitable claim first, and decided that claim, and the common issues, adversely to plaintiffs. As a result, it held that plaintiffs were precluded from relitigating those same issues before a jury on their legal claim. 308 F.2d 875, 884 (CA10 1962). Plaintiffs appealed, alleging a denial of their right to a jury trial, but the Tenth Circuit affirmed the trial court. This Court reversed the Court of Appeals on the basis of *Beacon Theatres, Inc. v. Westover,* 359 U. S. 500 (1959), and *Dairy Queen, Inc. v. Wood,* 369 U. S. 469 (1962), even though, unlike those cases, the equitable action in *Meeker* already had been tried and the common issues determined by the court. Thus, even though the plaintiffs in *Meeker* had received a "full and fair" opportunity to try the common issues in the prior equitable action, they nonetheless were given the opportunity to retry those issues before a jury. Today's decision is totally inconsistent with *Meeker,* and the Court fails to explain this inconsistency.

[Footnote 2/20]

The Court's decision today may well extend to other areas, such as antitrust, labor, employment discrimination, consumer protection, and the like, where a private plaintiff may sue for damages based on the same or similar violations that are the subject of government actions.

[Footnote 2/21]

This is not to say that Congress cannot commit enforcement of statutorily created rights to an "administrative process or specialized court of equity." *Curtis v. Loether,* 415 U. S. 189, 415 U. S. 195 (1974); *see Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n,* 430 U. S. 442 (1977); *Katchen v. Landy,* 382 U. S. 323 (1966); *NLRB v. Jones & Laughlin Steel Corp.,* 301 U. S. 1 (1937).

[Footnote 2/22]

Restatement (Second) of Judgments § 88(2), Comment *d* (Tent. Draft No. 2, Apr. 15, 1975). Citing *Rachal v. Hill,* 435 F.2d 59 (CA5 1970), *cert. denied,* 403 U.S. 904 (1971), the Reporter's Note states:

"The differences between the procedures available in the first and second actions, while not sufficient to deny issue preclusion between the same parties, may warrant a refusal to carry over preclusion to an action involving another party."

Restatement, *supra* at 100.

[Footnote 2/23]

*See, e.g.,* Hearings on Recording of Jury Deliberations before the Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws of the Senate Committee on the Judiciary, 84th Cong., 1st Sess., 63-81 (1955) (thorough summary of arguments pro and con on jury trials and an extensive bibliography); H. Kalven & H. Zeisel, The American Jury 4 n. 2 (1966) (bibliography); Redish, Seventh Amendment Right to Jury Trial: A Study in the Irrationality of Rational Decision Making, 70 Nw.U.L.Rev. 486, 502-508 (1975) (discussion of arguments for and against juries).

[Footnote 2/24]

Much of the delay in jury trials is attributed to the jury selection, *voir dire,* and the charge. *See* H. Zeisel, H. Kalven, & B. Buchholz, Delay in the Court 79 (1959). None of these delaying factors will be avoided by today's decision.

## Materials

### Oral Arguments

Oral Argument - October 30, 1978

## Search This Case

**Google Scholar**      **Google Books**      **Google Web**

**Google News**

# Muncie, Indiana Lawyers
### Sponsored Listings

**Susan D. Rayl**

> EMIUM

View All

(317) 964-6000

**Indianapolis, IN**
Appeals & Appellate, Criminal Law, White Collar Crime



# Article 1. - Bill of Rights.

### PREAMBLE.

*TO THE END,* that justice be established, public order maintained, and liberty perpetuated; *WE,* the *People* of the *State of Indiana,* grateful to *ALMIGHTY GOD* for the free exercise of the right to choose our own form of government, do ordain this *Constitution.*

Section 1. WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the people have, at all times, an indefeasible right to alter and reform their government.
*(History: As Amended November 6, 1984).*

Section 2. All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences.
*(History: As Amended November 6, 1984).*

Section 3. No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience.

Section 4. No preference shall be given, by law, to any creed, religious society, or mode of worship; and no person shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent.
*(History: As Amended November 6, 1984).*

Section 5. No religious test shall be required, as a qualification for any office of trust or profit.

Section 6. No money shall be drawn from the treasury, for the benefit of any religious or theological institution.

Section 7. No person shall be rendered incompetent as a witness, in consequence of his opinions on matters of religion.

Section 8. The mode of administering an oath or affirmation, shall be such as may be most consistent with, and binding upon, the conscience of the person, to whom such oath or affirmation may be administered.

Section 9. No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print,

freely, on any subject whatever: but for the abuse of that right, every person shall be responsible.

Section 10. In all prosecutions for libel, the truth of the matters alleged to be libellous, may be given in justification.

Section 11. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

Section 12. All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.
*(History: As Amended November 6, 1984).*

Section 13. (a) In all criminal prosecutions, the accused shall have the right to a public trial, by an impartial jury, in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor.

(b) Victims of crime, as defined by law, shall have the right to be treated with fairness, dignity, and respect throughout the criminal justice process; and, as defined by law, to be informed of and present during public hearings and to confer with the prosecution, to the extent that exercising these rights does not infringe upon the constitutional rights of the accused.
*(History: As Amended November 5, 1996).*

Section 14. No person shall be put in jeopardy twice for the same offense. No person, in any criminal prosecution, shall be compelled to testify against himself.

Section 15. No person arrested, or confined in jail, shall be treated with unnecessary rigor.

Section 16. Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense.

Section 17. Offenses, other than murder or treason, shall be bailable by sufficient sureties. Murder or treason shall not be bailable, when the proof is evident, or the presumption strong.

Section 18. The penal code shall be founded on the principles of reformation, and not of vindictive justice.

Section 19. In all criminal cases whatever, the jury shall have the right to determine the law and the facts.

Section 20. In all civil cases, the right of trial by jury shall remain inviolate.

Section 21. No person's particular services shall be demanded, without just compensation. No person's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered. *(History: As Amended November 6, 1984).*

Section 22. The privilege of the debtor to enjoy the necessary comforts of life, shall be recognized by wholesome laws, exempting a reasonable amount of property from seizure or sale, for the payment of any debt or liability hereafter contracted: and there shall be no imprisonment for debt, except in case of fraud.

Section 23. The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens.

Section 24. *No ex post facto* law, or law impairing the obligation of contracts, shall ever be passed.

Section 25. No law shall be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution.

Section 26. The operation of the laws shall never be suspended, except by the authority of the General Assembly.

Section 27. The privilege of the writ of *habeas corpus* shall not be suspended, except in case of rebellion or invasion; and then, only if the public safety demand it.

Section 28. Treason against the State shall consist only in levying war against it, and in giving aid and comfort to its enemies.

Section 29. No person shall be convicted of treason, except on the testimony of two witnesses to the same overt act, or upon his confession in open court.

Section 30. No conviction shall work corruption of blood, or forfeiture of estate.

Section 31. No law shall restrain any of the inhabitants of the State from assembling together in a peaceable manner, to consult for their common good; nor from instructing their representatives; nor from applying to the General Assembly for redress of grievances.

Section 32. The people shall have a right to bear arms, for the defense of themselves and the State.

Section 33. The military shall be kept in strict subordination to the civil power.

Section 34. No soldier shall, in time of peace, be quartered in any house, without the consent of the owner; nor, in time of war, but in a manner to be prescribed by law.

Section 35. The General Assembly shall not grant any title of nobility, nor confer hereditary distinctions.

Section 36. Emigration from the State shall not be prohibited.

Section 37. There shall be neither slavery, nor involuntary servitude, within the State, otherwise than for the punishment of crimes, whereof the party shall have been duly convicted.
*(History: As Amended November 6, 1984).*

## Serving Jury Duty

# Jury service represents one of the most important civic responsibilities we have as citizens. When you fulfill your obligation for jury service, you are helping to protect our liberties and to preserve our system of justice.

# Campaign on "Jury Service: It's Your Duty"

Shows the importance of going to court when called

# Indiana Jury Service: Duty, Privilege, Honor

Jury orientation video

# History

The principle of a jury trial was first established in the year 1215 in England when King John signed the Magna Carta.

In Indiana, the right to a trial by jury is protected by the Bill of Rights of our state constitution.

- Article 1 § 13 (http://iga.in.gov/legislative/laws/const/) (a) "In all criminal prosecutions, the accused shall have the right to a public trial, by an impartial jury..."
- Article 1 § 20 (http://iga.in.gov/legislative/laws/const/) (a) "In all civil cases, the right of trial by jury shall remain inviolate [undisturbed]."

# Eligibility for Jury Duty

In order to be eligible for jury duty, you must be:

- A citizen of the United States

- At least 18 years of age
- A resident of the county in which you are to serve as a juror
- Able to communicate in English
- Not suffering from a physical or mental disability that prevents you from performing your duties as a juror in a satisfactory manner
- Not under guardianship because of mental incapacity
- Not a person who has had your right to vote revoked and not yet reinstated as the result of a felony conviction
- Not a law enforcement officer, if the trial is for a criminal case

(See Indiana Jury Rule 5 (http://www.in.gov/judiciary/rules/jury/index.html#r5))

# Deferral of Jury Service

Indiana Jury Rule 7 permits the judge or judge's designee to authorize deferral of jury service upon a showing of hardship, extreme inconvenience, or necessity. Generally, courts do not require you to appear in court to request a deferral. There are a variety of ways in which to contact the court to request a deferral including by telephone, by electronic mail (where available), in writing, or in person. For more information or questions, please contact the court that sent you the notice and/or summons for jury service.

(See Indiana Jury Rule 7 (http://www.in.gov/judiciary/rules/jury/index.html#r7))

# More Information

If you are called for jury duty and you would like more information, you should seek that information through the local trial court to which you were called for duty. Following is a list of webpages detailing jury information for those Indiana counties that post this information online:

- Allen County (https://allencountyijuror.org/main.asp?id=index)
- Boone Circuit Court (http://www.boonecounty.in.gov/Offices/Circuit-Court)
- Boone Superior Court I (http://www.boonecounty.in.gov/Offices/Superior-Court-I)
- Hamilton Circuit and Superior Courts (http://www.hamiltoncounty.in.gov/704/Jury-Duty)
- Marion Superior Court (https://www.indy.gov/activity/jury-duty)

- Vanderburgh County (http://www.evansvillegov.org/county/topic/index.php?topicid=444)

# Jury Service in Federal District Courts

This web page is designed to give you some basic information about jury service in Indiana state trial courts. The policies and procedures for jury service in the Federal District Courts may differ from the information on this page. For information regarding jury service in the Federal District Courts, please refer to the following web sites:

- Northern District of Indiana (https://www.innd.uscourts.gov/jury-information)
- Southern District of Indiana (http://www.insd.uscourts.gov/juror-information)

# IN Supreme Court rules in favor of jury trials for civil confiscation cases

A convicted Indiana man can now seek a trial to decide the fate of the cash seized during his arrest

**Associated Press**

Published November 2, 2023 12:34pm EDT





**Fox News Flash top headlines for November 2**

Fox News Flash top headlines are here. Check out what's clicking on Foxnews.com.

Indiana residents are entitled to a trial by jury when the government seeks to confiscate their money or property through the civil forfeiture process, the state's high court ruled.

In a 5-0 decision Tuesday, the Indiana Supreme Court found that the history of civil forfeiture proceedings, from medieval England to Indiana statehood, weighs in favor of letting a jury decide whether property allegedly associated with a crime should be seized by the state, The Times of Northwest Indiana reported.

"We hold that a claimant in an action brought under Indiana's civil forfeiture statute has a constitutional right to trial by jury," Justice Christopher Goff wrote on behalf of the court.

**INDIANA MAN AWARDED $25.5 MILLION IN CIVIL RIGHTS VIOLATION SUIT INVOLVING POLICE OFFICER**



The justices' unanimous ruling reinforces a fundamental constitutional guarantee, an attorney said. (Fox News)

**INDIANA SUPREME COURT DECLINES IMMEDIATE CONSIDERATION OF CHALLENGE TO ABORTION BAN**

Tuesday's ruling also establishes a new test for the jury-trial right contained in Article I, Section 20 of the Indiana Constitution.

The decision stems from a case involving Alucious Kizer, who was convicted in December 2022 of three counts of drug dealing and sentenced to a total of 20 years in state prison.

Kizer, 45, will now have an opportunity to get the jury trial he initially requested more than two years ago to determine whether the $2,435 in cash recovered during his arrest for drug dealing in Allen County should be forfeited.

Kizer was represented before the state Supreme Court by the Virginia-based Institute for Justice, which has repeatedly challenged Indiana's civil forfeiture laws, including authorities' seizure of a Land Rover belonging to Tyson Timbs of Marion, Indiana, who was arrested in 2013 for selling $400 in drugs. In that case, the U.S. Supreme Court ruled in 2019 that the U.S. Constitution's ban on excessive fines applies to the states.

More than two years after the high court's ruling, the Indiana Supreme Court ruled that Timbs could keep his $35,000 vehicle.

**EX-INDIANA OFFICER GETS YEAR IN FEDERAL PRISON FOR ASSAULT ON HANDCUFFED SUSPECT**

Sam Gedge, the senior attorney for the Institute for Justice, argued Kizer's case before the Indiana Supreme Court. He said Tuesday that the justices' unanimous ruling reinforces a fundamental constitutional guarantee.

"The right to a trial by jury of our peers is core to our system of justice. And for centuries, courts across the nation have confirmed the obvious: When the government sues to forfeit your property, you're entitled to make your case to a jury," Gedge said.

Indiana Attorney General Todd Rokita had argued in Kizer's case that no right to a jury trial exists under the federal or state constitutions and that a trial by a judge is sufficient, since civil forfeiture of property in Indiana is a purely statutory procedure of relatively modern vintage.

The Associated Press emailed Rokita's office Wednesday seeking comment.



**Granted:**
October 20, 2003

**Argued:**
March 23, 2004

**Decided:**
June 24, 2004

## Syllabus

**SYLLABUS**
**OCTOBER TERM, 2003**
**BLAKELY V. WASHINGTON**

**SUPREME COURT OF THE UNITED STATES**

BLAKELY *v.* WASHINGTON

certiorari to the court of appeals of washington

No. 02–1632. Argued March 23, 2004—Decided June 24, 2004

Petitioner pleaded guilty to kidnaping his estranged wife. The facts admitted in his plea, standing alone, supported a maximum sentence of 53 months, but the judge imposed a 90-month sentence after finding that petitioner had acted with deliberate cruelty, a statutorily enumerated ground for departing from the standard range. The Washington Court of Appeals affirmed, rejecting petitioner's argument that the sentencing procedure deprived him of his federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence.

*Held:* Because the facts supporting petitioner's exceptional sentence were neither admitted by petitioner nor found by a jury, the sentence violated his Sixth Amendment right to trial by jury. Pp. 5–18.

(a) This case requires the Court to apply the rule of *Apprendi* v. *New Jersey,* 530 U. S. 466, 490, that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The relevant statutory maximum for *Apprendi* purposes is the maximum a judge may impose based solely on the facts reflected in the jury verdict or admitted by the defendant. Here, the judge could not have imposed the 90-month sentence based solely on the facts admitted in the guilty plea, because Washington law requires an exceptional sentence to be based on factors other than those used in computing the standard-range sentence. Petitioner's sentence is not analogous to those upheld in *McMillan* v. *Pennsylvania,* 477 U. S. 79, and *Williams* v. *New York,* 337 U. S. 241, which were not greater than what state law authorized based on the verdict alone. Regardless of whether the judge's authority to impose the enhanced sentence depends on a judge's finding a specified fact, one of several specified facts, or *any* aggravating fact, it remains the case that the jury's verdict alone does not authorize the sentence. Pp. 5–9.

(b) This Court's commitment to *Apprendi* in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the fundamental constitutional right of jury trial. Pp. 9–12.

(c) This case is not about the constitutionality of determinate sentencing, but only about how it can be implemented in a way that respects the Sixth Amendment. The Framers' paradigm for criminal justice is the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. That can be preserved without

# Blakely v. Washington, 542 U.S. 296 (2004)

Overview    Opinions    Materials

and in which Rehnquist, C. J., and Kennedy, J., joined except as to Part IV–B. Kennedy, J., filed a dissenting opinion, in which Breyer, J., joined. Breyer, J., filed a dissenting opinion, in which O'Connor, J., joined.

**Show Less**

## Opinions

**Opinion (Scalia)**   Dissent (O'Connor)   Dissent (Breyer)

Dissent (Kennedy)

Hear Opinion Announcement - June 24, 2004

**OPINION OF THE COURT**
**BLAKELY V. WASHINGTON**
**542 U. S. _____ (2004)**

**SUPREME COURT OF THE UNITED STATES**
**NO. 02-1632**

RALPH HOWARD BLAKELY, Jr., PETITIONER *v.* WASHINGTON

on writ of certiorari to the court of appeals of washington, division 3

[June 24, 2004]

 Justice Scalia delivered the opinion of the Court.

 Petitioner Ralph Howard Blakely, Jr., pleaded guilty to the kidnaping of his estranged wife. The facts admitted in his plea, standing alone, supported a maximum sentence of 53 months. Pursuant to state law, the court imposed an "exceptional" sentence of 90 months after making a judicial determination that he had acted with "deliberate cruelty." App. 40, 49. We consider whether this violated petitioner's Sixth Amendment right to trial by jury.

I

 Petitioner married his wife Yolanda in 1973. He was evidently a difficult man to live with, having been diagnosed at various times with psychological and personality disorders including paranoid schizophrenia. His wife ultimately filed for divorce. In 1998, he abducted her from their orchard home in Grant County, Washington, binding her with duct tape and forcing her at knifepoint into a wooden box in the bed of his pickup truck. In the process, he implored her to dismiss the divorce suit and related trust proceedings.

 When the couple's 13-year-old son Ralphy returned home from school, petitioner ordered him to follow in another car, threatening to harm Yolanda with a shotgun if he did not do so. Ralphy escaped and sought help when they stopped at a gas station, but petitioner continued on with Yolanda to a friend's house in Montana. He was finally arrested after the friend called the police.

 The State charged petitioner with first-degree kidnaping, Wash. Rev. Code Ann. §9 A. 40.020(1) (2000).[Footnote 1] Upon reaching a plea agreement, however, it reduced the charge to second-degree kidnaping involving domestic violence and use of a firearm, see

§§9 A. 40.030(1), 10.99.020(3)(p), 9.94 A. 125.[Footnote 2] Petitioner entered a guilty plea admitting the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but no other relevant facts.

   The case then proceeded to sentencing. In Washington, second-degree kidnaping is a class B felony. §9 A. 40.030(3). State law provides that "[n]o person convicted of a [class B] felony shall be punished by confinement … exceeding … a term of ten years." §9 A. 20.021(1)(b). Other provisions of state law, however, further limit the range of sentences a judge may impose. Washington's Sentencing Reform Act specifies, for petitioner's offense of second-degree kidnaping with a firearm, a "standard range" of 49 to 53 months. See §9.94 A. 320 (seriousness level V for second-degree kidnaping); App. 27 (offender score 2 based on §9.94A.360); §9.94A.310(1), box 2–V (standard range of 13–17 months); §9.94A.310(3)(b) (36-month firearm enhancement).[Footnote 3] A judge may impose a sentence above the standard range if he finds "substantial and compelling reasons justifying an exceptional sentence." §9.94A.120(2). The Act lists aggravating factors that justify such a departure, which it recites to be illustrative rather than exhaustive. §9.94 A. 390. Nevertheless, "[a] reason offered to justify an exceptional sentence can be considered only if it takes into account factors other than those which are used in computing the standard range sentence for the offense." *State* v. *Gore*, 143 Wash. 2d 288, 315–316, 21 P. 3d 262, 277 (2001). When a judge imposes an exceptional sentence, he must set forth findings of fact and conclusions of law supporting it. §9.94A.120(3). A reviewing court will reverse the sentence if it finds that "under a clearly erroneous standard there is insufficient evidence in the record to support the reasons for imposing an exceptional sentence." *Gore, supra*, at 315, 21 P. 3d, at 277 (citing §9.94A.210(4)).

   Pursuant to the plea agreement, the State recommended a sentence within the standard range of 49 to 53 months. After hearing Yolanda's description of the kidnaping, however, the judge rejected the State's recommendation and imposed an exceptional sentence of 90 months—37 months beyond the standard maximum. He justified the sentence on the ground that petitioner had acted with "deliberate cruelty," a statutorily enumerated ground for departure in domestic-violence cases. §9.94A.390(2)(h)(iii). [Footnote 4]

   Faced with an unexpected increase of more than three years in his sentence, petitioner objected. The judge accordingly conducted a 3-day bench hearing featuring testimony from petitioner, Yolanda, Ralphy, a police officer, and medical experts. After the hearing, he issued 32 findings of fact, concluding:

   "The defendant's motivation to commit kidnapping was complex, contributed

to by his mental condition and personality disorders, the pressures of the divorce litigation, the impending trust litigation trial and anger over his troubled interpersonal relationships with his spouse and children. While he misguidedly intended to forcefully reunite his family, his attempt to do so was subservient to his desire to terminate lawsuits and modify title ownerships to his benefit.

Â Â Â â€œThe defendantâ€™s methods were more homogeneous than his motive. He used stealth and surprise, and took advantage of the victimâ€™s isolation. He immediately employed physical violence, restrained the victim with tape, and threatened her with injury and death to herself and others. He immediately coerced the victim into providing information by the threatening application of a knife. He violated a subsisting restraining order.â€ App. 48â€"49.

The judge adhered to his initial determination of deliberate cruelty.

Â Â Â Petitioner appealed, arguing that this sentencing procedure deprived him of his federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence. The State Court of Appeals affirmed, 111 Wash. App. 851, 870â€"871, 47 P.Â 3d 149, 159 (2002), relying on the Washington Supreme Courtâ€™s rejection of a similar challenge in *Gore, supra,* at 311â€"315, 21 P.Â 3d, at 275â€"277. The Washington Supreme Court denied discretionary review. 148 Wash. 2d 1010, 62 P.Â 3d 889 (2003). We granted certiorari. 540 U. S. 965 (2003).

## II

Â Â Â This case requires us to apply the rule we expressed in *Apprendi* v. *New Jersey,* 530 U. S. 466, 490 (2000): â€œOther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.â€ This rule reflects two longstanding tenets of common-law criminal jurisprudence: that the â€œtruth of every accusationâ€ against a defendant â€œshould afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours,â€ 4 W. Blackstone, Commentaries on the Laws of England 343 (1769), and that â€œan accusation which lacks any particular fact which the law makes essential to the punishment is â€¦ no accusation within the requirements of the common law, and it is no accusation in reason,â€ 1 J. Bishop, Criminal Procedure Â§87, p. 55 (2d ed. 1872).[Footnote 5] These principles have been acknowledged by courts and treatises since the earliest days of graduated sentencing; we compiled the relevant authorities in *Apprendi,* see 530 U. S., at 476â€"483, 489â€"490, n.Â 15; *id.,* at 501â€"518 (Thomas, J., concurring), and need not repeat them here.[Footnote 6]

A A A *Apprendi* involved a New Jersey hate-crime statute that authorized a 20-year sentence, despite the usual 10-year maximum, if the judge found the crime to have been committed "â€˜with a purpose to intimidate â€¦ because of race, color, gender, handicap, religion, sexual orientation or ethnicity.â€™â€ â€ *Id.*, at 468â€"469 (quoting N.Â J. Stat. Ann. Â§2C:44â€"3(e) (West Supp. 1999â€"2000)). In *Ring* v. *Arizona,* 536 U. S. 584, 592â€"593, and n.Â 1 (2002), we applied *Apprendi* to an Arizona law that authorized the death penalty if the judge found one of ten aggravating factors. In each case, we concluded that the defendantâ€™s constitutional rights had been violated because the judge had imposed a sentence greater than the maximum he could have imposed under state law without the challenged factual finding. *Apprendi, supra,* at 491â€"497; *Ring, supra,* at 603â€"609.

Â Â Â In this case, petitioner was sentenced to more than three years above the 53-month statutory maximum of the standard range because he had acted with â€œdeliberate cruelty.â€ The facts supporting that finding were neither admitted by petitioner nor found by a jury. The State nevertheless contends that there was no *Apprendi* violation because the relevant â€œstatutory maximumâ€ is not 53 months, but the 10-year maximum for class B felonies in Â§9 A. 20.021(1)(b). It observes that no exceptional sentence may exceed that limit. See Â§9.94 A. 420. Our precedents make clear, however, that the â€œstatutory maximumâ€ for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* See *Ring, supra,* at 602 (â€œ â€˜the maximum he would receive if punished according to the facts reflected in the jury verdict aloneâ€™â€ â€ (quoting *Apprendi, supra,* at 483)); *Harris* v. *United States,* 536 U. S. 545, 563 (2002) (plurality opinion) (same); cf. *Apprendi, supra,* at 488 (facts admitted by the defendant). In other words, the relevant â€œstatutory maximumâ€ is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the juryâ€™s verdict alone does not allow, the jury has not found all the facts â€œwhich the law makes essential to the punishment,â€ Bishop, *supra,* Â§87, at 55, and the judge exceeds his proper authority.

Â Â Â The judge in this case could not have imposed the exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea. Those facts alone were insufficient because, as the Washington Supreme Court has explained, â€œ[a] reason offered to justify an exceptional sentence can be considered only if it takes into account factors other than those which are used in computing the standard range sentence for the offense,â€ *Gore,* 143 Wash. 2d, at 315â€"316, 21 P.Â 3d, at 277, which in this case included the elements of second-degree kidnaping and the use of a firearm, see Â§Â§9.94 A. 320, 9.94A.310(3)(b). [Footnote 7] Had the judge imposed the 90-month sentence solely on the basis of the plea, he would have been reversed. See Â§9.94A.210(4). The â€œmaximum sentenceâ€ is no more 10

years here than it was 20 years in *Apprendi* (because that is what the judge could have imposed upon finding a hate crime) or death in *Ring* (because that is what the judge could have imposed upon finding an aggravator).

Â Â Â The State defends the sentence by drawing an analogy to those we upheld in *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986), and *Williams* v. *New York*, 337 U. S. 241 (1949). Neither case is on point. *McMillan* involved a sentencing scheme that imposed a statutory *minimum* if a judge found a particular fact. 477 U. S., at 81. We specifically noted that the statute â€œdoes not authorize a sentence in excess of that otherwise allowed for [the underlying] offense.â€ *Id.*, at 82; cf. *Harris*, *supra*, at 567. *Williams* involved an indeterminate-sentencing regime that allowed a judge (but did not compel him) to rely on facts outside the trial record in determining whether to sentence a defendant to death. 337 U. S., at 242â€"243, and n.Â 2. The judge could have â€œsentenced [the defendant] to death giving no reason at all.â€ *Id.*, at 252. Thus, neither case involved a sentence greater than what state law authorized on the basis of the verdict alone.

Â Â Â Finally, the State tries to distinguish *Apprendi* and *Ring* by pointing out that the enumerated grounds for departure in its regime are illustrative rather than exhaustive. This distinction is immaterial. Whether the judgeâ€™s authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring*), or *any* aggravating fact (as here), it remains the case that the juryâ€™s verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact.[Footnote 8]

Â Â Â Because the Stateâ€™s sentencing procedure did not com- ply with the Sixth Amendment, petitionerâ€™s sentence is invalid.[Footnote 9]

III

Â Â Â Our commitment to *Apprendi* in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the peopleâ€™s ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed. 1981) (describing the jury as â€œsecur[ing] to the people at large, their just and rightful controul in the judicial departmentâ€); John Adams, Diary Entry (Feb. 12, 1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850) (â€œ[T]he common people, should have as complete a control â€¦ in every judgment of a court of judicatureâ€ as in the legislature); Letter from Thomas Jefferson to the AbbÃ© Arnoux (July 19, 1789),

reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958) (â€œWere I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislativeâ€); *Jones* v. *United States,* 526 U. S. 227, 244â€“248 (1999). *Apprendi* carries out this design by ensuring that the judgeâ€™s authority to sentence derives wholly from the juryâ€™s verdict. Without that restriction, the jury would not exercise the control that the Framers intended.

 Â Â Â Those who would reject *Apprendi* are resigned to one of two alternatives. The first is that the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factorsâ€"no matter how much they may increase the punishmentâ€"may be found by the judge. This would mean, for example, that a judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing the firearm used to commit itâ€"or of making an illegal lane change while fleeing the death scene. Not even *Apprendi*â€™s critics would advocate this absurd result. Cf. 530 U. S., at 552â€“553 (Oâ€™Connor, J., dissenting). The jury could not function as circuitbreaker in the Stateâ€™s machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish.[Footnote 10]

 Â Â Â The second alternative is that legislatures may establish legally essential sentencing factors *within limits*â€"limits crossed when, perhaps, the sentencing factor is a â€œtail which wags the dog of the substantive offense.â€ *McMillan,* 477 U. S., at 88. What this means in operation is that the law must not go *too far*â€"it must not exceed the judicial estimation of the proper role of the judge.

 Â Â Â The subjectivity of this standard is obvious. Petitioner argued below that second-degree kidnaping with deliberate cruelty was essentially the same as first-degree kidnaping, the very charge he had avoided by pleading to a lesser offense. The court conceded this might be so but held it irrelevant. See 111 Wash. App., at 869, 47 P.Â 3d, at 158.[Footnote 11] Petitionerâ€™s 90-month sentence exceeded the 53-month standard maximum by almost 70%; the Washington Supreme Court in other cases has upheld exceptional sentences 15 times the standard maximum. See *State* v. *Oxborrow,* 106 Wash. 2d 525, 528, 533, 723 P.Â 2d 1123, 1125, 1128 (1986) (15-year exceptional sentence; 1-year standard maximum sentence); *State* v. *Branch,* 129 Wash. 2d 635, 650, 919 P.Â 2d 1228, 1235 (1996) (4-year exceptional sentence; 3-month standard maximum sentence). Did the court go *too far* in any of these cases? There is no answer that legal analysis can provide. With *too far* as the yardstick, it is always possible to disagree with such judgments and never to refute them.

 Â Â Â Whether the Sixth Amendment incorporates this manipulable standard rather than

*Apprendi*â€™s bright-line rule depends on the plausibility of the claim that the Framers would have left definition of the scope of jury power up to judgesâ€™ intuitive sense of how far is *too far*. We think that claim not plausible at all, because the very reason the Framers put a jury-trial guarantee in the Constitution is that they were unwilling to trust government to mark out the role of the jury.

IV

Â Â Â By reversing the judgment below, we are not, as the State would have it, â€œfind[ing] determinate sentencing schemes unconstitutional.â€ Brief for Respondent 34. This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment. Several policies prompted Washingtonâ€™s adoption of determinate sentencing, including proportionality to the gravity of the offense and parity among defendants. See Wash. Rev. Code Ann. Â§9.94 A. 010 (2000). Nothing we have said impugns those salutary objectives.

Â Â Â Justice Oâ€™Connor argues that, because determinate sentencing schemes involving judicial factfinding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. *Post*, at 1â€“10. This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the juryâ€™s traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentenceâ€"and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentenceâ€"and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

Â Â Â But even assuming that restraint of judicial power unrelated to the juryâ€™s role is a Sixth Amendment objective, it is far from clear that *Apprendi* disserves that goal. Determinate judicial-factfinding schemes entail less judicial power than indeterminate schemes, but more judicial power than determinate *jury*-factfinding schemes. Whether *Apprendi* increases judicial power overall depends on what States with determinate judicial-

factfinding schemes would do, given the choice between the two alternatives. Justice O'Connor simply assumes that the net effect will favor judges, but she has no empirical basis for that prediction. Indeed, what evidence we have points exactly the other way: When the Kansas Supreme Court found *Apprendi* infirmities in that State's determinate-sentencing regime in *State* v. *Gould*, 271 Kan. 394, 404–414, 23 P. 3d 801, 809–814 (2001), the legislature responded not by reestablishing indeterminate sentencing but by applying *Apprendi*'s requirements to its current regime. See Act of May 29, 2002, ch. 170, 2002 Kan. Sess. Laws pp. 1018–1023 (codified at Kan. Stat. Ann. §21–4718 (2003 Cum. Supp.)); Brief for Kansas Appellate Defender Office as *Amicus Curiae* 3–7. The result was less, not more, judicial power.

   Justice Breyer argues that *Apprendi* works to the detriment of criminal defendants who plead guilty by depriving them of the opportunity to argue sentencing factors to a judge. *Post*, at 4–5. But nothing prevents a defendant from waiving his *Apprendi* rights. When a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding. See *Apprendi*, 530 U. S., at 488; *Duncan* v. *Louisiana*, 391 U. S. 145, 158 (1968). If appropriate waivers are procured, States may continue to offer judicial factfinding as a matter of course to all defendants who plead guilty. Even a defendant who stands trial may consent to judicial factfinding as to sentence enhancements, which may well be in his interest if relevant evidence would prejudice him at trial. We do not understand how *Apprendi* can possibly work to the detriment of those who are free, if they think its costs outweigh its benefits, to render it inapplicable.[Footnote 12]

   Nor do we see any merit to Justice Breyer's contention that *Apprendi* is unfair to criminal defendants because, if States respond by enacting "17-element robbery crime[s]," prosecutors will have more elements with which to bargain. *Post*, at 4–5, 9 (citing Bibas, Judicial Fact-Finding and Sentence Enhancements in a World of Guilty Pleas, 110 Yale L. J. 1097 (2001)). Bargaining already exists with regard to sentencing factors because defendants can either stipulate or contest the facts that make them applicable. If there is any difference between bargaining over sentencing factors and bargaining over elements, the latter probably favors the defendant. Every new element that a prosecutor can threaten to charge is also an element that a defendant can threaten to contest at trial and make the prosecutor prove beyond a reasonable doubt. Moreover, given the sprawling scope of most criminal codes, and the power to affect sentences by making (even nonbinding) sentencing recommendations, there is already no shortage of *in terrorem* tools at prosecutors' disposal. See King & Klein, *Apprendi* and Plea Bargaining, 54 Stan. L. Rev. 295, 296 (2001) ("Every prosecutorial bargaining chip mentioned by Professor Bibas existed pre-*Apprendi* exactly as it does post-*Apprendi*").

    Any evaluation of *Apprendi*'s "fairness" to criminal defendants must compare it with the regime it replaced, in which a defendant, with no warning in either his indictment or plea, would routinely see his maximum potential sentence balloon from as little as five years to as much as life imprisonment, see 21 U. S. C. §§841(b)(1)(A), (D),[Footnote 13] based not on facts proved to his peers beyond a reasonable doubt, but on facts extracted after trial from a report compiled by a probation officer who the judge thinks more likely got it right than got it wrong. We can conceive of no measure of fairness that would find more fault in the utterly speculative bargaining effects Justice Breyer identifies than in the regime he champions. Suffice it to say that, if such a measure exists, it is not the one the Framers left us with.

    The implausibility of Justice Breyer's contention that *Apprendi* is unfair to criminal defendants is exposed by the lineup of *amici* in this case. It is hard to believe that the National Association of Criminal Defense Lawyers was somehow duped into arguing for the wrong side. Justice Breyer's only authority asking that defendants be protected from *Apprendi* is an article written not by a criminal defense lawyer but by a law professor and former prosecutor. See *post*, at 4–5 (citing Bibas, *supra*); Association of American Law Schools Directory of Law Teachers 2003–2004, p. 319.

    Justice Breyer also claims that *Apprendi* will attenuate the connection between "real criminal conduct and real punishment" by encouraging plea bargaining and by restricting alternatives to adversarial factfinding. *Post*, at 7–8, 11–12. The short answer to the former point (even assuming the questionable premise that *Apprendi* does encourage plea bargaining, but see *supra*, at 14, and n. 12) is that the Sixth Amendment was not written for the benefit of those who choose to forgo its protection. It guarantees the *right* to jury trial. It does not guarantee that a particular number of jury trials will actually take place. That more defendants elect to waive that right (because, for example, government at the moment is not particularly oppressive) does not prove that a constitutional provision guaranteeing *availability* of that option is disserved.

    Justice Breyer's more general argument—that *Apprendi* undermines alternatives to adversarial factfinding—is not so much a criticism of *Apprendi* as an assault on jury trial generally. His esteem for "non-adversarial" truth-seeking processes, *post*, at 12, supports just as well an argument against either. Our Constitution and the common-law traditions it entrenches, however, do not admit the contention that facts are better discovered by judicial inquisition than by adversarial testing before a jury. See 3 Blackstone, Commentaries, at 373–374, 379–381. Justice Breyer may be convinced of the equity of the regime he favors, but his views are not the ones we are bound to uphold.

Â Â Â Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice. One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course. There is not one shred of doubt, however, about the Framersâ€™ paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. As *Apprendi* held, every defendant has the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment. Under the dissentersâ€™ alternative, he has no such right. That should be the end of the matter.

\* \* \*

Â Â Â Petitioner was sentenced to prison for more than three years beyond what the law allowed for the crime to which he confessed, on the basis of a disputed finding that he had acted with â€œdeliberate cruelty.â€ The Framers would not have thought it too much to demand that, before depriving a man of three more years of his liberty, the State should suffer the modest inconvenience of submitting its accusation to â€œthe unanimous suffrage of twelve of his equals and neighbours,â€ 4 Blackstone, Commentaries, at 343, rather than a lone employee of the State.

Â Â Â The judgment of the Washington Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

Footnote 1 Â Parts of Washingtonâ€™s criminal code have been recodified and amended. We cite throughout the provisions in effect at the time of sentencing.

Footnote 2 Â Petitioner further agreed to an additional charge of second-degree assault involving domestic violence, Wash. Rev. Code Ann. Â§Â§9 A. 36.021(1)(c), 10.99.020(3)(b) (2000). The 14-month sentence on that count ran concurrently and is not relevant here.

Footnote 3 Â The domestic-violence stipulation subjected petitioner to such measures as a â€œno-contactâ€ order, see Â§10.99.040, but did not increase the standard range of his sentence.

Footnote 4 Â The judge found other aggravating factors, but the Court of Appeals questioned their validity under state law and their independent sufficiency to support the extent of the departure. See 111 Wash. App. 851, 868â€“870, and n.Â 3, 47 P.Â 3d 149, 158â€“159, and n.Â 3 (2002). It affirmed the sentence solely on the finding of domestic violence with

deliberate cruelty. *Ibid.* We therefore focus only on that factor.

Footnote 5 Â Justice Breyer cites Justice Oâ€™Connorâ€™s *Apprendi* dissent for the point that this Bishop quotation means only that indictments must charge facts that trigger statutory aggravation of a common-law offense. *Post,* at 14 (dissenting opinion). Of course, as he notes, Justice Oâ€™Connor was referring to an entirely different quotation, from *Archboldâ€™s* treatise. See 530 U. S., at 526 (citing J. Archbold, Pleading and Evidence in Criminal Cases 51, 188 (15th ed. 1862)). Justice Breyer claims the two are â€œsimilar,â€ *post,* at 14, but they are as similar as chalk and cheese. Bishop was not â€œaddressingâ€ the â€œproblemâ€ of statutes that aggravate common-law offenses. *Ibid.* Rather, the entire chapter of his treatise is devoted to the point that â€œevery fact which is legally essential to the punishmentâ€ must be charged in the indictment and proved to a jury. 1 J. Bishop, Criminal Procedure, ch. 6, pp. 50â€"56 (2d ed. 1872). As one â€œexampleâ€ of this principle (appearing several pages before the language we quote in text above), he notes a statute aggravating common-law assault. *Id.,* Â§82, at 51â€"52. But nowhere is there the slightest indication that his general principle was *limited* to that example. Even Justice Breyerâ€™s academic supporters do not make *that* claim. See Bibas, Judicial Fact-Finding and Sentence Enhancements in a World of Guilty Pleas, 110 Yale L.Â J. 1097, 1131â€"1132 (2001) (conceding that Bishopâ€™s treatise supports *Apprendi,* while criticizing its â€œnatural-law theorizingâ€).

Footnote 6 Â As to Justice Oâ€™Connorâ€™s criticism of the quantity of historical support for the *Apprendi* rule, *post,* at 10 (dissenting opinion): It bears repeating that the issue between us is not *whether* the Constitution limits Statesâ€™ authority to reclassify elements as sentencing factors (we all agree that it does); it is only which line, ours or hers, the Constitution draws. Criticism of the quantity of evidence favoring our alternative would have some force if it were accompanied by *any* evidence favoring hers. Justice Oâ€™Connor does not even provide a coherent alternative meaning for the jury-trial guarantee, unless one considers â€œwhatever the legislature chooses to leave to the jury, so long as it does not go too farâ€ coherent. See *infra,* at 9â€"12.

Footnote 7 Â The State does not contend that the domestic-violence stipulation alone supports the departure. That the statute lists domestic violence as grounds for departure only when combined with some other aggravating factor suggests it could not. See Â§Â§9.94A.390(2)(h)(i)â€"(iii).

Footnote 8 Â Nor does it matter that the judge must, after finding aggravating facts, make a judgment that they present a compelling ground for departure. He cannot make that judgment without finding some facts to support it beyond the bare elements of the offense. Whether the judicially determined facts *require* a sentence enhancement or merely *allow* it,

the verdict alone does not authorize the sentence.

Footnote 9 Â The United States, as *amicus curiae*, urges us to affirm. It notes differences between Washington's sentencing regime and the Federal Sentencing Guidelines but questions whether those differences are constitutionally significant. See Brief for United States as *Amicus Curiae* 25–30. The Federal Guidelines are not before us, and we express no opinion on them.

Footnote 10 Â Justice O'Connor believes that a "built-in political check" will prevent lawmakers from manipulating offense elements in this fashion. *Post*, at 10. But the many immediate practical advantages of judicial factfinding, see *post*, at 5–7, suggest that political forces would, if anything, pull in the opposite direction. In any case, the Framers' decision to entrench the jury-trial right in the Constitution shows that they did not trust government to make political decisions in this area.

Footnote 11 Â Another example of conversion from separate crime to sentence enhancement that Justice O'Connor evidently does not consider going "too far" is the obstruction-of-justice enhancement, see *post*, at 6–7. Why perjury during trial should be grounds for a judicial sentence enhancement on the underlying offense, rather than an entirely separate offense to be found by a jury beyond a reasonable doubt (as it has been for centuries, see 4 W. Blackstone, Commentaries on the Laws of England 136–138 (1769)), is unclear.

Footnote 12 Â Justice Breyer responds that States are not *required* to give defendants the option of waiving jury trial on some elements but not others. *Post*, at 8–9. True enough. But why would the States that he asserts we are coercing into hard-heartedness—that is, States that *want* judge-pronounced determinate sentencing to be the norm but we won't let them—want to prevent a defendant from *choosing* that regime? Justice Breyer claims this alternative may prove "too expensive and unwieldy for States to provide," *post*, at 9, but there is no obvious reason why forcing defendants to choose between contesting all elements of his hypothetical 17-element robbery crime and contesting none of them is less expensive than also giving them the third option of pleading guilty to some elements and submitting the rest to judicial factfinding. Justice Breyer's argument rests entirely on a speculative prediction about the number of defendants likely to choose the first (rather than the second) option if denied the third.

Footnote 13 Â To be sure, Justice Breyer and the other dissenters would forbid those increases of sentence that violate the constitutional principle that tail shall not wag dog. The source of this principle is entirely unclear. Its precise effect, if precise effect it has, is presumably to require that the ratio of sentencing-factor add-on to basic criminal sentence be no greater than the ratio of caudal vertebrae to body in the breed of canine with the

longest tail. Or perhaps no greater than the average such ratio for all breeds. Or perhaps the median. Regrettably, *Apprendi* has prevented full development of this line of jurisprudence.

## Materials

### Oral Arguments

Oral Argument - March 23, 2004

## Search This Case

**Google Scholar**          **Google Books**          **Google Web**

**Google News**

# Muncie, Indiana Lawyers
## Sponsored Listings



**Susan D. Rayl**

> ‹

View All
PREMIUM

(317) 964-6000

**Indianapolis, IN**
Appeals & Appellate, Criminal Law, White Collar Crime

# Argument recap: Just what does Apprendi mean?

 By **Lyle Denniston**
on Jan 14, 2013 at 1:45 pm

**Share**

**Analysis**

After taking an obligatory look at whether the Supreme Court should feel bound by its past precedents, the Justices on Monday moved into an issue clearly of more interest to them: what do they need to do to protect the role of juries in laying the groundwork for criminal sentences?  This inquiry turned into a combative discussion of just what the Court meant in 2000 in giving jurors a much-enhanced role when their verdicts trigger the fixing of sentences — the historic decision in **Apprendi v. New Jersey**.

The Justices who were opposed to expanding Apprendi argued that it dealt singularly with curbing judges who decide to impose a sentence beyond the top limit set by the legislature, while the Justices who seemed ready to push Apprendi a bit further contended that it should mean that increasing a convicted individual's potential sentence should depend upon what the jury found, not the judge.  There did not seem to be a middle ground.  The two lawyers arguing the case were just as far apart.

The case of **Alleyne v. United States** (docket 11-9335) is a potentially historic dispute over the modern phenomenon of "mandatory minimum" sentences, and the roles of judges and juries in imposing such sentences. At stake are laws in which a legislature decides that some aspects of a specific crime justify a

**FEATURED POSTS**

Court lets F
continue with
k

READ

**ARCHIVES**

Select Month ⌄

sentence longer than the bottom of the range
(such as having or displaying a gun during
the crime), and dictate an add-on sentence
that is still within the range but may be more
than the judge would otherwise have
selected.  They are defended on the ground
that they make sentencing for such crimes
more uniform, but the actual impulse seems
to be to limit the discretion of kind-hearted
judges to go easy in such cases.

A lawyer for the federal government, Deputy
U.S. Solicitor General Michael R. Dreeben,
defended the constitutionality of such laws
by arguing that they have no effect on the
right to a jury trial, and in fact are predicated
upon the fact that the accused has
no constitutional right to a lenient judge.   But
a lawyer for Allen Ryan Alleyne, Assistant
Federal Public Defender Mary A. Maguire of
Richmond, Virginia, countered that such laws
are invalid because they intrude on the right
to have a jury determine a harsher
punishment and even then only when the
jury finds the justifying facts beyond a
reasonable doubt.

In a 2002 decision, **Harris v. United S**tates,
a splintered Court ruled that there is no
constitutional problem with "mandatory
minimums" when a judge uses a relaxed
legal standard to decide that a sentence
above the floor must be imposed.   While the
Court has granted review in the Alleyne case
to decide whether to overrule Harris,
Monday's argument in the case focused very
little on Harris, and very heavily on Apprendi.

In Apprendi, the Court ruled that the Sixth
Amendment right to a jury trial means that
any fact that leads to a sentence longer than
the maximum spelled out in law must be
found to exist by the jury, applying the
rigorous legal standard, beyond a reasonable
doubt.  In Harris, a plurality of the Court
concluded that "mandatory minimums" do
not run afoul of the Apprendi rule.   That

conclusion, though, is what is now at stake in the *Alleyne* case.

Justice Antonin Scalia, who supported the *Harris* outcome at the time, took the lead Monday in seeking to confine *Apprendi* to the situation where a sentence would go beyond a maximum. Under a "mandatory minimum" scheme, he said, the individual is "exposed" to anything within a range, not above it.   So, he explained, the Sixth Amendment is not offended if the judge is required to pick a specific sentence within the range — something the judge could do anyway, even without being told to pick such a sentence by a "mandatory minimum" law.

Justice Stephen G. Breyer, who went along with the outcome in *Harris* but has since developed strong doubts about it, sought to put the focus on what "mandatory minimum" laws mean to the individual being sentenced. They mean, the Justice said, that the individual finds himself worse off because he gets a harsher sentence than he otherwise might have.   The Court, he suggested, should not focus solely on the word "exposed," as in what range of sentence is open to the judge, but rather on the actual impact from the perspective of the convicted individual.

Justice Scalia, noting that Breyer had long been a critic of the *Apprendi* rule itself, sarcastically remarked that "*Apprendi* is so bad he [Breyer] wants to extend it."   In fact, Breyer did seem to be in favor of giving *Apprendi* some broader scope. (That, by the way, is the view of *Apprendi* that Justice Clarence Thomas has repeatedly championed, but he did not ask any questions or make any comments during the *Alleyne* argument.)

Although Justices Sonia Sotomayor and Elena Kagan (neither of whom was on the Court when *Harris* was decided) seemed

Court when *Harris* was decided) seemed
initially concerned about whether the Court
would be justified in overruling *Harris*, both
seemed as the argument proceeded to warm
to the idea that the precedent may well have
compromised the role of the jury in the
sentencing process.   Sotomayor wondered
what steps the Court should be taking now
to "protect the jury system," and to avoid "the
extreme" of having judges decide every fact
necessary to support a sentence, or having
the jury do so.   Kagan made a studied effort
to figure out what "principle" the *Apprendi*
decision established, and did seem
somewhat open to reading that principle
more generously than the *Harris* Court had.

Justice Ruth Bader Ginsburg said
comparatively little during the argument, but
she was a dissenter in *Harris*, and clearly
holds the view that "mandatory minimums"
infringe on the jury function.   It thus
appeared that there was a fairly solid
nucleus of Justices willing at least to seriously
re-think the *Harris* precedent.

Of the other Justices, Anthony M. Kennedy,
the author of the main *Harris* opinion,
seemed noncommittal about the core issue of
overruling it, although he suggested that
doing so might make it more difficult for
defense lawyers to figure out the strategy
they would follow in trying to develop the
facts that bore on sentencing.   Chief Justice
John G. Roberts, Jr., and Justice Samuel A.
Alito, Jr. (who also were not on the Court
when *Harris* was decided) asked tougher
questions of the public defender than for the
Justice Department's lawyer.

Posted in **Merits Cases**

Cases: **Alleyne v. United States**

**Recommended Citation:** Lyle Denniston, *Argument recap: Just what does Apprendi mean?*, SCOTUSblog (Jan. 14, 2013, 1:45 PM), https://www.scotusblog.com/2013/01/argument-recap-just-what-does-apprendi-mean/