# Argument recap: Just what does *Apprendi* mean?

 By **Lyle Denniston**
on Jan 14, 2013 at 1:45 pm

**Share**

**Analysis**

After taking an obligatory look at whether the Supreme Court should feel bound by its past precedents, the Justices on Monday moved into an issue clearly of more interest to them: what do they need to do to protect the role of juries in laying the groundwork for criminal sentences?  This inquiry turned into a combative discussion of just what the Court meant in 2000 in giving jurors a much-enhanced role when their verdicts trigger the fixing of sentences — the historic decision in **Apprendi v. New Jersey**.

The Justices who were opposed to expanding Apprendi argued that it dealt singularly with curbing judges who decide to impose a sentence beyond the top limit set by the legislature, while the Justices who seemed ready to push Apprendi a bit further contended that it should mean that increasing a convicted individual's potential sentence should depend upon what the jury found, not the judge.  There did not seem to be a middle ground.  The two lawyers arguing the case were just as far apart.

The case of **Alleyne v. United States** (docket 11-9335) is a potentially historic dispute over the modern phenomenon of "mandatory minimum" sentences, and the roles of judges and juries in imposing such sentences. At stake are laws in which a legislature decides that some aspects of a specific crime justify a

**FEATURED POSTS**

Justices all governmen communicati media conten

READ

**ARCHIVES**

Select Month

sentence longer than the bottom of the range
(such as having or displaying a gun during
the crime), and dictate an add-on sentence
that is still within the range but may be more
than the judge would otherwise have
selected.  They are defended on the ground
that they make sentencing for such crimes
more uniform, but the actual impulse seems
to be to limit the discretion of kind-hearted
judges to go easy in such cases.

A lawyer for the federal government, Deputy
U.S. Solicitor General Michael R. Dreeben,
defended the constitutionality of such laws
by arguing that they have no effect on the
right to a jury trial, and in fact are predicated
upon the fact that the accused has
no constitutional right to a lenient judge.   But
a lawyer for Allen Ryan Alleyne, Assistant
Federal Public Defender Mary A. Maguire of
Richmond, Virginia, countered that such laws
are invalid because they intrude on the right
to have a jury determine a harsher
punishment and even then only when the
jury finds the justifying facts beyond a
reasonable doubt.

In a 2002 decision, **Harris v. United S**tates,
a splintered Court ruled that there is no
constitutional problem with "mandatory
minimums" when a judge uses a relaxed
legal standard to decide that a sentence
above the floor must be imposed.   While the
Court has granted review in the Alleyne case
to decide whether to overrule Harris,
Monday's argument in the case focused very
little on Harris, and very heavily on Apprendi.

In Apprendi, the Court ruled that the Sixth
Amendment right to a jury trial means that
any fact that leads to a sentence longer than
the maximum spelled out in law must be
found to exist by the jury, applying the
rigorous legal standard, beyond a reasonable
doubt.  In Harris, a plurality of the Court
concluded that "mandatory minimums" do
not run afoul of the Apprendi rule.   That

conclusion, though, is what is now at stake in the *Alleyne* case.

Justice Antonin Scalia, who supported the *Harris* outcome at the time, took the lead Monday in seeking to confine *Apprendi* to the situation where a sentence would go beyond a maximum.  Under a "mandatory minimum" scheme, he said, the individual is "exposed" to anything within a range, not above it.   So, he explained, the Sixth Amendment is not offended if the judge is required to pick a specific sentence within the range — something the judge could do anyway, even without being told to pick such a sentence by a "mandatory minimum" law.

Justice Stephen G. Breyer, who went along with the outcome in *Harris* but has since developed strong doubts about it, sought to put the focus on what "mandatory minimum" laws mean to the individual being sentenced.  They mean, the Justice said, that the individual finds himself worse off because he gets a harsher sentence than he otherwise might have.   The Court, he suggested, should not focus solely on the word "exposed," as in what range of sentence is open to the judge, but rather on the actual impact from the perspective of the convicted individual.

Justice Scalia, noting that Breyer had long been a critic of the *Apprendi* rule itself, sarcastically remarked that "*Apprendi* is so bad he [Breyer] wants to extend it."  In fact, Breyer did seem to be in favor of giving *Apprendi* some broader scope.  (That, by the way, is the view of *Apprendi* that Justice Clarence Thomas has repeatedly championed, but he did not ask any questions or make any comments during the *Alleyne* argument.)

Although Justices Sonia Sotomayor and Elena Kagan (neither of whom was on the Court when *Harris* was decided) seemed

Court when *Harris* was decided) seemed
initially concerned about whether the Court
would be justified in overruling *Harris*, both
seemed as the argument proceeded to warm
to the idea that the precedent may well have
compromised the role of the jury in the
sentencing process.   Sotomayor wondered
what steps the Court should be taking now
to "protect the jury system," and to avoid "the
extreme" of having judges decide every fact
necessary to support a sentence, or having
the jury do so.   Kagan made a studied effort
to figure out what "principle" the *Apprendi*
decision established, and did seem
somewhat open to reading that principle
more generously than the *Harris* Court had.

Justice Ruth Bader Ginsburg said
comparatively little during the argument, but
she was a dissenter in *Harris*, and clearly
holds the view that "mandatory minimums"
infringe on the jury function.   It thus
appeared that there was a fairly solid
nucleus of Justices willing at least to seriously
re-think the *Harris* precedent.

Of the other Justices, Anthony M. Kennedy,
the author of the main *Harris* opinion,
seemed noncommittal about the core issue of
overruling it, although he suggested that
doing so might make it more difficult for
defense lawyers to figure out the strategy
they would follow in trying to develop the
facts that bore on sentencing.   Chief Justice
John G. Roberts, Jr., and Justice Samuel A.
Alito, Jr. (who also were not on the Court
when *Harris* was decided) asked tougher
questions of the public defender than for the
Justice Department's lawyer.

Posted in **Merits Cases**

Cases: **Alleyne v. United States**

**Recommended Citation:** Lyle Denniston, *Argument recap: Just what does Apprendi mean?*, SCOTUSblog (Jan. 14, 2013, 1:45 PM), https://www.scotusblog.com/2013/01/argument-recap-just-what-does-apprendi-mean/

# APPELLATE STANDARDS OF REVIEW

📅 Vol. 81, No. 4  April 2007  Pg 42    👤 Harvey J. Sepler    🗀 Featured Article

Since 2000, when Florida Rule of Appellate Procedure 9.210(5)(b) was amended, all briefs filed in Florida appellate courts must include explicit reference to the standard of review applicable to *each* issue raised in the appeal. And, while the rule is directed to appellate courts, practitioners at the trial level would be wise to couch their arguments, and their presentation of evidence, around the standards that guide trial judges in their decisions and, at the same time, establish records for use in the appellate courts.

There are three main standards of appellate review that practitioners will confront: de novo, abuse of discretion, and competent substantial evidence. (There are, of course, others — such as the clear and convincing evidence and manifest weight of the evidence standards1 — but they are less common and more case-specific).

These three main standards can conceptually be broken down to decisions of law and decisions of fact. Thus, when the appellate court is asked to interpret a statute or contract, for example, and there are no factual resolutions that must be made, the reviewing court is essentially in the same position as was the trial court and the standard of review is de novo. On the other hand, where the matter is fact-specific — where it entails resolving conflicting facts or determining the factual sufficiency in a case — the appellate court will often defer to the trial court for such determinations and the standard of review is whether the record contains competent substantial evidence to support the order under review. Finally, when the challenged action is one that is ordinarily left to trial court discretion — such as the admission of evidence or the administration of trial — the standard is whether the lower tribunal abused that discretion.

De novo review, or "free review,"2 means that "although the trial court is presumed to be correct, the appellate court is free to decide the legal issue differently without paying deference to the trial court's review of the law."3 In these purely legal matters, the appellate court stands on the same footing as the trial court. Examples of decisions of pure law in which the appellate court applies the de novo standard include reviewing orders dismissing a complaint,4 entering summary judgment, directed verdict or judgment of acquittal,5 interpreting a statute or contract,6 suppressing evidence (legal matters only)7 and determining whether a criminal sentence exceeds the statutory maximum.8 While evidentiary rulings are most often reviewed under the abuse of

discretion standard, there are some rulings that may be reviewed under the de novo standard; for example, whether evidence falls within the statutory definition of hearsay9 or, in the case of novel scientific evidence, whether a particular scientific principle or testing procedure is generally accepted by the relevant scientific community.10 Each of these rulings can be reviewed as a pure matter of law; they do not rest upon the determination of factual aspects of the case.

In contrast, where the rulings are fact-specific, appellate courts are more prone to defer to trial courts to make such decisions. This is so because trial courts are in a better position to assess the characteristics of testimony or other evidence they admit.11 This is the case, *e.g.*, when assessing witness credibility or assigning weight to the evidence.12 This is also the case when the appellate court looks to the evidentiary basis behind a jury verdict and nonjury findings.13

Other examples of the use of the competent substantial evidence standard include determining a party's earning capacity in a child support case14 and factual findings in rulings on a motion to suppress.15

Finally, a great many decisions made in the administration of trial proceedings are left to the trial court's discretion and appellate courts will not disturb them absent an abuse of discretion. Examples of discretionary court decisions include the granting of continuances,16 allowing jurors to ask witnesses questions,17 and limiting voir dire or opening and closing statements.18

Sometimes, orders on review involve mixed questions of law and fact which require the practitioner to parcel out the different aspects of the order and apply the standard of review appropriate to each. For example, when challenges are brought to the admissibility of novel scientific evidence, the appellate court will apply a two-part analysis to implement the *Frye* test set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923): 1) whether a particular scientific principle or testing procedure is generally accepted in the relevant scientific community (de novo standard); and 2) whether the testing conditions are substantially similar to commonly accepted testing conditions for that particular principle (abuse of discretion standard).19 Some statutory analyses involve both ultimate rulings of law (de novo standard) and factual findings (competent substantial evidence standard).20 And, in some sentencing decisions in criminal cases, courts have used several standards of review within the same issue.21

Whether we use former 11th Circuit Court of Appeals' Chief Judge Godbold's description of appellate standards ("[I]f you do not [couch arguments in accordance with the applicable standard of review], you may find you get up there on appeal and [the judge is] playing by basketball rules and you're proceeding under football rules."),22 or simply follow the requirements of Florida Rule of Appellate Procedure 9.210(b)(5), vigilant adherence to appellate standards of review is critical.

1 *See generally Holland v. Gross*, 89 So. 2d 255, 258 (Fla. 1956).

2 *See* **Childress & Davis**, 1 **Federal Standards of Review** §2.14, 276 (LEXIS Pub. 3d ed. 1999).

3 **Padovano, Standards of Review in Criminal Cases** 5 (unpublished manuscript of address to Florida Public Defender Association seminar (Feb. 17, 1999)).

4 *See Fox v. Professional Wrecker Operators of Florida, Inc.*, 801 So. 2d 175 (Fla. 5th D.C.A. 2001).

5 *See Landis v. Allstate Ins. Co.*, 546 So. 2d 1051 (Fla. 1989); *Ritz v. Florida Patient's Compensation Fund*, 436 So. 2d 987 (Fla. 5th D.C.A. 1983); *D.R. v. State*, 734 So. 2d 455 (Fla. 1st D.C.A. 1999).

6 *See Aramark Unif. & Career Apparel, Inc. v. Easton*, 894 So. 2d 20 (Fla. 2004); *Burns v. Barfield*, 732 So. 2d 1202 (Fla. 4th D.C.A. 1999).

7 *See Conner v. State*, 803 So. 2d 598 (Fla. 2001).

8 *See Demps v. State*, 761 So. 2d 302 (Fla. 2000).

9 *See Burkey v. State*, 922 So. 2d 1033 (Fla. 4th D.C.A. 2006).

10 *See, e.g., General Motors Corp. v. Porritt*, 891 So. 2d 1056 (Fla. 2d D.C.A. 2004).

11 *See Zack v. State*, 911 So. 2d 1190 (Fla. 2005).

12 *See State of Florida Highway Patrol v. The Forfeiture of Twenty Nine Thousand Nine Hundred and Eighty ($29,980.00) in U.S. Currency*, 802 So. 2d 1171 (Fla. 3d D.C.A. 2001) (nonjury); *White v. State*, 446 So. 2d 1031 (Fla. 1984) (jury).

13 *See Berges v. Infinity Ins. Co.*, 896 So. 2d 665 (Fla. 2005) (jury); *North American Islamic Trust, Inc. v. Muslim Center of Miami, Inc.*, 771 So. 2d 1227 (Fla. 3d D.C.A. 2000) (nonjury).

14 *See Jones v. Jones*, 920 So. 2d 800 (Fla. 5th D.C.A. 2006).

15 *See Caso v. State*, 524 So. 2d 422 (Fla. 1988).

16 *See Myers v. Siegel*, 920 So. 2d 1241 (Fla. 5th D.C.A. 2006).

17 *See Jimenez v. State*, 928 So. 2d 508 (Fla. 3d D.C.A. 2006).

18 *See King v. State*, 790 So. 2d 1253 (Fla. 5th D.C.A. 2001) (voir dire); *Stockton v. State*, 544 So. 2d 1006 (Fla. 1989) (closing); *Maleh v. Florida East Coast Properties, Inc.*, 491 So. 2d 290 (Fla. 3d D.C.A. 1986) (opening).

19 *See General Motors Corp. v. Porritt*, 891 So. 2d 1056 (Fla. 2d D.C.A. 2004).

20 *See North Florida Women's Health & Counseling Services, Inc. v. State*, 866 So. 2d 612 (Fla. 2003).

21 *See Blanco v. State*, 706 So. 2d 7 (Fla. 1997) (mitigating circumstances in capital case).

22 Godbold, *How to Communicate with Appellate Judges*, Address to the Annual Convention of the International Society of Barristers, Marco Island, Florida, 18 **Int'l Society of Barristers** Q. 274 (1983).



**WIKIPEDIA**
The Free Encyclopedia

# *Blakely v. Washington*

***Blakely v. Washington***, 542 U.S. 296 (2004), held that, in the context of mandatory sentencing guidelines under state law, the Sixth Amendment right to a jury trial prohibited judges from enhancing criminal sentences based on facts other than those decided by the jury or admitted by the defendant. The landmark nature of the case was alluded to by Justice Sandra Day O'Connor, who characterized the decision as a "Number 10 earthquake".[1]

## Background of the case

Ralph Howard Blakely was born in 1936; he started his criminal career in 1954.[2] Blakely married his wife in 1973. During the Blakely's 20-plus-year marriage, Mr. Blakely was involved in 80 or more lawsuits covering irrigation water rights, as well as crimes of assault, shoplifting, and many others. When his wife filed for divorce in 1996, Blakely kidnapped her from her home in rural Grant County, Washington, at knifepoint, forced her into a wooden box in the back of his pickup truck, and took her to Montana. He ordered their 13-year-old son to follow in another car, threatening to shoot his estranged wife with a shotgun if he did not comply. En route to Montana, their son escaped in Moses Lake, Washington, and alerted the police. FBI agents and sheriffs arrested Blakely in Montana near the town of Three Forks.

Blakely was charged with first-degree kidnapping, but ultimately pleaded guilty to second-degree kidnapping involving domestic violence and the use of a firearm. If one is convicted of first-degree kidnapping of a minor in Washington state, one must register as a sex offender upon release from prison. To avoid this, Mr. Blakely negotiated a plea of a longer sentence while pleading guilty only to second-degree kidnapping.[3] At the plea hearing, Blakely admitted the facts necessary to support these charges but no others. Under Washington law, second-degree kidnapping was a class B felony, punishable by a maximum sentence of 10 years in prison. However, under Washington's mandatory sentencing guidelines, the judge was required to sentence Blakely to no less than 49 and no more than 53 months in prison, unless he had "substantial and compelling" reasons to impose a sentence outside that range. These reasons could not take into account factors used to compute the standard range for the sentence. If the judge did not articulate specific findings of fact and conclusions of law justifying an exceptional sentence, an appellate court would have to reverse the sentence.

| Blakely v. Washington | |
|---|---|
| |  |
| **Supreme Court of the United States** | |
| **Argued March 23, 2004**<br>**Decided June 24, 2004** | |
| **Full case name** | *Ralph Howard Blakely, Jr. v. Washington* |
| **Citations** | 542 U.S. 296 (https://supreme.justia.com/us/542/296/case.html) (*more*)<br>124 S. Ct. 2531; 159 L. Ed. 2d 403; 2004 U.S. LEXIS 4573; 72 U.S.L.W. 4546; 17 Fla. L. Weekly Fed. S 430 |
| **Case history** | |
| **Prior** | Defendant sentenced, Grant County Superior Court, 11-13-00; affirmed, 47 P.3d 149 (Wash. App. 2002); review denied, 62 P.3d 889 (Wash. 2003); cert. granted, 540 U.S. 965 (2003). |
| **Subsequent** | Rehearing denied, 125 S. Ct. 21 (2004) |
| **Holding** | |
| The State of Washington's criminal sentencing system violated the Sixth | |

Despite these requirements, the trial judge sentenced Blakely to 90 months, finding that Blakely had acted with "deliberate cruelty." Blakely appealed, arguing that this unexpected additional factfinding on the judge's part violated his Sixth Amendment right under _Apprendi v. New Jersey_, 530 U.S. 466 (h ttps://supreme.justia.com/cases/federal/us/530/466/) (2000), to have the jury determine beyond a reasonable doubt all the facts legally necessary to his sentence. The Washington Court of Appeals rejected his claim, and the Washington Supreme Court declined to review it. Blakely then asked the U.S. Supreme Court to review the case, and it agreed to do so.

In an unusual turn of events, the local county prosecutor, John Knodell III, asked Washington's governor for permission to personally argue the case before the U.S. Supreme Court.[4] During oral argument, Justice Scalia challenged[5] Knodell for attempting to impose a prison sentence much longer than what state law authorized.[6]

# Majority opinion

In order to resolve this case, the Court had to apply the rule set forth in _Apprendi v. New Jersey_: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." This rule promoted the historic concerns of the jury-trial requirement — to subject all accusations against a criminal defendant to the "unanimous suffrage of twelve of his equals and neighbors," and to confirm the existence of those facts essential to the punishment under the law. In this case, the finding of "deliberate cruelty" had not been submitted to a jury, and Blakely had not admitted acting with "deliberate cruelty." The State contended that this was not problematic under _Apprendi_ because the statutory maximum was 10 years, not 53 months. The Court read _Apprendi_ as having held that the "statutory maximum" punishment was "the maximum sentence [the judge] may impose _without_ any additional findings." Accordingly, because "deliberate cruelty" was not an element of the crimes to which Blakely had pleaded guilty, the judge could not have used that fact to enhance Blakely's sentence above the 53-month statutory maximum.

The Court's "commitment to _Apprendi_ in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no procedural formality, but a fundamental reservation of power in our constitutional structure." Just as citizens participate in the legislative process by electing representatives to the legislature, they participate in the judicial process by serving on juries. The _Apprendi_ rule ensures that "the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended." Justice Scalia, as the author of the majority opinion, reasoned that those who reject _Apprendi_ "are resigned to one of two alternatives." First, a jury might be allowed only to pass on a small part of criminal activity, and then allow the judge to determine the punishment for the full range of conduct the government seeks to punish, as by letting the jury determine whether an accused murderer illegally possessed a firearm and then allowing the judge to impose a life

Amendment right to a jury trial, because it gave judges the ability to increase sentences based on their own determination of facts.

| Court membership | |
|---|---|
| **Chief Justice** | |
| William Rehnquist | |
| **Associate Justices** | |
| John P. Stevens · Sandra Day O'Connor Antonin Scalia · Anthony Kennedy David Souter · Clarence Thomas Ruth Bader Ginsburg · Stephen Breyer | |
| **Case opinions** | |
| Majority | Scalia, joined by Stevens, Souter, Thomas, Ginsburg |
| Dissent | O'Connor, joined by Breyer; Rehnquist, Kennedy (except as to Part IV-B) |
| Dissent | Kennedy, joined by Breyer |
| Dissent | Breyer, joined by O'Connor |
| **Laws applied** | |
| U.S. Const. amend. VI; Washington Sentencing Reform Act | |

sentence because the defendant had used the firearm to kill someone. Second, the legislature could establish judicial limits that were not *too* excessive, a necessarily subjective standard that would be hard for the Court to monitor and adjust as necessary. But this claim was not plausible, since the entire purpose of the jury-trial requirement was to check judicial authority.

Scalia insisted that the result of the case would not signal the end of determinate sentencing altogether. Rather, it merely required states to implement determinate sentencing in a manner consistent with the Sixth Amendment.

# Dissenting opinions

## Justice O'Connor's dissent

Justice O'Connor feared dire consequences as a result of the Court's ruling. Before Washington enacted its guidelines scheme, there was remarkable disparity among sentences meted out for similar offenses. Guidelines schemes have the effect of reducing this disparity by channeling the discretion of sentencing judges, who are told how to weigh what factors when computing a sentence. By enacting its sentencing guidelines, Washington did not intend to "manipulate the statutory elements of criminal offenses or circumvent the procedural protections of the Bill of Rights. Rather, lawmakers were trying to bring some much-needed uniformity, transparency, and accountability to an otherwise 'labyrinthine sentencing and corrections system that 'lacked any principle except unbridled discretion.'"

Far from "disregarding principles of due process and the jury trial right," O'Connor argued, the guidelines system honored them. Under the former sentencing scheme, a defendant like Blakely could have received anything from probation to 10 years in prison. Under the guidelines, he knows what range of sentence he might receive based on the conduct in which he engaged. "Criminal defendants still face the same statutory maximum sentences, but they now at least know, much more than before, the real consequences of their actions." The guidelines also reduce disparities, particularly those based on race, which was a concern of some critics of the pre-guidelines system.

O'Connor foresaw a "substantial constitutional tax" in applying the *Apprendi* rule to sentencing guidelines systems. She protested that the traditional sentencing factors would now have to be charged in the indictment and proved to a jury. Bifurcated proceedings may become commonplace in criminal trials, so that a jury might not improperly consider prior bad acts during the guilt phase but properly consider them when it comes time for sentencing. And under some guidelines schemes, such as the federal sentencing guidelines, some facts relevant to sentencing, such as perjury and obstruction of justice, cannot be known until the trial is underway. In any event, all relevant sentencing facts may not be known prior to trial, since prosecutors typically wait until after a guilty verdict is obtained before gathering a full history of the defendant and examining the pertinent facts of the crime in order to recommend a sentence.

Finally, O'Connor disagreed with the majority's interpretation of the "statutory maximum" in a guidelines context. She believed that, despite the mandatory nature of the guidelines, the "statutory maximum" remained (for Blakely) 10 years. For O'Connor, mere formalism dictated the conclusion that the "statutory maximum" was the greatest sentence the judge could legally impose based on the

facts found by the jury or admitted by the defendant, and formalism was not a virtue she felt was worth vindicating. Furthermore, the effects of the decision were not confined to Washington, for every system involving guidelines sentencing, including the federal system, were constitutionally suspect.

## Justice Breyer's dissent

Justice Breyer envisioned three possible responses to the majority's decision. First, legislatures could prescribe exactly the same sentence for all possible variations of a crime — an automatic five-year sentence for all robberies, for instance. This system has the "intolerable" effect of imposing the same sentence on people who commit their crimes in vastly different ways. Prosecutors would end up with the real control over defendants' sentences, since prosecutors ultimately make the decisions regarding how to charge the case. Second, states could return to indeterminate sentencing, in which the authorized range of punishment for crimes is very broad. But such systems were criticized (rightly, in Breyer's view) for their excessive disparity and unfairness. There would be less "reason" in an indeterminate sentencing system than in the guidelines system Washington had adopted.

Third, the guidelines systems currently in force would remain, and the jury-trial requirement would be grafted onto them. Breyer predicted this could play out in one of two ways. First, legislatures might redefine crimes with highly specific detail — a robbery statute could enhance punishment based on the value of the goods taken, whether a gun was used, the seriousness of the threat used to obtain the goods, and so on. But the result of this system would be the same as the first option — prosecutors would end up with the discretion to determine the defendant's sentence by manipulating the charge. Second, two juries could be assembled for each criminal trial, one for the guilt phase and one for the penalty phase. But this approach would be costly, as the experience with bifurcated trials in capital cases has shown.

Perhaps another solution would be to prescribe overly harsh sentences for crimes, and then define a list of mitigating factors, so that a judge could still retain the discretion to impose sentences (since the jury-trial requirement only applies to increases in the maximum sentence). But "political impediments" make vast revisions of any legislative scheme difficult to implement, and Breyer doubted that the mere fact that the Court ruled the Sixth Amendment demanded a legislative solution would impel many state legislatures to revamp their criminal codes in this way.

Finally, Breyer argued that legislatures needed to retain the constitutional authority to make the labelling decision between an "element" of a crime and a "sentencing factor." Without the ability to do so, legislatures cannot create "sentencing systems that are consistent with, and indeed may help to advance, the Constitution's greater fairness goals." For Breyer, those greater fairness goals are achieved when a defendant's real conduct drives the sentence he receives. Constitutional obstacles that stand in the way of this goal detract from the overall fairness of the criminal justice system.

# Effect on subsequent jurisprudence

Although the Court expressly stated that it was not addressing the constitutionality of the Federal Sentencing Guidelines, it was hard to resist the conclusion that the Guidelines as then constituted were in jeopardy in light of the tremendous similarity between the structure of the federal Guidelines and the Washington Guidelines at issue in *Blakely*. Six weeks after the decision in this case, the Court agreed to review two cases involving the constitutionality of sentence enhancements under the federal Guidelines — *United States v. Booker* and a companion case, *United States v. Fanfan* — an extraordinary step for the Court to take during the summer months. The Court ordered the briefs in *Booker* to be submitted during the month of September 2004, and scheduled oral argument in *Booker*

for the first day of the 2004 Term, Monday, October 4. The Court's opinion in *Booker* came out on January 12, 2005, and drastically changed the legal framework within which federal sentencing takes place.

Also, many states had to decide how *Blakely* applied to their sentencing systems. California, notably, concluded it did not affect its sentencing scheme in a case decided by the California Supreme Court called *People v. Black*. The U.S. Supreme Court later concluded that *Blakely* did apply in California, thereby overruling *Black* with its decision in *Cunningham v. California*.

# Subsequent developments

One week before release of the opinion which invalidated Blakely's sentence, John Knodell III, the Grant County prosecutor who lost the prior case before the U.S. Supreme Court, obtained authorization for a new warrant alleging Blakely solicited a planted prison informant for the murder of Blakely's wife and daughter. Blakely is now serving 35 years in prison due to this separate case.[2] Knodell personally prosecuted this second case against Blakely.[7] Blakely made a claim of prosecutorial vindictiveness, asserting Knodell vindictively filed the criminal solicitation charge in retaliation for Blakely's successful appeal of his sentence in Blakely, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403, but the court of appeals rejected Blakely's claim.[8]

# See also

- List of United States Supreme Court cases, volume 542
- List of United States Supreme Court cases

# References

1. Berman, Douglas; Chanenson, Steven (2006). "The Real (Sentencing) World: State Sentencing in the Post-*Blakely* Era" (https://web.archive.org/web/20080511223609/http://moritzlaw.osu.edu/osjc l/Articles/Volume4_1/BermanIntro.pdf) (PDF). *Ohio State Journal of Criminal Law*. **4**: 27. Archived from the original (http://moritzlaw.osu.edu/osjcl/Articles/Volume4_1/BermanIntro.pdf) (PDF) on May 11, 2008.
2. http://www.columbiabasinherald.com/articles/2005/03/23/news/news02.txt
3. Ralph Howard Blakely III
4. Rebecca Cook, Supreme Court rules judges alone cannot impose extra-long prison terms, Associated Press (June 25, 2004) https://news.google.com/newspapers? nid=861&dat=20040625&id=dScPAAAAIBAJ&sjid=elUDAAAAIBAJ&pg=3901,5855965
5. Jimmie Presley, Court to rule if judge can raise sentence, Spokesman-Review (March 24, 2004)
6. "Blakely *v.* Washington" (https://www.oyez.org/cases/2000-2009/2003/2003_02_1632). *Oyez Project*. Chicago-Kent College of Law.
7. "More prison time for Ralph Blakely, figure in key sentencing case | The Seattle Times" (http://com munity.seattletimes.nwsource.com/archive/?date=20050324&slug=webblakely24).

8. State v. Blakely, 134 Wash.App. 1043, 2006 Wash. App. LEXIS 1817 (2006)

## Further reading

- Berman, Douglas A. (2005). "Foreword: Beyond *Blakely* and *Booker*: Pondering Modern Sentencing Process". *Journal of Criminal Law and Criminology*. **95** (3): 653–688. ISSN 0091-4169 (https://www.worldcat.org/issn/0091-4169).
- WASHINGTON VS BLAKELY appeal denying legal papers for defense https://cdn.ca9.uscourts.gov/datastore/memoranda/2018/12/03/18-35647.pdf

## External links

- Text of *Blakely v. Washington*, 542 U.S. 296 (2004) is available from: Cornell (https://www.law.corn ell.edu/supct/html/02-1632.ZS.html) Findlaw (https://caselaw.findlaw.com/us-supreme-court/542/2 96.html) Google Scholar (https://scholar.google.com/scholar_case?case=1616320347316762436 9) Justia (https://supreme.justia.com/cases/federal/us/542/296/) Library of Congress (http://cdn.l oc.gov/service/ll/usrep/usrep542/usrep542296/usrep542296.pdf) Oyez (oral argument audio) (htt ps://www.oyez.org/cases/case/?case=2000-2009/2003/2003_02_1632)
- State sentencing commission responses to *Blakely* (https://web.archive.org/web/2006092311555 9/http://www.ussc.gov/STATES/blakely.htm), compiled by the United States Sentencing Commission
- Transcript of the oral argument (https://web.archive.org/web/20170216142300/https://www.supre mecourt.gov/oral_arguments/argument_transcripts/02-1632.pdf)
- Amicus brief of the ACLU (https://www.aclu.org/scotus/2003/13837lgl20040106.html)
- Response of the Department of Justice to *Blakely* (https://www.usdoj.gov/dag/readingroom/blakel y.htm)
- Amicus brief of the National Association of Criminal Defense Lawyers (http://www.nacdl.org/public. nsf/930c1929a542698485256ec4005673c7/4aad1e2414222dd685256ec400569992/$FILE/Blakel y_NACDL_amicus2.pdf)
- Sentencing Law and Policy Blog (http://sentencing.typepad.com) by Prof. Douglas Berman, Ohio State University Moritz College of Law

Retrieved from "https://en.wikipedia.org/w/index.php?title=Blakely_v._Washington&oldid=1175139162"

-

1 Anglemyer v. State
2 Summary
3 Holding "[b]ecause the trial court no longer has any obligation to weigh aggravating
and mitigating factors against each other when imposing a sentence, unlike the
pre-Blakely statutory regime, a trial court can not now be said to have abused its
discretion in failing to properly weigh such factors"

4
5 Summary of this case from Jackson v. State
6 See 25 Summaries
7 Opinion
8 No. 43S05-0606-CR-230.
9
10 June 26, 2007.
11
12 Joel M. Schumm, Indiana University School of Law, Indianapolis, IN, Michael W. Reed,
Reed Earhart Attorneys at Law, P.C., Warsaw, IN, Attorneys for Appellant.
13
14 Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney
General, Indianapolis, IN, Attorneys for Appellee.
15
16 On Petition To Transfer from the Indiana Court of Appeals, No. 43A05-0510-CR-590
17
18
19 RUCKER, Justice.
20
21 Summary
22 In this opinion we discuss the respective roles of Indiana trial and appellate
courts under the 2005 amendments to Indiana's criminal sentencing statutes. We hold
that where a trial court imposes sentence for a felony offense it is required to
issue a sentencing statement that includes a reasonably detailed recitation of the
trial court's reasons for the sentence imposed. The standard of review is abuse of
discretion.
23
24 Facts and Procedural History
25 Around 10:00 p.m. on May 14, 2005, Alexander J. Anglemyer telephoned a local
restaurant and ordered a pizza. He advised the person taking the order that the
delivery driver should bring change for a one hundred dollar bill. Anglemyer
provided the address to a vacant house located at the end of a residential street.
When the driver arrived Anglemyer walked up to him with his hands behind his back.
The driver thought that Anglemyer was reaching for his wallet, but "the next thing
[the driver] kn[e]w, [he] got hit in the head." App. at 30. The driver fell to the
ground where Anglemyer continued to beat and kick him while shouting "[g]ive me your
money." Id. The driver tossed Anglemyer a pouch containing cash and checks. As a
result of the attack the driver suffered severe pain, a broken right arm, and a
laceration to his head requiring seven staples. Id. at 7.
26
27 Anglemyer was arrested shortly thereafter and later charged with Count I, robbery as
a Class B felony, and Count II, battery as a Class C felony. Under the terms of a
written plea agreement, Anglemyer agreed to plead guilty as charged. Among other
things the agreement provided that the "sentence will not exceed sixteen (16) years
executed. Each count's sentence shall run consecutive." Id. at 8. The trial court
accepted the agreement, and Anglemyer pleaded guilty pursuant to its terms. At the
sentencing hearing the trial court imposed a ten-year sentence for the Class B
felony conviction and a six-year sentence for the Class C felony conviction.
Ordering the sentences to run consecutively, the trial court imposed a total term of
sixteen years.
28
29 Appealing his sentence Anglemyer raised a single issue, "Whether the maximum
possible sentence imposed under the Plea Agreement is inappropriate in light of
Anglemyer's character and the nature of the offenses." Br. of Appellant at 2. The
Court of Appeals declined to address this claim. However, because in the argument
section of his brief Anglemyer focused upon alleged trial court error in identifying
and weighing aggravating and mitigating factors, the Court of Appeals addressed
these claims. Concluding, among other things, that under the amended statutory
scheme any error related to the trial court's findings of aggravating and mitigating
circumstances is harmless, the court affirmed the trial court's judgment. Anglemyer
v. State, 845 N.E.2d 1087, 1090-92 (Ind.Ct.App. 2006). We previously granted

Anglemyer v. State

Summary

Holding "[b]ecause the trial court no longer has any obligation to weigh aggravating and mitigating factors against each other when imposing a sentence, unlike the pre-Blakely statutory regime, a trial court can not now be said to have abused its discretion in failing to properly weigh such factors"

Summary of this case from Jackson v. State

See 25 Summaries

Opinion

No. 43S05-0606-CR-230.

June 26, 2007.

Joel M. Schumm, Indiana University School of Law, Indianapolis, IN, Michael W. Reed, Reed Earhart Attorneys at Law, P.C., Warsaw, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

On Petition To Transfer from the Indiana Court of Appeals, No. 43A05-0510-CR-590

RUCKER, Justice.

Summary

In this opinion we discuss the respective roles of Indiana trial and appellate courts under the 2005 amendments to Indiana's criminal sentencing statutes. We hold that where a trial court imposes sentence for a felony offense it is required to issue a sentencing statement that includes a reasonably detailed recitation of the trial court's reasons for the sentence imposed. The standard of review is abuse of discretion.

Facts and Procedural History

Around 10:00 p.m. on May 14, 2005, Alexander J. Anglemyer telephoned a local restaurant and ordered a pizza. He advised the person taking the order that the delivery driver should bring change for a one hundred dollar bill. Anglemyer provided the address to a vacant house located at the end of a residential street. When the driver arrived Anglemyer walked up to him with his hands behind his back. The driver thought that Anglemyer was reaching for his wallet, but "the next thing [the driver] kn[e]w, [he] got hit in the head." App. at 30. The driver fell to the ground where Anglemyer continued to beat and kick him while shouting "[g]ive me your money." Id. The driver tossed Anglemyer a pouch containing cash and checks. As a result of the attack the driver suffered severe pain, a broken right arm, and a laceration to his head requiring seven staples. Id. at 7.

Anglemyer was arrested shortly thereafter and later charged with Count I, robbery as a Class B felony, and Count II, battery as a Class C felony. Under the terms of a written plea agreement, Anglemyer agreed to plead guilty as charged. Among other things the agreement provided that the "sentence will not exceed sixteen (16) years executed. Each count's sentence shall run consecutive." Id. at 8. The trial court accepted the agreement, and Anglemyer pleaded guilty pursuant to its terms. At the sentencing hearing the trial court imposed a ten-year sentence for the Class B felony conviction and a six-year sentence for the Class C felony conviction. Ordering the sentences to run consecutively, the trial court imposed a total term of sixteen years.

Appealing his sentence Anglemyer raised a single issue, "Whether the maximum possible sentence imposed under the Plea Agreement is inappropriate in light of Anglemyer's character and the nature of the offenses." Br. of Appellant at 2. The Court of Appeals declined to address this claim. However, because in the argument section of his brief Anglemyer focused upon alleged trial court error in identifying and weighing aggravating and mitigating factors, the Court of Appeals addressed these claims. Concluding, among other things, that under the amended statutory scheme any error related to the trial court's findings of aggravating and mitigating circumstances is harmless, the court affirmed the trial court's judgment. Anglemyer v. State, 845 N.E.2d 1087, 1090-92 (Ind.Ct.App. 2006). We previously granted

transfer, thereby vacating the Court of Appeals' opinion. See Anglemyer v. State, 855 N.E.2d 1012 (Ind. 2006) (Table); Ind. Appellate Rule 58(A). We now affirm the judgment of the trial court, but for reasons slightly different from those of our colleagues.

30

31  Relying on authority that stood for the proposition that once a defendant enters a plea agreement that calls for a sentencing cap, the defendant inherently agrees that such a sentence is appropriate, the court determined that Anglemyer "waived his appropriateness claim." Anglemyer v. State, 845 N.E.2d 1087, 1092 (Ind.Ct.App. 2006). We recently disapproved of this proposition. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

32

33  Background

34  In order to produce more uniform sentences the Indiana Legislature adopted a sentencing scheme in 1977 that included a fixed term presumptive sentence for each class of felonies. See Ind. Code §§ 35-50-2-3 to -7 (West Supp. 1977). These statutes also created upper and lower limits for each class of felony offenses, Id. In deciding whether to depart from the presumptive sentence, the trial judge was required to consider five enumerated factors and could consider various other aggravating and mitigating factors. See I.C. § 35-4.1-4-7 (West Supp. 1977). The upper and lower limits were revised over the years, but from the time this sentencing arrangement was adopted, our courts understood it as requiring a given presumptive term for each class of crimes from which a judge could deviate upon a finding of aggravating or mitigating circumstances deemed adequate to justify adding or subtracting years. See, e.g., Henderson v. State, 769 N.E.2d 172, 179-80 (Ind. 2002); Gardner v. State, 270 Ind. 627, 388 N.E.2d 513, 516-19 (1979). To facilitate this sentencing arrangement we determined that when a trial judge deviated from the fixed term presumptive sentence, it was required to "(1) identify all significant mitigating and aggravating circumstances; (2) state the specific reason why each circumstance ha[d] been determined to be mitigating or aggravating; and (3) articulate the court's evaluation and balancing of circumstances." Prickett v. State, 856 N.E.2d 1203, 1207 (Ind. 2006); see also Harris v. State, 659 N.E.2d 522, 527-28 (Ind. 1995); Hammons v. State, 493 N.E.2d 1250, 1254 (Ind. 1986); Robinson v. State, 477 N.E.2d 883, 886 (Ind. 1985).

35

36  For example, Indiana Code section 35-50-2-5 (2004) provided that a person convicted of a Class B felony "shall be imprisoned for a fixed term of ten (10) years, with not more than ten (10) years added for aggravating circumstances or not more than four (4) years subtracted for mitigating circumstances. . . ."

37

38  In 2000 the United States Supreme Court decided Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Apprendi involved a New Jersey "hate crime" statute that authorized a trial court to increase the sentencing range for a crime when the court found, by a preponderance of the evidence, that the defendant's purpose in committing the crime was to intimidate an individual or a group because of race, color, gender, handicap, religion, sexual orientation, or ethnicity. Id. at 468-69, 120 S.Ct. 2348. Finding this statute unconstitutional under the Fourteenth Amendment's Due Process Clause, the Court announced the rule that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348.

39

40  Four years later in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the Supreme Court reiterated, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 301, 124 S.Ct. 2531 (quoting Apprendi 530 U.S. at 490, 120 S.Ct. 2348). However, the Court clarified that "the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 303, 124 S.Ct. 2531 (emphasis omitted). The Court further explained, "In other words, the relevant `statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Id. at 303-04, 124 S.Ct. 2531. The Court thus declared that defendant Blakely's sentence, enhanced based on various facts found by the sentencing judge, violated Blakely's Sixth Amendment right to a jury trial. Id. at 305, 124 S.Ct. 2531. Not surprisingly, this decision cast doubt over the constitutionality of sentencing

transfer, thereby vacating the Court of Appeals' opinion. See Anglemyer v. State, 855 N.E.2d 1012 (Ind. 2006) (Table); Ind. Appellate Rule 58(A). We now affirm the judgment of the trial court, but for reasons slightly different from those of our colleagues.

30

31   Relying on authority that stood for the proposition that once a defendant enters a plea agreement that calls for a sentencing cap, the defendant inherently agrees that such a sentence is appropriate, the court determined that Anglemyer "waived his appropriateness claim." Anglemyer v. State, 845 N.E.2d 1087, 1092 (Ind.Ct.App. 2006). We recently disapproved of this proposition. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

32

33   Background

34   In order to produce more uniform sentences the Indiana Legislature adopted a sentencing scheme in 1977 that included a fixed term presumptive sentence for each class of felonies. See Ind. Code §§ 35-50-2-3 to -7 (West Supp. 1977). These statutes  also created upper and lower limits for each class of felony offenses, Id. In deciding whether to depart from the presumptive sentence, the trial judge was required to consider five enumerated factors and could consider various other aggravating and mitigating factors. See I.C. § 35-4.1-4-7 (West Supp. 1977). The upper and lower limits were revised over the years, but from the time this sentencing arrangement was adopted, our courts understood it as requiring a given presumptive term for each class of crimes from which a judge could deviate upon a finding of aggravating or mitigating circumstances deemed adequate to justify adding or subtracting years. See, e.g., Henderson v. State, 769 N.E.2d 172, 179-80 (Ind. 2002); Gardner v. State, 270 Ind. 627, 388 N.E.2d 513, 516-19 (1979). To facilitate this sentencing arrangement we determined that when a trial judge deviated from the fixed term presumptive sentence, it was required to "(1) identify all significant mitigating and aggravating circumstances; (2) state the specific reason why each circumstance ha[d] been determined to be mitigating or aggravating; and (3) articulate the court's evaluation and balancing of circumstances." Prickett v. State, 856 N.E.2d 1203, 1207 (Ind. 2006); see also Harris v. State, 659 N.E.2d 522, 527-28 (Ind. 1995); Hammons v. State, 493 N.E.2d 1250, 1254 (Ind. 1986); Robinson v. State, 477 N.E.2d 883, 886 (Ind. 1985).

35

36   For example, Indiana Code section 35-50-2-5 (2004) provided that a person convicted of a Class B felony "shall be imprisoned for a fixed term of ten (10) years, with not more than ten (10) years added for aggravating circumstances or not more than four (4) years subtracted for mitigating circumstances. . . ."

37

38   In 2000 the United States Supreme Court decided Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Apprendi involved a New Jersey "hate crime" statute that authorized a trial court to increase the sentencing range for a crime when the court found, by a preponderance of the evidence, that the defendant's purpose in committing the crime was to intimidate an individual or a group because of race, color, gender, handicap, religion, sexual orientation, or ethnicity. Id. at 468-69, 120 S.Ct. 2348. Finding this statute unconstitutional under the Fourteenth Amendment's Due Process Clause, the Court announced the rule that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348.

39

40   Four years later in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the Supreme Court reiterated, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 301, 124 S.Ct. 2531 (quoting Apprendi 530 U.S. at 490, 120 S.Ct. 2348). However, the Court clarified that "the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 303, 124 S.Ct. 2531 (emphasis omitted). The Court further explained, "In other words, the relevant `statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Id. at 303-04, 124 S.Ct. 2531. The Court thus declared that defendant Blakely's sentence, enhanced based on various facts found by the sentencing judge, violated Blakely's Sixth Amendment right to a jury  trial. Id. at 305, 124 S.Ct. 2531. Not surprisingly, this decision cast doubt over the constitutionality of sentencing

schemes throughout the country. And Indiana was no exception.

41
42   In Blakely the defendant kidnapped his wife at knifepoint, bound her and put her in his truck, and drove from Washington to Montana. The defendant pleaded guilty to second-degree kidnapping involving domestic violence and use of a firearm, a Class B felony. Under Washington state law punishment for a Class B felony was capped at ten years. See Blakely, 542 U.S. at 299, 124 S.Ct. 2531. According to Washington's Sentencing Reform Act, the standard sentencing range for Blakely's crime was 49 to 53 months. Id. The trial judge imposed an aggravated sentence of 90 months — 37 months over the standard range — pursuant to a Washington statute that allowed an increased sentence if a judge found "substantial and compelling reasons justifying an exceptional sentence." Id. (quoting Wash. Rev. Code § 9.94A. 120(2) (2000)). The Washington trial judge had relied on "deliberate cruelty," an aggravating factor enumerated in the statutes. Id. at 300, 124 S.Ct. 2531.

43
44   As Justice O'Connor observed, "The consequences of today's decision will be as far reaching as they are disturbing. Washington's sentencing system is by no means unique. Numerous other States have enacted guidelines systems, as has the Federal Government. Today's decision casts constitutional doubt over them all and, in so doing, threatens an untold number of criminal judgments." Blakely. 542 U.S. at 323, 124 S.Ct. 2531 (O'Connor, J., dissenting) (citations omitted).

45
46   Responding to Blakely this Court declared that Indiana's fixed term sentencing scheme was the functional equivalent of the sentencing scheme the Supreme Court disapproved in Blakely. In Smylie v. State, 823 N.E.2d 679 (Ind. 2005), we noted that, "Both establish a mandatory starting point for sentencing criminals based on the elements of proof necessary to prove a particular offense and the sentencing class into which the offense falls. The trial court judge then must engage in judicial fact-finding during sentencing if a sentence greater than the presumptive fixed term is to be imposed. It is this type of judicial fact-finding that concerned the Court in Blakely." Id. at 683. We thus concluded that Indiana's sentencing scheme ran afoul of the Sixth Amendment because "it mandates both a fixed term and permits judicial discretion in finding aggravating or mitigating circumstances to deviate from the fixed term." Id. at 685. Although reaching this conclusion, we identified two alternative ways in which Indiana's sentencing scheme could pass constitutional muster: "(1) our present arrangement of fixed presumptive terms, modified to require jury findings on facts in aggravation, or (2) a system in which there is no stated `fixed term' (or at least none that has legally binding effect) in which judges would impose sentences without a jury." Id.  To remedy the constitutional infirmity, we endorsed the former alternative, namely: a jury must find the facts used to enhance a fixed presumptive term. In our view, jury sentencing was more faithful to "the overarching theme of Indiana's 1977 sentencing reform," that of "abandon[ing] indeterminate sentencing in favor of fixed and predictable penalties." Id. at 686.

47
48   We observed that this latter alternative reflected the solution reached by the Supreme Court in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (Applying Blakely to the Federal Sentencing Guidelines, the Court severed and excised a portion of the sentencing statute that made the sentence indicated by the Guidelines range mandatory unless the trial court found aggravating or mitigating circumstances not adequately considered by the U.S. Sentencing Commission.).

49
50   Within weeks of Smylie, the Legislature amended Indiana's sentencing statutes essentially adopting the second alternative Smylie identified. The Legislature left intact  lower and upper limits for each class of felony offenses, but eliminated fixed presumptive terms in favor of "advisory sentences" that are between the minimum and maximum terms. See I.C. § 35-50-2-3 to -7. In addition the Legislature eliminated the requirement that trial courts must consider certain mandatory circumstances when determining the exact sentence to be imposed. Rather, the amended statute now includes a non-exhaustive list of aggravating and mitigating circumstances trial courts "may consider," I.C. § 35-38-1-7.1(a)-(b), and provides in part:

51
52   For example Indiana Code section 35-50-2-5 provides that a person convicted of a Class B felony "shall be imprisoned for a fixed term of between six (6) and twenty (20) years, with the advisory sentence being ten (10) years." We note that the

schemes throughout the country. And Indiana was no exception.

41

42   In Blakely the defendant kidnapped his wife at knifepoint, bound her and put her in his truck, and drove from Washington to Montana. The defendant pleaded guilty to second-degree kidnapping involving domestic violence and use of a firearm, a Class B felony. Under Washington state law punishment for a Class B felony was capped at ten years. See Blakely, 542 U.S. at 299, 124 S.Ct. 2531. According to Washington's Sentencing Reform Act, the standard sentencing range for Blakely's crime was 49 to 53 months. Id. The trial judge imposed an aggravated sentence of 90 months — 37 months over the standard range — pursuant to a Washington statute that allowed an increased sentence if a judge found "substantial and compelling reasons justifying an exceptional sentence." Id. (quoting Wash. Rev. Code § 9.94A. 120(2) (2000)). The Washington trial judge had relied on "deliberate cruelty," an aggravating factor enumerated in the statutes. Id. at 300, 124 S.Ct. 2531.

43

44   As Justice O'Connor observed, "The consequences of today's decision will be as far reaching as they are disturbing. Washington's sentencing system is by no means unique. Numerous other States have enacted guidelines systems, as has the Federal Government. Today's decision casts constitutional doubt over them all and, in so doing, threatens an untold number of criminal judgments." Blakely. 542 U.S. at 323, 124 S.Ct. 2531 (O'Connor, J., dissenting) (citations omitted).

45

46   Responding to Blakely this Court declared that Indiana's fixed term sentencing scheme was the functional equivalent of the sentencing scheme the Supreme Court disapproved in Blakely. In Smylie v. State, 823 N.E.2d 679 (Ind. 2005), we noted that, "Both establish a mandatory starting point for sentencing criminals based on the elements of proof necessary to prove a particular offense and the sentencing class into which the offense falls. The trial court judge must then engage in judicial fact-finding during sentencing if a sentence greater than the presumptive fixed term is to be imposed. It is this type of judicial fact-finding that concerned the Court in Blakely." Id. at 683. We thus concluded that Indiana's sentencing scheme ran afoul of the Sixth Amendment because "it mandates both a fixed term and permits judicial discretion in finding aggravating or mitigating circumstances to deviate from the fixed term." Id. at 685. Although reaching this conclusion, we identified two alternative ways in which Indiana's sentencing scheme could pass constitutional muster: "(1) our present arrangement of fixed presumptive terms, modified to require jury findings on facts in aggravation, or (2) a system in which there is no stated `fixed term' (or at least none that has legally binding effect) in which judges would impose sentences without a jury." Id.  To remedy the constitutional infirmity, we endorsed the former alternative, namely: a jury must find the facts used to enhance a fixed presumptive term. In our view, jury sentencing was more faithful to "the overarching theme of Indiana's 1977 sentencing reform," that of "abandon[ing] indeterminate sentencing in favor of fixed and predictable penalties." Id. at 686.

47

48   We observed that this latter alternative reflected the solution reached by the Supreme Court in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (Applying Blakely to the Federal Sentencing Guidelines, the Court severed and excised a portion of the sentencing statute that made the sentence indicated by the Guidelines range mandatory unless the trial court found aggravating or mitigating circumstances not adequately considered by the U.S. Sentencing Commission.).

49

50   Within weeks of Smylie, the Legislature amended Indiana's sentencing statutes essentially adopting the second alternative Smylie identified. The Legislature left intact  lower and upper limits for each class of felony offenses, but eliminated fixed presumptive terms in favor of "advisory sentences" that are between the minimum and maximum terms. See I.C. § 35-50-2-3 to -7. In addition the Legislature eliminated the requirement that trial courts must consider certain mandatory circumstances when determining the exact sentence to be imposed. Rather, the amended statute now includes a non-exhaustive list of aggravating and mitigating circumstances trial courts "may consider," I.C. § 35-38-1-7.1(a)-(b), and provides in part:

51

52   For example Indiana Code section 35-50-2-5 provides that a person convicted of a Class B felony "shall be imprisoned for a fixed term of between six (6) and twenty (20) years, with the advisory sentence being ten (10) years." We note that the

"advisory" sentences under the newly enacted statutes are the same as the "presumptive" sentences under the previous statutes.

53
54   A court may impose any sentence that is:
55   (1) authorized by statute; and
56   (2) permissible under the Constitution of the State of Indiana; regardless of the presence or absence of aggravating circumstances or mitigating circumstances.
57   I.C. § 35-38-1-7.1(d) (emphasis added). Notwithstanding this provision the Legislature retained Indiana Code section 35-38-1-3 that provides:

58
59   Before sentencing a person for a felony, the court must conduct a hearing to consider the facts and circumstances relevant to sentencing. The person is entitled to subpoena and call witnesses and to present information in his own behalf. The court shall make a record of the hearing, including:
60   (1) a transcript of the hearing;
61   (2) a copy of the presentence report; and
62   (3) if the court finds aggravating circumstances or mitigating circumstances, a statement of the court's reasons for selecting the sentence that it imposes.
63   In the aftermath of these legislative revisions the Court of Appeals has been divided on whether and to what extent trial judges are now required to make sentencing statements explaining their sentencing decisions and whether any such statements must include findings of aggravating and mitigating factors. Closely related to these issues are the scope and role of appellate review. This lack of consensus is understandable. Writing for the panel in Gibson v. State, 856 N.E.2d 142 (Ind.Ct.App. 2006), Judge Barnes noted the challenges courts now face in a post-Blakely/Smylie world. He observed, "[T]he new statutes raise a new set of questions as to the respective roles of trial and appellate courts in sentencing, the necessity of a trial court continuing to issue sentencing statements, and appellate review of a trial court's finding of aggravators and mitigators under a scheme where the trial court does not have to find aggravators or mitigators to impose any sentence within the statutory range for an offense, including the maximum sentence. The continued validity or relevance of well-established case law developed under the old `presumptive' sentencing scheme is unclear." Id. at 146. We acknowledge Judge Barnes' concerns. We also observe that subsequent to this case reaching us, the Legislature has spoken further on the subject mandating that, "After a court has pronounced a sentence for a felony conviction, the court shall issue a statement of the court's reasons for selecting the sentence that it imposes." Pub.L. No. 178-2007 (to be codified at I.C. § 35-38-1-1.3) (effective July 1, 2007).

64
65   Compare Golden v. State, 862 N.E.2d 1212, 1216 (Ind.Ct.App. 2007), trans. denied; McDonald v. State, 861 N.E.2d 1255, 1259 (Ind.Ct.App. 2007), trans. pending; Windhorst v. State, 858 N.E.2d 676, 678 n. 2 (Ind.Ct.App. 2006), trans. granted; Anglemyer, 845 N.E.2d at 1090-91 (all holding that challenges to a trial court's sentencing statement present no issue for appellate review); with Williams v. State, 861 N.E.2d 714, 716 (Ind.Ct.App. 2007), trans. not sought; Windhorst, 858 N.E.2d at 681 (Vaidik, J., concurring in result); McMahon v. State, 856 N.E.2d 743, 749 (Ind.Ct.App. 2006), trans. not sought; Gibson, 856 N.E.2d at 146-47, trans. not sought (all finding that trial courts have a continuing obligation to issue sentencing statements). See also Luhrsen v. State, 864 N.E.2d 452, 457 (Ind.Ct.App. 2007); Henderson v. State, 848 N.E.2d 341, 347-48 n. 4 (Ind.Ct.App. 2006) (Sullivan, J., concurring in result) (both recognizing the split among panels of the Court of Appeals).

66
67   Analysis
68   We begin our discussion by observing that Indiana's new sentencing statutes apparently were enacted to resolve the Sixth Amendment problem Blakely presented. By eliminating fixed terms, the Legislature created a regime in which there is no longer a maximum sentence a judge "may impose without any additional findings." Blakely, 542 U.S. at 304, 124 S.Ct. 2531 (emphasis omitted). And this is so because for Blakely purposes the maximum sentence is now the upper statutory limit. As a result, even with judicial findings of aggravating circumstances, it is now impossible to "increase the penalty for a crime beyond the prescribed statutory maximum." Blakely, 542 U.S. at 301, 124 S.Ct. 2531 (quoting Apprendi 530 U.S. at 490, 120 S.Ct. 2348).

69
70   In a recent decision the United States Supreme Court referenced Indiana as one of two jurisdictions that has modified its sentencing statutes in the wake of Apprendi

"advisory" sentences under the newly enacted statutes are the same as the "presumptive" sentences under the previous statutes.

53

54    A court may impose any sentence that is:
55    (1) authorized by statute; and
56    (2) permissible under the Constitution of the State of Indiana; regardless of the presence or absence of aggravating circumstances or mitigating circumstances.
57    I.C. § 35-38-1-7.1(d) (emphasis added). Notwithstanding this provision the Legislature retained Indiana Code section 35-38-1-3 that provides:

58

59    Before sentencing a person for a felony, the court must conduct a hearing to consider the facts and circumstances relevant to sentencing. The person is entitled to subpoena and call witnesses and to present information in his own behalf. The court shall make a record of the hearing, including:
60    (1) a transcript of the hearing;
61    (2) a copy of the presentence report; and
62    (3) if the court finds aggravating circumstances or mitigating circumstances, a statement of the court's reasons for selecting the sentence that it imposes.
63    In the aftermath of these legislative revisions the Court of Appeals has been divided on whether and to what extent trial judges are now required to make sentencing statements explaining their sentencing decisions and whether any such statements must include findings of aggravating and mitigating factors. Closely related to these issues are the scope and role of appellate review. This lack of consensus is understandable. Writing for the panel in Gibson v. State, 856 N.E.2d 142 (Ind.Ct.App. 2006), Judge Barnes noted the challenges courts now face in a post-Blakely/Smylie world. He observed, "[T]he new statutes raise a new set of questions as to the respective roles of trial and appellate courts in sentencing, the necessity of a trial court continuing to issue sentencing statements, and appellate review of a trial court's finding of aggravators and mitigators under a scheme where the trial court does not have to find aggravators or mitigators to impose any sentence within the statutory range for an offense, including the maximum sentence. The continued validity or relevance of well-established case law developed under the old 'presumptive' sentencing scheme is unclear." Id. at 146. We acknowledge Judge Barnes' concerns. We also observe that subsequent to this case reaching us, the Legislature has spoken further on the subject mandating that, "After a court has pronounced a sentence for a felony conviction, the court shall issue a statement of the court's reasons for selecting the sentence that it imposes." Pub.L. No. 178-2007 (to be codified at I.C. § 35-38-1-1.3) (effective July 1, 2007).

64
65    Compare Golden v. State, 862 N.E.2d 1212, 1216 (Ind.Ct.App. 2007), trans. denied; McDonald v. State, 861 N.E.2d 1255, 1259 (Ind.Ct.App. 2007), trans. pending; Windhorst v. State, 858 N.E.2d 676, 678 n. 2 (Ind.Ct.App. 2006), trans. granted; Anglemyer, 845 N.E.2d at 1090-91 (all holding that challenges to a trial court's sentencing statement present no issue for appellate review); with Williams v. State, 861 N.E.2d 714, 716 (Ind.Ct.App. 2007), trans. not sought; Windhorst, 858 N.E.2d at 681 (Vaidik, J., concurring in result); McMahon v. State, 856 N.E.2d 743, 749 (Ind.Ct.App. 2006), trans. not sought; Gibson, 856 N.E.2d at 146-47, trans. not sought (all finding that trial courts have a continuing obligation to issue sentencing statements). See also Luhrsen v. State, 864 N.E.2d 452, 457 (Ind.Ct.App. 2007); Henderson v. State, 848 N.E.2d 341, 347-48 n. 4 (Ind.Ct.App. 2006) (Sullivan, J., concurring in result) (both recognizing the split among panels of the Court of Appeals).

66
67    Analysis
68    We begin our discussion by observing that Indiana's new sentencing statutes apparently were enacted to resolve the Sixth Amendment problem Blakely presented. By eliminating fixed terms, the Legislature created a regime in which there is no longer a maximum sentence a judge "may impose without any additional findings." Blakely, 542 U.S. at 304, 124 S.Ct. 2531 (emphasis omitted). And this is so because for Blakely purposes the maximum sentence is now the upper statutory limit. As a result, even with judicial findings of aggravating circumstances, it is now impossible to "increase the penalty for a crime beyond the prescribed statutory maximum." Blakely, 542 U.S. at 301, 124 S.Ct. 2531 (quoting Apprendi 530 U.S. at 490, 120 S.Ct. 2348).

69
70    In a recent decision the United States Supreme Court referenced Indiana as one of two jurisdictions that has modified its sentencing statutes in the wake of Apprendi

and Blakely to permit judges "`to exercise broad discretion . . . within a statutory range,' which, `everyone agrees,' encounters no Sixth Amendment shoal." Cunningham v. California, ___ U.S. ___, ___, 127 S.Ct. 856, 871, 166 L.Ed.2d 856 (2007) (quoting Booker, 543 U.S. at 233, 125 S.Ct. 738).

71
72   This is not to say however that a sentencing statement setting forth the trial court's reasons for the sentence imposed no longer plays a role in the trial court's sentencing decision. Even before the 2005 and 2007 statutes requiring sentencing statements, our case law made clear that sentencing statements served two primary purposes: (1) they guarded against arbitrary and capricious sentencing, and (2) they provided an adequate basis for appellate review. Dumbsky v. State, 508 N.E.2d 1274, 1278 (Ind. 1987). We have also observed:

73
74   [A] statement of reasons for imposing a particular sentence serves numerous other goals beyond the two primary goals. An attempt by the sentencing judge to articulate his [or her] reasons for a sentence in each case should in itself contribute significantly to the rationality and consistency of sentences.
75   A statement by the sentencing judge explaining the reasons for commitment can help both the defendant and the public understand why a particular sentence, was imposed. An acceptance of the sentence by the defendant without bitterness is an important ingredient in rehabilitation, and acceptance by the public will foster confidence in the criminal justice system.
76   Abercrombie v. State, 275 Ind. 407, 417 N.E.2d 316, 319 (1981). These goals are no less important today.

77
78   Even though the statute unambiguously declares that a trial judge may impose any sentence within the statutory range without regard to the existence of aggravating or mitigating factors, it is important to note that the statute does not prohibit the judge from identifying facts in aggravation or mitigation. Indeed the statute requires that if the trial court "finds" the existence of "aggravating circumstances or mitigating circumstances" then the trial court is required to give "a statement of the court's reasons for selecting the sentence that it imposes." I.C. § 35-38-1-3. This language suggests a legislative acknowledgement that a sentencing statement identifying aggravators and mitigators retains its status as an integral part of the trial court's sentencing procedure. And this view is consistent with Blakely, which we have noted, "does not prohibit a trial court from finding aggravating circumstances. What [ Blakely] does prohibit is a trial court finding an aggravating circumstance and enhancing a sentence beyond the statutory maximum." Davidson v. State, 849 N.E.2d 591, 594-95 (Ind. 2006). Again, we note, under the amended statutory regime it is impossible to enhance a sentence beyond the statutory maximum.

79
80   We hasten to reiterate that the 2005 amendments were designed to rectify the Sixth Amendment problem that Blakely presented. We discern no legislative intent otherwise to alter fundamentally the trial procedure for sentencing criminal defendants. Thus, construing what we believe is a legislative intent to retain the traditional significance of sentencing statements we conclude that under the new statutory regime Indiana trial courts are required to enter sentencing statements whenever imposing sentence for a felony offense. In order to facilitate its underlying goals, see Abercrombie, 417 N.E.2d at 319, the statement must include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence. If the recitation includes a finding of aggravating or mitigating circumstances, then the statement must identify all significant mitigating and aggravating circumstances and explain why each circumstance has been determined to be mitigating or aggravating.

81
82   But what of appellate review? It is true that the discretion trial courts are now afforded in imposing sentences is significantly broader than that existing under the prior statutes. But our standard of review is only modestly altered by the new sentencing regime. That is to say, subject to the review and revise power discussed below, sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. Smallwood v. State, 773 N.E.2d 259, 263 (Ind. 2002). Nothing in the amended statutory regime changes this standard. So long as the sentence is within the statutory range, it is subject to review only for abuse of discretion. As we have previously observed, "In order to carry out our function of reviewing the trial court's exercise of discretion in sentencing, we must be told of [its] reasons for imposing the sentence. . . . This necessarily requires a statement of facts, in some detail, which are peculiar to the

and Blakely to permit judges "`to exercise broad discretion . . . within a statutory range,' which, `everyone agrees,' encounters no Sixth Amendment shoal." Cunningham v. California, ___ U.S. ___, ___, 127 S.Ct. 856, 871, 166 L.Ed.2d 856 (2007) (quoting Booker, 543 U.S. at 233, 125 S.Ct. 738).

71

72 This is not to say however that a sentencing statement setting forth the trial court's reasons for the sentence imposed no longer plays a role in the trial court's sentencing decision. Even before the 2005 and 2007 statutes requiring sentencing statements, our case law made clear that sentencing statements served two primary purposes: (1) they guarded against arbitrary and capricious sentencing, and (2) they provided an adequate basis for appellate review. Dumbsky v. State, 508 N.E.2d 1274, 1278 (Ind. 1987). We have also observed:

73

74 [A] statement of reasons for imposing a particular sentence serves numerous other goals beyond the two primary goals. An attempt by the sentencing judge to articulate his [or her] reasons for a sentence in each case should in itself contribute significantly to the rationality and consistency of sentences.

75 A statement by the sentencing judge explaining the reasons for commitment can help both the defendant and the public understand why a particular sentence, was imposed. An acceptance of the sentence by the defendant without bitterness is an important ingredient in rehabilitation, and acceptance by the public will foster confidence in the criminal justice system.

76 Abercrombie v. State, 275 Ind. 407, 417 N.E.2d 316, 319 (1981). These goals are no less important today.

77

78 Even though the statute unambiguously declares that a trial judge may impose any sentence within the statutory range without regard to the existence of aggravating or mitigating factors, it is important to note that the statute does not prohibit the judge from identifying facts in aggravation or mitigation. Indeed the statute requires that if the trial court "finds" the existence of "aggravating circumstances or mitigating circumstances" then the trial court is required to give "a statement of the court's reasons for selecting the sentence that it imposes." I.C. § 35-38-1-3. This language suggests a legislative acknowledgement that a sentencing statement identifying aggravators and mitigators retains its status as an integral part of the trial court's sentencing procedure. And this view is consistent with Blakely, which we have noted, "does not prohibit a trial court from finding aggravating circumstances. What [ Blakely] does prohibit is a trial court finding an aggravating circumstance and enhancing a sentence beyond the statutory maximum." Davidson v. State, 849 N.E.2d 591, 594-95 (Ind. 2006). Again, we note, under the amended statutory regime it is impossible to enhance a sentence beyond the statutory maximum.

79

80 We hasten to reiterate that the 2005 amendments were designed to rectify the Sixth Amendment problem that Blakely presented. We discern no legislative intent otherwise to alter fundamentally the trial procedure for sentencing criminal defendants. Thus, construing what we believe is a legislative intent to retain the traditional significance of sentencing statements we conclude that under the new statutory regime Indiana trial courts are required to enter sentencing statements whenever imposing sentence for a felony offense. In order to facilitate its underlying goals, see Abercrombie, 417 N.E.2d at 319, the statement must include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence. If the recitation includes a finding of aggravating or mitigating circumstances, then the statement must identify all significant mitigating and aggravating circumstances and explain why each circumstance has been determined to be mitigating or aggravating.

81

82 But what of appellate review? It is true that the discretion trial courts are now afforded in imposing sentences is significantly broader than that existing under the prior statutes. But our standard of review is only modestly altered by the new sentencing regime. That is to say, subject to the review and revise power discussed below, sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. Smallwood v. State, 773 N.E.2d 259, 263 (Ind. 2002). Nothing in the amended statutory regime changes this standard. So long as the sentence is within the statutory range, it is subject to review for abuse of discretion. As we have previously observed, "In order to carry out our function of reviewing the trial court's exercise of discretion in sentencing, we must be told of [its] reasons for imposing the sentence. . . . This necessarily requires a statement of facts, in some detail, which are peculiar to the

particular defendant and the crime, as opposed to general impressions or conclusions. Of course such facts must have support in the record." Page v. State, 424 N.E.2d 1021, 1023 (Ind. 1981). An abuse of discretion occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." K.S. v. State, 849 N.E.2d 538, 544 (Ind. 2006) (quoting In re L.J.M., 473 N.E.2d 637, 640 (Ind.Ct.App. 1985)).

83
84 One way in which a trial court may abuse its discretion is failing to enter a sentencing statement at all. Other examples include entering a sentencing statement that explains reasons for imposing a sentence — including a finding of aggravating and mitigating factors if any — but the record does not support the reasons, or the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration, or the reasons given are improper as a matter of law. Under those circumstances, remand for resentencing may be the appropriate remedy if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record.

85
86 Because the trial court no longer has any obligation to "weigh" aggravating and mitigating factors against each other when imposing a sentence, unlike the pre-Blakely statutory regime, a trial court can not now be said to have abused its discretion in failing to "properly weigh" such factors. See, e.g., Jackson v. State, 728 N.E.2d 147, 155 (Ind. 2000) (finding that the Court could not determine from the sentencing statement whether the trial court "properly weighed" the aggravating and mitigating factors); Morgan v. State, 675 N.E.2d 1067, 1073-74 (Ind. 1996) (finding that the Court could not conclude that the aggravating and mitigating factors were "properly weighed" where the sentencing statement did not, in part, explain its balancing process). And this is so because once the trial court has entered a sentencing statement, which may or may not include the existence of aggravating and mitigating factors, it may then "impose any sentence that is . . . authorized by statute; and . . . permissible under the Constitution of the State of Indiana." I.C. § 35-38-1-7.1(d). This does not mean however that criminal defendants have no recourse in challenging sentences they believe are excessive.

87
88 Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution "authorize independent appellate review and revision of a sentence imposed by the trial court." Childress, 848 N.E.2d at 1080 (emphasis omitted) (quoting Buchanan v. State, 767 N.E.2d 967, 972 (Ind. 2002)). This appellate authority is implemented through Appellate Rule 7(B), which provides that the "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." It is on this basis alone that a criminal defendant may now challenge his or her sentence where the trial court has entered a sentencing statement that includes a reasonably detailed recitation of its reasons for imposing a particular sentence that is supported by the record, and the reasons are not improper as a matter of law, but has imposed a sentence with which the defendant takes issue.

89
90 To summarize, the imposition of sentence and the review of sentences on appeal should proceed as follows:

91
92 1. The trial court must enter a statement including reasonably detailed reasons or circumstances for imposing a particular sentence.
93 2. The reasons given, and the omission of reasons arguably supported by the record, are reviewable on appeal for abuse of discretion.
94 3. The relative weight or value assignable to reasons properly found or those which should have been found is not subject to review for abuse.
95 4. Appellate review of the merits of a sentence may be sought on the grounds outlined in Appellate Rule 7(B).
96 With the foregoing framework in mind, we now turn to Anglemyer's claims.

97
98 The amended sentencing scheme was enacted on April 25, 2005. Pub.L. No. 71-2005, § 3 (codified at I.C. § 35-38-1-7.1(d) (West Supp. 2005)); Pub.L. No. 71-2005, § 5 (codified at I.C. § 35-50-2-1.3 (West Supp. 2005)). It thus applies to Anglemyer whose crimes were committed thereafter.

99

particular defendant and the crime, as opposed to general impressions or conclusions. Of course such facts must have support in the record." Page v. State, 424 N.E.2d 1021, 1023 (Ind. 1981). An abuse of discretion occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." K.S. v. State, 849 N.E.2d 538, 544 (Ind. 2006) (quoting In re L.J.M., 473 N.E.2d 637, 640 (Ind.Ct.App. 1985)).

83

84   One way in which a trial court may abuse its discretion is failing to enter a sentencing statement at all. Other examples include entering a sentencing statement that explains reasons for imposing a sentence — including a finding of aggravating and mitigating factors if any — but the record does not support the reasons, or the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration, or the reasons given are improper as a matter of law. Under those circumstances, remand for resentencing may be the appropriate remedy if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record.

85

86   Because the trial court no longer has any obligation to "weigh" aggravating and mitigating factors against each other when imposing a sentence, unlike the pre-Blakely statutory regime, a trial court can not now be said to have abused its discretion in failing to "properly weigh" such factors. See, e.g., Jackson v. State, 728 N.E.2d 147, 155 (Ind. 2000) (finding that the Court could not determine from the sentencing statement whether the trial court "properly weighed" the aggravating and mitigating factors); Morgan v. State, 675 N.E.2d 1067, 1073-74 (Ind. 1996) (finding that the Court could not conclude that the aggravating and mitigating factors were "properly weighed" where the sentencing statement did not, in part, explain its balancing process). And this is so because once the trial court has entered a sentencing statement, which may or may not include the existence of aggravating and mitigating factors, it may then "impose any sentence that is . . . authorized by statute; and . . . permissible under the Constitution of the State of Indiana." I.C. § 35-38-1-7.1(d). This does not mean however that criminal defendants have no recourse in challenging sentences they believe are excessive.

87

88   Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution "authorize independent appellate review and revision of a sentence imposed by the trial court." Childress, 848 N.E.2d at 1080 (emphasis omitted) (quoting Buchanan v. State, 767 N.E.2d 967, 972 (Ind. 2002)). This appellate authority is implemented through Appellate Rule 7(B), which provides that the "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." It is on this basis alone that a criminal defendant may now challenge his or her sentence where the trial court has entered a sentencing statement that includes a reasonably detailed recitation of its reasons for imposing a particular sentence that is supported by the record, and the reasons are not improper as a matter of law, but has imposed a sentence with which the defendant takes issue.

89

90   To summarize, the imposition of sentence and the review of sentences on appeal should proceed as follows:

91

92   1. The trial court must enter a statement including reasonably detailed reasons or circumstances for imposing a particular sentence.

93   2. The reasons given, and the omission of reasons arguably supported by the record, are reviewable on appeal for abuse of discretion.

94   3. The relative weight or value assignable to reasons properly found or those which should have been found is not subject to review for abuse.

95   4. Appellate review of the merits of a sentence may be sought on the grounds outlined in Appellate Rule 7(B).

96   With the foregoing framework in mind, we now turn to Anglemyer's claims.

97

98   The amended sentencing scheme was enacted on April 25, 2005. Pub.L. No. 71-2005, § 3 (codified at I.C. § 35-38-1-7.1(d) (West Supp. 2005)); Pub.L. No. 71-2005, § 5 (codified at I.C. § 35-50-2-1.3 (West Supp. 2005)). It thus applies to Anglemyer whose crimes were committed thereafter.

99

100    In imposing sentence the trial court entered a sentencing statement identifying as aggravating factors Anglemyer's criminal history that included several juvenile adjudications as well as a September 2004 conviction for criminal conversion as a Class A misdemeanor and a December 2004 conviction for visiting a common nuisance, a Class B misdemeanor. As additional aggravating factors the court cited the seriousness of this offense and also noted that within months of the December 2004 conviction Anglemyer committed the instant offenses. The court listed Anglemyer's age — eighteen — as the sole mitigating factor, but gave "greater weight to aggravating factors." App. at 84.

101
102    Anglemyer does not contest his ten-year advisory sentence for the Class B robbery conviction. Instead he focuses on the six-year sentence — two years above the advisory sentence — the trial court imposed for the Class C battery conviction. And except for the trial court's finding of the "seriousness of this offense" Anglemyer does not challenge the propriety of the remaining aggravating factors. Rather he contends, "Several valid mitigators were overlooked by the Trial Court. . ." Br. of Appellant at 10.

103
104    As one might anticipate, not having the benefit of our analysis today, the trial court's sentencing statement does not include a "reasonably detailed recitation" of the court's reasons for imposing a six-year term. However, the statement does identify both aggravating and mitigating factors and explain why they are deemed as such. It is thus sufficient for this Court to conduct meaningful appellate review.

105
106    Concerning the seriousness of the offense, this aggravator, which implicitly includes the nature and circumstances of the crime as well as the manner in which the crime is committed, has long been held a valid aggravating factor. See, e.g., Taylor v. State, 695 N.E.2d 117, 120 (Ind. 1998). We find no error here.

107
108    Anglemyer also contends the trial court "overlooked" the following mitigating factors: (1) the crime was the result of circumstances unlikely to recur, (2) he pleaded guilty, (3) he expressed remorse, and (4) he suffers "significant mental illness." Br. of Appellant at 10.

109
110    Our existing precedent is equal to the task of resolving this contention. As our courts have determined in the past, the trial court does not abuse its discretion in failing to consider a mitigating factor that was not raised at sentencing. Georgopulos v. State, 735 N.E.2d 1138, 1145 (Ind. 2000); see also Creekmore v. State, 853 N.E.2d 523, 530 (Ind.Ct.App. 2006) ("[I]f the defendant fails to advance a mitigating circumstance at sentencing, this court will presume that the factor is not significant, and the defendant is precluded from advancing it as a mitigating circumstance for the first time on appeal."). The record shows that at the sentencing hearing, Anglemyer argued the existence of two mitigating factors: his age and mental illness. App. at 100-02. As mentioned earlier, the trial court identified Anglemyer's age as a mitigating circumstance but assigned it minimal weight. We thus address Anglemyer's mental illness claim. The remaining alleged mitigating circumstances are precluded from review.

111
112    Because the trial court's recitation of its reasons for imposing sentence included a finding of mitigating circumstances, the trial court was required to  identify all significant mitigating circumstances. See also Battles v. State, 688 N.E.2d 1230, 1236 (Ind. 1997) (A sentencing statement must include those mitigators the trial court found to be significant.). An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. Carter v. State, 711 N.E.2d 835, 838 (Ind. 1999); see also Wilkins v. State, 500 N.E.2d 747, 749 (Ind. 1986) ("If significant mitigating circumstances are clearly supported by the record, it would be proper to remand with instructions to reconsider the sentence and enter a new sentencing statement in compliance with the foregoing requirements."). However, "If the trial court does not find the existence of a mitigating factor after it has been argued by counsel, the trial court is not obligated to explain why it has found that the factor does not exist." Fugate v. State, 608 N.E.2d 1370, 1374 (Ind. 1993).

113
114    Anglemyer is incorrect in his assertion that the trial court "overlooked" his mental illness as a mitigating factor, or in the language of our decision today, that "the sentencing statement omits [a] reason," specifically Anglemyer's mental illness,

100   In imposing sentence the trial court entered a sentencing statement identifying as aggravating factors Anglemyer's criminal history that included several juvenile adjudications as well as a September 2004 conviction for criminal conversion as a Class A misdemeanor and a December 2004 conviction for visiting a common nuisance, a Class B misdemeanor. As additional aggravating factors the court cited the seriousness of this offense and also noted that within months of the December 2004 conviction Anglemyer committed the instant offenses. The court listed Anglemyer's age — eighteen — as the sole mitigating factor, but gave "greater weight to aggravating factors." App. at 84.

101
102   Anglemyer does not contest his ten-year advisory sentence for the Class B robbery conviction. Instead he focuses on the six-year sentence — two years above the advisory sentence — the trial court imposed for the Class C battery conviction. And except for the trial court's finding of the "seriousness of this offense" Anglemyer does not challenge the propriety of the remaining aggravating factors. Rather he contends, "Several valid mitigators were overlooked by the Trial Court. . ." Br. of Appellant at 10.

103
104   As one might anticipate, not having the benefit of our analysis today, the trial court's sentencing statement does not include a "reasonably detailed recitation" of the court's reasons for imposing a six-year term. However, the statement does identify both aggravating and mitigating factors and explain why they are deemed as such. It is thus sufficient for this Court to conduct meaningful appellate review.

105
106   Concerning the seriousness of the offense, this aggravator, which implicitly includes the nature and circumstances of the crime as well as the manner in which the crime is committed, has long been held a valid aggravating factor. See, e.g., Taylor v. State, 695 N.E.2d 117, 120 (Ind. 1998). We find no error here.

107
108   Anglemyer also contends the trial court "overlooked" the following mitigating factors: (1) the crime was the result of circumstances unlikely to recur, (2) he pleaded guilty, (3) he expressed remorse, and (4) he suffers "significant mental illness." Br. of Appellant at 10.

109
110   Our existing precedent is equal to the task of resolving this contention. As our courts have determined in the past, the trial court does not abuse its discretion in failing to consider a mitigating factor that was not raised at sentencing. Georgopulos v. State, 735 N.E.2d 1138, 1145 (Ind. 2000); see also Creekmore v. State, 853 N.E.2d 523, 530 (Ind.Ct.App. 2006) ("[I]f the defendant fails to advance a mitigating circumstance at sentencing, this court will presume that the factor is not significant, and the defendant is precluded from advancing it as a mitigating circumstance for the first time on appeal."). The record shows that at the sentencing hearing, Anglemyer argued the existence of two mitigating factors: his age and mental illness. App. at 100-02. As mentioned earlier, the trial court identified Anglemyer's age as a mitigating circumstance but assigned it minimal weight. We thus address Anglemyer's mental illness claim. The remaining alleged mitigating circumstances are precluded from review.

111
112   Because the trial court's recitation of its reasons for imposing sentence included a finding of mitigating circumstances, the trial court was required to  identify all significant mitigating circumstances. See also Battles v. State, 688 N.E.2d 1230, 1236 (Ind. 1997) (A sentencing statement must include those mitigators the trial court found to be significant.). An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. Carter v. State, 711 N.E.2d 835, 838 (Ind. 1999); see also Wilkins v. State, 500 N.E.2d 747, 749 (Ind. 1986) ("If significant mitigating circumstances are clearly supported by the record, it would be proper to remand with instructions to reconsider the sentence and enter a new sentencing statement in compliance with the foregoing requirements."). However, "If the trial court does not find the existence of a mitigating factor after it has been argued by counsel, the trial court is not obligated to explain why it has found that the factor does not exist." Fugate v. State, 608 N.E.2d 1370, 1374 (Ind. 1993).

113
114   Anglemyer is incorrect in his assertion that the trial court "overlooked" his mental illness as a mitigating factor, or in the language of our decision today, that "the sentencing statement omits [a] reason," specifically Anglemyer's mental illness,

that is "supported by the record." The record shows that at sentencing Anglemyer presented to the trial court a lengthy psychological evaluation conducted on March 29, 2001 which, summarized, revealed that at age fourteen Anglemyer suffered a personality disorder characterized by symptoms of "situational stress," "depression," feelings of "guilt" and "inadequate amounts of energy." App. at 77. Anglemyer also presented excerpts of a psychiatric evaluation dated July 1, 2002 that noted, "Alex has a long history of emotional and behavioral problems." Id. at 82. He was diagnosed with "Bipolar Mood Disorder," "Intermittent Explosive Disorder," and "Oppositional Defiant Disorder." Id. at 83.

115

116 Apparently around the time Anglemyer robbed and battered the pizza delivery driver, he was enrolled in a program at a mental health facility that included monitoring of Anglemyer's activities and providing him with medication to control his behavior. But Anglemyer dropped out of the program. Indeed the trial court questioned Anglemyer's counsel on this very point:

117

118 [Trial Court] I guess my question was, was he involuntarily taken off or did he make a choice to not receive aid?

119 [Defense counsel] There was a choice made in that he was offered by the Bowen Center the opportunity to continue on the program; however, the monitoring system is something that an 18 year old was not ready for. . . . He would have been monitored on a daily basis, counseling on a daily basis. As an 18 year old, he said no at that time. . . .

120 [Trial court] Here's the problem that I have with your argument . . . Mr. Anglemyer, is to the extent that in our country at the present time an adult is considered to be 18 years of age. At 18 years of age you knew you had a problem. You were offered a helping hand and you slapped that hand away. . . . You could have lived your own life, but you didn't have to affect [the victim's] life and you did. He was injured. He lost work because you chose to not work, not get the help from the Bowen Center.

121 App. at 101-02, 104-05. It is apparent to us that rather than overlooking Anglemyer's mental illness, the trial court determined it was not significant and thus would not be a factor influencing the trial court's sentencing decision. This was the trial court's call. We find no error. To the extent Anglemyer complains that the trial court abused its discretion in failing to give his proffered mitigating factor greater weight, this claim is not available for appellate review.

122

123 We last address Anglemyer's inappropriateness claim. Although citing Appellate Rule 7(B) Anglemyer tells us nothing about the nature of the offense and little about his character. Instead he simply says, "An appropriate consideration of sentencing criteria should cause this Court to reduce Anglemyer's sentence for Count II (Battery) to the advisory period of four (4) years. Further, this sentence should be suspended and Anglemyer placed on probation for this period." Br. of Appellant at 7.

124

125 We have declared, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." Childress, 848 N.E.2d at 1080. Anglemyer has not carried this burden. In any event, regarding the nature of the offense, the advisory sentence is the starting point the Legislature has selected as an appropriate sentence for the crime committed. Id. at 1081. The advisory sentence for a Class C felony is four years. See I.C. § 35-50-2-6(a). Here the trial court imposed a six-year term. Although the nature of the offense may justify an advisory sentence under some circumstances, those circumstances are not present in this case. The victim's beating was unnecessarily brutal. Anglemyer beat and kicked the victim while he was merely doing his job — delivering a pizza. As for the character of the offender, in addition to Anglemyer's history of criminal conduct, he was also on bond at the time he committed this offense. Further the instant offense was carried out through subterfuge, deceit, and careful planning. In the end we are not persuaded that nature of the offense or character of the offender justifies revising Anglemyer's sentence.

126

127 Conclusion

128 We affirm the judgment of the trial court.

129

130 SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.

that is "supported by the record." The record shows that at sentencing Anglemyer presented to the trial court a lengthy psychological evaluation conducted on March 29, 2001 which, summarized, revealed that at age fourteen Anglemyer suffered a personality disorder characterized by symptoms of "situational stress," "depression," feelings of "guilt" and "inadequate amounts of energy." App. at 77. Anglemyer also presented excerpts of a psychiatric evaluation dated July 1, 2002 that noted, "Alex has a long history of emotional and behavioral problems." Id. at 82. He was diagnosed with "Bipolar Mood Disorder," "Intermittent Explosive Disorder," and "Oppositional Defiant Disorder." Id. at 83.

115

116   Apparently around the time Anglemyer robbed and battered the pizza delivery driver, he was enrolled in a program at a mental health facility that included monitoring of Anglemyer's activities and providing him with medication to control his behavior. But Anglemyer dropped out of the program. Indeed the trial court questioned Anglemyer's counsel on this very point:

117

118   [Trial Court] I guess my question was, was he involuntarily taken off or did he make a choice to not receive aid?

119   [Defense counsel] There was a choice made in that he was offered by the Bowen Center the opportunity to continue on the program; however, the monitoring system is something that an 18 year old was not ready for. . . . He would have been monitored on a daily basis, counseling on a daily basis. As an 18 year old, he said no at that time. . . .

120   [Trial court] Here's the problem that I have with your argument . . . Mr. Anglemyer, is to the extent that in our country at the present time an adult is considered to be 18 years of age. At 18 years of age you knew you had a problem. You were offered a helping hand and you slapped that hand away. . . . You could have lived your own life, but you didn't have to affect [the victim's] life and you did. He was injured. He lost work because you chose to not work, not get the help from the Bowen Center.

121   App. at 101-02, 104-05. It is apparent to us that rather than overlooking Anglemyer's mental illness, the trial court determined it was not significant and thus would not be a factor influencing the trial court's sentencing decision. This was the trial court's call. We find no error. To the extent Anglemyer complains that the trial court abused its discretion in failing to give his proffered mitigating factor greater weight, this claim is not available for appellate review.

122

123   We last address Anglemyer's inappropriateness claim. Although citing Appellate Rule 7(B) Anglemyer tells us nothing about the nature of the offense and little about his character. Instead he simply says, "An appropriate consideration of sentencing criteria should cause this Court to reduce Anglemyer's sentence for Count II (Battery) to the advisory period of four (4) years. Further, this sentence should be suspended and Anglemyer placed on probation for this period." Br. of Appellant at 7.

124

125   We have declared, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." Childress, 848 N.E.2d at 1080. Anglemyer has not carried this burden. In any event, regarding the nature of the offense, the advisory sentence is the starting point the Legislature has selected as an appropriate sentence for the crime committed. Id. at 1081. The advisory sentence for a Class C felony is four years. See I.C. § 35-50-2-6(a). Here the trial court imposed a six-year term. Although the nature of the offense may justify an advisory sentence under some circumstances, those circumstances are not present in this case. The victim's beating was unnecessarily brutal. Anglemyer beat and kicked the victim while he was merely doing his job — delivering a pizza. As for the character of the offender, in addition to Anglemyer's history of criminal conduct, he was also on bond at the time he committed this offense. Further the instant offense was carried out through subterfuge, deceit, and careful planning. In the end we are not persuaded that nature of the offense or character of the offender justifies revising Anglemyer's sentence.

126

127   Conclusion

128   We affirm the judgment of the trial court.

129

130   SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Potential Tax Fraud by Prior Owners
6 messages

**Jon F. Turpin** <jt4590@gmail.com>                                    Sat, Jul 15, 2023 at 2:22 PM
To: fma.usmarshals@gmail.com, "SA Joseph L. Chaney" <jlchaney@fbi.gov>, ronald.davis@gmail.com

As the recently registered agent for Turpin Electric, Inc., I must report potential prior tax fraud, and potential organized crime of the prior registered agents and any domestically-based, affiliated associates, out of genuine concern and for compliance.

Present company excluded, and no concerns regarding Juan P. Santos & Alexis I. Turpin, nor Jon & Samuel Cummings.

Documentation may be availabe in the tan and gray locked office filing cabinets in 522 W. Maple St., Cambridge City, IN 47327.

Sincerely,
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
E-mail: jt4590@gmail.com
FBI Infragard Louisiana & Indiana
Fritz Technology LLC & Turpin Electric, Inc.
BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

**20 attachments**


**Screenshot_20221222-030855_Facebook.jpg**
283K


**Screenshot_20221222-030915_Facebook.jpg**
424K



**Screenshot_20221222-030911_Facebook.jpg**
432K



**Screenshot_20211226-002443_Facebook.jpg**
272K



**FB_IMG_1596339896235.jpg**
285K



**Screenshot_20211226-002401_Facebook.jpg**
324K



**Screenshot_20230715_135151_Samsung Notes.jpg**
472K



**Screenshot_20211226-000738_Facebook.jpg**
328K



**IMAG0625.jpg**
2883K



**Screenshot_20221222-035715_Facebook.jpg**
460K



**Screenshot_20221217-222551_Facebook.jpg**
377K



**Screenshot_20221222-035611_Facebook.jpg**
440K



**20221217_182227.jpg**
2704K


**20221205_181723 1.jpg**
1944K



**Screenshot_20221222-035711_Facebook.jpg**
454K

**Screenshot_20221222-035604_Facebook.jpg**
471K



**Screenshot_20221222-031721_Facebook.jpg**
706K

**20221220_013814.jpg**
3083K

**20221217_184318.jpg**
4016K

**20221214_133434.jpg**
2843K

---

**Jon F. Turpin** <jt4590@gmail.com>                                     Sat, Jul 15, 2023 at 2:34 PM
To: fma.usmarshals@gmail.com, "SA Joseph L. Chaney" <jlchaney@fbi.gov>, ronald.davis@gmail.com

On Sat, Jul 15, 2023, 2:22 PM Jon F. Turpin <jt4590@gmail.com> wrote:
As the recently registered agent for Turpin Electric, Inc., I must report potential prior tax fraud, and potential organized crime of the prior registered agents and any domestically-based, affiliated associates, out of genuine concern and for compliance.

Present company excluded, and no concerns regarding Juan P. Santos & Alexis I. Turpin, nor Jon & Samuel Cummings.

Documentation may be availabe in the tan and gray locked office filing cabinets in 522 W. Maple St., Cambridge City, IN 47327.

Sincerely,
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
E-mail: jt4590@gmail.com
FBI Infragard Louisiana & Indiana
Fritz Technology LLC & Turpin Electric, Inc.
BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

**13 attachments**

**MichaelAlanMannHolwager_HighSchoolYears1.png**
99K

**Screenshot_20230625_003848_Chrome.jpg**
523K

**20230624_234816.jpg**
2223K

**20230624_232202.jpg**
4654K



**20230624_230254.jpg**
1959K

**Screenshot_20230625_003902_Chrome.jpg**
522K

**JonBTurpin_CoachmanParody1.png**
279K



**20230624_234806.jpg**
2164K

**Screenshot_20230625_003834_Chrome.jpg**
437K



**20211231_142839.jpg**
5401K



**Screenshot_20230625_003823_Chrome.jpg**
562K



**20230624_232136.jpg**
3674K

**OldHistory_CourtCaseforBells_NeverIncludeWives&Kids.pdf**
222K

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Sat, Jul 15, 2023 at 2:36 PM
To: fma.usmarshals@gmail.com, "SA Joseph L. Chaney" <jlchaney@fbi.gov>, ronald.davis@gmail.com, "cawray@fbi.gov" <cawray@fbi.gov>

On Sat, Jul 15, 2023, 2:34 PM Jon F. Turpin <jt4590@gmail.com> wrote:

On Sat, Jul 15, 2023, 2:22 PM Jon F. Turpin <jt4590@gmail.com> wrote:
As the recently registered agent for Turpin Electric, Inc., I must report potential prior tax fraud, and potential organized crime of the prior registered agents and any domestically-based, affiliated associates, out of genuine concern and for compliance.

Present company excluded, and no concerns regarding Juan P. Santos & Alexis I. Turpin, nor Jon & Samuel Cummings.

Documentation may be availabe in the tan and gray locked office filing cabinets in 522 W. Maple St., Cambridge City, IN 47327.

Sincerely,
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
E-mail: jt4590@gmail.com
FBI Infragard Louisiana & Indiana
Fritz Technology LLC & Turpin Electric, Inc.

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Sat, Jul 15, 2023 at 2:55 PM
To: kirjaamo.okv@gov.fi

---------- Forwarded message ----------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Sat, Jul 15, 2023 at 2:22 PM
Subject: Potential Tax Fraud by Prior Owners
To: <fma.usmarshals@gmail.com>, SA Joseph L. Chaney <jlchaney@fbi.gov>, <ronald.davis@gmail.com>


As the recently registered agent for Turpin Electric, Inc., I must report potential prior tax fraud, and potential organized crime of the prior registered agents and any domestically-based, affiliated associates, out of genuine concern and for compliance.

Present company excluded, and no concerns regarding Juan P. Santos & Alexis I. Turpin, nor Jon & Samuel Cummings.

Documentation may be availabe in the tan and gray locked office filing cabinets in 522 W. Maple St., Cambridge City, IN 47327.

Sincerely,
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
E-mail: jt4590@gmail.com
FBI Infragard Louisiana & Indiana
Fritz Technology LLC & Turpin Electric, Inc.
BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

---

**20 attachments**



**Screenshot_20221222-030855_Facebook.jpg**
283K



**Screenshot_20221222-030915_Facebook.jpg**
424K



**Screenshot_20221222-030911_Facebook.jpg**
432K

 **Screenshot_20211226-002443_Facebook.jpg**
272K

 **FB_IMG_1596339896235.jpg**
285K

 **Screenshot_20211226-002401_Facebook.jpg**
324K



**Screenshot_20230715_135151_Samsung Notes.jpg**
472K



**Screenshot_20211226-000738_Facebook.jpg**
328K

 **IMAG0625.jpg**
2883K

 **Screenshot_20221222-035715_Facebook.jpg**
460K

 **Screenshot_20221217-222551_Facebook.jpg**
377K



**Screenshot_20221222-035611_Facebook.jpg**
440K

 **20221217_182227.jpg**
2704K

**20221205_181723 1.jpg**
1944K

 **Screenshot_20221222-035711_Facebook.jpg**
454K

 **Screenshot_20221222-035604_Facebook.jpg**
471K

 **Screenshot_20221222-031721_Facebook.jpg**
706K

 **20221220_013814.jpg**
3083K

 **20221217_184318.jpg**
4016K

 **20221214_133434.jpg**
2843K

---

**Jon F. Turpin** <jt4590@gmail.com>                                          Sat, Jul 15, 2023 at 2:56 PM
To: kirjaamo.okv@gov.fi

---------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Sat, Jul 15, 2023 at 2:34 PM
Subject: Re: Potential Tax Fraud by Prior Owners
To: <fma.usmarshals@gmail.com>, SA Joseph L. Chaney <jlchaney@fbi.gov>, <ronald.davis@gmail.com>


On Sat, Jul 15, 2023, 2:22 PM Jon F. Turpin <jt4590@gmail.com> wrote:
As the recently registered agent for Turpin Electric, Inc., I must report potential prior tax fraud, and potential organized crime of the prior registered agents and any domestically-based, affiliated associates, out of genuine concern and for

compliance.

Present company excluded, and no concerns regarding Juan P. Santos & Alexis I. Turpin, nor Jon & Samuel Cummings.

Documentation may be availabe in the tan and gray locked office filing cabinets in 522 W. Maple St., Cambridge City, IN 47327.

Sincerely,
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
E-mail: jt4590@gmail.com
FBI Infragard Louisiana & Indiana
Fritz Technology LLC & Turpin Electric, Inc.
BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

**13 attachments**


**MichaelAlanMannHolwager_HighSchoolYears1.png**
99K


**Screenshot_20230625_003848_Chrome.jpg**
523K


**20230624_234816.jpg**
2223K


**20230624_232202.jpg**
4654K


**20230624_230254.jpg**
1959K


**Screenshot_20230625_003902_Chrome.jpg**
522K



**JonBTurpin_CoachmanParody1.png**
279K



**20230624_234806.jpg**
2164K



**Screenshot_20230625_003834_Chrome.jpg**
437K



**20211231_142839.jpg**
5401K

 **Screenshot_20230625_003823_Chrome.jpg**
562K



**20230624_232136.jpg**
3674K

**OldHistory_CourtCaseforBells_NeverIncludeWives&Kids.pdf**
222K

**Jon F. Turpin** <jt4590@gmail.com>                                              Sat, Jul 15, 2023 at 2:57 PM
To: kirjaamo.okv@gov.fi

---------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Sat, Jul 15, 2023 at 2:36 PM
Subject: Re: Potential Tax Fraud by Prior Owners
To: <fma.usmarshals@gmail.com>, SA Joseph L. Chaney <jlchaney@fbi.gov>, <ronald.davis@gmail.com>,
**cawray@fbi.gov <cawray@fbi.gov>**


On Sat, Jul 15, 2023, 2:34 PM Jon F. Turpin <jt4590@gmail.com> wrote:

On Sat, Jul 15, 2023, 2:22 PM Jon F. Turpin <jt4590@gmail.com> wrote:
As the recently registered agent for Turpin Electric, Inc., I must report potential prior tax fraud, and potential
organized crime of the prior registered agents and any domestically-based, affiliated associates, out of genuine
concern and for compliance.

Present company excluded, and no concerns regarding Juan P. Santos & Alexis I. Turpin, nor Jon & Samuel
Cummings.

Documentation may be availabe in the tan and gray locked office filing cabinets in 522 W. Maple St., Cambridge City,
IN 47327.

Sincerely,
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
E-mail: jt4590@gmail.com
FBI Infragard Louisiana & Indiana
Fritz Technology LLC & Turpin Electric, Inc.
BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley



# Ind. Dept. of State Revenue v. the Boswell Oil Co.

**148 Ind. App. 569 (1971)**

**268 N.E.2d 303**

INDIANA DEPARTMENT OF STATE REVENUE v. THE BOSWELL OIL COMPANY.

No. 870A126.

**Court of Appeals of Indiana.**

Filed April 12, 1971.

*570 Theodore L. Sendak, Attorney General, Hugh R. Couch, Larry J. McKinney, Deputies Attorney General, for appellant.

T. Stephen Phillips, Frost & Jacobs, of Cincinnati, Ohio, Richard H. Riegner, White, Raub, Reis & Wick, of Indianapolis, for appellee.

BUCHANAN, J.

STATEMENT OF THE CASE AND FACTS This appeal concerns an action brought by the plaintiff-appellee, Boswell Oil Company (Boswell), to determine whether its operations in Indiana qualify it as a "broker" under the Indiana Gross Income Tax Act, I.C. 1971, 6-2-1-1, Ind. Stat. Anno. § 64-2601 (n) Burns Cum. Supp. (1970), herein referred to as "the Act," thereby entitling it to favorable tax treatment accorded to brokers under the Act.

Boswell brought suit to recover alleged excess gross income taxes collected for the years 1964, 1965, and 1966 in the amount of $2,554.37, plus interest as allowed by statute. The case was tried to the court without the intervention of a jury and judgment awarded to

Boswell as prayed for in its complaint. At the request of defendant-appellant, Indiana Department *571 of State Revenue (the Department), Findings of Fact were entered by the court as follows:[1]

1. Plaintiff, The Boswell Oil Company, is an Ohio Corporation which is admitted to do business in the State of Indiana. 2. This Court has jurisdiction of the parties to this action and of the subject matter of this action. 3. The plaintiff operates in the State of Indiana by matching refinery-suppliers of residual fuel oil and consumers of such oil. The plaintiff's employee, Charles D. Mayer, calls on consumers of residual fuel oil in Indiana and seeks out refinery-sources of supply to cover the consumers' requirements. 4. The plaintiff negotiates fuel oil prices with the refinery and with the consumer in order to effect a transaction. 5. The average refinery cost of residual fuel oil is 7 cents to 9 cents, and the plaintiff adds a mark-up to the cost of normal 1/4 cent to 1/2 cent per gallon. 6. The plaintiff receives a commitment from a refinery that the refinery can supply gallonage at a specific price before the plaintiff takes an order from an Indiana consumer. 7. Orders for fuel oil are placed by Indiana consumers with the plaintiff in Cincinnati, Ohio, and the plaintiff in turn places identical orders with the refineries; the plaintiff does not place an order with a refinery before it has received an identical order from an Indiana consumer. 8. The fuel oil is transported directly from the refinery to the Indiana consumer by refinery truck or public carrier, the plaintiff never taking possession of the fuel oil. 9. The refinery supplying fuel oil knows the consumer to whom the oil is sold and shipped, and the consumer knows the refinery-source from which the oil originates. 10. The refinery invoices the plaintiff for oil transported and the plaintiff, in turn, invoices the consumer, adding a mark-up. 11. The plaintiff does not purchase and maintain in Indiana a store of fuel oil for sale or investment. 12. Within the fuel oil industry, refineries market residual fuel oil through brokers as contrasted with marketing directly to the consumer through their own facilities.

*572 ISSUES Both parties treat as the sole question for determination whether Boswell is a broker as that term is used in the Act and therefore entitled to be taxed at the rate of 2% of its gross earnings, rather than be taxed at the rate of 1/2 of 1% of its gross income.

The Department timely filed its Motion to Correct Errors alleging that the decision of the court was not sustained by sufficient evidence, was contrary to law, and that certain of the findings were faulty. The court then overruled the Motion and denied a new trial.

The Department seeks reversal on the grounds that Boswell's operations in Indiana were not those of a broker because contracts were not negotiated for others but for itself as principal; two contracts were entered into in which Boswell was a principal party; suppliers

looked to Boswell for payment after residual oil was sold to consumers; credit was extended by Boswell on occasions; the consumer looked to Boswell for delivery; and Boswell acted in its own name. The Department also contends that Findings of Fact numbered 1 to 12 do not contain the ultimate facts put into issue by Boswell's complaint as they are evidentiary only, and as such are inconsistent with the holding against the Department.

Not to be outdone, Boswell contends that it matches suppliers and consumers, negotiates prices, does not accept an order until it has a commitment to supply, does not maintain a store of goods and never takes possession of the oil, and deals with suppliers who know the consumer using the oil and with consumers knowing the supplier of the oil. As to the question of the insufficiency of the Findings of Fact because they are evidentiary in nature, Boswell contends that, taken together and not separately, the Findings do adequately describe the ultimate fact of Boswell's operation as a broker within the meaning of the Act.

DECISION It is our opinion that Boswell is a broker within the meaning of the Act and is therefore entitled to be taxed at the rate of 2% of its gross earnings.

*573 The Act uses the term "broker" but does not otherwise define this term. Burns § 64-2601 (n) supra provides as follows:

"In the case of banks, trust companies, building and loan associations, investment companies regulated under the federal investment company act of 1940, as amended, brokers, dealers in securities, finance companies, dealers in commercial paper, and persons engaged in the business of lending money or credit the term `gross income' shall be deemed to mean gross earnings, but only in respect to that part of the total gross income of such persons which is derived from the businesses and activities enumerated in this subsection." (Emphasis supplied.)

The Department has issued certain Instructions which relate to the use of the word "brokers" in the Act.

While Boswell finds some solace in the wording of these Instructions, both parties have relied on Indiana case law for the definition of a "broker." Therefore, we need not decide the legal effect of such Instructions.

We recognize that the courts of this state have taken opposing views as to construction of taxation statutes. In the case of exemptions from tax statutes, we have consistently held that statutes will be strictly construed against the party claiming the exemption. Gross Income Tax Division v. National Bank & Trust Co. (1948), 226 Ind. 293, 79 N.E.2d 651. It has also been consistently held, however, that in case of doubt as to the meaning or

applicability of the Indiana Gross Income Tax Act (the Act), it will be construed against the state and in favor of the taxpayer. Gross Income Tax Division v. L.S. Ayres & Co. (1954), 233 Ind. 194, 118 N.E.2d 480; Gross Income Tax Division v. Colpaert Realty Corp. (1952), 231 Ind. 463, 109 N.E.2d 415. In the case under consideration, we are not concerned with an exemption from the Act, and therefore we feel bound to resolve any doubts against the state and for the taxpayer.

Conceptually, we are here presented with the problem whether the requisite characteristics of a broker exist by virtue of the operations of Boswell in Indiana.

*574 We recognize that we must indulge in all reasonable presumptions in favor of the rulings and judgments of a trial court. Pennsylvania R.R. v. Mink (1966), 138 Ind. App. 311, 212 N.E.2d 784. Further, "this court in reviewing appellant's specification of error that the decision of the trial court is not sustained by sufficient evidence is limited only to that evidence most favorable to the appellee." Bradley v. Phelps (1970), 147 Ind. App. 349, 260 N.E.2d 894. Rule TR. 52(A). Therefore, in determining whether Boswell is a broker we are bound by the Findings of Fact and reasonable inferences therefrom.

The Department relies heavily on the vintage case of Haas v. Ruston (1895), 14 Ind. App. 8, 42 N.E. 298, to provide a definition of a "broker":

"A broker is a peculiar kind of an agent, and brokerage is a peculiar kind of agency. It is the business of a broker to negotiate contracts between others in matters of trade and commerce. He usually deals with the contracting parties and not with the things which may be the subject of the contract. He has neither interest in nor possession of the property which it is his business to buy or sell for others, and ordinarily he has no implied power to buy or sell in his own name. It is in these respects that a broker differs from a factor and from an ordinary agent."

Counsel have cited no cases, and we can find none, to indicate that Haas is no longer the law in Indiana.

As we see it, Boswell meets this definition in that, according to the Findings of Fact, it matches suppliers of residual fuel oil and consumers of such oil, negotiates fuel prices, causes the fuel oil to be transported directly from the refinery to the consumer, maintains no store of oil in Indiana for sale or investment, and the refiner and the consumer each know to whom the oil is sold and shipped. So far, Boswell has negotiated a "contract" between others and has dealt with contracting parties and has no interest in nor possession of the property. Thus, Boswell has performed the essential function of a broker, which is to

negotiate contracts *575 between others, and, unlike a factor, has not taken possession, management, or control of the goods. Robertson v. State (1934), 207 Ind. 374, 192 N.E.2d 887.

The Department's view is that Boswell is invoiced by the refinery and, in turn, adds a markup and invoices the consumer and that this amounts to two contracts in which Boswell is a principal party. Further, it has "no implied power to buy or sell in his [its] own name" and has not negotiated a contract for others.

Close scrutiny of the Haas case discloses the sole question decided was that a broker can make a contract in his own name only with the knowledge and consent of his principal. In the instant case, the court specifically found that both the consumer and the supplier of oil knew the identity of each and orders between the consumer and supplier were matched with full knowledge thereof. Thus, by the holding of Haas, Boswell is clearly a broker in this respect.

Haas may also be a plow which has unearthed another snake for the Board in that it goes on to say, at pages 18 and 19:

"Ordinarily, he [the broker] cannot make the contract in his own name, but ought to do it in the name of the principal. There are exceptions, however, by the usages of trade, as in cases of policies of insurance, which are usually made in the name of the policy broker, and he may then sue thereon. So, he cannot buy or sell on credit, except in cases justified by the usages of trade." (Emphasis supplied.)

Finding No. 12 states that within the fuel oil industry, refineries market residual fuel oil through brokers as contrasted with marketing directly to the consumer. The clear implication is that this is a usage of the trade in the business of supplying fuel oil to consumers.

As we construe the Findings of Fact, Boswell performed the essential functions of a broker by making a bargain for contracting parties without taking possession, management, or control or title of the goods involved. Further, it did so with *576 the knowledge and consent of the contracting parties negotiating one contract between them of an extended nature rather than two contracts.

We end this discussion by observing that there are many kinds of brokers[2] and that a broker, to be a broker, need not be an every-day, "garden" variety. Each case must be considered in the light of the peculiar facts involved.

In response to the Department's argument that the Findings of Fact do not contain the ultimate facts and are evidentiary in nature, we point to Rule TR. 52, which would only permit us to set aside the Findings if "clearly erroneous." In our opinion, the Findings of Fact, taken together, do sustain the conclusion of law that Boswell is a broker. Jones v. Greiger (1960), 130 Ind. App. 526, 166 N.E.2d 868.

The judgment of the trial court is therefore affirmed.

Sullivan, P.J., Lowdermilk and Robertson, JJ., concur.

NOTE. Reported in 268 N.E.2d 303.

NOTES

[1] Findings 13 and 14 are not included because they are not pertinent and are not challenged in this appeal.

[2] See 12 Am.Jur.2d, p. 772.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.



## FORTUNE

POLITICS · ENTERTAINMENT

## After the Britney Spears saga, California takes steps to dramatically limit conservatorships

BY SOPHIE AUSTIN AND THE ASSOCIATED PRESS

October 1, 2022 at 9:50 AM EDT



Britney Spears supporters celebrate following a hearing concerning the pop singer's conservatorship at the Stanley Mosk Courthouse, Friday, Nov. 12, 2021, in Los Angeles.
AP PHOTO/CHRIS PIZZELLO, FILE

SACRAMENTO, Calif. (AP) — California Gov. Gavin Newsom on Friday signed a bill limiting conservatorships that grant legal guardianship over individuals, a move that comes after Britney Spears' conservatorship case garnered national attention amid her attempts to regain control over her finances and livelihood.

The new law, authored by Democratic Assemblymember Brian Maienschein, will require that judges document all alternatives to a conservatorship before granting one. It aligns with similar legislation adopted in other states, following a push from advocates. In a statement, Newsom, a Democrat, said the state is committed to protecting the rights of Californians with disabilities.

People deemed to be unable to make certain life decisions for themselves can be placed into legal conservatorships in which a court-appointed conservator is given control over their finances and other critical aspects of their life, sometimes without their consent. They most often involve people with developmental or intellectual disabilities or those with age-related issues like dementia.

Advocacy groups contend that people like Spears, who was under a conservatorship for nearly 14 years, can become trapped in a system that removes their civil rights and the ability to advocate for themselves.

"This measure is an important step to empower Californians with disabilities to get needed support in caring for themselves and their finances, while maintaining control over their lives to the greatest extent possible," Newsom wrote in a signing statement, calling the new law a "transformative reform to protect self-determination for all Californians."

Spears, the pop singer and Mississippi native who has publicly struggled with her mental health, ended up at the center of a widespread #FreeBritney campaign aimed at regranting the pop singer authority over her medical, personal and financial decisions. She alleged she became a victim of misconduct at the hands of her father, James Spears, who was her conservator.

Fans and advocates rallied online and in person to bring attention to Spears' situation. Documentaries by The New York Times and Netflix on the effects of Spears' conservatorship brought renewed spotlight to the case and the conservatorship process more broadly. She was a 26-year-old new mother who had several public mental health struggles during the height of her career in 2008, when her father sought the conservatorship, at first on a temporary basis.

A Los Angeles judge ended Spears' conservatorship last year, a win followed by legislative proposals to protect the rights of conservatees and efforts to make it more difficult for people to end up in one.

Maienschein, who represents parts of San Diego, thanked the governor in a statement, noting the importance of ensuring the autonomy of people with disabilities.

The new law will give potential conservatees preference for selecting a conservator and make it easier to end probate conservatorships.

Disability rights organization Disability Voices United referred to news of Newsom's decision as historic.

"This law affirms that conservatorships should be rare and the last resort," the group wrote. "The default should be that people with disabilities retain their rights and get support when they need it. "

———

*Sophie Austin is a corps member for the Associated Press/Report for America Statehouse News Initiative. Report for America is a nonprofit national service program that places journalists in local newsrooms to report on undercovered issues. Follow Sophie Austin on Twitter.*

Sign up for the *Fortune Features* email list so you don't miss our biggest features, exclusive interviews, and investigations.

## Most popular Politics articles

**POLITICS**
Trump's bankers doubted the NFL would approve him as an owner, emails show: 'Never know the real facts with him'



October 31, 2023
BY JENNIFER PELTZ AND THE ASSOCIATED PRESS

**POLITICS**
The White House is throwing down over a $3.8 billion merger, saying JetBlue is 'intent on removing seats from planes...



November 1, 2023
BY DAVID KOENIG AND THE ASSOCIATED PRESS

**POLITICS**
Arizona man was so concerned by his son getting lessons on gender identity, subpar academics that he embraced private...



October 25, 2023
BY GEOFF MULVIHILL AND THE ASSOCIATED PRESS

# Related Articles

**POLITICS**
California workers will get 5 sick days a year instead of 3 after Gov. Newsom signs new law



October 5, 2023
BY SOPHIE AUSTIN, TRAN NGUYEN AND OTHERS

**FINANCE**
Gavin Newsom signs law raising California health care workers' minimum wage to $25 per hour—a key figure in …



October 14, 2023
BY ASSOCIATED PRESS

**POLITICS**
California to fast food workers: Your minimum wage just got raised by nearly $5 to $20 per hour



September 28, 2023
BY ADAM BEAM AND ASSOCIATED PRESS

**ASIA**
Xi Jinping holds surprise meeting with Gavin Newsom during the California' governor's visit to China



October 25, 2023
BY HUIZHONG WU AND ASSOCIATED PRESS

**NEWSLETTERS**
California takes the lead on pro-consumer tech legislation, with new laws on repairability and privacy



October 11, 2023
BY DAVID MEYER

## Rankings

| | |
|---|---|
| 40 Under 40 | Most Powerful Women |
| 100 Best Companies | World's Greatest Leaders |
| Fortune 500 | World's Most Admired Companies |
| Global 500 | See All Rankings |

## Sections

| | | | |
|---|---|---|---|
| Finance | Asia | Health | Newsletters |
| Leadership | Europe | Well | Magazine |
| Success | Environment | Retail | Features |
| Tech | Fortune Crypto | Lifestyle | Commentary |

Politics

## Customer Support

Frequently Asked Questions

Customer Service Portal

Privacy Policy

Terms of Use

Single Issues for Purchase

International Print

## Commercial Services

Fortune Brand Studio

Fortune Analytics

Fortune Conferences

Advertising

Business Development

## About Us

About Us

Editorial Calendar

Work at Fortune

Behavioral Advertising Notice

Terms and Conditions

Site Map



© 2023 Fortune Media IP Limited. All Rights Reserved. Use of this site constitutes acceptance of our Terms of Use and Privacy Policy | CA Notice at Collection and Privacy Notice | Do Not Sell/Share My Personal Information | Ad Choices
FORTUNE is a trademark of Fortune Media IP Limited, registered in the U.S. and other countries. FORTUNE may receive compensation for some links to products and services on this website. Offers may be subject to change without notice.
S&P Index data is the property of Chicago Mercantile Exchange Inc. and its licensors. All rights reserved. Terms & Conditions. Powered and implemented by Interactive Data Managed Solutions.

*CELEBRITY NEWS*

# Britney freed from dad: Judge ousts Jamie Spears from conservatorship

By Gabrielle Fonrouge and Tamar Lapin
Published Sep. 29, 2021, 8:19 p.m. ET

Fans support Britney outside of the hearing

**MORE ON:**
***BRITNEY SPEARS***

Kim Kardashian channels Britney Spears in sparkling nude bodysuit for Swarovski x Skims

Justin Timberlake spotted glued to his phone on family vacation amid Britney Spears' memoir backlash

Britney Spears told dad Jamie to 'get out' during 2004 tour shoot, photog says: 'She was so in charge'

Britney Spears' book 'The Woman In Me' tops New York Times bestseller list: 'it means the world to me'

LOS ANGELES — Britney Spears won big in court on Wednesday, when a judge declared that her dad's control over her life was "toxic" and granted the pop superstar's request to oust him as conservator of her estate.

Los Angeles Superior Court Judge Brenda Penny agreed that it was in Britney's "best interest" to suspend Jamie Spears from the legal arrangement that has controlled his famous daughter's life and money for the last 13 years.

"The current situation is untenable," she said after hearing arguments from both Jamie and Britney's attorneys.

"It reflects a toxic environment which requires the suspension of James Spears effective today."

Penny handed down the monumental decision before a packed room of onlookers, and as a mass of #FreeBritney supporters rallied outside, holding signs and chanting "Free Britney" so loudly, it could be heard inside the courtroom.



Britney Spears won big in court on Wednesday, when a judge granted the pop superstar's request to oust her dad Jamie as conservator of her estate.

Britney Spears/Instagram



Supporters of pop star Britney Spears celebrate after a judge removed her father as a conservator.

Mario Anzuoni/REUTERS



Supporters cheered for Britney Spears outside Mosk Courthouse.
Maria Anzuoni/REUTERS

The ruling came after the "Toxic" singer's attorney Mathew Rosengart petitioned the court to "immediately" suspend Jamie Spears from the role by Wednesday, arguing his continued involvement has done nothing but prolong "the Kafkaesque nightmare" that has been Britney's life since the conservatorship was established in 2008.

Rosengart asked the court to appoint certified public accountant John Zabel as temporary conservator to Britney's $60 million estate while he works to dissolve the conservatorship entirely. Penny on Wednesday agreed to Zabel's appointment, even as Jamie's attorney Vivian Thoreen tried to argue that appointing a "stranger" to take over the conservatorship wasn't the right move.

"It is not an appealable order," Penny shot back at Thoreen.



#FreeBritney supporters outside her conservatorship hearing on Sept. 29, 2021.
REUTERS



#FreeBritney activists reacted with joy after hearing the news.

Kevin Winter/Getty Images

The 39-year-old Grammy winner, who was not at the highly-anticipated hearing, gave two days of dramatic testimony in the case over the summer, calling the legal arrangement "abusive" and saying it had been used to "ruin" her life. Now that Jamie has been suspended from the conservatorship, Rosengart said his top priority is dissolving the arrangement altogether and a termination hearing has been set for Nov. 12.

While mental health evaluations are typically done before such arrangements are dissolved, Rosengart said outside of court Wednesday it's his "hope and expectation" that it won't be necessary ahead of the November court date.

"Mr. Spears himself, in his last filing, said not once not twice but three times that no mental evaluation was necessary. Britney doesn't believe a mental evaluation is necessary and I certainly don't. So, that's telling," Rosengart said.



Britney Spears supporter Mona Montgomery of Glendale, Calif., holds an image of the singer outside the courthouse.

AP



The conservatorship had been established 13 years ago.

Kevin Winter/Getty Images

"What today was about was suspending Jamie Spears, receiving the files, receiving the communications between Jamie Spears and his representatives and we succeeded in every regard in all of those fronts," he continued.

"This was a monumental win for Britney and for justice."

In the days and weeks leading up to the hearing, Rosengart and Jamie's attorneys have been trading legal blows in a flurry of petitions and motions filed before the court and those arguments continued on Wednesday.

Thoreen argued Zabel is not fit to manage Britney's estate because he lacks experience and "was duped out" of $1 million in a fraudulent real estate deal in 2007. She complained that little information was known on Zabel and told the court suspending Jamie would be "an extreme remedy" when he's had an "impeccable record" over the last 13 years as conservator.





Britney Spears supporters in LA on Sept. 29, 2021.

AP

LOG IN

Rosengart fired back that Jamie is a "cruel, toxic and abusive man" who Britney has been afraid of since she was a child and Zabel's accolades and qualifications far exceed the star's fathers. He countered that there is a "mountain of evidence" showing Jamie is unfit for the role and his "toxic, untenable presence" mandates an immediate suspension.

"Britney deserves to wake up tomorrow without her father as her conservator," he said.

longer necessary.

Thoreen repeatedly argued in court Wednesday that Penny should grant that petition instead of suspending Jamie because it's what Britney has asked for numerous times and it would render other matters before the court "moot."

But Rosengart pleaded with the judge to boot Jamie and said the only reason why the dad did a "180" and asked to dissolve the arrangement is because he wants to avoid getting deposed and having to hand over years of revealing documents in the case.



Los Angeles Superior Court Judge Brenda Penny made the decision with plenty of Britney supporters outside.
Mario Anzuoni/REUTERS



Supporters of Britney Spears hug following Wednesday's decision.
Mario Anzuoni/REUTERS

"What's the big deal? What are they afraid of?" Rosengart said in defense of the suspension.

"What he's afraid of is the revelation of his corruption."

Now that Jamie has been suspended, he'll be required to turn over 13 years worth of filings in the case, including communications he had with his attorney. It's in those records Rosengart believes Jamie's "corruption" will be revealed, he told the court.

Britney had been privately fighting to remove her father from the conservatorship but didn't speak out publicly against the arrangement until a dramatic, June 23 court hearing where she called on Jamie to be jailed and alleged he'd drugged her, forced her to take birth control and made her work against her will.

At the time, Britney was still being represented by Samuel D. Ingham III, the same attorney who was originally appointed to her case in 2008, and told the court she didn't know that she could hire her own attorney even though she desperately wanted one.

Three weeks later, Penny granted Spears the right to hire Rosengart, who promised from the outset that he'd move "aggressively" to oust Jamie and set Britney free once and for all.

FILED UNDER   BRITNEY SPEARS,  CELEBRITY LAWSUITS,  JAMIE SPEARS,  9/29/21

---

READ NEXT   Lisa Barlow takes a dig at Whitney Rose in 'RHOSLC' sneak ...

## Conversation





---

LOG IN

MUSIC    *EXCLUSIVE DETAILS*

# Why Britney Spears and her dad, Jamie, have been unable to settle her conservatorship case

By Eileen Reslen

Published Oct. 27, 2023, 3:33 p.m. ET

In my opinion, this is expected, because, she may have to try my current, unfortunately required, approach, to resolve.

We've updated our Terms of Use, including handling of legal claims. By continuing, you agree to the updated Terms and our Privacy Notice.



*Britney Spears and her father, Jamie Spears, are still in the midst of a heated legal battle regarding her conservatorship. Rachpoot/MEGA*

**MORE ON:**
***BRITNEY SPEARS***

**Kim Kardashian channels Britney Spears in sparkling nude bodysuit for Swarovski x Skims**

**Justin Timberlake spotted glued to his phone on family vacation amid Britney Spears' memoir backlash**

Britney Spears and her father, Jamie Spears, continue to battle in court nearly two years after her conservatorship was officially terminated, but their attorneys have very different perspectives as to why the legal dispute is ongoing.

**Britney Spears told dad Jamie to 'get out' during 2004 tour shoot, photog says: 'She was so in charge'**

**Britney Spears' book 'The Woman in Me' tops New York Times bestseller list: 'It means the world to me'**

The pop icon's lawyer, former federal prosecutor Mathew Rosengart, explains that the heart of the case "has been resolved" despite the outstanding financial matters.

"Britney won when we obtained the court-ordered suspension of her father. Britney won when she was freed from an abusive 13-year conservatorship," the noted trial attorney tells Page Six exclusively.

"After being deprived of certain fundamental rights for 13 years, Britney's civil liberties were restored, and that's always what this was about."

Jamie's attorney, Alex Weingarten, tells Page Six, though, that he has allegedly tried to bring an end to Britney's and his client's legal battle when he "first got involved" with the case and then again last summer, but to no avail.

He claims Rosengart only wanted to finish the case with "Jamie Spears in handcuffs."



Jamie was Britney's conservator from February 2008 until his suspension in November 2021.
Corbis via Getty Images

"All of the pending fee applications would have been withdrawn, and it would have been a complete and total walkaway," Weingarten claims.

Page Six first reported that Britney and Jamie were engaged in settlement talks in September 2022.

After a judge ruled in the "Toxic" singer's favor to both have her father sit down for a deposition and blocked his request to have her deposed, a source told us it became a logical time to renew discussions.



Britney's civil liberties were "restored" when her father was ousted
as conservator, her attorney says.

AFP via Getty Images

However, Weingarten claims Rosengart "refused" to settle and allegedly told him "that if he was not paid $7 million to cover his legal fees, that he was going to file new lawsuits against Jamie and others."

It was reported in May that the former federal prosecutor agreed to work pro bono after he made more than $4 million representing Britney — which disputes Weingarten's allegations.

Rosengart also previously pointed out in court filings that Jamie himself received "at least $6 million" for his role as conservator.



Jamie was Britney's conservator from 2008 to 2021.

Britney Spears/Instagram

However, Weingarten reiterates in his statement to Page Six that he's tried to settle "countless times."

The managing partner at Willkie Farr & Gallagher LLP's Litigation Group also claims that allegations Jamie, 71, secretly spied on his famous daughter, 41, using illegal surveillance tactics are false.

He still insists those claims are "meritless" and alleges to Page Six that Rosengart allowed the statute of limitation to pass on those in August 2022.



Jamie has denied via his attorney any claims that he spied on his daughter.
AFP via Getty Images

Weingarten also alleges to Page Six that there is "confidential information" under seal that "directly contracts all of the nonsense" that Rosengart has been "saying publicly and proves that there was never any illegal surveillance."

However, Alex Vlasov, who worked at Black Box Security from 2012 to 2021, previously alleged in an investigation conducted by the New York Times that the "Overprotected" singer's communications were being "monitored for her own security and protection."

**For more Page Six you love …**

Listen to our weekly "We Hear" podcast

Subscribe to our daily newsletter

Shop our exclusive merch

"Their reason for monitoring was looking for bad influence, looking for potential illegal activity that might happen, but they would also monitor conversations with her friends, with her mom, with her lawyer Sam Ingham," he claimed in September 2021.

Rosengart reportedly hired experts to sweep Britney's bedroom for proof that her father had bugged her.



Britney was freed from her conservatorship in November 2021.

Instagram/@britneyspears

### LATEST: PAGE SIX STYLE

Fans compare Billie Eilish's ___ ...eather'

Julia Haart on feeling sexy in ___

Kim Kardashian channels Britney Spears in sparkling nude bodysuit for Swarovski x Skims: 'It's giving 'Toxic''

The 31 best gifts for Taylor Swift fans — that aren't Eras Tour tickets

Shop the best under-$50 gift ideas from Oprah's 'Favorite Things' list 2023

**What do you think? Post a comment.**

In ___ the litigator also filed a declaration from former FBI agent Sherine Ebadi, who claimed Jamie "engaged in and directed others to engage in unconscionable violations of [Britney's] privacy and civil liberties," noting that the findings "raise criminal implications."

Th ___ h, a judge approved a separate trial to discuss the surveillance claims, but criminal charges have not yet been brought forth upon Jamie.

We're told a hearing regarding the surveillance matters is still pending and scheduled for May, and that the FBI reportedly still has time to prosecute Jamie over these issues.

**MORE PAGE SIX STYLE** ▶

FILED UNDER   BRITNEY SPEARS,   CELEBRITY CRIMES,   CELEBRITY FAMILIES,   CELEBRITY FINANCES,   CELEBRITY LAWSUITS,   COURTS,   EXCLUSIVE,   FAMILY FEUDS,   JAMIE SPEARS,   LAWYERS,   SETTLEMENTS,   10/27/23

MORE STORIES or Swift's recent outfits are full of '1989' Easter eg

PAGE SIX

## Conversation  4 Comments

Your voice matters. Discussions are moderated for civility. Read our guidelines here

Join the conversation

Sort by Best ⌄

**Jay_ny**
27 October, 2023
Britney's attorney made $4M from her. wow, that explains why they paint Jamie as bad so they can keep making money off of Britney.
Since Britney's been free last year, now you all know why Jamie was the conservator. Britney's money would have been all gone by now.

Reply · 👍 9 · Share



6 People Reacted

**What's your reaction to this article?**

| Top Notch | So-So | Next! |
|-----------|-------|-------|
| 5 | 0 | 1 |

FBI raided home of Adams fundraiser — who's made $150K from campaign — when agents knew mayor was out of NYC, sources say

# Page Six

© 2023 NYP Holdings, Inc. All Rights Reserved | Terms Of Use | Privacy Notice | Sitemap

Your California Privacy Rights

VIP | Powered by WordPress VIP

# Indiana man awarded $25.5 million in civil rights violation suit involving police officer

IN case involved rape, robbery and took place in 1980

**Associated Press**

Published November 25, 2022 3:19pm EST





**Fox News Flash top headlines for November 25**

Fox News Flash top headlines are here. Check out what's clicking on Foxnews.com.

A federal jury has awarded a Gary man $25.5 million in his lawsuit alleging that a now-retired police officer violated his civil rights and deprived him of a fair trial in a case involving a 1980 rape and robbery.

The jury in U.S. District Court in Hammond deliberated for about three hours Tuesday before awarding James Hill Jr. $25 million in compensatory damages and $500,000 in punitive damages.

The verdict following a civil trial represents the second time a federal jury has ruled against retired Hammond police Capt. Michael Solan and the city of Hammond, The (Northwest Indiana) Times reported.

**INDIANA PILOT DEPLOYS PARACHUTE IN EMERGENCY LANDING, PILOT UNINJURED**

In 2006, Hill's co-defendant in the 1980 case, Larry Mayes, won a $9 million verdict that was later reduced to $4.5 million.



An Indiana man was awarded $25.5 million in a lawsuit against a former officer. (Fox News)

Hill, 59, and Mays had their 1982 convictions set aside after a Lake County magistrate found the state had violated their rights by failing to turn over evidence to their defense attorneys before their trials.

**CLICK HERE TO GET THE FOX NEWS APP**

Hill filed his civil lawsuit in 2010. To win the case, he had to prove by a preponderance of the evidence that the outcome of his 1982 trial could have been different if Solan had turned over two sets of police records.

Jurors had to agree that the documents were favorable to Hill, were either exculpatory or could have been used to impeach a witness, and that they were material to the case.

**Despite how Dad talks to me about the "Trust" and disowns me and threatens us:**





*My friends are kind and sent pepper seeds for Dad's garden and we went to a Colts game*

**_Supposedly_ I keep a messy room, and abuse, neglect, or abandon cats.**



**_Look at those cat bellies! Why may a cat show their belly to someone?_**
**Here's an actually messy room of mine from 2008-2009 for viewing pleasure.**



**This young man had some cleaning to do. Don't worry, I know how to take out the trash.**
**_Anyone know a green guy with a vacuum?_**



DONATE NOW

Search for...

Shop our Store   Get Help

**Challenges, Path & Impact** ⌄   **Adoption & Rehoming** ⌄   **Pet Services** ⌄   **Expertise** ⌄   **Donate** ⌄   **Get Involved** ⌄

**About Us** ⌄

Home / Connect / Blog / The "Cat Tummy Trap" Explained

# Blog

## Blog

Animal Talk

Community Success Stories

Employee Volunteer Spotlights

Happy Tails

Humane Champion Stories

Press Releases

Success Stories

THS in the News

Uncategorized

Upcoming Events



## The "Cat Tummy Trap" Explained

ANIMAL TALK | MAY 20, 2022

You're relaxing while spending some quality time with your pet. All of the sudden your cat rolls over and exposes their belly. Instinctively you reach to touch their fluffy tummy – and what happens? Your hand is met with some claws and teeth.

You just fell for what many call the "cat tummy trap." So why do some cats react this way when we try to touch their bellies?

## The Belly is a Vulnerable Place

Many vital organs sit mere millimeters under the skin of your cat's tummy, and damage to any of them could be potentially fatal. It's their instinct to protect their bellies from potential injuries.

### Exposing the Exposed Belly

When a cat shows you their belly, the cat is relaxed, comfortable, and doesn't feel threatened. They feel safe enough to expose their vulnerable areas without worrying about being attacked. They are pretty much telling you, "I trust you with my life." It's a great honour! But this is not always an invitation to rub their belly.

### How Do I Know if it's a Trap?

Some cats like belly rubs – some cats even ask for it. How do you know if your cat enjoys being touched on their stomach? Listen to their body language. If they react well and accept gentle pets, then your cat likes to have their stomach touched. If you are met with a quick glare, a scratch, or a nip, your cat does not enjoy having their tummies touched.

# Related Articles



Understanding the Root Causes of Stray Pets: A Complex Challenge



Exxie

View all



The Many Benefits of Adopting a Senior Pet



Capture Unforgettable Moments at Toronto Humane Society's Annual Holiday Pet Pics Event

## Newsletter Signup

First Name

Last Name

Email Address

SUBMIT

**Saying I hurt animals isn't a "reputation thing." I don't, that's mean, and a crime.**



**Wow, what a neglected cat (sarcasm). Water fresh from the tap.**



**What a displeased hotel guest (sarcasm). Nose kisses and sharing the bed with Papa.**

Pet Policy Agreement

Welcome! We are excited to accommodate you and your pets! In fact, we are a pet loving hotel and we welcome your pet as a valued guest. We know they are like family members and like the pleasure to have them. We just may have a yummy treat for your pet as well. In order to provide a comfortable and awesome hospitality experience for you and your pet, as well as all of our guests, please read the following guidelines below.

I agree to the following terms:

- I must have a valid credit card on file at the front desk.
- A non-refundable fee will be charged to my account upon arrival. Staying 1-3 nights $50, 7+ nights $75.
- I am responsible for any damages to the guest room or furniture caused by my pet.
- Whenever I leave the hotel's premises without my pet, I will place my pet in a crate or pet carrier. If a pet is not crated, my room will not be serviced.
- My pet will be walked in the designated pet areas to do their daily duties. Right side of hotel. Additionally, if your pet is not a service animal, they are not allowed in the pool, fitness center, breakfast buffet and seating area but you are more than welcome to enjoy your breakfast on our Patio with your pet, weather permitted.
- I am responsible for picking up after my pet in and around the hotel at all times and dispose waste in the outside trash only.
- Noise/Disruptive Complaints - if hotel management receives more than two (2) complaints, I will be responsible for making alternative arrangements for my pet. Note, there will be no refund.
- Pets must be on a controllable leash at all times when not in the guest room.
- Your room will be inspected upon departure to assess if extra cleaning will be needed or any items repaired.
- You're welcome to come to the Front Desk at any time with your pet to treat your pet to some yummy treats!

I, _Jeo & Erin Turpin / Gus Turpin and Erin Golden Turpin_ have read the Holiday Inn Express & Suites Elizabethtown - North Pet Policy and fully understand and accept the guidelines set by the hotel. I also am aware that the specified pet fee is nonrefundable and in case of damage to the guest room or furniture, I may be charged an additional fee. I also agree that I may be asked to make alternate arrangements for my pet if my pet disrupts other guests.

Guest Signature: _____   Date: _01/06/24_

Guest Service Representative (reviewed Pet Policy with guest):  _____

Hotel Management Name (inspected guest room after check-out):  _____

Date of Guest Room Inspection:  _____

Guest's Cell Number for Emergency:  _____

**WHEW WHAT A MESSY ROOM (sarcasm). GUNS EVERYWHERE (sarcasm).**



**NO WAIT, THAT'S JUST MY OLD LITTLE LEAGUE BASEBALL BAT.**



**Here's where I trained my brother, friend, and coworker, Jesse.**



**We gave our best efforts to keep both sides of our office clean.**

**Mom has given me some dish sets over the years and Josh and I had a lot of glasses.**



**We tried our best to keep them organized, cleaned up, and placed in the cabinets.**

**Josh's cat Sophie is really cute.**



**Someone may have said it was a "girl" name but Sophie didn't mind at all.**



**We even got our cats a fun playground to lounge and climb on, Ritz is checking it out.**



**Skipper could be a handful, but he was our "king of the roost" and he loved this.**

**May Josh treat his cats well?**



***May this look like a happy cat to you?***

**May Skipper have been more comfortable in his last days without having to move?**



**May Dad's behavior and threats have hurt furry tenants too?**

# Oregon Man Awarded $1.4 Million After His Landlord Steals His Three-Year-Old Cat



Published Nov 7, 2023
By Mariah Maddox (she/her)



An Oregon jury awarded a man nearly $1.4 million for the loss of his 3-year-old cat, who was stolen by the man's landlord. Joshua Smith said his cat, Frank, had mysteriously disappeared. He had found the cat as a stray on the street in 2017. He took him in to where he was staying, which was a drug recovery group home in Portland.

In 2019, upon returning home, Joshua realized that his fur baby had gone missing. Just days later, he filed a lawsuit against his landlord, Devon Andrade, and the recovery house business, Pinestreet LLC.

In court, the landlord confessed to taking Frank, and further, having his girlfriend drop the cat off at a local shelter. He claimed that it was a violation of Joshua's lease to have a pet.

At the time of filing the lawsuit, Joshua was seeking up to $250,000 from the landlord and property. He was also offering $500 for the return of his cat, who eventually got returned to its original owner after veterinarians discovered the cat had a microchip.

**More from LittleThings:** Woman Saves Dog From Strange Man, Then Sees His Furry Face On TV And Sees The Real Owner



"The jury's message should be loud and clear to landlords," said Michael Fuller, the attorney who won the case. "You need to respect the rights of tenants, especially when it comes to pets. It turned out that the people on the jury were also animal lovers."

f  |   SHARE

LAWSUIT   AWARD   JURY   OREGON

## A DOCUMENT BROUGHT TO YOU BY FRITZ INFORMATICS & NANA'S DUMP TRUCK

| | |
|---|---|
| Business Name: **FRITZ INFORMATICS LLC** | Business ID: **201802181241473** |
| Entity Type: **Domestic Limited Liability Company** | Business Status: ~~Voluntarily Dissolved~~ |
| Creation Date: **02/18/2018** | Inactive Date: **01/13/2022** |
| Principal Office Address: **Cambridge City, IN, 47327** | Expiration Date: **Perpetual** |
| Jurisdiction of Formation: **Indiana** | Business Entity Report Due Date: **02/28/2022** |



**!BEEP BEEP!**

**DOCUMENTATION OF THE EXISTENCE OF AN ASSET INSTRUMENT & GUARDIANSHIP JON B. TURPIN AND LINDA B. TURPIN JOINT *REVOCABLE TRUST* *GUARDIANSHIP BATTLE* FOR ALICE Y. BECKER AND HER ESTATE**



In my unqualified opinion *the existence of a Revocable Trust* may be an odd decision. Would a Revocable Trust be in the best interests of the main beneficiaries or inheritors? Would a Joint Revocable Trust give a motive to remove or control a backup beneficiary? I've often been threatened with "Removal from The Trust" and our inheritance altogether. Other threats include felonies, institutionalization, conservatorship, or other "control."

Purportedly the "rules" to this trust may allow someone to be "framed" and removed. Since every property is contained in it, *within the will*, if Mom, Me, and Alexis are framed: *Theoretically, Dad can remove us from "The Trust" to divorce Mom and take everything. May ~$10,000,000+ be a motive to hurt a Son or mess up a background check?*

It doesn't matter how much money or assets are in this. No one should threaten a man's wife with being "destitute with five kids living under a bridge" like Nana said: "Eat sand."

Jon B. Turpin + Linda K. Turpin

Joint Revocable Trust

(According to Linda K. Turpin)

Purported RULES Established

What Dad may have attempted on me has a check.

[How to be Removed] ✓13. Death

✓1. Felony       ✓7. Non-Indiana Residency

✓2. Incompetency  ✓8. Too Few Assets in Wayne County

3. Guardianship  ✓9. Drug Addictions

✓4. Conservatorship ✓10. No "Progeny"

✓5. Interdiction  ✓11. Sex Offender

✓6. Institutionalized ✓12. Declaring a Power of ...

**May Dad have a motive to try these things with a _Joint Revocable Trust_?**

# Single and Joint Revocable Living Trusts

Trusts can be both single and joint. A single living trust involves just one individual, while a joint living trust usually involves a married couple. Joint living trusts are commonly used to transfer assets between spouses upon one spouse's death. However, like a single living trust, other beneficiaries can be designated as well.

In a joint trust, there is only one document that includes instructions for both trusts. Combining the two trusts has certain administrative advantages at the outset because there is no need to create two separate documents.

Joint trusts are particularly useful in community property states, such as Arizona, California, Nevada, Idaho, New Mexico, Louisiana, Texas, Washington, and Wisconsin. Any property in a joint trust will remain community property in these states, and it has certain tax advantages as well. The same tax benefits will likely not be available in non-community property states, however.

# Is Indiana a Community Property State?

This is a commonly asked question by people facing a divorce in Indiana. Divorces in Indiana can be broken down into two categories:

- Divorce with children; and
- Divorce without children.

In fact, Indiana cause numbers (the numbers given to each suit filed in court) distinguish between a divorce with children and a divorce without children (DN vs. DC). This is because in a divorce case with children, the Court has many more issues to address, including custody, visitation (called parenting time in Indiana), and child support. We will address each of these issues in subsequent articles.

However, when a divorce does not include children, the primary issue in a contested divorce is the marital assets/property. Of course, in a divorce with children, there can also be contested issues regarding the division of marital assets/property. This brings us back to the question that got you here: Is Indiana a Community Property State? The answer is no. Indiana is an equitable distribution state. But let's look at what that really means.

> *While this article addresses the specific divorce subtopic of the equitable distribution of marital property, I have written an article outlining the divorce laws in Indiana and the Indiana divorce process in general. That article may answer some of the other questions you may have about divorce in Indiana.*

# Community Property vs. Equitable Distribution

In a community property state, all assets and debts of a marriage are divided equally, or 50/50. Now there are some exceptions to the general rule that differ in different community property states, but overall it is a marital property regime under which most property and debts are split evenly.

The majority of states in the country, including Indiana, follow an equitable distribution regime in dividing marital assets. Now the word "equitable" in equitable distribution sounds like it means "equal", but "equitable" actually means "fair". And just because something is split equally does not necessarily mean that it is being split fairly. For example, if you have $1,000 and split it equally among two groups, that may not necessarily be a fair split. Especially if you learn that first group has 10 people in it and the second group has 50 people in it. The same thing can happen with marriage as an equal split of all marital assets might not be necessarily fair for various reasons.

**May this be a potential motive *for Dad to unjustly divorce Mom*? *Dad threatened to do so.***

# IS A REVOCABLE TRUST MARITAL PROPERTY?

No, generally trusts — revocable or irrevocable — are considered the separate property of the beneficiary spouse. The only exception would be if the funds from the trust were put into a joint account and used for marital assets or expenses; those funds would be considered marital property.

**In effect, if someone is *Removed From A Revocable Trust* as a beneficiary Assets may become *ONE MAIN BENEFICIARY'S* sole property, not marital.**

December 8, 2021

# Are trust assets marital or separate property in divorce?

Offered by Jewell Law, PLLC



## REVOCABLE TRUSTS

Revocable trusts involve the transfer of property to another individual to "hold" on behalf of a beneficiary, but the grantor is still permitted to revoke the trust and remove the assets.

Revocable trusts are typically used to avoid probate or to keep beneficiaries from squandering trust assets, but they can create unique complications in divorce cases.

In a divorce, the laws of equitable distribution distinguish marital property from separate property. Technically, only marital property, that is, property acquired after the parties' wedding date, will be divided between the parties in a divorce. Separate property, that is, property that is acquired before the parties' wedding date or through inheritance or a gift made directly to a party during the marriage and which remains titled solely in that party's name, is not subject to equitable distribution between the spouses absent specific circumstances.

Generally, trusts are considered the separate property of the beneficiary spouse and the assets in a trust are not subject to equitable distribution unless they contain marital property. Further, any income and principal paid from a separate property trust to a beneficiary spouse remains the separate property of that spouse, provided it is maintained in an account in the name of the beneficiary spouse and not commingled (mixed) with marital funds.

However, if the trust funds are put into a joint account, used to buy a marital asset, or used to pay ordinary marital expenses, those amounts cease to be separate property and become marital property, subject to equitable distribution, with one exception: Separate property contributions that are used as a down payment on or for capital improvements on an asset retain their separate property character provided documents exist to trace said contribution. Any funds remaining in the trust or in a separate account will continue to be the separate property of the beneficiary spouse.

There are legitimate reasons why a spouse would want to set up a trust during marriage, including for tax or Medicaid planning purposes as part of a robust estate plan. However, a spouse who attempts to shield assets that are marital from equitable distribution by placing them into a trust will fail in this goal. Putting marital assets into a trust does not make those assets separate property. In the divorce action, the non-beneficiary spouse may trace the source of the assets in the trust to determine if they are actually marital property and thus subject to equitable distribution.

Consequently, even though assets in a separate property trust are generally considered to retain their separate property character absent the exceptions noted above, there are two circumstances where those assets may be considered marital in nature. These are if the assets are commingled with or transmuted into marital assets or if the assets in the trust started out as marital assets and the beneficiary spouse is trying to shield them from equitable distribution.

**I'm sorry I wasn't available to clean at Mamaw's and Papaw's and I really wanted to help.**



**I was doing as told, but "carrying" Dad is a pain in the neck, and heart/back breaking:**



**So I listened when Jamie said "people with good backs" for my own health and safety.**

**In my opinion I was taught not to complain much, so our family may not be aware.**



***Is it normal for a 30-something to tough it out and work with scoliosis and 4 broken ribs?***

Patient:   TURPIN, JON F
DOB/Age/Sex:   4/5/1990    31 years    Male
MRN:
FIN:

Admit:   11/12/2021
Disch:   11/12/2021
Admitting:

---

*Patient Education Notes*

DOCUMENT NAME:
SERVICE DATE/TIME:
RESULT STATUS:

Patient Handout
11/12/2021 16:24 EST
Auth (Verified)

**Patient Handout**
Patient Education Materials Follows:

# Chest Wall Pain

Chest wall pain is pain in or around the bones and muscles of your chest. Sometimes, an injury causes this pain. Excessive coughing or overuse of arm and chest muscles may also cause chest wall pain. Sometimes, the cause may not be known. This pain may take several weeks or longer to get better.

## May I have been scheduled for a Stress Test and may I have passed it?

Stress Test                                                 TURPIN, JON F -
* Final Report *


# * Final Report *


**Treadmill**

TREADMILL - TREADMILL STRESS TEST

HISTORY:  31-year-old male undergoing evaluation because of chest and arm pain.  Blood pressure was 118/88 with a heart rate of 80.  The resting electrocardiogram demonstrated sinus rhythm.  It was normal.  There were no significant EKG changes with hyperventilation.  He complained of left arm pain at rest, graded 2 on a scale of 10.

STRESS STUDY:  He was exercised utilizing a standard Bruce protocol for 10 minutes 30 seconds into stage IV achieving a maximum heart rate of 175, which is 92% of predicted and a peak blood pressure of 148/82.  Workload was 12.1 METS.  His left arm pain actually improved with exercise.  The electrocardiogram revealed no ST-segment depression.  There were no arrhythmias.

CONCLUSIONS:
1.        Normal exercise electrocardiogram with average exercise tolerance for age and resolution of left arm pain during activity.
2.        Duke treadmill score +10.5, low risk.


CHRISTOPHER J HOLLON, MD

CJH/MODL
DD:  11/09/2021 12:56:00
DT:  11/09/2021 13:27:48
Job #:  4943/937423393

**Signature Line**
[Electronically Signed on: 11/10/2021 07:34 EST]
_____
Hollon, Christopher J MD



[Verified on: 11/10/2021 07:34 EST]
_____
Hollon, Christopher J MD



Printed by:     Waller, Bruce F MD                              Page 1 of 2
Printed on:     11/12/2021 12:27 EST

### May Dr. Waller have still been concerned and requested a more comprehensive scan?

## MAY THESE EVENTS AND HAVE PREVENTED MY CARDIOLOGY APPOINTMENTS?



HENRY COUNTY
**Cardiology**
Henry Community Health Medical Group

*Jon*
*11-29*
*7:00*

### PLEASE READ ALL INSTRUCTIONS

*Instructions for Stress Echo, Regular Stress Test, Nuclear Treadmill Stress Test & Lexiscan*

1. Wear comfortable walking clothes and shoes with socks. No metal should be on the front of your shirt.

2. Nothing to eat or drink (other than water) 4 hours prior to test. This includes decaffeinated and caffeine versions of water/food.

3. Do not drink coffee, tea, soda or have chocolate for 12 hours before your exam.

4. No Viagra, Levitra or Cialis for 24 hours before your exam.

5. *Do not take* the following blood pressure medicines or their generic substitutions for 24 hours before your test: Atenolol, Bisoprolol, Coreg, Metoprolol, Topral, Nadelol, Propanolol, Timolol, Sectral, Cardizem, Dilitiazem, Tiazac or Calan.

6. *Do take* blood pressure medicines that are *not* listed above in #5.

7. Discontinue all Nitrates 1 hour before your exam.

8. Patients must be off Theophylline, Adenosine, Dipyridamole or Persantine for 72 hours before your exam.

9. Medications with caffeine, such as Excedrine, do *not* take after midnight.

10. *If you are a diabetic and take insulin,* take half of the dose of the long acting insulin at your regular scheduled time, with orange juice and toast.

11. You may drink water before your exam.

12. After the stress test, patients may have anything they want to eat or drink. This includes anything with caffeine in it that you may want. Please resume taking all medications after testing is completed.

13. Please bring ALL your medications.

### MAY THIS POTENTIALLY HAVE BEEN DANGEROUS TO MY HEALTH?

**In my opinion the main factor of pain and cholesterol ratio was stress from harassment.**



***May my arm be permanently bent for a reason?***



**May my left knee have been damaged in my car accident?**

| | | | | | |
|---|---|---|---|---|---|
| Patient: | TURPIN, JON F | | Admit: | 1/14/2021 | |
| MRN: | | | Disch: | 1/14/2021 | |
| FIN: | | | Admitting: | Mathews,Thomas MD | |
| DOB/Age/Sex: | 4/5/1990 | 32 years   Male | Copy to: | CAREAWAREOAUTH,HENR_IN | |
| Location: | HCMH MOP | | | | |

### *Magnetic Resonance Imaging*

| Accession # | Exam Date/Time | Procedure | Ordering Dr. |
|---|---|---|---|
| | 1/14/2021 21:56 EST | MRI Knee w/o Contrast Left | Mathews,Thomas MD |

**Reason For Exam**
(MRI Knee w/o Contrast Left) r/o occult fracture, internal derangement

**Report**
EXAMINATION: MRI KNEE LT, W/O CONTRAST
Date: 1/14/2021 9:00 PM
History: Male, 30 years old. r/o occult fracture, internal derangement   Technologist Notes:  pt c/o lateral aspect pain lt knee x 1 months s/p mva

**May it be dangerous to harass and threaten someone during medical issues?**



***May kicking them out or making it unsafe to stay cause stress and detriment to them?***

**ERIN ISN'T HEAVY, BUT YOU CAN SEE THE STRAIN IN MY SMILE.**



*I CARRIED HER ANYWAY, BUT MEN DOING ALL THIS TO YOU HURTS.*



TURPIN ELECTRIC, INC.

CAMBRIDGE CITY, INDIANA  47327

Tuesday, May 12, 2009
Thomas Wheeler  II

Indianapolis, IN 46224

        Mr. Wheeler,

Please find enclosed the documents requested  from "Turpin Electric Company" in your non-party request for production of documents ref. cause no.: 1:07-cv-1205 LJM/JMS.  Please note that no such entity by that name exists at the mailing address. However, in good faith, we acknowledge that you or your clerk probably meant Turpin Electric Incorporated, which does occupy the                address in Cambridge City, Indiana.
We further confirm that Jon F. Turpin was employed part time at this address on March 1, 2006 (although he was unable to work his first evening due to being in the ER of Henry County Memorial Hospital being treated for injuries he sustained from an assault he suffered at the Western Wayne Schools High School locker room) and we confirm that he is still employed part time at Turpin Electric, Inc.


        Respectfully yours,

Jon B. Turpin VP
Turpin Electric, Incorporated

Cambridge City, IN  47327

**May Dad give support since I did physical labor in his business since I was 10 years old?**



*__May my left arm have been temporarily paralyzed?__*
*__May I have accepted I was on my own and just went to physical therapy?__*

**May Dad not treat his Son right?**
***May I wear my contacts on purpose?***



**May Dad have punched me without reason before?**
***May I have kept my mouth shut? May Dad now threaten I'll be shot?***

## 10. Emotional Blackmail

Emotional blackmail is another form of manipulation to make you feel fear, guilt, or doubt. They may use anger, intimidation, threats, warnings, or punishment to keep you in line.

**May Dad treat me poorly after discovering I may have a disability in early life?**

WESTERN WAYNE SCHOOLS

ALTERNATIVE LEARNING PLAN - ADDENDUM

REASONABLE ACCOMMODATIONS
UNDER SECTION 504
FOR

*J.T. Turpin*

_____ Mark student's correct and acceptable work, not his mistakes.

_____ Examinations and quizzes should be given orally.

_____ Reading assignments should be presented on cassette tapes.

_____ Make arrangements for homework assignments to reach home with clear, concise directions.

_____ Reversals and transpositions of letters and numbers should not be marked wrong. Instead, reversals or transpositions should be pointed out for correction.

_____ Recognize and give credit for student's oral participation in class.

__X__ Provide extra test time.

_____ Student should be allowed to tape classroom lectures or discussions.

_____ Student should be allowed to copy another student's class notes.

__X__ Student should be provided a carbon copy of another student's class notes.

_____ Utilization of peer tutoring.

_____ Utilization of cross-age tutoring.

_____ Avoid placing student under pressure of time or competition.

# IEP's vs. 504 Plans

There are two types of written plans, which must be developed and implemented by public schools regarding students with disabilities. First, students with disabilities requiring only reasonable accommodation must have a written plan under Section 504; this is commonly referred to as a 504 plan. Each public school should have a person (usually an assistant principal or a guidance counselor, but not a special educator) who serves as the school's "504 coordinator." This person should coordinate the development, maintenance, and implementation of 504 plans.

504 plans should be developed by a committee, consisting of the student with a disability (if appropriate), the student's parent (s)/guardian(s), the student's teacher(s), the student's counselor, and the 504 coordinator. The student's disability and corresponding need for reasonable accommodation are identified and documented in the plan. Likewise, the plan delineates the specific accommodations, which will be implemented by the school. All school staff involved in the provision of accommodations should be contacted by the 504 coordinator and made aware of their duties and responsibilities. The plan itself should be updated at least annually.

For students with disabilities who require specialized instruction, the IDEA controls the procedural requirements. The IDEA process is more involved than that required under Section 504. Instruction and accommodation under the IDEA are provided in accord with a plan called an Individualized Education Program, known as an IEP. A student's IEP is a legal document which, in part, sets forth the duties and responsibilities of the school district and staff regarding that student. It is the responsibility of special educators, regular education teachers, administrators, counselors, and other professional educators to be thoroughly familiar with the provisions of the IEP for EACH of their students with disabilities.

The remainder of this document sets forth the general procedural information that regular educators should know about the IEP/IDEA process. REMEMBER: Be safe. Seek the advice of special educators. Whether you are a teacher, an administrator, or a counselor, you will save yourself considerable time and trouble -- and you will do a much better job for your students with disabilities -- if you learn to appreciate these specialists as a valuable resource.

---

## WESTERN WAYNE SCHOOLS

### ALTERNATIVE LEARNING PLAN
### AS PER SECTION 504 OF THE REHABILITATION ACT OF 1973

STUDENT: J.T. Turpin SCHOOL: Lincoln High School GRADE: Junior

DATE OF IMPLEMENTATION: August 18, 2005 TERMINATION: June 1, 2006 REVIEW: August 16, 2005

STATEMENT OF STUDENT'S PERFORMANCE AS IT RELATES TO THIS "PLAN": Attention deficits consistent academic performance, impulsivity and problems dealing with distractions posed by classmates during an instructional period. Jon Frederick also has significant deficits in his visual-motor integration skills. These skills were in the average range, but were delayed significantly compared to his cognitive ability.

| INTERVENTION/STRATEGY | IMPLEMENTER(S) | MONITORING DATE | COMMENTS |
|---|---|---|---|
| Gentle, physical contact | All teachers | Daily | Meet at conclusion of semester |
| Seat J.T. accordingly | All teachers | Daily | Meet at conclusion of semester |
| • to reduce distractions | | | |
| • next to appropriate student models | | | |
| Increase frequency of interactions between student and teacher | All teachers | Daily | Meet at conclusion of semester |
| Cooperative learning groups should be chosen carefully | All teachers | Daily | Meet at conclusion of semester |
| Allow J.T. to read during free time | All teachers | Daily | Meet at conclusion of semester |

cc:   Parents
      Principal
      Teacher
      Section 504 Coordinator
      Educational Record

---

***May my 504 plan include "gentle physical contact" in part due to my Dad?***

**My body was in shock, but I did my best to keep an upbeat demeanor.**



**May this be enough pain to consider filing for short-term disability with it pre-accepted?**

Wed, Jun 17, 2020   Indianapolis, IN



**_When picked on and dismissed with "relax" by Dad may I be wary of it despite my pain?_**
**_Though I do as my doctor prescribes, if there's an honest mistake, Dad may blame me._**



## THIS MEDICINE WAS PRESCRIBED AND COMPLETED BEFORE I MOVED HOME. IT HAS AND HAD NO EFFECT ON THE SITUATIONS REPORTED.



## MAY DAD BE LIVING BY A PHILOSOPHY?



**_MAY DAD NOT CARE ABOUT HIS KIDS NOR MOM?_**

**May Dad be trying to justify his potential behavior?**



**May Dad threaten them, kick 'em out the fam', house, hometown, and inheritance?**
*May it teach a son and his wife not to buy two family businesses to preserve legacy?*

**Leviticus 19:11**
**You shall not steal. You shall not deceive or speak falsely to one another.**

**May Dad misrepresent the use of *Revocable Trusts*?**



**May Dad not be mentioning a *Revocable Trust* or may Dad be intellectually dishonest?**

**May I show respect to Mom's decisions? May I not want to be removed from Mom's will?**
*May Dad have aggressed me about inheritance so often that I may ask for my safety?*



*May it keep your assets from probate? May that only be half the story?*

## A *JOINT IRREVOCABLE TRUST* VS. A *JOINT REVOCABLE TRUST*

### IRREVOCABLE TRUSTS VS. REVOCABLE TRUST

A living trust is one that the grantor, the individual who creates and funds the trust, sets up while alive.

Living trusts come in two forms:

- Irrevocable: A trust that can't be modified, amended or terminated without the permission of the beneficiary. After transferring assets into the trust, the written terms can't be changed.
- Revocable: A trust that can be altered or cancelled at any time by the grantor. Income earned from the assets are distributed to the grantor and the assets won't transfer to beneficiaries until after death.

### May this be advertising, or may it be a slow take over of Becker's Greenhouse?



### May Dad push Mom to inherit from Bruce after Troy's passing? *May Mom not want to?* *May this prevent Becker's Florist and Greenhouse from being added to a Trust?*

**In my opinion, this is an odd choice of words with an understanding of "Trusts."**



12:55

← Search

**Jon B. Turpin**
Oct 28 ·

Working on controls for another grain operation. I'm thankful for all my loyal farm customers. I hope to keep earning your trust.

You, Jon F. Turpin and 32 others        6 Comments

**May Dad, Michael, and/or Jared incited fear in others to attempt to institutionalize me?**

# Freedom of speech includes the right:

- Not to speak (specifically, the right not to salute the flag).
  *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943).

- Of students to wear black armbands to school to protest a war ("Students do not shed their constitutional rights at the schoolhouse gate").
  *Tinker v. Des Moines*, 393 U.S. 503 (1969).

- To use certain offensive words and phrases to convey political messages.
  *Cohen v. California*, 403 U.S. 15 (1971).

- To contribute money (under certain circumstances) to political campaigns.
  *Buckley v. Valeo*, 424 U.S. 1 (1976).

- To advertise commercial products and professional services (with some restrictions).
  *Virginia Board of Pharmacy v. Virginia Consumer Council*, 425 U.S. 748 (1976); *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977).

- To engage in symbolic speech, (e.g., burning the flag in protest).
  *Texas v. Johnson*, 491 U.S. 397 (1989); *United States v. Eichman*, 496 U.S. 310 (1990).

# Freedom of speech does not include the right:

- To incite imminent lawless action.
  *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

- To make or distribute obscene materials.
  *Roth v. United States*, 354 U.S. 476 (1957).

- To burn draft cards as an anti-war protest.
  *United States v. O'Brien*, 391 U.S. 367 (1968).

- To permit students to print articles in a school newspaper over the objections of the school administration
  *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988).

- Of students to make an obscene speech at a school-sponsored event.
  *Bethel School District #43 v. Fraser*, 478 U.S. 675 (1986).

- Of students to advocate illegal drug use at a school-sponsored event.
  *Morse v. Frederick, __ U.S. __ (2007).*

**May my Mom have said via phone their words caused attempts to institutionalize me?**

**J.C. and two other boys abused me in the hallways, after months of abuse, I hit J.C. *once*.**

November 16, 2007

Dear whoever it may concern:

My name is Andrea Lynn Holwager. I have known Jon Turpin for 18 years and have watched him go through many hardships throughout his school career. During high school, Jon and I did not have many classes together so I was not able to witness a majority of the problems he dealt with. However, I do recall a few.

The first one I can remember recalling was an incident in our freshman hallway were Josh C     and Jon had a physical fight. I happened to be going towards my locker as the fight began when I witnessed Josh on top of Jon as he was throwing punches at him. A large crowd of students were around doing absolutely nothing to stop the fight. So I got through the crowd and got down at the level where Josh was and yelled at him to get off of Jon. He proceeded to call me a foul name and spit blood on me. Within a minute though, one student got behind Josh and lifted him off of Jon. What astounds me most about the situation is that it happened in front of four classrooms, the special education room, the computer lab, the band room, and the choir room. It took about four minutes for a teacher to get there and stop the fight. For me, it proved some teachers were doing absolutely nothing to stop the situation when Jon was in serious physical danger.

The other situation I can recall happening is when James D     got into a physical fight with Jon in the boys' locker room. I was not there when the fight occurred but Jon had told me a few days before the incident that he and James were not getting along. He told me he told the coaches about how they were not getting along. They did not act upon it. One of the coaches should have been in the locker room with them but they were not. Instead, students got to watch James attack Jon in the locker room, and they did nothing to stop it. Rather they took pictures of the incident and cheered James on. And still, neither of the coaches came even though they would have been likely to hear what was happening in the locker room.

The day afterwards, I heard students talking about how Jon had deserved to be beaten, and how they wish they could have done it. This was said even in some teachers' classrooms and they did nothing to stop the talk from continuing. I will give any other information if needed for the case of Jon.

Sincerely,

*Andrea Lynn Holwager*

Andrea Holwager

**_Thank you for being a real Sis, Andrea, I appreciate that you were there and took action._**

**I forgive J.D., J.C., M.H., J.S., and S.A.; we were middle and high schoolers.**
*We were kids, should we be to blame, or do adults shoulder the responsibility?*
**Josh Dunaway pulled another boy, J.G., off me in the middle school gym, and looked out for me after that.** *J.G. said he'd pull off my head: I didn't let him cheat off me in Algebra 1.*

Friday, December 28, 2007

    I Joshua R. Dunaway, upon returning a rented movie back to Hometown Videos in Cambridge City, Indiana, in December, 2007, had a discussion with an employee of the video store, Mr. Scott A___. Scott confirmed to me that he took pictures while James D___ assaulted and beat Jon F. Turpin in the locker room of Lincoln High School. MR. A___ said to me after I questioned him about the phone and picture/pictures that were supposedly sent to other people for their entertainment pleasures, that he had sent a picture and/or pictures to MR. Joshua J___ for further viewing. Thus further that the Lincoln High School Administration made him delete all picture/pictures and/or videos that were made at the time of this brutal, and what I believe to have been a premeditated attempt on the very life of Jon F. Turpin.

    Joshua R. Dunaway

*Joshua R. Dunaway*

***Thanks for being a real bro, Josh, I appreciate that you were there and took action.***

**I forgive J.G.: I was in 6th grade and he was in 8th grade.**
*We were kids, should we be to blame, or do adults shoulder the responsibility?*

**May my Mom have been the parent who needed to rebuke the principal after my beating?**
*When all of this was happening may Dad not have wanted to take my back?*

**May Dad have had something happen that made him take my back?**
*May Dad have said he was "the only one spending money" and that it made him angry?*

**Yes, I do have two misdemeanors** *but a judge* **specifically retained my gun rights.**
***How many judges* may tell Dad "No" before he gets it? Four?** *May we be at 3?*

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION COUNTY SUPERIOR COURT |
| COUNTY OF MARION | ) | CRIMINAL DIVISION ROOM 06 |
| STATE OF INDIANA | ) | |
| v. | ) | |
| JON TURPIN | ) | CAUSE NO.  49G06-1612-F5-046714 |
| DOB:  04/05/1990 | ) | |

## PLEA AGREEMENT

The Defendant, in person and by counsel, and the State of Indiana, hereby enters into this plea agreement made pursuant to negotiations. **The State may withdraw from this agreement if: Defendant is charged in a new criminal matter, Defendant fails to appear in court, the victim and/or law enforcement express disapproval of offer, or discovery of new information (e.g., additional criminal history, victim(s)' injuries, restitution).** The parties agree as follows:

1.  This agreement, signed by the Defendant, Defense Counsel, and the Deputy Prosecuting Attorney assigned to the above case, shall be introduced into evidence by stipulation of all the parties at the time of the guilty plea.

2.  Defendant enters into this agreement knowing that the Court has the authority to accept or reject the agreement and understands that the Court may take the Defendant's criminal record into consideration in determining whether to accept or reject this plea agreement.

3.  The Defendant agrees to plead guilty to:

    **49G06-1612-F5-046714**

    **COUNT II:  CRIMINAL RECKLESSNESS, L6**
    **COUNT III:  POINTING A FIREARM, L6**

4.  At the time of sentencing, the State will dismiss:

    **ALL REMAINING COUNTS**

5.  At the time of the taking of the guilty plea and again at the time of the Defendant's sentencing, the State reserves the right to question witnesses and comment on any evidence presented upon which the Court may rely to determine the sentence to be imposed; to present testimony or statements from the victim(s) or victim representative(s), and the State of Indiana and the Defendant agrees that the Court shall impose the following sentence:

**Why would someone say I've a "history of gun violence" if I may have defended myself?**
***Multiple professionals' opinions have agreed I was defending myself and non-violent.***

**May someone want to take my rights so I can't protect my wife, future kids or myself?**
***Dad has tried to take my guns away for 17 years. If done to you, may you worry?***

## That's not good, why is my background check showing felonies, not misdemeanors?

11:49 ← Zillow

**Case details**

Case number: 49G06-1612-F5-046714
State: IN
Category: Criminal
Source: IN Administrator of Courts
Jurisdiction: Marion
Comments: Case status date: 11/21/2017

**Offense details #1**

Type: Felony level five
Description: 35-47-4-3B/Ma: Pointing a firearm pointing a firearm at another
Offense date: 12/01/2016
Offense code: 35-47-4-3(B)
Charge filing date: 12/06/2016
Disposition: Plea by agreement
Disposition date: 11/21/2017
Court: Superior, Criminal Division 6

**Offense details #2**

Type: Felony level five
Description: 35-42-2-2A/Ma: Criminal recklessness committed with a deadly weapon.
Offense date: 12/01/2016
Offense code: 35-42-2-2(A)
Charge filing date: 12/06/2016
Disposition: Plea by agreement
Disposition date: 11/21/2017

11:49 ← Zillow

**Offense details #2**

Type: Felony level five
Description: 35-42-2-2A/Ma: Criminal recklessness committed with a deadly weapon.
Offense date: 12/01/2016
Offense code: 35-42-2-2(A)
Charge filing date: 12/06/2016
Disposition: Plea by agreement
Disposition date: 11/21/2017
Court: Superior, Criminal Division 6

**Bureau Contact Information**

Contemporary Information Corp.
c/o Consumer Relations Department
42913 Capital Drive, Unit 101
Lancaster, CA 93535
Phone: 1-888-316-4242 Fax: 1-888-797-2254
www.cicreports.com/consumer-assistance

The agency providing this report will provide, when contacted by the consumer seeking a copy of this report or making a request to review his/her file with the agency, a written notice in English and Spanish setting forth the terms and conditions of his/her right to receive disclosures of information such as office hours, any charges for disclosures, identification required for the release of information, names of recipients of reports on the consumer, what assistance is available to the consumer in reviewing/understanding the information and similar instructions.

End of Eviction & Criminal Report

This report is for rental purposes only. This report is confidential and is not to be

### *Maybe Marion County courts just made an honest mistake in filing?*

**In my opinion their filings and certified copies appear to align with my misdemeanors:**

## State of Indiana v. Jon Turpin

| | |
|---|---|
| Case Number | 49G06-1612-F5-046714 |
| Court | Marion Superior Court, Criminal Division 6 |
| Type | F5 - Felony 5 |
| Filed | 12/06/2016 |
| Status | 11/21/2017 , Decided |
| Reference | Prosecutor Case Management Number · 49G06-DM1246516 |
| | Police Agency Number · DP160144110 |

## Parties to the Case

⊡  Defendant  Turpin, Jon

⊡  State
Plaintiff  State of Indiana

## Charges

⊡  01  12/01/2016  35-45-2-1(a)(1)/F5: Intimidation where def. draws or uses a deadly weapon
     Statute      35-45-2-1(a)(1)
     Degree      F5

⊡  02  12/01/2016  35-42-2-2(a)/MA: Criminal Recklessness committed with a deadly weapon.
     Statute      35-42-2-2(a)
     Degree      MA
     Filed As     F6: 35-42-2-2(a)/F6: Criminal Recklessness committed with a deadly weapon.

⊡  03  12/01/2016  35-47-4-3(b)/MA: Pointing a Firearm pointing a firearm at another
     Statute      35-47-4-3(b)
     Degree      MA
     Filed As     F6: 35-47-4-3(b)/F6: Pointing a Firearm pointing a firearm at another

⊡  04  12/01/2016  35-42-2-1(c)(1)/MB: Battery
     Statute      35-42-2-1(c)(1)
     Degree      MB

**_These appear to follow the completed plea deal in my case, how may these errors occur?_**

STATE OF INDIANA ) IN THE MARION COUNTY SUPERIOR COURT
)
COUNTY OF MARION ) CRIMINAL DIVISION ROOM 06
)
STATE OF INDIANA )
)
vs. )
)
JON TURPIN ) CAUSE NO. 49G06-1612-F5-046714
DOB: 04/05/1990 )

**FILED**

NOV 2 1 2017

CLERK OF THE MARION CIRCUIT COURT

### PLEA AGREEMENT

The Defendant, in person and by counsel, and the State of Indiana, hereby enters into this plea agreement made pursuant to negotiation. The State may withdraw from this agreement if: Defendant is charged in a new criminal matter, Defendant fails to appear in court, the victim and/or law enforcement express disapproval of offer, or discovery of new information (e.g., additional criminal history, victim(s) injuries, restitution). The parties agree as follows:

1. This agreement, signed by the Defendant, Defense Counsel, and the Deputy Prosecuting Attorney assigned to the above case, shall be introduced into evidence by stipulation of all the parties at the time of the guilty plea.

2. Defendant enters into this agreement knowing that the Court has the authority to accept or reject the agreement and understands that the Court may take the Defendant's criminal record into consideration in determining whether to accept or reject this plea agreement.

3. The Defendant agrees to plead guilty to:

   49G06-1612-F5-046714

   COUNT II: CRIMINAL RECKLESSNESS, L6
   COUNT III: POINTING A FIREARM, L6

4. At the time of sentencing, the State will dismiss:

   ALL REMAINING COUNTS

5. At the time of the taking of the guilty plea and again at the time of the Defendant's sentencing, the State reserves the right to question witnesses and comment on any evidence presented upon which the Court may rely to determine the sentence to be imposed, to present testimony or statements from the victim(s) or victim representative(s), and the State of Indiana and the Defendant agrees that the Court shall impose the following sentence:



---

*__May my background check have an error for some other reason?__*

**I applied for an interim School Board position in late October of 2021.**
**May a background check be required for an interim school board position?**
**Cambridge City Town Hall and Cambridge City Police Department in the same building:**





**Applications for interim School Board submitted in person to Cambridge City Town Hall,**
**Deadline for applications was late Oct. of 2021. Background check errors in Nov. of 2021.**
*In my opinion, maybe my background check was reviewed, and may now have errors.*

**In my opinion I may have cause for concern regarding my background errors:**
***May an error on my background check prevent us from a honeymoon or public office?***
***May it prevent us from claiming a Revocable Trust or any inheritance in Wayne County?***








**My fiance and I had saved and planned a sweet honeymoon trip for after our wedding.**



### ADVERSE ACTION NOTICE

Hi Jon,

In connection with your request to make a reservation or activate a listing using Airbnb's platform or in response to written instructions you provided, Airbnb requested a background check on you to determine your eligibility to use its platform using our SafeDecision API product from Inflection.

Based in whole or in part on the results of the background check, Airbnb has made the determination to deactivate your account.

You are entitled to receive a free copy of this background check from Inflection by contacting us within 60 days of this notice. In addition, you may access the background check by clicking the link and following the prompts. A summary of your rights under FCRA is available at this link.

You can dispute the accuracy or completeness of any information in the background check directly with Inflection, our contact information is provided below. Airbnb will be notified of any changes to your report as a result of the reinvestigation and can then move forward with reviewing your account reinstatement request

***[MAY I HAVE NO HOPE OF RUNNING FOR A PUBLIC OFFICE DUE TO THESE EVENTS?]***

---------------------------------------------------------------------------------------------------

**My Airbnb account, which was active throughout and after my case, closed suddenly:**

## Important Information Regarding Your Airbnb Account 

Inbox ×

Airbnb <automated@airbnb.com>
to me ▾

Tue, Nov 2, 2021, 6:03 PM

 airbnb

Hi Jon,

We've recently completed an evaluation of your Airbnb account, which included a consumer report generated using the Inflection SafeDecision API product offered by Inflection Risk Solutions, LLC.

We regret to inform you that Airbnb, Inc. has decided to permanently deactivate your account due, at least in part, to the following information contained in that consumer report:

- Criminal Records Match

If you have any upcoming reservations, they'll be canceled for a full refund and all other parties will be notified of the cancellation.

We'll contact you if anything changes in the future, but until then, we won't be able to assist you any further with your account issues. You can read more in our Help Center.

**Erin, now my wife, rescheduled this, but unfortunately we later had to cancel for safety. *"Why" may be apparent later, but first let's discuss the "gun case" I referred to below.***

**<u>Here's my recounting of events in my "gun case" as they transpired without any edits.</u>**
**<u>*This is IN THE PAST, and ALL INVOLVED WERE AND ARE FORGIVEN if it's even needed.*</u>**
**<u>*J.L. was very inebriated at the time, and I'm still relieved no one, including him, was hurt.*</u>**

Engagement @ 6954 Challenge Lane
11/30/2016 ~7:00 PM

Jon Turpin
Chelsie T
Angie R

I went to visit my girlfriend Chelsie after work at her apartment. I proposed to her with an emerald engagement ring. She said yes and cried in happiness then rushed to tell her mom, Angie R      . We all decided to go out to one of our favorite pool halls, Kip's, to celebrate our engagement and publicly posted that we had become engaged. Chelsie and Angie got ready. Angie was wearing a brown jacket with a faux fur lining and Chelsie put on a grey short-sleeved sweater shirt and jeans with a cheetah design. She wore red lipstick and curled the ends of her hair so it was a blend of wavy and curly. She's beautiful. Chelsie attached her keys to her front belt loop with an Indiana pacers clip I got her. Then put on her red winter coat. I wore blue jeans with a tucked in grey button down shirt with black and red stripes and had on my pair of brown leather shoes.

Chelsie's former Manager from Buca Di Beppo, Jeremy L      , invited Chelsie to go out downtown with him and some friends to celebrate his birthday. She declined and texted him back to say she had plans with her fiancé and mom at Kip's, but didn't extend an invite. We left for Kip's with Chelsie in the front seat and Angie in the back-right passenger seat and arrived at Kip's about 9:00 PM to play pool.

Kip's Pool Hall
11/30/2016 ~9:00 PM

Jon Turpin – 2 Shots
Chelsie T        – 4 Shots +
Angie R        – Two Jack & Cokes
Stephen C        – 1 shot
Jeremy L      – 2 Shots +

The three of us, Chelsie, Angie, and myself, arrived at Kip's a bit after 9:00PM. Chelsie ordered two shots of when we arrived at Kip's, one for her and one for me and Angie ordered a Jack and Coke. We received change for a $20 bill as a 10, 5, and 5 one dollar bills, then used these in the quarter machine to get quarters for pool. Chelsie and I played quite a few games of pool while Angie drank two mixed drinks.

Angie played a game of pool with us and decided she was tired a little after 10:00 PM. Angie has COPD and can become very tired, so we took Angie home before coming back to Kip's. We invited a mutual acquaintance from the pool hall, Stephen C        to celebrate and play pool with us and he accepted and said he'd come out. We arrived back at Kip's around 11:00 PM after taking Angie back to the apartment she shares with Chelsie and Stephen C        arrived. Chelsie ordered us two more shots, and Stephen also ordered a shot. Stephen, Chelsie and I played a game of pool.

Jeremy L      arrived uninvited at Kip's before midnight wearing the Buca Di Beppo uniform: black shirt, black pants, and black shoes with a black jacket. We didn't think anything of this as Buca Di Beppo is

close to Kip's. We both assumed he was stopping by to say congratulations on our engagement. Jeremy insisted on buying Chelsie a shot, then another shot then invited her downtown with him again. I wasn't extended an invite and both Chelsie and I told Jeremy we had just gotten engaged and already had plans for the evening. Chelsie walked outside to smoke a cigarette and Jeremy commented to me that she and I would likely go through "the rocks" in our relationship. I went outside to smoke a cigarette with Chelsie instead of continuing to talk to Jeremy and we both decided to leave and head to Joe's Grille instead of Kips.

We returned to the inside of Kip's to invite Stephen to go with us. Jeremy was not extended an invite but followed us to Joe's Grille around 1:30AM on 12/01/2016.


**Joe's Grille**
12/01/2016 ~1:45 AM

Jon Turpin - Sober
Chelsie T              – 2 Shots +
Stephen C            – Sober
Jeremy L          – 2 Shots +


Chelsie and I arrived at Joe's about the same time as Stephen C          and entered the bar. Jeremy L        followed us to Joe's though he again hadn't been extended an invite, then claimed his friends had ditched on him during the drive between Kip's and Joe's. Chelsie felt bad for Jeremy and sat with him at the bar.

Stephen and I begin to play pool and I order a beef Manhattan, which Chelsie shares with me for about 5 minutes before going back to the Northwest side of the bar to sit with Jeremy. After a few games I notice more shots are ordered for both Jeremy and Chelsie and I worry as Chelsie and I could possibly be pregnant. I begin to think Jeremy may be intentionally trying to get her inebriated and that she may have become too drunk to realize how much she's drinking.

Chelsie got up to use the restroom at the back of the bar and Jeremy followed on the right side of her (Western side) reached around her pulled her close and squeezed her butt with his left hand. She pushed his arm away told him no and continued on to the restroom. Stephen saw this happen as well and mentions it to me. We both decide this isn't a good situation and Chelsie returns to the North side of the bar. I follow her and ask if everything is ok and let her know that Stephen and I saw Jeremy grabbing her butt. Jeremy overhears me and becomes belligerent while denying it.

He gets up from the bar and angrily approaches the pool table near the South of the bar where Stephen is waiting to continue our game. Jeremy Lewis confronts Stephen angrily and picks up the cue ball from the pool table and threatens Stephen with it, telling Stephen to go outside so he can assault Stephen. Chelsie is incredibly worried and we attempt to calm Jeremy, but it doesn't work. I step away from the situation and the bartender, who I know as "D," has to diffuse the situation.

Stephen begins collecting his pool cue to leave and Chelsie and I walk away from Jeremy and go to the back (South side) of the bar to smoke a cigarette. Chelsie and I both decide it's time to leave as well. Jeremy L     walks to the outside of the back of the bar still on his phone and remaining belligerent. He talks angrily on his phone while glaring at me as I'm standing between him and Chelsie. She finishes her cigarette first and begins heading to the North (front) of the bar to exit and Jeremy abruptly follows.

I drop my unfinished cigarette and follow Chelsie, incredibly concerned. Chelsie exits the front of the bar with Jeremy and I right behind her. I exit the front door in time to see Jeremy on the left (West) side of her attempting to direct her toward the parking lot by her left arm. Chelsie pulls away from Jeremy and steps down from the sidewalk, then immediately passes out onto the asphalt. I rush to pick her up and Jeremy tries to take her from me. I pull her arm out of his hands while I'm telling him "Let it go, we're going home." He tells me "I won't let it go, nobody talks about me like that."

I'm now carrying my passed fiancée to the car with an inebriated Jeremy L      who just tried to take her following me. He's angrily repeating "I won't just let it go, you have no right to say I grabbed her ass." I tell Jeremy "I'm her fiancé and we saw it happen, let it go, we're leaving." Jeremy repeats his prior statement in anger as I place Chelsie, still passed out, in the passenger seat of my car, close the door, then realize she's not buckled in, hurriedly buckle her in and close the front passenger door again.

Jeremy is standing at the back of my car by the back passenger wheel well and has positioned himself so I'll have to run over part of his foot or leg if I drive away. It's possible Chelsie and I could be pregnant and I'm heavily concerned about the entire situation and leaving as soon as possible. It's possible Jeremy slipped something in one of Chelsie drinks that caused her to pass out and he's already tried to take her out of my arms and followed me over 50 feet from the bar entrance to the second parking spot North of and on the East side of the East light pole.

I approach Jeremy and apologize in an attempt to get him to leave because I'm more concerned for the safety of my fiancée, myself, and what complications could arise if we're pregnant than I am about pride. I ask him to let it go and Jeremy tells me he won't, shoves me and I push back on his left shoulder with my right hand and ask him again twice to let it go. He refuses and as I walk to the driver's side of the car to leave and Jeremy follows me angrily repeating he won't let it go and again positions himself on the driver's (North) side of my car in the same fashion as the passenger (South) side of the car to prevent me from leaving. I approach the driver's side of the car to get in anyway where I plan to get in and call the police but realize my car key is no longer in my right jacket pocket. As I turn away from Jeremy to look for my car key and get into the vehicle Jeremy repeats "I won't let it go" then growls "I'll kill you and take her with me." No one is outside the bar to help the car is between Jeremy, myself and the bar and I hear Jeremy start toward me. I don't have time to use my phone to call 911 and Jeremy is large enough to pull me from the car by his weight alone if I can't get inside quickly enough. This would put Chelsie in danger so I hammer the door lock button and slam the driver's door and pull out my carry screaming "GET AWAY FROM ME!" pointing my gun at the ground and backing away.

I don't know if Jeremy is armed, but what I do know is:

I'm in fear for my life and Chelsie's safety. My car key is displaced, Jeremy is large enough to overpower me and is threatening my life and stopped approaching me when I drew my carry. Jeremy has already

committed sexual harassment against Chelsie, attempted to assault Stephen C            with a cue ball, intentionally gotten her intoxicated then tried to abduct her from me when she passed out. Jeremy's now followed me belligerently over 50 feet from the bar to the parking lot while too drunk to drive, prevented me from leaving and threatened my life. I don't want to kill a man, but I'm fully prepared to keep Chelsie, possibly our unborn child, and myself, safe from Jeremy L

Jeremy yells at me "DO IT!" and begins to start toward me again and abruptly stops as I point the gun upward and turn off the safety. A shot discharges as I continue screaming "GET THE HELL AWAY FROM ME!"

Jeremy continues screaming "SHOOT ME! DO IT! SHOOT ME!" begins coming forward again with his hands clenched and near his shoulders. Backing away quickly I point the gun at his chest and continue screaming "GET THE HELL AWAY FROM ME!" trying to issue as many warnings and show as much restraint as possible and not shoot Jeremy Lewis unless absolutely necessary. He continues screaming enraged "DO IT! SHOOT ME!" and I continue to exercise restraint hoping help will arrive.

Continuing to back away I immediately holster my carry as four people grab Jeremy attempting to restrain him. Jeremy continues to move toward me screaming until a fifth and sixth person grab onto him. A man named Josh begins screaming in my face as I tell him "Keep him away from me" pointing at Jeremy. He prevents me from going to Chelsie as she drunkenly exits the car. Four strangers grab me and repeatedly try to throw me to the ground as I'm yelling "What are you doing?! Stop!" but I don't try to punch or hit any of them and a fifth man reaches into my waistline and removes my carry. Another man who later claims he was a former police officer comes up behind me and chokeholds me until I entirely pass out even though I'm not fighting him in any way. I wake up to the former police officer straddling me while I'm on my back with my head facing West and "D" the bartender to the South of me in the direction of the bar. Jeremy is repeatedly approaching Chelsie wherever she goes in the crowd of people but he's not trying to do anything more now that people are around. I'm worried about Chelsie but the former police officer threatens to choke me out again if I try to move and "D" tells me "You fucked up, you're going to jail. Your woman's tricking you." None of them are concerned about her safety even though Jeremy has attempted to assault a man with a cue ball, sexually harassed her, tried to kill me and abduct her. Even though Chelsie was either drugged or became so drunk she passed out.

I wait until the police arrive on the scene and handcuff me without fighting. I'm in shock, in fear for Chelsie's safety and groggy from being assaulted and put in a chokehold. The police officers don't ask me for a statement and ignore me until I ask to speak to one. I attempt to explain that I was in fear for my life and am still in fear for Chelsie's safety. Still no statement is taken from me. I'm relieved when the police separate Chelsie from Jeremy L     and take her home instead of letting him leave with her. Jeremy is so drunk police officers insist that he can't drive so he leaves in a silver car that was an Uber and glares at me on the way out of the parking lot.

I later find out that Jeremy took the Uber to Chelsie's apartment and let himself in when Chelsie's mom opened the door. Chelsie locked herself in her room in fear and Jeremy wouldn't leave the apartment until Chelsie informed him she was calling the police. He continued to stand outside of her apartment door instead of calling himself an Uber or Taxi until police arrived and escorted him away.

Jeremy put me in fear for my life and Chelsie's safety. He attempted to follow through on his threats with

his actions and forced me to defend myself, my incapacitated fiancée, and potentially our unborn child. Jeremy made me and my fiancée live a nightmare on our engagement night in which I did everything I possibly could think to do to keep us safe and prevent anyone from irreparable harm.

**I KNOW WE were going to be _SEVERELY MAIMED OR DIE_ if I didn't act exactly AS I DID.**
**_May Dad have me accept "criminal recklessness" from a clear and present danger?_**
**_[NO STATEMENT ABOUT THE INCIDENT WAS GIVEN BY J.L. DURING DEPOSITIONS]_**
**_[MAY THIS MEAN IF I HAD GONE TO TRIAL IT WAS MY WORD AGAINST NO ONE ELSE?]_**

## Witnesses at the event corroborated my recounting of events, just like school events.



**Protective order by C.T. (my fiance at the time) towards J.L. (aggressor in gun case).**
**_J.L. didn't stop after the gun incident, followed C.T., and went into her apartment._**



\*\*\* THAT IS ALL THE EVIDENCE THAT WAS OFFERED AND \*\*\*

\*\*\* INTRODUCED IN THIS CAUSE ON THIS DATE. \*\*\*

**In my opinion I did what I had to do. Why may my Dad not back me up to trial?**
*If misdemeanors lost me my job at Ascension, may that put Mamaw & Papaw at risk?*
**I didn't hurt ANYONE in this event, and Dad may want their estate.**
*[MAY DAD'S INVOLVEMENT HAVE CAUSED ME TO RECEIVE TWO MISDEMEANORS?]*

**MAY THE INCIDENT HAVE OCCURRED IN EARLY DECEMBER OF 2016?**
*MAY DAD HAVE PAID FOR MY LAWYER WITHOUT ME GIVEN ANY CHOICE?*

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION COUNTY SUPERIOR COURT |
| | ) SS: | CRIMINAL DIVISION, COURTROOM SIX |
| COUNTY OF MARION | ) | CAUSE NO.: 49G06-1612-F5-046714 |

| | |
|---|---|
| STATE OF INDIANA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JON TURPIN, | ) |
| Defendant. | ) |

### SUBPOENA DUCES TECUM

TO THE NON-PARTY NAMED IN THE ATTACHED REQUEST FOR PRODUCTION OF DOCUMENTS TO A NON-PARTY:

**YOU ARE HEREBY COMMANDED** to comply with the attached REQUEST FOR PRODUCTION OF DOCUMENTS TO A NON-PARTY on or before February 13, 2017, on behalf of the Defendant in the above-entitled cause.

Issued this 12th day of January, 2017.

_____
Tom F. Hirschauer III, #27875-49
Attorney for the Defendant

Keffer Barnhart LLP

Indianapolis, Indiana 46204
Office: (317)
Fax: (855)
E-mail:     @KBindy.com

This Subpoena complies with the Requirements of Rule 45 of the Indiana Rules of Trial Procedure.

**MAY I HAVE TOLD DAD IMMEDIATELY THAT VIDEO EVIDENCE WOULD DEFEND ME?**
*[MAY VIDEO EVIDENCE NOT HAVE BEEN REQUESTED BY DAD UNTIL JANUARY 2017?]*

**MAY I HAVE RECEIVED CASE FILES ONLY AFTER WRITING THE INDIANA STATE BAR?**

GREG PENCE
6TH DISTRICT, INDIANA

ENERGY AND
COMMERCE COMMITTEE

## Congress of the United States
### House of Representatives
### Washington, DC 20515-1406

## PRIVACY RELEASE FORM
### Authorization in Accordance with the 1974 Privacy Act

**DO NOT use this form for inquiries to the U.S. Citizenship and Immigration Services (USCIS).**

**Full Name:** Jon Frederick Turpin

**Social Security #:** [redacted]    **Date of Birth:** 04/05/1990

**Home Address:** [redacted]    **City:** Cambridge City   **State:** IN   **ZIP:** 47327

**Primary/Daytime Phone:** 315- [redacted]   **Phone Type:** ☑ Cell ☐ Home ☐ Business

**Alternate Phone:**   **Phone Type:** ☐ Cell ☐ Home ☐ Business

**Email Address:** jt4590@gmail.com   **Sign up for Updates/Newsletter?** ☐ Yes ☐ No

**Is an Attorney or a CPA representing you with this issue?** No   **Phone/Email:**

**Which of the following best describes the Federal agency involved or the general nature of your case?**
- ☐ Department of Defense, Military, Veterans Affairs (JH)
- ☐ Federal Grant Programs (NG)
- ☐ Social Security, Disability, Medicare (RJLC)
- ☐ Dept. of State, Passports, Visas (DH)
- ☐ Unemployment, Medicaid, Food stamps, Rental Assistance, TANF, State Prisons (refer to state legislator)
- ☐ Financial assistance with rent, housing, food, utility bills or medical bills (refer to township trustee)
- ☑ Other Issue or Federal agency: Being denied depositions from completed and paid in full case.

**Do you have a case, claim, receipt, passport, or tracking number for this issue?**

**What other elected officials have you contacted about this problem?** Indiana State Attorney General

**What was their response?** Pending

**Please describe the specific problem you are experiencing and the resolution you are seeking.**
**Please attach any relevant supplemental information - do not send originals.**

**The problem I am having is** Lawyer Tom Hirschauer III refuses to provide me with the depositions from my completed case fully and the case I've been requesting these depositions regularly for years. Part of receiving them is prohibiting me from having evidence to properly file a civil suit.

**The resolution I am seeking is** Receipt of my depositions & UNREDACTED. I've not received these at all yet, but it must be specified for which I've already paid in full for the case.

THE PRIVACY ACT OF 1974 PROHIBITS THE GOVERNMENT FROM REVEALING ANY INFORMATION FROM THE PERSONAL FILES OF INDIVIDUALS WITHOUT THEIR EXPRESS WRITTEN PERMISSION. THE DISCLOSURE OF PERSONAL RECORDS TO A MEMBER OF CONGRESS WHO IS ACTING ON BEHALF OF THE CONSTITUENT IS PERMITTED, UNLESS THE INDIVIDUAL TO WHOM THE RECORDS PERTAINS HAS CONSENTED.

I, the undersigned, hereby authorize the Office of U.S. Representative Greg Pence to receive all information in my file pertinent to all inquiries on my behalf.

**SIGNATURE:** [signature]    **DATE:** 03/15/21

111 CANNON HOUSE OFFICE BUILDING, WASHINGTON, DC 20515, (202) 225-3021

**_IS IT TRUTHFUL I HADN'T RECEIVED THEM? YES. DO I FORGIVE TOM? YES._**
**_MAY DAD HAVE PREVENTED MY LAWYER FROM RELEASING THIS INFORMATION?_**

**May it have put patients within the Ascension's/St. Vincent's cardiology realm at risk?**



*__May I have been responsible as an expert, to keep their cardiology software running?__*

**May my prior manager, a Ph.D., and current director, have a view of my person and ethic?**

Hello,

I'd like to offer that my time in a professional and personal atmosphere with Jon Turpin his character and demeanor demonstrated what is good in a person. He inspired for excellence in his work and delivered on many complex items of projects and service delivery. As his team lead being able to find that 'nitch' that landed him in his wheelhouse was a joy to witness that transpire. Jon has a gift of technical genius and once channeled and fueled he can produce brilliance.

If I were building a team of people required for a serious event, Jon is going to be on that selection list. Would never doubt his abilities as a professional nor his personal relationship building. Everyone is unique and those differences are what meld our world. Jon's uniquises are to be valued and known to be a positive contribution.

Sincerely,

Anthony Goodwin

**_May I wish I was still working with Tony today, giving my all for the patients?_**

**Was I defamed as having "anger management issues" to multiple managers?**
*Tony referenced write-ups I received when Papaw Turpin and Broc Jacobs passed away.*



**Why weren't my write-ups entered into any Human Resources records?**
*They were against company policy regarding bereavement of family and friends.*

**Brian was a good man, but he wrote me up on a scheduled bereavement day for Papaw.**
***I worked for Brian until 4am to ensure a project was completed, and reverified it at 10AM.***



**Even though it was my scheduled bereavement for Papaw's passing, I was written up.**
***How did I handle it? I spoke to Brian's manager, Margie, and left for bereavement.***

**I was laid off, supposedly due to "anger management issues" but then was called to help.**
*__When I was laid off, the EEOC gave me the right to sue but I didn't, and helped anyway.__*



**Even when money was mentioned, I was more worried about "doing the needful."**
*__Patients' lives were on the line, and I had a job to do for them, "fork" the money!__*

**<u>How did I handle a wrongful termination and disrespect to my family and friends?</u>**



**<u>*Tony said I gave "excellent assistance and pure professionalism" despite it all.*</u>**

**How did I respond to someone who defamed me to management?**
***May defamation of me having "anger management issues" cost my job and hurt others?***

Jami S.
Sr Solutions Architect - SACOE at Ascension



Jami S. · 2nd
Sr Solutions Architect - SACOE at Ascension

MAR 19, 2021

 Jon Turpin · 10:37 PM

Dear Jami

I wanted to take the time to let you know the way you intentionally put me on the layoff pile was probably the third most cruel thing a manager has ever done to me.

The most cruel thing was revisiting an expired write up that I received illegally from Brian Shoulta. I received that write up for "being late" on a scheduled bereavement day on which I wasn't even supposed to have to work.

Because my grandfather died and I wasn't even allowed time to mourn.

You bringing that up again was completely your fault and not sorting me into the proper job role and not following policy were also completely your own decisions and your fault.

We both know what you were doing could have shut off medical machines and prevented patients from being seen, potentially killing them.

I hope you change someday and learned something. But for now I just want you to know I forgive you and I hope to never work with you again.

Sincerely,
Jon

***May I have been defamed to Jami by someone else before this?***
***May this be similar to defamation of me by Dad, Michael, and Jared of my mental state?***

## May I have spoken to Brian after he wrote me up regarding Papaw's passing?

**Brian S.**
Technical Platform Manager at CNO Financial Group



SEP 14, 2021

**Jon Turpin** · 12:57 AM

Dear Brian

I have something to say to you and I'm willing to pay for an inmail to say it.

Regardless of the circumstances I respect you for stepping down after what occurred. I kissed your ass when you wrote me up on a bereavement day. Not because I wanted to keep my job, but because I know you're a good man of God even though you, in my opinion, failed me badly as a manager.

I'll be open and say I was partially of the mind to see if you could outrun me in the parking lot when I received that write up because it was so blatantly disrespectful any reasonable person would be beyond furious... if you can't understand why I was so angry about it initially then I'd ask you to put yourself in my shoes:
Working 16 hours a day to make sure you would look good despite you not understanding how the software needed to be installed so we could actually finish the project. Coming in even though my grandfather died, and then eating crow to humbly show you that I did respect you even though I had every right to absolutely lose it.

I ended up with scoliosis and osteopenia from working so much without taking care of myself at Ascension to make sure we all would succeed, and I imagine a lot of your work life was the same, because when I took a step back and saw how many teams you were managing and how much weight you were carrying I reconsidered and handled it as maturely as I

**Brian S.**
Technical Platform Manager at CNO Financial Group

Ascension to make sure we all would succeed, and I imagine a lot of your work life was the same, because when I took a step back and saw how many teams you were managing and how much weight you were carrying I reconsidered and handled it as maturely as I could instead of my initial reaction.

That write up, illegal and unfounded as it was came back to bite me in the butt later because you didn't do your due diligence and remove it from my HR file. So Jami was able to use that to harass me even after it was expired. I can handle that too because I doubt that's what you intended, though if it was then I think you've paid in Karma for it at this point.

I hope you're doing well now wherever life and your career has taken you. You taught me some valuable people skills and I appreciate the patience you had with me at some times when our upbringing and philosophies collided rather than coinciding.

What I want you to know is even when we disagreed and even when I was angry with you I knew you were a good man and overall a manager doing his best with an impossible task he made possible. In that regard we were always the same; impossible wasn't in our vocabulary, and I enjoyed working with you because of that.

I forgive you.

Sincerely,
Jon

## In my opinion, any reasonable man would be upset by someone utterly disregarding the death of a loved one, especially a grandfather who spent years of his life walking by you.

### Would you remain calm and stick it out for the patients?
### Would you pay money to let someone know you forgive them?
### Would you show up even after being laid off and give your very best to help others?

### *That's the example I gave.*

## Brian and Jami got to read my opinion after they disrespected my family, friends, and me.
## In my opinion, that's something any reasonable person would support.

**Let's discuss more details of the gun case. Look at how far J.L. followed us uninvited:**



**How far J.L. followed me while making threats to me and trying to take C.T.:**



**I was carrying C.T., who J.L. tried to take,** *in my charge,* **who had inexplicably passed out.**



**Left red circle is where my gun was.** *NOT ON ME.* **I had been at the gun range that day.**
**In my opinion it may take more than a normal tolerance for me to fear for my life.**
***If I say I'm in danger may I be believed? May Dad threaten my wife, and that I'd be shot?***

**After being followed to her apartment, C.T. moved in with me at my condominium.**
***During the gun case Alexis was temporarily living with me in my Condo as well.***

**C.T.'s family stayed for a bit and unfortunately didn't make Alexis feel comfortable.**
***However, instead of being informed directly in my home, Mom and Dad were contacted.***

**C.T. wanted to put in a protective order and evidence, and had contact with a witness.**
***May Dad have attempted to separate me from C.T. who was a witness during the case?***

**Instead of focusing on retrieving video evidence or contacting S.C. for testimony:**
***May focus have been to "control" the home I paid for with the pretense I was guilty?***

**May this be similar to how Dad treated me with the school lawsuit filed as if I was gay?**
***May this be similar to how I may have been separated from witnesses recently?***



**In my opinion, it isn't ok not to inform an owner in his own home of potential issues.**
***In my opinion it's not ok for parents to harass, defame, nor control an adult Son & home.***

**It must be said: C.T. was a witness and without her taking action I may not have been ok.**
***Regardless, I'm sorry to my Sister that she was uncomfortable in any way. I Love her.***

***May Dad have left something in this condominium's attic? If so, are residents aware?***

**It may be noticed that my plea deal is signed and accepted retaining the right to appeal.**
**_May this have been done by me if my Dad forced me not to go to trial in my gun case?_**
**_[MAY RESEARCH HAVE STARTED WHEN I WAS DIRECTED TO WAYNE COUNTY FILES?]_**

**COUNT II:**
A TOTAL SENTENCE OF ONE [1] YEAR WITH ALL TIME NOT ALREADY SERVED SUSPENDED. DEFENDANT SHALL BE ON PROBATION FOR A PERIOD OF ONE [1] YEAR. DEFENDANT SHALL WRITE AN APOLOGY LETTER TO JEREMY LEWIS. THIS COUNT SHALL RUN CONSECUTIVE TO COUNT III. DEFENDANT SHALL HAVE NO CONTACT WITH JEREMY LEWIS. DEFENDANT SHALL RECEIVE AMS UPFRONT. OPEN ARGUMENT AS TO ALL OTHER TERMS.

**COUNT III:**
A TOTAL SENTENCE OF ONE [1] YEAR WITH ALL TIME NOT ALREADY SERVED SUSPENDED. DEFENDANT SHALL BE ON PROBATION FOR A PERIOD OF ONE [1] YEAR. THIS COUNT SHALL RUN CONSECUTIVE TO COUNT II. DEFENDANT SHALL HAVE NO CONTACT WITH JEREMY LEWIS. DEFENDANT SHALL RECEIVE AMS UPFRONT. OPEN ARGUMENT AS TO ALL OTHER TERMS.

6. The Defendant understands and acknowledges that placement into the Marion County Community Corrections program component depends on availability and that the Defendant shall (or may) be held in custody pending availability ☐ **FT**.

7. Defendant hereby waives the right to appeal any sentence imposed by the Court, including the right to seek appellate review of the sentence pursuant to Indiana Appellate Rule 7(B), so long as the Court sentences the defendant within the terms of this plea agreement (    ).

8. The Defendant acknowledges that the State's recommendation, or agreement to make no recommendation, is based on the Defendant's criminal history known to the Deputy Prosecutor representing the State at the time this agreement is executed and who entered into the agreement. In the event that such information is incomplete, that a further or more accurate criminal history is discovered prior to the entry of judgment or the Defendant is charged with the commission of another offense prior to sentencing, the State reserves the right to unilaterally withdraw from this agreement at any time prior to the entry of judgment herein. It is further agreed that the sentence recommended and/or imposed is the appropriate sentence to be served pursuant to this agreement ☐ **FT**.

9. The Defendant understands and acknowledges by his/her initials that, if this agreement is accepted by the Court, the Defendant will give up the following rights:

☐ FT (a) the right to a public and speedy trial by jury;
☐ FT (b) the right to confront and cross examine the witnesses against him/her;
☐ FT (c) the right to have compulsory process for obtaining witnesses in his/her favor;
☐ FT (d) the right to require the State to prove his/her guilt beyond a reasonable doubt;
☐ FT (e) the right to remain silent and the right not to be compelled to testify against oneself;
☐ FT (f) the right to present evidence on one's own behalf and to be presumed innocent.

JAN 05 2022

**It's my opinion that even if a Dad pays _up front_ for a lawyer the Dad isn't the client.**
**_May this only be pertinent in regards to my recent background check errors?_**
**_[MAY I HAVE NO HOPE ON APPLYING FOR THE FBI DUE TO THESE EVENTS?]_**
**_MAY IT ALSO BE NOTICED I HAVE NO RIGHT TO REMAIN SILENT ABOUT THE CASE?_**
**_THIS IS NOT MALICE: DAD THREATENING ME TO PREVENT MY TRIAL IS CONCERNING._**

*MAY DAD HAVE RETAINED THE LAWYER IN MY CASE PREVENTING ME FROM APPEAL?*
*MAY I HAVE BEEN UNABLE TO GET ANOTHER LAWYER DUE TO THIS RETAINMENT?*
*MAY DAD HAVE BEEN PREVENTING ME FROM GETTING INFORMATION FOR APPEAL?*
*MAY A LACK OF THIS INFORMATION PREVENT ME FROM PROVING MY CHARACTER?*

# Ind. R. App. P. 7

⬇ Download PDF

As amended through September 30, 2022

Rule 7 - Review of Sentences

(A) **Availability.** A defendant in a Criminal Appeal may appeal the defendant's sentence. The State may not initiate an appeal of a sentence, but may cross-appeal where provided by law.

(B) **Scope of Review.** The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.

*Ind. R. App. P. 7*

*MAY DAD HAVE TRIED TO CONVINCE ME THIS WAS ABOUT MY "REPUTATION?"*
*THIS IS NOT ABOUT REPUTATION. IT IS MY OPINION MY CHARACTER WAS ATTACKED.*
*MAY I HAVE HAD TO WRITE THE INDIANA STATE BAR AND THE LAWYER TO RELEASE?*
*THIS IS NOT MALICE: DAD'S BEHAVIOR PREVENTING MY APPEAL IS CONCERNING.*

**MAY I HAVE BEEN ASKING DAD TO HELP ME GET MY CASE INFORMATION?**



***MAY DAD HAVE BEEN THE "SOMETHING SHADY" THAT WAS IN MY WAY?***

**May it be that I know whether I've actually gotten a good deal or not?**
*Here's a testimonial from Hamfest 2001 when I was 11 and negotiated for a laptop.*



**Hamvention Customer Testimonials**

**Many thanks to our loyal Hamvention Customers who keep coming back year after year to see us and took the time to tell us how pleased they were with our products and our service!**

"I think I got a good deal!"

Our youngest customer this year was 11 year old J.T. Turpin of Indiana. We all enjoyed meeting J.T. who knew exactly what he wanted, negotiated his own deal, and shook our hands (at his initiative) after buying his P2/400 Gateway Solo 9100. Watch out Bill Gates! This young man is really something!

**Thank you sincerely to the Honorable Judge Mark D. Stoner, then Deputy Prosecuting Attorney Celita L. Scott, Defense Attorney Tom F. Hirschauer III, the Indiana State Bar Association, and Marion County S.C. 6 for the plea deal I received in my gun incident.**

**May it be acceptable to ask despite my Dad's potential involvement that it be honored?**
*May Dad have made me sign a contract forfeiting all my assets and a Revocable Trust if I had received a felony? Mom recently said that such a contract would no longer be valid.*

**This card references a contract as a "loan" which was only partially accurate.**
**_May I have been forced to take a loan and threatened to have no bail nor lawyer nor life?_**



26

NAME  John Turpin          DATE  1-5-17

Married__ Single__ Div__ Sep__ Living w/someone✗ Widowed__ Signif Rel &

Children (Chelsea - da - 6) - autistic - lost custody -

Presenting problem: Ex - Fiancé - ADHD, OCD - (mild autistic
Pediatrician - Never had Med / counseling for OCD (?), PTSD -
→ Friend for 4 years - dated longago - She was Previously married - has
a da - 15 when had da - She's a Child smasher) - Started dating - Oct. - She
sd recently left serious rel - he didn't know this - She's an alchy, was
on drugs - lived at Grandma (Mom's) lost custody), she was talking to other guys, Doc
engaged / Big Barnadout - he was hinged at - pulled gun - shot - 3
felony charges - (she gave him ch          ) - M.S. - gave M &
him - told people he was a guy.

**May a "lack of insight" be caused due to living with a narcissistic Dad?**
**May this have been different if I wasn't viewed as "guilty until proven innocent?"**

Anxiety__ inc heart rate__ Restlessness__ Worry ✓ Racing thoughts ✓ Irritability ✓ Sad ✓

Anger outbursts ✓ Withdrawn ✓ Fatigue ✓ Dec. Conc ✓ Indecisive ✓ Helplessness ✓

Hopelessness ✓ Crying ✓ Sleep __N__    Appetite __N__

Suspiciousness__ Delusions__ Hallucinations__ Dec. in ADL _____

Suicide ✓ thoughts H, S, plan_____ intent_____ means_____

Homocide: thought No plan_____ intent_____ means_____

Violence __writing__

Self-mutilation __NO__

Past history _____

Substance Abuse: __2-3x wk - 3 beers__

Past treatment: __PTSD - from High School - People thought he was gay - but Helpful__

Legal Issues: __Felony charges Pending__

Work Issues: __Missed due to Charges - hard to get stuff done__

Medical Issues: __stru abug - past -__

Education: __BA - @ IU PU D__

Religion: __Not - believe__    walked full time since 16

Financial Issues: __Not before incident - 84,000 a year - Attorney Fees - pays for Chelsea__

Family of Origin: __P's - No emotional support - Made him leave at 19 - P's argue like kids - in Cambridge City - Had to sign loan for Lawyer - Never felt loved by P's - low self-esteem - w/ Chelsea to feel love - Shows her love - Feels he's had to Parent his Parents__

## 2. Emotional Abuse

Emotional abuse could include accusing, belittling, blaming, bullying, criticizing, demanding, ordering, raging, sarcasm, shaming, or threatening.

| Support System: | *"Kind of" Parents* |
| Hobbies/leisure: | *Video games - puts all into work* |

## May I not be very "good" at League of Legends, but enjoyed it with friends?

| Mastery points ranking | | | |
| --- | --- | --- | --- |
| | Summoner | Mastery Points | Tier |
| 1. | ExQxr | 5,930,887 | Platinum IV |
| 2 | HAKAZE0157 | 4,172,191 | Iron III |
| 3. | Fuego Sagrado | 3,584,759 | Gold III |
| 4. | Mao Mao Dan Ta | 3,428,732 | Diamond II |
| 5. | LETHAL JARVAN IV | 3,084,425 | Gold IV |
| 6. | knifeplay | 2,988,329 | Platinum IV |
| 7. | Gold Grenade | 2,728,126 | - |
| 8. | Chuy409 | 2,631,508 | Platinum IV |
| 9. | Rank1InMyHead | 2,574,323 | Silver II |
| 10. | james abc111 | 2,489,843 | - |

**May I practice the same "champion" most of the time due to a lack of coordination?**
***May I also simply enjoy how the champion "Jarvan IV" works when playing the game?***
***May this be another sign of a hidden disability?***

_**May coercion to sign a contract for bail, lawyer, assets, and inheritance be exploitation?**_

**ABUSE, NEGLECT AND EXPLOITATION**

## What financial exploitation is

Financial exploitation occurs when someone improperly uses the money, assets or resources of a person with disabilities or an older adult to the abuser's advantage or to the disadvantage of the person with disabilities or older adult.

Examples of financial exploitation include:

- Stealing or misusing the victim's checks, credit cards or money
- Forging the victim's signature
- Forcing or deceiving the victim into signing checks, estate planning documents, contracts or other documents
- Taking the victim's possessions without permission
- Misusing a power of attorney to the exploiter's benefit

If you are concerned that a person with a disability or an older adult (60 or older) is being financially exploited, you may take action by following one or more of the options below.

## Reporting financial exploitation to state agencies

Several state agencies can investigate reports of financial exploitation and protect people with disabilities or older adults from further harm. Which agency investigates the report depends on a few factors, such as whether the exploitation occurred in a domestic setting or as part of a licensed program, and how that program is licensed.

You do not need to know detailed information about a facility's licensure or the victim's living situation or program to make a report. You should call any one of the agencies below if you are concerned that a caregiver or other person is financially exploiting a person with disabilities or an older adult. The person answering your call will help you determine the correct agency to receive the report.

Each agency has a hotline that is available 24 hours a day, seven days a week. The person taking your call will ask you for information, which may include:

- The victim's name, address, telephone number, age, and condition
- The alleged exploiter's name and relationship to the victim
- As much detail as possible about why you believe the victim is being financially exploited
- Whether the victim is in immediate danger
- Names and contact

## Reporting to the Department on Aging

The Illinois Department on Aging's Adult Protective Services unit investigates allegations of abuse, neglect and financial exploitation of people with disabilities and older adults when the victim lives in a domestic living situation or while engaged in activities in his or her community. A domestic living situation is either a community-based unlicensed facility or a home where the person with a disability or older adult lives alone, with family, with a support worker or caregiver, or with others.

2    ospip/oequality.org  |  Ilinois.gov/aging

## 25. Exploitation

People in their life are viewed as objects to meet the narcissist's needs. They will take advantage of others without guilt or shame. They do not think about how their actions affect others, leaving their victims feeling unloved and uncared for.

# The Cycle of Narcissistic Abuse

The narcissistic abuse cycle is a pattern of highs and lows in which the narcissist confuses their partner through manipulation and calculated behaviors aimed at making their partner question themselves. Each phase in the cycle works in tandem with the other in order to keep someone entangled in the narcissist's web.

Narcissists tend to deflect all their feelings onto others because of the pain they feel about their own feelings. They too may have had narcissist caregivers or parents, or experienced some kind of abuse or traumatic event which shaped their upbringing. However, this is not an excuse for the emotional and/or physical abuse inflicted on their victims.

# Effects of Narcissistic Abuse

Narcissistic abuse has both short and long-term effects no matter how long or short the involvement. This type of control and manipulation is slow, subtle, and deliberate. While narcissistic abuse syndrome is not a diagnosable disorder, the symptoms of the emotional pain can leave you feeling disconnected and confused.

Narcissistic abuse is a form of trauma, and the body internalizes and reacts to stress and trauma in many ways. You may experience body aches, headaches, and digestive problems from feeling on edge. In addition to stress on the body, the brain is affected too.

You may experience a wide range of issues after surviving narcissistic abuse, including:

- Cognitive difficulties including confusion, hypervigilance, or intrusive thoughts
- Behavioral issues including withdrawal, increase in alcohol or substance consumption, or a change in communication
- Emotional problems like fear, guilt, or irritability
- Depression
- Anxiety

# Exiting a Relationship With a Narcissist

You can never please a narcissist. You cannot make them happy because they are not happy with themselves. It is often best to end the relationship for your own mental health.

Exiting a relationship with a narcissist can be challenging. At the end of a relationship, they may beg, make promises to change, lavish you with expensive gifts, or profess their undying love for you. But know that a narcissist never changes—they only get better at their craft. Remind yourself that you deserve better and are worthy of love.

***[WITHOUT ME OR DAD: MAY ALEXIS POINT OUT WHICH MAN IN WHICH LOCATION?]***
***[MAY IRENE BE ALLOWED TO POINT OUT IAN ON THE STAIRS OR MARK IN DINING?]***
**Before the gun case, someone I know/knew may have pointed a gun at my Sister.**
**Unfortunately, I didn't see it if it did happen, and if so, can't confirm nor deny who did it.**
**What I can say is that after I entered my condo to see friends, Mark grabbed my firearm**
**from my hip holster. I turned to Mark and my focus was to retrieve the gun IMMEDIATELY.**
***DIRECTLY after retrieving my firearm, I told Mark "You NEVER touch someone's firearm!"***



***Then I informed all guests: "ANY firearms are to be put away, locked up, upstairs, NOW."***
***Alexis did not tell me at the time in my house, nor identify who had pointed a gun at her.***
**Irene abruptly said she was leaving and exited the condo via the front door. Later Dad**
**blamed me, on the phone, screaming it was Ian, as I entered 465 from 56th St., in my car.**
***May I not trust Dad? I de-escalated this, but if my Sister identifies, WE MAY REPORT IT.***
***[I TRUST MY SISTER THAT IT HAPPENED AND TO IDENTIFY WHICH OF THE TWO MEN.]***
**[MAY DAD LIE AND MAY I NOT BELIEVE WITHOUT PROOF? MAY DAD BE THE ISSUE?]**

**This photo is of the table and chairs previously on the condo's back deck for reference.**



*Others may have been present, but may not be drawn at this time.*

**[IN MY OPINION SOMEONE IS INNOCENT UNTIL PROVEN GUILTY NOT THE OTHER WAY]**
*[IAN MAY TREAT ME AS FAMILY AND MAY HAVE NO FAMILY: BUT ALEXIS IS MY SISTER]*
**What I do know is that Mark later entered my condo at night uninvited via the back sliding glass door after I had returned from singing lead with a rock band & after I went to sleep.**

| | | |
|---|---|---|
| ☒ State of Indiana v. Mark | | F |
| Court | Marion Superior Court 19 | |
| Case Type | CM - Criminal Misdemeanor | |
| Filed | 02/11/2020 | |
| Status | 01/11/2022, Decided | |
| Charges | 35-43-2-2(b)(2)/MA: Criminal Trespass Def., not having contractual interest in | |
| | property, knowingly, 7.1-5-1-3(a)(4)/MB: Public Intoxication -- Harassing, Annoying, | |

**Jerry was awake at first, Mark had no weapons, and appeared to be searching for alcohol. There was none to be found, and Jerry had Mark remove himself *immediately.***
*Jerry telling Mark to remove himself woke me up in time to confirm Mark was exiting.*



*In my opinion, Mark doesn't know gun safety, nor decorum.*
*In my opinion, Ian knows gun safety, but may lack decorum.*

**May Mark have been one reason I tried to move from Indianapolis to Cambridge City?**
*May Mark have attempted to give me pills on my back deck outside and I told him no?*
*[In my opinion, Ian and Mark look somewhat similar in complexion, but I trust my Sister]*

**May Dad have attempted to use an incident I had safely de-escalated against me?**
*May this incident and Dad's screaming be one reason Alexis and I aren't speaking?*

**May Dad not want me and Alexis to speak about nor resolve this incident?**
*May a resolution in this incident take away Dad's potential "control?"*

**[MAY THIS BE SO, MY SISTER MAY POINT AT IAN/MARK IN THE PHOTO AND REPORT.]**
*[MAY IRENE RESOLVE THIS ANY TIME BY POINTING THE MAN OUT TO JAMIE TURPIN?]*

https://drive.google.com/file/d/1ak--YOi7kKNiSaQpBtUgGc16j40nqau7/view?usp=share_link



**May I get defensive after saying "No" if my Dad may defame me to Mom to "push" her?**
***May I be required to express our boundaries more rigorously than normal to survive?***

## 2. Emotional Abuse

Emotional abuse could include accusing, belittling, blaming, bullying, criticizing, demanding, ordering, raging, sarcasm, shaming, or threatening.

## 13. Financial Abuse

Financial abuse might include controlling you through economic domination or draining your finances through extortion, theft, manipulation, or gambling, or by accruing debt in your name or selling your personal property.

## 24. Hogging the Conversation

Narcissists love to talk about themselves. They will embellish and flat-out lie to make themselves look better than others or inflate their accomplishments. There is no room to talk about your accomplishments, nor do they care about them in the first place.

**[MY OPINION ON BUDGET TRUCK IS POSITIVE: THEIR CEO TOOK GREAT CARE OF US.]**

*Here's Erin and I while we were packing the truck to move to Indiana. It was ~97 degrees.*



**During Erin's move from Louisiana to Indiana, the truck we received after hurricane Ida had some structural issues in the cab. Because no other trucks were available, I stopped due to concern, and began repairs to ensure the cab wouldn't detach from the truck.**



**While other bolts and possibly welds hold the cab to the lower frame, the upper cab behind the seatbelts had detached. This may not have been safe, but was repairable, so we decided to do so. Kind people at an auto parts store saw this and *gave us hardware,***





**Unfortunately the back also leaked, which may have damaged Erin's antique table.**
***Budget Truck's executive team helped us with this issue and it has been resolved.***



**More than once in front of any company, even after asking us to speak, my Dad harassed us about this trip. Dad first asked, and next waited until I spoke, to yell *"WAAH WAAH!!"* In response to our distress Mom said "Your stories aren't funny!" and Dad continued. *May Dad have humiliated our family and company in multiple attempts to make us upset?***

**Why may my parents have initially been replaced with other medical contacts?**
*When this accident occurred my parents may have stressed me more than the accident.*





**Before we proceed, what happened, was I at fault?**
*May Dad have a motive to attempt to convince me not to complete an insurance claim?*

**Here's a diagram of what occurred in the accident:**



**Shatara Butler**

**Jon Turpin**

**Jon Turpin**

My car spun at least 360 degrees after being hit by GEICO driver. The circle is where the GEICO driver hit me when she ran the red light at high speed and impeded my right of way.

**Shatara Butler**

*In my opinion, Ms. Butler went a long way after totaling my car, but I forgave her.*

**A respected law officer at the scene, Marco Zaragoza, seems to share this opinion also.**
*Mr. Zaragoza was kind enough to take time out of his busy schedule to correct the report.*



**Zaragoza, Marco A.** <Mar...   Thu, Aug 5, 2021, 12:00 PM   ☆   ↩   ⋮
to me ▾

Good afternoon, this Officer Zaragoza B239. I would like to apologize for the inconvenience of not being able to make the communication easier.
Can you explain to me exactly what is it that you need change on the report?
As far as I know you at listed as Unit 2 which means you are the victim of the accident.
For what I remember the other vehicle hit you almost head on and both vehicles were totaled.
What are you having issues with ?

Get Outlook for iOS



**Jon F. Turpin** <jt4590@gmai...   Thu, Aug 5, 2021, 12:12 PM   ☆   ↩   ⋮
to Marco ▾

Hi Officer Zaragoza,
Thank you for reaching out to me.

One of my issues with the report is that the point of impact was the passenger side. It was the front end of the passenger side, but not "head-on" as described.

Another is that my statement that the other driver ran the red light while speeding with one headlight doesn't appear to be included. I'm concerned it may not have made it on the report.

This matters because without these distinctions the report may cause me to be considered at fault during arbitration in an accident I didn't cause.

Sincerely,
Jon

**I was directed to the complaints department but made it clear I only needed to reach him.**
*To this day, I have no complaints regarding Mr. Zaragoza, and still greatly appreciate him.*

**I apologize for any frustration, Mr. Zaragoza, you do an important job and thank you.**
*May Dad have attempted to interdict me without Officer Zaragoza's assistance?*

**What made my parents so difficult to deal with when I had an accident at 38th and Post?**
*For clarity, 38th and Post is not the safest area in Indianapolis, a passerby even said:*
**"LOCK YOUR DOORS, ROLL UP YOUR WINDOWS,**
**DON'T GET OUT OF THE CAR, WAIT ON THE POLICE."**
*[SO I DID AS THE PASSERBY ADVISED]*
**Instead of picking me up from my condo, which I still owned, where I may have been safe, it *was demanded* I take an uber to McDonald's on Highway 40 to *stand outside.***



*While speaking with Officer Zaragoza, and already filing my insurance claim, I received approximately 20 phone calls from my parents, screaming, even though I said I was ok.*

**May Dad have been telling Mom not to allow me to go back to my condo?**
*This was the middle of winter and the height of COVID when you couldn't enter buildings.*

**IT WAS SO BAD I HAD TO HANG UP TO HEAR OFFICER ZARAGOZA'S INSTRUCTIONS.**
*IN FACT ONE OF HIS INSTRUCTIONS WAS: "HANG UP" AND I DID AS HE DIRECTED.*



Measured temperature at approximately 2 meters above the surface of an open field (black dots) and 6, 12, and 24-hour lows (horizontal blue lines) and highs (red lines), placed above the hourly average temperature (faint purple line), with 25th to 75th and 10th to 90th percentile bands. The thin dotted line is the perceived temperature. Civil twilight and night are indicated by shaded overlays.



## MY PARENTS' TREATMENT OF ME AND CALLS WERE BAD: I SET FIRM BOUNDARIES.

### May Dad have a motive to prevent me and Alexis from helping care for him and Mom?
*Alexis is a registered nurse, she's more than qualified, may she not help Dad either?*

### As stated, I decided to remove them as main contacts and choose other contacts.
*May this have been necessary for my health? May my parents have placed me in danger?*



### Since Andrea Holwager is like an older sister to me I asked her and Michael Mann.
*I later updated to have Josh King-Baker as my main medical contact: we lived together.*
*Erin Golden would have been my medical contact if we lived together/were married then.*

### May Dad admit he needs assistance, may we not be removed from a Revocable Trust?
*May Alexis not be considered qualified, may Dad need persistent mental care?*

### BOUNDARIES MAY DISPLEASE MY PARENTS: MAY THEY HAVE INFILTRATED THEM?

## 5. Lack of Empathy

The lack of empathy or ability to feel and express emotions is the major reason why a narcissist's relationships fail. In a healthy relationship, both partners care for each other's well-being. In a narcissistic relationship, the non-narcissistic partner will not feel cared for and will show signs of sadness and loneliness.

**_May Josh and Erin have been my main medical contacts?_**
**_May Michael Mann NOT be my "next of kin?"_**



**_May this be an attempt to access my medical records?_**
**_May Michael and/or Dad have attempted to institutionalize me?_**

## 14. Privacy Invasion

Ignoring your boundaries by looking through your things, phone, or mail; denying your physical privacy or stalking or following you; ignoring your request for privacy.

## 8. Sabotage

Disruptive interference with your endeavors or relationships for the purpose of revenge or personal advantage.

**While friends have contributed, no one has paid my rent, nor medical bills, since 2009.**
*_May my medical issues be ignored by Dad? May Dad attempt to have Mom pay for them?_*



12/13/2021

Patient: Jon Turpin
Service Date: 11/12/2021
Encounter:

An audit on this account shows an overpayment on your claim(s)

We have credited your credit card ending in 1088 in the amount of $60.00 due to an overpayment on your account. If you have any questions, please contact me at 765-

Respectfully,

Jessica
Central Business Office
Henry Delivery Services

**May this be an attempt to access my medical records? May that be Mom's credit card?**
*_May Dad and/or Michael attempt to use Mom and/or Andrea to claim I'm incompetent?_*

## 14. Privacy Invasion

Ignoring your boundaries by looking through your things, phone, or mail; denying your physical privacy or stalking or following you; ignoring your request for privacy.

**Below I'm repeatedly expressing a boundary while finishing wedding planning with Erin.**

**Mom may be a professional chef, but Erin had already made us both a delicious dinner.**
***Despite expressing boundaries my presence at their home was unequivocally demanded.***



**After I had a potential heart episode from stress of which both Erin and I informed them.**
***Neither accepted our repeated expression of boundaries and instead tried to "control."***

**May Dad have a motive to harass me or use Mom to do so until I become upset?**
***May Dad have attempted to diagnose me as an "angry boy with no future" at 18-19?***

## 1. Gaslighting

Gaslighting is the intentional act of making you distrust your views of reality or believe that you're mentally unstable using specific targeted phrases to make you feel this way. Here are a few signs you are being gaslighted:

- You no longer feel like the person you used to be
- You feel like everything you do is wrong
- You always think it's your fault when things go wrong
- You feel more anxious and less confident than you used to be
- You often wonder if you're being too sensitive
- You often question whether your response to your partner is appropriate
- You're apologizing often
- You have a sense that something's wrong, but aren't able to identify what it is
- You make excuses for your partner's behavior

## 2. Emotional Abuse

Emotional abuse could include accusing, belittling, blaming, bullying, criticizing, demanding, ordering, raging, sarcasm, shaming, or threatening.

## 3. Projection

Projection involves dumping their issues onto their victim instead of taking any blame. For instance, a narcissistic abuser may accuse their partner of lying when *they* have lied (this is sometimes referred to as "Deny, attack, reverse victim & offender"). Or they make a partner feel guilty when they've done nothing wrong. This creates confusion.

## 4. Twisting

When a narcissist is confronted, they will twist it around to blame their victims for their actions. They will not accept responsibility for their behavior and insist that their victim apologize to them.

## 5. Lack of Empathy

The lack of empathy or ability to feel and express emotions is the major reason why a narcissist's relationships fail. In a healthy relationship, both partners care for each other's well-being. In a narcissistic relationship, the non-narcissistic partner will not feel cared for and will show signs of sadness and loneliness.

**Dad reached out to Erin via message after he told law enforcement we'd be left alone.**
*On November 8 Dad was polite, but Erin was already not comfortable with his behavior.*



**May Dad harass my fiance again after threatening her and me telling him no?**
*Erin had informed Dad before she was overwhelmed after being threatened by him.*

**May Dad continue to harass Erin after Erin let Dad know she was overwhelmed?**
***May Dad have made Erin cry from how he treated her? If so, may that not be enough?***



**May others have spoken to me and may they only be afraid of my parents suing them?**
***May I have told Dad I wouldn't initiate any vote to remove anyone from a school board?***

**First of all, I'm sorry: Let's briefly discuss the now infamous "Opener Spat" below:**
**Medical issues, wedding planning, and boundaries were repeatedly ignored. *Erin cried.***
**These aren't excuses but merely "why" I was finally upset about it: NOTHING hit Mom.**



**Threw the *garage door opener straight down on the floor and stomped* it twice.**
**Walked toward Mom, *still farther than arms-length away*, approximately 5 feet.**
**Yelled "No more! I won't be forced to choose between my wife and my mother!"**
***In my opinion, that's a pretty valid statement: Dad's harassment made Erin cry.***

**After exclaiming the above to Mom, I immediately stopped, and backed away from her.**
**Erin was inside and I began to exit, walking East to the back door, past kitchen island.**
**Dad was inside the office at his computer, and exited it, so I stopped at Eastmost pantry.**
*May a reasonable man be upset and say "No more." if parents attempt to halt a wedding?*



**After saying "No more" twice in a normal tone while pointing at Dad, I continued to exit.**
**Mom left the kitchen table and both parents were saying what they nearly always do:**
*"We're so sorry for our son! Are you sure you want to marry our son!?"*
*You're not sorry for interrupting our wedding planning and making my fiance cry?*

**Mom and Dad had Erin between.** *Erin wasn't able to leave.* **Dad took no accountability.**
**Over a minute had passed outside, I was "cooled off" and just waiting at the doorway.**
**I stepped to the** *threshold of the back door* **to wait, Mom said "It** *could* **have hit my eye!"**
**Dad turned to me and** *screamed***: "This is how people get SHOT!!"**
**He MEANT IT, and I KNEW IT, so I ONLY REPLIED with "I'm moving!" and I MEANT IT.**



**Dad: "THINGS are gonna CHANGE around HERE!"**
Me: Backs away from threshold, *only waiting for Erin*.
**Dad: "So IRRESPONSIBLE for a man making [my salary] a YEAR!"**
**Dad: "Take your** *'WIFE'*, **take your** *'CATS'*, **take your** *'SH*#'* **and GET OUT!"**
*Erin and I leave as quickly as possible with full intent of moving out.*

[I simply won't disown my Mom] Genesis 2:24 [nor my Dad but it was time to go]
*"Therefore shall a man leave his father and his mother, and shall cleave unto his wife:
and they shall be one flesh."*

Prior to the "Opener Spat" my Mom had something I call the "Landlord Spat" around us.

During April of 2021 Mom had been out with Erin and entered the rental uninvited.
*Erin and I had plans that evening. Mom demanded she and Erin go out together.*



Unfortunately, I was in a meeting for work, but still took time to speak with my Mom.
*Erin and I let Mom know again we already had plans together as soon as I was off work.*

Mom may have been upset that she wasn't getting to spend more time with my fiance,
and this I may understand, but it was a boundary, not personal. This may not have gone
over well, and didn't seem to. But when courting, couples need time to plan together.

When Mom was asked to leave twice, then told to leave, talking turned into an argument.
*May this have been another time I wasn't working, may this have been less of an issue?*

Mom yelled at me, and I yelled "Get out, you need to go!" as I sat down in a kitchen chair.
*It was our wish for Mom to leave at the time, but equally for the argument to de-escalate.*

My Mom works very hard every day, and in my opinion Dad may be heavy to "carry" *so I
attempt to show Mom in my body language that even if upset with her actions, she's safe.
This did frustrate me, though, and Mom yelled:* "I'll never let a renter talk to me like that!"

While still upset Mom said she may kick me out of the rental as a landlord too so I asked:
"Did you come in as *my landlord* or *my Mom*?"
*This was just a reminder to Mom of boundaries.*

Mom and I may not need to discuss "spats" again.

**Before this, in February of 2021, 10 months before our wedding. I was sad that my grandma, "Mamaw" Coleen Turpin would purportedly pass away soon. I was also attempting to heal from a broken fibula head from the car accident, and to complete the insurance claim also from the accident. Dad approached me outside the rental.**

**Dad didn't ask how I was doing nor mention Mamaw, he just yelled "quit smoking!"**
*This stresses me and I've let Dad know, but Dad often begins conversations with this.*

**Dad had approached me and walked onto the rental property's cement steps.**
*This was outside the back door pictured in the "Landlord Spat" above and here.*



**Dad asked if I was done with my insurance claim yet, which was still ongoing.**
*I expressed frustration about the ongoing insurance claim, but none at my Dad.*

**Dad became upset and attempted to convince me to give up on the insurance claim.**
*I let Dad know I needed to follow it through to completion and told Dad he should go.*

**Dad responded to me with:**
*"Maybe you shouldn't have sold your condo yet!"*

**This stressed me greatly.**
*The condo sale was already on contract and I'm unsure I could even back out of it.*

**May Dad have wanted to kick me out of the rental while I had a broken fibula head?**
*May Dad have attempted to push Mom to kick me out when this didn't work?*

**Saint Gabriel Catholic Church**

232 West 9th Street, Connersville, IN 47331
Phone: 765-825-8578

March 10, 2022

I am writing pertaining to Jon F. Turpin.  I had the privilege of getting to know him in my capacity as pastor of St. Gabriel Catholic Church in Connersville, IN.

I first met Jon after a Sunday Mass in 2020 when he came up and introduced himself to me.  As I recall, he was with his fiancé, Erin (they have since married!).  While this might seem normal, it's not all that common to meet a young adult wanting to grow his faith alongside the woman with whom he plans to spend the rest of his life.  Normally, twenty-somethings are not attending churches of any kind – let alone seeking to establish a marital life founded on faith.

Jon was not Catholic when I first met him in 2020, but he and Erin would talk to me about their courtship.  He was living and working in a neighboring town.  Erin was not even living in Indiana.  They had to put in a tremendous amount of effort and make lots of sacrifices to ensure that the temporary distance between themselves did not hinder their life together.  In fact, I truly believe because they put so much effort into their relationship, the distance they had to overcome ended up serving them well as they prepared for marriage.  Because they overcame this geographic adversity, I believe it revealed a capacity within Jon.  He can utilize adversity and make it work for the good of himself and those around him.

Another depth to Jon's character was made apparent to me as he began his formal journey to becoming Catholic.  Jon was busy, but he prioritized well the things that were important to him.  And the things important to Jon are indeed important in and of themselves.  Besides his future spouse, his work, and other relationships, Jon's prioritization of faith was apparent.  He committed to weekly classes centered on growing his relationship with God through what the Catholic Church offers.  He asked questions, shared his own experiences, and personally grew throughout the process.  It all revealed a great maturity within him through prioritizing and taking responsibility for those things and relationships that are simply important and serve to make for a better society and human person.

Jon and Erin are now married.  Even though I no longer get to personally witness their commitment to one another, I have every confidence that Jon continues to prioritize the important things of faith, marriage and family, work, and service of all those he encounters within them.  And that is all something we miss in our parish community.  What Jon contributed to our little parish community is something I commonly see out of older generations, which is what stands out most to me as he is not of an older generation.  Jon's age group does not commonly possess the fortitude and sense of responsibility of previous generations.  Our parish and community's loss in that is felt.  However, our loss is now another community's gain, and that is as it should be.

Thank you for your time and your continued support and concern for Jon.

Fr. Dustin Boehm



April 6, 2021

Jon Turpin
DirectEmployers Association
7602 Woodland Drive, Suite 200
Indianapolis, IN 46278

Dear Jon,

In recognition of your dedication and initiative, Sun Pharma wanted to reach out and thank you for the time you took back in November of 2020 to help make our Taleo Server Migration Project work seamlessly and without any service interruption. You worked on a Saturday to make sure the needed changes were in place as soon as Oracle had migrated their Servers from Chicago to the Denver area.

We wish to thank you for your valuable professional contributions and your commitment to Sun Pharma. We look forward to a future of continued growth and success at Direct Employers Association.

Sincerely,

*Mark Oppenheim*

**Mark Oppenheim**
**Consultant**
Talent Acquisition – North America
Sun Pharmaceutical Industries Inc.

**Supporting Riley Children, inc.**

Nolan Ridin, 2
Orthopedics, Plainfield

February 13, 2013

Rag Tag Games, LLC
Mr. Jon F. Turpin
1 Mulberry St
Cambridge City, IN 47327

Dear Mr. Turpin,

On behalf of Supporting Riley Children, Inc., thank you for your gift of $2,500.00 received on 9/28/12 through Indiana University Dance Marathon.

Every day, children's lives are changed and saved at Riley Hospital for Children at Indiana University Health. Children like Hope Parker receive gold-standard treatment for even the most complex medical issues. Hope was born with hypoplastic left heart syndrome, meaning only one ventricle of her heart was operating. Her only chance for survival was a series of delicate open-heart surgeries beginning when she was just one week old. Hope's doctors say she may not have survived if it weren't for the availability of the ECMO infant life support system - equipment which Riley was the first hospital in Indiana to offer. Although she has faced many challenges including 17 surgeries, Hope is now a vibrant 5-year-old. Her family sees every day with Hope as a gift. They are overwhelmed by the expertise and warmth they have found across the Riley staff.

Your support means the world to the Parkers and to the thousands of other families whose children benefit from Riley's cutting-edge research, state-of-the-art equipment and constant advances in clinical patient care.

Thank you for showing your support for the children Riley serves.

With gratitude,

Jason Boley
Assistant Vice President, Development Operations

*Please Note: This Letter serves as the receipt for your gift and documents that no goods or services have been provided in connection with this gift.*

**Supporting Riley Children, inc.**

Hope Riley, 2
Orthopedics, Plainfield

April 19, 2013

Mr. Jon F. Turpin
6415 Woods Edge South Dr
Indianapolis, IN 46250-4578

Dear Mr. Turpin,

On behalf of Supporting Riley Children, Inc., thank you for your gift of $364.83 through Indiana University Dance Marathon.

Every day, children's lives are changed and saved at Riley Hospital for Children at Indiana University Health. Children like Hope Parker receive gold-standard treatment for even the most complex medical issues. Hope was born with hypoplastic left heart syndrome, meaning only one ventricle of her heart was operating. Her only chance for survival was a series of delicate open-heart surgeries beginning when she was just one week old. Hope's doctors say she may not have survived if it weren't for the availability of the ECMO infant life support system – equipment which Riley was the first hospital in Indiana to offer. Although she has faced many challenges including 17 surgeries, Hope is now a vibrant 5-year-old. Her family sees every day with Hope as a gift. They are overwhelmed by the expertise and warmth they have found across the Riley staff.

Your support means the world to the Parkers and to the thousands of other families whose children benefit from Riley's cutting-edge research, state-of-the-art equipment and constant advances in clinical patient care.

Thank you for showing your support for the children Riley serves.

With gratitude,

*Cara Lathrop*

Cara Lathrop
Assistant Vice President, Development

*Please Note: This Letter serves as the receipt for your gift and documents that no goods or services have been provided in connection with this gift.*



# FAYETTE COUNTY SCHOOL CORPORATION

306 West Sixteenth Street
Connersville, Indiana 47331-2806
Telephone (765) 827-0191
Fax (765) 825-8221

---

To Whom It May Concern,

I'm writing this letter of recommendation for Jon Turpin. I had the pleasure of working with Jon when he was a Student Intern from Whitewater Technical Career Center. As his Supervisor, I was pleased at how well Jon was willing to learn new things and to jump right in when something needed to be done.

At the young age of 16, I was so impressed by his abilities to work, get his class work done, and take a college class at the same time. He is a very motivated and will succeed in anything he tries to accomplish.

Our Corporation has 8 Elementary Schools, Middle School, High School, Vocational School, and Maintenance/Transportation building. Jon would have to travel to any one of these buildings to work on computers and/or printers. His job duties would include repairing computers, troubleshooting, ghosting computer images, cleaning, installing software, and setting up any new hardware that arrived.

He worked well with all Principals, Teachers, and Staff.

I would highly recommend Jon Turpin for a position in your company.

If you need any further information, please feel free to contact me!

Phyllis Savoy
Office/Data Coordinator
Fayette County School Corporation

Email: psavoy@fayette.k12.in.us
Phone: 765-827-0191 Ext. 231



# BRANDYWINE ELEMENTARY SCHOOL
413 E. 400 S.
Greenfield, IN  46140

Phone (317) 462-7396                     Fax (317) 467-0174

March 11, 2009

To Whom it May Concern,

My name is Mary Kirk and I am the principal's secretary at Brandywine Elementary School, as well as the school treasurer.  I am pleased to write this letter of recommendation for Jon Turpin.  Jon is our school's Building Level Tech.  Jon began his employment with Southern Hancock School Corporation back in July of 2009.  Jon works half of his day at Brandywine Elementary and the balance of his day at New Palestine High School.

Jon is a dedicated, responsible and hard-working employee. Jon's responsibilities include a broad range of duties as our IT person.  He is responsible for maintaining workable computers, printers, and scanners for our entire school.  If a problem arises, Jon is there to fix, reinstall, and gently correct any operator errors. On a daily basis, he works with the principal, teachers and support staff and ensures all of their equipment is operating efficiently.  Jon is also responsible for keeping classroom student computers, as well as 2 full-size computer labs, in excellent working condition.  Jon's gentle manner, combined with his vast knowledge of computer hardware and software, are truly an asset to our school corporation.

Oh, yes, I forgot to mention that Jon is 19 years old!  Jon graduated from college and is working a full time position as our IT person and taking additional college courses.  Jon is always looking for a way to assist and improve our technical environment.  Jon is truly gifted and would be a tremendous asset to any organization. If you have any questions or would like to discuss how Jon would be an asset to *your* organization, please feel free to contact me.

Sincerely,

Mary Kirk

W- 317-462-7396 ex 101
H – 317-861-4596
C – 317-627-9098



**WHITEWATER** TECHNICAL CAREER CENTER

1300 Spartan Drive • Connersville, Indiana 47331
Phone 765 825 0521    Fax 765 827 0836

Milt Eley, Vocational Director        Mark McCoskey, Asst. Vocational Director

Serving

Centerville High School



Connersville High School



Franklin County High School



Lincoln High School



Rushville High School



Union County High School

February 19, 2009

J.T. Turpin
522 W Maple Street
Cambridge City, IN 47327

Dear JT,

Whitewater Technical Career Center students and staff wish to thank you for your time and efforts given to successfully hold the Regional Skills USA contest at WTCC.

Your help that day made it a success, a day that the students will always remember.

WTCC did well in the competition. Twenty-seven students will be advancing to the State Contest in April.

Thanks again for all your help.

Sincerely,

*Milt Eley*
Milt Eley, Director
WTCC Staff and Students

*Preparing today's students for tomorrow's careers.*

Dear Mr. and Mrs. Turpin:

JT means the world to me, not just as a friend, but as an example of a human being I aspire to.

He is the most brilliant and driven person I have ever known. His sheer strength of will is inspiring, and his generosity immeasurable. I have never known a man to care as much as he does, so passionately that he seeks to help those around him to a fault.

I value his time and advice more than most. In fact, the only other person I have a higher opinion of is my own father. Whenever someone needs help, they turn to JT because he is a beacon of light is an uncaring and unforgiving world.

The unconditional love we have for each other has been expressed in our support for each other through good and bad times. We don't *seek* from each other; we drop everything and *do* for each other whatever is needed.

I know JT and I have had our disagreements, but we have worked through them like mature individuals and grown together as friends. Simply knowing JT has made me a better person. We have elevated each other and supported each other in many facets of life – careers, relationships, finance, and faith. These are the things you don't see.

I have learned two things about life from JT: success is what you make it, and stand up for what you believe in. He embodies these. In our 16 years of shared friendship, I have never seen him falter despite everything he has been subjected to. It would break a lesser man.

We have survived the death of a close friend together, faced our mortality together, and found common ground from which to weather any storm.

Unity is what bonds us. We are friends closer than brothers. Simply put, I would die for JT. I don't mean that in jest. I'd take a bullet for the man, give him a kidney, whatever it took. Why? Because if anyone deserves love and friendship and the chance in life to pursue it, it is JT.

I have seen through the brash, callous, stubborn, loud exterior of the young boy who latched onto me in 2005 during Spanish class. What I have found a decade and a half later was a true friend. I came to know him. Really KNOW him. I wouldn't trade a mountain of gold for his friendship.

All I ask is that you see him through my eyes.


Sincerely,

*Phillip Jenkins*

Phillip Jenkins

January 12, 2022

To whom it may concern,

I have known Mr. Turpin or "JT" as I know him, from the age of 7 or 8 when his mother would being him to the skating rink I volunteer at. I watched him grow from a young boy into a kind hearted teenager, he was always kind towards the younger kids at the skating rink, always willing to help them out. Once he graduated from High school I only knew him through Facebook which seemed to me he was doing really well. He did move back to Cambridge about a year ago and he was just a grown up JT to me still a kind, but more mature young man and knew which direction he wanted his life to head. In the times I spent with JT I found him to be very smart and very humble and of great character. I cannot say that about many of the young males I had skate at the skate rink over the last 30 some years.

Yours truly

Mike Buckland

**Anthony Goodwin, Ph.D, RT.**
Technical Relationship Director
INEVA Ascension Indiana
812-204-7231
tgradiology@gmail.com

Jan 29, 2022

**In Care Of: Jon Turpin**
247 Maximilian St.
Baton Rouge, LA  70802

Hello,

I'd like to offer that my time in a professional and personal atmosphere with Jon Turpin his character and demeanor demonstrated what is good in a person.  He inspired for excellence in his work and delivered on many complex items of projects and service delivery.  As his team lead being able to find that 'nitch' that landed him in his wheelhouse was a joy to witness that transpire.  Jon has a gift of technical genius and once channeled and fueled he can produce brilliance.

If I were building a team of people required for a serious event, Jon is going to be on that selection list.  Would never doubt his abilities as a professional nor his personal relationship building.  Everyone is unique and those differences are what meld our world.  Jon's uniquises are to be valued and known to be a positive contribution.

Sincerely,

Anthony Goodwin

January 18, 2022

To Whom it may Concern:

I have known Jon for more than 13 years. As a youth, his insecurity issues occasionally caused him to make poor choices. Fundamentally, he was a nice young man, and usually most compassionate.

Jon became a member of Greenfield Christian Church, where I baptized him. He later became a member of the church choir, which I directed. He soon joined my gospel quartet, which performed throughout Central Indiana as well as regularly at Sunday Services. As a result of performing, he matured and became much more outgoing.

Upon my retirement, my wife and I moved to Colorado. Our relationship has weathered the distance. Jon has been to visit us, and we see him when we return to Indiana. Jon came to visit when I had knee replacement surgery, and took me to rehab when I was unable to drive. This speaks to me of the maturity he has achieved.

Jon is very bright, and his computer skills have helped him to secure good jobs. He has also helped my wife and me solve some personal computer issues.

I hope this letter demonstrates how Jon has grown up and become an asset to others.

Sincerely,

1/22/23

To whom it may concern,

I met Jon F. Turpin for the first time outside the public library in his home town of Cambridge City, Indiana. I remember an excited boy with a wagon full of books and all kinds of possibilities of new things to read and learn. He was then and continues to be hungry for knowledge.

When Jon requested I write a letter defining his character, I knew immediately what to say in one simple sentence. Jon seeks to understand and be understood.

This can take many forms from gathering information through research, conversations that are in person, letters, text, email or social media, my personal favorite is when he uses movies to show an example.

Jon has helped me make decisions on computer purchases and insured my records have been transferred, installed software, and taught me how to access this information. During these times he has assessed my tech ability and adjusted his tech vocabulary so I could understand.

Jon has also reached out when my son was making poor decisions and offed a compassionate ear, without passing judgement or condoning the behavior, offering help while practicing boundaries and kindness, something my son needed, and I am grateful.

To be understood and to understand, isn't what we all really want?

Sincerely,

Linda Brower   *Linda Brower*

2712 South State Road 1, Cambridge City, IN 47327

Hello,

My name is Jesse Matherly. I've been a close friend of Jon Turpin's for 16 years, and coworker for nearly a year. I am writing to request an early expungement of his two misdemeanors.

Jon has always been someone that elevates the lives of those around him, never hesitating to lend a hand to those that need him. It would be quite a challenge to count all the time he's spent helping people out of difficult situations, and helping them to get on track to a better life for themselves. I am no exception. He is well loved and and recognized by so many people, as well as by everyone in our company. He has a bold reputation that he's built out of hard work and consideration.

He just recently married a woman he has known for many years, and just moved from Indiana to Louisiana to be with her, and to start their life together, but his current status is holding him back from a lot of their achievements. It has become a detriment. It has effected him in ways ranging from finding a home, to things as small as AirBnB reservations. My friend is just trying to make a life for him and his wife, and his soon to be family. I would deeply appreciate seeing his early expungement so that he can finally do so. My friend is not a person of a reprobate mind. I feel strongly - with what he has been through, all he has done and who he is - that he has earned it.

I hope that you will spend some time to consider. I greatly appreciate you having read this.

Thank you.

Catrianna King

6119 W 32nd Pl

Indianapolis, IN, 46224


January 18, 2022


To whom it may concern,

I am writing on behalf of Jon Turpin. Jon and I are coworkers and have been close friends for over seven years. I believe I am in a position to speak to Jon's moral character, so I hope you will take this letter into account when making your decision for his early expungement of past misdemeanors. Jon Turpin is, in short, a good person and has gone through many ups and downs in life. In this time, he has proven to be of a fine and responsible character. In general, Mr. Turpin, a Sales Engineer, is known for being a dedicated husband and employee. Mr. Turpin has always been caring and generous with others, whether it'd be an acquaintance or stranger, and has a strong sense of duty, which applies to his job, family, and community.

I am very well aware of the charges that he is facing and the consequences. He is a well-mannered gentleman, and I am sure he will learn from this experience and it would be one he would not repeat. Mr. Turpin confessed to me of the serious lack of judgement he exhibited and expressed both remorse and a strong desire to address the personal issues at the heart of the matter.

Mr. Turpin has thus far shown a steadfast and resolute demeanor in moving past this mistake in a constructive and successful manner. It must be difficult to make decisions like this when you do not actually know the person standing in front of you, so it is my hope that you will look at my letter and the countless others you are receiving, and understand that Jon Turpin is the kind of person around whom people rally. That has to say something, so please let that be a factor in your decision.


Sincerely,

Catrianna King

*Catrianna King*

Debra Matherly
5401 W. Egypt Hollow Road
Connersville, Indiana 47331

February 5, 2022

RE: Letter of reference for expungement

Your Honor:

This letter is a formal reference letter to request to have the court expunge the criminal record of Jon E. Turpin.

I have known Jon since he was 16 as I attended college with him. He became my son's best friend and a part of our family. I have proudly watched him grow up into the fine, responsible, caring young man he is today. All of his friends look up to him; he is always there for them and anyone else who need his help for whatever the situation may be.

I'm sure you know the details of Jon's charges. He considers his charges are the result of youthful carelessness from not knowing local gun laws. Jon has had no further problems with the law. He has always been honest and upfront about the regrettable choices that led to the incidence and is requesting that the two misdemeanors be expunged from his record as it is negatively impacting his life when trying to purchase/rent a home or anything requiring a criminal background check.

With hard work and determination, he has overcome some major hardships he has had to face in his life. Jon is a very intelligent person. While in high school, he attended community college and held down a job. At the age of 16 he went on to college and received a Bachelor's degree in Computer Science. Currently, he is employed using his college degree and working hard towards success. Just recently he got married and wants to provide a home and good life for his new wife and future family. However, whenever he fills out applications they are refused because he has a criminal record.

I have watched him over the years improve his life and would like to help him get the second chance he deserves. If you have any questions, I can be reached at 765-914-7023 or at damatherly12@yahoo.com.

Thank you in advance for considering my request.

Sincerely,

Debra Matherly
Debra Matherly

**Jon Turpin**

| | |
|---|---|
| From: | Molly O'Boyle <moboyle@obxtek.com> |
| Sent: | Wednesday, March 10, 2021 10:26 AM |
| To: | Jon Turpin |
| Subject: | RE: DirectEmployers - AMVETS - Account Access |

# OMG

# It worked!

# Thank you!!



**Molly J. O'Boyle**
Recruiting Project Manager

**Phone** 571-395-4548  **Mobile** 571.239.9996
**Web** www.obxtek.com  **Email** moboyle@obxtek.com
2000 Corporate Ridge Road, Suite 400, McLean, VA 22102



**From:** Jon Turpin <jturpin@directemployers.org>
**Sent:** Tuesday, March 9, 2021 5:23 PM
**To:** Molly O'Boyle <moboyle@obxtek.com>
**Subject:** RE: DirectEmployers - AMVETS - Account Access

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Molly,
Ok, I *believe* we've found the issue. The lockout needed to be cleared separately to allow your login attempts to work and this was in a different area of the DE/AMVETS system.

Please try again for me and let me know the results.

1



# Офіс Президента України

## Департамент з питань звернень громадян

27.07.2023   22/043892-28
_____ № _____

На № _____

Jon Turpin,
2421 Plum St,
Yorktown, IN 47396,
the United States of America

Dear Mr Turpin,

We are grateful to all those, who support and help Ukraine in this difficult time of war.

Taking this opportunity, we would like to express our appreciation to you for the present to President of Ukraine Volodymyr Zelenskyy.

We wish you peace, health and prosperity.

Best regards,

Acting Head of the Department                          Yurii Syzonenko

Вик. Сивець С. В.
EDOC-44-1118777

01220, м. Київ, вул. Банкова, 11, тел. (044) 255-75-33, факс (044) 255-70-51



CENTRAL INDIANA
**P O L I C E**
FOUNDATION

August 8, 2023

John F Turpin
2421 S Plum Street
Yorktown IN 47396

Dear John-

Thank you for your generous donations to support our officers.  We appreciate these gifts very much.

> 1985 2s Mustang LX          VIN 1FABP28A4FF166109
> Modified                    Estimated Value $25,000

CIPF is a registered 501(c) 3 organization, so your donation is tax deductible. Please keep this letter for your tax records to claim a deduction.

If you want to learn more about how CIPF is supporting our officers and communities, please take a moment to visit us at https://cipf.foundation or follow us on Facebook at www.facebook.com/CentralINPoliceFoundation. If you have questions, please do not hesitate to reach out to me.

Thank you, again, for your support!

Sincerely,

Lisa Rollings
Executive Director
Central Indiana Police Foundation
Lisa@cipf.foundation
317.536.1402

*CIPF is a registered 501(c) 3 organization, so your donation is tax deductible. Our EIN is 46-2417255. Please keep this for your tax records to claim your deduction.*

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Appeal 820-2024-000064A
1 message

---

**eeoc.foia@arkcase.com** <eeoc.foia@arkcase.com>
To: jt4590@gmail.com

Sat, Nov 11, 2023 at 8:51 PM

 **U.S. Equal Employment Opportunity Commission**

Dear Jon Turpin,

Your request has been delivered to the U.S. Equal Employment Opportunity Commission. The request has been assigned tracking # 820-2024-000064A, please log into your account and review your submission.

The application address is /portal/login

Thank you,

U.S. Equal Employment Opportunity Commission

Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at foia@eeoc.gov and destroy all copies of the original message and attachments.

# Request Details

| | |
|---|---|
| **Title** | 820-2024-000064A - Update: I have the complaint form from Federal Court to receive this information. The signed complaint will be mailed to the EEOC/ICRC on Monday, 11/13/2023. Please reopen/extend the time on this FOIA request: Request for Information: Charge 24F-2018-02406 Please provide me with any information regarding this EEOC entry that you may have available. Thank you so much for your assistance. |

| | | | |
|---|---|---|---|
| **Type** | Appeal | **Queue** | Appeal |
| **Created** | 11/12/2023 01:51 (UTC) | **Received** | 11/12/2023 01:51 (UTC) |

| **Assignee** | | **Owning Group** | HQ_APPEAL_PROCESSOR@EEOC. ARKCASE.COM |
|---|---|---|---|
| **Due** | 12/12/2023 22:30(UTC) | **Priority** | Normal |
| **Modified** | 11/12/2023 01:51 (UTC) | **Modified By** | |

This is an automated email notification sent from ArkCase.

**Appeal Received Acknowledgement Letter.pdf**
48K

**U.S. Equal Employment Opportunity Commission**

**FOIA Request Portal**

# Request Status

Request Status Definitions

Request Number *

470-2024-001451

Last Name *

Turpin

SEARCH

| Request Number | Request Title | Request Type | Request State | Request Status | Date | Actions |
|---|---|---|---|---|---|---|
| 470-2024-001451 | Request for Information: Charge 24F-2018-02406 | New Request | Release | Denied | 2023-11-12 01:15 | Appeal Inquiry |

 Gmail

**Jon F Turpin <jt4590@gmail.com>**

---

**Request Complete 470-2024-001451**
1 message

---

**eeoc.foia@arkcase.com** <eeoc.foia@arkcase.com>
To: jt4590@gmail.com

Sat, Nov 11, 2023 at 8:14 PM

 **U.S. Equal Employment Opportunity Commission**

Your FOIA request is closed. Please refer to the determination letter for detailed information on the results of your FOIA Request:

470-2024-001451

## "Request for Information: Charge 24F-2018-02406"

( Open Request )

Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at ecso@eeoc.gov and destroy all copies of the original message and attachments.

# Request Details

| | |
|---|---|
| **Title** | 470-2024-001451 - Request for Information: Charge 24F-2018-02406 Please provide me with any information regarding this EEOC entry that you may have available. Thank you so much for your assistance. |

| **Type** | New Request | **Queue** | Release |
|---|---|---|---|

| **Created** | 10/28/2023 10:55 PM America/New_York | **Received** | 10/28/2023 10:55 PM America/New_York |
|---|---|---|---|

| **Assignee** | dwillia@eeoc.arkcase.com | **Owning Group** | AO_FOIA_PROCESSOR_FULFILL_<br>BILLING_INDIANAPOLIS-<br>470@EEOC.ARKCASE.COM |
|---|---|---|---|
| **Due** | 12/07/2023 05:30 PM<br>America/New_York | | |
| **Modified** | 11/11/2023 08:13 PM<br>America/New_York | **Modified By** | dwillia@eeoc.arkcase.com |

This is an automated email notification sent from ArkCase.

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Acknowledgment Letter
1 message

---

**eeoc@mail.custhelp.com** <eeoc@mail.custhelp.com>
Reply-To: EEOC - I I G <info@eeoc.gov>
To: jt4590@gmail.com

Tue, Sep 12, 2023 at 4:26 PM



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
# Washington, D.C. 20507

Office of Field
Programs

Thank you for contacting the U.S. Equal Employment Opportunity Commission (EEOC).

Our agency enforces the federal laws that prohibit job discrimination based on race, color, religion, sex, national origin, age, disability, and genetic information; or based on retaliation for filing a charge of job discrimination, participating in an investigation of a job discrimination complaint, or opposing job discrimination.

In response to your recent communication with our EEOC Intake Information Group (IIG), you were provided information about the EEOC charge process. Please note that contact with the IIG is not the same as filing a Charge of Discrimination (charge). A charge is a signed statement asserting that an organization engaged in unlawful employment discrimination. The laws enforced by the EEOC, except the Equal Pay Act (EPA), require you to file a charge before you can file a lawsuit in court for unlawful employment discrimination.

**There are strict time limits for filing a charge of employment discrimination, and you must file a charge with the EEOC within either 180 or 300 days from the last act of alleged discrimination,** depending on whether the allegations are also covered by state or local employment discrimination laws. If you do not file a charge of discrimination within the required time period, you will lose your rights and the EEOC will not take further action.

**If you wish to begin the charge process, please go to** https://publicportal.eeoc.gov/ which will allow you to complete a pre-charge inquiry and schedule an intake appointment. An EEOC representative will then interview you and assist you in filing a charge.

If you have any difficulty with the online portal, including scheduling an intake appointment, please call 1-800-669-4000 or email at INFO@EEOC.GOV.

Additional information about the laws we enforce and our charge filing procedures is available on our web site at www.eeoc.gov. For more information about the time limits for filing a charge, please see http://www.eeoc.gov/employees/timeliness.cfm.

Sincerely,


U.S. Equal Employment Opportunity Commission (EEOC)

# Court agrees to hear Title VII employer discrimination case



By **Amy Howe**
on Jun 30, 2023 at 6:28 pm

**Share**



The Supreme Court agreed to decide what protections Title VII of the Civil Rights Act of 1964 provides to employees who contend they were the victim of a discriminatory transfer. The justices announced on Friday that they had granted review in *Muldrow v. St. Louis* and **six other cases**, two of which will be argued together. (I covered one of those cases, *United States v. Rahimi*, in **a separate article**.)

The question comes to the court in the case of Jatonya Muldrow, a sergeant with the St. Louis Police Department. She filed a lawsuit against the department, alleging that she was the victim of sex discrimination because she was involuntarily transferred from her position in the Intelligence Division to a patrol position because her supervisor wanted to hire a man for her job. The U.S. Court of Appeals for the 8th Circuit ruled for the police department, reasoning that Muldrow's transfer had not resulted in a significant employment disadvantage for her.

Muldrow went to the Supreme Court, asking the justices to take up her case. After considering the cases at a conference in early January, the justices sought the Biden administration's views. In a brief filed last month, the Biden administration urged the justices to grant review. U.S. Solicitor General Prelogar told the court that the rulings by the U.S. Court of Appeals for the 8th Circuit had "no foundation in Title VII's text, structure, or purpose."

After considering the case again at two conferences in June, the justices agreed to take up the case. But they instructed Muldrow and the city of St. Louis to brief a slightly narrower question than Muldrow had asked them to decide – whether Title VII bars discrimination in transfer decisions if a court has not determined separately that the transfer decision caused a significant disadvantage.

UnitedHealthcare
PO Box 2789 Dept 7566015
Warminster, PA 18974-9998

 

291OPTMIPSR0069001-07367-01
JON TURPIN
2421 S PLUM ST
YORKTOWN IN 47396-1513

**Please call us at
1-800-396-6228**

October 18, 2023

RE: Patient Name:            TURPIN, JON
Treatment received on or about:  2023-03-20
Group:                      DIRECTEMPLOYERS ASSOCIATION INC
Event #:                    141423880

Dear JON TURPIN,

Our records show you received medical care that may have been the result of an accident or injury. We need more information about the treatment you received. It is possible your medical costs should be paid by another insurer. This review helps to control or reduce the health care costs paid by you and/or your employer.

**<u>What should you do?</u>**
There are two easy options to provide the information requested:

 **Respond online** subroresponse.optum.com **and enter web code** SP1NT
Enter Event Number 141423880 and Patient Last Name.

Or, open the camera on your smartphone and scan this QR code to visit the site. 

 **Call Toll Free Phone:** 1-800-396-6228 *TTY - 711 7:00am to 7:00pm CT Monday - Friday*

**Please reply to this letter regardless of the reason for your treatment.**

**Thank you for your timely response,**

Optum Recovery Services

UnitedHealthcare has engaged Optum to conduct this review.
217041A-052023

MW
Human readable Integrity Payload datamatrix

UnitedHealthcare
PO Box 2789 Dept 7566015
Warminster, PA 18974-9998

 

JON TURPIN
2421 S PLUM ST
YORKTOWN IN 47396-1513

## Llame al
## 1-800-396-6228

18 de octubre de 2023

RE: Nombre del paciente:          TURPIN, JON
Fecha aproximada de tratamiento:  2023-03-20
Nombre del Grupo:                 DIRECTEMPLOYERS ASSOCIATION INC
**Número de evento:**             **141423880 - Tenga este número a mano**

Estimado(a) JON TURPIN,

Nuestros archivos muestran que usted recibió la asistencia médica que puede haber sido el resultado de un accidente o herida. Necesitamos más información sobre el tratamiento que usted recibió, porque esto es posible que sus gastos médicos debieran ser pagados por otro seguro. Esta revisión ayuda a controlar o reducir los gastos de asistencia médica pagados por usted y/o su empleado.

### ¿Qué debe hacer usted?

Hay dos modos simples en como proveer la información:

 **Sitio web:** subrorespónse.optum.com Ingrese el código web SP1NT, el número de evento y el apellido del paciente.

O bien, abra la cámara de su teléfono inteligente y escanee este código QR para visitar el sitio. 

 **Llame gratis por Teléfono:** 1-800-396-6228 TTY - 711 7:00am a 7:00pm CT Lunes - Viernes

**Por favor conteste a esta carta a pesar de la razón por su tratamiento.**

**Gracias por su respuesta atenta,**

Equipo de Recuperación de Reclamos de Optum

UnitedHealthcare ha contratado a Optum para realizar esta revisión.

217042B-052023

MW
Human readable Integrity Payload datamatrix

 **LOUISIANA** DEPARTMENT OF REVENUE   Post Office Box 66362
Baton Rouge, LA 70896-6362





JON TURPIN & ERIN GOLDEN
2421 S PLUM ST
YORKTOWN IN 47396-1519

| | |
|---|---|
| Date of Notice: | 05/23/2023 |
| Letter ID: | L0480633424 |
| Account ID: | 0483167-488-600 |
| Tax Type: | Individual Income |

RE:   Return Review

Period(s):   2022

Dear Taxpayer:

We are unable to accept your return as originally filed for the tax period referenced above.

The Digital School exemption claimed on your return has been removed. Our records indicate that you do not have an approved certification to claim this exemption. For more information on the requirements and application process please refer to Louisiana Administrative Code 61:I.1357.

If you have any questions, please contact me at 225-219-2435.

Sincerely,

Hope Lejeune
Revenue Tax Specialist
Taxpayer Compliance Division
(225) 219-2435

 **LOUISIANA** Post Office Box 201
DEPARTMENT of REVENUE   Baton Rouge, LA 70821-0201

JON TURPIN and ERIN GOLDEN
2421 S PLUM ST
YORKTOWN IN 47396-1513



| | |
|---|---|
| Date of Notice: | 05/26/2023 |
| Letter ID: | L0018724496 |
| Account ID: | 0483167-488-500 |
| Tax Type: | Individual Income |
| Tax Period: | 12/31/2022 |

# NOTICE OF ADJUSTMENT(S) TO YOUR TAX RETURN

### Why are you receiving this letter?

We have adjusted one or more lines on your 12/31/2022 return. The attached *Notice of Adjustment(s) to Your Tax Return* is a comparison of your originally filed return to your adjusted/changed return. The change will mean you will be receiving:

- a refund amount different than you expected, or
- a credit carryforward amount different than you expected, or
- a bill for a balance due different than you expected.

### What should you do?

Compare the amounts you reported with the line item adjustments shown on the attached *Notice of Adjustment(s) to Your Tax Return* to review which line items were adjusted. If you determine that your original return was filed with incorrect information you may file an amended return. If you agree with the adjustment(s) and a **Total Period Balance Due** is shown and you are not in active bankruptcy you should submit payment in full to our office as soon as possible to minimize any penalty and interest charges. If you are in active bankruptcy, this *Notice of Adjustment(s) to Your Tax Return* is not an attempt to collect. This notice is for informational purposes only.

*If you believe your return was adjusted because supporting documents were not submitted with your return, you may send missing supporting documents to P.O. Box 66362, Baton Rouge, LA 70896 or by fax to (225) 231-6238. Note, the submission of additional documents for consideration, reconsideration, or action by the Department with respect to this claim following the mailing of this notice shall not operate to extend the period within which an appeal may be taken.*

### What happens next?

If you have a **Total Tax Period Balance Due** shown on the bottom of the following page and you do not submit payment in full, a *Notice of Proposed Tax Due* will be issued after the due date of the tax return. If your account has a **Total Tax Period Credit** shown on the bottom of the following page, a refund will issue separate from this notice.

### Should you contact the Department of Revenue?

It is not necessary to contact us if you agree with these adjustments. If you have questions about these adjustments, you may call (855) 307-3893 to speak with a Customer Service Representative.



**LOUISIANA** DEPARTMENT OF REVENUE

Post Office Box 201
Baton Rouge, LA 70821-0201

For assistance, you may call (855) 307-3893 or visit our web site at www.revenue.louisiana.gov to contact us via email

## Notice of Adjustment(s) to Your Tax Return

JON TURPIN and ERIN GOLDEN
2421 S PLUM ST
YORKTOWN IN 47396-1513

| | |
|---|---|
| Date of Notice: | 06/26/2023 |
| Letter ID: | L0018724490 |
| Account ID: | 0483167-486-809 |
| Tax Type: | Individual Income |
| Tax Period: | 12/31/2022 |

Return Received Date: 4/18/2021

| Line Item on Return | As Filed | Net Change | After Change |
|---|---|---|---|
| 7. Federal Adj Gross Income | $57,455.00 | | $57,455.00 |
| 8. Louisiana Adjusted Income | | $40,005.00 | $40,005.00 |
| 9. Ratio LA Income to Fed Adj Gross | 0.00% | 69.74% | 69.74% |
| 11. Louisiana Net Income | | $40,005.00 | $40,005.00 |
| 12. Louisiana Income Tax | | $912.00 | $912.00 |
| 14. Tax Liability After Nonrefundable Priority 1 Credits | | $912.00 | $912.00 |
| 16. Tax Liability After Refundable Priority 2 Credits | | $912.00 | $912.00 |
| 22. Adjusted Louisiana Income Tax | | $912.00 | $912.00 |
| 33. Overpayment | $73.00 | ($73.00) | - |
| 35. Adjusted Overpayment | $73.00 | ($73.00) | - |
| 37. Subtotal (Subtract Line 36 from Line 35) | $73.00 | ($73.00) | - |
| 39. Amount to be Refunded | $73.00 | ($73.00) | - |
| 40. Amount You Owe | | $839.00 | $839.00 |
| 48. Balance Due Louisiana | | $839.00 | $839.00 |
| - NPR Code Exempt Income Code | 29S | | - |
| - NPR Amount Exempt Income Amount | $42,233.00 | ($42,233.00) | - |

| TOTAL 12/31/2022 TAX PERIOD BALANCE DUE: | $920.55 |
|---|---|

**Additional Remarks**

This notice shows the line item adjustments to your return. The **TOTAL TAX PERIOD BALANCE DUE** or **TOTAL TAX PERIOD CREDIT** is the current balance on the tax period including interest, penalties, previous payments and previously issued refunds. This figure may be different than the lines on your return labeled "Overpayment" and "Amount You Owe" if you already received a refund or submitted separate payments for this tax period. If you have questions about these adjustments you may call (855) 307-3893 to speak with a Customer Service Representative.

If you believe your return was adjusted because supporting documents were not submitted with your return, you may send missing supporting documents to P.O. Box 66362, Baton Rouge, LA 70896 or by fax to (225) 231-6238. Note, the submission of additional documents for consideration, reconsideration, or action by the Department with respect to this claim following the mailing of this notice shall not operate to extend the period within which an appeal may be taken.

CrossCountry Mortgage, LLC
1 Corporate Drive, Suite 360
Lake Zurich, IL 60047-8945

**ANTICIPATED ESCROW ACCOUNT DISBURSEMENTS**

| | |
|---|---|
| COUNTY TAX | $2,331.99 |
| HAZARD INS | $2,067.00 |
| Total | $4,398.99 |

**ANNUAL ESCROW ACCOUNT DISCLOSURE STATEMENT
AND CHANGE OR PAYMENT NOTICE PREPARED FOR
ACCOUNT NUMBER: 1494213525
ESCROW ANALYSIS DATE: 05/10/2023**

**NEW PAYMENT IS AS FOLLOWS:**

| | |
|---|---|
| Principal and Interest | $808.93 |
| Required Escrow Payment | $366.58 |
| Shortage/Surplus Spread | |
| Optional Coverages | |
| Buydown or Assistance Payments | |
| Other | |

DATE: 05/10/2023

Jan Frederick Tumlin
2421 S Plum St
Yorktown, IN 47396-1313

| | |
|---|---|
| Total Payment | $1,175.51 |
| Next Payment Change Date | 07/01/2023 |

CrossCountry Mortgage, LLC has completed an analysis of your escrow account, and has adjusted your mortgage payment to reflect changes in your real estate taxes or property insurance. The escrow items to be disbursed from your account over the next twelve months are itemized above.

**ESCROW ACCOUNT PROJECTION FOR THE COMING YEAR**

The following estimate of activity in your escrow account from 07/2023 through 06/2024 is provided for your information. All payments we anticipate receiving as well as disbursements we anticipate making on your behalf are included, along with the Projected Escrow Account Balance, derived by carrying forward your current actual escrow balance. The Required Escrow Account Balance displays the amount actually required to be on hand as specified by Federal law, State law and your mortgage documents, and may include a cushion of up to 1/6th of your Annual Disbursements. Please retain this statement for comparison with the actual activity in your account at the end of the next escrow account computation year.

| MONTH | PAYMENTS TO ESCROW ACCOUNT | PAYMENTS FROM ESCROW ACCOUNT | | | | ESCROW ACCOUNT BALANCES | |
|---|---|---|---|---|---|---|---|
| | | MIP/MI | TAXES | FLOOD | HAZ INS | SPECIAL | PROJECTED | REQUIRED |
| STARTING BAL | | | | | | | $1,073.00 | $733.16 |
| JUL | $366.58 | | | | | | | |
| AUG | $366.58 | | | | | | $1,812.35 | $1,466.84 |
| SEP | $366.58 | | | | | | | |
| OCT | $366.58 | | $1,144.99 | | | | $1,498.42 | $1,050.61 |
| NOV | $366.58 | | | | | | | |
| DEC | $366.58 | | | | | | $2,220.58 | $1,783.67 |
| JAN | $366.58 | | | | | | | |
| FEB | $366.24 | | | | | | $2,953.74 | $2,516.83 |
| MAR | $366.58 | | | | | | | |
| APR | $366.58 | | $1,112.00 | | | | $2,512.91 | $2,067.00 |
| MAY | $366.58 | | | | | | | |
| JUN | $366.58 | | | $2,067.00 | | | $1,172.07 | $733.16 |

*indicates your projected low point of $1,178.02. Your required reserve balance is $733.16. The difference between the projected low point and required reserve balance is $445.91. This is your escrow surplus amount. The escrow surplus amount in your escrow account is $50.00 or more. The surplus amount will be refunded to you in the form of a check that either is/is included with this statement or is/is if your loan is current as of the date of the escrow analysis and your refund check is not included with this statement, it will be mailed to you within 30 days.

If you have questions regarding this analysis, please write our Customer Service Department at CrossCountry Mortgage, LLC, 1 Corporate Drive, Suite 360, Lake Zurich, IL 60047-8945 or call toll free 1-877-336-9790, Monday through Friday, 8:00 am to 8:00 pm, CST.

 THIS DOCUMENT IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. IF YOU OR A LOAN RESPONSIBLE PARTY HAVE BEEN DISCHARGED IN BANKRUPTCY, THIS LETTER IS NOT AN INTERMEDIATE OR DIRECT ATTEMPT TO COLLECT A DEBT FROM YOU PERSONALLY, BUT A DISCLOSURE OF INFORMATION INTENDED TO SATISFY CERTAIN LEGAL REQUIREMENTS AND/OR TO ASSIST IN THE ADMINISTRATION OF THE LOAN WHICH IS SECURED BY REAL PROPERTY.

LII > U.S. Constitution Annotated > Amendment V. Rights of Persons > Due Process > Procedural Due Process > What Process is Due When a Deprivation Occurs > **Mathews Test**

# Amdt5.4.5.4.2 Mathews Test

Fifth Amendment:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

The requirements of due process, as has been noted, depend upon the nature of the interest at stake, while the form of due process required is determined by the weight of that interest balanced against the opposing interests.[1] The currently prevailing standard is that formulated in Mathews v. Eldridge,[2] which concerned termination of Social Security benefits.

"Identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and probable

value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

The termination of welfare benefits in Goldberg v. Kelly,[3] which could have resulted in a "devastating" loss of food and shelter, had required a pre-deprivation hearing. The termination of Social Security benefits at issue in Mathews would require less protection, however, because those benefits are not based on financial need and a terminated recipient would be able to apply for welfare if need be. Moreover, the determination of ineligibility for Social Security benefits more often turns upon routine and uncomplicated evaluations of data, reducing the likelihood of error, a likelihood found significant in Goldberg. Finally, the administrative burden and other societal costs involved in giving Social Security recipients a pre-termination hearing would be high. Therefore, a post-termination hearing, with full retroactive restoration of benefits, if the claimant prevails, was found satisfactory.[4]

Application of the Mathews standard and other considerations brought some noteworthy changes to the process accorded debtors and installment buyers. Earlier cases, which had focused upon the interests of the holders of the property in not being unjustly deprived of the goods and funds in their possession, leaned toward requiring pre-deprivation hearings. Newer cases, however, look to the interests of creditors as well. "The reality is that both seller and buyer had current, real interests in the property, and the definition of property rights is a matter of state law. Resolution of the due process question must take account not only of the interests of the buyer of the property but those of the seller as well."[5]

Thus, Sniadach v. Family Finance Corp.,[6] which mandated pre-deprivation hearings before wages may be garnished, has apparently been limited to instances when wages, and perhaps certain other basic necessities, are in issue and the consequences of deprivation would be severe.[7] Fuentes v. Shevin,[8] which struck down a replevin statute that authorized the seizure of property (here household goods purchased on an installment contract) simply upon the filing of an ex parte application and the posting of bond, has been limited,[9] so that an appropriately structured ex parte judicial determination before seizure is sufficient to satisfy due process.[10] Thus, laws authorizing sequestration, garnishment, or other seizure of

property of an alleged defaulting debtor need only require that (1) the creditor furnish adequate security to protect the debtor's interest, (2) the creditor make a specific factual showing before a neutral officer or magistrate, not a clerk or other such functionary, of probable cause to believe that he is entitled to the relief requested, and (3) an opportunity be assured for an adversary hearing promptly after seizure to determine the merits of the controversy, with the burden of proof on the creditor. [11]

Similarly, applying the Mathews v. Eldridge standard in the context of government employment, the Court has held, albeit by a combination of divergent opinions, that the interest of the employee in retaining his job, the governmental interest in the expeditious removal of unsatisfactory employees, the avoidance of administrative burdens, and the risk of an erroneous termination combine to require the provision of some minimum pre-termination notice and opportunity to respond, followed by a full post-termination hearing, complete with all the procedures normally accorded and back pay if the employee is successful. [12] Where the adverse action is less than termination of employment, the governmental interest is significant, and where reasonable grounds for such action have been established separately, then a prompt hearing held after the adverse action may be sufficient. [13] In other cases, hearings with even minimum procedures may be dispensed with when what is to be established is so pro forma or routine that the likelihood of error is very small. [14] In a case dealing with negligent state failure to observe a procedural deadline, the Court held that the claimant was entitled to a hearing with the agency to pass upon the merits of his claim prior to dismissal of his action. [15]

In Brock v. Roadway Express, Inc., [16] a Court plurality applied a similar analysis to governmental regulation of private employment, determining that an employer may be ordered by an agency to reinstate a "whistle-blower" employee without an opportunity for a full evidentiary hearing, but that the employer is entitled to be informed of the substance of the employee's charges, and to have an opportunity for informal rebuttal. The principal difference with the Mathews v. Eldridge test was that here the Court acknowledged two conflicting private interests to weigh in the equation: that of the employer "in controlling the

makeup of its workforce" and that of the employee in not being discharged for whistleblowing. Whether the case signals a shift away from evidentiary hearing requirements in the context of regulatory adjudication will depend on future developments.[17]

A delay in retrieving money paid to the government is unlikely to rise to the level of a violation of due process. In City of Los Angeles v. David,[18] a citizen paid a $134.50 impoundment fee to retrieve an automobile that had been towed by the city. When he subsequently sought to challenge the imposition of this impoundment fee, he was unable to obtain a hearing until 27 days after his car had been towed. The Court held that the delay was reasonable, as the private interest affected—the temporary loss of the use of the money—could be compensated by the addition of an interest payment to any refund of the fee. Further factors considered were that a 30-day delay was unlikely to create a risk of significant factual errors, and that shortening the delay significantly would be administratively burdensome for the city.

In another context, the Supreme Court applied the Mathews test to strike down a provision in Colorado's Exoneration Act.[19] That statute required individuals whose criminal convictions had been invalidated to prove their innocence by clear and convincing evidence in order to recoup any fines, penalties, court costs, or restitution paid to the state as a result of the conviction.[20] The Court, noting that "[a]bsent conviction of crime, one is presumed innocent,"[21] concluded that all three considerations under Mathews "weigh[ed] decisively against Colorado's scheme."[22] Specifically, the Court reasoned that (1) those affected by the Colorado statute have an "obvious interest" in regaining their funds;[23] (2) the burden of proving one's innocence by "clear and convincing" evidence unacceptably risked erroneous deprivation of those funds;[24] and (3) the state had "no countervailing interests" in withholding money to which it had "zero claim of right."[25] As a result, the Court held that the state could not impose "anything more than minimal procedures" for the return of funds that occurred as a result of a conviction that was subsequently invalidated.[26]

In another respect, the balancing standard of Mathews has resulted in states' having wider flexibility in determining what process is required. For instance, in an alteration of previously existing law, no hearing is required if a state affords the claimant an adequate alternative remedy, such as a judicial action for damages or breach of contract.[27] Thus, the Court, in

passing on the infliction of corporal punishment in the public schools, held that the existence of common-law tort remedies for wrongful or excessive administration of punishment, plus the context in which the punishment was administered (i.e., the ability of the teacher to observe directly the infraction in question, the openness of the school environment, the visibility of the confrontation to other students and faculty, and the likelihood of parental reaction to unreasonableness in punishment), made reasonably assured the probability that a child would not be punished without cause or excessively.[28] The Court did not, however, inquire about the availability of judicial remedies for such violations in the state in which the case arose.[29]

The Court has required greater protection from property deprivations resulting from operation of established state procedures than from those resulting from random and unauthorized acts of state employees,[30] and presumably this distinction still holds. Thus, the Court has held that post-deprivation procedures would not satisfy due process if it is "the state system itself that destroys a complainant's property interest."[31] Although the Court briefly entertained the theory that a negligent (i.e., non-willful) action by a state official was sufficient to invoke due process, and that a post-deprivation hearing regarding such loss was required,[32] the Court subsequently overruled this holding, stating that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."[33]

In "rare and extraordinary situations," where summary action is necessary to prevent imminent harm to the public, and the private interest infringed is reasonably deemed to be of less importance, government can take action with no notice and no opportunity to defend, subject to a later full hearing.[34] Examples are seizure of contaminated foods or drugs or other such commodities to protect the consumer,[35] collection of governmental revenues,[36] and the seizure of enemy property in wartime.[37] Thus, citing national security interests, the Court upheld an order, issued without notice and an opportunity to be heard, excluding a short-order cook employed by a concessionaire from a Naval Gun Factory, but the basis of the five-to-four decision is unclear.[38] On the one hand, the Court was ambivalent about a right-

privilege distinction;[39] on the other hand, it contrasted the limited interest of the cook—barred from the base, she was still free to work at a number of the concessionaire's other premises—with the government's interest in conducting a high-security program.[40]

**1** Footnotes

"The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' . . . and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." Goldberg v. Kelly, 397 U.S. 254, 262–63 (1970), (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 168 (1951) (Justice Frankfurter concurring)). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 894–95 (1961).

**2** 424 U.S. 319, 335 (1976).

**3** 397 U.S. 254, 264 (1970).

**4** Mathews v. Eldridge, 424 U.S. 319, 339–49 (1976).

**5** Mitchell v. W.T. Grant Co., 416 U.S. 600, 604 (1974). See also id. at 623 (Justice Powell concurring), 629 (Justices Stewart, Douglas, and Marshall dissenting). Justice White, who wrote Mitchell and included the balancing language in his dissent in Fuentes v. Shevin, 407 U.S. 67, 99–100 (1972), did not repeat it in North Georgia Finishing v. Di-Chem, 419 U.S. 601 (1975), but it presumably underlies the reconciliation of Fuentes and Mitchell in the latter case and the application of Di-Chem.

**6** 395 U.S. 337 (1969).

**7** North Georgia Finishing v. Di-Chem, 419 U.S. 601, 611 n.2 (1975) (Justice Powell concurring). The majority opinion draws no such express distinction, see id. at 605–06, rather emphasizing that Sniadach-Fuentes do require observance of some due process procedural guarantees. But see Mitchell v. W.T. Grant Co., 416 U.S. 600, 614 (1974) (opinion of Court by Justice White emphasizing the wages aspect of the earlier case).

**8** 407 U.S. 67 (1972).

**9** Fuentes was an extension of the Sniadach principle to all "significant property interests" and thus mandated pre-deprivation hearings. Fuentes was a decision of uncertain viability from the beginning, inasmuch as it was four-to-three; argument had been heard prior to the date Justices Powell and

Rehnquist joined the Court, hence neither participated in the decision. *See Di-Chem*, 419 U.S. at 616–19 (Justice Blackmun dissenting); *Mitchell*, 416 U.S. at 635–36 (1974) (Justice Stewart dissenting). ⬏

**10** *Mitchell v. W.T. Grant Co.*, 416 U.S. 600 (1974); *North Georgia Finishing v. Di-Chem*, 419 U.S. 601 (1975). More recently, the Court has applied a variant of the Mathews v. Eldridge formula in holding that Connecticut's prejudgment attachment statute, which "failed to provide a preattachment hearing without at least requiring a showing of some exigent circumstance," operated to deny equal protection. *Connecticut v. Doehr*, 501 U.S. 1, 18 (1991). "[T]he relevant inquiry requires, as in Mathews, first, consideration of the private interest that will be affected by the prejudgment measure; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, in contrast to Mathews, principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." 501 U.S. at 11. ⬏

**11** *Mitchell v. W.T. Grant Co.*, 416 U.S. at 615–18 (1974); *id.* at 623 (Justice Powell concurring). *See also Arnett v. Kennedy*, 416 U.S. 134, 188 (1974) (Justice White concurring in part and dissenting in part). Efforts to litigate challenges to seizures in actions involving two private parties may be thwarted by findings of "no state action," but there often is sufficient participation by state officials in transferring possession of property to constitute state action and implicate due process. *Compare Flagg Bros. v. Brooks*, 436 U.S. 149 (1978) (no state action in warehouseman's sale of goods for nonpayment of storage, as authorized by state law), *with Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) (state officials' joint participation with private party in effecting prejudgment attachment of property); *and Tulsa Professional Collection Servs. v. Pope*, 485 U.S. 478 (1988) (probate court was sufficiently involved with actions activating time bar in "nonclaim" statute). ⬏

**12** *Arnett v. Kennedy*, 416 U.S. 134, 170–71 (1974) (Justice Powell concurring), and 416 U.S. at 195–96 (Justice White concurring in part and dissenting in part); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (discharge of state government employee). In *Barry v. Barchi*, 443 U.S. 55 (1979), the Court held that the state interest in assuring the integrity of horse racing carried on under its auspices justified an interim suspension without a hearing once it established the existence of certain facts, provided that a prompt judicial or administrative hearing would follow suspension at which the issues could be determined was assured. *See also* FDIC v. Mallen, 486 U.S. 230 (1988) (strong public interest in the integrity of the banking industry justifies suspension of indicted bank official with no pre-suspension hearing, and with 90-day delay before decision resulting from post-suspension hearing). ⬏

13

Gilbert v. Homar, 520 U.S. 924 (1997) (no hearing required prior to suspension without pay of tenured police officer arrested and charged with a felony). 🔼

14 *E.g.,* Dixon v. Love, 431 U.S. 105 (1977) (when suspension of driver's license is automatic upon conviction of a certain number of offenses, no hearing is required because there can be no dispute about facts). 🔼

15 Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982). 🔼

16 481 U.S. 252 (1987). Justice Marshall's plurality opinion was joined by Justices Blackmun, Powell, and O'Connor; Chief Justice Rehnquist and Justice Scalia joined Justice White's opinion taking a somewhat narrower view of due process requirements but supporting the plurality's general approach. Justices Brennan and Stevens would have required confrontation and cross-examination. 🔼

17 For analysis of the case's implications, see Rakoff, Brock v. Roadway Express, Inc., and the New Law of Regulatory Due Process, 1987 Sup. Ct. Rev. 157. 🔼

18 538 U.S. 715 (2003). 🔼

19 *See* Nelson v. Colorado, No. 15-1256, Slip Op. (April 19, 2017). 🔼

20 *See id.* at 3–4 (describing Colorado's Exoneration Act). Initially, the Court concluded that because the case concerned the "continuing deprivation of property after a [criminal] conviction" was reversed or vacated and "no further criminal process" was implicated by the case, the appropriate lens to examine the Exoneration Act was through the Mathews balancing test that generally applies in civil contexts. *Id.* at 6. The Court noted, however, that even under the test used to examine criminal due process rights—the fundamental fairness approach—Colorado's Exoneration Act would still fail to provide adequate due process because the state's procedures offend a fundamental principle of justice—the presumption of innocence. *Id.* at 5 n.9. 🔼

21 *Id.* at 1. 🔼

22 *Id.* at 4. 🔼

23 *Id.* In so concluding, the Court rejected Colorado's argument that the money in question belonged to the state because the criminal convictions were in place at the time the funds were taken. *Id.* The Court reasoned that after a conviction has been reversed, the criminal defendant is presumed innocent and any funds provided to the state as a result of the conviction rightfully belong to the person who was formerly

subject to the prosecution. *Id.* at 5 ("Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions."). ⬆

24 *Id.* at 5–6. In particular, the Court noted that when a defendant seeks to recoup small amounts of money under the Exoneration Act, the costs of mounting a claim and retaining a lawyer "would be prohibitive," amounting to "no remedy at all" for any minor assessments under the Act. *Id.* at 1257. ⬆

25 *Id.* at 6. ⬆

26 *Id.* ⬆

27 *See, e.g.,* Lujan, G & G Fire Sprinklers, Inc., 523 U.S. 189 (2001) (breach of contract suit against state contractor who withheld payment to subcontractor based on state agency determination of noncompliance with Labor Code sufficient for due process purposes). ⬆

28 Ingraham v. Wright, 430 U.S. 651, 680–82 (1977). ⬆

29 Ingraham v. Wright, 430 U.S. 651, 680–82 (1977). In Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 19–22 (1987), involving cutoff of utility service for non-payment of bills, the Court rejected the argument that common-law remedies were sufficient to obviate the pre-termination hearing requirement. ⬆

30 Logan v. Zimmerman Brush Co., 455 U.S. at 435–36 (1982). The Court emphasized that a post-deprivation hearing regarding harm inflicted by a state procedure would be inadequate. "That is particularly true where, as here, the State's only post-termination process comes in the form of an independent tort action. Seeking redress through a tort suit is apt to be a lengthy and speculative process, which in a situation such as this one will never make the complainant entirely whole." 455 U.S. 422, 436–37 (1982). ⬆

31 455 U.S. at 436. ⬆

32 More expressly adopting the tort remedy theory, the Court in Parratt v. Taylor, 451 U.S. 527 (1981), held that the loss of a prisoner's mail-ordered goods through the negligence of prison officials constituted a deprivation of property, but that the state's post-deprivation tort-claims procedure afforded adequate due process. When a state officer or employee acts negligently, the Court recognized, there is no way that the state can provide a pre-termination hearing; the real question, therefore, is what kind of post-deprivation hearing is sufficient. When the action complained of is the result of the unauthorized failure of agents to follow established procedures and there is no contention that the procedures themselves are inadequate, the Due Process Clause is satisfied by the provision of a judicial remedy which the claimant

must initiate. 451 U.S. at 541, 543–44. It should be noted that Parratt was a property loss case, and thus may be distinguished from liberty cases, where a tort remedy, by itself, may not be adequate process. *See* Ingraham v. Wright, 430 U.S. at 680–82. ⬆

33  Daniels v. Williams, 474 U.S. 327, 328 (1986) (involving negligent acts by prison officials). Hence, there is no requirement for procedural due process stemming from such negligent acts and no resulting basis for suit under 42 U.S.C. § 1983 for deprivation of rights deriving from the Constitution. Prisoners may resort to state tort law in such circumstances, but neither the Constitution nor § 1983 provides a federal remedy. ⬆

34  Board of Regents v. Roth, 408 U.S. 564, 570 n.7 (1972); Bell v. Burson, 402 U.S. 535, 542 (1971). *See* Parratt v. Taylor, 451 U.S. 527, 538–40 (1981). Of course, one may waive his due process rights, though as with other constitutional rights, the waiver must be knowing and voluntary. D.H. Overmyer Co. v. Frick Co., 405 U.S. 174 (1972). *See also* Fuentes v. Shevin, 407 U.S. 67, 94–96 (1972). ⬆

35  North American Cold Storage Co. v. City of Chicago, 211 U.S. 306 (1908); Ewing v. Mytinger & Casselberry, 339 U.S. 594 (1950). *See also* Fahey v. Mallonee, 332 U.S. 245 (1947). *Cf.* Mackey v. Montrym, 443 U.S. 1, 17–18 (1979). ⬆

36  Phillips v. Commissioner, 283 U.S. 589, 597 (1931). ⬆

37  Central Union Trust Co. v. Garvan, 254 U.S. 554, 566 (1921). ⬆

38  Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886 (1961). ⬆

39  367 U.S. at 894, 895, 896 (1961). ⬆

40  367 U.S. at 896–98. See Goldberg v. Kelly, 397 U.S. 254, 263 n.10 (1970); Board of Regents v. Roth, 408 U.S. 564, 575 (1972); Arnett v. Kennedy, 416 U.S. 134, 152 (1974) (plurality opinion), and 416 U.S. at 181–183 (Justice White concurring in part and dissenting in part). ⬆

U.S.
Constitution
Annotated

Toolbox

- Explanation of the Constitution - from the Congressional Research Service

Accessibility   About LII   Contact us   Advertise here   Help   Terms of use   Privacy

 **Gmail**

Jon F Turpin <jt4590@gmail.com>

---

## Opinion
2 messages

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Thu, Oct 26, 2023 at 5:20 AM
Bcc: compass@rfkhumanrights.org, doughty_motions@lawd.uscourts.gov, judiciary_whistleblower@mail.house.gov, info@vaticanrome.it, braun_casework@braun.senate.gov

While my case and documents may differ, and in my opinion be much more tame, I am certainly part of "the people" and in my opinion, this affirm the opinions of the Honorable Judge Wilson, and the Honorable Judge Ho, in United States v. Zackey Rahimi, along with providing a whistleblow to His Holiness Pope Francis of how protective orders may be used to falsely and fraudulently attempt violation of a Catholic Sacrament marriage under God.

In my opinion, my case and documents, along with confirmation in action to uphold my valid expungement by the Honorable Judge Drake reaffirm Bruen again, and may show U.S.C. 922(g)(8) as unconstitutional.

Further, during research, I found another case, United States v. Patrick Darnell Daniel's, Jr., and during research found some interesting precedent which may be helpful if presented in Daniel's defense.

Those documents are referenced in attached screenshots for discernment.

Sincerely,
Jon F. D. Turpin
Pro Se Pro Hac Vice

---

**6 attachments**


**20231026_045617.jpg**
1625K


**20231026_045546.jpg**
1858K



**20231026_045525.jpg**
1996K



**20231026_045419.jpg**
4408K



**20231026_045317.jpg**
6518K



**20231026_045257.jpg**
7200K

---

**Jon F. Turpin** <jt4590@gmail.com>                                 Thu, Oct 26, 2023 at 5:42 AM
Bcc: doughty_motions@lawd.uscourts.gov, compass@rfkhumanrights.org, judiciary_whistleblower@mail.house.gov,
info@vaticanrome.it

Supporting documentation on Title VII, with the EEOC notice of right to file a charge, with one prior filing to ICRC while
protecting St. Vincent Ascension Health and the Catholic Health Institutions not pictured.

On Thu, Oct 26, 2023, 5:20 AM Jon F. Turpin <jt4590@gmail.com> wrote:

While my case and documents may differ, and in my opinion be much more tame, I am certainly part of "the people"
and in my opinion, this affirm the opinions of the Honorable Judge Wilson, and the Honorable Judge Ho, in United
States v. Zackey Rahimi, along with providing a whistleblow to His Holiness Pope Francis of how protective orders may
be used to falsely and fraudulently attempt violation of a Catholic Sacrament marriage under God.

In my opinion, my case and documents, along with confirmation in action to uphold my valid expungement by the
Honorable Judge Drake reaffirm Bruen again, and may show U.S.C. 922(g)(8) as unconstitutional.

Further, during research, I found another case, United States v. Patrick Darnell Daniel's, Jr., and during research found some interesting precedent which may be helpful if presented in Daniel's defense.

Those documents are referenced in attached screenshots for discernment.

Sincerely,
Jon F. D. Turpin
Pro Se Pro Hac Vice

**2 attachments**



**20231026_053827.jpg**
2528K



**20231026_053842.jpg**
8037K

 **Gmail**

Jon F Turpin <jt4590@gmail.com>

---

## URGENT Response Required: DirectEmployers Data Breach

---

**Jon F. Turpin** <jt4590@gmail.com>                                                                 Thu, Oct 19, 2023 at 4:03 PM
Bcc: compass@rfkhumanrights.org, doughty_motions@lawd.uscourts.gov

Bad apples are attempting to falsely allege this against me when we haven't even done anything wrong, I'm not an addict, and I don't behave as the example in this case.

https://youtu.be/GeKDnABb8vg?si=HThoKjThWmFjyO7e

None of this applies to me, nor my wife, yet attempts to invalidate out marriage and/or our rights have occurred persistently.

---------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Thu, Oct 19, 2023, 1:45 AM
Subject: Re: URGENT Response Required: DirectEmployers Data Breach
To: Candee Chambers <candee@directemployers.org>
Cc: Deanna Cross <deanna@directemployers.org>, Dan Jordan <djordan@directemployers.org>

[Quoted text hidden]

 Gmail

Jon F Turpin <jt4590@gmail.com>

## URGENT Response Required: DirectEmployers Data Breach

**Jon F. Turpin** <jt4590@gmail.com>                                Wed, Oct 25, 2023 at 12:20 PM
Bcc: judiciary_whistleblower@mail.house.gov, compass@rfkhumanrights.org, doughty_motions@lawd.uscourts.gov

Dear Whistleblower Judiciary Committee,
I was wrongfully terminated from DirectEmployers Association in Indianapolis, when attempting to protect us, and their organization against malware and a data breach, which I reported the possibility of to the Indianapolis FBI, the Secret Service, DHS, and Shreveport FBI.

I used to be part of the FBI InfraGard before my clearance was removed, supposedly due to my wrongful termination, and despite this, I've provided DEA, which is a Not-for-profit which works directly with the OFCCP, EEOC, and multiple organizations which used to be part of the original DOD and MIC contractors... with the Lockbit Ransomware Recovery Manual from the FBI and notified FBI Director Christopher Wray accordingly.

Further information regarding the termination and me informing the appropriate staff, and government agencies in good faith efforts out of genuine concern is available in 3:22-CV-01213 in Louisiana.

Any information that is needed may be provided upon request, but my current efforts are to attempt to obtain my career back and to have the Martha Mitchell effect pushed on me and my lovely wife alleviated.

The organization works so closely with the government it could easily be considered a government entity itself and in my opinion it would be beneficial to all parties to have this situation addressed and remedied now.

Recently they reached out and confirmed they had suffered a data breach to their payroll server including employees and former employees data to 2018, and let me know our information may be at risk. Yet despite the deadline for sign up for Pango by Aura, a credit monitoring service to protect our livelihood, being today, I haven't hear back from them regarding it as of yet.

Could you please assist us with this issue?


Sincerely,
Jon F. "D." Turpin

---------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Thu, Oct 19, 2023, 12:57 AM
Subject: Re: URGENT Response Required: DirectEmployers Data Breach
To: Candee Chambers <candee@directemployers.org>
Cc: Deanna Cross <deanna@directemployers.org>, Dan Jordan <djordan@directemployers.org>


Candee,
In my opinion, all you have to do is say "oops" and hire me back with backpay, and the FBI, DHS, CISA, etc. are likely obligated to help DEA recover from the intrusion attack, along with a valid insurance claim.

Bill Warren may have been associated in some way with the Warren commission that investigated Kennedy's assassination, and the founding companies in DirectEmployers Association were the original Defense Contractors from the MIC before the September 11th attacks broke them up.

Bad actors from a specific organization may be holding you, and your company, and employees' data, ransom, over me. Yet I, like you, am not negotiating, made sure they could not get your data, and told them no.

It is my opinion that I know which member has bad actors within it that are doing so, but without pointing fingers, what I can show you is a clear line of communication after performing a nationwide investigation.

You need to hire me back, I tried to get you and the FBI to collaborate before this occurred and they need to restore DEA, but you have to correct your honest mistake or it invalidates your company and insurance.

Do you understand why I haven't filed a civil rights and discrimination charge despite having the absolute right and ability to?

It's because I absolutely loved working for you, and did everything I possibly could to continue doing so, even when targeted.

But when I came to y'all and even offered to sleep on the floor just to keep my wife safe and work for y'all, and tried to protect you all the way to the U.S. Attorney General and the President while using my own vacation time just to treat you like family, I was let go.

It isn't misconduct to protect your employer, a Not-For-Profit entity, and underlying members who may have potentially been wrongfully accused of enabling intolerable bad behaviors in the past, and it's not misconduct for DirectEmployers Association to protect me, my wife, and cats when we have been wrongfully accused and point out honest mistakes.

That is my opinion, and I wish you the best.

On Wed, Oct 18, 2023, 10:36 AM Jon F. Turpin <jt4590@gmail.com> wrote:
Please sign me up for Pango.

I protected your systems and reported this, yet was fired while I had broken bones in my back and my data was accessed by bad apples and used to attempt a wrongful protective order which I reported to you and staff at DirectEmployers appropriately according to what I was allowed to share regarding my FBI InfraGard clearance.

Thank you,
Jon F. Turpin

On Wed, Oct 18, 2023, 9:32 AM Candee Chambers <candee@directemployers.org> wrote:

Dear Former Employee of DirectEmployers Association or Recruit Rooster:

We write today to provide you a courtesy notice concerning:

1. a data breach at DirectEmployers which may have accessed some of your employee information,
2. to encourage you to install a credit freeze on your financial accounts if you have not already done so in the normal course of modern life, and
3. to alert you to a no-cost-to-you, five-year courtesy identity theft protection program offered to all current employees and now to you.

**Please reply via email as soon as possible if you wish to accept the five-year identify theft monitoring and protection program described below.**

**What Happened?**
Last week, DirectEmployers learned that LockBit, a global ransomware group, had electronically invaded DirectEmployers in-office server, resulting in data being copied and encrypted. DirectEmployers took immediate action to shut its computer network down, limiting further access. Following the attack, the hacker group made a monetary ransom, accompanied with a sample of the documents within our network that were accessed.

**What Information was Accessed?**
Upon investigation, we were able to determine what documents the hacker had accessed and encrypted, which may have included, amongst other things, Human Resources files of DirectEmployers'

current and former employees dating back to 2018. These files **may** have included sensitive personally identifiable information (PII) such as names, Social Security numbers, bank account information and addresses. To be clear, we have no specific proof to believe information about you was captured, but it **may** have been.

**What Are We Doing?**
DirectEmployers did not pay the ransom demanded and continues restoration efforts to rebuild its critical systems, however, the email server is still active and was unaffected by this cyberattack. At this time, we are acting out of an abundance of caution, and we have no evidence the hacker group has released any of the data accessed.

We apologize for this inconvenience in which the confidentiality of some of your private personal information may have been accessed. We know all too well how disconcerting this experience is and want to help you protect yourself against any issues related to the PII that may be released.

**What You Can Do**
We urge you to take immediate action and freeze your credit, limiting access to your credit report and protecting you from fraudulent activity. You may contact the three major credit reporting agencies directly to freeze your financial accounts. Alternatively, you may find that your state attorney general's office offers a "one-stop" online credit freeze platform as Indiana's does. See here, for example: http://www.IN.gov/AttorneyGeneral/Consumer-Protection-Division. Alternatively, you can setup accounts directly with the following credit reporting agencies:

| Equifax | Experian | TransUnion |
|---|---|---|
| (800) 685-1111 | (888) 397-3742 | (800) 680-7289 |
| P.O. Box 740241 | P.O. Box 9701 | Fraud Victim Assistance |
| Atlanta, GA 30374-0241 | Allen, TX 75013 | P.O. Box 2000 |
| www.Equifax.com | www.Experian.com | Chester, PA 19022-2000 |
| | | www.TransUnion.com |

As a precaution, DirectEmployers has arranged, at your option, a five-year subscription to a credit monitoring and identity theft program from Pango by Aura at no cost to you. This credit protection plan is known as the "Identity Defense Total Family Plan," and is available to you and any of your adult children, up to age 26, for whom you are still responsible. Pango's plan automatically covers all children of its subscribers, age 17 or under. Additionally, DirectEmployers is willing to purchase additional protection for adult children who are within the ages of 18 to 25. If you have children between these ages, DE/Recruit Rooster will purchase additional subscriptions for those children on their own, as the subscription for you will not cover them.

Please respond to this email, indicating you are accepting enrollment in this program, and whether you require additional subscriptions for adult children, including the **number** of children ages 18 to 25 previously listed on our policies. Following your coverage acceptance, you will receive subscription instructions from Pango on how to enact your private setup.

Once your adult child reaches the age of 26 or five years under DirectEmployers/Recruit Rooster's sponsored PANGO credit protection plan (whichever comes first), s/he will roll off the paid plan. At that time, you and your family may choose to continue the subscription, but this would be at your own expense.

The deadline to accept enrollment is **Wednesday, October 25, 2023**, after which enrollment in this credit monitoring and identity theft program will close. Again, thank you for your urgent attention.

*Sincerely,*

*Candee*

**Candee J. Chambers** SPHR, SHRM-SCP, SR. CAAP | Executive Director & CEO | DirectEmployers Association & Recruit Rooster

**p** 317.874.9052 | **m** 614.795.3765 | **e** candee@directemployers.org | DirectEmployers.org

Connect with me: LinkedIn

JD Supra Readers' Choice Top Author 2021, 2022, 2023
Bronze 2023 Stevie Winner for Sales & Customer Service

Subscribe to DE OFCCP Week In Review by DirectEmployers

**Published Each Monday at 3:00 PM ET** • Subscribe Today

A yellow and purple background with text Description automatically generated

**Join me at DEAMcon24 in New Orleans, April 3–5** • Register Today

 Gmail

Jon F Turpin <jt4590@gmail.com>

## Consumer Complaint Documentation
3 messages

**Jon F. Turpin** <jt4590@gmail.com>                                   Sun, Oct 29, 2023 at 8:46 PM
Bcc: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, "SA Joseph L. Chaney" <jlchaney@fbi.gov>,
Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>, doughty_motions@lawd.uscourts.gov

I apologize for reaching out to you so much, Mr. Rokita,
I was unable to get the supporting documentation to upload to the supporting complaint form, so I've attached it here.
Consumer Complaint Case# 11733874

The issues I've experienced so far besides disputed information on my credit report were "clerical errors" on my Travelers
insurance which included about 7 vehicles showing up on my insurance information, incorrect background checks, AirBNB
being disabled, and LinkedIn being disabled.
The clerical errors occurred during my purchase of the 2020 Jeep Compass from Enterprise in Kentucky when I was
transporting potential evidence there after having to enter police reports and leave for safety and our marriage, and it was
after the ALLY loan offer which showed $0 due at all.
This was during the time that I was seeing a very odd version of the Chase Bank application on my phone, and shortly
before I determined it was logging into my accounts, and had to have been hacked by some type of Malware, at least
temporarily, and when I reported a credit card to the FBI.

Someone was attempting to have me sign up for free insurance, which seemed to occur at the same time as my wrongful
termination from DirectEmployers, which aligns with that being an already determined event and occurrence, just like
paying the IRS twice.
They were quiet in the background of the call, but I heard them, and had nothing to hide, so I told them directly as such. If
the government wants to trace your calls for your turning in individuals involved in what may be a DVE plot against you
and your wife... there's not much that can be done.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

---

**8 attachments**

**Dispute1_TransUnion.jpg**
139K

**CreditReport_Equifax.pdf**
120K

**Dispute1_Experian.pdf**
173K

**CreditReport_Experian.pdf**
739K

**Dispute1_TransUnion.pdf**
84K

**DisputeResults1_TransUnion.pdf**
93K

📄 **DisputeReport1_Experian.pdf**
1477K

📄 **CreditReport_TransUnion.pdf**
15155K

**Jon F. Turpin** <jt4590@gmail.com>                              Sun, Oct 29, 2023 at 9:37 PM
Bcc: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>, "SA Joseph L. Chaney" <jlchaney@fbi.gov>, doughty_motions@lawd.uscourts.gov, judiciary_whistleblower@mail.house.gov, compass@rfkhumanrights.org

I've attached the incorrect insurance card from Travelers Insurance for your review, along with the valid one.
It's very near my wrongful termination, that I received the administrative law letter referencing potential default.

But also as mentioned previously, I never received the corresponding hearing information, and instead, received a fictitious and fraudulent potential protective order out of Wayne County.
That paperwork initially referenced the same date of the supposed hearing in Marion County, but as simply the filing date in Wayne County and didn't request that I report to any hearing.

In my opinion, this may be indicative of some type of overreach, and was corrected shortly thereafter with a final order in my favor.
Please don't get me wrong, I greatly appreciate this, I'm just reporting it to you so it's recorded and reported out of genuine concern.

When I look at the back of the letter, which I never received while my mail was affected, and see that nothing was selected, it leaves me with at least an inquiry...

I have my doubts that someone as prudent as Mr. Douglas G. Carter, nor even someone as protocol oriented as Mr. Todd R. Harless would forget to select the options.
It does say the order may be left blank, so I supposed it was possible, but with so many coincidences which are repeatedly found to be connected after review, I doubt this.

Nor am I pointing fingers at the Honorable Kim Cross, nor the Honorable Trudy Selvia, nor even our USPS, since I suspect my mail was being affected by a few bad apples and/or malware.
Also, this was corrected shortly thereafter, which was appreciated, but if you look closely, you'll see "choose an item" portion is not completed, it's electronic service, and the name is wrong.





**STATE OF INDIANA**
**OFFICE OF ADMINISTRATIVE LAW PROCEEDINGS**

**FINAL AGENCY AUTHORITY: Indiana State Police**

IN THE MATTER OF THE LICENSE )Case No. ISP-2303-000047

TO CARRY A HANDGUN OF )PCN 2321072

JON TUPIN )Decision Date: June 8, 2023

## NON-FINAL ORDER OF DEFAULT

An administrative hearing was scheduled pursuant to the Indiana Administrative Orders and Procedures (I.C. 4-21.5) and the Uniform Firearms Act (I.C. 35-47) concerning Petitioner's firearms license under IC 35-47. The hearing was set at Indiana Government Center North, 100 North Senate Avenue Room 302, Indianapolis, Indiana to address the Indiana State Police's allegation that JON TUPIN is not a proper person to be licensed.

JON TUPIN was provided with notice and an opportunity to participate in the hearing. Formal written notice of the hearing was sent by Indiana State Police via U.S. Postal Service.

The State was present by a representative. JON TUPIN did not appear.

Accordingly, JON TUPIN is defaulted pursuant to IC 4-21.5-3-24 due to failure to appear for the hearing.

**NON-FINAL ORDER:**

By reason of the findings above, the Administrative Law Judge determines that JON TUPIN's firearms license be revoked or denied.

In accordance with IC 4-15-10.5-12(b), the OALP's Order is non-final and is subject to the review and approval of the superintendent of the Indiana State Police per a MOU dated July 1, 2020. Pursuant IC 4-21.5-3-29, a party may file an objection to this recommended order within 15 days after the party is served with Non-Final Order and may file the objection with the ultimate authority by contacting ISPFirearmsHearings@iot.IN.gov.

/S/ Trudy L. Selvia

Honorable Trudy L. Selvia, Administrative Law Judge
Indiana Office of Administrative Law Proceedings

Distribution:

100 N. Senate Ave. Rm. N802, Indianapolis, IN 46204          Page 1 of 1
OALPReception.org / (317) 234-6602



Sincerely,
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

[Quoted text hidden]

---

📎 **Erroneous and_or Fraudulent Insurance Cards.pdf**
79K

---

**Jon F. Turpin** <jt4590@gmail.com>                        Sun, Oct 29, 2023 at 9:38 PM
Bcc: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>, "SA Joseph L. Chaney" <jlchaney@fbi.gov>, doughty_motions@lawd.uscourts.gov, judiciary_whistleblower@mail.house.gov, compass@rfkhumanrights.org


[Update]
Correct insurance card attached.
Quite a difference from the other.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

[Quoted text hidden]

**Correct Insurance Card (1).pdf**
38K

ʌ  ALLY FINANCIAL                                          06/12/2023

Location                          Phone
200 RENAISSANCE CTR               (866) 710-4623
DETROIT, MI 48265

ʌ  JON TURPIN via KARMATRANSUNION INTERACT                04/16/2023

Location                          Phone
100 CROSS STREET                  (844) 580-6816
SAN LUIS OBISPO, CA 93401

## Also Known As

| AKA | JON FREDERICK TURPIN |
|-----|----------------------|
| AKA | JON R. TURPIN        |

## Phone Numbers

| Phone Number | (225) 259-6270 |
|--------------|----------------|
| Phone Number | (317) 378-9314 |
| Phone Number | (765) 478-3258 |
| Phone Number | (225) 228-5466 |
| Phone Number | (225) 432-5574 |
| Phone Number | (259) 627-6270 |
| Phone Number | (378) 931-9314 |

## Employers

| Employer | Occupation |
|----------|------------|
| ʌ  DIRECT EMPLOYERS ASSOCIATION | SENIOR SALES |
| Date Verified 03/18/2022 | |
| ʌ  FUJI FILM MED SYSTEMS | TECH SUPPORT |
| Date Hired 08/01/2011    Date Verified 06/01/2014 | |
| ʌ  TURPIN ELECTRIC | ELECTRICIAN ASSISTAN |
| Date Verified 01/16/2009 | |

ACORD® **VEHICLE OR EQUIPMENT CERTIFICATE OF INSURANCE**

DATE(MM/DD/YYYY)
06/12/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

This form is used to report coverages provided to a single specific vehicle or equipment.  Do not use this form to report liability coverage provided to multiple vehicles under a single policy.  Use ACORD 25 for that purpose.

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| GOOSEHEAD INSURANCE<br>1500 SOLANA BLVD BLDG 4 STE 4500<br>WESTLAKE, TX 76262 | PHONE (A/C, No, Ext): 800-474-1377 | | FAX (A/C, No): 866-877-6250 |
| | E-MAIL ADDRESS: | | |
| | PRODUCER CUSTOMER ID #: | | |

| | INSURER(S) AFFORDING COVERAGE | NAIC# |
|---|---|---|
| INSURED<br>JOSH SPENCER<br>2129 ROSEWELL DR<br>VIRGINIA BEACH, VA 23454-5855 | INSURER A : TRAVELERS PERSONAL SECURITY INSURANCE COMPANY | 36145 |
| | INSURER B : | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |

### DESCRIPTION OF VEHICLE OR EQUIPMENT

| YEAR | MAKE / MANUFACTURER | MODEL | BODY TYPE | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|---|---|
| 2003 | HONDA | CIVIC LX | PP | 2HGES16543H579763 |
| DESCRIPTION | | | | SERIAL NUMBER |

**COVERAGES**          **CERTIFICATE NUMBER:**                    **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICY(IES) OF INSURANCE LISTED BELOW HAS/HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD(S) INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICY(IES) DESCRIBED HEREIN IS/ARE SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICY(IES).

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE(MM/DD/YYYY) | POLICY EXPIRATION DATE(MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| | X | VEHICLE LIABILITY | | | | COMBINED SINGLE LIMIT | $ |
| | | | 6043774832031 | 06/03/2023 | 06/03/2024 | BODILY INJURY (Per person) | $ 100,000 |
| | | | | | | BODILY INJURY (Per accident) | $ 300,000 |
| | | | | | | PROPERTY DAMAGE | $ 100,000 |
| | | GENERAL  LIABILITY | | | | EACH OCCURRENCE | $ |
| | | OCCURRENCE | | | | GENERAL  AGGREGATE | $ |
| | | CLAIMSMADE | | | | | $ |

| INSR LTR | LOSS PAYEE | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE(MM/DD/YYYY) | POLICY EXPIRATION DATE(MM/DD/YYYY) | LIMITS / DEDUCTIBLE | | |
|---|---|---|---|---|---|---|---|---|
| | X | VEH COLLISION LOSS | 6043774832031 | 06/03/2023 | 06/03/2024 | ☐ ACV  ☐ AGREED AMT | $ | LIMIT |
| | | | | | | ☐  ☐ STATED AMT | $ 500 | DED |
| | X | VEH COMP  ☐ VEH OTC | 6043774832031 | 06/03/2023 | 06/03/2024 | ☐ ACV  ☐ AGREED AMT | $ | LIMIT |
| | | | | | | ☐  ☐ STATED AMT | $ 500 | DED |
| | | PROPERTY | | | | ☐ ACV  ☐ AGREED AMT | $ | LIMIT |
| | | ☐ BASIC  ☐ BROAD | | | | ☐ RC  ☐ STATED AMT | | DED |
| | | ☐ SPECIAL | | | | ☐ | $ | |
| | | | | | | | | |

REMARKS (INCLUDING SPECIAL CONDITIONS / OTHER COVERAGES)  (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

| ADDITIONAL INTEREST | CANCELLATION |
|---|---|
| Select one of the following:<br>☐ The additional interest described below has been added to the policy(ies) listed herein by policy number(s).<br>☐ A request has been submitted to add the additional interest described below to the policy(ies) listed herein by policy number(s). | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| VEHICLE / EQUIPMENT INTEREST:  ☐ LEASED  ☐ FINANCED | DESCRIPTION OF THE ADDITIONAL INTEREST |
| NAME AND ADDRESS OF ADDITIONAL INTEREST | ☐ ADDITIONAL INSURED  ☐ LOSS PAYEE |
| | ☐ LENDER'S LOSS PAYEE |
| | LOAN / LEASE NUMBER |
| | AUTHORIZED REPRESENTATIVE |

© 1997-2010 ACORD CORPORATION.  All rights reserved.

ACORD 23 (2010/05)          The ACORD name and logo are registered marks of ACORD

**ACORD®** **VEHICLE OR EQUIPMENT CERTIFICATE OF INSURANCE**

DATE(MM/DD/YYYY)
06/12/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

This form is used to report coverages provided to a single specific vehicle or equipment.  Do not use this form to report liability coverage provided to multiple vehicles under a single policy.  Use ACORD 25 for that purpose.

| PRODUCER | CONTACT NAME: | | | |
|---|---|---|---|---|
| GOOSEHEAD INSURANCE | PHONE (A/C, No, Ext): 800-474-1377 | | FAX (A/C, No): 866-877-6250 | |
| 1500 SOLANA BLVD BLDG 4 STE 4500 | E-MAIL ADDRESS: | | | |
| WESTLAKE, TX 76262 | PRODUCER CUSTOMER ID #: | | | |
| | INSURER(S) AFFORDING COVERAGE | | | NAIC# |
| INSURED | INSURER A : TRAVELERS PERSONAL SECURITY INSURANCE COMPANY | | | 36145 |
| JOSH SPENCER | INSURER B : | | | |
| 2129 ROSEWELL DR | INSURER C : | | | |
| VIRGINIA BEACH, VA 23454-5855 | INSURER D : | | | |
| | INSURER E : | | | |

**DESCRIPTION OF VEHICLE OR EQUIPMENT**

| YEAR | MAKE / MANUFACTURER | MODEL | BODY TYPE | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|---|---|
| 2023 | FORD | BRONCO | PU | 1FMEE5DP3PLA94875 |
| DESCRIPTION | | | | SERIAL NUMBER |

**COVERAGES**         CERTIFICATE NUMBER:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICY(IES) OF INSURANCE LISTED BELOW HAS/HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD(S) INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICY(IES) DESCRIBED HEREIN IS/ARE SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICY(IES).

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE(MM/DD/YYYY) | POLICY EXPIRATION DATE(MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| | X | VEHICLE LIABILITY | | | | COMBINED SINGLE LIMIT | $ |
| | | | 6043774832031 | 06/03/2023 | 06/03/2024 | BODILY INJURY (Per person) | $ 100,000 |
| | | | | | | BODILY INJURY (Per accident) | $ 300,000 |
| | | | | | | PROPERTY DAMAGE | $ 100,000 |
| | | GENERAL LIABILITY | | | | EACH OCCURRENCE | $ |
| | | OCCURRENCE | | | | GENERAL AGGREGATE | $ |
| | | CLAIMS MADE | | | | | $ |

| INSR LTR | LOSS PAYEE | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE(MM/DD/YYYY) | POLICY EXPIRATION DATE(MM/DD/YYYY) | LIMITS / DEDUCTIBLE | | |
|---|---|---|---|---|---|---|---|---|
| | X | VEH COLLISION LOSS | 6043774832031 | 06/03/2023 | 06/03/2024 | ☐ ACV ☐ AGREED AMT | $ | LIMIT |
| | | | | | | ☐ STATED AMT | $ 500 | DED |
| | X | VEH COMP ☐ VEH OTC | 6043774832031 | 06/03/2023 | 06/03/2024 | ☐ ACV ☐ AGREED AMT | $ | LIMIT |
| | | | | | | ☐ STATED AMT | $ 500 | DED |
| | | PROPERTY ☐ BASIC ☐ BROAD ☐ SPECIAL | | | | ☐ ACV ☐ AGREED AMT | $ | LIMIT |
| | | | | | | ☐ RC ☐ STATED AMT ☐ | $ | DED |
| | | | | | | | | |

REMARKS (INCLUDING SPECIAL CONDITIONS / OTHER COVERAGES)  (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

| ADDITIONAL INTEREST | CANCELLATION |
|---|---|
| Select one of the following: | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| X The additional interest described below has been added to the policy(ies) listed herein by policy number(s). A request has been submitted to add the additional interest described below to the policy(ies) listed herein by policy number(s). | |
| VEHICLE / EQUIPMENT INTEREST: ☐ LEASED   X FINANCED | DESCRIPTION OF THE ADDITIONAL INTEREST |
| NAME AND ADDRESS OF ADDITIONAL INTEREST | ☐ ADDITIONAL INSURED   X LOSS PAYEE |
| NAVY FEDERAL CREDIT UNION, PO BOX 25109 LEHIGH VALLEY, PA 18002-5109 | ☐ LENDER'S LOSS PAYEE |
| | LOAN / LEASE NUMBER |
| | AUTHORIZED REPRESENTATIVE |

© 1997-2010 ACORD CORPORATION.  All rights reserved.

ACORD 23 (2010/05)         The ACORD name and logo are registered marks of ACORD

# ACORD® VEHICLE OR EQUIPMENT CERTIFICATE OF INSURANCE

DATE (MM/DD/YYYY) 06/12/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

This form is used to report coverages provided to a single specific vehicle or equipment. Do not use this form to report liability coverage provided to multiple vehicles under a single policy. Use ACORD 25 for that purpose.

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| GOOSEHEAD INSURANCE<br>1500 SOLANA BLVD BLDG 4 STE 4500<br>WESTLAKE, TX 76262 | PHONE (A/C, No, Ext): 800-474-1377 | FAX (A/C, No): 866-877-6250 |
| | E-MAIL ADDRESS: | |
| | PRODUCER CUSTOMER ID #: | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED<br>JOSH SPENCER<br>2129 ROSEWELL DR<br>VIRGINIA BEACH, VA 23454-5855 | INSURER A : TRAVELERS PERSONAL SECURITY INSURANCE COMPANY | 36145 |
| | INSURER B : | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |

## DESCRIPTION OF VEHICLE OR EQUIPMENT

| YEAR | MAKE / MANUFACTURER | MODEL | BODY TYPE | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|---|---|
| 2021 | FORD | F-150 SUPE | PU | 1FTFW1E52MFC21783 |
| DESCRIPTION | | | | SERIAL NUMBER |

## COVERAGES     CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICY(IES) OF INSURANCE LISTED BELOW HAS/HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD(S) INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICY(IES) DESCRIBED HEREIN IS/ARE SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICY(IES).

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| | X | VEHICLE LIABILITY | 6043774832031 | 06/03/2023 | 06/03/2024 | COMBINED SINGLE LIMIT | $ |
| | | | | | | BODILY INJURY (Per person) | $ 100,000 |
| | | | | | | BODILY INJURY (Per accident) | $ 300,000 |
| | | | | | | PROPERTY DAMAGE | $ 100,000 |
| | | GENERAL LIABILITY | | | | EACH OCCURRENCE | $ |
| | | OCCURRENCE | | | | GENERAL AGGREGATE | $ |
| | | CLAIMS MADE | | | | | $ |

| INSR LTR | LOSS PAYEE | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | LIMITS / DEDUCTIBLE | | |
|---|---|---|---|---|---|---|---|---|
| | X | VEH COLLISION LOSS | 6043774832031 | 06/03/2023 | 06/03/2024 | ☐ ACV  ☐ AGREED AMT<br>☐      ☐ STATED AMT | $<br>$ 500 | LIMIT<br>DED |
| | X | VEH COMP   ☐ VEH OTC | 6043774832031 | 06/03/2023 | 06/03/2024 | ☐ ACV  ☐ AGREED AMT<br>☐      ☐ STATED AMT | $<br>$ 500 | LIMIT<br>DED |
| | | PROPERTY<br>☐ BASIC  ☐ BROAD<br>☐ SPECIAL | | | | ☐ ACV  ☐ AGREED AMT<br>☐ RC   ☐ STATED AMT<br>☐ | $<br>$ | LIMIT<br>DED |
| | | | | | | | | |

REMARKS (INCLUDING SPECIAL CONDITIONS / OTHER COVERAGES) (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

## ADDITIONAL INTEREST

Select one of the following:

X  The additional interest described below has been added to the policy(ies) listed herein by policy number(s).

☐ A request has been submitted to add the additional interest described below to the policy(ies) listed herein by policy number(s).

| VEHICLE / EQUIPMENT INTEREST: | ☐ LEASED | X FINANCED |
|---|---|---|

NAME AND ADDRESS OF ADDITIONAL INTEREST

FORD MOTOR CREDIT COMPANY
PO BOX 105704
ATLANTA, GA 30348-5704

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

DESCRIPTION OF THE ADDITIONAL INTEREST

| ADDITIONAL INSURED | X LOSS PAYEE |
|---|---|
| LENDER'S LOSS PAYEE | |

LOAN / LEASE NUMBER

AUTHORIZED REPRESENTATIVE

© 1997-2010 ACORD CORPORATION. All rights reserved.

ACORD 23 (2010/05)     The ACORD name and logo are registered marks of ACORD

# ACORD® VEHICLE OR EQUIPMENT CERTIFICATE OF INSURANCE

**DATE(MM/DD/YYYY)** 06/12/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

This form is used to report coverages provided to a single specific vehicle or equipment. Do not use this form to report liability coverage provided to multiple vehicles under a single policy. Use ACORD 25 for that purpose.

| PRODUCER | | | |
|---|---|---|---|
| GOOSEHEAD INSURANCE<br>1500 SOLANA BLVD BLDG 4 STE 4500<br>WESTLAKE, TX 76262 | CONTACT NAME: | | |
| | PHONE (A/C, No, Ext): 800-474-1377 | | FAX (A/C, No): 866-877-6250 |
| | E-MAIL ADDRESS: | | |
| | PRODUCER CUSTOMER ID #: | | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED<br>JOSH SPENCER<br>2129 ROSEWELL DR<br>VIRGINIA BEACH, VA 23454-5855 | INSURER A : TRAVELERS PERSONAL SECURITY INSURANCE COMPANY | 36145 |
| | INSURER B : | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |

## DESCRIPTION OF VEHICLE OR EQUIPMENT

| YEAR | MAKE / MANUFACTURER | MODEL | BODY TYPE | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|---|---|
| 2020 | JEEP | COMPASS LI | PU | 3C4NJDCB3LT203589 |
| DESCRIPTION | | | | SERIAL NUMBER |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICY(IES) OF INSURANCE LISTED BELOW HAS/HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD(S) INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICY(IES) DESCRIBED HEREIN IS/ARE SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICY(IES).

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE(MM/DD/YYYY) | POLICY EXPIRATION DATE(MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| | X | VEHICLE LIABILITY | 6043774832031 | 06/03/2023 | 06/03/2024 | COMBINED SINGLE LIMIT | $ |
| | | | | | | BODILY INJURY (Per person) | $ 100,000 |
| | | | | | | BODILY INJURY (Per accident) | $ 300,000 |
| | | | | | | PROPERTY DAMAGE | $ 100,000 |
| | | GENERAL LIABILITY | | | | EACH OCCURRENCE | $ |
| | | OCCURRENCE | | | | GENERAL AGGREGATE | $ |
| | | CLAIMS MADE | | | | | $ |

| INSR LTR | LOSS PAYEE | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE(MM/DD/YYYY) | POLICY EXPIRATION DATE(MM/DD/YYYY) | LIMITS / DEDUCTIBLE | | |
|---|---|---|---|---|---|---|---|---|
| | X | VEH COLLISION LOSS | 6043774832031 | 06/03/2023 | 06/03/2024 | ☐ ACV ☐ AGREED AMT<br>☐ STATED AMT | $<br>$ 500 | LIMIT<br>DED |
| | X | VEH COMP ☐ VEH OTC | 6043774832031 | 06/03/2023 | 06/03/2024 | ☐ ACV ☐ AGREED AMT<br>☐ STATED AMT | $<br>$ 500 | LIMIT<br>DED |
| | | PROPERTY<br>☐ BASIC ☐ BROAD<br>☐ SPECIAL | | | | ☐ ACV ☐ AGREED AMT<br>☐ RC ☐ STATED AMT<br>☐ | $<br> | LIMIT<br>DED |
| | | | | | | | | |

REMARKS (INCLUDING SPECIAL CONDITIONS / OTHER COVERAGES) (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

## ADDITIONAL INTEREST

**Select one of the following:**

| X | The additional interest described below has been added to the policy(ies) listed herein by policy number(s).<br>A request has been submitted to add the additional interest described below to the policy(ies) listed herein by policy number(s). |
|---|---|

| VEHICLE / EQUIPMENT INTEREST: | ☐ LEASED | X FINANCED |
|---|---|---|

| NAME AND ADDRESS OF ADDITIONAL INTEREST |
|---|
| BANK OF AMERICA<br>PO BOX 2758<br>JACKSONVILLE, FL 32203-2758 |

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

| DESCRIPTION OF THE ADDITIONAL INTEREST | |
|---|---|
| ADDITIONAL INSURED | X LOSS PAYEE |
| LENDER'S LOSS PAYEE | |
| LOAN / LEASE NUMBER | |
| AUTHORIZED REPRESENTATIVE | |

© 1997-2010 ACORD CORPORATION. All rights reserved.

ACORD 23 (2010/05)          The ACORD name and logo are registered marks of ACORD

**TRAVELERS** Virginia Automobile Insurance Identification Card

This card must be carried in the vehicle at all times as evidence of insurance.

| Year | Make | Model | Vehicle identification number (VIN) |
|------|------|-------|-------------------------------------|
| 2021 | FORD | F-150 SUPE | 1FTFW1E52MFC21783 |

Effective date 06/03/2023   Expiration date 06/03/2024

Policy number 604377483 203 1

**Insured**
JOSH SPENCER
2129 ROSEWELL DR
VIRGINIA BEACH, VA 23454-5855

**Company:** TRAVELERS PERSONAL SECURITY INSURANCE COMPANY

**For policy questions and changes**
GOOSEHEAD INSURANCE
800.474.1377

**To report a claim**
24 hours x 365 days a year
Go to Travelers.com or Call 1.800.252.4633

**Keep this card in the vehicle at all times. See reverse side.**

---

**TRAVELERS** Virginia Automobile Insurance Identification Card

This card must be carried in the vehicle at all times as evidence of insurance.

| Year | Make | Model | Vehicle identification number (VIN) |
|------|------|-------|-------------------------------------|
| 2020 | JEEP | COMPASS LI | 3C4NJDCB3LT203589 |

Effective date 06/03/2023   Expiration date 06/03/2024

Policy number 604377483 203 1

**Insured**
JOSH SPENCER
2129 ROSEWELL DR
VIRGINIA BEACH, VA 23454-5855

**Company:** TRAVELERS PERSONAL SECURITY INSURANCE COMPANY

**For policy questions and changes**
GOOSEHEAD INSURANCE
800.474.1377

**To report a claim or get roadside**
assistance 24 hours x 365 days a year
Go to Travelers.com or Call 1.800.252.4633

**Keep this card in the vehicle at all times. See reverse side.**

---

**TRAVELERS** Virginia Automobile Insurance Identification Card

This card must be carried in the vehicle at all times as evidence of insurance.

| Year | Make | Model | Vehicle identification number (VIN) |
|------|------|-------|-------------------------------------|
| 2003 | HONDA | CIVIC LX | 2HGES16543H579763 |

Effective date 06/03/2023   Expiration date 06/03/2024

Policy number 604377483 203 1

**Insured**
JOSH SPENCER
2129 ROSEWELL DR
VIRGINIA BEACH, VA 23454-5855

**Company:** TRAVELERS PERSONAL SECURITY INSURANCE COMPANY

**For policy questions and changes**
GOOSEHEAD INSURANCE
800.474.1377

**To report a claim or get roadside**
assistance 24 hours x 365 days a year
Go to Travelers.com or Call 1.800.252.4633

**Keep this card in the vehicle at all times. See reverse side.**

---

**TRAVELERS** Virginia Automobile Insurance Identification Card

This card must be carried in the vehicle at all times as evidence of insurance.

| Year | Make | Model | Vehicle identification number (VIN) |
|------|------|-------|-------------------------------------|
| 2023 | FORD | BRONCO | 1FMEE5DP3PLA94875 |

Effective date 06/03/2023   Expiration date 06/03/2024

Policy number 604377483 203 1

**Insured**
JOSH SPENCER
2129 ROSEWELL DR
VIRGINIA BEACH, VA 23454-5855

**Company:** TRAVELERS PERSONAL SECURITY INSURANCE COMPANY

**For policy questions and changes**
GOOSEHEAD INSURANCE
800.474.1377

**To report a claim**
24 hours x 365 days a year
Go to Travelers.com or Call 1.800.252.4633

**Keep this card in the vehicle at all times. See reverse side.**

**In case of an accident, once you are in a safe location:**

- Contact us at **Travelers.com** or 1.800.252.4633 to report a claim or to answer your questions regarding filing a claim
- Take photos of the accident scene and all vehicles/property damage if you can do so safely
- Obtain the name and contact information for each driver, passenger, or witness and each vehicles' insurance details, license plate state and number
- Do not discuss who caused the accident with anyone other than the police or a Travelers representative

**Before an accident happens, be prepared**

- Keep a pencil and paper in your glove box to write down and share information.
- Get the Travelers Mobile app and learn more about our tools at www.travelers.com/app.

Rev. 11-2018

**In case of an accident, once you are in a safe location:**

- Contact us at **Travelers.com** or 1.800.252.4633 to report a claim or to answer your questions regarding filing a claim
- Take photos of the accident scene and all vehicles/property damage if you can do so safely
- Obtain the name and contact information for each driver, passenger, or witness and each vehicles' insurance details, license plate state and number
- Do not discuss who caused the accident with anyone other than the police or a Travelers representative

**Before an accident happens, be prepared**

- Keep a pencil and paper in your glove box to write down and share information.
- Get the Travelers Mobile app and learn more about our tools at www.travelers.com/app.

Rev. 11-2018

**In case of an accident, once you are in a safe location:**

- Contact us at **Travelers.com** or 1.800.252.4633 to report a claim or to answer your questions regarding filing a claim
- Take photos of the accident scene and all vehicles/property damage if you can do so safely
- Obtain the name and contact information for each driver, passenger, or witness and each vehicles' insurance details, license plate state and number
- Do not discuss who caused the accident with anyone other than the police or a Travelers representative

**Before an accident happens, be prepared**

- Keep a pencil and paper in your glove box to write down and share information.
- Get the Travelers Mobile app and learn more about our tools at www.travelers.com/app.

Rev. 11-2018

**In case of an accident, once you are in a safe location:**

- Contact us at **Travelers.com** or 1.800.252.4633 to report a claim or to answer your questions regarding filing a claim
- Take photos of the accident scene and all vehicles/property damage if you can do so safely
- Obtain the name and contact information for each driver, passenger, or witness and each vehicles' insurance details, license plate state and number
- Do not discuss who caused the accident with anyone other than the police or a Travelers representative

**Before an accident happens, be prepared**

- Keep a pencil and paper in your glove box to write down and share information.
- Get the Travelers Mobile app and learn more about our tools at www.travelers.com/app.

Rev. 11-2018

# TRAVELERS J   Indiana Automobile Insurance Identification Card

This card must be carried in the vehicle at all times as evidence of insurance.

**Year** 2020  **Make** JEEP

**Model** COMPASS LI

**Vehicle identification number (VIN)** 3C4NJDCB3LT203589

**Policy number** 611916291 203 1

**Effective date** 07/18/2022

**Expiration date** 07/18/2023

**Insured** JON TURPIN

NAIC 19070

**Company:** THE STANDARD FIRE INSURANCE COMPANY
ONE TOWER SQUARE, HARTFORD, CT 06183

**For policy questions and changes**
GOOSEHEAD INS AGENCY LLC
800.474.1377

**To report a claim or get roadside assistance 24 hours x 365 days a year**
Go to Travelers.com or Call 1.800.252.4633

**Keep this card in the vehicle at all times. See reverse side.**

**In case of an accident, once you are in a safe location:**

- Contact us at **Travelers.com** or 1.800.252.4633 to report a claim or to answer your questions regarding filing a claim

- Take photos of the accident scene and all vehicles/property damage if you can do so safely

- Obtain the name and contact information for each driver, passenger, or witness and each vehicles' insurance details, license plate state and number

- Do not discuss who caused the accident with anyone other than the police or a Travelers representative

**Before an accident happens, be prepared**

- Keep a pencil and paper in your glove box to write down and share information.

- Get the Travelers Mobile app and learn more about our tools at www.travelers.com/app.

Rev. 11-2018

**Michael continued to harass and threaten me and my wife even after being informed too.**



**May Michael attempt to make others take medication they haven't requested themselves?**

**We weren't, and aren't afraid of "everyone around us," only people who may hurt us.**

## May Michael, Andrea, Elaine, and the shelter have violated the Indiana Wiretapping Law?

### Indiana Wiretapping Law

Indiana's wiretapping law is a "one-party consent" law. Indiana makes it a crime to record a telephone conversation unless one party to the conversation consents. See Ind. Code § 35-31.5-2-176 and Ind. Code § 35-33.5-5-5. Therefore, you may record a telephone conversation if you are a party to the conversation or you get permission from one party to the conversation. That said, if you intend to record conversations involving people located in more than one state, you should play it safe and get the consent of all parties. In-person conversations do not appear to be covered by the law, but it cannot hurt to get consent before recording just in case.

In addition to subjecting you to criminal prosecution, violating the Indiana wiretapping law can expose you to a civil lawsuit for damages by an injured party. Ind. Code § 35-33.5-5-4.

Consult The Reporters Committee for Freedom of the Press's Can We Tape?: Indiana for more on Indiana wiretapping law.

### *May Michael and Andrea not know the shelter WASN'T a party to any conversation?*

## What Makes One-Party Consent Legal?

As long as the person hitting "record" is aware and part of the conversation, recording conversations is legal under Federal law as well as Indiana law.

### Before defamation of me. | After defamation of me.



### *According to Elaine, neither party to our conversation consented, nor pressed record.*

## **Since Andrea didn't record me, may they have broken a Federal Law and State Law?**

### Federal Law

Federal law (18 U.S.C. § 2511) requires one-party consent, which means you can record a phone call or conversation so long as you are a party to the conversation. If you are not a party to the conversation, you can record a conversation or phone call only if at least one party consents and has full knowledge that the communication will be recorded. The statute also prohibits recording conversations with criminal or tortious intent.

### State Law

Most states have enacted laws that are similar to the federal statute, meaning that they generally require one-party consent (click each state to see the details below).

### One-Party Consent States

| | | |
|---|---|---|
| Alabama | Kentucky | Ohio |
| Alaska | Louisiana | Oklahoma |
| Arizona | Maine | Rhode Island |
| Arkansas | Minnesota | South Carolina |
| Colorado | Mississippi | South Dakota |
| District of Columbia | Missouri | Tennessee |
| Georgia | Nebraska | Texas |
| Hawaii | New Jersey | Utah |
| Idaho | New Mexico | Virginia |
| Indiana | New York | West Virginia |
| Iowa | North Carolina | Wisconsin |
| Kansas | North Dakota | Wyoming |

## ***May someone have committed a felony offense by eavesdropping and/or wiretapping?***

### Indiana

It is illegal to record or intercept any telephone or electronic communication without the consent of at least one party. This offense is a felony punishable by fine and/or imprisonment, and can also carry civil liability. Indiana's wiretapping statute does not appear to address in-person conversations.

IN Code § 35-31.5-2-176 (definition), § 35-33.5-5-5 (penalty), § 35-33.5-5-4 (civil damages)

## ***May Michael Mann distribute recordings of others to hurt others relationships?***

### 8. Sabotage

Disruptive interference with your endeavors or relationships for the purpose of revenge or personal advantage.

## ***May Michael Mann have committed a felony distributing a recording he wasn't a party to?***

### 14. Privacy Invasion

Ignoring your boundaries by looking through your things, phone, or mail; denying your physical privacy or stalking or following you; ignoring your request for privacy.

## ***May this have been recorded after my life was threatened while I spoke to a friend?***

### 21. Playing the Victim Card

When all else fails, the narcissist resorts to playing the victim card. This is designed to gain sympathy and further control behavior.

## ***May Michael attempt to pretend that others broke laws when he may have done so?***

**Michael moves belongings he should have set outside, then threatens Erin unprovoked.**



**May Michael say leave us alone, and make threats, then go to my sister's wedding?**

## 3. Projection

Projection involves dumping their issues onto their **victim** instead of taking any blame. For instance, a narcissistic abuser may accuse their partner of lying when *they* have lied (this is sometimes referred to as "Deny, attack, reverse **victim** & offender"). Or they make a partner feel guilty when they've done nothing wrong. This creates confusion.

**_May Michael's behavior have caused me to flee and caused Andrea the same stress?_**
**_Mom said there was a push for me to be institutionalized, may that be a motive?_**

**Maybe Michael forced his involvement? Maybe Andrea wasn't too hurt to enjoy a party?**

**Linda Turpin** Primo restaurant in New Castle



**Alan Michael**
Andrea and I had wonderful time Linda
Turpin! You planned an awesome party!

19h   Like   Reply

***Maybe Michael wanted to hurt us more? If he did, it worked, and may have hurt family.***

## 3. Triangulation

Narcissistic triangulation occurs when a person tries to bring a third person into a conflict to benefit them. This form of manipulation can be done within a relationship or friendship, or even with narcissistic parents. This is also common in the workplace, when a boss or coworker brings a third party into a conflict to encourage them to take their "side," or to deflect from their own actions.[2]

## 6. Smear Campaign

A smear campaign occurs when a narcissist creates a web of lies or exaggerations in order to discredit and isolate a person. This is typically done publicly, and to anyone who will listen-the victim's friends and family are not exempt. For instance, a person breaks up with their partner, and their ex in turn begins to spread rumors about them within close-knit social circles. Slowly, this person notices that their supports are turning away from them, and reducing contact.

The cruel end result of this is that oftentimes the victim is left with limited support, as their loved ones may believe the lies spread against them. When they try to report the abuse they are experiencing, they are treated as if they are the one causing the problems.[2]

## 7. Revenge Seeking

When someone with NPD feels wronged, they often go into revenge seeking mode. This may be done in the form of a smear campaign, but it can also occur in a number of other ways. A narcissist may seek revenge in the workplace if someone turned them down for a promotion or a raise, or criticized them openly in a meeting. The narcissist may then purposefully turn in projects late or avoid completing important tasks in order to make the other person's job more difficult.

## 8. Sabotage

Disruptive interference with your endeavors or relationships for the purpose of revenge or personal advantage.

## MICHAEL WASN'T SUPPOSED TO MOVE NOR PICK UP ANY PROPERTY.

**Response Times**

| | |
|---|---|
| **Assigned** | 12/19/21 06:19:23 |
| **Enroute** | 12/19/21 06:29:43 * |
| **Arrived** | 12/19/21 06:29:43 |
| **Leaving** | |
| **Arrived At** | |
| **Completed** | 12/19/21 06:40:09 |

**IR / External Agency Numbers**

**Command Log** Filter: All Commands | Details: Hidden | Units: All Units | Revised Entries: Shown

12/19/21 06:16:46 | Meyers, Natalie | New CFS
12/19/21 06:17:27 | Meyers, Natalie | SIG 6 ONLY
12/19/21 06:17:57 | Meyers, Natalie | THE ONGOING ISSUES WITH HIS FAMILY AND HARASSMENT.
12/19/21 06:19:23 | Meyers, Natalie | C2 | Dispatch
12/19/21 06:29:40 | Kuhn, Larry | 1st call no answer
12/19/21 06:29:43 | Kuhn, Larry | C2 | On Scene
12/19/21 06:30:59 | Kuhn, Larry | 2nd call no answer
12/19/21 06:38:44 | Kuhn, Larry | 3rd call now answer
12/19/21 06:38:55 | Kuhn, Larry | no
12/19/21 06:40:09 | Meyers, Natalie | C2 | Complete
12/19/21 06:53:38 | Meyers, Natalie | HE CALLED BACK AND CAN ANSWER HIS TX NOW
12/19/21 06:53:42 | Meyers, Natalie | C2 | Dispatch
12/19/21 07:13:53 | Meyers, Natalie | C2 | Available
12/19/21 07:14:50 | Meyers, Natalie | Complete
12/19/21 08:25:14 | Pierce, Indie | C2 | Dispatch
12/19/21 08:33:04 | Kuhn, Larry | John is worried about a bitcoin machine that he had Hagerstown. He stated that this machine has been used by someone else and thing that inappropriate child images has went through it. John stated that it has been removed and is now in storage and that he thinks his father and Michael Mann is trying to frame him. John told me that he has contacted the cyber tip line and reported this.
12/19/21 08:34:13 | Kuhn, Larry | C2 | Available (Location: In Service)

**Responders**

| | | |
|---|---|---|
| C3 (Primary) | C3 - Webb, Corey | CCPD (Primary) |

**Response Times**

| | |
|---|---|
| **Assigned** | 01/08/22 20:49:37 * |
| **Enroute** | 01/08/22 20:49:37 |
| **Arrived** | 01/08/22 20:51:20 * |
| **Leaving** | |
| **Arrived At** | |
| **Completed** | 01/08/22 20:51:20 |

**IR / External Agency Numbers**

**Command Log** Filter: All Commands | Details: Hidden | Units: All Units | Revised Entries: Hidden

01/08/22 19:28:05 | Christian, Jalin | New CFS
01/08/22 19:29:01 | Christian, Jalin | RED BIKE

Page 1 of 2

01/08/22 19:29:36 | Christian, Jalin | 9 MULBERRY ST
01/08/22 19:30:58 | Christian, Jalin | CALLER USED TO LIVE AT THE ADDRESS ABOVE. HAS RECENTLY MOVED
01/08/22 19:31:13 | Christian, Jalin | FROM WHAT I COULD GATHER SOMEONE IS PICKING UP HIS PROPERTY WHO SHOULD NOT BE
01/08/22 19:31:16 | Christian, Jalin | SIG 6
01/08/22 19:31:31 | Christian, Jalin | CALLER WAS ADVISED OF THE EXTENDED ETA
01/08/22 20:49:37 | Webb, Corey | C3 | Enroute
01/08/22 20:51:14 | Webb, Corey | I TRIED CALLING THE NUMBER BUT IT GOES TO SOME GOOGLE APP.
01/08/22 20:51:20 | Webb, Corey | C3 | Available (Location: In Service)

## *MICHAEL KNEW, AND THREATENED US. MAY IT BE TO COVER UP INVOLVEMENT?*

## 8. Sabotage

Disruptive interference with your endeavors or relationships for the purpose of revenge or personal advantage.

**May Michael have invited himself to move our belongings?**



### Michael Mann

Saturday, December 11, 2021

I just had anxiety and concern and I'm in a safe place now and taking care of my own needs with my primary care physician and therapist.

Thank you for your help and I'll coordinate having my things picked up.

I appreciate that my parents will leave me alone now. I want true distance.

***May Michael have attempted to say I asked him to do so even though I said "picked up?"***

## 4. Twisting

When a narcissist is confronted, they will twist it around to blame their **victims** for their actions. They will not accept responsibility for their behavior and insist that their **victim** apologize to them.

**May Michael misunderstand others and not ask for clarification?**

Andrea Holwager

Hey. Michael just showed me the messages/ screenshots you sent him via your Facebook. It sounds like you and Michael are misunderstanding each other in the messages, which makes sense because it's over messages/ Facebook. I just told Mike that you guys should talk about it over the phone versus messaging because this is where issues/miscommunication occurs.

***May misunderstanding others benefit Michael in some way?***

## 19. Withholding

This may include withholding such things as money, sex, communication, or affection from you.

**Despite this, may Michael have relocated a red Schwinn bike that my Mom gave to me?**





*May I have paid about $400 to have this bike restored at REI Bike shop in Indianapolis?*

**May Michael run away from problems if he may be caught?**
**_May I have been friends with Elaine Holwager at the time if I reached out?_**
**_May I have blocked Elaine if threatened in a similar way as Michael threatened us?_**



**May asking about avoiding a property be the opposite of breaking a boundary?**
**_May this indicate we wish to avoid Michael Mann in any way we can to be safe?_**

**May Andrea Holwager have expressed concerns of Michael cheating to me and my wife?**
***May Andrea have expressed concerns about possible infidelity to us over many years?***



**May Michael Mann have assisted in an attempt to halt our wedding?**
***May Michael Mann be defaming me and/or may he be dishonest about his own behavior?***

## 1. Gaslighting

Gaslighting is the intentional act of making you distrust your views of reality or believe that you're mentally unstable using specific targeted phrases to make you feel this way. Here are a few signs you are being gaslighted:

- You no longer feel like the person you used to be
- You feel like everything you do is wrong
- You always think it's your fault when things go wrong
- You feel more anxious and less confident than you used to be
- You often wonder if you're being too sensitive
- You often question whether your response to your partner is appropriate
- You're apologizing often
- You have a sense that something's wrong, but aren't able to identify what it is
- You make excuses for your partner's behavior

## 2. Emotional Abuse

Emotional abuse could include accusing, belittling, blaming, bullying, criticizing, demanding, ordering, raging, sarcasm, shaming, or threatening.

## 3. Projection

Projection involves dumping their issues onto their victim instead of taking any blame. For instance, a narcissistic abuser may accuse their partner of lying when *they* have lied (this is sometimes referred to as "Deny, attack, reverse victim & offender"). Or they make a partner feel guilty when they've done nothing wrong. This creates confusion.

## 4. Twisting

When a narcissist is confronted, they will twist it around to blame their victims for their actions. They will not accept responsibility for their behavior and insist that their victim apologize to them.

## 5. Lack of Empathy

The lack of empathy or ability to feel and express emotions is the major reason why a narcissist's relationships fail. In a healthy relationship, both partners care for each other's well being. In a narcissistic relationship, the non-narcissistic partner will not feel cared for and will show signs of sadness and loneliness.

## 7. Silent Treatment

Narcissists punish by ignoring. Then they let their victim "off the hook" by demanding an apology even if they weren't to blame. A narcissist may also have a history of cutting others out of their life permanently over small things.

## 8. Sabotage

Disruptive interference with your endeavors or relationships for the purpose of revenge or personal advantage.

## 9. Grandiosity & Overstating Their Own Importance

A narcissist's grandiose sense of self-importance leaves no time or space for their partner or anyone else, leaving their partner feeling alone in the relationship.

## 10. Emotional Blackmail

Emotional blackmail is another form of manipulation to make you feel fear, guilt, or doubt. They may use anger, intimidation, threats, warnings, or punishment to keep you in line.

## 24. Hogging the Conversation

Narcissists love to talk about themselves. They will embellish and flat-out lie to make themselves look better than others or inflate their accomplishments. There is no room to talk about your accomplishments, nor do they care about them in the first place.

**After saying they'd "leave us alone" our Priest Father Brent was called:**
***May Dad have tried to stop our wedding saying we were "incompetent?"***

# Rev. P. Brent

**Pastor | St. Agnes, Baton Rouge**

b            @diabr.org



**The same kind Priest who helped us with marriage counseling and preparation.**

Marriage Prep Meeting - Zoom info



**Fr. Brent**      <padre    @gmail.com>  Thu, Jul 15, 2021, 9:38 AM
to Erin, me

We haven't had to use Zoom much here at St. Agnes, so we don't have the upgraded
account to have longer sessions with 3+ people, so I set up two meetings in case we
need to back out and start over. Links below. See y'all virtually at 2!

Topic: Marriage Prep Meeting
Time: Jul 15, 2021 02:00 PM Central Time (US and Canada)

Join Zoom Meeting
https://us04web.zoom.us/j/76673142389?

Meeting ID: 766 7314
Passcode:

SECOND MEETING, If needed.
Join Zoom Meeting
https://us04web.zoom.us/j/78154813078?

Meeting ID: 781 5481
Passcode:

**May Dad have lied to a Priest to follow through on his threats with God watching?**
***If Dad may lie to Law Enforcement, a Priest, and God, may Dad be dishonest with You?***





**Father Brent even helped us with marriage preparation.**

"Called to Love" Retreat

Diocese of Baton Rouge
Marriage and Family Life Ministry

This is to certify that

# Erin Golden & Jon Turpin

Completed the Virtual Weekend of Premarital Spiritual Preparation for Marriage

## September 18-19, 2021

"It would be good for the engaged couple to arrive at the wedding having prayed together, one for the other, to seek God's help in remaining faithful and generous, to ask the Lord together what he wants of them."

*Familiaris Consortio #116   John Paul II*



_____                                    _____
Director of Marriage and Family Life                          Bishop of Baton Rouge

**This was a wonderful, spiritual stepping stone on a lifelong journey of marriage.**

**May we have been forced to start our marriage with practically no means to live?**



Cryptocurrency Business Sales
"Dowry" & Home Purchase & Repairs

**May we have started off our marriage destitute and living on a futon for safety?**
*May Dad have tried to make us "destitute with five kids living under a bridge?"*



*That's the vehicle where we slept and celebrated being "JUST MARRIED!"*

**May Dad's threat to Erin after Mamaw's be true? May we have lived like this for months?**



**May Dad have had Mom kick me out over "his business" before when I was 19 years old?**
*May this not be a good wedding gift for an event Dad threatened not to come to?*

## OVER THE COURSE OF THE PRIOR YEAR I'D BUILT A $48,000/YR BUSINESS



*MAY DAD HAVE HAD AN ISSUE WITH MY INCOME?*



*MAY DAD NOT HAVE WANTED ME TO BUY PROPERTY IN WAYNE COUNTY?*



*WITH MY ATTENTION ON OUR FUTURE, NOT DAD, MAY DAD CALL ME MANIC?*

*MAY DAD BE UPSET IF I OUTPACED TURPIN ELECTRIC'S PROFITS?*



*MAY DAD BE UPSET ENOUGH TO ACCUSE ME OF ILLEGAL ACTIVITY?*

**<u>Something seemed off: Mom was talking about forcing me into an institution.</u>**
**<u>*I'd already contacted my physician and therapist about these events myself.*</u>**



**<u>May this be similar to Dad taking me to psychoanalysis after the school abuse?</u>**
**<u>*May I have had reason to be upset then after a physician said I may lose my ears?*</u>**

## MAY DAD TRY TO HAVE MOM "REGIFT" ME SOMETHING I ALREADY PAID FOR?



***May I have to "play along" and leave for my safety and our wedding?***

**May Dad, Michael, and/or Jared not be doing rational things?**
*May Dad place blame on his Son?*
*May Michael place blame on people he calls friends?*
*May Jared attempt to hide issues to avoid accountability?*

**May Dad, Michael, and/or Jared defame me to my Mom?**
*May Dad know something I didn't after meeting with Michael?*

A message from Soraya "Cinnamon" Murphy to Jared R. Junkin, which he sent to me, that says J.R.J. was viewing "lollicon", which, apparently, is a type of virtual child porn...

My report to the FBI, regarding what J.R.J. said to me, out of genuine concern.



acknowledging my concerns you blow them off and act like a d█████ and ignore me. And all the times when I was depressed and hurting and you gave zero fucks and was looking at hard-core lollicon on █████ Valentine's Day... then not to mention all the times you had zero idea how to treat a lady because you just figured you didn't 'have to' with me... when the issue is that it didn't even cross your mind. When you love and care about someone other than yourself, you think about things from their perspective and take their feelings into account. You WANT to do romantic things for them to show your love. You grow some balls and stand up for them when your friends and family attack them. You listen to them to understand them when they're having problems, not just listen to reply. I care about you, and I love you, and I always will, but you don't know how to love someone properly and it's going to kill my spirit completely if I stay. I'm tired of being depressed and feeling alone even though I'm in a house with other people.

**MAY THIS BE A POSSIBLE REASON? MAY IT BE "MERRY CHRISTMAS" FROM DAD?**
*MAY EITHER BE AWARE I WAS TRYING TO GET JARED THERAPY LIKE JARED ASKED?*

**Why did I buy Jared's guns and why did we try to get him therapy?**



**Jared J**
Jul 29, 2021

I'm not sure how apparent it is, but my hand is quite swollen. The guy in the mirror was passing me off. It occured to me that he is the cause of all my problems, so I took a swing at him. I put everything I had into that swing and magically didn't break the mirror. So now here I am at work with a bum hand, still mad at the guy in the mirror.





11 comments





**May there be other reasons I may think Jared needs therapy?**



Cinnamon M

I'm sad that he was never appreciated before, and after being with someone so awful for 8 years. I really really, really appreciate all the little things that I might have otherwise taken for granted

I appreciate you agreeing to buy those from Jared last night, although I feel the need to be honest with you. Jared didn't really care about the money at first, and I'm sure the fact he could get money from selling them was an afterthought. And don't get me wrong, he absolutely needs the money. But he doesn't feel comfortable having them here because I suffer from severe manic depression and suicidal thoughts. I don't think I would ever hurt myself, I don't have the balls to do that and I have people that need me... but crazy people aren't always in control of their emotions, especially when they're manic and having an episode. So, I guess, thank you. I know Jared was keeping the truth about it from you for my sake, and going with the whole "Christmas" thing, (which as I said, isn't exactly a lie, because we need money and we have kids), but it was deeper than that and I thank you for that, I guess. *hugs

I understand and you're welcome. Thanks for opening up 😊

Will you or Josh or someone come and pick up Jared for a bit? He's destroying things around the house and threatening to burn the house down... and I've just been at work all day and he really needs someone there for him please. I know this isn't your problem or your fault, but you're his best friend.

Well f**k. We'll come get him.

On my way in just a bit.

**May there have been two people in the same house with kids who shouldn't have guns?**

## Why was Jared uninvited from our wedding?
### *Why was getting therapy resources the last thing I'd do for him?*



## May Jared have mentioned an addiction to cartoon pornography?
### *May this have made me question if Jared told me the full truth?*

### *BECAUSE JARED HAD ASKED ME TO HELP HIM FIND THERAPY, AND SORAYA CONTACTED ME, I APPROACHED JARED. HE WAS ADAMANT HE WAS ADDICTED TO CARTOONS. I STILL FELT JARED WOULD GET IN TROUBLE FOR OUTBURSTS AND THREATENING TO BURN HIS HOUSE. WE WERE UNEASY AND HE WAS UNINVITED.*

*ME AND MY FRIENDS AND EX-FRIENDS AREN'T WEALTHY PEOPLE WITH RESOURCES. JARED HAD CALMED DOWN AFTER HAVING THE POSSIBILITY OF GETTING THERAPY. THE GROUP WAS CONCERNED AND TRYING TO HELP JARED CORRECT COURSE.*



*LAST TIME DAD ACTED THIS BADLY WHEN I WAS 15, HE SMASHED MY COMPUTERS WITH A HAMMER AND LATER BEAT ME. WHEN DAD THREATENED ME AND MY WIFE AND BEGAN HIS ONSLAUGHT, I HAD NOWHERE FOR MY BUSINESS TEMPORARILY, NOR A RESIDENCE TO SUPPORT IT. MICHAEL'S AND ANDREA'S HAD POWER ISSUES.*

*I COULDN'T FINISH PREPARING FOR OUR MARRIAGE FINANCIALLY NOR HELP JARED GET THERAPY WITH A THIRD OF OUR INCOME BEING EVEN LESS SAFE NEAR DAD.*
**MAY I HAVE NOT KNOWN WHAT JARED SAID MAY BE ILLEGAL & FOUND IT IMMORAL?**



*[MAY I HAVE FELT JARED HAS A NEED FOR A PROFESSIONAL THERAPIST'S HELP?]*
*May it be responsible to "Red Flag" Jared before he hurts himself, me, my wife, or others? May it be responsible to repair defamation of my character for my wife and future family?*
*MAY THREATS OF BEING SHOT, DESTITUTE, AND OUR WEDDING RUINED BE WORSE? RESIDENCES WE WENT TO BUY WERE SABOTAGED IN ATTEMPTS TO MAKE US RENT. MAY THIS PREVENT US FROM TRESPASSING DAD IF HE CONTINUED HIS BEHAVIOR?*

### *MAY I ONLY CARE TO RESEARCH THINGS I HAVE AN INTEREST IN?*

B.  Restricted repetitive and stereotyped patterns of behavior, interests, and activities, as manifested by at least one of the following:

(1)  encompassing preoccupation with one or more stereotyped and restricted patterns of interest that is abnormal either in intensity or focus

### *[I HAVE NO INTEREST IN ANYTHING THAT EXPLOITS OR MAY EXPLOIT KIDS.]*



### MAY JARED HAVE DESCRIBED HIS POTENTIAL ISSUE AS A TYPE OF CARTOON?
### *[BOTH MY WIFE AND I VIEW WHAT JARED SAID AS IMMORAL AND HAVEN'T SEEN IT.]*

### MAY I HAVE DONE THE RIGHT THING BY REPORTING THIS?
### *[I REPORTED DIRECTLY AFTER MY WIFE AND I RESEARCHED THE DEFINITION.]*
### *MAY I STILL NOT HAVE HATE FOR JARED, AND HAVE DISASSOCIATED RESPONSIBLY?*

**MAY JARED HAVE SAID MANY THINGS THAT ARE "OFF THE WALL" OR "ECCENTRIC?"**
*MAY I HAVE DOUBTED JARED BUT FEEL I HAD TO REPORT WHAT HE SAID ANYWAY?*
*MAY JARED HAVE SAID MORE TO ME AND MY WIFE INVOLVING HIM AND MICHAEL?*



**May I have been targeted for trying to get Jared therapy as a former friend?**
***May Jared be trying to recover from a broken home and gone "over the edge?"***
**May Dad, Mom, Michael, and/or Andrea have a reason not to report?** *DID THEY REPORT?*

**IF NOT, MAY NOT REPORTING ONLY BE IN THEIR BEST INTERESTS?**
**MAY WE HAVE FACED RETALIATION ON A DEVASTATING LEVEL FOR REPORTING?**
*MAY PROTECTING KIDS AND SAFETY BE MORE IMPORTANT THAN A LICENSE?*



***IN MY OPINION BOTH KIDS AND SAFETY ARE MORE IMPORTANT THAN A LICENSE.***
**MAY I HAVE A PRACTICAL EXAMPLE OF THIS IN ACTION AFFECTING MY LIFE?**
*MAY MY LIFETIME CARRY LICENSE APPROVED BY THE DOD BE SUSPENDED NOW?*

**May Jared have done things in the past I find unacceptable?**



**May this have been in my parents' basement, and may I have promptly kicked Jared out?**
**[MAY MY OPINION OF JARED HAVE CHANGED AFTER PAST AND PRESENT EVENTS?]**

**<u>Why weren't we speaking and why don't Diana and I speak?</u>**
*<u>May she have been upset for a reason?</u>*



**<u>I disrespected Diana and Erin long ago, but Diana and I became friends afterward.</u>**
*<u>We went our separate ways eventually and I made the decision for us not to speak.</u>*

**<u>IN MY OPINION: IT'S RESPECTFUL OF ERIN. AND I'M NOT SORRY FOR THAT.</u>**
*<u>HOWEVER: I AM SORRY THAT MY ASKING ABOUT THE PAST UPSET DIANA.</u>*

**<u>A Brother Who Sins.*</u>**
**<u>"If your brother* sins [against you], go and tell him his fault between you and him alone.
If he listens to you, you have won over your brother. If he does not listen, take one or two
others along with you, so that 'every fact may be established on the testimony of two or
three witnesses.' If he refuses to listen to them, tell the church.* If he refuses to listen
even to the church, then treat him as you would a Gentile or a tax collector.</u>**

* [18:15–20] Passing from the duty of Christian disciples toward those who have strayed from their number, the discourse now turns to how they are to deal with one who sins and yet remains within the community. First there is to be private correction (Mt 18:15); if this is unsuccessful, further correction before two or three witnesses (Mt 18:16); if this fails, the matter is to be brought before the assembled community (the church), and if the sinner refuses to attend to the correction of the church, he is to be expelled (Mt 18:17). The church's judgment will be ratified in heaven, i.e., by God (Mt 18:18). This three-step process of correction corresponds, though not exactly, to the procedure of the Qumran community; see 1QS 5:25–6:1; 6:24–7:25; CD 9:2–8. The section ends with a saying about the favorable response of God to prayer, even to that of a very small number, for Jesus is in the midst of any gathering of his disciples, however small (Mt 18:19–20). Whether this prayer has anything to do with the preceding judgment is uncertain.

* [18:15] Your brother: a fellow disciple; see Mt 23:8. The bracketed words, against you, are widely attested but they are not in the important codices Sinaiticus and Vaticanus or in some other textual witnesses. Their omission broadens the type of sin in question. Won over: literally, "gained."

* [18:16] Cf. Dt 19:15.

* [18:17] The church: the second of the only two instances of this word in the gospels; see note on Mt 16:18. Here it refers not to the entire church of Jesus, as in Mt 16:18, but to the local congregation. Treat him...as a Gentile or a tax collector: just as the observant Jew avoided the company of Gentiles and tax collectors, so must the congregation of Christian disciples separate itself from the arrogantly sinful member who refuses to repent even when convicted of his sin by the whole church. Such a one is to be set outside the fellowship of the community. The harsh language about Gentile and tax collector probably reflects a stage of the Matthean church when it was principally composed of Jewish Christians. That time had long since passed, but the principle of exclusion for such a sinner remained. Paul makes a similar demand for excommunication in 1 Cor 5:1–13.

* [18:18] Except for the plural of the verbs bind and loose, this verse is practically identical with Mt 16:19b and many scholars understand it as granting to all the disciples what was previously given to Peter alone. For a different view, based on the different contexts of the two verses, see note on Mt 16:19.

* [18:19–20] Some take these verses as applying to prayer on the occasion of the church's gathering to deal with the sinner of Mt 18:17. Unless an fortiori argument is supposed, this seems unlikely. God's answer to the prayer of two or three envisages a different situation from one that involves the entire congregation. In addition, the object of this prayer is expressed in most general terms as anything for which they are to pray.

**\* [18:20] For where two or three…midst of them: the presence of Jesus guarantees the efficacy of the prayer. This saying is similar to one attributed to a rabbi executed in A.D. 135 at the time of the second Jewish revolt: "…When two sit and there are between them the words of the Torah, the divine presence (Shekinah) rests upon them" (Pirqê 'Abôt 3, 3).**

**May Dad, Michael, and/or Jared be reasons for me to schedule a flight out of state?**

# Expedia flight purchase confirmation – Baton Rouge, LA, United States (BTR-Baton Rouge Metropolitan) – Fri, Dec 10 – (Itinerary # 72212106149057)  Inbox ×

## Indianapolis to Atlanta – DL 1560
Dec 10, 2021, 5:50 AM–7:34 AM

Take-off
Dec 10, 2021, 5:50 AM

Landing
Dec 10, 2021, 7:34 AM

Flight duration
1 hr, 44 min

Passenger name
Jon Turpin (Adult)

Seat

Confirmation number
GZ5YRS

View in Travel

## Atlanta to Baton Rouge – DL 5418
Dec 10, 2021, 8:26 AM–9:09 AM

**May Dad, Michael, and/or Jared have attempted to take advantage of my absence?**

**May Michael blame Jared or others for his potential behaviors?**
***If so, may Michael have a reason to be involved with Jared?***
***May they both need a professional therapist's help?***





**Jared J**
Dec 11 · ⊙

Thanks to my good friends Michael and Andrea for kindly giving me this stove. It appears to be straight from the 70s, and you know what they say, "They just don't make 'em like they used to." 😊



👍❤️😮 Josh King and 14 others          8 Comments

**May Michael attempt to collect or access another's property without permission?**
***May Michael give gifts to others with a hidden or ulterior motive?***
***May Michael have had any affect on Jared's behavior?***
***May Michael have a past with Jared or his family?***