

**BAKERABOOPBOOP**



**_BEST I GOT, SIS, NO PHOTOSHOP._**

**_THIS ISN'T MALICE: DAD/MICHAEL/JARED DEFAMED/BLAMED ME OF THEIR ACTIONS._**

_Deuteronomy 15-21: False Witnesses._
_One witness alone shall not stand against someone in regard to any crime or any offense that may have been committed; a charge shall stand only on the testimony of two or three witnesses._
_If a hostile witness rises against someone to accuse that person of wrongdoing, the two parties in the dispute shall appear in the presence of the LORD, in the presence of the priests and judges in office at that time, and the judges must investigate it thoroughly. If the witness is a false witness and has falsely accused the other, you shall do to the false witness just as that false witness planned to do to the other. Thus shall you purge the evil from your midst._
_The rest shall hear and be afraid, and never again do such an evil thing as this in your midst._
_Do not show pity. Life for life,* eye for eye, tooth for tooth, hand for hand, and foot for foot!_

**MY DAD, MICHAEL, AND JARED HAVE BORNE FALSE WITNESS AGAINST US.**
**DEUTERONOMY DECLARES WHAT MUST BE DONE WITH FALSE WITNESSES.**

_If the witness is a false witness and has falsely accused the other, you shall do to the false witness just as that false witness planned to do to the other. Thus shall you purge the evil from your midst._

**_DEFAMATION OF ME INSTIGATED BY THEM ALLOWS ME TO DEFEND MY CHARACTER._**

*May I have had insight into some, but not all, of Michael and Jared's past?*





*May it be "their business" except that others wrongfully tried to blame me?*

### Sirach 28:13-26
### Vicious Talk

*Gossips and liars deserve to be cursed, because they have been the ruin of many people who were minding their own business. Many have had their lives ruined and have been driven from their homes because of people who meddled in their business. Such unwanted interference has resulted in the destruction of strong cities and the homes of respected people. Meddlers have caused faithful wives to be divorced, robbed of everything they had worked for. Anyone who pays attention to slander can never find peace of mind. A whip can raise a welt, but a vicious tongue can break bones. More people have died as a result of loose talk than were ever killed by swords. Count yourself lucky if you have been spared the experience of having irresponsible talk directed against you—if you have never had that iron yoke around your neck or those heavy chains on your legs. Slander leads to a miserable death; but in fact, you'd be better off dead.*

*Devout people, however, cannot be overcome by slander; they cannot be burned by its flames. Its victims are those who have abandoned the Lord; once the fire of slander has been lit among them, it cannot be put out. Slander will pounce on them like a lion and tear them to pieces like a leopard.*

*Don't you fence in your property? Don't you lock up your money? Well, be just as careful with what you say. Weigh every word, and have a lock ready for your mouth. Someone may be waiting for you to slip, and if you are not careful, you will stumble over your own words and fall down in front of him.*

### Isaiah 29:21-23

God will destroy those who slander others, those who prevent the punishment of criminals, and those who tell lies to keep honest people from getting justice.

So now the Lord, the God of Israel, who rescued Abraham from trouble, says, "My people, you will not be disgraced any longer, and your faces will no longer be pale with shame. When you see the children that I will give you, then you will acknowledge that I am the holy God of Israel. You will honor me and stand in awe of me.

How do you respond to false accusations in the Bible?

It was found that Jesus primarily responded to false accusation in six ways: by asking questions; by sharing parables, analogies, or maxims; by giving strong words of condemnation or affirmation; by referring to the scriptures; by withdrawing from the accusers, and by keeping silent.

*May I have attempted each method Jesus taught recorded by Mark against their slander?*

*MAY I HAVE STOPPED WORKING FOR DAD'S BUSINESS SOON AFTER DAD BEAT ME?*
**What do I call a beating and did I do something to deserve being beaten?**
**We have an example from the School Lawsuit, but I'll elaborate for clarity and to finally get it off my chest. Mom hated being in this house, and supposedly she was going through something which women sadly have to endure as they get older. Mom asked me to do something that I'd completed. I don't remember what, just that I said it was done.**
*Mom was sitting on the West side of the dining room table facing Northeast toward me. Dad was in the South chair facing Northeast towards me, and I was standing at the Northeast corner of the table facing Southwest towards both my Dad and my Mom.*
**Mom got extremely angry and started yelling at Dad "BEAT HIS A\*\*" and I was confused.**
*I hadn't even raised my voice: sometime shortly before this Dad had told me Mom was going through something and that I needed to be on my best and most respectful behavior with "Yes Mom" and all the ways you should treat a Mom in general but more.*



**I'm not sure if Mom was just having a bad day, or if my tone was off, but I wasn't trying to argue AT ALL. I was letting Mom know that I'd already completed what she asked me for, and I thought that would be a good thing, but this day it just wasn't and I don't know why.**
*Dad got up and started coming at me from where he'd been sitting, very aggressively, and I yelled "I don't want to fight you! I don't want to fight you!" but Dad kept coming and shoved me as I tried to get away from him going East, then South next to the kitchen island. When I caught my footing the first time, Dad punched me in the head, and when I kept backing away, Dad punched me by the edge of the kitchen island then threw me on the floor. After I hit the floor he grabbed me and slammed my head into the tile twice before he stopped. I got up and said "I should call CPS!" and was told "We'd have 5 minutes before the cops get here to make it worth it!" So I left through the garage, FAST. I don't remember where I rode my bike to, but I tried not to be at home much after this. I TRIED TO ADDRESS IT BUT DAD SAID "MAYBE I SHOULD'VE BEAT YOUR A\*\* MORE."*

### *MAY I HAVE MADE MISTAKES AT A WORKPLACE AND TAKEN ACCOUNTABILITY?*
**When I worked for ALCO there was an incident with another worker named Adam.**
**Adam allowed someone to take things out of the back of the store and got reported.**
**This was Brandi's boyfriend then, and maybe due to his behavior, they didn't work out.**
*Other incidents occurred at the store as well, to the point that loss prevention stepped in.*
*Adam tried to get me to participate, and I declined, and reported the theft to management.*
*Now, this isn't to say I was perfect, I wasn't, the manager had given many employees his*
*credentials, but I'd used these to return a TV that wasn't faulty against the store's policy.*



Sales Associate
October 2006 - October 2007 (1 year 1 month)
  • Operated computerized register , customer assistance, stockroom and theft prevention

**HOWEVER, when loss prevention was called in due to problems at the store, we were**
**informed that Kelly handing out his management credentials was against store policy.**
**How did they find out that this had occurred? I was honest about it, and let them know.**
*Shortly afterward, potentially due to so many losses at the store, ALCO was shut down in*
*Cambridge City. I'm unsure if they would have discovered what was happening if I hadn't*
*been forthcoming about theft from the back, and honest about the manager's credentials.*
*At the end of the review I wasn't let go, but I said I'd look for another job due to the TV.*
*LOSS PREVENTION MANAGER KEPT ME, THE NEW MANAGER IGNORED MY COLLEGE.*

*__MAY I HAVE OTHER EXAMPLES OF MY HONESTY DESPITE PRESSURE FROM OTHERS?__*

__I'm also the student that first reported the theft of cash from the registers at the Indiana State Fairground Dairy Barn one/two years before it was found to be unequivocally true.__ *__My report was ignored for over a year even though other students came forward after me.__* *__While I won't share an affidavit due to it being potentially sealed, I am able to prove this.__*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JON BRENT TURPIN, LINDA BECKER TURPIN, Individually and as parents and Next Friends of J.F.T., their son, a minor, | ) ) ) | |
| Plaintiffs, | ) ) | Cause No. 1:07-CV-1205 LJM/JMS |
| v. | ) ) | |
| WESTERN WAYNE SCHOOL CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

### ORDER

Plaintiffs, having filed their Administrative Motion to Seal or Withdraw Plaintiff's Supplemental Response to Defendant Western Wayne School Corporation's Third Request for Production of Documents to Plaintiffs, and the Court being duly advised, hereby orders the above- referenced document stricken and removed from the docket.

SO ORDERED

01/08/2010

*Jane Magnus-Stinson*
Jane Magnus-Stinson
United States Magistrate Judge
Southern District of Indiana

*__Should I need to prove this statement the Honorable Jane Magnus-Stinson may assist.__* __In my opinion I've received a large amount of hatred and been targeted for being different, and even more hatred for being honest so others won't be damaged or hurt.__ *__In my opinion my character has shown even down to the wire, but I'm often still ignored.__*

__THE AFFIDAVIT SUPPORTING THIS & ME IS FROM A COUSIN WHO RECENTLY PASSED.__

*During my tenure at K-Mart in Richmond there was an incident with a man named Taylor. Taylor decided to harass a friend named Brandi, despite her rebuking him repeatedly. The young man had followed her home, and Brandi told me what was happening after that. Management hadn't addressed the issue, though I'm sure the assistant store manager, Edna, would have done so had she been on duty at the time, and aware of the situation. As some young men may do, Taylor would ignore his job duties while bothering Brandi. Taylor continued to harass Brandi, at one point in front of me, and I told him to cut it out. Taylor wanted to fight about it, which I refused to do in a professional workplace, especially while on shift. As his superior I told him to get back to work, he ignored this.*



Electronics Assistant Manager at K-Mart
October 2007 - October 2008 (1 year 1 month)
  • Assisted store managers in overseeing and training a small team of associates throughout six departments.
  • Increased profitability of the store by providing excellent customer service, suggesting add-on sales, and proactive inventory management.

*Taylor continued to try and fight me, saying he'd meet me outside after work. During his shift he contacted friends of his in the Centerville athletics program, and when I ended my shift over 20 young men were outside to "fight me" and no one had called the police. The manager on duty, Nate, watched this crowd gather and just ignored it. Michael Mann had been informed that I may need help to get out, and showed up with a large knife. Michael wanted to run into this crowd and fight. I told him "no, we're leaving." Taylor and others from the crowd followed us in his purple Mitsubishi 3000gt and tried to run both my silver car, and Michael's blue car off the road repeatedly. I'm unsure of anyone's safety if I hadn't demanded we leave immediately. Taylor and the manager kept their jobs. May I have also worked directly with theft prevention at KMart to ensure our inventory?*

**When I was younger I was also babysat by another family in our town who ran a daycare. Michael's family lived next door to the daycare before Michael moved with the Holwagers.**



*Why did Michael move in with David and Elaine? There was purportedly violence in his home, and Michael supposedly took a pistol from his parents, and they kicked him out.*



This is in the past and I refuse to show the address of a daycare even when describing these past events.

*Regardless of the past, in my opinion the proximity of these possible events to a daycare is alarming and concerning. Michael later said he took their pistol without accountability.*

**I NEVER MENTIONED MICHAEL'S NAME IN A PHONE CALL WITH JARED'S SISTER.**
*CRYSTAL KNEW IT WAS ONE OF TWO PEOPLE AND I REFUSED TO ANSWER WHOM.*



**MICHAEL MANN THREATENED US DIRECTLY AFTER MY PHONE CALL WITH CRYSTAL.**
*MAY THIS BE FURTHER CONFIRMATION FROM MICHAEL MANN OF HIS INVOLVEMENT?*

**May I have known Crystal's and Jared's family for a long time?**
**This is a picture of me in Jared's/Crystal's place from a long time ago.**
*May Crystal be a Mom and one of the most responsible members of her family?*
*May I have contacted Crystal in respect to let her know her brother had gone "off-track?"*
**ONE OF THE LAST THINGS I SAID WAS "I'VE ALWAYS TRIED TO HELP OUT YOUR BROTHER... I REPORTED HIM FOR LOLICON... I THINK IT'S WHAT'S BEST FOR HIM."**



**May I have made this face since so many people called me "gay" I gave up fighting it?**
**May I have caught Jared looking at questionable material then and warned the group?**
*MAY MICHAEL HAVE SHOWN IT TO JARED THEN TRIED TO BLAME OTHERS AND ME?*
*MAY JARED HAVE TRIED TO HIDE HIS ISSUES AT THE TIME UNTIL HE WAS CAUGHT?*
*ON A LATER PHONE CALL WITH DAD I SAID "I THINK SOMEONE MOVED MY GUN!"*
*DAD SAID: "MAYBE YOUR FRIENDS THOUGHT IT WAS WHAT WAS BEST FOR YOU!"*

**May Michael Mann have been intimate with Jared's sister while she was only 13?**

IC 11-8-8-5: Sex or Violent Offender defined
a. A "sex or violent offender" means a person convicted of any of the following offenses:
1. Rape (IC 35-42-4-1).
2. Criminal deviate conduct (IC 35-42-4-2) (before its repeal).
3. Child molesting (IC 35-42-4-3).
4. Child exploitation (IC 35-42-4-4(b) or IC 35-42-4-4(c)).
5. Vicarious sexual gratification, including performing sexual conduct in the presence of a minor (IC 35-42-4-5).
6. Child solicitation (IC 35-42-4-6).
7. Child seduction (IC 35-42-4-7).
8. Sexual misconduct with a minor as a Class A, Class B, or Class C felony (for a crime committed before July 1, 2014) or a Level 1, Level 2, Level 4, or Level 5 felony (for a crime committed after June 30, 2014) (IC 35-42-4-9), unless:
A. The person is convicted of sexual misconduct with a minor as a Class C felony (for a crime committed before July 1, 2014) or a Level 5 felony (for a crime committed after June 30, 2014); and
B. The person is not more than:
(i) four (4) years older than the victim if the offense was committed after June 30, 2007; or
(ii) five (5) years older than the victim if the offense was committed before July 1, 2007; and
C. The sentencing court finds that the person should not be required to register as a sex or violent offender.
9. Incest (IC 35-46-1-3).
10. Sexual battery (IC 35-42-4-8).
11. Kidnapping (IC 35-42-3-2), if the victim is less than eighteen (18) years of age, and the person who kidnapped the victim is not the victim's parent or guardian.
12. Criminal confinement (IC 35-42-3-3), if the victim is less than eighteen (18) years of age, and the person who confined or removed the victim is not the victim's parent or guardian.
13. Possession of child pornography (IC 35-42-4-4(d) or IC 35-42-4-4(e)).

A minor may also be required to register if the following apply:

- The minor was 14 years old or older when committing the offense
- The minor has been released from confinement in a state institution or juvenile facility
- The minor is still likely to commit an act that would be considered a sex offense if committed by an adult

*May Michael be older than Jared's sister, Crystal?*

**May Dad, Michael, and/or Jared attempt to accuse me of "violation of privacy?"**



[Disclosure]

of this information outweighs the government's interest in disclosure."

In a second ruling involving a convicted rapist in Cincinnati, the court ruled that the notice requirement for hearings to determine sexual offender status is mandatory.

The Ohio law is modeled after a New Jersey law named for a 7-year-old girl raped and murdered by a convicted sex offender living in her neighborhood.

The decision ends the debate over Megan's law in Ohio, Hamilton County Prosecutor Michael Allen said.

"Citizens have a right to know who is living in their neighborhoods," he said. "A sexual predator's right to privacy is overridden by his neighbor's rights."

*May Megan's Law and the Supreme Court uphold that they have no "right to privacy?"*

**May I have appropriately reported Dad, Michael, and Jared?**



Additional Information

Hagerstown, IN Facebook Messenger Chat and Voice. After finding this out I contacted his sister Crystal who confirmed Jared looked at "victimless" things and had a problem. I mentioned someone from his childhood might be taking advantage of him and did not use the man's name, but she mentioned Michael M another, in my opinion, sexual deviant. Shortly thereafter we're threatened with a defamation suit by this man for "mentioning his name" which I didn't do. He has been threatening to me ever since I let his fiance, who grew up with me know I love her, which I did, because she and I grew up together and she is like my sister. There has never been anything more than platonic in this relationship. Shortly thereafter both myself and my fiance who I have been trying to protect since this incident escalated have moved out of state. When Jared J mentioned anything about 'lollicon' I asked Andrea H for therapy resources for him because I figured he needed help, but I have never been involved in any of his activities and don't touch his computer because I thought what he may or may not be doing was gross. I believe my life has been in danger since finding this

---

F    Dear Dr. P    ✕ ⋮

Gregory            MD + 1

prevented my rights. My Dad has tried to take my gun rights from me in a multitude of wrongful ways for 17 years, and it's concerning.

Thank you for promptly responding when you did. A picture of the damage to my genitalia is attached.

2 attachments

20220102_082805.jpg

20220102_082822.jpg

Gregory            MD
Dec 2, 7:27 AM

Hi Mr. Turpin,
So far as I can tell from looking back over records, no behavioral health referral was made and no discussion with behavioral health was ever started. Soon after you made the initial request/report, we had a phone visit in which you documented the situation with your parents.
g

*__I'M NOT ACTUALLY A LAWYER AT ALL, I'M CONCERNED AND WE'VE BEEN ATTACKED.__*
*__Since I didn't know the laws regarding this, how may I have discovered Megan's Law?__*





*__In my younger years I won an award from the American Legion and it was in the paper.__*
*__DAD YELLS AT ME "YOU SHOULD HAVE BEEN A LAWYER" WHILE BEATING ME DOWN.__*

***FOR ME TO BE A "PARTIAL PERSON" IN DAD'S PRESENCE I'M FORCED TO ARGUE.***

**On the back of the Palladium Item from that time, "Megan's Law" was mentioned:**



***Thank you sincerely to my Mom for being so diligent in documenting my childhood.***
***DAD ARGUES ACTIVELY BY YELLING OVER 3 MONTHS, AND LEGALLY OVER 7 YEARS.***

***DAD HABITUALLY LIES TO ME, BUT HIS JOKES ARE OFTEN TRUTHFUL.***
***May I have documentation showing this was me?***

# PROGRAM

Call to Order .......................... Post Commander  Claude Soper
Salute To Colors

Invocation.......................... Post Chaplain  Jim Disney
Pledge of Allegience

Welcome .......................... Post Commander  Soper

Introduction of Guests.......................... Past Commander  Phil Lottch

Speakers.......................... Mayor  Dennis Andrews
     American Legion  Dept  Commander of Indiana  Richard E. Tonkel
          10th District Commander   Homer Loudermilk

## PRESENTATIONS

Flag Education 4th Grade Winners ............ Presented by David Hughes
     J T Turpen - Rose Hamilton Elem
     Amber Vance - Northeastern Elem

Americanism Essay Contest.......................... Sponsored by Auxiliary
                         Presented by Mary Hughes & Judy Butler
     Class # I  Molly Cochran - Garrison Elem.
          Daughter of Terry & Pam Cochran
     Class # II  Steven Amburgey - C R  Richardson Elem.
          Son of  Lola Amburgey
     Class # III Aaron Stevens - Discovery Elem
          Son of Mr. & Mrs  Aaron Stevens

50 Year Award .......................... Dept  Commander  Tonkel
          10th Dist. Commander  Loudermilk
               Post 65 Commander  Soper

Introduction of Post 65 Past Commanders ...... Commander  Soper

Introduction of Post Officers.......................... Commander  Soper

***Thank you to all of our Veterans and Armed Service Members for your sacrifice.***
***DAD DOESN'T KEEP HIS QUIET WORD, BUT HE OFTEN ATTEMPTS HIS THREATS.***

*DAD SAYS MANY THINGS, BUT HE OFTEN PICKS SONGS REFLECTING HIS ACTIONS.*
*My name is misspelled, so is there other proof that this was me?*



AMERICAN LEGION POST 65
109 N 6th Street
Richmond, Indiana

One $50.00 SAVINGS BOND (forthcoming via mail)

PRESENTED TO:
J. T. TURPEN
ROSE HAMILTON ELEMENTARY

FOR: 100% in Flag Education Program
February 2000

Presented this 28th Day of April 2000

By: *David H Hughes*
Flag Education Chairman

Post 65

*Thank you to American Legion Post 65 for giving me the honor and this award/reward.*
*DAD CARES ABOUT HIS OWN REPUTATION, BUT HE OFTEN HURTS MY CHARACTER.*

*<u>While it is damaged after our forced moves, I have my pictures from 4th grade.</u>*







*Patty G., above me to the left, also participated in other extracurricular events with me.*



**When may I have first attempted intimacy with a girl?**
**Here I'm with my date for Prom in 2007 with Brittany. The picture was uploaded in 2011.**



**Why may I complain in the comments on this picture?**
**Brittany and I just didn't work out. May we have had different values?**

**On Prom night I was 17, and I had dated girls, and/or women older than me back then. May we have tried to be intimate on Prom night? No, I was raised in church with Nana.**



*There's an embarrassing story about when we thought about it but didn't follow through. I had a girlfriend, but was against being intimate. It may be one reason I was called gay.*



Anna M

**My prior girlfriend was Anna who was ~3 years older. We never "did anything" either.** *Anna and I broke up when I was 15-16: I was honest about how I got in trouble at Meijer.*

**My prior girlfriend to her was Sarah, a girl then, and now happily married woman of God.**
*Sarah and I stopped talking temporarily when we kissed and I was too self-conscious.*





**Fritz Turpin**
March 15, 2011

We've known each other for 5 years, and are great friends, but we didn't have a picture with both of us in it.

FIXED

**Sarah and I remain friends and her family has guided me on the right path.**
*Sarah and I didn't even have any pictures of us before this from 2004-2009.*

**<u>Why did Erin and I fall in Love with each other?</u>**
*<u>May it be because we both were raised in Church and didn't pressure for intimacy?</u>*
*<u>MAY WE HAVE PLANNED TO GET MARRIED IN 2009 BUT MY DAD KICKED ME OUT?</u>*



<u>May Dad, Michael, and/or Jared attempt to hatefully retaliate against us for reporting?</u>
*<u>Dad, Michael, and/or Jared have defamed, threatened us, our wedding, and our future.</u>*
*<u>MAY THIS BE THE SECOND TIME DAD HAS ATTEMPTED TO PREVENT OUR MARRIAGE?</u>*

*I'VE ALWAYS FACED MY ACCOUNTABILITY. WHEN HAVE I TAKEN ENOUGH OF DAD'S?*
*MAY DAD TWIST MAMAW'S WORDS TO SAY I'M LIKE MY PAPAW IN SOME AWFUL WAY?*
*MAY DAD DEFAME A HAPPY AND WONDERFUL MARRIAGE OF OUR GRANDPARENTS?*



*MAY DAD BE SO DETERMINED TO HURT US HE TWISTS HIS PARENTS' WORDS & LIFE?*
*MAY DAD BE SO VILE TO TRY AND RUIN OUR MARRIAGE TO AVOID ACCOUNTABILITY?*
*DO WE HAVE TO BE DESTITUTE, HAVE NO CHILDREN, FAMILY, OR DIE TO BE HONEST?*

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

# Dear Mr. Todd Rokita
18 messages

---

**Jon F. Turpin** <jt4590@gmail.com>                                          Sat, Jul 1, 2023 at 5:55 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

I have 5 individuals to report to you, out of genuine concern, for the safety of me and my wife, and these individuals may have attempted to, in the most tame of terms, make us, multiple states, multiple attorney generals, government officials, agencies, and even our constitution, and U.N. Charter "look bad" with their "bad behavior" and these 5 individuals are, even if one may be biologically related, no family, nor friends of mine, due to their own behaviors and choices, and I find their actions intolerable.

Even if there is no care, nor consideration given to me, these individuals threatened the safety of my wife, our livelihood, and even our religion, and our marriage, despite our attempts to appropriately report and walk away, and even after I ignored their attempts at me, and my rights, and my livelihood, and continued inaction to bring justice upon them prevents us from having children safely, and from restoration.

In respose I sent thank yous and sincere epxressions of gratitude to our public servants, yourself included, because it's one of the first times I've been allowed to speak my own sincere opinion of people like you, who I firmly believe also don't tolerate the bad behavior of these bad apples whom I, out of sincere necessity simply as a man of Faith, husband, and citizen, have "blown the whistle" on, due to the gravity and severity of the undue and unjust violations they have, in my opinion, forced upon us against all reason, civil rights, and our constitution.

While being pursued with a false, frivolous, and fractious protective order, which may be considered an abuse of our court system by potentially these same bad actors, instead of being angry or wven malicious at all, I instead requested a job as a public servant, where I could contribute to our great state of Indiana, and our nation.

How much longer must we endure? May we please have some justice and humanity, Mr. Theodore Rokita? If not for me, for my wife?


Sincerely, and with the utmost plea for humanity and justice in our prayers,
Jon Frederick "Dismas" Turpin

---

**Jon F. Turpin** <jt4590@gmail.com>                                          Sat, Jul 1, 2023 at 6:04 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Mr. Rokita,
If you put me behind a prosecutor, and allow me to point out the "bad apples" and allow me the opportunity at justice, for the safety of my wife, family, and actual friends, which is something in my opinion, I've been denied for the majority of my life, I'll do it, even if it means my certain death.

In my opinion, you can't find a more honest display of character than that, and I believe it's something you may understand with how tirelessly and honestly you fight for our state and nation against those who wish ill.

They threatened my wife, Mr. Rokita. What did she ever do to any of them, except love me? Nothing, and I find their bad behavior, while potentially forgivable, intolerable.

Sincerely,
Jon Frederick "Dismas" Turpin
[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                          Sat, Jul 1, 2023 at 7:07 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

7/11/23, 11:17 AM                                                Gmail - Dear Mr. Todd Rokita

Without justice, I must protect my wife, family, and "castle" Mr. Rokita, by any legal and responsible means, which, for clarity, I'm not threatening any rash behavior. We simply don't condone it, but anyone in our nation is allowed to stand their ground, and that's all we've ever done, even at harm to self, and only when forced from necessity.

In my opinion my continued compliance despite being falsely labeled as a threat, after actually being threatened by those who may have attempted to label us so, even with the danger presented, and despite never receiving any notice regarding a hearing for my gun permit, which was already returned twice now by honorable judges, legally and responsibly, should all be obvious examples of our character through continued compliance, and reasonable pleas for justice, a public job, and a pardon.

I've been requesting this from those, like yourself, appointed by the people, for the people, for nearly 10 years regardless of circumstances, and more fervently requesting justice and an end to the abuses heaped upon us for two years, patiently, Mr. Rokita, along with the necessary retainment of our rights, independence, and ability to defend ourselves from those who wish us harm. Each time I have done so, the effort to "hold me down" by those responsible has not only continued, but increased in severity in response to my pleas for simply, justice, and freedom from their abuse, not only for myself, but for all who are not bad actors, and especially my wife, family, and actual friends.

These efforts against us by these few individuals are in my opinion, unconstitutional, and against civil rights, and even beyond this, simply intolerable. In my opinion I'm a reasonable man, as many are, and when presented with the full picture, even those who have provided examples to me on how to "be" and live, with love towards others, shared their own opinions that the bad behaviors toward us by the few bad actors, would be intolerable were they to "walk a mile" in our shoes.

Thank you, sincerely, for your time, and any consideration afforded to us,
Jon F. D. Turpin
[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                          Sat, Jul 1, 2023 at 7:18 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

What I plan to do currently, is to mail to you directly my gun permit, which proves that I have already been reviewed in depth by our esteemed Department of Defense, and our esteemed FBI, and that actions currently taken against us are unconstitutional, and let you decide how to handle this debacle.

Hopefully before I'm terminated unjustly, just like I was unjustly terminated from my job recently in what I believe are continued attempts to get me to recant that my own Dad, one of the people targeting us all the way to my medical information, ripped part of my genitalia off as a baby, and whether he knows what he is doing or not, has been avoiding accountability unjustly ever since.

Because we will not tolerate this any longer. When I told the bad actors "no more" I meant it, and I said it without threatening intent, and merely in defense of our Faith, constitution, civil rights, character, and simply our rights to exist as human beings.

Please help us so our "no more" is heard.

Thank you, sincerely,
Jon F. D. Turpin

On Sat, Jul 1, 2023, 5:55 PM Jon F. Turpin <jt4590@gmail.com> wrote:
[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                          Sat, Jul 1, 2023 at 9:53 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Sent to you via FedEx overnight. The other package I've addressed to you and our honorable U.S. Attorney General Merrick Garland is in the Yorktown, IN evidence locker for pickup.

While I don't consider my rights and gun permit forfeit, I do consider the potential evidence under your, and Mr. Garland's purview within the Yorktown, IN evidence locker, forfeit.

If you also need my Mustang to pursue an investigation, I also forfeit that vehicle to you, as I offered in my report from concern.

Attached is proof of my gun permit being sent to you, and of items at Yorktown, IN, within the evidence garage for pickup by you, and the FBI, and Mr. Merrick Garland.

The box and my writings and information I've provided to you and the FBI includes the work of approximately 7 lawyers, and may expedite the process of "cracking the whip."

(If you would be so kind as to assist us.)

The remaining pictures of the materials in the Yorktown, IN evidence garage will be sent to you as a follow up email, since not all may be attached to this message.

Sincerely,
Jon F. D. Turpin
[Quoted text hidden]

**9 attachments**



**Screenshot_20230701_213407_Drive.jpg**
366K



**Screenshot_20230701_214234_Message+.jpg**
666K



**Screenshot_20230701_213321_Chrome.jpg**
480K



**20230701_205448.jpg**
3237K



**20230701_205313.jpg**
3421K



**20230701_213815.jpg**
4014K



**20230701_210931.jpg**
4359K



**20230701_204644.jpg**
5703K



**20230701_205433.jpg**
3320K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>
To: jt4590@gmail.com

Sat, Jul 1, 2023 at 9:53 PM



## Message too large

Your message couldn't be delivered to **todd.rokita@in.gov**
because it exceeds the size limit. Try reducing the message size
and resending.

The response from the remote server was:

```
552 size limit exceeded
```

Final-Recipient: rfc822; todd.rokita@in.gov
Action: failed
Status: 5.0.0
Remote-MTA: dns; mail1.egov.com. (206.16.212.235, the server for the domain in.gov.)
Diagnostic-Code: smtp; 552 size limit exceeded
Last-Attempt-Date: Sat, 01 Jul 2023 18:53:36 -0700 (PDT)

---------- Forwarded message ----------
From: "Jon F. Turpin" <jt4590@gmail.com>
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>
Cc:
Bcc:
Date: Sat, 1 Jul 2023 21:53:14 -0400
Subject: Re: Dear Mr. Todd Rokita
----- Message truncated -----

---

**Jon F. Turpin** <jt4590@gmail.com>
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Sat, Jul 1, 2023 at 9:57 PM

On Sat, Jul 1, 2023, 5:55 PM Jon F. Turpin <jt4590@gmail.com> wrote:

7/11/23, 11:17 AM                              Gmail - Dear Mr. Todd Rokita

[Quoted text hidden]

**6 attachments**



**20230627_200910.jpg**
4024K



**20230628_113508.jpg**
5328K



**20230627_184057.jpg**
3562K



**20230624_193525.jpg**
2780K



**20230624_193514.jpg**
2493K



**20230624_193331.jpg**
3925K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                    Sat, Jul 1, 2023 at 9:57 PM
To: jt4590@gmail.com

[Quoted text hidden]

Final-Recipient: rfc822; todd.rokita@in.gov
Action: failed
Status: 5.0.0
Remote-MTA: dns; mail1.egov.com. (206.16.212.235, the server for the domain in.gov.)
Diagnostic-Code: smtp; 552 size limit exceeded
Last-Attempt-Date: Sat, 01 Jul 2023 18:57:49 -0700 (PDT)

---------- Forwarded message ----------
From: "Jon F. Turpin" <jt4590@gmail.com>
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>
Cc:
Bcc:
Date: Sat, 1 Jul 2023 21:57:31 -0400
Subject: Re: Dear Mr. Todd Rokita
----- Message truncated -----

---

**Jon F. Turpin** <jt4590@gmail.com>                                          Sat, Jul 1, 2023 at 10:00 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

I apologize for resending, Mr. Rokita,
The message was over the size limit allowed by the email server for messages.
[Quoted text hidden]

**4 attachments**



**20230701_214049.jpg**
1770K

---



**20230701_205313.jpg**
3421K



**20230701_210931.jpg**
4359K



**20230628_113508.jpg**
5328K

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Sat, Jul 1, 2023 at 10:01 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

[Quoted text hidden]

**3 attachments**



**20230624_193525.jpg**
2780K



**20230624_193514.jpg**
2493K



**20230624_193331.jpg**
3925K

---

**Jon F. Turpin** <jt4590@gmail.com>                          Sat, Jul 1, 2023 at 10:09 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

I understand the stuffed animals included may make this seem like a joke, but they are instead proof that my wife and I have been to the old Louisiana State Capitol building when we first dated and it wasn't under maintenance, and in my opinion, show my ability to still present a genuine gift out of kindness, even in the most dire of situations, as I also did for the potential daughter of a possible sitting U.N. state member named Irisse Delatorre "Le" Roux in the past when someone tried to destroy me then to prevent their own accountability.

Caesar is a gift to Joseph L. Chaney, and the Alligator is a gift to you, Mr. Rokita.

The whip is simply an expression of my sentiment about this unfortunate situation, and aligns with my request to "crack it" or in other words, please sort this out.


Sincerely,
Jon F. D. Turpin
[Quoted text hidden]

**3 attachments**



**Screenshot_20230619_133906_Photos.jpg**
1147K



**20230624_193411.jpg**
3032K



**20230701_205218.jpg**
4233K

---

**Jon F. Turpin** <jt4590@gmail.com>                          Sat, Jul 1, 2023 at 10:23 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Michael Alan (Mann) Holwager
[Quoted text hidden]

**3 attachments**



**MichaelAlanMannHolwager_HighSchoolYears1.png**
81K



**MichaelMann_TheShop.PNG**
245K

7/11/23, 11:17 AM                                Gmail - Dear Mr. Todd Rokita



**20230624_234816.jpg**
2223K

---

**Jon F. Turpin** <jt4590@gmail.com>                    Sat, Jul 1, 2023 at 10:24 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Denis Kulkov
[Quoted text hidden]

**2 attachments**




**Screenshot_20230625_003848_Chrome.jpg**
523K



**Screenshot_20230625_003902_Chrome.jpg**
522K



---

**Jon F. Turpin** <jt4590@gmail.com>                    Sat, Jul 1, 2023 at 10:25 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Jon Brent Turpin
[Quoted text hidden]

**2 attachments**

7/11/23, 11:17 AM                                        Gmail - Dear Mr. Todd Rokita



**JonBTurpin_CoachmanParody1.png**
224K



**20230624_230254.jpg**
1959K

---

**Jon F. Turpin** <jt4590@gmail.com>                          Sat, Jul 1, 2023 at 10:27 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Richard Bell (only him, it's the only picture I could get)
[Quoted text hidden]



**20230624_232136.jpg**
3674K

---

**Jon F. Turpin** <jt4590@gmail.com>                          Sat, Jul 1, 2023 at 10:28 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Jared R. Junkin
[Quoted text hidden]



**20230624_234806.jpg**
2164K

Gmail - Dear Mr. Todd Rokita

**Jon F. Turpin** <jt4590@gmail.com>                                        Sun, Jul 2, 2023 at 4:48 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

There's one more thing I have to say. My portfolio that has records of my character is currently available for you to pickup and review in the Yorktown, IN town hall, and I don't consider it forfeit either, but you may pick it up and review it at your leisure, or I may mail it to you for review after the holidays.

The person currently attempting to push a protective order against me may be the wife of Michael A. M. Holwager, and I may have had to report her to the Dean of students at IU, because she may have attempted to say I was bipolar, after initially saying that her opinion was that I'm autistic.

The latter is correct, while the first would potentially align with further attempts to pretend that I don't have a valid memory, so that the persons I've identified may try, yet again, to attempt to scapegoat me, and more unfortunately and also unjustly, my wife, by destroying my character, and pretending that I'm an invalid, to escape their own accountability.

While I didn't want to have to report Andrea L. Holwager to the IU Dean of students, it was necessary because this aligned with attempts to invalidate me, override the already given decisions of our state and officials, and to prevent my freedom from the continued attempts to destroy our ability to worship, our marriage, my character, and our livelihood.

She isn't even a therapist yet, and her husband instigated this issue by threatening me and my wife with a civil suit, and telling my wife to "suffer lol."

In my opinion, instead of telling her husband "no" like she did when he watched me get beaten on a locker room floor in high school and didn't help by even reporting until both my own mom, and his now wife expressed their disappointment in his failure to act like a friend to me, she may have made an honest mistake in attempting to go along with his actions, potentially out of fear, not of us, but of the bad actors behaviors.

Should the actions of those I've identified continue and escalate further, should this bring us low and harm us further, even to the point of destitution, and or eventual slow destruction, and as threatened, death, I ask that if my Dad attempts to claim, like the parents of a current public case of abuse and neglect in our news that it is "so difficult to lose and bury a child" that you look my mom in the eyes and let her know I love her, but don't allow my Dad to claim ignorance and sorrow and victimhood in events he could have easily prevented by simply being an honest man about his own bad behaviors and taking his accountability.

To be clear as day, I'm neither homicidal, nor suicidal, but as anyone would be, I'm beleaguered, yet determined to endure.

You may find me guilty of being an honest man, for I've never hidden my flaws.

Sincerely,
Jon F. D. Turpin

On Sat, Jul 1, 2023, 5:55 PM Jon F. Turpin <jt4590@gmail.com> wrote:
[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                       Mon, Jul 3, 2023 at 12:21 PM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

I'm sincerely sorry for being so verbose, thank you for your time, service, and any consideration given.

If nothing I've submitted is considered evidence, and since I'm just a citizen and not the judge here, then please consider it, and the items in the evidence garage, and my Mustang, if you want it, as a sincere apology, if it is needed, and as donations in full support of our government, and especially, our thin blue line, with the request we continue to receive your service and protection, so that I may vote for you.

Please have a wonderful Independence Day.

Sincerely,
Jon F. D. Turpin
[Quoted text hidden]



7:23

**89163**
Mobile

Loss date 12/9/2021
Claim Professional MICKEY ERNST
716-517-9029

Travelers Claim Notification: Msg freq
varies. Reply HELP for HELP Reply
STOP to CANCEL Msg&Data Rates
May App

5:54 PM

Thank you for contacting Travelers.
Claim # I4M1717
Loss date 6/8/2023
Claim Professional JESSICA
COLMENERO
281-606-8866

Travelers Claim Notification: Msg freq
varies. Reply HELP for HELP Reply
STOP to CANCEL Msg&Data Rates
May App

Please visit https://travl.rs/3wX0wWC
to review Travelers Claims Electronic
Delivery Terms of Service.

Done    Thanks    Okay



# Invoice

**Slap Bledo Performance**
905 US I-94 STS.
Alma, IL 63906
816-334-1582

Number: 4674
Date: 9/15/2022

**Bill To:**
Jon Turpin
225-259-6270

**Ship To:**
Jon Turpin
225-259-6270

| Description | Order # | Customer # | Vendor Rep | Project |
|---|---|---|---|---|
| | 0 | | | 85 stang 5.0 stroker |

| Description | Quantity/Hours | Price/Rate | Tax | Amount |
|---|---|---|---|---|
| AJE Suspension Bolt-On Spring Perches | 1.00 | $72.00 | ✓ | $72.00 |
| AJE Suspension Mustang Tubular K-Members | 1.00 | $399.00 | ✓ | $399.00 |
| BMR Suspension A-Arms | 1.00 | $379.00 | ✓ | $379.00 |
| BMR Control Arms | 1.00 | $209.00 | ✓ | $209.00 |
| BMR Control Arms | 1.00 | $99.95 | ✓ | $99.95 |
| Eibach Pro-Plus Performance Handling Package | 1.00 | $823.00 | ✓ | $823.00 |
| labor to rebuild suspension | 1.00 | $1,000.00 | | $1,000.00 |
| alignment | 1.00 | $95.95 | ✓ | $95.95 |
| weatherstripping | 1.00 | $225.00 | ✓ | $225.00 |
| labor to replace all weather stripping | 5.00 | $95.00 | | $475.00 |
| led headlights | 1.00 | $150.00 | ✓ | $150.00 |
| labor to R&R headlights | 1.00 | $95.00 | | $95.00 |
| led taillights | 1.00 | $250.00 | ✓ | $250.00 |
| labor | 1.00 | $95.00 | | $95.00 |
| led bulbs | 8.00 | $15.00 | ✓ | $120.00 |

| 0 - 30 days | 31 - 60 days | 61 - 90 days | > 90 days | Total |
|---|---|---|---|---|
| $2,207.48 | $0.00 | $0.00 | $0.00 | $2,207.48 |

| Description | Quantity/Hours | Price/Rate |
|---|---|---|
| AJE Suspension Bolt-On Spring Perches | 1.00 | $72.00 |
| AJE Suspension Mustang Tubular K-Members | 1.00 | $399.00 |
| BMR Suspension A-Arms | 1.00 | $379.00 |
| BMR Control Arms | 1.00 | $209.00 |
| BMR Control Arms | 1.00 | $99.95 |
| Eibach Pro-Plus Performance Handling Package | 1.00 | $823.00 |
| labor to rebuild suspension | 1.00 | $1,000.00 |
| alignment | 1.00 | $95.95 |
| weatherstripping | 1.00 | $225.00 |
| labor to replace all weather stripping | 5.00 | $95.00 |
| led headlights | 1.00 | $150.00 |
| labor to R&R headlights | 1.00 | $95.00 |
| led taillights | 1.00 | $250.00 |
| labor | 1.00 | $95.00 |
| led bulbs | 8.00 | $15.00 |





LEITH HONDA
3940 CAPITAL HILLS DR
RALEIGH, NC 27616
9198765200

06/16/2023                    16:27:54
Terminal ID No.:              79409767

## Credit Sale:

Transaction #:                      52
Card Type:                        Visa
Account:            ************6681
Entry:                    Contactless
Invoice #:                      431278

## Amount: USD$79.27

Host Ref. Number:      316720172216
Auth. Code:                   030220
Batch Number:                    334
Response:          APPROVAL 030220

Mode:                         Issuer
AID:              A0000000031010
APPN:                    CHASE VISA

CUSTOMER COPY

# LEITH HONDA

3940 Capital Hills Drive · Raleigh, NC 27616

parts@leithhonda.com

**HONDA PARTS**
(919) 790-8228
(919) 876-5200
1-800-868-6970
(919) 850-0412 FAX

**HONDA**

| DATE SHIPPED | INVOICE DATE | INVOICE NUMBER | TIME |
|---|---|---|---|
| 16 JUN 23 | | 328682H | 15:17:26 |

ACCOUNT NO. 541339     PAGE 1 OF 1

JON TURPIN
2421 S PLUM ST
YORKTOWN, IN 47396

TURPIN, JON
2421 S PLUM ST
YORKTOWN, IN 47396

| SHIP VIA | SLSM. | | TERMS | | | | |
|---|---|---|---|---|---|---|---|
| | 13310 MIKES MICHE | | CASH | | | | |

| | | | PART NO. | DESCRIPTION | LIST | NET | AMOUNT |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 0 | LANYARD | DISPSG LA 13 | 8.95 | 8.95 | 8.95 |
| | | | Part number | LANYARD | | replaces | BLUELAN |
| 1 | 1 | 0 | 35CLASSIC | DISPSGLOG 1 | 20.95 | 20.95 | 20.95 |

PAID

### POLICY FOR RETURNED GOODS
ALL CLAIMS AND RETURNED GOODS MUST BE ACCOMPANIED BY THIS BILL.
NO RETURNS ON ELECTRICAL PARTS OR SPECIAL ORDER ITEMS.
15% HANDLING CHARGE ON ALL PARTS RETURNED
ALL PARTS RETURNED MUST BE IN THE ORIGINAL, CLEAN AND UNMARKED CONTAINER AND IN RESALABLE CONDITION.
NO RETURN AFTER 30 DAYS

| | |
|---|---|
| PARTS | 29.90 |
| SUBLET | |
| FREIGHT | 0.00 |
| SALES TAX | 2.17 |
| TOTAL | $32.07 |

CUSTOMER'S SIGNATURE X _____

CUSTOMER COPY

CUSTOMER #: 849940

431278

**HONDA**   **LEITH, INC.**

*INVOICE*

3940 Capital Hills Drive
Raleigh NC 27616
(919) 322-1000
(919) 876-6200

JON TURPIN

PAGE 1

HOME:
BUS:          CONT:225-259-6270
              CELL:225-259-6270    SERVICE ADVISOR: 7995 AUSTIN YARBOROUGH

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|---|---|---|---|---|---|---|
| | 08 | HONDA CR-V | 1CZRE38383708691 | | 163261/163261 | T406 |

| DEL DATE | PROD DATE | WARR. EXP. | PROMISED | P.O. NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 01JAN08 DD | | | WAIT 16JUN23 | | 0.00 | CASH | 16JUN23 |

| R.O. OPENED | READY | OPTIONS: |
|---|---|---|
| 15:12 16JUN23 | 16:35 16JUN23 | |

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|---|---|---|---|---|---|---|---|---|
| A **OIL AND FILTER CHANGE** | | | | | | | | |

A **OIL AND FILTER CHANGE**
       3K OIL AND FILTER CHANGE
       3151CHPAC                                              25.16       25.16
    1 15400-PLM-A02 FILTER, OIL                     9.85       9.85       9.85
    1 94109-14000R 14MM DRAIN WASHER                0.58       0.58       0.58
    5 08798-9123B 5w20HONBULK                       6.50       6.50      32.50
PARTS:   42.93  LABOR:   25.16  OTHER:   0.00  TOTAL LINE A:          68.09
*** 163261 DRAIN OIL AND REPLACE OIL FILTER AND CRUSH WASHER  CHECK ALL
*** FLUID LEVELS , TIRE PRESSURE.
       ***********************************************************

B **FREE** MULTI POINT VEHICLE INSPECTION & WELLNESS check for your car
       so you don't get surprised!
       FREE **FREE** MULTI POINT VEHICLE INSPECTION &
       WELLNESS check for your car so you don't get
       surprised!
       3151 CHEX                                              0.00        0.00
PARTS:   0.00  LABOR:   0.00  OTHER:   0.00  TOTAL LINE B:           0.00
*** 163261 MPI
*** RECOMMENDED TRANSMISSION SERVICE
*** RECOMMENDED SPARK PLUGS
*** RECOMMENDED BRAKE FLUSH
*** RECOMMENDED ROTATE AND BALANCE
       ***********************************************************

C** DOC
    1 DOC2 DOC
       99  CH5                                                0.00        0.00
       DOCF Electronic document storage               2.06        2.06
PARTS:   0.00  LABOR:   0.00  OTHER:   2.06  TOTAL LINE C:           2.06
*** 1DOC2
       ***********************************************************

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X

**CUSTOMER COPY**

CUSTOMER #: 541340

JON TURPIN

431278

*INVOICE*

PAGE 2

**LEITH, INC.**
HONDA
3940 Capital Hills Drive
Raleigh NC 27616
(919) 922-1600
(919) 876-9200

HOME:
BUS:

CONT:225-259-6270
CELL:225-259-6270

SERVICE ADVISOR: 7995 AUSTIN YARBOROUGH

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|------------|-----|---------|----------------|-----|
|       | 08   | HONDA CR-V | 3CZRE38350G708691 |  | 163261/163261 | T408 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | R.O. NO. | RATE | PAYMENT | INV DATE |
|----------|-----------|-----------|----------|----------|------|---------|----------|
| 01JAN08 DE |          |           | WAIT 16JUN23 |      | 0.00 | CASH    | 16JUN23 |

| R.O. OPENED | READY | OPTIONS: |
|-------------|-------|----------|
| 15:12 16JUN23 | 16:35 16JUN23 | |

LINE OPCODE TECH TYPE HOURS                            LIST    NET    TOTAL
****************************************************************************
ESTIMATE: 25.16                  16JUN23 15:12  SA: 7995
    CONTACT:
****************************************************************************

CUSTOMER PAY SUPPLIES FOR REPAIR ORDER                                 3.77

| DESCRIPTION | |
|-------------|---|
|             | 25.16 |
|             | 43.93 |
|             | 0.00 |
| LABOR AMOUNT | 5.83 |
| PARTS AMOUNT | 73.82 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 5.35 |
| MISC. CHARGES | |
| TOTAL CHARGES | 79.27 |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X

CUSTOMER COPY

# Honda Multi-Point Vehicle Inspection Checklist

**HONDA**

**TURPIN, JON**

| RO TAG NUMBER | 434278 | NEXT SERVICE DUE | |
|---|---|---|---|
| VIN | 3CZRU588358G708691 | MILEAGE | 163284 |
| SERVICE ADVISOR | Austin Yarborough | TECHNICIAN | Jamil Nasser |

■ Satisfactory   ☐ May Require Future Attention   ■ Requires Immediate Attention

**Interior Exterior**

- Headlights (check high and low beams)/Taillights/Brake lights/Hazard warning lights/Turn signals/Exterior lamps
- Interior light
- Windshield washer spray/Wiper operation/Wiper blades/Windshield condition
- Parking brake
- Horn operation
- Clutch operation (if applicable)
- Cabin air filter (replaced at owner's manual service interval) ☑Yes ☐No

**Battery Performance (see attached FD-18 printout)**

- Good
- Replace

**Under Hood**

- Check fluid levels: Oil/Coolant/Power steering fluid/Brake fluid (MT)/Windshield washer fluid/Automatic transmission fluid
- External drive belts and radiator hoses
- Hydraulic clutch reservoir fluid (MT vehicles)
- Engine air filter (replaced at owner's manual service interval) ☑Yes ☐No

**Under Vehicle**

- Brake lines/hoses/Parking brake cable
- Shock absorbers/Struts/Suspension/Tie rod ends and boots/Steering gear and dust seals
- Exhaust system
- Engine oil and/or fluid leaks
- Drive shaft boots/Constant velocity boots and bands

**Equipment**

**Tire Condition**

| | | | | | |
|---|---|---|---|---|---|
| Left Front | Normal | | Normal | | Right Front |
| | Wear pattern | | Wear pattern | | |
| | Tire tread 9 32nds | | Tire tread 9 32nds | | |
| Left Rear | Normal | | Normal | | Right Rear |
| | Wear pattern | | Wear pattern | | |
| | Tire tread 10 32nds | | Tire tread 10 32nds | | |
| Spare | Wear pattern | | Front tire inflation set to 32 psi | | |
| | Tire tread 32nds | | Rear tire inflation set to 32 psi | | |

**Brakes Condition**

| | | | | | |
|---|---|---|---|---|---|
| Left Front | 8 mms | | 8 mms | | Right Front |
| Left Rear | 8 mms | | 8 mms | | Right Rear |
| Brakes not inspected on this visit ☐ | | | | | |

*Brake fluid NOT fresh - fluid level indicates past fresh.*

Customer Detailed Copy

Leith Honda
3940 Capital Hills Drive
Raleigh, NC 27616 US
(919) 322-1000

Page 1 of 1

| CUSTOMER NO. | 541840 | | | | SERVICE ADVISOR | Austin Yarborough | | TAG ID | 406 | | INVOICE DATE | | INVOICE NO. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | POLICY NO. | | LICENSE NO. | | MILEAGE 161661 | | COLOR | | INVOICE NO. |
| JSW TURPIN | | | | | MANUFACTURER | 2008 HONDA CR-V | | | | | DELIVERY DATE | | RELEASE OUT |
| | | | | | VEHICLE IDENTIFICATION | 3CZRE38358G798691 | | | | | MANUFACTURER | | R-ENT NO. |
| | | | | | CEL PHONE | (225) 259-6470 | | PO # | 431279 | | R.O. DATE 05/10/2023 | | RENT NO. |
| TEL. HOME | | TEL. BUSINESS | | | COMMENTS | | | | | | | | |

| LINE | OP CODE | DESCRIPTION | | ESTIMATE |
|---|---|---|---|---|
| # A | MA20 | **Transmission, Automatic - Service**<br>Transmission, Automatic - Service<br>Parts<br> FLUID (ATF DW-1), Qty 4.00, CHPAC<br> WASHER, DRAIN (18MM), Qty 1.00, CHPAC | Labor<br>Parts<br>Misc<br>Discount | 80.95<br>44.92<br>0.00<br>(0.00) |
| | | | **Line Total** | **125.87** |
| # B | BR05 | **Hydraulic System, Brake - Flush**<br>Hydraulic System, Brake - Flush<br>Parts<br> FLUID, BRAKE (DOT 3), Qty 2.00, CHPAC | Labor<br>Parts<br>Misc<br>Discount | 136.00<br>14.10<br>0.00<br>(0.00) |
| | | $185 | **Line Total** | ~~150.10~~ |
| # C | TU40 | **Spark Plugs - Replace**<br>Spark Plugs - Replace<br>Parts<br> S/PLG (SKJ20DR-M11), Qty 4.00, CHPAC | Labor<br>Parts<br>Misc<br>Discount | 136.00<br>117.36<br>0.00<br>(0.00) |
| | | | **Line Total** | **253.36** |
| # D | MA41 | **Tires - Rotate And Balance**<br>Tires - Rotate And Balance | Labor<br>Parts<br>Misc<br>Discount | 51.95<br>0.00<br>0.00<br>(0.00) |
| | | $66 | **Line Total** | ~~51.95~~ |

| | | |
|---|---|---|
| | Subtotal | 581.28 |
| | Shop Charges | 0.00 |
| | Sales Tax | 42.14 |
| | Total | 623.42 |

Printed On          05/16/2023 4:25:33 PM

Estimate Expires on   07/16/2023

CUSTOMER #: 2191379

53502

*INVOICE*

**Jeff Wyler** Honda Auto Mall
Jeff Wyler Honda Auto Mall
9244 Dixie Hwy
Louisville, KY 40216
(502) 448-2802
www.jeffwylerlouhonda.com

JON TURPIN
2421 SOUTH PALM
YORKTOWN, IN 47396
HOME:
BUS:      CONT: 225-259-6270
          CELL: 225-259-6270

PAGE 1

SERVICE ADVISOR: 23244 JOHN WESSLING

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|---|---|---|---|---|---|---|
| | 08 | HONDA CR-V | 3CZRE38358G708691 | | 162330/162330 | G49NNG |

| DEL DATE | PROD DATE | WARR EXP | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 01JAN08 DE | | | 16:42 13JUN23 | | | CASH | 14JUN23 |

| R.O. OPENED | READY | OPTIONS: | DLR:67643 |
|---|---|---|---|
| 07:52 13JUN23 | 11:15 14JUN23 | | |

| LINE | OPCODE | TECH | TYPE | HOURS | LIST | NET | TOTAL |
|---|---|---|---|---|---|---|---|

A CUSTOMER IS REQUESTING TO CHECK FRONT SUSPENSION, ADVISE
   05H12 CUSTOMER IS REQUESTING TO CHECK FRONT
      SUSPENSION, ADVISE
      2259    CNT                                        169.95   169.95
      *************************************************************
B** Pump, Power Steering - Replace
   SR14 Pump, Power Steering - Replace
      2259    C                                          279.41   279.41
      1 08206-9002 FLUID, P.S.                     5.93     5.93     5.93
      1 06561-RTA-505RM P/S PUMP                 680.16   680.16   680.16
162330 1.50 VERIFIED THE CUSTOMER'S CONCERN OF STEERING WHEEL
BINDING AND HARD TO TURN. ROAD TESTED THE VEHICLE. FOUND THE POWER
STEERING PUMP ASSEMBLY IS THE POINT OR CONCERN. FURTHER EXAMINATION
FOUND THE POWER STEERING PUMP ASSEMBLY IS BINDING AND IS NOISY AND
FAILED FROM POWER STEERING HOSE/LINE LEAKING. ACCESSED, REMOVED AND
REPLACED THE POWER STEERING PUMP ASSEMBLY WITH ALL OTHER RELATED NEW
SEALS GASKETS AND/OR NON-REUSABLE HARDWARE. ALSO REPLACED SERPENTINE
BELT BECAUSE IT WAS SOAKED IN POWER STEERING FLUID FROM LEAK. FILLED
AND BLED THE POWER STEERING SYSTEM. ROAD TESTED THE VEHICLE TO VERIFY
REPAIRS.
      *************************************************************
C** POWER STEERING FEED HOSE REPLACEMENT
   PSFEED POWER STEERING FEED HOSE REPLACEMENT
      2259    C                                          455.09   455.09
      1 3401230 TS HOSE                          97.90    97.90    97.90
      1 38920-REP-E03 BELT, COMPRESSOR           99.97    99.97    99.97
162330 2.50 VERIFIED THE CUSTOMER'S CONCERN OF STEERING WHEEL
BINDING, HARD TO TURN. PERFORMED A VISUAL INSPECTION. PERFORMED A
COMPLETE FRONT AND REAR SUSPENSION EXAMINATION AND DIAGNOSTIC ON THE
VEHICLE HOIST. FOUND THE HIGH PRESSURE POWER STEERING PUMP HOSE IS THE
POINT OF CONCERN. FURTHER EXAMINATION FOUND THE HIGH PRESSURE POWER
STEERING PUMP HOSE IS POROUS. ACCESSED, REMOVED AND REPLACED THE HIGH
PRESSURE POWER STEERING PUMP HOSE WITH ALL OTHER RELATED NEW SEALS
GASKETS AND/OR NON-REUSABLE HARDWARE. REFILLED AND BLED THE POWER

| | | | DESCRIPTION | TOTALS |
|---|---|---|---|---|
| | | | LABOR AMOUNT | |
| | | | PARTS AMOUNT | |
| | | | GAS OIL LUBE | |
| | | | SUBLET AMOUNT | |
| | | | MISC. CHARGES | |
| ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED. | | | TOTAL CHARGES | |
| | | | LESS INSURANCE | |
| | | | SALES TAX | |
| | | | PLEASE PAY THIS AMOUNT | |

CUSTOMER COPY

CUSTOMER #: 2191379                  53502            **W** Jeff Wyler

JON TURPIN                                            Jeff Wyler Honda Auto Mall
2421 SOUTH PALM           *INVOICE*                   5244 Dixie Hwy
YORKTOWN, IN 47396                                    Louisville, KY 40216
HOME:        CONT:225-259-6270       PAGE 2           (502) 448-2802
BUS:         CELL:225-259-6270                        www.jeffwylerdixiehonda.com
                         SERVICE ADVISOR: 23244 JOHN WESSLING

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|------------|-----|---------|----------------|-----|
|       | 08   | HONDA CR-V | 3CZRE383X8G708691 |  | 162330/162330 | 049NNG |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | P.O. NO. | RATE | PAYMENT | INV DATE |
|-----------|------------|------------|----------|----------|------|---------|----------|
| 01JAN08 DD |          |            | 16:42 13JUN23 |     |      | CASH    | 14JUN23 |

| R.O. OPENED | READY | OPTIONS: DLR:67643 |
|-------------|-------|--------------------|
| 07:52 13JUN23 | 11:15 14JUN23 | |

LINE OP CODE TECH TYPE HOURS                          LIST    NET    TOTAL
STEERING SYSTEM. THE SYSTEM IS NOW OPERATING AS DESIGNED.
       ****************************************************
L** POWER STEERING FLUSH
      PS99 POWER STEERING FLUSH
             2257       C                             163.40   163.40
      1 03771 POWER STEERING FLUSH          57.30     57.30    57.30
162330 1.00 THE POWER STEERING FLUID IS DIRTY AND RECOMMENDED WITH
POWER STEERING COMPONENT REPLACEMENT. ATTACHED THE POWER STEERING FLUSH
EQUIPMENT AND PERFORMED A COMPLETE POWER STEERING FLUID FLUSH SERVICE
THEN RE-FILLED THE POWER STEERING SYSTEM WITH NEW FLUID TO THE PROPER
LEVEL. ROAD TESTED THE VEHICLE TO VERIFY MAINTENANCE REPAIRS.
       ****************************************************

************************************************
ESTIMATE: 1933.14              13JUN23 12:16  SA: 23244
       CONTACT:
************************************************

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 1867.35 |
| PARTS AMOUNT | 931.25 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 29.00 |
| TOTAL CHARGES | 3038.11 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 110.35 |
| PLEASE PAY THIS AMOUNT | 3148.46 |

SHOP SUPPLY COSTS
ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.

WARRANTY DISCLAIMER. ALL PARTS AND ACCESSORIES ARE SOLD AND ALL REPAIRS

DATE      CUSTOMER SIGNATURE          AUTHORIZED DEALER REPRESENTATIVE SIGNATURE

CUSTOMER COPY



| | |
|---|---|
| Retail Invoice | **Store# 902856** |
| 104776 | In: 05/15/23 01:44PM |
| Emailed on 05/15/2023 | Out: 05/15/23 04:03PM |
| Emailed to noemail@gmail.com | |

**COMPLETE AUTO CARE**

www.FirestoneCompleteAutoCare.com

### FINAL INVOICE

GONZALES  ·  233 S AIRLINE HWY, GONZALES, LA. 70737  ·  225.647.5520

| | | |
|---|---|---|
| Service Advisor: 3 MARSHALL | Wheel Lock: no | Technician: 05 MEL |
| **Customer Details:** | Alt. Auth. Name & Phone: | **Vehicle Details:** |
| TURPIN, JOHN | | 2008 HONDA CR-V LX |
| 2421 SOUTH PLUM ST | N/A | |
| | | 2.4L L4 FI GAS |
| YORKTOWN, IN  47396 | | VIN #: 3CZRE38558G706691 |
| 317.378.9314 Or 226.259.6270 x191 | | LIC #: 988ETG LA |
| | | MILEAGE: 160,197 |

| Description | Rev Hist /Article #ID | | Qty | Unit Price | Extended Price | Job Total |
|---|---|---|---|---|---|---|
| FIRESTONE TIRE PACKAGE | | 03 | | | | 673.48 |
| 0 13343 GR01 ALL SEASON BL 225/65R17 102H 55,000 Mile | 013343 | 05TN | 4 | 146.99 | 587.96 | |
| Limited Warranty | | | | | | |
| DOT#: 1TF5CHL5222 | | | | | | |
| DOT#: 1TF5CHL5122 | | | | | | |
| DOT#: 1TF5CHL5222 | | | | | | |
| DOT#: 1TF5CHL5102 | | | | | | |
| TIRE-DISC EMAIL TIRE PROMO 10% OFF | 7088998 | 05TN | -4 | 14.70 | -58.80 | |
| LDEQ WASTE TIRE FEE | 7095850 | 05NN | 4 | 2.25 | 9.00 | |
| NEW TIRE WHEEL BALANCE LABOR | 7013672 | 05TS | 4 | 12.99 | 51.96 | |
| TPMS VALVE SERVICE KIT LABOR | 7008100 | 05TS | 4 | 3.30 | 13.20 | |
| 6.111 TPMS KIT 1100K | 7007580 | 05TN | 4 | 7.99 | 31.96 | |
| 7093782 ROAD HAZARD PROTECTION | 7093782 | 05TN | 4 | 22.05 | 88.20 | |
| PRT-DISC Price Match/Match Competitor Offer | 7087155 | 05TN | -1 | 50.00 | -50.00 | |
| TIRE INSTALLATION | 7015016 | 05TS | 4 | N/C | N/C | |
| DEXOS (SYNTHETIC BLEND) OIL CHANGE | | 03 | 2 | | | 47.98 |
| 4.4 QTS | | | | | | |
| API - SAE 5W-20 | | | | | | |
| See owner's manual for specific requirements | | | | | | |
| PZ37 OIL FILTER | 7008949 | 05TN | 1 | 8.99 | 8.99 | |
| 5W-20 DEXOS CERTIFIED OIL UP TO 5 QTS | 7084692 | 05TN | 1 | 59.99 | 59.99 | |
| PRT-DISC Price Match/Match Competitor Offer | 7001674 | 05TN | -1 | 20.00 | -20.00 | |
| SYN BLEND OIL CHANGE LABOR | 7034604 | 01TS | 1 | 6.01 | 6.01 | |
| USED OIL FILTER RECYCLING CHG (1) | 7095051 | 05TN | 1 | 2.99 | 2.99 | |
| PRT-DISC $10 Off High Mileage/Syn Blend Oil Change | 7001674 | 05T | -1 | 9.23 | -9.23 | |
| LBF-DISC $10 Off High Mileage/Syn Blend Oil Change | 7001674 | 05T | -1 | 0.77 | -0.77 | |
| COURTESY CHECK | | 03 | | | | |
| Battery Test Results Your battery is measuring within the | | | | | | |
| manufacturer's specification for required CCA. Your battery | | | | | | |
| has sufficient power and should reliably start the vehicle. | | | | | | |
| You're recommended to have your battery tested after 90 | | | | | | |
| days. | | | | | | |
| COURTESY CHECK | 7046930 | 05TS | 1 | N/C | N/C | |
| ALIGNMENT CHECK W/TIRE PURCHASE - NO CHARGE | | 03 | 1 | | | |
| NO CHARGE ALIGNMENT CHECK | 7074810 | 05TS | 1 | N/C | N/C | |
| ALIGNMENT SERVICE (12 MONTH WARRANTY) | | 03 | 2 | | | 114.99 |
| STANDARD WHEEL ALIGNMENT | 7004578 | 05TS | 1 | 114.99 | 114.99 | |
| ORDER NOTES | | | | | | |
| MANUFACTURER'S RECOMMENDED MAINTENANCE: AIR CLEANER ELEMENT | | | | | | |
| MANUFACTURER'S RECOMMENDED MAINTENANCE: CABIN AIR FILTER | | | | | | |

Information on service warranty, maintenance, and safety can be located at
https://www.firestonecompleteautocare.com/maintain/service-warranty-options/

Inv1 WP 11 1 2022 002



**COMPLETE AUTO CARE**

Retail Invoice
104776
Emailed on 05/15/2023
Emailed to npemail@gmail.com

Store# 902556
In: 05/15/23 01:44PM
Out: 05/15/23 04:03PM

www.FirestoneCompleteAutoCare.com

**FINAL INVOICE**

Cust Status: Waiting        Appt: No

GONZALES  ·  231 S AIRLINE HWY, GONZALES, LA, 70737  ·  225.647.8520

*All parts are new unless otherwise specified.*

Payment History:
CFNA         3724         926.66      015028 Sale
MID: 222220408696
Term: 0003   Manual Entry

Total Tendered              926.66

**Summary:**

| | |
|---|---|
| Parts | 642.06 |
| Labor | 194.39 |
| Shop Supplies | 14.83 |
| Sub-Total | 851.28 |
| Tax (8.95%) | 75.38 |
| Total | $926.66 |

*CFNA'S current promotional financing terms, pricing information such as APR and fees,
and Credit Card Agreement can be viewed at CFNA.com, Privacy and Legal page.*

I acknowledge notice and oral approval of
a change in the original estimated price.

_____
Signature or Initials

**Revision History:**                    Rev
                                          Amt
1) 05/15/2023  02:17PM          0.00 TURPIN, JOHN IN PERSON
2) 05/15/2023  03:18PM        113.52 TURPIN, JOHN IN PERSON

Declined Work:
ENGINE AIR FILTER
CABIN AIR FILTER

Information on tire warranty, maintenance, and safety can be located at
https://www.firestonecompleteautocare.com/tires/warranty-options/
or by calling toll free 800-847-3272 to obtain a free printed copy



I have received the above goods and/or services. If this is a
credit card purchase, I agree to pay and comply with my
cardholder agreement with the issuer.

_____
Customer Signature



MOTORIST
ASSURANCE
PROGRAM
BUILDING TRUST THROUGH STANDARDS

**HOW ARE WE DOING?**
Tell us about your experience today!
Complete a 4-minute survey for a chance to win one of ten $50 gift cards each month!
Visit www.FirestoneSurvey.com within 4 days and enter Code 902556-104776

Information on service warranty, maintenance, and safety can be located at
https://www.firestonecompleteautocare.com/main/service-warranty-options/

Inv1_WF_11.14.2022.002



 

Questions?
Customer Service 1-833-402-1481
CFNA.COM

May 15 2023 - May 23 2023
30 days in billing cycle
Page 1 of 4

 JON F TURPIN
2421 S PLUM ST
YORKTOWN IN 47396-1513

ACCOUNT ENDING
9467

MINIMUM PAYMENT DUE
$32.00

## ACCOUNT SUMMARY

| | |
|---|---|
| Statement Closing Date | 05/23/2023 |
| Previous Balance | $0.00 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases/Debits | +$926.66 |
| Fees Charged | +$0.00 |
| Interest Charged | +$0.00 |
| New Balance | $926.66 |
| Promotional Balance | $926.66 |
| Revolving Balance | $0.00 |
| Minimum Payment Due | $32.00 |
| Current Pay Amount | $32.00 |
| Past Due Amount | $0.00 |
| Credit Limit | $8,000.00 |
| Available Credit (subject to change) | $7,073.00 |

To avoid interest charges, Pay the Revolving Balance by the Payment Due Date.

## PAYMENT INFORMATION

| | |
|---|---|
| NEW BALANCE | $926.66 |
| PAYMENT DUE DATE | 06/18/2023 |
| MINIMUM PAYMENT DUE | $32.00 |

Late Payment Warning: If we do not receive your minimum payment by the Payment Due Date, you may have to pay a Late Payment Fee of as much as $41.00.

Minimum Payment Warning: If you make only the minimum payment each month, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using the card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 5 years | $1,610.00 |
| $38.00 | 3 Years | $1,356.00 (Savings = $254.00) |

If you would like information about credit counseling services, call 1-800-848-8117.

## IMPORTANT MESSAGES

- We may report information about your account to credit bureaus. Late Payments, missed payments, or other defaults on your account may be reflected in your credit report.
- Payments can be made 24/7 through the CFNA phone system by calling 833-402-1481 or through CFNA.com when you log in to your account.

## PROMOTIONAL CREDIT PLAN PURCHASES

| PROMOTION TYPE | PROMOTION PURCHASE DATE | ANNUAL PERCENTAGE RATE (APR) | AVERAGE DAILY PROMOTIONAL BALANCE | MONTHLY INTEREST ACCRUED | TOTAL INTEREST ACCRUED | PROMOTIONAL DUE DATE | PROMOTIONAL BALANCE (PAYOFF AMOUNT) |
|---|---|---|---|---|---|---|---|
| 6-Month Promo Purchase | 05/15/23 | 26.240% (v) | $277.99 | $6.19 | $6.19 | 11/18/2023 | $926.66 |

(v) = variable rate

You must pay your Promotional Balance(s) in full by the Promotional Due Date(s) listed above to avoid paying accrued interest charges.

Please See The Reverse Side for Important Information

---

Detach Here and Return the Portion Below With Payment

 

P.O. Box 81410
Cleveland OH 44181-0410

ADDRESS SERVICE REQUESTED

Please Include Your Account Number on Your Check or Money Order.
Do Not Send Cash. Do Not Fold, Tape or Staple Payment to Remittance

| Payment Due Date | BALANCE | Account Ending | MINIMUM PAYMENT DUE | AMOUNT ENCLOSED |
|---|---|---|---|---|
| 06/18/2023 | $926.66 | 9467 | $32.00 | $ |

Make Checks Payable to: Credit First, N.A.
Pay by phone 1-833-402-1481 or CFNA.com

JON F TURPIN
2421 S PLUM ST
YORKTOWN IN 47396-1513

CREDIT FIRST N.A.
PO BOX 81344
CLEVELAND OH 44188-0344

0003200 5593301010113433 0092666

  

JON F TURPIN                                                                                              ACCOUNT ENDING 1187

**TRANSACTIONS**

**PURCHASES & DEBITS**

JON F TURPIN #1124

| 05/15/2023 | 55A12E64B625DDBEN | FIRESTONE#0286 GONZALES LA | $428.66 |

| TRANSACTION TOTAL | | | $428.66 |

**FEES**

| Date | Reference # | Description | Amount |
|---|---|---|---|
| TOTAL FEES FOR THIS PERIOD | | | $0.00 |

**INTEREST**

| Date | Description | Amount |
|---|---|---|
| TOTAL INTEREST FOR THIS PERIOD | | $0.00 |

**2023 TOTALS YEAR-TO-DATE**

| Total Fees Charged in 2023 | $0.00 |
| Total Interest Charged in 2023 | $0.00 |

| INTEREST CHARGE CALCULATION | | | | 1 of 1 variable rate |
|---|---|---|---|---|
| BALANCE TYPE | PERIODIC INTEREST RATE | ANNUAL PERCENTAGE RATE (APR) | BALANCE SUBJECT TO INTEREST RATE | INTEREST CHARGE |
| Your Annual Percentage Rate(s) (APR) is/are the annual interest rate(s) on your account. Please see Page 2 for important information. | | | | |
| Revolving | 2.228% (v) | 26.740% (v) | $0.00 | $0.00 |

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Claim Nbr: I4M1717 - The Standard Fire Insurance Company
16 messages

---

**Colmenero, Jessica** <JCOLMENE@travelers.com>
To: "JT4590@GMAIL.COM" <JT4590@gmail.com>

Wed, Jun 28, 2023 at 12:47 PM

Hello Mr. Turpin,

Just wanted to follow on your claim I4M1717. I received feedback from our appraisal team, they would like to review the invoices for completed work instead. Let me know once they are available, I can forward them to our appraisal team for review.


Thank you!


**Jessica Colmenero| Claim Professional | Auto Claim**

**Travelers**

**W**: 281-606-8866

Tuesday – Saturday 8AM-5PM


**Mailing Address**:

PO Box 430

Buffalo, NY 14240-0430

If further assistance is needed, please contact my manager at **KHEREDIA@travelers.com**

**Everything You Need at Your Fingertips**


With 24/7 access to your claim online via MyTravelers®; you can check your claim status, view your deductible, interact with us and upload documents. Log in to MyTravelers or download the app.

---

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.

TRVDiscDefault::1201

---

**Jon F. Turpin** <jt4590@gmail.com>
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

Wed, Jun 28, 2023 at 3:37 PM

Thank you so much, Jessica, and sincerely, thank you to Erica for her time, I apologize for any potential misunderstanding,

Below are the photos and historical maintenance records I've collected so far, thank you for your patience on any repeats, just let me know if I may provide any assistance.

- 📄 **MustangPics.zip**
- 📄 **20230622_004537.jpg**
- 📄 **20230622_114804.jpg**
- 📄 **20230622_114820.jpg**
- 📄 **20230622_114832.jpg**
- 📄 **20230622_114846.jpg**
- 📄 **20230622_114905.jpg**
- 📄 **20230622_114930.jpg**
- 📄 **20230622_114947.jpg**
- 📄 **20230622_115001.jpg**
- 📄 **20230622_115013.jpg**
- 📄 **20230622_115025.jpg**
- 📄 **20230622_115100.jpg**
- 📄 **20230622_115141.jpg**
- 📄 **20230622_115201.jpg**
- 📄 **20230622_115327.jpg**

# GREG HUBLER

Hometown Blvd Muncie, IN 47304
Phone (765) 289-0431

SERVICE DEPARTMENT HOURS
7:30 a.m. to 6:00 P.M. Mon-Fri
Closed Sat

| | |
|---|---|
| 09/27/22 | 2600E550/1 |
| 10/12/22 | Pre-Invoice |
| 44270 | 44270 |
| | Jake Parks/983 |

KUHN, JON
MUNCIE, IN  47302

275-369-6270

| 1988 | FORD | MUSTANG | 3DR HATCHBCK GT | | | |

#1 - Customer Reports:
   CUSTOMER STATES THE ALTERNATOR IS INOP - CHECK
   AND REPAIR
      Caused by
      verify concern, found no voltage regulator on
      alternator, install new alternator clean and
      transfer aftermarket alternator pully to customer
      supplied alternator
      Sub Total: .00

#2 - Customer Reports:
   CUSTOMER WANTS TO HAVE THE BATTERY BUT BACK UP
   PAINT WHERE IT BELONGS - GET ESTIMATE
      Caused by
      relocate battery tray to under hood and rewire
      and install battery verify proper operation
      Sub Total: .00

#3 - Customer Reports:                                    Internal
   TOW FOR REPAIR
   Work performed by 26681 : 621125

#4 - Customer Reports:
   ALTERNATOR REPLACEMENT
      Caused by

| | | |
|---|---|---|
| LABOR | | |
| PARTS | | |
| SUBLET | | |
| GAS/OIL/LUBE | | |
| SUBLET | | |
| HAZARDOUS MATERIALS | | |
| SALES TAX | | |
| SPECIAL ORDER DEPOSIT | | |
| DISCOUNTS | | |
| TOTAL DUE | | |

# GREG HUBLER

Ford

1400 N Hometown Blvd Muncie, IN 47304
Phone: (765) 289-0451

| | |
|---|---|
| SERVICE DEPARTMENT HOURS | |

TURGIN, DON
MUNCIE, IN  47302

765-252-6270

| 1995 | FORD | MUSTANG | 3DR HATCHBACK GT |

install alternator
Tech: 400 MB                    (400)                                         694.36
Sub Total: 694.36

#5 * Customer Reports:
BATTERY TRAY
Caused by
relocate battery tray
Tech: 400 MB                    (400)                                         606.10
Installed 0084 UNIVERSAL BATT TRAY          1894.48          64.48
Sub Total: 670.58

#6 * BELT REPLACE SERP/DRIVE BELTS- 1150 AN HR UNLESS WARR.
RIBBON OPERATION
*DRIVE BELT
Caused by
found belt is too long and squeaking, and no more
adjustment. install smaller belt reassemble
verify repair
Tech: 400 MB                    (400)                                         150.96
Installed K040316 BELT                      1812.21          12.22
Sub Total: 163.18

*****************************************************
* BREAST CANCER AWARENESS!!!!            WE            *
* ACCEPT DONATIONS IN EACH DEPARTMENT    DONATE AND    *
* PUT YOUR RIBBON ON THE WALL    THANK YOU FOR YOUR    *
* KINDNESS!!!                                          *

| | LABOR |
|---|---|
| | PARTS |
| | GAS/OIL/LUBE |
| | SUBLET |
| | SHOP SUPPLIES |
| | HAZARDOUS MATERIALS |
| | SALES TAX OR TAX I.D. |
| | SPECIAL ORDER DEPOSIT |
| | DISCOUNT |
| | TOTAL DUE |

Regards,
**Jon F. Turpin**
E-mail: jt4590@gmail.com

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

[Quoted text hidden]

---

Jon F. Turpin <jt4590@gmail.com>                     Wed, Jun 28, 2023 at 11:23 PM
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

Attached is the rubber "cap" that was on the water pump of the car and twisted around.

[Quoted text hidden]

**4 attachments**



**20230628_232238.jpg**
1883K



**20230628_232252.jpg**
1949K



**20230628_232244.jpg**
2054K



**20230628_232304.jpg**
2432K

---

**Colmenero, Jessica** <JCOLMENE@travelers.com>                           Thu, Jun 29, 2023 at 12:58 PM
To: "Jon F. Turpin" <jt4590@gmail.com>

Hello Mr. Turpin,

I have sent this over to our appraisal team. They will follow up once review is completed.

Thank you!

**Jessica Colmenero| Claim Professional | Auto Claim**

**Travelers**

**W:** 281-606-8866

Tuesday – Saturday 8AM-5PM

**Mailing Address**:

PO Box 430

Buffalo, NY 14240-0430

If further assistance is needed, please contact my manager at **KHEREDIA@travelers.com**

**Everything You Need at Your Fingertips**

With 24/7 access to your claim online via MyTravelers®; you can check your claim status, view your deductible, interact with us and upload documents. Log in to MyTravelers or download the app.

**From:** Jon F. Turpin <jt4590@gmail.com>
**Sent:** Wednesday, June 28, 2023 10:24 PM
**To:** Colmenero, Jessica <JCOLMENE@travelers.com>
**Subject:** [External] Re: Claim Nbr: I4M1717 - The Standard Fire Insurance Company

| CAUTION: This email came from outside of the company. Please exercise caution when opening attachments, clicking links or responding to this email. The original sender of this email is jt4590@gmail.com. |
|---|

[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                              Thu, Jun 29, 2023 at 1:09 PM
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

Thank you so much for the update, Jessica, I hope you have a great day :)
[Quoted text hidden]

---

**Colmenero, Jessica** <JCOLMENE@travelers.com>                    Thu, Jun 29, 2023 at 1:47 PM
To: "Jon F. Turpin" <jt4590@gmail.com>

Thank you, you too!

[Quoted text hidden]

---

**Colmenero, Jessica** <JCOLMENE@travelers.com>                    Tue, Jul 11, 2023 at 2:11 PM
To: "Jon F. Turpin" <jt4590@gmail.com>

Hello Mr. Turpin,

The appraisal team noticed the invoice is for a 1985 Ford Mustang. Your claim I4M1717 was for your 2008 HONDA CR-V LX, yes?

Let me know and I can update the team with a different invoice.

Thank you!


**Jessica Colmenero| Claim Professional | Auto Claim**

**Travelers**

**W**: 281-606-8866

Tuesday – Saturday 8AM-5PM


**Mailing Address:**

PO Box 430

Buffalo, NY 14240-0430

If further assistance is needed, please contact my manager at **KHEREDIA@travelers.com**

**Everything You Need at Your Fingertips**


With 24/7 access to your claim online via MyTravelers®; you can check your claim status, view your deductible, interact with us and upload documents. Log in to MyTravelers or download the app.


**From:** Jon F. Turpin <jt4590@gmail.com>
**Sent:** Wednesday, June 28, 2023 2:38 PM
**To:** Colmenero, Jessica <JCOLMENE@travelers.com>
**Subject:** [External] Re: Claim Nbr: I4M1717 - The Standard Fire Insurance Company

---

### CAUTION: This email came from outside of the company.
**Please exercise caution when opening attachments, clicking links or responding to this email. The original sender of this email is jt4590@gmail.com.**

---

Thank you so much, Jessica, and sincerely, thank you to Erica for her time, I apologize for any potential misunderstanding,

Below are the photos and historical maintenance records I've collected so far, thank you for your patience on any repeats, just let me know if I may provide any assistance.


📄 **MustangPics.zip**

📄 20230622_004537.jpg

📄 20230622_114804.jpg

📄 20230622_114820.jpg

📄 20230622_114832.jpg

📄 **20230622_114846.jpg**

📄 **20230622_114905.jpg**

📄 **20230622_114930.jpg**

📄 **20230622_114947.jpg**

📄 **20230622_115001.jpg**

📄 **20230622_115013.jpg**

📄 **20230622_115025.jpg**

📄 **20230622_115100.jpg**

📄 **20230622_115141.jpg**

📄 **20230622_115201.jpg**

📄 **20230622_115327.jpg**



# GREG HUBLER

Chevy

4499 N. Hometown Blvd Muncie, IN 47304
Phone: (765) 289-0451

| | |
|---|---|
| SERVICE DEPARTMENT HOURS | |
| 7:30 a.m. to 6:00 p.m. Mon-Fri | |
| Closed Sat. | |

| | |
|---|---|
| 08/29/22 | 2480KB6O/1 |
| 10/12/22 | Pre-Invoice |
| 44370 | 44378 |
| JAKE PAZHA/862 | |

MARTIN, DON
MUNCIE, IN  47302

| | |
|---|---|
| 1FABP28A1PF166109 | |
| 315-289-6370 | |

| 1985 | FORD | MUSTANG | 3DR HATCHBACK GT | |

| | | | |
|---|---|---|---|
| Install alternator | | | 694.36 |
| Tech: 400 MB | (400) | | |
| Sub-Total: 694.36 | | | |

#5 * Customer Reports:
BATTERY TRAY
Caused by
relocate battery tray
Tech: 400 MB        (400)                              504.16
Installed 0084 UNIVERSAL BATT TRAY        1869.48        54.44
Sub-Total: 570.38

#6 * BELT REPLACE SERP/DRIVE BELTS- $100 AN HR UNLESS WARR.
ADDED OPERATION
*DRIVE BELT
Caused by
found belt is too long and squeaking, and no more
adjustment, install smaller belt reassemble
verify repair
Tech: 400 MB        (400)                              150.95
Installed KG40518  BELT        1032.2)        32.23
Sub-Total: 183.18

*************************************************
* BREAST CANCER AWARENESS!!!!                   *
* ACCEPT DONATIONS IN EACH DEPARTMENT    DONATE AND*
* PUT YOUR RIBBON ON THE WALL    THANK YOU FOR YOUR*
* KINDNESS!!!!                                  *

| | |
|---|---|
| | LABOR |
| | PARTS |
| | G.O.G./TIRE |
| | SUBLET |
| | SHOP SUPPLIES |
| | HAZARDOUS MATERIALS |
| | SALES TAX ON TAX LI |
| | SPECIAL ORDER DEPOSIT |
| | DISCOUNTS |
| | TOTAL DUE |



Regards,

**Jon F. Turpin**

E-mail: jt4590@gmail.com

BAS in CIT - IUPUI

AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

[Quoted text hidden]

---

Jon F. Turpin <jt4590@gmail.com>                                    Tue, Jul 11, 2023 at 2:17 PM
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

I'm so sorry, honest mistake, I Aldo have the work orders and invoices for the CRV. Unfortunately we're having to file on each car due to unfortunate events.

Thank you for your patience and I'll get those files over to you once I have a moment.

Sincerely,

Jon F. D. Turpin
[Quoted text hidden]

**6 attachments**


**image001.png**
701K


**image002.png**
673K


**image003.png**
582K


**image002.png**
673K


**image001.png**
701K

 **image003.png**
582K

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Wed, Jul 12, 2023 at 7:17 PM
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

Hi Jessica, thank you for your patience,
This email and the next email will have maintenance costs attached, and if I find any further documentation I'll send it in a follow up email.

Thank you,
Jon F. D. Turpin
[Quoted text hidden]

**6 attachments**

 **20230622_001758.jpg**
1465K

 **20230622_001708.jpg**
1235K

 **20230622_001735.jpg**
1498K

 **20230622_001927.jpg**
5537K

 **20230622_001940.jpg**
6741K

 **20230622_002003.jpg**
6373K

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Wed, Jul 12, 2023 at 7:18 PM
To: "COLMENERO, Jessica" <JCOLMENE@travelers.com>

[Quoted text hidden]

**4 attachments**

 **20230622_002215.jpg**
7412K

**20230622_002049.jpg**
5357K

**20230622_002026.jpg**
6231K

**20230622_002131.jpg**
6197K

---

**Jon F. Turpin** <jt4590@gmail.com>                    Wed, Jul 12, 2023 at 7:19 PM
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

[Quoted text hidden]

**6 attachments**

**20230622_001758.jpg**
1465K

**20230622_001708.jpg**
1235K



**20230622_001735.jpg**
1498K

**20230622_001940.jpg**
6741K

**20230622_001927.jpg**
5537K

**20230622_002003.jpg**
6373K

---

**Jon F. Turpin** <jt4590@gmail.com>                    Wed, Jul 12, 2023 at 7:19 PM
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

On Wed, Jun 28, 2023, 12:47 PM Colmenero, Jessica <JCOLMENE@travelers.com> wrote:
[Quoted text hidden]

**4 attachments**



**20230622_002131.jpg**
6197K



**20230622_002026.jpg**
6231K

 **20230622_002049.jpg**
5357K



**20230622_002215.jpg**
7412K

---

**Jon F. Turpin** <jt4590@gmail.com>
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

Wed, Jul 12, 2023 at 7:20 PM

On Wed, Jun 28, 2023, 12:47 PM Colmenero, Jessica <JCOLMENE@travelers.com> wrote:
[Quoted text hidden]

**4 attachments**



**20230622_002049.jpg**
5357K



**20230622_002131.jpg**
6197K



**20230622_002026.jpg**
6231K

 **20230622_002215.jpg**
7412K

---

**Jon F. Turpin** <jt4590@gmail.com>                                          Wed, Jul 12, 2023 at 7:21 PM
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

On Wed, Jun 28, 2023, 12:47 PM Colmenero, Jessica <JCOLMENE@travelers.com> wrote:
[Quoted text hidden]

**3 attachments**

**20230622_002049.jpg**
5357K

**20230622_002026.jpg**
6231K

**20230622_002131.jpg**
6197K

---

**Jon F. Turpin** <jt4590@gmail.com>                                          Wed, Jul 12, 2023 at 7:21 PM
To: "Colmenero, Jessica" <JCOLMENE@travelers.com>

On Wed, Jun 28, 2023, 12:47 PM Colmenero, Jessica <JCOLMENE@travelers.com> wrote:
[Quoted text hidden]

**3 attachments**

**20230622_002300.jpg**
3642K

**20230622_002215.jpg**
7412K

**20230622_002240.jpg**
5915K

---

**Colmenero, Jessica** <JCOLMENE@travelers.com>                              Sat, Jul 15, 2023 at 4:10 PM
To: "Jon F. Turpin" <jt4590@gmail.com>

Thank you Mr. Turpin, I have sent the attachments over for the appraisal team to review.

Have a great weekend,

**Jessica Colmenero| Claim Professional | Auto Claim**

**Travelers**

**W**: 281-606-8866

Tuesday – Saturday 8AM-5PM


**Mailing Address**:

PO Box 430

Buffalo, NY 14240-0430

If further assistance is needed, please contact my manager at **KHEREDIA@travelers.com**

**Everything You Need at Your Fingertips**


With 24/7 access to your claim online via MyTravelers®; you can check your claim status, view your deductible, interact with us and upload documents. Log in to MyTravelers or download the app.


**From:** Jon F. Turpin <jt4590@gmail.com>
**Sent:** Wednesday, July 12, 2023 6:22 PM
**To:** Colmenero, Jessica <JCOLMENE@travelers.com>
**Subject:** [External] Re: Claim Nbr: I4M1717 - The Standard Fire Insurance Company

> ## CAUTION: This email came from outside of the company.
> **Please exercise caution when opening attachments, clicking links or responding to this email. The original sender of this email is jt4590@gmail.com.**


On Wed, Jun 28, 2023, 12:47 PM Colmenero, Jessica <JCOLMENE@travelers.com> wrote:

[Quoted text hidden]

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

**Hagerty claim**
9 messages

---

**Eric Russell** <erussell@hagerty.com>
To: "JT4590@GMAIL.COM" <JT4590@gmail.com>

Fri, Jul 28, 2023 at 12:59 PM

Hello Mr. Turpin

I am reaching out to advise that your claim has been resigned to me Eric Russell erica is no longer with Hagerty. If you could please submit to my email address the requested information erica requested, it would be greatly appreciated. My email address is erussell@hagerty.com and please include your claim number in the subject line thank you and have a great day.


-Type up statement of events

-Can you send me dated pictures of the vehicle prior to the vandalism and post.

-May I see any documentation or paperwork you may have regarding this matter?

-You can send pictures of everything to my email directly.

-What I am looking for is a timeline and detailed explanation of events having occurred to the Mustang.

-I will also be needing all contact info for the suspects in this.


Claim number MK23062314


Sincerely
Eric Russell
231-932-6886
Specialty claim adjuster

Please be advised the State of Indiana has a 10-year statute of limitations for Physical Damage. This means you must either settle your claim or file a lawsuit by no later than 10 years from the date of the accident in order to protect your rights to recover.


**Eric Russell**

**Specialty Claims Adjuster**

office: (231) 932-6886

hagerty.com | erussell@hagerty.com

**HAGERTY**

**Let's Drive Together**

This communication, including attachments, is intended only for the use of the designated recipient(s). Any dissemination, copying, or disclosure of this communication is prohibited without express written authorization. If you received this communication in error, please immediately notify us by telephone at 231 933-3798, destroy the original message and all copies, and delete permanently any electronic copies. Thank you.

---

**Jon F. Turpin** <jt4590@gmail.com>
To: Eric Russell <erussell@hagerty.com>
Bcc: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>, kirk@kirkfreemanlaw.com, sachatessier@gmail.com, "SA Joseph L. Chaney" <jlchaney@fbi.gov>, lmillet@portsl.com, shaun.cavanaugh@goosehead.com, "Heath P. Hopkins" <Heath@hopkinsins.com>

Sat, Jul 29, 2023 at 5:12 PM

Thank you Eric, and I wish Erica the best in all of her endeavors, and thank you again for time and effort she put into this claim,

Before I may be able to provide information regarding the events, I need to know if each of the dates of loss have been included.

Is each date of loss included in the claim?

Please let me know, and thank you for your time and service.

Sincerely,
Jon F. D. Turpin
[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                              Mon, Jul 31, 2023 at 12:44 AM
To: Eric Russell <erussell@hagerty.com>
Cc: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>
Bcc: "SA Joseph L. Chaney" <jlchaney@fbi.gov>, kirk@kirkfreemanlaw.com, sachatessier@gmail.com, spartzvictoria@gmail.com, jt4590@protonmail.com,
kirjaamo.okv@gov.fi, info@vaticanrome.it, shaun.cavanaugh@goosehead.com, "Heath P. Hopkins" <Heath@hopkinsins.com>

Dear Eric,
I'm following up regarding my question about the dates of loss on the claim.

Does this include each date of loss starting with the December 2021 date of loss?

Please let me know so we may discuss if necessary, and I may assist in your inquiry.


Sincerely,
Jon F. D. Turpin
[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                              Wed, Sep 20, 2023 at 4:52 PM
To: Charles Roach <croach@croachlaw.com>

Dear Chuck,
Would you be able or willing to reach out to Hagerty Insurance and officially request that they release to you the recording from the claim referenced in this email?

They have alleged that I documented damage on 12/10/21 to my vehicle in correspondence, but then denied releasing the recording to me despite Pro Se status.

Please let me know,
Jon
[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                              Wed, Sep 20, 2023 at 6:25 PM
To: doughty_motions@lawd.uscourts.gov

[Quoted text hidden]

---

**Charles Roach** <croach@croachlaw.com>                                          Thu, Sep 21, 2023 at 11:56 AM
To: "Jon F. Turpin" <jt4590@gmail.com>

Hi Jon:


Not being familiar with the current status, and being slammed at the moment, I would prefer not to jump in. I can refer you to someone if you wish. Just let me know. Thanks


Chuck


Chuck Roach, Esq.

Roach Law Office LLC

7855 S. Emerson Avenue, Suite I

Indianapolis, IN 46237

O: 317.888.7620

C: 317.313.2589

E: croach@croachlaw.com


---

**From:** Jon F. Turpin <jt4590@gmail.com>

[Quoted text hidden]


[Quoted text hidden]

Jon

[Quoted text hidden]

[Quoted text hidden]

**Eric Russell**

**Specialty Claims Adjuster**

office: (231) 932-6886

hagerty.com | erussell@hagerty.com

**HAGERTY**

Let's Drive Together

[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                                    Fri, Sep 22, 2023 at 8:21 PM
To: Charles Roach <croach@croachlaw.com>

Thank you so much for getting back to me, Chuck, despite the busy schedule.
[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                                    Tue, Sep 26, 2023 at 6:04 PM
To: Charles Roach <croach@croachlaw.com>

If you do have a referral, please let me know, I'd appreciate it.
[Quoted text hidden]

---

**Charles Roach** <croach@croachlaw.com>                                              Wed, Sep 27, 2023 at 11:49 AM
To: "Jon F. Turpin" <jt4590@gmail.com>

Jon:

I'm not sure what kind of attorney you need, so I would contact the bar association and describe the situation. The referral line is 269.2222 as I recall. You might also google "Indiana bar association referral service" and they might have an online search option.

[Quoted text hidden]

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Hagerty Letter 8/16/23
5 messages

---

**Jon F. Turpin** <jt4590@gmail.com>                                  Wed, Aug 16, 2023 at 2:00 PM
To: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>
Bcc: "SA Joseph L. Chaney" <jlchaney@fbi.gov>, lmillet@portsl.com, sachatessier@gmail.com, kirk@kirkfreemanlaw.com

This is a letter from Hagerty in Michigan after I donated the car and dropped the claim for multiple reasons. There was no response from Hagerty regarding the dates and times they would allow on the claim, after an initial refusal to include the original dates by the first insurance adjuster.

That insurance adjuster, named Erica, was purportedly no longer with Hagerty, when I was asked for more information, but not given specifics regarding the dates they wanted, and Eric never responded to my multiple requests to let me know which timeframes were being reviewed on the dates of loss, which in my opinion, prevents any claim from going through anyway.

Multiple attempts were made politely via email to determine the timeframe of any requested information, and there may be a difference in opinion on how the appraiser reacted regarding the car.

After initially saying they would not include the original date of loss, it is now included in this letter, yet with incorrect timing, along with mention of an Indiana Code which may again potentially aligning with possible attempts to allege false reporting.

I'm uncertain why the letter may allege false reports, nor have I attempted to defraud any insurance company, however, this may merely be mentioned in every letter regarding a closed claim from Hagerty.

If I'm potentially required to say nothing happened, then why am I receiving letters, which may cause a false dichotomy via possibly inaccurate information provided not by myself, but the insurance company?

I'm not pointing fingers here, but in my opinion it may be dubious for a Michigan company to potentially allege violation of an Indiana code after my cousin in Michigan was wrongfully terminated, and now I have been wrongfully terminated, and after we were potentially surveilled and cleared.

May this show a potential link?

Sincerely,
Jon F. D. Turpin

---

**5 attachments**



**20230816_133803.jpg**
2476K



**20230816_133755.jpg**
4130K



**20230816_133705.jpg**
4871K



**20230816_133655.jpg**
4911K



**20230816_133720.jpg**
5205K

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>
To: jt4590@gmail.com

Wed, Aug 16, 2023 at 2:00 PM



## Message too large

Your message couldn't be delivered to **todd.rokita@in.gov** because it exceeds the size limit. Try reducing the message size and resending.

The response from the remote server was:

552 size limit exceeded

Final-Recipient: rfc822; todd.rokita@in.gov
Action: failed
Status: 4.4.2
Remote-MTA: dns; mail1.egov.com. (206.16.212.235, the server for the domain in.gov.)
Diagnostic-Code: smtp; 552 size limit exceeded
Last-Attempt-Date: Wed, 16 Aug 2023 11:00:45 -0700 (PDT)

---------- Forwarded message ----------
From: "Jon F. Turpin" <jt4590@gmail.com>
To: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>
Cc:
Bcc:
Date: Wed, 16 Aug 2023 14:00:24 -0400
Subject: Hagerty Letter 8/16/23
----- Message truncated -----

**Jon F. Turpin** <jt4590@gmail.com>                              Wed, Aug 16, 2023 at 2:07 PM
To: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>

[Quoted text hidden]

**3 attachments**



**20230816_133803.jpg**
2476K



**20230816_133705.jpg**
4871K



**20230816_133655.jpg**
4911K

---

**Jon F. Turpin** <jt4590@gmail.com>
To: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>

Wed, Aug 16, 2023 at 2:08 PM

---------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Wed, Aug 16, 2023, 2:00 PM
Subject: Hagerty Letter 8/16/23
To: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>

[Quoted text hidden]

**2 attachments**



**20230816_133755.jpg**
4130K



**20230816_133720.jpg**
5205K

---

**Jon F. Turpin** <jt4590@gmail.com>                                                Wed, Aug 16, 2023 at 2:12 PM
To: Honorable Todd Rokita Attorney General IN <todd.rokita@in.gov>, Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>
Bcc: sachatessier@gmail.com, kirk@kirkfreemanlaw.com, "SA Joseph L. Chaney" <jlchaney@fbi.gov>, lmillet@portsl.com

In my opinion, a few bad apples, present company excluded, may be attempting to allege that I was in the area on the 10th of December 2021, which may align with my suspicions that someone tampered with computers and stole two hard drives in a potential attempt to frame me yet again by a few bad apples for their own intolerable bad behaviors, which we don't tolerate.

[Quoted text hidden]



**Comfort Inn Lafayette I-65 (IN300)**

4701 Maple Court
Lafayette, IN 47905
(765) 447-3434
GM.IN300@choicehotels.com

TURPIN, JON
2421 S PLUM ST
YORKTOWN, IN 47396

Account: 872589930
Date: 8/8/23
Room: 106
Arrival Date: 8/7/23
Departure Date: 8/8/23
Check In Time: 8/7/23 11:47 PM
Check Out Time: 8/8/23 5:20 AM
Rewards Program ID:
You were checked out by: mfore
You were checked in by: mmabel
Total Balance Due: 0.00

| Post Date | Description | Charges | Amount |
|-----------|-------------|---------|--------|
| | | | 0.00 |

Folio Summary

| | | | 0.00 |
| | Balance Due | | 0.00 |

**With this rate you are able to earn valuable Choice Privileges points!**

If you are paying with a DEBIT CARD, you may see a dual, or temporary extra charge on your bank account after your stay as per your bank policy. In the event of a temporary extra charge on your account, your bank releases the funds.
Please contact your BANK if you have any questions.
Comfort Inn of Lafayette is not responsible for ANY bank charges incurred by use of a Debit Card.

X _____

**CHOICE**
Privileges

**You could be earning free nights at Choice hotels and other great rewards. Join Choice Privileges today by stopping by the front desk, or logging on to www.choicehotels.com/choice-privileges.**

# Hilton
# Garden Inn
Louisville/Northeast

9850 Park Plaza Avenue · Louisville, KY 40241
Phone (502) 423-0018 · Fax (502) 434-1733
Reservations 1 877 STAY HGI at
www.louisvillenortheast.hgi.com

| Name & Address | |
|---|---|
| TURPIN, JON | |
| 2421 S PLUM ST | |
| YORK TOWN, IN 47396 | |
| UNITED STATES OF AMERICA | |

| Room | 118/K1RZ |
|---|---|
| Arrival Date | 03/12/2023 8:10:00 PM |
| Departure Date | 8/14/2023 |
| Adult/Child | 2/0 |
| Room Rate | 169.00 |

| Rate Plan | 2B |
|---|---|
| HH # | 630868122-SILVER |
| AL | |
| CAR | |

Confirmation Number: 3387728434

Hilton

8/14/2023

| DATE | DESCRIPTION | ID | REF. NO. | CHARGES | CREDITS | BALANCE |
|---|---|---|---|---|---|---|
| 8/12/2023 | MISC REVENUE | AADKINS4 | 1564238 | $80.00 | | |
| 8/12/2023 | GUEST ROOM | MISHARP | 1564344 | $169.00 | | |
| 8/12/2023 | RM STATE TAX | MISHARP | 1564344 | $11.10 | | |
| 8/12/2023 | RM CITY TAX | MISHARP | 1564344 | $16.06 | | |
| 8/13/2023 | PAVILION LOUNGE | LINTR | 1564518 | $5.20 | | |
| 8/13/2023 | PAVILION LOUNGE | LINTR | 1564521 | $5.20 | | |
| 8/13/2023 | PAVILION PANTRY | TRENISTON | 1564644 | $6.00 | | |
| 8/13/2023 | GUEST ROOM | MISHARP | 1564597 | $169.00 | | |
| 8/13/2023 | RM STATE TAX | MISHARP | 1564597 | $11.10 | | |
| 8/13/2023 | RM CITY TAX | MISHARP | 1564597 | $16.06 | | |
| 8/14/2023 | PAVILION PANTRY | MISHARP | 1564709 | $6.00 | | |
| 8/14/2023 | PAVILION PANTRY | AADKINS4 | 1564750 | $3.00 | | |
| 8/14/2023 | | | | | | |
| 8/14/2023 | VS *2147 | AADKINS4 | 1564765 | | ($455.72) | |
| | **BALANCE** | | | | | $0.00 |

Hilton Honors(R) stays are posted within 72 hours of checkout. To check your earnings or book your next stay at more than 6,400+ hotels and resorts in 119 countries, please visit Honors.com

| CARD TYPE | |
|---|---|
| VS *2147 | |

| DATE OF CHARGE | FOLIO NO./CHECK NO. |
|---|---|
| 8/14/2023 | 413109/A |

| CARD MEMBER NAME | |
|---|---|
| TURPIN, JON | |

| AUTHORIZATION | INITIAL |
|---|---|
| 447878 | |

| ESTABLISHMENT NO. & LOCATION | PURCHASES & SERVICES |
|---|---|

| TAXES | |
|---|---|

| TIPS & MISC | |
|---|---|

| CARD MEMBER SIGNATURE | TOTAL AMOUNT | 455.72 |
|---|---|---|
| X | PAYMENT DUE FROM RECEIPT | |

HIS RALEIGH/CRABTREE VALLEY  3920 ARROW DRIVE
RALEIGH, NC 27612
TELEPHONE 919-851-7050     FAX 919-881-2022

TURPIN, JON
4215 DAHLIA COURT

INDIANAPOLIS   IN 46220
United States of America

Room No.        526/MKJZ
Arrival Date     6/16/2023 10:00:00 PM
Departure Date  6/17/2023
Adult/Child      1/0
Room Rate       177.00 USD
Rate Plan        H1P
HH #             628655122 SILVER
AA#
Car

Confirmation Number:    82557257
Auto Make
License
6/16/2023
This is a 100% non-smoking facility.
A fee of up to $250.00 USD will be
assessed for smoking in it.

TURPIN, JON

526

528

GUEST IDENTIFICATION
GUEST NAME     TURPIN, JON
ACCOUNT          82557257
VALID UNTIL       6/17/2023

GUEST IDENTIFICATION
GUEST NAME       TURPIN, JON
ACCOUNT          82557257
VALID UNTIL       6/17/2023

HAMPTON INN & SUITES RALEIGH/CRABTREE VALLEY, NC

HIS RALEIGH/CRABTREE VALLEY,3920 ARROW DRIVE
RALEIGH, NC 27612
United States of America
TELEPHONE 919-881-7080 • FAX 919-881-2022
Reservations
www.hilton.com or 1 800 HILTONS

TURPIN, JON

2421 SOUTH PLUM ST

YORKTOWN IN 47396
UNITED STATES OF AMERICA

| | |
|---|---|
| Room No: | 526/NKJZ |
| Arrival Date: | 6/15/2023  10:00:00 PM |
| Departure Date: | 6/19/2023 11:05:00 AM |
| Adult/Child: | 1/0 |
| Cashier ID: | AJOVERT |
| Room Rate: | 155.82 |
| AL: | |
| HH # | 636658122 SILVER |
| VAT # | |
| Folio No/Che | 322742 A |

Confirmation Number: 52557267

HAMPTON INN & SUITES RALEIGH/CRABTREE VALLEY, NC 6/19/2023
11:05:00 AM

| DATE | REF NO | DESCRIPTION | CHARGES |
|---|---|---|---|
| 6/15/2023 | 977154 | GUEST ROOM | $183.00 |
| 6/15/2023 | 977154 | RM - STATE TAX | $13.27 |
| 6/15/2023 | 977154 | RM - OCCUPANCY TAX | $10.98 |
| 6/16/2023 | 977370 | INTERNET ACCESS | $14.85 |
| 6/16/2023 | 977386 | SUITE SHOP - BEVERAGE | $5.00 |
| 6/16/2023 | 977508 | GUEST ROOM | $177.66 |
| 6/16/2023 | 977508 | RM - STATE TAX | $12.88 |
| 6/16/2023 | 977508 | RM - OCCUPANCY TAX | $10.66 |
| 6/17/2023 | 977783 | GUEST ROOM | $177.66 |
| 6/17/2023 | 977783 | RM - STATE TAX | $12.88 |
| 6/17/2023 | 977783 | RM - OCCUPANCY TAX | $10.66 |
| 6/18/2023 | 977851 | VS *6681 | ($629.50) |
| 6/18/2023 | 977992 | GUEST ROOM | $155.82 |
| 6/18/2023 | 977992 | RM - STATE TAX | $11.30 |
| 6/18/2023 | 977992 | RM - OCCUPANCY TAX | $9.35 |
| 6/19/2023 | 978094 | VS *6681 | ($176.47) |
| | | **BALANCE** | $0.00 |

EXPENSE REPORT SUMMARY

| | 6/15/2023 | 6/16/2023 | 6/17/2023 | 6/18/2023 |
|---|---|---|---|---|
| ROOM AND TAX | $207.25 | $201.20 | $201.20 | $176.47 |
| SHOPS | $0.00 | $14.85 | $0.00 | $0.00 |
| MISCELLANEOUS | $0.00 | $5.00 | $0.00 | $0.00 |
| DAILY TOTAL | $207.25 | $221.05 | $201.20 | $176.47 |

EXPENSE REPORT SUMMARY

| | STAY TOTAL |
|---|---|
| ROOM AND TAX | $786.12 |
| SHOPS | $14.85 |
| MISCELLANEOUS | $5.00 |
| DAILY TOTAL | $805.97 |

Hilton Honors(R) stays are posted within 72 hours of checkout. To check your earnings or book your next stay at more than 6,500+ hotels and resorts in 119 countries, please visit Honors.com



3:50 ☂ ⓐ ⌖ ▦     ⏰ ✱ ⦿ 4G 100% 🔋

**Dusty Mills**
DM   Mobile

Thursday 8:47 AM

So my dad just flew down to Pinehurst for his 40th anniversary trip with his fraternity brothers ... so I would it currently put him in this spot

Is there anybody else at Community I could help you with?

Thursday 9:01 AM

I wouldn't want to do that to him with just a concern. If you know the lead physician over Dr. Gregory Polly and Tracy (the personnel member that responded in Polly's stead) I'd be glad to voice my concerns to them. Truly I just want to make sure the staff isn't being "pushed on" or potentially "misdirected" as I may have been in the past by my Dad before and after therapy and potentially when I've had to report something.

The tone of the social questionnaire I received concerns me because my wife was merely a witness, not a perpetrator of anything, but it seemed to make her the main point of interest...



3:51 ▲ ☺ 🖼                    🔔 ⚗ ♀ 4G 100% 🔋

← DM    **Dusty Mills**         📞    ⋮
            Mobile

**Thursday 9:01 AM**

I wouldn't want to do that to him with just a concern. If you know the lead physician over Dr. Gregory Polly and Tracy (the personnel member that responded in Polly's stead) I'd be glad to voice my concerns to them. Truly I just want to make sure the staff isn't being "pushed on" or potentially "misdirected" as I may have been in the past by my Dad before and after therapy and potentially when I've had to report something.

The tone of the social questionnaire I received concerns me because my wife was merely a witness, not a perpetrator of anything, but it seemed to make her the main point of interest...

All messages have been loaded.

You

Purely out of curiosity, why did the questionnaire ask about my current

In this conversation          ✕

Participants

Gregory Paul Polly, MD

➕   📷   Type a message...        😊   🎤

‹        ◯        |||



seemed to make her the main point of interest...

**In this conversation** ✕

Participants

Gregory Paul Polly, MD

Tracy

OK

Gregory Paul Polly, MD
Primary care provider

Lorraine M. Calvert, NP
Care team

    



**3:51**   🔋 100%

← DM   **Dusty Mills**
         Mobile

Gregory Paul Polly, MD
Primary care provider

Lorraine M. Calvert, NP
Care team

"Tracy" isn't even listed in my care team, so I'm concerned...

**Friday 10:21 AM**

There may have been attempts, potentially by someone in the "Dark Web" to infiltrate the businesses below and maybe others from within, while targeting us:
Community Health, SalesForce, Chase, Traveler's, Enterprise, Microsoft

    



3:51

**Dusty Mills**
DM  Mobile

Friday 10:21 AM

There may have been attempts, potentially by someone in the "Dark Web" to infiltrate the businesses below and maybe others from within, while targeting us:
Community Health, SalesForce, Chase, Traveler's, Enterprise, Microsoft (Dropbox), Yahoo, and potentially Google... in my assumed unqualified, but potentially qualified opinion, after research into a potential pattern, confirmed:

It may be an issue that your Dad's fraternity brothers, depending on their professional pursuits and stations, may wish, or may have necessity for awareness of the potential issue.

Please use your own discernment, I'm simply concerned.

Saturday 10:15 PM

What's your Dad's fraternity, by the way?

Saturday 11:21 PM

  Type a message...  



**3:51**                                       **4G** **100%**

← DM   **Dusty Mills**
        Mobile

Saturday 10:15 PM

What's your Dad's fraternity, by the way?

Saturday 11:21 PM

Wow
My apologies for never replying

Sigma Chi

Saturday 11:56 PM

It's ok, but they may have hacked some very prestigious businesses in their attempts to dox us and tamper with our cars and mail and identities.

But that's just my opinion, what I know is someone cut my wife's power steering and messed with her car's suspension.

I was ignoring them, but no reasonable man would allow that to just happen to his wife. We're pacifists and don't threaten people, but that's some bad behavior, and we don't tolerate bad behavior.



3:51

**Dusty Mills**
DM  Mobile

Saturday 11:56 PM

It's ok, but they may have hacked some very prestigious businesses in their attempts to dox us and tamper with our cars and mail and identities.

But that's just my opinion, what I know is someone cut my wife's power steering and messed with her car's suspension.

I was ignoring them, but no reasonable man would allow that to just happen to his wife. We're pacifists and don't threaten people, but that's some bad behavior, and we don't tolerate bad behavior.

To file a complaint telephonically, complainants should call **(202)406-5540** or TTY **(202)406-9805**.

https://www.secretservice.gov

Section 508 | United States Secret Service

People also ask

Who oversees Secret Service?

    



Mail Fraud Complaint form submitted successfully.

Thank you for completing the form.

The information you provided will be entered into our national complaint system.

The U.S. Postal Inspection Service gathers data on mail-related crime to determine whether a violation has occurred. While we can't guarantee that we can recover lost money or items, your information can help alert Inspectors to problem areas and possibly prevent other people from being victimized. U.S. Postal Inspectors base their investigations on the number, substance, and pattern of complaints received from the public.

We ask you to keep all original documents related to your complaint. We will contact you ONLY if more information is needed.



IU Health
2500 N. Spadeland Ave.
Indianapolis, IN 46218

 Indiana University Health

*Reference # 347 551018*

**Statement date:** 6/14/2023
**Patient name:** Jon Turpin
**Account number:** 99548349
**Amount paid since last statement:** $0.00
**Due date:** 7/7/2023

27500 1 AV 0.468
JON TURPIN
2421 S PLUM ST
YORKTOWN, IN 47396-1513



## Request for payment

### Account summary

| | |
|---|---|
| Total patient responsibility | $1,080.68 |
| **Minimum due by 7/7/2023** | **$200.00** |

Payments made after last statement due date may not be
reflected in this statement.

 Account status: Good standing 

### Insurance Information

Change in your insurance?
Please refer to the back of the coupon below for information
on how to notify us.

Statement date: June 14, 2023

Confirm patient information

ACCT # 99548349
JON TURPIN
2421 S PLUM ST
YORKTOWN, IN 47396-1513

☐ Please check here if your address or
insurance has changed. Please indicate
changes on the back of this page

## Payment and other information

 Pay your bill online at **MyIUHealth.org**.

 Pay your bill using our automated service:
**IU Health Customer Service**
8 am - 7 pm Monday through Friday
Tenemos asistencia disponible en
Español.

T **317.612.2754** Indianapolis
T **1.888.IUHEALTH** Toll free

 Pay by mail - return completed coupon by mail

Financial assistance is available to eligible patients per
Indiana University Health Financial Assistance Policy.
A plain language summary of this policy is located on
the back of this page or at IUHealth.org.

Statement ID: 98033324

| Payment due date 7/7/2023 | Pay this amount $200.00 | Amount enclosed |
|---|---|---|

Check payments - Please make checks payable to IU Health and write
your account number on the check.
Credit card payments: ☐ ☐ ☐ ☐
Card number: _____ Exp. date: _____
Cardholder name: _____
Cardholder signature: _____

IU HEALTH
PO BOX 4374
CHICAGO, IL 60680-4374



 Indiana University Health

Page 3

Patient: JON TURPIN

Account No: 99241349

| Serv date | Prov # | Provider name - Group - Location | Prov charge | Amount insurance discounts | Patient payments / adjustments | Account balance |
|---|---|---|---|---|---|---|
| 04/23/23 | 1046610054 | IU Health Ball Memorial Hospital - Emergency Services | $1,916.80 | $1,589.80 | $0.00 | $928.80 |
| 04/23/23 | 89435110 | Amanda N Khoza MD - Group 20, IU Radiology Associates | $33.00 | $26.93 | $0.00 | $6.07 |
| 04/23/23 | 42530883 | Robert J Daggета MD - Group 22, IU Health Physicians | $138.00 | $123.23 | $0.00 | $14.77 |
| 04/22/23 | 1045653135 | IU Health Ball Memorial Hospital - Emergency Services | $5,003.00 | $4,074.90 | $0.00 | $928.90 |
| 04/22/23 | 89473071 | Matthew Barker MD - Group 20, IU Radiology Associates | $62.00 | $52.24 | $0.00 | $9.76 |
| 04/22/23 | 89742481 | Gary R Sharpe MD - Group 22, IU Health Physicians    Did not pay | $250.00 | $221.96 | $0.00 | $28.04 |
| 04/21/23 | 1043834654 | IU Health Ball Memorial Hospital - Emergency Services | $2,646.00 | $2,237.20 | $0.00 | $278.80 |
| 04/21/23 | 89353103 | Joshua Duesthen MD - Group 20, IU Radiology Associates | $39.00 | $35.50 | $0.00 | $7.50 |
| 04/21/23 | 89525171 | Douglas J Rochouboe DO - Group 22, IU Health Physicians | $250.00 | $228.56 | $0.00 | $23.04 |

Total summary amount: $2,080.68

 **Indiana University Health**

## Turpin, Jon

DOB: 04/09/1890
MRN: 70398770
Visit Date: 04/23/2023

## Discharge Instructions

We would like to thank you for allowing us to assist you with your healthcare needs. The following includes patient education materials and information regarding your injury/illness.

### Your ED Provider
**Time Seen:**
Coggeshall, Robert P., MD 04/23/2023 15:31

### Tests Performed
**Radiology**
XR Chest PA and Lateral 04/23/2023 16:11 EDT

### Diagnosis from Today's Visit
Back pain
Muscle spasm

## What to Do Next

You were treated today on an emergency basis. It may be wise to contact your primary care provider to notify them of your visit today. You may have been referred to your regular doctor or a specialist. Please follow up as instructed. If your condition worsens or you cannot get in to see the doctor, contact the Emergency Department.

### You Need to Schedule the Following Appointments

**Follow Up with** Whitlow, Bonnie L., PA
**Where:** IU Health Ball Spine Program 2618 W. University Avenue Suite 502 Phone: (765) 751-5886 Fax: (765) 751-5585 Muncie, IN 47303
**When:** Within 1 to 2 days

**Follow Up with** Foley, Gregory F., MD, FAM
**Where:** IHN - Family Medicine Care 6920 E 56th St #150 Indianapolis, IN 46260 (317) 621-6925
**When:** Within 3 to 5 days

 **Indiana University Health**

**Turpin, Jon**

DOB: 04/05/1980
MRN: 70398770
Visit Date: 04/22/2023

---

## Discharge Instructions

We would like to thank you for allowing us to assist you with your healthcare needs. The following includes patient education materials and information regarding your injury/illness.

### Your ED Provider
**Time Seen:**
Sharpe, Gary R, MD 7 04/22/2023 07:24

### Tests Performed
**Radiology**
XR Spine Lumbar 2 or 3 View 04/22/2023 08:46 EDT
XR Spine Thoracic 2 View 04/22/2023 08:43 EDT

### Diagnosis from Today's Visit
Back pain   *Dismissive, Unprofessional, Unknowledgeable, Unwilling* (handwritten)
*LIED* (handwritten)

## What to Do Next

You were treated today on an emergency basis. It may be wise to contact your primary care provider to notify them of your visit today. You may have been referred to your regular doctor or a specialist, please follow up as instructed. If your condition worsens or you can't get in to see the doctor, contact the Emergency Department.

## You Need to Schedule the Following Appointments

**Follow Up with A referral**
coordinator will contact you
**Where:** Within 3 to 5 days

*Trust Line Ethics Report* (handwritten)
*Access codes* (handwritten)



# Indiana University Health

**Turpin, Jon**

DOB: 04/05/1990
MRN: 76998770
Visit Date: 04/21/2023

---

## Discharge Instructions

We would like to thank you for allowing us to assist you with your healthcare needs. The following includes patient education materials and information regarding your injury/illness.

### Your ED Provider
**Time Seen:**
Rasmussen, Douglas J, DO / 04/22/2023 00:00

### Tests Performed
**Radiology**
XR Ribs Bilat with PA and Lateral Chest 04/21/2023 21:43 EDT

### Diagnosis from Today's Visit
Rib fracture    *Accurate, Helpful Professional, Emphethic*

## What to Do Next    *HONEST*

You were treated today on an emergency basis. It may be wise to contact your primary care provider to notify them of your visit today. You may have been referred to your regular doctor or a specialist, please follow up as instructed. If your condition worsens or you can't get in to see the doctor, contact the Emergency Department.

### You Need to Schedule the Following Appointments

**Follow Up with** Polly, Gregory P,
MD, FGH
**When:** Within 3 to 5 days, only if
needed

**Why:** Return to the ED immediately if you have any emergent medical concern or you feel that your medical problem is getting worse. Follow up with your primary doctor in 3-5 days.
**Where:** GPH - Family Medicine Care 6925 E 96th St #160
Indianapolis, IN 46250
(317) 621-6925

**Ball Memorial Hospital**

(765) 747-3220

Disc No.: 1/1
Number: 14921
April 25, 2023
Studies on Disc: 3

Patient: TURPIN ION (4/5/1990)
XR Spine Lumbar 2 or 3 View (4/22/2023)
XR Spine Thoracic 2 View (4/22/2023)
XR Ribs Bilat with PA and Lateral Chest (4/21/2023)











Jon F. Turpin
2421 S. Main St.,
Yorktown, IN 47396
226-259-6270   JT4590@gmail.com

Wish to rule out my Dad, Jon B. Turpin
as potentially being one of the two
"Storyville Slayers" from 1990s cold case.
He may have lived/commuted to Metairie, LA during

the 1990 slayings of 12 prostitutes/addicts.
He drove a 1967 Lemans and chewed tobacco.
A LeMans is a Chevy Nova with different
stylings. Chewing Tobacco is the only DNA
evidence found at the scene of I55/I10.
Call to Howard Stern (1991) sounds like my Dad
and our family. Detective used to be Elizabeth
Wuggleton. I'm willing to submit my DNA to
see if it is a partial match.



6:21

ancestry.com/checkout/ML

## 🛒 Order Summary

**AncestryDNA kit + Traits (2)**      $238.00

**All Access Membership**      $80.00

Renews automatically every three
months at $119.00, beginning
September 21, 2023 until you cancel.

**Expedited Shipping**      $37.90

**Total**      $355.90
**Savings**      $39.00

**Shipping Address**
Jon Turpin
2421 S Plum St
Yorktown, Indiana 47396
United States of America

**Billing Address**
Jon Turpin
2421 S Plum St
Yorktown, Indiana 47396
United States of America

 *PayPal*

## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this
Memorandum Decision shall not be regarded as
precedent or cited before any court except for the
purpose of establishing the defense of res judicata,
collateral estoppel, or the law of the case.



FILED

Sep 14 2016, 8:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J. T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Richard L. Boswell, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | September 14, 2016 <br><br> Court of Appeals Case No. <br> 84A04-1505-CR-472 <br><br> Appeal from Vigo Superior Court. <br> The Honorable Michael J. Lewis, <br> Judge. <br> Cause No. 84D06-1010-MR-3358 |

## Friedlander, Senior Judge

[1]     Richard L. Boswell, Jr. appeals his convictions and sentences for murder, a felony,[1] and attempted murder, a Class A felony.[2] We affirm.

[2]     Boswell presents five issues for our review which we restate as:

> 1. Whether the trial court erred in denying Boswell's motion to dismiss on double jeopardy grounds.
>
> 2. Whether the trial court erred in denying Boswell's motion for change of venue.
>
> 3. Whether there was sufficient evidence to support Boswell's convictions.
>
> 4. Whether the trial court erred in denying Boswell's motions for a mistrial.
>
> 5. Whether the trial court erred in sentencing Boswell for his conviction of attempted murder.

[3]     In 1979 Kathy Jo Baker was murdered and her two-year-old son Ryan was viciously attacked and left for dead. Investigation into the crimes yielded no results, and the case remained unsolved. In 2008, new information was provided to the police which led to further investigation and eventually charges of murder and attempted murder being filed against Boswell in 2010.

[4]     Boswell's first jury trial in January 2013 ended in a mistrial, and the trial court re-set the cause for a second trial. Prior to the second trial, Boswell filed a

---

[1] Ind. Code § 35-42-1-1 (1977).

[2] Ind. Code §§ 35-42-1-1, 35-41-5-1 (1977).

motion for change of venue. After a hearing on the matter, the trial court denied Boswell's motion.

[5]   Boswell's second jury trial commenced in April 2013 and, like the first, ended in a mistrial. Boswell filed a motion to dismiss the case on double jeopardy grounds, to which the State objected. Following a hearing, the trial court denied Boswell's motion to dismiss but certified its order for interlocutory appeal at Boswell's request. The Court of Appeals declined to accept the appeal.

[6]   In October 2014, Boswell filed a second motion for change of venue. The trial court took the motion under advisement after a hearing and subsequently denied it. Boswell's third jury trial was held in April 2015, and he was found guilty as charged. The trial court sentenced Boswell to consecutive terms of fifty-five years for the murder of Kathy Jo and forty-five years for the attempted murder of Ryan. This appeal followed.

## 1. Motion to Dismiss on Double Jeopardy Grounds

[7]   Boswell first contends the trial court erred by denying his motion to dismiss the charges against him following a mistrial because his retrial violated the Double Jeopardy Clause of the Fifth Amendment.[3]

---

[3] Boswell also cites article I, section 14 of the Indiana Constitution, the state constitutional double jeopardy prohibition, and Indiana Code section 35-41-4-3 (1977), the codification of the state prohibition against placing a defendant in jeopardy twice for the same offense. However, he provides no authority or

[8]     The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." If a defendant moves for or consents to a mistrial, he forfeits the right to raise a double jeopardy claim in subsequent proceedings unless the motion for mistrial was necessitated by governmental conduct "'intended to goad the defendant into moving for a mistrial.'" *Willoughby v. State*, 660 N.E.2d 570, 576 (Ind. 1996) (quoting *Oregon v. Kennedy*, 456 U.S. 667, 676, 102 S. Ct. 2083, 2089, 72 L. Ed. 2d 416 (1982)). Accordingly, the subjective intent of the prosecutor is the dispositive issue. *Noble v. State*, 734 N.E.2d 1119 (Ind. Ct. App. 2000), *trans. denied*. "Although a trial court's determination of prosecutorial intent is not conclusive for purposes of state appellate review, we do regard its determination as very persuasive." *Butler v. State*, 724 N.E.2d 600, 603-04 (Ind. 2000). As this is a factual determination, we review it under a clearly erroneous standard. *Id.* at 604. Although Boswell urges us to utilize a de novo standard of review for this issue, we are obliged to follow the precedent of our supreme court.

[9]     In its order concerning the parties' pre-trial motions for Boswell's first trial, the trial court limited the testimony of State's witness Jodie Bennett. Bennett is an inmate to whom Boswell, while imprisoned on an unrelated sexual offense,

---

independent analysis supporting a separate standard under the Indiana Constitution or the statutory prohibition based thereon. Accordingly, his state constitutional and statutory claims are waived, and we address his claim solely under the Fifth Amendment. *See Butler v. State*, 724 N.E.2d 600, 602 n.1 (Ind. 2000).

confessed that he should have killed his victim like he had done previously when he killed a woman and tried to kill her son after his sexual advances were rejected by the woman. As to Boswell's statement, Bennett testified, "He told me he had killed another lady . . ." Tr. 1st Trial p. 506.[4] Defense counsel objected and moved for mistrial based upon the implication that Boswell had committed a murder in addition to the one he confessed to Bennett. Following a discussion between counsel and the judge, the trial court granted defense counsel's motion for mistrial and set the case for a second trial.

[10]   With the same evidentiary limits in place, the court proceeded with Boswell's second trial in April 2013. In its closing argument, the State said, "While in prison [Boswell]'s talking to Mr. Bennett and he tells Mr. Bennett that he had killed another women [sic]." Tr. 2nd Trial p. 766. Defense counsel immediately requested a mistrial, which the trial court granted without allowing any response from the State.

[11]   Boswell subsequently filed a motion to dismiss, claiming the charges should be dismissed because double jeopardy barred his retrial. The State filed its objection to Boswell's motion, and the court heard argument thereon. The court denied Boswell's motion and simply stated that its ruling was based upon

---

[4] Because we have transcripts from three different trials, for clarification purposes we will cite to the different transcripts as "Tr. 1st Trial," "Tr. 2nd Trial," and "Tr. 3rd Trial."

the arguments presented at the hearing and the parties' motions and memorandums.

[12]    In regard to whether the State intentionally goaded the defense into a mistrial, defense counsel stated at the hearing on Boswell's motion to dismiss that the prosecuting attorney has vast experience and that the motion in limine in this case had been discussed in detail. Defense counsel also argued that the State had gained an advantage for a subsequent retrial by hearing the cross-examination of the State's witnesses.

[13]    The State responded that had it been given an opportunity to present argument on Boswell's motion for mistrial at the second trial, it would have emphasized that the misstatement occurred during closing arguments of counsel, which is not evidence and which is more readily curable without a mistrial than a statement by a witness. The State then argued it had no reason to want a mistrial because it had encountered "no real difficulties in getting the evidence in." Tr. Mot. Dismiss Hrg. p. 12. In addition, the State reasoned that it would be inconsistent for it to intentionally cause further delay in this case because, at the time the misstatement occurred, all the evidence had been presented, the State still had an opportunity for rebuttal evidence if it needed to present anything else, and that further delay in this case could lead to the loss of witnesses and/or loss of memory given that the case is three decades old.

[14]    We see nothing in the record to indicate the State intended to deliberately cause a mistrial. Boswell's challenge to the trial court's ruling amounts to mere

speculation which does not demonstrate that the trial court's determination was clearly erroneous. We find no error with the trial court's denial of Boswell's motion to dismiss.

## 2. Motion for Change of Venue

[15] As his second claim of error Boswell asserts the trial court erred by denying his motion for change of venue. We review a trial court's denial of a motion for change of venue for an abuse of discretion. *Specht v. State*, 734 N.E.2d 239 (Ind. 2000). To prevail, a defendant must demonstrate the existence of two distinct elements: (1) prejudicial pretrial publicity, and (2) the inability of the jurors to render an impartial verdict. *Id.*

[16] In October 2014, prior to his third trial, Boswell filed a motion for change of venue maintaining that he was unable to receive a fair trial in Vigo County due to "public hostility" and "outrage" as well as "extensive, prejudicial news reporting" of the case. Appellant's App. p. 273. Boswell attached to his motion a recent newspaper article about the case. The parties presented argument on the motion at a hearing in the trial court, after which the court took the matter under advisement. In February 2015, the court denied Boswell's motion for change of venue.

[17] Pretrial publicity is prejudicial when it contains either inflammatory material that is not admissible at trial or when it misstates or distorts the evidence. *Green v. State*, 753 N.E.2d 52 (Ind. Ct. App. 2001), *trans. denied*. The newspaper article attached to Boswell's motion recounted the two prior mistrials of the

case, Boswell's criminal history post-1979 as it related to the existence of his DNA profile in the state's system, and the DNA evidence linking him to this crime. In this regard, the article contained inflammatory, inadmissible information. Thus, Boswell established the existence of prejudicial pretrial publicity, and the State acknowledged as much at the hearing on Boswell's motion. *See* Tr. Pre-Trial Hrgs. p. 92.

[18]   Yet, the overarching question is whether the jurors were able to render an impartial verdict. Jurors need not be totally ignorant of the facts in order for a defendant to receive a fair trial. *Collins v. State*, 826 N.E.2d 671 (Ind. Ct. App. 2005), *trans. denied*. Juror exposure to pretrial publicity, alone, is insufficient to support a claim that local prejudice entitles a defendant to a change of venue; the defendant must also demonstrate that the jurors were unable to set aside any preconceived notions of guilt and render a verdict based upon the evidence. *Id.*

[19]   Here, the potential jurors were asked to raise their hand if they had heard about the case or believed they knew anything about the case. The jurors who raised their hand were then taken into the judge's chambers individually for voir dire by the judge and the parties. Those jurors who were unsure of their impartiality or who had already formed an opinion on the case were excused. Nothing in our review of the transcript revealed that a juror who was unable to disregard any pretrial publicity or set aside a preconceived notion of guilt was allowed to remain on the jury panel. Further, Boswell has not directed our attention to any such evidence in the record. The trial court properly exercised its discretion in denying Boswell's motion for change of venue.

## 3. Sufficiency of the Evidence

[20]   Boswell argues that the State's evidence is insufficient. When we review a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. *Sandleben v. State*, 29 N.E.3d 126 (Ind. Ct. App. 2015), *trans. denied*. Instead, we consider only the evidence most favorable to the verdict and any reasonable inferences drawn therefrom. *Id.* If there is substantial evidence of probative value from which a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt, the verdict will not be disturbed. *Labarr v. State*, 36 N.E.3d 501 (Ind. Ct. App. 2015). Further, it is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Tongate v. State*, 954 N.E.2d 494 (Ind. Ct. App. 2011), *trans. denied*.

[21]   Boswell challenges the adequacy of the State's evidence, stating that "[o]nly two (2) items go toward establishing Boswell is guilty," and "[t]his evidence is far below the level at which a person can be found guilty beyond a reasonable doubt." Appellant's Br. pp. 25, 26. The two items Boswell refers to are a t-shirt found to contain his DNA and the testimony of the State's witness, inmate Bennett.

[22]   The evidence at trial showed that Kathy Jo and Kenny Baker were married and had a son, Ryan. On Tuesday, May 22, 1979, Kenny went to work, and Kathy Jo and two-year-old Ryan stayed at their home in a remote area of town. When Kenny returned home from work at the end of the day, the house was

undisturbed, but Kathy Jo and Ryan were missing. Friends and family immediately began searching for the two, and the next day they found Kathy Jo's body and a seriously injured Ryan in a marshy, secluded area not far from their home. Kathy Jo was found wearing a t-shirt and with her bathing suit bottoms stuffed in her mouth. Ryan was laying at his mother's feet with a severe head wound. He was taken to the hospital where he spent several months undergoing surgery and skin grafts and recovering from complications. The findings of an autopsy performed on Kathy Jo revealed that the primary cause of her death was strangulation by throttling.

[23]   Investigation into the case stalled and no charges were filed. In April 2008, a woman called the State Police and advised that she thought she knew who had murdered Kathy Jo. This caused the police to pull from storage the evidence from the case and perform further testing. DNA testing, which was not available in 1979, was performed on stains found on the t-shirt Kathy Jo was wearing when she was discovered and which had been preserved as part of the evidence in the case.

[24]   Paulita McGuire, a forensic DNA analyst at the Indiana State Police lab, testified that although the passage of time may degrade a DNA sample such that the amount of information able to be gleaned from the sample is reduced, time would not alter the DNA profile contained in the sample. McGuire then testified that in this case she performed DNA testing on certain items, one of which was the t-shirt Kathy Jo was wearing. One particular stain that McGuire tested was found on the back of the t-shirt and was a very small reddish-brown

stain. She testified that although the overall size of the stain was only one and one-half to two millimeters (roughly half the size of a pencil eraser), the stain contained a good concentration of DNA from which she was able to obtain a DNA profile. Tr. 3rd Trial pp. 776-77, 828. McGuire further testified that she was able to obtain a DNA profile for twelve of fifteen markers. Because four of the twelve yielded only partial information, she loaded only the remaining eight markers into the DNA database. *Id.* at 825-26. She explained that she would not put partial information into the database because the result would be inconclusive. *Id.* at 826. The information she submitted to the database matched a DNA profile contained in the database. McGuire explained that when a match occurs, the analyst examines both profiles to confirm the match, and then the sample is re-analyzed to further verify the results. Once the sample was re-analyzed and confirmed, she notified the agency that submitted the DNA standard for that individual and requested another sample from the individual. McGuire testified that the individual was Boswell and that the DNA profile obtained from the stain on the t-shirt was consistent with Boswell. Moreover, the frequency with which this DNA profile would occur in the Caucasian population of the earth is one in forty billion. *Id.* at 834-35.

[25]   The other piece of evidence Boswell challenges as insufficient is the testimony of State's witness Jodie Bennett, who had been a fellow inmate of Boswell. Bennett testified that in 1991 he was incarcerated at the Pendleton facility. Boswell arrived there and was placed in a cell with Bennett's half-brother. As all three men were housed in the same unit and were all from the Terre Haute

area, they formed a bond. Bennett testified that he and Boswell were together almost every day playing cards, going to the gym, playing pool, playing ping pong, and dining together. Bennett further testified that as they were playing pool one day, Boswell told him that he had killed someone. *Id.* at 589. Bennett stated he did not believe Boswell and instead thought that Boswell was just trying to "sound like [a] tough guy[ ]." *Id.* When the two men were playing pool again a few days later, Bennett asked Boswell who he had killed and why. Bennett testified that although Boswell did not tell him who he had killed, Boswell told him that he had made sexual advances toward a woman which were rejected, and he thought she would tell someone about his advances, so he killed her. *Id.* at 590. Boswell also told Bennett that a child was present and that he had tried to kill the child as well. *Id.* After that, Boswell said he did not want to talk about it any more.

[26]    Subsequently in 2010 Bennett saw an article in a Terre Haute newspaper about Boswell's arrest for the murder of a woman and the attempted murder of her young child. Detective Guinn of the Indiana State Police was named in the article, so Bennett sent him a letter. Before Bennett's letter reached Detective Guinn, the detective came to the prison to speak to Bennett about a different case, and Bennett told him about Boswell's statements.

[27]    Bennett additionally testified that he is in prison for a double homicide to which he pleaded guilty. He indicated he is remorseful for his actions and will "give back to somebody else's family" if he has the chance. *Id.* at 601. To that end, Bennett acknowledged that he had previously testified about a confession from

a fellow inmate in another murder case. Bennett further testified that in the previous case as well as this one he had neither asked for any leniency or special treatment nor had he been offered any.

[28]   In addition to the testimony of McGuire and Bennett, the jury heard the testimony of William Wilson who is employed with the Indiana Department of Correction. He testified that, pursuant to prison records, Bennett and Boswell were housed in the same unit of the Pendleton facility from October 1991 to March 1992. Detective Guinn testified that the police believed Bennett was being truthful when he talked to them about Boswell's statement because he had certain information — that the crime was of a sexual nature — that had not been released to the media.

[29]   Moreover, David Montgomery, a neighbor of the Bakers, testified that in 1979 he and Boswell had frequently ridden a dirt bike and three wheelers back in the area where Ryan and Kathy Jo's body were found. Laura Sherrill, a close friend of Kathy Jo's, testified that the Thursday before Kathy Jo went missing she was on her way to Kathy Jo's house when a yellow Vega passed her several times on Kathy Jo's road. As she and Kathy Jo were sunbathing that day, the car passed Kathy Jo's house several more times, and, at one point, Kathy Jo yelled, "[W]hy don't you take a picture, it'll last longer." *Id.* at 702. Both Eva Knopp, a friend of Kenny's family, and Detective Guinn testified that in 1979 Boswell drove a yellow Vega. The evidence, including the DNA evidence and the testimony of inmate Bennett, was sufficient to support Boswell's convictions

of the murder of Kathy Jo and the attempted murder of Ryan beyond a reasonable doubt.

## 4. Motions for Mistrial

[30]   Next, Boswell contends that the trial court erred by denying his motions for mistrial. A mistrial is an extreme remedy warranted only when no other curative measure will rectify the situation. *Donnegan v. State*, 809 N.E.2d 966 (Ind. Ct. App. 2004), *trans. denied*. The denial of a mistrial is a determination within the trial court's discretion, and we will reverse its decision only for an abuse of that discretion. *Id.* To prevail on appeal from the denial of a motion for mistrial, the defendant must establish that he was placed in a position of grave peril to which he should not have been subjected. *Williams v. State*, 755 N.E.2d 1128 (Ind. Ct. App. 2001), *trans. denied*. The gravity of the peril is measured by the probable persuasive effect of the misconduct on the jury's decision. *Id.* "We accord great deference to the trial court's decision, as it is in the best position to gauge the circumstances and the probable impact on the jury." *Donnegan*, 809 N.E.2d at 972.

[31]   During direct examination, McGuire testified that she performed a presumptive test for blood on the reddish-brown stain on the back of the t-shirt and got a positive result. Tr. 3rd Trial p. 785. She did not perform a confirmation test for blood on the stain because, due to the stain's size, the confirmation test would have consumed the entire stain leaving nothing for DNA analysis. *Id.* at 786. On re-direct, the State asked this question of McGuire: "If any marker that

you're able to generate from that spot of blood on that shirt does not match the defendant what . . ." *Id.* at 862. Defense counsel objected, and the State restated the question as: "The presumptively positive spot for blood on that shirt, if any marker doesn't match the defendant from that, would he be excluded?" *Id.* McGuire answered in the affirmative.

[32]   Defense counsel requested that the jury be excused and requested a mistrial. In support of the motion, defense counsel argued that the State's question about a spot of blood mischaracterized the evidence because, although the spot tested presumptively positive for blood, no confirmatory test was performed on the spot. The State responded that it was a statement by counsel, and therefore not evidence, and that it could be corrected both by an admonishment and on cross-examination. The court denied the mistrial, admonished the jury, and allowed defense counsel to cross-examine McGuire. The court admonished the jury as follows:

> Before we took a break you heard a question and answer from the uh, the question from the State of Indiana and answer from the uh witness. I'm gonna order that answer stricken from the record. And the question and the answer stricken from the record. You're not to consider that in any way. The test that was performed on that area of that shirt was a presumptive for blood it was not, there was no conclusive proof that that was a spot of blood.

*Id.* at 870.

[33]   Later, during the State's rebuttal closing argument, the deputy prosecutor argued, "This isn't where somebody got their blood on something and then that

touched her because it, it was to [sic], to [sic] deep in the fibers. She said no transference it had to actually been blood that was put on the shirt directly." *Id.* at 923. Boswell's counsel objected and the deputy prosecutor stated, "I'm sorry, the . . . [t]he DNA, I'm sorry Judge. It was the DNA. It's the DNA. The DNA that was on her, was on her shirt." *Id.* The trial court then interjected with this admonishment: "The jury, the jury [sic] is to disregard his statement about blood. There was no presumptive, or there was no conclusive evidence that any, that was blood." *Id.* at 923-24. The deputy prosecutor again clarified, "That is the fact. It, that it's only the presumptive test and that's it." *Id.* at 924.

[34] After final instructions were given and the jury retired to deliberate, defense counsel again requested a mistrial. The State argued that the court's response of admonishing the jury when the misstatements occurred and instructing the jury in final instructions that statements of the attorneys are not evidence was sufficient to cure any error. The State added that if the court deemed it necessary, the proper action would be for the court to further admonish the jury. The court agreed with the State and denied Boswell's motion for mistrial.

[35] When the deputy prosecutor mischaracterized the test results of the stain in posing a question to McGuire on re-direct, he immediately restated his question to correct the misstatement. The trial court then struck the question and answer from the record, admonished the jury not to consider the question and answer in any way, and clarified that the result of McGuire's testing of the stain was presumptive for blood but was not conclusive proof that the substance was

blood. We presume the jury followed the trial court's admonishment. *Street v. State*, 30 N.E.3d 41 (Ind. Ct. App. 2015), *trans. denied*.

[36]   In the second instance, the deputy prosecutor misspoke during rebuttal closing argument and immediately corrected his mistake. He also later clarified again that the blood testing on the stain was only presumptive. The trial court admonished the jury to disregard the State's statement about blood and reminded the jury that the test was not conclusive. Additionally, in its final instructions, the trial court instructed the jury that statements made by counsel are not evidence.[5] We not only presume the jury obeyed the trial court's admonishment, *id.*, but also we presume that jurors followed the court's instructions. *See Carpenter v. State*, 15 N.E.3d 1075 (Ind. Ct. App. 2014), *trans. denied*.

[37]   Boswell made no showing that he was placed in a position of grave peril to which he should not have been subjected by the State's misstatements. Regardless, based on the record, we conclude the trial court properly and timely admonished the jury following immediate correction of the misstatements by the State, and any error stemming from the misstatements was cured. Reversible error is seldom found when a trial court has admonished the jury to disregard a statement made during the proceedings. *Burks v. State*, 838 N.E.2d

---

[5] In final instruction number eighteen, the trial court instructed the jury as follows: "Statements by counsel - Statements made by the attorneys are not evidence." Tr. 3rd Trial p. 941.

510 (Ind. Ct. App. 2005), *trans. denied*. The trial court did not abuse its discretion by denying Boswell's motions for mistrial.

## 5. Sentencing

[38]   As his final claim of error, Boswell asserts that he was sentenced in violation of the Supreme Court's holding in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Although Boswell was sentenced in 2015, he committed these offenses in 1979 well before the April 25, 2005 revisions to our sentencing statutes. Therefore, in this case we apply the former presumptive sentencing scheme rather than the current advisory sentencing scheme. *See Gutermuth v. State*, 868 N.E.2d 427, 431 n.4 (Ind. 2007) (explaining that 2005 revisions to sentencing statutes did not alter long-standing rule that sentencing statute in effect at time crime is committed governs sentence for crime). As applied to Indiana's presumptive sentencing scheme under which Boswell was sentenced, *Blakely* prohibits the reliance on facts not found by a jury or admitted by the defendant to enhance a sentence above the presumptive, with the exception of criminal history. 124 S. Ct. 2531. Other than the bald assertion that he was entitled to have a jury determine the facts used to aggravate his sentence for his attempted murder conviction, Boswell presents no argument on this issue.

[39]   As an initial matter, we address the State's argument that Boswell waived any challenge under *Blakely* because he did not make an objection at the time of sentencing. Our Supreme Court has rejected this waiver argument. *See Kincaid*

*v. State*, 837 N.E.2d 1008 (Ind. 2005) (holding that for cases in which appellant's initial brief was filed after date of decision in *Smylie v. State*, 823 N.E.2d 679 (Ind. 2005), a specific *Blakely* claim must be made in appellant's initial brief on direct appeal for it to be reviewed on merits).[6] Here, Boswell raised his *Blakely* claim in his initial appellant's brief.

[40]   Attempted murder is a Class A felony. Ind. Code § 35-41-5-1(a) (1977). In 1979, the presumptive sentence for a Class A felony was thirty years, with not more than twenty years added for aggravating circumstances or not more than ten years subtracted for mitigating circumstances. Ind. Code § 35-50-2-4 (1977). For his conviction of the attempted murder of Ryan Baker, Boswell was sentenced to forty-five years. At his sentencing, the trial court stated:

> Mr. Boswell with regard to the aggravating circumstances, I know you don't have much criminal history but the criminal history you have is significant. You spent thirty years at the Indiana Department of Corrections [sic] for criminal confinement, criminal deviate conduct and the victim was compelled by force or an imminent threat of force and then the criminal confinement was armed with a deadly weapon and then rape. That's significant. There's also as to the, and that goes toward both counts. As to the count against Ryan, the attempted murder. Ryan was two years old at the commission of this crime. This violent crime. Against his mother and against him.

---

[6] We note that in *Kincaid*, the sentencing hearing occurred just two weeks after *Blakely* was issued and that Boswell's sentencing in 2015 occurred almost eleven years after the *Blakely* decision. Although we acknowledge that "a party may not sit idly by, permit the court to act in a claimed erroneous manner, and then attempt to take advantage of the alleged error at a later time," *see Robles v. State*, 705 N.E.2d 183, 187 (Ind. Ct. App. 1998), we are constrained to abide by the precedent set by our Supreme Court.

> If not for a few more hours this would have been a double
> murder. He was present when his mother was murdered. For
> the past almost thirty six [sic] years the emotional and
> psychological impact is it, it has had on Ryan and for that being
> the whole uh, Baker family. There are no mitigating
> circumstances in this case.

Tr. Sent'g. Hrg. p. 43.

[41]   Clearly, Boswell's prior convictions do not violate *Blakely* and thus are a valid

aggravator. Moreover, his prior convictions are particularly relevant given the

fact that they were of a sexual nature as was the attack in this case.

[42]   The latter part of the judge's comments referring only to the attempted murder

of Ryan appear to be an acknowledgement of the horrific nature of this crime

and its ripple effect on family, friends, and the community rather than an

independent basis for enhancement. If, however, the trial court used the nature

and circumstances of the crime as an aggravator, it is improper under *Blakely*

because it was based on facts neither found beyond a reasonable doubt by a jury

nor admitted by the defendant.

[43]   Ultimately, a single aggravating circumstance is adequate to justify a sentence

enhancement. *See Williams v. State*, 891 N.E.2d 621 (Ind. Ct. App. 2008).

Given the significance that the trial court placed on the aggravating factor of

Boswell's prior convictions and that the trial court found no mitigating factors,

we find no error in Boswell's enhanced sentence for the attempted murder of

Ryan Baker. *See Davis v. State*, 835 N.E.2d 1087 (Ind. Ct. App. 2005) (stating

that if trial court has improperly relied on aggravators neither found by jury nor

admitted by defendant, sentence may still be upheld if other valid aggravators exist from which court on appeal can discern that trial court would have imposed same sentence).

[44]   Boswell also alleges, without any supporting argument or case citation, that the trial court's imposition of consecutive sentences was in violation of *Blakely*. He is incorrect. In *Smylie*, our Supreme Court held that the imposition of consecutive sentences does not implicate *Blakely*. 823 N.E.2d at 686 (holding there is "no constitutional problem with consecutive sentencing so long as the trial court does not exceed the combined statutory maximums"). We find no error in the trial court's sentencing of Boswell.

[45]   In light of the foregoing, we affirm the judgment of the trial court.

[46]   Judgment affirmed.


Bailey, J., and Bradford, J., concur.

Officer Larry Kuhn
Cambridge City Police Department
127 N. Foote St.,
Cambridge City, IN 47327

Police Chief Richard Roberts

127 N. Foote St.,

Cambridge City, IN 47327

Officer Stover Badge # C4

127 N. Foote St.,
Cambridge City, IN 47327

Officer T.J. Wilkinson
9000 Airline Hwy.,
Baton Rouge, LA 70815

FBI Special Agent Joseph L. Chancy
8825 Nelson B Klein Pkwy,
Indianapolis, IN 46250

FBI Special Agent "Wright"
703-215-7241

[? Is this Special Agent Robert G. Wright, Jr.?
Reported missing/stolen/forfeit hard drives to him.]

FBI Special Agent Caitlyn Stinson
920 Pierremont Rd, Suite 400
Shreveport, LA 71106

FBI Special Agent Jason Hodges
920 Pierremont Rd, Suite 400
Shreveport, LA 71106



5:04

**(703) 215-7241**
Mobile

11/2/22 2:43 PM

This is Special Agent Wright with the FBI please give me a call.

11/4/22 2:01 AM

The part about all this that gets me, is that my background check started coming back wrong when the stuff I was talking to you about happened. I know you have other important matters to handle, but if you could point me in the right direction to just check why that occurred, I'd truly appreciate it

11/22/22 12:18 PM

Thank you for all your time. S.A. Chaney may be looking into it.

Sent

# JON C. CUMMINGS
## TECHNICAL SURVEILLANCE SPECIALIST

### DEPARTMENT OF JUSTICE
BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES

PHONE: 313-952-6001
FAX: 313-952-6039
MAIN: 313-952-6030
CELL: 313-268-6970

12605 ARNOLD ST.
REDFORD, MI 48239
EMAIL: Jon.Cummings@atf.gov







4:44 ▮ 🔋 100%

← cat

Any storage device such as a hard drive that Jared Junkin could have touched or accessed is abandoned and forfeit and should be destroyed

I don't know who has been in the shed besides us either since multiple people had access

Thank you for letting me know and agreeing that I'm no longer renting the shed

Please just take care of my cats and we'll coordinate with you at some point to pick up other personal belongings, but we aren't going to collect anything else at this time

Ok let me make sure I understand this correctly so are you leaving the cats for good and I am assuming that the rigs are also since they have hard drive attached and Jared had access to them as well. Also will you be getting your stuff before the end of Februr    like u had ask you to do



Message

4:44     100%

←    cat        ∧   ∨



this correctly so are you leaving the cats for good and I am assuming that the rigs are also since they have hard drive attached and Jared had access to them as well. Also will you be getting your stuff before the end of February like u had ask you to do

The drives should be removed and destroyed, I don't know if they have anything or not and don't want to know.

The graphics cards, CPU, Ram, and motherboards, along with the frames have no persistent storage, only the hard drives.

Which again, should be removed and destroyed, any persistent electronic storage device is abandoned and forfeit

Of course I'm not abandoning my cats, we will pick them up as soon as we can.

For other belongings we will coordina   ith you

Message



# Wayne County Emergency Communications
### Richmond, Indiana

CFS - Command Log                                    Printed on January 9, 2022

| | |
|---|---|
| **CFS #** | CFS21-082424 |
| **Call Taker** | Nancie Ruhl |
| **Location** | 9 MULBERRY ST, CAMBRIDGE CITY, IN 47327 |
| **Location Details** | |
| **Primary Incident Code** | PEACEOFFICER : Peace Officer Detail |
| **Mod** | |
| **Priority** | 3 |
| **Use Caution** | No |
| **Primary Disposition** | Assignment Completed/Settled by Phone Contact |
| **Beat** | |
| **Zone** | |
| **Call Time** | 12/27/21 16:45:11 |
| **Completed Time** | 12/27/21 17:56:10 |

---

### Reporters

**TURPIN, JON F (Initial Reporter)**

| | |
|---|---|
| **Sex** | |
| **DOB** | |
| **Address** | |
| **Report Time** | 12/27/21 16:45:11 |
| **How Reported** | Phone |
| **From Phone** | (317) 378-9314 |
| **Contact Phone** | |
| **Comments** | |

---

### Other Names

**TURPIN, JON FREDRICK (Complainant)**

| | |
|---|---|
| **Sex** | Male |
| **Address** | 9 MULBERRY ST CAMBRIDGE CITY, IN 47327 |
| **Cell Phone** | (317) 378-9314 |
| **Comments** | |

---

### Vehicles

---

### Responders

| | | |
|---|---|---|
| C2 (Primary) | C2 - Kuhn, Larry | CCPD (Primary) |
| 89-27 (Primary) | 89-027 - Garrett, Brent | WCSD |

---

### Response Times

| | |
|---|---|
| **Assigned** | 12/27/21 16:47:19 |
| **Enroute** | 12/27/21 16:47:50 |
| **Arrived** | 12/27/21 16:49:30 |
| **Leaving** | 12/27/21 17:03:31 * |
| **Arrived At** | 12/27/21 17:03:31 |

**Completed** 12/27/21 17:56:10

| IR / External Agency Numbers |
|---|

| Command Log Filter: All Commands \| Details: Hidden \| Units: All Units \| Revised Entries: Hidden |
|---|

12/27/21 16:45:11 | Ruhl, Nancie | New CFS
12/27/21 16:46:25 | Ruhl, Nancie | CP STANDING BY IN THE AREA IN HIS WHI CRV. HE NEEDS TO GET HIS BELONGINGS FROM RES
12/27/21 16:46:55 | Dunaway, Rebecca | NOTES FROM THE PRE CALL TODAY 12/27/21 15:48:45 Kuhn, Larry John F Turpin thinks that his parents has some of his vehicle paperwork and that would prevent him from caring his firearm. I explained to John that the vehicle paperwork has no say about him being abel to carry his firearm as long he is with it and has his CCW permit 12/27/21 15:49:59 Kuhn, Larry He wanted to know if he still had the right to enter the home on Mulberry St since he paid Decembers rent. I advised to to talk to his attorney about those circumstances
12/27/21 16:47:19 | Dunaway, Rebecca | C2 | Dispatch
12/27/21 16:47:50 | Dunaway, Rebecca | 89-27 | Enroute
12/27/21 16:49:30 | Dunaway, Rebecca | C2 | On Scene
12/27/21 16:50:33 | Garrett, Brent | 89-27 | On Scene
12/27/21 17:01:13 | Dunaway, Rebecca | 89-27, C2 | Check Status (Time (minutes): 15) - SIG 54
12/27/21 17:03:15 | Dunaway, Rebecca | C2 OUT AT 526 W MAPLE ST SPEAKING W/ THE PARENTS
12/27/21 17:03:31 | Dunaway, Rebecca | C2 | Arrived At (Location: 526 W MAPLE ST ST, CAMBRIDGE CITY, IN, 47327)
12/27/21 17:04:58 | Dunaway, Rebecca | 89-27, C2 | Radio Comm
12/27/21 17:06:04 | Dunaway, Rebecca | C2 | On Scene
12/27/21 17:06:15 | Dunaway, Rebecca | 89-27, C2 | Check Status (Time (minutes): 15) - R/C
12/27/21 17:20:43 | Dunaway, Rebecca | 89-27, C2 | Check Status (Time (minutes): 15) - sig 54
12/27/21 17:23:04 | Garrett, Brent | 89-27 | Available (Location: In Service)
12/27/21 17:35:01 | Kuhn, Larry | Jon was still requesting paperwork and other belonging from the house and his parents.
12/27/21 17:35:45 | Kuhn, Larry | Jon believes that he paid rent for December and has a cashed check that says he did.
12/27/21 17:35:52 | Kuhn, Larry | C2 | Check Status
12/27/21 17:35:55 | Dunaway, Rebecca | C2 | Clear Alarms
12/27/21 17:36:10 | Kuhn, Larry | Also on the check it read for damages
12/27/21 17:37:33 | Kuhn, Larry | Jon did receive a receipt for that payment that read for damages.
12/27/21 17:38:56 | Kuhn, Larry | Jon's mother stated that he does not have any right to the property and that she would put their belonging in the garage. and schedule a day for him to come pick it up
12/27/21 17:54:33 | Kuhn, Larry | I told Jon that I was not going to tell him yes or no on going into the property but I would suggest that he gets legal advice first.
12/27/21 17:55:06 | Kuhn, Larry | Jon left and agreed to wait for his property to be in the garage and come back to get it all.
12/27/21 17:56:10 | Kuhn, Larry | C2 | Available (Location: In Service)

| CLQ |
|---|

**Requested At**
**Sent To**
**Status**
**Received At**
**Location**
**Accuracy**



# Wayne County Emergency Communications
### Richmond, Indiana

CFS - Command Log                                                  Printed on January 9, 2022

| | |
|---|---|
| **CFS #** | CFS22-001528 |
| **Call Taker** | Jalin Christian |
| **Location** | 127 N FOOTE ST, CAMBRIDGE CITY, IN 47327 (Cambridge City Police Dept) |
| **Location Details** | |
| **Primary Incident Code** | SWO : Speak with Officer |
| **Mod** | |
| **Priority** | 4 |
| **Use Caution** | No |
| **Primary Disposition** | Assignment Completed/Settled by Phone Contact |
| **Beat** | |
| **Zone** | |
| **Call Time** | 01/08/22 19:28:05 |
| **Completed Time** | 01/08/22 20:51:20 |

### Reporters

**TURPIN, JOHN (Initial Reporter)**

| | |
|---|---|
| **Sex** | |
| **DOB** | |
| **Address** | |
| **Report Time** | 01/08/22 19:28:05 |
| **How Reported** | |
| **From Phone** | (317) 318-8038 |
| **Contact Phone** | |
| **Comments** | |

### Other Names

### Vehicles

### Responders

C3 (Primary)          C3 - Webb, Corey          CCPD (Primary)

### Response Times

| | |
|---|---|
| **Assigned** | 01/08/22 20:49:37 * |
| **Enroute** | 01/08/22 20:49:37 |
| **Arrived** | 01/08/22 20:51:20 * |
| **Leaving** | |
| **Arrived At** | |
| **Completed** | 01/08/22 20:51:20 |

### IR / External Agency Numbers

**Command Log** Filter: All Commands | Details: Hidden | Units: All Units | Revised Entries: Hidden

01/08/22 19:28:05 | Christian, Jalin | New CFS
01/08/22 19:29:01 | Christian, Jalin | RED BIKE

01/08/22 19:29:36 | Christian, Jalin | 9 MULBERRY ST
01/08/22 19:30:58 | Christian, Jalin | CALLER USED TO LIVE AT THE ADDRESS ABOVE, HAS RECENTLY MOVED
01/08/22 19:31:13 | Christian, Jalin | FROM WHAT I COULD GATHER SOMEONE IS PICKING UP HIS PROPERTY
WHO SHOULD NOT BE
01/08/22 19:31:16 | Christian, Jalin | SIG 6
01/08/22 19:31:31 | Christian, Jalin | CALLER WAS ADVISED OF THE EXTENDED ETA
01/08/22 20:49:37 | Webb, Corey | C3 | Enroute
01/08/22 20:51:14 | Webb, Corey | I TRIED CALLING THE NUMBER BUT IT GOES TO SOME GOOGLE APP.
01/08/22 20:51:20 | Webb, Corey | C3 | Available (Location: In Service)

**CLQ**

**Requested At**
**Sent To**
**Status**
**Received At**
**Location**          ,
**Accuracy**



# Wayne County Emergency Communications
### Richmond, Indiana

CFS - Command Log                                                    Printed on January 9, 2022

| | |
|---|---|
| **CFS #** | CFS22-001528 |
| **Call Taker** | Jalin Christian |
| **Location** | 127 N FOOTE ST, CAMBRIDGE CITY, IN 47327 (Cambridge City Police Dept) |
| **Location Details** | |
| **Primary Incident Code** | SWO : Speak with Officer |
| **Mod** | |
| **Priority** | 4 |
| **Use Caution** | No |
| **Primary Disposition** | Assignment Completed/Settled by Phone Contact |
| **Beat** | |
| **Zone** | |
| **Call Time** | 01/08/22 19:28:05 |
| **Completed Time** | 01/08/22 20:51:20 |

### Reporters

**TURPIN, JOHN (Initial Reporter)**

| | |
|---|---|
| **Sex** | |
| **DOB** | |
| **Address** | |
| **Report Time** | 01/08/22 19:28:05 |
| **How Reported** | |
| **From Phone** | (317) 318-8038 |
| **Contact Phone** | |
| **Comments** | |

### Other Names

### Vehicles

### Responders

C3 (Primary)                C3 - Webb, Corey            CCPD (Primary)

### Response Times

| | |
|---|---|
| **Assigned** | 01/08/22 20:49:37 * |
| **Enroute** | 01/08/22 20:49:37 |
| **Arrived** | 01/08/22 20:51:20 * |
| **Leaving** | |
| **Arrived At** | |
| **Completed** | 01/08/22 20:51:20 |

### IR / External Agency Numbers

### Command Log Filter: All Commands | Details: Hidden | Units: All Units | Revised Entries: Hidden

01/08/22 19:28:05 | Christian, Jalin | New CFS
01/08/22 19:29:01 | Christian, Jalin | RED BIKE

Page 1 of 2

01/08/22 19:29:36 | Christian, Jalin | 9 MULBERRY ST
01/08/22 19:30:58 | Christian, Jalin | CALLER USED TO LIVE AT THE ADDRESS ABOVE, HAS RECENTLY MOVED
01/08/22 19:31:13 | Christian, Jalin | FROM WHAT I COULD GATHER SOMEONE IS PICKING UP HIS PROPERTY
WHO SHOULD NOT BE
01/08/22 19:31:16 | Christian, Jalin | SIG 6
01/08/22 19:31:31 | Christian, Jalin | CALLER WAS ADVISED OF THE EXTENDED ETA
01/08/22 20:49:37 | Webb, Corey | C3 | Enroute
01/08/22 20:51:14 | Webb, Corey | I TRIED CALLING THE NUMBER BUT IT GOES TO SOME GOOGLE APP.
01/08/22 20:51:20 | Webb, Corey | C3 | Available (Location: In Service)

| CLQ |
| --- |

**Requested At**
**Sent To**
**Status**
**Received At**
**Location**
**Accuracy**



# Wayne County Emergency Communications
### Richmond, Indiana

CFS - Command Log

Printed on December 27, 2021

| | |
|---|---|
| **CFS #** | CFS21-080790 |
| **Call Taker** | Natalie Meyers |
| **Location** | 127 N FOOTE ST, CAMBRIDGE CITY, IN 47327 (Cambridge City Police Dept) |
| **Location Details** | |
| **Primary Incident Code** | SWO : Speak with Officer |
| **Mod** | |
| **Priority** | 4 |
| **Use Caution** | No |
| **Primary Disposition** | Assignment Completed/Settled by Phone Contact |
| **Beat** | |
| **Zone** | |
| **Call Time** | 12/19/21 06:16:46 |
| **Completed Time** | 12/19/21 06:40:09 |

### Reporters

**turpin, john (Initial Reporter)**

| | |
|---|---|
| **Sex** | |
| **DOB** | |
| **Address** | |
| **Report Time** | 12/19/21 06:16:46 |
| **How Reported** | |
| **From Phone** | (317) 378-9314 |
| **Contact Phone** | |
| **Comments** | |

### Other Names

**TURPIN, JON BRENT (Other)**

| | |
|---|---|
| **Sex** | Male |
| **DOB** | |
| **Address** | 522 W MAPLE ST<br>CAMBRIDGE, IN 47327 |
| **Home Phone** | (765) 478-3258 |
| **Cell Phone** | (765) 541-0777 |
| **Comments** | |

**TURPIN, JON FREDRICK (Other)**

| | |
|---|---|
| **Sex** | Male |
| **DOB** | |
| **Address** | 9 MULBERRY ST<br>CAMBRIDGE CITY, IN 47327 |
| **Cell Phone** | (317) 378-9314 |
| **Comments** | |

### Vehicles

### Responders

| C2 (Primary) | C2 - Kuhn, Larry | CCPD (Primary) |
|---|---|---|

**Response Times**

| | |
|---|---|
| **Assigned** | 12/19/21 06:19:23 |
| **Enroute** | 12/19/21 06:29:43 * |
| **Arrived** | 12/19/21 06:29:43 |
| **Leaving** | |
| **Arrived At** | |
| **Completed** | 12/19/21 06:40:09 |

**IR / External Agency Numbers**

**Command Log** Filter: All Commands | Details: Hidden | Units: All Units | Revised Entries: Shown

12/19/21 06:16:46 | Meyers, Natalie | New CFS
12/19/21 06:17:27 | Meyers, Natalie | SIG 6 ONLY
12/19/21 06:17:57 | Meyers, Natalie | THE ONGOING ISSUES WITH HIS FAMILY AND HARASSMENT.
12/19/21 06:19:23 | Meyers, Natalie | C2 | Dispatch
12/19/21 06:29:40 | Kuhn, Larry | 1st call no answer
12/19/21 06:29:43 | Kuhn, Larry | C2 | On Scene
12/19/21 06:30:59 | Kuhn, Larry | 2nd call no answer
12/19/21 06:38:44 | Kuhn, Larry | 3rd call now answer
12/19/21 06:38:55 | Kuhn, Larry | no
12/19/21 06:40:09 | Meyers, Natalie | C2 | Complete
12/19/21 06:53:38 | Meyers, Natalie | HE CALLED BACK AND CAN ANSWER HIS TX NOW
12/19/21 06:53:42 | Meyers, Natalie | C2 | Dispatch
12/19/21 07:13:53 | Meyers, Natalie | C2 | Available
12/19/21 07:14:50 | Meyers, Natalie | Complete
12/19/21 08:25:14 | Pierce, Indie | C2 | Dispatch
12/19/21 08:33:04 | Kuhn, Larry | John is worried about a bitcoin machine that he had Hagerstown. He stated that this machine has been used by someone else and thing that inappropriate child images has went through it. John stated that it has been removed and is now in storage and that he thinks his father and Michael Mann is trying to frame him. John told me that he has contacted the cyber tip line and reported this.
12/19/21 08:34:13 | Kuhn, Larry | C2 | Available (Location: In Service)

**CLQ**

**Requested At**
**Sent To**
**Status**
**Received At**
**Location**
**Accuracy**



# Wayne County Emergency Communications
## Richmond, Indiana

CFS - Command Log                                            Printed on December 27, 2021

| | |
|---|---|
| **CFS #** | CFS21-075668 |
| **Call Taker** | Nancie Ruhl |
| **Location** | 9 MULBERRY ST, CAMBRIDGE CITY, IN 47327 |
| **Location Details** | |
| **Primary Incident Code** | THEFT : Investigate Theft |
| **Mod** | |
| **Priority** | 3 |
| **Use Caution** | No |
| **Primary Disposition** | Assignment Completed/Settled by Phone Contact |
| **Beat** | |
| **Zone** | |
| **Call Time** | 11/25/21 11:16:05 |
| **Completed Time** | 11/25/21 12:37:17 |

### Reporters

**TURPIN, JON (Initial Reporter)**

| | |
|---|---|
| **Sex** | |
| **DOB** | |
| **Address** | |
| **Report Time** | 11/25/21 11:16:05 |
| **How Reported** | 911 |
| **From Phone** | (317) 378-9314 |
| **Contact Phone** | |
| **Comments** | |

### Other Names

**TURPIN, JON FREDRICK (Victim)**

| | |
|---|---|
| **Sex** | Male |
| **DOB** | |
| **Address** | 9 MULBERRY ST |
| | CAMBRIDGE CITY, IN 47327 |
| **Cell Phone** | (317) 378-9314 |
| **Comments** | |

### Vehicles

### Responders

| C2 (Primary) | C2 - Kuhn, Larry | CCPD (Primary) |
|---|---|---|
| 126 | 126 - Santiago, Sergio | RPD |
| 128 (Primary) | 128 - Tudor, Jordan | RPD |

### Response Times

| | |
|---|---|
| **Assigned** | 11/25/21 11:38:20 * |
| **Enroute** | 11/25/21 11:38:20 * |
| **Arrived** | 11/25/21 11:38:20 |
| **Leaving** | |

**Arrived At**

**Completed** 11/25/21 12:37:17

| IR / External Agency Numbers |
| --- |

| CC2021-0097 | PO: C2 - Kuhn, Larry |
| --- | --- |

| Command Log Filter: All Commands \| Details: Hidden \| Units: All Units \| Revised Entries: Shown |
| --- |

11/25/21 11:16:05 | Ruhl, Nancie | New CFS
11/25/21 11:19:46 | Ruhl, Nancie | BLACK GLOCK 9 MIL W/LIGHT GRY MARKING'S W/IN A BLK HOLSTER W/1 EXTRA MAG. SUSPECT IS CHRIS TAGGART WHO WAS @ HIS RES YESTERDAY. CP IS IN THE MIDDLE OF MOVING. CP IS 76 FROM NEW CASTLE IS A LT BLUE PONTIAC VIBE ETA 20 MINS.
11/25/21 11:20:36 | Ruhl, Nancie | CP ADV CHRIS IS THE ONLY FRIEND OF HIS THAT HELPED HIM MOVE YESTERDAY THAT HE NORMALLY DOESNT HANG WITH/TRUST.
11/25/21 11:22:26 | Ruhl, Nancie | CP WILL LOOK FOR SERIAL #'S WHEN HE RETURNS TO CAMBRIDGE
11/25/21 11:22:38 | Ruhl, Nancie | ENTRY REVISED - BLACK GLOCK 9 MIL W/LIGHT GRY MARKING W/IN A BLK HOLSTER W/1 EXTRA MAG. SUSPECT IS CHRIS TAGGART WHO WAS @ HIS RES YESTERDAY. CP IS IN THE MIDDLE OF MOVING. CP IS 76 FROM NEW CASTLE IS A LT BLUE PONTIAC VIBE ETA 20 MINS.
11/25/21 11:38:20 | Kuhn, Larry | C2 | On Scene
11/25/21 11:59:36 | Meyers, Natalie | 126, 128 | Staged
11/25/21 11:59:56 | Meyers, Natalie | 126, 128 | On Scene
11/25/21 12:00:03 | Meyers, Natalie | 126 | Clear Alarms
11/25/21 12:03:05 | Dunaway, Rebecca | 126, 128 | Available
11/25/21 12:24:15 | Pierce, Indie | C2 | Check Status (Time (minutes): 50)
11/25/21 12:37:17 | Kuhn, Larry | C2 | Available (Location: In Service)

| CLQ |
| --- |

**Requested At**
**Sent To**
**Status**
**Received At**
**Location** ,
**Accuracy**



# Wayne County Emergency Communications
### Richmond, Indiana

CFS - Command Log | Printed on December 27, 2021

| | |
|---|---|
| **CFS #** | CFS21-074974 |
| **Call Taker** | Valerie Boggs |
| **Location** | 9 MULBERRY ST, CAMBRIDGE CITY, IN 47327 |
| **Location Details** | |
| **Primary Incident Code** | HARRASSMENT : Harassment |
| **Mod** | |
| **Priority** | 3 |
| **Use Caution** | No |
| **Primary Disposition** | Assignment Completed/Settled by Phone Contact |
| **Beat** | |
| **Zone** | |
| **Call Time** | 11/21/21 23:41:30 |
| **Completed Time** | 11/22/21 01:50:10 |

## Reporters

**TURPIN, JON FREDRICK (Initial Reporter)**

| | |
|---|---|
| **Sex** | Not Specified |
| **DOB** | |
| **Address** | 9 MULBERRY ST<br>CAMBRIDGE CITY, IN 47327 |
| **Report Time** | 11/21/21 23:41:00 |
| **How Reported** | 911 |
| **From Phone** | (317) 378-9314 |
| **Contact Phone** | |
| **Comments** | |

## Other Names

**TURPIN, JON (Suspect)**

| | |
|---|---|
| **Sex** | Male |
| **DOB** | |
| **Address** | 522 W MAPLE ST<br>CAMBRIDGE, IN 47327 |
| **Home Phone** | (765) 478-3258 |
| **Cell Phone** | (765) 541-0777 |
| **Comments** | |

## Vehicles

## Responders

| C3 (Primary) | C3 - Webb, Corey | CCPD |
|---|---|---|
| 89-22 (Primary) | 89-022 - Brown, Thomas | WCSD (Primary) |

## Response Times

| | |
|---|---|
| **Assigned** | 11/21/21 23:48:33 |
| **Enroute** | 11/22/21 00:48:30 * |
| **Arrived** | 11/22/21 00:48:30 |

**Leaving**     11/22/21 01:18:16
**Arrived At**
**Completed** 11/22/21 01:50:10

| IR / External Agency Numbers |
|---|

| Command Log Filter: All Commands | Details: Hidden | Units: All Units | Revised Entries: Shown |
|---|

11/21/21 23:41:30 | Boggs, Valerie | New CFS
11/21/21 23:42:09 | Boggs, Valerie | BEING HARASSED BY HIS PARENTS VIA TX
11/21/21 23:44:41 | Boggs, Valerie | CALLER'S PARENTS ARE HIS LANDLORD.
11/21/21 23:47:17 | Boggs, Valerie | HAS BEEN COMING IN THE HOUSE UNINVITED. FATHER THREATENED TO SHOOT/KILL THE CALLER LAST SUNDAY.
11/21/21 23:47:28 | Boggs, Valerie | ALL HARASSMENT TODAY IS BY TX
11/21/21 23:48:33 | Brown, Jennifer | 89-22 | Dispatch
11/21/21 23:48:56 | Brown, Jennifer | 89-22 | Available
11/21/21 23:50:03 | Boggs, Valerie | CALLER SIG 80 X3 - HAS APPROVED CCW
11/21/21 23:51:13 | Boggs, Valerie | SUSPECT - JON TURPIN - SIG 80 X3 - APPROVED CCW
11/22/21 00:28:37 | Newton, Rachel | CALLED 911 AGAIN TO SEE WHERE OFFICERS WERE.... ADV HIM THAT THEY ARE CLEARING FROM OTHER CALLS AND WILL START THAT WAY SHORTLY
11/22/21 00:41:54 | Brown, Jennifer | C3 | Dispatch
11/22/21 00:48:30 | Webb, Corey | C3 | On Scene
11/22/21 01:18:16 | Brown, Jennifer | C3 | Leaving Scene (Location: 522 W MAPLE ST)
11/22/21 01:44:38 | Webb, Corey | I SPOKE WITH JON F. TURPIN AND HE STATED THAT HIS PARENTS ARE HARASSING HIM AND HIS FIANCE. THEY OWN THE HOME HE LIVES IN AND THEY COME INTO TO HOUSE WHEN THEY WANT. HE SAID HE HAS THEM BLOCKED ON EVERYTHING BUT THEY CONTINUE TO TRY TO CONTACT HIM THROUGH OTHER PEOPLE. I ASKED HIM TO SEE THE TEXT MESSAGES WHERE THEY ARE HARASSING HIM AND HE SHOWED ME ONES WHERE HIS PARENTS WERE WANTING HIM AND HIS FIANCE TO COME TO DINNER THAT NIGHT SINCE THEY HAD TO WORK THE NEXT NIGHT. JON SAID HE WOULD COME THERE ON MONDAY OR TUESDAY, BUT HIS MOM SAID CANT YOU JUST SPARE 30 MINUTES. HE SAID HE WENT UP THERE WITH HIS FIANCE TO GET THE GARAGE DOOR OPENERS THAT THEY HAD FOR HIM. HE SAID HE GOT ANGRY WHILE HE WAS AT HIS PARENTS HOUSE AND BROKE THE GARAGE DOOR OPENER. HE SAID HE JUST WANTS HIS PARENTS TO LEAVE HIM ALONE AND HE WANTS TO GET A RESTRAINING ORDER AGAINST THEM. I TOLD HIM HE WOULD HAVE TO GO THROUGH THE COURTS TO HAVE THAT DONE. HE ALSO WANTED ME TO TRESSPASS THEM BUT i TOLD HIM SINCE THEY OWNED THE HOME, I WAS UNABLE TO DO THAT. HE ALSO STATED THAT WHEN HE WAS AT HIS PARENTS HOUSE THE OTHER NIGHT HIS DAD THREATENED TO KILL HIM, I ASKED HIM IF HE HAD THIS ON RECORDING OR THROUGH TEXT MESSAGES AND HE SAID NO IT WAS JUST HIS PARENTS, HIM AND HIS FIANCE THERE. I ADVISED JON THAT WITHOUT HIS DAD ADMITTING TO THE TREAT THEN I WAS NOT ABLE CHARGE HIM SINCE THERE WAS NO PROOF THAT IT HAPPENED, BUT I WOULD SPEAK WITH HIS PARENTS FOR HIM AND ASK THEM TO LEAVE HIM ALONE.
11/22/21 01:49:54 | Webb, Corey | I SPOKE WITH JON AND LINDA TURPIN, JON'S PARENTS. I TOLD THEM THAT JON WANTS THEM TO LEAVE HIM ALONE AND THEY SAID THAT THEY HAVE FOR OVER A WEEK EVER SINCE HE CAME TO THE HOUSE FOR DINNER AND STORMED THROUGH THERE DOOR CUSSING AND SCREAMING AT THEM. THEY SAID WHEN HE CAME UP TO THERE HOUSE HE PUSHED THROUGH THE DOOR AND GOT INTO HIS MOMS FACE, AND SHE SAID THAT SHE WAS SCARED. HE LEFT THEN HIS FIANCE CAME BACK UP AND WHEN HIS FIANCE GOT THERE HE AGAIN CAME CRASHING THROUGH THE DOOR AND JON TURPIN SAID HE TOLD HIM THAT KIND OF BEHAVIOR IS WHAT GETS YOU SHOT OR TAKEN TO JAIL. LINDA CONFIRMED THAT IS WHAT JON SAID AND HE DID NOT THREATEN THEIR SON. THEY SAID HE HAS BEEN GETTING WORSE HE LATELY AND POSTED A BUNCH OF STUFF ON FACEBOOK ABOUT THEIR FRIENDS THAT AREN'T TRUE AND THEY SAID THEY ARE SCARED THAT HE IS GOING TO HURT HIMSELF OR THEM. JON AND LINDA AGREED TO LEAVE HIM ALONE AND THEY SAID THAT IS WHAT THEY WERE PLANNING ON DOING ANYWAYS.
11/22/21 01:50:10 | Webb, Corey | C3 | Available (Location: In Service)

| CLQ |
|---|

**Requested At**
**Sent To**

**Status**
**Received At**
**Location**          ,
**Accuracy**



# Wayne County Emergency Communications
### Richmond, Indiana

CFS - Command Log                                           Printed on December 27, 2021

| | |
|---|---|
| **CFS #** | CFS21-081100 |
| **Call Taker** | Jennifer Buckler |
| **Location** | 127 N FOOTE ST, CAMBRIDGE CITY, IN 47327 (Cambridge City Police Dept) |
| **Location Details** | |
| **Primary Incident Code** | SWO : Speak with Officer |
| **Mod** | |
| **Priority** | 4 |
| **Use Caution** | No |
| **Primary Disposition** | Assignment Completed/Settled by Phone Contact |
| **Beat** | |
| **Zone** | |
| **Call Time** | 12/20/21 17:09:07 |
| **Completed Time** | 12/20/21 19:39:43 |

### Reporters

**TURPIN,JON (Initial Reporter)**

| | |
|---|---|
| **Sex** | |
| **DOB** | |
| **Address** | |
| **Report Time** | 12/20/21 17:09:07 |
| **How Reported** | Phone |
| **From Phone** | (317) 378-9314 |
| **Contact Phone** | |
| **Comments** | |

### Other Names

### Vehicles

### Responders

| C4 (Primary) | C4 - Stover, Scott | CCPD (Primary) |
|---|---|---|

### Response Times

| | |
|---|---|
| **Assigned** | 12/20/21 19:13:33 * |
| **Enroute** | 12/20/21 19:13:33 |
| **Arrived** | 12/20/21 19:39:43 * |
| **Leaving** | |
| **Arrived At** | |
| **Completed** | 12/20/21 19:39:43 |

### IR / External Agency Numbers

### Command Log Filter: All Commands | Details: Hidden | Units: All Units | Revised Entries: Shown

12/20/21 17:09:07 | Buckler, Jennifer | New CFS
12/20/21 17:10:25 | Buckler, Jennifer | SIG 6 ONLY

12/20/21 17:11:12 | Buckler, Jennifer | HE WANTS TO MAKE SURE THAT THE CALL WAS UPDATED ABOUT HIS GLOCK 19 WAS FOUND
12/20/21 17:11:36 | Buckler, Jennifer | HE SAID IT WAS NOT UPDATED THE FIRST TIME HE CALLED
12/20/21 19:10:34 | Robertson, Jeremy | Pending
12/20/21 19:13:33 | Stover, Scott | C4 | Enroute
12/20/21 19:38:01 | Stover, Scott | Jon wanted CFS numbers for all of the calls he has been involved in and before I got off the phone with him he asked me for if there was a report made in reference to "fictional child pornography", I told him I was unaware of any calls in ref to that.
12/20/21 19:39:25 | Stover, Scott | I also informed Jon that his pistol is not listed as stolen, he asked for a report of it not being stolen and I told him I would not do that.
12/20/21 19:39:43 | Stover, Scott | C4 | Available (Location: In Service)

| CLQ |
| --- |

**Requested At**
**Sent To**
**Status**
**Received At**
**Location**        ,
**Accuracy**

# Indianapolis Indiana FBI Office in Indianapolis, Indiana

Home (/) > Government Offices (/government-offices/) > FBI Offices (/fbi-office/) > Indiana (/in-fbi-office/) > Marion County (/in-marion-county-fbi-office/) > Indianapolis (/indianapolis-in-fbi-office/)

Address, Phone Number, and Hours for Indianapolis Indiana FBI Office, a FBI Office, at Nelson B Klein Parkway, Indianapolis IN.

## Indianapolis Indiana FBI Office Contact Information

Address, Phone Number, and Hours for Indianapolis Indiana FBI Office, a FBI Office, at Nelson B Klein Parkway, Indianapolis IN.

**Name**
Indianapolis Indiana FBI Office ✂ Suggest Edit

**Address**
8825 Nelson B Klein Parkway
Indianapolis, Indiana, 46250

**Phone**
317-595-4000 (tel:+1-317-595-4000)

**Hours**
Mon-Fri 8:00 AM-5:00 PM

## Map of Indianapolis Indiana FBI Office in Indianapolis, Indiana

View map of Indianapolis Indiana FBI Office, and get driving directions from your location (https://www.google.com/maps/dir/?api=1&destination=Indianapolis+Indiana+FBI+Office%2C+8825+Nelson+B+Klein+Parkway%2C+Indianapolis%2C+Indiana%2C+46250)
.



## Nearby FBI Offices

Find 4 FBI Offices within 40.6 miles miles of Indianapolis Indiana FBI Office.

# Louisville Kentucky FBI Office in Louisville, Kentucky

Home (/) > Government Offices (/government-offices/) > FBI Offices (/fbi-office/) > Kentucky (/ky-fbi-office/)

Address, Phone Number, and Fax Number for Louisville Kentucky FBI Office, a FBI Office, at Sycamore Station Place, Louisville KY.

## Louisville Kentucky FBI Office Contact Information

Address, Phone Number, and Fax Number for Louisville Kentucky FBI Office, a FBI Office, at Sycamore Station Place, Louisville KY.

**Name**
Louisville Kentucky FBI Office

**Address**
12401 Sycamore Station Place
Louisville, Kentucky, 40299

**Phone**
502-240-5944 (tel:+1-502-240-5944)

**Fax**
502-263-6245

## Map of Louisville Kentucky FBI Office in Louisville, Kentucky

View map of Louisville Kentucky FBI Office, and get driving directions from your location (https://www.google.com/maps/dir/?api=1&destination=Louisville+Kentucky+FBI+Office%2C+12401+Sycamore+Station+Place%2C+Louisville%2C+Kentucky%2C+40299).

## Nearby FBI Offices

Find 2 FBI Offices within 40.1 miles miles of Louisville Kentucky FBI Office.

### Frankfort Kentucky FBI Office (/frankfort-kentucky-fbi-office-frankfort-ky-0c3/)

West Broadway Street, Frankfort, KY - 35.4 miles

# Louisville Kentucky US Marshals Service in Louisville, Kentucky

Home (/) > Government Offices (/government-offices/) > US Marshals Service Offices (/us-marshals-service/) > Kentucky (/ky-us-marshals-service/)

Address and Phone Number for Louisville Kentucky US Marshals Service, an US Marshals Service Office, at West Broadway, Louisville KY.

## Louisville Kentucky US Marshals Service Contact Information

Address and Phone Number for Louisville Kentucky US Marshals Service, an US Marshals Service Office, at West Broadway, Louisville KY.

**Name**
Louisville Kentucky US Marshals Service ⚔ Suggest Edit

**Address**
601 West Broadway, 114
Louisville, Kentucky, 40202

**Phone**
502-588-8000 (tel:+1-502-588-8000)

## Map of Louisville Kentucky US Marshals Service in Louisville, Kentucky

View map of Louisville Kentucky US Marshals Service, and get driving directions from your location (https://www.google.com/maps/dir/?api=1&destination=Louisville+Kentucky+US+Marshals+Service%2C+601+West+Broadway%2C+Louisville%2C+Kentucky%2C+40202)



# Baton Rouge Louisiana FBI Office in Baton Rouge, Louisiana

Home (/) > Government Offices (/government-offices/) > FBI Offices (/fbi-office/) > Louisiana (/la-fbi-office/) > East Baton Rouge Parish (/la-east-baton-rouge-parish-fbi-office/) > Baton Rouge (/baton-rouge-la-fbi-office/)

Address and Phone Number for Baton Rouge Louisiana FBI Office, a FBI Office, at East Petroleum Drive, Baton Rouge LA.

## Baton Rouge Louisiana FBI Office Contact Information

Address and Phone Number for Baton Rouge Louisiana FBI Office, a FBI Office, at East Petroleum Drive, Baton Rouge LA.

**Name**
Baton Rouge Louisiana FBI Office ⚒ Suggest Edit

**Address**
18134 East Petroleum Drive
Baton Rouge, Louisiana, 70809

**Phone**
225-291-5159 (tel:+1-225-291-5159)

## Map of Baton Rouge Louisiana FBI Office in Baton Rouge, Louisiana

View map of Baton Rouge Louisiana FBI Office, and get driving directions from your location (https://www.google.com/maps/dir/?api=1&destination=Baton+Rouge+Louisiana+FBI+Office%2C+18134+East+Petroleum+Drive%2C+Baton+Rouge%2C+Louisiana%2C+70809)



## Nearby FBI Offices

Find 1 FBI Offices within 5.2 miles miles of Baton Rouge Louisiana FBI Office.

**Baton Rouge Louisiana FBI Office (/baton-rouge-louisiana-fbi-office-baton-rouge-la-fe4/)**
Bluebonnet Centre Boulevard, Baton Rouge, LA - 5.2 miles

# Shreveport Louisiana FBI Office in Shreveport, Louisiana

Home (/) > Government Offices (/government-offices/) > FBI Offices (/fbi-office/) > Louisiana (/la-fbi-office/)

Address and Phone Number for Shreveport Louisiana FBI Office, a FBI Office, at Pierremont Road, Shreveport LA.

## Shreveport Louisiana FBI Office Contact Information

Address and Phone Number for Shreveport Louisiana FBI Office, a FBI Office, at Pierremont Road, Shreveport LA.

**Name**
Shreveport Louisiana FBI Office ✗ Suggest Edit

**Address**
920 Pierremont Road, 400
Shreveport, Louisiana, 71106

**Phone**
318-861-1890 (tel:+1-318-861-1890)

**Website**
fbi.gov (https://www.fbi.gov/)

## Shreveport Louisiana FBI Office Services

**Records**
Criminal Records, Most Wanted List

**Services**
Background Checks, Education & Training Programs, Emergency Services, Laboratory Services, Witness Services, Tip Line

## Map of Shreveport Louisiana FBI Office in Shreveport, Louisiana

View map of Shreveport Louisiana FBI Office, and get driving directions from your location (https://www.google.com/maps/dir/?api=1&destination=Shreveport+Louisiana+FBI+Office%2C+920+Pierremont+Road%2C+Shreveport%2C+Louisiana%2C+71106)



**Vulgar Betrayal (The Story Of Robert Wright Jr.)**

Adam Fitzgerald
5.59K subscribers

[Subscribe]

👍 23     👎     ↗ Share     ⬇ Download     

328 views Nov 16, 2021

Robert G. Wright Jr. is an FBI agent who has criticized the FBI's counterterrorist activities in the 1990s, when he worked in the Chicago division on terrorists with links to the Middle East, especially on the issue of money laundering. Specifically, he worked on project Vulgar Betrayal, the single largest counter-intelligence operation pre 9/11, which allegedly implicated Yasin al-Qadi. Qadi is multi-millionaire from Jeddah and trained as an architect in Chicago, Illinois. He is also said to have personally met with Osama Bin Laden in Chicago in 1979 and was said to have links with Hamas. The program also investigated the The Holy Land Foundation charity which was secretly financing Hamas suicide bombings. He later wrote a detailed book which the FBI prevented him from publishing with threats of criminal prosecution. He complained that "FBI management intentionally and repeatedly thwarted and obstructed my attempts to launch a more comprehensive investigation to identify and neutralize terrorists."





## Viewable files (8)

FBI-Vulgar-Betrayal-investigation-Section-6.pdf

FBI-Vulgar-Betrayal-investigation-Section-7.pdf

FBI-Vulgar-Betrayal-investigation-Section-9.pdf

FBI-Vulgar-Betrayal-investigation-Section-10.pdf

FBI-Vulgar-Betrayal-investigation-Section-11.pdf

FBI-Vulgar-Betrayal-investigation-Section-12.pdf

FBI-Vulgar-Betrayal-investigation-Section-13.pdf

FBI-Vulgar-Betrayal-investigation-Section-19.pdf

**(1 of 177)**



# Operation Vulgar Betrayal

by Federal Bureau of Investigation

☆ Favorite   ⤴ Share   ⚑ Flag

| Usage | Public Domain Mark 1.0   |
|---|---|
| Topics | FBI, FBI files, Federal Bureau of Investigation |

| | |
|---|---|
| Collection | nsia-fbi-files; nationalsecurityarchive; additional_collections |
| Language | English |

FBI files on Operation Vulgar Betrayal

| | |
|---|---|
| Addeddate | 2016-07-13 04:11:12 |
| Identifier | VulgarBetrayal |
| Identifier-ark | ark:/13960/t4jm71p1k |
| Ocr | ABBYY FineReader 11.0 |
| Ppi | 600 |
| Scanner | Internet Archive HTML5 Uploader 1.6.3 |

 # Reviews

 Add Review

There are no reviews yet. Be the first one to write a review.

## 2,017 Views

## 1 Favorite

### DOWNLOAD OPTIONS

| | |
|---|---|
| ABBYY GZ | 8 files |
| DAISY<br>For users with print-disabilities | 8 files |
| EPUB | 8 files |
| FULL TEXT | 8 files |
| PDF | 8 files |
| PDF WITH TEXT | 8 files |
| SINGLE PAGE PROCESSED JP2 ZIP | 8 files |
| TORRENT | 1 file |

| | |
|---|---|
| SHOW ALL | 69 Files |
| | 13 Original |

**IN COLLECTIONS**

FBI Files

National Security Internet Archive (NSIA)

Additional Collections

Uploaded by

**Paul Galante**

on July 13, 2016

SIMILAR ITEMS (based on metadata)



**WIKIPEDIA**
The Free Encyclopedia

# Robert Wright Jr.

**Robert G. Wright Jr.** is an FBI agent who has criticized the FBI's counterterrorist activities in the 1990s, when he worked in the Chicago division on terrorists with links to the Middle East, especially on the issue of money laundering. Specifically, he worked on project Vulgar Betrayal, which allegedly implicated Yasin al-Qadi. He wrote a detailed book which the FBI prevented him from publishing with threats of criminal prosecution.[1] He complained that "FBI management intentionally and repeatedly thwarted and obstructed my attempts to launch a more comprehensive investigation to identify and neutralize terrorists."[1][2]

Three months before 9/11 he wrote the following:

> "Knowing what I know, I can confidently say that until the investigative responsibilities for terrorism are removed from the FBI, I will not feel safe. The FBI has proven for the past decade it cannot identify and prevent acts of terrorism against the United States and it's [*sic*] citizens at home and abroad. Even worse, there is virtually no effort on the part of the FBI's international terrorism unit to neutralize known and suspected terrorists residing within the United States."[1][3]

After his revelations circa 2002–2003 he was demoted.[1][4]

On May 6, 2009, Judge Gladys Kessler issued a ruling allowing Wright to publish his manuscript.[5] Wright is focused on fighting the system of prepublication review and censorship of government employee writings.[6]

Other FBI agents who supported Wright's allegations were John Vincent and Barry Carmody.[1]

## See also

- Yasin al-Qadi (Financier)
- Coleen Rowley (FBI Whistleblower)
- Sibel Edmonds (FBI Whistleblower)
- National Security Whistleblowers Coalition
- The Shadow Factory (Other information on the FBI terrorism work pre-9/11)
- Judith Miller (journalist)
- The Feeling of Being Watched

## References

1. C-SPAN video (http://vids.rationalveracity.com/v/960/robert_wright_judicial_watch_briefing.html) Archived (https://web.archive.org/web/20110901133556/http://vids.rationalveracity.com/v/960/robert_wright_judicial_watch_briefing.html) 2011-09-01 at the Wayback Machine, address to the National Press Club on May 30, 2002, with Judicial Watch, via rationalveracity.com

2. circa 24:00 of the C-SPAN video
3. circa 23:30 of the C-SPAN video
4. circa 59:00 of the C-SPAN video
5. "Robert G. Wright, Jr. v. Federal Bureau of Investigation (http://www.fas.org/sgp/jud/wright050609.pdf), from fas.org 05 06 2009
6. "Judge: FBI can't 'censor' agent's book on counter-terror failures", by Josh Gerstein, May 11, 2009 (http://www.politico.com/blogs/joshgerstein/0509/Judge_FBI_cant_censor_agents_book_on_terror_failures.html), The Politico

# External links

- Scoop Links: FBI Whistleblower Blows Lid Off 911 (http://www.scoop.co.nz/mason/stories/HL0206/S00001.htm), 1 June 2002
- Profile (http://www.sourcewatch.org/index.php/Robert_Wright,_Jr.) at SourceWatch
- PBS Frontline (https://www.pbs.org/wgbh/pages/frontline/shows/sleeper/fbi/gamal.html) story on FBI Agent Gamal Abdel-Hafiz, by Marlena Telvick
- History Commons (http://www.historycommons.org/entity.jsp?entity=robert_wright) article on Robert Wright, retrieved May 2011

Retrieved from "https://en.wikipedia.org/w/index.php?title=Robert_Wright_Jr.&oldid=1143199399"

-

OCTOBER 19, 2005 | JUDICIAL WATCH

# Justice Department Rejects FBI Proposal to Dismiss FBI Whistleblower Special Agent Robert G. Wright, Jr.

Judicial Watch, the public interest group that investigates and prosecutes government corruption, announced today that the FBI's proposal to fire Special Agent Robert G. Wright Jr., has been rejected by the Justice Department. Judicial Watch represented Special Agent Wright in his efforts to reverse the FBI's decision to dismiss him in apparent retaliation for his criticism of the FBI's handling of terror investigations. On October 12, 2005, Associate Deputy Attorney General David Margolis decided that Special Agent Wright can continue his career as an FBI agent, rejecting the FBI's proposal to terminate him. The FBI targeted Special Agent Wright for dismissal after he publicly criticized FBI counterterrorism investigations during a press conference held on June 2, 2003.

The Justice Department's decision follows a two-year legal campaign initiated by Judicial Watch on Special Agent Wright's behalf. Judicial Watch filed two lawsuits against the FBI, both of which are still pending. When the FBI threatened Special Agent Wright with disciplinary action and dismissal, Judicial Watch actively represented Wright through the appeals process, ultimately securing an impartial review of the case by the Justice Department.

Special Agent Wright also received assistance from Senator Charles Grassley (R-IA) and Senator Patrick Leahy (D-VT) in the matter. The Senators called on former Attorney General John Ashcroft and FBI Director Robert Mueller to investigate the "continued targeting" of Special Agent Wright following his public criticisms. Judicial Watch commends Senator Grassley and Senator Leahy for their efforts on behalf of Special Agent Wright and his whistleblowing activities.

Special Agent Wright is the only FBI agent prior to September 11, 2001 to have seized funds (over $1.4 million) from U.S. based terrorists using federal civil forfeiture statutes. During his career, he has consistently received excellent job performance evaluations despite his outspoken criticism of the FBI's counter-terrorism efforts. Moreover, Special Agent Wright's motive for speaking out about his concerns over the FBI's handling of terrorism investigations was patriotic and he never profited monetarily or otherwise from voicing his criticism. These considerations played a significant role in the Justice Department's decision to reject the FBI's proposal to dismiss him.

"The FBI retaliated against Special Agent Wright because he had the courage to speak out about his concerns over the FBI's handling of terrorism investigations. We are pleased that Special Agent Wright can continue doing what he does best to protect all Americans," said JW President Tom Fitton. "And Judicial Watch and Special Agent Wright are grateful to Senators Grassley and Leahy for helping Judicial Watch save Special Agent Wright's 15-year career."

---

© 2019 Judicial Watch, Inc.

Judicial Watch is a 501(c)(3) nonprofit organization. Contributions are received from individuals, foundations, and corporations and are tax-deductible to the extent allowed by law.

Shop   Donate

SEPTEMBER 10, 2002 | JUDICIAL WATCH

# FBI Agent Robert Wright: Agents Assigned to Intelligence Operations Protect Terrorists from Criminal Investigation & Prosecution

Judicial Watch, the public interest group that investigates and prosecutes government corruption and abuse, represents "whistleblowing" FBI Special Agent (SA) Robert G. Wright, Jr., of the bureau's Chicago Division, who said today that the FBI continues to dodge accountability and cover-up its negligence and dereliction of duty in pursuing terrorists who pose a direct threat to the United States. SA Wright is the only FBI agent to seize terrorist funds (over $1.4 million) from U.S.-based Middle Eastern terrorists using federal civil forfeiture statutes, prior to the September 11th attacks. The original source of the funds was Yassin Kadi, a Saudi businessman, who is reportedly a financier of Osama bin Laden.

SA Wright points to recent misconduct and falsifications of wiretap warrant applications by FBI agents (signed-off by the former FBI Director, Louis Freeh) to the Foreign Intelligence Surveillance Act (FISA) Court. Prior to September 11th, SA Wright alleged FBI intelligence agents lied and hid vital records from criminal agents for the purpose of obstructing his criminal investigation of the terrorists in order to protect their "subjects," and prolong their intelligence operations. SA Wright was stunned to learn recently that some of the FBI intelligence agents that had stalled and

obstructed his criminal investigations of terrorists in Chicago had also lied to the judges of the FISA Court in Washington, D.C.

SA Wright says that, in his opinion, prior to September 11th, the ITU's incompetence and repeated failures to support criminal investigations contributed directly to the deaths of five Americans. The ITU's absolute failure to detect and identify the September 11th terrorist plot, and the radical Islamists that carried it out, is further evidence of the ITU's negligence, and places the deaths of thousands of Americans at their door.

Over the last year, SA Wright has repeatedly tried to lawfully expose the FBI's incompetence and dereliction: 1) through FBI and Justice Department channels, 2) through individual Congressmen and Senators, 3) to the Joint Congressional Intelligence Committee and, 4) at a press conference held by his legal counsel, Larry Klayman, the Chairman of Judicial Watch, Inc., and co-counsel, David Schippers, Esq., of Schippers and Bailey of Chicago, IL.

The FBI continues to illegally refuse the release of SA Wright's 500 page manuscript, Fatal Betrayals of the Intelligence Mission, that SA Wright submitted for prepublication review in October 2001. In fact, the FBI refused to turn the manuscript over to Sen. Richard C. Shelby, Vice Chairman of the Joint Intelligence Commitee, charged with investigating the FBI's intelligence failures. The FBI falsely claims that the manuscript contains grand jury material, although SA Wright has publicly available, "open source," references for all of the material in the manuscript. Schippers, a former federal prosecutor, has suggested that the committee petition U.S. District Court Chief Judge Charles P. Kocoras to disclose any such grand jury material under Criminal Rule 6(e)(3)(D), as matter involving intelligence and counterintelligence.

In anticipation of being subpoenaed by the Joint Intelligence Committee, SA Wright has prepared a statement detailing the FBI's negligence and dereliction of duty in pursuing the terrorist threat to the American public.

"SA Wright is performing a service for his country by exposing the FBI's dereliction of duty – particularly by FBI headquarters staffers. Director Mueller survived the 'bad press' of last May, and the nation's attention has moved on to something else – until the next terrorist attack. How many more dead Americans will it take to get accountability from the FBI?" stated Judicial Watch Chairman and General Counsel Larry Klayman.

---

© 2019 Judicial Watch, Inc.

Judicial Watch is a 501(c)(3) nonprofit organization. Contributions are received from individuals, foundations, and corporations and are tax-deductible to the extent allowed by law.

Shop   Donate

MAY 12, 2009 | JUDICIAL WATCH

# Court Rejects FBI Censorship on Terrorism Investigation

**Judicial Watch, the public interest group that investigates and prosecutes government corruption, announced a favorable decision by a federal court in a lawsuit against the FBI's efforts to censor the speech of agents seeking to expose the mishandling of a terrorism investigation in the days before 9/11. The investigation, known as *Vulgar Betrayal*, touched upon both Hamas and Al Qaeda. The court ruling was handed down on May 8, 2009, by U.S. District Court Judge Gladys Kessler in a lawsuit filed by Judicial Watch on behalf of FBI Special Agent Robert G. Wright, Jr. and retired FBI Special Agent John Vincent (*Wright v. Federal Bureau of Investigation* (02-915) (D.D.C.); *Vincent v. Federal Bureau of Investigation* (03-226) (D.D.C.)).**

Special Agent Wright wanted to publish a book as well as complaints he made with the Department of Justice Office of Inspector General, and he wanted to respond to a media inquiry from Judith Miller, a then-reporter of *The New York Times.* Wright had been censored in these efforts by the FBI. Wright's former partner John Vincent, now retired from the FBI, had been similarly censored by the FBI and Department of Justice over his answers to the *New York Times* inquiry. Judge Kessler excoriated the FBI's censorship and emphasized the public importance of the lawsuit:

> "This is a sad and discouraging tale about the determined efforts of the FBI to censor various portions of a 500-page manuscript, written by a former long-time FBI agent, severely criticizing the FBI's conduct of the investigation of a money laundering scheme in which United States-based members of the Hamas terrorist organization were using non-profit

organizations in this country to recruit and train terrorists and fund terrorist activities both here and abroad. The FBI also sought to censor answers given by both Plaintiffs to a series of written questions presented to them by a New York Times reporter concerning Wright's allegations about the FBI's alleged mishandling of the investigation. In its efforts to suppress this information, the FBI repeatedly changed its position, presented formalistic objections to release of various portions of the documents in question, admitted finally that much of the material it sought to suppress was in fact in the public domain and had been all along, and now concedes that several of the reasons it originally offered for censorship no longer have any validity.

Unfortunately, the issues of terrorism and of alleged FBI incompetence remain as timely as ever."

For over seven years, FBI Special Agent Wright and retired FBI Special Agent Vincent wished to exercise their First Amendment rights to expose FBI and Department of Justice bungling that shut down efforts to roll up terrorist financial networks in the United States prior to 9/11. Special Agent Wright is the only FBI agent prior 9/11 to have seized funds (over $1.4 million) from U.S.-based terrorists using federal civil forfeiture statutes.

"Judicial Watch is pleased that a federal court beat back the FBI's illegal effort to censor criticism by its own agents. Wright and Vincent sought to blow the whistle to help prevent other terrorist attacks like 9/11. We hope it is not too late for the FBI to listen to our clients, clean up its act, and better protect our nation from the Islamic terrorist threat," stated Judicial Watch President Tom Fitton.

---

© 2019 Judicial Watch, Inc.

Judicial Watch is a 501(c)(3) nonprofit organization. Contributions are received from individuals, foundations, and corporations and are tax-deductible to the extent allowed by law.

Shop   Donate

1  Wright v. Federal Bureau of Investigation
2  Opinion
3  Civil Action Nos. 02-915 (GK), 03-226 (GK).
4
5  July 31, 2006
6
7  MEMORANDUM OPINION
8  GLADYS KESSLER, District Judge
9
10 Plaintiffs are Robert G. Wright, Jr., a FBI Special Agent based in Chicago, and John
   Vincent, a retired FBI Special Agent, who were both members of the FBI's
   Counter-Terrorism Task Force. Plaintiffs were denied permission, pursuant to the
   FBI's prepublication review policy, to publish certain writings critical of the
   FBI's counter-terrorism efforts. They bring these separate lawsuits against the
   Defendant, Federal Bureau of Investigation ("FBI"). Vincent has also named the
   Department of Justice as a  Defendant. Both Plaintiffs allege the same causes of
   action: that Defendants violated the First Amendment (Count I), 28 C.F.R. § 17.18
   (the FBI's prepublication review regulation) (Count II), and the Administrative
   Procedure Act, 5 U.S.C. §§ 706(2)(A), (B), and (D) (Count III). Plaintiffs both
   seek: 1) a declaratory judgment that Defendants' refusal to grant them permission to
   publish their writings was unlawful; 2) an injunction prohibiting Defendants from
   continuing to refuse them permission to publish their writings; and 3) attorneys'
   fees and costs.
11
12 The Court uses the term "Defendants" throughout this Opinion to refer to the FBI and
   the DOJ. Where only Plaintiff Wright's submissions are concerned, however, the term
   should be read to include only the FBI.
13
14 This matter is before the Court on Defendants' Motions for Summary Judgment and
   Plaintiffs' Cross Motions for Summary Judgment in both cases. Upon consideration of
   the Motions, Oppositions, Replies, and the entire record herein, and for the reasons
   stated below, Plaintiffs' Motions are denied, and Defendants' Motions are denied
   with respect to Plaintiffs' First Amendment Claims, and granted with respect to
   Plaintiffs' claims under 28 C.F.R. § 17.18 and the APA.  I. BACKGROUND
15
16 Although these cases have not been consolidated, the Court has addressed the Cross
   Motions for Summary Judgment in both cases in this single Memorandum Opinion because
   almost all the legal issues overlap and many of the facts overlap.
17
18 Summary judgment may be granted only when there is no genuine issue as to any
   material fact and the moving party is entitled to judgment as a matter of law.
   Fed.R.Civ.P. 56(c). Consequently, unless otherwise noted, the Court states only
   uncontroverted facts.
19
20 Upon joining the FBI, Plaintiffs signed an agreement requiring them to seek
   prepublication review from the Office of Public and Congressional Affairs ("OPCA")
   of certain information before disclosing it publicly. The agreement states:
21
22 as consideration for employment, I agree that I will never divulge, publish, or
   reveal . . . to any unauthorized recipient without official written authorization by
   the Director of the FBI or his delegate, any information from the investigatory
   files of the FBI or any information relating to material contained in the files, or
   disclose any information or produce any material acquired as a part of the
   performance of my official duties or because of my official status . . . I agree to
   request approval of the Director of the FBI in each such instance by presenting the
   full text of my proposed disclosure in writing . . . at least thirty (30) days prior
   to disclosure. I understand that this agreement is not intended to apply to
   information which has been placed in the public domain. . . .
23 Defs.' Vincent Mot. Summ. J., Ex. 3.
24
25 In furtherance of this employment agreement, the FBI developed its prepublication
   review policy, which is mandatory for all current and former FBI employees. Its
   purpose is to "identify information obtained during the course of an individual
   employee's employment/work with the FBI, the disclosure of which could harm national
   security, violate federal law, or interfere with the law  enforcement functions of
   the FBI." Defs.' Vincent Mot., Ex. 1, Bolthouse Decl. ¶ 8.
26

27    The FBI's prepublication review policies and procedures are set forth in the FBI's
      Manual of Administrative Operations and Procedures ("MAOP") Part I, Sections 1-24.
      See id., Ex. 18. Pursuant to the policy, an employee or former employee who wishes
      to disclose information obtained during the course of his or her employment with the
      FBI, must first obtain the Bureau's permission. To do so, the individual must submit
      to the FBI the information he or she wishes to disclose in written format prior to
      disclosing it.

28

29    The FBI "endeavors to complete the prepublication review process within 30 business
      days from the date of receipt although additional time may be required depending
      upon the complexity of the submission." Id., Ex. 1, Bolthouse Decl. ¶ 9; see also
      id., Ex. 18, MAOP Part 1, Section 1-24(4)(a)(1) ("The Bureau will endeavor to review
      the material in a timely manner but disclosure is not authorized until the review is
      complete.");id. at 4(a)(2)(b) (OPCA will "prepare the FBI response to each request
      for prepublication review not later than 30 workdays after the request and all
      related materials are received by the FBI").

30

31    At the time Plaintiffs submitted their writings, the prepublication review process
      utilized a panel comprised of one member from each of the FBI's five divisions. Each
      panel member would read the submissions and, through either group meetings or
      individual reports, identify matters which he or she thought could not be published.
      The MAOP requires that the panel "either authorize disclosure in full or provide
      written objections to specific portions (by page and paragraph number) specifying
      why the FBI should withhold permission to disclose," id. at 4(a)(3)(d), and that
      "[i]f a panel objects to disclosure of any portion of a work, OPCA shall notify the
      requester that the FBI withholds permission to disclose or publish the portions to
      which the board has objected and request such modifications as may be necessary,"
      id. at 4(a)(4).

32

33    The prepublication review policy provides that the FBI may request the assistance of
      "personnel from other agencies or entities if the work contains or relates to
      matters under the cognizance of or involves the expertise of such agencies or
      entities." Id. at 4(a)(3)(c).

34

35    Pursuant to the prepublication review policy, Wright sought permission to publish:
      1) his answers from an interview with New York Times reporter Judith Miller; 2) his
      five-hundred page manuscript ("Fatal Betrayals manuscript") about an investigation
      ("Vulgar Betrayal investigation") into known terrorist threats against United States
      national security and the FBI's efforts to thwart that investigation; 3) a 38 page
      complaint filed with the DOJ, Office of Inspector General ("OIG"), titled
      "Dereliction of Duty by the Federal Bureau of Investigation in Failing to
      Investigate and Prosecute Terrorism and Obstruction of Justice in Retaliating
      Against Special Agent Robert G. Wright, Jr."; and 4) a 113 page complaint to be
      filed with the DOJ, OIG, titled "Whistleblowing Retaliation by the Federal Bureau of
      Investigation against Special Agent Robert G. Wright, Jr." (referred to together
      herein as OIG complaints). Vincent sought permission to publish only his answers
      from his interview with Judith Miller.

36

37    Plaintiffs both worked on the Vulgar Betrayal investigation, which uncovered a money
      laundering scheme in which United States-based members of the HAMAS terrorist
      organization were using non-profit organizations to recruit and train terrorists and
      fund terrorist activities in the United States and abroad. Wright Decl. ¶ 3. The
      Vulgar Betrayal investigation ultimately resulted in the FBI's seizure of $1.4
      million in funds which were targeted for terrorist activities. The seized funds were
      linked directly to Saudi businessman Yassin Kadi, who was later designated by the
      Government as a financial supporter of Osama Bin Laden. Plaintiffs' submissions were
      highly critical of the FBI's handling of the Vulgar Betrayal investigation and other
      FBI operations prior to September 11, 2001.

38

39    Defendants agree that the Vulgar Betrayal investigation was shut down in 1999 and
      officially closed in August 2000. Defs.' Vincent Mot., Ex. 5.

40

41    Wright completed his manuscript days after the September 11 attacks.

42

43    Wright submitted his Fatal Betrayals manuscript for prepublication review in the
      beginning of October 2001. In the beginning of January 2002, the FBI informed him
      that about 18% of the manuscript would require modifications because it contained

"classified information; information containing sensitive investigative material and information protected by the Privacy Act." Defs.' Wright Mot., Ex. 1, Bolthouse Decl. at ¶ 5(d). In accordance with the FBI's suggestions, Wright edited and re-submitted his materials, with the 18% either deleted or modified to address the Government's concerns. In support of his revisions, Wright submitted three binders full of endnotes, which he alleges provided a public source of information for each of the passages to which Defendants had objected.

44
45  Wright resubmitted his manuscript in November 2001, after being informed that delivery of the first copy was delayed by disruptions in mail flow due to anthrax incidents.

46
47  These endnotes have not been filed with the Court and therefore are not part of the record of this case.

48
49  On November 13, 2001, Wright submitted his OIG complaints to the OPCA for prepublication review. On January 7, 2002, the OPCA responded, taking issue with only 4% of the first document and 6% of the second. Again, on January 18, 2002, Wright re-submitted the documents with deletions and edits.

50
51  In March 2002, New York Times reporter Judith Miller submitted to Wright a series of written questions concerning his allegations  about the FBI's mishandling of the Vulgar Betrayal investigation. She gave Vincent a similar series of questions. Miller also interviewed FBI officials, including Wright's supervisor, about Wright's charges against the agency in March of 2002. On March 31, 2002, both Wright and Vincent submitted to the OPCA their proposed answers to Miller's questions for prepublication review.

52
53  On May 10, 2002, the day after Wright filed suit in this Court, the FBI responded separately to Wright and Vincent regarding all of their submissions. The FBI indicated to both of them that, as a result of its review and guidance from the U.S. Attorney's Office for the Northern District of Illinois, their submissions all contained information regarding open investigations, matters occurring before a grand jury, and information relating to law enforcement techniques and other sensitive information. According to the FBI, the protected information was so intertwined with other material in the submissions, that they could not be amended or segregated so as to be suitable for publication. The FBI  therefore reversed its prior position and denied Wright permission to publish any of the materials he submitted, and issued a blanket denial as to Vincent's interview answers submission.

54
55  At some point, the FBI consulted with the United States Attorney's Office for the Northern District of Illinois ("USAO N.D.Ill.") because that office had "participated in the investigation(s), possessed a detailed knowledge of the investigation(s), and had an interest in the success of the investigation(s)." Defs.' Vincent Mot. at 18. The FBI also consulted with the US Attorney's Office for the Eastern District of Wisconsin. Both offices informed the FBI that Plaintiffs' submissions were not suitable for publication.

56
57  The FBI did not provide more specific objections by line and paragraph number.

58
59  In early June 2002, both Wright and Vincent appealed these decisions to the FBI Director, Robert Mueller, and their appeals were denied.

60
61  On November 7, 2002, and January 6, 2003, respectively, Plaintiffs Wright and Vincent appealed to the Office of the Deputy Attorney General pursuant to 28 C.F.R. § 17.18(i). On December 19, 2002, and January 17, 2003, respectively, Deputy Attorney General David Margolis responded, indicating that an appeal to his office, which handled appeals of FBI decisions prohibiting disclosure of classified information, was inappropriate because "no classified information" was contained in Plaintiffs' submissions.

62
63  Approximately 15 months later, the FBI changed its position yet again. On October 31, 2003, more than two years after Wright first submitted the Fatal Betrayals manuscript for prepublication review, the FBI sent him a letter explaining that "following a request from a Congressional committee for the [manuscript] another review had been conducted . . . and that it had been determined that Chapters 1-4 (inclusive)" and parts of Chapter 7 could be published. Def.'s Wright Mot. at 8. The

FBI still prohibited publication of answers 5-6 and 8 through 27.

64
65    On December 22, 2003, approximately one year and seven months after its blanket
      denial of Vincent's request, the FBI sent him a letter stating that the answers to
      many of the interview questions previously submitted (2-6; 8-9; 11-14; 16; 18-19;
      and 21) could be disclosed in their entirety, and that the answers to questions 15
      and 17 could be disclosed in part. On May 4, 2004, the FBI granted Vincent
      permission to publish the response to interview question 15 in full. The FBI
      continued to prohibit publication of 5 of Vincent's interview answers.

66
67    On February 5, 2004, the FBI sent Wright a letter advising him that it had conducted
      a re-review of his answers to Judith Miller's interview questions and had determined
      that answers 2-6, 8, 11-13, 15-16, 18-19, 21, 25-26 and parts of 1, 9, and 14 could
      be published. Id. at 9.

68
69    Finally, on March 25, 2004, the FBI sent Wright a letter stating that his OIG
      complaints could be submitted to the DOJ, OIG without the need for prepublication
      review, but that release to any other party was prohibited.

70
71    Wright's OIG complaints had already been submitted to the OIG in 2001. See Wright
      Decl. at ¶ 43.

72
73    II. STANDARD OF REVIEW
74    Summary judgment should be granted if the pleadings, depositions, answers to
      interrogatories, and admissions on file, together with any affidavits or
      declarations, show that there is no genuine issue as to any material fact and that
      the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56.
      Material facts are those that "might affect the outcome of the suit under the
      governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

75
76    The party seeking summary judgment bears the initial burden of demonstrating the
      absence of a genuine issue of material fact.Celotex Corp. v. Catrett, 477 U.S. 317,
      322 (1986). The nonmoving party then must "go beyond the pleadings and by [its] own
      affidavits, or by depositions, answers to interrogatories, and admissions on file,
      designate specific facts showing that there is a genuine issue for trial." Id. at
      324 (internal quotations omitted). See Laningham v. U.S. Navy, 813 F.2d 1236, 1242
      (D.C. Cir. 1987) (nonmoving party has affirmative duty "to provide evidence that
      would permit a reasonable jury to find" in its favor); Crenshaw v. Georgetown Univ.,
      23 F.Supp.2d 11, 15 (D.D.C. 1998) (noting that "adverse party must do more than
      simply `show that there is some metaphysical doubt as to the material facts'"
      (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586
      (1986)).

77
78    In deciding a motion for summary judgment, "the court must draw all reasonable
      inferences in favor of the nonmoving party, and it may not make credibility
      determinations or weigh the evidence."Reeves v. Sanderson Plumbing Prods., Inc., 530
      U.S. 133, 150 (2000). Ultimately, the court must determine "whether the evidence
      presents a sufficient disagreement to require submission to a jury or whether it is
      so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at
      251-52.

79
80    In McGehee v. Casey, the D.C. Circuit articulated a standard for judicial review of
      individual censorship decisions by the CIA pursuant to a secrecy agreement. The
      court stated:

81
82    Although in McGehee, the court was addressing a prepublication review scheme which
      applied only to classified information, the standard articulated is useful in this
      case because it attempts to balance the interests of an intelligence agency in
      maintaining secrecy and protection of national security information and an
      individual's First Amendment rights.

83
84    While we believe courts in securing such determinations should defer to [agency]
      judgment as to the harmful results of publication, they must nevertheless satisfy
      themselves from the record, in camera or otherwise, that the [agency] in fact had
      good reason to classify, and therefore censor, the materials at issue. Accordingly,
      the courts should require that [agency] explanations justify censorship with
      reasonable specificity, demonstrating a logical connection between the deleted

information and the reasons for classification. These should not rely on a
'presumption of regularity' if such rational explanations are missing. We anticipate
that in camera review of affidavits, followed if necessary by further judicial
inquiry, will be the norm.

85    718 F.2d 1137, 1148-49 (D.C. Cir. 1983). Furthermore, "[c]ourts should . . . strive
to benefit from 'criticism and illumination by the party with the actual interest
in forcing disclosure.'" Id. at 1149 (internal citations omitted).

86    The Government submitted for in camera review the Plaintiffs' actual submissions
along with a letter from Joan Bainbridge Safford to the OPCA and a letter from
Assistant U.S. Attorney Joseph Ferguson to the FBI. The letters provide some of the
reasoning underlying the FBI's decision to censor parts of Plaintiffs' submissions.

87

88    III. ANALYSIS
89    A. Genuine Issues of Material Fact Preclude Entry of Summary Judgment in Either
Party's Favor on Plaintiffs' First Amendment Claims

90

91    In this case, Plaintiffs are only making a First Amendment challenge to Defendants'
decisions denying them permission to publish various materials they submitted for
prepublication review; they are not making a facial challenge to the
constitutionality of the FBI's entire prepublication review process. Therefore, this
Court must conduct a narrow, fact-based inquiry into whether the FBI violated
Plaintiffs' First Amendment rights in handling their requests and ultimately denying
them permission to publish portions of their submissions.

92

93    1. The Pickering Balancing Test

94

95    A recently decided Supreme Court case, Garcetti v. Ceballos, 126 S. Ct. 1951, 1955
(2006), dealt with "whether the First Amendment protects a government employee from
discipline based on speech made pursuant to the employee's official duties."Garcetti
does not apply to the case at bar because neither Vincent's nor Wright's submissions
were written as part of their official duties as FBI Special Agents.

96

97    The Supreme Court has long recognized that expression about public issues rests "on
the highest rung of the hierarchy of First Amendment values." Carey v. Brown, 447
U.S. 455, 467 (1980). The constitutional protection for freedom of expression on
public matters, which was "fashioned to assure unfettered interchange of ideas for
the bringing about of political and social changes desired by the people," Roth v.
United States, 354 U.S. 476, 484 (1957), is at the very core of our constitutional
and democratic system. Stromberg v. People of State of Cal., 283 U.S. 359, 369
(1931). Therefore, in addressing challenges under the First Amendment, courts must
keep in mind that "debate on public issues should be uninhibited, robust, and
wide-open, and that it may well include vehement, caustic, and sometimes
unpleasantly sharp attacks on government and public officials."New York Times Co. v.
Sullivan, 376 U.S. 254, 270 (1964) (citing Terminiello v. Chicago, 337 U.S. 1, 4
(1949); De Jonge v. Oregon, 299 U.S. 353, 365 (1937)).

98

99    The Supreme Court has also recognized, however, that the speech of public employees
on matters of public concern may be restrained in ways that, if imposed on the
general public at large, would violate the Constitution. Pickering v. Bd. of Educ.,
391 U.S. 563, 568 (1968); United States v. NTEU, 513 U.S. 454, 115 S. Ct. 1003, 1012
(1995); see also Snepp v. United States, 444 U.S. 507, 510 n. 3 (1980). As our
Circuit has noted, this principle "impl[ies] a substantially voluntary assumption of
special burdens in exchange for special opportunities, as well as the complex and
subtle interests peculiar to any employer's needs in making effective use of its
workforce. . . ." Weaver v. United States  Info. Agency, 87 F.3d 1429, 1440 (D.C.
Cir. 1996) (cert denied, 117 S.Ct. 2407 (June 2, 1997)).

100

101   In Pickering, the Supreme Court established a basic test by which such speech is to
be evaluated. Our Circuit framed the test as follows: "Restraints on the speech of
government employees on matters of public concern are governed by a balancing test;
they are permissible where the government interest in promoting the efficiency of
the public services it performs through its employees outweighs the interests of
prospective speakers and their audiences in free dissemination of the speakers
views."Weaver, 87 F.3d at 1439 (internal quotations and citations omitted).

102

103   a. Plaintiffs' Interest in the Exercise of Their First Amendment Rights
104   On one side of the Pickering balancing test, this Court must consider the

Plaintiffs' well-established First Amendment rights. As noted above, and as Pickering emphasized, "[t]he public interest in having free and unhindered debate on matters of public importance" is a "core value of the Free Speech Clause of the First Amendment." 391 U.S. at 572.

105

106   Protection of First Amendment rights is particularly vital where the speech regards a matter of significant public importance. For some time now, especially since the terrorist attacks of September 11, 2001, the FBI has been under intense public scrutiny with respect to the effectiveness of its counter-terrorism efforts. Its critics are legion. See, e.g., Bruce Berkowitz, The Big Difference Between Intelligence and Evidence, Wash. Post, Feb. 2, 2002, at B1; Dana Priest Dan Eggen, FBI Faulted on Al Qaeda Assessment, Domestic Threat was Underestimated, Panel Told, Wash. Post, Sept. 20, 2002, at A1; F.B.I. Chief Admits 9/11 Might Have Been Detectable, N.Y. Times, May 30, 2002, at A1 (quoting FBI Director at news conference in May 2002 as stating with respect to September 11: "But that doesn't mean there weren't red flags out there or dots that should have been connected."); see generally Joint Inquiry Into the Intell. Comm. Activities Before and After the Terrorist Attacks of Sept. 11, 2001, House Permanent Select Comm. on Intell. Senate Select Comm. on Intell., H.R. Rep. No. 107-792, S. Rep. No. 107-351, at 62, 335, 337, 340 (2002) (referring several times to the intelligence community's failure to "connect the dots") (available at http://www.gpoaccess.gov/ serialset/creports/911.html); see also id., Add'l Views of the Members of the Joint Inquiry at 6, 33, 45, 67, 106.

107

108   This public debate is still very much alive, despite the passage of nearly five years. See, e.g. Lawrence Wright, A Reporter at Large: The Agent, The New Yorker, July 10 and 17, 2006 (outlining critical failures of communication between the CIA and the FBI prior to September 11, 2001).

109

110   Plaintiffs in this case sought to contribute their views and perspective to this public debate, but were denied permission by Defendants. FBI Special Agents like Plaintiffs, both of whom had long careers with the FBI, are the kind of people who are likely to contribute the most illuminating insights to the public discourse about the Bureau and its performance in the counter-terrorism area. See Pickering, 391 U.S. at 571-72 (noting that teachers, as a class, are most likely to be able to provide "informed and definite opinions" on how funds allotted to schools should be spent — a matter of public concern for which the school administration's word should not be taken as conclusive).

111

112   The case for allowing Plaintiffs to be heard in this case is, if anything, far more compelling than in Pickering. Schools are, by their very nature, open institutions and, it is fair to say, that all parents (and many non-parents) have strong views about the teaching of their children and prioritizing of limited public funds. Moreover, there is no lack of informed public discussion in the media about educational policy. In contrast, the FBI, by its very nature, is not an open institution, and very few people are knowledgeable about its inner operations. For that very reason, the views of knowledgeable, informed, experienced "insiders" are of particular utility. Of course, it goes without saying that the subject matter itself — whether the FBI's efforts to counter and prevent terrorism attacks in this country have been successful — is of extraordinary public concern.

113

114   Moreover, Plaintiffs allege that the FBI was itself contributing its views to the public debate, while censoring Plaintiffs from contributing theirs. See Pl.'s Wright Mot. at 15 ("the FBI's real motive was to `spin' the New York Times story [from the Miller interviews] in a favorable way to the agency . . ."). The FBI does not deny that during the time frame that Judith Miller interviewed Plaintiffs, she was permitted to interview Agency officials regarding the facts of the Vulgar Betrayal investigation. Given this scenario, it is even more important that First Amendment freedoms are guaranteed in order to allow the dissemination of competing views in the public forum for debate and analysis. Sullivan, 376 U.S. at 270 ("The First Amendment . . . `presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.'") (quoting United States v. Assoc. Press, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)).

115

116   For all of these reasons, the interests favoring Plaintiffs' ability to publish their submissions carry great weight.

**b. The Government's Interest in Promoting the Efficiency of Its Mission**

On the other side of the Pickering balance, the Court must consider "the Government's ability to promote the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. In this case, the Government argues that censorship of parts of Plaintiffs' submissions was necessary because they involve open investigations, grand jury proceedings, and sensitive law enforcement techniques.

There is no denying that the Government has a strong interest in "protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation" of its intelligence operations. Snepp, 444 U.S. at 510, n. 3. Plaintiffs argue, however, that the Government's interest is significantly reduced, if not entirely eliminated, when the information at issue is already in the public domain and, therefore, the Government's operations cannot be affected adversely. Here, Plaintiffs contend that all of the censored portions of their submissions were already in the public domain, and therefore none should be censored. See Pl.'s Wright Mot. at 2.

It should be noted that the secrecy agreement Plaintiffs signed upon joining the FBI, requiring prepublication review, does not "apply to information which has been placed in the public domain" Defs.' Vincent Mot., Ex. 3; nor does the Government make any argument that it does.

There is no case, from the Supreme Court or our Circuit, nor has the Government cited any, holding that information in the public domain may be censored. Indeed, in McGehee, the D.C. Circuit specifically noted that "when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." 718 F.2d at 1141. The Circuit relied heavily on United States v. Marchetti, which held that the government may not censor information obtained from public sources, "contractually or otherwise." 466 F.2d 1309, 1313 (4th Cir. 1972). see also Snepp, 444 U.S. at 513 n. 8 (dictum) ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned").

Finally, in the most recent case from our Court of Appeals dealing with these issues, Weaver, the Court observed that "it is doubtful that the agency could, consistent with Pickering v. Bd. of Educ., 391 U.S. 563 (1968), penalize publications devoid of non-public information, by employees with non-sensitive responsibilities (e.g., a driver, a payroll accountant), writing in a context where their statements could not possibly be viewed as representing the agency or the United States, simply because the publication took a view inconsistent with current foreign policy." 87 F.3d at 1436 (internal citation omitted).

Wright claims he submitted "copious documentation in support of his submissions" to the FBI, which he alleges "provide[s] a publicly available source of information for each fact contained in SA Wright's submissions relating to terrorism." Pl.'s Wright Mot. at 17. For example, Wright alleges that Chapter 26 of his manuscript, which he was not allowed to publish, was "based entirely on newspaper accounts and discusses well known cases. . . ." Id. Wright attests to this in his Declaration, but does not provide the actual documentation to support his claim, which he did submit to the FBI after it had conducted its first review of his Fatal Betrayals manuscript.

Defendants' only argument in response is that Wright's submissions "were reviewed by the USAO-N.D.Ill., and that office determined that many of them post date [his] submissions, indicating that his original base of knowledge was not public source information, but rather was obtained by virtue of his position with the FBI and, more specifically, because of his knowledge of grand jury proceedings." Def.'s Wright Reply at 9; see also Bolthouse Decl. (Wright) at ¶ 21.

Defendants' argument, even if accurate, does not explain how, regardless of how or when Wright learned of certain information, the Government could have any interest whatsoever in censoring it if it is already in the public domain.

With respect to the Miller interview questions and answers, both Plaintiffs argue that Miller's questions essentially asked them to confirm or deny statements of fact that the FBI officials had already given to her.

136
137 Again, although the Government contests that the information it censored was in the public domain, it provides little support for its argument. In Vincent's case the Government submitted a summary of the FBI officials' interview with Miller as an interrogatory response. See Defs.' Vincent Mot., Ex. 21. This summary, however, does not adequately show how the information Vincent sought to publish went beyond what the FBI officials had divulged to Miller, or how it was otherwise not within the public domain.

138
139 In short, there are genuine issues of material fact in dispute. The record is by no means clear enough for the Court to establish whether the censored portions of Plaintiffs' submissions were in the public domain. Moreover, since the Government did not follow its own internal policy pursuant to the MAOP, Section 1-24 (4)(a)(3)(d), requiring that it identify by line and page number the reasons for its objections, there is no basis for determining whether the censored submissions were in the public domain. Defs.' Vincent Mot., Ex. 18. Without such information, the Court cannot weigh the Government's interest in maintaining the secrecy of the information it censored. Therefore, Defendants will be required to submit detailed affidavits explaining which portions of the censored submissions were not in the public domain, and Plaintiffs will be given an opportunity to respond.

140
141 c. Whether Non-Classified Information May Be Censored
142 Plaintiffs also argue that the Government is not allowed to censor information that is not classified, as Defendants concede is the case for all of Plaintiffs' submissions. There is some case law supporting this general principle. See McGehee, 718 F.3d at 1141 ("The government has no legitimate interest in censoring unclassified materials."); Snepp, 444 U.S. at 513 n. 8 (dictum) ("if in fact the information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned").

143
144 However, Plaintiffs' secrecy agreement does not limit the scope of the Government's censorship to classified information. Moreover, the Government may still have a legitimate interest in censoring unclassified information. The mere fact that information is not classified does not mean that it is not `secret' in the lay sense of the word. For example, during oral argument on these Motions, the Government's counsel noted that lists of undercover agents may not be classified, but dissemination of such information would nonetheless seriously impair the Government's counter-terrorism efforts and national security interests.

145
146 This Court's task, under Pickering, is to balance the competing interests of the parties. Only after determining which portions of Plaintiffs' censored submissions were in the public domain, will the Court be able to consider all of the Government's arguments for censoring Plaintiffs' submissions against the exceedingly strong interest Plaintiffs have in publishing that information.

147
148 B. Defendants' Motions Are Granted as to Plaintiffs' Claims Under 28 CFR § 17.18
149
150 Plaintiffs allege in Count II of their Complaints that Defendants violated 28 C.F.R. § 17.18, a regulation relating to the DOJ's prepublication review process for classified information. Part 17 of Title 28 of the Code of Federal Regulations is titled "Classified National Security Information and Access to Classified Information." The purpose of the section is "to ensure that information relating to the national security is classified, protected, and declassified pursuant to the provisions of Executive Orders 12958 and 12968 and implementing directives from the Information Security Oversight Office of the National Archives and Records Administration." 29 C.F.R. § 17.1. Therefore, the prepublication review provision contained in Part 17 (section 17.18) applies only to review of classified information.

151
152 Since it is undisputed that none of Plaintiffs' submissions contain classified information, this regulation does not apply to Plaintiffs' submissions. Accordingly, Defendants' Motions must be granted as to Plaintiffs' claims under 28 CFR § 17.18.

153
154 C. Defendants' Motions Are Granted as to Plaintiffs' APA Claims
155 In Count III of their Complaints, Plaintiffs argue that Defendants' final decisions censoring their submissions from publication were arbitrary and capricious, in violation of the APA.

156
157   When reviewing actions by an administrative agency, courts are bound by the highly deferential standard embodied by the APA. 5 U.S.C. § 706(2)(A). Under this standard an agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. If the "agency's reasons and policy choices . . . conform to `certain minimal standards of rationality,'" the decision "is reasonable and must be upheld." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 520-21 (D.C. Cir. 1983) (citation omitted).

158
159   Plaintiffs first allege an APA violation based on Defendants' failure to follow "their own procedures," by "failing to specify any particular portions of the answers that allegedly are objectionable to allow Plaintiff to revise the answers to address Defendants' alleged concerns." Wright Second Am. Compl. at ¶ 44.

160
161   Defendants argue, and Plaintiffs do not dispute, that these procedures are internal agency guidelines. The law is well-settled that internal guidelines can not create a cause of action in federal court. To be given the force and effect of law, a regulation must prescribe "substantive" or "legislative" rules rather than merely "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice."Chrysler Corp. v. Brown, 441 U.S. 281, 301 (1979) (internal citation omitted). Moreover, the regulation must be promulgated pursuant to a statutory grant of authority and "must conform with any procedural requirements imposed by Congress," id. at 302-03, characteristics which are not present in this case.

162
163   Internal guidelines, such as those at issue in this case, do not create an actionable duty for an agency. United States v. Am. Prod. Indus., Inc., 58 F.3d 404, 407 (9th Cir. 1995);Akin v. Office of Thrift Supervision, 950 F.2d 1180, 1186 n. 7 (5th Cir. 1992); United States v. Craveiro, 907 F.2d 260, 264 (1st Cir. 1990). Accordingly, the fact that Defendants did not follow their internal guidelines in this case, although not desirable, does not, in and of itself, amount to a violation of the APA.Schweiker v. Hansen, 450 U.S. 785, 789 (1981) (holding that claims processing manual was for internal agency use, and did not carry the force of law or bind the agency); Prudential-Maryland Joint Venture Co. v. Lehman, 590 F. Supp. 1390, 1403 (D.D.C. 1994) (Department of Defense directives and instructions regarding procurements were for internal guidance and did not have the force and effect of law).

164
165   Second, Plaintiffs argue that Defendants' change of position regarding their submissions demonstrates arbitrary and capricious behavior. Defendants openly concede that they made mistakes handling Plaintiffs' submissions. "The FBI does admit (as it must) that the agency's initial decision denying plaintiff permission to publish any of his responses was not the proper determination." The FBI further admits that it erred in failing to consult the USAO N.D.Ill. sooner. "The FBI acknowledges, as it must, that such consultation should have taken place when SA Wright first submitted his manuscript and other materials, rather than after he submitted his revisions in January/February 2002." Def.'s Wright Reply at 5.

166
167   However, none of these procedural mistakes demonstrate that the substance of Defendants' final decision was arbitrary and capricious. Defendants' final position was reached after obtaining additional crucial information, of which they were not previously aware, from other agencies and entities. As opposed to being arbitrary and capricious, Defendants' changes in position were in line with the recommendations they received from those other agencies and entities.

168
169   Finally, Plaintiffs point to the fact that Defendants' final decisions were not reached until years after they first submitted their materials for prepublication review. Plaintiffs' argument highlights the problems that arise from an agency deciding not to follow its guidelines and procedures for handling prepublication review requests. As Defendant's concede, had they handled Plaintiffs' request differently, the time for total review would most probably have been much shorter.

170
171   However, the prepublication review policy itself does not set out a strict deadline by which a final decision must be made, and the D.C. Circuit has declined to hold that such a deadline is required. Weaver, 87 F.3d at 1443 ("[W]e reject the idea that prior review in the employment context must proceed under a pre-set time limit."). Therefore, while the Court is sympathetic to Plaintiffs' position, the

time lag does not amount to a violation of the law.

Because Defendants' course of action conformed to "certain minimal standards of rationality," the Court does not conclude that the Government's actions were arbitrary and capricious and in violation of the APA. Small Refiner Lead Phase-Down Task Force v.  EPA, 705 F.2d 506, 521 (D.C. Cir. 1983) (internal citation and quotation omitted). Accordingly, Defendants' Motions must be granted as to Plaintiffs' APA claims.

IV. CONCLUSION

For the reasons stated herein, the parties' Motions for Summary Judgment are denied with respect to Plaintiffs' First Amendment Claims, and Defendants' Motions are granted with respect to Plaintiffs' claims under 28 C.F.R. § 17.18 and the APA.

An Order will issue with this Memorandum Opinion.

**IndyStar.**   Subscribe   **Sign in**



# New details show interventions failed — again and again — to stop FedEx shooting

**Tony Cook** and **Johnny Magdaleno** Indianapolis Star

Published 5:01 AM EST Nov. 11, 2021 | **Updated 10:52 AM EST Nov. 16, 2021**

*This story contains discussion of suicide. If you or someone you know is struggling with suicidal thoughts, call the Suicide Prevention Lifeline at 800-273-8255 or seek out _area resources_.*

The afternoon just before Indianapolis' worst mass shooting was unusually calm in Sheila Hole's house.

She got off work at Five Guys on April 15 and came home with a burger, fries and a chocolate shake for her son. When she arrived, she found a rarity: Her suicidal and physically abusive

19-year-old was in a good mood.

After eating he told her he wanted a haircut. Their usual go-to, the Great Clips on Shadeland Avenue, was closed for remodeling. So they decided she would cut his hair there in their east-side home.

She messed up a couple of times so they talked about shaving his head. He was OK with that. One effect of his obsessive-compulsive disorder was that he didn't like having long hair.

The events of the past year weighed heavily on Sheila Hole. Domestic abuse, police interventions, his threats of suicide, his dead-end therapy sessions. The FBI task force officer who showed up at their door to say he was a neo-Nazi. The time he emerged from a gun store, smiling, with his new rifle.

Their relationship was always one comment or violent memory away from becoming volatile. But that evening, he decided to draw a hot bath for himself.

## This is why we are writing about a mass shooter

Read the column

He sat it in for 30 minutes. She thought — she hoped — he was at peace.

She said goodnight and went to bed. He asked if he could order a movie. She told him he could.

Such moments — rare as they were — were why she never stopped trying, despite his violent tendencies, abusive behavior and consistently bad decisions.

"I think all is pretty good," Sheila wrote later in a journal documenting their final interaction.

He never ordered a movie. Instead, he slipped out of the house and traveled to a FedEx facility in southwest Indianapolis. He had two rifles in his car.

Once there, he selfishly and callously unleashed four minutes of terror.

He killed eight people and wounded five others before killing himself. Some of his victims were arriving or leaving work. Others were collecting their paychecks.

       

Matthew R. Alexander, 32  ▪  Samaria Blackwell, 19  ▪  Amarjeet Kaur Johal, 66  ▪

Jasvinder Kaur, 50  ▪  Amarjit Sekhon, 48  ▪  Jaswinder Singh, 68  ▪

Karli Smith, 19  ▪  John Weisert, 74

All innocent. All targets for no reason. All with grieving families left behind. Loved ones and a city searching for an answer. Why?

And could anyone have done something to prevent it?

**FedEx shooting in Indianapolis:** Who were the victims?

## The reason for doing this story

Understanding the killer's backstory exposes not only his culpability — he is the one accountable for his actions — but also whether those with the power and responsibility to intervene did all they should.

IndyStar found law enforcement and mental health care professionals had multiple interactions with the killer. They were warned of his propensity for violence. But at crucial moments, their interventions failed.



## Exclusive on-camera interview: Sheila Hole sat down with Fox59's Angela Ganote (1:22)

FOX59, INDIANAPOLIS STAR

The details of the killer's life were told to IndyStar by Sheila Hole in a series of interviews between September and November. She was hesitant to speak at first. She didn't want to cause the victims of her son's crimes any additional grief.

She said she decided to break her silence because she hopes telling the story will expose a series of shortcomings. That includes her own mistakes.

Sheila provided IndyStar with medical records and other documents dating back 10 years. She gave reporters a journal, which she kept in a briefcase by her kitchen table, that she filled after the shooting. It details her efforts to find help the year prior.

IndyStar also spoke with her close friend and her sister, who confirmed the killer's abusive behavior and the family's interactions with the FBI.

IndyStar has decided to share this story with a simple intention. We hope, much like Sheila Hole, that some good can come of this, whether by giving more attention to mental health care issues or holding accountable those whose job it is to protect us.

**Column:** This is why we are writing about a mass shooter

# A history of mental illness

The killer had a long history of mental health issues.

That doesn't mean he was destined to become a mass shooter. One in five U.S. adults have a diagnosable mental disorder, according to the American Psychiatric Association.

"People with mental illnesses are no more likely to be violent than those without a mental health disorder," the American Psychiatric Association says. "In fact, those with mental illness are 10 times more likely to be the victims of violent crime."

Sheila began to notice issues with her son as early as fourth grade. His agitated behavior spurred her to bring him to Barrington Health Center on the southeast side of Indianapolis.

She took it seriously. She had reason to.

Seven years earlier, her son's father killed himself after an argument with Sheila over his drug use.

"I said, 'You're useless anyways, go kill yourself,'" Sheila told IndyStar. "I was angry. I said it. And he did it."

A neighbor found his body in the family's backyard. Their son was 3.

The experience shaped how Sheila would react years later, when her son threatened to follow in his father's footsteps. "I couldn't take it as a ploy," she said.

When he began to exhibit symptoms of a mental health disorder, his mother felt confident she could find him help.



## Tragedy at FedEx

**'He should have been red flagged': mother of FedEx shooter speaks out in Fox59 interview →**

FOR SUBSCRIBERS
**Fed Ex mass shooter's past held more violence, missed red flags, disclosed documents reveal →**

**'Act of violence' took mere minutes: How the FedEx mass shooting in Indianapolis unfolded →**

It was a belief borne of her experience with his older sister and only sibling. She had Tourette syndrome. To help her calm down, Sheila used to wrap her arms around her and squeeze tight. "I love you, I love you, I love you," Sheila would repeat.

**Indiana's red flag law didn't stop shooter from killing 8 people →**

**FedEx shooting in Indianapolis: Who were the victims? →**

The family's physician was unfamiliar with Tourette syndrome, so he recommended an expert in childhood neurology. She called the office, but getting an appointment proved difficult.

So she began dialing numbers that differed from the main line by just one digit. Finally she landed on the direct line to the expert's office. A staff member booked the appointment.

The appointment led to her daughter's diagnosis of Tourette syndrome, and medication that helped her manage the neurological disorder.

Now, she focused that same determination on her son's behavior.

"I was like, all I've got to do is… get in and tell people what's going on," she said.

## Troubling behavior

At Barrington Health Center, he was diagnosed with obsessive-compulsive disorder and prescribed Lexapro, a depression and anxiety medication.

The following year, as he started fifth grade, the problems grew. During a 2-month period in the fall of 2012, medical records show he resisted going to school. He was aggressive with his mother "to the point that mom doesn't know what to do anymore." His mother told his therapist "he has always been aggressive to her but she never told anybody."

## FedEx shooter had more than a dozen encounters with law enforcement, mental health care system

Explore the timeline

Twice in the medical records there were references to police being called to the family's home.

His behavior had deteriorated. The records described "aggression to others, blatant disrespect for authority, property destruction." He "often loses temper, argues with adults, defiance, often blames others for his/her mistakes, is often touchy or easily annoyed by others, is angry and resentful."

Post-traumatic stress disorder symptoms were also noted. He "has had a lot of stress and trauma — dad killed himself, several deaths in family."

For the first time, self-harm was listed as a risk factor.

He was further diagnosed with disruptive behavior disorder and anxiety disorder. Several behavioral therapy sessions followed. He was prescribed a stronger dose of Lexapro, plus Intuniv, an attention deficit hyperactivity disorder medication.

Still, none of it seemed to make a significant difference, Sheila said.

**Timeline:** FedEx shooter had over a dozen mental health care, law enforcement encounters

## Water fight turns violent

On May 16, 2013, her son, then 11 years old, was arrested after a water fight with his mother's boyfriend turned violent. The boy was upset he had been sprayed with a hose. He began yelling and spraying the inside of the house, according to a police report.

After the boyfriend left, the boy locked himself in the bathroom and began destroying it. When his mother picked the lock, he charged at her, she told police. He punched and slapped her in the face, kicked her legs, bit her, and then, according to the police report, stabbed her in the arm with a table knife.



**BEGAN TO PHYSICALLY ASSAULT HIS MOTHER BY PUNCHING HER TWICE ON BOTH SIDES OF THE FACE, SLAPPING HER SEVERAL TIMES TO BOTH SIDES OF THE FACE, KICKED HER LEGS, AND THEN GRABBED HER LEFT ARM AND BIT HER ON THE FOREARM. ▅▅▅▅ LET GO AND RAN TO THE KITCHEN AND MS HOLE FOLLOWED HIM. AS MS HOLE ENTERED THE KITCHEN, ▅▅▅▅ PROCEEDED TO AGAIN SLAP, PUNCH, AND KICK MS HOLE. ▅▅▅▅ THEN WENT THRU THE SILVERWARE DRAWER WHERE HE PULLED OUT 2 TABLE KNIVES, AND STARTED TRYING TO STAB MS HOLE. MS HOLE TRIED TO STAY AWAY FROM THE KNIVES; BUT ▅▅▅▅ DID STAB MS HOLE ON HER RIGHT FOREARM; BUT ONLY CAUSED A SMALL LACERATION W/ LITTLE BLEEDING.**

A 2013 police report about the FedEx shooter. Redacted by IndyStar.
PROVIDED

He was transported to juvenile detention for a few hours and later put on probation for several months, his mother said.

That fall, he began attending Raymond Park Intermediate and Middle School. It didn't go well. His inflexibility caused frequent outbursts. He was often overcome with anxiety. After just a few weeks, he dropped out.



Sheila Hole points to a scar on her arm where she alleges her son stabbed her with a table knife in 2013.

MICHELLE PEMBERTON/INDYSTAR

"I'm fighting for like two hours to get him to school. We go in there, he's crying, I'm crying," Sheila told IndyStar. "And they're like, 'He can go home.' After 12 or 13 times I'm like, OK, that is not doing us any good."

Staying home reduced the stress in his life. In that sense, Sheila said, the isolation was something of a relief. But it did little to improve his underlying mental health challenges. He remained depressed, she said.

He enjoyed spending time on his computer and playing video games. But he never attended high school and did not graduate. He also refused counseling, Sheila said.

Over time, he developed a fascination with the military.

He began going to the nearby Indy Gun Bunker, a firearms and military surplus store. He would buy MREs — meals ready to eat — and try on camouflage jackets.

He even thought he might enlist. He and his mother spoke with a recruiter after he turned 18. But they were told his braces would prevent him from serving, Sheila said.

Then, on March 2, 2020, he bought something else from the surplus store.

## 'He's going to kill himself'

He had threatened suicide before. So when he told his mother he wanted to purchase a gun, he didn't hide why.

"He says he's going to get a gun and kill himself," Sheila told IndyStar.

She refused to drive him to the store at first. When he said he would drive himself, she relented and went with him. She was worried, but told herself, *he probably doesn't have enough money to buy a gun.*

She also believed there would be a several-day waiting period before he could take possession of the gun. She was wrong.

"I couldn't even believe he was filling out the paperwork," she said. She considered screaming in the middle of the store: "He's going to kill himself!"

Then something happened that bought her time. He successfully purchased a shotgun, but the store was out of ammunition.

When they got home, she tried to talk to him. "If you won't go to counseling, I have to call someone on you to stop you from doing this," she remembers telling him.

He got angry. He punched her.



Sheila Hole, the mother of the FedEx mass shooter, on Oct. 28, 2021, in Indianapolis.
MICHELLE PEMBERTON/INDYSTAR

"It's my life, I'll end it the way I want," he told her. "If you call the police I will point an unloaded gun at them and they will shoot me anyways."

Driven by desperation, Sheila and her daughter made a plan that night. The next day, they would go to IMPD's East District office. They'd plead for help.

Officers were in the middle of roll call when the two women arrived. Sheila banged on the door until someone opened it.

Police reports from that day show she told officers everything: Her son had purchased a .410 caliber shotgun the day before. He had threatened suicide by cop. He had hit her. His father had killed himself.

She said she also told them he'd been diagnosed with several mental health disorders.

████████ BECAME ANGRY AND STRUCK HIS MOTHER WITH A CLOSED FIST IN THE ARM AND TOLD HER TO SHUT UP.  **REDACTED** CONTINUED TO INQUIRE WHAT ████████ PLANNED ON DOING WITH THE SHOTGUN AND HE REPLIED, " THIS IS NOT THE LIFE I WANT TO LIVE I'LL END IT MY WAY."  FURTHER, " I AM GOING TO POINT THIS UNLOADED GUN AT THE POLICE AND THEY WILL SHOOT ME."

Indianapolis Metropolitan Police Department Case Report, March 3, 2020. Redacted by IndyStar.
PROVIDED

When police arrived at the home, Sheila called her son downstairs. Police handcuffed him. He "became immediately anxious," a police report says.

"Please just turn the power strip off on my computer," he told officers. "I don't want anyone to see what's on it."

Police confiscated the shotgun under <u>Indiana's red flag law</u>, which allows law enforcement to seize firearms without a warrant when they believe someone is a danger to themselves or others.

▍ **'He should have been red flagged':**  <u>Mother of FedEx shooter speaks out in Fox59 interview</u>

They also saw what they described in the police report as white supremacist websites on his computer. Sheila said one of the officers told her that her son was on a neo-Nazi website, talking to someone in Germany with neo-Nazi rhetoric.

Sheila said she told the officers to take his computer and arrest him, but they didn't.

Instead, they kept him on the couch for about 45 minutes.

He downplayed any suicidal thoughts or plans. But he voiced feelings of sadness and depression, according to the police report. He said he would benefit from counseling. So he was transported to Eskenazi Hospital for further assessment.

Guns were now out of the picture, Sheila thought. Her son was finally going to get the help he needed.

Neither of those things turned out to be true.

## 'They brushed him off'

He spent less than two hours at Eskenazi before he was released, Sheila told IndyStar.

Medical records show he was seen by an emergency medicine physician. The records show the physician was aware that he was brought in by police, had recently purchased a gun, made statements that he did not want to live and contemplated pointing a gun at police in an attempt to end his life.

"The patient denies this in its entirety to me," the physician wrote, "says he feels fine has no medical complaints and (does) not feel like he would hurt himself or anyone else."

There is no indication in the medical records that he was seen by a psychologist or psychiatrist.

Under "Final diagnosis," the physician wrote, "None."

The physician did not respond to inquiries from IndyStar, including a note left at an address associated with him in public records. Reporters sent questions to Eskenazi about whether a formal psychological assessment or suicide risk evaluation were performed. Todd Harper, a spokesman for Eskenazi, said the hospital could not answer specific questions because of patient privacy requirements.





Investigators on the scene following a mass shooting at a FedEx facility in Indianapolis on April 16, 2021.

MICHELLE PEMBERTON/INDYSTAR

"We are deeply saddened by the tragedy at FedEx," Harper said in an emailed statement. "Eskenazi Health follows standard evidence-based policies and practices governing the assessment of safety and suicide risk in all patient care settings. Decisions regarding involuntary detentions and treatment are made based upon clinical review and clear legal parameters in place to protect individual rights."

Mental health experts who reviewed the medical records at IndyStar's request said hospitals should be equipped to deal with complex psychiatric issues, especially when someone presents a threat to themselves or others. The reality is, they often are not.

"That's not uncommon, but they brushed him off," said Jeffrey A. Lieberman, chairman of the Department of Psychiatry at Columbia University and a former president of the American Psychiatric Association. "They sent him out because he said the right things initially and they didn't see any extreme acuity of the situation."

## 'They cut him loose'

The decisions made at Eskenazi would also play a role in determining his access to firearms.

On March 3, 2020 — the day police responded to the home and confiscated his shotgun — it should have set in motion the filing of a probable cause affidavit with a Marion County judge. Under the red flag law, police must file an affidavit with a judge within 48 hours of confiscating a weapon.

But at that time, police were first sending the probable cause information to be vetted by the Marion County Prosecutor's Office.

Had prosecutors decided to bring the case before a judge, a hearing would have been set within 14 days. If the judge found the then-18 year old to be a danger to himself or others, he would have been prohibited from possessing or purchasing firearms — including the rifles he would later use to carry out the FedEx shooting.

But Marion County prosecutors declined to open a red flag case.

Marion County Prosecutor Ryan Mears would later blame what he called shortcomings in the law. He would also stress the quick release from the hospital.

"He was cut loose," Mears said during a press conference in April defending his office's decision.

"They didn't so much as prescribe him any additional medication after he walked out of there or any medication. And so we're left with a situation (where) we have one incident, he was treated by mental health professionals, they didn't civilly commit him, they didn't prescribe him any additional medication, and he was cut loose."

### 'They could have arrested me'

Sheila received a call to pick up her son from Eskenazi less than two hours after he had been detained. She was shocked — and afraid.

"I figure he's going to beat on me for doing this to him," she told IndyStar.

For a while, he said little about what had happened. Sheila asked if they talked to him or helped him. "No," he said. He did, however, express concern he had been labeled a neo-Nazi.

A day or two later, his mom was sitting on a chair in the living room, playing Candy Crush on her phone. Suddenly, he emerged from his bedroom and sprinted down the stairs.

He ran up to her, she said, and smacked her on the side of the head as hard as he could.

She felt her eye shake in its socket. Her phone went flying across the room.

"What did I do?" she asked.

He said he understood why she called the police about the gun. But "you did not have to tell them that I hit you," he said. "They could have arrested me for domestic violence!"

*I wish they would have*, Sheila thought.

### IMPD tries to return the gun

That week, Sheila received a phone call from a woman at IMPD. She was trying to reach her son about the gun, but he was not answering. Sheila told the woman she would tell him to call her.

The woman called again an hour later. She said the woman told her that her son had an attitude problem, and that he hung up on her. The woman said she just needed to know if he wanted the gun back.

Sheila couldn't believe it. "Hell no!" she remembers telling the woman.

The woman told Sheila she needed to hear it from him. So Sheila convinced him to get on the phone and tell the woman IMPD could keep the gun.



## When a person is suicidal and chooses to use a weapon of a gun as their means to attempt that, and then ultimately you're just handing it back to them? Now, what kind of message does that send to the suicidal person?

Sheila Hole

TWEET                    FACEBOOK                    REDDIT

Sheila didn't fully understand the ramifications of the phone call at the time. She didn't know then that the prosecutor's office would not be filing a red flag case.

But she did know this: She was exasperated. The experience with Eskenazi and law enforcement had left her disillusioned.

"When a person is suicidal and chooses to use a weapon of a gun as their means to attempt that, and then ultimately you're just handing it back to them?" she told IndyStar. "Now, what kind of message does that send to the suicidal person?"

Officers from IMPD's behavioral health unit stopped by to check in a few days later. Sheila asked them to leave.

## What was on his computer?

Police intervention prompted little action from doctors or prosecutors, but it did draw the attention of another agency — the FBI.

The material IMPD saw on his computer led to a referral to the FBI. Details of what exactly police saw have never been made public.

Sheila said she went into her son's bedroom after police left on March 3, 2020. On his computer screen, she said, was a Google search for a song about Krieg, an apocalyptic, nuclear-decimated world from the fantasy game Warhammer 40,000. Inhabitants of the world, known as the Death Korps of Krieg, are fatalistic soldiers whose appearance and insignia are largely based on the German militaries of WWI and WWII.

The songs in the search results were dark and, in hindsight, disturbingly prescient.

The top result was a song that referred to "a suicide mission" and included lines such as, "Here, corpses are winners...our deaths have been assigned — and I choose mine...through our pile of corpses, triumph we shall gain."

Another top search result featured an image of an iron cross and a song that began, "I've got the reach and the teeth of a killin' machine." Other lyrics include, "I'll bring death to the place you're about to be: another river of blood runnin' under my feet."

It's unclear if that's what police saw. But whatever they saw led to a referral to the FBI's joint terrorism task force.

## 'No, no, no,' she screamed

Later that month, Sheila said she received a phone call from FBI task force officer Matt Stevenson. He needed to talk to her. They agreed to meet at the Propylaeum, where she worked at the time. The interview took place in his car, Sheila said.

He asked her about what police saw on her son's computer. She showed him the Krieg song search page. Then Sheila said he asked her a series of questions.



**Photos of the scene, families gathering at nearby hotel**

Photo gallery

Is he a loner?

Yes, she said.

Does he have a girlfriend?

No, she said.

Does he get on 4chan, an anonymous internet forum?

Yes, she said.

Does he talk to people online?

No, she said, but he does get on Omegle, a website that randomly pairs strangers in anonymous one-on-one chats.

After answering all his questions, Sheila said Stevenson said something that burned in her brain.

He said her son hit every red flag for a mass shooter.

"No, no, no," Sheila screamed.

She said she told Stevenson to go take his computer and arrest him. Stevenson told her he needed to talk to him first, she said.

Her friend and co-worker, Janice Radford, told IndyStar she saw Sheila get out of Stevenson's car. Sheila told her what Stevenson said.

"She was extremely upset," Radford said. "She was crying. She was shaking. I had never seen her that upset before."

## Another FBI interview

A few weeks later, in mid-April of 2020, Sheila said Stevenson and another member of the task force showed up at her home one morning.

The interaction that followed — as relayed by Sheila Hole — raises questions about whether the FBI's involvement accomplished anything other than unwittingly antagonizing a person its task force officer had already described as exhibiting characteristics of a mass shooter.

She doesn't remember the entire conversation. IndyStar sent the FBI a list of questions about the exchange, but the bureau would not comment. Here's what Sheila Hole told IndyStar she does remember.

Stevenson asked her son why he bought the shotgun. He told him he bought it to kill himself.

Stevenson then asked about his internet activities. He acknowledged using 4chan. He told Stevenson it wasn't all bad, some things were funny.

Then Stevenson asked a question that, to Sheila, seemed to come out of nowhere.

Did he like My Little Pony?

He said he did.

His mom was startled. She was unaware of so-called Bronies: adult fans of the animated children's series. Many members of the subculture genuinely enjoy watching the show with its bright colors and positive messages. But since the subculture's inception on 4chan, there have always been strains of sexualization and racism.

Sheila said Stevenson went on to say My Little Pony message sites were a way for neo-Nazis to talk to each other and make plans. He asked her son if he had talked to anyone on those sites. He insisted he hadn't. He told Stevenson he could take his computer, Sheila said.

It was the third time Sheila or her son had offered the computer to law enforcement. And for the third time, they declined, she said.

Stevenson then asked him what he was going to do with his life. The teen suggested he could work for the FBI, help them out.

Sheila said Stevenson shot him down. You need to get your mental health together, she remembers Stevenson saying.

As they left, Sheila heard Stevenson say something over his shoulder: Don't hit your mom. She had nothing to do with this.

As soon as they were gone, her son became agitated, furious.

"Why didn't you say something," he screamed. "How come you let him talk to me like that?"

## 'They don't have a flag on me'

The run-in with police and the FBI became an obsession. *How dare they?* he felt. Their questions humiliated him. Especially the accusation that he was a neo-Nazi.

"Let's just try to go one day not talking or thinking about it," Sheila told him.

That summer, he told her he wanted to move out of their home. Sheila thought it might be good for him. Living on his own might help with his obsessive tendencies and his anger.

They put a down payment on a trailer on the west side, close to his aunt.

Now that he was on his own, he needed protection, he later told his mom.

He was going to a gun store.



**Marion County prosecutor discusses red flag law**

Photo gallery

On July 7, 2020, she went with him to Indy Arms Company on East 55th Street. She told IndyStar she went because she didn't believe they'd sell him a firearm. After what happened in March, she was sure he'd been "red flagged."

*If he comes out furious*, she thought, *I don't want him driving. If he comes out furious*, she thought, *he'll probably beat me*.

Sheila didn't go in with him. She chain-smoked Marlboro Lights outside in the car. Ten cigarettes — and less than 20 minutes — after he walked in, he walked out with an HM Defense rifle.

"My emotions were off the charts," she said.

He was smiling.

"They don't have a flag on me," he told his mom.

For a second, she was relieved. The fact that he could buy a gun suggested the FBI didn't act on what Stevenson told her. Maybe federal law enforcement didn't really think her son was a mass shooter. And seeing him happy was like coming across an oasis after years of wandering.

Then reality set in. Her suicidal son had a firearm again.

## 'I don't see any white supremacists doing anything'

On Aug. 19, 2020, one day before his 19th birthday, he would have one last known interaction with law enforcement.

That day, Sheila was driving her son home from the dentist when she looked over and saw he had Stevenson's business card in his hands. He was dialing his number.

She reached over and tried to stop him. He pushed her hand away and called Stevenson multiple times. Sheila told IndyStar that when they finally connected, her son went on a rant.

"How can you bring your personal opinion into an investigation?" he asked Stevenson. "What side should I join if you gonna label me?"

Then Sheila said her son shifted the conversation to race.

"You're labeling me a neo-Nazi white supremacist but you got the FBI kneeling to Black Lives Matter," he said. "And I don't see any white supremacists doing anything. But Black Lives Matter are out here burning, rioting."

*He's losing his shit*, Sheila thought.

She figured the unhinged call would place him back on the FBI's radar. But as far as she knows, that phone call ended the FBI's involvement with her son.

When IndyStar reached out to the FBI after he shot and killed eight people, the bureau would only say it had previously concluded he had displayed no Racially Motivated Violent Extremism ideology.

The next day, Sheila and her son did nothing. He didn't feel like celebrating what would be his final birthday.

## New job at FedEx

That August, he started a new job at the FedEx ground facility near the Indianapolis International Airport. He liked it there.



## Four minutes at FedEx: Inside the terror of Indianapolis' deadliest mass shooting

Read the story

Sheila spoke with him over the phone almost every morning "to keep him calm, help him see things can and will get better," she said. He "seems good," she wrote in her journal.

But there was one thing he didn't tell her. In September 2020 he purchased a second rifle — a Ruger AR-556. Sheila said she later learned he purchased it at the Indy Trading Post on Madison Avenue.

About that same time, he told her he hadn't shown up to work for a few days. He assumed he was fired. He couldn't get out of bed, he said. It was probably his depression, Sheila told IndyStar.

But then he went to FedEx to pick up his last paycheck and found out he wasn't fired after all. He returned to work.

By October, he had stopped showing up to work for good.

### 'No guns in the house'

He started having second thoughts about living on his own. He wanted to move back, he told his mom in February 2021.

She said he could. But he had to go to counseling.

He agreed. On March 19, they went to an Eskenazi Health clinic. Sheila sat in the waiting room. Her son sat in the car outside, rocking back and forth. He was "highly agitated," Sheila said.

Hours passed. His name was never called.



**Morning after FedEx mass shooting where 8 people died**

Photo gallery

Sheila approached a staff member. "I'm willing to sit here until you guys close," she said. "He needs to be seen."

It doesn't look like they're going to get to him today, staff told Sheila.

She started to cry.

Four hours passed. They never saw a mental health professional. But before they left they received good news. He was put on the schedule for the following Monday.

That morning, he met with a social worker at Eskenazi Health's clinic on Crawfordsville Road. It was the first time he'd seen a counselor in almost a decade.

The five pages of notes from that session are thoroughly detailed. He had generalized anxiety disorder, panic attacks, recurrent major depressive disorder and chronic suicidal ideation, the notes say. He had obsessive-compulsive tendencies, poor anger control and impaired social functioning.

"Involvement with FBI and IMPD terrorism unit was traumatizing," the notes say. Around the time of that incident he tried to hang himself, he told the counselor.

Anger Control: poor anger control, unhealthy expression of anger,"I can get very, very angry. I have very little control over myself when that happens." Suicide Risk: chronic suicidal ideation attempted hanging himself 9 months ago and 8 months ago mother took him to buy a gun and then [REDACTED] threatened to commit suicide or point it at police so they would shoot him, FBI and IMPD terrorism unit involved after mother sought help through Mobile Crisis Assistance Team, Adjustment to Trauma: involvement with FBI and IMPD terrorism unit was traumatizing.

The FedEx shooter's mental health records, March 22, 2021. Redacted by IndyStar.
PROVIDED

He also told the social worker he excessively worried "about everything, financial problems, my mental state."

"I worry that I could kill myself one day."

Medication for psychiatric symptoms would be good for him, the notes say. But he was never given medication, according to Sheila. And his records never indicate he received a prescription.

He was deemed a "moderate risk" and given a suicide prevention safety plan.

One of the plan's steps: "No guns in the house."

## 'Doesn't care about the lives of others'

Nine days later, on March 31, he met with a different Eskenazi Health social worker.

He told the social worker "he doesn't have empathy; he doesn't care about the lives of others even his own mother," the Eskenazi therapy notes say.

> ████ said he believes he is antisocial. When things doesn't go the way he believes they should go he becomes angry. ████ said he doesn't have empathy; he doesn't care about the lives of others even his own mother.

The FedEx shooter's mental health records, March 31, 2021. Redacted by IndyStar.
PROVIDED

His run-ins with IMPD and the FBI the previous year came up again. He said he was intimidated. They were too intrusive. The experiences "made him very angry towards society and law enforcement," the notes say.

His most recent suicide attempt also came up in greater detail. He tried to hang himself but failed. He didn't have the rope positioned correctly.

He took a suicide risk assessment test with the social worker. "Risk was not identified," according to the therapy notes.

## 'You're not going to like this'

He met with the social worker again on April 14, 2021 — the day before the shooting.

The last counseling session of his life focused on "strategies to address anger issues," according to the social worker's therapy notes.

He told her he might be bipolar. He said he might be a "vulnerable narcissist."

He also asked if his mom could then join them. Sheila told the social worker about March 3, 2020, when IMPD came to their home after Sheila reported her son to authorities, the therapy notes say.

Sheila said she didn't realize he'd "be able to own a gun so soon," according to the notes.



**Vigils held for FedEx shooting victims**

Photo gallery

She talked about his obsessive-compulsive disorder and attention deficit hyperactivity disorder, and how they affected him in elementary school.

The social worker also noted that one of the triggers that remains is that no one is allowed to touch his Applejack plush toy. He "said he loves 'My Little Pony,'" the notes say.

Although not reflected in the notes, Sheila told IndyStar he brought up white supremacism.

"You're not gonna like this," he told the social worker, who is Black. "They labeled me a white supremacist."

When the social worker didn't react, he continued.

"You're not gonna like this either," he said. "I'm not a white supremacist, but if I was, that would be my legal right to be one."

Sheila said her son gave a warning, also not reflected in the notes: "I have no empathy for anyone. I'm a danger to society. Society should be afraid of me."

Sheila started crying. She said she told the social worker, "He needs help."

The social worker patted her on the shoulder, Sheila said, and said, "We'll get him. He'll be fine."

The social worker did not respond to inquiries from IndyStar, including a note left at an address associated with her in public records. A spokesperson for Eskenazi also declined to answer specific questions about the counseling sessions, citing patient privacy requirements.

## The FedEx shooting

The following night, after his haircut and bath, he made his final post on Facebook. His account was later taken down at the request of Indianapolis police, but the post was referenced in an internal Facebook memo reviewed by the Wall Street Journal.

It featured the image of a cartoon pony and was timestamped 10:19 p.m.

"I hope that I can be with Applejack in the afterlife, my life has no meaning without her," the post said. "If there's no afterlife and she isn't real then my life never mattered anyway."

Less than an hour later, he pulled into the parking lot of his former employer. Police said he likely chose FedEx simply because he was familiar with it.

The massive facility near the Indianapolis International Airport was bustling with activity.

He went into the building and spoke with security, then returned to his car. He retrieved the two rifles he had purchased and began to spray gunfire. He killed four people outside. Four more inside the building. Five others were injured.

The massacre lasted about four minutes. Then he killed himself.

## 'An act of suicidal murder'

After the shooting, the FBI reappeared. This time, they were tasked with trying to figure out why it had happened.

Along with Indianapolis police and the U.S. attorney's office, the bureau conducted more than 120 interviews, issued more than 20 search warrants and subpoenas and reviewed more than 150 pieces of evidence.

They also pored over his computer and other devices.

They discovered about 200 files with German military and Nazi content. However, they noted, that was "an extremely small percentage" of the roughly 175,000 files they reviewed.

Despite that content, the agency announced in July that the killer's motivation did not appear to be based on bias or the desire to advance any ideology. That had been a major concern of the Sikh community, who lost four of its members in the shooting.

Instead, the FBI called his actions "an act of suicidal murder" intended to "demonstrate his masculinity and capability while fulfilling a final desire to experience killing people."

## Experts weigh in

It will never be known for sure if a more successful law enforcement or mental health intervention may have prevented the shooting.

That said, mental health experts asked by IndyStar to review the medical records and therapy notes had harsh criticism.

"There was a tremendous failure to address the complexity and gravity of his mental disorder," said Lieberman, chairman of the Department of Psychiatry at Columbia University and a former president of the American Psychiatric Association.

The diagnostic evaluations were "inadequate," Lieberman continued. The treatment he received focused on symptoms, not underlying issues. Those could have been uncovered

through a deeper neuro-psychological assessment and questions about his developmental history, he said.

He compared the treatment to someone who is given aspirin to quell a fever, or cough medicine to treat a cough, even though the cause of those symptoms is pneumonia or a strep infection.

If he indeed said he was a danger to society and that society should be afraid of him, it should have "set off all kinds of alarms," Lieberman said.

"You immediately act to restrain, admit or take them under observation." They should also be reported to law enforcement, he said. And if you think the statement is vague, you need to ask more specific questions to determine if the person is a danger, he added.



**To me, it's a system failure. And until we, as a society realize that we can't continue to operate and have a mental health system that has so many gaps in it, and holes in it, I worry that this kind of thing will continue.**

Christine Sarteschi, a professor of social work and criminology

TWEET          FACEBOOK          REDDIT

Christine Sarteschi, a professor of social work and criminology who has written extensively about mass murder, said the discrepancy between the medical records and Sheila's account of what he said during his final counseling session is "worrisome."

Miscommunications do happen. But if such a statement was made, Sarteschi said, it should have been included in the notes.

She was also surprised he was never deemed more than at moderate risk for suicide when social workers saw him in the spring. "He did seem like a high risk to me," she said. "For sure."

"To me, it's a system failure," she said. "And until we, as a society realize that we can't continue to operate and have a mental health system that has so many gaps in it, and holes in it, I worry that this kind of thing will continue."

## 'I grieve those people'

_____

On a recent Tuesday afternoon, Sheila's eyes followed a delivery vehicle as it passed in front of her porch and down the street.

"Every time I turn around there's the FedEx truck."

She can be found here most days. Sitting outside on the porch.





Sheila Hole on Oct. 28, 2021, in Indianapolis.
MICHELLE PEMBERTON/INDYSTAR

Waiting. Though she's not sure for what.

For lawyers representing the victims' families to pull up, step across her driveway and tell her it's time for her to talk.

For a victim's family member to pull up and shoot her.

She wouldn't blame them if they did. Whatever the families want.

During her trips in public she carries copies of a police report that she hands out to people who approach her. It's the report that details law enforcement's concern he was a danger to himself and others.

So much so that they took his shotgun that day. So much so that they took him to the hospital.

It's how she tells people he was within the grasp of those who might have prevented the city's deadliest mass shooting.

She wants people to understand that she tried.

And she wants her son to know that when she cries these days, it's not for him. It's for the victims.

"I grieve those people," she would tell her son if she had the chance, "more than I ever will you."

*Contact IndyStar reporter Tony Cook at 317-444-6081 or tony.cook@indystar.com. Follow him on Twitter: @IndyStarTony.*

*Call IndyStar courts reporter Johnny Magdaleno at 317-273-3188 or email him at jmagdaleno@gannett.com. Follow him on Twitter @IndyStarJohnny*

Published 5:01 AM EST Nov. 11, 2021 | **Updated 10:52 AM EST Nov. 16, 2021**

# Timeline: FedEx shooter had over a dozen mental health care, law enforcement encounters

**Tony Cook** and **Johnny Magdaleno** Indianapolis Star

Published 10:25 am UTC Nov. 11, 2021 | Updated 3:32 pm UTC Nov. 16, 2021

*This story contains discussion of suicide. If you or someone you know is struggling with suicidal thoughts, call the Suicide Prevention Lifeline at 800-273-8255 or seek out area resources.*

## This is why we are writing about a mass shooter

Read the column

### Sept. 7, 2011

The person who would become the FedEx killer is 10 years old. His agitated behavior spurs his mother, Sheila Hole, to take him to Barrington Health Center. He is assessed to have obsessive-compulsive disorder and is given anxiety medication.

### Aug. 7, 2012

A few weeks after starting 5th grade, he is seen again at Barrington Health Center. Medical records show his mother reports he has been resistant to attending school and been very aggressive "to the point that mom doesn't know what to do anymore." His behaviors are described as "aggression to others, aggression to self, lies excessively, blatant disrespect for authority, property destruction, leaves home without permission." He "often loses temper, argues with adults...often blames others for his/her mistakes, is often touchy or easily annoyed by others, is angry and resentful." He tells the nurse practitioner, "when I'm nice, I'm really nice and when I'm mad, I'm very angry." The medical records indicate his mother "has had to call the police on patient he's been so abusive to her." For the first time in his medical history, he is described by a nurse as being at risk for self-harm. He is assessed with

disruptive behavior disorder and anxiety disorder. He is prescribed more of the same medication.

| **FedEx shooting:** How inadequate interventions failed to stop killings

| **Column:** This is why we are writing about a mass shooter

### Sept. 19, 2012

He is seen again at Barrington Health Center. Medical records say his medication is having a "mild benefit" with some improvement to his anxiety. But he is still "feeling restless or on edge," has a history of panic attacks, and has "compulsive tendencies." His behaviors, like aggression towards others and property destruction, persist. The records also indicate post-traumatic stress disorder symptoms from stress and trauma including his father's suicide, which happened when he was three. "Police have been called once since last visit," the records say. His medication dosage is doubled.

### Sept. 27, 2012



Sheila Hole, the mother of the FedEx mass shooter, on Oct. 28, 2021, in Indianapolis.
MICHELLE PEMBERTON/INDYSTAR

During another visit at Barrington Health Center, his mother says he has always been aggressive to her, but she never told anybody.

## Sheila Hole shares her son's story

Read more

## Oct. 18, 2012

Records from Barrington Health Center show his anxiety is improving, medication is providing mild benefit, and he is seeing a counselor. He has been less aggressive and has gone to school daily since last visit. A second medication is prescribed.

## Oct. 24, 2012

During a behavioral therapy session at Barrington Health Center, he identifies obsessive thoughts. He also completes a 5-point anger scale, but no results are noted in the records.

## May 16, 2013

He is arrested after an altercation with his mother and her boyfriend. He is accused of punching his mother in the face and stabbing her in the arm with a table knife, according to a police report. He is transported to juvenile detention. His mother told IndyStar he was put on probation for several months.



Sheila Hole points to a scar on her arm where she alleges her son stabbed her with a table knife in 2013.

MICHELLE PEMBERTON/INDYSTAR

## March 3, 2020

> Apparently the patient had a gun that he recently purchased, had made statements in front of others that he did not Wanna live and was contemplating pointing a gun at others or possibly police in attempt to end his life. The patient denies this in its entirety to me says he feels fine has no medical complaints and is not feel like he would hurt himself or anyone else.

The FedEx shooter's emergency department records, March 3, 2020.
PROVIDED

His mother alerts police that her 18-year-old son is suicidal and purchased a shotgun the day before. According to police records, she tells police that when she confronted him about the gun, he hits her and says, "This is not the life I want to live I'll end it my way." He also says, "I am going to point this unloaded gun at the police and they will shoot me." Police arrive and place him in handcuffs. "Please just turn the power strip off on my computer," he says. "I don't want anyone to see what's on it." Officers seize the shotgun and observe what they described as white supremacist websites on his computer. They transport him to Eskenazi. His mother says he is held for less than two hours. He denies any suicidal thoughts and says he does not feel like he would hurt himself or others, according to medical records. There is no indication in the records that he was seen by a psychologist or a psychiatrist.

## Early March 2020

He smacks his mother in the side of the head and yells at her for disclosing to police that he hits her. IMPD calls about returning his shotgun. She says "Hell no!" and convinces her son to tell police to keep it, according to Sheila Hole. IMPD behavioral health officers also visit the family's home to check on her son. Frustrated that he didn't receive help the first time and fearing he might hit her again, she asks them to leave.

## March 11, 2020



Marion County Prosecutor Ryan Mears talks with media on Monday, April 19, 2021, about the individual who authorities said recently killed eight people in an overnight shooting at a FedEx Ground Plainfield Operations Center on Indianapolis' southwest side.
ROBERT SCHEER, ROBERT SCHEER/INDYSTAR

The Marion County Prosecutor's Office reviews the March 3, 2020 incident but decides not to pursue a red flag case. This could have prevented him from possessing or purchasing additional firearms. Prosecutor Ryan Mears would later say his office didn't have access to evidence strong enough to convince a judge he was a danger to himself or others.

## Mid- to late-March 2020

FBI task force officer Matt Stevenson asks to speak with Sheila Hole and meets her in his car outside her workplace, where he asks her a series of questions, according to Sheila Hole. The questions include: Is he a loner? Does he have a girlfriend? Does he get on 4chan, an internet image board? Then Stevenson says her son hits every red flag for a mass shooter, according to Sheila Hole. He says he will need to speak with her son.

## Mid-April 2020

According to Sheila Hole, Stevenson and another member of the FBI's joint terrorism task force interview her son at the family's home. Stevenson questions him about his connection to websites for adult fans of My Little Pony where sexual, violent and racist fan art is often shared. The encounter left him furious, his mother says.

## July 7, 2020



Indy Arms Company, on Wednesday, Oct. 6, 2021, 2550 E. 55th St., Indianapolis Ind.
MICHELLE PEMBERTON/INDYSTAR

He wants to buy a gun. His mother believes he has been red flagged and will be turned away. Fearing how he will react, she goes with him to the Indy Arms Company gun store. She is surprised when he comes out of the store, smiling, with a rifle.

## August 2020

He begins working at the FedEx Ground facility near the Indianapolis International Airport.

## Aug. 19, 2020

He calls FBI task force officer Matt Stevenson, according to his mother, who said she was in the car with him at the time. He accuses Stevenson of bringing his personal opinions into his investigation and says their interaction stressed him out. "What side should I join if you gonna label me?" Sheila Hole recalls her son saying. "You're labeling me a neo-Nazi white supremacist, but you got the FBI kneeling to Black Lives Matter. And I don't see any white supremacists doing anything. But Black Lives Matter are out here burning, rioting." Stevenson tells him he doesn't have time to argue with him and ends the phone call, according to Sheila Hole.

## Sept. 9, 2020

He purchases a second rifle at Indy Trading Post, according to his mother. She says she was unaware of the purchase at the time.

## October 2020

He stops showing up for work at FedEx and is terminated.



**Four minutes at FedEx: Inside the terror of Indianapolis' deadliest mass shooting**

Read the story

## March 19, 2021

His mother takes him to an Eskenazi Health clinic on the west side and waits for more than four hours, but can't be seen due to a lack of staff, according to a letter from the clinic that Sheila Hole provided to IndyStar.

## March 22, 2021

He undergoes an intake assessment at Eskenazi Health's clinic on Crawfordsville Road. Medical records indicate that his problems include "generalized anxiety disorder" with "panic attacks" and "major depressive disorder, recurrent" with "chronic suicidal ideation." He has "obsessive compulsive tendencies," "poor anger control," and "impaired social functioning due to social anxiety and other mental health symptoms." The records reference his earlier interaction with law enforcement. "Involvement with FBI and IMPD terrorism unit was traumatizing," the records say. He says he excessively worries "about everything, financial problems, my mental state. I worry that I could one day kill myself." He also says, "I can get very, very angry. I have very little control over myself when that happens." The records say he will benefit from medication for psychiatric symptoms, but there is no indication that he was actually prescribed any medication. He is deemed a "moderate risk" and given a suicide prevention safety plan. One of the plan's steps: "No guns in the house."

## March 31, 2021

He said the the experience with law enforcement made him very angry towards society and law enforcement; he felt "how dare they,"  They were too intrusive;

The FedEx shooter's mental health records, March 31, 2021.
PROVIDED

He meets with an Eskenazi social worker for a therapy session. He tells the social worker "he doesn't have empathy; he doesn't care about the lives of others even his own mother." He says he was intimidated by their presence and they were too intrusive. The experience "made him very angry towards society and law enforcement." He reports he tried to hang himself but he didn't have the rope positioned correctly. He is given a suicide risk assessment, but "Risk was not identified," according to the records.

## April 14, 2021

█████████ reported he's been more energetic and hasn't been hopeless. Wondering if he might become suicidal as a result of his euphoric mood.

The FedEx shooter's mental health records, April 14, 2021. Redacted by IndyStar.
PROVIDED

A day before the FedEx shooting, he meets with the Eskenazi social worker again, specifically to address his anger issues. He tells the therapist he feels he might be bipolar because his "mood switches." He also says he might be a "vulnerable narcissist" even though he is shy. He asks the therapist if his mother could join them. She tells the therapist about the shotgun confiscation and says she didn't realize he "would be able to own a gun so soon." The records show one of his triggers is his Applejack plush toy. No one is allowed to touch it. He "loves 'My Little Pony.'" It is not in the medical records, but according to Sheila Hole her son tells the therapist, who is Black, "You're not going to like this, but they labeled me a white supremacist." When the therapist does not react, he goes on. "You're not going to like this either. I'm not a white supremacist, but if I was, that would be my legal right to be one." He also tells the therapist he has no empathy for anyone, he's a danger to society and society should be afraid of him, according to his mother. She begins to cry and says, "He needs help." According to Sheila Hole, the therapist pats her on the shoulder and tells her, "We'll get him. He will be fine."

**April 15, 2021**



The scene outside a FedEx facility in Indianapolis where eight people died April 15, 2021. The shooter also took their own life.

MYKAL MCELDOWNEY/INDYSTAR

He drives to his former employer, FedEx, where he uses two rifles to shoot and kill eight workers. Five others are injured. It's the worst mass shooting in the city's history.

> **Four minutes at FedEx:** Inside the terror of Indianapolis' deadliest mass shooting in 15 years
>
> **FedEx shooting in Indianapolis:** Who were the victims?

*Contact IndyStar reporter Tony Cook at 317-444-6081 or tony.cook@indystar.com. Follow him on Twitter: @IndyStarTony.*

*Call IndyStar courts reporter Johnny Magdaleno at 317-273-3188 or email him at jmagdaleno@gannett.com. Follow him on Twitter @IndyStarJohnny*

Published 10:25 am UTC Nov. 11, 2021 | **Updated 3:32 pm UTC Nov. 16, 2021**

Help  ·  Terms of Service  ·  Subscription Terms and Conditions  ·
Your California Privacy Rights/Privacy Policy  ·  Privacy Policy  ·  Site Map  ·  Accessibility  ·
Ethical Principles  ·  **Manage Cookies**

   

© 2023 www.indystar.com. All rights reserved.



# Federal Bureau of Investigation
# Department of Homeland Security

[ Strategic Intelligence Assessment and Data on
Domestic Terrorism ]

*This doesn't describe me, nor my wife, but it may*

*Submitted to the Permanent Select Committee on Intelligence, the Committee on
Homeland Security, and the Committee of the Judiciary of the United States House
of Representatives, and the Select Committee on Intelligence, the Committee on
Homeland Security and Governmental Affairs, and the Committee of the Judiciary
of the United States Senate* *have targeted us for two years.*

*describe those who*

I wish to be very clear: Simply because I read and understand, to the best of my ability, "the law", I do not consider *June 2023* myself to be of the "sovereign citizen" group... there are simply some factual circumstances which cause types of immunity. It is my opinion that my circumstances do cause it... however, I'm not "the judge" and simply, in my opinion, know how to "argue my case" and I'm non-violent.

## Table of Contents

I.    Overview of Reporting Requirement.................................................................................2
II.   Executive Summary.........................................................................................................2
III.  Domestic Terrorism: Definitions, Terminology, and Methodology ...........................3
IV.   Strategic Intelligence Assessment..................................................................................6
V.    Discussion and Comparison of Investigative Activities.............................................11
VI.   Data on Domestic Terrorism ........................................................................................23
VII.  Recommendations..........................................................................................................30
Appendix A.................................................................................................................................33
Appendix B.................................................................................................................................40

## I.   Overview of Reporting Requirement

Pursuant to Section 5602(a) and (b) of the National Defense Authorization Act for Fiscal Year (FY) 2020[1] (hereafter "the Act"), the Federal Bureau of Investigation (FBI) and the Department of Homeland Security (DHS), in consultation with the Office of the Director of National Intelligence (ODNI), including the National Counterterrorism Center (NCTC), and the Department of Justice (DOJ), jointly produce a report containing a strategic intelligence assessment and data on domestic terrorism (DT). The Act requires the report to contain a strategic intelligence assessment, a discussion of specified activities, certain data on DT matters, and recommendations. Section 5602(d) of the Act requires the Director of the FBI and the Secretary of Homeland Security, in consultation with the Director of National Intelligence (DNI) in a manner consistent with the authorities and responsibilities of such Director, to jointly submit to the appropriate Congressional committees annual updates to those reports. This report constitutes the annual updates for FY 2022.[2]

## II.  Executive Summary

Preventing terrorist attacks remains a top priority for both the FBI and DHS, and the FBI serves as the lead investigative agency on terrorism matters. The threat posed by international and domestic threat actors has evolved significantly since 9/11. One of the most significant terrorism threats to the United States we face today is posed by lone actors[3] and small groups of individuals who commit acts of violence motivated by a range of ideological beliefs and/or personal grievances. Of these actors, domestic violent extremists represent one of the most persistent threats to the United States today. These individuals are often radicalized online and

---

[1] Public Law 116-92, enacted 20 December 2019.
[2] Consistent with Congressional direction, as of December 2022, NCTC has limited its work to the transnational and international dimensions of the terrorism threat against the United States. Because this report covers the prior FY 2022 period, it includes descriptions of NCTC's involvement in lines of effort and assessments during that period.
[3] The FBI and DHS define a lone actor as an individual motivated by one or more violent extremist ideologies who, operating alone, supports or engages in acts of unlawful violence in furtherance of that ideology or ideologies that may involve influence from a larger terrorist organization or a foreign actor. The mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics does not constitute violent extremism, and is constitutionally protected.

look to conduct attacks with easily accessible weapons. Many of these violent extremists are motivated and inspired by a mix of ideological, socio-political, and personal grievances against their targets. This report provides our strategic intelligence assessments on DT, a detailed discussion of our procedures and methods to address DT threats, as well as data on DT incidents and FBI investigations.

### III.  Domestic Terrorism: Definitions, Terminology, and Methodology

Section 5602(a) of the Act requires the Director of the FBI and the Secretary of Homeland Security, in consultation with the DNI, to jointly develop, to the fullest extent feasible and for purposes of internal recordkeeping and tracking, uniform and standardized definitions of the terms "domestic terrorism," "act of domestic terrorism," "domestic terrorism groups," and any other commonly used terms with respect to DT; methodologies for tracking incidents of DT; and descriptions of categories and subcategories of DT and ideologies relating to DT; and to jointly submit the information in a report to the appropriate Congressional committees.

### *Definitions*

For the FBI's purposes, "domestic terrorism" is defined by 18 USC § 2331(5), as activities:

- Involving acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;
- Appearing to be intended to:
  - Intimidate or coerce a civilian population;
  - Influence the policy of government by intimidation or coercion; or
  - Affect the conduct of a government by mass destruction, assassination or kidnapping; and
- Occurring primarily within the territorial jurisdiction of the United States.

DHS derives its definition of "domestic terrorism" from the Homeland Security Act definition of "terrorism," 6 USC § 101(18), which is similar, but not identical, to the 18 USC § 2331(5) definition. Under the Homeland Security Act of 2002, "terrorism" is defined as any activity that:

- Involves an act that:
  - Is dangerous to human life or potentially destructive of critical infrastructure or key resources; and
  - Is a violation of the criminal laws of the United States or of any State or other subdivision of the United States; and
- Appears to be intended to:
  - Intimidate or coerce a civilian population;
  - Influence the policy of a government by intimidation or coercion; or
  - Affect the conduct of a government by mass destruction, assassination, or kidnapping.

Both references in the US Code are definitions and not federal criminal charging statutes for DT.

*Terminology*

The FBI and DHS use the term "domestic violent extremism" to refer to DT threats. The word "violent" is important because the mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics does not constitute violent extremism and is constitutionally protected. The FBI and DHS do not investigate, collect, or maintain information on US persons solely for the purpose of monitoring activities protected by the First Amendment. Under FBI policy and federal law, no investigative activity may be based solely on activity protected by the First Amendment, or the apparent or actual race, ethnicity, national origin, religion, gender, sexual orientation, or gender identity of an individual or group. Similarly, DHS's Office of Intelligence and Analysis (I&A) is prohibited from engaging in any intelligence activities for the purpose of affecting the political process in the United States or for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States, and DHS policy prohibits any intelligence activities based solely on an individual's or group's race, ethnicity, gender, religion, sexual orientation, gender identity, country of birth, or nationality.

A "domestic violent extremist" (DVE) is defined as an individual based and operating primarily within the United States or its territories without direction or inspiration from a foreign terrorist group or other foreign power who seeks to further political or social goals, wholly or in part, through unlawful acts of force or violence dangerous to human life.

The US Government, including the FBI and DHS, continually reviews and evaluates intelligence and information from multiple sources to ensure it appropriately identifies and categorizes national security threats, including those that are criminal in nature, to the United States. As part of this continual internal review, the FBI and DHS prioritize threat categories, which are further described below, as needed, and as threats evolve. While categories help the FBI and DHS better understand threats associated with broad categories of DT-related criminal actors, the FBI and DHS recognize motivations vary, are nuanced, and sometimes are derived from a blend of ideologies. Categories also inform our intelligence and prevention efforts.

Since 2019, the US Government uses the following five threat categories to understand the DT threat:

(1) **Racially or Ethnically Motivated Violent Extremism:** This threat category encompasses threats involving the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political or social agendas which are deemed to derive from bias, often related to race, held by the actor against others, including a given population group. Racially or ethnically motivated violent extremists (RMVEs) use both political and religious justifications to support their racially- or ethnically-based ideological objectives and criminal activities. One set of RMVE threat actors use their belief in the superiority of the white race to justify their use of violence to further their political, cultural, and religious goals. A separate and distinct set of RMVE threat actors use real or perceived racism or injustice in American society, their desire for a separate Black homeland, and/or violent

interpretations of religious teachings to justify their use of violence to further their social or political goals.

(2) **Anti-Government or Anti-Authority Violent Extremism:** This threat category encompasses the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas, which are deemed to derive from anti-government or anti-authority sentiment, including opposition to perceived economic, social, or racial hierarchies, or perceived government overreach, negligence, or illegitimacy. This threat category typically includes threats from anarchist violent extremists (AVEs), militia violent extremists (MVEs), sovereign citizen violent extremists (SCVEs), and anti-government or anti-authority violent extremists-other (AGAAVE-Other).

(3) **Animal Rights or Environmental Violent Extremism:** This threat category encompasses the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas by those seeking to end or mitigate perceived cruelty, harm, or exploitation of animals and/or the perceived exploitation or destruction of natural resources and the environment.

(4) **Abortion-Related Violent Extremism:** This threat category encompasses the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas relating to abortion, including individuals who advocate for violence in support of either pro-life or pro-choice beliefs.

(5) **All Other Domestic Terrorism Threats:** This threat category encompasses threats involving the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas which are not otherwise exclusively defined under one of the other threat categories. Such agendas may derive from, but are not limited to, a mixture of personal grievances and beliefs, political concerns, and aspects of conspiracy theories, including those described in the other DT threat categories. Some actors in this category may also carry bias related to religion, gender, or sexual orientation. Several DVEs have combined components of different ideologies to develop a personalized belief system that they use to justify violent, criminal action.

*In my opinion*
*This describes the bad apples who continue to cause us harms*

*Methodology*

The FBI defines a "DT incident" as a criminal act, including threats or acts of violence to *and losses, as* specific victims, made in furtherance of a domestic political and/or social goal, which has *they threatened* occurred and can be confirmed. The FBI defines a "DT plot" as a combination of criminal *to do.* activity and planning that collectively reflect steps toward criminal action in furtherance of a domestic political or social goal. "Disrupted DT plots" are plots which, absent law enforcement intervention, could have resulted in a DT incident.

*In my opinion*

*This also describes the bad apples. My biological dad bought a gun from me, then has attempted to label me "suicidal"...*

DHS I&A defines a "DT attack" as an incident motivated by a DVE ideology in which a weapon or tactic is purposefully deployed against a target for the purpose of causing injury, death, or property destruction. DHS I&A defines a "DT plot" as an incident motivated by a DVE ideology in which a specific target is identified, and significant steps have been taken to acquire weapons or plan the tactics intended to be used against the target. For DHS, these ideologically driven criminal acts must be dangerous to human life or potentially destructive to critical infrastructure or key resources to meet the definition of DT. A single incident may be part of a spree of criminal or violent activity conducted by the same perpetrator(s) using the same tactic(s), which are carried out against multiple locations in short succession.

*He also threatened I'd be shot, that our wife and kids would be destitute... and that he would shoot school administrators. None of that is okay at all...*

The FBI and DHS I&A make every effort to document lethal and non-lethal DT incidents, but there is no mandatory incident reporting requirement for state, local, tribal, and territorial (SLTT) law enforcement agencies to report criminal activity that appears to be motivated by a social or political goal and is mitigated at the SLTT level. As such, some DT incidents likely go unreported by other law enforcement agencies. These factors make it difficult for the FBI and DHS I&A to identify every DT incident that has occurred in the United States. DHS I&A complements the FBI's effort to document DT incidents through I&A's ongoing DT incident tracking initiative, which is informed by I&A's intelligence officers deployed to fusion centers, engagement with SLTT law enforcement and homeland security partners, review of DHS Component information and US Intelligence Community reporting, and open source research. The results of DHS's incident tracking efforts are also shared with the FBI, SLTT, and private sector partners. Therefore, Appendix A provides information that represents significant DT incidents and disrupted plots that have occurred in the United States, of which the FBI and DHS I&A have knowledge, but not a comprehensive listing of all incidents.

## IV.  Strategic Intelligence Assessment

The FBI, in coordination with prosecutors in the US Attorneys' Offices (USAOs) and DOJ's National Security Division (NSD), continues to successfully investigate and disrupt DVE activities, plots, and threats. The FBI and DHS I&A continue to provide strategic warnings and analysis of the heightened DT threat, and Appendix B provides a strategic intelligence assessment authored by the FBI, DHS, and NCTC, titled *Wide-Ranging Domestic Violent Extremist Threat to Persist*, published on 17 June 2022. Analytic overviews of the current state of the various DVE threats can be found below. DVE lone offenders and small groups motivated by a range of ideological beliefs and personal grievances continue to pose a persistent and lethal threat to the Homeland.

### *Racially or Ethnically Motivated Violent Extremism*

Throughout 2022, RMVEs driven by a belief in the superiority of the white race remained among the FBI's highest priority threats. RMVEs continued to pose the most consistent threat of lethal and non-lethal violence against religious, cultural, and government targets. The FBI, in conjunction with state and local partners, disrupted RMVEs based on a number of criminal violations. This RMVE movement remained fluid and decentralized, consisting of both organized groups and individuals. Nearly all those in this RMVE movement engaged heavily online across a variety of different platforms, which continues to contribute to some RMVEs

coalescing online; the creation of new, primarily online groups; and the fragmentation of other groups. While RMVEs used the internet to spread propaganda for many years, 2022 saw a significant shift in some RMVEs' coordinated efforts to spread overtly violent and racist propaganda within encrypted chat applications, specifically to encourage others to engage in violence. RMVE lethal attacks also continued in 2022, including one in the United States and another abroad. In May 2022, an RMVE conducted an attack at a grocery store in Buffalo, New York, resulting in the deaths of 10 individuals, most of whom were Black. Before the attack, the RMVE posted a manifesto online which aligned with that of Australian RMVE attacker Brenton Tarrant, who attacked two mosques in New Zealand in 2019. In November 2022, an RMVE conducted an attack in Slovakia which resulted in two fatalities outside an LGBTQ+ bar. The attacker also authored a manifesto; referenced past attackers, including the recent Buffalo, New York, RMVE attacker; and lauded other RMVEs' propaganda and efforts to incite others to violence. These RMVEs' behavior, and their attacks, signify the influence overtly violent propaganda and manifestos continue to have on this RMVE movement in the United States and abroad.

During 2022, other RMVEs, such as those motivated by perceptions of racial injustice in American society, the desire for a separate Black homeland, or violent interpretations of religious teachings, posed a generally low threat of lethal and non-lethal violence. These RMVEs are characterized by disparate motivating ideologies and grievances that target a range of perceived ideological opponents, including law enforcement, the Jewish community, and individuals of the white race. While some RMVEs advocate for a separate Black homeland or starting a "race war," many broadly target law enforcement and the US Government. Retaliation and retribution for perceived or actual color of law violations and the perception of unjust legal proceedings surrounding the officers involved are among the organizing drivers for some RMVEs. RMVEs who adhere to violent interpretations of Black Hebrew Israelite religious teachings use anti-Semitic rhetoric as justification for violence. Although violent rhetoric and threats of violence by these RMVEs remained consistent, there were minimal observed acts of violence in 2022.

### Anti-Government or Anti-Authority Violent Extremism

#### Anarchist Violent Extremism

Anarchist violent extremists (AVEs) are a subset of the anti-government or anti-authority extremism threat category. The FBI and DHS I&A continue to assess the most serious threat AVEs pose likely will continue to be their use, or potential use, of improvised incendiary devices (IIDs) or improvised explosive devices (IEDs); their injury of law enforcement and others during confrontations; and their access and occasional intent to illegally use firearms. Throughout FY 2022, AVEs continued to oppose government and corporate policies perceived to infringe on individual freedoms referencing anti-capitalism, anti-fascism, anti-gentrification, anti-government, and anti-law enforcement sentiment, and social justice issues related to the environment, immigration, reproductive rights, and Indigenous Peoples' rights as justification for criminal activity.

For example, on several occasions throughout 2022, AVEs and others opposed to construction of a public safety training facility in Atlanta, Georgia, committed numerous crimes to include vandalizing construction equipment and personal property, and using IIDs to damage law enforcement vehicles, construction equipment, and business property. Law enforcement authorities continue to investigate these and other related incidents throughout the country to identify perpetrators. Most AVE-related criminal activity continues to involve physical assaults and property crimes, often committed by self-directed or small groups of AVEs. While most crimes violate state or local laws, some crimes such as arson, acts of sabotage, and threats of violence are investigated by the FBI and may be prosecuted at the federal level.

### *Militia Violent Extremism*

In late 2021 and throughout 2022, militia violent extremists (MVEs), a subset of the anti-government or anti-authority extremism threat category, more frequently cited singular sociopolitical issues as their justifications for violence or criminal activity. These increasingly diffuse grievances contrasted with the compounding grievances of 2020 surrounding civil unrest, COVID-19-related restrictions, election issues, and the deaths of individuals in encounters with law enforcement, which led to a surge in MVE activity and, to a degree, centralization within the movement. As the overlapping grievances of 2020 faded, MVEs began citing standalone issues that often did not have movement-wide appeal but that individual MVEs still perceived to indicate the movement's longstanding narratives surrounding government overreach, abuse of power, and incompetence.

Additionally, lack of a high-profile, public leader within the MVE movement; prominent law enforcement arrests and disruptions of MVE actors; and absence of a galvanizing event to unite MVEs contributed to the increasingly diffuse nature of the MVE threat from late 2021 through 2022. Issues MVEs most frequently cited as potential mobilizers to violence included immigration and southern border policy; potential changes to firearms laws; conspiratorial perceptions about the tax enforcement provisions of the Inflation Reduction Act of 2022; and perceived government inaction or overreach related to child welfare issues, including crimes against children or Child Protective Services matters. Despite MVE grievances being more disjointed than in previous years, the most likely targets for MVE violence very likely continue to be government officials, facilities, law enforcement personnel, and specific populations. Barring unifying events or figures reminiscent of 2020, the FBI and DHS I&A assess that through 2023, the MVE threat likely will be defined by lone actors and small cells who cite singular sociopolitical issues in their mobilization to violence.

### *Sovereign Citizen Violent Extremism*

Sovereign citizen violent extremists (SCVEs), a subset of the anti-government or anti-authority extremism threat category, posed a threat of ideologically motivated violence and crimes through FY 2022 and into recent months, continuing to target law enforcement, government officials, and court personnel. SCVE violence occurs most commonly during law enforcement encounters. SCVEs threaten and harass officials and personnel with threats of kidnapping and criminal acts including filing of fraudulent liens and illicit monetary or tax claims. Individuals also use the ideology to justify criminal acts and use of force related to loss of, or infringement upon,

perceived rights. SCVE incidents, threats, and criminal acts in the past two years remained rooted in grievances and perceptions of infringed rights, or claims of immunity from government actions, frequently emanating from responses and circumstances relating to the COVID-19 pandemic.

SCVEs range from lone actors to loose networks and small groups. Disruption and prosecution of SCVEs occurs on an ongoing basis, frequently in coordination with federal, state, and local law enforcement partners. The FBI and DHS I&A assess SCVE and ideologically motivated threats and crimes of fraud or theft may increase if economic circumstances within the United States result in widespread housing or property losses, to include widespread evictions. Historically, periods of major economic downturns with broad scale negative impacts on the housing sector have borne an attendant rise in SCVE and other sovereign citizen crimes involving property.

### *Anti-Government or Anti-Authority Extremism-Other*

AGAAVEs citing anti-government or anti-authority motivations for violence or criminal activity not otherwise defined include, but are not limited to, those motivated by a desire to commit violence against individuals or entities they perceive to be associated with a specific political party or faction thereof. AGAAVE-Others do not fit within the AVE, MVE, or SCVE threat subcategories.Threats from these DVEs have increased in the last two years, and any further increases in threats likely will correspond to potential flashpoints, such as high-profile elections and campaigns or contentious current events.

Historically, these DVEs have conducted or plotted attacks targeting perceived political opponents, including elected officials, other government officials and law enforcement, candidates for public office, political party offices, and members of the media. In 2018, a DVE mailed 16 IEDs packed with explosive material and glass shards to victims including prominent figures in the media and Democratic Party; he pleaded guilty to 65 felony counts and was sentenced to 20 years in federal prison. In 2017, a now-deceased DVE injured several Republican members of Congress, staffers, and responding officers after opening fire at a charity baseball event in Alexandria, Virginia.

More recently, an AGAAVE-Other subject was indicted in November 2022 on charges related to breaking into the residence of the then-Speaker of the House and assaulting the Speaker's husband. Since FY 2022, at least six other AGAAVE-Other subjects were arrested for threatening government or law enforcement officials to whom they were ideologically opposed. These DVEs likely will continue to pose a heightened threat as they plot or threaten violence to redress political and/or social grievances and continue to draw inspiration from conspiracy theories surrounding a range of current events.

Investigations, arrests, and prosecutions related to the 6 January 2021 breach of the US Capitol are ongoing, and dozens of these subjects are categorized as AGAAVE-Other. For example, in March 2022, an AGAAVE-Other subject was arrested in Miami, Florida, for alleged activity related to the Capitol breach; in June 2022, he and four associates were charged in a superseding indictment with seditious conspiracy and other counts.

### Abortion-Related Violent Extremism

Abortion-related violent extremists (AbRVEs) – both pro-life and pro-choice – have threatened, vandalized, and impeded access to facilities that provide reproductive health services or counseling, which can violate the Freedom of Access to Clinic Entrances Act (FACE Act). FACE Act violations can be jointly investigated as civil rights violations and as domestic violent extremism. AbRVE violence can be connected to flashpoint events such as abortion-related legislation or court proceedings. One such flashpoint was the leak of the draft opinion and the subsequent decision by the US Supreme Court in *Dobbs v. Jackson Women's Health Organization*. Prior to the *Dobbs* decision, the majority of abortion-related violence was perpetrated by pro-life aligned AbRVEs. However, the FBI and DHS I&A assess the *Dobbs* decision exacerbated the grievances of pro-choice aligned AbRVEs, resulting in an increase in violent activity.

### Animal Rights or Environmental Violent Extremism

The FBI and DHS I&A assess the animal rights violent extremism threat remained persistent throughout FY 2022. Animal rights violent extremists (ARVEs) continued to target entities perceived to be harming or exploiting animals through crimes such as vandalism, trespassing, and threats of violence. Typical targets included individuals and entities involved in animal research; the fur industry; and businesses selling animal products or involved in concentrated animal feeding operations. ARVEs operated and likely will continue to operate in individual or small groups when committing criminal acts. ARVEs used vitriolic rhetoric and threats of violence as a means to intimidate or coerce those perceived as harming or exploiting animals. ARVEs often communicate threats of violence by telephone or email, or by posting threatening language on social media. The FBI and DHS I&A assess ARVEs in FY 2023 likely will continue to pose a persistent threat, and likely will commit actions intended to cause financial losses, intimidation, and heightened awareness of animal rights-related issues.

The FBI and DHS I&A assess environmental violent extremists (EVEs) in FY 2022 continued to commit criminal actions intended to cause financial loss or operational damage and disruption against entities perceived to be exploiting or contributing to destruction of the environment or natural resources. Criminal acts continued in the form of property destruction, acts of vandalism, and threats of violence. Although federal criminal activity associated with EVEs has decreased in the last several years, some crimes, such as threats of violence or destruction of property are investigated by the FBI and may be prosecuted at the federal level. However, most EVE-related criminal activity in the last few years has violated state or local laws. The FBI and DHS I&A assess opposition to oil and natural gas infrastructure developments or expansion projects – particularly those near perceived ecologically sensitive habitats or waterways or in close proximity to farmlands, urban, or Native American lands – and issues related to the environmental impact of climate change and deforestation likely will remain drivers for criminal actions in FY 2023. Criminal acts likely will continue to include acts of vandalism or arson to delay or disrupt construction projects and cause financial loss.

*All Other DT Threats*

DVEs motivated by a personalized ideology, or an ideology that does not fit within the US Government's identified categories, continue to pose an intermittent threat of lethal violence. DVEs within this broad category include involuntary celibate violent extremists (IVEs) and DVEs with a personalized mix of various DVE ideologies. IVEs continue to consume online rhetoric supporting their personal grievances against women who reject them or against men whom they deem as more romantically successful. IVEs have targeted both men and women for violence in an attempt to either promote awareness of IVE grievances or punish populations for their own perceived romantic failures. Generally, IVE violence is rarely connected to current events or environmental variables.

## V.  Discussion and Comparison of Investigative Activities

The Act calls for a discussion and comparison of the following activities:

- The criteria for opening, managing, and closing DT and international terrorism (IT) investigations.

- Standards and procedures for the FBI with respect to the review, prioritization, and mitigation of DT and IT threats in the United States.

- The planning, development, production, analysis, and evaluation of intelligence and intelligence products relating to terrorism, noting any differences with respect to DT and IT.

- The sharing of information relating to DT and IT by and between the federal government, SLTT and foreign governments, the appropriate Congressional committees, nongovernmental organizations, and the private sector.

- The criteria and methodology used by the FBI to identify or assign terrorism classifications to DT investigations.

- Compliance with privacy, civil rights, and civil liberties policies and protections, including protections against the public release of names or other personally identifiable information of individuals involved in incidents, investigations, indictments, prosecutions, or convictions for which data is reported under the Act.

- Information regarding any training or resources provided to assist federal and SLTT law enforcement agencies in understanding, detecting, deterring, and investigating acts of DT, including the date, type, subject, and recipient agencies of such training or resources.

### Criteria for Opening, Managing, and Closing DT and IT Investigations

The FBI's criteria for opening, managing, and closing DT and IT investigations stem from agency authorities outlined in the *Attorney General's Guidelines for Domestic FBI Operations (AGG-Dom)* and are implemented through FBI policy, referred to as the *Domestic Investigations*

*and Operations Guide (DIOG)*. Consistent with those policies, the following outlines the criteria and methodology the FBI utilizes when conducting both DT and IT investigations:

**Opening**: The FBI opens a full investigation[4] predicated on an "articulable factual basis" that reasonably indicates the existence of federal criminal activity or a threat to national security, or to protect against such activity or threat. The opening of a full investigation must be approved by a Supervisory Special Agent and notice to the responsible Headquarters unit must be provided within 15 days of opening. The FBI may open a preliminary investigation[5] on the basis of any "allegation or information" indicative of possible criminal activity or threats to the national security.[6] The opening of a preliminary investigation by a Field Office requires the approval of a Supervisory Special Agent, but does not require notice to the DOJ, unless it involves a sensitive investigative matter (SIM).[7]

The opening of an investigation involving a SIM must be reviewed by the Field Office's Chief Division Counsel (CDC), approved by the Special Agent in Charge, and provided to the responsible Headquarters Unit Chief within 15 days of opening as notice to Headquarters. The Field Office must notify the USAO within 30 days unless inappropriate and, in that case, Headquarters must notify and provide an explanation to DOJ within 30 days.

No investigation may be opened based solely on activities protected by the First Amendment or the lawful exercise of rights secured by the Constitution or laws of the United States.

Opening a preliminary or full investigation classified as one of the identified DT threat categories must be approved by the Field Office's CDC; however, the opening of a full investigation classified as an IT matter does not have the same requirement.

**Managing**: The *AGG-Dom* authorizes all lawful investigative methods in the conduct of a full investigation; however, the *AGG-Dom* requires that the "least intrusive" means or method of

---

[4] A full investigation may be opened if there is an "articulable factual basis" for the investigation that reasonably indicates one of the following circumstances exists: an activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur, and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity. An enterprise investigation is a type of full investigation that examines the structure, scope, and nature of the group or organization.

[5] A preliminary investigation is a type of predicated investigation that may be opened (predicated) on the basis of any "allegation or information" indicative of possible criminal activity or threats to the national security. Preliminary investigations may be opened to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security. Enterprise investigations cannot be conducted as preliminary investigations or assessments, nor may they be conducted for the sole purpose of collecting foreign intelligence.

[6] The significance of the distinction between the full and preliminary investigation is in the availability of investigative tools. A preliminary investigation, which is based on the lesser factual predicate, limits the investigative tools and methods available, while the full investigation, which is based on the more robust factual predicate, permits the full range of legally available investigative tools and methods. In some instances, cases opened as preliminary investigations may be converted to full investigations based on the development of additional facts during the course of the investigation.

[7] A SIM involves the activities of a domestic public official or political candidate (involving corruption or a threat to the national security), religious or political organization or individual prominent in such an organization, or news media, or any other matter which, in the judgment of the official authorizing an investigation, should be brought to the attention of FBI Headquarters and other DOJ officials.

investigation be considered and, if reasonable based on the facts and circumstances of the investigation, that investigative method should be used to obtain information in lieu of other more intrusive methods. The FBI requires file reviews of full investigations every 90 days. Some investigative methods the FBI is authorized to use differ between DT and IT investigations, based on the differences in statutory investigative authorities available in criminal matters, such as DT investigations, and in foreign intelligence matters, such as IT investigations. For example, a full investigation of a DT matter may conduct electronic surveillance, if authorized, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968. A full investigation of an IT matter may also conduct electronic surveillance, as authorized, pursuant to the Foreign Intelligence Surveillance Act of 1978, as amended. Additionally, investigations of DT and IT matters may make use of federal grand jury subpoenas to compel the disclosure of records and other relevant information, but investigations of IT matters may also use a National Security Letter[8] to compel defined categories of records from certain businesses. Finally, investigations of DT matters must be periodically reviewed by the Field Office's CDC, and investigations of IT matters do not have the same requirement.

**Closing**: A Supervisory Special Agent must approve the closure of both full and preliminary investigations. A preliminary investigation must be closed within six months of its opening but may be extended for an additional six months. At the conclusion of either type of investigation, each of the following items must be documented:

- A summary of the results of the investigation.

- Whether logical and reasonable investigation was completed.

- Whether all investigative methods/techniques initiated have been completed and/or discontinued.

- Whether all set leads have been completed and/or discontinued.

- Whether all evidence has been returned, destroyed, or retained in accordance with evidence policy.

- A summary statement of the reason the full investigation will be closed.

At the conclusion of a full investigation, the Field Office must also document whether sufficient personnel and financial resources were expended on the investigation, or an explanation or justification for not expending sufficient resources.

There are no substantive differences in how the FBI closes full investigations of DT or IT matters.

---

[8] A National Security Letter is a statutorily-created administrative tool that allows investigators to issue a demand for documents or records that are relevant to a predicated investigation to protect against international terrorism or clandestine intelligence activities.

The following chart presents a comparison of FBI policies for both DT and IT preliminary and full investigations.

| | PRELIMINARY INVESTIGATION | FULL INVESTIGATION |
|---|---|---|
| PREDICATION | Information or an allegation indicating the existence of federal criminal activity or a threat to national security (or to protect against such activity or threat) | Articulable factual basis that reasonably indicates the existence of federal criminal activity or a threat to national security (or to protect against such activity or threat) |
| APPROVAL TO OPEN | • Supervisory Special Agent (SSA)<br>• If a Domestic Terrorism (DT) matter, Field Office (FO) Chief Division Counsel (CDC) | • SSA<br>• Notice to the responsible Headquarters (HQ) unit must be provided within 15 days of opening<br>• If a DT matter, FO CDC |
| APPROVAL TO OPEN: *SENSITIVE INVESTIGATIVE MATTER (SIM)* | • FO CDC<br>• FO Special Agent in Charge (SAC)<br>• Notice to responsible HQ Unit Chief within 15 days of opening<br>• Notice to the US Attorney's Office (USAO) within 30 days unless inappropriate, HQ must notify the Department of Justice (DOJ) within 30 days | • FO CDC<br>• FO SAC<br>• Notice to responsible HQ Unit Chief within 15 days of opening<br>• Notice to the USAO within 30 days unless inappropriate, HQ must notify DOJ within 30 days |
| FILE REVIEW | Every 90 calendar days | Every 90 calendar days |
| EXAMPLES OF AUTHORIZED INVESTIGATIVE METHODS | In a DT Matter:<br>• Obtain public information<br>• Physical surveillance<br>• Federal grand jury subpoenas<br><br>In an International Terrorism (IT) Matter:<br>• Obtain public information<br>• Physical Surveillance<br>• Federal grand jury subpoenas and National Security Letters (NSLs) | In a DT Matter:<br>• Obtain public information<br>• Physical surveillance<br>• Federal grand jury subpoenas<br>• Electronic surveillance pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968<br><br>In an IT Matter:<br>• Obtain public information<br>• Physical Surveillance<br>• Federal grand jury subpoenas and NSLs<br>• Electronic surveillance pursuant to Foreign Intelligence Surveillance Act of 1978, as amended |
| CLOSURE | Must be closed within six months but may be extended for an additional six months | No duration limit |
| APPROVAL TO CLOSE | • SSA<br>• Notice to the responsible HQ unit must be provided prior to closing | • SSA<br>• Notice to the responsible HQ unit must be provided prior to closing |
| APPROVAL TO CLOSE: *SIM* | SSA, with SAC approval | SSA, with SAC approval |

***Standards and Procedures for Reviewing, Prioritizing, and Mitigating DT and IT Threats***

The FBI uses the Threat Review and Prioritization (TRP) process as a standardized method for reviewing and prioritizing threats within operational programs to inform threat strategies, mitigation plans, and resource allocation. Headquarters operational divisions use the TRP process to uniformly define threat issues for the organization, determine their prioritization at the national level, establish FBI National Threat Priorities (NTPs), and develop national threat strategies for those threats for the FBI enterprise. Field Offices then cascade the results of the national-level TRP process to prioritize threat issues and create threat strategies to mitigate threats based on the threat landscape of their specific areas of responsibility (AORs). The FBI conducts the TRP process on a biennial basis, but it may be conducted annually at the discretion of the Field Office or Headquarters operational division head. For DT and IT threats, DOJ Counterterrorism Section (CTS) attorneys offer prosecutorial views during the national-level TRP process.

The TRP process seeks to build consensus, and includes applicable USAO(s) and stakeholders, such as NSD/CTS, to determine prioritization (banding) and to develop threat strategies for mitigation of threat issues. Headquarters operational divisions develop national threat strategies for each threat issue to guide enterprise-wide mitigation efforts. Field Offices develop threat strategies annually for all threat issues they band, and they detail the particular steps the Field Office plans to take to mitigate each banded threat issue in their AOR. These threat strategies must be used to guide mitigation of each threat issue for the upcoming fiscal year, unless a change in threat banding or threat strategies occurs during midyear negotiations. The TRP of the FBI is classified as it incorporates sources and methods as a basis of strategic alignment of national security resources.

There are no differences in how the FBI reviews and prioritizes DT and IT threats, and each threat issue is reviewed independently; however, the threat band dictates priorities within these programs. Investigative methods the FBI is authorized to use differ between DT and IT investigations, and DT investigations may be subject to additional legal review.

***Planning, Development, Production, Analysis, and Evaluation of Intelligence and Intelligence Products Relating to DT and IT***

The FBI intelligence cycle for both DT and IT matters consists of planning intelligence efforts around priorities based on national or Field Office threat strategies, collecting raw intelligence information, processing and synthesizing data, analyzing and crafting assessments into analytic intelligence products, disseminating those products, briefing analysis to decision makers, and evaluating disseminated products and the production process to inform future efforts.

Similarly, DHS began Intelligence Threat Banding in 2019, a process in which DHS intelligence leadership, in coordination with the Homeland Security Intelligence Council, prioritizes threat topics. The process is informed by DHS's execution of the intelligence cycle – development of requirements, collection through field operations or open source collectors, and analysis to

produce finished intelligence in the DT space. DHS implements Intelligence Threat Banding across its mission areas. Results are used to inform and drive the Department's collection and analysis efforts for maximum impact against the "high banded" topic areas; develop cross component programs, projects, and activities; and inform intelligence resource allocation decisions.

During the planning phase of the intelligence cycle, both the FBI and DHS consider the National Intelligence Priorities Framework, which documents the US Intelligence Community's priorities; the FBI also considers its own standing intelligence and investigative responsibilities, which are addressed and prioritized in the TRP process. During the TRP process, the FBI identifies intelligence needs related to threat priorities, and those intelligence needs drive subsequent stages of the intelligence cycle. Meanwhile, DHS also addresses any additional priorities and/or requirements identified by the Secretary of Homeland Security or the Under Secretary of Homeland Security for Intelligence and Analysis, the latter of whom serves as the DHS Chief Intelligence Officer.

During the collection and processing phases of the intelligence cycle, both the FBI and DHS obtain raw intelligence from lawful collection methods consistent with their respective authorities and then synthesize this data into a form intelligence personnel can use. In the analysis and evaluation phases, analysts examine and evaluate all source intelligence, including collected information; add context, as needed; and integrate the information into finished intelligence assessments. Analysts make assessments about information implications for national security.

Legal review is required for any FBI intelligence product, such as an Intelligence Information Report (IIR),[9] related to a potential SIM or other sensitive information, in accordance with the guidelines in the FBI's *DIOG* and identified "legal review triggers." One such legal review trigger is information related to DT. Similarly, in accordance with DHS I&A policy, I&A's finished intelligence products undergo a rigorous review prior to dissemination to ensure compliance with all legal requirements; policies for the protection of privacy, civil rights, and civil liberties; and oversight principles, guidelines, and procedures.

Finally, intelligence analysis is disseminated in either a written intelligence product or a verbal briefing during the production phase. Intelligence analysis customers for both the FBI and DHS include leadership, policymakers, military leaders, other federal and SLTT government officials, private sector partners, and operational counterparts who then make decisions informed by that information. For DHS, the Homeland Security Information Network is the primary platform for disseminating unclassified raw intelligence reporting and finished intelligence products to authorized federal and SLTT partners.

DHS also maintains a mobile application to enhance our SLTT and federal government partners' ability to consume intelligence information from their mobile devices. The DHS Intel App was a collaborative effort, which enables a secure way for approved users to access and view

---

[9] An IIR is the FBI's primary document used to share raw, non-compartmented FBI intelligence information.

intelligence information produced across the country, receive alerts on new intelligence products, and search key topics related to homeland security.

To support and improve intelligence and information sharing efforts nationwide, DHS, in coordination with federal and SLTT law enforcement, intelligence, and homeland security organizations, sponsored an Intelligence Summit (Summit) in August 2022. Senior leaders and stakeholders across federal, SLTT, and campus communities participated to discuss existing intelligence and information sharing issues and gaps, as well as focus areas requiring action and resolution to address the evolving threat environment. The Summit served as a forum to galvanize and unify collaboration, with senior leaders reaffirming commitments to discovering new opportunities and improving existing avenues to enhance information sharing between and across all levels of government, while ensuring the protection of privacy, civil rights, and civil liberties of US citizens.

### *Sharing of Information Relating to DT and IT*

The FBI's *National Strategy for Information Sharing and Safeguarding* provides the common vision, goals, and framework needed to guide information sharing initiatives with our federal and SLTT partners, foreign government counterparts, and private sector stakeholders. The FBI shares information consistent with the Privacy Act, FBI policy, and any other applicable laws and memoranda of understanding or agreement with other agencies.

The FBI works closely with our federal and SLTT law enforcement partners to investigate and disrupt both DT and IT. The FBI also has a strong working relationship with DOJ's CTS, which, as of June 2022, includes a Domestic Terrorism Unit.

Drawing on expertise across NSD and the DOJ more broadly, the DOJ's Domestic Terrorism Unit has several functions: prosecuting and coordinating DT cases, developing training and policies on DT matters, and supporting the work of the Department in implementing a whole-of-government strategy on countering DT. This structure preserves flexibility, while allowing CTS to better support the FBI. Recognizing that countering DT must be a whole-of-Department effort, the unit will include liaisons from components outside of NSD, including the Civil Rights Division and the Tax Division, among others, to marshal Department-wide expertise and resources and offer a mechanism for DOJ components to assess collaboratively and bring to bear all available tools to hold violent extremists accountable. It will also leverage the strong work by our SLTT law enforcement partners. The unit will engage in outreach to these partners to share lessons learned, increase information sharing, and ensure that we are bringing all available tools – state and federal – to bear against violent extremism.

The front line of the counterterrorism mission in the United States is the FBI-led Joint Terrorism Task Forces (JTTFs). The FBI maintains about 56 JTTFs nationwide spanning over 100 locations, with representation in all 56 FBI Field Offices and satellite Resident Agencies. The JTTFs have participation of over 50 federal and over 500 SLTT agencies. These relationships are critical to effective information sharing and the leveraging of local expertise and experience in FBI investigations. The FBI also shares intelligence products with federal and SLTT partners, as

appropriate, to inform them of the current threat environment and these products are posted on portals like the Law Enforcement Enterprise Portal.

The FBI and DHS I&A, in coordination with NCTC, produce Joint Intelligence Bulletins (JIBs) and other products that communicate updated threat information and assessments to our federal, SLTT, and private sector partners at the Unclassified//For Official Use Only (FOUO) or Law Enforcement Sensitive (LES) levels. JIBs alert our partners to significant arrests – including those accomplished through collaboration among different law enforcement entities – and trends we have observed in both the DT and IT arenas. Additionally, in early 2022, the FBI, DHS I&A, and NCTC began producing tri-seal domestic violent extremism-focused intelligence products under the auspices of a Joint Analytic Cell (JAC). The JAC ensures close collaboration among the three agencies, as appropriate, to provide more data-informed strategic analysis of the DT threat environment and better inform policymakers and state and local law enforcement agencies of changes in the threat landscapes. NCTC will ensure any continued collaboration and contributions through the JAC, or otherwise, are consistent with recent Congressional direction, limiting its contributions to these intelligence products to analysis concerning terrorism threats with an identified foreign nexus.

DHS products within the DT and IT spaces are shared with authorized federal, SLTT, and private sector partners, including the National Network of Fusion Centers, private sector security officials, and other customers. For those operating at primarily the unclassified level, products at the FOUO and LES levels are shared via the Homeland Security Information Network.

### Criteria and Methodology to Identify or Assign Terrorism Classifications to FBI DT Investigations

While classifications, or categories, help the FBI better understand the criminal actors we pursue, we recognize actors' motivations vary, are nuanced, and sometimes are derived from a blend of socio-political goals or personal grievances. Regardless of the classification, the FBI follows the facts and evidence of the case to carry out our investigations. Currently, the US Government broadly refers to the DT threat by using the following threat categories, which are further defined in the "Definitions, Terminology and Methodology" section of this report: (1) racially or ethnically motivated violent extremism; (2) anti-government or anti-authority violent extremism; (3) animal rights or environmental violent extremism; (4) abortion-related violent extremism; and (5) all other DT threats.

In addition to conducting investigative activity in response to the DT threats described above, the FBI also conducts civil unrest and anti-riot investigations under its DT Program. Although civil unrest and anti-riot investigations may not be directly aligned to the DT threat categories, these investigations are part of the FBI's DT Program for multiple reasons, including: because investigation of these matters may be closely related to separate terrorism investigations; because this criminal activity may be motivated by similar ideologies as those that appear in the DT threat categories; and/or for other administrative or organizational matters.

The FBI conducts civil unrest investigations to address violations of federal criminal law involving a civil disturbance, and the FBI conducts anti-riot investigations to address violations

of federal criminal law in which an individual uses force or violence during a public gathering. For both civil unrest and anti-riot investigations, the FBI provides information or assistance to other federal, state, or local authorities.

### Compliance with Privacy, Civil Rights, and Civil Liberties Policies and Protections

The FBI is responsible for protecting the security of our nation and its people from crime and terrorism while maintaining rigorous obedience to the Constitution and compliance with all applicable statutes, regulations, and policies. The *AGG-Dom* establishes a set of basic principles that serve as the foundation for all FBI mission-related activities. These principles demonstrate respect for civil liberties and privacy as well as adherence to the Constitution and laws of the United States.

One of the most important principles in the *AGG-Dom* is the threshold requirement that all investigative activities be conducted for an authorized purpose, which under the *AGG-Dom* means an authorized national security, criminal, or foreign intelligence collection purpose. The authorized purpose must be well-founded and well-documented, and the information sought and investigative method used to obtain it must be focused in scope, time, and manner to achieve the underlying purpose. Furthermore, the Constitution sets limits on what that purpose may be. It may not be solely to monitor the exercise of constitutional rights, such as the free exercise of speech, religion, assembly, press and petition; and, equally important, the authorized purpose may not be based solely on the race, ethnicity, gender, national origin, religion, disability, sexual orientation, or gender identity of an individual, group, or organization, or a combination of only those factors.

The *AGG-Dom* authorizes all lawful investigative methods in the conduct of a full investigation. These methods, which range in intrusiveness, consider the effect on the privacy and civil liberties of individuals and the potential to cause harm to, or otherwise damage the reputation of individuals. According to policy, the least intrusive method should be used, based upon the circumstances of the investigation, but the FBI may use any lawful method consistent with the *AGG-Dom*. A more intrusive method may be warranted in light of the seriousness of a criminal or national security threat or the importance of a foreign intelligence requirement, and the options available to obtain the intelligence, information, or evidence.

By emphasizing the use of the least intrusive means to obtain intelligence, information, or evidence, FBI employees can effectively execute their duties while mitigating the potential negative impact on the privacy and civil liberties of all people encompassed within the investigation, including targets, witnesses, and victims.

As a matter of FBI policy, law enforcement activities within the scope of DT investigations are particularly subject to close internal legal review and supervisory approvals to ensure constitutional rights, privacy, and civil liberties are protected at each juncture. DT investigations undergo numerous legal reviews due to the likelihood these investigations may touch upon First Amendment-protected activities, and/or other Constitutional rights, civil liberties and privacy-related considerations.

DHS is committed to ensuring activities are conducted in a manner that is consistent with the Constitution; applicable statutes, including the Privacy Act; applicable executive orders and Presidential Directives, including Executive Order 12333, *United States Intelligence Activities*, as amended; and other applicable law, policies, and procedures pertaining to the appropriate handling of information about US persons (as defined in Executive Order 12333) and other individuals protected by US law and Department policy.[10] DHS I&A is also governed by its *Intelligence Oversight Guidelines*, approved by the Attorney General in 2017.[11] These guidelines reflect I&A's legal authorities and policy protections for privacy, civil rights, and civil liberties. Countering domestic violent extremism is a vital part of the Department's broader obligation to help ensure the security of our nation, and DHS recognizes that our mission can succeed only if the Department respects and protects the our national values. DHS prioritizes rigorous safeguarding civil rights, civil liberties, and individual privacy protections across all its domestic counterterrorism efforts, including those related to countering DT.

In confronting the threat of domestic violent extremism, DHS focuses on threats related to individuals, groups, and/or events that meet national and Departmental intelligence requirements. It does not engage in any intelligence activity for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States, or for the purpose of retaliating against a whistleblower or suppressing or burdening criticism or dissent. Further, as a matter of internal DHS policy, I&A personnel are not permitted to engage in intelligence activities based solely on an individual's or group's race, ethnicity, gender, religion, sexual orientation, gender identity, country of birth, or nationality.

How DHS identifies and detects DT requires faithful adherence to fair information practice principles and privacy-focused departmental policies. DHS always incorporates privacy protections in information technology systems, technologies, rulemakings, programs, pilot projects, and other activities that involve the planned use of personally identifiable information. DHS's Office for Civil Rights and Civil Liberties, Privacy Office, and Office of the General Counsel are involved in all of its counterterrorism and prevention missions, and DHS I&A's intelligence activities are further reviewed by its internal Privacy and Intelligence Oversight Branch. These offices continue to help oversee and train DHS intelligence personnel on how to respect the privacy, civil rights, and civil liberties of all people and communities.

NCTC supports the FBI and DHS, as appropriate, including through analytic work focusing on the transnational dynamics of violent extremist movements and threats and by identifying linkages to international or transnational terrorism. NCTC ensures these efforts are fully consistent with NCTC's authorities and undertaken in accordance with the *ODNI Intelligence Activities Procedures Approved by the Attorney General Pursuant to Executive Order 12333 (ODNI Guidelines)* for the protection of US person information. NCTC has issued procedures to

---

[10] Executive Order 12333 defines a US person as a US citizen, an alien known by the intelligence element concerned to be a permanent resident alien, an unincorporated association substantially composed of US citizens or permanent resident aliens, or a corporation incorporated in the United States, except for a corporation directed and controlled by a foreign government or governments.

[11] The *Intelligence Oversight Guidelines* are available via: www.dhs.gov/publication/office-intelligence-and-analysis-intellience-oversight-program-and-guidelines.

implement the *ODNI Guidelines* requirements and established additional prudential safeguards to inform the Center's support to the FBI and DHS in this area. These safeguards include prior supervisory approval and completion of training on domestic counterterrorism authorities prior to undertaking queries designed to retrieve domestic counterterrorism intelligence.

Consistent with Congressional direction, NCTC's support to the FBI and DHS focuses on transnational threats and trends, and when assessing individual actors to identify any connections to international or transnational terrorism, NCTC relies on FBI and DHS determinations of whether specific individuals are DVEs. Legal, privacy, civil rights, and civil liberties officers advise on all aspects of NCTC's support to the FBI and DHS related to domestic violent extremism. NCTC is not authorized to and does not collect, access, obtain, or maintain information concerning US persons solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States.

### *Training or Resources Provided to Federal, State, Local, and Tribal Law Enforcement Agencies*

The FBI takes a leadership role in identifying and addressing emerging threats and, as such, actively engages with its federal and SLTT law enforcement partners through the JTTFs. The FBI shares and encourages the sharing of intelligence and participates in multi-agency command posts to ensure maximum coordination. In order to proactively address threats, especially during ongoing incidents, the FBI has developed and shared best practices that are implemented across the nation.

The FBI's Behavioral Threat Assessment Center (BTAC), housed within the FBI's Critical Incident Response Group, supports the FBI JTTFs, as well as state and local law enforcement partners by providing operational support in the form of tailored threat management strategies in complex threat and terrorism investigations. The BTAC is the only national-level, multi-agency, multidisciplinary federal task force focused on the prevention of terrorism and targeted violence through the application of behaviorally-based operational support, training, and research. The BTAC trains internally and externally on lessons learned from operational experience and research to better inform violence prevention efforts. The BTAC is leading an unfunded national Threat Assessment and Threat Management (TATM) initiative to organize, coordinate, and synchronize the FBI's enterprise-wide strategy to incorporate TATM principles, which endeavors to build operational response capabilities within all FBI Field Offices and develop stronger partnerships across all levels of government, with local mental health practitioners, and other relevant stakeholders in an effort to prevent acts of terrorism and targeted violence.

Since 2018, the FBI's BTAC has established designated Threat Management Coordinators (TMCs) in each Field Office, provided advanced training to 115 TMCs, hosted a Mental Health Practitioners Conference to inform and educate FBI mental health partners on TATM-related topics, and commenced training of FBI Task Force Officers to work as liaison counterparts within state and local governments. The BTAC and local Field Office TMCs have identified 12 active local or regional TATM teams with FBI participation, and an additional five FBI-led TATM teams. The 12 local/regional teams are in/around and have participation from FBI Field

Offices in Baltimore, Buffalo, Las Vegas, Los Angeles, Miami, Minneapolis, New Haven, New York, Phoenix, Pittsburgh, San Antonio, and Washington, DC; the five FBI-led teams are run by the FBI Boston, Denver, Honolulu, Oklahoma City, and Philadelphia Field Offices. There has been great interest from the FBI Field Offices on helping establish and support local/regional teams. Given this interest, we expect these local/regional TATM teams to increase in 2023. In addition, during 2022 the FBI established the Behavioral Analysis Unit-Counterterrorism Division Threat Management Alliance, which aims to expand implementation of the BTAC's TATM initiative to mitigate terrorism threats, particularly in relation to challenging investigations involving subjects who are juveniles, young adults, or persons with severe mental health challenges.

In 2021, the FBI, DHS I&A, and NCTC jointly updated the booklet, *US Violent Extremist Mobilization Indicators*, which contains observable indicators to help bystanders or observers recognize behaviors that may indicate mobilization to violence. Unlike prior editions – which focused entirely on foreign terrorist-inspired, homegrown violent extremists – the 2021 edition was expanded to include indicators that apply across US-based ideologically motivated violent extremists, including indicators validated as relevant for DVEs.[12] The booklet was published to help law enforcement and first responder partners and the public at large recognize potentially dangerous behaviors that may indicate individuals are preparing to engage in violent extremist activities. It is important to note some behavioral indicators may relate to constitutionally-protected or otherwise lawful activities. Law enforcement action should never be taken solely on the basis of constitutionally-protected activities; therefore, the FBI considers the totality of the circumstances in determining whether there is a lawful basis for investigative activity.

The FBI also maintains the eGuardian system as a resource to facilitate sharing of suspicious activity reports for terrorism or other threat-related information by federal and SLTT law enforcement agencies, to include 80 state and local fusion centers and the Department of Defense. Partners in all 50 states, four US Territories, and the District of Columbia currently use eGuardian.

Specific to formalized training, the FBI offers the Counterterrorism Baseline Operational Learning Tool (CT BOLT) course to all new counterterrorism employees, including Task Force Officers supporting the JTTFs. In addition to operational training and instruction, the course provides training on applicable privacy and civil liberties law and policy and the fundamentals of protecting First Amendment rights during the course of FBI investigations. The FBI conducts the CT BOLT course on a monthly basis and, during 2022, more than 220 students completed the course.

DHS I&A's National Threat Evaluation and Reporting (NTER) program, established in 2019, provides law enforcement and homeland security partners with resources and training to assist in identifying and preventing targeted violence and mass casualty incidents, including terrorism. NTER leads the Nationwide Suspicious Activity Reporting (SAR) Initiative, which assists partners in identifying, reporting, and sharing suspicious activity. Additionally, NTER's Master

---

[12] The 2021 edition served as an update to a prior version published in 2019, and it was published on the ODNI's public website.

Trainer Program trains federal and SLTT partners in behavioral threat assessment and management techniques to assist local communities in implementing a behavioral approach to violence prevention by identifying and assessing risk and warning signs, and managing potential threat of future, targeted violence, regardless of motive.

The DHS Office for State and Local Law Enforcement (OSLLE) is a headquarters-level organization created on the recommendation of the 9/11 Commission. OSLLE's mission is to lead DHS coordination, liaison, and advocacy for SLTT and campus law enforcement by building and cultivating strong partnerships. The office executes its mission by sharing timely and pertinent information and resources with SLTT and campus partners; advising the Secretary and DHS components on the issues, concerns, and recommendations of SLTT and campus law enforcement during policy, program, and initiative development; and ensuring that DHS law enforcement and terrorism focused grants are appropriately focused on terrorism prevention activities. To efficiently and effectively share many of the resources readily available to SLTT and campus law enforcement, including training and grant opportunities, OSLLE maintains the *DHS Law Enforcement Resource Guide*,[13] and works to share these resources with SLTT campus law enforcement and other related stakeholders through various forums. When a SLTT and campus law enforcement request for resources cannot be fulfilled by existing DHS resources, OSLLE works with intra- and interagency partners to develop customized solutions.

The US Secret Service National Threat Assessment Center (NTAC), within DHS, is authorized by the Presidential Threat Protection Act of 2000[14] to conduct research, training, and consultation on threat assessment and the prevention of targeted violence. NTAC is comprised of a multidisciplinary team of social science researchers and regional program managers who support and empower our partners in law enforcement, schools, government, and other public and private sector organizations to combat the ever-evolving threat of targeted violence impacting communities across the United States. NTAC publishes operationally relevant research examining all forms of targeted violence and produces guides for establishing proactive, targeted violence prevention programs. NTAC staff provide training on threat assessment and the prevention of targeted violence, by request, to public safety audiences, which often include SLTT law enforcement, schools, universities, and other agencies and organizations with public safety responsibilities. NTAC is authorized to provide consultation on the development of threat assessment policies and protocols, as well as on complex threat assessment cases.

## VI. Data on Domestic Terrorism

The Act calls for annual updates to the following data and information, and this report provides an annual update, to include data and information for FY 2022:[15]

- For each completed or attempted DT incident that has occurred in the United States: a description of such incident; the date and location of such incident; the number and type of completed and attempted federal nonviolent crimes committed during such incident; the

---

[13] The *DHS Law Enforcement Resource Guide* is available via: https://www.dhs.gov/sites/default/files/2023-01/23_0126_OSLLE_LE-resource-guide-signed_508.pdf.
[14] Public Law 106-544, enacted 19 December 2000.
[15] For data related to investigations, DHS defers to the FBI.

number and type of federal and state property crimes committed during such incident, including an estimate of economic damages resulting from such crimes; and the number and type of completed and attempted federal violent crimes committed during such incident, including the number of people killed or injured as a result of such crimes.

- An identification of each assessment,[16] preliminary investigation, full investigation, and enterprise investigation with a nexus to DT opened, pending, or closed by the FBI; and the number of assessments, preliminary investigations, full investigations, and enterprise investigations associated with each DT investigative classification.

- The number of assessments, preliminary investigations, full investigations, and enterprise investigations with a nexus to DT initiated as a result of a referral or investigation by a federal, SLTT, or foreign government of a hate crime.

- The number of federal criminal charges with a nexus to DT, including the number of indictments and complaints associated with each DT investigative classification; a summary of the allegations in each such indictment; the disposition of the prosecution; and, if applicable, the sentence imposed as a result of a conviction on such charges.

- Referrals of DT incidents by or to SLTT or foreign governments, to or by departments or agencies of the federal government, for investigation or prosecution, including the number of such referrals associated with each DT investigative classification, and a summary of each such referral that includes the rationale for such referral and the disposition of the applicable federal investigation or prosecution.

- The number of intelligence products associated with each DT investigative classification.

- With respect to the FBI, the number of staff working on DT matters and a summary of time utilization by and recordkeeping data for personnel working on such matters, including the number or percentage of such personnel associated with each DT investigative classification in the FBI's Headquarters Operational Divisions and Field Divisions.

- With respect to DHS I&A, the number of staff working on DT matters.

- With respect to NCTC, the number of staff working on DT matters and the applicable legal authorities relating to the activities of such staff.

### *Completed or Attempted DT Incidents in the United States*

Appendix A provides information that represents significant DT incidents and disrupted plots that have occurred in the United States during FY 2022. Many DT incidents are rooted in state and local level criminal activity. While the FBI and DHS I&A make every effort to document

---

[16] An assessment is an investigative activity, which requires an authorized purpose and articulated objective(s). Assessments may be carried out to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence.

lethal and non-lethal DT incidents, there is currently no mandatory incident reporting requirement for reporting these incidents by SLTT law enforcement to the federal government. As such, some DT incidents likely go unreported by other law enforcement agencies, which makes it difficult for the FBI and DHS I&A to identify every DT incident that has occurred in the United States.

### *Identification and Number of Each FBI Investigation in the DT Program*

As of the end of FY 2022, the FBI's DT Program included approximately 2,700 pending investigations. Approximately half of the FY 2022 investigations were directly related to the unlawful activities during the January 2021 breach of the US Capitol. The following table presents the percentage breakout of investigations within the FBI's DT Program by investigative case classification as of the end of FY 2022.

| Percentage Breakout of Investigations within the FBI's Domestic Terrorism Program, by Investigative Case Classification | |
| --- | --- |
| **Investigative Classification** | **End of FY 2022** |
| Racially or Ethnically Motivated Violent Extremism | 19% |
| Anti-Government or Anti-Authority Violent Extremism | 31% |
| Animal Rights or Environmental Violent Extremism | 1% |
| Abortion-Related Violent Extremism | 1% |
| All Other DT Threats | 13% |
| Anti-Riot Laws/Civil Unrest* | 35% |

*Non-DT threat category case classifications that are covered under the DT Program

### *Identification of FBI DT Assessments and Investigations as a Result of a Hate Crime*

Hate crimes and DT are not mutually exclusive. A hate crime is targeted violence motivated by the offender's bias against a person's actual or perceived characteristics, while a DT incident involves acts dangerous to human life that are in violation of criminal laws and in furtherance of a social or political goal. The FBI's Domestic Terrorism-Hate Crimes Fusion Cell helps to address the intersection of the FBI counterterrorism and criminal investigative missions to combat DT and provide justice to those who are victims of hate crimes.

The Hate Crime Statistics Program of the FBI's Uniform Crime Reporting (UCR) Program collects data regarding criminal offenses motivated, in whole or in part, by the offender's bias against a person's actual or perceived race/ethnicity, gender, gender identity, religion, disability, or sexual orientation, and committed against persons, property, or society. The FBI publishes an annual report of hate crime statistics and, in 2021, law enforcement agencies participating in the UCR Program reported 9,065 hate crime incidents.[17]

---

[17] The FBI's *Hate Crime Statistics, 2021,* released Fall 2022, and updated in March 2023. As of the date of this report, the FBI has not yet published the annual report for 2022.

While the FBI collects and reports hate crime statistics, there is no mandatory reporting requirement to identify hate crime incidents that are also considered criminal activity that appears motivated by a political and/or social goal consistent with the DT threat categories. In instances of a potential hate crime, the FBI opens a civil rights investigation. If throughout the investigation a DT ideology is identified, the Criminal Investigative Division and Counterterrorism Division work together through the Domestic Terrorism-Hate Crimes Fusion Cell to determine the best path forward. This may include, but is not limited to, converting the investigation to a DT case, assigning a DT agent to the case, or developing regular communication between the two programs. In cases involving DVEs where a potential hate crime is identified, the Counterterrorism Division's DT Program coordinates with the Criminal Investigative Division's Civil Rights Program and the local USAO to assess the potential for a hate crimes charge. In certain instances, based on the specific context of the investigation, parallel DT and hate crimes cases are opened.

### *Number of Federal Charges with a DT Nexus*

A litany of federal and state charges are used to charge DT subjects for applicable criminal violations. Federal charges include those related to weapons, explosives, threats, attacks on federal officials or facilities, hate crimes, arson, violence against animal enterprises, and material support to terrorists. Under 18 USC § 2339A, it is a crime to provide material support or resources to another knowing or intending they will be used in preparation for or carrying out certain terrorism-related offenses. Unlike a violation of 18 USC § 2339B, the recipient of material support need not be a designated foreign terrorist organization.

In FY 2022, the FBI, often in coordination with partner agencies, arrested over 400 subjects included within the domestic terrorism program.

Individuals whose conduct involves DT or a threat thereof may be prosecuted by any USAO under a wide range of criminal statutes, some of which on their face relate to DT, and others of which do not.[18] While the criminal code includes a definition of DT, *see* 18 USC § 2331(5), there is no standalone federal DT statute. For example, the DOJ has prosecuted cases against such individuals using weapons charges, e.g., 18 USC §§ 922, 924; charges relating to use or possession of destructive devices, e.g., 26 USC §§ 5845, 5861;[19] threat, hoax, or riot charges, e.g., 18 USC §§ 871, 875, 876, 1038, 2101; and charges proscribing attacks on federal officials or facilities, e.g., id. § 111, 115, 351, 844, 930, 1114, 1361, 1751. DOJ has also prosecuted cases involving DT using the material support to terrorist activity statute at 18 USC § 2339A. Hate crimes charges, e.g., id. § 249, may be appropriate where individuals engage in DT that is motivated by biases against a race, religion, ethnicity, or other specified factors. However, not all hate crimes cases involve DT. Arson, id. § 844, or specific charges relating to violence against

---

[18] Several statutes reach conduct that may be associated with terrorism, without regard to whether the offense itself involves domestic or international terrorism. These include statutes relating to aircraft sabotage, id. § 32; weapons of mass destruction, e.g., id. §§ 175, 175b, 175c, 229, 831, 832, 2332a, 2332h, 2332i; arson and bombing of federal property, e.g., id. §§ 844, 2332a, 2332f; and causing injury or death to a federal official, e.g. id. §§ 111, 115, 351, 1114, 1751; among others. It is also a crime to provide material support or resources to another knowing or intending that they be used in preparation for or carrying out certain terrorism-related offenses. Id. § 2339A.

[19] Offenses under the Gun Control Act of 1968 and National Firearms Act of 1934 are primarily investigated and enforced by DOJ's Bureau of Alcohol, Tobacco, Firearms and Explosives.

animal enterprises, id. § 43, may apply to animal rights or environmental violent extremists. In some cases, drug trafficking, tax, or state and local charges could also provide a lawful basis to disrupt an individual believed to be planning or pursuing acts of DT. Finally, in some DT cases, DOJ seeks the use of the terrorism sentencing enhancement.[20]

DOJ recognizes the need for coordination and consistency in DOJ and FBI efforts to hold accountable DVEs who engage in criminal conduct. An important part of achieving those goals is to have the ability to identify and internally track investigations and prosecutions involving conduct related to domestic violent extremism, and the Department is implementing changes that will allow us to better identify and track such cases. In March 2021, the Acting Deputy Attorney General issued guidance to all USAOs to provide information to NSD on DT investigations and prosecutions. This directive not only highlighted the need for effective coordination, but also implemented a plan for better tracking of the important DVE-related work being done by federal investigators and prosecutors around the country. In November 2022, an update to the Justice Manual codified these notification and coordination requirements and made additional changes to promote consistency and appropriate coordination and oversight of DVE-related matters.

### Referrals of DT Incidents to the FBI

The eGuardian system is the FBI's case management system for handling suspicious activity reports from federal and SLTT law enforcement agencies and the Department of Defense related to counterterrorism, counterintelligence, cyber incidents, criminal complaints, and weapons of mass destruction. These reports are then migrated to the FBI's internal Guardian system where they are further evaluated by the appropriate squad or JTTF for any action deemed necessary.

In FY 2022, the FBI had approximately 5,772 total Guardians on possible DT incidents. In FY 2022, the FBI received approximately 3,440 referrals of possible DT incidents from federal and/or SLTT partners. In FY 2022, the FBI referred approximately 1,118 possible DT incidents to federal and/or SLTT partners. The FBI refers incidents to partner agencies for multiple reasons. For example, the incident may not have a federal criminal nexus or the incident may be the statutory responsibility of another law enforcement organization. In addition, the FBI may refer an incident to a partner agency, but continue to investigate the incident jointly. In FY 2022, the FBI converted approximately 394 Guardians on possible DT incidents to preliminary or full investigations.

### DT Intelligence Products

During FY 2022, the FBI produced approximately 3,000 DT-related intelligence products. A single intelligence product often contains threat reporting or case information from subjects associated with multiple investigative classifications and, as such, the FBI does not have the data to determine the number of intelligence products associated with each DT investigative

---

[20] The Sentencing Guidelines provide a significant sentencing enhancement for offenses that involve, or are intended to promote, a "federal crime of terrorism" – often increasing the guideline range to the statutory maximum. See USSG § 3A1.4. "The Sentencing Guidelines also provide for a similar upward departure for other offenses that were calculated to influence or affect the conduct of government by intimidation or coercion, to retaliate against government conduct, or to intimidate or coerce a civilian population." See id. cmt. n.4.

classification. FBI intelligence products incorporate collection, domain, targeting, or threat analysis and are written at the tactical, operational, and strategic levels. FBI intelligence products are prepared for both internal and external audiences.

During FY 2022, DHS I&A produced over 200 DT-related raw intelligence reports (IIRs, Open Source Intelligence Reports, and Field Intelligence Reports) and produced, jointly produced, or contributed to approximately 100 finished intelligence products related to DT, with the majority of these products released at the Unclassified//FOUO level to better inform SLTT partners. The finished intelligence products are available to appropriate Congressional partners via CapNet.

In NCTC's support role to FBI and DHS on DT, the Center regularly partnered during FY 2022 with these organizations on joint analytic products related to this topic – particularly as part of the FBI-DHS-NCTC JAC. The JAC particularly focused on publishing broad, strategic analytic products on DT trends.

### *Number of Staff Working DT Matters*

One of the FBI's most vital assets in the counterterrorism fight is our ability to remain agile in combatting the threats we face. Staffing for the FBI's counterterrorism mission is aligned based on threat priorities and, as is true across the FBI, can and does realign in response to the evolution of the threats and any critical incidents.

The front line of the counterterrorism mission in the United States is represented by the FBI-led JTTFs, which investigate both DT and IT matters. The FBI leads approximately 56 JTTFs spanning over 100 locations nationwide and across all 56 Field Offices, including our satellite Resident Agencies, with participation of over 50 federal and over 500 SLTT agencies. The JTTFs are comprised of approximately 4,400 investigators, including FBI special agents and task force officers, and additional analysts and professional staff who support these JTTF members and the investigations they lead. The JTTF partnerships at the federal and SLTT levels are force multipliers leveraging local expertise, experience, and resources in FBI counterterrorism investigations.

In FBI Field Offices, squads are dedicated to the counterterrorism mission and not necessarily assigned specifically to investigate DT or IT matters. This is significant because the motivation behind an alleged threat or act of terrorism may not be immediately apparent. Additionally, when an incident occurs, Field Office personnel from all operational programs – for example, criminal or counterintelligence – may respond.

Similar to our posture against the IT threat, the FBI's Counterterrorism Division at Headquarters has a dedicated Domestic Terrorism Operations Section (DTOS), comprised of special agents, intelligence analysts, and professional staff. The FBI's DTOS oversees and provides operational and tactical intelligence support to all 56 Field Offices and their Resident Agencies in investigating the use of violence by individuals to further political and/or social goals in violation of federal criminal statutes. The DTOS oversees the Domestic Terrorism-Hate Crimes Fusion Cell, which creates more opportunities for investigative creativity, provides multi-program

coordination, helps ensure seamless information sharing, and enhances investigative resources to combat the DT threat.

The FBI's Counterterrorism Division also has specialized intelligence and targeting units that work to combat DT specifically, as well as additional units that provide support across the FBI's counterterrorism mission, not exclusive to DT or IT matters. The FBI conducts national-level strategic analysis of the DT threat through the Counterterrorism Analysis Section. This dedicated body of intelligence analysts focuses on providing strategic assessments of the IT and DT threat and actively works with DHS and NCTC to provide accurate intelligence on the threat picture. Further, all FBI counterterrorism investigations are led by Counterterrorism Division Deputy Assistant Directors, who have unique vantage points from which to assess the terrorism threat around the globe and prioritize investigations and operations across the country. Additionally, the FBI's Office of the General Counsel employs in-house attorneys within the National Security and Cyber Law Branch that are dedicated to providing legal assistance on DT operations at FBI Headquarters. This aligns with the legal counsel represented in all 56 FBI Field Offices.

As indicated above, DOJ/NSD also recently established a Domestic Terrorism Unit within the CTS with several functions: prosecuting and coordinating DT cases, developing training and policies on DT matters, and supporting the work of the Department in implementing a whole-of-government strategy on countering DT. The Department believes that this change best enables us to respond to the evolving and persistent DT threat.

DHS I&A's Counterterrorism Mission Center (CTMC) leads I&A's analysis of DT issues. CTMC provides intelligence support and analysis that focuses on domestic threat actors, including DVEs, consistent with the Department's statutory charges to identify priorities for protective and support measures regarding terrorist and other threats to homeland security. In 2021, DHS I&A created a Domestic Terrorism Branch, housed within CTMC, consisting of intelligence personnel solely dedicated to focusing on the DT landscape. These analysts have enabled DHS I&A to increase its production and sharing of information on DT threats, engagement with FBI and NCTC counterparts to jointly author strategic DT intelligence products, briefings to government and private sector customers, and interactions with subject matter experts outside government. This branch currently consists of ten full time DHS intelligence analysts and one manager. Additionally, DHS I&A maintains a presence at state and major urban area fusion centers through its Office of Regional Intelligence,[21] and DHS I&A analysts at DHS Headquarters work with those individuals to author joint products and share threat-related information on issues relevant to their regions, including domestic violent extremism and physical threats to critical infrastructure.

In addition, DHS I&A maintains the Open Source Intelligence Division with a branch of open source collection officers that research and report on publicly available information sources online within the DT space, consistent with I&A's *Intelligence Oversight Guidelines*.

DHS I&A's Office of Regional Intelligence has over 130 personnel deployed to field locations across the United States, primarily in state and major urban area fusion centers. These officers

---

[21] The Office of Regional Intelligence was formerly the Field Operations Division.

work across a range of threat issues and actors, including the DVE mission space. DHS I&A's field-deployed intelligence officers collect and report intelligence information in serialized raw intelligence reports and provide regionally-focused analysis, which may include DVE topics.

DHS I&A's Engagement and Liaison Office has one person detailed to FBI Headquarters to serve as the senior DHS Intelligence representative to the FBI responsible for improving the multi-directional information flow by meeting mutual intelligence needs of the Department and FBI. The Liaison Officer works across a range of threat issues and actors, including the DVE mission space.

All of the DHS staff mentioned are specific to DHS I&A, in accordance with reporting requirements. Similar to FBI, DHS added personnel and resources to counter DT in response to the evolution of the threat and to support implementation of the June 2021 *National Strategy for Countering Domestic Terrorism*. These personnel span the breadth and depth of the DHS mission set, including but not limited to DHS representatives to JTTFs. DHS is the largest and longest standing federal contributor to the JTTFs nationwide and those personnel are closely involved with countering DT through the JTTFs.

While NCTC's primary missions are focused on the threat posed by IT, the Center provides domestic counterterrorism support, where appropriate and consistent with Congressional direction, to the FBI and DHS, which are the lead domestic counterterrorism agencies. NCTC identifies and monitors international and transnational trends across a range of violent extremist actors and looks for and analyzes transnational linkages. NCTC defers to the FBI and DHS regarding assessments of the overall threat posed by DVEs and determinations of whether specific individuals are DVEs. NCTC does not have analysts focused exclusively on domestic violent extremism threats.

## VII.  Recommendations

The Act requires the Director of the FBI and the Secretary of Homeland Security, in consultation with the DNI, to jointly submit to the appropriate Congressional committees a report on DT containing recommendations with respect to the need to change authorities, roles, resources, or responsibilities within the federal government to more effectively prevent and counter DT activities, and measures necessary to ensure the protection of privacy and civil liberties.

### *Implementation of the National Strategy for Countering Domestic Terrorism*

In June 2021, the White House released the first-ever *National Strategy for Countering Domestic Terrorism*, which provides a government-wide strategy to counter domestic violent extremism. The national strategy references the March 2021, US Intelligence Community intelligence assessment titled, *Domestic Violent Extremism Poses Heightened Threat in 2021*, and lays out a comprehensive strategy to address the DT threat, building on a foundation of US Government collaboration on programmatic aspects of countering DT – such as information sharing, training, prevention, and intervention efforts – while fostering a broader community that extends beyond the US Government to critical partners. The national strategy also reinforces the US Government's commitment to approaching this important work while avoiding unlawful

discrimination, bias, and stereotyping and the protection of American civil rights and civil liberties, including preserving and safeguarding constitutionally protected freedom of speech and association, while focusing on addressing unlawful violence. The strategy also includes prevention efforts to enhance community resilience against DT and the provision of available resources.

The FBI and DHS, with support from NCTC, remain dedicated to working with our partners on the effective implementation of the national strategy and continue to evolve our response to this threat.

As part of the national strategy, the FBI has increased intelligence production regarding the DT threat; continued to develop and implement TATM teams throughout the country; enhanced engagement with private sector partners; and developed and provided unclassified resources – such as the *US Violent Extremist Mobilization Indicators* booklet, which was jointly developed with DHS and NCTC – to multiple audiences, including law enforcement partners, first responders, and the American public.

Importantly, DHS plays a key role in this whole-of-government effort, and DHS I&A has undertaken a number of actions and initiatives to support the national strategy, in line with broader Departmental efforts. As noted above, in 2021, DHS I&A established a Domestic Terrorism Branch solely focused on analyzing threats from domestic violent extremism. Since January 2021, DHS I&A also regularly delivered in-person and virtual briefings to a variety of partners regarding the DVE movements and various trends impacting homeland security, and DHS I&A contributed to the development of seven National Terrorism Advisory System bulletins, which provide the public awareness of the current threat environment in the Homeland.

DHS continues to enhance the role of its Counterterrorism (CT) Coordinator. As the principal counterterrorism official at DHS, the CT Coordinator is responsible for the Department's counterterrorism-related activities ensuring they are appropriately developed, coordinated, integrated, aligned, and implemented.

DHS's Center for Prevention Programs and Partnerships (CP3) also continues to expand its efforts to prevent terrorism and targeted violence by providing partners at the state and local level with tools to prevent violence. Through technical, financial, and educational assistance, CP3 is leveraging community-based partnerships to enhance local capabilities and help ensure individuals receive help before they radicalize to violence. CP3 also partners with DHS's Federal Emergency Management Agency to administer the Targeted Violence and Terrorism Prevention (TVTP) Grants Program, which provides funding to enhance and expand prevention capabilities. The TVTP grant program complements existing programs that enhance the preparedness of our nation, including the Nonprofit Security Grant Program which provides support for target hardening and other physical security enhancements at nonprofit organizations, as well as the State Homeland Security Program and Urban Area Security Initiative grant programs, which have prioritized combatting domestic violent extremism as a "National Priority Area" in both FY 2021 and FY 2022.

DHS's Office for Civil Rights and Civil Liberties (CRCL) conducts extensive engagement with diverse communities across the country, including communities threatened by targeted violence, and frequently facilitates direct engagement between senior DHS leadership and these communities. CRCL partners with DOJ and other federal agencies to provide information to communities on federal efforts to prevent violent extremism and hear directly from communities about concerns they need to address. Trusted partnerships built as a result of these CRCL engagements enable DHS to work closely with diverse communities on DT prevention efforts.

### Legislative Initiatives

DOJ continually assesses whether additional legislative authorities would improve our efforts to combat DT and other national security threats. The FBI is actively working with DOJ on some broader legislative initiatives that can benefit both federal investigations and prosecutions, including those relating to DT. For example, there are ongoing discussions about adjusting legislation in response to the challenges in disrupting juvenile threat actors via federal law enforcement actions. We will inform and work with the Congress and the Office of Management and Budget in the event we identify any critical gaps in our authorities that may negatively impact our ability to accomplish our mission.

### Resource Enhancements

To close the gaps in the FBI's ability to disrupt and deter DT threats, the DOJ and FBI have continuously engaged with Congress and the Office of Management and Budget to appropriately allocate resources towards combatting the DT threat.

Meanwhile, DHS is committed to expanding its ability to collect domestic violent extremism information obtained overtly or from publicly available sources, consistent with its authorities, while simultaneously safeguarding privacy, civil rights, and civil liberties of all persons. We are enhancing DHS's ability to rapidly analyze and communicate DT threats and inform policymakers' and its homeland security partners' decisions and actions, designed to prevent acts of terrorism and targeted violence.

**Appendix A**

**<u>Significant Domestic Terrorism Incidents in the United States from Fiscal Year 2022</u>[22]**

This appendix includes domestic terrorism (DT) incidents from fiscal year 2022 that FBI and DHS Office of Intelligence and Analysis identify as significant, including high-profile attacks, plots, threats of violence, arrests, and disruptions. To be considered a DT incident, the incident must involve the use or threat of force or violence, have the potential for a federal violation, and appear intended to further social or political goals. These incidents are typically investigated by the FBI for a variety of potential federal criminal activities, including hate crimes, and/or

---

[22] Unless otherwise noted, some of these matters are active/pending. All defendants are presumed innocent unless and until proven guilty in a court of law.

investigated by state and local law enforcement for criminal violations in their respective jurisdictions.

| Date and Location | Description |
|---|---|
| October 2021: Missouri | Two anarchist violent extremists (AVEs) were convicted and sentenced to prison related to their June 2020 attempt to set fire to a convenience store during the 2020 civil disorder. In September 2021, one AVE pleaded guilty to a federal charge of possessing a firearm as a convicted felon and intentionally demonstrating a technique that would be unlawfully employed in furtherance of a civil disorder and was sentenced to 36 months in prison. In October 2021, the second AVE was arrested on a federal charge of conspiracy to commit arson, and in February 2022, the AVE pleaded guilty. In August 2022, the AVE was sentenced to 27 months in prison. |
| October 2021: Michigan | Approximately 10 masked individuals claiming association with environmental groups broke into a pipeline facility and used tools and equipment to close an emergency shut-off valve on the pipeline. The event was livestreamed and posted to multiple social media accounts. This incident remains under investigation as potential environmental violent extremism. |
| November 2021: Arkansas | Four racially or ethnically motivated violent extremists (RMVEs) were arrested and federally charged with unlawful possession of, and conspiracy to sell, a firearm to a prohibited person. This case is pending. |
| November 2021: Ohio | An RMVE was arrested and federally charged with possession of a firearm by a convicted felon. This arrest disrupted the movement of illegally purchased firearms to numerous individuals, some of whom are known felons. In April 2023, the RMVE pleaded guilty, and is awaiting sentencing. |
| November 2021: Virginia | An RMVE was arrested and federally charged with possession of a firearm by an unlawful user of controlled substances. In January 2022, the RMVE pleaded guilty and in July 2022, was sentenced to four years and nine months in prison. |
| November 2021: Pennsylvania | An AVE was arrested and federally charged with interstate threats after placing telephone calls threatening violence against law enforcement officers following an officer involved shooting. In March 2022, the AVE pleaded guilty, and in June 2022, was sentenced to seven months time served. |
| November 2021: New York | An RMVE was arrested and federally charged with unlawful possession of a firearm and ammunition by a convicted felon. This case is pending. |
| December 2021: Washington | An AVE was arrested and federally charged with unlawful possession of destructive devices in connection with a September 2020 plot to burn the Seattle Police Officers Guild building. In September 2022, the AVE pleaded guilty, and is awaiting sentencing. |
| December 2021 and January 2022: Washington | Two militia violent extremists (MVEs) were arrested and federally charged with conspiracy to make or possess an unregistered destructive device, which they planned to use to attack law enforcement officers. In March 2023, both MVEs pleaded guilty, and are awaiting sentencing. |

| | |
|---|---|
| January 2022: Texas | An MVE, who identifies as the founder and leader of the Oath Keepers, was arrested and federally charged with seditious conspiracy and other charges related to the breach of the US Capitol on 6 January 2021. In November 2022, the MVE was found guilty, and in May 2023, was sentenced to 18 years in prison. |
| January 2022: North Carolina | An MVE was arrested and federally charged with teaching the making of an explosive device weapon of mass destruction for use in furtherance of a federal crime of violence and possession of unregistered firearms and destructive devices. The MVE owned a tactical training company and provided instructions for the manufacture and sale of improvised explosive devices. This case is pending. |
| January 2022: Texas | An AVE was arrested and federally charged with attempt to destroy property that affects interstate or foreign commerce by means of explosive. The AVE attempted to detonate a device to damage or destroy a portion of a natural gas pipeline in Texas as part of his fight against capitalism and climate change. In October 2022, the AVE pleaded guilty, and in February 2023, was sentenced to five years in prison. |
| February 2022: Alabama, Mississippi | Eight AVEs were arrested and federally charged with conspiracy to maliciously destroy by fire in connection with a series of fires set at four Walmart stores — two in Alabama and two in Mississippi — in May and June 2021. During 2022, all eight AVEs pleaded guilty. In May 2023, one was sentenced to 18 years; a second was sentenced to 15 years; and a third was sentenced to three years. In June 2023, two others were sentenced to four years; and the sixth was sentenced to two years. The remaining two AVEs are awaiting sentencing. |
| February 2022: Florida | A DVE with a personalized ideology was arrested and federally charged with transmitting interstate threatening communications after posting a video online in February 2021, threatening to kill an FBI special agent attempting to interview the DVE in furtherance of an investigation into the 6 January 2021 breach of the US Capitol. In July 2022, the DVE was found guilty, and in April 2023, was sentenced to 18 months in prison. |
| March 2022: New York | An anti-government or anti-authority violent extremist-other (AGAAVE-Other) was arrested and federally charged with transmitting interstate threatening communications after sending voicemails threatening violence against a member of Congress due to a dislike of public statements by the Congressperson. This case is pending. |
| April 2022: New York | An RMVE was arrested and federally charged with committing a terrorist attack or other violence against a mass transportation vehicle after conducting a shooting attack on the New York City subway in Brooklyn, New York, resulting in dozens of gunshot wounds and other injuries. In January 2023, the RMVE pleaded guilty, and is awaiting sentencing. |

| | |
|---|---|
| April 2022:<br>Utah | Two environmental violent extremists (EVEs) were arrested on state charges in connection with the May 2020 purposeful damaging or sabotaging of several pieces of heavy operating machines used in construction. Losses were estimated in excess of $500,000. In September 2022, one EVE pleaded guilty, and in November 2022, was sentenced to a suspended prison term of one to 15 years and 120 days of home confinement. In January 2023, the second EVE pleaded guilty, and in March 2023, was sentenced to a suspended prison term of one to 15 years, with one year prison. |
| April 2022:<br>Oklahoma | An AVE was arrested and federally charged with illegal possession of a machine gun and possession of numerous firearms and ammunition by a convicted felon after making threatening statements to law enforcement. In July 2022, the AVE pleaded guilty, and is awaiting sentencing. |
| May 2022:<br>New York | An RMVE was arrested on state charges following a mass shooting attack, which targeted victims because of their actual or perceived race or color, at a grocery store, and which killed 10 individuals and injured three others. The RMVE was subsequently federally charged with a hate crime resulting in death, use of a firearm to commit murder, and use and discharge of a firearm during and in relation to a crime of violence. The RMVE posted a manifesto on social media outlining violent extremist views, including self-identified white supremacist ideology, and livestreamed the shooting on social media. In November 2022, the RMVE pleaded guilty to state charges of murder motivated by hate, and is awaiting sentencing. The federal case is pending. |
| May 2022:<br>Nevada | A sovereign citizen violent extremist (SCVE) was arrested and federally charged with prohibited person in possession of a firearm after threatening Douglas County court personnel — including a judge, defense attorney, district attorneys, and county sheriff — in furtherance of his SCVE ideology. The SCVE filed false legal documents alleging violations of federal statutes, threatening the individuals with arrest and death. This case is pending. |
| May 2022:<br>Illinois | An SCVE was arrested on state charges of aggravated battery to a peace officer and resisting arrest following a traffic stop during which the SCVE refused to recognize the authority of the law enforcement officers, proclaimed himself to be a "nationalist," and fought the officers while being extracted from the vehicle. In March 2023, the presiding judge in the state trial declared a mistrial with prejudice. |
| June 2022:<br>Louisiana | An RMVE was arrested and federally charged with possession of firearms by a convicted felon. The RMVE posted threats to kill preachers on a social media platform, and was apparently motivated in part by violent interpretations of Black Hebrew Israelite teachings. This case is pending. |

| | |
|---|---|
| June 2022: New York | An RMVE was arrested and federally charged with aiding and abetting the making of a false statement to a federal firearm licensee that was material to the lawfulness of the sale of a firearm and pertained to information required to be kept by the licensee in connection with purchase of a firearm, and conspiring to do the same. This case is pending. |
| June 2022: Maryland | An abortion-related violent extremist (AbRVE) was arrested and federally charged with attempting to kidnap or murder a US Supreme Court Justice following the leak of a draft opinion in the US Supreme Court case, *Dobbs v. Jackson Women's Health Organization*, regarding federal abortion protections. This case is pending. |
| June 2022: Oregon | An AVE was arrested on state charges for attempting to build a destructive device. The arrest followed information the AVE was constructing Molotov cocktails and may have been planning to use them at a protest; search warrants resulted in seizure of material consistent with manufacture of destructive devices. |
| June 2022: Ohio | An RMVE was arrested on multiple federal charges related to making and selling untraceable homemade weapons using a 3D printer. While employed to provide security services at local synagogues and Jewish schools, the RMVE threatened to commit a shooting attack at a synagogue. Prior to the federal arrest, the RMVE was arrested by local law enforcement on state charges including making terroristic threats. In February 2023, the RMVE was sentenced in federal court to 71 months in prison, and was sentenced in county court to six years in prison, to be served concurrently with the federal term. |
| July 2022: Texas | An MVE was arrested and federally charged with unlawful possession of a firearm by a felon. The MVE conducted armed patrols of the US-Mexico border. This case is pending |
| July 2022: South Dakota | One or more unknown individuals fired multiple gunshots into a substation that powers the Keystone Pipeline. The damages resulted in lost production and physical property damage to the transformer and pump station. This incident remains under investigation as potential environmental violent extremism. |
| July 2022: Tennessee | An AbRVE was arrested and federally charged with destruction of government property related to a drive-by shooting, which struck the windows of an occupied federal courthouse in Knoxville, Tennessee. The AbRVE also allegedly fired at and set fire to a reproductive health services facility. |
| July 2022: Multiple states | A juvenile RMVE was formally petitioned after calling in a false active shooter threat to a middle school and making threatening calls and swatting incidents targeting historically Black colleges and universities. In October 2022, after pleading guilty to a state charge of conspiracy to make false threats, the RMVE was sentenced to nine months' probation, including a juvenile assessment, counseling, and behavior program. |

| | |
|---|---|
| August 2022: Oklahoma | Two alleged SCVEs were arrested and federally charged with kidnapping following the abduction of a minor and refusal to comply with law enforcement. In March 2023, the charges were dismissed without prejudice. |
| August 2022: Ohio | An AGAAVE-Other attempted to breach the FBI's Cincinnati Field Office with the intention of killing FBI personnel. The AGAAVE-Other fled the area and was fatally wounded after an hours-long standoff with law enforcement. |
| August 2022: Pennsylvania | An MVE was arrested and federally charged with making interstate threats and influencing or retaliating against a federal officer by threat for making threats of violence against the FBI following the FBI's execution of a federal search warrant at a former President's Florida home. In June 2023, the MVE pleaded guilty, and is awaiting sentencing. |
| August 2022: Pennsylvania | One or more unknown individuals vandalized construction vehicles in a state park and left warning signs that trees had been "spiked," and cutting the trees could result in damage or injury. This incident remains under investigation as potential anarchist violent extremism. |
| August 2022: Florida | An AGAAVE-Other was arrested and federally charged with mailing threatening communications after sending nine threatening letters to individuals who participated in, or were linked to, the 6 January 2021 breach of the US Capitol. In October 2022, the AGAAVE-Other pleaded guilty, and in February 2023, was sentenced to time served. |
| September 2022: North Carolina | An SCVE was arrested and federally charged with transmission of threats in interstate or foreign commerce after sending multiple purported "Writs of Execution," all of which threatened to arrest county officials, law enforcement, and others. In January 2023, the SCVE pleaded guilty, and is awaiting sentencing. |
| September 2022: North Carolina | An RMVE was arrested and federally charged with receiving, possessing, transferring, or manufacturing an unregistered firearm. In April 2023, the RMVE pleaded guilty, and is awaiting sentencing. |
| September 2022: Texas | An RMVE was arrested and federally charged with interstate threatening communications and threatening a federal officer after posting threatening statements against law enforcement officers, government officials, and racial and religious groups on a social media platform. In June 2023, the RMVE pleaded guilty, and is awaiting sentencing. |

**Appendix B**

UNCLASSIFIED

**SPECIAL ANALYSIS**
JOINT ANALYTIC CELL                                      17 JUNE 2022



## (U) Wide-Ranging Domestic Violent Extremist Threat to Persist

(U) The Department of Homeland Security (DHS), Federal Bureau of Investigation (FBI), and National Counterterrorism Center (NCTC) assess that domestic violent extremists (DVEs)ᵃ fueled by various evolving ideological and sociopolitical grievances pose a sustained threat of violence to the American public, democratic institutions, and government and law enforcement officials. Flashpoint events in the coming months may exacerbate these perceived grievances, further increasing the potential for DVE violence. DVEs adhering to different violent extremist ideologies have coalesced around anger at issues including perceived election fraud, as well as immigration and government responses to the COVID-19 pandemic, drawing on their varied perceptions of those issues. These factors, along with fluid conspiracy theories, have amplified longstanding DVE grievances, including perceptions of government and law enforcement overreach or oppression and shifts in US demographics and cultural values.

- (U) The mass shooting last month targeting Black people in Buffalo, New York, was allegedly perpetrated by a racially or ethnically motivated violent extremist (RMVE) driven by a belief in the superiority of the white race. The RMVE was charged with federal hate crimes and using a firearm to commit murder in June 2022. This attack underscores how RMVEs—who have been responsible for a majority of DVE-related deaths since 2010—pose a significant threat of lethal violence against civilians, particularly of racial, ethnic, and religious minorities.

- (U) The lethal threat from militia violent extremists (MVEs) remains elevated, primarily toward government and law enforcement personnel, as MVEs remain willing to use violence to redress perceived government overreach and other sociopolitical grievances, judging from an increase in MVE plotting, disruptions, and FBI investigations since 2020. Anarchist violent extremists (AVEs) present a threat of sporadic violent physical assaults and property crimes impacting the efficient operation of critical infrastructure; developments that heighten perceptions of inequality or social injustice might further embolden AVEs to commit acts of violence.

- (U) Several DVEs motivated by perceptions of fraud in the 2020 general election were arrested in 2021 and 2022 for plotting or threatening violence against federal, state, and local officials and political party representatives, highlighting the elevated threat posed to elected officials countrywide. In November 2021, a New York–based MVE was sentenced to 19 months in prison for threatening to assault and murder members of the US Congress.

- (U) A wide-ranging set of DVEs have shared their perceptions of government overreach on COVID-19 pandemic mitigation efforts and anger at government responses to immigration issues in person and online and have encouraged one another to act violently. Anger at the mitigation efforts of businesses and federal, state, and local governments motivated several DVE attacks, plots, and calls for violence against health care workers and mobile vaccine clinics in 2020 and 2021. In 2021, some DVEs visited the US-Mexico border with the intention of detaining those crossing into the United States.

ᵃ(U) For the purpose of this assessment, DHS, FBI, and NCTC use the term DVE to refer to an individual based and operating primarily within the United States or its territories without direction or inspiration from a foreign terrorist group or other foreign power who seeks to further political or social goals, wholly or in part, through unlawful acts of force or violence. The mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics do not constitute domestic violent extremism and is constitutionally protected. DHS, FBI, and NCTC apply this term as appropriate within the scope of their respective authorities.

AUTHORED BY FBI DHS, NCTC

UNCLASSIFIED

UNCLASSIFIED

SPECIAL ANALYSIS
JOINT ANALYTIC CELL                                                         17 JUNE 2022



(U) DVEs carried out at least four lethal attacks in 2021—the same number as in 2020—killing 13 people. Additional potential DVE incidents that have occurred in 2022 remain under FBI investigation. The number of pending FBI domestic terrorism investigations grew from approximately 1,000 in the spring of 2020 to approximately 2,700 in late 2021, in part because of investigations related to the siege of the US Capitol on 6 January 2021. Since the beginning of 2010, DVEs adhering to various violent extremist ideologies have conducted at least 47 lethal attacks that have killed 152 people in the United States. These figures do not include lethal attacks classified as violent hate crimes rather than DVE attacks.

(U) Developments related to midterm elections, immigration, perceptions of government overreach or social injustice, and other flashpoint events will probably motivate some DVEs across ideologies to plot or attempt violence in the coming months. In the context of these events, some DVEs might promote or exploit the public prevalence of violent extremist narratives to encourage violence. DVE attackers and plotters are typically lone actors—individuals acting without the direct support of others—who plot or conduct attacks on soft targets using easily accessible weapons. The persistent difficulty of detecting threats from such actors underscores the value of the public's assistance in identifying people who might be mobilizing to violence and in reporting concerning behavior to authorities before violence occurs.

- (U) Heightened tensions surrounding the 2022 midterm election cycle will probably cause some DVEs to target political candidates, party offices, judges, election events, or poll workers because of their actual or perceived political affiliations, as several did in 2021. On 26 January 2021, FBI arrested a California-based MVE for allegedly threatening family members of a member of the US Congress and a journalist. The MVE was sentenced to three years in prison in December 2021.

- (U) Immigration-related developments, amplified by DVEs in violent extremist messaging, might spur DVEs to conduct planned or opportunistic violence. Historically, RMVEs—such as the Pittsburgh synagogue attacker in 2018 and the El Paso Walmart attacker in 2019—have conducted attacks motivated in part by immigration-related grievances, and MVEs have targeted perceived immigration-related threats to national security, including initiating armed border patrols with the intent of curbing illegal immigration, posing a potential risk to law enforcement and immigrants. AVEs have targeted US Immigration and Customs Enforcement (ICE) facilities in opposition to US Government immigration policies.

- (U) Even if perceptions of government overreach related to COVID-19 mitigation measures subside, some DVEs will probably continue adhering to evolving anti-government and conspiracy narratives that they adopted during the pandemic and might use to justify violence. Some DVE adherents to QAnon conspiracy theories continue to violently target a shifting array of individuals and entities that they accuse of perpetrating or enabling child abuse. Such conspiracy theories have led to threats or acts of violence, including against businesses, US Government buildings, public officials, and the transportation sector that significantly impacted their operations.

- (U) New legislation or US Supreme Court rulings that exacerbate DVEs' grievances or deepen their animosity toward perceived ideological opponents, including on high-salience issues such as abortion and gun rights, might result in increased threats of violence from a range of DVEs. Law enforcement involvement in the deaths of DVEs or like-minded people might also lead to calls for violence. Additionally, in 2020, some DVEs exploited lawful gatherings after law enforcement-involved deaths of unarmed African-Americans to engage in violence against ideological opponents and other targets.

2022-19951

AUTHORED BY FBI, DHS, NCTC

UNCLASSIFIED

UNCLASSIFIED

**SPECIAL ANALYSIS**
JOINT ANALYTIC CELL                                    17 JUNE 2022

  

**(U) RMVEs Motivated by Real or Perceived Racism and Injustice in American Society, the Desire for a Separate Black Homeland, and/or Violent Interpretations of Religious Teachings Will Probably Engage in Sporadic Violence**

(U) RMVEs who are motivated by perceptions of racial injustice in American society, the desire for a separate Black homeland, and/or violent interpretations of religious teachings will probably continue to commit intermittent acts of violence. This subset of RMVEs has historically targeted those they perceive as representing oppression, including government officials, law enforcement, and white people, as well as individuals and locations associated with Judaism. These RMVEs conducted 11 lethal attacks from 2010 to 2021, resulting in 25 fatalities.

- (U) On 23 June 2021, an RMVE allegedly used his interpretations of Black Hebrew Israelite religious teachings to justify violence and shot to death a law enforcement officer in Daytona Beach, Florida. The suspect has been charged with capital murder and is awaiting trial.
- (U) In December 2019, an RMVE allegedly motivated by antisemitism and his interpretations of Black Hebrew Israelite religious teachings attacked the home of a Hasidic rabbi in New York during a Hanukkah celebration, wounding five people, one of whom later died. In the same month, two RMVEs with similar motivations fatally shot a local law enforcement officer at a cemetery in New Jersey and attacked a nearby kosher supermarket, killing three people and injuring several others. Both RMVEs were fatally wounded during an encounter with responding law enforcement officers.
- (U) RMVEs conducted attacks on law enforcement during the weeks after the officer-involved shooting deaths of two African Americans in Louisiana and Minnesota in July 2016. On 7 July 2016, a now-deceased RMVE motivated by incidents of actual or perceived police brutality ambushed and shot 11 law enforcement officers, killing five, in Dallas, Texas. On 17 July 2016, a now-deceased RMVE with similar motivations ambushed and shot six law enforcement officers, killing three, in Baton Rouge, Louisiana.

**(U) Anti-Government or Anti-Authority Violent Extremism**
**(U) MVEs Pose Heightened Lethal Threat to Law Enforcement and Symbols of Government**

(U) The lethal threat level from MVEs to law enforcement and government personnel will almost certainly remain elevated in the coming months because some of these actors are willing to use violence to redress perceived government overreach and other sociopolitical issues. Some MVEs will almost certainly continue to harbor grievances over their perceptions of fraud during the 2020 election and government measures related to the COVID-19 pandemic. Some MVEs might also mobilize to violence in response to the enactment of any legislation that they perceive as restricting access to firearms, expanding immigration, or managing public land that MVEs might view as unacceptable infringements on civil liberties or harmful to the security of the United States.

- (U) In April 2021, FBI arrested an MVE in Texas who intended to bomb a commercial cloud service provider's servers under the belief that the data center provided services to federal agencies, including CIA and FBI. The MVE pleaded guilty to a malicious attempt to destroy a building with an explosive and was sentenced to 10 years in federal prison in October 2021.
- (U) In January 2021, FBI disrupted a plot by two suspected MVEs who were allegedly planning to bomb the state headquarters of a political party in Sacramento, California. Federal investigators discovered multiple pipe bombs and dozens of firearms at the home of one of the MVEs. The subjects pleaded guilty to multiple offenses and are awaiting sentencing.

AUTHORED BY FBI, DHS, NCTC

UNCLASSIFIED

UNCLASSIFIED

## SPECIAL ANALYSIS
JOINT ANALYTIC CELL

17 JUNE 2022



- (U) Dozens of probable MVEs were arrested for their involvement in the violent, unlawful entry of the US Capitol building on 6 January 2021.

**(U) Most AVEs Will Probably Engage in Nonlethal Criminal Activity, Impact Law Enforcement Operations**

(U) We assess that AVEs will continue to plot and potentially conduct sporadic attacks on critical infrastructure and federal, state, and local facilities, as well as violent physical assaults against their perceived ideological opponents. Perceptions of inequality or social injustices related to flashpoint events might further embolden AVEs to commit acts of violence. Target selection by AVEs—whether premeditated or opportunistic—will probably remain focused on people or institutions seen as representing authority, capitalism, and oppression, including perceived racism or fascism. Although AVEs have sometimes acted collectively, we assess AVEs are not organized at the countrywide level.

- (U) In January 2021, FBI arrested a Florida-based AVE after he issued a "call to arms" for like-minded individuals to join him with firearms to violently confront others who might gather at a lawful protest at the Florida Capitol earlier that month. In October 2021, the AVE was sentenced to 44 months in federal prison for communicating a threat to kidnap or injure others.
- (U) In August 2020, an individual who expressed views on social media consistent with AVE ideology fatally shot a man during an event with individuals of opposing ideologies in Portland, Oregon. This incident was the first known lethal attack in the United States by an AVE in more than 20 years. The AVE was subsequently killed after drawing a firearm when law enforcement attempted to arrest him.
- (U) In July 2019, a probable AVE set fire to a vehicle and threw incendiary devices at a building near a detention facility linked to ICE operations in Tacoma, Washington. He then engaged responding law enforcement officers with an AR-style rifle and was killed during the encounter.

**(U) SCVEs Pose Sporadic Threat of Violence Against Law Enforcement and Government Personnel**

(U) We assess that sovereign citizen violent extremists (SCVEs) will continue to pose a sporadic threat of violence against law enforcement and government personnel on the basis of SCVEs' perceived rights and belief in their immunity from government authority and laws. In furtherance of these beliefs, SCVEs have committed a wide variety of property and financial crimes that have often brought them into conflict with law enforcement, sometimes resulting in violence. Law enforcement officers will probably remain SCVEs' most frequent targets, with violence most likely to occur during law enforcement encounters, including traffic stops.

- (U) On 3 July 2021, 11 individuals, believed to be members of an armed organization that espouses sovereign citizen ideology, engaged in an hours-long armed standoff with Massachusetts State Police near Wakefield that was streamed live by the group's spokesperson on a social media platform. The incident occurred after an attempted traffic stop on a vehicle driven by group members and had the potential to escalate to violence. After the standoff, the individuals were charged with multiple firearms-related violations. Group members' statements before, during, and after the standoff have been consistent with sovereign citizen extremist ideology.
- (U) In February 2018, a probable SCVE opened fire on local law enforcement officers who were trying to serve a warrant at the violent extremist's residence in Locust Grove, Georgia, for failure to appear in court. After the SCVE killed one police officer and wounded two sheriff's deputies, law enforcement officers shot and killed him.

2022-19494

AUTHORED BY FBI, DHS, NCTC

UNCLASSIFIED

UNCLASSIFIED

**SPECIAL ANALYSIS**
JOINT ANALYTIC CELL                                                    17 JUNE 2022



**(U) All Other Domestic Terrorism Threats**

**(U) Other DVEs Pose Threat of Violence Because of Political Grievances, Conspiracy Theories**

(U) We assess that DVEs who mobilize to commit violence in response to partisan grievances and who do not fall under other DVE threat categories will pose a heightened threat to individuals in the 2022 midterm election cycle because of their actual or perceived political affiliation. These DVEs might target candidates, government officials, other civilians, and institutions with violence to try to redress their perceived grievances or advance their agendas. Conspiracy theories related to the 2020 general election will probably continue to contribute to the radicalization of some DVEs with partisan grievances and potentially be reinforced by their view that the Capitol breach on 6 January 2021 was a success.

- (U) In December 2021, a DVE motivated by partisan grievances who is awaiting trial was arrested en route to Washington, DC, after telling law enforcement officers that he would "do whatever it takes" to kill government leaders on his "hit list." The DVE was found to have a rifle, ammunition, loaded magazines, body armor, and medical kits.
- (U) In September 2021, authorities arrested a DVE motivated by partisan grievances for throwing a Molotov cocktail at the offices of a political party in Austin, Texas. The subject pleaded guilty to one count of arson and was sentenced to six years in prison.
- (U) In June 2017, a now-deceased DVE injured several members of Congress, staffers, and responding officers after opening fire at a charity baseball event in Alexandria, Virginia.

(U) Conspiracy theories related to the COVID-19 pandemic almost certainly contribute to the mobilization to violence of some DVEs who do not fall into the other threat categories. We assess that these DVEs pose an ongoing threat to government officials and critical infrastructure.

- (U) In March 2020, a DVE deliberately derailed a train that he was operating near the USNS Mercy hospital ship at the Port of Los Angeles to draw media attention to the ship's presence. The DVE told law enforcement that he believed that the ship had an "alternate purpose" related to COVID-19 or an unspecified US Government takeover and that he wanted to "wake people up." In April 2022, he was sentenced to three years in prison after pleading guilty to committing a terrorist attack and other violence against railroad carriers and mass transportation systems.

(U) We assess that adherence to elements of the continuously evolving QAnon conspiracy theory—some of which are bolstered by the resonance of election fraud narratives—will contribute to the radicalization and mobilization to violence of a small number of DVEs, posing a threat to individuals and institutions that supporters of the conspiracy theory have prominently denounced. The participation of some self-identifying QAnon adherents in the breach of the US Capitol on 6 January 2021—who were arrested and charged with violent entry and disorderly conduct in a restricted building and obstruction of an official proceeding — underscores how some QAnon adherents can accept the legitimacy of violent action.

- (U) On 7 January 2021, a North Carolina–based, self-identified QAnon adherent was arrested by FBI in Washington, DC, and charged with interstate communication of threats after he brought firearms and ammunition into the city and threatened the Speaker of the House and DC Mayor. The DVE pleaded guilty and was sentenced to two years in federal prison.
- (U) On 8 January 2021, a probable DVE and self-identified QAnon adherent was arrested on charges of destroying government property after allegedly firing several rounds at a federal courthouse in Oregon. In November 2021, the DVE was sentenced to probation.

AUTHORED BY FBI, DHS, NCTC

UNCLASSIFIED

UNCLASSIFIED

SPECIAL ANALYSIS

JOINT ANALYTIC CELL                                                                            17 JUNE 2022



(U) Some DVEs form uniquely personalized grievances that might also draw from established DVE movements and, on a limited basis, from other violent extremist ideologies, probably aided by the proliferation and accessibility of a wide range of DVE and other extremist content online, a trend we expect to continue in coming years.

- (U) On 21 June 2021, a now-deceased DVE conducted a shooting attack in Arvada, Colorado, killing two people. The preliminary investigation revealed that the alleged attacker's personalized ideology included a hatred of police stemming from perceptions of corruption among law enforcement agencies.
- (U) On 16 March 2021, a DVE with a personalized ideology related to his claimed sex and pornography addictions allegedly conducted shootings at spas near Atlanta, Georgia, killing eight people. The attacker was sentenced to life in prison for four murders to which he pleaded guilty and is awaiting trial on four counts of murder to which he pleaded not guilty.

(U) We assess that involuntary celibate violent extremists (IVEs) pose a persistent threat of violence against women, heterosexual couples, and others perceived as successful in sexual or romantic pursuits. IVEs motivated by grievances related to their belief that society unjustly denies them sexual or romantic attention have conducted three lethal attacks in the United States since 2014, mostly using firearms, that have resulted in 17 fatalities. The incel movement, which includes IVEs, has online participants in many Western countries, and at least four Canadian IVEs have conducted lone-actor attacks since 2016.

- (U) In July 2021, FBI arrested an IVE based on his alleged actions in planning an attack on women at a university in Ohio. The IVE allegedly wrote a manifesto describing his hatred of women and his desire to "slaughter" them. He was charged with illegal firearms possession and attempting to commit a hate crime and is awaiting trial.
- (U) In May 2020, a self-identified involuntary celibate shot and injured three people at an outdoor mall in Glendale, Arizona, before authorities arrested him. In March 2022, the IVE pleaded guilty to two counts of attempted first degree murder and two counts of assault with a deadly weapon.

### (U) Abortion-Related Violent Extremism

#### (U) Abortion-Related Violent Extremists Might React to Ongoing Events

(U) We assess that abortion-related violent extremist activity will probably increase in line with abortion-related legislative and legal debates, such as those surrounding the recent unauthorized disclosure of a draft opinion in the anticipated US Supreme Court ruling in the case of Dobbs v. Jackson Women's Health Organization. Historically, abortion-related violent extremists motivated by pro-life beliefs have committed acts of violence, including at least 10 murders and dozens of bombings and arsons, all targeting abortion providers and facilities. Abortion-related violent extremists motivated by pro-choice beliefs—although historically less violent than pro-life abortion-related violent extremists—will probably pose a threat to individuals or critical infrastructure and will most often likely target organizations or people expressing pro-life views.

- (U) On 31 December 2021, a fire destroyed an unoccupied reproductive health clinic in Knoxville, Tennessee. Local investigators determined that the event was an arson attack by unknown perpetrators.
- (U) In September 2021, an individual from Oklahoma was arrested for making online threats targeting Texas lawmakers associated with state-level abortion restrictions. The individual pleaded guilty and is awaiting sentencing.

AUTHORED BY FBI, DHS, NCTC

UNCLASSIFIED

UNCLASSIFIED

**SPECIAL ANALYSIS**
JOINT ANALYTIC CELL

  

17 JUNE 2022

- (U) On 3 January 2020, a DVE with a history of expressing pro-life beliefs online threw an incendiary device at the front window of a reproductive healthcare facility in Newark, Delaware, starting a fire that damaged the front porch and window. The subject pleaded guilty in February 2021 and was sentenced to 26 months in federal prison in March 2022.

### (U) Animal Rights and Environmental Violent Extremism

#### (U) Animal Rights and Environmental Violent Extremists Primarily Target Critical Infrastructure

(U) We assess that violent extremists supporting animal rights and environmental causes will continue to disrupt the operation of critical infrastructure to try to exact an economic toll on the industries they target. Most environmental violent extremist activity in recent years has opposed oil and natural gas infrastructure projects, particularly those near perceived ecologically sensitive habitats or waterways, while animal rights violent extremists primarily oppose large-scale farming or animal agriculture.

- (U) In November 2020, two environmental violent extremists in Whatcom County, Washington, were arrested and charged with impeding the operation of a railroad signal system by using a "shunt" across the railroad tracks, which disrupts the electrical current on the tracks and can disable safety features, potentially causing derailments or other accidents. A claim of responsibility followed a similar incident in early 2020, stating that extremists had carried out the shunting with the goal of preventing the construction of an oil pipeline across British Columbia. Both defendants were found guilty and sentenced to one year and to six months in prison, respectively.

1/22-19514

AUTHORED BY FBI DHS, NCTC

UNCLASSIFIED