Gmail

Jon F Turpin <jt4590@gmail.com>

## Case Precedents

**Jon F. Turpin** <jt4590@gmail.com>                                      Mon, Oct 30, 2023 at 7:38 AM
Bcc: Honorable Jeffrey Landry Attorney General Louisiana <jeff.landry@la.gov>, doughty_motions@lawd.uscourts.gov,
compass@rfkhumanrights.org, judiciary_whistleblower@mail.house.gov

---------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Mon, Oct 30, 2023, 7:31 AM
Subject: Re: Case Precedents
To:

Todd Rokita is the top prosecutor in the state and part of the executive branch. The whole case is already decided via the
main authorities of the executive branch and what I called double jeopardy upon me via its filing is factual, but known as
collateral estoppel, allowing for res judicata, and for me to submit compulsory civil suit with criminal charges against them,
even by the false dichotomy precedent potentially being attempted by co-conspirators who already failed to file in tandem
with my "parents" who were purportedly denied filing their own frivolous claim after their own documented irresponsibility.

The case violates not only my 1st and 2nd amendment rights, but also my 3rd, 5th, 6th, 7th, and 8th amendment rights as
well.

Importantly it goes against Indiana's constitution which backs up the right and requirement for trial by jury from the 6th
and 7th amendments with Indiana's own constitution saying it shall be inviolate.

In my opinion any IU McKinney School of Law students and affiliates who aren't following the rule of law may need to
respect the Honorable Larry J. McKinney's already decided ruling that I reaffirmed.

Because if they're from the IU McKinney school and going against his ruling and the Indiana Supreme Court and the
Supreme Court along with Aprendi precedent they have intentional, provable conflict of interest all the way to the
Supreme Court.

**10 attachments**



**20231030_063945.jpg**
2254K



**20231030_063835.jpg**
2242K



**20231030_064946.jpg**
2150K



**20231030_063801.jpg**
2874K



**20231030_063750.jpg**
1860K



**20231030_064621.jpg**
2337K



**20231030_064747.jpg**
1945K



**20231030_064328.jpg**
2194K



**20231030_063814.jpg**
1675K



**20231030_063910.jpg**
2561K



1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3

    UNITED STATES OF AMERICA,      )
4                                  )
                                   )  CRIMINAL ACTION
5       v.                         )  NO. 23-mj-274(MN)
                                   )
6    ROBERT HUNTER BIDEN,          )  CRIMINAL ACTION
                                   )  NO. 23-61(MN)
7              Defendant.          )

8

9                       Wednesday, July 26, 2023
                        10:00 a.m.
10                      Initial Appearance
                        Plea Hearing
11

12                      844 King Street
                        Wilmington, Delaware
13

14   BEFORE:   THE HONORABLE MARYELLEN NOREIKA
                United States District Court Judge
15

16

17   APPEARANCES:

18               UNITED STATES ATTORNEY'S OFFICE
                 DISTRICT OF DELAWARE
19               BY:  BENJAMIN L. WALLACE, ESQ.
                 BY:  DEREK E. HINES, ESQ.
20               BY:  LEO J. WISE, ESQ.

21

22                         Counsel for the United States

23

20

1    in the other.  I have not had time to review those

2    submissions.  I understand that there is some objection to

3    them and I will give the Defendant and the government if it

4    wishes an opportunity to respond to those if they choose.

5    But even though I have not been able to review the

6    third-party submissions, I do understand that they request

7    that I reject the plea agreement based on information that

8    the filers submit cast doubt on the investigation performed

9    or the charges brought or both.

10                   So let me ask you this.  If I were to think that

11   the facts presented in those submissions or even the facts

12   that have been presented to me in this case and the attached

13   agreements suggest that the investigation was lacking or

14   that more serious charges should have been brought, is it

15   within my power to ask or direct the United States Attorney

16   or the Attorney General of the United States to redo the

17   investigation or bring different or more serious charges?

18                   MR. WISE:  I don't believe so, Your Honor, no.

19                   MR. CLARK:  We agree, Your Honor, it would raise

20   obviously massive separation of powers questions if that was

21   to be taken.

22                   THE COURT:  Okay.  And isn't that decision about

23   what charges to bring for the prosecutor as part of the

24   Executive Branch?

25                   MR. WISE:  It is, Your Honor.

21

1              MR. CLARK:  We concur, Your Honor.

2              THE COURT:  All right.  So if there were a

3    failure in the investigation or the charges brought were

4    inappropriate, how would that get addressed in our form of

5    government?

6              MR. WISE:  Through the political process, Your

7    Honor.

8              MR. CLARK:  In particular, Your Honor, the

9    Executive Branch is charged fully with investigating, making

10   prosecutorial discretion decisions, and indeed that's where

11   the term prosecutorial discretion comes from, it is vested

12   in the Executive Branch.

13             THE COURT:  All right.  Okay.  Let's walk

14   through some of the provisions of the plea, Memorandum of

15   Plea Agreement.  Do you have it in front of you, sir?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  It's six pages long and has an

18   attached Exhibit 1 which is four pages long as well as a

19   sealed attachment referenced as Attachment A.  Attachment A

20   is a document that is not public, but it is a standard

21   document that is filed in all cases in this district and is

22   not filed only in connection with this case.  The Memorandum

23   of Plea Agreement has three signatures on the final page.

24   Is one of those signatures yours?

25             THE DEFENDANT:  Yes, Your Honor.

OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA



302 W. WASHINGTON ST. 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

TODD ROKITA
ATTORNEY GENERAL

July 7, 2023

Mr. Jon Turpin
2421 S. Plum St.
Yorktown, IN 47936

Dear Mr. Turpin,

This week we received both the U.S. Mint coin of President Theodore Roosevelt and your handgun license in the mail. While the coin was a very thoughtful gift, we are unfortunately unable to accept. Indiana Code prevents state employees from accepting gifts or favors from their constituents.

Also enclosed is your State of Indiana license to carry handgun. We recommend you retain this document for your personal records. If you have any questions about the license, please contact the Firearms Division of the Indiana State Police at (317) 232-8264 with your questions.

Please let us know if we can be of assistance in the future.

Sincerely,

Constituent Services
Office of Indiana Attorney General Todd Rokita

cs/hm



U.S. Code  >  Title 18  >  Part I  >  Chapter 44  >  § 925

⊟ Collapse to view only § 925. Exceptions: Relief from disabilities

§ 921. Definitions

§ 922. Unlawful acts

§ 923. Licensing

§ 924. Penalties

§ 925. Exceptions: Relief from disabilities

§ 925A. Remedy for erroneous denial of firearm

§ 925B. Reporting of background check denials to State authorities

§ 925C. Annual report to Congress

§ 925D. Special assistant U.S. attorneys and cross-deputized attorneys

§ 926. Rules and regulations

§ 926A. Interstate transportation of firearms

§ 926B. Carrying of concealed firearms by qualified law enforcement officers

§ 926C. Carrying of concealed firearms by qualified retired law enforcement officers

§ 927. Effect on State law

§ 928. Severability

§ GovRegs appl

§101(F).) [TITLE XVI, §1624(B)(3), Feb. 10, 1996, 110 STAT. 522; PUB. L. 104–208, DIV. A, TITLE I, §101(F), [TITLE VI, §658(D)], Sept. 30, 1996, 110 STAT. 3009–314, 3009–372; PUB. L. 104–294 TITLE VI, §607(C), Oct. 11, 1996, 110 STAT. 3511; PUB. L. 107–296, TITLE XI, §1112(F)(6), Nov. 25, 2002, 116 STAT. 2276; PUB. L. 108–174, §1(3), Dec. 9, 2003, 117 STAT. 2481; PUB. L. 115–232, DIV. A, TITLE VIII, §809(E)(3), Aug. 13, 2018, 132 STAT. 1842.)

CITE AS: 18 USC 925

## §925A.  Remedy for erroneous denial of firearm

Any person denied a firearm pursuant to subsection (s) or (t) of section 922—

**(1)** due to the provision of erroneous information relating to the person by any State or political subdivision thereof, or by the national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act; or

**(2)** who was not prohibited from receipt of a firearm pursuant to subsection (g) or (n) of section 922,

may bring an action against the State or political subdivision responsible for providing the erroneous information or

## Download the GovRegs app!

(b) Requirements for Report.—A report is made in accordance with this subsection if the report is made under subsection (a) within 24 hours after the NICS denies a firearm transfer in accordance with SECTION 922(T) OF TITLE 18, United States Code, except that the making of the report may be delayed for so long as is necessary to avoid compromising an ongoing investigation.

Amendment of Report.—If a report is made in accordance with subsection (b) and, after such report is made, the Federal Bureau of Investigation determines that the receipt of a firearm by a person for whom the report was made would not violate subsection (g) or (n) of section 922 or State, local, or Tribal law, the Attorney General shall notify any law enforcement authority and any prosecutor to whom the report was made of that determination.

Rule of Construction.—Nothing in subsection (a) shall be construed to require a report with respect to a person if the same State authorities that made the original denial determination with respect to the person prohibits the person from receiving the firearm, subject to any limitations on the disclosure of such information in the firearm.

(Added Pub. L. 117-159 ... § 12001(C), Mar. 15, 2022, 136 STAT. 919.)



oneous information be corrected or that the transfer be approved (as the case may be). In any action under this section, the court, in its discretion, may allow the prevailing party a reasonable attorney's fees as part of the costs.

(Added Pub. L. 103–159, TITLE I, §104(A), Nov. 30, 1993, 107 STAT. 1543.)

18 USC 925A.

(e) Reporting of background check denials to State authorities

(1) In general.—If the national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act (34 U.S.C. 40901) (referred to in this section as "NICS") provides a notice pursuant to section 922(t) that the receipt of a firearm by a person would violate subsection (g) or (n) of this section or State, local, or Tribal law, the Attorney General shall, in accordance with subsection (f) of this section—

(A) report to the local law enforcement authority of the State or Tribe where the person sought to acquire the firearm and, if different, the local law enforcement authorities of the State or Tribe of residence of the person that—

(A) that the notice was provided;

(B) the Federal, State, local, or Tribal prohibition;

(C) the date and time the notice was provided;

(D) the location where the firearm was sought to be transferred; and

(E) the identity of the person; and

(2) where practicable, report the incident to State and local prosecutors or Tribal prosecutors in the jurisdiction where the firearm transfer was sought.

(3) Requirements for report.—A report is made in accordance with this subsection if the report is made within ...

(4) ...

Effect on State law

provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.

(Added PUB. L. 90–351, TITLE IV, §902, June 19, 1968, 82 STAT. 234; amended PUB. L. 90–618, TITLE I, §102, June 22, 1968, 82 STAT. 1226.)

CITE AS: 18 USC 927

§928. Separability

If any provision of this chapter or the application thereof to any person or circumstances is held invalid, the remainder of the chapter and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

(Added PUB. L. 90–351, TITLE IV, §902, June 19, 1968, 82 STAT. 234; amended PUB. L. 90–618, TITLE I, §102, June 22, 1968, 82 STAT. 1226.)

CITE AS: 18 USC 928

Section 9. No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print,

freely, on any subject whatever; but for the abuse of that right, every person shall be responsible.

Section 10. In all prosecutions for libel, the truth of the matters alleged to be libelous, may be given in justification.

Section 11. The right of the people to be secure in their persons, houses, papers, and ... against unreasonable search or seizure, shall not be violated; and no warrant shall ... probable cause, supported by oath or affirmation, and particularly ... the place to be searched, and the person or thing to be seized.

... All courts shall be open, and every person, for injury done to him in his ... reputation, shall have remedy by due course of law. Justice shall be ... and without purchase; completely, and without denial; speedily, and ... without delay.

(History: As Amended November 6, 1984.)

... In all criminal prosecutions, the accused shall have the right to a public ... in the county in which the offense shall have been committed; to ... counsel; to demand the nature and cause of the accusation against ... to meet the witnesses face to face, and to have compulsory ... process for obtaining witnesses in his favor.

... as defined by law, shall have the right to be treated with fairness, ... throughout the criminal justice process and, as defined by ... ... the hearing, public hearing, and to confer with the pro... ... these rights does not infringe upon the constitutional ... accused.

(History: As Amended November 5, 1996).



Section 14. No person shall be put in jeopardy twice for the same offense. No person in any criminal prosecution, shall be compelled to testify against himself.

Section 15. No person arrested, or confined in jail, shall be treated with unnecessary rigor.

Section 16. Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense.

Section 17. Offenses, other than murder or treason, shall be bailable by sufficient sureties. Murder or treason shall not be bailable, when the proof is evident, or the presumption strong.

The penal code shall be founded on the principles of reformation, and not of vindictive justice.

... criminal cases whatever, the jury shall have the right to determine the law and the facts.

... civil cases, the right of trial by jury shall remain ...

Section 27. The privilege of the writ of *habeas corpus* shall not be suspended, except in case of rebellion or invasion; and then, only if the public safety demand it.

Section 28. Treason against the State shall consist only in levying war against it, or in giving aid and comfort to its enemies.

Section 29. No person shall be convicted of treason, except on the testimony of two witnesses to the same overt act, or upon his confession in open court.

Section 30. No conviction shall work corruption of blood, or forfeiture of estate.

Section 31. No law shall restrain any of the inhabitants of the State from assembling together in a peaceable manner, to consult for their common good, nor from making known their representatives; nor from applying to the General Assembly for redress of grievances.

Section 32. The people shall have a right to bear arms, for the defense of themselves and the State.

Section 33. The military shall be kept in strict subordination to the civil power.

Section 34. No soldier shall, in time of peace, be quartered in any house without the consent of the owner; nor, in time of war, but in a manner to be prescribed by law.

*Cover Sheet for Protection Order, No Contact Order, Child Protective Order, WorkPlace Violence Restraining Order*

## COVER SHEET *(Check Only One)*

| | |
|---|---|
| **Protection Order** | **Child Protective Order** |
| ☑ IC 34-26-5 | ☐ IC 31-34-2.3 |

**No Contact Order**

☐ IC 31-32-13    ☐ IC 33-39-1-8    ☐ IC 35-33-8-3.6
☐ IC 31-34       ☐ IC 35-33-8-3.2   ☐ IC 35-38-1-30
☐ IC 31-37                            and/or 35-38-2-2.3

**Workplace Violence Restraining Order**    ☐ IC 34-26-6

**Case No.** 89C01-2305-PO-000087

**Court** WAYNE CIRCUIT COURT

WAYNE, INDIANA
**County**

### PETITIONER/PROTECTED PERSON/CHILD'S NAME IF CHILD IS PROTECTED PERSON

Andrea Lynn Holwager

*(First / Middle / Last)*

And/or on behalf of minor family member(s):
N/A

### PETITIONER/PROTECTED PERSON IDENTIFIERS

| BIRTH YEAR | SEX | RACE |
|---|---|---|
| 1988 | F | White |

Other Protected Persons:
Michael Alan Holwager (M-White - 1988)

---

**V.       RESPONDENT/DEFENDANT**

Jon Frederick Turpin

*(First / Middle / Last)*

Relationship between Petitioner/Protected Person:
COMMITTED HARASSMENT AGAINST PROTECTED PERSON

Respondent's/Defendant's Address:
2421 S. Plum Street, Yorktown, IN 47396

**CAUTION:**

☐ Weapon Involved   ☑ Weapon Present on the property

### RESPONDENT/DEFENDANT IDENTIFIERS

| SEX | RACE | DOB | HT | WT |
|---|---|---|---|---|
| M | White | 04/05/1990 | | |

| EYES | HAIR | DISTINGUISHING FEATURES |
|---|---|---|
| | | |

| DRIVERS LICENSE # | STATE | EXP DATE |
|---|---|---|
| | | |

**THE COURT FINDS:**
That it has jurisdiction over the parties and subject matter, and the Respondent/Defendant has been or will be provided with reasonable notice and opportunity to be heard.

**Additional findings of this order follow on succeeding pages.**

**THE COURT ORDERS:**
The Respondent/Defendant is restrained from committing further acts of abuse or threats of abuse to the Petitioner/Protected Person.

☐ Yes  ☑ No   The Respondent/Defendant is Brady disqualified.

The Respondent/Defendant is restrained from any contact with the Petitioner/Protected Person.

**Additional terms of this order follow on succeeding pages.**
**The terms of this order shall be effective until:**   *(Check Only One)*
☑ 11/03/2025       [date]        ☐ further order of the court.

**WARNINGS TO RESPONDENT/DEFENDANT:**
**This order shall be enforced, even without registration, by the courts and law enforcement personnel of any state, the District of Columbia, any U.S. Territory, and may be enforced by Indian Tribal Government (18 U.S.C. Section 2265). Crossing state, territorial, or tribal boundaries to violate this order may result in Federal imprisonment (18 U.S.C. Section 2262).**
**Federal law provides penalties for possessing, transporting, shipping, or receiving any firearm or ammunition (18 U.S.C. Section 922(g)(8)).**

**Only the Court can change this order.** *[The following court information is required by statute.]*

Court Phone:  (765) 973-9266

To verify status, call: Clerk (765) 973-9224

Court Hours:  M 8:30 - 5 T-F 8:30-4:30

Sheriff (765) 973-9393      IDACS Message ID:          **Mod**

11/03/2023 12:15 PM

89C01-2305-PO-000087

STATE OF INDIANA         )

COUNTY OF WAYNE     ) SS:

                                  )

Andrea Lynn Holwager,     )

Petitioner                     )

                                  )

        vs.                   )

                                  )

Jon Frederick Turpin,      )

Respondent              )

IN THE WAYNE CIRCUIT COURT

COURT 89C01

Case Number 89C01-2305-PO-000087
Petition Filing Date 5/30/2023

## ORDER FOR PROTECTION

### FINDINGS

This matter having been heard by the Court on 10/31/2023, the Court now makes the following Findings:

*False*    a.    Andrea Lynn Holwager filed a timely Request for Hearing under Ind. Code § 34-26-5-10(a); and/or,

*False*    b.    The Court is required to hold a hearing under Ind. Code § 34-26-5-9(b) or § 34-26-5-10(b).

             c.    The Petitioner was present at the hearing and the Respondent was present.

             d.    This order does not protect an intimate partner or child.

             e.    The Respondent had notice and an opportunity to be heard.

*False*    f.    The Respondent represents a credible threat to the safety of the Petitioner or a member of the Petitioner's household.

*False*    g.    The Petitioner has shown, by a preponderance of the evidence, that repeated acts of harassment has occurred sufficient to justify the issuance of this Order. *Unless it is her husband to us.*

*True*    h.    The Respondent does not agree to the issuance of the Order for Protection.

*False*    i.    The following relief is necessary to bring about a cessation of the violence or the threat of violence.

### ORDER

### Section 1 - General Provisions

*He did, I didn't threaten him. I'm suing him.*    1.    The Respondent is hereby enjoined from threatening to commit or committing acts of domestic or family violence, stalking, sex offenses, a course of conduct involving repeated or continuing contact with Petitioner that is intended to prepare or condition the Petitioner for sexual activity (as defined in IC § 35-42-4-13), or harassment against the Petitioner and the following designated family or household members, if any: Michael Alan Holwager

             2.    The Respondent is prohibited from harassing, annoying, telephoning, contacting, or directly or indirectly communicating with the Petitioner.

*Already left.*    3.    The Respondent shall be excluded from the Petitioner's residence.

*Already do.*    4.    The Respondent is ordered to stay away from the residence, school, and/or place of employment

89C01-2305-PO-000087

of the Petitioner.  The Respondent is further ordered to stay away from the following place(s) that is/are frequented by the Petitioner and/or Petitioner's family or household members:
537 W Main Street, Richmond, IN 47374; 113 E Delaware Street, Cambridge City, IN 47327

5.   N/A

6.   N/A

7.   N/A

8.   N/A

9.   N/A

10.  N/A

*Violation of my rights, and safety, Unconstitutional*

11.  The Respondent is prohibited from using or possessing a firearm, ammunition, or deadly weapon. The Respondent is ordered to surrender the following firearm(s), ammunition, and/or deadly weapon(s) which the Court finds are in the control, ownership, or possession of the Respondent or in the control or possession of another person on behalf of the Respondent:
Any firearms in the possession of or owned by Respondent.

12.  N/A

13.  N/A

14.  N/A

### Section 2 - Parenting Provisions

15.  N/A

16.  N/A

### Section 3 - Monetary Relief

17.  N/A

18.  N/A

19.  N/A

20.  N/A

21.  N/A

22.  N/A

23.  N/A

89C01-2305-PO-000087

## Section 4 - Telephones

24 a. N/A

    b. N/A

    c. N/A

## Section 5 - Duration of Order

***THIS ORDER FOR PROTECTION EXPIRES:***

ON THE 3rd DAY OF November, 2025.

Date:    11/02/2023

Approved and ordered by:

*Ann R. Drake*

HON APRIL R DRAKE,  Judge

## ****** IMPORTANT NOTICE ******

**Violation of this order is punishable by confinement in jail, prison and/or a fine.**

**If so ordered by the court, the respondent is forbidden to enter or stay at the petitioner's residence or residence of any child who is the subject of the order, even if invited to do so by the petitioner or any other person. In no event is the order for protection voided.**

**Pursuant to 18 U.S.C. 2265, this order for protection shall be given full faith and credit in any other state or tribal land and shall be enforced as if it were an order issued in that state or tribal land.**

**Pursuant to 18 U.S.C. 922(g), once a respondent has received notice of this order and an opportunity to be heard, it is a federal violation to purchase, receive or possess a firearm while subject to this order if the protected person is:**

*None of* **(A) The respondent's current or former spouse;**

*these apply* **(B) A current or former person with whom the respondent resided while in an intimate**
*what are the* **relationship; or,**

*grounds?* **(C) A person with whom the respondent has a child.**

**Interstate violation of this order may subject the respondent to federal criminal penalties under 18 U.S.C. 2261 and 18 U.S.C. 2262.**

*There are no legal grounds.*

OJA-PO-0113    Approved 07/2002
Rev. by Ind. Office Ct. Serv.  07/2019



# What can I do when someone filed a false protection order, they lied/ perjured themself in the complaint/order? Can I sue for harassment?

Answer | Follow [30] | Request | Details | More

Ad by AI Equity Trader



**Nasdaq: Mynz Unleashes AI Power for Advanced Cancer Detection.**

The healthcare sector is eagerly awaiting Mynz's upcoming FDA trials.

Learn More

All related (44) ⌄ | Recommended ⌄



⬛⬛⬛⬛ · Follow ✕
Has been married and divorced · 5y

People who make up completely bogus restraining orders are *never* prosecuted for perjury, even if the narrative is definitively proven to be utterly impossible.



⬆ Upvote · 66   ⬇   💬 22   ↻ 4   •••



**Brian Miller** · Follow
Has been married and divorced · 5y

People who make up completely bogus restraining orders are *never* prosecuted for perjury, even if the narrative is definitively proven to be utterly impossible.

This is because the family courts do not want to discourage actually abused women from successfully fleeing their abusers. Better safe than sorry after all. And if that means some innocent people have their freedom taken away and rot in jail for a while, maybe lose jobs and the right to keep and bear arms, too bad. Society is "better" when women get the latitude to subvert the justice system at will.

Seriously it all depends on the jurisdiction, and particularly the judge or magistrate. In my case, my ex wife's story was complete and total fiction, a lurid tale of kidnapping, torture, rape, abuse, stalking, threatening, all with zero actual evidence. It was thrown out because the accusations were too old, and didn't fit into the paradigm of "immediate" harm. It was denied, thank God.

However, appeals for court costs and attorney fees were denied, and her story was deemed "credible." That way, the magistrate could help her avoid the consequences of perjury. It sure opened my eyes to how evil people can be, and how easy it is for brilliant (but disturbed) individuals to subvert the very





of kidnapping, torture, rape, abuse, stalking, threatening, all with zero actual evidence. It was thrown out because the accusations were too old, and didn't fit into the paradigm of "immediate" harm. It was denied, thank God.

However, appeals for court costs and attorney fees were denied, and her story was deemed "credible." That way, the magistrate could help her avoid the consequences of perjury. It sure opened my eyes to how evil people can be, and how easy it is for brilliant (but disturbed) individuals to subvert the very institutions that are designed to protect the actually innocent. ████████ almost got away with it too.

Yes you can attempt to sue for harassment, you can sue for anything in the U.S. Just because you feel harassed doesn't mean you will win that case.

I think if I had it to do over again and the time had not yet elapsed, I'd take the transcript to the supreme court in that state for some kind of judicial review. But at that point I was completely sick of the stress involved in proving my innocence. After all, I had undeniable proof that her claims were completely false.



51.8K views · View 66 upvotes · View 4 shares

⤒ Upvote · 66   ⤓    💬 22   🔄 4        •••









Your account might still be at risk

You've already changed your password, but you should review your account for unfamiliar changes

**Security Checkup**

Critical issues found

Recent security activity

Critical security alert

12:05 PM    Someone tried to change sign in

**Yorktown Police Property**

Case # 2023-05451

PE #: 053

Item # 9

Date: 06/28/2023

Victim: Jon F Turpin

Suspect:

Description: 1) Gray & Black Sentry Safe w/painting, cut gun lock x2, power cord, white stuffed animal, xtreme garage door opener, Brinks cut locks x3, Dell power supply, Scandisk, team group, Hard drive, Samsung smart phone & misc. papers (approx. 600-700 pages□□□□□□□□□

# Yorktown Police Department
### 9312 W Smith St/PO Box 518, Yorktown, IN 47396
### Phone (765) 759-7760 Fax (765) 759-4008

Chief of Police
Kurt Walthour

I Jon F Turpin have willingly handed the items listed on the attached document over to the Yorktown Police Department for potential future evidence.

Signature _____

Date _____

# Yorktown Police Department
## Yorktown, Indiana
### (765)-759-7760

## Receipt for Return of Property
### CR# 2023-05451

The following items of property are now being returned to the person listed below. These items are no longer needed by the Yorktown Police Department or to be physically present during an investigation or possible investigation, or never were needed but simply placed in our control as a measure of caution, request or found property.

Person taking possession of items:

| |
|---|
| Name: Jon F Turpin |
| OLN/ID# or DOB: 04-05-1990 |
| Address: 2421 S Plum/Yorktown, IN 47896 |
| Phone: 225-259-6270 |

(Attach copy of ID and  Supplement if further details are needed)

Items:
1. (1) Gray & Black Sentry Safe w/painting, cut gun lock x2, power cord, white stuffed animal, Brinks cut locks x3, Dell power supply Scandisk, misc. papers (approx. 600-700 pages) and Samsung smart phone.

2. Click here to enter text.

3. Click here to enter text.

4. Click here to enter text.

Officer or Administrator returning items: _____

Signature of Person taking possession: _____

Date: 2/19/2023      Time: 2:22 PM

5.  Click here to enter text.

6.  Click here to enter text.

7.  Click here to enter text.

8.  Click here to enter text.

9.  Click here to enter text.

10.  Click here to enter text.

11.  Click here to enter text.

12.  Click here to enter text.

13.  Click here to enter text.

14.  Click here to enter text.

15.  Click here to enter text.

16.  Click here to enter text.

17.  Click here to enter text.

18.  Click here to enter text.

19.  Click here to enter text.



WASHINGTON COUNTY SHERIFF'S OFFICE

Hillsboro, Oregon

Abandonment of Property Form

I, _Alan F. Fregoire_ voluntarily relinquish the following property to the Washington County Office for destruction:

PA# OLN-0310-09-8538

| Item of Evidence | Serial Number (if applicable) | Quantity of Items Abandoned |
|---|---|---|
| Smith & W .38 Rev. | 058581 | (1) |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

_____   _12-28-21_
Signature                    Date

_____  my commission expires:  _2-17-2022_
Notary Public                                        (mm/dd/yyyy)



# UNITED STATES DISTRICT COURT
## Southern District of Indiana

### Roger A.G., Clerk of Court

| Birch Bayh Federal Building | U.S. Courthouse, Room 104 | Winfield K. Denton Federal Building | Lee H. Hamilton Federal Building |
|---|---|---|---|
| & U.S. Courthouse, Room 105 | 921 Ohio Street | & U. S. Courthouse, Room 304 | & U.S. Courthouse, Room 210 |
| 46 East Ohio Street | Terre Haute, IN 47807 | 101 NW Martin Luther King Blvd. | 121 West Spring Street |
| Indianapolis, IN  46204 | (812) 231-1840 | Evansville, IN 47708 | New Albany, IN 47150 |
| (317) 229-3700 | | (812) 434-6410 | (812) 542-4510 |

August 1, 2023

Jon F. Turpin
2421 S. Plum St.
Yorktown, IN 47396

Mr. Turpin:

We are returning the enclosed check as no fees are due in this case. We have filed your Motion for Release of Affidavit for Troy Davis and the court will rule in due course.

Sincerely,

United States District Court for the Southern District of Indiana

OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA



302 W. WASHINGTON ST. 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

# TODD ROKITA
## ATTORNEY GENERAL

July 7, 2023

Mr. Jon Turpin
2421 S. Plum St.
Yorktown, IN 47936

Dear Mr. Turpin,

This week we received both the U.S. Mint coin of President Theodore Roosevelt and your handgun license in the mail. While the coin was a very thoughtful gift, we are unfortunately unable to accept. Indiana Code prevents state employees from accepting gifts or favors from their constituents.

Also enclosed is your State of Indiana license to carry handgun. We recommend you retain this document for your personal records. If you have any questions about the license, please contact the Firearms Division of the Indiana State Police at (317) 232-8264 with your questions.

Please let us know if we can be of assistance in the future.

Sincerely,

Constituent Services
Office of Indiana Attorney General Todd Rokita

cs/hm

**STATE OF INDIANA**
**OFFICE OF ADMINISTRATIVE LAW PROCEEDINGS**

**FINAL AGENCY AUTHORITY: Indiana State Police**

| | |
|---|---|
| IN THE MATTER OF THE LICENSE | ) Cause No: ISP – 2303-000947 |
| | ) |
| TO CARRY A HANDGUN OF | ) FCN 2321072 |
| | ) |
| JON TURPIN | ) Decision Date: June 29, 2023 |

## NON-FINAL ORDER FOR REINSTATEMENT OF LICENSE

An administrative hearing was scheduled pursuant to the Indiana Administrative Orders and Procedures (I.C. 4-21.5) and the Uniform Firearms Act (I.C. 35-47) concerning Petitioner's firearms license under IC 35-47. The hearing was set at Indiana Government Center North, 100 North Senate Avenue Room 302, Indianapolis, Indiana to address the Indiana State Police's allegation that JON TURPIN is not a proper person to be licensed. Notice of the hearing was by US Postal Service.

Pursuant to the request of JON TURPIN , and agreed to by the Indiana State Police, the Hearing in this matter was cancelled. JON TURPIN requested the waive their right to hearing and agreed that their license would be reinstated.

**NON- FINAL ORDER:**

By reason of the findings above, the Administrative Law Judge determines that JON TURPIN's firearms license be reinstated.

In accordance with I.C. 4-15-10.5-12(b), the OALP's Order is non-final and is subject to the review and approval of the superintendent of the Indiana State Police per a MOU dated July 1, 2020. Pursuant IC 4-21.5-3-29, a party may file an objection to this recommended order within 15 days after the party is served with Non-Final order and must file the objection with the ultimate authority by contacting ISPFirearmsHearings@isp.IN.gov.

/S/ *Trudy L. Selvia*

Honorable Trudy L. Selvia, Administrative Law Judge
Indiana Office of Administrative Law Proceedings

Distribution:
JON TURPIN, by U.S. Postal Service.
Indiana State Police, by electronic service on the attorney of record.
Superintendent of State Police, Ultimate Authority, by electronic service on Kim Cross.

The below documentation is to be used by the Indiana State Police. If this documentation is blank, then a final decision has not yet been made.

## INDIANA STATE POLICE
## ULTIMATE AUTHORITY DECISION

The Superintendent of the Indiana State Police, the Ultimate Authority on this matter, has reviewed the above Non-Final Order and now decides to Choose an item, the Non-Final Order made by the Administrative Law Judge.

**IT IS THEREFORE ORDERED AND DIRECTED** by the Superintendent of the Indiana State Police that the license to carry a handgun of JON TURPIN is hereby Choose an item.

### THIS IS A FINAL ORDER.

**APPEAL RIGHTS:**

This final order by the Superintendent of the Indiana State Police may be appealed. You have the right to file a Petition for Judicial Review (appeal) under Indiana Code 4-21.5-5, et seq..

Pursuant to Indiana Code 4-21.5-5-5, **you have thirty (30) days after the receipt of this notice to file a Petition for Judicial Review.** You must file your Petition for Judicial review in the correct place (this is called "venue"). The correct venue is determined by Indiana Code 4-21.5-5-6.

So ORDERED: Click or tap to enter a date.

_____
[illegible] Carter
Superintendent of the Indiana State Police

8415 N. Senate Ave, Rm. N302, Indianapolis, IN 46204                    Page 2 of 2
[illegible]@isp.in.gov / (317) 234-6889



**IMPD**

||||||||||||||||||||||||||||

S#: DP16144110 4

NDIANA LICENSE TO CARRY HANDGU

Jon Turpin

| STATE OF INDIANA | ) | IN THE MARION COUNTY SUPERIOR COURTS |
| | )SS: | CRIMINAL DIVISION, COURTROOM 6 |
| COUNTY OF MARION | ) | CAUSE NO.: 49G06-1012-FS-046744 |

| STATE OF INDIANA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JON TURPIN, | ) |
| Defendant. | ) |

**F I L E D**

May 17, 2018

CLERK OF THE COURT
MARION COUNTY
DA

## ORDER DIRECTING RETURN OF PERSONAL PROPERTY

Comes now defendant, Jon Turpin, by counsel, Tom F. Hirschauer III of Keffer Barnhart LLP, moves the Court for an order directing the return of property seized from defendant at the time of his arrest. The Court, being duly advised, now **GRANTS** said motion and **ORDERS** the return of Jon Turpin's personal property, including his firearm. The Court **ORDERS** the return of Jon Turpin's personal property, including his firearm, to be given to Jon Brent Turpin, his father, (DLN: XXXX-XX-3602, DOB: 10/23/1956, located at 522 West Maple Street, Cambridge City, Indiana 47327)(SEE CONFIDENTIAL FORM).

**May 16, 2018**

So ORDERED, this _____ day of _____, 201___

Dated _____

Judge, Marion County Superior Court 6

Distribution:

Marion County Prosecutor's Office          * Copy in Marion County Prosecutor's Office mailbox 5-17-18
251 East Ohio Street, Suite 160
Indianapolis, Indiana 46204

Tom F. Hirschauer III
Keffer Barnhart LLP
230 East Ohio Street, Suite 400
Indianapolis, Indiana 46204          E-mailed on 5-17-18

Petition Number: 2023053011263517

*committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies):*

    b. _____ the Respondent has committed stalking against me.

    c. _____ the Respondent has committed a sex offense against me.

    d. ✓ the Respondent has committed repeated acts of harassment against me.

3. How old is the Respondent? __33__ years old

4. Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent.

| Case Name | Case Number | County & State |
|---|---|---|
| State of IN v. Jon Turpin | 49G06-1612-F5-046714 | Marion, IN |

5. This case is filed in this county because:

    a. the Respondent lives in this county.

    ✓ b. the incident(s) of domestic or family violence, stalking, sex offense, or harassment happened in this county.

    ✓ c. I live in this county.

6. If you are not represented by an attorney, fill in your public mailing address.

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at confidential@atg.state.in.us to get information on how to participate in that program.

7. The Respondent has committed the following act(s) of domestic or family violence, stalking, a sex offense, or harassment (*Check those which apply*):

    a. the Respondent attempted to cause physical harm to me;

    ✓ b. the Respondent threatened to cause physical harm to me;

    c. the Respondent did cause physical harm to me;

    ✓ d. the Respondent placed me in fear of physical harm;

    e. the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

    f. the Respondent committed stalking against me;

    g. the Respondent committed a sex offense against me;

    h. the Respondent committed an act of animal cruelty by beating, torturing, mutilating, or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass, or terrorize a family or household member.

    ✓ i. the Respondent committed repeated acts of harassment against me.

CIVPO-0100 Approved 07/02
Revised Ind Office of Serv 07/19

Petition Number: P202305301126351?

*committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies):*

b. _____ the Respondent has committed stalking against me.

c. _____ the Respondent has committed a sex offense against me.

d. __✓__ the Respondent has committed repeated acts of harassment against me.

3. How old is the Respondent? __33__ years old

4. Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent

| Case Name | Case Number | County & State |
|---|---|---|
| State of IN v. [illegible] | 49G06-1612-F5-046714 | Marion, IN |

5. This case is filed in this county because:

_____ a. the Respondent lives in this county.

__✓__ b. the incident of domestic or family violence, stalking, sex offense, or harassment happened in this county.

__✓__ c. I live in this county.

6. If you are not represented by an attorney, fill in your public mailing address:

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at: confidential@atg.state.in.us to get information on how to participate in that program.

7. The Respondent has committed the following act(s) of domestic or family violence, stalking, a sex offense, or harassment *(Check those which apply):* *

_____ a. the Respondent attempted to cause physical harm to me;

__✓__ b. the Respondent threatened to cause physical harm to me;

_____ c. the Respondent did cause physical harm to me;

__✓__ d. the Respondent placed me in fear of physical harm;

_____ e. the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

_____ f. the Respondent committed stalking against me;

_____ g. the Respondent committed a sex offense against me;

_____ h. the Respondent committed an act of animal cruelty by beating, torturing, mutilating, or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass or terrorize a family or household member.

_____ i. the Respondent has committed repeated acts of harassment against me.

2

7/20/23, 6:08 AM                                    Gmail - Shiba Inu and DeFi Token Scams - Help

 Gmail                                             Jon F Turpin <jt4590@gmail.com>

---

## Shiba Inu and DeFi Token Scams - Help
3 messages

                                                                    Tue, Jun 15, 2021 at 3:36 PM
**Jon F. Turpin** <jt4590@gmail.com>
To: InfraGardTeam@fbi.gov

Hi,
I'm contacting you because I cannot remember my username and I need to report what I believe to be a huge financial
crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring.
I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find
me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be
named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've
never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this
will be immediately passed over to the FBI to investigate.


Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting
scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please
spread awareness before more people are taken for all they have.


Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

---

                                                                    Tue, Jun 15, 2021 at 3:50 PM
**Jon F. Turpin** <jt4590@gmail.com>
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Hi Joseph,
I'm contacting you because I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring.
I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find
me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be
named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've
never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this
will be immediately passed over to the FBI to investigate.          \

7/20/23, 6:08 AM                                    Gmail - Shiba Inu and DeFi Token Scams - Help

Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please spread awareness before more people are taken for all they have.

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

---

Jon F. Turpin <jt4590@gmail.com>                                         Sun, Jul 2, 2023 at 2:59 AM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

The majority of times I've reported anything: My Dad's abuse, Michael's abuse, the abuse of me at the school which they didn't help stop, but instead, attempted to use me as collateral in and "put me down" as gay, my report of the unconstitutional Revocable Trust that has been used to falsely, against my civil rights, classify me as a dependent:

All have been attempts to ensure I'd never have a family, nor inherit, and now that I've reported the crypto scam, and potential child porn by Jared Junkin, and Michael Mann, there have been further, persistent attempts to destroy me, my wife, our marriage, our home, and even our ability to exist, and it still continues, with me properly reporting out of genuine concern, and enduring the same situation I had to endure as a child in the Western Wayne School Systems, without, so far, justice.

I've identified the "bad apples" and have done so by researching and pointing out a pattern, so, why will no one collect the evidence I've provided, and/or attempted to provide from the start, without attempting to continuously force me under the tyranny of my Dad, who has treated me as collateral to use for court cases instead of as a son?

Why, as the actual victim, who still loves our state of Indiana, and even denied taking a settlement from Western Wayne School Systems, and instead asked them then to "keep your money and just make this School a better place for kids so this doesn't happen again" am I still allowed to be abused?

I don't blame our government, nor our state, nor our Indiana Bar Association, nor our lawyers, nor our ISP, nor our STK, nor the government agencies with good people that do their best every day, nor my family, friends, nor even my former employers for being "duped" by these persons.

But I do say these persons are the issue here, and I am disappointed that, even now that they have proven their pattern of bad behaviors, that it may be allowed to continue, with not only me, but my wife losing everything just to even be heard.

They even threatened us with this destitution and loss of employment, and they always follow through, or attempt to, and they've threatened us with either complete and utter loss of rights and character and family, and/or death.

Now there are accusations to the DHS that we are threats to society, or that I'm a potentially gun violent person (one of the only ways to invalidate a valid expungement and attempt to force a false eviction from a home we purchased, which will be yet another attempt to prevent us from home ownership in our state of Indiana, and would allow my Dad to excise me from inheritance, and divorce my mom, as he threatened to do, while blaming me).

When that didn't/doesn't work, then the claims become that we must be mentally unfit, or potentially drug addicts, which is just incorrect and untrue.

7/20/23, 6:08 AM
Gmail - Shiba Inu and DeFi Token Scams - Help

Mr. Rokita, I wouldn't care what they said about me if it hadn't already been used in such a way to damage my character irreparably without a full pardon, and if it hadn't already been used to damage my jobs repeatedly, and even my career, and most importantly, if it hadn't been used to hurt and attempt to continue to hurt my wife, and our marriage without justice.

I truly don't care about my reputation, but this has damaged my character, and Faith alongside character make the foundation on which a man builds a life with his wife, and protects his family and children.

They have no right to my Faith, nor my wife, nor my character, nor my independence, and further they have no right to destroy my life and my wife's life simply because they cannot carry their own false reputations, cannot view themselves honestly in the mirror, and cannot sleep with their own guilty consciences for their sins.

With that in mind, would you ever allow this to happen to your wife and children, even if some of the persons perpetrating it claimed they were your Dad, or claimed they were your friends? Their actions speak otherwise to me.

My Dad even contacted our priest from states away and tried to claim I was incompetent and unfit to be married, against the opinion of our qualified priest.


For independence day, I pray for true independence, and for justice, and I've already asked Jesus, Mary, and God, and I have Faith in them, and now I'm asking you.


Sincerely,
Jon F. D. Turpin

———— Forwarded message ————
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Tue, Jun 15, 2021, 3:50 PM
Subject: Fwd: Shiba Inu and DeFi Token Scams - Help
To: SA Joseph L. Chaney <jlchaney@fbi.gov>


Hi Joseph,
I'm contacting you because I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring. I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this will be immediately passed over to the FBI to investigate.


Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please spread awareness before more people are taken for all they have.

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI

AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

7/20/23, 6:05 AM                                          Gmail - InfraGard Account - Dormant Status

 **Gmail**                                          Jon F Turpin <jt4590@gmail.com>

## InfraGard Account - Dormant Status

2 messages

---

**Joseph Chaney** <jlchaney@fbi.gov>                          Tue, Mar 22, 2022 at 3:01 PM

**Good Afternoon,**

With the increase of potential cyber threats related to the Russia-Ukraine war, it is important for cybersecurity professionals to stay informed. If you are receiving this email, you are listed as a <u>dormant</u> InfraGard member. Dormant members are those whom have not logged-in to the portal for over one year. Dormant members DO NOT received network broadcast emails from InfraGard National or the local InfraGard Chapter. If you have trouble logging in to the portal, please contact the InfraGard helpdesk at InfraGardTeam@fbi.gov for assistance to re-establish your login credentials. We encourage you to re-establish your InfraGard Secure Portal Account and encourage you to review DHS CISA's Shield's Up public web site at https://www.cisa.gov/shields-up and the FBI's public facing web site at www.IC3.gov for additional public intelligence and cyber security practices.

**Thank You,**

**Joseph L. Chaney**

**Special Agent, FBI Indianapolis**

**Private Sector Coordinator, InfraGard Coordinator**

**Imminent Threat or Crime in Progress – call 911**

Reporting Computer Intrusions (Including Ransomware) – www.ic3.gov or 1-800-callFBI

Business Email Compromise – www.ic3.gov & **contact your financial institution immediately**

State of Indiana -Indiana Cyber Hub : **www.in.gov/cybersecurity/report-a-cyber-crime/.**

---

**Joseph Chaney** <jlchaney@fbi.gov>                          Tue, Mar 22, 2022 at 3:09 PM

Good Afternoon,

Despite my best efforts to manually filter through the membership roster, a few Active InfraGard members were captured in this email, so I do apologize if you received this message in error.  However,  a good time to make sure your InfraGard login credentials still work.

Thanks!

[Quoted text hidden]

7/20/23, 6:07 AM          Gmail - FBI InfraGard Portal | Username & Credentials

 **Gmail**

Jon F Turpin <jt4590@gmail.com>

## FBI InfraGard Portal | Username & Credentials
1 message

**jt4590@gmail.com** <jt4590@gmail.com>
To: InfraGardTeam@fbi.gov
Cc: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Mon, Jun 26, 2023 at 12:57 AM

Dear FBI InfraGard,
My name is Jon F. D. Turpin, and I've recertified as requested and need to reestablish my credentials with the FBI
InfraGard for appropriate login.
There are ongoing attempts by those I've reported to infiltrate our personal information, accounts, and identities, so it is
imperative I reach out:
Accounts of mine have been hacked and I've been "doxxed" after successfully reporting a major cryptocurrency scam, so
my username may need updated, along with a password reset.

Would you please contact me directly at jt4590@gmail.com, or via phone at 225-259-6270, and/or provide me with the
appropriate number to call in this situation?

Thank you for your assistance,
Jon F. D. Turpin
FBI InfraGard
225-259-6270
jt4590@gmail.com

---------- Forwarded message ----------
From: "Jon F. Turpin" <jt4590@gmail.com>
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>
Cc:
Bcc:
Date: Tue, 15 Jun 2021 15:50:06 -0400
Subject: Fwd: Shiba Inu and DeFi Token Scams - Help

Hi Joseph,
I'm contacting you because I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring.
I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find
me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be
named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've
never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this
will be immediately passed over to the FBI to investigate.

Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting
scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please
spread awareness before more people are taken for all they have.

7/20/23, 6:07 AM                          Gmail - FB4mtGard Portal | Username & Credentials

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

---

**Fwd: Shiba Inu and DeFi Token Scams - Help.eml**
6K

7/20/23, 6:07 AM

Gmail - This is What They Are Abusing and Attempting

 **Gmail**

Jon F Turpin <jt4590@gmail.com>

## This is What They Are Abusing and Attempting

1 message

**jt4590@gmail.com** <jt4590@gmail.com>
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Mon, Jun 26, 2023 at 1:21 AM

This correlates directly with some of the threats that were made towards me and my wife and shows the motivation behind the current abuse of the court system in attempts to falsely accuse and destroy us completely.

The bad actors have abused our government all the way to the Department of Homeland Security, and our court system, in successful attempts to wrongfully terminate me repeatedly, wrongfully charge us, and evict us.

Situations such as the one we're currently presented with, which I unfortunately predicted would happen, because persons with behaviors such as those I've identified are predictable, are why it's imperative I receive a pardon.

Not only was the original conviction wrongful and forced upon me via unconstitutional use of a Revocable Trust to falsely claim me as a dependent and further abuse and neglect. Expungement has been utilized by the same bad actors, not by our government, to falsely identify me as a threat to society when I'm attempting to turn over required evidence to prevent future corruption of this nature, which is on an unprecedented scale, from continuing.

By journaling, documenting, researching, and understanding our history, legacy, and to some degree out of necessity our legal system, I've been able to identify and "pull back the curtain" on the motivations behind these attacks.

Unfortunately, even when I do this, the bad actors further pretend that I'm a problem for simply destroying their illusion and presenting their, in my opinion once shown, obvious end goals, which I can only describe as dire hatred.

Hatred towards us for merely existing and attempting through all odds to continue to exist, safely, with the rights to protect ourselves and continue our life, liberty, and pursuit of happiness, as our forefathers intended.

Judge Mark D. Stoner needs to be contacted by the FBI about this, and we, in my opinion, should be considered key witnesses in, my assumed unqualified but potentially qualified opinion, a top-priority indictment of bad actors.

3.    The Indiana State Police Central Repository for Criminal History information is ordered to seal Petitioner's expunged records relating to Cause No. 49G06-1612-F5-046714. Records sealed may be disclosed only to:

A.    A prosecuting attorney if authorized by court order and needed to carry out the official duties of the prosecuting attorney;

B.    A defense attorney, if authorized by a court order and needed to carry out the professional duties of the defense attorney;

C.    A probation department, if authorized by a court order and necessary to prepare a presentence report;

D.    The Federal Bureau of Investigation and the Department of Homeland Security, if disclosure is required to comply with an agreement as to the sharing of criminal history information;

E.    The Indiana Supreme Court, members, the executive directors or employees of the Indiana State Board of Law Examiners in accordance with rules adopted by the such board for determining whether an applicant possesses the necessary good moral character for admission to the bar and

F.    A person required to access expunged records to comply with the Secure and Fair Enforcement of Mortgage Licensing Act (12 U.S.C. 5101 et seq.) or regulations adopted under such act.

Signed Expungement Order - Turpin.pdf
241K

7/14/23, 10:45 PM                                                Gmail - FBI VCC & NCOP Swatting

                                             Jon F Turpin <jt4590@gmail.com>

## FBI VCC & NCOP Swatting
4 messages

**Jon F. Turpin** <jt4590@gmail.com>                             Fri, Jun 30, 2023 at 12:14 PM
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Dear Mr Chaney,
After what we've experienced over the last two years at the hands of a few individuals, and the unfortunate, in my opinion,
waste of government resources by potetial repeated attempts of these individuals to:

1. Classify me falsely as someone who is "gun violent."

2. Classify my wife falsely as "mentally unsound" and or an "abusive spouse."

3. Destroy via fictitious and fractious abuse of our thin blue line, legal system, department of homeland security, and other
esteemed governmental agencies:
Our character, careers, livelihood, savings, freedom of speech, and most importantly, our marriage, health, civil rights,
peace of mind, and ability to have a family and pets.

Potentially as attempts to vicariously carry out their prior expressed threats upon us, simply for reporting out of concern
for our safety, and for necessary "whistle blowing," but most unfortunately, potentially for the expressed enjoyment of
these individuals to not only watch us suffer but cause us to "suffer lol," in the words of a man now attempting to abuse
our court systems...

It is my sincere opinion that there was an active attempt by these, in my opinion, "bad actors" to "swat" us, and I thank
you and our FBI for creating the NCOP within our VCC to combat this potentially dangerous bad behavior in our nation.

Would you please review, and include me, and my wife, Jon F. Turpin, and Erin R. Golden, appropriately as victims of
potential swatting in our national swatting database in an effort to keep us safe from further harms and/or attempts by bad
actors to abuse not only us, but our thin blue line and governmental agencies and resources?


Thank you sincerely,
Jon F. Turpin & Erin R. Golden
225-259-6270 & 225-432-5574
jt4590@gmail.com & erin465336@gmail.com
2421 S. Plum St. Yorktown, IN 47396

**Jon F. Turpin** <jt4590@gmail.com>                             Fri, Jun 30, 2023 at 4:56 PM
To: Legal <legal@kirkfreemanlaw.com>

Request to be added to the FBI's VCC NCOP Database as victims of "swatting," due to recent events where Michael A.
M. Holwager may have attempted to wrongfully classify me as someone who is "gun violent" and/or as an active shooter.
https://abcnews.go.com/US/fbi-creates-national-database-track-swatting/story?id=100527427

Best Regards,
**Jon F. Turpin**
E-mail: jt4590@gmail.com

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley
[Quoted text hidden]

**Jon F. Turpin** <jt4590@gmail.com>                             Fri, Jun 30, 2023 at 5:04 PM
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Gmail - FBI VCC & NCOP Swatting

Messages sent by Michael A. M. Holwager with statements regarding me, "JT" and "gun violence."



**Jon F. Turpin**
E-mail: jt4590@gmail.com

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

[Quoted text hidden]

---

**Jon F. Turpin <jt4590@gmail.com>**                                    Fri, Jun 30, 2023 at 5:05 PM
To: Legal <legal@kirkfreemanlaw.com>

Messages sent by Michael A. M. Holwager with statements regarding me, "JT" and "gun violence."

2



Welfare Checks

Turned off Facebook May 28th
Welfare Check #1 May 29th
Welfare Check #2 Jun 1st

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Your FBI Assessment Account

**fbi_support@panpowered.com** <fbi_support@panpowered.com>
Reply-To: fbi_support@panpowered.com
To: jt4590@gmail.com

Tue, Nov 14, 2023 at 7:33 PM

Dear Jon,

Thank you for registering your new FBI assessment account. To access the assessment scheduling website, click below or paste the URL into your Internet browser. You will enter the Login ID and Password that you just created to log in to the site.

https://secure.vitapowered.com/fbi/login

Your Login ID is: Throfinnr

For security reasons, we cannot display your Password. If you have forgotten your Password, please use the "Forgot Your Password?" link in the upper right corner of the web page listed above.

If you have any problems accessing the URL above, please email fbi_support@panpowered.com.

**\*REASONABLE ACCOMMODATIONS FOR INDIVIDUALS WITH DISABILITIES:** The FBI provides reasonable accommodations to qualified applicants with disabilities. If you need a reasonable accommodation, please check the reasonable accommodation box in this system to request an accommodation for this test.  Additionally, please be advised applicants will need to submit a new request for a reasonable accommodation for each phase of the process. The Reasonable Accommodation Program will conduct an individualized assessment of each request during each stage of the process.

Thank you,
Federal Bureau of Investigation
Human Resources Division (HRD)
New Agent/Analyst Testing and Selection Unit (NAATSU)

 Gmail                                                    Jon F Turpin <jt4590@gmail.com>

## FBI Assessment Reasonable Accommodation Request

2 messages

**fbi_support@panpowered.com** <fbi_support@panpowered.com>          Tue, Nov 14, 2023 at 7:42 PM
Reply-To: fbi_support@panpowered.com
To: jt4590@gmail.com

Dear Jon,

You have requested the following accommodation for the assessment process:

Approved Breaks

In order to process your request, you will be required to submit supporting documentation.

The amount and types of information that may be sufficient to document your need depends on the nature or your impairment. Relevant documentation may include:

- A general overview of the disability or impairment.
- Information on how the disability or impairment would affect performance on the assessment. The assessment information package describes the assessment. To view the assessment information package, click on the link in your online assessment account.
- Current documentation supporting the existence of a disability from a bona fide source (for example, licensed professional, state department of rehabilitation, approved agency).
- Information on how the disability or impairment limits you physically or mentally.

**If you listed a reason that requires review, you will receive an email within five (5) business days with further instructions on how to submit your documentation. Your expiration date will automatically be extended while you are going through the reasonable accommodation process.**

**If your request was sent due to a scheduling conflict or military obligation, please withdraw your reasonable accommodation request and contact your Applicant Coordinator to discuss your testing options.** To see a list of field offices and their contact numbers, please visit www.FBI.gov.

Privacy Act Statement: Your information will be used to make reasonable accommodation decisions. Collection is authorized by 39 U.S.C. 401, 410, 1001, 1005, and 1206.

Please note that while provision of this information is voluntary, if it is not provided, your accommodation request will be denied. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Federal Bureau of Investigation (FBI) or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with FBI; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel. For more information regarding our privacy policies visit us at fbi.gov.

Please keep the following Phase I policies in mind:

- Two (2) Phase I failures will result in permanent disqualification from the SA position.  Failures prior to November 19, 2017 do not count towards this total.
- Two (2) failed attempts to attend a scheduled Phase I test may result in disqualification from the SA position.
- Two (2) expired Phase I invitations may result in disqualification from the SA position.

Respectfully,

Federal Bureau of Investigation
Office of Equal Employment Opportunity Affairs

---

**fbi_support@panpowered.com** <fbi_support@panpowered.com>                Tue, Nov 14, 2023 at 7:42 PM
Reply-To: fbi_support@panpowered.com
To: jt4590@gmail.com

Dear Jon,

You have requested the following accommodation for the assessment process:

50% Time Extension

In order to process your request, you will be required to submit supporting documentation.

The amount and types of information that may be sufficient to document your need depends on the nature or your impairment. Relevant documentation may include:

- A general overview of the disability or impairment.
- Information on how the disability or impairment would affect performance on the assessment. The assessment information package describes the assessment. To view the assessment information package, click on the link in your online assessment account.
- Current documentation supporting the existence of a disability from a bona fide source (for example, licensed professional, state department of rehabilitation, approved agency).
- Information on how the disability or impairment limits you physically or mentally.

**If you listed a reason that requires review, you will receive an email within five (5) business days with further instructions on how to submit your documentation. Your expiration date will automatically be extended while you are going through the reasonable accommodation process.**

**If your request was sent due to a scheduling conflict or military obligation, please withdraw your reasonable accommodation request and contact your Applicant Coordinator to discuss your testing options.** To see a list of field offices and their contact numbers, please visit www.FBI.gov.

Privacy Act Statement: Your information will be used to make reasonable accommodation decisions. Collection is authorized by 39 U.S.C. 401, 410, 1001, 1005, and 1206.

Please note that while provision of this information is voluntary, if it is not provided, your accommodation request will be denied. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Federal Bureau of Investigation (FBI) or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with FBI; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel. For more information regarding our privacy policies visit us at fbi.gov.

Please keep the following Phase I policies in mind:

- Two (2) Phase I failures will result in permanent disqualification from the SA position.  Failures prior to November 19, 2017 do not count towards this total.
- Two (2) failed attempts to attend a scheduled Phase I test may result in disqualification from the SA position.
- Two (2) expired Phase I invitations may result in disqualification from the SA position.

Respectfully,

Federal Bureau of Investigation
Office of Equal Employment Opportunity Affairs

 **Gmail**

Jon F Turpin <jt4590@gmail.com>

---

## Reasonable Accommodation Request Received | OEEOA
1 message

---

**REASONABLE_ACCOMMODA@FBI.GOV** <REASONABLE_ACCOMMODA@fbi.gov>
Reply-To: "REASONABLE_ACCOMMODA@FBI.GOV" <REASONABLE_ACCOMMODA@fbi.gov>
To: "jt4590@gmail.com" <jt4590@gmail.com>
Cc: "REASONABLE_ACCOMMODA@FBI.GOV" <REASONABLE_ACCOMMODA@fbi.gov>

Wed, Nov 15, 2023 at 5:33 AM

---

Thank you for initiating an accommodation request with the Office of Equal Employment Opportunity Affairs' (OEEOA) Reasonable Accommodation (RA) Program and considering this office's services in potentially recommending your request for an accommodation. A follow-up email will be sent within the next 1 - 3 business days identifying your assigned Reasonable Accommodation Program Coordinator (RAPC).

**Please be advised** that due to unusually high volumes of requests, processing times are longer than normal. The Reasonable Accommodation Program appreciates your patience as we work to respond to inquiries, requests, and communications in a timely manner. Outside of these processes, we are currently unable to provide individual request status updates. Additionally, we ask that you not overwhelm our program with duplicate requests for the same accommodation. Thank you for your understanding.

**Office of Equal Employment Opportunity Affairs**

**May some of my childhood behaviors fit autism spectrum disorder?**

# EAST CENTRAL SPECIAL SERVICES DIST.

Waterloo Diagnostic Center
3440 E. Co. Rd. 250 North
Connersville, IN 47331-9123                                    1-800-382-6908

Jon & Linda Turpin

Cambridge City, Indiana 47327

02/09/2001

RE: Jon Turpin

Dear Mr. and Mrs. Turpin,

Your child has been referred to me by the school to complete an evaluation to determine whether he is eligible for special education services. I am planning on evaluating him as soon as possible.

---Please complete the enclosed behavior rating scale.
---Please respond to questions as you have observed the behavior at home.
---Please do not leave any questions on the rating scale blank.
---Please do not tear open the rating scale.
---Please return the form to me in the envelope provided.

If you would like some assistance with completing this form or have questions regarding this matter, do not hesitate to contact me at (800) 382-6908. Thank you for your time.

Sincerely,

Lara L

Enclosure--BASC                          Lara L. A          Ed.S.
                                          School Psychologist

**SERVING...**
Centerville – Abington Community School Corporation – Fayette County School Corporation
Franklin County Community School Corporation – Northeastern Wayne School Corporation
Rush County Schools – Union County College Corner Joint School District – Western Wayne Schools

## OBSERVATION REPORT

Student: J. T. Turpin        DOB: 4-5-90        Grade: 5        Teacher: Mrs.
School: Western Wayne Elementary  Date: 3-20-01        Observer: Gena S

J. T. was observed during a portion of Channel 1 and snack time in Mrs.
from 11:00 to 11:20 a.m. When the observer entered the room, J. T. was sitting
the back of the classroom. The desks were arranged in small clusters of two to three
throughout the room. J. T.'s desk was on the left side of a cluster of three desks, all
front of the room. Shortly after the observer entered, J. T. got up and walked to a table
below the television where the Channel 1 program was playing. He paused there for
two and watched the program, picked up a piece of paper from the table, and returned to
Other students in the room were eating their snacks, talking quietly, or working on
they listened to the program. The teacher was working at her desk. The atmosphere of the
was relaxed and students were allowed to move around the room, as needed. J. T. returned
desk and folded a paper airplane with the piece of paper. He talked quietly to the student
beside him, who also folded a paper airplane.

At 11:10, Mrs. Risch turned off the television and turned on the lights in the room. She
reminded the students of their choices for the remainder of the period. She told them they
work on Spelling and reminded them of a spelling test the next day. The other choices were
or the NCAA research project. J. T. and the other student were reminded that it was not paper
airplane time. She said that the paper airplanes would be in Science. Both boys ignored
continued folding their airplanes. J. T. got up and stood for a moment by another group of
students who were seated in front of him. He then returned to his desk, where he stood and
continued to fold the paper airplane. When reminded again that it was not paper airplane time, he
said he hadn't tried it out yet. When asked if the assignment was done, he replied that it was.
When asked if it was finished and turned in, he said he had done it but it was not turned in. He
tried to debate how to do the page. He didn't want to color it and said that it was all white
because it was snow. He then smiled and asked if he would get a check if he colored it all one
color. Mrs. R_____ replied that he would not. He worked on it for about two minutes. He then
resumed folding his paper airplane while talking to the boy beside him. Other students in the
room were working on Math, working in pairs at the computer, or playing hangman with spelling
words at the board.

J. T. joined two other students seated in front of him. He carried his paper airplane and
used it as a pointer when he talked. He made growling noises in one boy's ear as he stood behind
him. He then helped the boy with his assignment. A moment later, J. T. jerked a popcorn bag
from the same boy and spilled the contents. The teacher told J. T. not to grab things from other
people's hands. J. T. laughed and pushed the popcorn back into a pile. He took the popcorn
with him to his seat. He tore off a piece of the bag and licked the butter and salt from it.

At 11:20, when reminded to pick up, he turned in the pages he had at his desk. He also
completed the color page.

At 1:45, the observer returned to the classroom to complete a fifteen minute time
sampling. When the observer entered the room, J. T. was seated at his desk with a
magazine open. The teacher was in the front of the room discussing an article in the

with the class.  J. T. was pouring glue from his glue bottle into an indentation in the top of his pencil box.  The glue was a bluish color.  As he did this, he spoke out without looking up or raising his hand.  His comments reflected that he had been listening to the teacher, however.  The time-sampling was completed using 30 second intervals to measure on-task behavior.  In this particular session, J. T. was considered to be on-task if he looked at the book or magazine when it was being read or discussed, if he looked at teacher or other students when they were speaking, if he made on-task comments or questions, or if he was writing to complete an assignment.   J. T. was on-task 37% of the time sampled.  Off-task behaviors noted included: running his pencil through the glue on his pencil box, out of seat to get a drink, had paper airplane out, had scissors out snipping them in the air, looking through a magazine instead of the Social Studies book, kneeling on floor in front of desk, chewing on ink pen, blowing ink from pen into glue bottle, looking through desk while still kneeling on floor, licking popcorn bag from desk, and taking a pen from the student's desk beside his.  Although J.T. was on the floor and playing with other things, he still blurted out comments that were related to the subject being discussed.

_Tena S.____  ED teacher_

**May test scores and Mom's diligent efforts in my growth shadow a "hidden" disability?**

East Central Special Services District
Waveland Diagnostic Center
1440 E. Co. Rd. 250 W.
Cambersville, IN 4723 (9111)

Telephone)
1-800-382-0908 (Indiana only)
(765) 825-7831
Fax (765) 825-0802

## CASE CONFERENCE REPORT

☑ CASE CONFERENCE                    MANIFESTATION DETERMINATION

PURPOSE: *To review evaluation data, determine eligibility & develop plan, determine placement.*

| Date: 3-22-01 | Time: 8:00 am | Location: Western Wayne Elementary |

I.E.P. Expiration Date: N/A     Re-evaluation date: N/A     Due ___ Yes ___

STUDENT: J. T. Turpin                          D.O.B.: 4/5/1990

PARENT NAME: M/M Jon/Linda Turpin          TELEPHONE: [redacted]

ADDRESS: [redacted]                          SEX: ☒ Male ☐ Female

CITY: Cambridge City          STATE: IN     ZIP CODE: 47327

CURRENT SCHOOL: W. W. Elem.     HOME SCHOOL: W. W. Elem.

CURRENT SERVICES RECEIVING: None          CURRENT GRADE LEVEL: 5

| | | Name | | Position |
|---|---|---|---|---|
| ☒ | ☑ | Dr. Terry R[redacted] | | Case Conference Coordinator |
| ☒ | ☑ | M/M Jon/Linda Turpin | | Parents |
| ☒ | ☑ | Steve B[redacted] /Martha W[redacted] | | Principal |
| ☒ | ☐ | Jenni R[redacted] | | 5ᵗʰ Grade Teacher |
| ☒ | ☑ | Gena S[redacted] | | ED Teacher |
| ☒ | ☑ | Joyce T[redacted] | | School Counselor |
| ☒ | ☑ | Lara A[redacted] | | School Psychologist |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

(Signature and title of person(s) with written opinion) _____     None expressed _____
(Place mark when written)

For initial placement or change in placement, complete the following:
___ YES  NA   A copy of the evaluation report(s) was given to parent, if applicable.
___ YES  NO   A notice of Procedural Safeguards has been explained and offered in writing.
___ YES  NO   I/We agree with the case conference committee recommendation, including placement.

Signature of parent / legal guardian X L. Turp     3-22-01     Not Eligible

Comments:

| STUDENT *J. T. Turpin* | |
|---|---|
| **PRESENT LEVELS OF PERFORMANCE AND EVALUATION RESULTS** | **DATE** |
| **APTITUDE** Verbal = 140 <br> WISC III  Perf = 104        Exp. = 126 <br> Full Scale = 126     B/a Verb. | 2-20-01 |
| **ACHIEVEMENT** <u>SS</u> (Diff) <br> DAB-II  Lng. 124   -2 <br> Writ. 120  -6 <br> Math  139  +13 | 2-20-01 |
| **ADAPTIVE BEHAVIOR**  Social/Emotional Cont. <br> Reported to have friends. Peer relations at times <br> are appropriate and other times they are not. | 3-22-01 |
| **SOCIAL/EMOTIONAL** BASC  Teacher        Parent <br> Self Report  Est %        Ext. 67 <br> Not Significant  Beh. Sym Index 69     Beh Sym Index 65 | 2-20-01 |
| **PHYSICAL/MEDICAL** <br> Allergies noted.  Counseling w/ Comprehensive Mental <br> ADHD  Health Services. 24th month. <br> (Dr. Thibodaux)  Views dim. No longer involved in Counseling. | 2-20-01 |
| **OTHER** <br> Visual Motor ✓ VMI  SS = 92  Good general <br> Observations  Behavioral. Some impulsivity health <br> Interviews  mild approvable <br> Social Development History  Listening: Noted to be on task 97% <br> Speech  of the time during a time sample | |
| **PARENT INPUT/CONCERNS** Parents expressed concern <br> regarding J. T. eye hand coordination. | 3-22-01 |
| **STUDENT INPUT CONCERNS** N/A | 3-22-01 |
| 504 plan was discussed. | |

Page 3

STUDENT  J. T. Turpin

STRENGTHS AND WEAKNESSES OF STUDENT:  *J.T. is not always respectful to adults. Good school attendance. Mother reports that it depends on the situation.*

CURRENT PROGRESS/GRADES IN GENERAL EDUCATION CLASSES:  *Current progress noted to be satisfactory.*

PARTICIPATION AND BEHAVIOR:  *J.T., at times will need time out to re-focus. In general he is not a behavioral concern.*

Based upon evaluation data and student need, the case conference committee determines that:

☐ The student is eligible for special education services under Article 7.

☒ The student is not eligible for special education services under Article 7.

**STOP! COMPLETE THE IEP BEFORE MAKING PLACEMENT DECISIONS**

DISABILITY _____  LEAST RESTRICTIVE ENVIRONMENT (based on continuum) _____
(Enter codes using the reference chart)

**Placement:**
Reason(s) for placement recommendation including options considered and the reasons rejected:

_____
_____

Other factors relevant to proposed placement, including any possible harmful effect of the proposed placement on the student or the quality of services:

_____

Will the student be attending his/her neighborhood school? If no, please explain:

_____

Based on the goals and objectives developed in the IEP, the services to be delivered are:

_____
_____
_____

**Related Services:**
Using the reference chart, enter the codes of all areas of related service that the student requires in order to benefit from special education:

_____

**_May it be statistically possible to be "missed" even with my known diagnoses?_**

**According to CDC statistics on Autism Spectrum Disorder (reviewed March 2, 2022,):**
**1 in 44 children may be diagnosed with autism spectrum disorder.**

## Data & Statistics

### Prevalence

- About 1 in 44 children has been identified with autism spectrum disorder (ASD) according to estimates from CDC's Autism and Developmental Disabilities Monitoring (ADDM) Network. [Read article]
- ASD is reported to occur in all racial, ethnic, and socioeconomic groups. [Read article]
- ASD is more than 4 times more common among boys than among girls. [Read article]
- About 1 in 6 (17%) children aged 3–17 years were diagnosed with a developmental disability, as reported by parents, during a study period of 2009-2017. These included autism, attention-deficit/hyperactivity disorder, blindness, and cerebral palsy, among others. [Read summary]

Identified Prevalence of Autism Spectrum Disorder
ADDM Network 2000-2018 Combining Data from All Sites

| Surveillance Year | Birth Year | Number of ADDM Sites Reporting | Combined Prevalence per 1,000 Children (Range Across ADDM Sites) | This is about 1 in X children... |
|---|---|---|---|---|
| 2000 | 1992 | 6 | 6.7 (4.5-9.9) | 1 in 150 |
| 2002 | 1994 | 14 | 6.6 (3.3-10.6) | 1 in 150 |
| 2004 | 1996 | 8 | 8.0 (4.6-9.8) | 1 in 125 |

**In the years from 2000-2002, only 1 in 150 children were diagnosed with autism spectrum disorder. Medical procedures, including diagnostic standards, have improved over time. It is 3.41 times more likely a child may be properly diagnosed with autism spectrum disorder using today's diagnostic standards than it was at the turn of the millennium.**

### What Environmental Factors May Be Associated With Autism?

Progress has been made toward understanding different environmental risk factors, and the clearest evidence involves events before and during birth, such as:

- Advanced parental age at time of conception
- Prenatal exposure to air pollution or certain pesticides
- Maternal obesity, diabetes, or immune system disorders
- Extreme prematurity or very low birth weight
- Any birth difficulty leading to periods of oxygen deprivation to the baby's brain

But these factors alone are unlikely to cause autism. Rather, they appear to increase a child's risk for developing autism when combined with genetic factors.

**According to the NIH, autism spectrum disorder may mainly be genetic**
**However, the NIH says environmental risk factors may increase a child's risk.**

**May I have had an environmental risk at conception?**

# EAST CENTRAL SPECIAL SERVICES DISTRICT

Waterloo Diagnostic Center
3440 E. Co. Rd. 250 North
Connersville, IN 47331-9123

Telephone
1-800-382-6908 (Indiana City)
(765) 825-2411
Fax
(765) 825-0459

## CONFIDENTIAL

### REPORT OF PSYCHOEDUCATIONAL EVALUATION

| | |
|---|---|
| **NAME OF STUDENT:** | Jon Frederick Turpin "J.T." |
| **ADDRESS OF STUDENT:** | Cambridge City, Indiana  47327 |
| **NAME OF PARENT:** | Jon & Linda Turpin |
| **PHONE:** | (765) |
| **PRESENT SCHOOL:** | Western Wayne Elementary School |
| **GRADE:** | 5th |
| **SCHOOL CORPORATION:** | Western Wayne County |
| **DATE TESTED:** | 02/20/01 |
| **DATE OF BIRTH:** | 04/05/90 |
| **CHRONOLOGICAL AGE:** | 10 years, 10 months |

### REASON FOR REFERRAL

Psychological services were requested by J.T.'s mother because of behavior difficulties at home and school.

### BACKGROUND INFORMATION/SOCIAL AND DEVELOPMENTAL HISTORY

J.T. is a 10 year, 10 month old boy who currently participates in a general education, 5th grade classroom.  The following information was obtained from a previous psychoeducational report dated April of 1996.  J.T. was previously referred for an evaluation during kindergarten by his teacher and parents because of behavioral difficulties at home and school.  Behavioral concerns included temper tantrums, defiance, perfectionism, tattling, resistance to being touched, frequent trips to the restroom, and overreaction to being teased by peers.  No problems with pregnancy, birth, or early childhood were reported.  J.T.'s mother reported that J.T. had had "temperament problems" since he was an infant.  Problems such as refusing to breastfeed or eat much from a bottle, sleeping only short periods of time, and struggling against anyone holding him were reported.  It was reported that J.T. began having temper tantrums around the age of 18 months, some of which lasted as long as an hour.  According to Mrs. Turpin, J.T. suffered from several identified allergies and took regular allergy serum shots as a preventative measure.  J.T. also was on a modified diet that precluded corn products and candy with sugar.  The diet had reportedly decreased J.T.'s extreme mood swings.  It was reported that J.T. had always been quite active but also enjoyed individual activities such as playing a computer chess game.  He also enjoyed music and became very involved in the lyrics and themes.  The results of the evaluation completed in April of 1996 suggested that J.T. had high average intellectual functioning.  Academic achievement was average to above average and consistent with his ability level.  Visual-motor integration skills were average as well.  An objective report from school indicated that J.T. was demonstrating significant levels of hyperactivity, aggression, attention problems, and atypical behavior at school.  A case conference committee determined that J.T. was not eligible for special education services.

### SERVING...

Centerville -- Abington Community School Corporation -- Fayette County School Corporation
Franklin County Community School Corporation -- Northeastern Wayne School Corporation
Rush County Schools -- Union County College Corner Joint School District -- Western Wayne Schools

**Student:** Jon Frederick Turpin "J.T."
**Date Of Evaluation:** 02/20/01

School records indicated that J.T. attended Western Wayne Schools from kindergarten through 3rd grade. He was transferred to Centerville Elementary School for 4th grade and the beginning of 5th grade before being transferred back to Western Wayne Elementary School this year. He has not been retained. J.T. has received A's and B's for his academic efforts since kindergarten. Results from ISTEP testing during 3rd grade suggested far above average skills in math, English, and cognition. J.T. has been afforded opportunities to receive instruction at home above grade level in certain areas. Information from the current referral completed in December of 2000 by J.T.'s 5th grade teacher indicated that J.T. demonstrates excellent general knowledge and very strong academic skills. He was described as a "brilliant" student who enjoys working with computers and is good at sports. Concerns were reported in the areas of obedience, organization, and social skills. His teacher reported that J.T. often misbehaves in class and can be disrespectful with those in authority. He often runs instead of walking in the hallway, can be aggressive with peers, loses items, and focuses on tasks that he is interested in while becoming restless during tasks that are not interesting to him. His teacher reported that J.T. seems to be quite impulsive and reacts before he has a chance to consider consequences.

The following information was obtained during an interview with J.T.'s parents. J.T. resides with his biological parents and a 6-year-old sister. <u>J.T.'s parents reported that J.T. had some breathing difficulties at birth that required him to be in an incubator for 24 hours.</u> No other special care was required. Developmental milestones were achieved quite a bit earlier than would be expected with J.T. crawling up and down stairs and speaking his first words at 6 months of age, walking at 10 months, and riding a bicycle without training wheels at 3 years of age. Many other skills were acquired about two years earlier than would be typical for the average child. No serious accidents or illnesses were reported. Present health was reported to be good. J.T. has received allergy drops daily for the last four years. According to J.T.'s parents, J.T. has a high activity level and has been diagnosed with Attention Deficit Hyperactivity Disorder in the past by two different individuals. He participated in counseling with Dr. Linda Ronald for a brief period during early elementary school and was evaluated by the Cleveland Clinic during 2nd grade. He is currently participating in counseling with Comprehensive Mental Health Services in New Castle twice a month (since October of 2000). A family history of high intelligence and possible Attention Deficit Disorder was reported. No concerns were reported in the areas of vision or hearing. Mr. and Mrs. Turpin reported that J.T. is highly intelligent, has a beautiful singing voice, is advanced in academic abilities, and is building his own computer at home. He enjoys swimming, bike riding, roller-skating, and reading. Concerns were reported in the areas of art, social skills, and organizational skills. J.T. was described as argumentative when his own agenda is compromised. His parents also reported that J.T. often acts out when he is bored or not challenged. J.T. becomes irritated when he feels tasks are unnecessary or when he feels he is not being treated fairly. Mr. and Mrs. Turpin reported that they would like to see J.T.'s attitude improve and for him to realize that even if he is bored, he must conform. They would also like for J.T. to respect others and be able to interact appropriately with others. J.T. has one close friend and enjoys interacting with his cousins who are also highly intelligent. He enjoys playing outside with neighborhood children but loses interest in playing with them once they must play indoors because of the difference in their ability levels and interests. They reported that J.T. seems to want to make friends and want to fit in but has difficulty

_**May "breathing difficulties" be an "environmental risk factor" of "oxygen deprivation?"**_

**_May an environmental risk factor have been shadowed by older diagnostic reviews?_**

EAST CENTRAL SPECIAL SERVICES DISTRICT

Form 8 - Page 1 of 4

Telephone
1-800-382-6908 (Indiana Only)
(317) 825-2551
Fax
(317) 825-0805

## CASE CONFERENCE/ANNUAL CASE REVIEW REPORT

| ✓ CASE CONFERENCE | ANNUAL CASE REVIEW | RE-EVALUATION | CAUSAL |
|---|---|---|---|

PURPOSE: *The purpose of this conference is to review the evaluation results.*

DATE OF CONFERENCE: 5-15-96     TIME: 8:00     LOCATION: *Dublin El.*

STUDENT: *Joe "J.D." Turpin*     D.O.B. 4-5-90

PARENT NAME: *Jon and Linda Turpin*     TELEPHONE: _____

ADDRESS: _____     SEX: ✓ MALE ____ FEMALE

CITY *Cambridge City*     STATE *IN*     ZIP *47327-1006*

CURRENT SCHOOL: *Dublin El.*     HOME SCHOOL *Dublin El.*

CURRENT SERVICES RECEIVING: *None*     CURRENT GRADE LEVEL: *K*

\* Denotes Case Conference Coordinator

### CASE CONFERENCE COMMITTEE MEMBERSHIP

| Invited | Present | Name | Position |
|---|---|---|---|
| ✓ | ✓ | *Mrs. A.* | *Teacher* |
| ✓ | ✓ | *Jon and Linda Turpin* | *Parents* |
| ✓ | ✓ | *Judy H.* | *Behavioral Consultant* |
| ✓ | | *Mr. S.* | *Principal* |
| ✓ | | *Jan D.* | *CCC* |
| | ✓ | *Mrs. S.* | *Nurse* |

FOR INITIAL PLACEMENT, CHANGE IN PLACEMENT, MOVE IN STUDENTS COMPLETE THE FOLLOWING:

### THE FOLLOWING WERE EXPLAINED:

| | | |
|---|---|---|
| ✓ YES ___ NO | A NOTICE OF PARENT'S RIGHTS HAS BEEN EXPLAINED AND OFFERED IN WRITING. | |
| ✓ YES ___ NO | I/WE AGREE WITH THE CASE CONFERENCE COMMITTEE RECOMMENDATIONS, INCLUDING ~~PLACEMENT~~ *not eligible* | |

DATE 5-15-96     SIGNATURE PARENT/LEGAL GUARDIAN     *Linda Turpin*

White    EC55
Yellow   Parent
Pink     Teacher of Record
Gold     School

Reviewed by _____

9/93

Form 8 - Page 2 of 4

_[handwritten name]_

| TEST/EVALUATION PROCEDURE | RESULTS | DATE |
|---|---|---|
| **APTITUDE**<br>WISC-III | Verbal IQ 117<br>Performance IQ 113  _above avg range_<br>Freedom from Distractibility 104<br>Full Scale IQ 118<br>Processing Speed 112 | 4-24-96 |
| **ACHIEVEMENT**<br>Woodcock-Johnson | _Grade    s.s._<br>Reading   1.0    104<br>Math      2.6    135<br>Written Lang  K.7    98 | 4-24-96 |
| **ADAPTIVE BEHAVIOR** | | |
| **SOCIAL/EMOTIONAL**<br>per conf<br>BASC (Teacher) | Have worked w/ Riley since<br>Jan. - therapy _____<br>Tantrums or somatic lows at school<br>Hyperactivity 77   Atypicality 95<br>Aggression 85   Adaptability 30 | 5-15-96<br><br>4-24-96 |
| **PHYSICAL/MEDICAL**<br>per conf | Allergies - Regular anual shots<br>Modified diet has decreased mood swings<br>Needs to use restroom frequently<br>Reluctant to touch<br>Boys interested | 5-15-96 |
| **OTHER**<br>☑ Vision/Hearing DVM1<br>☑ Observation/s 2 observations<br>☑ Interview by psychologist<br>☑ Social Development/History<br>☐ Speech | S.D. at Age 5-6 Works quietly/working   4-24<br>when teacher directs J.<br>to do something, he doesn't want<br>to do, he withdraws, affect<br> | 4-24-96 |

5-15-96

Additional Information: Organizational skills still a great concern for Mrs. _[redacted]_.  She sees some signs of ADD.

WISC:   Scale:<br>Verbal:  Score:<br>Performance:  Range of Score:<br>Other:  Percent:

5/93

Form 8 - Page 3 of 4

Based upon evaluation data and student need, the case conference committee determines that:
☐ The student is eligible for special education services under Article 7.
☐ The student is not eligible for special education services under Article 7.

## DISABILITY

| | | |
|---|---|---|
| ☐ 01 - Multiple Handicap | ☐ 07 - Learning Disability | ☐ 14 - Dual Sensory Impairment |
| ☐ 02 - Orthopedic Impairment | ☐ 08 - Communication Disorder | ☐ 15 - Autism |
| ☐ 03 - Visual Impairment | ☐ 10 - Mild Mental Handicap | ☐ 16 - Traumatic Brain Injury |
| ☐ 04 - Hearing Impairment | ☐ 11 - Moderate Mental Handicap | ☐ 17 - Other Health Impairment |
| ☐ 05 - Emotional Handicap-FT | ☐ 12 - Severe Mental Handicap | |
| ☐ 06 - Emotional Handicap-Other | ☐ 13 - Homebound/Hospital | |

**IF DETERMINED ELIGIBLE FOR SERVICES, COMPLETE FORM 7 (INDIVIDUAL EDUCATION PLAN)**

## LOCAL PROGRAM LEVEL

| | | |
|---|---|---|
| ☐ 02 - Early Childhood Program (Ages 3-4 including age 5A) | ☐ 03 - Elementary Program (Including 5B) | ☐ 04 - Secondary Program |
| | ☐ 05 - Not applicable | |

## LEAST RESTRICTIVE ENVIRONMENT

| | | |
|---|---|---|
| ☐ 01 - Full-Time Sp Ed Instruction in a Reg. Public School Facility | ☐ 05 - Full-Time Sp Ed Instruction in a Public Day School Facility | ☐ 09 - Sp Ed Consultation |
| ☐ 02 - Full-Time Sp Ed Instruction in a Separate Public School Facility | ☐ 06 - Full-Time Sp Ed Instruction in a Private Day School Facility | ☐ 10 - Sp Ed Homebound/ Homebased Instruction (disabled students only) |
| ☐ 03 - Full-Time Sp Ed Instruction in a Public Residential Facility | ☐ 07 - Part-Time Sp Ed Instruction (25% to 49% of instructional time) | ☐ 11 - PH-4 |
| ☐ 04 - Full-Time Sp Ed Instruction in a Private Residential Facility | ☐ 08 - Sp Ed Resource Services (up to 24% of instructional time) | ☐ 12 - Experimental Programs (511 IAC 7-14-6) |
| | | ☐ 13 - Not Applicable |

Reason(s) for placement recommendation including options considered and the reasons rejected:
_____
_____
_____

Other factors relevant to proposed placement:
_A 504 plan may be beneficial_
_____

Based upon goals and objectives developed in the IEP, the services to be delivered are:
_____
_____
_____

CP (Rev. 3/98)

**May this review have missed an environmental risk factor simply due to older standards?**

### May a 504 plan have been implemented for me under Article VII for a hidden disability?

School started Aug.22
JT had his first, what I thought was a temper tantrum
8-23,24, and 28.

JT was so mad. He cried, pounded his fist on the table, and
screamed at me. The sounds he made were terrible. It was
inaudible. He held his teeth together. He sounded like a
panicked animal. The other students were frightened. He
made no effort to leave his seat. I don't know how long
these tantrums lasted. Every thing was so new and we were
all just getting to know each other.

I talked with Jon and we're both at a loss. Linda called
our house around 9-3, we talked at lenght, but really don't
know what to do. We did decide to have some kind of snack
every day. JT seemed to do better when he ate something
around 10:00. It might be a cookie, a glass of punch,
sometimes a piece of fruit.

9-13  JT was out of control again. Talked with Jon 9-14.
We are going to go for a % every day. JT goes to the
bathroom 3-4 times in 2½ hours. He waits till the last
minute. He did not ask for drinks. I thought maybe a sugar
imbalance.

10-12  JT hit me in the face. I was keeping him from going
after one of the students. I don't know that he would, but
it wasn't worth the chance. It seems like these spells last
about 5-10 minutes. They end quicker if I can get JT to
focus on something else.

10-17  JT hit me again. It wasn't as bad. He was sorry
fairly soon. The students have learned to move away from JT
when he's out of control. Some just automatically put their
heads down on their table.

10-24  Parent Conference- Academic great, temper terrible.

11-1  Substitute, all went fairly well until they were
lining up at 11:00. JT hit the sub. because he didn't like
his place in line. At least that's what she decided.

Most of Nov.and Dec. fairly calm, or we just know what to
do, or not to do. JT is very defiant. He expects the
other students to behave. If they don't he hits them. He
apologizes, usually. He interrupts, but usually it's
something to go along with school. JT was mad at me if I
didn't give him a high enough % to get his finger paint.
(his reward)

One time in Nov. JT had a spell. I really thought he was
having some kind of seizure. His eyes rolled, he screamed,
pounded his fists, and he trembled. When he calmed down I
asked him if he knew what happen. He said it felt like
electrical shocks.

### MAY I HAVE HAVE BEEN OVERSENSITIZED AND HAD TO LEARN TO COPE?

Most of the time the students are willing to play with JT.
They are very forgiving. JT can be very kind. He
volunteered his dad to wire Christopher's tree house.

We didn't come back to school until 1-15 because of all the
snow. Jon said their Christmas was not a good one.
The first week back was hard on all of us. Being out of a
regular routine really upsets children (and teachers!) Many
of the students kept asking how soon they could go home.
The mood of the class was not good.
1- JT screamed, pounded, and cried. He was mad because
Jon did not hug him good-bye. It didn't matter to JT that
he had thrown his coat in the middle of the floor, had taken
off his boots, but was still in his socks, and he'd been
working on the computer. JT mad no effort to see Jon.

JT now brings his own snack that Linda packs for him.
Before all the students had a snack with him. Kids are
handling that fairly well.

JT is an excellent student at least orally and intuitively.
His written work is messy and disorganized when he writes.
He's is able to almost tell time, he counts to over 100, and I
tested him on recognizing the numbers 0-50 out of order. He
knows the capital and small letters and their sounds. He
does not color well. He can't (or won't) stay in the lines
when he colors or he uses a different color when I give
specific directions. If I say write your name at the top
he may write it at the bottom. JT has some letter and number
reversals especially the "u" and "n"in Turpin. JT has
learned to look at the alphabet cards that are posted in
the room, to help him remember the directionality.

2-23 The students go to the library at 9:00. We'd already
talked about Ground Hog's day. The librarian had brought up
a reference on ground hogs. The students were standing
around the computer when JT started pushing because he
couldn't see. I asked him twice not to move or I would take
him out of the room. JT started to yell. I picked him up
and we went to our room. I put him in my chair so he could
thrash around and be fairly safe. JT kept yelling at me.
This was the first time I had been able to understand
everything JT was screaming. He said I couldn't keep him in
that chair, he wanted to go to the library. I said fine,
(I've really worked on staying calm with him), but he couldn't
go back until he was quiet. He yelled some more. I asked
him to help me grade some papers. He yelled again about
being in that chair. He acted like he was tied. (He wasn't)
I said you can come and sit with me. He said he would not
grade those papers, but he did come and sit with me. It
didn't take long and he was telling me how to grade some
papers. He was very definite about how poor some of the papers
were and how they needed sad faces for grades. JT got a
kleenex, blew his nose, sat back down, calmed down, and
hand-in-hand we walked to the library.

**_MAY I NOT HAVE WANTED TO SEE MY DAD FOR MORE THAN ONE REASON?_**

I asked him about the library later and he said he couldn't see. I told him I knew that, and that's why I moved him, and finally picked him up. He said he didn't want me to yell at him. I said I didn't and hadn't, we know that won't work. He even got 70% when he went home and didn't yell at me.

I apologize for the length of this note. I just keep thinking there's a way to work around JT and give him what he needs to cope with life. We all know it won't get any easier.

Sincerely,

*Christina Clevenger*

Christina Clevenger

*Dublin El   478·*

*ME, MY KINDERGARTEN, AND 1ST GRADE TEACHERS TOLD DAD I COULDN'T SEE.*
*SO WHEN DID I FINALLY GET GLASSES? MRS. GREWE TOLD MOM I COULDN'T SEE!*



*THAT'S ALMOST 4 YEARS! MAY DAD NEGLECT OR DENY DISABILITIES?*
*DAD DIDN'T EVEN GO WITH ME AND I GOT HUGE GLASSES AND BULLIED.*
*HOW DID DAD RESPOND? "GRAB THEIR SHIRT AND PUNCH THEM IN THE NOSE!"*
*I LATER TOLD PAPAW "I DON'T LIKE DAD'S ADVICE, I DON'T WANT TO HURT OTHERS"*
*PAPAW TOLD ME: "YOU HAVE A GOOD HEART, AND YOU SHOULD FOLLOW IT."*



MISS CLEVENGER                    DUBLIN ELEMENTARY SCHOOL                    MR. GADDIS
Kindergarten A.M.                       Dublin, Indiana                        Principal
                                          1995 - 1996
ROW 1: Aide Nina Baker, John Barrett, J.T. Turpin, Christopher Morefield, Tshiana Richardson, Michael Gross, Sammy Hartsock,
Christina Clevenger  ROW 2: Jessica Gross, Jerry Moore, Anna Rühn, Autumn Messer, Rachel Barnes, Samantha Crouch  ROW 3: Jordan George,
Jessica Runkle, Donn Schrader, Tony Gosser, Fenolise Yount, Ronnie Ross  ABSENT: Christopher Thatcher



MRS. LAWSON                    WESTERN WAYNE ELEMENTARY SCHOOL                    GRADE 1
                                       Cambridge City, Indiana
                                          1996 - 1997
ROW 1: Mrs. Lawson, Christopher Morefield, Lindsay Bane, Jon Turpin (JT), Danielle Hawell, Brook Ray, Joshua Scarbrough, Mrs. Cl...
ROW 2: Daniel Terhorst, Michael Gross, Rachel Barnes, Jessica Dunaway, Luke Pattison, Chandler Shank  ROW 3: Aimee ...
Shannon Stonerock, Hailey Watson, Jesse Whitton, Candace Rigney, Kristi Henderson  ABSENT: Amber McFarland



MRS. CREWE         WESTERN WAYNE ELEMENTARY SCHOOL         MR. EMMONS
Grade 2              Cambridge City, Indiana                Principal
                        1997 - 1998
ROW 1: Mrs. Crewe, Jon "JT" Turpin, Chris Tate, Samantha Crouch, Christopher Yoakum, Aaron Ervin, Brook Ray, Mrs. Longnecker
ROW 2: Joni Taylor, Jonathon Saunders, Alissha Meistner, Jessica Dunaway, Shannon Stonerock, Charles Ryan Morefield   ROW 3: Kaitlyn Ervin,
           John Garrett, Brittany McCracken, Jessica Runkle, Donn Schroder, Micha Maley



Mrs. Sawyers              Western Wayne Elementary School
                               1998-1999
First Row: Mrs. Pat Rea, Kenny Pipenger, Christina Fanisshel, Nicole Mann, Kara Fortman, Austin Saxon, J.T. Turpin, Mrs. Peggy Sawyers Second Row:
David Lilly, Miranda Burwick, Kaitlyn Judy, Danielle Hunt, Emily Amick, Luke Pattison, Steven Picket Third Row: Robert Osborne, Tommy Snowden,
Jarred Singer, Jessica Runkle, Kristi Henderson, Nikki Sexton

Form B - Page 2 of 4

| EVALUATION PROCEDURE | RESULTS | DATE |
|---|---|---|
| APTITUDE<br>WISC-III | Verbal IQ 119   Above<br>Performance IQ 113   Avg. Range<br>Freedom from Distractibility 104<br>Full Scale IQ 118<br>Processing Speed 112 | 4-24-96 |
| ACHIEVEMENT<br>Woodcock-Johnson | Grade   S.S.<br>Reading   1.0   104<br>Math   2.6   135<br>Written Lang. K.7   98 | 4-24-96 |
| ADAPTIVE BEHAVIOR | | |
| SOCIAL/EMOTIONAL<br>peer conf.<br>BASC (Teacher) | Have worked w/ they some<br>Jan - therapy<br>tantrums on arcade bus at school<br>Hyperactivity 77   Atypicality 95<br>Aggression 85   Adaptability 30 | 5-15-96<br>4-24-96 |
| PHYSICAL/MEDICAL<br>peer conf. | Allergies - Regular swim state<br>Modified diet has decreased mood swings<br>Needs to use restroom - frequently<br>sensitive to touch<br>Hx's attendance | 5-15-96 |
| OTHER<br>Clinical Interview(BVM)<br>Observations of classroom<br>Interviews by psychologist<br>Social Development/History<br>Speech | D.S. 91  Age 5-6 Works quickly / impulsively<br>when criteria arrived J.S.<br>to do something he doesn't want<br>B. has had some troubles | 4-24-96 |
| Additional Information:   5-15-96 | gradual in some group<br>frustration while still a great concern for<br>The C_____ Sue was sign of ADD. | |

**MAY I HAVE JUST NOT BEEN AS EASILY ABLE TO ADAPT AS SOME OTHER CHILDREN?**

## May Dad treat me poorly after discovering I may have a disability in early life?



# IEP's vs. 504 Plans

There are two types of written plans which must be developed and implemented by public schools regarding students with disabilities. First, students with disabilities requiring only reasonable accommodation must have a written plan under Section 504; this is commonly referred to as a 504 plan. Each public school should have a person (usually an assistant principal or a guidance counselor, but not a special educator) who serves as the school's "504 coordinator." This person should coordinate the development, maintenance, and implementation of 504 plans.

504 plans should be developed by a committee, consisting of the student with a disability (if appropriate), the student's parent (s)/guardian(s), the student's teacher(s), the student's counselor, and the 504 coordinator. Additionally, special educators often serve as advisors to 504 committees. The student's disability and corresponding need for reasonable accommodation are identified and documented in the plan. Likewise, the plan delineates the specific accommodations which will be implemented by the school. All school staff involved in the provision of accommodations should be contacted by the 504 coordinator and made aware of their duties and responsibilities. The plan itself should be updated at least annually.

For students with disabilities who require specialized instruction, the IDEA controls the procedural requirements. The IDEA process is more involved than that required under Section 504. Instruction and accommodation under the IDEA are provided in accord with a plan called an Individualized Education Program, known as an IEP. A student's IEP is a legal document which, in part, sets forth the duties and responsibilities of the school district and staff regarding that student. It is the responsibility of special educators, regular education teachers, administrators, counselors, and other professional educators to be thoroughly familiar with the provisions of the IEP for EACH of their students with disabilities.

The remainder of this document sets forth the general procedural information that regular educators should know about the IEP/IDEA process. REMEMBER: Be safe. Seek the advice of special educators. Whether you are a teacher, an administrator, or a counselor, you will save yourself considerable time and trouble -- and you will do a much better job for your students with disabilities -- if you learn to appreciate these specialists as a valuable resource.

## WESTERN WAYNE SCHOOLS

### ALTERNATIVE LEARNING PLAN
### AS PER SECTION 504 OF THE REHABILITATION ACT OF 1973

STUDENT: J.T. Turpin SCHOOL: Lincoln High School GRADE: Junior

DATE OF IMPLEMENTATION: August 18, 2005 TERMINATION: June 1, 2006 REVIEW: August 16, 2005

STATEMENT OF STUDENT'S PERFORMANCE AS IT RELATES TO THIS "PLAN": Attention deficits consistent academic performance, impulsiveness and problems dealing with distractions posed by classmates during an instructional period. Jon Frederick also has significant delays in his visual-motor integration skills. These skills were in the average range, but were delayed significantly compared to his cognitive ability.

| INTERVENTION/STRATEGY | IMPLEMENTOR(S) | MONITORING DATE | COMMENTS |
|---|---|---|---|
| Gentle, physical contact | All teachers | Daily | Meet at conclusion of semester |
| Seat J.T. accordingly | All teachers | Daily | Meet at conclusion of semester |
| • to reduce distractions | | | |
| • next to appropriate student models | | | |
| Increase frequency of interactions between student and teacher | All teachers | Daily | Meet at conclusion of semester |
| Cooperative learning groups should be chosen carefully | All teachers | Daily | Meet at conclusion of semester |
| Allow J.T. to read during free time | All teachers | Daily | Meet at conclusion of semester |

cc:  Parents
     Principal
     Teacher
     Section 504 Coordinator
     Educational Record

***May my 504 plan include "gentle physical contact" in part due to my Dad?***

## May I have displayed symptoms of mistreatment in early life?
## [INFORMATION PERTAINS TO ME AND I CONSENT TO VIEWING *IN THIS DOCUMENT*]





*__May I have been lucky to realize I needed therapy of my own volition?__*

REFERRAL SOURCE:Individual self referral

## → Causes and Risk Factors

**Causes and risk factors for oppositional defiant disorder**

While the exact cause for this disorder is unknown, researchers agree that there are a number of causes and risk factors that lead to the development of ODD. The most accepted explanations include:

*Genetic:* Many children who have developed ODD have close family members with a history of mental illness, which is an indicator that a vulnerability to ODD is inherited.

*Physical:* It has been frequently suggested that deficits in the brain or injuries to certain areas of the brain have the ability to lead to serious behavioral problems among children. Additionally, chemical imbalances in the brain, as a result of abnormal functioning of neurotransmitters, are known to bring about symptoms of mental illnesses. More specifically, neurotransmitters help nerve cells in the brain communicate with each other and when they are not working properly nerve messages may not be received properly leading to symptoms of ODD.

*Environmental:* Finally, it is a widely accepted belief that a person's environment has a significant impacts on the development of mental health disorders such as ODD. This may be especially important because the onset of ODD symptoms occurs in childhood, making the environment in which a child is raised extremely influential. Factors such as a chaotic home life, inconsistent discipline by parents, and being exposed to abuse, neglect, or trauma at an early age can all lead to the onset of ODD symptoms.

*Risk Factors:*

- Family history of mental illness
- Witnessing violent or aggressive behaviors
- Exposure to trauma / abuse/ neglect
- Being raised in a chaotic / stressful home
- Inconsistent parenting
- Exposure to substance use or abuse

*__May I have realized Dad may not change, but I could, and started therapy at 10 years old?__*

CLIENT NAME & I.D.:   Jon "J.T." Turpin
DATE OF INTAKE:              11/28/00

*__May my anxiety align with symptoms of "narcissistic abuse?"__*

## Effects on Children

If you have children who witnessed narcissistic abuse, they could also be at risk of developing mental health problems such as PTSD, anxiety disorders, or depression.[3] They might become fearful in situations that remind them of their traumatic experiences. They might also feel angry at your spouse or the world, feel disconnected from other people, or have low self-esteem or confidence issues.

T-1 & Mood dysthymic, affect guarded. Discussed treatment goals. JT announced that after the next pre-scheduled meeting would be the last. Stated that this can be discussed with his dad. He states that he had discussed this with dad. Asked general questions. JT uses some advanced vocabulary, but asks if he is not sure of a word he hears. Used this to get to dad's health concerns and how this effects JT. He seemed less worried after the discussion, affect less restrained. Played a round of checkers. He is very good and thinks through all of his moves. He was more spontaneous with conversation when not putting energy into his strategy. Reschedule 1 week

*__May Dad's genetics predispose me to ODD in childhood? May Dad have a mental illness?__*

**If so, may I have successfully withstood this without being "deviant" or "pathological"?**

Jon Turpin's MMPI --2 profile was consistent with a test taken in a valid and appropriate manner. All validity scales were well within average ranges. There was no information from the validity scales indicating any attempt to appear overly virtuous or to endorse large numbers of pathological items. The Welsh Code for Jon Turpin's MMPI-2 was: 4'9+-325/81670: L/KF;

There were no indications of important psychiatric difficulties and no indications of thought disorder, hallucinations or delusions in the psychological testing. The current protocol was not consistent with significant anxiety or any somatic disorders or depression. Jon presented himself as an individual who valued social interaction and enjoy the company of others.

The most important findings in the current psychological inventory was of an angry, disaffected individual with a great deal of energy and emotional turmoil. Individuals with this type of protocol are usually seen as having important conflicts with authority, including family members. Much of the anger appears to be internalized; usually the result of conflicts which the individual feels powerless to resolve. The emotional energy appears to serve dual purposes. On one hand, he has been able to keep himself very busy and active, while at the same time harboring resentment and bad feelings about instances of perceived mistreatment and injustice, both of himself and of others.

Profiles with similar elevations are not unusual in young individuals. However the degree of upset and conflict, with few other emotional indicators is not nearly as common. Similar protocols were usually seen in individuals who have undergone important conflicts in their lives. Jon Turpin's personality testing on the MCMI-II generated the following Personality Code ( : 5 ** 6 B 4 * 6A + 8A 7 " 8B 1 3 2 ' ' // - ** - * // )

The MCMI-II was taken in a valid and thoughtful manner. The validity scales indicated no attempt to appear overly virtuous nor attempts to present himself in a very negative fashion.

There were no indications of severe personality pathology, although feelings of persecution and of being misunderstood were endorsed. There were no indications of severe thought disorders, major depressions or delusional disorders indicated. This individual did not endorse items indicative of a high level of anxiety, alcohol or drug use or dependence are some out of form disorders.

# ESPINOZA v. MONTANA DEPT. OF REVENUE

Supreme Court

# Syllabus

ESPINOZA v. MONTANA DEPT. OF REVENUE
393 Mont. 446, 435 P. 3d 603, reversed and remanded.

- **Syllabus** [Syllabus] [PDF]
- **Opinion**, Roberts [Roberts Opinion] [PDF]
- **Concurrence**, Thomas [Thomas Concurrence] [PDF]
- **Concurrence**, Alito [Alito Concurrence] [PDF]
- **Concurrence**, Gorsuch [Gorsuch Concurrence] [PDF]
- **Dissent**, Ginsburg [Ginsburg Dissent] [PDF]
- **Dissent**, Breyer [Breyer Dissent] [PDF]
- **Dissent**, Sotomayor [Sotomayor Dissent] [PDF]

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

SUPREME COURT OF THE UNITED STATES

Syllabus

ESPINOZA ET AL. *v.* MONTANA DEPARTMENT OF REVENUE ET AL.

certiorari to the supreme court of montana

No. 18–1195.   Argued January 22, 2020—Decided June 30, 2020

The Montana Legislature established a program that grants tax credits to those who donate to organizations that award scholarships for private school tuition. To reconcile the program with a provision of the Montana Constitution that bars government aid to any school "controlled in whole or in part by any church, sect, or denomination," Art. X, §6(1), the Montana Department of Revenue promulgated "Rule 1," which prohibited families from using the scholarships at religious schools. Three mothers who were blocked by Rule 1 from using scholarship funds for their children's tuition at Stillwater Christian School sued the Department in state court, alleging that the Rule discriminated on the basis of their religious views and the religious nature of the

school they had chosen. The trial court enjoined Rule 1. Reversing, the Montana Supreme Court held that the program, unmodified by Rule 1, aided religious schools in violation of the Montana Constitution's no-aid provision. The Court further held that the violation required invalidating the entire program.

*Held*: The application of the no-aid provision discriminated against religious schools and the families whose children attend or hope to attend them in violation of the Free Exercise Clause of the Federal Constitution. Pp. 6–22.

(a) The Free Exercise Clause "protects religious observers against unequal treatment" and against "laws that impose special disabilities on the basis of religious status." *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, ___. In *Trinity Lutheran*, this Court held that disqualifying otherwise eligible recipients from a public benefit "solely because of their religious character" imposes "a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Id.*, at ___. Here, the application of Montana's no-aid provision excludes religious schools from public benefits solely because of religious status. As a result, strict scrutiny applies. Pp. 6–12.

(b) Contrary to the Department's contention, this case is not governed by *Locke* v. *Davey*, 540 U. S. 712. The plaintiff in *Locke* was denied a scholarship "because of what he proposed *to do*—use the funds to prepare for the ministry," an essentially religious endeavor. *Trinity Lutheran*, 582 U. S., at ___. By contrast, Montana's no-aid provision does not zero in on any essentially religious course of instruction but rather bars aid to a religious school "simply because of what it is"—a religious school. *Id.*, at ___. *Locke* also invoked a "historic and substantial" state interest in not funding the training of clergy, 540 U. S., at 725, but no comparable tradition supports Montana's decision to disqualify religious schools from government aid. Pp. 12–16.

(c) The proposed alternative approach involving a flexible case-by-case analysis is inconsistent with *Trinity Lutheran*. The protections of the Free Exercise Clause do not depend on a varying case-by-case analysis regarding whether discrimination against religious adherents would serve ill-defined interests. Pp. 16–18.

(d) To satisfy strict scrutiny, government action "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546. Montana's interest in creating greater separation of church and State than the Federal Constitution requires "cannot qualify as compelling" in the face of the infringement of free exercise here. *Trinity Lutheran*, 582 U. S., at ___. The Department's argument that the no-aid provision actually promotes religious freedom is unavailing because an infringement of First Amendment rights cannot be justified by a State's alternative view that the infringement advances religious liberty. The Department's argument is especially unconvincing because the infringement here broadly burdens not only religious schools but also the families whose children attend them. The Department suggests that the no-aid provision safeguards public education by ensuring that government support is not diverted to private schools, but that interest does not justify a no-aid provision that requires only religious private schools to bear its weight. Pp. 18–20.

(e) Because the Free Exercise Clause barred the application of the no-aid provision here, the Montana Supreme Court had no authority to invalidate the program on the basis of that provision. The Department argues that the invalidation of the entire program prevented a free exercise violation, but the Department overlooks the

Montana Supreme Court's threshold error of federal law. Had the Montana Supreme Court recognized that the application of the no-aid provision was barred by the Free Exercise Clause, the Court would have had no  basis for invalidating the program. The Court was obligated to disregard the no-aid provision and decide this case consistent with the Federal Constitution. Pp. 20–22.

393 Mont. 446, 435 P. 3d 603, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined. ALITO, J., and GORSUCH, J., filed concurring opinions. GINSBURG, J., filed a dissenting opinion, in which KAGAN, J., joined. BREYER, J., filed a dissenting opinion, in which KAGAN, J., joined as to Part I. SOTOMAYOR, J., filed a dissenting opinion.

**TOP**

# Opinion

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.   Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

SUPREME COURT OF THE UNITED STATES

No. 18–1195

KENDRA ESPINOZA, ET AL., PETITIONERS v. MONTANA DEPARTMENT OF REVENUE, ET AL.

on writ of certiorari to the supreme court of montana

[June 30, 2020]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Montana Legislature established a program to provide tuition assistance to parents who send their children to private schools. The program grants a tax credit to anyone who donates to certain organizations that in turn award scholarships to selected students attending such schools. When petitioners sought to use the scholarships at a religious school, the Montana Supreme Court struck down the program. The Court relied on the "no-aid" provision of the State Constitution, which prohibits any aid to a school controlled by a "church, sect, or denomination." The question presented is whether the Free Exercise Clause of the United States Constitution barred that application of the no-aid provision.

# I

## A

In 2015, the Montana Legislature sought "to provide parental and student choice in education" by enacting a scholarship program for students attending private schools. 2015 Mont. Laws p. 2168, §7. The program grants a tax credit of up to $150 to any taxpayer who donates to a participating "student scholarship organization." Mont. Code Ann. §§15–30–3103(1), –3111(1) (2019). The scholarship organizations then use the donations to award scholarships to children for tuition at a private school. §§15–30–3102(7)(a), –3103(1)(c).[1]

So far only one scholarship organization, Big Sky Scholarships, has participated in the program. Big Sky focuses on providing scholarships to families who face financial hardship or have children with disabilities. Scholarship organizations like Big Sky must, among other requirements, maintain an application process for awarding the scholarships; use at least 90% of all donations on scholarship awards; and comply with state reporting and monitoring requirements. §§15–30–3103(1), –3105(1), –3113(1).

A family whose child is awarded a scholarship under the program may use it at any "qualified education provider"—that is, any private school that meets certain accreditation, testing, and safety requirements. See §15–30–3102(7). Virtually every private school in Montana qualifies. Upon receiving a scholarship, the family designates its school of choice, and the scholarship organization sends the scholarship funds directly to the school. §15–30–3104(1). Neither the scholarship organization nor its donors can restrict awards to particular types of schools. See §§15–30–3103(1)(b), –3111(1).

The Montana Legislature allotted $3 million annually to fund the tax credits, beginning in 2016. §15–30–3111(5)(a). If the annual allotment is exhausted, it increases by 10% the following year. *Ibid*. The program is slated to expire in 2023. 2015 Mont. Laws p. 2186, §33.

The Montana Legislature also directed that the program be administered in accordance with Article X, section 6, of the Montana Constitution, which contains a "no-aid" provision barring government aid to sectarian schools. See Mont. Code Ann. §15–30–3101. In full, that provision states:

"Aid prohibited to sectarian schools. . . . The legislature, counties, cities, towns, school districts, and public corporations shall not make any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property for any sectarian purpose or to aid any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination." Mont. Const., Art. X, §6(1).

Shortly after the scholarship program was created, the Montana Department of Revenue promulgated "Rule 1," over the objection of the Montana Attorney General. That administrative rule prohibited families from using scholarships at religious schools. Mont. Admin. Rule §42.4.802(1)(a) (2015). It did so by changing the definition of "qualified education provider" to exclude any school "owned or controlled in whole or in part by any church, religious sect, or denomination." *Ibid.* The Department explained that the Rule was needed to reconcile the scholarship program with the no-aid provision of the Montana Constitution.

The Montana Attorney General disagreed. In a letter to the Department, he advised that the Montana Constitution did not require excluding religious schools from the program, and if it did, it would "very likely" violate the United States Constitution by discriminating against the schools and their students. See Complaint in No. DV–15–1152A (Dist. Ct. Flathead Cty.), Exh. 3, pp. 2, 5–6. The Attorney General is not representing the Department in this case.

## B

This suit was brought by three mothers whose children attend Stillwater Christian School in northwestern Montana. Stillwater is a private Christian school that meets the statutory criteria for "qualified education providers." It serves students in prekindergarten through 12th grade, and petitioners chose the school in large part because it "teaches the same Christian values that [they] teach at home." App. to Pet. for Cert. 152; see *id.*, at 138, 167. The child of one petitioner has already received scholarships from Big Sky, and the other petitioners' children are eligible for scholarships and planned to apply. While in effect, however, Rule 1 blocked petitioners from using scholarship funds for tuition at Stillwater. To overcome that obstacle, petitioners sued the Department of Revenue in Montana state court. Petitioners claimed that Rule 1 conflicted with the statute that created the scholarship program and could not be justified on the ground that it was compelled by the Montana Constitution's no-aid provision. Petitioners further alleged that the Rule discriminated on the basis of their religious views and the religious nature of the school they had chosen for their children.

The trial court enjoined Rule 1, holding that it was based on a mistake of law. The court explained that the Rule was not required by the no-aid provision, because that provision prohibits only "appropriations" that aid religious schools, "not tax credits." *Id.*, at 94.

The injunctive relief freed Big Sky to award scholarships to students regardless of whether they attended a religious or secular school. For the school year beginning in fall 2017, Big Sky received 59 applications and ultimately awarded 44 scholarships of $500 each. The next year, Big Sky received 90 applications and awarded 54 scholarships of $500 each. Several families, most with incomes of $30,000 or less, used the scholarships to send their children to Stillwater Christian.

In December 2018, the Montana Supreme Court reversed the trial court. 393 Mont. 446, 435 P. 3d 603. The Court first addressed the scholarship program unmodified by Rule 1, holding that the program aided religious schools in violation of the no-aid provision of the Montana Constitution. In the Court's view, the no-aid provision "broadly and strictly prohibits aid to sectarian schools." *Id.*, at 459, 435 P. 3d, at 609. The scholarship program provided such aid by using tax credits to "subsidize tuition payments" at private schools that are "religiously affiliated" or "controlled in whole or in part by churches." *Id.*, at 464–467, 435 P. 3d, at 612–613. In that way, the scholarship program flouted the State Constitution's "guarantee to all Montanans that their government will not use state funds to aid religious schools." *Id.*, at 467, 435 P. 3d, at 614.

The Montana Supreme Court went on to hold that the violation of the no-aid provision required invalidating the entire scholarship program. The Court explained that the program provided "no mechanism" for preventing aid from flowing to religious schools, and therefore the scholarship program could not "under *any* circumstance" be

construed as consistent with the no-aid provision. *Id.*, at 466–468, 435 P. 3d, at 613–614. As a result, the tax credit is no longer available to support scholarships at either religious or secular private schools.

The Montana Supreme Court acknowledged that "an overly-broad" application of the no-aid provision "could implicate free exercise concerns" and that "there may be a case" where "prohibiting the aid would violate the Free Exercise Clause." *Id.*, at 468, 435 P. 3d, at 614. But, the Court concluded, "this is not one of those cases." *Ibid.*

Finally, the Court agreed with petitioners that the Department had exceeded its authority in promulgating Rule 1. The Court explained that the statute creating the scholarship program had broadly defined qualifying schools to include all private schools, including religious ones, and  the Department lacked authority to "transform" that definition with an administrative rule. *Id.*, at 468–469, 435 P. 3d, at 614–615.

Several Justices wrote separately. All agreed that Rule 1 was invalid, but they expressed differing views on whether the scholarship program was consistent with the Montana and United States Constitutions. Justice Gustafson's concurrence argued that the program violated not only Montana's no-aid provision but also the Federal Establishment and Free Exercise Clauses. *Id.*, at 475–479, 435 P. 3d, at 619–621. Justice Sandefur echoed the majority's conclusion that applying the no-aid provision was consistent with the Free Exercise Clause, and he dismissed the "modern jurisprudence" of that Clause as "unnecessarily complicate[d]" due to "increasingly value-driven hairsplitting and overstretching." *Id.*, at 482–484, 435 P. 3d, at 623–624.

Two Justices dissented. Justice Rice would have held that the scholarship program was permissible under the no-aid provision. He criticized the majority for invalidating the program "*sua sponte*," contending that no party had challenged it under the State Constitution. *Id.*, at 495, 435 P. 3d, at 631. Justice Baker also would have upheld the program. In her view, the no-aid provision did not bar the use of scholarships at religious schools, and free exercise concerns could arise under the Federal Constitution if it did. *Id.*, at 493–494, 435 P. 3d, at 630.

We granted certiorari. 588 U. S. ___ (2019).

# II

## A

The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." We have recognized a " 'play in the joints' " between what the Establishment Clause permits and the Free Exercise Clause compels." *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, ___ (2017) (slip op., at 6) (quoting *Locke* v. *Davey*, 540 U. S. 712, 718 (2004)). Here, the parties do not dispute that the scholarship program is permissible under the Establishment Clause. Nor could they. We have repeatedly held that the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs. See, *e.g.*, *Locke*, 540 U. S., at 719; *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 839 (1995). See also *Trinity Lutheran*, 582 U. S., at ___ (slip op., at 6) (noting the parties' agreement that the Establishment Clause was not violated by including churches in a playground resurfacing program). Any Establishment Clause objection to the scholarship program here is particularly unavailing because the government support makes its way to religious schools only as a result of Montanans independently

choosing to spend their scholarships at such schools. See *Locke*, 540 U. S., at 719; *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 649–653 (2002). The Montana Supreme Court, however, held as a matter of state law that even such indirect government support qualified as "aid" prohibited under the Montana Constitution.

The question for this Court is whether the Free Exercise Clause precluded the Montana Supreme Court from applying Montana's no-aid provision to bar religious schools from the scholarship program. For purposes of answering that question, we accept the Montana Supreme Court's interpretation of state law—including its determination that the scholarship program provided impermissible "aid" within the meaning of the Montana Constitution—and we assess whether excluding religious schools and affected families from that program was consistent with the Federal Constitution.[2]

The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, "protects religious observers against unequal treatment" and against "laws that impose special disabilities on the basis of religious status." *Trinity Lutheran*, 582 U. S., at ___, ___ (slip op., at 6, 9) (internal quotation marks and alterations omitted); see *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940). Those "basic principle[s ]" have long guided this Court. *Trinity Lutheran*, 582 U. S., at ___–___ (slip op., at 6–9). See, *e.g.*, *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947) (a State "cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation"); *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 449 (1988) (the Free Exercise Clause protects against laws that "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens").

Most recently, *Trinity Lutheran* distilled these and other decisions to the same effect into the "unremarkable" conclusion that disqualifying otherwise eligible recipients from a public benefit "solely because of their religious character" imposes "a penalty on the free exercise of religion that triggers the most exacting scrutiny." 582 U. S., at ___–___ (slip op., at 9–10). In *Trinity Lutheran*, Missouri provided grants to help nonprofit organizations pay for playground resurfacing, but a state policy disqualified any organization "owned or controlled by a church, sect, or other religious entity." *Id.*, at ___ (slip op., at 2). Because of that policy, an otherwise eligible church-owned preschool was denied a grant to resurface its playground. Missouri's policy discriminated against the Church "simply because of what it is—a church," and so the policy was subject to the "strictest scrutiny," which it failed. *Id.*, at ___–___ (slip op., at 11–15). We acknowledged that the State had not "criminalized" the way in which the Church worshiped or "told the Church that it cannot subscribe to a certain view of the Gospel." *Id.*, at ___ (slip op., at 11). But the State's discriminatory policy was "odious to our Constitution all the same." *Id.*, at ___ (slip op., at 15).

Here too Montana's no-aid provision bars religious schools from public benefits solely because of the religious character of the schools. The provision also bars parents who wish to send their children to a religious school from those same benefits, again solely because of the religious character of the school. This is apparent from the plain text. The provision bars aid to any school "controlled in whole or in part by any church, sect, or denomination." Mont. Const., Art. X, §6(1). The provision's title—"Aid prohibited to sectarian schools"—confirms that the provision singles out schools based on their religious character. *Ibid.* And the Montana Supreme Court explained that the

provision forbids aid to any school that is "sectarian," "religiously affiliated," or "controlled in whole or in part by churches." 393 Mont., at 464–467, 435 P. 3d, at 612–613. The provision plainly excludes schools from government aid solely because of religious status. See *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 9–10).

The Department counters that *Trinity Lutheran* does not govern here because the no-aid provision applies not because of the religious character of the recipients, but because of how the funds would be used—for "religious education." Brief for Respondents 38. In *Trinity Lutheran*, a majority of the Court concluded that the Missouri policy violated the Free Exercise Clause because it discriminated on the basis of religious status. A plurality declined to address discrimination with respect to "religious uses of funding or other forms of discrimination." 582 U. S., at \_\_\_, n. 3 (slip op., at 14, n. 3). The plurality saw no need to consider such concerns because Missouri had expressly discriminated "based on religious identity," *ibid.*, which was enough to invalidate the state policy without addressing how government funds were used.

This case also turns expressly on religious status and not religious use. The Montana Supreme Court applied the no-aid provision solely by reference to religious status. The Court repeatedly explained that the no-aid provision bars aid to "schools controlled in whole or in part by churches," "sectarian schools," and "religiously-affiliated schools." 393 Mont., at 463–467, 435 P. 3d, at 611–613. Applying this provision to the scholarship program, the Montana Supreme Court noted that most of the private schools that would benefit from the program were "religiously affiliated" and "controlled by churches," and the Court ultimately concluded that the scholarship program ran afoul of the Montana Constitution by aiding "schools controlled by churches." *Id.*, at 466–467, 435 P. 3d, at 613–614. The Montana Constitution discriminates based on religious status just like the Missouri policy in *Trinity Lutheran*, which excluded organizations "owned or controlled by a church, sect, or other religious entity." 582 U. S., at \_\_\_ (slip op., at 2).

The Department points to some language in the decision below indicating that the no-aid provision has the goal or effect of ensuring that government aid does not end up being used for "sectarian education" or "religious education." 393 Mont., at 460, 466–467, 435 P. 3d, at 609, 613–614. The Department also contrasts what it characterizes as the "completely non-religious" benefit of playground resurfacing in *Trinity Lutheran* with the unrestricted tuition aid at issue here. Tr. of Oral Arg. 31. General school aid, the Department stresses, could be used for religious ends by some recipients, particularly schools that believe faith should "*permeate*[ ]" everything they do. Brief for Respondents 39 (quoting *State ex rel. Chambers* v. *School Dist. No. 10*, 155 Mont. 422, 438, 472 P. 2d 1013, 1021 (1970)). See also *post*, at 8, 13 (BREYER, J., dissenting).

Regardless, those considerations were not the Montana Supreme Court's basis for applying the no-aid provision to exclude religious schools; that hinged solely on religious status. Status-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses.

Undeterred by *Trinity Lutheran*, the Montana Supreme Court applied the no-aid provision to hold that religious schools could not benefit from the scholarship program. 393 Mont., at 464–468, 435 P. 3d, at 612–614. So applied, the provision "impose[s] special disabilities on the basis of religious status" and "condition[s] the availability of benefits upon a recipient's willingness to surrender [its] religiously impelled status." *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 9–10) (quoting *Church of*

*Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 533 (1993), and *McDaniel* v. *Paty*, 435 U. S. 618, 626 (1978) (plurality opinion) (alterations omitted)). To be eligible for government aid under the Montana Constitution, a school must divorce itself from any religious control or affiliation. Placing such a condition on benefits or privileges "inevitably deters or discourages the exercise of First Amendment rights." *Trinity Lutheran*, 582 U. S., at ____ (slip op., at 11) (quoting *Sherbert* v. *Verner*, 374 U. S. 398, 405 (1963) (alterations omitted)). The Free Exercise Clause protects against even "indirect coercion," and a State "punishe[s] the free exercise of religion" by disqualifying the religious from government aid as Montana did here. *Trinity Lutheran*, 582 U. S., at ____–____ (slip op., at 10–11) (internal quotation marks omitted). Such status-based discrimination is subject to "the strictest scrutiny." *Id.*, at ____ (slip op., at 11).

None of this is meant to suggest that we agree with the Department, Brief for Respondents 36–40, that some lesser degree of scrutiny applies to discrimination against religious uses of government aid. See *Lukumi*, 508 U. S., at 546 (striking down law designed to ban religious practice involving alleged animal cruelty, explaining that a law "target[ing] religious conduct for distinctive treatment or advanc[ing] legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases"). Some Members of the Court, moreover, have questioned whether there is a meaningful distinction between discrimination based on use or conduct and that based on status. See *Trinity Lutheran*, 582 U. S., at ____–____ (slip op., at 1–2) (GORSUCH, J., joined by THOMAS, J., concurring in part) (citing, *e.g.*, *Lukumi*, 508 U. S. 520, and *Thomas* v. *Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707 (1981)). We acknowledge the point but need not examine it here. It is enough in this case to conclude that strict scrutiny applies under *Trinity Lutheran* because Montana's no-aid provision discriminates based on religious status.

## B

Seeking to avoid *Trinity Lutheran*, the Department contends that this case is instead governed by *Locke* v. *Davey*, 540 U. S. 712 (2004). See also *post*, at 5 (BREYER, J., dissenting); *post*, at 9 (SOTOMAYOR, J., dissenting). *Locke* also involved a scholarship program. The State of Washington provided scholarships paid out of the State's general fund to help students pursuing postsecondary education. The scholarships could be used at accredited religious and nonreligious schools alike, but Washington prohibited students from using the scholarships to pursue devotional theology degrees, which prepared students for a calling as clergy.  This prohibition prevented Davey from using his scholarship to obtain a degree that would have enabled him to become a pastor. We held that Washington had not violated the Free Exercise Clause.

*Locke* differs from this case in two critical ways. First, *Locke* explained that Washington had "merely chosen not to fund a distinct category of instruction": the "essentially religious endeavor" of training a minister "to lead a congregation." *Id.*, at 721. Thus, Davey "was denied a scholarship because of what he proposed *to do*—use the funds to prepare for the ministry." *Trinity Lutheran*, 582 U. S., at ____ (slip op., at 12). Apart from that narrow restriction, Washington's program allowed scholarships to be used at "pervasively religious schools" that incorporated religious instruction throughout their classes. *Locke*, 540 U. S., at 724–725. By contrast, Montana's Constitution does not zero in on any particular "essentially religious" course of instruction at a religious school. Rather, as we have explained, the no-aid provision

bars all aid to a religious school "simply because of what it is," putting the school to a choice between being religious or receiving government benefits. *Trinity Lutheran*, 582 U. S., at ____ (slip op., at 12). At the same time, the provision puts families to a choice between sending their children to a religious school or receiving such benefits.

Second, *Locke* invoked a "historic and substantial" state interest in not funding the training of clergy, 540 U. S., at 725, explaining that "opposition to . . . funding 'to support church leaders' lay at the historic core of the Religion Clauses," *Trinity Lutheran*, 582 U. S., at ____ (slip op., at 13) (quoting *Locke*, 540 U. S., at 722). As evidence of that tradition, the Court in *Locke* emphasized that the propriety of state-supported clergy was a central subject of founding-era debates, and that most state constitutions from that era prohibited the expenditure of tax dollars to support the clergy. See *id.*, at 722–723.

But no comparable "historic and substantial" tradition supports Montana's decision to disqualify religious schools from government aid. In the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones. "Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy." L. Jorgenson, The State and the Non-Public School, 1825–1925, p. 4 (1987); *e.g.*, R. Gabel, Public Funds for Church and Private Schools 210, 217–218, 221, 241–243 (1937); C. Kaestle, Pillars of the Republic: Common Schools and American Society, 1760–1860, pp. 166–167 (1983). Local governments provided grants to private schools, including religious ones, for the education of the poor. M. McConnell, et al., Religion and the Constitution 318–319 (4th ed. 2016). Even States with bans on government-supported clergy, such as New Jersey, Pennsylvania, and Georgia, provided various forms of aid to religious schools. See Kaestle, *supra*, at 166–167; Gabel, *supra*, at 215–218, 241–245, 372–374; cf. *Locke*, 540 U. S., at 723. Early federal aid (often land grants) went to religious schools. McConnell, *supra*, at 319. Congress provided support to denominational schools in the District of Columbia until 1848, *ibid.*, and Congress paid churches to run schools for American Indians through the end of the 19th century, see *Quick Bear* v. *Leupp*, 210 U. S. 50, 78 (1908); Gabel, *supra*, at 521–523. After the Civil War, Congress spent large sums on education for emancipated freedmen, often by supporting denominational schools in the South through the Freedmen's Bureau. McConnell, *supra*, at 323.[3]

The Department argues that a tradition *against* state support for religious schools arose in the second half of the 19th century, as more than 30 States—including Montana—adopted no-aid provisions. See Brief for Respondents 40–42 and App. D. Such a development, of course, cannot by itself establish an early American tradition. JUSTICE SOTOMAYOR questions our reliance on aid provided during the same era by the Freedmen's Bureau, *post*, at 10 (dissenting opinion), but we see no inconsistency in recognizing that such evidence may reinforce an early practice but cannot create one. In addition, many of the no-aid provisions belong to a more checkered tradition shared with the Blaine Amendment of the 1870s. That proposal—which Congress nearly passed—would have added to the Federal Constitution a provision similar to the state no-aid provisions, prohibiting States from aiding "sectarian" schools. See *Mitchell* v. *Helms*, 530 U. S. 793, 828 (2000) (plurality opinion). "[I]t was an open secret that 'sectarian' was code for 'Catholic.'" *Ibid.*; see Jorgenson, *supra*, at 70. The Blaine Amendment was "born of bigotry" and "arose at a time of pervasive hostility to the Catholic Church and to Catholics in general"; many of its state counterparts have a similarly "shameful pedigree." *Mitchell*, 530 U. S., at 828–829 (plurality opinion); see Jorgenson, *supra*, at 69–70, 216; Jeffries & Ryan, A

Political History of the Establishment Clause, 100 Mich. L. Rev. 279, 301–305 (2001). The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause.

The Department argues that several States have rejected referendums to overturn or limit their no-aid provisions, and that Montana even re-adopted its own in the 1970s, for reasons unrelated to anti-Catholic bigotry. See Brief for Respondents 20, 42. But, on the other side of the ledger, many States today—including those with no-aid provisions—provide support to religious schools through vouchers, scholarships, tax credits, and other measures. See Brief for Oklahoma et al. as *Amici Curiae* 29–31, 33–35; Brief for Petitioners 5. According to petitioners, 20 of 37 States with no-aid provisions allow religious options in publicly funded scholarship programs, and almost all allow religious options in tax credit programs. Reply Brief 22, n. 9.

All to say, we agree with the Department that the historical record is "complex." Brief for Respondents 41. And it is true that governments over time have taken a variety of approaches to religious schools. But it is clear that there is no "historic and substantial" tradition against aiding such schools comparable to the tradition against state-supported clergy invoked by *Locke*.

## C

Two dissenters would chart new courses. Justice Sotomayor would grant the government "some room" to "single . . . out" religious entities "for exclusion," based on what she views as "the interests embodied in the Religion Clauses." *Post*, at 8, 9 (quoting *Trinity Lutheran*, 582 U. S., at ___, ___ (Sotomayor, J., dissenting) (slip op., at 8, 9)). Justice Breyer, building on his solo opinion in *Trinity Lutheran*, would adopt a "flexible, context-specific approach" that "may well vary" from case to case. *Post*, at 14, 16; see *Trinity Lutheran*, 582 U. S., at ___ (Breyer, J., concurring in judgment). As best we can tell, courts applying this approach would contemplate the particular benefit and restriction at issue and discern their relationship to religion and society, taking into account "context and consequences measured in light of [the] purposes" of the Religion Clauses. *Post*, at 16–17, 19 (quoting *Van Orden* v. *Perry*, 545 U. S. 677, 700 (2005) (Breyer, J., concurring in judgment)). What is clear is that Justice Breyer would afford much freer rein to judges than our current regime, arguing that "there is 'no test-related substitute for the exercise of legal judgment.' " *Post*, at 19 (quoting *Van Orden*, 545 U. S., at 700 (opinion of Breyer, J.)).

The simplest response is that these dissents follow from prior separate writings, not from the Court's decision in *Trinity Lutheran* or the decades of precedent on which it relied. These precedents have "repeatedly confirmed" the straightforward rule that we apply today: When otherwise eligible recipients are disqualified from a public benefit "solely because of their religious character," we must apply strict scrutiny. *Trinity Lutheran*, 582 U. S., at ___–___ (slip op., at 6–10). This rule against express religious discrimination is no "doctrinal innovation." *Post*, at 13 (opinion of Breyer, J.). Far from it. As *Trinity Lutheran* explained, the rule is "unremarkable in light of our prior decisions." 582 U. S., at ___ (slip op., at 10).

For innovation, one must look to the dissents. Their "room[y]" or "flexible" approaches to discrimination against religious organizations and observers would mark a significant departure from our free exercise precedents. The protections of the Free

Exercise Clause do not depend on a "judgment-by-judgment analysis" regarding whether discrimination against religious adherents would somehow serve ill-defined interests. Cf. *Medellín* v. *Texas*, 552 U. S. 491, 514 (2008).

## D

Because the Montana Supreme Court applied the no-aid provision to discriminate against schools and parents based on the religious character of the school, the "strictest scrutiny" is required. *Supra*, at 9, 12 (quoting *Trinity Lutheran*, 582 U. S., at ____ (slip op., at 11)). That "stringent standard," *id.*, at ____ (slip op., at 14), is not "watered down but really means what it says," *Lukumi*, 508 U. S., at 546 (internal quotation marks and alterations omitted). To satisfy it, government action "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Ibid.* (quoting *McDaniel*, 435 U. S., at 628).

The Montana Supreme Court asserted that the no-aid provision serves Montana's interest in separating church and State "more fiercely" than the Federal Constitution. 393 Mont., at 467, 435 P. 3d, at 614. But "that interest cannot qualify as compelling" in the face of the infringement of free exercise here. *Trinity Lutheran*, 582 U. S., at ____ (slip op., at 14). A State's interest "in achieving greater separation of church and State than is already ensured under the Establishment Clause . . . is limited by the Free Exercise Clause." *Ibid.* (quoting *Widmar* v. *Vincent*, 454 U. S. 263, 276 (1981)).

The Department, for its part, asserts that the no-aid provision actually *promotes* religious freedom. In the Department's view, the no-aid provision protects the religious liberty of taxpayers by ensuring that their taxes are not directed to religious organizations, and it safeguards the freedom of religious organizations by keeping the government out of their operations. See Brief for Respondents 17–23. An infringement of First Amendment rights, however, cannot be justified by a State's alternative view that the infringement advances religious liberty. Our federal system prizes state experimentation, but not "state experimentation in the suppression of free speech," and the same goes for the free exercise of religion. *Boy Scouts of America* v. *Dale*, 530 U. S. 640, 660 (2000).

Furthermore, we do not see how the no-aid provision promotes religious freedom. As noted, this Court has repeatedly upheld government programs that spend taxpayer funds on equal aid to religious observers and organizations, particularly when the link between government and religion is attenuated by private choices. A school, concerned about government involvement with its religious activities, might reasonably decide for itself not to participate in a government program. But we doubt that the school's liberty is enhanced by eliminating any option to participate in the first place.

The Department's argument is especially unconvincing because the infringement of religious liberty here broadly affects both religious schools and adherents. Montana's no-aid provision imposes a categorical ban—"broadly and strictly" prohibiting "*any* type of aid" to religious schools. 393 Mont., at 462–463, 435 P. 3d, at 611. This prohibition is far more sweeping than the policy in *Trinity Lutheran*, which barred churches from one narrow program for playground resurfacing—causing "in all likelihood" only "a few extra scraped knees." 582 U. S., at ____ (slip op., at 15).

And the prohibition before us today burdens not only religious schools but also the families whose children attend or hope to attend them. Drawing on "enduring American tradition," we have long recognized the rights of parents to direct "the

religious upbringing" of their children. *Wisconsin* v. *Yoder*, 406 U. S. 205, 213–214, 232 (1972). Many parents exercise that right by sending their children to religious schools, a choice protected by the Constitution. See *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925). But the no-aid provision penalizes that decision by cutting families off from otherwise available benefits if they choose a religious private school rather than a secular one, and for no other reason.

The Department also suggests that the no-aid provision advances Montana's interests in public education. According to the Department, the no-aid provision safeguards the public school system by ensuring that government support is not diverted to private schools. See Brief for Respondents 19, 25. But, under that framing, the no-aid provision is fatally underinclusive because its "proffered objectives are not pursued with respect to analogous nonreligious conduct." *Lukumi*, 508 U. S., at 546. On the Department's view, an interest in public education is undermined by diverting government support to *any* private school, yet the no-aid provision bars aid only to *religious* ones. A law does not advance "an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Id.*, at 547 (internal quotation marks and alterations omitted). Montana's interest in public education cannot justify a no-aid provision that requires only religious private schools to "bear [its] weight." *Ibid.*

A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious.

## III

The Department argues that, at the end of the day, there is no free exercise violation here because the Montana Supreme Court ultimately eliminated the scholarship program altogether. According to the Department, now that there is no program, religious schools and adherents cannot complain that they are excluded from any generally available benefit.

Two dissenters agree. JUSTICE GINSBURG reports that the State of Montana simply chose to "put all private school parents in the same boat" by invalidating the scholarship program, *post*, at 5–6, and JUSTICE SOTOMAYOR describes the decision below as resting on state law grounds having nothing to do with the federal Free Exercise Clause, see *post*, at 1, 6.

The descriptions are not accurate. The Montana Legislature created the scholarship program; the Legislature never chose to end it, for policy or other reasons. The program was eliminated by a court, and not based on some innocuous principle of state law. Rather, the Montana Supreme Court invalidated the program pursuant to a state law provision that expressly discriminates on the basis of religious status. The Court applied that provision to hold that religious schools were barred from participating in the program. Then, seeing no other "mechanism" to make absolutely sure that religious schools received no aid, the court chose to invalidate the entire program. 393 Mont., at 466–468, 435 P. 3d, at 613–614.

The final step in this line of reasoning eliminated the program, to the detriment of religious and non-religious schools alike. But the Court's error of federal law occurred at the beginning. When the Court was called upon to apply a state law no-aid provision to exclude religious schools from the program, it was obligated by the Federal Constitution to reject the invitation. Had the Court recognized that this was, indeed, "one of those cases" in which application of the no-aid provision "would violate

the Free Exercise Clause," *id.*, at 468, 435 P. 3d, at 614, the Court would not have proceeded to find a violation of that provision. And, in the absence of such a state law violation, the Court would have had no basis for terminating the program. Because the elimination of the program flowed directly from the Montana Supreme Court's failure to follow the dictates of federal law, it cannot be defended as a neutral policy decision, or as resting on adequate and independent state law grounds.[4]

The Supremacy Clause provides that "the Judges in every State shall be bound" by the Federal Constitution, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. "[T]his Clause creates a rule of decision" directing state courts that they "must not give effect to state laws that conflict with federal law[ ]." *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. 320, 324 (2015). Given the conflict between the Free Exercise Clause and the application of the no-aid provision here, the Montana Supreme Court should have "disregard[ed]" the no-aid provision and decided this case "conformably to the [C]onstitution" of the United States. *Marbury* v. *Madison*, 1 Cranch 137, 178 (1803). That "*supreme* law of the land" condemns discrimination against religious schools and the families whose children attend them. *Id.*, at 180. They are "member[s] of the community too," and their exclusion from the scholarship program here is "odious to our Constitution" and "cannot stand." *Trinity Lutheran*, 582 U. S., at ___, ___ (slip op., at 11, 15).[5]

\*      \*      \*

The judgment of the Montana Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

## Notes

1  The Legislature provided the same tax credit to taxpayers who donate to public schools for the purpose of supporting innovative educational programs or curing technology deficiencies at such schools. See Mont. Code Ann. §15-30-3110 (2019).

2  JUSTICE SOTOMAYOR argues that the Montana Supreme Court "expressly declined to reach any federal issue." *Post*, at 6 (dissenting opinion). Not so. As noted, *supra*, at 5, the Montana Supreme Court recognized that certain applications of the no-aid provision could "violate the Free Exercise Clause." 393 Mont. 446, 468, 435 P. 3d 603, 614 (2018). But the Court expressly concluded that "this is not one of those cases." *Ibid.*

3  JUSTICE BREYER sees "no meaningful difference" between concerns animating bans on support for clergy and bans on support for religious schools. *Post*, at 8–10. But evidently early American governments did. See *supra,* at 14.  JUSTICE BREYER contests particular examples but acknowledges that some bans on clergy support did not bar certain "sponsorship" of religious schools. *Post*, at 10. And, central to the issue here, he certainly does not identify a consistent early tradition, of the sort invoked in *Locke*, *against* support for religious schools.  Virginia's opposition to establishing university theology professorships and chartering theological seminaries, see *ibid.*, do not fit the bill. Buckley, After Disestablishment: Thomas Jefferson's Wall of Separation in Antebellum Virginia, 61 J. So. Hist. 445, 452–453 (1995).  JUSTICE BREYER also invokes Madison's objections to the Virginia Assessment Bill, *post*, at 8–9, but Madison

objected in part because the Bill provided special support to certain churches and clergy, thereby "violat[ing] equality by subjecting some to peculiar burdens." Memorial and Remonstrance Against Religious Assessments, Art. 4, reprinted in *Everson*, 330 U. S., at 66 (appendix to dissenting opinion of Rutledge, J.); see V. Muñoz, God and the Founders: Madison, Washington, and Jefferson 21–22, 27 (2009). It is far from clear that the same objections extend to programs that provide equal support to all private primary and secondary schools. If anything, excluding religious schools from such programs would appear to impose the "peculiar burdens" feared by Madison.

4  JUSTICE SOTOMAYOR worries that, in light of our decision, the Montana Supreme Court must "order the State to recreate" a scholarship program that "no longer exists." *Post*, at 6 (dissenting opinion). But it was the Montana Supreme Court that eliminated the program, in the decision below, which remains under review. Our reversal of that decision simply restores the status quo established by the Montana Legislature before the Court's error of federal law. We do not consider any alterations the Legislature may choose to make in the future.

5  In light of this holding, we do not address petitioners' claims that the no-aid provision, as applied, violates the Equal Protection Clause or the Establishment Clause.

**TOP**

# Concurrence

SUPREME COURT OF THE UNITED STATES

---

No. 18–1195

---

KENDRA ESPINOZA, ET AL., PETITIONERS *v.* MONTANA DEPARTMENT OF REVENUE, ET AL.

on writ of certiorari to the supreme court of montana

[June 30, 2020]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

The Court correctly concludes that Montana's no-aid provision expressly discriminates against religion in violation of the Free Exercise Clause. And it properly provides relief to Montana religious schools and the petitioners who wish to use Montana's scholarship program to send their children to such schools. I write separately to explain how this Court's interpretation of the Establishment Clause continues to hamper free exercise rights. Until we correct course on that interpretation, individuals will continue to face needless obstacles in their attempts to vindicate their religious freedom.

# I

## A

This case involves the Free Exercise Clause, not the Establishment Clause. But as in all cases involving a state actor, the modern understanding of the Establishment Clause is a "brooding omnipresence," *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205, 222 (1917) (Holmes, J., dissenting), ever ready to be used to justify the government's infringement on religious freedom. Under the modern, but erroneous, view of the Establishment Clause, the government must treat all religions equally and treat religion equally to nonreligion. As this Court stated in its first case applying the Establishment Clause to the States, the government cannot "pass laws which aid one religion, aid all religions, or prefer one religion over another." *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 15 (1947); see also *post*, at 3 (BREYER, J., dissenting). This "equality principle," the theory goes, prohibits the government from expressing any preference for religion—or even permitting any signs of religion in the governmental realm. Thus, when a plaintiff brings a free exercise claim, the government may defend its law, as Montana did here, on the ground that the law's restrictions are *required* to prevent it from "establishing" religion.

This understanding of the Establishment Clause is unmoored from the original meaning of the First Amendment. As I have explained in previous cases, at the founding, the Clause served only to "protec[t] States, and by extension their citizens, from the imposition of an established religion by the *Federal* Government." *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 678 (2002) (THOMAS, J., concurring) (emphasis added); see also, *e.g.*, *Town of Greece* v. *Galloway*, 572 U. S. 565, 604–607 (2014) (THOMAS, J., concurring in part and concurring in judgment); *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 49–50 (2004) (THOMAS, J., concurring in judgment). Under this view, the Clause resists incorporation against the States. See *Town of Greece*, 572 U. S., at 604 (opinion of THOMAS, J.).

There is mixed historical evidence concerning whether the Establishment Clause was understood as an individual right at the time of the Fourteenth Amendment's ratification. *Id.*, at 607–608. Even assuming that the Clause creates a right and that such a right could be incorporated, however, it would only protect against an "establishment" of religion as understood at the founding, *i.e.*, " 'coercion of religious orthodoxy and of financial support by force of law and threat of penalty.' " *Id.*, at 608 (quoting *Lee* v. *Weisman*, 505 U. S. 577, 640 (1992) (Scalia, J., dissenting); emphasis deleted); *American Legion* v. *American Humanist Assn.*, 588 U. S. \_\_\_, \_\_\_ (2019) (THOMAS, J., concurring in judgment) (slip op., at 3); see also McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2131–2181 (2003); McConnell, Coercion: The Lost Element of Establishment, 27 Wm. & Mary L. Rev. 933, 936–939 (1986).[1]

Thus, the modern view, which presumes that States must remain both completely separate from and virtually silent on matters of religion to comply with the Establishment Clause, is fundamentally incorrect. Properly understood, the Establishment Clause does not prohibit States from favoring religion. They can legislate as they wish, subject only to the limitations in the State and Federal Constitutions. See Muñoz, The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation, 8 U. Pa. J. Const. L. 585, 632 (2006).

B

I have previously made these points in Establishment Clause cases to show that the Clause likely has no application to the States or, if it is capable of incorporation, that the Court employs a far broader test than the Clause's original meaning. See, *e.g.*, *American Legion*, 588 U. S., at ____ (opinion concurring in judgment) (slip op., at 1); *Town of Greece*, 572 U. S., at 604 (opinion concurring in part and concurring in judgment). But the Court's wayward approach to the Establishment Clause also impacts its free exercise jurisprudence. Specifically, its overly expansive understanding of the former Clause has led to a correspondingly cramped interpretation of the latter.

Under this Court's current approach, state and local governments may rely on the Establishment Clause to justify policies that others wish to challenge as violations of the Free Exercise Clause. Once the government demonstrates that its policy is *required* for compliance with the Constitution, any claim that the policy infringes on free exercise cannot survive. A few examples suffice to illustrate this practice.

Of most relevance to this case is *Locke* v. *Davey*, 540 U. S. 712 (2004), which Montana principally relies on to justify its discriminatory law. In *Locke*, the Court held that prohibiting a student from using a generally available state scholarship to pursue a degree in devotional theology did not violate the student's free exercise rights. This was so, the Court said, in part because it furthered the State's "antiestablishment interests" in avoiding the education of religious ministers. *Id.*, at 722. But no antiestablishment interests, properly understood, were at issue in *Locke*. The State neither coerced students to study devotional theology nor conscripted taxpayers into supporting any form of orthodoxy. Thus, as I have explained, *Locke* incorrectly interpreted the Establishment Clause and should not impact free exercise challenges. *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, ___ (2017) (THOMAS, J., concurring). Yet, as Montana's proffered justification for its law shows, governments continue to rely on *Locke*'s improper understanding of "antiestablishment interests" to defend against free exercise challenges. See Brief for State of Colorado et al. as *Amici Curiae* 3, 10–12 (arguing that *Locke* justifies the 38 state constitutional provisions that are similar to Montana's); see also *Trinity Lutheran Church of Columbia, Inc.* v. *Pauley*, 788 F. 3d 779, 785 (CA8 2015), rev'd and remanded, 582 U. S. ___; *Eulitt* v. *Maine*, 386 F. 3d 344, 354 (CA1 2004); *post*, at 5–8 (BREYER, J., dissenting); *post*, at 9–10 (SOTOMAYOR, J., dissenting).

The Court has also repeatedly stated that a government has a compelling interest in avoiding an Establishment Clause violation altogether, which "may justify" abridging other First Amendment freedoms. See *Good News Club* v. *Milford Central School*, 533 U. S. 98, 112 (2001); *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 394 (1993); *Widmar* v. *Vincent*, 454 U. S. 263, 271 (1981). Unsurprisingly, governmental employers have relied on these pronouncements to defeat challenges from employees who alleged violations of their First Amendment rights. See, *e.g.*, *Berry* v. *Department of Social Servs.*, 447 F. 3d 642, 650–651 (CA9 2006); *Knight* v. *Connecticut Dept. of Public Health*, 275 F. 3d 156, 166 (CA2 2001); *Marchi* v. *Board of Cooperative Ed. Servs. of Albany*, 173 F. 3d 469, 475 (CA2 1999).

Finally, this Court's infamous test in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), has sometimes been understood to prohibit governmental practices that have the effect of endorsing religion. See *Lynch* v. *Donnelly*, 465 U. S. 668, 692 (1984) (O'Connor, J.,

concurring). This, too, presupposes that the Establishment Clause prohibits the government from favoring religion or taking steps to promote it. But as described *supra*, at 2–3, the Establishment Clause does nothing of the sort. The concern with avoiding endorsement has nevertheless been used to prohibit voluntary practices that potentially implicate free exercise rights, with courts and governments going so far as to make the "remarkable" suggestion "that even while off duty, a teacher or coach cannot engage in any outward manifestation of religious faith." *Kennedy* v. *Bremerton School Dist.*, 586 U. S. ___, ___ (2019) (slip op., at 5) (ALITO, J., concurring in denial of certiorari); see *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 308 (2000) (voluntary decision to begin football games with a prayer violated the Establishment Clause); see also *Kennedy* v. *Bremerton School Dist.*, 869 F. 3d 813, 831 (CA9 2017) (M. Smith, J., concurring) (coach's decision to lead voluntary prayer after football games); *Walz* v. *Egg Harbor Twp. Bd. of Ed.*, 342 F. 3d 271, 280 (CA3 2003) (student's decision to distribute small gifts with religious messages to classmates).

# II

The Court's current understanding of the Establishment Clause actually thwarts, rather than promotes, equal treatment of religion. Under a proper understanding of the Establishment Clause, robust and lively debate about the role of religion in government is permitted, even encouraged, at the state and local level. The Court's distorted view of the Establishment Clause, however, removes the entire subject of religion from the realm of permissible governmental activity, instead mandating strict separation.

This interpretation of the Establishment Clause operates as a type of content-based restriction on the government. The Court has interpreted the Free Speech Clause to prohibit content-based restrictions because they "value some forms of speech over others," *City of Ladue* v. *Gilleo*, 512 U. S. 43, 60 (1994) (O'Connor, J., concurring), thus tending to "tilt public debate in a preferred direction," *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 578–579 (2011). The content-based restriction imposed by this Court's Establishment Clause jurisprudence operates no differently. It communicates a message that religion is dangerous and in need of policing, which in turn has the effect of tilting society in favor of devaluing religion.

Historical evidence suggests that many advocates for this separationist view were originally motivated by hostility toward certain disfavored religions. See P. Hamburger, Separation of Church and State 391–454 (2002). And this Court's adoption of a separationist interpretation has itself sometimes bordered on religious hostility. Justice Black, well known for his role in formulating the Court's modern Establishment Clause jurisprudence, once described Catholic petitioners as "powerful sectarian religious propagandists" "looking toward complete domination and supremacy" of their "preferences and prejudices." *Board of Ed. of Central School Dist. No. 1* v. *Allen*, 392 U. S. 236, 251 (1968) (dissenting opinion). Other Members of the Court have characterized religions as "divisive forces." *Edwards* v. *Aguillard*, 482 U. S. 578, 584 (1987) (internal quotation marks omitted); *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 287 (1990) (Stevens, J., dissenting) (internal quotation marks omitted); *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign Cty.*, 333 U. S. 203, 231 (1948) (Frankfurter, J., concurring). And the Court once described a statute permitting employees to request accommodations to avoid work on the Sabbath as "arm[ing]" religious employees with

the "absolute and unqualified right" to pursue their religion "over all other . . . interests." *Estate of Thornton* v. *Caldor, Inc.*, 472 U. S. 703, 709–711 (1985). The siren song of religion is apparently so strong that we once held that public school teachers cannot provide assistance at parochial schools, lest they "subtly (or overtly) conform their instruction to the environment in which they teach." *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 388 (1985), overruled by *Agostini* v. *Felton*, 521 U. S. 203, 235 (1997). In the Court's view, "[t]he 'atmosphere' of a Catholic school ha[d] such power to influence the unsuspecting mind that it may move even public school . . . specialists to 'conform'—though their only contact with the school is to walk down its halls." McConnell, Religious Freedom at a Crossroads, 59 U. Chi. L. Rev. 115, 122 (1992).

Although such hostility may not be overtly expressed by the Court any longer, manifestations of this "trendy disdain for deep religious conviction" assuredly live on. *Locke*, 540 U. S., at 733 (Scalia, J., dissenting). They are evident in the fact that, unlike other constitutional rights, the mere exposure to religion can render an " 'offended observer' " sufficiently injured to bring suit against the government, *American Legion*, 588 U. S., at ___ (Gorsuch, J., concurring in judgment) (slip op., at 2), even if he has not been coerced in any way to participate in a religious practice, *Lee*, 505 U. S., at 584; *Engel* v. *Vitale*, 370 U. S. 421, 430 (1962).[2] We also see them in the special privilege of taxpayer standing in Establishment Clause challenges, even though such suits directly contravene Article III's restrictions on standing. See *Hein* v. *Freedom From Religion Foundation, Inc.*, 551 U. S. 587, 618 (2007) (Scalia, J., concurring in judgment); see also *Bowen* v. *Kendrick*, 487 U. S. 589, 618–620 (1988); *Flast* v. *Cohen*, 392 U. S. 83, 102–104 (1968). And they persist in the repeated denigration of those who continue to adhere to traditional moral standards, as well as laws even remotely influenced by such standards, as outmoded at best and bigoted at worst. See *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. ___, ___ (2018) (Thomas, J., concurring in part and concurring in judgment) (slip op., at 14); *Obergefell* v. *Hodges*, 576 U. S. 644, 712 (2015) (Roberts, C. J., dissenting). So long as this hostility remains, fostered by our distorted understanding of the Establishment Clause, free exercise rights will continue to suffer.

\*     \*     \*

As I have recently explained, this Court has an unfortunate tendency to prefer certain constitutional rights over others. See *United States* v. *Sineneng-Smith*, *ante*, at 6 (Thomas, J., concurring). The Free Exercise Clause, although enshrined explicitly in the Constitution, rests on the lowest rung of the Court's ladder of rights, and precariously so at that. Returning the Establishment Clause to its proper scope will not completely rectify the Court's disparate treatment of constitutional rights, but it will go a long way toward allowing free exercise of religion to flourish as the Framers intended. I look forward to the day when the Court takes up this task in earnest.

## Notes

1  A party wishing to expand the scope of the Establishment Clause beyond its meaning at the founding carries the burden of demonstrating that this broader reading is historically sound. *Town of Greece* v. *Galloway*, 572 U. S. 565, 607–608 (2014) (Thomas, J., concurring in part and concurring in judgment).

2  This stands in striking contrast to the Court's view in the free speech context that "the burden normally falls upon the viewer" to avoid offense "simply by averting his eyes." *Hill* v. *Colorado*, 530 U. S. 703, 753, n. 3 (2000) (Scalia, J., dissenting) (quoting *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 210–211 (1975); quotation altered)).

**TOP**

# Concurrence

SUPREME COURT OF THE UNITED STATES

No. 18–1195

KENDRA ESPINOZA, ET AL., PETITIONERS *v.* MONTANA DEPARTMENT OF REVENUE, ET AL.

on writ of certiorari to the supreme court of montana

[June 30, 2020]

JUSTICE ALITO, concurring.

I join the opinion of the Court in full. The basis of the decision below was a Montana constitutional provision that, according to the Montana Supreme Court, forbids parents from participating in a publicly funded scholarship program simply because they send their children to religious schools. Regardless of the motivation for this provision or its predecessor, its application here violates the Free Exercise Clause.

Nevertheless, the provision's origin is relevant under the decision we issued earlier this Term in *Ramos* v. *Louisiana*, 590 U. S. ____ (2020). The question in *Ramos* was whether Louisiana and Oregon laws allowing non-unanimous jury verdicts in criminal trials violated the Sixth Amendment. The Court held that they did, emphasizing that the States originally adopted those laws for racially discriminatory reasons. See *id.*, at ____–____ (slip op., at 1–3). The role of the Ku Klux Klan was highlighted. See *ibid.*; see also *id.*, at ____ (SOTOMAYOR, J., concurring in part) (slip op., at 4); *id.*, at ____ (KAVANAUGH, J., concurring in part) (slip op., at 12).

I argued in dissent that this original motivation, though deplorable, had no bearing on the laws' constitutionality because such laws can be adopted for non-discriminatory reasons, and "both States readopted their rules under different circumstances in later years." *Id.*, at ____ (slip op., at 3). But I lost, and *Ramos* is now precedent. If the original motivation for the laws mattered there, it certainly matters here.

The origin of Montana's "no-aid" provision, Mont. Const., Art. X, §6(1) (1972), is emphasized in petitioners' brief and in the briefs of numerous supporting *amici*. See Brief for Petitioners 31–45; Brief for United States as *Amicus Curiae* 1–2, 25; Brief for

Center for Constitutional Jurisprudence as *Amicus Curiae* 10–12; Brief for Pioneer Institute, Inc., as *Amicus Curiae* 5–17; Brief for Cato Institute as *Amicus Curiae* 2; Brief for State of Oklahoma et al. as *Amici Curiae* 16; Brief for Montana Catholic School Parents et al. as *Amici Curiae* 21–25; Brief for Senator Steve Daines et al. as *Amici Curiae* 1–27 (Sen. Daines Brief ); Brief for Becket Fund for Religious Liberty as *Amicus Curiae* 4–20 (Becket Fund Brief ); Brief for the Rutherford Institute as *Amicus Curiae* 2–10; Brief for Georgia Goal Scholarship Program, Inc., as *Amicus Curiae* 1–5, 16–21; Brief for Liberty Justice Center et al. as *Amici Curiae* 16–17; Brief for Alliance for Choice in Education as *Amicus Curiae* 4–8; Brief for Independence Institute as *Amicus Curiae* 4–26 (Independence Institute Brief ); Brief for Jewish Coalition for Religious Liberty as *Amicus Curiae* 1–5; Brief for Rusty Bowers et al. as *Amici Curiae* 8–9; Brief for Center for Education Reform et al. as *Amici Curiae* 21–27 (CER Brief ); Brief for Montana Family Foundation as *Amicus Curiae* 9–13; Brief for Arizona Christian School Tuition Organization et al. as *Amici Curiae* 14–22; Brief for Justice and Freedom Fund et al. as *Amici Curiae* 22–23; Brief for 131 Current and Former State Legislators as *Amici Curiae* 2–10.

These briefs, most of which were not filed by organizations affiliated with the Catholic Church, point out that Montana's provision was modeled on the failed Blaine Amendment to the Constitution of the United States. Named after House Speaker James Blaine, the Congressman who introduced it in 1875, the amendment was prompted by virulent prejudice against immigrants, particularly Catholic immigrants. In effect, the amendment would have "bar[red] any aid" to Catholic and other "sectarian" schools. *Mitchell* v. *Helms*, 530 U. S. 793, 828 (2000) (plurality opinion). As noted in a publication from the United States Commission on Civil Rights, a prominent supporter of this ban was the Ku Klux Klan.[1]

The Blaine Amendment was narrowly defeated, passing in the House but falling just short of the two-thirds majority needed in the Senate to refer the amendment to the States. See 4 Cong. Rec. 5191–5192 (1876) (House vote); *id.*, at 5595 (28 yeas, 16 nays in the Senate). Afterwards, most States adopted provisions like Montana's to achieve the same objective at the state level, often as a condition of entering the Union. Thirty-eight States still have these "little Blaine Amendments" today. See App. D to Brief for Respondents.

This history is well-known and has been recognized in opinions of this Court. See, *e.g.*, *Locke* v. *Davey*, 540 U. S. 712, 723, n. 7 (2004); *Mitchell*, 530 U. S., at 828–829 (plurality opinion); see also *ante*, at 15–16; *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 720–721 (2002) (Breyer, J., dissenting). But given respondents' and one dissent's efforts to downplay it in contravention of *Ramos*, see Brief for Respondents 16–23; *post*, at 4–5, n. 2 (Sotomayor, J., dissenting), it deserves a brief retelling.

A wave of immigration in the mid-19th century, spurred in part by potato blights in Ireland and Germany, significantly increased this country's Catholic population.[2] Nativist fears increased with it. An entire political party, the Know Nothings, formed in the 1850s "to decrease the polit ical influence of immigrants and Catholics," gaining hundreds of seats in Federal and State Government.[3]

Catholics were considered by such groups not as citizens of the United States, but as "soldiers of the Church of Rome,"[4] who "would attempt to subvert representative government."[5] Catholic education was a particular concern. As one series of newspaper articles argued, " 'Popery is the natural enemy of *general* education. . . . If it is establishing schools, it is to make them *prisons* of the youthful intellect of the country.' " C. Glenn, The Myth of the Common School 69 (1988) (Glenn) (quoting S.

Morse, Foreign Conspiracy Against the Liberties of the United States (1835)). With a Catholic school breaking ground in New York City, the New York Times ran an article titled "Sectarian Education. Anti-Public School Crusade. Aggressive Attitude of the Roman Catholic Clergy—The Terrors of the Church Threatened." N. Y. Times, Aug. 24, 1873, p. 8. The project, the article concluded, would cause "intense anxiety by all who are interested in upholding the admirable system of public school education." *Ibid.*

The feelings of the day are perhaps best encapsulated by this famous cartoon, published in Harper's Weekly in 1871, which depicts Catholic priests as crocodiles slithering hungrily toward American children as a public school crumbles in the background:

The resulting wave of state laws withholding public aid from "sectarian" schools cannot be understood outside this context. Indeed, there are stronger reasons for considering original motivations here than in *Ramos* because, unlike the neutral language of Louisiana's and Oregon's non- unanimity rules, Montana's no-aid provision retains the bigoted code language used throughout state Blaine Amendments.

The failed Blaine Amendment would have prohibited any public funds or lands devoted to schooling from "ever be[ing] under the control of any religious sect." 4 Cong. Rec. 205 (1875). As originally adopted, Montana's Constitution prohibited the state and local governments from "ever mak[ing,] directly or indirectly, any appropriation" for "any sectarian purpose" or "to aid in the support of any school . . . controlled in whole or in part by any church, sect or denomination whatever." Mont. Const., Art. XI, §8 (1889). At the time, "it was an open secret that 'sectarian' was code for 'Catholic.' " *Mitchell*, 530 U. S., at 828 (plurality opinion). Dictionaries defined a "sectarian" as a member "of a party  in religion which has separated itself from the established church, or which holds tenets different from those of the prevailing denomination in a kingdom or state"—a heretic. N. Webster, An American Dictionary of the English Language (1828); see also Independence Institute Brief 9–16 (collecting several similar definitions). Newspapers throughout the country, including in Montana, used the word in similarly pejorative fashion. See *id.*, at 17–26 (collecting several articles). The term was likewise used against Mormons and Jews.[6]

Backers of the Blaine Amendment either held nativist views or capitalized on them. When Blaine introduced the amendment, The Nation reported that it was "a Constitutional amendment directed against the Catholics"—while surmising that Blaine, whose Presidential ambitions were known, sought "to use it in the campaign to catch anti- Catholic votes."[7] The amendment had its intended galvanizing effect. "Its popularity was so great" that "even congressional Democrats," who depended on Catholic votes, "were expected to support it," and the congressional floor debates were rife with anti-Catholic sentiment, including "a tirade against Pope Pius IX."[8]

Montana's no-aid provision was the result of this same prejudice. When Congress allowed Montana into the Union in 1889, it still included prominent supporters of the failed Blaine Amendment. See Sen. Daines Brief 10–13. The Act enabling Montana to become a State required "[t]hat provision shall be made for the establishment and maintenance  of systems of public schools . . . free from sectarian control." Act of Feb. 22, 1889, §4, 25 Stat. 677; see also Becket Fund Brief 17–18 (quoting one Senator's description of the Act as " 'completing the unfinished work of the failed Blaine Amendment' "). Montana thereafter adopted its constitutional rule against public funding for any school "controlled" by a "sect." Mont. Const., Art. XI, §8 (1889). There appears to have been no doubt which schools that meant. As petitioners show, Montana's religious schools—and its private schools in general—were predominantly

Catholic, see Brief for Petitioners 42, and n. 41, and anti-Catholicism was alive in Montana too. See, *e.g.*, Sen. Daines Brief 1–3 (describing a riot over an anti-Catholic sign hung over a Butte saloon on Independence Day, 1894).

Respondents argue that Montana's no-aid provision merely reflects a state interest in "preserv[ing] funding for public schools," Brief for Respondents 7, known as "common schools" during the Blaine era. Yet just as one cannot separate the Blaine Amendment from its context, "[o]ne cannot separate the founding of the American common school and the strong nativist movement."[9]

Spearheaded by Horace Mann, Secretary of the Massachusetts Board of Education from 1837 to 1848, the common-school movement did not aim to establish a system that was scrupulously neutral on matters of religion. (In a country like ours, that would have been exceedingly difficult, if not impossible.) Instead the aim was to establish a system that would inculcate a form of "least-common- denominator Protestantism."[10] This was accomplished with

daily reading from the King James Bible, a curriculum that, Mann said, let the book "speak for itself." 4 Life and Works of Horace Mann 312 (1891) (Mann's 12th annual report on the Massachusetts schools; emphasis deleted). Yet it was an affront to many Christians and especially Catholics, not to mention non-Christians.[11]

Mann's goal was to "Americanize" the incoming Catholic immigrants. In fact, he and other proponents of the common-school movement used language and made insinuations that today would be considered far more inflammatory. In his 10th annual report on the Massachusetts schools, Mann described the State as "parental," assuming the responsibility of weaning children "[f ]or the support of the poor, nine-tenths of whose cost originate with foreigners or come from one prolific vice," meaning alcohol. 4 Life and Works of Horace Mann, at 132, 134 (emphasis deleted). In other writing, he described the common-school movement as " 'laboring to elevate mankind into the upper and purer regions of civilization, Christianity, and the worship of the true God; all those who are obstructing the progress of this cause are impelling the race backwards into barbarism and idolatry.' " Glenn 171–172 (quoting an 1846 article by Mann in the Common School Journal).

These "obstructers" were Catholic and other religious groups and families who objected to the common schools' religious programming, which, as just seen, was not neutral on matters of religion. Objections met violent response. In Massachusetts and elsewhere, Catholic students were beaten and expelled for refusing to read from the King James Bible.[12] In New York, a mob destroyed the residence of Bishop John Hughes, who had argued that, if the State

was going to fund religious public education, it should also support church schools. The militia needed to be called to protect St. Patrick's Cathedral.[13] Most notorious were the Philadelphia Bible Riots. In 1844, a rumor circulated in the city's nativist newspapers that a school director, who was Catholic, had ordered that Bible reading be stopped.[14] Months of scaremongering broke out into riots that left two of the city's Catholic churches burned and several people dead. Only by calling out the militia and positioning a cannon in front of a Catholic church—which itself had been taking cannon fire—were the riots ultimately quelled.[15]

Catholic and Jewish schools sprang up because the common schools were not neutral on matters of religion. "Faced with public schools that were culturally Protestant and with curriculum[s] and textbooks that were, consequently, rife with

material that Catholics and Jews found offensive, many Catholics and Orthodox Jews created separate schools," and those "who could afford to do so sent their children to" those schools.[16]

But schools require significant funding, and when religious organizations requested state assistance, Mann and others labeled them "sectarian"—that is, people who had separated from the prevailing orthodoxy. See, *e.g.*, Jeffries & Ryan 298, 301. The Blaine movement quickly followed.

In 1854, the Know Nothing party, in many ways a forerunner of the Ku Klux Klan,[17] took control of the legislature in Mann's State of Massachusetts and championed one of the first constitutional bans on aid to "sectarian" schools (along with attempting to limit the franchise to native-born people). See Viteritti, Blaine's Wake 669–670.

Respondents and one dissent argue that Montana's no-aid provision was cleansed of its bigoted past because it was readopted for non-bigoted reasons in Montana's 1972 constitutional convention. See *post*, at 4–5, n. 2 (opinion of Sotomayor, J.); see also Brief for Respondents 18; Tr. of Oral Arg. 22–23. They emphasize that the convention included Catholics, just as the constitutional convention that readopted Louisiana's purportedly racist non-unanimous jury provision included black delegates. As noted, a virtually identical argument was rejected in *Ramos*, even though " 'no mention was made of race' " during the Louisiana convention debates. 590 U. S., at ___ (Alito, J., dissenting) (slip op., at 3) (quoting *State v. Hankton*, 2012–0375, p. 19 (La. App. 4 Cir. 8/2/13), 122 So. 3d 1028, 1038). Under *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's "uncomfortable past" must still be "[e]xamined." 590 U. S., at ___, n. 44 (opinion of the Court) (slip op., at 14, n. 44). And here, it is not so clear that the animus was scrubbed.

Delegates at Montana's constitutional convention in 1972 acknowledged that the no-aid provision was "a badge of bigotry," with one Catholic delegate recalling "being let out of school in the fourth grade to erase three 'Ks' on the front doors of the Catholic church in Billings."[18] Nevertheless the  convention proposed, and the State adopted, a provision with the *same* material language, prohibiting public aid "for any *sectarian* purpose or to aid any . . . school . . . controlled in whole or in part by any church, *sect*, or denomination." Mont. Const., Art. X, §6(1) (1972) (emphasis added). A leading definition of "sect" at the time, as during the Blaine era, was "a dissenting religious body; *esp: one that is heretical in the eyes of other members within the same communion*." Webster's Third New International Dictionary 2052 (1971) (emphasis added).

Given the history above, the terms "sect" and "sectarian" are disquieting remnants. And once again, there appears to have been little doubt which schools this provision would predominantly affect. In 1970, according to the National Center for Educational Statistics, Montana had 61 religiously affiliated schools. Forty-five were Roman Catholic.[19] Not only did the convention delegates acknowledge the no-aid provision's original anti-Catholic intent, but the Montana Supreme Court had only ever applied the provision once—to a Catholic school, and one that had "carrie[d] a sizeable portion of the total educational load" in Anaconda, Montana. *State ex rel. Chambers* v. *School Dist. No. 10 of Deer Lodge Cty.*, 155 Mont. 422, 430, 472 P. 2d 1013, 1017 (1970) (*per curiam*). The Montana Catholic Conference also voiced concerns about access to

school funds, and a convention delegate proposed removing the no-aid provision's restriction on "indirect" aid. See Convention Tr. 2010, 2027. That amendment was rejected.

Thus, the no-aid provision's terms keep it "[t]ethered" to its original "bias," and it is not clear at all that the State "actually confront[ed]" the provision's "tawdry past in reenacting it." *Ramos*, 590 U. S., at ____ (SOTOMAYOR, J., concurring in part) (slip op., at 4). After all, whereas the no-aid provision had originally been foisted on Montana, the State readopted it voluntarily—"sectarian" references included. Whether or not the State did so for any reason that could be called legitimate, the convention delegates recognized that the provision would "continue to mean and do whatever it does now," Convention Tr. 2014 (statement of Delegate Loendorf ), and the discrimination in this case shows that the provision continues to have its originally intended effect. And even if Montana had done more to address its no-aid provision's past, that would of course do nothing to resolve the bias inherent in the Blaine Amendments among the 17 States, by respondents' count, that have not readopted or amended them since around the turn of the 20th century.[20]

Today's public schools are quite different from those envisioned by Horace Mann, but many parents of many different faiths still believe that their local schools inculcate a worldview that is antithetical to what they teach at home. Many have turned to religious schools, at considerable expense, or have undertaken the burden of homeschooling. The tax-credit program adopted by the Montana Legisla ture but overturned by the Montana Supreme Court provided necessary aid for parents who pay taxes to support the public schools but who disagree with the teaching there. The program helped parents of modest means do what more affluent parents can do: send their children to a school of their choice. The argument that the decision below treats everyone the same is reminiscent of Anatole France's sardonic remark that " '[t]he law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.' " J. Cournos, A Modern Plutarch 35 (1928).

# Notes

1 See U. S. Commission on Civil Rights, School Choice: The Blaine Amendments & Anti-Catholicism 36 (2007).

2 See T. Anbinder, Nativism and Slavery: The Northern Know Nothings and the Politics of the 1850s, pp. 6–8 (1992).

3 *Id.*, at 127–128, 135.

4 *Id.*, at 110 (emphasis deleted).

5 P. Hamburger, Separation of Church and State 206 (2002).

6 See Natelson, Why Nineteenth Century Bans on "Sectarian" Aid Are Facially Unconstitutional: New Evidence on Plain Meaning, 19 Federalist Soc. Rev. 98, 104 (2018).

7 Green, The Blaine Amendment Reconsidered, 36 Am. J. Legal Hist. 38, 54 (1992) (quoting article; internal quotation marks omitted).

8  DeForrest, An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns, 26 Harv. J. L. & Pub. Pol'y 551, 566, 570 (2003); see also, e.g., Becket Fund Brief 5–11.

9  Viteritti, Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law, 21 Harv. J. L. & Pub. Pol'y 657, 667 (1998) (Viteritti, Blaine's Wake).

10  Jeffries & Ryan, A Political History of the Establishment Clause, 100 Mich. L. Rev. 279, 298 (2001) (Jeffries & Ryan); see also, e.g., CER Brief 23–26.

11  See Glenn 166; Lain, God, Civic Virtue, and the American Way: Reconstructing Engel, 67 Stan. L. Rev. 479, 487–488 (2015).

12  See Jeffries & Ryan 300.

13  See Viteritti, Choosing Equality: School Choice, the Constitution, and Civil Society 151 (1999).

14  See Sekulow & Tedesco, The Story Behind Vidal v. Girard's Executors: Joseph Story, the Philadelphia Bible Riots, and Religious Liberty, 32 Pepperdine L. Rev. 605, 630 (2005).

15  See id., at 633–638.

16  Brief for Union of Orthodox Jewish Congregations of America as Amicus Curiae in Trinity Lutheran Church of Columbia, Inc. v. Comer, O. T. 2016, No. 15–577, p. 15 (internal quotation marks, citation, and brackets omitted).

17  See generally Myers, Know Nothing and Ku Klux Klan, 219 North American Rev. 1 (Jan. 1924).

18  6 Montana Constitutional Convention 1971–1972, Proceedings and Transcript, p. 2012 (Mont. Legislature and Legislative Council) (Convention Tr.) (statement of Delegate Schiltz); see also, e.g., id., at 2010 (statement of Delegate Harbaugh) (recognizing the provision as a Blaine Amendment, which "espoused the purpose of the Know-nothing Party"); id., at 2011 (statement of Delegate Toole) (recognizing the provision as a Blaine Amendment); id., at 2013 (statement of Chairman Graybill) (same); id., at 2027 (statement of Delegate Campbell) (same); id., at 2030 (statement of Delegate Champoux) (same).

19  See Nat. Center for Educational Statistics, Statistics of Nonpublic Elementary and Secondary Schools 1970–71, pp. 32–33 (1973) (Table 1).

20  Ala. Const., Art. XIV, §263 (1901); Ariz. Const., Art. II, §12, Art. IX, §10 (1912); Colo. Const., Art. V, §34, Art. IX, §7 (1876); Del. Const., Art. X, §3 (1897); Ind. Const., Art. I, §6 (1851); Ky. Const. §189 (1891); Miss. Const., Art. 8, §208 (1890); Nev. Const., Art. XI, §10 (1880); N. H. Const., Pt. II, Art. 83 (1877); N. M. Const., Art. XII, §3 (1911); N. D. Const., Art. VIII, §152 (1889); Ohio Const., Art. VI, §2 (1851); Okla. Const., Art. II, §5 (1907); Ore. Const., Art. I, §5 (1857); S. D. Const., Art. VIII, §16 (1889); Wis. Const., Art. I, §18, Art. X, §3 (1848); Wyo. Const., Art. I, §19, Art. VII, §8 (1889).

**TOP**

# Concurrence

SUPREME COURT OF THE UNITED STATES

----

No. 18–1195

----

KENDRA ESPINOZA, ET AL., PETITIONERS *v.* MONTANA DEPARTMENT OF REVENUE, ET AL.

on writ of certiorari to the supreme court of montana

[June 30, 2020]

JUSTICE GORSUCH, concurring.

The people of Montana, acting through their legislature, adopted a school choice program. It provided a modest tax credit to individuals and businesses who donated to nonprofit scholarship organizations. As the program began to take root, Montana had just one scholarship organization. It granted scholarships to families who were struggling financially or had children with disabilities. Recipients were free to use the scholarships at the schools of their choice. Some families chose secular schools, others religious ones.

Kendra Espinoza, the lead petitioner in this case, is a single mother who works three jobs. She planned to use scholarships to help keep her daughters at an accredited religious school. That is, until the Montana Supreme Court struck down the tax credit program. Those seeking a tax credit were free to choose whether to direct their donations to the independent scholarship organization; the organization was then free to choose scholarship recipients; and, after that, parents were free to choose where to use those scholarships. But, the Montana Supreme Court held, this arrangement impermissibly allowed state funds to find their way to religious schools, in violation of a state constitutional provision. By way of remedy, the court ordered an end to the tax credit program, effectively killing Montana's school choice experiment: Without tax credits, donations dry up, and so do the scholarships enabling school choice.

Today, the Court explains how the Montana Constitution, as interpreted by the State Supreme Court, violates the First Amendment by discriminating against parents and schools based on their religious status or identity. The Court explains, too, why the State Supreme Court's decision to eliminate the tax credit program fails to mask the discrimination. But for the Montana Constitution's impermissible discrimination, after all, the legislature's tax credit and scholarship program would be still operating for the benefit of Ms. Espinoza and everyone else. I agree with all the Court says on these scores and join its opinion in full. I write separately only to address an additional point.

The Court characterizes the Montana Constitution as discriminating against parents and schools based on "religious status and not religious use." *Ante,* at 10. No doubt, the Court proceeds as it does to underscore how the outcome of this case follows from *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___ (2017), where

the Court struck down a similar public benefits restriction that, it held, discriminated on the basis of religious status. No doubt, too, discrimination on the basis of religious status raises grave constitutional questions for the reasons the Court describes. But I was not sure about characterizing the State's discrimination in *Trinity Lutheran* as focused only on religious status, and I am even less sure about characterizing the State's discrimination here that way. See *id.,* at ___–___ (slip op., at 1–2) (GORSUCH, J., concurring in part).

In the first place, discussion of religious activity, uses, and conduct—not just status—pervades this record. The Montana Constitution forbids the use of public funds "for any sectarian purpose," including to "aid" sectarian schools. Art. X, §6(1). Tracking this directive, the State Supreme Court reasoned that the legislature's tax credit program  could be used to "subsidiz[e] the sectarian school's educational program" and thereby "strengthen . . . religious education." 393 Mont. 446, 466, 467, 435 P. 3d 603, 613, 614 (2018). Meanwhile, Ms. Espinoza admits that she would like to use scholarship funds to enable her daughters to be taught in school the "same Christian values" they are taught at home. App. to Pet. for Cert. 152. Finally, in its briefing before this Court, Montana has represented that its Constitution focuses on preventing the use of tax credits to subsidize religious activity.

Not only is the record replete with discussion of activities, uses, and conduct, any jurisprudence grounded on a status-use distinction seems destined to yield more questions than answers. Does Montana seek to prevent religious parents and schools from participating in a public benefits program (status)? Or does the State aim to bar public benefits from being employed to support religious education (use)? Maybe it's possible to describe what happened here as status-based discrimination. But it seems equally, and maybe more, natural to say that the State's discrimination focused on what religious parents and schools *do*—teach religion. Nor are the line-drawing challenges here unique; they have arisen before and will again. See *Trinity Lutheran*, 582 U. S., at ___–___ (slip op., at 1–2) (opinion of GORSUCH, J.).

Most importantly, though, it is not as if the First Amendment cares. The Constitution forbids laws that prohibit the free exercise of religion. That guarantee protects not just the right to *be* a religious person, holding beliefs inwardly and secretly; it also protects the right to *act* on those beliefs outwardly and publicly. At the time of the First Amendment's adoption, the word "exercise" meant (much as it means today) some "[l]abour of the body," a "[u]se," as in the "actual application of any thing," or a "[p]ractice," as in some "outward performance." 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773); see also *ibid.* (5th ed. 1784). By speaking of a right to "free exercise," rather than  a right "of conscience," an alternative the framers considered and rejected, our Constitution "extended the broader freedom of action to all believers." McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1490 (1989). So whether the Montana Constitution is better described as discriminating against religious status or use makes no difference: It is a violation of the right to free exercise either way, unless the State can show its law serves some compelling and narrowly tailored governmental interest, conditions absent here for reasons the Court thoroughly explains.

Our cases have long recognized the importance of protecting religious actions, not just religious status. In its very first decision applying the Free Exercise Clause to the States, the Court explained that the First Amendment protects the "freedom to act" as well as the "freedom to believe." *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940). The Court then reversed a criminal conviction against Newton Cantwell and his sons,

Jehovah's Witnesses who were prosecuted not because of who they were but because of what they did—proselytize door-to-door without a license. See *id.*, at 300–301, 307, 311. In fact, this Court has already recognized that parents' decisions about the education of their children—the very conduct at issue here—can constitute protected religious activity. In *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972), the Court held that Amish parents could not be compelled to send their children to a public high school if doing so would conflict with the dictates of their faith. See *id.*, at 214–215, 220, 234–235.

Even cases that seemingly focus on religious status do so with equal respect for religious actions. In *McDaniel* v. *Paty*, 435 U. S. 618 (1978) (plurality opinion), for example, a State had barred the clergy from serving in the state legislature or at the state constitutional convention. See *id.*, at 620–622. Some have described the discrimination there as focused on religious " ' status.' " *Trinity Lutheran*, 582 U. S., at ___ (slip op., at 7) (quoting *McDaniel*, 435 U. S., at 627) (emphasis deleted). But no one can question that conduct lurked just beneath the surface. After all, the State identified clergy based on their "conduct and activity," and the plurality opinion concluded that the State's prohibition was based on "status, acts, and conduct." 435 U. S., at 627; see also *id.*, at 630–633 (Brennan, J., concurring in judgment); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520 (1993).

Consistently, too, we have recognized the First Amendment's protection for religious conduct in public benefits cases. When the government chooses to offer scholarships, unemployment benefits, or other affirmative assistance to its citizens, those benefits necessarily affect the "baseline against which burdens on religion are measured." *Locke* v. *Davey*, 540 U. S. 712, 726 (2004) (Scalia, J., dissenting) (citing *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947)). So, as we have long explained, the government "penalize[s] religious activity" whenever it denies to religious persons an "equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 449 (1988). What benefits the government decides to give, whether meager or munificent, it must give without discrimination against religious conduct.

Our cases illustrate the point. In *Sherbert* v. *Verner*, 374 U. S. 398 (1963), for example, a State denied unemployment benefits to Adell Sherbert not because she was a Seventh Day Adventist but because she had put her faith into practice by refusing to labor on the day she believed God had set aside for rest. See *id.*, at 399–401. Recognizing her right to exercise her religion freely, the Court held that Ms. Sherbert was entitled to benefits. See *id.*, at 410. Similarly, in *Thomas* v. *Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707 (1981), the Court held that Eddie Thomas had the right to resign from his job and still collect an unemployment check after he decided he could not assemble military tank turrets consistent with the teachings of his faith. See *id.*, at 709–712, 720. In terms that speak equally to our case, the Court explained that the government tests the Free Exercise Clause whenever it "conditions receipt of an important benefit upon conduct proscribed by a religious faith, or . . . denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.*, at 717–718.

The First Amendment protects religious uses and actions for good reason. What point is it to tell a person that he is free to *be* Muslim but he may be subject to discrimination for *doing* what his religion commands, attending Friday prayers, living his daily life in harmony with the teaching of his faith, and educating his children in its

ways? What does it mean to tell an Orthodox Jew that she may have her religion but may be targeted for observing her religious calendar? Often, governments lack effective ways to control what lies in a person's heart or mind. But they can bring to bear enormous power over what people say and do. The right to *be* religious without the right to *do* religious things would hardly amount to a right at all.

If the government could intrude so much in matters of faith, too, winners and losers would soon emerge. Those apathetic about religion or passive in its practice would suffer little in a world where only inward belief or status is protected. But what about those with a deep faith that requires them to do things passing legislative majorities might find unseemly or uncouth—like knocking on doors to spread their beliefs, refusing to build tank turrets during wartime, or teaching their children at home? "[T]hose who take their religion seriously, who think that their religion should affect the whole of their lives," and those whose religious beliefs and practices are least popular, would face  the greatest disabilities. *Mitchell* v. *Helms*, 530 U. S. 793, 827–828 (2000) (plurality opinion). A right meant to protect minorities instead could become a cudgel to ensure conformity.

It doesn't take a long or searching look through history or around the world to see how this can go. In the century before our Nation's founding, Oliver Cromwell promised to Catholics in Ireland: " 'As to freedom of conscience, I meddle with no man's conscience; but if you mean by that, liberty to celebrate the Mass, I would have you understand that in no place where the power of the Parliament of England prevails shall that be permitted.' " *McDaniel*, 435 U. S., at 631, n. 2 (opinion of Brennan, J.) (quoting S. Hook, Paradoxes of Freedom 23 (1962)); see also 1 T. Carlyle, Oliver Cromwell's Letters and Speeches 395 (1845) (recording Cromwell's October 19, 1649, letter to the Governor of Ross). Even today, in fiefdoms small and large, people of faith are made to choose between receiving the protection of the State and living lives true to their religious convictions.

Of course, in public benefits cases like the one before us the stakes are not so dramatic. Individuals are forced only to choose between forgoing state aid or pursuing some aspect of their faith. The government does not put a gun to the head, only a thumb on the scale. But, as so many of our cases explain, the Free Exercise Clause doesn't easily tolerate either; any discrimination against religious exercise must meet the demands of strict scrutiny. In this way, the Clause seeks to ensure that religion remains "a matter of voluntary choice by individuals and their associations, [where] each sect ' flourish[es] according to the zeal of its adherents and the appeal of its dogma,' " influenced by neither where the government points its gun nor where it places its thumb. *McDaniel*, 435 U. S., at 640 (opinion of Brennan J.) (quoting *Zorach* v. *Clauson*, 343 U. S. 306, 313 (1952)).

Montana's Supreme Court disregarded these foundational principles. Effectively, the court told the state legislature and parents of Montana like Ms. Espinoza: You can have school choice, but if anyone dares to choose to send a child to an accredited religious school, the program will be shuttered. That condition on a public benefit discriminates against the free exercise of religion. Calling it discrimination on the basis of religious status or religious activity makes no difference: It is unconstitutional all the same.

**TOP**

# Dissent

SUPREME COURT OF THE UNITED STATES

_____

No. 18–1195

_____

KENDRA ESPINOZA, ET AL., PETITIONERS *v.* MONTANA DEPARTMENT OF REVENUE, ET AL.

on writ of certiorari to the supreme court of montana

[June 30, 2020]

JUSTICE GINSBURG, with whom JUSTICE KAGAN joins, dissenting.

The Montana Legislature enacted a scholarship program to fund tuition for students attending private secondary schools. See Mont. Code Ann. §15–30–3111 (2019). In the decision below, the Montana Supreme Court struck down that program in its entirety. The program, the state court ruled, conflicted with the State Constitution's no-aid provision, which forbids government appropriations to religious schools. Mont. Const., Art. X, §6(1). Parents who sought to use the program's scholarships to fund their children's religious education challenged the state court's ruling. They argue in this Court that the Montana court's application of the no-aid provision violated the Free Exercise Clause of the Federal Constitution. Importantly, the parents, petitioners here, disclaim any challenge to the no-aid provision on its face. They instead argue—and this Court's majority accepts—that the provision is unconstitutional as applied because the First Amendment prohibits discrimination in tuition-benefit programs based on a school's religious status. Because the state court's decision does not so discriminate, I would reject petitioners' free exercise claim.

The First Amendment prohibits the government from "mak[ing a] law . . . prohibiting the free exercise" of religion. U. S. Const., Amdt. 1. This Court's decisions have recognized that a burden on religious exercise may occur both when a State proscribes religiously motivated activity and when a law pressures an adherent to abandon her religious faith or practice. *Sherbert* v. *Verner*, 374 U. S. 398, 406 (1963); *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 140–141 (1987). The Free Exercise Clause thus protects against "indirect coercion or penalties on the free exercise of religion." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 450 (1988). Invoking that principle in *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___ (2017), the Court observed that disqualifying an entity from a public benefit "solely because of [the entity's] religious character" can impose "a penalty on the free exercise of religion." *Id.*, at ___–___ (slip op., at 9–10). The Court then concluded that a Missouri law making churches ineligible for a government playground-refurbishing grant impermissibly burdened the church's religious exercise by "put[ting it] to the choice between being a church and receiving a government benefit." *Id.*, at ___ (slip op., at 13).

Petitioners argue that the Montana Supreme Court's decision fails when measured against *Trinity Lutheran*. I do not see how. Past decisions in this area have entailed *differential treatment* occasioning a burden on a plaintiff 's religious exercise. *Lyng*, 485 U. S., at 450–451; *Trinity Lutheran*, 582 U. S., at ____ (slip op., at 11). This case is missing that essential component. Recall that the Montana court remedied the state constitutional violation by striking the scholarship program in its entirety. Under that decree, secular and sectarian schools alike are ineligible for benefits, so the decision cannot be said to entail differential treatment based on petitioners' religion. Put somewhat differently, petitioners argue that the Free Exercise Clause requires a State to treat institutions and people neutrally when doling out a benefit—and neutrally is how Montana  treats them in the wake of the state court's decision.

Accordingly, the Montana Supreme Court's decision does not place a burden on petitioners' religious exercise. Petitioners may still send their children to a religious school. And the Montana Supreme Court's decision does not pressure them to do otherwise. Unlike the law in *Trinity Lutheran*, the decision below puts petitioners to no "choice": Neither giving up their faith, nor declining to send their children to sectarian schools, would affect their entitlement to scholarship funding. 582 U. S., at ____ (slip op., at 10). There simply are no scholarship funds to be had.

True, petitioners expected to be eligible for scholarships under the legislature's program, and to use those scholarships at a religious school. And true, the Montana court's decision disappointed those expectations along with those of parents who send their children to secular private schools. But, as JUSTICE SOTOMAYOR observes, see *post*, at 3 (dissenting opinion), this Court has consistently refused to treat neutral government action as unconstitutional solely because it fails to benefit religious exercise. See *Sherbert*, 374 U. S., at 412 (Douglas, J., concurring) ("[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.").

These considerations should be fatal to petitioners' free exercise claim, yet the Court does not confront them. Instead, the Court decides a question that, in my view, this case does not present: "[W]hether excluding religious schools and affected families from [the scholarship] program was consistent with the Federal Constitution." *Ante*, at 7 (majority opinion). The Court goes on to hold that the Montana Supreme Court's application of the no-aid provision violates the Free Exercise Clause because it " 'condition[s] the availability of benefits upon a recipient's willingness to surrender [its] religiously impelled status.' " *Ante*, at 11 (quoting *Trinity Lutheran*, 582 U. S., at ____–____ (slip  op., at 9–10); alterations in original). As I see it, the decision below— which maintained neutrality between sectarian and nonsectarian private schools—did no such thing.

Finding the "beginning" of the Montana Supreme Court's decision erroneous, this Court regards the state court's ultimate judgment as irrelevant. *Ante*, at 20–22. In the Court's recounting, the Montana court first held that religious schools must be excluded from the scholarship program—necessarily determining that the Free Exercise Clause permitted that result—and only subsequently struck the entire program as a way of carrying out its holding. See *ante*, at 21 ("When the [Montana Supreme] Court was called upon to apply a state law no-aid provision to exclude religious schools from the program, it was obligated by the Federal Constitution to reject the invitation."). But the initial step described by this Court is imaginary. The Montana court determined that the scholarship program violated the no-aid provision

because it resulted in aid to religious schools. Declining to rewrite the statute to exclude those schools, the state court struck the program in full. 393 Mont. 446, 463–468, 435 P. 3d 603, 612–614 (2018). In doing so, the court never made religious schools ineligible for an otherwise available benefit, and it never decided that the Free Exercise Clause would allow that outcome.[1]

Thus, contrary to this Court's assertion, see *ante,* at 21, the no-aid provision did not require the Montana Supreme

Court to "exclude" religious schools from the scholarship program. The provision mandated only that the state treasury not be used to fund religious schooling. As this case demonstrates, that mandate does not necessarily require differential treatment. The no-aid provision can be implemented in two ways. A State may distinguish within a benefit program between secular and sectarian schools, or it may decline to fund all private schools. The Court agrees that the First Amendment permits the latter course. See *ante,* at 20. Because that is the path the Montana Supreme Court took in this case, there was no reason for this Court to address the alternative.

By urging that it is impossible to apply the no-aid provision in harmony with the Free Exercise Clause, the Court seems to treat the no-aid provision itself as unconstitutional. See *ante,* at 21. Petitioners, however, disavowed a facial First Amendment challenge, and the state courts were never asked to address the constitutionality of the no-aid provision divorced from its application to a specific government issue. See, *e.g.*, Reply Brief 8, 20, 21–22. This Court therefore had no call to reach that issue. See *Adams* v. *Robertson,* 520 U. S. 83, 90 (1997) (*per curiam*) (" '[I]t would be unseemly in our dual system of government' to disturb the finality of state judgments on a federal ground that the state court did not have occasion to consider." (quoting *Webb* v. *Webb,* 451 U. S. 493, 500 (1981))). The only question properly raised is whether application of the no-aid provision to bar all state-sponsored private-school funding violates the Free Exercise Clause. For the reasons stated, *supra,* at 2–3, it does not.

Nearing the end of its opinion, the Court writes: "A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Ante,* at 20. Because Montana's Supreme Court did not make such a decision—its judgment put all private school parents in the same boat—this Court had no occasion to address the matter.[2] On that sole ground, and reaching no other issue, I dissent from the Court's judgment.

# Notes

[1] In its opinion, Montana's highest court stated without explanation that this case is not one in which application of the no-aid provision violates the Free Exercise Clause. 393 Mont., at 468, 435 P. 3d, at 614. When the court made that statement, it had already invalidated the entire scholarship program. *Ibid.* Accordingly, the court's statement cannot be understood to have approved of excluding religious schools from an otherwise available scholarship. Instead, the statement is most fairly read to convey that the Free Exercise Clause allows a State to decline to fund any private schools, an outcome that avoids state aid to religious schools.

2 The Montana Supreme Court's decision leaves parents where they would be had the State never enacted a scholarship program. In that event, no one would argue that Montana was obliged to provide such a program solely for parents who send their children to religious schools. But cf. *ante,* at 13 (ALITO, J., concurring) (inapt reference to Anatole France's remark).

**TOP**

# Dissent

SUPREME COURT OF THE UNITED STATES

No. 18–1195

KENDRA ESPINOZA, ET AL., PETITIONERS *v.* MONTANA DEPARTMENT OF REVENUE, ET AL.

on writ of certiorari to the supreme court of montana

[June 30, 2020]

JUSTICE BREYER, with whom JUSTICE KAGAN joins as to Part I, dissenting.

The First Amendment's Free Exercise Clause guarantees the right to practice one's religion. At the same time, its Establishment Clause forbids government support for religion. Taken together, the Religion Clauses have helped our Nation avoid religiously based discord while securing liberty for those of all faiths.

This Court has long recognized that an overly rigid application of the Clauses could bring their mandates into conflict and defeat their basic purpose. See, *e.g., Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 668–669 (1970). And this potential conflict is nowhere more apparent than in cases involving state aid that serves religious purposes or institutions. In such cases, the Court has said, there must be constitutional room, or " 'play in the joints,' " between "what the Establishment Clause permits and the Free Exercise Clause compels." *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, ___ (2017) (slip op., at 6) (quoting *Locke* v. *Davey*, 540 U. S. 712, 718 (2004)). Whether a particular state program falls within that space depends upon the nature of the aid at issue, considered in light of the Clauses' objectives.

The majority barely acknowledges the play-in-the-joints doctrine here. It holds that the Free Exercise Clause forbids a State to draw any distinction between secular and religious uses of government aid to private schools that is not required by the Establishment Clause. The majority's approach and its conclusion in this case, I fear, risk the kind of entanglement and conflict that the Religion Clauses are intended to prevent. I consequently dissent.

# I

In 2015, Montana's Legislature enacted a statute giving a $150 tax credit to any person who contributes at least that amount to an organization that provides scholarships for students who attend non-public schools. See Mont. Code Ann. §15–30–3111 (2019). The overwhelming majority of these schools are religious. (In 2018, 94% of the scholarships awarded helped to pay religious-school tuition. 393 Mont. 446, 466, 478–479, and n. 6, 435 P. 3d 603, 613, 621, and n. 6; App to Pet. for Cert. 123, 125.) The Montana Supreme Court held that this program violated a state constitutional provision that forbids the legislature to make "any direct or indirect appropriation or payment" for "any sectarian purpose or to aid any church, school, academy . . . controlled in whole or in part by any church, sect, or denomination." Mont. Const., Art. X, §6.

Petitioners are the parents of students who attend one of Montana's Christian private schools. They believe that the tenets of their faith require them to send their children to a religious school. And they claim that, by preventing them from using state-supported scholarships at those schools, the Montana Supreme Court's interpretation of Montana's Constitution violates their First Amendment right to free exercise. I shall assume, for purposes of this opinion, that petitioners' free exercise claim survived the Montana Supreme Court's wholesale invalidation of the tax credit program. Cf. *ante*, at 2 (GINSBURG, J., dissenting); *post*, at 2–3 (SOTOMAYOR, J., dissenting).

## A

We all recognize that the First Amendment prohibits discrimination against religion. At the same time, our history and federal constitutional precedent reflect a deep concern that state funding for religious teaching, by stirring fears of preference or in other ways, might fuel religious discord and division and thereby threaten religious freedom itself. See, *e.g.*, *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 794–796 (1973). The Court has consequently made it clear that the Constitution commits the government to a "position of neutrality" in respect to religion. *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 226 (1963).

The inherent tension between the Establishment and Free Exercise Clauses means, however, that the "course of constitutional neutrality in this area cannot be an absolutely straight line." *Walz*, 397 U. S., at 669. Indeed, "rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Ibid.*

That, in significant part, is why the Court has held that "there is room for play in the joints" between the Clauses' express prohibitions that is "productive of a benevolent neutrality," allowing "religious exercise to exist without sponsorship and without interference." *Ibid.* It has held that there "are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Locke*, 540 U. S., at 719; see *Cutter* v. *Wilkinson*, 544 U. S. 709, 719 (2005). And that "play in the joints" should, in my view, play a determinative role here.

It may be that, under our precedents, the Establishment Clause does not *forbid* Montana to subsidize the education of petitioners' children. But, the question here is whether the Free Exercise Clause *requires* it to do so. The majority

believes that the answer to that question is "yes." It writes that "once a State decides" to support nonpublic education, "it cannot disqualify some private schools solely because they are religious." *Ante*, at 20. I shall explain why I disagree.

# B

As the majority acknowledges, two cases are particularly relevant: *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, and *Locke* v. *Davey*, 540 U. S. 712. In *Trinity Lutheran*, we considered whether Missouri could exclude a church-owned preschool from applying for a grant to renovate its playground. The Court assumed that the Establishment Clause *permitted* the State to make grants of this kind to church-affiliated schools. See 582 U. S., at ___ (slip op., at 6). But, the Court added, this did not "answer the question" because there is " 'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." *Ibid.* The Court therefore went on to consider the burdens that Missouri's law imposed upon the church's right to free exercise.

By excluding schools with ties to churches, the Court wrote, the State's law put the church "to a choice: It may participate in an otherwise available benefit program or remain a religious institution." *Id.*, at ___ (slip op., at 10). That kind of " 'indirect coercion,' " the Court explained, "imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Id.*, at ___, ___ (slip op., at 10, 11). Finding that a State's "policy preference for skating as far as possible from religious establishment concerns" could not satisfy that standard, the Court held that the Free Exercise Clause *required* Missouri to include church-affiliated schools as candidates for playground renovation grants. *Id.*, at ___ (slip op., at 14).

We confronted a different kind of aid program, and came to a different conclusion, in *Locke*. There, we reviewed a Washington law that offered taxpayer-funded scholarships to college students on the express condition that they not pursue degrees that were " 'devotional in nature or designed to induce religious belief.' " 540 U. S., at 716; see *id.*, at 719, n. 2 (quoting Wash. Const., Art. II, §11). Again, the Court assumed that the Establishment Clause *permitted* the State to support students seeking such degrees. 540 U. S., at 719. But the Court concluded that the Free Exercise Clause did not *require* it to do so.

The Court observed that the State's decision not to fund devotional degrees did not penalize religious exercise or require anyone to choose between their faith and a "government benefit." *Id.*, at 721. Rather, the State had "merely chosen not to fund a distinct category of instruction" that was "essentially religious." *Ibid.* Although Washington's Constitution drew "a more stringent line than that drawn by the United States Constitution," the Court found that the State's position was consistent with the widely shared view, dating to the founding of the Republic, that taxpayer-supported religious indoctrination poses a threat to individual liberty. *Id.*, at 722. Given this "historic and substantial state interest," the Court concluded, it would be inappropriate to subject Washington's law to a "presumption of unconstitutionality." *Id.*, at 725. And, without such a presumption, the claim that the exclusion of devotional studies violated the Free Exercise Clause "must fail," for "[i]f any room exists between the two Religion Clauses, it must be here." *Ibid.*; see *id.*, at 721, n. 3.

C

The majority finds that the school-playground case, *Trinity Lutheran*, and not the religious-studies case, *Locke*, controls here. I disagree. In my view, the program at issue here is strikingly similar to the program we upheld in *Locke* and importantly different from the program we found unconstitutional in *Trinity Lutheran*. Like the State of Washington in *Locke*, Montana has chosen not to fund (at a distance) "an essentially religious endeavor"—an education  designed to " 'induce religious faith.' " *Locke*, 540 U. S., at 716, 721. That kind of program simply cannot be likened to Missouri's decision to exclude a church school from applying for a grant to resurface its playground.

The Court in *Locke* recognized that the study of devotional theology can be "akin to a religious calling as well as an academic pursuit." *Id.*, at 721. Indeed, "the shaping, through primary education, of the next generation's minds and spirits" may be as critical as training for the ministry, which itself, after all, is but one of the activities necessary to help assure a religion's survival. *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 725 (2002) (BREYER, J., dissenting). That is why many faith leaders emphasize the central role of schools in their religious missions. See, *e.g.*, Southern Baptist Convention, Resolution on the Importance of Christ-Centered Education (2014) (underscoring the power of Christian schools to "win students to salvation through evangelism, make disciples, and foster spiritual development"); The Holy See, John Paul II, Catechesi Tradendae ¶69 (Oct. 16, 1979) (explaining that "the underlying reason for" the Catholic school "is precisely the quality of the religious instruction integrated into the education of the pupils"). It is why at least some teachers at religious schools see their work as a form of ministry. See, *e.g.*, *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 192 (2012). And petitioners have testified that it is a "major reason" why they chose religious schools for their children. App. to Pet. for Cert. 152 (the school teaches "the same Christian values that I teach at home").

Nothing in the Constitution discourages this type of instruction. To the contrary, the Free Exercise Clause draws upon a history that places great value upon the freedom of parents to teach their children the tenets of their faith. Cf. *Wisconsin* v. *Yoder*, 406 U. S. 205, 213–214 (1972). The leading figures of America's  Enlightenment followed in the footsteps of those who, after the English civil wars, came to believe "with a passionate conviction that they were entitled to worship God in their own way and to teach their children and to form their characters in the way that seemed to them calculated to impress the stamp of the God-fearing man." C. Radcliffe, The Law & Its Compass 71 (1960). But the bitter lesson of religious conflict also inspired the Establishment Clause and the state-law bans on compelled support the Court cited in *Locke*. Cf., *e.g.*, J. Madison, Memorial and Remonstrance Against Religious Assessments, reprinted in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 69 (1947) (appendix to dissent of Rutledge, J.) (recalling the "[t]orrents of blood" shed in efforts to establish state religion).

What, then, is the difference between *Locke* and the present case? And what is it that leads the majority to conclude that funding the study of religion is more like paying to fix up a playground (*Trinity Lutheran*) than paying for a degree in theology (*Locke*)? The majority's principal argument appears to be that, as in *Trinity Lutheran*, Montana has excluded religious schools from its program "solely because of the religious character of the schools." *Ante*, at 9. The majority seeks to contrast this *status*-based discrimination with the program at issue in *Locke*, which it says

denied scholarships to divinity students based on the religious *use* to which they put the funds—*i.e.*, training for the ministry, as opposed to secular professions. See *ante*, at 11 (citing *Trinity Lutheran*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 9–10)).

It is true that Montana's no-aid provision broadly bars state aid to schools based on their religious affiliation. But this case does not involve a claim of status-based discrimination. The schools do not apply or compete for scholarships, they are not parties to this litigation, and no one here purports to represent their interests. We are instead faced with a suit by *parents* who assert that *their* free exercise rights are violated by the application of the no-aid provision  to prevent them from *using* taxpayer-supported scholarships to attend the schools of their choosing. In other words, the problem, as in *Locke*, is what petitioners " 'propos[e] *to do*—use the funds to' " obtain a religious education. *Ante*, 13 (quoting *Trinity Lutheran*, 582 U. S., at \_\_\_ (slip op., at 12)).

Even if the schools' status were relevant, I do not see what bearing the majority's distinction could have here. There is no dispute that religious schools seek generally to inspire religious faith and values in their students. How else could petitioners claim that barring them from using state aid to attend these schools violates their free exercise rights? Thus, the question in this case—unlike in *Trinity Lutheran*—boils down to what the schools would *do* with state support. And the upshot is that here, as in *Locke*, we confront a State's decision not to fund the inculcation of religious truths.

The majority next contends that there is no " 'historic and substantial' tradition against aiding" religious schools "comparable to the tradition against state-supported clergy invoked by *Locke*." *Ante*, at 16. But the majority ignores the reasons for the founding era bans that we relied upon in *Locke*.

"Perhaps the most famous example," *Locke*, 540 U. S., at 722, n. 6, is the 1786 defeat of a Virginia bill (often called the Assessment Bill) that would have levied a tax in support of "learned teachers" of "the Christian Religion." A Bill Establishing a Provision for Teachers of the Christian Religion, reprinted in *Everson*, 330 U. S., at 72 (supplemental appendix to dissent of Rutledge, J.). In his Memorial and Remonstrance against that proposal, James Madison argued that compelling state sponsorship of religion in this way was "a signal of persecution" that "degrades from the equal rank of citizens all those whose opinions in religion do not bend to those of the Legislative authority." *Id.*, at 68–69. Even among those who might benefit from such a  tax, Madison warned, the bill threatened to "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced among its several sects." *Id.*, at 69.

The opposition galvanized by Madison's Remonstrance not only scuttled the Assessment Bill; it spurred Virginia's Assembly to enact a very different law, the Bill for Religious Liberty drafted by Thomas Jefferson. See Brant, Madison: On the Separation of Church and State, 8 Wm. & Mary  Q. 3, 11 (1951); Drakeman, Religion and the Republic: James Madison and the First Amendment, 25 J. Church & St. 427, 436 (1983); *Everson*, 330 U. S., at 12.

Like the Remonstrance, Jefferson's bill emphasized the risk to religious liberty that state-supported religious indoctrination threatened. "[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves," the preamble declared, "is sinful and tyrannical." A Bill for Establishing Religious Freedom (1779), in 2 The Papers of Thomas Jefferson 545 (J. Boyd ed. 1950). The statute accordingly provided "that no man shall be compelled to frequent or support any

religious worship, place, or ministry whatsoever." *Id.*, at 546. Similar proscriptions were included in the early constitutions of many States. See *Locke*, 540 U. S., at 723 (collecting examples).

I see no meaningful difference between the concerns that Madison and Jefferson raised and the concerns inevitably raised by taxpayer support for scholarships to religious schools. In both instances state funds are sought for those who would "instruc[t] such citizens, as from their circumstances and want of education, cannot otherwise attain such knowledge" in the tenets of religious faith. A Bill Establishing a Provision for Teachers of the Christian Religion, reprinted in *Everson*, 330 U. S., at 72. In both cases, that would compel taxpayers "to support the propagation of opinions" on matters of religion with which they may disagree, by teachers whom they have not chosen. A Bill for Establishing Religious Freedom, *supra*, at 545. And, in both cases, the allocation of state aid to such purposes threatens to "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced among its several sects." Memorial and Remonstrance, reprinted in *Everson*, 330 U. S., at 69.

The majority argues that at least some early American governments saw no contradiction between bans on compelled support for clergy and taxpayer support for religious schools or universities. See *ante*, at 14, n. 3. That some States appear not to have read their prohibitions on compelled support to bar this kind of sponsorship, however, does not require us to blind ourselves to the obvious contradiction between the *reasons* for prohibiting compelled support and the effect of taxpayer funding for religious education. Madison and Jefferson saw it clearly. They opposed including theological professorships in their plans for the public University of Virginia and the Commonwealth hesitated even to grant charters to religiously affiliated schools. See Buckley, After Disestablishment: Thomas Jefferson's Wall of Separation in Antebellum Virginia, 61 J. So. Hist. 445, 453 (1995); Brant, *supra,* at 19–20.

As for the majority's examples, it suffices to say that the record is not so simple. In Georgia, the Governor advocated for school funding legislation in terms that mirrored the language of Virginia's Assessment Bill. See R. Gabel, Public Funds for Church and Private Schools 241–242 (1937). And the general levies the majority cites from Pennsylvania and New Jersey were not adopted until after the founding. See *id.,* at 215–216; see C. Kaestle, Pillars of the Republic: Common Schools and American Society, 1780–1860, pp. 166–167 (1983).

That is not to deny that the history of state support for denominational schools is " 'complex.' " *Ante*, at 16. But founding era attitudes toward compelled support of clergy were no less complex. Many prominent members of the founding generation, including George Washington, Patrick Henry, and John Marshall, supported Virginia's Assessment Bill. See Dreisbach, George Mason's Pursuit of Religious Liberty in Revolutionary Virginia, 108 Va. Mag. Hist. & Biography 5, 31 (2000). Some who supported this kind of government aid thought it posed no threat to freedom of conscience; others denied that provisions for aid to religion amounted to an "establishment" at all. See *id.,* at 34–35; D. Drakeman, Church, State, and Original Intent 224–225 (2010). Indeed, at least one historian has persuasively argued that it is next to impossible to attribute to the Founders any uniform understanding as to what constitutes, in the Constitution's phrase, "an Establishment of religion." *Id.,* at 216–229, 260–262.

This diversity of opinion made no difference in *Locke* and it makes no difference here. For our purposes it is enough to say that, among those who gave shape to the young Republic were people, including Madison and Jefferson, who perceived a grave threat to individual liberty and communal harmony in tax support for the teaching of religious truths. These "historic and substantial" concerns have consistently guided the Court's application of the Religion Clauses since. *Locke*, 540 U. S., at 725; see, *e.g.*, *Nyquist*, 413 U. S., at 794–798; *Walz*, 397 U. S., at 695 (Harlan, J., concurring); *Schempp*, 374 U. S., at 307 (Goldberg, J., joined by Harlan, J., concurring). The Court's special attention to these views should come as no surprise, for the risks the Founders saw have only become more apparent over time. In the years since the Civil War, the number of religions practiced in our country has grown to scores. And that has made it more difficult to avoid suspicions of favoritism—or worse—when government becomes entangled with religion.

Nor can I see how it could make a difference that the Establishment Clause might *permit* the State to subsidize religious education through a program like Montana's. The tax benefit here inures to donors, who choose to support a particular scholarship organization. That organization, in turn, awards scholarships to students for the qualifying school of their choice. The majority points to cases in which we have upheld programs where, as here, state funds make their way to religious schools by means of private choices. *Ante*, at 7 (citing *Zelman*, 536 U. S., at 649–653). As the Court acknowledged in *Trinity Lutheran*, however, that does not answer the question whether providing such aid is *required*. 582 U. S., at ____ (slip op., at 6).

Neither does it address related concerns that I have previously described. Private choice cannot help the taxpayer who does not want to finance the propagation of religious beliefs, whether his own or someone else's. It will not help religious minorities too few in number to support a school that teaches their beliefs. And it will not satisfy those whose religious beliefs preclude them from participating in a government-sponsored program. Some or many of the persons who fit these descriptions may well feel ignored—or worse—when public funds are channeled to religious schools. See *Zelman*, 536 U. S., at 728 (BREYER, J., dissenting). These feelings may, in turn, sow religiously inspired political conflict and division—a risk that is considerably greater where States are *required* to include religious schools in programs like the one before us here. And it is greater still where, as here, those programs benefit only a handful of a State's many religious denominations. See *ibid.*; Big Sky Scholarships, Schools (2019), www.bigskyscholarships.org/schools.

Indeed, the records of Montana's constitutional convention show that these concerns were among the reasons that a religiously diverse group of delegates, including faith leaders of different denominations, supported the no-aid provision. See Brief for Respondents 18–23; Brief for Montana Constitutional Convention Delegates as *Amici Curiae* 19–21, 22, 24–25 (noting support for the provision from a Congregational minister, the Roman Catholic priest responsible for Catholic schools in the Diocese of Great Falls, a Methodist pastor, a Presbyterian minister, and the Montana Catholic Conference, among others).

In an effort to downplay this risk and further distinguish this case from *Locke*, the majority contends that "Montana's Constitution does not zero in on any particular 'essentially religious' course of instruction." *Ante*, at 13 (quoting *Locke*, 540 U. S., at 721). But this is not a facial challenge to the no-aid provision. See Reply Brief 8. As applied, the provision affects only a scholarship program that, in effect, uses taxpayer funds to help pay for student tuition at religious schools. We have long recognized that

unrestricted cash payments of this kind raise special establishment concerns. Cf. *Mitchell* v. *Helms*, 530 U. S. 793, 818–819 (2000) (plurality opinion); see *id.*, at 848–849 (O'Connor, J., concurring in judgment). And for good reason: The subsidy petitioners demand would go to pay for, among other things, the salaries of teachers and administrators who have been found in at least some instances to so "personify [the] beliefs" of the churches that employ them that they are quite literally "ministers" within the meaning of the First Amendment. *Hosanna-Tabor*, 565 U. S., at 188.

If, for 250 years, we have drawn a line at forcing taxpayers to pay the salaries of those who teach their faith from the pulpit, I do not see how we can today require Montana to adopt a different view respecting those who teach it in the classroom.

# II

In reaching its conclusion that the Free Exercise Clause requires Montana to allow petitioners to use taxpayer-supported scholarships to pay for their children's religious education, the majority makes several doctrinal innovations that, in my view, are misguided and threaten adverse consequences.

Although the majority refers in passing to the "play in the joints" between that which the Establishment Clause forbids and that which the Free Exercise Clause requires, its holding leaves that doctrine a shadow of its former self. See, *e.g.*, *Cutter*, 544 U. S., at 719; *Walz*, 397 U. S., at 669. Having concluded that there is no obstacle to subsidizing a religious education under our Establishment Clause precedents, the majority says little more about Montana's antiestablishment interests or the reasoning that underlies them. It does not engage with the State's concern that its funds not be used to support religious teaching. Instead, the Court holds that it need not consider how Montana's funds would be used because, in its view, all distinctions on the basis of religion—whether in respect to playground grants or devotional teaching—are similarly and presumptively unconstitutional. See *ante*, at 10.

Setting aside the problems with the majority's characterization of this case, *supra*, at 7–8, I think the majority is wrong to replace the flexible, context-specific approach of our precedents with a test of "strict" or "rigorous" scrutiny. And it is wrong to imply that courts should use that same heightened scrutiny whenever a government benefit is at issue. See *ante*, at 9, 11–12.

Experience has taught us that "we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication." *Tilton* v. *Richardson*, 403 U. S. 672, 678 (1971) (plurality opinion); see also *Schempp*, 374 U. S., at 306 (opinion of Goldberg, J., joined by Harlan, J.) (there is "no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible"); *Walz*, 397 U. S., at 669 ("[R]igidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited"). If the Court has found it possible to walk what we have called the " 'tight rope' " between the two Religion Clauses, it is only by "preserving doctrinal flexibility and recognizing the need for a sensible and realistic application" of those provisions. *Yoder*, 406 U. S., at 221.

The Court proceeded in just this way in *Locke*. It considered the same precedents the majority today cites in support of its presumption of unconstitutionality. But it found that applying the presumption set forth in those cases to Washington's decision

not to fund devotional degrees would "extend" them "well beyond not only their facts but their reasoning." 540 U. S., at 720. In my view, that analysis applies equally to this case.

Montana's law does not punish religious exercise.  Cf. *Locke*, 540 U. S., at 720 (citing *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 535 (1993)); see *ante*, at 11. It does not deny anyone, because of their faith, the right to participate in political affairs of the community. Cf. *Locke*, 540 U. S., at 720–721 (citing *McDaniel* v. *Paty*, 435 U. S. 618, 626 (1978)); see *ante*, at 11–12. And it does not require students to choose between their religious beliefs and receiving secular government aid such as unemployment benefits. Cf. *Locke*, 540 U. S., at 720 (citing *Sherbert* v. *Verner*, 374 U. S. 398, 403–404 (1963)); see *ante*, at 11–12. The State has simply chosen not to fund programs that, in significant part, typically involve the teaching and practice of religious devotion. And "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 549 (1983); see also *Lyng* v. *Automobile Workers*, 485 U. S. 360, 368 (1988).

I disagree, then, with what I see as the majority's doctrinal omission, its misplaced application of a legal presumption, and its suggestion that this presumption is appropriate in many, if not all, cases involving government benefits. As I see the matter, our differences run deeper than a simple disagreement about the application of prior case law.

The Court's reliance in our prior cases on the notion of "play in the joints," our hesitation to apply presumptions of unconstitutionality, and our tendency to confine benefit- related holdings to the context in which they arose all reflect a recognition that great care is needed if we are to realize the Religion Clauses' basic purpose "to promote and assure the fullest scope of religious liberty and religious tolerance for all and to nurture the conditions which secure the best hope of attainment of that end." *Schempp*, 374 U. S., at 305 (opinion of Goldberg, J., joined by Harlan, J.); see *Van Orden* v. *Perry*, 545 U. S. 677, 698 (2005) (BREYER, J., concurring in judgment).

For one thing, government benefits come in many shapes and sizes. The appropriate way to approach a State's  benefit-related decision may well vary depending upon the relation between the Religion Clauses and the specific benefit and restriction at issue. For another, disagreements that concern religion and its relation to a particular benefit may prove unusually difficult to resolve. They may involve small but important details of a particular benefit program. Does one detail affect one religion negatively and another positively? What about a religion that objects to the particular way in which the government seeks to enforce mandatory (say, qualification-related) provisions of a particular benefit program? See, *e.g.*, *New Life Baptist Church Academy* v. *East Longmeadow*, 885 F. 2d 940 (CA1 1989) (BREYER, J., for the court). Or the religious group that for religious reasons cannot accept government support? See Brief for Respondents 20–21 (noting, *inter alia*, Seventh-day Adventists' support for Montana's no-aid provision on this ground). And what happens when qualification requirements mean that government money flows to one religion rather than another? Courts are ill equipped to deal with such conflicts. Yet, in a Nation with scores of different religions, many such disagreements are possible. And I have only scratched the surface.

The majority claims that giving weight to these considerations would be a departure from our precedent and give courts too much discretion to interpret the Religion Clauses. See *ante*, at 16–18. But we have long understood that the "application" of the First Amendment's mandate of neutrality "requires interpretation of a delicate sort." *Schempp*, 374 U. S., at 226. "Each value judgment under the Religion Clauses," we have explained, must "turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so." *Walz*, 397 U. S., at 669.

Nor does the majority's approach avoid judicial entanglement in difficult and sensitive questions. To the contrary, as I have just explained, it burdens courts with the still more complex task of untangling disputes between religious organizations and state governments, instead of giving deference to state legislators' choices to avoid such issues altogether. At the same time, it puts States in a legislative dilemma, caught between the demands of the Free Exercise and Establishment Clauses, without "breathing room" to help ameliorate the problem.

I agree with the majority that it is preferable in some areas of the law to develop generally applicable tests. The problem, as our precedents show, is that the interaction of the Establishment and Free Exercise Clauses makes it particularly difficult to design a test that vindicates the Clauses' competing interests in all—or even most—cases. That is why, far from embracing mechanical formulas, our precedents repeatedly and frankly acknowledge the need for precisely the kind of " 'judgment-by-judgment analysis' " the majority rejects. *Ante*, at 17; see, *e.g.*, *Walz*, 397 U. S., at 669. "The standards" of our prior decisions, we have said, "should rather be viewed as guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired." *Tilton*, 403 U. S., at 678 (plurality opinion); accord, *Nyquist*, 413 U. S., at 773, n. 31.

The Court's occasional efforts to declare rules in spite of this experience have failed to produce either coherence or consensus in our First Amendment jurisprudence. See *Van Orden*, 545 U. S., at 697 (BREYER, J., concurring in judgment) (listing examples). The persistence of such disagreements bears out what I have said—namely, that rigid, bright-line rules like the one the Court adopts today too often work against the underlying purposes of the Religion Clauses. And a test that fails to advance the Clauses' purposes is, in my view, far worse than no test at all.

Consider some of the practical problems that may arise from the Court's holding. The States have taken advantage of the "play in the joints" between the Religion Clauses to craft programs of public aid to education that address their local needs. Many provide assistance to families with students in nonpublic schools, ranging from scholarships to tax credits and deductions that reimburse tuition expenses. See Dept. of Ed., A Duncan et al., Education Options in the States 3–6 (2009). Although most state constitutions today have no-aid provisions like Montana's, those provisions are only one part of a broader system of local regulation. See App. D to Brief for Respondents. Some States have concluded that their no-aid provisions do not bar scholarships to students at religious schools, while others without such clauses have nevertheless chosen not to fund religious education. See Brief for State of Colorado et al. as *Amici Curiae* 6–7; Brief for State of Maine as *Amicus Curiae* 10–15. Today's decision upends those arrangements without stopping to ask whether they might actually further the objectives of the Religion Clauses in some or even many cases.

And what are the limits of the Court's holding? The majority asserts that States "need not subsidize private education." *Ante*, at 20. But it does not explain why that is so. If making scholarships available to only secular nonpublic schools exerts "coercive" pressure on parents whose faith impels them to enroll their children in religious schools, then how is a State's decision to fund only secular *public* schools any less coercive? Under the majority's reasoning, the parents in both cases are put to a choice between their beliefs and a taxpayer-sponsored education.

Accepting the majority's distinction between public and nonpublic schools does little to address the uncertainty that its holding introduces. What about charter schools? States vary widely in how they permit charter schools to be structured, funded, and controlled. See Mead, Devilish Details: Exploring Features of Charter School Statutes That Blur the Public/Private Distinction, 40 Harv. J. Legis. 349, 353–357, 367–368 (2003). How would the majority's rule distinguish between those States in which support for charter schools is akin to public school funding and those in which it triggers a constitutional obligation to fund private religious schools? The majority's rule provides no guidance, even as it sharply limits the ability of courts and legislatures to balance the potentially competing interests that underlie the Free Exercise and Antiestablishment Clauses.

\*       \*       \*

It is not easy to discern "the boundaries of the neutral area between" the two Religion Clauses "within which the legislature may legitimately act." *Tilton*, 403 U. S., at 677 (plurality opinion). And it is more difficult still in cases, such as this one, where the Constitution's policy in favor of free exercise, on one hand, and against state sponsorship, on the other, are in conflict. In such cases, I believe there is "no test-related substitute for the exercise of legal judgment." *Van Orden*, 545 U. S., at 700 (opinion of BREYER, J.). That judgment "must reflect and remain faithful to the underlying purposes of the Clauses, and it must take account of context and consequences measured in light of those purposes." *Ibid.* Here, those purposes, along with the examples set by our decisions in *Locke* and *Trinity Lutheran*, lead me to believe that Montana's differential treatment of religious schools is constitutional. "If any room exists between the two Religion Clauses, it must be here." *Locke*, 540 U. S., at 725. For these reasons, I respectfully dissent from the Court's contrary conclusion.

**TOP**

# Dissent

SUPREME COURT OF THE UNITED STATES

No. 18–1195

KENDRA ESPINOZA, ET AL., PETITIONERS *v.* MONTANA DEPARTMENT OF REVENUE, ET AL.

on writ of certiorari to the supreme court of montana

[June 30, 2020]

Justice Sotomayor, dissenting.

The majority holds that a Montana scholarship program unlawfully discriminated against religious schools by excluding them from a tax benefit. The threshold problem, however, is that such tax benefits no longer exist for anyone in the State. The Montana Supreme Court invalidated the program on state-law grounds, thereby foreclosing the as-applied challenge petitioners raise here. Indeed, nothing required the state court to uphold the program or the state legislature to maintain it. The Court nevertheless reframes the case and appears to ask whether a longstanding Montana constitutional provision is facially invalid under the Free Exercise Clause, even though petitioners disavowed bringing such a claim. But by resolving a constitutional question not presented, the Court fails to heed Article III principles older than the Religion Clause it expounds. *Coleman* v. *Thompson*, 501 U. S. 722, 730 (1991) (forbidding "resolution of a federal question" that "cannot affect" a state-court judgment).

Not only is the Court wrong to decide this case at all, it decides it wrongly. In *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___ (2017), this Court held, "for the first time, that the Constitution requires the government to provide public funds directly to a church." *Id.*, at ___ (Sotomayor, J., dissenting) (slip op., at 1). Here, the Court invokes that precedent to require a State to subsidize religious schools if it enacts an education tax credit. Because this decision further "slights both our precedents and our history" and "weakens this country's longstanding commitment to a separation of church and state beneficial to both," *ibid.*, I respectfully dissent.

## I

### A

The Montana Supreme Court invalidated a state tax-credit program because it was inconsistent with the Montana Constitution's "no-aid provision," Art. X, §6(1), which forbids government appropriations for sectarian purposes, including funding religious schools. 393 Mont. 446, 467–468, 435 P. 3d 603, 614 (2018). In so doing, the court expressly declined to resolve federal constitutional issues. "Having concluded the Tax Credit Program violates" the no-aid provision, the court held, "it is not necessary to consider federal precedent interpreting the First Amendment's less-restrictive Establishment Clause." *Ibid.* So too the court declined to ground its holding on the Free Exercise Clause. *Ibid.* The court also remedied the only potential harm of discriminatory treatment by striking down the program altogether. After the state court's decision, neither secular nor sectarian schools receive the program's tax benefits.

Petitioners' free exercise claim is not cognizable. The Free Exercise Clause, the Court has said, protects against "indirect coercion or penalties on the free exercise of religion." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 450

(1988). Accordingly, this Court's cases have required not only differential treatment, cf. *ante*, at 11–12, but also a resulting burden on religious exercise, *Lyng*, 485 U. S., at 450–451.

Neither differential treatment nor coercion exists here because the Montana Supreme Court invalidated the tax-credit program entirely. 393 Mont., at 467–468, 435 P. 3d, at 614. Because no secondary school (secular or sectarian) is eligible for benefits, the state court's ruling neither treats petitioners differently based on religion nor burdens their religious exercise. See *ante*, at 2–6 (GINSBURG, J., dissenting). Petitioners remain free to send their children to the religious school of their choosing and to exercise their faith.

To be sure, petitioners may want to apply for scholarships and would prefer that Montana subsidize their children's religious education. But this Court had never before held unconstitutional government action that merely failed to benefit religious exercise. "The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.' " *Lyng*, 485 U. S., at 451 (quoting *Sherbert* v. *Verner*, 374 U. S. 398, 412 (1963) (Douglas, J., concurring)). Put another way, the Constitution does not compel Montana to create or maintain a tax subsidy.

Notably, petitioners did not allege that the no-aid provision itself caused their harm or that invalidating the entire tax-credit scheme would create independent constitutional concerns. Even now, petitioners disclaim a facial challenge to the no-aid provision. Reply Brief 8, 20–22. Petitioners thus have no cognizable as-applied claim arising from the disparate treatment of religion, because there is no longer a program to which Montana's no-aid provision can apply.

Nor is it enough that petitioners might wish that Montana's no-aid provision were no longer good law. Petitioners identify no disparate treatment traceable to the state constitutional provision that they challenge because the tax-credit program no longer operates. See *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 41–42, 44–46 (1976).[1] Short of ordering Montana to create a religious subsidy that Montana law does not permit, there is nothing for this Court to do.[2]

# B

As another dissenting opinion observes, see *ante,* at 3 (opinion of GINSBURG, J.), the Court sidesteps these obstacles by asking a question that this case does not raise and that the Montana Supreme Court did not answer: whether by excluding "religious schools and affected families from [a scholarship] program," Montana's no-aid provision was "consistent with the Federal Constitution," *ante*, at 7 (majority opinion). In so doing, the Court appears to transform petitioners' as-applied challenge into a facial one. *Ante*, at 10; see also *ante*, at 1 (THOMAS, J., concurring).

This approach lacks support in our case law. The Court typically declines to read state-court decisions as impliedly resolving federal questions, especially ones not raised by the parties. See, *e.g.*, *Adams* v. *Robertson*, 520 U. S. 83, 88–89 (1997) (*per curiam*). Indeed, to honor principles of comity, this Court generally dismisses writs of certiorari from a State's highest court where, as is true here of the Court's bespoke inquiry, "the sole federal question" the Court seeks to decide was not "raised, preserved, or passed upon in the state courts below." *Cardinale* v. *Louisiana*, 394 U. S. 437, 438 (1969); see also *Webb* v. *Webb*, 451 U. S. 493, 499 (1981).

That rule respects not only federalism, but also the separation of powers. Article III confines this Court's authority to adjudicating actual "[c]ases" or "[c]ontroversies." See also *Allen* v. *Wright*, 468 U. S. 737, 750 (1984) (case-or-controversy requirement reflects "the idea of separation of powers on which the Federal Government is founded"). Federal courts thus lack power "to decide questions that cannot affect the rights of litigants in the case before them" and may resolve only "real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 477 (1990) (alteration in original; internal quotation marks omitted). Consonant with that limitation, the Court has declined to " ' "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." ' " *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 450 (2008) (quoting *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring)). By answering an apparent hypothetical question, today's Court subverts these longstanding practices.

True, on occasion this Court has resolved federal constitutional questions when it was unclear whether the state-court judgment rested on an adequate and independent state-law ground. See, *e.g.*, *Michigan* v. *Long*, 463 U. S. 1032, 1043 (1983). But that is not this case. Recall that the Montana Supreme Court remedied a state constitutional violation by invalidating a state program on state-law grounds, having expressly declined to reach any federal issue. See 393 Mont., at 467–468, 435 P. 3d, at 614; see also *ante*, at 4–5 (GINSBURG, J., dissenting).

These principles exist to prevent this Court from issuing advisory opinions, sowing confusion, and muddying the law. This is case in point. Having held that petitioners may not be "exclu[ded] from the scholarship program" that no longer exists, the Court remands to the Montana Supreme Court for "further proceedings not inconsistent with this opinion." *Ante*, at 22. But it is hard to tell what this Court wishes the state court to do. There is no program from which petitioners are currently "exclu[ded]," so must the Montana Supreme Court order the State to recreate one? Has this Court just announced its authority to require a state court to order a state legislature to fund religious exercise, overruling centuries of contrary precedent and historical practice? See *Cutter* v. *Wilkinson*, 544 U. S. 709 (2005); *Locke* v. *Davey*, 540 U. S. 712 (2004); see also *Trinity Lutheran*, 582 U. S., at ___–___, and nn. 7–11 (SOTOMAYOR, J., dissenting) (slip op., at 12–20, and nn. 7–11) (describing States' religious disestablishment movements near the founding and cataloging state constitutional provisions declining to aid religious ministry). Indeed, it appears that the Court has declared that once Montana created a tax subsidy, it forfeited the right to eliminate it if doing so would harm religion. This is a remarkable result, all the more so because the Court strains to reach it.

The Court views its decision as "simply restor[ing] the status quo established by the Montana Legislature." *Ante* at 22, n. 4. But it overlooks how that status quo allowed the State Supreme Court to cure any disparate treatment of religion while still giving effect to a state constitutional provision ratified by the citizens of Montana. Today's decision replaces a remedy chosen by representatives of Montanans and designed to honor the will of the electorate with one that the Court prefers instead.

In sum, the decision below neither upheld a program that "disqualif[ies] some private schools solely because they are religious," *ante*, at 20, nor otherwise decided the case on federal grounds. The Court's opinion thus turns on a counterfactual

hypothetical it is powerless (and unwise) to decide.

# II

Even on its own terms, the Court's answer to its hypothetical question is incorrect. The Court relies principally on *Trinity Lutheran*, which found that disqualifying an entity from a public benefit "solely because of [the entity's] religious character" could impose "a penalty on the free exercise of religion." 582 U. S., at ___–___ (slip op., at 9–10). *Trinity Lutheran* held that ineligibility for a government benefit impermissibly burdened a church's religious exercise by "put[ting it] to the choice between being a church and receiving a government benefit." *Id.*, at ___ (slip op., at 13). Invoking that precedent, the Court concludes that Montana must subsidize religious education if it also subsidizes nonreligious education.[3]

The Court's analysis of Montana's defunct tax program reprises the error in *Trinity Lutheran*. Contra the Court's current approach, our free exercise precedents had long granted the government "some room to recognize the unique status of religious entities and to single them out on that basis for exclusion from otherwise generally applicable laws." *Id.*, at ___ (SOTOMAYOR, J., dissenting) (slip op., at 9).

Until *Trinity Lutheran*, the right to exercise one's religion did not include a right to have the State pay for that religious practice. See *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 226 (1963). That is because a contrary rule risks reading the Establishment Clause out of the Constitution. Although the Establishment Clause "permit[s] some government funding of secular functions performed by sectarian organizations," the Court's decisions "provide[d] no precedent for the use of public funds to finance religious activities." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 847 (1995) (O'Connor, J., concurring). After all, the government must avoid "an unlawful fostering of religion." *Cutter*, 544 U. S., at 714 (internal quotation marks omitted). Thus, to determine the constitutionality of government action that draws lines based on religion, our precedents "carefully considered  whether the interests embodied in the Religion Clauses justify that line." *Trinity Lutheran*, 582 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 8). The relevant question had always been not whether a State singles out religious entities, but why it did so.

Here, a State may refuse to extend certain aid programs to religious entities when doing so avoids "historic and substantial" antiestablishment concerns. *Locke*, 540 U. S., at 725. Properly understood, this case is no different from *Locke* because petitioners seek to procure what the plaintiffs in *Locke* could not: taxpayer funds to support religious schooling.[4] Indeed, one of the concurrences lauds petitioners' spiritual pursuit, acknowledging that they seek state funds for manifestly religious purposes like "teach[ing] religion" so that petitioners may "outwardly and publicly" live out their religious tenets. *Ante*, at 3 (opinion of GORSUCH, J.). But those deeply religious goals confirm why Montana may properly decline to subsidize religious education. Involvement in such spiritual matters implicates both the Establishment Clause, see *Cutter*, 544 U. S., at 714, and the free exercise rights of taxpayers, "denying them the chance to decide for themselves whether and how to fund religion," *Trinity Lutheran*, 582 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 17). Previously, this Court recognized that a "prophylactic rule against the use of public funds" for "religious activities" appropriately balanced the Religion Clauses' differing but equally weighty interests. *Ibid.*

The Court maintains that this case differs from *Locke* because no pertinent " 'historic and substantial' " tradition supports Montana's decision. *Ante*, at 14. But the Court's historical analysis is incomplete at best. For one thing, the Court discounts anything beyond the 1850s as failing to "establish an early American tradition," *ante*, at 15, while itself relying on examples from around that time, *ante*, at 14. For another, although the States may have had "rich diversity of experience" at the founding, "the story relevant here is one of consistency." *Trinity Lutheran*, 582 U. S., at ___ (Sotomayor, J., dissenting) (slip op., at 11); see also *id.*, at ___–___ (slip op., at 12–20) (chronicling state histories). The common thread was that "those who lived under the laws and practices that formed religious establishments made a considered decision that civil government should not fund ministers and their houses of worship." *Id.*, at ___ (slip op., at 16). And as the Court's recent precedent holds, at least some teachers in religiously affiliated schools are ministers who inculcate the faith. See *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 178, 196 (2012); see also *ante*, at 3 (Gorsuch, J., concurring); *ante*, at 6, 13 (Breyer, J., dissenting).

The Court further suggests that by abstaining from funding religious activity, the State is " 'suppress[ing]' " and "penaliz[ing]" religious activity. *Ante*, at 19–20. But a State's decision not to fund religious activity does not "disfavor religion; rather, it represents a valid choice to remain secular in the face of serious establishment and free exercise concerns." *Trinity Lutheran*, 582 U. S., at ___ (Sotomayor, J., dissenting) (slip op., at 24). That is, a "legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 549 (1983).

Finally, it is no answer to say that this case involves "discrimination." *Ante*, at 11–12. A "decision to treat entities differently based on distinctions that the Religion Clauses make relevant does not amount to discrimination." *Trinity Lutheran*, 582 U. S., at ___ (Sotomayor, J., dissenting) (slip op., at 22). So too here.

\*       \*       \*

Today's ruling is perverse. Without any need or power to do so, the Court appears to require a State to reinstate a tax-credit program that the Constitution did not demand in the first place. We once recognized that "[w]hile the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs." *Schempp*, 374 U. S., at 226 (emphasis deleted). Today's Court, by contrast, rejects the Religion Clauses' balanced values in favor of a new theory of free exercise, and it does so only by setting aside well-established judicial constraints.

I respectfully dissent.


# Notes

1 To revive their as-applied challenge, petitioners rely on *Griffin* v. *School Bd. of Prince Edward Cty.*, 377 U. S. 218 (1964), for the proposition that eliminating a public benefit does not always remedy discrimination. See Reply Brief 5. But *Griffin* is inapposite. There, a Virginia county closed its public schools and so-called "private schools" were set up in their place to avoid a court desegregation order. See 377 U. S., at 223. These so-called private schools "were open to whites only and . . . were in fact

run by a practical partnership between State and county, designed to preserve segregated education." *Palmer* v. *Thompson,* 403 U. S. 217, 221–222 (1971). That is nothing like what the Montana Supreme Court's remedy achieved here. Nor have petitioners said otherwise; there is no allegation that Montana confers clandestine tax credits solely to secular schools.

2  Petitioners here have not asserted a free exercise claim on a theory that they were victims of religious animus, either. Cf. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 533 (1993). Instead, one concurrence seeks to make the argument for them while attempting to compare the state constitutional provision here with a nonunanimous jury rule rooted in racial animus. *Ante,* at 1 (opinion of ALITO, J.) (citing the dissent in *Ramos* v. *Louisiana,* 590 U. S. ___ (2020)). But those questions are not before the Court. In any case, the concurrence's arguments are as misguided as they are misplaced. Citing the Court's opinion in *Ramos,* the concurrence maintains that a law's " 'uncomfortable past' must still be '[e]xamined.' " *Ante,* at 10 (opinion of ALITO, J.). But as previously explained: "Where a law otherwise is untethered to [discriminatory] bias—and perhaps also where a legislature actually confronts a law's tawdry past in reenacting it—the new law may well be free of discriminatory taint." *Ramos,* 590 U. S., at ___ (SOTOMAYOR, J., concurring in part) (slip op., at 4). That could not "be said of the laws at issue" in *Ramos*. *Ibid.* It can be here. See Part II, *infra*. The concurrence overlooks the starkly different histories of these state laws. Also missing from the concurrence (and the *amicus* briefs it repeats) is the stubborn fact that the constitutional provision at issue here was adopted in 1972 at a convention where it was met with overwhelming support by religious leaders (Catholic and non-Catholic), even those who examined the history of prior no-aid provisions. See Brief for Respondents 16–27; 6 Montana Constitutional Convention 1971–1972 Proceedings and Transcript, pp. 2012–2013, 2016–2017 (Mont. Legislature and Legislative Council); see also *ante,* at 12–13 (BREYER, J., dissenting); Brief for Public Funds Public Schools as *Amicus Curiae* 5–11; Brief for Montana Constitutional Convention Delegates as *Amici Curiae* 19–25. These supporters argued that it would be wrong to put taxpayer dollars to religious purposes and that it would invite unwelcome entanglement between church and state.  See, *e.g.,* U. S. Const., Amdt. 1; Brief for Respondents 20.

3  Petitioners' as-applied challenge fails under *Trinity Lutheran* for the reasons stated above: The Montana Supreme Court's remedy does not put petitioners to any "choice" at all. Rather, petitioners are free to send their children to any secondary school they wish while practicing their religious beliefs, and no one receives a tax credit for their school choice.

4  *Locke* confirms that a facial challenge to no-aid provisions must fail. But cf. *ante,* at 13–14 (majority opinion). In *Locke,* this Court upheld the application of a materially similar no-aid provision in Washington State, concluding that the Free Exercise Clause permitted Washington to forbid state-scholarship funds for students pursuing devotional theology degrees. 540 U. S., at 721.



# UNITED STATES DISTRICT COURT
## Southern District of Indiana

Roger A.G., Clerk of Court

Birch Bayh Federal Building
& U.S. Courthouse, Room 105
46 East Ohio Street
Indianapolis, IN 46204
(317) 229-3700

U.S. Courthouse, Room 104
921 Ohio Street
Terre Haute, IN 47807
(812) 231-1840

Winfield K. Denton Federal Building
& U. S. Courthouse, Room 304
101 NW Martin Luther King Blvd.
Evansville, IN 47708
(812) 434-6410

Lee H. Hamilton Federal Building
& U.S. Courthouse, Room 210
121 West Spring Street
New Albany, IN 47150
(812) 542-4510

August 1, 2023

Jon F. Turpin
2421 S. Plum St.
Yorktown, IN 47396

Mr. Turpin:

We are returning the enclosed check as no fees are due in this case. We have filed your Motion for Release of Affidavit for Troy Davis and the court will rule in due course.

Sincerely,

United States District Court for the Southern District of Indiana

OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA



302 W. WASHINGTON ST. 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

# TODD ROKITA
ATTORNEY GENERAL

July 7, 2023

Mr. Jon Turpin
2421 S. Plum St.
Yorktown, IN 47936

Dear Mr. Turpin,

This week we received both the U.S. Mint coin of President Theodore Roosevelt and your handgun license in the mail. While the coin was a very thoughtful gift, we are unfortunately unable to accept. Indiana Code prevents state employees from accepting gifts or favors from their constituents.

Also enclosed is your State of Indiana license to carry handgun. We recommend you retain this document for your personal records. If you have any questions about the license, please contact the Firearms Division of the Indiana State Police at (317) 232-8264 with your questions.

Please let us know if we can be of assistance in the future.

Sincerely,

Constituent Services
Office of Indiana Attorney General Todd Rokita

cs/hm



**STATE OF INDIANA**
**OFFICE OF ADMINISTRATIVE LAW PROCEEDINGS**

**FINAL AGENCY AUTHORITY: Indiana State Police**

| | |
|---|---|
| IN THE MATTER OF THE LICENSE | ) Cause No: ISP – 2303-000947 |
| | ) |
| TO CARRY A HANDGUN OF | ) FCN 2321072 |
| | ) |
| JON TURPIN | ) Decision Date: June 29, 2023 |

## NON-FINAL ORDER FOR REINSTATEMENT OF LICENSE

An administrative hearing was scheduled pursuant to the Indiana Administrative Orders and Procedures (I.C. 4-21.5) and the Uniform Firearms Act (I.C. 35-47) concerning Petitioner's firearms license under IC 35-47. The hearing was set at Indiana Government Center North, 100 North Senate Avenue Room 302, Indianapolis, Indiana to address the Indiana State Police's allegation that JON TURPIN is not a proper person to be licensed. Notice of the hearing was by US Postal Service.

Pursuant to the request of JON TURPIN , and agreed to by the Indiana State Police, the Hearing in this matter was cancelled. JON TURPIN requested the waive their right to hearing and agreed that their license would be reinstated.

**NON- FINAL ORDER:**

By reason of the findings above, the Administrative Law Judge determines that JON TURPIN's firearms license be reinstated.

In accordance with I.C. 4-15-10.5-12(b), the OALP's Order is non-final and is subject to the review and approval of the superintendent of the Indiana State Police per a MOU dated July 1, 2020. Pursuant IC 4-21.5-3-29, a party may file an objection to this recommended order within 15 days after the party is served with Non-Final order and must file the objection with the ultimate authority by contacting ISPFirearmsHearings@isp.IN.gov.

/S/ *Trudy L. Selvia*

Honorable Trudy L. Selvia, Administrative Law Judge
Indiana Office of Administrative Law Proceedings

Distribution:
JON TURPIN, by U.S. Postal Service.
Indiana State Police, by electronic service on the attorney of record.
Superintendent of State Police, Ultimate Authority, by electronic service on Kim Cross.

The below documentation is to be used by the Indiana State Police. If this documentation
is blank, then a final decision has not yet been made.

## INDIANA STATE POLICE
## ULTIMATE AUTHORITY DECISION

The Superintendent of the Indiana State Police, the Ultimate Authority on this
matter, has reviewed the above Non-Final Order and now decides to Choose an item. the
Non-Final Order made by the Administrative Law Judge.

**IT IS THEREFORE ORDERED AND DIRECTED** by the Superintendent of
the Indiana State Police that the license to carry a handgun of JON TURPIN is hereby
Choose an item.

## THIS IS A FINAL ORDER.

**APPEAL RIGHTS:**

This final order by the Superintendent of the Indiana State Police may be
appealed. You have the right to file a Petition for Judicial Review (appeal) under Indiana
Code 4-21.5-5, *et seq.*

Pursuant to Indiana Code 4-21.5-5-5, **you have thirty (30) days after the receipt
of this notice to file a Petition for Judicial Review.** You must file your Petition for
Judicial review in the correct place (this is called "venue"). The correct venue is
determined by Indiana Code 4-21.5-5-6.

So ORDERED: Click or tap to enter a date.

Douglas G. Carter
Superintendent of the Indiana State Police

100 N. Senate Ave. Rm. N802 / Indianapolis, IN 46204          Page 2 of 2
OALP@oalp.in.gov / (317) 234-6689



IMPD

100019516

CS#: DP16144110 4

NDIANA LICENSE TO CARRY HANDGU

Jon Turpin

THIS END UP

CASE NUMBER: DP16144110

ITEM NUMBER: 4

DATE(S): 12-1-16

INITIALS: A

RECOVERED AT/FROM: 6693 E. Blvd st—

CONTENTS: Gun permit

TIME RECOVERED:

EVIDENCE

INDIANAPOLIS-MARION COUNTY FORENSIC SERVICES AGENCY

022 R2

BIOHAZARD LABEL (IF REQUIRED)

EVIDENCE

IMCFSA LABEL

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION COUNTY SUPERIOR COURTS |
| | )SS: | CRIMINAL DIVISION, COURTROOM 6 |
| COUNTY OF MARION | ) | CAUSE NO.: 49G06-1612-F5-046714 |

| | |
|---|---|
| STATE OF INDIANA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JON TURPIN, | ) |
| Defendant. | ) |

## F I L E D

May 17, 2018

*Myla P. Eldridge*

CLERK OF THE COURT
MARION COUNTY

DA

## ORDER DIRECTING RETURN OF PERSONAL PROPERTY

Comes now defendant, Jon Turpin, by counsel, Tom F. Hirschauer III of Keffer Barnhart LLP, moves the Court for an order directing the return of property seized from defendant at the time of his arrest. The Court, being duly advised, now **GRANTS** said motion and **ORDERS** the return of Jon Turpin's personal property, including his firearm. The Court **ORDERS** the return of Jon Turpin's personal property, including his firearm, to be given to Jon Brent Turpin, his father, (DLN: XXXX-XX-3602, DOB: 10/23/1956, located at 522 West Maple Street, Cambridge City, Indiana 47327)(SEE CONFIDENTIAL FORM).

So ORDERED, this _____ day of _____, 201__.
                    **May 16, 2018**

Dated_____

_____
Judge, Marion County Superior Court 6

Distribution:

Marion County Prosecutor's Office      ✓ Copy in Marion County Prosecutor's Office mailbox 5-17-19
251 East Ohio Street, Suite 160
Indianapolis, Indiana 46204

Tom F. Hirschauer III
Keffer Barnhart LLP
230 East Ohio Street, Suite 400
Indianapolis, Indiana 46204         E-mailed on 5-17-18

Indiana Metropolitan Police Department
Attn: Property Room, Lt. George Crooks
50 North Alabama Street
317-327-3430
Room E-100

FILED PAPERWORK FRIDAY MAY 18th, 2018

Petition Number: 2023053011263517

*committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies):*

b. _____ the Respondent has committed stalking against me.

c. _____ the Respondent has committed a sex offense against me.

d. _✓_ the Respondent has committed repeated acts of harassment against me.

3.    How old is the Respondent? _33_ years old.

4.    Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent.

| Case Name | Case Number | County & State |
|---|---|---|
| State of IN v. Jon Turpin | 49G06-1612-F5-046714 | Marion, IN |

5.    This case is filed in this county because:

_____ a.  the Respondent lives in this county.

_✓_ b.  the incident(s) of domestic or family violence, stalking, sex offense, or harassment happened in this county.

_✓_ c.  I live in this county.

6.    If you are not represented by an attorney, fill in your public mailing address:

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at: confidential@atg.state.in.us to get information on how to participate in that program.

7.    The Respondent has committed the following act(s) of domestic or family violence, stalking, a sex offense, or harassment *(Check those which apply):**

_____ a.  the Respondent attempted to cause physical harm to me;

_✓_ b.  the Respondent threatened to cause physical harm to me;

_____ c.  the Respondent did cause physical harm to me;

_✓_ d.  the Respondent placed me in fear of physical harm;

_____ e.  the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

_____ f.  the Respondent committed stalking against me;

_____ g.  the Respondent committed a sex offense against me;

_____ h.  the Respondent committed an act of animal cruelty by beating, torturing, mutilating, or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass or terrorize a family or household member.

_✓_ i.  the Respondent committed repeated acts of harassment against me.

2

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office Ct. Serv. 07/19

Petition Number: 3053011263517

*committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies):*

b. _____ the Respondent has committed stalking against me.

c. _____ the Respondent has committed a sex offense against me.

d. ~~✓ the Respondent has committed repeated acts of harassment against me.~~

3. How old is the Respondent? __33__ years old.

4. Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent.

| Case Name | Case Number | County & State |
|---|---|---|
| ~~State of IN v. Jon Turpin~~ | ~~49G06-1612-F5-046714~~ | ~~Marion, IN~~ |

5. This case is filed in this county because:

_____ a. the Respondent lives in this county.

~~✓ b. the incident(s) of domestic or family violence, stalking, sex offense, or harassment happened in this county.~~

✓ c. I live in this county.

6. If you are not represented by an attorney, fill in your public mailing address:

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at: confidential@atg.state.in.us to get information on how to participate in that program.

7. The Respondent has committed the following act(s) of domestic or family violence, stalking, a sex offense, or harassment *(Check those which apply):* *

_____ a. the Respondent attempted to cause physical harm to me;

~~✓ b. the Respondent threatened to cause physical harm to me;~~

_____ c. the Respondent did cause physical harm to me;

~~✓ d. the Respondent placed me in fear of physical harm;~~

_____ e. the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

_____ f. the Respondent committed stalking against me;

_____ g. the Respondent committed a sex offense against me;

_____ h. the Respondent committed an act of animal cruelty by beating, torturing, mutilating, or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass or terrorize a family or household member.

~~✓ i. the Respondent committed repeated acts of harassment against me.~~

2

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office Ct. Serv. 07/19



# UNITED STATES DISTRICT COURT
## Southern District of Indiana

Roger A.G., Clerk of Court

Birch Bayh Federal Building
& U.S. Courthouse, Room 105
46 East Ohio Street
Indianapolis, IN 46204
(317) 229-3700

U.S. Courthouse, Room 104
921 Ohio Street
Terre Haute, IN 47807
(812) 231-1840

Winfield K. Denton Federal Building
& U. S. Courthouse, Room 304
101 NW Martin Luther King Blvd.
Evansville, IN 47708
(812) 434-6410

Lee H. Hamilton Federal Building
& U.S. Courthouse, Room 210
121 West Spring Street
New Albany, IN 47150
(812) 542-4510

August 1, 2023

Jon F. Turpin
2421 S. Plum St.
Yorktown, IN 47396

Mr. Turpin:

We are returning the enclosed check as no fees are due in this case. We have filed your Motion for Release of Affidavit for Troy Davis and the court will rule in due course.

Sincerely,

United States District Court for the Southern District of Indiana

OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA



302 W. WASHINGTON ST. 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

## TODD ROKITA
### ATTORNEY GENERAL

July 7, 2023

Mr. Jon Turpin
2421 S. Plum St.
Yorktown, IN 47936

Dear Mr. Turpin,.

This week we received both the U.S. Mint coin of President Theodore Roosevelt and your handgun license in the mail. While the coin was a very thoughtful gift, we are unfortunately unable to accept. Indiana Code prevents state employees from accepting gifts or favors from their constituents.

Also enclosed is your State of Indiana license to carry handgun. We recommend you retain this document for your personal records. If you have any questions about the license, please contact the Firearms Division of the Indiana State Police at (317) 232-8264 with your questions.

Please let us know if we can be of assistance in the future.

Sincerely,

Constituent Services
Office of Indiana Attorney General Todd Rokita

cs/hm

TELEPHONE: 317.232.6201
www.in.gov/attorneygeneral/



**STATE OF INDIANA**
**OFFICE OF ADMINISTRATIVE LAW PROCEEDINGS**

**FINAL AGENCY AUTHORITY: Indiana State Police**

| | |
|---|---|
| IN THE MATTER OF THE LICENSE | ) Cause No: ISP – 2303-000947 |
| | ) |
| TO CARRY A HANDGUN OF | ) FCN 2321072 |
| | ) |
| JON TURPIN | ) Decision Date: June 29, 2023 |

### NON-FINAL ORDER FOR REINSTATEMENT OF LICENSE

An administrative hearing was scheduled pursuant to the Indiana Administrative Orders and Procedures (I.C. 4-21.5) and the Uniform Firearms Act (I.C. 35-47) concerning Petitioner's firearms license under IC 35-47. The hearing was set at Indiana Government Center North, 100 North Senate Avenue Room 302, Indianapolis, Indiana to address the Indiana State Police's allegation that JON TURPIN is not a proper person to be licensed. Notice of the hearing was by US Postal Service.

Pursuant to the request of JON TURPIN , and agreed to by the Indiana State Police, the Hearing in this matter was cancelled. JON TURPIN requested the waive their right to hearing and agreed that their license would be reinstated.

**NON-FINAL ORDER:**

By reason of the findings above, the Administrative Law Judge determines that JON TURPIN's firearms license be reinstated.

In accordance with I.C. 4-15-10.5-12(b), the OALP's Order is non-final and is subject to the review and approval of the superintendent of the Indiana State Police per a MOU dated July 1, 2020. Pursuant IC 4-21.5-3-29, a party may file an objection to this recommended order within 15 days after the party is served with Non-Final order and must file the objection with the ultimate authority by contacting ISPFirearmsHearings@isp.IN.gov.

/S/ *Trudy L. Selvia*
_____
Honorable Trudy L. Selvia, Administrative Law Judge
Indiana Office of Administrative Law Proceedings

Distribution:
JON TURPIN, by U.S. Postal Service.
Indiana State Police, by electronic service on the attorney of record.
Superintendent of State Police, Ultimate Authority, by electronic service on Kim Cross.
_____

The below documentation is to be used by the Indiana State Police. If this documentation is blank, then a final decision has not yet been made.

## INDIANA STATE POLICE
## ULTIMATE AUTHORITY DECISION

The Superintendent of the Indiana State Police, the Ultimate Authority on this matter, has reviewed the above Non-Final Order and now decides to Choose an item. the Non-Final Order made by the Administrative Law Judge.

**IT IS THEREFORE ORDERED AND DIRECTED** by the Superintendent of the Indiana State Police that the license to carry a handgun of JON TURPIN is hereby Choose an item.

## THIS IS A FINAL ORDER.

**APPEAL RIGHTS:**

This final order by the Superintendent of the Indiana State Police may be appealed. You have the right to file a Petition for Judicial Review (appeal) under Indiana Code 4-21-5-5, et seq.

Pursuant to Indiana Code 4-21-5-5, **you have thirty (30) days after the receipt of this notice to file a Petition for Judicial Review.** You must file your Petition for judicial review in the correct place (this is called "venue"). The correct venue is determined by Indiana Code 4-21-5-6.

So ORDERED:  Click or tap to enter a date.

Douglas G. Carter
Superintendent of the Indiana State Police

100 N. Senate Ave. Rm. N302, Indianapolis, IN 46204
SAPLHelpdesk.gov / (317) 234-5839

Page 2 of 2



STATE OF INDIANA          )          IN THE MARION COUNTY SUPERIOR COURTS
                          ) SS:      CRIMINAL DIVISION, COURTROOM 6
COUNTY OF MARION          )          CAUSE NO. 49G06-1612-F5-046714

STATE OF INDIANA,         )
         Plaintiff,       )
                          )                    F I L E D
                          )                    May 17, 2018
       vs.                )
                          )          CLERK OF THE COURT
                          )          MARION COUNTY
JON TURPIN,               )                              DA
         Defendant.       )

## ORDER DIRECTING RETURN OF PERSONAL PROPERTY

Comes now defendant, Jon Turpin, by counsel, Tom F. Hirschauer III of Keffer Barnhart LLP, moves the Court for an order directing the return of property seized from defendant at the time of his arrest. The Court, being duly advised, now **GRANTS** said motion and **ORDERS** the return of Jon Turpin's personal property, including his firearm. The Court **ORDERS** the return of Jon Turpin's personal property, including his firearm, to be given to Jon Brent Turpin, his father, (DLN: XXXX-XX-3602, DOB: 10/23/1956, located at 522 West Maple Street, Cambridge City, Indiana 47327)(SEE CONFIDENTIAL FORM).

                              May 16, 2018
SO ORDERED, this _____ day of _____, 201___

                                        _____
Dated _____            _____
                                        Judge, Marion County Superior Court 6

Distribution:

Marion County Prosecutor's Office        ✓ Copy in Marion County Prosecutor's Office mailbox 5-17-18
251 East Ohio Street, Suite 160
Indianapolis, Indiana 46204

Tom F. Hirschauer III
Keffer Barnhart LLP
230 East Ohio Street, Suite 400
Indianapolis, Indiana 46204          E-mailed on 5-17-18

Indiana Metropolitan Police Department
Attn: Property Room, Lt. Gerard Crooks
333 North Alabama Street

                        Filed: Defendant Facility   May 18th, 2018

Petition Number: 20230530112635.17

*committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies).*

    b. _____ the Respondent has committed stalking against me.

    c. _____ the Respondent has committed a sex offense against me.

    d. ✓ the Respondent has committed repeated acts of harassment against me.

     How old is the Respondent? 33 years old.

4. Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent.

| Case Name | Case Number | County & State |
|---|---|---|
| State of IN v. Jon Turpin | 49G06-1612-F5-046714 | Marion, IN |

5. This case is filed in this county because:

    a. _____ the Respondent lives in this county.

    ✓ b. the incident(s) of domestic or family violence, stalking, sex offense, or harassment happened in this county.

    ✓ c. I live in this county.

6. If you are not represented by an attorney, fill in your public mailing address.

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at confidential@atg.state.in.us to get information on how to participate in that program.

7. The Respondent has committed the following act(s) of domestic or family violence, stalking, a sex offense, or harassment *(Check those which apply)*:

    a. _____ the Respondent attempted to cause physical harm to me;

    ✓ b. the Respondent threatened to cause physical harm to me;

    c. _____ the Respondent did cause physical harm to me;

    ✓ d. the Respondent placed me in fear of physical harm;

    e. _____ the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

    f. _____ the Respondent committed stalking against me;

    g. _____ the Respondent committed a sex offense against me;

    h. _____ the Respondent committed an act of animal cruelty by beating, torturing, mutilating, or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass or terrorize a family or household member.

    ✓ i. the Respondent committed repeated acts of harassment against me.

2

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office of Serv. 07/19

Petition Number: 53011266517

*committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies):*

b. _____ the Respondent has committed stalking against me.

c. _____ the Respondent has committed a sex offense against me.

d. __✓__ the Respondent has committed repeated acts of harassment against me.

3. How old is the Respondent? 33 years old.

4. Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent.

| Case Name | Case Number | County & State |
|---|---|---|
| State of IN v. Jon Turpin | 49G06-1612-F5-046714 | Marion, IN |

5. This case is filed in this county because:

a. the Respondent lives in this county.

✓ b. the incident(s) of domestic or family violence, stalking, sex offense, or harassment happened in this county.

✓ c. I live in this county.

6. If you are not represented by an attorney, fill in your public mailing address.

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at: confidential@atg.state.in.us to get information on how to participate in that program.

7. The Respondent has committed the following act(s) of domestic or family violence, stalking, a sex offense, or harassment (*Check those which apply*): *

a. the Respondent attempted to cause physical harm to me;

✓ b. the Respondent threatened to cause physical harm to me;

c. the Respondent did cause physical harm to me;

✓ d. the Respondent placed me in fear of physical harm;

e. the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

f. the Respondent committed stalking against me;

g. the Respondent committed a sex offense against me;

h. the Respondent committed an act of animal cruelty by beating, torturing, mutilating, or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass or terrorize a family or household member;

✓ i. the Respondent committed repeated acts of harassment against me.

2

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office of Serv. 0/06



# UNITED STATES DISTRICT COURT
## Southern District of Indiana

Roger A.G., Clerk of Court

Birch Bayh Federal Building
& U.S. Courthouse, Room 105
46 East Ohio Street
Indianapolis, IN 46204
(317) 229-3700

U.S. Courthouse, Room 104
921 Ohio Street
Terre Haute, IN 47807
(812) 231-1840

Winfield K. Denton Federal Building
& U. S. Courthouse, Room 304
101 NW Martin Luther King Blvd.
Evansville, IN 47708
(812) 434-6410

Lee H. Hamilton Federal Building
& U.S. Courthouse, Room 210
121 West Spring Street
New Albany, IN 47150
(812) 542-4510

August 1, 2023

Jon F. Turpin
2421 S. Plum St.
Yorktown, IN 47396

Mr. Turpin:

We are returning the enclosed check as no fees are due in this case. We have filed your Motion for Release of Affidavit for Troy Davis and the court will rule in due course.


Sincerely,


United States District Court for the Southern District of Indiana



OFFICE OF THE ATTORNEY GENERAL.
STATE OF INDIANA

302 W. WASHINGTON ST. 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

## TODD ROKITA
### ATTORNEY GENERAL

July 7, 2023

Mr. Jon Turpin
2421 S. Plum St.
Yorktown, IN 47936

Dear Mr. Turpin,

This week we received both the U.S. Mint coin of President Theodore Roosevelt and your handgun license in the mail. While the coin was a very thoughtful gift, we are unfortunately unable to accept. Indiana Code prevents state employees from accepting gifts or favors from their constituents.

Also enclosed is your State of Indiana license to carry handgun. We recommend you retain this document for your personal records. If you have any questions about the license, please contact the Firearms Division of the Indiana State Police at (317) 232-8264 with your questions.

Please let us know if we can be of assistance in the future.

Sincerely,

Constituent Services
Office of Indiana Attorney General Todd Rokita

cs/hm

TELEPHONE: 317.232.6201
www.in.gov/attorneygeneral/



**STATE OF INDIANA**
**OFFICE OF ADMINISTRATIVE LAW PROCEEDINGS**

**FINAL AGENCY AUTHORITY: Indiana State Police**

| | |
|---|---|
| IN THE MATTER OF THE LICENSE | ) Cause No: ISP – 2303-000947 |
| | ) |
| TO CARRY A HANDGUN OF | ) FCN: 2321072 |
| | ) |
| JON TURPIN | ) Decision Date: June 29, 2023 |

## NON-FINAL ORDER FOR REINSTATEMENT OF LICENSE

An administrative hearing was scheduled pursuant to the Indiana Administrative Orders and Procedures (I.C. 4-21.5) and the Uniform Firearms Act (I.C. 35-47) concerning Petitioner's firearms license under IC 35-47. The hearing was set at Indiana Government Center North, 100 North Senate Avenue Room 302, Indianapolis, Indiana to address the Indiana State Police's allegation that JON TURPIN is not a proper person to be licensed. Notice of the hearing was by US Postal Service.

Pursuant to the request of JON TURPIN , and agreed to by the Indiana State Police, the Hearing in this matter was cancelled. JON TURPIN requested the waive their right to hearing and agreed that their license would be reinstated.

**NON-FINAL ORDER:**

By reason of the findings above, the Administrative Law Judge determines that JON TURPIN's firearms license be reinstated.

In accordance with I.C. 4-15-10.5-12(b), the OALP's Order is non-final and is subject to the review and approval of the superintendent of the Indiana State Police per a MOU dated July 1, 2020. Pursuant IC 4-21.5-3-29, a party may file an objection to this recommended order within 15 days after the party is served with Non-Final order and must file the objection with the ultimate authority by contacting ISPFirearmsHearings@isp.IN.gov.

/S/ *Trudy L. Selvia*
_____
Honorable Trudy L. Selvia, Administrative Law Judge
Indiana Office of Administrative Law Proceedings

Distribution:
JON TURPIN, by U.S. Postal Service.
Indiana State Police, by electronic service on the attorney of record.
Superintendent of State Police: Ultimate Authority, by electronic service on Kim Cross.

The below documentation is to be used by the Indiana State Police. If this documentation is blank, then a final decision has not yet been made.

## INDIANA STATE POLICE
## ULTIMATE AUTHORITY DECISION

The Superintendent of the Indiana State Police, the Ultimate Authority on this matter, has reviewed the above Non-Final Order and now decides to Choose an item. the Non-Final Order made by the Administrative Law Judge.

**IT IS THEREFORE ORDERED AND DIRECTED** by the Superintendent of the Indiana State Police that the license to carry a handgun of JON TURPIN is hereby Choose an item.

### THIS IS A FINAL ORDER.

**APPEAL RIGHTS:**

This final order by the Superintendent of the Indiana State Police may be appealed. You have the right to file a Petition for Judicial Review (appeal) under Indiana Code 4-21.5-5, et seq.

Pursuant to Indiana Code 4-21.5-5, **you have thirty (30) days after the receipt of this notice to file a Petition for Judicial Review.** You must file your Petition for Judicial review in the correct place (this is called "venue"). The correct venue is determined by Indiana Code 4-21.5-5-6.

So ORDERED: Click or tap to enter a date.

Douglas G. Carter
Superintendent of the Indiana State Police.

100 N. Senate Ave. Rm. N302 / Indianapolis, IN 46204
ISPLegaladmin.gov / (317) 234-5689

Page 2 of 2



IMPD

1000019546

**S#: DP16144110 4**

**NDIANA LICENSE TO CARRY HANDGU**

Jon Turpin

EVIDENCE

STATE OF INDIANA ) IN THE MARION COUNTY SUPERIOR COURTS
)SS: CRIMINAL DIVISION, COURTROOM 6
COUNTY OF MARION ) CAUSE NO: 49G06-1612-F5-046714

STATE OF INDIANA, )
    Plaintiff, )
     )
     ) **FILED**
    vs. ) May 17, 2018
     ) CLERK OF THE COURT
     ) MARION COUNTY
     ) DA
JON TURPIN, )
    Defendant. )

## ORDER DIRECTING RETURN OF PERSONAL PROPERTY

    Comes now defendant, Jon Turpin, by counsel, Tom F. Hirschauer III of Keffer Barnhart LLP, moves the Court for an order directing the return of property seized from defendant at the time of his arrest. The Court, being duly advised, now **GRANTS** said motion and **ORDERS** the return of Jon Turpin's personal property, including his firearm. The Court **ORDERS** the return of Jon Turpin's personal property, including his firearm, to be given to Jon Brent Turpin, his father, (DLN: XXXX-XX-3602, DOB: 10/23/1956, located at 522 West Maple Street, Cambridge City, Indiana 47327)(SEE CONFIDENTIAL FORM).

So ORDERED this _____ day of _____May 16, 2018_____, 201___

Dated _____

    _____
    Judge, Marion County Superior Court 6

Distribution:

Marion County Prosecutor's Office ✓ Copy in Marion County Prosecutor's Office mailbox 5-17-18
251 East Ohio Street, Suite 160
Indianapolis, Indiana 46204

Tom F. Hirschauer III
Keffer Barnhart LLP
230 East Ohio Street, Suite 400
Indianapolis, Indiana 46204 E-mailed on 5-17-18

Indiana Metropolitan Police Department
Auto Property Room, Lt. George Crooks
40 North Alabama Street
Indianapolis, Indiana 46204

When Presenter Party on May 18th, 2018

Petition Number: 2023053011263517

*committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies):*

b.  ____ the Respondent has committed stalking against me.

c.  ____ the Respondent has committed a sex offense against me.

d.  ✓ the Respondent has committed repeated acts of harassment against me.

3.  How old is the Respondent? **33** years old

4.  Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent

| Case Name | Case Number | County & State |
|---|---|---|
| State of IN v. Jon Turpin | 49G06-1612-F5-046714 | Marion, IN |

5.  This case is filed in this county because:

    a.  ____ the Respondent lives in this county.

    ✓ b.  the incident(s) of domestic or family violence, stalking, sex offense, or harassment happened in this county.

    ✓ c.  I live in this county.

6.  If you are not represented by an attorney, fill in your public mailing address:

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at: confidential@atg.state.in.us to get information on how to participate in that program.

7.  The Respondent has committed the following act(s) of domestic or family violence, stalking, a sex offense, or harassment (*Check those which apply*):*

    a.  ____ the Respondent attempted to cause physical harm to me;

    ✓ b.  the Respondent threatened to cause physical harm to me;

    c.  ____ the Respondent did cause physical harm to me;

    ✓ d.  the Respondent placed me in fear of physical harm;

    e.  ____ the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

    f.  ____ the Respondent committed stalking against me;

    g.  ____ the Respondent committed a sex offense against me;

    h.  ____ the Respondent committed an act of animal cruelty by beating, torturing, mutilating, or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass, or terrorize a family or household member;

    ✓ i.  the Respondent committed repeated acts of harassment against me.

2

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office Court (Ser 9/07-8)

Petition Number: _____

*committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies):*

b. _____ the Respondent has committed stalking against me,

c. _____ the Respondent has committed a sex offense against me,

d. ___✓___ the Respondent has committed repeated acts of harassment against me.

3. How old is the Respondent? 33 years old.

4. Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent.

| Case Name | Case Number | County & State |
|---|---|---|
| State of IN v. Jon Turpin | 49G06-1612-F5-046714 | Marion, IN |

5. This case is filed in this county because:

a. the Respondent lives in this county.

b. the incident(s) of domestic or family violence, stalking, sex offense, or the offense happened in this county.

✓ c. I live in this county.

6. If you are not represented by an attorney, fill in your public mailing address.

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at: confidential@atg.state.in.us to get information on how to participate in that program.

7. The Respondent has committed the following act(s) of domestic or family violence, stalking, a sex offense, or harassment *(Check those which apply).* *

a. the Respondent attempted to cause physical harm to me;

b. the Respondent threatened to cause physical harm to me;

c. the Respondent did cause physical harm to me;

d. the Respondent placed me in fear of physical harm;

e. the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

f. the Respondent committed stalking against me;

g. the Respondent committed a sex offense against me;

h. the Respondent committed an act of animal cruelty by beating, torturing, mutilating or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass or terrorize a family or household member;

i. the Respondent committed repeated acts of harassment against me.

2

OJA PO-0100 Approved 07/02
Rev. by Ind. Office of Serv. 07/15

# Yorktown Police Department
## Compact

| | | | |
|---|---|---|---|
| **Print Date/Time:** | 09/20/2023 10:05 | | Yorktown Police Department |
| **Login ID:** | kwalthour96 | **ORI Number:** | IN0180400 |
| **Case Number:** | 2023-00007683 | | |

## Case Details:

| | | | |
|---|---|---|---|
| **Case Number:** | 2023-00007683 | **Incident Type:** | Criminal Mischief |
| **Location:** | 9312 W SMITH ST | **Occured From:** | 12/10/2021 09:45 |
| | Yorktown,IN | **Occured Thru:** | 12/10/2021 09:45 |
| | | **Reported Date:** | 09/20/2023 09:42 Wednesday |
| **Status:** | Unfounded | **Status Date:** | 09/20/2023 |

| Assigned Officer | Assignment Date/Time | Assignment Type | Assigned By Officer | Due Date/Time |
|---|---|---|---|---|
| Associated Cases | Status | Assisting ORIs | Role | |
| Modus Operandi | | Solvability Factors | Weight | |

## Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|

## Subjects

| Type | No. | Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|---|
| Suspect | 1 | Moffitt, Tonya | | | | | |
| Suspect | 2 | Holwager, Michael | , | | | | |
| Suspect | 3 | Junkin, Jared | , | | | | |
| Suspect | 4 | Baker, Josh King- | , | (765)238-7738 | | | |
| Victim | 1 | TURPIN, JOHN | 2421 S PLUM ST Yorktown,IN 47396 | (225)259-6270 | White | Male | 04/05/1990 33 |
| Witness | 1 | Sexton, Alan | , | (765)313-6651 | | | |

# Yorktown Police Department
## Compact

| | | | |
|---|---|---|---|
| **Print Date/Time:** | 09/20/2023 10:05 | **ORI Number:** | Yorktown Police Department |
| **Login ID:** | kwalthour96 | | IN0180400 |
| **Case Number:** | 2023-00007683 | | |

## Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|---|---|---|---|---|---|---|---|

## Vehicles

| No. | Role | Vehicle Type | Year | Make | Model | Color | License Plate | State |
|---|---|---|---|---|---|---|---|---|

2013-7683

549 S. Messick Rd.

2023-01683

New Castle, IN 47362

Date Range: 12/10/21 - 12/27/21

Suspects: Tanya Moffitt

Michael A. M. Holwager  Jared R. Sunkin

Witnesses: Alan Sexton

765-313-6651

Josh King-Baker

765-238-7738

Alan Sexton let me know on 9/13/23 that Tanya Moffitt admitted to deflating the tires on my 1985 mustang and was "bragging" about doing so just before our marriage, admitting she had vandalized my car before a cross-country trip just after Michael A. M. Holwager's involvement

# Yorktown Police Department
## Compact

| | | | |
|---|---|---|---|
| **Print Date/Time:** | 09/20/2023 10:05 | **ORI Number:** | Yorktown Police Department |
| **Login ID:** | kwalthour96 | | IN0180400 |
| **Case Number:** | 2023-00007683 | | |

## Case Details:

| | | | |
|---|---|---|---|
| **Case Number:** | 2023-00007683 | **Incident Type:** | Criminal Mischief |
| **Location:** | 9312 W SMITH ST | **Occured From:** | 12/10/2021 09:45 |
| | Yorktown,IN | **Occured Thru:** | 12/10/2021 09:45 |
| | | **Reported Date:** | 09/20/2023 09:42 Wednesday |
| **Status:** | Unfounded | **Status Date:** | 09/20/2023 |

| Assigned Officer | Assignment Date/Time | Assignment Type | Assigned By Officer | Due Date/Time |
|---|---|---|---|---|
| Associated Cases | Status | Assisting ORIs | Role | |
| Modus Operandi | | Solvability Factors | Weight | |

## Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|

## Subjects

| Type | No. | Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|---|
| Suspect | 1 | Moffitt, Tonya | | | | | |
| Suspect | 2 | Holwager, Michael | | | | | |
| Suspect | 3 | Junkin, Jared | | | | | |
| Suspect | 4 | Baker, Josh King- | | (765)238-7738 | | | |
| Victim | 1 | TURPIN, JOHN | 2421 S PLUM ST Yorktown,IN 47396 | (225)259-6270 | White | Male | 04/05/1990 33 |
| Witness | 1 | Sexton, Alan | | (765)313-6651 | | | |

# Yorktown Police Department
## Compact

| | | | |
|---|---|---|---|
| **Print Date/Time:** | 09/20/2023 10:05 | **ORI Number:** | Yorktown Police Department |
| **Login ID:** | kwalthour96 | | IN0180400 |
| **Case Number:** | 2023-00007683 | | |

| **Subject #** | **1-Suspect** |
|---|---|
| **Primary:** | No |
| **Name:** | Moffitt, Tonya |

Domestic Violence Referrals:

| **Subject #** | **2-Suspect** |
|---|---|
| **Primary:** | No |
| **Name:** | Holwager, Michael |

Domestic Violence Referrals:

| **Subject #** | **3-Suspect** |
|---|---|
| **Primary:** | No |
| **Name:** | Junkin, Jared |

Domestic Violence Referrals:

| **Subject #** | **4-Suspect** |
|---|---|
| **Primary:** | No |
| **Name:** | Baker, Josh King- |

**Primary Phone:**   (765)238-7738

Domestic Violence Referrals:

| **Subject #** | **1-Victim** |
|---|---|
| **Primary:** | No |
| **Name:** | TURPIN, JOHN |
| **Address:** | 2421 S PLUM ST |
| | Yorktown IN 47396 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Race:** | White | **Sex:** | Male | **DOB:** | | 04/05/1990 |
| **Height:** | 5ft 8 in | **Weight:** | 170.0 lbs. | | | |
| **Eyes:** | GRN | **Hair:** | BRO | **Age:** | | 33 |
| **DVL #:** | 0210-07-5538 | **State:** | IN | | | |

**Primary Phone:**   (225)259-6270

Domestic Violence Referrals:

| **Subject #** | **1-Witness** |
|---|---|
| **Primary:** | No |
| **Name:** | Sexton, Alan |

**Primary Phone:**   (765)313-6651

Domestic Violence Referrals:

## Arrests

| Arrest No. | Name | Address | Date/Time | Type | Age |
|---|---|---|---|---|---|
| | | | | | |

# Yorktown Police Department
## Compact

| | |
|---|---|
| **Print Date/Time:** | 09/20/2023 10:05 |
| **Login ID:** | kwalthour96 |
| **Case Number:** | 2023-00007683 |

**ORI Number:** Yorktown Police Department
IN0180400

## Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|---|---|---|---|---|---|---|---|

## Vehicles

| No. | Role | Vehicle Type | Year | Make | Model | Color | License Plate | State |
|---|---|---|---|---|---|---|---|---|

**2023 7683**

**2023-07683 Yorktown Police Department**

On 9-19-2023 Mr. John Turpin came in to the Yorktown Police Office and requested a report for a possible criminal mischief that occurred in New Castle, Indiana between 12-10-2021 and 12-27-2021. Due to the time frame, I have attached the letter Mr. Turpin gave me. I have attempted to contact both of the witnesses. I was unable to get ahold of either witness.

/s/ Kurt Walthour
**Kurt Walthour, Chief**
**Yorktown Police Department**

Case Number: 2023-0007683. ORI: IN0180400.

Page: 5 of 5

**2013-7683**

549 S. Messick Rd.

New Castle, IN 47362

Date Range: 12/10/21 - 12/23/21

Suspects: Tanya Moffitt

Michael A. M. Holwager Jared R. Surkin

2023-07683

Witnesses: Alan Sexton

765-313-6651

Josh King-Baker

765-238-7738

Alan Sexton let me know on 9/13/23 that Tanya Moffitt admitted to deflating the tires on my 1985 mustang and was "bragging" about doing so just before our marriage, admitting she had vandalized my car before a cross-country trip just after Michael A. M. Holwager's involvement

7/20/23, 6:08 AM                                    Gmail - Shiba Inu and DeFi Token Scams - Help

# M Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Shiba Inu and DeFi Token Scams - Help
3 messages

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Tue, Jun 15, 2021 at 3:36 PM
To: InfraGardTeam@fbi.gov

Hi,
I'm contacting you because I cannot remember my username and I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring. I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this will be immediately passed over to the FBI to investigate.


Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please spread awareness before more people are taken for all they have.

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Tue, Jun 15, 2021 at 3:50 PM
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Hi Joseph,
I'm contacting you because I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring. I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this will be immediately passed over to the FBI to investigate.    \

Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please spread awareness before more people are taken for all they have.

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

---

Jon F. Turpin <jt4590@gmail.com>                                    Sun, Jul 2, 2023 at 2:59 AM
To: todd.rokita@in.gov, "SA Joseph L. Chaney" <jlchaney@fbi.gov>

The majority of times I've reported anything: My Dad's abuse, Michael's abuse, the abuse of me at the school which they didn't help stop, but instead, attempted to use me as collateral in and "put me down" as gay, my report of the unconstitutional Revocable Trust that has been used to falsely, against my civil rights, classify me as a dependent:

All have been attempts to ensure I'd never have a family, nor inherit, and now that I've reported the crypto scam, and potential child porn by Jared Junkin, and Michael Mann, there have been further, persistent attempts to destroy me, my wife, our marriage, our home, and even our ability to exist, and it still continues, with me properly reporting out of genuine concern, and enduring the same situation I had to endure as a child in the Western Wayne School Systems, without, so far, justice.

I've identified the "bad apples" and have done so by researching and pointing out a pattern, so, why will no one collect the evidence I've provided, and/or attempted to provide from the start, without attempting to continuously force me under the tyranny of my Dad, who has treated me as collateral to use for court cases instead of as a son?

Why, as the actual victim, who still loves our state of Indiana, and even denied taking a settlement from Western Wayne School Systems, and instead asked them then to "keep your money and just make this School a better place for kids so this doesn't happen again" am I still allowed to be abused?

I don't blame our government, nor our state, nor our Indiana Bar Association, nor our lawyers, nor our ISP, nor our STK, nor the government agencies with good people that do their best every day, nor my family, friends, nor even my former employers for being "duped" by these persons.

But I do say these persons are the issue here, and I am disappointed that, even now that they have proven their pattern of bad behaviors, that it may be allowed to continue, with not only me, but my wife losing everything just to even be heard.

They even threatened us with this destitution and loss of employment, and they always follow through, or attempt to, and they've threatened us with either complete and utter loss of rights and character and family, and/or death.

Now there are accusations to the DHS that we are threats to society, or that I'm a potentially gun violent person (one of the only ways to invalidate a valid expungement and attempt to force a false eviction from a home we purchased, which will be yet another attempt to prevent us from home ownership in our state of Indiana, and would allow my Dad to excise me from inheritance, and divorce my mom, as he threatened to do, while blaming me).

When that didn't/doesn't work, then the claims become that we must be mentally unfit, or potentially drug addicts, which is just incorrect and untrue.

7/20/23, 6:08 AM
Gmail - Shiba Inu and DeFi Token Scams - Help

Mr. Rokita, I wouldn't care what they said about me if it hadn't already been used in such a way to damage my character irreparably without a full pardon, and if it hadn't already been used to damage my jobs repeatedly, and even my career, and most importantly, if it hadn't been used to hurt and attempt to continue to hurt my wife, and our marriage without justice.

I truly don't care about my reputation, but this has damaged my character, and Faith alongside character make the foundation on which a man builds a life with his wife, and protects his family and children.

They have no right to my Faith, nor my wife, nor my character, nor my independence, nor our peace of mind, and further they have no right to destroy my life and my wife's life simply because they cannot carry their own false reputations, cannot view themselves honestly in the mirror, and cannot sleep with their own guilty consciences for their sins.

With that in mind, would you ever allow this to happen to your wife and children, even if some of the persons perpetrating it claimed they were your Dad, or claimed they were your friends? Their actions speak otherwise to me.

My Dad even contacted our priest from states away and tried to claim I was incompetent and unfit to be married, against the opinion of our qualified priest.

For independence day, I pray for true independence, and for justice, and I've already asked Jesus, Mary, and God, and I have Faith in them, and now I'm asking you.

Sincerely,
Jon F. D. Turpin

--------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Tue, Jun 15, 2021, 3:50 PM
Subject: Fwd: Shiba Inu and DeFi Token Scams - Help
To: SA Joseph L. Chaney <jlchaney@fbi.gov>

Hi Joseph,
I'm contacting you because I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring. I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this will be immediately passed over to the FBI to investigate.

Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please spread awareness before more people are taken for all they have.

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI

AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

7/20/23, 6:05 AM

Gmail - InfraGard Account - Dormant Status

 **Gmail**

Jon F Turpin <jt4590@gmail.com>

---

## InfraGard Account - Dormant Status

2 messages

---

**Joseph Chaney** <jlchaney@fbi.gov>                    Tue, Mar 22, 2022 at 3:01 PM

Good Afternoon,

With the increase of potential cyber threats related to the Russia-Ukraine war, it is important for cybersecurity professionals to stay informed. If you are receiving this email, you are listed as a <u>dormant</u> InfraGard member. Dormant members are those whom have not logged-in to the portal for over one year. Dormant members DO NOT received network broadcast emails from InfraGard National or the local InfraGard Chapter. If you have trouble logging in to the portal, please contact the InfraGard helpdesk at InfraGardTeam@fbi.gov for assistance to re-establish your login credentials. We encourage you to re-establish your InfraGard Secure Portal Account and encourage you to review DHS CISA's Shield's Up public web site at https://www.cisa.gov/shields-up and the FBI's public facing web site at www.IC3.gov for additional public intelligence and cyber security practices.

Thank You,

Joseph L. Chaney

Special Agent, FBI Indianapolis

Private Sector Coordinator, InfraGard Coordinator

Imminent Threat or Crime in Progress – call 911

Reporting Computer Intrusions (Including Ransomware) – www.ic3.gov or 1-800-callFBI

Business Email Compromise – www.ic3.gov & contact your financial institution immediately

State of Indiana -Indiana Cyber Hub : www.in.gov/cybersecurity/report-a-cyber-crime/.

---

**Joseph Chaney** <jlchaney@fbi.gov>                    Tue, Mar 22, 2022 at 3:09 PM

Good Afternoon,

Despite my best efforts to manually filter through the membership roster, a few Active InfraGard members were captured in this email, so I do apologize if you received this message in error. However, a good time to make sure your InfraGard login credentials still work.

Thanks!

[Quoted text hidden]

7/20/23, 6:07 AM                                    Gmail - FBI InfraGard Portal | Username & Credentials

 **Gmail**                                              Jon F Turpin <jt4590@gmail.com>

---

## FBI InfraGard Portal | Username & Credentials
1 message

---

**jt4590@gmail.com** <jt4590@gmail.com>                          Mon, Jun 26, 2023 at 12:57 AM
To: InfraGardTeam@fbi.gov
Cc: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Dear FBI InfraGard,
My name is Jon F. D. Turpin, and I've recertified as requested and need to reestablish my credentials with the FBI
InfraGard for appropriate login.
There are ongoing attempts by those I've reported to infiltrate our personal information, accounts, and identities, so it is
imperative I reach out:
Accounts of mine have been hacked and I've been "doxxed" after successfully reporting a major cryptocurrency scam, so
my username may need updated, along with a password reset.


Would you please contact me directly at jt4590@gmail.com, or via phone at 225-259-6270, and/or provide me with the
appropriate number to call in this situation?


Thank you for your assistance,
Jon F. D. Turpin
FBI InfraGard
225-259-6270
jt4590@gmail.com


---------- Forwarded message ----------
From: "Jon F. Turpin" <jt4590@gmail.com>
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>
Cc:
Bcc:
Date: Tue, 15 Jun 2021 15:50:06 -0400
Subject: Fwd: Shiba Inu and DeFi Token Scams - Help

Hi Joseph,
I'm contacting you because I need to report what I believe to be a huge financial crypto scam now.

I am currently being doxxed (not hard, but still not ok) by members of what I believe to be an organized crypto crime ring.
I've compiled some of the info I've found in a YouTube video and they've taken to doxxing me and sending a threat to find
me and "visit" on Reddit which I've reported... I'm not sure how far they are going to go.

https://www.facebook.com/jon.f.turpin/posts/10165369436100331&show_text=true&width=500

I've been doxxed by someone claiming to be at the email address of tonirod86@gmail.com and someone claiming to be
named Micelle Demers.
They've contacted my workplace and claimed that I own a crypto wallet worth 25m in attempts to get me fired as well. I've
never had this amount of money in my life, and if I somehow did come into possession of an ill-gained crypto wallet this
will be immediately passed over to the FBI to investigate.


Certainly there is more doxxing going on because I went public with this in an attempt to prevent others from getting
scammed, but with one potential death threat already this is much bigger than me and I need some help.

I encourage you to investigate and please get in touch with me. If this is a scam, which to me it appears to be, please
spread awareness before more people are taken for all they have.

7/20/23, 6:07 AM

Gmail - FBI InfraGard Portal | Username & Credentials

Regards,
**Jon F. Turpin**
Phone: (317) 378-9314
E-mail: jt4590@gmail.com
Owner: Rag Tag Games, LLC (2011-2013)
*Proud Corporate Sponsor of Riley Children's Foundation, Inc.*

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

_____

📄 **Fwd: Shiba Inu and DeFi Token Scams - Help.eml**
6K

7/20/23, 6:07 AM                                Gmail - This is What They Are Abusing and Attempting

 **Gmail**                                              Jon F Turpin <jt4590@gmail.com>

---

## This is What They Are Abusing and Attempting
1 message

---

**jt4590@gmail.com** <jt4590@gmail.com>                          Mon, Jun 26, 2023 at 1:21 AM
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

This correlates directly with some of the threats that were made towards me and my wife and shows the motivation behind the current abuse of the court system in attempts to falsely accuse and destroy us completely.

The bad actors have abused our government all the way to the Department of Homeland Security, and our court system, in successful attempts to wrongfully terminate me repeatedly, wrongfully charge us, and evict us.

Situations such as the one we're currently presented with, which I unfortunately predicted would happen, because persons with behaviors such as those I've identified are predictable, are why it's imperative I receive a pardon.

Not only was the original conviction wrongful and forced upon me via unconstitutional use of a Revocable Trust to falsely claim me as a dependent and further abuse and neglect. Expungement has been utilized by the same bad actors, not by our government, to falsely identify me as a threat to society when I'm attempting to turn over required evidence to prevent future corruption of this nature, which is on an unprecedented scale, from continuing.

By journaling, documenting, researching, and understanding our history, legacy, and to some degree out of necessity our legal system, I've been able to identify and "pull back the curtain" on the motivations behind these attacks.

Unfortunately, even when I do this, the bad actors further pretend that I'm a problem for simply destroying their illusion and presenting their, in my opinion once shown, obvious end goals, which I can only describe as dire hatred.

Hatred towards us for merely existing and attempting through all odds to continue to exist, safely, with the rights to protect ourselves and continue our life, liberty, and pursuit of happiness, as our forefathers intended.

Judge Mark D. Stoner needs to be contacted by the FBI about this, and we, in my opinion, should be considered key witnesses in, my assumed unqualified but potentially qualified opinion, a top-priority indictment of bad actors.

3.     The Indiana State Police Central Repository for Criminal History information is ordered to seal Petitioner's expunged records relating to Cause No. 49G06-1612-F5-046714. Records sealed may be disclosed only to:

      A.     A prosecuting attorney if authorized by court order and needed to carry out the official duties of the prosecuting attorney,

      B.     A defense attorney, if authorized by a court order and needed to carry out the professional duties of the defense attorney,

      C.     A probation department, if authorized by a court order and necessary to prepare a presentence report,

      D.     The Federal Bureau of Investigation and the Department of Homeland Security, if disclosure is required to comply with an agreement as to the sharing of criminal history information,

      E.     The Indiana Supreme Court, members, the executive directors or employees of the Indiana State Board of Law Examiners in accordance with rules adopted by the such board for determining whether an applicant possesses the necessary good moral character for admission to the bar and

      F.     A person required to access expunged records to comply with the Secure and Fair Enforcement of Mortgage Licensing Act (12 U.S.C. 5101 et seq.) or regulations adopted under such act.

Signed Expungement Order - Turpin.pdf
241K

7/14/23, 10:45 PM                                                    FBI VCC & NCOP Swatting

 Gmail                                          Jon F Turpin <jt4590@gmail.com>

## FBI VCC & NCOP Swatting
4 messages

**Jon F. Turpin** <jt4590@gmail.com>                                Fri, Jun 30, 2023 at 12:14 PM
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

Dear Mr Chaney,
After what we've experienced over the last two years at the hands of a few individuals, and the unfortunate, in my opinion, waste of government resources by potetial repeated attempts of these individuals to:

1. Classify me falsely as someone who is "gun violent."

2. Classify my wife falsely as "mentally unsound" and or an "abusive spouse."

3. Destroy via fictitious and fractious abuse of our thin blue line, legal system, department of homeland security, and other esteemed governmental agencies:
Our character, careers, livelihood, savings, freedom of speech, and most importantly, our marriage, health, civil rights, peace of mind, and ability to have a family and pets.

Potentially as attempts to vicariously carry out their prior expressed threats upon us, simply for reporting out of concern for our safety, and for necessary "whistle blowing," but most unfortunately, potentially for the expressed enjoyment of these individuals to not only watch us suffer but cause us to "suffer lol," in the words of a man now attempting to abuse our court systems...

It is my sincere opinion that there was an active attempt by these, in my opinion, "bad actors" to "swat" us, and I thank you and our FBI for creating the NCOP within our VCC to combat this potentially dangerous bad behavior in our nation.

Would you please review, and include me, and my wife, Jon F. Turpin, and Erin R. Golden, appropriately as victims of potential swatting in our national swatting database in an effort to keep us safe from further harms and/or attempts by bad actors to abuse not only us, but our thin blue line and governmental agencies and resources?


Thank you sincerely,
Jon F. Turpin & Erin R. Golden
225-259-6270 & 225-432-5574
jt4590@gmail.com & erin465336@gmail.com
2421 S. Plum St. Yorktown, IN 47396

**Jon F. Turpin** <jt4590@gmail.com>                                Fri, Jun 30, 2023 at 4:56 PM
To: Legal <legal@kirkfreemanlaw.com>

Request to be added to the FBI's VCC NCOP Database as victims of "swatting," due to recent events where Michael A. M. Holwager may have attempted to wrongfully classify me as someone who is "gun violent" and/or as an active shooter. https://abcnews.go.com/US/fbi-creates-national-database-track-swatting/story?id=100527427

Best Regards,
**Jon F. Turpin**
E-mail: jt4590@gmail.com

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley
[Quoted text hidden]

**Jon F. Turpin** <jt4590@gmail.com>                                Fri, Jun 30, 2023 at 5:04 PM
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>

7/14/23, 10:45 PM                                    Gmail - FBI VCC & NCOP Swatting

Messages sent by Michael A. M. Holwager with statements regarding me, "JT" and "gun violence."



**Jon F. Turpin**
E-mail: jt4590@gmail.com

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

[Quoted text hidden]

---

**Jon F. Turpin** <jt4590@gmail.com>                                    Fri, Jun 30, 2023 at 5:05 PM
To: Legal <legal@kirkfreemanlaw.com>

Messages sent by Michael A. M. Holwager with statements regarding me, "JT" and "gun violence."

7/14/23, 10:45 PM                                    Gmail - FBI VCC & NCOP Swatting



**Jon F. Turpin**
E-mail: jt4590@gmail.com

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

[Quoted text hidden]



Welfare Checks

Turned off Facebook May 28th
Welfare Check #1 May 29th
Welfare Check #2 Jun 1st





# 2022
## ANNUAL REPORT
*Office of the Indiana Attorney General*
## Todd Rokita



OFFICE OF THE INDIANA
ATTORNEY GENERAL
Todd Rokita



# FROM THE ATTORNEY GENERAL

2022 Office of the Indiana Attorney General's Annual Report



Dear Fellow Hoosiers:

After two years as your Attorney General, I remain deeply grateful for the trust and confidence you placed in me to serve as Indiana's chief legal officer.

Every day, I encourage my team to work for all Hoosiers with servants' hearts, and together, we have taken strong actions to protect liberty and the rule of law in our great state.

Since the day I took office, I have committed to being accountable and transparent about our actions and achievements. This 2022 annual report allows you to review our work.

Employing approximately 400 staff members, the Office of the Indiana Attorney General focuses daily on accomplishing our key priorities to ensure Hoosier voices are heard — providing legal representation to the State of Indiana; protecting consumers from illicit business practices; investigating and prosecuting Medicaid fraud; collecting and returning unclaimed property; and challenging federal overreach where it may harm or infringe upon our citizens.

In 2022, we continued a pattern of accomplishment.

We protected Hoosiers from criminals, including by fulfilling our role serving as prosecutors at the appellate stage of all criminal cases. We successfully defended convictions and sentences in several murder cases, including cases in which the victims were children.

We further worked to keep Hoosiers safe by pressing federal officials to start enforcing immigration laws and securing the US-Mexico border. Within 48 hours of illegally crossing that national boundary, a cartel member can be right here in Indiana — selling fentanyl, trafficking girls and women, and unleashing other crimes in our communities. We became the first state not geographically adjacent to the border to sue the Biden administration over costs imposed on our taxpayers by federal failure to enforce the law.

We held drug companies and pharmacies accountable for their roles in the opioid epidemic — winning hundreds of millions of dollars for Hoosiers in settlements with opioid manufacturers, marketers and distributors.

We fought and won lawsuits against the Biden administration's mask mandates, vaccine requirements and transgender extremism. We also repudiated federal and other interference with parents' rights to educate and raise our own children — a God-given prerogative that we also have advanced through our office's publication of the Parents' Bill of Rights.

We continued our strong defense of the right to bear arms — publishing the Gun Owners' Bill of Rights to help ensure that Indiana citizens understand the constitutional provisions and other laws that safeguard their Second Amendment liberties.

We protected job creators and the overall Hoosier economy by opposing leftist efforts to stall free enterprise with red-tape obstructionism. This includes our continued leadership of multistate amicus briefs against local governments that, based on climate-change concerns, lodge common-law public nuisance claims in state courts against fossil-fuel companies.

We kept standing up for the sanctity of life — winning such legal battles as defending state laws outlawing dismemberment abortions and discriminatory abortions (destroying unborn babies because of their race, sex, or disability). Now, we are doing our duty to defend the most pro-life law in recent Indiana history — SB1, passed last summer by the Indiana General Assembly.



# FROM THE ATTORNEY GENERAL

2022 Office of the Indiana Attorney General's Annual Report

We targeted the abuses of Big Tech — winning a $20 million settlement with Google to resolve our lawsuit over deceptive location tracking practices. We also filed two separate lawsuits against TikTok — both related to false claims made by the Chinese company about its video-sharing app.

We went after robocallers and other scammers — winning historic settlements with several telecommunications companies accused of facilitating illegal robocalls from overseas. We also announced that Indiana is leading a nationwide Anti-Robocall Litigation Task Force.

We protected Hoosiers' religious liberties — successfully supporting the legal efforts of two Catholic schools, for example, to defend their rights to require ministerial staff to uphold church doctrine in the area of traditional marriage.

On all these fronts and many more, we won significant victories in 2022 on Hoosiers' behalf.

With 2023 upon us, my staff and I remain fully committed to keep doing the hard work necessary to produce such positive results.

Please do not hesitate to contact our office with comments or questions — either through our website at in.gov/attorneygeneral/ or by calling (317) 232-6201.

Thank you again for the honor of asking me to serve as your attorney general.

May God bless you and Indiana in the year ahead.

Yours in service,

Todd Rokita





# TABLE OF CONTENTS

2022 Office of the Indiana Attorney General's Annual Report

| | |
|---|---|
| Financial Stewardship | 4 |
| Policy Wins | 5 |
| Solicitor General | 6-7 |
| Advisory | 8 |
| Consumer Protection | 9-12 |
| Litigation | 13-15 |
| Medicaid Fraud | 16 |
| Unclaimed Property | 17 |
| Complex Litigation | 18 |
| Appeals | 19 |



# FINANCIAL STEWARDSHIP

2022 Office of the Indiana Attorney General's Annual Report

Staffed by servant leaders, our office is mindful to maximize Hoosiers' return on taxpayer dollars.

## Accomplishments

| | |
|---|---|
| Unclaimed Property returned $62,116,202 directly to Hoosiers. | $62,116,202 |
| The State received $115.8 million from consumer settlements. | $115,722,718 |

## Actuals 2022

| | | |
|---|---|---|
| **The OAG recovered more than $475.2 million in 2022.** | **$475,222,186** | |
| Collections for the State | $9,705,617 | 2% |
| Medicaid Fraud Control Unit (MFCU) Recoveries | $13,933,774 | 3% |
| Unclaimed Property Received | $149,223,838 | 31% |
| Tobacco Settlement Funds | $150,067,532 | 32% |
| Opioid Settlement Funds | $111,318,566 | 23% |
| Other (Consumer Litigation Settlements, Homowner Protection, ID Theft Recoveries, Solicitation and Real Estate Fees) | $40,972,859 | 9% |



The OAG recovered more than $475 million in 2022

4



# POLICY WINS

2022 Office of the Indiana Attorney General's Annual Report

## Accomplishments

### Abortion
After the Supreme Court overturned Roe v. Wade, Attorney General Todd Rokita worked together with the Indiana General Assembly to pass Senate Enrolled Act 1 outlawing abortion in the State of Indiana with some exceptions.

### Title IX
Attorney General Todd Rokita led multiple multistate efforts concerning the radical rewrites of Title IX rules. Indiana obtained an injunction through its joint suit with Tennessee challenging the Department of Education's Title IX guidance. Indiana also submitted comments in response to Department of Education's Proposed Rule completely rewriting Title IX.

### Parents Bill of Rights
Attorney General Todd Rokita released a new installment of the Parents' Bill of Rights focused on Liberty in Education and School Choice.

### Woke Corporations
Attorney General Todd Rokita issued an advisory opinion affirming that Indiana law requires Indiana Public Retirement System (INPRS) investments to be based solely on the financial interests of Hoosier public employees and retirees. Such investments may not, under state law, be based upon any so-called "Environmental, Social and Governance" (ESG) considerations. These are activist-driven agendas intend to achieve radical environmental and social policies.

### TikTok
Attorney General Todd Rokita led two lawsuits against TikTok. The first lawsuit alleges that TikTok has lured children onto the platform through a variety of misleading representations indicating that the app contains only "infrequent/mild" sexual content, profanity, or drug references — when in reality the app is rife with extreme examples of such material. An essential part of TikTok's business model is presenting the application as safe and appropriate for children ages 13 to 17. The second lawsuit asserts that TikTok has reams of highly sensitive data and personal information about Indiana consumers and has deceived those consumers to believe that this information is protected from the Chinese government and Communist Party.

### Protecting Girls' Sports
Attorney General Todd Rokita defended House Enrolled Act 1041 against the ACLU to protect Girls Sports. HEA 1041 provides a new safeguard for girls' equal opportunity in sports by requiring only biological females may participate in sports designated for females, and it does so to ensure biological girls and women have the same opportunities in sports as biological boys and men, including respect and safety.

### Immigration
A record number of immigrants have entered the United States on a daily basis, some with nefarious intentions such as drug trafficking. There has been a 4,000 percent increase in fentanyl seizures at the southern border. Attorney General Todd Rokita has initiated numerous challenges to the Biden Administration's immigration policies to combat illegal immigration and defend against the attack at the southern border.

### China
Three weeks after Attorney General Todd Rokita announced an investigation into Valparaiso University's association with the Confucius Institutes, which are alleged to function as a propaganda arm of the Chinese Communist Party. The university went on to end it's relationship with ithe Confucius Institute which ultimately closed its door.



# SOLICITOR GENERAL

2022 Office of the Indiana Attorney General's Annual Report

The Solicitor General represents the State of Indiana in litigation before the United States Supreme Court and in dozens of other significant and high-profile matters.

## Accomplishments

### Amicus Briefs

The SG Division provided national leadership by writing and filing fifteen multi-state amicus briefs in high-profile cases pending before the U.S. Supreme Court, lower federal courts, and state supreme courts. These briefs spanned a variety of cutting-edge legal issues, including:

- Constitutional law, where the State filed an amicus brief inviting the U.S. Supreme Court to hold that Spending Clause statutes do not include an implied private right of action. The Solicitor General argued before the Court on behalf of the *amici* States in November 2022.

- Public safety, where the State filed an amicus brief inviting the U.S. Supreme Court to restore the States' police authority to fine railroads that block grade crossings for over five minutes.

- Criminal justice, where the State filed an amicus brief asking the Illinois Supreme Court to affirm a judgment that permitted law enforcement to compel a prisoner to provide the passcode to his encrypted device.

- Energy and climate, where the State filed amicus briefs supporting defendant oil companies' efforts to remove to federal court lawsuits designed to hold them liable for the costs of global climate change under a common-law public-nuisance theory.

### Ongoing Appeals

- Indiana appealed a decision enjoining enforcement of state statutes requiring public school students to use restrooms and locker rooms consistent with their biological sex. Briefing is complete at the Seventh Circuit.

### Other Important Victories

- Indiana, with Louisiana and Mississippi, persuaded the Fifth Circuit to stay President Biden's vaccine mandates for federal contractors and children participating in the Head Start program.

- Indiana and Tennessee obtained an injunction against a Biden Administration policy that would reimagine Title IX to prohibit discrimination for sexual orientation and gender identity.

- The U.S. Supreme Court vacated an injunction that barred enforcement of the State's Medicaid-driven Healthy Indiana Plan (HIP).



# SOLICITOR GENERAL

2022 Office of the Indiana Attorney General's Annual Report

The Solicitor General represents the State of Indiana in litigation before the United States Supreme Court and in dozens of other significant and high-profile matters.

## Accomplishments

### Abortion

In the wake of the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Center,* which overturned the right to abortion recognized in *Roe v. Wade and Planned Parenthood v. Casey*, the SG Division secured favorable decisions in multiple federal abortion cases, including the following:

- *Doe v. Ind. Att'y Gen.*: The State appealed an order enjoining Indiana's statutes requiring burial or cremation of aborted fetal remains. The SG Division persuaded the Seventh Circuit to vacate the injunction with costs and mandate a judgment for the State on the merits, closing the case.

- *All Options v. Ind. Att'y Gen.*: Despite a preliminary injunction against a statute requiring that women seeking abortion be told that mifeprex alone may not yield a chemical abortion, the State reached settlement allowing the requirement to go into effect in 2023.

- *Bernard v. Medical Lic. Bd., et al.*: The State secured vacatur of an injunction barring enforcement of its dismemberment abortion ban.

- *Whole Women's Health v. Ind. Att'y Gen.*: The State persuaded the Seventh Circuit to vacate an injunction barring Indiana from enforcing a series of abortion restrictions, including its tele-medicine ban and abortion facility safety requirements.

Meanwhile, the State continues to appeal the judgment and injunction with respect to certain laws enjoined by district courts, including:

- *Planned Parenthood Great Northwest, Haw., Alaska, Ind., Ky., Inc., et al. v. Medical Lic. Bd., et al.*: The State persuaded the Indiana Supreme Court to hear its appeal from an order enjoin-ing Indiana's 2022 abortion ban under the Indiana Constitution. Oral argument has been set for January 19, 2022.

- *Anonymous Plaintiff 1, et al. v. Medical Lic. Bd., et al.*: The State appealed a district court order enjoining enforcement of Indiana's abortion ban as applied to five individual plaintiffs under the State's Religious Freedom Restoration Act. Briefing is currently underway at the Indiana Court of Appeals.

- *Planned Parenthood Great Northwest, Haw., Alaska, Ind., Ky., Inc., et al. v. Commissioner, Ind. Dep't of Health, et al.*: The State now litigates at summary judgment a challenge to state statutes requiring (a) physicians to identify and attest that the adult consenting to a pregnant minor's abortion is a parent or legal guardian and (b) prohibiting aiding or assisting minors in their efforts to circumvent Indiana criminal law by obtaining an abortion in another state

7



# ADVISORY

2022 Office of the Indiana Attorney General's Annual Report

The Attorney General's Advisory Division provides guidance to public officials in their efforts to understand state statutes, policies, procedures and the law. It does this by helping research and craft official advisory opinions, memoranda of guidance and informal legal counsel; advising state government in the review and creation of administrative rules and regulations; reviewing and approving the form and legality of all state contracts; acting as legal advisor to Indiana's licensing boards and commissions.

## Accomplishments

• Access to Public Records Act Requests Completed = 257

• Active MOUs = 32

• Administrative Rules = 41

• Boards & Commissions Advised = 54

**Contracts :**

• For 2022 = 4,701 (4,558 electronic 118 paper, and 23 CNtS, and 2 interlocal agmts)

Covenants Not to Sue = 23

Form Approvals = 88

Interlocal Agreements = 2

Memorandums of Legal Guidance = 11

Official Opinions = 3

2022-1 RE: Off-label prescription of medications for treatment and prevention of  COVID-19

2022-2 RE: School liability for COVID policies

2022-3 RE: Indiana Public Retirement System and ESG Investments



# CONSUMER PROTECTION

2022 Office of the Indiana Attorney General's Annual Report

In our current economy, everyone is essentially a consumer. The Indiana Consumer Protection Division ("CPD") is responsible for preventing business practices in Indiana that are unlawful, unfair, abusive, or deceptive, through education or litigation, if necessary, and doing so without unduly burdening legitimate business endeavors. Consumers in Indiana face perpetual choices as to where and how to spend their finite, and hard-earned money. Those Hoosiers often encounter unscrupulous or illegitimate businesses or business tactics aimed at separating consumers from their money or their data. CPD's various Sections including Intake, Data Privacy and Identity Theft Unit, Consumer Litigation and Tobacco Enforcement, Mediation, Licensing Enforcement, and the Homeowner Protection Unit are charged with protecting Hoosiers from illegitimate businesses and tactics.

## Accomplishments

### Intake

The Intake Section receives all of the calls and complaints filed by consumers. They are responsible for reviewing and directing those calls and complaints to the appropriate Section or agency.

Calls: 20,166

Complaints Received: 14,525

Caller satisfaction rate for telephone intake staff: 80%

Referred to mediation: 7,750

Referred to Data Privacy: 3,405

Referred to Licensing Enforcement: 3,370

*Written feedback from customer surveys:*

"The person who answered the phone was cheerful, helpful and very positive. She directed me to the right place, I really appreciate that. She was professional as well. Thank you."

"I just want to say that I'm thoroughly satisfied with the help I'm getting from you guys. I literally have no place else to turn except you guys. You are at least getting on it and I do appreciate it. Ya know, there is right and wrong and you guys are right. Jackson Hewitt Tax Services is wrong and they just won't live up to their promise. Thank you all for getting on them. I'm sure this is going to resolve because there nothing really to resolve. So thank you very much and I appreciate your help getting my return tax refund. It's almost November. So thanks again and I'll get off your ear and let you all get back to work. Thanks for all you do."

"Everyone was very pleasant and helpful. I didn't have to wait long to speak with somebody. Thank you."

"Very um, professional and conscientious and she was very friendly. She was able to answer the question even though I haven't had the response yet, she was very nice to point out how many more days I can expect to wait. All around very nice. Now hopefully, the rest of the process goes as well and I can either get my money back or the product I originally purchased."

9



# CONSUMER PROTECTION

2022 Office of the Indiana Attorney General's Annual Report

## Mediation

CPD has four full time mediators who work to try to resolve consumer complaints in an effort to avoid further investigation or protracted litigation.

In 2022, there were approximately **4,461** matters mediated, which resulted in approximately **$6,540,318.44** in value returned to consumers.

## Consumer Litigation and Tobacco Enforcement

The Consumer Litigation Section investigates and litigates allegations of unfair, deceptive, or abusive trade practices under state and federal law.  It also investigates and litigates antitrust lawsuits, allegations against nonprofits and involving charitable trusts, and allegations involving fraud or deception directed toward senior consumers. Consumer Litigation opened 225 cases and 574. In 2022, through litigation or by agreement, Consumer Litigation recovered the following:

| Type of Relief | 2021 Totals | 2022 Totals | Grand Total |
|---|---|---|---|
| Penalties | $7,496,038.70 | $2,891,893.83 | $10,387,932.53 |
| Restitution | $4,959,549.82 | $10,083,064.83 | $15,042,614.65 |
| Contract/Loan Cancellation | $9,807,547.00 | $26,328,205.00 | $36,135,752.00 |
| Costs | $8,100.00 | $82,775.92 | $90,875.92 |
| Tobacco | $146,262,255.84 | $150,067,532.33 | $296,329,788.17 |
| **Grand Totals** | **$168,533,491.36** | **$189,453,471.91** | **$357,986,963.27** |

### *Highlights of Consumer Litigation's lawsuits include:*

Navient Settlement: 29C01-2201-PL-000221
- This case resulted in a $1.7 billion multistate settlement with student loan servicer Navient to resolve allegations of unfair and deceptive student loan servicing practices. The alleged misconduct included abuses in originating predatory subprime student loans and steering struggling student loan borrowers into costly long-term forbearances instead of counseling them about the benefits of more affordable income-driven repayment plans. Under the settlement, Indiana borrowers received more than $31 million in relief. That includes $26.3 million in the form of loan forgiveness for 1,189 consumers and $4.3 million in restitution payments for 16,304 consumers. Navient also paid the State of Indiana an additional $688,871.

In re: ImmediaDent of Indiana, P.C. Settlement: 49D05-2208-MI-02654
- A chain of dental practices failed to refund consumers amounts they had prepaid for services that they never received because of the practices' sudden closures. After receiving consumer information in response to our Civil Investigative Demand, the Office negotiated an Assurance of Voluntary Compliance in which ImmediaDent agreed to hire a settlement administrator to repay over $2 million dollars in refunds it identified as being owed to more than 22,000 Indiana consumers.



# CONSUMER PROTECTION

2022 Office of the Indiana Attorney General's Annual Report

**Frontier Communications Settlement:  49D11-2209-PL-30483**
- Following a lawsuit alleging that Frontier misrepresented internet speeds and reliability to consumers, the company entered into an Assurance of Voluntary Compliance and agreed to certain terms including:
    - Agreeing to invest $15 million over a period of four years to improve internet infrastructure in Indiana.
    - A requirement to review service speeds and provide options to consumers to reduce service plans (and costs) if their current plans promise higher speeds than those provided.
    - Change its advertising efforts to accurately represent to Indiana consumers both the availability and reliability of their internet service.

**Juul multistate settlement**
- Juul - E-cigarette maker Juul Labs agreed to pay nearly $440 million to 33 states after an investigation revealed the company marketed its products to underage teens. The money will be paid out over a period of six to 10 years and is expected to go toward vaping prevention and education efforts.

## Licensing Enforcement and the Homeowner Protection Unit ("HPU")

The Licensing Enforcement Section and the Homeowner Protection Unit investigates and prosecutes consumer complaints against licensed professionals. There are approximately thirty-five boards that LE and HPU appear before including, but not limited to physicians, nurses, pharmacists, veterinarians, real estate professionals, appraisers, plumbers, and architects. The Section seek sanctions for licensees who have violated practice standards, acted dishonestly, or acted unethically and pursues litigation in Hoosier courtrooms, when necessary.

In 2022, Licensing Enforcement opened 2,172 investigations and closed 1,913. They opened 378 litigation matters and closed 561. That Section sought the emergency suspensions of approximately 20 individuals or entities and obtained suspensions in 80% of those cases.

### *Noteworthy cases for Licensing Enforcement and HPU include:*

**Lankford Funeral Home**
Licensee allowed 31 bodies to decompose in his funeral home located in Jeffersonville, Indiana, without refrigeration or function air conditioning. Licensee also allegedly mixed up or divided up cremains which he gave to the wrong families. His license and funeral home's license have been revoked.

**Cresthaven**
After receiving multiple complaints from families regarding deteriorating conditions at a cemetery mausoleum in Bedford, Indiana, our office conducted site visits. Before the Professional Licensing Agency, our office successfully secured a ruling against the owner, requiring him to submit an action plan. Our office continues to monitor the owner to ensure that he is carrying out this plan.

**Dr. Shareef**
Dr. Faizuddin Shareef's license was originally suspended in 2019 after the OAG demonstrated significant incompetency in prescribing opioids. After four failed reinstatement hearings, the OAG asked for and received a revocation of his license.

**State of Indiana v. Aloft, et. al**
Property managers failed to meet their basic obligation to provide tenants with safe and secure housing. The properties were sold to a new owner who made a commitment to invest the necessary capital to improve the conditions for tenants, including $7.25 million in repairs.



# CONSUMER PROTECTION

2022 Office of the Indiana Attorney General's Annual Report

## Data Privacy

The Data Privacy & Identity Theft Unit oversees issues related to consumer privacy, identity theft, and information security. It enforces statutes related to telephone use such as autodialers, "Do Not Call" and misleading caller IDs. The Unit also monitors data privacy matters governed by the Fair Credit Reporting Act of 1970 (FCRA), the Children's Online Privacy Protection Act (COPPA), the Genetic Information Nondiscrimination Act of 2008, the Communications Decency Act of 1996 (DCA), Health Insurance Portability and Accountability Act of 1996 (HIPAA), Indiana Deceptive Consumer Sales Act and many others.

Data Privacy also assists consumer victims to correct false information in their credit report or credit records. It has a duty to coordinate with federal, state, and local Law enforcement in investigation and prosecution of crimes including identity deception, synthetic identity deception, fraud, and related crimes.

- In 2022, there were approximately 845.5 million calls placed, which averages 136.9 calls per person.

- In 2022, Indiana has seven active cases against entities responsible for over 1 billion robocalls.

- Indiana is a leader of a 50 state robocall task force along with Ohio and North Carolina.

- Indiana leads a national working group that includes international regulators, federal agencies, and state agencies.







Total Indiana residents impacted 2020 = 641,342
Total Indiana residents impacted 2021 = 2,081,087
Total Indiana residents impacted 2022 = 1,875,758



Identity Theft Complaints

12



# LITIGATION

2022 Office of the Indiana Attorney General's Annual Report

The Litigation Division serves as the State's law firm. Our dedicated litigators represent the State and its agencies, officials, and employees in state and federal courts in complex and significant interest cases in almost every substantive area of the law. The Litigation Division has four Sections – each with their own area of expertise.

## Accomplishments

Protecting the legal interests of the State and its citizens
Defending the rule of law
Fighting fraud and public corruption
Recouping monies owed to the State and saving taxpayer dollars

- During 2022, the Litigation Division successfully and efficiently managed a growing docket of 6,144 cases
- Litigation opened 4,005 cases - a 25% increase from 2021
- Litigation closed 3,429 cases - a 14% increase from 2021
- Litigation saved considerable taxpayer monies through its representation and advocacy and recouped more than $13.4 million.

### Administrative and Regulatory Enforcement Litigation Section (AREL)

This Section represents the State and its agencies in a wide variety of civil cases. The Section is also responsible for affirmative litigation on behalf of state regulatory agencies seeking to enforce state laws and regulations to protect the State and its citizens. The Section litigates cases involving the enforcement of administrative orders, election law, environmental law, IOSHA Whistleblower complaints, the judicial review of final agency decisions, mental health law, qui tams, requests for specialized driving privileges, subpoena enforcement, and tax law.

- Successfully defended the State's interest in high-profile and significant cases involving important issues such as sovereign immunity, separation of powers, and statutory interpretation. The team has continued to litigate in such complex areas as election law, alcohol regulation, and health and safety law.

- Recouped $1,527,500.00 for the state through court ordered assessments of fines or through negotiation.

- Successfully defended in the U.S. District Court a challenge to HEA 1300, the Indiana law governing nonprofit organizations that crowdsource funding for bail. This matter is currently in front of the Seventh Circuit.

- Representing the Secretary of State and other defendants, the team successfully defended a challenge to Indiana's campaign finance rules, noting that for-profit corporations may contribute to political action committees for the purposes of independent expenditures. This matter is now in front of the Seventh Circuit.

- In an election integrity case, successfully defended Indiana's ability to maintain its absentee ballot requirements. This case is in front of the Seventh Circuit.

- Achieved a state trial court victory involving a challenge to Indiana's mechanism to offer unused public-school buildings to charter schools.

- In response to an effort by plaintiffs to force federal court control over FSSA's efforts to shorten detention time for those who are found not competent to stand trial, the AREL team successfully argued that FSSA is not violating the rights of those who are incompetent to stand trial.



# LITIGATION

2022 Office of the Indiana Attorney General's Annual Report

## Accomplishments

### Asset Recovery and Bankruptcy Litigation Section

This Section handles cases where state agencies are owed monies. The case types range from damage to state property to enforcement of contracts or fines and penalties to collection of monies misappropriated or diverted by public officials through malfeasance, misfeasance or nonfeasance. The litigation performed by the Section covers all phases of litigation, from initial demand letter to post-judgment collection efforts. Additionally, the Section handles bankruptcy work for the State. That can include filing and pursuing adversary proceedings to ensure debts are not discharged in bankruptcy or working through issues for agencies in Chapter 11 cases.

- ARB obtained judgments and settlements of over $30M, which is a 110% protection rate of the referred amounts.

- ARB continued its fight on behalf of the State against fraudsters. Those efforts include pursuing unemployment benefits received through fraud in both State and Bankruptcy courts; also pursuing cases involving fraudulently obtained SNAP or other welfare benefits.

- ARB continues to work to ensure that public corruption is not allowed to run rampant, and the perpetrators of the corruption are held accountable for their actions. Those actions include pursuing the public officials and employees that misappropriated or diverted public funds, those who might have received those funds, and others who are liable. Those liable are pursued to recover the monies lost due to the official's and employee's actions as well as the costs of the investigations, and also penalties for their actions.

- Recouped $9,795,616.87 for the state through court ordered assessments or through negotiation fines, restitution, recoupments, and penalties.

- Successfully recovered more than $3 million for INDOT to pay for repairs to damage to State property.





# LITIGATION

2022 Office of the Indiana Attorney General's Annual Report

## Accomplishments

### Government Litigation Section

This Section represents the State of Indiana and its officials, agencies, and employees in a wide variety of civil cases. For example, the Section handles civil lawsuits involving constitutional challenges, civil rights and employment claims, contract disputes, and petitions for habeas corpus and post-conviction relief.

- Successfully defended hundreds of Section 1983 civil rights, employment, and other claims through jury and bench trials, mediations, settlement conferences, and dispositive motions including saving taxpayers millions of dollars by way of successful jury verdicts, motion practice, and negotiations.
- Government litigation tried nine successful federal jury trials in 2022, including a finding of not liable in an excessive force case involving the Indiana State Police.
- Government Litigation effectuated a federal filing ban against an abusive filer following a hearing uncovering the frequent filer's perjury across several cases.
- Summary judgments were granted in favor of the State on issues including deliberate indifference by Correctional staff, wrongful termination, due process in usage of restrictive disciplinary housing, and judicial immunity.

### Real Estate Litigation Section

This Section handles eminent domain matters, quiet title actions, mortgage foreclosures, and other real estate-related litigation for state agencies. This Section also handles administrative matters and provides state agencies with transactional real estate advice to ensure that the State is obtaining good title through various real estate transactions.

- Represented the State in all eminent domain cases, which assisted INDOT in meeting its construction deadlines.
- Obtained jury verdicts in favor of the State and consistent with the "just compensation" requirement set forth by the Indiana Constitution.
- Represented the State in mortgage foreclosure cases, which assisted IDOR in recouping unpaid tax warrants.
- Negotiated real estate acquisitions and handled the review and approval of 1,323 secured real estate parcels, representing a 24% increase over 2022.

 # MEDICAID FRAUD CONTROL UNIT

2022 Office of the Indiana Attorney General's Annual Report

**The Medicaid Fraud Control Unit investigates Medicaid provider fraud and patient abuse or neglect.**

## Accomplishments

- Recovered 13,933,774 from various civil and criminal cases involving either fraud or the abuse or neglect of patients receiving Medicaid benefits
- Achieved 32 criminal convictions in State and Federal courts
- Achieved 29 federal criminal indictments in State and Federal courts

*The Indiana Medicaid Fraud Control Unit receives 75 percent of its funding from the U.S. Department of Health and Human Services under a federal grant. The remaining 25 percent is funded by the State of Indiana.*



16

# UNCLAIMED PROPERTY

2022 Office of the Indiana Attorney General's Annual Report

**The Unclaimed Property Division collects, safeguards, and returns unclaimed property to rightful owners.**

## Accomplishments

- Returned over $62 million
- Reviewed over 51,000 claims
- Average claim amount was $1,021.50
- Received and processed over $147 million and over 840,000 properties
- Sold 1,327 items on 300+ eBay auctions for over $172,000
- Launched a chat bot on the website to assist constituents 24/7. Over 2,067 inquiries answered
- Answered 21,886 calls from constituents

*Check www.IndianaUnclaimed.gov to see if the Office of the Attorney General has funds for you!*





# COMPLEX LITIGATION

2022 Office of the Indiana Attorney General's Annual Report

**The Complex Litigation Division handles unique cases requiring specialized expertise.**

## Accomplishments

- In conjunction with the Finance Division distributed payments totaling $111,285,625.69 to the State and cities, counties, and towns in Indiana from the settlement with the three largest drug distributors (Cardinal Health, McKesson, and AmerisourceBergen) and the settlement with Johnson & Johnson and its subsidiary Janssen regarding opioids.

- Continued investigations regarding issues that significantly impact Hoosiers, including the nationwide opioid crisis to determine whether additional action could be pursued to obtain relief.

- Participated in discussions with other states that resulted in tentative settlements with Walmart, CVS, and Walgreens regarding their distribution and dispensing of opioids. The settlements would bring an additional $187.9 million to the State and its cities, counties, and towns.

- Continued assisting Consumer Protection Division in its investigation of Amazon, Apple, Facebook, and Twitter to determine whether those businesses have engaged in abusive deceptive or unfair practices that have negatively affected Hoosiers.

- Assisted the Consumer Protection Division in prosecuting and settling the lawsuit against Google for $20 million related to Google's deceptive location tracking practices.

- Assisted the Consumer Protection Division in recouping approximately $56,000 in costs for the State of Indiana related to the prosecution of the non-profit Wildlife in Need.

- Continued assisting the Consumer Litigation Section in the continued prosecution of three cases in the Eastern District of Pennsylvania alleging price fixing in generic drugs in violation of federal and state anti-trust and consumer protection laws.

- Assisted the Consumer Protection Division in the investigation and prosecution of two cases against TikTok. The first complaint alleges violations of the Deceptive Consumer Sales Act for misrepresentations made to obtain a 12+ rating in app stores. The second lawsuit alleges TikTok misleads consumers about the security of their data from the Chinese government or Chinese Communist Party.

- Initiated prosecution of federal government challenging immigration policy issued by the Department of Homeland Security that permits the release of immigrants violating the federal law.



# APPEALS

2022 Office of the Indiana Attorney General's Annual Report

The Appeals Division represents the State's interests before the Indiana Supreme Court, U.S. Courts of Appeals, and the Court of Appeals of Indiana. This includes serving as prosecutors at the appellate stage of all criminal cases, as well as litigating appellate cases in a wide range of civil matters. Its attorneys also represent State officials in habeas corpus challenges to criminal convictions and prison disciplinary sanctions that are filed by prisoners in the U.S. District Courts. The Division also operates several programs to assist crime victims, including Indiana's Address Confidentiality Program, which protects victims from future abuse by helping conceal their whereabouts.

## Accomplishments

### Criminal Appeals

- Successfully defended convictions and sentences in several murder cases, including defeating Jeffrey Weisheit's habeas corpus petition in the U.S. District Court that attacked his murder convictions and capital sentence for the 2010 murders of his girlfriend's two young children, and convincing the Indiana Supreme Court to reinstate the life without parole sentence of 17-year-old Andrew Conley, who murdered his 10-year-old brother in 2009, and to affirm the murder and two attempted murder convictions of Marquis Young that were initially reversed by the Court of Appeals.

- Secured clarification from the Indiana Supreme Court that recent changes to court rules do not prevent trial courts from considering a defendant's future dangerousness when setting bail or pretrial release conditions.

- Successfully defended several statutes related to criminal law and procedure, including the legislature's authority to pass and the constitutionality of statute protecting child victims from being deposed by their alleged abusers (Church v. State); constitutionality of the crime of dealing a controlled substance resulting in death (Yeary v. State); constitutionality of the distribution of an intimate image, known as the "revenge porn" statute (State v. Katz); and validity of juvenile statutes authorizing waiver of jurisdiction to criminal courts (Kedrowitz v. State).

### Civil Appeals

- Successfully defended the constitutionality of a state law that facilitates public education by requiring public schools to offer unused school buildings to charter schools and state universities for $1 because public schools are political subdivisions of the State and thus cannot assert a takings claim under the Indiana and United States Constitutions against the State.

- Convinced the Seventh Circuit to dismiss a case brought by lakefront homeowners seeking to exclude the public from the state-owned beach property in front of their homes, and convinced the U.S. Supreme Court to deny review of the Seventh Circuit's decision.

- Persuaded the Seventh Circuit that the appropriate defendant-employer in a Title VII action brought by legislative employees is the General Assembly, not the State itself or the Executive Branch.

- Won important appeals concerning the ability of trial courts to impose dispositive-motion deadlines through case-management plans, reversing a contempt sanction entered against a state agency, enforcing the requirement that a prisoner exhaust the prison's internal-review process before filing a federal civil rights suit and subjecting the state to liability, confirming a licensing board's ability to maintain previously imposed discipline on a professional's license even after the professional has obtained expungement of a conviction, and prohibiting one who has obtained a generous severance package from his former employer to also dip into the funds used to provide unemployment benefits.





**Visit us at: https://www.in.gov/attorneygeneral/**



# 2022
## ANNUAL REPORT
Office of the Indiana Attorney General
## Todd Rokita

**About the Office**

🏠 Attorney General (/attorneygeneral)    >    About the Office

The Office of the Indiana Attorney General represents the state in cases involving the state's interest, provides legal defense to state officials or agencies in court, and gives formal legal advisory opinions on constitutional or legal questions to state officials.

The Office of the Attorney General is organized into eight divisions. These include: Advisory Division, Appeals Division, Complex Litigation, Consumer Protection Division, Litigation, Medicaid Fraud Control Division, Solicitor General, and Unclaimed Property Unit.

Click here to contact the office (/attorneygeneral/contact-us)

Click here to view the 2022 Annual Report (/attorneygeneral/files/2022-Annual-Report_Digital-Pages_1.pdf)

Click here to view staff biographies (/attorneygeneral/files/OAG-Bios-for-Website_.pdf)    (/attorneygeneral/files/03.20.2023-Vaccine-Mandate-Update.pdf)    Click here for Vaccine Mandate Information (/attorneygeneral/files/04.09.22.1-Vaccine-Mandate-Info.pdf)

# Advisory

At every level of state government, elected officials do their best to make intelligent, well-considered decisions. To do so, they must rely on sound legal advice—often provided by the Attorney General's Advisory Division. Large state agencies and individual officials alike depend on the Advisory Division's counsel. The division also publishes official opinions related to significant state issues.

The Advisory Division does not make or recommend policy. Rather, it guides officials in their efforts to understand specific state statutes, policies, and procedures.

The Attorney General's law clients for whom he provides legal advice are the statewide elected officials, state legislators, state agencies, and the 92 county prosecutors.

Click here to learn more (/attorneygeneral/about-the-office/advisory)

# Appeals

The Attorney General's Appeals Division's attorneys represent the state in both civil and criminal appeals, as well as in other specialized areas.

Civil Appeals represents the state in appellate cases involving constitutional issues, civil rights, consumer protection, government benefits, administrative procedures, and employment matters, as well as business regulations and cases involving claims against the state.

Criminal Appeals represents the state in criminal cases appealed to the Indiana Court of Appeals and Indiana Supreme Court. This means these attorneys work to uphold sentences - and keep criminals in prison. This section also represents the state's interests when prison inmates challenge their convictions in the federal court system through a habeas corpus petition.

Click here to learn more (/attorneygeneral/about-the-office/appeals)

# Complex Litigation

The Complex Litigation Division represents the State of Indiana in high profile and often multifaceted investigations and litigation in both state and federal courts. In furtherance of those matters, Complex Litigation works closely with other State agencies, States and office divisions to best advocate for Hoosiers. While not limited to one substantive subject matter area, Complex Litigation matters typically involve issues of unsettled law, large number of impacted individuals or damages, or issues of particular importance to the State of Indiana.

Click here to learn more (/attorneygeneral/about-the-office/complex-litigation)

# Consumer Protection Division

The Indiana Attorney General's Office is dedicated to protecting consumers from deceptive and predatory business practices. It is also committed to educating consumers to make wise choices when buying products or entering into contracts. The office administers a number of programs designed to help Indiana citizens become savvy consumers.

By state law, the Attorney General's Office cannot act as an individual's private attorney or provide legal advice to citizens. However, the Attorney General's Consumer Protection Division mediates and investigates consumer complaints against businesses and other organizations and takes legal action on behalf of the state against individuals and companies that violate Indiana's Deceptive Consumer Sales Act.

Click here to learn more (/attorneygeneral/consumer-protection-division)

# Litigation

The Litigation Division serves as the State's law firm. Our dedicated team represents the State and its agencies, officials and employees in state and federal courts in complex and significant interest cases in almost every substantive area of the law - protecting the public interest by defending constitutional challenges and class actions to bringing actions to enforce state statutes and regulations to condemnation to public integrity whistleblower and fraud cases to recoup taxpayer money. The Litigation Division has four Sections - each with their own area of expertise.

Click here to learn more (/attorneygeneral/about-the-office/litigation)

# Medicaid Fraud Control Division

The Indiana Attorney General's Medicaid Fraud Control Unit (MFCU) investigates unscrupulous practices and enforces state health care laws to keep costs as low as possible, and to ensure tax dollars are being spent properly. These efforts ensure that less fortunate Hoosiers get the health care services they need and deserve.

Click here to learn more (/attorneygeneral/about-the-office/medicaid-fraud-and-patient-abuse)

# Solicitor General

The Solicitor General is the chief litigation policy advisor to the attorney general, providing comprehensive oversight of state and federal litigation for Indiana. The solicitor general also:

- Handles specific cases involving constitutional challenges
- Pursues cases with issues of vital interest to the state government
- Makes recommendations to the attorney general on the state's participation in filing *amicus curiae* briefs (friend of the court briefs)
- Consults with the Appellate Division to determine which civil cases the state should appeal and the appropriate legal position to pursue

Click here to learn more (/attorneygeneral/about-the-office/solicitor-general)

# Unclaimed Property Unit

Each year, millions of dollars in assets are turned over to the Indiana Attorney General's Office as unclaimed property. It's the job of the Attorney General's Unclaimed Property Division to help return these assets to their rightful owners.

Unclaimed property is any financial asset that has been abandoned for a certain period of time. This includes:

- Dormant bank accounts
- Lost or forgotten uncashed checks
- Stocks or bonds, dividends, and bond interest
- Insurance proceeds
- Utility refunds
- Safe-deposit box contents

You can search the free online database to find out if you have any money waiting for you at http://www.indianaunclaimed.gov/ (http://www.indianaunclaimed.gov)

**Click here to learn more (http://www.indianaunclaimed.gov)**

# Get Email Updates

**Email Updates**

To sign up for updates or to access your subscriber preferences, please enter your contact information below.

Subscription Type

| Email |

★Email Address

| |

**Submit**



# WIKIPEDIA
The Free Encyclopedia

# *United States v. Rahimi*

***United States v. Rahimi*** (Docket 22-915) is a pending United States Supreme Court case regarding the Second Amendment to the United States Constitution and whether it confers the government's ability to prohibit firearm possession by a person with a domestic violence restraining order.[1]

It came from a 2023 decision by the United States Court of Appeals for the Fifth Circuit invalidating a federal law prohibiting individuals from possessing firearms while under a restraining order relating to domestic abuse.[2][3]

## Background

In 2022, the Supreme Court of the United States issued a ruling in *New York State Rifle & Pistol Association, Inc. v. Bruen*, which changed the way courts assessed laws related to the Second Amendment to the United States Constitution. Rather than examining the history of the Second Amendment and its scope, then applying intermediate scrutiny if the former is unclear, the test articulated by Justice Clarence Thomas requires gun-related legislation to be in line with the country's historical firearm legislation.[2][3] According to that opinion, laws must have "historical analogues" to laws existing at the time of the Second Amendment's ratification in 1791 or incorporation in 1868 via the Fourteenth Amendment.[4]

Zackey Rahimi was issued a civil restraining order by a Texas state court on February 5, 2020, after his ex-girlfriend accused him of assaulting her; the order barred him from engaging in certain harassment-related behaviors towards his ex-girlfriend or her child, as well as owning firearms. Suspecting Rahimi of an unrelated crime, officers executed a search warrant at his home, discovering a rifle and a pistol he admitted to possessing. He was charged and convicted in a federal district court of unlawful firearm possession under U.S.C. § 922(g)(8), which prohibits individuals from owning firearms if they are "subject to a court order that restrains [them] from harassing, stalking, or threatening an intimate partner."[3][4]

## Procedural history

Rahimi appealed his conviction, bringing a facial challenge to U.S.C. § 922(g)(8) in the District Court for the Northern District of Texas on Second Amendment grounds. The court rejected his challenge,[a] and Rahimi appealed to the Fifth Circuit Court of Appeals. A panel for the Fifth Circuit initially upheld Section 922(g)(8), but while Rahimi's petition for a rehearing was pending, the Supreme Court

| *United States v. Rahimi* | |
|---|---|
|  | |
| **Supreme Court of the United States** | |
| **Full case name** | *United States, Petitioner v. Zackey Rahimi* |
| **Docket no.** | 22-915 (https://www.supremecourt.gov/docket/docketfiles/html/public/22-915.html) |
| **Questions presented** | |
| Whether 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms by persons subject to domestic-violence restraining orders, violates the Second Amendment on its face. | |
| **Laws applied** | |
| U.S. Const. amends. II | |

decided *Bruen*, causing the panel to withdraw its opinion.[5] The parties filed supplementary briefs and re-argued the case before a new panel of three judges, two appointed by President Donald Trump and the third by President Ronald Reagan.[6]

On February 2, 2023, the Fifth Circuit Court of Appeals struck down U.S.C. § 922(g)(8) as unconstitutional, barring it from being enforced in Texas, Mississippi, and Louisiana.[3] The Fifth Circuit withdrew the panel's opinion and filed a revised opinion on March 2, 2023, reaching the same result.[6] On March 17, 2023, the United States Justice Department petitioned the Supreme Court to overturn the appeals court decision and allow the federal law criminalizing firearm ownership by people under domestic violence restraining orders to stand.[7]

## Opinions of the Fifth Circuit Court

Writing the February 2 opinion for the unanimous panel, Judge Cory T. Wilson rejected the government's argument that Second Amendment applies only to "law abiding, respectable citizens", citing Justice Amy Coney Barrett's dissent in *Kanter v. Barr*, when she served as a judge on the United States Court of Appeals for the Seventh Circuit.[3][6] Justice Barrett argued, "Founding era legislatures did not strip felons of the right to bear arms simply because of their status as felons", or impose any "virtue-based restrictions" on that right.[3]

Judge Wilson then applied the historical tradition test articulated in *Bruen* in considering whether the historical analogues put forward by the Justice Department were applicable to Section 922(g)(8).[6] The Justice Department had submitted three categories of possible analogues: "(1) English and American laws...providing for the disarmament of 'dangerous' people, (2) English and American 'going armed' laws, and (3) colonial and early state surety laws".[6] The February 2 opinion stated that the historical laws disarming "dangerous" classes of people were not similar to the modern law, because "The purpose of these 'dangerousness' laws was the preservation of political and social order, not the protection of an identified person from the specific threat posed by another".[8]

The revised March 2 opinion included an expanded concurrence from Judge James C. Ho, arguing that "civil protective orders are too often misused as a tactical device in divorce proceedings – and issued without any actual threat of danger".[5][9] Judge Wilson went further and argued that Section 922(g)(8) could even put victims of domestic violence "in greater danger than before",[5] because they would be unable to defend themselves against their abusers with guns, if a judge had issued a "mutual" protective order.[9]

# Supreme Court

In their final order list of the October 2022 term, the Supreme Court agreed to hear this case on June 30, 2023.[1]

The United States Conference of Catholic Bishops filed an amicus brief, arguing that protecting the innocent "is a proper consideration" when regulating firearms:[10]

As the Church teaches, and this Nation's historical traditions demonstrate, the right to bear arms is not an unqualified license that must leave vulnerable family members to live in fear. Abused victims are precisely the people whom a just government is tasked with protecting. The Second Amendment does not stand as a barrier to their safety.[10]

# Reactions

In an opinion for *The New York Times* following the Fifth Circuit Court of Appeals' decision, Linda Greenhouse stressed the importance of the government's appeal to the Supreme Court. Greenhouse predicted that the Court would take the case, and wrote that the Court's eventual decision would clarify how favorable the current Court is towards gun owners.[11]

# Notes

a. Stern 2023 writes that the district court ruled for Rahimi, but that version of events is not supported by other sources – the article cites *United States v. Perez-Gallan*, a separate case involving similar questions.

# References

1. "The last grants of October Term 2022?" (https://www.scotusblog.com/2023/06/the-last-grants-of-october-term-2022/). *SCOTUSblog*. June 29, 2023. Retrieved June 30, 2023.
2. Ian Millhiser, *It's Now Legal for Domestic Abusers to Own a Gun in Texas, Louisiana, and Mississippi* (https://www.vox.com/policy-and-politics/2023/2/2/23583377/supreme-court-guns-domestic-abuse-fifth-circuit-second-amendment-rahimi-united-states), *Vox* (February 2, 2023).
3. Marcia Coyle, *Analysis: How a Supreme Court Ruling Led to the Overturning of a Guns and Domestic Violence Law* (https://www.pbs.org/newshour/politics/analysis-how-a-supreme-court-ruling-led-to-the-overturning-of-a-guns-and-domestic-violence-law), PBS NewsHour (February 8, 2023).
4. Mark Joseph Stern, *5th Circuit Rules That People Accused of Domestic Violence Have a Right to Keep Their Guns* (https://slate.com/news-and-politics/2023/02/5th-circuit-court-domestic-violence-second-amendment-right.html), *Slate* (February 2, 2023).
5. *United States v. Rahimi,* No. 21-11001 (5th Cir.).
6. Andrew Willinger, *Fifth Circuit Strikes Down Domestic-Violence Prohibitor in United States v. Rahimi* (https://firearmslaw.duke.edu/2023/02/fifth-circuit-strikes-down-domestic-violence-prohibitor-in-united-states-v-rahimi/), Duke Center for Firearms Law (February 6, 2023).
7. Gram Slattery & Nate Raymond, *US asks Supreme Court to uphold domestic violence gun law* (https://www.reuters.com/world/us/us-asks-supreme-court-uphold-domestic-violence-gun-law-2023-03-18/), Reuters (March 20, 2023).
8. Tierney Sneed, *Law barring people with domestic violence restraining orders from having guns is unconstitutional, court rules* (https://edition.cnn.com/2023/02/02/politics/domestic-violence-guns-fifth-circuit/index.html), CNN (February 3, 2023).
9. Ruth Marcus, *Revised ruling on guns for domestic offenders just makes things worse* (https://www.washingtonpost.com/opinions/2023/03/03/ruling-guns-domestic-offenders-worse/), The Washington Post (March 3, 2023).
10. Asher, Julie (September 1, 2023). "USCCB argues protecting innocent life must be priority in gun rights case before high court". *The Pilot.* Vol. 194, no. 33. p. 3.

11. Linda Greenhouse, *We're About to Find Out How Far the Supreme Court Will Go to Arm America (https://www.nytimes.com/2023/03/29/opinion/guns-supreme-court.html?searchResultPosition=1)*, The New York Times (March 29, 2023).

# External links

- Text of *United States v. Rahimi*, 601 U.S. ___ (2024) is available from: Oyez (oral argument audio) (https://www.oyez.org/cases/2023/22-915)

Retrieved from "https://en.wikipedia.org/w/index.php?title=United_States_v._Rahimi&oldid=1178133872"

-

# United States v. Rahimi

**FEATURED POSTS**

Cou

contin

**Share**

| Docket No. | Op. Below | Argument | Opinion | Vote | Author | Term |
|---|---|---|---|---|---|---|
| 22-915 | 5th Cir. | Nov 7, 2023 | TBD | TBD | TBD | OT 2023 |

**Issue:** Whether **18 U.S.C. § 922(g)(8)**, which prohibits the possession of firearms by persons subject to domestic-violence restraining orders, violates the Second Amendment on its face.

## SCOTUSblog Coverage

- **Supreme Court sets seven cases for November argument session** (Amy Howe, September 6, 2023)
- **Court agrees to hear Title VII employer discrimination case** (Amy Howe, June 30, 2023)
- **Justices take up major Second Amendment dispute** (Amy Howe, June 30, 2023)
- **The last grants of October Term 2022?** (John Elwood, June 29, 2023)
- **Government seeks review of federal gun regulations on domestic abusers, bump stocks** (Kalvis Golde, April 23, 2023)

| Date | Proceedings and Orders (**key to color coding**) |
|---|---|
| Mar 17 2023 | **Petition for a writ of certiorari filed. (Response due April 20, 2023)** |

This website may use cookies to improve your experience. We'll assume you're ok with this, but you can leave if you wish.    Accept    Read More

submitted to The Clerk.

| Apr 11 2023 | Motion to extend the time to file a response is granted and the time is extended to and including May 23, 2023. |
| May - | - |
| Apr 20 2023 | **Brief amicus curiae of California Governor Gavin Newsom filed.** |
| Apr 20 2023 | **Brief amicus curiae of Texas Advocacy Project filed.** |
| Apr 20 2023 | **Brief amici curiae of Gun Violence and Domestic Violence Prevention Groups filed.** |
| Apr 20 2023 | **Brief amicus curiae of New York County Lawyers Association filed.** |
| Apr 20 2023 | **Brief amici curiae of Illinois, et al. filed.** |
| Apr 20 2023 | **Brief amici curiae of Joshua Horwitz, et al. filed.** |
| Apr 20 2023 | **Brief amici curiae of Tarrant County Criminal District Attorney, et al. filed.** |
| May 15 2023 | **Motion to extend the time to file a response from May 23, 2023 to June 13, 2023, submitted to The Clerk.** |
| May 16 2023 | **Response to motion to extend the time to file a response filed.** |
| May 16 2023 | Motion to extend the time to file a response is granted in part and the time is further extended to and including May 30, 2023. |
| May 30 2023 | **Brief of respondent Zackey Rahimi in opposition filed.** |
| May 30 | **Motion for leave to proceed in forma pauperis** |

This website may use cookies to improve your experience. We'll assume you're ok with this, but you can leave if you wish.    Accept    Read More

| | |
|---|---|
| Jun 01 2023 | **Waiver of the 14-day waiting period for the distribution of the petition pursuant to Rule 15.5 received.** |
| Jun 06 2023 | DISTRIBUTED for Conference of 6/22/2023. |
| Jun 06 2023 | **Reply of petitioner United States filed. (Distributed)** |
| Jun 29 2023 | DISTRIBUTED for Conference of 6/29/2023. |
| Jun 30 2023 | Motion for leave to proceed in forma pauperis filed by respondent GRANTED. |
| Jun 30 2023 | Petition GRANTED. |
| Aug 04 2023 | **Motion for an extension of time filed.** |
| Aug 14 2023 | **Brief of petitioner United States filed.** |
| Aug 14 2023 | **Joint appendix filed.** |
| Aug 17 2023 | **Brief amicus curiae of Patrick J. Charles in support of neither party filed.** |
| Aug 18 2023 | **Brief amicus curiae of 97Percent filed.** |
| Aug 18 2023 | **Brief amicus curiae of California Legislative Women's Caucus filed.** |
| Aug 21 2023 | **Brief amici curiae of City of New York, et al. filed.** |
| Aug 21 2023 | **Brief amici curiae of National Indigenous Women's Resource Center, et al. filed.** |

This website may use cookies to improve your experience. We'll assume you're ok with this, but you can leave if you wish.    Accept    Read More

| | |
|---|---|
| Aug 21 2023 | **Brief amici curiae of Educators, Practitioners, et al. filed.** |
| Aug 21 2023 | **Brief amici curiae of Tarrant County Criminal District Attorney et al filed.** |
| Aug 21 2023 | **Brief amicus curiae of New York County Lawyers Association filed.** |
| Aug 21 2023 | **Brief amici curiae of Professors of History and Law filed.** |
| Aug 21 2023 | **Brief amici curiae of Legal Aid Chicago, et al. filed.** |
| Aug 21 2023 | **Brief amici curiae of Religious Leaders and Organizations filed.** |
| Aug 21 2023 | **Brief amici curiae of DC Coalition Against Domestic Violence, et al. filed.** |
| Aug 21 2023 | **Brief amici curiae of Illinois, et al. filed.** |
| Aug 21 2023 | **Brief amici curiae of National League of Cities, et al. filed.** |
| Aug 21 2023 | **Brief amicus curiae of Center for Reproductive Rights.** |
| Aug 21 2023 | **Brief amici curiae of Senator Richard Blumenthal, et al. filed.** |
| Aug 21 2023 | **Brief amici curiae of Senator Amy Klobuchar, et al. filed.** |
| Aug 21 2023 | **Brief amici curiae of Gun Violence and Domestic Violence Prevention Groups filed.** |
| Aug 21 2023 | **Brief amici curiae of Public-Health Researchers and Lawyers filed.** |

This website may use cookies to improve your experience. We'll assume you're ok with this, but you can leave if you wish.    Accept    Read More

| | |
|---|---|
| Aug 21 2023 | **Brief amici curiae of Former State Chief Justices and Chief Judges filed.** |
| Aug 21 2023 | **Brief amici curiae of Global Action On Gun Violence, et al. filed.** |
| Aug 21 2023 | **Brief amicus curiae of Prosecutors Against Gun Violence filed.** |
| Aug 21 2023 | **Brief amicus curiae of California Governor Gavin Newsom filed.** |
| Aug 21 2023 | **Brief amicus curiae of March For Our Lives Action Fund filed.** |
| Aug 21 2023 | **Brief amicus curiae of AEquitas filed.** |
| Aug 21 2023 | **Brief amicus curiae of Giffords Law Center to Prevent Gun Violence filed.** |
| Aug 21 2023 | **Brief amici curiae of Texas Advocacy Project, et al. filed.** |
| Aug 21 2023 | **Brief amicus curiae of Citizens Crime Commission of New York City filed.** |
| Aug 21 2023 | **Brief amicus curiae of United States Conference of Catholic Bishops filed.** |
| Aug 21 2023 | **Brief amicus curiae of Professor Mary Anne Franks filed.** |
| Aug 21 2023 | **Brief amicus curiae of Houston Area Women's Center filed.** |
| Aug 21 2023 | **Brief amicus curiae of Everytown for Gun Safety filed.** |
| Aug 21 2023 | Amicus brief of Prosecutor and Law Enforcement Associations and Office not accepted for filing. (Duplicate submission--August 24, 2023) |

This website may use cookies to improve your experience. We'll assume you're ok with this, but you can leave if you wish.   Accept   Read More

| | |
|---|---|
| Aug 21 2023 | **Brief amici curiae of American Medical Association, et al. filed.** |
| Aug 21 2023 | **Brief amici curiae of The Domestic Violence Legal Empowerment and Appeals Project, et al. filed.** |
| Aug 22 2023 | **Brief amicus curiae of Americans Against Gun Violence filed.** |
| Aug 24 2023 | Motion to extend the time to file respondent's brief on the merits is granted and the time is extended to and including September 27, 2023. |
| Sep 06 2023 | SET FOR ARGUMENT on Tuesday, November 7, 2023. |
| Sep 07 2023 | Record requested from the United States Court of Appeals for the Fifth Circuit. |
| Sep 14 2023 | Record from the United States District Court for the Northern District of Texas received electronically and available with the Clerk. The USCA-5 record is available on PACER. |
| Sep 18 2023 | CIRCULATED |
| Sep 22 2023 | **Brief amicus curiae of Center for Prosecutor Integrity filed. (Distributed)** |
| Sep 27 2023 | **Brief of respondent Zackey Rahimi filed. (Distributed)** |
| Oct 02 2023 | **Brief amicus curiae of National Association for Gun Rights filed. (Distributed)** |
| Oct 03 2023 | **Brief amici curiae of Cato Institute, et al. filed. (Distributed)** |
| Oct 03 | **Brief amici curiae of Alameda County Public** |

This website may use cookies to improve your experience. We'll assume you're ok with this, but you can leave if you wish.   Accept   Read More

| | |
|---|---|
| 2023 | **Johnson filed. (Distributed)** |
| Oct 03 2023 | **Brief amici curiae of Phyllis Schlafly Eagles and Eagle Forum Education & Legal Defense Fund filed. (Distributed)** |
| Oct 04 2023 | **Brief amici curiae of The Bronx Defenders Union and National Association of Criminal Defense Lawyers filed. (Distributed)** |
| Oct 04 2023 | **Brief amicus curiae of California Rifle & Pistol Association, Inc. and Gun Owners of California filed. (Distributed)** |
| Oct 04 2023 | **Brief amicus curiae of National Association of Federal Defenders filed. (Distributed)** |
| Oct 04 2023 | **Brief amici curiae of Professors of Second Amendment Law, et al. filed. (Distributed)** |
| Oct 04 2023 | **Brief amicus curiae of FPC Action Foundation filed. (Distributed)** |
| Oct 04 2023 | **Brief amici curiae of Law Enforcement Groups and Firearms Rights Groups filed. (Distributed)** |
| Oct 04 2023 | **Brief amicus curiae of National African American Gun Association, Inc. filed. (Distributed)** |
| Oct 04 2023 | **Brief amicus curiae of Foundation for Moral Law filed. (Distributed)** |
| Oct 04 2023 | **Brief amicus curiae of Firearms Policy Coalition filed. (Distributed)** |
| Oct 04 2023 | **Brief amicus curiae of The Second Amendment Foundation filed. (Distributed)** |
| Oct 04 | **Brief amicus curiae of Angus Kirk McClellan,** |

This website may use cookies to improve your experience. We'll assume you're ok with this, but you can leave if you wish.   Accept   Read More

| | |
|---|---|
| Oct 04 2023 | **Brief amicus curiae of Crime Prevention Research Center filed. (Distributed)** |
| Oct 04 2023 | **Brief amicus curiae of National Rifle Associationof America, Inc. filed. (Distributed)** |
| Oct 04 2023 | **Brief amici curiae of William English, Ph.D. and Citizens Committee for the Right to Keep and Bear Arms filed. (Distributed)** |
| Oct 04 2023 | **Brief amici curiae of Gun Owners of America, Inc., et al. filed. (Distributed)** |
| Oct 06 2023 | Proposal to lodge of Zackey Rahimi submitted. |

This website may use cookies to improve your experience. We'll assume you're ok with this, but you can leave if you wish.   Accept   Read More

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 2, 2023

Lyle W. Cayce
Clerk

No. 21-11001

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

ZACKEY RAHIMI,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CR-83-1

Before JONES, HO, and WILSON, *Circuit Judges.*

CORY T. WILSON, *Circuit Judge*:

Our prior panel opinion, *United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023), is WITHDRAWN and the following opinion is SUBSTITUTED therefor:

The question presented in this case is *not* whether prohibiting the possession of firearms by someone subject to a domestic violence restraining order is a laudable policy goal. The question is whether 18 U.S.C. § 922(g)(8), a specific statute that does so, is constitutional under the Second

No. 21-11001

Amendment of the United States Constitution. In the light of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), it is not.

Zackey Rahimi levies a facial challenge to § 922(g)(8). The district court and a prior panel upheld the statute, applying this court's pre-*Bruen* precedent. *See United States v. Rahimi*, No. 21-11001, 2022 WL 2070392 at *1 n.1 (5th Cir. June 8, 2022). Rahimi filed a petition for rehearing en banc; while that petition was pending, the Supreme Court decided *Bruen*. The prior panel withdrew its opinion and requested supplemental briefing on the impact of that case on this one. Considering the issue afresh, we conclude that *Bruen* requires us to re-evaluate our Second Amendment jurisprudence and that under *Bruen*, § 922(g)(8) fails to pass constitutional muster. We therefore reverse the district court's ruling to the contrary and vacate Rahimi's conviction.

## I.

Between December 2020 and January 2021, Rahimi was involved in five shootings in and around Arlington, Texas.[1] On December 1, after selling narcotics to an individual, he fired multiple shots into that individual's residence. The following day, Rahimi was involved in a car accident. He exited his vehicle, shot at the other driver, and fled the scene. He returned to the scene in a different vehicle and shot at the other driver's car. On December 22, Rahimi shot at a constable's vehicle. On January 7, Rahimi fired multiple shots in the air after his friend's credit card was declined at a Whataburger restaurant.

Officers in the Arlington Police Department identified Rahimi as a suspect in the shootings and obtained a warrant to search his home. Officers

---

[1] The facts are drawn from the Pre-Sentence Report, which the district court adopted, and the factual resume, to which Rahimi stipulated.

executed the warrant and found a rifle and a pistol. Rahimi admitted that he possessed the firearms. He also admitted that he was subject to an agreed civil protective order entered February 5, 2020, by a Tarrant County state district court after Rahimi's alleged assault of his ex-girlfriend. The protective order prohibited Rahimi from, *inter alia*, "[c]ommitting family violence," "[g]oing to or within 200 yards of the residence or place of employment" of his ex-girlfriend, and "[e]ngaging in conduct . . . including following the person, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass" either his ex-girlfriend or a member of her family or household. The order also expressly prohibited Rahimi from possessing a firearm.[2]

A federal grand jury indicted Rahimi for possessing a firearm while under a domestic violence restraining order in violation of 18 U.S.C. § 922(g)(8), which provides:

> It shall be unlawful for any person[] who is subject to a court order that[:] (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use,

___

[2] The validity of the underlying protective order, and Rahimi's breach of it, are not before us, though the order's underlying prohibitions, e.g., restraining Rahimi from committing family violence, from using or threatening use of physical force, from following, harassing, annoying, abusing, or tormenting his ex-girlfriend, and from going within 200 yards of his ex-girlfriend or her family (including their child), are plainly lawful and enforceable.

No. 21-11001

> or threatened use of physical force against such intimate
> partner or child that would reasonably be expected to cause
> bodily injury . . . to . . . possess in or affecting commerce, any
> firearm or ammunition . . . .

Rahimi moved to dismiss the indictment on the ground that § 922(g)(8) is unconstitutional, but he acknowledged that *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), foreclosed his argument.[3] The district court denied Rahimi's motion, and he pled guilty.

On appeal, Rahimi renewed his constitutional challenge to § 922(g)(8).[4] Rahimi again acknowledged that his argument was foreclosed, and a prior panel of this court agreed. *See Rahimi*, 2022 WL 2070392 at *1 n.1. But after *Bruen*, the prior panel withdrew its opinion, ordered supplemental briefing, and ordered the clerk to expedite this case for oral argument before another panel of the court. Rahimi now contends that *Bruen* overrules our precedent and that under *Bruen*, § 922(g)(8) is unconstitutional. We agree on both points.

## II.

Under the rule of orderliness, one panel of the Fifth Circuit "'may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.'" *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)

---

[3] The Government urged Rahimi's argument was also foreclosed by *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).

[4] Rahimi also asserted that the district court erred when it ordered his federal sentence to run consecutively to sentences for his state crimes because the underlying conduct of the state sentences was relevant conduct for the purposes of U.S.S.G. § 1B1.3. The prior panel affirmed the district court. Because we conclude that § 922(g)(8) is unconstitutional and vacate Rahimi's sentence, we do not further address the sentencing issue here.

4

No. 21-11001

(quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). The Supreme Court need not expressly overrule our precedent. "Rather, a latter panel must simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law." *Id.* "One situation in which this may naturally occur is where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis." *Id.* (internal quotation marks and alterations omitted). That is the case here, as the Government concedes.

In *Emerson*, we held that the Second Amendment guarantees an individual right to keep and bear arms—the first circuit expressly to do so. 270 F.3d at 260. But we also concluded that § 922(g)(8) was constitutional as applied to the defendant there. *Id.* at 263. "*Emerson* first considered the scope of the Second Amendment right 'as historically understood,' and then determined—presumably by applying some form of means-end scrutiny *sub silentio*—that § 922(g)(8) [was] 'narrowly tailored' to the goal of minimizing 'the threat of lawless violence.'" *McGinnis*, 956 F.3d at 755 (quoting *Emerson*, 270 F.3d at 264).

After *D.C. v. Heller*, 554 U.S. 570 (2008), courts coalesced around a similar "two-step inquiry for analyzing laws that might impact the Second Amendment." *McGinnis*, 956 F.3d at 753 (internal quotation marks omitted). First, we "ask[ed] whether the conduct at issue [fell] within the scope of the Second Amendment right." *Id.* at 754 (internal quotation marks omitted). If the conduct fell outside the scope of the Second Amendment right, then the challenged law was constitutional. *Id.* But if the conduct fell within the scope of the right, then we proceeded to the second step of the analysis, which applied either intermediate or strict scrutiny. *Id.* at 754, 757 (expressly applying means-end scrutiny). In *McGinnis*, this court upheld § 922(g)(8) using this two-step framework. The initial panel in this case did likewise, citing *McGinnis*. *Rahimi*, 2022 WL 2070392 at *1 n.1.

5

No. 21-11001

Enter *Bruen*. Expounding on *Heller*, the Supreme Court held that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. In that context, the Government bears the burden of "justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Put another way, "the [G]overnment must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. In the course of its explication, the Court expressly repudiated the circuit courts' means-end scrutiny—the second step embodied in *Emerson* and applied in *McGinnis*. *Id.* at 2128–30. To the extent that the Court did not overtly overrule *Emerson* and *McGinnis*—it did not cite those cases but discussed other circuits' similar precedent—*Bruen* clearly "fundamentally change[d]" our analysis of laws that implicate the Second Amendment, *Bonvillian Marine*, 19 F.4th at 792, rendering our prior precedent obsolete.

## III.

Our review of Rahimi's facial challenge to § 922(g)(8) is de novo. *See United States v. Bailey*, 115 F.3d 1222, 1225 (5th Cir. 1997). First, the court addresses the Government's argument that Rahimi is not among those citizens entitled to the Second Amendment's protections. Concluding he is, we then turn to whether § 922(g)(8) passes muster under *Bruen*'s standard.[5]

---

[5] The Government also argues that because *Bruen* endorsed "shall-issue" licensing schemes, and Texas's shall-issue licensing scheme (since modified to allow "constitutional carry," *see* 2021 Tex. Sess. Law Serv. Ch. 809 (West)) included the requirement that an applicant not be under a domestic violence restraining order, it follows that § 922(g)(8) is constitutional. Of course, the *Bruen* Court did not rule on the constitutionality of 43 specific state licensing regimes because that was not the issue before the Court. *See Bruen*,

No. 21-11001

## A.

According to the Government, *Heller* and *Bruen* add a gloss on the Second Amendment that restricts its applicability to only "law-abiding, responsible citizens," *Heller*, 554 U.S. at 635, and "ordinary, law-abiding citizens," *Bruen*, 142 S. Ct. at 2122. Because Rahimi is neither responsible nor law-abiding, as evidenced by his conduct and by the domestic violence restraining order issued against him, he falls outside the ambit of the Second Amendment.    Therefore,  argues  the  Government,  § 922(g)(8)  is constitutional as applied to Rahimi.

> The Second Amendment provides, simply enough:
>
> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II. *Heller* explained that the words "the people" in the Second Amendment have been interpreted throughout the Constitution to "unambiguously refer[] to all members of the political community, not an unspecified subset." 554 U.S. at 580.  Further, "the people" "refer[] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)).  For those reasons, the *Heller* Court began its analysis with the "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans," *id.* at 581, and then confirmed that presumption, *id.* at 595. *Heller*'s exposition of "the people" strongly

---

142 S. Ct. at 2138 n.9.  Rather, the Court merely blessed the general concept of shall-issue regimes. *Id.*

7

No. 21-11001

indicates that Rahimi is included in "the people" and thus within the Second Amendment's scope.

To be sure, as the Government argues, *Heller* and *Bruen* also refer to "law-abiding, responsible citizens" in discussing the amendment's scope (*Bruen* adds "ordinary, law-abiding citizens"). And there is some debate over the extent to which the Court's "law-abiding" qualifier constricts the Second Amendment's reach. *Compare Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J. dissenting), *abrogated by Bruen*, 142 S. Ct. 2111, *with Binderup v. Att'y Gen.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments). As summarized by now-Justice Barrett, "one [approach] uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). The Government's argument that Rahimi falls outside the community covered by the Second Amendment rests on the first approach. But it runs headlong into *Heller* and *Bruen*, which we read to espouse the second one.

That reading, in turn, leads us to conclude that, in context, *Heller* simply uses "law-abiding, responsible citizens" as shorthand in explaining that its holding (that the amendment codifies an individual right to keep and bear arms) should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." 554 U.S. at 626–27; *accord Range v. Attorney Gen.*, 53 F.4th 262, 266 (3d Cir. 2022) (upholding 18 U.S.C. § 922(g)(1), which prohibits firearm possession by convicted felons, because "the people" categorically "excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses"), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023). In other words, *Heller*'s

8

No. 21-11001

reference to "law-abiding, responsible" citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders "presumptively" tolerated or would have tolerated. *See* 554 U.S. at 627, n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."). *Bruen*'s reference to "ordinary, law-abiding" citizens is no different. *See* 142 S. Ct. at 2134.

From the record before us, Rahimi did not fall into any such group at the time he was charged with violating § 922(g)(8), so the "strong presumption" that he remained among "the people" protected by the amendment holds. When he was charged, Rahimi was subject to an agreed domestic violence restraining order that was entered in a civil proceeding. That alone does not suffice to remove him from the political community within the amendment's scope. And, while he was *suspected* of other criminal conduct at the time, Rahimi was not a convicted felon or otherwise subject to another "longstanding prohibition[] on the possession of firearms" that would have excluded him. *Heller*, 554 U.S. at 626–27; *see Range*, 53 F.4th at 273 (concluding that *Heller, McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), and *Bruen* support that criminals, as a group, "fall[] outside 'the people' . . . and that § 922(g)(1) is well-rooted in the nation's history and tradition of firearm regulation").[6]

---

[6] This discussion is not to cast doubt on firearm restrictions that attach during criminal proceedings prior to conviction. *E.g.*, 18 U.S.C. § 922(n) (prohibiting person under indictment from shipping, transporting, or receiving any firearm); 18 U.S.C. § 3142(c)(B)(viii) (allowing judicial officer to require person released on pretrial bond to "refrain from possessing a firearm, destructive device, or other dangerous weapon"). Those restrictions are not before us. We simply hew carefully to the Supreme Court's delineation of who falls within, and without, the overarching class of "law-abiding, responsible citizens" covered by the Second Amendment.

No. 21-11001

Indeed, the upshot of the Government's argument is that the Second Amendment right can be readily divested, such that "a person could be in one day and out the next: . . . his rights would be stripped as a self-executing consequence of his new status." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). But this turns the typical way of conceptualizing constitutional rights on its head. And the Government's argument reads the Supreme Court's "law-abiding" gloss so expansively that it risks swallowing the text of the amendment. *Cf. Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" (quoting *McDonald*, 561 U.S. at 780)).

Further, the Government's proffered interpretation of "law-abiding" admits to no true limiting principle. Under the Government's reading, Congress could remove "unordinary" or "irresponsible" or "non-law-abiding" people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the contrary, the Supreme Court has made clear that "the Second Amendment right is exercised individually and belongs to all Americans," *Heller*, 554 U.S. at 581. Rahimi, while hardly a model citizen, is nonetheless among "the people" entitled to the Second Amendment's guarantees, all other things equal.

**B.**

Which brings us to the question of whether Rahimi's right to keep and bear arms may be constitutionally restricted by operation of § 922(g)(8). The parties dispute Rahimi's burden necessary to sustain his facial challenge to

No. 21-11001

the statute. The Government contends that Rahimi "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Rahimi contests that assertion, asserting during oral argument that the Government's interpretation of *Salerno* has fallen out of favor, though he contends that in any event, he has satisfied *Salerno*'s standard.

*Bruen* instructs how to proceed. The plaintiffs there levied a facial challenge to New York's public carry licensing regime. 142 S. Ct. at 2122. To evaluate the challenged law, the Supreme Court employed a historical analysis, aimed at "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. Construing *Heller*, the Court flatly rejected any means-end scrutiny as part of this analysis, *id.* at 2129, such that if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances. *Cf. Salerno*, 481 U.S. at 745; *Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019) ("A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." (cleaned up)).

*Bruen* articulated two analytical steps: First, courts must determine whether "the Second Amendment's plain text covers an individual's conduct[.]" 142 S. Ct. at 2129–30. If so, then the "Constitution presumptively protects that conduct," and the Government "must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

No. 21-11001

To carry its burden, the Government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 2131–32 (internal quotation marks omitted). "[W]e are not obliged to sift the historical materials for evidence to sustain [§ 922(g)(8)]. That is [the Government's] burden." *Id.* at 2150.

The Government need not identify a "historical *twin*"; rather, a "well-established and representative historical *analogue*" suffices. *Id.* at 2133. The Supreme Court distilled two metrics for courts to compare the Government's proffered analogues against the challenged law: *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right. *Id.* (citing *McDonald*, 561 U.S. at 767, and *Heller*, 544 U.S. at 599). "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (internal quotation marks and emphasis omitted).

As to the degree of similarity required, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* (internal quotation marks, alterations, and citations omitted). On the other hand, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* The core question is whether the challenged law and proffered analogue are "relevantly similar." *Id.* at 2132.

When the challenged regulation addresses a "general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the

No. 21-11001

challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Moreover, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

## C.

Rahimi's possession of a pistol and a rifle easily falls within the purview of the Second Amendment. The amendment grants him the right "to keep" firearms, and "possession" is included within the meaning of "keep." *See id.* at 2134–35. And it is undisputed that the types of firearms that Rahimi possessed are "in common use," such that they fall within the scope of the amendment. *See id.* at 2143 ("[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'") (quoting *Heller*, 554 U.S. at 627)). Thus, *Bruen*'s first step is met, and the Second Amendment presumptively protects Rahimi's right to keep the weapons officers discovered in his home. *See id.* at 2126.

But Rahimi, like any other citizen, may have forfeited his Second Amendment rights if his conduct ran afoul of a "lawful regulatory measure[]" "prohibiting . . . the possession of firearms," *Heller*, 554 U.S. at 626–27 & 627 n.26, that is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127. The question turns on whether § 922(g)(8) falls within that historical tradition, or outside of it.

To reiterate, the statute makes it unlawful

for any person[] who is subject to a court order that[:] (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking,

No. 21-11001

> or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . .

§ 922(g)(8); *see McGinnis*, 956 F.3d at 758 (stating that § 922(g)(8)'s purpose is to reduce "domestic gun abuse"). Distilled to its essence, the provision operates to deprive an individual of his right to possess (i.e., "to keep") firearms once a court enters an order, after notice and a hearing, that restrains the individual "from harassing, stalking, or threatening an intimate partner" or the partner's child. The order can rest on a specific finding that the restrained individual poses a "credible threat" to an intimate partner or her child. Or it may simply include a general prohibition on the use, attempted use, or threatened use of physical force reasonably expected to cause bodily injury. The covered individual forfeits his Second Amendment right for the duration of the court's order. This is so even when the individual has not been criminally convicted or accused of any offense and when the underlying proceeding is merely civil in nature.

These characteristics crystallize "how" and "why" § 922(g)(8) "burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. In particular, we focus on these key features of the statute: (1) forfeiture of the right to possess weapons (2) after a civil proceeding[7]

---

[7] The distinction between a criminal and civil proceeding is important because criminal proceedings have afforded the accused substantial protections throughout our Nation's history. In crafting the Bill of Rights, the Founders were plainly attuned to

No. 21-11001

(3) in which a court enters a protective order based on a finding of a "credible threat" to another specific person, or that includes a blanket prohibition on the use, of threatened use, of physical force, (4) in order to protect that person from "domestic gun abuse." The first three aspects go to *how* the statute accomplishes its goal; the fourth is the statute's goal, the *why*.

To sustain § 922(g)(8)'s burden on Rahimi's Second Amendment right, the Government bears the burden of proffering "relevantly similar" historical regulations that imposed "a comparable burden on the right of armed self-defense" that were also "comparably justified." *Id.* at 2132–33. And "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (internal quotation marks omitted). We thus afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification.

The Government offers potential historical analogues to § 922(g)(8) that fall generally into three categories: (1) English and American laws (and sundry unadopted proposals to modify the Second Amendment) providing for disarmament of "dangerous" people, (2) English and American "going armed" laws, and (3) colonial and early state surety laws. We discuss in turn why each of these historical regulations falters as "relevantly similar" precursors to § 922(g)(8).

---

preservation of these protections. *See* U.S. CONST. amend. IV; U.S. CONST. amend. V; U.S. CONST. amend. VI; U.S. CONST. amend. VIII. It is therefore significant that § 922(g)(8) works to eliminate the Second Amendment right of individuals subject merely to civil process.

No. 21-11001

## 1.

The Government relies on laws of varying antiquity as evidence of its "dangerousness" analogues. We sketch these chronologically, mindful that greater weight attaches to laws nearer in time to the Second Amendment's ratification.

Under the English Militia Act of 1662, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." 13 & 14 Car. 2, c.3, § 13 (1662). Citing scholarship, the Government thus posits that "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 WYO. L. REV. 249, 261 (2020).

But the Militia Act's provenance demonstrates that it is not a forerunner of our Nation's historical tradition of firearm regulation. Under Charles I (who reigned 1625–1649), the Crown and Parliament contested for control of the militia. Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 GA. L. REV. 1, 8 (1996). After the resulting civil war and Oliver Cromwell's interregnum, the monarchy was restored in 1660 when Charles II took the throne. Charles II began using the militia to disarm his political opponents. *Id.* (citing J. MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994) 35–38 (1994). The Militia Act of 1662 facilitated this disarmament, which escalated under the Catholic James II once he took the throne in 1685. *Id.*; *see Heller*, 554 U.S. at 593 (noting that the disarmaments "caused Englishmen . . . to be jealous of their arms"). After the Glorious Revolution, which enthroned Protestants William and Mary, the Declaration of Rights,

16

No. 21-11001

codified as the 1689 English Bill of Rights, qualified the Militia Act by guaranteeing "[t]hat the subjects which are Protestants may have arms for their defence suitable to their Conditions and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. "This right," which *restricted* the Militia Act's reach in order to prevent the kind of politically motivated disarmaments pursued by Charles II and James II, "has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. This understanding, and the history behind it, defeats any utility of the Militia Act of 1662 as a historical analogue for § 922(g)(8).

The Government next points to laws in several colonies and states that disarmed classes of people considered to be dangerous, specifically including those unwilling to take an oath of allegiance, slaves, and Native Americans. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157–60 (2007). These laws disarmed people thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200–01 (5th Cir. 2012) (discussing relevant scholarship), *abrogated by Bruen*, 142 S. Ct. at 2126–30. "While public safety was a concern, most disarmament efforts were meant to prevent armed rebellions. The early Americans adopted much of that tradition in the colonies." Greenlee, *supra*, at 261.

But we question at a threshold level whether colonial and state laws disarming categories of "disloyal" or "unacceptable" people present tenable analogues to § 922(g)(8). Laws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community—i.e., written out of "the people" altogether—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is therefore dubious, at best. In any

No. 21-11001

event, these laws fail on substance as analogues to § 922(g)(8), because out of the gate, *why* they disarmed people was different. The purpose of laws disarming "disloyal" or "unacceptable" groups was ostensibly the preservation of political and social order, not the protection of an identified person from the threat of "domestic gun abuse," *McGinnis*, 956 F.3d at 758, posed by another individual. Thus, laws disarming "dangerous" classes of people are not "relevantly similar" to § 922(g)(8) such that they can serve as historical analogues.

Finally, the Government offers two proposals that emerged in state ratification conventions considering the proposed Constitution. A minority of Pennsylvania's convention authored a report in which they contended that citizens have a right to bear arms "unless for crimes committed, *or real danger of public injury*." 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 662, 665 (1971) (emphasis added). And at the Massachusetts convention, Samuel Adams proposed a qualifier to the Second Amendment that limited the scope of the right to "peaceable citizens." *Id.* at 681.

But these proposed amendments are not reflective of the Nation's early understanding of the scope of the Second Amendment right. While they were influential proposals, *see Heller*, 554 U.S. at 604, neither became part of the Second Amendment as ratified. Thus, the proposals might somewhat illuminate the scope of firearm rights at the time of ratification, but they cannot counter the Second Amendment's text, or serve as an analogue for § 922(g)(8) because, *inter alia*, they were not enacted. *Cf. Bruen*, 142 S. Ct. at 2137 ("[T]o the extent later history contradicts what the text [of the Second Amendment] says, the text controls.").

18

No. 21-11001

**2.**

The Government also relies on the ancient criminal offense of "going armed to terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141 (alteration and emphasis omitted). This common law offense persisted in America and was in some cases codified. *Id.* at 2144. The Government offers four exemplars codified in the Massachusetts Bay Colony, the state of Virginia, and the colonies of New Hampshire and North Carolina.

The Massachusetts law provided "[t]hat every justice of the peace . . . may cause to be staid and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively . . . and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison . . . and seize and take away his armor or weapons . . . ." 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52–53 (1869) (1692 statute) (cleaned up). Similarly, the New Hampshire statute authorized justices of the peace "upon view of such justice, confession of the party, or legal proof of any such offense . . . [to] cause the [offender's] arms or weapons to be taken away . . . ." Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament, 17 (1771) (1701 statute); *see Bruen*, 142 S. Ct. at 2142–43 (noting that Massachusetts and New Hampshire laws "were substantively identical"). Virginia's law differed slightly: "[N]o man . . . [shall] go []or ride armed by night or by day, in fairs or markets, or in other places, in terror of the country, upon pain of being arrested and committed to prison by any justice on his view, or proof of others, there to a time for so long a time as a jury, to be sworn for that purpose by the said justice, shall direct, and in like manner to forfeit his armour to the Commonwealth . . . ." Revised Code of the State of Virginia: Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force, 554 (1819) (1786

No. 21-11001

statute).  North Carolina's colonial law was contained within its constable's oath, which required constables to "arrest all such persons as, in your sight, shall ride or go armed offensively, or shall commit or make any riot, affray, or other breach of his Majesty's peace . . . ." Collection of All of the Public Acts of Assembly of the Province of North-Carolina: Now in Force and Use, 131 (1751) (1741 statute) (cleaned up).  While similarly aimed at curbing "going armed offensively," the North Carolina law did not provide for forfeiture.

These proffered analogues fall short for several reasons.  An overarching one is that it is doubtful these "going armed" laws are reflective of our Nation's historical tradition of firearm regulation, at least as to forfeiture of firearms.  *See Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public carry regulation.").  North Carolina's law did not provide for forfeiture, so it quickly falls out of the mix.  And fairly early on, Massachusetts and Virginia dropped forfeiture as a penalty, going the way of North Carolina and thereby undercutting the Government's reliance on those laws.  Indeed, Massachusetts amended its law to remove the forfeiture provision in 1795, just four years after the ratification of the Second Amendment. 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807, 653 (1807) (statute enacted Jan. 29, 1795).  Virginia had done so by 1847, shortly before the Commonwealth re-codified its laws in 1849.  *See* Code of Virginia: With the Declaration of Independence and Constitution of the United States and the Declaration of Rights and Constitution of Virginia, 756 (1849).[8]  It is unclear how long New Hampshire's "going armed" law preserved its forfeiture provision, but assuming *arguendo* it persisted longer

---

[8] By the 1849 code, Virginia's going armed law had evolved into its anti-riot law (chapter 195) and surety law (chapter 201). *See id.* Neither chapter provided for forfeiture of an offender's weapons.

No. 21-11001

than the others, one outlier is not enough "to show a tradition of public carry regulation." *Bruen*, 142 S. Ct. at 2142.

And on substance, the early "going armed" laws that led to weapons forfeiture are not relevantly similar to § 922(g)(8). First, those laws only disarmed an offender after criminal proceedings and conviction. By contrast, § 922(g)(8) disarms people who have merely been civilly adjudicated to be a threat to another person—or, who are simply governed by a civil order that "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force," § 922(g)(8)(C)(ii), whether or not there is a "credible threat to the physical safety" of anyone else, § 922(g)(8)(C)(i). Rahimi's domestic violence restraining order satisfied both conditions; but it bears emphasis that the order at issue here was entered by agreement, in a civil proceeding, after Rahimi apparently waived hearing (the order states no formal hearing was held, and no record was created), and without counsel or other safeguards that would be afforded him in the criminal context. These distinctions alone defeat the "going armed" laws as useful analogues for § 922(g)(8).

Moreover, the "going armed" laws, like the "dangerousness" laws discussed above, appear to have been aimed at curbing terroristic or riotous behavior, i.e., disarming those who had been adjudicated to be a threat to society generally, rather than to identified individuals. And § 922(g)(8) works to disarm not only individuals who are threats to other individuals but also every party to a domestic proceeding (think: divorce court) who, with no history of violence whatever, becomes subject to a domestic restraining order that contains boilerplate language that tracks § 922(g)(8)(C)(ii). In other words, where "going armed" laws were tied to violent or riotous conduct and threats to society, § 922(g)(8) implicates a much wider swath of conduct, not inherently dependent on any actual violence or threat. Thus, these "going armed" laws are not viable historical analogues for § 922(g)(8).

No. 21-11001

### 3.

Lastly, the Government points to historical surety laws. At common law, an individual who could show that he had "just cause to fear" that another would injure him or destroy his property could "demand surety of the peace against such person." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 252 (1769). The surety "was intended merely for prevention, without any crime actually committed by the party; but arising only from probable suspicion, that some crime [wa]s intended or likely to happen." *Id.* at 249. If the party of whom surety was demanded refused to post surety, he would be forbidden from carrying a weapon in public absent special need. *See Bruen*, 142 S. Ct. at 2148–49 (discussing operation of historical surety laws). Many jurisdictions codified this tradition, either before ratification of the Bill of Rights or in early decades thereafter.[9]

The surety laws come closer to being "relevantly similar" to § 922(g)(8) than the "dangerousness" and "going armed" laws discussed *supra*. First, they are more clearly a part of our tradition of firearm regulation. And they were "comparably justified," *id.* at 2133, in that they were meant to protect an identified person (who sought surety) from the risk of harm posed by another identified individual (who had to post surety to carry arms).

---

[9] *E.g.*, 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52–53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament, 17 (1771) (1701 statute); 2 Statutes at Large of Pennsylvania from 1682 to 1801, pg. 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven, pg. 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New-England 91 (1901) (1702 statute); *see also Bruen*, 142 S. Ct. at 2148 (stating that at least ten jurisdictions enacted surety laws between 1836 and 1871).

22

No. 21-11001

Put simply, the *why* behind historical surety laws analogously aligns with that underlying § 922(g)(8).[10]

Aspects of *how* the surety laws worked resemble certain of the mechanics of § 922(g)(8) as well. The surety laws required only a civil proceeding, not a criminal conviction. The "credible threat" finding required to trigger § 922(g)(8)(C)(i)'s prohibition on possession of weapons echoes the showing that was required to justify posting of surety to avoid forfeiture. But that is where the analogy breaks down: As the Government acknowledges, historical surety laws did not prohibit public carry, much less possession of weapons, so long as the offender posted surety. *See also id.* at 2149 (noting that there is "little evidence that authorities ever enforced surety laws"). Where the surety laws imposed a conditional, partial restriction on the Second Amendment right, § 922(g)(8) works an absolute deprivation of the right, not only publicly to carry, but to *possess* any firearm, upon entry of a sufficient protective order. And, as discussed *supra*, § 922(g)(8)(C)(ii) works that deprivation based on an order that "prohibits the use, attempted use, or threatened use of physical force," whether there is a "just cause to fear" any harm, or not. At bottom, the historical surety

---

[10] The parties spar somewhat over the required granularity of the underlying problem in comparing § 922(g)(8) to proffered analogues. Rahimi contends more generally that domestic violence was, and remains, a persistent social ill that society has taken numerous actions against—though not disarmament. The Government counters that "crime statistics from the founding era are hard to come by," but that "there is reason to doubt that domestic *homicide* was as prevalent at the founding as it is in the modern era." To be sure, historical surety laws were not targeted to domestic violence or even more specifically to domestic homicide. But somewhat abstracting the laws' justifications, as we do above the line, strikes us as consistent with *Bruen*'s instruction that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133.

23

No. 21-11001

laws did not impose "a comparable burden on the right of armed self-defense," *id.* at 2133, as § 922(g)(8).

\*     \*     \*

The Government fails to demonstrate that § 922(g)(8)'s restriction of the Second Amendment right fits within our Nation's historical tradition of firearm regulation. The Government's proffered analogues falter under one or both of the metrics the Supreme Court articulated in *Bruen* as the baseline for measuring "relevantly similar" analogues: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*[11] As a result, § 922(g)(8) falls outside the class of firearm regulations countenanced by the Second Amendment.

---

[11] *Accord* David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (2017) ("[T]here is simply no tradition—from 1791 or 1866—of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders."); Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017) ("Historical support for the exclusion of domestic violence offenders from Second Amendment protection appears rather thin."); Keateon G. Hille, The *Second Amendment: From* Miller *to* Chovan, *and Why the* Marzzarella *Framework is the Best Shot Courts Have*, 50 Gonz. L. Rev. 377, 392 (2015) (acknowledging that the "prohibition on firearms possession by domestic violence misdemeanants is not longstanding" and advocating for a means-ends test); Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 741 (2012) ("If longstanding tradition is the key common characteristic of the items on the *Heller* list, modern legal innovations like the ban on guns for domestic violence misdemeanants, however much they may reduce risks and benefit society, do not qualify.").

No. 21-11001

## IV.

Doubtless, 18 U.S.C. § 922(g)(8) embodies salutary policy goals meant to protect vulnerable people in our society. Weighing those policy goals' merits through the sort of means-end scrutiny our prior precedent indulged, we previously concluded that the societal benefits of § 922(g)(8) outweighed its burden on Rahimi's Second Amendment rights. But *Bruen* forecloses any such analysis in favor of a historical analogical inquiry into the scope of the allowable burden on the Second Amendment right. Through that lens, we conclude that § 922(g)(8)'s ban on possession of firearms is an "outlier[] that our ancestors would never have accepted." *Id.* Therefore, the statute is unconstitutional, and Rahimi's conviction under that statute must be vacated.

REVERSED; CONVICTION VACATED.

No. 21-11001

JAMES C. HO, *Circuit Judge*, concurring:

The right to keep and bear arms has long been recognized as a fundamental civil right. Blackstone saw it as an essential component of "'the natural right'" to "'self-preservation and defence.'" *District of Columbia v. Heller*, 554 U.S. 570, 593–94 (2008) (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 139–40 (1765)). And the Supreme Court has repeatedly analogized the Second Amendment to other constitutional rights guaranteed to every American. *See, e.g., Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (describing the First, Second, Fourth, Fifth, and Sixth Amendments as the "civil-rights Amendments"); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49–50 n.10 (1961) (comparing "the commands of the First Amendment" to "the equally unqualified command of the Second Amendment"); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126, 2130 (2022) (quoting *Konigsberg*).

But lower courts have routinely ignored these principles, treating the Second Amendment as "a second-class right." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion). So the Supreme Court has now commanded lower courts to be more forceful guardians of the right to keep and bear arms, by establishing a new framework for lower courts to apply under the Second Amendment.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "[T]his historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm

26

No. 21-11001

regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 2132. This framework "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. It requires the government to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

Our court's decision today dutifully applies *Bruen*, and I join it in full. I write separately to explain how respect for the Second Amendment is entirely compatible with respect for our profound societal interest in protecting citizens from violent criminals. Our Founders firmly believed in both the fundamental right to keep and bear arms and the fundamental role of government in combating violent crime.

## I.

"[T]he right to keep and bear arms . . . has controversial public safety implications." *Bruen*, 142 S. Ct. at 2126 n.3 (quotations omitted). But it's hardly "the *only* constitutional right" that does. *Id.* (quotations omitted, emphasis added). To the contrary, "[a]ll of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, 561 U.S. at 783 (plurality opinion).

So any legal framework that involves any of these constitutional provisions can have significant and controversial public safety consequences. A framework that under-protects a right unduly deprives citizens of liberty. But a framework that over-protects a right unduly deprives citizens of competing interests like public safety.

Take, for example, the exclusionary rule. *See Mapp v. Ohio*, 367 U.S. 643 (1961). Since its inception, the rule has been sharply criticized for over-protecting the accused and releasing dangerous criminals into our neighborhoods. It's often said that nothing in the Constitution requires the criminal to "go free because the constable has blundered." *Herring v. United*

No. 21-11001

*States*, 555 U.S. 135, 148 (2009) (quoting *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926)). "The exclusionary rule generates substantial social costs" by "setting the guilty free and the dangerous at large." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (cleaned up).

The same can be said about *Miranda v. Arizona*, 384 U.S. 436 (1966). The Supreme Court has "repeatedly referred to the *Miranda* warnings as 'prophylactic' and 'not themselves rights protected by the Constitution.'" *Dickerson v. United States*, 530 U.S. 428, 437–38 (2000) (citations omitted). What's more, "[i]n some unknown number of cases the Court's rule will return a killer, a rapist or other criminal to the streets and to the environment which produced him, to repeat his crime whenever it pleases him." *Miranda*, 384 U.S. at 542 (White, J., dissenting).

So it's easy to see why decisions like *Mapp* and *Miranda* have been criticized for over-protecting constitutional rights and harming public safety.

But there's a big difference between the first criticism and the second, at least as far as the judiciary is concerned. It's our duty as judges to interpret the Constitution based on the text and original understanding of the relevant provision—not on public policy considerations, or worse, fear of public opprobrium or criticism from the political branches. *See, e.g.*, *McDonald*, 561 U.S. at 783 (plurality opinion) (finding "no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications"); *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2278 (2022) ("[W]e cannot allow our decisions to be affected by any extraneous influences such as concern about the public's reaction to our work."); *Mance v. Sessions*, 896 F.3d 390, 405 (5th Cir. 2018) (Ho, J., dissenting from denial of rehearing en banc) ("Constitutional rights must not give way to hoplophobia.").

No. 21-11001

And that's precisely the problem here: Members of the Supreme Court have repeatedly criticized lower courts for disfavoring the Second Amendment.[1] The Supreme Court has now responded by setting forth a new legal framework in *Bruen*. It is incumbent on lower courts to implement *Bruen* in good faith and to the best of our ability.

*Bruen* calls on us to examine our Nation's history and traditions to determine the meaning and scope of the Second Amendment. It's hardly the first time that the Supreme Court has looked to history and tradition to interpret constitutional provisions.[2] And it surely won't be the last.

---

[1] *See, e.g., Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari) (bemoaning "lower courts' general failure to afford the Second Amendment the respect due an enumerated constitutional right"); *Peruta v. California*, 137 S. Ct. 1995, 1999 (2017) (Thomas, J., joined by Gorsuch, J., dissenting from denial of certiorari) (lamenting "distressing trend" of "the treatment of the Second Amendment as a disfavored right"); *Friedman v. City of Highland Park*, 136 S. Ct. 447, 447 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) (criticizing "noncompliance with our Second Amendment precedents" by "several Courts of Appeals"); *Jackson v. City & Cty. of San Francisco*, 135 S. Ct. 2799, 2799 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) ("lower courts, including the ones here, have failed to protect [the Second Amendment right]"); *id.* at 2802 ("'A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.'") (quoting *Heller*, 554 U.S. at 634).

[2] *See, e.g., Myers v. United States*, 272 U.S. 52, 109–76 (1926) (noting that "the power of removal of executive officers . . . was presented early in the first session of the First Congress," known as the "decision of 1789," and also surveying English and colonial history and subsequent Congressional and Executive practice); *Marsh v. Chambers*, 463 U.S. 783, 786–92 (1983) (noting that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country" and surveying colonial history, the deliberations of the First Congress, and "unambiguous and unbroken history of more than 200 years"); *Crawford v. Washington*, 541 U.S. 36, 43–50 (2004) (examining the "historical background" of the Confrontation Clause, noting that "[t]he right to confront one's accusers is a concept that dates back to Roman times," and surveying English history and colonial and early state practice); *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (reviewing "historic and traditional categories" of speech that government has been allowed to regulate "[f]rom 1791 to the

29

No. 21-11001

## II.

Those who commit violence, including domestic violence, shouldn't just be disarmed—they should be detained, prosecuted, convicted, and incarcerated. And that's exactly why we have a criminal justice system—to punish criminals and disable them from engaging in further crimes.

The Constitution presumes the existence of a criminal justice system. *See, e.g.*, U.S. CONST. amends. V, VI (setting forth various rights of the accused in criminal proceedings); U.S. CONST. amend. VIII (prohibiting cruel and unusual punishments). That system allows the government to deny convicted criminals a wide range of liberties that it could not deny to innocent, law-abiding citizens. For example, the government cannot deprive innocent citizens of their liberty of movement. *See, e.g.*, *Williams v. Fears*, 179 U.S. 270, 274 (1900); *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999). But it can certainly arrest and incarcerate violent criminals.

Arrest and incarceration naturally entail the loss of a wide range of liberties—including the loss of access to weapons. *See, e.g.*, *Chimel v. California*, 395 U.S. 752, 762–63 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape."); *State v. Buzzard*, 4 Ark. 18, 21 (1842) (Ringo, C.J.) ("Persons accused of crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned.").

The Supreme Court has also made clear that our Nation's history and traditions include "longstanding prohibitions on the possession of firearms

---

present"); *Timbs v. Indiana*, 139 S. Ct. 682, 687–89 (2019) (observing that "[t]he Excessive Fines Clause traces its venerable lineage back to at least 1215" and surveying authorities from English history and colonial practice).

30

No. 21-11001

by felons"—and that such measures are "presumptively lawful." *Heller*, 554 U.S. at 626 & n.26. *See also McDonald*, 561 U.S. at 786 (plurality opinion) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons,'" and "[w]e repeat those assurances here. . . . [I]ncorporation does not imperil every law regulating firearms."). So the government can presumably disarm dangerous convicted felons, whether they're incarcerated or not, without violating the Second Amendment.

The Second Amendment is not "a second-class right." *Bruen*, 142 S. Ct. at 2156. It is not "subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* That principle guides us here: The government can impose various restrictions on the rights of dangerous convicted felons, consistent with our Nation's history and traditions—and that includes the right to keep and bear arms.

### III.

The power to incarcerate violent criminals is not just constitutionally permissible—it's imperative to protecting victims. After all, anyone who's willing to break the law when it comes to domestic violence is presumably willing to break the law when it comes to guns as well. The only way to protect the victim may be to detain as well as disarm the violent criminal.

For example, the government can detain and disarm, not just after conviction, but also before trial. Pre-trial detention is presumed by the Excessive Bail Clause and the Speedy Trial Clause. And it plays a significant role in protecting citizens from violence, including domestic violence. *See, e.g., United States v. Salerno*, 481 U.S. 739, 755 (1987) (permitting "the detention prior to trial of arrestees charged with serious felonies who . . . pose a threat to the safety of individuals or to the community").

No. 21-11001

In addition, the government can detain and disarm, based not just on acts of violence, but criminal threats of violence as well. *See, e.g., United States v. Ackell*, 907 F.3d 67 (1st Cir. 2018) (upholding criminal stalking law); *United States v. Gonzalez*, 905 F.3d 165 (3rd Cir. 2018) (same); *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014) (same); *United States v. Petrovic*, 701 F.3d 849 (8th Cir. 2012) (same); *see also People v. Counterman*, 497 P.3d 1039 (Colo. App. 2021) (same), *cert. granted sub nom. Counterman v. Colorado*, 143 S. Ct. 644 (2023). After all, to the victim, such actions are not only life-threatening—they're life-altering, even if they don't eventually result in violence.

## IV.

18 U.S.C. § 922(g)(8) disarms individuals based on civil protective orders—not criminal proceedings. As the court today explains, there is no analogous historical tradition sufficient to support § 922(g)(8) under *Bruen*.

Moreover, there are additional reasons why disarmament based on civil protective orders should give us pause. Scholars and judges have expressed alarm that civil protective orders are too often misused as a tactical device in divorce proceedings—and issued without any actual threat of danger. That makes it difficult to justify § 922(g)(8) as a measure to disarm dangerous individuals.

## A.

"Many divorce lawyers routinely recommend pursuit of civil protection orders for clients in divorce proceedings . . . as a tactical leverage device." Jeannie Suk, *Criminal Law Comes Home*, 116 YALE L.J. 2, 62 n.257 (2006). *See also, e.g.*, Randy Frances Kandel, *Squabbling in the Shadows: What the Law Can Learn from the Way Divorcing Couples Use Protective Orders as Bargaining Chips in Domestic Spats and Child Custody Mediation*, 48 S.C. L.

No. 21-11001

Rev. 441, 448 (1997) (civil protective orders are deployed as "an affirmative element of divorce strategy").

That's because civil protective orders can help a party in a divorce proceeding to "secure [favorable] rulings on critical issues such as [marital and child] support, exclusion from marital residence and property disposition." *Murray v. Murray*, 631 A.2d 984, 986 (N.J. Super. Ct. App. Div. 1993). Protective orders can also be "a powerful strategic tool in custody disputes." Suk, *supra*, at 62.

That makes civil protective orders a tempting target for abuse. Judges have expressed "concern[] . . . with the serious policy implications of permitting allegations of . . . domestic violence" to be used in divorce proceedings. *Murray*, 631 A.2d at 986. *See also City of Seattle v. May*, 256 P.3d 1161, 1166 n.1 (Wash. 2011) (Sanders, J., dissenting) (noting "the growing trend to use protection orders as tactical weapons in divorce cases"). And for good reason. "[N]ot all parties to divorce are above using [protective orders] not for their intended purpose but solely to gain advantage in a dissolution." Scott A. Lerner, *Sword or Shield? Combating Orders–of–Protection Abuse in Divorce*, 95 Ill. Bar J. 590, 591 (2007). Anyone who is "willing to commit perjury can spend months or even years . . . planning to file a domestic violence complaint at an opportune moment in order to gain the upper hand in a divorce proceeding." David N. Heleniak, *The New Star Chamber: The New Jersey Family Court and the Prevention of Domestic Violence Act*, 57 Rutgers L. Rev. 1009, 1014 (2005). So "[a] plaintiff willing to exaggerate past incidents or even commit perjury can have access to a responsive support group, a sympathetic court, and a litany of immediate relief." Peter Slocum, *Biting the D.V. Bullet: Are Domestic-Violence Restraining Orders Trampling on Second Amendment Rights?*, 40 Seton Hall L. Rev. 639, 662–63 (2010).

33

No. 21-11001

Moreover, these concerns are exacerbated by the fact that judges are too often ill-equipped to prevent abuse. Family court judges may face enormous pressure to grant civil protective orders—and no incentive to deny them. For example, family court judges may receive mandatory training in which they're warned about "the unfavorable publicity" that could result if they deny requests for civil protective orders. *Id.* at 668. As one judge has noted, "[a] newspaper headline can be death to a municipal court judge's career." *Id.* at 667 n.213 (quotations omitted). So "the prospect of an unfavorable newspaper headline is a frightening one." *Id.* To quote another judge: "Your job is not to become concerned about all the constitutional rights of the [defendant] you're violating as you grant a restraining order. Throw him out on the street, give him the clothes on his back and tell him, 'See ya' around.'" *Id.* at 668. Yet another judge said: "If there is any doubt in your mind about what to do, you should issue the restraining order." *Id.*

As a result, "[r]estraining orders . . . are granted to virtually all who apply." *May*, 256 P.3d at 1166 n.1 (Sanders, J., dissenting) (quotations omitted). So there's a "tremendous" risk that courts will enter protective orders automatically—despite the absence of any real threat of danger. Heleniak, *supra*, at 1014. *See generally* Slocum, *supra*. In one case, for example, a family court judge granted a restraining order on the ground that the husband told his wife that he did not love her and was no longer attracted to her. *See Murray*, 631 A.2d at 984. "There was no prior history of domestic violence," yet the judge issued the order anyway. *Id.* Another judge issued a restraining order against David Letterman on the ground that his presence on television harassed the plaintiff. *See* Todd Peterson, *David Letterman Fights Restraining Order*, PEOPLE (Dec. 21, 2005).

No. 21-11001

## B.

Moreover, the consequences of disarming citizens under § 922(g)(8) may be especially perverse considering the common practice of "mutual" protective orders.

In any domestic violence dispute, a judge may see no downside in forbidding *both* parties from harming one another. A judge "may think that mutual restraining orders are not substantially different from regular restraining orders—after all, the goal is to keep the parties away from one another so that the violence will not continue." Jacquie Andreano, *The Disproportionate Effect of Mutual Restraining Orders on Same-Sex Domestic Violence Victims*, 108 CAL. L. REV. 1047, 1054 (2020). "Judges may also feel that issuing a mutual restraining order saves time because they do not have to hear testimony and make a finding regarding which party is a primary aggressor or even that one party has committed domestic violence." *Id.*

But "[t]hese judicial assessments have often led to the issuance of *unmerited* mutual restraining orders, namely in situations where one party is the abuser and the other party is a victim." *Id.* (emphasis added). As a result, "both parties are restrained *even if only one is an abuser*." *Id.* at 1055 (emphasis added). *See also* Elizabeth Topliffe, *Why Civil Protection Orders Are Effective Remedies for Domestic Violence but Mutual Protective Orders Are Not*, 67 IND. L.J. 1039, 1055–56 (1992) ("[J]udges often issue a mutual protection order without any request from the respondent or his lawyer. . . . [J]udges and lawyers . . . may be tempted to resort to mutual protective orders frequently. However, when they do this in cases where there truly is one victim and one batterer, they ignore some of the real difficulties of mutual protection orders."). *See generally* DAVID HIRSCHEL, NAT'L CRIMINAL JUSTICE REFERENCE SERV., DOMESTIC VIOLENCE

No. 21-11001

Cases: What Research Shows About Arrest and Dual Arrest Rates (2008).

The net result of all this is profoundly perverse, because it means that § 922(g)(8) effectively disarms *victims* of domestic violence. What's worse, victims of domestic violence may even be put in greater danger than before. Abusers may know or assume that their victims are law-abiding citizens who will comply with their legal obligation not to arm themselves in self-defense due to § 922(g)(8). Abusers might even remind their victims of the existence of § 922(g)(8) and the entry of a mutual protective order to taunt and subdue their victims. Meanwhile, the abusers are criminals who have already demonstrated that they have zero propensity to obey the dictates of criminal statutes. As a result, § 922(g)(8) effectively empowers and enables abusers by guaranteeing that their victims will be unable to fight back.

\* \* \*

We must protect citizens against domestic violence. And we can do so without offending the Second Amendment framework set forth in *Bruen.*

Those who commit or criminally threaten domestic violence have already demonstrated an utter lack of respect for the rights of others and the rule of law. So merely enacting laws that tell them to disarm is a woefully inadequate solution. Abusers must be detained, prosecuted, and incarcerated. And that's what the criminal justice system is for. I concur.

36

Search documents in this case: [                    ] [ Search ]

## No. 23-376

| Title: | **United States, Petitioner**<br>**v.**<br>**Patrick Darnell Daniels, Jr.** |
|---|---|
| Docketed: | October 10, 2023 |
| Lower Ct: | United States Court of Appeals for the Fifth Circuit |
| Case Numbers: | (22-60596) |
| Decision Date: | August 9, 2023 |

| DATE | PROCEEDINGS AND ORDERS |
|---|---|
| Oct 05 2023 | Petition for a writ of certiorari filed. (Response due November 9, 2023)<br><br>**Petition    Proof of Service** |

| NAME | ADDRESS | PHONE |
|---|---|---|
| Attorneys for Petitioner | | |
| Elizabeth B. Prelogar<br>    Counsel of Record | United States Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>SUPREMECTBRIEFS@USDOJ.GOV | 202-514-2217 |
| Party name: United States | | |

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2023

Lyle W. Cayce
Clerk

No. 22-60596

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

PATRICK DARNELL DANIELS, JR.,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:22-CR-58-1

Before SMITH, HIGGINSON, and WILLETT, *Circuit Judges.*
JERRY E. SMITH, *Circuit Judge:*

Title 18 U.S.C. § 922(g)(3) bars an individual from possessing a firearm if he is an "unlawful user" of a controlled substance. Patrick Daniels is one such "unlawful user"—he admitted to smoking marihuana multiple days per month. But the government presented no evidence that he was intoxicated at the time of arrest, nor did it identify when he last had used marihuana. Still, based on his confession to regular usage, a jury convicted Daniels of violating § 922(g)(3).

The question is whether Daniels's conviction violates his right to bear

No. 22-60596

arms. The answer depends on whether § 922(g)(3) is consistent with our nation's "historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). It is a close and deeply challenging question.

Throughout American history, laws have regulated the combination of guns and intoxicating substances. But at no point in the 18th or 19th century did the government disarm individuals who used drugs or alcohol at one time from possessing guns at another. A few states banned carrying a weapon while actively under the influence, but those statutes did not emerge until well after the Civil War. Section 922(g)(3)—the first federal law of its kind—was not enacted until 1968, nearly two centuries after the Second Amendment was adopted.

In short, our history and tradition may support some limits on an intoxicated person's right to carry a weapon, but it does not justify disarming a sober citizen based exclusively on his past drug usage. Nor do more generalized traditions of disarming dangerous persons support this restriction on nonviolent drug users. As applied to Daniels, then, § 922(g)(3) violates the Second Amendment. We reverse the judgment of conviction and render a dismissal of the indictment.

I.

In April 2022, two law enforcement officers pulled Daniels over for driving without a license plate. One of the officers—an agent with the Drug Enforcement Administration ("DEA")—approached the vehicle and recognized the smell of marihuana. He searched the cabin and found several marihuana cigarette butts in the ashtray. In addition to the drugs, the officers found two loaded firearms: a 9mm pistol and a semi-automatic rifle. Daniels was taken into custody and transported to the local DEA office.

At no point that night did the DEA administer a drug test or ask

Daniels whether he was under the influence; nor did the officers note or testify that he appeared intoxicated. But after Daniels was Mirandized at the station, he admitted that he had smoked marihuana since high school and was still a regular user. When asked how often he smoked, he confirmed he used marihuana "approximately fourteen days out of a month."

Based on his admission, Daniels was charged with violating 18 U.S.C. § 922(g)(3), which makes it illegal for any person "who is an unlawful user of or addicted to any controlled substance . . . to . . . possess . . . any firearm." An "unlawful user" is someone who uses illegal drugs regularly and in some temporal proximity to the gun possession. *See United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006).

While Daniels was under indictment, the Supreme Court decided *Bruen*. It clarified that firearms regulations are unconstitutional unless they are firmly rooted in our nation's history and tradition of gun regulation. *See* 142 S. Ct. at 2129–30. Daniels immediately moved to dismiss the indictment, claiming that § 922(g)(3) is unconstitutional under that new standard.

The district court denied the motion. *See United States v. Daniels*, 610 F. Supp. 3d 892, 892 (S.D. Miss. 2022). It expressed some doubt that Daniels was part of "the people" whom the Second Amendment protects, as Daniels was not a "law abiding, responsible citizen[]." *Id.* at 894. Nevertheless, assuming that Daniels had a right to bear arms, the court found that § 922(g)(3) was a longstanding gun regulation. *See id.* at 895. It compared § 922(g)(3) to laws disarming felons and the mentally ill that *Heller* called "presumptively lawful." *Id.* at 895 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008)). Congress passed § 922(g)(3) in 1968, only after many states had similarly banned habitual drug abusers from possessing guns. *Id.* at 896. The district court placed great weight on that regulatory tradition. It engaged with few historical sources from the Founding or

3

No. 22-60596

Reconstruction, but it relied on statements from other courts—notably all predating *Bruen*—that § 922(g)(3) was supported by the historical practice of disarming those who "exhibit a dangerous lack of self-control." *Id.* at 897.

A jury found Daniels guilty. He was sentenced to nearly four years in prison and three years of supervised release. By nature of his § 922(g)(3) felony, Daniels is also barred for life from possessing a firearm. *See* 18 U.S.C. § 922(g)(1).

Daniels appeals his conviction, reasserting the Second Amendment challenge that he raised before trial.[1] As with all constitutional questions, we consider the issue *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

## II.

The Second Amendment protects the right of individuals to "keep and bear" firearms for their self-defense. U.S. CONST. amend. II; *see Heller*, 554 U.S. at 595. But even fundamental rights have limits. *See Bruen*, 142 S. Ct. at 2128. Before *Bruen*, our circuit evaluated the legality of gun restrictions using the familiar standards of scrutiny. *See United States v. McGinnis*, 956 F.3d 747, 753–54 (5th Cir. 2020). If legislation infringed on the historical right to bear arms, we asked whether the government had a sufficiently strong interest and whether its firearm regulation was sufficiently tailored. If a law breached the core of the Second Amendment liberty, we applied strict scrutiny; if not, we applied intermediate scrutiny. *Id.* at 754.

*Bruen*, 142 S. Ct. at 2129–31, decisively rejected that kind of analysis. In place of means-end balancing, *Bruen* "requires" us to interpret the Second

---

[1] Daniels also contends that § 922(g)(3) is unconstitutionally vague and that there was insufficient evidence for a reasonable jury to convict. Because we hold that § 922(g)(3) is unconstitutional as applied to Daniels, we need not address his additional challenges.

No. 22-60596

Amendment in light of its original public meaning. *Id.* at 2126, 2131. As the Court explained, the Second Amendment codified a *"pre-existing* right" with pre-existing limits. *Id.* at 2127 (quoting *Heller*, 554 U.S. at 592). To ascertain those limits, history is our heuristic. Because historical gun regulations evince the kind of limits that were well-understood at the time the Second Amendment was ratified, a regulation that is inconsistent with those limits is inconsistent with the Second Amendment. *Id.*

To determine whether a modern firearms law is unconstitutional, we now proceed in two steps. *First*, we ask whether the Second Amendment applies by its terms. *Id.* at 2129–30. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. *Second*, we ask whether a given gun restriction is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The government bears the burden of demonstrating a tradition supporting the challenged law. *Id.* at 2130. Only by showing that the law does not tread on the historical scope of the right can the government "justify its regulation." *Id.*

The second step requires both close attention to history and analogical reasoning. *Bruen* did not forswear all legislative innovation. To the contrary, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. What we are looking for is a "tradition"—well-accepted limits on the right to bear arms manifested by a tangible practice of comparable gun regulations. But how do we know whether an older regulatory practice is "comparable"?

*Bruen* helpfully gave us two conceptual pathways. If the modern regulation addresses "a general societal problem that has persisted since the 18th century," then "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is incon-

No. 22-60596

sistent with the Second Amendment." *Id.* at 2131. But if a modern law addresses "unprecedented societal concerns or dramatic technological changes," it calls for a "more nuanced approach." *Id.* at 2132. We must reason by analogy to determine whether older regulations are "relevantly similar" to the modern law. *Id.*

*Bruen* acknowledged the difficulty of determining whether two laws are "relevantly similar." *Id. Bruen* clarified that two laws are "relevantly similar" if they share a common "why" and "how"; they must both address a comparable problem (the "why") and place a comparable burden on the rightsholder (the "how"). *Id.* at 2132–33.

In all of that, *Bruen* reminded us that we are looking for a "representative historical analogue, not a historical twin." *Id.* at 2133 (emphasis removed). It is not a death knell to the government that the challenged regulation did not previously exist. What matters is whether a conceptual fit exists between the old law and the new. Deciding whether there is a match between historical and modern regulations requires the exercise of both analogical reasoning and sound judgment. Nevertheless, we hew closely to *Bruen*'s own reasoning and hold the government to its heavy burden.

A.

We begin with the threshold question: whether the Second Amendment even applies to Daniels.

The right to bear arms is held by "the people." U.S. Const. amend. II. That phrase "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Indeed, the Bill of Rights uses the phrase "the people" five times. In each place, it refers to all members of our political community, not a special group of upright citizens. *Id.* (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Based on that consistent usage, *Heller* concluded that "the Second

No. 22-60596

Amendment right is exercised individually and belongs to *all* Americans." *Heller*, 554 U.S. at 581 (emphasis added).

Even as a marihuana user, Daniels is a member of our political community. Therefore, he has a presumptive right to bear arms. By infringing on that right, § 922(g)(3) contradicts the plain text of the Second Amendment.

True, *Heller* described the Second Amendment as applying to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. And *Bruen* used the phrase "law-abiding" fourteen times, including in the opening sentence, where it says that the Second Amendment "protect[s] the right of an ordinary, *law-abiding* citizen to possess a handgun." 142 S. Ct. at 2122 (emphasis added). The government seizes on that language and insists that the Second Amendment does not extend to Daniels because he is a criminal.

But we cannot read too much into the Supreme Court's chosen epithet. More than just "model citizen[s]" enjoy the right to bear arms. *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (June 30, 2023). Indeed, *Rahimi* held that citizens accused of domestic violence still had Second Amendment rights. It reasoned that when *Heller* and *Bruen* used the phrase "law-abiding," it was just "shorthand" to "exclude from the . . . discussion" the mentally ill and felons, people who were historically "stripped of their Second Amendment rights." *Id.* at 452. All others are presumptively included in the Second Amendment's ambit. Because Daniels is not a felon or mentally ill, *Rahimi*'s treatment of the "law-abiding" moniker suggests that he has presumptive Second Amendment rights as well.

Still, *Heller*'s and *Bruen*'s emphasis on "law-abiding" citizens hints that Congress and state legislatures have greater latitude to limit the gun liberties of the lawless. But, as a general rule, limitations on the Second Amend-

7

No. 22-60596

ment come from the traditionally understood restrictions on the right to bear arms, not because ordinary citizens are categorically excluded from the privilege. *See Rahimi*, 61 F.4th at 453.[2]

Once we conclude that Daniels has presumptive Second Amendment rights, the focus shifts to step two of the *Bruen* analysis: whether history and tradition support § 922(g)(3).

## B.

Before we decide whether § 922(g)(3) is consistent with our tradition of gun regulation, we must first ask a methodological question: What kind of similarity are we looking for? "Distinct" similarity or a less precise "relevant" similarity? *See Bruen*, 142 S. Ct. at 2131–32. That depends on whether § 922(g)(3) "addresses a general societal problem that has persisted since the 18th century" or an "unprecedented societal concern[]" that the Founding generation did not experience. *Id.* at 2131–32.

*Bruen* does not require more than "relevant" similarity here. It is true that the Founding generation was familiar with intoxication via alcohol,[3] and it was familiar with marihuana plants.[4] But the Founders grew hemp to make

---

[2] That accords with the holding in *Range v. Att'y General United States of America*, 69 F.4th 96, 101–03 (3d Cir. 2023) (en banc), where the court held that a man convicted of a false statement was part of "the people" and had Second Amendment rights, even though he was not "law-abiding." *Range* relied in part on then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019), in which she reasoned that "all people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right."

[3] W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 10 (1981) ("[I]n 1770 the annual per capita intake of alcohol from all sources was 3.5 gallons. In the years following the Revolution the amount declined . . . . But after 1800, as the quantity of spirits consumed increased, the total quantity of alcohol consumed from all sources increased until it reached a peak of nearly 4 gallons per capita in 1830.").

[4] *See, e.g.*, BENJAMIN FRANKLIN, A MODEST INQUIRY INTO THE NATURE

No. 22-60596

rope.[5] They were not familiar with widespread use of marihuana as a narcotic, nor the modern drug trade.[6] Thus, though intoxication generally was a persistent social problem, *see Bruen* 142 S. Ct. at 2131, the Founding generation had no occasion to consider the relationship between firearms and intoxication via cannabis.[7] Although marihuana might be comparable in some ways to alcohol or tobacco, merely by making the comparison we have moved past the hunt for a distinctly similar law and are engaged in analogical reasoning.

Indeed, *Bruen*'s discussion of "distinct" and "relevant" similarity seems aimed at interpreting historical silence. That is, when the historical

---

AND NECESSITY OF A PAPER CURRENCY (1729), *reprinted in* 2 THE WORKS OF BENJAMIN FRANKLIN 253, 275 (Boston, Hilliard, Gray & Co. 1836) (claiming that America was "very capable" of growing hemp). George Washington himself cultivated hemp. 1 THE DIARIES OF GEORGE WASHINGTON 1748-1799, at 213 (John C. Fitzpatrick ed., 1925).

[5] *See* THOMAS PAINE, COMMON SENSE (1776), *in* 1 THE POLITICAL WRITINGS OF THOMAS PAINE 15, 52 (Charlestown, George Davidson 1824) ("Hemp flourishes even to rankness, so that we need not want cordage.").

[6] Some post-colonial books and newspapers noted that people in the Middle East used hemp as an intoxicant. *See, e.g.,* 3 C.S. SONNINI, TRAVELS IN UPPER AND LOWER EGYPT: UNDERTAKEN BY ORDER OF THE OLD GOVERNMENT OF FRANCE 92 (Henry Hunter trans., London 1807). But the novelty of those reports from faraway lands demonstrates the absence of marihuana intoxication in America at the Founding.

[7] *See* David F. Musto, *The American Experience with Stimulants and Opiates,* 2 PERSPS. ON CRIME & JUST. 51, 51 (1998) ("[M]ost [non-alcoholic] drugs were not familiar products early in the 19th century . . . ."); *see also* Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition,* 56 VA. L. REV. 971, 985-87, 1010-11 (1970) (describing how American society gradually realized the social effects of narcotics in the late 1800s and began regulating them at the turn of the century); *see also id.* at 1011 ("[From 1914–31], we can find no evidence of public concern for, or understanding of, marijuana, even in those states that banned it . . . . Observers in the middle and late 1930's agreed that marijuana was . . . a very new phenomenon on the national scene.").

No. 22-60596

record reveals no regulations of a particular kind, we could interpret that silence in one of two ways. We could say that it means nothing (i.e., neither approval nor disapproval), or we could count silence as evidence that the public did not approve of such a regulation. *Bruen* says we should make the latter inference, at least when the public experienced the harm the modern-day regulation attempts to address. *Bruen*, 142 S. Ct. at 2131. By contrast, when the ratifying public did not confront a particular harm, its failure to regulate it says little about whether it approved such regulation.

In that case, we look instead for analogues—similar harms that the Founding generation did confront and the regulations they used to address them. *Id.* at 2132. Just as Founding-era prohibitions on firearms in "sensitive places" can extend to "*new* and analogous sensitive places," *id.* at 2133, we can compare the Founders' treatment of one problem to new problems that the Founders could not have anticipated.

Even so, the government has the burden to find and explicate the historical sources that support the constitutionality of § 922(g)(3). *Rahimi*, 61 F.4th at 455 (citing *Bruen*, 142 S. Ct. at 2132–33). Here, the government's proffered analogues fall into three general buckets: (1) statutes disarming intoxicated individuals, (2) statutes disarming the mentally ill or insane, and (3) statutes disarming those adjudged dangerous or disloyal.[8] Each deserves

---

[8] We limit ourselves to the record amassed by the district court, the parties, and the *amici* who offered additional historical materials in response to this court's order on June 6, 2023. *See Bruen*, 142 S. Ct. at 2130 n.6 ("*Heller*'s text-and-history test . . . [requires] resolv[ing] *legal* questions presented in particular cases or controversies. . . . Courts are thus entitled to decide a case based on the historical record compiled by the parties."). Still, notable repositories of historical gun laws—such as the database maintained by the Duke Center for Firearms Law—do not reveal additional probative statutes. *See Repository of Historical Gun Laws*, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu/repository/ (last visited July 20, 2023).

No. 22-60596

independent consideration.

### 1.

Because there was little regulation of drugs (related to guns or otherwise) until the late-19th century,[9] intoxication via alcohol is the next-closest comparator. Throughout the colonial period and into the 19th century, Americans drank alcohol—and lots of it.[10] Common sense indicates that individuals who are impaired by alcohol lack the self-restraint to handle deadly weapons safely. So it is unsurprising to find historical laws dealing with guns and alcohol. Such rules are relevant to our history and tradition of gun regulation.

Unfortunately for the government, that regulatory tradition is sparse and limited during the relevant time periods. Despite the prevalence of alcohol and alcohol abuse, neither the government nor *amici* identify any restrictions at the Founding that approximate § 922(g)(3). Although a few states after the Civil War prohibited carrying weapons while under the influence, none barred gun possession by regular drinkers.

### a.

Founding-era statutes concerning guns and alcohol were few. They were also limited in scope and duration. The laws that did exist had two primary concerns: (1) the misuse of weapons while intoxicated and (2) the

---

[9] *See* Bonnie & Whitebread, *supra* note 7, at 985–86.

[10] John Adams claimed that Americans "exceed all other and millions of people in the world in this degrading, beastly vice of intemperance." Letter from John Adams to William Willis (Feb. 21, 1819), in 10 THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 365, 365 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1856); *see also* Musto, *supra* note 7, at 52 (finding that "[i]n the early Republic," there was "an extremely high level of alcohol consumption (chiefly, distilled spirits)").

No. 22-60596

discipline of state militias.

Consider the first group of statutes. In 1656, Virginia banned "shoot[ing] any gunns at drinkeing."[11] But in historical context, that was not a disarming regulation like § 922(g)(3). Virginia was a brand-new colony at the time. The 1656 statute was explicitly passed to conserve gunpowder, which was at a premium, and because ill-timed gunshots might be mistaken for a signal that local Indians were attacking.[12] Not only was the statute enacted for a different purpose, but it did not even ban gun possession or carry—it only prevented the colonists from misusing the guns they did have during bouts of drinking.

Another law, passed by New York in 1771, prohibited citizens from firing guns from December 31 to January 2 because of the "great Damages" done by those "intoxicated with Liquor" during New Year's celebrations.[13]

---

[11] Acts of Mar. 10, 1655–56, Act 12, *reprinted in* 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 401, 401–02 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823). As a historical note, some old statutes are dated with dual years because, until 1752, the British colonies dated the new year from March 25 (the Feast of the Annunciation). Thus, a law marked "1655" between January 1 and March 24 was actually passed in 1656 according to the New Style (Gregorian) Calendar. *See Colonial Records & Topics,* CONN. STATE LIBR., https://libguides.ctstatelibrary.org/hg/colonialresearch/calendar (last visited July 9, 2023).

[12] According to the statute, the misuse of weapons while intoxicated furthered "that beastly vice[:] spending much powder in vaine" instead of "reserve[ing] [it] against the comon enemie," "the Indians." Acts of Mar. 10, 1655–56, Act 12, *reprinted in* 1 THE STATUTES AT LARGE, *supra* note 11, at 401. Plus, "[t]he only means for the discovery of [Indian] plotts is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking." *Id.* at 401. The 1656 law was a descendant of a 1632 law, which prevented "spend[ing] powder unnecessaril[y] . . . in dringinge or enterteynments." Acts of Feb. 24, 1631–32, Act 50, *reprinted in* 1 THE STATUTES AT LARGE, *supra* note 11, at 155, 173.

[13] Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 THE COLONIAL LAWS OF NEW

No. 22-60596

The statute had a similar purpose as § 922(3) does—preventing public harm by individuals under the influence. Nevertheless, the law was strikingly narrow. It applied on only three days out of the year; it only prevented firing guns (not possessing them); and it applied only to those under the influence, not habitual drinkers.

Beyond that duet of colonial regulations—separated by over a century—the government identifies no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if that intoxication was routine.

Instead, the government points to a second group of statutes regulating militia service. For example, a soldier could be "disarm[ed]" if he showed up for militia service in New Jersey "disguised in Liquor."[14] Pennsylvania did the same in 1780.[15] For related reasons, dram shops were prohibited from selling to local soldiers.[16]

---

YORK FROM THE YEAR 1664 TO THE REVOLUTION 244, 244–245 (Albany, James B. Lyon 1894).

[14] Act of May 8, 1746, ch. 200, § 3, *reprinted in* ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW JERSEY 140, 140–41 (Samuel Allison ed., Burlington, Isaac Collins 1776).

[15] Act of Mar. 20, 1780, ch. 902, § 45, *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION, pt. 11, at 75, 97 (Arthur Vollmer ed., 1947) ("[I]f any non-commissioned officer or private shall . . . be found drunk . . . he shall be disarmed . . . until the company is dismissed . . . ."). Later, some states excluded "common drunkards" from militia service. *See, e.g.*, An Act to regulate the Militia, § 1, *reprinted in* PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 501, 503 (Providence, Knowles & Vose 1844).

[16] *See, e.g.*, Act of May 22, 1756, *reprinted in* 2 MILITARY OBLIGATION, *supra* note 15, pt. 5, at 83, 93 (Arthur Vollmer ed., 1947) (Maryland statute); Act of May 8, 1703, § 19, *reprinted in* 2 MILITARY OBLIGATION, *supra* note 15, pt. 13, at 8, 13 (South Carolina statute). It is not clear how strictly those laws were enforced, however. Founding-era militias were notorious for imbibing heavily. One officer wrote that it was "the universal custom, in all regiments of the militia . . . for the officers, on every muster day, to get

13

No. 22-60596

Those laws, however, are even less probative. For one thing, their purpose is different. They exist to ensure a competent military—a service-member cannot perform his duties if he is impaired. Furthermore, the limitations applied only to the militia; none of the laws spoke to the ability of militiamen to carry outside of their military service. At the Founding, as today, restrictions on the liberties of servicemen tell us little about the limits acceptable for the general public.

Given the prevalence of drinking at the Founding, that handful of laws puts the government on shaky footing. The government has failed to identify any relevant tradition at the Founding of disarming ordinary citizens who consumed alcohol.

### b.

The government's Reconstruction-era evidence, though stronger, still falls short of the history and tradition that could validate § 922(g)(3).

Between 1868 and 1883, three states prohibited carrying firearms while intoxicated: Kansas, Missouri, and Wisconsin.[17] Missouri's law was

---

gloriously drunk in their country's service." *See* Reminiscences of a Retired Militia Officer: No. IV, *reprinted in* 3 THE NEW-ENGLAND MAGAZINE 110, 111 (Boston, J. T. & E. Buckingham 1832).

[17] Art. 9, § 282, *in* THE GENERAL STATUTES OF THE STATE OF KANSAS 378, 378 (Lawrence, John Speer 1868) ("[A]ny person under the influence of intoxicating drink . . . who shall be found . . . carrying on his person a pistol . . . or other deadly weapon, shall be subject to arrest . . . ."); Act of Mar. 5, 1883, § 1, *reprinted in* LAWS OF MISSOURI PASSED AT THE SESSION OF THE THIRTY-SECOND GENERAL ASSEMBLY 76, 76 (Jefferson City, State J. Co. 1883) ("If any person . . . shall have or carry any [firearms] upon or about his person. when intoxicated or under the influence of intoxicating drinks . . . he shall [be punished].")); Act of Apr. 3, 1883, ch. 329, § 3, *reprinted in* 1 THE LAWS OF WISCONSIN 290, 290 (Madison, Democrat Printing Co. 1883) ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."). Oklahoma Territory banned all public carry of pistols in 1890 and specifically prohibited public officers from carrying while intoxicated. *See Bruen*, 142 S. Ct. at 2154; Art. 47, § 4, *in* THE

No. 22-60596

challenged under the state constitution but was upheld by the Missouri Supreme Court. *State v. Shelby*, 2 S.W. 468 (Mo. 1886). The opinion acknowledged that the state constitution "secure[d] to the citizen the right to bear arms in the defense of his home, person, and property." *Id.* at 469. But the court reasoned that if the state could regulate the "manner in which arms may be borne," there is "no good reason . . . why the legislature may not do the same thing with reference to the condition of the person who carries such weapons." *Id.* The ban on intoxicated carry was therefore "in perfect harmony with the constitution." *Id.*

Those laws come closer to supporting § 922(g)(3), but they are notably few. The *Bruen* Court doubted that three colonial-era laws could suffice to show a tradition, let alone three laws passed eighty to ninety years after the Second Amendment was ratified. *See* 142 S. Ct. at 2142.

More fatally, § 922(g)(3) is substantially broader than the postbellum intoxication laws. On *Bruen*'s two axes of relevant similarity, the postbellum laws and § 922(g)(3) share a common "why": preventing public harm by individuals who lack self-control and carry deadly weapons.[18] But the "how"

---

STATUTES OF OKLAHOMA 495, 495 (Will T. Little et al. eds., Guthrie, State Capital Printing Co. 1891).

    In a similar vein (but less relevant here), Mississippi limited the *sale* of small firearms to people who were actively intoxicated. Ch. 77, § 2986, *in* THE REVISED CODE OF THE STATUTE LAWS OF THE STATE OF MISSISSIPPI 776, 776 (J.A.P. Campbell ed., Jackson, J.L. Power 1880). And in 1899, South Carolina prohibited the "*discharge* [of] any gun, pistol, or other firearm . . . within fifty yards of any public road" while "under the influence[] of intoxicating liquors." Ch. 12, § 252, *in* 2 CODE OF LAWS OF SOUTH CAROLINA, 1902, at 318, 318 (1902) (emphasis added).

    [18] *Compare Shelby*, 2 S.W. at 469 (acknowledging the obvious "mischief to be apprehended from an intoxicated person going abroad with fire-arms"), *with Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983) ("Congress' intent in enacting [§ 922(g)] was to keep firearms out of the hands of presumptively risky people.").

15

No. 22-60596

is different. At most, the postbellum statutes support the banning the *carry* of firearms *while under the influence.* Section 922(g)(3) bans all possession, and it does so for an undefined set of "user[s]," even if they are not under the influence.

As applied to Daniels, § 922(g)(3) is a significantly greater restriction of his rights than were any of the 19th-century laws. Although the older laws' bans on "carry" are likely analogous to § 922(g)(3)'s ban on "possess[ion],"[19] there is a considerable difference between someone who is actively intoxicated and someone who is an "unlawful user" under § 922(g)(3). The statutory term "unlawful user" captures regular users of marihuana, but its temporal nexus is vague—it does not specify how recently an individual must "use" drugs to qualify for the prohibition.[20] Daniels himself admitted to smoking marihuana fourteen days a month, but we do not know how much he used at those times, and the government presented no evidence that Daniels was intoxicated at the time he was found with a gun. Indeed, under the government's reasoning, Congress could ban gun possession by anyone who has multiple alcoholic drinks a week from possessing guns based on the postbellum intoxicated carry laws. The analogical reasoning *Bruen* prescribed cannot stretch that far.

A further problem with the Reconstruction-era statutes is precisely

---

[19] Possession for the purposes of § 922(g)(3) includes either "direct physical control" over a weapon or "'dominion or control' over the thing itself or the area in which it was found." *United States v. Jones,* 484 F.3d 783, 787 (5th Cir. 2007). Though that is not coextensive with the concept of "carry," it is analogous, at least here, where Daniels was in the same vehicle as his firearms.

[20] According to the implementing rules for § 922(g)(3), "[a] person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person . . . possesses a firearm." 27 C.F.R. § 478.11. An inference of "current use" can even be drawn from "a conviction for use or possession of a controlled substance *within the past year.*" *Id.* (emphasis added).

16

No. 22-60596

that they emerged during and after Reconstruction. *Bruen* did not discount the relevance of late-19th-century history, but it insisted that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." *Bruen*, 142 S. Ct. at 2132. A tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later. *Id.*; *see also id.* at 2162–63 (Barrett, J., concurring). When 19th-century practice is inconsistent with the categorical protection of the Second Amendment, the "*text* controls." *Id.* at 2137 (emphasis added).

Admittedly, there is an "ongoing scholarly debate" about whether the right to bear arms acquired new meaning in 1868 when it was incorporated against the states. *Id.* at 2137–38; *see also McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) (incorporating the Second Amendment against the states via the Fourteenth Amendment). But the instant case involves a federal statute and therefore implicates the Second Amendment, not the Fourteenth. Even if the public understanding of the right to bear arms *did* evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791.[21]

And even if late-century practice sheds some dim light on Founding-era understandings,[22] the most the Reconstruction-era regulations support is a ban on gun possession while an individual is *presently* under the influence. By regulating citizens like Daniels based on a pattern of drug use, § 922(g)(3)

---

[21] *See Bruen*, 142 S. Ct. at 2137 ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."); *see also* Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 NOTRE DAME L. REV. 1, 15 (2015).

[22] *See Bruen*, 142 S. Ct. at 2137 (calling 19th-century commentary "secondary," and "mere confirmation" of what Founding-era sources reveal) (quotation omitted).

No. 22-60596

goes further. Our history and tradition do not support the leap.

### 2.

As an alternative, the government posits that the tradition of disarming the mentally ill supports § 922(g)(3). To quote *Heller*'s now-famous caveat, "longstanding prohibitions on the possession of firearms by . . . the mentally ill" are still "presumptively lawful."[23] Obviously, mental illness and drug use are not the same thing. But there is an intuitive similarity: Those who are "briefly mentally infirm as a result of intoxication" are similar to those "permanently mentally infirm" because of illness or disability.[24]

We note at the outset that there is not a clear set of positive-law statutes concerning mental illness and firearms. In fact, the federal ban on gun possession by those judged mentally ill was enacted in 1968, the same year as § 922(g)(3). *See* 18 U.S.C. § 922(g)(4); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010). But scholars have suggested that the tradition was implicit at the Founding because, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'"[25] In other words, the greater restriction included the lesser. If the insane could be wholly deprived of their liberty and property, the government could necessarily take away their firearms.

Of course, the practice of institutionalizing so-called "lunatics" does not give clear guidance about which lesser impairments are serious enough to

---

[23] 554 U.S. at 626, 627 n.26; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting that portion of *Heller*); *McDonald*, 561 U.S. at 786 (quoting the same).

[24] Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 U.C.L.A. L. REV. 1443, 1535 (2009).

[25] *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (per curiam) (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1377 (2009)).

No. 22-60596

warrant the loss of constitutional freedoms. But we can assume that intoxication with marihuana is analogous to short-term mental illness. Dr. Benjamin Rush—who signed the Declaration of Independence—said a "temporary fit of madness" was a symptom of drunkenness.[26] And in an influential treatise on constitutional law, Thomas Cooley described drunkenness as a form of "temporary insanity."[27] The same could be said of intoxication via marihuana.

Still, that comparison could justify disarming a citizen only while he is in a state comparable to lunacy. Just as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence.

Indeed, it is helpful to compare the tradition surrounding the insane and the tradition surrounding the intoxicated side-by-side. The Founders purportedly institutionalized the insane and stripped them of their guns; but they allowed alcoholics to possess firearms while sober. We must ask, in *Bruen*-style analogical reasoning, which is Daniels more like: a categorically "insane" person? Or a repeat alcohol user? Given his periodic marihuana usage, Daniels is firmly in the latter camp. If and when Daniels uses marihuana, he may be comparable to a mentally ill individual whom the Founders would have disarmed. But while sober, he is like the repeat alcohol user in between periods of drunkenness.

---

[26] BENJAMIN RUSH, AN INQUIRY INTO THE EFFECTS OF ARDENT SPIRITS UPON THE HUMAN BODY AND MIND 6 (8th ed., Boston, James Loring 1823).

[27] THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 660 n.1 (2d ed., Boston, Little Brown & Co. 1871). He suggests that some states prohibited intoxicated people from voting on that basis. *Id.*

No. 22-60596

In short, neither the restrictions on the mentally ill nor the regulatory tradition surrounding intoxication can justify Daniels's conviction. Perhaps the government could show that the drugs Daniels used were so powerful that anyone who uses them is permanently impaired in a way that is comparable to ongoing mental illness. Or the government could demonstrate that Daniels's drug use was so regular and so heavy that he was continually impaired. Here, it has shown evidence of neither.

3.

Finally, the government asserts that Congress can limit gun possession by those "dangerous" to public peace or safety. It contends that principle was well understood when the Second Amendment was ratified. And it posits that Daniels—a repeat marihuana user—was presumptively dangerous enough to be disarmed. Although there is some historical evidence for the government's underlying principle, the historical examples of danger-based disarmament do not justify § 922(g)(3)'s application here.

a.

As Justice Barrett detailed when she was a judge on the Seventh Circuit, history supports the intuitive proposition that the government can keep deadly firearms away from dangerous people. *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).[28] Even the *amici* who believe that Daniels should prevail on his Second Amendment challenge suggest that the government *can* disarm the dangerous, even under *Bruen*'s history-and-tradition test.[29]

---

[28] *See also Folajtar v. Att'y Gen. of U.S.*, 980 F.3d 897, 913–15 (3d Cir. 2020) (Bibas, J., dissenting) (urging the same); *see generally* Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. (forthcoming 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317000 (collecting historical regulations).

[29] Brief of *Amicus Curiae* Scholars of Second Amendment Law and the Inde-

No. 22-60596

That said, no one piece of historical evidence suggests that when the Founders ratified the Second Amendment, they authorized Congress to disarm anyone it deemed dangerous. Instead, the government collects different statutes disarming discrete classes of persons at various points in history. Those laws suggest an abstract belief that an individual's right to bear arms could be curtailed if he was legitimately dangerous to the public.

The government's examples fall into two general buckets. *First*, states barred political dissidents from owning guns during periods of conflict. Many American states, for instance, disarmed those who failed to take an oath of allegiance during the Revolutionary War.[30] *Second*, both British and American governments disarmed religious minorities—especially Catholics.[31]

---

pendence Institute at 9 ("Dangerousness should be the key feature for firearms prohibitors, and a person whose conduct is never dangerous may not be disarmed."); Brief of *Amici Curiae* Firearms Policy Coalition and FPC Action Foundation at 30 ("The only historical justification for disarmament is dangerousness.").

[30] *See, e.g.*, Act of June 13, 1777, ch. 756, § 3, *reprinted in* 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 110, 112–13 (Wm. Stanley Ray ed., 1903) (allowing local law enforcement to freeze the assets and "disarm[]" those who did not take a loyalty oath); Act of May 1, 1776, ch. 21, *reprinted in* 5 THE ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF THE MASSACHUSETTS BAY 479, 479 (Boston, Wright & Potter Printing Co. 1886) (ordering those "notoriously disaffected to the cause of America" to be "disarmed" and their weapons given to the Continental Army); Act of June 1776, *reprinted in* 7 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS IN NEW ENGLAND 566, 567 (John Russell Bartlett ed., Providence, A. Crawford Greene 1862) (permitting county sheriffs to take the "arms, ammunition[,] and warlike stores" of those refusing to take loyalty oaths and transfer the weapons to the local militia).

[31] During the English Interregnum, Oliver Cromwell's government disarmed "all known Popish and dangerous or seditious persons." Council: Day's Proceedings (Feb. 15, 1654–55), *reprinted in* 8 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, 1655, at 42, 43–44 (Mary Anne Everett Green ed., London, Longmans & Co. et al. 1881). Several American states disarmed Catholics as well. *See, e.g.*, Act of March 25, 1756, ch. 4, *reprinted in* 7 STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619,

No. 22-60596

Each of those laws was generally based on concerns for the safety of the polity, but each disarmament also had its own unique political or social motivations. Almost all the laws disarming dissidents were passed during wartime or periods of unprecedented political turmoil. Indeed, Founding-era governments did not disarm Loyalists because they were thought to lack self-control; it was because both were viewed as potential threats to the integrity of the state.[32] The same was true of religious minorities—the perceived threat was as much political as it was religious.[33]

Independent of those class-based restrictions, the government relies

_____

at 9, 35-36 (William Waller Hening ed., Richmond, Franklin Press 1820) (disarming "Papists" because it was "dangerous at this time to permit [them] to be armed").

But disarmament was not limited to Catholics. The civil government disarmed fifty-eight supporters of John Wheelwright, a clergyman who was expelled from Massachusetts for his religious views around the same time as Anne Hutchinson. *See* James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 N. Eng. Q. 381, 391 (1988). Quakers and other pacifist sects were also perceived to be Tory sympathizers or traitors because they refused to support the American Revolution. Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51-52 (2006).

[32] Greenlee, *supra* note 288, at 42-43.

[33] *Id.* at 38-40. Although the government does not mention it, perhaps the most categorical firearm restrictions at the Founding were the discriminatory gun bans applicable to blacks and Indians. *See* Stephen P. Halbrook, *To Bear Arms for Self-Defense: A "Right of the People" or a Privilege of the Few?*, 21 Federalist Soc'y Rev. 46, 53 (2020); Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders, in* New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society (Joseph Blocher et al. eds., forthcoming) (manuscript at 4-5), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696. Americans feared that slaves, free blacks, and Indians would stage violent attacks or revolts. Greenlee, *supra* note 28, at 28, 31. Although those laws are also examples of danger-based disarmament, we need not build our history and tradition on repugnant laws that today would be struck down as unconstitutional. There are plenty of examples at the Founding of states' disarming citizens who were considered a violent threat to society.

No. 22-60596

heavily on the Militia Act of 1662, which allowed the Crown to disarm those whom he judged "dangerous to the Peace of the Kingdome." 14 Car. 2 c. 3, § 13 (1662). That is the most direct support for the government's principle that the legislature could prophylactically disarm any citizen who could potentially be dangerous.

But *Rahimi* held that the Militia Act was not incorporated into American law. After all, the Act was the justification for the widespread disarming of political opponents by Charles II and James II. *Rahimi*, 61 F.4th at 456. After the Glorious Revolution, the 1689 English Bill of Rights expanded the right to bear arms in order to curtail the Militia Act's reach and limit the Crown's "politically motivated disarmaments." *Id.* Our Second Amendment is a direct descendant of that latter guarantee. *Id.* (citing *Heller*, 554 U.S. at 593). If anything, our constitutional right to bear arms was purposefully broader than its English ancestor. *See* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 122–23 (Philadelphia, H.C. Carey & I. Lea 1825). Although some historians maintain that the Militia Act was still frequently used after the Glorious Revolution,[34] its limitations likely did not survive the categorical command of the Second Amendment. *See Rahimi*, 61 F.4th at 456.

Finally, the government posits that Congress can disarm dangerous citizens because the idea was discussed during the ratification of the Consti-

---

[34] *See* Patrick J. Charles, *"Arms For Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 CLEVE. STATE L. REV. 351, 376 (2009) (noting that "the 1662 Militia Act's seizure of arms provision was not only frequently used" after the English Bill of Rights, "but it was also supported by both Houses of Parliament"); *see also* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 405–06 (2019).

23

No. 22-60596

tution. Samuel Adams, for example, proposed an amendment at the Massachusetts ratifying convention that would have limited the right to bear arms to "peaceable citizens."[35] At the Pennsylvania ratifying convention, the dissenting minority suggested several constitutional amendments, including one that would have protected the right to bear arms "unless for crimes committed, or real danger of public injury from individuals."[36] *Heller* described the Pennsylvania proposal as an "influential" precursor to our Second Amendment, 554 U.S. at 604, as many of the Pennsylvania minority's suggestions ended up in our current Bill of Rights.[37]

Again, however, we must pause. The predecessors of the Second Amendment gave concrete language to possible limits on the right to bear arms. Yet that language was not adopted. Instead, the People ratified the unqualified directive: "shall not be infringed." U.S. Const. amend. II. Usually, when the relevant lawmaking body does not adopt language in a draft, we presume that the stricken language was not intended. *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting). Indeed, *Rahimi* also considered those Second Amendment precursors and concluded that the unadopted language could not supplant the Amendment's enacted text. *Rahimi*, 61 F.4th at 457.

That said, there is an undeniable throughline in all those historical sources: Founding-era governments took guns away from persons perceived to be dangerous. Even if the disarming of Loyalists and Catholics was limited

---

[35] Convention Journal (Feb. 6, 1788), *reprinted in* 6 The Documentary History of the Ratification of the Constitution 1452, 1453 (J. Kaminski et al. eds. 2000).

[36] The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents (1787), *reprinted in* 2 Documentary History of the Ratification, *supra* note 35, at 618, 624.

[37] *See* Address and Reasons of Dissent, *supra* note 36, at 623–24.

to exigent historical contexts, no party identifies "disputes regarding the lawfulness of such prohibitions" at the time. *Bruen*, 142 S. Ct. at 2133. Indeed, some states such as Pennsylvania disarmed dissident citizens while their state constitutions guaranteed a right to bear arms.[38] And even if the Founders repudiated the Militia Act and rejected the Second Amendment precursors, the language of those documents says something about the outer limit of the right to bear arms in the English tradition.

Perhaps the Second Amendment was meant to do away with all those restrictions of liberty, and we can chalk such restrictions up to reactionary excess during the birth of a nation. On the other hand, we cannot completely discount the sheer number of disarming statutes at the time of the Founding. Together, they suggest a public understanding that when a class of individuals was thought to pose a grave danger to public peace, it could be disarmed.

b.

Assuming the Second Amendment encodes some government power to disarm the dangerous, the question becomes: At what level of generality may we implement that principle? *Bruen* requires us to interrogate the historical record for "relevantly" similar regulations. It does not allow us to enforce unenacted policy goals lurking behind the Second Amendment.

Indeed, any ability to implement a "dangerousness principle" is fenced in by at least two strictures in the applicable caselaw. On the one hand, the legislature cannot have unchecked power to designate a group of persons as "dangerous" and thereby disarm them. Congress could claim that immigrants, the indigent, or the politically unpopular were presumptively "dangerous" and eliminate their Second Amendment rights without judicial

---

[38] *Compare* PA. CONST., Decl. of Rights, § XIII (1776), *with* Act of June 13, 1777, *supra* note 30.

No. 22-60596

review. That would have "no true limiting principle," *Rahimi*, 61 F.4th at 454, and would render the Second Amendment a dead letter.

On the other hand, we cannot inspect a legislature's judgment of dangerousness using traditional standards of scrutiny. *Bruen* forbids us from balancing a law's justifications against the burden it places on rightsholders. 142 S. Ct. at 2127, 2129. Imagine, for example, that a state legislature disarms all men, citing statistics that men commit more violent crimes than do women.[39] Before *Bruen*, we would have considered whether the evidence supporting male dangerousness was substantial enough—and whether the law was sufficiently tailored—to justify such a categorical restriction on gun rights. But *Bruen* forswears that kind of review. *Bruen*, 142 S. Ct. at 2129. Similarly, imagine that the government bars all convicted cybercriminals from owning guns, referencing the "dangerousness" of cybercrime. Cybercrime is assuredly dangerous, but in a different way than is violent crime. Applying a standard of scrutiny, we might have interrogated whether Congress had adequately demonstrated that someone who spreads ransomware or pirates television shows is likely to be dangerous with a firearm. Again, *Bruen* heads that analysis off at the pass. *Id.*[40]

How, then, do we square the post-*Bruen* circle? To remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead

---

[39] In 2012, approximately 80% of offenders arrested for violent crimes were men. *Crime in the United States 2012*, FED. BUREAU INVEST. (2012), https://ucr.fbi.gov/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/tables/42tabledatadecoverviewpdf/table_42_arrests_by_sex_2012.xls.

[40] Indeed, when then-Judge Barrett wrote in *Kanter* that danger-based disarmament was consistent with the original understanding of the Second Amendment, *Bruen* had not yet been decided. 919 F.3d at 451 (Barrett, J., dissenting). So she explicitly relied on means-end scrutiny to cabin the government's modern-day determinations that a particular group is too dangerous to possess guns. *Id.* at 465. But post-*Bruen*, that judicial check is no longer available to us. *Bruen*, 142 S. Ct. at 2129–30.

of a general notion of "dangerousness." The government must show that a historical danger-based disarmament is analogous to the challenged regulation.[41] We must use *Bruen*'s "why" and "how" analysis to assess whether the Founding-era restriction is relevantly similar to the modern one. We must ask: *Why* was the group considered dangerous at the Founding and therefore disarmed? And *why* does the modern law classify a person as presumptively dangerous? Is the comparison supported by the record? Furthermore, *how* did the historical regulation limit the rights of the dangerous class? And *how* does the modern regulation do so?[42]

c.

Applying *Bruen*'s framework to the proffered analogues, it follows that the government's theory of danger-based disarmament falls apart. The government identifies no class of persons at the Founding (or even at Reconstruction) who were "dangerous" for reasons comparable to marihuana users. Marihuana users are not a class of political traitors, as British Loyalists were perceived to be. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the Founding, Daniels is not like the minorities

---

[41] *Bruen*, 142 S. Ct. at 2133 n.7 ("[C]ourts may [not] engage in independent means-end scrutiny under the guise of an analogical inquiry. . . . Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, . . . not . . . revise that balance through means-end scrutiny.").

[42] The en banc Third Circuit recently followed that approach in *Range*, 69 F.4th at 104–05. Facing a challenge to § 922(g)(1), the felon-in-possession statute, the court acknowledged Founding-era evidence for disarming the dangerous. But it required the government to "analogize [historically disarmed] groups to [the defendant] and his individual circumstances." *Id.* "That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [a defendant] is part of a similar group today." *Id.* at 105. The Third Circuit ultimately held that § 922(g)(1) was unconstitutional as applied to a non-violent felon. *Id.* at 106.

No. 22-60596

who the Founders thought threatened violent revolt.

The government suggests that, in the spirit of the drafts of the Second Amendment and the Militia Act, marihuana users threaten the public "peace." But at the time of the Founding, that notion referred specifically to violence or rebellion, not generalized public harm.[43] And § 922(g)(3) is not limited to those with a history of violent behavior—not all members of the set of "drug users" are violent. As applied in this case, the government has not shown how Daniels's marihuana use predisposes him to armed conflict or that he has a history of drug-related violence.

Furthermore, even as the Founders were disarming Catholics and politically disaffected citizens, they left ordinary drunkards unregulated. The government has no meaningful response to the fact that neither Congress nor the states disarmed alcoholics, the group most closely analogous to marihuana users in the 18th and 19th centuries. As with the government's analogy to mental illness, we must ask: Which are marihuana users more like: British Loyalists during the Revolution? Or repeat alcohol users? The answer is surely the latter.

The government asks us to set aside the particulars of the historical record and defer to Congress's modern-day judgment that Daniels is presumptively dangerous because he smokes marihuana multiple times a month. But that is the kind of toothless rational basis review that *Bruen* proscribes. Absent a comparable regulatory tradition in either the 18th or 19th century,

---

[43] *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 266 (2020); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting). Indeed, to the extent the Militia Act is probative, it was primarily used to disarm religious minorities and "disaffected persons," neither of which is comparable to Daniels. *See* O'Scannlain, *supra* note 34, at 405–06. The Militia Act of 1661 had also permitted law enforcement to disarm and detain "Disturbers of the Peace," but that statute was similarly targeted at insurrectionists. *See* 13 Car. 2. c. 6, § 2.

No. 22-60596

§ 922(g)(3) fails constitutional muster under the Second Amendment.[44]

## III.

Daniels's § 922(g)(3) conviction is inconsistent with our "history and tradition" of gun regulation. *Bruen*, 142 S. Ct. at 2128. We conclude only by emphasizing the narrowness of that holding. We do not invalidate the statute in all its applications, but, importantly, only as applied to Daniels. Nor do we suggest that a robust Second Amendment is incompatible with other reasonable gun regulations.[45] Such statutes just need to be consonant with the limits the Founding generation understood to be permissible when they ratified the Second Amendment. The government has failed to demonstrate that here.

The judgment of conviction is therefore REVERSED, and a judgment dismissing the indictment is RENDERED.

---

[44] Irrespective of any historical analysis, the government also asks us to side with the many district courts around the country that have upheld § 922(g)(3) in the face of constitutional challenges. Of those, however, the vast majority relied reflexively on pre-*Bruen* caselaw or the same loose analogies that the government advances in this case. We decline to follow those decisions for the reasons detailed above. The district courts that have engaged carefully with the historical sources and the strictures of *Bruen* have found that § 922(g)(3) violates the Second Amendment. *See, e.g., United States v. Harrison*, No. CR-22-00328, 2023 WL 1771138, at *24–25 (W.D. Okla. Feb. 3, 2023); *United States v. Connelly*, No. EP-22-CR-229(2), 2023 WL 2806324, at *12 (W.D. Tex. Apr. 6, 2023).

[45] *Bruen*, 142 S. Ct. at 2133; *cf. Heller*, 554 U.S. at 635 (leaving open the constitutionality of further "regulations of the right").

No. 22-60596

STEPHEN A. HIGGINSON, *concurring*:

In the fifteen years since the Supreme Court first found in the Second Amendment an individual right to keep and bear arms to defend the home, *See District of Columbia v. Heller*, 554 U.S. 570, 595, 636 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) (incorporating this right against the states), historians and legal scholars have continued to question this interpretation,[1] while the nation has continued to look for constitutionally permissible safeguards against gun violence and gun-related death rates that outstrip those of almost every other country.[2]

---

[1] See, e.g., Richard A. Epstein, *A Structural Interpretation of the Second Amendment: Why Heller is (Probably) Wrong on Originalist Grounds*, 59 SYRACUSE L. REV. 171 (2008); Paul Finkelman, *It Really Was About a Well Regulated Militia*, 59 SYRACUSE L. REV. 267 (2008); Saul Cornell, *Heller, New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss,"* 56 UCLA L. REV. 1095 (2009); Patrick J. Charles, *The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing "Standard Model" Moving Forward*, 39 FORDHAM URB. L.J. 1727 (2012); Lee Epstein & David T. Konig, *The Strange Story of the Second Amendment in the Federal Courts, and Why It Matters*, 60 WASH. U. J.L. & POL'Y 147 (2019); Darrell A. H. Miller, Owning Heller, 30 U. FLA. J.L. & PUB. POL'Y 153 (2020).

[2] *See, e.g.,* Evan D. Gumas, Munira Z. Gunja & Reginald D. Williams II, *The Health Costs of Gun Violence: How the U.S. Compares to Other Countries*, THE COMMONWEALTH FUND (Apr. 20, 2023), https://www.commonwealthfund.org/publications/2023/apr/health-costs-gun-violence-how-us-compares-other-countries (noting that the death rate from firearms-related causes in 2019 was around five times greater in the U.S. (10.4 deaths per 100,000 people) than in the high-income countries with the second- (France, 2.2) and third-highest rates (Switzerland, 2.1)); Chris Gilligan, *U.S. Remains an Outlier in Firearm Possession, Gun-Related Deaths*, U.S. NEWS & WORLD REP. (Jan. 30, 2023, 3:42 p.m.), https://www.usnews.com/news/best-countries/articles/2023-01-30/how-the-u-s-compares-to-the-world-on-guns; *see also* John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, PEW RSCH. CTR. (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s (reporting that 48,830 people died from gun-related injuries in 2021, just over half of which were suicides); Stefanie Dazio & Larry Fenn, *Six Months. 28 Mass Killings in the US. That's the Worst Yet, and All But One Case Involved Guns*, AP NEWS

No. 22-60596

Faced with this expanded Second Amendment reach and the corresponding wave of legal challenges to gun safety regulations, lower courts eventually "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny."[3] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2125 (2022). In applying this framework, courts were attempting to balance *Heller*'s rejection, on originalist grounds, of the previously narrow focus on a militia interest in favor of an interest in self-defense, with *Heller*'s recognition that the Second Amendment contains limiting principles and exceptions. Specifically, *Heller* acknowledged that the Second Amendment does not curtail the legislative power to regulate and restrict the carrying of "dangerous and unusual weapons," 554 U.S. at 627, nor does it undermine "longstanding prohibitions" on the carrying of firearms in sensitive places or by certain persons, or "laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626-27.

Thus, even as the politics of gun safety remained hotly contested, the law had somewhat settled. And under this framework, courts generally

---

(July 13, 2023, 11:43 p.m.), https://apnews.com/article/mass-killings-record-gun-violence-0174103c37756fe4d247fd15cd3bc009; Kiara Alfonseca, *There Have Been More Mass Shootings Than Days in 2023, Database Shows*, ABC NEWS (May 8, 2023, 9:24 a.m.), https://abcnews.go.com/US/mass-shootings-days-2023-database-shows/story?id=96609874; John Gramlich, *Gun Deaths Among U.S. Children and Teens Rose 50% in Two Years*, PEW RSCH. CTR. (Apr. 6, 2023), https://www.pewresearch.org/short-reads/2023/04/06/gun-deaths-among-us-kids-rose-50-percent-in-two-years.

[3] Courts would first turn to text, history, and tradition to determine whether the challenged law or regulation burdens conduct protected by the Second Amendment, and then, if so, evaluate the law under a version of means-end scrutiny. *See* Mark Anthony Frassetto, *Judging History: How Judicial Discretion in Applying Originalist Methodology Affects the Outcome of Post-Heller Second Amendment Cases*, 29 WM. & MARY BILL RTS. J. 413, 418-19 (2020).

31

No. 22-60596

permitted Americans, through both state and federal elected officials, to enact, or opt not to enact, gun safety regulations to address the ongoing crisis of gun violence.[4]

Last year, however, the Supreme Court again revised Second Amendment doctrine in *Bruen*, declaring that this "two-step" approach, which combined attentiveness to history with a traditional judicial balancing test, was "one step too many." *Id.* at 2127. Now, the Court has written, if "the Second Amendment's plain text covers an individual's conduct," then a gun regulation is presumptively unlawful unless the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[5] *Id.* at 2126, 2129-30.

---

[4] This is not to say that courts disregarded *Heller* and *McDonald*, or otherwise relegated the Second Amendment to the status of a "second class" right. Indeed, some firearms restrictions were struck down, *see, e.g., Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (finding Illinois's ban on the carrying of ready-to-use weapons unconstitutional), and, although it is difficult to precisely calculate rates of gun ownership, *see* Jennifer Mascia, *How Many Guns Are Circulating in the U.S.?*, THE TRACE (Mar. 6, 2023), https://www.thetrace.org/2023/03/guns-america-data-atf-total, there are significantly more firearms in circulation today than ever before, and this expansion has primarily occurred post-*Heller, see* Daniel De Visé, *Americans Bought Almost 60 Million Guns During the Pandemic*, THE HILL (Apr. 21, 2023, 6:00 a.m.), https://thehill.com/policy/national-security/3960527-americans-bought-almost-60-million-guns-during-the-pandemic, (noting that FBI firearm background checks more than doubled from 2005 to 2015, and then skyrocketed further between 2015 and 2020).

[5] Although *Bruen* appears to contemplate a "one-step" test, courts have correctly perceived it to require a new two-step analysis wherein courts first determine whether the challenged regulation or statute implicates the Second Amendment and then, if so, analyze the relevant history and tradition to decide if such a restriction is justified. *See Range v. Att'y Gen. U.S.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) ("After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. If it does, the government now bears the burden of proof: it 'must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" (internal citations omitted)); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (describing *Bruen* as having adopted a "two-

No. 22-60596

Bound by this interpretative sequence, we hold today that 18 U.S.C. § 922(g)(3), a decades-old felony provision of our federal firearms law, is unconstitutional as applied to Mr. Daniels. Although our decision is limited in scope, it is hard for me to avoid the conclusion that most, if not all, applications of § 922(g)(3) will likewise be deficient.[6] It is also important to acknowledge that other gun safety laws, especially longstanding status-based prohibitions previously understood to be constitutionally unassailable, have been recently struck down by courts across the country as they attempt to faithfully implement *Bruen*.[7]

_____

part test"); *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("[W]hen the Second Amendment's 'plain text' covers the regulated conduct, the government has only one way to defend the regulation—by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.'" (quoting *Bruen*, 142 S. Ct. at 2126)).

[6] Reviewing our precedent, many offenders convicted under § 922(g)(3) were not intoxicated *when* they were found to possess or receive a firearm, but rather were generally users of a controlled substance. *See, e.g., United States v. Patterson*, 431 F.3d 832, 837 (5th Cir. 2005) (upholding the defendant's conviction where he admitted that he regularly used marijuana and where his urine sample tested positive for marijuana, which stays in the system of an occasional user for up to two weeks); *United States v. Edwards*, 182 F.3d 333, 335-36 (5th Cir. 1999) (rejecting the argument that the defendant's conduct did not constitute a violation of § 922(g)(3) because "he was not using drugs at the exact moment the police found him in possession of a firearm"); *cf. United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006) (finding that the defendant qualified as an "unlawful user" for the purposes of the Sentencing Guidelines because the evidence showed that he "followed a pattern of use over an extended period of time").

[7] In fact, there is already a circuit split on the constitutionality of § 922(g)(1), the federal felon-in-possession statute. *Compare Range*, 69 F.4th at 98 (holding § 922(g)(1) unconstitutional as applied), *with United States v. Jackson*, 69 F.4th 495, 501-02 (8th Cir. 2023) (upholding the constitutionality of § 922(g)(1) as applied and concluding that "there is no need for felony-by-felony litigation regarding the constitutionality" of that provision). Some courts, faced with *Bruen* challenges to multiple provisions of the federal criminal code, have upheld one provision while striking down another. *E.g., United States v. Price*, No. 22-cr-97, 635 F. Supp. 3d 455, 464, 467 (S.D.W. Va. Oct. 12, 2022) (finding 18 U.S.C. § 922(k), which makes it unlawful to possess a firearm with an obliterated serial number, unconstitutional while holding that § 922(g)(1) "accords with the Second Amendment").

No. 22-60596

To be clear, I fully concur in the majority's reasoning—albeit with the caveat that the Supreme Court has granted *certiorari* in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, No. 22-915, ___ S. Ct. ___, 2023 WL 4278450, at *1 (June 30, 2023)—as I believe that we have applied *Bruen* as well as possible in evaluating the constitutionality of § 922(g)(3). I write separately to highlight what has become increasingly apparent—that courts, operating in good faith, are struggling at every stage of the *Bruen* inquiry. Those struggles encompass numerous, often dispositive, difficult questions, including, but not limited to the following. First, who, and what conduct, is covered by the Second Amendment?[8] Second, how does the

---

Moreover, the effect of *Bruen* has been especially dramatic as to civil claims. *See* Jake Charles, *One Year of* Bruen*'s Reign: An Updated Empirical Analysis*, DUKE CTR. FOR FIREARMS LAW (July 7, 2023), https://firearmslaw.duke.edu/2023/07/one-year-of-bruens-reign-an-updated-empirical-analysis.

[8] For instance, courts are divided as to whether the Supreme Court's description of the right as one belonging to "law-abiding, responsible citizens," *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635), is meant to exclude certain categories of citizens, such as those convicted of a crime, from the protection of the Second Amendment. *See United States v. Jackson*, No. 22-cr-141, 2023 WL 2499856, at *7 (D. Md. Mar. 13, 2023) (collecting cases in which courts "rejected post-*Bruen* challenges to status-based gun laws on the ground that the restricted people are not law-abiding, responsible citizens to whom the Second Amendment applies"). *Compare* *United States v. Charles*, 633 F. Supp. 3d 874, 887-88 (W.D. Tex. 2022) (concluding that there is a historical basis for excluding felons under the Second Amendment), *and United States v. Hughes*, No. 22-cr-640, 2023 WL 4205226, at *5-8 (D.S.C. June 27, 2023) (discussing how several courts have concluded that "convicted felons have traditionally been excluded from the political community" and are therefore not part of "the people" protected by the Second Amendment), *with Range*, 69 F.4th at 103 ("[W]e reject the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment."). In other cases, the debate as to what constitutes a "bearable arm" covered by the Second Amendment has revitalized relevance. *See, e.g.*, Oral Argument at 1:10-2:10, *Bevis v. City of Naperville*, No. 23-1353, (7th Cir. June 29, 2023) (state and local defendants arguing that large-capacity magazines are not "arms" but "accessories that are not necessary to the operation of any firearm"); *see also Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *11-13 (D.R.I. Dec. 14, 2022) (finding at the preliminary-injunction stage that plaintiffs had not shown that large-capacity magazines are

No. 22-60596

Government demonstrate a regulatory "tradition"? This inquiry implicates
questions about how many states must have historically addressed an issue,
or how many laws must have been passed—or some combination of the
two[9]—for a historical practice to constitute a "tradition,"[10] *see Bruen*, 142 S.
Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show
a tradition of public-carry regulation."), as well as the related issue of
enforcement.[11] Third, what is the operative time period for such
regulations—1791 or 1868?—and to what extent does post-ratification

---

"arms" within the "textual meaning of the Second Amendment"); *Nat'l Assoc. for Gun
Rights v. Lamont*, No. 22-cv-1118, 2023 WL 4975979, at *26 (D. Conn. Aug. 3, 2023)
(concluding that plaintiffs had failed to carry their burden of showing that statutorily
defined assault weapons and large-capacity magazines are covered by the Second
Amendment).

[9] For example, is it enough if the historical record shows that one state had passed
and enforced numerous laws addressing a particular firearms issue, or must multiple states
have taken action on an issue? *See Bruen*, 142 S. Ct. at 2154 ("[W]e will not stake our
interpretation of the Second Amendment upon a law, in effect in a single State, or a single
city, 'that contradicts the overwhelming weight of other evidence regarding the right to
keep and bear arms' in public for self-defense." (quoting *Heller*, 554 U.S. at 632)).

[10] *See, e.g., Hardaway v. Nigrelli*, No. 22-cv-771, 2022 WL 16646220, at *14-17
(W.D.N.Y. Nov. 3, 2022) (discussing the necessary showing to establish a historical
tradition before finding plaintiffs were likely to prevail on their claim that New York's
"place of worship" ban on firearms possession violates the Second Amendment). *Compare
also United States v. Rowson*, No. 22-cr-310, 2023 WL 431037, at *19-24 (S.D.N.Y. Jan. 26,
2023) (finding § 922(n) consistent with this nation's historical tradition of firearms
regulations on the basis of colonial laws disarming groups of persons perceived as
dangerous and historical surety laws), *with United States v. Hicks*, 21-cr-60, 2023 WL
164170, at *3-7 (W.D. Tex. Jan. 9, 2023) (finding these same historical analogies to be
insufficient and holding § 922(n) to be unconstitutional).

[11] *See Bruen*, 142 S. Ct. at 2149 ("[R]espondents offer little evidence that
authorities ever enforced surety laws."); *see also United States v. Combs*, No. 22-cr-136,
2023 WL 1466614, at *12 (E.D. Ky. Feb. 2, 2023) (explaining that the *Bruen* plurality
rejected surety laws as a suitable historical analogue not because of a lack of evidence that
these laws were enforced, but because they did not impose a comparable burden on the
right).

practice count? *See id.* at 2162-63 (Barrett, J., concurring).[12] Fourth—but again, this list is not exhaustive—how are courts to differentiate between "general societal problem[s]" that have "persisted since the 18th century," and those that "implicat[e] unprecedented societal concerns or dramatic technological changes," *id.* at 2131-32, and, moreover, between "historical analogue[s]" as distinct from "historical twin[s]"? *Id.* at 2133.[13]

More foundationally, courts are laboring to give meaning to the *Bruen* requirement of "historical inquiry." Must the Government provide expert testimony to prevail, or could a district court independently seek such evidence?[14] And in the event such evidence is lacking in the record below,

---

[12] *See, e.g., Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322-23 (11th Cir. 2023) (holding that because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," for purposes of a challenge to a *state* law, "the right's contours" turn on the understanding of the right "when the Fourteenth Amendment was ratified" (internal quotation marks and citations omitted)), *re'hg granted, vacated*, 72 F.4th 1346 (July 14, 2023); *Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *10-12 (D. Minn. Mar. 31, 2023) (noting that *Bondi* is "difficult to square with the Supreme Court's emphasis on applying the Bill of Rights against the states and federal government according to the same standards" and suggesting that 1791 would be the operative time period for defining the scope of the right).

[13] *See, e.g., Alaniz*, 69 F.4th at 1129-30 (9th Cir. 2023) (describing "illegal drug trafficking" as "a largely modern crime" that is "not closely analogous to founding-era smuggling crimes" such that the Government's proposed analogues needed to be only "relevantly similar," in upholding the application of a sentencing enhancement pursuant to U.S.S.G. § 2D1.1(b)(1)"); *Range*, 69 F.4th at 120 (Krause, J., dissenting) (asserting that § 922(g)(1) implicates "unprecedented societal concerns" or dramatic technological changes" due to "the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel [which] were unknown at the Founding"); *see also Protecting Public Safety After* New York State Rifle & Pistol Association v. Bruen, *Hearing Before the Senate Comm. On the Judiciary*, 118th Cong. (Mar. 15, 2023) (written testimony of Eric Ruben, Assistant Professor of Law, SMU Dedman School of Law, at 9-12).

[14] *See Miller v. Bonta*, No. 19-cv-1537, Tr. of Proceedings at 9-10, ECF 162 (S.D. Cal., Dec. 12, 2022) (statement by the district court, at a hearing, that it does not have the staff nor the resources to create a historical survey of relevant laws and statutes in a timely

may courts of appeal collect their own history and make up for a party's earlier failing?[15] Going even further, should courts undertake discovery and evidentiary testing of historical evidence to perceive the existence of a sufficient regulatory tradition?[16] And, in making that conclusion, does the

---

fashion); *id.* Min. Entry, ECF 161 (Dec. 15, 2022) (ordering the state defendants to confer with the plaintiffs and to create a "survey or spreadsheet of relevant statutes, laws, or regulations in chronological order" that began at the time of the adoption of the Second Amendment and continued until twenty years past the adoption of the Fourteenth Amendment, and which contained specific directions as to the information that should be included); *see also United States v. Bullock*, No. 18-cr-165, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022) (ordering briefing as to whether the court should appoint a consulting historian to aid in evaluating the defendant's motion to dismiss his indictment under § 922(g)(1)); *United States v. Sims*, No. 22-cr-30081, 2023 WL 4461997, at *2 (C.D. Ill. July 11, 2023) (suggesting that both the government and the defendant "should freely cast a wider net and provide more detail about whatever history they rely on" and "freely employ the expert services of historians and historiographers" in briefing a motion to dismiss an indictment brought under § 922(g)(1) and § 922(d)) (internal quotation and citation omitted).

[15] Although the Supreme Court in *Heller*, *McDonald*, and *Bruen* received numerous unsolicited amici briefs from historians and other interested parties, as an inferior court, we rarely receive that amount of independent interest in our cases. Accordingly, in this case, we found it helpful to publish a court directive "invit[ing] briefs from amici curiae who wish to supply relevant information regarding the history and tradition of the issues presented in this case." *See also Alaniz*, 69 F.4th at 1129, n.2 (citing to a 113-page compilation of historical state firearms and weapons regulations which neither party had cited to in their briefing).

[16] *See, e.g., Atkinson v. Garland*, 70 F.4th 1018, 1022-24 (7th Cir. 2023) (remanding to the district court for a "proper, fulsome analysis of the historical tradition" and identifying specific questions to help focus that analysis as the district court's ruling occurred pre-*Bruen* and thus the parties had not yet developed that record); *Oregon Firearms Fed.'n v. Kotek*, Nos. 2:22-cv-01815, 22-cv-01859, 22-cv-01862, 22-cv-01869, 2023 WL 3687404, *5 (D. Or. May 26, 2023) (denying cross-motions for summary judgment, noting that "the threshold question of whether [the challenged restrictions] involve conduct covered by the plain text of the Second Amendment" is a disputed fact); *id.*, 2023 WL 4541027, at *3 (D. Or. July 14, 2023) (findings of fact and conclusions of law followed from a weeklong bench trial involving "testimony from twenty witnesses" and "more than 100 exhibits"). *Compare Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, at *6 (9th Cir. Aug. 7, 2023) (denying a request for a remand so that the district court, which

No. 22-60596

constitutionality of any given provision rise or fall with the strength of the historical record as to a specific case, or will rulings be treated as establishing a single historical truth?

The majority in *Bruen*, responding to unworkability concerns identified by the dissent and echoed by courts over the past year, may have intimated answers. Specifically, the majority insisted that, as in other legal disputes, "historical evidence" is predicated on our "adversarial system of adjudication," in which courts must "decide [the] case based on the historical record compiled by the parties." *Id.* at 2130, n.6. In my view, this suggests that *Bruen* requires that an evidentiary inquiry first be conducted in courts of original jurisdiction, subject to party presentation principles, aided by discovery and cross-examination and with authority to solicit expert opinion.[17]

In granting *certiorari* in *Rahimi*, the Supreme Court likely will resolve some of these questions. Of course, in the meantime, it is our job as an inferior court to apply the Supreme Court's mandates and aid the development of this field of law. But the uncertainty and upheaval resulting from best efforts to apply *Bruen* now extend far beyond our dockets. Myriad and obvious public safety laws, some over a century old, face inconsistent invalidation.

---

had issued its ruling pre-*Bruen*, could conduct further factual development on the basis that "the historical research required under *Bruen* involves issues of so-called 'legislative facts' . . . rather than 'adjudicative facts'" such that no additional inquiry from the district court was required).

[17] This reading of *Bruen* seems to me to be supported by the single authority cited in the majority's answer to the dissent, which frames its discussion of originalist methodology with reference to a title dispute in which the court was required to trace a chain of title, that is, develop and decide adjudicative facts, and where the court simply had to determine whether prior precedent had been overruled. William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & HIST. REV. 809, 809-10 (2019). Notably, in *Bruen*, the Supreme Court speaks of historical "evidence" over fifty times.

No. 22-60596

The impact of these challenges, outside of the evident yet indescribable tragedies of victims of gun violence, will fall heavily on states, which exercise most police power and must assure public safety. *See Teter v. Lopez*, No. 20-15948, 2023 WL 5008203 (9th Cir. Aug. 7, 2023) (striking down Hawaii's ban on butterfly knives as unconstitutional under *Bruen*). Already, as courts work through the impact of *Bruen*, defendants guilty of a gun crime in one jurisdiction are presently innocent of it in another.[18]

In attempting to navigate this new landscape, it is prudent to first return to the text of the Second Amendment, which states, in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Just as the doctrine corrected in *Heller* was held to have over-emphasized the first third of the text ("[a] self regulated Militia"), it is possible that inferior judicial officers such as myself are misinterpreting *Bruen* by pressing too much on the last ("the right . . . to keep and bear Arms"). It may be that the Supreme Court will remind us of the Second Amendment's middle, where the Framers stated explicitly that they were fashioning a right "necessary to the security of a free State." In this sense,

---

[18] Our holding today conflicts with decisions from district courts across the country upholding the constitutionality of § 922(g)(3). *See United States v. Seiwert*, No. 20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Posey*, No. 22-cr-83, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Randall*, No. 22-cr-99, 2023 WL 3171609 (S.D. Iowa Feb. 14, 2023); *United States v. Stennerson*, No. 22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Cleveland-McMichael*, No. 21-cr-119, 2023 WL 2613548 (D. Alaska Mar. 23, 2023); *United States v. Le*, No. 23-cr-14, 2023 WL 3016297 (S.D. Iowa Apr. 11, 2023); *United States v. Costianes*, No. 21-cr-0458, 2023 WL 3550972 (D. Md. May 18, 2023); *United States v. Hart*, No. 22-cr-114, 2023 WL 4144834 (W.D. Mo. June 6, 2023) (report and recommendation), *adopted by* 2023 WL 4141044 (W.D. Mo. June 22, 2023); *United States v. Ray*, No. 21-cr-57, 2023 WL 4378152 (W.D. Va. July 6, 2023); *United States v. Lewis*, No. 22-cr-222, 2023 WL 4604563 (S.D. Ala. July 18, 2023); *United States v. Beaty*, No. 22-cr-95, 2023 WL 4662247 (M.D. Fla. July 20, 2023).

No. 22-60596

unlike the textually unbounded pledges assuring freedom of speech and conscience, "the right of the people to keep and bear Arms" is less about the antithesis of liberty and control, and is more designed to assure "domestic Tranquility [and] . . . the general Welfare." U.S. Const. pmbl. Put another way, the Second Amendment is not only a right to have, but is especially a right to have to protect the state. That right to protect, as both *Heller, McDonald,* and *Bruen* affirmatively acknowledged, incorporates significant public safety exceptions.[19]

Importantly, the Supreme Court in *Bruen* saw itself as continuing with, rather than breaking from, *Heller,* which recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller,* 554 U.S. at 626. Thus, although in *dicta,* the *Heller* majority was confident that, though never conceived of by the Framers and hence never subject to public safety regulation, certain "dangerous and unusual weapons" could properly be banned. *Id.* at 624, 627. Similarly, the majority assured that "nothing in our opinion should be taken to cast doubt on" some of the most critical tools for combatting gun violence, including both people- and place-based restrictions. *Id.* at 626-27; *see also McDonald,* 561 U.S. at 786 (plurality) ("We repeat [*Heller's*] reassurances here."); *Bruen,* 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, CJ., concurring). These assurances are a recognition that the Second Amendment, explicitly and unlike the other original ten amendments in our Bill of Rights, ties to the "security" of our country. The Second Amendment assured a vigilant, armed citizenry and it did so for an explicit purpose, i.e. "being necessary to the security of a free

---

[19] Indeed, the *Bruen* majority was careful to emphasize that its opinion was not meant to "suggest the unconstitutionality" of all licensing regimes and specifically highlighted that "shall-issue" licensing regimes, "which often require applicants to undergo a background check or pass a firearms safety course," are unlikely to pose a constitutional problem. *Bruen,* 142 S. Ct. at 2138, n.9.

State....” To read the Second Amendment as providing an ever-expanding individual right, without limits, therefore, runs counter to both its text and the Framers' own understanding.

As should be evident, I am appreciative that the court that speaks the final word has agreed to provide more guidance on an issue of such national importance. I cannot help but fear that, absent some reconciliation of the Second Amendment's *several* values, any further reductionism of *Bruen* will mean systematic, albeit inconsistent, judicial dismantling of the laws that have served to protect our country for generations. Furthermore, such decisions will constrain the ability of our state and federal political branches to address gun violence across the country, which every day cuts short the lives of our citizens. This state of affairs will be nothing less than a Second Amendment caricature, a right turned inside out, against freedom and security in our State.