No.

# In the Supreme Court of the United States

UNITED STATES OF AMERICA, PETITIONER

*v.*

PATRICK DARNELL DANIELS, JR.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI**

ELIZABETH B. PRELOGAR
  *Solicitor General*
    *Counsel of Record*
NICOLE M. ARGENTIERI
  *Acting Assistant Attorney*
  *General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
VIVEK SURI
  *Assistant to the Solicitor*
  *General*
PAUL T. CRANE
  *Attorney*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTION PRESENTED

Whether 18 U.S.C. 922(g)(3), which prohibits the possession of firearms by a person who "is an unlawful user of or addicted to any controlled substance," *ibid.*, violates the Second Amendment.

(I)

**RELATED PROCEEDINGS**

United States District Court (S.D. Miss.):

    *United States* v. *Daniels*, No. 22-cr-58 (July 8, 2022)

United States Court of Appeals (5th Cir.):

    *United States* v. *Daniels*, No. 22-60596
      (Aug. 9, 2023)

(II)

# TABLE OF CONTENTS

Page

Opinions below .......................................................................... 1
Jurisdiction ............................................................................... 1
Constitutional and statutory provisions involved ..................... 2
Statement ................................................................................. 2
Reasons for granting the petition ............................................. 4
    A.  The court of appeals erred in holding Section
        922(g)(3) unconstitutional as applied to respondent ...... 5
        1.  Congress may disarm unlawful drug users
            because they are not law-abiding, responsible
            citizens .......................................................................... 6
        2.  The court of appeals' contrary analysis is
            flawed ............................................................................ 13
    B.  The decision below has significant practical
        consequences ............................................................... 18
    C.  This Court should hold this certiorari petition
        pending the resolution of *Rahimi* ............................... 19
Conclusion ............................................................................... 21
Appendix A — Court of appeals opinion (Aug. 9, 2023) ... 1a
Appendix B — District court memorandum opinion and
             order (July 8, 2022) ................................... 50a
Appendix C — Constitutional and statutory provisions ..... 61a

# TABLE OF AUTHORITIES

Cases:

    *Andrus* v. *Texas*, 140 S. Ct. 1875 (2020) ................................ 8
    *Bell* v. *Cone*, 535 U.S. 685 (2002) ........................................ 8
    *Buford* v. *United States*, 532 U.S. 59 (2001) ........................ 8
    *Dickerson* v. *New Banner Institute, Inc.*,
        460 U.S. 103 (1983) .............................................................. 12
    *District of Columbia* v. *Heller*,
        554 U.S. 570 (2008) ................................................. 3, 12, 17

(III)

IV

Cases—Continued:                                                 Page

*Florence* v. *Board of Chosen Freeholders,*
566 U.S. 318 (2012)................................................................ 7

*Harmelin* v. *Michigan,* 501 U.S. 957 (1991) ................... 7-10

*Iancu* v. *Brunetti,* 139 S. Ct. 2294 (2019) ............................ 19

*Johnson* v. *United States,* 576 U.S. 591 (2015).................. 10

*Kendall* v. *Ewert,* 259 U.S. 139 (1922) ................................ 16

*McDonald* v. *City of Chicago,* 561 U.S. 742 (2010) ........... 12

*Michigan* v. *Summers,* 452 U.S. 692 (1981) ......................... 9

*Muscarello* v. *United States,* 524 U.S. 125 (1998)............. 10

*NYSRPA* v. *Bruen,* 142 S. Ct. 2111 (2022) .......... 3, 9, 13, 14

*National Treasury Employees Union* v.
*Von Raab,* 489 U.S. 656 (1989) ......................................... 11

*Ramirez* v. *Collier,* 142 S. Ct. 1264 (2022) ........................... 8

*Range* v. *Attorney General United States,*
69 F.4th 96 (3d Cir. 2023)................................................... 20

*Rehaif* v. *United States,* 139 S. Ct. 2191 (2019) ................. 18

*Richards* v. *Wisconsin,* 520 U.S. 385 (1997)....................... 10

*Rosemond* v. *United States,* 572 U.S. 65 (2014) ................. 10

*Smith* v. *Texas,* 543 U.S. 37 (2004) ........................................ 8

*Smith* v. *United States,* 508 U.S. 223 (1993).................. 4, 10

*United States* v. *Augustin,* 376 F.3d 135
(3d Cir. 2004) ........................................................................ 5

*United States* v. *Bowens,* 938 F.3d 790
(6th Cir. 2019), cert. denied, 140 S. Ct. 814,
and 140 S. Ct. 2572 (2020) .................................................. 5

*United States* v. *Carter,* 750 F.3d 462 (4th Cir.),
cert. denied, 574 U.S. 907 (2014) .................................. 9, 10

*United States* v. *Cook,* 970 F.3d 866 (7th Cir. 2020) ........... 5

*United States* v. *Dugan,* 657 F.3d 998
(9th Cir. 2011)...................................................................... 10

*United States* v. *Marceau,* 554 F.3d 24 (1st Cir.),
cert. denied, 556 U.S. 1275 (2009) ...................................... 5

V

Cases—Continued:                                                Page

    *United States* v. *McCowan*, 469 F.3d 386
        (5th Cir. 2006)........................................................................5
    *United States* v. *Patterson*, 431 F.3d 832
        (5th Cir. 2005), cert. denied, 547 U.S. 1138 (2006)........... 10
    *United States* v. *Purdy*, 264 F.3d 809
        (9th Cir. 2001)........................................................................5
    *United States* v. *Rahimi*:
        61 F.4th 443 (5th Cir.), cert. granted,
            143 S. Ct. 2688 (2023) ................................................3
        143 S. Ct. 2688 (2023) ............................................. 4, 5, 21
    *United States* v. *Seay*, 620 F.3d 919
        (8th Cir. 2010), cert. denied, 562 U.S. 1191 (2011)........... 10
    *United States* v. *Skoien*, 614 F.3d 638
        (7th Cir. 2010), cert. denied, 562 U.S. 1303 (2011)..............6
    *United States* v. *Yancey*, 621 F.3d 681
        (7th Cir. 2010)........................................................ 9, 10, 12
    *Wong* v. *Belmontes*, 558 U.S. 15, (2009) ................................8

Constitution and statutes:

    U.S. Const.:
        Amend. II .....................................2, 4-6, 12-15, 19, 20, 61a
        Amend. IV ................................................................... 11
    Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 ....................... 16
    Controlled Substances Act, 21 U.S.C. 801 *et seq* ................. 6
        21 U.S.C. 802(6) ........................................................ 6, 61a
        21 U.S.C. 812(c), Schedule I(c)(10) .......................... 6, 62a
        21 U.S.C. 844(a) .............................................................. 6
    18 U.S.C. 922(g) .................................................... 12, 18, 20
    18 U.S.C. 922(g)(1).......................................................... 18, 20
    18 U.S.C. 922(g)(3)................................ 2-7, 11-15, 18, 21, 61a

VI

Statutes—Continued:                                                 Page

18 U.S.C. 922(g)(8).................................................... 19

Act of Apr. 12, 1827, § 1,
    1827 Mich. Terr. Laws 584-585 .......................... 16

Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237 ............ 16

Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of*
    *the State of California, from 1850 to 1864, inclusive*
    1076-1077 (Theodore H. Hitchell ed., 1865) ..................... 17

Act of Feb. 7, 1856, ch. 26, § 1,
    1855-1856 N.M. Terr. Laws 94 (1856)............................... 16

Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws,
    Vol. 1, at 431 ..................................................... 16

Act of Mar. 5, 1860, ch. 386, §§ 6-7,
    1860 Md. Laws 607-608 ......................................... 16

Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10............. 16

Act of Mar. 2, 1868, ch. 60, § 5, *in The General*
    *Statutes of the State of Kansas* 553
    (John M. Price et al. eds., 1868) ........................ 16

Act of Mar. 17, 1870, ch. 131, § 1,
    1870 Wis. Gen. Laws 197......................................... 16

Act of Apr. 1, 1870, ch. 426, § 2,
    1869-1870 Cal. Stat. 585-586 .................................. 16

Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local*
    *Laws and Joint Resolutions* 6 (1871)............................. 16

Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477 ...................... 16

Act of Mar. 28, 1872, ch. 996, §§ 10-11,
    1872 Ky. Acts, Vol. 2, at 523-524 ....................... 16

Act of Mar. 31, 1873, ch. 57, §§ 1, 3,
    1873 Miss. Laws 61-62......................................... 16

Act of July 25, 1874, ch. 113, § 1,
    1874 Conn. Pub. Acts 256..................................... 16

Act of Aug. 18, 1876, ch. 112, § 147,
    1876 Tex. Gen. Laws 188....................................... 16

VII

Statutes—Continued:                                        Page

Act of June 18, 1885, ch. 339, §§ 1-3,
   1885 Mass. Acts 790....................................................16
Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67.............16
Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116 ..........16
Ala. Code § 13A-11-72(b) .............................................11, 17
Ark. Code Ann.:
   § 5-73-309(7)(A)........................................................11
   § 5-73-309(8)(A)........................................................17
Ark. Rev. Stat., ch. 78, § 1, at 456 (William McK. Ball
   & Sam C. Roane eds., 1838)....................................16
Cal. Penal Code § 29800(a)(1)..........................................11
Colo. Rev. Stat. Ann.:
   § 18-12-203(1)(e) .......................................................17
   § 18-12-203(1)(f).......................................................11
Del. Code Ann. tit. 11, § 1448(a)(3) .....................................11
D.C. Code § 7-2502.03(a)(4)(A)..........................................11
Fla. Stat. Ann.:
   § 790.06(2)(e)-(f)........................................................11
   § 790.06(2)(f) .............................................................17
Ga. Code Ann.:
   § 16-11-129(b)(2)(I)-(J)...............................................11
   § 16-11-129(b)(2)(J) ...................................................17
Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803, at 358
   (R. H. Clark et al. eds., 1861)....................................16
10 Guam Code Ann.:
   § 60109.1(b)(5)-(6).....................................................11
   § 60109.1(b)(6)..........................................................17
Haw. Rev. Stat. § 134-7(c)(1)..........................................11, 17
Idaho Code Ann. § 18-3302(11)(e).......................................12
720 Ill. Comp. Stat. § 5/24-3.1(a)(3)....................................12
Ind. Code § 35-47-1-7(5).................................................12, 17

VIII

Statutes—Continued:                                    Page

    Kan. Stat. Ann.:
        § 21-6301(a)(10).................................................. 12
        § 21-6301(a)(13).................................................. 17
    Ky. Rev. Stat. Ann.:
        § 237.110(4)(d)................................................... 12
        § 237.110(4)(e)................................................... 17
    Md. Code Ann., Public Safety:
        § 5-133(b)(4) .................................................... 17
        § 5-133(b)(5) .................................................... 12
    Mass. Gen. Laws ch. 140, § 131(d)(iii)(A) ..................... 12, 17
    Minn. Stat. § 624.713(10)(iii).................................. 12
    Minn. Terr. Rev. Stat. ch. 67, § 12 (1851) ...................... 16
    Mo. Rev. Stat. § 571.070.1(2) .................................. 12, 17
    Nev. Rev. Stat. § 202.360.1(f) .................................. 12
    N.J. Stat. Ann. § 2C:58-3.c.(3) ................................. 12, 17
    N.Y. Penal Law § 400.00.1(e) .................................. 12
    N.C. Gen. Stat. § 14-415.12(b)(5)............................... 12, 17
    6 N. Mar. I. Code § 10610(a)(3) ............................... 12
    Ohio Rev. Code § 2923.13(A)(4)................................ 12, 17
    P.R. Laws Tit. 25, § 462a(a)(3) ................................ 12, 17
    R.I. Gen. Laws § 11-47-6....................................... 12
    S.C. Code Ann. § 16-23-30(A)(1) .............................. 12, 17
    S.D. Codified Laws § 23-7.7.1(3) .............................. 12, 17
    Utah Code Ann. § 76-10-503(1)(b)(iv) ......................... 12
    V.I. Code tit. 23, § 456a(a)(3) ................................. 12
    W. Va. Code:
        § 61-7-7(a)(2) ................................................. 17
        § 61-7-7(a)(3) ................................................. 12

IX

Miscellaneous:                                                              Page

1 William Blackstone, *Commentaries on the Laws of England* (1765)................................................................ 17

Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice:

Jennifer Bronson et al., *Special Report—Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009* (rev. Aug. 10, 2020) ............................................. 8, 10

*Drugs & Crime Data—Fact Sheet: Drug-Related Crime* (Sept. 1994)...................................................... 9

Edward Coke, *The First Part of the Institutes of the Lawes of England, or, A Commentarie upon Littleton* (1628)................................................................ 17

Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice:

*Federal Denials—Reasons Why the NICS Section Denies, November 30, 1998–August 31, 2023* ........................................................ 18

*National Instant Criminal Background Check System Operational Report 2020-2021* (Apr. 2022)................................................................ 18

H.R. Doc. No. 407, 89th Cong., 2d Sess. (1966) ................... 7

H.R. Rep. No. 1486, 89th Cong., 2d Sess. (1966)................. 8

National Academies of Sciences, Engineering, and Medicine, *The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research* (2017) ....................... 7, 9

Office of National Drug Control Policy, Executive Office of the President, *ADAM II—2013 Annual Report, Arrestee Drug Abuse Monitoring Program II* (2014) ............................................................. 10

X

Miscellaneous—Continued:                          Page

Carrie B. Oser et al., *The Drugs-Violence Nexus
  Among Rural Felony Probationers,*
  24 J. Interpersonal Violence 1285 (Aug. 2009) .................. 9

S. Rep. No. 1667, 89th Cong., 2d Sess. (1966)........................ 8

# In the Supreme Court of the United States

No.

UNITED STATES OF AMERICA, PETITIONER

*v.*

PATRICK DARNELL DANIELS, JR.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI**

The Solicitor General, on behalf of the United States, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fifth Circuit in this case.

**OPINIONS BELOW**

The opinion of the court of appeals (App., *infra*, 1a-50a) is reported at 77 F.4th 337. The memorandum opinion and order of the district court (App., *infra*, 51a-60a) is reported at 610 F. Supp. 3d 892.

**JURISDICTION**

The judgment of the court of appeals was entered on August 9, 2023. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

(1)

2

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are reproduced in the appendix. App., *infra*, 61a-62a.

## STATEMENT

1. In April 2022, law-enforcement officers stopped respondent Patrick Daniels for driving without a license plate. App., *infra*, 2a. An officer approached the car and recognized the smell of marijuana. *Ibid.* A search of the car uncovered several marijuana cigarette butts in an ashtray, a loaded pistol, and a loaded rifle. *Id.* at 2a-3a. Daniels admitted in an interview that he had used marijuana since high school and that he smoked marijuana "approximately fourteen days out of a month." *Id.* at 3a.

A federal grand jury in the Southern District of Mississippi indicted Daniels for possessing a firearm as an unlawful user of a controlled substance, in violation of 18 U.S.C. 922(g)(3). App., *infra*, 3a, 51a. The district court denied Daniels' motion to dismiss the indictment, rejecting his contention that Section 922(g)(3) violated the Second Amendment as applied to him. *Id.* at 51a-60a. The court observed that several courts had upheld Section 922(g)(3) under "standards of history and tradition," and it stated that it agreed with those courts' decisions. *Id.* at 58a; see *id.* at 56a-60a.

Daniels was convicted after a jury trial. Judgment 1. The district court sentenced him to 46 months of imprisonment, to be followed by three years of supervised release. Judgment 2-3.

2. The Fifth Circuit reversed. App., *infra*, 1a-50a. The court held that Section 922(g)(3) violated the Second Amendment "as applied to Daniels." *Id.* at 34a.

3

The court of appeals first determined that, because Daniels is among "'the people,'" he has "a presumptive right to bear arms." App., *infra*, 7a (citation omitted). The court acknowledged that, in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), and *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022), this Court described the right to possess arms as a right of "law-abiding, responsible citizens." App., *infra*, 8a (citation omitted). But the court attached little significance to what it described as "the Supreme Court's chosen epithet." *Ibid.* Instead, relying on its own decision in *United States* v. *Rahimi*, 61 F.4th 443 (5th Cir.), cert. granted, 143 S. Ct. 2688 (2023) (oral argument scheduled for Nov. 7, 2023), the court determined that Daniels presumptively had a right to possess arms regardless of whether he was a law-abiding, responsible citizen. App., *infra*, 8a-9a.

The court of appeals then concluded that Section 922(g)(3) is not "consistent with our tradition of gun regulation." App., *infra*, 9a. "Because there was little regulation of drugs" at the Founding, the court viewed "intoxication via alcohol" as the "next-closest comparator." *Id.* at 12a. The court asserted that, while some jurisdictions in the 19th century had prohibited "carrying weapons while under the influence, none barred gun possession by regular drinkers." *Id.* at 13a. The court concluded that history and tradition could at most support "a ban on gun possession while an individual is *presently* under the influence," not a ban on gun possession based on "a pattern of drug use." *Id.* at 20a.

The court of appeals rejected the government's reliance on "the tradition of disarming the mentally ill." App., *infra*, 20a. The court determined that such a tradition "could justify disarming a citizen only while he is in a state comparable to lunacy," and could not support

4

"disarming a sober citizen who is not currently under an impairing influence." *Id.* at 22a.

Finally, the court of appeals rejected the argument that Section 922(g)(3) complies with the Second Amendment because "Congress can limit gun possession by those 'dangerous' to public peace or safety." App., *infra*, 23a. The court stated that the government had identified "no class of persons at the Founding (or even at Reconstruction) who were 'dangerous' for reasons comparable to [drug] users." *Id.* at 32a.

Judge Higginson concurred. He stated that "courts, operating in good faith, are struggling at every stage of the *Bruen* inquiry." App., *infra*, 41a. He expressed hope that this Court would provide further guidance about how to apply *Bruen* in *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (2023) (No. 22-915) (oral argument scheduled for Nov. 7, 2023). App., *infra*, 47a.

## REASONS FOR GRANTING THE PETITION

"[D]rugs and guns are a dangerous combination." *Smith* v. *United States*, 508 U.S. 223, 240 (1993). The physiological effects of illegal drugs may impair drug users' ability to handle firearms safely. Drug users also often use firearms to commit crimes that fund their drug habit, to engage in violence in the course of drug deals, to endanger police officers who are investigating their drug crimes, and to commit suicide.

In Section 922(g)(3), Congress sought to address those problems by disarming regular drug users and drug addicts. That prohibition lasts only as long as a person remains a regular user or addict; an individual can regain his ability to possess firearms by stopping his illegal drug abuse. The Fifth Circuit, however, concluded that Section 922(g)(3) violates the Second Amendment. Although the court stated that it had in-

5

validated the statute only as applied to Daniels, the concurrence understood the court's reasoning to imply that "most, if not all, applications of § 922(g)(3) will likewise be deficient." App., *infra*, 39a-40a (Higginson, J., concurring).

That holding was profoundly mistaken. The Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens, and Section 922(g)(3) falls comfortably within that principle. This Court should not leave the court of appeals' contrary decision in place. But because the Court is already considering closely related Second Amendment issues in *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (2023) (No. 22-915) (oral argument scheduled for Nov. 7, 2023), plenary review is not warranted at this time. The Court should instead hold the petition for a writ of certiorari pending its decision in *Rahimi*, and then dispose of the petition as appropriate.

### A.  The Court Of Appeals Erred In Holding Section 922(g)(3) Unconstitutional As Applied To Respondent

Section 922(g)(3) makes it a crime for a person to possess a firearm if he "is an unlawful user" of "any controlled substance." 18 U.S.C. 922(g)(3). The courts of appeals that have considered the issue have uniformly agreed that the word "user" refers to someone who engages in the regular use of a controlled substance.[1] And a "controlled substance" is a drug or other substance

---

[1] See *United States* v. *Marceau*, 554 F.3d 24, 30 (1st Cir.), cert. denied, 556 U.S. 1275 (2009); *United States* v. *Augustin*, 376 F.3d 135, 138-139 (3d Cir. 2004); *United States* v. *McCowan*, 469 F.3d 386, 392 (5th Cir. 2006); *United States* v. *Bowens*, 938 F.3d 790, 793-794 (6th Cir. 2019), cert. denied, 140 S. Ct. 814, and 140 S. Ct. 2572 (2020); *United States* v. *Cook*, 970 F.3d 866, 874 (7th Cir. 2020); *United States* v. *Purdy*, 264 F.3d 809, 812 (9th Cir. 2001).

6

that is listed in one of the schedules of the Controlled Substances Act, 21 U.S.C. 801 *et seq.* See 18 U.S.C. 922(g)(3); 21 U.S.C. 802(6). Marijuana, the drug at issue here, is a controlled substance. See 21 U.S.C. 812(c), Schedule I(c)(10). Simple possession of marijuana is a misdemeanor, and possession after a previous conviction for a drug offense is a felony. See 21 U.S.C. 844(a). The Second Amendment allows Congress to disarm the unlawful drug users covered by Section 922(g)(3), including Daniels.

### 1. Congress may disarm unlawful drug users because they are not law-abiding, responsible citizens

a. The government's brief in *Rahimi* explains that the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens. See Gov't Br. at 10-27, *Rahimi, supra* (No. 22-915). That category includes persons whose possession of firearms would endanger themselves or others. See *id.* at 27. English law before the Founding allowed the disarmament of dangerous individuals; an influential Second Amendment precursor contemplated the disarmament of individuals who posed a "real danger of public injury"; 19th-century sources recognized legislatures' power to disarm individuals whose possession of arms would endanger the public; and American legislatures have been disarming such individuals since the 17th century. See *id.* at 27-28.

In exercising that power, Congress need not require case-by-case findings of dangerousness. Congress may make categorical judgments about responsibility; "[t]hat *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), cert. denied, 562 U.S. 1303 (2011). For example,

7

past legislatures enacted laws categorically disarming loyalists, see Gov't Br. at 22, *Rahimi, supra* (No. 22-915); minors, see *id.* at 24 & n.16; and vagrants, see *id.* at 25 & n.18—each time without requiring case-by-case findings of dangerousness or irresponsibility.

b. Section 922(g)(3) is consistent with that tradition of imposing categorical limits on the right to keep and bear arms. Armed drug users endanger society in multiple ways.

First, drug users may mishandle firearms—or use firearms to commit crimes—because of "drug-induced changes in physiological functions, cognitive ability, and mood." *Harmelin* v. *Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment); see *Florence* v. *Board of Chosen Free-holders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden [individuals] in aggression."). The effects of marijuana intoxication, for example, include an altered "perception of time," "decreased short-term memory," and "impaired perception and motor skills." National Academies of Sciences, Engineering, and Medicine, *The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research* 53 (2017) (*Health Effects*).

Second, illegal drug users often "commit crime in order to obtain money to buy drugs"—and thus pose a danger of using firearms to facilitate such crime. *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment). In the years before Section 922(g)(3)'s enactment, President Lyndon B. Johnson and both Houses of Congress recognized that drug use often motivates crime.[2] This Court's cases are

---

[2] See H.R. Doc. No. 407, 89th Cong., 2d Sess. 7 (1966) (presidential message) ("Drug addiction  * * *  drives its victims to commit

8

likewise replete with examples of crimes motivated by drug habits.[3]  And in one study, around 20% of state inmates—and nearly 40% of state inmates who were incarcerated for property crimes—stated that they committed their crimes in order to obtain drugs or money for drugs.  See Jennifer Bronson et al., Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Special Report—Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009*, at 6 (rev. Aug. 10, 2020) (*Drug Use*).

Third, "violent crime may occur as part of the drug business or culture." *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment).  That violence can involve not only drug dealers, but also their customers.  For example, violence may result from "disputes and ripoffs among individuals in-

---

untold crimes to secure the means to support their addiction."); H.R. Rep. No. 1486, 89th Cong., 2d Sess. 8 (1966) ("Narcotic addicts in their desperation to obtain drugs often turn to crime in order to obtain money to feed their addiction."); S. Rep. No. 1667, 89th Cong., 2d Sess. 13 (1966) (observing that drug users can be driven "to commit criminal acts in order to obtain money with which to purchase illegal drugs").

[3] See, *e.g.*, *Ramirez* v. *Collier*, 142 S. Ct. 1264, 1296 (2022) (Thomas, J., dissenting) ("the brutal slaying of a working father during a robbery spree to supply a drug habit"); *Andrus* v. *Texas*, 140 S. Ct. 1875, 1877 (2020) (per curiam) ("To fund a spiraling drug addiction, [she] turned to prostitution" and "began selling drugs."); *Wong* v. *Belmontes*, 558 U.S. 15, 15-16 (2009) (per curiam) ("bludgeoned [the victim] to death, * * * stole [her] stereo, sold it for $100, and used the money to buy beer and drugs"); *Smith* v. *Texas*, 543 U.S. 37, 41 (2004) (per curiam) ("regularly stole money from family members to support a drug addiction"); *Bell* v. *Cone*, 535 U.S. 685, 703 (2002) ("In an apparent effort to fund this growing drug habit, he committed robberies."); *Buford* v. *United States*, 532 U.S. 59, 62 (2001) ("robberies had been motivated by her drug addiction").

9

volved in the illegal drug market." Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Drugs & Crime Data—Fact Sheet: Drug-Related Crime* 3 (Sept. 1994); see, *e.g.*, Carrie B. Oser et al., *The Drugs-Violence Nexus Among Rural Felony Probationers*, 24 J. Interpersonal Violence 1285, 1288 (Aug. 2009) ("A drug deal gone wrong may frequently progress to victimization and violence."). Guns increase both the likelihood and the lethality of such drug violence.

Fourth, armed drug users endanger the police. "[D]ue to the illegal nature of their activities, drug users and addicts would be more likely than other citizens to have hostile run-ins with law enforcement officers," and such encounters "threaten the safety" of the officers "when guns are involved." *United States* v. *Carter*, 750 F.3d 462, 469 (4th Cir.) (citation omitted), cert. denied, 574 U.S. 907 (2014); see *Michigan* v. *Summers*, 452 U.S. 692, 702 (1981) ("[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence.").

Fifth, armed drug users endanger themselves. Most gun deaths in the United States result from suicide, not homicide. See *NYSRPA* v. *Bruen*, 142 S. Ct. 2111, 2164 (2022) (Breyer, J., dissenting) (noting that 61% of gun deaths are suicides and 37% are homicides). And drug users, including marijuana users, pose a higher risk of suicide than ordinary citizens. See *Health Effects* 311.

c. "Studies bear out these possibilities." *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment); see *United States* v. *Yancey*, 621 F.3d 681, 686 (7th Cir. 2010) (per curiam) ("Ample academic evidence confirms the connection between drug use and violent crime."). In one study, "over

10

60 percent of adult male arrestees * * * tested positive for some drug in their system at the time of arrest," and "a large portion of those arrestees tested positive for marijuana." Office of National Drug Control Policy, Executive Office of the President, *ADAM II—2013 Annual Report, Arrestee Drug Abuse Monitoring Program II*, at 38 (Jan. 2014). In another, 42% of state prisoners stated that they were drug users at the time of their crimes. *Drug Use* 6.

Judicial decisions, too, acknowledge the dangers posed by armed drug users. Many of this Court's decisions describe "drugs and guns" as a "dangerous combination."[4] And multiple courts of appeals have recognized that drug users are likelier than ordinary citizens to misuse firearms.[5]

---

[4] *Rosemond* v. *United States*, 572 U.S. 65, 75 (2014) (citation omitted); see *Muscarello* v. *United States*, 524 U.S. 125, 132 (1998); *Smith*, 508 U.S. at 240; see also *Johnson* v. *United States*, 576 U.S. 591, 642 (2015) (Alito, J., dissenting) ("Drugs and guns are never a safe combination."); *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment) ("[There is a] direct nexus between illegal drugs and crimes of violence."); *Richards* v. *Wisconsin*, 520 U.S. 385, 391 n.2 (1997) ("This Court has encountered before the links between drugs and violence.").

[5] See *Carter*, 750 F.3d at 470 (4th Cir.) ("[D]rug use, including marijuana use, frequently coincides with violence."); *United States* v. *Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("[U]nlawful users of controlled substances pose a risk to society if permitted to bear arms."), cert. denied, 547 U.S. 1138 (2006); *Yancey*, 621 F.3d at 685 (7th Cir.) ("[H]abitual drug abusers * * * are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."); *United States* v. *Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("[I]n passing § 922(g)(3), Congress expressed its intention to 'keep firearms out of the possession of drug abusers, a dangerous class of individuals.'") (citation omitted), cert. denied, 562 U.S. 1191 (2011); *United States* v. *Dugan*, 657 F.3d 998, 999 (9th

11

In particular, this Court's decision in *National Treasury Employees Union* v. *Von Raab*, 489 U.S. 656 (1989), supports Section 922(g)(3)'s constitutionality. That case involved a claim that suspicionless drug testing as a condition of promotion to certain federal jobs violated the Fourth Amendment. *Id.* at 659-663. The Court upheld the drug-testing requirement as applied to those who sought jobs that required them to carry firearms. See *id.* at 664. The Court emphasized "the extraordinary safety * * * hazards that would attend the promotion of drug users to positions that require the carrying of firearms." *Id.* at 674.[6] Similar hazards justify Section 922(g)(3).

Congress was not alone in disarming drug users and drug addicts. At least 32 States and territories have adopted similar laws.[7] That legislative consensus con-

---

Cir. 2011) ("[W]e see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so.").

[6] See, *e.g.*, *Treasury Employees*, 489 U.S. at 670 ("The public interest * * * demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm."); *ibid.* ("[E]ven a momentary lapse in attention [by an employee carrying a firearm] can have disastrous consequences."); *id.* at 671 ("[T]he public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force."); *id.* at 679 ("The Government's compelling interests in preventing the promotion of drug users to positions where they might endanger * * * the life of the citizenry outweigh the privacy interests of those who seek promotion to these positions.").

[7] See Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(7)(A); Cal. Penal Code § 29800(a)(1); Colo. Rev. Stat. Ann. § 18-12-203(1)(f); Del. Code Ann. tit. 11, § 1448(a)(3); D.C. Code § 7-2502.03(a)(4)(A); Fla. Stat. Ann. § 790.06(2)(e)-(f); Ga. Code Ann. § 16-11-129(b)(2)(I)-(J); 10 Guam Code Ann. § 60109.1(b)(5)-(6); Haw. Rev. Stat. § 134-

12

firms that drug users are not, in fact, among the law-abiding, responsible citizens protected from disarmament by the Second Amendment. It also distinguishes Section 922(g)(3) from the outlier gun laws found unconstitutional in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), and *Bruen*. See Gov't Br. at 34-36, *Rahimi*, *supra* (No. 22-915).

d. Finally, Section 922(g)(3) disarms a person only if he "*is* an unlawful user of or addicted to any controlled substance." 18 U.S.C. 922(g)(3) (emphasis added); see *Dickerson* v. *New Banner Institute, Inc.*, 460 U.S. 103, 116 (1983) (discussing the significance of the verb tenses in Section 922(g)). The disqualification thus applies "only so long as [a person] abuses drugs"; a user can "regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686-687. That limit makes Section 922(g)(3)'s constitutionality particularly clear. The Second Amendment protects the right to possess arms, but it does not entitle anyone "to simultaneously choose both gun possession and drug abuse." *Id.* at 687.

---

7(c)(1); Idaho Code Ann. § 18-3302(11)(e); 720 Ill. Comp. Stat. § 5/24-3.1(a)(3); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(10); Ky. Rev. Stat. Ann. § 237.110(4)(d); Md. Code Ann., Public Safety § 5-133(b)(5); Mass. Gen. Laws ch. 140, § 131(d)(iii)(A); Minn. Stat. § 624.713(10)(iii); Mo. Rev. Stat. § 571.070.1(2); Nev. Rev. Stat. § 202.360.1(f); N.J. Stat. Ann. § 2C:58-3.c.(3); N.Y. Penal Law § 400.00.1(e); N.C. Gen. Stat. § 14-415.12(b)(5); 6 N. Mar. I. Code § 10610(a)(3); Ohio Rev. Code § 2923.13(A)(4); P.R. Laws Tit. 25, § 462a(a)(3); R.I. Gen. Laws § 11-47-6; S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7.7.1(3); Utah Code Ann. § 76-10-503(1)(b)(iv); V.I. Code tit. 23, § 456a(a)(3); W. Va. Code § 61-7-7(a)(3).

13

### 2. *The court of appeals' contrary analysis is flawed*

a. The court of appeals reasoned that "a general notion of 'dangerousness'" could not justify Section 922(g)(3). App., *infra*, 31a. The court instead required the government to show that Section 922(g)(3) is comparable to a "particular" "historical danger-based disarmament"—*i.e.*, to identify a "class of persons at the Founding * * * who were 'dangerous' for reasons comparable to [drug] users." *Id.* at 31a-32a. That analysis is unsound on multiple levels.

As an initial matter, the court of appeals erred in reducing the inquiry into the Second Amendment's original meaning to a search for a specific historical analogue. The test set forth in this Court's cases "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. That inquiry into original meaning "will often involve reasoning by analogy" to historical statutes, but it need not always do so. *Id.* at 2132. The government has provided extensive evidence apart from historical statutes —for example, parliamentary and congressional debates, precursors to the Second Amendment, treatises, and commentaries—showing that the Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens. See Gov't Br. at 13-22, *Rahimi*, *supra* (No. 22-915). That body of historical evidence establishes that Section 922(g)(3) complies with the Second Amendment regardless of whether the statute mirrors a "particular" "historical danger-based disarmament." App., *infra*, 31a.

Moreover, even when the government defends a modern law by invoking historical statutes, it need only cite a "historical *analogue*, not a historical *twin*."

14

*Bruen*, 142 S. Ct. at 2133. In judging whether a modern law is "analogous enough" to "historical precursors" to "pass constitutional muster," a court should ask whether the laws "impose a comparable burden" and are "comparably justified." *Ibid.* The government has identified many historical laws that impose the same type of burden as Section 922(g)(3) (disqualifying someone from possessing arms) for the same type of reason (the person is not responsible enough to be trusted with arms). See Gov't Br. at 22-27, *Rahimi, supra* (No. 22-915). To demand a closer match is effectively to demand a historical twin.

The court of appeals' approach is especially inapt because Section 922(g)(3) addresses "novel modern conditions." *Bruen*, 142 S. Ct. at 2134 (citation omitted). As the Fifth Circuit itself acknowledged, the Founding generation was "not familiar" with modern drugs and thus "had no occasion to consider" whether to disarm illegal drug users. App., *infra*, 10a. Because this case "implicate[s] unprecedented societal concerns," it requires "a more nuanced approach" than that applied by the court of appeals. *Bruen*, 142 S. Ct. at 2132.

b. The court of appeals acknowledged that "history and tradition may support some limits on an intoxicated person's right to carry a weapon." App., *infra*, 2a. More specifically, it stated that the tradition of prohibiting gun possession by persons intoxicated with alcohol and by persons with mental illnesses could support laws disarming drug users who are "currently under an impairing influence." *Id.* at 22a. The court concluded, however, that the Second Amendment does not permit disarming a drug user "between periods" of drug intoxication. *Id.* at 23a. That, too, is incorrect.

15

The danger to society posed by an armed drug user extends beyond the risk that he will mishandle firearms while under the influence of the drug. As explained above, drug users use firearms to commit crimes that fund their drug habit, to engage in violence as part of the drug business or culture, to attack police officers who are investigating their drug crimes, and to commit suicide. See pp. 7-9, *supra*. Those risks justify disarming drug users even "between periods" of drug intoxication. App., *infra*, 23a.

Even if a court considers only the risk that a person will misuse firearms while under the influence of drugs, Section 922(g)(3) would still comply with the Second Amendment. Drug users who possess firearms are apt to retain possession while under the influence. They are unlikely to put their guns away before using drugs and to retrieve them only after regaining sobriety. In this case, for example, the law-enforcement officers who found Daniels in possession of two firearms also detected the smell of marijuana in his car and saw marijuana cigarette butts in his ashtray. App., *infra*, 2a-3a. Although the government did not "administer a drug test," *id.* at 3a, the facts strongly suggest that Daniels possessed firearms while under the influence of drugs—vindicating Congress's judgment that persons such as Daniels cannot be trusted to carry arms responsibly in the first place.

The analogy between drug use and alcohol use does not support the court of appeals' contrary decision. Drinking was legal at the Founding and thus did not pose the same types of dangers as the use of illegal drugs does today. States, in any event, have long done more than ban gun possession while drunk. In the 19th century, many States enacted statutes allowing "habit-

16

ual drunkards" to be committed to asylums or placed under guardians in the same manner as "'lunatics.'" *Kendall* v. *Ewert*, 259 U.S. 139, 146 (1922) (citation omitted).[8]  The Fifth Circuit recognized that, because "'lunatics'" "could be wholly deprived of their liberty and property, the government could necessarily take away their firearms," App., *infra*, 21a, but the same is true of "drunkards."  In addition, at least one State in the mid-19th century specifically disarmed "common

---

[8] See, *e.g.*, Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (District of Columbia); Ark. Rev. Stat., ch. 78, § 1, at 456 (William McK. Ball & Sam C. Roane eds., 1838); Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586; Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256; Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803, at 358 (R. H. Clark et al. eds., 1861); Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477; Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67; Act of Mar. 2, 1868, ch. 60, § 5, *in The General Statutes of the State of Kansas* 553 (John M. Price et al. eds., 1868); Act of Mar. 28, 1872, ch. 996, §§ 10-11, 1872 Ky. Acts, Vol. 2, at 523-524; Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116; Act of Mar. 5, 1860, ch. 386, §§ 6-7, 1860 Md. Laws 607-608; Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790; Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585; Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851); Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61-62; Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237; Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 94 (1856); Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1, at 431; Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local Laws and Joint Resolutions* 6 (1871); Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10; Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188; Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197.

17

drunkards,"[9] and many States and territories today prohibit firearm possession by alcoholics.[10]

Nor does the analogy between drug use and mental illness support the court of appeals' decision. It has long been understood that a person with a mental illness does not necessarily exhibit symptoms all the time. Blackstone thus defined a "lunatic" as "one that hath lucid intervals; sometimes enjoying his senses, and sometimes not." 1 William Blackstone, *Commentaries on the Laws of England* 294 (1765). And Coke defined a "[l]unatique" as a person "that hath sometime his understanding, and sometime not." Edward Coke, *The First Part of the Institutes of the Lawes of England, or, A Commentarie upon Littleton* § 405, at 247 (1628). This Court has nonetheless approved "longstanding prohibitions on the possession of firearms by * * * the mentally ill"; it has never suggested that the validity of such laws fluctuates with the remission and relapse of a person's symptoms. *Heller*, 554 U.S. at 626. Just as Congress may disarm persons with mental illnesses

---

[9] See Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

[10] See Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(8)(A); Colo. Rev. Stat. Ann. § 18-12-203(1)(e); Fla. Stat. Ann. § 790.06(2)(f); Ga. Code Ann. § 16-11-129(b)(2)(J); 10 Guam Code Ann. § 60109.1(b)(6); Haw. Rev. Stat. § 134-7(c)(1); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(13); Ky. Rev. Stat. Ann. § 237.110(4)(e); Md. Code Ann., Public Safety § 5-133(b)(4); Mass. Gen. Laws ch. 140, § 131(d)(iii)(A); Mo. Rev. Stat. § 571.070.1(2); N.J. Stat. Ann. § 2C:58-3.c.(3); N.C. Gen. Stat. § 14-415.12(b)(5); Ohio Rev. Code § 2923.13(A)(4); P.R. Laws Tit. 25, § 462a(a)(3); S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7.7.1(3); W. Va. Code § 61-7-7(a)(2).

18

even during their lucid intervals, it may disarm drug users even during their sober intervals.

## B. The Decision Below Has Significant Practical Consequences

The court of appeals' decision has significant practical consequences. Section 922(g) "is no minor provision." *Rehaif* v. *United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting). It "probably does more to combat gun violence than any other federal law." *Ibid.* And Section 922(g)(3) is one of the most frequently applied of Section 922(g)'s disqualifications. Since the creation of the federal background-check system in 1998, it has resulted in more than 217,000 denials of firearms transactions. See Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *Federal Denials—Reasons Why the NICS Section Denies, November 30, 1998 – September 30, 2023*. In 2021, the most recent year for which statistics are available, Section 922(g)(3) resulted in more than 15,000 denials—more than any other provision apart from Section 922(g)(1), which disarms convicted felons. See Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System Operational Report 2020-2021*, at 19 (Apr. 2022).

Although the court of appeals held Section 922(g)(3) invalid "only as applied to Daniels," App., *infra*, 34a, its analysis did not turn on any distinctive characteristics of Daniels's conduct. The full scope of the court's holding remains unclear, but the concurrence found it "hard" to "avoid the conclusion that most, if not all, applications of § 922(g)(3) will likewise be deficient" under the court's reasoning. *Id.* at 39a-40a (Higginson, J., concurring).

19

**C. This Court Should Hold This Certiorari Petition Pending The Resolution Of *Rahimi***

The decision below, which held an important Act of Congress unconstitutional, would ordinarily warrant this Court's review. See, *e.g.*, *Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2298 (2019) (noting that this Court's "usual" approach is to grant review "when a lower court has invalidated a federal statute"). But the Court has already granted review in *Rahimi* to decide the constitutionality of 18 U.S.C. 922(g)(8), the statute that disarms individuals who are subject to domestic-violence protective orders. See Pet. at I, *Rahimi*, *supra* (No. 22-915). The Court should therefore hold this petition for a writ of certiorari until it decides *Rahimi*. Once *Rahimi* is resolved, the Court could determine how best to dispose of this petition and other petitions raising related issues that are filed while *Rahimi* is pending.

That course is appropriate because *Rahimi* and this case substantially overlap. Both cases concern Congress's authority to prohibit a category of individuals from possessing firearms. In each case, the government argues that the Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens. In each, the government relies on statements in *Heller*, *McDonald*, and *Bruen* that the right to keep and bear arms belongs to law-abiding, responsible citizens; on Second Amendment precursors that express a similar understanding; and on 19th-century laws prohibiting unfit persons from possessing arms. See pp. 6-7, *supra*; Gov't Br. at 10-27, *Rahimi*, *supra* (No. 22-915). Each case also raises similar methodological questions about how to apply the historical test set forth in *Bruen*.

20

The court of appeals' opinion and Judge Higginson's concurrence confirm the overlap between *Rahimi* and this case. The court repeatedly relied on its previous decision in *Rahimi*—in rejecting the argument that the Second Amendment protects only law-abiding, responsible citizens, see App., *infra*, 8a-9a; in identifying the type of historical evidence that the government must produce in order to establish a gun regulation's constitutionality, see *id.* at 12a, 30a; in rejecting reliance on the English tradition of disarming dangerous individuals, see *id.* at 27a-28a; and in rejecting reliance on precursors to the Second Amendment, see *id.* at 29a. Judge Higginson concurred in the court's analysis "with the caveat that [this] Court has granted certiorari in [*Rahimi*]." *Id.* at 41a (emphasis omitted). He also considered it "likely" that this Court's decision in *Rahimi* "will resolve some of [the methodological] questions" raised by this case. *Id.* at 47a.

This Court should also hold this petition because it will receive multiple petitions this Term concerning the constitutionality of status-based disqualifications in Section 922(g). On the same day that the government is filing this petition, it is also filing a petition in a case in which the Third Circuit invalidated 18 U.S.C. 922(g)(1), the provision disarming convicted felons. See *Range* v. *Attorney General United States*, 69 F.4th 96 (2023) (en banc). Petitions concerning other status-based disqualifications could also come before this Court. Holding such petitions for *Rahimi* would be more efficient than granting multiple overlapping petitions over the course of the Term.

For all those reasons, this Court should hold this petition for *Rahimi*. After deciding *Rahimi*, the Court should either (1) grant this petition, vacate the court of

21

appeals' judgment, and remand the case for reconsideration in light of *Rahimi* or (2) grant plenary review in this case or in another case that provides an appropriate vehicle for resolving Section 922(g)(3)'s constitutionality.

## CONCLUSION

This Court should hold the petition for a writ of certiorari pending the disposition of *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (2023) (No. 22-915) (oral argument scheduled for Nov. 7, 2023), and then dispose of the petition as appropriate.

Respectfully submitted.

ELIZABETH B. PRELOGAR
  *Solicitor General*
NICOLE M. ARGENTIERI
  *Acting Assistant Attorney
  General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
VIVEK SURI
  *Assistant to the Solicitor
  General*
PAUL T. CRANE
  *Attorney*

OCTOBER 2023

# APPENDIX

## TABLE OF CONTENTS

Page

Appendix A — Court of appeals opinion
(Aug. 9, 2023) ............................................. 1a
Appendix B — District court memorandum opinion and
order denying defendant's motion
to dismiss (July 8, 2022) ........................ 50a
Appendix C — Constitutional and statutory provisions:
U.S. Const. Amend. II ........................... 61a
18 U.S.C. 922(g)(3) ................................ 61a
21 U.S.C. 802(6) ..................................... 61a
21 U.S.C. 812(c), Schedule I(c)(10) ...... 62a

## APPENDIX A

### UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

———————

No. 22-60596

UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE

*v.*

PATRICK DARNELL DANIELS, JR.,
DEFENDANT-APPELLANT

———————

[Filed:   Aug. 9, 2023]

———————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:22-CR-58-1

———————

Before SMITH, HIGGINSON, and WILLETT, *Circuit Judges.*

JERRY E. SMITH, *Circuit Judge*:

Title 18 U.S.C. § 922(g)(3) bars an individual from possessing a fire-arm if he is an "unlawful user" of a controlled substance. Patrick Daniels is one such "unlawful user"—he admitted to smoking marihuana multiple days per month.   But the government presented no evidence that he was intoxicated at the time of arrest, nor did it identify when he last had used marihuana.   Still, based on his confession to regular usage, a jury convicted Daniels of violating § 922(g)(3).

(1a)

2a

The question is whether Daniels's conviction violates his right to bear arms.   The answer depends on whether § 922(g)(3) is consistent with our nation's "historical tradition of firearm regulation."   *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022).   It is a close and deeply challenging question.

Throughout American history, laws have regulated the combination of guns and intoxicating substances. But at no point in the 18th or 19th century did the government disarm individuals who used drugs or alcohol at one time from possessing guns at another.   A few states banned carrying a weapon while actively under the influence, but those statutes did not emerge until well after the Civil War.   Section 922(g)(3)—the first federal law of its kind—was not enacted until 1968, nearly two centuries after the Second Amendment was adopted.

In short, our history and tradition may support some limits on an intoxicated person's right to carry a weapon, but it does not justify disarming a sober citizen based exclusively on his past drug usage.   Nor do more generalized traditions of disarming dangerous persons support this restriction on nonviolent drug users.   As applied to Daniels, then, § 922(g)(3) violates the Second Amendment.   We reverse the judgment of conviction and render a dismissal of the indictment.

I.

In April 2022, two law enforcement officers pulled Daniels over for driving without a license plate.   One of the officers—an agent with the Drug Enforcement Administration ("DEA")—approached the vehicle and recognized the smell of marihuana.   He searched the cabin and found several marihuana cigarette butts in the ash-

3a

tray.   In addition to the drugs, the officers found two loaded firearms:   a 9mm pistol and a semi-automatic rifle.   Daniels was taken into custody and transported to the local DEA office.

At no point that night did the DEA administer a drug test or ask Daniels whether he was under the influence; nor did the officers note or testify that he appeared intoxicated.   But after Daniels was Mirandized at the station, he admitted that he had smoked marihuana since high school and was still a regular user.   When asked how often he smoked, he confirmed he used marihuana "approximately fourteen days out of a month."

Based on his admission, Daniels was charged with violating 18 U.S.C. § 922(g)(3), which makes it illegal for any person "who is an unlawful user of or addicted to any controlled substance   .  .  .   to   .  .  .   possess .  .  .   any firearm."   An "unlawful user" is someone who uses illegal drugs regularly and in some temporal proximity to the gun possession.   *See United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006).

While Daniels was under indictment, the Supreme Court decided *Bruen*.   It clarified that firearms regulations are unconstitutional unless they are firmly rooted in our nation's history and tradition of gun regulation. *See* 142 S. Ct. at 2129-30.   Daniels immediately moved to dismiss the indictment, claiming that § 922(g)(3) is unconstitutional under that new standard.

The district court denied the motion.   *See United States v. Daniels*, 610 F. Supp. 3d 892, 892 (S.D. Miss. 2022).   It expressed some doubt that Daniels was part of "the people" whom the Second Amendment protects, as Daniels was not a "law abiding, responsible citizen[]." *Id.* at 894.   Nevertheless, assuming that Daniels had a

4a

right to bear arms, the court found that § 922(g)(3) was a longstanding gun regulation.   *See id.* at 895.   It compared § 922(g)(3) to laws disarming felons and the mentally ill that *Heller* called "presumptively lawful."   *Id.* at 895 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008)).   Congress passed § 922(g)(3) in 1968, only after many states had similarly banned habitual drug abusers from possessing guns.   *Id.* at 896. The district court placed great weight on that regulatory tradition.   It engaged with few historical sources from the Founding or Reconstruction, but it relied on statements from other courts—notably all predating *Bruen*—that § 922(g)(3) was supported by the historical practice of disarming those who "exhibit a dangerous lack of self-control."   *Id.* at 897.

A jury found Daniels guilty.   He was sentenced to nearly four years in prison and three years of supervised release.   By nature of his § 922(g)(3) felony, Daniels is also barred for life from possessing a firearm.   *See* 18 U.S.C. § 922(g)(1).

Daniels appeals his conviction, reasserting the Second Amendment challenge that he raised before trial.[1] As with all constitutional questions, we consider the issue *de novo*.   *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

## II.

The Second Amendment protects the right of individuals to "keep and bear" firearms for their self-defense.

---

[1]   Daniels also contends that § 922(g)(3) is unconstitutionally vague and that there was insufficient evidence for a reasonable jury to convict.   Because we hold that § 922(g)(3) is unconstitutional as applied to Daniels, we need not address his additional challenges.

5a

U.S. CONST. amend. II; *see Heller*, 554 U.S. at 595.   But even fundamental rights have limits.   *See Bruen*, 142 S. Ct. at 2128.   Before *Bruen*, our circuit evaluated the legality of gun restrictions using the familiar standards of scrutiny.   *See United States v. McGinnis*, 956 F.3d 747, 753-54 (5th Cir. 2020).   If legislation infringed on the historical right to bear arms, we asked whether the government had a sufficiently strong interest and whether its firearm regulation was sufficiently tailored. If a law breached the core of the Second Amendment liberty, we applied strict scrutiny; if not, we applied intermediate scrutiny.   *Id.* at 754.

*Bruen*, 142 S. Ct. at 2129-31, decisively rejected that kind of analysis. In place of means-end balancing, *Bruen* "requires" us to interpret the Second Amendment in light of its original public meaning.   *Id.* at 2126, 2131. As the Court explained, the Second Amendment codified a *"pre-existing* right" with pre-existing limits.   *Id.* at 2127 (quoting *Heller*, 554 U.S. at 592).   To ascertain those limits, history is our heuristic.   Because historical gun regulations evince the kind of limits that were well-understood at the time the Second Amendment was ratified, a regulation that is inconsistent with those limits is inconsistent with the Second Amendment.   *Id.*

To determine whether a modern firearms law is unconstitutional, we now proceed in two steps.   *First*, we ask whether the Second Amendment applies by its terms. *Id.* at 2129-30.   "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."   *Id.* at 2126.   *Second*, we ask whether a given gun restriction is "consistent with the Nation's historical tradition of firearm regulation."   *Id.* at 2130.   The government bears the

6a

burden of demonstrating a tradition supporting the challenged law.   *Id.* at 2130.   Only by showing that the law does not tread on the historical scope of the right can the government "justify its regulation."   *Id.*

The second step requires both close attention to history and analogical reasoning.   *Bruen* did not forswear all legislative innovation.   To the contrary, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."   *Id.* at 2132.   What we are looking for is a "tradition"—well-accepted limits on the right to bear arms manifested by a tangible practice of comparable gun regulations.   But how do we know whether an older regulatory practice is "comparable"?

*Bruen* helpfully gave us two conceptual pathways. If the modern regulation addresses "a general societal problem that has persisted since the 18th century," then "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."   *Id.* at 2131.   But if a modern law addresses "unprecedented societal concerns or dramatic technological changes," it calls for a "more nuanced approach."   *Id.* at 2132.   We must reason by analogy to determine whether older regulations are "relevantly similar" to the modern law.   *Id.*

*Bruen* acknowledged the difficulty of determining whether two laws are "relevantly similar."   *Id.   Bruen* clarified that two laws are "relevantly similar" if they share a common "why" and "how"; they must both address a comparable problem (the "why") and place a comparable burden on the rightsholder (the "how"). *Id.* at 2132-33.

7a

In all of that, *Bruen* reminded us that we are looking for a "representative historical analogue, not a historical twin." *Id.* at 2133 (emphasis removed).   It is not a death knell to the government that the challenged regulation did not previously exist.   What matters is whether a conceptual fit exists between the old law and the new.   Deciding whether there is a match between historical and modern regulations requires the exercise of both analogical reasoning and sound judgment. Nevertheless, we hew closely to *Bruen*'s own reasoning and hold the government to its heavy burden.

### A.

We begin with the threshold question: whether the Second Amendment even applies to Daniels.

The right to bear arms is held by "the people."   U.S. CONST. amend. II.   That phrase "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.   Indeed, the Bill of Rights uses the phrase "the people" five times.   In each place, it refers to all members of our political community, not a special group of upright citizens. *Id.* (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).   Based on that consistent usage, *Heller* concluded that "the Second Amendment right is exercised individually and belongs to *all* Americans." *Heller*, 554 U.S. at 581 (emphasis added).

Even as a marihuana user, Daniels is a member of our political community.   Therefore, he has a presumptive right to bear arms.   By infringing on that right, § 922(g)(3) contradicts the plain text of the Second Amendment.

8a

True, *Heller* described the Second Amendment as applying to "law-abiding, responsible citizens." *Heller,* 554 U.S. at 635. And *Bruen* used the phrase "law-abiding" fourteen times, including in the opening sentence, where it says that the Second Amendment "protect[s] the right of an ordinary, *law-abiding* citizen to possess a handgun." 142 S. Ct. at 2122 (emphasis added). The government seizes on that language and insists that the Second Amendment does not extend to Daniels because he is a criminal.

But we cannot read too much into the Supreme Court's chosen epithet. More than just "model citizen[s]" enjoy the right to bear arms. *United States v. Rahimi,* 61 F.4th 443, 453 (5th Cir. 2023), *cert. granted,* No. 22-915, 2023 WL 4278450 (June 30, 2023). Indeed, *Rahimi* held that citizens accused of domestic violence still had Second Amendment rights. It reasoned that when *Heller* and *Bruen* used the phrase "law-abiding," it was just "short-hand" to "exclude from the . . . discussion" the mentally ill and felons, people who were historically "stripped of their Second Amendment rights." *Id.* at 452. All others are presumptively included in the Second Amendment's ambit. Because Daniels is not a felon or mentally ill, *Rahimi*'s treatment of the "law-abiding" moniker suggests that he has presumptive Second Amendment rights as well.

Still, *Heller*'s and *Bruen*'s emphasis on "law-abiding" citizens hints that Congress and state legislatures have greater latitude to limit the gun liberties of the lawless. But, as a general rule, limitations on the Second Amendment come from the traditionally understood restrictions on the right to bear arms, not because ordinary cit-

9a

izens are categorically excluded from the privilege. *See Rahimi*, 61 F.4th at 453.[2]

Once we conclude that Daniels has presumptive Second Amendment rights, the focus shifts to step two of the *Bruen* analysis: whether history and tradition support § 922(g)(3).

### B.

Before we decide whether § 922(g)(3) is consistent with our tradition of gun regulation, we must first ask a methodological question: What kind of similarity are we looking for? "Distinct" similarity or a less precise "relevant" similarity? *See Bruen*, 142 S. Ct. at 2131–32. That depends on whether § 922(g)(3) "addresses a general societal problem that has persisted since the 18th century" or an "unprecedented societal concern[]" that the Founding generation did not experience. *Id.* at 2131–32.

*Bruen* does not require more than "relevant" similarity here. It is true that the Founding generation was familiar with intoxication via alcohol,[3] and it was famil-

---

[2] That accords with the holding in *Range v. Att'y General United States of America*, 69 F.4th 96, 101–03 (3d Cir. 2023) (en banc), where the court held that a man convicted of a false statement was part of "the people" and had Second Amendment rights, even though he was not "law-abiding." Range relied in part on then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019), in which she reasoned that "all people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right."

[3] W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 10 (1981) ("[I]n 1770 the annual per capita intake of alcohol from all sources was 3.5 gallons. In the years following the Revolution the amount declined. . . . But after 1800, as the quan-

10a

iar with marihuana plants.[4]   But the Founders grew
hemp to make rope.[5]   They were not familiar with wide-
spread use of marihuana as a narcotic, nor the modern
drug trade.[6]   Thus, though intoxication generally was a
persistent social problem, *see Bruen* 142 S. Ct. at 2131,
the Founding generation had no occasion to consider the
relationship between firearms and intoxication via canna-
bis.[7]   Although marihuana might be comparable in some

---

tity of spirits consumed increased, the total quantity of alcohol con-
sumed from all sources increased until it reached a peak of nearly 4
gallons per capita in 1830.").

   [4] *See, e.g.*, BENJAMIN FRANKLIN, A MODEST INQUIRY INTO THE
NATURE AND NECESSITY OF A PAPER CURRENCY (1729), *reprinted
in* 2 THE WORKS OF BENJAMIN FRANKLIN 253, 275 (Boston, Hilli-
ard, Gray & Co. 1836) (claiming that America was "very capable" of
growing hemp).   George Washington himself cultivated hemp.   1
THE DIARIES OF GEORGE WASHINGTON 1748-1799, at 213 (John C.
Fitzpatrick ed., 1925).

   [5] *See* THOMAS PAINE, COMMON SENSE (1776), *in* 1 The Political
Writings of Thomas Paine 15, 52 (Charlestown, George Davidson
1824) ("Hemp flourishes even to rankness, so that we need not want
cordage.").

   [6] Some post-colonial books and newspapers noted that people in
the Middle East used hemp as an intoxicant. *See, e.g.*, 3 C.S. SONINI,
TRAVELS IN UPPER AND LOWER EGYPT:   UNDERTAKEN BY ORDER
OF THE OLD GOVERNMENT OF FRANCE 92 (Henry Hunter trans.,
London 1807).   But the novelty of those reports from faraway lands
demonstrates the absence of marihuana intoxication in America at
the Founding.

   [7] *See* David F. Musto, *The American Experience with Stimulants
and Opiates*, 2 PERSPS. ON CRIME & JUST. 51, 51 (1998) ("[M]ost
[non-alcoholic] drugs were not familiar products early in the 19th
century.   . . .   "); *see also* Richard J. Bonnie & Charles H. White-
bread, II, *The Forbidden Fruit and the Tree of Knowledge:   An In-
quiry into the Legal History of American Marijuana Prohibition*,
56 VA. L. REV. 971, 985-87, 1010-11 (1970) (describing how American
society gradually realized the social effects of narcotics in the late

11a

ways to alcohol or tobacco, merely by making the comparison we have moved past the hunt for a distinctly similar law and are engaged in analogical reasoning.

Indeed, *Bruen*'s discussion of "distinct" and "relevant" similarity seems aimed at interpreting historical silence. That is, when the historical record reveals no regulations of a particular kind, we could interpret that silence in one of two ways. We could say that it means nothing (i.e., neither approval nor disapproval), or we could count silence as evidence that the public did not approve of such a regulation. *Bruen* says we should make the latter inference, at least when the public experienced the harm the modern-day regulation attempts to address. *Bruen*, 142 S. Ct. at 2131. By contrast, when the ratifying public did not confront a particular harm, its failure to regulate it says little about whether it approved such regulation.

In that case, we look instead for analogues—similar harms that the Founding generation did confront and the regulations they used to address them. *Id.* at 2132. Just as Founding-era prohibitions on firearms in "sensitive places" can extend to "*new* and analogous sensitive places," *id.* at 2133, we can compare the Founders' treatment of one problem to new problems that the Founders could not have anticipated.

Even so, the government has the burden to find and explicate the historical sources that support the consti-

---

1800s and began regulating them at the turn of the century); *see also id.* at 1011 ("[From 1914–31], we can find no evidence of public concern for, or understanding of, marijuana, even in those states that banned it. . . . Observers in the middle and late 1930's agreed that marijuana was . . . a very new phenomenon on the national scene.").

12a

tutionality of § 922(g)(3).  *Rahimi*, 61 F.4th at 455 (citing *Bruen*, 142 S. Ct. at 2132-33).  Here, the government's proffered analogues fall into three general buckets:  (1) statutes disarming intoxicated individuals, (2) statutes disarming the mentally ill or insane, and (3) statutes disarming those adjudged dangerous or disloyal.[8]  Each deserves independent consideration.

### 1.

Because there was little regulation of drugs (related to guns or otherwise) until the late-19th century,[9] intoxication via alcohol is the next-closest comparator.  Throughout the colonial period and into the 19th century, Americans drank alcohol—and lots of it.[10]  Common sense indicates that individuals who are impaired

---

[8]  We limit ourselves to the record amassed by the district court, the parties, and the *amici* who offered additional historical materials in response to this court's order on June 6, 2023.  *See Bruen*, 142 S. Ct. at 2130 n.6 ("*Heller*'s text-and-history test . . . [requires] resolv[ing] *legal* questions presented in particular cases or controversies. . . .  Courts are thus entitled to decide a case based on the historical record compiled by the parties.").  Still, notable repositories of historical gun laws—such as the database maintained by the Duke Center for Firearms Law—do not reveal additional probative statutes.  *See Repository of Historical Gun Laws*, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu/repository/ (last visited July 20, 2023).

[9]  *See* Bonnie & Whitebread, *supra* note 7, at 985-86.

[10]  John Adams claimed that Americans "exceed all other and millions of people in the world in this degrading, beastly vice of intemperance."  Letter from John Adams to William Willis (Feb. 21, 1819), in 10 THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 365, 365 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1856); *see also* Musto, *supra* note 7, at 52 (finding that "[i]n the early Republic," there was "an extremely high level of alcohol consumption (chiefly, distilled spirits)").

13a

by alcohol lack the self-restraint to handle deadly weapons safely.   So it is unsurprising to find historical laws dealing with guns and alcohol.   Such rules are relevant to our history and tradition of gun regulation.

Unfortunately for the government, that regulatory tradition is sparse and limited during the relevant time periods.   Despite the prevalence of alcohol and alcohol abuse, neither the government nor *amici* identify any restrictions at the Founding that approximate § 922(g)(3).   Although a few states after the Civil War prohibited carrying weapons while under the influence, none barred gun possession by regular drinkers.

a.

Founding-era statutes concerning guns and alcohol were few.   They were also limited in scope and duration.   The laws that did exist had two primary concerns:   (1) the misuse of weapons while intoxicated and (2) the discipline of state militias.

Consider the first group of statutes.   In 1656, Virginia banned "shoot[ing] any gunns at drinkeing."[11] But in historical context, that was not a disarming regu-

---

[11] Acts of Mar. 10, 1655-56, Act 12, *reprinted in* 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 401, 401-02 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823).   As a historical note, some old statutes are dated with dual years because, until 1752, the British colonies dated the new year from March 25 (the Feast of the Annunciation). Thus, a law marked "1655" between January 1 and March 24 was actually passed in 1656 according to the New Style (Gregorian) Calendar. *See Colonial Records & Topics*, CONN. STATE LIBR., https:// libguides.ctstatelibrary.org/hg/colonialresearch/calendar (last visited July 9, 2023).

14a

lation like § 922(g)(3).   Virginia was a brand-new colony at the time.   The 1656 statute was explicitly passed to conserve gunpowder, which was at a premium, and because ill-timed gunshots might be mistaken for a signal that local Indians were attacking.[12]   Not only was the statute enacted for a different purpose, but it did not even ban gun possession or carry—it only prevented the colonists from misusing the guns they did have during bouts of drinking.

Another law, passed by New York in 1771, prohibited citizens from firing guns from December 31 to January 2 because of the "great Damages" done by those "intoxicated with Liquor" during New Year's celebrations.[13] The statute had a similar purpose as § 922(3) does—preventing public harm by individuals under the influence.   Nevertheless, the law was strikingly narrow. It applied on only three days out of the year; it only prevented firing guns (not possessing them); and it applied only to those under the influence, not habitual drinkers.

---

[12] According to the statute, the misuse of weapons while intoxicated furthered "that beastly vice[:]   spending much powder in vaine" instead of "reserve[ing] [it] against the comon enemie," "the Indians." Acts of Mar. 10, 1655-56, Act 12, *reprinted in* 1 THE STATUTES AT LARGE, *supra* note 11, at 401.   Plus, "[t]he only means for the discovery of [Indian] plotts is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking." *Id.* at 401.   The 1656 law was a descendant of a 1632 law, which prevented "spend[ing] powder unnecessaril[y]   . . .   in dringinge or enterteynments."   Acts of Feb. 24, 1631-32, Act 50, *reprinted in* 1 THE STATUTES AT LARGE, *supra* note 11, at 155, 173.

[13] Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 244, 244-245 (Albany, James B. Lyon 1894).

15a

Beyond that duet of colonial regulations—separated by over a century—the government identifies no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if that intoxication was routine.

Instead, the government points to a second group of statutes regulating militia service. For example, a soldier could be "disarm[ed]" if he showed up for militia service in New Jersey "disguised in Liquor."[14]   Pennsylvania did the same in 1780.[15]   For related reasons, dram shops were prohibited from selling to local soldiers.[16]

---

[14]  Act of May 8, 1746, ch. 200, § 3, *reprinted in* ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW-JERSEY 140, 140-41 (Samuel Allison ed., Burlington, Isaac Collins 1776).

[15]  Act of Mar. 20, 1780, ch. 902, § 45, *reprinted in* 2 MILITARY OBLIGATION:  THE AMERICAN TRADITION, pt. 11, at 75, 97 (Arthur Vollmer ed., 1947) ("[I]f any non-commissioned officer or private shall  .  .  .  be found drunk  .  .  .  he shall be disarmed  .  .  . until the company is dismissed.  .  .  .  ").   Later, some states excluded "common drunkards" from militia service.   *See, e.g.,* An Act to regulate the Militia, § 1, *reprinted in* PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 501, 503 (Providence, Knowles & Vose 1844).

[16]  *See, e.g.,* Act of May 22, 1756, *reprinted in* 2 MILITARY OBLIGATION, *supra* note 15, pt. 5, at 83, 93 (Arthur Vollmer ed., 1947) (Maryland statute); Act of May 8, 1703, § 19, *reprinted in* 2 MILITARY OBLIGATION, *supra* note 15, pt. 13, at 8, 13 (South Carolina statute). It is not clear how strictly those laws were enforced, however. Founding-era militias were notorious for imbibing heavily.   One officer wrote that it was "the universal custom, in all regiments of the militia  .  .  .  for the officers, on every muster day, to get gloriously drunk in their country's service."   *See* Reminiscences of a Retired Militia Officer:   No. IV, *reprinted in* 3 THE NEW-ENGLAND MAGAZINE 110, 111 (Boston, J. T. & E. Buckingham 1832).

16a

Those laws, however, are even less probative.   For one thing, their purpose is different. They exist to ensure a competent military—a service-member cannot perform his duties if he is impaired.   Furthermore, the limitations applied only to the militia; none of the laws spoke to the ability of militiamen to carry outside of their military service.   At the Founding, as today, restrictions on the liberties of servicemen tell us little about the limits acceptable for the general public.

Given the prevalence of drinking at the Founding, that handful of laws puts the government on shaky footing.   The government has failed to identify any relevant tradition at the Founding of disarming ordinary citizens who consumed alcohol.

b.

The government's Reconstruction-era evidence, though stronger, still falls short of the history and tradition that could validate § 922(g)(3).

Between 1868 and 1883, three states prohibited carrying firearms while intoxicated:   Kansas, Missouri, and Wisconsin.[17]   Missouri's law was challenged under

---

[17] Art. 9, § 282, *in* THE GENERAL STATUTES OF THE STATE OF KANSAS 378, 378 (Lawrence, John Speer 1868) ("[A]ny person under the influence of intoxicating drink  . . .   who shall be found . . . carrying on his person a pistol  . . .   or other deadly weapon, shall be subject to arrest.  . . .   "); Act of Mar. 5, 1883, § 1, *reprinted in* LAWS OF MISSOURI PASSED AT THE SESSION OF THE THIRTY-SECOND GENERAL ASSEMBLY 76, 76 (Jefferson City, State J. Co. 1883) ("If any person  . . .   shall have or carry any [firearms] upon or about his person when intoxicated or under the influence of intoxicating drinks  . . .   he shall [be punished]."); Act of Apr. 3, 1883, ch. 329, § 3, *reprinted in* 1 THE LAWS OF WISCONSIN 290, 290 (Madison, Democrat Printing Co. 1883) ("It shall be unlawful for any per-

17a

the state constitution but was upheld by the Missouri Supreme Court. *State v. Shelby*, 2 S.W. 468 (Mo. 1886). The opinion acknowledged that the state constitution "secure[d] to the citizen the right to bear arms in the defense of his home, person, and property." *Id.* at 469. But the court reasoned that if the state could regulate the "manner in which arms may be borne," there is "no good reason . . . why the legislature may not do the same thing with reference to the condition of the person who carries such weapons." *Id.* The ban on intoxicated carry was therefore "in perfect harmony with the constitution." *Id.*

Those laws come closer to supporting § 922(g)(3), but they are notably few. The *Bruen* Court doubted that three colonial-era laws could suffice to show a tradition, let alone three laws passed eighty to ninety years after the Second Amendment was ratified. *See* 142 S. Ct. at 2142.

---

son in a state of intoxication, to go armed with any pistol or revolver."). Oklahoma Territory banned all public carry of pistols in 1890 and specifically prohibited public officers from carrying while intoxicated. *See Bruen*, 142 S. Ct. at 2154; Art. 47, § 4, *in* THE STATUTES OF OKLAHOMA 495, 495 (Will T. Little et al. eds., Guthrie, State Capital Printing Co. 1891).

In a similar vein (but less relevant here), Mississippi limited the *sale* of small firearms to people who were actively intoxicated. Ch. 77, § 2986, *in* THE REVISED CODE OF THE STATUTE LAWS OF THE STATE OF MISSISSIPPI 776, 776 (J.A.P. Campbell ed., Jackson, J.L. Power 1880). And in 1899, South Carolina prohibited the "*discharge* [of] any gun, pistol, or other firearm . . . within fifty yards of any public road" while "under the influence[] of intoxicating liquors." Ch. 12, § 252, *in* 2 CODE OF LAWS OF SOUTH CAROLINA, 1902, at 318, 318 (1902) (emphasis added).

18a

More fatally, § 922(g)(3) is substantially broader than the postbellum intoxication laws. On *Bruen*'s two axes of relevant similarity, the postbellum laws and § 922(g)(3) share a common "why": preventing public harm by individuals who lack self-control and carry deadly weapons.[18] But the "how" is different. At most, the postbellum statutes support the banning the *carry* of firearms *while under the influence*. Section 922(g)(3) bans all possession, and it does so for an undefined set of "user[s]," even if they are not under the influence.

As applied to Daniels, § 922(g)(3) is a significantly greater restriction of his rights than were any of the 19th-century laws. Although the older laws' bans on "carry" are likely analogous to § 922(g)(3)'s ban on "possess[ion],"[19] there is a considerable difference between someone who is actively intoxicated and someone who is an "unlawful user" under § 922(g)(3). The statutory term "unlawful user" captures regular users of marihuana, but its temporal nexus is vague—it does not specify how recently an individual must "use" drugs to qual-

---

[18] *Compare Shelby*, 2 S.W. at 469 (acknowledging the obvious "mischief to be apprehended from an intoxicated person going abroad with fire-arms"), *with Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983) ("Congress' intent in enacting [§ 922(g)] was to keep firearms out of the hands of presumptively risky people.").

[19] Possession for the purposes of § 922(g)(3) includes either "direct physical control" over a weapon or "'dominion or control' over the thing itself or the area in which it was found." *United States v. Jones*, 484 F.3d 783, 787 (5th Cir. 2007). Though that is not coextensive with the concept of "carry," it is analogous, at least here, where Daniels was in the same vehicle as his firearms.

19a

ify for the prohibition.[20]   Daniels himself admitted to
smoking marihuana fourteen days a month, but we do
not know how much he used at those times, and the gov-
ernment presented no evidence that Daniels was intoxi-
cated at the time he was found with a gun.   Indeed, un-
der the government's reasoning, Congress could ban
gun possession by anyone who has multiple alcoholic
drinks a week from possessing guns based on the post-
bellum intoxicated carry laws.   The analogical reason-
ing *Bruen* prescribed cannot stretch that far.

A further problem with the Reconstruction-era stat-
utes is precisely that they emerged during and after Re-
construction.   *Bruen* did not discount the relevance of
late-19th-century history, but it insisted that the Second
Amendment's "meaning is fixed according to the under-
standings of those who ratified it."   *Bruen*, 142 S. Ct.
at 2132.   A tradition cannot inform the original mean-
ing of the Bill of Rights if it emerges one hundred years
later.   *Id.*; *see also id.* at 2162-63 (Barrett, J., concur-
ring).   When 19th-century practice is inconsistent with
the categorical protection of the Second Amendment,
the "*text* controls."   *Id.* at 2137 (emphasis added).

Admittedly, there is an "ongoing scholarly debate"
about whether the right to bear arms acquired new
meaning in 1868 when it was incorporated against the
states.   *Id.* at 2137-38; *see also McDonald v. City of*

---

[20]  According to the implementing rules for § 922(g)(3), "[a] per-
son may be an unlawful current user of a controlled substance even
though the substance is not being used at the precise time the per-
son . . . possesses a firearm."   27 C.F.R. § 478.11.   An infer-
ence of "current use" can even be drawn from "a conviction for use
or possession of a controlled substance *within the past year.*"   *Id.*
(emphasis added).

20a

*Chicago*, 561 U.S. 742, 750 (2010) (incorporating the Second Amendment against the states via the Fourteenth Amendment).   But the instant case involves a federal statute and therefore implicates the Second Amendment, not the Fourteenth.   Even if the public understanding of the right to bear arms *did* evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791.[21]

And even if late-century practice sheds some dim light on Founding-era understandings,[22] the most the Reconstruction-era regulations support is a ban on gun possession while an individual is *presently* under the influence.   By regulating citizens like Daniels based on a pattern of drug use, § 922(g)(3) goes further. Our history and tradition do not support the leap.

2.

As an alternative, the government posits that the tradition of dis-arming the mentally ill supports § 922(g)(3). To quote *Heller*'s now-famous caveat, "longstanding prohibitions on the possession of firearms by   .  .  .

---

[21] *See Bruen*, 142 S. Ct. at 2137 ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."); *see also* Lawrence B. Solum, *The Fixation Thesis:   The Role of Historical Fact in Original Meaning*, 91 Notre Dame L. Rev. 1, 15 (2015).

[22] *See Bruen*, 142 S. Ct. at 2137 (calling 19th-century commentary "secondary," and "mere confirmation" of what Founding-era sources reveal) (quotation omitted).

21a

the mentally ill" are still "presumptively lawful."[23]   Obviously, mental illness and drug use are not the same thing. But there is an intuitive similarity:   Those who are "briefly mentally infirm as a result of intoxication" are similar to those "permanently mentally infirm" because of illness or disability.[24]

We note at the outset that there is not a clear set of positive-law statutes concerning mental illness and firearms.   In fact, the federal ban on gun possession by those judged mentally ill was enacted in 1968, the same year as § 922(g)(3).   *See* 18 U.S.C. § 922(g)(4); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010).   But scholars have suggested that the tradition was implicit at the Founding because, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'"[25]   In other words, the greater restriction included the lesser.   If the insane could be wholly deprived of their liberty and property, the government could necessarily take away their firearms.

Of course, the practice of institutionalizing so-called "lunatics" does not give clear guidance about which lesser impairments are serious enough to warrant the loss of

---

[23] 554 U.S. at 626, 627 n.26; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting that portion of *Heller*); *McDonald*, 561 U.S. at 786 (quoting the same).

[24] Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 U.C.L.A. L. REV. 1443, 1535 (2009).

[25] *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (per curiam) (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory:   District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1377 (2009)).

22a

constitutional freedoms. But we can assume that intoxication with marihuana is analogous to short-term mental illness.   Dr. Benjamin Rush—who signed the Declaration of Independence—said a "temporary fit of madness" was a symptom of drunkenness.[26]   And in an influential treatise on constitutional law, Thomas Cooley described drunkenness as a form of "temporary insanity."[27]   The same could be said of intoxication via marihuana.

Still, that comparison could justify disarming a citizen only while he is in a state comparable to lunacy. Just as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence.

Indeed, it is helpful to compare the tradition surrounding the insane and the tradition surrounding the intoxicated side-by-side.   The Founders purportedly institutionalized the insane and stripped them of their guns; but they allowed alcoholics to possess firearms while sober.   We must ask, in *Bruen*-style analogical reasoning, which is Daniels more like:   a categorically "insane" person?   Or a repeat alcohol user?   Given his periodic marihuana usage, Daniels is firmly in the latter camp.   If and when Daniels uses marihuana, he may be

---

[26] BENJAMIN RUSH, AN INQUIRY INTO THE EFFECTS OF ARDENT SPIRITS UPON THE HUMAN BODY AND MIND 6 (8th ed., Boston, James Loring 1823).

[27] THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 660 n.1 (2d ed., Boston, Little Brown & Co. 1871).   He suggests that some states prohibited intoxicated people from voting on that basis.   *Id.*

23a

comparable to a mentally ill individual whom the Founders would have disarmed.   But while sober, he is like the repeat alcohol user in between periods of drunkenness.

In short, neither the restrictions on the mentally ill nor the regulatory tradition surrounding intoxication can justify Daniels's conviction.   Perhaps the government could show that the drugs Daniels used were so powerful that anyone who uses them is permanently impaired in a way that is comparable to ongoing mental illness.   Or the government could demonstrate that Daniels's drug use was so regular and so heavy that he was continually impaired.   Here, it has shown evidence of neither.

### 3.

Finally, the government asserts that Congress can limit gun possession by those "dangerous" to public peace or safety.   It contends that principle was well understood when the Second Amendment was ratified. And it posits that Daniels—a repeat marihuana user— was presumptively dangerous enough to be disarmed. Although there is some historical evidence for the government's underlying principle, the historical examples of danger-based disarmament do not justify § 922(g)(3)'s application here.

### a.

As Justice Barrett detailed when she was a judge on the Seventh Circuit, history supports the intuitive proposition that the government can keep deadly firearms away from dangerous people.   *Kanter*, 919 F.3d at 451

24a

(Barrett, J., dissenting).[28]   Even the *amici* who believe that Daniels should prevail on his Second Amendment challenge suggest that the government *can* disarm the dangerous, even under *Bruen*'s history-and-tradition test.[29]

That said, no one piece of historical evidence suggests that when the Founders ratified the Second Amendment, they authorized Congress to disarm anyone it deemed dangerous.   Instead, the government collects different statutes disarming discrete classes of persons at various points in history.   Those laws suggest an abstract belief that an individual's right to bear arms could be curtailed if he was legitimately dangerous to the public.

The government's examples fall into two general buckets.   *First*, states barred political dissidents from owning guns during periods of conflict.   Many American states, for instance, disarmed those who failed to take an oath of allegiance during the Revolutionary War.[30]   *Second*, both British and American govern-

---

[28] *See also Folajtar v. Att'y Gen. of U.S.*, 980 F.3d 897, 913-15 (3d Cir. 2020) (Bibas, J., dissenting) (urging the same); *see generally* Joseph G.S. Greenlee, *Disarming the Dangerous:   The American Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. (forthcoming 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317000 (collecting historical regulations).

[29] Brief of *Amicus Curiae* Scholars of Second Amendment Law and the Independence Institute at 9 ("Dangerousness should be the key feature for firearms prohibitors, and a person whose conduct is never dangerous may not be disarmed."); Brief of *Amici Curiae* Firearms Policy Coalition and FPC Action Foundation at 30 ("The only historical justification for disarmament is dangerousness.").

[30] *See, e.g.*, Act of June 13, 1777, ch. 756, § 3, *reprinted in* 9 The Statutes at Large of Pennsylvania from 1682 to 1801, at 110, 112-

25a

ments disarmed religious minorities—especially Catholics.[31]

---

13 (Wm. Stanley Ray ed., 1903) (allowing local law enforcement to freeze the assets and "disarm[]" those who did not take a loyalty oath); Act of May 1, 1776, ch. 21, *reprinted in* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479, 479 (Boston, Wright & Potter Printing Co. 1886) (ordering those "notoriously disaffected to the cause of America" to be "disarmed" and their weapons given to the Continental Army); Act of June 1776, *reprinted in* 7 Records of the Colony of Rhode Island and Providence Plantations in New England 566, 567 (John Russell Bartlett ed., Providence, A. Crawford Greene 1862) (permitting county sheriffs to take the "arms, ammunition[,] and warlike stores" of those refusing to take loyalty oaths and transfer the weapons to the local militia).

[31] During the English Interregnum, Oliver Cromwell's government disarmed "all known Popish and dangerous or seditious persons." Council:  Day's Proceedings (Feb. 15, 1654-55), *reprinted in* 8 CALENDAR OF STATE PAPERS, DOMESTIC SERIES, 1655, at 42, 43-44 (Mary Anne Everett Green ed., London, Longmans & Co. et al. 1881).   Several American states disarmed Catholics as well. *See, e.g.*, Act of March 25, 1756, ch. 4, *reprinted in* 7 STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 9, 35-36 (William Waller Hening ed., Richmond, Franklin Press 1820) (disarming "Papists" because it was "dangerous at this time to permit [them] to be armed").

But disarmament was not limited to Catholics.   The civil government disarmed fifty-eight supporters of John Wheelwright, a clergyman who was expelled from Massachusetts for his religious views around the same time as Anne Hutchinson.   *See* James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 N. Eng. Q. 381, 391 (1988). Quakers and other pacifist sects were also perceived to be Tory sympathizers or traitors because they refused to support the American Revolution.   Jim Wedeking, *Quaker State:  Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & LIBERTY 28, 51-52 (2006).

26a

Each of those laws was generally based on concerns for the safety of the polity, but each disarmament also had its own unique political or social motivations.   Almost all the laws disarming dissidents were passed during wartime or periods of unprecedented political turmoil. Indeed, Founding-era governments did not disarm Loyalists because they were thought to lack self-control; it was because both were viewed as potential threats to the integrity of the state.[32]   The same was true of religious minorities—the perceived threat was as much political as it was religious.[33]

Independent of those class-based restrictions, the government relies heavily on the Militia Act of 1662, which allowed the Crown to disarm those whom he judged "dangerous to the Peace of the Kingdome."   14 Car. 2 c. 3, § 13 (1662).   That is the most direct support

---

[32]  Greenlee, *supra* note 288, at 42-43.

[33]  *Id.* at 38-40.   Although the government does not mention it, perhaps the most categorical firearm restrictions at the Founding were the discriminatory gun bans applicable to blacks and Indians. *See* Stephen P. Halbrook, *To Bear Arms for Self-Defense:  A "Right of the People" or a Privilege of the Few?*, 21 FEDERALIST SOC'Y REV. 46, 53 (2020); Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION:  ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher et al. eds., forthcoming) (manuscript at 4-5), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696.   Americans feared that slaves, free blacks, and Indians would stage violent attacks or revolts.   Greenlee, *supra* note 28, at 28, 31.   Although those laws are also examples of danger-based disarmament, we need not build our history and tradition on repugnant laws that today would be struck down as unconstitutional. There are plenty of examples at the Founding of states' disarming citizens who were considered a violent threat to society.

27a

for the government's principle that the legislature could prophylactically disarm any citizen who could potentially be dangerous.

But *Rahimi* held that the Militia Act was not incorporated into American law. After all, the Act was the justification for the widespread disarming of political opponents by Charles II and James II. *Rahimi*, 61 F.4th at 456. After the Glorious Revolution, the 1689 English Bill of Rights expanded the right to bear arms in order to curtail the Militia Act's reach and limit the Crown's "politically motivated disarmaments." *Id.* Our Second Amendment is a direct descendant of that latter guarantee. *Id.* (citing *Heller*, 554 U.S. at 593). If anything, our constitutional right to bear arms was purposefully broader than its English ancestor. *See* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 122-23 (Philadelphia, H.C. Carey & I. Lea 1825). Although some historians maintain that the Militia Act was still frequently used after the Glorious Revolution,[34] its limitations likely did not survive the categorical command of the Second Amendment. *See Rahimi*, 61 F.4th at 456.

Finally, the government posits that Congress can disarm dangerous citizens because the idea was dis-

---

[34] *See* Patrick J. Charles, *"Arms For Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 CLEVE. STATE L. REV. 351, 376 (2009) (noting that "the 1662 Militia Act's seizure of arms provision was not only frequently used" after the English Bill of Rights, "but it was also supported by both Houses of Parliament"); *see also* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 405-06 (2019).

28a

cussed during the ratification of the Constitution. Samuel Adams, for example, proposed an amendment at the Massachusetts ratifying convention that would have limited the right to bear arms to "peaceable citizens."[35] At the Pennsylvania ratifying convention, the dissenting minority suggested several constitutional amendments, including one that would have protected the right to bear arms "unless for crimes committed, or real danger of public injury from individuals."[36] *Heller* described the Pennsylvania proposal as an "influential" precursor to our Second Amendment, 554 U.S. at 604, as many of the Pennsylvania minority's suggestions ended up in our current Bill of Rights.[37]

Again, however, we must pause.   The predecessors of the Second Amendment gave concrete language to possible limits on the right to bear arms.   Yet that language was not adopted.   Instead, the People ratified the unqualified directive:   "shall not be infringed." U.S. CONST. amend. II.   Usually, when the relevant lawmaking body does not adopt language in a draft, we presume that the stricken language was not intended. *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting).   Indeed, *Rahimi* also considered those Second Amendment precursors and concluded that the unadopted language

---

[35] Convention Journal (Feb. 6, 1788), *reprinted in* 6 THE DOCU-MENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1452, 1453 (J. Kaminski et al. eds. 2000).

[36] The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents (1787), *reprinted in* 2 DOCUMENTARY HISTORY OF THE RATIFICATION, *supra* note 35, at 618, 624.

[37] *See* Address and Reasons of Dissent, *supra* note 36, at 623–24.

29a

could not supplant the Amendment's enacted text. *Rahimi*, 61 F.4th at 457.

That said, there is an undeniable throughline in all those historical sources: Founding-era governments took guns away from persons perceived to be dangerous. Even if the disarming of Loyalists and Catholics was limited to exigent historical contexts, no party identifies "disputes regarding the lawfulness of such prohibitions" at the time. *Bruen*, 142 S. Ct. at 2133. Indeed, some states such as Pennsylvania disarmed dissident citizens while their state constitutions guaranteed a right to bear arms.[38] And even if the Founders repudiated the Militia Act and rejected the Second Amendment precursors, the language of those documents says something about the outer limit of the right to bear arms in the English tradition.

Perhaps the Second Amendment was meant to do away with all those restrictions of liberty, and we can chalk such restrictions up to reactionary excess during the birth of a nation. On the other hand, we cannot completely discount the sheer number of disarming statutes at the time of the Founding. Together, they suggest a public understanding that when a class of individuals was thought to pose a grave danger to public peace, it could be disarmed.

### b.

Assuming the Second Amendment encodes some government power to disarm the dangerous, the question becomes: At what level of generality may we implement that principle? *Bruen* requires us to interrogate

---

[38] *Compare* PA. CONST., Decl. of Rights, § XIII (1776), *with* Act of June 13, 1777, *supra* note 30.

30a

the historical record for "relevantly" similar regula-
tions.   It does not allow us to enforce unenacted policy
goals lurking behind the Second Amendment.

Indeed, any ability to implement a "dangerousness
principle" is fenced in by at least two strictures in the
applicable caselaw.   On the one hand, the legislature
cannot have unchecked power to designate a group of
persons as "dangerous" and thereby disarm them.
Congress could claim that immigrants, the indigent, or
the politically unpopular were presumptively "danger-
ous" and eliminate their Second Amendment rights
without judicial review.   That would have "no true lim-
iting principle," *Rahimi*, 61 F.4th at 454, and would ren-
der the Second Amendment a dead letter.

On the other hand, we cannot inspect a legislature's
judgment of dangerousness using traditional standards
of scrutiny.   *Bruen* forbids us from balancing a law's
justifications against the burden it places on rightshold-
ers.   142 S. Ct. at 2127, 2129.   Imagine, for example,
that a state legislature disarms all men, citing statistics
that men commit more violent crimes than do women.[39]
Before *Bruen,* we would have considered whether the
evidence supporting male dangerousness was substan-
tial enough—and whether the law was sufficiently
tailored—to justify such a categorical restriction on gun
rights.   But *Bruen* forswears that kind of review.
*Bruen,* 142 S. Ct. at 2129.   Similarly, imagine that the
government bars all convicted cybercriminals from own-

---

[39] In 2012, approximately 80% of offenders arrested for violent
crimes were men.   *Crime in the United States 2012,* FED. BUREAU
INVEST. (2012), https://ucr.fbi.gov/crime-in-the-u.s/2012/crime-in-
the-u.s.-2012/tables/42tabledatadecoverviewpdf/table_42_arrests_
by_sex_2012.xls.

31a

ing guns, referencing the "dangerousness" of cyber-crime.   Cyber-crime is assuredly dangerous, but in a different way than is violent crime.   Applying a standard of scrutiny, we might have interrogated whether Congress had adequately demonstrated that someone who spreads ransomware or pirates television shows is likely to be dangerous with a firearm.   Again, *Bruen* heads that analysis off at the pass.   *Id.*[40]

How, then, do we square the post-*Bruen* circle?   To remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead of a general notion of "dangerousness."   The government must show that a historical danger-based disarmament is analogous to the challenged regulation.   We must use *Bruen*'s "why" and "how" analysis to assess whether the Founding-era restriction is relevantly similar to the modern one.[41]   We must ask:   *Why* was the group considered dangerous at the Founding and therefore disarmed?   And *why* does the modern law classify a person as presumptively dangerous?   Is the comparison supported by the record?   Furthermore, *how* did the

---

[40] Indeed, when then-Judge Barrett wrote in *Kanter* that danger-based disarmament was consistent with the original understanding of the Second Amendment, *Bruen* had not yet been decided.   919 F.3d at 451 (Barrett, J., dissenting).   So she explicitly relied on means-end scrutiny to cabin the government's modern-day determinations that a particular group is too dangerous to possess guns. *Id.* at 465.   But post-*Bruen*, that judicial check is no longer available to us.   *Bruen*, 142 S. Ct. at 2129-30.

[41] *Bruen*, 142 S. Ct. at 2133 n.7 ("[C]ourts may [not] engage in independent means-end scrutiny under the guise of an analogical inquiry. . . . Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, . . . not . . . revise that balance through means-end scrutiny.").

32a

historical regulation limit the rights of the dangerous class?   And *how* does the modern regulation do so?[42]

c.

Applying *Bruen*'s framework to the proffered analogues, it follows that the government's theory of danger-based disarmament falls apart.   The government identifies no class of persons at the Founding (or even at Reconstruction) who were "dangerous" for reasons comparable to marihuana users.   Marihuana users are not a class of political traitors, as British Loyalists were perceived to be.   Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists.   And even if we consider the racially discriminatory laws at the Founding, Daniels is not like the minorities who the Founders thought threatened violent revolt.

The government suggests that, in the spirit of the drafts of the Second Amendment and the Militia Act, marihuana users threaten the public "peace."   But at the time of the Founding, that notion referred specifically to violence or rebellion, not generalized public

---

[42] The en banc Third Circuit recently followed that approach in *Range*, 69 F.4th at 104-05.   Facing a challenge to § 922(g)(1), the felon-in-possession statute, the court acknowledged Founding-era evidence for disarming the dangerous.   But it required the government to "analogize [historically disarmed] groups to [the defendant] and his individual circumstances."   *Id.*   "That Founding-era governments disarmed groups they dis-trusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [a defendant] is part of a similar group today."   *Id.* at 105. The Third Circuit ultimately held that § 922(g)(1) was unconstitutional as applied to a non-violent felon.   *Id.* at 106.

33a

harm.[43]   And § 922(g)(3) is not limited to those with a history of violent behavior—not all members of the set of "drug users" are violent.   As applied in this case, the government has not shown how Daniels's marihuana use predisposes him to armed conflict or that he has a history of drug-related violence.

Furthermore, even as the Founders were disarming Catholics and politically disaffected citizens, they left ordinary drunkards unregulated.   The government has no meaningful response to the fact that neither Congress nor the states disarmed alcoholics, the group most closely analogous to marihuana users in the 18th and 19th centuries.   As with the government's analogy to mental illness, we must ask:   Which are marihuana users more like: British Loyalists during the Revolution? Or repeat alcohol users?   The answer is surely the latter.

The government asks us to set aside the particulars of the historical record and defer to Congress's modern-day judgment that Daniels is presumptively dangerous because he smokes marihuana multiple times a month. But that is the kind of toothless rational basis review that *Bruen* proscribes.   Absent a comparable regulatory tradition in either the 18th or 19th century,

---

[43] *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 266 (2020); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting). Indeed, to the extent the Militia Act is probative, it was primarily used to disarm religious minorities and "disaffected persons," neither of which is comparable to Daniels.   *See* O'Scannlain, *supra* note 34, at 405-06.   The Militia Act of 1661 had also permitted law enforcement to disarm and detain "Disturbers of the Peace," but that statute was similarly targeted at insurrectionists.   *See* 13 Car. 2. c. 6, § 2.

34a

§ 922(g)(3) fails constitutional muster under the Second Amendment.[44]

## III.

Daniels's § 922(g)(3) conviction is inconsistent with our "history and tradition" of gun regulation. *Bruen*, 142 S. Ct. at 2128. We conclude only by emphasizing the narrowness of that holding. We do not invalidate the statute in all its applications, but, importantly, only as applied to Daniels. Nor do we suggest that a robust Second Amendment is incompatible with other reasonable gun regulations.[45] Such statutes just need to be consonant with the limits the Founding generation understood to be permissible when they ratified the Second Amendment. The government has failed to demonstrate that here.

The judgment of conviction is therefore RE-VERSED, and a judgment dismissing the indictment is RENDERED.

---

[44] Irrespective of any historical analysis, the government also asks us to side with the many district courts around the country that have upheld § 922(g)(3) in the face of constitutional challenges. Of those, however, the vast majority relied reflexively on pre-*Bruen* caselaw or the same loose analogies that the government advances in this case. We decline to follow those decisions for the reasons detailed above. The district courts that have engaged carefully with the historical sources and the strictures of *Bruen* have found that § 922(g)(3) violates the Second Amendment. *See, e.g., United States v. Harrison*, No. CR-22-00328, 2023 WL 1771138, at *24-25 (W.D. Okla. Feb. 3, 2023); *United States v. Connelly*, No. EP-22-CR-229(2), 2023 WL 2806324, at *12 (W.D. Tex. Apr. 6, 2023).

[45] *Bruen*, 142 S. Ct. at 2133; *cf. Heller*, 554 U.S. at 635 (leaving open the constitutionality of further "regulations of the right").

35a

STEPHEN A. HIGGINSON, *concurring*:

In the fifteen years since the Supreme Court first found in the Second Amendment an individual right to keep and bear arms to defend the home, *See District of Columbia v. Heller*, 554 U.S. 570, 595, 636 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) (incorporating this right against the states), historians and legal scholars have continued to question this interpretation,[1] while the nation has continued to look for constitutionally permissible safeguards against gun violence and gun-related death rates that outstrip those of almost every other country.[2]

---

[1] See, e.g., Richard A. Epstein, *A Structural Interpretation of the Second Amendment: Why Heller is (Probably) Wrong on Originalist Grounds*, 59 SYRACUSE L. REV. 171 (2008); Paul Finkelman, *It Really Was About a Well Regulated Militia*, 59 Syracuse L. Rev. 267 (2008); Saul Cornell, Heller, *New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss,"* 56 UCLA L. REV. 1095 (2009); Patrick J. Charles, *The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing "Standard Model" Moving Forward*, 39 FORDHAM URB. L.J. 1727 (2012); Lee Epstein & David T. Konig, *The Strange Story of the Second Amendment in the Federal Courts, and Why It Matters*, 60 WASH. U. J.L. & Pol'y 147 (2019); Darrell A. H. Miller, Owning Heller, 30 U. FLA. J.L. & PUB. POL'Y 153 (2020).

[2] *See, e.g.,* Evan D. Gumas, Munira Z. Gunja & Reginald D. Williams II, *The Health Costs of Gun Violence: How the U.S. Compares to Other Countries*, THE COMMONWEALTH FUND (Apr. 20, 2023), https://www.commonwealthfund.org/publications/2023/apr/health-costs-gun-violence-how-us-compares-other-countries (noting that the death rate from firearms-related causes in 2019 was around five times greater in the U.S. (10.4 deaths per 100,000 people) than in the high-income countries with the second- (France, 2.2) and third-highest rates (Switzerland, 2.1)); Chris Gilligan, *U.S. Remains an Outlier in Firearm Possession, Gun-Related Deaths,*

36a

Faced with this expanded Second Amendment reach and the corresponding wave of legal challenges to gun safety regulations, lower courts eventually "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny."[3] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2125 (2022).   In applying this framework, courts were attempting to balance *Heller*'s rejection, on originalist grounds, of the previously narrow focus on a militia interest in favor of an interest

---

U.S. NEWS & WORLD REP. (Jan. 30, 2023, 3:42 p.m.), https://www.usnews.com/news/best-countries/articles/2023-01-30/how-the-u-s-compares-to-the-world-on-guns; *see also* John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, PEW RSCH. CTR. (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s (reporting that 48,830 people died from gun-related injuries in 2021, just over half of which were suicides); Stefanie Dazio & Larry Fenn, *Six Months. 28 Mass Killings in the US. That's the Worst Yet, and All But One Case Involved Guns*, AP NEWS (July 13, 2023, 11:43 p.m.), https://apnews.com/article/mass-killings-record-gun-violence-0174103c37756fe4d247fd15cd3bc009; Kiara Alfonseca, *There Have Been More Mass Shootings Than Days in 2023, Database Shows*, ABC NEWS (May 8, 2023, 9:24 a.m.), https://abcnews.go.com/US/mass-shootings-days-2023-database-shows/story?id=96609874; John Gramlich, *Gun Deaths Among U.S. Children and Teens Rose 50% in Two Years*, PEW RSCH. CTR. (Apr. 6, 2023), https://www.pewresearch.org/short-reads/2023/04/06/gun-deaths-among-us-kids-rose-50-percent-in-two-years.

[3] Courts would first turn to text, history, and tradition to determine whether the challenged law or regulation burdens conduct protected by the Second Amendment, and then, if so, evaluate the law under a version of means-end scrutiny.  *See* Mark Anthony Frassetto, *Judging History:  How Judicial Discretion in Applying Originalist Methodology Affects the Outcome of Post-*Heller *Second Amendment Cases*, 29 WM. & MARY BILL RTS. J. 413, 418-19 (2020).

37a

in self-defense, with *Heller*'s recognition that the Second Amendment contains limiting principles and exceptions. Specifically, *Heller* acknowledged that the Second Amendment does not curtail the legislative power to regulate and restrict the carrying of "dangerous and unusual weapons," 554 U.S. at 627, nor does it undermine "longstanding prohibitions" on the carrying of firearms in sensitive places or by certain persons, or "laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626-27.

Thus, even as the politics of gun safety remained hotly contested, the law had somewhat settled.   And under this framework, courts generally permitted Americans, through both state and federal elected officials, to enact, or opt not to enact, gun safety regulations to address the ongoing crisis of gun violence.[4]

Last year, however, the Supreme Court again revised Second Amendment doctrine in *Bruen*, declaring

---

[4] This is not to say that courts disregarded *Heller* and *McDonald*, or otherwise relegated the Second Amendment to the status of a "second class" right.   Indeed, some firearms restrictions were struck down, *see, e.g., Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (finding Illinois's ban on the carrying of ready-to-use weapons unconstitutional), and, although it is difficult to precisely calculate rates of gun ownership, *see* Jennifer Mascia, *How Many Guns Are Circulating in the U.S.?*, THE TRACE (Mar. 6, 2023), https://www.thetrace.org/2023/03/guns-america-data-atf-total, there are significantly more firearms in circulation today than ever before, and this expansion has primarily occurred post-*Heller*, *see* Daniel De Visé, *Americans Bought Almost 60 Million Guns During the Pandemic*, THE HILL (Apr. 21, 2023, 6:00 a.m.), https://thehill.com/policy/national-security/3960527-americans-bought-almost-60-million-guns-during-the-pandemic, (noting that FBI firearm background checks more than doubled from 2005 to 2015, and then skyrocketed further between 2015 and 2020).

38a

that this "two-step" approach, which combined attentiveness to history with a traditional judicial balancing test, was "one step too many." *Id.* at 2127.   Now, the Court has written, if "the Second Amendment's plain text covers an individual's conduct," then a gun regulation is presumptively unlawful unless the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[5]   *Id.* at 2126, 2129-30.

Bound by this interpretative sequence, we hold today that 18 U.S.C. § 922(g)(3), a decades-old felony provision of our federal firearms law, is unconstitutional as applied to Mr. Daniels.   Although our decision is limited in scope, it is hard for me to avoid the conclusion that most, if not all, applications of § 922(g)(3) will likewise

---

[5] Although *Bruen* appears to contemplate a "one-step" test, courts have correctly perceived it to require a new two-step analysis wherein courts first determine whether the challenged regulation or statute implicates the Second Amendment and then, if so, analyze the relevant history and tradition to decide if such a restriction is justified.   *See Range v. Att'y Gen. U.S.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) ("After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct.   If it does, the government now bears the burden of proof:   it 'must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'." (internal citations omitted)); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (describing *Bruen* as having adopted a "two-part test"); *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("[W]hen the Second Amendment's 'plain text' covers the regulated conduct, the government has only one way to defend the regulation—by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.'" (quoting *Bruen*, 142 S. Ct. at 2126)).

39a

be deficient.[6]   It is also important to acknowledge that
other gun safety laws, especially longstanding status-
based prohibitions previously understood to be constitu-
tionally unassailable, have been recently struck down by
courts across the country as they attempt to faithfully
implement *Bruen*.[7]

---

[6] Reviewing our precedent, many offenders convicted under
§ 922(g)(3) were not intoxicated *when* they were found to possess
or receive a firearm, but rather were generally users of a controlled
substance.   *See, e.g., United States v. Patterson*, 431 F.3d 832, 837
(5th Cir. 2005) (upholding the defendant's conviction where he ad-
mitted that he regularly used marijuana and where his urine sam-
ple tested positive for marijuana, which stays in the system of an
occasional user for up to two weeks); *United States v. Edwards*,
182 F.3d 333, 335-36 (5th Cir. 1999) (rejecting the argument that
the defendant's conduct did not constitute a violation of § 922(g)(3)
because "he was not using drugs at the exact moment the police
found him in possession of a firearm"); *cf. United States v.
McCowan*, 469 F.3d 386, 392 (5th Cir. 2006) (finding that the de-
fendant qualified as an "unlawful user" for the purposes of the Sen-
tencing Guidelines because the evidence showed that he "followed
a pattern of use over an extended period of time").

[7] In fact, there is already a circuit split on the constitutionality
of § 922(g)(1), the federal felon-in-possession statute.   *Compare
Range*, 69 F.4th at 98 (holding § 922(g)(1) unconstitutional as ap-
plied), *with United States v. Jackson*, 69 F.4th 495, 501-02 (8th Cir.
2023) (upholding the constitutionality of § 922(g)(1) as applied and
concluding that "there is no need for felony-by-felony litigation re-
garding the constitutionality" of that provision).   Some courts,
faced with *Bruen* challenges to multiple provisions of the federal
criminal code, have upheld one provision while striking down an-
other.   *E.g., United States v. Price*, No. 22-cr-97, 635 F. Supp. 3d
455, 464, 467 (S.D.W. Va. Oct. 12, 2022) (finding 18 U.S.C. § 922(k),
which makes it unlawful to possess a firearm with an obliterated
serial number, unconstitutional while holding that § 922(g)(1) "ac-
cords with the Second Amendment").   Moreover, the effect of *Bruen*
has been especially dramatic as to civil claims.   *See* Jake Charles,

40a

To be clear, I fully concur in the majority's reasoning —albeit with the caveat that the Supreme Court has granted *certiorari* in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, No. 22-915, __ S. Ct. __, 2023 WL 4278450, at *1 (June 30, 2023)—as I believe that we have applied *Bruen* as well as possible in evaluating the constitutionality of § 922(g)(3).   I write separately to highlight what has become increasingly apparent —that courts, operating in good faith, are struggling at every stage of the *Bruen* inquiry.   Those struggles encompass numerous, often dispositive, difficult questions, including, but not limited to the following. First, who, and what conduct, is covered by the Second Amendment?[8]   Second, how does the Government demon-

---

*One Year of* Bruen*'s Reign:   An Updated Empirical Analysis*, DUKE CTR. FOR FIREARMS LAW (July 7, 2023), https://firearmslaw. duke.edu/2023/07/one-year-of-bruens-reign-an-updated-empirical-analysis.

[8] For instance, courts are divided as to whether the Supreme Court's description of the right as one belonging to "law-abiding, responsible citizens," *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635), is meant to exclude certain categories of citizens, such as those convicted of a crime, from the protection of the Second Amendment. *See United States v. Jackson*, No. 22-cr-141, 2023 WL 2499856, at *7 (D. Md. Mar. 13, 2023) (collecting cases in which courts "rejected post-*Bruen* challenges to status-based gun laws on the ground that the restricted people are not law-abiding, responsible citizens to whom the Second Amendment applies").   *Compare also United States v. Charles*, 633 F. Supp. 3d 874, 887-88 (W.D. Tex. 2022) (concluding that there is a historical basis for excluding felons under the Second Amendment), *and United States v. Hughes*, No. 22-cr-640, 2023 WL 4205226, at *5-8 (D.S.C. June 27, 2023) (discussing how several courts have concluded that "convicted felons have traditionally been excluded from the political community" and are therefore not part of "the people" protected by the Second Amendment), *with Range*, 69 F.4th at 103 (" [W]e reject the Government's

41a

strate a regulatory "tradition"?   This inquiry impli-
cates questions about how many states must have his-
torically addressed an issue, or how many laws must
have been passed—or some combination of the two[9]—
for a historical practice to constitute a "tradition,"[10] *see*

---

contention that only 'law-abiding, responsible citizens' are counted
among 'the people' protected by the Second Amendment.").   In
other cases, the debate as to what constitutes a "bearable arm" cov-
ered by the Second Amendment has revitalized relevance.   *See* ,
*e.g.*, Oral Argument at 1:10-2:10, *Bevis v. City of Naperville*, No. 23-
1353, (7th Cir. June 29, 2023) (state and local defendants arguing
that large-capacity magazines are not "arms" but "accessories that
are not necessary to the operation of any firearm"); *see also Ocean
State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL
17721175, at *11-13 (D.R.I. Dec. 14, 2022) (finding at the preliminary-
injunction stage that plaintiffs had not shown that large-capacity
magazines are "arms" within the "textual meaning of the Second
Amendment"); *Nat'l Assoc. for Gun Rights v. Lamont*, No. 22-cv-
1118, 2023 WL 4975979, at *26 (D. Conn. Aug. 3, 2023) (concluding
that plaintiffs had failed to carry their burden of showing that stat-
utorily defined assault weapons and large-capacity magazines are
covered by the Second Amendment).

[9] For example, is it enough if the historical record shows that one
state had passed and enforced numerous laws addressing a particu-
lar firearms issue, or must multiple states have taken action on an
issue?   *See Bruen*, 142 S. Ct. at 2154 ("[W]e will not stake our inter-
pretation of the Second Amendment upon a law, in effect in a single
State, or a single city, 'that contradicts the overwhelming weight of
other evidence regarding the right to keep and bear arms' in public
for self-defense." (quoting *Heller*, 554 U.S. at 632)).

[10] *See, e.g., Hardaway v. Nigrelli*, No. 22-cv-771, 2022 WL
16646220, at *14-17 (W.D.N.Y. Nov. 3, 2022) (discussing the neces-
sary showing to establish a historical tradition before finding plain-
tiffs were likely to prevail on their claim that New York's "place of
worship" ban on firearms possession violates the Second Amend-
ment).   *Compare also United States v. Rowson*, No. 22-cr-310, 2023
WL 431037, at *19-24 (S.D.N.Y. Jan. 26, 2023) (finding § 922(n) con-
sistent with this nation's historical tradition of firearms regulations

42a

*Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."), as well as the related issue of enforcement.[11]   Third, what is the operative time period for such regulations—1791 or 1868?—and to what extent does post-ratification practice count?   *See id.* at 2162-63 (Barrett, J., concurring).[12]   Fourth—but again, this list is not exhaustive—how are courts to differentiate between "general societal problem[s]" that have "persisted since the 18th century," and those that "implicat[e] unprecedented societal concerns or dramatic technological changes," *id.* at 2131-32, and, moreover,

---

on the basis of colonial laws disarming groups of persons perceived as dangerous and historical surety laws), *with United States v. Hicks*, 21-cr-60, 2023 WL 164170, at *3-7 (W.D. Tex. Jan. 9, 2023) (finding these same historical analogies to be insufficient and holding § 922(n) to be unconstitutional).

[11] *See Bruen*, 142 S. Ct. at 2149 ("[R]espondents offer little evidence that authorities ever enforced surety laws."); *see also United States v. Combs*, No. 22-cr-136, 2023 WL 1466614, at *12 (E.D. Ky. Feb. 2, 2023) (explaining that the *Bruen* plurality rejected surety laws as a suitable historical analogue not because of a lack of evidence that these laws were enforced, but because they did not impose a comparable burden on the right).

[12] *See, e.g., Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322-23 (11th Cir. 2023) (holding that because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," for purposes of a challenge to a *state* law, "the right's contours" turn on the understanding of the right "when the Fourteenth Amendment was ratified" (internal quotation marks and citations omitted)), *re'hg granted, vacated*, 72 F.4th 1346 (July 14, 2023); *Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *10-12 (D. Minn. Mar. 31, 2023) (noting that *Bondi* is "difficult to square with the Supreme Court's emphasis on applying the Bill of Rights against the states and federal government according to the same standards" and suggesting that 1791 would be the operative time period for defining the scope of the right).

43a

between "historical analogue[s]" as distinct from "historical twin[s]"?   *Id.* at 2133.[13]

More foundationally, courts are laboring to give meaning to the Bruen requirement of "historical inquiry."   Must the Government provide expert testimony to prevail, or could a district court independently seek such evidence?[14]   And in the event such evidence

---

[13] *See, e.g., Alaniz*, 69 F.4th at 1129-30 (9th Cir. 2023) (describing "illegal drug trafficking" as "a largely modern crime" that is "not closely analogous to founding-era smuggling crimes" such that the Government's proposed analogues needed to be only "relevantly similar," in upholding the application of a sentencing enhancement pursuant to U.S.S.G. § 2D1.1(b)(1)"); *Range*, 69 F.4th at 120 (Krause, J., dissenting) (asserting that § 922(g)(1) implicates "unprecedented societal concerns" or dramatic technological changes" due to "the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel [which] were unknown at the Founding"); *see also Protecting Public Safety After* New York State Rifle & Pistol Association v. Bruen, *Hearing Before the Senate Comm. On the Judiciary*, 118th Cong. (Mar. 15, 2023) (written testimony of Eric Ruben, Assistant Professor of Law, SMU Dedman School of Law, at 9-12).

[14] *See Miller v. Bonta*, No. 19-cv-1537, Tr. of Proceedings at 9-10, ECF 162 (S.D. Cal., Dec. 12, 2022) (statement by the district court, at a hearing, that it does not have the staff nor the resources to create a historical survey of relevant laws and statutes in a timely fashion); *id.* Min. Entry, ECF 161 (Dec. 15, 2022) (ordering the state defendants to confer with the plaintiffs and to create a "survey or spreadsheet of relevant statutes, laws, or regulations in chronological order" that began at the time of the adoption of the Second Amendment and continued until twenty years past the adoption of the Fourteenth Amendment, and which contained specific directions as to the information that should be included); *see also United States v. Bullock*, No. 18-cr-165, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022) (ordering briefing as to whether the court should appoint a consulting historian to aid in evaluating the defendant's motion to dismiss his indictment under § 922(g)(1)); *United States v. Sims*, No.

44a

is lacking in the record below, may courts of appeal collect their own history and make up for a party's earlier failing?[15]   Going even further, should courts undertake discovery and evidentiary testing of historical evidence to perceive the existence of a sufficient regulatory tradition?[16]   And, in making that conclusion, does the con-

22-cr-30081, 2023 WL 4461997, at *2 (C.D. Ill. July 11, 2023) (suggesting that both the government and the defendant "should freely cast a wider net and provide more detail about whatever history they rely on" and "freely employ the expert services of historians and historiographers" in briefing a motion to dismiss an indictment brought under § 922(g)(1) and § 922(d)) (internal quotation and citation omitted).

[15] Although the Supreme Court in *Heller*, *McDonald*, and *Bruen* received numerous unsolicited amici briefs from historians and other interested parties, as an inferior court, we rarely receive that amount of independent interest in our cases.   Accordingly, in this case, we found it helpful to publish a court directive "invit[ing] briefs from amici curiae who wish to supply relevant information regarding the history and tradition of the issues presented in this case."   *See also Alaniz*, 69 F.4th at 1129, n.2 (citing to a 113-page compilation of historical state firearms and weapons regulations which neither party had cited to in their briefing).

[16] *See, e.g.*, *Atkinson v. Garland*, 70 F.4th 1018, 1022-24 (7th Cir. 2023) (remanding to the district court for a "proper, fulsome analysis of the historical tradition" and identifying specific questions to help focus that analysis as the district court's ruling occurred pre-*Bruen* and thus the parties had not yet developed that record); *Oregon Firearms Fed.'n v. Kotek*, Nos. 2:22-cv-01815, 22-cv-01859, 22-cv-01862, 22-cv-01869, 2023 WL 3687404, *5 (D. Or. May 26, 2023) (denying cross-motions for summary judgment, noting that "the threshold question of whether [the challenged restrictions] involve conduct covered by the plain text of the Second Amendment" is a disputed fact); *id.*, 2023 WL 4541027, at *3 (D. Or. July 14, 2023) (findings of fact and conclusions of law followed from a weeklong bench trial involving "testimony from twenty witnesses" and "more than 100 exhibits").   *Compare Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, at *6 (9th Cir. Aug. 7, 2023) (denying a request for a remand so that

45a

stitutionality of any given provision rise or fall with the strength of the historical record as to a specific case, or will rulings be treated as establishing a single historical truth?

The majority in *Bruen*, responding to unworkability concerns identified by the dissent and echoed by courts over the past year, may have intimated answers.   Specifically, the majority insisted that, as in other legal disputes, "historical evidence" is predicated on our "adversarial system of adjudication," in which courts must "decide [the] case based on the historical record compiled by the parties."   *Id.* at 2130, n.6.   In my view, this suggests that *Bruen* requires that an evidentiary inquiry first be conducted in courts of original jurisdiction, subject to party presentation principles, aided by discovery and cross-examination and with authority to solicit expert opinion.[17]

In granting *certiorari* in *Rahimi*, the Supreme Court likely will resolve some of these questions.   Of course, in the meantime, it is our job as an inferior court to apply

---

the district court, which had issued its ruling pre-*Bruen*, could conduct further factual development on the basis that "the historical research required under *Bruen* involves issues of so-called 'legislative facts' . . . rather than 'adjudicative facts'" such that no additional inquiry from the district court was required).

[17] This reading of *Bruen* seems to me to be supported by the single authority cited in the majority's answer to the dissent, which frames its discussion of originalist methodology with reference to a title dispute in which the court was required to trace a chain of title, that is, develop and decide adjudicative facts, and where the court simply had to determine whether prior precedent had been overruled. William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & HIST. REV. 809, 809-10 (2019).   Notably, in *Bruen*, the Supreme Court speaks of historical "evidence" over fifty times.

46a

the Supreme Court's mandates and aid the development of this field of law.   But the uncertainty and upheaval resulting from best efforts to apply *Bruen* now extend far beyond our dockets.   Myriad and obvious public safety laws, some over a century old, face inconsistent invalidation.   The impact of these challenges, outside of the evident yet indescribable tragedies of victims of gun violence, will fall heavily on states, which exercise most police power and must assure public safety.   *See Teter v. Lopez*, No. 20-15948, 2023 WL 5008203 (9th Cir. Aug. 7, 2023) (striking down Hawaii's ban on butterfly knives as unconstitutional under *Bruen*).   Already, as courts work through the impact of *Bruen*, defendants guilty of a gun crime in one jurisdiction are presently innocent of it in another.[18]

In attempting to navigate this new landscape, it is prudent to first return to the text of the Second Amend-

---

[18] Our holding today conflicts with decisions from district courts across the country upholding the constitutionality of § 922(g)(3). *See United States v. Seiwert*, No. 20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Posey*, No. 22-cr-83, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Randall*, No. 22-cr-99, 2023 WL 3171609 (S.D. Iowa Feb. 14, 2023); *United States v. Stennerson*, No. 22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Cleveland-McMichael*, No. 21-cr-119, 2023 WL 2613548 (D. Alaska Mar. 23, 2023); *United States v. Le*, No. 23-cr-14, 2023 WL 3016297 (S.D. Iowa Apr. 11, 2023); *United States v. Costianes*, No. 21-cr-0458, 2023 WL 3550972 (D. Md. May 18, 2023); *United States v. Hart*, No. 22-cr-114, 2023 WL 4144834 (W.D. Mo. June 6, 2023) (report and recommendation), *adopted by* 2023 WL 4141044 (W.D. Mo. June 22, 2023); *United States v. Ray*, No. 21-cr-57, 2023 WL 4378152 (W.D. Va. July 6, 2023); *United States v. Lewis*, No. 22-cr-222, 2023 WL 4604563 (S.D. Ala. July 18, 2023); *United States v. Beaty*, No. 22-cr-95, 2023 WL 4662247 (M.D. Fla. July 20, 2023).

47a

ment, which states, in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Just as the doctrine corrected in *Heller* was held to have over-emphasized the first third of the text ("[a] self regulated Militia"), it is possible that inferior judicial officers such as myself are misinterpreting *Bruen* by pressing too much on the last ("the right . . . to keep and bear Arms"). It may be that the Supreme Court will remind us of the Second Amendment's middle, where the Framers stated explicitly that they were fashioning a right "necessary to the security of a free State." In this sense, unlike the textually unbounded pledges assuring freedom of speech and conscience, "the right of the people to keep and bear Arms" is less about the antithesis of liberty and control, and is more designed to assure "domestic Tranquility [and] . . . the general Welfare." U.S. CONST. pmbl. Put another way, the Second Amendment is not only a right to have, but is especially a right to have to protect the state. That right to protect, as both *Heller*, *McDonald*, and *Bruen* affirmatively acknowledged, incorporates significant public safety exceptions.[19]

Importantly, the Supreme Court in *Bruen* saw itself as continuing with, rather than breaking from, *Heller*, which recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. Thus, although in *dicta*, the

---

[19] Indeed, the *Bruen* majority was careful to emphasize that its opinion was not meant to "suggest the unconstitutionality" of all licensing regimes and specifically highlighted that "shall-issue" licensing regimes, "which often require applicants to undergo a background check or pass a firearms safety course," are unlikely to pose a constitutional problem. *Bruen*, 142 S. Ct. at 2138, n.9.

48a

*Heller* majority was confident that, though never conceived of by the Framers and hence never subject to public safety regulation, certain "dangerous and unusual weapons" could properly be banned. *Id.* at 624, 627. Similarly, the majority assured that "nothing in our opinion should be taken to cast doubt on" some of the most critical tools for combatting gun violence, including both people- and place-based restrictions. *Id.* at 626-27; *see also McDonald*, 561 U.S. at 786 (plurality) ("We repeat [*Heller's*] reassurances here."); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, CJ., concurring). These assurances are a recognition that the Second Amendment, explicitly and unlike the other original ten amendments in our Bill of Rights, ties to the "security" of our country. The Second Amendment assured a vigilant, armed citizenry and it did so for an explicit purpose, i.e. "being necessary to the security of a free State. . . . " To read the Second Amendment as providing an ever-expanding individual right, without limits, therefore, runs counter to both its text and the Framers' own understanding.

As should be evident, I am appreciative that the court that speaks the final word has agreed to provide more guidance on an issue of such national importance. I cannot help but fear that, absent some reconciliation of the Second Amendment's *several* values, any further reductionism of *Bruen* will mean systematic, albeit inconsistent, judicial dismantling of the laws that have served to protect our country for generations. Furthermore, such decisions will constrain the ability of our state and federal political branches to address gun violence across the country, which every day cuts short the lives of our citizens. This state of affairs will be nothing less than

49a

a Second Amendment caricature, a right turned inside
out, against freedom and security in our State.

50a

**APPENDIX B**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

———

Case No. 1:22-cr-58-LG-RHWR-1

UNITED STATES OF AMERICA

*v.*

PATRICK DARNELL DANIELS, JR.

———

Filed:   July 8, 2022

———

**MEMORANDUM OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO DISMISS**

———

**BEFORE THE COURT** is the [24] Motion to Dismiss filed by Defendant, Patrick Darnell Daniels, Jr.   The Government filed a [27] Response, to which Defendant [28] replied.   This Defendant is under indictment for knowingly possessing a firearm while an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3).   Defendant has filed the instant [24] Motion to Dismiss the indictment, arguing that 18 U.S.C. § 922(g)(3), is unconstitutional under the Second Amendment and pursuant to the Supreme Court's recent decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, --- S. Ct. ---, 2022 WL 2251305 (June 23, 2022).   The Court has conducted a hearing on the matter and after due consideration of the arguments of

51a

counsel, the record, and the applicable law, finds that the Motion should be denied.

DISCUSSION

## I.   Second Amendment Framework

Defendant argues that this case must be dismissed because section 922(g)(3) is unconstitutional under the Second Amendment to the United States Constitution. Therefore, to rule of this Motion, the Court must analyze and apply Second Amendment jurisprudence as articulated by the Supreme Court.

The Second Amendment provides:   "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."   U.S. Const. amend. II.   In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court concluded, after thorough textual and historical analysis, that the Second Amendment confers "an individual right to keep and bear arms."   *Id.* at 595. The Court was quick to note that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."   *Id.* at 626.   Relevant here, the Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."   *Id.*   In a footnote, the Supreme Court classified these traditional restrictions on firearm possession as a non-exhaustive list of "presumptively lawful regulatory measures."   *Id.* at 627 n.26.   The Supreme Court went on to strike down a law in the District of Columbia which "totally bans handgun possession in the home."   *Id.* at 628.   In doing so, the Supreme Court conducted a historical analysis of handgun restrictions in the United States and found the

52a

D.C. restriction to be novel in its severity, targeting "the quintessential self-defense weapon." *Id.* at 629.

In *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, --- S. Ct. ---, 2022 WL 2251305 (June 23, 2022), the Supreme Court again considered the contours of the Second Amendment right to bear arms. The Court characterized its earlier decisions as "recogniz[ing] . . . the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Id.* at 5. The Court was called upon to assess the constitutionality of a New York licensing scheme which allowed authorities to deny concealed-carry permits even where an applicant met certain threshold criteria. *Id.* at 5-6. In doing so, the Court clarified and explained the methodology to be used in addressing Second Amendment claims. The Court rejected "a 'two-step' framework" involving "means-end scrutiny" in use by various appellate courts and instead clarified that the appropriate methodology centers "on constitutional text and history." *Id.* at 7-10. Hence, to answer Second Amendment questions, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 12. In other words:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with

53a

this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961)).

On the second prong of the *Bruen* test, the Court said: "'historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" *Id.* at 11 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 803-04 (2010) (Scalia, J., concurring)). This analysis will often require the use of "historical analogies," whether because of "unprecedented societal concerns or dramatic technological changes." *Bruen*, 2022 WL 2251305, at 12. Thus, "[w]hen confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* at 13. "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*[1]

---

[1] The opinion gives an example of analogical reasoning in the case of location-based firearm restrictions. Because there are historical analogues to modern "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Heller*, 554 U.S. at 626, even though such analogues may have protected relatively few "sensitive places," still, "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 2022 WL 2251305, at 14.

54a

## II. Application to Section 922(g)(3)

The Court now applies the Second Amendment framework outlined in *Bruen* to the criminal statute at issue. Section 922(g)(3) provides that "[i]t shall be unlawful for any person . . . (3) who is an unlawful user of or addicted to any controlled substance . . . [to] possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(3).

### 1. Textual Analysis

The Court begins with the textual coverage of the Second Amendment. On this subject the Supreme Court has read "the Amendment's operative clause," that "'the right of the people to keep and bear Arms shall not be infringed,'" to mean that "'guarantees the individual right to possess and carry weapons in case of confrontation' that does not depend on service in the militia." *Bruen*, 2022 WL 2251305, at 9 (quoting *Heller*, 554 U.S. at 592). Because section 922(g)(3) restricts the "possess[ion]" of "any firearm or ammunition," the Court concludes that section 922(g)(3) regulates conduct which is facially covered by the plain text of the Second Amendment. *See* 18 U.S.C. § 922(g)(3).

The Court notes for the purpose of comprehensiveness that *Bruen* describes "ordinary, law-abiding, adult citizens" as indisputably "part of 'the people' whom the Second Amendment protects." *Id.* at 14; *see also id.* at 12 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.") (quoting *Heller*, 554 U.S. at 635). In fact, the Court specifically limited its decision to "may-issue" licensing regimes; it did not "suggest the unconstitutionality" of the "shall-issue" licensing regimes in use by 43 states,

55a

which "are designed to ensure only that those bearing
arms in the jurisdiction are, in fact 'law-abiding, respon-
sible citizens.'"  *Bruen*, 2022 WL 2251305, at 18 n.9.
Because it is concerned with "unlawful" drug users and
addicts, there is some doubt that section 922(g)(3) is tex-
tually covered by the Second Amendment, insofar as it
has been interpreted to guarantee the right to keep and
bear arms to ordinary, law-abiding, responsible citizens.
*See Roberge v. United
States*, No. 1:04CR70, 1:10CV273, 2013 WL 4052926, at
*17 (E.D. Tenn. Aug. 12, 2013) ("Persons like Roberge,
who unlawfully use controlled substances, are not law
abiding, responsible citizens.   Roberge can be lawfully
prohibited from possessing firearms while he is engag-
ing in criminal conduct by using methamphetamine.");
*see also United States v. Campbell*, No. 4:18CR23, 2020
WL 699821, at *4 (E.D. Tenn. Feb. 11, 2020).

### 2.   Historical Analysis

To be certain, the Court will review historical re-
search into statutes in the American legal tradition
which are analogous to § 922(g)(3).   *Heller* explicitly
cautioned readers not to "doubt  . . .  longstanding
prohibitions on the possession of firearms by felons and
the mentally ill."   *Heller*, 554 U.S. at 626.   Such regu-
latory measures are "presumptively lawful."   *See id.* at
627 n. 26.   The Supreme Court echoed this in *McDon-
ald v. Chicago*, 561 U.S. 742, 786 (2010) ("We repeat
those assurances here," namely, "that our holding did
not cast doubt on such longstanding regulatory mea-
sures as 'prohibitions on the possession of firearms by
felons and the mentally ill.'") (quoting *Heller*, 554 U.S.
at 626).   "In addition, *Heller* demonstrates that a regu-
lation can be deemed 'longstanding' even if it cannot

56a

boast a precise founding-era analogue." *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) (citing *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)).

In a pre-*Heller* case, the Fifth Circuit characterized § 922(g)(3) as a "'limited, narrowly tailored specific exception'" to the Second Amendment right which is "not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *United States v. Patterson*, 431 F.3d 832, 835-36 (5th Cir. 2005) (quoting *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001)).[2] The Fifth Circuit tethered its holding to the high-risk nature of drug abusers—"Congress may prohibit those who pose a risk to society, like felons, from exercising the right to bear arms," and "unlawful users of controlled substances pose a risk to society if permitted to bear arms." *Patterson*, 431 F.3d at 835-836. In an earlier decision, the Fifth Circuit had drawn upon numerous law review articles and other secondary sources to establish that § 922(g)'s restriction on possession of firearms by felons—another high-risk class—has a long and established history in English and American common law. *Emerson*, 270 F.3d at 226 n.21.[3] The Fifth Circuit reaffirmed this holding in a post-*Heller* decision in 2013. *See United States v. May*, 538 F. App'x 465,

---

[2] *See also United States v. Roach*, 201 F. App'x 969, 974 (5th Cir. 2006) (repeating this holding).

[3] *See also Nat'l Rifle Ass'n*, 700 F.3d at 200-04 (discussing the historical foundations of modern firearm restrictions and noting "revolutionary and founding-era gun regulations . . . that targeted particular groups for public safety reasons").

57a

466 (5th Cir. 2013) (citing *Patterson*, 431 F.3d at 836); *see also United States v. Moreno*, 811 F. App'x 219, 223 (5th Cir. 2020) (upholding Sentencing Guideline § 2D1.1(b)(1), which "increases a base offense level by two levels 'if a dangerous weapon (including a firearm) was *possessed*' in the course of an offense involving drugs," because "drug traffickers pose a risk to society that is enhanced by their possession firearms" and the enhancement "harmonizes with historical traditions regarding the Second Amendment") (emphasis in original). District courts in the Fifth Circuit have also upheld the constitutionality of § 922(g)(3) since *Heller*.[4]

Other circuit courts have likewise upheld the constitutionality of § 922(g)(3) under *Heller*'s standards of history and tradition. For instance, the Eighth Circuit collected various cases which found that § 922(g)(3) fell within *Heller*'s presumptively lawful category of historically attested firearm restrictions. *See United States v. Seay*, 620 F.3d 919, 924-25 (8th Cir. 2010) (holding that "§ 922(g)(3) has the same historical pedigree as other portions of § 922(g) which are repeatedly upheld by numerous courts since *Heller*"); *see also United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) (adopting the reasoning of *Seay* and *Yancey*, discussed *infra*, that § 922(g)(3) "embodies a long-standing prohibition of conduct similar to the examples listed in *Heller*"); *United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009) (upholding § 922(g)(3) as one of the "'presumptively lawful regulatory measures'" mentioned in *Heller*).

---

[4] *See, e.g., Piscitello v. Bragg*, No. EP-08-CA-266-KC, 2009 WL 536898, at *3 (W.D. Tex. Feb. 18, 2009).

58a

Perhaps the most robust discussion of the historicity of § 922(g)(3) is contained in *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010).   In that case, the Seventh Circuit began by noting that "[i]t was not until 1968 that Congress barred the mentally ill from possessing guns, and it was in that same legislation that habitual drug users were prohibited from having guns."   *Id.* at 683 (citing Gun Control Act of 1968, Pub. L. 90-618, § 102, 82 Stat. 1213, 1220).   However, Congress's disarmament of drug abusers did not occur in a vacuum; rather, "many states" had theretofore "restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684.   "These statutes demonstrate that Congress was not alone in concluding that habitual drug abusers are unfit to possess firearms."   *Id.*   And these prohibitions "are merely the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification."   *Id.*

The Seventh Circuit analogized disarmament of drug abusers to disarmament of felons, though it noted a debate in legal scholarship as to the extent to which felons were disarmed in American legal tradition.   *Id.* at 684. The Court cited cases from the nineteenth century upholding statutes which disarmed "tramps," *see State v. Hogan*, 58 N.E. 572 (Ohio 1900), and "intoxicated persons," *see State v. Shelby*, 2 S.W. 468 (Mo. 1886).   The Seventh Circuit ultimately concluded:   "Whatever the pedigree of the rule against even nonviolent felons possessing weapons  . . .  most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"   *Id.* at 684-85 (citing *United States v. Vongxay*,

594 F.3d 1111, 1118 (9th Cir. 2010)).[5]   With the histori-
cal conclusion that dangerous or unvirtuous citizens
could be disarmed, the Seventh Circuit produced sources
corroborating Congress's finding that drug abusers are
more likely to engage in gun violence and more likely to
exhibit a dangerous lack of self-control.   *Id.*, the Court
found § 922(g)(3) constitutional.

## CONCLUSION

The Court finds that the analysis in *Yancey* demon-
strates the historical attestation demanded by the
*Bruen* framework.   The appellate courts observe that
"Congress enacted the exclusions in § 922(g) to keep
guns out of the hands of presumptively risky people,"
*Yancey*, 621 F.3d at 683, and enumerated unlawful drug
users and addicts amongst other similar classes.   The
Court need not repeat the Seventh Circuit's historical
analysis in *Yancey*; it suffices to show that analogous
statutes which purport to disarm persons considered a

---

[5]   *See also Nat'l Rifle Ass'n*, 700 F.3d at 201, where, while sum-
marizing the historical evidence relating to disarmament of dan-
gerous persons, the Fifth Circuit said:   "[t]hese categorical re-
strictions may have been animated by a classical republican notion
that only those with adequate civic 'virtue' could claim the right to
arms."   *Id.*   "Scholars have proposed that at the time of the found-
ing, 'the right to arms was inextricably and multifariously linked to
that of civic virtu[e] (i.e., the virtuous citizenry),' and that 'one im-
plication of this emphasis on the virtuous citizen is that the right to
arms does not preclude laws disarming the unvirtuous citizens (i.e.,
criminals) or those who, like children or the mentally imbalanced,
are deemed incapable of virtue."   *Id.* (citing Don B. Kates & Clay-
ton E. Cramer, *Second Amendment Limitations and Criminolog-
ical Considerations*, 60 HASTINGS L. J. 1339, 1359 (2009)).   This
observation comports with the Supreme Court's statements that
the Second Amendment, as a threshold matter, covers only ordi-
nary and responsible law-abiding citizens.

60a

risk to society—whether felons or alcoholics—were known to the American legal tradition. *See, e.g., United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous."). The Court therefore finds that 18 U.S.C. § 922(g)(3) passes constitutional muster under the legal framework articulated in *Heller* and *Bruen.*

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [24] Motion to Dismiss filed by Defendant, Patrick Darnell Daniels, Jr. is **DENIED.**

**SO ORDERED AND ADJUDGED** this the 8th day of July, 2022.

/s/   LOUIS GUIROLA, JR.
        LOUIS GUIROLA, JR.
        United States District Judge

61a

## APPENDIX C

1.   U.S. Const. Amend. II provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.


2.   18 U.S.C. 922(g)(3) provides:

**Unlawful Acts**

   (g)   It shall be unlawful for any person—

   (3)   who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));   *   *   *

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.


3.   21 U.S.C. 802(6) provides:

**Definitions**

   As used in this subchapter:

   (6)   The term "controlled substance" means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter. The term does not include distilled spirits, wine, malt beverages, or tobacco, as those terms are defined or used in subtitle E of the Internal Revenue Code of 1986.

62a

4.   21 U.S.C. 812(c), Schedule I(c)(10) provides:

**Schedules of controlled substances**

**(c)  Initial schedules of controlled substances**

Schedules I, II, III, IV, and V shall, unless and until amended pursuant to  section 811 of this title, consist of the following drugs or other substances,[1] by whatever official name, common or usual name, chemical name, or brand name designated:

SCHEDULE I

(c)  Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

(10)  Marihuana.

---

[1]  See Amendment of Schedules of Controlled Substances note below.



**WIKIPEDIA**
The Free Encyclopedia

# *New York State Rifle & Pistol Association, Inc. v. Bruen*

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ____ (https://supreme.justia.com/cases/federal/us/597/____/) (2022), abbreviated **NYSRPA v. Bruen** and also known as **NYSRPA II** or **Bruen** to distinguish it from the 2020 case, is a landmark decision[1][2] of the United States Supreme Court related to the Second Amendment to the United States Constitution. The case concerned the constitutionality of the 1911 Sullivan Act, a New York State law requiring applicants for a pistol concealed carry license to show "proper cause", or a special need distinguishable from that of the general public, in their application.

In a 6–3 decision, the Supreme Court ruled that New York's law was unconstitutional and that the ability to carry a pistol in public was a constitutional right guaranteed by the Second Amendment. The Court ruled that states are allowed to enforce "shall-issue" permitting, where applicants for concealed carry permits must satisfy certain objective criteria, such as passing a background check, but that "may-issue" systems that use "arbitrary" evaluations of need made by local authorities are unconstitutional.[3]

In the wake of *Bruen*, several lawsuits involving federal and states' gun regulations have been filed, their plaintiffs arguing that the judiciary should evaluate the regulation not in consideration of the public good, but in light of the "historical tradition of firearm regulation", a phrase penned by majority opinion author Justice Clarence Thomas.[4] Several of these cases had successfully overturned long-standing regulations due to the regulations being not of historical tradition. The Supreme Court's decision has been considered by some to be a dramatic expansion of its gun jurisprudence, and has been criticized by some lower court judges as unworkable.[5] Others hold that the findings of Bruen reaffirm the precedent set by District of Columbia v. Heller and clarifies the framework with which lower courts are to decide

| New York State Rifle & Pistol Association, Inc. v. Bruen | |
|---|---|
|  | |
| **Supreme Court of the United States** | |
| Argued November 3, 2021 Decided June 23, 2022 | |
| **Full case name** | *New York State Rifle & Pistol Association, Inc., et al. v. Kevin P. Bruen, in His Official Capacity as Superintendent of New York State Police, et al.* |
| **Docket no.** | 20-843 (https://www.supremecourt.gov/docket/docketfiles/html/public/20-843.html) |
| **Citations** | 597 U.S. ____ (more) 142 S.Ct. 2111 213 L. Ed. 2d 387 2022 WL 2251305 2022 U.S. LEXIS 3055 |
| **Argument** | Oral argument (https://www.oyez.org/cases/2021/20-843) |
| **Decision** | Opinion (https://www.supremecourt.go |

second amendment cases.[6][7] On June 30, 2023, the Supreme Court granted certiorari in *United States v. Rahimi*, a case that many believe could scale back *Bruen*.[8]

# Background

## Prior Second Amendment case law

The issue around the right to carry guns in public in the United States has been a contested area in politics and constitutional law for most of the 21st century. Prior to the case, the Supreme Court established two major decisions toward gun possession in one's home: *District of Columbia v. Heller*[9] affirmed that U.S. citizens did have an individual right, unconnected to a "well-regulated militia", to possess guns within their own homes under the Second Amendment, and *McDonald v. City of Chicago*[10] affirmed this was a right that was incorporated against the states. However, the question of ownership outside of one's home had not yet reached the Supreme Court, and instead was based on an inconsistent framework of state laws and federal court decisions. These decisions were generally rested on long-standing common law that the government does have the ability to regulate firearms in public spaces to uphold state regulations on public gun possession.[11] Across over one thousand cases since *Heller*, most federal appeals courts have used intermediate scrutiny rather than strict scrutiny to judge the validity of public-carry gun control laws which defer to the states' compelling interest to protect the public by restricting possession of guns in public spaces.[12][13]

Since *Heller* and *McDonald*, the Supreme Court had been pressed by gun-rights advocates like the National Rifle Association to further review Second Amendment rights related to public possession of guns, but the Court had passed on numerous cases that were presented.[13] The case *New York State Rifle & Pistol Association Inc. v. City of New York*,[14] which dealt with transporting guns out of New York City, had been accepted by the Supreme Court in 2019, but due to changes in the underlying law, the case was rendered moot.[11]

## Case background

To combat growing criminal violence in certain neighborhoods of New York City, including the assassination attempt on New York City mayor William J. Gaynor and the murder of author David Graham Phillips, Timothy Sullivan led the state legislature to enact the Sullivan Act in 1911.[15][16][17] It made the possession of a handgun without a permit a crime, and instituted issuance of

v/opinions/21pdf/20-843_7j80.pdf)

| Case history | |
|---|---|
| **Prior** | • *N.Y. State Rifle & Pistol Ass'n, Inc. v. Beach*, No. 1:18-cv-00134-BKS-ATB, granting motion to dismiss (N.D.N.Y. 2018)<br>• *N.Y. State Rifle & Pistol Ass'n, Inc. v. Beach*, No. 19-00156, affirmed (2d Cir. 2020) |

| Holding |
|---|
| The Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home. New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms. |

| Court membership |
|---|
| **Chief Justice**<br>John Roberts |
| **Associate Justices**<br>Clarence Thomas · Stephen Breyer<br>Samuel Alito · Sonia Sotomayor<br>Elena Kagan · Neil Gorsuch<br>Brett Kavanaugh · Amy Coney Barrett |

| Case opinions | |
|---|---|
| **Majority** | Thomas, joined by Roberts, Alito, Gorsuch, Kavanaugh, Barrett |
| **Concurrence** | Alito |

concealed carry permits at the discretion of local law enforcement. The law states that to obtain a permit, the applicant must "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession".[12] The state had clarified that this must be a non-speculative need for self-defense as to establish a proper cause to grant a permit.[18] The New York State Rifle and Pistol Association, along with Robert Nash and Brandon Koch, who failed to obtain a permit in New York state, challenged

| Concurrence | Kavanaugh, joined by Roberts |
|---|---|
| Concurrence | Barrett |
| Dissent | Breyer, joined by Sotomayor, Kagan |
| **Laws applied** | |
| U.S. Const. amends. II, XIV | |

that law, seeking to make the issue of permits no longer discretionary.[11][19] Nash, for example, sought a permit for a handgun after a string of robberies in his neighborhood but was denied as he could not prove a need for self-defense.[19] The plaintiffs argued that the law and judgements against their permits were flawed; "Good, even impeccable, moral character plus a simple desire to exercise a fundamental right is, according to these courts, not sufficient. Nor is living or being employed in a 'high crime area.'"[18] The Sullivan Act is considered the first may-issue public carry law in the United States, since the discretion on allowing a person to carry a gun in public is based on the evaluation of need, which seven other states adopted from New York. This is in contrast to more recent "shall-issue" licensing requirements based on determinant methods such as using background checks and aptitude checks to determine eligibility.[11][16]

## Lower courts

The case, filed against then-Superintendent George P. Beach II of the New York State Police and Justice Richard J. McNally of the New York Supreme Court, was initially dismissed at the Northern District of New York in 2018. The plaintiffs appealed to the Second Circuit, which affirmed the dismissal by the District Court in August 2020. Beach was replaced by Keith M. Corlett in 2019; Corlett was replaced by Kevin P. Bruen in 2021, and Bruen was subsequently named as the defendant and respondent in the suit.

## Supreme Court

The petitioners had asked the Supreme Court to review their case, specifically pressing the question of "whether the Second Amendment allows the government to prohibit ordinary law-abiding citizens from carrying handguns outside the home for self-defense".[12] The Supreme Court granted certiorari on April 26, 2021, though it limited the case to the question of "whether the State's denial of petitioners' applications for concealed-carry licenses for self-defense violated the Second Amendment".[11][12] The case was heard on November 3, 2021.[12][20] The petitioners were represented by Paul Clement, who served as solicitor general during the administration of George W. Bush and argued as *amicus curiae* on behalf of the United States in *Heller*, and on behalf of the National Rifle Association in support of the petitioners in *McDonald*.[19] The respondents were represented by New York State Solicitor General Barbara Underwood, who served in the Solicitor General's Office during the administration of Bill Clinton and temporarily served as acting Solicitor General of the United States between the transition from Clinton to Bush.[21]

The case was the first major gun-rights case that the Supreme Court had heard in more than a decade, outside of the moot *New York State Rifle & Pistol Association Inc. v. City of New York*.[11] It was also the first gun-rights case to be heard by the six-member conservative majority, which included Justices Clarence Thomas, Neil Gorsuch and Brett Kavanaugh, who in prior opinions had emphasized the need for the Supreme Court to review the current stance on Second Amendment cases.[11] Justice Amy

Coney Barrett had also expressed support for a Second Amendment review prior to her appointment to the Supreme Court.[12] Because of the shift toward a more-conservative membership, some court analysts believed that the Court might interpret the Second Amendment more liberally in favor of individual rights over states' powers, which could render many existing public-possession regulations unconstitutional.[11][12] However, as discussed by *Vox*'s Ian Millhiser, the limited question that the Court granted may restrict the issue to concealed-carry licenses and not the matter of any and all public possession.[12]

## Amicus briefs

More than eighty *amici curiae* for this case were filed.[22]

### Discrimination and marginalized groups

Organizations representing American minority groups submitted amicus briefs in support of striking down much of the Sullivan Act as unconstitutional.[23] The Bronx Defenders, Brooklyn Defenders Services, and Black Attorneys of Legal Aid opined that the Second Amendment is a "legal fiction" in New York when it comes to people of color.[23] According to these public defender and legal aid organizations, some 96% of those arrested for illegal gun possession in New York during 2020 were either Black or Latino.[23] The disparate racial impact of the Sullivan Act and other discretionary New York state gun control regulations is "no accident" according to their brief provided to the Court.[23] Black Guns Matter, A Girl & A Gun Women's Shooting League, and Armed Equality, an LGBT self-defense group, voiced a similar opinion to the Court in their own amicus brief, calling may-issue "deeply discriminatory".[23]

### Weakness of "proper cause"

Twenty-six state attorneys general argued that the subjective nature of the proper-cause test "fails muster under any level of scrutiny" because it required license applicants to prove they "have already become victims of violent crimes" before they could carry a firearm to protect themselves against that very violence from occurring in the first place.[22][24]

Black Guns Matter opined the proper-cause requirement had no objective standards, and therefore lent itself to discriminatory usage in practice.[22]

### History and precedent

A group of Republican lawyers including J. Michael Luttig, Peter Keisler, and Stuart M. Gerson argued that text, history, tradition, and precedent make it clear that states may restrict concealed carry and pass legislation to reduce gun violence in public.[22][25]

## Opinion of the Court

The case's decision was released on June 23, 2022. In a 6–3 opinion authored by Justice Clarence Thomas,[26][27] the Court held that the state law was unconstitutional as it infringed on the right to keep and bear arms, reversing the Second Circuit's decision and remanding the case for further review.

Thomas' majority opinion, joined by Chief Justice John Roberts and Justices Samuel Alito, Neil Gorsuch, Brett Kavanaugh, and Amy Coney Barrett, effectively rendered public carry a constitutional right under the Second Amendment. Thomas wrote, "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need."[28]

Because public carry is a constitutional right, Thomas ruled out use of the two-part test to evaluate state gun laws, which generally involved application of intermediate scrutiny, that many lower courts had used, and instead evaluated New York's law under a more-stringent test of whether the proper-cause requirement is consistent with the nation's historical tradition of firearm regulation.[29] Thomas wrote that gun control laws that identify restricted "sensitive places", such as courthouses and polling places, would still likely pass constitutional muster, though urban areas would not qualify as such sensitive places.[29]

After striking down the two-step test (formerly used by Courts of Appeals addressing Second Amendment issues), *Bruen* identified the new test courts must use on Second Amendment cases. The Court held: "When the Second Amendment's plain text covers an individual's conduct [here the right to bear arms], the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's '''unqualified command.'"

## Concurrence

Justice Kavanaugh penned a concurring opinion, joined by Chief Justice Roberts, affirming states may still implement licensing requirements such as background checks before issuing public carry permits. Kavanaugh wrote that these checks differ from the New York law as that law "grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense."[28] Kavanaugh quoted from Justice Antonin Scalia's majority opinion in *Heller*, stating that "nothing in our opinion, should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[29]

## Dissent

Justice Stephen Breyer wrote the dissenting opinion, joined by Justices Sonia Sotomayor and Elena Kagan. Breyer led his dissent by referring the amount of gun violence in the United States, including listing several major mass shootings from the months prior. He then wrote that "New York's Legislature considered the empirical evidence about gun violence and adopted a reasonable licensing law to regulate the concealed carriage of handguns in order to keep the people of New York safe", and that the majority decision established a new framework for courts to use in Second Amendments cases that would harm states' abilities to regulate guns. He concluded that "when courts interpret the Second Amendment, it is constitutionally proper, indeed often necessary, for them to consider the serious dangers and consequences of gun violence that lead States to regulate firearms".[28][30]

## Criticism of dissent

Justice Alito wrote a separate concurrence to the majority, in which he criticized Breyer's dissent, stating, "It is hard to see what legitimate purpose can possibly be served by most of the dissent's lengthy introductory section ... Much of the dissent seems designed to obscure the specific question that the Court has decided."[30] Dismissing Breyer's concern on a new legal framework for Second Amendment cases, Alito wrote, "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."[30] Justice Alito also questioned whether a person bent on committing an atrocity such as a mass shooting would be deterred because it would be illegal for him to carry a firearm outside of his home. Alito further pointed out that the recent shooting rampage in Buffalo occurred in New York, and New York's law had done nothing to stop the perpetrator.

# Impact

While the ruling directly applied only to New York's law, legal analysts and lawmakers expected the ruling to be used to challenge the "may-issue" gun regulations in California, Hawaii, Maryland, Massachusetts, New Jersey, and Rhode Island. Lawmakers in New York and these states began evaluating new regulations that would comply with the Supreme Court ruling while maintaining strict ownership laws.[31]

On June 24, 2022, the Acting Attorney General of New Jersey, Matthew J. Platkin, concluded that *Bruen* disallowed the state from requiring concealed carry permit applicants to demonstrate a justifiable need to carry a handgun and directed law enforcement and prosecutors to process applications on a shall-issue basis.[32] The Attorneys General of California[33] and Hawaii[34] issued similar directives.

Within months of the ruling of *Bruen*, several existing and new lawsuit challenging federal and states' firearms regulations pressed on the language of "historical tradition of firearm regulation" that was introduced in Thomas' majority opinion, and to ignore the traditional metric of whether the restriction serves the public good.[4] Among federal laws that have been blocked from enforcement as of February 2023 include those that prevented gun ownership from those convicted of misdemeanor domestic violence, individuals subject to final (issued after a hearing of which the respondent had notice and at which the respondent had the opportunity to appear) domestic violence restraining orders, felony defendants, and drug users. These decisions have been praised by Second Amendment activists but criticized by those fighting for stronger gun control in the U.S. The interpretations of *Bruen* have been considered varied by judges and legal scholars, since interpreting the "historical tradition" requires judges to understand how the framers of the Constitution envisioned gun ownership in the 18th century.[4]

# Reactions

The Governor of New York, Kathy Hochul (D-NY), called the decision by the court "frightening" and said it "strips away the state's right to protect its citizens". She also criticized the decision as "reckless" and "reprehensible".[35] By July 1, 2022, Hochul signed a revised Concealed Carry Improvement Act (CCIA) into law with restrictions on public possession of guns based on the decision from *Bruen*. The new law removes the old "may-issue" standard that had been challenged, but adds new requirements including classroom training and a background check of the applicant's social media posts for any red flags. In addition, the law prohibits guns from being carried in sensitive locations that include polling places, schools, and churches, and well as New York's tourist attractions like Times Square.[36][37][38] The law came into effect on September 1, 2022; an initial lawsuit seeking to block enforcement of the

law was thrown out due to lack of standing though federal judge Glenn Suddaby did agree the new law may be unconstitutional under the *Bruen* decision.[39] A second lawsuit, filed by citizens that belonged to Gun Owners of America, led to Judge Suddaby to grant an injunction on the law on October 6, 2022, stating that the law's full list of locations where public carry was banned was likely indefensible, though the state filed an emergency appeal to the Second Circuit.[40] The Second Circuit lifted the injunction, allowing the law to be enforced, while they reviewed their case.[41]

Separately, New York City passed a bill on October 11, 2022, that designated Times Square as a sensitive location where public possession of a gun would be unlawful.[42]

The Legal Aid Society said the decision "may be an affirmative step toward ending arbitrary licensing standards that have inhibited lawful Black and Brown gun ownership in New York."[43]

House minority Leader Kevin McCarthy (R-CA) supported the ruling, saying it "rightfully ensures the right of all law-abiding Americans to defend themselves without unnecessary government interference."[44]

Law professor Steve Vladeck said the decision will "have monumental ramifications far beyond carrying firearms in public" and predicts there will be a "slew of litigation challenging any and every gun-control measure".[45]

Dudley Brown, president of the National Association for Gun Rights, commented on the ramifications of the Bruen decision in a May 2023 New York Times article, "Dudley Brown, the president of the National Association for Gun Rights, which opposes any restrictions on gun ownership, said the Bruen decision was a bulwark against regulation and would help his organization win a host of lawsuits against gun restrictions. But he said that even with the Bruen ruling, a monumental victory in the Supreme Court, the fight would be playing out for years in state legislatures and lower courts that now have to interpret the decision. 'It often feels like one step forward, two steps back,' he said."[46]

# References

1. Root, Damon (June 23, 2022). "In Landmark 2nd Amendment Ruling, SCOTUS Affirms Right 'To Carry a Handgun for Self-Defense Outside the Home' " (https://web.archive.org/web/20220626000611/https://reason.com/2022/06/23/in-landmark-2nd-amendment-ruling-scotus-affirms-right-to-carry-a-handgun-for-self-defense-outside-the-home/). *Reason*. Archived from the original (https://reason.com/2022/06/23/in-landmark-2nd-amendment-ruling-scotus-affirms-right-to-carry-a-handgun-for-self-defense-outside-the-home/) on June 26, 2022. Retrieved June 26, 2022. "In a landmark victory for gun rights advocates, the U.S. Supreme Court today ruled 6–3 that 'the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home.' "
2. Seddiq, Oma (June 23, 2022). "Supreme Court strikes down century-old New York law, dramatically expanding Second Amendment rights to carry guns outside the home" (https://web.archive.org/web/20220626001859/https://www.businessinsider.com/supreme-court-guns-decision-second-amendment-new-york-2022-6). Business Insider. Archived from the original (https://www.businessinsider.com/supreme-court-guns-decision-second-amendment-new-york-2022-6) on June 26, 2022. Retrieved June 26, 2022. "The landmark decision came 14 years after the nation's top court last significantly expanded gun rights."

3. Thomas, Clarence (June 23, 2022). "New York State Rifle & Pistol Association, Inc., Et Al. v. Bruen, Superintendent of New York State Police, Et Al" (https://www.supremecourt.gov/opinions/21pdf/20-843_7j80.pdf) (PDF). *supremecourt.gov*. The Supreme Court of the United States. Archived (https://web.archive.org/web/20220623143132/https://www.supremecourt.gov/opinions/21pdf/20-843_7j80.pdf) (PDF) from the original on June 23, 2022. Retrieved June 23, 2022.

4. Richer, Alanna Durkin; Whitehurst, Lindsay (February 18, 2023). "Turmoil in courts on gun laws in wake of justices' ruling" (https://apnews.com/article/politics-mississippi-state-government-delaware-california-massachusetts-3983cecfd1107c263d5309ec0d80a966). *Associated Press*. Retrieved February 19, 2023.

5. "Judges Find Supreme Court's Bruen Test Unworkable" (https://www.brennancenter.org/our-work/research-reports/judges-find-supreme-courts-bruen-test-unworkable). *www.brennancenter.org*. Retrieved July 19, 2023.

6. "New York State Rifle & Pistol Association (NYSRPA) v. Bruen (2022)" (https://www.law.cornell.edu/wex/new_york_state_rifle_pistol_association_(nysrpa)_v._bruen_(2022)). *Cornell Law School*. June 1, 2022. Retrieved September 23, 2023.

7. "Text-and-History or Means-End Scrutiny? A Response to Professor Nelson Lund's Critique of Bruen" (https://fedsoc.org/commentary/publications/text-and-history-or-means-end-scrutiny-a-response-to-professor-nelson-lund-s-critique-of-bruen). *The Federalist Society*. March 16, 2023. Retrieved September 23, 2023.

8. "Supreme Court considers recoil from landmark gun rights ruling" (https://www.nbcnews.com/politics/supreme-court/supreme-court-considers-recoil-landmark-gun-rights-ruling-rcna89261). *NBC News*. June 18, 2023. Retrieved July 19, 2023.

9. *District of Columbia v. Heller*, 554 U.S. 570 (https://supreme.justia.com/cases/federal/us/554/570/) (2008)

10. *McDonald v. City of Chicago*, 561 U.S. 742 (https://supreme.justia.com/cases/federal/us/561/742/) (2010)

11. Liptak, Adam (April 26, 2021). "Supreme Court to Hear Case on Carrying Guns in Public" (https://web.archive.org/web/20211101133529/https://www.nytimes.com/2021/04/26/us/supreme-court-gun.html). *The New York Times*. Archived from the original (https://www.nytimes.com/2021/04/26/us/supreme-court-gun.html) on November 1, 2021. Retrieved April 26, 2021.

12. Millhiser, Ian (April 26, 2021). "The Supreme Court will hear a major Second Amendment case that could gut US gun laws" (https://web.archive.org/web/20210825055425/https://www.vox.com/2021/4/26/22364154/supreme-court-guns-second-amendment-new-york-state-rifle-corlett-shootings-kavanaugh-barrett). *Vox*. Archived from the original (https://www.vox.com/2021/4/26/22364154/supreme-court-guns-second-amendment-new-york-state-rifle-corlett-shootings-kavanaugh-barrett) on August 25, 2021. Retrieved April 26, 2021.

13. Wolf, Richard (April 27, 2020). "Supreme Court sidesteps major Second Amendment case, a setback for NRA" (https://www.usatoday.com/story/news/politics/2020/04/27/guns-supreme-court-setback-national-rifle-association/2634492001/). *USA Today*. Archived (https://web.archive.org/web/20210426152242/https://www.usatoday.com/story/news/politics/2020/04/27/guns-supreme-court-setback-national-rifle-association/2634492001/) from the original on April 26, 2021. Retrieved April 26, 2021.

14. *New York State Rifle & Pistol Association, Inc. v. City of New York, New York (https://www.supremecourt.gov/opinions/19pdf/18-280_ba7d.pdf) Archived (https://web.archive.org/web/20210421030419/https://www.supremecourt.gov/opinions/19pdf/18-280_ba7d.pdf) April 21, 2021, at the Wayback Machine*, No. 18–280 (April 27, 2020).

15. Gorrivan, Charles (February 4, 2022). "The Sullivan Act and the Supreme Court: Are New York's Gun Laws Constitutional?" (https://www.standrewslawreview.com/post/the-sullivan-act-and-the-su preme-court-are-new-york-s-gun-laws-constitutional). *St. Andrews Law Journal*. Archived (https:// web.archive.org/web/20220510235809/https://www.standrewslawreview.com/post/the-sullivan-act -and-the-supreme-court-are-new-york-s-gun-laws-constitutional) from the original on May 10, 2022. Retrieved June 23, 2022.

16. Depew, Briggs; Swensen, Isaac (January 12, 2022). "The Effect of Concealed-Carry and Handgun Restrictions on Gun-Related Deaths: Evidence from the Sullivan Act of 1911". *The Economic Journal*. **132** (646): 2118–2140. doi:10.1093/ej/ueac004 (https://doi.org/10.1093%2Fej%2Fueac00 4).

17. "An Act to amend the penal law, in relation to the sale and carrying of dangerous weapons" (http s://hdl.handle.net/2027/uc1.b4375314?urlappend=%3Bseq=462). *Laws of the State of New York Passed at the Sessions of the Legislature*. 134th sess.: I: 442–445. 1911. hdl:2027/uc1.b4375314 (https://hdl.handle.net/2027%2Fuc1.b4375314). ISSN 0892-287X (https://www.worldcat.org/issn/0 892-287X). Chapter 195, enacted May 25, 1911, effective September 1, 1911.

18. Fritze, John; Jansen, Bart (April 26, 2021). "Supreme Court takes case seeking to expand concealed-carry rights in public places" (https://www.usatoday.com/story/news/politics/2021/04/26/ supreme-court-takes-gun-case-aimed-regulations-outside-home/7062821002/). *USA Today*. Archived (https://web.archive.org/web/20210426141612/https://www.usatoday.com/story/news/poli tics/2021/04/26/supreme-court-takes-gun-case-aimed-regulations-outside-home/7062821002/) from the original on April 26, 2021. Retrieved April 26, 2021.

19. de Vogue, Ariane; Cole, Devan (April 26, 2021). "Supreme Court agrees to take up major Second Amendment case" (https://www.cnn.com/2021/04/26/politics/supreme-court-second-amendment-c ase/index.html). CNN. Archived (https://web.archive.org/web/20210426172300/https://www.cnn.co m/2021/04/26/politics/supreme-court-second-amendment-case/index.html) from the original on April 26, 2021. Retrieved April 26, 2021.

20. "[New York State Rifle & Pistol Assn v. Bruen] Oral Arguments | C-SPAN.org" (https://www.c-span. org/video/?514699-1/new-york-state-rifle-pistol-assn-v-bruen-oral-arguments&vod). *C-SPAN*. November 3, 2021. Archived (https://web.archive.org/web/20220704061645/https://www.c-span.or g/video/?514699-1/supreme-court-strikes-york-concealed-gun-law-6-3-opinion&vod=) from the original on July 4, 2022. Retrieved November 3, 2021.

21. "Majority of court appears dubious of New York gun-control law, but justices mull narrow ruling" (ht tps://www.scotusblog.com/2021/11/majority-of-court-appears-dubious-of-new-york-gun-control-law -but-justices-mull-narrow-ruling/). November 3, 2021. Archived (https://web.archive.org/web/20211 205151323/https://www.scotusblog.com/2021/11/majority-of-court-appears-dubious-of-new-york-g un-control-law-but-justices-mull-narrow-ruling/) from the original on December 5, 2021. Retrieved December 5, 2021.

22. Ellena Erskine. "We read all the amicus briefs in New York State Rifle so you don't have to (http s://www.scotusblog.com/2021/11/we-read-all-the-amicus-briefs-in-new-york-state-rifle-so-you-dont -have-to/) Archived (https://web.archive.org/web/20220623172055/https://www.scotusblog.com/20 21/11/we-read-all-the-amicus-briefs-in-new-york-state-rifle-so-you-dont-have-to/) June 23, 2022, at the Wayback Machine". *SCOTUSBlog*, November 2, 2021. Accessed June 23, 2022.

23. Arun Venugopal; Herb Pinder. "An upcoming U.S. Supreme Court ruling in a NY case could mean more handguns in public places (https://gothamist.com/news/an-upcoming-us-supreme-court-rulin g-in-a-ny-case-could-mean-more-handguns-in-public-places) Archived (https://web.archive.org/we b/20220622194211/https://gothamist.com/news/an-upcoming-us-supreme-court-ruling-in-a-ny-cas e-could-mean-more-handguns-in-public-places) June 22, 2022, at the Wayback Machine". *Gothamist*, June 2, 2022. Accessed June 22, 2022.

24. Brief of Arizona, Missouri, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming as Amici Curiae in Support of Petitioners (https://www.supremecourt.gov/DocketPDF/20/20-843/1 84422/20210720153608584_20-843%20tsac%20Arizona%20Missouri%20et%20al.pdf) Archived (https://web.archive.org/web/20220623172109/https://www.supremecourt.gov/DocketPDF/20/20-8 43/184422/20210720153608584_20-843%20tsac%20Arizona%20Missouri%20et%20al.pdf) June 23, 2022, at the Wayback Machine". Supreme Court of the United States. Accessed June 23, 2022.

25. BRIEF OF J. MICHAEL LUTTIG, PETER KEISLER, CARTER PHILLIPS AND STUART GERSON, ET AL., AS AMICI CURIAE IN SUPPORT OF RESPONDENTS (https://www.supremecourt.gov/Do cketPDF/20/20-843/192413/20210914195816977_20-843%20Brief%20in%20Opp.pdf) [[Supreme Court of the United States ] Archived (https://web.archive.org/web/20220607184831/https://www.s upremecourt.gov/DocketPDF/20/20-843/192273/20210913145956623_20-843_Amici%20Brief.pd f) June 7, 2022, at the Wayback Machine". Supreme Court of the United States. Accessed Aug 19, 2022.

26. Williams, Pete (June 23, 2022). "Supreme Court allows the carrying of firearms in public in major victory for gun rights groups" (https://web.archive.org/web/20220626001859/https://www.businessi nsider.com/supreme-court-guns-decision-second-amendment-new-york-2022-6). NBC News. Archived from the original (https://www.nbcnews.com/politics/supreme-court/supreme-court-says-s econd-amendment-guarantees-right-carry-guns-public-rcna17721) on June 26, 2022. Retrieved June 26, 2022.

27. "New York State Rifle & Pistol Association, Inc. v. Bruen" (https://www.supremecourt.gov/opinions/ 21pdf/20-843_7j80.pdf) (PDF). *Supreme Court of the United States*. July 4, 2022. Archived (http s://web.archive.org/web/20220623145604/https://www.supremecourt.gov/opinions/21pdf/20-843_ 7j80.pdf) (PDF) from the original on June 23, 2022. Retrieved June 23, 2022.

28. Williams, Pete (June 23, 2022). "Supreme Court allows the carrying of firearms in public in major victory for gun-rights groups" (https://www.nbcnews.com/news/amp/rcna17721). NBC News. Archived (https://web.archive.org/web/20220623145245/https://www.nbcnews.com/news/amp/rcn a17721) from the original on June 23, 2022. Retrieved June 23, 2022.

29. Howe, Amy (June 23, 2022). "In 6-3 ruling, court strikes down New York's concealed-carry law" (ht tps://www.scotusblog.com/2022/06/in-6-3-ruling-court-strikes-down-new-yorks-concealed-carry-la w/). *SCOTUSBlog*. Archived (https://web.archive.org/web/20220623143901/https://www.scotusblo g.com/2022/06/in-6-3-ruling-court-strikes-down-new-yorks-concealed-carry-law/) from the original on June 23, 2022. Retrieved June 23, 2022.

30. "Samuel Alito lashes out at liberals in guns case as tensions boil over at SCOTUS" (https://www.c nn.com/2022/06/23/politics/samuel-alito-stephen-breyer-guns/index.html). *CNN*. June 23, 2022. Archived (https://web.archive.org/web/20220624002303/https://www.cnn.com/2022/06/23/politics/ samuel-alito-stephen-breyer-guns/index.html) from the original on June 24, 2022. Retrieved June 24, 2022.

31. MacDermitt, Jennifer (June 24, 2022). "States brace for fight over gun laws after high court ruling" (https://apnews.com/article/us-supreme-court-new-york-jersey-gun-politics-government-and-24a6 a82ea365212ecaa7af71f9c72561). *Associated Press*. Archived (https://web.archive.org/web/2022 0624065956/https://apnews.com/article/us-supreme-court-new-york-jersey-gun-politics-governme nt-and-24a6a82ea365212ecaa7af71f9c72561) from the original on June 24, 2022. Retrieved June 24, 2022.

32. "ATTORNEY GENERAL LAW ENFORCEMENT DIRECTIVE NO. 2022-07" (https://www.nj.gov/oa g/dcj/agguide/directives/ag-Directive-2022-07_Directive-Clarifying-Requirements-For-Carrying-Of-Firearms-In-Public.pdf) (PDF). June 24, 2022. Archived (https://web.archive.org/web/2022062421 3853/https://www.nj.gov/oag/dcj/agguide/directives/ag-Directive-2022-07_Directive-Clarifying-Req uirements-For-Carrying-Of-Firearms-In-Public.pdf) (PDF) from the original on June 24, 2022. Retrieved June 26, 2022.

33. "Legal Alert: U.S. Supreme Court's Decision in New York State Rifle & Pistol Association v. Bruen, No. 20-843" (https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf) (PDF). Archived (https://web.archive.org/web/20220625052535/https://oag.ca.gov/system/files/media/legal-alert-oa g-2022-02.pdf) (PDF) from the original on June 25, 2022. Retrieved June 26, 2022.

34. "Public Carry Licensing Under Hawai'i Law Following New York State Rifle & Pistol Association v. Bruen" (https://ag.hawaii.gov/wp-content/uploads/2022/07/Attorney-General-Opinion-22-02.pdf) (PDF). *Ag.hawaii.gov*. Retrieved July 28, 2022.

35. "Supreme Court's Gun-Rights Ruling Is 'Frightening,' New York Governor Hochul Says" (https://w ww.bloomberg.com/news/articles/2022-06-23/n-y-governor-hochul-says-supreme-court-ruling-frigh tening). *Bloomberg.com*. June 23, 2022. Retrieved June 23, 2022.

36. El-bawab, Nadine; Katersky, Aaron (July 1, 2022). "New York governor signs bill to ban guns from Times Square, mass transit" (https://abcnews.go.com/US/york-lawmakers-introduce-bill-ban-guns-times-square/story?id=86071477). *ABC News*. Archived (https://web.archive.org/web/2022070116 0313/https://abcnews.go.com/US/york-lawmakers-introduce-bill-ban-guns-times-square/story?id= 86071477) from the original on July 1, 2022. Retrieved July 1, 2022.

37. Kaplan, Anna (July 1, 2022). "NYS Senate Fixes Gun Laws Following Reckless Supreme Court Decision" (https://www.nysenate.gov/newsroom/press-releases/anna-m-kaplan/nys-senate-fixes-g un-laws-following-reckless-supreme-court) (Press release). New York State Senate. Retrieved October 2, 2022.

38. "Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision" (https://www.go vernor.ny.gov/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-r estrictions) (Press release). Office of the Governor of New York. July 1, 2022. Retrieved October 2, 2022.

39. "New York law that bars carrying guns in Time Square and other areas goes into effect" (https://np r.org/2022/09/01/1120460484/new-york-law-that-bars-carrying-guns-in-certain-areas-goes-into-eff ect). *NPR*. September 2022.

40. Bromwich, Johan (October 6, 2022). "Federal Judge Blocks N.Y. Gun Law, Finding Much of It Unconstitutional" (https://www.nytimes.com/2022/10/06/nyregion/judge-blocks-ny-gun-law.html). *The New York Times*. Retrieved October 7, 2022.

41. "New York's new concealed carry law can remain in effect for now, court rules" (https://amp.cnn.co m/cnn/2022/10/12/politics/new-york-gun-laws/index.html).

42. "Times Square Gun Ban Bill Signed by New York Mayor Eric Adams" (https://deadline.com/2022/1 0/times-square-gun-ban-bill-1235141028/). October 11, 2022.

43. Justin Rohrlich. "[Supreme Court Paves Way for Even Looser Gun Laws Weeks After Uvalde Massacre]". *Yahoo News*, June 23, 2022. Accessed June 24, 2022.

44. "Live updates" (https://apnews.com/article/supreme-court-guns-decision-live-updates-ee17efebab 4c2c44a41561be31fe31d0). AP. June 23, 2022. Archived (https://web.archive.org/web/202206231 95242/https://apnews.com/article/supreme-court-guns-decision-live-updates-ee17efebab4c2c44a 41561be31fe31d0) from the original on June 23, 2022. Retrieved June 23, 2022.

45. de Vogue, Ariane; Sneed, Tierney (June 23, 2022). "Supreme Court says Constitution protects right to carry a gun outside the home" (https://web.archive.org/web/20220623212958/https://editio n.cnn.com/2022/06/23/politics/supreme-court-guns-second-amendment-new-york-bruen/index.ht ml). CNN. Archived from the original (https://www.cnn.com/2022/06/23/politics/supreme-court-gun s-second-amendment-new-york-bruen/index.html) on June 23, 2022. Retrieved June 23, 2022.

46. Dewan, Shaila (May 24, 2023). "In Capitols and Courthouses, No End to National Divide Over Gun Policy" (https://www.nytimes.com/2023/05/24/us/gun-control-laws-uvalde.html). *The New York Times*. ISSN 0362-4331 (https://www.worldcat.org/issn/0362-4331). Retrieved May 25, 2023.

# Further reading

- Matza, Max; Zurcher, Anthony (July 14, 2022). "What comes next for US gun control?" (https://ww w.bbc.com/news/world-us-canada-62157480). BBC. Retrieved July 15, 2022.

# External links

- Text of *New York State Rifle & Pistol Association, Inc. v. Bruen*, No. 20-843, 597 U.S. ___ (2022) is available from: Justia (https://supreme.justia.com/cases/federal/us/597/20-843/) Oyez (oral argument audio) (https://www.oyez.org/cases/2021/20-843) Supreme Court (slip opinion) (https:// www.supremecourt.gov/opinions/21pdf/20-843_7j80.pdf) ℗ This article incorporates text from this source, which is in the public domain.
- S.51001 Concealed Carry Improvement Act (https://www.nysenate.gov/legislation/bills/2021/S510 01) from the New York State Senate

Retrieved from "https://en.wikipedia.org/w/index.php? title=New_York_State_Rifle_%26_Pistol_Association,_Inc._v._Bruen&oldid=1181672415"

-

(Slip Opinion)                OCTOBER TERM, 2021                           1

Syllabus

> NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
> being done in connection with this case, at the time the opinion is issued.
> The syllabus constitutes no part of the opinion of the Court but has been
> prepared by the Reporter of Decisions for the convenience of the reader.
> See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL. *v.* BRUEN, SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 20–843.   Argued November 3, 2021—Decided June 23, 2022

The State of New York makes it a crime to possess a firearm without a license, whether inside or outside the home. An individual who wants to carry a firearm outside his home may obtain an unrestricted license to "have and carry" a concealed "pistol or revolver" if he can prove that "proper cause exists" for doing so. N. Y. Penal Law Ann. §400.00(2)(f). An applicant satisfies the "proper cause" requirement only if he can "demonstrate a special need for self-protection distinguishable from that of the general community." *E.g., In re Klenosky,* 75 App. Div. 2d 793, 428 N. Y. S. 2d 256, 257.

Petitioners Brandon Koch and Robert Nash are adult, law-abiding New York residents who both applied for unrestricted licenses to carry a handgun in public based on their generalized interest in self-defense. The State denied both of their applications for unrestricted licenses, allegedly because Koch and Nash failed to satisfy the "proper cause" requirement. Petitioners then sued respondents—state officials who oversee the processing of licensing applications—for declaratory and injunctive relief, alleging that respondents violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications for failure to demonstrate a unique need for self-defense. The District Court dismissed petitioners' complaint and the Court of Appeals affirmed. Both courts relied on the Second Circuit's prior decision in *Kachalsky* v. *County of Westchester,* 701 F. 3d 81, which had sustained New York's proper-cause standard, holding that the requirement was "substantially related to the achievement of an important governmental interest." *Id.,* at 96.

2    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Syllabus

*Held*: New York's proper-cause requirement violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their Second Amendment right to keep and bear arms in public for self-defense. Pp. 8–63.

(a) In *District of Columbia* v. *Heller*, 554 U. S. 570, and *McDonald* v. *Chicago*, 561 U. S. 742, the Court held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense. Under *Heller*, when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and to justify a firearm regulation the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation. Pp. 8–22.

(1) Since *Heller* and *McDonald*, the Courts of Appeals have developed a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. The Court rejects that two-part approach as having one step too many. Step one is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support a second step that applies means-end scrutiny in the Second Amendment context. *Heller*'s methodology centered on constitutional text and history. It did not invoke any means-end test such as strict or intermediate scrutiny, and it expressly rejected any interest-balancing inquiry akin to intermediate scrutiny. Pp. 9–15.

(2) Historical analysis can sometimes be difficult and nuanced, but reliance on history to inform the meaning of constitutional text is more legitimate, and more administrable, than asking judges to "make difficult empirical judgments" about "the costs and benefits of firearms restrictions," especially given their "lack [of] expertise" in the field. *McDonald*, 561 U. S., at 790–791 (plurality opinion). Federal courts tasked with making difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. While judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment "is the very product of an interest balancing by the people," and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U. S., at 635. Pp. 15–17.

(3) The test that the Court set forth in *Heller* and applies today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. Of course, the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. But the Constitution

Syllabus

can, and must, apply to circumstances beyond those the Founders specifically anticipated, even though its meaning is fixed according to the understandings of those who ratified it. See, *e.g.*, *United States* v. *Jones*, 565 U. S. 400, 404–405. Indeed, the Court recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." 554 U. S., at 582.

To determine whether a firearm regulation is consistent with the Second Amendment, *Heller* and *McDonald* point toward at least two relevant metrics: first, whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether that regulatory burden is comparably justified. Because "individual self-defense is 'the *central component*' of the Second Amendment right," these two metrics are "'*central*'" considerations when engaging in an analogical inquiry. *McDonald*, 561 U. S., at 767 (quoting *Heller*, 554 U. S., at 599).

To be clear, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. For example, courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible. *Id.,* at 626. That said, respondents' attempt to characterize New York's proper-cause requirement as a "sensitive-place" law lacks merit because there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department. Pp. 17–22.

(b) Having made the constitutional standard endorsed in *Heller* more explicit, the Court applies that standard to New York's proper-cause requirement. Pp. 23–62.

(1) It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects. See *Heller*, 554 U. S., at 580. And no party disputes that handguns are weapons "in common use" today for self-defense. See *id.,* at 627. The Court has little difficulty concluding also that the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense. Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms, and the definition of "bear" naturally encompasses public carry. Moreover, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," *id.,* at 592, and confrontation can surely take place outside the home. Pp. 23–24.

4    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Syllabus

(2) The burden then falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. To do so, respondents appeal to a variety of historical sources from the late 1200s to the early 1900s. But when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller,* 554 U. S., at 634–635. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or post-dates either time may not illuminate the scope of the right. With these principles in mind, the Court concludes that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement. Pp. 24–62.

(i) Respondents' substantial reliance on English history and custom before the founding makes some sense given *Heller's* statement that the Second Amendment "codified a right 'inherited from our English ancestors.'" 554 U. S., at 599. But the Court finds that history ambiguous at best and sees little reason to think that the Framers would have thought it applicable in the New World. The Court cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection. Pp. 30–37.

(ii) Respondents next direct the Court to the history of the Colonies and early Republic, but they identify only three restrictions on public carry from that time. While the Court doubts that just three colonial regulations could suffice to show a tradition of public-carry regulation, even looking at these laws on their own terms, the Court is not convinced that they regulated public carry akin to the New York law at issue. The statutes essentially prohibited bearing arms in a way that spread "fear" or "terror" among the people, including by carrying of "dangerous and unusual weapons." See 554 U. S., at 627. Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are today "the quintessential self-defense weapon." *Id.,* at 629. Thus, these colonial laws provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today. Pp. 37–42.

(iii) Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate. Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes. None of these restrictions imposed a substantial burden on public carry analogous to that imposed by New York's restrictive licensing regime.

Cite as: 597 U. S. \_\_\_\_ (2022)                                    5

Syllabus

*Common-Law Offenses.* As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.

*Statutory Prohibitions.* In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. But the antebellum state-court decisions upholding them evince a consensus view that States could not altogether prohibit the public carry of arms protected by the Second Amendment or state analogues.

*Surety Statutes.* In the mid-19th century, many jurisdictions began adopting laws that required certain individuals to post bond before carrying weapons in public. Contrary to respondents' position, these surety statutes in no way represented direct precursors to New York's proper-cause requirement. While New York presumes that individuals have no public carry right without a showing of heightened need, the surety statutes presumed that individuals had a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836). Thus, unlike New York's regime, a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace. And, even then, proving special need simply avoided a fee.

In sum, the historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation, but none of these limitations on the right to bear arms operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose. Pp. 42–51.

    (iv) Evidence from around the adoption of the Fourteenth Amendment also does not support respondents' position. The "discussion of the [right to keep and bear arms] in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves," *Heller*, 554 U. S., at 614, generally demonstrates that during Reconstruction the right to keep and bear arms had limits that were consistent with a right of the public to peaceably carry handguns for self-defense. The Court acknowledges two Texas cases—*English* v. *State*, 35 Tex. 473 and *State* v. *Duke*, 42 Tex. 455—that approved a statutory "reasonable grounds" standard for public carry analogous to New York's proper-cause requirement. But these decisions were outliers and therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public. See *Heller*, 554 U. S., at 632. Pp. 52–58.

6    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Syllabus

(v) Finally, respondents point to the slight uptick in gun regulation during the late-19th century. As the Court suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence. In addition, the vast majority of the statutes that respondents invoke come from the Western Territories. The bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry. See *Heller*, 554 U. S., at 614. Moreover, these territorial laws were rarely subject to judicial scrutiny, and absent any evidence explaining why these unprecedented prohibitions on all public carry were understood to comport with the Second Amendment, they do little to inform "the origins and continuing significance of the Amendment." *Ibid.*; see also The Federalist No. 37, p. 229. Finally, these territorial restrictions deserve little weight because they were, consistent with the transitory nature of territorial government, short lived. Some were held unconstitutional shortly after passage, and others did not survive a Territory's admission to the Union as a State. Pp. 58–62.

(vi) After reviewing the Anglo-American history of public carry, the Court concludes that respondents have not met their burden to identify an American tradition justifying New York's proper-cause requirement. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor have they generally required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" to carry arms in public. *Klenosky*, 75 App. Div. 2d, at 793, 428 N. Y. S. 2d, at 257. P. 62.

(c) The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U. S., at 780 (plurality opinion). The exercise of other constitutional rights does not require individuals to demonstrate to government officers some special need. The Second Amendment right to carry arms in public for self-defense is no different. New York's proper-cause requirement violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms in public. Pp. 62–63.

818 Fed. Appx. 99, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. ALITO, J., filed a concurring opinion. KAVANAUGH, J., filed a concurring opinion, in which ROBERTS, C. J., joined. BARRETT, J., filed a concurring opinion. BREYER, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 20–843

---

## NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS v. KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE THOMAS delivered the opinion of the Court.

In *District of Columbia* v. *Heller*, 554 U. S. 570 (2008), and *McDonald* v. *Chicago*, 561 U. S. 742 (2010), we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home.

The parties nevertheless dispute whether New York's licensing regime respects the constitutional right to carry handguns publicly for self-defense. In 43 States, the government issues licenses to carry based on objective criteria. But in six States, including New York, the government further conditions issuance of a license to carry on a citizen's showing of some additional special need. Because the State

2    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution.

I
A

New York State has regulated the public carry of handguns at least since the early 20th century. In 1905, New York made it a misdemeanor for anyone over the age of 16 to "have or carry concealed upon his person in any city or village of [New York], any pistol, revolver or other firearm without a written license . . . issued to him by a police magistrate." 1905 N. Y. Laws ch. 92, §2, pp. 129–130; see also 1908 N. Y. Laws ch. 93, §1, pp. 242–243 (allowing justices of the peace to issue licenses). In 1911, New York's "Sullivan Law" expanded the State's criminal prohibition to the possession of all handguns—concealed or otherwise—without a government-issued license. See 1911 N. Y. Laws ch. 195, §1, p. 443. New York later amended the Sullivan Law to clarify the licensing standard: Magistrates could "issue to [a] person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon" only if that person proved "good moral character" and "proper cause." 1913 N. Y. Laws ch. 608, §1, p. 1629.

Today's licensing scheme largely tracks that of the early 1900s. It is a crime in New York to possess "any firearm" without a license, whether inside or outside the home, punishable by up to four years in prison or a $5,000 fine for a felony offense, and one year in prison or a $1,000 fine for a misdemeanor. See N. Y. Penal Law Ann. §§265.01–b (West 2017), 261.01(1) (West Cum. Supp. 2022), 70.00(2)(e) and (3)(b), 80.00(1)(a) (West 2021), 70.15(1), 80.05(1). Meanwhile, possessing a loaded firearm outside one's home or place of business without a license is a felony punishable by

Opinion of the Court

up to 15 years in prison.    §§265.03(3) (West 2017), 70.00(2)(c) and (3)(b), 80.00(1)(a).

A license applicant who wants to possess a firearm *at home* (or in his place of business) must convince a "licensing officer"—usually a judge or law enforcement officer—that, among other things, he is of good moral character, has no history of crime or mental illness, and that "no good cause exists for the denial of the license." §§400.00(1)(a)–(n) (West Cum. Supp. 2022). If he wants to carry a firearm *outside* his home or place of business for self-defense, the applicant must obtain an unrestricted license to "have and carry" a concealed "pistol or revolver." §400.00(2)(f). To secure that license, the applicant must prove that "proper cause exists" to issue it. *Ibid.* If an applicant cannot make that showing, he can receive only a "restricted" license for public carry, which allows him to carry a firearm for a limited purpose, such as hunting, target shooting, or employment. See, *e.g., In re O'Brien*, 87 N. Y. 2d 436, 438–439, 663 N. E. 2d 316, 316–317 (1996); *Babernitz* v. *Police Dept. of City of New York*, 65 App. Div. 2d 320, 324, 411 N. Y. S. 2d 309, 311 (1978); *In re O'Connor*, 154 Misc. 2d 694, 696–698, 585 N. Y. S. 2d 1000, 1003 (Westchester Cty. 1992).

No New York statute defines "proper cause." But New York courts have held that an applicant shows proper cause only if he can "demonstrate a special need for self-protection distinguishable from that of the general community." *E.g., In re Klenosky*, 75 App. Div. 2d 793, 428 N. Y. S. 2d 256, 257 (1980). This "special need" standard is demanding. For example, living or working in an area "'noted for criminal activity'" does not suffice. *In re Bernstein*, 85 App. Div. 2d 574, 445 N. Y. S. 2d 716, 717 (1981). Rather, New York courts generally require evidence "of particular threats, attacks or other extraordinary danger to personal safety." *In re Martinek*, 294 App. Div. 2d 221, 222, 743 N. Y. S. 2d 80, 81 (2002); see also *In re Kaplan*, 249 App. Div. 2d 199, 201, 673 N. Y. S. 2d 66, 68 (1998) (approving the New York

4    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

City Police Department's requirement of "'extraordinary personal danger, documented by proof of recurrent threats to life or safety'" (quoting 38 N. Y. C. R. R. §5–03(b))).

When a licensing officer denies an application, judicial review is limited. New York courts defer to an officer's application of the proper-cause standard unless it is "arbitrary and capricious." *In re Bando*, 290 App. Div. 2d 691, 692, 735 N. Y. S. 2d 660, 661 (2002). In other words, the decision "must be upheld if the record shows a rational basis for it." *Kaplan*, 249 App. Div. 2d, at 201, 673 N. Y. S. 2d, at 68. The rule leaves applicants little recourse if their local licensing officer denies a permit.

New York is not alone in requiring a permit to carry a handgun in public. But the vast majority of States—43 by our count—are "shall issue" jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability.[1]  Meanwhile, only six

---

[1] See Ala. Code §13A–11–75 (Cum. Supp. 2021); Alaska Stat. §18.65.700 (2020); Ariz. Rev. Stat. Ann. §13–3112 (Cum. Supp. 2021); Ark. Code Ann. §5–73–309 (Supp. 2021); Colo. Rev. Stat. §18–12–206 (2021); Fla. Stat. §790.06 (2021); Ga. Code Ann. §16–11–129 (Supp. 2021); Idaho Code Ann. §18–3302K (Cum. Supp. 2021); Ill. Comp. Stat., ch. 430, §66/10 (West Cum. Supp. 2021); Ind. Code §35–47–2–3 (2021); Iowa Code §724.7 (2022); Kan. Stat. Ann. §75–7c03 (2021); Ky. Rev. Stat. Ann. §237.110 (Lexis Cum. Supp. 2021); La. Rev. Stat. Ann. §40:1379.3 (West Cum. Supp. 2022); Me. Rev. Stat. Ann., Tit. 25, §2003 (Cum. Supp. 2022); Mich. Comp. Laws §28.425b (2020); Minn. Stat. §624.714 (2020); Miss. Code Ann. §45–9–101 (2022); Mo. Rev. Stat. §571.101 (2016); Mont. Code Ann. §45–8–321 (2021); Neb. Rev. Stat. §69–2430 (2019); Nev. Rev. Stat. §202.3657 (2021); N. H. Rev. Stat. Ann. §159:6 (Cum. Supp. 2021); N. M. Stat. Ann. §29–19–4 (2018); N. C. Gen. Stat. Ann. §14–415.11 (2021); N. D. Cent. Code Ann. §62.1–04–03 (Supp. 2021); Ohio Rev. Code Ann. §2923.125 (2020); Okla. Stat., Tit. 21, §1290.12 (2021); Ore. Rev. Stat. §166.291 (2021); 18 Pa. Cons. Stat. §6109 (Cum. Supp. 2016); S. C. Code Ann. §23–31–215(A) (Cum. Supp. 2021); S. D. Codified Laws §23–7–7 (Cum. Supp. 2021); Tenn. Code Ann. §39–17–1366 (Supp. 2021); Tex. Govt. Code Ann. §411.177 (West Cum. Supp. 2021); Utah Code §53–5–

Opinion of the Court

States and the District of Columbia have "may issue" licensing laws, under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license. Aside from New York, then, only California, the District of Columbia, Hawaii, Maryland, Massachusetts, and New

704.5 (2022); Va. Code Ann. §18.2–308.04 (2021); Wash. Rev. Code §9.41.070 (2021); W. Va. Code Ann. §61–7–4 (2021); Wis. Stat. §175.60 (2021); Wyo. Stat. Ann. §6–8–104 (2021). Vermont has no permitting system for the concealed carry of handguns. Three States—Connecticut, Delaware, and Rhode Island—have discretionary criteria but appear to operate like "shall issue" jurisdictions. See Conn. Gen. Stat. §29–28(b) (2021); Del. Code, Tit. 11, §1441 (2022); R. I. Gen. Laws §11–47–11 (2002). Although Connecticut officials have discretion to deny a concealed-carry permit to anyone who is not a "suitable person," see Conn. Gen. Stat. §29–28(b), the "suitable person" standard precludes permits only to those "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Dwyer* v. *Farrell*, 193 Conn. 7, 12, 475 A. 2d 257, 260 (1984) (internal quotation marks omitted). As for Delaware, the State has thus far processed 5,680 license applications and renewals in fiscal year 2022 and has denied only 112. See Del. Courts, Super. Ct., Carrying Concealed Deadly Weapon (June 9, 2022), https://courts.delaware.gov/forms/download.aspx?ID=125408. Moreover, Delaware appears to have no licensing requirement for open carry. Finally, Rhode Island has a suitability requirement, see R. I. Gen. Laws §11–47–11, but the Rhode Island Supreme Court has flatly denied that the "[d]emonstration of a proper showing of need" is a component of that requirement. *Gadomski* v. *Tavares*, 113 A. 3d 387, 392 (2015). Additionally, some "shall issue" jurisdictions have so-called "constitutional carry" protections that allow certain individuals to carry handguns in public within the State without *any* permit whatsoever. See, *e.g.*, A. Sherman, More States Remove Permit Requirement To Carry a Concealed Gun, PolitiFact (Apr. 12, 2022), https://www.politifact.com/article/2022/apr/12/more-states-remove-permit-requirement-carry-concea/ ("Twenty-five states now have permitless concealed carry laws . . . The states that have approved permitless carry laws are: Alabama, Alaska, Arizona, Arkansas, Idaho, Indiana, Iowa, Georgia, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, New Hampshire, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming").

Opinion of the Court

Jersey have analogues to the "proper cause" standard.[2] All of these "proper cause" analogues have been upheld by the Courts of Appeals, save for the District of Columbia's, which has been permanently enjoined since 2017. Compare *Gould* v. *Morgan*, 907 F. 3d 659, 677 (CA1 2018); *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, 101 (CA2 2012); *Drake* v. *Filko*, 724 F. 3d 426, 440 (CA3 2013); *United States* v. *Masciandaro*, 638 F. 3d 458, 460 (CA4 2011); *Young* v. *Hawaii*, 992 F. 3d 765, 773 (CA9 2021) (en banc), with *Wrenn* v. *District of Columbia*, 864 F. 3d 650, 668 (CADC 2017).

B

As set forth in the pleadings below, petitioners Brandon Koch and Robert Nash are law-abiding, adult citizens of Rensselaer County, New York. Koch lives in Troy, while Nash lives in Averill Park. Petitioner New York State Rifle & Pistol Association, Inc., is a public-interest group organized to defend the Second Amendment rights of New Yorkers. Both Koch and Nash are members.

In 2014, Nash applied for an unrestricted license to carry a handgun in public. Nash did not claim any unique danger to his personal safety; he simply wanted to carry a handgun for self-defense. In early 2015, the State denied Nash's application for an unrestricted license but granted him a restricted license for hunting and target shooting only. In late 2016, Nash asked a licensing officer to remove the restrictions, citing a string of recent robberies in his neighborhood. After an informal hearing, the licensing officer denied the request. The officer reiterated that Nash's existing license permitted him "to carry concealed for purposes of off

---

[2]See Cal. Penal Code Ann. §26150 (West 2021) ("Good cause"); D. C. Code §§7–2509.11(1) (2018), 22–4506(a) (Cum. Supp. 2021) ("proper reason," *i.e.*, "special need for self-protection"); Haw. Rev. Stat. §§134–2 (Cum. Supp. 2018), 134–9(a) (2011) ("exceptional case"); Md. Pub. Saf. Code Ann. §5–306(a)(6)(ii) (2018) ("good and substantial reason"); Mass. Gen. Laws, ch. 140, §131(d) (2020) ("good reason"); N. J. Stat. Ann. §2C:58–4(c) (West Cum. Supp. 2021) ("justifiable need").

Opinion of the Court

road back country, outdoor activities similar to hunting," such as "fishing, hiking & camping etc." App. 41. But, at the same time, the officer emphasized that the restrictions were "intended to *prohibit* [Nash] from carrying concealed in ANY LOCATION typically open to and frequented by the general public." *Ibid.*

Between 2008 and 2017, Koch was in the same position as Nash: He faced no special dangers, wanted a handgun for general self-defense, and had only a restricted license permitting him to carry a handgun outside the home for hunting and target shooting. In late 2017, Koch applied to a licensing officer to remove the restrictions on his license, citing his extensive experience in safely handling firearms. Like Nash's application, Koch's was denied, except that the officer permitted Koch to "carry to and from work." *Id.*, at 114.

### C

Respondents are the superintendent of the New York State Police, who oversees the enforcement of the State's licensing laws, and a New York Supreme Court justice, who oversees the processing of licensing applications in Rensselaer County. Petitioners sued respondents for declaratory and injunctive relief under Rev. Stat. 1979, 42 U. S. C. §1983, alleging that respondents violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications on the basis that they had failed to show "proper cause," *i.e.*, had failed to demonstrate a unique need for self-defense.

The District Court dismissed petitioners' complaint and the Court of Appeals affirmed. See 818 Fed. Appx. 99, 100 (CA2 2020). Both courts relied on the Court of Appeals' prior decision in *Kachalsky*, 701 F. 3d 81, which had sustained New York's proper-cause standard, holding that the requirement was "substantially related to the achievement of an important governmental interest." *Id.*, at 96.

8    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

We granted certiorari to decide whether New York's denial of petitioners' license applications violated the Constitution. 593 U. S. ___ (2021).

## II

In *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense. In doing so, we held unconstitutional two laws that prohibited the possession and use of handguns in the home. In the years since, the Courts of Appeals have coalesced around a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.

Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg* v. *State Bar of Cal.*, 366 U. S. 36, 50, n. 10 (1961).[3]

---

[3]Rather than begin with its view of the governing legal framework, the dissent chronicles, in painstaking detail, evidence of crimes committed by individuals with firearms. See *post*, at 1–9 (opinion of BREYER, J.). The dissent invokes all of these statistics presumably to justify granting States greater leeway in restricting firearm ownership and use. But, as Members of the Court have already explained, "[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications." *McDonald* v. *Chicago*, 561 U. S. 742, 783 (2010) (plurality opinion).

Opinion of the Court

### A

Since *Heller* and *McDonald*, the two-step test that Courts of Appeals have developed to assess Second Amendment claims proceeds as follows. At the first step, the government may justify its regulation by "establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood." *E.g., Kanter* v. *Barr,* 919 F. 3d 437, 441 (CA7 2019) (internal quotation marks omitted). But see *United States* v. *Boyd,* 999 F. 3d 171, 185 (CA3 2021) (requiring claimant to show "'a burden on conduct falling within the scope of the Second Amendment's guarantee'"). The Courts of Appeals then ascertain the original scope of the right based on its historical meaning. *E.g., United States* v. *Focia,* 869 F. 3d 1269, 1285 (CA11 2017). If the government can prove that the regulated conduct falls beyond the Amendment's original scope, "then the analysis can stop there; the regulated activity is categorically unprotected." *United States* v. *Greeno,* 679 F. 3d 510, 518 (CA6 2012) (internal quotation marks omitted). But if the historical evidence at this step is "inconclusive or suggests that the regulated activity is *not* categorically unprotected," the courts generally proceed to step two. *Kanter,* 919 F. 3d, at 441 (internal quotation marks omitted).

At the second step, courts often analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Ibid.* (internal quotation marks omitted). The Courts of Appeals generally maintain "that the core Second Amendment right is limited to self-defense *in the home.*" *Gould,* 907 F. 3d, at 671 (emphasis added). But see *Wrenn,* 864 F. 3d, at 659 ("[T]he Amendment's core generally covers carrying in public for self defense"). If a "core" Second Amendment right is burdened, courts apply "strict scrutiny" and ask whether the Government can prove that the law is "narrowly tailored to achieve a compelling governmental interest." *Kolbe* v. *Hogan,* 849 F. 3d 114, 133 (CA4 2017) (internal quotation

10   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

marks omitted). Otherwise, they apply intermediate scrutiny and consider whether the Government can show that the regulation is "substantially related to the achievement of an important governmental interest." *Kachalsky*, 701 F. 3d, at 96.[4]  Both respondents and the United States largely agree with this consensus, arguing that intermediate scrutiny is appropriate when text and history are unclear in attempting to delineate the scope of the right.  See Brief for Respondents 37; Brief for United States as *Amicus Curiae* 4.

B

Despite the popularity of this two-step approach, it is one step too many.  Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.  Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

1

To show why *Heller* does not support applying means-end scrutiny, we first summarize *Heller*'s methodological approach to the Second Amendment.

In *Heller*, we began with a "textual analysis" focused on

_____

[4] See *Association of N. J. Rifle & Pistol Clubs, Inc.* v. *Attorney General N. J.*, 910 F. 3d 106, 117 (CA3 2018); accord, *Worman* v. *Healey*, 922 F. 3d 26, 33, 36–39 (CA1 2019); *Libertarian Party of Erie Cty.* v. *Cuomo*, 970 F. 3d 106, 127–128 (CA2 2020); *Harley* v. *Wilkinson*, 988 F. 3d 766, 769 (CA4 2021); *National Rifle Assn. of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F. 3d 185, 194–195 (CA5 2012); *United States* v. *Greeno*, 679 F. 3d 510, 518 (CA6 2012); *Kanter* v. *Barr*, 919 F. 3d 437, 442 (CA7 2019); *Young* v. *Hawaii*, 992 F. 3d 765, 783 (CA9 2021) (en banc); *United States* v. *Reese*, 627 F. 3d 792, 800–801 (CA10 2010); *GeorgiaCarry.Org, Inc.* v. *Georgia*, 687 F. 3d 1244, 1260, n. 34 (CA11 2012); *United States* v. *Class*, 930 F. 3d 460, 463 (CADC 2019).

Cite as: 597 U. S. ____ (2022)                    11

Opinion of the Court

the "'normal and ordinary'" meaning of the Second Amendment's language. 554 U. S., at 576–577, 578. That analysis suggested that the Amendment's operative clause—"the right of the people to keep and bear Arms shall not be infringed"—"guarantee[s] the individual right to possess and carry weapons in case of confrontation" that does not depend on service in the militia. *Id.*, at 592.

From there, we assessed whether our initial conclusion was "confirmed by the historical background of the Second Amendment." *Ibid.* We looked to history because "it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *Ibid.* The Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Id.*, at 599 (alterations and internal quotation marks omitted). After surveying English history dating from the late 1600s, along with American colonial views leading up to the founding, we found "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.*, at 595.

We then canvassed the historical record and found yet further confirmation. That history included the "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment," *id.*, at 600–601, and "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," *id.*, at 605. When the principal dissent charged that the latter category of sources was illegitimate "postenactment legislative history," *id.*, at 662, n. 28 (opinion of Stevens, J.), we clarified that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification" was "a critical tool of constitutional interpretation," *id.*, at 605 (majority opinion).

In assessing the postratification history, we looked to four

different types of sources. First, we reviewed "[t]hree important founding-era legal scholars [who] interpreted the Second Amendment in published writings." *Ibid.* Second, we looked to "19th-century cases that interpreted the Second Amendment" and found that they "universally support an individual right" to keep and bear arms. *Id.*, at 610. Third, we examined the "discussion of the Second Amendment in Congress and in public discourse" after the Civil War, "as people debated whether and how to secure constitutional rights for newly freed slaves." *Id.*, at 614. Fourth, we considered how post-Civil War commentators understood the right. See *id.*, at 616–619.

After holding that the Second Amendment protected an individual right to armed self-defense, we also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right. We noted that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.*, at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Ibid.* For example, we found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'" *Id.*, at 627 (first citing 4 W. Blackstone, Commentaries on the Laws of England 148–149 (1769); then quoting *United States* v. *Miller*, 307 U. S. 174, 179 (1939)). That said, we cautioned that we were not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment" and moved on to considering the constitutionality of the District of Columbia's handgun ban. 554 U. S., at 627.

We assessed the lawfulness of that handgun ban by scrutinizing whether it comported with history and tradition. Although we noted that the ban "would fail constitutional

Opinion of the Court

muster" "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," *id.*, at 628–629, we did not engage in means-end scrutiny when resolving the constitutional question. Instead, we focused on the historically unprecedented nature of the District's ban, observing that "[f]ew laws in the history of our Nation have come close to [that] severe restriction." *Id.*, at 629. Likewise, when one of the dissents attempted to justify the District's prohibition with "founding-era historical precedent," including "various restrictive laws in the colonial period," we addressed each purported analogue and concluded that they were either irrelevant or "d[id] not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.*, at 631–632; see *id.*, at 631–634. Thus, our earlier historical analysis sufficed to show that the Second Amendment did not countenance a "complete prohibition" on the use of "the most popular weapon chosen by Americans for self-defense in the home." *Id.*, at 629.

2

As the foregoing shows, *Heller*'s methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny.

Moreover, *Heller* and *McDonald* expressly rejected the application of any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Heller*, 554 U. S., at 634 (quoting *id.*, at 689–690 (BREYER, J., dissenting)); see also *McDonald*, 561 U. S., at 790–791 (plurality opinion) (the Second Amendment does not permit—let alone require—"judges to assess

Opinion of the Court

the costs and benefits of firearms restrictions" under means-end scrutiny).  We declined to engage in means-end scrutiny because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U. S., at 634.  We then concluded: "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Ibid.*

Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt.  Dissenting in *Heller*, JUSTICE BREYER's proposed standard—"ask[ing] whether [a] statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests," *id.*, at 689–690 (dissenting opinion)—simply expressed a classic formulation of intermediate scrutiny in a slightly different way, see *Clark* v. *Jeter*, 486 U. S. 456, 461 (1988) (asking whether the challenged law is "substantially related to an important government objective").  In fact, JUSTICE BREYER all but admitted that his *Heller* dissent advocated for intermediate scrutiny by repeatedly invoking a quintessential intermediate-scrutiny precedent.  See *Heller*, 554 U. S., at 690, 696, 704–705 (citing *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180 (1997)).  Thus, when *Heller* expressly rejected that dissent's "interest-balancing inquiry," 554 U. S., at 634 (internal quotation marks omitted), it necessarily rejected intermediate scrutiny.[5]

---

[5]The dissent asserts that we misread *Heller* to eschew means-end scrutiny because *Heller* mentioned that the District of Columbia's handgun ban "would fail constitutional muster" "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller*, 554 U. S., at 628–629; see *post*, at 23 (opinion of BREYER, J.).  But *Heller*'s passing observation that the District's ban would fail under any

In sum, the Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny. We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg*, 366 U. S., at 50, n. 10.

## C

This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms. 554 U. S., at 582, 595, 606, 618, 634–635. In that context, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 816 (2000); see also *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767, 777 (1986). In some cases, that burden includes showing whether the expressive conduct falls outside of the category of protected speech. See *Illinois ex rel. Madigan* v. *Telemarketing Associates, Inc.*, 538 U. S. 600, 620, n. 9 (2003). And to carry that burden, the government must generally point to *historical* evidence about the reach of the First Amendment's protections. See,

---

heightened "standar[d] of scrutiny" did not supplant *Heller*'s focus on constitutional text and history. Rather, *Heller*'s comment "was more of a gilding-the-lily observation about the extreme nature of D.C.'s law," *Heller* v. *District of Columbia*, 670 F. 3d 1244, 1277 (CADC 2011) (Kavanaugh, J., dissenting), than a reflection of *Heller*'s methodology or holding.

Opinion of the Court

*e.g., United States* v. *Stevens*, 559 U. S. 460, 468–471 (2010) (placing the burden on the government to show that a type of speech belongs to a "historic and traditional categor[y]" of constitutionally unprotected speech "long familiar to the bar" (internal quotation marks omitted)).

And beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims. If a litigant asserts the right in court to "be confronted with the witnesses against him," U. S. Const., Amdt. 6, we require courts to consult history to determine the scope of that right. See, *e.g., Giles* v. *California*, 554 U. S. 353, 358 (2008) ("admitting only those exceptions [to the Confrontation Clause] established at the time of the founding" (internal quotation marks omitted)). Similarly, when a litigant claims a violation of his rights under the Establishment Clause, Members of this Court "loo[k] to history for guidance." *American Legion* v. *American Humanist Assn.*, 588 U. S. ___, ___ (2019) (plurality opinion) (slip op., at 25). We adopt a similar approach here.

To be sure, "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *McDonald*, 561 U. S., at 803–804 (Scalia, J., concurring). But reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to "make difficult empirical judgments" about "the costs and benefits of firearms restrictions," especially given their "lack [of] expertise" in the field. *Id.*, at 790–791 (plurality opinion).[6]

---

[6]The dissent claims that *Heller*'s text-and-history test will prove unworkable compared to means-end scrutiny in part because judges are relatively ill equipped to "resolv[e] difficult historical questions" or engage in "searching historical surveys." *Post*, at 26, 30. We are unpersuaded. The job of judges is not to resolve historical questions in the abstract; it

Opinion of the Court

If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment "is the very *product* of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U. S., at 635. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

### D

The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that

_____

is to resolve *legal* questions presented in particular cases or controversies. That "legal inquiry is a refined subset" of a broader "historical inquiry," and it relies on "various evidentiary principles and default rules" to resolve uncertainties. W. Baude & S. Sachs, Originalism and the Law of the Past, 37 L. & Hist. Rev. 809, 810–811 (2019). For example, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States* v. *Sineneng-Smith*, 590 U. S. ___, ___ (2020) (slip op., at 3). Courts are thus entitled to decide a case based on the historical record compiled by the parties.

Opinion of the Court

a modern regulation is unconstitutional. And if some juris-
dictions actually attempted to enact analogous regulations
during this timeframe, but those proposals were rejected on
constitutional grounds, that rejection surely would provide
some probative evidence of unconstitutionality.

*Heller* itself exemplifies this kind of straightforward his-
torical inquiry. One of the District's regulations challenged
in *Heller* "totally ban[ned] handgun possession in the
home." *Id.*, at 628. The District in *Heller* addressed a per-
ceived societal problem—firearm violence in densely popu-
lated communities—and it employed a regulation—a flat
ban on the possession of handguns in the home—that the
Founders themselves could have adopted to confront that
problem. Accordingly, after considering "founding-era his-
torical precedent," including "various restrictive laws in the
colonial period," and finding that none was analogous to the
District's ban, *Heller* concluded that the handgun ban was
unconstitutional. *Id.*, at 631; see also *id.*, at 634 (describing
the claim that "there were somewhat similar restrictions in
the founding period" a "false proposition").

New York's proper-cause requirement concerns the same
alleged societal problem addressed in *Heller*: "handgun vio-
lence," primarily in "urban area[s]." *Ibid.* Following the
course charted by *Heller*, we will consider whether "histor-
ical precedent" from before, during, and even after the
founding evinces a comparable tradition of regulation. *Id.*,
at 631. And, as we explain below, we find no such tradition
in the historical materials that respondents and their *amici*
have brought to bear on that question. See Part III–B, *in-
fra.*

While the historical analogies here and in *Heller* are rel-
atively simple to draw, other cases implicating unprece-
dented societal concerns or dramatic technological changes
may require a more nuanced approach. The regulatory
challenges posed by firearms today are not always the same

Opinion of the Court

as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch* v. *Maryland*, 4 Wheat. 316, 415 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated. See, *e.g., United States* v. *Jones*, 565 U. S. 400, 404–405 (2012) (holding that installation of a tracking device was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted").

We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." 554 U. S., at 582. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Ibid.* (citations omitted). Thus, even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. Cf. *Caetano* v. *Massachusetts*, 577 U. S. 411, 411–412 (2016) (*per curiam*) (stun guns).

Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all

20   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

analogical reasoning, determining whether a historical reg-
ulation is a proper analogue for a distinctly modern firearm
regulation requires a determination of whether the two reg-
ulations are "relevantly similar." C. Sunstein, On Analogi-
cal Reasoning, 106 Harv. L. Rev. 741, 773 (1993). And be-
cause "[e]verything is similar in infinite ways to everything
else," *id.,* at 774, one needs "some metric enabling the anal-
ogizer to assess which similarities are important and which
are not," F. Schauer & B. Spellman, Analogy, Expertise,
and Experience, 84 U. Chi. L. Rev. 249, 254 (2017). For in-
stance, a green truck and a green hat are relevantly similar
if one's metric is "things that are green." See *ibid.* They
are not relevantly similar if the applicable metric is "things
you can wear."

While we do not now provide an exhaustive survey of the
features that render regulations relevantly similar under
the Second Amendment, we do think that *Heller* and
*McDonald* point toward at least two metrics: how and why
the regulations burden a law-abiding citizen's right to
armed self-defense. As we stated in *Heller* and repeated in
*McDonald,* "individual self-defense is 'the *central compo-
nent*' of the Second Amendment right." *McDonald,* 561
U. S., at 767 (quoting *Heller,* 554 U. S., at 599); see also *id.,*
at 628 ("the inherent right of self-defense has been central
to the Second Amendment right"). Therefore, whether mod-
ern and historical regulations impose a comparable burden
on the right of armed self-defense and whether that burden
is comparably justified are "'*central*'" considerations when
engaging in an analogical inquiry. *McDonald,* 561 U. S., at
767 (quoting *Heller,* 554 U. S., at 599).[7]

---

[7]This does not mean that courts may engage in independent means-
end scrutiny under the guise of an analogical inquiry. Again, the Second
Amendment is the "product of an interest balancing *by the people*," not
the evolving product of federal judges. *Heller,* 554 U. S., at 635 (empha-
sis altered). Analogical reasoning requires judges to apply faithfully the
balance struck by the founding generation to modern circumstances, and

Opinion of the Court

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond* v. *Robinson*, 9 F. 4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U. S., at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); see also Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

Although we have no occasion to comprehensively define

---

contrary to the dissent's assertion, there is nothing "[i]roni[c]" about that undertaking. *Post,* at 30. It is not an invitation to revise that balance through means-end scrutiny.

22   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

"sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. See Part III–B, *infra*. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

Like *Heller*, we "do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." 554 U. S., at 626. And we acknowledge that "applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins." *Heller* v. *District of Columbia*, 670 F. 3d 1244, 1275 (CADC 2011) (Kavanaugh, J., dissenting). "But that is hardly unique to the Second Amendment. It is an essential component of judicial decisionmaking under our enduring Constitution." *Ibid.* We see no reason why judges frequently tasked with answering these kinds of historical, analogical questions cannot do the same for Second Amendment claims.

Opinion of the Court

## III

Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement.

### A

It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects. See *Heller*, 554 U. S., at 580. Nor does any party dispute that handguns are weapons "in common use" today for self-defense. See *id.*, at 627; see also *Caetano*, 577 U. S., at 411–412. We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.

We have little difficulty concluding that it does. Respondents do not dispute this. See Brief for Respondents 19. Nor could they. Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms. As we explained in *Heller*, the "textual elements" of the Second Amendment's operative clause— "the right of the people to keep and bear Arms, shall not be infringed"—"guarantee the individual right to possess and carry weapons in case of confrontation." 554 U. S., at 592. *Heller* further confirmed that the right to "bear arms" refers to the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.*, at 584 (quoting *Muscarello* v. *United States*, 524 U. S. 125, 143 (1998) (Ginsburg, J., dissenting); internal quotation marks omitted).

This definition of "bear" naturally encompasses public carry. Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often "keep" firearms in their home, at the ready for self-defense, most do not "bear" (*i.e.*,

Opinion of the Court

carry) them in the home beyond moments of actual confrontation.  To confine the right to "bear" arms to the home would nullify half of the Second Amendment's operative protections.

Moreover, confining the right to "bear" arms to the home would make little sense given that self-defense is "the *central component* of the [Second Amendment] right itself." *Heller*, 554 U. S., at 599; see also *McDonald*, 561 U. S., at 767.  After all, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U. S., at 592, and confrontation can surely take place outside the home.

Although we remarked in *Heller* that the need for armed self-defense is perhaps "most acute" in the home, *id.*, at 628, we did not suggest that the need was insignificant elsewhere.  Many Americans hazard greater danger outside the home than in it.  See *Moore* v. *Madigan*, 702 F. 3d 933, 937 (CA7 2012) ("[A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower").  The text of the Second Amendment reflects that reality.

The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense.

B

Conceding that the Second Amendment guarantees a general right to public carry, contra, *Young*, 992 F. 3d, at 813, respondents instead claim that the Amendment "permits a State to condition handgun carrying in areas 'frequented by the general public' on a showing of a nonspeculative need for armed self-defense in those areas," Brief for Respondents 19 (citation omitted).[8]  To support

_____

[8]The dissent claims that we cannot answer the question presented without giving respondents the opportunity to develop an evidentiary record fleshing out "how New York's law is administered in practice, how

Opinion of the Court

that claim, the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct.

Respondents appeal to a variety of historical sources from the late 1200s to the early 1900s. We categorize these periods as follows: (1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries.

We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Heller*, 554 U. S., at 634–635 (emphasis added). The Second Amendment was adopted in 1791; the

---

much discretion licensing officers in New York possess, or whether the proper cause standard differs across counties." *Post*, at 20. We disagree. The dissent does not dispute that any applicant for an unrestricted concealed-carry license in New York can satisfy the proper-cause standard only if he has "'"a special need for self-protection distinguishable from that of the general community."'" *Post*, at 13 (quoting *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, 86 (CA2 2012)). And in light of the text of the Second Amendment, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense. See *infra*, at 62. That conclusion does not depend upon any of the factual questions raised by the dissent. Nash and Koch allege that they were denied unrestricted licenses because they had not "demonstrate[d] a special need for self-defense that distinguished [them] from the general public." App. 123, 125. If those allegations are proven true, then it simply does not matter whether licensing officers have applied the proper-cause standard differently to other concealed-carry license applicants; Nash's and Koch's constitutional rights to bear arms in public for self-defense were still violated.

26   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for courts to "reac[h] back to the 14th century" for English practices that "prevailed up to the 'period immediately before and after the framing of the Constitution.'" *Sprint Communications Co.* v. *APCC Services, Inc.,* 554 U. S. 269, 311 (2008) (ROBERTS, C. J., dissenting). It is quite another to rely on an "ancient" practice that had become "obsolete in England at the time of the adoption of the Constitution" and never "was acted upon or accepted in the colonies." *Dimick* v. *Schiedt,* 293 U. S. 474, 477 (1935).

As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights. The common law, of course, developed over time. *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters,* 459 U. S. 519, 533, n. 28 (1983); see also *Rogers* v. *Tennessee,* 532 U. S. 451, 461 (2001). And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution. Even "the words of *Magna Charta*"—foundational as they were to the rights of America's forefathers—"stood for very different things at the time of the separation of the American Colonies from what they represented originally" in 1215. *Hurtado* v. *California,* 110 U. S. 516, 529 (1884). Sometimes, in interpreting our own Constitution, "it [is] better not to go too far back into antiquity for the best securities of our liberties," *Funk* v. *United States,* 290 U. S. 371, 382 (1933), unless evidence shows that medieval law survived to become our Founders' law. A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice.

Similarly, we must also guard against giving postenactment history more weight than it can rightly bear. It is true

Opinion of the Court

that in *Heller* we reiterated that evidence of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represented a "critical tool of constitutional interpretation." 554 U. S., at 605. We therefore examined "a variety of legal and other sources to determine *the public understanding* of [the Second Amendment] after its . . . ratification." *Ibid.* And, in other contexts, we have explained that "'a regular course of practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases'" in the Constitution. *Chiafalo* v. *Washington*, 591 U. S. ___, ___ (2020) (slip op., at 13) (quoting Letter from J. Madison to S. Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908)); see also, *e.g.*, *Houston Community College System* v. *Wilson*, 595 U. S. ___, ___ (2022) (slip op., at 5) (same); The Federalist No. 37, p. 229 (C. Rossiter ed. 1961) (J. Madison); see generally C. Nelson, *Stare Decisis* and Demonstrably Erroneous Precedents, 87 Va. L. Rev. 1, 10–21 (2001); W. Baude, Constitutional Liquidation, 71 Stan. L. Rev. 1 (2019). In other words, we recognize that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *NLRB* v. *Noel Canning*, 573 U. S. 513, 572 (2014) (Scalia, J., concurring in judgment); see also *Myers* v. *United States*, 272 U. S. 52, 174 (1926); *Printz* v. *United States*, 521 U. S. 898, 905 (1997).

But to the extent later history contradicts what the text says, the text controls. "'[L]iquidating' indeterminacies in written laws is far removed from expanding or altering them." *Gamble* v. *United States*, 587 U. S. ___, ___ (2019) (THOMAS, J., concurring) (slip op., at 13); see also Letter from J. Madison to N. Trist (Dec. 1831), in 9 Writings of James Madison 477 (G. Hunt ed. 1910). Thus, "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text

28   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

obviously cannot overcome or alter that text." *Heller*, 670 F. 3d, at 1274, n. 6 (Kavanaugh, J., dissenting); see also *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. ___, ___ (2020) (slip op., at 15).

As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." 554 U. S., at 614; cf. *Sprint Communications Co.*, 554 U. S., at 312 (ROBERTS, C. J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]"). And we made clear in *Gamble* that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." *Gamble*, 587 U. S., at ___ (majority opinion) (slip op., at 23). In other words, this 19th-century evidence was "treated as mere confirmation of what the Court thought had already been established." *Ibid.*

A final word on historical method: Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. See, *e.g.*, *Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243, 250–251 (1833) (Bill of Rights applies only to the Federal Government). Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. See, *e.g.*, *Ramos* v. *Louisiana*, 590 U. S. ___, ___ (2020) (slip op., at 7); *Timbs* v. *Indiana*, 586 U. S. ___, ___–___ (2019) (slip op., at 2–3); *Malloy* v. *Hogan*, 378 U. S. 1, 10–11 (1964). And we have generally assumed that the

Opinion of the Court

scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. See, *e.g.*, *Crawford* v. *Washington*, 541 U. S. 36, 42–50 (2004) (Sixth Amendment); *Virginia* v. *Moore*, 553 U. S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics* v. *Carrigan*, 564 U. S. 117, 122–125 (2011) (First Amendment).

We also acknowledge that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.*, A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings"). We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry.

*       *       *

With these principles in mind, we turn to respondents' historical evidence. Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly

30   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

prohibiting the public carry of commonly used firearms for
self-defense. Nor is there any such historical tradition lim-
iting public carry only to those law-abiding citizens who
demonstrate a special need for self-defense.[9] We conclude
that respondents have failed to meet their burden to iden-
tify an American tradition justifying New York's proper-
cause requirement. Under *Heller*'s text-and-history stand-
ard, the proper-cause requirement is therefore unconstitu-
tional.

1

Respondents' substantial reliance on English history and
custom before the founding makes some sense given our
statement in *Heller* that the Second Amendment "codified
a right 'inherited from our English ancestors.'"  554 U. S.,
at 599 (quoting *Robertson* v. *Baldwin*, 165 U. S. 275, 281
(1897)); see also *Smith* v. *Alabama*, 124 U. S. 465, 478

---

[9]To be clear, nothing in our analysis should be interpreted to suggest
the unconstitutionality of the 43 States' "shall-issue" licensing regimes,
under which "a general desire for self-defense is sufficient to obtain a
[permit]." *Drake* v. *Filko*, 724 F. 3d 426, 442 (CA3 2013) (Hardiman, J.,
dissenting). Because these licensing regimes do not require applicants
to show an atypical need for armed self-defense, they do not necessarily
prevent "law-abiding, responsible citizens" from exercising their Second
Amendment right to public carry. *District of Columbia* v. *Heller*, 554
U. S. 570, 635 (2008). Rather, it appears that these shall-issue regimes,
which often require applicants to undergo a background check or pass a
firearms safety course, are designed to ensure only that those bearing
arms in the jurisdiction are, in fact, "law-abiding, responsible citizens."
*Ibid.* And they likewise appear to contain only "narrow, objective, and
definite standards" guiding licensing officials, *Shuttlesworth* v. *Birming-
ham*, 394 U. S. 147, 151 (1969), rather than requiring the "appraisal of
facts, the exercise of judgment, and the formation of an opinion," *Cant-
well* v. *Connecticut*, 310 U. S. 296, 305 (1940)—features that typify
proper-cause standards like New York's. That said, because any permit-
ting scheme can be put toward abusive ends, we do not rule out constitu-
tional challenges to shall-issue regimes where, for example, lengthy wait
times in processing license applications or exorbitant fees deny ordinary
citizens their right to public carry.

Opinion of the Court

(1888). But this Court has long cautioned that the English common law "is not to be taken in all respects to be that of America." *Van Ness* v. *Pacard*, 2 Pet. 137, 144 (1829) (Story, J., for the Court); see also *Wheaton* v. *Peters*, 8 Pet. 591, 659 (1834); *Funk*, 290 U. S., at 384. Thus, "[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*," not as they existed in the Middle Ages. *Ex parte Grossman*, 267 U. S. 87, 108–109 (1925) (emphasis added); see also *United States* v. *Reid*, 12 How. 361, 363 (1852).

We interpret the English history that respondents and the United States muster in light of these interpretive principles. We find that history ambiguous at best and see little reason to think that the Framers would have thought it applicable in the New World. It is not sufficiently probative to defend New York's proper-cause requirement.

To begin, respondents and their *amici* point to several medieval English regulations from as early as 1285 that they say indicate a longstanding tradition of restricting the public carry of firearms. See 13 Edw. 1, 102. The most prominent is the 1328 Statute of Northampton (or Statute), passed shortly after Edward II was deposed by force of arms and his son, Edward III, took the throne of a kingdom where "tendency to turmoil and rebellion was everywhere apparent throughout the realm." N. Trenholme, The Risings in the English Monastic Towns in 1327, 6 Am. Hist. Rev. 650, 651 (1901). At the time, "[b]ands of malefactors, knights as well as those of lesser degree, harried the country, committing assaults and murders," prompted by a more general "spirit of insubordination" that led to a "decay in English national life." K. Vickers, England in the Later Middle Ages 107 (1926).

The Statute of Northampton was, in part, "a product of . . . the acute disorder that still plagued England." A. Verduyn, The Politics of Law and Order During the Early

Opinion of the Court

Years of Edward III, 108 Eng. Hist. Rev. 842, 850 (1993). It provided that, with some exceptions, Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." 2 Edw. 3 c. 3 (1328).

Respondents argue that the prohibition on "rid[ing]" or "go[ing] . . . armed" was a sweeping restriction on public carry of self-defense weapons that would ultimately be adopted in Colonial America and justify onerous public-carry regulations. Notwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791. The Statute of Northampton was enacted nearly 20 years before the Black Death, more than 200 years before the birth of Shakespeare, more than 350 years before the Salem Witch Trials, more than 450 years before the ratification of the Constitution, and nearly 550 years before the adoption of the Fourteenth Amendment.

The Statute's prohibition on going or riding "armed" obviously did not contemplate handguns, given they did not appear in Europe until about the mid-1500s. See K. Chase, Firearms: A Global History to 1700, p. 61 (2003). Rather, it appears to have been centrally concerned with the wearing of armor. See, *e.g.*, Calendar of the Close Rolls, Edward III, 1330–1333, p. 131 (Apr. 3, 1330) (H. Maxwell-Lyte ed. 1898); *id.*, at 243 (May 28, 1331); *id.*, Edward III, 1327–1330, at 314 (Aug. 29, 1328) (1896). If it did apply beyond armor, it applied to such weapons as the "launcegay," a 10- to 12-foot-long lightweight lance. See 7 Rich. 2 c. 13 (1383); 20 Rich. 2 c. 1 (1396).

The Statute's apparent focus on armor and, perhaps,

Opinion of the Court

weapons like launcegays makes sense given that armor and lances were generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace.  See, *e.g.*, Calendar of the Close Rolls, Edward III, 1327–1330, at 402 (July 7, 1328); *id.*, Edward III, 1333–1337, at 695 (Aug. 18, 1336) (1898).  Contrast these arms with daggers.  In the medieval period, "[a]lmost everyone carried a knife or a dagger in his belt."  H. Peterson, Daggers and Fighting Knives of the Western World 12 (2001).  While these knives were used by knights in warfare, "[c]ivilians wore them for self-protection," among other things.  *Ibid.*  Respondents point to no evidence suggesting the Statute applied to the smaller medieval weapons that strike us as most analogous to modern handguns.

When handguns were introduced in England during the Tudor and early Stuart eras, they did prompt royal efforts at suppression.  For example, Henry VIII issued several proclamations decrying the proliferation of handguns, and Parliament passed several statutes restricting their possession. See, *e.g.*, 6 Hen. 8 c. 13, §1 (1514); 25 Hen. 8 c. 17, §1 (1533); 33 Hen. 8 c. 6 (1541); Prohibiting Use of Handguns and Crossbows (Jan. 1537), in 1 Tudor Royal Proclamations 249 (P. Hughes & J. Larkin eds. 1964).  But Henry VIII's displeasure with handguns arose not primarily from concerns about their safety but rather their inefficacy.  Henry VIII worried that handguns threatened Englishmen's proficiency with the longbow—a weapon many believed was crucial to English military victories in the 1300s and 1400s, including the legendary English victories at Crécy and Agincourt.  See R. Payne-Gallwey, The Crossbow 32, 34 (1903); L. Schwoerer, Gun Culture in Early Modern England 54 (2016) (Schwoerer).

Similarly, James I considered small handguns—called dags—"utterly unserviceable for defence, Militarie practise, or other lawful use."  A Proclamation Against Steelets,

Opinion of the Court

Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616). But, in any event, James I's proclamation in 1616 "was the last one regarding civilians carrying dags," Schwoerer 63. "After this the question faded without explanation." *Ibid.* So, by the time Englishmen began to arrive in America in the early 1600s, the public carry of handguns was no longer widely proscribed.

When we look to the latter half of the 17th century, respondents' case only weakens. As in *Heller*, we consider this history "[b]etween the [Stuart] Restoration [in 1660] and the Glorious Revolution [in 1688]" to be particularly instructive. 554 U. S., at 592. During that time, the Stuart Kings Charles II and James II ramped up efforts to disarm their political opponents, an experience that "caused Englishmen . . . to be jealous of their arms." *Id.*, at 593.

In one notable example, the government charged Sir John Knight, a prominent detractor of James II, with violating the Statute of Northampton because he allegedly "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects." *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686). Chief Justice Holt explained that the Statute of Northampton had "almost gone in *desuetudinem*," *Rex* v. *Sir John Knight*, 1 Comb. 38, 38–39, 90 Eng. Rep. 330 (K. B. 1686), meaning that the Statute had largely become obsolete through disuse.[10] And the Chief Justice further explained

---

[10]Another medieval firearm restriction—a 1541 statute enacted under Henry VIII that limited the ownership and use of handguns (which could not be shorter than a yard) to those subjects with annual property values of at least £100, see 33 Hen. 8 c. 6, §§1–2—fell into a similar obsolescence. As far as we can discern, the last recorded prosecutions under the 1541 statute occurred in 1693, neither of which appears to have been successful. See *King and Queen* v. *Bullock*, 4 Mod. 147, 87 Eng. Rep. 315 (K. B. 1693); *King* v. *Litten*, 1 Shower, K. B. 367, 89 Eng. Rep. 644 (K. B. 1693). It seems that other prosecutions under the 1541 statute during the late 1600s were similarly unsuccessful. See *King* v. *Silcot*, 3 Mod. 280, 280–

that the act of "go[ing] armed *to terrify* the King's subjects" was "a great offence at the *common law*" and that the Statute of Northampton "is but an affirmance of that law." 3 Mod., at 118, 87 Eng. Rep., at 76 (first emphasis added). Thus, one's conduct "will come within the Act,"—*i.e.*, would terrify the King's subjects—only "where the crime shall appear to be malo animo," 1 Comb., at 39, 90 Eng. Rep., at 330, with evil intent or malice. Knight was ultimately acquitted by the jury.[11]

---

281, 87 Eng. Rep. 186 (K. B. 1690); *King* v. *Lewellin*, 1 Shower, K. B. 48, 89 Eng. Rep. 440 (K. B. 1689); cf. *King and Queen* v. *Alsop*, 4 Mod. 49, 50–51, 87 Eng. Rep. 256, 256–257 (K. B. 1691). By the late 1700s, it was widely recognized that the 1541 statute was "obsolete." 2 R. Burn, The Justice of the Peace, and Parish Officer 243, n. (11th ed. 1769); see also, *e.g.*, The Farmer's Lawyer 143 (1774) ("entirely obsolete"); 1 G. Jacob, Game-Laws II, Law-Dictionary (T. Tomlins ed. 1797); 2 R. Burn, The Justice of the Peace, and Parish Officer 409 (18th ed. 1797) (calling the 1541 statute "a matter more of curiosity than use").

In any event, lest one be tempted to put much evidentiary weight on the 1541 statute, it impeded not only public carry, but further made it unlawful for those without sufficient means to "kepe in his or their houses" any "handgun." 33 Hen. 8 c. 6, §1. Of course, this kind of limitation is inconsistent with *Heller*'s historical analysis regarding the Second Amendment's meaning at the founding and thereafter. So, even if a severe restriction on keeping firearms in the home may have seemed appropriate in the mid-1500s, it was not incorporated into the Second Amendment's scope. We see little reason why the parts of the 1541 statute that address public carry should not be understood similarly.

We note also that even this otherwise restrictive 1541 statute, which generally prohibited shooting firearms in any city, exempted discharges "for the defence of [one's] p[er]son or house." §4. Apparently, the paramount need for self-defense trumped the Crown's interest in firearm suppression even during the 16th century.

[11] The dissent discounts *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, because it only "arguably" supports the view that an evil-intent requirement attached to the Statute of Northampton by the late 1600s and early 1700s. See *post*, at 37. But again, because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope. See *supra*, at 15. To the extent there are multiple plausible

Opinion of the Court

Just three years later, Parliament responded by writing the "predecessor to our Second Amendment" into the 1689 English Bill of Rights, *Heller*, 554 U. S., at 593, guaranteeing that "Protestants . . . may have Arms for their Defence suitable to their Conditions, and as allowed by Law," 1 Wm. & Mary c. 2, §7, in 3 Eng. Stat. at Large 417 (1689). Although this right was initially limited—it was restricted to Protestants and held only against the Crown, but not Parliament—it represented a watershed in English history. Englishmen had "never before claimed . . . the right of the individual to arms." Schwoerer 156.[12] And as that individual right matured, "by the time of the founding," the right to keep and bear arms was "understood to be an individual right protecting against both public and private violence." *Heller*, 554 U. S., at 594.

To be sure, the Statute of Northampton survived both *Sir John Knight's Case* and the English Bill of Rights, but it was no obstacle to public carry for self-defense in the decades leading to the founding. Serjeant William Hawkins, in his widely read 1716 treatise, confirmed that "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People." 1 Pleas of the Crown 136. To illustrate that proposition, Hawkins noted as an example that "Persons of Quality" were "in no Danger of Offending against this Statute by wearing common Weapons" because, in those circumstances, it would be clear that they

---

interpretations of *Sir John Knight's Case*, we will favor the one that is more consistent with the Second Amendment's command.

[12] Even Catholics, who fell beyond the protection of the right to have arms, and who were stripped of all "Arms, Weapons, Gunpowder, [and] Ammunition," were at least allowed to keep "such necessary Weapons as shall be allowed . . . by Order of the Justices of the Peace . . . for the Defence of his House or Person." 1 Wm. & Mary c. 15, §4, in 3 Eng. Stat. at Large 399 (1688).

Opinion of the Court

had no "Intention to commit any Act of Violence or Disturbance of the Peace." *Ibid.*; see also T. Barlow, The Justice of Peace 12 (1745). Respondents do not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people. In fact, the opposite seems to have been true. As time went on, "domestic gun culture [in England] softened" any "terror" that firearms might once have conveyed. Schwoerer 4. Thus, whatever place handguns had in English society during the Tudor and Stuart reigns, by the time we reach the 18th century—and near the founding—they had gained a fairly secure footing in English culture.

At the very least, we cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection.

### 2

Respondents next point us to the history of the Colonies and early Republic, but there is little evidence of an early American practice of regulating public carry by the general public. This should come as no surprise—English subjects founded the Colonies at about the time England had itself begun to eliminate restrictions on the ownership and use of handguns.

In the colonial era, respondents point to only three restrictions on public carry. For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation. In any event, even looking at these laws on their own terms, we are not convinced that they regulated public carry akin to the New York law before us.

Two of the statutes were substantively identical. Colonial Massachusetts and New Hampshire both authorized justices of the peace to arrest "all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or

Opinion of the Court

go armed Offensively . . . by Night or by Day, in Fear or Affray of Their Majesties Liege People." 1692 Mass. Acts and Laws no. 6, pp. 11–12; see 1699 N. H. Acts and Laws ch. 1. Respondents and their *amici* contend that being "armed offensively" meant bearing any offensive weapons, including firearms. See Brief for Respondents 33. In particular, respondents' *amici* argue that "'offensive'" arms in the 1600s and 1700s were what Blackstone and others referred to as "'dangerous or unusual weapons,'" Brief for Professors of History and Law as *Amici Curiae* 7 (quoting 4 Blackstone, Commentaries, at 148–149), a category that they say included firearms, see also *post*, at 40–42 (BREYER, J., dissenting).

Respondents, their *amici*, and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself. See *supra*, at 34–37. For instance, the Massachusetts statute proscribed "go[ing] armed Offensively . . . in Fear or Affray" of the people, indicating that these laws were modeled after the Statute of Northampton to the extent that the statute would have been understood to limit public carry *in the late 1600s*. Moreover, it makes very little sense to read these statutes as banning the public carry of all firearms just a few years after Chief Justice Holt in *Sir John Knight's Case* indicated that the English common law did not do so.

Regardless, even if respondents' reading of these colonial statutes were correct, it would still do little to support restrictions on the public carry of handguns *today*. At most, respondents can show that colonial legislatures sometimes prohibited the carrying of "dangerous and unusual weapons"—a fact we already acknowledged in *Heller*. See 554 U. S., at 627. Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the

Opinion of the Court

time," as opposed to those that "are highly unusual in society at large." *Ibid.* (internal quotation marks omitted). Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." *Id.*, at 629. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

The third statute invoked by respondents was enacted in East New Jersey in 1686. It prohibited the concealed carry of "pocket pistol[s]" or other "unusual or unlawful weapons," and it further prohibited "planter[s]" from carrying all pistols unless in military service or, if "strangers," when traveling through the Province. An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881) (Grants and Concessions). These restrictions do not meaningfully support respondents. The law restricted only concealed carry, not all public carry, and its restrictions applied only to certain "unusual or unlawful weapons," including "pocket pistol[s]." *Ibid.* It also did not apply to all pistols, let alone all firearms. "Pocket pistols" had barrel lengths of perhaps 3 or 4 inches, far smaller than the 6-inch to 14-inch barrels found on the other belt and hip pistols that were commonly used for lawful purposes in the 1600s. J. George, English Pistols and Revolvers 16 (1938); see also, *e.g.*, 14 Car. 2 c. 3, §20 (1662); H. Peterson, Arms and Armor in Colonial America, 1526–1783, p. 208 (1956) (Peterson). Moreover, the law prohibited only the *concealed* carry of pocket pistols; it presumably did not by its terms touch the

Opinion of the Court

open carry of larger, presumably more common pistols, except as to "planters."[13]  In colonial times, a "planter" was simply a farmer or plantation owner who settled new territory.  R. Lederer, Colonial American English 175 (1985); New Jersey State Archives, J. Klett, Using the Records of the East and West Jersey Proprietors 31 (rev. ed. 2014), https://www.nj.gov/state/archives/pdf/proprietors.pdf.  While the reason behind this singular restriction is not entirely clear, planters may have been targeted because colonial-era East New Jersey was riven with "strife and excitement" between planters and the Colony's proprietors "respecting titles to the soil."  See W. Whitehead, East Jersey Under the Proprietary Governments 150–151 (rev. 2d ed. 1875); see also T. Gordon, The History of New Jersey 49 (1834).

In any event, we cannot put meaningful weight on this solitary statute.  First, although the "planter" restriction may have prohibited the public carry of pistols, it did not prohibit planters from carrying long guns for self-defense—including the popular musket and carbine.  See Peterson 41.  Second, it does not appear that the statute survived for very long.  By 1694, East New Jersey provided that no slave "be permitted to carry any gun or pistol . . . into the woods, or plantations" unless their owner accompanied them.  Grants and Concessions 341.  If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence.  Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey.  See 1 Nevill, Acts of the General Assembly of the Province of New-Jersey (1752).  At most eight years of

_____

[13]Even assuming that pocket pistols were, as East Jersey in 1686 deemed them, "unusual or unlawful," it appears that they were commonly used at least by the founding. See, e.g., G. Neumann, The History of Weapons of the American Revolution 150–151 (1967); see also H. Hendrick, P. Paradis, & R. Hornick, Human Factors Issues in Handgun Safety and Forensics 44 (2008).

Cite as: 597 U. S. ____ (2022)          41

Opinion of the Court

history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.

Respondents next direct our attention to three late-18th-century and early-19th-century statutes, but each parallels the colonial statutes already discussed. One 1786 Virginia statute provided that "no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country." Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794).[14] A Massachusetts statute from 1795 commanded justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth." 1795 Mass. Acts and Laws ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts. And an 1801 Tennessee statute likewise required any person who would "publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" to post a surety; otherwise, his continued violation of the law would be "punished as for a breach of the peace, or riot at common law." 1801 Tenn. Acts pp. 260–261.

A by-now-familiar thread runs through these three statutes: They prohibit bearing arms in a way that spreads "fear" or "terror" among the people. As we have already explained, Chief Justice Holt in *Sir John Knight's Case* interpreted this *in Terrorem Populi* element to require something more than merely carrying a firearm in public. See *supra*, at 34–35. Respondents give us no reason to think that the founding generation held a different view. Thus, all told, in the century leading up to the Second Amendment

---

[14] The Virginia statute all but codified the existing common law in this regard. See G. Webb, The Office and Authority of a Justice of Peace 92 (1736) (explaining how a constable "may take away Arms from such who ride, or go, offensively armed, in Terror of the People").

Opinion of the Court

and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry.

3

Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate. Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes. None of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime.

*Common-Law Offenses.* As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But as with the earlier periods, there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.

For example, the Tennessee attorney general once charged a defendant with the common-law offense of affray, arguing that the man committed the crime when he "'arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people.'" *Simpson* v. *State*, 13 Tenn. 356, 358 (1833). More specifically, the indictment charged that Simpson "with force and arms being arrayed in a warlike manner . . . unlawfully, and to the great terror and disturbance of divers good citizens, did make an affray." *Id.*, at 361. The Tennessee Supreme Court quashed the indictment, holding that the Statute of Northampton was never part of Tennessee law. *Id.*, at 359. But even assuming that Tennesseans' ancestors brought with them the common law associated with the Statute, the *Simpson* court found that if the Statute had

Opinion of the Court

made, as an "independent ground of affray," the mere arming of oneself with firearms, the Tennessee Constitution's Second Amendment analogue had "completely abrogated it." *Id.*, at 360. At least in light of that constitutional guarantee, the court did not think that it could attribute to the mere carrying of arms "a necessarily consequent operation as terror to the people." *Ibid.*

Perhaps more telling was the North Carolina Supreme Court's decision in *State* v. *Huntly*, 25 N. C. 418 (1843) (*per curiam*). Unlike the Tennessee Supreme Court in *Simpson*, the *Huntly* court held that the common-law offense codified by the Statute of Northampton was part of the State's law. See 25 N. C., at 421–422. However, consistent with the Statute's long-settled interpretation, the North Carolina Supreme Court acknowledged "that the carrying of a gun" for a lawful purpose "*per se* constitutes no offence." *Id.*, at 422–423. Only carrying for a "wicked purpose" with a "mischievous result . . . constitute[d a] crime." *Id.*, at 423; see also J. Haywood, The Duty and Office of Justices of Peace 10 (1800); H. Potter, The Office and Duties of a Justice of the Peace 39 (1816).[15] Other state courts likewise recognized that the common law did not punish the carrying of

_____

[15]The dissent concedes that *Huntly*, 25 N. C. 418, recognized that citizens were "'at perfect liberty' to carry for 'lawful purpose[s].'" *Post*, at 42 (quoting *Huntly*, 25 N. C., at 423). But the dissent disputes that such "lawful purpose[s]" included self-defense, because *Huntly* goes on to speak more specifically of carrying arms for "business or amusement." *Id.*, at 422–423. This is an unduly stingy interpretation of *Huntly*. In particular, *Huntly* stated that "the citizen is at perfect liberty to carry his gun" "[f]or *any* lawful purpose," of which "business" and "amusement" were then mentioned. *Ibid.* (emphasis added). *Huntly* then contrasted these "lawful purpose[s]" with the "wicked purpose . . . to terrify and alarm." *Ibid.* Because there is no evidence that *Huntly* considered self-defense a "wicked purpose," we think the best reading of *Huntly* would sanction public carry for self-defense, so long as it was not "in such [a] manner as naturally will terrify and alarm." *Id.*, at 423.

44   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

deadly weapons *per se*, but only the carrying of such weapons "for the purpose of an affray, and in such manner as to strike terror to the people." *O'Neil* v. *State*, 16 Ala. 65, 67 (1849). Therefore, those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so.

*Statutory Prohibitions.* In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. As we recognized in *Heller*, "the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U. S., at 626. Respondents unsurprisingly cite these statutes[16]—and decisions upholding them[17]—as evidence that States were historically free to ban public carry.

In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents'

---

[16] Beginning in 1813 with Kentucky, six States (five of which were in the South) enacted laws prohibiting the concealed carry of pistols by 1846. See 1813 Ky. Acts §1, p. 100; 1813 La. Acts p. 172; 1820 Ind. Acts p. 39; Ark. Rev. Stat. §13, p. 280 (1838); 1838 Va. Acts ch. 101, §1, p. 76; 1839 Ala. Acts no. 77, §1. During this period, Georgia enacted a law that appeared to prohibit both concealed and open carry, see 1837 Ga. Acts §§1, 4, p. 90, but the Georgia Supreme Court later held that the prohibition could not extend to open carry consistent with the Second Amendment. See *infra*, at 45–46. Between 1846 and 1859, only one other State, Ohio, joined this group. 1859 Ohio Laws §1, p. 56. Tennessee, meanwhile, enacted in 1821 a broader law that prohibited carrying, among other things, "belt or pocket pistols, either public or private," except while traveling. 1821 Tenn. Acts ch. 13, §1, p. 15. And the Territory of Florida prohibited concealed carry during this same timeframe. See 1835 Terr. of Fla. Laws p. 423.

[17] See *State* v. *Mitchell*, 3 Blackf. 229 (Ind. 1833); *State* v. *Reid*, 1 Ala. 612, 616 (1840); *State* v. *Buzzard*, 4 Ark. 18 (1842); *Nunn* v. *State*, 1 Ga. 243 (1846); *State* v. *Chandler*, 5 La. 489 (1850); *State* v. *Smith*, 11 La. 633 (1856); *State* v. *Jumel*, 13 La. 399 (1858). But see *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822). See generally 2 J. Kent, Commentaries on American Law *340, n. *b*.

Opinion of the Court

cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. That was true in Alabama. See *State* v. *Reid*, 1 Ala. 612, 616, 619–621 (1840).[18] It was also true in Louisiana. See *State* v. *Chandler*, 5 La. 489, 490 (1850).[19] Kentucky, meanwhile, went one step further—the State Supreme Court *invalidated* a concealed-carry prohibition. See *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822).[20]

The Georgia Supreme Court's decision in *Nunn* v. *State*, 1 Ga. 243 (1846), is particularly instructive. Georgia's 1837 statute broadly prohibited "wearing" or "carrying" pistols "as arms of offence or defence," without distinguishing between concealed and open carry. 1837 Ga. Acts 90, §1. To the extent the 1837 Act prohibited "carrying certain weapons *secretly*," the court explained, it was "valid." *Nunn*, 1

---

[18] See *Reid*, 1 Ala., at 619 (holding that "the Legislature cannot inhibit the citizen from bearing arms openly"); *id.*, at 621 (noting that there was no evidence "tending to show that the defendant could not have defended himself as successfully, by carrying the pistol openly, as by secreting it about his person").

[19] See, *e.g., Chandler*, 5 La., at 490 (Louisiana concealed-carry prohibition "interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality"); *Smith*, 11 La., at 633 (The "arms" described in the Second Amendment "are such as are borne by a people in war, or at least carried openly"); *Jumel*, 13 La., at 399–400 ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society").

[20] With respect to Indiana's concealed-carry prohibition, the Indiana Supreme Court's reasons for upholding it are unknown because the court issued a one-sentence *per curiam* order holding the law "not unconstitutional." *Mitchell*, 3 Blackf., at 229. Similarly, the Arkansas Supreme Court upheld Arkansas' prohibition, but without reaching a majority rationale. See *Buzzard*, 4 Ark. 18. The Arkansas Supreme Court would later adopt Tennessee's approach, which tolerated the prohibition of all public carry of handguns except for military-style revolvers. See, *e.g., Fife* v. *State*, 31 Ark. 455 (1876).

46   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Ga., at 251. But to the extent the Act also prohibited "bearing arms *openly*," the court went on, it was "in conflict with the Constitutio[n] and *void*." *Ibid.*; see also *Heller*, 554 U. S., at 612. The Georgia Supreme Court's treatment of the State's general prohibition on the public carriage of handguns indicates that it was considered beyond the constitutional pale in antebellum America to altogether prohibit public carry.

Finally, we agree that Tennessee's prohibition on carrying "publicly or privately" any "belt or pocket pisto[l]," 1821 Tenn. Acts ch. 13, p. 15, was, on its face, uniquely severe, see *Heller*, 554 U. S., at 629. That said, when the Tennessee Supreme Court addressed the constitutionality of a substantively identical successor provision, see 1870 Tenn. Acts ch. 13, §1, p. 28, the court read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would "violat[e] the constitutional right to keep arms." *Andrews* v. *State*, 50 Tenn. 165, 187 (1871); see also *Heller*, 554 U. S., at 629 (discussing *Andrews*).[21]

All told, these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of "arms" protected by the Second Amendment or state analogues.[22]

_____

[21] Shortly after *Andrews*, 50 Tenn. 165, Tennessee codified an exception to the State's handgun ban for "an[y] army pistol, or such as are commonly carried and used in the United States Army" so long as they were carried "openly in [one's] hands." 1871 Tenn. Pub. Acts ch. 90, §1; see also *State* v. *Wilburn*, 66 Tenn. 57, 61–63 (1872); *Porter* v. *State*, 66 Tenn. 106, 107–108 (1874).

[22] The Territory of New Mexico made it a crime in 1860 to carry "any class of pistols whatever" "concealed or otherwise." 1860 Terr. of N. M. Laws §§1–2, p. 94. This extreme restriction is an outlier statute enacted by a territorial government nearly 70 years after the ratification of the Bill of Rights, and its constitutionality was never tested in court. Its value in discerning the original meaning of the Second Amendment is insubstantial. Moreover, like many other stringent carry restrictions

Opinion of the Court

*Surety Statutes.* In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.

As discussed earlier, Massachusetts had prohibited riding or going "armed offensively, to the fear or terror of the good citizens of this Commonwealth" since 1795. 1795 Mass. Acts and Laws ch. 2, at 436, in Laws of the Commonwealth of Massachusetts. In 1836, Massachusetts enacted a new law providing:

> "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided." Mass. Rev. Stat., ch. 134, §16.

In short, the Commonwealth required any person who was reasonably likely to "breach the peace," and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm. Between 1838 and 1871, nine other jurisdictions adopted variants of

_____

that were localized in the Western Territories, New Mexico's prohibition ended when the Territory entered the Union as a State in 1911 and guaranteed in its State Constitution that "[t]he people have the right to bear arms for their security and defense, but nothing herein shall be held to permit the carrying of concealed weapons." N. M. Const., Art. II, §6 (1911); see *infra*, at 61.

48   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

the Massachusetts law.[23]

Contrary to respondents' position, these "reasonable-cause laws" in no way represented the "direct precursor" to the proper-cause requirement. Brief for Respondents 27. While New York presumes that individuals have *no* public carry right without a showing of heightened need, the surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836).[24] As William Rawle explained in an influential treatise, an individual's carrying of arms was "sufficient cause to require him to give surety of the peace" only when "attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them." A View of the Constitution of the United States of America 126 (2d ed. 1829). Then, even on such a showing, the surety laws did not *prohibit* public carry in locations frequented by the general community. Rather, an accused arms-bearer "could go on carrying without criminal penalty" so long as he "post[ed] money that would be forfeited if he breached the peace or injured others—a requirement from which he was exempt if *he* needed self-defense." *Wrenn*, 864 F. 3d, at 661.

Thus, unlike New York's regime, a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace. And, even then, proving special need simply avoided a fee rather than a ban. All told, therefore, "[u]nder surety laws

_____

[23] See 1838 Terr. of Wis. Stat. §16, p. 381; Me. Rev. Stat., ch. 169, §16 (1840); Mich. Rev. Stat., ch. 162, §16 (1846); 1847 Va. Acts ch. 14, §16; Terr. of Minn. Rev. Stat., ch. 112, §18 (1851); 1854 Ore. Stat. ch. 16, §17, p. 220; D. C. Rev. Code ch. 141, §16 (1857); 1860 Pa. Laws p. 432, §6; W. Va. Code, ch. 153, §8 (1868).

[24] It is true that two of the antebellum surety laws were unusually broad in that they did not expressly require a citizen complaint to trigger the posting of a surety. See 1847 Va. Acts ch. 14, §16; W. Va. Code, ch. 153, §8 (1868).

Opinion of the Court

. . . everyone started out with robust carrying rights" and only those reasonably accused were required to show a special need in order to avoid posting a bond. *Ibid.* These antebellum special-need requirements "did not expand carrying for the responsible; it shrank burdens on carrying by the (allegedly) reckless." *Ibid.*

One Court of Appeals has nonetheless remarked that these surety laws were "a severe constraint on anyone thinking of carrying a weapon in public." *Young*, 992 F. 3d, at 820. That contention has little support in the historical record. Respondents cite no evidence showing the average size of surety postings. And given that surety laws were "intended merely for prevention" and were "not meant as any degree of punishment," 4 Blackstone, Commentaries, at 249, the burden these surety statutes may have had on the right to public carry was likely too insignificant to shed light on New York's proper-cause standard—a violation of which can carry a 4-year prison term or a $5,000 fine. In *Heller*, we noted that founding-era laws punishing unlawful discharge "with a small fine and forfeiture of the weapon . . . , not with significant criminal penalties," likely did not "preven[t] a person in the founding era from using a gun to protect himself or his family from violence, or that if he did so the law would be enforced against him." 554 U. S., at 633–634. Similarly, we have little reason to think that the hypothetical possibility of posting a bond would have prevented anyone from carrying a firearm for self-defense in the 19th century.

Besides, respondents offer little evidence that authorities ever enforced surety laws. The only recorded case that we know of involved a justice of the peace *declining* to require a surety, even when the complainant alleged that the arms-bearer "'did threaten to beat, wou[n]d, mai[m], and kill'" him. Brief for Professor Robert Leider et al. as *Amici Curiae* 31 (quoting *Grover* v. *Bullock*, No. 185 (Worcester Cty.,

50   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Aug. 13, 1853)); see E. Ruben & S. Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L. J. Forum 121, 130, n. 53 (2015). And one scholar who canvassed 19th-century newspapers—which routinely reported on local judicial matters—found only a handful of other examples in Massachusetts and the District of Columbia, all involving black defendants who may have been targeted for selective or pretextual enforcement.   See R. Leider, Constitutional Liquidation, Surety Laws, and the Right To Bear Arms 15–17, in New Histories of Gun Rights and Regulation (J. Blocher, J. Charles, & D. Miller eds.) (forthcoming); see also Brief for Professor Robert Leider et al. as *Amici Curiae* 31–32. That is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry.[25]

Respondents also argue that surety statutes were severe restrictions on firearms because the "reasonable cause to fear" standard was essentially *pro forma,* given that "merely carrying firearms in populous areas breached the peace" *per se.*  Brief for Respondents 27.  But that is a counterintuitive reading of the language that the surety statutes actually used.  If the mere carrying of handguns breached the peace, it would be odd to draft a surety statute requiring a complainant to demonstrate "reasonable cause to fear an injury, or breach of the peace," Mass. Rev. Stat., ch. 134, §16, rather than a reasonable likelihood that the arms-bearer carried a covered weapon.  After all, if it was the nature of the weapon rather than the manner of carry that

---

[25]The dissent speculates that the absence of recorded cases involving surety laws may simply "show that these laws were normally followed." *Post,* at 45.  Perhaps.  But again, the burden rests with the government to establish the relevant tradition of regulation, see *supra,* at 15, and, given all of the other features of surety laws that make them poor analogues to New York's proper-cause standard, we consider the barren record of enforcement to be simply one additional reason to discount their relevance.

Opinion of the Court

was dispositive, then the "reasonable fear" requirement would be redundant.

Moreover, the overlapping scope of surety statutes and criminal statutes suggests that the former were not viewed as substantial restrictions on public carry. For example, when Massachusetts enacted its surety statute in 1836, it reaffirmed its 1794 criminal prohibition on "go[ing] armed offensively, to the terror of the people." Mass. Rev. Stat., ch. 85, §24. And Massachusetts continued to criminalize the carrying of various "dangerous weapons" well after passing the 1836 surety statute. See, *e.g.*, 1850 Mass. Acts ch. 194, §1, p. 401; Mass. Gen. Stat., ch. 164, §10 (1860). Similarly, Virginia had criminalized the concealed carry of pistols since 1838, see 1838 Va. Acts ch. 101, §1, nearly a decade before it enacted its surety statute, see 1847 Va. Acts ch. 14, §16. It is unlikely that these surety statutes constituted a "severe" restraint on public carry, let alone a restriction tantamount to a ban, when they were supplemented by direct criminal prohibitions on specific weapons and methods of carry.

To summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.

None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose.

Opinion of the Court

4

Evidence from around the adoption of the Fourteenth Amendment also fails to support respondents' position. For the most part, respondents and the United States ignore the "outpouring of discussion of the [right to keep and bear arms] in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves" after the Civil War. *Heller,* 554 U. S., at 614. Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden. Nevertheless, we think a short review of the public discourse surrounding Reconstruction is useful in demonstrating how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens.

A short prologue is in order. Even before the Civil War commenced in 1861, this Court indirectly affirmed the importance of the right to keep and bear arms in public. Writing for the Court in *Dred Scott* v. *Sandford,* 19 How. 393 (1857), Chief Justice Taney offered what he thought was a parade of horribles that would result from recognizing that free blacks were citizens of the United States. If blacks were citizens, Taney fretted, they would be entitled to the privileges and immunities of citizens, including the right "to keep and carry arms *wherever they went.*" *Id.,* at 417 (emphasis added). Thus, even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum America.

After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted. This Court has already recounted some of the Southern abuses violating blacks' right to keep and bear arms. See *McDonald,* 561 U. S., at 771 (noting the "systematic efforts"

Opinion of the Court

made to disarm blacks); *id.*, at 845–847 (THOMAS, J., con-
curring in part and concurring in judgment); see also S.
Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) ("Pistols,
old muskets, and shotguns were taken away from [freed
slaves] as such weapons would be wrested from the hands
of lunatics").

In the years before the 39th Congress proposed the Four-
teenth Amendment, the Freedmen's Bureau regularly kept
it abreast of the dangers to blacks and Union men in the
postbellum South. The reports described how blacks used
publicly carried weapons to defend themselves and their
communities. For example, the Bureau reported that a
teacher from a Freedmen's school in Maryland had written
to say that, because of attacks on the school, "[b]oth the
mayor and sheriff have warned the colored people to go
armed to school, (which they do,)" and that the "[t]he super-
intendent of schools came down and brought [the teacher]
a revolver" for his protection. Cong. Globe, 39th Cong., 1st
Sess., 658 (1866); see also H. R. Exec. Doc. No. 68, 39th
Cong., 2d Sess., 91 (1867) (noting how, during the New Or-
leans riots, blacks under attack "defended themselves . . .
with such pistols as they had").

Witnesses before the Joint Committee on Reconstruction
also described the depredations visited on Southern blacks,
and the efforts they made to defend themselves. One Vir-
ginia music professor related that when "[t]wo Union men
were attacked . . . they drew their revolvers and held their
assailants at bay." H. R. Rep. No. 30, 39th Cong., 1st Sess.,
pt. 2, p. 110 (1866). An assistant commissioner to the Bu-
reau from Alabama similarly reported that men were "rob-
bing and disarming negroes upon the highway," H. R. Exec.
Doc. No. 70, 39th Cong., 1st Sess., 297 (1866), indicating
that blacks indeed carried arms publicly for their self-
protection, even if not always with success. See also H. R.
Exec. Doc. No. 329, 40th Cong., 2d Sess., 41 (1868) (describ-
ing a Ku Klux Klan outfit that rode "through the country

Opinion of the Court

. . . robbing every one they come across of money, pistols, papers, &c."); *id.*, at 36 (noting how a black man in Tennessee had been murdered on his way to get book subscriptions, with the murderer taking, among other things, the man's pistol).

Blacks had "procured great numbers of old army muskets and revolvers, particularly in Texas," and "employed them to protect themselves" with "vigor and audacity." S. Exec. Doc. No. 43, 39th Cong., 1st Sess., at 8. Seeing that government was inadequately protecting them, "there [was] the strongest desire on the part of the freedmen to secure arms, revolvers particularly." H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 3, at 102.

On July 6, 1868, Congress extended the 1866 Freedmen's Bureau Act, see 15 Stat. 83, and reaffirmed that freedmen were entitled to the "full and equal benefit of all laws and proceedings concerning personal liberty [and] personal security . . . *including the constitutional right to keep and bear arms.*" §14, 14 Stat. 176 (1866) (emphasis added). That same day, a Bureau official reported that freedmen in Kentucky and Tennessee were still constantly under threat: "No Union man or negro who attempts to take any active part in politics, or the improvement of his race, is safe a single day; and nearly all sleep upon their arms at night, and carry concealed weapons during the day." H. R. Exec. Doc. No. 329, 40th Cong., 2d Sess., at 40.

Of course, even during Reconstruction the right to keep and bear arms had limits. But those limits were consistent with a right of the public to peaceably carry handguns for self-defense. For instance, when General D. E. Sickles issued a decree in 1866 pre-empting South Carolina's Black Codes—which prohibited firearm possession by blacks—he stated: "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons. . . . And no

Opinion of the Court

disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess., at 908–909; see also *McDonald,* 561 U. S., at 847–848 (opinion of THOMAS, J.).[26] Around the same time, the editors of The Loyal Georgian, a prominent black-owned newspaper, were asked by "A Colored Citizen" whether "colored persons [have] a right to own and carry fire arms." The editors responded that blacks had "the *same* right to own and carry fire arms that *other* citizens have." The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4. And, borrowing language from a Freedmen's Bureau circular, the editors maintained that "[a]ny person, white or black, may be disarmed if convicted of making an improper or dangerous use of weapons," even though "no military or civil officer has the right or authority to disarm any class of people, thereby placing them at the mercy of others." *Ibid.* (quoting Circular No. 5, Freedmen's Bureau, Dec. 22, 1865); see also *McDonald,* 561 U. S., at 848–849 (opinion of THOMAS, J.).[27]

[26] Respondents invoke General Orders No. 10, which covered the Second Military District (North and South Carolina), and provided that "[t]he practice of carrying deadly weapons, except by officers and soldiers in the military service of the United States, is prohibited." Headquarters Second Military Dist., Gen. Orders No. 10 (Charleston, S. C., Apr. 11, 1867), in S. Exec. Doc. No. 14, 40th Cong., 1st Sess., 64 (1867). We put little weight on this categorical restriction given that the order also specified that a violation of this prohibition would "render the offender amenable to trial and punishment by military commission," *ibid.*, rather than a jury otherwise guaranteed by the Constitution. There is thus little indication that these military dictates were designed to align with the Constitution's usual application during times of peace.

[27] That said, Southern prohibitions on concealed carry were not always applied equally, even when under federal scrutiny. One lieutenant posted in Saint Augustine, Florida, remarked how local enforcement of concealed-carry laws discriminated against blacks: "To sentence a negro to several dollars' fine for carrying a revolver concealed upon his person, is in accordance with an ordinance of the town; but still the question naturally arises in my mind, 'Why is this poor fellow fined for an offence which is committed hourly by every other white man I meet in the streets?'" H. R. Exec. Doc. No. 57, 40th Cong., 2d Sess., 83 (1867); see

56    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

As for Reconstruction-era state regulations, there was little innovation over the kinds of public-carry restrictions that had been commonplace in the early 19th century.  For instance, South Carolina in 1870 authorized the arrest of "all who go armed offensively, to the terror of the people," 1870 S. C. Acts p. 403, no. 288, §4, parroting earlier statutes that codified the common-law offense.  That same year, after it cleaved from Virginia, West Virginia enacted a surety statute nearly identical to the one it inherited from Virginia.  See W. Va. Code, ch. 153, §8.  Also in 1870, Tennessee essentially reenacted its 1821 prohibition on the public carry of handguns but, as explained above, Tennessee courts interpreted that statute to exempt large pistols suitable for military use.  See *supra*, at 46.

Respondents and the United States, however, direct our attention primarily to two late-19th-century cases in Texas.  In 1871, Texas law forbade anyone from "carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person." 1871 Tex. Gen. Laws §1.  The Texas Supreme Court upheld that restriction in *English* v. *State*, 35 Tex. 473 (1871).  The Court reasoned that the Second Amendment, and the State's constitutional analogue, protected only those arms "as are useful and proper to an armed militia," including holster pistols, but not other kinds of handguns.  *Id.*, at 474–475.  Beyond that constitutional holding, the *English* court further opined that the law was not "contrary to public policy," *id.*, at 479, given that it "ma[de] all necessary exceptions" allowing deadly weapons to "be carried as means of self-defense," and therefore "fully cover[ed] all wants of society," *id.*, at 477.

Four years later, in *State* v. *Duke*, 42 Tex. 455 (1875), the Texas Supreme Court modified its analysis.  The court reinterpreted Texas' State Constitution to protect not only

─────────────

also H. R. Rep. No. 16, 39th Cong., 2d Sess., 427 (1867).

Opinion of the Court

military-style weapons but rather all arms "as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense." *Id.*, at 458. On that understanding, the court recognized that, in addition to "holster pistol[s]," the right to bear arms covered the carry of "such pistols at least as are not adapted to being carried concealed." *Id.*, at 458–459. Nonetheless, after expanding the scope of firearms that warranted state constitutional protection, *Duke* held that requiring any pistol-bearer to have "'reasonable grounds fearing an unlawful attack on [one's] person'" was a "legitimate and highly proper" regulation of handgun carriage. *Id.*, at 456, 459–460. *Duke* thus concluded that the 1871 statute "appear[ed] to have respected the right to carry a pistol openly when needed for self-defense." *Id.*, at 459.

We acknowledge that the Texas cases support New York's proper-cause requirement, which one can analogize to Texas' "reasonable grounds" standard. But the Texas statute, and the rationales set forth in *English* and *Duke*, are outliers. In fact, only one other State, West Virginia, adopted a similar public-carry statute before 1900. See W. Va. Code, ch. 148, §7 (1887). The West Virginia Supreme Court upheld that prohibition, reasoning that *no* handguns of any kind were protected by the Second Amendment, a rationale endorsed by no other court during this period. See *State* v. *Workman*, 35 W. Va. 367, 371–374, 14 S. E. 9, 11 (1891). The Texas decisions therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public.

In the end, while we recognize the support that postbellum Texas provides for respondents' view, we will not give disproportionate weight to a single state statute and a pair of state-court decisions. As in *Heller*, we will not "stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and

Opinion of the Court

bear arms for defense" in public.  554 U. S., at 632.

5

Finally, respondents point to the slight uptick in gun reg-ulation during the late-19th century—principally in the Western Territories.  As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contra-dicts earlier evidence.  See *id.*, at 614; *supra*, at 28.[28]  Here, moreover, respondents' reliance on late-19th-century laws has several serious flaws even beyond their temporal dis-tance from the founding.

The vast majority of the statutes that respondents invoke come from the Western Territories.  Two Territories prohib-ited the carry of pistols in towns, cities, and villages, but seemingly permitted the carry of rifles and other long guns everywhere.  See 1889 Ariz. Terr. Sess. Laws no. 13, §1, p. 16; 1869 N. M. Laws ch. 32, §§1–2, p. 72.[29]  Two others prohibited the carry of *all* firearms in towns, cities, and vil-lages, including long guns.  See 1875 Wyo. Terr. Sess. Laws ch. 52, §1; 1889 Idaho Terr. Gen. Laws §1, p. 23.  And one Territory completely prohibited public carry of pistols *eve-rywhere*, but allowed the carry of "shot-guns or rifles" for certain purposes.  See 1890 Okla. Terr. Stats., Art. 47, §§1–2, 5, p. 495.

These territorial restrictions fail to justify New York's

---

[28]We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*.  As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.

[29]The New Mexico restriction allowed an exception for individuals car-rying for "the lawful defence of themselves, their families or their prop-erty, and the same being then and there threatened with danger."  1869 Terr. of N. M. Laws ch. 32, §1, p. 72.  The Arizona law similarly exempted those who have "reasonable ground for fearing an unlawful attack upon his person."  1889 Ariz. Terr. Sess. Laws no. 13, §2, p. 17.

Opinion of the Court

proper-cause requirement for several reasons.  First, the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry.  For starters, "[t]he very transitional and temporary character of the American [territorial] system" often "permitted legislative improvisations which might not have been tolerated in a permanent setup."  E. Pomeroy, The Territories and the United States 1861–1890, p. 4 (1947).  These territorial "legislative improvisations," which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect "the origins and continuing significance of the Second Amendment" and we do not consider them "instructive." *Heller*, 554 U. S., at 614.

   The exceptional nature of these western restrictions is all the more apparent when one considers the miniscule territorial populations who would have lived under them.  To put that point into perspective, one need not look further than the 1890 census.  Roughly 62 million people lived in the United States at that time.  Arizona, Idaho, New Mexico, Oklahoma, and Wyoming combined to account for only 420,000 of those inhabitants—about two-thirds of 1% of the population. See Dept. of Interior, Compendium of the Eleventh Census: 1890, Part I.–Population 2 (1892).  Put simply, these western restrictions were irrelevant to more than 99% of the American population.  We have already explained that we will not stake our interpretation of the Second Amendment upon a law in effect in a single State, or a single city, "that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms" in public for self-defense. *Heller*, 554 U. S., at 632; see *supra*, at 57–58.  Similarly, we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also "contradic[t] the overwhelming weight" of

Opinion of the Court

other, more contemporaneous historical evidence. *Heller*, 554 U. S., at 632.

Second, because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality. When States generally prohibited both open and concealed carry of handguns in the late-19th century, state courts usually upheld the restrictions when they exempted army revolvers, or read the laws to exempt at least that category of weapons. See, *e.g.*, *Haile* v. *State*, 38 Ark. 564, 567 (1882); *Wilson* v. *State*, 33 Ark. 557, 560 (1878); *Fife* v. *State*, 31 Ark. 455, 461 (1876); *State* v. *Wilburn*, 66 Tenn. 57, 60 (1872); *Andrews*, 50 Tenn., at 187.[30] Those state courts that upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*. For example, the Kansas Supreme Court upheld a complete ban on public carry enacted by the city of Salina in 1901 based on the rationale that the Second Amendment protects only "the right to bear arms as a member of the state militia, or some other military organization provided for by law." *Salina* v. *Blaksley*, 72 Kan. 230, 232, 83 P. 619, 620 (1905). That was clearly erroneous. See *Heller*, 554 U. S., at 592.

Absent any evidence explaining *why* these unprecedented prohibitions on *all* public carry were understood to comport with the Second Amendment, we fail to see how they inform "the origins and continuing significance of the Amendment." *Id.*, at 614; see also The Federalist No. 37,

---

[30] Many other state courts during this period continued the antebellum tradition of upholding concealed carry regimes that seemingly provided for open carry. See, *e.g.*, *State* v. *Speller*, 86 N. C. 697 (1882); *Chatteaux* v. *State*, 52 Ala. 388 (1875); *Eslava* v. *State*, 49 Ala. 355 (1873); *State* v. *Shelby*, 90 Mo. 302, 2 S. W. 468 (1886); *Carroll* v. *State*, 28 Ark. 99 (1872); cf. *Robertson* v. *Baldwin*, 165 U. S. 275, 281–282 (1897) (remarking in dicta that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons").

Opinion of the Court

at 229 (explaining that the meaning of ambiguous constitutional provisions can be "liquidated and ascertained *by a series of particular discussions and adjudications*" (emphasis added)).

Finally, these territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial government—short lived. Some were held unconstitutional shortly after passage. See *In re Brickey*, 8 Idaho 597, 70 P. 609 (1902). Others did not survive a Territory's admission to the Union as a State. See Wyo. Rev. Stat., ch. 3, §5051 (1899) (1890 law enacted upon statehood prohibiting public carry only when combined with "intent, or avowed purpose, of injuring [one's] fellow-man"). Thus, they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation.

Beyond these Territories, respondents identify one Western State—Kansas—that instructed cities with more than 15,000 inhabitants to pass ordinances prohibiting the public carry of firearms. See 1881 Kan. Sess. Laws §§1, 23, pp. 79, 92.[31] By 1890, the only cities meeting the population threshold were Kansas City, Topeka, and Wichita. See Compendium of the Eleventh Census: 1890, at 442–452. Even if each of these three cities enacted prohibitions by 1890, their combined population (93,000) accounted for only 6.5% of Kansas' total population. *Ibid.* Although other Kansas cities may also have restricted public carry unilaterally,[32] the lone late-19th-century state law respondents

---

[31] In 1875, Arkansas prohibited the public carry of all pistols. See 1875 Ark. Acts p. 156, §1. But this categorical prohibition was also short lived. About six years later, Arkansas exempted "pistols as are used in the army or navy of the United States," so long as they were carried "uncovered, and in [the] hand." 1881 Ark. Acts p. 191, no. 96, §§1, 2.

[32] In 1879, Salina, Kansas, prohibited the carry of pistols but broadly exempted "cases when any person carrying [a pistol] is engaged in the pursuit of any lawful business, calling or employment" and the circumstances were "such as to justify a prudent man in carrying such weapon,

Opinion of the Court

identify does not prove that Kansas meaningfully restricted public carry, let alone demonstrate a broad tradition of States doing so.

\*    \*    \*

At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to "all Americans" the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. *Heller*, 554 U. S., at 581. Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" in order to carry arms in public. *Klenosky*, 75 App. Div., at 793, 428 N. Y. S. 2d, at 257.

IV

The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U. S., at 780 (plurality opinion). We know of no other constitutional right that an individual may exercise only after demonstrating to government offic-

---

for the defense of his person, property or family." Salina, Kan., Rev. Ordinance No. 268, §2.

Opinion of the Court

ers some special need.  That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion.  It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him.  And it is not how the Second Amendment works when it comes to public carry for self-defense.

New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.  We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

1

ALITO, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 20–843

## NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS *v.* KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE ALITO, concurring.

I join the opinion of the Court in full but add the following comments in response to the dissent.

### I

Much of the dissent seems designed to obscure the specific question that the Court has decided, and therefore it may be helpful to provide a succinct summary of what we have actually held. In *District of Columbia* v. *Heller*, 554 U. S. 570 (2008), the Court concluded that the Second Amendment protects the right to keep a handgun in the home for self-defense. *Heller* found that the Amendment codified a preexisting right and that this right was regarded at the time of the Amendment's adoption as rooted in "'the natural right of resistance and self-preservation.'" *Id.,* at 594. "[T]he inherent right of self-defense," *Heller* explained, is "central to the Second Amendment right." *Id.,* at 628.

Although *Heller* concerned the possession of a handgun in the home, the key point that we decided was that "the people," not just members of the "militia," have the right to use a firearm to defend themselves. And because many people face a serious risk of lethal violence when they venture

2    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

ALITO, J., concurring

outside their homes, the Second Amendment was understood at the time of adoption to apply under those circumstances. The Court's exhaustive historical survey establishes that point very clearly, and today's decision therefore holds that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun for this purpose.

That is all we decide. Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* v. *Chicago*, 561 U. S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns.

In light of what we have actually held, it is hard to see what legitimate purpose can possibly be served by most of the dissent's lengthy introductory section. See *post*, at 1–8 (opinion of BREYER, J.). Why, for example, does the dissent think it is relevant to recount the mass shootings that have occurred in recent years? *Post*, at 4–5. Does the dissent think that laws like New York's prevent or deter such atrocities? Will a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home? And how does the dissent account for the fact that one of the mass shootings near the top of its list took place in Buffalo? The New York law at issue in this case obviously did not stop that perpetrator.

What is the relevance of statistics about the use of guns to commit suicide? See *post*, at 5–6. Does the dissent think that a lot of people who possess guns in their homes will be stopped or deterred from shooting themselves if they cannot lawfully take them outside?

The dissent cites statistics about the use of guns in domestic disputes, see *post*, at 5, but it does not explain why these statistics are relevant to the question presented in

ALITO, J., concurring

this case. How many of the cases involving the use of a gun in a domestic dispute occur outside the home, and how many are prevented by laws like New York's?

The dissent cites statistics on children and adolescents killed by guns, see *post,* at 1, 4, but what does this have to do with the question whether an adult who is licensed to possess a handgun may be prohibited from carrying it outside the home? Our decision, as noted, does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18, 18 U. S. C. §§922(x)(2)–(5), and bars the sale of a handgun to anyone under the age of 21, §§922(b)(1), (c)(1).[1]

The dissent cites the large number of guns in private hands—nearly 400 million—but it does not explain what this statistic has to do with the question whether a person who already has the right to keep a gun in the home for self-

_____

[1] The dissent makes no effort to explain the relevance of most of the incidents and statistics cited in its introductory section (*post,* at 1–8) (opinion of BREYER, J.). Instead, it points to studies (summarized later in its opinion) regarding the effects of "shall issue" licensing regimes on rates of homicide and other violent crimes. I note only that the dissent's presentation of such studies is one-sided. See RAND Corporation, Effects of Concealed-Carry Laws on Violent Crime (Apr. 22, 2022), https://www.rand.org/research/gun-policy/analysis/concealed-carry/violent-crime-html; see also Brief for William English et al. as *Amici Curiae* 3 ("The overwhelming weight of statistical analysis on the effects of [right-to-carry] laws on violent crime concludes that RTC laws do not result in any statistically significant increase in violent crime rates"); Brief for Arizona et al. as *Amici Curiae* 12 ("[P]opulation-level data on licensed carry is extensive, and the weight of the evidence confirms that objective, non-discriminatory licensed-carry laws have two results: (1) statistically significant reductions in some types of violent crime, or (2) no statistically significant effect on overall violent crime"); Brief for Law Enforcement Groups et al. as *Amici Curiae* 12 ("[O]ver the period 1991–2019 the inventory of firearms more than doubled; the number of concealed carry permits increased by at least sevenfold," but "murder rates fell by almost half, from 9.8 per 100,000 people in 1991 to 5.0 per 100,000 in 2019" and "[v]iolent crimes plummeted by over half").

4      NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

ALITO, J., concurring

defense is likely to be deterred from acquiring a gun by the knowledge that the gun cannot be carried outside the home. See *post*, at 3. And while the dissent seemingly thinks that the ubiquity of guns and our country's high level of gun violence provide reasons for sustaining the New York law, the dissent appears not to understand that it is these very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense.

No one apparently knows how many of the 400 million privately held guns are in the hands of criminals, but there can be little doubt that many muggers and rapists are armed and are undeterred by the Sullivan Law. Each year, the New York City Police Department (NYPD) confiscates thousands of guns,[2] and it is fair to assume that the number of guns seized is a fraction of the total number held unlawfully. The police cannot disarm every person who acquires a gun for use in criminal activity; nor can they provide bodyguard protection for the State's nearly 20 million residents or the 8.8 million people who live in New York City. Some of these people live in high-crime neighborhoods. Some must traverse dark and dangerous streets in order to reach their homes after work or other evening activities. Some are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury.

Ordinary citizens frequently use firearms to protect

---

[2]NYPD statistics show approximately 6,000 illegal guns were seized in 2021. A. Southall, This Police Captain's Plan To Stop Gun Violence Uses More Than Handcuffs, N. Y. Times, Feb. 4, 2022. According to recent remarks by New York City Mayor Eric Adams, the NYPD has confiscated 3,000 firearms in 2022 so far. City of New York, Transcript: Mayor Eric Adams Makes Announcement About NYPD Gun Violence Suppression Division (June 6, 2022), https://www1.nyc.gov/office-of-the-mayor/news/369-22/transcript-mayor-eric-adams-makes-announcement-nypd-gun-violence-suppression-division.

Cite as: 597 U. S. ____ (2022)     5

ALITO, J., concurring

themselves from criminal attack. According to survey data, defensive firearm use occurs up to 2.5 million times per year. Brief for Law Enforcement Groups et al. as *Amici Curiae* 5. A Centers for Disease Control and Prevention report commissioned by former President Barack Obama reviewed the literature surrounding firearms use and noted that "[s]tudies that directly assessed the effect of actual defensive uses of guns . . . have found consistently lower injury rates among gun-using crime victims compared with victims who used other self-protective strategies." Institute of Medicine and National Research Council, Priorities for Research To Reduce the Threat of Firearm-Related Violence 15–16 (2013) (referenced in Brief for Independent Women's Law Center as *Amicus Curiae* 19–20).

Many of the *amicus* briefs filed in this case tell the story of such people. Some recount incidents in which a potential victim escaped death or serious injury only because carrying a gun for self-defense was allowed in the jurisdiction where the incident occurred. Here are two examples. One night in 1987, Austin Fulk, a gay man from Arkansas, "was chatting with another man in a parking lot when four gay bashers charged them with baseball bats and tire irons. Fulk's companion drew his pistol from under the seat of his car, brandished it at the attackers, and fired a single shot over their heads, causing them to flee and saving the would-be victims from serious harm." Brief for DC Project Foundation et al. as *Amici Curiae* 31 (footnote omitted).

On July 7, 2020, a woman was brutally assaulted in the parking lot of a fast food restaurant in Jefferson City, Tennessee. Her assailant slammed her to the ground and began to drag her around while strangling her. She was saved when a bystander who was lawfully carrying a pistol pointed his gun at the assailant, who then stopped the assault and the assailant was arrested. *Ibid.* (citing C. Wethington, Jefferson City Police: Legally Armed Good Samaritan Stops Assault, ABC News 6, WATE.com (July 9, 2020),

ALITO, J., concurring

https://www.wate.com/news/local-news/jefferson-city-police-legally-armed-good-samaritan-stops-assault/).

In other incidents, a law-abiding person was driven to violate the Sullivan Law because of fear of victimization and as a result was arrested, prosecuted, and incarcerated. See Brief for Black Attorneys of Legal Aid et al. as *Amici Curiae* 22–25.

Some briefs were filed by members of groups whose members feel that they have special reasons to fear attacks. See Brief for Asian Pacific American Gun Owners Association as *Amicus Curiae*; Brief for DC Project Foundation et al. as *Amici Curiae*; Brief for Black Guns Matter et al. as *Amici Curiae*; Brief for Independent Women's Law Center as *Amicus Curiae*; Brief for National African American Gun Association, Inc., as *Amicus Curiae*.

I reiterate: All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional.

## II

This brings me to Part II–B of the dissent, *post*, at 11–21, which chastises the Court for deciding this case without a trial and factual findings about just how hard it is for a law-abiding New Yorker to get a carry permit. The record before us, however, tells us everything we need on this score. At argument, New York's solicitor general was asked about an ordinary person who works at night and must walk through dark and crime-infested streets to get home. Tr. of Oral Arg. 66–67. The solicitor general was asked whether such a person would be issued a carry permit if she pleaded: "[T]here have been a lot of muggings in this area, and I am scared to death." *Id.,* at 67. The solicitor general's candid answer was "in general," no. *Ibid.* To get a permit, the applicant would have to show more—for example, that she

ALITO, J., concurring

had been singled out for attack. *Id.,* at 65; see also *id.,* at 58. A law that dictates that answer violates the Second Amendment.

## III

My final point concerns the dissent's complaint that the Court relies too heavily on history and should instead approve the sort of "means-end" analysis employed in this case by the Second Circuit. Under that approach, a court, in most cases, assesses a law's burden on the Second Amendment right and the strength of the State's interest in imposing the challenged restriction. See *post,* at 20. This mode of analysis places no firm limits on the ability of judges to sustain any law restricting the possession or use of a gun. Two examples illustrate the point.

The first is the Second Circuit's decision in a case the Court decided two Terms ago, *New York State Rifle & Pistol Assn., Inc.* v. *City of New York,* 590 U. S. ___ (2020). The law in that case affected New York City residents who had been issued permits to keep a gun in the home for self-defense. The city recommended that these permit holders practice at a range to ensure that they are able to handle their guns safely, but the law prohibited them from taking their guns to any range other than the seven that were spread around the city's five boroughs. Even if such a person unloaded the gun, locked it in the trunk of a car, and drove to the nearest range, that person would violate the law if the nearest range happened to be outside city limits. The Second Circuit held that the law was constitutional, concluding, among other things, that the restriction was substantially related to the city's interests in public safety and crime prevention. See *New York State Rifle & Pistol Assn., Inc.* v. *New York,* 883 F. 3d 45, 62–64 (2018). But after we agreed to review that decision, the city repealed the law and admitted that it did not actually have any beneficial effect on public safety. See N. Y. Penal Law Ann.

8        NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

ALITO, J., concurring

§400.00(6) (West Cum. Supp. 2022); Suggestion of Mootness in *New York State Rifle & Pistol Assn., Inc.* v. *City of New York*, O. T. 2019, No. 18–280, pp. 5–7.

Exhibit two is the dissent filed in *Heller* by JUSTICE BREYER, the author of today's dissent. At issue in *Heller* was an ordinance that made it impossible for any District of Columbia resident to keep a handgun in the home for self-defense. See 554 U. S., at 574–575. Even the respondent, who carried a gun on the job while protecting federal facilities, did not qualify. *Id.,* at 575–576. The District of Columbia law was an extreme outlier; only a few other jurisdictions in the entire country had similar laws. Nevertheless, JUSTICE BREYER's dissent, while accepting for the sake of argument that the Second Amendment protects the right to keep a handgun in the home, concluded, based on essentially the same test that today's dissent defends, that the District's complete ban was constitutional. See *id.,* at 689, 722 (under "an interest-balancing inquiry. . ." the dissent would "conclude that the District's measure is a proportionate, not a disproportionate, response to the compelling concerns that led the District to adopt it").

Like that dissent in *Heller*, the real thrust of today's dissent is that guns are bad and that States and local jurisdictions should be free to restrict them essentially as they see fit.[3] That argument was rejected in *Heller*, and while the dissent protests that it is not rearguing *Heller*, it proceeds to do just that. See *post*, at 25–28.

*Heller* correctly recognized that the Second Amendment

---

[3] If we put together the dissent in this case and JUSTICE BREYER's *Heller* dissent, States and local governments would essentially be free to ban the possession of all handguns, and it is unclear whether its approach would impose any significant restrictions on laws regulating long guns. The dissent would extend a very large measure of deference to legislation implicating Second Amendment rights, but it does not claim that such deference is appropriate when any other constitutional right is at issue.

ALITO, J., concurring

codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun. In 1791, when the Second Amendment was adopted, there were no police departments, and many families lived alone on isolated farms or on the frontiers. If these people were attacked, they were on their own. It is hard to imagine the furor that would have erupted if the Federal Government and the States had tried to take away the guns that these people needed for protection.

Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to protect themselves. And today, no less than in 1791, the Second Amendment guarantees their right to do so.

KAVANAUGH, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 20–843

## NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS v. KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE KAVANAUGH, with whom THE CHIEF JUSTICE joins, concurring.

The Court employs and elaborates on the text, history, and tradition test that *Heller* and *McDonald* require for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense. See *District of Columbia* v. *Heller*, 554 U. S. 570 (2008); *McDonald* v. *Chicago*, 561 U. S. 742 (2010). Applying that test, the Court correctly holds that New York's outlier "may-issue" licensing regime for carrying handguns for self-defense violates the Second Amendment.

I join the Court's opinion, and I write separately to underscore two important points about the limits of the Court's decision.

*First*, the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense. In particular, the Court's decision does not affect the existing licensing regimes—known as "shall-issue" regimes—that are employed in 43 States.

The Court's decision addresses only the unusual discretionary licensing regimes, known as "may-issue" regimes, that are employed by 6 States including New York. As the

2   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

KAVANAUGH, J., concurring

Court explains, New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense to many "ordinary, law-abiding citizens." *Ante*, at 1; see also *Heller*, 554 U. S., at 635. The Court has held that "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U. S., at 767 (quoting *Heller*, 554 U. S., at 599). New York's law is inconsistent with the Second Amendment right to possess and carry handguns for self-defense.

By contrast, 43 States employ objective shall-issue licensing regimes. Those shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements. Brief for Arizona et al. as *Amici Curiae* 7. Unlike New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense. As petitioners acknowledge, shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice. Tr. of Oral Arg. 50–51.

Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so. Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States.

KAVANAUGH, J., concurring

*Second*, as *Heller* and *McDonald* established and the Court today again explains, the Second Amendment "is neither a regulatory straightjacket nor a regulatory blank check." *Ante*, at 21.   Properly interpreted, the Second Amendment allows a "variety" of gun regulations. *Heller*, 554 U. S., at 636.  As Justice Scalia wrote in his opinion for the Court in *Heller*, and JUSTICE ALITO reiterated in relevant part in the principal opinion in *McDonald*:

> "Like most rights, the right secured by the Second Amendment is not unlimited.   From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.  [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.]
>
> "We also recognize another important limitation on the right to keep and carry arms.  *Miller* said, as we have explained, that the sorts of weapons protected were those in common use at the time.  We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U. S., at 626–627, and n. 26 (citations and quotation marks omitted); see also *McDonald*, 561 U. S., at 786 (plurality opinion).

\*       \*       \*

With those additional comments, I join the opinion of the Court.

BARRETT, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 20–843

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS *v.* KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE BARRETT, concurring.

I join the Court's opinion in full. I write separately to highlight two methodological points that the Court does not resolve. First, the Court does not conclusively determine the manner and circumstances in which postratification practice may bear on the original meaning of the Constitution. See *ante,* at 24–29. Scholars have proposed competing and potentially conflicting frameworks for this analysis, including liquidation, tradition, and precedent. See, *e.g.,* Nelson, Originalism and Interpretive Conventions, 70 U. Chi. L. Rev. 519 (2003); McConnell, Time, Institutions, and Interpretation, 95 B. U. L. Rev. 1745 (2015). The limits on the permissible use of history may vary between these frameworks (and between different articulations of each one). To name just a few unsettled questions: How long after ratification may subsequent practice illuminate original public meaning? Cf. *McCulloch* v. *Maryland,* 4 Wheat. 316, 401 (1819) (citing practice "introduced at a very early period of our history"). What form must practice take to carry weight in constitutional analysis? See *Myers* v. *United States,* 272 U. S. 52, 175 (1926) (citing a "legislative exposition of the Constitution . . . acquiesced in for a long term of years"). And may practice settle the meaning of individual

BARRETT, J., concurring

rights as well as structural provisions?  See Baude, Constitutional Liquidation, 71 Stan. L. Rev. 1, 49–51 (2019) (canvassing arguments).  The historical inquiry presented in this case does not require us to answer such questions, which might make a difference in another case.  See *ante*, at 17–19.

Second and relatedly, the Court avoids another "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Bill of Rights was ratified in 1791.  *Ante*, at 29.  Here, the lack of support for New York's law in either period makes it unnecessary to choose between them.  But if 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little).  Cf. *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. ___, ___–___ (2020) (slip op., at 15–16) (a practice that "arose in the second half of the 19th century . . . cannot by itself establish an early American tradition" informing our understanding of the First Amendment).  So today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.  On the contrary, the Court is careful to caution "against giving postenactment history more weight than it can rightly bear."  *Ante*, at 26.

Cite as: 597 U. S. \_\_\_\_ (2022)  1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 20–843

## NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS v. KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

In 2020, 45,222 Americans were killed by firearms. See Centers for Disease Control and Prevention, Fast Facts: Firearm Violence Prevention (last updated May 4, 2022) (CDC, Fast Facts), https://www.cdc.gov/violenceprevention/ firearms/fastfact.html. Since the start of this year (2022), there have been 277 reported mass shootings—an average of more than one per day. See Gun Violence Archive (last visited June 20, 2022), https://www.gunviolence archive.org. Gun violence has now surpassed motor vehicle crashes as the leading cause of death among children and adolescents. J. Goldstick, R. Cunningham, & P. Carter, Current Causes of Death in Children and Adolescents in the United States, 386 New England J. Med. 1955 (May 19, 2022) (Goldstick).

Many States have tried to address some of the dangers of gun violence just described by passing laws that limit, in various ways, who may purchase, carry, or use firearms of different kinds. The Court today severely burdens States' efforts to do so. It invokes the Second Amendment to strike down a New York law regulating the public carriage of con-

2    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

cealed handguns. In my view, that decision rests upon several serious mistakes.

First, the Court decides this case on the basis of the pleadings, without the benefit of discovery or an evidentiary record. As a result, it may well rest its decision on a mistaken understanding of how New York's law operates in practice. Second, the Court wrongly limits its analysis to focus nearly exclusively on history. It refuses to consider the government interests that justify a challenged gun regulation, regardless of how compelling those interests may be. The Constitution contains no such limitation, and neither do our precedents. Third, the Court itself demonstrates the practical problems with its history-only approach. In applying that approach to New York's law, the Court fails to correctly identify and analyze the relevant historical facts. Only by ignoring an abundance of historical evidence supporting regulations restricting the public carriage of firearms can the Court conclude that New York's law is not "consistent with the Nation's historical tradition of firearm regulation." See *ante,* at 15.

In my view, when courts interpret the Second Amendment, it is constitutionally proper, indeed often necessary, for them to consider the serious dangers and consequences of gun violence that lead States to regulate firearms. The Second Circuit has done so and has held that New York's law does not violate the Second Amendment. See *Kachalsky* v. *County of Westchester,* 701 F. 3d 81, 97–99, 101 (2012). I would affirm that holding. At a minimum, I would not strike down the law based only on the pleadings, as the Court does today—without first allowing for the development of an evidentiary record and without considering the State's compelling interest in preventing gun violence. I respectfully dissent.

I

The question before us concerns the extent to which the

BREYER, J., dissenting

Second Amendment prevents democratically elected officials from enacting laws to address the serious problem of gun violence. And yet the Court today purports to answer that question without discussing the nature or severity of that problem.

In 2017, there were an estimated 393.3 million civilian-held firearms in the United States, or about 120 firearms per 100 people. A. Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey 4 (June 2018), https://www.smallarmssurvey.org/sites/default/files/ resources/SAS-BP-Civilian-Firearms-Numbers.pdf. That is more guns per capita than in any other country in the world. *Ibid.* (By comparison, Yemen is second with about 52.8 firearms per 100 people—less than half the per capita rate in the United States—and some countries, like Indonesia and Japan, have fewer than one firearm per 100 people. *Id.,* at 3–4.)

Unsurprisingly, the United States also suffers a disproportionately high rate of firearm-related deaths and injuries. Cf. Brief for Educational Fund To Stop Gun Violence et al. as *Amici Curiae* 17–18 (Brief for Educational Fund) (citing studies showing that, within the United States, "states that rank among the highest in gun ownership also rank among the highest in gun deaths" while "states with lower rates of gun ownership have lower rates of gun deaths"). In 2015, approximately 36,000 people were killed by firearms nationwide. M. Siegel et al., Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States, 107 Am. J. Pub. Health 1923 (2017). Of those deaths, 22,018 (or about 61%) were suicides, 13,463 (37%) were homicides, and 489 (1%) were unintentional injuries. *Ibid.* On top of that, firearms caused an average of 85,694 emergency room visits for nonfatal injuries each year between 2009 and 2017. E. Kaufman et al., Epidemiological Trends in Fatal and Nonfatal Firearm Injuries in the US, 2009–2017, 181 JAMA Internal Medicine

4    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

237 (2021) (Kaufman).

Worse yet, gun violence appears to be on the rise. By 2020, the number of firearm-related deaths had risen to 45,222, CDC, Fast Facts, or by about 25% since 2015. That means that, in 2020, an average of about 124 people died from gun violence every day. *Ibid.* As I mentioned above, gun violence has now become the leading cause of death in children and adolescents, surpassing car crashes, which had previously been the leading cause of death in that age group for over 60 years. Goldstick 1955; J. Bates, Guns Became the Leading Cause of Death for American Children and Teens in 2020, Time, Apr. 27, 2022, https://www.time.com/6170864/cause-of-death-children-guns/. And the consequences of gun violence are borne disproportionately by communities of color, and Black communities in particular. See CDC, Age-Adjusted Rates of Firearm-Related Homicide, by Race, Hispanic Origin, and Sex—National Vital Statistics System, United States, 2019, at 1491 (Oct. 22, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7042a6-H.pdf (documenting 34.9 firearm-related homicides per 100,000 population for non-Hispanic Black men in 2019, compared to 7.7 such homicides per 100,000 population for men of all races); S. Kegler et al., CDC, *Vital Signs*: Changes in Firearm Homicide and Suicide Rates—United States, 2019–2020, at 656–658 (May 13, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7119e1-H.pdf.

The dangers posed by firearms can take many forms. Newspapers report mass shootings occurring at an entertainment district in Philadelphia, Pennsylvania (3 dead and 11 injured); an elementary school in Uvalde, Texas (21 dead); a supermarket in Buffalo, New York (10 dead and 3 injured); a series of spas in Atlanta, Georgia (8 dead); a busy street in an entertainment district of Dayton, Ohio (9 dead and 17 injured); a nightclub in Orlando, Florida (50 dead and 53 injured); a church in Charleston, South Carolina (9 dead); a movie theater in Aurora, Colorado (12 dead and 50

BREYER, J., dissenting

injured); an elementary school in Newtown, Connecticut (26 dead); and many, many more. See, *e.g.,* R. Todt, 3 Dead, 11 Wounded in Philadelphia Shooting on Busy Street, Washington Post, June 5, 2022; A. Hernández, J. Slater, D. Barrett, & S. Foster-Frau, At Least 19 Children, 2 Teachers Killed at Texas Elementary School, Washington Post, May 25, 2022; A. Joly, J. Slater, D. Barrett, & A. Hernandez, 10 Killed in Racially Motivated Shooting at Buffalo Grocery Store, Washington Post, May 14, 2022; C. McWhirter & V. Bauerlein, Atlanta-Area Shootings at Spas Leave Eight Dead, Wall Street Journal, Mar. 17, 2021; A. Hassan, Dayton Gunman Shot 26 People in 32 Seconds, Police Timeline Reveals, N. Y. Times, Aug. 13, 2019; L. Alvarez & R. Pérez-Peña, Orlando Gunman Attacks Gay Nightclub, Leaving 50 Dead, N. Y. Times, June 12, 2016; J. Horowitz, N. Corasaniti, & A. Southall, Nine Killed in Shooting at Black Church in Charleston, N. Y. Times, June 17, 2015; R. Lin, Gunman Kills 12 at 'Dark Knight Rises' Screening in Colorado, L. A. Times, July 20, 2012; J. Barron, Nation Reels After Gunman Massacres 20 Children at School in Connecticut, N. Y. Times, Dec. 14, 2012. Since the start of this year alone (2022), there have already been 277 reported mass shootings—an average of more than one per day. Gun Violence Archive; see also Gun Violence Archive, General Methodology, https://www.gunviolencearchive.org/methodology (defining mass shootings to include incidents in which at least four victims are shot, not including the shooter).

And mass shootings are just one part of the problem. Easy access to firearms can also make many other aspects of American life more dangerous. Consider, for example, the effect of guns on road rage. In 2021, an average of 44 people each month were shot and either killed or wounded in road rage incidents, double the annual average between 2016 and 2019. S. Burd-Sharps & K. Bistline, Everytown for Gun Safety, Reports of Road Rage Shootings Are on the Rise (Apr. 4, 2022), https://www.everytownresearch.org/reports-

6       NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

of-road-rage-shootings-are-on-the-rise/; see also J. Dono-
hue, A. Aneja, & K. Weber, Right-to-Carry Laws and Vio-
lent Crime: A Comprehensive Assessment Using Panel
Data and a State-Level Synthetic Control Analysis, 16 J.
Empirical Legal Studies 198, 204 (2019). Some of these
deaths might have been avoided if there had not been a
loaded gun in the car. See *ibid.*; Brief for American Bar
Association as *Amicus Curiae* 17–18; Brief for Educational
Fund 20–23 (citing studies showing that the presence of a
firearm is likely to increase aggression in both the person
carrying the gun and others who see it).

The same could be said of protests: A study of 30,000 pro-
tests between January 2020 and June 2021 found that
armed protests were nearly six times more likely to become
violent or destructive than unarmed protests. Everytown
for Gun Safety, Armed Assembly: Guns, Demonstrations,
and Political Violence in America (Aug. 23, 2021), https://
www.everytownresearch.org/report/armed-assembly-guns-
demonstrations-and-political-violence-in-america/ (finding
that 16% of armed protests turned violent, compared to less
than 3% of unarmed protests). Or domestic disputes: An-
other study found that a woman is five times more likely to
be killed by an abusive partner if that partner has access to
a gun. Brief for Educational Fund 8 (citing A. Zeoli, R. Ma-
linski, & B. Turchan, Risks and Targeted Interventions:
Firearms in Intimate Partner Violence, 38 Epidemiologic
Revs. 125 (2016); J. Campbell et al., Risk Factors for Femi-
cide in Abusive Relationships: Results From a Multisite
Case Control Study, 93 Am. J. Pub. Health 1089, 1092
(2003)). Or suicides: A study found that men who own
handguns are three times as likely to commit suicide than
men who do not and women who own handguns are seven
times as likely to commit suicide than women who do not.
D. Studdert et al., Handgun Ownership and Suicide in Cal-
ifornia, 382 New England J. Med. 2220, 2224 (June 4,
2020).

BREYER, J., dissenting

Consider, too, interactions with police officers. The presence of a gun in the hands of a civilian poses a risk to both officers and civilians. *Amici* prosecutors and police chiefs tell us that most officers who are killed in the line of duty are killed by firearms; they explain that officers in States with high rates of gun ownership are three times as likely to be killed in the line of duty as officers in States with low rates of gun ownership. Brief for Prosecutors Against Gun Violence as *Amicus Curiae* 23–24; Brief for Former Major City Police Chiefs as *Amici Curiae* 13–14, and n. 21, (citing D. Swedler, M. Simmons, F. Dominici, & D. Hemenway, Firearm Prevalence and Homicides of Law Enforcement Officers in the United States, 105 Am. J. Pub. Health 2042, 2045 (2015)). They also say that States with the highest rates of gun ownership report four times as many fatal shootings of civilians by police officers compared to States with the lowest rates of gun ownership. Brief for Former Major City Police Chiefs as *Amici Curiae* 16 (citing D. Hemenway, D. Azrael, A. Connor, & M. Miller, Variation in Rates of Fatal Police Shootings Across US States: The Role of Firearm Availability, 96 J. Urb. Health 63, 67 (2018)).

These are just some examples of the dangers that firearms pose. There is, of course, another side to the story. I am not simply saying that "guns are bad." See *ante*, at 8 (ALITO, J., concurring). Some Americans use guns for legitimate purposes, such as sport (*e.g.,* hunting or target shooting), certain types of employment (*e.g.,* as a private security guard), or self-defense. Cf. *ante*, at 4–6 (ALITO, J., concurring). Balancing these lawful uses against the dangers of firearms is primarily the responsibility of elected bodies, such as legislatures. It requires consideration of facts, statistics, expert opinions, predictive judgments, relevant values, and a host of other circumstances, which together make decisions about how, when, and where to regulate guns more appropriately legislative work. That consideration counsels modesty and restraint on the part of judges

BREYER, J., dissenting

when they interpret and apply the Second Amendment.

Consider, for one thing, that different types of firearms may pose different risks and serve different purposes. The Court has previously observed that handguns, the type of firearm at issue here, "are the most popular weapon chosen by Americans for self-defense in the home." *District of Columbia* v. *Heller*, 554 U. S. 570, 629 (2008). But handguns are also the most popular weapon chosen by perpetrators of violent crimes. In 2018, 64.4% of firearm homicides and 91.8% of nonfatal firearm assaults were committed with a handgun. Dept. of Justice, Bureau of Justice Statistics, G. Kena & J. Truman, Trends and Patterns in Firearm Violence, 1993–2018, pp. 5–6 (Apr. 2022). Handguns are also the most commonly stolen type of firearm—63% of burglaries resulting in gun theft between 2005 and 2010 involved the theft of at least one handgun. Dept. of Justice, Bureau of Justice Statistics, L. Langton, Firearms Stolen During Household Burglaries and Other Property Crimes, 2005–2010, p. 3 (Nov. 2012).

Or consider, for another thing, that the dangers and benefits posed by firearms may differ between urban and rural areas. See generally Brief for City of Chicago et al. as *Amici Curiae* (detailing particular concerns about gun violence in large cities). Firearm-related homicides and assaults are significantly more common in urban areas than rural ones. For example, from 1999 to 2016, 89.8% of the 213,175 firearm-related homicides in the United States occurred in "metropolitan" areas. M. Siegel et al., The Impact of State Firearm Laws on Homicide Rates in Suburban and Rural Areas Compared to Large Cities in the United States, 1991–2016, 36 J. Rural Health 255 (2020); see also Brief for Partnership for New York City as *Amicus Curiae* 10; Kaufman 237 (finding higher rates of fatal assault injuries from firearms in urban areas compared to rural areas); C. Branas, M. Nance, M. Elliott, T. Richmond, & C. Schwab, Urban-Rural Shifts in Intentional Firearm Death: Different

BREYER, J., dissenting

Causes, Same Results, 94 Am. J. Pub. Health 1750, 1752 (2004) (finding higher rates of firearm homicide in urban counties compared to rural counties).

JUSTICE ALITO asks why I have begun my opinion by reviewing some of the dangers and challenges posed by gun violence and what relevance that has to today's case. *Ante,* at 2–4 (concurring opinion).  All of the above considerations illustrate that the question of firearm regulation presents a complex problem—one that should be solved by legislatures rather than courts.   What kinds of firearm regulations should a State adopt?  Different States might choose to answer that question differently.   They may face different challenges because of their different geographic and demographic compositions.  A State like New York, which must account for the roughly 8.5 million people living in the 303 square miles of New York City, might choose to adopt different (and stricter) firearms regulations than States like Montana or Wyoming, which do not contain any city remotely comparable in terms of population or density.  See U. S. Census Bureau, Quick Facts: New York City (last updated July 1, 2021) (Quick Facts: New York City), https:// www.census.gov/quickfacts/newyorkcitynewyork/; Brief for City of New York as *Amicus Curiae* 8, 22.  For a variety of reasons, States may also be willing to tolerate different degrees of risk and therefore choose to balance the competing benefits and dangers of firearms differently.

The question presented in this case concerns the extent to which the Second Amendment restricts different States (and the Federal Government) from working out solutions to these problems through democratic processes.  The primary difference between the Court's view and mine is that I believe the Amendment allows States to take account of the serious problems posed by gun violence that I have just described.  I fear that the Court's interpretation ignores these significant dangers and leaves States without the ability to address them.

10   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

## II
## A

New York State requires individuals to obtain a license in order to carry a concealed handgun in public. N. Y. Penal Law Ann. §400.00(2) (West Cum. Supp. 2022). I address the specifics of that licensing regime in greater detail in Part II–B below. Because, at this stage in the proceedings, the parties have not had an opportunity to develop the evidentiary record, I refer to facts and representations made in petitioners' complaint and in *amicus* briefs filed before us.

Under New York's regime, petitioners Brandon Koch and Robert Nash have obtained restricted licenses that permit them to carry a concealed handgun for certain purposes and at certain times and places. They wish to expand the scope of their licenses so that they can carry a concealed handgun without restriction.

Koch and Nash are residents of Rensselaer County, New York. Koch lives in Troy, a town of about 50,000, located eight miles from New York's capital city of Albany, which has a population of about 98,000. See App. 100; U. S. Census Bureau, Quick Facts: Troy City, New York (last updated July 1, 2021), https://www.census.gov/quickfacts/troycitynewyork; *id.*, Albany City, New York, https://www.census.gov/quickfacts/albanycitynewyork. Nash lives in Averill Park, a small town 12.5 miles from Albany. App. 100.

Koch and Nash each applied for a license to carry a concealed handgun. Both were issued restricted licenses that allowed them to carry handguns only for purposes of hunting and target shooting. *Id.*, at 104, 106. But they wanted "unrestricted" licenses that would allow them to carry concealed handguns "for personal protection and all lawful purposes." *Id.*, at 112; see also *id.*, at 40. They wrote to the licensing officer in Rensselaer County—Justice Richard

BREYER, J., dissenting

McNally, a justice of the New York Supreme Court—requesting that the hunting and target shooting restrictions on their licenses be removed. *Id.,* at 40, 111–113. After holding individual hearings for each petitioner, Justice McNally denied their requests. *Id.,* at 31, 41, 105, 107, 114. He clarified that, in addition to hunting and target shooting, Koch and Nash could "carry concealed for purposes of off road back country, outdoor activities similar to hunting, for example fishing, hiking & camping." *Id.,* at 41, 114. He also permitted Koch, who was employed by the New York Court System's Division of Technology, to "carry to and from work." *Id.,* at 111, 114. But he reaffirmed that Nash was prohibited from carrying a concealed handgun in locations "typically open to and frequented by the general public." *Id.,* at 41. Neither Koch nor Nash alleges that he appealed Justice McNally's decision. Brief for Respondents 13; see App. 122–126.

Instead, petitioners Koch and Nash, along with the New York State Rifle & Pistol Association, Inc., brought this lawsuit in federal court against Justice McNally and other State representatives responsible for enforcing New York's firearms laws. Petitioners claimed that the State's refusal to modify Koch's and Nash's licenses violated the Second Amendment. The District Court dismissed their complaint. It followed Second Circuit precedent holding that New York's licensing regime was constitutional. See *Kachalsky,* 701 F. 3d, at 101. The Court of Appeals for the Second Circuit affirmed. We granted certiorari to review the constitutionality of "New York's denial of petitioners' license applications." *Ante,* at 8 (majority opinion).

### B

As the Court recognizes, New York's licensing regime traces its origins to 1911, when New York enacted the "Sullivan Law," which prohibited public carriage of handguns without a license. See 1911 N. Y. Laws ch. 195, §1, p. 443.

Two years later in 1913, New York amended the law to establish substantive standards for the issuance of a license. See 1913 N. Y. Laws ch. 608, §1, pp. 1627–1629.  Those standards have remained the foundation of New York's licensing regime ever since—a regime that the Court now, more than a century later, strikes down as unconstitutional.

As it did over 100 years ago, New York's law today continues to require individuals to obtain a license before carrying a concealed handgun in public.  N. Y. Penal Law Ann. §400.00(2); *Kachalsky*, 701 F. 3d, at 85–86.  Because the State does not allow the open carriage of handguns at all, a concealed-carry license is the only way to legally carry a handgun in public.  *Id.*, at 86.  This licensing requirement applies only to handguns (*i.e.*, "pistols and revolvers") and short-barreled rifles and shotguns, not to all types of firearms.  *Id.*, at 85.  For instance, the State does not require a license to carry a long gun (*i.e.*, a rifle or a shotgun over a certain length) in public.  *Ibid.*; §265.00(3) (West 2022).

To obtain a concealed-carry license for a handgun, an applicant must satisfy certain eligibility criteria.  Among other things, he must generally be at least 21 years old and of "good moral character."  §400.00(1).  And he cannot have been convicted of a felony, dishonorably discharged from the military, or involuntarily committed to a mental hygiene facility.  *Ibid.*  If these and other eligibility criteria are satisfied, New York law provides that a concealed-carry license "shall be issued" to individuals working in certain professions, such as judges, corrections officers, or messengers of a "banking institution or express company." §400.00(2).  Individuals who satisfy the eligibility criteria but do not work in one of these professions may still obtain a concealed-carry license, but they must additionally show that "proper cause exists for the issuance thereof." §400.00(2)(f).

The words "proper cause" may appear on their face to be

BREYER, J., dissenting

broad, but there is "a substantial body of law instructing licensing officials on the application of this standard." *Id.*, at 86. New York courts have interpreted proper cause "to include carrying a handgun for target practice, hunting, or self-defense." *Ibid.* When an applicant seeks a license for target practice or hunting, he must show "'a sincere desire to participate in target shooting and hunting.'" *Ibid.* (quoting *In re O'Connor*, 154 Misc. 2d 694, 697, 585 N. Y. S. 2d 1000, 1003 (Westchester Cty. 1992)). When an applicant seeks a license for self-defense, he must show "'a special need for self-protection distinguishable from that of the general community.'" 701 F. 3d, at 86 (quoting *In re Klenosky*, 75 App. Div. 2d 793, 793, 428 N. Y. S. 2d 256, 257 (1980)). Whether an applicant meets these proper cause standards is determined in the first instance by a "licensing officer in the city or county . . . where the applicant resides." §400.00(3). In most counties, the licensing officer is a local judge. *Kachalsky*, 701 F. 3d, at 87, n. 6. For example, in Rensselaer County, the licensing officer who denied petitioners' requests to remove the restrictions on their licenses was a justice of the New York Supreme Court. App. 31. If the officer denies an application, the applicant can obtain judicial review under Article 78 of New York's Civil Practice Law and Rules. *Kachalsky*, 701 F. 3d, at 87. New York courts will then review whether the denial was arbitrary and capricious. *Ibid.*

In describing New York's law, the Court recites the above facts but adds its own gloss. It suggests that New York's licensing regime gives licensing officers too much discretion and provides too "limited" judicial review of their decisions, *ante*, at 4; that the proper cause standard is too "demanding," *ante*, at 3; and that these features make New York an outlier compared to the "vast majority of States," *ante*, at 4. But on what evidence does the Court base these characterizations? Recall that this case comes to us at the pleading stage. The parties have not had an opportunity to conduct

BREYER, J., dissenting

discovery, and no evidentiary hearings have been held to develop the record. See App. 15–26. Thus, at this point, there is no record to support the Court's negative characterizations, as we know very little about how the law has actually been applied on the ground.

Consider each of the Court's criticisms in turn. First, the Court says that New York gives licensing officers too much discretion and "leaves applicants little recourse if their local licensing officer denies a permit." *Ante,* at 4. But there is nothing unusual about broad statutory language that can be given more specific content by judicial interpretation. Nor is there anything unusual or inadequate about subjecting licensing officers' decisions to arbitrary-and-capricious review. Judges routinely apply that standard, for example, to determine whether an agency action is lawful under both New York law and the Administrative Procedure Act. See, *e.g.,* N. Y. Civ. Prac. Law Ann. §7803(3) (2021); 5 U. S. C. §706(2)(A). The arbitrary-and-capricious standard has thus been used to review important policies concerning health, safety, and immigration, to name just a few examples. See, *e.g., Biden* v. *Missouri,* 595 U. S. ___, ___ (2022) (*per curiam*) (slip op., at 8); *Department of Homeland Security* v. *Regents of Univ. of Cal.,* 591 U. S. ___, ___, ___ (2020) (slip op., at 9, 17); *Department of Commerce* v. *New York,* 588 U. S. ___, ___ (2019) (slip op., at 16); *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.,* 463 U. S. 29, 41, 46 (1983).

Without an evidentiary record, there is no reason to assume that New York courts applying this standard fail to provide license applicants with meaningful review. And there is no evidentiary record to support the Court's assumption here. Based on the pleadings alone, we cannot know how often New York courts find the denial of a concealed-carry license to be arbitrary and capricious or on what basis. We do not even know how a court would have reviewed the licensing officer's decisions in Koch's and

BREYER, J., dissenting

Nash's cases because they do not appear to have sought judicial review at all. See Brief for Respondents 13; App. 122–126.

Second, the Court characterizes New York's proper cause standard as substantively "demanding." *Ante*, at 3. But, again, the Court has before it no evidentiary record to demonstrate how the standard has actually been applied. How "demanding" is the proper cause standard in practice? Does that answer differ from county to county? How many license applications are granted and denied each year? At the pleading stage, we do not know the answers to these and other important questions, so the Court's characterization of New York's law may very well be wrong.

In support of its assertion that the law is "demanding," the Court cites only to cases originating in New York City. *Ibid.* (citing *In re Martinek*, 294 App. Div. 2d 221, 743 N. Y. S. 2d 80 (2002) (New York County, *i.e.,* Manhattan); *In re Kaplan*, 249 App. Div. 2d 199, 673 N. Y. S. 2d 66 (1998) (same); *In re Klenosky*, 75 App. Div. 2d 793, 428 N. Y. S. 2d 256 (same); *In re Bernstein*, 85 App. Div. 2d 574, 445 N. Y. S. 2d 716 (1981) (Bronx County)). But cases from New York City may not accurately represent how the proper cause standard is applied in other parts of the State, including in Rensselaer County where petitioners reside.

To the contrary, *amici* tell us that New York's licensing regime is purposefully flexible: It allows counties and cities to respond to the particular needs and challenges of each area. See Brief for American Bar Association as *Amicus Curiae* 12; Brief for City of New York as *Amicus Curiae* 20–29. *Amici* suggest that some areas may interpret words such as "proper cause" or "special need" more or less strictly, depending upon each area's unique circumstances. See *ibid.* New York City, for example, reports that it "has applied the [proper cause] requirement relatively rigorously" because its densely populated urban areas pose a heightened risk of gun violence. Brief for City of New York

16   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

as *Amicus Curiae* 20. In comparison, other (perhaps more rural) counties "have tailored the requirement to their own circumstances, often issuing concealed-carry licenses more freely than the City." *Ibid.*; see also *In re O'Connor*, 154 Misc. 2d, at 698, 585 N. Y. S. 2d, at 1004 ("The circumstances which exist in New York City are significantly different than those which exist in Oswego or Putnam Counties. . . . The licensing officers in each county are in the best position to determine whether any interest of the population of their county is furthered by the use of restrictions on pistol licenses"); Brief for Citizens Crime Commission of New York City as *Amicus Curiae* 18–19. Given the geographic variation across the State, it is too sweeping for the Court to suggest, without an evidentiary record, that the proper cause standard is "demanding" in Rensselaer County merely because it may be so in New York City.

Finally, the Court compares New York's licensing regime to that of other States. *Ante,* at 4–6. It says that New York's law is a "may issue" licensing regime, which the Court describes as a law that provides licensing officers greater discretion to grant or deny licenses than a "shall issue" licensing regime. *Ante,* at 4–5. Because the Court counts 43 "shall issue" jurisdictions and only 7 "may issue" jurisdictions, it suggests that New York's law is an outlier. *Ibid.*; see also *ante,* at 1–2 (KAVANAUGH, J., concurring). Implicitly, the Court appears to ask, if so many other States have adopted the more generous "shall issue" approach, why can New York not be required to do the same?

But the Court's tabulation, and its implicit question, overlook important context. In drawing a line between "may issue" and "shall issue" licensing regimes, the Court ignores the degree of variation within and across these categories. Not all "may issue" regimes are necessarily alike, nor are all "shall issue" regimes. Conversely, not all "may issue" regimes are as different from the "shall issue" re-

BREYER, J., dissenting

gimes as the Court assumes. For instance, the Court recognizes in a footnote that three States (Connecticut, Delaware, and Rhode Island) have statutes with discretionary criteria, like so-called "may issue" regimes do. *Ante,* at 5, n. 1. But the Court nonetheless counts them among the 43 "shall issue" jurisdictions because, it says, these three States' laws operate in practice more like "shall issue" regimes. *Ibid.*; see also Brief for American Bar Association as *Amicus Curiae* 10 (recognizing, conversely, that some "shall issue" States, *e.g.,* Alabama, Colorado, Georgia, Oregon, and Virginia, still grant some degree of discretion to licensing authorities).

As these three States demonstrate, the line between "may issue" and "shall issue" regimes is not as clear cut as the Court suggests, and that line depends at least in part on how statutory discretion is applied in practice. Here, because the Court strikes down New York's law without affording the State an opportunity to develop an evidentiary record, we do not know how much discretion licensing officers in New York have in practice or how that discretion is exercised, let alone how the licensing regimes in the other six "may issue" jurisdictions operate.

Even accepting the Court's line between "may issue" and "shall issue" regimes and assuming that its tally (7 "may issue" and 43 "shall issue" jurisdictions) is correct, that count does not support the Court's implicit suggestion that the seven "may issue" jurisdictions are somehow outliers or anomalies. The Court's count captures only a snapshot in time. It forgets that "shall issue" licensing regimes are a relatively recent development. Until the 1980s, "may issue" regimes predominated. See *id.,* at 9; R. Grossman & S. Lee, May Issue Versus Shall Issue: Explaining the Pattern of Concealed-Carry Handgun Laws, 1960–2001, 26 Contemp. Econ. Pol'y 198, 200 (2008) (Grossman). As of 1987, 16 States and the District of Columbia prohibited concealed

BREYER, J., dissenting

carriage outright, 26 States had "may issue" licensing regimes, 7 States had "shall issue" regimes, and 1 State (Vermont) allowed concealed carriage without a permit.  Congressional Research Service, Gun Control: Concealed Carry Legislation in the 115th Congress 1 (Jan. 30, 2018).  Thus, it has only been in the last few decades that States have shifted toward "shall issue" licensing laws.  Prior to that, most States operated "may issue" licensing regimes without legal or practical problem.

Moreover, even considering, as the Court does, only the present state of play, its tally provides an incomplete picture because it accounts for only the number of States with "may issue" regimes, not the number of people governed by those regimes.  By the Court's count, the seven "may issue" jurisdictions are New York, California, Hawaii, Maryland, Massachusetts, New Jersey, and the District of Columbia. *Ante,* at 5–6.  Together, these seven jurisdictions comprise about 84.4 million people and account for over a quarter of the country's population.  U. S. Census Bureau, 2020 Population and Housing State Data (Aug. 12, 2021) (2020 Population), https://www.census.gov/library/visualizations/interactive/2020-population-and-housing-state-data.html. Thus, "may issue" laws can hardly be described as a marginal or outdated regime.

And there are good reasons why these seven jurisdictions may have chosen not to follow other States in shifting toward "shall issue" regimes.  The seven remaining "may issue" jurisdictions are among the most densely populated in the United States: the District of Columbia (with an average of 11,280.0 people/square mile in 2020), New Jersey (1,263.0), Massachusetts (901.2), Maryland (636.1), New York (428.7), California (253.7), and Hawaii (226.6).  U. S. Census Bureau, Historical Population Density (1910–2020) (Apr. 26, 2001), https://www.census.gov/data/tables/time-series/dec/density-data-text.html.  In comparison, the average population density of the United States as a whole is

BREYER, J., dissenting

93.8 people/square mile, and some States have population densities as low as 1.3 (Alaska), 5.9 (Wyoming), and 7.4 (Montana) people/square mile. *Ibid.* These numbers reflect in part the fact that these "may issue" jurisdictions contain some of the country's densest and most populous urban areas, *e.g.,* New York City, Los Angeles, San Francisco, the District of Columbia, Honolulu, and Boston. U. S. Census Bureau, Urban Area Facts (Oct. 8, 2021), https://www.census .gov/programs-surveys/geography/guidance/geo-areas/ urban-rural/ua-facts.html. New York City, for example, has a population of about 8.5 million people, making it more populous than 38 States, and it squeezes that population into just over 300 square miles. Quick Facts: New York City; 2020 Population; Brief for City of New York as *Amicus Curiae* 8, 22.

As I explained above, *supra,* at 8–9, densely populated urban areas face different kinds and degrees of dangers from gun violence than rural areas. It is thus easy to see why the seven "may issue" jurisdictions might choose to regulate firearm carriage more strictly than other States. See Grossman 199 ("We find strong evidence that more urban states are less likely to shift to 'shall issue' than rural states").

New York and its *amici* present substantial data justifying the State's decision to retain a "may issue" licensing regime. The data show that stricter gun regulations are associated with lower rates of firearm-related death and injury. See, *e.g.,* Brief for Citizens Crime Commission of New York City as *Amicus Curiae* 9–11; Brief for Former Major City Police Chiefs as *Amici Curiae* 9–12; Brief for Educational Fund 25–28; Brief for Social Scientists et al. as *Amici Curiae* 9–19. In particular, studies have shown that "may issue" licensing regimes, like New York's, are associated with lower homicide rates and lower violent crime rates than "shall issue" licensing regimes. For example, one study compared homicide rates across all 50 States during

20   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

the 25-year period from 1991 to 2015 and found that "shall issue" laws were associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates. Siegel, 107 Am. J. Pub. Health, at 1924–1925, 1927. Another study longitudinally followed 33 States that had adopted "shall-issue" laws between 1981 and 2007 and found that the adoption of those laws was associated with a 13%–15% increase in rates of violent crime after 10 years. Donohue, 16 J. Empirical Legal Studies, at 200, 240. Numerous other studies show similar results. See, *e.g.,* Siegel, 36 J. Rural Health, at 261 (finding that "may issue" laws are associated with 17% lower firearm homicide rates in large cities); C. Crifasi et al., Association Between Firearm Laws and Homicide in Urban Counties, 95 J. Urb. Health 383, 387 (2018) (finding that "shall issue" laws are associated with a 4% increase in firearm homicide rates in urban counties); M. Doucette, C. Crifasi, & S. Frattaroli, Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis (1992–2017), 109 Am. J. Pub. Health 1747, 1751 (Dec. 2019) (finding that States with "shall issue" laws between 1992 and 2017 experienced 29% higher rates of firearm-related workplace homicides); Brief for Social Scientists et al. as *Amici Curiae* 15–16, and nn. 17–20 (citing "thirteen . . . empirical papers from just the last few years linking ["shall issue"] laws to higher violent crime").

JUSTICE ALITO points to competing empirical evidence that arrives at a different conclusion. *Ante,* at 3, n. 1 (concurring opinion). But these types of disagreements are exactly the sort that are better addressed by legislatures than courts. The Court today restricts the ability of legislatures to fulfill that role. It does so without knowing how New York's law is administered in practice, how much discretion licensing officers in New York possess, or whether the proper cause standard differs across counties. And it does so without giving the State an opportunity to develop the

BREYER, J., dissenting

evidentiary record to answer those questions. Yet it strikes down New York's licensing regime as a violation of the Second Amendment.

### III
#### A

How does the Court justify striking down New York's law without first considering how it actually works on the ground and what purposes it serves? The Court does so by purporting to rely nearly exclusively on history. It requires "the government [to] affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of 'the right to keep and bear arms.'" *Ante,* at 10. Beyond this historical inquiry, the Court refuses to employ what it calls "means-end scrutiny." *Ibid.* That is, it refuses to consider whether New York has a compelling interest in regulating the concealed carriage of handguns or whether New York's law is narrowly tailored to achieve that interest. Although I agree that history can often be a useful tool in determining the meaning and scope of constitutional provisions, I believe the Court's near-exclusive reliance on that single tool today goes much too far.

The Court concedes that no Court of Appeals has adopted its rigid history-only approach. See *ante,* at 8. To the contrary, every Court of Appeals to have addressed the question has agreed on a two-step framework for evaluating whether a firearm regulation is consistent with the Second Amendment. *Ibid.*; *ante,* at 10, n. 4 (majority opinion) (listing cases from the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D. C. Circuits). At the first step, the Courts of Appeals use text and history to determine "whether the regulated activity falls within the scope of the Second Amendment." *Ezell* v. *Chicago,* 846 F. 3d 888, 892 (CA7 2017). If it does, they go on to the second step and consider "'the strength of the government's justification for restricting or regulating'" the Second

22   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

Amendment right. *Ibid.* In doing so, they apply a level of "means-ends" scrutiny "that is proportionate to the severity of the burden that the law imposes on the right": strict scrutiny if the burden is severe, and intermediate scrutiny if it is not. *National Rifle Assn. of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F. 3d 185, 195, 198, 205 (CA5 2012).

The Court today replaces the Courts of Appeals' consensus framework with its own history-only approach. That is unusual. We do not normally disrupt settled consensus among the Courts of Appeals, especially not when that consensus approach has been applied without issue for over a decade. See Brief for Second Amendment Law Professors as *Amici Curiae* 4, 13–15; see also this Court's Rule 10. The Court attempts to justify its deviation from our normal practice by claiming that the Courts of Appeals' approach is inconsistent with *Heller*. See *ante*, at 10. In doing so, the Court implies that all 11 Courts of Appeals that have considered this question misread *Heller*.

To the contrary, it is this Court that misreads *Heller*. The opinion in *Heller* did focus primarily on "constitutional text and history," *ante*, at 13 (majority opinion), but it did *not* "rejec[t] . . . means-end scrutiny," as the Court claims, *ante*, at 15. Consider what the *Heller* Court actually said. True, the Court spent many pages in *Heller* discussing the text and historical context of the Second Amendment. 554 U. S., at 579–619. But that is not surprising because the *Heller* Court was asked to answer the preliminary question whether the Second Amendment right to "bear Arms" encompasses an individual right to possess a firearm in the home for self-defense. *Id.*, at 577. The *Heller* Court concluded that the Second Amendment's text and history were sufficiently clear to resolve that question: The Second Amendment, it said, does include such an individual right. *Id.*, at 579–619. There was thus no need for the Court to go further—to look beyond text and history, or to suggest what

BREYER, J., dissenting

analysis would be appropriate in other cases where the text and history are not clear.

But the *Heller* Court did not end its opinion with that preliminary question. After concluding that the Second Amendment protects an individual right to possess a firearm for self-defense, the *Heller* Court added that that right is "not unlimited." *Id.,* at 626. It thus had to determine whether the District of Columbia's law, which banned handgun possession in the home, was a permissible regulation of the right. *Id.,* at 628–630. In answering that second question, it said: "Under *any of the standards of scrutiny that we have applied to enumerated constitutional rights,* banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family' would fail constitutional muster." *Id.,* at 628–629 (emphasis added; footnote and citation omitted). That language makes clear that the *Heller* Court understood some form of means-end scrutiny to apply. It did not need to specify whether that scrutiny should be intermediate or strict because, in its view, the District's handgun ban was so "severe" that it would have failed either level of scrutiny. *Id.,* at 628–629; see also *id.,* at 628, n. 27 (clarifying that rational-basis review was not the proper level of scrutiny).

Despite *Heller*'s express invocation of means-end scrutiny, the Court today claims that the majority in *Heller* rejected means-end scrutiny because it rejected my dissent in that case. But that argument misreads both my dissent and the majority opinion. My dissent in *Heller* proposed directly weighing "the interests protected by the Second Amendment on one side and the governmental public-safety concerns on the other." *Id.,* at 689. I would have asked "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.,* at 689–690. The majority rejected my dissent,

24   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

not because I proposed using means-end scrutiny, but because, in its view, I had done the opposite. In its own words, the majority faulted my dissent for proposing "a *freestanding* 'interest-balancing' approach" that accorded with "*none of the traditionally expressed levels* [of scrutiny] (strict scrutiny, intermediate scrutiny, rational basis)." *Id.,* at 634 (emphasis added).

The majority further made clear that its rejection of freestanding interest balancing did *not* extend to traditional forms of means-end scrutiny. It said: "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." *Ibid.* To illustrate this point, it cited as an example the First Amendment right to free speech. *Id.,* at 635. Judges, of course, regularly use means-end scrutiny, including both strict and intermediate scrutiny, when they interpret or apply the First Amendment. See, *e.g., United States* v. *Playboy Entertainment Group, Inc.,* 529 U. S. 803, 813 (2000) (applying strict scrutiny); *Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180, 186, 189–190 (1997) (applying intermediate scrutiny). The majority therefore cannot have intended its opinion, consistent with our First Amendment jurisprudence, to be read as rejecting all traditional forms of means-end scrutiny.

As *Heller*'s First Amendment example illustrates, the Court today is wrong when it says that its rejection of means-end scrutiny and near-exclusive focus on history "accords with how we protect other constitutional rights." *Ante,* at 15. As the Court points out, we do look to history in the First Amendment context to determine "whether the expressive conduct falls outside of the category of protected speech." *Ibid.* But, if conduct falls within a category of protected speech, we then use means-end scrutiny to determine whether a challenged regulation unconstitutionally burdens that speech. And the degree of scrutiny we apply

BREYER, J., dissenting

often depends on the type of speech burdened and the severity of the burden. See, *e.g., Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett,* 564 U. S. 721, 734 (2011) (applying strict scrutiny to laws that burden political speech); *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791 (1989) (applying intermediate scrutiny to time, place, and manner restrictions); *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 557, 564–566 (1980) (applying intermediate scrutiny to laws that burden commercial speech).

Additionally, beyond the right to freedom of speech, we regularly use means-end scrutiny in cases involving other constitutional provisions. See, *e.g., Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 546 (1993) (applying strict scrutiny under the First Amendment to laws that restrict free exercise of religion in a way that is not neutral and generally applicable); *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 227 (1995) (applying strict scrutiny under the Equal Protection Clause to race-based classifications); *Clark* v. *Jeter,* 486 U. S. 456, 461 (1988) (applying intermediate scrutiny under the Equal Protection Clause to sex-based classifications); see also *Virginia* v. *Moore,* 553 U. S. 164, 171 (2008) ("When history has not provided a conclusive answer, we have analyzed a search or seizure in light of traditional standards of reasonableness").

The upshot is that applying means-end scrutiny to laws that regulate the Second Amendment right to bear arms would not create a constitutional anomaly. Rather, it is the Court's rejection of means-end scrutiny and adoption of a rigid history-only approach that is anomalous.

## B

The Court's near-exclusive reliance on history is not only unnecessary, it is deeply impractical. It imposes a task on the lower courts that judges cannot easily accomplish. Judges understand well how to weigh a law's objectives (its

"ends") against the methods used to achieve those objectives (its "means"). Judges are far less accustomed to resolving difficult historical questions. Courts are, after all, staffed by lawyers, not historians. Legal experts typically have little experience answering contested historical questions or applying those answers to resolve contemporary problems.

The Court's insistence that judges and lawyers rely nearly exclusively on history to interpret the Second Amendment thus raises a host of troubling questions. Consider, for example, the following. Do lower courts have the research resources necessary to conduct exhaustive historical analyses in every Second Amendment case? What historical regulations and decisions qualify as representative analogues to modern laws? How will judges determine which historians have the better view of close historical questions? Will the meaning of the Second Amendment change if or when new historical evidence becomes available? And, most importantly, will the Court's approach permit judges to reach the outcomes they prefer and then cloak those outcomes in the language of history? See S. Cornell, *Heller*, New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss," 56 UCLA L. Rev. 1095, 1098 (2009) (describing "law office history" as "a results oriented methodology in which evidence is selectively gathered and interpreted to produce a preordained conclusion").

Consider *Heller* itself. That case, fraught with difficult historical questions, illustrates the practical problems with expecting courts to decide important constitutional questions based solely on history. The majority in *Heller* undertook 40 pages of textual and historical analysis and concluded that the Second Amendment's protection of the right to "keep and bear Arms" historically encompassed an "individual right to possess and carry weapons in case of confrontation"—that is, for self-defense. 554 U. S., at 592; see also *id.*, at 579–619. Justice Stevens' dissent conducted an

BREYER, J., dissenting

equally searching textual and historical inquiry and con-
cluded, to the contrary, that the term "bear Arms" was an
idiom that protected only the right "to use and possess arms
in conjunction with service in a well-regulated militia." *Id.,*
at 651. I do not intend to relitigate *Heller* here. I accept its
holding as a matter of *stare decisis.* I refer to its historical
analysis only to show the difficulties inherent in answering
historical questions and to suggest that judges do not have
the expertise needed to answer those questions accurately.

For example, the *Heller* majority relied heavily on its in-
terpretation of the English Bill of Rights. Citing Black-
stone, the majority claimed that the English Bill of Rights
protected a "'right of having and using arms for self-preser-
vation and defence.'" *Id.,* at 594 (quoting 1 Commentaries
on the Laws of England 140 (1765)). The majority inter-
preted that language to mean a private right to bear arms
for self-defense, "having nothing whatever to do with ser-
vice in a militia." 554 U. S., at 593. Two years later, how-
ever, 21 English and early American historians (including
experts at top universities) told us in *McDonald* v. *Chicago,*
561 U. S. 742 (2010), that the *Heller* Court had gotten the
history wrong: The English Bill of Rights "did not . . . pro-
tect an individual's right to possess, own, or use arms for
private purposes such as to defend a home against bur-
glars." Brief for English/Early American Historians as
*Amici Curiae* in *McDonald* v. *Chicago,* O. T. 2009, No. 08–
1521, p. 2. Rather, these *amici* historians explained, the
English right to "have arms" ensured that the Crown could
not deny Parliament (which represented the people) the
power to arm the landed gentry and raise a militia—or the
right of the people to possess arms to take part in that mi-
litia—"should the sovereign usurp the laws, liberties, es-
tates, and Protestant religion of the nation." *Id.,* at 2–3.
Thus, the English right did protect a right of "self-preserva-
tion and defence," as Blackstone said, but that right "was to

be exercised not by individuals acting privately or inde-
pendently, but as a militia organized by their elected repre-
sentatives," *i.e.,* Parliament. *Id.,* at 7–8. The Court, not an
expert in history, had misread Blackstone and other
sources explaining the English Bill of Rights.

And that was not the *Heller* Court's only questionable
judgment. The majority rejected Justice Stevens' argument
that the Second Amendment's use of the words "bear Arms"
drew on an idiomatic meaning that, at the time of the
founding, commonly referred to military service. 554 U. S.,
at 586. Linguistics experts now tell us that the majority
was wrong to do so. See, *e.g.,* Brief for Corpus Linguistics
Professors and Experts as *Amici Curiae* (Brief for Linguis-
tics Professors); Brief for Neal Goldfarb as *Amicus Curiae*;
Brief for Americans Against Gun Violence as *Amicus Cu-
riae* 13–15. Since *Heller* was decided, experts have
searched over 120,000 founding-era texts from between
1760 and 1799, as well as 40,000 texts from sources dating
as far back as 1475, for historical uses of the phrase "bear
arms," and they concluded that the phrase was overwhelm-
ingly used to refer to "'war, soldiering, or other forms of
armed action by a group rather than an individual.'" Brief
for Linguistics Professors 11, 14; see also D. Baron, Corpus
Evidence Illuminates the Meaning of Bear Arms, 46 Has-
tings Const. L. Q. 509, 510 (2019) ("Non-military uses of
*bear arms* in reference to hunting or personal self-defense
are not just rare, they are almost nonexistent"); *id.,* at 510–
511 (reporting 900 instances in which "bear arms" was used
to refer to military or collective use of firearms and only 7
instances that were either ambiguous or without a military
connotation).

These are just two examples. Other scholars have con-
tinued to write books and articles arguing that the Court's
decision in *Heller* misread the text and history of the Second
Amendment. See generally, *e.g.,* M. Waldman, The Second
Amendment (2014); S. Cornell, The Changing Meaning of

BREYER, J., dissenting

the Right To Keep and Bear Arms: 1688–1788, in Guns in Law 20–27 (A. Sarat, L. Douglas, & M. Umphrey eds. 2019); P. Finkelman, The Living Constitution and the Second Amendment: Poor History, False Originalism, and a Very Confused Court, 37 Cardozo L. Rev. 623 (2015); D. Walker, Necessary to the Security of Free States: The Second Amendment as the Auxiliary Right of Federalism, 56 Am. J. Legal Hist. 365 (2016); W. Merkel, *Heller* as Hubris, and How *McDonald* v. *City of Chicago* May Well Change the Constitutional World as We Know It, 50 Santa Clara L. Rev. 1221 (2010).

I repeat that I do not cite these arguments in order to relitigate *Heller.* I wish only to illustrate the difficulties that may befall lawyers and judges when they attempt to rely *solely* on history to interpret the Constitution. In *Heller,* we attempted to determine the scope of the Second Amendment right to bear arms by conducting a historical analysis, and some of us arrived at very different conclusions based on the same historical sources. Many experts now tell us that the Court got it wrong in a number of ways. That is understandable given the difficulty of the inquiry that the Court attempted to undertake. The Court's past experience with historical analysis should serve as a warning against relying exclusively, or nearly exclusively, on this mode of analysis in the future.

Failing to heed that warning, the Court today does just that. Its near-exclusive reliance on history will pose a number of practical problems. First, the difficulties attendant to extensive historical analysis will be especially acute in the lower courts. The Court's historical analysis in this case is over 30 pages long and reviews numerous original sources from over 600 years of English and American history. *Ante,* at 30–62. Lower courts—especially district courts—typically have fewer research resources, less assistance from *amici* historians, and higher caseloads than we do. They are therefore ill equipped to conduct the type of

searching historical surveys that the Court's approach requires. Tellingly, even the Courts of Appeals that have addressed the question presented here (namely, the constitutionality of public carriage restrictions like New York's) "have, in large part, avoided extensive historical analysis." *Young* v. *Hawaii*, 992 F. 3d 765, 784–785 (CA9 2021) (collecting cases). In contrast, lawyers and courts are well equipped to administer means-end scrutiny, which is regularly applied in a variety of constitutional contexts, see *supra*, at 24–25.

Second, the Court's opinion today compounds these problems, for it gives the lower courts precious little guidance regarding how to resolve modern constitutional questions based almost solely on history. See, *e.g., ante,* at 1 (BARRETT, J., concurring) ("highlight[ing] two methodological points that the Court does not resolve"). The Court declines to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Ante,* at 20. Other than noting that its history-only analysis is "neither a . . . straightjacket nor a . . . blank check," the Court offers little explanation of how stringently its test should be applied. *Ante,* at 21. Ironically, the only two "relevan[t]" metrics that the Court does identify are "how and why" a gun control regulation "burden[s the] right to armed self-defense." *Ante,* at 20. In other words, the Court believes that the most relevant metrics of comparison are a regulation's means (how) and ends (why)—even as it rejects the utility of means-end scrutiny.

What the Court offers instead is a laundry list of reasons to discount seemingly relevant historical evidence. The Court believes that some historical laws and decisions cannot justify upholding modern regulations because, it says, they were outliers. It explains that just two court decisions or three colonial laws are not enough to satisfy its test. *Ante,* at 37, 57. But the Court does not say how many cases or laws would suffice "to show a tradition of public-carry

BREYER, J., dissenting

regulation." *Ante,* at 37.  Other laws are irrelevant, the Court claims, because they are too dissimilar from New York's concealed-carry licensing regime.  See, *e.g., ante,* at 48–49.  But the Court does not say what "representative historical analogue," short of a "twin" or a "dead ringer," would suffice.  See *ante,* at 21 (emphasis deleted).  Indeed, the Court offers many and varied reasons to reject potential representative analogues, but very few reasons to accept them.  At best, the numerous justifications that the Court finds for rejecting historical evidence give judges ample tools to pick their friends out of history's crowd.  At worst, they create a one-way ratchet that will disqualify virtually any "representative historical analogue" and make it nearly impossible to sustain common-sense regulations necessary to our Nation's safety and security.

Third, even under ideal conditions, historical evidence will often fail to provide clear answers to difficult questions. As an initial matter, many aspects of the history of firearms and their regulation are ambiguous, contradictory, or disputed.  Unsurprisingly, the extent to which colonial statutes enacted over 200 years ago were actually enforced, the basis for an acquittal in a 17th-century decision, and the interpretation of English laws from the Middle Ages (to name just a few examples) are often less than clear.  And even historical experts may reach conflicting conclusions based on the same sources.  Compare, *e.g.,* P. Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Clev. St. L. Rev. 1, 14 (2012), with J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 104 (1994). As a result, history, as much as any other interpretive method, leaves ample discretion to "loo[k] over the heads of the [crowd] for one's friends."  A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 377 (2012).

Fourth, I fear that history will be an especially inade-

32  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

quate tool when it comes to modern cases presenting modern problems. Consider the Court's apparent preference for founding-era regulation. See *ante,* at 25–28. Our country confronted profoundly different problems during that time period than it does today. Society at the founding was "predominantly rural." C. McKirdy, Misreading the Past: The Faulty Historical Basis Behind the Supreme Court's Decision in District of Columbia v. Heller, 45 Capital U. L. Rev. 107, 151 (2017). In 1790, most of America's relatively small population of just four million people lived on farms or in small towns. *Ibid.* Even New York City, the largest American city then, as it is now, had a population of just 33,000 people. *Ibid.* Small founding-era towns are unlikely to have faced the same degrees and types of risks from gun violence as major metropolitan areas do today, so the types of regulations they adopted are unlikely to address modern needs. *Id.,* at 152 ("For the most part, a population living on farms and in very small towns did not create conditions in which firearms created a significant danger to the public welfare"); see also *supra,* at 8–9.

This problem is all the more acute when it comes to "modern-day circumstances that [the Framers] could not have anticipated." *Heller,* 554 U. S., at 721–722 (BREYER, J., dissenting). How can we expect laws and cases that are over a century old to dictate the legality of regulations targeting "ghost guns" constructed with the aid of a three-dimensional printer? See, *e.g.,* White House Briefing Room, FACT SHEET: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has the Leadership It Needs To Enforce Our Gun Laws (Apr. 11, 2022), https:// whitehouse.gov/briefing-room/statements-releases/2022/ 04/11/fact-sheet-the-biden-administration-cracks-down-on-ghost-guns-ensures-that-atf-has-the-leadership-it-needs-to-enforce-our-gun-laws/. Or modern laws requiring all gun shops to offer smart guns, which can only be fired by authorized users? See, *e.g.,* N. J. Stat. Ann. §2C:58–

BREYER, J., dissenting

2.10(a) (West Cum. Supp. 2022). Or laws imposing additional criminal penalties for the use of bullets capable of piercing body armor? See, *e.g.,* 18 U. S. C. §§921(a)(17)(B), 929(a).

The Court's answer is that judges will simply have to employ "analogical reasoning." *Ante,* at 19–20. But, as I explained above, the Court does not provide clear guidance on how to apply such reasoning. Even seemingly straightforward historical restrictions on firearm use may prove surprisingly difficult to apply to modern circumstances. The Court affirms *Heller*'s recognition that States may forbid public carriage in "sensitive places." *Ante,* at 21–22. But what, in 21st-century New York City, may properly be considered a sensitive place? Presumably "legislative assemblies, polling places, and courthouses," which the Court tells us were among the "relatively few" places "where weapons were altogether prohibited" in the 18th and 19th centuries. *Ante,* at 21. On the other hand, the Court also tells us that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines th[at] category . . . far too broadly." *Ante,* at 22. So where does that leave the many locations in a modern city with no obvious 18th- or 19th-century analogue? What about subways, nightclubs, movie theaters, and sports stadiums? The Court does not say.

Although I hope—fervently—that future courts will be able to identify historical analogues supporting the validity of regulations that address new technologies, I fear that it will often prove difficult to identify analogous technological and social problems from Medieval England, the founding era, or the time period in which the Fourteenth Amendment was ratified. Laws addressing repeating crossbows, launcegays, dirks, dagges, skeines, stillraders, and other ancient weapons will be of little help to courts confronting modern problems. And as technological progress pushes

BREYER, J., dissenting

our society ever further beyond the bounds of the Framers' imaginations, attempts at "analogical reasoning" will become increasingly tortured. In short, a standard that relies solely on history is unjustifiable and unworkable.

## IV

Indeed, the Court's application of its history-only test in this case demonstrates the very pitfalls described above. The historical evidence reveals a 700-year Anglo-American tradition of regulating the public carriage of firearms in general, and concealed or concealable firearms in particular. The Court spends more than half of its opinion trying to discredit this tradition. But, in my view, the robust evidence of such a tradition cannot be so easily explained away. Laws regulating the public carriage of weapons existed in England as early as the 13th century and on this Continent since before the founding. Similar laws remained on the books through the ratifications of the Second and Fourteenth Amendments through to the present day. Many of those historical regulations imposed significantly stricter restrictions on public carriage than New York's licensing requirements do today. Thus, even applying the Court's history-only analysis, New York's law must be upheld because "historical precedent from before, during, and . . . after the founding evinces a comparable tradition of regulation." *Ante,* at 18 (majority opinion) (internal quotation marks omitted).

### A. England.

The right codified by the Second Amendment was "'inherited from our English ancestors.'" *Heller*, 554 U. S., at 599 (quoting *Robertson* v. *Baldwin*, 165 U. S. 275, 281 (1897)); see also *ante,* at 30 (majority opinion). And some of England's earliest laws regulating the public carriage of weapons were precursors of similar American laws enacted

roughly contemporaneously with the ratification of the Second Amendment. See *infra,* at 40–42. I therefore begin, as the Court does, *ante,* at 30–31, with the English ancestors of New York's laws regulating public carriage of firearms.

The relevant English history begins in the late-13th and early-14th centuries, when Edward I and Edward II issued a series of orders to local sheriffs that prohibited any person from "going armed." See 4 Calendar of the Close Rolls, Edward I, 1296–1302, p. 318 (Sept. 15, 1299) (1906); *id.,* at 588 (July 16, 1302); 5 *id.,* Edward I, 1302–1307, at 210 (June 10, 1304) (1908); *id.,* Edward II, 1307–1313, at 52 (Feb. 9, 1308) (1892); *id.,* at 257 (Apr. 9, 1310); *id.,* at 553 (Oct. 12, 1312); *id.,* Edward II, 1323–1327, at 560 (Apr. 28, 1326) (1898); 1 Calendar of Plea and Memoranda Rolls of the City of London, 1323–1364, p. 15 (Nov. 1326) (A. Thomas ed. 1926). Violators were subject to punishment, including "forfeiture of life and limb." See, *e.g.,* 4 Calendar of the Close Rolls, Edward I, 1296–1302, at 318 (Sept. 15, 1299) (1906). Many of these royal edicts contained exemptions for persons who had obtained "the king's special licence." See *ibid.*; 5 *id.,* Edward I, 1302–1307, at 210 (June 10, 1304); *id.,* Edward II, 1307–1313, at 553 (Oct. 12, 1312); *id.,* Edward II, 1323–1327, at 560 (Apr. 28, 1326). Like New York's law, these early edicts prohibited public carriage absent special governmental permission and enforced that prohibition on pain of punishment.

The Court seems to suggest that these early regulations are irrelevant because they were enacted during a time of "turmoil" when "malefactors . . . harried the country, committing assaults and murders." *Ante,* at 31 (internal quotation marks omitted). But it would seem to me that what the Court characterizes as a "right of armed self-defense" would be more, rather than less, necessary during a time of "turmoil." *Ante,* at 20. The Court also suggests that laws that were enacted before firearms arrived in England, like

36   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

these early edicts and the subsequent Statute of Northampton, are irrelevant. *Ante,* at 32. But why should that be? Pregun regulations prohibiting "going armed" in public illustrate an entrenched tradition of restricting public carriage of weapons. That tradition seems as likely to apply to firearms as to any other lethal weapons—particularly if we follow the Court's instruction to use analogical reasoning. See *ante,* at 19–20. And indeed, as we shall shortly see, the most significant prefirearm regulation of public carriage—the Statute of Northampton—was in fact applied to guns once they appeared in England. See *Sir John Knight's Case,* 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)

The Statute of Northampton was enacted in 1328. 2 Edw. 3, 258, c. 3. By its terms, the statute made it a criminal offense to carry arms without the King's authorization. It provided that, without such authorization, "no Man great nor small, of what Condition soever he be," could "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." *Ibid.* For more than a century following its enactment, England's sheriffs were routinely reminded to strictly enforce the Statute of Northampton against those going armed without the King's permission. See Calendar of the Close Rolls, Edward III, 1330–1333, at 131 (Apr. 3, 1330) (1898); 1 Calendar of the Close Rolls, Richard II, 1377–1381, at 34 (Dec. 1, 1377) (1914); 2 *id.,* Richard II, 1381–1385, at 3 (Aug. 7, 1381) (1920); 3 *id.,* Richard II, 1385–1389, at 128 (Feb. 6, 1386) (1921); *id.,* at 399–400 (May 16, 1388); 4 *id.,* Henry VI, 1441–1447, at 224 (May 12, 1444) (1937); see also 11 Tudor Royal Proclamations, The Later Tudors: 1553–1587, pp. 442–445 (Proclamation 641, 21 Elizabeth I, July 26, 1579) (P. Hughes & J. Larkin eds. 1969).

The Court thinks that the Statute of Northampton "has little bearing on the Second Amendment," in part because

BREYER, J., dissenting

it was "enacted . . . more than 450 years before the ratification of the Constitution." *Ante,* at 32. The statute, however, remained in force for hundreds of years, well into the 18th century. See 4 W. Blackstone, Commentaries 148–149 (1769) ("The offence of *riding* or *going armed,* with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; *and is particularly prohibited by the Statute of Northampton*" (first emphasis in original, second emphasis added)). It was discussed in the writings of Blackstone, Coke, and others. See *ibid.;* W. Hawkins, 1 Pleas of the Crown 135 (1716) (Hawkins); E. Coke, The Third Part of the Institutes of the Laws of England 160 (1797). And several American Colonies and States enacted restrictions modeled on the statute. See *infra,* at 40–42. There is thus every reason to believe that the Framers of the Second Amendment would have considered the Statute of Northampton a significant chapter in the Anglo-American tradition of firearms regulation.

The Court also believes that, by the end of the 17th century, the Statute of Northampton was understood to contain an extratextual intent element: the intent to cause terror in others. *Ante,* at 34–38, 41. The Court relies on two sources that arguably suggest that view: a 1686 decision, *Sir John Knight's Case,* and a 1716 treatise written by Serjeant William Hawkins. *Ante,* at 34–37. But other sources suggest that carrying arms in public was prohibited *because* it naturally tended to terrify the people. See, *e.g.,* M. Dalton, The Country Justice 282–283 (1690) ("[T]o wear Armor, or Weapons not usually worn, . . . seems also be a breach, or means of breach of the Peace . . . ; *for* they strike a fear and terror in the People" (emphasis added)). According to these sources, terror was the natural consequence—not an additional element—of the crime.

I find this view more persuasive in large part because it is not entirely clear that the two sources the Court relies on

actually support the existence of an intent-to-terrify requirement. Start with *Sir John Knight's Case*, which, according to the Court, considered Knight's arrest for walking "'about the streets'" and into a church "'armed with guns.'" *Ante,* at 34 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep., at 76). The Court thinks that Knight's acquittal by a jury demonstrates that the Statute of Northampton only prohibited public carriage of firearms with an intent to terrify. *Ante,* at 34–35. But by now the legal significance of Knight's acquittal is impossible to reconstruct. Brief for Patrick J. Charles as *Amicus Curiae* 23, n. 9. The primary source describing the case (the English Reports) was notoriously incomplete at the time *Sir John Knight's Case* was decided. *Id.,* at 24–25. And the facts that historians can reconstruct do not uniformly support the Court's interpretation. The King's Bench required Knight to pay a surety to guarantee his future good behavior, so it may be more accurate to think of the case as having ended in "a conditional pardon" than acquittal. *Young,* 992 F. 3d, at 791; see also *Rex* v. *Sir John Knight,* 1 Comb. 40, 90 Eng. Rep. 331 (K. B. 1686). And, notably, it appears that Knight based his defense on his loyalty to the Crown, not a lack of intent to terrify. 3 The Entring Book of Roger Morrice 1677–1691: The Reign of James II, 1685–1687, pp. 307–308 (T. Harris ed. 2007).

Similarly, the passage from the Hawkins treatise on which the Court relies states that the Statute of Northampton's prohibition on the public carriage of weapons did not apply to the "wearing of Arms . . . unless it be accompanied with such Circumstances as are apt to terrify the People." Hawkins 136. But Hawkins goes on to enumerate relatively narrow circumstances where this exception applied: when "Persons of Quality . . . wea[r] common Weapons, or hav[e] their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use

BREYER, J., dissenting

of them," or to persons merely wearing "privy Coats of Mail." *Ibid.* It would make little sense if a narrow exception for nobility, see Oxford English Dictionary (3d ed., Dec. 2012), https://www.oed.com/view/Entry/155878 (defining "quality," A.I.5.a), and "privy coats of mail" were allowed to swallow the broad rule that Hawkins (and other commentators of his time) described elsewhere. That rule provided that "there may be an Affray where there is no actual Violence; as where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People, which is . . . strictly prohibited by [the Statute of Northampton]." Hawkins 135. And it provided no exception for those who attempted to "excuse the wearing such Armour in Publick, by alleging that . . . he wears it for the Safety of his Person from . . . Assault." *Id.,* at 136. In my view, that rule announces the better reading of the Statute of Northampton—as a broad prohibition on the public carriage of firearms and other weapons, without an intent-to-terrify requirement or exception for self-defense.

Although the Statute of Northampton is particularly significant because of its breadth, longevity, and impact on American law, it was far from the only English restriction on firearms or their carriage. See, *e.g.,* 6 Hen. 8 c. 13, §1 (1514) (restricting the use and ownership of handguns); 25 Hen. 8 c. 17, §1 (1533) (same); 33 Hen. 8 c. 6, §§1–2 (1541) (same); 25 Edw. 3, st. 5, c. 2 (1350) (making it a "Felony or Trespass" to "ride armed covertly or secretly with Men of Arms against any other, to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have his Deliverance") (brackets and footnote omitted). Whatever right to bear arms we inherited from our English forebears, it was qualified by a robust tradition of public carriage regulations.

As I have made clear, I am not a historian. But if the foregoing facts, which historians and other scholars have

BREYER, J., dissenting

presented to us, are even roughly correct, it is difficult to see how the Court can believe that English history fails to support legal restrictions on the public carriage of firearms.

### B. The Colonies.

The American Colonies continued the English tradition of regulating public carriage on this side of the Atlantic. In 1686, the colony of East New Jersey passed a law providing that "no person or persons . . . shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province." An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881). East New Jersey also specifically prohibited "planter[s]" from "rid[ing] or go[ing] armed with sword, pistol, or dagger." *Ibid*. Massachusetts Bay and New Hampshire followed suit in 1692 and 1771, respectively, enacting laws that, like the Statute of Northampton, provided that those who went "armed Offensively" could be punished. An Act for the Punishing of Criminal Offenders, 1692 Mass. Acts and Laws no. 6, pp. 11–12; An Act for the Punishing of Criminal Offenders, 1771 N. H. Acts and Laws ch. 6, §5, p. 17.

It is true, as the Court points out, that these laws were only enacted in three colonies. *Ante,* at 37. But that does not mean that they may be dismissed as outliers. They were successors to several centuries of comparable laws in England, see *supra,* at 34–40, and predecessors to numerous similar (in some cases, materially identical) laws enacted by the States after the founding, see *infra,* at 41–42. And while it may be true that these laws applied only to "dangerous and unusual weapons," see *ante,* at 38 (majority opinion), that category almost certainly included guns, see Charles, 60 Clev. St. L. Rev., at 34, n. 181 (listing 18th century sources defining "'offensive weapons'" to include "'Fire Arms'" and "'Guns'"); *State* v. *Huntly,* 25 N. C. 418, 422

BREYER, J., dissenting

(1843) (*per curiam*) ("A gun is an 'unusual weapon,' wherewith to be armed and clad"). Finally, the Court points out that New Jersey's ban on public carriage applied only to certain people or to the concealed carriage of certain smaller firearms. *Ante,* at 39–40. But the Court's refusal to credit the relevance of East New Jersey's law on this basis raises a serious question about what, short of a "twin" or a "dead ringer," qualifies as a relevant historical analogue. See *ante,* at 21 (majority opinion) (emphasis deleted).

## C. The Founding Era.

The tradition of regulations restricting public carriage of firearms, inherited from England and adopted by the Colonies, continued into the founding era. Virginia, for example, enacted a law in 1786 that, like the Statute of Northampton, prohibited any person from "go[ing] nor rid[ing] armed by night nor by day, in fairs or markets, or in other places, in terror of the Country." 1786 Va. Acts, ch. 21. And, as the Court acknowledges, "public-carry restrictions proliferate[d]" after the Second Amendment's ratification five years later in 1791. *Ante,* at 42. Just a year after that, North Carolina enacted a law whose language was lifted from the Statute of Northampton virtually verbatim (vestigial references to the King included). Collection of Statutes, pp. 60–61, ch. 3 (F. Martin ed. 1792). Other States passed similar laws in the late-18th and 19th centuries. See, *e.g.,* 1795 Mass. Acts and Laws ch. 2, p. 436; 1801 Tenn. Acts pp. 260–261; 1821 Me. Laws p. 285; see also Charles, 60 Clev. St. L. Rev., at 40, n. 213 (collecting sources).

The Court discounts these laws primarily because they were modeled on the Statute of Northampton, which it believes prohibited only public carriage with the intent to terrify. *Ante,* at 41. I have previously explained why I believe

that preventing public terror was one *reason* that the Statute of Northampton prohibited public carriage, but not an *element* of the crime. See *supra,* at 37–39. And, consistent with that understanding, American regulations modeled on the Statute of Northampton appear to have been understood to set forth a broad prohibition on public carriage of firearms without any intent-to-terrify requirement. See Charles, 60 Clev. St. L. Rev., at 35, 37–41; J. Haywood, A Manual of the Laws of North-Carolina, pt. 2, p. 40 (3d ed.1814); J. Ewing, The Office and Duty of a Justice of the Peace 546 (1805).

The Court cites three cases considering common-law offenses, *ante,* at 42–44, but those cases do not support the view that only public carriage in a manner likely to terrify violated American successors to the Statute of Northampton. If anything, they suggest that public carriage of firearms was not common practice. At least one of the cases the Court cites, *State* v. *Huntly,* wrote that the Statute of Northampton codified a pre-existing common-law offense, which provided that "riding or going armed with dangerous or unusual weapons, is a crime against the public peace, *by* terrifying the good people of the land." 25 N. C., at 420–421 (quoting 4 Blackstone, Commentaries, at 149; emphasis added). *Huntly* added that "[a] gun is an 'unusual weapon'" and that "[n]o man amongst us carries it about with him, as one of his every-day accoutrements—as a part of his dress—and never, we trust, will the day come when any deadly weapon will be worn or wielded in our peace-loving and law-abiding State, as an appendage of manly equipment." 25 N. C., at 422. True, *Huntly* recognized that citizens were nonetheless "at perfect liberty" to carry for "lawful purpose[s]"—but it specified that those purposes were "business or amusement." *Id.,* at 422–423. New York's law similarly recognizes that hunting, target shooting, and certain professional activities are proper causes justifying lawful carriage of a firearm. See *supra,* at 12–13. The other two

BREYER, J., dissenting

cases the Court cites for this point similarly offer it only limited support—either because the atextual intent element the Court advocates was irrelevant to the decision's result, see *O'Neill* v. *State*, 16 Ala. 65 (1849), or because the decision adopted an outlier position not reflected in the other cases cited by the Court, see *Simpson* v. *State*, 13 Tenn. 356, 360 (1833); see also *ante,* at 42–43, 57 (majority opinion) (refusing to give "a pair of state-court decisions" "disproportionate weight"). The founding-era regulations—like the colonial and English laws on which they were modeled—thus demonstrate a longstanding tradition of broad restrictions on public carriage of firearms.

### D. The 19th Century.

Beginning in the 19th century, States began to innovate on the Statute of Northampton in at least two ways. First, many States and Territories passed bans on concealed carriage or on any carriage, concealed or otherwise, of certain concealable weapons. For example, Georgia made it unlawful to carry, "unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence." Ga. Code §4413 (1861). Other States and Territories enacted similar prohibitions. See, *e.g.,* Ala. Code §3274 (1852) (banning, with limited exceptions, concealed carriage of "a pistol, or any other description of fire arms"); see also *ante,* at 44, n. 16 (majority opinion) (collecting sources). And the Territory of New Mexico appears to have banned all carriage whatsoever of "any class of pistols whatever," as well as "bowie kni[ves,] . . . Arkansas toothpick[s], Spanish dagger[s], slung-shot[s], or any other deadly weapon." 1860 Terr. of N. M. Laws §§1–2, p. 94. These 19th-century bans on concealed carriage were stricter than New York's law, for they prohibited concealed carriage with at most limited exceptions, while New York permits concealed carriage

44  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

with a lawfully obtained license. See *supra,* at 12. Moreover, as *Heller* recognized, and the Court acknowledges, "the majority of the 19th-century courts to consider the question held that [these types of] prohibitions on carrying concealed weapons *were lawful* under the Second Amendment or state analogues." 554 U. S., at 626 (emphasis added); see also *ante,* at 44.

The Court discounts this history because, it says, courts in four Southern States suggested or held that a ban on concealed carriage was only lawful if open carriage or carriage of military pistols was allowed. *Ante,* at 44–46. (The Court also cites *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822), which invalidated Kentucky's concealed-carry prohibition as contrary to that State's Second Amendment analogue. *Id.,* at 90–93. *Bliss* was later overturned by constitutional amendment and was, as the Court appears to concede, an outlier. See *Peruta* v. *County of San Diego*, 824 F. 3d 919, 935–936 (CA9 2016); *ante,* at 45.) Several of these decisions, however, emphasized States' leeway to regulate firearms carriage as necessary "to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence." *State* v. *Smith*, 11 La. 633 (1856); see also *Andrews* v. *State*, 50 Tenn. 165, 179–180 (1871) (stating that "the right to *keep*" rifles, shotguns, muskets, and repeaters could not be "*infringed* or *forbidden*," but "[t]heir *use* [may] be subordinated to such regulations and limitations as are or may be authorized by the law of the land, passed to subserve the general good, so as not to infringe the right secured and the necessary incidents to the exercise of such right"); *State* v. *Reid*, 1 Ala. 612, 616 (1840) (recognizing that the constitutional right to bear arms "necessarily . . . leave[s] with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals"). And other courts upheld concealed-carry restrictions without any reference to an exception allowing

BREYER, J., dissenting

open carriage, so it is far from clear that the cases the Court cites represent a consensus view. See *State* v. *Mitchell*, 3 Blackf. 229 (Ind. 1833); *State* v. *Buzzard*, 4 Ark. 18 (1842). And, of course, the Court does not say whether the result in this case would be different if New York allowed open carriage by law-abiding citizens as a matter of course.

The second 19th-century innovation, adopted in a number of States, was surety laws. Massachusetts' surety law, which served as a model for laws adopted by many other States, provided that any person who went "armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon," and who lacked "reasonable cause to fear an assualt [*sic*]," could be made to pay a surety upon the "complaint of any person having reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836). Other States and Territories enacted identical or substantially similar laws. See, *e.g.,* Me. Rev. Stat., ch. 169, §16 (1840); Mich. Rev. Stat., ch. 162, §16 (1846); Terr. of Minn. Rev. Stat., ch. 112, §18 (1851); 1854 Ore. Stat., ch. 16, §17; W. Va. Code, ch. 153, §8 (1868); 1862 Pa. Laws p. 250, §6. These laws resemble New York's licensing regime in many, though admittedly not all, relevant respects. Most notably, like New York's proper cause requirement, the surety laws conditioned public carriage in at least some circumstances on a special showing of need. Compare *supra,* at 13, with Mass. Rev. Stat., ch. 134, §16.

The Court believes that the absence of recorded cases involving surety laws means that they were rarely enforced. *Ante,* at 49–50. Of course, this may just as well show that these laws were normally followed. In any case, scholars cited by the Court tell us that "traditional case law research is not especially probative of the application of these restrictions" because "in many cases those records did not survive the passage of time" or "are not well indexed or digitally searchable." E. Ruben & S. Cornell, Firearms

46   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L. J. Forum 121, 130–131, n. 53 (2015).   On the contrary, "the fact that restrictions on public carry were well accepted in places like Massachusetts and were included in the relevant manuals for justices of the peace" suggests "that violations were enforced at the justice of peace level, but did not result in expensive appeals that would have produced searchable case law." *Id.*, at 131, n. 53 (citation omitted).   The surety laws and broader bans on concealed carriage enacted in the 19th century demonstrate that even relatively stringent restrictions on public carriage have long been understood to be consistent with the Second Amendment and its state equivalents.

E. Postbellum Regulation.

After the Civil War, public carriage of firearms remained subject to extensive regulation.   See, *e.g.,* Cong. Globe, 39th Cong., 1st Sess., 908 (1866) ("The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons").   Of course, during this period, Congress provided (and commentators recognized) that firearm regulations could not be designed or enforced in a discriminatory manner.   See *ibid.*; Act of July 16, 1866, §14, 14 Stat. 176–177 (ensuring that all citizens were entitled to the "full and equal benefit of all laws . . . including the constitutional right to keep and bear arms . . . without respect to race or color, or previous condition of slavery"); see also The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4.   But that by-now uncontroversial proposition says little about the validity of nondiscriminatory restrictions on public carriage, like New York's.

What is more relevant for our purposes is the fact that, in the postbellum period, States continued to enact generally applicable restrictions on public carriage, many of

BREYER, J., dissenting

which were even more restrictive than their predecessors. See S. Cornell & J. Florence, The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation? 50 Santa Clara L. Rev. 1043, 1066 (2010). Most notably, many States and Western Territories enacted stringent regulations that prohibited *any* public carriage of firearms, with only limited exceptions. For example, Texas made it a misdemeanor to carry in public "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense" absent "reasonable grounds for fearing an [immediate and pressing] unlawful attack." 1871 Tex. Gen. Laws ch. 34, §1. Similarly, New Mexico made it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory." 1869 Terr. of N. M. Laws ch. 32, §1. New Mexico's prohibition contained only narrow exceptions for carriage on a person's own property, for self-defense in the face of immediate danger, or with official authorization. *Ibid.* Other States and Territories adopted similar laws. See, *e.g.,* 1875 Wyo. Terr. Sess. Laws ch. 52, §1; 1889 Idaho Terr. Gen. Laws §1, p. 23; 1881 Kan. Sess. Laws §23, p. 92; 1889 Ariz. Terr. Sess. Laws no. 13, §1, p. 16.

When they were challenged, these laws were generally upheld. P. Charles, The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters, 64 Clev. St. L. Rev. 373, 414 (2016); see also *ante,* at 56–57 (majority opinion) (recognizing that postbellum Texas law and court decisions support the validity of New York's licensing regime); *Andrews,* 50 Tenn., at 182 (recognizing that "a man may well be prohibited from carrying his arms to church, or other public assemblage," and that the carriage of arms other than rifles, shot guns, muskets, and repeaters "may be prohibited if the Legislature

BREYER, J., dissenting

deems proper, absolutely, at all times, and under all circumstances").

The Court's principal answer to these broad prohibitions on public carriage is to discount gun control laws passed in the American West. *Ante,* at 58–61. It notes that laws enacted in the Western Territories were "rarely subject to judicial scrutiny." *Ante,* at 60. But, of course, that may well mean that "[w]e . . . can assume it settled that these" regulations were "consistent with the Second Amendment." See *ante,* at 21 (majority opinion). The Court also reasons that laws enacted in the Western Territories applied to a relatively small portion of the population and were comparatively short lived. See *ante,* 59–61. But even assuming that is true, it does not mean that these laws were historical aberrations. To the contrary, bans on public carriage in the American West and elsewhere constitute just one chapter of the centuries-old tradition of comparable firearms regulations described above.

### F. The 20th Century.

The Court disregards "20th-century historical evidence." *Ante,* at 58, n. 28. But it is worth noting that the law the Court strikes down today is well over 100 years old, having been enacted in 1911 and amended to substantially its present form in 1913. See *supra,* at 12. That alone gives it a longer historical pedigree than at least three of the four types of firearms regulations that *Heller* identified as "presumptively lawful." 554 U. S., at 626–627, and n. 26; see C. Larson, Four Exceptions in Search of a Theory: *District of Columbia* v. *Heller* and Judicial *Ipse Dixit,* 60 Hastings L. J. 1371, 1374–1379 (2009) (concluding that "'prohibitions on the possession of firearms by felons and the mentally ill [and] laws imposing conditions and qualifications on the commercial sale of arms'" have their origins in the 20th century); *Kanter* v. *Barr,* 919 F. 3d 437, 451 (CA7 2019) (Barrett, J., dissenting) ("Founding-era legislatures

BREYER, J., dissenting

did not strip felons of the right to bear arms simply because of their status as felons"). Like JUSTICE KAVANAUGH, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding.  *Ante,* at 3 (concurring opinion). But unlike JUSTICE KAVANAUGH, I find the disconnect between *Heller*'s treatment of laws prohibiting, for example, firearms possession by felons or the mentally ill, and the Court's treatment of New York's licensing regime, hard to square.  The inconsistency suggests that the Court today takes either an unnecessarily cramped view of the relevant historical record or a needlessly rigid approach to analogical reasoning.

\*     \*     \*

The historical examples of regulations similar to New York's licensing regime are legion.  Closely analogous English laws were enacted beginning in the 13th century, and similar American regulations were passed during the colonial period, the founding era, the 19th century, and the 20th century.  Not all of these laws were identical to New York's, but that is inevitable in an analysis that demands examination of seven centuries of history.  At a minimum, the laws I have recounted *resembled* New York's law, similarly restricting the right to publicly carry weapons and serving roughly similar purposes.  That is all that the Court's test, which allows and even encourages "analogical reasoning," purports to require.  See *ante,* at 21 (disclaiming the necessity of a "historical *twin*").

In each instance, the Court finds a reason to discount the historical evidence's persuasive force.  Some of the laws New York has identified are too old.  But others are too recent.  Still others did not last long enough.  Some applied to too few people.  Some were enacted for the wrong reasons. Some may have been based on a constitutional rationale that is now impossible to identify.  Some arose in historically unique circumstances.  And some are not sufficiently

50   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

analogous to the licensing regime at issue here.  But if the examples discussed above, taken together, do not show a tradition and history of regulation that supports the validity of New York's law, what could?  Sadly, I do not know the answer to that question.  What is worse, the Court appears to have no answer either.

V

We are bound by *Heller* insofar as *Heller* interpreted the Second Amendment to protect an individual right to possess a firearm for self-defense.  But *Heller* recognized that that right was not without limits and could appropriately be subject to government regulation.  554 U. S., at 626–627. *Heller* therefore does not require holding that New York's law violates the Second Amendment.  In so holding, the Court goes beyond *Heller*.

It bases its decision to strike down New York's law almost exclusively on its application of what it calls historical "analogical reasoning." *Ante*, at 19–20.  As I have admitted above, I am not a historian, and neither is the Court.  But the history, as it appears to me, seems to establish a robust tradition of regulations restricting the public carriage of concealed firearms.  To the extent that any uncertainty remains between the Court's view of the history and mine, that uncertainty counsels against relying on history alone. In my view, it is appropriate in such circumstances to look beyond the history and engage in what the Court calls means-end scrutiny.  Courts must be permitted to consider the State's interest in preventing gun violence, the effectiveness of the contested law in achieving that interest, the degree to which the law burdens the Second Amendment right, and, if appropriate, any less restrictive alternatives.

The Second Circuit has previously done just that, and it held that New York's law does not violate the Second Amendment.  See *Kachalsky*, 701 F. 3d, at 101.  It first evaluated the degree to which the law burdens the Second

Cite as: 597 U. S. ____ (2022)                51

BREYER, J., dissenting

Amendment right to bear arms. *Id.,* at 93–94. It concluded that the law "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public," but does not burden the right to possess a firearm in the home, where *Heller* said "'the need for defense of self, family, and property is most acute.'" *Kachalsky*, 701 F. 3d, at 93–94 (quoting *Heller,* 554 U. S., at 628). The Second Circuit therefore determined that the law should be subject to heightened scrutiny, but not to strict scrutiny and its attendant presumption of unconstitutionality. 701 F. 3d, at 93–94. In applying such heightened scrutiny, the Second Circuit recognized that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." *Id.,* at 97. I agree. As I have demonstrated above, see *supra,* at 3–9, firearms in public present a number of dangers, ranging from mass shootings to road rage killings, and are responsible for many deaths and injuries in the United States. The Second Circuit then evaluated New York's law and concluded that it is "substantially related" to New York's compelling interests. *Kachalsky*, 701 F. 3d, at 98–99. To support that conclusion, the Second Circuit pointed to "studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces." *Id.,* at 99. We have before us additional studies confirming that conclusion. See, *e.g., supra,* at 19–20 (summarizing studies finding that "may issue" licensing regimes are associated with lower rates of violent crime than "shall issue" regimes). And we have been made aware of no less restrictive, but equally effective, alternative. After considering all of these factors, the Second Circuit held that New York's law does not unconstitutionally burden the right to bear arms under the Second Amendment. I would affirm that holding.

52  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

New York's Legislature considered the empirical evidence about gun violence and adopted a reasonable licensing law to regulate the concealed carriage of handguns in order to keep the people of New York safe. The Court today strikes down that law based only on the pleadings. It gives the State no opportunity to present evidence justifying its reasons for adopting the law or showing how the law actually operates in practice, and it does not so much as acknowledge these important considerations. Because I cannot agree with the Court's decision to strike New York's law down without allowing for discovery or the development of any evidentiary record, without considering the State's compelling interest in preventing gun violence and protecting the safety of its citizens, and without considering the potentially deadly consequences of its decision, I respectfully dissent.



WIKIPEDIA
The Free Encyclopedia

# *District of Columbia v. Heller*

*District of Columbia v. Heller*, 554 U.S. 570 (2008), is a landmark decision of the Supreme Court of the United States. It ruled that the Second Amendment to the U.S. Constitution protects an individual's right to keep and bear arms—unconnected with service in a militia—for traditionally lawful purposes such as self-defense within the home, and that the District of Columbia's handgun ban and requirement that lawfully owned rifles and shotguns be kept "unloaded and disassembled or bound by a trigger lock" violated this guarantee.[1] It also stated that the right to bear arms is not unlimited and that certain restrictions on guns and gun ownership were permissible. It was the first Supreme Court case to decide whether the Second Amendment protects an individual right to keep and bear arms for self-defense or whether the right was only intended for state militias.[2]

Because of the District of Columbia's status as a federal enclave (it is not in any U.S. state), the decision did not address the question of whether the Second Amendment's protections are incorporated by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution against the states.[3] This point was addressed two years later by *McDonald v. City of Chicago* (2010), in which it was found that they are.

On June 26, 2008, the Supreme Court affirmed by a vote of 5 to 4 the U.S. Court of Appeals for the D.C. Circuit in *Heller v. District of Columbia*.[4][5] The Supreme Court struck down provisions of the Firearms Control Regulations Act of 1975 as unconstitutional, determined that handguns are "arms" for the purposes of the Second Amendment, found that the Regulations Act was an unconstitutional ban, and struck down the portion of the Act that requires all firearms including rifles and shotguns be kept "unloaded and disassembled or bound by a trigger lock". Prior to this decision, the law at issue also restricted residents from owning handguns except for those registered prior to 1975.

## Lower court background

In 2002, Robert A. Levy, a senior fellow at the Cato Institute, began vetting plaintiffs with Clark M. Neily III for a planned Second Amendment lawsuit that he would personally finance. Although he himself had never owned a gun, as a constitutional scholar, he had an academic interest in the subject and wanted to

| | |
|---|---|
| **District of Columbia v. Heller** | |
| |  |
| **Supreme Court of the United States** | |
| **Argued March 18, 2008** **Decided June 26, 2008** | |
| **Full case name** | *District of Columbia, et al. v. Dick Anthony Heller* |
| **Docket no.** | 07-290 (https://www.supremecourt.gov/docketfiles/07-290.htm) |
| **Citations** | 554 U.S. 570 (https://supreme.justia.com/us/554/570/case.html) (*more*) 128 S. Ct. 2783; 171 L. Ed. 2d 637; 2008 U.S. LEXIS 5268; 76 U.S.L.W. 4631; 21 Fla. L. Weekly Fed. S 497 |
| **Argument** | Oral argument (https://www.oyez.org/cases/2000-2009/2007/2007_07_290/argument/) |
| **Opinion announcement** | Opinion announcement (https://www.oyez.org/cases/2000-200 |

model his campaign after the legal strategies of Thurgood
Marshall, who had successfully led the challenges that overturned
school segregation.[6] They aimed for a group that would be
diverse in terms of gender, race, economic background, and age
and selected six plaintiffs from their mid-20s to early 60s: three
men and three women; four white and two black:[7]

**Shelly Parker**
A software designer and former nurse who had been active
in trying to rid her neighborhood of drugs. Parker is a single
woman whose life had been threatened on numerous
occasions by drug dealers who had sometimes tried to
break into her house.[8][9]

**Tom G. Palmer**
A colleague of Robert A. Levy at the Cato Institute and the
only plaintiff that Levy knew before the case began.[7]
Palmer, who is gay, defended himself with a 9mm handgun
in 1982. While walking with a friend in San Jose, California,
he was accosted by a gang of about 20 young men who
used profane language regarding his sexual orientation and
threatened his life. When he produced his gun, the men
fled. Palmer believes that the handgun saved his life.[10][11]

**Gillian St. Lawrence**
A mortgage broker who lives in the Georgetown section of
D.C. and who owns several legally registered long guns that
she uses for recreation in nearby Chantilly, Virginia. It had
taken St. Lawrence two years to complete the registration
process. She wanted to be able to use these guns to defend
herself in her home and to be able to register a
handgun.[12][13]

**Tracey Ambeau (now Tracey Hanson)**
An employee of the U.S. Department of Agriculture.
Originally from St. Gabriel, Louisiana, she lives in the
Adams Morgan neighborhood of D.C. with her husband,
Andrew Hanson, who is from Waterloo, Iowa. They live in a
high-crime neighborhood near Union Station in D.C. She
grew up around guns and wanted one to defend her
home.[14][12]

**George Lyon**
A communications lawyer who had previously contacted the
National Rifle Association (NRA) about filing a lawsuit to
challenge the gun laws in the District of Columbia. Lyon
held D.C. licenses for a shotgun and a rifle, but wanted to
have a handgun in his home.[15]

**Dick Anthony Heller**
A licensed special police officer for the District of Columbia.
For his job, Heller carried a gun in federal office buildings,
but was not allowed to have one in his home.[16] Heller had
lived in southeast D.C. near the Kentucky Courts public
housing complex since 1970 and had seen the
neighborhood "transformed from a child-friendly welfare
complex to a drug haven". Heller had also approached the

| | |
|---|---|
| | 9/2007/2007_07_290/opinion/) |
| Decision | Opinion (https://www.supremecourt.gov/opinions/boundvolumes/554bv.pdf) |
| **Case history** | |
| Prior | *Parker v. D.C.*, 311 F. Supp. 2d 103 (https://www.leagle.com/decision/2004414311fsupp2d1031404) (D.D.C. 2004), reversed, 478 F.3d 370 (https://law.justia.com/cases/federal/appellate-courts/F3/478/370/473051/) (D.C. Cir. 2007); cert. granted, 552 U.S. 1035 (2007). |
| Procedural | Writ of Certiorari to the U.S. Court of Appeals for the District of Columbia Circuit |
| **Holding** | |
| The Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home. Provisions of the Firearms Control Regulations Act of 1975 infringe an individual's right to bear arms as protected by the Second Amendment. United States Court of Appeals for the District of Columbia Circuit affirmed. | |
| **Court membership** | |
| **Chief Justice** John Roberts | |
| **Associate Justices** | |

National Rifle Association about a lawsuit to overturn the D.C. gun ban, but the NRA declined.[12]

Previous federal case law pertaining to the question of an individual's right to bear arms included *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), which supported the right and *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), which opposed the right. The Supreme Court ruling in *United States v. Miller*, 307 U.S. 174 (1939) was interpreted to support both sides of the issue.

| | |
|---|---|
| John P. Stevens · Antonin Scalia | |
| Anthony Kennedy · David Souter | |
| Clarence Thomas · Ruth Bader Ginsburg | |
| Stephen Breyer · Samuel Alito | |
| **Case opinions** | |
| **Majority** | Scalia, joined by Roberts, Kennedy, Thomas, Alito |
| **Dissent** | Stevens, joined by Souter, Ginsburg, Breyer |
| **Dissent** | Breyer, joined by Stevens, Souter, Ginsburg |
| **Laws applied** | |
| U.S. Const. amend. II; D.C. Code §§ 7-2502.02(a)(4), 22–4504, 7–2507.02 | |

## District Court

In February 2003, the six residents of the District of Columbia filed a lawsuit in the District Court for the District of Columbia, challenging the constitutionality of provisions of the Firearms Control Regulations Act of 1975, a local law (part of the District of Columbia Code) enacted pursuant to District of Columbia home rule. This law restricted residents from owning handguns, excluding those grandfathered in by registration prior to 1975 and those possessed by active and retired law enforcement officers. The law also required that all firearms including rifles and shotguns be kept "unloaded and disassembled or bound by a trigger lock."[17] They filed for an injunction pursuant to 28 U.S.C. § 2201 (https://www.law.cornell.edu/uscode/text/28/2201), 2202, and 42 U.S.C. § 1983 (https://www.law.cornell.edu/uscode/text/42/1983). District Court Judge Emmet G. Sullivan dismissed the lawsuit on March 31, 2004.[18]

## Court of Appeals

On appeal, the U.S. Court of Appeals for the D.C. Circuit reversed the dismissal in a 2-1 decision. The Court of Appeals struck down provisions of the Firearms Control Regulations Act as unconstitutional. Judges Karen L. Henderson, Thomas B. Griffith and Laurence H. Silberman formed the Court of Appeals panel, with Senior Circuit Judge Silberman writing the court's opinion and Circuit Judge Henderson dissenting.

The court's opinion first addressed whether appellants have standing to sue for declaratory and injunctive relief in section II (slip opinion, at 5–12). The court concluded that of the six plaintiffs, only Heller – who applied for a handgun permit but was denied – had standing.

The court then held that the Second Amendment "protects an individual right to keep and bear arms", that the "right existed prior to the formation of the new government under the Constitution", also stating that the right was "premised on the private use of arms for activities such as hunting and self-defense, the latter being understood as resistance to either private lawlessness or the depredations of a tyrannical government (or a threat from abroad)." They also noted that though the right to bear arms also helped preserve the citizen militia, "the activities [the Amendment] protects are not limited to militia service, nor is an individual's enjoyment of the right contingent upon his or her continued or intermittent enrollment in the militia." The court determined that handguns are "Arms" and concluded that thus they may not be banned by the District of Columbia.

The court also struck down the portion of the 2748 that requires all firearms including rifles and shotguns be kept "unloaded and disassembled or bound by a trigger lock." The District argued that there is an implicit self-defense exception to these provisions, but the D.C. Circuit rejected this view, saying that the requirement amounted to a complete ban on functional firearms and prohibition on use for self-defense:[19]

> Section 7-2507.02, like the bar on carrying a pistol within the home, amounts to a complete prohibition on the lawful use of handguns for self-defense. As such, we hold it unconstitutional.

In her dissent, Circuit Judge Henderson stated that Second Amendment rights did not extend to residents of District of Columbia, writing:

> To sum up, there is no dispute that the Constitution, case law and applicable statutes all establish that the District is not a State within the meaning of the Second Amendment. Under *United States v. Miller*, 307 U.S. at 178, the Second Amendment's declaration and guarantee that "the right of the people to keep and bear Arms, shall not be infringed" relates to the Militia of the States only. That the Second Amendment does not apply to the District, then, is, to me, an unavoidable conclusion.[20]

In April 2007, the District and Mayor Adrian Fenty petitioned for rehearing *en banc*, arguing that the ruling created inter- and intra-jurisdictional conflict.[21] On May 8, the Court of Appeals for the D.C. Circuit denied the request to rehear the case, by a 6–4 vote.

# Supreme Court

The defendants petitioned the United States Supreme Court to hear the case. The Supreme Court granted certiorari on November 20, 2007.[22] The court rephrased the question to be decided as follows:

> The petition for a writ of certiorari is granted limited to the following question: Whether the following provisions, D.C. Code §§ 7-2502.02(a)(4), 22-4504(a), and 7-2507.02, violate the Second Amendment rights of individuals who are not affiliated with any state-regulated militia, but who wish to keep handguns and other firearms for private use in their homes.

This represented the first time since the 1939 case *United States v. Miller* that the Supreme Court had directly addressed the scope of the Second Amendment.[17]

### *Amicus curiae* briefs

Because of the controversial nature of the case, it garnered much attention from many groups on both sides of the gun rights issue. Many of those groups filed *amicus curiae* (friend of the court) briefs, about 47 urging the court to affirm the case and about 20 to remand it.[23]

A majority of the members of Congress[24] signed the brief authored by Stephen Halbrook advising that the case be affirmed overturning the ban on handguns not otherwise restricted by Congress.[25] Vice President Dick Cheney joined in this brief, acting in his role as President of the United States Senate, and breaking with the George W. Bush administration's official position.[24] Arizona Senator John McCain, Republican, also signed the brief. Then-Illinois Senator Barack Obama did not.[26]

A majority of the states signed the brief of Texas Attorney General Greg Abbott, authored by Abbott's solicitor general, Ted Cruz,[27] advising that the case be affirmed, while at the same time emphasizing that the states have a strong interest in maintaining each of the states' laws prohibiting and regulating firearms.[28][29][30] Law enforcement organizations, including the Fraternal Order of Police and the Southern States Police Benevolent Association, also filed a brief urging that the case be affirmed.[31]

A number of organizations signed friend of the court briefs advising that the case be remanded, including the United States Department of Justice[32] and Attorneys General of New York, Hawaii, Maryland, Massachusetts, New Jersey, and Puerto Rico.[33] Additionally, friend of the court briefs to remand were filed by a spectrum of religious and anti-violence groups,[34] a number of cities and mayors,[35] and many police chiefs and law enforcement organizations.[36]

A collection of organizations and prominent scholars, represented by attorney Jeffrey Teichert, submitted an "errors brief" arguing that many of the common historical and factual "myths and misrepresentations" generally offered in favor of banning handguns were in error. Teichert's brief argued from a historical perspective that the Second Amendment protected an individual right to keep and bear arms.[37]

## Oral arguments

The Supreme Court heard oral arguments in the case on March 18, 2008. Both the transcript[38] and the audio[39] of the argument have been released. Each side was initially allotted 30 minutes to argue its case, with U.S. Solicitor General Paul D. Clement allotted 15 minutes to present the federal government's views.[40] During the argument, however, extra time was extended to the parties, and the argument ran 23 minutes over the allotted time.[41]



Robert A. Levy (left) and Alan Gura, counsel for Heller

Walter E. Dellinger of the law firm O'Melveny & Myers, also a professor at Duke University Law School and former Acting Solicitor General, argued the District's side before the Supreme Court. Dellinger was assisted by Thomas Goldstein of Akin Gump Strauss Hauer & Feld, Robert Long of Covington & Burling and D.C. Solicitor General Todd Kim. The law firms assisting the District worked *pro bono*.[42]

Alan Gura, of the D.C.-based law firm Gura & Possessky, was lead counsel for Heller, and argued on his behalf before the Supreme Court.[43] Robert Levy, a senior fellow at the Cato Institute, and Clark Neily, a senior attorney at the Institute for Justice, were his co-counsel.[44][45]

## Decision

The Supreme Court held:[46]

(1) The Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home. Pp. 2–53.



Justice Antonin Scalia wrote the majority opinion.

(a) The Amendment's prefatory clause announces a purpose, but does not limit or expand the scope of the second part, the operative clause. The operative clause's text and history demonstrate that it connotes an individual right to keep and bear arms. Pp. 2–22.

(b) The prefatory clause comports with the Court's interpretation of the operative clause. The "militia" comprised all males physically capable of acting in concert for the common defense. The Antifederalists feared that the Federal Government would disarm the people in order to disable this citizens' militia, enabling a politicized standing army or a select militia to rule. The response was to deny Congress power to abridge the ancient right of individuals to keep and bear arms, so that the ideal of a citizens' militia would be preserved. Pp. 22–28.

(c) The Court's interpretation is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed the Second Amendment. Pp. 28–30.

(d) The Second Amendment's drafting history, while of dubious interpretive worth, reveals three state Second Amendment proposals that unequivocally referred to an individual right to bear arms. Pp. 30–32.

(e) Interpretation of the Second Amendment by scholars, courts and legislators, from immediately after its ratification through the late 19th century also supports the Court's conclusion. Pp. 32–47.

(f) None of the Court's precedents forecloses the Court's interpretation. Neither *United States v. Cruikshank*, 92 U.S. 542 (1876), nor *Presser v. Illinois*, 116 U.S. 252 (1886), refutes the individual-rights interpretation. *United States v. Miller*, 307 U.S. 174 (1939), does not limit the right to keep and bear arms to militia purposes, but rather limits the type of weapon to which the right applies to those used by the militia, i.e., those in common use for lawful purposes.

(2) Like most rights, the Second Amendment right is not unlimited. It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose: For example, concealed weapons prohibitions have been upheld under the Amendment or state analogues. The Court's opinion should not be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. Miller's holding that the sorts of weapons protected are those "in common use at the time" finds support in the historical tradition of prohibiting the carrying of dangerous and unusual weapons. Pp. 54–56.

(3) The handgun ban and the trigger-lock requirement (as applied to self-defense) violate the Second Amendment. The District's total ban on handgun possession in the home amounts to a prohibition on an entire class of "arms" that Americans overwhelmingly choose for the lawful purpose of self-defense. Under any of the standards of scrutiny the Court has applied to enumerated constitutional rights, this prohibition – in the place where the importance of the

lawful defense of self, family, and property is most acute – would fail constitutional muster. Similarly, the requirement that any lawful firearm in the home be disassembled or bound by a trigger lock makes it impossible for citizens to use arms for the core lawful purpose of self-defense and is hence unconstitutional. Because Heller conceded at oral argument that the D.C. licensing law is permissible if it is not enforced arbitrarily and capriciously, the Court assumes that a license will satisfy his prayer for relief and does not address the licensing requirement. Assuming he is not disqualified from exercising Second Amendment rights, the District must permit Heller to register his handgun and must issue him a license to carry it in the home. Pp. 56–64.

The Opinion of the Court, delivered by Justice Scalia, was joined by Chief Justice John G. Roberts, Jr. and by Justices Anthony M. Kennedy, Clarence Thomas and Samuel Alito.[47]

## Second Amendment findings and reasoning

The Illinois Supreme Court in *People v. Aguilar* (2013), summed up the *Heller*'s findings and reasoning:

> In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court undertook its first-ever "in-depth examination" of the second amendment's meaning *Id.* at 635. After a lengthy historical discussion, the Court ultimately concluded that the second amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" (*id.* at 592); that "central to" this right is "the inherent right of self-defense"(*id.* at 628); that "the home" is "where the need for defense of self, family, and property is most acute" (*id.* at 628); and that, "above all other interests," the second amendment elevates "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (*id.* at 635). Based on this understanding, the Court held that a District of Columbia law banning handgun possession in the home violated the second amendment. *Id.* at 635.[48]

## Issues addressed by the majority

The core holding in *D.C. v. Heller* is that the right to keep and bear arms is an individual right intimately tied to the natural right of self-defense.

The Scalia majority invokes much historical material to support its finding that the right to keep and bear arms belongs to individuals; more precisely, Scalia asserts in the Court's opinion that the "people" to whom the Second Amendment right is accorded are the same "people" who enjoy First and Fourth Amendment protection: "' The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning. *United States v. Sprague*, 282 U.S. 716, 731 (1931); see also *Gibbons v. Ogden*, 9 Wheat. 1, 188 (1824). Normal meaning may, of course, include an idiomatic meaning, but it excludes secret or technical meanings ... .'"

With that finding as an anchor, the Court ruled a total ban on operative handguns in the home is unconstitutional, as the ban runs afoul of both the self-defense purpose of the Second Amendment – a purpose not previously articulated by the Court – and the "in common use at the time" prong of the *Miller* decision: Since handguns are in common use, their ownership is protected.

The Court applies as the remedy that "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." The Court, additionally, hinted that other remedy might be available in the form of eliminating the license requirement for carrying in the home, but that no such relief had been requested: "Respondent conceded at oral argument that he does not 'have a problem with ... licensing' and that the District's law is permissible so long as it is 'not enforced in an arbitrary and capricious manner.' Tr. of Oral Arg. 74–75. We, therefore, assume that petitioners' issuance of a license will satisfy respondent's prayer for relief and do not address the licensing requirement."

In regard to the scope of the right, the Court wrote, in an *obiter dictum*, "Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[49]

The Court also added dicta regarding the private ownership of machine guns. In doing so, it suggested the elevation of the "in common use at the time" prong of the *Miller* decision, which by itself protects handguns, over the first prong (protecting arms that "have some reasonable relationship to the preservation or efficiency of a well regulated militia"), which may not by itself protect machine guns: "It may be objected that if weapons that are most useful in military service – M16 rifles and the like – may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home."[50]

The Court did not address which level of judicial review should be used by lower courts in deciding future cases claiming infringement of the right to keep and bear arms: "[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field." The Court states, "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."[51] Also, regarding Justice Breyer's proposal of a "judge-empowering 'interest-balancing inquiry'," the Court states, "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach."[52]

## Dissenting opinions

In a dissenting opinion, Justice John Paul Stevens stated that the court's judgment was "a strained and unpersuasive reading" which overturned longstanding precedent, and that the court had "bestowed a dramatic upheaval in the law".[53] Stevens also stated that the amendment was notable for the "omission of any statement of purpose related to the right to use firearms for hunting or personal self-defense" which was present in the Declarations of Rights of Pennsylvania and Vermont.[53]

The Stevens dissent seems to rest on four main points of disagreement: that the Founders would have made the individual right aspect of the Second Amendment express if that was what was intended; that the "militia" preamble and exact phrase "to keep and bear arms" demands the conclusion that the Second Amendment touches on state militia service only; that many lower courts' later "collective-right" reading of the Miller decision constitutes *stare decisis*, which may only be overturned at great

peril; and that the Court has not considered gun-control laws (e.g., the National Firearms Act) unconstitutional. The dissent concludes, "The Court would have us believe that over 200 years ago, the Framers made a choice to limit the tools available to elected officials wishing to regulate civilian uses of weapons.... I could not possibly conclude that the Framers made such a choice."

Justice Stevens's dissent was joined by Justices David Souter, Ruth Bader Ginsburg, and Stephen Breyer.

Justice Breyer filed a separate dissenting opinion, joined by the same dissenting Justices, which sought to demonstrate that, starting from the premise of an individual-rights view, the District of Columbia's handgun ban and trigger lock requirement would nevertheless be permissible limitations on the right.



Justice John Paul Stevens wrote a dissenting opinion.

The Breyer dissent looks to early municipal fire-safety laws that forbade the storage of gunpowder (and in Boston the carrying of loaded arms into certain buildings), and on nuisance laws providing fines or loss of firearm for imprudent usage, as demonstrating the Second Amendment has been understood to have no impact on the regulation of civilian firearms. The dissent argues the public safety necessity of gun-control laws, quoting that "guns were responsible for 69 deaths in this country each day.'"

With these two supports, the Breyer dissent goes on to conclude, "there simply is no untouchable constitutional right guaranteed by the Second Amendment to keep loaded handguns in the house in crime-ridden urban areas." It proposes that firearms laws be reviewed by balancing the interests (i.e., "'interest-balancing' approach") of Second Amendment protections against the government's compelling interest of preventing crime.

The Breyer dissent also objected to the "common use" distinction used by the majority to distinguish handguns from machine guns: "But what sense does this approach make? According to the majority's reasoning, if Congress and the States lift restrictions on the possession and use of machineguns, and people buy machineguns to protect their homes, the Court will have to reverse course and find that the Second Amendment does, in fact, protect the individual self-defense-related right to possess a machine-gun...There is no basis for believing that the Framers intended such circular reasoning."[54]

# Non-party involvement

## National Rifle Association (NRA)

Attorney Alan Gura, in a 2003 filing, used the term "sham litigation" to describe the NRA's attempts to have *Parker (aka Heller)* consolidated with its own case challenging the D.C. law. Gura also stated that "the NRA was adamant about not wanting the Supreme Court to hear the case".[55] These concerns were based on NRA lawyers' assessment that the justices at the time the case was filed might reach an unfavorable decision.[56] Cato Institute senior fellow Robert Levy, co-counsel to the *Parker* plaintiffs, has stated that the *Parker* plaintiffs "faced repeated attempts by the NRA to derail the litigation."[57] He also stated that "The N.R.A.'s interference in this process set us back and almost killed the case. It was a very acrimonious relationship."[6]

Wayne LaPierre, the NRA's chief executive officer, confirmed the NRA's misgivings. "There was a real dispute on our side among the constitutional scholars about whether there was a majority of justices on the Supreme Court who would support the Constitution as written," Mr. LaPierre said.[6] Both Levy and LaPierre said the NRA and Mr. Levy's team were now on good terms.[6]

Elaine McArdle wrote in the *Harvard Law Bulletin*: "If Parker is the long-awaited "clean" case, one reason may be that proponents of the individual-rights view of the Second Amendment – including the National Rifle Association, which filed an amicus brief in the case – have learned from earlier defeats, and crafted strategies to maximize the chances of Supreme Court review." The NRA did eventually support the litigation by filing an amicus brief with the Court arguing that the plaintiffs in *Parker* had standing to sue and that the D.C. ban was unconstitutional under the Second Amendment.[58]

Chris Cox, executive director of the NRA's Institute for Legislative Action, had indicated support of federal legislation which would repeal the D.C. gun ban. Opponents of the legislation argued that this would have rendered the Parker case moot, and would have effectively eliminated the possibility that the case would be heard by the Supreme Court.[59]

Immediately after the Supreme Court's ruling, the NRA filed a lawsuit against the city of Chicago over its handgun ban, followed the next day by a lawsuit against the city of San Francisco over its ban of handguns in public housing.[60]

## Brady Campaign to Prevent Gun Violence

The Brady Campaign to Prevent Gun Violence opposed the arguments made by the plaintiffs in *Parker*, and filed amicus curiae against those arguments in both the District and Circuit courts.

Paul Helmke, the president of the Brady Campaign, suggested to D.C. before the Court granted certiorari that it modify its gun laws rather than appeal to the Supreme Court.[61] Helmke has written that if the Supreme Court upholds the Circuit court ruling, it "could lead to all current and proposed firearms laws being called into question."[62]

After the ruling, Paul Helmke stated that, "the classic 'slippery slope' argument", "that even modest gun control would lead down the path to a complete ban on gun ownership", "is now gone." Helmke added that, "The Court also rejected the absolutist misreading of the Second Amendment that some use to argue 'any gun, any time for anyone,' which many politicians have used as an excuse to do nothing about the scourge of gun violence in our country and to block passage of common sense gun laws."[63]

# Reactions

## To the lower court rulings

Various experts expressed opinions on the D.C. Circuit's decision.

Harvard Law School professor Laurence Tribe contended that the Second Amendment protects an individual right, and predicted that if *Parker* is reviewed by the Supreme Court "there's a really quite decent chance that it will be affirmed."[58] However, Professor Tribe has also argued that the District's

ban on one class of weapons does not violate the Second Amendment even under an individual rights view.[64]

Erwin Chemerinsky, then of Duke Law School and now dean of the University of California, Berkeley School of Law, argued that the District of Columbia's handgun laws, even assuming an "individual rights" interpretation of the Second Amendment, could be justified as reasonable regulations and thus upheld as constitutional. Professor Chemerinsky believes that the regulation of guns should be analyzed in the same way "as other regulation of property under modern constitutional law" and "be allowed so long as it is rationally related to achieving a legitimate government purpose."[65] However, the dicta in *Heller* suggests that applying a mere rational basis analysis is an incorrect reading of the Constitution and would, in fact, defeat the entire purpose of the Second Amendment.[51]

## To the Supreme Court rulings

Cato Institute senior fellow Robert Levy, co-counsel to the *Parker* plaintiffs, agreed with the court's ruling but describes that his interpretation of the Second Amendment would not preclude all governmental regulation of private ownership of weapons:

> Even the NRA concedes that you can't have mad men running around with weapons of mass destruction. So there are some restrictions that are permissible and it will be the task of the legislature and the courts to ferret all of that out and draw the lines. I am sure, though, that outright bans on handguns like they have in D.C. won't be permitted. That is not a reasonable restriction under anybody's characterization. It is not a restriction, it's a prohibition.[66]

Clark Neily, an attorney for Dick Heller in this case, has said regarding *Heller*:

> America went over 200 years without knowing whether a key provision of the Bill of Rights actually meant anything. We came within one vote of being told that it did not, notwithstanding what amounts to a national consensus that the Second Amendment means what it says: The right of the people to keep and bear arms shall not be infringed. Taking rights seriously, including rights we might not favor personally, is good medicine for the body politic, and Heller was an excellent dose.[67]

Richard Posner, judge for the United States Court of Appeals for the Seventh Circuit, compares *Heller* to *Roe v. Wade*, stating that it created a federal constitutional right that did not previously exist, and he asserts that the originalist method – to which Justice Antonin Scalia claimed to adhere – would have yielded the opposite result of the majority opinion.

> The text of the amendment, whether viewed alone or in light of the concerns that actuated its adoption, creates no right to the private possession of guns for hunting or other sport, or for the defense of person or property. It is doubtful that the amendment could even be thought to require that members of state militias be allowed to keep weapons in their homes, since that would reduce the militias' effectiveness. Suppose part of a state's militia was engaged in combat and needed additional weaponry. Would the militia's commander have to collect the weapons from the homes of militiamen who had not been mobilized, as

opposed to obtaining them from a storage facility? Since the purpose of the Second Amendment, judging from its language and background, was to assure the effectiveness of state militias, an interpretation that undermined their effectiveness by preventing states from making efficient arrangements for the storage and distribution of military weapons would not make sense.[68]

J. Harvie Wilkinson III, chief judge of United States Court of Appeals for the Fourth Circuit, consents to Posner's analysis, stating that *Heller* "encourages Americans to do what conservative jurists warned for years they should not do: bypass the ballot and seek to press their political agenda in the courts."[69]

> *Heller* thus represents the worst of missed opportunities—the chance to ground conservative jurisprudence in enduring and consistent principles of restraint. The Constitution expresses the need for judicial restraint in many different ways—separation of powers, federalism, and the grant of life tenure to unelected judges among them. It is an irony that *Heller* would in the name of originalism abandon insights so central to the Framers' designs.[70]

Alan Gura, Lead Counsel for Respondent in *Heller* rejects Wilkinson's criticism, stating that "Rather, the Court affirmed the Second Amendment's original public meaning, as confirmed by its plain text. Having determined the Amendment's meaning, the Court showed the proper level of deference to the D.C. City Council's outright repudiation of the constitutional text: none."[71]

# Post-ruling impacts

Since the June 2008 ruling, over 80 different cases have been heard in lower federal courts on the constitutionality of a wide variety of gun control laws.[72][73] These courts have heard lawsuits in regard to bans of firearm possession by felons, drug addicts, illegal immigrants, and individuals convicted of domestic violence misdemeanors.[72][73] Also, cases have been heard on the constitutionality of laws prohibiting certain types of weapons, such as machine guns, sawed-off shotguns and/or specific types of weapons attachments. In addition, courts have heard challenges to laws barring guns in post offices and near schools and laws outlawing "straw" purchases, carrying of concealed weapons, types of ammunition and possession of unregistered firearms.[72][73] There have been as of May 2019 more than 1,370 Second Amendment cases nationwide which challenged restrictive gun laws of various kinds since the Supreme Court issued its decision in *Heller*. In most cases the gun safety law or criminal conviction at issue has been however upheld by the lower courts.[74][75] Provided with only minimum guidance from the Supreme Court in *Heller* the lower courts were tasked with defining the scope of the Second Amendment rights and the proper standard of review for evaluating Second Amendment claims in the aforementioned cases.[76]

The courts have upheld most of the above-mentioned laws as being constitutional.[73] The basis for the lower court rulings is the dicta in the paragraph near the end of the Heller ruling that states:

> Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions on the commercial sale of arms.[77]

Consistently since the Heller ruling, the lower federal courts have ruled that almost all gun control measures as presently legislated are lawful and that according to UCLA professor of constitutional law Adam Winkler: "What gun rights advocates are discovering is that the vast majority of gun control laws fit within these categories."[72]

Robert Levy, the executive director of the Cato Institute who funded the Heller litigation has commented on this passage describing constitutionally acceptable forms of prohibitions of firearms: "I would have preferred that that not have been there," and that this paragraph in Scalia's opinion "created more confusion than light."[72]

Similar to the lifting of gun bans mentioned previously in the settlements of lawsuits filed post-*Heller*, in *US v. Arzberger*, also decided post-*Heller*, it was noted:

> To the extent, then, that the Second Amendment creates an individual right to possess a firearm unrelated to any military purpose, it also establishes a protectible liberty interest. And, although the Supreme Court has indicated that this privilege may be withdrawn from some groups of persons such as convicted felons, there is no basis for categorically depriving persons who are merely accused of certain crimes of the right to legal possession of a firearm.[78]

## District of Columbia

The D.C. government indicated it would continue to use zoning ordinances to prevent firearms dealers from operating and selling to citizens residing in the District, meaning it would continue to be difficult for residents to legally purchase guns in the District.[79] Additionally, the District enacted new firearms restrictions in an effort to cure the constitutional defects in the ordinance that the Supreme Court had identified in *Heller*. The new provisions were: (1) the firearms registration procedures; (2) the prohibition on assault weapons; and (3) the prohibition on large capacity ammunition feeding devices. In response, Dick Heller challenged these new restrictions filing a civil suit named *Heller v. District of Columbia* (Civil Action No. 08-1289 (RMU), No. 23., 25) where he requested a summary judgment to vacate the new prohibitions. On March 26, 2010, the D.C. District Judge Ricardo M. Urbina denied Dick Heller's request and granted the cross motion, stating that the court "*concludes that the regulatory provisions that the plaintiffs challenge permissibly regulate the exercise of the core Second Amendment right to use arms for the purpose of self-defense in the home.*"[80]



Dick Heller, pictured here in 2018

Dick Heller's application to register his semi-automatic pistol was rejected because the gun was a bottom-loading weapon, and according to the District's interpretation, all bottom-loading guns, including magazine-fed non-assault-style rifles, are outlawed because they are grouped with machine guns.[81] Revolvers will likely not fall under such a ban.[82]

On December 16, 2008, the D.C. Council unanimously passed the Firearms Registration Emergency Amendment Act of 2008[83] which addresses the issues raised in the Heller Supreme Court decision, and also puts in place a number of registration requirements to update and strengthen the District's gun laws.[84]

Justice Antonin Scalia's opinion for the majority provided Second Amendment protection for commonly used and popular handguns but not for atypical arms or arms used for unlawful purposes, such as short-barreled shotguns. Scalia stated: "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." "We think that Miller's "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U. S., at 179." "We therefore read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." "It may be objected that if weapons that are most useful in military service – M-16 rifles and the like – may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty."[85]

On July 24, 2014, the U.S. District Court for the District of Columbia ruled, in *Palmer v. District of Columbia*, that the District's total ban on the public carrying of ready-to-use handguns is unconstitutional.[86][87] In its decision, the Court stated: "[ . . . ] the Court finds that the District of Columbia's complete ban on the carrying of handguns in public is unconstitutional. Accordingly, the Court grants Plaintiffs' motion for summary judgment and enjoins Defendants from enforcing the home limitations of D.C. Code § 7-2502.02(a)(4) (http://dccode.org/simple/sections/7-2502.02.htm l) and enforcing D.C. Code § 22-4504(a) (http://dccode.org/simple/sections/22-4504.html) unless and until such time as the District of Columbia adopts a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms. Furthermore, this injunction prohibits the District from completely banning the carrying of handguns in public for self-defense by otherwise qualified non-residents based **solely** on the fact that they are not residents of the District."[88]

## New York

Mayor of New York City Michael Bloomberg said that "all of the laws on the books in New York State and New York City" would be allowed by the ruling as "reasonable regulation."[89] Robert Levy has stated that the current New York City gun laws are "not much different" from the D.C. ban that has been overturned.[90] The National Rifle Association and other gun-rights advocates have not ruled out suing New York City, especially over the definition of "reasonable regulation".[91]

Southern District of New York Magistrate Judge James Francis has said that, prior to *Heller*, it would not have been considered unreasonable to require a defendant to surrender a firearm as a condition of pretrial release. Specifically, according to Judge Francis:[92]

This all changed, with the recent U.S. Supreme Court decision in *District of Columbia v. Heller*; 128 S.Ct. 2783 (2008), where the court changed the course of Second Amendment jurisprudence by creating what he said was a "protectible liberty interest" in the possession

of firearms. Thus, in the absence of an individualized determination at a bail hearing, requiring the defendant to give up any firearms violates due process.

*Maloney v. Rice* (a.k.a. *Maloney v. Cuomo* and *Maloney v. Spitzer*), 554 F.3d 56 (2d. Cir. 2009) originally held that the 2nd Amendment does not apply to the states in the Second Circuit. The case involved a state ban on Nunchaku sticks (a martial arts weapon) in New York. In a memorandum opinion dated June 29, 2010, the Supreme Court vacated the Second Circuit decision in *Maloney* and remanded for further consideration in light of the holding in *McDonald v. City of Chicago* that the Second Amendment *does* apply to the states. The Second Circuit has remanded the case to the trial court.


Bloomberg delivering a speech

## Illinois

The NRA has filed five related lawsuits since the *Heller* decision.[93] In four Illinois lawsuits, the NRA sought to have the Second Amendment incorporated by the Fourteenth Amendment, causing the Second Amendment to apply to state and local jurisdictions and not just to the federal government.[94] Three Illinois lawsuits have been negotiated and settled out of court involving agreements that repeal gun ban ordinances and did not result in incorporation of the Second Amendment to state and local jurisdictions. The fourth NRA lawsuit against Chicago was rejected.[95] The NRA appealed the case to the 7th Circuit Court of Appeals. On June 2, 2009, the Court of Appeals affirmed the district court's decision, based on the theory that Heller applied only to the Federal Government (including the District of Columbia), and not to states or their subordinate jurisdictions. This opinion directly conflicts with the 9th Circuit Court of Appeals' earlier decision, holding that *Heller* applies to states as well.

On June 28, 2010, the Supreme Court reversed the Court of Appeals for the Seventh Circuit's decision in *McDonald v. City of Chicago* and remanded it back to Seventh Circuit to resolve conflicts between certain Chicago gun restrictions and the Second Amendment. Chicago's handgun law was likened to the D.C. handgun ban by Justice Breyer.[96]

Similarly, three Illinois municipalities with gun control measures on the books that previously had banned all handguns have rescinded their handgun bans.[97][98][99][100] These cities were Morton Grove, Illinois,[101] Wilmette, another Illinois village,[102] and Evanston, Illinois which enacted a partial repeal of its handgun ban.

In *Ezell v. Chicago*,[103] decided July 6, 2011, the Seventh Circuit reversed a district court decision that the post-*McDonald* measures adopted by the City of Chicago were constitutional. The Chicago law required firearms training in a shooting range in order to obtain a gun permit, but also banned shooting ranges within the City of Chicago. The city had argued that applicants could obtain their

training at gun ranges in the suburbs. The opinion noted that Chicago could not infringe Second Amendment rights on the grounds that they could be exercised elsewhere, any more than it could infringe the right to freedom of speech on the grounds that citizens could speak elsewhere.

## California

On January 14, 2009, in *Guy Montag Doe v. San Francisco Housing Authority*, the San Francisco Housing Authority reached a settlement out of court with the NRA, which allows residents to possess legal firearms within a SFHA apartment building. The San Francisco lawsuit resulted in the elimination of the gun ban from the SF Housing Authority residential lease terms. Tim Larsen speaking for the Housing Authority said that they never intended to enforce its 2005 housing lease gun ban against law-abiding gun owners and have never done so.[104]

## Idaho

On January 10, 2014, in *Morris v. U.S. Army Corps of Engineers*, the District Court struck down a Corps of Engineers regulation barring possession of loaded guns in recreation areas surrounding Corps dams. The court held that tents are akin to homes, and under *Heller*, Second Amendment rights are protected.[105]

# Legacy

The decision in *McDonald v. City of Chicago*, which was brought in response to Heller and decided in 2010, did invalidate much of Chicago's gun purchase and registration laws, and has called into question many other state and local laws restricting purchase, possession, and carry of firearms.

Justice Stevens later called the decision "unquestionably the most clearly incorrect decision that the Supreme Court announced during my tenure on the bench" and called for a Constitutional amendment overruling it".[106]

Stephen Halbrook, a lawyer and Second Amendment analyst who successfully argued three firearms-related cases before the Supreme Court, concluded the majority's opinion in Heller "relied on text, history, and tradition."[107] Halbrook asserted that the individual right to bear arms was not an invention of gun rights activists in the preceding few decades, but was in fact a textualist interpretation confirmed by the historical context of the Second Amendment. This included the English Declaration of Rights of 1689, as well as "post-ratification commentary, antebellum judicial opinions, Reconstruction legislation, and post-Civil War commentary."[108]

The Court's statement that the right secured by the Second Amendment is limited has been widely discussed by lower courts and the media.[109][110][111][112] According to Justice John Paul Stevens, he was able to persuade Justice Anthony M. Kennedy to ask for "some important changes" to Justice Scalia's opinion,[113] so that the final version of *Heller* "should not be taken to cast doubt" on the many gun laws existing in the United States.[113][114]

# See also

- List of United States Supreme Court cases, volume 554
- List of United States Supreme Court cases

- Firearm case law in the United States
- Gun politics in the United States
- Incorporation (Bill of Rights)#Amendment II
- Second Amendment to the United States Constitution

# References

1. *District of Columbia v. Heller*, 554 U.S. 570 (https://supreme.justia.com/cases/federal/us/554/570/) (2008).
2. Barnes, Robert (June 27, 2008). "Justices Reject D.C. Ban On Handgun Ownership" (https://www.washingtonpost.com/wp-dyn/content/article/2008/06/26/AR2008062600615.html). *The Washington Post*. Retrieved February 19, 2010. "The Supreme Court ... decided for the first time in the nation's history that the Second Amendment guarantees an individual's right to own a gun for self-defense."
3. Barnes, Robert (October 1, 2009). "Justices to Decide if State Gun Laws Violate Rights" (https://www.washingtonpost.com/wp-dyn/content/article/2009/09/30/AR2009093001723.html). *The Washington Post*. Retrieved February 19, 2010. "... the 5 to 4 opinion in *District of Columbia v. Heller* did not address the question of whether the Second Amendment extends beyond the federal government and federal enclaves such as District of Columbia."
4. 478 F.3d 370 (https://law.justia.com/cases/federal/appellate-courts/F3/478/370/473051/) (D.C. Cir. 2007), *cert. denied*, 128 S. Ct. 2994 (2008)
5. *Misc. order Certiorari Denied p.2 (https://www.supremecourt.gov/orders/courtorders/062708pzr.pdf)*; Court: A constitutional right to a gun (http://www.scotusblog.com/wp/court-a-constitutional-right-to-a-gun)
6. Liptak, Adam (December 3, 2007). "Carefully Plotted Course Propels Gun Case to Top" (https://www.nytimes.com/2007/12/03/us/03bar.html). *The New York Times*. Retrieved February 19, 2010.
7. Duggan, Paul (March 18, 2007). "Lawyer Who Wiped Out D.C. Ban Says It's About Liberties, Not Guns" (https://www.washingtonpost.com/wp-dyn/content/article/2007/03/17/AR2007031701055.html). *The Washington Post*. Retrieved February 19, 2010.
8. Doherty 2009, pp. 29–30.
9. Mears, Bill (March 18, 2008). "Court decision on gun control is personal for 2 women" (http://www.cnn.com/2008/US/03/17/scotus.guns/index.html). CNN. Retrieved February 19, 2010.
10. Doherty 2009, pp. 30–31.
11. Palmer, Tom (March 14, 2008). *Tom Palmer talks about the DC gun ban on Reporter's Roundtable (http://www.cato.org/multimedia/video-highlights/tom-palmer-talks-about-dc-gun-ban-reporters-roundtable)*. Cato Institute. Event occurs at 1:20. Retrieved October 27, 2013.
12. Jaffe, Harry (March 2008). "DC Gun Rights: Do You Want This Next to Your Bed?" (http://www.washingtonian.com/2008/03/01/dc-gun-rights-do-you-want-this-next-to-your-bed). *Washingtonian*. Retrieved February 19, 2010.
13. Doherty 2009, pp. 35–37.
14. Doherty 2009, pp. 37–38.
15. Doherty 2009, pp. 34–35.
16. Doherty 2009, pp. 39–41.
17. Barnes, Robert; Nakamura, David (September 4, 2007). "D.C. Asks Supreme Court to Back Gun Ban" (https://www.washingtonpost.com/wp-dyn/content/article/2007/09/04/AR2007090400474.html). *The Washington Post*. Retrieved February 19, 2010.

18. *Parker v. D.C.*, 311 F. Supp. 2d 103 (https://www.leagle.com/decision/2004414311fsupp2d103140 4) (D.D.C. 2004).

19. Parker Opinion, *Opinion of the Court*, p. 57. "He simply contends that he is entitled to the possession of a 'functional' firearm to be employed in case of a threat to life or limb. The District responds that, notwithstanding the broad language of the Code, a judge would likely give the statute a narrowing construction when confronted with a self-defense justification. That might be so, but judicial lenity cannot make up for the unreasonable restriction of a constitutional right. Section 7-2507.02, like the bar on carrying a pistol within the home, amounts to a complete prohibition on the lawful use of handguns for self-defense. As such, we hold it unconstitutional."

20. Page III-17 of dissent.

21. "Petition for rehearing en banc for the District of Columbia" (http://www.scotusblog.com/movablety pe/archives/Parker%20rehearing%20denial.pdf) (PDF). Retrieved October 29, 2020 – via SCOTUSblog.com.

22. Cert. granted, *District of Columbia v. Heller* 128 S. Ct. 645 (2007).

23. Coyle, Marcia (March 10, 2008). "Amicus Briefs Are Ammo for Supreme Court Gun Case" (https:// web.archive.org/web/20080315014352/http://www.law.com/jsp/article.jsp?id=1205146037339). *The National Law Journal*. Archived from the original (http://www.law.com/jsp/article.jsp?id=12051 46037339) on March 15, 2008. Retrieved March 11, 2008.

24. Barnes, Robert (February 9, 2008). "Cheney Joins Congress In Opposing D.C. Gun Ban; Vice President Breaks With Administration" (https://www.washingtonpost.com/wp-dyn/content/article/20 08/02/08/AR2008020803802.html?hpid=topnews). *The Washington Post*.

25. "Stephen Halbrook amicus brief" (http://www.gurapossessky.com/news/parker/documents/07-290 bsacMembersUSSenate.pdf) (PDF). Retrieved February 26, 2008.

26. "US Supreme Court in historic hearing on gun laws" (https://web.archive.org/web/2011031015561 0/http://afp.google.com/article/ALeqM5jzed0VxlZG6lVkzLYze5m5z012iw). AFP. March 18, 2008. Archived from the original (http://afp.google.com/article/ALeqM5jzed0VxlZG6lVkzLYze5m5z012iw) on March 10, 2011. Retrieved March 18, 2008.

27. "D.C. Gun Ban Critic: Court Must Clarify Constitution" (https://www.npr.org/templates/story/story.p hp?storyId=88251874). NPR.

28. "Amicus brief of 31 States" (https://web.archive.org/web/20080414053616/http://www.gurapposses sky.com/news/parker/documents/07-290bsacTexas.pdf) (PDF). p. 36. Archived from the original on April 14, 2008. Retrieved February 27, 2008.

29. McKee, Jennifer (February 13, 2008). "State signs gun rights brief" (https://web.archive.org/web/2 0080918050101/http://www.missoulian.com/articles/2008/02/13/news/local/znews02.txt). *Missoulian*. Archived from the original (https://www.missoulian.com/articles/2008/02/13/news/local/ znews02.txt) on September 18, 2008. Retrieved February 22, 2008.

30. "Hutchison, Abbott Fight For Gun Rights" (http://www.kxan.com/Global/story.asp?s=7861398). KXAN-TV.

31. "International Law Enforcement Educators and Trainers Association" (http://www.scotusblog.com/ wp/wp-content/uploads/2008/02/07-290bsacreprintintllawenforcementeducatorstrainers.pdf) (PDF). Retrieved February 24, 2008 – via SCOTUSblog.com.

32. "U.S. Department of Justice brief" (http://www.gurapossessky.com/news/parker/documents/07-290 tsacUnitedStates.pdf) (PDF). Retrieved February 26, 2008.

33. "Amicus States" (http://www.scotusblog.com/wp/wp-content/uploads/2008/01/07-290_amicus_stat es.pdf) (PDF). Retrieved February 24, 2008 – via SCOTUSblog.com.

34. "Amicus coalition" (http://www.scotusblog.com/wp/wp-content/uploads/2008/01/07-290_amicus_c oalition.pdf) (PDF). Retrieved February 24, 2008 – via SCOTUSblog.com.

35. "Amicus Cities" (http://www.scotusblog.com/wp/wp-content/uploads/2008/01/07-290_amicus_citie s.pdf) (PDF). Retrieved February 24, 2008 – via SCOTUSblog.com.

36. "Amicus Brady Center" (http://www.scotusblog.com/wp/wp-content/uploads/2008/01/07-290_amic us_brady_center.pdf) (PDF). Retrieved February 24, 2008 – via SCOTUSblog.com.

37. "Brief Amicus Curiae of Organizations and Scholars Correcting Myths and Misrepresentations Commonly Deployed by Opponents of an Individual-Rights-Based Interpretation of the Second Amendment in Support of Respondent" (https://web.archive.org/web/20130531235429/http://www. gurapossessky.com/news/parker/documents/07-290bsacCitizensCommittee.pdf) (PDF). Archived from the original (http://www.gurapossessky.com/news/parker/documents/07-290bsacCitizensCo mmittee.pdf) (PDF) on May 31, 2013.

38. "Oral Arguments of Case No. 07-290" (https://web.archive.org/web/20100528173702/http://www.s upremecourt.gov/oral_arguments/argument_transcripts/07-290.pdf) (PDF). United States Supreme Court. March 18, 2008. Archived from the original (https://www.supremecourt.gov/oral_a rguments/argument_transcripts/07-290.pdf) (PDF) on May 28, 2010. Retrieved March 18, 2008.

39. "District Columbia Heller Oral Argument" (https://www.c-span.org/video/?204466-1/district-columbi a-v-heller-oral-argument). *C-SPAN*. March 18, 2008.

40. Barnes, Robert (March 5, 2008). "Supreme Court to Release Same-Day Tapes" (https://www.wash ingtonpost.com/wp-dyn/content/article/2008/03/04/AR2008030402005.html). *The Washington Post*. p. B03. Retrieved March 5, 2008.

41. "D.C. v. Heller" (https://web.archive.org/web/20090101095307/http://www.scotuswiki.com/index.ph p?title=DC_v._Heller). *Scotuswiki*. Archived from the original (http://www.scotuswiki.com/index.ph p?title=DC_v._Heller) on January 1, 2009. Retrieved March 19, 2008.

42. Emerling, Gary (January 5, 2008). "Fenty arms self with new lawyer to defend gun ban" (http://ww w.washingtontimes.com/apps/pbcs.dll/article?AID=/20080105/METRO/682529164/1004&template =printart). *Washington Times*.

43. Greenhouse, Linda (October 21, 2007). "Justices to Decide on Right to Keep Handgun" (https://w ww.nytimes.com/2007/11/21/us/21scotus.html?pagewanted=print). *The New York Times*. Retrieved March 18, 2008.

44. "About Us" (https://web.archive.org/web/20080108053359/http://dcguncase.com/blog/about-us/). *DCGunCase.com*. Archived from the original (http://dcguncase.com/blog/about-us/) on January 8, 2008. Retrieved January 10, 2008.

45. "Supreme Court Dared to Uphold Handgun Ban by Man Who Has None" (https://web.archive.org/ web/20090122224028/http://www.bloomberg.com/apps/news?pid=20601103). *Bloomberg*. February 19, 2008. Archived from the original (https://www.bloomberg.com/apps/news?pid=20601 103&sid=atP8CmD4vVfg&refer=us) on January 22, 2009. Retrieved February 20, 2008.

46. Heller Opinion, *Opinion of the Court*, pp. 1–3.

47. Heller Opinion, *Opinion of the Court*, p. 3.

48. "People v. Aguilar, 2013 IL 112116" (https://web.archive.org/web/20140611110947/http://www.stat e.il.us/court/Opinions/SupremeCourt/2013/112116.pdf) (PDF). Illinois Supreme Court. September 12, 2013. pp. 5–6. Archived from the original (http://www.state.il.us/court/Opinions/SupremeCourt/ 2013/112116.pdf) (PDF) on June 11, 2014. Retrieved September 14, 2014.

49. Heller Opinion, *Opinion of the Court*, p. 54.

50. Heller Opinion, *Opinion of the Court*, p. 55.

51. Heller Opinion, *Opinion of the Court*, pp. 56–57.

52. Heller Opinion, *Opinion of the Court*, p. 62.

53. Greenhouse, Linda (June 27, 2008). "Justices Rule for Individual Gun Rights" (https://www.nytime s.com/2008/06/27/washington/27scotuscnd.html?pagewanted=1&_r=1&hp&adxnnlx=1214566644 -y9NRsbBuErVCPyegbU0ryg). *The New York Times*. Retrieved June 27, 2008.

54. Heller Opinion, *Breyer, J., dissenting*, p. 42.

55. Mauro, Tony (July 30, 2007). "Both Sides Fear Firing Blanks if D.C. Gun Case Reaches High Court" (https://web.archive.org/web/20080724101924/http://www.legaltimes.com/). *Legal Times*. Archived from the original (http://www.law.com/jsp/article.jsp?id=1185527215310) on July 24, 2008. Retrieved October 29, 2020.

56. Weiss, Debra Cassens (July 30, 2007). "NRA Had High Court Misgivings" (http://www.abajournal.com/news/article/nra_had_high_court_misgivings/). *ABA Journal*. Retrieved October 31, 2020.

57. Levy, Robert (April 3, 2007). "Should Congress or the Courts Decide D.C. Gun Ban's Fate?" (http://www.cato.org/publications/commentary/should-congress-or-courts-decide-dc-gun-bans-fate). *DC Examiner*. Retrieved October 27, 2013.

58. McArdle, Elaine. "Lawyers, Guns and Money" (https://web.archive.org/web/20071218200333/http://www.law.harvard.edu/alumni/bulletin/2007/summer/feature_3.php). *Harvard Law Bulletin*. Archived from the original (http://www.law.harvard.edu/alumni/bulletin/2007/summer/feature_3.php) on December 18, 2007. Retrieved November 1, 2020.

59. Rubin, Jennifer (March 29, 2007). "Opening Shots" (https://web.archive.org/web/20070412220051/http://article.nationalreview.com/?q=NjQzZTY2NzQ5MmFhOWIxZGQ2NjUwMGY5YzVlZTUwYzM%3D). *National Review Online*. Archived from the original (http://article.nationalreview.com/?q=NjQzZTY2NzQ5MmFhOWIxZGQ2NjUwMGY5YzVlZTUwYzM=) on April 12, 2007.

60. "NRA Targets San Francisco, Chicago" (https://web.archive.org/web/20080929091308/https://www.cbsnews.com/stories/2008/06/27/national/main4216152.shtml). *CBS News*. June 27, 2008. Archived from the original (http://www.cbsnews.com/stories/2008/06/27/national/main4216152.shtml) on September 29, 2008. Retrieved November 1, 2020.

61. "Washington Gun Ban Under Fire" (https://archive.today/20070609092030/http://ap.google.com/article/ALeqM5ilfPpSjPKLwSwZfD7tFDFDNi8PmQD8S2J27O0). Associated Press. Archived from the original (http://ap.google.com/article/ALeqM5ilfPpSjPKLwSwZfD7tFDFDNi8PmQD8S2J27O0) on June 9, 2007.

62. Helmke, Paul (November 20, 2008). "Taking Aim at Judicial Activism" (https://web.archive.org/web/20081128151046/http://www.bradycampaign.org/blog/2007/03/14/taking-aim-at-judicial-activism/). Brady Campaign to Prevent Gun Violence. Archived from the original (http://www.bradycampaign.org/blog/2007/03/14/taking-aim-at-judicial-activism/) on November 28, 2008.

63. "After Heller, The Gun Lobby's "Slippery Slope" Is Gone; Reasonable Regulations Ahead" (https://web.archive.org/web/20081029220132/http://www.bradycampaign.org/blog/?m=200806). Brady Campaign to Prevent Gun Violence. June 27, 2008. Archived from the original (http://www.bradycampaign.org/blog/?m=200806) on October 29, 2008.

64. Tribe, Laurence H. (March 4, 2008). "Sanity and the Second Amendment" (https://www.wsj.com/articles/SB120459428907209205?mod=opinion_main_commentaries). *The Wall Street Journal*. Retrieved November 1, 2020.

65. Chemerinsky, Erwin (March 14, 2007). "A Well-Regulated Right to Bear Arms" (https://www.washingtonpost.com/wp-dyn/content/article/2007/03/13/AR2007031301508.html). *The Washington Post*. Retrieved November 1, 2020.

66. Ferrara, Leigh (April 19, 2007). "Interview: The Way of the Gun" (https://www.motherjones.com/interview/2007/02/robert_levy.html). *Mother Jones*. Retrieved November 1, 2020.

67. Neily, Clark (September 8, 2008). "*District of Columbia v. Heller*: The Second Amendment Is Back, Baby" (https://www.cato.org/sites/cato.org/files/serials/files/supreme-court-review/2008/9/hellerneily_0.pdf) (PDF). Cato Institute. Retrieved November 1, 2020.

68. Posner, Richard A. (August 27, 2008). "In Defense of Looseness" (https://web.archive.org/web/20081028220233/http://www.tnr.com/booksarts/story.html?id=d2f38db8-3c8a-477e-bd0a-5bd56de0e7c0). *The New Republic*. Archived from the original (http://www.tnr.com/booksarts/story.html?id=d2f38db8-3c8a-477e-bd0a-5bd56de0e7c0) on October 28, 2008. Retrieved October 22, 2008.

69. Wilkinson 2009, p. 254.

70. Wilkinson 2009, pp. 322–323.

71. Gura, Allan (2009). "Heller and the Triumph of Originalist Judicial Engagement: A Response to Judge Harvie Wilkinson" (http://www.uclalawreview.org/pdf/56-5-3.pdf) (PDF). *UCLA Law Review*. **56**: 1129.

72. Winkler, Adam (January 2, 2009). "Adam Winkler: The New Second Amendment: A Bark Worse Than Its Right" (http://www.huffingtonpost.com/adam-winkler/the-new-second-amendment_b_154783.html). *Huffington Post*. Retrieved February 1, 2009.

73. Liptak, Adam (December 18, 2012). "Supreme Court Gun Ruling Doesn't Block Proposed Controls" (https://www.nytimes.com/2012/12/19/us/gun-plans-dont-conflict-with-justices-08-ruling.html?_r=0). *The New York Times*. Retrieved December 18, 2012.

74. "Protecting Strong Gun Laws: The Supreme Court Leaves Lower Court Victories Untouched" (https://giffords.org/lawcenter/gun-laws/second-amendment/protecting-gun-safety-laws-in-appellate-courts/). Giffords Law Center. May 31, 2019. Archived (https://web.archive.org/web/20200919095053/https://giffords.org/lawcenter/gun-laws/second-amendment/protecting-gun-safety-laws-in-appellate-courts/) from the original on September 19, 2020. Retrieved January 13, 2021.

75. "Post-Heller Litigation Summary" (https://web.archive.org/web/20201027224703/https://giffords.org/lawcenter/gun-laws/litigation/post-heller-litigation-summary/). Giffords Law Center. August 25, 2020. Archived from the original (https://giffords.org/lawcenter/gun-laws/litigation/post-heller-litigation-summary/) on October 27, 2020. Retrieved January 13, 2021.

76. Sarah Herman Peck (Congressional Research Service) (March 25, 2019). "Post-*Heller* Second Amendment Jurisprudence; here esspecially the Summary and pages 1-2 and 45-47" (https://web.archive.org/web/20201204070507/https://fas.sgp/crs/misc/R44618.pdf) (PDF). Congressional Research Service via Federation of American Scientists. Archived from the original (https://fas.org/sgp/crs/misc/R44618.pdf) (PDF) on December 4, 2020. Retrieved January 13, 2021.

77. "*District of Columbia v. Heller*" (http://supreme.justia.com/us/554/07-290/opinion.html). Supreme.justia.com. Retrieved August 30, 2010.

78. "United States District Court Southern District of New York case United States vs. Jason Arzberger (Case 1:08-cr-00894-AKH; Filed 12/31/2008), p. 24" (https://web.archive.org/web/20200331111334/http://www.volokh.com/files/arzberger.pdf) (PDF). The Volokh Conspiracy. Archived from the original (http://www.volokh.com/files/arzberger.pdf) (PDF) on March 31, 2020. Retrieved March 31, 2020.

79. Fields, Gary; Radnofsky, Louise (June 27, 2008). "Absence of Gun Shops Limits Ruling's Reach in Capital" (https://www.wsj.com/articles/SB121453058531709463). *The Wall Street Journal*. Retrieved June 27, 2008..

80. "United States District Court, District of Columbia case Heller v. District of Columbia (Civil Action No. 08-1289 (RMU), No. 23., 25) from March 26, 2010" (https://web.archive.org/web/20200331110004/https://www.leagle.com/decision/infdco20100329000t). Leagle.com. Archived from the original (http://www.leagle.com/unsecure/page.htm?shortname=infdco20100329000t) on March 31, 2020. Retrieved March 31, 2010.

81. "DC Rejects Handgun Application" (https://web.archive.org/web/20080718201434/http://www.wusa9.com/news/local/story.aspx?storyid=74036&catid=158). July 17, 2008. Archived from the original (http://www.wusa9.com/news/local/story.aspx?storyid=74036&catid=158) on July 18, 2008. Retrieved July 17, 2008. "Dick Heller is the man who brought the lawsuit against the District's 32-year-old ban on handguns. He was among the first in line Thursday morning to apply for a handgun permit. But when he tried to register his semi-automatic weapon, he says he was rejected."

82. Simmons, Greg (July 7, 2008). "D.C. Officials Weigh Keeping Semiautomatic Pistols Illegal After Blanket Handgun Ban is Struck Down" (http://www.foxnews.com/printer_friendly_story/0,3566,377 203,00.html). Fox News. Retrieved July 7, 2008.

83. "Firearms Registration Emergency Amendment Act of 2008" (https://web.archive.org/web/2010030 5135807/http://mpdc.dc.gov/mpdc/frames.asp?doc=%2Fmpdc%2Flib%2Fmpdc%2Finfo%2Fpdf% 2Ffirearms_act_17651.pdf) (PDF). District of Columbia Metropolitan Police Department. December 16, 2008. Archived from the original (http://mpdc.dc.gov/mpdc/frames.asp?doc=/mpdc/l ib/mpdc/info/pdf/firearms_act_17651.pdf) (PDF) on March 5, 2010. Retrieved March 8, 2010.

84. "Councilmember Phil Mendelson" (https://web.archive.org/web/20070808005435/http://www.dcco uncil.us/Mendelson/). DCCouncil.us. Archived from the original (http://www.dccouncil.us/mendelso n/) on August 8, 2007. Retrieved February 1, 2009.

85. "2008-06-26 Supreme Court of the United States case DISTRICT OF COLUMBIA v. HELLER (No. 07-290)" (https://web.archive.org/web/20200218195853/https://www.law.cornell.edu/supct/html/07 -290.ZO.html). Cornell Law School. Archived from the original (https://www.law.cornell.edu/supct/h tml/07-290.ZO.html#25ref) on February 18, 2020. Retrieved April 12, 2009.

86. Mullen, Jethro; Sutton, Joe (July 27, 2014). "Judge says Washington's ban on handguns in public is unconstitutional" (http://www.cnn.com/2014/07/27/justice/washington-gun-ruling/index.html). CNN. Retrieved November 1, 2020.

87. Tom G. Palmer v. District of Columbia, July 24, 2014 (docket entry 51 on July 26, 2014), case no. 1:09-cv-01482-FJS, U.S. District Court for the District of Columbia.

88. Memorandum - Decision and Order, pp. 16-17, Tom G. Palmer v. District of Columbia, July 24, 2014 (docket entry 51 on July 26, 2014), case no. 1:09-cv-01482-FJS, U.S. District Court for the District of Columbia (footnote omitted; bolded typeface in the original).

89. Stohr, Greg (June 26, 2008). "Individual Gun Rights Protected, Top U.S. Court Says" (https://web. archive.org/web/20090122224028/http://www.bloomberg.com/apps/news?pid=20601103). Bloomberg.com. Archived from the original (https://www.bloomberg.com/apps/news?pid=2060110 3&sid=aYY3yDLLiMQg&refer=us) on January 22, 2009. Retrieved June 27, 2008.

90. Liptak, Adam (June 27, 2008). "Coming Next, Court Fights on Guns in Cities" (https://www.nytime s.com/2008/06/27/washington/27guns.html). The New York Times. Retrieved June 30, 2008.

91. Lisberg, Adam (June 28, 2008). "Supreme Court ruling against D.C. gun laws may make New York next" (http://www.nydailynews.com/news/us_world/2008/06/26/2008-06-26_supreme_court_r uling_against_dc_gun_laws.html). New York Daily News. Retrieved July 5, 2008.

92. Hamblett, Mark (January 12, 2009). "Mandatory Restrictions Ruled Invalid in Porn Case" (http://w ww.law.com/jsp/article.jsp?id=1202427359812). New York Law Journal. Retrieved February 3, 2009.

93. "Links to new gun rights lawsuits | SCOTUSblog" (https://web.archive.org/web/20090109214004/h ttp://www.scotusblog.com/wp/links-to-new-gun-rights-lawsuits/print/). Archived from the original (ht tp://www.scotusblog.com/wp/links-to-new-gun-rights-lawsuits/print/) on January 9, 2009. Retrieved February 2, 2009.

94. "More Second Amendment cases" (https://web.archive.org/web/20090109005949/http://www.scot usblog.com/wp/more-second-amendment-cases/). SCOTUSblog. Archived from the original (htt p://www.scotusblog.com/wp/more-second-amendment-cases/) on January 9, 2009. Retrieved February 2, 2009.

95. "Chicago Handgun Ban Upheld" (https://web.archive.org/web/20090130050115/http://chicagoist.c om/2008/12/18/chicago_handgun_ban_upheld.php). Chicagoist. Archived from the original (http:// chicagoist.com/2008/12/18/chicago_handgun_ban_upheld.php) on January 30, 2009. Retrieved February 3, 2009.

96. Heller Opinion, Breyer, J., dissenting, p. 34. "Chicago has a law very similar to the District's, and many of its suburbs also ban handgun possession under most circumstances."

97. "NRA-ILA :: News Releases" (https://web.archive.org/web/20080915230142/http://www.nraila.org/News/Read/NewsReleases.aspx?ID=11317). September 15, 2008. Archived from the original (http://www.nraila.org/News/Read/NewsReleases.aspx?ID=11317) on September 15, 2008.

98. "NRA-ILA press release – Evanston Amends Gun Ban" (https://web.archive.org/web/20080909132550/http://www.nraila.org/legislation/read.aspx?id=4140). Archived from the original (http://www.nraila.org/Legislation/Read.aspx?ID=4140) on September 9, 2008.

99. "NRA-ILA press release – Winnetka, IL Repeals Draconian Handgun Ban Becomes Third Chicago Suburb to Drop Total Ban Since Supreme Court Ruling" (https://web.archive.org/web/20081226054234/http://www.nraila.org/News/Read/NewsReleases.aspx?ID=11844). Archived from the original (http://www.nraila.org/News/Read/NewsReleases.aspx?id=11844) on December 26, 2008.

100. Keen, Judy (September 10, 2008). "High court ruling triggers gun ban repeals, NRA suits" (https://www.usatoday.com/news/nation/2008-09-10-gunsbans_N.htm). USA Today. Retrieved January 31, 2009.

101. Channick, Robert (July 28, 2008). "Morton Grove repeals 27-year-old gun ban" (https://web.archive.org/web/20110511052728/http://articles.chicagotribune.com/). Chicago Tribune. Archived from the original (http://archives.chicagotribune.com/2008/jul/28/local/chi-morton-grove-guns-both-29jul29) on May 11, 2011. Retrieved February 1, 2009. "Morton Grove was the first city in the U.S. to completely outlaw all possession of handguns in 1981, repealed its handgun ban in response to the Heller decision."

102. "Wilmette Handgun Ban Dead, 7-0 Vote Repeals Law" (https://web.archive.org/web/20080802040706/http://www.wbbm780.com/Wilmette-Handgun-Ban-Dead--7-0-Vote-Repeals-Law/2650983). WBBM News Radio 780. CBS Radio Stations. July 23, 2008. Archived from the original (http://www.wbbm780.com/Wilmette-Handgun-Ban-Dead--7-0-Vote-Repeals-Law/2650983) on August 2, 2008. Retrieved February 1, 2009. "Wilmette also repealed its 19 year ban of handguns following the ruling. Village President Christopher Canning commented prior to the repeal, "The Village of Wilmette ordinance, as it is drafted and on the books today, would not withstand constitutional scrutiny, and therefore should be repealed." "

103. "Ezell v. Chicago" (http://media.ca7.uscourts.gov/cgi-bin/rssExec.pl?Submit=Display&Path=Y2011/D07-12/C:10-3525:J:Sykes:aut:T:op:N:729421:S:0). United States Courts. July 6, 2011. Retrieved July 26, 2017.

104. Egelko, Bob (January 14, 2009). "San Francisco Housing Authority settles gun lawsuit" (http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2009/01/14/BALM15A1SG.DTL&type=printable). SFGate.com. Retrieved January 16, 2009.

105. "Morris v. U.S. Army Corps of Engineers" (https://archive.org/details/gov.uscourts.idd.32180). Case No. 3:13-CV-00336-BLW. UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO. Retrieved January 12, 2014.

106. Stevens, John Paul (May 14, 2019). "The Court Failed on Gun Control" (https://www.theatlantic.com/ideas/archive/2019/05/john-paul-stevens-court-failed-gun-control/587272/). The Atlantic. Retrieved October 29, 2020.

107. Halbrook 2018, pp. 175–203.

108. Halbrook 2018, pp. 179–180.

109. Harris, Andrew (February 22, 2013). "Illinois' bid for rehearing of gun-carry appeal rejected" (https://web.archive.org/web/20131113033941/http://origin-www.bloomberg.com/apps/news?pid=conewsstory&tkr=STOCO1:US&sid=aXHg6J1OG9bE). Bloomberg News. Archived from the original (http://origin-www.bloomberg.com/apps/news?pid=conewsstory&tkr=STOCO1:US&sid=aXHg6J1OG9bE) on November 13, 2013. "The U.S. Court of Appeals in Denver today ruled the constitutional provision doesn't guarantee a right to carry a concealed firearm ..."

110. Kirkland, Michael (December 16, 2012). "Scalia: Right to bear arms is "not unlimited" " (https://we b.archive.org/web/20131113024300/http://www.upi.com/Top_News/US/2012/12/16/Scalia-in-08-Ri ght-to-bear-arms-is-not-unlimited/UPI-80201355648700/). UPI. Archived from the original (http://w ww.upi.com/Top_News/US/2012/12/16/Scalia-in-08-Right-to-bear-arms-is-not-unlimited/UPI-8020 1355648700/#ixzz2kUVeJdST) on November 13, 2013.

111. Henigan, Dennis (2009). *Lethal Logic: Exploding the myths that paralyze American gun policy* (htt ps://books.google.com/books?id=4DA2XtEHSBUC&pg=PA204). Potomac Books. p. 204. ISBN 978-1597973564.

112. Huebert, Jacob (2010). *Libertarianism Today* (https://books.google.com/books?id=cdiZqI5szwgC& pg=PA147). ABC-CLIO. p. 147. ISBN 978-0313377549.

113. Liptak, Adam (November 26, 2018). " 'It's a Long Story': Justice John Paul Stevens, 98, Is Publishing a Memoir" (https://web.archive.org/web/20210712122120/https://www.nytimes.com/20 18/11/26/us/politics/john-paul-stevens-memoir.html). *The New York Times*. Archived from the original (https://www.nytimes.com/2018/11/26/us/politics/john-paul-stevens-memoir.html) on July 12, 2021. Retrieved August 29, 2021.

114. Millhiser, Ian (April 26, 2021). "The Supreme Court will hear a major Second Amendment case that could gut US gun laws" (https://web.archive.org/web/20210825055425/https://www.vox.com/2 021/4/26/22364154/supreme-court-guns-second-amendment-new-york-state-rifle-corlett-shooting s-kavanaugh-barrett). *Vox*. Archived from the original (https://www.vox.com/2021/4/26/22364154/s upreme-court-guns-second-amendment-new-york-state-rifle-corlett-shootings-kavanaugh-barrett) on August 25, 2021. Retrieved April 26, 2021.

## Sources

- Doherty, Brian (February 25, 2009). *Gun Control on Trial: Inside the Supreme Court Battle over the Second Amendment* (https://archive.org/details/guncontrolontria0000dohe). Cato Institute. ISBN 978-1-933995-25-0.
- Halbrook, Stephen (2018). "Taking Heller Seriously: Where Has the Roberts Court Been, and Where is it Headed, on the Second Amendment?" (https://secureservercdn.net/198.71.233.51/ae 1.c83.myftpupload.com/law_review_articles/Taking_Heller_Seriously.pdf) (PDF). *Charleston Law Review*. **13**. Retrieved October 29, 2020.
- Wilkinson, J. Harvie (2009). "Of Guns, Abortions, and the Unraveling Rule of Law" (http://www.virg inialawreview.org/sites/virginialawreview.org/files/253.pdf) (PDF). *Virginia Law Review*. **95** (2): 253.
- **Heller Opinion**, "District of Columbia, et al., v. Dick Anthony Heller. 554 U.S. 570" (https://www.su premecourt.gov/opinions/07pdf/07-290.pdf) (PDF). United States Supreme Court. June 26, 2008. Retrieved February 19, 2010.
- **Parker Opinion**, "Shelly Parker, et al. v. District of Columbia and Adrian M. Fenty, Mayor of the District of Columbia, Case No. 04-7041" (http://pacer.cadc.uscourts.gov/docs/common/opinions/2 00703/04-7041a.pdf) (PDF). United States Court of Appeals for the District of Columbia Circuit. March 9, 2007. Retrieved February 12, 2008.

# External links

- 🔗 Works related to District of Columbia v. Heller at Wikisource
- Text of *District of Columbia v. Heller*, 554 U.S. 570 (2008) is available from: Cornell (https://www.la w.cornell.edu/supct/html/07-290.ZS.html) CourtListener (https://www.courtlistener.com/opinion/14 5777/district-of-columbia-v-heller/) Google Scholar (https://scholar.google.com/scholar_case?cas e=6484080926445491577) Justia (https://supreme.justia.com/cases/federal/us/554/57

0/)  Supreme Court (slip opinion) (archived) (https://web.archive.org/web/0/https://www.supremecourt.gov/opinions/07pdf/07-290.pdf)

- Archive of case pleadings, orders, and opinions. Maintained by Gura & Possessky P.L.L.C., plaintiff's counsel. (https://web.archive.org/web/20070928200456/http://www.gurapossessky.com/news/parker/pleadings.html)
- United States Department of Justice Solicitor General 1-11-2008 *amicus curiae* brief (http://www.scotusblog.com/wp/wp-content/uploads/2008/01/us-heller-brief-1-11-08.pdf)
- Audio commentary by Appellant's Attorney Clark Neily regarding his views on the Second Amendment, dated January 17, 2008 (https://web.archive.org/web/20110930081516/http://wamu.org/audio/nw/08/01/n12080117-19210.asx)
- Audio/visual recording of the arguments (RealMedia) (http://video.c-span.org/archive/sc/sc031808_2amendment.rm)
- Audio recording of the arguments (MP3) (https://www.oyez.org/cases/2000-2009/2007/2007_07_290/argument/)
- Harvard Law Review forum: Heller is a "Second Amendment Revolution" (http://hlrecord.org/2008/11/profs-district-of-columbia-v-heller-is-a-second-amendment-revolution/) in the *Harvard Law Record*
- CRS Report for Congress: *"District of Columbia v. Heller*: The Supreme Court and the Second Amendment" (https://web.archive.org/web/20110719173845/http://assets.opencrs.com/rpts/RL34446_20080905.pdf) (public domain – can be copied into article with citations)
- Summary of *District of Columbia v. Heller* (https://web.archive.org/web/20100311202937/http://www.lawnix.com/cases/dc-heller.html)

Retrieved from "https://en.wikipedia.org/w/index.php?title=District_of_Columbia_v._Heller&oldid=1174645624"

-

# District of Columbia v. Heller, 554 U.S. 570 (2008)

Overview    Opinions    Materials

| | | | |
|---|---|---|---|
| **Docket No.** | **Granted:** | **Argued:** | **Decided:** |
| 07-290 | November 20, 2007 | March 18, 2008 | June 26, 2008 |

## Annotation

**PRIMARY HOLDING**

Private citizens have the right under the Second Amendment to possess an ordinary type of weapon and use it for lawful, historically established situations such as self-defense in a home, even when there is no relationship to a local militia.

**Read More**

..........................................................................................................................................

## Syllabus

**SYLLABUS**
**OCTOBER TERM, 2007**
**DISTRICT OF COLUMBIA V. HELLER**

**SUPREME COURT OF THE UNITED STATES**

DISTRICT OF COLUMBIA et al. *v.* HELLER

certiorari to the united states court of appeals for the district of columbia circuit

No. 07–290.   Argued March 18, 2008—Decided June 26, 2008

District of Columbia law bans handgun possession by making it a crime to carry an unregistered firearm and prohibiting the registration of handguns; provides separately that no person may carry an unlicensed handgun, but authorizes the police chief to issue 1-year licenses; and requires residents to keep lawfully owned firearms unloaded and disassembled or bound by a trigger lock or similar device. Respondent Heller, a D. C. special policeman, applied to register a handgun he wished to keep at home, but the District refused. He filed this suit seeking, on Second Amendment grounds, to enjoin the city from enforcing the bar on handgun registration, the licensing requirement insofar as it prohibits carrying an unlicensed firearm in the home, and the trigger-lock requirement insofar as it prohibits the use of functional firearms in the home. The District Court dismissed the suit, but the D. C. Circuit reversed, holding that the Second Amendment protects an individual's right to possess firearms and that the city's total ban on handguns, as well as its requirement that firearms in the home be kept nonfunctional even when necessary for self-defense, violated that right.

*Held:*

1. The Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home. Pp. 2–53.

**Read More**

## Opinions

**Opinion (Scalia)**      Dissent (Stevens)      Dissent (Breyer)

Hear Opinion Announcement – June 26, 2008

**OPINION OF THE COURT**
**DISTRICT OF COLUMBIA V. HELLER**
**554 U. S. ____ (2008)**

**SUPREME COURT OF THE UNITED STATES**
**NO. 07-290**

DISTRICT OF COLUMBIA, et al., PETITIONERS *v.* DICK ANTHONY HELLER

on writ of certiorari to the united states court of appeals for the district of columbia circuit

[June 26, 2008]

Justice Scalia delivered the opinion of the Court.

We consider whether a District of Columbia prohibition on the possession of usable handguns in the home violates the Second Amendment to the Constitution.

I

The District of Columbia generally prohibits the possession of handguns. It is a crime to carry an unregistered firearm, and the registration of handguns is prohibited. See D. C. Code §§7–2501.01(12), 7–2502.01(a), 7–2502.02(a)(4) (2001). Wholly apart from that prohibition, no person may carry a handgun without a license, but the chief of police may issue licenses for 1-year periods. See §§22–4504(a), 22–4506. District of Columbia law also requires residents to keep their lawfully owned firearms, such as registered long guns, "unloaded and dissembled or bound by a trigger lock or similar device" unless they are located in a place of business or are being used for lawful recreational activities. See §7–2507.02.[Footnote 1]

Respondent Dick Heller is a D. C. special police officer authorized to carry a handgun while on duty at the Federal Judicial Center. He applied for a registration certificate for a handgun that he wished to keep at home, but the District refused. He thereafter filed a lawsuit in the Federal District Court for the District of Columbia seeking, on Second Amendment grounds, to enjoin the city from enforcing the bar on the registration of handguns, the licensing requirement insofar as it prohibits the carrying of a firearm in the home without a license, and the trigger-lock requirement insofar as it prohibits the use of "functional firearms within the home." App. 59a. The District Court dismissed respondent's complaint, see *Parker* v. *District of Columbia*, 311 F. Supp. 2d 103, 109 (2004). The Court of Appeals for the District of Columbia Circuit, construing his complaint as seeking the right to render a firearm operable and carry it about his home in that condition only when necessary for self-defense, [Footnote 2] reversed, see *Parker* v. *District of Columbia*, 478 F. 3d 370, 401 (2007). It held that the Second Amendment protects an individual right to possess firearms and that the city's total ban on handguns, as well as its requirement that firearms in the home be kept nonfunctional even when necessary for self-defense, violated that right. See *id.,* at 395, 399–401. The Court of Appeals directed the District Court to enter summary judgment for respondent.

We granted certiorari. 552 U. S. ____ (2007).

II

We turn first to the meaning of the Second Amendment.

A

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In interpreting this text, we are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *United States* v. *Sprague,* 282 U. S. 716, 731 (1931); see also *Gibbons* v. *Ogden,* 9 Wheat. 1, 188 (1824). Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.

The two sides in this case have set out very different interpretations of the Amendment. Petitioners and today's

dissenting Justices believe that it protects only the right to possess and carry a firearm in connection with militia service. See Brief for Petitioners 11–12; *post*, at 1 (Stevens, J., dissenting). Respondent argues that it protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home. See Brief for Respondent 2–4.

The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but rather announces a purpose. The Amendment could be rephrased, "Because a well regulated Militia is necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." See J. Tiffany, A Treatise on Government and Constitutional Law §585, p. 394 (1867); Brief for Professors of Linguistics and English as *Amici Curiae* 3 (hereinafter Linguists' Brief). Although this structure of the Second Amendment is unique in our Constitution, other legal documents of the founding era, particularly individual-rights provisions of state constitutions, commonly included a prefatory statement of purpose. See generally Volokh, The Commonplace Second Amendment, 73 N. Y. U. L. Rev. 793, 814– 821 (1998).

Logic demands that there be a link between the stated purpose and the command. The Second Amendment would be nonsensical if it read, "A well regulated Militia, being necessary to the security of a free State, the right of the people to petition for redress of grievances shall not be infringed." That requirement of logical connection may cause a prefatory clause to resolve an ambiguity in the operative clause ("The separation of church and state being an important objective, the teachings of canons shall have no place in our jurisprudence." The preface makes clear that the operative clause refers not to canons of interpretation but to clergymen.) But apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause. See F. Dwarris, A General Treatise on Statutes 268–269 (P. Potter ed. 1871) (hereinafter Dwarris); T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 42–45 (2d ed. 1874).[Footnote 3] " 'It is nothing unusual in acts ... for the enacting part to go beyond the preamble; the remedy often extends beyond the particular act or mischief which first suggested the necessity of the law.' " J. Bishop, Commentaries on Written Laws and Their Interpretation §51, p. 49 (1882) (quoting *Rex* v. *Marks*, 3 East, 157, 165 (K. B. 1802)). Therefore, while we will begin our textual analysis with the operative clause, we will return to the prefatory clause to ensure that our reading of the operative clause is consistent with the announced purpose.[Footnote 4]

1. Operative Clause.

a. "Right of the People." The first salient feature of the operative clause is that it codifies a "right of the people." The unamended Constitution and the Bill of Rights use the phrase "right of the people" two other times, in the First Amendment's Assembly-and-Petition Clause and in the Fourth Amendment's Search-and-Seizure Clause. The Ninth Amendment uses very similar terminology ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people"). All three of these instances unambiguously refer to individual rights, not "collective" rights, or rights that may be exercised only through participation in some corporate body.[Footnote 5]

Three provisions of the Constitution refer to "the people" in a context other than "rights"—the famous preamble ("We the people"), §2 of Article I (providing that "the people" will choose members of the House), and the Tenth Amendment (providing that those powers not given the Federal Government remain with "the States" or "the people"). Those provisions arguably refer to "the people" acting collectively—but they deal with the exercise or reservation of powers, not rights. Nowhere else in the Constitution does a "right" attributed to "the people" refer to anything other than an individual right.[Footnote 6]

What is more, in all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. As we said in *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 265 (1990):

" '[T]he people' seems to have been a term of art employed in select parts of the Constitution... . [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

This contrasts markedly with the phrase "the militia" in the prefatory clause. As we will describe below, the "militia" in colonial America consisted of a subset of "the people"—those who were male, able bodied, and within a

certain age range. Reading the Second Amendment as protecting only the right to "keep and bear Arms" in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as "the people."

We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.

b. "Keep and bear Arms." We move now from the holder of the right—"the people"—to the substance of the right: "to keep and bear Arms."

Before addressing the verbs "keep" and "bear," we interpret their object: "Arms." The 18th-century meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "weapons of offence, or armour of defence." 1 Dictionary of the English Language 107 (4th ed.) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary (1771); see also N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar).

The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity. For instance, Cunningham's legal dictionary gave as an example of usage: "Servants and labourers shall use bows and arrows on *Sundays*, &c. and not bear other arms." See also, *e.g.*, An Act for the trial of Negroes, 1797 Del. Laws ch. XLIII, §6, p. 104, in 1 First Laws of the State of Delaware 102, 104 (J. Cushing ed. 1981 (pt. 1)); see generally *State* v. *Duke*, 42 Tex. 455, 458 (1874) (citing decisions of state courts construing "arms"). Although one founding-era thesaurus limited "arms" (as opposed to "weapons") to "instruments of offence *generally* made use of in war," even that source stated that all firearms constituted "arms." 1 J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (1794) (emphasis added).

Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, *e.g.*, *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 849 (1997), and the Fourth Amendment applies to modern forms of search, *e.g.*, *Kyllo* v. *United States*, 533 U. S. 27, 35–36 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.

We turn to the phrases "keep arms" and "bear arms." Johnson defined "keep" as, most relevantly, "[t]o retain; not to lose," and "[t]o have in custody." Johnson 1095. Webster defined it as "[t]o hold; to retain in one's power or possession." No party has apprised us of an idiomatic meaning of "keep Arms." Thus, the most natural reading of "keep Arms" in the Second Amendment is to "have weapons."

The phrase "keep arms" was not prevalent in the written documents of the founding period that we have found, but there are a few examples, all of which favor viewing the right to "keep Arms" as an individual right unconnected with militia service. William Blackstone, for example, wrote that Catholics convicted of not attending service in the Church of England suffered certain penalties, one of which was that they were not permitted to "keep arms in their houses." 4 Commentaries on the Laws of England 55 (1769) (hereinafter Blackstone); see also 1 W. & M., c. 15, §4, in 3 Eng. Stat. at Large 422 (1689) ("[N]o Papist ... shall or may have or keep in his House ... any Arms ... "); 1 Hawkins, Treatise on the Pleas of the Crown 26 (1771) (similar). Petitioners point to militia laws of the founding period that required militia members to "keep" arms in connection with militia service, and they conclude from this that the phrase "keep Arms" has a militia-related connotation. See Brief for Petitioners 16–17 (citing laws of Delaware, New Jersey, and Virginia). This is rather like saying that, since there are many statutes that authorize aggrieved employees to "file complaints" with federal agencies, the phrase "file complaints" has an employment-related connotation. "Keep arms" was simply a common way of referring to possessing arms, for militiamen *and everyone else.[Footnote 7]*

At the time of the founding, as now, to "bear" meant to "carry." See Johnson 161; Webster; T. Sheridan, A Complete Dictionary of the English Language (1796); 2 Oxford English Dictionary 20 (2d ed. 1989) (hereinafter Oxford). When used with "arms," however, the term has a meaning that refers to carrying for a particular purpose —confrontation. In *Muscarello* v. *United States*, 524 U. S. 125 (1998), in the course of analyzing the meaning of "carries a firearm" in a federal criminal statute, Justice Ginsburg wrote that "[s]urely a most familiar meaning is, as the Constitution's Second Amendment ... indicate[s]: 'wear, bear, or carry ... upon the person or in the clothing

as the Constitution's Second Amendment ... indicate[s]: "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.' " *Id.*, at 143 (dissenting opinion) (quoting Black's Law Dictionary 214 (6th ed. 1998)). We think that Justice Ginsburg accurately captured the natural meaning of "bear arms." Although the phrase implies that the carrying of the weapon is for the purpose of "offensive or defensive action," it in no way connotes participation in a structured military organization.

From our review of founding-era sources, we conclude that this natural meaning was also the meaning that "bear arms" had in the 18th century. In numerous instances, "bear arms" was unambiguously used to refer to the carrying of weapons outside of an organized militia. The most prominent examples are those most relevant to the Second Amendment: Nine state constitutional provisions written in the 18th century or the first two decades of the 19th, which enshrined a right of citizens to "bear arms in defense of themselves and the state" or "bear arms in defense of himself and the state." [Footnote 8] It is clear from those formulations that "bear arms" did not refer only to carrying a weapon in an organized military unit. Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right, for example, as a recognition of the natural right of defense "of one's person or house"—what he called the law of "self preservation." 2 Collected Works of James Wilson 1142, and n. x (K. Hall & M. Hall eds. 2007) (citing Pa. Const., Art. IX, §21 (1790)); see also T. Walker, Introduction to American Law 198 (1837) ("Thus the right of self-defence [is] guaranteed by the [Ohio] constitution"); see also *id.*, at 157 (equating Second Amendment with that provision of the Ohio Constitution). That was also the interpretation of those state constitutional provisions adopted by pre-Civil War state courts.[Footnote 9] These provisions demonstrate—again, in the most analogous linguistic context—that "bear arms" was not limited to the carrying of arms in a militia.

The phrase "bear Arms" also had at the time of the founding an idiomatic meaning that was significantly different from its natural meaning: "to serve as a soldier, do military service, fight" or "to wage war." See Linguists' Brief 18; *post*, at 11 (Stevens, J., dissenting). But it *unequivocally* bore that idiomatic meaning only when followed by the preposition "against," which was in turn followed by the target of the hostilities. See 2 Oxford 21. (That is how, for example, our Declaration of Independence ¶28, used the phrase: "He has constrained our fellow Citizens taken Captive on the high Seas to bear Arms against their Country ... .") Every example given by petitioners' *amici* for the idiomatic meaning of "bear arms" from the founding period either includes the preposition "against" or is not clearly idiomatic. See Linguists' Brief 18–23. Without the preposition, "bear arms" normally meant (as it continues to mean today) what Justice Ginsburg's opinion in *Muscarello* said.

In any event, the meaning of "bear arms" that petitioners and Justice Stevens propose is *not even* the (sometimes) idiomatic meaning. Rather, they manufacture a hybrid definition, whereby "bear arms" connotes the actual carrying of arms (and therefore is not really an idiom) but only in the service of an organized militia. No dictionary has ever adopted that definition, and we have been apprised of no source that indicates that it carried that meaning at the time of the founding. But it is easy to see why petitioners and the dissent are driven to the hybrid definition. Giving "bear Arms" its idiomatic meaning would cause the protected right to consist of the right to be a soldier or to wage war—an absurdity that no commentator has ever endorsed. See L. Levy, Origins of the Bill of Rights 135 (1999). Worse still, the phrase "keep and bear Arms" would be incoherent. The word "Arms" would have two different meanings at once: "weapons" (as the object of "keep") and (as the object of "bear") one-half of an idiom. It would be rather like saying "He filled and kicked the bucket" to mean "He filled the bucket and died." Grotesque.

Petitioners justify their limitation of "bear arms" to the military context by pointing out the unremarkable fact that it was often used in that context—the same mistake they made with respect to "keep arms." It is especially unremarkable that the phrase was often used in a military context in the federal legal sources (such as records of congressional debate) that have been the focus of petitioners' inquiry. Those sources would have had little occasion to use it *except* in discussions about the standing army and the militia. And the phrases used primarily in those military discussions include not only "bear arms" but also "carry arms," "possess arms," and "have arms"—though no one thinks that those *other* phrases also had special military meanings. See Barnett, Was the Right to Keep and Bear Arms Conditioned on Service in an Organized Militia?, 83 Tex. L. Rev. 237, 261 (2004). The common references to those "fit to bear arms" in congressional discussions about the militia are matched by use of the same phrase in the few nonmilitary federal contexts where the concept would be relevant. See, *e.g.*, 30 Journals of Continental Congress 349–351 (J. Fitzpatrick ed. 1934). Other legal sources frequently used "bear arms" in nonmilitary contexts.[Footnote 10] Cunningham's legal dictionary, cited above, gave as an example of its usage a sentence unrelated to military affairs ("Servants and labourers shall use bows and arrows on *Sundays*, &c. and not bear other arms"). And if one looks beyond legal sources, "bear arms" was frequently used in nonmilitary

and not bear other arms"). And if one looks beyond legal sources, "bear arms" was frequently used in nonmilitary contexts. See Cramer & Olson, What Did "Bear Arms" Mean in the Second Amendment?, 6 Georgetown J. L. & Pub. Pol'y (forthcoming Sept. 2008), online at http://papers.ssrn.com/abstract=1086176 (as visited June 24, 2008, and available in Clerk of Court's case file) (identifying numerous nonmilitary uses of "bear arms" from the founding period).

Justice Stevens points to a study by amici supposedly showing that the phrase "bear arms" was most frequently used in the military context. See post, at 12–13, n. 9; Linguists' Brief 24. Of course, as we have said, the fact that the phrase was commonly used in a particular context does not show that it is limited to that context, and, in any event, we have given many sources where the phrase was used in nonmilitary contexts. Moreover, the study's collection appears to include (who knows how many times) the idiomatic phrase "bear arms against," which is irrelevant. The amici also dismiss examples such as " 'bear arms ... for the purpose of killing game' " because those uses are "expressly qualified." Linguists' Brief 24. (Justice Stevens uses the same excuse for dismissing the state constitutional provisions analogous to the Second Amendment that identify private-use purposes for which the individual right can be asserted. See post, at 12.) That analysis is faulty. A purposive qualifying phrase that contradicts the word or phrase it modifies is unknown this side of the looking glass (except, apparently, in some courses on Linguistics). If "bear arms" means, as we think, simply the carrying of arms, a modifier can limit the purpose of the carriage ("for the purpose of self-defense" or "to wage war against the King"). But if "bear arms" means, as the petitioners and the dissent think, the carrying of arms only for military purposes, one simply cannot add "for the purpose of killing game." The right "to carry arms in the militia for the purpose of killing game" is worthy of the mad hatter. Thus, these purposive qualifying phrases positively establish that "to bear arms" is not limited to military use.[Footnote 11]

Justice Stevens places great weight on James Madison's inclusion of a conscientious-objector clause in his original draft of the Second Amendment: "but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person." Creating the Bill of Rights 12 (H. Veit, K. Bowling, & C. Bickford eds. 1991) (hereinafter Veit). He argues that this clause establishes that the drafters of the Second Amendment intended "bear Arms" to refer only to military service. See post, at 26. It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process.[Footnote 12] In any case, what Justice Stevens would conclude from the deleted provision does not follow. It was not meant to exempt from military service those who objected to going to war but had no scruples about personal gunfights. Quakers opposed the use of arms not just for military service, but for any violent purpose whatsoever—so much so that Quaker frontiersmen were forbidden to use arms to defend their families, even though "[i]n such circumstances the temptation to seize a hunting rifle or knife in self-defense ... must sometimes have been almost overwhelming." P. Brock, Pacifism in the United States 359 (1968); see M. Hirst, The Quakers in Peace and War 336–339 (1923); 3 T. Clarkson, Portraiture of Quakerism 103–104 (3d ed. 1807). The Pennsylvania Militia Act of 1757 exempted from service those "scrupling the use of arms"—a phrase that no one contends had an idiomatic meaning. See 5 Stat. at Large of Pa. 613 (J. Mitchell & H. Flanders eds. 1898) (emphasis added). Thus, the most natural interpretation of Madison's deleted text is that those opposed to carrying weapons for potential violent confrontation would not be "compelled to render military service," in which such carrying would be required. [Footnote 13]

Finally, Justice Stevens suggests that "keep and bear Arms" was some sort of term of art, presumably akin to "hue and cry" or "cease and desist." (This suggestion usefully evades the problem that there is no evidence whatsoever to support a military reading of "keep arms.") Justice Stevens believes that the unitary meaning of "keep and bear Arms" is established by the Second Amendment's calling it a "right" (singular) rather than "rights" (plural). See post, at 16. There is nothing to this. State constitutions of the founding period routinely grouped multiple (related) guarantees under a singular "right," and the First Amendment protects the "right [singular] of the people peaceably to assemble, and to petition the Government for a redress of grievances." See, e.g., Pa. Declaration of Rights §§IX, XII, XVI, in 5 Thorpe 3083–3084; Ohio Const., Arts. VIII, §§11, 19 (1802), in id., at 2910–2911.[Footnote 14] And even if "keep and bear Arms" were a unitary phrase, we find no evidence that it bore a military meaning. Although the phrase was not at all common (which would be unusual for a term of art), we have found instances of its use with a clearly nonmilitary connotation. In a 1780 debate in the House of Lords, for example, Lord Richmond described an order to disarm private citizens (not militia members) as "a violation of the constitutional right of Protestant subjects to keep and bear arms for their own defense." 49 The London Magazine or Gentleman's Monthly Intelligencer 467 (1780). In response, another member of Parliament referred to "the right of bearing arms for personal defence," making clear that no special military meaning for "keep and bear arms" was intended in the discussion. Id., at 467–468.[Footnote 15]

c. Meaning of the Operative Clause. Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed." As we said in *United States* v. *Cruikshank*, 92 U. S. 542, 553 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second amendment declares that it shall not be infringed … ."[Footnote 16]

Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents. See J. Malcolm, To Keep and Bear Arms 31–53 (1994) (hereinafter Malcolm); L. Schwoerer, The Declaration of Rights, 1689, p. 76 (1981). Under the auspices of the 1671 Game Act, for example, the Catholic James II had ordered general disarmaments of regions home to his Protestant enemies. See Malcolm 103–106. These experiences caused Englishmen to be extremely wary of concentrated military forces run by the state and to be jealous of their arms. They accordingly obtained an assurance from William and Mary, in the Declaration of Right (which was codified as the English Bill of Rights), that Protestants would never be disarmed: "That the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law." 1 W. & M., c. 2, §7, in 3 Eng. Stat. at Large 441 (1689). This right has long been understood to be the predecessor to our Second Amendment. See E. Dumbauld, The Bill of Rights and What It Means Today 51 (1957); W. Rawle, A View of the Constitution of the United States of America 122 (1825) (hereinafter Rawle). It was clearly an individual right, having nothing whatever to do with service in a militia. To be sure, it was an individual right not available to the whole population, given that it was restricted to Protestants, and like all written English rights it was held only against the Crown, not Parliament. See Schwoerer, To Hold and Bear Arms: The English Perspective, in Bogus 207, 218; but see 3 J. Story, Commentaries on the Constitution of the United States §1858 (1833) (hereinafter Story) (contending that the "right to bear arms" is a "limitatio[n] upon the power of parliament" as well). But it was secured to them as individuals, according to "libertarian political principles," not as members of a fighting force. Schwoerer, Declaration of Rights, at 283; see also *id.*, at 78; G. Jellinek, The Declaration of the Rights of Man and of Citizens 49, and n. 7 (1901) (reprinted 1979).

By the time of the founding, the right to have arms had become fundamental for English subjects. See Malcolm 122–134. Blackstone, whose works, we have said, "constituted the preeminent authority on English law for the founding generation," *Alden* v. *Maine*, 527 U. S. 706, 715 (1999), cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen. See 1 Blackstone 136, 139–140 (1765). His description of it cannot possibly be thought to tie it to militia or military service. It was, he said, "the natural right of resistance and self-preservation," *id.*, at 139, and "the right of having and using arms for self-preservation and defence," *id.*, at 140; see also 3 *id.*, at 2–4 (1768). Other contemporary authorities concurred. See G. Sharp, Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia 17–18, 27 (3d ed. 1782); 2 J. de Lolme, The Rise and Progress of the English Constitution 886–887 (1784) (A. Stephens ed. 1838); W. Blizard, Desultory Reflections on Police 59–60 (1785). Thus, the right secured in 1689 as a result of the Stuarts' abuses was by the time of the founding understood to be an individual right protecting against both public and private violence.

And, of course, what the Stuarts had tried to do to their political enemies, George III had tried to do to the colonists. In the tumultuous decades of the 1760's and 1770's, the Crown began to disarm the inhabitants of the most rebellious areas. That provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms. A New York article of April 1769 said that "[i]t is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence." A Journal of the Times: Mar. 17, New York Journal, Supp. 1, Apr. 13, 1769, in Boston Under Military Rule 79 (O. Dickerson ed. 1936); see also, *e.g.*, Shippen, Boston Gazette, Jan. 30, 1769, in 1 The Writings of Samuel Adams 299 (H. Cushing ed. 1968). They understood the right to enable individuals to defend themselves. As the most important early American edition of Blackstone's Commentaries (by the law professor and former Antifederalist St. George Tucker) made clear in the notes to the description of the arms right, Americans understood the "right of self-preservation" as permitting a citizen to "repe[l] force by force" when "the intervention of society in his behalf, may be too late to prevent an injury." 1 Blackstone's Commentaries 145–146, n. 42 (1803) (hereinafter Tucker's Blackstone). See also W. Duer, Outlines of the Constitutional Jurisprudence of the United States 31–32 (1833).

There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an

individual right to keep and bear arms. Of course the right was not unlimited, just as the First Amendment's right of free speech was not, see, *e.g.*, *United States* v. *Williams*, 553 U. S. ___ (2008). Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.* Before turning to limitations upon the individual right, however, we must determine whether the prefatory clause of the Second Amendment comports with our interpretation of the operative clause.

2. Prefatory Clause.

The prefatory clause reads: "A well regulated Militia, being necessary to the security of a free State ... ."

a. "Well-Regulated Militia." In *United States* v. *Miller*, 307 U. S. 174, 179 (1939), we explained that "the Militia comprised all males physically capable of acting in concert for the common defense." That definition comports with founding-era sources. See, *e.g.*, Webster ("The militia of a country are the able bodied men organized into companies, regiments and brigades ... and required by law to attend military exercises on certain days only, but at other times left to pursue their usual occupations"); The Federalist No. 46, pp. 329, 334 (B. Wright ed. 1961) (J. Madison) ("near half a million of citizens with arms in their hands"); Letter to Destutt de Tracy (Jan. 26, 1811), in The Portable Thomas Jefferson 520, 524 (M. Peterson ed. 1975) ("[T]he militia of the State, that is to say, of every man in it able to bear arms").

Petitioners take a seemingly narrower view of the militia, stating that "[m]ilitias are the state- and congressionally-regulated military forces described in the Militia Clauses (art. I, §8, cls. 15–16)." Brief for Petitioners 12. Although we agree with petitioners' interpretive assumption that "militia" means the same thing in Article I and the Second Amendment, we believe that petitioners identify the wrong thing, namely, the organized militia. Unlike armies and navies, which Congress is given the power to create ("to raise ... Armies"; "to provide ... a Navy," Art. I, §8, cls. 12–13), the militia is assumed by Article I already to be *in existence.* Congress is given the power to "provide for calling forth the militia," §8, cl. 15; and the power not to create, but to "organiz[e]" it—and not to organize "a" militia, which is what one would expect if the militia were to be a federal creation, but to organize "the" militia, connoting a body already in existence, *ibid.*, cl. 16. This is fully consistent with the ordinary definition of the militia as all able-bodied men. From that pool, Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first militia Act, which specified that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." Act of May 8, 1792, 1 Stat. 271. To be sure, Congress need not conscript every able-bodied man into the militia, because nothing in Article I suggests that in exercising its power to organize, discipline, and arm the militia, Congress must focus upon the entire body. Although the militia consists of all able-bodied men, the federally organized militia may consist of a subset of them.

Finally, the adjective "well-regulated" implies nothing more than the imposition of proper discipline and training. See Johnson 1619 ("Regulate": "To adjust by rule or method"); Rawle 121–122; cf. Va. Declaration of Rights §13 (1776), in 7 Thorpe 3812, 3814 (referring to "a well-regulated militia, composed of the body of the people, trained to arms").

b. "Security of a Free State." The phrase "security of a free state" meant "security of a free polity," not security of each of the several States as the dissent below argued, see 478 F. 3d, at 405, and n. 10. Joseph Story wrote in his treatise on the Constitution that "the word 'state' is used in various senses [and in] its most enlarged sense, it means the people composing a particular nation or community." 1 Story §208; see also 3 *id.*, §1890 (in reference to the Second Amendment's prefatory clause: "The militia is the natural defence of a free country"). It is true that the term "State" elsewhere in the Constitution refers to individual States, but the phrase "security of a free state" and close variations seem to have been terms of art in 18th-century political discourse, meaning a " 'free country' " or free polity. See Volokh, "Necessary to the Security of a Free State," 83 Notre Dame L. Rev. 1, 5 (2007); see, *e.g.*, 4 Blackstone 151 (1769); Brutus Essay III (Nov. 15, 1787), in The Essential Antifederalist 251, 253 (W. Allen & G. Lloyd eds., 2d ed. 2002). Moreover, the other instances of "state" in the Constitution are typically accompanied by modifiers making clear that the reference is to the several States—"each state," "several states," "any state," "that state," "particular states," "one state," "no state." And the presence of the term "foreign state" in Article I and Article III shows that the word "state" did not have a single meaning in the Constitution.

There are many reasons why the militia was thought to be "necessary to the security of a free state." See 3 Story §1890. First, of course, it is useful in repelling invasions and suppressing insurrections. Second, it renders large

standing armies unnecessary—an argument that Alexander Hamilton made in favor of federal control over the militia. The Federalist No. 29, pp. 226, 227 (B. Wright ed. 1961) (A. Hamilton). Third, when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny.

3. Relationship between Prefatory Clause and   Operative Clause

   We reach the question, then: Does the preface fit with an operative clause that creates an individual right to keep and bear arms? It fits perfectly, once one knows the history that the founding generation knew and that we have described above. That history showed that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents. This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights.

   The debate with respect to the right to keep and bear arms, as with other guarantees in the Bill of Rights, was not over whether it was desirable (all agreed that it was) but over whether it needed to be codified in the Constitution. During the 1788 ratification debates, the fear that the federal government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric. See, e.g., Letters from The Federal Farmer III (Oct. 10, 1787), in 2 The Complete Anti-Federalist 234, 242 (H. Storing ed. 1981). John Smilie, for example, worried not only that Congress's "command of the militia" could be used to create a "select militia," or to have "no militia at all," but also, as a separate concern, that "[w]hen a select militia is formed; the people in general may be disarmed." 2 Documentary History of the Ratification of the Constitution 508–509 (M. Jensen ed. 1976) (hereinafter Documentary Hist.). Federalists responded that because Congress was given no power to abridge the ancient right of individuals to keep and bear arms, such a force could never oppress the people. See, e.g., A Pennsylvanian III (Feb. 20, 1788), in The Origin of the Second Amendment 275, 276 (D. Young ed., 2d ed. 2001) (hereinafter Young); White, To the Citizens of Virginia, Feb. 22, 1788, in id., at 280, 281; A Citizen of America, (Oct. 10, 1787) in id., at 38, 40; Remarks on the Amendments to the federal Constitution, Nov. 7, 1788, in id., at 556. It was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down.

   It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution. Justice Breyer's assertion that individual self-defense is merely a "subsidiary interest" of the right to keep and bear arms, see post, at 36, is profoundly mistaken. He bases that assertion solely upon the prologue—but that can only show that self-defense had little to do with the right's codification; it was the central component of the right itself.

   Besides ignoring the historical reality that the Second Amendment was not intended to lay down a "novel principl[e]" but rather codified a right "inherited from our English ancestors," Robertson v. Baldwin, 165 U. S. 275, 281 (1897), petitioners' interpretation does not even achieve the narrower purpose that prompted codification of the right. If, as they believe, the Second Amendment right is no more than the right to keep and use weapons as a member of an organized militia, see Brief for Petititioners 8—if, that is, the organized militia is the sole institutional beneficiary of the Second Amendment's guarantee—it does not assure the existence of a "citizens' militia" as a safeguard against tyranny. For Congress retains plenary authority to organize the militia, which must include the authority to say who will belong to the organized force.[Footnote 17] That is why the first Militia Act's requirement that only whites enroll caused States to amend their militia laws to exclude free blacks. See Siegel, The Federal Government's Power to Enact Color-Conscious Laws, 92 Nw. U. L. Rev. 477, 521–525 (1998). Thus, if petitioners are correct, the Second Amendment protects citizens' right to use a gun in an organization from which Congress has plenary authority to exclude them. It guarantees a select militia of the sort the Stuart kings found useful, but not the people's militia that was the concern of the founding generation.

B

   Our interpretation is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment. Four States adopted analogues to the Federal Second Amendment in the period between independence and the ratification of the Bill of Rights. Two of them—

Pennsylvania and Vermont—clearly adopted individual rights unconnected to militia service. Pennsylvania's Declaration of Rights of 1776 said: "That the people have a right to bear arms *for the defence of themselves*, and the state ... ." §XIII, in 5 Thorpe 3082, 3083 (emphasis added). In 1777, Vermont adopted the identical provision, except for inconsequential differences in punctuation and capitalization. See Vt. Const., ch. 1, §15, in 6 *id.*, at 3741.

North Carolina also codified a right to bear arms in 1776: "That the people have a right to bear arms, for the defence of the State ... ." Declaration of Rights §XVII, in *id.*, at 2787, 2788. This could plausibly be read to support only a right to bear arms in a militia—but that is a peculiar way to make the point in a constitution that elsewhere repeatedly mentions the militia explicitly. See §§14, 18, 35, in 5 *id.*, 2789, 2791, 2793. Many colonial statutes required individual arms-bearing for public-safety reasons—such as the 1770 Georgia law that "for the security and *defence of this province* from internal dangers and insurrections" required those men who qualified for militia duty individually "to carry fire arms" "to places of public worship." 19 Colonial Records of the State of Georgia 137–139 (A. Candler ed. 1911 (pt. 2)) (emphasis added). That broad public-safety understanding was the connotation given to the North Carolina right by that State's Supreme Court in 1843. See *State* v. *Huntly*, 3 Ired. 418, 422–423.

The 1780 Massachusetts Constitution presented another variation on the theme: "The people have a right to keep and to bear arms for the common defence... ." Pt. First, Art. XVII, in 3 Thorpe 1888, 1892. Once again, if one gives narrow meaning to the phrase "common defence" this can be thought to limit the right to the bearing of arms in a state-organized military force. But once again the State's highest court thought otherwise. Writing for the court in an 1825 libel case, Chief Justice Parker wrote: "The liberty of the press was to be unrestrained, but he who used it was to be responsible in cases of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction." *Commonwealth* v. *Blanding*, 20 Mass. 304, 313–314. The analogy makes no sense if firearms could not be used for any individual purpose at all. See also Kates, Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204, 244 (1983) (19th-century courts never read "common defence" to limit the use of weapons to militia service).

We therefore believe that the most likely reading of all four of these pre-Second Amendment state constitutional provisions is that they secured an individual right to bear arms for defensive purposes. Other States did not include rights to bear arms in their pre-1789 constitutions—although in Virginia a Second Amendment analogue was proposed (unsuccessfully) by Thomas Jefferson. (It read: "No freeman shall ever be debarred the use of arms [within his own lands or tenements]."[Footnote 18] 1 The Papers of Thomas Jefferson 344 (J. Boyd ed. 1950)).

Between 1789 and 1820, nine States adopted Second Amendment analogues. Four of them—Kentucky, Ohio, Indiana, and Missouri—referred to the right of the people to "bear arms in defence of themselves and the State." See n. 8, *supra*. Another three States—Mississippi, Connecticut, and Alabama—used the even more individualistic phrasing that each citizen has the "right to bear arms in defence of himself and the State." See *ibid.* Finally, two States—Tennessee and Maine—used the "common defence" language of Massachusetts. See Tenn. Const., Art. XI, §26 (1796), in 6 Thorpe 3414, 3424; Me. Const., Art. I, §16 (1819), in 3 *id.*, at 1646, 1648. That of the nine state constitutional protections for the right to bear arms enacted immediately after 1789 at least seven unequivocally protected an individual citizen's right to self-defense is strong evidence that that is how the founding generation conceived of the right. And with one possible exception that we discuss in Part II–D–2, 19th-century courts and commentators interpreted these state constitutional provisions to protect an individual right to use arms for self-defense. See n. 9, *supra*; *Simpson* v. *State*, 5 Yer. 356, 360 (Tenn. 1833).

The historical narrative that petitioners must endorse would thus treat the Federal Second Amendment as an odd outlier, protecting a right unknown in state constitutions or at English common law, based on little more than an overreading of the prefatory clause.

C

Justice Stevens relies on the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress. It is dubious to rely on such history to interpret a text that was widely understood to codify a pre-existing right, rather than to fashion a new one. But even assuming that this legislative history is relevant, Justice Stevens flatly misreads the historical record.

It is true, as Justice Stevens says, that there was concern that the Federal Government would abolish the institution of the state militia. See *post*, at 20. That concern found expression, however, *not* in the various Second Amendment precursors proposed in the State conventions, but in separate structural provisions that would have given the States concurrent and seemingly nonpre-emptible authority to organize, discipline, and arm the militia

given the States concurrent and seemingly nonpre-emptive authority to organize, discipline, and arm the militia when the Federal Government failed to do so. See Veit 17, 20 (Virginia proposal); 4 J. Eliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 244, 245 (2d ed. 1836) (reprinted 1941) (North Carolina proposal); see also 2 Documentary Hist. 624 (Pennsylvania minority's proposal). The Second Amendment precursors, by contrast, referred to the individual English right already codified in two (and probably four) State constitutions. The Federalist-dominated first Congress chose to reject virtually all major structural revisions favored by the Antifederalists, including the proposed militia amendments. Rather, it adopted primarily the popular and uncontroversial (though, in the Federalists' view, unnecessary) individual-rights amendments. The Second Amendment right, protecting only individuals' liberty to keep and carry arms, did nothing to assuage Antifederalists' concerns about federal control of the militia. See, *e.g.*, Centinel, Revived, No. XXIX, Philadelphia Independent Gazetteer, Sept. 9, 1789, in Young 711, 712.

Justice Stevens thinks it significant that the Virginia, New York, and North Carolina Second Amendment proposals were "embedded ... within a group of principles that are distinctly military in meaning," such as statements about the danger of standing armies. *Post*, at 22. But so was the highly influential minority proposal in Pennsylvania, yet that proposal, with its reference to hunting, plainly referred to an individual right. See 2 Documentary Hist. 624. Other than that erroneous point, Justice Stevens has brought forward absolutely no evidence that those proposals conferred only a right to carry arms in a militia. By contrast, New Hampshire's proposal, the Pennsylvania minority's proposal, and Samuel Adams' proposal in Massachusetts unequivocally referred to individual rights, as did two state constitutional provisions at the time. See Veit 16, 17 (New Hampshire proposal); 6 Documentary Hist. 1452, 1453 (J. Kaminski & G. Saladino eds. 2000) (Samuel Adams' proposal). Justice Stevens' view thus relies on the proposition, unsupported by any evidence, that different people of the founding period had vastly different conceptions of the right to keep and bear arms. That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties.

D

We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century. Before proceeding, however, we take issue with Justice Stevens' equating of these sources with postenactment legislative history, a comparison that betrays a fundamental misunderstanding of a court's interpretive task. See *post*, at 27, n. 28. "Legislative history," of course, refers to the pre-enactment statements of those who drafted or voted for a law; it is considered persuasive by some, not because they reflect the general understanding of the disputed terms, but because the legislators who heard or read those statements presumably voted with that understanding. *Ibid*. "Postenactment legislative history," *ibid.*, a deprecatory contradiction in terms, refers to statements of those who drafted or voted for the law that are made after its enactment and hence could have had no effect on the congressional vote. It most certainly does not refer to the examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification. That sort of inquiry is a critical tool of constitutional interpretation. As we will show, virtually all interpreters of the Second Amendment in the century after its enactment interpreted the amendment as we do.

1. Post-ratification Commentary

Three important founding-era legal scholars interpreted the Second Amendment in published writings. All three understood it to protect an individual right unconnected with militia service.

St. George Tucker's version of Blackstone's Commentaries, as we explained above, conceived of the Blackstonian arms right as necessary for self-defense. He equated that right, absent the religious and class-based restrictions, with the Second Amendment. See 2 Tucker's Blackstone 143. In Note D, entitled, "View of the Constitution of the United States," Tucker elaborated on the Second Amendment: "This may be considered as the true palladium of liberty ... . The right to self-defence is the first law of nature: in most governments it has been the study of rulers to confine the right within the narrowest limits possible. Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." 1 *id.*, at App. 300 (ellipsis in original). He believed that the English game laws had abridged the right by prohibiting "keeping a gun or other engine for the destruction of game." *Ibid*; see also 2 *id.*, at 143, and nn. 40 and 41. He later grouped the right with some of the individual rights included in the First Amendment and said that if "a law be passed by congress, prohibiting" any of those rights, it would "be the province of the judiciary to pronounce whether any such act were constitutional, or not; and if not, to acquit the accused ... ." 1 *id.*, at App. 357. It is unlikely that Tucker was referring to a person's being "accused" of violating

a law making it a crime to bear arms in a state militia.[Footnote 19]

In 1825, William Rawle, a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights, published an influential treatise, which analyzed the Second Amendment as follows:

"The first [principle] is a declaration that a well regulated militia is necessary to the security of a free state; a proposition from which few will dissent... .

"The corollary, from the first position is, that the right of the people to keep and bear arms shall not be infringed.

"The prohibition is general. No clause in the constitution could by any rule of construction be conceived to give to congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretence by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both." Rawle 121–122.[Footnote 20]

Like Tucker, Rawle regarded the English game laws as violating the right codified in the Second Amendment. See *id.*, 122–123. Rawle clearly differentiated between the people's right to bear arms and their service in a militia: "In a people permitted and accustomed to bear arms, we have the rudiments of a militia, which properly consists of armed citizens, divided into military bands, and instructed at least in part, in the use of arms for the purposes of war." *Id.*, at 140. Rawle further said that the Second Amendment right ought not "be abused to the disturbance of the public peace," such as by assembling with other armed individuals "for an unlawful purpose"—statements that make no sense if the right does not extend to *any* individual purpose.

Joseph Story published his famous Commentaries on the Constitution of the United States in 1833. Justice Stevens suggests that "[t]here is not so much as a whisper" in Story's explanation of the Second Amendment that favors the individual-rights view. *Post*, at 34. That is wrong. Story explained that the English Bill of Rights had also included a "right to bear arms," a right that, as we have discussed, had nothing to do with militia service. 3 Story §1858. He then equated the English right with the Second Amendment:

"§1891. A similar provision [to the Second Amendment] in favour of protestants (for to them it is confined) is to be found in the bill of rights of 1688, it being declared, 'that the subjects, which are protestants, may have arms for their defence suitable to their condition, and as allowed by law.' But under various pretences the effect of this provision has been greatly narrowed; and it is at present in England more nominal than real, as a defensive privilege." (Footnotes omitted.)

This comparison to the Declaration of Right would not make sense if the Second Amendment right was the right to use a gun in a militia, which was plainly not what the English right protected. As the Tennessee Supreme Court recognized 38 years after Story wrote his Commentaries, "[t]he passage from Story, shows clearly that this right was intended ... and was guaranteed to, and to be exercised and enjoyed by the citizen as such, and not by him as a soldier, or in defense solely of his political rights." *Andrews v. State*, 50 Tenn. 165, 183 (1871). Story's Commentaries also cite as support Tucker and Rawle, both of whom clearly viewed the right as unconnected to militia service. See 3 Story §1890, n. 2; §1891, n. 3. In addition, in a shorter 1840 work Story wrote: "One of the ordinary modes, by which tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offence to keep arms, and by substituting a regular army in the stead of a resort to the militia." A Familiar Exposition of the Constitution of the United States §450 (reprinted in 1986).

Antislavery advocates routinely invoked the right to bear arms for self-defense. Joel Tiffany, for example, citing Blackstone's description of the right, wrote that "the right to keep and bear arms, also implies the right to use them if necessary in self defence; without this right to use the guaranty would have hardly been worth the paper it consumed." A Treatise on the Unconstitutionality of American Slavery 117–118 (1849); see also L. Spooner, The Unconstitutionality of Slavery 116 (1845) (right enables "personal defence"). In his famous Senate speech about the 1856 "Bleeding Kansas" conflict, Charles Sumner proclaimed:

"The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defence, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached. And yet such is the madness of the hour, that, in defiance of the solemn guarantee, embodied in the Amendments to the Constitution, that 'the right of the people to keep and bear arms shall not be infringed,' the people of Kansas have been arraigned for keeping and bearing them, and the Senator from South Carolina has

had the face to say openly, on this floor, that they should be disarmed—of course, that the fanatics of Slavery, his allies and constituents, may meet no impediment." The Crime Against Kansas, May 19–20, 1856, in American Speeches: Political Oratory from the Revolution to the Civil War 553, 606–607 (2006).

We have found only one early 19th-century commentator who clearly conditioned the right to keep and bear arms upon service in the militia—and he recognized that the prevailing view was to the contrary. "The provision of the constitution, declaring the right of the people to keep and bear arms, &c. was probably intended to apply to the right of the people to bear arms for such [militia-related] purposes only, and not to prevent congress or the legislatures of the different states from enacting laws to prevent the citizens from always going armed. A different construction however has been given to it." B. Oliver, The Rights of an American Citizen 177 (1832).

2. Pre-Civil War Case Law

The 19th-century cases that interpreted the Second Amendment universally support an individual right unconnected to militia service. In *Houston* v. *Moore*, 5 Wheat. 1, 24 (1820), this Court held that States have concurrent power over the militia, at least where not pre-empted by Congress. Agreeing in dissent that States could "organize, discipline, and arm" the militia in the absence of conflicting federal regulation, Justice Story said that the Second Amendment "may not, perhaps, be thought to have any important bearing on this point. If it have, it confirms and illustrates, rather than impugns the reasoning already suggested." *Id.*, at 51–53. Of course, if the Amendment simply "protect[ed] the right of the people of each of the several States to maintain a well-regulated militia," *post*, at 1 (Stevens, J., dissenting), it would have enormous and obvious bearing on the point. But the Court and Story derived the States' power over the militia from the nonexclusive nature of federal power, not from the Second Amendment, whose preamble merely "confirms and illustrates" the importance of the militia. Even clearer was Justice Baldwin. In the famous fugitive-slave case of *Johnson* v. *Tompkins*, 13 F. Cas. 840, 850, 852 (CC Pa. 1833), Baldwin, sitting as a circuit judge, cited both the Second Amendment and the Pennsylvania analogue for his conclusion that a citizen has "a right to carry arms in defence of his property or person, and to use them, if either were assailed with such force, numbers or violence as made it necessary for the protection or safety of either."

Many early 19th-century state cases indicated that the Second Amendment right to bear arms was an individual right unconnected to militia service, though subject to certain restrictions. A Virginia case in 1824 holding that the Constitution did not extend to free blacks explained that "numerous restrictions imposed on [blacks] in our Statute Book, many of which are inconsistent with the letter and spirit of the Constitution, both of this State and of the United States as respects the free whites, demonstrate, that, here, those instruments have not been considered to extend equally to both classes of our population. We will only instance the restriction upon the migration of free blacks into this State, and upon their right to bear arms." *Aldridge* v. *Commonwealth*, 2 Va. Cas. 447, 449 (Gen. Ct.). The claim was obviously not that blacks were prevented from carrying guns in the militia. [Footnote 21] See also *Waters* v. *State*, 1 Gill 302, 309 (Md. 1843) (because free blacks were treated as a "dangerous population," "laws have been passed to prevent their migration into this State; to make it unlawful for them to bear arms; to guard even their religious assemblages with peculiar watchfulness"). An 1829 decision by the Supreme Court of Michigan said: "The constitution of the United States also grants to the citizen the right to keep and bear arms. But the grant of this privilege cannot be construed into the right in him who keeps a gun to destroy his neighbor. No rights are intended to be granted by the constitution for an unlawful or unjustifiable purpose." *United States* v. *Sheldon*, in 5 Transactions of the Supreme Court of the Territory of Michigan 337, 346 (W. Blume ed. 1940) (hereinafter Blume). It is not possible to read this as discussing anything other than an individual right unconnected to militia service. If it did have to do with militia service, the limitation upon it would not be any "unlawful or unjustifiable purpose," but any nonmilitary purpose whatsoever.

In *Nunn* v. *State*, 1 Ga. 243, 251 (1846), the Georgia Supreme Court construed the Second Amendment as protecting the "*natural* right of self-defence" and therefore struck down a ban on carrying pistols openly. Its opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause, in continuity with the English right:

"The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State. Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this *right*, originally belonging to our forefathers, trampled under foot by Charles I. and his two wicked sons and successors, re-established by the

revolution of 1688, conveyed to this land of liberty by the colonists, and finally incorporated conspicuously in our own Magna Charta!"

Likewise, in *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850), the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

Those who believe that the Second Amendment preserves only a militia-centered right place great reliance on the Tennessee Supreme Court's 1840 decision in *Aymette* v. *State*, 21 Tenn. 154. The case does not stand for that broad proposition; in fact, the case does not mention the word "militia" at all, except in its quoting of the Second Amendment. *Aymette* held that the state constitutional guarantee of the right to "bear" arms did not prohibit the banning of concealed weapons. The opinion first recognized that both the state right and the federal right were descendents of the 1689 English right, but (erroneously, and contrary to virtually all other authorities) read that right to refer only to "protect[ion of] the public liberty" and "keep[ing] in awe those in power," *id.*, at 158. The court then adopted a sort of middle position, whereby citizens were permitted to carry arms openly, unconnected with any service in a formal militia, but were given the right to use them only for the military purpose of banding together to oppose tyranny. This odd reading of the right is, to be sure, not the one we adopt—but it is not petitioners' reading either. More importantly, seven years earlier the Tennessee Supreme Court had treated the state constitutional provision as conferring a right "of all the free citizens of the State to keep and bear arms for their defence," *Simpson*, 5 Yer., at 360; and 21 years later the court held that the "keep" portion of the state constitutional right included the right to personal self-defense: "[T]he right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace." *Andrews*, 50 Tenn., at 178; see also *ibid.* (equating state provision with Second Amendment).

3. Post-Civil War Legislation.

In the aftermath of the Civil War, there was an outpouring of discussion of the Second Amendment in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves. See generally S. Halbrook, Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866–1876 (1998) (hereinafter Halbrook); Brief for Institute for Justice as *Amicus Curiae*. Since those discussions took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources. Yet those born and educated in the early 19th century faced a widespread effort to limit arms ownership by a large number of citizens; their understanding of the origins and continuing significance of the Amendment is instructive.

Blacks were routinely disarmed by Southern States after the Civil War. Those who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms. Needless to say, the claim was not that blacks were being prohibited from carrying arms in an organized state militia. A Report of the Commission of the Freedmen's Bureau in 1866 stated plainly: "[T]he civil law [of Kentucky] prohibits the colored man from bearing arms. . . . Their arms are taken from them by the civil authorities.... . Thus, the right of the people to keep and bear arms as provided in the Constitution is *infringed*." H. R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236. A joint congressional Report decried:

"in some parts of [South Carolina], armed parties are, without proper authority, engaged in seizing all fire-arms found in the hands of the freemen. Such conduct is in clear and direct violation of their personal rights as guaranteed by the Constitution of the United States, which declares that 'the right of the people to keep and bear arms shall not be infringed.' The freedmen of South Carolina have shown by their peaceful and orderly conduct that they can safely be trusted with fire-arms, and they need them to kill game for subsistence, and to protect their crops from destruction by birds and animals." Joint Comm. on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 229 (1866) (Proposed Circular of Brigadier General R. Saxton).

The view expressed in these statements was widely reported and was apparently widely held. For example, an editorial in The Loyal Georgian (Augusta) on February 3, 1866, assured blacks that "[a]ll men, without distinction of color, have the right to keep and bear arms to defend their homes, families or themselves." Halbrook 19.

Congress enacted the Freedmen's Bureau Act on July 16, 1866. Section 14 stated:

"[The right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal

[T]he right ... to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens ... without respect to race or color, or previous condition of slavery... ." 14 Stat. 176–177.

The understanding that the Second Amendment gave freed blacks the right to keep and bear arms was reflected in congressional discussion of the bill, with even an opponent of it saying that the founding generation "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense." Cong. Globe, 39th Cong., 1st Sess., 362, 371 (1866) (Sen. Davis).

Similar discussion attended the passage of the Civil Rights Act of 1871 and the Fourteenth Amendment. For example, Representative Butler said of the Act: "Section eight is intended to enforce the well-known constitutional provision guaranteeing the right of the citizen to 'keep and bear arms,' and provides that whoever shall take away, by force or violence, or by threats and intimidation, the arms and weapons which any person may have for his defense, shall be deemed guilty of larceny of the same." H. R. Rep. No. 37, 41st Cong., 3d Sess., pp. 7–8 (1871). With respect to the proposed Amendment, Senator Pomeroy described as one of the three "indispensable" "safeguards of liberty ... under the Constitution" a man's "right to bear arms for the defense of himself and family and his homestead." Cong. Globe, 39th Cong., 1st Sess., 1182 (1866). Representative Nye thought the Fourteenth Amendment unnecessary because "[a]s citizens of the United States [blacks] have equal right to protection, and to keep and bear arms for self-defense." *Id.*, at 1073 (1866).

It was plainly the understanding in the post-Civil War Congress that the Second Amendment protected an individual right to use arms for self-defense.

4. Post-Civil War Commentators.

Every late-19th-century legal scholar that we have read interpreted the Second Amendment to secure an individual right unconnected with militia service. The most famous was the judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations. Concerning the Second Amendment it said:

"Among the other defences to personal liberty should be mentioned the right of the people to keep and bear arms... . The alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms. How far it is in the power of the legislature to regulate this right, we shall not undertake to say, as happily there has been very little occasion to discuss that subject by the courts." *Id.*, at 350.

That Cooley understood the right not as connected to militia service, but as securing the militia by ensuring a populace familiar with arms, is made even clearer in his 1880 work, General Principles of Constitutional Law. The Second Amendment, he said, "was adopted with some modification and enlargement from the English Bill of Rights of 1688, where it stood as a protest against arbitrary action of the overturned dynasty in disarming the people." *Id.*, at 270. In a section entitled "The Right in General," he continued:

"It might be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. The militia, as has been elsewhere explained, consists of those persons who, under the law, are liable to the performance of military duty, and are officered and enrolled for service when called upon. But the law may make provision for the enrolment of all who are fit to perform military duty, or of a small number only, or it may wholly omit to make any provision at all; and if the right were limited to those enrolled, the purpose of this guaranty might be defeated altogether by the action or neglect to act of the government it was meant to hold in check. The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose. But this enables government to have a well-regulated militia; for to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." *Id.*, at 271.

All other post-Civil War 19th-century sources we have found concurred with Cooley. One example from each decade will convey the general flavor:

"[The purpose of the Second Amendment is] to secure a well-armed militia... . But a militia would be useless

unless the citizens were enabled to exercise themselves in the use of warlike weapons. To preserve this privilege, and to secure to the people the ability to oppose themselves in military force against the usurpations of government, as well as against enemies from without, that government is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms... . The clause is analogous to the one securing the freedom of speech and of the press. Freedom, not license, is secured; the fair use, not the libellous abuse, is protected." J. Pomeroy, An Introduction to the Constitutional Law of the United States 152–153 (1868) (hereinafter Pomeroy).

"As the Constitution of the United States, and the constitutions of several of the states, in terms more or less comprehensive, declare the right of the people to keep and bear arms, it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons, when not on a journey, or as travellers, from *wearing or carrying concealed weapons*, be constitutional. There has been a great difference of opinion on the question." 2 J. Kent, Commentaries on American Law *340, n. 2 (O. Holmes ed., 12th ed. 1873) (hereinafter Kent).

"Some general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war. The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right. No doubt, a person whose residence or duties involve peculiar peril may keep a pistol for prudent self-defence." B. Abbott, Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land 333 (1880) (hereinafter Abbott).

"The right to bear arms has always been the distinctive privilege of freemen. Aside from any necessity of self-protection to the person, it represents among all nations power coupled with the exercise of a certain jurisdiction. ... [I]t was not necessary that the right to bear arms should be granted in the Constitution, for it had always existed." J. Ordronaux, Constitutional Legislation in the United States 241–242 (1891).

E

We now ask whether any of our precedents forecloses the conclusions we have reached about the meaning of the Second Amendment.

*United States* v. *Cruikshank*, 92 U. S. 542, in the course of vacating the convictions of members of a white mob for depriving blacks of their right to keep and bear arms, held that the Second Amendment does not by its own force apply to anyone other than the Federal Government. The opinion explained that the right "is not a right granted by the Constitution [or] in any manner dependent upon that instrument for its existence. The second amendment ... means no more than that it shall not be infringed by Congress." 92 U. S., at 553. States, we said, were free to restrict or protect the right under their police powers. The limited discussion of the Second Amendment in *Cruikshank* supports, if anything, the individual-rights interpretation. There was no claim in *Cruikshank* that the victims had been deprived of their right to carry arms in a militia; indeed, the Governor had disbanded the local militia unit the year before the mob's attack, see C. Lane, The Day Freedom Died 62 (2008). We described the right protected by the Second Amendment as " 'bearing arms for a lawful purpose' "[Footnote 22] and said that "the people [must] look for their protection against any violation by their fellow-citizens of the rights it recognizes" to the States' police power. 92 U. S., at 553. That discussion makes little sense if it is only a right to bear arms in a state militia.[Footnote 23]

*Presser* v. *Illinois*, 116 U. S. 252 (1886), held that the right to keep and bear arms was not violated by a law that forbade "bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law." *Id.*, at 264–265. This does not refute the individual-rights interpretation of the Amendment; no one supporting that interpretation has contended that States may not ban such groups. Justice Stevens presses *Presser* into service to support his view that the right to bear arms is limited to service in the militia by joining *Presser's* brief discussion of the Second Amendment with a later portion of the opinion making the seemingly relevant (to the Second Amendment) point that the plaintiff was not a member of the state militia. Unfortunately for Justice Stevens' argument, that later portion deals with the *Fourteenth Amendment;* it was the *Fourteenth Amendment* to which the plaintiff's nonmembership in the militia was relevant. Thus, Justice Stevens' statement that *Presser* "suggested that... nothing in the Constitution protected the use of arms outside the context of a militia," *post*, at 40, is simply wrong. *Presser* said nothing about the Second Amendment's meaning or scope, beyond the fact that it does not prevent the prohibition of private paramilitary organizations.

Justice Stevens places overwhelming reliance upon this Court's decision in *United States* v. *Miller*, 307 U. S. 174

(1939). "[H]undreds of judges," we are told, "have relied on the view of the amendment we endorsed there," *post*, at 2, and "[e]ven if the textual and historical arguments on both side of the issue were evenly balanced, respect for the well-settled views of all of our predecessors on this Court, and for the rule of law itself ... would prevent most jurists from endorsing such a dramatic upheaval in the law," *post*, at 4. And what is, according to Justice Stevens, the holding of *Miller* that demands such obeisance? That the Second Amendment "protects the right to keep and bear arms for certain military purposes, but that it does not curtail the legislature's power to regulate the nonmilitary use and ownership of weapons." *Post*, at 2.

Nothing so clearly demonstrates the weakness of Justice Stevens' case. *Miller* did not hold that and cannot possibly be read to have held that. The judgment in the case upheld against a Second Amendment challenge two men's federal convictions for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act, 48 Stat. 1236. It is entirely clear that the Court's basis for saying that the Second Amendment did not apply was *not* that the defendants were "bear[ing] arms" not "for ... military purposes" but for "nonmilitary use," *post*, at 2. Rather, it was that the *type of weapon at issue* was not eligible for Second Amendment protection: "In the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument*." 307 U. S., at 178 (emphasis added). "Certainly," the Court continued, "it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." *Ibid.* Beyond that, the opinion provided no explanation of the content of the right.

This holding is not only consistent with, but positively suggests, that the Second Amendment confers an individual right to keep and bear arms (though only arms that "have some reasonable relationship to the preservation or efficiency of a well regulated militia"). Had the Court believed that the Second Amendment protects only those serving in the militia, it would have been odd to examine the character of the weapon rather than simply note that the two crooks were not militiamen. Justice Stevens can say again and again that *Miller* did "not turn on the difference between muskets and sawed-off shotguns, it turned, rather, on the basic difference between the military and nonmilitary use and possession of guns," *post*, at 42–43, but the words of the opinion prove otherwise. The most Justice Stevens can plausibly claim for *Miller* is that it declined to decide the nature of the Second Amendment right, despite the Solicitor General's argument (made in the alternative) that the right was collective, see Brief for United States, O. T. 1938, No. 696, pp. 4–5. *Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons.

It is particularly wrongheaded to read *Miller* for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment. Justice Stevens claims, *post*, at 42, that the opinion reached its conclusion "[a]fter reviewing many of the same sources that are discussed at greater length by the Court today." Not many, which was not entirely the Court's fault. The respondent made no appearance in the case, neither filing a brief nor appearing at oral argument; the Court heard from no one but the Government (reason enough, one would think, not to make that case the beginning and the end of this Court's consideration of the Second Amendment). See Frye, The Peculiar Story of *United States v. Miller*, 3 N. Y. U. J. L. & Liberty 48, 65–68 (2008). The Government's brief spent two pages discussing English legal sources, concluding "that at least the carrying of weapons without lawful occasion or excuse was always a crime" and that (because of the class-based restrictions and the prohibition on terrorizing people with dangerous or unusual weapons) "the early English law did not guarantee an unrestricted right to bear arms." Brief for United States, O. T. 1938, No. 696, at 9–11. It then went on to rely primarily on the discussion of the English right to bear arms in *Aymette* v. *State*, 21 Tenn. 154, for the proposition that the only uses of arms protected by the Second Amendment are those that relate to the militia, not self-defense. See Brief for United States, O. T. 1938, No. 696, at 12–18. The final section of the brief recognized that "some courts have said that the right to bear arms includes the right of the individual to have them for the protection of his person and property," and launched an alternative argument that "weapons which are commonly used by criminals," such as sawed-off shotguns, are not protected. See *id.*, at 18–21. The Government's *Miller* brief thus provided scant discussion of the history of the Second Amendment—and the Court was presented with no counterdiscussion. As for the text of the Court's opinion itself, that discusses *none* of the history of the Second Amendment. It assumes from the prologue that the Amendment was designed to preserve the militia, 307 U. S., at 178 (which we do not dispute), and then reviews some historical materials dealing with the nature of the militia, and in particular with the nature of the arms their members were expected to possess, *id.*, at 178–182. Not a word (*not a word*) about the history of the Second Amendment. This is the mighty rock upon which the dissent rests its case.[Footnote 24]

We may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits. Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller*'s "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U. S., at 179. The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." *State* v. *Kessler*, 289 Ore. 359, 368, 614 P. 2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6–15, 252–254 (1973)). Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface. We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right, see Part III, *infra.[Footnote 25]*

We conclude that nothing in our precedents forecloses our adoption of the original understanding of the Second Amendment. It should be unsurprising that such a significant matter has been for so long judicially unresolved. For most of our history, the Bill of Rights was not thought applicable to the States, and the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens. Other provisions of the Bill of Rights have similarly remained unilluminated for lengthy periods. This Court first held a law to violate the First Amendment's guarantee of freedom of speech in 1931, almost 150 years after the Amendment was ratified, see *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931), and it was not until after World War II that we held a law invalid under the Establishment Clause, see *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign Cty.*, 333 U. S. 203 (1948). Even a question as basic as the scope of proscribable libel was not addressed by this Court until 1964, nearly two centuries after the founding. See *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964). It is demonstrably not true that, as Justice Stevens claims, *post*, at 41–42, "for most of our history, the invalidity of Second-Amendment-based objections to firearms regulations has been well settled and uncontroversial." For most of our history the question did not present itself.

III

Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. See, *e.g.*, *Sheldon*, in 5 Blume 346; Rawle 123; Pomeroy 152–153; Abbott 333. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. See, *e.g.*, *State* v. *Chandler*, 5 La. Ann., at 489–490; *Nunn* v. *State*, 1 Ga., at 251; see generally 2 Kent *340, n. 2; The American Students' Blackstone 84, n. 11 (G. Chase ed. 1884). Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[Footnote 26]

We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U. S., at 179. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." See 4 Blackstone 148–149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New-York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). See also *State* v. *Langford*, 10 N. C. 381, 383–384 (1824); *O'Neill* v. *State*, 16 Ala. 65, 67 (1849); *English* v. *State*, 35 Tex. 473, 476 (1871); *State* v. *Lanier*, 71 N. C. 288, 289 (1874).

It may be objected that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said,

the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

IV

We turn finally to the law at issue here. As we have said, the law totally bans handgun possession in the home. It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable.

As the quotations earlier in this opinion demonstrate, the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights,[Footnote 27] banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," 478 F. 3d, at 400, would fail constitutional muster.

Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down. In *Nunn* v. *State*, the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). See 1 Ga., at 251. In *Andrews* v. *State*, the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," 50 Tenn., at 187, violated the state constitutional provision (which the court equated with the Second Amendment). That was so even though the statute did not restrict the carrying of long guns. *Ibid.* See also *State* v. *Reid*, 1 Ala. 612, 616–617 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional").

It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

We must also address the District's requirement (as applied to respondent's handgun) that firearms in the home be rendered and kept inoperable at all times. This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional. The District argues that we should interpret this element of the statute to contain an exception for self-defense. See Brief for Petitioners 56–57. But we think that is precluded by the unequivocal text, and by the presence of certain other enumerated exceptions: "Except for law enforcement personnel ... , each registrant shall keep any firearm in his possession unloaded and disassembled or bound by a trigger lock or similar device unless such firearm is kept at his place of business, or while being used for lawful recreational purposes within the District of Columbia." D. C. Code §7–2507.02. The nonexistence of a self-defense exception is also suggested by the D. C. Court of Appeals' statement that the statute forbids residents to use firearms to stop intruders, see *McIntosh* v. *Washington*, 395 A. 2d 744, 755–756 (1978).[Footnote 28]

Apart from his challenge to the handgun ban and the trigger-lock requirement respondent asked the District Court to enjoin petitioners from enforcing the separate licensing requirement "in such a manner as to forbid the carrying of a firearm within one's home or possessed land without a license." App. 59a. The Court of Appeals did not invalidate the licensing requirement, but held only that the District "may not prevent [a handgun] from being moved throughout one's house." 478 F. 3d, at 400. It then ordered the District Court to enter summary judgment "consistent with [respondent's] prayer for relief." *Id.*, at 401. Before this Court petitioners have stated that "if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, assuming he is not

otherwise disqualified," by which they apparently mean if he is not a felon and is not insane. Brief for Petitioners 58. Respondent conceded at oral argument that he does not "have a problem with ... licensing" and that the District's law is permissible so long as it is "not enforced in an arbitrary and capricious manner." Tr. of Oral Arg. 74–75. We therefore assume that petitioners' issuance of a license will satisfy respondent's prayer for relief and do not address the licensing requirement.

Justice Breyer has devoted most of his separate dissent to the handgun ban. He says that, even assuming the Second Amendment is a personal guarantee of the right to bear arms, the District's prohibition is valid. He first tries to establish this by founding-era historical precedent, pointing to various restrictive laws in the colonial period. These demonstrate, in his view, that the District's law "imposes a burden upon gun owners that seems proportionately no greater than restrictions in existence at the time the Second Amendment was adopted." *Post*, at 2. Of the laws he cites, only one offers even marginal support for his assertion. A 1783 Massachusetts law forbade the residents of Boston to "take into" or "receive into" "any Dwelling House, Stable, Barn, Out-house, Ware-house, Store, Shop or other Building" loaded firearms, and permitted the seizure of any loaded firearms that "shall be found" there. Act of Mar. 1, 1783, ch. 13, 1783 Mass. Acts p. 218. That statute's text and its prologue, which makes clear that the purpose of the prohibition was to eliminate the danger to firefighters posed by the "depositing of loaded Arms" in buildings, give reason to doubt that colonial Boston authorities would have enforced that general prohibition against someone who temporarily loaded a firearm to confront an intruder (despite the law's application in that case). In any case, we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home. The other laws Justice Breyer cites are gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. *Post*, at 6–7. Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns. Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents.

Justice Breyer points to other founding-era laws that he says "restricted the firing of guns within the city limits to at least some degree" in Boston, Philadelphia and New York. *Post*, at 4 (citing Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America, 25 Law & Hist. Rev. 139, 162 (2007)). Those laws provide no support for the severe restriction in the present case. The New York law levied a fine of 20 shillings on anyone who fired a gun in certain places (including houses) on New Year's Eve and the first two days of January, and was aimed at preventing the "great Damages ... frequently done on [those days] by persons going House to House, with Guns and other Firearms and being often intoxicated with Liquor." 5 Colonial Laws of New York 244–246 (1894). It is inconceivable that this law would have been enforced against a person exercising his right to self-defense on New Year's Day against such drunken hooligans. The Pennsylvania law to which Justice Breyer refers levied a fine of 5 shillings on one who fired a gun or set off fireworks in Philadelphia without first obtaining a license from the governor. See Act of Aug. 26, 1721, §4, in 3 Stat. at Large 253–254. Given Justice Wilson's explanation that the right to self-defense with arms was protected by the Pennsylvania Constitution, it is unlikely that this law (which in any event amounted to at most a licensing regime) would have been enforced against a person who used firearms for self-defense. Justice Breyer cites a Rhode Island law that simply levied a 5-shilling fine on those who fired guns in *streets* and *taverns*, a law obviously inapplicable to this case. See An Act for preventing Mischief being done in the town of Newport, or in any other town in this Government, 1731, Rhode Island Session Laws. Finally, Justice Breyer points to a Massachusetts law similar to the Pennsylvania law, prohibiting "discharg[ing] any Gun or Pistol charged with Shot or Ball in the Town of *Boston*." Act of May 28, 1746, ch. X, Acts and Laws of Mass. Bay 208. It is again implausible that this would have been enforced against a citizen acting in self-defense, particularly given its preambulatory reference to "the *indiscreet* firing of Guns." *Ibid.* (preamble) (emphasis added).

A broader point about the laws that Justice Breyer cites: All of them punished the discharge (or loading) of guns with a small fine and forfeiture of the weapon (or in a few cases a very brief stay in the local jail), not with significant criminal penalties.[Footnote 29] They are akin to modern penalties for minor public-safety infractions like speeding or jaywalking. And although such public-safety laws may not contain exceptions for self-defense, it is inconceivable that the threat of a jaywalking ticket would deter someone from disregarding a "Do Not Walk" sign in order to flee an attacker, or that the Government would enforce those laws under such circumstances. Likewise, we do not think that a law imposing a 5-shilling fine and forfeiture of the gun would have prevented a person in the founding era from using a gun to protect himself or his family from violence, or that if he did so the law would be enforced against him. The District law, by contrast, far from imposing a minor fine, threatens

law would be enforced against him. The District law, by contrast, far from imposing a minor fine, threatens citizens with a year in prison (five years for a second violation) for even obtaining a gun in the first place. See D. C. Code §7–2507.06.

Justice Breyer moves on to make a broad jurisprudential point: He criticizes us for declining to establish a level of scrutiny for evaluating Second Amendment restrictions. He proposes, explicitly at least, none of the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis), but rather a judge-empowering "interest-balancing inquiry" that "asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Post*, at 10. After an exhaustive discussion of the arguments for and against gun control, Justice Breyer arrives at his interest-balanced answer: because handgun violence is a problem, because the law is limited to an urban area, and because there were somewhat similar restrictions in the founding period (a false proposition that we have already discussed), the interest-balancing inquiry results in the constitutionality of the handgun ban. QED.

We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie. See *National Socialist Party of America* v. *Skokie*, 432 U. S. 43 (1977) (*per curiam*). The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest-balancing by the people—which Justice Breyer would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

Justice Breyer chides us for leaving so many applications of the right to keep and bear arms in doubt, and for not providing extensive historical justification for those regulations of the right that we describe as permissible. See *post*, at 42–43. But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field, any more than *Reynolds* v. *United States*, 98 U. S. 145 (1879), our first in-depth Free Exercise Clause case, left that area in a state of utter certainty. And there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.

In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense. Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home.

\*     \*     \*

We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, see *supra*, at 54–55, and n. 26. But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home. Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct.

We affirm the judgment of the Court of Appeals.

It is so ordered.

Footnote 1   There are minor exceptions to all of these prohibitions, none of which is relevant here.

Footnote 2   That construction has not been challenged here.

Footnote 2  That construction has not been challenged here.

Footnote 3  As Sutherland explains, the key 18th-century English case on the effect of preambles, *Copeman* v. *Gallant*, 1 P. Wms. 314, 24 Eng. Rep. 404 (1716), stated that "the preamble could not be used to restrict the effect of the words of the purview." J. Sutherland, Statutes and Statutory Construction, 47.04 (N. Singer ed. 5th ed. 1992). This rule was modified in England in an 1826 case to give more importance to the preamble, but in America "the settled principle of law is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms." *Ibid.*

Justice Stevens says that we violate the general rule that every clause in a statute must have effect. *Post*, at 8. But where the text of a clause itself indicates that it does not have operative effect, such as "whereas" clauses in federal legislation or the Constitution's preamble, a court has no license to make it do what it was not designed to do. Or to put the point differently, operative provisions should be given effect as operative provisions, and prologues as prologues.

Footnote 4  Justice Stevens criticizes us for discussing the prologue last. *Post*, at 8. But if a prologue can be used only to clarify an ambiguous operative provision, surely the first step must be to determine whether the operative provision is ambiguous. It might be argued, we suppose, that the prologue itself should be one of the factors that go into the determination of whether the operative provision is ambiguous—but that would cause the prologue to be used to produce ambiguity rather than just to resolve it. In any event, even if we considered the prologue *along with* the operative provision we would reach the same result we do today, since (as we explain) our interpretation of "the right of the people to keep and bear arms" furthers the purpose of an effective militia no less than (indeed, more than) the dissent's interpretation. See *infra*, at 26–27.

Footnote 5  Justice Stevens is of course correct, *post*, at 10, that the right to assemble cannot be exercised alone, but it is still an individual right, and not one conditioned upon membership in some defined "assembly," as he contends the right to bear arms is conditioned upon membership in a defined militia. And Justice Stevens is dead wrong to think that the right to petition is "primarily collective in nature." *Ibid.* See *McDonald* v. *Smith*, 472 U. S. 479, 482–484 (1985) (describing historical origins of right to petition).

Footnote 6  If we look to other founding-era documents, we find that some state constitutions used the term "the people" to refer to the people collectively, in contrast to "citizen," which was used to invoke individual rights. See Heyman, Natural Rights and the Second Amendment, in The Second Amendment in Law and History 179, 193–195 (C. Bogus ed. 2000) (hereinafter Bogus). But that usage was not remotely uniform. See, *e.g.*, N. C. Declaration of Rights §XIV (1776), in 5 The Federal and State Constitutions, Colonial Charters, and Other Organic Laws 2787, 2788 (F. Thorpe ed. 1909) (hereinafter Thorpe) (jury trial); Md. Declaration of Rights §XVIII (1776), in 3 *id.*, at 1686, 1688 (vicinage requirement); Vt. Declaration of Rights ch. 1, §XI (1777), in 6 *id.*, at 3737, 3741 (searches and seizures); Pa. Declaration of Rights §XII (1776), in 5 *id.*, at 3081, 3083 (free speech). And, most importantly, it was clearly not the terminology used in the Federal Constitution, given the First, Fourth, and Ninth Amendments.

Footnote 7  See, *e.g.*, 3 A Compleat Collection of State-Tryals 185 (1719) ("Hath not every Subject power to keep Arms, as well as Servants in his House for defence of his Person?"); T. Wood, A New Institute of the Imperial or Civil Law 282 (1730) ("Those are guilty of *publick* Force, who keep Arms in their Houses, and make use of them otherwise than upon Journeys or Hunting, or for Sale ..."); A Collection of All the Acts of Assembly, Now in Force, in the Colony of Virginia 596 (1733) ("Free Negros, Mulattos, or Indians, and Owners of Slaves, seated at Frontier Plantations, may obtain Licence from a Justice of Peace, for keeping Arms, &c."); J. Ayliffe, A New Pandect of *Roman* Civil Law 195 (1734) ("Yet a Person might keep Arms in his House, or on his Estate, on the Account of Hunting, Navigation, Travelling, and on the Score of Selling them in the way of Trade or Commerce, or such Arms as accrued to him by way of Inheritance"); J. Trusler, A Concise View of the Common Law and Statute Law of England 270 (1781) ("if [papists] keep arms in their houses, such arms may be seized by a justice of the peace"); Some Considerations on the Game Laws 54 (1796) ("Who has been deprived by [the law] of keeping arms for his own defence? What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece ... ?"); 3 B. Wilson, The Works of the Honourable James Wilson 84 (1804) (with reference to state constitutional right: "This is one of our many renewals of the Saxon regulations. 'They were bound,' says Mr. Selden, 'to keep arms for the preservation of the kingdom, and of their own person' "); W. Duer, Outlines of the Constitutional Jurisprudence of the United States 31–32 (1833) (with reference to colonists' English rights: "The right of every individual to keep arms for his defence, suitable to his condition and degree; which was the public allowance, under due restrictions of the natural right of resistance and self-preservation"); 3 R. Burn, Justice of the Peace and the Parish Officer 88 (1815) ("It is, however, laid down by

Serjeant Hawkins, ... that if a lessee, after the end of the term, keep arms in his house to oppose the entry of the lessor, ..."); *State* v. *Dempsey*, 31 N. C. 384, 385 (1849) (citing 1840 state law making it a misdemeanor for a member of certain racial groups "to carry about his person or keep in his house any shot gun or other arms").

Footnote 8  See Pa. Declaration of Rights §XIII, in 5 Thorpe 3083 ("That the people have a right to bear arms for the defence of themselves and the state... "); Vt. Declaration of Rights §XV, in 6 *id.*, at 3741 ("That the people have a right to bear arms for the defence of themselves and the State..."); Ky. Const., Art. XII, cl. 23 (1792), in 3 *id.*, at 1264, 1275 ("That the right of the citizens to bear arms in defence of themselves and the State shall not be questioned"); Ohio Const., Art. VIII, §20 (1802), in 5 *id.*, at 2901, 2911 ("That the people have a right to bear arms for the defence of themselves and the State ... "); Ind. Const., Art. I, §20 (1816), in 2 *id.*, at 1057, 1059 ("That the people have a right to bear arms for the defense of themselves and the State... "); Miss. Const., Art. I, §23 (1817), in 4 *id.*, at 2032, 2034 ("Every citizen has a right to bear arms, in defence of himself and the State"); Conn. Const., Art. I, §17 (1818), in 1 *id.*, at 536, 538 ("Every citizen has a right to bear arms in defence of himself and the state"); Ala. Const., Art. I, §23 (1819), in 1 *id.*, at 96, 98 ("Every citizen has a right to bear arms in defence of himself and the State"); Mo. Const., Art. XIII, §3 (1820), in 4 *id.*, at 2150, 2163 ("[T]hat their right to bear arms in defence of themselves and of the State cannot be questioned"). See generally Volokh, State Constitutional Rights to Keep and Bear Arms, 11 Tex. Rev. L. & Politics 191 (2006).

Footnote 9  See *Bliss* v. *Commonwealth*, 2 Litt. 90, 91–92 (Ky. 1822); *State* v. *Reid*, 1 Ala. 612, 616–617 (1840); *State* v. *Schoultz*, 25 Mo. 128, 155 (1857); see also *Simpson* v. *State*, 5 Yer. 356, 360 (Tenn. 1833) (interpreting similar provision with "common defence" purpose); *State* v. *Huntly*, 25 N. C. 418, 422–423 (1843) (same); cf. *Nunn* v. *State*, 1 Ga. 243, 250–251 (1846) (construing Second Amendment); *State* v. *Chandler*, 5 La. Ann. 489, 489–490 (1850) (same).

Footnote 10  See J. Brydall, Privilegia Magnatud apud Anglos 14 (1704) (Privilege XXXIII) ("In the 21st Year of King Edward the Third, a Proclamation Issued, that no Person should bear any Arms within London, and the Suburbs"); J. Bond, A Compleat Guide to Justices of the Peace 43 (1707) ("Sheriffs, and all other Officers in executing their Offices, and all other persons pursuing Hu[e] and Cry may lawfully bear arms"); 1 An Abridgment of the Public Statutes in Force and Use Relative to Scotland (1755) (entry for "Arms": "And if any person above described shall have in his custody, use, or bear arms, being thereof convicted before one justice of peace, or other judge competent, summarily, he shall for the first offense forfeit all such arms" (quoting 1 Geo. 1, c. 54, §1)); Statute Law of Scotland Abridged 132–133 (2d ed. 1769) ("Acts for disarming the highlands" but "exempting those who have particular licenses to bear arms"); E. de Vattel, The Law of Nations, or, Principles of the Law of Nature 144 (1792) ("Since custom has allowed persons of rank and gentlemen of the army to bear arms in time of peace, strict care should be taken that none but these should be allowed to wear swords"); E. Roche, Proceedings of a Court-Martial, Held at the Council-Chamber, in the City of Cork 3 (1798) (charge VI: "With having held traitorous conferences, and with having conspired, with the like intent, for the purpose of attacking and despoiling of the arms of several of the King's subjects, qualified by law to bear arms"); C. Humphreys, A Compendium of the Common Law in force in Kentucky 482 (1822) ("[I]n this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify people unnecessarily").

Footnote 11  Justice Stevens contends, *post*, at 15, that since we assert that adding "against" to "bear arms" gives it a military meaning we must concede that adding a purposive qualifying phrase to "bear arms" can alter its meaning. But the difference is that we do not maintain that "against" *alters* the meaning of "bear arms" but merely that it *clarifies* which of various meanings (one of which is military) is intended. Justice Stevens, however, argues that "[t]he term 'bear arms' is a familiar idiom; when used unadorned by any additional words, its meaning is 'to serve as a soldier, do military service, fight.' " *Post*, at 11. He therefore must establish that adding a contradictory purposive phrase can *alter* a word's meaning.

Footnote 12  Justice Stevens finds support for his legislative history inference from the recorded views of one Antifederalist member of the House. *Post*, at 26 n. 25. "The claim that the best or most representative reading of the [language of the] amendments would conform to the understanding and concerns of [the Antifederalists] is ... highly problematic." Rakove, The Second Amendment: The Highest Stage of Originalism, Bogus 74, 81.

Footnote 13  The same applies to the conscientious-objector amendments proposed by Virginia and North Carolina, which said: "That any person religiously scrupulous of bearing arms ought to be exempted upon payment of an equivalent to employ another to bear arms in his stead." See Veit 19; 4 J. Eliot, The Debates in the Several State Constitutions on the Adoption of the Federal Constitution 243, 244 (2d ed. 1836) (reprinted 1941).

Certainly their second use of the phrase ("bear arms in his stead") refers, by reason of context, to compulsory bearing of arms for military duty. But their first use of the phrase ("any person religiously scrupulous of bearing arms") assuredly did not refer to people whose God allowed them to bear arms for defense of themselves but not for defense of their country.

Footnote 14  Faced with this clear historical usage, Justice Stevens resorts to the bizarre argument that because the word "to" is not included before "bear" (whereas it is included before "petition" in the First Amendment), the unitary meaning of "to keep and bear" is established. *Post,* at 16, n. 13. We have never heard of the proposition that omitting repetition of the "to" causes two verbs with different meanings to become one. A promise "to support and to defend the Constitution of the United States" is not a whit different from a promise "to support and defend the Constitution of the United States."

Footnote 15  Cf. 3 Geo., 34, §3, in 7 Eng. Stat. at Large 126 (1748) ("That the Prohibition contained ... in this Act, of having, keeping, bearing, or wearing any Arms or Warlike Weapons ... shall not extend ... to any Officers or their Assistants, employed in the Execution of Justice ...").

Footnote 16  Contrary to Justice Stevens' wholly unsupported assertion, *post,* at 17, there was no pre-existing right in English law "to use weapons for certain military purposes" or to use arms in an organized militia.

Footnote 17  Article I, §8, cl. 16 of the Constitution gives Congress the power

"[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."

It could not be clearer that Congress's "organizing" power, unlike its "governing" power, can be invoked even for that part of the militia not "employed in the Service of the United States." Justice Stevens provides no support whatever for his contrary view, see *post,* at 19 n. 20. Both the Federalists and Anti-Federalists read the provision as it was written, to permit the creation of a "select" militia. See The Federalist No. 29, pp. 226, 227 (B. Wright ed. 1961); Centinel, Revived, No. XXIX, Philadelphia Independent Gazetteer, Sept. 9, 1789, in Young 711, 712.

Footnote 18  Justice Stevens says that the drafters of the Virginia Declaration of Rights rejected this proposal and adopted "instead" a provision written by George Mason stressing the importance of the militia. See *post,* at 24, and n. 24. There is no evidence that the drafters regarded the Mason proposal as a substitute for the Jefferson proposal.

Footnote 19  Justice Stevens quotes some of Tucker's unpublished notes, which he claims show that Tucker had ambiguous views about the Second Amendment. See *post,* at 31, and n. 32. But it is clear from the notes that Tucker located the power of States to arm their militias in the *Tenth* Amendment, and that he cited the Second Amendment for the proposition that such armament could not run afoul of any power of the federal government (since the amendment prohibits Congress from ordering disarmament). Nothing in the passage implies that the Second Amendment pertains only to the carrying of arms in the organized militia.

Footnote 20  Rawle, writing before our decision in *Barron ex rel. Tiernan* v. *Mayor of Baltimore,* 7 Pet. 243 (1833), believed that the Second Amendment could be applied against the States. Such a belief would of course be nonsensical on petitioners' view that it protected only a right to possess and carry arms when conscripted by the State itself into militia service.

Footnote 21  Justice Stevens suggests that this is not obvious because free blacks in Virginia had been required to muster without arms. See *post,* at 28, n. 29 (citing Siegel, The Federal Government's Power to Enact Color-Conscious Laws, 92 Nw. U. L. Rev. 477, 497 (1998)). But that could not have been the type of law referred to in *Aldridge,* because that practice had stopped 30 years earlier when blacks were excluded entirely from the militia by the First Militia Act. See Siegel, *supra,* at 498, n. 120. Justice Stevens further suggests that laws barring blacks from militia service could have been said to violate the "right to bear arms." But under Justice Stevens' reading of the Second Amendment (we think), the protected right is the right to carry arms to the extent one is enrolled in the militia, not the right *to be in the militia.* Perhaps Justice Stevens really does adopt the full-blown idiomatic meaning of "bear arms," in which case every man and woman in this country has a right "to be a soldier" or even "to wage war." In any case, it is clear to us that *Aldridge's* allusion to the existing Virginia "restriction" upon the right of free blacks "to bear arms" could only have referred to "laws prohibiting blacks from keeping weapons," Siegel, *supra.* at 497–498.

Footnote 22  Justice Stevens' accusation that this is "not accurate," *post*, at 39, is wrong. It is true it was the indictment that described the right as "bearing arms for a lawful purpose." But, in explicit reference to the right described in the indictment, the Court stated that "The second amendment declares that it [*i.e.*, the right of bearing arms for a lawful purpose] shall not be infringed." 92 U. S., at 553.

Footnote 23  With respect to *Cruikshank*'s continuing validity on incorporation, a question not presented by this case, we note that *Cruikshank* also said that the First Amendment did not apply against the States and did not engage in the sort of Fourteenth Amendment inquiry required by our later cases. Our later decisions in *Presser* v. *Illinois*, 116 U. S. 252, 265 (1886) and *Miller* v. *Texas*, 153 U. S. 535, 538 (1894), reaffirmed that the Second Amendment applies only to the Federal Government.

Footnote 24  As for the "hundreds of judges," *post*, at 2, who have relied on the view of the Second Amendment Justice Stevens claims we endorsed in *Miller*: If so, they overread *Miller*. And their erroneous reliance upon an uncontested and virtually unreasoned case cannot nullify the reliance of millions of Americans (as our historical analysis has shown) upon the true meaning of the right to keep and bear arms. In any event, it should not be thought that the cases decided by these judges would necessarily have come out differently under a proper interpretation of the right.

*Footnote 25 Miller* was briefly mentioned in our decision in *Lewis* v. *United States*, 445 U. S. 55 (1980), an appeal from a conviction for being a felon in possession of a firearm. The challenge was based on the contention that the prior felony conviction had been unconstitutional. No Second Amendment claim was raised or briefed by any party. In the course of rejecting the asserted challenge, the Court commented gratuitously, in a footnote, that "[t]hese legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties. See *United States* v. *Miller* ... (the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia')." *Id.*, at 65–66, n. 8. The footnote then cites several Court of Appeals cases to the same effect. It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued.

Footnote 26  We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.

Footnote 27  Justice Breyer correctly notes that this law, like almost all laws, would pass rational-basis scrutiny. *Post*, at 8. But rational-basis scrutiny is a mode of analysis we have used when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws. See, *e.g.*, *Engquist* v. *Oregon Dept. of Agriculture*, 553 U. S. ___, ___ (2008) (slip op., at 9–10). In those cases, "rational basis" is not just the standard of scrutiny, but the very substance of the constitutional guarantee. Obviously, the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms. See *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152, n. 4 (1938) ("There may be narrower scope for operation of the presumption of constitutionality [*i.e.*, narrower than that provided by rational-basis review] when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments..."). If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.

Footnote 28  *McIntosh* upheld the law against a claim that it violated the Equal Protection Clause by arbitrarily distinguishing between residences and businesses. See 395 A. 2d, at 755. One of the rational bases listed for that distinction was the legislative finding "that for each intruder stopped by a firearm there are four gun-related accidents within the home." *Ibid*. That tradeoff would not bear mention if the statute did not prevent stopping intruders by firearms.

Footnote 29  The Supreme Court of Pennsylvania described the amount of five shillings in a contract matter in 1792 as "nominal consideration." *Morris's Lessee* v. *Smith*, 4 Dall. 119, 120 (Pa. 1792). Many of the laws cited punished violation with fine in a similar amount; the 1783 Massachusetts gunpowder-storage law carried a somewhat larger fine of 10 (200 shillings) and forfeiture of the weapon.

## Materials

### Oral Arguments

Oral Argument - March 18, 2008

## Procedural History

### Prior History

- Parker, Shelly, et al v. DC, et al, No. 04-7041 (D.C. Cir. Mar. 09, 2007)

## Attorneys

Walter E. Dellinger (defendant)

Thomas Goldstein (defendant)

Robert Long (defendant)

Todd Kim (defendant)

Alan Gura (plaintiff)

Robert Levy (plaintiff)

Clark Neily (plaintiff)

## Search This Case

**Google Scholar**       **Google Books**       **Google Web**

**Google News**

## Chicago, Illinois Lawyers
### Sponsored Listings

**Christopher Helt**

(888) 739-6794

**Chicago, IL**
Immigration Law

PREMIUM   **10.0**