UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

RECEIVED
IN MONROE, LA.

NOV 2 1 2023
AM

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

JON F.D. TURPIN, et al.          )
                                 )  Civil Action No. 1:23-CV-01059-TAD-JPM
          V                      )
                                 )
JOSEPH R BIDEN, JR, et al.       )

Dear Honorable Terry A. Doughty,

    Please add this to my exhibits regarding this case and Missouri v. Biden and Murthy v. Missouri, per your prudence.

Thank you for your time and consideration, Your Honor,

Jon F. "D" Turpin

2421 S. Plum St.,

Yorktown, IN 47396

John Fritz Turpin
November 24, 2020.

Edit

10

Like   Comment   Share

Josh King

Well it's Groundhog Day...

Write a comment...

QUARANTINE DAY

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder | GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Friday, August 25, 2023 4:02 PM |
| **To:** | braun_casework@braun.senate.gov |
| **Subject:** | Re: AN OPINION REGARDING BRANDON QUIXOTE DOE |

Just as an FYI,

I've been a whistleblower for quite some time longer than anyone is allowed to withhold clearances even by army, navy, and military court martial jurisprudence... and without malice, but for transparency, this is the 4th or 5th time... in other words... in a confirmed pattern... that my clearance has been wrongfully removed and that I've been unemployed and/or potentially blacklisted...

In my opinion, I think I've earned my clearance back and top secret clearance, and I certainly shouldn't be banned from LinkedIn.

Especially when I'm not even posting online...
It just seems a bit... intentional at this point.

What is your opinion?

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Aug 24, 2023, 9:50 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

> I understand that our Honorable Jim Jordan is requesting any information relating to the federal government in DA Fani Willis' investigation...
>
> The whole thing is Federal because it's dealing with federal election votes and potentially fraud tying counties together between states with similar county names.
>
> Look at Wayne County and how many states it's within, the at Fulton County, then Santa Cruz County, in Arizona ties to California...
>
> Do you know how simple it would be to copy and/or change the data in a SQL database if it got hacked in any voting machines if they had any external internet connection or even if someone plugged in a Bluetooth dongle if they knew what operating system it was on?
>
> Or even less trackable, if someone were to open the SQL database without changing it or even the timestamps on the hard drives, if these were sent somewhere and bad apples were inclined to do so to change the votes?
>
> It's not like changing a traditional file and having the timestamp be changed to reflect the update. It could be done via temp tables without changing the underlying database, then sent to printers to print paper ballots.
>
> Then, someone could simply not save the underlying changes to the database, leaving paper ballots as the only evidence of fraud.

To my knowledge we don't have the same security features on paper ballots that we even have in our paper money to ensure they aren't counterfeit, and we haven't started using the blockchain with encryption with its public ledger to perform vote counting yet.

Of course, we see how cyber criminals even break that system of credibility with "DeFi" cryptocurrency by hiding the ledger in an e change and changing the "smart contracts."

I digress, the point here is that the paper ballots could easily be forged and used to cause a statistically significant impact at the county levels, but a statistically insignificant percentage of votes at the state levels, to win an election in swing states, in a way that is however overall so improbable at the big picture level that it finally raises eyebrows.

Especially when there's a pattern like this. The whole thing is federal, at the very least, and it absolutely is a U.N. mayter as well, and Zimbabwe, in my opinion, actually did the correct thing, and our Honorable Jessica Jennings may need to retract her USAID statement until further investigation may be performed. If Zimbabwe is willing to work with the core U.N. Intelligence agencies and cooperate to research this in depth they're trying to figure this out and aren't the issue.

This is "why" Zimbabwe may be stopping the counts because the issue is that even if you recount, unless you can identify which if any ballots are fake, you don't spot the problem.

I saw this as a possibility when I sent a donation to Zimbabwe a short while ago.


Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Aug 24, 2023, 7:28 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

> IN MY OPINION,
> THE COUNTIES AT BORDER CROSSINGS WOULD BE THE MAIN TARGETS,
> AND THE REASON LOUISIANA HAS AVOIDED THIS ISSUE IS BECAUSE OF
> HAVING PARISHES.
> IT'S A BIT DIFFERENT TO HAVE PARISHES VS. COUNTIES AND IT WOULD
> MAKE IT A BIT HARDER FOR BAD APPLES TO BE FORGING BALLOTS
> AGAINST LOUISIANA USING THE METHOD WHICH I'M IDENTIFYING AS
> POSSIBLE IN THIS SITUATION.

WAYNE COUNTY IN MICHIGAN HOLDS DETROIT AND A BORDER CROSSING.

# Wayne County

Article   Talk

From Wikipedia, the free encyclopedia

**Wayne County** may refer to:

## Counties in the United States  [ edit ]

- Wayne County, Georgia
- Wayne County, Illinois
- Wayne County, Indiana
- Wayne County, Iowa
- Wayne County, Kentucky
- Wayne County, Michigan
- Wayne County, Mississippi
- Wayne County, Missouri
- Wayne County, Nebraska
- Wayne County, New York
- Wayne County, North Carolina
- Wayne County, Ohio
- Wayne County, Pennsylvania
- Wayne County, Tennessee
- Wayne County, Utah
- Wayne County, West Virginia

FULTON COUNTY EXISTS IN MOST OF THE STATES IN OUR CENTER LOGISTICS.

# Fulton County

Article   Talk

From Wikipedia, the free encyclopedia

**Fulton County** is the name of eight counties in the United States of America. Most are named for R(

- Fulton County, Arkansas, named after Governor William Savin Fulton
- Fulton County, Georgia, the most populous of Georgia's counties and by far the most populous c
- Fulton County, Illinois
- Fulton County, Indiana
- Fulton County, Kentucky
- Fulton County, New York
- Fulton County, Ohio
- Fulton County, Pennsylvania

## Other uses   [ edit ]

- *Fulton County* (novel) by James Goldman
- Atlanta–Fulton County Stadium, former home to the Atlanta Braves (1966–96) and the Atlanta Fa



*This disambiguation page lists articles associated with the title **Fulton County**.*

*If an internal link led you here, you may wish to change the link to point directly to the intended article.*

Categories: Disambiguation pages │ Place name disambiguation pages │ United States county nat

IN MY OPINION ARIZONA WOULD BE HARDER TO USE THE FRAUD I'M SUSPECTING OCCURRED SINCE COUNTY NAMES MAY BE UNIQUE BESIDES SANTA CRUZ, WHICH DOESN'T CONTAIN PHOENIX, SO AN INVASION WOULD BE NECESSARY, AND WE SEE THAT OCCURRING VIA REPORTED CARTEL INVOLVEMENT THERE. THIS WAS ALSO PERFORMED REPORTEDLY VIA CYBER CRIMINAL ACTIVITY VIA MOBILE APPS, AND THAT CERTAINLY ALIGNS

WITH PRETTY MUCH EVERYTHING ELSE WE'RE SEEING HERE.



IN MY OPINION THIS, ESPECIALLY WHEN APPROPRIATELY LINKED WITH
PAST EVENTS, AND TARGETING OF CATHOLICS AND CATHOLIC HEALTH
INSTITUTIONS...
IN LINE WITH REPEATED ATTEMPTS TO OUST OUR HONORABLE KENNEDYS
AND HONORABLE JOHNSONS, AND HONORABLE CONNALLYS AND
CONNOLLYS...

IT'S TRULY LIKE A "FLASHING RED NEON SIGN" POINTING TO BAD APPLES
AND THEIR INTOLERABLE BAD BEHAVIORS. IN MY OPINION IT'S TREASON
AND A COUP.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
------- Original Message -------
On Thursday, August 24th, 2023 at 6:53 PM, ThorfinThunder | GoldGrenade
<jt4590@protonmail.com> wrote:

[UNDER WHISTLEBLOWER PROTECTIONS | CAPITALIZATION FOR IMPORTANCE]
I understand there may be an attempt to civilly commit me rather than solving the actual problem of the intolerable bad behavior of my parents and the very few specific bad apples.

There have already been multiple attempts by a very ill and criminally insane person to interdict me, conservatorship me, violation of my constitutional and civil rights on all levels.
Bad apples committed overt and covert sexual and domestic violence, molestation, violation of privacy against me and my lovely wife with continued attempts to frame us even now.

M.A.H.M has done some of these same things and each J.B.T., and M.A.H.M. have lied to multiple jobs of mine, committed terrorism against me and my wife, they have actually threatened public officials with violence.
This is definitely different from me saying I would protect our public officials and is also completely different from me identifying jurisprudence, especially jurisprudence already affirmed in pattern by historical jurisprudence and religious jurisprudence.

This is still different from R.E.B. acting like I was an addict on some bender when I certainly wasn't, and/or him saying I would receive a felony for attempting to hand over potential evidence in line with a whistleblow.
BECAUSE SINCE MY EVIDENCE WAS, AND HAS BEEN SUBMITTED, EVEN IF IT ONLY CLEARED ME, IT MEANS R.E.B. COMMITTED OBSTRUCTION OF JUSTICE AND BROKE MULTIPLE PROTOCOLS.
NOT TAKING IN THE EVIDENCE WITH THE LATER LOSS OF MY CLEARANCE FOR ANY REASON MEANS HE MAY HAVE ATTEMPTED TO ENTRAP ME EVEN IF I'M REDUCED TO ONLY A CITIZEN.

EVEN IF I WERE TO BE ASSASSINATED, THERE IS NO WAY OUT UNDER ANY JURISPRUDENCE FOR THE BAD APPLES EXCEPT BY CONCESSION AND SIMPLY ACCOUNTABILITY, THEN FORGIVENESS AND GOD'S GRACE.
THIS IS THE POINT I'M TRYING TO GET ACROSS IN A PEACEFUL MANNER. THEY ALREADY LOST. PROVABLY, CONCLUSIVELY, AND ABSOLUTELY, AND ALLOWING THEM TO CONTINUE THE FIGHT ONLY ALLOWS FOR WAR.

THAT'S THE OBVIOUS CONSPIRACY, BAD APPLES FORCING WAR, THEN SCAPEGOATING GOOD APPLES AROUND THEM. IN MY OPINION, THIS IS WHERE CIA AND OTHER INTELLIGENCE AGENCIES MAKE ISSUES HALT.

EVEN IF R.E.B. BELIEVED HE WAS PROTECTING THE

PRESIDENT, THE TAMPERING TO MY MAIL AND FEAR FROM
DHS OFFICIALS PROVES SOME DUBIOUS BREACHES OF
PROTOCOL OCCURRED.
EVEN IF THE TAMPERING TO OUR VEHICLES IS COVERED UP,
AND ESPECIALLY WITH IT COVERED UP, THE CLERICAL
ERRORS DUBIOUSLY MATCH ATTEMPTS TO FRAME ME FOR
HARD DRIVES...
THIS NOT ONLY FURTHER PROVES ATTEMPTS TO FRAME ME,
BUT ALSO SOLIDIFIES THE POTENTIAL FOR OBVIOUS AND
CONCLUSIVE ELECTION TAMPERING BY NON-CONSERVATIVE
LEADERS.

What I want to know is why were any of these persons allowed to
behave in the way they did and then cover it up so heavily? WAS
OUR FORMER CIA AND FORMER FBI LEADERSHIP HEAVILY
UNDERMINED?

I DON'T AGREE WITH EVERYTHING THAT LOUDER WITH
CROWDER SAYS, BUT WHEN I WATCHED THE VIDEO
REGARDING FULTON COUNTY, IT'S OBVIOUS.
RIGHT NOW FULTON COUNTY GEORGIA AND FULTON COUNTY
PENNSYLVANIA WERE LINKED, JUST LIKE LAFAYETTE INDIANA
AND LAFAYETTE LOUISIANA.

EXCEPT FULTON COUNTIES WERE LINKED BY TAMPERING,
WHILE THE LAFAYETTES ARE LINKED BY TRYING TO
UNCOVER AND RESOLVE BAD BEHAVIOR.
WHY WOULD THE COUNTIES END UP BEING LINKED DURING
ELECTION FRAUD? BECAUSE CHANGING THE DATA WOULD BE
EASIER FOR SOMEONE TO DO.

THAT'S MY ASSUMED UNQUALIFIED, BUT POTENTIALLY
QUALIFIED OPINION, AFTER RESEARCH INTO A POTENTIAL
PATTERN OF BAD BEHAVIORS CONFIRMED.
HOW MANY COUNTIES IN ILLINOIS, OHIO, INDIANA, MICHIGAN,
PENNSYLVANIA, GEORGIA, AND ARIZONA HAVE MATCHING
NAMES ALLOWING FAKE BALLOTS TO BE EASILY FORGERED?

MAKE A MAP MATCHING THE SAME COUNTY NAMES TO ANY
STATE WHERE VOTING COUNTS MAY HAVE BEEN
QUESTIONED AND/OR RECONSIDERED FOR ANY REVIEW LIKE
A DATABASE.
KEEP IN MIND IT MAY BE SIMULTANEOUSLY POSSIBLE FOR
DOMINION VOTING ITSELF NOT TO HAVE COMMITTED ANY
FRAUD IF HACKING OCCURRED REGARDING VOTING
MACHINES.
IT ALSO MAY BE POSSIBLE THAT DOMINION VOTING DIDN'T
TAMPER WITH ANY HARD DRIVES THEMSELVES ESPECIALLY
WITH THE FBI INFRAGARD FINDING CYBER CRIMINAL
ACTIVITY.

IN MY OPINION THIS IS THE ISSUE REGARDING DEFAMATION
LAWSUITS AGAINST REPORTS OUT OF GENUINE CONCERN:
THIS ALONG WITH THE PROVEN CONSPIRACY OF SILENCE
AND OUR WRONGFUL EVICTIONS AND THE WRONGFUL CIVIL
INJUNCTION ATTEMPTED AGAINST US AND THE FAILED
CARTEL INDICTMENT...
ACTUALLY GIVES PROVEN AND REAFFIRMED PRECEDENT

FOR ME TO CIVILLY EVICT MISBEHAVING PUBLIC OFFICIALS
AND ACTIVATE WHAT I CALLED "NAPOLEONIC IMMINENT
DOMAIN" AS I STATED.

IT IS SIMPLY FACTUAL, AND THE PRECEDENT IS PATTERNED,
JUST ATTEMPTED TO BE HIDDEN. IT WOULD HAVE LIKELY
BEEN CONSIDERED CLASSIFIED AND ONLY CIA BUSINESS
BEFORE FOIA AND THE PATTERN CONFIRMED.
SINCE I WAS FACTUALLY MADE A DUAL-CITIZEN BY OUR
ESTEEMED IRS, STILL WITHOUT POINTING FINGERS, THIS
PROVIDES FURTHER PRECEDENT FOR THE POSSIBILITY OF
LIKE AND SIMILAR DUAL COUNTY FORGED BALLOTS.


OF NOTE REGARDING ONGOING PROCEEDINGS. I DON'T NEED
ANSWERS TO THESE QUESTIONS BELOW, THIS IS TO CONVEY
INFORMATION, I'M AUTISTIC:
WHO WAS THE 40-YEAR U.N. DIPLOMATIC AGENT UNDER MIKE
POMPEO FOR WHICH THE TIMELINE ALIGNS WITH THE LAST
COLD WAR AND AFGHANISTAN?
WHO IS BRANDON "QUIXOTE" DOE WHO SHIPPED THEIR
WRITINGS FROM KENTUCKY TO JOIN THE CASE UNDER A
PSEUDONYM FOR THEIR OWN SAFETY?

**[IN MY OPINION, WITH THIS POSSIBILITY, I BELIEVE BRANDON
QUIXOTE DOE MAY HAVE EVERY REASON TO UTILIZE A
PSEUDONYM TO ENTER INTO 3:22-CV-01213]
[BECAUSE IN MY OPINION THEY HAVE EVERY RIGHT TO USE
THEIR PSEUDONYM UNTIL WE IDENTIFY WHO UNDERMINED
COMEY, POMPEO, WRAY, AND BURNS.]**

**Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice**

 Gmail

Jon F Turpin <jt4590@gmail.com>

## Opinion
1 message

Jon F. Turpin <jt4590@gmail.com>
To: "SA Joseph L. Chaney" <jlchaney@fbi.gov>, cawray@fbi.gov

I reviewed some of the documentation from the CISA regarding Dominion Voting Systems and how they're designed, and I also reviewed how they used to be designed as far back as 2008.
So far at a rudimentary glance, what I noticed is that in each instance there is the possibility of an AES key to be compromised in each of these, and that each could be targeted by known ma

The older versions would have been extremely likely to be hit by the Cobalt Strike attack methods, which have been going on for some time, and even delete evidence of themselves after act
In fact, the older versions utilized Assembly Code and versions of Windows and processors now known to have allowed, unfortunately, system access via x86 coding faults, but that's less like

What I see is that WinEDS 4.0, and any version running on Windows XP, Windows XP SP2, Windows Server 2003, or Windows Server 2008, and maybe R2, would have similar vectors for at
That's what I identified as the most likely potential for attack besides paper ballots themselves, because the EDS server would be what counts and generates the tallies for the election in each

Because there have been questions about the last 3 elections, and I'm not pointing fingers at any candidate, what I'm doing is researching these systems from the time they were anti-trusted a
In my opinion, the root cause of any potential issue will be found in these older files, which is once again not to point fingers at Sequoia Voting Systems, Election Voting Systems, nor Dominio

Because the newer systems are based upon the design of the older systems, even though some of these have switched to Android, very similar potential exploits seem to exist in the newer sy
When I reviewed documentation as recent as 2021 from California, I found that Windows System Builds are still mentioned in regards to the Democracy Suite EMS, which seems to be the se
https://votingsystems.cdn.sos.ca.gov/vendors/dominion/ds510a/provv-source.pdf

**1.4    System Overview**

The Democracy Suite 5.10-A Voting System is a paper-based optical scan voting system consisting of the following major components: The Election Management System (EMS), the ImageCast Central (ICC) ballot scanner, the ImageCast Precinct 2 (ICP2) precinct count tabulator, ImageCast Evolution (ICE) precinct count tabulator, ImageCast Voter Activation (ICVA), Mobile Ballot Printing (MBP), and ImageCast X (ICX) BMD ballot marking device.

**1.5    Description of Component Code**

The table below provides the component lines of code for D-Suite 5.10-A.

Table 1-1 Democracy Suite 5.10-A Component Lines of Code

| Component | Language/s | Lines of Code | Standard |
|---|---|---|---|
| EMS* | C# | 1,721,537 | SD_CSharp_AutomatedCodeReview_5.10_A.pdf |
| ICP2 | C/C++ | 486,907 | SD_CplusPlus_CodingStandard_5.10_A.pdf |
| ICX | Java | 224,307 | SD_DVSJavaCodingStandards_5.10_A.pdf |
| ICE | C/C++ | 852,980 | SD_CplusPlus_CodingStandard_5.10_A.pdf |
| ICC | C/C++ | 231,903 | SD_CplusPlus_CodingStandard_5.10_A.pdf |
| ADJ | C# | 200,913 | SD_Csharp_AutomatedCodeReview_5.10_A.pdf |

*Note: EMS includes ICVA and MBP.

Does this still utilize SQL? Many things do, which isn't a bad thing, but my reference to the susceptibility to hide changes not only to a system, but also to the transaction files within SQL via C

## Summary



The Optech 400-C is a high capacity scanner used by election of
ballots in a central location. The Optech 400-C originally develop
Records Corporation and later by both Sequoia Voting Systems a
Systems and Software. As the result of an antitrust settlement, ES
production of the Optech 400-C in 1997 but continues to service
in many jurisdictions. (In jurisdictions with maintenance contracts
equipment is often called the Optech IV-C or Model 400.) Ballots
precincts and placed in ballot boxes. The ballots are then delivere
workers to the central count facility, where they are fed by an ele
into the 400-C. Because it is used by election officials in a secure
location, the 400-C does not provide voters with feedback about
problems.

The system consists of a high-capacity scanner linked to a PC ru
Windows. The 400-C uses a proprietary tabulation program, Win
the ballots that it scans. WinEDS is used to configure the ballot d
and precinct identifiers that instruct the 400-C's as to how to inte
ballot voter's ballot marks. The ballot definitions are then transfer
WinEDS to the 400-C via removable media, such as USB sticks, D
disks. When the 400-C is done tallying the results for the election
copied from the 400-C onto a DVD or a memory cartridge and tra
WinEDS server. The WinEDS server combines these results with t
Insight and Edge units used in the jurisdiction. Finally, WinEDS ge
reports for the election.

The process is still effectively the same even if it switched to Android, and you can see this in the potential exploits listed on the CISA's Website: https://www.cisa.gov/news-events/ics-advisories/icsa-22-154-01

## 2.2 VULNERABILITY OVERVIEW

NOTE: Mitigations to reduce the risk of exploitation of these vulnerabilities can be found in Section 3 of this document.

### 2.2.1   IMPROPER VERIFICATION OF CRYPTOGRAPHIC SIGNATURE CWE-347[a]

The tested version of ImageCast X does not validate application signatures to a trusted root certificate. Use of a trusted root certificate ensures software installed on a device is traceable to, or verifiable against, a cryptographic key provided by the manufacturer to detect tampering. An attacker could leverage this vulnerability to install malicious code, which could also be spread to other vulnerable ImageCast X devices via removable media.

CVE-2022-1739 has been assigned to this vulnerability.

### 2.2.2   MUTABLE ATTESTATION OR MEASUREMENT REPORTING DATA CWE-1283[a]

The tested version of ImageCast X's on-screen application hash display feature, audit log export, and application export functionality rely on self-attestation mechanisms. An attacker could leverage this vulnerability to disguise malicious applications on a device.

CVE-2022-1740 has been assigned to this vulnerability.

### 2.2.3   HIDDEN FUNCTIONALITY CWE-912[a]

The tested version of ImageCast X has a Terminal Emulator application which could be leveraged by an attacker to gain elevated privileges on a device and/or install malicious code.

CVE-2022-1741 has been assigned to this vulnerability.

## 2.2.4  IMPROPER PROTECTION OF ALTERNATE PATH CWE-424

The tested version of ImageCast X allows for rebooting into Android Safe Mode, which allows an attacker to directly access the operating system. An attacker could leverage this vulnerability to escalate privileges on a device and/or install malicious code.

CVE-2022-1742 has been assigned to this vulnerability.

## 2.2.5  PATH TRAVERSAL: '../FILEDIR' CWE-24

The tested version of ImageCast X can be manipulated to cause arbitrary code execution by specially crafted election definition files. An attacker could leverage this vulnerability to spread malicious code to ImageCast X devices from the EMS.

CVE-2022-1743 has been assigned to this vulnerability.

## 2.2.6  EXECUTION WITH UNNECESSARY PRIVILEGES CWE-250

Applications on the tested version of ImageCast X can execute code with elevated privileges by exploiting a system level service. An attacker could leverage this vulnerability to escalate privileges on a device and/or install malicious code.

CVE-2022-1744 has been assigned to this vulnerability.

## 2.2.7  AUTHENTICATION BYPASS BY SPOOFING CWE-290

The authentication mechanism used by technicians on the tested version of ImageCast X is susceptible to forgery. An attacker with physical access may use this to gain administrative privileges on a device and install malicious code or perform arbitrary administrative actions.

CVE-2022-1745 has been assigned to this vulnerability.

## 2.2.8  INCORRECT PRIVILEGE ASSIGNMENT CWE-266

The authentication mechanism used by poll workers to administer voting using the tested version of ImageCast X can expose cryptographic secrets used to protect election information. An attacker could leverage this vulnerability to gain access to sensitive information and perform privileged actions, potentially affecting other election equipment.

CVE-2022-1746 has been assigned to this vulnerability.

## 2.2.9  ORIGIN VALIDATION ERROR CWE-346

The authentication mechanism used by voters to activate a voting session on the tested version of ImageCast X is susceptible to forgery. An attacker could leverage this vulnerability to print an arbitrary number of ballots without authorization.

CVE-2022-1747 has been assigned to this vulnerability.

But despite the vulnerabilities listed about ImageCast X, I'm not concerned as much with the endpoint, nor even the scanner, since individuals may have been caught with extra b My concern would rest with, specifically, the central component which holds the database, the EMS, which still appears to run on Windows, which is fine, but as with any OS exp

How similar it is to the old systems, could anyone undetectably grab an export (it says yes, above regarding ImageCast X)
Could they change a database and/or even print a number of ballots out and potentially even make minimal changes to them? (It says yes, above regarding ImageCast X)
Since it's so similar, and the core architecture may still be very similar, could it even be taken to an older machine to have ballots printed in a way that seems legitimate?

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Legal Counsel**

131 M St, N. E., Fifth Floor
Washington, D. C. 20507
Free: (877)-869-1802
TTY (844) 234-5122
FAX (202) 827-7545
Website: www.eeoc.gov

11/11/2023

Dear Jon  Turpin:

Your appeal has been official received on 11/12/2023 and the due date is 12/12/2023. Please see the below summary of your appeal details.

Appeal Number: 820-2024-000064A

Original Request Number: 470-2024-001451

Appealer Name: Mr.  Jon  Frederick  Turpin

Appealer Title: Mr.

Appealer Email Address: jt4590@gmail.com

Request Type: Appeal

Category: Charge File

Delivery Method of Response: Email

Appealer Address: 2421 S Plum St   Yorktown  IN  47396  US

Description: Update: I have the complaint form from Federal Court to receive this information. The signed complaint will be mailed to the EEOC/ICRC on Monday, 11/13/2023. Please reopen/extend the time on this FOIA request: Request for Information: Charge 24F-2018-02406 Please provide me with any information regarding this EEOC entry that you may have available. Thank you so much for your assistance.

Delivered Date: 11/11/2023

## jt4590@protonmail.com

| | |
|---|---|
| **From:** | ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Thursday, September 14, 2023 10:21 AM |
| **Subject:** | Re: Thank You |
| **Attachments:** | 20230914_101822.jpg |

Paperwork will arrive on Monday. USPS box sent to P.O Box 895.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

-------- Original Message --------
On Sep 13, 2023, 10:20 PM, ThorfinThunder \| GoldGrenade < jt4590@protonmail.com> wrote:
This is the subcommittee we may wish to address:
https://judiciary.house.gov/subcommittees/committee-judiciary/select-subcommittee-weaponization-federal-government

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
------- Original Message -------
On Wednesday, September 13th, 2023 at 10:19 PM, ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> wrote:

This is the hearing we may want to deliver whistleblower information for:
https://judiciary.house.gov/committee-activity/hearings/oversight-us-department-justice-0

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
------- Original Message -------
On Wednesday, September 13th, 2023 at 9:55 PM, ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> wrote:

Thank you to our Honorable Mr. Johnson for the open invite.
My wife and I hope to see you tomorrow to clear our names.
https://www.youtube.com/watch?v=zcUtizIxWvk

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Saturday, September 2, 2023 5:52 AM |
| **Subject:** | Opinion |

In my opinion, it's concerning that Catholics, Catholic Health Systems, our Supreme Court, our Judiciary System, and potentially even elections, and Presidents have been targeted even for asking questions that other candidates have often asked in the past...

May all mainly targeted be pro-life?

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

In my opinion, after reviewing the knowledge disseminated by the FBI InfraGard,

0. Public and health institutions, including Catholic Health and religious institutions hacked.
1. Hackers accessed the FBI InfraGard portal
2. Hacking was discovered within judiciary systems
3. Hacking was potentially discovered in Qualcomm chips
4. Hacking or foul-play was potentially discovered in Apple
5. Hacking was potentially discovered between Silicon Valley and Qualcomm
6. Censorship was discovered violating the first amendment
7. Lack of due process was discovered violating the second amendment and 1st & 14th, etc.

**IN MY OPINION IT IS LOGICAL TO REVIEW THE OUTCOMES OF EACH:**

**1. THE DONALD TRUMP VS. HILLARY CLINTON ELECTION**
**2. THE JOSEPH BIDEN, JR. VS. DONALD TRUMP ELECTION**

**IN MY OPINION AFTER THE DISCOVERY THAT EACH:**
**1. EMAIL ALLEGATIONS AGAINST HILLARY CLINTON WERE WAIVED**
**2. DOSSIER ALLEGATIONS AGAINST DONALD TRUMP WERE WAIVED**
**3. INVESTIGATION INTO AN ORDINARY CITIZEN WERE WAIVED**
**4. CARTEL OPERATIONS MAY HAVE BEEN EXTREMELY PREVALENT**

**IT IS NO STRETCH TO PRESUME AFTER REVIEWING PRECEDENTS OF**
**1. JOHN F. KENNEDY AND JOHN CONNALLY**

**2. ELECTIONS OF LYNDON B. JOHNSON AND HARRY TRUMAN AFTERWARD.**

**3. WORLD WAR II EVENTS WHICH ARE BEING REPEATED WORLDWIDE**

**4. SEEING THE ONLY OTHER TIME THESE TYPES OF ELECTION ANOMALIES OCCURRED WAS DURING EVENTS SO SIMILAR THEY ARE A MIRROR IMAGE**

**5. INCLUDING THE NEARLY UNPRECEDENTED TURN OVER OF A PATTERN OF SWING STATES AND THE SUBSEQUENT DISCOVERY OF ORGANIZED CRIME, EXCEPT IN THIS SITUATION IT MAY ALSO INCLUDE CYBER CRIME**

**IN MY OPINION, AFTER SEEING THAT THE ELECTORAL COLLEGE WAS COMPROMISED IN TWO STATES FOR ONLY THE FIRST AND SECOND TIMES AS WELL ALONG WITH LAX VOTER ID REQUIREMENTS AND MAIL-IN BALLOTS, AND AFTER EXTENSIVE REVIEW INTO THIS INFORMATION...**

**IN MY OPINION:**
**I HAVE NO OTHER CONCLUSION AVAILABLE EXCEPT THAT FOREIGN AID INTERFERENCE RUINED EACH HILLARY CLINTON'S ELECTION, AND ALSO THAT FOREIGN AID INTERFERENCE RUINED DONALD TRUMP'S ELECTION.**

**GEORGIA AND PENNSYLVANIA ACTUALLY VOTED FOR DONALD TRUMP.**
**ARIZONA IS IN QUESTION, YET IS THE MOST LIKELY TO HAVE BEEN AFFECTED BY ILLEGAL IMMIGRATION, LAX VOTER ID REQUIREMENTS, AND ESPECIALLY DUE TO LACK OF COMPLETION OF A BORDER WALL.**

**THE DISASTROUS EFFECTS OF WHICH WE ARE SEEING NOW, IN DEFINITE AND COMPLETELY APPARENT INVASION OF OUR BORDERS AND COUNTRY.**

HOWEVER, EVEN WERE WE TO GIVE THE BENEFIT OF THE DOUBT AND SAY THAT ARIZONA MAY HAVE LEGITIMATELY VOTED FOR JOSEPH BIDEN...

THIS BRINGS THE ELECTORAL COLLEGE VOTE TO:
TRUMP: 268 | BIDEN: 270

NOW HERE IS THE PROBLEM... EVEN IF WE ATTEST THAT ARIZONA WAS LEGITIMATE, IT IS SO OVERWHELMINGLY REPUBLICAN THAT NOT ALLOWING ARIZONA THE EXACT SAME SPLIT WHICH HAS BEEN AFFORDED TO EACH NEBRASKA AND MAINE IN THE PAST CAUSES A DISPARITY.

IN MY OPINION, IT IS ABSOLUTELY NECESSARY TO ALLOW ARIZONA 1 ELECTORAL COLLEGE VOTE WHEN BASED AGAINST THE DEMOGRAPHICS OF TWO SIMILAR STATES BEING ALLOWED A SPLIT OF 1 VOTE IN THE ELECTORAL COLLEGE, AND FOR EXAMPLE LET'S REVIEW THE BELOW:



| | ← 2016 | November 3, 2020 | 2024 → |
| --- | --- | --- | --- |
| Turnout | | 76.33% (of registered voters) [1] | |

| | | |
| --- | --- | --- |
| Nominee | Donald Trump | Joe Biden |
| Party | Republican | Democratic |
| Home state | Florida | Delaware |
| Running mate | Mike Pence | Kamala Harris |
| Electoral vote | 4 | 1 |
| Popular vote | 556,846 | 374,583 |
| Percentage | 58.51% | 39.36% |

EVEN WITH ALL AVAILABLE BENEFIT OF THE DOUBT THIS BRINGS THE
ELECTORAL COLLEGE VOTE FOR THE MOST RECENT ELECTION TO:
THIS BRINGS THE ELECTORAL COLLEGE VOTE TO:
TRUMP: 269 | BIDEN: 269

NOW, AS THE PERSON WHO REALIZED WE CURRENTLY HAVE A CONSTITUTIONAL
ELECTION, AND AS A BACKUP COMMANDER-IN-CHIEF WHO IS TOO YOUNG TO BE
PRESIDENT, YET, AND HAS CONSTITUTIONALLY VOTED FOR ROBERT F. KENNEDY,
JR. AND RON JOHNSON TO BE THE NEXT PRESIDENT AND VICE PRESIDENT
RESPECTIVELY TO UPHOLD OUR CONSTITUTION, AND ALSO WITHOUT POINTING
FINGERS, DUE TO MIKE PENCE'S DECLINATION TO RESOLVE THE OBVIOUS TIE
ABOVE:

IN MY OPINION, DONALD TRUMP IS CURRENTLY PRESIDENT, AND HILLARY
CLINTON IS CURRENTLY VICE PRESIDENT. SO THERE IS MY FOUNDATIONAL,
CONSTITUTIONAL, VOTE, WHICH IN MY OPINION RESOLVES ALL OF THIS MESS.
WITH NO OTHER CONCLUSION AND IF THIS IN FACT BE TRUE: BIDEN CAN'T BE
IMPEACHED SINCE HE'S NOT THE PRESIDENT, BUT HE CAN BE PROSECUTED FOR
ANY AND ALL BAD BEHAVIOR, THOUGH HE SHOULD BE TREATED WITH RESPECT.

IT IS ONLY FAIR FOR HIM TO BE PARDONED IF JOSEPH BIDEN WILL SIMPLY DO
THE CORRECT THING AND CORRECT HONEST MISTAKES, AS DONALD TRUMP
WOULD ALSO BE PARDONED, JUST AS HILLARY CLINTON HAS BEEN PARDONED.

EACH OF MY PROPOSED SOLUTIONS CREATES A PATTERN AND LINES UP IN A
WAY WHICH WOULD TRULY RESOLVE THIS MESS. THE ALTERNATIVE IS THAT
DONALD TRUMP IS GOING TO WIN THE UPCOMING ELECTION AND CAUSE A 3RD
TERM, WHICH IS AGAINST THE RESULTS OF ALEXANDER HAMILTON'S
FEDERALIST PAPERS OUT OF NEW YORK, THOUGH HE DID INITIALLY ARGUE FOR
WHAT NEW YORK MAY BE TRYING TO FORCE TO HAPPEN NOW, WHICH IS TO
CAUSE DONALD TRUMP TO BE ELECTED, THEN IMMEDIATELY IDENTIFY THAT "OH
HE WAS ALREADY PRESIDENT! SO NOW WE HAVE A 3RD TERM PRESIDENT AND
THAT'S A NEW PRECEDENT, NOW WE WANT A DICTATOR!"

IN MY OPINION BAD APPLES CONSPIRACY IS SO OBVIOUS IT CANNOT BE HIDDEN,
BAD APPLES AND THEIR BAD BEHAVIOR IS ABSOLUTELY INTOLERABLE, AND
CANNOT BE ALLOWED, AND THE SOLUTION I'VE PRESENTED MAY BE THE ONLY
WAY TO PREVENT BAD APPLES, PRESENT COMPANY EXCLUDED, FROM THEIR
OBVIOUS ATTEMPTS TO CAUSE WORLD WAR 3 AND NUCLEAR WAR, WHICH HAVE
BEEN ABSOLUTELY CONFIRMED BY PUBLIC THREATS AGAINST POLITICAL
OPPONENTS.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

------- Original Message -------
On Tuesday, August 22nd, 2023 at 10:34 PM, ThorfinThunder | GoldGrenade <jt4590@protonmail.com> wrote:





**administration (n.)**

IN MY OPINION, MY GOOD FAITH ACTIONS AND REPORTS OUT OF GENUINE CONCERN, ALONGSIDE HAMILTON'S FEDERALIST PAPERS, OUR CONSTITUTION, JURISPRUDENCE, CURRENT FILINGS, AND EVEN LATIN AT THIS POINT, SHOW THAT I WAS IDENTIFYING ISSUES REGARDING ADMINISTRATION [OF] EXECUTIVE AND JUDICIAL BRANCHES, BUT VERY SPECIFICALLY AND ONLY BAD APPLES AND BAD BEHAVIORS, WHILE INVESTIGATING IN DEPTH AND PROVIDING ANY AVAILABLE BENEFIT OF DOUBT.

mid-14c., *administracioun*, "act of giving or dispensing;" late 14c., "management (of a business, property, etc.), act of administering," from Latin *administrationem* (nominative *administratio*) "aid, help, cooperation; direction, management," noun of action from past-participle stem of *administrare* "to help, assist; manage, control, guide, superintend; rule, direct," from *ad* "to" (see ad-) + *ministrare* "to serve, attend, wait upon," from *minister* "inferior, servant, priest's assistant" (see **minister** (n.)).

It is attested by early 15c. as "management of a deceased person's estate under a commission from authority." The sense of "management of public affairs" is from 1680s; hence, "executive power in a government" (1731), though in Britain later *government* was used in this sense. The meaning "a U.S. president's period in office" is recorded by 1796 in the writings of George Washington.

The administration of government, in its largest sense, comprehends all the operations of the body politic, whether legislative, executive, or judiciary; but in its most usual, and perhaps in its most precise, signification, it is limited to executive details, and falls peculiarly within the province of the executive department. ["The Federalist," No. 72 (Hamilton)]

also from **mid-14c.**

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

-------- Original Message --------
On Aug 22, 2023, 1:53 AM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

In my opinion, our very existence and entered evidence thus far as a plaintiff in Missouri v. Biden categorically destroys many of the defendants argument against the injunction.

https://youtu.be/_s7kcB-a4Bs

How may we ever recover from the lost time to have and support our own family, from fear of death and destitution, from a potential heart attack or a heart episode, from broken back bones and detached ribs, from wrongful termination after potential unconstitutional surveillance, from forced scuttling of disaster recovery backups of patient data, from forced dissolution of a profitable small business I put savings and toils of years into, from displacement and legal fees, from being silenced and prevented from public office, from undue threats even for attempting to hand over potential evidence... how may we recover from harms and losses so severe and devastating we may never be able to retire?

In my opinion the defendant has failed to understand the purpose of the injunction and how potentially vast government overreach has been that absolutely required the injunction to be just as vast to be effective.

Because of what has occurred, I have explicit fear to even post on social media and I'm applying to be a government official. One of my posts I wished to repost yesterday on Facebook mentioned the Trump v. Goodyear controversy, where I defended the first amendment and free speech in 2020, but if I were to post this it may be subject to even further attacks, which is absolutely no stretch to have genuine concern about with an arrest and additional indictments against Donald J. Trump happening even today.

In my opinion each argument made by the defendant is fictitious and fractious except potentially the comments regarding that our esteemed FBI may be allowed to report regarding cyber criminal activities.

I disprove his arguments by my existence, and even my wife has fear of communicating with me over social media even privately regarding the same subject matter with the same genuine concerns and it is appalling in my opinion that these effects would be somehow willfully ignored by the defendants.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

-------- Original Message --------
On Aug 22, 2023, 1:12 AM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

After the 5th District Court's rulings on Title VII regarding employment discrimination and events including termination of employment, in my opinion it may be obvious why an employee of DirectEmployers Association falsely alleged misconduct against me and terminated me, a Catholic man and husband of Faith in God and a Pro Se Pro Hac Vice...

After denying my remote work certification for Louisiana where a recent Title VII case is based, along with a decision which would preclude that I have a viable discrimination claim and furthermore after selling their Taapestry Affirmative Action company prior to the repeal of Affirmative action, it may show that an employee in DirectEmployers Association makes not only business sales decisions based upon

upcoming legislation...

In my opinion it may also show that any decision regarding allowing surveillance of me, termination of my employment, and denying me any severance, or even Human Resources discussion, were based not upon the merits and performance of me as employee in a non-discriminatory way, but in direct antithesis with their oaths, FMLA, and Equal Opportunity Employment guidelines.

In my opinion a decision regarding my continued employment may have been discriminatory and based upon upcoming legislation and against my civil rights.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

------- Original Message -------
On Monday, August 21st, 2023 at 3:19 PM, ThorfinThunder | GoldGrenade <jt4590@protonmail.com> wrote:

[Under Whistleblower Protections]
[CORRECTION & CLARIFICATION]
In my opinion, the few bad apples may try to frame me and any witness for anything they can since they've been caught and reported privately out of genuine concern for their intolerable bad behaviors but not prosecuted.

So it may be pertinent for me to dispel even more of their consistent and repeatedly false allegations and defamations against me.

When I arrived at the Indianapolis International Airport in the very early morning of 12/10/2021, and before I passed any TSA security checkpoint, I had my hardshell, locked, cream-colored case, which had some shotgun shells in it. It also had bank account information I later took photos of for records.

This is legal, and despite being in genuine fear for my life from a few bad apples and their intolerable bad behaviors, I realized these were in the case before passing any security checkpoint, returned immediately to Joshua Ryan King-Baker's car, unlocked the case and removed important identification such as my social security card and birth certificate from the locked hardshell case, relocked the case and placed it in the car of J.R.K.B., another lawful concealed carry owner, who never entered the airport and immediately left, which is in full accord with carry laws, even without a permit and with:
49 CFR § 1540.111

Not only is this legal constitutionally and by jurisprudence, I could have flown without any change to my checked luggage because I had no firearm with me at all, and the ammunition was already in a locked hard shell case. My firearms were in the gun safe of two bad apples. Which one of the bad apples admitted was the case in texts, yet while denying their, and another bad apples documented and intolerable bad behaviors, and I didn't have time nor was it safe for me to retrieve these due to their bad behaviors.

The bad apple M.A.M.H. even tried to misrepresent private sales in what may have been another attempt to threaten me and another witness, J.R.K.B., in obvious collusion with J.B.T. who is very ill and made threats of harms and death upon my person, and against my lovely wife for no reason.

Bad apples have expressed in texts what may have been further attempts to threaten me with undue loss of constitutional and civil rights, and in my opinion, they simply expressed lack of understanding of laws regarding firearms in general, which gives me genuine concern regarding M.A.H.M., and J.B.T. each of which may have a severe mental illness, one of which is reportedly diagnosed, which may align with their confirmed, patterned, concerning, and intolerable bad behaviors.

Such as bad apples' threats, misrepresentation of laws, blackmailing, tampering with witnesses, threatening me and my wife with a civil suit, then attempting to file a civil injunction in an untimely fashion with no legal grounds to violate my constitutional and civil rights, along with attempts to cause another wrongful eviction.

Even after potentially attempting swatting against us via unnecessary welfare checks, and according to our esteemed FBI's documentation regarding the VCC NCOP, if so bad apples potentially committed terrorism against me and my wife, and defamed me to access an expunged case possibly to even enter any case against us.

Even my prior wrongful convictions being used potentially feloniously by bad apples to falsely allege me as a threat of any kind are directly against Indiana Code 35-41-3-2.

In my opinion this along with attacks against us both foreign and domestic, gave full precedent and requirement for me to request and receive full diplomatic immunity by heritage, Civil Laws, Rights of Succession, Usufruct, and even religious jurisprudence.

Bad apples actually violated our judicial system, civil rights, and our U.N. charter.

The intolerable bad behaviors being seen by bad apples in the current situation directly mimic their intolerable bad behaviors during my wrongful convictions, where I was forced not to go to trial by a bad apple and their intolerable bad behaviors, including attempting to frame me then by allowing the deletion of video evidence in my defense, just as they did during my school lawsuit, and by threats against all my livelihood, including my home, car, career and person to force me to be misrepresented by J.B.T., who I believe also may have made threats against my lawyer, the Esteemed Tom Hirschauer III.

I had to beg for my documentation, but I have no complaint, he is a great lawyer and he corrected any honest mistake and helped point me in the right direction to perform the incredibly amount of research required to even begin to escape bad apples' conspiracy.

In my opinion he is and was afraid of J.B.T., and I forgive him, but I had to request my legal documentation for about four years, including depositions which would help show the pattern of bad apples intolerable bad behaviors so I might not be murdered by bad apples and their intolerable bad behaviors.

Hunter Biden may have no precedent for immunity, but I do, especially since I was able to establish that some Revocable Trusts are being utilized unconstitutionally to create an unelected, unqualified, and tyrannical form of government, and the effects are documented.

Not only via an obvious conspiracy proven after research into bad apples and a confirmed pattern of their intolerable bad behaviors against all reason, our constitution, our foundations, and all

jurisprudence.

But also in current events including the horrific kidnapping of children by companies potentially utilizing unconstitutional Revocable Trusts for horrific and tragic intolerable bad behaviors such as kidnapping, human trafficking, and Cartel involvement.

It took me a week to document just a portion of the laws that bad apples may have broken with their intolerable bad behaviors against us, and our harms and losses are enormous.

Unlike bad apples, I've tried to clear good apples of any potential blackmail and prevent witness tampering, even researching members of our respected law enforcement and past police reports in depth to protect Police Chief Richard Roberts, respected former law enforcement officer and now respected town manager Douglas Young.

Along with a respected deputy who gave me a gun lock to ensure I could lock up a pistol before traveling, which had been mishandled by a bad apple and hidden in my gun case.

Respected officer Larry Kuhn advised me against going into the rental which other bad apples illegally evicted me from, or they may have attempted further to frame me then, and he also let me know to cut the locks off my gun case before traveling and check it, then to lock it with my own locks which I did.

In following his suggestion, I found a hidden firearm which bad apples may have mishandled, which I legally abandoned to respected law enforcement in Kentucky on an official abandonment form, because it used to belong to J.R.J. who reported some intolerable bad behaviors to me and my wife. I had purchased this pistol from J.R.J. earlier when he and his ex-girlfriend said J.R.J. may be suicidal and might harm himself or others.

When J.R.J. informed me of other intolerable bad behaviors, I suggested therapy and offered to pay for it for him, and let him know I was exiting his life. Therapy resources were offered, but then prevented by another bad apple, A.L.H., who despite studying to be a therapist, did not take J.R.J.'s issues seriously and instead tried to harm me and my wife in collusion with other bad apples.

After J.R.J. gave a more detailed description of his intolerable bad behaviors, I said he should turn himself in, and duly reported the information to our respected local law enforcement and our esteemed FBI.


[CLARIFICATION]
The chronological order was already documented, except for the obvious clerical error of Hagerty, which as stated I forgive them for their honest mistake. I may have repeated myself a bit here, but in my defense if bad apples weren't making such a mess, and if there wasn't any "CYA-ing" going on, I wouldn't have to clarify so often and heavily.

In my opinion, it would be so much simpler for the correct thing to have been done in the first place, or even at each step of this process, after I was told "well do this if this happens" where I repeatedly proved we already did the correct thing as suggested.

How many times do we need to reaffirm the pattern and how many honest mistakes do I need to forgive before the stated correct thing is simply done about the bad apples?

If they are removed from the situation and aptly prosecuted then the whole mess stops.
As a sincere inquiry, isn't this common sense, isn't it fundamentally how society works?

In my opinion bad apples have committed intolerable bad behaviors on a federal level, and if they were already arrested and prosecuted, they may not have the chance still to even attempt to push and blackmail others to make clerical errors, recant, etc. et al.

I'm not on the defense side of the bench unless bad apples broke our judicial system.
[CLARIFICATION]

Bad apples M.A.M.H. and A.L.H. seem to have attempted to continue their involvement with J.R.J., and to attempt to frame me despite that I had already reported out of genuine concern and left the situation.


[CORRECTION]
All aforementioned good apples identified such as the respected attorney I named, respected law enforcement I named, esteemed FBI, respected public servants, and present company excluded from any mention of bad apples and intolerable bad behaviors including mentions of attempts to frame me and/or cause loss of rights.

It is so tiring to so clearly identify who the bad apples are since they may actually be incapable of taking accountability and may have pointed at so many good apples.
Public officials who were in my opinion were previously threatened and/or blackmailed by bad apples, such as respected Police Chief Richard Roberts and Town Manager Douglas Young who helped file a police report and collect evidence of a severe beating I took as a teenager without anyone having to push him to do so. Unlike M.A.M.H. who watched the beating, laughed about my ability to somehow get back up afterward, and only put in an honest report because each his now wife, A.L.H., and my mother, L.K.B.T., expressed disappointment in his complete lack of assistance to a "friend."

[CORRECTION]
J.B.T., M.A.H.M., and J.R.J. included in bad apples and their intolerable bad behavior.
Those intolerable bad behaviors belong to bad apples representative of themselves.


Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

-------- Original Message --------
On Aug 21, 2023, 5:02 AM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:
Itinerary of my flight attached. A bad apple also texted my wife to attempt to determine my location during my absence, and later brought a stove to another bad apple in what Joshua Ryan King-Baker at the time said were attempts by the bad apples to acces and tamper with my main desktop computer.

May this give cause for my genuine concern?

May there be more attempts to frame me by bad apples for their own intolerable bad behaviors?

Sincerely,

Jon F. D. Turpin, Pro Se, Pro Hac Vice

-------- Original Message --------
On Aug 21, 2023, 4:49 AM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:
There is no defrauding here, however, Hagerty has made a clerical error after they purportedly
terminated the original insurance adjuster. The initial damage was noticed on 12/27/2021 and
12/28/2021.

I wasn't in the state after 12/10/2021, and two missing hard drives, which could have been tampered
with by some bad apples, and which were later appropriately reported to special agent Wright of our
Esteemed FBI to report to Officer Larry Kuhn. I report out of genuine concern that there may be
attempts to frame me regarding those hard drives.

A clerical error by Hagerty after a termination of the original adjuster, stonewalling any entry of the
original claim by not clarifying which dates they were including on the claim, then sudden mention of
incorrect dates out of order along with an Indiana code, then their and denial to produce the recording
referenced to a Pro Se Hac Vice forces me to report this to you out of genuine concern.

This has been reported to our respected law enforcement, our Honorable Todd Rokita, and our
Honorable Jeffrey Landry for their experienced review and discernment.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

-------- Original Message --------
On Aug 20, 2023, 5:29 AM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:
I've let our Honorable Pinkertons know that Hagerty has surely made a clerical error on dates in their
most recent insurance letter.

Maybe it's coincidence, but each is based in Michigan. Either way, we forgive them for the honest
mistake about our oral history as well.

We're all Turpins.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

Case 1:23-cv-01059-JE-JPM   Document 17   Filed 11/21/23   Page 28 of 307 PageID #: 2824

 **Gmail**                                                                    Jon F Turpin <jt4590@gmail.com>

---

## PIN 20220718 - Cyber Criminals Create Fraudulent Cryptocurrency Investment Applications to Defraud US Investors
1 message

---

**infragardteam@ignconnect.org** <infragardteam@ignconnect.org>                Mon, Jul 18, 2022 at 8:21 AM
To: jt4590@gmail.com

Attention InfraGard member,

*You have received a new broadcast message.*

A new Private Industry Notification (PIN) titled "Cyber Criminals Create Fraudulent Cryptocurrency Investment Applications to Defraud US Investors" has been posted to the InfraGard system.

To read this document you must login to the InfraGard system. This document is located on the secure site: Publications > Documents > Flash & Pins.

Please contact InfraGardTeam@fbi.gov for account assistance.

Please do not reply directly to this email. Thank you!

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Cyber Criminals Accessed FBI's InfraGard Membership Portal
1 message

**infragardteam@ignconnect.org** <infragardteam@ignconnect.org>
To: jt4590@gmail.com

Wed, Dec 21, 2022 at 8:28 PM

Dear InfraGard Members,

InfraGard National Members Alliance, representing the private sector component of the InfraGard program, is reaching out to connect with our InfraGard members regarding the important events of the past few days.

Our team has a long history of working very closely with our FBI partners, and we have remained in close communication ever since an article was published, titled *FBI's Vetted Info Sharing Network 'InfraGard' Hacked,* on December 13. Please be assured that all available resources have been dedicated around the clock to gaining a better understanding of this situation, and as a result, the FBI was quickly able to provide additional information.

On Friday, December 16, the FBI issued the attached Private Industry Notification (PIN) to all InfraGard members, titled *Cyber Criminals Accessed FBI's InfraGard Membership Portal.* Please carefully review the contents of this PIN and take special care to implement the recommendations provided by the FBI. Nothing is more important to us than our members, and we ask you to take these steps as soon as possible to protect yourself from potential cyber-attacks using the exfiltrated information.

This PIN is classified as TLP: Amber and restricted to InfraGard members only. Please do not share or distribute this PIN to anyone who is not an InfraGard member.

We will continue to keep the lines of communication open and appreciate your patience as our FBI partners continue to look into this matter. While we all joined InfraGard for different reasons, the common thread of serving our nation and the American people binds us all together, even during this challenging time. Serving and protecting our members' best interests is our top priority, and we will reach out again as soon as we can.

Best Regards,

Ivan Wolkind, Chairman

Douglas Farber, President

Gene Kingsley, Vice President

Sandy Moul, Executive Director

InfraGard National Members Alliance

Please do not reply directly to this email. Thank you!

📄 **PIN_InfraGard_221216.pdf**
619K



TLP: AMBER+STRICT

# Private Industry *Notification*

### FEDERAL BUREAU OF INVESTIGATION ◆ CYBER DIVISION

**16 December 2022**

**PIN Number**

20221216-001

The following information is being provided by the FBI, with no guarantees or warranties, for potential use at the sole discretion of recipients to protect against cyber threats. This data is provided to help cyber security professionals and system administrators guard against the persistent malicious actions of cyber actors. This PIN was coordinated with DHS/CISA.

This PIN has been released TLP: AMBER+STRICT The information in this product may be shared with members of your organization on a need-to-know basis to protect their organization and prevent further harm.

**Please contact the FBI with any questions related to this Private Industry Notification via your local Cyber Task Force or FBI CyWatch.**

www.fbi.gov/contact-us/field-offices | Email: cywatch@fbi.gov | Phone: 1-855-292-3937

# Cyber Criminals Accessed FBI's InfraGard Membership Portal

## Summary

The FBI is informing InfraGard members of a potential data breach of the InfraGard member portal and the potential threat of continued exploitation by malicious cyber actors. On 10 December 2022, a cyber criminal allegedly offered to sell the contact information for more than 80,000 InfraGard members on the Breached English-language cyber crime forum. The sale and exposure of this sensitive information could lead to subsequent cyber attacks against members of organizations affiliated with InfraGard. In response, the FBI immediately locked all user accounts and has paused processing of all new InfraGard applications. There is currently no evidence of any additional security vulnerabilities on the InfraGard portal.

The FBI provided in an earlier statement that, "The FBI is aware of a potential false account associated with the InfraGard Portal and is actively looking into this matter. This is an ongoing situation, and we are not able to provide any additional information at this time." The FBI will continue to provide additional information as appropriate.

TLP: AMBER+STRICT

TLP: AMBER+STRICT

## Threat

Cyber actors routinely seek opportunities to conduct attacks against government and law enforcement organizations for a variety of motives. On 10 December 2022, at least one cyber criminal offered to sell contact information of approximately 80,000 FBI InfraGard partner entities on Breached, an English-language cyber crime forum. The cyber criminal who posted the data used the handle 'USDoD' and the seal of the US Department of Defense as their avatar. The FBI does not believe 'USDoD' has any affiliation to the US Government. The Breached cyber criminal forum is viewed by the cyber criminal underground as the successor to RaidForums, which was seized by the FBI in April 2022.

'USDoD' claimed to have gained access to the InfraGard system by possibly social engineering a new account using the personal details of a financial industry CEO in November 2022. 'USDoD' was able to complete the multi-factor authentication required to access InfraGard by using a fictitious email address. 'USDoD' allegedly exfiltrated available InfraGard user data using a python script that queried InfraGard's Application Programming Interface (API).

After posting the stolen data, 'USDoD' began communicating directly with a small number of InfraGard members through the online portal using the newly created account under the assumed identity of that CEO. According to a reputable online cyber news and security website, the user stated they hoped their imposter account would exist unnoticed long enough to send direct messages as a CEO to other executives through the InfraGard messaging portal. In the Breached forum post advertising the data, 'USDoD' demanded $50,000 for the data. Initial assessment of data exposed includes aspects of: usernames, first and last name, phone numbers, business title, email addresses, organization, critical sector association, and zip codes.

The FBI has locked down all InfraGard member accounts at this time and paused processing of all new InfraGard accounts. There is currently no set timeframe for when accounts will be reactivated. There is currently no other evidence of nefarious activity on the InfraGard portal. The FBI is aware of the demand and interest for more information on this topic and will continue to provide messaging as appropriate.

## Recommendations

FBI recommends InfraGard members take the following steps to protect themselves from malicious cyber-attacks using the exfiltrated information.

- Use strong passwords and regularly change passwords to network systems and all business and personal accounts, implementing the shortest acceptable timeframe for password changes. Avoid reusing passwords for multiple accounts.

TLP: AMBER+STRICT

- Ensure mobile carriers place additional security measures on accounts to avoid SIM swapping.
- Any credible threatening information should be reported to law enforcement for their awareness to guard against swatting.
- Scrub social media accounts for personal details. Any piece of data alone can be innocuous, but tied to other sources, it becomes a full picture of an individual. Online behavior can reveal patterns of life that can lead to physical risks in the real world.
- Protect your personal information. If people contacting you have key details from your life—your job title, multiple email addresses, full name, and more that you may have published online somewhere—they can attempt a direct spear-phishing attack on you. Cyber criminals can also use social engineering with these details to try to manipulate you into skipping normal security protocols.
- Regularly conduct web searches for your company name to identify results that return multiple websites that may be used in a scam. For example, the actual website "abccompanyllc.com" may be spoofed by fake domains such as "abccompany.biz", "abccompany11c.com", or "abcompanyllc.com".
- Notify company personnel of the breach and educate employees about BEC scams, including preventative strategies such as how to identify phishing emails and how to respond to suspected compromises, and look at the FBI resources for the latest trends.
- Be wary of hyperlinks. Avoid clicking on hyperlinks in emails and hover over links to verify authenticity. Also ensure that URLs begin with "https." The "s" indicates encryption is enabled to protect users' information.
- Double your login protection. Enable multi-factor authentication (MFA) to ensure that the only person who has access to your account is you. Use it for email, banking, social media, and any other service that requires logging in. If MFA is an option, enable it by using a trusted mobile device, such as your smartphone, an authenticator app, or a secure token—a small physical device that can hook onto your key ring.
- Think before you act. Be wary of communications that implore you to act immediately. Many phishing emails attempt to create a sense of urgency, causing the recipient to fear their account or information is in jeopardy. If you receive a suspicious email that appears to be from someone you know, reach out to that person directly on a separate secure platform. If the email comes from an organization but still looks "phishy," reach out to them via customer service to verify the communication.

## Additional Resources

The Department of Homeland Security Cybersecurity and Infrastructure Security Agency (DHS-CISA) offers a range of no-cost cyber hygiene services to help critical infrastructure organizations assess, identify, and reduce their exposure to threats, including ransomware. By requesting these services, organizations of any size could find ways to reduce their risk and mitigate attack vectors.

TLP: AMBER+STRICT

Direct any additional requests or questions to the FBI Private Sector Coordinator at your local FBI Field Office: https://www.fbi.gov/contact-us/field-offices.

## Reporting Notice

The FBI encourages recipients of this document to report information concerning suspicious or criminal activity to their local FBI field office or the FBI's 24/7 Cyber Watch (CyWatch). Field office contacts can be identified at www.fbi.gov/contact-us/field-offices. CyWatch can be contacted by phone at 855-292-3937 or by email at CyWatch@fbi.gov. When available, each report submitted should include the date, time, location, type of activity, number of people, type of equipment used for the activity, the name of the submitting company or organization, and a designated point of contact. Press inquiries should be directed to the FBI's National Press Office at npo@fbi.gov or (202) 324-3691.

## Administrative Note

This product is marked TLP: AMBER+STRICT. The information in this product may be shared with members of your organization on a need-to-know basis to protect their organization and prevent further harm.

TLP: AMBER+STRICT

## Your Feedback Regarding this Product is Critical

*Please take a few minutes to send us your feedback. Your feedback submission may be anonymous. We read each submission carefully, and your feedback will be extremely valuable to the FBI. Feedback should be specific to your experience with our written products to enable the FBI to make quick and continuous improvements to these products. Feedback may be submitted online here*

 Gmail

Jon F Turpin <jt4590@gmail.com>

---

## Update on InfraGard Data Compromise
1 message

**infragardteam@ignconnect.org** <infragardteam@ignconnect.org>    Sat, Dec 24, 2022 at 3:20 PM
To: jt4590@gmail.com

Attention InfraGard member,

*You have received a new broadcast message.*

InfraGard Members,

We want to thank you for your patience during this time of uncertainty regarding the compromise of data to the InfraGard Portal. The InfraGard Program Office wanted to provide you all with the following update regarding what data was compromised, and the status of the InfraGard Portal for the immediate future.

**What data fields were taken during the compromise of the InfraGard Portal?**

The following fields were taken during the data compromise and exposed:

**UserID** (always visible), **UserName** (always visible), **First Name, Last Name** (If marked visible), **Chapter** (always visible), **Sector** (always visible), **Organization** (if marked visible), **Position Title** (if marked visible), **Email** (if marked visible), **Is Speaker** (always visible), **Speaker Description** (always visible)

There were no DOBs or SSNs involved in the data compromise. While the above fields were taken during the data compromise, it is important to note that for members who marked certain data fields as "Private" (not visible to other members) asterisk(s) appear for those fields. *The data is no longer for sale but has been posted on a cyber-criminal forum. As a result, this could lead to other actors posting or even selling the data in other forums.*

As a result of this data compromise, we encourage members to follow all guidance noted in the PIN sent on 12/16/2022. A summary of best practices noted in the PIN are below.

The FBI recommends InfraGard members take the following steps to protect themselves from malicious cyber-attacks using the exfiltrated information.

• Use strong passwords and regularly change passwords to network systems and all business and personal accounts, implementing the shortest acceptable timeframe for password changes. Avoid reusing passwords for multiple accounts.

• Ensure mobile carriers place additional security measures on accounts to avoid SIM swapping.

• Any credible threatening information should be reported to law enforcement for their awareness to guard against swatting.

• Scrub social media accounts for personal details. Any piece of data alone can be innocuous, but tied to other sources, it becomes a full picture of an individual. Online behavior can reveal patterns of life that can lead to physical risks in the real world.

• Protect your personal information. If people contacting you have key details from your life—your job title, multiple email addresses, full name, and more that you may have published online somewhere—they can attempt a direct spear-

phishing attack on you. Cyber criminals can also use social engineering with these details to try to manipulate you into skipping normal security protocols.

• Regularly conduct web searches for your company name to identify results that return multiple websites that may be used in a scam. For example, the actual website "abccompanyllc.com" may be spoofed by fake domains such as "abccompany.biz", "abccompany11c.com", or "abccompanyllc.com".

• Notify company personnel of the breach and educate employees about BEC scams, including preventative strategies such as how to identify phishing emails and how to respond to suspected compromises, and look at the FBI resources for the latest trends.

• Be wary of hyperlinks. Avoid clicking on hyperlinks in emails and hover over links to verify authenticity. Also ensure that URLs begin with "https." The "s" indicates encryption is enabled to protect users' information.

• Double your login protection. Enable multi-factor authentication (MFA) to ensure that the only person who has access to your account is you. Use it for email, banking, social media, and any other service that requires logging in. If MFA is an option, enable it by using a trusted mobile device, such as your smartphone, an authenticator app, or a secure token—a small physical device that can hook onto your key ring.

• Think before you act. Be wary of communications that implore you to act immediately. Many phishing emails attempt to create a sense of urgency, causing the recipient to fear their account or information is in jeopardy. If you receive a suspicious email that appears to be from someone you know, reach out to that person directly on a separate secure platform. If the email comes from an organization but still looks "phishy," reach out to them via customer service to verify the communication.

**When can I get back in the Portal to update my password, or change my settings?**

Currently the InfraGard Portal is not available for use by membership and will not be until further notice.  If you have additional questions regarding Portal status, please reach out to your FBI Private Sector Coordinator, or email us at InfraGardTeam@fbi.gov

Thank you,

The InfraGard Program Office

Please do not reply directly to this email. Thank you!

11:06 📱 ⊘ 🅜 📷 📷 📷  •            ᴏ━ 🔋 📵 🛜 ᵢₗ 26%⬆

← Post



**Benny Johnson** ☑ ⁹ᵐ                    Subscribe

Election fraud is now being exposed across
the country.

-In Connecticut, a city employee has been
accused of stuffing ballot boxes to sway
the outcome of a mayoral primary election
after surveillance video evidence was
discovered

-In New Jersey, multiple Democrats
have been charged with election fraud—
Paterson Council Speaker, Alex Mendez,
stole mail in ballots, filled them out,
and mailed in fake ballots to rig election
outcome

-In Michigan, GBI Strategies allegedly
sent hundreds of thousands of fake
ballot applications to Muskegon County
to collect fraudulent ballots and deposit
them into mail in ballot drop boxes

-In Arizona, a Democrat woman was
convicted for harvesting ballots in a mail in

Reply to reply                              

       ‹            ◯            |||

11:06

Post

after surveillance video evidence was
discovered

-In New Jersey, multiple Democrats
have been charged with election fraud—
Paterson Council Speaker, Alex Mendez,
stole mail in ballots, filled them out,
and mailed in fake ballots to rig election
outcome

-In Michigan, GBI Strategies allegedly
sent hundreds of thousands of fake
ballot applications to Muskegon County
to collect fraudulent ballots and deposit
them into mail in ballot drop boxes

-In Arizona, a Democrat woman was
convicted for harvesting ballots in a mail in
ballot collection scheme

In all cases, mail in ballots are at the center
of the fraud schemes.

When will we actually have election
security in this country?

986K Views



8:35

**R** **Leading Report** ✓

BREAKING: True the Vote claims there
were over 200 'mules' in the city of
Phoenix, Arizona, that delivered to 10+
drop boxes during the 2020 election, with
an estimated 207,000 harvested votes
statewide.

64.5K Views

**2,043** 25 Quotes **4,336** Likes

44

**Yogini** ✓
This is substantial, is accurate🤯

Wow, more and more evidence each day.
Who can we really trust?

**Ken Thereaux** ✓



12:57 ← Post

**Leading Report**

BREAKING: Former GOP Arizona Attorney General nominee Abe Hamadeh has filed a lawsuit to decertify and redo the Maricopa County 2022 election due to machine failures that "affected tens, if not hundreds, of thousands of votes."

161K Views

2,123       35       8,335

70

**Joshua Walker**

Maricopa County alone needs to have every election investigated.

That state is the epicenter of election fraud!

**Kevin Coggins**

Let's decertify the 2020 election as well.



12:42

83%

← Post

R **Rasmussen Reports** ⊕

## AZ Senate Forensic Report: "In excess of 200,000 individual ballots were printed on unauthorized, not official compromised commercially available papers not suitable for compliant ballot-voting stock. Ten-percent of the (2.1M 2020) ballots cast in Maricopa County in the Arizona general election were compromised due to the wrong paper ballot stock being utilized."

R **Rasmussen Reports** ⊕

AZ 2020 Counterfeit Ballot Exhibits: Be kind and share?
- Maricopa County 2020 Ballot official paper standard
- Voter-volunteer ballot hand-examination find...





← Post

**Leading Report** ☑

BREAKING: Arizona Gov. Katie Hobbs'
Election Task Force concluded that
then-Secretary of State Hobbs engaged in
election interference in 2022 by preventing
Arizonans from voting while running her
own election for governor.

**616K** Views

**7,422** **294** **25.2K**

**394**

**DanaD** ☑
How about let's do something about it?! 🙄

**Joshua Walker** ☑
That's just the tip of the iceberg in Arizona.

The whole voting system needs abolished
and those guilty need criminally charged.



11:14 · · 100%

**Elon Musk** @ @elonmusk · 1d

Judge orders a new election in Connecticut town after surveillance video showed ballot stuffing in drop boxes!

That this happened here is beyond reasonable doubt. The only question is how common it is.

🎙 **Benny Johnson** @ @bennyjohn... · 2d

🎙 Judge Overturns Bridgeport Democrat Mayoral Primary Election, Calling Evidence of Fraud 'Shocking'

"The volume of ballots so mishandled is...



**Bridgeport**, Elections

# Court Overturns Ganim Win in Bridgeport Primary, Calling Evidence of Fraud 'Shocking'



10:56

← Post

**Leading Report**

BREAKING: A Connecticut judge has
overturned the results of Bridgeport's
Democratic mayoral primary, ordering
a new election after video evidence of
election fraud was found.

0:01

432K

4,210        297          12.3K

188

EC



8:23

← Post

**Leading Report**

BREAKING: Florida lawmakers have introduced a bill that will require all ballot boxes to be supervised by law enforcement at all times during an election until they have been transported to the supervisor.

**167K** Views

**2,295** Reposts   **92** Quotes   **11K** Likes

**34**

**Rudy**
So common sense?

**Rae A**
Good. Seems like a no-brainer.

**GodTier J8k**



8:35

← Post

**Leading Report**

BREAKING: VoterGa claims that during the 2020 Georgia elections, 1.7 million ballot images were illegally destroyed, with video monitoring also missing for 181,000 drop-box ballots.

**69K** views

**2,390** **51** **4,870** Likes

**71**

**Southern FFA Family**

Whoa. 😂😂😂😂

**Vox Populi**

But we were told that it was the most secure election in history 🐸



8:34

← Post

**R** **Leading Report**

BREAKING: True the Vote identified 67 ballot-harvesting "mules" in Atlanta that went to an average of 24 drop boxes and also participated in the 2020 Antifa riots.

74.5K

**2,185**   **38**   **4,842**

**63**

**Nine Foot Couch**
So the question is, which was their primary operation and which one was the added bonus? I say the rioting was just for fun.

**OneSilverBullet2.0**
Oh boy, wait until Madam Gabriel Sterling finds out 😂😂😂😂😂

**Bill C.**



8:34

← Post

**Leading Report**

BREAKING: A retired DoD analyst says large injections of votes, over 10,000, were added on five occasions during the Georgia Senate runoff race overnight.

158K

3,609   73   8,599

116

**Ken Theroux**  @KenTheroux  05 Oct

"Huh, that's strange."



11:23

← Post

**R  Leading Report** ✓                    Following

BREAKING: Cybersecurity expert Russell
J. Ramsland, Jr., testified that his team
identified over 96,000 phantom votes in
the Georgia 2020 election, meaning that
they had been counted, but there was no
record of the counties recording those
ballots as "received."

**561K** Views

**6,055**         **216**         **15.9K** Likes

**363**

**MatthewJshow** ✓
2020 election was stolen.

We all know it!

**Ramblin On** ✓
They can't prosecute Trump for being right!



8:24

Post

**Leading Report**

BREAKING: Louisiana has become the first state in the nation to fully crack down on election meddling and pass a constitutional amendment that bans 'Zuckbucks' and foreign money in state elections.

**223K** Views

**3,418** **108** Quotes **15.8K** Likes

**63**

**Nick**

This is step one of many steps to stop corruption.

Every state should adopt this!

Time for congressman to be BOLD and Reject Passivity. Time to but the American public back 1st.



8:23

← Post

**Leading Report**

BREAKING: Election expert Charles Cicchetti analyzed absentee ballots in Detroit in the 2020 election and found that 174,384 out of 566,694 did not have registration numbers.

**817K** Views

**9,305**      **407**      **24.7K** Likes

**611**

**Andrew Castiglia** · 17 Oct

Not discrediting the lack of registration numbers on counted ballets but unless they all add up to more than 7 million votes across the entirety of the United States none of it matters as it would not have changed the actual outcome of the race only made it a narrow margin win

**Christy Helton** · 17 Oct





8:38

← Post

**Leading Report** ⦿

BREAKING: A report presented to Congress went over 130,000 incidents of what statistical PhDs found were actual voter fraud in Nevada, not just statistical analyses.

**69K** views

**1,557** **25** **3,766**

**57**

**Yogini** ⦿
This doesn't make sense
PhDs found statistically considered infractions ... but not statistical analysis?

**Nine Foot Couch** ⦿
But the cheating is **not wide spread.**
~ My Leftist family at Thanksgiving dinner.



8:17   🔋 52%

← Post

**Leading Report** ✓

BREAKING: Two Democrats in New Jersey are facing new state mail-in ballot election fraud charges after having previously been charged in 2020 and 2021.

Two NJ Democrats Charged With Election Fraud Involving Mail-in Ballots & Registration

86.1K views

**1,664** Reposts   **48** Quotes   **5,106** Likes

**86** Bookmarks



8:21

← Post

**R** **Leading Report** ☑

BREAKING: An election expert's report shows that Biden got an extra 300,000 unexpected votes in New York during the 2020 election and an extra 75,000 unexpected votes in Illinois.

**756K**

**6,732**    **344**    **19.5K**

**422**

**Mila Joy** ☑ · 19 Oct

What does "unexpected" mean?

**Darlene Richard** ☑ · 19 Oct

Is this like locking the gate after the horse has escaped? All this damage to President Trump! Breaks my heart. America is being lost.



8:37

**Leading Report** ✓

BREAKING: A retired DoD analyst has testified that he examined voter data in Pennsylvania and observed 79k votes being shifted by machines ostensibly from Trump to a third-party candidate, then shifted ostensibly back to Biden.

**880K** Views

**10.1K** Reposts   **354** Quotes   **24.3K** Likes

**698** Bookmarks

**Vicki green** ✓
That is almost enough to nullify that election. I would rather go down the list to McCarthy than keep Biden and Harris in there.

**The Prince of Nuance** ✓
Testified where?



8:34

← Post

**Leading Report**

BREAKING: A retired DoD analyst has testified that 280,000 to 300,000 votes in Pennsylvania were "vote laundered" through the electronic tabulating machines.

905K Views

11.1K          363 Quotes   29K Likes

647

**Rapidsloth**
Everyday:



3:51

← Post

**Leading Report**                    Follow

BREAKING: Texas cybersecurity expert Russell J. Ramsland, Jr., has testified that his team discovered Biden picked up 78% of Dominion counties but only 46% of counties using machines from other manufacturers in 2020.

**862K** Views

**7,978**          **371** Quotes    **23.5K** Likes

**765**

**Nobody** ★ ⚑ ★
I keep seeing all this data coming out but nothing being done.

**Calvin N. Cole**
Source?

XM.COM



← Post

**Leading Report**

BREAKING: An audit of the 2022 primary election in Harris County, Texas, shows that the count had at least 14 mobile ballot boxes that did not have proper chain of custody records for 184,999 ballots.

288K Views

4,070 Reposts   122 Quotes   11.5K Likes

193

**Molly Pitcher**

2000

FROM DINESH D'SOUZA

8:21

← Post



**Leading Report**

BREAKING: Texas Secretary of State has released bombshell findings from the 2022 midterm election audit of Harris County that reveal:

· Harris County had 9,000 more voters in the registration system than what was reported to the state.

· Almost 3,600 mail-in ballots were sent to voters but not reported to the state.

· 27% of polling locations failed to return or properly complete the necessary paperwork.

**1.4M** Views

**10.3K** Reposts   **418** Quotes   **29.5K** Likes

**809** Bookmarks



**S Led23**

8:29

Post



**Chuck Callesto** ✅

Subscribe

BOMBSHELL REPORT: 47 boxes of ballots MOVED to Hyatt Regency in Wisconsin on November 3, 2020..

"Somewhere around 6:15AM, ballots will begin to arrive at the HOTEL."

There will be approximately 47 BOXES OF BALLOTS that will go to the Grand Ballroom."

"Do not UNLOCK Grand ballroom until Michael Spitzer-Rubenstein REQUESTS and is with security."

Michael Spitzer-Rubenstein listed as is a Democratic Party-aligned consultant and operative who was the Wisconsin lead for the left-of-center National Vote at Home Institute (NVAHI) in Green Bay, Wisconsin, for the 2020 election. -Influencer Watch





8:29

← Post

and is with security."

Michael Spitzer-Rubenstein listed as  is a Democratic Party-aligned consultant and operative who was the Wisconsin lead for the left-of-center National Vote at Home Institute (NVAHI) in Green Bay, Wisconsin, for the 2020 election. -Influencer Watch



1.3M Views

13.4K          494          24.1K



11:00

← Post

**Leading Report**

BREAKING: Wisconsin House Speaker has advanced Articles of Impeachment filed against Wisconsin Election Administrator Meagan Wolfe after she allowed illegal ballot drop boxes all over the state and illegally enabled voting in nursing homes, resulting in massive fraud.

28K

**784** 30 **2,453**

22

**ghettomensachick**

Trump won

**Steven Miller, MD, PhD**

Any individual who attempts to tamper with an election undermines the very foundation of our democracy and should face the gravest of repercussions. Such deceitful acts



8:36

← Post

**Leading Report**

BREAKING: Federal prosecutors admitted two Iranian nationals hacked into a state's database and stole the identities of 100,000 voters in an effort to influence the 2020 election.

**93.3K** Views

**2,024**    **60** Quotes    **3,902** Likes

**86**

**Quintin G**
That's it. Where's the rest of the story

**Vox Populi**
If we had an impartial FBI this would be a priority to get to the bottom of

**NoCodeDevs**    Ad
You don't need to be a developer to build



8:37  50%

← Post

**Leading Report**

BREAKING: True the Vote claims 7 percent of mail-in ballots, 4.8 million nationwide, were illegally trafficked during the 2020 election.

192K Views

3,382   68   8,174

108

**Ken Theroux**

**Steve McQueen**



8:36

**Post**

**Leading Report** ✓

BREAKING: True the Vote has uncovered that federal agencies were involved in ballot harvesting during the 2020 election.

**696K** Views

**7,460** Reposts  **210** Quotes  **20.1K** Likes

**351** Bookmarks

**Mofobian** ✓ @Mofobian · 02 Oct
Replying to @LeadingReport

This continues to flow in but we continue to be told "where's the proof". If you are still denying that the 2020 election was stolen for a purpose, you are just ignoring our reality. It is a shame, because that denial is going to leave a lot of people wondering why they are... Show more

**bren the autistic bear** ✓ @... · 03 Oct
Replying to @LeadingReport

They normalized ballot harvesting as a legal strategy and with valid signatures what is the recourse? The entire idea of mail-in's simply



8:33

← Post

**Leading Report**

BREAKING: A complaint filed with SCOTUS says that if the rejection rate for signatures had remained the same in 2020 as it was in 2016, Trump would have received a net 25,587 more votes, making him the winner in Georgia.

**173K** Views

**3,285** **61** **10.9K**

**122**

**bobbld.eth**
The same Georgia that indicted Trump?

**Cardero White**
Trump won every battle Ground state and most other states as well. The ballot dumps used to up Bidens votes were fraudulent and almost everyone knows it now



8:30

← Post

**Leading Report** ✓

BREAKING: Among states with the narrowest margins of victory in 2020, such as Arizona, Georgia, and Wisconsin, Trump is firmly ahead of Biden at 41% vs. 35%, according to a new Reuters poll.

**74.1K** Views

**957**    **25**    **4,055**

**25**

**Yogini**
Reuters is no-go😂

By a landslide, like I've said before it was a stolen election!

**IcarusPhoenix27**

11:45 📵 100%

For you                    Following

**Julie Kelly** ✈️ @julie_kelly2 · 6h

Hot off the presses: I just received the transcript from Nov 1 classified docs hearing before Judge Cannon.

Here's the passage where Trump's lawyer discusses discovery of "extensive" collaboration btw Biden White House, DOJ, NARA, and intel agencies prior to indictment:



🗨 📤 ♡ ⇧

10      We have seen communications between NARA and the

11  Department of Justice and the White House and the Special

12  Counsel that started way before what has been publicly

13  disclosed and extensive meetings, extensive communications; and

14  so we feel very strongly and expect that we will win on that,

15  when we file the motion that NARA is absolutely part of this

16  prosecution team and that the intelligence communities that

17  they worked very closely with in determining the -- well, from

18  what we can tell, the particular documents that they chose to

19  charge, so there is purportedly a tranche of documents that

20  have classified headings on them, and then 32 that they decided

21  to charge.  That wasn't just done in a vacuum.  They didn't

22  just, you know, pick 32 documents out of a hat and say, "We

23  will go with these."  There was a lot of coordination that we

24  can tell from the materials we do have with the intelligence

25  community that ultimately led them to proceed the way they did.

17

1       So yes, we have an answer with them.  They say very

2  strongly that they view the prosecution team as being limited

3  to the Special Counsel's Office and the FBI, and we very

4  strongly believe that's wrong.



12:55

← Post

**DOC**

People are asking me what this means...
IMO.

The RICO case against Trump et al. in
Georgia tries to prove that Trump knew the
election in Georgia was fair and there was
no fraud, that his questioning of the vote
count was an attempt to steal the election,
and that Biden was legally elected in that
state.
In this case, **Flavorito v. Wan** and its
companion case **Jeffords v Fulton County**
(they will be tried together) will prove that
Georgia counted 150,000 fake ballots that
put Biden over the top.

They can't find those ballots now.

What will it do to the RICO case?
It will destroy it, and also the Indictment in
D.C.

**DOC**

This is the most important case in America.



12:55

← Post

🐦 **DOC** ✓ @............. 1d
This is the most important case in America.

And the State of Georgia just folded their hand.

I talked about this months ago......

> **DOC** ✓ @doctormalibu · 5/22/R5
> For reference, it is actually TWO 2020
> Election FRAUD cases being returned to the
> **Georgia** Trial Court.
>
> **Favorito v Wan** A22A0939
> law.justia.com/cases/georgia/...
>
> and **Jeffords v. Fulton** County A22A1097
> referenced
> law.justia.com/cases/georgia/...
>
> **DOC** ✓ @doctormalibu · 5/22/R5
> Coming to a Georgia trial court soon. A
> 2020 election challenge.

**5,171** Views



4:06

← Post

**Leading Report**

BREAKING: A lawsuit dating back to 2017 in Georgia regarding alleged vulnerabilities in Dominion Voting Systems machines is set for trial in January, where the plaintiffs will seek to switch from electronic voting machines to paper ballots.

**24.1K** Views

**695** Reposts  **18** Quotes  **2,432** Likes

**17** Bookmarks

**Richard Moreland**
Replying to @LeadingReport
Why did it take 5 years to go to trial?

**Mycological**
Replying to @LeadingReport

.

Elections are the most important aspect of maintaining our Republic.

I am reposting any post regarding election



← Post

set for trial in January, where the plaintiffs will seek to switch from electronic voting machines to paper ballots.

**24.1K** Views

**695** **18** **2,432** Likes

**17**

**Richard Moreland**

Why did it take 5 years to go to trial?

**Mycological**

Elections are the most important aspect of maintaining our Republic.

I am reposting any post regarding election security.

Please join me in this practice to keep election security at the forefront of discussion.

8:17

Post



R  **Rasmussen Reports** ⊘

Why is voter discovery of unfolded pristine mail ballots with perfectly filled in ovals in 2020 a huge problem for 2024?

They are a likely indicator of a multi-state counterfeiting operation, something that requires specialty ballot software to do because of precinct voting.

More here -

R  **Rasmussen Reports** ⊘ @Rasmuss... · 25 Sep
Tea Leaves: A reasonable theory for the extraordinary multi-state early morning vote count pause. The electronic vote results were in, and large batches of perfect counterfeit ballots were at the ready to back-fill the gaps for Biden...



8:17

## Post

counterfeiting operation, something that requires specialty ballot software to do because of precinct voting.

More here -

R  **Rasmussen Reports**

Tea Leaves: A reasonable theory for the extraordinary multi-state early morning vote count pause. The electronic vote results were in, and large batches of perfect counterfeit ballots were at the ready to back-fill the gaps for Biden...



158K

8:17

← Post

R **Rasmussen Reports**

Tea Leaves: A reasonable theory for the extraordinary multi-state early morning vote count pause. The electronic vote results were in, and large batches of perfect counterfeit ballots were at the ready to back-fill the gaps for Biden to "win." This is why blocking audits was key



Archer Bowman @Archer9M · 21 Sep

12:43 · · · · · ·                    ·· · · 83%

← Post



𝓣𝓱𝓮 𝓣𝓱𝓮                    **Following**

This is what a Left leaning Liberal who
supported both Hillary Clinton and Joe
Biden had to say about the 2020 Election:
"Google alone shifted more than 6 Million
Votes to Joe Biden... We learned how to
look at and Election that took place, look
at the numbers and we can factor out
Google now. So in 2020 Trump wins 5
out of what were generally considered 13
Swing States, if you factored out google,
Trump would of won 11 of those 13 Swing
States and easily, easily would have won
the Electoral College."

To know that Google has this kind of an
influence on our Elections, just imagine
all the search suggestions on Google and
the shadow banning of accounts on all the
Social Media Platforms, not to mention
Election Law changing without approval
of the legislatures, the overnight drops
of illegals ballots, flipping of votes on the
machine, 2000 + Mules etc. Should tell us
that #TrumpWon2020 in all 50 States in a
landslide.



12:43  83%

← Post

To know that Google has this kind of an
influence on our Elections, just imagine
all the search suggestions on Google and
the shadow banning of accounts on all the
Social Media Platforms, not to mention
Election Law changing without approval
of the legislatures, the overnight drops
of illegals ballots, flipping of votes on the
machine, 2000 + Mules etc. Should tell us
that in all 50 States in a
landslide.



They have an absolutely free
hand.

CAT

790K Views

12:54  [status bar icons]  81%

← Post



**The Alan Sanders Sh...**  **Following**

Remember when I told you a few months ago that a Supreme Court decision in another part of the country opened up the ability for this Georgia-based lawsuit to look into 300,000 ballots that have been locked away and no one's been allowed to see? The plot thickens.

**KevinKelton**

*BREAKING* Update on the VoterGA Fulton County Counterfeit Ballot Inspection Case.

Criminal Defense Attorneys Donald F. Samuel and Amanda R. Clark Palmer have motioned to ...



12:54

81%

← Post

🚨 BREAKING - Update on the VoterGA Fulton County Counterfeit Ballot Inspection Case.

Criminal Defense Attorneys Donald F. Samuel and Amanda R. Clark Palmer have motioned to ...

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

GARLAND FAVORITO, et al.
Petitioners,

v.                                              CIVIL ACTION NO.
                                                2020CV343938

ALEX WAN, et al.
Respondents.

**MOTION TO WITHDRAW AS ATTORNEYS FOR RESPONDENTS**

COMES NOW, Attorneys Donald F. Samuel and Amanda R. Clark Palmer, and hereby move this Court for an Order permitting their withdrawal as counsel of record for Respondents in this matter, specifically, Respondents Aaron Johnson and Teresa Crawford.

Undersigned counsel has followed the requirements of Uniform Superior Court Rule 4.3 and provided written notice to the affected clients of counsel's intention to withdraw. A notification certificate is attached.

In providing this notice, the undersigned notifies Respondents to be further informed under the above Rule:

1) This Court retains jurisdiction of this matter;
2) Respondents have the burden of keeping the Court informed of their current address for the service of notices, pleadings, or other papers;
3) Respondents have the obligation to prepare for or go forward with their case or to hire other counsel to handle their case;
4) If Respondents fail or refuse to meet these obligations, they may suffer adverse consequences, including the entry of judgment against them.

16.1K views

289           10           450

12:47

← Post



**Rasmussen Reports**

"Destroying evidence amidst a case is an admission of guilt."

**George**

BREAKING: Defense Attorneys for Fulton County have withdrawned from the 2020 election mail-in ballot inspection case that is back in court. The petitioners allege that thousands of ballots counted by Fulton County were counterf...

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

GARLAND FAVORITO, et al.,
                    Petitioners,

V.

ALEX WAN, et al.,
                    Respondents.

CIVIL ACTION NO.
2020CV343938

**MOTION TO WITHDRAW AS ATTORNEYS FOR RESPONDENTS**

COMES NOW, Attorneys Donald P. Stone I and Amanda R. Carol Pelson, and hereby move this Court for an Order permitting their withdrawal as counsel of record for Respondents in this matter specifically, Respondents Aaron Johnson and Teresa Crawford.

Undersigned counsel has followed the requirements of Uniform Superior Court Rule 4.3 and provided written notice to the affected client and counsel' intention to withdraw. A notice/time certificate is attached.

In accordance therewith, the undersigned certifies Respondents are further informed under the above Rule:

1) The Court retains jurisdiction of this matter;
2) Respondents leave the burden of keeping the Court informed of their current address for the service of notices, pleadings, or other papers;
3) Respondents have the obligation to prepare for go forward with their case or to hire other counsel to handle their case;
4) If Respondents fail or refuse to meet these obligations, they may suffer adverse consequences including the entry of judgment against them.

12:45 · · · · · ·         82%

← Post

to say they have destroyed the ballots in question in the case. If so, Fulton County is in a lot of legal trouble. Destroying evidence amidst a case is an admission of guilt



4.3M Views

12:49  82%

← Post

Ames

Follow

Attorneys against Trump in Georgia Case RESIGN, after they were ordered to produce 2020 ballots.

UNFOLDED MAIL IN BALLOTS



7,662 Views

258        10        364 Likes

8

Peter Neziol  PN6ZZZ  2h



12:44

83%

← Post

**Scott Adams** ✔

Subscribe

Keep an eye on this story.

Three eye-witnesses, under oath, with same story about allegedly fake ballots.

An alleged room full of proof (the actual ballots) kept locked for three years.

Lawyers for the defense suddenly bailing out.

Lower court dawdling, but ordered by higher court to unlock the door.

Per usual, be skeptical of ALL election integrity claims. Most do not pan out. But this one has all the right smell and suspense to it. Fun!

R  **Rasmussen Reports** ✔ @Rasmussen_P...

There is NO EVIDENCE, they claim
(because it's been kept secret for over 3 years)

Take it to COURT, they whine
(CA Supreme Court said bring out the ballots)



← Post

**R**  **Rasmussen Reports**

Refresh: Georgia 2020 Counterfeit Ballot Case

Court talk - "I believe (Judge) McBurney had it, or has it.

Q: It's still open?

A: Yes sir, it just came back from the Supreme Court, Court of Appeals"

These still secret 2020 ballots must be huge trouble.

If they still exist.

**CannCon**

They about to have a really, really shitty 2024 thanks to Fani Willis.





12:50 · 82%

← Post

375K views

1,897 Reposts   77 Quotes   4,555 Likes

389 Bookmarks

**KanekoaTheGreat** @theKanekoaT... · 10h
Replying to @KanekoaTheGreat

GEORGIA

Here are a few affidavits filed shortly after the election attesting to the "counterfeit" ballots in Fulton County.

GA Democrat:
"Hundreds of these ballots seemed impeccable, no folds or creases. The bubble

12:50

← Post



**KanekoaTheGreat**

Subscribe

GEORGIA

Here are a few affidavits filed shortly after the election attesting to the *counterfeit* ballots in Fulton County.

GA Democrat:
"Hundreds of these ballots seemed impeccable, no folds or creases. The bubble selections were perfectly made... only black ink, and all.. for Biden."

GA Democrat:
"All had a perfect black bubble and were all Biden... I heard... Biden.. over 500 times in a row."

Susan Voyles, 20-year election official:
"Pristine" sheets "difference in the texture of the paper" with "a different feel" and "no markings" and approximately "98% for Joe Biden."

Our election system is so corrupt that





12:50 · 82%

← Post

Our election system is so corrupt that ░░░░ ░░░░ has been fighting in court for three years for the right to inspect these ballots from the 2020 election.

**200K** Views

956    19    2,685

131

**KanekoaTheGreat** @KanekoaTheGreat

GEORGIA

Fulton County poll worker Bridget Thorne says thousands of "test ballots" were printed on the same "heavy cardstock" used for

12:49

← Post



**KanekoaTheGreat**

Subscribe

GEORGIA

20-year Fulton County Election Official Susan Voyles Says Test Ballots Counted In Georgia

"This is the part that I am just so sure of. I think that some of the TEST BALLOTS from prior to the election made their way into these batches."

"These are so clean, these are pristine. These are almost immaculate... I could tell that these had been printed... 107 of them all had this little eclipse for Biden... Every vote on every ballot, both sides, even soil and conservation, was exactly the same."

"These were the cleanest ballots I have ever in my life seen... And then the paper felt different. There was just such an anomaly to these ballots."

It doesn't take a rocket scientist to realize



12:49 ← Post

"These were the cleanest ballots I have ever in my life seen... And then the paper felt different. There was just such an anomaly to these ballots."

It doesn't take a rocket scientist to realize that these 145,000 ballots in Fulton County need to be forensically audited.

Yet election integrity advocates like [redacted] have been fighting in court for three years to inspect these "pristine" ballots on "different paper" with "no folds, or creases" and "perfect bubbles" that were "all for Biden."

Especially considering New York City "accidentally" counted 135,000 test ballots in a June 2021 Mayoral election.

Furthermore, there are NINE witness affidavits in Fulton County testifying to stacks of unusual mail-in ballots with "pristine sheets, no creases, and perfect bubbles" that went "all for Biden".



← Post

It doesn't take a rocket scientist to realize that these 145,000 ballots in Fulton County need to be forensically audited.

Yet election integrity advocates like ~~~~~~~~~ have been fighting in court for three years to inspect these "pristine" ballots on "different paper" with "no folds, or creases" and "perfect bubbles" that were "all for Biden."

Especially considering New York City "accidentally" counted 135,000 test ballots in a June 2021 Mayoral election.

Furthermore, there are NINE witness affidavits in Fulton County testifying to stacks of unusual mail-in ballots with "pristine sheets, no creases, and perfect bubbles" that went "all for Biden".



12:51

← Post



**KanekoaTheGreat**

Subscribe

GEORGIA

Fulton County falsified 7 audit tally sheets containing fabricated vote totals for their respective batches of ballot images.

For example, a batch containing 59 actual ballot images for Joe Biden, 42 for Donald Trump, and 0 for Jo Jorgenson was reported as 100 for Biden and 0 for Trump.

The seven batches of ballot images with 554 votes for Joe Biden, 140 for Donald Trump, and 11 for Jo Jorgenson had tally sheets falsified to show 850 for Biden, 0 for Trump, and 0 for Jorgenson.

The VoterGA team also found at least 36 duplicate batches of mail-in ballots, resulting in 4,255 total extra votes.

These fraudulent votes include 3,390 extra votes for Joe Biden, 865 extra votes for Donald Trump, and 43 extra votes for Jo



12:51

← Post

These fraudulent votes include 3,390 extra votes for Joe Biden, 865 extra votes for Donald Trump, and 43 extra votes for Jo Jorgenson.



130K Views

947 Reposts   26 Quotes   2,457 Likes

117 Bookmarks

KanekoaTheGreat
Replying to @KanekoaTheGreat
GEORGIA

12:51 🔵🔵🔵🔵✉ ⬇ •          ☏ 🔋 ⁂ 🛜 ⁞⁞ 82% ▣

← Post



**KanekoaTheGreat** ⊘

Subscribe

GEORGIA 🟥

Fulton County election officials told the
media and observers that they were
shutting down the tabulation center at
State Farm Arena at 10:30 pm on election
night only to continue counting ballots
until 1:00 am.

Video footage shows everyone was
cleared out, including observers, but a
handful of election workers stayed behind,
pulled ballots out from under a table, and
continued to scan ballots until 1:00 am.

This included scanning the same sets of
ballots multiple times in a row.

SOS Brad Raffensperger hired a private
contractor to monitor the Fulton County
election.

His notes obtained by @JustTheNews
reveal that Raffensperger "ripped" Fulton

12:51

Post

His notes obtained by @JustTheNews reveal that Raffensperger "ripped" Fulton County at 11:17 pm, saying, "Fulton can't get anything right," after the media reported that State Farm Arena had stopped counting for the night.

His notes continue:

11:26 — There is confusion about whether or not they're still scanning at State Farm bc there were reports that the staff there told the rest of the staff and press to leave, but I am still getting number reports from Shaye

~11:30 — Amid reports from local news that the lights are off and the staff have left, I head to state farm

11:52 — I arrive at State Farm Arena and report to Ryan Germany and Deputy Secretary Jordan Fuchs that they staff are still scanning on all five scanners. "The media just packed up when I released all the staff opening and sorting ballots," Shaye told me. The scanners worked to

12:51 [icons] 82%

← Post

11:52 — I arrive at State Farm Arena and report to Ryan Germany and Deputy Secretary Jordan Fuchs that they staff are still scanning on all five scanners. "The media just packed up when I released all the staff opening and sorting ballots," Shaye told me. The scanners worked to clear what had been processed that day instead of interrupting the processing flow to secure the ballots before leaving. Their goal is to hit Ralph's 100k by the end of the night.

12:08 — I send Ryan insert photo timestamped image showing that scanners are still working so that he can refute stories to the contrary. Order is starting to break down ---> Ralph newly re-scanned some ballots that had already been processed by Shaye

12:15 AM — Inspector James Callaway arrives to investigate the accusations that the Fulton staff had told the press to go home and were scanning without observers.

Post your reply                                    [camera icon]

12:51 ⬛⬛⬛⬛⬛✉ ⬇ ·     👓 🔔 ✳ 🛜 .ıl 82% 🔋

← **Post**

12:15 AM — Inspector James Callaway arrives to investigate the accusations that the Fulton staff had told the press to go home and were scanning without observers.

If the private contractor is saying "order is starting to break down" at 12:08 due to some "already been processed" ballots being "re-scanned," why does the arena footage show the very same election workers repeatedly re-scanning the same batches of ballots multiple times in a row before the private contractor arrives?

Lastly, Fulton County released ballot images, and guess what?

Fulton County counted the same ballots multiple times.



< ○ |||

12:51

← Post

some "already been processed" ballots being "re-scanned," why does the arena footage show the very same election workers repeatedly re-scanning the same batches of ballots multiple times in a row before the private contractor arrives?

Lastly, Fulton County released ballot images, and guess what?

Fulton County counted the same ballots multiple times.



**223K** Views

**1,361** Reposts   **73** Quotes   **2,882** Likes

**257** Bookmarks

John Fritz Turpin
November 24, 2020

Edit

Like     Comment     Share

Josh King

Well it's Groundhog Day...

Write a comment...

Curling et al v. Raffensperger et al          Doc. 964
Case 1:23-cv-01059-JE-JPM  Document 17  Filed 11/21/23  Page 102 of 307 PageID #: 2898
Case 1:17-cv-02989-AT  Document 964  Filed 10/11/20  Page 1 of 147

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,          :
                                  :
    Plaintiffs,                :
                                  :
v.                                :          CIVIL ACTION NO.
                                  :          1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*,     :
                                  :
    Defendants.                :

## OPINION AND ORDER

### I.   Introduction and Overview

In the 1983 film Groundhog Day, weather man Phil Connors is doomed to repeat the same day over and over again: "I wake up every day, right here, right in Punxsutawney, and it's always February 2nd, and there's nothing I can do about it." The Court can relate; it feels like it's February 2nd in Punxsutawney. But quite likely, the Court is not alone in this sentiment in many respects. Amidst the many other serious concerns facing the public in this challenging era, issues surrounding election system security, reliability, fairness, and the correct counting of votes continue on the forefront of citizen concerns. And so too, in turn, does voting litigation perforce continue.

Dockets.Justia.com

Now in Act 4, this voting case raising fundamental First Amendment and Fourteenth Amendment constitutional claims is before the Court on Plaintiffs'[1] current Motions for Preliminary Injunction seeking relief before the November 3, 2020 general election. The Court held three days of hearings on Plaintiffs' motions and has reviewed the parties' extensive briefs and evidentiary submissions. The Plaintiffs' motions are identified and described below.

(a) The Curling Plaintiffs' August 19, 2020 Motion for Preliminary Injunction [Doc. 785] seeks to require Defendants "to conduct in-person voting in elections by a hand-marked paper ballot system" in combination with "provisions for pre-certification, post-election, manual tabulation audits of paper ballots and to independently check the accuracy of equipment and procedures used to tabulate votes . . . based on well-accepted audit principles that assure a high probability that incorrect outcomes will be detected and remedied"; and

(b) The Coalition Plaintiffs' August 24, 2020 Motion for Preliminary Injunction on BMDs, Scanning and Tabulating, and Auditing [Doc. 809] seeks to require the State Defendants to: (i) refrain from forcing in-person voters to use ballot marking devices ("BMDs") and instead cause voters to use hand-marked paper ballots as the standard method for in-person voting; (ii) adopt scanning threshold settings for the Dominion optical scanners and vote review procedures

---

[1] The two sets of Plaintiffs in this case are represented by separate counsel and seek overlapping but somewhat differently articulated, equitable relief. Donna Curling, Donna Price, and Jeffrey Schoenberg are referred to as the "Curling Plaintiffs." The Coalition for Good Governance ("Coalition"), Laura Digges, William Digges III, Ricardo Davis, and Megan Missett are referred to as the "Coalition Plaintiffs."

that will ensure all voter marks on mailed and hand-marked paper ballots are counted; and (iii) require election superintendents to conduct meaningful, effective pre-certification audits of scanned hand-marked paper ballots to ensure the correctness of election outcomes.

The Coalition Plaintiffs' Motion for Preliminary Injunction on Paper Pollbook Backups also sought related relief requiring the Secretary of State to direct county election superintendents to use paper backups of the electronic pollbook at each precinct polling location to facilitate issuance of regular or emergency ballots on election day in the event of voting machine breakdowns and mishaps, power outages, and associated long voter lines. (Doc. 800.) This Court's Order of September 28, 2020 (Doc. 918) addressed these issues at length and granted that separate motion.

Plaintiffs' motions challenge the State Defendants' mode of implementation of a new voting system enacted by the Georgia Legislature on April 2, 2019[2] and their ongoing use of software, data systems, policies and practices that allegedly burden and impede Plaintiffs' exercise of their First and Fourteenth Amendment rights to cast ballot votes that will be reliably counted. The Plaintiffs allege that Defendants have failed to implement a constitutionally acceptable election system by requiring all in-person voters to use a BMD system that, as a whole, in its design and operation, is not voter-verifiable, secure, or reliable. They contend this system

---

[2] *See* O.C.G.A. § 21–2–300(a)(2); O.C.G.A. § 21–2–2(7.1); O.C.G.A. § 21–2–300(a)(2); Ga. Comp. R. & Reg. r. 590–8–1–.01(d).

suffers from some of the same major cybersecurity vulnerabilities posed by Defendants' deeply flawed, outdated Direct Recording Electronic ("DRE") Voting System addressed by the Court's lengthy Order of August 15, 2019 that granted injunctive relief.[3] (Doc. 579.) Plaintiffs' challenge embraces an array of associated issues involving the electronic voting process that impact if an individual's vote (whether recorded from a scanned BMD-generated barcode or a hand-marked paper ballot) will be correctly captured, scanned, and accurately counted.[4] Their claims thus also raise significant issues regarding the auditing of the election system's voting results and ballot processing.

First and foremost, Plaintiffs' challenge focuses on the Defendants' implementation of the new statewide BMD system, pursuant to the terms of the State's 2019 contract with Dominion Voting Systems.[5] The software and hardware system purchased provides for each citizen's BMD ballot vote selections to be printed on a paper ballot generated by a printer connected to the BMD. But the tabulation of the vote is actually based on the ballot's non-encrypted QR barcode

---

[3] The Court summarized the three-year background history surrounding this case in its Order of August 7, 2020 (Doc. 768) that denied without prejudice Plaintiffs' earlier facial challenge of the BMD system, filed in October 2019, before any elections using the system had been held.

[4] Plaintiffs in this connection present evidence of the votes on some hand-marked ballots being treated as blank votes because the optical scanner failed to recognize the hand-made mark that did not fully fill in the vote bubble, although the hand votes still demonstrated the voter's ballot intent through a check or X or otherwise, and therefore would satisfy the requirement of Georgia law for being counted. The State Board of Elections has recently approved some modifications in the scanning program settings that may result in more of these "blank" votes being flagged and referred to county adjudication panels for review. The Coalition Plaintiffs have offered expert testimony that other scanner adjustments can be made that would more completely address this ballot scanning issue. Defendants dispute this.

[5] Dominion Voting Systems, Inc.'s contract with the Georgia Secretary of State calls for Dominion's provision of all equipment and software components of the BMD system as well as training and technical assistance. (Doc. 786.)

4

on the ballot – designed to summarize the voter's ballot selections in code – that by itself is not voter reviewable or verifiable. Thus, Plaintiffs contend that the system precludes direct voter verification of the QR barcode of votes cast on the ballot. The printed ballot is fed into an ImageCast optical scanner that tabulates the ballot votes solely based on the QR code – and not based on the human readable text on the printed ballot. Plaintiffs challenge the constitutionality of the State Defendants' implementation of a barcode-based system for all in-person voting, based on (1) this alleged fundamental vote verification defect; (2) the system's purported known and demonstrated risk vulnerabilities to access and manipulation identified by national cybersecurity experts; and (3) the inherent problems posed in properly auditing votes tallied based on QR barcodes that cannot be verified by voters.[6]

Additionally, the Coalition Plaintiffs press their separate but related claim for relief based on the alleged intrusion on voters' free exercise of their right to cast a secret ballot at the polls. The nature of this claim is two-fold. First, the Coalition Plaintiffs assert that in-person voters are required to make their ballot selections on oversized voting touchscreens that are not shielded and that expose the voter's ballot choices to easy viewing by other people in the precinct voting location.

---

[6] As detailed in the Court's Order of September 28, 2020, Plaintiffs' challenge also addresses dysfunctions in the voter registration information database system and the pollbook voter check-in system, both of which they contend fundamentally impact the voting process and voter access to the ballot. (Doc. 918.)

Second, they assert that a timestamping feature on the precinct scanner could be used to identify voters to reveal their vote choices.

As a whole, the State Defendants have steadfastly denied the factual and legal merits of Plaintiffs' constitutional claims. They argue that Plaintiffs have not carried their high burden of proof to show they are substantially like to prevail on their claims or their entitlement to relief under the rigorous legal standards for grant of a preliminary injunction.[7] Defendants have also urged the Court to per se deny all relief on the grounds that it would interfere with the State Defendants' authority and responsibility for oversight of election process and procedures, unfettered by burdens and confusion that can be caused by Court ordered changes to state election procedures or requirements on the eve of an election under *Republican Nat'l Comm. v Democratic Nat'l Com.*, 140 S. Ct. 1205, 1207 (2020) and *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

The General Election will be held on November 3, 2020. In-person early voting will proceed in select polling locations in every Georgia county from October 12, 2020 through October 30, 2020. While early voting in counties is done on BMD machines, the state still denominates these votes as "absentee" ballots. Under Georgia law, counties are authorized to begin sending out traditional paper

---

[7] Although Defendant Fulton County has also taken an active role in the defense of this litigation the State Defendants' counsel have assumed by far the primary role in presentation of the defense. Representatives of both the State Defendants and Fulton County at various points have acknowledged some of the genuine challenges and major problems experienced in the first statewide in person election for a large array of offices that was held on June 9, 2020 using the new BMD system. (The March 24, 2020 presidential primary election was postponed twice – once until May 19, 2020 and then until June 9, 2020. Some voters cast absentee mail ballots and absentee in-person "early voting" ballots before the March primary was postponed.)

absentee ballots this year on September 15, 2020 and to continue to do so thereafter in the weeks ahead prior to the election. The last date for submitting an application for an absentee mail paper ballot in Georgia is October 30, 2020. October 5, 2020 is the deadline for voter registration.[8]

Faced with this looming timeline, the Secretary of State just two weeks discovered a system-wide ballot display issue on the BMD touchscreen voting machines for the U.S. Senate special election with 20 candidates in the race. The Secretary of State designed the ballot using a two-column display to ensure that all 20 candidates appeared at the same time to voters on a single screen. Because BMDs primarily display candidates in a single column list, the two-column display is not a typical setup. Logic and Accuracy testing performed on the BMDs by two counties in the last week of September revealed that the second column of candidates did not appear in some instances. Dominion engineered a software modification as a fix and within a few days the Secretary of State began distribution of the new software to counties for installation on all 30,000 plus BMDs before the start of early voting. Dominion submitted its application to the U.S. Election Assistance Commission ("EAC") for approval for the software engineering change on October 5, 2020 and secured the EAC's approval in a one sentence letter issued

---

[8] *See generally*, O.C.G.A. § 21-2-384, § 21-2-385(a); *see also* Georgia Secretary of State's web posting, Elections and Voter Registration Calendar, https://sos.ga.gov/admin/files/2020%20Revised%20Short%20Calendar.pdf (last visited September 17, 2020).

on October 9, 2020. EAC approval was secured after the modified software had been installed throughout the state.

Not surprisingly, the parties take wildly different positions on the magnitude of the problem and its impact on the general election. The State Defendants characterize this as a very minor issue and the fix as a de minimis change to the voting system software. Plaintiffs assert instead that the State is undertaking substantial changes to the election equipment two weeks before early voting begins without adequate testing that further jeopardizes the reliability and security of the Dominion voting machines. These unforeseen circumstances, Plaintiffs insist, justify an emergency switch to hand-marked paper ballots.

Given the complex findings and analysis already covered by the Court's review of several lengthy preliminary injunction motions and issuance of related procedural orders over the last two years of intensive litigation, the Court refers the reader to its earlier orders for a further overview of the course of proceedings, relevant legal context, rulings, and factual findings. (*See, e.g.*, Doc. 309, September 17, 2018 Order (denying motion to dismiss and motion for preliminary injunction); Doc. 579, August 15, 2019 Order (granting in part preliminary injunction motions); Doc. 751, July 30, 2020 Order (granting in part and denying in part Defendants' most recent motion to dismiss including new BMD claims); Doc. 768, August 7, 2020 Order (denying without prejudice Plaintiffs' initial motions for preliminary injunction, Docs. 619 and 540, that facially challenged the BMD system and were

8

filed in October, 2019, long prior to the 2020 election cycle, and summarizing case history).)

Finally, the Court notes that it has already addressed and rejected the State Defendants' renewed contention that several of Plaintiffs' requests for relief fall outside the bounds of the case as pled and presented to this Court. (*See, e.g.*, Order on Motion to Dismiss, Doc. 751 at 20-25; August 15, 2019 Order, Doc. 579 at 88-89.) Portions of the relief requested by Plaintiffs are clearly associated with their contentions regarding the Defendants' non-implementation of some of the relief granted in the Court's August 15, 2019 Order, as discussed in the Court's Opinion and Order issued on September 28, 2020. (Doc. 918.) Similarly, Plaintiffs have repeatedly advocated in their amended and supplemental complaints, motions, and briefs as well as at court hearings for the relief addressed in the current preliminary injunction motions before this Court.

## II.    Legal Standards

### A. Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remedy" designed to prevent irreparable harm to the parties during the pendency of a lawsuit before a final decision on the merits can be rendered. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief . . . in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995); *Federal Trade Comm'n v. United States Oil and*

*Gas Corp.*, 748 F.2d 1431, 1433–34 (11th Cir. 1984). To support a preliminary injunction, Plaintiffs must present evidence that clearly establishes: (1) a substantial likelihood of success on the merits on their claims; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendants; and (4) that granting the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). At the preliminary injunction stage, a district court "need not find that the evidence positively guarantees a final verdict in plaintiff's favor," and may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co.*, 51 F.3d at 985 (quoting *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)); *McDonald's Corp.*, 147 F.3d at 1306 (11th Cir. 1998).

Federal courts "possess broad discretion to fashion an equitable remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court."). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017)

(per curiam); *Kansas v. Nebraska*, 574 U.S. 445, 456 (2015) (noting that a court of equity may "'mold each decree to the necessities of the particular case' and 'accord full justice' to all parties"). In formulating the appropriate remedy, "a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 (citation omitted). And the Supreme Court has repeatedly advised, "[w]hen federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'" *Kansas v. Nebraska*, 574 U.S. at 456 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) and *Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 552 (1937)).

### B.   Standard for Challenging Constitutionality of State Election Laws/Systems

When considering the constitutionality of an election law, the Court applies the framework established by the Supreme Court in *Anderson v. Celebrezze* and *Burdick v. Takushi*. Under this framework, referred to as the *Anderson-Burdick* test, when deciding whether a state election law violates the due process rights guaranteed by the Fourteenth Amendment, the Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983). "[T]he level of the scrutiny to which

11

election laws are subject varies with the burden they impose on constitutionally protected rights." *Stein v. Alabama Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014). A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. *Burdick*, 504 U.S. at 434; *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). But "reasonable, nondiscriminatory restrictions" that impose a minimal burden may be warranted by "the State's important regulatory interests." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citing *Anderson*, 460 U.S. at 788). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Lee*, 915 F.3d at 1318-19; *Billups*, 554 F.3d at 1352.

## III. Discussion of Claims and Relief Issues

### A. Background Context

Georgia's new 2019 Election Code mandates that "all federal, state, and county general primaries and general elections as well as special primaries and special elections in the State of Georgia shall be conducted with the use of scanning ballots marked by electronic ballot markers and tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person, unless otherwise authorized by law; provided, however, that such electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector." O.C.G.A. § 21-2-300(a)(2). The legislation places the responsibility of selecting the equipment for the new voting system with the

Secretary of State. *See* O.C.G.A. § 21-2-300(a). The law expressly requires that the "equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county of this state and shall be *provided to each county by the state, as determined by the Secretary of State*." O.C.G.A. § 21-2-300(a)(1) (emphasis added).

The Election Code further requires the Secretary of State to certify the new BMD voting system as "safe and practicable for use" in compliance with the Rules of the Georgia State Election Board prior to authorizing its implementation in state, federal, and county elections in the State. O.C.G.A. § 21-2-300(a)(2); *see also* Ga. Comp. R. & Reg. 590-8-1-.01(d). It also requires that the state furnished uniform electronic ballot system "be certified by the United States Election Assistance Commission prior to purchase, lease, or acquisition." O.C.G.A. § 21-2-300(a)(3). The Election Code tasks the Georgia State Election Board with promulgating rules and regulations governing audit procedures and requires that "[t]he procedures prescribed by the State Election Board shall include security procedures to ensure that collection of validly cast ballots is complete, accurate, and trustworthy throughout the audit." O.C.G.A. § 21-2-498(b)&(d).

The legislation enacted in April 2019 was adopted on the heels of a number of public events revolving around Georgia's outdated DRE election system: a widely publicized breach of the State's election server maintained by the State's election services contractor, Kennesaw State University, that exposed voluminous voter data, as well as sensitive software applications and passwords that triggered

13

the transfer of the University's Center for Election Services election operations directly to the Secretary of State's office from its contractor after December 31, 2017;[9] a prior failed effort to pass election legislation during the winter legislative session of 2018 to phase out the old DRE voting machines and State Global Election Management Systems ("GEMS") that dated back to 2001; and this Court's Order in September 2018 on the Plaintiffs' Motions for Preliminary Injunction declining to enter the injunctive relief requested but finding that the Plaintiffs had demonstrated a likelihood of prevailing on the merits of their claim that the outdated DRE system as implemented was constitutionally not sustainable.[10]

The State commenced replacement of the DRE/GEMS system with Dominion's BMD system beginning in the summer of 2019 after conclusion of the request for proposals and contracting processes. This voting system change, targeted for completion in time for full implementation in 2020, was a major shift and undertaking. Dominion plays a large role in all dimensions of the implementation of the new voting system in partnership with the Secretary of

---

[9] As found in the Court's 2018 and 2019 Orders, the Secretary of State contracted with Kennesaw State University from 2002 to December 2017 to maintain the central server and provide critical related election services for the State at a unit in the University called the Center for Election Services ("CES"). Evidence reviewed in detail by the Court showed that the central server was accessible via the internet from at least between August 2016 and March 2017. After an information security engineer KSU's Information Security Office performed a scan of the server on March 4, 2017, it was immediately taken down. The FBI was contacted and took temporary possession of the elections server. Prior to returning it to KSU, the FBI made two forensic images of the server. KSU destroyed the original server and backup server soon after the news of the breach was publicized and after Plaintiffs' lawsuit was served on Defendants.
[10] *Curling v. Kemp*, 334 F.Supp.3d 1303 (N.D. Ga. 2018).

14

State's Office.[11]  The contract was entered at a time when the cybersecurity risks and vulnerabilities of digital election systems had emerged as a major concern of national leadership and as well as prominent computer engineering and cybersecurity experts and academic organizations. Election systems were now classified as critical national infrastructure.  Voter-verified ballots and hand-marked ballots in particular were deemed important tools for protecting the security of voting systems by leaders in the academic cybersecurity field, including the sole information technology and cybersecurity expert on the Commission[12] appointed by the Secretary of the State to provide recommendations regarding the replacement of the DRE System. (*See* August 15, 2019 Order, Doc. 579 at 35-42; September 17, 2018 Order, Doc. 309 at 11-12.)

Georgia is the only state using the Dominion barcode-based BMD system statewide as the mandatory voting method for all in-person voters.  (*See* Decl. of Dr. Eric Coomer, Doc. 658-2 ¶ 5) ("Dominion's ImageCast X BMD system is currently used by Cook County and the City of Chicago, Illinois, several jurisdictions within the States of Michigan and Pennsylvania, and will be used by several California counties including San Francisco, Alameda, Riverside, Contra Costa, and San Diego in the upcoming 2020 election cycle."). According to a study

---

[11]  The leadership of the Secretary of State's Elections Division and Center for Elections Systems (transferred from Kennesaw) has remained intact throughout.

[12] Dr. Wenke Lee, Professor of Computer Science at Georgia Tech University and Co-Executive Director of the Institute for Information Security, was the sole computer scientist appointed to the Secretary of State's Secure Accessible Fair Elections ("SAFE") Commission.

by Verified Voting, Georgia and South Carolina[13] are the only states that require the use of BMDs as the primary method for all voters. (Decl. of Warren Stewart,[14] Doc. 681-2; Decl. of Dr. Alex Halderman, Doc. 785-2 ¶ 47; Decl. of Dr. Alex Halderman, Doc. 855-1 at ¶ 3.) The majority of election jurisdictions across the U.S. use hand-marked paper ballots as the primary method of voting and provide BMDs exclusively for voters who request them for accessibility (e.g., those with certain disabilities) or upon voter request.[15]

The Secretary of State's Office contracted with Dominion for all equipment and software components of the system (the BMD touchscreens, attached ballot printers, ImageCast optical scanners that tabulate ballot votes, and the KnowInk PollPads) but continued to use its ENET voter registration database system. The ENET system provides the voter data foundation for the PollPads used for voter check-in at the polls.

In entering into the Dominion contract, the Secretary of State proceeded with an agreement for the current level of capacity of Dominion's ImageCast optical scanner to tabulate votes based on the scanned image of the QR barcode encoded with the voter's designated ballot selections. The Dominion ImageCast optical scanners used by Georgia in tandem with the BMDs are capable of scanning

---

[13] In 2019, South Carolina began using the ExpressVote ballot marking system developed and marketed by ES&S.
[14] Warren Stewart is a Senior Editor and Data Specialist at Verified Voting.
[15] *See* Verified Voting, The Verifier, https://verifiedvoting.org/verifier/#mode/navigate/map/ppEquip/mapType/normal/year/2020 (last visited Aug. 18, 2020). (*See also* Ex. 1 to Stewart Decl., Doc. 681-2 at 6-14.)

and tabulating votes without a QR barcode.  (Decl. of Dr. Eric Coomer, Doc. 658-2 ¶ 9; Decl. of Dr. Alex Halderman, Doc. 785-2 ¶¶ 4, 37-40.)  In response to the State's request for proposals during the procurement process, Dominion represented that an upcoming version of its BMD software would not need to print barcodes on ballots.[16]  The BMDs under the prospective option would instead produce a human-readable ballot that would be counted by the optical scanner/tabulators based on voters' electronic vote designations on the ballot by reading particular target areas associated with the voter selections, similar to how they are programmed to read hand-marked paper ballots. (Decl. of Dr. Eric Coomer, Doc. 658-2 ¶ 9; Decl. of Dr. Alex Halderman, Doc. 785-2 ¶ 37.)  This option is described as an "upgrade" available only after "certification is complete at the EAC."[17]  The Court assumes that cost considerations, among others, may have played a role in this purchasing decision, as it was currently available through some other vendors.[18]  However, the State's actual option in the long run of upgrading the system to one that tabulates from the voter designations, and not a QR barcode is potentially relevant.[19]  When that might occur is another question,

---

[16] "Clarification Questions\MS 16-1 Supply Chain Dominion and KnowInk Final.docx" *available at* https://sos.ga.gov/admin/uploads/Dominion.zip.

[17] EAC is the acronym for the U.S. Election Assistance Commission.

[18] Other manufacturers offer EAC-certified non-barcode BMDs, including the Clear Ballot ClearAccess system and the Hart Verity Touch Writer. Instead of a barcode for vote tabulation, these systems print a ballot that looks like a hand-marked paper ballot but has scan targets filled in for the selected candidates. (Decl. of Dr. Alex Halderman, Doc. 785-2 ¶ 37.)

[19] If the referenced Dominion software upgrade moved forward and was purchased, this would also allow an independent audit's capacity to track voting back to scanned ballots that are counted by a scanner based on human text identified voter selections that serve as the actual basis for the scanner/tabulators' tallying of ballot votes.

as the EAC has apparently yet to certify Dominion's upgrade option, and in any event, it may entail costs the State might not be willing to incur.

The Court focuses in this Order on the salient evidence that Plaintiffs have presented in support of their Motions to demonstrate the constitutional infirmity of the system because of its alleged impact on voters' exercise of the right to vote and whether their votes will be counted as cast or at all.

The Court recognizes from the outset that the State Defendants did face significant challenges in implementing a new statewide voting system in barely 15 months and that early elections and primaries would occur prior to the ultimate election date of November 3, 2020. The Covid-19 pandemic further complicated that challenge. While this fact does not in any way erase the issues raised by Plaintiffs, especially in the context of the particular record in this case, the Court still bears this pragmatic reality in mind.

The Court divides its discussion below of the motions before it as follows. Section B addresses the evidence presented in conjunction with the Curling Plaintiffs' Motion for Preliminary Injunction and a portion of the Coalition Plaintiffs' Motion for Preliminary Injunction on BMDs, Scanners and Tabulators and Audits. Section C addresses the Coalition Plaintiffs' Motion related to the issue of ballot secrecy. Section D addresses that portion of the Coalition's Motion as to Scanners and Tabulators focused on the review and counting of hand-marked

ballots, including absentee ballots, provisional ballots, and finally, some portion of emergency ballots cast.[20]

## B.  Claims Relating to BMDs, Scanners/Tabulators, and Audits

### 1.  Cybersecurity Risks and Reliability Issues Presented by Implementation of the BMD System

The evidence, expert opinion testimony, and argument Plaintiffs offer in support of their challenge to the constitutionality of the State Defendants' implementation of a barcode-based system for all in-person voting falls into three main areas.  They contend that the evidence shows:

(1) The QR barcode-based BMD voting system does not produce a voter-verifiable paper record of the votes cast.  Therefore, voters will be unable to conduct any verification of the information encoded in the non-human readable barcode, will have no way of knowing what votes they are actually casting, and will instead be forced to trust that the barcode accurately conveys their intended ballot selections.  Both the QR barcode recording of votes and the text summary of ballot selections are subject to being accessed and manipulated through hacking, unauthorized intrusion into the BMD computer system or its various components (scanner, printer, etc.), by USB flash drives (or similar devices), or by other

---

[20]  For a variety of reasons, local precinct polling stations end up sending emergency ballots to their Counties' election office for scanning and tabulation rather than handling this themselves. Local precincts in the past have treated emergency ballots like provisional ballots that must be sent to the County office for a determination to be made of voter eligibility.  However, consistent with current state regulations, precincts processing emergency ballots are authorized to allow voters to cast and scan their own emergency ballots, assuming voting equipment is operational.

interfaces with the internet through cyber attacks or applications that may be carrying malware (whether intentionally or not).

(2) The QR barcode-based BMD voting system poses major security and fidelity of vote issues because the BMD system is susceptible to significant cybersecurity risks and manipulation through hacking access to any one of its multiple components (BMD, printer, scanner) and through untraceable manipulation or alteration of code. The QR barcode is not encrypted and may also be a vector of data system manipulation.

(3) The QR barcode-based BMD voting system is incapable of being meaningfully audited for a variety of reasons: (a) the QR code cannot itself be verified by a voter; (b) the length and complexity of many ballots and the printed ballot text's condensed mode of summarizing the voter's ballot selections (identifying solely the candidate selected by office or condensed constitutional amendment summaries identified by question number or by a few words); and (c) research reflecting that most voters do not review these printed ballot summaries, and those that do, will not detect errors in ballots presented for verification based solely on their memories.

Plaintiffs presented multiple expert witnesses to address their assessment of the Dominion system's cyber risk vulnerabilities and incapacity to provide a voter verifiable or auditable vote.[21] Plaintiffs' experts testifying at the hearing or by

---

[21] State Defendants requested that some of the Plaintiffs' expert testimony be presented in sealed proceedings and affidavits to ensure the protection of Dominion's intellectual property and the

affidavit included: Dr. Andrew W. Appel, Dr. Richard DeMillo, Dr. J. Alex Halderman, Mr. Harri Hursti, Mr. Vincent Liu, Mr. Kevin Skoglund, and Dr. Philip B. Stark.

Defendants have contested Plaintiffs' cybersecurity, vote fidelity, and voting system evidence through cross-examination as well as through the testimony of the State's witnesses and Dr. Eric Coomer, Director of Product Strategy and Security for Dominion Voting Systems, and the testimony of Jack Cobb, the Director of Pro V&V, the United States EAC accredited private laboratory retained by the Georgia Secretary of State to assess and test Dominion's Democracy Suite 5.5-A voting system software and associated components[22] and the KnowInk electronic pollbook as deployed in Georgia for EAC certification. Although Mr. Cobb's affidavits addressed cybersecurity related matters, his testimony at the injunction hearing plainly indicated that he actually claims no specialized knowledge or background in cybersecurity engineering and did not himself perform any security risk analysis of the BMD system. Defendants did not introduce any evidence from

---

security of the voting system. The Court preliminarily granted these requests by and large so as to rapidly move proceedings forward as it could not predict precisely what matters would be covered in the testimony or the import of information in advance. Plaintiffs preserved their objections to the sealing. The Court will reconsider these sealing decisions, if appropriate, upon a properly supported motion.

[22] According to Mr. Cobb's first affidavit, "Georgia certified the Dominion Voting's Democracy Suite 5.5-A in August 2019. Pro V&V did not test this specific version of the voting system for the EAC, but had previously engaged in testing the baseline system (D-Suite 5.5)," apparently for another client. (Doc. 821-6 at 3-4.) Later, in 2020, another modification was made to the software relating to scanner software (denominated 5.5-A GA) and approved on April 13, 2020 by EAC. Georgia conducted pilot elections in 2019 and some early voting during the March 2020 primary (before it was postponed and combined with the statewide primary) on the system while this certification was pending.

Fortalice Solutions, the cybersecurity consulting firm that previously has performed security analysis regarding the Secretary of State's information technology system, as discussed in the Court's Order of August 15, 2019 and which conducted a confidential initial evaluation of the BMD system in November 2019 at Defendants' counsel's request on behalf of the Secretary of State. Thus, the State Defendants did not present any independent cybersecurity expert to directly address the cybersecurity issues and risk vulnerabilities of Dominions' QR code voting system raised by Plaintiffs. Instead, State Defendants relied on Dr. Coomer's testimony, to address – based on his professional experience[23] – some of the significant cybersecurity issues raised by Plaintiffs.  The State Defendants also provided expert testimony regarding the issue of whether a QR code based voting system, where votes are recorded and tabulated based on a scanner/tabulator's reading of the QR code, can be properly subject to a risk-limiting audit as to the outcome of any specific election in response to the extensive testimony provided by Plaintiffs' experts on this subject.

Plaintiffs' substantive evidence regarding the Defendants' implementation or usage of the BMDs, scanner/tabulators, and audits is the most complex, expert-intense evidence presented in this case. Indeed, this array of experts and subject

---

[23] Dr. Coomer previously served as Vice President of U.S. Engineering for Dominion and prior to that was the Vice President of Research and Development for Sequoia Voting Systems.  He has worked in product development for election systems since 2005.  He obtained his Masters degree and Ph.D. in nuclear physics and plasma physics from the University of California, Berkeley and a bachelor of science degree in engineering physics from Rensselaer Polytechnic Institute.  (Tr. Vol. II at 99-100.)  He additionally testified that he had designed the vote adjudication system used by Dominion, had written code for various election components, and provides primary election support for major Dominion customers.

matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented both in witness declarations and live testimony at the preliminary injunction hearing.[24]  As authorized discovery only commenced shortly before the preliminary injunction hearing, no expert or other depositions had been conducted.

While Plaintiffs' experts provided illuminating evidence, this evidence still had its own constraints. *First*, security information from the Secretary of State's office was limited. The Secretary of State's response to Plaintiffs' authorized expedited discovery requests indicated that its cybersecurity consultant, Fortalice Solutions, had not generated any consulting studies, audits, or assessments of data system security issues since August 1, 2019 when the State commenced its early work on implementation of the Dominion system, other than a November 2019 report requested by Defendants' counsel and withheld based on attorney work product privilege.[25] (*See* September 2, 2020 Order, Doc. 858 (approving non-disclosure based on assertion of privilege and in turn, granting on limited terms Plaintiffs' request for inspection of BMD equipment); *see also*, August 15, 2019 Order, Doc. 579 at 73-90 (discussing the focus of Fortalice evaluations of security

---

[24]  Additionally, witness declarations and testimony given in connection with earlier preliminary injunction motions was available for consideration to the extent that it was relevant and filed in the record.

[25]  The Court's August 15, 2019 Order provided this explicit remedial relief: "The Secretary of State's Office should work with its consulting cybersecurity firm to conduct an in-depth review and formal assessment of issues relating to exposure and accuracy of the voter registration database discussed here as well as those related issues that will migrate over to the State's database or its new vendor's handling of the EPoll voter database." (Doc. 579 at 150.)  The consulting firm referenced is Fortalice.

and software issues prior to August 2019).)  *Second*, while some of Plaintiffs' experts had accessed other related BMD models and Dominion software previously, the specific BMD model and software variation (along with the optical scanners/tabulators programed with Dominion's proprietary software) used in Georgia was not accessible to the Plaintiffs and their cybersecurity expert, Dr. Halderman, until Friday, September 4, 2020 at 5:30 p.m. – and then, only by Court Order.[26]  This was just days before the preliminary injunction hearing commenced on September 10, 2020.  Upon the Plaintiffs' filing of a discovery dispute notice regarding their access issue, the Court ordered the swift production of a BMD and related ImageCast precinct scanner for Plaintiffs' expert's testing and assessment, subject to various confidentiality provisions and other terms.[27]  (As the Dominion system uses an off-the-shelf printer, the Plaintiffs provided their own new printer of the same model used by the Defendants.)

Dr. Halderman's testing of the equipment and software occurred over the short period of time before the scheduled hearing.[28]  His evaluation in this abbreviated time frame yielded some supplemental results that supported the

---

[26]   Other cybersecurity experts such as Mr. Hursti also appear to have also consulted with Dr. Halderman in this process.

[27] The Defendants sought this confidentiality for two purposes: to protect the confidentiality and secrecy of this portion of the election system's functioning as well as to protect Dominion's confidential intellectual property pursuant to its contract with the State.

[28]   Dr. Halderman is a Professor of Computer Science and Engineering and Director of the University of Michigan Center for Computer Security and Society.  He is a nationally recognized expert in cybersecurity and computer science in the elections field.  He testified before the United States Senate Select Committee hearings held on the topic of on Intelligence held on Russian interference in the 2016 U.S. Elections.  His testimony and work was referenced in the Senate Committee's report.  Professor Halderman has testified multiple times in this case.

Plaintiffs' cybersecurity analysis of the malware vulnerability risks of this specific BMD system. In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.[29] As the National Academies of Sciences, Engineering, and Medicine, found in its seminal report, Securing the Vote: Protecting American Democracy 42, 80 (National Academies Press, 2018)("National Academies Report" or "NAS Report"):

> [A]ll digital information – such as ballot definitions, voter choice records, vote tallies, or voter registration lists – is subject to malicious alteration; there is no technical mechanism currently available that can ensure that a computer application – such as one used to record or count votes – will produce accurate results; testing alone cannot ensure that systems have not been compromised; and any computer system used for elections – such as a voting machine or e-pollbook – can be rendered inoperable.

(Doc. 285-1, Ex. 1.)

Dr. Halderman had physical access to the BMD system when conducting his tests, which expedited his experimentation and intrusion into the software system. Evidence presented in this case overall indicates the possibility generally of hacking or malware attacks occurring in voting systems and this particular system through a variety of routes – whether through physical access and use of a USB

---

[29] The Defendants disputed this evidence and implied the existence of other possible factors. Given that Dr. Halderman's testimony was presented under seal, the Court only describes this portion of the evidence in a general manner.

flash drive or another form of mini-computer, or connection with the internet. As discussed in the declarations and testimony of the proffered national cybersecurity experts in this case, a broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data. In these experts' views, these risk issues are in play in the operation of Dominion's Democracy Suite 5.5-A GA, and take on greater significance because the system is one that does not provide a verifiable and auditable ballot record because it relies on the QR code for vote tabulation and that code itself cannot be read and verified by the voter. (*See, e.g,* Declaration of Vincent Liu, Doc. 855-2 at 6-8; Tr. Vol. II at 59, 64; Declaration of Dr. Andrew Appel, Doc. 855-3 at 6; Declarations of Dr. Alex Halderman, Doc. 682 at 4-11, Doc. 785-2; *see also* Appel, A.W., R. DeMillo, and P.B. Stark,[30] Ballot-Marking Devices Cannot Ensure the Will of the Voters, Election Law Journal (2020), Doc. 619-10.) Hacking alterations of the barcodes and/or predicate text, security keys, or hash values renders tracing or auditing of the fraudulent change in voting data difficult

---

[30]  As will be discussed further later in this Order, Dr. Stark serves on the Advisory Board of the U.S. Election Assistance Commission and as a member of the EAC's cybersecurity committee. (Doc. 296-6.) Dr. Appel is the Eugene Higgs Professor of Computer Science at Princeton University and has over 40 years' experience in computer science and 15 years if experience in studying voting machines and elections. He has served as Editor in Chief of ACM Transactions on Programming Languages and Systems, the leading journal in his field. (Doc.681-3). Dr. DeMillo is the Chair of Computer Science at Georgia Tech University. He previously served as the Director of the Georgia Tech Center for Information Security and Chief Technology Officer for Hewlett-Packard. (Doc. 548 at 74; Doc. 579 at 34.) Dr. DeMillo has conducted research relating to voting system and election security since 2002. He helped write guidelines for using electronic voting machines for use by the Carter Center. He has also served on the advisory boards of Verified Voting and the Open Source Election Technology Institute. (*Id.*)

or impossible in their viewpoint – and in turn impacts the capacity to conduct appropriate auditing of ballot data or to implement corrective "re-count" measures.

Dr. Halderman's empirical evaluation of the Georgia programmed BMD voting equipment and software was partial and incomplete due to the short time allocated for the examination prior to the injunction hearing. And Dr. Halderman indicated that he would need more time with the equipment and software to conduct further testing of the software and modeling of other malware that could attack any component of the BMD system and infect the system and recording of votes or cause other mayhem. Dr. Halderman provided directly relevant information to a demonstration of the risks facing this specific voting system. However, his evaluation and testing of the system was limited as described and not fully subject to being itself examined in depth by Dominion's own cyber security staff given the last moment nature of the testing.[31]

That said, Dr. Halderman has also offered other core relevant testimony in this case in open and sealed hearings as well as in sworn declarations. (*See, e.g.,* Doc. 785-2.) He as well as other cybersecurity experts testifying on behalf of Plaintiffs here have provided evidence credibly explaining how malware can mask itself when inserted in voting software systems or QR codes, erase the malware's

---

[31] The Court makes this point not as a criticism of Dr. Halderman but simply to point out that due to a variety of circumstances and the timing of the Court's ruling on the Defendants' motion to dismiss the BMD claims at a late date, discovery did not proceed here until the eleventh hour – and only then on a highly expedited, curtailed basis prior to the preliminary injunction motion.

tracks, alter data, or create system disruption.  And while some attacks can be
detected, their results often are not susceptible to full correction.  For all these
reasons, Dr. Halderman and Plaintiffs' other cybersecurity expert witnesses
testified that heightened proactive protection measures are needed beyond what
the current Dominion system as implemented in Georgia provides[32] or

---

[32] There was some back and forth in the parties' submissions regarding one of Dr. Halderman's
affidavits pointing to a 2019 finding of one or more of the Texas Secretary of State's examiners'
determining that Dominion's Democracy Suite 5.5-A version was substantively deficient and did
not meet certification standards. Dr. Coomer dismissed the significance of that one report in his
affidavit in this case. Ultimately, on January 24, 2020, the Texas Secretary of State's Office, based
on the multiple reports of different Texas examiners on varied technical and substantive issues,
concluded along lines quite close to Dr. Halderman's ultimate opinion in this case that
certification should be denied.  The Texas Secretary of State's Office found this same Dominion
5.5-A version should be denied certification for use in Texas elections on this basis: "The examiner
reports identified multiple hardware and software issues that preclude the Office of the Texas
Secretary of State from determining that the Democracy Suite 5.5-A system satisfies each of the
voting-system requirements set forth in the Texas Election Code. Specifically, the examiner
reports raise concerns about whether the Democracy Suite 5.5-A system is suitable for its intended
purpose; operates efficiently and accurately; *and is safe from fraudulent or unauthorized
manipulation.* Therefore, the Democracy Suite 5.5-A system and corresponding hardware devices
do not meet the standards for certification prescribed by Section 122.001 of the Texas Election
Code." https://www.sos.texas.gov/elections/laws/dominion.shtml (last visited September 25,
2020) (emphasis added). The Court also notes, though, that there are other jurisdictions that have
approved the certification of the 5.5-A system, as Defendants assert. As noted in the affidavit of
Jack Cobb, Defendant's witness who is the Laboratory Director for Pro V&V, the State of
Pennsylvania has certified Dominion's Democracy Suite 5.5-A for usage. The Report of the
Pennsylvania Commonwealth of Pennsylvania Department of State approving the usage of
Democracy Suite 5.5. and 5.5A (in Pennsylvania jurisdictions choosing to utilize it), highlights
that the approval is given "**provided the voting system is implemented with the
conditions listed in Section IV**" of the Report. Commonwealth of Pennsylvania, Department
of State, Report Concerning the Examination Results of Dominion Voting Systems Democracy
Suite 5.5A With ImageCast X Ballot Marking Device (ICX-BMD), ImageCast Precinct Optical
Scanner (ICP), ImageCast Central Station (ICC), and Democracy Suite EMS (EMS), *available at*
https://www.dos.pa.gov/VotingElections/Documents/Voting%20Systems/Dominion%20Demo
cracy%20Suite%205.5- A/Dominion%20Democracy%20Suite%20Final%20Report%20scanned
2owith%20sig nature%20011819.pdf (emphasis in original.) These conditions are substantive,
addressing items ranging from system security and prohibition of the connection of the system's
components with any interface with modems or networks, to requirements for manual statistical
audits, robust Logic and Accuracy testing on each device, voter education and warnings, needed
voter instruction changes, and a host of other proactive substantive measures. Pennsylvania's
review indicates that jurisdictions using the Dominion system do so in principal part with a *hand-
marked ballot* based version of the system in tandem with scanners for vote tabulation. However,

alternatively, are simply not feasible given the system's central reliance on a humanly unverifiable QR code.

Plaintiffs' voluminous expert testimony describes an interrelated range of systemic software and operational practices that define and impact the functioning of the voting system. The Plaintiffs maintain that the BMD system and software design as well State Defendants' identified practices independently and as a whole undermine the integrity, security, and functionality of the voting system and in turn, adversely impact whether citizens' votes will be counted as intended or counted at all. The Court has considered this challenge on its merits because a voting system, procedure, or practice can in reality subvert or impair citizens' exercise of the franchise and the counting of their votes. Still, the Court notes from the outset that the voting system challenged here is a new system for Georgia,[33] replacing the outdated DRE system that was dependent on totally obsolete software and defective usage practices that patently made it unreliable. Whatever the new BMD system's flaws in design, age, and reliability of components, or implementation – some of which may be significant – the evidence would at this early point in time have to be highly compelling to justify the Court's considering enjoining on a wholesale basis the State's use of the a BMD voting system approved

---

all voters are given the opportunity to use the ADA compliant marking device feature of the Democracy Suite 5.5 A. System.

[33] However, as Plaintiffs' experts Mr. Liu and Dr. Halderman testified in their respective affidavits in connection with the instant motions, BMDs use an Android operating system that is more than five years old and outdated.

by the Secretary of State, pursuant to his authority under a state law enacted as recently as 2019.

The issues and alleged practices identified by Plaintiffs as a basis for enjoining the system include:

- the BMD QR code's lack of encryption, that opens voting data up to breach, alteration, and other security weaknesses;

- cybersecurity risk management and practices that allegedly render the voting system vulnerable to compromise and breach, and alteration or loss of votes;

- alleged major shortcuts taken in state protocols now used for conducting Logic and Accuracy testing ("L & A") of voting machines required under Georgia law preceding each election, even though L & A testing constitutes a fundamental threshold standard to verify the correct functioning and accurate output of the BMD system and its component parts;

- the alleged impossibility or inadequacy of using Risk-Limiting Audit methodology meaningfully to audit BMD ballots and votes tallied based on a scanned QR code, where evidence indicates that only a fraction of voters review their printed ballot;

- scanning software, practices, and settings that allegedly result in voters' ballot selections on paper ballots (whether cast as absentee, provisional, or emergency ballots) being interpreted as blank and not counted, though clearly appearing on the hand-marked ballots cast by voters;

- the alleged failure to protect the confidentiality of the voting process by the use of timestamps on scanners that trace back to the voters at the precinct and by the large BMD screens that expose the voter's selection choices to other individuals in the precinct and burdening their free exercise of the franchise.

### 2.   Encryption & Risk Exposure

The Court at some length described in its August 15, 2019 Order the changed landscape of cybersecurity in which election systems operate.   More evidence emerging in the past year has added to this picture of heightened security concerns. The Court does not further delve into this reality here because the Defendants do not appear to actually dispute that cybersecurity risks are significant in the electoral sphere.   Dr. Halderman's voting machine testing exercise in the 2020 preliminary injunction hearing – as in 2019 – showed how this might play out. As several of Plaintiffs' national cybersecurity and engineering experts explained in their testimony, the issues presented for any cyber electoral system is how to fortify the system's protection against unauthorized intrusion or accessing of software and databases, the system's detection and limitation of the impact of malware, and minimization of risk overall, including through active auditing procedures.[34]

---

[34] *See generally*, Mr. Liu testimony, Tr. Vol. II, Mr. Liu Declaration at Doc. 855-2; Dr. Halderman testimony, Tr. Vol II and Vol. III (and in conjunction with both preceding preliminary injunction hearings and related filings); Dr. Halderman Declarations at Docs. 785-2, 855-1; Mr. Skogland testimony, Tr. Vol. III; Mr. Skoglund Declarations at Docs. 853-5, 853-6; Dr. Appel Declaration, Doc. 855-3; Mr. Hursti testimony, Tr. Vol. I; Hurti Declarations at Docs. 809-3, 800-2, 680-1; Dr. Demillo Declarations, Docs. 285, 716-1; Dr. Stark testimony, Tr. Vol. I; Dr. Stark Declaration, Doc. 809-2.

The State Defendants presented the BMD system's cybersecurity as reliable and fortified both based on the testimony of Dr. Coomer as Dominion's Director of Product Strategy and Security and the testimony of Mr. Jack Cobb, the Laboratory Director for Pro V&V.[35] The Secretary of State retained Pro V&V to perform a review of its newly adopted BMD voting system, as required for EAC certification purposes, for submission to the EAC for approval. Pro V&V originally certified the Dominion Democracy Voting's Democracy Suite 5.5-A system in August 2019 and has certified a modified version since that time – once in November 26, 2019 and once on October 2, 2020.[36] Mr. Cobb represented in his affidavits filed by Defendants that the Dominion system's security was fortified by the encryption of the QR code and accompanying digital signature code as well as various other security measures such as use of a built in security feature that generates SHA-256 hash values. (Doc. 821-6 at 4.)

Mr. Cobb testified at the injunction hearing that he had fourteen years of experience in testing voting machines, but as became apparent in the course of these proceedings, he does not have any specialized expertise in cybersecurity testing or analysis or cybersecurity risk analysis. Further, Mr. Cobb had not personally done any of the security testing referenced in his affidavits.

---

[35] Pro V&V, Inc., a private company, is a National Institute of Standards Technology (NIST) Accredited Voting Systems Test Laboratory (VSTL) and a United States Election Assistance Commission Accredited Voting Systems Laboratory.

[36] Pro V&V similarly was previously retained by the Secretary of State and certified Georgia's DRE system in 2012 to the EAC. (Tr. Vol. II at 233.) The company's last October 2, 2020 report is addressed later in this Order. The EAC has as of the date of this Order not approved or acted upon this last recommendation.

In his first affidavit, Mr. Cobb stated that the BMD printed ballot's QR codes are signed and encrypted. (Doc. 821-6 at 4.) When Plaintiffs' experts disputed this encryption claim, Mr. Cobb in his second affidavit pointed to Dominion's own documentation as the source of his prior statement that the encoded QR codes and digital signature were encrypted.[37]   And at the injunction hearing, Mr. Cobb conceded that he accepted such representations on face value rather than on any testing that he had actually done. (Tr. Vol. II at 243.)   The evidence plainly contradicts any contention that the QR codes or digital signatures are encrypted here, as ultimately conceded by Mr. Cobb and expressly acknowledged later by Dr. Coomer during his testimony. (Tr. Vol. II at 123, 146, 237, 243.)   In his second affidavit, Mr. Cobb averred that his prior description of the QR code as encrypted as opposed to "encoded" was just a difference in verbiage because he is not an academic.   As discussed later below in connection with Mr. Vincent Liu's testimony, this is simply not correct.   Similarly, during cross examination, after conceding that malware could affect hash value generation, Mr. Cobb indicated he was not familiar with the fact that malware could defeat or disable the hash values[38] – a concern addressed by all of Plaintiffs' cybersecurity specialists who provided declarations or testimony in this case.

---

[37] Mr. Cobb's second affidavit referenced the basis of his earlier statements regarding encryption as Dominion documentation about digital signing and encrypting. "My statement about digital signing and encrypting . . . come directly from Dominion Voting 2.2 – Democracy Suite System Overview Version 5.5:146 Dated August 18, 2018 Section 2.6.1 Electronic Mobile Ballot" that describes QR barcode encoded data as encrypted." (Doc. 865-1.)

[38]  Tr. Vol. II at 236.

Mr. Cobb's first affidavit discloses that Pro V&V did not itself conduct any form of penetration or security testing of the 5.5-A software version specifically to be used in Georgia (certified by Dominion in August 2019) but relied on another company's security testing of earlier versions of the Dominion Democracy Suite software.[39]  (Doc. 865-1 at 5; Tr. Vol. II, at 233.)[40]  Dr. Coomer testified that there is a difference between the 5.5 and 5.5-A Dominion Democracy Suite versions – a change to the ICX software that was not deemed de minimis.  (Tr. Vol. II at 138.) Pro V&V's assessment of the modified software version in November 2019 ("5.5.A GA" update) (classified as de minimis) was performed by an employee no longer with the company.  Mr. Cobb's affidavit did not indicate that he actually had personal familiarity with that specific testing or actually any specific testing, as he testified he did not engage in this type of activity.  (Tr. Vol. II at 243.)  At the injunction hearing, he indicated that Pro V&V had never tried or tested alteration of the QR code in Dominion version 5.5-A, though he had previously declared in effect that this could not be done.  (Tr. Vol. II at 238.)  While Mr. Cobb's affidavits addressed cybersecurity matters and criticisms of Plaintiffs' cybersecurity and engineering expert affidavits, he was candid in his testimony at the injunction hearing that he actually had no specific expertise in cybersecurity testing.

---

[39] Pro V&V had conducted an assessment of an earlier version of the Dominion Democracy Suite software.

[40] Pro V&V's August 2019 certification documentation indicates that "[t]he state certification test was not intended to result in exhaustive tests of system hardware and software attributes."  (*See* discussion of this in Dr. Halderman's affidavit, Doc. 785-2 at 10.)

Mr. Vincent Liu, is a leading international cybersecurity analyst and consultant. He has focused on the "offensive side of security for 21 years," starting with the National Security Agency as a global network exploitation analyst and moving from there to work at Ernst & Young in their advanced security centers. He subsequently led the global penetration team for Honeywell International and in 2005 co-founded the cybersecurity firm of Bishop Fox of which he is CEO. As he describes, "we are hired by some of the most sophisticated, largest companies in the world to perform product security testing, application security testing, penetration testing, code reviews, red teaming. Essentially, companies hire us to find vulnerabilities within their system to identify weaknesses." [41] (Liu Testimony, Tr. Vol. II at 54.)

Mr. Liu addressed head-on the inaccuracy of any contention that the QR code or signature utilized in the Dominion BMD system in Georgia is encrypted. Mr. Liu testified at the injunction hearing that based on his and his firm's examination of the QR codes, the codes were not encrypted. "And the process that we undertook to perform the verification was to develop code that read the QR code. Wherein, we were able to extract the raw data and determine . . . whether or not it was encrypted. And our conclusion was that it was not." (Liu Testimony, Vol. II at 56.)   Mr. Liu further explained that encryption and encoding have

---

[41] Mr. Liu further explained that his firm performs this consulting work for 8 of the top technology companies in the world, 10 of the top 20 retailers, 5 of the 10 top media companies. (Tr. Vol. II at 54; Liu Decl., Doc. 855-2.) At Honeywell, Dr. Liu led the penetration testing team for Honeywell International's global security team, "where our mission was to assess and breach the security of Honeywell's IT infrastructure and applications." (Doc. 855-2 at 2.)

fundamentally different meanings. "The use of encryption implies that there is an algorithm that confers some measure of security to the system . . . . [A] way to think about it is encryption is used to provide security.   Encoding is intended for usability. It is to make information more easily accessible, which is oftentimes counter to, say, encryption, which is something more secret . . . . [I]t is a concept that is very, very fundamental." (*Id.* at 57.)  QR codes, in short, are made to facilitate access, not to conceal the code.

Mr. Liu also addressed whether the digital signature in the Dominion QR code provided security for the QR code:

> [T]ypically when you are thinking about digital signatures you are referring to the use of public-key cryptography.  And the intention is to provide for integrity.  In this case, public-key cryptography was not being used with QR codes. And so the implication is that with the BMDs and the generation of the QR codes the QR codes themselves -- the implication with the design of the Dominion BMD system is that any device that has necessary keys to operate would be able to generate a fake QR code. And you would not be able to determine which machine generated it, whether it was the EMS, the BMD, the ICP, or any other system that had that key loaded on to it.

(*Id.* at 58.)

Mr. Liu goes on to dismiss Pro V&V's and Dominion's reliance on hash values as a central software security protective device.  "[I]f you have an infected BMD that has been compromised [by malware], it can just tell you whatever value that it wants." (*Id.* at 59.) "[A]s it is deployed within the Dominion devices, it does not appear to be used in a fashion that could be considered secure. It can easily be circumvented." (*Id.* at 64.) Liu similarly addresses the insecurity of the encryption key and other gateways to the system that he states can be bypassed by malware to

allow access to QR codes (and faking of such).  (*Id.* at 60-61, 63; Liu Decl., Doc. 855-2 at 5-8.)

On cross-examination, Mr. Liu explained that while he had not personally physically examined the BMD system in Georgia because it has not been accessible for independent evaluation, he had used established standard cybersecurity evaluation practices for assessing the vulnerability of software.  Liu reviewed the architecture and documentation regarding this specific BMD system (including certification documentation) and considered the outdated Android operating system[42] and principles of how relevant checksum software works, his knowledge of applicable technology and software principles and cybersecurity vulnerabilities.  (*Id.* at 63-67.)  He also considered the system's use of USB devices and portals which in his view generally are "fraught with security concerns."  (*Id.* at 69-70.)  Liu concluded that in his view, the design of the security of the BMD system is not secure and "require[s] a more in-depth review."  (*Id.* at 68.)

In contrast, Defendants contend that Plaintiffs' evidence boils down to hypothetical speculation by Dr. Halderman about what "could" happen based on his experience with other electronic voter systems, and review of Dominion documentation, rather than a studied evaluation of the Dominion 5.5-A GA system or its implementation. They argue that the Plaintiffs' experts have never actually

---

[42] Mr. Liu indicated that the Android system in use was over half a decade out of date, with known vulnerabilities. (Tr. Vol. II at 68.)  Similarly, Dr. Halderman noted that the Android OS versions used on the Dominion BMDs do not have the latest security features of later Android releases. (Halderman Decl., Doc. 785-2 at 9-11.)

seen malware that would actually alter a ballot on the Dominion voting system. The State Defendants also question Dr. Halderman's mode of testing the BMD system when the Court ordered the equipment be made available for confidential testing in early September[43] and assessment of the vulnerability of the system's design.

Given the Court's assessment of the limitations in Mr. Cobbs' and Pro V&V's evaluation of cybersecurity elements of Georgia's BMD system and affidavit accuracy issues, the Court looks to Dr. Coomer's testimony for a fuller picture. Dr. Coomer averred in his November 2019 affidavit, "while all computers can be hacked with enough time and access, Dominion is not aware of any situation where an individual used the barcode on one of its units to launch software or to affect the operation of the unit." (Doc. 852-1 at 8.)  In his court testimony, Dr. Coomer describes Dominion's Democracy Suite system as a protected "end-to-end" election management system that is a "self-contained, self-functioning election management system and tallying tabulation system." (Tr. Vol. II at 117.)

Dr. Coomer represents that the servers and work-stations are "hardened" to meet benchmarks set by NIST, the National Institute of Standards Technology. And he represented to the Court that the NIST benchmarks do not address whether other software applications – i.e., game applications that Mr. Hursti observed on

---

[43] Dr. Halderman suggests that the "test mode" that the equipment was "on" when delivered was designed to limit his testing capacity. And on the other hand, Defendants imply in their questioning that Dr. Halderman may have modified the equipment in some other fashion. The Court sees no value in such guessing now.

servers in Georgia county voting offices – must be removed to ensure that servers are securely hardened and protected.[44] Dr. Coomer testified that one of the strong assets of the system's touchscreen interface is that voters cannot cast overvotes (more than one vote in a single race) and that undervotes (no vote cast) are clearly indicated to the voter on the screen, thereby addressing "a lot of the voter intent issues you have with hand-marked ballots." (*Id.* at 119.)  And in this connection, he commented on the clarity of the touchscreens that do not have the calibration problems posed by legacy voting systems. (*Id.* at 121.)

Dr. Coomer testified at the injunction hearing that Dominion did not intend to encrypt the QR barcode.  He also testified regarding the use of digital signatures, secure keys in the system "that are part of the system and the standard SHA-256 hashing algorithm" as protective security architecture for the software system and the QR codes.[45] (Tr. Vol. II at 123.)  Responding to State Defendants' question regarding what would be necessary to generate a valid (but false) QR code accepted by the ICP scanner, Dr. Coomer discussed how *all* physical and software defenses of the system would have to be defeated and source code accessed, which his testimony as a whole suggests he did not think likely. (Tr. Vol. II. at 124.)  He also in his 2019 affidavit testified that as the BMD touch-screen tablets run the Dominion Voting Systems software in Kiosk mode (in a mode only showing the

---

[44]  As discussed later, Mr. Hursti testified based on his cybersecurity experience and observations, that a host of the game and other applications on the servers and equipment he observed as well as internet connectivity created an obvious source for injection of malware.

[45]  Mr. Liu's and Dr. Halderman's testimony and declarations, addressed earlier, discussed their views of the fallibility of this approach.

Touchscreen voting display), "this prevents any access to software or features outside of the certified installed program." (Doc. 821-1 at 2-3.)   Finally, Dr. Coomer's affidavit represents that "the BMD has no physical component that would allow for wireless transmissions."[46]   (Id.)   Dr. Coomer acknowledged on cross examination, however, that the Democracy Suite software works on an Android operating system that is separate from the software and hardware, and that is not written by Dominion. (Tr. Vol. II at 86-87.) He further acknowledged the potential for compromise of the operating system, by exploiting a vulnerability, that could allow a hacker to take over the voting machine and compromise the security of the voting system software. (*Id.*)

The evidence of actual implementation presented by Harri Hursti's testimony suggest a very different picture as to the system's implementation at this juncture.   Mr. Hursti is a nationally recognized cybersecurity expert who has worked in security-oriented IT technology for over 30 years, with a particular expertise in the knowledge, observation and prevention of malicious activities in networked environments.   Mr. Hursti also has an expertise in optical scanning. (Doc. 680-1 at 37; Doc. 853-2; Tr. Vol. I at 120-121.) Mr. Hursti is the co-founder and organizer of one of the largest annual cybersecurity and hacker community meetings, attracting over 30,000 participants in Las Vegas in the four years prior to the Covid-19 pandemic.   He also organized the 2018 Voting Machine Hacking

---

[46] The Court's Opinion and Order of September 28, 2020 (Doc. 918) addressed in depth issues relating to the PollPads and the continuation of prior issues involving the ENET database and program. The Court therefore does not revisit these issues here.

Village for which he was awarded a Cyber Security Excellence Award and has engaged in other organized efforts to work with local election officials to assist them in gaining security expertise.

In response to the State Defendants' critique of his specific qualifications, Mr. Hursti indicates that "there are only a few independent voting system researchers with more hands-on experience than I have with key components of the Dominion Voting System elements. To my knowledge, no jurisdiction has permitted, and Dominion has not permitted, independent research, academic or otherwise, to be conducted on its systems, which greatly limits the number of people with any experience with the Dominion systems." (Doc. 853-2 at 2.) He notes that the Voting Machine Hacking Village issued its 2019 annual report that addressed security weaknesses, vulnerability, and exploitations discovered by the participants regarding an array of computing systems, including a different hybrid piece of Dominion voting equipment, the ImageCast Precinct with Ballot-Marking Device.[47] (*Id.* at 3.) The report intentionally did not provide a public disclosure of how the exploits were conducted but instead a high-level overview. Hursti states that he was actively engaged with the underlying work and that the discoveries were intentionally not included in the annual report for protective security reasons. He has evaluated BMD-type devices during the DEF CON conference and

---

[47] Voting Machine Hacking Village 2019 Annual Report, pp. 17-18, media.defcon.org › voting-village-report-defcon27 (last visited October 8, 2020). (*See* Doc. 619-3.)

otherwise. He has also conducted in-person observations of electoral operations and scanning in Georgia precincts and county offices during the last year since the introduction of Dominion's BMD system.

Mr. Hursti testified at the September 2020 injunction hearing and through several declarations regarding his observations made while visiting county facilities where voting activity was transpiring in the August 2020 elections and in other sites both before and after the August observations. Based on his cybersecurity expertise and in-depth knowledge hacker strategies, Hursti identified concerns regarding the security of these systems. He found that in the two county election offices he visited, election servers enabled unsafe remote access to the system through a variety of means, extending from frequent use of flash drives and accessing of the internet to the use of outside unauthorized applications (such as game programs) residing on election management and tabulation servers and other practices. Mr. Hursti testified that these practices drive a hole through the essential cybersecurity foundation requirement of maintaining a "hardened"[48] server (and associated computers) as well as air

---

[48] "Hardening is the standard basic security practice under the well-accepted principle that a general-purpose device when used with a lot of software for different purposes is more vulnerable than a limited system which has [includes only] the minimum necessary to accomplish the task." This is accomplished by "eliminating and removing all unnecessary services, and removing all drivers to make it the bare bone minimum needed for the task. And that is by reducing using the attack surface making it inherently more secure." (Hursti testimony, Tr. Vol. 1 at 126-27.) "In essence, hardening is the process of securing a system by reducing its surface of vulnerability, which is larger when a system performs more functions; in principle it is to the reduce the general purpose system into a single-function system which is more secure than a multipurpose one. Reducing available ways of attack typically includes changing default passwords, the removal of unnecessary software, unnecessary usernames or logins, grant accounts and programs with the

gapped secure protection of the system. Without these basic protections, malware can far more easily penetrate the server and the operative BMD system software in turn.

Hursti found that in one of the counties, server logs were not regularly recording or updated in full and that Dominion's technical staff maintained control over the logs and made deletions in portions of the logs. Yet secure and complete logs, Hursti testified, are essential as the most basic feature of system security as they provide the detailed activity trail necessary for the identification of security threats and server activity and are required for purposes of conducting a sound audit.[49] (*See* Hursti Decl., Doc. 853-2; Tr. Vol. II at 117-169.)

In sum, at the preliminary injunction hearing, Mr. Hursti succinctly presented his opinion that given the irregularities that he observed as a cybersecurity expert he had serious doubt that the system was operating correctly and that "when you don't have an end-to-end chain of the voter's intent" and when

---

minimum level of privileges needed for the tasks and create separate accounts for privileged operations as needed, and the disabling or removal of unnecessary services." (Hursti Decl., Doc. 809-2 ¶ 28.) "Computers performing any sensitive and mission critical tasks such as elections should unquestionably be hardened. Voting system are designated by the Department of Homeland Security as part of the critical infrastructure and certainly fall into the category of devices which should be hardened as the most fundamental security measure." (*Id.* ¶ 29.) Hursti's personal first-hand observations and review of server log entries "confirmed that services which would have been disabled in the hardening process are running on the server." (Hursti Decl., Doc. 853-2 ¶ 6.) And he testified that it was visibly evident that "this system was not hardened both based on icons observed" and on "logs showing all programs running, all drivers running, and software installed. And that list is comprehensively proving that the system has been not hardened." (Tr. Vol. 1 at 127.)

[49] "The most basic security practice is never to let the operators have privileges to delete or alter log events, because that makes supervision impossible and performing forensics difficult, if not impossible. In addition, trustworthy logs are essential to detect and deter malicious software or intrusion." (Doc. 853-2 at 12.)

a system could be maliciously or unintentionally compromised, there is no capability of auditing the system results.

### 3. Other Issues: Software Changes and Installation

In addition to the above issues, approximately two weeks after the last day of the injunction hearing in this case, a new development or crisis (depending on which party's perspective) was brought to the Court's attention. Logic and Accuracy testing in at least two counties demonstrated an unpredictable defect or bug in the presentation on the ballot of the 20 candidates for one of Georgia's U.S. Senate seats. A column of the senatorial candidates erratically would disappear from the ballot. Dominion conducted expedited testing to identify the source of the bug. At first it determined it would have to replace the database system wide across Georgia to address the issue. On the afternoon of September 25, 2020, Chris Harvey, the Director of Elections for the Secretary of State's Office, issued a written notice to all County election directors regarding a ballot problem that had arisen that might require replacement of the entire voting database. He therefore directed that all county election offices cease Logic & Accuracy testing until further notice. Georgia's 159 counties thus temporarily halted all Logic and Accuracy testing preparation of voting equipment for the elections.

Plaintiffs' counsel notified the Court over the ensuing weekend of this significant new election system problem. The Court held a phone conference with counsel along with Dr. Coomer regarding the issues raised on September 28th. The Court was at that time advised that Dominion had now determined after

44

further testing that the issue should be addressed by a software modification to run on the ICX BMD Touchscreen voting machines that would have to be installed in each of these BMD voting machines across the state. Meanwhile, Dominion sent a modified version of the software for running the election on the operative ICX BMD Touchscreen voting equipment to Pro V&V for independent testing.[1] Although as it turns out, Pro V&V had not started their testing of the software modification (or so it seems) aimed at remedying the issue at the time of the September 28th phone call, Dr. Coomer initially advised the Court then that "so the testing lab has already deemed the change de minimis" – an instantaneous conclusion that bears consequences and raises questions, as later discussed here. (Tr., Sept. 28, 2020, Doc. 926 at 38.) Dr. Coomer then responded to the Court's question of when therefore did the testing actually occur. He further responded that Pro V&V had first analyzed the code change to determine if the change was "de minimis" pursuant to EAC standards and then, based on that finding, would conduct testing, which was proceeding on that day, Monday, September 28th.[50] By Tuesday at latest, Pro V&V had given its full approval of the software modification, though it had yet to issue a written testing report. By that Tuesday afternoon or evening (or earlier), Pro V&V had transmitted the modified software to the State Elections Division for review, use, and distribution to counties on Wednesday. (Doc. 928-1.) The State in turn transmitted on Wednesday,

---

[50] Based on the sudden change in circumstances, the Court issued an express directive that the State Defendants file information and documentation as to the timing of the production of the testing documents to Pro V&V and the EAC. (*See* Doc. 957.)

September 30th one flash drive to each county elections office for mass reproduction in hundreds of flash drives for installation of replacement software on all BMDs.

At the time it was distributed to the counties, the Dominion software modification had not yet been reviewed or approved by the Election Assistance Commission.[51] The State contends it could immediately legally proceed without such approval and has now launched and apparently completed the process of Counties' (whether by county staff or Dominion staff or contract employees) removal of the prior software and installation of the new modified software in thousands of voting machines across the state. At conferences held by the Court on September 28th and October 1st, the State Defendants' counsel maintained that the State did not need EAC approval to implement newly modified software essential to running all critical aspects of the voting machines as state law only requires that the BMD system be "certified by the United States Election Assistance Commission prior to purchase, lease, or acquisition." O.C.G.A. § 21–2–300(a)(3). (Tr. of Sept. 28, 2020 hearing, Doc. 925.) The State Defendants filed at the Court's directive the Pro V&V written testing documentation on October 2, 2020 and

---

[51] HAVA authorized the creation of the Election Assistance Commission as an independent, bipartisan organization, to establish minimum election administration and equipment standards in the administration of federal elections. (Issues with Florida's election machines in the 2000 presidential election were one of the triggers for Congress's creation of the Commission.) While state participation in EAC's review and approval regime is voluntary, once a state has elected to do so as in Georgia's case, the EAC treats state compliance with its standards and procedures as required. There is no provision for half compliance or half participation in EAC's review procedures. On the other hand, the EAC is not vested with actual coercive regulatory authority and thus relies on state cooperation in connection with compliance with its standards and determinations.

represented in the same filing that the Pro V&V summary letter had been submitted to the EAC. However, Dominion did not in fact submit the software modification for approval to the EAC as a de minimis change until Monday, October 5, 2020 and then re-submitted its engineering change order request on Tuesday evening, October 6, 2020, a day after installation of new software statewide in BMDs across the state's 159 counties was completed.[52] (Doc. 959-5.) And on Wednesday, October 7, 2020, upon the EAC's request, Pro V&V submitted the engineering change order to the EACT verifying that it viewed the software change as de minimis and did not require further testing. (Doc. 959-5 at 11.) The EAC notified Dominion of its approval on Friday, October 9, 2020 in a one-line sentence. (Doc. 960-1.) The Court is certainly not in the position to second guess the EAC's approval. But it does delineate here the entire sequence of events and review to make transparent that the EAC review process and associated independent private laboratory review process does not offer exactly a firm protective shield as the EAC functions on a voluntary cooperation basis and does not exercise independent regulatory authority.

EAC Certification requirements specify that pre-approval of software program modifications is necessary, even if considered "de minimis" because of the potential systemic impacts of software changes. Section 3.4.3 of the EAC Certification Manual (revised November 19, 2019) provides: "Manufacturers who

---

[52]  Given the nature of the communications between counsel reflected in Plaintiffs' filing of October 6, 2002, the Court does not know what documents precisely were filed with the EAC.

wish to implement a proposed de minimis change must submit it for VSTL review and EAC approval. A proposed de minimis change may not be implemented as such until it has been approved in writing by the EAC." The EAC Manual regulatory revision at 3.4.3.1. (3) specifies that a Voting System Test Laboratory (VSTL) (in this case, Pro V&V) must review and assess the proposed change and among other requirements, detail "the basis for its determination that the change will not alter the system's reliability, functionality, or operation." It also must determine whether the change meets the definition or instead "requires the voting system to undergo additional testing as a system modification." Section 3.4.3.1(7). In turn, if the VSTL endorses the proposed change as de minimis and provides requisite documentation, EAC "has sole authority to determine whether the VSTL endorsed change constitutes a de minimis change under this section." Section 3.4.3.3. If the EAC determines that the proposed de minimis change cannot be approved, "the proposed change will be considered a modification and require testing and certification" consistent with the requirements of the EAC manual. The Manual provision goes on to delineate six types of features of a proposed software change that should be reviewed in determining whether a change is de minimis or a modification that requires more testing.

The Plaintiffs maintain that the software changes are far more than de minimis and can have broad systemic impact. Three of their cybersecurity experts submitted affidavits regarding the issues raised by the new software and its testing, thus far. The Plaintiffs' experts' affidavits address the EAC delineated

characteristics for determining if a software change is de minimis and conclude that the VSTL (Pro V&V) failed to implement requisite testing measures and analysis to determine the impact of the proposed software code changes on overall system software functionality, as required for assessment of whether a software change is "de minimis." They further contend that Pro V&V conducted a rubber-stamp highly abbreviated testing review of the software changes that failed to test the software changes properly to determine (a) the source of the bug or that the software modification actually fixed the actual source of the bug or (b) how or if the new modified code included in the software would impact the structure and function of other code in the software or functionality of the software as a whole. (Pro V&V Testing Report, Doc. 939; Declarations of Dr. Halderman and Kevin Skoglund, Docs. 941, 943.)

Other substantive concerns were also raised in Plaintiffs' experts' affidavits regarding the nature of the Pro V&V testing, review, and issues posed by the software change. Pro V&V reproduced the bug on a mock election panel database it had created and ran Dominion's new software version on that sample to determine the bug did not reappear. However, as Pro V&V was never able to reproduce the flickering on/off appearance of one column of the 20 candidate screen on a copy of Douglas' County's actual database that first demonstrated the bug, there is no indication that Pro V&V actually identified the root cause of the bug or that Pro V&V actually verified that the new software fixed the bug or fixed it without impacting other portions of the software. Finally, Plaintiffs' two experts

discuss how in their experience, rushed, last minute software code changes without assessment of their impact on the functionality of software and code as a whole constitutes an enormous functionality and security risk for the election system.[53] Mr. Skoglund additionally states that Logic and Accuracy testing, that should follow the new software installation process in every county, will not be able to catch the range of errors and software functionality problems potentially created by the new software. (Skoglund Decl., Doc. 943.)

Additionally, Plaintiffs have offered an affidavit from cybersecurity expert Harri Hursti who witnessed on October 1, 2020 some of the initial installation of the software now proceeding on approximately 3,300 of Fulton County's ballot marking device touchscreen units to ICX software version 5.5.10.32 in the Fulton County Election Preparation Center. (Doc. 942.) He describes in detail how 14 Dominion technicians en masse engaged in removal of the old software and installation of the new software in disorganized, rushed, and careless form – without consistent implementation of various required steps and Dominion directives for installation of the software or any evident security standards or tracking of flash drives containing sensitive information. In Hursti's view, the entire hasty and unprofessional software swap out and installation process is itself

---

[53] Both Dr. Halderman and Mr. Skoglund's affidavits discuss a host of problems that they have seen arise with last minute software fixes that are not thoroughly tested and evaluated for impact on the rest of the software system and in connection with use on a copy of the actual database. Dr. Halderman discusses the analogy – i.e., worst case scenario – of what happened with Boeing's late "minor" software fix in its Boeing 737 Max plane. Halderman and Skoglund's affidavits also discuss the security risks posed by last minute installation of software in voting machines in their experience.

cause for grave concern as to the future security and consistent functionality of the new system.

### 4.   Logic and Accuracy Testing

Pre-election Logic and Accuracy Testing (L & A) is an important operations verification practice and standard in jurisdictions across the nation that use any form of computerized voting equipment. L & A testing is required under the 2019 Georgia statutory provisions enacted as part of the adoption of legislation approving the statewide usage of the BMD system.  As discussed below, L & A testing is designed to verify pre-election that all voting equipment, BMD touchscreens, printers, scanners, and PollPads are properly configured and functioning.  L & A testing should also confirm that the voting system tabulators are accurately tabulating cast ballots going into the election.  The testing gives election staff an opportunity to identify basic errors in election and ballot configuration and related vote attribution in scanning and ballot printing as well as to address other basic functionality problems.

O.C.G.A. § 21-2-379.25(c) provides:

On or before the third day preceding a primary or election, including special primaries, special elections, and referendum elections, the superintendent shall have **each electronic ballot marker tested to ascertain that it will correctly record the votes cast for all offices and on all questions and produce a ballot reflecting such choices of the elector in a manner that the State Election Board shall prescribe by rule or regulation.** Public notice of the time and place of the test shall be made at least five days prior thereto; provided, however, that, in the case of a runoff, the public notice shall be made at least three days prior thereto. Representatives of political parties and bodies, news media, and the public shall be permitted to observe such tests.

(Emphasis added).  The language of Georgia's 2019 statutory provision appears transparent: Each County superintendent shall have each electronic ballot marker machine (i.e., BMD and its components) tested to ascertain that "it will correctly record the votes cast for <u>all offices and on all questions</u> and produce a ballot" for such offices.  O.C.G.A. § 21-2-379.25(c) (emphasis added).  This provision was adopted simultaneous to the Legislature's enactment of O.C.G.A. § 21-2-300, authorizing the Secretary of State's mandatory statewide implementation of the BMD system.  O.C.G.A. § 21-2-379.25(c) in essence, defines the pre-election standard operational verification process required to implement the BMD election system specified in O.C.G.A. § 21-2-300.

Dr. Coomer, Dominion's Director of Product Strategy and Security, "absolutely" agreed in his hearing testimony "that one of the goals of logic and accuracy testing and equipment is to do some measure of confirmation that that the equipment is working properly." (Tr. Vol. II at 83.)  His affidavit submitted earlier by Defendants both in 2019 and 2020 summarized in more detail the purpose and function of pre-election L & A testing in connection with the Dominion voting systems used in Georgia:

> Dominion's optical scanners (ICP) can be used with BMD-marked paper ballots or hand-marked paper ballots. The ICP units do not interpret the human-readable (text) portion of either type of ballot. Instead, the ICP units are programmed to read the QR Code for the BMD ballot or particular coordinates on hand-marked ballot. . . . The target locations are then correlated to individual choices represented on the ballot. Pre-Logic and Accuracy Testing (Pre-LAT) is performed each election on every machine to verify that the target locations on hand-marked ballots, and the barcodes on BMD-marked ballots correspond correctly to the choices represented on the ballots and the digital cast-vote-records.

(Doc. 821-1 at 6.)

The Georgia State Election Board in early 2020 adopted a new Logic and Accuracy Testing Rule, SEB Rule 183-1-12.08.[54] This Rule requires:

> During the public preparation and testing of the electronic poll books, electronic ballot markers, printers, and ballot scanners to be used in a particular primary or election, the election superintendent shall cause each electronic ballot marker and scanner to be programmed with the election files for the precinct at which the electronic ballot marker and ballot scanner unit will be used. The superintendent shall cause the accuracy of the components to be tested by causing the following tasks to be performed:

> A. Check that the electronic poll books accurately look up and check-in voters via both the scanning function and manual lookup and create a voter access card that pulls up the correct ballot on the electronic ballot marker for every applicable ballot style.

> B. Check that the touchscreen on the electronic ballot marker accurately displays the correct selections and that the touchscreen accurately reflects the selected choices.

> C. Check that the printer prints a paper ballot that accurately reflects the choices selected on the touchscreen and immediately mark all printed paper ballots as "test" ballots.

> D. Check that the ballot scanner scans the paper ballot, including both ballots marked by electronic ballot markers and ballots marked with a pen, and that the ballot scanner scans ballots regardless of the orientation the ballot is entered into the scanner.

> E. Check that the tabulation contained in the ballot scanner memory card can be accurately uploaded to the election management system, and that the tabulated results match the selections indicated on the paper ballot.

Ga. Comp. R. & Regs, 183-1-12-.08(3)(A)-(E).

---

[54] Ga. Comp. R. & Regs, 183-1-12-.08, new Rule adopted January 23, 2020, eff. Feb. 12, 2020; amended March 2, 2020 and eff. March 22, 2020.

Yet the Secretary of State's January 20, 2020 published procedures for conducting L & A testing give an instruction for a fraction of the testing required under O.C.G.A. § 21-2-379.25(c) and its implementing regulation. (Doc. 809-4 at 25; Doc. 809-5 at 2-8.)  The procedure's provision for "Testing the BMD and Printer" requires testing of only one candidate race per BMD for each ballot style (i.e., one designated vote for the presidential race and no other races or one designated vote for another office and nothing else).  It also provides that "[a]ll unique ballot styles do not have to be tested on each BMD."  (*Id.*) The published procedure gives this example for how to conduct the BMD machines' ballot testing: "Example: Ballot from BMD 1 contains a vote for only the first candidate in each race listed in Ballot style 1.  Ballot from BMD 2 contains a vote only for the second candidate in each race on Ballot 1, and continue through the line of devices until all the candidates in all races within the unique ballot style will have received a single vote." (Doc. 809-4 at 25.)  In other words, the testing instructions do not provide for a review of whether each BMD machine in the precinct can correctly produce candidate selections on the touchscreens, and aligned ballot results in turn on scanners and printers for all elective offices on the ballot.  But whether a BMD machine or scanner may be able to accurately relay a vote designation for one office does not mean that it properly does so for all other races and offices listed on the ballot.

At the October 1, 2020 follow-up hearing to address the State's implementation of the brand new software modification on the BMDs, the Court

54

explored whether the software change would impact the scope of L & A testing procedures. The Court heard from Michael Barnes, Director of the Secretary's Center for Election Systems, who conducted acceptance testing on the BMD system prior to distribution of the software update to the 159 counties on or about September 29, 2020. The Court learned that Mr. Barnes was involved in the development of the logic and accuracy testing procedures, though Mr. Harvey, as Director of Elections, rather than Mr. Barnes apparently directly oversees their implementation. Mr. Barnes indicated that the counties were instructed to follow the original L & A protocols after verifying the new hash signature for the new version of the ICX software application. (October 1, 2020 Tr. at 35.) Mr. Barnes described a procedure for L & A testing that does not mirror the written instructions in the Secretary of State's January 2020 Procedures manual. Mr. Barnes has not been in the field to observe how counties are conducting the L & A testing pursuant to the instructions provided by the Secretary of State's Office. (*Id.* at 43.) Therefore, it is not clear what practices the counties are using in conducting their L & A testing, and it is entirely possible different counties employ different testing protocols or that they are implementing the narrow process delineated by Mr. Harvey and the January 2020 procedures guide. Even though the process as Mr. Barnes understands it is more expansive than the written guidance provided to the counties by the Secretary of State's Office, it is still incomplete when compared to the requirements of the statutory or regulatory provisions in terms of

providing a full scope of testing of all ballot contests on every piece of the voting equipment.

Putting aside the intent and specifications of the L & A statutory provision, the Court looks at the basic purpose and function of L & A testing as a preliminary threshold standard for testing and ensuring the functionality of every voting machine to be used in an election by voters and capacity to produce pre-election an accurate record and tabulation of votes for candidates appearing on the ballot. First, the Court has considered Dr. Coomer's explanation above that describes the baseline functional examination that L & A provides of voting balloting equipment – and how this translates into correct operation of voting machines, production of ballot results that correlate with ballot position, and vote tabulation. Next, it considers the testimony of Plaintiffs' expert, Mr. Kevin Skoglund, on this subject that goes into greater detail, along the same lines.

Mr. Skoglund, a cybersecurity expert with significant consulting experience with public jurisdictions, testified regarding the Secretary of State's L & A testing directive issued in January 2020. He explained that L & A testing is aimed at "verifying that every piece of equipment is going to operate properly and record votes properly on election day. And so we're crafting a set of questions to ask in advance to try and ascertain if that is true . . . . you would want to test every ballot style because you want every ballot style to work properly. And you want to check every contest. At a minimum, you want to make sure that every candidate is able to receive a vote . . . . But you also have to make sure that the votes aren't being

56

swapped, that they are not crisscrossing." (Tr. Vol. III at 128.)   Mr. Skoglund further clarified that this involves checking to make sure that "whatever you do on the screen is reflected in what is output in the end. On a tabulator, you're validating that when you take the input of the ballot into the tabulator that the totals that come out at the end match correctly. In both cases, you are looking to see if what goes in gives you what you expect to come out the other side." (*Id.* at 131-132.) Finally, he explained how as an election consultant as well as when he has served as a poll manager/voting adjudicator in his home state of Pennsylvania, he has seen some dramatic systematic vote tallying failures that could have been prevented if the L & A testing had properly been handled and identified the issue causing these results that had to be reversed.[55] The tabulation for some races on a ballot also could be totally correct while for others, they were wrong and there were candidates who received zero votes. (*Id.* at 132-133.)   In summary, "[i]f you are only auditing one race, you are only going to detect problems in one race.   Once you test, the scope of your testing determines whether you will find the problems. If you don't look, you can't find problems." (*Id.* at 130.)

The Secretary of State's Director of Elections, Mr. Chris Harvey, provides an affidavit in this case that addresses the Secretary of State's L & A testing policy.  He states the Secretary of State's Office designed the current L & A testing process "in consultation with Dominion and local election officials, and considered the best practices in doing so." (Doc. 834-3 ¶ 7.)  In his opinion, the Coalition Plaintiffs'

---

[55] The county voting machines involved were not the ones now used in Georgia.

proposal that all races within the unique ballot style be tested is "overly burdensome and require[s] a test deck that is extremely large for each BMD." (*Id.* ¶ 6.) According to Mr. Harvey, the State/Dominion/local election officials group therefore concluded that the "increase in burden on local elections officials" would be "dramatic" and "unnecessary" if it conducted any more extensive L & A testing of the ballot than what is required in the January 2020 election procedures manual. *However, Dr. Coomer testified at the injunction hearing that he was not aware that the Georgia Secretary of State now is only requiring testing of one vote position on each ballot.* (Tr. Vol. II at 84.)

The Court understands Mr. Harvey's concern as to the testing burden. But the current state procedure slices and dices standard L & A protocols and objectives in testing for each voting machine (and scanner and printer) to only a small fraction of the electoral races for offices on the ballots to be run on each machine in each County precinct. This is a serious short cut that truncates L & A testing's basic objective of checking on a pre-election basis the voting equipment and software's functionality as well as logic and accuracy in producing a useable, proper ballot printout and vote count, as discussed both by Mr. Skoglund and Dr. Coomer, and anticipated under Georgia law. This makes no sense when the goal is for the system to run smoothly on election day and produce ballots that accurately reflect citizens' votes cast on the BMD system tabulators.

The Court respects that the Secretary of State and Georgia State Election Board are vested with considerable discretion in implementing the mandate of

O.C.G.A. § 21-2-379.25(c). However, the Secretary of State's January 2020 Procedures Manual is plainly inconsistent with the state statutory objective and requirements. The issue before the Court, though, is not whether any particular set of procedures is in full compliance with state law or a mere error in judgment by the Secretary of State's Office. Voters do not have a First or Fourteenth Amendment constitutional right to perfect implementation of state statutory provisions guiding election preparations and operations. But they do have the right to cast a ballot vote that is properly counted on machinery that is not compromised or that produces unreliable results. L & A testing is not complex. It is tedious – but it is essential homework that protects the system and voters as the elections commence.

Recognizing that early voting starts on October 12, 2020 and the imminence of the November 3, 2020 general election, the Court must defer to the Secretary of State's Office and State Board of Elections determination of whether additional measures are pragmatically feasible at this juncture to strengthen the scope of L & A preparations for a general election with a huge anticipated turnout. As L & A testing has already commenced on BMD equipment to be deployed at early voting locations, the Court is not prepared to issue a ruling on the L & A testing issue purely standing on its own. Accordingly, the Court recommends that the Secretary of State and State Election Board expeditiously review in conjunction with Dominion: (1) the adequacy of the current January 2020 procedures, particularly in light of evidence of prevailing protocols used in states nationwide for conducting

for logic and accuracy tests; (2) what modifications can and will be made by the time of the January 2021 elections runoffs and thereafter, or beforehand (if at all feasible). The Court further recommends that the process for evaluation and change in procedures shall be made public on a timely basis and that the results of such evaluation and any changes be made public on a timely basis.[56]

### 5.    Audits

Plaintiffs assert that the Dominion BMDs should not be used in Georgia's elections because unlike hand-marked paper ballots the BMDs are unauditable. In conjunction with their request to enjoin the use of BMDs and to require hand-marked paper ballots as the primary voting method for in-person voting, Plaintiffs request that the State be required to adopt more robust election audit procedures based on generally accepted audit principles. Specifically, the Coalition Plaintiffs' motion seeks an order "commanding the State Defendants to issue rules requiring meaningful pre-certification audits of election results, focusing on contested candidate races and ballot questions, with such auditing to be based on application of well-accepted audit principles in order to establish to a scientifically appropriate level of confidence that any incorrect outcomes will be detected in time to be remedied prior to certification of results." (Doc. 809.) The Curling Plaintiffs similarly request that the Court order Defendants to file "a plan providing specific

---

[56] State Defendants' counsel has pointed to two counties' successful flagging of the U.S. Senate ballot problem through their L & A testing. The Court agrees – this was a positive net result of the testing. For that very reason, though, thorough L & A testing, consistent with standard protocols across the country and Georgia law, would seem to be essential.

steps the Defendants intend to take to . . . institute pre-certification, post-election, manual tabulation audits of the paper ballots to verify election results, in sufficient detail for the Court to evaluate its adequacy." (Doc. 785.)

Plaintiffs presented expert testimony from Dr. Philip Stark, a preeminent renowned statistician and original inventor and author of the risk-limiting audit ("RLA") statistical methodology for auditing election outcomes embraced by the National Academies of Sciences, Engineering, and Medicine, et al. *Securing the Vote: Protecting American Democracy* at 109 (National Academies Press, 2018) ("National Academies Report" or "NAS Report").[57] (*See* Declarations of Dr. Philip A. Stark, Docs. 296; 640-1 at 40-45; 680-1 at 2-24; 809-2; 853-1.) A risk-limiting audit is a "particular approach to catching and correcting incorrect election outcomes before they become official." (Stark Decl., Doc. 296 ¶ 27.)

---

[57] Dr. Stark is a Professor of Statistics and Associate Dean of Mathematical and Physical Sciences at the University of California, Berkeley, a faculty member in the Graduate Program in Computational Data Science and Engineering, a co-investigator at the Berkeley Institute for Data Science, and was previously the Chair of the Department of Statistics and Director of the Statistical Computing Facility. (Decl. of Philip B. Stark, Doc. 296.) He has published hundreds of articles and books and has served on the editorial boards of academic journals in physical science, applied mathematics, computer science, and statistics and is a coauthor on a number of papers on end-to-end cryptographically verifiable voting systems, including being on the development team for the STAR-Vote system for Travis County, Texas. (*Id.*; Tr. Vol. I at 57.) Dr. Stark has consulted for many government agencies and currently serves on the Advisory Board of the U.S. Election Assistance Commission and its cybersecurity subcommittee. He also served on former California Secretary of State Debra Bowen's Post-Election Audit Standards Working Group in 2007. In addition to testifying as an expert in statistics in both federal and state courts, Dr. Stark has testified before the U.S. House of Representatives Subcommittee on the Census and the State of California Senate Committee on Elections, Reapportionment and Constitutional Amendments, and before California Little Hoover Commission about election integrity, voting equipment, and election audits. Dr. Stark's statistical "risk-limiting audits" approach to auditing elections has been incorporated into statutes in several states including California, Colorado, Rhode Island, and in some respects in Georgia's new Election Code. (Doc. 296; Doc. 640-1; Tr. Vol. I at 83.) Dr. Stark pioneered the introduction of RLAs in state sponsored studies and elections in California and Colorado. (Stark Decl., Doc. 296; Stark Suppl. Decl., Doc. 680-1 ¶ 17.)

As Dr. Stark explains, a RLA "offers the following statistical guarantee: if a full manual tally of the complete voter verifiable paper trail would show a different electoral outcome, there is a known, predetermined minimum chance that the procedure will lead to a full manual tally." (*Id.*) If the RLA "does lead to a full manual tally, the result of that manual tally replaces the reported outcome, thereby correcting it." (*Id.* ¶ 28.) In a RLA, "the 'outcome' means the political result: the candidate(s) or position that won, or the determination that a run-off is needed, not the exact vote totals." (*Id.* ¶ 29.) "The maximum chance that the procedure will not lead to a full manual tally if that tally would show a different outcome is called the *risk limit*." (*Id.* ¶ 30.) In other words, "the risk limit is the largest chance that the audit will fail to correct an outcome that is incorrect, where 'incorrect' means that a full manual tally of the voter-verifiable paper trail would find different winner(s)." (*Id.*) For example, a RLA with "a risk limit of 5% has at least a 95% chance of requiring a full manual tally, if that tally would show an outcome that differs from the reported outcome." (*Id.* ¶ 31.)

According to Dr. Stark the "simplest risk-limiting audit is an accurate full hand tally of a reliable audit trail: Such a count reveals the correct outcome." Lindeman, M. and Stark, P., *A Gentle Introduction to Risk-Limiting Audits*, IEEE SECURITY AND PRIVACY, SPECIAL ISSUE ON ELECTRONIC VOTING (2012) at 1. Because a full hand count is administratively burdensome and time consuming, Dr. Stark designed the RLA as a method of examining far fewer ballots that "can provide strong evidence that the outcome is correct," where the "ballots

are chosen at random by suitable means." *Id.* RLAs provide "statistical efficiency" because a RLA of an election "with tens of millions of ballots may require examining by hand as few as several hundred randomly selected paper ballots. A RLA might determine that more ballots need to be examined, or even that a full hand recount should be performed, if the contest is close or the reported outcome incorrect." NAS Report at 95.

The RLA methods Dr. Stark designed "conduct an 'intelligent' incremental recount that stops when the audit provides sufficiently strong evidence that a full hand count would confirm the original (voting system) outcome. As long as the audit does not yield sufficiently strong evidence, more ballots are manually inspected, potentially progressing to a full hand tally of all the ballots."[58]   *Id.* Whether the evidence is "sufficiently strong" is "quantified by the risk limit, the largest chance that the audit will stop short of a full hand tally when the original outcome is in fact wrong, no matter why it is wrong, including 'random' errors, voter errors, configuration errors, bugs, equipment failures, or deliberate fraud."[59] *Id.*

---

[58] Smaller risk limits require stronger evidence that the outcome is correct: All else equal, the audit examines more ballots if the risk limit is 1% than if it is 10%. Lindeman and Stark (2012) at 1. Similarly, smaller (percentage) margins require more evidence, because there is less room for error. *Id.*

[59] RLAs therefore "address limitations and vulnerabilities of voting technology, including the accuracy of algorithms used to infer voter intent, configuration and programming errors, and malicious subversion." Lindeman and Stark (2012) at 1. This is one reason why the NAS has endorsed the use of risk-limiting audits of human-readable, voter-verifiable paper ballots. NAS Report at 94-95.

Risk-limiting audits "do not guarantee that the electoral outcome is right, but they have a large chance of correcting the outcome if it is wrong" but they do "guarantee that if the vote tabulation system found the wrong winner, there is a large chance of a full hand count to correct the results." Lindeman and Stark (2012) at 6. In order to provide this guarantee, a RLA must be based on a reliable and trustworthy audit trail produced by a voting system that is software independent. *Id.* at 1. (*See also* Stark Suppl. Decl., Doc. 680-1 ¶ 4; Stark Suppl. Decl. 640-1 at 42 ¶ 10.)

RLAs involve manually examining and interpreting randomly selected portions of an audit trail of ballots that voters had the opportunity to verify recorded their selections accurately. Lindeman and Stark (2012) at 1. The consensus among voting system experts is that the best audit trail is voter-marked paper ballots; voter-verifiable paper records printed by voting machines are not as good. *Id.*; *see also* NAS Report at 94-95.[60]

---

[60] Dr. Stark's auditing principles are in line with the recommendation of the NAS:

An evidence-based election would produce not only a reported (or initial) election outcome, but also evidence that the reported outcome is correct. This evidence may be examined in a "recount" or in a "post-election audit" to provide assurance that the reported outcome indeed is the result of a correct tabulation of cast ballots.

Voter-verifiable paper ballots provide a simple form of such evidence provided that many voters have verified their ballots. The ability of each voter to verify that a paper ballot correctly records his or her choices, before the ballot is cast, means that the collection of cast paper ballots forms a body of evidence that is not subject to manipulation by faulty hardware or software. These cast paper ballots may be recounted after the election or may be selectively examined by hand in a post-election audit. Such an evidence trail is generally preferred over electronic evidence like electronic cast-vote records or ballot images. Electronic evidence can be altered by compromised or faulty hardware or software.

A voting system is strongly software independent "if an undetected change or error in its software cannot cause an undetectable change or error in an election outcome, and moreover, a detected change or error in an election outcome (due to change or error in the software) can be corrected without re-running the election." (Stark Suppl. Decl., Doc. 640-1 at 42 ¶ 10.) "Systems based on optically scanning hand-marked paper ballots (with reliable chain of custody of the ballots) are strongly software independent, because inspecting the hand-marked ballots allows an auditor to determine whether malfunctions altered the outcome, and a full manual tabulation from the paper ballots can determine who really won, without having to re-run the election." (*Id.*) Therefore, a risk-limiting audit of an election conducted using hand-marked paper ballots "can guarantee a large chance of correcting the outcome if the outcome is wrong." (*Id.*)

Dr. Stark's affidavits and hearing testimony address the impossibility of conducting a reliable audit of ballots and voting totals derived from QR codes for purposes of verifying the accuracy or integrity of election results or processes. In Dr. Stark's view, the risk-limiting audit methodology cannot be properly utilized to assess the accuracy of election results in the context of a BMD system where ballots

---

Paper ballots are designed to provide a human-readable recording of a voter's choices. The term "paper ballot" here refers to a "voter-verifiable paper ballot," in the sense that voters have the opportunity to verify that their choices are correctly recorded before they cast their paper ballots. The voter may mark the ballot by hand, or the marked ballot may be produced by a voting machine. In the current context, the human-readable portion of the paper ballot is the official ballot of record that acts as the record of the voter's expressed choices. Rather than, for example, an electronic interpretation of the paper ballot or a non-human readable barcode appearing on a ballot.

(NAS Report at 94-95.)

are tabulated based on a humanly non-readable QR code that is not voter verifiable and where the computer voting system is vulnerable to data hacking or manipulation that can alter votes cast in untraceable ways – including in the votes actually shown on the ballots that are audited.

In his December 15, 2019 declaration, Dr. Stark explains,

> The most compelling reason for post-election audits is to provide public evidence that the reported outcomes are correct, so that the electorate and the losers' supporters have reason to trust the results. Audits that cannot provide evidence that outcomes are correct are little comfort. A transparent, full hand count of a demonstrably trustworthy paper record of votes can provide such evidence. So can a risk-limiting audit of a demonstrably trustworthy paper record of votes.

(Stark Suppl. Decl., Doc. 680-1 ¶ 3.) But if "there is no trustworthy paper trail, a true risk-limiting audit is not possible, because an accurate full manual recount would not necessarily reveal who won." (*Id.* ¶ 4.) Unlike voting systems using optical scan hand-marked paper ballots, BMD based voting systems are not strongly software independent. (Stark Suppl. Decl., Doc. 640-1 at 42 ¶ 10.) According to Dr. Stark, a BMD "by its nature, erases all direct evidence of voter intent." (Tr. Vol. I at 46.) There is no way to tell from a BMD printout what the voter actually saw on the screen, what the voter did with the device, or what the voter heard through the audio interface. (*Id.*) For this reason, there is no way to establish that a BMD printout is a trustworthy record of what the BMD displayed to the voter or what the voter expressed to the BMD. (Stark Suppl. Decl., Doc. 680-1 ¶ 10.) Because a BMD printout cannot be trusted to reflect voters' selections,

auditors can only determine whether the BMD printout was tabulated accurately, not whether the election outcome is correct. (Stark Suppl. Decl., Doc. 640-1 at 42 ¶ 10.) Nor can auditors determine the correct outcome under these circumstances. (*Id.*) Therefore, because a BMD printout is not trustworthy, "applying risk-limiting audit procedures to [a] BMD printout does not yield a true risk-limiting audit." (*Id.* ¶ 4.)

Plaintiffs provided additional affidavits, testimony, and evidence from other nationally recognized experts that addressed their similar views that the QR code based voting system does not produce a reliable voter-verifiable audit trail that can be audited consistent with established RLA standards and foundation principles. (*See* Decls. of Dr. Andrew W. Appel, Doc. 681-3, Doc. 855-3; Decls. of Dr. Alex Halderman, Doc. 619-2, Doc. 682, Doc. 692-3; Decls. Of Dr. Richard A. DeMillo, Doc. 680-1 at 45-56, Doc. 716-1; *see also* Doc. 615-2, Wenke Lee, Ph.D., Secure, Accessible & Fair Elections Commission, *Basic Security Requirements for Voting Systems* (October 8, 2018); Andrew A. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-marking devices (BMDs) cannot assure the will of the voters* (April 21, 2019); Doc. 692-3 at 8-23, Bernhard, M., A. McDonald, H. Meng, J. Hwa, N. Bajaj, K. Chang, and J.A. Halderman Can Voters Detect Malicious Manipulation of Ballot Marking Devices? IEEE Proc. Security & Privacy, 1, 679-694 (2020)).

Dr. Halderman has explained the many ways a BMD could be maliciously programed or otherwise malfunction such that the ballot printed by the BMD does not match the voter's intended selections. He also attests that "if voters do not

reliably detect when their paper ballots are wrong, no amount of post-election auditing can detect or correct the problem." (Halderman Decl., Doc. 619-2 ¶ 12.) Dr. Halderman, along with others at the University of Michigan, conducted experiments to determine how often voters fail to notice that their BMD printed ballots differ from the selections made on the touchscreen voting machines. (*Id.* ¶ 13.) When not given any prompting to review their ballots, only 6.5% of participants in the study noticed their votes had been changed by the BMD. (*Id.* ¶ 14.)

Between November 2018 and March 2019, Dr. Appel conducted a research collaboration with Dr. DeMillo of Georgia Tech and Dr. Stark, leading to the publication of a joint paper, Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters. After analyzing the consequences of a study of whether voters review ballot cards produced by BMDs, their research concluded:

> Risk-limiting audits of a trustworthy paper trail can check whether errors in tabulating the votes as recorded altered election outcomes, but there is no way to check whether errors in how BMDs record expressed votes altered election outcomes. The outcomes of elections conducted on current BMDs therefore cannot be confirmed by audits.

(Appel Decl., Doc. 681-3 ¶¶ 11, 13, 21.)

Dr. Wenke Lee, the only cybersecurity expert appointed to the Georgia Secretary of State's "Secure, Accessible & Fair Elections Commission," echoed Dr. Stark's opinions in advising the Commission on basic security requirements for voting systems:

> In order to support risk-limited - auditing, paper ballots must be easily and clearly readable and manually countable. In particular, a paper ballot must show each and every vote exactly as cast by the voter. It cannot be just a summary of the votes (e.g., only a tally, or only the presidential ballot and not the down ballots). A manual count absolutely cannot rely upon a barcode, QR code, or any other kind of encoding scheme that is readable only by a machine because the cyber system that reads those codes also can be compromised and lie to the voter or auditor. In short, during a manual review, a human must be able to clearly see evidence of the voter's original act.

(Doc. 615-2 at 3.)

In the face of this consensus as to the role of voter verification and auditing in ensuring voters' ballots are properly and accurately counted, and that the voting tallies are reliable, the State Defendants presented two rebuttal expert witnesses regarding the viability of conducting a valid risk-limiting audit of a QR code based voting system. Both Dr. Gilbert and Dr. Adida's declarations focused on the RLA as the essential tool for protecting against voting system mishaps in the implementation of a BMD system. (Doc. 834-2 at 7; Doc. 658-3 at 13-14, 20-21.)

Professor Juan Gilbert, Professor and Chair of the Computer & Information Science & Engineering Department of the University of Florida and leader of the Department's Human Experience Research Lab[61] testified regarding his views as to the value and reliability of RLA as part of the BMD system, which he endorses.

---

[61] Dr. Gilbert also was a member of the National Academies of Science, Engineering and Medicine Committee on the Future of Accessible Voting: Accessible Reliable, Verifiable Technology, among other leadership and publishing accomplishments. (*See* Doc. 658-2.) Dr. Gilbert's research currently focuses on human use of technology and access to voting systems rather than cybersecurity or cyber engineering issues. His testimony focused on the comparative benefits of the BMD system, its broad human accessibility, its automated generation of a paper ballot that voters have the opportunity to review, and how and if the system's use of a QR code impacts its auditability. Dr. Gilbert's background and expertise is not in the field of statistics.

Dr. Gilbert's research currently focuses on human use of technology and access to voting systems as opposed to issues involving cybersecurity issues or statistical methodology. He described the access benefits of the BMD system and addressed why in his view, voters will verify their printed ballots and therefore enable a meaningful RLA audit which he saw as a vital protective device. Dr. Gilbert has himself not performed any studies of voter review of ballots at the polls. The Court notes that Dr. Halderman has recently published an article on this very subject.[62] Dr. Gilbert's risk/benefit assessment of the vote integrity or manipulation risks entailed in a QR code BMD system clearly differed from Plaintiffs' experts – and specifically Dr. Appel, Dr. Halderman, and Dr. Stark's views regarding the risks posed by the BMD system's reliance on tabulating votes based on a humanly unverifiable QR code.

Dr. Benjamin Adida is co-founder and Executive Director of VotingWorks, a non-profit vendor of election auditing technology and more recently, voting systems in the United States, including accessible ballot-marking devices and hand-marked ballots.[63] Dr. Adida holds a PhD in cryptography and information security from MIT and has significant experience in the private and public sector.

---

[62] Dr. Halderman and Matthew Bernhard co-authored their research in a May 2020 published article, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" A number of the experts referenced the paper, which discusses low rates of voter verification of ballots and the degree to which that may be increased by different voter prompts It also constitutes part of the research literature that bears on the issues of the validity of RLAs where BMDs are used that tabulate the vote based on a QR code rather than the readable information that voters might review.

[63] VotingWorks is a vendor of barcoded ballot-marking devices just like the Dominion system. (Tr. Vol. II at 281.)

While his academic background is impressive, Dr. Adida's background and expertise is not specifically in statistics.[64]

VotingWorks contracts with multiple jurisdictions, assisting in the design and implementation of RLAs. According to Dr. Adida, "[t]he deployment of RLAs is challenging" and highly variable between jurisdictions. To date Georgia has contracted with VotingWorks for guidance in the development and implementation of a RLA in Georgia of one major statewide race every two years to be selected by the Secretary of State, under new rules adopted by the State Board of Elections. Ga. Comp. R. & Regs. 183-1-15-.04. Georgia is the only state so far that VotingWorks has contracted with that uses BMDs for all in-person voting.[65] (Tr. Vol. II at 285.)

Dr. Adida's methodology contained the inherent assumption of voter ballot verification. Dr. Adida testified that "[i]f the paper ballots have a chance to be verified by the voter, they can be used in a RLA whether they were BMD-produced or hand-marked produced." (*Id.* at 284.) Under the State's audit procedures, the

---

[64] In response to the Court's question about the methodology of the Arlo software which incorporates Dr. Stark's statistical algorithm, Dr. Adida admitted, "I'm going to tell you my best understanding of it and admit that there is a level of statistics that goes a little bit outside of my expertise . . . And exactly how that is done, that is where my expertise stops and Dr. Stark's begins." (Tr. Vol. II at 302-303.)

[65] Most of the states where VotingWorks has assisted in conducting RLAs primarily use hand-marked paper ballots with BMDs used only for voters with accessibility needs. These include Virginia, Michigan, Missouri, and Rhode Island. In California, and Pennsylvania, the majority of the voters in the state use hand-marked paper ballots and only certain jurisdictions in those States use BMDs for all voters. In Ohio, there is no uniform voting system; instead roughly half of the jurisdictions use hand-marked paper ballots, a handful use DREs with voter verified paper audit trails, and a handful use BMDs. *See* Verified Voting, The Verifier, *available at* https://verifiedvoting.org/verifier/#mode/navigate/map/ppEquip/mapType/normal/year/2020.

RLA is conducted on the human readable text of the BMD ballot printout, not on the QR code. (*Id.* at 294; Adida Decl., Doc. 934-2 ¶ 12.) Therefore, according to Dr. Adida, "[a]s long as voters verify the text, and as long as RLAs are conducted on the basis of the same ballot text, then potential QR code mismatches are caught just like any other tabulation mistake might be caught. A successful RLA thus provides strong evidence that, if there were QR code mismatches, they did not affect the outcome of the election." (Adida Decl., Doc. 934-2 ¶ 12.)

Dr. Stark has submitted two affidavits in which he severely criticizes the premise of Dr. Adida's position that a valid RLA or valid RLA results can be conducted in the context of a BMD election in which there is no meaningful audit trail and voters cannot verify the QR code, among other things.[66]

First, despite Dr. Adida's assumption that BMD voters will review and verify their ballot selections on the ballot printout, the overwhelming evidence from actual studies of voter behavior "suggests that less than ten percent of voters check their printouts and that voters who do check often overlook errors." (Stark Suppl. Decl., Doc. 680-1 ¶¶ 14, 30(d); Stark Suppl. Decl., Doc. 891 ¶¶ 9-10, 12.) In an actual election, there is no way to know how many voters checked their BMD printouts for accuracy. (Stark Suppl. Decl., Doc. 891 ¶ 16.) "The fact that a voter has the opportunity to check the BMD printout does not make a BMD printout trustworthy." (*Id.* ¶ 7.)

---

[66] Other criticisms raised focused on the statistical invalidity of auditing only one race and the absence of any meaningful audit trail.

Second, Dr. Stark categorically disagrees with Dr. Adida's position that a post-election RLA can demonstrate that BMDs function correctly during elections. According to Dr. Stark – whose opinions are affirmed by other experts – audits of BMD-marked ballot printouts cannot reliably detect whether malfunctioning BMDs printed the wrong votes or omitted votes or printed extra votes (whether due to bugs, configuration errors, or hacking).[67]  And "this is true even if the malfunctions were severe enough to make losing candidates appear to win." (*Id.* ¶ 5.) Dr. Stark testified that "[t]here is no audit procedure that can be conducted on the output of ballot-marking devices to confirm that the outcome of a contest is correct in the sense that it reflects what the voters actually did on the BMD or saw on the screen or heard through the audio." (Tr. Vol. I at 68.)  "[U]nless virtually every voter diligently checks the printout before casting it, there is no reason to believe that an accurate tabulation of BMD printouts will show who really won." (Stark Suppl. Decl., Doc. 680-1 ¶ 13.)

---

[67] According to the NAS Report:

> RLAs can establish high confidence in the accuracy of election results—even if the equipment that produced the original tallies is faulty. This confidence depends on two conditions: (1) that election administrators follow appropriate procedures to maintain the chain-of-custody and secure physical ballots—from the time ballots are received, either in-person or by mail, until auditing is complete; and (2) that the personnel conducting the audit are following appropriate auditing procedures and the equipment and software used to audit the election are independent of the equipment and software used to produce the initial tallies. In the latter case, this not only requires that the software be independent of the software used to tally votes, but also that the software's specifications/algorithms, inputs, and outputs are transparent to permit members of the public to reproduce the software's operation.

(NAS Report at 96.)  As Dr. Stark has attested, the BMDs are not software independent and therefore cannot establish high confidence in the accuracy of the results "even if the equipment that produced the original tallies is faulty."

The fundamental disagreement between Dr. Stark and Dr. Adida boils down to the purpose and function of a risk-limiting audit. Dr. Adida testified at the hearing that the "point of a RLA is to check the tabulation of the votes matches what the voters saw on the paper ballot" and that the "most important function" of a RLA "is to make sure that bugs, malfunctions, dust on the scanner, [or] nation state attacks do not corrupt that function." (Tr. Vol. II at 292.) According to Dr. Stark, ballot polling risk-limiting audits, the audit method piloted and planned in Georgia, do not check the tabulation of votes, per se.[68] (Stark Suppl. Decl., Doc. 809-2 ¶ 12.) They do not check whether the votes were recorded or tabulated correctly. (*Id.* ¶¶ 12, 13(b).) Ballot-polling risk limiting audits do not check the tabulation of any individual BMD ballot or any group of ballots, except in the sense that they check whether the reported total was wrong by more than the reported margin. (*Id.* ¶ 13(c).) Ballot-polling audits only check whether a full hand count of the BMD printout would find the same winners by checking whether the paper

---

[68] There are two general types of risk-limiting audits: ballot-polling audits and comparison audits (either ballot-level comparison or batch comparison). Lindeman and Stark (2012) at 2, 6. Ballot-polling audits are a bit like exit polls, but instead of asking randomly selected voters how they voted, they manually inspect randomly selected cast ballots to see the votes they contain. (Doc. 680-1 ¶ 18.) They require knowing who reportedly won, but no other data from the tabulation system. Lindeman and Stark (2012) at 2. Ballot-polling audits are the best method "when the vote tabulation system cannot export vote counts for individual ballots or clusters of ballots or when it is impractical to retrieve the ballots that correspond to such counts," i.e., systems like Georgia's that use precinct level tabulators that apply randomization to scanned ballots to protect voter anonymity. *See id.* In a ballot-polling RLA, "if a large enough random sample of ballots shows a large enough majority for the reported winner(s), that is strong statistical evidence that the reported winner(s) really won. It would be very unlikely to get a large majority for the reported winner(s) in a large random sample of ballots if the true outcome were a tie, or if some other candidate(s) had won. There is deep mathematics behind proving out how large is "large enough" to control the risk to a pre-specified level, such as five percent. However, the calculations that determine when the audit can stop examining more ballots are relatively simple." (Doc. 680-1 ¶ 18.)

trail has more votes for the reported winner than for any other candidate. "The tabulators could misread every single vote and still find the correct winner" and a ballot-polling audit would not detect this because the outcome could be "correct despite the complete mistabulation." (*Id.* ¶ 12; Stark Suppl. Decl., Doc. 680-1 ¶¶ 20-21.) For this reason, "it is incorrect to consider ballot-polling RLAs to be checks of the tabulation system." (Stark Suppl. Decl., Doc. 891 ¶ 15; Stark Suppl. Decl., Doc. 680-1 ¶¶ 20-21.)

A ballot-polling audit of a contest conducted on a BMD system cannot confirm the reported outcomes are correct because it cannot show that the BMDs functioned correctly. (Stark Suppl. Decl., Doc. 680-1 ¶ 21.) All such an audit can do is provide statistical evidence that a full manual tabulation of the BMD printouts would find the same winner that was reported in the audited contest.[69] (*Id.*) "If

---

[69] Somewhat confusingly, Dr. Stark also testified that "[t]he sense in which a risk-limiting audit may still be worth doing is that it can catch — it can detect whether errors in the tabulation of a particular pile of ballots was large enough to alter the reported outcome of one or more contests. But what it can't do is determine whether that particular pile of paper is a trustworthy representation of what voters did, saw, or heard." (*Id.* at 68-69.) In other words, "[a]pplying risk-limiting audit (RLA) procedures to securely curated BMD printouts can check the accuracy of the tabulation of the printouts. It can provide confidence that if errors in scanning and tabulation were large enough to change the reported winner(s), that fact would be detected and corrected. But such an audit does nothing to check whether the BMDs printed incorrect votes, omitted votes, or printed extra votes. Risk-limiting audit procedures check the *tabulation of BMD printouts*; they do not check the *functioning of the BMDs*. They cannot confirm the outcome of elections conducted using BMDs." (Doc. 680-1 ¶¶ 6-7.) Similarly, he remarked that "[r]igorous audits can ensure (statistically) that tabulation errors did not alter the reported outcomes. But they cannot ensure that errors in BMD printouts did not alter the reported outcomes." (*Id.* ¶ 12.) While there appears to be some disconnect between the use of RLAs to check tabulations, it is possible Dr. Stark is referring to ballot-level or batch comparison RLAs here which, unlike ballot-polling audits, check outcomes by comparing a manual interpretation of ballots selected at random to the voting system's interpretation of those ballots counts.

the BMD printouts contained outcome-changing errors, the audit would have no chance of detecting that, nor of correcting the reported outcomes." (*Id.*)

This is essentially what the pilot audits Georgia has conducted accomplish and what the planned audit for the selected contest in the November 2020 election will accomplish.[70] However, this does not serve the purpose and function of a true risk-limiting audit as designed by Dr. Stark to statistically guarantee that the audit will produce a large chance of correcting the election outcome if the reported outcome is wrong.[71]

Additionally, the Court pursued a range of questions with Dr. Adida when he testified about VotingWorks' application of the RLA for the first time in a state of Georgia's size in solely one race under these circumstances. The Court cannot

---

[70] In conjunction with Dr. Adida's organization, VotingWorks, the State of Georgia consulted with the Verified Voting Foundation when it conducted a RLA pilot of two election contests in Cartersville in November 2019. (680-1 ¶ 17.) Dr. Stark was on the Board of Directors of Verified Voting for years until he resigned after the President of Verified Voting declined to clarify publicly that the Cartersville pilot audit did not "confirm outcomes" or show that the voting system worked correctly. (*Id.* ¶ 23.) Since that time, Verified Voting's official positions on RLAs and BMDs have for the most part realigned with Dr. Stark's findings and opinions. (Tr. Vol. I at 80.) *See* Statement on Ballot Marking Devices and Risk-Limiting Audits, *available at* https://verifiedvoting.org/statement-on-ballot-marking-devices-and-risk-limiting-audits/.

[71] Again, Dr. Stark invented virtually every extant method for performing risk limiting audits, including ballot-polling risk-limiting audits. Dr. Stark was the first person to pilot a ballot-polling risk-limiting audit, in Monterey, CA, in May, 2011. Dr. Stark published the first software tool to conduct ballot-polling risk-limiting audits which was the official tool used by the State of Colorado for its ballot-polling risk-limiting audits and is referenced in Colorado election regulations. (Doc. 809-2 ¶ 10.) The VotingWorks Arlo software to be used in Georgia's audit incorporates Dr. Stark's algorithm, and Stark understands that VotingWorks benchmarked the Arlo software against his to confirm Arlo is a correct implementation of the algorithm. (*Id.* ¶ 11.) Understandably, Dr. Stark strenuously disagrees with any attempts to redefine the RLA methodology so that it only corrects some kinds of errors or to modify its application for use on systems with an untrustworthy paper trail because such measures go against the whole principle the RLA was designed to fulfill and weakens the concept to a degree that it destroys the fundamental property that the audit has a large chance of correcting the election outcome if it is wrong. (Tr. Vol. I at 80-83.)

say that it got close to understanding the rationale or specific contours of the sampling methodology to be used by Voting Works.

Suffice it to say, the experts here are in hot debate and approach these issues from different backgrounds and areas of expertise. The Court recognizes that the RLA is deemed by all of the experts as a control valve essential to election integrity. The question they differ on is whether a RLA can be validly implemented in the context of Georgia's QR code BMD voting system. While the Plaintiffs have marshalled a formidable amount of evidence that casts serious doubt on the validity of the use of the RLA with the current system (including the specific RLA methodology that VotingWorks is pursuing here), unless the Court determines that the BMDs must be enjoined from use in Georgia's upcoming elections, the requested remedy appears irrelevant. Absent such an injunction, there is no audit remedy that can confirm the reliability and accuracy of the BMD system, as Dr. Stark has stressed. Plaintiffs do not request, and have not offered, any other proposed audit procedures to accomplish the goal of the RLA. Nor is the Court in a position to reach a judgment regarding whether the Secretary of State's plan to conduct a single RLA assessment in one statewide race under these circumstances provides any meaningful protection or guidance regarding the accuracy of tabulation of the overall voting results (or system). The Court has some major doubts, given the entirety of the evidence discussed here. But under O.C.G.A. § 21-2-498(e) the Secretary of State will be required to implement risk-limiting auditing for all statewide elections "beginning not later than November 1, 2024." The

Secretary and State Election Board still have the opportunity to consider other options for effectuating a somewhat more meaningful RLA process – i.e., by at very least strengthening voting protocols for the 2022 election cycle to encourage voters' ballot verification and expanding the number of electoral contests audited. That said, the specific relief Plaintiffs ask for ultimately rises or falls on whether the evidence as a whole establishes the Plaintiffs' likelihood of success on their challenge of the current QR barcode-based BMD system. And the auditing issues considered are relevant to this central claim.

### 6. Analysis of Preliminary Injunction Standards as Applied to Plaintiffs' Primary BMD Vote Related Claims

The Court has in Section II A. above discussed the standards the Court must weigh and apply in determining the Plaintiffs' entitlement to preliminary injunctive relief. The Court must first consider whether Plaintiffs have established a substantial likelihood of prevailing on the merits of their claims and related to that, "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment." *Anderson,* 460 U.S. at 789.

The interest Plaintiffs seek to vindicate now is the same interest at stake when they brought this litigation under the old voting system in 2017. As the Court first recognized in its August 2018 Order, the Constitution affords Plaintiffs an interest in transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote. Plaintiffs assert they will suffer immediate and irreparable harm to this interest if required

by the State to cast a ballot on the BMD system that cannot be confirmed or verified as reflecting their actual vote choices because the votes are tabulated solely from a computer generated QR barcode that is not human-readable and is vulnerable in the current system to failure or breach. They further assert that this injury is exacerbated because votes cast by BMDs pose the significant risk of having the votes altered, diluted, or effectively not counted.[72]   Plaintiffs have shown demonstrable evidence that the manner in which Defendants' alleged mode of implementation of the BMD voting system, logic and accuracy testing procedures, and audit protocols deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted).

The Court views the burden and the threatened deprivation as significant under the *Anderson/Burdick* balancing framework. The right to vote derives from the right of individuals to associate for the advancement of political beliefs that is at the core of the First Amendment and is protected from state infringement by the Fourteenth Amendment. *E.g., Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968); *NAACP v. Button*, 371 U.S. 415, 430 (1963). "Writing for a unanimous Court in *NAACP v. Alabama*, Justice Harlan stated that it 'is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable

---

[72] In addition to a burden on the fundamental right to vote, Plaintiffs also assert in-person voters are subject to unequal treatment as compared to provisional and absentee voters whose paper ballots are capable of being meaningfully recounted, reviewed against an independent record to verify the accuracy of the vote tabulation, and may have discrepancies detected and corrected through audits.

aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Anderson*, 460 U.S. at 786-87 (internal citation omitted). As discussed in both the Court's September 28, 2020 Order and this Order, the individual Plaintiffs have a strong preference to cast votes in person and do not want to be shunted out of the regular exercise of the shared political experience of voting with their fellow citizens at their local precinct location. The First and Fourteenth Amendments afford them this right to associate for the advancement of political beliefs by exercising the franchise at the voting booth and to cast their votes effectively. *See generally, Anderson*, 460 U.S. at 788; *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968); *Reynolds v. Sims*, 377 U.S. 533, 563 (1964).

"Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 562. "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). "Although these rights of voters are fundamental, not all restrictions imposed by the States . . . impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." *Anderson*, 460 U.S. at 788. Rather, the Supreme Court has recognized that States retain the power to regulate their elections to provide fairness, honesty, and order in the democratic process. *Id.* The right to vote is the right to participate in an

electoral process that is necessarily structured to maintain the integrity of the democratic system. *Anderson*, 460 U.S. at 788. "To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes." *Id.* Election laws "invariably impose some burden upon individual voters," whether they govern the "registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself," and such laws "inevitably affect[] — at least to some degree — the individual's right to vote and his right to associate with others for political ends." *Id.*; *Burdick*, 504 U.S. at 433. But, "cumbersome election machinery can effectively suffocate the right of association, the promotion of political ideas and programs of political action, and the right to vote." *Williams*, 393 U.S. at 39 (Douglas, concurring). And, "[w]hen a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Reynolds*, 377 U.S. at 566 (quoting *Gomillion v. Lightfoot*, 364 U.S. at 347).

Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, communicate such interpretation for elector verification, and print an elector verifiable paper ballot;" and (2) "produce paper ballots which are marked with the

elector's choices in a format readable by the elector"   O.C.G.A. § 21-2-2(7.1);
O.C.G.A. § 21-2-300(a)(2).

Plaintiffs and other voters who wish to vote in-person are required to vote
on a system that does none of those things.   Rather, the evidence shows that the
Dominion BMD system does not produce a voter-verifiable paper ballot or a paper
ballot marked with the voter's choices in a format readable by the voter because
the votes are tabulated solely from the unreadable QR code.   Thus, under Georgia's
mandatory voting system for "voting at the polls"[73] voters must cast a BMD-
generated ballot tabulated using a computer generated barcode that has the
potential to contain information regarding their voter choices that does not match
what they enter on the BMD (as reflected in the written text summary), or could
cause a precinct scanner to improperly tabulate their votes.

As a result, each of the Plaintiffs attest that they are forced to forego their
right to full and unfettered participation in the political process and to alternatively
exercise their right to vote using Georgia's absentee ballot regime which carries its
own burdensome procedures, though they may be minimal as compared to the
burdens created by the BMDs.[74]   Absentee voting itself has been the subject of

---

[73] O.C.G.A. § 21-2-300(a)(2) (effective April 2, 2019) (mandating a new uniform statewide voting
system that provides for "the use of scanning ballots marked by electronic ballot markers and
tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person").
[74] Georgia law permits a registered voter to vote via absentee ballot for any reason. *See* O.C.G.A.
§ 21-2-380. Voters under age 65 must submit separate, distinct applications for each election (i.e.
primary, general, runoff) sufficiently early to their county registrar's office to ensure timely receipt
of their absentee ballot.   O.C.G.A. § 21-2-381(a)(1)(A); O.C.G.A. § 21-2-381(a)(1)(G).   Absentee
ballot applications may be denied if the registrar determines that the information provided by the
voter in the application does not match the voter's information on file with the registrar's office

much constitutional litigation where the implementation of these procedures resulted in the rejection of absentee ballots and voter disenfranchisement. To avoid being denied the ability to verify their votes on the BMD system, Plaintiffs must trade one unfavorable burden for another. Plaintiffs are left with the choice of having to run another gauntlet of the absentee voting process because of potential uncertain postal delivery issues, untimely processing by the registrar's office, signature matches, etc. As discussed in Section III D herein, Plaintiffs have shown a significant burden resulting from the accuracy and voter invalidation issues that affect Dominion's scanner/tabulators and adjudication software used for determining voter intent and tallying hand-marked absentee ballots. A choice between two evils is no choice at all; the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election regardless of which method they choose to cast their vote.

That Plaintiffs and other voters have the alternative of casting an absentee hand-marked paper ballot does not lessen or absolve the State of the burdens

---

or if the voter's signature on the absentee ballot envelope does not match the signature on their voter registration card. O.C.G.A. § 21-2-381(b)(2)(3). Once received and completed, voters must sign an oath on their absentee ballot envelope and personally mail or deliver their ballot to the board of registrars or absentee ballot clerk or to a dropbox. O.C.G.A. § 21-2-385(a). Georgia does not provide pre-paid postage for the return of the absentee ballot, and thus, voters must pay for their own return postage to vote by mail. The State of Georgia does not count mail ballots received after the closing of polls at 7:00 p.m. on Election Day. *See* O.C.G.A. § 21-2-386(a)(1)(F). This is true even if a ballot arrives late for reasons objectively outside the voter's control, and even if the ballot was postmarked weeks before Election Day or alternatively, on Election Day. Absentee ballots will be rejected if not received by election day or "[i]f the elector has failed to sign the oath, or if the signature does not appear to be valid, or if the elector has failed to furnish required information or information so furnished does not conform with that on file ... or if the elector is otherwise found disqualified to vote[.]" O.C.G.A. § 21-2-386(a)(1)(C).

imposed by the State's chosen, preferred, primary voting system, in which it invested hundreds of millions of taxpayer dollars. The State opposes a court-ordered switch to hand-marked paper ballots for in-person voters at the polls. The State does not wish to be forced into an administratively burdensome system of carrying out an election using hand-marked ballots and voters do not wish to be forced into an absentee regime that contains its own distinct array of burdens and uncertainties associated with whether the ballot will be accepted and counted.

While the Court recognizes Plaintiffs' strong voting interest and evidentiary presentation that indicate they may ultimately prevail in their claims, the Court must perforce address the posture of this case as a whole as well as the Plaintiffs' burdens "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *New Georgia Project v. Raffensperger*, ---F.3d. ---- 2020 WL 5877588, at *2 (11th Cir. 2020).

In election cases, the Supreme Court and Eleventh Circuit have made ever more abundantly clear the mandate that district courts must exercise great restraint in considering the grant of injunctive relief that requires new rules on the cusp of an election where the Court's Order could cause electoral disruption and voter confusion. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *Republican National Committee v. Democratic National Committee*, --- U.S. ---, 140 S.Ct. 1205, 1207 (2006); *Republican Nat'l Comm. v. Common Cause R.I.*, --- U.S. ---, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020); *Merrill v. People first of Alabama*, ---S. Ct ---

-, 2020 WL 3604049 (U.S. July 2, 2020); *New Georgia Project v. Raffensperger*, 2020 WL 5877588 at *3.  The Court expressed its concerns anew to Plaintiffs' counsel about this timing issue when Plaintiffs filed a renewed motion for preliminary injunction in August 2020, shortly after the denial without prejudice of their initial October, 2020 preliminary injunction motions targeting the BMD system and other voting practices.[75]  The timing of the relief sought plays a paramount role in the evaluation of the practicality of granting the requested remedy at this point.

Litigation since Plaintiffs' amendment of their claims to include a challenge to the BMD system as a whole has stretched on since October 2019, with plenty of delays occurring.  But these delays were not attributable to any lack of litigation diligence or aggressiveness on Plaintiffs' counsel's part.  For a variety of reasons, including multiple motions to dismiss that stalled discovery, the Court's own schedule especially after the advent of the Covid-19 pandemic, and challenges posed by the difficulty of the case as a whole, Plaintiffs' motions for preliminary injunction were not heard until September in this Presidential election cycle year.  Some evidentiary challenges at that point reared their heads.  Due to Dominion's own historic unwillingness to provide independent cybersecurity researchers with

---

[75] The first initial motions for preliminary injunction seeking to enjoin the BMD system, filed in October 2019 (Docs. 619, 640), were denied without prejudice in August 2020. At that juncture, the Court viewed the evidence as presented as closer to a quasi-facial challenge rather than one that was rooted, at least in part, in the record evidence involving the actual use of the BMD machines and associated Dominion equipment and attached KnowInk registration check-in PollPad tablets at voting precincts.  Covid-19 pandemic ramifications triggered major election scheduling delays and changes that resulted in the March presidential primary being moved ultimately to early June 2020.

access to the Dominion Suite software and equipment package (through sale or otherwise), Plaintiffs obtained only last-minute, court-ordered access to the Dominion system for hands-on testing.   Finally, as State Defendants have not maintained a practice of regular independent cybersecurity testing and evaluation of vulnerability issues in their own systems impacting the elections realm and had asserted work product privilege over the one extant report, these types of reports were not available to the parties or Court when the hearing was about to commence.

Plaintiffs have presented a massive and complex record in this matter for the Court's review that has consumed its attention for long swaths of time. Plaintiffs also in the course of their hearing preparation presented an expanded array of expert affidavits as well as voter and election evidence, collected primarily from the June and August 2020 statewide primary and runoff elections. These elections produced more substantive empirical evidence and helped to bring into sharper focus the evidentiary issues in this case.

Defendants also have presented substantive evidence in support of their overarching legal defense.  They generally minimize the claims, concerns, and risk threats documented in Plaintiffs' challenge.  At core, the State Defendants' counsel argue that Plaintiffs' legal claims boil down to their disagreement with the policy choices legally vested in the Secretary of State and State Election Board's purview. In turn, they contend that Plaintiffs have suffered no cognizable threat of harm or burden in their exercise of their First and Fourteenth Amendment rights.

Defendants also maintain that they have taken sufficient proactive measures in implementation of the new voting system to ensure its security and reliability.

The preliminary injunction hearing started on September 9, 2020 and concluded on September 13, 2020. But that was not the end, by any means, of the parties' continuing supplemental submissions to the Court. And record developments such as the State Defendants and Dominion's last-minute introduction of a modified system-wide software change to the voting system and dealings with the EAC continued to roll out before the Court – some of which was directly relevant to the evidentiary issues before the Court. Early voting in Georgia with the use of BMD voting machines, will commence now in one day, on October 12, 2020.

Some of Plaintiffs' claims pursued involved discrete and limited relief that do not upset the election apple cart. The Court has considered relief in two instances where there was strong evidence of state-imposed burdens to Plaintiffs' First Amendment constitutionally protected exercise of the franchise as well as narrowly tailored relief that was fully consistent with state law. The Court in those instances balanced the state's interests and burdens as well as relief issues relative to the operation of the elections before granting any form of narrowly tailored relief or delaying such relief until after the election. Indeed, the Court's Pollbook relief[76] was expressly framed based on the State's emergency ballot voting statutory and regulatory provisions to ensure that these emergency procedures could

---

[76] *See* Court's Opinion and Order of September 28, 2002. (Doc. 918.)

pragmatically be implemented on Election Day, November 3, 2020, if necessary so as to mitigate the severe burdens experienced by Plaintiffs and other voters in casting votes in the new BMD-equipped system during the June and August 2020 elections.

By comparison, the Plaintiffs' BMD systemic injunctive challenge and request for replacement of the system with hand-marked paper ballots pose relief issues of an entirely different, more expansive scope. After reviewing all of the evidence in scrupulous detail, the Court must step back at this juncture, despite the persuasive evidence that Plaintiffs have provided. Plaintiffs' central claim seeks statewide relief, requesting that the Court enjoin implementation of the State's newly designated BMD voting system under O.C.G.A. § 21-2-300 and require instead the state's implementation of a hand-marked ballot system in its 159 counties. The problems posed obviously go beyond whatever the State's and counties' purported capacity issues are in connection with the purchase of ballot paper stock or printing arrangements. The requested relief would entail a fundamental modification in the election system that the Secretary of State and county election offices are not now equipped or prepared to administer. The Court has already seen in the record of this case enough election chaos, operational deficiencies, and challenges on all levels, plus stress in the system spiked further by Covid-19 complications, that the Court cannot embrace a rosy view of the simplicity of moving to a total, comprehensive paper ballot system with so little time to prepare for such a major transition. And this would likely have been true

also even if such relief had been ordered on September 15th, the day after the injunction hearing concluded, based on election operations evidence presented in connection with the hearing.  The substantial risks and long-run threats posed by Georgia's BMD system, at least as currently configured and implemented, are evident.  However,  the Court – especially after reviewing evidence regarding election staff management and operations challenges in the June and August 2020 elections – cannot envision that state and county elections staff (including paid temporary contract personnel) would be equipped to move the system and voters through such a major operational change without chaotic disruptions occurring anew.

Risks are posed both by a sudden shift to a statewide hand-marked paper system and proceeding with the BMD system. Ultimately, the Court must find that imposition of such a sweeping change in the State's primary legally adopted method for conducting elections at this moment in the electoral cycle would fly in the face of binding appellate authority and the State's strong interest in ensuring an orderly and manageable administration of the current election, consistent with state law. So, for this reason alone, despite the strength of Plaintiffs' evidence, the Court must decline the Plaintiffs' Motions for Preliminary Injunction.

## C.    Coalition Plaintiffs' Claims Relating to Ballot Secrecy

The Coalition Plaintiffs seek to enjoin the use of BMDs on the basis that they severely burden the fundamental right to vote by depriving voters of secrecy of the ballot. They assert two theories as to how BMDs result in the deprivation of ballot

secrecy: (1) the large size of the BMD touchscreens, if not configured to shield the screens from public view, permit anyone in the polling place to observe how a voter is voting; and (2) the precinct scanners record timestamp information such that a voted BMD ballot card can be traced back to the individual in-person voter by comparing the timestamps on the scanned cast vote records with the order in which voters used the machines.

In support of their first challenge, the Coalition Plaintiffs presented declaration testimony from 7 individuals who served as poll watchers in the June and August elections that the BMD touchscreens were clearly visible to the public from 30 to 50 feet away during the voting process. Additionally, there was some affidavit evidence of voter discomfort at the perception of the exposure of the voting process. (*See* Doc. 853-4 at 25.) Despite these observations, Plaintiffs have not established a resulting First Amendment injury where there is no evidence from any Plaintiff or any other voter claiming that the publication of their vote selections subjected them to threats, harassment, reprisals, or other "chilling" of the free exercise of the franchise from either Government officials or private parties. *See Buckley v. Valeo*, 424 U.S. 1, 64, 74 (1976) (per curiam); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 (1995) (noting that the "respected tradition of anonymity in the advocacy of political causes . . . is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation"); *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 366-67 (2010).

For Plaintiffs, this is an all or nothing proposition, as they seek to enjoin the BMDs outright and do not propose other solutions to the ballot secrecy problems posed by the oversize BMD touchscreens.  However, it is not necessary to scrap the new voting machines where a less burdensome fix exists.  Georgia's Election Code places the responsibility of arranging voting equipment at polling places to ensure voter privacy with "the governing authority of each county and municipality." O.C.G.A. § 21-2-267. The Secretary of State's Office has undertaken measures to instruct local election officials on proper polling place layout and arrangement of BMDs to maintain voter privacy.  (Harvey Decl. ¶ 3, Doc. 834-3; Ex. 1 to Harvey Decl., Doc. 834-3 at 7-11) ("The Secretary of State's office has provided guidance to county election officials about the setup of precincts so that [touch]screens will not be visible to other voters when they are being used by a voter.").  If the counties fail to follow the requirements of O.C.G.A. § 21-2-267 and the guidance provided by the Secretary of State and voter privacy rights are violated, the State Election Board can undertake an investigation and/or enforcement action as necessary.

In support of their second contention, Plaintiffs assert that the "Dominion precinct scanners record timestamp information directly onto the digital cast vote record that is created when a ballot is scanned, with the result that a voted BMD ballot card can easily be connected afterward with the individual voter who cast that ballot by simply comparing the scanned cast vote records (ordered by timestamps) with the order in which voters are observed going through the voting process." (Br. Supp. Mot., Doc. 809-1 at 32-33.)

The Coalition Plaintiffs have not offered a single instance of actual infringement of voter anonymity as a result of the use of digitally recorded scanner timestamp records. And despite the lack of evidence of any local election official going to such great lengths to discover how someone voted, the evidence in the record describing and illustrating how the precinct scanners actually operate does not bear this out.

Instead, the Coalition Plaintiffs rely on scanned ballot images from Fulton County bearing timestamps recorded by the ICC central count scanner used to tabulate absentee and provisional ballots by election personnel at the county election office. The timestamp recorded on the digital record of ballots tabulated by the ICC correlates to the time the ballot is run through the scanner by an election official and has no demonstrated correlation to the individual voter having marked an absentee ballot at home (or a voter having marked a provisional ballot at the precinct). *See* O.C.G.A. § 21-2-386 (providing that "[t]he process for opening the inner envelopes of and tabulating absentee ballots on the day of a primary, election, or runoff as provided in this subsection shall be a confidential process to maintain the secrecy of all ballots). The Coalition Plaintiffs have not offered any theory to suggest that absentee and provisional ballots can be linked back to individual voters using the timestamp recorded in the digital record by the ICC central scanner.

Unlike the ICC central scanner, the ICP precinct scanner does not record a digital timestamp on the ballots of in-person voters. Rather, ballots scanned on

the ICP precinct scanner/tabulator includes a "randomized sequence number" that "preserves voter anonymity as there is no way to correlate the sequence number to either an individual voter, or a specific point in time that the ballot was cast. When results and images are stored on the removable memory (Compact Flash cards), no date-timestamp information is included which prevents the ability to recreate the sequence of how the ballots were cast thus preserving voter anonymity." (Coomer Decl. ¶ 10; Doc. 821-1; *see also* Ex. 19-A to Decl. of Marilyn Marks, Doc. 853-4 at 6 (showing ballot image from ICP scanner without any timestamp).) Dr. Coomer confirmed this again at the September 11 hearing, stating that there is no timestamp associated with ballot images scanned and stored in the digital cast vote records created by the ICP precinct scanner/tabulator. (Tr. Vol. II at 91-92.)

Accordingly, the Coalition Plaintiffs have failed to establish a likelihood of succeeding on the merits of their claim that the BMD system violates their right to ballot secrecy.

### D.   Hand-Ballot Scanning and Its Impact on Counting of the Vote

The Coalition Plaintiffs request that the Court require the State Defendants "to adopt scanning threshold settings for the Dominion scanners and vote review procedures that will ensure all voter marks on mailed and hand marked paper ballots are counted." (Br. Supp. Mot., 809-1 at 10.) They assert that the Dominion scanner and tabulation software and equipment are failing to count all legal votes as defined under Georgia law, resulting in an unconstitutional denial of review of the ballot before arbitrarily discarding perceptible ballot votes containing such

marks. Plaintiffs contend that Defendants' challenged practices in connection with scanning and tabulation of such hand ballot votes violate Georgia law, which requires votes to be counted if the intent behind a voter's mark can be ascertained upon review. *See* O.C.G.A. §§ 21-2-438(b)& (c); *see also* O.C.G.A. § 21-2-483(g) (requiring manual review by the vote review panel of any overvote detected by the central tabulator).[77] And Plaintiffs also argue the current system and its configuration is a violation of equal protection because in-person voters who use BMD voting machines are not subject to having their votes rejected by a scanner due to faint marks. Each of the individual Plaintiffs additionally have submitted affidavits in this case indicating that while they strongly prefer to vote in person, they have felt compelled to vote by absentee ballot because of their concerns about whether their ballots would be accurately counted in the State's BMD and prior DRE systems. (Decl. of Donna A. Curling, Doc. 785-3; Decl. of Donna Price, Doc. 785-4; Decl. of Jeffrey H. Schoenberg, Doc. 785-5; Decl. of Megan Missett, Doc.

---

[77] Sections (b) and (c) of O.C.G.A. § 21-2-438 provide as follows:

(b) At elections, any ballot marked by any other mark than a cross (X) or check (✓) mark in the spaces provided for that purpose shall be void and not counted; provided, however, that no vote recorded thereon shall be declared void because a cross (X) or check (✓) mark thereon is irregular in form. A cross (X) or check (✓) mark in the square opposite the names of the nominees of a political party or body for the offices of President and Vice President shall be counted as a vote for every candidate of that party or body for the offices of presidential elector.

(c) Notwithstanding any other provisions of this chapter to the contrary and in accordance with the rules and regulations of the State Election Board promulgated pursuant to paragraph (7) of Code Section 21-2-31, if the elector has marked his or her ballot in such a manner that he or she has indicated clearly and without question the candidate for whom he or she desires to cast his or her vote, his or her ballot shall be counted and such candidate shall receive his or her vote, notwithstanding the fact that the elector in indicating his or her choice may have marked his or her ballot in a manner other than as prescribed by this chapter.

640-1 at 149-154; Decl. of William Digges, III, Doc. 640-1 at 167-170; Decl. of Laura Digges, Doc. 640-1 at 162-65; Decl. of Ricardo Davis, Doc. 640-1 at 156-160.)

The Coalition Plaintiffs have presented ballot images that they assert are evidence of clear voter disenfranchisement. The 5 ballot images shown below depict actual unadjudicated ballot images from Fulton County's August 11, 2020 election, showing the ICC scanner interpreted as a "blank contest" several voter marks that indicate a clear visible selection for the candidate[78]:



---

[78] According to the Dominion contract, for each ballot scanned, a corresponding ballot image is created and stored for audit purposes, that consists of two parts: (1) the scanned image of the ballot; and (2) machine generated text showing each mark that the scanner interpreted for that particular ballot, referred to as the AuditMark. (Doc. 619-8 at 57.)

**FULTON COUNTY**
877-11N

**OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT**

OFFICIAL DEMOCRATIC PARTY PRIMARY AND
NONPARTISAN GENERAL ELECTION RUNOFF BALLOT
OF THE STATE OF GEORGIA
AUGUST 11, 2020

05150_00003_000029.tif scanned at: 12:58:26 on 08/04/20.

Scanned on: ICC  Tabulator: 5150   Batch:  3
Poll ID:  625   Ballot ID: 472

DEM - District Attorney - Atlanta
  BLANK CONTEST
DEM - Sheriff
  Patrick "Pat" Labat
Superior Court - Atlanta - Russell
  BLANK CONTEST



**FULTON COUNTY**
531-12B

**OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT**

OFFICIAL DEMOCRATIC PARTY PRIMARY AND
NONPARTISAN GENERAL ELECTION RUNOFF BALLOT
OF THE STATE OF GEORGIA
AUGUST 11, 2020

05150_00006_000002.tif scanned at: 13:46:05 on 08/04/20.

Scanned on: ICC  Tabulator: 5150   Batch:  6
Poll ID:  302   Ballot ID: 488

DEM - District Attorney - Atlanta
  BLANK CONTEST
DEM - Sheriff
  Theodore "Ted" Jackson (I)
Superior Court - Atlanta - Russell
  BLANK CONTEST





(Pls.' Hrg. Ex. 7; *see also* Decl. of Marilyn Marks ¶ 17, Doc. 809-5; Ex. 19-D to Decl.

of Marilyn Marks, Doc. 853-4 at 41.)

The State Defendants assert in opposition to Plaintiffs' motion that "[t]he only possible burden on a voter arising from the scanner-threshold settings is if the voter disregards the instructions that come with the ballot. That is not a burden on the right to vote — it is a voter choosing to not follow the required regulatory structure of the state." (State Defs.' Resp., Doc. 834 at 25.)  In essence, the State Defendants contend that a voter who marks their absentee paper ballot with a check mark or an X, rather than filling in the oval to the left of the candidate name, does not have a right to have their vote counted.  (*See* Suppl. Decl. of Chris Harvey, Doc. 834-3 ¶¶ 4-5) ("The instructions for absentee ballots instruct voters to fill in the bubble next to the preferred candidate name and instructs voters not to make check marks or X to mark their ballot. Tabulating absentee ballots where voters do not follow the instructions takes additional time for county election officials."). Defendants' litigation position, as explained below, is not in line with the requirements of Georgia's Election Code and the State Election Board's regulation providing that if the voter "has marked his or her ballot in such a manner that he or she has indicated clearly and without question the candidate for whom he or she desires to cast his or her vote, his or her ballot shall be counted, notwithstanding the fact that the elector in indicating his or her choice may have marked his or her ballot in a manner other than as prescribed."[79] Ga. Comp. R. & Reg. r. 183-1-15-.02(2)(2).

---

[79] A potential explanation for the phenomenon of some voters marking their absentee ballots without filling in the designated oval is two-fold.  Hand marked ballots, where votes were cast

### 1.    Operation of the Scanners

The Dominion precinct (ICP)[80] and central count (ICC)[81] scanners do not interpret the text of a hand marked paper ballot.[82] (Decl. of Dr. Eric Coomer ¶ 9, Doc. 658-2.) Instead, the scanners detect votes by reading particular coordinates on the ballot, what is known as a "target area" inside an oval next to a voter's choice as shown below:



---

with an X or check, were used prior to the introduction of the DRE system in Georgia in 2002. And this may be found in Georgia's existing election regulation that contains different provisions for vote tabulation in statewide versus municipal elections. *See* Rule 183-1-15-.02(2)(2)&(3). The Dominion BMD/optical scan system is required to be used in all statewide elections. But Georgia still allows for other voting systems to be used in non-statewide "municipal" elections (*see* provisions of rule that still pertain to lever systems, Rule 183-1-15-.02(2)(1) and non-optical scan, i.e., hand counted paper ballots, Rule 183-1-15-.02(2)(3)). For optical scan paper ballots, the voter must "fill in the oval" to mark their vote choice. Rule 183-1-15-.02(2)(a). But for non-optical scan paper ballots, the voter must "place an X, a check, or other similar mark" in a square to mark their vote choice. Rule 183-1-15-.02(2)(3)(a). This might account for why a number of voters are placing either an X or a check in the oval rather than filling it in and may create a problem if the ICP and ICC scanners in operation disregard these types of markings on the optical scan ballots without further review. Further, the Court notes, that prior to the instant 2020 ballot cycle, a vote with an X or check on an absentee or provisional ballot would not have been subject to adjudication software review programmed to kick out marks that were too light to register on the scanner, but to the human eye were visible as an X or check vote designation.
[80] The ImageCast Precinct Scanner and Tabulator is an optical scan ballot tabulator used to scan marked paper ballots and interpret voter marks on the paper ballot. It is a proprietary Dominion product. (Tr. Vol. II at 81.)
[81] The ImageCast Central Scanner consists of a Canon DR-G1130 commercial off-the-shelf digital high-speed document scanner configured to work with the ImageCast Central Software for high speed ballot tabulation.
[82] The scanner does not work like a camera – it does not take a picture of the paper ballot. (Tr. Vol. I at 140-41.)

(Coomer Decl. ¶ 9; Ex. A to Coomer Decl., doc. 658-2 at 9.)   The target areas correlate to the voter choices represented on the ballot.   (*Id.*)   According to Dominion's documentation,

> When a ballot is fed into an ImageCast tabulator – at the precinct level or centrally – a complete duplex image is created and then analyzed for tabulation by evaluating the pixel count of a voter mark.  The pixel count of each mark is compared with two thresholds (which can be defined through the Election Management System) to determine what constitutes a vote.  If a mark falls above the upper threshold, it's a valid vote.  If a mark falls below the lower threshold, it will not be counted as a vote.

(Ex. M to Decl. of Harri Hursti, Doc. 809-3 at 48.) However, if a mark falls between the two thresholds, in what is known as the "ambiguous zone," it will be deemed as a "marginal mark"[83] and the ballot should be flagged for review by a vote review panel – either manually or using Dominion's vote adjudication software application. (*Id.*)

The default scanner threshold settings in Democracy Suite 5.5A for both the ICP and ICC are 12% for the low-end and 35% for the high-end.  (Defs.' Hrg. Ex. 4 at 1, Doc. 887-4 at 2.)   Dominion's "Democracy Suite 5.5A is not designed to register voter intent from a hand-marked ballot if the vote target area (oval to the left of the choice) is not marked in some manner" and does not meet or exceed the

---

[83] According to Dr. Coomer, when an in-person voter scans a hand-marked paper ballot (i.e., an emergency ballot) on the precinct scanner, the scanner will alert the voter if the ballot is rejected as having contained an ambiguous mark and that voter will have the opportunity to correct the ballot. (Tr. Vol. II at 75-76; *see also* Ex. M to Hursti Decl., Doc. 809-3 at 48.)  However, because of the configuration of the ICP scanner in Georgia, if the voter marked a selection, but the scanner did not recognize that as a vote, the voter would not be alerted if an undervote is detected for a particular contest. (Tr. Vol. II at 75.)  The ICP will only alert an in-person voter if the ballot is completely blank for all races. (*Id.* at 76.)

high-end threshold setting. (*Id.*)   A visual representation of the threshold interpretation of voter marks is shown below:



(Doc. 809-3 at 48.)

For all elections conducted on the new Dominion voting system to date, including the June 2020 primary and August 2020 runoff elections, the ICP and ICC scanners were set to the default threshold settings. Using these default settings, when a ballot is scanned by either the ICP or ICC scanners, the scanners are programmed to interpret voter marks as follows: (a) any mark deemed by the scanner to be less than 12% darkened within the vote target areas (i.e., ovals) is designated as a blank vote for the given contest; (b) any mark deemed by the scanner to be equal to or greater than 35% darkened within the target ovals is designated as a vote for the choice associated to the target area marked; and (c) any mark deemed by the scanner to be equal to 12% or less than 35% darkened within the vote target ovals is designated as an ambiguous mark.   (Defs.' Hrg. Ex. 4 at 1, Doc. 887-4 at 2.)  Any ambiguous mark within a vote target oval does not

count toward the vote total.  (*Id.*) Instead, "[i]t is anticipated that ballots isolated by the ICP or ICC scanners containing scanner-deemed ambiguous marks are adjudicated manually or electronically by the designated election official in order to determine the voter intent that is in question by the ICP or ICC scanners." (*Id.*)

According to the Coalition Plaintiffs' expert Harri Hursti, Dominion's precinct and central count scanners cannot be relied upon to accurately count all votes using the default threshold settings and the current configuration for image resolution. (Tr. Vol. I at 125.)  In addition to the use of arbitrary default threshold settings, Hursti criticizes Dominion's configuration of the ICC central count scanner to intentionally downgrade the resolution quality of the scanned image. Hursti testified that the ICC central count scanner "can be configured to capture higher quality and more information retaining images" and is capable of producing images of a significant higher order of magnitude than it currently produces based on Dominion's programming. (*Id.* at 126, 133-34.) As Hursti explained, "the way the scanner is used in this environment is like driving your sports car locked on the first gear." (*Id.* at 134.) The central count scanner is recording a lower quality image than it is capable of because "as part of the configuration, that scanner is instructed to produce low quality images with a reduced amount of information." (*Id.*)  For example, the image produced by the ICC is only 200 dots per inch ("DPI") which is "a fraction of what the scanner is capable" of producing and the image "has been reduced to have only black or white pixels based on algorithms and so-called business logic and the scanner itself is capable of producing color images and gray

scale images." (*Id.* at 135-36.)  Dominion also configured the ICC scanner to "drop out" or ignore red pigment from the scanned image. (*See* Ex. E to Hursti Decl., Doc. 809-3 at 40.)  As a result, any red markings do "not meet the internal algorithm criteria for black, therefore [red] gets erased to white instead." (Hursti Decl. ¶ 61, Doc. 809-3.)

During the September 10, 2020 injunction hearing, Mr. Hursti explained that he would have expected the ICC scanner to have counted the clear voter marks shown in the ballot images of the Fulton County August 11 election interpreted by the ICC as "blank" contests. (Tr. Vol. I at 136.)  The problem according to Hursti is that "the scanner is reducing all information to either black or white and that predetermination tells what the image is recording. And after that, a mathematical algorithm is applied which is only blindly counting how many black and white pixels it sees and based on that make[s] a determination if there is a vote or not. So based on that reduced information, the system didn't cross the threshold to see [those markings] as a vote or even as ambiguous mark[s]." (*Id.* at 137.)  An ambiguous mark means "that the system sees something, which it says that it is not clear whether it is a mark or not. And that would have then gone to the human [ballot review] process." (*Id.* at 138.)  But in the case of the Fulton County ballot images in Plaintiffs' Hearing Exhibit 7, "the system didn't even see that there would be a mark requiring a human observation." (*Id.*)

The Coalition Plaintiffs conducted an examination of test ballots scanned on the ICP precinct scanner/tabulator using test ballots with various types of

markings and different colors of pens.   (*See* Pls.' Hrg. Ex. 7.1, Doc. 888-6.) Plaintiffs' Hearing Exhibit 7.1 illustrates two images of the same ballot produced by two different image resolutions and qualities and the scanner's resulting interpretation of the voter markings from the lower quality scan.[84] According to Mr. Hursti, the visible differences in the two images are "hallmarks of bad quality scanning and bad quality technology." (Tr. Vol. I at 139.) The poor quality of the ballot image scanned on the ICP does not even show the ovals that would be filled in by the voter. (*Id.*) Mr. Hursti believes that for the ICC scanner, the DPI level could be increased from the current 200 DPI configuration to 300 DPI, which is the standard setting for commercial off-the shelf scanners in order to improve the quality of the image of the ballots scanned for interpretation by the system software threshold settings.[85]

During the court-authorized testing of the Dominion equipment supplied by Fulton County, Coalition member Jeanne Dufort marked and scanned a series of test ballots to see how the marks were interpreted and tabulated by the scanner. To replicate the various ways voters might feed paper ballots into the scanner, Dufort scanned the same ballot multiple times "top side up, top first and then bottom first, and bottom side up, top first, and then bottom first to see if it made

---

[84] As shown in Exhibit 7.1, the ballot image on the left illustrates what the ballot looks like to the human eye when voted.  The ballot image on the right shows the ballot recorded by the ICP scanner and is the image that is tabulated for vote counting.
[85] To be fair to his testimony, Mr. Hursti opined that in order to maximize the accuracy of the ICC tabulation scanner, the ICC should be configured to capture additional information from the images, such as gray scale or color, in addition to an increase in the DPI.

any difference in how the scanner saw the vote." (*Id.* at 178.) As Dufort described at the September 10 hearing, the test ballot "had five contests on it. Three were races, and two were questions. When I put it through, the first thing I did was put it through each of the four possible ways to feed it. And each time, I got a different message from the scanner. It would return it with an error saying there were ambiguous marks, but it never pointed out the same ambiguous marks." (*Id.* at 179.) More specifically, she testified that "the first time when we put it in face up like you see first, it told us that one SPLOST race, one of the contests on the backside, was ambiguous. The second time when I put it in bottom first, it told me that the liquor sale vote was what was ambiguous and it didn't tell me anything about the SPLOST. The third time when I turned it over and put it backside facing up top end, it told me the SPLOST and one of the judge races was ambiguous. Then the fourth time when I put it backside bottom in, it told me the SPLOST and the liquor sales was in there." (*Id.*) Each of the four times Dufort fed the same ballot through the scanner, she got four different responses from the scanner. (*Id.* at 179-80.) Dufort repeated the experiment again, this time feeding the ballot in the same direction five separate times and still each time she got a different response from the scanner. (*Id.* at 180-81.)

Dr. Eric Coomer, the Director of Security for Dominion Voting Systems disagrees with Plaintiffs' contention that the Dominion scanners either discard or disregard valid votes or do not count certain marks as a vote even though the marks are obvious to the human eye as indications of a vote. (Tr. Vol. II at 73, 77.)

According to Dr. Coomer, the system is simply scanning the image and detecting the percentage fill of the target area. Based on the settings, it will automatically say whether it is a valid counted vote, whether it is an ambiguous mark, or whether the system does not characterize it as any. "There are further processes in the system, mainly adjudication, which allows secondary review – voter review for voter intent issues, which is integral to the system, which is where you can apply voter intent guidelines and processes to essentially characterize a vote that the system is not automatically specifying as a vote." (*Id.* at 73.)

During the hearing on September 11, 2020, Dr. Coomer was shown the Fulton County ballot images in Plaintiffs' Hearing Exhibit 7. Although Dr. Coomer disagrees with the contention that the scanners do not count certain marks that are visible to the human eye as votes, he admits that the mark shown by candidate Theodore "Ted" Jackson's name on the first page of Plaintiffs' Hearing Exhibit 7 looked like a vote to him but that according to the AuditMark created at the time of scanning, the ICC did not recognize the mark as a vote and did not count it as a vote. (*Id.* at 73-74.) Dr. Coomer also admitted that if a voter's mark is below the low-end threshold, it does not register as either an ambiguous mark or a vote. (*Id.* at 77.) According to Dr. Coomer's hearing testimony, the AuditMark created at the time of scanning, which contains the text indicating how the scanner interpreted the voter mark, does not indicate whether the ballot fell within the ambiguous threshold required for adjudication. (*Id.* at 75.) Therefore, one cannot tell from the AuditMark for the ballot image at page one of Plaintiffs' Hearing Exhibit 7

whether the ballot was flagged for adjudication. (*Id.*) Dr. Coomer stated that the "AuditMark simply shows everything that was counted as a vote. There is additional metadata in the cast vote record, which is the electronic record, that includes information about ambiguous marks. And that is the data that is used to determine whether it is sent to adjudication." (*Id.* at 78.) But then when asked "[i]f the ballot in this particular case had been adjudicated to be a vote, would that adjudication show up on this AuditMark?," Dr. Coomer replied "Yes, it would." (Id.) And again, he was asked "if it had been adjudicated in the course of a normal election process, you would have seen that on the AuditMark in front of us; right?," Dr. Coomer responded, "Yes. Yes."[86] (*Id.* at 79.) But the AuditMark on this ballot – Hearing Exhibit 7 – did not reflect that it had been flagged for adjudication.

Dr. Coomer also disagrees with Mr. Hursti, testifying that the accuracy of the ICP and ICC scanners "has absolutely nothing to do with the scanner resolution, the DPI setting." (*Id.* at 72.)  According to Dr. Coomer, because the "Dominion scanners capture the percentage fill of the targets for every mark that is made on the ballot, that has absolutely nothing to do with the scanner resolution, the DPI setting, whether a mark is characterized as a ballot vote, an ambiguous mark, or not a vote is wholly dependent on the threshold settings of the lower and upper threshold limits as well as the percentage fill of the target detected by the

---

[86] This is consistent with the representations made in the Dominion contract that "[a]fter a ballot is adjudicated, the ballot image is appended with a record of that decision including the user's name, action taken by the user, and date and time of the action. This adjudication AuditMark is appended to the ballot image under the original AuditMark, which was manifested during tabulation." (Doc. 619-8 at 54.)

system." (*Id.*) He went on to "categorically state that going from the current 200 DPI to some higher level of 300 DPI does not improve the accuracy of the system." (Tr. Vol. II at 147.) Referring back to the ballot images in Plaintiffs' Hearing Ex. 7, Dr. Coomer explained that "just to put it simply, we have all seen the images. And the images clearly show the voter's mark . . . if you had a physical ballot and you had some mark on there and then you showed the [scanned ballot] image and that mark wasn't there, then we could talk about DPI. But the fact is we're looking at the image. The mark is there" so the issue is "not the fact that the image is not, you know, sufficiently fine enough resolution to capture that." (*Id.* 147-48.) But, the ballot images in Plaintiffs' Ex. 7.1 show the exact scenario Dr. Coomer admits might indicate a problem with low DPI resolution.  In these side-by-side images of the same ballot, the first image scanned at high resolution shows clearly the voter marks while the second image scanned on the ImageCast shows several of the voter marks having been erased by the system and some portions of the ballot printing totally distorted due to the poor image quality.

Dr. Coomer also attempted to explain why Jeanne Dufort experienced inconsistent results when she scanned the same ballot through the ICP scanner multiple times.  According to Dr. Coomer, "the scanners have what is called a CIS array. It is contact image sensor array. That is what is used to actually digitize the image of the ballot. And those inherently, like all electronic systems, have some variability, plus or minus ten percent. So on one scan you could certainly have a target area that registers 12.5 percent and you round that up to 13. And on the next

scan it could be 11.9 percent. There is inherent variability in all electronic systems . . . that is irrespective of the resolution setting that's on the system. (Tr. Vol. II at 148-149.)

### 2.    Vote Review Panel Evidence

The Coalition Plaintiffs presented testimony from individuals who either served on or observed vote review panels. According to Coalition member Jeanne Dufort, who testified at the September 10 hearing and serves on the adjudication panel in Morgan County, the vote review panel "makes up for the limits of technology. We take ballots that can't be scanned or ballots that have marks that the scanner can't interpret, and we put human eyes on them. So I like to think of us as backstop to make sure that every vote ... where voter intent is clear gets counted." (Tr. Vol. I at 171.)  Under the new system, counties have the option to use the Dominion adjudication software to review scanned ballot images cued up on a computer screen.  (*Id.*)

Adam Shirley served on the Clarke County Vote Review Panel for the June 9, 2020 Presidential Preference Primary and General Primary.  (Decl. of Adam Shirley, Doc. 809-7.) Out of approximately 15,000 scanned absentee ballots, about 350 were flagged for adjudication by the software. When adjudicating a ballot, a scanned image of the complete ballot was displayed on the screen.  The software indicated the flagged contests for human review by outlining them in red.  The software used highlighting to indicate how it had interpreted the voter's mark.  This highlighting was used for the entire ballot, not only the contests that were

flagged for adjudication. Green highlighting indicated the software recognized the mark as a vote and counted it unless it was also flagged as an overvote. Yellow highlighting indicated the software categorized the mark as ambiguous and would not be counted until there was a vote review panel adjudication. When at least one oval in a contest was darkened sufficiently to be categorized as "ambiguous," the software highlighted the ambiguous option(s) in yellow, outlined the contest in red, and sent the entire ballot to an adjudication queue. Below is an example illustrative of the adjudication screen:



(Exhibit 2 to Shirley Decl., Doc. 809-7 at 12.)

The most common reason for ballots to be flagged as ambiguous was the voter having marked their intent with check marks or X marks. The Clarke County review panel adjudicated vote marks categorized as "ambiguous" to count votes that were clear as to voter intent. The panel took the approach that for any votes flagged for adjudication, the vote should be counted if voter intent was clear from

the on-screen image. In its review, the panel attempted to answer two questions: (1) could the voter's intent be discerned?; and (2) what was that intent? While only a simple majority was required, the bipartisan vote review panel's decision on each ballot reviewed was unanimous.

In the course of reviewing the entire ballot to inform their adjudication of flagged contests, the panel discovered clear ballot markings made by the voter that had not been highlighted by the software for adjudication. These markings were not counted as a vote (and therefore were not highlighted in green by the software) nor were they categorized as ambiguous (and therefore were not highlighted in yellow by the software). Below is the scanned image on one such marked ballot.



(Ex. 3 to Shirley Decl., Doc. 809-7 at 13.) The top and middle contests bear the red box flagging them for adjudication and yellow highlighting showing marks the

software has classified as ambiguous. The bottom contest, though clearly marked by the voter, bears no red box or highlighting of any kind. This shows the software did not count that vote and was programmed not to send such a ballot to adjudication. The system seemed to simply ignore such votes.

In every instance the panel encountered where the system had not counted such votes (or flagged them for adjudication), the review panel agreed without question that the voter had made their intent clear though the vote had not been counted. The panel therefore instructed the software to count the previously-ignored votes on the ballots, although the software had not flagged these particular votes for adjudication by the panel. Based on his review of hundreds of ballots, it is Shirley's opinion that it is possible that there were ballots with uncounted votes that would never be corrected by human review because no other marks on those ballots triggered flagging for adjudication.

The vote review panel expressed these concerns to elections staff, Election Director Charlotte Sosebee, and the Board of Elections. In response to these concerns, the Board of Elections ordered a pre-certification partial recount of only the absentee ballots for 5 of Clarke County's 24 precincts. The partial recount took place on June 17. The Election Board was not authorized by statute or rule to conduct a recount using any method other than what had been used for the first count. In the recount, 2,665 absentee ballots were re-scanned and 76 ballots were flagged for adjudication. For those 76 ballots, the vote review panel unanimously agreed that 35 individual votes had not been counted by the software. Those votes

were spread across 12 separate ballots. A Dominion technician confirmed the software was programmed to classify votes in one of three ways: a normal vote (highlighted in green), an ambiguous mark (highlighted in yellow), and an uncounted vote (which the system recognized, quantified, but was programmed not to count and not to be flagged for review).

As a voter, Shirley finds such a high rate of missed votes – nearly 16% of the adjudicated ballots – to be alarming. He also found concerning the procedures followed by the review panel in not providing a paper audit trail, not verifying the record of changes made to vote tallies, and not referencing the original ballot to determine if the low quality image was an accurate depiction of the voter-marked ballot. Shirley also found troubling that there was no attempt to reconcile the votes added to the vote tally before and after the adjudication process, leaving the opportunity for unauthorized changes to the tallies by others with access to the system.

Jeanne Dufort, served on the Vote Review Panel for the Morgan County Board of Elections and Registration for the combined Presidential Preference and General Primaries in June 2020. (Decl. of Jeanne Dufort, Doc. 809-6.) When she arrived at 8pm on June 9 for her duties, the elections office was still in the process of opening absentee ballots. Dufort assisted the team in opening the remainder of approximately 3,000 mail ballots. Ballots were scanned from 10pm to 2am. Dufort noticed voters marking their choices in a number of ways, including filling in the

oval, circling the oval, making X or check marks, and one who made smiley faces in the oval to mark their selection.

The Vote Review Panel convened on the afternoon of June 10.  Morgan County used the adjudication software provided by Dominion.   The Election Supervisor Jennifer Doran instructed the Dominion technician to pull up all ballots with overvote and ambiguous marks.  There were about 150 out of 3,000 ballots to review.  The Morgan County review panel used the same procedure described by Adam Shirley.

The first time the panel encountered a contest with no highlights (meaning it was deemed blank by the software), but with a clearly marked vote, Dufort asked the on-site Dominion technician whether that vote was counted, and he said "of course, that's a vote," and assured the panel it was counted.  The panel moved on to the next ballot. This time Dufort asked the Dominion technician to show her the cast vote record for the ballot.  It showed "blank contest" for the race with no highlights, despite the presence of a clear vote.  By unanimous agreement, the panel adjudicated that contest to show the vote, overriding the inaccurate tabulator software.  The panel returned to the previous ballot and did the same.  During the course of review of about 150 ballots, Dufort estimates the panel found and adjudicated about 20 votes that were clearly marked by the voters, but the software had interpreted as a "blank contest."

Dufort attended the Morgan County Election Board meeting on June 11, and spoke about her concerns as a review panel member and the need to expand the

adjudication process to determine whether other votes had been rejected by the system. The Morgan County Election Board denied the motions of board member Helen Butler to expand the adjudication process to review the remaining 2,700 mail ballots to see if there were additional uncounted votes.

Coalition member Rhonda Martin observed somewhat similar adjudication procedures at the Fulton County Elections Preparation Center on August 14, 2020. (Decl. of Rhonda J. Martin, Doc. 809-4.) The adjudication process took place entirely on a low resolution black and white on-screen image, without looking at the original paper ballot. Based on her observation of the two vote review panels used by the Fulton County elections office, the panel members quickly clicked here and there and switched from one view to another as they examined the ballot images, without making a record of who approved each vote change or why the decision was made. Martin also observed that at times, the panel members appeared to almost forget to confer with one another and confirm that they agreed on the interpretation of the vote because they were so focused on operating the adjudication software.

Of the ten ballots Martin observed being adjudicated, three appeared to be completely blank with no votes marked anywhere on the ballot. The first review panel to encounter a blank ballot with no single vote shown paused to ask the Registrations Chief, Ralph Jones, what to do. After waiting for a while for Mr. Jones to finish up with the second review panel, the first review panel decided to accept the blank ballot so they could continue adjudicating other ballots. They did

not request to see the original paper ballot to confirm that it was, in fact, blank. While not impossible, Martin found it odd that a voter would go to the trouble of returning a ballot with no vote marks at all.

### 3. The Secretary of State's Center for Election Systems Study on Scanner Settings

When Plaintiffs filed their motion in August 2020, the State Election Board was considering proposed revisions to the regulation providing for "the definition of a vote" to designate specific settings for the ballot scanners used to tabulate optical scan ballots marked by hand. Plaintiffs' expert Harri Hursti asserted that before the State sets threshold standards for the Dominion system, extensive testing is needed to establish optimal configuration and to identify a setting that will not have the widespread effect of discarding at least some valid votes. (*See* Hursti Decl. ¶ 77, Doc. 809-3.) At that time, neither Mr. Hursti nor the Plaintiffs were aware of a study undertaken by the Center for Election Systems of the Secretary of State's Office in July of 2020 to determine "how various reductions to the default, ambiguous mark threshold setting within Democracy Suite 5.5A would impact the scanning and interpretation of ambiguously marked ballot samples" on the ICC central count scanner. (Defs.' Ex. 4 at 1, Doc. 887-4 at 2.) "The examination was done in an effort to increase absentee ballot scanning efficiency and reduce the need to adjudicate ballots that reflect a clear voter intent." (*Id.*) A draft copy of the report prepared by CES's Michael Barnes was subsequently produced during expedited discovery prior to the injunction hearing.

As further explained in the draft report, CES undertook an examination to determine whether "the high-end setting of 35% is forcing election officials to review ballots that should instead be processed as marked by the ICC scanner on the initial read by the IC scanner" and counted as a valid vote. (Defs.' Ex. 4 at 2, Doc. 887-4 at 3.) Because "Democracy Suite 5.5A gives the end user the ability to adjust ambiguous mark threshold settings used by the Dominion scanners to interpret voter intent on hand-marked optical scan ballots," CES ran ballot test decks through the ICC scanner using various threshold settings. (Defs.' Ex. 4 at 1, Doc. 887-4 at 2.)

At the start of the examination, a "test deck of 100 hand-marked optical scan ballots was prepared. The instructions at the top of the ballot instruct the voter to fill in the oval next to the candidate of their choice. The filling in of the oval (vote target area) is designed to provide a clear intent for the ICC scanner to interpret." (Defs.' Ex. 4 at 2, Doc. 887-4 at 3.) To examine the various ways the scanner might interpret different marks, the testers did not fill in the vote target areas as instructed. Instead, "testers placed a variety of marks that only darkened a portion of the vote target areas" on the deck of test ballots. "Testers also used differing marking devices (i.e., blue ink, black ink, red ink, pencil, etc.) and marking pressures." On some ballots, testers marked outside the vote target area (by circling or underlining the candidate name rather than filling in the oval) "to confirm that marks [placed] outside the vote areas would not be recognized" by the scanner. (*Id.*)

117

Each test ballot had three contests with a total of 6 vote target areas (two ovals per contest). "Testers used the same type of variable mark within each of three contests when marking a ballot in an attempt to simulate how an individual voter would most likely mark each oval on their ballot in the same manner throughout." (*Id.*) As described in the CES draft report, the scanner will interpret a marked ballot in one of three ways: (1) Marked – the scanner will "interpret the mark within all vote target areas on the ballot and increment vote totals and ballots cast total forward" (the mark falls above the high-end threshold and is counted as a vote); (2) Blank – the scanner "will interpret the vote area as not including a mark and would not increment vote total forward, but would increment the ballots cast forward" (the mark falls below the low-end threshold and is not counted as a vote in the vote totals); and (3) Ambiguous – the scanner will "not be able to determine marks and set the ballot aside for review" (the mark falls below the high-end threshold to count as a vote but above the low-end threshold to register as a blank). (*Id.*)

After marking the test ballots, the test deck was scanned a total of two times on an ICC scanner configured with the default low-end 12% and the high-end 35% settings. This process created two batches collected by the ICC scanner, each batch containing 100 ballots. Each batch was then loaded into Dominion's Adjudication Client application. The Adjudication Client application was set to review all ballots within the batch and isolate any ballots containing Ambiguous Marks, Blank Ballots, and Overvotes (the standard Adjudication Client settings). The testers

created 6 criteria into which each ballot could fall under for review: (1) Marked – all contests on ballot contained a single interpretable mark; (2) 1/3 Ambiguous – one of the three contests on the ballot contained a mark requiring review; (3) 2/3 Ambiguous – two of the three contests on the ballot contained a mark requiring review; (4) Ambiguous – all three contests on the ballot contained a mark requiring review; (5) Blank Ballot – all three contests on the ballot contained no interpretable marks; and (6) Overvote – all contests on ballot contained multiple interpretable marks. (Defs.' Ex. 4 at 2-3, Doc. 887-4 at 3-4.)

Upon completing the review of each scanned batch within the Adjudication Client software, the testers documented the following results:

- Marked          53
- 1/3 Ambiguous   15
- 2/3 Ambiguous   11
- Ambiguous       12
- Blank            9
- Overvote         0

(Defs.' Ex. 4 at 3, Doc. 887-4 at 4.)   A total of 47 ballots required some level of review after being processed by the ICC.   The testers were concerned that nearly half of the test deck required additional review to determine voter intent.

In an effort to assess what impact a reduction in the high-end setting level would have on potential ambiguous marked ballots being registered on the ICC, testers reduced the default high-end setting 3 times: from 35% to 30%, from 30% to 25%, and finally from 25% to 20%. (Defs.' Ex. 4 at 3-5, Doc. 887-4 at 4-6.)   In the third test pass, the testers ran the test deck through the scanner following the

same protocol but the ICC scanner was configured with the low-end default setting of 12% but the high-end setting was reduced from 35% to 20%.   (Defs.' Ex. 4, Doc. 887-4 at 5.) Using a high-end setting of 20%, testers documented the following results for each batch within the Adjudication Client software:

- Marked            70
- 1/3 Ambiguous     10
- 2/3 Ambiguous      8
- Ambiguous          1
- Blank             10
- Overvote           1

(Defs.' Ex. 4 at 4-5, Doc. 887-4 at 5-6.) With a low-end 12% and high-end 20% setting, there was a 36% reduction in the number of ballots (47 to 30) after scanning needing further review, in relation to the original default setting. (Defs.' Ex. 4 at 5, Doc. 887-4 at 6.)  The adjustment of the high-end setting down to 20% also resulted in 17 more ballots being processed as marked (an increase of 53 to 70) and voter intent being registered and tabulated without need of further review or adjudication. The reduction to 20% also resulted in a potential overvote being detected in the test deck that had previously been undetected using the higher high-end settings.  This reduction in the high-end setting from 35% to 20% also decreased the number of ballots with all three contests registering ambiguous marks from 12 ballots down to 1 ballot.  The reduction did not eliminate the presence of ambiguous marks, but it does appear to reduce the number of instances where the review of all contests on a ballot would be needed. (*Id.*)

In an effort to reveal if there were any additional ambiguous marks that could be detected and made available for review to users, the testers reduced the low-end threshold setting from 12% to 10% (keeping the high-end at the adjusted 20% threshold). (*Id.*) The testers ran the test deck through the scanner following the same protocol described above, but the ICC scanner was configured with the low-end at 10% and the high-end at 20%.    Using this configuration, testers documented the following results upon reviewing the test ballots within the Adjudication Client software:

- Marked            71
- 1/3 Ambiguous     13
- 2/3 Ambiguous      6
- Ambiguous          2
- Blank              7
- Overvote           1

(*Id.*) With the low-end 10% and high-end 20% settings, there was a 38% reduction in the number of ballots (47 to 29) after scanning needing further review, in relation to the original default setting.  This configuration reduced the number of instances of ambiguous (12 to 2) and blank ballots (9 to 7) from the original default settings.   Under these settings, 29 ballots remained as needing some physical review.  (Defs.' Ex. 4 at 6, Doc. 887-4 at 7.) Of those 29, 7 ballots were seen by the ICC as completely blank.  Upon physical review of the 7 ballots, 5 ballots contained no physical mark anywhere within the vote target oval, but did have the candidate name circled or underlined.   The remaining 2 ballots seen as blank by the ICC, upon visual review, did have discernable marks within the vote target area,

however, the mark was made with red ink.  While it did not remove the detection of ambiguous marks or blank ballots, it does appear the combination of these settings eliminated the need to review some ballots and reduced the number of contests per ballot needing review when a ballot review was detected. (Defs.' Ex. 4 at 5, Doc. 887-4 at 6.)

During the assessment, the testers made note of whether the type and placement of marks in and around the vote target oval had an impact on the scanner's interpretation. (Defs.' Ex. 4 at 6, Doc. 887-4 at 7.) In addition to partial filling in of the vote target oval, the ICC scanner registered various types of marks, including an X, checkmark, dash, and dots, when they were placed within the vote target oval.  The darker the mark within the vote target area, the easier the ICC registered the mark.  These findings indicate that instructions to voters should inform the voter to fill in the oval next to the candidate name and to avoid circling, underlining, or placing checkmarks or Xs, or otherwise marking the candidate name outside the vote target oval.  Voters should also be warned to NOT use red ink.

### 4.   Georgia's Election Code and Regulations Pertaining to Optical Scan Ballots

Based on the results of the CES study in July 2020, the State Election Board proposed a rule adopting the adjusted threshold settings that was.  The regulation, approved by the Board on September 10, 2020 now provides:

> Ballot scanners that are used to tabulate optical scan ballots marked  by hand shall be set so that:

1. Detection of 20% or more fill-in of the target area surrounded by the oval shall be considered a vote for the selection;

2. Detection of less than 10% fill-in of the target area surrounded by the oval shall not be considered a vote for that selection;

3. Detection of at least 10% but less than 20% fill-in of the target area surrounded by the oval shall flag the ballot for adjudication by a vote review panel as set forth in O.C.G.A. 21-2-483(g). In reviewing any ballot flagged for adjudication, the votes shall be counted if, in the opinion of the vote review panel, the voter has clearly and without question indicated the candidate or candidates and answers to questions for which such voter desires to vote.

Ga. Comp. R. & Regs. 183-1-15-.02(2)(k).

The State Election Board's regulation providing for the definition of a vote, states that for optical scan paper ballots, the voter must "fill in the oval" to mark their vote choice. Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(a). Where an optical scan ballot marked by hand has been rejected by the scanner/tabulator as containing an overvote in accordance with O.C.G.A. § 21-2-483(g), in reviewing such a ballot: (1), if "it appears that there is a properly cast vote and what is clearly a stray mark which has caused the ballot scanner to read the vote for such office as an overvote, the properly cast vote shall be counted and the stray mark shall be ignored;" and (2) if "a voter marks his or her ballot in a manner other than that specified by law and this rule, the votes shall be counted if, in the opinion of the vote review panel as provided in O.C.G.A. § 21-2-483(g)(2)(B), the voter has clearly and without question indicated the candidate or candidates and answers to questions for which such voter desires to vote." Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(c)&(d). Under O.C.G.A. § 21-2-483(g)(1), "[t]he central tabulator shall be programmed to reject any ballot, including absentee ballots, on which an

overvote is detected and any ballot so rejected shall be manually reviewed by [a] vote review panel . . . to determine the voter's intent as described in subsection (c) of Code Section 21-2-438." O.C.G.A. § 21-2-438(c) in turn provides that "if the elector has marked his or her ballot in such a manner that he or she has indicated clearly and without question the candidate for whom he or she desires to cast his or her vote, his or her ballot shall be counted and such candidate shall receive his or her vote, notwithstanding the fact that the elector in indicating his or her choice may have marked his or her ballot in a manner other than as prescribed by this chapter."

Similarly, "[i]f, in reviewing an optical scan ballot marked by hand, a discrepancy is found between the voter's mark on the ballot that clearly and without question indicated the voter's intent and the result tabulated by the ballot scanner, the voter's mark shall control and be counted." Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(e). Finally, "[w]hen an optical scan ballot marked by hand contains stray marks or marks which prevent the ballot scanner from properly recording valid votes as determined under this rule and by law, the ballot shall be duplicated in accordance with law to correct such problems and the duplicate shall then be tabulated." Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(f). The regulation further provides that "[n]othing herein shall be deemed to disallow the use of ballot scanners for tabulation of ballots." Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(e).

### 5.   Plaintiffs' Proposed Remedy

Coalition Plaintiffs seek from this Court "[a]n order commanding the State Defendants to standardize required settings of Dominion precinct and central ballot scanners and related tabulation software to ensure that all perceptible votes written on mailed and hand marked paper ballots are either counted as votes or flagged for human review by a Vote Review Panel, and requiring that Dominion scanner sensitivity settings and tabulation software be uniform across all counties." (Mot., Doc. 809 at 2). According to their motion, the full problem with the ballot scanners will not be solved by the State's new rule, but it can be solved by restraining the State from requiring scanner settings that automatically discard any degree of perceptible voter markings. In response, the State Defendants assert that Plaintiffs do not propose any solution beyond ensuring every single stray mark on every hand-marked ballot is reviewed by a human.

For the reasons that follow, the court will not grant the requested relief for the November general election based on pragmatic timing considerations where absentee voting has already begun and alteration of the scanner settings would require changes to the election system database and would result in disruption of the ongoing administration of the election by the State and the Counties. Instead, the Court has directed the State to itself explore and determine whether a solution exists for the discounting of votes resulting from system deficiencies in the tabulator/scanning and the potential implementation of remedial measures in time for any runoffs in January 2021.

There is no question that the default scanner settings used in elections conducted to date on the Dominion system caused certain voter marks to register as blank and therefore prevented some valid votes on hand-marked ballots from being counted. (*See* ballot images at Doc. 809-5.) The testimony of the vote review panelists clearly establish the differences between the scanner's perception and human perception of voter intent. In addition, the ballots provided in the record show that different results were reached by the scanners and the vote review panel members about whether voter markings counted. Dr. Coomer acknowledged that the scanners will not count marks that fall below the low-end threshold setting. It is also evident that the State's adjustment of the Dominion default settings (used to date) pursuant to the SEB's newly promulgated regulation will not cause the scanner software to capture all perceptible ballot vote markings and count them as votes in the upcoming November election. (*See* Defs.' Ex. 4 at 6, Doc. 887-4 at 7) (noting that even after the adjustment, 7 out of 100 test ballots were seen by the ICC as completely blank though voter markings could be discerned upon physical human review).

The scanners are programmed to flag overvotes[87] for review and adjudication. They are not, however, programmed to flag undervotes (i.e., blank contests) for review. As evidenced by the Fulton County ballots shown in Plaintiffs' Exhibit 7, the result is that some votes are not recorded by the scanners and are

---

[87] An overvote occurs when the scanner/tabulator registers more than one legible vote for a single contest.

not counted. Under the current procedures used with the Dominion system, these votes escape any review before being rejected – resulting in irreversible voter disenfranchisement.[88] It appears that prior to the use of the Dominion system and introduction of the adjudication software, no voter's ballot choices were getting kicked out based on their visible designations of candidate choices with an X or check mark, as these markings are recognized under Georgia's Election Code as clear manifestations of voter intent. These circumstances are quite troubling and present an opportunity to potentially disenfranchise older voters in particular – based on their historical experience voting under the State's prior systems – at a greater percentage than younger voters.

To decide whether Plaintiffs have established a substantial likelihood of prevailing on the merits of their claim related to the scanner settings, the Court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment." *Anderson*, 460 U.S. at 789. The Court must then "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden and consider the extent to which the State's concerns make the burden necessary." *Timmons*, 520 U.S. at 358.

---

[88] This is the result unless they can be discovered in a subsequent manual recount, like the one conducted by Clarke County that recovered some of these types of lost votes by allowing full examination of the ballots with "blanks" in the 5 districts where such re-counting was allowed. The panel's bipartisan members agreed on all of the vote determinations.

Here the asserted injury is that Plaintiffs and other absentee mail voters face a risk of suffering a diminished ability to participate fully in the democratic process and to elect the candidates of their choosing if the scanners do not recognize their ballot markings as valid votes. To echo the late Congressman John Lewis, "The vote is precious. It is the most powerful non-violent tool we have in a democratic society, and we must use it." As this Court has repeatedly recognized in this case, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. 533, 555 (1964). This right carries with it the right not only to cast a ballot but to have it counted.  *United States v. Classic*, 313 U.S. 299, 315 (1941); *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d at 1315 ("of course, voting alone is not enough to keep democracy's heart beating. Legitimately cast votes must then be counted").  The loss of a vote cast is permanent.[89]  The significance of the indelible nature of the injury cannot be overstated.

It is precisely because of the character and magnitude of the interest at stake that voters themselves have an independent responsibility to proceed with care

---

[89] *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018) ("The Court finds that [p]laintiffs have established irreparable injury as a violation of the right to vote cannot be undone through monetary relief and, once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes."); *see also League of Women Voters of N.C.*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury . . . [because] once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin the law.").

and caution when exercising the franchise.  Georgia has implemented a voting system that relies on the efficiencies afforded by technology.  The State Election Board has adopted a regulation for processing and tabulating hand marked ballots using optical scanners that requires the voter to "fill in the oval" to mark their vote choice. Ga. Comp. R. & Regs. 183-1-15-.02(2)(a).  Under the regulation, markings that trigger "detection of 20% or more fill-in of the target area surrounded by the oval shall be considered a vote for the selection," while markings that trigger "detection of less than 10% fill-in of the target area surrounded by the oval shall not be considered a vote for that selection."  Ga. Comp. R. & Regs.  183-1-15-.02(2)(k). The burden on voters to read and follow the instructions for marking their absentee, provisional, or emergency ballots is minimal.[90]  The burden to do so in a manner consistent with the regulation's adopted scanner settings to ensure their vote is automatically accepted by the scanner software is a different matter. Certain well-informed voters may be aware of this new regulation adopted just weeks ago.  Other voters may have read recent news articles documenting the problems with Georgia's scanners in failing to recognize certain types of voter markings during the June primary elections.  The average voter, however, is likely unaware that their failure to adequately darken the oval to a certain percentage may cause their vote to be rejected by the scanner and in turn, not counted

---

[90] Although the burden is minimal, the evidence indicates the instructions are not effective or are ignored by a number of voters.

altogether. The Court therefore finds this burden to be more than minimal but less than severe and will apply an intermediate level of scrutiny.

The Court must weigh the burden on the right to vote against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration the 'extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789); *see also People First of Alabama v. Sec'y of State for Alabama*, 2020 WL 3478093, at *6 (11th Cir. June 25, 2020) (Rosenbaum, J. & Pryor, J., concurring) ("But whatever the burden, no matter how slight, 'it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.'") (internal citations omitted).

State Defendants assert that any burden on the right to vote created by the 10% threshold for discarding voter marks is justified by the regulatory interests of the State as outlined by the Secretary of State's Director of Elections, Chris Harvey. Mr. Harvey attested that "[r]equiring a manual review of every stray mark that happens to be in a target area would require significant time by county officials and would result in delays of finalizing results, certifying results, and conducting audits." (Decl. of Chris Harvey, Doc. 834-3 ¶ 9.) According to Harvey, "[u]sing a 10% threshold for scanners minimizes the burden on election officials while still ensuring that ambiguous marks are properly evaluated." (*Id.* ¶ 10.)

The Court understands that the State does not want to make the standard so low that it sweeps in thousands of ballots with actual blank contests and some truly

errant marks for adjudication panel review because it might lead to an unreasonably inefficient process and become potentially unmanageable in the timeframe permitted under Georgia law for finalizing the results of the election. However, there is no evidence in the record of any burden on the Counties were the Court to grant some form of relief to address the ballot scanner settings. No evidence has been presented from any county election official to support Mr. Harvey's supposition that changes to the scanner, tabulation, and adjudication software to ensure that all perceptible votes written on mailed and hand marked paper ballots are either counted as votes or flagged for human review by a Vote Review Panel would create an undue administrative burden on county officials and would "result in delays of finalizing results, certifying results, and conducting audits." And notably, Fulton County's response to Plaintiffs' motion is silent on the issue of the ballot scanner settings.

Each county election superintendent must certify the county's consolidated election results not later than 5:00 P.M. on the second Friday following the date of the election (i.e., Friday, November 13, 2020) and immediately transmit the certified returns to the Secretary of State, "provided, however, that such certification date may be extended by the Secretary of State in his or her discretion if necessary to complete a precertification audit." O.C.G.A. § 21-2-493(k). The Secretary of State must certify the election results not later than 5:00 P.M. on the seventeenth day following the date of the election, in this year that date falls on Thursday, November 20, 2020. O.C.G.A. § 21-2-499(b). Prior to final certification,

Georgia's election code requires the Secretary of State "[u]pon receiving the certified returns of any election from the various superintendents . . . shall immediately proceed to tabulate, compute, and canvass the votes cast," prior to certifying the returns.  *Id.* § 21-2-499(a).  "In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes . . . the Secretary of State shall notify the county submitting the incorrect returns and direct the county to correct and recertify such returns.  Upon receipt by the Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results." *Id.*

Under these provisions, the counties have ten days to tabulate and certify their results to the Secretary of State,[91] who in turn has an additional seven days to certify the election after a thorough review of the returns.  The State Defendants' fear of an unsupported and unquantified "delay" in certification caused by review of additional ballots by a Vote Review Panel is outweighed by the burden on voters. *See Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018) (rejecting the State's argument that remedy requiring measures to ensure proper counting of provisional ballots would delay certification of election under statutory timeline for certification); *Doe v. Walker*, 746 F. Supp. 2d 667, 678–80 (D.Md. 2010) (finding that Maryland's statutory deadline for the receipt of absentee

---

[91] This deadline can be extended by the Secretary of State, if necessary, in order to perform an audit.

ballots imposed a severe burden on the absent uniformed services and overseas voters that was not justified by the state's interest in certifying election results).

The Court finds that Plaintiffs have satisfied the first two prerequisites for preliminary injunctive relief. Plaintiffs have presented enough evidence to establish a substantial likelihood of success on the merits of their claim that the State Defendants' use of an arbitrary threshold on its ballot scanners to discard voter ballot markings for specific candidates or initiatives that are obvious to the human eye results in a violation of the fundamental right of each voter to have his or her vote accurately recorded and counted. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (holding that state and local laws that unconstitutionally burden the right to vote are impermissible); *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d at 1321 (characterizing disenfranchisement by signature mismatch rules as imposing a serious burden on the right to vote); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("[E]ven one disenfranchised voter—let alone several thousand—is too many.") The threat of this injury is substantial and irreparable if relief is not granted before the election. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018) ("The Court finds that [p]laintiffs have established irreparable injury as a violation of the right to vote cannot be undone through monetary relief and, once the election results are tallied,

the rejected electors will have been disenfranchised without a future opportunity to cast their votes."); *see also League of Women Voters of N.C.*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury . . . [because] once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin the law.").

The Court must now consider the requested relief in connection with the two remaining requirements for granting a preliminary injunction: whether the threatened injury to the Plaintiffs outweighs the harm an injunction may cause the Defendants and whether granting the injunction is in the public interest.  The Court considers these last two factors "in tandem . . . as the real question posed in this context is how injunctive relief at this eleventh-hour would impact the public interest in an orderly and fair election, with the fullest voter participation possible. . . ." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018), *aff'd in part, appeal dismissed in part*, 761 F. App'x 927 (11th Cir. 2019); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).  Indeed, the Supreme Court has recognized that there are special considerations involved with impending elections and the critical issues at stake.  In *Reynolds v. Sims*, the Court stated:

> [O]nce a State's [election-related] scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.  However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the

> granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid.  In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.

377 U.S. at 585.  The Court notes, however, that *Reynolds* is not an inviolable commandment against pre-election injunctions where the constitutional violations are significant, and the relief is not adverse to the public interest.

Plaintiffs' requested relief is based on proposed solutions of their cybersecurity and scanner expert, Harri Hursti.

First, in his August 24, 2020 declaration, Mr. Hursti called for extensive testing before choosing mandated threshold settings. The Secretary of State's Center for Election Systems conducted an assessment of various scanner settings before landing on the low-end 10% and high-end 20% threshold settings.  But the CES did not test or assess thresholds lower than 10%.  CES's assessment resulted in a significant increase in the number of marks recognized by the ICC as valid votes and a corresponding decrease in the number of marks characterized as blank votes as well as significant decrease in the number of marks flagged as ambiguous requiring further adjudication.  Despite this notable improvement, this one adjustment alone does not address the outstanding injury experienced by a significant number of voters who cast hand marked ballots (and votes) that will continue to be excluded from "counting"  although they manifest the voter's electoral designation intent. Based on the results of the CES study as well as other

evidence in the record, clearly evident ballot vote markings will not be detected by the Dominion tabulators, and such marks will not be counted as votes absent further exercise of human judgment in review of improved images of the ballots or the original ballots or alternatively, improved screening by the adjudication software.  While the precise scope of the affected ballots is unknown, the evidence reviewed indicates that there remains a sufficient volume of impacted voters post implementation of the State's new 10% bottom threshold rule, that these incidents are not errant, isolated cases that can be simply ignored as the incidental vote counting errors or irregularities that can be expected in a large election. Nor are they just "incidental" or accidental "errors" to the extent that the software operates to exclude voting marks that clearly manifest the intent of the voter and therefore must be considered as a vote under Georgia law.

Second, for the ICC central count scanner Mr. Hursti proposes that the current configuration be modified "to allow the scanner to capture the images with a higher resolution and higher amount of information, meaning either color or gray scale images" and to adjust the DPI from 200 to the "current minimum standard of office technology" of 300 DPI. [92] (Vol. I at 143.)  He recommends as a stop-gap

---

[92] On the other hand, during his September 10th testimony before this Court, Mr. Hursti seemed to indicate that no other system configuration adjustments could be made to increase the accuracy of the ICP tabulators used at precinct locations. Instead, his proposed solution for the ICP precinct scanner is to provide better instructions to voters carefully to fill the whole oval and provide all voters with black felt ink pens for marking paper ballots by hand. (Tr. Vol. I at 141, 159, 168.) According to Mr. Hursti, the evidence demonstrates that many voters do not follow the existing written instructions printed on the absentee/provisional/emergency paper ballots – an indication that the instructions have not been effective. (*Id.* at 159.) The CES study similarly concluded that instructions to voters should be modified to inform the voter to fill in the oval next to the candidate

measure and mitigation for the November 2020 election that the State undertake an examination of the necessary changes to ensure that every vote is counted. (*Id.* at 161-62.)

As previously discussed, Dr. Coomer testified, scanner threshold settings for the Dominion Democracy Suite 5.5-A are not set on each individual scanner. Instead, scanner threshold settings are set when the voting database is built. (Tr. Vol II at 83.) While Dr. Coomer acknowledged that the settings on the central count scanners could be changed before the project is built, he stated that as of September 11, 2020, Dominion is in the midst of building the project for the November election. (*Id.* at 84.)

Accordingly, the Court must consider remedies that go beyond the 10 to 20 percent threshold standard recently adopted by the Secretary of State, while balancing the potential for administrative confusion and serious vote mishaps by any course of action that is not deliberate and properly researched. The Court is

---

name and to avoid circling, underlining, or placing checkmarks or Xs, or otherwise marking the candidate name outside the vote target oval. The CES study also determined that voters should be warned to not use red ink when marking ballots. The Court takes judicial notice that the Secretary of State has revised the written instructions on its paper ballots to incorporate these recommendations from the CES study, though its revised ballot instructions removed the visual illustration showing how to blacken in the oval. And the Secretary of State's guidance on the use of emergency paper ballots for in-person voting specifies that precincts provide only the two pens approved by Dominion Voting – the Sharpie Fine Point black pen and the Paper Mate Flair M Medium Point black pen.[92] (*See* Pls.' Ex. 11.) The casting of hand marked emergency ballots in prior elections in the 2020 election cycle appears to have been fairly rare based on the evidence before the Court. However, as the Secretary of State's Office and County Registrar's Offices should be providing more training to county poll workers on the State's emergency ballot options and process prior to the 2020 general election, a focus upon scanning issues impacting the scanning of hand marked ballots at the precinct level, where scanners produce even less refined images, would be sensible.

not prepared to direct the State to make additional adjustments to the settings prior to the November election because it is not feasible under the circumstances where the voting database has already been built, has been rolled out to the counties, and has already or soon will be undergoing logic and accuracy testing. There are additional challenges of implementing manageable relief where the evidence is not clear that the resolution can be fixed on the software in time or moreover, whether a  software fix of ballot image resolution quality would be effective or not in increasing the number of ballot markings that will be automatically read and counted as votes by the scanner/tabulators.

The current adjustments of the default settings adopted by the State in time for the November election lowers the gateway and allows more paper ballots with voter marks such as Xs or checks (rather than oval fill-ins) to be counted or referred for adjudication of voter intent.  This change in settings used in the 2019 pilots and the 2020 primary elections, while an incomplete remedy, should be an improved mechanism to address the issue of lost scanned hand marked ballot votes in the voting tabulation in the November election. Plaintiffs as well as the Defendants or County Boards of Election may of course revisit the question of additional relief related to the ballot scanners if there turns out to be more evidence after the election and if huge swaths of voters' absentee, provisional, or emergency paper ballot votes did not count.[93]

---

[93] The Court recognizes that some counties have indicated they do not plan to use the adjudication software and will proceed according to their established procedures to systematically review

That said, the evidence supports a finding that the modified scanner settings may well still result in the rejection of valid votes and ballots falling through the identified crack in the system by failing to flag visibly clear voter marks for adjudication by a review panel.   Although the Court will not require further changes to the scanner settings prior to the November election, another potential measure may allow for an expanded review of optical scan hand-marked ballots in connection with the adjudication software.   Ballot contests flagged for human review by the adjudication software appear on the review screen with a red box outline around the contest.   The adjudication software assigns green highlighting to voter marks that meet the high-end threshold setting to count as a vote and assigns yellow highlighting to voter marks that fall between the high and low-end threshold settings and deemed by the scanner as ambiguous.   Currently, the adjudication software does not assign any highlighting to voter marks that are deemed blank because they fall under the low-end threshold setting.[94]   Because the adjudication software is capable of isolating ballot marks flagged as ambiguous, it would make sense that the software could similarly be configured to isolate ballot marks interpreted as "blank."   It therefore appears likely that the adjudication software can be used to review ballot images flagged with blank contests to verify that no clearly discernable ballot marks are present on the ballot

---

scanned hand marked ballots along with the original ballots, consistent with the penultimate "voter intent" standard established under Georgia law.

[94] Dr. Coomer, however, testified that the scanner software (not the adjudication software) is programmed to provide an alert where a ballot is scanned that registers as completely blank.

images that have not been recognized by the scanner software as falling within the designated threshold to constitute a vote.[95]  As the vote review panel testimony indicates, the adjudication software allows the reviewer to quickly scan and move through the flagged ballot images on the review screen.[96]  The Court recognizes the potential for a large number of ballots with truly blank contests (those where a voter intentionally chose not to mark a vote for a particular candidate or ballot question) are swept in for review.  For this reason, a thorough examination of the feasibility of using the adjudication software for this purpose may reveal that any material increase in burden on election officials to perform this additional review measure weighs against its consideration as a potential method of relief in future elections after November.

Accordingly, the Court **GRANTS** relief that is narrowly tailored to address the specific voter disenfranchisement by operation of the optical scanners/tabulators in tandem with the BMD adjudication software raised in

---

[95] Every hand-marked paper ballot has a unique corresponding ballot ID number printed at the bottom that is recorded by the scanner/tabulator and reflected on the AuditMark associated with the ballot image.  The AuditMark that indicates the disposition of the candidate choices on each scanned ballot contains a record of the ballot ID from the paper ballot. The AuditMark on the scanned ballot image is therefore traceable to the original paper ballot.  As a result, the original paper ballots can be compared, as needed under the circumstances, to the AuditMark to confirm that voter intent has been accurately recorded by the scanners.

[96] To the extent questions arise whether voter marks are clearly discernible on the scanned image, the Vote Review Panels can review the original paper ballots if necessary.  Every hand-marked paper ballot has a unique corresponding ballot ID number printed at the bottom that is recorded by the scanner/tabulator and reflected on the AuditMark associated with the ballot image.  The AuditMark that indicates the disposition of the candidate choices on each scanned ballot contains a record of the ballot ID from the paper ballot.  The AuditMark on the scanned ballot image is therefore traceable to the original paper ballot.  As a result, the original paper ballots can be compared, as needed under the circumstances, to the AuditMark to confirm that voter intent has been accurately recorded by the scanners.

Plaintiffs' motion. The Court finds that injunctive relief is warranted but based on the testimony and evidence in the record, recognizes that there will not be an "instant fix" of this issue, though in any event, remedial measures should be in place by the next election cycle following the January 2021 election cycle, or if feasible, by the January 2021 runoff elections.

The Court has reviewed the Coalition Plaintiffs' requested relief (Docs. 809, 817) and finds that the relief identified is at once broader than what is called for to address the specific injury identified[97] and on the other hand, insufficiently precise. Accordingly, the Court **DIRECTS** Plaintiffs to submit a proposed injunctive relief order that delineates the specific measures or course of action they are seeking that the Court adopt to address this vote counting issue **by October 26, 2020**. In that connection the Court recognizes the State Election Board and Secretary's staff and/or Plaintiffs may likely need to conduct a further review with Dominion and other potential experts of some additional suitable options to address the issues raised here and to run sample tests to further assess such options; to consider the remedy of red outlined vote target ovals on hand marked ballots as used in other jurisdictions contracting with Dominion that facilitate the reading of a fuller range of voter markings; and the schedule for proceeding if programming changes must be made to implement the chosen option(s) in conjunction with the build of the ballot database for the election in question, as Dr. Coomer indicated would be necessary for some changes. This is how Dominion

---

[97] *See, e.g.,* Paragraph (a) of proposed Order at Doc. 809-17.

proceeded with the build of the database for the current election while a proposed regulation for modified threshold percentages was pending before the State Election Board.

In a rational world, the parties' representatives would sit down and discuss these matters together to discuss alternative remedial courses of action and further review. The Court would be more than willing to facilitate this by modifying timelines. In any event, the expanded method(s) to address the scanner/tabulator and adjudication software's per se "blank" exclusion of marks that may reasonably be considered by an adjudication panel as indicating voter intent must be in place no later than the next election cycle following the conclusion of the January 2021 runoffs.   The Court will enter a further relief order upon receipt of Plaintiffs' proposed remedy by October 26, 2020 and Defendants' response within 14 days of receipt of the Plaintiffs' proposal.

## IV. Conclusion

The Constitution's preamble speaks first of "We, the People," and then of their elected representatives. The judiciary is third in line and it is placed apart from the political fray so that its members can judge fairly, impartially, in accordance with the law, and without fear about the animosity of any pressure group.

In Alexander Hamilton's words, the mission of judges is "to secure a steady, upright, and impartial administration of the laws." I would add that the judge should carry out that function without fanfare, but with due care. She should decide the case before her without reaching out to cover cases not yet seen. She should be ever mindful, as Judge and then Justice Benjamin Nathan Cardozo said, "Justice is not to be taken by storm. She is to be wooed by slow advances."[98]

---

[98] Justice Ruth Bader Ginsburg – Opening Remarks to Senate Judiciary Committee in her 1993 Senate Confirmation Hearing.

Plaintiffs' challenge to the State of Georgia's new ballot marking device QR barcode-based computer voting system and its scanner and associated software presents serious system security vulnerability and operational issues that may place Plaintiffs and other voters at risk of deprivation of their fundamental right to cast an effective vote that is accurately counted. While these risks might appear theoretical to some, Plaintiffs have shown how voting equipment and voter registration database problems during the 2019 pilot elections and again in the June and August 2020 primary elections caused severe breakdowns at the polls, severely burdening voters' exercise of the franchise. (*See* September 28, 2020 Order, Doc. 918.)

Established Supreme Court authority recognizes that States retain the authority and power to regulate their elections and the voting process itself, subject to the preservation of citizens' fundamental First and Fourteenth Amendment rights. And the Supreme Court has repeatedly emphasized in the last months the principle that district courts must exercise great restraint in considering the grant of injunctive relief that requires major new electoral rules on the cusp of an election where a court's order could cause electoral disruption and potential voter confusion. The posture of this case collides with this latter principle. The sweeping injunctive relief that Plaintiffs seek would require immediate abandonment of the ballot marking device voting system enacted by the Georgia Legislature in 2019 that is in its first year of implementation by the Secretary of State pursuant to his

143

authority under Georgia law. Though major difficulties have arisen during the course of this new system's rocky first year, the Court recognizes that the staff of the Secretary of State's Office and county election offices have worked hard to roll out the system in short order during a Covid-19 pandemic era that presents unique hurdles. That hard work though does not answer the fundamental deficits and exposure in the system challenged by Plaintiffs.

Thus, although Plaintiffs have put on a strong case indicating they may prevail on the merits at some future juncture, the Court must exercise real caution in considering the grant of their request for extraordinary injunctive relief, given its obligation to follow governing Supreme Court and Eleventh Circuit authority. Despite the profound issues raised by the Plaintiffs, the Court cannot jump off the legal edge and potentially trigger major disruption in the legally established state primary process governing the conduct of elections based on a preliminary evidentiary record. The capacity of county election systems and poll workers, much less the Secretary of State's Office, to turn on a dime and switch to a full-scale hand-marked paper ballot system is contradicted by the entire messy electoral record of the past years. Implementation of such a sudden systemic change under these circumstances cannot but cause voter confusion and some real measure of electoral disruption. As with any systemic change, implementation of a statewide hand-marked paper ballot system as the State's primary electoral system would require long term planning and advanced poll worker training. Accordingly, based on the binding appellate legal authority, the State's strong legal interest in ensuring an

orderly and manageable administration of the current election, and the Court's assessment of the operational realities before it, the Court must deny the Plaintiffs' Motions for Preliminary Injunctive Relief in so far as they request immediate replacement of the current BMD system with a statewide hand-marked paper ballot system. [99]

But the Court cannot part with that message alone. The Court's Order has delved deep into the true risks posed by the new BMD voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances. The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted, if equipment and software systems are not properly protected, implemented, and audited. The modality of the BMD systems' capacity to deprive voters of their cast votes without burden, long wait times, and insecurity regarding how their votes are actually cast and recorded in the unverified QR code makes the potential constitutional deprivation less transparently visible as well, at least until any portions of the system implode

---

[99] For the reasons discussed in Section III D, the Coalition Plaintiffs' Motion is **GRANTED IN PART** in connection with the scanner/tabulator settings in tandem with Dominion's adjudication software that as currently configured allow certain voter marks on hand-marked absentee and provisional ballots to disregarded and not be counted.

because of system breach, breakdown, or crashes. Any operational shortcuts now in setting up or running election equipment or software creates other risks that can adversely impact the voting process.

The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" – but "when it will happen," especially if further protective measures are not taken.   Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well.

Still, this is year one for Georgia in implementation of this new BMD system as the first state in the nation to embrace statewide implementation of this QR barcode-based BMD system for its entire population.   Electoral dysfunction – cyber or otherwise – should not be desired as a mode of proof.  It may well land unfortunately on the State's doorstep.  The Court certainly hopes not.

The Court recognizes the major challenges facing the Secretary of State's Office in rapidly implementing a new statewide voting system.  Yet the vital issues identified in this case will not disappear or be appropriately addressed without focused State attention, resources, ongoing serious evaluation by independent cybersecurity experts, and open-mindedness. The Secretary of State and Dominion are obviously not without resources to tackle these issues. And at very least, the Court cannot fathom why, post-election, the State and Dominion would not at least be moving toward consideration of the software upgrade option Dominion

originally promised, allowing voters to cast ballots that are solely counted based on their voting designations and not on an unencrypted, humanly unverifiable QR code that can be subject to external manipulation and does not allow proper voter verification and ballot vote auditing.

Time will tell whether Act V here can be still avoided or at least re-written.

For the foregoing reasons, the Court **DENIES** the Curling Plaintiffs' Motion for Preliminary Injunction [Doc. 785] and **DENIES IN PART AND GRANTS IN PART** the Coalition Plaintiffs' Motion for Preliminary Injunction on BMDs, Scanners, and Tabulators, and Audits [Doc. 809].

**IT IS SO ORDERED** this 11th day of October, 2020.

**Honorable Amy Totenberg**
**United States District Judge**

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: September 17, 2021 8:12 PM<br>FILING ID: E9E5DD591D201<br>CASE NUMBER: 2020CV34319 |
| ERIC COOMER, Ph.D.,<br>Plaintiff<br><br>vs.<br><br>DONALD J. TRUMP FOR PRESIDENT,<br>INC., et al.,<br>Defendants | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff**<br>Charles J. Cain, No. 51020<br>ccain@cstrial.com<br>Steve Skarnulis, No. 21PHV6401<br>skarnulis@cstrial.com<br>Bradley A. Kloewer, No. 50565<br>bkloewer@cstrial.com<br>Zachary H. Bowman, No. 21PHV6676<br>zbowman@cstrial.com<br>**CAIN & SKARNULIS PLLC**<br>P. O. Box 1064<br>Salida, Colorado 81201<br>719-530-3011/512-477-5011 (Fax)<br><br>Thomas M. Rogers III, No. 28809<br>trey@rklawpc.com<br>Mark Grueskin, No. 14621<br>mark@rklawpc.com<br>Andrew E. Ho, No. 40381<br>andrew@rklawpc.com<br>RechtKornfeld PC<br>1600 Stout Street, Suite 1400<br>Denver, Colorado 80202<br>303-573-1900/303-446-9400 (Fax) | Case Number:      2020cv034319<br><br>Division Courtroom:      409 |
| **EXHIBIT E-1** | |

```
 1   DISTRICT COURT, CITY AND COUNTY OF DENVER
     STATE OF COLORADO
 2   1437 Bannock Street
     Denver, CO 80202
 3                                    ^ COURT USE ONLY ^

 4   ─────────────────────────────────────────────
     ERIC COOMER, Ph.D.,              Case Number 20CV34319
 5        Plaintiff,
                                      Courtroom 409
 6   vs.
 7   DONALD J. TRUMP FOR PRESIDENT, INC.,
     SIDNEY POWELL, SIDNEY POWELL, P.C.,
 8   RUDOLPH GIULIANI, JOSEPH OLTMANN,
     FEC UNITED, SHUFFLING MADNESS MEDIA, INC.,
 9   dba CONSERVATIVE DAILY, JAMES HOFT,
     TGP COMMUNICATIONS LLC, dba THE GATEWAY PUNDIT,
10   MICHELLE MALKIN, ERIC METAXAS, CHANEL RION,
     HERRING NETWORKS, INC. dba ONE AMERICA
11   NEWS NETWORK, and NEWSMAX MEDIA, INC.,
          Defendants.
12   ─────────────────────────────────────────────
13          VIDEO-RECORDED REMOTE DEPOSITION OF
                JAMES HOFT, individually
14          and as authorized representative of
        TGP COMMUNICATIONS, LLC, dba THE GATEWAY PUNDIT
15
                   August 10, 2021
16   ─────────────────────────────────────────────
17   REMOTE APPEARANCES:
18   FOR THE PLAINTIFF:
          STEVE SKARNULIS, ESQ.
19        BRAD KLOEWER, ESQ.
          Cain & Skarnulis PLLC
20        P.O. Box 1064
          Salida, Colorado 81201
21        Telephone: 719-530-3011
          Email: skarnulis@cstrial.com
22              bkloewer@cstrial.com
23
24
25
                                         Page 1
```

**Page 2**

```
 1   REMOTE APPEARANCES (Continued):
 2   FOR DEFENDANT JAMES HOFT AND TGP COMMUNICATIONS, LLC,
      dba THE GATEWAY PUNDIT:
 3      RANDY B. CORPORON, ESQ.
         Law Offices of Randy B. Corporon, P.C.
 4       2821 South Parker Road, Suite 555
         Aurora, Colorado 80114
 5       Telephone: 303-749-0062
         Email: rbc@corporonlaw.com
 6
        JONATHAN C. BURNS, ESQ.
 7       P.O. Box 191250
         St. Louis, Missouri 63119
 8       Telephone: 314-329-5040
         Email: tblf@pm.me
 9
     FOR DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.:
10      JOHN ZAKHEM, ESQ.
         Jackson Kelly, PLLC
11       1099 Eighteenth Street, Suite 2150
         Denver, Colorado 80202
12       Telephone: 303-390-0016
         Email: jszakhem@jacksonkelly.com
13
     FOR DEFENDANTS CHANEL RION and HERRING NETWORKS, INC.,
14    dba ONE AMERICA NEWS NETWORK:
        BERNARD J. RHODES, ESQ.
15      BRAD JOHNSON, ESQ.
         Lathrop GRM LLP
16       1515 Wynkoop Street, Suite 600
         Denver, Colorado 80202
17       Telephone: 720-931-3200
         Email: bernie.rhodes@lathropgpm.com
18
        THOMAS M. ROGERS III (TREY), ESQ.
19       Recht Kornfeld, PC
         1600 Stout Street, Suite 100
20       Denver, Colorado 80202
         Telephone: 303-573-1900
21       Email: trey@rklawpc.com
22   FOR DEFENDANT SIDNEY POWELL & SIDNEY POWELL, P.C.:
        BARRY ARRINGTON, ESQ.
23       Arrington Law Firm
         3801 East Florida Avenue, Suite 830
24       Denver, Colorado 80210
         Telephone: 303-205-7870
25       Email: barry@arringtonpc.com
```

**Page 3**

```
 1   REMOTE APPEARANCES (Continued):
 2   FOR DEFENDANT ERIC METAXAS:
        MARGARET BOEHMER, ESQ.
 3      THOMAS B. QUINN, ESQ.
         Gordon Rees Scully Mansukhani, LLP
 4       555 Seventeenth Street, Suite 3400
         Denver, Colorado 80202
 5       Telephone: 303-534-5160
         tquinn@grsm.com
 6      ERIC P. EARLY, ESQ.
         Early Sullivan Wright Gizer & McRae, LLP
 7      mbochanec@grsm.com
 8       6420 Wilshire Boulevard, Seventeenth Floor
         Los Angeles, California 90048
 9       Telephone: 323-301-4660
         Email: eearly@earlysullivan.com
10
     FOR DEFENDANTS JOSEPH OLTMANN, FEC UNITED, and
11    SHUFFLING MADNESS MEDIA, INC. dba CONSERVATIVE DAILY:
        ANDREA M. HALL, ESQ.
12      The Hall Law Office, LLC
         P.O. Box 2251
13       Loveland, Colorado 80539
         Telephone: 970-419-8234
14       Email: andrea@thehalllawoffice.com
15   FOR DEFENDANT MICHELLE MALKIN:
        GORDON A. QUEENAN, ESQ.
16       Patterson Ripplinger, P.C.
         5613 DTC Parkway, Suite 400
17       Greenwood Village, Colorado 80111
         Telephone: 303-741-4539
18       Email: gqueenan@pepclegal.com
19   FOR DEFENDANT DEFENDING THE REPUBLIC:
        MICHAEL W. REAGOR, ESQ.
20       Dymond • Reagor, PLLC
         8400 East Prentice Avenue, Suite 1040
21       Greenwood Village, Colorado 80111
         Telephone: 303-734-3400
22       Email: mreagor@dre-law.com
23   Also Present (via videoconference):
         Rebecca Dominguez, Veritext Case Manager
24       Peter Zierlein, Videographer
25
```

**Page 4**

```
 1      PURSUANT TO WRITTEN NOTICE and the appropriate rules
 2   of civil procedure, the video-recorded remote deposition
 3   of JAMES HOFT and TGP COMMUNICATIONS, LLC, dba THE GATEWAY
 4   PUNDIT, called for examination by Plaintiff, was taken via
 5   videoconference, commencing at 10:35 a.m. CST, on
 6   August 10, 2021, before Sara A. Stueve, Registered
 7   Professional Reporter and Notary Public in and for the
 8   State of Colorado.
 9
10               I N D E X
11   EXAMINATION OF JAMES HOFT:              PAGE
12   By Mr. Skarnulis                 7
      By Mr. Corporon                 110
13
14   PLAINTIFF'S DEPOSITION EXHIBITS        PAGE
15   Exhibit 75 Text correspondence between Joseph Oltmann  74
         and James Hoft; June 10, 2020
16
     Exhibit 76 Text from Jenny Beth Martin introducing     87
17      James Hoft to Randy Corporon;
         November 13, 2020
18
     Exhibit 78 Text from James Hoft to Joseph Oltmann;     89
19      November 24, 2020
20   Exhibit 79 Text from Joseph Oltmann to James Hoft;     90
         December 23, 2020
21
     Exhibit 82 Text from Randy Corporon to James Hoft;     91
22      November 15, 2020
23   Exhibit 83 Text from James Hoft to Randy Corporon;     92
         November 16, 2020
24
     Exhibit 84 Text from Randy Corporon to James Hoft;     92
25      November 16, 2020
```

**Page 5**

```
 1             I N D E X (Continued)
 2   PLAINTIFF'S DEPOSITION EXHIBITS           PAGE
 3   Exhibit 85 Text from Joseph Oltmann to James Hoft;      94
         November 24, 2020
 4
     Exhibit 86 November 13, 2020, article by Jim Hoft;      95
 5      "Dominion Voting Systems Officer of Strategy
         and SECURITY Eric Coomer Admitted in 2016
 6      Vendors and Election Officials Have Access to
         Manipulate the Vote"
 7
     DEFENDANT'S DEPOSITION EXHIBITS           PAGE
 8
     Exhibit D Screenshot of "About" page from       113
 9      TheGatewayPundit.com
10   Exhibit A Collection of TGP articles mentioned   116
         in complaint
11
     Exhibit E Publication by The Gateway Pundit:     136
12      "Election Fraud and Irregularities in the
         2020 US Election"
13
...
25
```

2 (Pages 2 - 5)

PROCEEDINGS
* * * * *

THE VIDEOGRAPHER:  Here begins the deposition of James Hoft, individually and as a corporate representative of TGP Communications.  Today's date is August 10, 2021.  The time is 10:35 a.m.

Will counsel please identify themselves for the record, after which the court reporter will swear in the witness.

MR. SKARNULIS:  Steve Skarnulis for the plaintiff, Dr. Eric Coomer.

MR. CORPORON:  This is Randy Corporon on behalf of Defendants James Hoft and TGP Communications.  John Burns is on the line as well.

MR. SKARNULIS:  Thank you.

Before I get started, I wanted to note for the record a couple agreements between counsel.

First of all, yesterday's deposition of the Donald J. Trump for President Inc. representative was cut short due to some obligations.

We've reached an agreement to continue that after Friday's deposition of Eric Metaxas, which I believe starts at 8:30 Eastern Time.

Secondly, as with our prior depositions, counsel have agreed that one objection for defendants counts for

*Page 6*

all defendants.  And I don't hear any objection to that.  So with that, I'll proceed.

JAMES HOFT,
having been first duly sworn to state the whole truth, testified as follows:

DIRECT EXAMINATION
BY MR. SKARNULIS:

Q.  Good morning, Mr. Hoft.

A.  Morning.

Q.  My name is Steve Skarnulis.  I represent Dr. Coomer.  Could you start by stating your name for the record?

A.  My name is James Hoft.

Q.  And, Mr. Hoft, I understand that today you will be appearing both individually and as a corporate representative for your company, The Gateway Pundit; is that correct?

A.  Yes.

Q.  All right.  And were you able to review the deposition notice for the corporate representative deposition with the categories of topics that we may cover today?

A.  Yes.

Q.  All right.  Now, with your permission, because I understand you're a principal in your business, I will try

*Page 7*

to blend my questions.  In other words, I'll ask you a question individually.  If it also needs to apply to the entity, I'll clarify that.  Does that make sense?

A.  Yes.

Q.  And I think that'll make for a more efficient deposition, and we can conclude a little sooner than we would in a two-part deposition.

So have you given a deposition before?

A.  No.

Q.  All right.  Just a few basics, then, since this is your first time.

You understand that this is the same as if you were giving testimony in the courthouse with the judge and the jury?

A.  Yes.

Q.  Okay.  And you're doing a great job of it.  But I will need verbal answers from you, so uh-huh, you know, head nods, don't work.  But -- so if you could continue that, that'd be great.

A.  Okay.

Q.  Our deposition with you individually is scheduled for three hours.  As I said, it may extend a little longer to cover some of the entity questions.  But if you need a break, please just let me know.

A.  Okay.

*Page 8*

Q.  And if you have any questions about a question I've asked, you need a clarification, if you'll let me know, I'm always happy to rephrase the question.

A.  Great.

Q.  Is there any reason or impairment that would prevent you from properly answering questions today?

A.  No.

Q.  All right.  What is your current job?

A.  I am the founder and owner of Gateway Pundit.  My current position is editor-in-chief, and I also contribute as a writer at Gateway Pundit.

Q.  All right.  And when did you found The Gateway Pundit?

A.  2004.

Q.  Why did you start Gateway Pundit in 2004?

A.  I felt there was a need for an alternative conservative voice online.

Q.  And explain for the jury, if you will, what Gateway Pundit is.

A.  Gateway Pundit is currently one of the top conservative websites in the country.  We started as a blog, an opinion blog.  And we have grown from two to three readers a day to 2.5 million readers a day currently.

Q.  Okay.  And is The Gateway Pundit still

*Page 9*

3 (Pages 6 - 9)

1  considered a blog, or would you call it something else at
2  this point?
3      A.  Many people consider it a blog today.  We use
4  the same type of format.  We get a lot of tips from
5  readers and -- as a blog would.  We use opinion as a blog
6  would.  And we also report news as a blog would.
7      Q.  How does The Gateway Pundit distinguish between
8  its opinion pieces and its news pieces?
9      A.  I may need a clarification on this.  As far as
10  what do you mean by "news"?
11     Q.  Well, you mentioned that there are both opinion
12  pieces; right?
13     A.  Yes.
14     Q.  And then you also cover stories; correct?
15     A.  Yep.
16     Q.  Is that a yes?
17     A.  Yes.
18     Q.  And those stories -- would you consider those
19  news articles?
20     A.  News with opinion.
21         THE REPORTER:  Can I interject and ask somebody
22  to please mute?  I don't know who that is.
23         MS. DOMINGUEZ:  Mr. Thorn, could you please
24  mute?  Thank you.
25     Q.  (By Mr. Skarnulis)  So you said that it is news
Page 10

1      Q.  Okay.  And prior to The Gateway Pundit, did you
2  work in a science-related field?
3      A.  Yes, for a period of years.
4      Q.  And how long did you work in a science-related
5  field?
6      A.  Probably 13 years.
7      Q.  And what'd you do -- and what'd you do after
8  that?
9      A.  Then I worked in human resources.
10     Q.  Where'd you work in human resources?
11     A.  At a major corporation based in St. Louis.
12     Q.  And after that employment, what was your next
13  job?
14     A.  And then I -- I quit that job and went to --
15  full-time at The Gateway Pundit.
16     Q.  Okay.  Had you started The Gateway Pundit
17  part-time prior to leaving that human resources job?
18     A.  Yes.
19     Q.  All right.  Did you have any training in
20  journalism prior to starting The Gateway Pundit?
21     A.  No.
22     Q.  Do you have -- did you take any courses, or do
23  you have any educational background in journalism?
24     A.  I took some -- I went to some seminars on
25  journalism throughout the years.  I've attended breakout
Page 12

1  with opinion; right?
2      A.  Correct.
3      Q.  Okay.  Do you -- within your articles that
4  contain both news and opinion, do you attempt to clarify
5  what part is news and what part is opinion?
6      A.  We leave that up to our readers.  But, yes, many
7  times we do.
8      Q.  And you're an author of some of the pieces;
9  right?
10     A.  Correct.
11     Q.  Who are the other authors of pieces at The
12  Gateway Pundit?
13     A.  We currently have several contributors.  The
14  main writers today include my twin brother, Joe Hoft.
15  Our -- one of our editors is Cristina Laila.
16     Cassandra Fairbanks is another contributor.
17  Jordan Conradson is a contributor from Arizona.  Alicia
18  Powe contributes articles.
19     We have different organizations that send us
20  articles.  We have people who contribute articles
21  through -- through -- through our email, if we choose to
22  use them.  So we have guest -- guest articles also.
23     Q.  What's your educational background?
24     A.  My background is in science.  I have a BS in
25  science, biology.
Page 11

1  sessions on journalism, different topics of journalism.
2  I've been to symposiums before in different countries.
3      And so I've had some experience since I started
4  the website in 2004.
5      Q.  Okay.  What -- can you name any of the seminars
6  or symposiums you -- you attended related to journalism?
7      A.  The first -- the first conference where they
8  spoke about journalism would have been in Nashville,
9  Tennessee.  I believe that was in 2006.  And it was -- I
10  think it was called -- it was a blog -- blogger
11  conference.
12     I went to an event in 2007 in Prague, Czech
13  Republic, on dissidence, international dissidence, where
14  I -- I interviewed several dissidents and learned quite a
15  bit about human rights, the different struggles people
16  have.
17     Q.  Any other seminars or symposiums on journalism
18  that you can recall?
19     A.  You know, I've gone to several conferences over
20  the years where they talk about what it takes to become
21  successful, what -- what you need to do, how to -- how to
22  interview.
23     And that would be like at -- there were some
24  conferences that were named -- they don't have them
25  currently.  They were sponsored by -- I believe it was the
Page 13

4 (Pages 10 - 13)

**Page 14**

1 Koch brothers, and it was -- I can't recall the name of
2 the conference, but they had them annually.
3 Q. Have you attended any conferences, seminars, or
4 symposiums that have dealt with journalism ethics?
5 A. I believe there -- over the years, I would say,
6 yes, they talked about journalism ethics.
7 Q. Have you personally undertaken any study of
8 journalism ethics?
9 A. No, I wouldn't say that.
10 Q. Are you or is TGP a member of the Radio
11 Television Digital News Association?
12 A. Not currently.
13 Q. Were you at one point?
14 A. We belonged to different media groups over the
15 past several years. I would have to look that up, which
16 groups we belong to.
17 Q. When you say "we," do you mean TGP?
18 A. Yes, sir.
19 Q. Is it okay if I shorthand it with TGP?
20 A. That's fine.
21 Q. All right. What -- what groups has TGP been a
22 member of in the past several years?
23 A. Yeah, we belong -- I know we were with --
24 membership with Poynter. We've been in membership with
25 PEN, P-E-N. We've had membership with a couple other

**Page 15**

1 organizations. I'd have to look that up.
2 Q. What is Poynter?
3 A. Poynter is a -- I -- I -- I'm not the one -- I'm
4 not an expert on what Poynter is. It's a large
5 corporation, and I know they do fact checks and different
6 things.
7 Q. What about PEN? What is that?
8 A. We were a member of that for at least a year.
9 And it's an international organization of journalism --
10 journalists.
11 Q. Did PEN have a written set of journalism
12 standards?
13 A. I don't know that.
14 Q. How about Poynter? Did Poynter have a written
15 set of journalism standards?
16 A. We're currently investigating Poynter. We'd
17 also like to become a fact check site. So we -- we know
18 that they have different standards to be a fact check
19 site. And that is something that we -- we're looking at
20 right now.
21 Q. When you say "a fact check site," what do you
22 mean by that?
23 A. There are some credentialed fact check sites
24 that are out there on the internet that get a
25 certification to become a certified fact check site. And

**Page 16**

1 that's through Poynter.
2 Q. What are some examples of those certified fact
3 check sites?
4 A. Obviously, there's several out there. I know of
5 a couple. I guess lead stories would be one. And there
6 are some science websites that are part of this fact check
7 association.
8 Q. Why does TGP want to become a fact check site?
9 A. We believe that we need more conservative voices
10 out there, not just liberal voices in this community.
11 Q. Have you or TGP been a member of the Society of
12 Professional Journalists?
13 A. I don't believe so. Don't know.
14 Q. How about the National Conference of Editorial
15 Writers?
16 A. No.
17 Q. The American Society of News Editors?
18 A. No.
19 Q. Now, with Poynter, I would assume that to be a
20 certified fact checking site, there's some standards that
21 Poynter has that are written that must be satisfied;
22 right?
23 A. Correct.
24 Q. What, generally, do you understand those
25 standards to be?

**Page 17**

1 A. Well, I do understand that you need to have a
2 track record, and you need to be doing fact checks for a
3 certain period of time, and that they -- they need to be
4 somehow approved by the Poynter organization. So that's
5 what we're looking at.
6 Q. And even without being certified by Poynter,
7 would you say that TGP has tried to build a track record
8 of fact checking?
9 MR. BURNS: Steve, this is John Burns. I just
10 wanted to interject here for a moment because -- just so
11 that Mr. Hoft isn't confused that you're not confused,
12 because I think you guys are talking past each other.
13 TGP Communications has set up a separate website
14 called tgpfactcheck.com, which is -- which is a fact --
15 which is what they're building as a fact check site, not
16 TGP proper, if that makes sense.
17 MR. SKARNULIS: That does. Thanks, John.
18 That -- that clarified it.
19 MR. BURNS: Yes, sir. Thank you.
20 Q. (By Mr. Skarnulis) And, Mr. Hoft, with that
21 clarification, are you intending to have two separate
22 sites, one for fact checking and one for the TGP as it's
23 existed presently?
24 A. Yes.
25 Q. Okay. Have you started the fact checking site?

5 (Pages 14 - 17)

1    A.  Yes.
2    Q.  Okay.  What's your role with fact checking site?
3    A.  I'm hands off with the fact checking site.  I
4  may send tips.  I may offer suggestions.  More of an
5  editorial role.
6    Q.  Okay.  Has the fact checking site done any
7  investigation or -- or pieces on Eric Coomer?
8    A.  I don't believe so.
9    Q.  All right.  Let's set the fact checking site
10  aside and go back to TGP, Gateway Pundit; okay?
11    A.  Okay.
12    Q.  Does The Gateway Pundit have written
13  professional standards that it expects its authors to
14  comply with?
15    A.  Yes, we have an About page that discusses who we
16  are and what we're about.
17    Q.  Okay.  And that contains also the professional
18  standards that you hold your writers to?
19    A.  I believe so, yes.
20    Q.  Okay.  What, generally, are they, as you
21  understand it?
22    A.  We want to be truthful.  We want to be honest.
23  We want to be timely.  And we want to be trusted.
24    Q.  Okay.  When you say "truthful," in preparing a
25  story, what do you expect of a writer for The

Page 18

1 Gateway Pundit to do?
2    A.  For any story?
3    Q.  Sure.  I mean, is there -- is there a basic
4  level of investigation that's expected for an author for
5  The Gateway Pundit?
6    A.  Yes.
7    Q.  What -- what, generally, do you expect for a
8  writer of The Gateway Pundit to do by way of investigation
9  of a story?
10    A.  They must confirm that the story is authentic,
11  that the source is legitimate, and that the story, of
12  course, is something that is -- our audience -- that, you
13  know, pertains to our audience.
14    Q.  And your audience, would it be fair to say, is
15  conservative politically?
16    A.  Yes.
17    Q.  All right.  Now, do you expect your writers,
18  when investigating a story, to approach the subject matter
19  with impartiality?
20    A.  Yes, a certain degree, yes.
21    Q.  When you say "a certain degree," what do you
22  mean?
23    A.  Well, our writers, like any writer on the
24  internet today, or on a news organization, has their own
25  opinions.  But, yes, we -- we would like it to be factual.

Page 19

1    Q.  Does The Gateway Pundit expect its writers to
2  consider potential conflicts of interest prior to
3  publishing a story?
4    A.  Sure.
5    Q.  Is it important for an author for The
6  Gateway Pundit to consider opposing facts that may exist?
7    A.  We've done that.  Oh, no, no, no.  You're going
8  to have to repeat that.
9    Q.  Well, is it important for a writer, who is going
10  to be published in The Gateway Pundit, to consider not
11  only one source that -- that they're investigating, but
12  other potential sources with opposing facts?
13    A.  We do that frequently.
14    Q.  Does The Gateway Pundit have a standard for
15  publishing stories that come from anonymous sources?
16    A.  No, we don't.
17    Q.  Why not?
18    A.  We have seen that at other news organizations,
19  and we just, you know, don't believe that that's -- it's
20  not helpful.  We try not to do that.
21        We've done it before.  But we try to at least --
22  we will check out our sources.  Some people want to remain
23  mon marks, but certainly we check out the source before we
24  put anything up.
25    Q.  Does The Gateway Pundit typically attempt to get

Page 20

1 a response from a person who is the subject of a story it
2  publishes?
3    A.  Yes.
4    Q.  Did The Gateway Pundit do that with Dr. Coomer?
5    A.  We reached out to the originator of the piece,
6  and that was Joe Oltmann at the time.
7    Q.  Did you reach out to Dr. Coomer to hear from
8  him?
9    A.  We'd reached out to Dr. Coomer -- well, we've
10  reached out to Dominion.  I don't believe we've heard back
11  from them except in a -- their attorneys at times.
12    Q.  When did -- and -- and I'm blurring the lines a
13  little bit here between you and TGP.  When did TGP reach
14  out to Dominion for comment?
15    A.  I'd have to look back.  I know we did as
16  recently as this past week.
17    Q.  Did TGP reach out to Dominion for comment prior
18  to publishing its first story related to Dominion Voting?
19    A.  Prior to that, no.
20    Q.  Did TGP reach out to Dominion for comment prior
21  to publishing its first story on Dr. Eric Coomer?
22    A.  No.
23    Q.  Why not?
24    A.  I don't have the access to Eric Coomer.  We did
25  reach out to the person who wrote the story.  Again, I

Page 21

6 (Pages 18 - 21)

1   spoke extensively with Joe Oltmann.
2       Q.  Okay.  Why did TGP not reach out to Dr. Coomer
3   for his comment?
4       A.  We were reporting on Joe Oltmann's report.
5   That's what we were reporting on.  And so we reached out
6   to Joe to get his -- what -- what -- the information that
7   he had.
8       Q.  Okay.  What was it -- well, I guess, let's --
9   let's start at the beginning.
10      When did you first learn of Joe Oltmann and his
11  story regarding Eric Coomer?
12      A.  The first time I was aware of Joe was the week
13  of -- before our first report, which was November 13th.
14  And his story -- his social media was going viral.
15      Q.  And what was on his social media that drew your
16  attention?
17      A.  He had written extensively on his Twitter
18  page about Eric Coomer working with Dominion and different
19  things about Dominion Voting Systems.
20      Q.  And was that the first time you'd heard about
21  Eric Coomer?
22      A.  When I read it at his Twitter page, I believe.
23      Q.  Had you heard anything about Dominion Voting
24  Systems prior to seeing Mr. Oltmann's social media?
25      A.  Yes.

Page 22

1       Q.  What video did you find?
2       A.  We found a video from 2016, from Chicago, of
3   Eric Coomer speaking to, I believe, perspective buyers of
4   the Dominion system, discussing its features of the
5   system.
6       Q.  And what -- what did you learn from that video?
7       A.  From that video, I believe we found that the --
8   the money quote for us was them saying that they can
9   bypass -- that the systems could bypass -- and I'd have to
10  get the exact quote.  But it was something about bypassing
11  the -- the users, I believe, who are -- who are -- I -- I
12  really need to get the exact quote.  I would hate to
13  misquote that.
14      Q.  That's fine.  And I'm not here to test your
15  memory on that.
16      And did -- whatever you saw on that video, did
17  that give you concerns about Dominion Voting?
18      A.  Absolutely.
19      Q.  Did whatever you saw on that video indicate
20  something about Dr. Coomer that gave you concerns?
21      A.  Yes.
22      Q.  Why?
23      A.  I'm sorry.  Is it breaking up a little?
24      Q.  Yeah.  You froze up on us there for a second.
25      Why did the video give you Dr. --

Page 24

1       Q.  What had you heard?
2       A.  I believe the first story on Dominion was the
3   Antrim County results in Michigan.
4       Q.  Do you recall approximately when that first came
5   to your attention?
6       A.  That would have been the 4th or 5th.
7       Q.  And did The Gateway Pundit then publish articles
8   about Dominion Voting prior to publishing its first
9   article about Eric Coomer?
10      A.  Yes.
11      Q.  But, if I understand your previous testimony,
12  Gateway Pundit did not reach out to Dominion at that time
13  for comment; right?
14      A.  I'm not sure.
15      Q.  Okay.  After seeing social media posts of
16  Joe Oltmann, what did you do next?
17      A.  I researched Eric Coomer online.
18      Q.  Did you assign anyone else to help with the
19  investigation of Dr. Coomer?
20      A.  I believe I wrote the first piece on
21  Eric Coomer.
22      Q.  What research did you do online about
23  Dr. Coomer?
24      A.  I looked up Eric Coomer at Dominion and found
25  video.

Page 23

1       A.  Uh-oh.  Okay.
2       Q.  Are you with us?
3       A.  I hear you.  Yeah.
4       Q.  Why did the video you saw give you concerns
5   about Dr. Coomer?
6       A.  It gave me concerns about the Dominion systems,
7   the fact that they had said that they were able to bypass
8   the -- again, I need to get the exact quote -- but that it
9   appeared that they were doing -- they -- they had the
10  capability of bypassing the users on the systems and
11  inserting, possibly -- I -- you know -- it just -- it
12  sounded -- it sounded -- it -- it -- it piqued our -- it
13  piqued our interest in the fact that the systems were able
14  to do things that we did not know they were able to do.
15      Q.  Okay.  Did you do anything to research what it
16  was the Dominion Voting machines were able to do?
17      A.  Yes.
18      Q.  What'd you do?
19      A.  Well, we found the actual video.  We found the
20  transcript.  And so we were able to use that as a source
21  of the capabilities with the Dominion systems.
22      Q.  When you say "the transcript," what do you mean?
23      A.  Talking about -- we were -- it was a transcript
24  of what Eric Coomer was saying to the officials in
25  Chicago, Illinois.

Page 25

7 (Pages 22 - 25)

**Page 26**

1    Q.   And you understood that to be a sales
2  presentation?
3    A.   Yes.  At the time, yes.  Or a training, sales or
4  training, or both.
5    Q.   Would it make sense to you that if Dominion had
6  a feature that allowed them to somehow change votes, they
7  would publically admit that?
8    A.   Depends what their motive is.
9    Q.   What do you think Dominion's motive was?
10       MR. BURNS:  Objection.  Calls for speculation.
11    A.   I'd hate to speculate.
12    Q.   (By Mr. Skarnulis)  Okay.  That's fine.
13       All right.  So other than the video, what'd you
14  do to -- online to investigate Eric Coomer?
15    A.   He also had posted his Facebook page items about
16  the Antifa manifesto and his comments -- anti-Trump
17  comments.
18    Q.   How did you come into possession of those?
19    A.   So that was posted on Joe Oltmann's Twitter
20  page at the time.
21    Q.   Did you contact Mr. Oltmann to discuss how he
22  came into possession of those posts?
23    A.   I contacted Mr. Oltmann on the 14th or 15th and
24  spoke with him.
25    Q.   Okay.  Had you -- well, did you do that prior to

**Page 28**

1    Q.   (By Mr. Skarnulis)  Okay.  Prior -- now, let
2  me -- let me confine this -- these questions to prior to
3  publishing your first story about Dr. Eric Coomer, what
4  did you do to investigate him?
5    A.   That was where we did the search online, and
6  that's where we found video of Dr. Coomer.  And that's
7  where we found his training or sales pitch to the Chicago
8  officials.
9    Q.   And other than the social media post of
10  Mr. Oltmann and the videos you found regarding Dr. Coomer,
11  and also noticing that Dominion had his name at one point
12  on their website and then removed it, what else did you do
13  to investigate Eric Coomer?
14    A.   Well, we also had done several reports at this
15  time on the Dominion system, I believe.
16    Q.   Okay.  And, of course, those didn't deal
17  specifically with Dr. Coomer, though; right?
18    A.   Correct.
19    Q.   Okay.  Then other than those stories
20  about Dominion and the prior investigation that we
21  covered, was there anything else you did to learn more
22  about Eric Coomer?
23    A.   On the 13th, I think that was -- that was about
24  it -- a search online, finding information on him, and
25  then the material that Mr. Oltmann had posted.

**Page 27**

1  publishing your first story about Dr. Coomer?
2    A.   We used his information as a source.
3    Q.   Well, my question --
4    A.   So -- so -- so, no, I had not reached out to
5  him.  I do know that he had reached out to me, I believe.
6  But I did not know that at the time.
7    Q.   So you were relying on Joe Oltmann as a source
8  through his social media publications; right?
9    A.   At the time.  And also relying on -- it was --
10  it was a newsworthy story that was going viral online.
11  And several people were reporting on it, and we -- we
12  posted that this was out there.
13    Q.   Okay.  And we'll look at some of the stories
14  later.  I'm just, kind of, getting general background.
15       So what -- what else did you do to research
16  Dr. Coomer?
17    A.   Well, I noticed that his name was on the
18  Dominion website, and that it had been removed from the
19  Dominion website.
20    Q.   Okay.  And what else did you do to investigate
21  Dr. Coomer?
22       MR. BURNS:  Objection -- one objection, Steve.
23  Could you provide clarification on time, like at what
24  time?
25       MR. SKARNULIS:  Sure.  That's fair.

**Page 29**

1    Q.   Okay.  Now, at what point did you actually first
2  contact Joe Oltmann?
3    A.   I spoke with him on the 15th, which would have
4  been Sunday night.  And we put up that article on the
5  13th, I believe.
6       And so I'm not sure when we first spoke, if it
7  was the 14th or the 15th.  But then we -- I interviewed
8  Mr. Oltmann on the 15th.
9    Q.   Okay.  Did you speak to him prior to actually
10  formally interviewing him?
11    A.   I believe we exchanged either text messages -- I
12  believe that's what we did.  Could have been on Twitter,
13  direct message.
14       As I said, he had tried to contact me before
15  then, but I -- I had not seen that he had reached out to
16  me.
17    Q.   Okay.  In your first conversation with
18  Joe Oltmann, what did the two of you talk about?
19    A.   So I -- I did an interview -- held an interview
20  with Joe.  And it was on Sunday night.  I believe it was
21  at least a half hour.  I believe it's still posted online.
22       And we spoke about his experience in Denver, his
23  experience investigating Antifa, and his experience with
24  what he discovered on Mr. Coomer.
25    Q.   All right.  And in having this interview with

8 (Pages 26 - 29)

1  Mr. Oltmann, were you assessing his credibility?
2      A.  Yes.
3      Q.  What about this conversation with Mr. Oltmann
4  made you believe he was a credible source?
5      A.  Several things.  Several things.
6          Well, I knew he had spoken with Michelle Malkin,
7  a conservative journalist who has an impeccable
8  reputation, who is a columnist.  And so I knew that had
9  happened.
10         And I searched a little bit on -- on his -- who
11  he was online.  And I had looked, like I said, at his
12  social media.
13     Q.  Okay.  Did you investigate Mr. Oltmann's
14  background at all?
15     A.  Not extensively.
16     Q.  During this interview with Mr. Oltmann, did he,
17  at that point, relay to you the entire story of his
18  alleged infiltration of an Antifa call?
19     A.  Yes.
20     Q.  All right.  And as you recall it, what,
21  generally, did he tell you?
22     A.  He spoke about the man who was shot dead at the
23  protest in Denver by an assailant linked to Antifa who was
24  with a local reporter.  He said that's what piqued his
25  interest.

Page 30

1          And, again, this is all -- this is still
2  online -- and -- which I understood because we followed
3  that story at The Gateway Pundit.  Horrific story that
4  didn't get much national play but was a horrific story.
5          And we spoke about his infiltration of the
6  Antifa group and his sitting in on the call with
7  Eric Coomer.
8      Q.  Okay.  When you said "his infiltration of the
9  Antifa group," what did Mr. Oltmann tell you about his
10  infiltration of the Antifa group?
11     A.  Mr. Oltmann told me that after this murder, or
12  killing, in Denver of the pro-Trump protester, who was
13  shot dead blank on the street, that he wanted to find out
14  more about what was happening in the community in Denver.
15         And he, again, relayed that he was doing a
16  research on the Antifa and the media connections.  And --
17  and -- and he also said that there were several people who
18  were involved with this with him, and he said that they
19  were researching the groups -- the local Antifa groups.
20     Q.  Okay.  And what -- what time period did you
21  understand it that Mr. Oltmann was researching Antifa
22  groups?
23     A.  Well, this -- this killing of this man was, I
24  believe, in October, I believe.  And so it would have been
25  since that time through the election.  Might have been

Page 31

1  September, but I'm thinking it was October.
2      Q.  Okay.  Now, I'll represent to you that the
3  alleged call that Mr. Oltmann infiltrated, where he heard
4  Eric from Dominion -- you're familiar with that; right?
5      A.  Yes.
6      Q.  And Mr. Oltmann told you all about that;
7  correct?
8      A.  Yes.
9      Q.  So as I understand it, Mr. Oltmann says that
10  that call happened sometime in late September.  Were you
11  aware of that?
12     A.  I -- I knew it was sometime in the fall.
13     Q.  What did Mr. Oltmann tell you about that call?
14     A.  He said he sat in and was listening, and he
15  heard some horrific things, and that he actually had said
16  that he took some notes.
17     Q.  Did you ask to see Mr. Oltmann's notes?
18     A.  No.
19     Q.  Why not?
20     A.  He was telling me everything -- as far as I was
21  concerned, he was telling me what he knew at that time.
22     Q.  As -- were you acting as a journalist in
23  interviewing Mr. Oltmann?
24     A.  Yes.
25     Q.  As a journalist, wouldn't it be important to

Page 32

1  corroborate Mr. Oltmann's story?
2      A.  Yes.
3      Q.  And wouldn't his notes have provided some
4  corroboration?
5      A.  Among other things.
6      Q.  What did you do to corroborate Mr. Oltmann's
7  story about the Antifa conference call?
8      A.  Again, I spoke with him directly.  I knew that
9  he had spoken with -- he had been speaking about this
10  incident for several days at that time.  And I knew that
11  he had already had an interview with, as I said,
12  Michelle Malkin, who was very credible.
13     Q.  Did you ask Mr. Oltmann -- well, hold on.  Let
14  me back up.
15         You've said that twice now, that Ms. Malkin is
16  very credible.  Why is it you find Ms. Malkin to be very
17  credible?
18     A.  She's very honest.  She's extremely intelligent.
19  She's been a columnist for 20 or 30 years.  She's
20  certainly been outspoken in her opinions, and yet she's
21  also been very popular with the conservative set.
22     Q.  Okay.  Ms. malkin has a very conservative
23  approach to her stories; right?
24     A.  She's conservative.
25     Q.  Would you consider Ms. Malkin to be a journalist

Page 33

9 (Pages 30 - 33)

1  or an opinion writer?
2       MR. BURNS:  Object to the form.
3    A.  She's a journalist and opinion.
4    Q.  (By Mr. Skarnulis)  Okay.  A little of both?
5    A.  She -- she's very well respected, yes.
6    Q.  Prior to interviewing Mr. Oltmann, did you speak
7  with Ms. Malkin to ask her about her interactions with
8  him?
9    A.  I don't recall.
10   Q.  Did you ever talk to Ms. Malkin about
11 Joe Oltmann or the Eric Coomer story?
12   A.  I don't recall.
13   Q.  Okay.  Do you know -- do you have any idea what
14 investigation Ms. Malkin performed before first publishing
15 the story about Joe Oltmann and the Antifa conference
16 call?
17   A.  I don't know what research she did.
18   Q.  Okay.  Going back to your interview with
19 Mr. Oltmann, did you ask him how it was that he came to
20 join this Antifa conference call?
21   A.  No.  He explained that to me.
22   Q.  What did he tell you?
23   A.  Again, the transcript or the -- the recording is
24 out there.  I believe he said it was because he was upset
25 about this shooting, and that's why several people had

Page 34

1  noticed the, again, coordination between the media and the
2  Antifa activists, and that's why he wanted to learn more.
3  I believe that's what he told me.
4    Q.  Now I'm kind of asking you mechanics.  Did you
5  ask Mr. Oltmann how it was that he got the number or got
6  the dial-in for the call?
7    A.  No.  No.  And he may have told me that.
8    Q.  When you say he may have told you, do you have
9  any recollection of him telling you that?
10   A.  Well, he described a bit of his research, so I'd
11 have to look back and look exactly at what he said.
12   Q.  As you sit here today, what is your recollection
13 of Mr. Oltmann's research that he described to you?
14   A.  I felt it was thorough.  I felt it was,
15 obviously, an explosive story.  It was his -- it was his
16 story we were reporting on.  It was his accusations we
17 were reporting on.  And it was going viral online.  I
18 wanted to hear more about it.
19   Q.  Did you ask Mr. Oltmann the names of any of the
20 attendees on this call?
21   A.  No.  No.
22   Q.  Why not?
23   A.  He may -- he may have mentioned a couple names,
24 but I didn't ask him about the names on the call.
25   Q.  Why would you --

Page 35

1    A.  I believe he said that some of them -- again, I
2  believe he said some of them are anonymous, but I'll --
3  I'd have to check back at his exact words on that.
4    Q.  For any of the names Mr. Oltmann may have
5  mentioned, did you attempt to contact those people?
6    A.  No.
7    Q.  Why not?
8    A.  My story was about the -- it was about Oltmann's
9  accusations, and I wanted to hear his story.  And so I did
10 not reach out to any Antifa activists at that time.
11   Q.  Did you ask Mr. Oltmann for the name of the
12 person who gave him access to this call?
13   A.  No.
14   Q.  Why not?
15   A.  I trusted him.  He -- he appeared to be a -- a
16 credible witness.
17   Q.  You'd never met Mr. Oltmann prior to speaking
18 with him about this; right?
19   A.  Correct.
20   Q.  And this story was the first conversation you'd
21 ever had with Mr. Oltmann; right?
22   A.  As far as I know, yeah.  I mean, we set it up,
23 and I'm not sure exactly -- I don't recall how exactly we
24 set it up.  I think it was through text message.  But as
25 far as a conversation, I believe that was our first

Page 36

1  conversation.
2    Q.  And this first conversation was a phone call?
3    A.  It was a phone call interview.
4    Q.  So you were not able to observe Mr. Oltmann's
5  demeanor or expressions?
6    A.  I had seen his -- you know, I've seen, since
7  then, his demeanor and expressions.  And I don't think we
8  did a -- no, we didn't do a video interview.  We do
9  several of those at Gateway Pundit.  I think it was a
10 phone conversation.
11   Q.  Okay.  But you were not able to observe
12 Mr. Oltmann's demeanor or expressions on the phone; right?
13   A.  I don't -- I don't recall.
14   Q.  And you were not able to be shown any documents
15 or any supporting evidence that Mr. Oltmann may have been
16 in possession of; right?
17   A.  I included the documents in our initial report
18 of Mr. Coomer's Facebook page.
19   Q.  Okay.  And I wasn't referring to those
20 documents.  I was talking about on this phone call,
21 Mr. Oltmann had notes or an email from somebody who got
22 him on the Antifa call.  Those would have been important
23 to see; right?
24   A.  Well, sure.
25      And he had already interviewed with Ms. Malkin,

Page 37

10 (Pages 34 - 37)

1  so I -- I had seen how he performed with her, and -- but
2  as far as his notes, I did not see his notes.
3      Q.  Did you ask Mr. Oltmann whether there was a
4  recording of the call?
5      A.  I don't recall.
6      Q.  Did Mr. Oltmann ever tell you that he had a
7  recording of the call?
8      A.  I don't recall.
9      Q.  Would it -- would it be important if there had
10 been a recording of the call for you to listen to it to
11 corroborate Mr. Oltmann's story?
12     A.  Yes.
13     Q.  Is so, wouldn't that be something that you'd ask
14 Mr. Oltmann to hear?
15     A.  That makes sense.
16     Q.  Wouldn't it make sense, if Mr. Oltmann had been
17 able to infiltrate an Antifa conference call, for him to
18 record it?
19     A.  I don't know what the law is in Colorado.
20     Q.  Okay.  But assuming the law is only one party to
21 a recording needs to be aware of it, you'd agree that it
22 would have made -- it would have been good for Mr. Oltmann
23 to have recorded the call to corroborate his story; right?
24         MR. SEERVELD:  Object to form.  Chris Seerveld.
25 Object to form.

Page 38

1      Q.  (By Mr. Skarnulis)  And you can go ahead and
2  answer.  They'll do that occasionally.
3      A.  Oh.  Okay.
4         It would have made the explosive story even more
5  explosive, I think, if there was a recording.
6      Q.  Okay.  And about how long was the interview with
7  Mr. Oltmann?  About how long did you talk?
8      A.  I believe around 30 minutes.
9      Q.  And after this interview with Mr. Oltmann, did
10 you do anything further to investigate the story?
11     A.  Well, I did continue to do research on
12 Mr. Coomer.
13     Q.  Okay.  What other research did you do on
14 Dr. Coomer?
15     A.  I found more video of Dr. Coomer, could have
16 been in Georgia, where he had told individuals that you
17 can access the machines online.  And we put up video of
18 that.
19         And -- and we've written a few other stories
20 on -- that included Mr. Coomer since then.
21     Q.  Sure.  We'll -- we'll look specifically at the
22 stories a little later.  Again, kind of going through
23 background.
24         What about the Georgia video got your attention?
25     A.  Well, again, in reporting, it's -- it's great to

Page 39

1  have first-person evidence.  It -- it's -- it's better to
2  have photos.  Adds a lot of credence to your story.
3         But if you have a video, it's really -- it's --
4  it really helps your report when you have, actually, the
5  video of the person doing what you're saying they're
6  doing.
7         So, of course, that made for a -- a pretty big
8  story to hear the Dominion top executive talk about how
9  you can access the machines through the internet.
10     Q.  Did you attempt to reach out to Georgia
11 officials to learn about what you saw on the video about
12 accessing the machines?
13     A.  I don't recall.  I don't believe so.
14     Q.  Why not?
15     A.  Well, we've reached out to Georgia officials on
16 numerous reports.  I don't know if we did on this report.
17 I don't believe we did.
18         This was something that they -- that was
19 previous, and it was something that was recorded.  I
20 believe, again, it was either a sales pitch or a training
21 video with Mr. Coomer.
22         And I believe -- again, I believe it was
23 Georgia.  I really have to look back and see where he was
24 at that point.  He had given several trainings around the
25 country -- trainings, sales pitches.  And so I -- I'm

Page 40

1  thinking it was Georgia, but I can't be exact sure at this
2  point.
3      Q.  Did you find the video that you saw regarding
4  Georgia -- did you believe that to be incriminating in
5  some way?
6      A.  Yes.
7      Q.  Why?
8      A.  The -- the Dominion executives and on the
9  Dominion web page, they had said that they -- they're not
10 connected to the internet.  So when I heard him say that
11 you can have access from the internet to these machines, I
12 felt that that was very -- again, very explosive
13 development.
14     Q.  Do you know whether it was that the machines are
15 not connected to the internet during the election or ever?
16     A.  I -- that's not something for me to answer.
17 That's -- isn't -- you're asking me to -- if they had the
18 capability; that's what I was reporting on.  If they had
19 the -- I'm not going to speculate on that.
20     Q.  Do you contend that Dominion Voting Systems
21 influenced the outcome of the 2020 presidential election?
22     A.  We're currently undergoing an investigation, and
23 that's what we want to find out.
24     Q.  Okay.  So you -- you currently do not contend
25 that Dominion Voting Systems influenced the outcome of the

Page 41

11 (Pages 38 - 41)

1  election?
2      A.  Again, we're -- we're investigating currently.
3  There's obviously a major symposium going on in
4  Sioux Falls, South Dakota, today where -- I don't know
5  what's happening.  We're on this call.  But, possibly,
6  information could happen there.
7          We -- we are speaking with several witnesses
8  still who have access to the Dominion systems.  And we --
9  so we're waiting to see and to really try to piece this
10  all together.
11      Q.  Who are you speaking to about the Dominion
12  systems?
13      A.  Well, we've written about it, and -- at the
14  Gateway Pundit.  We have for months.  And -- but I'd
15  rather not talk about -- I don't know if I -- I'd rather
16  not talk about my sources right now, since we're still
17  investigating.
18      Q.  Are you continuing to investigate Dr. Coomer?
19      A.  If something came up, it -- well, we actually
20  reported something on Dr. Coomer a week or two ago.  So if
21  something comes up, we would report on it, certainly, that
22  was newsworthy.
23      Q.  My question is, are you currently investigating
24  Dr. Coomer?  And when I say "you," I mean TGP.
25      A.  Again, if -- "currently investigating" -- I

Page 42

1  mean, we'll continue to follow the story, new
2  developments.  But do we have a staff who are just
3  assigned to the Eric Coomer story?  No.
4      Q.  Do you contend that Dr. Coomer influenced the
5  outcome of the 2020 presidential election?
6      A.  We've never said that.
7      Q.  And that's not my question.
8          My question is, do you believe that Dr. Coomer
9  influenced the outcome?
10      A.  We believe that's possible.
11      Q.  How do you believe that Dr. Coomer possibly
12  influenced the outcome of the election?
13      A.  Again, we're still in investigation.  It's been
14  several months, but there's still information that's being
15  released and released this week.
16          And so once we have more information, I believe
17  we could continue to follow this story and see where it
18  leads us.
19      Q.  Is it typically The Gateway Pundit's practice to
20  publish a story with pretty shocking allegations prior to
21  confirming whether those allegations are true?
22      A.  I'd say no.  I think we're -- we do a very
23  effective job with our reporting.
24      MR. ZAKHEM:  This is John Zakhem.  I object to
25  form on the last question.

Page 43

1      MR. SKARNULIS:  We've been going a little over
2  an hour.  Why don't we take a short break, Mr. Hoft.
3      THE WITNESS:  Okay.  Thank you.
4      MR. SKARNULIS:  Sure.
5      THE VIDEOGRAPHER:  Going off the record.  The
6  time is 11:41.
7          (Recess from 11:41 a.m. until 12:11 p.m.)
8      THE VIDEOGRAPHER:  Back on the record.  The time
9  is 12:11.
10      MR. SKARNULIS:  Over -- we just took a break,
11  and I want to get on the record, over the break, a number
12  of supplemental text messages were produced by counsel for
13  Mr. Hoft and TGP.
14          I've attempted to get through them as best I
15  can, and I anticipate that I will be able to cover all
16  these within today's time.  And I'll do my best to do
17  that.  But I need to reserve, in case something comes up
18  that -- regarding those exhibits that I may need
19  additional time.  But, again, I don't anticipate that.
20          All right --
21      MR. CORPORON:  And, Steve, I'd like to address
22  those very briefly myself.
23      MR. SKARNULIS:  Sure.
24      MR. CORPORON:  I just want to make clear,
25  there's 31 texts, I believe.  There's a couple from May or

Page 44

1  June that do not specifically reference Eric Coomer, so
2  they didn't come up in the search that was done by --
3  excuse me -- the organization that was hired by John Burns
4  to perform the search.
5          And then the recent ones that refer to Saturday
6  or Thursday are new texts that we became aware of, and
7  that occurred after Mr. Hoft published a couple of news
8  stories regarding Eric Coomer.  So we became aware of
9  those last night.
10          We talked about getting them to you this
11  morning, and then we just plain forgot.  So apologies on
12  that.
13          Except for those May and June that didn't refer
14  to Coomer, all of the others would be supplemental, just
15  newly acquired.
16      MR. SKARNULIS:  Okay.  Thanks for that.
17      Q.  (By Mr. Skarnulis)  All right.  Mr. Hoft, are
18  you ready to proceed?
19      A.  Yes.
20      Q.  You have never met Eric Coomer, have you?
21      A.  Correct.
22      Q.  You've never talked to him, have you?
23      A.  Correct.
24      Q.  You did not participate in the alleged Antifa
25  call; right?

Page 45

12 (Pages 42 - 45)

| | |
|---|---|
| 1   A. Correct.<br>2   Q. You don't know the identity of any of the<br>3 participants on the call; right?<br>4   A. Just Joe Oltmann.<br>5   Q. Fair enough.<br>6     And did you ask Mr. Oltmann whether he<br>7 recognized Eric Coomer's voice when he later saw a video<br>8 of Dr. Coomer?<br>9   A. No. But -- but I believe he has said that on --<br>10 on the record somewhere, that he felt it was the same<br>11 voice.<br>12   Q. Okay. Did you know that prior to publishing<br>13 your first story about Dr. Coomer?<br>14   A. No.<br>15   Q. You have no evidence that Dr. Coomer interfered<br>16 with the 2020 presidential election; right?<br>17   A. Correct.<br>18   Q. Okay. And you ultimately relied on Joe Oltmann<br>19 as TGP's source for your reporting on Dr. Coomer; right?<br>20   A. Correct.<br>21   Q. And at the time you published articles about<br>22 Dr. Coomer involving Joe Oltmann, were you aware that<br>23 Oltmann was a conservative podcast host?<br>24   A. He told me at some point in our first<br>25 interview.<br><br>Page 46 | 1   A. No.<br>2   Q. Prior to publishing your first story about<br>3 Dr. Coomer, were you aware that Mr. Oltmann had made<br>4 allegations of election fraud about the 2020 election?<br>5   A. No.<br>6   Q. Prior to publishing your story about -- your<br>7 first story about Dr. Coomer, were you aware that<br>8 Joe Oltmann, on his podcast, had discussed the possibility<br>9 of election fraud prior to November 3rd?<br>10   A. No.<br>11   Q. Wouldn't that have been important to know?<br>12   A. It was more information.<br>13   Q. Well, isn't it possible that Mr. Oltmann, on his<br>14 podcast, had alleged election fraud and then created a<br>15 story about Dr. Coomer to support that?<br>16     MR. CORPORON: Objection as to form. Anything's<br>17 possible.<br>18   A. I don't -- I don't want to speculate on that. I<br>19 don't know what was going through his head.<br>20   Q. (By Mr. Skarnulis) Prior to hearing<br>21 Joe Oltmann's story about the alleged Antifa conference<br>22 call, had you ever heard of Antifa members participating<br>23 in a conference call?<br>24   A. Yes.<br>25   Q. When?<br><br>Page 48 |
| 1   Q. Okay. Did he tell you that he had an ownership<br>2 interest in the conservative podcast?<br>3   A. No.<br>4   Q. Were you aware that he could have financially<br>5 benefited from statements made on his podcast?<br>6   A. No.<br>7   Q. Were you aware prior to publishing stories about<br>8 Dr. Coomer that Joe Oltmann was a vocal supporter of<br>9 former President Trump?<br>10   A. Not specifically, no.<br>11   Q. Prior to publishing stories about Dr. Coomer,<br>12 were you aware that Joe Oltmann, through his organization<br>13 FEC United, held rallies in support of former<br>14 President Trump?<br>15   A. No.<br>16   Q. Were you aware that Joe Oltmann had raised funds<br>17 in support of former President Trump?<br>18   A. No.<br>19   Q. Prior to publishing your first stories about<br>20 Dr. Coomer, did you know anything about Joe Oltmann's<br>21 organization, FEC United?<br>22     MR. BURNS: Object to form. John Burns.<br>23     MR. SKARNULIS: That's fine.<br>24   Q. (By Mr. Skarnulis) And you can go ahead and<br>25 answer.<br><br>Page 47 | 1   A. We've reported on Antifa activities for years,<br>2 and we've reported on -- their activities include planning<br>3 and carrying out different activities.<br>4     I know we have one reporter who was also<br>5 harassed at her home by Antifa, and she had access to<br>6 some -- some information that wasn't public that they had<br>7 been planning -- you know, when they were planning. And<br>8 she -- she ended up moving from her house because the<br>9 violent threats she was receiving.<br>10   Q. Okay. But have you -- had you previously<br>11 reported about Antifa conference calls?<br>12   A. A conference call? Maybe not a conference call.<br>13   Q. Any Antifa meetings? Have you reported on<br>14 those?<br>15   A. Yes.<br>16   Q. Okay. When?<br>17   A. We've reported hundreds of articles on Antifa.<br>18 We've reported, maybe, a hundred thousand articles at<br>19 Gateway Pundit over the years. So we've reported on<br>20 Antifa activities.<br>21   Q. Were you aware of any instance in which<br>22 Joe Oltmann mentioned the alleged Antifa conference call<br>23 prior to the election?<br>24   A. No.<br>25   Q. Are you aware of any instance in which<br><br>Page 49 |

13 (Pages 46 - 49)

1  Joe Oltmann mentioned the alleged Antifa conference call
2  prior to November 9, 2020?
3      A.  No.
4      Q.  Did you ask Mr. Oltmann, in reporting on his
5  story, whether or not he knew any of the other
6  participants on the conference call?
7      A.  No.
8      Q.  Do you know whether Joe Oltmann alleges that
9  Dr. Coomer influenced the outcome of the 2020 presidential
10  election?
11      MS. HALL:  Andrea Hall.  Object to form.
12      A.  I'm not aware of that.
13      Q.  (By Mr. Skarnulis)  Do you know of any theory
14  Mr. Oltmann had on how Eric Coomer could have influenced
15  the 2020 presidential election?
16      MS. HALL:  Andrea Hall.  Object to form.
17      A.  No.
18      Q.  (By Mr. Skarnulis)  Do you have a working theory
19  as to how Dr. Eric Coomer could have influenced the
20  outcome of the 2020 presidential election?
21      MR. BURNS:  John Burns.  Object.  Calls for
22  speculation.
23      Q.  (By Mr. Skarnulis)  And you can go ahead and
24  answer.  Do you have a working theory of how that might
25  have happened?
Page 50

1  presidential election were fraudulent?
2      A.  Prior to Coomer?
3      Q.  Yes, sir.
4      A.  The president had said it was -- the executive
5  branch had said it was a fraudulent election, something he
6  still considers.
7      Q.  Okay.  Other than the president, were you aware
8  of a federal governmental body that had determined the
9  results of the 2020 presidential election were fraudulent?
10      A.  We -- no, not a government body.
11      Q.  Were you aware before you published your first
12  story about Dr. Coomer that the Cybersecurity and
13  Infrastructure Security Agency reported on
14  November 12, 2020, there was no evidence that the 2020
15  presidential election was fraudulent?
16      A.  We reported on that.
17      Q.  Did you disagree with that conclusion of CISA?
18      A.  Yes.
19      Q.  Why?
20      A.  We did not believe it was a thorough
21  investigation.
22      Q.  You were aware that Chris Krebs was the one who
23  was the head of CISA; right?
24      A.  Absolutely.
25      Q.  And you were aware that he had been appointed by
Page 52

1      A.  We're still investigating, as I said.  And we're
2  open to all of the evidence.
3      And, obviously, some evidence we see we -- we
4  turn away.  And -- but we're still investigating what
5  happened at the 2020 election.
6      Q.  Okay.  Do you have currently a working theory as
7  to how Eric Coomer could have affected the outcome of the
8  2020 election?
9      MR. BURNS:  John Burns.  Same objection.
10      A.  I'd say no.
11      Q.  (By Mr. Skarnulis)  Okay.  What -- you said you
12  turned away some evidence regarding your investigation of
13  Dr. Coomer.  What evidence have you turned away?
14      A.  Well, we've turned away evidence pertaining to
15  the election.  Some people give us stories.  We receive a
16  lot of information from readers.  And we have to be
17  selective with what we're going to report on.
18      So, yes, we've turned away some information.
19  I -- I would not say that it was pertaining to Dr. Coomer,
20  but certainly to -- to some elections.  I'd say some of
21  the information didn't sound like it was -- it sounded
22  more conspiracy than it was factual.
23      Q.  Prior to publishing the first story about
24  Dr. Coomer, were you aware of any federal government --
25  governmental body that had determined the results of the
Page 51

1  President Trump; right?
2      A.  Absolutely.
3      Q.  Did you not find Chris Krebs to be credible?
4      A.  I believe we've written about Chris Krebs, and
5  I -- we have doubts about his expertise.
6      Q.  Were you aware prior to publishing stories about
7  Dr. Coomer that 59 election scientists had signed a letter
8  finding that there was no credible evidence of computer
9  manipulation of the 2020 presidential election?
10      A.  No.
11      Q.  Were you aware that U.S. Attorney General
12  William Barr stated on December 1, 2020, there was no
13  evidence that the 2020 presidential election was
14  fraudulent?
15      A.  We reported on that.
16      Q.  Did you point that out in reporting on
17  Dr. Coomer?
18      A.  No.
19      Q.  Do you believe Joe Oltmann more than CISA as to
20  how the 2020 presidential election was run?
21      A.  I -- I don't compare those two in the same
22  category.  CISA's a agency.  Joe Oltmann is a private
23  citizen.
24      Q.  If you were to learn that your reporting on
25  Dr. Coomer was in any way inaccurate, would
Page 53

14 (Pages 50 - 53)

1 The Gateway Pundit retract or correct its reporting?
2     A.   We make corrections with our reporting all the
3 time.  We have no problem making a correction if we are
4 found that it wasn't correct or accurate.
5     Q.   And you would do that if you came to learn that
6 your reporting on Dr. Coomer was somehow inaccurate?
7     A.   Yes.
8     Q.   But you have not retracted or corrected your
9 publications concerning Dr. Coomer at this point; right?
10    A.   Correct.
11    Q.   Prior to reporting on Dr. Coomer, did
12 The Gateway Pundit utilize any election systems experts to
13 learn how the election was conducted?
14    A.   We have used election systems experts in our
15 reporting.
16    Q.   Who have you used?
17    A.   Several individuals.  So would you like me to
18 list some names?
19    Q.   Sure.
20    A.   Jovan Pulitzer has been an exceptional source.
21 We have done reports with Matthew DePerno, an attorney
22 from Michigan who's investigating the Dominion systems in
23 Michigan.
24         We've done reporting with the founder of 8chan,
25 who has extensive experience -- analysis, cyber -- cyber

Page 54

1     Q.   You do not contend that Dr. Coomer had any
2 involvement in the alleged boxes of ballots found in
3 Detroit; right?
4     A.   We've never connected the two.
5     Q.   Do you contend that Dr. Coomer had any
6 involvement in influencing the outcome of the Georgia
7 election?
8     A.   We know that he was active in the state prior to
9 the election.
10    Q.   Okay.  But my question is, do you have any --
11 any -- do you have any evidence that Dr. Coomer somehow
12 influenced the outcome of the Georgia election?
13    A.   Yes.
14    Q.   What evidence do you have?
15    A.   As -- again, he was working in Georgia prior to
16 the election.  He was one of the major players from
17 Dominion who was part of the sales and training of the
18 Dominion system in Georgia, the hundred --
19 ten-million-dollar deal.
20         He also was called in, I believe, after a
21 deadline in Georgia, and was asked to do some work.  And I
22 believe it was questionable because of the timing, as we
23 reported, that this was -- this was taking place prior to
24 the election, some updates were taking place.  And some
25 people had serious questions about this.

Page 56

1 analysis.  We're spoken with actuaries, who wish to remain
2 anonymous.
3         We've spoken with -- again, my twin brother was
4 a top auditor in southeast Asia, running teams of audits
5 across southeast Asia, major corporations.  So he was a
6 exceptional source for our investigations, and continues
7 to be.
8         We've spoken with several witnesses on the
9 ground -- we have their affidavits -- and dozens and
10 dozens of people that have signed legal affidavits to --
11 of what they saw happening.
12        We have researched different venues.  We were
13 reporting on the Georgia late-night ballot, where they
14 were recounting ballots two, three times, stacks of
15 ballots.
16        We -- we -- we asked for the video from the
17 TCF Center in Detroit from election night, November 4th,
18 and received that after several weeks.  Cost us a lot of
19 money.  And we were able to reveal a late-night ballot
20 drop of 61 boxes of ballots late at night.
21        So we've done extensive investigations.  We
22 continue to.  And we've spoken with several experts.
23    Q.   Have any of the experts opined on how Dr. Coomer
24 may have influenced the outcome of the election?
25    A.   Not that I'm aware of.

Page 55

1         So when I say that he influenced the election, I
2 mean that he had undertaken certain activities before the
3 election that certainly could have influenced the
4 election.
5     Q.   Okay.  You're aware that Georgia -- the
6 secretary of state was Republican; right?
7     A.   He says that, yes.
8     Q.   Do you have a reason to disagree with that?
9     A.   I think he's a very flawed individual.
10    Q.   Why?
11    A.   We believe that we've caught him in some
12 dishonest activity.
13    Q.   What dishonest activity?
14    A.   He released a call.  His office released a call
15 with President Trump.  It was doctored.  It was later
16 found to be doctored.
17         And it was later found that this call -- it was
18 either the transcript or the actual recording -- was --
19 was deleted and was only found after some cyber experts
20 found it.  So they tried to cover that this -- this call
21 was doctored.  And it was, again, deleted, which sounds
22 very, very dishonest.
23    Q.   Okay.  Prior to reporting on Dr. Coomer, did you
24 have any reason to believe that the Republican secretary
25 of state in Georgia was not credible or reliable?

Page 57

15 (Pages 54 - 57)

1    A.  Yes.
2    Q.  What evidence did you have?
3    A.  We reported on the activity in Georgia for
4  several weeks and for several days following the election.
5  And, of course, the secretary of state was a major player.
6    Q.  In considering the probability of the
7  allegations that Mr. Oltmann made regarding Dr. Coomer,
8  were you aware that all states other than Louisiana used
9  voting machines that produced paper ballots?
10       MR. BURNS:  This is John Burns.  Object to form.
11    Q.  (By Mr. Skarnulis)  You can go ahead and answer.
12  Were you aware of that?
13    A.  I don't know which states used which systems.  I
14  assumed they all used some voting computer system.
15    Q.  Well, what I'm asking about is, were you aware
16  that all the states except Louisiana used machines that
17  produce paper ballots?
18    A.  I wasn't aware of that.
19    Q.  So that if the machines were compromised, there
20  are paper ballots to verify.  Were you aware of that?
21       MR. CORPORON:  Objection.  Asked and answered
22    Q.  (By Mr. Skarnulis)  You can go ahead and answer.
23    A.  I wasn't aware of that.
24    Q.  Do you disagree with the manual recount of the
25  paper ballots that was conducted in Georgia?
                                                  Page 58

1  did you give any consideration to the fact that
2  Republicans gained seats in down-ballot elections such as
3  the Senate?
4       MR. BURNS:  This is John Burns.  Object to form.
5    A.  We believe that that's a piece of evidence that
6  actually backs our assertion that the presidential
7  election was flawed.
8    Q.  (By Mr. Skarnulis)  How?
9    A.  When you have historic revelations -- outcomes
10  that have never happened before, and not just one or two
11  but, maybe, ten, yes, it -- it -- you have a pattern.  And
12  it is -- the pattern shows that this was not a credible,
13  secure election as some people insist it was.
14    Q.  Well, wouldn't it have made sense, if Dr. Coomer
15  was to have an influence on the outcome of the election,
16  that he would also influence the outcome of the elections
17  for the Senate and the House?
18    A.  Not necessarily.
19    Q.  Why not?
20    A.  And we don't know if that happened or not.
21  Again, it's speculation.
22       But we -- looking at the presidential election,
23  the fact that all the bellwethers went to President Trump;
24  the fact that he increased his vote tally by 12-,
25  13 million votes, the greatest ever; the fact that he had
                                                  Page 60

1    A.  Yes.
2    Q.  Why?
3    A.  I don't believe it was an accurate audit.
4  Again, I have a close source who has done international
5  audits with major companies throughout eastern Asia,
6  from -- from Korea to Japan to Australia to Singapore.
7  And from their expertise, they're saying this was not an
8  accurate audit.
9    Q.  That source is your brother?
10    A.  Yes.  That is one of my sources.
11    Q.  And you'd agree with me that he is paid by
12  The Gateway Pundit; right?
13    A.  Currently, yes.
14    Q.  And so he has a financial motive to potentially
15  have that opinion; is that fair?
16    A.  He has a financial motive to be honest.
17    Q.  Did you brother conduct any review of the
18  recount that was performed in Georgia?
19    A.  Yes.
20    Q.  What did he do?
21    A.  We looked at their -- their process and their
22  results.  And, again, he believed this was not a credible
23  audit.
24    Q.  In considering the probability of the
25  allegations that Mr. Oltmann made regarding Dr. Coomer,
                                                  Page 59

1  the most votes of any president ever; the fact that he won
2  all of the battleground House seats; the fact that he won
3  Florida, Georgia, and Ohio -- something that every winner
4  has done for the past hundred years; the fact that the
5  turnout was incredibly high, almost unrealistically high,
6  in the presidential election this time -- something we
7  haven't seen in a hundred years.
8       All of this -- and, of course, with the
9  candidate he was running against, who did not make many
10  campaign stops and certainly didn't have the enthusiasm of
11  the president, it all makes you raise an eyebrow; which,
12  of course, we're seeing to this day.  At least 50 percent
13  of the population suspects that the election had some
14  flaws.
15    Q.  Okay.  Were you aware -- in considering the --
16  the probability of Mr. Oltmann's allegations against
17  Dr. Coomer, were you aware of the extensive preelection
18  security measures that are in place with all 50 states?
19       MR. BURNS:  John Burns.  Object to form.
20    A.  I'm not familiar with what each state has as its
21  security measures.
22    Q.  (By Mr. Skarnulis)  Were you aware that before
23  the election, the U.S. Election Assistance Commission
24  certified voting equipment?
25    A.  I'm not familiar with that commission.
                                                  Page 61

16 (Pages 58 - 61)

1    Q.   Were you aware that all 50 states and thousands
2  of lower jurisdictions had joined the Elections
3  Infrastructure Information Sharing Analysis Center prior
4  to the 2020 presidential election?
5    A.   Could you repeat that?
6    Q.   Sure.  Have you ever heard of the Elections
7  Infrastructure Information Sharing Analysis Center?
8    A.   I don't believe so.
9    Q.   So you were not aware prior to publishing
10  statements about Dr. Coomer that all 50 states had joined
11  that?
12    A.   Correct.
13    Q.   And you don't know what the -- what measures the
14  Elections Infrastructure Information Sharing Analysis
15  Center has in place to secure the election?
16    A.   Again, I'm not familiar with that commission or
17  that agency.
18    Q.   Did The Gateway Pundit publish any stories
19  suggesting that there might be election fraud prior to
20  November 3, 2020?
21    A.   We -- yes.
22    Q.   What -- what stories did The Gateway Pundit
23  publish regarding election fraud prior to the election?
24    A.   Yes.  We questioned the activity of several
25  secretaries of state in -- in numerous battleground states

Page 62

1    A.   This is something that's developed.
2    Q.   What have you learned that makes you question it
3  at this point?
4    A.   We currently believe that one of the actors
5  behind this was not a credible source.
6    Q.   Who?
7    A.   We -- we believe that -- what is his name?  I
8  want to say -- I'll have to think about that.  But we've
9  written about him several times.  I mean, I could look it
10  up real quick.  I'm going blank right now.  But I believe
11  his name's Montgomery.
12    Q.   Okay.  I don't think I asked earlier:  Did you
13  consult with Ron Watkins at all regarding allegations
14  about Dr. Coomer?
15    A.   I've spoken with Ron, not about -- I don't think
16  about Coomer, but I've spoken with Ron Watkins.
17    Q.   What have you spoken with Ron Watkins about?
18    A.   He gave us some amazing information that backed
19  up our beliefs on -- I believe it was the Dominion
20  systems, something that was posted online.  And he looked
21  at it.
22         And he, along with, again, my brother, who was a
23  top -- led audit teams and an actuary source we have that
24  believed that the information that Dominion had released
25  was inaccurate.  It never would have passed muster in --

Page 64

1  who had changed the election law unilaterally, when this
2  was a -- this was the power of the legislative branch, and
3  here these -- these officials were changing the rules
4  before the election.
5         It was something we had not seen before, and it
6  raised -- certainly, it made us think that this was not --
7  this was a nefarious act.
8    Q.   Prior to the November 3, 2020, election, did
9  The Gateway Pundit publish any stories regarding potential
10  computer or technological manipulation of the election?
11    A.   We've written about voting systems several times
12  in the past.
13    Q.   Did you do so immediately prior to the
14  November 3, 2020, election?
15    A.   I don't recall.
16    Q.   Did The Gateway Pundit publish any story about
17  the Hammer and Scorecard theory?
18    A.   We may have.
19    Q.   You're not sure, as you sit here today?
20    A.   It's -- it's something that we certainly -- I --
21  I -- I would -- I question that -- the information on that
22  today.
23    Q.   Did you question the information on that at the
24  time The Gateway Pundit may have reported on the Hammer
25  and Scorecard theory?

Page 63

1  in the private sector.
2    Q.   Did you find Ron Watkins to be a credible source
3  for information about Dominion Voting Systems?
4    A.   For that piece of information, yes.
5    Q.   Why?
6    A.   Because it lined up exactly with what our other
7  experts were saying.
8    Q.   Other than your brother, were there any other
9  experts who were corroborating Mr. Watkins' conclusions?
10    A.   Actually, we had another actuary who agreed with
11  Mr. Watkins.
12    Q.   Okay.  And who was that?
13    A.   I can't tell you his name.  He wants to go
14  anonymous.  We've never -- we've never released his name.
15    Q.   Okay.  But he was an expert as well?
16    A.   Yes.
17    Q.   Did -- were you aware of any specific expertise
18  that Mr. Watkins had regarding how voting systems work?
19    A.   We were aware of his experience and expertise
20  with cyber analysis.
21    Q.   What did you understand that to be?
22    A.   He's been very successful.  I believe he was the
23  one who is credited with creating the 8chan forum.  And I
24  believe his family also has experience with creating cyber
25  platforms.  And he seemed very credible.  And the

Page 65

17 (Pages 62 - 65)

1  information he was putting out, again, agreed with our
2  other sources.
3      Q.  Okay.  You discussed Mr. Watkins' involvement
4  with cyber work.  Are you aware of any specific elections
5  or voting-systems expertise that Mr. Watkins has?
6      A.  Yes.  We reported just last week that he had
7  access to what he says is a Dominion whistleblower.  And
8  he released information from that whistleblower online.
9          And he also -- we expect we'll release more
10  information this week from that whistleblower, as early as
11  tonight.
12      Q.  Okay.  Well, I'll look for that.
13          Were you aware that Fredrick Brennan claims to
14  have created 8chan?
15      A.  No.
16      Q.  Were you aware that Watkins -- the Watkins
17  family bought 8chan?
18      A.  No.
19      Q.  Has The Gateway Pundit published other
20  allegations regarding election fraud other than Dr. Coomer
21  and Dominion Voting Systems after the election?
22      A.  Yes.
23      Q.  What other allegations have -- has
24  The Gateway Pundit published stories on?
25      A.  We published several, again, witness affidavits
                                                    Page 66

1          And we also were able to detect that they were
2  counting the same ballots, stacks of ballots, three
3  different times.
4          We found this also happening outside of the
5  vote-counting room, we believe, at a different time in
6  Georgia, where they were counting stacks of ballots two or
7  three different times.
8          And we reported on several other witnesses who
9  have written us over the months about what they saw at
10  their election, you know, polling stations.
11          We've written about numerous, like -- we called
12  it the "drop and roll."  We still don't believe that it's
13  been successfully explained to us how these ballots in
14  five or six different swing states were all dropped -- a
15  huge amount of ballots for Joe Biden in the middle of the
16  night.
17          Of course, the media does not report on this --
18  the mainstream media, but we have, because we consider
19  ourself a credible organization.
20          And this has never been looked at, never been
21  discussed.  And we actually have an award out, a reward,
22  if somebody can explain this to us, how this happens and
23  how this is legitimate.
24          We also believe that -- after the election, we
25  were looking at the Edison numbers that are used to track
                                                    Page 68

1  that were recorded on video.  We posted several of those
2  online.  We posted, I think, at least 20 from Detroit.  We
3  covered the hearings in several states.
4          We posted video from inside the TCF Center that
5  we were told by the local media this never happened.  And
6  we -- we researched.  We got the video.
7          And, of course, our sources from the beginning
8  who gave us this information on November 4th were
9  absolutely correct.
10          And we were able to reveal that there was a
11  vanload of ballots that were dropped at 3:30 in the
12  morning in the TCF Center on election night and actually
13  came back for a second drop after the first drop.
14          We know that that -- that van was escorted into
15  the building.  We know that the gate had to be lifted.
16  And we also know that they told us that this had never
17  happened.  So when we presented the proof, of course, we
18  believe that this was an illicit act that should be
19  investigated that should never have happened.
20          We also were the first to report on, in Georgia,
21  they had told the election observers to leave for the
22  night.  They all had left, and then we saw the five
23  activist workers enter into the State Farm Center
24  vote-counting room and continue to pull ballots out from
25  under the table, count them.
                                                    Page 67

1  the totals across the country, and we saw that there was a
2  pattern of several of these states, after their big vote
3  drops, to have the same ratio of votes then play out for
4  the rest of the election cycle, which is, again, something
5  that's never been explained, and we find it abnormal and
6  nearly impossible.
7          So there's still several questions out there
8  about what we found and what has not been explained.
9          We had one Harvard professor who tried to
10  explain the drop and roll, didn't do a very good job,
11  wasn't very -- it wasn't a thorough description, and so we
12  completely disagreed with that.
13          So, anyway, those are some of the main -- the
14  main points that we've reported on.  There's been several
15  more.  We put up over 2,000 articles about the election
16  fraud.  That was back in January.  I'm sure it's up to
17  3,000, maybe 4,000, at this point.
18          We put up several articles every day.  So the
19  Eric Coomer reporting and the Dominion reporting was just
20  a bit part of what we reported over the past several
21  months.
22      Q.  (By Mr. Skarnulis)  Although reporting about
23  Dr. Coomer was just a bit part of your election fraud
24  reporting, prior to publishing your first story about
25  Dr. Coomer, did you give any thought to what effect it may
                                                    Page 69

18 (Pages 66 - 69)

1  have on his personal life?
2      A.  Well, I can tell you I know our source,
3  Joe Oltmann, had said that he's under extreme stress since
4  he decided to come out with his actual name.  He's lost
5  his business.  He's had threats.  He's had white powder
6  sent to his house.  He's had to move his family at times.
7          So I understand that it was very stressful and a
8  very courageous decision for him to come out with what he
9  believed.
10         As far as Eric Coomer, I understand -- I read
11  the reports where he said that he had moved at one point.
12  So -- and, again, we never support any violence.  We -- we
13  don't support anyone to attack anyone.  But we also
14  continue to investigate this story.
15     Q.  Okay.  Did you, prior to publishing your first
16  story about Dr. Coomer, give any thought to what the
17  effect might be on his personal life?
18     A.  We've never wished any sort of harm to
19  Dr. Coomer.
20     Q.  Okay.  But my question is a little more
21  straightforward than that:  Did you consider, prior to
22  publication, what effect it may have?
23     A.  We report on different individuals every day,
24  and we always consider their safety.  We're not a website
25  that goes out and doxes people.  We're not a website that
Page 70

1  goes out and, you know, calls on mobs to cause harm to an
2  individual.  That's not who we are.
3      Q.  Were you aware that Mr. Oltmann has called on
4  people to observe Eric Coomer where he lives?
5      MS. HALL:  Object to form.  Andrea Hall.
6      A.  No.
7      Q.  (By Mr. Skarnulis)  Do you have any working
8  theory as to what motive or what benefit there may have
9  been for Dominion Voting Systems to somehow manipulate the
10 outcome of the 2020 election?
11     MR. BURNS:  John Burns.  Object to form.
12     A.  I -- I -- I would hate to speculate.  I think
13 that -- I think it's very dangerous go in that direction.
14         And -- but I think we need to investigate what
15 happened in 2020 election.  And we continue to, despite
16 the fact that others have not done a very good
17 investigation themselves.
18     Q.  (By Mr. Skarnulis)  Okay.  But do you have any
19 theory as to why it would be in Dominion Voting Systems'
20 best interest to manipulate the 2020 election?
21     A.  Again, I don't want to speculate on that.
22     Q.  Well, you'd agree with me that Dominion is in
23 the business of making voting machines.
24     A.  Correct.
25     Q.  And Dominion, as part of its business,
Page 71

1  advertises them as being safe and reliable; right?
2      A.  Yes.
3      Q.  And you're aware that Dominion markets its
4  systems in both red and blue states; right?
5      A.  Yes.
6      Q.  And so do you have any understanding how it
7  might benefit Dominion Voting Systems to have had a role
8  in shaping the outcome of the election?
9      A.  I believe that I would speculate if I answered
10 why they would be influencing an election.
11     Q.  How about Eric Coomer?  Do you have any working
12 theory as to what motive he might have had in influencing
13 the 2020 election?
14     A.  I believe, with Eric Coomer, we have the
15 evidence of the -- his Facebook page.  We have the
16 evidence of his phone calls.  We have the evidence of
17 his -- again, the videos.  And we have the evidence that
18 Dominion had deleted his name off of their website for
19 some reason and then locked down their -- their website
20 for a while.
21         And so that's -- we also have evidence now that
22 Eric Coomer was, I believe, hosting a party in Denver with
23 several election officials that seemed a bit questionable
24 activity for someone who's in the voting -- into voting
25 systems; that they would be holding parties with democrat
Page 72

1  officials.
2      Q.  Okay.  We'll look at the texts that were
3  produced today in a little while.
4          Did The Gateway Pundit derive any benefit in
5  publishing its stories regarding election fraud?
6      MR. BURNS:  John Burns.  Object to form.
7      A.  We try to be as honest as we can.  We try to
8  follow the facts.  That's always what our goal has been.
9          We have -- actually, as we're sitting here
10 today, there's a great risk in reporting on the election,
11 questioning the election.  I'm sitting here today
12 testifying because we question the election.  We -- we put
13 out sets of facts, and people didn't like to see those.
14 And so here we are today.
15         So there's a -- you know, obviously, there is a
16 great risk for us, as there was for Mr. Oltmann, to come
17 forward and to -- to -- to report on what we believe.
18     Q.  (By Mr. Skarnulis)  Okay.  But was there any
19 benefit to it?
20     A.  The benefit would be that we are, I believe, in
21 many -- in the eyes of many, we're -- we're seen as more
22 credible today.  We're seen as more -- seen as more
23 reputable.  We're seen as, certainly, grassroots leaders.
24 And we're also seen as pro-Trump.
25     Q.  How does The Gateway Pundit make money?
Page 73

19 (Pages 70 - 73)

1    A.  We make money off of subscriptions.  We make
2  money off of advertising.
3    Q.  Did you see an increase in subscriptions
4  following publishing stories regarding election fraud?
5    A.  We started our subscription services in the
6  spring, so it's hard to say.
7    Q.  Well, didn't you have, like, for example, a
8  monthly average leading up to the election?
9    A.  Oh.  Like traffic-wise?
10    Q.  Yes, sir.
11    A.  Our traffic has grown every year for the past
12  seven years.  Every single year -- we had a huge jump in
13  2016.  We also -- election year 2016.  We also have grown
14  every year since then.
15        We had a huge jump last year, another election
16  year.  But we've continued to grow every year, and it
17  looks like we'll continue to grow this year as well.
18    Q.  Okay.  Did you -- have you seen an increase in
19  views following the election?
20    A.  Well, yes.
21    Q.  Okay.  We're going to try to look at some
22  documents here.  Give me just a minute.  I need to --
23    MR. BURNS:  Hey, Steve?  We've been going for a
24  while.  Can we maybe take five or ten?
25    MR. SKARNULIS:  Yeah.  Sure.  That'll let me get

Page 74

1    Q.  What is it?
2    A.  It's a text message from Joe Oltmann.
3    Q.  Okay.  Was there a particular reason why
4  Mr. Oltmann was reaching out to you on May 5?
5    A.  No.
6    Q.  How about on -- on June 10?  Was there a reason
7  that Mr. Oltmann was reaching out to you, that you know
8  of?
9    A.  No.  He was sending some information on the
10  10th.
11    Q.  Okay.  Have you met Mr. Oltmann in person?
12    A.  No.
13    Q.  Do you communicate with him regularly?
14    A.  I would not say so, no.
15    Q.  Now, I've scrolled down on Exhibit 75.  And
16  this -- is this -- where it says "Wow," on June 10, that's
17  your response; right?
18    A.  Yes.
19    Q.  Okay.  And then there's a text Sunday from
20  Mr. Oltmann with a picture labeled Jennifer Morrell.  Do
21  you see that?
22    A.  Yes.
23    Q.  And it says "This is at Eric Coomer's house,"
24  and has another picture of Ms. Morrell and another woman
25  down below.  Do you see that?

Page 76

1  my exhibits in order.
2    MR. BURNS:  Okay.  Thank you.
3    THE VIDEOGRAPHER:  Going off the record.  The
4  time is 1:05.
5        (Recess from 1:05 p.m. until 1:20 p.m.)
6    THE VIDEOGRAPHER:  Back on the record.  This
7  marks the beginning of Media Number 2.  The time is 1:20.
8    Q.  (By Mr. Skarnulis)  Okay.  Mr. Hoft, at -- at
9  this point, we're going to look at some documents.  And
10  I'll share my screen.  Let me do that with the first one.
11        Are you having a technical problem there?
12    MR. CORPORON:  It says you're muted, Jim.
13    THE WITNESS:  There we go.  Thank you.
14    Q.  (By Mr. Skarnulis)  That'll help.
15    A.  Yep.
16    Q.  All right.  So I'm going to show you some
17  exhibits.  I'm going to start -- and we've numbered these
18  through the other depositions.  So this one that I'm going
19  to show you, we've marked as Exhibit 75.
20        (Plaintiff's Exhibit Number 75 was introduced.)
21    Q.  (By Mr. Skarnulis)  Okay.  Can you see that?
22    A.  Yes.
23    Q.  Great.  Now, Exhibit 75 was produced to us
24  today.  Do you recognize it?
25    A.  Yes.

Page 75

1    A.  Yes.
2    Q.  And there's an arrow drawn on the second
3  picture, pointing at the house.  And you understand that
4  to be Eric Coomer's house?
5    A.  I believe that was a point of reference, that
6  it's the same house behind.
7    Q.  Who do you understand Jennifer Morrell to be?
8    A.  We've written about Jennifer Morrell.  She's an
9  activist.  She's a far-left activist who's been involved
10  in Arizona, Georgia, and then we see her pop up here at a
11  party at Eric Coomer's.
12    Q.  What -- when you say she's "been involved,"
13  involved in what?
14    A.  We've written about Jennifer Morrell.  And
15  she -- she -- I believe she was involved in Arizona as one
16  of the people that the Democrats called in -- the
17  secretary of state -- to -- as a witness.
18        But she's actually -- has a strong background in
19  Democrat politics, liberal politics, and election systems.
20    Q.  Do you know what her job is?
21    A.  I can't -- I can't tell you that offhand.  That
22  was not in the (audio distortion).
23    Q.  Do you know where she lives?
24    A.  I don't know that.
25    Q.  Do you know who the other woman is in this

Page 77

20 (Pages 74 - 77)

**Page 78**

1  second picture that we're looking at?
2      A.  I'm not sure -- certainly not from this picture.
3  There were some other photos from that same party that
4  included Eric Coomer that were -- several of the
5  individuals were -- were identified.
6      Q.  And I'll -- I'll continue to scroll down so that
7  we can see.  Let me zoom out for you.  And we're looking
8  at -- I guess it's page three of Exhibit 75.  Sorry.  I'm
9  having troubles here.
10     All right.  This Facebook post from
11 Lynn Bartels -- do you know who Lynn Bartels is?
12     A.  I'm not -- I'm not clear at this point.
13     Q.  Do you know whether she's Republican or
14 Democrat?
15     A.  I know that she was at this party.
16     Q.  Do you know whether she was Republican or
17 Democrat?
18     A.  No.
19     Q.  Do you know who Melissa Polk is identified in
20 this Facebook post?
21     A.  The secretary of state's Melissa Polk, is what
22 is -- she's identified as.
23     Q.  Do you know who Colorado's secretary of state
24 is?
25     A.  We've written about that secretary of state in

**Page 79**

1  Colorado.
2      Q.  Do you know what the name of the secretary of
3  state is?
4      A.  Not offhand; although we have written about her
5  recently.
6      Q.  Do you know whether Colorado's secretary of
7  state is a Republican or a Democrat?
8      A.  She's a Democrat.
9      Q.  Here's another post from Lynn Bartels, and it
10 identifies -- it says, "What a team.  Steven Bennett" --
11 or Bennett -- "and Eric Coomer from
12 Dominion Voting Systems.  Such great, capable guys."
13     Can you see this?
14     A.  Yes.
15     Q.  Do you know who Steven Bennett is?
16     A.  Not offhand.
17     Q.  Do you know when these photos were taken?
18     A.  The date said before -- in the fall of 2018.
19     Q.  Okay.  And were you aware that in the fall of
20 2018, that -- well, at least until Jena Griswold was
21 elected -- Colorado's secretary of state was a Republican?
22     A.  I was not aware of that.
23     Q.  Named Wayne Williams?
24     A.  Okay.
25     Q.  Would it surprise you if members of Wayne

**Page 80**

1  Williams' staff at the secretary of state's office were at
2  Eric Coomer's party, depicted in those photos?
3      A.  I think I lost you on that question.
4      Q.  I'm sorry.  You cut out there, Mr. Hoft.
5      Can you --
6      A.  I didn't hear your question.
7      Q.  Oh.  Okay.
8      Would it surprise you to learn that members of
9  Wayne Williams' staff were at a party at Eric Coomer's in
10 August of 2018?
11     A.  It would not surprise me.
12     Q.  Why not?
13     A.  Well, we've written about one of the individuals
14 who was there who says he's a Republican, yes.
15     Q.  You did a story with some of these photos,
16 didn't you?
17     A.  Yes.
18     Q.  When was that?
19     A.  Very recent.  Could have been last week.
20     Q.  What did you consider newsworthy about these
21 photos?
22     A.  A number of things.  One is that you have top
23 elections officials attending parties.  Another is that
24 Jennifer Morrell was there, who's been in several
25 different states.  It's interesting, again.

**Page 81**

1      And then you have voting machines executives who
2  are -- who are holding the party.  And then you have some
3  other individuals.  Just -- it just looks like an
4  interesting crowd.
5      What makes it -- what makes it newsworthy is
6  that, you know, these are election officials hanging out
7  with government officials.
8      Q.  Did you -- prior to publishing this most recent
9  story, did you consider the possibility that it could be
10 normal marketing for Dominion Voting to host elections
11 officials?
12     A.  No, I did not consider that.
13     Q.  Hold on a second.  Let me scroll back up.
14     Mr. Oltmann writes here on Exhibit 75, "I have
15 been doing research on all of them."
16     Can you see that?
17     A.  Right.
18     Q.  Prior to publishing this recent article with
19 these photos, did you ask Mr. Oltmann to see the research
20 he'd performed on -- on these individuals?
21     A.  No.
22     Q.  Why not?
23     A.  We weren't doing a deep dive into this.  We were
24 doing a -- report of these individuals at a party, which
25 is, again, very newsworthy and something that most -- I

21 (Pages 78 - 81)

1  would say -- I would argue most Americans did not know
2  that we had political officials hanging out with voting
3  machines officials at parties.
4       So it's an interesting story, and so we posted
5  that. And, again, that Jennifer Morrell, the fact that
6  she's there and she's having a party with these people
7  in -- in Colorado after we've spotted her in several
8  states, is -- we thought that was newsworthy.
9    Q.  Okay. And Mr. Oltmann writes here, "Also, the
10 judge in the Coomer case, who has been breaking all the
11 procedural rules and acting as a proxy for them, she
12 participated in the June 2020 Antifa BLM March in Denver,
13 Moses."
14       Did I read that correctly?
15   A.  Yes.
16   Q.  And you wrote, "Wow. You got proof of that?
17 That's big, too"; right?
18   A.  I asked the question.
19   Q.  Have you published the story on Judge Moses
20 attending a march?
21   A.  No. I -- I got an echo for some reason.
22       MR. BURNS: Objection. Relevance.
23   A.  I -- I actually researched this and did not find
24 any proof of that. I did not report on that.
25   Q.  (By Mr. Skarnulis) Mr. Oltmann writes here on
                                                    Page 82

1  Exhibit 75, "I have a lawyer friend of mine that came
2  forward and told me she was so far left in her posts on
3  Facebook, she wondered how she got chosen."
4       Did I read that correctly?
5    A.  Yes.
6    Q.  Do you know who Mr. Oltmann's lawyer friend is
7  he referred to?
8    A.  No.
9    Q.  Exhibit 75 has a few other pictures, I believe,
10 that are from this party. Is that what you understand
11 them to be?
12   A.  Yes.
13   Q.  For example, there's this picture here posted by
14 Lynn Bartels, "Love this picture of three county clerks --
15 Baca's Sharon Dubois, Pitkin's Janice Vos Caudill, and
16 Adams's Stan Martin."
17       Do you see that?
18   A.  Yes.
19   Q.  Do you know whether these county clerks are
20 Republican or Democrat?
21   A.  I did not look into that, and I did not report
22 that these three people were there.
23   Q.  Would it have mattered to you in reporting on
24 this that there were a number of Republicans in attendance
25 at this party?
                                                    Page 83

1    A.  Well, we did report that one Republican was
2  there.
3    Q.  Okay. But if there were others who attended,
4  would -- would that have mattered in your reporting?
5    A.  Not necessarily.
6    Q.  Did you give consideration, prior to publishing
7  the story on it, that it's possible this was a bipartisan
8  meeting of Colorado State elections officials?
9    A.  We were just reporting on the party, not the
10 conference that they were attending.
11   Q.  Did you consider this gathering to be somehow
12 nefarious?
13   A.  Again, I believe I answered that.
14       We felt it was newsworthy because most
15 Americans, I would argue, don't -- don't under --
16 certainly was news to me that -- were having voting
17 machines executives hanging out with secretary of states
18 and county clerks at parties.
19   Q.  Okay. Now, you're aware that other businesses
20 regularly lobby governments in order to obtain business;
21 right?
22   A.  Yes.
23       MR. SKARNULIS: There's somebody who needs to
24 mute themselves.
25   Q.  (By Mr. Skarnulis) Matt Crane. Do you know who
                                                    Page 84

1  Matt Crane is?
2    A.  We've corresponded with Matt Crane. He's
3  written us, and we've written him, and we've written about
4  Matt Crane.
5    Q.  Who do you understand -- understand him to be?
6    A.  I believe his wife works for Dominion, or did.
7  I believe he was a Republican officeholder.
8       I believe he -- he had -- he had written us, and
9  we disagreed with some of the comments he made. And --
10 and we wrote about him, and we thought -- we have a big
11 question mark in our reporting with Matt Crane.
12      At this point, he's not someone that we believe
13 is -- we didn't believe the information he sent us was
14 credible.
15   Q.  Why not?
16   A.  We didn't trust the information he was sending
17 us.
18   Q.  Okay. Down here on Exhibit 75, Joe Oltmann
19 writes, "I can deliver the attorney that gave me access."
20      What do you understand him to mean by that
21 sentence?
22   A.  I -- again, I would speculate. To me, since
23 we're talking about these photos, I believe it was about
24 this party, the photos that were taken.
25   Q.  Okay. Did he deliver the attorney that gave him
                                                    Page 85

1 access to --
2     A.  No.
3     Q.  So you don't have a name of someone who gave him
4 access?
5     A.  No.
6     Q.  I believe I'm just about to the end of this.
7         Okay.  Let's move on to a different exhibit.  I
8 apologize, Mr. Hoft.  It is not a particularly quick
9 process going through these exhibits.
10        MR. SKARNULIS:  Rebecca, I am having troubles
11 marking our next exhibit.  Have I forgotten some secret
12 from the private folder to the marked exhibits?
13        MS. DOMINGUEZ:  Which one are you trying to
14 mark, sir?
15        MR. SKARNULIS:  Four is the next one on the
16 private folder.  But, essentially, I want to mark four
17 through 16 as 76 through whatever.
18        MS. DOMINGUEZ:  Okay.  I'll go ahead and get
19 those entered for you.
20        MR. SKARNULIS:  Great.  Thank you.
21        MS. DOMINGUEZ:  And you said four through 16?
22        MR. SKARNULIS:  Yeah.  And if you just want to
23 put four in there now marked as 76, that would be great,
24 and then sequentially from there.
25        MS. DOMINGUEZ:  Yes, sir.
Page 86

1        Exhibit 76 has been introduced.
2        MR. SKARNULIS:  Great.  Thank you.  Got it.
3     Q.  (By Mr. Skarnulis) Okay.  Now let me share my
4 screen with you, Mr. Hoft.
5        (Plaintiff's Exhibit Number 76 was introduced.)
6     Q.  (By Mr. Skarnulis) Okay.  Exhibit 76 is a --
7 appears to be a text message.  And correct me if I'm
8 reading this wrong, but this appears to be from Jenny Beth
9 Martin; is that right?
10    A.  Yes.
11    Q.  Who is Jenny Beth Martin?
12    A.  She is the leader of the Tea Party Patriots
13 group.
14    Q.  Where at?
15    A.  I believe she's based in Georgia.
16    Q.  Okay.  How do you know Ms. Martin?
17    A.  She's been a national spokesperson for
18 conservative causes and -- and activist for several years.
19    Q.  And if I'm reading this correctly, I -- I take
20 it this text was sent November 13; is that right?
21    A.  Yes.
22        MR. BURNS:  Actually, Steve, this is John Burns.
23 It's actually to the right.
24        MR. SKARNULIS:  Oh.  Here it is.  It's 11/16.
25        MR. BURNS:  And it's -- one thing that's
Page 87

1 important is that it's in UTC Time, which, for Jim, would
2 be five hours ahead of Central Time.  So just FYI.
3        MR. SKARNULIS:  Got it.  Okay.  Thank you for
4 that, John.
5        MR. BURNS:  No problem.
6     Q.  (By Mr. Skarnulis) So it's actually
7 November 16.
8        Ms. Martin wrote, "May I introduce you to Randy
9 Corporon in Denver?  You have a story about one of his
10 clients and something about Dominion.  He said some of the
11 details are not correct, and he wants to get the detail
12 [sic] -- to help get the details correct."
13        Do you see that?
14    A.  Yes.
15    Q.  Did you --
16        MR. BURNS:  Steve, one last thing.  Sorry to
17 keep butting in.
18        It says November 16th, but the time is -- is
19 1:10 a.m.  For what it's worth, I believe that this
20 message was actually sent and received by Jim on the 15th.
21 So, sorry.
22        MR. SKARNULIS:  Makes sense.  Got it.
23    Q.  (By Mr. Skarnulis) So, actually, this is
24 November 15th with the time adjustment.
25        Prior to this text message, did you know Randy
Page 88

1 Corporon?
2     A.  No.  I don't believe so.
3     Q.  Did you talk to Randy Corporon after this text
4 from Ms. Martin?
5     A.  I'm not sure.
6     Q.  It said, "You have a story about one of his
7 clients and something about Dominion.  He said some of the
8 details are not correct."
9        Do you know what details she is referring to
10 here?
11    A.  I think she explained that in another text --
12    Q.  Okay.
13    A.  -- as I recall.
14    Q.  Okay.  Probably the easiest thing is I'll go
15 through these texts.  Look at that.  Rebecca has set all
16 the exhibits up.
17        Okay.  Can you see my screen there?
18    A.  Yes.
19    Q.  And is this your response to Ms. Martin?
20    A.  Actually, this is Randy's response to
21 Ms. Martin and to myself.
22    Q.  Gotcha.  Thank you for that clarification.
23 Okay.
24        (Plaintiff's Exhibit Number 78 was introduced.)
25    Q.  (By Mr. Skarnulis) Okay.  Exhibit 78.  This is
Page 89

23 (Pages 86 - 89)

1  dated November 24th at 4:00 in the morning, so it's
2  actually, probably, November 23rd with the Universal Time.
3       What is this exhibit?
4    A.  I had reached out to Joe Oltmann and asked him
5  about the whereabouts of Eric Coomer.
6    Q.  Why were you asking Mr. Oltmann about the
7  where -- whereabouts of Eric Coomer?
8    A.  For numerous reasons.
9    Q.  What are some of those reasons?
10   A.  I wanted to see if I could reach out to him, for
11  one, if he had the contact of Mr. Coomer.  I wanted to see
12  if Mr. Coomer was safe.  I wanted to see if anybody knew
13  where he was, since I don't believe we had heard anything
14  at that time.  Certainly, I don't think I had heard
15  anything at that time about Coomer since our articles went
16  up.
17   Q.  Did you ever do a Google search for Mr. Coomer's
18  address or phone number?
19   A.  No.
20   Q.  And let's keep moving here so I can live by my
21  promise to keep this timely.
22       Okay.  This has been marked as Exhibit, I
23  believe, 79.  Yeah, 79.
24       (Plaintiff's Exhibit Number 79 was introduced.)
25   Q.  (By Mr. Skarnulis)  Do you recognize this?
Page 90

1  Randy Corporon to you.
2       In the second the sentence there, it says, "My
3  client friend Joe Oltmann just told me you guys are
4  talking in 15, so that will handle what I wanted to talk
5  about."
6       Do you see that?
7    A.  Yes.
8    Q.  So was this the interview on November 15 that
9  you and I discussed earlier?
10   A.  Yes.
11       (Plaintiff's Exhibit Number 83 was introduced.)
12   Q.  (By Mr. Skarnulis)  Okay.  And this appears to
13  be -- this is Exhibit 83.  This appears to be your
14  response to Mr. Corporon; right?
15   A.  Yes.
16   Q.  Okay.  And then when was the first article about
17  Dr. Coomer published?
18   A.  That would have been on the 13th, at
19  The Gateway Pundit.
20   Q.  Okay.  And then subsequent to interviewing
21  Mr. Oltmann, you published another article; right?
22   A.  Yes.
23   Q.  Okay.
24       (Plaintiff's Exhibit Number 84 was introduced.)
25   Q.  (By Mr. Skarnulis)  Okay.  Exhibit -- sorry --
Page 92

1    A.  Yes.
2    Q.  What is it?
3    A.  This is a text message from Randy.
4    Q.  Okay.  And this is dated December 23rd, 2020, at
5  4:00 p.m.
6       At this point.  Were you aware about the lawsuit
7  that was filed on behalf of Dr. Coomer?
8    A.  I don't remember when that lawsuit was filed.
9    Q.  I believe it was December 22nd.  It might have
10  been December 23rd, but just probing your memory.
11       Did you ever appear on Mr. Corporon's radio
12  show?
13   A.  I believe so, yes.
14   Q.  And did you discuss Dr. Coomer?
15   A.  I'm not sure what the topics were.
16   Q.  When did you appear on Mr. Corporon's radio
17  show?
18   A.  I believe it was around this time, that that
19  text message was sent.
20   Q.  Exhibit 80 -- I'm sorry -- appears to be a
21  duplicate.
22       (Plaintiff's Exhibit Number 82 was introduced.)
23   Q.  (By Mr. Skarnulis)  Okay.  All right.  This
24  exhibit, Exhibit 82, is dated November 16 at 2:00 in the
25  morning, so it's actually November 15.  And this is from
Page 91

1  84.  Do you recognize this?
2    A.  It appears to be a text message from Randy
3  Corporon.
4    Q.  Okay.  Mr. Corporon writes, "Yes.  And he
5  understands the technology, code, back-door access, even
6  though we don't have any proof of that. "
7       Do you see that?
8    A.  Yes.
9    Q.  Did you ever ask Mr. Oltmann about his
10  understanding of the technology of the Dominion Voting
11  Systems machines?
12   A.  I believe he volunteered that information during
13  our discussion.
14   Q.  What did he tell you about his knowledge about
15  the technology?
16   A.  He had told me that he runs a -- some sort of a
17  technology firm, and that he was knowledgeable of this --
18  this type of information.
19   Q.  Did Mr. Oltmann ever tell you that he was
20  knowledgeable about the software code in
21  Dominion Voting Systems' machines?
22   A.  I don't recall that.
23   Q.  How about back-door access?  Did Mr. Oltmann
24  ever talk to you about his knowledge regarding back-door
25  access?
Page 93

24 (Pages 90 - 93)

**Page 94**

1   A.  I don't recall that.
2   Q.  What do you understand back-door access to mean?
3   A.  It means secret access to a system online.
4   Q.  In any of your stories regarding Dr. Coomer, did
5   you ever -- did The Gateway Pundit ever note that there
6   was no proof of Dr. Coomer influencing the election?
7   A.  I don't believe we wrote that.
8   Q.  Mr. Corporon goes on to say, "Sounds like Rudy
9   and Sidney Powell do, though."
10      Did you talk to Rudy Giuliani regarding the
11  story about Dr. Coomer?
12  A.  No.
13  Q.  How about Sidney Powell?  Did you talk to
14  Sidney Powell about Dr. Coomer?
15  A.  No.
16  Q.  He writes here, "But she said specifically
17  that votes were switched."
18      Are you aware of any specific evidence from
19  Sidney Powell that votes were switched?
20  A.  No.
21  (Plaintiff's Exhibit Number 85 was introduced.)
22  Q.  (By Mr. Skarnulis)  Okay.  Exhibit 85.  This is
23  dated November 24th.  Do you recognize this?
24  A.  I believe that must be from Joe --
25  Q.  Okay.

**Page 95**

1   A.  -- Oltmann.
2   Q.  "I sent someone to his house and no sign of
3   him," is what it appears Mr. Oltmann writes to you; is
4   that correct?
5   A.  Yes.
6   Q.  Do you know why Mr. Oltmann would have sent
7   someone to Dr. Coomer's house?
8   A.  Just for his own investigation.
9   Q.  Didn't that concern you that Mr. Oltmann was
10  having someone observe Eric Coomer?
11      MS. HALL:  Objection.  Andrea Hall.  Form.
12  Q.  (By Mr. Skarnulis)  Go ahead and answer.
13  A.  I don't -- I don't think someone driving by the
14  house to see if there's some lights on is something that's
15  a major concern.
16  Q.  You wouldn't think that that could be considered
17  menacing to the resident of that house?
18      MS. HALL:  Objection to form.  Andrea Hall.
19      MR. CORPORON:  Objection.  Calls for legal
20  conclusion.  Corporon.
21  Q.  (By Mr. Skarnulis)  You can go ahead and answer.
22  A.  I -- I don't want to speculate.
23  (Plaintiff's Exhibit Number 86 was introduced.)
24  Q.  (By Mr. Skarnulis)  Okay.  Exhibit -- trying to
25  remember what exhibit we're on.  I believe it's 86.

**Page 96**

1   Yeah, 86.
2      Do you recognize this?
3   A.  Yes.
4   Q.  What is this?
5   A.  So this is our first report where we mentioned
6   Eric Coomer.
7   Q.  Okay.  And you're the author of this; right?
8   A.  Yes.
9   Q.  On the second page of this exhibit, you write,
10  "In 2016, Coomer told the Illinois State Board of --
11  State's Board of Elections that it was possible to bypass
12  election system software."
13      Did I read that correctly?
14  A.  Yes.
15  Q.  What did you base that assertion on?
16  A.  Video and report that was written in 2016.
17  Q.  What report was that?
18  A.  It was this report here at The Post & Email.
19  Q.  What is The Post?
20  A.  I think it's -- The Post & Email is the name of
21  the media outlet.
22  Q.  What is The Post & Email?
23  A.  It's a -- it's a -- I believe, a website.
24  Q.  Is it a blog similar to The Gateway Pundit?
25  A.  Yes.

**Page 97**

1   Q.  Does The Post & Email have either a liberal or
2   conservative angle?
3   A.  I assume conservative.  I don't know.
4   Q.  Did you contact anyone at The Post & Email
5   before publishing this article?
6   A.  No.
7   Q.  On this -- two pages down, it says, "Dominion
8   was written about by the Clinton Global Initiative."
9      Do you see that?
10  A.  Yes.
11  Q.  What did you do to learn that Dominion was
12  written about by the Clinton Global Initiative?
13  A.  I -- I believe if you scroll down, there's a
14  screen grab.  Maybe not.  We actually had found that
15  online.
16  Q.  Now, on this next page that we're looking at
17  here, you begin to discuss Mr. Oltmann's story; right?
18  A.  Yes.
19  Q.  And this is where you post Mr. -- or
20  Dr. Coomer's Facebook entries; right?
21  A.  Yes.
22  Q.  At the time of publication, were you aware that
23  these were from a private Facebook account?
24  A.  I don't know.  I -- I knew it was from Facebook.
25  I didn't know if it was private or not.

25 (Pages 94 - 97)

1    Q.   Where it says here -- and I'll, kind of, point
2  for you -- "Dr. Coomer retweeted the Antifa manifesto
3  letter to President Trump."
4        You'd seen that Antifa manifesto letter before;
5  right?
6    A.   I don't know.
7    Q.   Well, you've read it since; right?
8    A.   Sure.
9    Q.   Do you believe that to be actually a letter
10  created by somebody associated with Antifa?
11   A.   I would say associated or someone who -- from
12  Antifa who supports this letter.
13   Q.   And -- this copy is not very --
14   A.   Yeah.
15   Q.   Did you not --
16   A.   The screen grabs -- the -- actual post
17  includes screen grabs of the actual letter, but they did
18  not show up in this copy here.
19   Q.   Gotcha.
20       Well, again, going back to the Antifa manifesto,
21  did you not understand at least some of that to be
22  intended as sarcasm or irony?
23   A.   No.
24       MR. SKARNULIS:   Okay.   Let's go off the record
25  for five minutes.   Let me check and see what more, if any,

Page 98

1        So, Mr. Hoft, I just went on
2  The Gateway Pundit's website to pull up this article
3  written by you and published December 28, 2020.   Do you
4  recognize it?
5    A.   Yes.
6    Q.   What prompted you to write this article about
7  "Old Billionaire Offers Million-Dollar Bounty for
8  Dominion's Eric Coomer's Comeuppance"?
9    A.   This individual, Alki David, offered a million
10  dollars for information on Eric Coomer and
11  Dominion Voting Systems.
12   Q.   Did you know Alki David before writing this
13  article?
14   A.   No.
15   Q.   Did you talk to Mr. David in preparing to write
16  this article?
17   A.   No.
18   Q.   Why not?
19   A.   We felt we had the information.
20   Q.   What -- what does this headline mean by
21  "comeuppance"?
22   A.   This was an opinion piece just saying that this
23  is a -- if you scroll down -- there was a -- this
24  Alki David had offered a reward if someone can produce
25  information that would prove that, as I wrote, an easy way

Page 100

1  I've got to go over with you.
2        THE VIDEOGRAPHER:   Going off the record.   The
3  time is 2:01.
4        (Recess from 2:01 p.m. until 2:09 p.m.)
5        THE VIDEOGRAPHER:   Back on the record.   The time
6  is 2:09.
7        THE WITNESS:   This is not working.   Let me see.
8        MR. SKARNULIS:   Can you -- can you hear me,
9  Mr. Hoft?
10       THE WITNESS:   Sorry.   Technical difficulties.
11       THE VIDEOGRAPHER:   Can we go off the record?
12       MR. SKARNULIS:   Yeah.
13       THE VIDEOGRAPHER:   Going off the record.   The
14  time is 2:10.
15       (Recess from 2:10 p.m. until 2:11 p.m.)
16       THE VIDEOGRAPHER:   Back on the record.   The time
17  is 2:11.
18   Q.   (By Mr. Skarnulis)   All right, Mr. Hoft.   I'm
19  going to show you my screen.   I'll represent -- can you
20  see that?
21   A.   Yes.
22   Q.   I -- I just --
23   A.   Yes.
24   Q.   Somebody, I don't think, is muted.   So hopefully
25  that doesn't happen again.

Page 99

1  to become a millionaire.   Yeah.   Just to find out more
2  information on the Dominion systems, I believe.
3    Q.   Okay.   But, again, let me go back to the word
4  "comeuppance."   What did you mean by "comeuppance?"
5    A.   Well, in our opinion at this point, this was --
6  this was a -- this was a billionaire offering money for
7  someone -- again, comeuppance would be someone to catch
8  Dominion or its executives in actual voter fraud.
9    Q.   You'd agree with me, at the time of the
10  publication of this article, you had no evidence that
11  Dr. Coomer actually influenced the outcome of the 2020
12  presidential election; right?
13   A.   Well, we spoke about this earlier.
14       He was very active in several states, and we
15  also had that information from his Facebook page and from
16  the call he made with the Antifa activist that he was
17  plotting against the Republican candidate.
18   Q.   Okay.   But let me ask the question again.
19       At the time of the publication, you had no
20  evidence that Dr. Coomer had actually, in any way,
21  manipulated the vote?
22   A.   No.   Just what I said.
23   Q.   Okay.   And, in fact, as we sit here today, you
24  still don't have any evidence that Dr. Coomer changed even
25  one vote in the 2020 presidential election, do you?

Page 101

26 (Pages 98 - 101)

1    A.   Just what we reported.
2    Q.   In publishing this article about a bounty, you
3 don't, in -- anywhere in this article, designate this
4 piece as purely opinion, do you?
5    A.   Well, no.  But certainly from the -- the
6 headline, it's clear that it's opinion.
7    Q.   How is that clear?
8    A.   Eric Coomer's comeuppance, that's not -- that's
9 not something we typically say.  And opinion means that
10 this is our belief that he would be caught in something.
11 And so we -- you know, when you say someone's comeuppance,
12 it's because they're guilty of something.
13    Q.   And you considered Eric Coomer to be guilty of
14 something on December 28, 2020?
15    A.   In our opinion.
16    Q.   You were aware of Dr. Coomer's lawsuit at the
17 time of this publication, weren't you?
18    A.   Yes.
19    Q.   Have you talked to Alki David since the
20 publication of this article?
21    A.   No, I don't believe so.
22    Q.   Are you aware of any evidence that this bounty
23 offered by Alki David procured?
24    A.   I have not heard of anyone collecting the
25 reward.

Page 102

1    Q.   Do you have any evidence that Eric Coomer has
2 any ties to China?
3    A.   No.
4    Q.   Are you familiar with Sidney Powell's
5 allegations regarding Dominion and Venezuela?
6    A.   Certainly, we've heard those allegations.
7    Q.   What do you understand those allegations to be?
8         MR. BURNS:  John Burns.  Objection.  Calls for
9 speculation.
10    A.   Yeah.  Truly.
11         She's accusing Dominion of being involved with
12 Dominion -- with Venezuelan elections.
13    Q.   (By Mr. Skarnulis)  Do you have any evidence of
14 any ties between Dr. Coomer and Venezuela?
15    A.   No.
16    Q.   Here in this article -- which, for counsel, we
17 will add a copy of this.  We'll screen-capture this and
18 add a copy to the marked exhibits.
19         You write in blue here, "He also can be seen in
20 training videos explaining to users adjudication functions
21 on the vote machine that could allegedly be used to alter
22 votes singularly or in bulk if a nefarious user chose to
23 do so."
24         Did I read that correctly?
25    A.   Yes, sir.

Page 103

1    Q.   You don't have any evidence that Dr. Coomer,
2 either singularly or in bulk, used the adjudication
3 function to switch votes; right?
4    A.   If you -- that's actually a link, the blue text.
5 And if you click on that, you'll see the video of him
6 explaining that -- the adjudication function from the
7 machines, which, again, he describes can be used to alter
8 votes.  And so that's where we get that statement.
9    Q.   What do you understand the adjudication process
10 in elections to be?
11    A.   When ballots -- in my understanding, when
12 ballots are kicked out of the machines, and then you need
13 human resources to determine what they believe the voter
14 intended on the ballot.
15    Q.   And do you understand that that function is
16 performed by local elections officials?
17    A.   Yes.
18    Q.   And you're aware that there's supposed to be a
19 Republican adjudication official and a Democrat
20 adjudication official to meet and try to adjudicate
21 ballots; right?
22    A.   I believe that's what's intended.  I don't
23 believe that that's what always takes place.
24    Q.   You know that adjudication's been around for
25 decades; right?

Page 104

1    A.   Sure.
2    Q.   And the voting machines, you'd agree with me,
3 have to have some manner in which the local elections
4 officials, if properly done, can meet, confer, and
5 adjudicate what was intended on a particular ballot;
6 right?
7         MR. BURNS:  John Burns.  Objection as to form.
8 Calls for speculation.
9    A.   I do know that witnesses in Detroit testified
10 that they were adjudicating ballots without -- without
11 both Republican and Democrat observers present.
12    Q.   (By Mr. Skarnulis)  You don't contend that
13 Dr. Coomer had any involvement in that, do you?
14    A.   I would contend that there were reports that
15 these machines were kicking out a high number of ballots
16 for adjudication process.
17    Q.   Do you have any reason to believe that
18 Dr. Coomer had any influence on Detroit machines kicking
19 out any ballots?
20    A.   I believe that the Dominion officials were at
21 the TCF Center in Detroit.
22    Q.   Was Dr. Coomer at the TCF Center?
23    A.   I don't have any information that he was there.
24    Q.   Do you have any information that Dr. Coomer,
25 even if he was not there, was involved in the adjudication

Page 105

27 (Pages 102 - 105)

1 at the TCF Center?
2     A.  I don't have information that he was involved in
3 that, except for the fact that he was the person who had
4 patents on the adjudication processes, procedures, or
5 software with the Dominion systems.
6     Q.  Do you know exactly what patents Dr. Coomer had
7 attributed to him?
8     A.  We've written about that, and I would have to
9 see that information.
10     Q.  You write here, "It is also alleged that he or
11 Dominion performed illegal, uncertified updates to
12 possibly thousands of Georgia election machines just days
13 before the election"; right?
14     A.  Yes.
15     Q.  And you'd agree with me that your -- well, who
16 alleged that?
17     A.  This was a report we had posted through
18 information that they had updated these machines, as I had
19 previously stated, in Georgia within the time frame where
20 it should have been -- it should have been -- it should
21 have taken place before this -- this -- I forget, 30-,
22 45-day time period before the election.
23         And, actually, they broke that rule and put the
24 updates in despite the -- the legal parameters.  They
25 broke that and -- and made the adjustments within that
Page 106

1 time period.
2     Q.  Do you believe that Dr. Coomer performed
3 illegal, uncertified updates to, possibly, thousands of
4 Georgia election machines?
5     A.  I -- I put "he or Dominion."  And I know that he
6 was involved with the secretary of state of Georgia in
7 making this decision, in coming to this decision to make
8 these updates that many perceived as illegal because they
9 were within that certain time period.
10     Q.  "He or Dominion."  So it could have been him,
11 could have been somebody else at Dominion?
12     A.  Correct.  But he was actually mentioned in the
13 news articles being part of this decision process.
14     Q.  All right.  Mr. Hoft, have you understood my
15 questions today?
16     A.  Yes.
17     Q.  Have I treated you fairly and respectfully
18 today?
19     A.  Yes.
20         MR. SKARNULIS:  All right.  I pass the witness.
21         MR. CORPORON:  All right.  I've got a few
22 questions for him, Steve.
23         MR. SKARNULIS:  Randy, I'm going to object to
24 that.  I will let you know that this notion of Defendants
25 asking softball leading questions to their witnesses
Page 107

1 violates the Court order.  We intend to file a motion to
2 stop this practice.
3         If you want to do it, I want a running objection
4 that I disagree with this whole follow-up questioning.
5         MR. CORPORON:  Well, I certainly understand your
6 objection and would be interested in you pointing me to
7 any provision in the Court's order that prohibits us from
8 doing the normal course of activity during a deposition,
9 and that is asking follow-up or clarifying questions.
10         MR. SKARNULIS:  Well, the Court's order allowed
11 Plaintiff to conduct limited discovery.
12         Furthermore, by way of a reply brief, the
13 defendants cannot add additional evidence.  So it's
14 nonsensical to think that follow-up deposition questions
15 can be evidence, where you have access to the witness and
16 could certainly provide affidavit testimony.
17         MR. ARRINGTON:  This is Barry Arrington.  If I
18 could jump in for just a moment, because I cannot allow
19 Steve's prior statement to go unchallenged.
20         Can you point me to any provision of law that
21 prevents a party filing a reply brief to point to
22 additional evidence that rebuts the evidence that was put
23 in the response to which they're replying?  It seems like
24 a reply would be pointless if you couldn't do that.
25         Now, I agree you can't come up with entirely
Page 108

1 different theories of law and -- and just go in a
2 completely different way that was never contemplated in
3 the opening brief.  But the whole point of a reply brief
4 is to rebut -- is to rebut the response.
5         And so I'm just putting on the record now that
6 you should expect that our reply brief will have whatever
7 evidence that we deem necessary to respond to your
8 response.
9         MR. SKARNULIS:  Well, I can give you case cites
10 about the reapply brief in the anti-SLAPP context, because
11 I have researched it, and it is not allowed.
12         So we can have that fight via the papers.  I
13 just wanted to make my record about why I'm objecting to
14 additional questioning.
15         MR. ARRINGTON:  Well, maybe I'm wrong about this
16 and have been, you know, always wrong about what the
17 purpose of reply brief is.
18         But if you could send the group some of your
19 cites saying it's wrong to reply in a reply, I sure would
20 appreciate it.
21         MR. SKARNULIS:  Gladly.
22         MR. CORPORON:  Yeah.  And, Steve, when did you
23 do this research?  If it's conclusive, as you make it
24 sound, any reason not to have shared it sooner with us?
25         MR. SKARNULIS:  I'm not sure when.  I'm looking
Page 109

28 (Pages 106 - 109)

```
 1  it up to see if I can figure out when we looked at that.
 2  But we are planning on filing a motion to that effect.
 3  And I believe I've shared this, perhaps, with -- I'm not
 4  sure. I'm not readily finding it in my email.
 5      But you can go ahead and ask your questions,
 6  Randy. I -- I have put my record together, and I'll
 7  object to form or otherwise as necessary. And in the
 8  meantime, I'll continue to search my emails.
 9      MR. CORPORON: We'll note your ongoing
10  objection, then. Thank you, Steve.
11      MR. SKARNULIS: Sure.
12      MR. CORPORON: Can you throw that -- that online
13  article that you just had as an exhibit back up there?
14      MR. SKARNULIS: Yeah.
15      MR. CORPORON: Go ahead.
16          CROSS-EXAMINATION
17  BY MR. CORPORON:
18  Q.  All right. Thank you.
19      This is awkward, since I'm not operating it, but
20  I guess we'll start here. Mr. Hoft, do you note the date
21  of this article is December 28th; correct?
22  A.  Correct.
23  Q.  December 28, 2020.
24      By the time this article was -- but published at
25  Gateway Pundit, were you aware that -- that Mr. Coomer had
                                              Page 110
```

```
 1      Q.  All right. You're not concluding that these
 2  are -- you're not concluding that these are facts that are
 3  proven or established, are you?
 4      A.  Correct.
 5      Q.  Okay.
 6      MR. CORPORON: All right. You can take that
 7  off, Steve, and I'm going to see if I can access the
 8  exhibits.
 9      And someone on tech can help me. I'm getting
10  security privacy concerns about sharing the screen with
11  Zoom.
12      Rebecca, are you there?
13      MS. DOMINGUEZ: Yes. You should be able to
14  share. Anyone can share. It's all set up correctly.
15      MR. CORPORON: All right. Try again. I do
16  apologize. This is my very first time. And I messed
17  around with Zoom beforehand.
18      I wonder, is there a distinction -- I'm on Apple
19  computers. Is it Rebecca?
20      MS. DOMINGUEZ: Yes, sir. You should just have
21  to hit that "Share Screen" button in the very center.
22      MR. CORPORON: I did, and it says "open system
23  preferences," which I've done, and it goes to security and
24  privacy.
25      MS. DOMINGUEZ: Then that's an internal issue
                                              Page 112
```

```
 1  published a commentary in Denver Post on December 3rd
 2  where he denied that the social media posts that we've
 3  been talking about quite a bit on Facebook, Antifa,
 4  et cetera, were not his?
 5      MR. SKARNULIS: Objection. Leading.
 6      MR. CORPORON: It's cross-examination.
 7  A.  I'm aware of that article.
 8  Q.  (By Mr. Corporon) Okay. Were you --
 9      MR. SKARNULIS: He's not a fact witness,
10  Mr. Corporon. I'll make my objections.
11      MR. CORPORON: Thank you.
12  Q.  (By Mr. Corporon) Will you scroll down near the
13  end of that, please? And then, hopefully, I have the
14  skills to take over the exhibits.
15      Just scroll up from there just a little bit, if
16  you would, Steve. Little more. Right there.
17      Mr. Hoft, I notice in the concluding paragraphs
18  of this story that you used the term "allegedly"
19  repeatedly. And why do you use the term "allegedly" when
20  you're talking about some of the conclusions in this
21  piece?
22  A.  "Allegedly" meaning it's -- it's been alleged.
23  It's been -- he's been accused of this. So when you say
24  "alleged," it's -- it's -- you're still investigating if
25  the accusation is accurate.
                                              Page 111
```

```
 1  with you MacBook. You need to go to your video settings
 2  in your MacBook and give Zoom access to your screens.
 3      MR. SKARNULIS: Do we want to go off the record?
 4      MR. CORPORON: Yeah. Let's -- give me
 5  five minutes here. It's telling me I've got to quit and
 6  reopen. I've figured my way through the security issues.
 7      Five minutes?
 8      MR. SKARNULIS: Sure.
 9      THE VIDEOGRAPHER: Going off the record. The
10  time is 2:34.
11      (Recess from 2:34 p.m. until 2:39 p.m)
12      THE VIDEOGRAPHER: Back on the record. The time
13  is 2:39.
14      (Defendant's Exhibit D was introduced.)
15  Q.  (By Mr. Corporon) All right. Mr. Hoft, can you
16  see what's been marked as Defendant's Exhibit D, your
17  About page from the Gateway Pundit?
18  A.  Yes.
19  Q.  All right. And who wrote this?
20  A.  That would have been myself and maybe an
21  assistant.
22  Q.  And on the About page, you give your history of
23  starting out as a blogger; correct?
24  A.  Correct.
25  Q.  And say -- you say that you wrote brief
                                              Page 113
```

29 (Pages 110 - 113)

1  introductions, links to other content, serving as a hub
2  for current events in the political and media sphere.
3       So at that time, were you offering opinion along
4  with your links to other content?
5    A.  Yes.
6    Q.  And has that really changed in your evolution
7  from blogspot.com to TheGatewayPundit.com?
8    A.  It's basically the same.
9    Q.  All right.  Why did you believe that a site like
10  yours was necessary?  What's going on in the news world
11  that causes you to spend the kind of time that you do
12  here?
13    A.  There was obviously an opening, and we filled
14  that gap in media coverage, and we continue to to this
15  day.
16    Q.  You say here at the bottom of the page -- you
17  can probably see my pointer -- that you believe it is
18  important to be transparent about your beliefs and
19  perspectives, how it may shape your news and opinion
20  priorities.
21       Why is that important?
22    A.  People know what their -- our perspective is
23  when they come to the page.  We're well known to be
24  conservatives, and they certainly can -- can see that in
25  our writing.
                                                Page 114

1    A.  They told us to take down some articles.
2    Q.  All right.  And did you consider their requests?
3    A.  We certainly reviewed the articles in question.
4  We -- we decided to leave up a couple of these articles,
5  and a couple of the articles we took down.
6    Q.  All right.  Do you remember what was the
7  determining factor in articles that you took down versus
8  those that you left up?
9    A.  I'm honestly not sure at this point.
10    Q.  Okay.  Well, let's take a look at -- at the
11  articles that were referenced.
12       (Defendant's Exhibit A was introduced.)
13    Q.  (By Mr. Corporon)  I've got Defendant's
14  Exhibit A on the screen now.  Is that large enough for do
15  you see it okay?
16    A.  Yes, sir.
17    Q.  All right.  This is a compendium of the articles
18  that are listed in the complaint filed by Mr. Coomer
19  against you and others.  Let me scroll back up to the top
20  here.  These are in chronological order.
21       So I think you testified earlier that this is
22  the first story that you published regarding the 2020
23  election on election fraud?
24    A.  This certainly looks like one of them back in
25  October.
                                                Page 116

1    Q.  On the top of the next page, "Our website covers
2  breaking news and provides opinion in the most pressing
3  issues of the day."
4       Do you often combine your news and opinion into
5  the same articles?
6    A.  Sure.
7    Q.  Is there a particular way that you try and
8  distinguish the two?
9    A.  I think it's evident most the time.
10    Q.  All right.  Go ahead.
11    A.  No.  That's -- that's it.
12    Q.  All right.
13       You said you do provide opportunities for people
14  who find statements that you've made or links that you've
15  posted to be untrue to let you know about that so that you
16  can do further investigation?
17    A.  Yes.
18    Q.  Have you received any responses from
19  Dominion Voting Systems or Eric Coomer on your correction
20  links challenging any specific question -- any specific
21  statements or articles that you've posted?
22    A.  We -- we were contacted by some Dominion
23  attorneys at one point within the past several months.
24    Q.  All right.  Did they point to any specific facts
25  or articles that they were claiming were untrue?
                                                Page 115

1    Q.  I'm sorry.  Strike that question.
2       This is an early October story that you
3  published as part of ongoing series of questions and
4  articles that you've published regarding election fraud;
5  correct?
6    A.  Yes.
7    Q.  All right.  Scroll down to two here.  Will you
8  read what you printed in bold?
9    A.  "Its time for every American to keep their eyes
10  open for Democrat voter fraud.  If you see anything
11  suspicious, capture it on your iPhone.  Make sure to
12  capture faces or licenses if available.  Everyone can help
13  to stop voter fraud."
14    Q.  All right.  That first sentence, is that opinion
15  or news?
16    A.  That would be opinion.
17    Q.  And yet, earlier in the story.  You do report on
18  some news facts; correct?  You link to articles from other
19  sources that talk about ballot applications and the other
20  topics that this story addresses; correct?
21    A.  Correct.
22    Q.  All right.  Let's scroll down here through a few
23  pages.  We could stop on each of those, but I just don't
24  want to take the time.
25    A.  That was actually a good article there.
                                                Page 117

                                          30 (Pages 114 - 117)

1    Q.   This article on the election?
2    A.   This was -- yes.  It was the 2020 prediction.
3         We used the same -- same sort of patterns we
4    were watching in 2016 as we were in 2020.  And we -- we
5    made our prediction, and we made the same prediction in
6    2016, and using the same data.
7         And so it was a very thorough investigation and
8    really an excellent piece and looking at what was
9    happening before the actual vote count in November.
10   Q.   And I do understand.  The reason I blew by it is
11   because this really is opinion; isn't it?  This is you as
12   Gateway Pundit --
13   A.   Absolutely.  It was a prediction.
14   Q.   Yeah.  Okay.
15        So this next article is entitled -- that I want
16   to look at is -- October 31, 2020, Roger Stone exclusive,
17   "How the Democrats plan to steal the 2020 election."
18   A.   Correct.
19   Q.   Do you consider news or opinion?
20   A.   This, obviously, is an opinion piece.
21   Q.   And why do you say "obviously"?
22   A.   Because there's no facts yet.  I mean, it was
23   before the election.  So for him to say that this is how
24   they're going to do it is just his speculation.
25   Q.   Okay.  And this is Roger Stone talking about
                                                    Page 118

1    these issues, not The Gateway Pundit; correct?
2    A.   This was a guest post by Roger Stone.
3    Q.   Okay.  Now, you're the title holder here.  It
4    says, "By Joe Hoft."  So when you say it was a guest post
5    by Roger Stone, what do you mean?
6    A.   Roger Stone submitted it.  My brother Joe
7    actually published it.
8    Q.   Okay.  Does the article make clear that this is
9    written by Roger Stone?
10   A.   Yes.
11   Q.   And is there any opinion added to this article
12   by your brother, Joe Hoft?
13   A.   I do not believe so, no.
14   Q.   Okay.  Just scrolling through again, in the
15   chronology over events, this is the first article that you
16   published about Eric Coomer on November 13, 2020; correct?
17   A.   Correct.
18   Q.   This was prior to your interview of Joe Oltmann?
19   A.   Correct.
20   Q.   Yet you were reporting on -- had you had any
21   contact with Joe Oltmann prior to those text messages
22   between Jenny Beth Martin or yourself or Joe that you went
23   through with Mr. Skarnulis?
24   A.   I had contact with Joe Oltmann sometime in that
25   weekend, and I had interviewed Joe.  And then around that
                                                    Page 119

1    time, I heard from Jenny Beth and from you, Randy
2    Corporon.
3    Q.   I think we established that you interviewed Joe
4    in the late evening of November 15th, and --
5    A.   Correct.
6    Q.   -- then you published the interview with him on
7    the 16th; correct?
8    A.   Correct.
9    Q.   So this article was published in
10   November 13th about Eric Coomer.  Was this prior to you
11   having contact with Joe Oltmann?
12   A.   Yes.
13   Q.   Direct contact.  Okay.
14        So what was it that led you to be looking into
15   Eric Coomer prior to having any contact -- direct contact
16   with Joe Oltmann?
17   A.   Well, this information for this story was going
18   viral online.  And we had already reported on Dominion.
19   So this was another, let me say, piece of the puzzle.  It
20   was more information on Dominion that was newsworthy.
21        And, again we -- we then found video to -- we
22   included in this -- this report here on Mr. Coomer.
23   Q.   Okay.  Did you find it concerning that -- that
24   ten days after the election -- by ten days after the
25   election, that Dominion had actually removed Eric Coomer's
                                                    Page 120

1    profile from their website?
2         MR. SKARNULIS:  Objection.  Leading.
3    A.   Absolutely.
4    Q.   (By Mr. Corporon)  Why?
5    A.   His -- Eric Coomer's name was suddenly making
6    the rounds online, on Twitter.  The stories going viral.
7    And so then, all of a sudden, his name disappears from the
8    Dominion page.
9    Q.   Again, this is prior to you having any contact
10   with Joe Oltmann; correct?
11   A.   Correct.
12   Q.   This next section of this story, this is the
13   September 2016, video in Illinois where Dr. Coomer is
14   describing how votes can be changed within the software?
15   A.   Correct.
16   Q.   And I'm not particularly computer savvy, but did
17   I describe that properly?
18   A.   Yes.
19   Q.   The question, apparently, that Dr. Coomer was
20   asked is if it's possible to bypass election system
21   software, go directly to the data tables that manage the
22   systems running elections.  And his response was, "Yes, if
23   they have access."
24        What did you take that to mean?
25   A.   I took to it mean that, yes, they can alter
                                                    Page 121

31 (Pages 118 - 121)

1 information on their systems from outside of -- from
2 outside of the immediate location.
3    Q.  All right.  Below this picture of the video of
4 Dr. Coomer, you say, "Here's more from the Post & Email."
5 And then you have in bold some statements here:
6      "Dr. Coomer's statement brings to light a very
7 serious issue."  Is that your statement or a statement of
8 The Post & Email?
9    A.  That's from The Post & Email.
10    Q.  Okay.  So anything that's in an indented
11 paragraph --
12    A.  Yes.
13    Q.  -- with the bold line is -- is you quoting from
14 an article or a source?
15    A.  Yes.
16    Q.  All right.
17      And now this last paragraph in bold, "It is very
18 interesting that Twitter would remove the one account that
19 was investigating Coomer, his far-left background, and his
20 role at Dominion."
21      Is that news or opinion?
22    A.  That's opinion.
23    Q.  Written my whom?
24    A.  That would have been written by me.
25    Q.  So this is another example of one of your many
Page 122

1 articles on the election combining news and opinion?
2    A.  Correct.
3    Q.  All right.  Now, this report, "Anti-Trump
4 Dominion Voting Systems security chief was participating
5 in Antifa calls, posted Antifa Manifesto letter to Trump
6 online."
7      What sources of information did you have to
8 share this report?
9    A.  This was from -- more information from his
10 Facebook page.
11    Q.  All right.  And this was, again, prior to those
12 text messages with Jenny Beth Martin and me or the
13 interview that you did with Joe Oltmann; correct?
14    A.  Correct.
15    Q.  Subsequent to posting this report November 14th
16 of last year, have you learned of any information that
17 would cause you to change any of the allegations or
18 conclusions that you drew in this piece?
19    A.  No.
20    Q.  We'll come back to some of the Facebook posts in
21 just a little bit, but I want to get through this exhibit.
22      Now, this article published November 16, 2020,
23 this was following your interview of Joe Oltmann and
24 publication of that interview; correct?
25    A.  Correct.
Page 123

1    Q.  And in the title, you say, "Denver business
2 owner, Dominion's Eric Coomer, is an unhinged sociopath.
3 His internet profile is being deleted and erased."
4      Is that you making those statements?
5    A.  No.  That's a Denver business owner.
6    Q.  So that's -- that title is intended to
7 demonstrate that you're referring to what somebody else
8 says?
9    A.  Correct.
10    Q.  Okay.
11      Throughout this piece, did you utilize any other
12 sources other than your interview with Joe Oltmann or
13 actual -- what you believed to be actual Facebook and
14 other social media of Eric Coomer?
15    A.  I believe I may have mentioned that Mr. Oltmann
16 had been interviewed by Michelle Malkin.  I did that on
17 this post or a previous post.  And so I included that
18 information also.
19    Q.  All right.  Did you ever watch any of the
20 interviews between Joe Oltmann and Michelle Malkin?
21    A.  Yes.
22    Q.  All right.  In any of those interviews, do you
23 recall Joe Oltmann -- did you watch him during this period
24 of this publication?  Or what's the time frame that you
25 watched those interviews?
Page 124

1    A.  I believe Michelle interviewed Joe Oltmann on
2 the 14th, and I interviewed Joe Oltmann on the 15th.
3    Q.  Do you remember when you watched Michelle's
4 interview?  Was that prior to yours?
5    A.  Absolutely.
6    Q.  Do you recall if Joe Oltmann stated, then,
7 whether he had a recording of the phone call or not?
8    A.  I don't recall that.
9    Q.  Okay.  Now, when you did your interview of
10 Joe Oltmann, did you edit that in any way before you
11 posted it?
12    A.  No.
13    Q.  All right.  During the interview, did
14 Joe Oltmann describe for you the -- the -- the history of
15 his involvement in looking into Antifa infiltration of
16 Denver media?
17    A.  Yes.
18    Q.  Did he describe for you any timeline -- maybe
19 not specific dates, but just the period of time that he
20 was involved in making these inquiries?
21    A.  Yes.
22    Q.  And was there anything about his story that you
23 found to be disingenuous or conflicting narrative?
24    A.  No.
25    Q.  During his interview with you, did he claim to
Page 125

32 (Pages 122 - 125)

1  have any kind of a smoking gun?
2      A.  No, just his sitting in on the call with the
3  Antifa protesters.
4      Q.  In fact, during the interview with you,
5  Joe Oltmann said he didn't have a smoking gun, didn't he?
6      A.  Correct.
7      Q.  In fact, what he said is that all of the
8  different facts that he laid out during the course of the
9  interview is what led to his conclusion that there was a
10  smoking gun?
11      A.  Yes.
12      Q.  Do you remember him -- do you remember him
13  saying at the end that you can draw a conclusion one way
14  or another, but if you put all the pieces together, that's
15  your smoking gun, at the end of your interview?
16      A.  Makes -- sounds -- sounds good, yes.
17      Q.  All right.  I'm not going to pull up a
18  transcript of the interview --
19      A.  Okay.
20      Q.  -- in the interest of time.  But if he said
21  that, did that make sense to you?
22      A.  Yes.
23      Q.  And did that contribute to your decision to
24  publish the entire interview, along with the social media
25  you had discovered that you believed to belong to
                                                    Page 126

1  Eric Coomer?
2      A.  Yes.
3      Q.  Is there anything -- any fact, any letter from a
4  lawyer, just anything at all that has caused you to doubt
5  whether the Facebook postings and other social media
6  contained in this article are not the postings of
7  Eric Coomer?
8      A.  No.
9      Q.  Since his denial in the Denver Post on
10  December 3rd, have you heard or seen anything from
11  Eric Coomer that would lead you to believe that he has
12  changed or recanted his denial that this is his social
13  media?
14      A.  I believe that has happened.  I don't have that
15  information with me.
16      Q.  Have you read anything in the court proceedings
17  and filings of Eric Coomer that lead you to believe that
18  he now admits that this is his social media?
19      A.  I have not read that.
20      Q.  Okay.
21      Looking at this sentence in the middle of the
22  page that I'm pointing to, "Joe's tweets on Eric Coomer
23  obviously upset big tech."
24      Is this fact reporting or opinion reporting?
25      A.  That would be opinion.
                                                    Page 127

1      Q.  All right.  And it's interspersed in between a
2  number of different facts that you're reporting; correct?
3      A.  Why yes.
4      Q.  For instance, just above, you actually link to
5  the actual Antifa manifesto, or what you call the Antifa
6  letter to Trump?
7      A.  Yes.
8      Q.  And where did you discover that Antifa letter to
9  Trump?
10      A.  That was on Joe Oltmann's Twitter page before it
11  was taken down.
12      Q.  Okay.
13      What did you find most -- or what did you find
14  disturbing about Coomer's Facebook posts, given his
15  position as a security expert and officer at
16  Dominion Voting Systems?
17      A.  They appeared completely biased and unhinged.
18      Q.  Did they appear to be pro-American,
19  anti-American?
20      A.  Anti-American.
21      Q.  Did they appear to be opposed against any
22  particular political candidate?
23      A.  They were against President Trump.
24      Q.  Okay.  In this section that is highlighted right
25  now -- take a quick look at that, and then tell us, who do
                                                    Page 128

1  you believe Eric Coomer is addressing these statements to?
2      A.  Trump voters.
3      Q.  Well, look a little more carefully and read the
4  actual language here, if you can.
5      A.  He's writing to -- oh -- Christian jihadists, VP
6  pic.  Unfriend me now if you're going to vote for this
7  narcissist.  I'm not joking.
8      Q.  Now, that you've looked at it --
9      A.  He says, "I'm looking at you," three names of
10  friends.  "I disagree with you on many philosophical
11  grounds but respect your opinions.  Only an absolute F-ing
12  idiot would ever vote for that windbag F-tard."
13      Q.  Yeah.  And what is his final instruction there
14  in bold?
15      A.  "Unfriend me now."
16      Q.  Yeah.  So now that you've read that, who do you
17  think they're addressing this to?
18      A.  Must be some friends or acquaintances.
19      Q.  Did it concern you that Mr. Coomer would write
20  to his own friends this way, understanding that he was the
21  security expert and officer at Dominion Voting machines?
22      MR. SKARNULIS:  Objection.  Form.  Objection.
23  Leading.
24      A.  Yes.  It's shocking.
25      Q.  (By Mr. Corporon)  Did statements like this --
                                                    Page 129

33 (Pages 126 - 129)

Veritext Legal Solutions
800-336-4000

1 and we're not going to go through them all. Well, let me
2 just ask you this: Did you read the deposition transcript
3 of the deposition of OAN expert -- I'm sorry -- OAN
4 officer, Charles Herring?
5    A.  Yes.
6    Q.  Did you review the cross-examination of
7 Mr. Herring by his attorney, Bernard Rhodes?
8    A.  I read it over.
9    Q.  And do you recall --
10    MR. ZAKHEM:  Randy -- can I -- can I just jump
11 in?  This is Zakhem.  Can I ask how much longer you've got
12 so I can deal with my afternoon?
13    MR. CORPORON:  I would say maybe 20 minutes,
14 maybe less.
15    MR. ZAKHEM:  Thank you.
16    MR. CORPORON:  This is my longest exhibit.
17    Q.  (By Mr. Corporon)  All right.  So you read the
18 cross-examination by Mr. Rhodes of Mr. Herring, where they
19 outlined all of the different -- so many of the different
20 statements from Facebook and other social media of
21 Eric Coomer; correct?
22    A.  Yes.
23    Q.  Were you familiar with and aware of all of those
24 statements at the time that you posted this particular
25 article?
                                                    Page 130

1    A.  Yes.
2    Q.  In fact, most of them are included in this
3 article; correct?
4    A.  Yeah.
5    Q.  How did this factor into your consideration
6 about continuing to post articles about Eric Coomer?
7    A.  I think it's very relevant.
8    Q.  Why?
9    A.  Because it really shows you what he's really
10 thinking when he's posting something like this on a
11 private Facebook page.
12       It appears that he'd be much more open on a
13 private Facebook page than he would in a public page, and
14 it would really reveal what he was thinking about the
15 current political climate and the current president and
16 his supporters.
17    Q.  You've been asked multiple times today whether
18 you have specific evidence that Eric Coomer shifted a vote
19 here or flipped a vote there.  Do you remember that line
20 of questioning that's come up throughout your deposition?
21    A.  Sure.  Yes.
22    Q.  In response to those questions, your answer has
23 been, no, you don't have any specific evidence; correct?
24    A.  Correct.
25    Q.  Do you believe you have significant evidence of
                                                    Page 131

1 Mr. Coomer's motivation to do such things if he is, in
2 fact, able to do so?
3    A.  Yes.
4    MR. SKARNULIS:  Object.
5    A.  Yes.
6    THE REPORTER:  I'm sorry.  I didn't quite
7 understand the objection.
8    MR. SKARNULIS:  Leading.
9    MR. CORPORON:  Cross-examination.
10    Q.  (By Mr. Corporon)  All right.  This is a
11 68-page exhibit.  We're at about 45 now.  So we're just
12 about done with the big one.
13       This statement here, "A lot of people may be
14 glad to know that Texas rejected using Dominion Voting."
15       Is that news or opinion?
16    A.  That would be opinion.
17    Q.  So this is another example of the type of
18 reporting that you do where you intersperse links to news
19 with your opinion throughout?
20    A.  Yes.
21    Q.  Okay.  You were asked some questions about this
22 particular article at the end of the direct examination.
23 This is the article about the billionaire offering a
24 million dollars; correct?
25    A.  Correct.
                                                    Page 132

1    Q.  And you published this December 28th?
2    A.  Yes.
3    Q.  And perhaps I already asked you this.  I think,
4 maybe, I did, so apologies if I did.  You were aware at
5 the time you published this that Eric Coomer had written
6 in the Denver Post that the social media Antifa
7 allegations, et cetera, were not his?
8    A.  I believe so.
9    Q.  Okay.  And did you believe his denials at the
10 time?
11    A.  No.
12    Q.  Did his denials add to your thinking about
13 whether the allegations against Mr. Coomer were credible
14 or not?
15    A.  I don't understand the question.
16    Q.  Well, you saw that Eric Coomer denied in the
17 Denver Post that these were his -- that the Facebook
18 postings and social media postings -- he claimed they were
19 fabricated; correct?
20    A.  I don't -- I don't know the exact wording.
21 Something like that.
22    Q.  Okay.  He denied that they were his.  Does
23 that -- do you remember that?
24    A.  Sure.
25    Q.  Okay.  Did the fact that he was making those
                                                    Page 133

34 (Pages 130 - 133)

1 denials when you had actually seen these Facebook postings
2 and other social media posts with his name on them add to
3 your belief that you were publishing truth about
4 Eric Coomer?
5     A.  Yes.
6     Q.  In your reporting, did you ever publish, as a
7 fact, that Eric Coomer actually changed the election?
8     A.  No.
9     Q.  Did you publish in your stories evidence about
10 the ways Eric Coomer could have changed the election?
11     A.  That's a broad question. I'm not sure.
12     Q.  I'll withdraw the question.
13     A.  Yeah.
14     Q.  When you're explaining how -- well, strike that.
15 Let's just keep moving, since we're getting -- all getting
16 tired here.
17        Looking at the blue links in this:  As an
18 employee of Dominion, he seemed to be fairly integral.  In
19 fact, he seems to have designed several voting-machine
20 patents which belong to Dominion but now belong to China's
21 HSBC as of last year.
22        Is this an example of opinion, fact, or a
23 combination of both?
24     A.  I'd say a combination.
25     Q.  All right.  What's the opinion portion?

Page 134

1     A.  Just linking him to China.
2     Q.  All right.
3     A.  And that -- yeah.
4     Q.  Go ahead.
5     A.  No.  I just think just the fact that this -- I
6 say he's fairly integral, and he certainly had a high
7 position.  And so I think that's what I was trying to
8 spell out there.
9     Q.  Okay.  You refer -- in this subsection that's
10 highlighted with arrows, you refer to Smartmatic.  How are
11 Smartmatic and Dominion related, in your understanding?
12     A.  I believe Smartmatic and Dominion, obviously,
13 are two different companies.  I think one might have been
14 a spinoff of the other.
15        I think Smartmatic was the first company --
16 voting company.  That was the based in Venezuela.  And
17 then, I believe, Dominion, of course, is based in -- out
18 of -- their headquarters Canada, with a big presence in
19 Denver, Colorado.
20     Q.  All right.  Let's skip through a few of these
21 and see if we can bring this exhibit to a close.
22        You were asked several times during your
23 deposition, Mr. Hoft, about working theories that you have
24 about how Dominion or Eric Coomer stole this election.  Do
25 you remember some of those questions?

Page 135

1     A.  Sure.
2     Q.  And I believe your answer to those was you don't
3 personally have any working theories.  Was that -- is
4 accurate?
5     A.  Sounds good, yes.
6     Q.  Okay.  Have you reported on others' working
7 theories?
8     A.  Yes.
9     Q.  Is this article dated January 9, 2021, by
10 Deroy -- where you report on the Deroy Murdock's
11 inventory -- is that an example of one of those?
12     A.  Right.  That was some analysis he put together
13 that he had published around that time.
14     Q.  All right.  And, in fact, you also have put
15 together a -- a presentation about some of the theories
16 that you have reported on in the Gateway Pundit, haven't
17 you?
18     A.  Yes.
19     Q.  And, in fact, let's move to Exhibit E.
20        (Defendant's Exhibit E was introduced.)
21     Q.  (By Mr. Corporon)  This exhibit is entitled.
22 "The Gateway Pundit election fraud and irregularities in
23 the 2020 U.S. election."
24        Who put this together?
25     A.  That was myself and my twin brother.

Page 136

1     Q.  Okay.  And you mentioned your brother's
2 qualifications as some kind of a security analyst.  Can
3 you elaborate on that a little bit?
4     A.  Yes.  He was a top auditor, vice president of
5 one of the top 200 Fortune 500 -- or Fortune 200
6 companies, and he ran the audit teams across Southeast
7 Asian from -- as I mentioned, from Korea, Japan, down to
8 Taiwan and New Zealand and Australia.
9        So he did that for ten years.  He was based out
10 Hong Kong and ran, like I said, audit teams.  So he's very
11 well-versed on -- you know what to expect from an audit,
12 how to run an audit, preparation for audits, what -- what
13 you look for in audits, and how people react to audits.
14        So he was a great source during this time.
15     Q.  All right.  This is a 39-page exhibit, including
16 the title page.  So was each one of these a slide that you
17 used for a presentation?  Or was what was the purpose of
18 this?
19     A.  Yes.  This was for a pen presentation we
20 delivered at Liberty University in April, along with
21 several other individuals.
22        I believe we were the keynote speakers for that
23 conference.  And so we presented this online at the
24 Liberty University master's program, I believe --
25 business -- business program.

Page 137

35 (Pages 134 - 137)

1   Q.  Okay.  So when you were asked about not have- --
2  about having a theory of how the election was stolen, did
3  you understand what Mr. Skarnulis was asking you?
4      A.  Well, certainly, this -- this full report, then,
5  would be our evidence of what we were -- what we believed
6  happened.
7      Q.  Okay.  So, in effect, you do have some working
8  theories about the election, don't you?
9      A.  Sure.
10      Q.  And I'm not going to go through this entire
11  PowerPoint, but just this introduction lays out a number
12  of different facets to your ongoing investigation into the
13  2020 election; correct?
14      A.  Correct.
15      Q.  And what is your conclusion at the end of this
16  presentation?
17      A.  We concluded that there was several things that
18  happened and occurred during the 2020 election that would
19  bring us to the conclusion that the election was likely
20  stolen.
21      Q.  All right.  And during any of this presentation,
22  did you refer to any of your reporting on Eric Coomer?
23      A.  I don't believe so.
24      Q.  Do you consider your reporting on Eric Coomer to
25  be conclusive with regard to the 2020 presidential

Page 138

1  election or simply one piece of a very large pie?
2      A.  It was definitely just one piece of the
3  reporting we have done since November.
4      Q.  Okay.  Did you ever -- you were asked some
5  questions, I believe, about Dominion's denials of their
6  involvement in changing the results of this election.  Do
7  you recall those questions?
8      A.  Sure.
9      Q.  Do you remember if you ever reported on or
10  linked to Dominion's website and their denials?
11      A.  I believe we've linked to the Dominion website.
12  And, yes, I believe we reported on their denials when they
13  posted that.
14      Q.  Okay.
15          You were asked a number of questions about the
16  impact of doing this reporting on -- on Eric Coomer.  You
17  were asked to speculate on what that impact might be.
18          Are you aware of any significant impact on
19  Joe Oltmann for coming forward with -- with his
20  presentation?
21      A.  I think it -- I think it's been devastating for
22  him.  He's lost his position at his corporation.  His
23  family has been under threat.  He's been -- has hired
24  security.  He continues to be under threat, as I believe.
25  And so it's been devastating for him to step forward.

Page 139

1      Q.  Are you aware that police evacuated his house
2  when a white substance was delivered to him earlier this
3  year?
4      A.  Yes.
5      Q.  Are you aware that he has, apparently, relocated
6  out of the state of Colorado?
7      A.  Not clear on that, no.
8      Q.  Are you at all sensitive to the concerns of
9  being associated with or coming under the scrutiny of
10  Antifa?
11      A.  Yes.
12      Q.  Why?
13      A.  Because I've been under threat from Antifa
14  activists also.
15      Q.  In what way?
16      A.  In, I believe it was 2018, Antifa organizers out
17  in Washington, D.C. posted -- well, published their own
18  hit list of conservative individuals, including
19  Tucker Carlson, Ann Coulter, Gateway Pundit, myself,
20  Breitbart, and a couple others.
21          And they actually had assaulted Tucker Carlson's
22  home, had vandalized his home, had threatened his wife,
23  who was home at the time.
24          The police in St. Louis actually visited my home
25  when they were informed that I was one of the people who

Page 140

1  was also on this same list.
2      Q.  So we were -- you were asked to speculate on how
3  that might -- your reporting might make Eric Coomer feel.
4  How did finding out you were on an Antifa hit list make
5  you feel?
6      A.  It's frightening.
7      Q.  When you saw that a well-known reporter, Tucker
8  Carlson, had to leave his home, how did that make you
9  feel?
10      A.  It's -- it's -- it's frightening and
11  infuriating.  And, certainly, I was very concerned.
12      Q.  As you sit here today, and in light of the
13  multiple questions and answers and things that you've had
14  to consider, are you aware of any statements that you've
15  made or stories that you've posted on the Gateway Pundit
16  that you now would like to retract?
17      A.  No, not at this time.
18      Q.  If someone brings forward evidence to you that
19  something you have said or reported as a fact is untrue,
20  do you stand ready to -- to publish that correction
21  immediately?
22      A.  Yes.
23      Q.  During the entire course of this litigation -- I
24  think you mentioned that some lawyer wrote to you about a
25  story or two that you took down?

Page 141

36 (Pages 138 - 141)

1    A.  Yes.

2    Q.  All right.  Has anyone asked you to take down

3  your allegations that Eric Coomer is an Antifa operative?

4    A.  No.

5    Q.  Has anyone asked you to take down the allegation

6  that Eric Coomer posted the Antifa manifesto the day it

7  came out?

8    A.  No.

9    Q.  Has anyone asked you to take down your

10  screenshots of Eric Coomer's -- what you've purported to

11  be Eric Coomer's social media?

12    A.  No.

13    Q.  Has anyone brought to you an alternate theory

14  for what motivations Eric Coomer could have for

15  participating so vigorously in supporting the Antifa

16  agenda?

17    A.  No.

18    Q.  What do you conclude from his support of Antifa

19  that his motivations are?

20    A.  It appears very clear where -- what me felt

21  about conservatives, what he felt about the country, what

22  he felt about what he wanted to do to people who supported

23  something he doesn't believe in.  So very threatening.

24    Q.  This will probably be my last series of

25  questions, very short.

Page 142

---

1    You've done significant reporting on Antifa over

2  your career at Gateway Pundit; correct?

3    A.  Yes.

4    Q.  Have you read the reporting that Andy Ngô has

5  done on Antifa?

6    A.  Yes.

7    Q.  Do you understand them -- you were asked if you

8  found it surprising that Antifa would be on a covert phone

9  call.  Is it your belief that Antifa is a decentralized

10  organization?

11    A.  I believe they have several branches in several

12  locations across the country.

13    Q.  Do they operate covertly?

14    A.  Yes.

15    Q.  We've heard some politicians and others say that

16  Antifa is just simply an idea.  Do you believe that to be

17  true?

18    A.  Much more than an idea.

19    Q.  Are they extremely violent?

20    A.  Absolutely.

21    Q.  Do they operate with clandestine cells?

22    A.  Yes.

23    Q.  Do you believe that it's very important to

24  expose anyone who affiliates with Antifa's belief system

25  or activities?

Page 143

---

1    A.  I believe it's a very dangerous group.

2    Q.  Is it important for you to report on people who

3  are involved with that dangerous group?  Or can it be?

4    A.  It can be.  If that person has a significant

5  role in society, that's newsworthy.

6    Q.  But for Eric Coomer's role as the security

7  director and salesman and expert witness for

8  Dominion Voting Systems, would you have ever been

9  interested in reporting on his apparent Antifa ties?

10    A.  No, not unless he was involved in a violent

11  incident.

12    MR. CORPORON:  I have nothing further.

13    MR. SKARNULIS:  I want to reiter -- reiterate my

14  objection to that whole questioning of Mr. Hoft by

15  Mr. Corporon.  While it raises follow-up questions, I'm

16  going to decline to ask any.  And so I pass the witness.

17    MR. CORPORON:  Appreciate your courtesy today,

18  Steve.

19    MR. SKARNULIS:  Of course, Randy.

20    THE VIDEOGRAPHER:  This concludes the deposition

21  of Jim Hoft individually and as the corporate

22  representative TGP Communications.  Going off the record.

23  The time is 3:23.

24    MR. ZAKHEM:  This is Zakhem.  I'd like an

25  electronic transcript.

Page 144

---

1    (Whereupon, the video record was concluded.)

2    MS. HALL:  There is Andrea Hall, Sara.  I would

3  like one as well.

4    MS. BOEHMER:  This is Margaret Boehmer for Eric

5  Metaxas.  I'd like act e-tran, please.

6    MR JOHNSON:  Brandon Johnson for OAN and Chanel

7  Rion.  I'd like an e-transcript as well.

8    MR. CORPORON:  Corporon for the deponent.  Four

9  to a page, full concordance, please.

10    MR. ARRINGTON:  Barry Arrington for

11  Sidney Powell.  Electronic transcript, please.

12    THE REPORTER:  Anybody else?  Okay.  Thank you.

13  And, Mr. Skarnulis, I have your standing order.

14    * * * * * * *

15    WHEREUPON, the foregoing deposition was

16  concluded at 3:24 p.m.  Total time on the record was

17  3 hours and 50 minutes.

18

19

20

21

22

23

24

25

Page 145

37 (Pages 142 - 145)

1    I, JAMES HOFT, the deponent in the above deposition,
2 do hereby acknowledge that I have read the foregoing
3 transcript of my testimony, and state under oath that it,
4 together with any attached Amendment to Deposition pages,
5 constitutes my sworn testimony.
6
7 _____ I have made changes to my deposition
8 _____ I have NOT made any changes to my deposition
9
10
      JAMES HOFT
11
12
13 Subscribed and sworn to before me this _____ day of
14 _____, 20____.
15 My commission expires: _____.
16
17
      NOTARY PUBLIC
18
19
20
21
22
23
24
25
                                Page 146

---

1 Coomer, Eric, Ph.D. v. Donald J. Trump For President, Inc.
2 James Hoft , Corp Rep Job No. 4708849
3      E R R A T A   S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 James Hoft , Corp Rep           Date
25
                                Page 148

---

1      REPORTER'S CERTIFICATE
2 STATE OF COLORADO     )
3 CITY AND COUNTY OF DENVER  )
4    I, Sara A. Stueve, a Registered Professional Reporter
5 and Notary Public within and for the State of Colorado,
6 commissioned to administer oaths, do hereby certify that
7 previous to the commencement of the examination, the
8 witness was duly sworn by me to testify the truth in
9 relation to matters in controversy between the said
10 parties; that the said deposition was taken in stenotype
11 by me at the time and place aforesaid and was thereafter
12 reduced to typewritten form by me; and that the foregoing
13 is a true and correct transcript of my stenotype notes
14 thereof; that I am not an attorney nor counsel nor in any
15 way connected with any attorney or counsel for any of the
16 parties to said action nor otherwise interested in the
17 outcome of this action.
18    My commission expires October 26, 2024.
19
20
      SARA A. STUEVE
21    Registered Professional Reporter
      Notary Public, State of Colorado
22
23
24
25
                                Page 147

---

1 rbc@corporonlaw.com
2      August 13, 2021
3 Coomer, Eric, Ph.D. v. Donald J. Trump For President, Inc.
4 DEPOSITION OF: James Hoft , Corp Rep 4708849
5    The above-referenced witness transcript is
6 available for read and sign.
7    Within the applicable timeframe, the witness
8 should read the testimony to verify its accuracy. If
9 there are any changes, the witness should note those
10 on the attached Errata Sheet.
11    The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14    According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18      Yours,
19      Veritext Legal Solutions
20
21
22
23
24
25
                                Page 149

38 (Pages 146 - 149)

Colorado Rules of Civil Procedure

Chapter 4, Disclosure and Discovery

Rule 30


(e) Review by Witness; Changes; Signing. If
requested by the deponent or a party before
completion of the deposition, the deponent shall be
notified by the officer that the transcript or
recording is available. Within 35 days of receipt
of such notification the deponent shall review the
transcript or recording and, if the deponent makes
changes in the form or substance of the deposition,
shall sign a statement reciting such changes and
the deponent's reasons for making them and send
such statement to the officer. The officer shall
indicate in the certificate prescribed by
subsection (f)(1) of this rule whether any review
was requested and, if so, shall append any changes
made by the deponent.


DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF
CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

6:21

 **Joe Oltman @**

**Wed, May 5**

Influencer event in denver May 26th. Rally may 27th. You need to be here for it . One Voice.

May 5 7:50 PM

**Thu, Jun 10**

Hey Jim. I have some information that I got from my daughter who works as a cyber engineer at Raytheon. The CEO put out a video praising Pride month George Floyd's death, The Tulsa race massacre and a bunch of other propaganda but left out DJ and nearly 30% of their workforce is retired military

D day

Jun 10 7:05 PM

Wow

Jun 10 11:18 PM

**Sunday**



New Message

6:21



Joe Oltman @

Wow
Jun 10 11:18 PM

Sunday



Jennifer Morrell

This is at Eric Coomer's house



New Message

6:21



JO   Joe Oltman @



This is at Eric Coomer's house



Pretty in Pink: The secretary of state's Melissa Polk and

+   New Message   

6:22

 Joe Oltman @

## Another at Eric Coomer's house



Lynn Bartels
Pretty in Pink. The secretary of state's Melissa
Polk and Jennifer Morrel with Democracy Fund.



August 22, 2018



Eric Coomer

Lynn Bartels
What a team. Steven Bennet and Eric Coomer
from Dominion Voting Systems. Such great,
capable guys.

Timeline Photos · Aug 22, 2018 ·

+ New Message

6:22

JO  **Joe Oltman** @

Eric Coomer holding a party at his house with County Clerks of Colorado

Sun 6:35 PM

Wow!! Where did you see that?

Sun 6:36 PM



I have been doing research on all of them

Saw your article and it clicked. "Holy crap she was at his house

Sun 6:36 PM

New Message



6:22

< JO  Joe Oltman Ⓐ

That's huge
Sun 6:37 PM 💬

Also. The judge in the Coomer
case, who has been breaking all
the procedural rules and acting as
a proxy for them.. she participated
in the June 2020 Antifa/BLM
March in denver

Moses...
Sun 6:38 PM

Wow!! You got proof of that?
That's big!! Too
Sun 6:39 PM 💬



New Message

6:22

 Joe Oltman @ 

She made this sign.

They cleaned the internet but missed this one

I had a lawyer friend of mine that came forward and told me, she was so far left in her posts on Facebook she wondered how she got chosen



Couple others

Look I'm really sorry you got sued Jim. I feel terrible, but I never lied, embellished or even remotely stretched the truth and the price I have paid for me and my family has been immense. Just thought I would tell you that...

This Antifa stuff runs deep

New Message   



6:22

JO Joe Oltman ⊚



This is Eric's house



Pathway to trash can only

New Message



6:22

JO  Joe Oltman @

**Lynn Bartels**
Sorry the sun made this picture so dark. Check out Hilary Rudy with the SOS office, Mesa County Clerk Sheila Reiner, Boulder County Clerk Hillary Hall and Arapahoe County Clerk Matt Crane.

Timeline Photos · Aug 22, 2018 ·

View Full Size · More Options

👍 Like          ↪ Share

👍❤ 23

## Matt crane was there too
Sun 6:48 PM

+   New Message

6:22

< JO Joe Oltman @

**We wrote on him**
Sun 6:52 PM

You did

They are all connected...
Sun 6:54 PM

**That's really big!!**
Sun 7:38 PM

I just lost my mind on a live video

It's been 9 months of hell.

I have so much more

The judge is a piece of trash.
Sun 7:39 PM

**Would like to hear more**
Sun 7:40 PM

I can deliver the attorney that gave
me access. But she has to be
anonymous

Lynn Bartels is with Eric Coomer and 13 others
August 22, 2018 · ©

The wind was well, windy, but the food was at the Colorado County Clerks
Association summer conference in Salida, where we went to a BBQ. Check out
these fun folks, from Dwight Shellman to [illegible] to [illegible]
County clerks and their staffs are some of the hardest working people in
government so when they unwind, they unwind.

New Message

6:22

JO  Joe Oltman @



Sun 8:30 PM

Sure
Sun 8:43 PM

**Tuesday**



New Message

6:22

 Joe Oltman @



Did you know that in Portland the DAs house and office are protected by Antifa?

Tue 1:46 PM

No - insane!

Tue 6:12 PM

From head of PB who stood over a church... :

We need the entire story. DA and police team up with Antifa to create their own mafia style crime syndicate. Police serve as proxy for Antifa arresting those who defend churches and the

New Message

6:23

JO **Joe Oltman** ⊕

From head of PB who stood over a church... :

We need the entire story. DA and police team up with Antifa to create their own mafia style crime syndicate. Police serve as proxy for Antifa arresting those who defend churches and the parishioners.

Thx for checking Bro 5:29 PM

yeah man! 5:31 PM

Unread Messages

Today

Hey I just wanted to let you know that my cousin in PPD just called me and told me if we are going to the pastor event to be careful because antifa is going to be there in force and the DA has ordered PBs be arrested first. 8:49 AM

I do believe that. 10:33 AM

Message

The things they were telling me were unbelievable.
Tue 6:14 PM

New Message

6:23



JO  Joe Oltman @

event to be careful because antifa is going to be there in force and the DA has ordered PBs be arrested first. 8:49 AM

I do believe that. 10:33 AM ✓

Message

The things they were telling me were unbelievable.
Tue 6:14 PM



Insane
Tue 6:14 PM

I saw your stories

You should know Jena Griswold did not even show up to the public comment today.

In colorado

Sent a group as her proxy

For their "emergency rules" change
Tue 6:15 PM



Wow
Tue 10:53 PM

+ New Message   

# IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 3 |
| Display names | +14042855853 |
| | Jenny Beth Martin (+14042855853) |
| | Local User |
| Local user | |
| **CONVERSATION DETAILS** | |
| Number of messages | 64 |
| First message sent date/time | 11/13/2020 1:01:20 PM |
| Last message sent date/time | 6/19/2021 1:27:07 AM |
| Case time zone | (UTC) Coordinated Universal Time |

↔ Unknown direction
11/16/2020 1:10:57 AM

**+14042855853**

May I introduce you to Randy Corporon in Denver?

You have a story about one of his clients and something about dominion. He said some of the details are not correct and he wants to help get the details correct.

Exhibit
PX 0076
Hoft

# IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 3 |
| Display names | +13038852550 |
| | +14042855853 |
| | Local User |
| Local user | |
| **CONVERSATION DETAILS** | |
| Number of messages | 3 |
| First message sent date/time | 11/16/2020 1:43:33 AM |
| Last message sent date/time | 11/16/2020 2:31:25 AM |
| Case time zone | (UTC) Coordinated Universal Time |

↔ Unknown direction
11/16/2020 1:44:27 AM

**+13038852550**

Thx, JB. Hi, Jim. I'll text you privately re Dominion so JB can get back to work.

**Exhibit
PX 0077**
Hoft

## IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 2 |
| Display names | +13036675105 |
| | Local User |
| Local user | |
| CONVERSATION DETAILS | |
| Number of messages | 14 |
| First message sent date/time | 11/16/2020 2:15:31 AM |
| Last message sent date/time | 11/25/2020 5:31:16 AM |
| Case time zone | (UTC) Coordinated Universal Time |

↔ Unknown direction
11/24/2020 4:30:55 AM

**Local User <Jim iPad_00008101-000C44900CA0001E>**

This is Jim Hoft — Joe has anyone seen Eric Coomer? Does anyone know where he is? Has he popped his head up at all?

Exhibit
PX 0078
Hoft