## IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 2 |
| Display names | +13038852550 |
| | Local User |
| Local user | |
| **CONVERSATION DETAILS** | |
| Number of messages | 41 |
| First message sent date/time | 11/16/2020 2:08:33 AM |
| Last message sent date/time | 3/8/2021 2:49:36 PM |
| Case time zone | (UTC) Coordinated Universal Time |

---

**+13038852550**

↔ Unknown direction
12/23/2020 4:02:54 PM

Hey, Jim. I'm doing morning drive in Denver tomorrow. Any time for radio on Coomer lawsuit and your reporting?

---

**Exhibit
PX 0079**
Hoft

## IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 2 |
| Display names | ɪ 13036675105 |
| | Local User |
| Local user | |
| **CONVERSATION DETAILS** | |
| Number of messages | 14 |
| First message sent date/time | 11/16/2020 2:15:31 AM |
| Last message sent date/time | 11/25/2020 5:31:16 AM |
| Case time zone | (UTC) Coordinated Universal Time |

↔ Unknown direction
11/24/2020 4:30:55 AM

**Local User <Jim iPad_00008101-000C44900CA0001E_2>**

This is Jim Hoft — Joe has anyone seen Eric Coomer? Does anyone know where he is? Has he popped his head up at all?

Exhibit
**PX 0080**
Hoft

# IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 3 |
| Display names | +13038852550 |
| | +14042855853 |
| | Local User |
| Local user | |
| **CONVERSATION DETAILS** | |
| Number of messages | 3 |
| First message sent date/time | 11/16/2020 1:43:33 AM |
| Last message sent date/time | 11/16/2020 2:31:25 AM |
| Case time zone | (UTC) Coordinated Universal Time |

**:+14042855853**

↔ Unknown direction
11/16/2020 1:43:33 AM

Jim, meet Randy Corporon. Randy, meet Jim Hoft. I'll let you take it from here.

**Exhibit
PX 0081**
Hoft

## IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 2 |
| Display names | +13038852550 |
| | Local User |
| Local user | |
| **CONVERSATION DETAILS** | |
| Number of messages | 41 |
| First message sent date/time | 11/16/2020 2:08:33 AM |
| Last message sent date/time | 3/8/2021 2:49:36 PM |
| Case time zone | (UTC) Coordinated Universal Time |

---

**+13038852550**                                                                    ↔ Unknown direction
                                                                                         11/16/2020 2:08:33 AM

Hi Jim. Randy Corporon, Rep Natl Committeeman, Chair of largest Tea Party group in CO, atty, radio host.

My client/friend Joe Oltmann just told me you guys are talking in 15 so that will handle what I wanted to talk about.

Thank you!

---

**Exhibit
PX 0082**

Hoft

TGP-001_0238

## IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 2 |
| Display names | +13038852550 |
| | Local User |
| Local user | |
| **CONVERSATION DETAILS** | |
| Number of messages | 41 |
| First message sent date/time | 11/16/2020 2:08:33 AM |
| Last message sent date/time | 3/8/2021 2:49:36 PM |
| Case time zone | (UTC) Coordinated Universal Time |

**Local User <Jim iPad_00008101-000C44900CA0001E>**

↔ Unknown direction
11/16/2020 2:30:54 AM

Ok thanks Randy. We just spoke. Quite a story he has!

Exhibit
PX 0083
Hoft

## IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 2 |
| Display names | +13038852550 |
| | Local User |
| Local user | |
| CONVERSATION DETAILS | |
| Number of messages | 41 |
| First message sent date/time | 11/16/2020 2:08:33 AM |
| Last message sent date/time | 3/8/2021 2:49:36 PM |
| Case time zone | (UTC) Coordinated Universal Time |

↔ Unknown direction
11/16/2020 2:35:58 AM

**+13038852550**

Yes. And, he understands the technology, code, back-door access even though we don't have any proof of that. Sounds like Rudy and Sidney Powell do though. I'm trying not to bug her. But she has said specifically that votes were switched. God bless whistleblowers?!

**Exhibit
PX 0084**
Hoft

# IOS IMESSAGE/SMS/MMS

| CHAT PARTICIPANTS | |
|---|---|
| Number of participants | 2 |
| Display names | +13036675105 |
| | Local User |
| Local user | |
| **CONVERSATION DETAILS** | |
| Number of messages | 14 |
| First message sent date/time | 11/16/2020 2:15:31 AM |
| Last message sent date/time | 11/25/2020 5:31:16 AM |
| Case time zone | (UTC) Coordinated Universal Time |

↔ Unknown direction
11/24/2020 4:32:15 AM

**+13036675105**

I sent someone to his house and no sign of him

**Exhibit
PX 0085**

Hoft

# Dominion Voting Systems Officer of Strategy and SECURITY Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote

**By Jim Hoft**
**Published November 13, 2020 at 7:55am**
**632 Comments**



**Eric Coomer**

Director Product
Strategy & Security,
Dominion Voting
Systems

**Dr. Eric Coomer who is responsible for the strategy and Security of Dominion Voting Systems at Dominion Voting Systems.**

**But if you search the company's profile Eric Coomer has since been removed from their page of directors.**

12/17/2020          Dominion Voting Systems Officer of Strategy and SECURITY Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipul…



In 2016 Coomer **told the Illinois States Board of Elections** that it was possible to bypass election systems software.



(Sep. 1, 2016) — On Friday, August 26th, during a meeting at the Illinois State Board of Elections, the Vice President of Engineering for Dominion Voting, Dr. Eric Coomer*, was asked if it was possible to bypass election systems software and go directly to the data tables that manage systems running elections in Illinois. His response was, "Yes, if they have access."



Here is more from the 2016 article at **the Post and Email:**

> ***Dr. Coomer's statement brings to light a very serious issue all voters should understand.*** *Voting systems must be re-certified each time they make changes to the hardware or software. Recertification is an expensive and time consuming process.* ***What Dr. Coomer told the Board is that Dominion Voting does not go back for recertification of software when threats to their code are discovered.*** *Rather, they rely on post-election audits and providing advice to election jurisdictions about security. I have reviewed all of the recertification documents produced by Dominion, and I do not recall any software adjustments for security purposes.*
>
> ***This is the reality of the security of your vote.*** *Software systems that count and record the vote across Illinois and throughout the USA are not updated to address security problems, and even if they were, the software can be completely bypassed by going to the data tables that drive the systems.*

Here is the video…

Dominion was written about by the Clinton Global Initiative.

**The AP mentioned Coomer in their September article.**

**President elect Julie Fox**
@jlfgetserious

AP article on the Georgia machines from sept 29,2020, exec with dominion

7:51 PM · Nov 12, 2020

♡ 52      ♡ 46 people are Tweeting about this

**More...**

Entrepreneur **Joe Oltmann** researched the Dominion Voting Systems this week after news broke on the unexplained **computer "glitches" that mysteriously took votes** from President Trump in many states and gave those votes to Joe Biden or erased the votes completely.

**Joe Oltmann did a deep dive on Dr. Eric Coomer who is responsible for the strategy and Security of Dominion Voting Systems.**

**Oltmann posted a Facebook post by Coomer from June.**
**Dr. Coomer retweeted the "Antifa" manifesto letter to President Trump.**

**Needless to say Dr. Coomer is NOT a Trump supporter!**

> *This is a FB post from Dr. Eric Coomer. This is the Antifa "manifesto" letter to Trump. This is the man that is responsible for the strategy and Security of Dominion Voting Systems. I will post all of the posts here over the next couple of days. Share and follow pic.twitter.com/E2rK9TznVw*
>
> *– Joe Oltmann (@JoeOltmann)* **November 12, 2020**

Here is that letter:

page 2

page 3

page 4

Joe Oltmann also posted other anti-Trump Facebook posts by Dr. Coomer including a YouTube video titled "Dead Prez."

Twitter removed Joe Oltmann's account last night for some reason.

It is very interesting that Twitter would remove the one account that was investigating Coomer, his far left background and his role at Dominion.

## Submit a Correction

 **Jim Hoft**

| More Info | Recent Posts | Contact |

Jim Hoft is the founder and editor of The Gateway Pundit, one of the top conservative news outlets in America. Jim was awarded the Reed Irvine Accuracy in Media Award in 2013 and is the proud recipient of the Breitbart Award for Excellence in Online Journalism from the Americans for Prosperity Foundation in May 2016.

**Gateway** Pundit

*Where Hope Finally Made a Comeback.*

© 2020 The Gateway Pundit – All Rights Reserved.

Home

About

Advertise

Privacy

Facebook

Twitter

YouTube

Terms

Contact

## Report: Anti-Trump Dominion Voting Systems Security Chief Was Participating in Antifa Calls, Posted Antifa Manifesto Letter to Trump Online

By Jim Hoft
Published November 14, 2020 at 9:21pm
878 Comments



In 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering. According to his **bio**, Coomer graduated from the University of California, Berkeley with a Ph.D. in Nuclear Physics.

Eric Coomer was later promoted to Voting Systems Officer of Strategy and Security although Coomer has **since been removed** from the Dominion page of directors.



In a stunning interview conducted by **Michelle Malkin, Joe Oltmann**, FEC (Faith Education Commerce) United founder, reveals how he infiltrated Antifa and how during a conversation with Antifa members, he discovered "Eric from Dominion" was allegedly part of the chat during the week of September 27, 2020.

Oltmann explained that "Eric" was telling the Antifa members they needed to "keep up the pressure." When one of the caller's asked, "Who's Eric?" someone answered, "Eric, he's the Dominion guy." Oltmann said that as the conversation continued, someone asked, "What are we gonna do if F*cking Trump wins?" Oltmann paraphrased how Eric (the Dominion guy) responded, **"Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!"**

After Oltmann, who runs a data company, finished the call, he started to


Exhibit PX 0087
Hoft

investigate "Eric from Dominion," in Denver, CO., and came upon Eric Coomer. Oltmann admitted that it didn't make sense that Eric Coomer would be the Antifa member on the call and that at the time, he knew nothing about Dominion Voting Systems.

It wasn't until after he started hearing about Dominion Voting Systems in the news following the election that he remembered the remarks made by "Eric from Dominion" on the Antifa chat.

Oltmann began digging into Eric Coomer, trying to find anything he could about him. Oltmann finally **hit gold when he was able to (legally) access** what he claims is Dominion VP, Eric Coomer's Facebook page. What he found was stunning. Joe Oltmann said he never saw such hate and vitriol coming from someone who has a Ph.D. in Nuclear Physics. Oltmann explained to Malkin that Coomer actually re-posted the Antifa manifesto to President Trump on his Facebook page.

Do you think Dominion was in on the steal?

○ Yes   ○ No

Enter your email                                    | Submit |

Completing this poll entitles you to The Gateway Pundit news updates free of charge. You may opt out at anytime. You also agree to our **Privacy Policy** and **Terms of Use**.

The Gateway Pundit posted  a copy of **that Antifa letter to Trump** in a previous report.

Joe Oltmann was removed from Twitter this week.  His tweets on Eric Coomer upset big tech.

Oltman admits that by revealing this information about Coomer, he is putting himself in danger.

He may have a Ph.D. in Nuclear Physics, but when it comes to hiding his hatred for President Trump, Trump supporters, law enforcement, or even for Texans, Dominion's Eric Coomer isn't very smart.

In 2017, when Coomer was in Nevada, he mocked President Trump's Election Integrity Commission on Facebook.

Coomer shared a **Washington Post** article titled, "The voting commission is a fraud itself. Shut it down." The article, written by the unhinged Trump hater Jennifer Rubin, was an attack on President Trump's May 11, 2017, **Executive**

**Order** on the Establishment of Presidential Advisory Commission on Election Integrity.

What about Trump's Election Integrity Commission triggered Coomer? Was it the part about "Vulnerabilities in *voting systems* and practices used for Federal elections that could lead to improper voter registrations and *improper voting*, including fraudulent voter registrations and *fraudulent voting,*" that caused Coomer to have a childish meltdown on his Facebook page?

Dominion's Director of Strategy and Security's response to Rubin's article appears to be a bit unhinged: "And in other news..There be some serious fuckery going on right here fueled by our Cheeto-in-chief stocking lie after lie on the flames of [former Kansas Sec. of State Chris] Kobach..You want something serious to worry about? This is it. "

Here's what Coomer had to say to his "friends" on Facebook on July 21, 2016, who are Trump supporters.



**From Coomer's Facebook post:**

*Facebook friend land- open call-*

*If you are planning to vote for the autocratic, narcissistic, fascists, ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. I'm all for reasoned political discourse and healthy debate- I'm looking at you (3 names of friends). I disagree with you three on many philosophical grounds but respect your opinions. Only and absolute FUCKING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST FUCK! No bullshit, I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker–UNFRIEND ME NOW. I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason. you are controlled by fear, reaction, and bullshit. Get your shit together.*

*Oh, it that doesn't persuade you, FUCK YOU! Seriously, this fucking ass-clown stands against everything that makes this country awesome! You want in on that? You deserve nothing but contempt.*

*Near the bottom of his rant, Coomer clarifies: "These opinions are rational and completely my own. They are based in reason and highly credible. Though they are not necessarily the thoughts of my employer, though if not, I should probably find another job. Who wants to work for complete morons?" Comer appears to be trying to cover his tracks, "None of my personal opinions affect my professional conduct or attitudes," adding, "I am non-partisan."*



According to Oltmann, Eric Coomer isn't a big fan of the police. During his interview with Malkin, he shared several screenshots of anti-police rhetoric like an image a link to YouTube from the hip-hop song "Dead Prez."

Here's a portion of the lyrics from the "Dead Prez" song in case it's not on your personal playlist:

Is there heaven for us hip-hop heathens
Big Pop and Pac, even Eazy had 'em leanin'
We all children lookin' for a reason
What do you believe in, betrayal, treason?
I'm out for dead presidency
I'm out for dead presidency
I'm out for dead presidency
I'm out for dead fuckin' presidents that represent me







This screenshot, captured by Joe Oltmann, makes one wonder if Eric's not a fan of the United States either.





**A lot of people may be glad to know that Texas rejected using Dominion Voting Systems in their state after reading this garbage!**

**30 states in America, including every critical swing state in the November election, used Dominion Voting Systems.**

**Submit a Correction**

 **Jim Hoft**

| | More Info | Recent Posts | Contact |
|---|---|---|---|

Jim Hoft is the founder and editor of The Gateway Pundit, one of the top conservative news outlets in America. Jim was awarded the Reed Irvine Accuracy in Media Award in 2013 and is the proud recipient of the Breitbart Award for Excellence in Online Journalism from the Americans for Prosperity Foundation in May 2016.

Home
About
Advertise
Privacy
Facebook

Twitter
YouTube
Terms
Contact

**Gateway** Pundit
*Where Hope Finally Made a Comeback.*

© 2021 The Gateway Pundit – All Rights Reserved.

# Georgia Secretary of State Brad Raffensperger's Update to Georgia's Voting Machine Software Right Before the 2020 Election Was Unlawful and Violates Any Certification of State Results

**By Joe Hoft**
**Published January 4, 2021 at 8:15am**
**424 Comments**



**Georgia's corrupt Secretary of State Brad Raffensperger is in criminal trouble now after leaking a phone call with the President of the United States.**

**Raffensperger is also responsible for approving an update to the voting machines in the state days before**

**the 2020 election which was illegal and should invalidate the results of the election in the state.**

Yesterday it was reported that Georgia's corrupt Secretary of State (SoS) Brad Raffensperger is the party to two lawsuits from the President of the United States after leaking information related to their recent phone call:

*President Trump Files Two Lawsuits Against Dirty Georgia Secretary of State Raffensperger for Leaking Confidential Litigation Call*



But quite frankly, Raffensperger has done much worse. The Georgia SoS is to ensure secure and accurate elections.   And, yet he allowed Dominion voting machines to be used in the 2020 Presidential election opening the door to blatant discrepancies and fraud.

But it gets worse… Raffensperger actually allowed an update to the software used in these Dominion voting machines only days before the 2020 election.

We reported on this weeks ago:

1/11/2021        Georgia Secretary of State Brad Raffensperger's Update to Georgia's Voting Machine Software Right Before the 2020 Election Was Unlawful and Violat...

## *Dominion's Trump-Hating Executive Eric Coomer Performed a Suspicious Update in Georgia a Week Before Early Voting Started*

As we noted, a local news channel actually reported on this update:

**CD Media reports** that the update was to the imaging system in Dominion's machines:

> *After the election equipment is certified for use, **no changes can be made to the software or hardware without SoS and EAC approval and maintain the certification for the election**.*
>
> ***According to a 2020 election lawsuit filed in GA**, during September 2020 ahead of the general election GA SoS Raffesperger ordered county election officials to do a complete software wipe of the BMDs [Ballot Marketing Devices] and install brand new software that never went through the certification process. **As of the October 2nd report, Dominion had not submitted a request for this major change with the U.S. Election Assistance Commission (EAC).***

*According to the Master Technical Evaluation listed above, both Dominion and the GA SoS are very clear on the fact that **this breaks the certification for GA and may well get the ballots voters cast tossed as a result.** The new software was never even tested to see if it caused other issues with the system.*

***GA SoS Raffensperger ordered counties to make the change knowing it is illegal in GA and puts the onus of liability on the county election managers themselves if they complied.** This email, from the lawsuit shows how serious the situation is. SoS Raffensperger also helped draft a loophole in the law to make EAC certification meaningless even though GA law demands compliance with Federal election standards.*

**George Eliason at CD media** goes on to discuss the illegal updates made in Georgia before the 2020 election and then after much more information and fact, Eliason ends with this:

> *Stacy Abrams lobbied online to get Dominion's Democracy Suite for this election because she is part of that system with Governor Brian Kemp and SoS Raffenspurger.*

*Georgia's Constitutional rights and citizen's rights have been violated during every election for the past 18 years every time someone took advantage of this voting system at every level it's used for. Your vote didn't matter. Your election was decided for you. Georgia! I'm offended for you.*

*Both Republicans and Democrats use these corrupted elections systems to gain power and wealth today at the expense of voters. If you voted for Joe Biden and think it's ok because your candidate won, think again.*

*Every time a good qualified candidate who is for the American people runs, the election WILL BE STOLEN if this isn't stopped now. Georgia, it's time to say no more!*

*The 2020 ELECTION WAS STOLEN. If the information above doesn't convince you, it's because you're part of the problem. Donald Trump won the 2020 election.*

## And there it is…

## Submit a Correction

  **Joe Hoft**

| Summary | Recent Posts | Contact |
| --- | --- | --- |

Joe Hoft is the twin brother of TGP's founder, Jim Hoft. His posts have been retweeted by President Trump and have made the headlines at the Drudge Report. Joe worked as a corporate executive in Hong Kong and traveled the world for his work, which gives him a unique perspective of US and global current events. He has ten degrees or designations and is the author of three books. His new book: 'In God We Trust: Not in Lying Liberal Lunatics' is out now - please take a look and buy a copy.

🐦 **@joehoft**

**Gateway** Pundit

*Where Hope Finally Made a Comeback.*

© 2020 The Gateway Pundit – All Rights Reserved.

Home

About

Advertise

Privacy

Facebook

Twitter

YouTube

Terms

Contact

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: September 17, 2021 8:12 PM<br>FILING ID: E9E5DD591D201<br>CASE NUMBER: 2020CV34319 |
| ERIC COOMER, Ph.D.,<br>Plaintiff<br><br>vs.<br><br>DONALD J. TRUMP FOR PRESIDENT,<br>INC., et al.,<br>Defendants | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff**<br>Charles J. Cain, No. 51020<br>ccain@cstrial.com<br>Steve Skarnulis, No. 21PHV6401<br>skarnulis@cstrial.com<br>Bradley A. Kloewer, No. 50565<br>bkloewer@cstrial.com<br>Zachary H. Bowman, No. 21PHV6676<br>zbowman@cstrial.com<br>CAIN & SKARNULIS PLLC<br>P. O. Box 1064<br>Salida, Colorado 81201<br>719-530-3011/512-477-5011 (Fax)<br><br>Thomas M. Rogers III, No. 28809<br>trey@rklawpc.com<br>Mark Grueskin, No. 14621<br>mark@rklawpc.com<br>Andrew E. Ho, No. 40381<br>andrew@rklawpc.com<br>RechtKornfeld PC<br>1600 Stout Street, Suite 1400<br>Denver, Colorado 80202<br>303-573-1900/303-446-9400 (Fax) | Case Number:          2020cv034319<br><br>Division Courtroom:          409 |
| **EXHIBIT F-1** | |

```
 1    DISTRICT COURT, CITY AND COUNTY OF DENVER
      STATE OF COLORADO
 2    1437 Bannock Street
      Denver, CO 80202
 3                                       ^ COURT USE ONLY ^

 4    ─────────────────────────────────────────────────
      ERIC COOMER, Ph.D.,              Case Number 20CV34319
 5         Plaintiff,
                                       Courtroom 409
 6    vs.
 7    DONALD J. TRUMP FOR PRESIDENT, INC.,
      SIDNEY POWELL, SIDNEY POWELL, P.C.,
 8    RUDOLPH GIULIANI, JOSEPH OLTMANN,
      FEC UNITED, SHUFFLING MADNESS MEDIA, INC.,
 9    dba CONSERVATIVE DAILY, JAMES HOFT,
      TGP COMMUNICATIONS LLC, dba THE GATEWAY PUNDIT,
10    MICHELLE MALKIN, ERIC METAXAS, CHANEL RION,
      HERRING NETWORKS, INC., dba ONE AMERICA
11    NEWS NETWORK, and NEWSMAX MEDIAN, INC.,
           Defendants.
12    ─────────────────────────────────────────────────
13            VIDEO-RECORDED REMOTE DEPOSITION OF
                      MICHELLE MALKIN
14
                      July 27, 2021
15    ─────────────────────────────────────────────────
16    REMOTE APPEARANCES:
17    FOR THE PLAINTIFF:
              CHARLES A. CAIN, ESQ.
18            STEVE SKARNULIS, ESQ.
              BRAD KLOEWER, ESQ.
19            Cain & Skarnulis PLLC
              P.O. Box 1064
20            Salida, Colorado 81201
              Telephone: 719-530-3011
21            Email: ccain@cstrial.com
                     skarnulis@cstrial.com
22                   bkloewer@cstrial.com
23            THOMAS M. ROGERS III (TREY), ESQ.
              Recht Kornfleld, PC
24            1600 Stout Street, Suite 100
              Denver, Colorado 80202
25            Telephone: 303-573-1900
              Email: trey@rklawpc.com
```

                                                    Page 1

**Page 2**

```
 1  REMOTE APPEARANCES (Continued):
 2  FOR DEFENDANT SIDNEY POWELL & SIDNEY POWELL, P.C.:
        BARRY ARRINGTON, ESQ.
 3      Arrington Law Firm
        3801 East Florida Avenue, Suite 830
 4      Denver, Colorado 80210
        Telephone: 303-205-7870
 5      Email: barry@arringtonpc.com
 6  FOR DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.:
        JOHN ZAKHEM, ESQ.
 7      BETH CHAMBERS, ESQ.
        Jackson Kelly, PLLC
 8      1099 Eighteenth Street, Suite 2150
        Denver, Colorado 80202
 9      Telephone: 303-390-0016
        Email: jszakhem@jacksonkelly.com
10      beth.chambers@jacksonkelly.com
11  FOR DEFENDANTS JOSEPH OLTMANN, FEC UNITED, and
        SHUFFLING MADNESS MEDIA, INC. dba CONSERVATIVE DAILY:
12      ANDREA M. HALL, ESQ.
        The Hall Law Office, LLC
13      P.O. Box 2251
        Loveland, Colorado 80539
14      Telephone: 970-419-8234
        Email: andrea@thehalllawoffice.com
15
    FOR DEFENDANTS JAMES HOFT and TGP COMMUNICATIONS, LLC,
16  dba THE GATEWAY PUNDIT:
        RANDY B. CORPORON, ESQ.
17      Law Offices of Randy B. Corporon, P.C.
        2821 South Parker Road, Suite 555
18      Aurora, Colorado 80014
        Telephone: 303-749-0062
19      Email: rbc@corporonlaw.com
20  FOR DEFENDANT MICHELLE MALKIN:
        GORDON A. QUEHAN, ESQ.
21      Patterson Ripplinger, P.C.
        5613 DTC Parkway, Suite 400
22      Greenwood Village, Colorado 80111
        Telephone: 303-741-4539
23      Email: gqueenan@prpclegal.com
24
25
                                              Page 2
```

**Page 3**

```
 1  REMOTE APPEARANCES (Continued):
 2  FOR DEFENDANT ERIC METAXAS:
        MARGARET BOEHMER, ESQ.
 3      Gordon Rees Scully Mansukhani, LLP
        555 Seventeenth Street, Suite 3400
 4      Denver, Colorado 80202
        Telephone: 303-534-5160
 5      Email: mboehmer@grsm.com
 6  FOR DEFENDANTS CHANEL RION and HERRING NETWORKS, INC.,
        dba ONE AMERICA NEWS NETWORK:
 7      STEPHEN K. DEXTER, ESQ.
        BERNARD J. RHODES, ESQ.
 8      Lathrop GRM LLP
        1515 Wynkoop Street, Suite 600
 9      Denver, Colorado 80202
        Telephone: 720-931-3200
10      Email: stephen.dexter@lathropgpm.com
        bernie.rhodes@lathropgpm.com
11
        ERIC P. EARLY, ESQ.
12      Early Sullivan Wright Gizer & McRae, LLP
        6420 Wilshire Boulevard, Seventeenth Floor
13      Los Angeles, California 90048
        Telephone: 323-301-4670
14      Email: eearly@earlysullivan.com
15  FOR DEFENDANT REPUBLIC:
        MICHAEL W. REAGOR, ESQ.
16      Dymond • Reagor, PLLC
        8400 East Prentice Avenue, Suite 1040
17      Greenwood Village, Colorado 80111
        Telephone: 303-734-3400
18      Email: mreagor@ddrc-law.com
19  Also Present:
        Dennis Clayton, Videographer
20      Rebecca Dominguez, Veritext Case Manager
        Chanel Rion
21      Abbie Frye
        Christopher Seerveld
22      Bobby Herring
        Charles Herring
23      Tom Quinn
        Lexi Christopher
24
25
                                              Page 3
```

**Page 4**

```
 1      PURSUANT TO WRITTEN NOTICE and the appropriate rules
 2  of civil procedure, the video-recorded remote deposition
 3  of MICHELLE MALKIN, called for examination by Plaintiff,
 4  was taken via videoconference, commencing at 9:42 a.m. on
 5  July 27, 2021, before Sara A. Stueve, Registered
 6  Professional Reporter and Notary Public in and for the
 7  State of Colorado.
 8
 9          I N D E X
10  EXAMINATION OF MICHELLE MALKIN:              PAGE
11      By Mr. Cain                    8
12  DEPOSITION EXHIBITS                          PAGE
13  Exh 15 November 13, 2020, live-stream interview    36
        of Joe Oltmann by Michelle Malkin
14
    Exh 16 November 13, 2020, Setting the Record Straight:  --
15      Facts & Rumors
16  Exh 17 November 28, 2020, Newsmax broadcast of    89
        Sovereign Nation with Michelle Malkin
17
    Exh 18 November 25, 2020, Setting the Record Straight:  71
18      Facts & Rumors
19  Exh 19 November 13, 2020, Michelle Malkin tweet    61
        re "Joe Oltmann (now banned on Twitter)"
20
    Exh 20 November 13, 2020, Michelle Malkin tweet    63
21      of full Joe Oltmann interview
22  Exh 21 November 13, 2020, Michelle Malkin          63
        Twitter reply, "What are they trying to hide?"
23
    Exh 22 November 15, 2020, Michelle Malkin tweet    80
24      re "Dominion, Antifa & #EricCoomer," etc.
25
                                              Page 4
```

**Page 5**

```
 1          I N D E X (Continued)
    DEPOSITION EXHIBITS                          PAGE
 2
    Exh 23 November 16, 2020, Michelle Malkin tweet    87
 3      re  Denver Business Owner: Dominion's
        Eric Coomer Is An Unhinged Sociopath,  etc
 4
    Exh 24 November 19, 2020, Michelle Malkin repost   87
 5      of Joe Oltmann interview
 6  Exh 25 Series of Signal text messages between     13
        Randy Corporon and Michelle Malkin
 7
    Exh 26 November 25, 2020, email from Michelle Malkin  74
 8      to Pierce Sargent
        re  Sovereign Nation - Wednesday pretape -
 9      guests/contact info
10  Exh 27 State of Colorado Uniform Voting Submission  --
        Provider Narrative for Dec 4th PERC Meeting
11
    Exh 28 Affidavit of Joseph T Oltmann               --
12
    Exh 29 Photos of handwritten notes                 --
13
    Exh 30 Newsmax retraction of Coomer coverage       122
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 5
```

2 (Pages 2 - 5)

PROCEEDINGS

\* \* \* \* \*

3  THE VIDEOGRAPHER:  Good morning.  We're going on
4  the record at 10:04 a.m., Mountain Time, on July 27, 2021.
5      Please note that microphones are sensitive and
6  may pick up whispering, private conversations, and
7  cellular interference.  Please turn all off cell phones or
8  place them away from the microphones, as they can
9  interfere with the deposition audio.
10     Audio and video recording will continue to take
11  place unless all parties agree to go off the record.
12     This is Media Number 1 of the video-recorded
13  deposition of Michelle Malkin, taken by counsel for the
14  Plaintiffs in the matter of Eric Coomer, Ph.D., v.
15  Donald J. Trump for President, Inc., et al., filed in the
16  District Court, District of Colorado – District Court,
17  Denver County, State of Colorado, Case Number
18  2020CV034319.
19     This deposition is being held remotely with all
20  parties at various locations.
21     My name is Dennis Clayton for the firm Myers
22  Legal Video, and I am the videographer.  The court
23  reporter today is Sara Stueve from the firm Veritext Legal
24  Solutions.
25     I am not related to any party in this action,

Page 6

---

MICHELLE MALKIN,

2  having been first duly sworn to state the whole truth,
3  testified as follows:
4      MR. CAIN:  Before the deposition started, we
5  discussed and agreed amongst the lawyers that one
6  objection by the defendants' lawyer would be sufficient to
7  preserve objections by all defendants.
8      I'm getting some feedback on the audio.  I don't
9  know what that is about, but hopefully it will correct
10  itself.
11     MR. ARRINGTON:  So whoever Lexi Christopher is
12  probably needs to mute.
13     MR. CAIN:  Okay.
14         DIRECT EXAMINATION
15  MR. CAIN:
16     Q.  Ma'am, state your full name for the record,
17  please.
18     A.  Michelle Malkin.
19     Q.  Good morning, Ms. Malkin.  My name is Charlie
20  Cain.  I introduced myself to you about eight minutes ago;
21  right?
22     A.  Yes.
23     Q.  Let's jump right in.
24        When did you first meet Joe Oltmann?
25     A.  I have -- he has recalled meeting me, but I

Page 8

---

1  nor am I financially interested in the outcome.
2      Because of the large number of participants,
3  counsel and everyone attending remotely will place their
4  appearances and affiliations for the record on --in the
5  chat room and will be reflected on the transcript.
6      The court reporter has a brief statement and
7  then will swear in the witness.
8      THE REPORTER:  Thank you, Dennis.
9      The attorneys participating in this deposition
10  acknowledge that I am not physically present in a
11  deposition room and that I will be reporting this
12  deposition remotely.
13     They further acknowledge that, in lieu of an
14  oath administered in person, the witness will verbally
15  declare her testimony in this matter is given under
16  penalty of perjury.
17     The parties and their counsel consent to this
18  arrangement and waive any objections to this manner of
19  reporting.
20     If there are any objections to this matter of
21  reporting, please state them at this time.
22     Hearing none, Ms. Malkin, will you raise your
23  right hand, please.
24  //
25  //

Page 7

---

1  don't remember it, years ago at an event.
2      Q.  Okay.  Your audio is cutting out.  You said
3  that -- and respond again?  I didn't hear what you said.
4      A.  I said that he recalled meeting me years ago at
5  a book event, and I did not recall it.
6      Q.  Okay.  When do you recall first meeting
7  Joe Oltmann?
8      A.  I don't recall having met him before the
9  interview that we did.  I meet a lot of people.  I knew
10  about him, but I don't recall exactly when I first met
11  him.
12     Q.  Okay.  Did you speak at a July 20, 2020, rally
13  in Denver that Mr. Oltmann also attended?
14     THE REPORTER:  Counsel, your audio is also
15  cutting out.  I'm concerned that this deposition is going
16  to be difficult until we resolve this audio issue.
17     MR. CAIN:  All right.  Let's go off the record.
18     THE VIDEOGRAPHER:  Going off the record.  The
19  time is 10:09.
20     (Recess from 10:09 a.m. until 10:13 a.m.)
21     THE VIDEOGRAPHER:  We're back on record.  The
22  time is 10:13.
23     Q.  (By Mr. Cain)  Okay.  Ms. Malkin, when we went
24  off, we were talking about whether you recalled being at
25  this July 20th rally in Denver with Mr. Oltmann.

Page 9

---

3 (Pages 6 - 9)

**Page 10**

1     Do you recall anything about that?
2     A.  I'd have to know more about which rally that
3  was.  I attended several rallies during the summer.  It
4  was --
5     Q.  Okay.  It -- it was a pro-police rally in Denver
6  on July 20th.
7     A.  I don't recall seeing him there.  I saw a lot of
8  people.  But I did attend that rally, yes.
9     Q.  When's the first time that you recall actually
10  speaking to Mr. Oltmann then?
11     A.  At the interview that I did with him.  I spoke
12  with him at length during that interview.
13     Q.  Were you a listener to his podcast, The
14  Conservative Daily, before you interviewed him?
15     A.  No.
16     Q.  Had you spoken at any FEC United functions prior
17  to the interview?
18     A.  No.
19     Q.  Are you a member of that organization?
20     A.  I am not.
21     Q.  Were you aware of Mr. Oltmann's efforts to
22  infiltrate Antifa prior to the interview he gave?
23     A.  Nope.
24     Q.  How did it come to be that he ended up on your
25  live stream?

**Page 11**

1     A.  I was contacted by a friend of mine,
2  Randy Corporon.  And then I followed him on Twitter.  He
3  was banned on Twitter the night before my live stream
4  interview the next morning.
5     Q.  Mr. -- you mentioned Mr. Corporon.  How do you
6  know him?
7     A.  We travel in the same political circles.  I have
8  been on his radio show many time -- many times over
9  the years.
10     Q.  When did he contact you about Mr. Oltmann?
11     A.  He said I should pay attention to his reporting
12  on election integrity.
13     Q.  Was this in a phone call?
14     A.  It was initially by a -- a Signal message, and
15  then I believe I had a short, brief conversation with him
16  the next day.
17     Q.  What do you remember about that conversation?
18     A.  He told me that Joe Oltmann had done a podcast
19  and that I should listen to it, and that I should explore
20  more about what he had been reporting on.
21     Q.  Did you listen to the podcast?
22     A.  I saw some snippets of information that he had
23  put up on Twitter, and I followed his Twitter account
24  before it was suspended the day before my interview.
25     Q.  My question was, did you listen to the podcast?

**Page 12**

1     A.  I listened to snippets of the podcast.
2     Q.  Was this a podcast relating to Eric Coomer?
3     A.  It was on election integrity issues.  I can't
4  recall specifically if he had mentioned Eric Coomer in the
5  snippets that I had listened to.
6     Q.  Okay.  So Mr. Corporon contacts you, says that
7  you need to follow what Mr. Oltmann is doing regarding
8  election integrity.
9     You then followed Mr. Oltmann on Twitter, saw
10  some snippets from his Twitter account, and listened to
11  some snippets, as you put it, on Mr. Oltmann's podcast; is
12  that correct?
13     A.  Correct.
14     Q.  Do you -- do you text with Mr. Corporon?  You
15  mentioned a Signal account.
16     A.  I have --
17     Q.  Do you text with him?
18     A.  I have texted with him, yes.
19     Q.  Okay.  I want to share my screen with you,
20  Ms. Malkin.  There's going to be some exhibits that I've
21  already premarked.  We're running these -- these exhibits
22  sequentially, so we have some exhibits that were already
23  marked in Ms. Powell's deposition.
24     We're going -- we're going to pick up
25  numerically from there, just so counsel knows.

**Page 13**

1     The next exhibit that has been marked -- and
2  it's in the marked exhibit folder -- is Exhibit 15.  I've
3  premarked Exhibit 15 through 30.
4     And, Ms. Malkin, just for ease, I'm going to --
5  I'm going to share my screen so that you can -- you can
6  follow along at home.
7     All right.  Do you see what I'm seeing, which is
8  Exhibit 25 to your deposition?
9     (Exhibit Number 25 was introduced.)
10     A.  Yes.
11     Q.  (By Mr. Cain)  This is a series of text messages
12  that you produced; correct?
13     A.  These, I believe, are Signal.  This is Signal.
14     Q.  Okay.
15     A.  So yes.  I mean, it's a text message, yes.
16     Q.  Text through Signal.
17     A.  Correct.
18     Q.  All right.  So you had Mr. Corporon's Signal
19  account, like you mentioned, and on Thursday, November 12,
20  at 12:57 p.m., it appears Mr. Corporon is sending you
21  Joe Oltmann's contact information; is that correct?
22     A.  Correct.
23     Q.  And this would have been after your discussion
24  with Mr. Corporon about following or paying attention to
25  Mr. Oltmann; right?

4 (Pages 10 - 13)

| | |
|---|---|
| 1   A.  I don't remember if it was before or after. | 1   Q.  Do you to still have those emails? |
| 2   Q.  Okay.  At or around the same time; fair? | 2   A.  I produced the emails, yes. |
| 3   A.  Yes.  Uh-huh. | 3   Q.  All right.  Tell me what you learned from having |
| 4   Q.  Okay. | 4   a conversation, either through emails or otherwise, with |
| 5   A.  Yes. | 5   Mr. Oltmann about what he was coming on your live stream |
| 6   Q.  And when did -- when did Mr. Oltmann ultimately | 6   to do or say. |
| 7   go on your -- your live stream? | 7       MR. QUEENAN:  Object to form. |
| 8   A.  It was a little bit after 10:00 in the morning | 8       You can answer. |
| 9   the next day, Friday, November 13th. | 9   A.  So I knew that he had been banned from Twitter, |
| 10   Q.  Okay.  So as of Thursday, November 12th, is | 10   and I knew that he had been covering an angle related to |
| 11   there any other biographical information you knew about | 11   Dominion Voting Systems, base -- which is a company based |
| 12   Mr. Oltmann other than what you've described to this | 12   here in Colorado. |
| 13   point? | 13   Q.  (By Mr. Cain)  Okay.  Anything else? |
| 14       MR. QUEENAN:  Object to form. | 14   A.  That's what I recall. |
| 15   Q.  (By Mr. Cain)  And, Ms. Malkin, I don't know if | 15   Q.  Well, didn't you discuss with him what he was |
| 16   you know this -- this process, but there will be | 16   going to be talking about on your live stream before you |
| 17   objections occasionally to preserve the record.  Unless | 17   went on? |
| 18   your counsel instructs you not to answer the question, | 18   A.  So this was essentially breaking news, because |
| 19   that's just to preserve the objection for the Court. | 19   he had been banned on Twitter, and whatever information |
| 20       You still need to respond to the question unless | 20   that he had been sharing, I was not privy to. |
| 21   you don't understand it and I'll -- I'll -- | 21       And so I wanted to give him a platform to talk |
| 22       MR. QUEENAN:  And, Ms. Malkin, in the future if | 22   about what it is he knew that had caused him to be banned. |
| 23   I object, I'll say you can answer or can't answer. | 23   Q.  Okay.  That -- that's the point of my question, |
| 24       So you can answer. | 24   ma'am.  What did he tell you before he went on your live |
| 25       THE WITNESS:  Okay. | 25   stream that he was going to talk about that caused him to |
| Page 14 | Page 16 |

| | |
|---|---|
| 1   A.  Sure.  I knew that he was a local businessman, I | 1   be banned on Twitter? |
| 2   knew that he was tech savvy, and I knew that he was a | 2   A.  So I did not have an extensive preinterview with |
| 3   philanthropist and a grassroots conservative organizer who | 3   him, because I did not know what he knew.  It was |
| 4   had been prominent in opposing the lockdowns here in | 4   essentially a breaking live news story, similar to many of |
| 5   Colorado, supporting the police, supporting local | 5   the previous live streams that I had broadcast throughout |
| 6   businesses, and religious liberty. | 6   the election season. |
| 7   Q.  (By Mr. Cain)  Okay.  So someone that shared | 7       MR. CAIN:  Objection.  Nonresponsive. |
| 8   your political and philosophical views; fair? | 8   Q.  (By Mr. Cain)  Let -- let me ask you this way. |
| 9   A.  Yeah -- | 9   Did you know before he came on your live stream that he |
| 10       MR. QUEENAN:  Object to form. | 10   was going to discuss a so-called Antifa conference call |
| 11       You can answer. | 11   where he identified Eric Coomer as being someone who made |
| 12   A.  Yes. | 12   a statement regarding fixing or rigging the 2020 |
| 13   Q.  (By Mr. Cain)  So after you received this | 13   presidential election? |
| 14   contact information, did you reach out to Mr. Oltmann | 14   A.  I did not know what he was going to talk about. |
| 15   directly? | 15   He did send me two zip files related to screenshots of |
| 16   A.  Yes, but not immediately. | 16   Facebook posts that were posted, he says, by Eric Coomer, |
| 17   Q.  Okay.  Tell me what you recall. | 17   and that was the main focus and thrust of the interview. |
| 18   A.  I reached out to schedule a live stream | 18   And we walked -- |
| 19   interview with him, and it was after he had been banned | 19   Q.  Okay.  So you -- pardon me, ma'am.  I'm sorry. |
| 20   from Twitter. | 20   A.  And that's what we walked through on the live |
| 21   Q.  Okay.  So you had a telephone discussion with | 21   stream. |
| 22   Mr. Oltmann before he got on your live stream; true? | 22   Q.  Okay.  So you received from Mr. Oltmann zip |
| 23   A.  I can't recall if it was a telephone | 23   files that contained private Facebook messages; is that |
| 24   conversation, but I know that I communicated with him by | 24   correct? |
| 25   email. | 25       MR. QUEENAN:  Object to form. |
| Page 15 | Page 17 |

5 (Pages 14 - 17)

1    You can answer.

2    A. He sent me zip files just as we were going to

3  air, and they were Facebook messages that he attributed to

4  Eric Coomer.

5    Q. (By Mr. Cain) Okay. And did he tell you that

6  this -- these Facebook messages were from a private

7  account?

8    MR. QUEENAN: Object to form and foundation.

9    You can answer.

10    A. He mentioned that they were from a Facebook

11  account that was Eric Coomer's. And he mentioned in the

12  interview, which there was a transcript of, that he had

13  obtained them, he says, legally.

14    MR. ZAKHEM: Are we still looking at this

15  exhibit? Can we take that down, Counsel?

16    MR. CAIN: Yeah. We're going to look at it in a

17  little more depth.

18    Q. (By Mr. Cain) Ms. Malkin, did you know before

19  Mr. Oltmann came on your live stream whether or not the

20  Facebook account messages were private or public? Did you

21  know one way or the other?

22    A. No.

23    Q. And it's your sworn testimony that Mr. Oltmann

24  did not, prior to appearing on your show, disclose to you

25  that he was going to be talking about Mr. Coomer allegedly

Page 18

1  being on an Antifa conference call?

2    A. I can't remember whether he mentioned that to me

3  prior to our going live on air.

4    Q. Well, what did you think he was coming on to

5  say?

6    A. I knew that he had been discussing Dominion

7  Voting Systems, which is based here in Colorado, as a

8  story of local interest. And because of everything that

9  had happened postelection, I wanted to give him a platform

10  to tell my audience exactly what he knew about it and why

11  Eric Coomer's role might be of concern.

12    I didn't know exactly what he was going to tell

13  me, because after I had followed him on Twitter the day

14  before, his account was deleted -- or rather -- let me

15  amend that. He had been suspended from Twitter,

16  permanently suspended.

17    Q. I gotcha.

18    So your testimony is you -- you really didn't

19  have a specific idea of what Mr. Oltmann was going to say

20  on your live stream before he came on; fair?

21    A. Well, I assumed that he wanted to talk about the

22  Facebook posts, because he sent two zip files of them as

23  we were going to air.

24    Q. Did he send you anything else besides the

25  Facebook posts, ma'am?

Page 19

1    A. No.

2    Q. Going back to Exhibit 25, just building the

3  timeline, this was on Thursday when you got Mr. Oltmann's

4  contact information. Bookmark that for a second, since

5  I'm just going to go sequentially on what you produced to

6  us.

7    The second page of this exhibit is a text or

8  Signal text from someone named Lauren. It says: "Hey

9  Michelle it's Lauren (previously from Hannity Radio). I

10  am working with Sidney Powell and Don Brown

11  (Clint Lorance's atty). We saw your interview with

12  Joe Oltmann - absolutely incredible. They'd like to get a

13  signed affidavit from Joe about Coomer and use his info in

14  their federal complaint. Is there any way you can put us

15  in touch?"

16    Did I read that correctly?

17    A. Yes.

18    Q. Okay. So this is obviously after the live

19  stream occurred. Who is this Lauren that you were

20  exchanging texts with?

21    A. Lauren McLaughlin is a former producer for the

22  Hannity radio show, and I believe at one time the TV show

23  who had booked him and used to book interviews that I

24  did for Hannity radio and, I believe, TV.

25    Q. Okay. And at the time that you were exchanging

Page 20

1  these messages, who -- do you know who she was working

2  with or for?

3    A. Not until she told me. The last time I had any

4  contact with her, as she mentioned, is the Clint Lorance

5  case, which was a soldier who had been wrongfully

6  convicted and then was released.

7    Q. All right. Did you follow up with

8  Ms. McLaughlin, putting them in touch; Joe Oltmann on the

9  one hand, and Ms. McLaughlin on the other?

10    A. I did.

11    Q. What did you do?

12    A. Gave the contact information from one to the

13  other.

14    Q. And that was the extent of it?

15    A. Yep.

16    Q. All right.

17    On Sunday the 15th, this would have been

18  two days after the live stream -- I don't have the full

19  text. This is how it was produced to us. It looks like

20  you're saying about "Connecting you with Joe ASAP." That

21  means Joe Oltmann, as you just testified.

22    "And I'll email one of his zip files. He has

23  tons of screenshots and documents. Stand" -- I assume you

24  said stand by.

25    Did you send that information to Lauren

Page 21

1  McLaughlin?
2    A.  Yes.
3    Q.  And the information that you sent included
4  screenshots, but you referenced documents.  What -- what
5  documents did you send Ms. McLaughlin?
6    A.  No documents.  I think I just meant the --
7  whatever was in the -- the zip file.
8    Q.  Okay.  Which, as you recall, were the -- just
9  the screenshots of the Facebook page?
10   A.  Right.  Correct.
11   Q.  This goes on to say -- again, it's cut off, but
12  this is what we have to work with:  "Record his call with
13  Antifa when Joe said he's taking care of the election;
14  right?  I couldn't tell if" -- and then it's cut off
15  again.
16      Do you recall what the exchange was here?
17   A.  I believe she was asking me did I know if
18  Joe Oltmann had recorded the phone call.
19   Q.  Okay.  Did you know that information as of the
20  15th?
21   A.  No.
22   Q.  So you didn't -- you didn't ask Mr. Oltmann
23  either during his live stream or during the preinterview
24  process or any time thereafter whether he had a recording
25  of this supposed Antifa conference call; is that true?
Page 22

1    Q.  (By Mr. Cain)  My question was --
2      MR. QUEENAN:  That's not nonresponsive.  That is
3  responsive.
4      MR. CAIN:  Well, that's not a -- that's an
5  improper sidebar, Gordon.  I'm making an objection for the
6  record.
7      MR. QUEENAN:  You're making an improper
8  objection.  She's responding to your question.  The fact
9  that you don't like her answer doesn't make it
10  nonresponsive.
11     MR. CAIN:  Well, if we're going to play it that
12  way with the sidebars, then -- then so be it, Gordon.  But
13  I'm going to object for the record just like you will.
14  Don't comment on my objections.  If you don't like any of
15  my objections --
16     MR. QUEENAN:  I just ask that you be respectful
17  to me and the witness.  That's all I'm asking.
18     MR. CAIN:  I'm being respectful.  I'm making my
19  objection as I see fit.
20     MR. QUEENAN:  That's fine.
21   Q.  (By Mr. Cain)  So, ma'am, did you think to ask
22  him about whether there was a recording of this call or
23  not?
24   A.  I did not.
25   Q.  You -- you mentioned that Mr. Oltmann was tech
Page 24

1    A.  You asked me two different questions.
2      I did not ask him if he had recorded the phone
3  call.
4    Q.  And you didn't think that was an important
5  question to ask --
6      MR. QUEENAN:  Can I just (unintelligible) really
7  quick?
8      You mentioned that that text message is
9  incomplete.  I think the full version of that text message
10  is Malkin Text 9.
11     So to the extent that's helpful, we -- we did
12  produce that full text message.
13     MR. CAIN:  Okay.  Thank you, Gordon.
14   Q.  (By Mr. Cain)  Ma'am, let's go back to my
15  question.  Did you ever ask Mr. Oltmann if he had a
16  recording of the Antifa conference call?
17   A.  I did not.
18   Q.  And you didn't think that was important in terms
19  of corroborating his version of this call?
20   A.  During the live stream, he described the phone
21  call, and we then proceeded to go into detail about the
22  Facebook screenshots.
23     If he had a recording of the phone call, I
24  think, at the time, he probably would have released it.
25     MR. CAIN:  Objection.  Nonresponsive.
Page 23

1  savvy.  Would you have expected him, if he was going to
2  crash an Antifa conference call, to record it?
3      MR. QUEENAN:  Object to form.
4      You can answer.
5    A.  You'd have to ask him about that.
6    Q.  (By Mr. Cain)  You didn't find that curious
7  yourself?
8    A.  Not in the context of him explaining why he was
9  on the call in the first place, which he --
10   Q.  Right.
11   A.  -- went into detail in on my interview.  He
12  initially did not go on to that phone call thinking that
13  there was going to be somebody of import to the election
14  at the time, because he was investigating something
15  entirely different.
16     So, you know, unless he had some sort of magic
17  ball, he -- he -- it wouldn't have occurred to him to --
18  to do that.  But, again, ask him about that, not me.
19   Q.  Well, I'm going to ask you what you know, and
20  what you know seems to be from him.  So let's -- let's
21  continue this line of questioning.
22     Did you talk to him before he went on your live
23  stream about how he was able to access this Antifa
24  conference call?
25   A.  I did not.
Page 25

7 (Pages 22 - 25)

1    Q.  Did you ever ask him if he had credentials to
2  access it or if he used a conduit to get on to the call?
3    A.  What I --
4    MR. QUEENAN:  Object to form.
5    You can answer.
6    A.  What I knew about how he came on to the phone
7  call, what he was doing there, what he discovered, and why
8  he realized it was important only became clear to me as we
9  were doing the interview.  That was the reason for doing
10  the interview in the first place.
11    Q.  (By Mr. Cain)  So I'm scrolling down just to try
12  to get through this exhibit.  This is some more of your
13  email chain with Ms. McLauglin.  It looks like she
14  provided you with her Gmail account so you could send the
15  information you had gotten from Mr. Oltmann; is that true?
16    MR. QUEENAN:  Object to form.
17    A.  Yes.
18    Q.  (By Mr. Cain)  Okay.  And here's what your
19  counsel was talking about.  This is the full message from
20  Ms. McLauglin.
21    All right.  And I went through that just to get
22  back to your communications with Mr. Oltmann.
23    We saw earlier, you got the -- the contact
24  information from Mr. Corporon on the 12th, sometime
25  shortly after noon, and then looks like later on the 12th,

Page 26

1    Q.  (By Mr. Cain)  Do you -- as of this period of
2  time on November 13th, do you -- do you have any
3  recollection as to why Twitter was suspending accounts
4  such as Mr. Oltmann's?
5    A.  In general, my recollection is that many users
6  who were tweeting about election integrity were getting
7  suspended or banned.
8    Q.  And you know it was because -- or Twitter has
9  said that it's because the information that was being
10  disseminated by these Twitter account holders was either
11  misinformation, disinformation, or flat false.
12    You know that; right?
13    A.  Yes --
14    MR. QUEENAN:  Object to form and foundation.
15    A.  Yes, I do.
16    Q.  (By Mr. Cain)  So Mr. Oltmann goes on to say
17  that Twitter suspended his account, and that he filed an
18  affidavit with the Trump administration, and the death
19  threat's rolled in.
20    Let me -- let me pause there.  Had you, at this
21  point, had any communications with anyone with the Trump
22  campaign regarding election integrity issues?
23    A.  No.
24    Q.  Do you know whether Ms. McLauglin was working
25  for the Trump campaign?

Page 28

1  at 1:55 p.m., Mr. Oltmann kind -- is in touch with you.
2    Is that -- is that how it happened?
3    A.  Yes.
4    Q.  Okay.  So 1:55 the day before the live stream:
5  "Hi, Michelle.  This is Joe Oltmann.  Hoping to connect
6  with you at some point.  I'm not usually the public person
7  but the calls and emails are pouring in."
8    It looks like then you respond:  "Hi, Joe."
9  This is the afternoon before the live stream.  "Great work
10  you are doing.  Let's touch base tomorrow.  If you are up
11  for a live stream in the afternoon, that would be great."
12    And then it doesn't look like, and -- and
13  correct me if this -- if your memory is different, but it
14  doesn't look like you got confirmation that Mr. Oltmann
15  would appear on your live stream until early in the
16  morning of Friday, November 13th; is that correct?
17    A.  Yes.
18    Q.  So this was a fairly precipitous booking on to
19  your live stream.  Is that a fair characterization?
20    MR. QUEENAN:  Object -- I apologize.  Object to
21  form.
22    A.  Yes.  So as I stated, it was the suspension of
23  his Twitter account that raised the news urgency of having
24  him on my show to talk about what it is that got him
25  suspended.

Page 27

1    A.  No.
2    Q.  Had you had any discussions with either
3  Ms. Sidney Powell or Mr. Giuliani as of this point in time
4  regarding election integrity issues?
5    A.  No.
6    MR. QUEENAN:  Object to form.
7    A.  No.
8    Q.  (By Mr. Cain)  Okay.  So Mr. Oltmann confirm --
9  confirms that he'll be a guest on your live stream, it
10  appears, early that morning.  Again, around 4:43 a.m.  And
11  then at 6:21 -- this is your response; right?
12    A.  Correct.
13    Q.  Okay.
14    "Very crazy.  Thanks for standing up.  Can you
15  do a live stream at 10:00 a.m.?"
16    "Yes, I can."
17    "Okay, great.  I use a platform called
18  StreamYard."
19    And then you go into, essentially, the nuts and
20  bolts of how to do the live stream; right?
21    A.  Correct.
22    Q.  So is it -- is it fair to say that at this
23  point, you really hadn't had the time to thoroughly vet
24  Mr. Oltmann's story as to what he was going to come on to
25  your live stream to say.  Is that true?

Page 29

8 (Pages 26 - 29)

1    MR. QUEENAN:  Object to form.
2    A.  Yes.  Whatever information I could have gleaned
3  the night before or the morning of, I was denied that
4  information because his Twitter account was nuked.
5    Q.  (By Mr. Cain)  Okay.  And just to be clear, did
6  you have an inkling that part of what Mr. Oltmann was
7  coming on your live stream to talk about included this
8  person named Eric Coomer, who worked for Dominion Voting
9  Systems?
10    A.  In general, yes.
11    Q.  Okay.  And did you -- prior to this point in
12  time, had you heard of Mr. Coomer?
13    A.  Prior to the election, or prior to the -- the --
14    Q.  Your live stream.
15    A.  I believe his -- I believe I had seen the name
16  the day before on Twitter.
17    Q.  Okay.  On -- do you remember the account?
18    A.  No.  I -- I follow thousands of people on
19  Twitter.
20    Q.  Right.  And you have, what, two million
21  followers on your Twitter account?
22    A.  Something like that, yes.
23    Q.  As of this point in time that we're talking
24  about, November of 2020, just after the election, you had
25  around two million followers; true?

Page 30

---

1    I did not think of -- I -- I did not think one
2  way or another about whether he was a private or public
3  figure.
4    Q.  Okay.  Do you have a -- a belief one way or the
5  other as you sit here, as of the time of your live stream,
6  did you consider him to be a public figure, Mr. Coomer?
7    MR. QUEENAN:  Object to form and foundation.
8    A.  I considered him to be a figure of public
9  interest, which is why I held the live stream in the first
10  place.
11    Q.  (By Mr. Cain)  Well, we -- we looked at the lead
12  up to this, and it appears from your timestamps on your
13  emails that you confirmed that Mr. Oltmann would appear on
14  your live stream about three and a half hours before
15  you -- you went live.
16    Is that accurate, just temporally?
17    A.  Sure.
18    Q.  Okay.  And then you had received shortly before
19  the live stream a -- a group of Facebook screenshots.
20    Had you talked to Mr. Oltmann before he went on
21  your live stream about how he actually got access to those
22  screenshots?  I know you said he -- he said it was legal.
23  But did he disclose to you how he got access?
24    MR. QUEENAN:  Object to form, and I think I asked
25  and answered.

Page 32

---

1    A.  Yes.
2    Q.  Okay.  But to Mr. Coomer, my question was, other
3  than what you may have seen on that one Twitter account,
4  you really had no biographical information on him, didn't
5  know who he was, what he did; fair?
6    MR. QUEENAN:  Object to form.
7    You can answer.
8    A.  I did not.
9    Q.  (By Mr. Cain)  And you didn't consider -- you
10  didn't know him to be a public figure such as yourself;
11  true?
12    MR. QUEENAN:  Object to form and foundation.
13    A.  I knew that he was a high-profile executive at
14  Dominion Voting Systems.
15    Q.  (By Mr. Cain)  Okay.  Which is a private
16  company; right?
17    A.  Yes.
18    Q.  All right.  But did you consider Mr. Coomer to
19  be a public figure at the time that your live stream
20  went -- went on air on the -- on the following day, on
21  Friday?
22    MR. QUEENAN:  Object to form.
23    Q.  (By Mr. Cain)  Do you know, ma'am?
24    A.  Yes.  Well, I'm -- I'm just thinking about the
25  question, if that's okay.

Page 31

---

1    Go ahead and answer.
2    A.  You did ask it previously, and I did answer
3  that, no, we did not discuss that prior to going live on
4  air.
5    And as I had mentioned earlier, I received the
6  zip files as we were -- literally as we were going live on
7  air.
8    Q.  (By Mr. Cain)  You know, though, that -- that
9  individuals can make their Facebook pages public or
10  private; right?
11    MR. QUEENAN:  Object to form.
12    A.  They can close them off, yes, to groups of -- of
13  people, yes.
14    Q.  (By Mr. Cain)  Okay.  And did you inquire about
15  that?  That was the point of my question.  Did you inquire
16  whether this was a closed-off-to-the-public Facebook page?
17    A.  As I mentioned, I did not ask about that.
18    Q.  Do you have a -- do you have a private Facebook
19  page?
20    MR. QUEENAN:  Object to form and found-- well,
21  actually, relevance.  What does this have to do with
22  actual malice or any of this -- the issues in the -- in
23  the litigation?  Is it just about her knowledge of
24  Facebook generally?
25    MR. CAIN:  No, it's -- it's not.  It's more

Page 33

---

9 (Pages 30 - 33)

1 specific than that. And -- and we have more than, of
2 course, the defamation claim.
3      Your client was publishing private Facebook
4 pages on her live stream. That's what I'm inquiring
5 about.
6      MR. QUEENAN: That's got nothing to do with --
7      Q. (By Mr. Cain) Do you have a private Facebook
8 account --
9      MR. QUEENAN: -- having a private Facebook
10 account.
11      Q. (By Mr. Cain) Do you have a private Facebook
12 account, ma'am?
13      A. No, I don't.
14      Q. As for Mr. Coomer, or Dr. Coomer, you mentioned
15 that you knew he was a high-profile executive at Dominion
16 Did you have time to do any research about him before
17 putting Mr. Oltmann on your live stream?
18      A. No.
19      Q. And had you done any independent research --
20 this was, of course, after the election, but had you done
21 any independent research about Dominion Voting Systems
22 before this live stream?
23      MR. QUEENAN: Object to form.
24      A. Yes.
25      Q. (By Mr. Cain) Okay. Walk me through that.

Page 34

1      see if I can pull that. Bear with me.
2      THE VIDEOGRAPHER: And, Ms. Malkin, this is the
3 videographer. If you could just delay your response a
4 little bit to give your counsel a chance to object if he
5 wants to, it will make it a much cleaner record for the
6 court reporter.
7      THE WITNESS: Yeah. Sorry about that.
8      MR. QUEENAN: I'm sorry, Dennis.
9      Q. (By Mr. Cain) All right. Ms. Malkin, I'm
10 showing you what has been electric- -- electronically
11 marked as Exhibit 15.
12      (Exhibit Number 15 was introduced.)
13      Q. (By Mr. Cain) This is, I'll just represent to
14 you, the live stream that we've been talking about that
15 was on Friday, November 13th.
16      Are you with me?
17      A. Yes.
18      MR. QUEENAN: Charlie, before we go any further,
19 I have -- I have you marking the text messages as 15.
20 Should this be 16, or did I have the text messages wrong?
21      MR. CAIN: Yeah. The texts were 25. I may have
22 misspoken --
23      MR. QUEENAN: Okay.
24      MR. CAIN: -- the texts. And they're -- and
25 like I said, they're on the Exhibit Share. But to be

Page 36

1 What research had you done and when?
2      A. Over the course of 30 years, I've been
3 interested in many aspects of election integrity, and
4 electronic voting systems has reared its head as a -- as
5 an election issue for as long as I've been a political
6 journalist.
7      And although it wasn't a -- as keen a focus of
8 mine in -- in 2020, I had watched documentaries on
9 electronic voting systems. Dominion's name had come up in
10 general. And there had been concerns across the
11 ideological spectrum about the potential for shenanigans
12 and fraud and -- and hacking of these types of systems in
13 the United States and around the world.
14      Q. But let's -- let's focus on the time period
15 around the 2020 presidential election, shortly before
16 and -- and thereafter, before your live stream.
17      Had you taken a closer look at Dominion Voting
18 Systems specifically beyond what you've described?
19      MR. QUEENAN: Object to --
20      A. No. Oh.
21      MR. QUEENAN: I'll withdraw the objection.
22      THE WITNESS: Okay.
23      A. No.
24      Q. (By Mr. Cain) Okay. So he comes -- he,
25 Mr. Oltmann, comes on your -- your live stream. Let me

Page 35

1 clear, the texts were 25, and this is Exhibit 15.
2      MR. QUEENAN: Okay. I apologize. Thanks for
3 clarifying.
4      Q. (By Mr. Cain) Ms. Malkin, we're going to look
5 just a little bit at some sections of your live stream.
6 Okay?
7      A. Okay.
8      (The video segment was played.)
9      Q. (By Mr. Cain) All right. I'm going to pause
10 there.
11      So you say that you're bringing information
12 vital to the understanding of the "systemic stealing of
13 the election." We just heard that.
14      At this point in time, what were you referring
15 to when you're telling your audience that you're bringing
16 information regarding the "systemic stealing of the
17 election"?
18      A. Yeah. I think broadly defined, the "stealing of
19 the election" took many forms. And over the course of
20 many of these live streams that I did, as I mentioned in
21 the introductory remarks, it paints a picture of election
22 integrity that was undermined by many forces.
23      And so the prime focus of mine was a nonprofit
24 called the Center for Tech and Civic Life, which was
25 heavily funded by Mark Zuckerberg.

Page 37

10 (Pages 34 - 37)

1     But that's just one aspect of it. I've covered
2  election fraud, as I mentioned, over the last 30 years.
3  And it's the entire mountain of everything from
4  illegal-alien fraud, fraud that was catalyzed by the motor
5  voter law, its obstruction of GOP poll workers.
6     And I had interviewed one of them in Michigan.
7  It had to do with a -- a lot of the training that I
8  believe was done by partisan figures and electronic voting
9  systems and the weaknesses and the -- the problems with
10 those, which have been highlighted by, as I said, people
11 on both the left and the right, is part of that larger
12 picture of the stealing of an election.
13    Q.  And that's how you framed the story that you
14 were doing on -- on Eric Coomer on this live stream,
15 though; that he -- that this was part of this systemic
16 stealing of the election; true?
17    A.  Correct.
18    Q.  And you wanted the viewers to know that -- that
19 Eric Coomer was potentially instrumental in the stealing
20 of the 2020 presidential election; true?
21    A.  I wanted people to hear what Joe Oltmann had
22 discovered about him, and why he felt it was important and
23 germane to the public discussion of how the election was
24 run, yes.
25    Q.  Okay.  And you didn't talk about -- I mean, this

Page 38

1  conclude that he was going to raise red flags about
2  Eric Coomer's role as -- as an executive in that company,
3  which, as I said in my prefatory remarks, had been in the
4  headlines and was of concern to my audience.
5     MR. QUEENAN:  I apologize, everybody.  My Zoom
6  crashed about three minutes ago.
7     MR. CAIN:  She just confessed to the crime.
8     MR. QUEENAN:  Then I object to form and
9  foundation.
10    Are we -- I'm sorry.  I assume we're still on
11 the record?
12    MR. CAIN:  We've been on the record, Gordon.
13 And I don't know what to do to -- to cure that.  I'll give
14 you the option, if you want, during the last four minutes
15 to interject to form, objection after the facts, if you
16 want to review the transcript.
17    MR. QUEENAN:  That sounds great.
18    MR. CAIN:  Let's move on --
19    MR. QUEENAN:  Yeah.
20    Q.  (By Mr. Cain)  Let's move on, Ms. Malkin.
21    We're at 1:04 in your live stream with
22 Mr. Oltmann.  You bring him on.  And -- and I assume this
23 is the first time you remember, like, seeing him.  Didn't
24 sound like you had --
25    A.  It is --

Page 40

1  entire live stream was devoted to Eric Coomer, was it not?
2     A.  It was, because that's the information
3  Joe Oltmann had to bring to the table.
4     Q.  Right.  Well, you mentioned Zuckerberg and --
5  and a bunch of other things that you had been reporting
6  on.
7     But in -- in the context of this live stream
8  that you framed as the "systemic stealing of the election"
9  as being the topic, Eric Coomer was the only person you
10 were talking about on this day; right?
11    A.  On this day, it was.  But I think the context of
12 the series of live streams that I had done, which my many
13 viewers on YouTube and Twitter and Facebook had followed,
14 understood that it was a bigger picture, an -- an entire
15 umbrella of election integrity irregularities and concerns
16 that spelled the stealing of an election, yes.  I believe
17 that they understood when I prefaced my remarks that
18 that's what I was talking about.
19    Q.  All right.  But as you've testified, ma'am, you
20 didn't know what Mr. Oltmann was going to say about
21 Dr. Coomer before he went on your show.  All you had was
22 his Facebook posts; right?
23    A.  So I had in my possession the Facebook posts.
24 Certainly knowing who Joe Oltmann was and that he had been
25 covering concerns about Dominion, I think it was fair to

Page 39

1     Q.  -- you knew what you were looking at before now.
2     A.  Correct.
3     Q.  Okay.
4     (The video segment was played.)
5     Q.  (By Mr. Cain)  I noticed -- I'll stop there.
6  Mr. Oltmann mentions this FEC United, and I -- I know I
7  asked you about that organization before.
8     Did you know when he was coming on your live
9  stream that he was going to be talking about FEC United?
10    A.  Well, he heads it, so I assumed, yes, that he
11 would.
12    Q.  And it looked like -- I don't know how your
13 program works for your live streams, but it looks like
14 when he mentions it, you -- you have the ability and did
15 throw that up on the screen.  Is that true?
16    A.  Yeah.  I do that for most of my guests if they
17 have an organization or whatnot, to put it in the lower
18 third or the chyron.
19    Q.  Yeah.  It helps get information or, at least,
20 the identity of the organization out to the public; fair?
21    A.  Yes.
22    Q.  There's some prefatory statements here.  I'll
23 try to fast forward.
24    I want to go into -- I think this section is
25 when he talks more specifically about this Eric Coomer

Page 41

11 (Pages 38 - 41)

1  story.
2       (The video segment was played.)
3    Q.  (By Mr. Cain)  I'm going to stop there.
4       So the week of the 27th of September is when
5  Mr. Oltmann indicated that he was on this Antifa
6  conference call.
7       Is that -- is that your recollection, ma'am?
8    A.  That's what he said.
9    Q.  Okay.  So that would have been, you know, over a
10 month before the election itself; true?
11   A.  Correct.
12   Q.  And -- and this is now after the election, and
13 he's making it public on your show that he had learned
14 back in September prior to the election; fair?
15   A.  Yes.
16   Q.  And in your preinterview -- well, you've --
17 you've talked about the limited discussion.  Did it strike
18 you at all when you were listening to this as to the
19 timing of all of this?  Why he was just now bringing up
20 this alleged call when it occurred back in September?
21       MR. QUEENAN:  Object to form.
22   A.  Well, if you keep playing it, he explains why it
23 didn't occur to him until later to connect the dots.
24   Q.  (By Mr. Cain)  All right.
25       (The video segment was played.)
                                                    Page 42

1    Q.  (By Mr. Cain)  I'm going to pause there.
2       You learned, I guess, for the first time here,
3  that someone named Eric from Dominion was on this call.
4  But there was no -- as you heard, there was no mention
5  that it was an Eric Coomer; true?
6    A.  Right.  But then, as I recall from doing the
7  interview, he explains how it is that he connected those
8  dots.
9    Q.  Right.  And -- and we'll get to that.
10      But --
11   A.  Right.
12   Q.  -- it's a fair statement that the allegation
13 that Mr. Oltmann was making was that he was on a call.
14 And at the time, there was no -- no identification beyond
15 Eric of Dominion; right?
16   A.  At this point, no.
17   Q.  All right.  And he also mentioned that he was
18 taking copious notes.  You heard that; right?
19   A.  Yes.
20   Q.  Did you ever ask to see the notes that he took
21 of this Antifa conference call?
22   A.  No.
23      (The video segment was played.)
24   Q.  (By Mr. Cain)  Now, at this point in your live
25 stream, ma'am, are you thinking about whether this story
                                                    Page 43

1  could be corroborated by other sources?  Is that going
2  through your head?
3    A.  I'm giving him a platform to tell me what he
4  knows, and I wanted to listen to what he had to say.  And
5  I believed it was important for my audience to be able to
6  hear what he had to say because he had been censored on
7  Twitter from saying it.
8       MR. CAIN:  Objection.  Nonresponsive.
9    Q.  (By Mr. Cain)  Let -- let me ask you this way.
10 Do you believe that you have a responsibility as a
11 journalist to put verifiable facts out, facts that can be
12 verified?
13      MR. QUEENAN:  Object to form and foundation.
14   A.  I believe that I have an imperative to broadcast
15 stories that are not being covered and to give a platform
16 to people who are being censored for disseminating what is
17 considered dangerous or dissident information but that is
18 of high public interest.  And election integrity certainly
19 was at that particular time and now.
20      MR. CAIN:  Objection.  Nonresponsive.
21   Q.  (By Mr. Cain)  My -- my question was maybe a
22 little bit different --
23   A.  I did respond.
24   Q.  Let me repeat it.
25   A.  I did respond to you.  I said -- I said what I
                                                    Page 44

1  had an obligation to do as a journalist, yes.
2    Q.  Did you have a responsibility as a journ- --
3  journalist to publish on your -- on your live stream or on
4  your show verifiable facts?  Yes or no?
5       MR. QUEENAN:  Object to form.
6    A.  If I were held to a standard of only live
7  streaming facts that I could verify beforehand, I would be
8  restrained from doing any live streams at all; and so, for
9  that matter, would any outlet that covers breaking news or
10 live streams.
11   Q.  (By Mr. Cain)  Well, you -- we'll talk about it
12 in a minute, ma'am.
13      But you -- you -- you replayed, not then
14 replayed -- you had another interview a couple of weeks
15 with Mr. Oltmann after this; right?
16   A.  Correct.
17   Q.  And by that point, it wasn't breaking news, was
18 it?
19   A.  Those were completely two different forms of
20 journalism.  This is a live stream that was conducted by
21 myself independently, and the follow-up program was on a
22 corporate news channel, as you know.
23   Q.  I do know.
24      Is it your view, then, ma'am, if you're
25 conducting a live stream with, as you call it, breaking
                                                    Page 45

                                        12 (Pages 42 - 45)

1  news, that you have no responsibility to verify the
2  factual accuracy of the person that's making the
3  statements?
4      MR. QUEENAN: Object to form and foundation.
5      A. I always do my best to report the truth in
6  whatever platform or medium I am on.
7      Q. (By Mr. Cain) Well, you started off your live
8  stream by saying that you're reporting on the systemic
9  stealing of the election, but we've already established
10  you didn't even know what he was going to say on your live
11  stream.
12      MR. QUEENAN: Object to form and foundation.
13      Q. (By Mr. Cain) You didn't know what he was going
14  to say; true?
15      A. I had a general idea that he was going to talk
16  about red flags that he was raising about Dominion that
17  got him suspended from Twitter.
18      Q. What if what he was saying was false, ma'am? Do
19  you have a responsibility as a journalist, even if it's
20  breaking news, to -- to correct the record if false facts
21  are said in this context?
22      MR. QUEENAN: Object to form and foundation.
23      A. I do correct the record if it comes to light
24  that what I have said or broadcast is false.
25      Q. And that's -- that's an -- that's an ethical

Page 46

1  duty that a journalist has; right? That's a fair
2  statement, isn't it?
3      A. Yes.
4      MR. QUEENAN: Object to form and foundation.
5      A. Yes.
6      Q. (By Mr. Cain) And don't you agree with me that
7  if -- if you're verifying facts that you're putting out
8  into the public discourse and you're being transparent
9  with your audience, that that is a way that a journalist
10  can eliminate the potential for bias?
11      MR. QUEENAN: Object to form.
12      Q. (By Mr. Cain) Do you agree with that statement?
13      A. Can you repeat the question?
14      Q. Yeah. I'll -- I'll do it in a shorter form.
15      Verification and transparency in reporting
16  eliminates or reduces bias in reporting.
17      A. Sure.
18      MR. QUEENAN: Object to form and foundation.
19      Q. (By Mr. Cain) That's -- that's a basic tenant
20  of journalism, isn't it?
21      MR. QUEENAN: Object to form and foundation.
22      Q. (By Mr. Cain) Did you answer? You were talking
23  over a little bit.
24      A. I did.
25      Q. Okay. And your answer was "Yes"; right?

Page 47

1      A. I said, "Sure."
2      Q. Okay.
3      And you actually -- I mean, you were a print
4  journalist for a while, were you not?
5      MR. QUEENAN: Object to form.
6      Q. (By Mr. Cain) And you worked for a newspaper,
7  maybe even more than one; right?
8      A. I'm a multimedia journalist. I started out my
9  career as an intern in Washington, D.C., for NBC News,
10  when Tim Russert was the Washington bureau chief. I
11  worked for two major metropolitan newspapers, the
12  L.A. Daily News and the Seattle Times.
13      I've had a nationally syndicated newspaper
14  column since 1999. I've worked for a number of cable TV
15  stations, written seven books, and founded two internet
16  news companies.
17      Q. So you're more than familiar, based on that
18  experience, in the standards relating to journalistic
19  reporting; right?
20      A. Yes.
21      MR. HICKS: Object to form.
22      Q. (By Mr. Cain) Things like corroborating
23  sources, when and if to use anonymous sources, those sort
24  of standard journalistic practices; right?
25      A. Yes.

Page 48

1      Q. Right. And as you sit here -- and we listened
2  to some of your live stream -- did you hear anything in
3  what Mr. Oltmann was saying that indicated to you that
4  this could be corroborated --
5      MR. QUEENAN: Object --
6      Q. (By Mr. Cain) -- his story?
7      MR. QUEENAN: Object to form.
8      A. So as the live stream unfolded, I was listening
9  to his firsthand account of what he says that he heard,
10  and then what he saw in a very large series of screenshots
11  of Facebook posts whose authenticity has not been
12  questioned.
13      Q. (By Mr. Cain) Okay. Well, I'm -- I'm talking
14  about the story that he gave you.
15      A. And part of the -- a huge part of the story and
16  the bulk of what we talked about in our live stream were
17  the screenshots that he had obtained that were attributed
18  to Eric Coomer.
19      Q. Okay. And we'll -- we'll get to those, ma'am.
20  Let's not put the cart before the horse.
21      What I'm -- what I'm asking you about, you heard
22  what he was saying. Did you hear anything with your
23  journalistic ear that gave you some clues as how -- as to
24  how you might corroborate that story that he was telling
25  you?

Page 49

13 (Pages 46 - 49)

1    MR. QUEENAN: Object to form.
2    A.   At the time of the live stream, my main focus
3  was in giving him a platform to tell me and to tell my
4  audience what he knew about Eric Coomer and to share
5  information that he had gathered about Eric Coomer's bias,
6  because that bias was pertinent to people's understanding
7  and perspective of Dominion Voting Systems.
8    Q.   (By Mr. Cain)  What do you mean by "bias"?
9  What -- what "bias" are you referring to?
10   A.   I'm talking about the substance of the Facebook
11 posts in which Eric Coomer manifested an extreme bias
12 against Donald Trump, against his supporters, against the
13 police, and many other people who are ideologically
14 similar to Joe Oltmann and myself.
15   Q.   Well, what -- what if he was a -- a -- let's
16 just run with what you're saying.
17      What if -- what if Mr. -- or Dr. Coomer was a
18 vehement supporter of Donald Trump?  Are you saying that
19 an election worker can't have a political viewpoint?
20      MR. QUEENAN: Object to form.
21   Q.   (By Mr. Cain)  I'm trying to understand the
22 relevance of -- of this.
23   A.   Sure.  I'd -- I'd be glad to explain it.
24      Eric Coomer was a high-profile, highly placed
25 executive at Dominion Voting Systems, not just a

Page 50

1  rank-and-file election worker.
2       And I wanted to bring this information that
3  Joe Oltmann had obtained to my audience so that they could
4  make determinations for themselves about how concerned to
5  be about Eric Coomer and his role at Dominion.
6    Q.   Well, he's entitled to have a political
7  viewpoint; isn't he?
8    A.   I'm not disputing that.
9    Q.   Okay.  Well, then, I -- you're not linking it
10 for me, either.  If -- if he happened to be a --
11   A.   I'm sorry.  I didn't understand the word that
12 you said.  I'm not --
13   Q.   Linking it.  I'm originally from Texas, so
14 sometimes I drop the G.
15      I don't understand how you're linking this.  If
16 an election worker -- there are thousands of election
17 workers in the United States.  You know that; right?
18      MR. QUEENAN: Object to form and foundation.
19   Q.   (By Mr. Cain)  You know that, don't you?
20   A.   Yes, I know that.
21   Q.   Okay.  Good.
22      And there's a variety, must be a variety of
23 political viewpoints amongst election workers; right?
24   A.   Yes.
25   Q.   Stands to reason, doesn't it?

Page 51

1       So if that's true, then -- then how are you
2  sitting here linking a political viewpoint with one's
3  ability to administer or serve in a -- in an election
4  role?  I don't get it.
5       MR. QUEENAN: Object to form.
6       You can answer.
7    A.   What's the question?
8    Q.   (By Mr. Cain)  Who cares?  Maybe he didn't like
9  Donald Trump.  What does that have to do with election
10 integrity?
11   A.   Joe Oltmann explains why he believes it is
12 relevant, and I agree with him; that it is concerning that
13 the sheaf of Facebook posts that not merely express some
14 di minimus level of discontent but are actually very
15 extreme and profane in vitreal and even hatred for people
16 who are on the right, is of great public interest to
17 voters who were concerned about how Election 2020 was
18 conducted.
19   Q.   And so that's why you chose to -- to put up the
20 Facebook posts during this live stream?
21      MR. QUEENAN: Object to form.
22   Q.   (By Mr. Cain)  Is that why?
23   A.   Yes.  Eric Coomer was a high-level official for
24 Dominion Voting Systems whose products are used in almost,
25 what, 30 states in the country.  Dominion was at the

Page 52

1  center of public media attention and policy attention in
2  the aftermath of Election 20 -- 2020, and information
3  pertaining to high-level officials, particularly one whose
4  title is vice president of strategy and security, is
5  certainly of great news value to my viewers and should
6  have been to any consumers of -- of news at that time.
7       MR. QUEENAN: Mr. Cain, just for the record,
8  communications from Brad -- it looks like from Brad
9  Kloewer -- are coming in, and I can see them on the screen
10 share.  So I'm assuming they're being recorded.  I'm
11 guessing that's inadvertent.  I just wanted to flag it for
12 you.
13      MR. CAIN: It's on a separate screen.  That's --
14 can you see them now?
15      MR. QUEENAN: Not now.  But there was a pop-up
16 on the top right corner where, like -- I'm guessing you're
17 on a --
18      MR. CAIN: I see.
19      MR. QUEENAN: Like, under the date, basically,
20 in the top right corner of your screen, I could see Brad
21 was -- it looked like it was a proposed question or
22 something like that.
23      MR. CAIN: Thank you for pointing that out.
24      For the record, I generally ignore what Brad has
25 to say, so it didn't matter.  I'm just kidding, Brad.  I

Page 53

14 (Pages 50 - 53)

1  actually do care what you have to say.
2    Q.  (By Mr. Cain)  Let me ask you:  Did you do any
3  reporting during the 2020 election cycle on Trump poll
4  workers or Trump election workers in states that Trump
5  won, or were you just focused on the left?
6    A.  I --
7        MR. QUEENAN:  Object --
8    A.  -- am known as a conservative journalist.  That
9  doesn't mean that I don't cover corruption or shenanigans
10 on the other side.  But in this -- in that election year,
11 my focus was on election fraud and election shenanigans
12 and problems that were placed on the left side of the
13 aisle.
14        There's -- there's not -- I don't -- not -- I --
15 I've -- I've never, in the nearly 30 years that I've been
16 a journalist, ever hid what ideological side of the
17 spectrum I belong on.
18    Q.  (By Mr. Cain)  Yeah.  But I asked you a yes/no
19 question:  Did you do any of those stories?
20        And from what I heard your -- your answer, I'm
21 going to imply that the answer is no; you didn't do any
22 stories on Trump election personnel in -- in states that
23 Trump won.  True?
24    A.  True.
25    Q.  Okay.  At or around the 11-minute mark -- and
                                                  Page 54

1    MR. QUEENAN:  Object to form.
2    A.  Facebook keeps those statistics.  And it
3  sometimes flashes, if I'm paying attention, how many
4  people will be on it.
5    Q.  (By Mr. Cain)  Okay.  Any -- any guess on how
6  many folks were watching your live stream on this day?
7    A.  I don't know.  I could go back and look at the
8  statistics and tell you precisely how many people watched.
9    Q.  All right.  Well, suffice it to say that at this
10 point, 12 minutes in, you know now that you're showing
11 your live stream audience what purport to be private
12 Facebook posts by Dr. Coomer; fair?
13        MR. QUEENAN:  Object to form and foundation.
14    A.  So I don't -- I don't know what type of a
15 Facebook account it was other than that Joe Oltmann
16 attributed the Facebook posts to Eric Coomer.
17    Q.  (By Mr. Cain)  Okay.  And that was the extent of
18 your knowledge?
19    A.  Yes.
20    Q.  And he never disclosed to you the means -- the
21 manner or means by which he gained access?
22    A.  He said during the live stream that he obtained
23 them legally.
24    Q.  Do you -- have you done any research since this
25 live stream as to whether it is legal to access a private
                                                  Page 56

1  I'm going to play a little bit more of this, and then
2  we'll move on to another scintillating topic.  This is
3  when you start going into, I think, the Facebook.
4        (The video segment was played.)
5    Q.  (By Mr. Cain)  And that's because -- I'll stop
6  there -- because it became evident to you at this point
7  that this was not a public Facebook page; correct?
8        MR. QUEENAN:  Object to form and foundation.
9    A.  At -- at that point, 1 wasn't -- I didn't -- I
10 didn't know what he -- I didn't know what he meant.
11        But when he told me that he -- he -- he mentions
12 that he obtained them legally, I -- I took him at his word
13 because I had no reason to question him or doubt him
14 otherwise.
15    Q.  (By Mr. Cain)  Well, you don't -- I mean, you're
16 not an attorney; right?
17    A.  No.  But you had asked me how I knew him, how
18 I -- how I came to know his -- his work, what I knew about
19 his reputation.  And based on all of that, I -- I -- I
20 didn't have reason to -- to think that he was lying to me.
21    Q.  Right.  But as of 12 minutes into your live
22 stream, it's clear to you that you're, on -- on your live
23 stream -- by the way, let me back up.
24        Do you know how many people watch your live
25 stream at any given time?
                                                  Page 55

1  Facebook page and then post those in a public forum?
2    A.  No.
3        MR. QUEENAN:  Object to form and foundation.
4        And to the extent that question is calling for
5  information that would have been gleaned from
6  attorney-client communications, I -- I'd object to
7  privilege as well.
8        MR. CAIN:  She's -- I -- I understand that.
9  She's answered it.
10    Q.  (By Mr. Cain)  I'm going to fast forward a
11 little bit.  You -- you keep showing or -- well, let me
12 ask you this.  Were you putting these screenshots up or
13 was Mr. Oltmann?
14    A.  I was.  As I mentioned, he sent me zip files,
15 and then I opened them as the live stream started.  And
16 then he referred to numbers.  And, yes, I was in control
17 of --
18    Q.  Okay.
19    A.  -- opening them up as he explained them.
20    Q.  And are you seeing these for the first time as
21 you're opening them up?
22    A.  Yes.
23    Q.  I'm going to go to the 12:58 mark or -- yeah,
24 somewhere -- well, let's go to 12:49.
25        (The video segment was played.)
                                                  Page 57

                                         15 (Pages 54 - 57)

1    Q. (By Mr. Cain) Okay. A couple of things there.
2  You said "jaw drop, floor" when Mr. Oltmann indicated that
3  Dr. Coomer was a major shareholder in Dominion Voting
4  Systems.
5         Is that -- I assume your jaw dropped because
6  that was the first time you'd heard that information.
7    A. Yes.
8    Q. And that hadn't been part of your -- any
9  discussions at the preinterview stage; correct?
10   A. No. Correct.
11   Q. And then there was some discussion about patents
12  and then the market share that Dominion has, and you've
13  made the statement, "that's how we go from conspiracy
14  theory to conspiracy truth."
15        What did you mean by that statement?
16   A. Right. So in the context of -- of considering
17  whether it would be possible to use these systems to have
18  an impact on the election, the market share of Dominion
19  lends credibility to the idea that widespread undermining
20  of election integrity would be possible.
21   Q. And -- and similarly, Mr.-- excuse me,
22  Dr. Coomer -- if he's listening, I apologize for
23  continuing to say Mr. Coomer.
24        Dr. Coomer's status as a major shareholder in a
25  company that has the major share of the election services

Page 58

1  business, that's an important component to that statement
2  too; right?
3         MR. QUEENAN: Object to form.
4    Q. (By Mr. Cain) Do -- do you want me to restate
5  that? That was kind of long and --
6    A. Yes.
7    Q. Would you like me to restate that? Okay.
8    A. Yes, please.
9    Q. Part of your statement about conspiracy truth --
10  the -- the information that you got about Dr. Coomer being
11  a major shareholder in Dominion, that also formed the
12  basis for you saying, "We're now into conspiracy truths";
13  right?
14   A. Yes. That it reaches more towards that than
15  dismissing it altogether as something that's -- that's
16  unfathomable. And, again, it was in the context of
17  discussing these Facebook posts, which are -- are
18  troubling considering his position at Dominion.
19   Q. Yeah. And if he's a major shareholder in the
20  company, then, at least in your mind, that would indicate
21  that he had more influence over that -- over Dominion
22  Voting Systems; right?
23        MR. HICKS: Object to form.
24   A. Well, that was Joe -- that was Joe --
25        MR. QUEENAN: I just objected to form.

Page 59

1         Go ahead and answer.
2         THE WITNESS: Sorry. Sorry. I'll wait a little
3  bit more.
4    A. That was Joe Oltmann's opinion, and I -- I
5  agreed with the sentiment of it, yes.
6    Q. (By Mr. Cain) Well, that's not an opinion.
7  Being a major shareholder is not an opinion, is it?
8    A. No. The idea that being a major shareholder
9  could lend itself to the dangers of sabotaging election
10  integrity. That's an opinion. And I agree with that
11  underlying sentiment --
12   Q. Yeah.
13   A. -- that it was --
14   Q. And conversely, if Dr. Coomer is not a major
15  shareholder, then the opposite would be true; right? That
16  he wouldn't have the -- the amount of influence over the
17  corporate entity that a major shareholder would; fair?
18        MR. QUEENAN: Object to form and foundation.
19   A. Well, it would certainly a piece of the puzzle,
20  you know, given -- given his high profile in the company,
21  plus that, plus the animas that he manifested in the -- in
22  the Facebook posts. It was all of it.
23   Q. (By Mr. Cain) You doing okay, ma'am? Do you
24  need a break?
25   A. I'm fine.

Page 60

1         MR. QUEENAN: Do you -- Charlie, I -- I know you
2  probably don't have a specific time frame in mind, but are
3  you thinking you want to power through until lunch and
4  then pick up after that? Does that make sense?
5         MR. CAIN: Whatever Sara wants to do and
6  Ms. Malkin.
7         MR. QUEENAN: Okay. Sounds good.
8    Q. (By Mr. Cain) I just want to get a few things
9  confirmed for the record.
10        Ma'am, I'm going to show you exhibit -- I
11  believe it's 19.
12        (Exhibit Number 19 was introduced.)
13   Q. (By Mr. Cain) Just confirm for me, this is
14  November 13th at 12:43. So this would have been after
15  this live stream; correct?
16   A. Correct.
17   Q. And this is going out via Twitter?
18   A. Correct.
19   Q. All right. So Mr. Oltmann was banned from
20  Twitter, as you point out. And this is you -- did -- did
21  you post this yourself?
22   A. Yes.
23   Q. Or do you have a --
24   A. Yes. I don't have anyone else. It's just me.
25   Q. Okay. By the way, you didn't have -- as far as

Page 61

16 (Pages 58 - 61)

1  your live stream, you produced that.  You -- you're the --
2  you do it soup to nuts; right?
3      A.  I fly solo, yes.
4      MR. QUEENAN:  Object to form.
5      Q.  (By Mr. Cain)  All right.  So you post this
6  shortly after the live stream; correct?
7      A.  Correct.
8      Q.  And you talk about the -- the major shareholder.
9  We looked at that in the -- in the live stream itself;
10  correct?
11     A.  Correct.
12     Q.  Right.  And so you're trying to promote the
13  story and get -- well, let me ask you this way.  You are
14  trying to promote this story, number one; right?
15     A.  Yes.  Of course.
16     Q.  Of course.  And can people click on this to --
17  to view a replay of the live stream?
18     A.  So this is clipped using Twitter Media Studio -
19  LiveCut, which you can see down there.
20     Q.  Yes, ma'am.
21     A.  It gives people a -- a snippet.  So this is a
22  25-second snippet.  And then it doesn't -- there's no
23  embedded link to the full stream yet because that was a
24  separate Twitter URL.
25         So either I will repost the full URL, or when

Page 62

1  don't know what that is specifically.  But you say I was
2  replying to someone.  Again, it's a thread related to
3  Dominion.
4      Q.  Well, I didn't say you were.  It -- it
5  appears --
6      A.  No, you did.  You said that I was replying to
7  someone.  And I'm just pointing out that I was replying to
8  myself, because it's a thread.
9      Q.  I see.  I see.
10     A.  Yeah.
11     Q.  Now, did -- did you know              personally at
12  this point?
13     A.  No.  I interviewed him, though.
14     Q.  Before this?
15     MR. QUEENAN:  Object to form.
16     Q.  (By Mr. Cain)  Before this time period?
17     A.  Yeah.  I interviewed him before this on a
18  separate topic.
19     Q.  Okay.  All right.  So now we're talking about,
20  you know, shortly after that live stream.  As -- as I
21  understand it, the next time that you posted a story
22  about -- had anything to do with Dr. Coomer was
23  November 28th.  Does that jibe with your recollection?
24     A.  I believe that's correct.  But I could always go
25  back and search to see if I'd --

Page 64

1  the YouTube version is processed, retweet that -- the
2  YouTube URL.
3      Q.  I gotcha.  So this is like an appetizer.  It's a
4  little clip of what your live stream was about.
5      A.  It's pretty standard, yes.  Yeah.
6      Q.  Exhibit 20, this is also something that you
7  posted on Twitter, looks like, at or around the same time;
8  right?
9         (Exhibit Number 20 was introduced.)
10     A.  Correct.  And that's threaded.  So it --
11  under -- this is underneath the initial tweet of the
12  snippet, probably, so that if people want to see the whole
13  thing, they can just click on that URL.
14     Q.  (By Mr. Cain)  Great.
15         (Exhibit Number 21 was introduced.)
16     Q.  (By Mr. Cain)  This is Exhibit 21.  This is,
17  again -- appears to be your Twitter account, November 13.
18  This is a little later than the ones that we saw
19  previously, and there's someone replying to you:  What are
20  the -- "What are they trying to hide?
21  #Dominion Voting Systems."
22         There's this fella named          .  Do you know
23  who he is?
24     A.  Yes.  He's a young activist and journalist in
25  Denver who was covering some of these same issues.  I

Page 63

1      Q.  Okay.
2      A.  -- done anything else, but that's my
3  recollection.
4      Q.  Because I -- and correct me if I'm wrong, I only
5  know of these two, at least in this medium:  A live stream
6  on the 13th, and then the Newsmax piece on the 28th.
7      A.  Correct.
8      Q.  Okay.  And then after the 28th, you did not do
9  any more stories that directly related to Dr. Coomer;
10  right?
11     A.  Correct.
12     Q.  Is there a reason why you stopped reporting on
13  this?
14     A.  I --
15     Q.  Just moved on?
16     A.  I -- I do tons of stories on tons of topics.
17     Q.  But you just moved on?
18     A.  Well, I think that the two stories covered
19  everything that needed to be said about what Joe Oltmann
20  had discovered about Eric Coomer and his role at Dominion.
21     Q.  Well --
22     A.  The live stream was 15 minutes and a full
23  segment on Newsmax.
24     Q.  Okay.  Now, let's -- let's talk about the
25  intervening two weeks, approximately two weeks between the

Page 65

17 (Pages 62 - 65)

1  live stream and the Newsmax piece.  Are you with me on
2  that?
3      A.  Yes.
4      Q.  Okay.  So did you have any discussions,
5  follow-up discussions, with Mr. Oltmann between those two
6  pieces?
7      A.  With regard to his specific interview?  I
8  don't --
9      Q.  Anything about his allegations that Dr. Coomer
10  was on an Antifa conference call, et cetera.
11         MR. QUEENAN:  Object to form.
12      A.  Any communications I had, I have produced.
13      Q.  (By Mr. Cain)  Well, you can't produce a phone
14  call, so that's why I'm asking.
15      A.  Yeah.  I --
16      Q.  Did you have any --
17      A.  I don't believe -- I don't believe I had any
18  follow-up phone calls with him, no.
19      Q.  Okay.  Let's do this.  Let's go back to those
20  texts we were looking at at the beginning.  I believe
21  counsel correctly corrected me when I said they were 15.
22         Let me share this.
23         Okay.  So remember this, Ms. Malkin?  We looked
24  at this at the beginning.
25      A.  Right.

Page 66

---

1      Q.  This is Exhibit 25.
2      A.  Right.
3      Q.  Right.  I'm going to -- I'm going to scroll down
4  as quickly as I can since we're on the clock.  Don't look
5  at it if you have problems with blinking lights.
6      A.  I (unintelligible) seizure.
7      Q.  It may give me one.
8      A.  Yeah.
9      Q.  This is -- okay.  We're -- we're past that where
10  you gave Mr. Oltmann the -- the information on how to do
11  the live stream.
12         I'm going to go down to page -- what I think is
13  where you pick up some more discussions with Mr. Oltmann.
14         There's some intervening messages with
15  Mr. Oltmann.  We're going to skip those for today.
16  Something about frauds.
17         Ah.  Page 41 of 61.  I tried to see if there's a
18  way to jump on this thing, and I haven't figured it out
19  yet.
20         But we're on page 41 of 61 of Exhibit 25, and
21  this is back to your Signal account, right, with
22  Mr. Oltmann now in your contacts; true?
23      A.  Yes.
24      Q.  All right.  So Tuesday, November 24th, at
25  6:08 a.m.:  "Can you come on my Newsmax show to talk about

Page 67

---

1  Coomer and Dominion?  We pretape it tomorrow at 12:30
2  p.m., Mountain Time.  It would be one segment that will
3  run around seven minutes."
4         "For you, absolutely.  I'm in South Dakota."
5         This is him responding.
6         "So on my computer okay?"
7         You say, "Thank you.  Yes, it'll be by Skype.
8  Send me your account name.  My Newsmax producer will be in
9  touch soon to nail down logistics."
10         And you ask him about new graphics or documents.
11  You tell him to keep up the fight.
12         He has lots of info, including the Mongolian
13  connection.  Do you know what he was referring to with the
14  Mongolian connection?
15      A.  No.  I don't know what that was.
16      Q.  I don't, either.
17         "Let me know if there are specific questions."
18         That's you asking him that.
19         "You've got a seven-minute segment.  Three topic
20  areas."
21         And then you ask:  "Are you allowed to talk
22  about your conversations with the Trump lawyers?"
23         Were you, presumably, aware that he was talking
24  with the Trump lawyers during the interim period?
25      A.  In between the live stream and this?  No.  I was

Page 68

---

1  referring to what I knew about Lauren McLaughlin asking me
2  for his contact information.
3      Q.  Okay.  Because you -- had you -- you hadn't been
4  briefed by anyone to update you on the status of either
5  the -- Ms. McLaughlin's request or the affidavit that was
6  referenced --
7      A.  That's correct.
8      Q.  -- fair?
9      A.  That is correct.
10      Q.  And I guess it goes on to say:  "That was
11  amazing.  Wish we had more time, but I know this segment
12  will have a huge impact.  Have a blessed Thanksgiving."
13         So you prerecorded -- correct me if I'm wrong.
14  You prerecorded this segment a couple of days before it
15  aired on Newsmax; true?
16      A.  Yes.
17      Q.  Okay.  And at least by the 28th -- or excuse me,
18  the 25th, you -- you had done that recording; fair?
19      A.  Yes.  Yes.
20      Q.  All right.  Okay.  So back to my question.
21         During the time between the 13th and this
22  recording on the 25th, the prerecording, had you had any
23  discussions with Mr. Oltmann about any developments
24  concerning Dr. Coomer?
25      A.  I don't believe I did.  I don't -- I don't

Page 69

18 (Pages 66 - 69)

1   recall that I did.
2     Q.  Okay.  But you knew from your prior live stream
3   that -- that Mr. Oltmann said he had taken copious notes
4   of this Antifa conference call; right?
5     A.  Correct.
6     Q.  And you didn't ask him for those notes, did you?
7     A.  I did not.
8     Q.  And had you learned by this point in time
9   whether or not there was a recording of the Antifa
10  conference call?
11    A.  I had not.
12    Q.  And you didn't ask him whether there was a
13  recording, did you?
14    A.  I did not.
15    Q.  Had you gone on to the Dominion website to look
16  to see what their position was with respect to election
17  integrity issues by this point?
18     MR. QUEENAN:  Object to form.
19    A.  I can't recall that I went on their website
20  specifically.  But there had been a spate of news coverage
21  of Dominion, and -- and where they stood in the --
22  defending their company.
23    Q.  (By Mr. Cain)  Okay.  Well, here's what I'm
24  asking you, ma'am.  What did you do, if anything, to
25  follow up on the November 13th story in preparation for

Page 70

1   the pretaping of the next Oltmann interview?
2     A.  I reviewed the live stream that I had done, and
3   I reviewed the zip files, which were going to be one of
4   the subjects of the interview.  And I had kept up on the
5   news of questions that people were raising about Dominion
6   in the period between my live stream and the taping of the
7   news program for Newsmax.
8     Q.  Okay.  Do -- do you recall approaching Dominion
9   either for comment -- well, for comment during this
10  interim period?
11    A.  I don't recall that, no.
12    Q.  Okay.  And did you reach out to Dr. Coomer to
13  get, potentially, his side of the story?
14    A.  I did not.
15    Q.  And did you ask Mr. Oltmann if he knew of -- of
16  the identities of anybody else that was on this alleged
17  call?
18    A.  I did not.
19    Q.  So you didn't then independently try to
20  determine who was -- who -- who may have been on the call
21  other than Mr. Oltmann and potentially Eric Coomer?
22    A.  I did not.
23    Q.  I'm going to share my screen.
24     (Exhibit Number 18 was introduced.)
25    Q.  (By Mr. Cain)  This is Exhibit 18, which I'll

Page 71

1   represent to you is a screenshot of the Dominion website
2   from November 28th showing that it was updated
3   November 25th.
4      November 25th would have been the day that you
5   did the -- the prerecording; correct?
6    A.  The morning of the 25th, correct.
7    Q.  Okay.  You see it's got a little contact button
8   here to contact Dominion directly.  But you didn't hit --
9   you didn't hit that button, did you --
10    A.  No.
11    Q.  -- prior to the -- okay.  Thank you.
12     And did you reach out to any of their media?  I
13  know I asked Dominion in general, but any of their public
14  relations people or media people prior to interviewing
15  Oltmann the second time?
16    A.  I did not.
17    Q.  And the FAQs that they had posted in response to
18  what they considered to be disinformation concerning the
19  election, you didn't review those before interviewing
20  Mr. Oltmann, did you?
21    A.  Not this specific page, no.
22    Q.  Okay.  Well, any page on the Dominion site.
23    A.  Like I said, I was familiar that -- with news
24  stories in which Dominion was defending itself.
25    Q.  Okay.  I think I understand your answer.

Page 72

1     But as of the 25th, as Dominion is reporting on
2   their website, CISA -- you know who CISA is; right?
3    A.  I do.  I had tweeted about CISA's statement.
4    Q.  This statement here that "There is no evidence
5   that any voting system deleted or lost votes, changed
6   votes, or was in any way compromised."  You tweeted about
7   that statement?
8    A.  Yes.  And I believe the nature of my response
9   was that CISA itself was a conflict -- conflicted entity
10  in itself, because many of these same private companies
11  that it's supposed to watchdog were members of committees
12  of CISA itself.
13    Q.  Okay.  So you don't believe CISA is an
14  authoritative group as it relates to this issue due to
15  conflicts of interest; is that fair?
16    A.  Yes.
17     MR. QUEENAN:  Object to form.
18    Q.  (By Mr. Cain)  Okay.  Now, at this point, did
19  you have a working theory as to how Dr. Coomer, if, in
20  fact, he said that he had rigged the election -- the
21  election, excuse me -- how he had gone about doing so?
22    A.  I did not have such a theory.  And as I stated
23  on the Newsmax program, I did not have any evidence that
24  he made good on his threat.  And I made my conclusion
25  about that explicit.

Page 73

19 (Pages 70 - 73)

1    Q.  Actually, that's an interesting point.  You did
2  make that disclaimer during the second interview.  Was
3  that something that you wrote?
4        MR. QUEENAN:  Object to the form.
5        You can answer.
6    A.  Yeah.  I didn't write it.  I said it.
7    Q.  (By Mr. Cain)  Well, you read from a
8  teleprompter, don't you?
9    A.  My opening monologue is on a teleprompter, and
10  the rest of the show is a free-flow conversation and
11  interview with my guests.
12    Q.  Okay.  Well, we know that there was a producer
13  involved in that segment; right?  On Newsmax?
14    A.  I have a producer, yes.
15    Q.  All right.  And so, I guess, here's -- let's
16  just go to it since we're on the topic, and you made a
17  point of saying it.
18        You had some discussions prior to -- let me get
19  it real quick -- prior to doing the Newsmax segment with
20  the gentleman on this next exhibit.  So let's -- let's
21  look at that.
22        (Exhibit Number 26 was introduced.)
23    Q.  (By Mr. Cain)  This is Plaintiff's Exhibit 26.
24  Now, these are some emails you produced; right, ma'am?
25    A.  I did, yes.

Page 74

1    Q.  Okay.  About the Wednesday pretape.  You've got
2  guest information, and this is being sent to this fella,
3  Pierce Sargeant; right?
4    A.  Correct.
5    Q.  Who is -- who's Pierce Sargeant?  Is he the
6  producer?
7    A.  He's a young man who works for Newsmax, and he
8  handled the nuts and bolts of putting the show together as
9  my producer, yes.
10    Q.  Okay.  And Pierce -- this is what I was talking
11  about, the -- the teleprompter.  This is -- this is what
12  you're reading off during the beginning of the show;
13  right?
14    A.  Correct.  That's the only time I use one, and
15  then for teases and the wrap-up of a show.
16    Q.  Okay.  Thanks.
17        Pardon me, again, as I scroll through it.
18        You say to Pierce on the 25th about the script,
19  "Let me know you received it."
20        He got it.  Had a question.  We won't go into
21  the question, because it relates to that Philippine
22  attorney that you put on.  And then there's this fella,
23  Gary Kanofsky.  You see that?
24    A.  Yes.
25    Q.  Okay.  Who is he?

Page 75

1    A.  He's some high-level official at Newsmax.  I
2  can't remember which office he's in -- I believe New York
3  office -- who was brought in at some point to have some
4  level of editorial oversight over the show.
5    Q.  Was this the first time that Mr. --
6  Mr. Kanofsky had been brought in to have editorial
7  oversight over your show?
8    A.  I believe it was there.  There are a couple of
9  people who, sort of, rotated through.  This might have
10  been the first time I talked to him.
11    Q.  Okay.  And so when I was asking you earlier --
12  and this, kind of, speaks for itself:  We're being extra
13  diligent about how we cover these stories, in sum.
14        When I was asking you earlier about this
15  disclaimer that you put on the Newsmax piece about no
16  evidence of Dr. Coomer actually doing anything with the
17  election, was that something that Mr. Kanofsky added to
18  the show as the editor?
19    A.  No.
20    Q.  Or how did that come about?
21    A.  No.  That came about in the course of the
22  discussion with Joe Oltmann in which I wanted to make
23  clear what my position was.  Gary Kanofsky had nothing to
24  do with it.
25    Q.  Did -- did that clip of Mr. Oltmann on the

Page 76

1  Newsmax piece get edited down from a longer form?
2        MR. QUEENAN:  Object to form.
3    A.  Not as far as I know.
4    Q.  (By Mr. Cain)  Okay.  So that was the entire
5  interview unedited?
6    A.  As far as I know.  Once I tape the interview, I
7  do not have control over the footage.  So you'd have to
8  ask them.
9    Q.  I see.
10        THE VIDEOGRAPHER:  Counsel, ten minutes until
11  required media change.
12        MR. CAIN:  Yeah.  And I'm -- I've been pushing
13  my luck with all the people that are producing this.  So
14  let me just finish this line of questioning.
15    Q.  (By Mr. Cain)  The reason I asked that prior
16  question, ma'am, is there was no scrolling through the
17  private Facebook pages on the Newsmax piece, unless it was
18  edited out.  Do you recall one way or the other?
19        MR. QUEENAN:  Object to form.  And foundation.
20    A.  Could you reask the question?  I just want to
21  make sure I -- that I'm responsive to the question.
22    Q.  (By Mr. Cain)  Yeah.  Let me break it down.
23        It's true, just based on your recollection, that
24  in the second piece, you didn't put up the private
25  Facebook pages like you did in the live stream; correct?

Page 77

20 (Pages 74 - 77)

1     MR. QUEENAN: Object to form.
2     A. I believe that -- I just -- I don't know if you
3 heard me.
4     Q. (By Mr. Cain) You talked over each other. Can
5 you answer my question again, please?
6     THE VIDEOGRAPHER: It looks like the witness is
7 froze up.
8     MR. CAIN: All right. Let's go off the record
9 since we're at the end of the media tape, and we're also
10 frozen.
11     MR. QUEENAN: Michelle, are you back?
12     THE WITNESS: Yeah. Did I -- you guys froze on
13 me, so I don't know where I -- it stopped.
14     MR. QUEENAN: You froze on us.
15     THE WITNESS: Oh, okay. Sorry about that.
16     MR. CAIN: We're going to -- we're going to go
17 off the record so that we can plug in the internet again.
18     THE VIDEOGRAPHER: Counsel, can you stop the
19 screen share so I can go off?
20     This is the end of Media Number 1. Going off
21 the record, this time is 11:58.
22     (Recess from 11:58 a.m. to 12:19 p.m.)
23     (Mr. Rhodes and Ms. Powell are now present.)
24     THE VIDEOGRAPHER: We're back on the record.
25 This is the beginning of Media Number 2 in the deposition

Page 78

1     (Exhibit Number 22 was introduced.)
2     Q. (By Mr. Cain) Exhibit 22 -- this is November 15
3 at 12:09 p.m., and this is a tweet you sent out; right?
4     A. Yeah. This is just a recap of the program that
5 I had done, because I can't -- I believe that was a
6 Friday. So a lot of people miss the news cycle on Friday,
7 so I retweeted it out around the -- the next couple days.
8     Q. All right. And looks like you also, on
9 November 16th, this would be the next day -- this is
10 Plaintiff's Exhibit 23 -- you tweeted out this as well;
11 correct?
12     A. Yes.
13     Q. "#WhoIsEricCoomer," et cetera, "Denver business
14 owner," that's a reference to Mr. -- Mr. Oltmann; correct?
15     A. Correct.
16     Q. "Dominion's Eric Coomer is an unhinged
17 sociopath - his internet profile is being deleted and
18 erased."
19     And there's a -- you tweeted out a picture that
20 came with this Gateway Pundit article; correct?
21     MR. QUEENAN: Object to form and foundation.
22     A. There is a -- a retweet of the -- this is the
23 news story in that it's embedded in the Gateway Pundit
24 website.
25     Q. (By Mr. Cain) Right.

Page 80

1 of Michelle Malkin. The time is 12:19 p.m.
2     Q. (By Mr. Cain) Ms. Malkin, do you recall whether
3 or not you displayed the private Facebook messages in the
4 Newsmax piece?
5     A. I did not.
6     MR. QUEENAN: Form.
7     Q. (By Mr. Cain) Is there a reason why you didn't?
8     A. We didn't get to them.
9     Q. But that was your plan?
10     A. I didn't have a plan. The interview flowed for
11 seven minutes, and I'm constrained in a way that I'm not
12 with the live stream. And we didn't get to hit on that
13 before the segment ended.
14     Q. Okay. And in the prior session, I asked you
15 what you did between -- in the two weeks to investigate
16 this story further before going to the -- to the Newsmax
17 taping, and you answered me.
18     Is there anything else that, as you sit here,
19 you can think of you did to investigate this Antifa call
20 or Dr. Coomer?
21     MR. QUEENAN: Object to form.
22     A. Not that I recall.
23     Q. (By Mr. Cain) Now, you did have the time during
24 that interim period I just referenced to continue
25 tweeting.

Page 79

1     A. So whatever they chose as the featured images
2 was embedded in the URL that I tweeted.
3     Q. Right. So you would have had to go to the
4 Gateway Pundit website first; correct?
5     A. Sometimes you just take the URL from the
6 account, the Twitter account, of the -- of the blog or
7 whoever --
8     Q. Right.
9     A. -- and it -- and it will automatically populate
10 the image and the headline. And that's what happened
11 here.
12     Q. Okay. But did -- did you actually read this
13 article before you retweeted it?
14     A. Yes.
15     Q. And you -- you obviously knew at this point that
16 your story about the -- the Oltmann so-called Antifa
17 conference call had been published previously, and now
18 you're retweeting something about my client being an
19 unhinged sociopath, with a link to -- that included his
20 picture.
21     Is that fair?
22     MR. QUEENAN: Object to form.
23     A. Can you -- there was a lot in there. Can you --
24 you repeat the question?
25     Q. (By Mr. Cain) Yeah, I can. I'll break it down.

Page 81

21 (Pages 78 - 81)

1    So by this point on the 16th, you had -- you'd
2  already done the live stream; correct?
3    A.  Correct.
4    Q.  And then you had -- we saw those earlier tweets
5  where you retweeted the live stream; true?
6    A.  Right.  Yes.
7    Q.  All right.  And then we saw just -- just a
8  second ago the tweet about Dr. Coomer being a major
9  shareholder in Dominion.  You did that; right?
10    A.  Right.
11    Q.  And now you're tweeting about Dr. Coomer being
12  an unhinged sociopath --
13    MR. QUEENAN:  Object to form and foundation.
14    Q.  (By Mr. Cain)  -- is that right?
15    A.  This was the headline of the Gateway Pundit post
16  which was summarizing Joe Oltmann's characterization of
17  Eric Coomer based on the Facebook posts that we discussed
18  in our live stream.  And the article was summarizing my
19  live stream interview with Joe Oltmann.
20    Q.  Okay.  But why are you tweeting out something
21  about Dr. Coomer being an unhinged sociopath?
22    A.  I was --
23    Q.  Why do this?
24    A.  I was sharing a post that covered the live
25  stream that I had done with Joe Oltmann.

Page 82

1    Q.  Okay.  Now, did you know at this point whether
2  or not Dominion employees were beginning to receive death
3  threats, including Dr. Coomer?
4    MR. QUEENAN:  Object to form and foundation.
5    A.  I don't recall that I knew that when I tweeted
6  this out, no.
7    Q.  (By Mr. Cain)  Did you -- did you ever look into
8  the effect of the news stories concerning Dr. Coomer and
9  whether or not he was receiving death threats?  Did you
10  ever look at that?
11    MR. QUEENAN:  Object to form and foundation.
12    A.  At some point I became aware of news coverage of
13  Eric Coomer complaining about death threats to him.  Yes.
14    Q.  (By Mr. Cain)  And before -- at least as of this
15  point, you're tweeting out to your roughly two million
16  followers a link to an article that has a picture of him,
17  aren't you?
18    A.  Yes.
19    Q.  Had you talked to The Gateway Pundit, anybody
20  associated with them, prior to November 16, 2020, when you
21  retweeted this about Dr. Coomer?
22    A.  Talked to them about this specifically, about
23  this --
24    Q.  Yeah.  And I'm sorry.  I'll clarify it if I need
25  to.

Page 83

1    I'm just trying to find out if you'd had any
2  interactions with either The Gateway Pundit or Mr. Hoft
3  about this story prior to retweeting this picture.
4    A.  I don't recall that I did, no.
5    Q.  Do you know Jim Hoft?
6    A.  I do.
7    Q.  How do you know him?
8    A.  From the earliest days of the conservative
9  blogosphere.
10    Q.  Okay.  Do you guys -- like we saw those texts,
11  do you guys share texts?
12    A.  I haven't texted with him in -- I haven't texted
13  with him in years.
14    Q.  Okay.  And did you talk to anybody at
15  The Gateway Pundit or Mr. Hoft directly about this Coomer
16  story that we're looking at on Plaintiff's Exhibit 23?
17    A.  About this story in particular?  I don't recall
18  that I did.
19    Q.  Okay.  Let me broaden it out, then, since you
20  referenced "this story" in particular.
21    Did you have any discussions with Mr. Hoft or
22  the Gateway Pundit either right before the election or
23  after the election up to this point in time about
24  Dominion Voting Systems?
25    MR. QUEENAN:  Object to form.

Page 84

1    A.  I don't recall.  I don't recall that I did.
2    Q.  (By Mr. Cain)  Do you have -- I'm sorry.
3    When you retweet something like this, this
4  Gateway Pundit article, is that something you do just
5  because the spirit moves you?  Or is there some agreement
6  between media outlets to retweet each other's content?
7    MR. QUEENAN:  Form and foundation.
8    A.  In general, I do not have any kind of agreement
9  with anyone about what I put on my Twitter account.
10    Q.  (By Mr. Cain)  Okay.  And so this wasn't -- this
11  wasn't the result of some agreement that you had with --
12    A.  Yes.
13    Q.  -- Mr. Hoft; fair?
14    A.  Fair, yes.
15    Q.  Okay.  I meant to ask you earlier when we looked
16  at that live stream.  Is there a way that you are able to
17  monetize a live stream such as the one that we saw with
18  Mr. Oltmann?
19    A.  No.  I am -- I do not -- I have no monetization
20  on any of my social media.
21    Q.  But at the time that you did the
22  Sovereign Nation piece, that's your -- that was the show
23  that you had on Newsmax; right?
24    A.  Correct.
25    Q.  Is that -- is that show still running?

Page 85

22 (Pages 82 - 85)

1    A.   No.

2    Q.   All right.  At the time that you were doing the

3    Sovereign Nation program, did you have a financial

4    arrangement with Newsmax for them to be able to run that

5    show on their air way -- airwaves?

6    A.   I did.

7    Q.   And I don't really care how much money you made

8    or didn't make, but is it -- is it based on a per-episode

9    formula or just -- how is that generally structured?

10   A.   I had a contract with Newsmax to produce a show

11   and to appear on other shows.

12   Q.   And is that based, though, on the number of

13   appearances and shows you produce?  That was my question.

14   A.   I had an agreement to produce a a -- my

15   half-hour weekend show, and there was a -- a set number of

16   shows that I had agreed to do, as well as appearances for

17   other shows.  That -- that's the general nature of the

18   contract.

19   Q.   Okay.  And -- and given that you're no longer

20   with them, is it because the set number of shows that you

21   agreed to do, you had reached the conclusion of -- of that

22   contract?

23   A.   I ended my relationship with Newsmax.

24   Q.   Was that after they ran the retraction?

25        MR. QUEENAN:  Object to form and foundation.

Page 86

1    And I don't think that has anything to do with this case

2    at all.

3        MR. CAIN:  Okay.  Retraction from Newsmax, I

4    think, is probably relevant.

5    Q.   (By Mr. Cain)  But I -- I'm asking just from a

6    timing standpoint, did you end your contract with Newsmax,

7    as you put it, after they issued the retraction relating

8    to Dr. Coomer?

9    A.   I did end it after that.  And there were many

10   reasons why I ended my contract with Newsmax, not merely

11   or even because of this case.

12   Q.   Well, was Dr. -- the Dr. Coomer retraction one

13   of the reasons that you ended your contract with Newsmax?

14   Yes or no?

15   A.   It had -- it had an influence on my decision,

16   which had already been made.

17   Q.   I see.

18        Okay.  Well, I got a little far afield.  We were

19   talking about the unhinged sociopath retweet, and then I

20   went to Sovereign Nation.  So let's just, kind of, finish

21   up on your tweeting.

22        MR. CAIN:  This is Exhibit 23.

23        (Exhibit Number 23 was introduced.)

24        MR. CAIN:  Exhibit 24.

25        (Exhibit Number 24 was introduced.)

Page 87

1    Q.   (By Mr. Cain)  This looks like "In case you

2    missed it," a November 19th tweet; fair?

3    A.   Yes.

4    Q.   Concerning the prior live stream; right?

5    A.   Correct.

6    Q.   All right.  So we know you -- you had time to do

7    the tweeting.  Did you -- did you have time, by this

8    point, to go back -- remember we looked at the Dominion

9    website FAQ?  Did you have time to go back and really get

10   into the Dominion position on election interference

11   issues?

12        MR. QUEENAN:  Object to form.

13   A.   As I stated, I was familiar with their defense

14   of -- of their -- their conduct during the election.

15   Q.   (By Mr. Cain)  And I think I checked this box,

16   but let me just make sure.

17        You're not here sitting today telling either

18   Judge Moses or the jury that you have some evidence

19   that -- that Dr. Coomer actually made good on his threats

20   and had some role in rigging the election; fair?

21        MR. QUEENAN:  Form.

22   A.   Can you just restate it?  Because I just want to

23   make sure that I answer it correctly.  Just -- it was

24   just -- could you say it over again?

25   Q.   (By Mr. Cain)  You have no evidence that

Page 88

1    Dr. Coomer rigged the election, do you?

2    A.   That is correct.  And that's what I stated on

3    Newsmax, and that is what I believe today.

4    Q.   All right.  Thank you.  It's always better when

5    I ask shorter questions.

6        MR. QUEENAN:  It's not just you.

7        (Exhibit Number 17 was introduced.)

8    Q.   (By Mr. Cain)  Okay.  Ms. Malkin, I'm going to

9    turn your attention now to Exhibit 17, which is, as you

10   can see, November 28th.  This is when the second Coomer

11   story ran; correct?

12   A.   Correct.

13   Q.   All right.  I'll just -- you said earlier at the

14   beginning, you kind of have prepared remarks that you read

15   from the teleprompter; right?

16   A.   Correct.

17   Q.   Okay.  Let's just -- let's just watch a little

18   of the beginning of this.

19        (The video segment was played.)

20   Q.   (By Mr. Cain)  I'm sorry.  What is the reference

21   there?  I didn't -- to the "feckless fourth estate"?  What

22   does that mean?

23   A.   Most of the corporate media that was not

24   reporting on election fraud and election integrity issues.

25   "Feckless" --

Page 89

23 (Pages 86 - 89)

1    Q.  I know what --
2    A.  -- dictionary definition.
3    Q.  Yeah.  The "fourth estate" is the media; right?
4    A.  Yes.
5    Q.  Okay.
6        All right.  Well, you go on in this report --
7    I'm not going to play the stuff about Mr. Chong.  Let me
8    fast forward a little bit.
9        You show a hacker that talks about hacking into
10   voting machines; right?  Remember that part of it?
11   A.  I do.
12       MR. QUEENAN:  Object to form.
13   Q.  (By Mr. Cain)  And, you know, just from a --
14   from an actual technical standpoint, you know, I asked you
15   about Dr. Coomer and whether he had any role in -- in
16   engaging in rigging the election.
17       The hacker that you put up on this particular
18   program had direct access to the voting machine; correct?
19   He was able to plug directly into it; true?
20   A.  I believe that's correct.
21   Q.  Okay.  And are you aware of any evidence of that
22   occurring during the 2020 presidential election --
23       MR. QUEENAN:  Object to --
24   Q.  (By Mr. Cain) -- where a malicious actor was
25   able to hack directly into -- into any of the election
                                                    Page 90

1    machines, either tabulators or voting machines?
2    A.  I'm just trying to recall what your -- the
3    question was, am I aware of it?
4    Q.  Yeah.  I mean, you -- you show a hacker --
5    A.  No.  I just wanted to make sure that that's what
6    you said:  Am I aware.
7    Q.  Yeah.
8    A.  No.
9    Q.  All right.  And I'm going to fast forward
10   through the hacker.
11       By the way, where did you interview this
12   particular hacker?  Was that at one of those symposiums?
13   A.  I did not interview the hacker.
14       As you can see, the bug of the media
15   organization called Now This, which is a left-wing
16   journalism outfit, ran this story a couple of years ago.
17   And I was informing my audience that concerns about
18   hacking into these electronic voting machines were
19   shared on --
20       MR. CAIN:  Well, here we go again.  Michelle is
21   frozen, so let's go off the record until she unfreezes.
22       THE VIDEOGRAPHER:  Going off the record.  The
23   time is --
24       THE WITNESS:  Hello.  I'm here.
25       MR. CAIN:  She's back.
                                                    Page 91

1        MR. QUEENAN:  She's back.
2        THE VIDEOGRAPHER:  Staying on the record.
3    Q.  (By Mr. Cain)  All right.  Okay.  So you froze
4    in the middle of pointing out that this is from Now This,
5    which is a left-wing organization, and you were just
6    replaying that.  Is that a fair statement?
7    A.  Yes, that's correct.  And we attributed our
8    sources on this, and that's why the -- it's labeled.
9    Q.  Gotcha.
10       And then it cuts back to you.  We'll just pick
11   up there.
12       (The video segment was played.)
13   Q.  (By Mr. Cain)  I'm going to stop you right
14   there.
15       What's the basis for that statement, "Smartmatic
16   machines have used Dominion software"?
17       THE VIDEOGRAPHER:  Looks like she froze up
18   again, Counsel.  Can we go off the record?
19       MR. CAIN:  Yes.
20       THE VIDEOGRAPHER:  Going off the record.  The
21   time is 12:40.
22       (Video-recording was stopped.)
23       THE WITNESS:  The last thing I heard -- can
24   everybody hear me?
25       MR. CAIN:  Yeah.
                                                    Page 92

1        THE WITNESS:  -- was, what was the basis for the
2    statement "Smartmatic machines have used Dominion
3    software"?
4        THE VIDEOGRAPHER:  Michelle, can you go ahead
5    and log completely off and come back in?  Your -- your
6    internet connection is very intermittent.
7        THE WITNESS:  Okay.
8        (Recess from 12:40 p.m. until 12:43 p.m.)
9        THE VIDEOGRAPHER:  All right.  We're back on
10   the -- we're back on the record.  The time is 12:43.
11   Q.  (By Mr. Cain)  Ms. Malkin, we've had some
12   interruptions, technical issues.
13       I'm going to go back to an exhibit that we
14   started to talk about before this went off the rails.
15       Okay.  So we started the Sovereign Nation video
16   a bit ago.  Showed you the intro.  Then we started talking
17   about the hacker interview that you replayed.
18       Then I started to play this next segment after
19   you came back from the hacker piece.  So I'm going to
20   replay that.
21       (The video segment was played.)
22   Q.  (By Mr. Cain)  Okay.  So then you go on to talk
23   about the Philippines and voting issues there.
24       And what I was asking you when everything froze
25   is, what was the basis of your statement that Smartmatic
                                                    Page 93

24 (Pages 90 - 93)

1  machines had used Dominion software, if you can answer
2  that.
3      MR. QUEENAN:  Counsel, there's a commentary
4  running in the top right corner between you, Brad, and
5  Steve that's kind of disparaging of Ms. Malkin.
6      So I don't know if there's something we can do
7  about that, but it's kind of distracting.
8      MR. CAIN:  All right.  Well, whoever is texting,
9  don't text me.
10     Q.  (By Mr. Cain)  Can you answer my question?
11     A.  Can you restate the question?
12     Q.  Yes.  What evidence do you have that Smartmatic
13 machines have used Dominion software in the past?  You
14 stated that in your segment.
15     A.  Yes.  I'll have to -- I would have to go back
16 and look at my notes.
17     I had corroborating links and references in my
18 script and my research, so I'm confident that what I said
19 is true.
20     Q.  Okay.  So you did do some research on voting
21 software and the relationship between Smartmatic and
22 Dominion prior to this episode; right?
23     A.  Okay.  I'm back.  Yes.
24     Q.  Did you hear my question?
25     A.  Can you restate it?

Page 94

1  Q.  I said, so you did do some research prior to
2  this episode regarding the use of Dominion software by
3  Smartmatic and the -- the relationship between those
4  companies; correct?
5      A.  For the monologue in which I mentioned these
6  things, yes.
7      Q.  All right.  And you also did some research, it
8  sounds like, about shell companies that were in place that
9  had -- I guess that tied Dominion to Smartmatic from an
10 ownership standpoint.
11     Is that true, too?
12     A.  Yes.
13     Q.  Okay.  And can you, as you sit here, explain for
14 the judge and the jury what the relationship is that you
15 discovered between Smartmatic on the one hand and Dominion
16 on the other?
17     A.  It's as I stated in the monologue.  What I
18 summarized from my research were the descriptions of those
19 relationships as stated in the monologue based on research
20 that I had done citing newspaper articles from the
21 Los Angeles Times, I believe the Huffington Post, the
22 Washington Post, as well as couple of government agencies,
23 including, I think, an agency whose acronym was NIST, and
24 another one who I believe was CFIUS.
25     Q.  Okay.  And those are embedded in your notes as

Page 95

1  part of your script?
2      A.  Correct.
3      Q.  Okay.  So any research that you would have done
4  regarding ownership issues, we could just simply go back
5  to the notes that you produced and look at the references?
6      A.  Yes.  I believe there was one other email that
7  included a bunch of the URLs that I had sent to a
8  different producer.
9      Q.  Okay.  And you've produced those?
10     A.  Not that specific one, because it did not
11 pertain to Eric Coomer.
12     Q.  I see.
13     All right.  Now, you talk a fair amount during
14 this particular clip -- and I don't really have an
15 interest in looking into it -- but you talk about issues
16 in the Philippines when you interview this attorney,
17 Mr. Chong; right?
18     A.  Correct.
19     Q.  Right.  So we'll go through the commercials and
20 that -- that part of it.  Get to, I think, around
21 ten minutes in, ten-and-a-half minutes in when you come
22 back from commercial.
23     Here we are.
24     (The video segment was played.)
25     Q.  (By Mr. Cain)  I forgot to ask you earlier, the

Page 96

1  reference to him being affiliated with the Antifa
2  movement -- did you look into that particular issue, the
3  structure of -- if there is a structure of Antifa and how
4  it's organized in Central Colorado or on the Front Range?
5      MR. QUEENAN:  Object to form.
6      A.  I had been covering Antifa in Denver,
7  Colorado Springs, and across the country, yes.
8      Q.  (By Mr. Cain)  So does that group, if you want
9  to call it a group, have a formal structure that you're
10 aware of?
11     A.  Some of the cell organizations have very defined
12 formal structures, yes.
13     Q.  Okay.  Can you give -- can you give me an
14 example of one of those, please?
15     A.  Sure.  The oldest Antifa chapter in the United
16 States is Rose City Antifa, and they have formal
17 structure, formal meetings, formal recruitment, and that
18 has been documented by journalists.  And there's chapters
19 across the country, including chapters in Denver and
20 Colorado Springs.
21     Q.  Okay.  So it sounds like you have a pretty
22 decent amount of familiarity with that being here in
23 Colorado; right?
24     A.  And in other parts of the country, yes.
25     Q.  Sure.  And throughout your either looking into

Page 97

25 (Pages 94 - 97)

1  Antifa or being familiar with them, did you ever run
2  across Eric Coomer as being a member of that loosely
3  affiliated organization?
4       MR. QUEENAN:  Object to form.
5    A.  I did not.
6       (The video segment was played.)
7    Q.  (By Mr. Cain)  Now, you didn't follow up -- and
8  I'll play it.  Let's just play it.
9       (The video segment was played.)
10   Q.  (By Mr. Cain)  I'll stop there.
11      He just said -- I believe he followed up on his
12  ability to affect the election.  But you did not, in this
13  piece, think to ask him what the basis of his belief was;
14  right -- that Dr. Coomer committed election fraud?
15   A.  That was his conclusion based on his research
16  and based on what he saw at Eric Coomer's Facebook posts
17  That's his opinion.  That was his conclusion.
18      Mine was the opposite, and both views were aired
19  in this segment.
20   Q.  Right.  You're talking about the later statement
21  that you make that we'll talk about.  But you've mentioned
22  it already, where you -- where you said you didn't find
23  any evidence; fair?
24   A.  Yes.  And these were -- this was a -- sort of
25  the opening, and he's barely begun to talk yet, and I let
Page 98

1  him talk.
2    Q.  Yes.  Let's let him talk a little more.
3       (The video segment was played.)
4    Q.  (By Mr. Cain)  So, basically, this is
5  substantially similar to the -- story that Mr. Oltmann
6  gave you on November 13th; is that accurate?
7    A.  Yes.
8    Q.  Let me ask you:  When you use that term
9  "alarming," at that point you knew, because you were about
10  to say it, that there was no evidence that -- that
11  Dr. Coomer actually did anything to affect the election.
12      So what was so alarming about it that caused you
13  to make that statement?
14   A.  What was alarming was the possibility that he
15  could have fulfilled that threat.  And that's why I was
16  sharing this information, because I wanted people to know
17  what Joe Oltmann had discovered about him.  It is
18  alarming.
19   Q.  Well, he could have.  "He could have" is
20  conjecture; is it not?
21      MR. QUEENAN:  Object to form and foundation.
22   A.  The intent of this segment was to air
23  Joe Oltmann's discoveries and raise questions and call for
24  further investigation of what he had discovered.
25   Q.  (By Mr. Cain)  Okay.  But my question, again,
Page 99

1  was different.  It's whether he could have done something
2  is conjecture; true?  You would, at least, agree with
3  that?
4    A.  Yes.  We're raising the possibility that he --
5  he might have made good on the threat.  And yes, it is
6  exploring the possibility that he could have done it, yes.
7    Q.  (By Mr. Cain)  Okay.  Give me a working theory,
8  if he could have done it, how he could have rigged the
9  election such that you would say that on this -- on this
10  broadcast?
11      MR. QUEENAN:  Object to form.
12   Q.  (By Mr. Cain)  How could he?
13   A.  I'm not -- I'm not a statistical person.  I'm
14  not a technical person.  I don't have the software or IT
15  background that Joe Oltmann has.
16      But as a high-ranking member of an electronic
17  voting system company that has products in nearly 30
18  states in the United States, somebody whose title is vice
19  president of strategy and security, one could imagine that
20  Eric Coomer might have had some ability to access that
21  system and do something untoward.
22      I can't spell out all of the specs of how it
23  might be done, and this is why we were discussing whether
24  he had the motivation or the means or the bias to do such
25  a thing.  It wasn't my intent to get into the nuts and
Page 100

1  bolts of how exactly that might have happened.
2    Q.  Let me break that down.
3       You're not -- you're not a technical person as
4  it relates to how voting systems are implemented on -- on
5  the various states and counties; right?
6    A.  Right.
7    Q.  Okay.  And you don't have any technical
8  expertise with respect to the -- the voting software
9  that's used and the process by which it goes from Dominion
10  through certification to the various jurisdictions.  You
11  don't have any expertise in that; right?
12   A.  Right.  I couldn't describe for you the -- the
13  actual implementation of how such a thing would be done.
14  But as I had mentioned in the monologue, there had been a
15  lot of concerns about how such a thing could be
16  perpetrated.
17   Q.  Right.  Well, what -- what I was asking you was,
18  give me your theory.  When you say that he could -- or he
19  had the ability to carry out this threat -- alleged
20  threat -- what -- under what circumstance?  Under what
21  practical circumstance?
22   A.  Yeah.  So I don't have a theory, and that is why
23  I was interviewing Joe Oltmann.
24   Q.  Well, he's not an election expert, is he?
25   A.  He -- his business is in IT.  My understanding
Page 101

26 (Pages 98 - 101)

1  is that he is a tech entrepreneur.
2      Q.  So?  What does that have to do with elections?
3          MR. QUEENAN:  Object to form and foundation.
4      A.  He works in software and data.
5      Q.  (By Mr. Cain)  So?  Did you see any of his data?
6      A.  You were asking about what kind of expertise I
7  have --
8      Q.  No, ma'am --
9      A.  -- and, no, I did not see --
10         (Simultaneous speakers.)
11     Q.  (By Mr. Cain)  Did you see any of his data?
12     A.  No, I did not see his data.
13     Q.  Did you ask for his data?
14     A.  He gave me two zip files of Facebook
15  screenshots.
16     Q.  That's not what I'm talking about.  I'm talking
17  about data relating to election riggin' -- rigging, with a
18  G, or fraud.
19         MR. QUEENAN:  Object to form.
20     Q.  (By Mr. Cain)  Anything like that?
21     A.  No.  I did not see his data, as I stated.
22     Q.  So as you sit here, you cannot cite to the Court
23  one working theory as to how Eric Coomer could have rigged
24  the 2020 presidential election; isn't that true?
25         MR. QUEENAN:  Object to form.

Page 102

1      A.  That is true.
2      Q.  (By Mr. Cain)  All right.  Now, you go on --
3          (The video segment was played.)
4      Q.  (By Mr. Cain)  That's what you were referring to
5  earlier -- the research you did; right?  The relationship
6  between Smartmatic and Dominion and, perhaps, Sequoia;
7  right?
8      A.  Correct.
9          (The video segment was played.)
10     Q.  (By Mr. Cain)  Were you provided with the
11  patents, or did you do any research about whether he had
12  patents and who owned them?
13     A.  I believe I might have done a Google search at
14  some point, and his name came up.  But Joe Oltmann did not
15  provide that information for me, nor did I solicit it from
16  him.
17     Q.  Nor did you review any of the patents
18  themselves?
19     A.  I just said I believe I -- I might have Googled
20  and saw his name on patents that were attributed to him.
21     Q.  Well, I mean, even just a -- you're a
22  businesswoman and a journalist, are you not?
23     A.  Yes.
24     Q.  Okay.  And you know that when technical people
25  work for companies and there's technology that's -- that's

Page 103

1  patented, that's a normal process by which the company
2  would own the patent, and the inventor might be the -- the
3  scientists that have worked for that company.  Are you
4  familiar with that paradigm?
5      A.  Yes.
6          MR. QUEENAN:  Object to form and foundation.
7      Q.  (By Mr. Cain)  So what is unusual about the fact
8  that Dr. Coomer would be associated with -- with Dominion
9  patents?  Who cares?
10         MR. QUEENAN:  Object to form.
11     A.  Some people might care.
12     Q.  (By Mr. Cain)  Well, why did you state it?  What
13  was the relevance to you when you were stating it?
14     A.  It underscored his high profile and his
15  expertise and his position at the company.
16     Q.  (By Mr. Cain)  Okay.
17         (The video segment was played.)
18     Q.  (By Mr. Cain)  Now, I'm just going to go through
19  that.
20         Any relevance in your mind to the fact that
21  Dr. Coomer was a witness in Georgia for the secretary of
22  state?
23     A.  I think he's just establishing that -- that
24  Eric Coomer played a pivotal role at -- at the company,
25  and that was -- that was one of the notable things that he

Page 104

1  did.
2          (The video segment was played.)
3      Q.  (By Mr. Cain)  Changing votes -- do you know
4  what the adjudication process is?
5          MR. QUEENAN:  Objection.
6      Q.  (By Mr. Cain)  -- in elections?
7      A.  In general, yes.
8      Q.  Okay.  And in terms of this reference to
9  changing votes, you're aware, and were aware at this time,
10  that when ballots are flagged because there's an anomaly
11  on it, then you go through -- that ballot will go through
12  this adjudication process; right?
13     A.  That is my --
14         MR. QUEENAN:  Object to form and foundation.
15     A.  That is my understanding.
16     Q.  (By Mr. Cain)  Okay.  I'm sorry if I talked over
17  you.
18         And that adjudication process involves one
19  member from the Democratic party and one member from the
20  Republican party examining the actual ballot; right?
21     A.  Right.
22     Q.  Coming to a determination as to what the voter
23  intent was based on the review of the ballot; correct?
24     A.  Okay.  Yes.
25     Q.  So when -- when Mr. Oltmann's talking about

Page 105

27 (Pages 102 - 105)

1 changing votes, is there some other paradigm that -- that
2 you can think of besides the adjudication process where a
3 vote might be actually changed?
4     MR. QUEENAN: Object to form.
5     A. You'll have to ask him what specifically he's
6 referring to with regard to that video and Eric Coomer's
7 statements.
8     Q. (By Mr. Cain) You didn't -- you hadn't reviewed
9 that YouTube video that he's referring to that he -- that
10 he's talking about Dr. Coomer stating how to change votes?
11     A. Only afterwards did I understand that he was
12 referring to a -- a video in which Eric Coomer discussed
13 what he's talking about.
14     Q. Okay. That wasn't part of your preshow
15 investigation or research; correct?
16     A. No. Correct.
17     (The video segment was played.)
18     Q. (By Mr. Cain) Now, this large shareholder part,
19 that is -- as I think I've heard your testimony -- part of
20 the importance -- or part of the basis, shall we say, for
21 the statement that Dr. Coomer would have the ability to
22 carry out his threat, just like the patents that we talked
23 about earlier; correct?
24     MR. QUEENAN: Form.
25     A. I'd have to go back and refresh my memory of --
Page 106

1 of the context of -- of how you asked me that. But it was
2 just a piece of the -- of a picture of Eric Coomer being a
3 high-profile, powerful executive of this company.
4     Q. (By Mr. Cain) Which as you've stated, I think,
5 many times now, gave rise to your statement that he would
6 have the ability to carry out on his threat of election
7 rigging; true?
8     A. True.
9     Q. All right.
10     (The video segment was played.)
11     Q. (By Mr. Cain) Okay. Obviously, you go on to --
12 we've already, kind of, covered that.
13     But the -- this piece ends, I guess, going on to
14 Victoria Toensing, if that's how you say her name, which
15 is one of the Trump lawyers.
16     As to -- as to Eric Coomer and this story, did
17 you end up ever reaching out to him or attempt to reach
18 out to him after this publication to get his side of this
19 story?
20     MR. ZAKHEM: Object to form and foundation.
21     A. I did not.
22     Q. (By Mr. Cain) I mean, we looked earlier --
23 let's see if I can bring up the exhibit.
24     This is back, like we were talking about
25 earlier, from the Dominion website. Did you reach out
Page 107

1 after this -- well, it was published on the 28th, the
2 Newsmax piece. Did you reach out to Dominion after you
3 produced that particular show and it aired?
4     A. I did not.
5     Q. As it relates to -- and you didn't go to their
6 FAQ site either, either before the show or after, did you?
7     A. You asked me that before, and as I said, I had
8 seen news stories in which they defended themselves, and
9 quotes from this website were included.
10     Q. Okay. Now, here, on the FAQ site, there's a
11 statement about the fact that Dominion's not shutting its
12 office and employees have now gone to work remotely. And
13 it talks about threats to personal safety concerns,
14 et cetera.
15     What was your view on publishing both personal
16 Facebook pictures from Dr. Coomer's account, as you
17 understood it, and his picture as we saw it on The
18 Gateway Pundit? Didn't that lead to some concern on your
19 part that Dr. Coomer might be exposed to threats?
20     MR. QUEENAN: Object to form and foundation.
21     A. I shared those Facebook posts because I believed
22 that the content of the posts were of public interest.
23 And I believed that they had inherent news value because
24 they showed an animus and a hostility towards
25 conservatives and Trump voters and police, and that's why
Page 108

1 I shared them.
2     Q. (By Mr. Cain) Okay. Did you care about the
3 impact on Dr. Coomer --
4     MR. QUEENAN: Object to form.
5     Q. (By Mr. Cain) -- as a result of your reporting?
6     A. I couldn't have predicted what the impact on
7 Eric Coomer is. And every single thing that I've written
8 over the last 30 years has an impact on somebody.
9     Q. Yes, it does.
10     All right. This number two, the reason I'm
11 showing you this -- again, this is from the Dominion
12 website. It was published on the 25th before your show
13 aired.
14     There's a statement here that "The U.S.
15 Department of Homeland Security Cyber Security Division
16 has confirmed that it is not possible for a bad actor to
17 change election results without detection."
18     Do you see that?
19     A. Yes.
20     Q. Okay. Were you not aware of that statement or
21 confirmation by Homeland Security; that it would not have
22 been possible for a bad actor, such as Dr. Coomer, to --
23 to change results without detection?
24     A. I don't recall this specific statement. But in
25 general, just as I mentioned with CISA, I'm not going to
Page 109

28 (Pages 106 - 109)

1 take at face value any statement that was made by any
2 government agency about the election at that time.
3     Q.  Okay.  Well, who -- who do you consider -- since
4 you don't consider CISA to be someone that you would rely
5 on, or the Department of Homeland Security, who do you
6 think is authoritative that you would rely on?
7 Russ Ramsland, someone like that?
8     A.  You asked me about these specific agencies, and
9 I already explained why.  Specifically, I had questions
10 about CISA's conclusions since the very same electronic
11 voting systems companies that they were watchdogging were
12 committee members under CISA raised questions about their
13 objectivity and their liability.
14         And there are a lot of operatives and
15 bureaucrats within the Homeland Security department who
16 have political biases themselves.
17         So, I mean, I can't -- I would -- I would trust
18 an independent, nonpartisan -- nonpartisan, not
19 interest-conflicted agency or neutral academics on making
20 these kinds of conclusions.
21     MR. CAIN:  All right.  I just noticed --
22 thank you for that.
23     I just noticed that it appears your counsel may
24 have been booted off again.
25     Are you there, Gordon?
                                                    Page 110

1     THE VIDEOGRAPHER:  He's just coming back in.
2     MR. CAIN:  I tell you what.  I know we're still
3 on the record, and I wish we were off.  But this has been
4 the most technically challenging Zoom deposition since the
5 beginning of the pandemic.
6     Gordon, I'm sorry.  I just realized that you
7 were off again.
8     MR. QUEENAN:  That's fine.  Do you want to just
9 do the same thing, where I have a rough idea of how long I
10 was off, I'll look through the transcript; if I have an
11 objection, I'll put it in, like, an errata sheet.  You
12 just keep truckin'.
13     And to the extent it matters -- I mean, I've
14 been keeping a log of interruptions so we can -- I think
15 Judge Moses would appreciate us getting done today, and
16 I'm not going to jam you up saying you had three hours and
17 because Ms. Malkin froze, you get the short end of the
18 stick.  So I have it at about ten minutes over.
19     MR. CAIN:  Well, just so you know, while you
20 were gone, the last thing that I talked about was this --
21 this statement here about the Department of Homeland
22 Security confirming it's not possible for a bad actor to
23 change the election results without detection.
24     Ms. Malkin gave her answer, essentially, that
25 that department, she thinks, may have a bias or some other
                                                    Page 111

1 reason why they're not reliable.
2     Now my question was, if not the Department of
3 Homeland Security or CISA, who do you consider to be a
4 reliable source of information concerning whether or not
5 it's possible for a bad actor to change election results
6 without detection.
7     Q.  (By Mr. Cain)  And that's my -- that's for you,
8 Ms. Malkin.
9     A.  And what I answered was some independent entity
10 that's not attached to divisions of the government, that
11 work with many of these private companies, that sit on
12 committees under the umbrella of supposed watchdog
13 quasi-governmental entities like CISA.
14     So a neutral academic, somebody who does not
15 have a stake in the outcome of the election.
16     MR. CAIN:  Okay.  Did we lose counsel again?
17     MR. QUEENAN:  No.  I'm turning my video off
18 because I'm concerned that that's part of the problem and
19 I'm hoping that that will resolve the issue.
20     So I'm still here.  Fire away.
21     Q.  (By Mr. Cain)  Can you name one neutral entity,
22 as you refer to them, that you would consider
23 authoritative in this respect?
24     MR. QUEENAN:  Object to form.
25     A.  I know that there are watchdogs, particularly
                                                    Page 112

1 when it comes to black box voting and -- and these
2 electronic voting systems, that may not necessarily share
3 my same political ideology or outlook that are on the
4 other side of the aisle.
5     So groups or watchdogs like that that have a
6 long track record of red-flagging problems with these
7 systems.
8     And then I interviewed one of them -- well, I'm
9 just finishing my answer.
10     I think somebody like Glen Chong in the
11 Philippines, who's been doing research on this and dealing
12 with a -- a lot of these software problems and hardware
13 problems in another country, is also a credible assessor
14 of the stability of these systems.
15     Q.  (By Mr. Cain)  Okay.  Well, let's -- let's stick
16 to the United States for the time being.
17     I'm asking you, you don't consider CISA or the
18 Department of Homeland Security to be authoritative in
19 this respect, and I just want you to name a group that you
20 consider that's not Mr. Chong in the Philippines to be
21 authoritative.
22     A.  Yeah.  So as I mentioned, there -- I can't
23 recall off the top of my head the name of the groups that
24 have been red-flagging problems with Dominion and Sequoia
25 and Smartmatic for years prior to Election 2020.
                                                    Page 113

29 (Pages 110 - 113)

**Page 114**

1     But they have websites that have documented many
2  of these problems. I -- I can go back and find the actual
3  names of them, but people who have been tracking many of
4  these issues.
5     And then I think a lot of the elected officials
6  who have elected not to use these types of products
7  because of -- of concerns. I believe that Chicago
8  Democrats had raised issues about some of these systems,
9  for example, and other municipalities that elected not to
10 use them.
11    Q. Okay. Now, let's look at Number 3. And -- and
12 let me frame this for you, ma'am. You made the statement
13 on your piece about Dr. Coomer having the ability to -- to
14 rig the election. We've talked about that.
15    And what I'm trying to drill down on is the
16 information that you had available to you to test that
17 theory and to validate it.
18    And in Number 3 here, this is a discussion about
19 certification by the U.S. Election Assistant Commission.
20 And I'll just read it quickly.
21    It says, "All U.S. voting systems must provide
22 assurances that they work accurately and reliably as
23 intended under Federal USEAC and state certifications and
24 testing requirements. Dominion Voting Systems are
25 certified for the 2020 elections."

**Page 115**

1     And then it has some bullet points.
2     "Servers that run Dominion software are located
3  in local election offices and data never leaves control of
4  the local election officials."
5     All right. Were you aware of that, or do you
6  have some basis to dispute that?
7     MR. QUEENAN: Object to form and foundation.
8     A. I was generally aware of these requirements,
9  yes.
10    Q. (By Mr. Cain) Okay.
11    "Dominion does not have the ability to review
12 votes in real-time as they are submitted. Dominion's
13 software does not have the ability to fractionalize for
14 weight votes. Dominion tabulators do not have an exposed
15 USB or other memory ports."
16    Did I read that correctly?
17    A. Yes.
18    Q. Okay. So given those statements, how would
19 someone like Dr. Coomer penetrate the U.S. election system
20 without detection?
21    MR. QUEENAN: Object to form and foundation.
22    A. Like I said, I am not a technical expert in
23 election software or hardware. And that is why I was
24 raising these questions; so that citizens out there who
25 might have more expertise than I do or the ability to

**Page 116**

1  raise their voices to ask their elected officials to ask
2  these questions could do so.
3     Q. (By Mr. Cain) Well, you agree with me, ma'am,
4  that Dominion, the company that Dr. Coomer is part of,
5  they don't actually conduct the elections; right? You
6  know that?
7     MR. QUEENAN: Object to form.
8     Q. (By Mr. Cain) Do you know that to be true?
9     A. They're an integral and fundamental part of the
10 conducting of our elections. They do not conduct them qua
11 conducting, if that's what you mean.
12    Q. What I mean to say is, the actual elections are
13 conducted by both the state and county officials; right?
14 Do you know that?
15    MR. QUEENAN: Object to form and foundation.
16    A. Yes. That's how it's supposed to work, yes.
17    Q. (By Mr. Cain) Okay.
18    THE VIDEOGRAPHER: Counsel, five minutes,
19 heads-up.
20    MR. QUEENAN: Charlie, do you want to just make
21 it 15? Will that make it fair in terms of the
22 interruptions?
23    MR. CAIN: Sure. We'll figure it out.
24    Q. (By Mr. Cain) But do you, as you sit here --
25 I'm just trying to mine your knowledge. Do you think

**Page 117**

1  Dr. Coomer or Dominion employees participate in the actual
2  election? In other words, are they acting as tabulators?
3     MR. QUEENAN: Object to form.
4     A. I -- I -- I don't know. I -- I don't know
5  what -- I don't know the totality of what happened during
6  the last election cycle.
7     But in general, the tabulators are not the
8  people who conduct the elections.
9     Q. (By Mr. Cain) Well, let's take an example. If
10 you'd have read through this before airing the last piece
11 you did on Dr. Coomer, it says, "Dominion employees do not
12 have access to the ballot adjudication system nor do they
13 operate it."
14    Do you have any basis to dispute that?
15    MR. QUEENAN: Object to form and foundation.
16    A. I don't have any basis one way or the other.
17    Q. (By Mr. Cain) And you didn't do any research
18 prior to the Coomer story on the -- on the 28th as to
19 whether or not Dr. Coomer specifically had access to the
20 adjudication system during the election, did you?
21    MR. HICKS: Object to form.
22    A. That's not a claim that I made.
23    Q. (By Mr. Cain) Well, you said that he had the
24 ability to do it. So part of the ability is opportunity,
25 and that's why I'm asking you this question.

30 (Pages 114 - 117)

1     Did he have the opportunity, through access, to
2  affect the election?  And my -- and that's the basis of my
3  question.  Either you know that or you don't.  Do you
4  know?
5     MR. QUEENAN:  Object to form.
6     A.  When I stated that he had the ability to have an
7  influence on the election, I did not spell out, nor did I
8  have any particular theory about how he might have done
9  that.
10    Joe Oltmann apparently did, and others did.  And
11 you can ask them to spell out how exactly they believe it
12 happened.
13    But as I stated on the show, I had no evidence
14 at the time that he acted on that threat, and that's what
15 I told my audience.
16    Q.  (By Mr. Cain)  Right.  Just that he had the
17 ability to do it.  That's why I'm asking.
18    MR. QUEENAN:  Object to form and foundation.
19    Q.  (By Mr. Cain)  Let me ask you this:  Were you --
20 actually, back up before I move on to that.
21    And I had asked you previously about Mr. Hoft
22 and some of the other defendants in this case.  I didn't
23 ask you about Mr. Giuliani.
24    Did -- did you have any interactions with
25 Mr. Giuliani during the 2020 election cycle in -- in this

Page 118

1     A.  I wouldn't know anything about who coordinated
2  what.
3     Q.  (By Mr. Cain)  Okay.  Well, the reason I was
4  asking you is I saw there was a fair number of tweets by
5  you directed towards Mr. Giuliani.  Do you remember doing
6  that?
7     A.  Directed towards him?  I don't -- I don't know
8  what you mean by that.
9     Q.  Well, I'm not a Twitter guy, so I don't --
10 you're tweeting about Mr. Giuliani during this particular
11 rally.  Do you remember that?
12    A.  Yes.  I was there not only to speak but also to
13 cover the hearing.  And so I tagged the people who are
14 speaking, and he was one of them.
15    Q.  By the way, I -- okay.  So you didn't meet with
16 him or talk to him during that Arizona visit, did you?
17    A.  I did not.
18    Q.  Okay.  And the Stop the Steal, is that an
19 organization in the sense of Antifa, or does it have some
20 actual, you know, organizational structure that you know
21 of?
22    MR. QUEENAN:  Object to form and foundation.
23    Q.  (By Mr. Cain)  And I butchered that a little
24 bit.
25    I'm just -- I'm trying to figure out what that

Page 120

1  period of time?
2     MR. QUEENAN:  Object to form.
3     A.  No.
4     Q.  (By Mr. Cain)  I noticed that you were at -- I
5  think you spoke -- correct me if I'm wrong -- at a
6  Stop the Steal rally in November -- late November, so it
7  would have been a couple of weeks after -- well, it would
8  have been a couple of days after the Newsmax piece aired.
9     But do you recall speaking at the Stop the Steal
10 rally in -- I think it was Phoenix, on November 30th?
11    A.  Yes.  I spoke very briefly at the phoenix
12 Stop the Steal rally.
13    Q.  Okay.  And that was outside of -- was -- was
14 Ali Alexander also speaking at that --
15    MR. QUEENAN:  Object to form.  What name did you
16 say?
17    Q.  (By Mr. Cain)  Ali Alexander.
18    Was he there?
19    A.  Yes.
20    Q.  And was Mr. Giuliani, at the time, was this
21 coordinated with him speaking to the legislature there
22 in -- in Arizona?
23    MR. QUEENAN:  Object to --
24    A.  I wouldn't know any -- oh.
25    MR. QUEENAN:  You can answer.

Page 119

1  organization is, if you know.
2     A.  So I believe it was formed in the aftermath of
3  the election to galvanize people to show up at rallies,
4  and I had a lot of friends who were participating in them.
5  I don't know much about the organization itself.
6     Q.  And do you have a -- a firmly held belief,
7  ma'am, that the 2020 presidential election was stolen?
8     A.  As I stated at the beginning, I believe broadly
9  that there were a number of irregularities, problems with
10 ballot harvesting and the intervention of private
11 philanthropic nonprofits that led to what I believe
12 broadly was a stealing of Election 2020.  Absolutely.
13    Q.  Okay.  And is that -- I'm just trying to
14 understand the -- how you're characterizing it.
15    Does that mean -- when you say "stealing," does
16 that mean that there were activities that affected the
17 vote count to the point where the wrong person won?
18    A.  Yes.
19    Q.  We'll just do one more exhibit since we're --
20 and I apologize, Ms. Malkin.  Have you done one of these
21 Zoom depositions before?
22    A.  I did one, yes, one other one, and also had
23 similar problems.  It's -- it's crunch time, like, in our
24 neighborhood, so a lot of people are on the internet.  I
25 told my son to get off.

Page 121

31 (Pages 118 - 121)

| | |
|---|---|
| 1    (Exhibit Number 30 was introduced.) | 1  reveal anything that's privileged information. |

**Page 122**

1    (Exhibit Number 30 was introduced.)
2  Q.  (By Mr. Cain) All right. Let me share my
3  screen. This is Exhibit 30. This is from your Newsmax
4  Sovereign Nation show on May 8, 2021. It's about a minute
5  and a half. Take a look at Exhibit 30.
6    (The video segment was played.)
7  Q.  (By Mr. Cain) Had you seen that before,
8  Ms. Malkin?
9  A.  Yes.
10  Q.  All right. So you differed from your former --
11  were they an employer? I want to refer to them as -- in
12  the appropriate term.
13  A.  They --
14  Q.  What was Newsmax to you?
15  A.  They do not employ me. I was an independent
16  contractor.
17  Q.  You had just told us that the election was
18  stolen, in your view. And you, obviously, understand from
19  seeing that piece that Newsmax had found no evidence of
20  that and made that statement to the public; true?
21      MR. QUEENAN: Object to form.
22  A.  What is the question?
23  Q.  (By Mr. Cain) Yeah. You had told us that the
24  election, in your view, was stolen. But you would agree
25  that your independent contractor company, Newsmax, made

Page 122

**Page 123**

1  the statement to the public to the opposite effect?
2      MR. QUEENAN: Object to form.
3  A.  You're asking me if I agreed that they came to
4  an opposite conclusion about the election?
5  Q.  (By Mr. Cain) Yeah. You -- well, I can ask it
6  a different -- Newsmax doesn't agree with your position
7  that the election was stolen, at least as -- as it relates
8  to this retraction; correct?
9  A.  Yes.
10  Q.  Okay. And is that why you guys parted ways,
11  because of differing views on the election?
12      MR. QUEENAN: Object to form and foundation.
13  Asked and answered.
14      You can answer.
15  A.  As I mentioned, there were many reasons beyond
16  this particular issue that I voluntarily ended my
17  relationship with Newsmax.
18  Q.  (By Mr. Cain) Did they consult you prior to
19  issuing this retraction for your input?
20      MR. QUEENAN: Object to form.
21  Q.  (By Mr. Cain) Did they?
22  A.  So --
23  Q.  Did Newsmax consult you --
24  A.  Yeah. I understand the question. I understand
25  the question. I'm just trying to make sure that I don't

Page 123

**Page 124**

1  reveal anything that's privileged information.
2  Q.  Okay. Well --
3  A.  I don't -- I don't know how to handle ensuring
4  that I don't disclose privileged information or
5  information that's covered by an NDA.
6  Q.  Okay. Well, I don't know your NDA situation.
7  Let me ask it this way.
8      Let's just talk about the topic without going
9  into the detail. So you understand, topic, substance.
10  We're going to talk about a topic.
11      Did the topic or the issue of whether you were
12  going to be given input into the retraction -- was that
13  topic ever discussed or addressed without going into the
14  details?
15  A.  It was broached with me, yes.
16  Q.  Did you provide, without going into substance,
17  any input into the retraction that Newsmax issued?
18  A.  Yes.
19      MR. QUEENAN: Object to form.
20  Q.  (By Mr. Cain) And your input, was that through
21  counsel? What -- what was the setting?
22      MR. QUEENAN: I think I'm going to have to
23  interpose a privilege objection here because this would be
24  derived from attorney-client communications, Charlie.
25      MR. CAIN: Well, I -- if that's true --

Page 124

**Page 125**

1      MR. QUEENAN: Well, I think it's a fair topic.
2  I'm just trying to think of a way to ask the question
3  where it's not running afoul of privilege.
4  Q.  (By Mr. Cain) Well, let me ask it this way,
5  ma'am. As it relates to the retraction, did you have any
6  discussions directly with Newsmax without lawyers present
7  about this topic?
8  A.  I was contacted inappropriately by a nonlawyer
9  about the retraction.
10  Q.  Someone at Newsmax?
11  A.  Correct.
12  Q.  Okay. While you had counsel?
13  A.  Correct.
14  Q.  All right. Okay. Well, we'll save that for
15  another day. I don't think it matters for our purposes at
16  this point.
17      Have you issued any retractions concerning your
18  reporting on Dr. Coomer?
19  A.  I have not.
20  Q.  And in terms of your ability now, in hindsight,
21  to corroborate any of your reporting, have you done
22  anything since the November 28th broadcast that would
23  corroborate Mr. Oltmann's story that Dr. Coomer was on
24  this Antifa conference call?
25  A.  I have not followed up because I have not done

Page 125

1 any further stories on it.
2      MR. QUEENAN: And -- and, Charlie, that's
3 three hours and ten minutes, I think. Is that correct,
4 Dennis?
5      THE VIDEOGRAPHER: With a running total, yes. I
6 have three hours and nine minutes and some seconds.
7      MR. QUEENAN: So a couple more questions, then.
8   Q.  (By Mr. Cain) You recognize, ma'am, that if --
9 if what Mr. Oltmann claims is true, then there are other
10 witnesses to this event. You recognize that fact; right?
11      MR. QUEENAN: Object to form.
12   A.  To which event are you referring?
13   Q.  (By Mr. Cain) The supposed Antifa call that
14 Dr. Coomer was on.
15   A.  Yes, that would be true.
16   Q.  Right. And none of those witnesses have been
17 interviewed by you; correct?
18   A.  Correct.
19   Q.  Or anyone, to your knowledge, working for you?
20   A.  I don't have anyone working for me.
21      MR. QUEENAN: And I think that's time, Charlie.
22 You tell me if you think I'm wrong. I don't want to -- I
23 don't want to have to go to Judge Moses with a dispute,
24 but I -- I think ten minutes kind of encapsulated the
25 technical difficulties.

Page 126

1      Do you disagree?
2      MR. CAIN: I don't know. This has been one of
3 the more disruptive and disrupted Zoom depositions in the
4 history of (unintelligible).
5      MR. QUEENAN: Was I've been doing was basically
6 keeping a sort of an injury time of -- every time there
7 was a disruption, I wrote down and added a minute. And
8 then I came up with seven of those.
9      And then there was two times where I dropped
10 off, and when I came back on, you had to -- we had to have
11 a conversation about that. So I figured that worked out
12 to another three minutes. That puts us at three hours and
13 ten minutes.
14      I mean --
15      MR. CAIN: So let me do this.
16      MR. QUEENAN: Is it --
17      (Simultaneous speakers.)
18      MR. CAIN: Let me wrap it up.
19   Q.  (By Mr. Cain) Ms. Malkin, have -- have I been
20 professional and courtesy -- and courteous to you today?
21   A.  Mostly.
22   Q.  Okay. As you sit here -- I've asked you a
23 number of questions. Are there any responses that you
24 have given that, upon reflection -- and you'll have an
25 opportunity to -- to look at -- at the transcript, but as

Page 127

1 you sit here, you think that you may have misspoken and
2 you need to correct today?
3   A.  I've answered to the best of my ability.
4      MR. CAIN: Okay. Well, thank you. I apologize
5 for the disruption on my -- my text. My wife had texted
6 during one of your questions that the plumber has arrived.
7 I'm going to go attend to that.
8      Thank you for your time, ma'am.
9      THE WITNESS: Sure.
10      THE REPORTER: Counsel, before we all
11 disconnect, I do need to --
12      THE VIDEOGRAPHER: Just one -- one second.
13      Any follow-up, Counsel?
14      MR. QUEENAN: No.
15      THE VIDEOGRAPHER: Okay. We are off the record
16 at 1:43 p.m., and this concludes today's testimony given
17 by Michelle Malkin.
18      The total number of media units used was two and
19 will be retained by Veritext Legal Solutions. Thank you,
20 all. And please stay online for the court reporter.
21      (The video record was concluded.)
22      THE REPORTER: Yes. Counsel, I just need to get
23 any transcript orders on the record, including any
24 rough-draft requests and any expedited requests.
25      And I will start with Mr. Cain.

Page 128

1      MR. CAIN: I think we have a three-day standing
2 order.
3      THE REPORTER: Okay.
4      MR. CAIN: And we're going to need a good video
5 editor; I know that.
6      THE REPORTER: Is that it for orders? No more
7 orders at this point?
8      MR. QUEENAN: I -- I would like an electronic
9 transcript just to the -- I don't need the video right
10 now, just the transcript, four pages a page, if that's
11 possible, please.
12      THE REPORTER: Yes. And will you handle
13 signature for Ms. Malkin as well?
14      MR. QUEENAN: Yes, ma'am.
15      THE REPORTER: Okay.
16      MS. HALL: And, Sara, this is Andrea Hall. I
17 don't know if you saw in the chat, but I will take a copy
18 of the transcript as well.
19      MR. QUEENAN: Ms. Malkin, you're free to --
20 you're -- you're released.
21      THE WITNESS: Thank you.
22      MR. ZAKHEM: This is John Zakhem. I'd like an
23 electronic copy as well.
24      MR. ARRINGTON: Barry Arrington, electronic
25 copy, please.

Page 129

33 (Pages 126 - 129)

1   MR. RHODES:  Bernie Rhodes for OAN.  Electronic
2   copy, please.
3       THE REPORTER:  Anybody else?  Okay.
4   Thank you, all.
5       MR. CAIN:  Thanks, Sara.
6       THE REPORTER:  You bet.
7       MS. DOMINGUEZ:  All right.  You all have a good
8   evening.
9       THE REPORTER:  Thanks, Rebecca.
10      MS. DOMINGUEZ:  Thank you.
11      MS. CHRISTOPHER:  Hi, there.  Sorry.  My name is
12  Lexi Christopher.  I am here on behalf of Mr. Corporon.  I
13  am his legal assistant.
14      I just needed to request a transcript.  But I
15  had some internet trouble, and so I, kind of, got kicked
16  out and came back in.
17      THE REPORTER:  No worries.
18      MS. CHRISTOPHER:  But if we can request a
19  transcript.  He asked for four to a page and a full
20  concordance, if you guys can do that.
21      THE REPORTER:  I can do that.  Thank you, Lexi.
22      * * * * * * *
23      WHEREUPON, the foregoing deposition was
24  concluded at 1:43 p.m.  Total time on the record was
25  3 hours and 33 minutes.

Page 130

---

REPORTER'S CERTIFICATE
1
2   STATE OF COLORADO         )
3   CITY AND COUNTY OF DENVER  )
4       I, Sara A. Stueve, a Registered Professional Reporter
5   and Notary Public within and for the State of Colorado,
6   commissioned to administer oaths, do hereby certify that
7   previous to the commencement of the examination, the
8   witness was duly sworn by me to testify the truth in
9   relation to matters in controversy between the said
10  parties; that the said deposition was taken in stenotype
11  by me at the time and place aforesaid and was thereafter
12  reduced to typewritten form by me; and that the foregoing
13  is a true and correct transcript of my stenotype notes
14  thereof; that I am not an attorney nor counsel nor in any
15  way connected with any attorney or counsel for any of the
16  parties to said action nor otherwise interested in the
17  outcome of this action.
18      My commission expires October 26, 2024.
19
20
                    _____
                    SARA A. STUEVE
21                  Registered Professional Reporter
                    Notary Public, State of Colorado
22
23
24
25

Page 132

---

1   I, MICHELLE MALKIN, the deponent in the above
2   deposition, do hereby acknowledge that I have read the
3   foregoing transcript of my testimony, and state under oath
4   that it, together with any attached Amendment to
5   Deposition pages, constitutes my sworn testimony.
6
7   _____ I have made changes to my deposition
8   _____ I have NOT made any changes to my deposition
9
10          _____
            MICHELLE MALKIN
11
12
13  Subscribed and sworn to before me this _____ day of
14  _____, 20_____.
15  My commission expires: _____.
16
17          _____
            NOTARY PUBLIC
18
19
20
21
22
23
24
25

Page 131

---

1   Coomer, Eric, Ph.D v. Donald J. Trump For President, Inc.
2   Michelle Malkin Job No. 4691504
3       E R R A T A  S H E E T
4   PAGE____ LINE____ CHANGE_____
5   _____
6   REASON_____
7   PAGE____ LINE____ CHANGE_____
8   _____
9   REASON_____
10  PAGE____ LINE____ CHANGE_____
11  _____
12  REASON_____
13  PAGE____ LINE____ CHANGE_____
14  _____
15  REASON_____
16  PAGE____ LINE____ CHANGE_____
17  _____
18  REASON_____
19  PAGE____ LINE____ CHANGE_____
20  _____
21  REASON_____
22  _____
23  _____
24  Michelle Malkin            Date
25

Page 133

34 (Pages 130 - 133)

```
 1  gqueenan@prpclegal.com
 2            July 30, 2021
 3  Coomer, Eric, Ph.D v. Donald J. Trump For President, Inc.
 4  DEPOSITION OF: Michelle Malkin 4691504
 5     The above-referenced witness transcript is
 6  available for read and sign.
 7     Within the applicable timeframe, the witness
 8  should read the testimony to verify its accuracy. If
 9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11     The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
                                    Page 134
```

35 (Page 134)

Colorado Rules of Civil Procedure

Chapter 4, Disclosure and Discovery

Rule 30

(e) Review by Witness; Changes; Signing. If requested by the deponent or a party before completion of the deposition, the deponent shall be notified by the officer that the transcript or recording is available. Within 35 days of receipt of such notification the deponent shall review the transcript or recording and, if the deponent makes changes in the form or substance of the deposition, shall sign a statement reciting such changes and the deponent's reasons for making them and send such statement to the officer. The officer shall indicate in the certificate prescribed by subsection (f)(1) of this rule whether any review was requested and, if so, shall append any changes made by the deponent.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

4691504 - ER

DISTRICT COURT, CITY AND COUNTY OF DENVER
STATE OF COLORADO
1437 Bannock Street
Denver, CO 80202

^ COURT USE ONLY ^

ERIC COOMER, Ph.D.,                         Case Number 20CV34319
        Plaintiff,
                                            Courtroom 409
vs.
DONALD J. TRUMP FOR PRESIDENT, INC.,
SIDNEY POWELL, SIDNEY POWELL, P.C.,
RUDOLPH GIULIANI, JOSEPH OLTMANN,
FEC UNITED, SHUFFLING MADNESS MEDIA, INC.,
dba CONSERVATIVE DAILY, JAMES HOFT,
TGP COMMUNICATIONS LLC, dba THE GATEWAY PUNDIT,
MICHELLE MALKIN, ERIC METAXAS, CHANEL RION,
HERRING NETWORKS, INC., dba ONE AMERICA
NEWS NETWORK, and NEWSMAX MEDIAN, INC.,
        Defendants.

VIDEO-RECORDED REMOTE DEPOSITION OF
MICHELLE MALKIN

July 27, 2021

REMOTE APPEARANCES:
FOR THE PLAINTIFF:
        CHARLES A. CAIN, ESQ.
        STEVE SKARNULIS, ESQ.
        BRAD KLOEWER, ESQ.
        Cain & Skarnulis PLLC
        P.O. Box 1064
        Salida, Colorado 81201
        Telephone: 719-530-3011
        Email: ccain@cstrial.com
               skarnulis@cstrial.com
               bkloewer@cstrial.com
        THOMAS M. ROGERS III (TREY), ESQ.
        Recht Kornfleld, PC
        1600 Stout Street, Suite 100
        Denver, Colorado 80202
        Telephone: 303-573-1900
        Email: trey@rklawpc.com

Page 1

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF COLORADO                )

 3    CITY AND COUNTY OF DENVER        )

 4         I, Sara A. Stueve, a Registered Professional Reporter

 5    and Notary Public within and for the State of Colorado,

 6    commissioned to administer oaths, do hereby certify that

 7    previous to the commencement of the examination, the

 8    witness was duly sworn by me to testify the truth in

 9    relation to matters in controversy between the said

10    parties; that the said deposition was taken in stenotype

11    by me at the time and place aforesaid and was thereafter

12    reduced to typewritten form by me; and that the foregoing

13    is a true and correct transcript of my stenotype notes

14    thereof; that I am not an attorney nor counsel nor in any

15    way connected with any attorney or counsel for any of the

16    parties to said action nor otherwise interested in the

17    outcome of this action.

18         My commission expires October 26, 2024.

19

20

             SARA A. STUEVE

21           Registered Professional Reporter

             Notary Public, State of Colorado

22

23

24

25

                                            Page 132
```

I, MICHELLE MALKIN, the deponent in the above deposition, do hereby acknowledge that I have read the foregoing transcript of my testimony, and state under oath that it, together with any attached Amendment to Deposition pages, constitutes my sworn testimony.

✓  I have made changes to my deposition

_____  I have NOT made any changes to my deposition

_____
MICHELLE MALKIN

Subscribed and sworn to before me this 26th day of August, 2021.

My commission expires: _____

_____
NOTARY PUBLIC

Page 131

1  Coomer, Eric, Ph.D v. Donald J. Trump For President, Inc.

2  Michelle Malkin Job No. 4691504

3                 E R R A T A   S H E E T

4  PAGE **38**  LINE **5**  CHANGE **"Its"** to **"it's"**

5  _____

6  REASON ____ **typo**

7  PAGE **52**  LINE **15**  CHANGE **"vitreal"** to **"vitriol"**

8  _____

9  REASON ____ **TYPO**

10 PAGE **60**  LINE **21**  CHANGE **"animas"** to **"animus"**

11 _____

12 REASON ____ **TYPO**

13 PAGE **65**  LINE **22**  CHANGE **"15"** to **"50"**

14 _____

15 REASON ____ **Typo**

16 PAGE ____  LINE ____  CHANGE ____

17 _____

18 REASON ____

19 PAGE ____  LINE ____  CHANGE ____

20 _____

21 REASON ____

22

23 _____          **8/26/21**

24 Michelle Malkin                  Date

25

Page 133

1    But that's just one aspect of it.  I've covered

2    election fraud, as I mentioned, over the last 30 years.

3    And it's the entire mountain of everything from

4    illegal-alien fraud, fraud that was catalyzed by the motor

5    voter law, (its) obstruction of GOP poll workers.

6         And I had interviewed one of them in Michigan.

7    It had to do with a -- a lot of the training that I

8    believe was done by partisan figures and electronic voting

9    systems and the weaknesses and the -- the problems with

10   those, which have been highlighted by, as I said, people

11   on both the left and the right, is part of that larger

12   picture of the stealing of an election.

13        Q.    And that's how you framed the story that you

14   were doing on -- on Eric Coomer on this live stream,

15   though; that he -- that this was part of this systemic

16   stealing of the election; true?

17        A.    Correct.

18        Q.    And you wanted the viewers to know that -- that

19   Eric Coomer was potentially instrumental in the stealing

20   of the 2020 presidential election; true?

21        A.    I wanted people to hear what Joe Oltmann had

22   discovered about him, and why he felt it was important and

23   germane to the public discussion of how the election was

24   run, yes.

25        Q.    Okay.  And you didn't talk about -- I mean, this

                                                    Page 38

```
1          So if that's true, then -- then how are you
2   sitting here linking a political viewpoint with one's
3   ability to administer or serve in a -- in an election
4   role?  I don't get it.
5          MR. QUEENAN:  Object to form.
6          You can answer.
7      A.  What's the question?
8      Q.  (By Mr. Cain)  Who cares?  Maybe he didn't like
9   Donald Trump.  What does that have to do with election
10  integrity?
11     A.  Joe Oltmann explains why he believes it is
12  relevant, and I agree with him; that it is concerning that
13  the sheaf of Facebook posts that not merely express some
14  di minimus level of discontent but are actually very
15  extreme and profane in vitreal and even hatred for people
16  who are on the right, is of great public interest to
17  voters who were concerned about how Election 2020 was
18  conducted.
19     Q.  And so that's why you chose to -- to put up the
20  Facebook posts during this live stream?
21         MR. QUEENAN:  Object to form.
22     Q.  (By Mr. Cain)  Is that why?
23     A.  Yes.  Eric Coomer was a high-level official for
24  Dominion Voting Systems whose products are used in almost,
25  what, 30 states in the country.  Dominion was at the
```

Page 52

1        Go ahead and answer.

2        THE WITNESS:  Sorry.  Sorry.  I'll wait a little

3   bit more.

4        A.    That was Joe Oltmann's opinion, and I -- I

5   agreed with the sentiment of it, yes.

6        Q.    (By Mr. Cain)  Well, that's not an opinion.

7   Being a major shareholder is not an opinion, is it?

8        A.    No.  The idea that being a major shareholder

9   could lend itself to the dangers of sabotaging election

10  integrity.  That's an opinion.  And I agree with that

11  underlying sentiment --

12       Q.    Yeah.

13       A.    -- that it was --

14       Q.    And conversely, if Dr. Coomer is not a major

15  shareholder, then the opposite would be true; right?  That

16  he wouldn't have the -- the amount of influence over the

17  corporate entity that a major shareholder would; fair?

18       MR. QUEENAN:  Object to form and foundation.

19       A.    Well, it was certainly a piece of the puzzle,

20  you know, given -- given his high profile in the company,

21  plus that, plus the animas that he manifested in the -- in

22  the Facebook posts.  It was all of it.

23       Q.    (By Mr. Cain)  You doing okay, ma'am?  Do you

24  need a break?

25       A.    I'm fine.

Page 60

1        Q.    Okay.

2        A.    -- done anything else, but that's my

3    recollection.

4        Q.    Because I -- and correct me if I'm wrong, I only

5    know of these two, at least in this medium:   A live stream

6    on the 13th, and then the Newsmax piece on the 28th.

7        A.    Correct.

8        Q.    Okay.  And then after the 28th, you did not do

9    any more stories that directly related to Dr. Coomer;

10   right?

11       A.    Correct.

12       Q.    Is there a reason why you stopped reporting on

13   this?

14       A.    I --

15       Q.    Just moved on?

16       A.    I -- I do tons of stories on tons of topics.

17       Q.    But you just moved on?

18       A.    Well, I think that the two stories covered

19   everything that needed to be said about what Joe Oltmann

20   had discovered about Eric Coomer and his role at Dominion.

21       Q.    Well --

 50 min

22       A.    The live stream was 15 minutes and a full

23   segment on Newsmax.

24       Q.    Okay.  Now, let's -- let's talk about the

25   intervening two weeks, approximately two weeks between the

                                              Page 65

REPORTER'S NOTE:

EXHIBIT 15

Video File

PRESERVED IN NATIVE FORMAT



HOME   ABOUT ∨   PRODUCTS ∨   SUPPORT   SECURITY   CAREERS   **CONTACT**

**Exhibit
PLTF 0016**
MALKIN

Updated: November 13, 2020
SETTING THE RECORD STRAIGHT: FACTS & RUMORS

# DOMINION VOTING SYSTEMS CATEGORICALLY DENIES FALSE ASSERTIONS ABOUT VOTE SWITCHING ISSUES WITH OUR VOTING SYSTEMS.

According to a Joint Statement by the federal government agency that oversees U.S. election security, the Department of Homeland Security's Cybersecurity & Infrastructure Security Agency (CISA): "There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." The government & private sector councils that support this mission called the 2020 election "the most secure in American history."

## 1) VOTE DELETION/SWITCHING ASSERTIONS ARE COMPLETELY FALSE.

An unsubstantiated claim about the deletion of 2.7 million pro-Trump votes that was posted on the Internet and spread on social media has been taken down and debunked by independent fact-checkers.

- Edison Research (ER) has refuted any claims that company data suggests any voting irregularities, including vote switching. ER President Larry Rosin told The Dispatch Fact Check, *"Edison Research created no such report and we are not aware of any voter fraud."*

- Claims that 941,000 votes for President Trump in Pennsylvania were deleted are impossible, as Dominion only serves 14 Commonwealth counties. Collectively, those Counties produced 1.3 million votes representing a voter turnout of 76%. Fifty-two percent of those votes went to President Trump, which amounts to 676,000 votes the company's system processed for the President in Pennsylvania.

## 2) DOMINION IS A NONPARTISAN U.S. COMPANY.

Dominion has no company ownership relationships with any member of the Pelosi family, the Feinstein family, or the Clinton Global Initiative, Smartmatic, or any ties to Venezuela. Dominion works with all political parties; our customer base and our government outreach practices reflect this nonpartisan approach.

- As reported by the Associated Press, *"Dominion made a one-time philanthropic commitment at a Clinton Global Initiative meeting in 2014, but the Clinton Foundation has no stake or involvement in Dominion's operations, the nonprofit confirmed."* The meeting included bipartisan attendees focused on international democracy-building.

## 3) DOMINION SOFTWARE ACCURATELY TABULATED BALLOTS, AND TABULATED RESULTS ARE 100% AUDITABLE.

No credible reports or evidence of any software issues exist. Dominion equipment is used by county and state officials to tabulate ballots. Human errors related to reporting tabulated results have arisen in a few counties, including some using Dominion equipment, but appropriate corrections were made prior to the canvass process. More importantly, states have taken appropriate steps to review all reported issues.

- The Michigan Secretary of State's office offers a Fact Check Page which debunks false or erroneous claims about voting in Detroit, as well as a user-error incident in Antrim County.

- The Georgia Secretary of State has also repeatedly stated throughout the count that *"[a]s the work goes on, I want to assure Georgia voters that every legal vote was cast and accurately counted."*

# 4) NO UNAUTHORIZED OR LAST-MINUTE SOFTWARE UPDATES OCCURRED.

Claims about software updates being done the night before Election Day are 100% false.

- Georgia Voting System Implementation Manager Gabe Sterling has independently, and unequivocally, rebutted inaccurate claims made about an update to machines on the eve of the election. He affirmed in his daily press briefing on November 5 that *"nothing was done to the [PollPad] system after [October 31],"* when voter files were updated as part of normal procedure.

# 5) THERE ARE NO ISSUES WITH THE USE OF SHARPIE PENS.

Election officials provide writing instruments that are approved for marking ballots to all in-person voters using hand-marked paper ballots. Dominion Voting Systems machines can read all of these instruments, including Sharpies.

- The DHS Cybersecurity and Infrastructure Security Agency, *"if a ballot has issues that impacts its ability to be scanned, it can be hand counted."* The Maricopa County Board of Supervisors assured voters that *"sharpies do not invalidate ballots."* Dominion has stated that *"Sharpie pens are safe and reliable to use on ballots, and recommended due to their quick-drying ink."*

# 6) ASSERTIONS OF VOTER FRAUD CONSPIRACIES ARE 100% FALSE.

- The U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) has debunked numerous claims, including claims about the existence of a secret CIA program for vote fraud called Hammer and Scorecard.

All U.S. voting systems must provide assurance that they work accurately and reliably as intended under federal U.S. EAC and state certification and testing requirements. Election safeguards - from testing and certification of voting systems, to canvassing and auditing - prevent malicious actors from tampering with vote counts and ensure that final vote tallies are accurate. Read more from the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency.

---



Founded in 2003, Dominion Voting Systems is a leading industry supplier of election technology across the U.S., Canada and globally.

**PRODUCTS**

EKG ENGINE
Democracy Suite®

IN-PERSON AND ACCESSIBLE VOTING
ImageCast® X

CENTRAL TABULATION
ImageCast® Central

COMBINATION VOTING AND TABULATION
ImageCast® Precinct
ImageCast® Evolution

Optional Solutions

**ABOUT**

Dominion Difference

Dominion Secure

Careers

**INFO**

Customer Support

1-866-654-VOTE (8683)

Contact Us

U.S.: Denver, CO
CANADA: Toronto, ON

Copyright © 2020 Dominion Voting Systems Corp. All Rights Reserved.          Privacy Policy | Terms of Use | Site Map

REPORTER'S NOTE:


EXHIBIT 17

Video File


PRESERVED IN NATIVE FORMAT





**Exhibit
PLTF 0018
MALKIN**

Go to Statement from Dominion on Sidney Powell Charges

Updated: November 25, 2020
SETTING THE RECORD STRAIGHT: FACTS & RUMORS

# DOMINION VOTING SYSTEMS CATEGORICALLY DENIES FALSE ASSERTIONS ABOUT VOTE SWITCHING AND SOFTWARE ISSUES WITH OUR VOTING SYSTEMS.

According to a Joint Statement by the federal government agency that oversees U.S. election security, the Department of Homeland Security's Cybersecurity & Infrastructure Security agency (CISA): "There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." The government & private sector council that support this mission called the 2020 election "the most secure in American history."

# 1) DOMINION IS NOT SHUTTERING ITS OFFICES. EMPLOYEES HAVE BEEN ENCOURAGED TO WORK REMOTELY AND PROTECT THEIR SOCIAL MEDIA PROFILES DUE TO PERSISTENT HARASSMENT AND THREATS AGAINST PERSONAL SAFETY.

Dominion employees are being forced to retreat from their lives due to personal safety concerns, not only for our employees themselves, but also for their extended families.

- ABC News has reported on these security concerns, saying that after "two weeks of false fraud alarms," this is the latest sign that "freewheeling online rhetoric has real world consequences."
- Dominion team members are working around the clock to address issues with law enforcement and take every measure we can to ensure the safety of our employees.
- Dominion will not comment further about our personnel due to these safety concerns.

# 2) VOTE DELETION/SWITCHING ASSERTIONS ARE COMPLETELY FALSE.

An unsubstantiated claim about the deletion of 2.7 million pro-Trump votes that was posted on the internet and spread on social media has been taken down and debunked by independent fact-checkers.

- Edison Research (ER) has refuted any claims that company data suggests any voting irregularities, including vote switching. Edison Research President Larry Rosin told The Dispatch Fact Check, "Edison Research created no such report and we are not aware of any voter fraud."
- Claims that 941,000 votes for President Trump in Pennsylvania were deleted are impossible. The fourteen counties using Dominion systems collectively produced 1.3 million votes, representing a voter turnout of 76%. Fifty-two percent of those votes went to President Trump, amounting to 676,000 votes processed for the President in Pennsylvania using company systems.
- The U.S. Department of Homeland Security's cybersecurity division has confirmed that it is not possible for a bad actor to change election results without detection.
- Dominion doesn't even operate in some of the contested districts, including Philadelphia; Allegheny County, PA; Milwaukee; and Dane County.

# 3) DOMINION'S SYSTEMS ARE SECURE AND ARE CERTIFIED UNDER THE U.S. ELECTION ASSISTANCE COMMISSION (EAC).

All U.S. voting systems must provide assurance that they work accurately and reliably as intended under federal U.S. EAC and state certifications and testing requirements. Dominion's voting systems are certified for the 2020 elections.

- Servers that run Dominion software are located in local election offices, and data never leaves the control of local election officials.
- Dominion does not have the ability to review votes in real-time as they are submitted.
- Dominion software does not have the ability to fractionalize or weight a vote.
- Dominion's tabulators do not have exposed USB or other memory ports.
- Dominion software tabulates ballots. It does not collect or store voter information.
- Dominion is certified in 28 states. While we disagree with Texas' decision to not certify our systems, we understand there are different standards in different states. Sometimes it takes adjustments, for any company's systems, to meet a certain state's standard.

# 4) ASSERTIONS OF "SUPERCOMPUTER" ELECTION FRAUD CONSPIRACIES ARE 100% FALSE.

The Cybersecurity and Infrastructure Security Agency (CISA) has debunked claims about the existence of a secret CIA program for vote fraud called Hammer and Scorecard.

- All U.S. voting systems must provide assurance that they work accurately and reliably as intended under federal U.S. EAC and state certifications and testing requirements. Election safeguards - from testing and certification of voting systems, to canvassing and auditing - prevent malicious actors from tampering with vote counts and ensure final vote tallies are accurate. Read more from CISA.
- There have been no "raids" of Dominion servers by the U.S. military or otherwise, and Dominion does not have servers in Germany. CISA has refuted this claim on Twitter, and the U.S. Army has also confirmed to the Associated Press that it's false.

# 5) THERE WERE NO DOMINION SOFTWARE GLITCHES AND BALLOTS WERE ACCURATELY TABULATED. THE RESULTS ARE 100% AUDITABLE.

No credible reports or evidence of any software issues exist. Vote counts are conducted by county and state election officials, not by Dominion. Our systems support tabulation by those officials alone. Human errors related to reporting tabulated results have arisen in a few counties, including some using Dominion equipment, but appropriate procedural actions have been taken by the county to address these errors were made prior to the canvass process.

- The Michigan Secretary of State's office offers a Fact Check Page which debunks false or erroneous claims about voting in Detroit, as well as a user-error incident in Antrim County.
- The Georgia Secretary of State has also repeatedly stated throughout the count that "[a]s the work goes on, I want to assure Georgia voters that every legal vote was cast and accurately counted."
- Dominion's systems are not responsible for 2,631 uncounted ballots discovered in Floyd County, Georgia during the statewide recount. The Secretary of State's office has cited clerical error and lack of following proper procedures as the cause.
- Votes are not processed outside the United States. Votes are counted and reported by county and state election officials - not by Dominion, or any other election technology company. Assertions that votes are counted in Germany are completely false, as has been fact-checked by the Associated Press.

# 6) DOMINION EMPLOYEES DO NOT HAVE ACCESS TO THE BALLOT ADJUDICATION SYSTEM, NOR DO THEY OPERATE IT.

The canvass process exists to allow election officials to validate and count ballots that were unable to be counted on Election Day because they needed additional adjudication. Dominion employees do not have access to this adjudication system, nor do they operate it.

- Access to any adjudication system resides with the election authority using it. The system is controlled through secure and verifiable user accounts, and all the voter intent adjustments are securely logged in the system and then recorded in the digital image of the ballot.
- All states require bipartisan/multi-person teams in order to adjudicate ballots in accordance with the law.

# 7) DOMINION IS A NONPARTISAN U.S. COMPANY BASED IN DENVER, CO.

Dominion has no company ownership relationships with the Pelosi family, Feinstein family, Clinton Global Initiative, Smartmatic, Scytl, or any ties to Venezuela or Cuba. Dominion works with all U.S. political parties; our customer base and our government outreach practices reflect this nonpartisan approach.

- The Associated Press has verified that Dominion has no ties to Venezuela.
- As reported by the Associated Press, "Dominion made a one-time philanthropic commitment at a Clinton Global Initiative meeting in 2014, but the Clinton Foundation has no stake or involvement in Dominion's operations, the nonprofit confirmed." The meeting included bipartisan attendees focused on international democracy building.

# 8) DOMINION IS NOT, AND HAS NEVER BEEN, OWNED BY SMARTMATIC.

Dominion is an entirely separate company and a fierce competitor to Smartmatic.

- Dominion and Smartmatic do not collaborate in any way and have no affiliate relationships or financial ties.
- Dominion does not use Smartmatic software.
- The only associations the companies have ever had were:
  - In 2009, Smartmatic licensed Dominion machines for use in the Philippines. The contract ended in a lawsuit.
  - In 2010, Dominion purchased certain assets from Sequoia, a private U.S. Company. Smartmatic, a previous owner of Sequoia, pursued legal actions against Dominion.
- Dominion did not acquire Smartmatic and/or its software from Sequoia.

# 9) NO UNAUTHORIZED OR LAST-MINUTE SOFTWARE UPDATES OCCURRED.

Claims about software updates being done the night before Election Day are 100% false. Our voting systems are designed and certified by the U. S. government to be closed and do not rely on network connectivity.

- Both Spalding County and the Georgia Secretary of State have verified that a) this type of unauthorized update is impossible, and b) the actual logs from equipment under the custody of the County determined an update did NOT happen the night before the election.
- Georgia Voting System Implementation Manager Gabe Sterling has affirmed in his daily press briefing on November 9 that "nothing was done to the [audited] system after [October 31]," when voter files were updated as part of normal procedure.

## 10) MISINFORMATION IS AN ATTACK ON OUR DOMINION CUSTOMERS: LOCAL ELECTION OFFICIALS AND SECRETARIES OF STATE.

Erroneous claims that precincts in Michigan had more votes recorded than actual voters point to an affidavit that has several glaring errors. The counties cited are in Minnesota, not Michigan, and the affidavit's claims regarding over-votes are not verified with any data from previous Minnesota elections or the Secretary of State. This claim has no basis in truth.

These elected public servants – not Dominion – run our elections and many have reaffirmed the integrity of the elections. Recent statements from election officials include:

### MICHIGAN

- The Michigan Secretary of State's office debunked false claims about the election in the state, stating absentee ballot counting was transparent and accurate and that an isolated user error in Antrim County did not affect election results.

- A spokesperson for the Michigan Secretary of State stated, "We have not seen any evidence of fraud or foul play in the actual administration of the election. What we have seen is that it was smooth, transparent, secure and accurate."

### GEORGIA

- The Georgia Secretary of State stated upon completion of a statewide review of ballots on November 19, "Georgia's historic first statewide audit reaffirmed that the state's new secure paper ballot voting system securely counted and reported results."

### ARIZONA

- The Chairman of the Maricopa County Board of Supervisors released a letter on November 17 noting, "The evidence overwhelmingly shows the system used in Maricopa County is accurate and provided voters with a reliable election... The Dominion tabulation equipment met mandatory requirements during logic and accuracy testing before the Presidential Preference Election, the Primary Election and the General Election. And after each of these 2020 elections, the hand count audit showed the machines generated an accurate count."

## 11) THERE ARE NO ISSUES WITH THE USE OF SHARPIE PENS.

Election officials provide writing instruments that are approved for marking ballots to all in-person voters using hand-marked paper ballots. Dominion Voting Systems machines can read all of these instruments, including Sharpies.

- The DHS Cybersecurity and Infrastructure Security Agency, "If a ballot has issues that impacts its ability to be scanned, it can be hand counted." The Maricopa County Board of Supervisors assured voters that "sharpies do not invalidate ballots." Dominion has stated that "Sharpie pens are safe and reliable to use on ballots, and recommended due to their quick drying ink."



**PRODUCTS**

ImageCast X

**ABOUT**

Dominion at Congress

Dominion Secure

**INFO**

Customer Support

1 866 654 VOTE (8683)

Contact Us

U.S. | Denver, CO
CANADA | Toronto, ON

Optional Solutions

Founded in 2003, Dominion Voting Systems is a leading supplier of election technology across the U.S. and internationally.

Copyright © 2020 Dominion Voting Systems Corp. All Rights Reserved.        Privacy Policy | Terms of Use | Site Map



**Michelle Malkin** ✔
@michellemalkin

ᵒᵒᵒ

Joe Oltmann (now banned on Twitter) exposes pro-Antifa, cop hatred-inciting rants of #EricCoomer, VP of strategy/security of Dominion Voting Systems. "What if I told you he is a major shareholder" in Dominion & "owns patents associated with other voting systems?" #MalkinLive



0:25   236.3K views

12:43 PM · Nov 13, 2020 · Twitter Media Studio - LiveCut

**5.6K** Retweets    **737** Quote Tweets    **8.1K** Likes

Exhibit
PLTF 0019
MALKIN

 Michelle Malkin ✔
@michellemalkin

Replying to @michellemalkin

Full interview with #joeoltmann on #ericcoomer #dominion here ==>


#MalkinLive: Election update
🔗 youtube.com

12:46 PM · Nov 13, 2020 · Twitter Web App

**702** Retweets   **101** Quote Tweets   **1.1K** Likes

Exhibit
PLTF 0020
MALKIN



**Michelle Malkin** ✔
@michellemalkin

Replying to @michellemalkin

## What are they trying to hide? #DominionVotingSystems

twitter.com/JoeyCamp2020/s...

This Tweet is unavailable.

2:31 PM · Nov 13, 2020 · Twitter Web App

**597** Retweets   **28** Quote Tweets   **1K** Likes

**Exhibit
PLTF 0021**
MALKIN

 **Michelle Malkin** ✔
@michellemalkin                                                    ⚬⚬⚬

## ICYMI - Dominion, Antifa & #EricCoomer exposed by Joe Oltmann on #MalkinLive last week. Joe was suspended by Twitter but you can find him on @parler



**Michelle Malkin** ✔ @michellemalkin · Nov 13
Joe Oltmann (now banned on Twitter) exposes pro-Antifa, cop hatred-inciting rants of #EricCoomer, VP of strategy/security of Dominion Voting Systems. "What if I told you he is a major shareholder" in Dominion & "owns patents associated with other voting systems?" #MalkinLive

Show this thread

Michelle Malkin                    Joe Oltmann

0:36   236.3K views

12:09 PM · Nov 15, 2020 · Twitter for iPhone

**Exhibit PLTF 0022**
MALKIN

**1.7K** Retweets     **130** Quote Tweets     **3K** Likes



**Michelle Malkin** ✓
@michellemalkin

ICYMI: #ExposeDominion #WhoIsEricCoomer #JoeOltmann

Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath -- His Internet Profile Is Being Deleted and Erased (AUDIO)



Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath --...
In 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering. According to his bio, Coomer graduated from the University of California, ...
⊘ thegatewaypundit.com

12:29 PM · Nov 16, 2020 · Twitter Web App

**Exhibit**
**PLTF 0023**
MALKIN

**572** Retweets   **62** Quote Tweets   **931** Likes

 **Michelle Malkin** ✅
@michellemalkin

⋯

In case you missed it: My interview with #JoeOltmann from six days ago exposing #EricCoomer #Antifa #ExposeDominion ==>

> **Michelle Malkin** ✅ @michellemalkin · Nov 13
> #MalkinLive: Election update pscp.tv/w/cn1j_zE1MzEw...
> Show this thread

12:19 PM · Nov 19, 2020 · Twitter Web App

**287** Retweets   **21** Quote Tweets   **604** Likes

Exhibit
PLTF 0024
MALKIN

**Verizon**  4:09 PM  41%



< 7

**Randy** ›

Exhibit
PLTF 0025
MALKIN


is essential. So glad to know you.

**Thu, Nov 12, 12:57 PM**



**Wed, Nov 25, 9:54 PM**

  iMessage 

      

 **Verizon** 4:12 PM 40%



**Lauren** ›

# Hey Michelle it's Lauren (previously from Hannity radio). I am working with Sidney Powell and Don Brown (Clint

  iMessage 

      

 Verizon

4:12 PM



**Lauren** ›

Lorance's atty)_

We saw your interview with Joe Oltmann-absolutely in-credible. They'd like to get a signed

   iMessage  

      

 Verizon  4:12 PM ✓ 40% 🔋

< 7

**LS**

**Lauren ›**

# They'd like to get a signed affidavit from Joe about Coomer and use his info in their federal complaint. Is there any way

  iMessage 

      

Verizon 4:12 PM 40%



**Lauren** ›

# Coomer and use his info in their federal complaint. Is there any way you can put us in touch?

## Sun, Nov 15, 7:49 AM

iMessage

 **Verizon** 4:18 PM √ 40%



**Lauren** ›

nect you with Joe ASAP and I'll email you one of his zip files - he has tons of screenshots and docu- ments - stand

  iMessage 

      

Verizon    4:18 PM    40%





Lauren ›

record his call w antifa when Joe said he's taking care of the election, right? I couldn't tell if

iMessage

**Lauren** ›

# Ugh- perfect! Let's do this.

# Thank you so much

# lauren.m-claughlin117@gmail.com

iMessage



**Lauren** ›

Oh, I'm assuming Joe didn't record his call w antifa when Joe said he's taking care of the election, right? I couldn't tell if

iMessage



Lauren ›

couldn't tell if it was a online chat or a phone call...

He might have it - it was tak-ing forever that morning to send me all his

iMessage

 Verizon 🌐    4:20 PM    ✓ 39% 🔋



**Lauren** ›

morning to send me all his files so we just jumped in with discussing the one zip

That would be incredible



      

 Verizon   3:33 PM   33%



JO

**Joe** ›

# iMessage
## Thu, Nov 12, 1:55 PM

# Hi Michelle, this is Joe Olt-mann. Hoping to connect with you at some point. I'm not usually the

iMessage

  

      





**Joe** ›

not usually the public person but the calls and emails are pouring in

**Thu, Nov 12, 4:40 PM**

Hi Joe!!! Great

iMessage

           

      

‹ 7

Joe ›

work you are doing – let's touch base tomorrow – if you are up for doing a livestream in the afternoon that would be

iMessage



**Verizon** 3:34 PM 33%

< 7

JO

Joe ›

great

Fri, Nov 13, 4:43 AM

Just missed
this. Crazy
night. Twitter
suspended my
account for
telling the

  iMessage 

      



.ıl Verizon 🛜                3:34 PM                √ 33% 🔋



‹ 7
Joe ›

account for
telling the
truth, I filed an
affidavit with
the trump ad-
ministration
and the death
threats rolled
in. Been a fun

    iMessage   

      



.ıll Verizon 🤖    3:34 PM    🗸 33% 🔋

‹ 7



JO

Joe ›

day...

I can do a
livestream.

Fri, Nov 13, 6:21 AM

Very crazy -
thanks for
standing up -

      iMessage    

            



**Joe** ›

can u do a stream at 10am today

Yes I can

Ok great I use a platform called stream-yard - very

iMessage

.ıl Verizon 📶                    3:34 PM                    🧭 33% 🔋



**Joe** ›

seamless – I'll send you the live link 15 minutes before start time

Here's a guest FAQ



    iMessage   

**.ıl** Verizon 📶   **3:35 PM**   📍 33% ▭



Joe ›

**Guest instructions**
streamyard.com

**See you then**

**There is a share screen function so if you have documents or**

iMessage



Verizon                    3:35 PM                          33%



JO

Joe ›

graphics you want me to put on screen I can do that

Sounds great. I have lots

Great You can email anything

iMessage

  

      



**Verizon** 3:35 PM 33%



**Joe** ›

you want me to line up at writemalkin at gmail dot com

I am headed to the office now

Great - here is the live link

  iMessage 

      



Joe ›



**StreamYard | Browser-based live studio for professionals**

streamyard.com



  iMessage     



Joe ›

Just sent you a large file.

cut up with pics.

Ok didn't get it yet

am standing

iMessage



JO

Joe ›

by on stream yard - let me know if you have any prob-lems

stand by. cutting it up for you

iMessage

 Verizon 3:35 PM 33%



Joe ›

Sat, Nov 14, 10:07 AM

Thank you again for the time yesterday. Appreciate all that you do.

iMessage



Verizon 3:35 PM 33%

< 7

**JO**

**Joe ›**

## Sun, Nov 15, 5:52 AM

> Thank u Joe! I just got a message from Sidney Powell's aide – they want to get an affidavit from

iMessage

  

      

 Verizon 🛜 **3:36 PM** ⊿ 33% 🔋



**Joe** ›

you!! Stand by - I'm going to connect you by text now

Lauren is Sean Hannity's for- mer senior producer and a rockstar - she

iMessage



Verizon    3:36 PM    33%



**Joe** ›

rockstar - she and Sidney are patriots

You are a patri-ot!

Been a crazy weekend

iMessage

 Verizon 🤙  3:32 PM  ✈ 33% 🔋

< ⑦  JO  Joe ›

# Fri, Nov 20, 6:39 AM



**Thread**

Josh Caplan ✔
@joshdcaplan

NBOX: After Dominion Voting
ystems backed out of attending
lanned fact-finding hearing with PA
louse State Government Committee
ommittee members will hold press
onference to discuss election at
0:00 A.M. EST

:30 AM · 20 Nov 20 · Twitter Web App

01 Retweets and comments  1,542 Likes

  iMessage 

      

 Verizon 📶   3:37 PM   ⏦ 33% 🔋

< ⑦



**Joe** ›

Mainstream media still ig-noring it

Dawn Keefer was amazing – do you know her

No



    iMessage 

      



JO

Joe ›

No

Can you talk now - sorry the day got away from me yesterday



Michelle Malkin ✔ @mic... · 39m ⌄
This is the state legislative hearing

  iMessage 

.ıll Verizon 📶                3:37 PM              ◁ 33% 🔋

‹ ❼                            

**Joe** ›

Michelle Malkin ✔ @mic... · 39m ⌄
This is the state legislative hearing
Dominion backed out of in
Pennsylvania this morning.
Supposedly a press conference by
GOP legislators is about to happen.

📅 Friday, November 20, 20

10:00 AM  **STATE GOVERNMENT**
📅        Add to Calendar Outlook (iCal) or Go...
          informational meeting with Dominion
          any other business that may come
          committee. Dominion Systems will
          virtually.

💬 33    🔁 546    🤍 1,367    📤              📊

Show this thread

Michelle Malkin ✔ @mich... · 13m ⌄
5/ Yes. Keep the heat on,
@PAHouseGOP. Dawn Keefer was
total fire at the press conferen 

🌐 PA House Republ... ✔ · 31m

   iMessage 

      



**ıll** Verizon 🛜                    3:37 PM                    ⤴ 33% 🔋



**Joe** ›

 **PA House Republ...** ✓ · 31m

Rep. Dawn Keefer: 14 counties used the Dominion Voting Systems software. We trust the workers in our polling places and in our counties. But what...

💬 3        🔁 61        🤍 310        ⬆️

 **Michelle Malkin** ✓ @mich... · 12m

6/ No blind trust. Not now. Not ever.

 **PA House Republ...**  · 29m

Rep. Dawn Keefer: Transparency is key for our election security. Dominion Voting Software is asking us to give them only blind trust. We...

💬 6        🔁 48        🤍 233        ⬆️            

 **PA House Republ...** ✓ · 29m

Rep. Dawn Keefer:
Transparency is key for our

           iMessage        

            



**Verizon** 3:37 PM 33%



**Joe** ›



🏛 PA House Republ... ✔ · 29m

Rep. Dawn Keefer:
Transparency is key for our
election security. Dominion
Voting Software is asking us to
give them only blind trust. We...

💬 7    🔁 48    ♡ 234    ⬆️

🔁 You Retweeted



**Valerie Gaydos** @valgaydos · 5h
UPDATE: At 10 pm last night we
were informed that Dominion Voter
Systems backed out of testifying
before the House State Govt
Comm.  There will be a House
press conf at 10 am TODAY to
address Dominion's failure to
appear.

💬 156    🔁 2,915    🖤 7,681    ⬆️

iMessage











 Verizon 3:37 PM 33%



**Joe ›**

GOP State Rep. Dawn Keefer on Dominion: "How tightly controlled is the source code and who has control over the source code?"

https://t.co/0AjO86Aab1

  iMessage 

      

 Verizon 3:38 PM 33%



Joe >

# #ExposeDominion

 **Michelle Malkin**

twitter.com

# They are frauds



Not a useful tweet "proudboys spotted"

"Where? When? What are they doing?"

  iMessage 

  Pay    



**Verizon** 3:38PM 32%



**Joe** ›



**L**ocation & Direction
Manhattan: East of Central Park, E 97th ST

**U**niformed Clothes
Dark clothing, face ram

**T**ime & Date of Observation
E 17 PM, current?

**E**quipment & Weapons
They have Kevly Armor and Pepper spray?

Not a useful tweet: "proudboys spotted"
"Where? When? What are they doing?
How Many? What are they carrying?"

Use your Judgement!

POSTING GUIDELINES:
This channel exclusively
disseminatiles information relevant
to our people OTG at events.

#ground - Info from folks OTG
#tip - Info from those not
participating in the protest, but have
eyes on useful intel
#twitter - Info found on twitter
#fb - Info found on facebook
#livestream - Info seen on livestream
#radar - Info from flight radar

If you want an example of well run
scanner check out Seattle's scanner:
t.me/SeattlePLMScanner
#ground Few dozen maga folks
congregating at the Capitol. Lots of flags

Denver Metro Scanner

  iMessage 

      

**Verizon** 3:38PM 32%

< 8

JO

**Joe** >

Denver Metro Scanner

#twitter Posted at 1:49PM: 'Riot cops coming in from 14th and Sherman.' No word on numbers as of right now.
2:05 PM

Denver Metro Scanner

#livestream 7 officers standing next to a tree about 100ft from the Capitol. Standing next to the tree where the guard rail begins on the S walkway that leads to the corner of Lincoln and W 14th. Shown about 10 mins ago.
2:12 PM

Denver Metro Scanner

#twitter cops are blocking 14th and Bannock.
2:00 PM

November 19

Denver Metro Scanner

#tip
1:51 AM

Denver Metro Scanner

Forwarded message
From Jackie O

Denver Metro Scanner                    Sat

#twitter cops are blocking 14th and Bann...

  iMessage  

      



Pinned Message
POSTING GUIDELINES:

Denver Metro Scanner
#ground Few dozen maga folks congregating at the Capitol. Lots of flags
👁 57  1:42 PM

Denver Metro Scanner
#twitter Posted at 1:49PM: 'Riot cops coming in from 14th and Sherman.'
No word on numbers as of right now.
👁 58  2:06 PM

Denver Metro Scanner
#livestream 7 officers standing next to a tree about 100ft from the Capitol. Standing next to the tree where the guard rail begins on the S walkway that leads to the corner of Lincoln and W 14th. Shown about 10 mins ago.
👁 58  2:12 PM

Denver Metro Scanner
#twitter cops are blocking 14th and Bannock.
👁 54  4:19 PM

November 19

Denver Metro Scanner
#tip  👁 2  2:31 AM

Denver Metro Scanner
Forwarded message
From Jackie O
Is Eric from Dominion here? I think he might be in trouble and maybe needs help.
👁 3  2:31 AM

MUTE








Joe ›

Tue, Nov 24, 6:08 AM

Can you come on my Newsmax show to talk about Coomer and Dominion - we pretape to-morrow at

iMessage

 Verizon 🌐          3:39PM          ✈ 32% 🔋



Joe ›

pretape tomorrow at 1230pm mountain time – it would be one segment that will run around 7 minutes

    iMessage   

      

 Verizon 3:39 PM 32%



Joe ›

For you abso-lutely

I'm in South Dakota

So on my com-puter ok?

Thank you!

  iMessage 

      

 Verizon 📶    3:39 PM    32% 🔋



**Joe** ›

Yes it will be by Skype (send me your Skype account name) - my Newsmax producer will be in touch soon to nail down logistics.

iMessage





**Joe** ›

Let me know if you have any new graphics or documents you want me to feature - keep up the fight!

Sounds great

  iMessage 

      



**●ıll Verizon** 📶     **3:39 PM**     ⤴ 32% 🔋

‹ **8**



**Joe ›**

**Tue, Nov 24, 12:20 PM**

# I'm back. I have lots of info in- cluding the Mongolia con- nection

**Tue, Nov 24, 6:23 PM**

     **iMessage**    

      



.ıl Verizon 🤔  **3:40 PM**  ⌇ 32% 🔋



**Joe** ›

**Wed, Nov 25, 6:43 AM**

Let me know if there are specific questions you want me to ask you

A 7 minute segment gives

   iMessage  

      



.Il Verizon 🔐     3:41 PM     🔋 32% ▊

< 8



**Joe** ›

us time for about 3 topic areas

Are you al-lowed to talk about your conversations with the trump lawyers

  iMessage 

      

 Verizon 3:41 PM √ 32% 



Joe ›

**Wed, Nov 25, 10:55 AM**

That was amazing - wish we had more time but I know this segment will have huge impact -

iMessage



Verizon   3:41 PM   32%



JO

Joe ›

have a blessed and safe Thanksgiving ! !! Show airs Saturday at 5pm mountain and Sunday 9am mountain



  iMessage 

      


.ıll Verizon 🛜 3:42 PM ✓ 32% 🔋



Joe ›

**Wed, Dec 2, 6:20 PM**

I am so angry at ken buck

He had a meeting tonight and lied

      iMessage     

      




**Joe**

And let domin-ion have an audience

I am so angry

What!!!!! Where and how? Is he bought off??

iMessage



Joe >

This swamp is so deep Michelle

I know ugh

I cannot tell you how angry I am

iMessage



**Verizon** 3:42 PM 32%



Joe ›

I have never been this angry

Flat evil

But I found Eric Coomer

So f$&@ ken

~~and the rest of~~

  iMessage 

      

 Verizon   3:42 PM   7 32%



Joe >

So f$&@ ken and the rest of the Rino's

Do you want to do another livestream on it?  What did buck lie about and to whom

iMessage



Joe ›

back lie about and to whom did he lie

Michigan grass roots conservatives tell me they are also being screwed over

iMessage

JO

Joe ›

screwed over by rinos there

Whistleblow-ers being blocked

Yes

I don't under-stand this

iMessage

 Verizon 3:42 PM ✓ 31%


JO

Joe ›

Yes

I don't under-stand this

Why???

This is pure evil

    iMessage   

      



**Joe** ›

## Sat, Dec 5, 9:51 AM

> Hey. John Baker states today, Eric Coomer is the smoking gun. He is the motive...





**Randy Corporon** @

Missed audio call
Nov 11, 2020 2:29pm

just got off livestream and have another taping...can call after 430pm if that works
Nov 11, 2020 2:09pm

Call when able re Dominion
Nov 11, 2020 1:36pm

Yup. Anytime.
Nov 11, 2020 2:12pm

Sidney Powell is talking to Joe this morning __ after watching our livestream
Nov 15, 2020 11:05am

Good.
Nov 15, 2020 11:11am

Nov 11, 2020 2:29pm

just got off livestream and have another taping...can call after 430pm if that works

Nov 11, 2020 2:09pm

Sidney Powell is talking to Joe this morning 📺 after watching our livestream 📺

Nov 15, 2020 11:05am

**RC** Randy Corporon ⓐ

Call when able re Dominion

Nov 11, 2020 1:36pm

Yup. Anytime.

Nov 11, 2020 2:12pm

Good.

Nov 15, 2020 11:11am

And, good job!

Nov 15, 2020 11:11am

--
*From: Michelle Malkin <writemalkin@gmail.com>*
*Date: Tue, Nov 24, 2020 at 1:10 PM*
*Subject: Sovereign Nation - Wednesday pretape - guests/contact info*
*To: Pierce Sargeant <pierces@newsmax.com>, Stephanie Cassidy*
*<stephaniec@newsmax.com>, Jaclyn Anastasakos <jaclyna@newsmax.com>*

*My topic is: Hacking the Vote.*

*Guests:*

*Joe Oltmann, Colorado businessman, founder of FEC United & host of*
*Conservative Daily podcast*
*joe@fecunited.com*
*303 667 5105*

*Victoria Toensing, Trump legal adviser and former Reagan Justice Department*
*official*
*202 255 8863*
*VT@digenovatoensing.com*

*best,*
*michelle*
--
*Michelle Malkin*
*www.michellemalkin.com*

*\* \* \**

*From: Michelle Malkin <writemalkin@gmail.com>*
*Date: Wed, Nov 25, 2020 at 12:30 AM*
*Subject: Sovereign Nation script*
*To: Pierce Sargeant <pierces@newsmax.com>*

*Please let me know that you received this, thanks.*

*best,*
*michelle*

Exhibit
PLTF 0026
MALKIN

[Note: Michelle's script was attached to this email; see below for text of script.]

*WELCOME TO SOVEREIGN NATION. I'M MICHELLE MALKIN.*

*OUR FOCUS TODAY: HACKING THE VOTE.*

*NEWSFLASH: IT HAS ALREADY HAPPENED AROUND THE WORLD. THAT'S WHAT THE PROPAGANDISTS OF THE FECKLESS FOURTH ESTATE IN AMERICA DON'T WANT YOU TO KNOW. THEY ALSO DON'T WANT YOU TO REMEMBER THAT THERE WAS A TIME – NOT VERY LONG AGO - WHEN IT SERVED THE LEFT-WING MEDIA'S IDEOLOGICAL AGENDA TO EXPOSE THE GRAVE SECURITY RISKS OF AUTOMATED VOTING MACHINES.*

*JUST TWO YEARS AGO, THE LIBERAL SOCIAL MEDIA OUTFIT NOWTHIS SOUNDED THE ALARM OVER VULNERABLE VOTING MACHINES WITH A VIDEO SHOWING THAT "A HACKER ONLY NEEDS 1 MINUTE TO CHANGE ELECTION RESULTS IN 24 STATES." TWITTER DIDN'T CENSOR OR LABEL IT. THEY JUST PRETEND IT DOESN'T EXIST.*

*SOT start at :31 "The serial console in the back"...end 1:25 "prepped and ready to go, a minute."*
*https://twitter.com/nowthisnews/status/1034614864180858880*

*THREE COMPANIES IMPLICATED IN WORLDWIDE ELECTION MEDDLING SCANDALS ARE INTERTWINED THROUGH A LABYRINTH OF SHELL COMPANIES: DOMINION, SMARTMATIC, AND SEQUOIA. DOMINION VOTING SYSTEMS MANUFACTURES BOTH ELECTION HARDWARE AND SOFTWARE WITH HEADQUARTERS IN TORONTO, CANADA, AND DENVER, COLORADO. SMARTMATIC IS THE MULTINATIONAL CORPORATION THAT MAKES VOTE COUNTING MACHINES AS WELL AS SOFTWARE...AND IS PURPORTEDLY TIED TO THE LATE VENEZUELAN DICTATOR HUGO CHAVEZ'S REGIME. SMARTMATIC MACHINES HAVE USED DOMINION SOFTWARE. SEQUOIA, WHICH WAS ACQUIRED BY DOMINION IN 2010, MAKES VOTING MACHINES THAT HAVE USED SMARTMATIC SOFTWARE.*

*THE LOS ANGELES TIMES, MIAMI HERALD, CHICAGO CITY OFFICIALS, AND THE U.S. COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES HAVE ALL INVESTIGATED THE PERILS OF FOREIGN CONTROL OVER OUR ELECTIONS POSED BY ONE OR MORE OF THESE COMPANIES*

*AS FAR BACK AS 2006. CNN REPORTER KITTY PILGRIM FILED THIS REPORT FOR LOU DOBBS...*

*SOT start :31 "the use of some 19,000" and end at 1:37 "We believe this is a national security issue"*
*https://www.youtube.com/watch?v=-s9PkuiIw2Q&feature=emb_logo*

*WATCHDOGS IN THE PHILIPPINES HAVE GRAPPLED WITH WHAT THEY BELIEVE IS WIDESPREAD SMARTMATIC AND DOMINION-RELATED ELECTION MANIPULATION FOR 10 YEARS. ATTORNEY AND FORMER FILIPINO CONGRESSMAN GLENN CHONG SCOURED AUDIT LOGS TO UNCOVER HOW SMARTMATIC MACHINES HAD SOMEHOW PRELOADED AND TRANSMITTED THOUSANDS OF VOTES BEFORE POLLS EVEN OPENED.*

*SOT chong*
*Start :21 "Michelle, the term preloaded"...to :35 "they are signed"...pick up again 1:14 "we have 70,000 voters" and end at 1:30 "seven percent."*
*https://twitter.com/michellemalkin/status/1331430647970230273*

*CHONG NOTES SIMILARITIES IN HOW HE SAYS HIS RACE AND OTHERS IN THE PHILIPPINES WERE RIGGED WITH WHAT HAPPENED HERE IN AMERICA:*

*SOT chong (attached MP4)*
*:00 to :31 end at "that was his lead"...pick up again at 1:23 "within a few hours" and end at 1:40 "was wiped"*

*CHONG ALSO EXPOSED AUTOMATIC VOTE PADDING AND SHAVING MANIPULATION BY SMARTMATIC MACHINES, PLUS MISSING AND OUT OF SEQUENCE BALLOT IMAGES. HE CONFRONTED SMARTMATIC OFFICIALS WITH REAMS OF LOGS OUTLINING FRAUD. OTHER POLITICIANS TURNED UP THE HEAT:*

*SOT Marcos*
*https://www.youtube.com/watch?v=B745Rq958G4*
*3:32 "I'm sorry I have to say this"...end at 3:43 "a method of cheating to whoever pays them the most." (PLEASE ADD CAPTION)*

*INSTEAD OF PROVIDING ANSWERS, SEVERAL SMARTMATIC OFFICIALS LEFT THE COUNTRY, INCLUDING VETERAN SMARTMATIC OFFICIAL HEIDER GARCIA [SCREENSHOT THIS PAGE HTTPS://WWW.TARRANTCOUNTY.COM/EN/ELECTIONS/MEET-THE-STAFF.HTML]. THE VENEZUELAN-BORN OPERATIVE NOW SERVES AS ELECTION ADMINISTRATOR FOR TARRANT COUNTY, TEXAS – WHICH TURNED BLUE FOR THE FIRST TIME SINCE 1964 AFTER THE INTRODUCTION OF NEW ELECTRONIC VOTING MACHINES.*

*EVADING SCRUTINY SEEMS TO BE PART OF THE VOTE-HACKING PLAYBOOK. LAST WEEK, DOMINION OFFICIALS BAILED OUT OF A STATE LEGISLATIVE HEARING IN BATTLEGROUND PENNSYLVANIA. GOP STATE REPRESENTATIVE DAWN KEEFER ASKED THE QUESTIONS THEY WON'T ANSWER:*

*SOT Keefer start at :15 "Does Dominion"...end :45 "and who has control of that source code?"*
*https://twitter.com/DawnRep/status/1329804317914779654*

*WHO HAS CONTROL OVER OUR ELECTIONS? WHO HAS DOMINION OVER OUR VOTES – WE THE PEOPLE OR THE ELECTRONIC VOTING OLIGARCHS? WITHOUT FULL ELECTION TRANSPARENCY, THERE CAN BE NO ELECTION PEACE.*
*NEXT UP: DENVER BUSINESSMAN JOE OLTMANN JOINS ME TO DISCUSS HIS SHOCKING DISCOVERIES ABOUT DOMINION VICE PRESIDENT OF STRATEGY AND SECURITY ERIC COOMER AND MUCH MORE. STAY TUNED.*

*WELCOME BACK TO SOVEREIGN NATION. MY FIRST GUEST IS JOE OLTMANN, FOUNDER OF FEC UNITED AND HOST OF CONSERVATIVE DAILY...*

*WE'VE GOTTA TAKE A QUICK BREAK. WHEN WE COME BACK, VICTORIA TOENSING WILL UPDATE US ON THE TRUMP LEGAL TEAM'S LATEST BATTLES TO PROTECT THE VOTE. DON'T TOUCH THAT DIAL.*

*THANKS FOR STAYING WITH US. VICTORIA TOENSING IS A MEMBER OF THE TRUMP LEGAL TEAM AND A FORMER REAGAN JUSTICE DEPARTMENT ATTORNEY.*

*THAT'S ALL THE TIME WE HAVE FOR TODAY. JOIN US NEXT TIME FOR ANOTHER EDITION OF SOVEREIGN NATION.*

*\* \* \**

***From:*** *Michelle Malkin <writemalkin@gmail.com>*
***Sent:*** *Wednesday, November 25, 2020 2:31 AM*
***To:*** *Pierce Sargeant <PierceS@newsmax.com>*
***Subject:*** *Sovereign Nation script*

*Please let me know that you received this, thanks.*

*best,*
*michelle*

*\* \* \**

*From:* ***Pierce Sargeant*** *<PierceS@newsmax.com>*
*Date: Wed, Nov 25, 2020 at 4:54 AM*
*Subject: RE: Sovereign Nation script*
*To: Michelle Malkin <writemalkin@gmail.com>*

*I got the script. One question on the second Chong SOT. Is it from the full interview in the youtube link on the tweet below the one you put in the script?*

*Thanks,*
*Pierce Sargeant*
*Producer, Newsmax TV*
*NewsmaxTV.com*
*561.686.1165 EXT: 1867*

*\* \* \**

*From:* ***Elliot Jacobson*** *<ElliotJ@newsmax.com>*
*Date: Wed, Nov 25, 2020 at 9:53 AM*
*Subject: Important*
*To: Michelle Malkin <writemalkin@gmail.com>*

*Cc: Pierce Sargeant <PierceS@newsmax.com>, Gary Kanofsky*
*<GaryK@newsmax.com>*

*Hi Michelle, we are being extra diligent right now about how we cover certain stories as we are very much in the cross hairs given our significant growth I am sure you have seen some of the articles.*
*I am tied up until later today with show rehearsals for new launches so I have asked Gary Kanofsky our News Director to touch base with you   ( as he is doing with all weekend shows) on some guard rails we need to maintain and talk through your show.*
*Also I will have ratings for you shortly,*
*Elliot*

*Elliot Jacobson*
*EVP & Chief Content Officer, NewsmaxTV*
*805 Third Ave, 22nd Floor*
*New York, NY 10022*
*(646) 616–3368 x3450*

\* \* \*

Text message from Gary Kanofsky sent November 25th:



iMessage
Wed, Nov 25, 10:34 AM

Hi. Gary Kanofsky here from NewsMax. Please call me at 201-841-3589 at your earliest opportunity. Thanks!

I can call after my show taping if that works - so after 3pm your time



Actually it's before your show that is like to share a quick word

Ok hang on

Delivered





# State of Colorado
# UNIFORM VOTING SYSTEM SUBMISSION

## Provider Narrative for Dec 4th PERC Meeting



**Prepared by:** Steven Bennett, Regional Sales Manager
**Proposal Due Date:** Tuesday, December 1, 2015 – 5 pm MT

**Exhibit**
**PLTF 0027**
MALKIN

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

# Table of Contents

Letter of Introduction ................................................................ 3
1) Preliminary Project Schedule .................................................. 5
   Project Management Communication ......................................... 5
   Proposed Project Plan ........................................................... 5
   Certification ......................................................................16
   Procurement ......................................................................16
   Configuration, Installation, Testing and Training ........................16
   2016 Primary Election Implementation .....................................18
   2016 General Election Implementation .....................................20
   Problem Escalation Procedure................................................21
2) Proposed Staffing ...............................................................23
   Dominion Colorado Project Team ............................................23
   Staff Qualifications.............................................................24
3) Updated Schedule of Activities in Other Jurisdictions ..................28
   (a) Jurisdictions in which provider has deployed the temporarily approved (or a substantially similar) voting system...................28
   References ........................................................................28
   Democracy Suite Customers...................................................29
   (b) Jurisdictions in which provider has contractually committed to deploy voting system(s) in 2016-2020 ..............................32
   (c) Jurisdictions in which provider has an outstanding offer but has not yet contracted to deploy voting system(s) in 2016-2020. ................33

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

# Letter of Introduction

To Members of the Colorado Pilot Election Review Committee:

Dominion Voting Systems, Inc. ("Dominion") welcomes the opportunity to present our staffing and implementation plan for the State of Colorado, for consideration as the Uniform Voting System (UVS) provider.

Peace of mind comes with knowing that a professional project team with dedicated resources is assigned from beginning through completion of the implementation. **The State of Colorado will benefit from Dominion's years of product installation and project management experience that is unmatched in the election industry.** Our Colorado project team includes some of Dominion's most experienced team members - professionals with ample experience and understanding of system implementations, best project management practices, training methodologies, and a passion for customer service.

The Dominion project management methodology has been developed through years of experience implementing both large and small voting solutions by individuals who know and understand elections. **As an established election provider in the United States, we have a diverse customer base with jurisdictions in 18 states that have successfully implemented our Democracy Suite®[1] system, including the States of California, Louisiana, New Mexico, and 52 counties in New York.** Best practices and lessons learned from each project have refined our approach and have been incorporated at each stage of the methodology, including our most recent pilots in the City and County of Denver and Mesa County. We are keenly aware of the realities involved and what it takes to make a smooth transition to a new voting system platform, as well as ample experience to ensure the success of all of Colorado's counties.

Dominion's project management approach is based on open communication with our customers at all times. We will work closely with the counties and the State to include their input throughout all stages of the project plan and establish effective Problem Escalation Procedures to address potential issues successfully. **One of the most important things that we do as a company is to always listen to our customer's needs.** We value an open, honest relationship with our customers, and we take every opportunity to act on their feedback and respond in a timely manner.

Our proposed project plan for the State of Colorado manages timelines for all key milestones, deliverables, training, Election Day support and post-election support for the 24 Colorado counties planning to transition in 2016. **We understand the service needs of large and small counties will be different given our support of both large and small Colorado counties today.** We are familiar not only with the unique needs of our current customers, but also with the legislative and electoral environment in Colorado. Over the past thirty years, Dominion personnel have worked with Colorado counties of all sizes, giving us a sophisticated understanding of how to deliver a uniform elections solution.

Colorado is Dominion's home state. Most of our proposed project staff are based in Colorado, and have a sincere desire to support the counties in which they live and work. Our corporate

---

[1] Democracy Suite is a registered trademark of Dominion Voting Systems.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

headquarters are based in Denver, which will become an essential home base of infrastructure and support for any future implementations in the state. As a Colorado based company that spends millions of dollars on salaries and expenses in state, your investment in our growth will be repaid with excellent products, local services and experience, Colorado job creation, increased tax revenue, and other benefits that can only come from "buying" local.

We firmly believe that we have the technology, resources and capacity to become Colorado's Uniform Voting System provider, and ensure the best pathway to your continued success. We are enthusiastic about the opportunity to work with each Colorado County Clerk and their staff. We are determined and committed to meet your every challenge. This is who we are. **This is the Power of Partnership.**

If you have any questions or feedback, please feel free to contact me at (909) 362-1715 or via email at steven.bennett@dominionvoting.com.

Sincerely,

Steven Bennett
Regional Sales Manager

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

# 1)    Preliminary Project Schedule

*At the time of the original RFP, the exact number of initial UVS counties was not known. For that reason, Section 5.3.12 of the original RFP requested you to provide a preliminary project schedule and staffing plan for a "large Colorado Target County...." Since the original RFP, the committee surveyed all Colorado counties and has determined that, at this juncture, **24 counties tentatively plan to convert to the new voting system before the June 28, 2016 Primary Election**. Please update the preliminary project schedule and staffing plan submitted with your original RFP response, to show how your organization will support the transition of the 24 counties before the 2016 Primary Election, giving due regard to the certification application and testing schedule set forth in the attached UVS timeline.*

## Project Management Communication

Dominion subscribes to a collaborative management approach, where transparency, frankness, and open communications drive our projects. The key aspects to effective management are planning and control processes. Through experience in several state installations, we have developed comprehensive project plans, and we implement controls to maintain schedules and quality standards.

Throughout the project lifecycle, our State Project Manager (PM) will coordinate with Colorado counties to deliver exceptional management performance and high-quality products in support of the project objectives. There will be monthly status reports and during review of the status reports, Colorado counties and Dominion will determine if adjustments are needed to ensure process and project improvements are captured.

Dominion management and the PM will perform the monthly project review, in order to provide tactical communication and transparency across the project and within the corporate structure. It is also an opportunity to promote innovation, table new ideas, and deliver professional support to the PM. The agenda for this meeting includes a review of the proposed schedule and assessment of progress on deliverables. Potential issues will be reviewed, and Dominion management will provide guidance on mitigation approaches.

In addition to formal monthly and independent corporate reviews, informal daily contact will help to keep Colorado counties abreast of all contract and task activities, performance levels, and issues. Open communication between the customer and the PM will allow issues to be raised, addressed, and mitigated. This feedback loop expedites issue resolution and the development of mutually agreed upon mitigation approaches, thus increasing customer satisfaction throughout the project lifecycle.

## Proposed Project Plan

The State of Colorado requires a comprehensive workplan based on well-established principles of project management. The structure of the plan includes key milestones, which allow the State of Colorado to see tangible progress.

Dominion has designed the State of Colorado workplan based on the following:

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

1) Dominion's workplan adheres to PMBOK standards and practices.
2) It is developed using MS Project and will be monitored/reported by using MS Project.
3) It is designed with key milestones (clear tangible deliverables) that are designed to mitigate risk to the extent possible.
4) Tasks are focused on accomplishing specific objectives.
5) The work breakdown structure is a logical progression of steps, activities, and subtasks that lead to tangible work products or deliverables.
6) Our plan provides Colorado counties with visibility into the tasks and schedule.
7) Our plan incorporates Dominion's prior experience in successfully implementing voting systems.
8) Our workplan is achievable and will be used to manage specific deadlines.

The proposed project workplan is based on our current understanding of project requirements from the UVS timeline provided and it draws from our extensive, real world implementation experience. This proposed project workplan and schedule will be adjusted in consultation with individual counties to establish the "baseline" plan.

Dominion's PM will closely follow the Colorado approved MS Project plan to identify variance that may indicate a problem. The PM will follow the Problem Escalation Process (PEP), provided after the project plan description, to report variances and propose mitigation actions. Additionally, the PM will update the plan on a weekly basis and provide Colorado counties with a monthly summary of project status reports and meetings. The task dependencies, resources, and critical path are available by viewing the plan in MS Project (provided in the electronic submission).

As noted above, the following project workplan is based on our current understanding of project requirements and key implementation dates. Therefore it will need to be revised in consultation with Colorado counties, in line with best practices outlined in the PMBOK. Until finalized, it should be considered draft and used for discussion purposes.

Project Implementation will be divided into the following five stages: Certification, Procurement and Logistics; Configuration, Installation, Training and Testing; 2016 Primary Election and; 2016 General Election.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

Colorado 1.0

| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 0 | | **Colorado 1.0** | **394 days** | **Tue 12/1/15** | **Wed 12/28/16** |
| 1 | | **1 Project Milestones** | **314 days** | **Thu 12/31/15** | **Tue 11/8/16** |
| 2 | | 1.1 Selection of UVS Finalist | 0 days | Thu 12/31/15 | Thu 12/31/15 |
| 3 | | 1.2 County Contracts Negotiated and Signed | 40 days | Mon 1/4/16 | Fri 2/12/15 |
| 4 | | 1.3 Certification of System | 1 day | Tue 3/1/16 | Tue 3/1/16 |
| 5 | | **1.4 System Deployment to Counties** | **59 days** | **Wed 3/2/16** | **Fri 4/29/16** |
| 6 | | 1.4.1 Deployment and Installation | 31 days | Wed 3/2/16 | Fri 4/1/16 |
| 7 | | 1.4.2 Install Trusted Builds | 26 days | Mon 4/4/16 | Fri 4/29/16 |
| 8 | | **1.5 Primary Election Milestones** | **58 days** | **Mon 5/2/16** | **Tue 6/28/16** |
| 9 | | 1.5.1 Ballot Production | 26 days | Mon 5/2/16 | Fri 5/27/16 |
| 10 | | 1.5.2 UOCAVA Ballot Deadline | 1 day | Sat 5/14/16 | Sat 5/14/16 |
| 11 | | 1.5.3 Absentee ballots sent - Primary | 17 days | Mon 6/6/16 | Wed 6/22/16 |
| 12 | | 1.5.4 L&A Testing - Primary | 11 days | Tue 5/31/16 | Fri 6/10/16 |
| 13 | | 1.5.5 Voting Centers Open - Primary | 9 days | Mon 6/20/16 | Tue 6/28/16 |
| 14 | | 1.5.6 Election Day - Primary | 0 days | Tue 6/28/16 | Tue 6/28/16 |
| 15 | | **1.6 General Election Milestones** | **58 days** | **Mon 9/12/16** | **Tue 11/8/16** |
| 16 | | 1.6.1 Ballot Production | 26 days | Mon 9/12/16 | Fri 10/7/16 |
| 17 | | 1.6.2 UOCAVA Ballot Deadline | 1 day | Sat 9/24/16 | Sat 9/24/16 |
| 18 | | 1.6.3 Absentee ballots sent - General | 5 days | Mon 10/17/16 | Fri 10/21/16 |
| 19 | | 1.6.4 L&A Testing - General | 11 days | Mon 10/10/16 | Thu 10/20/15 |
| 20 | | 1.6.5 Voting Centers Open - General | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 21 | | 1.6.6 Election Day - General | 0 days | Tue 11/8/16 | Tue 11/8/16 |
| 22 | | **2 Project Management** | **364 days** | **Thu 12/31/15** | **Wed 12/28/16** |
| 23 | | **2.1 Initiate Project** | **23 days** | **Thu 12/31/15** | **Fri 1/22/16** |
| 24 | | 2.1.1 Internal Project Kick-off | 1 day | Thu 12/31/15 | Thu 12/31/15 |
| 25 | | 2.1.2 Kick-off with State | 1 day | Wed 1/6/16 | Wed 1/6/16 |
| 26 | | 2.1.3 Kick-Off Meeting with Counties | 12 days | Mon 1/11/16 | Fri 1/22/16 |
| 27 | | **2.2 System Certification** | **43 days** | **Tue 1/19/16** | **Tue 3/1/16** |
| 28 | | 2.2.1 UVS Certification Tasks | 43 days | Tue 1/19/16 | Tue 3/1/16 |

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

Page 8 of 33

Colorado 1.0

| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 29 | | 2.2.1.1 Deadline for Cert. App. With TDP | 1 day | Tue 1/19/16 | Tue 1/19/16 |
| 30 | | 2.2.1.2 Completion of documentation review | 1 day | Tue 1/26/15 | Tue 1/26/15 |
| 31 | | 2.2.1.3 Prepare and finalize Test Plan Agreement | 1 day | Fri 1/29/16 | Fri 1/29/16 |
| 32 | | 2.2.1.4 Complete supplemental testing, if necessary | 1 day | Mon 2/15/16 | Mon 2/15/16 |
| 33 | | 2.2.1.5 Certification of System | 1 day | Tue 3/1/16 | Tue 3/1/16 |
| 34 | | **2.3 Project Management Meetings w State/Counties** | 346 days | Mon 1/18/16 | Wed 12/28/16 |
| 35 | | **2.3.1 Project Update Call** | 346 days | Mon 1/18/16 | Wed 12/28/16 |
| 60 | | **2.4 Dominion Internal Project Management Meetings** | 348 days | Fri 1/15/16 | Tue 12/27/16 |
| 61 | | **2.4.1 Project Update Call** | 348 days | Fri 1/15/16 | Tue 12/27/16 |
| 86 | | **3 Procurement and Logistics** | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 87 | | **3.1 Procurement** | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 88 | | **3.1.1 ICC system** | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 89 | | 3.1.1.1 Canon G1130 | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 90 | | 3.1.1.2 Kofax board and software | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 91 | | 3.1.1.3 Dell all-in-one PC | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 92 | | 3.1.1.4 I-Button programmer | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 93 | | 3.1.1.5 Other Requested Supplies and Consumables | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 94 | | **3.1.2 ICX System** | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 95 | | 3.1.2.1 Tablets | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 96 | | 3.1.2.2 Tablet Kiosk | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 97 | | 3.1.2.3 Mag Striper Reader | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 98 | | 3.1.2.4 Hub multiport network | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 99 | | 3.1.2.5 BMD Printer | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 100 | | 3.1.2.6 Networking Hardware | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 101 | | 3.1.2.7 Administrator Laptop | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 102 | | 3.1.2.8 Voting Booth | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 103 | | 3.1.2.9 Accessibility system hardware | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 104 | | 3.1.2.10 Other Identified or Requested IT Hardware | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 105 | | **3.1.3 EMS and Adjudication Hardware** | 30 days | Mon 2/1/16 | Tue 3/1/16 |

Page 2

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

**Colorado 1.0**

| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 106 | | 3.1.3.1 EMS Server | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 107 | | 3.1.3.2 EMS Workstation | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 108 | | 3.1.3.3 Adjudication Workstation | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 109 | | 3.1.3.4 Network Security Devices | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 110 | | 3.1.3.5 Monitors (2 server and Adjudication) | 30 days | Mon 2/1/16 | Tue 3/1/15 |
| 111 | | 3.1.3.6 Keyboard, Mouse, Cables... | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 112 | | 3.1.3.7 Report Printer | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 113 | | 3.1.3.8 Other Identified or Requested IT Hardware | 30 days | Mon 2/1/16 | Tue 3/1/16 |
| 114 | | **4 Configuration, Installation, Training and Testing** | **182 days** | **Tue 12/1/15** | **Mon 5/30/16** |
| 115 | | **4.1 System Configuration** | **51 days** | **Thu 12/31/15** | **Fri 2/19/16** |
| 116 | | **4.1.1 Create Election Data Import Bridge** | **49 days** | **Thu 12/31/15** | **Wed 2/17/16** |
| 117 | | 4.1.1.1 Examine existing data structure | 21 days | Thu 12/31/15 | Wed 1/20/16 |
| 118 | | 4.1.1.2 Create data import bridge from customer database | 21 days | Thu 1/21/16 | Wed 2/10/16 |
| 119 | | 4.1.1.3 Test import bridge and revise as required | 7 days | Thu 2/11/16 | Wed 2/17/16 |
| 120 | | **4.1.2 Customization of configurable options** | **49 days** | **Thu 12/31/15** | **Wed 2/17/16** |
| 121 | | 4.1.2.1 Finalize ballot style template | 28 days | Thu 12/31/15 | Wed 1/27/16 |
| 122 | | 4.1.2.2 Define configurable settings | 28 days | Thu 12/31/15 | Wed 1/27/16 |
| 123 | | 4.1.2.3 Finalize reporting templates | 21 days | Thu 1/28/16 | Wed 2/17/16 |
| 124 | | 4.1.3 End-to-End Test | 2 days | Thu 2/18/16 | Fri 2/19/16 |
| 125 | | **4.2 Installation and Acceptance Testing** | **121 days** | **Thu 12/31/15** | **Fri 4/29/16** |
| 126 | | **4.2.1 Preparation for Acceptance Testing** | **86 days** | **Thu 12/31/15** | **Fri 3/25/16** |
| 127 | | 4.2.1.1 Review County Operations Space | 18 days | Thu 12/31/15 | Sun 1/17/16 |
| 128 | | 4.2.1.2 Issue space recommendations | 5 days | Mon 1/18/16 | Fri 1/22/16 |
| 129 | | **4.2.1.3 Stage and Ship Delivery** | **25 days** | **Tue 3/1/16** | **Fri 3/25/16** |
| 130 | | 4.2.1.3.1 Configure Servers | 5 days | Tue 3/1/16 | Sat 3/5/16 |
| 131 | | 4.2.1.3.2 Test Servers | 5 days | Mon 3/7/16 | Fri 3/11/16 |
| 132 | | 4.2.1.3.3 Internal Acceptance of ICX, ICC and Adjudication systems | 10 days | Mon 3/14/16 | Wed 3/23/16 |
| 133 | | 4.2.1.3.4 Configure ICC Systems | 10 days | Tue 3/1/16 | Thu 3/10/16 |

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

Colorado 1.0

| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 134 | | 4.2.1.3.5 Test ICC Systems | 10 days | Tue 3/1/16 | Thu 3/10/16 |
| 135 | | 4.2.1.3.6 Stage and Ship | 12 days | Mon 3/14/16 | Fri 3/25/16 |
| 136 | | 4.2.2 Acceptance Testing | 26 days | Mon 4/4/16 | Fri 4/29/16 |
| 137 | | 4.2.2.1 ICX Acceptance | 19 days | Mon 4/4/16 | Fri 4/22/16 |
| 138 | | 4.2.2.2 Acceptance Testing of EMS Systems | 19 days | Mon 4/4/16 | Fri 4/22/16 |
| 139 | | 4.2.2.3 Acceptance Testing of ICC Systems | 19 days | Mon 4/4/16 | Fri 4/22/16 |
| 140 | | 4.2.2.4 End-to-End System Tests | 5 days | Mon 4/25/16 | Fri 4/29/16 |
| 141 | | 4.3 Training | 182 days | Tue 12/1/15 | Mon 5/30/16 |
| 142 | | 4.3.1 Finalize User Documentation | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 143 | | 4.3.1.1 ICX Documentation | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 144 | | 4.3.1.1.1 ICX User Guide | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 145 | | 4.3.1.1.2 Acceptance Test Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 146 | | 4.3.1.1.3 L&A Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 147 | | 4.3.1.1.4 Poll-Worker Training Manual | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 148 | | 4.3.1.2 ICC Documentation | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 149 | | 4.3.1.2.1 ICC User Guide | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 150 | | 4.3.1.2.2 Acceptance Test Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 151 | | 4.3.1.2.3 Operator Training Manual | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 152 | | 4.3.1.2.4 L & A Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 153 | | 4.3.1.3 Adjudication | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 154 | | 4.3.1.3.1 Adjudication Users Guide | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 155 | | 4.3.1.3.2 Adjudication Quick Reference Guide | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 156 | | 4.3.1.3.3 Operator Training Manual | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 157 | | 4.3.1.3.4 L&A Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 158 | | 4.3.1.4 EMS Documentation | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 159 | | 4.3.1.4.1 EED Users guide | 28 days | Tue 12/1/15 | Mon 12/28/15 |
| 160 | | 4.3.1.4.2 RTR Users guide | 28 days | Tue 12/1/15 | Mon 12/28/15 |

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

Colorado 1.0

| ID | Task Mode | O | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|---|
| 161 | | | **4.3.2 Customer System Training** | **85 days** | **Mon 3/7/16** | **Mon 5/30/16** |
| 162 | | | **4.3.2.1 Region 1 Training** | **78 days** | **Mon 3/7/16** | **Mon 5/23/16** |
| 163 | | | 4.3.2.1.1 ICC/Adjudication Operations training | 2 days | Mon 3/7/16 | Tue 3/8/15 |
| 164 | | | 4.3.2.1.2 ICX Operations training | 1 day | Wed 3/9/16 | Wed 3/9/16 |
| 165 | | | 4.3.2.1.3 EMS / RTR Training | 5 days | Mon 4/25/16 | Fri 4/29/16 |
| 166 | | | 4.3.2.1.4 Pollworker Train the Trainer | 1 day | Mon 5/23/16 | Mon 5/23/16 |
| 167 | | | **4.3.2.2 Region 2 Training** | **73 days** | **Mon 3/14/16** | **Wed 5/25/16** |
| 168 | | | 4.3.2.2.1 ICC/Adjudication Operations training | 2 days | Mon 3/14/16 | Tue 3/15/16 |
| 169 | | | 4.3.2.2.2 ICX Operations training | 1 day | Wed 3/16/16 | Wed 3/16/16 |
| 170 | | | 4.3.2.2.3 EMS / RTR Training | 5 days | Mon 5/2/16 | Fri 5/6/16 |
| 171 | | | 4.3.2.2.4 Pollworker Train the Trainer | 1 day | Wed 5/25/16 | Wed 5/25/16 |
| 172 | | | **4.3.2.3 Region 3 Training** | **68 days** | **Mon 3/21/16** | **Fri 5/27/16** |
| 173 | | | 4.3.2.3.1 ICC/Adjudication Operations training | 2 days | Mon 3/21/16 | Tue 3/22/16 |
| 174 | | | 4.3.2.3.2 ICX Operations training | 1 day | Wed 3/23/16 | Wed 3/23/16 |
| 175 | | | 4.3.2.3.3 EMS / RTR Training | 5 days | Mon 5/9/16 | Fri 5/13/16 |
| 176 | | | 4.3.2.3.4 Pollworker Train the Trainer | 1 day | Fri 5/27/16 | Fri 5/27/16 |
| 177 | | | **4.3.2.4 Tier 1.1 Counties Training** | **64 days** | **Mon 3/28/16** | **Mon 5/30/16** |
| 178 | | | 4.3.2.4.1 ICC/Adjudication Operations training | 2 days | Mon 3/28/16 | Tue 3/29/16 |
| 179 | | | 4.3.2.4.2 ICX Operations training | 1 day | Wed 3/30/16 | Wed 3/30/16 |
| 180 | | | 4.3.2.4.3 EMS / RTR Training | 5 days | Mon 5/2/16 | Fri 5/6/16 |
| 181 | | | 4.3.2.4.4 Pollworker Train the Trainer | 1 day | Mon 5/30/16 | Mon 5/30/16 |
| 182 | | | **5 2016 Primary Election** | **87 days** | **Mon 4/4/16** | **Wed 6/29/16** |
| 183 | | | **5.1 Election Programming** | **56 days** | **Mon 4/4/16** | **Sun 5/29/16** |
| 184 | | | **5.1.1 Import Jurisdictional Data** | **16 days** | **Mon 4/4/16** | **Tue 4/19/16** |
| 185 | | | 5.1.1.1 Jurisdictional data imported | 1 day | Mon 4/4/16 | Mon 4/4/16 |
| 186 | | | 5.1.1.2 Preliminary Election Database, Ballot and Report Creation | 8 days | Fri 4/8/16 | Fri 4/15/16 |
| 187 | | | 5.1.1.3 Initial Ballot Proofs Reviewed by Counties | 1 day | Mon 4/18/16 | Mon 4/18/16 |
| 188 | | | 5.1.1.4 Initial Report Proofing Packages Reviewed by Counties | 1 day | Tue 4/19/16 | Tue 4/19/16 |

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

**Colorado 1.0**

| ID | Task Mode | Task Name | Duration | Start | Finish |
|----|-----------|-----------|----------|-------|--------|
| 189 | | **5.1.2 Final Election Ballot and Database Creation** | 11 days | Mon 5/2/16 | Thu 5/12/16 |
| 190 | | 5.1.2.1 Ballot Certification Deadline for Primary | 1 day | Mon 5/2/16 | Mon 5/2/16 |
| 191 | | 5.1.2.2 Final Ballot and Report Proofs to County Officials | 8 days | Tue 5/3/16 | Tue 5/10/16 |
| 192 | | 5.1.2.3 Ballot and Report Review by Client | 1 day | Wed 5/11/16 | Wed 5/11/16 |
| 193 | | 5.1.2.4 Revisions to Ballots and/or Reports | 1 day | Thu 5/12/16 | Thu 5/12/16 |
| 194 | | **5.1.3 Election Materials Provided to County** | 17 days | Fri 5/13/16 | Sun 5/29/16 |
| 195 | | 5.1.3.1 Official Ballot Images generated | 1 day | Fri 5/13/16 | Fri 5/13/16 |
| 196 | | 5.1.3.2 L&A Test Ballots Generated | 8 days | Fri 5/13/16 | Fri 5/20/16 |
| 197 | | 5.1.3.3 Distribute Election Project Packages | 7 days | Mon 5/23/16 | Sun 5/29/16 |
| 198 | | **5.2 Primary Election - Finalize Election Files & Logic and Accuracy Testing** | 12 days | Mon 5/30/16 | Fri 6/10/16 |
| 199 | | 5.2.1 County Receives and Restores Election package | 1 day | Mon 5/30/16 | Mon 5/30/16 |
| 200 | | 5.2.2 Test ballots provided to printer | 3 days | Tue 5/31/16 | Thu 6/2/16 |
| 201 | | 5.2.3 Load Election Files to ICC and CX | 1 day | Tue 5/31/16 | Tue 5/31/16 |
| 202 | | 5.2.4 Scan test ballots, upload and verify results | 10 days | Tue 5/31/16 | Thu 6/9/16 |
| 203 | | 5.2.5 Export Results to State-wide System | 1 day | Fri 6/10/16 | Fri 6/10/16 |
| 204 | | **5.3 Election Support - Primary Election** | 17 days | Mon 6/13/16 | Wed 6/29/16 |
| 205 | | **5.3.1 Mail Ballot Tabulation Support** | 16 days | Mon 6/13/16 | Tue 6/28/16 |
| 206 | | 5.3.1.1 Region 1 | 16 days | Mon 6/13/16 | Tue 6/28/16 |
| 207 | | 5.3.1.2 Region 2 | 16 days | Mon 6/13/16 | Tue 6/28/16 |
| 208 | | 5.3.1.3 Region 3 | 16 days | Mon 6/13/16 | Tue 6/28/16 |
| 209 | | 5.3.1.4 County Tier 1.1 | 16 days | Mon 6/13/16 | Tue 6/28/16 |
| 210 | | 5.3.1.5 County Tier 1.1 | 16 days | Mon 6/13/16 | Tue 6/28/16 |
| 211 | | **5.3.2 VSPC** | 9 days | Mon 6/20/16 | Tue 6/28/16 |
| 212 | | 5.3.2.1 Region 1 | 9 days | Mon 6/20/16 | Tue 6/28/16 |
| 213 | | 5.3.2.2 Region 2 | 9 days | Mon 6/20/16 | Tue 6/28/16 |
| 214 | | 5.3.2.3 Region 3 | 9 days | Mon 6/20/16 | Tue 6/28/16 |
| 215 | | 5.3.2.4 County Tier 1.1 | 9 days | Mon 6/20/16 | Tue 6/28/16 |
| 216 | | 5.3.2.5 County Tier 1.1 | 9 days | Mon 6/20/16 | Tue 6/28/16 |

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

Colorado 1.0

| ID | Task Mode | O | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|---|
| 217 | | | **5.3.3 Election Day Support** | **3 days** | **Mon 6/27/16** | **Wed 6/29/16** |
| 218 | | | 5.3.3.1 Region 1 | 3 days | Mon 6/27/16 | Wed 6/29/16 |
| 219 | | | 5.3.3.2 Region 2 | 3 days | Mon 6/27/16 | Wed 6/29/16 |
| 220 | | | 5.3.3.3 Region 3 | 3 days | Mon 6/27/16 | Wed 6/29/16 |
| 221 | | | 5.3.3.4 County Tier 1.1 | 3 days | Mon 6/27/16 | Wed 6/29/16 |
| 222 | | | 5.3.3.5 County Tier 1.1 | 3 days | Mon 6/27/16 | Wed 6/29/16 |
| 223 | | | **6 General Election 2016** | **165 days** | **Tue 7/5/16** | **Fri 12/16/16** |
| 224 | | | **6.1 Project Plan Review and Update** | **28 days** | **Tue 7/5/16** | **Mon 8/1/16** |
| 225 | | | **6.1.1 Capture Lessons Learned** | **14 days** | **Tue 7/5/16** | **Mon 7/18/16** |
| 226 | | | 6.1.1.1 Internal Review | 14 days | Tue 7/5/16 | Mon 7/18/16 |
| 227 | | | 6.1.1.2 Stakeholder consultations | 14 days | Tue 7/5/16 | Mon 7/18/16 |
| 228 | | | 6.1.1.3 Review issues log | 14 days | Tue 7/5/16 | Mon 7/18/16 |
| 229 | | | 6.1.2 Revise Project Plan and Project Schedule | 14 days | Tue 7/19/15 | Mon 8/1/16 |
| 230 | | | 6.1.3 Revise Project and User Documentation | 14 days | Tue 7/19/16 | Mon 8/1/16 |
| 231 | | | **6.2 General Election Supplemental Training for Trainers** | **16 days** | **Mon 9/19/16** | **Tue 10/4/16** |
| 232 | | | **6.2.1 Region 1 Training** | **2 days** | **Mon 9/19/16** | **Tue 9/20/16** |
| 233 | | | 6.2.1.1 Refresh Training | 2 days | Mon 9/19/16 | Tue 9/20/16 |
| 234 | | | **6.2.2 Region 2 Training** | **2 days** | **Wed 9/21/16** | **Thu 9/22/16** |
| 235 | | | 6.2.2.1 Refresh Training | 2 days | Wed 9/21/16 | Thu 9/22/16 |
| 236 | | | **6.2.3 Region 3 Training** | **2 days** | **Mon 9/26/16** | **Tue 9/27/16** |
| 237 | | | 6.2.3.1 Refresh Training | 2 days | Mon 9/26/16 | Tue 9/27/16 |
| 238 | | | **6.2.4 County Tier 1.1** | **2 days** | **Wed 9/28/16** | **Thu 9/29/16** |
| 239 | | | 6.2.4.1 Refresh Training | 2 days | Wed 9/28/16 | Thu 9/29/15 |
| 240 | | | **6.2.5 County Tier 1.1** | **2 days** | **Mon 10/3/16** | **Tue 10/4/16** |
| 241 | | | 6.2.5.1 Refresh Training | 2 days | Mon 10/3/16 | Tue 10/4/16 |
| 242 | | | **6.3 Election Programming - General Election** | **25 days** | **Tue 9/6/16** | **Fri 9/30/16** |
| 243 | | | **6.3.1 Import Jurisdictional Data** | **4 days** | **Tue 9/6/16** | **Fri 9/9/16** |
| 244 | | | 6.3.1.1 Jurisdictional data imported | 1 day | Tue 9/6/16 | Tue 9/6/16 |

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4^(TH) PERC MEETING

Colorado 1.0

| ID | ⓘ | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|---|
| 245 | | | 6.3.1.2 Preliminary Election Database, Ballot and Report Creation | 2 days | Wed 9/7/15 | Thu 9/8/16 |
| 246 | | | 6.3.1.3 Initial Ballot Proofs Reviewed by Counties | 1 day | Fri 9/9/16 | Fri 9/9/16 |
| 247 | | | **6.3.2 Final Election Ballot and Database Creation** | 9 days | Mon 9/12/16 | Tue 9/20/16 |
| 248 | | | 6.3.2.1 Ballot Certification Deadline for General | 1 day | Mon 9/12/16 | Mon 9/12/16 |
| 249 | | | 6.3.2.2 Final Ballot and Report Proofs to County Officials | 8 days | Tue 9/13/15 | Tue 9/20/16 |
| 250 | | | 6.3.2.3 Ballot and Report Review by Client | 1 day | Tue 9/13/15 | Tue 9/13/16 |
| 251 | | | 6.3.2.4 Revisions to Ballots and/or Reports | 1 day | Wed 9/14/16 | Wed 9/14/16 |
| 252 | | | **6.3.3 Election Materials Provided to County** | 16 days | Thu 9/15/16 | Fri 9/30/16 |
| 253 | | | 6.3.3.1 Official Ballot Images generated | 1 day | Thu 9/15/16 | Thu 9/15/16 |
| 254 | | | 6.3.3.2 L&A Test Ballots Generated | 8 days | Fri 9/16/16 | Fri 9/23/16 |
| 255 | | | 6.3.3.3 Distribute Election Project Packages | 7 days | Sat 9/24/16 | Fri 9/30/16 |
| 256 | | | **6.4 General Election - Finalize Election Files & Logic and Accuracy Testing** | 16 days | Wed 10/5/16 | Thu 10/20/16 |
| 257 | | | 6.4.1 County Receives and Restores Election package | 1 day | Wed 10/5/16 | Wed 10/5/16 |
| 258 | | | 6.4.2 Test ballots provided to printer | 3 days | Thu 10/6/16 | Sat 10/8/15 |
| 259 | | | 6.4.3 Load Election Files to ICC and ICX | 1 day | Mon 10/10/15 | Mon 10/10/16 |
| 260 | | | 6.4.4 Scan test ballots, upload and verify results | 10 days | Mon 10/10/16 | Wed 10/19/16 |
| 261 | | | 6.4.5 Export Results to State-wide System | 1 day | Thu 10/20/16 | Thu 10/20/16 |
| 262 | | | **6.5 Election Support - General Election** | 54 days | Mon 10/24/16 | Fri 12/16/16 |
| 263 | | | **6.5.1 Mail Ballot Tabulation Support** | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 264 | | | 6.5.1.1 Region 1 | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 265 | | | 6.5.1.2 Region 2 | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 266 | | | 6.5.1.3 Region 3 | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 267 | | | 6.5.1.4 County Tier 1.1 | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 268 | | | 6.5.1.5 County Tier 1.1 | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 269 | | | **6.5.2 VSPC support** | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 270 | | | 6.5.2.1 Region 1 | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 271 | | | 6.5.2.2 Region 2 | 16 days | Mon 10/24/16 | Tue 11/8/16 |

Page 8

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

Colorado 1.0

| ID | Task Mode | Task Name | Duration | Start | Finish |
|----|-----------|-----------|----------|-------|--------|
| 272 | | 6.5.2.3 Region 3 | 16 days | Mon 10/24/16 | Tue 11/8/15 |
| 273 | | 6.5.2.4 County Tier 1.1 | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 274 | | 6.5.2.5 County Tier 1.1 | 16 days | Mon 10/24/16 | Tue 11/8/16 |
| 275 | | **6.5.3 Election Day Support** | **3 days** | **Mon 11/7/16** | **Wed 11/9/16** |
| 276 | | 6.5.3.1 Region 1 | 3 days | Mon 11/7/16 | Wed 11/9/16 |
| 277 | | 6.5.3.2 Region 2 | 3 days | Mon 11/7/16 | Wed 11/9/16 |
| 278 | | 6.5.3.3 Region 3 | 3 days | Mon 11/7/16 | Wed 11/9/16 |
| 279 | | 6.5.3.4 County Tier 1.1 | 3 days | Mon 11/7/16 | Wed 11/9/15 |
| 280 | | 6.5.3.5 County Tier 1.1 | 3 days | Mon 11/7/16 | Wed 11/9/16 |
| 281 | | **6.5.4 Project Plan Review and Update** | **33 days** | **Mon 11/14/16** | **Fri 12/16/16** |
| 282 | | **6.5.4.1 Capture lessons Learned** | **33 days** | **Mon 11/14/16** | **Fri 12/15/16** |
| 283 | | 6.5.4.1.1 Internal Review | 5 days | Mon 11/14/16 | Fri 11/18/16 |
| 284 | | 6.5.4.1.2 Stakeholder consultations | 5 days | Mon 12/5/16 | Fri 12/9/16 |
| 285 | | 6.5.4.1.3 Review issues log | 5 days | Mon 12/12/16 | Fri 12/16/16 |

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

## Certification

Dominion shall participate and comply with all items prescribed by the UVS committee for certification including:

- Deadline for finalist to file Applications for Certification with State Elections Division Voting Systems Team, together with Technical Data Package (TDP) consisting of all system documentation, prior certifications and test reports:  1/19/2016
- Completion of documentation review:  1/26/2016
- Prepare and finalize Test Plan Agreement, if final system differs from system temporarily authorized:  1/29/2016
- Complete supplemental testing, if necessary:  2/15/2016
- Certification of system, issuance of conditions of use (if any), and county authorization to purchase:  3/1/2016

As part of the implementation cycle, Dominion will continue to solicit feedback from our customers, including our Colorado counties. This feedback loop will feed back into our development cycle, and as we develop additional features and improvements, these will be put back into certification working with the State.

## Procurement

Procurement will be conducted in a manner that allows the coordination of supplies and consumables to be shipped directly to each county. During the procurement phase of the project, all of the commercial off the shelf components used in our election system are purchased.

While it would be preferable for all parties to identify final quantities of all supplies and consumables required for Election Day on the initial contract, provision in the project plan has been made to allow incremental orders to be placed following change management processes.

## Configuration, Installation, Testing and Training

### *System Configuration*

The Dominion Voting Democracy Suite Election Management System (EMS) is a configurable election system that can be adapted to meet the needs of any jurisdiction. The initial steps in each installation involve working closely with the county to ensure that the system is deployed in a manner that meets all jurisdiction requirements. The following steps are required:

**Create Election Data Import Bridge –** In this series of steps, Dominion works with the IT professional responsible for the creation and maintenance of SCORE to create a bridge that allows the direct import of jurisdictional data into the Democracy Suite EMS. This step

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

dramatically increases the speed and accuracy of the creation of the election database within the Democracy Suite EMS.  As a result, election divisions, contests, candidate names, propositions and other essential data will be inputted only once, reducing the likelihood of user error. Normally several iterations are required, and some manual data adjustment may be required.

Tiers 1.4, 2 and 3 counties will have the option to use Dominion staff for database creation in our Colorado local office on equipment that has had the trusted build installed by the Secretary of State staff.

**Customization of Configurable Options** – Basic compliance with the requirements will have been demonstrated in the certification of the Democracy Suite line of products; however additional customization may be required. During this stage, final input and approval on ballot layouts, reports content, and the configuration of the options to the ImageCast[2] Central and ImageCastX may be requested. This step takes place at the same time that the data import bridge is created.

**Create Audio Ballot Production Process** – Dominion understands the importance of generating accurate and easily understood audio ballots. As part of the initial configuration process and during the election cycle, Dominion and the counties will leverage existing processes, tools and systems to generate audio ballots.

*Staging and Logistics*

Dominion deliveries take place on a continuous basis. In this way, the acceptance process can operate in a just-in-time basis, thus minimizing the need to handle equipment twice, and reducing the burden and disruption to the acceptance test process during the scheduled delivery dates.

At the same time, delivery of the IT hardware and central count scanning system will take place. This allows Dominion technicians to begin installation of election servers in parallel with equipment acceptance. In this way, counties will have the benefit of being able to work with the complete election system immediately upon delivery of the tabulators.

*Installation and Acceptance Testing*

**Preparation for Acceptance Testing -** A Dominion technical lead will provide guidelines to the counties for acceptance testing and coordinate dates with the Secretary of State staff for trusted build installation. This includes assessing suitability and identifying any modifications required, identifying areas for each process including a secure area for inventory control, preparing necessary acceptance documentation, and ensuring all necessary supplies are available.

**Acceptance Testing** – Dominion and county staff will conduct detailed acceptance testing of the voting equipment. This acceptance testing provides assurance of full product functionality. Acceptance testing is an essential part of the Dominion quality assurance process. While it is our goal that all election equipment arrive to the county in perfect condition, it is normal to see a

---

[2] ImageCast is a registered trademark of Dominion Voting Systems.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

small number of issues that may fail initial acceptance. A Dominion employee will be on-site during the tabulator acceptance test process to assist, answer questions, troubleshoot, and where necessary complete minor adjustments.

**Installation of EMS** – IT Servers will be procured and shipped to Dominion's Denver office where the servers will be prepared for the trusted build installation of the EMS system software.

*Training*

At Dominion, our training methodology focuses on providing election administration staff the necessary knowledge for successful implementation and effective operation of our voting system. We accomplish this through tailored training, using various training formats, implementing adult learning principles, and proper course pacing. Training customization begins with tailoring our courses to a specific jurisdiction's needs.  For example, for those counties that will rely on Dominion to provide election services, such as building the voting system database, the training curriculum will only focus on the aspects of the system pertaining to how they will deploy it. Counties that will be doing their own election programming will be trained on how to do so using the Democracy Suite EMS. Another aspect of the customization is using different formats for training, including instructor-led classes in person, and instructor-led classes online.

Tier 1.1 counties will have their own county project managers that will be dedicated to their accounts. This is based on the size of the jurisdiction and need for a more intimate approach dealing with larger staff.  Often, election preparation schedules prevent the delivery of training at the optimal time for retention on Election Day. This can be particularly apparent in small counties, where a very limited team is responsible for all election related activities. To that end, Dominion proposes a regional training program for all other tiered counties where regional project managers will be dedicated to multiple counties. All counties regardless of size will have a technical project manager, product specialist(s), documentation & training specialist(s), voter outreach and a networking hardware specialist. Training for the regional accounts will be combined which allows questions and concerns from multiple counties to be heard. This will facilitate ideas on how our training program can work best for each county, and allow trainees to discuss concerns with the implementation that can help all involved. This type of training does not affect VSPC or election night support requirements for each individual county.

## 2016 Primary Election Implementation

*Election Programming*

For those counties where Dominion will be providing election programming services such as database programming and generating ballots, the following steps outline this phase of the implementation.

The creation of the election database is a critical step in the election implementation. Given the very limited time available between the certification of the final ballot and the distribution of UOCAVA / Absentee ballots, it is very important that timelines are appropriately managed.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

Dominion employs an iterative approach to ballot and report creation, where successive rounds of proofs are provided to election officials as more information becomes available. Using this approach, in many cases ballots have already been approved by the time they are certified, maximizing the time available for pre-election testing and logistics.

Dominion is familiar with the level of care and attention, and the rigorous proofing that election data should receive. While we are strong advocates of exercising rigor and caution during the ballot production phase, some or all of the iterative steps described below may not be required. This decision will be made by the Dominion PM in conjunction with the county following system configuration and end-to-end testing.

**Import Jurisdictional Data** - Using the data import bridge created during configuration, the Dominion project team will create an initial election database, ballots and reports using approved templates. Dominion staff will review the database for internal consistency, and provide draft proofing packages to the county for review.

**Final Election Ballot and Database Creation** – As soon as possible following the certification of final election data, the Dominion project team will provide final ballot proofs to the county.

**Election Materials Provided to or Generated by the County** – Final ballot PDF images are provided to the county for provision to certified printers. Election Project back-ups are uploaded to a secure transfer site for restoration on election servers.

**Generate Audio Files** – Dominion uses machine synthesized audio files for the ImageCast X systems.

_Logic and Accuracy Testing_

Logic and Accuracy testing (L&A) is the responsibility of the counties. The Dominion project team will be available throughout the L&A process available to assist on an as required basis.

To facilitate the L&A process, Democracy Suite has an optional, stand-alone test deck generation utility that can be employed by certified printers, or sold separately for the automated creation of pre-marked test decks. These decks are always marked with 100% accuracy, allowing for increased confidence in the L&A process.

Dominion recommends that L&A testing include the upload of results files to the election database, so that a full end-to-end test of the relevant election is completed prior to Election Day.

_Election Support_

The Dominion project team will reach an agreement with the county on their specific roles during VSPC voting and Election Night. Dominion takes pride in our ability to transfer to local officials the skills necessary to conduct even complex elections with complete autonomy. As an example, following the successful initial deployment of Democracy Suite in Mongolia in June 2012, a nation-wide Presidential election was subsequently conducted by the Mongolian General Election Commission with only two Dominion staff members in-country. Throughout the

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

election, their role was simply to respond to questions and to be available in case of unexpected performance issues, of which there were none. This is a testament not only to Dominion's strength as capacity-builders, but also the reliability and ease of use of our systems.


## 2016 General Election Implementation

The Election support plan for the 2016 General Election is the same as the support plan for the 2016 Primary.

*Project Plan Review and Update*

In accordance with accepted project management practice, Dominion will conduct a project review upon completion of the 2016 Primary Election. The counties will be consulted, and a review of change orders and PEP tickets will be conducted. On completion of these reviews, project documentation and the project plan will be revised to reflect learning from the Primary Election. This will be presented to the counties for their approval prior to moving forward with the implementation of the 2016 General Election.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

## Problem Escalation Procedure

During the normal course of implementing Democracy Suite, Dominion staff works closely with customers to establish a clear and timely flow of information. This communication helps reduce the number of issues and support early identification of problems that may require resolution through the Problem Escalation Procedure (PEP).

Dominion has successfully applied the proposed PEP to implementations in States of Louisiana, New Mexico, Nevada and many other large jurisdictions. The proposed process has the following key steps:

- **Problem Identification** – Customer identifies a problem or Dominion proactively identifies a problem.
- **Problem Analysis** – The Dominion PM will describe, document, and log the problem into Dominion's automated ticket tracking system. They will notify appropriate Customer/Dominion staff of the severity and risk of the problem.
- **Problem Mitigation Plan (PMP)** – The Dominion PM will lead a team to identify the root cause, determine/document mitigation approach, and identify the management point of contact for approval of the PMP.
- **Mitigation Execution** – The team will execute the approved PMP and track resolution.
- **Problem Escalation Process** – The Dominion PM will escalate a problem based on exceeding the resolution target time or at their discretion.
- **Problem Close-out** – The Dominion PM will document problem, resolution, and lessons learned. The PM will also close out the item on the problem and risk logs.

**Problem Identification** – The Project Management Institute (PMI) defines a problem or issue as a variance between planed and actual performance in terms of schedule, resource allocation, technical performance, or quality. A problem or potential problem can be identified by Colorado counties or proactively by Dominion staff.

**Problem Analysis** – The Dominion PM will work with the individual that identified the problem and Dominion staff to clearly characterize the issue, assess its severity, and determine the initial mitigation strategy. The Dominion PM will update the problem log (Dominion's automated ticket tracking system) and make an entry into the risk log if necessary.

**Problem Mitigation Plan (PMP)** – The Dominion PM will work with key Dominion and Colorado county staff to identify the root cause and to determine a mitigation approach. They will document the approach and seek authorization (if necessary) from the Colorado PM to execute the PMP. The Dominion PM will carefully analyze the PMP to avoid implementing a mitigation solution that causes more problems or does not address the root cause.

**Mitigation Execution** - The Dominion PM will lead, monitor, and report on the execution of the PMP. The Dominion PM will monitor the problem on daily or weekly bases during mitigation execution. If the PMP results in problem resolution, the Dominion PM will close out the problem. If the PMP fails to address the problem, the Dominion PM will notify the state and execute the escalation procedure.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

**Problem Close Out –** The Dominion PM will update the problem and risk logs, document lessons learned, and report the problem in the monthly status report.

**Problem Escalation –** If the PMP is not completed within the specified Target Resolution Time, the Dominion PM will execute problem escalation process.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

## 2)   Proposed Staffing

*Section 5.3.13 of the original RFP requested you to identify and provide information about proposed staffing to implement UVS. To the extent necessary, please update your original RFP response on this issue.*

<u>Dominion Colorado Project Team</u>



State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

## Staff Qualifications

### Executive Sponsor – Mike Frontera

As Executive Vice-President of Operations, Mike brings over 22 years of election experience to Dominion's operations team, which manages voting system implementations, customer relations, election support, training and sales support. Mike was the Executive Sponsor for a number of large Dominion implementations including the country of Mongolia and States of New York and Louisiana. Prior to joining Dominion, Mike was the Vice President of Operations for Sequoia Voting Systems for over seven years. Mike began his career working in the public sector, including serving as the Election Director for the City and County of Denver.
Mike is licensed to practice law in the State of Colorado and holds a Juris Doctor from the University of Arizona College of Law, as well as a Bachelor of Arts in Psychology.

### Regional Sales Manager (Primary Business Contact) - Steven Bennett

Steven Bennett is the Regional Sales Manager for the State of Colorado, and responsible for all activities in the State. He has been involved in the sale and installation of election solutions for the past 10 years, in California, Colorado and New Mexico. Steven has studied the process by which jurisdictions deploy voting systems, understands how counties procure the equipment they need, and the role of the State in elections and voting system implementation. He has expertise in developing election solutions for state and county needs, cultivating partnerships to ensure successful collaboration between the customer and the company. Additionally, Steven has been instrumental in translating customer needs into R&D priorities for the companies, ensuring that customers have the products they truly need.

Steven received a Bachelor of Science in Business Administration, with a focus on Finance, from Indiana University of Pennsylvania in 1988. Steven will be your contact for the duration of the contract.

### Director of Operations, West – Sheree Noell

A seasoned professional, Sheree has more than twenty years of experience in the elections industry.  She has extensive experience in ballot printing, optical scan and direct record electronic tabulation, audio voting, precinct and central count environments.  Sheree has served as the Director of Operations, Sales manager and Project/Implementation Manager on various installs in California, Washington, Oregon and Nevada. Most recently, Sheree manages the day to day activities of the Western Region, which includes over 100 separate jurisdictions and 20+ personnel resources.  Sheree is a direct liaison to customers and is stationed in California. From this strategic location she can ensure the provision of day to day services and actively participate with her team and customers in planning for future election cycles and needed services.  Sheree received her under-grad degree from College of the Sequoias.  Sheree is currently enrolled in the Election Center's CERA/CERV Professional Education Program.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

## Customer Relations Manager – Geneice Mathews

Geneice Mathews is the in-state Customer Relations Manager for the State of Colorado responsible for Project management of multiple, parallel projects within the state. These tasks include new equipment installations, preventative maintenance and state wide election support activities. Geneice has a stellar record of customer satisfaction, and has been a great asset for investigating and solving customers' problems, which may be complex or long-standing problems. She has over 14 years of elections experience having held many positions in the company. From her start as a QA Analyst, to her experience in product management, election programming and implementation, testing, technical documentation and election support, and now as Customer Relations Manager, Geneice has a deep understanding of Dominion's systems, products and services. She helped manage numerous county and international implementations, and specifically state implementations of Nevada and Louisiana.
Geneice received a Bachelor of Arts in Political Science and German at the University of Longwood in Virginia.

## Product Specialist – Lisa Flanagan-Crane

Lisa is based out of Colorado and has worked in Elections Administration for 16 years.  During that time, Lisa has been Project Manager of Voting System installations for multiple Colorado counties, provided software/hardware training and election judge training for customers, produced and printed Op-Tech ballots, provided support for Logic and Accuracy Testing, Public Tests, hardware preventative maintenance and supported customers in voter registration. Previous to Dominion/Sequoia, Lisa worked for the Colorado Department of State and Arapahoe County. While working in the Colorado Secretary of State Office, Lisa helped with upgrading 19 counties to a Windows based Voter Registration System, trained staff from each county, and ran the help desk.  Lisa has visited over 25 election offices around the state, understands Colorado Election Law, and has worked hard to build an outstanding reputation for customer service.

Lisa has provided election support to jurisdictions in Arizona, California, Colorado, Illinois, Nevada, New Jersey, New Mexico, and Pennsylvania.

## Senior Product Manager – Ronald Morales

Ronald Morales is a Systems Engineer with more than 15 years of experience, providing technological expertise and solutions to ensure quality implementation and integration of Dominion Voting System products.

Ronald began his career in elections when he joined Smartmatic in 2004 where he managed the EMS Quality Assurance process for elections in Venezuela.  After the acquisition of Sequoia by Smartmatic, Ronald was responsible for the integration of Smartmatic's newly-developed equipment with Sequoia's EMS and for the EAC certification of the integrated solution.

When Dominion Voting Systems acquired Sequoia and assets of Premier Election Solutions in 2010, Ronald began working with modifications and new solutions in software and hardware for the Premier product line, along with the EAC certification process of the updated products.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

In his current role, Ronald is engaged in the research and implementation of new technologies with a focus on reliability, performance and efficiency, for both existing legacy systems (Sequoia and Premier) and systems currently in development by Dominion. His most noticeable achievement is the design and implementation of fully redundant Dominion Democracy Suite EMS server infrastructure for the elections in Mongolia during 2012 and 2013.

### Director, Product Strategy – Eric Coomer

Eric Coomer graduated from the University of California, Berkeley in 1997 with a Ph.D. in Nuclear Physics. After working in IT consulting for several years, Eric entered the elections industry in 2005 with Sequoia Voting Systems as Chief Software Architect. After three years with the company, Eric took over all development operations as Vice President of Engineering. When Sequoia was acquired by Dominion Voting Systems in 2010, Eric joined the DVS team as Vice President of US Engineering overseeing development in the Denver, Colorado office.

Recently, Eric has taken over as the Director of Product Strategy driving the creation of next generation products through close collaboration with customers, combined with a deep understanding of technology and the needs of Elections departments throughout the United States and abroad. Eric has been an active participant in the development of the IEEE common data format for Elections systems, as well as the working group for developing standards for Risk-Limiting Audits for elections results. When not designing new products, Eric supports large and small scale customers during Election season.

### Director, Product Strategy – David Moreno

David Moreno is an accomplished and committed IT professional, with years of experience in software design, development, deployment, and testing.

David has more than 20 years of professional experience in the areas of IT support, IT infrastructure, capacity planning, system design and development, QA and QC processes applied to software and hardware development and full Product Lifecycle Management. David also brings over 10 years of experience in the election business, from working in the design and development of different voting equipment, to deploying new voting technology in counties like San Francisco and Alameda County, California. David's career has been full of learning experiences, like implementing the RCV (Ranked Choice Voting) vote tally system for the City of San Francisco and Alameda County and working on multiple demonstrations of voting technology in different countries and states.

### Product Specialist – Alyssa Prohaska

Alyssa Prohaska has over 11 years of elections experience ranging from county elections administration to technical support, training, and quality assurance testing of election management, voter registration, and other web-based applications. Alyssa began working in elections as an Election and Campaign Finance Specialist with the Adams County Elections Division of the Clerk & Recorder Office in 2004. She has recently worked with the Colorado Secretary of State's office where she served in a technical and business support capacity –

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

testing, training, and providing tier 2 support of the voter registration and election management systems, and online voter registration applications.

Alyssa holds a Bachelor of Arts degree in Communication from the University of Denver, as well as a Master's of Science in Information Technology Management and Graduate Certificates in Oracle Database Administration, and Executive Information Technology from Regis University.

## Senior Software Developer – Benjamin Rice

Benjamin Rice has over six years of experience in architecting, developing, and managing elections software solutions. He is a certified ScrumMaster and evangelist for Agile practices and technologies in software development. He has close to twenty years' experience in the Web development and client-service solutions world. Before joining Dominion, Ben was a senior software developer at Sequoia and Slice of Lime and director of technology with FOCI.

Ben graduated from Northwestern University with Bachelor of Arts degrees in both Psychology and English Literature.

## Manager, Certification – Jessica Bowers

Jessica has been involved in the voting industry for over seven years in the R&D, engineering, and certification of voting systems. She has been involved in both state and federal level certifications and, most recently, led the Colorado provisional certification effort for Dominion's Universal Voting System entry. Jessica brings over 18 years of experience in development and Information Technology to her work with Dominion and is responsible for ensuring that the company's products are compliant with all state and federal certification standards.

Jessica earned a Bachelor of Science in Information Technology from the University of Phoenix in 2005 and is a U.S. Air Force veteran.

## Quality Assurance Analyst – Yaping Lou

Yaping Lou is a Quality Assurance Analyst for our Denver development department, and is responsible for ongoing testing to ensure the high performance quality of Democracy Suite. She has expertise in testing all components of our products, understands processes of the equipment and implementation of the voting system. Yaping has experience in election support, collaboration between software development and testing, and developing product test procedures to ensure high quality and performance of products. She has seven years of work experience in the field of computer science, including software testing and development.

Yaping received a Master of Computer Science from the University of Colorado, Denver, and joined Dominion Voting in 2015.

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

# 3)   Updated Schedule of Activities in Other Jurisdictions

*Please provide us with the information regarding your activities in other jurisdictions. For each of the following categories, please list the individual jurisdictions, and provide the name, title, telephone number and email address of your organization's principal local contact.*

### (a)   <u>Jurisdictions in which provider has deployed the temporarily approved (or a substantially similar) voting system</u>

Dominion's Democracy Suite voting system has been sold in 19 states. Below is a list of all election jurisdictions where the Democracy Suite system has been deployed, the major scanning components used (ImageCast Central, ImageCast Evolution, ImageCast Precinct, ImageCast X), and the year of signed business. Contact details for a cross section of customers are also provided in the references section. Should additional references be necessary, please contact our sales representative.

## References

**State of Louisiana**
Contact Name: Angie Rogers, Commissioner of Elections, LA Secretary of State's Office
Address: 8585 Archives Ave, Baton Rouge, LA, 70809
Phone Number: 1-225-922-0900
E-mail: <u>Angie.rogers@sos.louisiana.gov</u>

> The state of Louisiana uses a blend of Dominion products for precinct, early voting and absentee voting. In 2011, Louisiana bought the ImageCast Central absentee ballot counting system for all parishes in the State. The ImageCast Central system is a software-driven central count solution. For the State of Louisiana, the ImageCast Central software was paired with a Kodak Sidekick COTS scanner.

> The State of Louisiana uses 110 ImageCast Central units to process their absentee ballots. The State has benefited from significant efficiencies and cost-savings through the use of this system, also being proposed for the State of Colorado. The complete system is administered and managed by the Secretary of State with support from the Dominion Team, and administered at the local level by the Registrar of Voters and Clerk of Court in each parish.

**City and County of Denver**
Amber McReynolds, Director of Elections
Address: Denver Elections Division, 200 W 14th Ave #100, Denver, CO 80204
Phone Number: 720-865-4850
E-mail: <u>amber.mcreynolds@denvergov.org</u>

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4TH PERC MEETING

In 2015, the City and County of Denver streamlined their election processes by replacing their voting system - which required three vendors and seven different databases - with a single database to power the entire election – Democracy Suite. Denver selected the ImageCast Central to tabulate paper ballots, more than 90% of which came from ballots received by mail. Denver also implemented the ImageCast X, a tablet-based in-person voting device, which prints a paper ballot for tabulation by the ImageCast Central. Dominion provided training on all aspects of the system, technical services and support for system installation and configuration, early voting, Election Day voting and post-election activities. Dominion also provided a dedicated project manager for their May 2015 Municipal Election. Dominion worked closely with the City and County of Denver to configure the system to meet their needs and requirements.

**Clark County, Nevada**
Joe Gloria, Registrar of Voters
Address: 965 Trade Drive #1, North Las Vegas, NV 89030-7801
Phone: 702-455-2846
E-mail: jpg@co.clark.nv.us

Clark County, Nevada uses a blend of Dominion products for precinct, early voting and absentee voting. In 2015, Clark County upgraded their central count scanning system to Democracy Suite, deploying six ImageCast Central workstations paired with Canon G1130 scanners. Clark County also implemented Dominion's ImageCast Adjudication software for digital real-time adjudication of ballots with outstack conditions.

The State of Nevada has been a customer of Dominion and its predecessors for over 20 years, and this longstanding relationship is a testament to Dominion's commitment to outstanding customer service and support. Most of the original members of the Clark County install team in 1991 are still employed by Dominion Voting today and continue to provide support and services in the state.

## Democracy Suite Customers

Below is a list of all election jurisdictions where the Democracy Suite system has been deployed, the major scanning components used (ImageCast Central - ICC, ImageCast Evolution - ICE, ImageCast Precinct - ICP, ImageCast X - ICX), and the year of signed business.

**52 Counties in the State of New York** (all except Albany, Erie, Nassau, Rockland, Schenectady and the five boroughs of New York City) (ICP, BMD, ICC - 2008)

**The State of New Jersey**
o   Burlington County (ICC, 2014)
o   Camden County (ICC, 2013)
o   Cape May County (ICC, 2013)
o   Cumberland County (ICC, 2015)
o   Essex County (ICC, 2013)

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4th PERC MEETING

- o Mercer County (ICC 2013)
- o Monmouth County (ICC, 2014)
- o Hunterdon County (ICC, 2015)
- o Salem County (ICC, 2015)
- o Gloucester County (ICC, 2015)
- o Morris County (ICC, 2015)
- o Passaic County (ICC, 2015)
- o Union County (ICC, 2013)
- o Hudson County (ICC, 2013)

**All 64 Parishes in the State of Louisiana** (ICC, 2011)

**The Commonwealth of Virginia**
- o Caroline County (ICP BMD Audio,  2015)
- o Isle of Wight County (ICE, 2011)
- o King George County (ICP- BMD Audio, 2014)
- o Bedford County (ICE, 2015)
- o Page County (ICP- BMD Audio, 2014)
- o Craig County (ICE, 2015)
- o Franklin County (ICE, 2015)
- o Louisa County (ICE, 2015)
- o Mecklenburg County (ICE, 2015)
- o Nottoway County (ICE, 2015)
- o Suffolk City (ICE, 2015)

**The State of Ohio**
- o Guernsey County (ICE, ICC, 2013)
- o Harrison County (ICP, ICE, ICC, 2014)
- o Huron County (ICC, ICE, ICP-AV, MBP, 2015)
- o Belmont County (ICP-AV, ICC, 2015)

**The State of Tennessee**
- o Hamilton County (ICE, ICP-A, ICC, 2013)

**The State of Iowa**
- o Cedar County  (ICP BMD Audio, 2013)
- o Adair County (ICP, 2015)
- o Hardin County (ICP-BMD Audio, ICC, 2015)
- o Mitchell County (ICP-BMD Audio, 2015)

**The State of Florida**
- o Baker County (ICE, 2013)
- o Hardee  County (ICE, 2013)
- o Hernando (ICE-DD, ICC, MBP, 2015)
- o Leon County (ICE, ICC, 2014)

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4th PERC MEETING

- o  Levy County (ICE, 2014)
- o  Madison County (ICE, 2013)
- o  Monroe County (ICE, 2013)
- o  St Lucie County (ICE, ICC, 2014)
- o  Alachua County (ICE, ICC, 2015)
- o  Flagler County (ICC, 2015)

**The State of New Mexico** (ICC, ICE, ICP BMD Audio, ICP, 2014)

**The State of Alaska**
- o  City and Borough of Sitka (ICP BMD Audio, 2014)

**The State of Massachusetts**
- o  Clinton County (ICP, 2015)
- o  Needham County (ICP, 2014)

**The State of Missouri**
- o  Adair County (ICP-BMD Audio, 2015)
- o  Warren County (ICP, 2015)
- o  Osage County (ICP-BMD Audio, 2015)
- o  Callaway County (ICP-BMD Audio, 2015)
- o  Crawford County (ICP-BMD Audio, 2015)
- o  Gasconade County (ICP-BMD Audio, 2015)
- o  Jasper County (ICP-BMD Audio, 2015)
- o  Maries County (ICP-BMD Audio, 2015)
- o  McDonald County (ICP-BMD Audio, 2015)
- o  Newton County(ICP-BMD Audio, 2015)
- o  Warren County (ICP-BMD Audio, 2015)
- o  Saline County (ICP-BMD Audio, 2015)
- o  Carroll County (ICP-BMD Audio, 2015)
- o  Lafayette County (ICP-BMD Audio, 2015)

**The State of Nevada**
- o  Clark County (ICC, 2015)

**The State of Colorado**
- o  City and County of Denver (ICC, ICX, 2015)
- o  Mesa County (ICC, ICX, 2015)

**The State of California**
- o  Imperial County (ICC, ICE, 2015)
- o  Kern County (ICC, 2015)

**The State of Kansas**
- o  Lane County (ICP-BMD Audio, 2015)

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4th PERC MEETING

**The State of Utah**
o   Salt Lake County (ICC, 2014)

**The State of Minnesota**
o   Dakota County (ICC, ICE, 2015)
o   Scott County (ICC, ICE, 2015)

(b)   <u>Jurisdictions in which provider has contractually committed to deploy voting system(s) in 2016-2020</u>

Dominion is contractually committed to deploy the Democracy Suite Voting System in the following jurisdictions in the United States:

**The Commonwealth of Puerto Rico**

**The State of California**
o   Del Norte County
o   Glenn County
o   Siskiyou County
o   Tehama County
o   Napa County

**The State of Florida**
o   Columbia County

**The State of Ohio**
o   Lorain County

**The State of Wisconsin**
o   Door County
o   Green County
o   Ozaukee County
o   Vilas County
o   Washington County
o   Winnebago County

Dominion has a number of distributors who provide election implementation services in various jurisdictions. Dominion and its distributors are contractually committed to deploy the Democracy Suite Voting System in the following jurisdictions:

**The State of Iowa**
o   Appanoose County
o   Wayne County
o   Lucas County

**The State of Missouri**
o   Livingston County

State of Colorado
UNIFORM VOTING SYSTEM SUBMISSION
PROVIDER NARRATIVE FOR DEC 4th PERC MEETING

- o Pike County
- o Grundy County
- o Mercer County
- o Harrison County
- o Montgomery County

**The Commonwealth of Virginia**
- o Buchanan County
- o Dickenson County
- o Russell County
- o Lee County
- o Salem City
- o Amelia County
- o Waynesboro City

**The State of Wisconsin**
- o Fond du Lac County

(c)    <u>Jurisdictions in which provider has an outstanding offer but has not yet contracted to deploy voting system(s) in 2016-2020.</u>

Dominion continues to work with jurisdictions to provide upgrade paths and demonstrate new technologies. At this time, we do not have any outstanding offers for contractual commitments beyond 2015 for new implementations.

| ID | | | Task Mode | Task Name | Duration | Start | Finish | Predecessor |
|---|---|---|---|---|---|---|---|---|
| 0 | | | | **Colorado 1.0** | **394 days** | **Tue 12/1/15** | **Wed 12/28/1** | |
| 1 | | | | **1 Project Milestones** | **314 days** | **Thu 12/31/15** | **Tue 11/8/16** | |
| 2 | | | | **1.1 Selection of UVS Finalist** | 0 days | Thu 12/31/15 | Thu 12/31/15 | |
| 3 | | | | **1.2 County Contracts Negotiated and Signed** | 40 days | Mon 1/4/16 | Fri 2/12/16 | |
| 4 | | | | **1.3 Certification of System** | 1 day | Tue 3/1/16 | Tue 3/1/16 | |
| 5 | | | | **1.4 System Deployment to Counties** | **59 days** | **Wed 3/2/16** | **Fri 4/29/16** | |
| 6 | | | | 1.4.1 Deployment and Installation | 31 days | Wed 3/2/16 | Fri 4/1/16 | |
| 7 | | | | 1.4.2 Install Trusted Builds | 26 days | Mon 4/4/16 | Fri 4/29/16 | |
| 8 | | | | **1.5 Primary Election Milestones** | **58 days** | **Mon 5/2/16** | **Tue 6/28/16** | |
| 9 | | | | 1.5.1 Ballot Production | 26 days | Mon 5/2/16 | Fri 5/27/16 | 14SS-69 da |
| 10 | | | | 1.5.2 UOCAVA Ballot Deadline | 1 day | Sat 5/14/16 | Sat 5/14/16 | |
| 11 | | | | 1.5.3 Absentee ballots sent - Primary | 17 days | Mon 6/6/16 | Wed 6/22/16 | |
| 12 | | | | 1.5.4 L&A Testing - Primary | 11 days | Tue 5/31/16 | Fri 6/10/16 | |
| 13 | | | | 1.5.5 Voting Centers Open - Primary | 9 days | Mon 6/20/16 | Tue 6/28/16 | |
| 14 | | | | 1.5.6 Election Day - Primary | 0 days | Tue 6/28/16 | Tue 6/28/16 | |
| 15 | | | | **1.6 General Election Milestones** | **58 days** | **Mon 9/12/16** | **Tue 11/8/16** | |
| 16 | | | | 1.6.1 Ballot Production | 26 days | Mon 9/12/16 | Fri 10/7/16 | 21SS-69 da |
| 17 | | | | 1.6.2 UOCAVA Ballot Deadline | 1 day | Sat 9/24/16 | Sat 9/24/16 | |
| 18 | | | | 1.6.3 Absentee ballots sent - General | 5 days | Mon 10/17/16 | Fri 10/21/16 | |
| 19 | | | | 1.6.4 L&A Testing - General | 11 days | Mon 10/10/16 | Thu 10/20/16 | |
| 20 | | | | 1.6.5 Voting Centers Open - General | 16 days | Mon 10/24/16 | Tue 11/8/16 | |
| 21 | | | | 1.6.6 Election Day - General | 0 days | Tue 11/8/16 | Tue 11/8/16 | |
| 22 | | | | **2 Project Management** | **364 days** | **Thu 12/31/15** | **Wed 12/28/16** | |
| 23 | | | | **2.1 Initiate Project** | **23 days** | **Thu 12/31/15** | **Fri 1/22/16** | |
| 24 | | | | 2.1.1 Internal Project Kick-off | 1 day | Thu 12/31/15 | Thu 12/31/15 | |
| 25 | | | | 2.1.2 Kick-off with State | 1 day | Wed 1/6/16 | Wed 1/6/16 | |
| 26 | | | | 2.1.3 Kick-Off Meeting with Counties | 12 days | Mon 1/11/16 | Fri 1/22/16 | 25SS |
| 27 | | | | **2.2 System Certification** | **43 days** | **Tue 1/19/16** | **Tue 3/1/16** | |
| 28 | | | | **2.2.1 UVS Certification Tasks** | **43 days** | **Tue 1/19/16** | **Tue 3/1/16** | |
| 29 | | | | 2.2.1.1 Deadline for Cert. App. With TDP | 1 day | Tue 1/19/16 | Tue 1/19/16 | |
| 30 | | | | 2.2.1.2 Completion of documentation review | 1 day | Tue 1/26/16 | Tue 1/26/16 | |
| 31 | | | | 2.2.1.3 Prepare and finalize Test Plan Agreement | 1 day | Fri 1/29/16 | Fri 1/29/16 | |
| 32 | | | | 2.2.1.4 Complete supplemental testing, if necessary | 1 day | Mon 2/15/16 | Mon 2/15/16 | |

| ID | | Task Mode | Task Name | Duration | Start | Finish | Predecessor |
|---|---|---|---|---|---|---|---|
| 33 | ● | | 2.2.1.5 Certification of System | 1 day | Tue 3/1/16 | Tue 3/1/16 | |
| 34 | | | **2.3 Project Management Meetings w State/Counties** | 346 days | Mon 1/18/16 | Wed 12/28/16 | |
| 35 | | ↻ | 2.3.1 Project Update Call | 346 days | Mon 1/18/16 | Wed 12/28/16 | |
| 60 | | | **2.4 Dominion Internal Project Management Meetings** | 348 days | Fri 1/15/16 | Tue 12/27/16 | |
| 61 | | ↻ | 2.4.1 Project Update Call | 348 days | Fri 1/15/16 | Tue 12/27/16 | |
| 86 | | | **3 Procurement and Logistics** | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 87 | | | **3.1 Procurement** | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 88 | | | **3.1.1 ICC system** | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 89 | ▦ | | 3.1.1.1 Canon G1130 | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 90 | ▦ | | 3.1.1.2 Kofax board and software | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 91 | ▦ | | 3.1.1.3 Dell all-in-one PC | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 92 | ▦ | | 3.1.1.4 i-Button programmer | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 93 | ▦ | | 3.1.1.5 Other Requested Supplies and Consumables | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 94 | | | **3.1.2 ICX System** | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 95 | ▦ | | 3.1.2.1 Tablets | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 96 | ▦ | | 3.1.2.2 Tablet Kiosk | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 97 | ▦ | | 3.1.2.3 Mag Striper Reader | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 98 | ▦ | | 3.1.2.4 Hub multiport network | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 99 | ▦ | | 3.1.2.5 BMD Printer | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 100 | | | 3.1.2.6 Networking Hardware | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 101 | | | 3.1.2.7 Administrator Laptop | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 102 | | | 3.1.2.8 Voting Booth | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 103 | | | 3.1.2.9 Accessibility system hardware | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 104 | ▦ | | 3.1.2.10 Other Identified or Requested IT Hardware | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 105 | | | **3.1.3 EMS and Adjudication Hardware** | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 106 | ▦ | | 3.1.3.1 EMS Server | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 107 | | | 3.1.3.2 EMS Workstation | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 108 | | | 3.1.3.3 Adjudication Workstation | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 109 | ▦ | | 3.1.3.4 Network Security Devices | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 110 | ▦ | | 3.1.3.5 Monitors (2 server and Adjudication) | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 111 | ▦ | | 3.1.3.6 Keyboard, Mouse, Cables... | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 112 | ▦ | | 3.1.3.7 Report Printer | 30 days | Mon 2/1/16 | Tue 3/1/16 | |
| 113 | ▦ | | 3.1.3.8 Other Identified or Requested IT Hardware | 30 days | Mon 2/1/16 | Tue 3/1/16 | |

| ID | | Task Mode | Task Name | Duration | Start | Finish | Predecessor |
|---|---|---|---|---|---|---|---|
| 114 | | | **4 Configuration, Installation, Training and Testing** | **182 days** | **Tue 12/1/15** | **Mon 5/30/16** | |
| 115 | | | **4.1 System Configuration** | **51 days** | **Thu 12/31/1!** | **Fri 2/19/16** | |
| 116 | | | **4.1.1 Create Election Data Import Bridge** | **49 days** | **Thu 12/31/1!** | **Wed 2/17/16** | |
| 117 | | | 4.1.1.1 Examine existing data structure | 21 days | Thu 12/31/15 | Wed 1/20/16 | |
| 118 | | | 4.1.1.2 Create data import bridge from customer database | 21 days | Thu 1/21/16 | Wed 2/10/16 | 117 |
| 119 | | | 4.1.1.3 Test import bridge and revise as required | 7 days | Thu 2/11/16 | Wed 2/17/16 | 118 |
| 120 | | | **4.1.2 Customization of configurable options** | **49 days** | **Thu 12/31/1!** | **Wed 2/17/16** | |
| 121 | | | 4.1.2.1 Finalize ballot style template | 28 days | Thu 12/31/15 | Wed 1/27/16 | 2 |
| 122 | | | 4.1.2.2 Define configurable settings | 28 days | Thu 12/31/15 | Wed 1/27/16 | 2 |
| 123 | | | 4.1.2.3 Finalize reporting templates | 21 days | Thu 1/28/16 | Wed 2/17/16 | 121 |
| 124 | | | **4.1.3 End-to-End Test** | **2 days** | **Thu 2/18/16** | **Fri 2/19/16** | 119,121,12 |
| 125 | | | **4.2 Installation and Acceptance Testing** | **121 days** | **Thu 12/31/1!** | **Fri 4/29/16** | |
| 126 | | | **4.2.1 Preparation for Acceptance Testing** | **86 days** | **Thu 12/31/1!** | **Fri 3/25/16** | |
| 127 | | | 4.2.1.1 Review County Operations Space | 18 days | Thu 12/31/15 | Sun 1/17/16 | 2 |
| 128 | | | 4.2.1.2 Issue space recommendations | 5 days | Mon 1/18/16 | Fri 1/22/16 | 127 |
| 129 | | | **4.2.1.3 Stage and Ship Delivery** | **25 days** | **Tue 3/1/16** | **Fri 3/25/16** | |
| 130 | | | 4.2.1.3.1 Configure Servers | 5 days | Tue 3/1/16 | Sat 3/5/16 | |
| 131 | | | 4.2.1.3.2 Test Servers | 5 days | Mon 3/7/16 | Fri 3/11/16 | 130FS+1 da |
| 132 | | | 4.2.1.3.3 Internal Acceptance of ICX, ICC and Adjudication systems | 10 days | Mon 3/14/16 | Wed 3/23/16 | 131FS+2 da |
| 133 | | | 4.2.1.3.4 Configure ICC Systems | 10 days | Thu 3/1/16 | Thu 3/10/16 | |
| 134 | | | 4.2.1.3.5 Test ICC Systems | 10 days | Tue 3/1/16 | Thu 3/10/16 | |
| 135 | | | 4.2.1.3.6 Stage and Ship | 12 days | Mon 3/14/16 | Fri 3/25/16 | |
| 136 | | | **4.2.2 Acceptance Testing** | **26 days** | **Mon 4/4/16** | **Fri 4/29/16** | |
| 137 | | | 4.2.2.1 ICX Acceptance | 19 days | Mon 4/4/16 | Fri 4/22/16 | |
| 138 | | | 4.2.2.2 Acceptance Testing of EMS Systems | 19 days | Mon 4/4/16 | Fri 4/22/16 | |
| 139 | | | 4.2.2.3 Acceptance Testing of ICC Systems | 19 days | Mon 4/4/16 | Fri 4/22/16 | |
| 140 | | | 4.2.2.4 End-to-End System Tests | 5 days | Mon 4/25/16 | Fri 4/29/16 | |
| 141 | | | **4.3 Training** | **182 days** | **Tue 12/1/15** | **Mon 5/30/16** | |
| 142 | | | **4.3.1 Finalize User Documentation** | **28 days** | **Tue 12/1/15** | **Mon 12/28/1!** | |
| 143 | | | **4.3.1.1 ICX Documentation** | **28 days** | **Tue 12/1/15** | **Mon 12/28/1!** | |
| 144 | | | 4.3.1.1.1 ICX User Guide | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 145 | | | 4.3.1.1.2 Acceptance Test Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 146 | | | 4.3.1.1.2 L&A Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 | |

| ID | | Task Mode | Task Name | Duration | Start | Finish | Predecessor |
|---|---|---|---|---|---|---|---|
| 147 | | | 4.3.1.1.4 Poll-Worker Training Manual | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 148 | | | **4.3.1.2 ICC Documentation** | **28 days** | **Tue 12/1/15** | **Mon 12/28/15** | |
| 149 | | | 4.3.1.2.1 ICC User Guide | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 150 | | | 4.3.1.2.2 Acceptance Test Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 151 | | | 4.3.1.2.3 Operator Training Manual | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 152 | | | 4.3.1.2.4 L & A Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 153 | | | **4.3.1.3 Adjudication** | **28 days** | **Tue 12/1/15** | **Mon 12/28/15** | |
| 154 | | | 4.3.1.3.1 Adjudication Users Guide | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 155 | | | 4.3.1.3.2 Adjudication Quick Reference Guide | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 156 | | | 4.3.1.3.3 Operator Training Manual | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 157 | | | 4.3.1.3.4 L&A Procedure, checklist and sign-off form | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 158 | | | **4.3.1.4 EMS Documentation** | **28 days** | **Tue 12/1/15** | **Mon 12/28/15** | |
| 159 | | | 4.3.1.4.1 EED Users guide | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 160 | | | 4.3.1.4.2 RTR Users guide | 28 days | Tue 12/1/15 | Mon 12/28/15 | |
| 161 | | | **4.3.2 Customer System Training** | **85 days** | **Mon 3/7/16** | **Mon 5/30/16** | |
| 162 | | | **4.3.2.1 Region 1 Training** | **78 days** | **Mon 3/7/16** | **Mon 5/23/16** | |
| 163 | | | 4.3.2.1.1 ICC/Adjudication Operations training | 2 days | Mon 3/7/16 | Tue 3/8/16 | |
| 164 | | | 4.3.2.1.2 ICX Operations training | 1 day | Wed 3/9/16 | Wed 3/9/16 | |
| 165 | | | 4.3.2.1.3 EMS / RTR Training | 5 days | Mon 4/25/16 | Fri 4/29/16 | |
| 166 | | | 4.3.2.1.4 Pollworker Train the Trainer | 1 day | Mon 5/23/16 | Mon 5/23/16 | |
| 167 | | | **4.3.2.2 Region 2 Training** | **73 days** | **Mon 3/14/16** | **Wed 5/25/16** | |
| 168 | | | 4.3.2.2.1 ICC/Adjudication Operations training | 2 days | Mon 3/14/16 | Tue 3/15/16 | |
| 169 | | | 4.3.2.2.2 ICX Operations training | 1 day | Wed 3/16/16 | Wed 3/16/16 | |
| 170 | | | 4.3.2.2.3 EMS / RTR Training | 5 days | Mon 5/2/16 | Fri 5/6/16 | |
| 171 | | | 4.3.2.2.4 Pollworker Train the Trainer | 1 day | Wed 5/25/16 | Wed 5/25/16 | |
| 172 | | | **4.3.2.3 Region 3 Training** | **68 days** | **Mon 3/21/16** | **Fri 5/27/16** | |
| 173 | | | 4.3.2.3.1 ICC/Adjudication Operations training | 2 days | Mon 3/21/16 | Tue 3/22/16 | |
| 174 | | | 4.3.2.3.2 ICX Operations training | 1 day | Wed 3/23/16 | Wed 3/23/16 | |
| 175 | | | 4.3.2.3.3 EMS / RTR Training | 5 days | Mon 5/9/16 | Fri 5/13/16 | |
| 176 | | | 4.3.2.3.4 Pollworker Train the Trainer | 1 day | Fri 5/27/16 | Fri 5/27/16 | |
| 177 | | | **4.3.2.4 Tier 1.1 Counties Training** | **64 days** | **Mon 3/28/16** | **Mon 5/30/16** | |
| 178 | | | 4.3.2.4.1 ICC/Adjudication Operations training | 2 days | Mon 3/28/16 | Tue 3/29/16 | |
| 179 | | | 4.3.2.4.2 ICX Operations training | 1 day | Wed 3/30/16 | Wed 3/30/16 | |

| ID | | Task Mode | Task Name | Duration | Start | Finish | Predecessor |
|---|---|---|---|---|---|---|---|
| 180 | | | 4.3.2.4.3 EMS / RTR Training | 5 days | Mon 5/2/16 | Fri 5/6/16 | |
| 181 | | | 4.3.2.4.4 Pollworker Train the Trainer | 1 day | Mon 5/30/16 | Mon 5/30/16 | |
| 182 | | | 5 2016 Primary Election | 87 days | Mon 4/4/16 | Wed 6/29/16 | |
| 183 | | | 5.1 Election Programming | 56 days | Mon 4/4/16 | Sun 5/29/16 | |
| 184 | | | 5.1.1 Import Jurisdictional Data | 16 days | Mon 4/4/16 | Tue 4/19/16 | |
| 185 | | | 5.1.1.1 Jurisdictional data imported | 1 day | Mon 4/4/16 | Mon 4/4/16 | |
| 186 | | | 5.1.1.2 Preliminary Election Database, Ballot and Report Creation | 8 days | Fri 4/8/16 | Fri 4/15/16 | |
| 187 | | | 5.1.1.3 Initial Ballot Proofs Reviewed by Counties | 1 day | Mon 4/18/16 | Mon 4/18/16 | 186FS+2 da |
| 188 | | | 5.1.1.4 Initial Report Proofing Packages Reviewed by Counties | 1 day | Tue 4/19/16 | Tue 4/19/16 | 187 |
| 189 | | | 5.1.2 Final Election Ballot and Database Creation | 11 days | Mon 5/2/16 | Thu 5/12/16 | |
| 190 | | | 5.1.2.1 Ballot Certification Deadline for Primary | 1 day | Mon 5/2/16 | Mon 5/2/16 | |
| 191 | | | 5.1.2.2 Final Ballot and Report Proofs to County Officials | 8 days | Tue 5/3/16 | Tue 5/10/16 | 190 |
| 192 | | | 5.1.2.3 Ballot and Report Review by Client | 1 day | Wed 5/11/16 | Wed 5/11/16 | 191 |
| 193 | | | 5.1.2.4 Revisions to Ballots and/or Reports | 1 day | Thu 5/12/16 | Thu 5/12/16 | 192 |
| 194 | | | 5.1.3 Election Materials Provided to County | 17 days | Fri 5/13/16 | Sun 5/29/16 | |
| 195 | | | 5.1.3.1 Official Ballot Images generated | 1 day | Fri 5/13/16 | Fri 5/13/16 | 193 |
| 196 | | | 5.1.3.2 L&A Test Ballots Generated | 8 days | Fri 5/13/16 | Fri 5/20/16 | 193SS+1 da |
| 197 | | | 5.1.3.3 Distribute Election Project Packages | 7 days | Mon 5/23/16 | Sun 5/29/16 | 196FS+2 da |
| 198 | | | 5.2 Primary Election - Finalize Election Files & Logic and Accuracy Testing | 12 days | Mon 5/30/16 | Fri 6/10/16 | |
| 199 | | | 5.2.1 County Receives and Restores Election package | 1 day | Mon 5/30/16 | Mon 5/30/16 | 197 |
| 200 | | | 5.2.2 Test ballots provided to printer | 3 days | Tue 5/31/16 | Thu 6/2/16 | 199 |
| 201 | | | 5.2.3 Load Election Files to ICC and ICX | 1 day | Tue 5/31/16 | Tue 5/31/16 | 199 |
| 202 | | | 5.2.4 Scan test ballots, upload and verify results | 10 days | Tue 5/31/16 | Thu 6/9/16 | 199 |
| 203 | | | 5.2.5 Export Results to State-wide System | 1 day | Fri 6/10/16 | Fri 6/10/16 | 202 |
| 204 | | | 5.3 Election Support - Primary Election | 17 days | Mon 6/13/16 | Tue 6/28/16 | |
| 205 | | | 5.3.1 Mail Ballot Tabulation Support | 16 days | Mon 6/13/16 | Tue 6/28/16 | |
| 206 | | | 5.3.1.1 Region 1 | 16 days | Mon 6/13/16 | Tue 6/28/16 | |
| 207 | | | 5.3.1.2 Region 2 | 16 days | Mon 6/13/16 | Tue 6/28/16 | |
| 208 | | | 5.3.1.3 Region 3 | 16 days | Mon 6/13/16 | Tue 6/28/16 | |
| 209 | | | 5.3.1.4 County Tier 1.1 | 16 days | Mon 6/13/16 | Tue 6/28/16 | |
| 210 | | | 5.3.1.5 County Tier 1.1 | 16 days | Mon 6/13/16 | Tue 6/28/16 | |
| 211 | | | 5.3.2 VSPC | 9 days | Mon 6/20/16 | Tue 6/28/16 | |
| 212 | | | 5.3.2.1 Region 1 | 9 days | Mon 6/20/16 | Tue 6/28/16 | |

| ID | | Task Mode | Task Name | Duration | Start | Finish | Predecessor |
|----|---|-----------|-----------|----------|-------|--------|-------------|
| 213 | | | 5.3.2.2 Region 2 | 9 days | Mon 6/20/16 | Tue 6/28/16 | |
| 214 | | | 5.3.2.3 Region 3 | 9 days | Mon 6/20/16 | Tue 6/28/16 | |
| 215 | | | 5.3.2.4 County Tier 1.1 | 9 days | Mon 6/20/16 | Tue 6/28/16 | |
| 216 | | | 5.3.2.5 County Tier 1.1 | 9 days | Mon 6/20/16 | Tue 6/28/16 | |
| 217 | | | 5.3.3 Election Day Support | 3 days | Mon 6/27/16 | Wed 6/29/16 | 14 |
| 218 | | | 5.3.3.1 Region 1 | 3 days | Mon 6/27/16 | Wed 6/29/16 | |
| 219 | | | 5.3.3.2 Region 2 | 3 days | Mon 6/27/16 | Wed 6/29/16 | |
| 220 | | | 5.3.3.3 Region 3 | 3 days | Mon 6/27/16 | Wed 6/29/16 | |
| 221 | | | 5.3.3.4 County Tier 1.1 | 3 days | Mon 6/27/16 | Wed 6/29/16 | |
| 222 | | | 5.3.3.5 County Tier 1.1 | 3 days | Mon 6/27/16 | Wed 6/29/16 | |
| 223 | | | 6 General Election 2016 | 165 days | Tue 7/5/16 | Fri 12/16/16 | |
| 224 | | | 6.1 Project Plan Review and Update | 28 days | Tue 7/5/16 | Mon 8/1/16 | |
| 225 | | | 6.1.1 Capture Lessons Learned | 14 days | Tue 7/5/16 | Mon 7/18/16 | |
| 226 | | | 6.1.1.1 Internal Review | 14 days | Tue 7/5/16 | Mon 7/18/16 | 14FS+7 day |
| 227 | | | 6.1.1.2 Stakeholder consultations | 14 days | Tue 7/5/16 | Mon 7/18/16 | 14FS+7 day |
| 228 | | | 6.1.1.3 Review issues log | 14 days | Tue 7/5/16 | Mon 7/18/16 | 14FS+7 day |
| 229 | | | 6.1.2 Revise Project Plan and Project Schedule | 14 days | Tue 7/19/16 | Mon 8/1/16 | 228,226,22 |
| 230 | | | 6.1.3 Revise Project and User Documentation | 14 days | Tue 7/19/16 | Mon 8/1/16 | 228,226,22 |
| 231 | | | 6.2 General Election Supplemental Training for Trainers | 16 days | Mon 9/19/16 | Tue 10/4/16 | |
| 232 | | | 6.2.1 Region 1 Training | 2 days | Mon 9/19/16 | Tue 9/20/16 | |
| 233 | | | 6.2.1.1 Refresh Training | 2 days | Mon 9/19/16 | Tue 9/20/16 | |
| 234 | | | 6.2.2 Region 2 Training | 2 days | Wed 9/21/16 | Thu 9/22/16 | |
| 235 | | | 6.2.2.1 Refresh Training | 2 days | Wed 9/21/16 | Thu 9/22/16 | 233SS+2 da |
| 236 | | | 6.2.3 Region 3 Training | 2 days | Mon 9/26/16 | Tue 9/27/16 | |
| 237 | | | 6.2.3.1 Refresh Training | 2 days | Mon 9/26/16 | Tue 9/27/16 | 235SS+5 da |
| 238 | | | 6.2.4 County Tier 1.1 | 2 days | Wed 9/28/16 | Thu 9/29/16 | |
| 239 | | | 6.2.4.1 Refresh Training | 2 days | Wed 9/28/16 | Thu 9/29/16 | 237SS+2 da |
| 240 | | | 6.2.5 County Tier 1.1 | 2 days | Mon 10/3/16 | Tue 10/4/16 | |
| 241 | | | 6.2.5.1 Refresh Training | 2 days | Mon 10/3/16 | Tue 10/4/16 | 239SS+5 da |
| 242 | | | 6.3 Election Programming - General Election | 25 days | Tue 9/6/16 | Fri 9/30/16 | |
| 243 | | | 6.3.1 Import Jurisdictional Data | 4 days | Tue 9/6/16 | Fri 9/9/16 | |
| 244 | | | 6.3.1.1 Jurisdictional data imported | 1 day | Tue 9/6/16 | Tue 9/6/16 | |
| 245 | | | 6.3.1.2 Preliminary Election Database, Ballot and Report Creation | 2 days | Wed 9/7/16 | Thu 9/8/16 | 244 |

| ID | Task Mode | Task Name | Duration | Start | Finish | Predecessor |
|---|---|---|---|---|---|---|
| 246 | | 6.3.1.3 Initial Ballot Proofs Reviewed by Counties | 1 day | Fri 9/9/16 | Fri 9/9/16 | 244,245 |
| 247 | | **6.3.2 Final Election Ballot and Database Creation** | **9 days** | **Mon 9/12/1** | **Tue 9/20/16** | **245** |
| 248 | | 6.3.2.1 Ballot Certification Deadline for General | 1 day | Mon 9/12/16 | Mon 9/12/16 | 245 |
| 249 | | 6.3.2.2 Final Ballot and Report Proofs to County Officials | 8 days | Tue 9/13/16 | Tue 9/20/16 | 248 |
| 250 | | 6.3.2.3 Ballot and Report Review by Client | 1 day | Tue 9/13/16 | Tue 9/13/16 | 249SS |
| 251 | | 6.3.2.4 Revisions to Ballots and/or Reports | 1 day | Wed 9/14/16 | Wed 9/14/16 | 250 |
| 252 | | **6.3.3 Election Materials Provided to County** | **16 days** | **Thu 9/15/16** | **Fri 9/30/16** | **250** |
| 253 | | 6.3.3.1 Official Ballot Images generated | 1 day | Thu 9/15/16 | Thu 9/15/16 | 251 |
| 254 | | 6.3.3.2 L & A Test Ballots Generated | 8 days | Fri 9/16/16 | Fri 9/23/16 | 253 |
| 255 | | 6.3.3.3 Distribute Election Project Packages | 7 days | Sat 9/24/16 | Fri 9/30/16 | 254 |
| 256 | | **6.4 General Election - Finalize Election Files & Logic and Accuracy Testing** | **16 days** | **Wed 10/5/1** | **Thu 10/20/16** | **254** |
| 257 | | 6.4.1 County Receives and Restores Election package | 1 day | Wed 10/5/16 | Wed 10/5/16 | |
| 258 | | 6.4.2 Test ballots provided to printer | 3 days | Thu 10/6/16 | Sat 10/8/16 | 257 |
| 259 | | 6.4.3 Load Election Files to ICC and ICX | 1 day | Mon 10/10/1 | Mon 10/10/16 | |
| 260 | | 6.4.4 Scan test ballots, upload and verify results | 10 days | Mon 10/10/1 | Wed 10/19/16 | |
| 261 | | 6.4.5 Export Results to State-wide System | 1 day | Thu 10/20/1 | Thu 10/20/16 | 260FS+2 da |
| 262 | | **6.5 Election Support - General Election** | **54 days** | **Mon 10/24/1** | **Fri 12/16/16** | |
| 263 | | **6.5.1 Mail Ballot Tabulation Support** | **16 days** | **Mon 10/24/1** | **Tue 11/8/16** | |
| 264 | | 6.5.1.1 Region 1 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 265 | | 6.5.1.2 Region 2 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 266 | | 6.5.1.3 Region 3 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 267 | | 6.5.1.4 County Tier 1.1 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 268 | | 6.5.1.5 County Tier 1.1 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 269 | | **6.5.2 VSPC support** | **16 days** | **Mon 10/24/1** | **Tue 11/8/16** | |
| 270 | | 6.5.2.1 Region 1 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 271 | | 6.5.2.2 Region 2 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 272 | | 6.5.2.3 Region 3 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 273 | | 6.5.2.4 County Tier 1.1 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 274 | | 6.5.2.5 County Tier 1.1 | 16 days | Mon 10/24/1 | Tue 11/8/16 | |
| 275 | | **6.5.3 Election Day Support** | **3 days** | **Mon 11/7/1** | **Wed 11/9/16** | |
| 276 | | 6.5.3.1 Region 1 | 3 days | Mon 11/7/16 | Wed 11/9/16 | |
| 277 | | 6.5.3.2 Region 2 | 3 days | Mon 11/7/16 | Wed 11/9/16 | |
| 278 | | 6.5.3.3 Region 3 | 3 days | Mon 11/7/16 | Wed 11/9/16 | |

| ID | | Task Mode | Task Name | Duration | Start | Finish | Predecessor |
|---|---|---|---|---|---|---|---|
| 279 | | | 6.5.3.4 County Tier 1.1 | 3 days | Mon 11/7/16 | Wed 11/9/16 | |
| 280 | | | 6.5.3.5 County Tier 1.1 | 3 days | Mon 11/7/16 | Wed 11/9/16 | |
| 281 | | | **6.5.4 Project Plan Review and Update** | **33 days** | **Mon 11/14/1** | **Fri 12/16/16** | |
| 282 | | | **6.5.4.1 Capture Lessons Learned** | **33 days** | **Mon 11/14/1** | **Fri 12/16/16** | |
| 283 | | | 6.5.4.1.1 Internal Review | 5 days | Mon 11/14/1 | Fri 11/18/16 | |
| 284 | | | 6.5.4.1.2 Stakeholder consultations | 5 days | Mon 12/5/16 | Fri 12/9/16 | |
| 285 | | | 6.5.4.1.3 Review issues log | 5 days | Mon 12/12/1 | Fri 12/16/16 | |

Page 8

Resource Names

Page 9

Resource Names

Page 10

Resource Names

Page 11

Resource Names

Page 12

Resource Names

Resource Names

Page 14

Resource Names

Page 15

Resource Names

Page 16



STATE OF COLORADO      )
                       )ss.
County of _Douglas_    )

COMES NOW, Affiant Joseph T. Oltmann, being first duly sworn, under oath, and states under penalty of perjury that the following information is true and accurate within his personal knowledge and belief:

My name Joseph Oltmann. I am over eighteen years of age. I am not suffering under any mental disability and am competent to give this sworn affidavit. I am able to read and write and to give this affidavit voluntarily and on my own free will and accord. No one has used any threats, force, pressure, or intimidation to make me sign this affidavit. I make this affidavit in support of the truth.

I am the CEO of a tech company based just outside of Denver, Colorado. I am also the founder of an organization called FEC United. [Fecunited.com] The goal of this organization is to restore constitutional integrity to our community and empower those in our community to stand up to state and national leadership that intends to suppress the rights of individuals holistically.

Through this organization "FEC" I became a target of journalists who began to slander both me and my organization. I became the topic of Antifa and extremists through my involvement in a movement to resist the narrative that police are bad and our society represented the rhetoric shared by these extremists. As a result of these attacks, I started researching Antifa, BLM, Inc. and their connection to violence and unrest inside of our communities. As a result, I set out to infiltrate Antifa meetings and de-mask those Antifa members who are journalists in the mainstream media in Colorado specifically.

On or about the week of September 27, 2020, I was able to attend an Antifa meeting which appeared to be between Antifa members in Colorado Springs and in Denver Colorado. I cannot verify the connection between the two or the leadership as they were disorganized. Discussions of Our Revolution and Antifa were discussed. Rhetoric of "eliminating fascists" and frustration as to the dwindling of support to rally in the street was evident.

Then I honed in among other conversations key actors in the organization who work for local and state news publications. One such person of interest was              , identified leader of Our Revolution in El Paso County (Southern Colorado) and Antifa leader of the same area.

name is actually                    . She is a journalist at Colorado Springs Independent, Colorado Springs Business Journal and a freelance writer for several online publications. Others to remain unnamed in this were present.

The conversation went like this:

Someone identified as "Eric" began to speak. Someone asked who Eric was, and someone else replied "he is the Dominion guy" [paraphrased].

Eric then began to speak after being told to continue, but was interrupted and asked by someone, "What are we going to do if Trump wins this fucking election?"

Eric responded, "Don't worry about the election. Trump is not going to win. I made fucking sure of that.. Hahaha"

Someone responded, "Fucking right."

Eric continued with fortifying the groups and recruiting. I would describe his tone as eccentric and boisterous. I wrote down his name and started to do some research into him.

At the time, I thought that they were so disconnected with reality that they think they can "make sure Trump is not elected."

I started with a simple google search: Keywords: "Eric," "Dominion," "Denver Colorado." The fifth result in organic search returned:


Dominion Voting Systems | Employee Profiles, Emails, Mutual ...

www.leadcandy.io › company › Dominion-Voting-Syst...

Find people working at Dominion Voting Systems. LeadCandy provides Full ... Denver, Colorado. VIEW FULL PROFILE ... FULL PROFILE. Eric Coomer's photo ...


Above that were results for Eric Schussler- Old Dominion University and Eric E Johnson, Attorney - Sherman & Howard. The first two on organic search however was as follows:


Dominion - Colorado Secretary of State

www.sos.state.co.us › elections › files › projectPlans
**PDF**

**Sep 9, 2016 — our most recent pilots in the City and County of Denver and Mesa County. ... 1 Democracy Suite is a registered trademark of Dominion Voting Systems. ... Eric Coomer graduated from the University of California, Berkeley in ...**

> And

Eric Coomer's email & phone | Dominion Voting Systems's ...

rocketreach.co › eric-coomer-email_7112825

Location, **Denver, Colorado**, United States. Work, Director, Market Strategy @ **Dominion** Voting Systems Member, Board of Directors @ Friends of Levitt Pavilion ...

I began doing research on Eric Coomer and discovered that Colorado Secretary of state link the following about Dr. Eric Coomer on page 26:

*"Eric Coomer graduated from the University of California, Berkeley in 1997 with a Ph.D. in Nuclear Physics. After working in IT consulting for several years, Eric entered the elections industry in 2005 with Sequoia Voting Systems as Chief Software Architect. After three years with the company, Eric took over all development operations as Vice President of Engineering. When Sequoia was acquired by Dominion Voting Systems in 2010, Eric joined the DVS team as Vice President of US Engineering overseeing development in the Denver, Colorado office.*

*Recently, Eric has taken over as the Director of Product Strategy driving the creation of next generation products through close collaboration with customers, combined with a deep understanding of technology and the needs of Elections departments throughout the United States and abroad. Eric has been an active participant in the development of the IEEE common data format for Elections systems, as well as the working group for developing standards for Risk-Limiting Audits for elections results. When not designing new products, Eric supports large and small scale customers during Election season."*

I did some cursory research on Eric, but my conclusion was that he was either a part of the government or not relevant to the conversation. In other words, this was not a target I would

identify as being influential in Antifa. My conclusion was based on his credentials of having a PhD in Nuclear Physics. Did not add up for someone with that intelligence. I set it aside and concentrated my focus on the activist journalist who were actually Antifa members.

On October 15, 2020 I spoke at an FEC meeting in Bandimere Speedway. It was a rally around the unconstitutional actions of Jefferson County, Colorado government leadership to hurt Bandimere Speedway. I spoke and before the event started they escorted a suspected Antifa Journalist Erik Maulbetsch [Colorado Recorder] off the premises. In that meeting I talked about outing activist journalists who were Antifa and holding them accountable in our community for attacking organizations like FEC United that serve the community.

These activist journalists frequently slander people of faith, conservatives and call them names that defame them in the community. I had enough and warned that we would call them out by name. Maulbetsch wrote and article reflecting this as he was listening in online and decided to omit details about the meeting, causing the entire journalistic community to wonder if they were on the list. It had a positive effect contrary to their intentions.

On Friday November 6th, I received a forwarded a article about Georgia irregularities on the election day. I normally do not read many of these articles because I am inundated with information both from FEC, and my company. I started reading it and noticed Eric Coomer was the spokesperson for a company called Dominion Voting Systems. I immediately stopped and started to go back through my notes to find the info on Eric Coomer. I then started research Dominion Voting Systems. The information became rather scary as everywhere I looked I found Eric's name. Some listing him as VP of Security and others calling him Director of Strategy and Security. I began my search for everything Eric Coomer, Dr. Eric Coomer and any information related to legal filings, RFPs, states using Dominion, Colorado uses and even areas in Colorado that do not use Dominion.

I then turned my attention to Eric Coomer's Facebook profile and page while I gathered information on correlating email addresses, profiles, screen names, etc. Searching Twitter, Reddit, Facebook, 4Chan, etc etc.

I was able to get screenshots of Eric Coomer's Facebook posts going back to 2016. What I discovered was disturbing. Anti-Trump rhetoric, posts referring to: Fuck USA, Fuck the Police, A.C.A.B., posts that were anti Conservative, and even posts being happy someone died. Then the bigger shocker. He reposted the Antifa "Manifesto" letter to Donald Trump. I knew that I had the right guy and someone that was clearly mentally unstable and radical. I started digging into the

code irregularities and tying all of the pieces together with the irregularities and the Dominion uses in the disputed states. The correlation was astonishing. I then found the information related to justifying voting machines being online and his justification that they had "hardware and IP address protection". This statement by itself is FALSE.

I then attempted to reach out to all sources to bring this information to light. Calling major news stations and attempting to connect with the DOJ.

I took the information to the listeners of an organization that I also own called Conservative Daily. We have a podcast that we do on weekdays. I felt I had enough information and was confident that the Eric on the conference call was the same Eric Coomer that worked for Dominion. I was also confident that given the Facebook and other information I was able to collect that Eric Coomer was interfering with the election and as he admits in one of his posts that people at his company think and feel the same way he does. I began to research his patents, who owns them, the pattern of states they acquired as clients.

I began to research the connection to Diane Feinstein, her husband, campaign manager, Clinton Foundation and became worried that the finger of radicals had taken away the voice of the American people in deciding the election. I used ARIMA analysis to show me trends on data and probability models to prove that they were in fact using code and technology to ghost votes, switch votes or even remove probable ballots completely. Code is random unless it is not. Since we are a data company and understand artificial intelligence and use of neural networks, we understand the capabilities of creating chaos in outcome based on weighted density of probable voters.

These statements are true and accurate to the best of my knowledge.

Joseph Oltmann

STATE OF COLORADO
COUNTY OF _Douglas_

    Personally appeared before me, _LYNN KIEFFER_____, a Notary Public in and for the aforesaid State and County, JOSEPH T OLTMANN, the within named bargainer, with whom I am personally acquainted and who, after being duly sworn, acknowledged that she executed the foregoing Agreement for the purposes contained therein.

                                         _____
                                         JOSEPH T OLTMANN

    Sworn to and subscribed before me this _17th_ day of _November_____, 2020.

My Commission Expires:

_07·24·2021_

                          NOTARY PUBLIC

                                    LYNN KIEFFER
                                    Notary Public
                                   State of Colorado
                            Notary ID # 20174069010
                      My Commission Expires 07-24-2021

REPORTER'S NOTE:

EXHIBIT 30

Video File

PRESERVED IN NATIVE FORMAT

(AVAILABLE UPON REQUEST.)